CASE NOS. 24-8028, 24-2013, 24-2061

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

IN RE: MCP NO. 191

STATES OF INDIANA, ARKANSAS, LOUISIANA, *et al.*,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION, *et al.*,

*Respondents.*

On Petitions for Review of a Final Order of the
Federal Communications Commission

**OPENING BRIEF FOR PETITIONERS STATES OF INDIANA,
ARKANSAS, LOUISIANA, ALABAMA, FLORIDA, GEORGIA, IDAHO,
IOWA, MISSISSIPPI, MISSOURI, OHIO, SOUTH CAROLINA, SOUTH
DAKOTA, TENNESSEE, TEXAS, UTAH, AND VIRGINIA; LOUISIANA
SHERIFFS SID GAUTREAUX, BOBBY WEBRE, MARK WOOD, AND
KEVIN COBB; AND THE LOUISIANA SHERIFFS' ASSOCIATION**

THEODORE E. ROKITA
  *Attorney General of Indiana*

Office of the Indiana Attorney
General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

BLAKE E. LANNING
  Assistant Chief Deputy
JOSHUA J. DAVID
  Deputy Attorney General
  Legislative & Policy Division
JADE A. POORMAN
BRADLEY S. DAVIS
  Deputy Attorneys General
  Litigation Division

*Counsel for the State of Indiana*

TIM GRIFFIN
  *Attorney General of Arkansas*

Office of Attorney General Tim
Griffin
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

DYLAN L. JACOBS
  Deputy Solicitor General and
  Interim Solicitor General

*Counsel for the State of Arkansas*

ELIZABETH B. MURRILL
  *Attorney General of Louisiana*

Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

KELSEY L. SMITH
  Deputy Solicitor General

*Counsel for the State of Louisiana*

*(Additional counsel listed on signature block)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners submit the following corporate disclosure statement:

**Louisiana Sheriffs' Association** (the "LSA") is a Louisiana nonprofit corporation whose active and associate membership includes Louisiana's 64 sheriffs and nearly 14,000 deputy sheriffs. The purpose of the association is to maintain the powers of the sheriff as peace officer, to ensure the delivery of public safety services through education and the monitoring and support of legislation and regulations that promote the delivery of public safety services and the administration of criminal justice. The Association is governed by an executive committee, an executive board and a President, who are all elected from the active membership of the Association. It has no stock, no stockholders and no corporate ownership.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF CONTENTS........................................................... ii

TABLE OF CITATIONS .......................................................iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD........................ viii

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ..........................................2

STANDARD OF REVIEW ......................................................3

STATEMENT OF THE ISSUES...............................................4

STATEMENT OF THE CASE................................................4

I.      THE PARTIES ........................................................5

II.     BACKGROUND AND PROCEDURAL HISTORY ....................................6

ARGUMENT ........................................................................9

I.      NEITHER THE MWRA NOR SECTION 201(B) OF THE
        COMMUNICATIONS ACT AUTHORIZE THE FCC TO PROHIBIT THE
        PRACTICE OF SITE COMMISSION PAYMENTS. ....................................9

        A.      Section 276 doesn't authorize the regulation of "practices.".............10

        B.      Section 201 doesn't authorize the FCC to prohibit site
                commissions. .......................................................14

        C.      The MWRA doesn't authorize the preemption of state and local laws
                that require site commission payments. ...............................17

II.   THE FCC EXCEEDED ITS STATUTORY DIRECTIVE BY FAILING TO "CONSIDER" THE COSTS OF NECESSARY SAFETY AND SECURITY MEASURES. ............................................................19

    A.   The FCC did not make an express and considered decision concerning costs associated with any necessary safety and security measures.....20

    B.   The FCC's narrow application of the used-and-useful framework highlights its failure to consider the costs associated with any necessary safety and security measures. ............................................21

III.   THE CHALLENGED ORDER IS UNLAWFUL BECAUSE THE FCC DID NOT ENGAGE IN REASONED DECISIONMAKING.............................23

    A.   The Record Demonstrates Substantial Costs Directly Related to the Provision of IPCS.................................................................24

    B.   The Order Arbitrarily Failed to Provide For Facility and Safety Measure Cost Recovery. ....................................................29

        1.   *Safety and Security Features*. ........................................29

        2.   *Site Commission Payments*.............................................35

        3.   *Fair Compensation*........................................................40

IV.   THE STRUCTURE OF THE FEDERAL COMMUNICATIONS COMMISSION IS UNCONSTITUTIONAL. ..............................................41

V.   VENUE IS IMPROPER IN THIS COURT. .................................................45

CONCLUSION .................................................................46

# TABLE OF CITATIONS

## CASES

*AT & T Corp. v. Iowa Utils. Bd.*,
  525 U.S. 366 (1999)...................................................................................18

*Atieh v. Riordan*,
  797 F.3d 135 (1st Cir. 2015)....................................................................33

*Cable & Wireless P.L.C. v. FCC*,
  166 F.3d 1224 (D.C. Cir. 1999).............................................................13

*California v. FCC*,
  905 F.2d 1217 (9th Cir. 1990) ................................................................15

*Cellular Telecomms. & Internet Ass'n v. FCC*,
  330 F.3d 502 (D.C. Cir. 2003)................................................................22

*Collins v. Yellen*,
  594 U.S. 220 (2021)...........................................................................41, 44

Consolidation Order, *In re: MCP 191*,
  No. 24-8028 (1st Cir. Sept. 18, 2024)......................................................9

*Consumer Elecs. Ass'n v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003)................................................................45

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
  98 F.4th 646 (5th Cir. 2024) ...................................................................43

*Corley v. United States*,
  556 U.S. 303 (2009).................................................................................16

*Council Tree Commc'ns, Inc. v. FCC*,
  503 F.3d 284 (3d Cir. 2007) ...................................................................45

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...........................................................................32, 33

*Dillmon v. NTSB*,
  588 F.3d 10850 (D.C. Cir. 2009)............................................................31

CASES [CONT'D]

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010)........................................................................41, 42

*Global Tel\*Link v. FCC*,
  866 F.3d 397 (D.C. Cir. 2017)....................................................*passim*

*Gozlon-Peretz v. United States*,
  498 U.S. 395 (1991).................................................................................16

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006)...........................................................................11, 12

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935).................................................................................43

*JL Simmons Co. v. NLRB*,
  425 F.2d 52 (7th Cir. 1970) ...................................................................45

*Johnson v. United States*,
  576 U.S. 591 (2015).................................................................................34

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986).............................................................14, 15, 17, 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020).................................................................................41

*Melone v. Coit*,
  100 F.4th 21 (1st Cir. 2024)..............................................................24, 29

*Michigan v. E.P.A.*,
  576 U.S. 743 (2015).................................................................................2, 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
  463 U.S. 29 (1983)....................................................................*passim*

*Myers v. United States*,
  272 U.S. 52 (1926)...........................................................................41, 42

CASES [CONT'D]

*Nat. Res. Def. Council v. EPA*,
    31 F.4th 1203 (9th Cir. 2022) ...........................................................39

*Nat'l Parks Conservation Ass'n v.EPA*,
    788 F.3d 1134 (9th Cir. 2015) ...........................................................39

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier*
    *Safety Admin.*,
    656 F.3d 580 (7th Cir. 2011) .....................................................20, 21

*Penobscot Air Services, Ltd. v. F.A.A.*,
    164 F.3d 713 (1st Cir. 1999).......................................................38, 39

*In re Promotion of Competitive Networks*,
    15 F.C.C. Rcd. 22,983 (2000)...........................................................13

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004).........................................................21

*Russello v. United States*,
    464 U.S. 16 (1983)............................................................................11

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020).......................................................41, 42, 43, 44

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).........................................................................44

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and*
    *Explosives*,
    437 F.3d 75 (D.C. Cir. 2006).............................................................37

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011).....................................................31, 39

CONSTITUTIONAL PROVISIONS

U.S. CONST. art. II, § 1, cl. 1 ....................................................................41

U.S. CONST. art. II, § 3..............................................................................41

## REGULATIONS

47 C.F.R. § 0.111 ...................................................................................44

47 C.F.R. § 0.311 ...................................................................................44

47 C.F.R. § 1.4(b)(1) .................................................................................3

## STATUTES

5 U.S.C. § 706 ....................................................................................2, 3

28 U.S.C § 2342 ......................................................................................3

28 U.S.C. § 2344 ......................................................................................3

47 U.S.C. §151 ....................................................................................5, 19

47 U.S.C. § 152 ...............................................................................17, 18, 19

47 U.S.C. § 154 ...............................................................................42, 43, 44

47 U.S.C. § 201 ......................................................................................10

47 U.S.C. § 276 ...........................................................................10, 17, 24, 38

47 U.S.C. § 402 ......................................................................................3

47 U.S.C. § 405 ......................................................................................3

## OTHER AUTHORITIES

1 Annals of Cong. 463 (1789)...............................................................42

Martha Wright-Reed Just and Reasonable Communications Act of
    2022, Pub. Law. No. 117-338 (117th Cong.) ................................*passim*

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The Federal Communications Commission ("FCC") instituted rulemaking under a novel law, leading to various issues of statutory interpretation because it has never been applied before. And the interpretations made by the FCC will have a dramatic fiscal impact on state and local governments and potentially lead to serious public safety consequences for state and local law enforcement. Further, the decisionmaking process utilized by the FCC is questionable. Lastly, this case raises significant Constitutional questions given the ever-evolving caselaw handed down by the Supreme Court on these issues. Therefore, Petitioners request oral argument.

