# United States Court of Appeals
# For the First Circuit

---

No. 24-8028
In re: MCP 191
*(Caption Continued on Inside Cover)*

---

On Petitions for Review of a Final Order of the
Federal Communications Commission

---

**JOINT INTERVENOR BRIEF OF DIRECT ACTION FOR RIGHTS AND
EQUALITY, CRIMINAL JUSTICE REFORM CLINIC, PENNSYLVANIA
PRISON SOCIETY, AND OFFICE OF COMMUNICATION OF UNITED
CHURCH OF CHRIST, INC., IN SUPPORT OF RESPONDENT**

---

Andrew Jay Schwartzman
525 Ninth Street, NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

Erik Stallman
SAMUELSON LAW, TECHNOLOGY &
  PUBLIC POLICY CLINIC
UC Berkeley School of Law
353 Law Building
Berkeley, CA 94720
Telephone: (510) 642-2485
estallman@clinical.law.berkeley.edu

*Counsel for Office of Communication of
the United Church of Christ, Inc.*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC, 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights
and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform
Clinic*

Nos. 24-1860 & 24-1927

SECURUS TECHNOLOGIES, LLC,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenors submit the following corporate disclosure statements:

**Direct Action for Rights and Equality** is a non-profit organization. Direct Action for Rights and Equality has no parent corporation and no publicly held corporation holds 10% or more of its stock.

**Criminal Justice Reform Clinic** is a non-profit organization. Criminal Justice Reform Clinic has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**Pennsylvania Prison Society** is a non-profit organization. Pennsylvania Prison Society has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**Office of Communication of the United Church of Christ, Inc.** is a non-profit organization. Office of Communication of the United Church of Christ, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ..................................................................4

ISSUES PRESENTED ....................................................................................4

STATEMENT OF THE CASE .........................................................................4

STANDARD OF REVIEW ...........................................................................10

SUMMARY OF ARGUMENT .....................................................................10

ARGUMENT ...............................................................................................12

I.    LOWER IPCS RATE CAPS PROVIDE NUMEROUS BENEFITS
      FOR INCARCERATED INDIVIDUALS AND SOCIETY.........................12

      A.    Lower Rate Caps Ensure that More Incarcerated People Can
            Use Communications Services that Were Previously
            Unaffordable.........................................................................13

      B.    Affordable Communication Alleviates the Isolation of
            Incarceration and the Burdens on Incarcerated People's
            Families. ...............................................................................14

      C.    Affordable Communication Reduces Recidivism and Makes
            Facilities and Communities Safer. ........................................16

II.   THE PROVIDERS' AND STATES' PETITIONS FOR REVIEW
      SHOULD BE DENIED. .......................................................................19

      A.    The Order Properly Implements the Act's Requirement to
            Ensure All IPCS Providers Are Fairly Compensated. ........19

      B.    The Commission Properly Considered Necessary Safety and
            Security Measures by Applying its Used and Useful
            Framework to Exclude Five Categories of Such Costs........23

C.     The Commission Has Authority to Prohibit Site Commissions Under Sections 276(b)(1)(A) and 201(b). ...........................................27

      1.     Section 276(b)(1)(A) Authorizes the Commission to Prohibit Site Commissions.........................................................27

      2.     Section 201(b) Also Authorizes the Commission to Prohibit Site Commissions.........................................................30

      3.     The Commission Has Authority to Preempt State and Local Laws Requiring Site Commissions.................................32

D.     Section 276 Does Not Compel the Commission to Preempt Lower State-Imposed Rate Caps. ........................................................34

E.     The Commission Reasonably Prohibited IPCS Providers from Billing for Ancillary Services on a Per-Use Basis. ............................36

CONCLUSION ....................................................................................39

# TABLE OF AUTHORITIES

C<small>ASES</small>

*Cohen v. Apple*, 46 F.4th 1012 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2513 (2023) ........................................................................................34

*Collins v. Yellen*, 594 U.S. 220 (2021) ....................................................39

*Consumer Data Industry Ass'n v. Frey*, 26 F.4th 1 (1st Cir. 2022) .................34, 35

*Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87 (2017)...................33

*Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437 (1987)........................32

*Eagle Insurance Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.)*, 360 F.3d 291 (1st Cir. 2004) ....................................................32

*Environmental Defense Fund v. United States EPA*, 124 F.4th 1 (D.C. Cir. 2024) ........................................................................................10

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................................10

*In re Financial Oversight & Management Board for Puerto Rico*, 32 F.4th 67 (1st Cir. 2022)........................................................................33

*Free Enterprise Fund v. Public Accounting Oversight Board*, 561 U.S. 477 (2010)........................................................................................39

*Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45 (2007) ...................................................32

*Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).......................7, 20, 21, 29

*Gozlon-Peretz v. United States*, 498 U.S. 395 (1991) .............................................32

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985)........................................................................................35

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ................................39

*Medicaid & Medicare Advantage Products Ass'n of Puerto Rico, Inc. v. Hernandez*, 58 F.4th 5 (1st Cir. 2023) .............................................................34

*Minnesota Public Utilities Commission v. FCC*, 483 F.3d 570 (8th Cir. 2007) ...................................................................................30

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020) ...................................................................................39

*SPGGC, LLC v. Ayotte*, 488 F.3d 525 (1st Cir. 2007).............................36

*Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002) ..................22

*Vimar Seguros Y Reaseguros v. M/V Sky Reefer*, 29 F.3d 727 (1st Cir. 1994), *aff'd*, 515 U.S. 528 462 (1995).................................................32

STATUTES

5 U.S.C. § 706(2)(A)..................................................................................10

28 U.S.C. § 2342(1) .....................................................................................4

47 U.S.C. § 201(b) ...........................................................................6, 7, 30

47 U.S.C. § 276 ............................................................................................6

47 U.S.C. § 276(b)(1)(A) .....................................................................7, 8, 20

47 U.S.C. § 276(b)(1)(A) (2022) ...........................................................6, 20

47 U.S.C. § 276(d) (2022) ...........................................................................6

47 U.S.C. § 276(c) ......................................................................................33

47 U.S.C. § 402(a) ........................................................................................4

47 U.S.C. § 405(a) ......................................................................................39

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) .....................1, 8, 20, 23, 24

LEGISLATIVE MATERIALS

168 Cong. Rec. H10026 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) ...................................................................................................22

**ADMINISTRATIVE RULINGS**

*In re Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) ............................................................................................5

*In re Rates for Interstate Inmate Calling Services*, 29 FCC Rcd 13170 (2014) ............................................................................................5

*In re Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015), *vacated in part*, *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ................................................................... 4-5, 13, 16

*In re Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519 (2021) .......................................................................13, 14, 16, 17, 31

**OTHER AUTHORITIES**

Nicole Loonstyn & Alice Galley, *Low-Cost Phone Calls Benefit Incarcerated People, Their Families, and Criminal Legal Institutions*, Urb. Inst. (Aug. 30, 2023).............................................................13

Peter Wagnar & Wanda Bertram, *State of Phone Justice 2022: The Problem, the Progress, and What's Next*, Prison Pol'y Inst. (updated July 18, 2024), https://www.prisonpolicy.org/phones/appendices 2022_1.html ........................................................................................36

# INTRODUCTION

Incarcerated people need affordable communications services to maintain vital connections with their family and loved ones, their counsel, and their broader support systems. These communications services improve the well-being of incarcerated people and their families, promote safety within carceral institutions, and reduce recidivism. Yet for far too long, incarcerated individuals have paid exorbitant prices for incarcerated people's communications services ("IPCS") due to market failures that eliminate any meaningful competitive pressure for IPCS providers to reduce costs at the facilities they serve. For their part, prisons and jails have extracted "site commissions" and other payments from providers that do not benefit incarcerated people, but which incarcerated people and their family members, clergy, and loved ones nonetheless must bear to stay in touch.

