# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### IN RE: MCP 191
Lead Case No. 24-8028

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents.*

On Petitions for Review of a Final Order of the Federal Communications Commission

(c*aption continued on inside cover*)

## BRIEF OF NATIONAL CONSUMER LAW CENTER, ELECTRONIC PRIVACY INFORMATION CENTER, PRISON POLICY INITIATIVE, AND THE UTILITY REFORM NETWORK AS AMICI CURIAE IN SUPPORT OF RESPONDENT FEDERAL COMMUNICATIONS COMMISSION

**Stephen A. Raher**
Tabor Law Group
4110 SE Hawthorne Blvd., PMB #506
Portland, Oregon 97214
sraher@pdx-law.com
T: (971) 867-2440

*Attorney for Amici Curiae National
  Consumer Law Center, Electronic
  Privacy Information Center, Prison
  Policy Initiative, and The Utility Reform
  Network*

*(caption, continued)*

---

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents.*

---

No. 24-1860

SECURUS TECHNOLGIES, LLC,

*Petitioner,*

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,

*Interevenor,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; CRIMINAL JUSTICE REFORM CLINIC; OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,

*Intervenors.*

---

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents.*

---

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

SECURUS TECHNOLOGIES, LLC,

*Intervenor.*

*(caption, continued)*

---

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

SECURUS TECHNOLOGIES, LLC,

*Intervenor.*

---

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

SECURUS TECHNOLOGIES, LLC,

*Intervenor.*

---

No. 24-1927

SECURUS TECHNOLGIES, LLC;

*Petitioner,*

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,

*Interevenor,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA
PRISON SOCIETY; CRIMINAL JUSTICE REFORM CLINIC; OFFICE OF
COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,

*Intervenors.*

---

*(caption, continued)*

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

*Petitioner,*

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,

*Intervenor,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

PENNSYLVANIA PRISON SOCIETY; DIRECT ACTION FOR RIGHTS AND EQUALITY; OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,

*Intervenors.*

No. 24-2013

STATES OF INDIANA, ARKANSAS, ALABAMA, FLORIDA, GEORGIA, IDAHO, IOWA, MISSOURI, OHIO, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSE, UTAH, VIRGINIA,

*Petitioners,*

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,

*Intervenor,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHIRST, INC.; DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY,

*Intervenors.*

*(caption, continued)*

No. 24-2061

STATES OF LOUISIANA, MISSISSIPPI, TEXAS; SHERIFFS SID
GAUTREAUX, BOBBY WEBRE, MARK WOOD, KEVIN COBB;
LOUISIANA SHERIFFS' ASSOCIATION,

*Petitioners,*

GLOBAL TEL*LINK; NATIONAL SHERIFFS' ASSOCIATION,

*Intervenors,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents,*

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; OFFICE OF
COMMUNICATION OF THE UNITED CHURCH OF CHIRST, INC.;
PENNSYLVANIA PRISON SOCIETY,

*Intervenors.*

# DISCLOSURE STATEMENTS

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), amici curiae provide the following corporate disclosure statements:

**National Consumer Law Center** is a non-profit corporation with no parent corporation or issued stock. No publicly held corporation holds 10% or more of its stock.

**Electronic Privacy Information Center** is a non-profit corporation with no parent corporation or issued stock. No publicly held corporation holds 10% or more of its stock.

**Prison Policy Initiative** is a non-profit corporation with no parent corporation or issued stock. No publicly held corporation holds 10% or more of its stock.

**The Utility Reform Network** a non-profit corporation with no parent corporation or issued stock. No publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS ................................................................... i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

IDENTITY, INTEREST, AND AUTHORITY TO FILE OF AMICI CURIAE ... 1

FRAP 29(a)(4)(E) STATEMENT ........................................................ 2

SUMMARY OF THE CASE ................................................................. 3

ARGUMENT ..................................................................................... 7

I.    Congress Recognized That Telecommunications Services Are Critically
      Important to Maintaining Family Connections and Preparing Incarcerated
      People for Reentry ....................................................................... 7

II.   Congress Directed the Commission to Address an Acknowledged Market
      Failure ...................................................................................... 11

      A.   Site Commissions Incentivize Correctional Facilities to Rely on High IPCS
           Rates ................................................................................... 12

      B.   Many IPCS Security and Surveillance Costs Do Not Benefit Ratepayers
           and Should Thus Not be Funded Through Financial Extractions from
           Consumers ............................................................................ 15

      C.   The IPCS Market Is a Failed Market ........................................ 18

III.  The Challenged Order Appropriately Fulfills the Commission's Statutory
      Obligation to "Consider" Which Security Features Are "Necessary" to the
      Provision of IPCS ....................................................................... 19

      A.   The Commission Acted Reasonably in Applying the "Used and Useful"
           Framework ............................................................................ 20

      B.   The Commission's Exclusion of Certain Safety and Security Costs When
           Calculating Rate Caps Is Consistent with Congress's Delegation of
           Authority ............................................................................. 24

      C.   The Order Does Not Contravene Section 276's Fair Compensation
           Requirement .......................................................................... 27

IV.   The Commission's Pro-Consumer Application of Federal Preemption Is an
      Appropriate Use of Cooperative Federalism ................................... 30

CONCLUSION ................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am. v. Dept. of Transp.*, 613 F.3d 206 (D.C. Cir. 2010) ........... 21

*Allnet Comm'cn Serv. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118 (D.C. Cir. 1992) .......................................................................................................... 30

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986) ................................. 17

*FCC v. Prometheus Radio Proj.*, 592 U.S. 414 (2021) ........................................ 19, 24

*Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ......................... 25

*Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ......................... 5, 12, 27, 28

*Ill. Pub. Telecommc'ns Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997) ...................... 28

*King v. Burwell*, 576 U.S. 473 (2015) ..................................................................... 29

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ................................................................................................................ 17

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .................................... 19