**INTRODUCTION**

States and their sheriffs carry an important burden in running correctional facilities—ensuring the safety and security of inmates, facility workers, and the public. This is no small task; it requires a delicate balance between affording inmates everyday comforts, like the ability to access phones to talk to loved ones (known as Incarcerated People's Communication Services ("IPCS")), and preventing the misuse of such comforts, like an inmate using a phone to conduct illegal activities. This balance is embodied in the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWRA"), which gives the FCC limited authority over IPCS and seeks to make IPCS more accessible, affordable, and sustainable, while also accommodating the necessary security and facility costs associated with providing IPCS measures.

Unfortunately, the FCC's recent Order goes well beyond its statutory authority and does nothing to aid States and their sheriffs in accomplishing the balance between costs and access in correctional facilities. The FCC set out to lower rates charged to inmates for phone calls, but in doing so, it promulgated an Order that exceeds its authority and makes an inmate's benefit supreme—largely discrediting the very real costs associated with States providing access to IPCS (known as site commission payments) and ignoring safety and security measures that are demonstrably necessary for IPCS. The Order will lead to correctional

facilities restricting or removing inmate access to IPCS, thus flouting the very goal of the MWRA.

The FCC's Order must be set aside, as it is in excess of the FCC's statutory authority, contrary to constitutional rights, and arbitrary and capricious. First, neither the Communications Act of 1934 nor the MWRA confer statutory authority upon the FCC to prohibit the practice of site commission payments. By prohibiting site commissions, the FCC overstepped its statutory authority. Second, the FCC did not engage in "reasoned decisionmaking" because in setting IPCS rate caps, it ignored substantial costs to providers and the safety and security concerns of facilities providing services, and the final rule is therefore arbitrary and capricious. *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (citations omitted); *see also* 5 U.S.C. § 706(2)(A). Third, the structure of the FCC is unconstitutional. The Order should therefore be vacated.

Moreover, that decision should be made by the Fifth Circuit, as venue is improper in this Court.

## JURISDICTIONAL STATEMENT

On September 20, 2024, the Federal Communications Commission published in the Federal Register a Final Rule and Order ("Final Order", "Order", or "Final Rule") titled "In the matter of Incarcerated People's Communication Services: Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling

Services." This Court has jurisdiction to review this Final Rule and Order pursuant to 47 U.S.C. § 402(a) and 28 U.S.C § 2342(1). Petitioners timely filed their petitions "within 60 days after its entry," on September 30, 2024 (Eighth Circuit) and November 1, 2024 (Fifth Circuit). 28 U.S.C. § 2344; *see* 47 U.S.C. § 405(a); 47 C.F.R. § 1.4(b)(1).

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard of review, courts assess whether the agency engaged in "reasoned decisionmaking," *Michigan*, 576 U.S. at 750 (internal quotation marks omitted), which requires courts to determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted). Likewise, under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is " arbitrary, capricious, [or] an abuse of discretion," "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B)–(C).

The FCC's Final Order should be set aside on all three grounds. The Final Order is in excess of the FCC's statutory authority; is arbitrary and capricious; and violates Article II of the U.S. Constitution.

## STATEMENT OF THE ISSUES

1. Whether the FCC is statutorily authorized to prohibit the practice of site commission payments.

2. Whether the FCC exceeded its statutory directive by not considering necessary safety and security measures when issuing the Final Rule.

3. Whether the FCC failed to engage in reasoned decisionmaking when promulgating the Final Rule.

4. Whether the structure of the FCC violates Article II of the U.S. Constitution by vesting its Commissioners with far-reaching executive power while limiting the President's authority to remove, supervise, or control the exercise of that power.

5. Whether venue is proper in this Court.

## STATEMENT OF THE CASE

Petitioners are the States of Indiana, Arkansas, Alabama, Florida, Georgia, Idaho, Iowa, Louisiana, Mississippi, Missouri, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, and Virginia representing their state and local government interests and their citizens. Additionally, petitioners include Louisiana Sheriffs Sid Gautreaux, Bobby Webre, Mark Wood, Kevin Cobb, and the Louisiana Sheriffs'

Association. Petitioners appeal a Final Rule promulgated by the FCC in a report and order adopted on July 22, 2024. *See* Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act: Rates for Interstate Inmate Calling Services*, WC Docket Nos 23-62 & 12-375, FCC 24-75 (rel. July 22, 2024) ("*Order*") (JA___).

## I.    THE PARTIES

The FCC is an agency of the federal government established by the Communications Act of 1934, responsible for regulating communications by radio, television, wire, satellite, and cable, so as to make available, "so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, [and] *for the purpose of promoting safety of life and property through the use of wire and radio communications* . . . ." 47 U.S.C. §151 (emphasis added).

The States of Indiana, Arkansas, Alabama, Florida, Georgia, Idaho, Iowa, Louisiana, Mississippi, Missouri, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, and Virginia are sovereign states.

Sid Gautreaux III is the elected Sheriff of East Baton Rouge, Louisiana. Bobby Webre is the elected Sheriff of Ascension Parish, Louisiana. Mark Wood is the elected Sheriff of Rapides Parish, Louisiana. Kevin Cobb is the elected Sheriff of Franklin Parish, Louisiana.

The Louisiana Sheriffs' Association is a professional organization that represents the interests of Louisiana's 64 sheriffs and approximately 14,000 deputy sheriffs.

## II.     BACKGROUND AND PROCEDURAL HISTORY

The FCC's efforts to regulate IPCS began in 2013 when the FCC adopted interim interstate rate caps and mandatory data collection regarding inmate-calling services ("ICS") by requiring all providers to submit data on their underlying costs of service. *Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107, 14111 (2013) (JA___). At that time, the FCC also imposed an annual reporting obligation on IPCS providers concerning, among other things, rates and ancillary service charges. *Id*.

In 2015, the FCC adopted a comprehensive regulatory framework for interstate and intrastate inmate calling services that included permanent rate caps for those services. *See Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30

6

FCC Rcd. 12763, 12768, 12813-18, ¶ ¶ 7, 106-16 (2015) (*2015 ICS Order*) (JA___).
It also imposed limits on ancillary service charges. *2015 ICS Order*, 30 FCC Rcd. at
12838-39, ¶ 144-45 (JA___). Further, the FCC set tiered rate caps for interstate calls
based on the type and size of correctional facilities, *see 2015 ICS Order*, 30 FCC
Rcd. at 12775, ¶ 22 (JA___), and calculated these caps using industry-wide average
costs as reported in the First Mandatory Data Collection. *Id*. at 12790, para. 52 &
n.170 (JA___). The 2015 ICS Order was appealed, and in *Global Tel\*Link v.
Federal Communications Commission*, 866 F.3d 397, 417 (D.C. Cir. 2017), the U.S.
Court of Appeals for the D.C. Circuit vacated and remanded portions of the 2015
ICS Order as having exceeded the FCC's statutory authority.

In response to the decision in *Global Tel\*Link*, Congress enacted the MWRA.
*See* Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub.
Law. No. 117-338 (117th Cong.). The MWRA amended the Communications Act of
1934 to require the FCC to prescribe regulations to establish a compensation plan to
ensure that all payphone service providers are "fairly compensated," and all rates
and charges are "just and reasonable," for completed intrastate and interstate
communications using their payphone or other calling device. *Id*.

The MWRA permitted the FCC to use "industry-wide average costs of
telephone service and advanced communications services and the average costs of
service of a communications service provider." *Id*. Congress also mandated that the

FCC "consider costs associated with any safety and security measures necessary to provide [telephone service and advanced communication services] and [the] differences in . . . costs [for those communications services] by small, medium, or large facilities or other characteristics." *Id*. The Act also provided that none of its provisions were to displace laws that require telephone services or advanced communications services or prohibit the implementation of safety and security measures at State or local prisons, jails, or detention facilities. *Id*.