The Order under review represents a significant step forward.[1] The Order draws on expanded statutory authority that Congress conferred under the Martha Wright-Reed Just and Reasonable Communications Act of 2022 Act, Pub. L. No. 117-338, 136 Stat. 6156 (2023) ("MWRA" or "Act"), which expressly directs the Commission to set "just and reasonable" IPCS rates. MWRA § 2(a)(1)(B). Pursuant to that authority and the long-settled rate-setting framework it uses to determine such

---

[1] *See In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 39 FCC Rcd 7647 (2024) ("Order") (JA__).

rates, the Commission promulgated temporary rate caps for video communications services and permanent rate caps for audio communications services that significantly reduce the per-minute rates that IPCS consumers pay.  Order ¶ 3 (JA__). Among other changes, the Commission also ensured that incarcerated people and their loved ones are not required to pay for certain services—including various "safety and security" costs—that do not benefit them; prohibited IPCS providers from paying site commissions to protect IPCS consumers from these monopoly charges; preempted state and local laws requiring site commissions; and barred duplicative and unnecessary separate charges for so-called "ancillary services." *Id.* (JA__).

Intervenors Direct Action for Rights and Equality ("DARE"), Criminal Justice Reform Clinic ("CJCR"), Pennsylvania Prison Society ("PPS"), and Office of Communication of the United Church of Christ, Inc. ("UCC") (collectively, the "Public Interest Intervenors") work and communicate with incarcerated people and their families to improve conditions in incarcerated facilities.  The Public Interest Intervenors have intervened in support of the Commission to make two primary points:

*First*, affordable IPCS benefits not only incarcerated people, but also their families and loved ones by maintaining vital connections.  Affordable IPCS also

reduces violence and conflict in carceral facilities. And it reduces recidivism rates, making communities safer.

*Second*, this Court should reject the petitions for review filed by Pay Tel Communications, Inc. and Securus Technologies, Inc. (the "Providers"); and a group of States and Sheriffs (the "States"). The Commission (1) satisfied its dual mandate to ensure consumers pay "just and reasonable rates" while ensuring providers are "fairly compensated" by applying the well-established "used and useful" framework; (2) satisfied its statutory mandate to "consider" safety and security measures that are "necessary" to the provision of IPCS in excluding five categories of safety and security costs;[2] (3) acted in accordance with law in prohibiting IPCS providers from making site commission payments and preempting state and local laws requiring such payments; (4) acted in accordance with law in declining to preempt states from adopting *lower* rate caps than the caps set in the Order; and (5) acted reasonably in incorporating the cost of ancillary service charges into the IPCS rate caps. Because, as set forth herein and in the Commission's brief, the Providers and States have not identified any grounds for vacating the Order, their petitions for review should be denied.

---

[2] The Public Interest Petitioners separately raised a challenge to the Commission's *inclusion* of one category of safety and security costs known as "communications security services." *See* Public Interest Petitioners Br. 26-32; Commission Br. 61-64.

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).  The Commission released the Order on July 22, 2024, and it was published in two parts in the Federal Register on August 26, 2024, and September 20, 2024.  Securus, DARE, PPS, and CJRC timely petitioned for review of the August 26 notice.  Those parties' petitions were transferred to this Court by the Judicial Panel on Multidistrict Litigation.  Those parties (along with the other petitioners in these consolidated cases) timely filed petitions for review following the September 20 notice.  *See generally* Public Interest Petitioners Br. 5.

## ISSUES PRESENTED

The Public Interest Intervenors agree with the Statement of Issues set forth in the Commission's brief.

## STATEMENT OF THE CASE

The Order addresses an IPCS market that has been neither competitive nor well-functioning for decades.[3]  Order ¶ 382 (JA__).  IPCS providers have long charged egregiously high rates to the captive IPCS market because they enjoy a monopoly at each facility they serve.[4]  To the extent there has been any "competition"

---

[3] The Public Interest Petitioners' opening brief (at 6-16) sets forth in greater detail the pre-Act efforts to address excessive IPCS rates and charges; the changes wrought by the Act; and the major achievements of the Order.

[4] *See, e.g.*, *In re Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763, 12765 ¶ 1 (2015) ("2015 Order") (noting that "[f]amily members report paying

4

in this market, it has taken the form of site commissions that IPCS providers pay to prisons and jails in exchange for the exclusive contracts to operate at their facilities. *See* Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 & 12-375, at 4 (Apr. 29, 2024) (JA__).[5]  The magnitude of these site commissions has been significant: in some cases, site commissions approached 100% of gross revenues.  Comments of the Wright Petitioners et al. at 27 n.105, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA__) ("Wright Petitioners May 8, 2023 Comments").

The existence of such payments significantly "distort[ed] the [IPCS] marketplace by creating 'reverse competition' in which the financial interests of the entity making the buying decisions (the correctional institution) [were] aligned with the seller (the [IPCS] provider) and not the consumer (the incarcerated person or a member of his or her family)."  *In re Rates for Interstate Inmate Calling Servs.*, 29 FCC Rcd 13170, 13180-81 ¶ 22 (2014).  These site commission costs—along with

_____

egregious amounts[] … just to stay connected to incarcerated spouses, parents and children" and that "[f]or over a decade, they have pleaded with this agency for help fighting these excessive and unaffordable phone charges"), *vacated in part*, *Glob. Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).

[5] Site commissions are payments made by IPCS providers to "correctional facilities and related state authorities," and can take a variety of forms that include "a percentage of gross revenue, a signing bonus, a monthly fixed amount, a yearly fixed amount, or in-kind contributions."  *In re Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107, 14124-25 ¶¶ 33-34 (2013).

other costs that were not themselves useful in the provision of IPCS—were passed on to incarcerated people and their families, with incarcerated individuals and their loved ones "play[ing] no role in the process of selecting IPCS providers or the services they offer." Order ¶ 23 (JA__). Thus, the IPCS system left incarcerated individuals with "only one choice if they want to call their loved ones"—paying the price, no matter how steep. Wright Petitioners May 8, 2023 Comments, Appx. A, *Brattle Report*, at II-2 (May 8, 2023) (JA__); *see also* Comments of Nathan Miller, WC Docket No. 23-62 (May 4, 2023) (JA__), Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay*, at 21 (Nov. 4, 2022) (JA__) ("Inmates and their families are at the mercy of the quality and prices of a provider that is determined without their input.").

Beginning in 2013, the Commission attempted to address this market failure through a series of orders. In adopting those orders, the Commission relied on two primary sources of statutory authority: Sections 276 and 201(b) of the Communications Act. 47 U.S.C. §§ 276, 201(b). As relevant here, Section 276(b)(1)(A) (prior to the MWRA) directed the Commission to ensure that providers of "inmate telephone service in correctional institutions" are "fairly compensated for each and every completed intrastate and interstate call using their payphone." *Id.* § 276(d), (b)(1)(A) (2022). For its part, Section 201(b) authorizes the Commission

to ensure that "[a]ll charges" for interstate and international communications services are "just and reasonable." *Id.* § 201(b).