*Lummi Tribe of the Lummi Reservation v. U.S.*, 112 Fed. Cl. 353 (2013) ................. 27

*Tex. Med. Ass'n v. U.S. Dept. of Health & Human Servs.*, 110 F.4th 762 (5th Cir. 2024) ................................................................................................................ 26

*U.S. Telecomm'cns Ass'n v. FCC*, 188 F.3d 521 (D.C. Cir. 1997) ........................... 29

*WorldCom v. FCC*, 238 F.3d 449 (D.C. Cir. 2001) ................................................. 20

## Statutes

47 U.S.C. § 276 ................................................................ 4, 10, 19, 23, 27, 28, 29

Martha Wright-Reed Just and Reasonable Communications Act, Pub. L. 117-338, 136 Stat. 6156 (2023) ........................................ 4, 10, 11, 15, 16, 19, 21, 24, 25, 28

Telecommunications Act of 1996, Pub L. 104-104, 110 Stat. 56 (1996) .............. 4, 10

## Legislative Materials

168 Cong. Rec. H10027, Consideration of Wright-Reed Act (Dec. 22, 2022) .... 6, 7

## Administrative Rulemaking Documents

*Implementation of the Martha Wright Reed-Act*, Report & Order, Order on Reconsideration, Clarification & Waiver, and Further Notice of Proposed Rulemaking, WC Dkt. Nos. 23-62 & 12-375 (rel. Jul. 22, 2024).... 6, 11, 12, 13, 15, 16, 20, 21, 22, 23, 24, 26, 28, 30

*Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking, 27 FCC Rcd. 16629 (2012) .................................................................................... 4, 5

*Rates for Interstate Inmate Calling Services*, Report & Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) ............................................ 20

*Rates for Interstate Inmate Calling Services*, Second Report & Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd. 12763 (rel. Nov. 5, 2015) .................................................................................................... 11, 12, 18

## Other Authorities

Christy Visher, et al., *Baltimore Prisoners' Experiences Returning Home*, Urban Institute (Mar. 2004), *available at* https://perma.cc/6P69-Q5VN ..................... 9

Drew Kurkowski, et al., *Please Deposit All Your Money: Kickbacks, Rates, and Hidden Fees in the Jail Phone Industry* (May 2013), *available at* https://perma.cc/6RYW-VUEQ .................................................................................... 13

Katarzyna Celinska and Hung-En Sung, *Gender Differences in the Determinants of Prison Rule Violations*, 94 The Prison Journal 220 (2014) .................................... 8

Kelle Barrick, et al., *Reentering Women: The Impact of Social Ties on Long-Term Recidivism*, 94 The Prison Journal no. 3 (June 11, 2014) .................................... 8

Monica Solinas-Saunders and Melissa J. Stacer, *Prison Resources and Physical/Verbal Assault in Prison: A Comparison of Male and Female Inmates*, 7 Victims & Offenders 279 (Jul. 2012) ................................................................ 8

Nathan H. Miller, et al., *Phoning Home: The Procurement of Telecommunications for Incarcerated Individuals in the United States* (Jan. 24, 2025), *available at* https://perma.cc/8RNW-L3Q4 .................................................................... 14

Peter Wagner and Alexi Jones, "On kickbacks and commissions in the prison and jail phone market," (Feb. 2019), available at https://perma.cc/JSL6-366H ....... 14

Richard A. Posner, *Natural Monopoly and Its Regulation*, 21 Stan. L. Rev. 548, 627 (1969) ................................................................................................ 29

Saneta deVuono-powell, *Who Pays? The True Cost of Incarceration on Families* (Sep. 2015), available at https://perma.cc/Q94Z-4XNS ............................................ 10

The Financial Justice Project, *Justice is Calling* (Feb. 18, 2021), available at https://perma.cc/SZE3-UHV6 .................................................................... 10

Thomas J. Mowen, et al., *Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters During Reentry from Prison*, 56 J. Res. Crime & Delinq. 483 (2018), author manuscript at 20, available at https://perma.cc/KQC2-9PCD. .......................................................................... 9

Tracy Palmer, *Rate-of-Return Versus Price Caps: The Long Distance Regulation Battle*, 14 Colum.-VLA J.L. & Arts 571 (1989) ............................................ 20

## IDENTITY, INTEREST, AND AUTHORITY TO FILE OF
## AMICI CURIAE

Since 1969, the **National Consumer Law Center** (**"NCLC"**) has worked for consumer justice and economic security for low-income and other disadvantaged people in the United States. Through its Criminal Justice Debt and Reintegration Project, NCLC uses advocacy, litigation, and education to address harmful practices at the intersection of criminal and consumer law, including practices related to prison and jail communications services.

**Electronic Privacy Information Center** was established in 1994 to protect privacy, freedom of expression, and democratic values in the information age.

**Prison Policy Initiative** produces cutting edge research to expose the broader harm of mass criminalization, and then sparks advocacy campaigns to create a more just society.

**The Utility Reform Network** is an independent non-profit organization representing the interests of California utility consumers, including customers of telecommunications services, in California and federal administrative and judicial proceedings.

The above-referenced amici (collectively the **"Consumer Advocates"**) have a multi-year track record of advocating for the rights of individual users of incarcerated people's communications services—both incarcerated consumers as

well as their friends and family members who typically foot the bill. Via motion filed contemporaneously with this brief, the Consumer Advocates respectfully seek authorization to appear as amici curiae pursuant Federal Rule of Appellate Procedure 29(a)(3).

## FRAP 29(a)(4)(E) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel states that no party to this proceeding, or counsel thereto, authored any portion of this brief or contributed money intended to fund preparation or submission of this brief. No person other than the undersigned counsel has contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF THE CASE

The narrative underlying this case is conceptually simple: while most Americans rely on market competition to ensure reasonably priced telecommunications service, incarcerated people and their families are left with no meaningful choice. To communicate across the prison wall, incarcerated people must use a designated provider of "incarcerated people's communications services" (**"IPCS"**). The IPCS provider operates under a monopoly contract granted by the correctional facility.