Following passage of the Act, on March 17, 2023, the FCC released the *2023 IPCS Notice* and *2023 IPCS Order* in a new docket, WC Docket No. 23-62 (JA___), and the existing docket, WC Docket No. 12-375 (JA___), to begin implementation of the MWRA. (JA___). On September 20, 2024, Final Rule FCC 24-75, implementing the MWRA, was published in the Federal Register. *See* 47 CFR §§ 14, 64 (JA___). The Final Rule adopts rate caps for interstate and intrastate IPCS and limits ancillary service charges imposed by IPCS providers. (JA___). The Final Rule also set caps on all interstate and intrastate calling rates for IPCS, established a tiered rate structure based on the size and type of facility being served, limited the types of ancillary services that IPCS providers may charge for, capped the charges for permitted fees, banned flat-rate calling, included provisions concerning access to IPCS by people with disabilities, and imposed reporting and certification requirements on IPCS providers. (JA___).

Since the Final Rule was released, multiple petitions were filed challenging the Order. In consequence, the FCC notified the judicial panel on multidistrict litigation ("JPML") on September 16, 2024, pursuant to 28 U.S.C. § 2112(a)(3), of the four petitions for review. *See* Consolidation Order, *In re: MCP 191,* No. 24-8028 (1st Cir. Sept. 18, 2024). On September 18, 2024, the JPML selected the First Circuit as the designated forum for all four petitions. *Id.*

## ARGUMENT

## I.     NEITHER THE MWRA NOR SECTION 201(B) OF THE COMMUNICATIONS ACT AUTHORIZE THE FCC TO PROHIBIT THE PRACTICE OF SITE COMMISSION PAYMENTS.

The FCC lacked authority to preclude providers from paying site commissions. The FCC found that site commission payments weren't "used and useful" in providing ICPS because they didn't benefit inmates. Order ¶ 270 (JA___). But the FCC acknowledged that so long as providers made those payments, they were "legitimate costs," Order ¶ 307 (JA___), that Section 276's "fair compensation requirement . . . requires that ICPS providers be able to recover," Order ¶¶ 296, 304 (JA___). Indeed, when the FCC had previously excluded site commission payments from the recoverable costs it used to set rates, the D.C. Circuit held its action was unlawful, explaining that since state and local governments required providers to pay site commissions, "those commissions [we]re accordingly a cost of providing

9

service like other state taxes and fees that the FCC recognizes as recoverable costs."
*Glob. Tel\*Link*, 866 F.3d at 412.

Recognizing, then, that "regulat[ing] rates [wa]s at best a highly imperfect tool" to get at its concerns about site commission payments, Order ¶ 304 (JA___), the FCC squared this circle by "precluding providers from paying site commissions altogether." Order ¶ 307 (JA___). But the FCC lacked that authority. By contrast with its authority to regulate interstate communications, where Congress gave the FCC the power to regulate interstate communications "practices," the FCC's authorization to regulate ICPS only gives it the authority to regulate "rates and charges." 47 U.S.C. § 201(a); 47 U.S.C. § 276(b)(1)(A). So once the FCC acknowledged it couldn't regulate site commission payments by regulating rates, it should have acknowledged it couldn't regulate site commission payments.

## A.   Section 276 doesn't authorize the regulation of "practices."

As amended by the MWRA, Section 276 authorizes the FCC only to "prescribe regulations that . . . establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable." 47 U.S.C. § 276(b)(1)(A). In search of a source of authority to ban site commission payments, the FCC claimed that its authority to set just and reasonable rates for ICPS implicitly includes the authority to prescribe just and reasonable practices in connection with providing ICPS. Order ¶ 79 (JA___). But

unlike with interstate communications, Congress did not grant the FCC authority to regulate ICPS provider practices—instead, the FCC can only regulate ICPS rates and charges.

Section 276 doesn't grant the FCC authority to regulate "practices."  That omission is intentional. In amending Section 276 through the MWRA, Congress borrowed Section 201(b)'s "just and reasonable" ratemaking standard. *See* Order ¶ 84 n.284 (JA___). That provision, like Section 276, authorizes the FCC to ensure that interstate-communications common carriers set just and reasonable "charges." 47 U.S.C. § 201(b). But it also authorizes the FCC to regulate, under the just-and-reasonable standard, those common carriers' "*practices* . . . for and in connection with . . . communication service[s]." *Id.* (emphasis added). Had Congress intended for the FCC to have similar authority over IPCS providers, it could have easily borrowed all of Section 201(b)'s language. But instead, Congress only authorized the FCC to ensure that all rates and charges are "just and reasonable." *Id.*

Congress's omission of ICPS providers' practices from the FCC's regulatory oversight in Section 276 was presumptively intentional. For "[w]here Congress includes [particular] language in one section of [a statute] but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citations omitted); *see Hamdan v. Rumsfeld*, 548 U.S. 557, 578

11

(2006) ("a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." (citations omitted)). Thus, the exclusion of "practices" from Section 276, when Congress otherwise borrowed from Section 201, suggests that Congress intentionally precluded the FCC from exercising regulatory authority over IPCS providers' practices—including the payment of site commissions.

Lacking express authority to regulate "practices," the FCC attempts to find it in its authority to regulate rates. Specifically, the FCC purports to find authority to regulate provider practices in Section 276's directive to "establish a compensation plan" that ensures "rates and charges" are "just and reasonable." Order ¶ 80 (JA___). But none of those phrases grants the FCC the authority it claims.

First, prohibiting payments that providers make to third parties does not fall within the FCC's authority to establish a plan for compensating providers. While the power to establish a compensation plan includes more than just setting rates, past compensation-plan regulations addressed only "the practical details associated, with charging for, and receiving payment for, payphone services." Order ¶ 81 (JA___). For example, the FCC had previously "require[ed] the transmission of information to enable tracking of calls from payphones," which facilitated payphone service compensation. *Id.* Site commission payments are not associated with compensating payphone services; they're a cost providers incur prior to being compensated. So

they don't fall within the FCC's authority to establish a compensation plan, any more than preempting "state taxes and fees" would. *Glob. Tel*Link*, 866 F.3d at 412.

Second, ensuring that providers' "rates and charges" are "just and reasonable" doesn't carry with it the hidden authority to prohibit carceral facilities, over whom the FCC concedes it "has no direct jurisdiction," from charging providers commissions that may necessitate higher rates. Order ¶ 333 (JA___). The FCC noted in its order that it has regulated contracts between providers and third parties outside its "direct jurisdiction" in the past. *Id.* But in each example, it cited the FCC relied on its express authority to regulate provider practices, not an implicit grant of authority embedded in its power to regulate rates. *Id.* For example, when the FCC prohibited exclusive rights contracts between providers and multi-tenant property owners, the FCC relied on Section 201(b), which it explained provided a "specific, substantive framework for the FCC's regulation of [] *practices*." *In re Promotion of Competitive Networks*, 15 F.C.C. Rcd. 22,983, 23,042 (2000) (emphasis added). Similarly, when the FCC regulated contracts between U.S. carriers and extra-jurisdictional foreign carriers over international communication costs, *see* Order ¶ 333 (JA___), it explicitly invoked its Section 201(b) authority to regulate "practices." *See Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1231 (D.C. Cir. 1999) ("The Commission may declare a practice unlawful"). The FCC didn't say in those cases that because those types of contracts would affect the costs that providers

bear and in turn affect rates, the FCC could use its rate-regulating power to regulate the contracts. Instead, it appealed to its authority to regulate provider practices— authority that it lacks here.

Indeed, the regulation of "rates" and "practices" is distinct. The regulation of either requires a specific source of statutory authority because an "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). In short, the belief that "calling rates reflect desirable social policy cannot justify regulations that exceed [the FCC's] statutory mandate." *Glob. Tel\*Link*, 866 F.3d at 412.

### B. Section 201 doesn't authorize the FCC to prohibit site commissions.

The FCC mistakenly suggests that—in the absence of authority under Section 276—its Order can independently rest on Section 201(b). *See* Order ¶ 85 (JA___). But Section 201(b) only authorizes regulation of interstate and international communications. Recognizing this, the FCC relied on the so-called "impossibility exception" to the interstate limits on its Section 201 authority, Order ¶ 86 (JA___), which authorizes regulating "the intrastate portion of jurisdictionally mixed services where it is impossible . . . to separate the service's intrastate [and] interstate components." *Id.* (quoting 35 F.C.C. Rcd. 8,485, 8,496 (2020) (JA___)). That exception doesn't apply here because it's possible to separate the interstate and intrastate components of IPCS.

14

As the FCC acknowledged, and as its name suggests, the impossibility exception applies "where it [i]s *not* possible to separate the interstate and the intrastate components of the asserted FCC regulation." *La. Pub. Serv. Comm'n*, 476 U.S. at 375 n.4 (citations omitted). By contrast, where it is "possible to apply different rates . . . once the correct allocation between interstate and intrastate use has been made," the exception doesn't apply. *Id.* at 375.