The Commission's efforts to address these market failures were severely hindered by a challenge to the 2015 Order filed by IPCS providers and the States in the D.C. Circuit. *See Glob. Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017). As relevant here, the D.C. Circuit concluded that the Commission's rates set in the 2015 Order exceeded the Commission's statutory authority under Section 276 because the Commission's use of industry-wide cost averaging, as applied to calls with above-average costs, did not "fulfill the mandate of § 276 that 'each and every' inter- and intrastate call be fairly compensated." *Id.* at 414. The D.C. Circuit further found that some providers were required under state law or "as a condition of doing business" to pay site commissions, thereby rejecting the Commission's decision to exclude the cost of site commissions when setting rate caps. *Id.* at 413.

In response to the D.C. Circuit's decision, Congress enacted the MWRA. The MWRA made several important revisions to Section 276(b)(1)(A), including removing the words "per call" before "compensation plan," removing the words "for each and every" after "fairly compensated," and, most importantly, incorporating a "just and reasonable" standard for rates and charges, as is found in Section 201(b). 47 U.S.C. § 276(b)(1)(A). Thus, the amended version of Section 276(b)(1)(A) now requires the Commission to "establish a compensation plan to ensure that all

payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device." *Id.* In addition, as relevant here, the Act directed the Commission to "consider costs associated with any safety and security measures" that are "necessary to provide" IPCS. MWRA, § 3(b)(2).

To implement the MWRA, the Commission solicited comments and required providers to submit data on their services, rates and charges, site commissions, and safety and security measures. *See* Order ¶ 17 & n.60 (JA__). The providers' data were not always complete and appear to have inflated providers' costs.[6] Nonetheless, working with that data, the Commission unanimously issued the Order under review. The Order explains that because "Congress has imported section 201(b)'s 'just and reasonable' standard into section 276(b)(1)(A)," the Commission should incorporate the "used and useful" framework that has been applied for decades to set just and reasonable rates. Order ¶ 41 (JA__). That framework "allows [the Commission] to recognize all IPCS costs *that benefit IPCS users*, including any such costs incurred by correctional facilities, as costs that should be recovered through IPCS rates and

_____

[6] *See, e.g.*, Letter from Gregory R. Capobianco, Counsel for the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375, at 2 (Dec. 15, 2023) (JA__) (noting that "[s]ome of the IPCS providers submitted responses with allocations that do not track the instructions, including the seven categories [of safety and security costs]" and that "[o]ther providers left the safety and security cost section of their submissions entirely blank"); Order ¶¶ 210-212, 217 (JA__-__, __).

charges." *Id.* ¶ 43 (JA__) (emphasis added).  This approach would also ensure that providers receive "fair compensation," as required by the MWRA, *id.* ¶ 219 (JA__), by allowing providers an opportunity to recover the industry average of these costs on a company-wide basis.

Using that framework, the Order adopts significantly lower rate caps for audio and video calls.  Order ¶ 3 (JA__).  The Commission also excluded five of seven categories of reported costs associated with safety and security measures from the lower bounds because such costs predominantly serve law enforcement purposes and do not benefit IPCS users under the relevant ratemaking standard.  *See id*. ¶¶ 339-407 (JA__–__).

The Commission further prohibited IPCS providers from paying monopolist site commissions—understood as payments from providers to facilities for costs that are not used and useful in the provision of IPCS—based on both on its authority under the MWRA-revised Section 276, as well as on its general authority under Section 201(b).  *See id.* ¶¶ 242, 294-338 (JA__, __-__).  And the Commission preempted state and local laws requiring such payments.  *Id.* ¶ 302 (JA__).  More broadly, the Commission preempted state laws setting higher rate caps than those adopted in the Order, while leaving states free to set even lower rate caps.  *Id.* ¶ 235 (JA __).  Finally, the Commission prohibited providers from charging separate fees for "ancillary services," which "reflect routine internal business functions" such as

"automated payment fees, third-party financial transaction fees, live agent fees, [and] paper bill/statement fees." *Id.* ¶ 415 (JA__).  Instead, the Commission incorporated the reported costs of ancillary services into its rate caps.  *Id.* ¶¶ 408-426 (JA__-__).  In these and other ways, the Order comprehensively addressed nearly every aspect of the IPCS market that had resulted in unaffordable rates for incarcerated people.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a petition for review of agency action should be granted where agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In determining whether an "agency's interpretation of its governing statute is contrary to law," the Court "must exercise [its] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of the statute."  *Env't Def. Fund v. U.S. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)).   The "APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## SUMMARY OF ARGUMENT

I.     Lower IPCS rate caps are essential for incarcerated people to afford communications services, which in turn provide numerous benefits to incarcerated

people, their loved ones, and society as a whole.  As extensively set forth in the record and prior orders, affordable IPCS allows incarcerated people to stay in touch with loved ones and maintain connections with the outside world.  Such communication is crucial for children of incarcerated people and for the successful reintegration of incarcerated people following their release.  Moreover, affordable IPCS has been shown to reduce recidivism and make incarcerated facilities safer.  By reducing IPCS rate caps, the Order advances all of these benefits.

II.    The Providers' and States' petitions for review should be denied.

A.    The Commission satisfied its dual statutory obligations to set "just and reasonable" rates and "fairly compensat[e]" IPCS providers by applying its "used and useful" framework.  In arguing that this approach did not adequately compensate "all" providers, the Providers fail to accord adequate weight to Congress' careful amendments in the MWRA, which expressly allow the use of industry-wide data and eliminate the Commission's obligation to ensure fair compensation on a per-call basis.

B.    The Commission also satisfied its statutory obligation to "consider" all possibly "necessary" safety and security costs by applying the "used and useful" framework.  "Consider" does not mean "include," and the Commission correctly declined to read the statute to require it to incorporate all such costs within its rate caps.

C.     The Commission's prohibition on providers contracting to pay site commissions has ample grounding in both Section 276(b)(1)(A) and Section 201(b). The Commission also properly concluded that state laws permitting such payments were preempted based on these authorities and longstanding preemption principles, and properly accounted for the D.C. Circuit's decision in *GTL*.

D.     More broadly, the Commission also properly concluded that state and local laws setting lower rate caps were not preempted by the Order. That result flows directly from a straightforward preemption analysis, in which the Order's rate caps set only a ceiling but not a floor for states and localities.

E.     Finally, the Commission reasonably allocated all costs into the overall per-minute caps and eliminated separate fees for ancillary services. That change accords with how analogous services are provided outside of the IPCS context, and it best addresses the exploitative practices of providers who had taken advantage of a per-use charge for such services.

## ARGUMENT

## I.  LOWER IPCS RATE CAPS PROVIDE NUMEROUS BENEFITS FOR INCARCERATED INDIVIDUALS AND SOCIETY.

"The benefits of communications between incarcerated people and their families are wide-ranging and well-documented."  Order ¶ 29 (JA__); *see also* Commission Br. 2, 8, 84.  Affordable communication with the outside world promotes incarcerated individuals' well-being, helps their families thrive in their

absence, facilitates law-abiding reintegration into society, and improves safety within carceral facilities. The Commission has long recognized these benefits. *See* Order ¶¶ 26-30 (JA___); *In re Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, 9534-35 ¶¶ 34–37 (2021) ("2021 Order"); 2015 Order ¶¶ 93-94.[7] As organizations that work with incarcerated individuals and their families, the Public Interest Intervenors are well-positioned to speak to the record evidence showing the justifications for and benefits of the Commission's Order.