Historically, most correctional facilities have issued IPCS contracts that allow the facility to obtain a portion of the revenue collected from consumers; as a result, both the provider and the correctional facility are incentivized to impose high prices on consumers who have no other alternative. In 2023, Congress directed the Federal Communications Commission (**"Commission"**) to craft new rules to ensure just and reasonable IPCS prices. The Commission did its work and now IPCS providers, states, and local jails seek judicial review based on legally unsound arguments.

We urge the Court to consider the broader historical context of the current dispute. The IPCS industry arose between the two seminal events that shaped modern telecommunications law: the breakup of AT&T in 1982 and the overhaul of

the Communications Act of 1934 (**"Communications Act"**) via the Telecommunications Act of 1996 (Pub L. 104-104, 110 Stat. 56 (1996), the **"1996 Act"**). When Congress passed the 1996 Act, telephones in correctional facilities were just one of the many types of payphones that could be found throughout the country. Section 276 of the 1996 Act classifies phones in prisons and jails as *per se* payphones. 1996 Act § 276(d) (codified as 47 U.S.C. § 276(d)). Although traditional coin-operated payphones have largely disappeared in the intervening years, Congress has reinvigorated and revised section 276 with the recent passage of the Martha Wright-Reed Just and Reasonable Communications Act (Pub. L. 117-338, 136 Stat. 6156 (2023), **"MWRA"** or **"Wright-Reed Act"**).

The 1996 Act emphasizes market competition; yet competition alone cannot heal all wounds, particularly in markets where consumers lack any semblance of choice. Perhaps no portion of the telecommunications landscape is more bereft of competitive forces than the market for IPCS. The grassroots movement to end exploitation of IPCS consumers entered a new chapter when Martha Wright-Reed and other families of incarcerated people sought relief in the courts and from the Commission.[1] After years of inaction, the Commission—under the leadership of

---

[1] *Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking ¶¶ 11-15, 27 FCC Rcd. 16629, 16634-16635 (2012) (background on the Wright petition). After filing the petition for rulemaking, which became known as the

Commissioner Mignon Clyburn—acted on Ms. Wright-Reed's petition and began the serious work of regulating IPCS rates.[2] Notably, the fight for phone justice has found support from a wide spectrum of people motivated by different ideologies. No less a proponent of free markets than former Commission Chair Ajit Pai welcomed action to address IPCS rates, stating:

> As a general matter, I believe that prices should be set by the free market rather than by government fiat. At the same time, however, we must recognize that choice and competition are not hallmarks of life behind bars . . . . [P]rison administrators select the [IPCS] provider, and their incentives do not necessarily align with those who are incarcerated.[3]

After the Commission promulgated pro-consumer ICPS reforms in 2015, the industry challenged the rules. *See generally Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) [hereinafter **"*GTL*"**]. While acknowledging "a variety of market failures in the prison and jail payphone industry," which led to "prohibitive per-minute charges and ancillary fees," the U.S. Court of Appeals for the District of Columbia Circuit nonetheless sustained portions of the industry's challenge, largely on jurisdictional grounds. In response, Congress legislatively abrogated the

---

"Wright Petition," Martha Wright married and changed her last name to "Wright-Reed."

[2] *Id.* at 16660 (statement of Clyburn, Comm'r.).

[3] *Id.* at 16662 (Statement of Pai, Comm'r).

*GTL* decision by passing the MWRA,[4] a statute that clarifies the Commission's authority over IPCS, affirms the rate-setting methodology employed in the Commission's 2015 rules, and requires the issuance of new rules to bring fairness to ratepayers.

The Commission followed Congress's directive and issued implementing rules (the **"Order"**)[5] in July 2024. Various parties have brought petitions for review or successfully moved to intervene; the proceedings have been consolidated and are now before the Court for argument on the merits.[6] The Consumer Advocates support the Commission in this proceeding.[7]

As explained in this brief, the Commission adhered to the relevant statutory text and Congressional intent by appropriately using its regulatory authority to

---

[4] *See* 168 Cong. Rec. H10027, Statement of Mr. Pallone (Dec. 22, 2022) (citing the *GTL* decision as an impetus for the MWRA).

[5] *Implementation of the Martha Wright Reed-Act*, Report & Order, Order on Reconsideration, Clarification & Waiver, and Further Notice of Proposed Rulemaking, WC Dkt. Nos. 23-62 & 12-375 (rel. Jul. 22, 2024).

[6] To align with the language used in the Commission's opening brief, we refer to the IPCS providers who are parties to these proceedings as the **"Providers,"** while referring to the state and law enforcement parties as the **"States."** *See* Resp. Br. at 35.

[7] The Consumer Advocates take no position on the petitions for review filed by the Public Interest Petitioners. *See* Resp. Br. at 27.

implement the MWRA. Accordingly, the Court should not hesitate to deny the Providers' and States' challenges.

The Consumer Advocates begin this brief with an explanation of the societal importance of IPCS and the market failure that Congress intended to address through the MWRA, before addressing specific arguments made in opposition to the Order.

## ARGUMENT

In passing the Wright-Reed Act, Congress recognized the important role that IPCS plays in keeping families connected.[8] The statute thus directs the Commission to create socially beneficial IPCS rules that ensure affordable rates in the face of an acknowledged market failure. The Order carries out this legislative mandate consistent with applicable law and should not be vacated.

## I. Congress Recognized That Telecommunications Services Are Critically Important to Maintaining Family Connections and Preparing Incarcerated People for Reentry

IPCS offerings provide a vital lifeline for incarcerated people and their families, allowing people to stay connected and maintain relationships notwithstanding a period of incarceration. The Commission's Order reflects

---

[8] 168 Cong. Rec. H10027, Statement of Ms. Jackson Lee (Dec. 22, 2022) (families of incarcerated people "should not have been left out of the circle of humanity and family and the ability to stay connected").