The exception does not apply here. IPCS providers are already required to differentiate between interstate and intrastate calls, *see* Order ¶ 81 n.272 (citing 47 C.F.R. § 64.1310)(JA___), making it neither infeasible nor impractical to charge site commissions based on a call's location. And even if current technology fails to adequately track location, *see* Order ¶ 87 (JA___), the FCC has not shown that its regulations are "narrowly tailored to preempt *only* such state regulations as would negate valid FCC regulatory goals." *California v. FCC.*, 905 F.2d 1217, 1243 (9th Cir. 1990) (holding the impossibility exception is so limited). Because inmate calls are routed through pre-approved lists that verify the recipient's address, providers can presumably determine whether a call is interstate or intrastate. Thus, the FCC's conclusory claim of impracticability is insufficient because it "neglects to address the possibility that" providers could find alternative ways to charge site commissions for intrastate communications. *Id*. at 1244.

15

Additionally, basic canons of statutory construction weigh against the FCC's reliance on Section 201(b). The impossibility exception may authorize incidental regulation of intrastate communications where the Act doesn't specifically speak to those intrastate communications. But here, Section 276 specifically addresses intrastate IPCS. Because a "specific provision typically controls over a more general one," *see, e.g.*, *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), Section 201(b) can't be read to provide an alternate path to regulating intrastate IPCS. If it were, it would displace all the specific limits on the FCC's Section 276 authority, including its lack of authority to regulate IPCS practices as opposed to rates.

Moreover, applying the impossibility exception as the FCC suggests would render Section 276 superfluous. If Section 201(b) applied to intrastate IPCS via the impossibility exception, it would have already permitted the FCC to ensure that all interstate and intrastate practices, charges, and rates are "just and reasonable." Congress then should never have bothered with amending Section 276. Yet Sections 201(b) and 276 must be construed "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citations omitted). Accordingly, Section 201(b) is not an independent statutory basis for the Order—including the Order's prohibition on site commission payments.

**C.    The MWRA doesn't authorize the preemption of state and local laws that require site commission payments.**

A "federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority." *La. Pub. Serv. Comm'n*, 476 U.S. at 374. As explained, Congress did not grant the FCC authority to ban site commission payments. Accordingly, the FCC may not preempt state and local law that requires IPCS providers to make these payments.

Section 276 does not contain a freestanding grant of authority to preempt state law. Rather, it merely provides that "to the extent that any State requirements are inconsistent with the [FCC's] regulations [under Section 276], the [FCC's] regulations on such matters shall preempt such State requirements." 47 U.S.C. § 276(c). If the FCC's regulations prohibiting site commission payments are invalid, they can't preempt state law that requires them.

Not only does Section 276 not grant the FCC authority to preempt state law that requires site commission payments, but the Communications Act also provides a rule of construction that, where ambiguous, the Act cannot be read to grant the FCC authority to regulate intrastate communications practices, and thus to preempt state law concerning them. Section 152(b) provides that, except as otherwise provided by the Act, "nothing in this chapter shall be construed to apply or to give the FCC jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service

17

by wire or radio of any carrier." 47 U.S.C. § 152(b). That provision is "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction." *La. Pub. Serv. Comm'n*, 476 U.S. at 373. Under that rule, even if it is "possible to find some support" in a provision of the Act for the FCC's claim of authority to regulate intrastate communications, that provision won't be read to authorize regulation (and preemption) unless it is "so unambiguous . . . as to override the command of § 152(b)." *Id.* at 377. So long as Congress doesn't speak to an "aspect of intrastate communication," the FCC cannot regulate it "on the theory that it had an ancillary effect on matters within the FCC's primary jurisdiction." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 381 n.8 (1999).

The FCC claimed below that Congress "expressly exempt[ed] section 276 from [Section 152's] preservation of state authority over intrastate communications." Order ¶ 320 (JA___). That isn't correct. Congress amended Section 152 to say it applies "[e]xcept *as provided in* . . . section 276," 47 U.S.C. 152(b) (emphasis added), not that Section 152's rule of construction doesn't apply to Section 276. That exception merely means that, where Section 276 expressly provides the FCC the authority to preempt state law, Section 152 doesn't bar preemption. But if Section 276 doesn't clearly speak to preemption, Section 152's "specific instructions regarding . . . how we should read" the Act still apply. *La. Pub. Serv. Comm'n*, 476 U.S. at 376 n.5. Section 276 doesn't clearly authorize banning

18

site commission payments; indeed, it is best read not to authorize them. So, Section 152's rule of construction means Section 276 can't be read to authorize preempting state law that requires site commission payments.

Moreover, to the extent the FCC grounds its authority to prohibit site commission payments in Section 201(b) and the impossibility exception, Section 152(b)'s anti-preemption rule would flatly bar preempting state law to the contrary. For Section 152(b) does not contain any exception for Section 201. *See* 47 U.S.C. § 152(b) ("Except as provided in sections 223 through 227 of this title, inclusive, section 276 of this title, and section 332 of this title . . . .").

## II.    THE FCC EXCEEDED ITS STATUTORY DIRECTIVE BY FAILING TO "CONSIDER" THE COSTS OF NECESSARY SAFETY AND SECURITY MEASURES.

The MWRA provides that in setting IPCS rates, the FCC "shall consider any costs associated with any safety and security measures necessary to provide [IPCS]." MWRA § 3(b)(2). This is in line with the FCC's general mandate to consider the "safety of life and property" in the regular course of its regulatory actions. 47 U.S.C. § 151. Yet the FCC declined to decide what safety and security measures were necessary, or even to "define the ultimate scope" of the term. Order ¶ 369 (JA___). Instead, it applied the used-and-useful framework to safety and security costs, determined whether those costs benefited "incarcerated people and their loved ones" who received their calls, Order ¶ 381 (JA___), and then declared that in identifying

19

safety and security measures that were useful to inmates it had accounted for "any safety and security measure that even arguably could be viewed as necessary to the provision of IPCS," Order ¶ 369 (JA___). But whether a security measure benefits the inmates who use IPCS isn't even an approximate proxy for whether a safety or security measure is necessary to provide IPCS. The relevant question, rather, is whether a safety or security measure is necessary to carceral facilities' being able to safely offer IPCS. Because the FCC asked the wrong question, it excluded costs that easily qualify.

### A. The FCC did not make an express and considered decision concerning costs associated with any necessary safety and security measures.

As an initial matter, even if the used-and-useful framework were a reasonably approximate proxy for necessary costs, the Order must be vacated because the FCC failed to specifically decide what costs are necessary. The FCC declined to even define what "necessary" meant because it believed the used-and-useful framework would capture all costs that were even arguably necessary. Order ¶ 369 (JA___). But when Congress mandates an agency to consider a particular factor, an agency can't take a pass on considering it in favor of considering a related one: "the 'relatedness of the concept discussed to the statutorily mandated factor that the agency does not discuss does not relieve the agency of the duty of compliance with the congressional instruction.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier*

*Safety Admin.*, 656 F.3d 580, 589 (7th Cir. 2011) (quoting *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004)). Here, Congress said the FCC "shall" consider necessary costs. MRWA § 3(b)(2). So, the FCC had to at least identify what those necessary costs were.

### B.    The FCC's narrow application of the used-and-useful framework highlights its failure to consider the costs associated with any necessary safety and security measures.

The MWRA's directive to consider "costs associated with any necessary safety and security measures" suggests certain safety and security measures *are required* for the provision of IPCS, and that, without adequate funding for such measures, carceral facilities may choose to withhold IPCS altogether. *See infra* Part III. But the FCC's application of the used-and-useful framework systematically ignores those realities.

As the FCC admits, IPCS is "different than communications services offered to the general public [because of] safety and security measures needed to adapt communications services to the carceral context." Order ¶ 339 (JA___). And the need for such considerations is well-documented: inmates have used communication services to manage organized crime operations and order executions. *In the Matter of Rates for Interstate Inmate Calling Servs.*, 28 F.C.C. Rcd. 14,107, 14,194 ¶ 58 & n.216 (JA___). These threats are not anomalous. As one of the FCC's own reports explains, inmates "contact witnesses with wrongful intent, call their victims, and plot

21

and plan criminal enterprises with regularity." *Id*. Unfortunately, these crimes "disproportionately" victimize "vulnerable populations."  Order ¶ 397 (JA___).

Thus, while safety and security measures may not be technologically required for the provision of IPCS, such measures are still necessary for the provision of IPCS because—in their absence—such services could not be safely provided. This is what "necessary" means within "the context in which the word is used." *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 510 (D.C. Cir. 2003); s*ee* Order ¶ 366 (JA___) (acknowledging that if a safety and security measure were "required" for providing IPCS, it would be necessary). After all, carceral facilities remain free to deny IPCS to inmates. *See* MWRA § 4 ("Nothing in this Act shall be construed to . . . require telephone service or advanced communications services at a State or local prison, jail, or detention facility."). If carceral facilities are forced to choose between providing IPCS in an insecure manner or withholding it altogether, they are free to choose the latter. So, safety and security measures, absent which carceral facilities wouldn't offer IPCS, are necessary to the provision of IPCS.