### A. Lower Rate Caps Ensure that More Incarcerated People Can Use Communications Services that Were Previously Unaffordable.

The Order's lower rate caps help place IPCS within the reach of more incarcerated people and their families. Two-thirds of incarcerated people made less than $12,000 per year before they were arrested. Nicole Loonstyn & Alice Galley, *Low-Cost Phone Calls Benefit Incarcerated People, Their Families, and Criminal Legal Institutions*, Urb. Inst. (Aug. 30, 2023), cited in attachment to Letter from Geoffrey G. Why, Verrill Dana LLP, Counsel to Ameelio, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (Dec. 6, 2024) ("Ameelio Ex Parte") (JA___). It is therefore no surprise that the "high costs" of IPCS resulted in "more

---

[7] Chairman Carr's statement similarly noted the "decline in mental and emotional health that can result from a lack of external communications," and explained that "studies have repeatedly shown that increased communication between incarcerated people and their families, friends, and other outside resources helps reduce recidivism rates." Statement of Commissioner Carr, Order at 486 (JA___).

than 1 in 3 families" going into debt to stay in touch with their loved ones.  Order
¶ 26 & n.97 (JA__) (quoting California State Senator Josh Becker Comments, WC
Docket Nos. 23-62 & 12-375, at 1 (May 8, 2023) (JA__)); *see also* 2021 Order ¶ 36
(citing study finding that 34% of families incur such debt).

Indeed, the high costs of calling previously forced some families to forgo
communication entirely.  *See* Order ¶ 28 (JA__).  As one commenter put it during a
listening session included in the agency record: "[I]f you have kids at the house to
feed, the smartest thing would be to just scratch the phone."  IPCS Charleston
Listening Session Ex Parte at 14:5-10, WC Docket No. 23-62 (filed Mar. 5, 2024)
("Charleston Listening Session") (JA__).  As another example, one formerly
incarcerated person with food allergies was forced to choose between "nutritious
food or call[ing] my family."  IPCS Chicago Listening Session Ex Parte at lines 431-
432 (filed Feb. 6, 2024) ("Chicago Listening Session") (JA__).  These unreasonable
tradeoffs are the hallmark of unaffordable IPCS, and the lower rate caps are an
important step to address this problem.

**B.    Affordable Communication Alleviates the Isolation of Incarceration and the Burdens on Incarcerated People's Families.**

The Commission has also found that affordable communication is a vital tool
for navigating the isolation of incarceration and the harmful effects of family
separation.  "Exorbitant costs and fees heighten depression, isolation, and loneliness
among incarcerated individuals" by cutting them off from sources of external

support.  Order ¶ 26 n.96 (JA__) (quoting Letter from Leadership Conference to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375, at 1 (June 17, 2024) ("Leadership Conference Comments") (JA__)).

Formerly incarcerated individuals have likened prison to a "sensory deprivation tank."  IPCS Phoenix Listening Session Ex Parte at 39:6-8, WC Docket No. 23-62 (filed June 20, 2024) (JA__) ("Phoenix Listening Session").  In that environment, external support is crucial.  One formerly incarcerated individual described the power of a 15-minute conversation: it is "not 15 minutes for me.  It's life."  *Id.* at 40:9-11 (JA__).  Calls from loved ones provide, in the words of another incarcerated person, a "lifeline to my family, to my children."  Charleston Listening Session at 55:8-13 (JA__).  That lifeline is especially important for incarcerated people experiencing mental health crises, who have limited support resources, and must rely on family support.  *See, e.g.*, Phoenix Listening Session at 32:1-18 (JA__); Chicago Listening Session ¶¶ 454-459 (JA__).

Children similarly suffer psychological, behavioral, developmental, and social harms related to their parents' incarceration—but the record establishes that frequent, reliable conversations with their incarcerated parents can mitigate those harms.  *See* Comments of Civil Rights Corps at 3 & n.5, WC Docket No. 23-62 & 12-375 (May 8, 2023) (JA__) (citing Annie E. Casey Foundation, *A Shared Sentence: The Devastating Toll of Parental Incarceration on Kids, Families and*

*Communities* (2016)).  Notably, the Commission has long concluded based on the evidence presented to it that consistent communication between incarcerated parents and their children improves parent-child relationships, Order ¶ 29 (JA__), lessens "disruptive and anxious behaviors" in those children, 2015 Order ¶ 94, results in fewer foster care placements, 2021 Order ¶ 37, and significantly reduces the likelihood that children of incarcerated parents will themselves be incarcerated in the future, Order ¶ 29 n.116 (JA__) (*citing* Danielle Haverkate et al., *The Differential Effects of Prison Contact on Parent-Child Relationship Quality and Child Behavioral Changes*, Corrections: Policy, Prac., & Rsch. 228 (2020)).  But according to one study, just 38 percent of incarcerated individuals reported having at least one phone call a month with their children under the pre-Order rates.  2015 Order ¶ 94 n.285.  The Order therefore helps remove barriers between incarcerated individuals and the 2.7 million children of incarcerated parents.  Order ¶ 29 n.116 (JA__) (citing 2015 Order, ¶ 3 n.13).

### C.    Affordable Communication Reduces Recidivism and Makes Facilities and Communities Safer.

The Commission also found that familial contact is a key part of facilitating incarcerated individuals' successful reintegration into society.  *See* Order ¶ 29 n.116 (JA__).  It helps incarcerated people maintain "hope of reengaging with society and their loved ones," *id.* ¶ 29 (JA__), and increases their ability to plan with loved ones for housing, a job, healthcare, and other aspects of a successful return to the

16

community, *see, e.g.*, 2021 Order ¶ 37.  The record also showed that affordable IPCS helps incarcerated individuals access education crucial to facilitating reintegration both during and after incarceration.  In one example, a formerly incarcerated woman stated that the high costs of maintaining contact hindered her ability to afford her education after release.  Chicago Listening Sessions, ¶¶ 440–441 (JA___); *see also id.* ¶¶ 603–635 (JA___).

Several commenters highlighted this issue for the Commission, noting that communication is "essential for improving people's ability to successfully re-enter their communities—supporting family stability, facilitating access to community support and job opportunities."  Leadership Conference Comments at 1 (JA___).  Indeed, "ongoing communication with loved ones and maintaining social ties is critical to successful reentry after any time incarcerated."  Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375, at 1 (July 8, 2024) (JA___); *see also* Color of Change Comments at 1, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA___) (emphasizing that "maintaining communication with loved ones during incarceration has measurable positive impacts on public safety" (citation omitted)).

The reentry benefits associated with affordable IPCS are further supported by extensive research, as the Commission and commenters recognized.  For example, a 2014 study conducted in women's prisons demonstrated that familial telephone

contact brought about the largest reduction in recidivism rates among several contributing factors.  Order ¶ 29 n.116 (JA__) (citing Kelle Barrick et al., *Reentering Women: The Impact of Social Ties on Long-Term Recidivism*, 94 Prison J. 3, 1 (2014)); *see also* Comments of Center on the Administration of Criminal Law at 8 & n.34, WC Docket No. 12-375 (Mar. 25, 2013) (JA__) (citing Rebecca Naser et al., *Family Members' Experiences with Incarceration and Reentry*, 7 W. Criminology Rev. 20, 21 (2006)); Comments of California State Senator Josh Becker at 1, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA__) (citing Ryan Shanahan & Sandra Villalobos Agudelo, *The Family and Recidivism*, American Jails at 17-24 (Sept.-Oct. 2012), https://www.prisonpolicy.org/scans/vera/the-family-and-recidivism.pdf).