Congress's recognition that communications are critical for strengthening families and reducing recidivism in multiple ways. First, research shows that incarcerated people who make telephone calls have reduced rates of verbal or physical assaults on staff, and fewer rule violations in general.[9] This makes prisons safer not only for incarcerated people, but also for corrections staff.

Second, IPCS provides documented societal benefits in connection with post-confinement reentry. A 2014 study of incarcerated women found that those who had any phone contact with a family member were less likely to be reincarcerated within five years after their release. Of all forms of family contact, phone calls had the most significant impact on recidivism, more significant than visitation or mail.[10] Indeed, family contact not only addresses the emotional needs of incarcerated people but also facilitates practical reentry support—like housing and financial resources—which is crucial to a successful life after incarceration. One study on the positive effects of family connection concludes:

---

[9] Monica Solinas-Saunders and Melissa J. Stacer, *Prison Resources and Physical/Verbal Assault in Prison: A Comparison of Male and Female Inmates*, 7 Victims & Offenders 279 (Jul. 2012); Katarzyna Celinska and Hung-En Sung, *Gender Differences in the Determinants of Prison Rule Violations*, 94 The Prison Journal 220 (2014).

[10] Kelle Barrick, et al., *Reentering Women: The Impact of Social Ties on Long-Term Recidivism*, 94 The Prison Journal no. 3 (June 11, 2014).

affectionate and emotional types of family support may play a secondary role to the more utility-oriented form of instrumental support in promoting positive reentry outcomes. In other words, families may "matter" during reentry because they provide support in the form of caring for the basic needs of returning loved ones.[11]

Consistent with this finding, formerly incarcerated people who enjoy closer family relationships are more likely to be employed and less likely to use drugs after release.[12]

Third, IPCS offerings help strengthen families and communities outside of prison. Families—and particularly children—struggling with the imprisonment of a loved one can mitigate this painful situation by maintaining emotional connections, thereby helping all family members to thrive. But unreasonably high IPCS costs have the opposite effect: they suppress families' use of telecommunications to stay in touch with loved ones during periods of incarceration. When San Francisco made jail phone calls free in 2020, there was an overnight 41% increase in the number of phone calls per person, and incarcerated people spent 81% more time in

---

[11] Thomas J. Mowen, et al., *Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters During Reentry from Prison*, 56 J. Res. Crime & Delinq. 483 (2018), author manuscript at 20, *available at* https://perma.cc/KQC2-9PCD.

[12] Christy Visher, et al., *Baltimore Prisoners' Experiences Returning Home*, Urban Institute (Mar. 2004), at 6-8, *available at* https://perma.cc/6P69-Q5VN.

communication with their families and support networks than in 2019.[13] The cost of phone calls is often borne by relatives and friends of the incarcerated. In a 2015 survey of incarcerated people and their families, 82% of survey participants reported that families were primarily responsible for telephone fees. Of those family members, 87% were women, and one in three survey participants reported going into debt to cover phone and visitation costs.[14]

The Commission's Order is squarely in line with the policy priorities of both the 1996 Act and the MWRA. Both congressional acts utilize 47 U.S.C. § 276 as one of several vehicles for regulating the IPCS industry. Section 276 requires the Commission to craft a rate plan that accounts for "the benefit of the general public." 47 U.S.C. § 276(b)(1). As shown by numerous researchers, affordable IPCS produces quantifiable benefits for incarcerated people, family members of incarcerated people, and society writ large.

---

[13] The Financial Justice Project, *Justice is Calling* at 2 (Feb. 18, 2021), *available at* https://perma.cc/SZE3-UHV6.

[14] Saneta deVuono-powell, *Who Pays? The True Cost of Incarceration on Families*, at 29-31 (Sep. 2015), *available at* https://perma.cc/Q94Z-4XNS.

## II.     Congress Directed the Commission to Address an Acknowledged Market Failure

In recognition of persistently high IPCS rates, Congress legislatively overturned the *GTL* decision by passing the Wright-Reed Act. Not only does the MWRA clarify the Commission's jurisdiction and relax carrier compensation requirements, but it *requires* the Commission to issues new IPCS rules on a specified timeline. Congress took this action in recognition of the undisputed fact that the IPCS industry represents a market failure. Since taking up Martha Wright's petition for rulemaking in 2012,[15] the Commission has repeatedly found that IPCS providers operate under monopoly contracts awarded by correctional facilities whose financial interests conflict with those of IPCS ratepayers. Order ¶¶ 23-25. Correctional facilities have historically used two tactics to extract money from IPCS consumers: (1) site commissions, and (2) forcing consumers to pay for security and surveillance features that are not directly necessary to the provision of IPCS.

---

[15] *Rates for Interstate Inmate Calling Services*, Second Report & Order and Third Further Notice of Proposed Rulemaking [hereinafter **"2015 Order"**] ¶¶ 1 and 12-13, 30 FCC Rcd. 12763, 12765 and 12771 (rel. Nov. 5, 2015) (background on the movement for fair IPCS rates).

### A.    Site Commissions Incentivize Correctional Facilities to Rely on High IPCS Rates

Correctional facilities have long used "site commissions" (alternately referred to as "kickbacks") to fund general facility operations through involuntary extractions from ratepayers. On multiple occasions, the Commission has correctly concluded that site commissions constitute a form of "location rent," or "an apportionment of profits between the facility owners and the [IPCS providers]." 2015 Order ¶ 120, n.380 and accompanying text.[16] In the present Order, the Commission held, based on an extensive record, that "site commission payments . . . are fundamentally incompatible with our mandate . . . to ensure both just and reasonable IPCS rates and charges for IPCS consumers and providers as well as fair compensation for IPCS providers." Order ¶ 244.