However, the FCC's application of the used-and-useful framework systematically ignores these realities. In determining whether a cost should be recoverable under this framework, the FCC "asks whether the investment or expense promotes customer benefits, or is primarily for the benefit of the carrier." Order ¶ 380 (cleaned up)(JA___). Applying that standard, the FCC found, for example, that

22

call recording services weren't used and useful because they are used "for law enforcement purposes" rather than the benefit of inmates, Order ¶ 398 (JA___), and don't technologically "facilitate the provision of IPCS," Order ¶ 400 (JA___). Likewise, it concluded that communications monitoring services weren't used and useful "because they primarily serve a law enforcement purpose, not a communications purpose." Order ¶ 401 (JA___). The FCC never asked whether those services were necessary to safely provide IPCS, or even whether carceral facilities might stop paying for IPCS if those services couldn't be compensated. Ultimately, then, the FCC not only flouted its mandate to identify necessary safety and security measures but limited itself to considering an alternate factor—utility to inmates—that was only loosely related to the inquiry Congress actually mandated that it make. For that reason, the Order must be vacated.

## III. THE CHALLENGED ORDER IS UNLAWFUL BECAUSE THE FCC DID NOT ENGAGE IN REASONED DECISIONMAKING.

In setting the new rate caps, the FCC violated the APA by ignoring many commenters' serious concerns about the practical and legitimate costs of offering IPCS services, including those associated with necessary security measures and the actual cost of offering such services within jails and prisons (site commission payments). Specifically, the FCC incorrectly and arbitrarily determined the vast majority of safety and security costs are not recoverable in rates, as they are supposedly not "used and useful" in providing IPCS. *See infra* Part II. The FCC also

incorrectly arbitrarily prohibited IPCS providers from paying site commissions, *see infra* Part I, thus preventing facilities from recovering the costs associated with making IPCS available to inmates—many of which are directly related to safety and security functions.

While the legitimate needs of inmates and their families are part of the analysis, they must be balanced with the realistic costs of offering such services and the overriding need to ensure effective security within jails and public safety in the community. The FCC's decisionmaking failed to consider seriously these important problems, and the Order doesn't offer a sufficient explanation for its arbitrary decisions. *See Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (citations omitted). The Order is therefore unlawful and should be set aside.

### A.    The Record Demonstrates Substantial Costs Directly Related to the Provision of IPCS.

Any payphone service provider faces the cost of locating the equipment in a particular place. Section 276 acknowledges the very real costs of doing business and generally promotes unfettered negotiation and contracting between location providers and payphone providers. *See* 47 U.S.C. § 276(b)(1)(E). These costs drastically increase when the location of the payphone is inside a jail or a prison, partially due to legitimate security concerns that result from giving inmates the opportunity to use an unmonitored telephone.

Without appropriate safety and security measures, some inmates will use telephone services to engage in illicit activities. *See* Order ¶¶ 1, 367 (JA___); *see also infra* Part II. This goes to the core of IPCS—the whole point of these specialized services is to keep inmates and the public safe in a way that normal telephone services simply cannot. The FCC itself has historically "recognized that communications services for incarcerated people are different than communications services offered to the general public due, in part, to certain safety and security measures needed to adapt communications services to the carceral context." Order ¶ 339 (JA___). In response to this unfortunate reality, facilities and IPCS providers continuously work to develop calling platforms that integrate safety and security features required by correctional facilities. Unsurprisingly, providing inmates with access to telephone services and the corresponding necessary security measures is costly for facilities.

The record is replete with evidence showing that costs associated with security measures and facility requirements are a real and necessary part of allowing IPCS in correctional institutions. For example, the record shows that site commission payments, which are essentially "operating costs," "are directly related to the provision of IPCS." Reply Comments of National Sheriffs' Association WC Docket Nos. 23-62, 12-375 at 14 (July 12, 2023) (JA___); Comments of Securus Technologies, LLC, WC Docket Nos. 23-62, 12-375 at 25 (May 8, 2023) (JA___)

("site commissions are a 'cost of providing service'"). The FCC itself has repeatedly acknowledged that facilities incur legitimate costs in providing IPCS. *See, e.g.*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107, at ¶ 63 (rel. Sept. 26, 2013) (JA___) ("2013 ICS Order") (implementing "safe harbor rates that are intended to approximate the costs of providing interstate ICS—costs that include fair compensation (including a reasonable profit) and include full recovery for security features the correctional facilities have determined to be necessary to protect the public safety"); Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd. 8485, at p. 30, n. 209 (rel. Aug. 7, 2020) (JA___) ("2020 ICS Order") ("[S]ome portion of these site commission payments do reflect legitimate costs that correctional facilities incur that are reasonably related to the provision of inmate calling services."). "[T]he substantial, unrebutted evidence in the record shows that facilities incur costs associated with making IPCS available." Ex Parte Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62, 12-375 at 14 (July 9, 2024) (JA___) (collecting record citations).

The record further demonstrates that the costs inherent in allowing IPCS are intertwined with the cost of necessary security and safety features. *Id.* at 13 ("Many of the IPCS-related tasks performed by confinement facilities are directly related to

IPCS safety and security functions."). Take, for example, the comment from the

Montana Sheriffs & Peace Officers Association, which explained:

> Telephones and telecommunication devices in secure facilities require specialized equipment and software essential for maintaining inmate well-being and secure facility safety. Sheriffs rely on outside vendors to install both hardware and software and maintain the equipment within the facility and the data outside of the facility. A secure phone system must ensure the hardware cannot be used to physically harm an inmate and that through the software and phone recordings, facilities are able to identify threats, coercion, and extortion of victims, family members and the community. Sheriffs rely on telecommunications companies for the specialized equipment and proprietary software to provide the necessary security measures, which simultaneously allow inmates the opportunity to stay connected to family and friends outside the facility while maintaining security inside the facility. Unfortunately, there are inmates who use the jail phones to plan the smuggling of contraband into the facility, conspire to escape from the secure facility, attempt to continue their criminal enterprise from inside, intimidate witnesses, and attempt to violate restraining orders and further traumatize their victims. Security software is an essential safety measure for confinement facilities.

Comments of the Montana Sheriffs & Peace Officer Association, WC Docket Nos.

23-62,12-375, at 1–2 (filed Jul. 11, 2024) (JA___). Or the letter submitted by Sheriff

Kieran Donahue, who addressed the need for security measures and their benefits:

> Call monitoring, transcription, and review are not merely operational conveniences but essential tools for detecting mental health needs, preventing self-harm and suicide, and curbing criminal activities within our facilities. These measures are critical to ensuring the safety of incarcerated individuals, facility personnel, and the integrity of the facility itself.

Letter from Sheriff Kieran Donahue, Canyon County, Idaho, and President of the

National Sheriffs' Association to Marlene Dortch, Secretary of the FCC, EC Dockets

Nos. 23-62, 12-375, at 1 (filed Jul. 11, 2024) (JA___) ("Sheriff Donahue Letter").

Many other commenters echoed the same concerns and requirements.[1]

Moreover, these comments are backed by data submitted by the National

Sheriffs' Ass'n ("NSA") and Pay Tel. *See* Nat'l Sheriffs' Association Comments,

WC Docket No. 12-375, Exh. A (rec. Jan. 12, 2015) (JA___); Letter from Marcus

W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay

Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos.

23-62 and 12-375, Attach. (filed June 7, 2024) (JA___) ("Pay Tel Report"). Pay

Tel's recent data collection surveyed 30 facilities, varying in size, from 11 different

states. Pay Tel Report at 5. It collected and analyzed the weekly time spent on

---

[1] *See also* Comments of the Florida Department of Corrections, WC Docket Nos. 23-62, 12-375, at 3 (filed Jul. 11, 2024) (JA___) ("Implementing safety and security measures . . . is necessary to ensure the safety of inmates, department staff, and the public."); *id.* (JA___) (listing "call monitoring, call recording, three-way call detection and termination, voicemail recording and storage, and call blocking" as necessary features); Comments of the Virginia Association of Regional Jails, WC Docket No. 12-375 (filed Jul. 11, 2024) (JA___) (emphasizing the importance of security and safety features and the need for on-site commissions).

Organizations continued to raise these issues even after the Order was published in July. *See* Letter from Aaron M. Dawson, Executive Director of the Alabama Jail Administrators' Council, to the FCC, Re: Report and Order, Order on Reconsideration, Clarification and Waiver, and Further notice of Proposed Rulemaking, at 2 (Nov. 21, 2024) (JA___) ("There are very real costs associated with the administration of ICS systems, including: monitoring phone calls, analyzing recordings, investigative platforms, providing escorts for phone repair technicians, answering questions about the system from inmates and their families, etc. [and] the commissions that jails receive help to offset these costs.").

preventative call monitoring, responding to ICS system alerts, call recording review, investigating potential PIN theft, enrolling inmates for voice biometrics, blocking and unblocking of numbers, and other costs specifically related to making IPCS available to inmates. *Id.* The result? A clear "demonstrat[ion] that confinement facilities do incur actual and quantifiable costs related to safety and security costs in order to make IPCS available." *Id.* at 6.