Moreover, low-cost IPCS also benefits incarcerated facilities.  One study found a 55% decrease in violent misconduct and a 30% decrease in drug misconduct following the rollout of a low-cost communications program.  Panka Bencsik et al., *Calls and Conduct: The Impact of Free Communication on Prison Misconduct* (Dec. 2024) (forthcoming publication) (JA__), attached to Ameelio Ex Parte.  That conclusion accords with the first-hand views of formerly incarcerated individuals who spoke at the Commission's listening sessions.  *See, e.g.*, Phoenix Listening Session at 21:10-13 (JA__) (formerly incarcerated individual estimating that "65 percent of the population in the prison system turn to drugs secondary to not being able to communicate because the penal system is designed so that you don't

communicate"); Charleston Listening Session at 35:2-6 (JA__) (formerly incarcerated man stating that more communication means less stress taken out on other incarcerated individuals, including less violence). Here again, the Order's lower rate caps provide indispensable benefits to incarcerated people, their loved ones, and society at large.

## II.     THE PROVIDERS' AND STATES' PETITIONS FOR REVIEW SHOULD BE DENIED.

Despite this record evidence showing the needs underlying the Commission's Order, the Providers and States, along with their supporting intervenors, argue that the Order's lower rate caps and other efforts to address distortions in the IPCS market exceed the Commission's statutory authority or were not the product of reasoned decisionmaking. The Court should reject those arguments and deny the petitions.

### A.     The Order Properly Implements the Act's Requirement to Ensure All IPCS Providers Are Fairly Compensated.

The Providers argue that by setting "just and reasonable" rates in accordance with the Commission's well-established used and useful framework, the Commission failed to satisfy its statutory obligation to ensure that all IPCS providers are "fairly compensated." *See* Providers Br. 31-36. But the Commission's approach "g[a]ve full effect to both" clauses. Order ¶ 60 (JA__).

As amended by the MWRA, § 276(b)(1)(A) charges the Commission with creating "a compensation plan to ensure that all payphone service providers are fairly

19

compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications." 47 U.S.C. § 276(b)(1)(A). The Providers' primary argument is that the Commission's use of industry-wide data about providers' costs does not ensure that "all" providers receive "fair compensation." 47 U.S.C. § 276(b)(1)(A) (2022). But the Commission correctly concluded that "fair compensation need not be evaluated on a provider-by-provider basis." *See* Order ¶¶ 69, 219 (JA__, __). Indeed, two of the MWRA's major statutory changes—which responded directly to the D.C. Circuit's rejection of the use of industry-wide average costs—essentially compel that conclusion.

To start, the MWRA eliminated the prior requirements that the Commission establish a "*per call* compensation plan to ensure . . . fair[] compensat[ion] for *each and every* completed . . . call." *GTL*, 866 F.3d at 403 (emphases added); Order ¶ 69 (JA__). As the agency concluded, these changes "respond directly to the D.C. Circuit's holding in *GTL v. FCC* that setting rate caps based on industry-wide average costs was 'patently unreasonable' because 'calls with above-average costs' would not be fairly compensated on a per call basis." Order ¶ 69 (JA__); *see also* Wright Petitioners May 8, 2023, Comments at 17 (JA__).

Even more tellingly, the MWRA also expressly grants the Commission authority to "use industry-wide average costs" in "determining just and reasonable rates." MWRA § 3(b)(1); Order ¶ 68 (JA__). Thus, as commenters explained:

"Nowhere does the MWRA speak in terms of provider-specific costs." Wright Petitioners May 8, 2023, Comments at 18–19 (JA___) (quoting MWRA Dec. 22, 2022, Congressional Record, 168 Cong. Rec. H10027 (statement of Rep. Pallone)); *see also* Opening Comments, United Church of Christ Media Justice Ministry and Public Knowledge at 18–19, WC Docket Nos. 23-62 & 12-375 (May 9, 2023) ("UCC May 9, 2023, Comments") (JA___).

By focusing on the word "all," the Providers essentially suggest that any provider, no matter how inefficient, must be profitable. *Cf.* Providers Br. 34. But "fairly compensating" providers does not require "allow[ing] for the recovery of inefficiently incurred costs" of each provider. Order ¶ 219 n.778 (JA___); *see also, e.g.*, Wright Petitioners May 8, 2023, Comments at 12 (JA___) (explaining that the "fairly compensated" requirement "focuses on the objective value of the services being provided, rather than on the subjective or idiosyncratic cost structure of any particular provider"). Indeed, *GTL* itself recognized that the "fair compensation" requirement was intended to end the unfair practice of denying payment to certain payphone operators altogether—not to require consumers to pay inflated rates because of providers' imprudent investments or other similarly inefficient behavior. *GTL*, 866 F.3d at 403; *see also* UCC May 9, 2023, Comments at 17-18 (JA___) (explaining that the statute as originally enacted "was intended to address the situation, in the past, where payphone providers were receiving no compensation

21

because of the rise of dial-around services"). Put differently, the word "all" does not permit the Providers to read the word "fair" out of the statute: by limiting the rate caps to encompass only the costs incurred in providing service efficiently, the Commission satisfied its obligation to provide "fair compensation" to "all" providers.

The Providers also contend that the Commission's approach conflates "just and reasonable" rates and "fair compensation." Providers Br. 32-33. According to the Providers, the fact that the "just and reasonable" standard contemplates a "'fair' return . . . to mimic natural incentives in competitive markets," *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 486 (2002), means that "fair compensation" must "go beyond that baseline." Providers Br. 32. But Congress plainly did not enact the MWRA to further increase providers' return. Rather, it added the "just and reasonable" language to shift the Commission's focus squarely to what benefits consumers. *See* 168 Cong. Rec. H10026 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) ("[T]his bill will help reduce financial burdens that prevent people from being able to communicate with loved ones and friends."). And, in any case, the Providers point to no case parsing "fair compensation" and "just and reasonable" rates in the manner they suggest. *Cf.* Wright Petitioners May 8, 2023, Comments at 11 (JA__) ("The basic 'fairness' contemplated in Section 276 naturally flows from just and reasonable rates.").

Finally, the Providers worry that the Commission's interpretation of the "fairly compensated" requirement resulted in rate caps that were "below cost for one-third of IPCS providers."  Providers Br. 34.  As an initial matter, the affected providers appear to account for less than five percent of the IPCS market's volume.  Order ¶ 216 (JA__).  But to the extent that the industry-wide data did not reveal every unusual circumstance in which a provider had high costs but still operated efficiently, the Commission has accounted for that possibility through a waiver process.  *Id.* ¶¶ 219 n.778, 475-481 (JA__, __-__); *see also* Ex Parte Letter from UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 at 2 (July 12, 2024) (JA__).  The Commission's approach was therefore consistent with both the "fair compensation" and "just and reasonable" requirements of the statute.

### B. The Commission Properly Considered Necessary Safety and Security Measures by Applying its Used and Useful Framework to Exclude Five Categories of Such Costs.