While the Commission has allowed correctional facilities to receive reimbursement for costs that are "used and useful" in the provision of IPCS (Order ¶ 163), it has prohibited other types of revenue sharing, a rule that is compatible even with the largely abrogated holding of the D.C. Circuit in *GTL*. *See GTL*, 866 F.3d at 414 ("We . . . leave it to the Commission to assess on remand

---

[16] 30 FCC Rcd. at 12820.

which portions of site commissions might be directly related to the provision of I[P]CS *and therefore legitimate*, and which are not." (emphasis added)).

IPCS providers are quick to claim that inter-company competition for correctional facility contracts provides salutary effects of market competition; however, such contracts are rarely awarded based on the lowest cost to consumers. Instead, site commissions have historically been the driving factor that determines which IPCS bidder obtains a lucrative contract. In a 2013 study, amicus Prison Policy Initiative (**"PPI"**) found multiple examples of jails and prisons awarding contracts based primarily or solely on kickback amounts, with little regard to which bid provided the lowest cost to consumers.[17] Prior to the Commission's Order, site commissions at prisons and jails could reach as high as 100%. Order ¶ 299, n.1069 Over time, IPCS companies have engaged in an "arms race" to deliver the highest possible site commissions in order to secure contracts.

The site-commission arms race has had predictable and detrimental effects on consumers. Unsurprisingly, high site commissions are associated with high

---

[17] Drew Kurkowski, et al., *Please Deposit All Your Money: Kickbacks, Rates, and Hidden Fees in the Jail Phone Industry* (May 2013), *available at* https://perma.cc/6RYW-VUEQ.

IPCS rates.[18] As providers spent more on site-commission payments, they also sought other forms of revenue separate from per-minute rates, such as opaque "ancillary fees" levied when a consumer deposited money into a prepaid IPCS account. In 2013, PPI published a quantitative analysis estimating that families of incarcerated people spent $386 million on ancillary fees each year.[19] These fees often came with misleading names, suggesting they were government-required taxes, when in fact, companies were passing on their own costs directly to consumers.

Site commissions also grew to include other complex in-kind payments that came at the expense of consumers. Even when regulation from state legislatures has limited site commissions, kickbacks have continued in other forms, like signing bonuses for contracts, administrative fees, or in-kind donations to facilities. The California prison system, for example, did not take a percentage commission, but did accept equipment (provided at ratepayer expense) that would have otherwise cost the state between $16.5 million and $33 million.[20]

---

[18] Nathan H. Miller, et al., *Phoning Home: The Procurement of Telecommunications for Incarcerated Individuals in the United States* at 1 (Jan. 24, 2025), *available at* https://perma.cc/8RNW-L3Q4.

[19] Kurkowski, *supra* note 17.

[20] Peter Wagner and Alexi Jones, "On kickbacks and commissions in the prison and jail phone market," (Feb. 2019), *available at* https://perma.cc/JSL6-366H.

Curtailing payments from regulated IPCS providers to correctional facilities is a valid exercise of the Commission's authority. Using this regulatory power to address the pernicious problem of site commissions is consistent with Congress's instruction that the Commission must ensure just and reasonable rates.

### B. Many IPCS Security and Surveillance Costs Do Not Benefit Ratepayers and Should Thus Not be Funded Through Financial Extractions from Consumers

IPCS providers have long forced consumers to fund safety and security features that are not directly necessary to the provision of telecommunications service. To comply with the Wright-Reed Act's directive to "consider costs associated with any safety and security measures *necessary* to provide [IPCS],"[21] the Commission applied the well-established "used and useful" doctrine to determine what costs should be included in rate-cap calculations. Ultimately, the Commission determined that safety and security features "that serve only a law enforcement function or provide no benefit to IPCS consumers are not used and useful in the provision of IPCS." Order ¶ 383.

The Commission considered and correctly rejected a rigid but-for causation standard which would have saddled IPCS ratepayers with paying for a wide range of safety and security features that are barely related to IPCS. Order ¶ 379, n.1359.

---

[21] MWRA § 3(b)(2) (emphasis added).

Although some States complain that "[s]afety and security measures are . . . an inherent pre-requisite to (and defining feature of) a [correctional] facility's offering of IPCS services" (Illinois, et al. Br. at 31), such statements are not only unsupported by the record but also reflect a short-sighted focus on immediate budgetary considerations instead of long-term social impact. The Commission's decision to allocate certain security costs to correctional facilities complies with the MWRA's directive to consider costs of features that are "necessary" to the provision of IPCS, as opposed to features that are "nice-to-haves." Order ¶ 382.

Provider Securus Technologies, LLC (**"Securus"**) seeks to muddy the waters by claiming "jails and prisons require IPCS providers to implement a host of safety and security measures as a condition of providing IPCS," and then citing the legislatively overruled *GTL* opinion for the proposition that providers must therefore be allowed to include security costs in IPCS rates. Securus Br. at 37-38. Securus's argument misstates the issue: prior to the MWRA, correctional facilities often demanded certain security features and made consumers foot the bill. The Commission considered such security features and allowed facilities to use features of their choosing (as required by § 4 of the MWRA), as long as facilities cover the cost. The Order simply protects consumers from paying for services that provide them with no direct benefit. Securus asks this Court to hold that any security

feature requested by a correctional facility must be paid for by IPCS consumers—

yet this framework appears nowhere in the text of the statute and thus runs afoul of

the well-established doctrine that courts may not insert absent provisions into a

statute. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S.

657, 677 (2020) ("This principle applies not only to adding terms not found in the

statute, but also to imposing limits on an agency's discretion that are not supported

by the text.").

That the Order requires revisions to certain business models does not make

it legally infirm. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227

(1986) ("Those who do business in the regulated field cannot object if the

legislative scheme is buttressed by subsequent amendments to achieve the

legislative end." (*quoting FHA v. The Darlington, Inc.*, 358 U.S. 84, 91 (1958))

(internal quotation marks omitted)). Correctional agencies may have to identify

new funding sources for certain security features now that the Order protects IPCS

consumers from being used as involuntary piggy banks for prisons and jails. While

this outcome may displease correctional authorities, it is consistent with the

purpose of the MWRA and not a reason for vacating the Order.