### B. The Order Arbitrarily Failed to Provide For Facility and Safety Measure Cost Recovery.

Despite the overwhelming record evidence that facility and safety costs are real and necessary, the FCC determined the costs were not recoverable and excluded them from the rate cap analysis. This was arbitrary and capricious for a host of reasons. *See Melone*, 100 F.4th at 29–30; *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43–44.

#### 1. *Safety and Security Features.*

The FCC arbitrarily disregarded necessary safety and security features from its analysis and excluded from cost-recovery five of the seven categories of safety and security features that it had included in its prior data collection effort, including "law enforcement support services, communications recording services, communications monitoring services, and voice biometrics services." Order ¶ 339 (JA___). These safety and security features, according to the FCC, "are ultimately highly unlikely to benefit the ratepayer and, therefore, produce rates that are not 'just

and reasonable." *Id.* ¶ 209. In addition to exceeding the FCC's authority, *see infra* Part II*,* this conclusion is also arbitrary and capricious.

The FCC attempts to justify the removal of these safety costs under the "use and useful" framework to determine "just and reasonable IPCS rates." Order ¶ 370 (JA___). This considers "whether a cost 'promotes customer benefits, or is primarily for the benefit of the carrier,' as well as whether that cost was prudently incurred." *Id.* (JA___) (citations omitted); *id.* ¶ 374 (JA___) ("Safety and security measures that do not facilitate the provision of underlying communications services in correctional institutions are not used and useful."). The FCC makes clear, however, that the focus is on the *users* of the service (i.e., incarcerated people or their family and friends paying for IPCS calls). *Id.* ¶ 380 (JA___). Thus, the costs which are necessary to make the calling system safe and secure aren't recoverable so long as the *user* does not benefit directly from those features. *Id.* In the FCC's words, "costly services that are unrelated (or only marginally related) to providing IPCS and thus provide no (or only marginal) benefits to ratepayers in their capacity as consumers of IPCS" do not "facilitate the provision of underlying communications services in correctional institutions" and are therefore "not used and useful." *Id.* ¶ 374 (JA___) (acknowledging, however, that "law enforcement, correctional facilities, and the public at large may benefit from these measures"). This is nonsensical and contrary to the purpose of IPCS services.

1. IPCS is specifically designed to accommodate the safety and security needs of confinement facilities—otherwise, normal payphones would be sufficient. *Infra* Part III.A. Safety and security measures are thus an inherent pre-requisite to (and defining feature of) a facility's offering of IPCS services. The FCC acknowledges as much. Order ¶ 339 (JA___) (recognizing IPCS services "are different" than normal communication services because of "safety and security measures needed to adapt communications services to the carceral context"). The Order's exclusion of safety requirements goes against the very purpose of IPCS and the requirements of the MRWA. *See Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (an agency must show that "its interpretation is 'rationally related to the goals of' the statute" (cleaned up)).

The departure from its historical approach to safety and security measures is itself unlawful, as "[r]easoned decision making . . . necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent." *Dillmon v. NTSB*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009) (citations omitted). The FCC skirts this requirement, instead asserting it has maintained a constant standard through the years: Only certain safety and security costs should be recovered through regulated rates—those that are "necessary" to the provision of IPCS. Order ¶ 375 (JA___). But this is belied by the Order, which newly excludes from cost-recovery five of the seven categories of safety and security

features that had previously been included in its prior data collection effort. *Id.* ¶ 339.

The record fully supports the necessity of safety measures for IPCS services, as it includes extensive evidence of the possible harms to inmates and the public that result from unsecured access to communication services. *See infra* Part II,  Part III.A (describing what safety measures are necessary and why); *see also* Sheriff Donahue Letter at 1 (JA___) ("The presence of IPCS necessitates these measures, as failure to monitor calls could result in significant legal liabilities, such as lawsuits for inadequate suicide prevention efforts."); Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107, at ¶ 58 (rel. Sept. 26, 2013) (JA___) ("[DOJ] has chronicled hundreds of criminal convictions involving the use of ICS as part of the criminal activity. Moreover . . . a disproportionately large percentage of ICS enabled crimes target and victimize vulnerable populations consisting of victims, witnesses, jurors, inmates, and family members of these individuals."). Yet the Order's new "policies on cost recovery fail to acknowledge the necessity of these safety and security expenses and the regulatory constraints faced by jails." Sheriff Donahue Letter at 1 (JA___). The FCC arbitrarily and unlawfully ignored this evidence, focusing instead on the user-inmate in its analysis. *See Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (to uphold the Order, the FCC would have had to show that it "examined 'the relevant data' and articulated 'a satisfactory

explanation' for [its] decision, 'including a rational connection between the facts and the choice made'" (citations omitted)(cleaned up)). This decision isn't "supported by any rational view of the record" and should not be upheld. *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (quotation omitted).

2. The focus on a benefit to the user-inmate is inapt and arbitrarily applied. First, the benefit to the user-inmate is given an extreme weight. But not all security features are *meant* to benefit the user-inmate—rather, many are required by facilities to ensure the safety of other inmates, facility staff, and the public. *See* Florida Comments at 3 (JA___); Sheriff Donahue Letter at 1 (JA___). In the same regard, there is no evidence in the record suggesting that providers are "benefitting" from the safety and security measures which the Order excludes. To the contrary, the evidence shows that providers have incurred substantial costs to provide features and functions which are required as a condition to the provision of service by the facilities themselves—which, again, is the whole point of IPCS. *See, e.g.*, Pey Tel Report (JA___).

Second, the Order inconsistently applies the user-benefit analysis. Pay Tel framed these inconsistencies succinctly:

The Order disallows some features that are simply second- or third-generation versions of features that the Order deems to be recoverable in rates. Order ¶ 385 n.1384. The Order also prohibits recovery for safety and security measures it concedes benefit users (¶ 394), while allowing recovery for measures it says do not benefit users (¶ 391); excludes some features because it is possible to make calls without them (¶ 394), while allowing recovery for others (like "fraud management") that are unnecessary to make calls (¶ 395); and bars recovery for "call monitoring" and "call recording" while permitting recovery for compliance with CALEA—a law requiring call monitoring and recording capabilities. *See id.* ¶ 391.

Motion of Pay Tel Communication, Inc. For Stay Pending Judicial Review, Entry ID: 6677330, at 14 (JA___). The Order's inability to articulate and apply a consistent limiting approach to safety and security costs is compelling evidence of a "standard" which is "standardless" and which constitutes arbitrary and capricious decision making. *Cf. Johnson v. United States*, 576 U.S. 591, 595 (2015) (a regulation can be "so standardless that it invites arbitrary enforcement"). The Order attempts to explain these inconsistencies away based on a "preponderance" analysis—if the predominant use of tasks and functions within a category are not used and useful, then the entire category is excluded. But the evidentiary record before the FCC was woefully inadequate to make any such determination and the agency's post hoc effort to articulate a refinement to its "user benefit" test further illustrates the arbitrary nature of its decisionmaking.

Finally, the excluded safety measures *do* benefit the user-inmates. *See* Virginia Association of Regional Jails Comments at 2 (JA___) ("Excluding the

services from allowable cost recovery ignores the importance of these services and technologies in improving the safety of these facilities, including the safety of incarcerated individuals."). For example, the Order accepts "prevent[ion] of witness tampering and violations of no-contact orders, and protect[ion of] consumer accounts from being used unlawfully" as recoverable in IPCS rates. Order ¶ 395 n.1422 (JA___). But the costs for the features that make it possible to curtail such activity—like voice biometrics, monitoring, and recording of calls—are rejected by the Order. The Order erred by excluding the features that do, in fact, provide meaningful and direct benefits to consumers of IPCS and the public. *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 (decision are arbitrary or capricious if the agency explained the decision in terms that run counter to the evidence).

2.    *Site Commission Payments.*

The FCC has long targeted correctional facilities and their commissions as "a division of locational monopoly profit" and not a cost of providing payphone service. Order ¶ 255 (JA___). Unsurprisingly then, the Order attempts to "end IPCS providers' long-standing practice of making site commission payments to carceral facilities." *Id.* ¶ 2 (JA___). In addition to the FCC lacking authority to regulate site commission payments, *see infra* Part I, the Order's prohibition is also arbitrary and capricious.