In addition, the Providers, States, and the National Sheriffs' Association ("NSA") all argue that the Commission's reliance on the "used and useful" framework to evaluate safety and security measures was contrary to the Commission's statutory obligation to "consider costs associated with any safety and security measures necessary to provide a service."  MWRA § 3(b)(2).  In particular, they argue that the agency skipped a mandatory step by failing to identify which costs are "necessary" to provide IPCS.  *See* Providers Br. 38-41; States Br. 21-23;

*see also* NSA Br. 8-10.  The States further argue that it was unreasonable to apply the "used and useful framework" to safety and security costs because that approach places too much focus on the "users" of the service rather than the needs of carceral facilities.  States Br. 29-35; *see also* NSA Br. 6-8.

First, the Act's imposition of an obligation to "consider" "necessary" safety and security costs does not, *contra* Providers Br. 39; States Br. 20-21, require first identifying which costs are "necessary."  The Commission properly considered *all* safety and security costs in its analysis, from which it "necessarily follows" that it considered necessary costs.  Order ¶ 369 n.1315 (JA__).  Effectuating the requisite consideration through application of the "used and useful" framework was an entirely proper "continuation of the sort of analyses the Commission has long undertaken in the IPCS context" and in its "ratemaking role" in general.  Order ¶¶ 359, 361 (JA__, __).

Second, to the extent these petitioners seek to argue that the MWRA in fact requires the Commission to include all safety and security costs within its rate caps, that argument is plainly foreclosed by the statutory text.  The statute merely requires that the Commission "consider" all such costs.  MWRA, § 3(b)(2).  The Commission readily satisfied this requirement.  To be sure, this obligation uses mandatory language ("*shall* consider") but the mandatory obligation is merely an obligation to "consider," not to include, those costs.  *See, e.g.*, Wright Petitioners May 8, 2023,

24

Comments at 23 (JA__) ("Congress did not say that the Commission 'must include' or 'shall allow for the recovery of' the safety and security costs claimed by IPCS providers."); Opening Comments of Stephen A. Raher at 14-15, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA__) (similar).

Third, these petitioners also take issue with the applicability of the "used and useful" framework to exclude five of seven categories of safety and security costs. Providers Br. 41-45; States Br. 29-35; NSA Br. 6-14.  For example, the States contend that the "used and useful" framework does not sufficiently account for carceral facilities' needs and the fact that safety and security costs are inherent in IPCS.  *See* States Br. 20, 31-36.  This argument fundamentally misunderstands the purpose of the "used and useful" analysis, which focuses on the utility to *users*, rather than facilities, because "incarcerated people or their loved ones are the ones paying for and using IPCS."  Order ¶ 380 (JA__); Worth Rises Reply Comment at 2, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) (JA__) (any "reference to correctional agencies as 'customers' is misleading," as the facts "suggest[] more of a profit-sharing arrangement between IPCS providers and corrections agencies").  Moreover, prioritizing facilities in this way would be "inconsistent with [the Commission's] mandate to ensure just and reasonable IPCS rates"—statutory

language that the MWRA added to ensure that those *paying* rates would not face unreasonable rates.  Order ¶ 380 (JA__).

In any case, the States do not offer any valid reason to believe that the excluded safety and security features are so central to IPCS that they are "necessary" costs.  That is especially true given that many of these costs are for *optional* features that not all jurisdictions adopt and that are sometimes used simply to win contracts.[8] If "security features [not] *meant* to benefit the user-inmate" but "required by facilities" were nonetheless considered recoverable costs by default, States Br. 33-34, that approach would improperly take the Commission out of the regulatory equation, *see* Order ¶ 362 (JA__).

Finally, the States and NSA warn that facilities may stop providing IPCS if safety and security costs are not compensated.  States Br. 24; NSA Br. 4, 12-14.  That

---

[8] *See, e.g.*, Comments of the Electronic Privacy Information Center at 3-4, WC Docket Nos. 23-62 & 12-375 (June 6, 2023) (JA__) ("Other commenters document multiple instances in which these services cannot be considered necessary by virtue of the fact that they are not utilized universally."); Wright Petitioners May 8, 2023 Comments at 24 (JA__) ("[S]afety and security features that are not universally used across facilities suggests that they cannot be 'necessary'"); Comments of Worth Rises at 4-5, Appx. B, WC Docket Nos. 23-62 & 12-375 (May 8, 2024) (JA__) (explaining how ViaPath claimed certain safety and security services as both "necessary" and "elective"); Order ¶ 382 (JA__) ("Features not included in requests for bids were clearly not considered critical to IPCS by the correctional institutions themselves.").  Even the NSA explained that "different facilities have different security requirements," indicating that various of these costs are not necessary across the board. Reply Comments of NSA at 12, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) (JA__); Order ¶ 381 (JA__).

threat is no reason to overturn the Order.  As noted above, the services that IPCS providers offer improve the wellbeing of incarcerated people and, in turn, the safety of facilities.  *See supra* Section I.C; Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 & 12-375, at 2 (July 11, 2024) (JA__) (recognizing the "rehabilitative value of providing telephone and advanced communication services to incarcerated people"). The Commission therefore correctly concluded that "denial or reduction of access to IPCS" would "elicit an 'intensely negative backlash,'" Order ¶ 312 (JA__) (quoting 2015 Order ¶ 140), and that facilities are unlikely to make good on this threat.

### C.    The Commission Has Authority to Prohibit Site Commissions Under Sections 276(b)(1)(A) and 201(b).

The States also argue that the Commission lacked authority to prohibit site commission payments.  States Br. 9-19.  But the Order correctly concluded that Sections 276 and 201 provide the requisite statutory authority, and that the statute also preempts state law to the contrary.

### 1.    Section 276(b)(1)(A) Authorizes the Commission to Prohibit Site Commissions.

First, the States argue that Section 276 does not expressly incorporate Section 201's application to "practices," and prohibiting site commission payments therefore exceeds Section 276's scope.  States Br. 12-16.  But Section 276 plainly requires the Commission to "ensure that … all rates and charges" to consumers "are just and

reasonable," which necessarily confers authority to regulate conduct—like site commissions—that would impede the provision of such rates. *E.g.*, Order ¶¶ 79, 289 (JA__, __).

Indeed, the States concede that Section 276(b)(1)(A) confers authority to establish a "compensation plan to ensure" just and reasonable rates, and that the "power to establish a compensation plan includes more than just setting rates." States Br. 12; *see also* Order ¶ 80 (JA__) (asserting that setting a "compensation plan" "requires more of the Commission than the simple act of setting rates and charges"). Consistent with that concession, the Commission cited multiple examples where its "regulation of the entities subject to its jurisdiction has affected entities over which the Commission has no direct jurisdiction," yet that regulation was upheld by the D.C. Circuit. Order ¶ 333 (JA__); *see also id.* ¶ 81 (JA__). Congress did not alter the "compensation plan to ensure" language in enacting the MWRA, and it therefore ratified the Commission's approach of regulating provider practices when needed to set appropriate rates.

It also bears emphasizing that—as the Commission explained at length—IPCS rates that reflect site commission payments are not by definition "just and reasonable." Such payments had "demonstrated negative effects … particularly with regard to consumer affordability," *id.* ¶ 244 (JA__); indeed, they "historically could account for 33 percent of the out-of-pocket consumer call charges on average,"

*id.* ¶ 253 (JA__) (internal quotation marks omitted).  Site commissions also "fund a wide and disparate range of activities," many of which are completely unrelated to the provision of IPCS services.  *Id.* ¶ 251 (JA__) (internal quotation marks omitted).  Site commissions have therefore "distorted the IPCS marketplace" by incentivizing bidders to "offer the highest site commission payments" rather than "compet[e] on service-based, competitive market factors."  *Id.* ¶ 254 (JA__) (internal quotation marks omitted); *see also id.* ¶ 298 (JA__).