### C.    The IPCS Market Is a Failed Market

Site commissions, along with the funding of safety and security features, illustrate the lack of market discipline in IPCS rates. The correctional facility (which benefits from forcing consumers to fund activities that would otherwise be part of the agency's budget) is the party that awards monopoly contracts to IPCS providers. In its 2015 Order, the Commission called the IPCS market "a prime example of market failure," noting that "[m]arket forces often lead to more competition, lower prices, and better services. Unfortunately, the [IPCS] market, by contrast, is characterized by increasing rates, with no competitive pressures to reduce rates." 2015 Order ¶ 2.[22] When the Commission's efforts to address this problem were largely undone by the *GTL* ruling, Congress reacted by passing the MWRA and requiring the Commission to try again.

The Providers and States must reexamine their fiscal reliance on revenue from captive IPCS consumers. An apparent reluctance to undertake this reexamination may motivate some of the challenges to the Order. But the Commission has wide latitude to determine and protect the public interest, and such decisions by the agency are entitled to significant deference. *FCC v.*

---

[22] 30 FCC Rcd. at 12765.

*Prometheus Radio Proj.*, 592 U.S. 414, 422 (2021). Because the challengers have failed to articulate a legal basis for setting aside the Commission's sound, fact-based reasoning, the petitions challenging the Order should be dismissed.

### III. The Challenged Order Appropriately Fulfills the Commission's Statutory Obligation to "Consider" Which Security Features Are "Necessary" to the Provision of IPCS

Federal courts defer to agency findings "upon concluding that a particular statute empowered an agency to decide how a broad statutory term applied to specific facts found by the agency." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 388 (2024). The Wright-Reed Act is just such a statute, requiring the Commission to create rules that interpret and implement patently ambiguous terms like just, reasonable, and fair. MWRA § 3; 47 U.S.C. § 276(b)(1).

As the Supreme Court recently held, "when a particular statute delegates authority to an agency consistent with constitutional limits, *courts must respect the delegation*, while ensuring that the agency acts within it." *Loper Bright*, 603 U.S. at 413 (emphasis added). The Order is well-grounded in an extensive record and the Commission's legal interpretations are focused on statutory terms (such as "fair compensation") that are "sufficiently intertwined with the agency's factfinding." *Id.* at 389. Accordingly, the Court should uphold the reasoned decision embodied in the Order.

## A.    The Commission Acted Reasonably in Applying the "Used and Useful" Framework

Rate caps (sometimes referred to as price caps) are one of several ways the Commission can achieve its statutory mandate to ensure just and reasonable rates.[23] Since 2013, the Commission has chosen to use rate caps as a key tool in regulating the IPCS industry.[24] When setting rate caps, a regulator must draw conclusions about the types of provider costs that may appropriately be recovered from ratepayers. In the Order, the Commission applied the traditional "used and useful" analysis in determining what safety and security costs to include in rate-cap calculations. Order ¶ 359.

The used and useful doctrine, which is "common in rate regulation," requires that a specific asset or expense be "'used and useful' before it can be included" in a utility's recoverable costs. *Air Transp. Ass'n of Am. v. Dept. of*

---

[23] *See WorldCom v. FCC*, 238 F.3d 449, 454 (D.C. Cir. 2001) ("Price cap regulation offers more pricing flexibility than rate of return regulation, as companies are relatively free to set their own prices so long as they remain below the cap"); Tracy Palmer, *Rate-of-Return Versus Price Caps: The Long Distance Regulation Battle*, 14 Colum.-VLA J.L. & Arts 571, 585 (1989) ("[N]o single method need be followed by the Commission in considering the justness and reasonableness of rates." (*quoting Duquesne Light Co. v. Barasch*, 488 U.S. 299, 316 (1989) (internal quotation marks omitted)).

[24] *Rates for Interstate Inmate Calling Services*, Report & Order and Further Notice of Proposed Rulemaking ¶¶ 73-81, 28 FCC Rcd. 14107, 14147-15153 (2013) (establishing interim rate caps).

*Transp.*, 613 F.3d 206, 214 (D.C. Cir. 2010). The doctrine is rooted in principles of equity and serves to protect consumers from being "forced to pay a return except on investment which can be shown directly to benefit them." Order ¶ 42.[25]

The Commission explains that it is obligated, under section 3(b)(2) of the MWRA, to "evaluate the evidence . . . regarding the costs associated with any safety and security measures necessary to provide IPCS and make a reasoned judgment about whether and to what extent such costs should be included in just and reasonable IPCS rates, consistent with fair compensation for providers." Order ¶ 361. After considering a wide array of safety and security costs, the Commission then applied the used and useful analysis, allowing those costs that provide a benefit to consumers and disallowing costs that "serve predominantly law enforcement functions [and] do not yield sufficient (if any) benefit to IPCS customers." Order ¶ 381. The Commission was careful to note that its analysis does not prevent correctional facilities from employing security measures in their discretion—rather, the Commission's "narrow" task was to "determine the extent to which claimed IPCS costs can be recovered through regulated rates charged to consumers." Order ¶ 390.

---

[25] *Quoting AT&T and the Associated Bell Sys. Cos.*, Phase II Final Decision & Order ¶ 111-112, 64 FCC.2d 1, 38 (1977).