35

1. As with safety measures, substantial evidence in the record proves that facilities incur costs associated with making IPCS available. *See infra* Part III.A; Ex Parte Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62, 12-375 at 14 (July 9, 2024) (JA___) (collecting record citations). The FCC has accepted similar evidence in the past, acknowledging "legitimate costs that correctional facilities incur that are reasonably related to the provision of inmate calling services." *See* 2020 ICS Order at p. 30, n.209 (JA___); *see also* Order ¶ 138 (JA___) ("Previously, the Commission found that correctional facilities incur certain costs that are 'reasonably and directly related' to the provision of IPCS"). The FCC has also previously increased rate caps "to better reflect the costs that facilities incur that are reasonably related to the provision of ICS." *See* Order on Reconsideration, WC Docket No. 12-375, FCC 16-102, at ¶ 22 (Rel. August 9, 2016) (JA___).

Despite its history of accepting data and acknowledging the direct costs of providing IPCS, the Order concludes, "[g]iven the state of the record . . . that no allowance for correctional facility costs is warranted." Order ¶ 166 (JA___). This conclusion is arbitrary and capricious for several reasons. First, the cursory reversal of the FCC's findings goes against the MRWA's explicit acknowledgement of the linkage between security and IPCS, mandating that the FCC "shall  consider costs associated with any safety and security measures" in establishing IPCS rates. MRWA § 3(b). Second, excluding site commission payments "defies reasoned

decisionmaking because site commissions obviously are costs of doing business incurred by ICS providers." *See Glob. Tel\*Link*, 866 F.3d at 413 ("Ignoring costs that the Commission acknowledges to be legitimate is implausible."). Third, basic requirements of administrative law require an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 (citations omitted). But in reaching its conclusion, the FCC ignored relevant data provided by the NSA regarding the costs incurred by jails in allowing IPCS. Pay Tel submitted more recent data that corroborated NSA's data. *See* Pay Tel Report (JA___). Instead of engaging with this evidence, the FCC denounced its reliability. Order ¶¶ 166, 171–72, 175 (JA___). Conclusory complaints of "uncertainty," however, aren't a justification for agency action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52–55. And ignoring this evidence was selective and capricious. *Id.* at 43 (agencies are required to "examine the relevant data and articulate . . . a 'rational connection between the facts found and the choice made'").

2. The Order is also internally contradictory. While claiming to eliminate site commissions, the Order simultaneously "permits IPCS providers to reimburse correctional facilities for the used and useful costs the facilities incur to enable the provision of IPCS." Order ¶ 246 (JA___). Courts owe "no deference to [the agency's] purported expertise" when its "'explanation for its determination . . . lacks

any coherence.'" *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006) (citation omitted).

3. Finally, the record makes it exceedingly clear that failing to provide for facility and safety measure cost recovery will result in decreased access to IPCS services. "If jail telecommunications rates are severely restricted," then "local detention facilities will have no choice but to return to pay phones with the option to make a collect call. This would ultimately be more costly to inmates and would lack the necessary security measures to keep the inmates, detention officers, and the public safe." Montana Comments at 2 (JA___); *see, e.g.*, Florida Comments at 4 (JA___) ("[E]stablishing rates that do not allow for the recovery of costs associated with those measures would have the effect of hindering or preventing their implementation and potentially limiting the availability of telephone and advanced communication services in correctional institutions and facilities."); Alabama Comments at 2 (JA___) ("[N]either inmates, their families, nor other members of the community could be served by such new FCC regulations."); Comment of Virginia Sheriffs' Association, WC Docket No. 23-62 (filed Jul. 15, 2024) (JA___) ("While benefiting the individual inmate by lowering the upfront communications costs, the new caps and regulations will greatly negatively impact the services the inmates receive."). Put simply: "Disallowing cost recovery will only impede access to IPCS, not enhance it." Sheriff Donahue Letter at 1 (JA___).

38

The inevitable reduction of services to incarcerated persons contradicts the fundamental goal of Section 276—to "promote the widespread deployment of payphone services to the benefit of the general public," 47 U.S.C. § 276(b)(1)—which flouts basic APA requirements of reasoned decisionmaking. *See Penobscot Air Services, Ltd. v. F.A.A.*, 164 F.3d 713, 720 (1st Cir. 1999) (reviewing court "must determine that the decision is rational, [and] that it 'makes . . . sense.'" (cleaned up)); *Vill. of Barrington*, 636 F.3d at 660 (an agency must show that "its interpretation is 'rationally related to the goals of' the statute" (cleaned up)). This reduction would also flout the FCC's existential mandate to promote the "safety of life and property" under Section 151.

Yet the Order entirely dismisses these concerns in one conclusory paragraph. According to the FCC, it is "highly unlikely that correctional facilities would limit or deny access to IPCS as a result of the elimination of site commission payments." Order ¶ 312 (JA___). And, entirely ignoring the evidence cited above, the order concludes that there's "no reason to believe that correctional institutions will curtail or eliminate access to IPCS simply because they no longer receive site commission payments." *Id.* "Unsubstantiated or bare assumptions" aren't enough for reasoned decisionmaking. *Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022) (cleaned up); *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) ("[U]nexplained assertions . . . unsupported by any explained reasoning" are

"arbitrary and capricious"). The decision was therefore arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency breached its duty when it "entirely fail[s] to consider an important aspect of the problem," or "offer[s] an explanation for its decision that runs counter to the evidence before the agency").

### 3. *Fair Compensation.*

As noted above, the FCC's Order exceeds its statutory authority because it uses Section 276 to deliberately undercompensate IPCS providers. But this same reality can also be seen as an additional reason why the Order is arbitrary and capricious. An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As detailed above, the text, context, history, and purpose of Section 276(b)(1)(A) all demonstrate that Congress was concerned with providers being "fairly compensated" for costs actually incurred in providing payphone service. Nothing indicates that Congress intended that the FCC examine the practices of location providers (like jails and prisons) and question the legitimacy of the costs imposed on payphone providers by location providers based on how location providers choose to use their revenue.

Section 276(b)(1)(A) commands the FCC to ensure that payphone providers are compensated for all costs incurred in providing payphone service rather than to rely on as a factor what facilities do with revenue gained from imposing those costs.

Indeed, such attempts to restructure the market by requiring that payphone providers be undercompensated flips Section 276 on its head. The Order's exclusion of reimbursement for necessary security measures and facility costs will result in inmates having restricted access for IPCS services.

\*     \*     \*

Despite ample evidence in the record to support these serious concerns, the challenged Order arbitrarily excluded security and facility costs from the new rates in favor of lower costs for inmates and their families. The FCC's decisionmaking is therefore unlawful, as an agency's decision is arbitrary and capricious when it "entirely fail[s] to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (cleaned up) (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43).

## IV. THE STRUCTURE OF THE FEDERAL COMMUNICATIONS COMMISSION IS UNCONSTITUTIONAL.

The President's power to remove executive branch officers at will is critical to ensuring the proper functioning of, and democratic accountability within, the executive branch. *See Collins v. Yellen*, 594 U.S. 220, 252 (2021) (explaining that presidential "control is essential to subject Executive Branch actions to a degree of electoral accountability"). Article II vests "[t]he executive Power . . . in a President of the United States of America," who must "take Care that the Laws be faithfully

41

executed." U.S. CONST. art. II, § 1, cl. 1; *id.,* § 3. The "President's power to remove—and thus supervise—those who wield executive power on his behalf," "follows from the text of Article II, was settled by the First Congress, and was confirmed in the landmark decision *Myers*." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020); *see also Myers v. United States*, 272 U.S. 52 (1926) (holding that Article II provides the President with the exclusive power of removal of executive officers); *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (explaining "the executive power include[s] a power to oversee executive officers through removal").

Put another way, because no one person could discharging the responsibility to "take Care that the Laws be faithfully executed," the "Framers expected that the President would rely on subordinate officers for assistance." *Seila Law*, 591 U.S. 197 at 203–04. And to ensure the President's subordinates assist the President faithfully, the Constitution generally affords the President "the authority to remove those who assist him in carrying out his duties." *Free Enterprise*, 561 U.S. at 513–14; *see also* 1 Annals of Cong. 463 (1789) (statement of James Madison on the floor of the First Congress that "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws"). "Political accountability is enhanced by the solitary nature of the Executive Branch"

in which "[t]he President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." *Seila Law*, 591 U.S. at 224.

The FCC and its commissioners aren't sufficiently accountable to the President because the President's power to remove the commissioners is limited by the FCC's organic statute, which provides that "[a] commissioner shall be appointed for a term of five years." 47 U.S.C. § 154(c). As the Supreme Court explained in *Seila Law*, a fixed, five-year term for the head of an executive agency means that "some Presidents may not have any opportunity to shape [the agency's] leadership and thereby influence its activities." *Seila Law*, 591 U.S. at 225. In short, the structure of the FCC does not allow the President to exercise the level of supervision and control required by Article II.