The States also assert that the D.C. Circuit previously held that site commissions are a "cost of doing business" that must be recovered.  *Cf. GTL*, 866 F.3d at 413.  But, as the Commission explained, the Order "eliminated the factual predicate— the payment of site commissions as a condition precedent to providing IPCS—which led the court in *GTL* to hold that site commissions could not be wholly excluded from the Commission's ratemaking calculus."  Order ¶ 307 (JA__).  The *GTL* court "had no occasion to consider the Commission's authority to prohibit negotiated agreements … or its authority to preempt state and local requirements. And that court never suggested that the Commission lacked authority to take such actions to fulfill its statutory mandate."  *Id.* (internal quotation marks omitted).  Thus, Section 276(b)(1)(A) authorizes the Commission to prohibit site commissions.

2. **Section 201(b) Also Authorizes the Commission to Prohibit Site Commissions.**

Moreover, despite the States' contrary argument (at 14-16), the Order also correctly concluded that Section 201(b) independently authorizes the Commission to prohibit site commissions because, as the Commission explained, that prohibition is consistent with both the language of Section 201(b) and its impossibility exception. *Id.* ¶¶ 86, 336-338 (JA__, __–__). Section 201(b) grants the Commission jurisdiction over "charges, practices, classifications, and regulations" of carriers "for and in connection with" interstate and international communications services. 47 U.S.C. § 201(b). Under the "impossibility exception," this authority extends to intrastate communications where (1) "it is not possible to separate the interstate and intrastate aspects of the service," and (2) "federal regulation is necessary to further a valid federal regulatory objective." *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007).

The Commission explained that it has consistently and repeatedly relied on this authority to find "carrier practices unjust and unreasonable where necessary to protect competition and consumers against carrier practices" lacking "cognizable justifications" or where "the public interest … outweighed any countervailing policy concerns." Order ¶ 336 (JA__). And based on its conclusions that site commission payments are not "used and useful" in the provision of IPCS services, their

30

prohibition was entirely consistent with these prior exercises of the Commission's authority under Section 201.

As to the impossibility exception, the Commission explained that "[t]he record contain[ed] no evidence that IPCS providers can practicably separate the practice of *paying site commissions* in connection with" interstate/international and intrastate IPCS. *Id.* ¶ 338 (JA__) (emphasis added). In fact, providers have explained to the Commission that technical issues make it impracticable or impossible to determine whether a call is interstate or intrastate. *See generally* 2021 Order ¶¶ 236-238, 254 (rejecting providers' request to permit them to use an inaccurate proxy for distinguishing interstate and intrastate calls based on geography and requiring compliance with interstate rules pursuant to the impossibility exception). The States do not attempt to refute this determination that, in some cases, it is impossible to differentiate between interstate and intrastate IPCS calls. *Cf.* States Br. 16. Moreover, even if it were possible to distinguish the nature of calls, it is not feasible to apportion site commission payments among the interstate and intrastate components of IPCS. The Commission, recognizing that such payments may encompass gifts and in-kind payments alike, concluded that they could not be separated. Order ¶ 338 (JA__); *see id.* ¶ 332 (JA__).

Contrary to the States' assertion (at 16), the Commission's reliance on Section 201(b) does not implicate the canon that "[a] specific provision controls over one of

more general application." *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991).

The canon applies only "where two statutes conflict," *Vimar Seguros Y Reaseguros*

*v. M/V Sky Reefer*, 29 F.3d 727, 732 (1st Cir. 1994), *aff'd*, 515 U.S. 528 (1995), that

is, where one statute would be "controlled *or nullified* by" the other, *Crawford*

*Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) (emphasis added)

(quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). That is not

the case here. Nor does the existence of "substantial overlap" between Sections

276(b)(1)(A) and 201(b) implicate the rule against surplusage because "redundancy

is not the same as surplusage." *Eagle Ins. Co. v. BankVest Cap. Corp. (In re BankVest*

*Cap. Corp.)*, 360 F.3d 291, 301 (1st Cir. 2004). And the Supreme Court has

expressly concluded that Section 276 "nowhere forbids the Commission to [also]

rely on [Section] 201[]" and that such reliance instead "furthers basic [Section] 276

purposes." *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550

U.S. 45, 64 (2007).

>    **3.    The Commission Has Authority to Preempt State and Local**
>    **Laws Requiring Site Commissions.**

The States also argue that the Commission lacked statutory authority to

preempt contrary state law requiring site commissions. States Br. 17-19. That

argument rests in part on the faulty premise that the Commission lacked authority

32

under Section 276 to regulate site commissions at all, which is wrong for the reasons just explained.

Because Congress conferred authority on the Commission to regulate site commissions, the Commission also possesses the requisite authority to preempt state law to the contrary. The Supreme Court has emphasized that it "do[es] not require Congress to employ a particular [] formulation when preempting state law" so long as Congress "manifests the … intent to" do so. *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 99 (2017). That intent is readily apparent in Section 276(c), which expressly preempts state requirements "[t]o the extent that any State requirements are inconsistent with the Commission's regulations." 47 U.S.C. § 276(c).

Conflict preemption compels the same conclusion. Federal law preempts state laws when those state laws "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 32 F.4th 67, 79 (1st Cir. 2022) (alteration in original) (quoting *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 343 (1st Cir. 2015), *aff'd*, 579 U.S. 115 (2016)). The States do not dispute that rates including site commissions would defeat the Commission's statutory mandate to establish a compensation plan that fairly compensates providers and ensures that rates and charges are just and reasonable. Nor could they, as those higher rates plainly would

33

"render the [Commission's] statutory balancing essentially meaningless." *Cohen v. Apple*, 46 F.4th 1012, 1031 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2513 (2023). Instead, the States attempt to divert the Court's attention to 47 U.S.C. § 152(b)'s exceptions. States Br. 18-20. But this provision is irrelevant because it exempts Section 276 from its reach, *see* MRWA § 2(c); *see also* Order ¶ 320 (JA__), and Section 276 otherwise unambiguously authorizes the Commission to prohibit site commission payments.

### D. Section 276 Does Not Compel the Commission to Preempt Lower State-Imposed Rate Caps.

The Providers separately argue that the Order violates preemption principles by permitting states to set lower rate caps than those adopted in the Order. Providers Br. 54-57. In their view, "the [Commission's] compensation plan must serve as a ceiling and a floor." *Id.* at 56. But that argument conflates federal statutes that expressly preempt "any" state law on a particular issue subject to federal law, on the one hand, and federal statutes that expressly preempt state laws that are "inconsistent with federal standards" on the other. *See Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Hernandez*, 58 F.4th 5, 12–13 (1st Cir. 2023). Consistent with that distinction, this Court has declined to hold state law preempted where it "s[aw] no reason to presume that Congress intended, in providing some federal protection to consumers …, to oust all opportunity for the states to provide more protections." *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 9 (1st Cir. 2022).