Securus contends that the Commission's application of the used and useful doctrine is "especially arbitrary" because the costs of complying with the Communications Assistance for Law Enforcement Act (**"CALEA"**) are included in rate-cap calculations, but other types of monitoring and recording costs are excluded. Securus Br. at 43. Securus makes the particularly misleading argument that CALEA and other monitoring or recording are "all legal requirements, the first in a federal statute, the latter two required by government officials." *Id*. CALEA is a national statute that imposes uniform obligations on *all* telecommunications providers and equipment manufacturers. Order ¶ 391. In contrast, the "government officials" who require monitoring and recording of IPCS calls are largely the same corrections officials who negotiate contracts with IPCS providers—contracts which have historically coerced payment from consumers to pay for functions that would otherwise be funded by correctional agency budgets. This is the precise conflict of interest that the MWRA was designed to address.

Intervenor National Sheriffs' Association (**"NSA"**) asserts that the used and useful framework is inappropriate because it "was designed for traditional two-party telecommunications markets and fails to account for the unique three-party structure of the IPCS market." NSA Br. at 4. This argument fails both as a matter

of logic and statutory interpretation. First, the Commission has taken into account the three-party nature of IPCS by ending problematic site commissions and prohibiting payments from providers to facilities except reimbursements for "the used and useful costs the facilities incur to enable the provision of IPCS." Order ¶ 246.

Second, the NSA's focus on recouping security and surveillance costs for the benefit of correctional facilities (the "third party" in the NSA's characterization of the IPCS market) elides the actual focus of section 276(b), which mandates that the Commission devise a plan to fairly compensate providers while also taking into account "the benefit of the general public." 47 U.S.C. § 276(b)(1). Section 276 thus protects consumers (who are entitled to just and reasonable rates) and telecom providers (who are entitled to fair compensation), but it is conspicuous in its lack of protection for correctional facilities (or "location providers" in the parlance of payphone regulation).

The NSA argues the Commission "failed to recognize that safety measures primarily benefit incarcerated persons by enabling IPCS in the first place," (NSA Br. at 4), but this contention ignores that the Communications Act does not create a right for unregulated location providers to use telecommunications rates as their own revenue source. Rather, section 276(b)(1)(A) directs the Commission to

establish a plan to ensure reasonable rates, and the Commission has properly

regulated payments to location providers as part of that plan.

Ultimately, the MWRA preserves correctional facilities' ability to deploy

security measures of their choosing while protecting IPCS consumers from being

used as a captive funding source for measures that are not necessary for the

provision of telecommunications. The Commission's application of the used and

useful doctrine correctly balances the interests recognized by the statute. The

States and Providers, unhappy with this result, ask the Court to substitute its

judgment for that of the agency, but such judicial action is foreclosed under settled

principles of administrative law. *Prometheus Radio*, 592 U.S. at 423.

### B.    The Commission's Exclusion of Certain Safety and Security Costs When Calculating Rate Caps Is Consistent with Congress's Delegation of Authority

The Wright-Reed Act directs the Commission to "consider costs associated

with any safety and security measures necessary to provide [IPCS]." MWRA

§ 3(b)(2). To implement this mandate, the Commission considered seven

categories of safety and security costs when calculating the Order's rate caps.

Order ¶ 384. After an extensive analysis, the Commission determined that two of

these categories were used and useful for IPCS consumers, and therefore allowed

those costs to be included in rate-cap calculations. Order ¶¶ 384-407. The

Providers and States claim that the exclusion of some security costs contravenes the MWRA. To the contrary, the MWRA clearly gives the Commission discretion to make such determinations, and no petitioner has articulated a valid basis for a court to second-guess the Commission's reasoned exercise of its delegated powers.

Intervenor NSA complains that the Commission's failure to "give any specific weight" to security costs somehow violates the canon against surplusage. NSA Br. at 5. This argument finds no support in case law, which routinely recognizes that agencies have discretion to construe inherently ambiguous terms. Congress delegated to the Commission (via section 3(b) of the MWRA) the authority to "consider" which safety and security measures are "necessary" for the provision of IPCS and how those costs relate to "just and reasonable" rates. The use of such patently ambiguous terms necessarily endows the Commission with considerable discretion. *See Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) (ratemaking agency charged with ensuring "just and reasonable" rates is "not bound to the use of any single formula or combination of formulae in determining rates").

That Congress did not mandate any specific treatment of any certain safety and security costs amplifies the level of discretion given to the Commission. *See Tex. Med. Ass'n v. U.S. Dept. of Health & Human Servs.*, 110 F.4th 762, 775 (5th Cir.

2024) ("[W]hen Congress charges a decisionmaker with considering several factors without assigning them a procedural order or 'specific weight,' the weighing of those factors is left to the decisionmaker's sound discretion"). The Commission, in a reasoned exercise of its discretion, considered the full spectrum of safety and security costs and made an independent judgment regarding which costs "should be included in just and reasonable IPCS rates, consistent with fair compensation for providers." Order ¶ 361. The NSA may disagree with the Commission on a normative basis, but the amplitude of such disagreement does not form a legal basis upon which to undo the Commission's diligent decision-making.

Securus's complaint that the Commission failed to specifically classify which safety and security measures are "necessary" (Securus Br. at 38-39) is especially unpersuasive. The MWRA requires no such exercise, and Securus's argument to this Court studiously ignores the Commission's detailed analysis on the overlap and interplay between the used and useful doctrine and the MWRA's reference to necessary security services. Order ¶ 369, n.1315.

In totality, the States argue that because they must take steps to accommodate the rules governing IPCS providers, the Order somehow reaches too far. Yet just as a prison that hires a physician must respect the doctor's duties and obligations under a state medical-licensing statute, so too is it reasonable to expect

a correctional facility to adjust to generally applicable regulations governing the facility's IPCS provider.

### C. The Order Does Not Contravene Section 276's Fair Compensation Requirement

The Providers complain that the Commission's methodology violates the fair compensation requirement in 47 U.S.C. § 276(b)(1)(A). Securus's first such argument rests on the pre-MWRA interpretation of § 276(b)(1)(A) set forth in *GTL*. Securus Br. at 32-33. This reasoning is doubly deficient because Congress amended the statute interpreted in that decision and *GTL* is no longer good law.