Further, the limited exception to the President's constitutionally required, at-will removal power recognized by the Supreme Court in *Humphrey's Executor* for "multimember bod[ies] of experts, balanced along partisan lines" that "do not wield substantial executive power," does not apply to the FCC. *Seila Law,* 591 U.S. at 216, 218 (discussing *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)). The more executive power an agency exerts, the more important it is for the President to have full power to remove the heads of the agency.[2]

---

[2] Separately, Petitioners urge that the exception recognized in *Humphrey's Executor* has been effectively overruled by more recent Supreme Court decisions

The FCC clearly exercises substantial executive power. The FCC has been granted broad statutory authority to "perform any and all acts, make such rules and regulations, and issue such orders," "as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). In addition, the FCC possesses substantial enforcement authority, including receiving and adjudicating complaints, undertaking investigations, issuing subpoenas, and levying penalties and forfeitures for violations of the Communications Act. *See* 47 U.S.C. § 154(j); 47 C.F.R. § 0.111; 47 C.F.R. § 0.311.

These powers are core executive powers that cannot be exercised consistent with Article II without full presidential oversight of the FCC. *See Collins*, 594 U.S. at 254 (holding that an agency "empowered to issue a regulation or order" and "authorized to issue subpoenas" "clearly exercises executive power"); *Seila Law*, 591 U.S. at 219 ("seek[ing] daunting monetary penalties against private parties on behalf of the United States in federal court" is a "quintessentially executive power"); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch."). Consequently,

---

and cannot be relied upon to sustain an agency structure that restricts the President's removal authority. *See Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 98 F.4th 646, 649 (5th Cir. 2024) (Willet, J., concurring in denial of rehearing en banc) ("*Humphrey's Executor* . . . seems nigh impossible to square with the Supreme Court's current separation-of-powers sentiment.").

the limits on the President's power to remove FCC commissioners impede the President's ability to "take Care that the Laws be faithfully executed" and are unlawful. Thus, the Final Order cannot lawfully be administered or enforced by the FCC as the agency is currently structured. *See Collins*, 594 U.S. at 260.

## V.    VENUE IS IMPROPER IN THIS COURT.

The States and sheriffs agree with Securus and Pay Tel that venue is improper in this Court. The lottery that resulted in transfer was improper. This Court should therefore grant the pending motions to transfer to the Fifth Circuit.

When a party challenges an order under the Hobbs Act before it is published in the Federal Register, it is incurably premature, and the court of appeals lacks jurisdiction over it. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 296-97 (D.C. Cir. 2003); *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 287 (3d Cir. 2007) ("We have no jurisdiction to consider an incurably premature petition for review."). The three non-Securus petitioners to the original lottery were not aggrieved by the August 26 Order because they only seek to challenge the FCC's determination that providers may recover safety and security costs in their rates, and that determination was not made until the September 20 Order. Order ¶ 339 (JA___). But for the lottery triggered by those three invalid petitions, Securus and Pay Tel's petitioners would have stayed in the Fifth Circuit. Transfer to that circuit is therefore justified. *See JL Simmons Co. v. NLRB*, 425 F.2d 52, 55 (7th Cir. 1970) (holding that, when a

consolidated challenge is in a forum based on the petition of a party whose aggrievement was "insignificant," the interest of justice supports a transfer to where "the party who is substantially aggrieved ha[d] petitioned for review").

## CONCLUSION

For the foregoing reasons, the Court should hold the Final Rule unlawful and set aside the FCC's Order.

January 27, 2025                              Respectfully submitted,


THEODORE E. ROKITA                          /s/ Blake E. Lanning
   *Attorney General of Indiana*       BLAKE E. LANNING
                                                 *Assistant Chief Deputy*
Office of the Indiana Attorney General      JOSHUA J. DAVID
IGC South, Fifth Floor                           *Deputy Attorney General*
302 W. Washington Street                         *Legislative & Policy Division*
Indianapolis, IN 46204                      JADE A. POORMAN
(317) 232-0709                              BRADLEY S. DAVIS
blake.lanning@atg.in.gov                         *Deputy Attorneys General*
                                                 *Litigation Division*

                                            *Counsel for the State of Indiana*


TIM GRIFFIN                                 /s/ Dylan L. Jacobs
   *Attorney General of Arkansas*      DYLAN L. JACOBS
                                                 *Deputy Solicitor General and*
Office of Attorney General Tim Griffin           *Interim Solicitor General*
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201                *Counsel for the State of Arkansas*
(501) 682-2007
dylan.jacobs@arkansasag.gov


46

ELIZABETH B. MURRILL
   *Attorney General of Louisiana*

Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

/s/ Kelsey L. Smith
KELSEY L. SMITH
   *Deputy Solicitor General*

*Counsel for the State of Louisiana*

STEVE MARSHALL
   *Attorney General of Alabama*

Office of the Alabama
Attorney General
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

/s/ Edmund G. LaCour Jr.
EDMUND G. LACOUR JR.
   *Solicitor General*

*Counsel for the State of Alabama*

JAMES UTHMEIER
   *Attorney General of Florida*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

/s/ John Guard
JOHN GUARD
   *Chief Deputy Attorney General*

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
   *Attorney General of Georgia*

Office of the Georgia
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

/s/ Stephen J. Petrany
STEPHEN J. PETRANY
   *Solicitor General*

*Counsel for the State of Georgia*

RAÚL R. LABRADOR
  *Attorney General of Idaho*

Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

/s/ Alan Hurst
ALAN HURST
  *Solicitor General*
SEAN M. CORKERY
  Assistant Solicitor General

*Counsel for the State of Idaho*

BRENNA BIRD
  *Attorney General of Iowa*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

/s/ Eric H. Wessan
ERIC H. WESSAN
  *Solicitor General*

*Counsel for the State of Iowa*

LYNN FITCH
  *Attorney General of Mississippi*

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

/s/ Justin L. Matheny
JUSTIN L. MATHENY
  *Deputy Solicitor General*

*Counsel for State of Mississippi*

ANDREW BAILEY
  *Attorney General of Missouri*

815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

/s/ Dominic X. Barceleau
JOSHUA M. DIVINE, #69875MO
  *Solicitor General*
DOMINIC X. BARCELEAU,
#76510MO
  *Assistant Attorney General*

*Counsel for State of Missouri*

DAVE YOST
   *Attorney General of Ohio*

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

ALAN WILSON
   *Attorney General of South*
   *Carolina*

1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

MARTY J. JACKLEY
   *Attorney General of South Dakota*

Office of Attorney General
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

JONATHAN SKRMETTI
   *Attorney General of Tennessee*

Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
whitney.hermandorfer@ag.tn.gov

/s/ T. Elliot Gaiser
T. ELLIOT GAISER
   *Ohio Solicitor General*
MATHURA J. SRIDHARAN
   *Deputy Solicitor General*

*Counsel for the State of Ohio*

/s/ Joseph D. Spate
JOSEPH D. SPATE
   *Assistant Deputy Solicitor General*

*Counsel for the State of South Carolina*

/s/ Ryan McFall
RYAN MCFALL
   *Assistant Attorney General*

*Counsel for the State of South Dakota*

/s/ Whitney Hermandorfer
WHITNEY HERMANDORFER
   *Director of Strategic Litigation*

*Counsel for the State of Tennessee*

49

KEN PAXTON
   *Attorney General of Texas*

Office of the Attorney General of
Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

/s/ Jacob Beach
BRENT WEBSTER
   *First Assistant Attorney General*
AARON L. NEILSON
   *Solicitor General*
JACOB BEACH*
   *Assistant Solicitor General*

*Counsel for the State of Texas*

*admission pending

DEREK E. BROWN
   *Attorney General of Utah*

Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

/s/ Stanford Purser
STANFORD PURSER
   *Solicitor General*

*Counsel for the State of Utah*

JASON MIYARES
   Attorney General of Virginia

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

/s/ Kevin M. Gallagher
KEVIN M. GALLAGHER
   *Principal Deputy Solicitor General*

*Counsel for the Commonwealth of
Virginia*

50

SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; AND THE LOUISIANA SHERIFFS' ASSOCIATION

Frosch, Rodrigue, Arcuri, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

/s/ Craig E. Frosch
CRAIG E. FROSCH
   Executive Counsel,
   Louisiana Sheriffs' Association

SHANNON DIRMANN
   Louisiana Sheriff's Association
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

MARY ERLINGSON
   EAST BATON ROUGH PARISH
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

*Counsel for Sheriff Sid Gautreaux; Sheriff Bobby Webre; Sheriff Mark Wood; Sheriff Kevin Cobb; and The Louisiana Sheriffs' Association*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7) because this document contains 10,801 words, excluding the parts

exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5)-(6) because this document has been prepared in a proportionally spaced

typeface using Microsoft Word in Times New Roman 14-point font.

January 27, 2025                                    /s/ Blake E. Lanning
                                                    Blake Lanning

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

January 27, 2025                          /s/ Blake E. Lanning
                                         Blake E. Lanning