Instead, express preemption of "inconsistent" state law may leave "states … at the same time free to provide additional protections." *Id.*

That is equally true under conflict preemption, which permits state "requirements more stringent than those imposed by" the agency where those requirements do not "interfere with the federal goal" expressed by the statute. *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 720–22, (1985). Here, the Commission recognized that "[s]tate IPCS rate proceedings are designed to look at cost data and market conditions unique to that particular state, a much smaller geographic area and a much more disaggregated basis than the ratemaking analysis the Commission was required to undertake on a national level which covered the entire country." Order ¶ 236 (JA__). Thus, the Commission's conclusion that lower rate caps imposed by states may more adequately reflect just and reasonable rates was entirely consistent with its recognition that the "cost data reflecting a smaller subset of the national footprint of facilities targeted to only certain state specific facilities could yield fair compensation for providers operating in that state at those facilities at lower rates than reflected by the Commission's rate caps." *Id.* Indeed, the record shows that, as of October 2020, sixteen state prisons offered rates at five cents per minute or below, including a dozen at four cents per minute or below, and that two offered rates as low as one cent a minute. *See* Comments of Worth Rises at 7, WT Docket No. 12-375 (Nov. 23, 2020) (JA__); *see*

*also* Peter Wagnar & Wanda Bertram, *State of Phone Justice 2022: The Problem, the Progress, and What's Next*, Prison Pol'y Inst., at App'x Tbl. 1 (updated July 18, 2024), https://www.prisonpolicy.org/phones/appendices2022_1.html.[9]

In addition, the Commission correctly concluded that conflict preemption did not preclude lower state rate caps for the related reason that such caps "would not violate any specific provision of the Communications Act."  Order ¶ 236 (JA__) (quoting Wright Petitioners May 8, 2023 Comments at 13).  That conclusion accords with the principle that "'irreconcilable conflict with state law" exists only when "compliance with both state and federal statutes is a physical impossibility." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 531 (1st Cir. 2007) (citation omitted).  No such impossibility exists here.

### E.    The Commission Reasonably Prohibited IPCS Providers from Billing for Ancillary Services on a Per-Use Basis.

Finally, despite the Providers' argument to the contrary (at 6, 25, 49-52), the Commission's prohibition on billing for ancillary services on a per-use basis was entirely reasonable, *see* Order ¶¶ 408-426 (JA__-__).[10]  Consistent with the aims of

---

[9] This outcome also accommodates the reality that the Commission relied in part on self-reported, potentially exaggerated data regarding costs in selecting the rates that it did.  *See, e.g.*, Order ¶ 167 (JA__).

[10] For its part, Global Tel*Link's intervention brief primarily objects to the Commission's shorter implementation deadline for changes to ancillary service charges.  Global Tel*Link  Br.  6-12; *see also* Providers Br. 52-54.  That argument should be rejected for the reasons the Commission provides.  *See* Commission Br. 92-94.

the MWRA, this prohibition is of tremendous benefit to IPCS consumers and comes in the wake of the Commission's previous, thwarted efforts to address the issue. As the Order notes, ancillary service charges "have been a continuous source of confusion and gamesmanship," and the Commission's prior attempts to regulate those charges were met with "allegations of" IPCS "provider abuses." Order ¶¶ 409, 411 (JA__, __). After the Commission attempted to strike a balance in the 2021 Order by permitting recovery of certain categories of ancillary service charges, that attempt was met with "further allegations of harmful provider practices," which the Commission again sought to rectify in its 2022 Order. *Id.* ¶ 412 (JA__).

Here, the Commission ultimately found it necessary to prohibit separate ancillary service charges to "[e]liminat[e] [i]ncentives for [a]buses" based on an ample record establishing that "providers are still motivated to exploit every reasonable opportunity to continue deriving unreasonable profits from such fees." *Id.* ¶ 418 (JA__) (internal quotation marks omitted). Instead of forcing inmates and their loved ones to bear those costs through add-on fees, the Commission folded them into the rate caps it adopted to the extent that the record established that they were "used and useful" in the provision of IPCS services. The Commission concluded that "[a] rate structure that eliminates all separate ancillary service charges while still allowing providers to recover the costs of these functions will

37

eliminate the incentive and ability for providers to charge multiple fees for the same transaction." *Id.*

The Providers have offered no tenable basis for questioning this result. The notion that per-use charges for these services is necessary to provide incarcerated people "with proper economic incentives to make efficient use" of ancillary services, Providers Br. 49, is baseless. Ancillary services "reflect routine internal business functions" and otherwise "relate primarily to how consumers are billed for and pay for IPCS," Order ¶¶ 415, 416 (JA__, __), meaning they are unlikely to serve as "incentives" for incarcerated people in the way the Providers suggest. Indeed, as the Commission found, "most of these functions have become an intrinsic part of providing IPCS because they provide IPCS consumers the means to obtain IPCS, such that consumers typically must either incur [these charges] when making a call or forego contact with their loved ones." *Id.* ¶ 425 (JA__) (alteration in original) (internal quotation marks omitted). Moreover, the Commission's treatment better accords with how these charges are handled in the non-IPCS context. *Id.* ¶ 417 (JA__). In reality, the Commission's treatment of ancillary service charges was necessary to ensure that *providers* have the right "incentives." As the Commission

38

explained, eliminating separate charges will remove providers' "incentive ... to engage in practices that unreasonably burden consumers." *Id.*¶ 418 (JA__).[11]

## CONCLUSION

For the above reasons, the Court should deny the Providers and States' petitions for review.

Dated: April 21, 2025                    Respectfully submitted,

                                        */s/Jessica Ring Amunson*
Andrew Jay Schwartzman              Jessica Ring Amunson
525 Ninth Street, NW, Seventh Floor   Arjun R. Ramamurti
Washington, DC 20004                Andrew C. DeGuglielmo
Telephone: (202) 241-2408            Ruby C. Giaquinto
andyschwartzman@gmail.com            JENNER & BLOCK LLP
                                        1099 New York Avenue NW, #900
*Counsel for Pennsylvania Prison*     Washington, DC 20001
*Society*                             Telephone: (202) 639-6000
                                        jamunson@jenner.com

                                        *Counsel for Direct Action for Rights*
                                        *and Equality*

---

[11] Finally, Public Interest Intervenors agree with the Commission that the States' constitutional challenge to the Commission's removal provisions is procedurally barred. *See* Commission Br. 101-02; *see generally* 47 U.S.C. § 405(a). Were the Court nonetheless to reach the merits of that challenge, the Court should reject the States' challenge simply because—unless and until the Supreme Court holds otherwise—binding precedent recognizes the validity of for-cause removal protection for commissioners of independent, multi-member agencies that exercise quasi-adjudicatory and quasi-legislative functions. *See Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935); *see also Collins v. Yellen*, 594 U.S. 220, 250-51 (2021); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 215, 228 (2020); *Free Enter. Fund v. Public Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

Erik Stallman
SAMUELSON LAW, TECHNOLOGY &
  PUBLIC POLICY CLINIC
UC Berkeley School of Law
353 Law Building
Berkeley, CA 94720
Telephone: (510) 642-2485
estallman@clinical.law.berkeley.edu

*Counsel for Office of Communication
of the United Church of Christ, Inc.*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform
Clinic*

**CERTIFICATE OF COMPLIANCE**

Under Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure, I certify that this brief complies with the length limits set forth in this Court's Order of December 18, 2024, because it contains 9,053 words, as counted by Microsoft Word, excluding the items that may be exempted under Federal Rule of Appellate Procedure 27(a)(2)(B).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*/s/ Jessica Ring Amunson*

Jessica Ring Amunson

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jessica Ring Amunson*

Jessica Ring Amunson