When Congress amends a statute, the new law "should be interpreted in light of the court decisions that may have prompted the amendment." *Lummi Tribe of the Lummi Reservation v. U.S.*, 112 Fed. Cl. 353, 366 (2013). Because the MWRA reversed the *GTL* decision, any holding contained in the D.C. Circuit's opinion must be reexamined in light of the amended law.

We urge this Court to take particular care to reevaluate the *GTL* majority's holding that 47 U.S.C. § 276(b)(1)(A) acts as a "one-way ratchet whereby providers are always entitled to recoup 'actual' costs incurred under monopoly conditions, no matter how extravagant." *GTL*, 866 F.3d at 424 (Pillard, J., dissenting in part and concurring in part). The majority opinion in *GTL* relied heavily on § 276's original intent of promoting competition in the (now moribund)

public payphone industry, ultimately concluding that fair compensation under § 276 does not take consumer welfare into account.[26] *GTL*, 866 F.3d at 410. But *GTL*'s narrow interpretation of "fair compensation" is no longer tenable in light of the MWRA's amendment to § 276(b)(1)(A), which now incorporates a "just and reasonable" requirement into section 276. MWRA § 2(a)(1)(B); Order ¶¶ 59-71 (articulating the "interdependent standards" of fair compensation and just and reasonable rates).

Securus also argues that the Order contravenes § 276(b)(1)(A) because the Commission uses industry averages to set rate caps and economically inefficient providers may not be able to remain profitable. Securus Br. at 33-34. This argument fails because Congress expressly authorized the use of such methodology in section 3(b)(1) of the MWRA. Order ¶ 68.

Rate caps that may present challenges for inefficient providers are consistent with the statutory directive and favored as a matter of policy because such caps can incentivize efficient providers, allowing "the regulated firm to retain those profits

---

[26] Notably, § 276's fair compensation requirement was meant to address the problem of callers using "dial around" codes to place calls from payphones, thereby utilizing a third-party service provider without making any cash payment to the phone provider. *Ill. Pub. Telecommc'ns Ass'n v. FCC*, 117 F.3d 555, 559 (D.C. Cir. 1997). This dynamic is completely absent in the IPCS context where callers do not have the option of using a dial around code and the IPCS provider has complete control over what services are offered.

that represent not the exploitation of its monopoly position but superior efficiency." Richard A. Posner, *Natural Monopoly and Its Regulation*, 21 Stan. L. Rev. 548, 627 (1969); *U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 524 (D.C. Cir. 1997) ("The price cap system is intended (among other things) to improve a utility's incentives to cut costs and refrain from overinvestment.").

Section 276's reference to "all" providers should be understood to allow all providers the opportunity to earn fair compensation from reasonably efficient operations. Securus, on the other hand, seeks to overturn the Order based on an overly rigid application of the canon against surplusage, arguing that "each and every" provider must be guaranteed a profit. Securus Br. at 32-33. This proposed reading of the statute asks too much of the canon against surplusage, which is a guiding principle not an absolute rule. *King v. Burwell*, 576 U.S. 473, 491 (2015). To hold that even the most inefficient provider should be entitled to profits would read "just and reasonable" out of § 276(b)(1)(A) and would render § 3(b)(1) of the MWRA illusory.

The Order provides an opportunity for efficient providers to receive fair compensation and this Court should not vitiate the Commission's work in the interest of rescuing inefficient providers.

## IV.    The Commission's Pro-Consumer Application of Federal Preemption Is an Appropriate Use of Cooperative Federalism

In recognition of "considerable state-level reform efforts," the Commission used its statutory preemption powers to act as a ceiling, but not a floor, for IPCS rate caps. Order ¶ 238. In other words, state laws that would allow IPCS rates above the federal caps are preempted, but laws that impose lower rate caps are not. *Id.* ¶ 237. This approach is a form of "cooperative federalism," which provides substantive federal protections while preserving a role for states to act based on local concerns and expertise. *Id.* ¶ 238, n.831.

Securus challenges this form of preemption by arguing that if states can set lower caps, providers may not be able to earn fair compensation. Securus Br. at 55. No evidence in the record supports this claim, and Securus ignores the Order's provision that carriers harmed by state rate caps can seek an individualized ruling from the Commission. Order ¶ 238. Accordingly, any challenge to the Commission's use of preemption should be heard first by the agency on an as-applied basis, under the doctrine of primary jurisdiction. *Allnet Comm'cn Serv. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1121 (D.C. Cir. 1992).

## CONCLUSION

When the Commission's previous effort at major IPCS rate reform was reversed, Congress reacted by legislatively overturning the *GTL* decision and

mandating that the Commission swiftly issue new rules, based on factual determinations, with the goal of providing just and reasonable rates. The Commission carefully followed Congress's instructions and made well-reasoned findings based on a substantial record. The Providers and States that stand to lose unfettered access to a captive revenue source are unhappy with the Order, but these parties' financial self-interest cannot mask the absence of error on the Commission's part. The Order is consistent with relevant statutory requirements and is based on sound decision making. Accordingly, the Consumer Advocates urge the Court to dismiss the Providers' and States' petitions for review.

Dated this 21st day of April 2025.

TABOR LAW GROUP

By: */s/ Stephen A. Raher*
    Stephen A. Raher, OSB No. 985625
        Phone: 971.867.2440
        Email: sraher@pdx-law.com
    4110 SE Hawthorne Blvd. PMB #506
    Portland, Oregon 97214

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This motion complies with the type-volume limit of Fed. R. App. P.

29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P.

32(f), this document contains 6,431 words, as counted by Microsoft Word.

2.      This motion complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) because this document has been prepared in a proportionally spaced

typeface using Microsoft Word 2021 in 14-point Equity Text B font.

Dated:  April 21, 2025

*/s/ Stephen A. Raher*
Stephen A. Raher
*Counsel for Amici Curiae*