Case Nos. 24-8028, 24-2013, 24-2061

**United States Court of Appeals
for the First Circuit**

**No. 24-8028**

In re: MCP 191

**No. 24-2013**

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

OFFICE OF COMMUNCAITON OF THE UNITED CHURCH OF CHRIST, DIRECT ACTION FOR RIGHTS AND EQUALITY, PENNSYLVANIA PRISON SOCIETY,

Intervenors.

No. 24-2061

STATE OF LOUSIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUSIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY, OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHRIST, PENNSYLVANIA PRISON SOCIETY,

Intervenors.

On Petitions for Review of a Final Order of the Federal Communications Commission

**Brief of Amici Curiae Public Knowledge, The Benton Institute for Broadband & Society, Center for Digital Democracy, and Free Press in Support of Respondents.**

John Bergmayer
*Legal Director*

*Counsel for Amici Curiae*

Public Knowledge
1818 N St. NW Suite 410
Washington, DC 20036
john@publicknowledge.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici certify that they are each nonprofit, non-stock corporations. They each have no parent corporation and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF CONTENTS ......................................... ii

TABLE OF AUTHORITIES ................................................. iii

INTEREST OF AMICI CURIAE .......................................... v

SUMMARY OF ARGUMENT ......................................... 1

   I.    **Multi-Member Bipartisan Commissions Have Long Been Constitutionally Permissible** ........................................ **4**

   II.   **The Legislative History Affirms the Importance of FCC Independence.** ................................................ **9**

   III.  **The President, Congress, and the Courts Retain Ample Oversight of the FCC.** ................................................ **16**

CONCLUSION ........................................... 19

CERTIFICATE OF COMPLIANCE ........................... 20

CERTIFICATE OF SERVICE ............................... 21

# TABLE OF AUTHORITIES

## CASES

*Collins v. Yellen*, 594 U.S. 220 (2021) ............................................................ 5

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010)............................................................................................. 2, 5, 6

Harris v. Bessent, Nos. 25-5037, 25-5055, 25-5057, slip op. (D.C. Cir. Apr. 7, 2025) (en banc) ................................................................................................ 4

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ....................... passim

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023)........................................... 9

*Morrison v. Olson*, 487 U.S. 654 (1988) ...................................................... passim

*Myers v. United States*, 272 U.S. 52 (1926) ........................................................ 9

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)..... 9

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020) .. 2, 5, 9

*Wiener v. United States*, 357 U.S. 349 (1958)............................................... passim

## STATUTES

12 U.S.C. §§ 1819(a), 1818(a), (b), (e), (i) ........................................................ 8

12 U.S.C. §§ 248(p), 1844(b), 1818(b) ............................................................... 8

15 U.S.C. §§ 46, 45, 57 ....................................................................................... 8

15 U.S.C. §§ 77s(a), 78w(a), 78u, 78u–2, 78u–3 ............................................... 8

29 U.S.C. §§ 156, 160 ......................................................................................... 8

42 U.S.C. §§ 2201(p), 2239(a), 2282 .................................................................. 8

47 U.S.C. § 151 .................................................................................................... 7

47 U.S.C. § 154 .................................................................................................... 6

47 U.S.C. § 154(a) ............................................................................................. 17

47 U.S.C. § 504(b)(1) .......................................................................................... 7

47 U.S.C. § 504(b)(3)(B) ..................................................................................... 7

7 U.S.C. §§ 12a(5), 13a–1, 13b .......................................................................... 8

Federal Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927)........ 2, 10, 15

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 1 ......................................................................................... 1

U.S. Const. art. II, § 3 ......................................................................................... 1

## LEGISLATIVE MATERIALS

67 Cong. Rec. 2328 (Jan. 24, 1923) ................................................................. 11

69 Cong. Rec. 4109 (Feb. 18, 1927) ................................................................. 15

69 Cong. Rec. 5479 (Mar. 12, 1926) ................................................... 11

69 Cong. Rec. 5481 (Mar. 12, 1926) ................................................... 11

69 Cong. Rec. 5484 (Mar. 12, 1926) ................................................... 12

69 Cong. Rec. 5498 (Mar. 12, 1926) ................................................... 14

69 Cong. Rec. 5499 (Mar. 12, 1926) ................................................... 13

69 Cong. Rec. 5500 (Mar. 12, 1926) ................................................... 13

69 Cong. Rec. 5555 (Mar. 13, 1926) ................................................... 14

69 Cong. Rec. 5558 (Mar. 13, 1926) ............................................. 13, 16

69 Cong. Rec. 5561 (Mar. 13, 1926) ................................................... 13

69 Cong. Rec. 5578 (Mar. 13, 1926) ................................................... 13

H.R. Rep. No. 69-404 (1926) ............................................................. 11

H.R. Rep. No. 69-464 (1926) .......................................................... 3, 12

Letter from Sarah M. Harris, Acting Solicitor General, to Mike Johnson, Speaker,
    U.S. House of Representatives (Feb. 25, 2025) ...................................... 4

Powers of Secretary of Commerce to Regulate Radio Communication, 34 Op.
    Att'y Gen. 320 (1926) ............................................................. 10

S. Rep. No. 69-772 (1926) .............................................................. 3, 15

# INTEREST OF AMICI CURIAE[1]

Public Knowledge is a nonprofit public interest organization that advocates for an open internet, free expression, and universal access to affordable communications. For over twenty years, it has participated in FCC proceedings and litigation to ensure that communications policy promotes democratic values and serves the public interest. Public Knowledge has a strong interest in defending the constitutionality of independent agencies like the FCC. The FCC's structure is essential to its expert and impartial regulation of communications.

The Benton Institute for Broadband & Society is a 44 year-old, 501(c)(3) private operating foundation that conducts research and analyses, and engages in advocacy, to bring open, affordable access to telecommunications, including high-performance broadband, to all people in the U.S. to ensure a thriving democracy. Making telecommunications more affordable, and devising alternative mechanisms to insure that all Americans have access to affordable telecommunications, are among its highest priorities.

The Center for Digital Democracy (CDD) has worked with Federal Communications Commission for more than three-decades, including playing a key

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel for amici curiae certifies that this brief was not authored in whole or in part by counsel for any of the parties; that no party or party's counsel contributed money for preparing or submitting this brief; and that no one other than amici curiae and its counsel have contributed money for preparing or submitting this brief.

role ensuring the agency protect the well-being of children (helping it implement the bipartisan Children's Television Act of 1990, for example). The FCC's founding legislation to serve the public interest, as well its independent decision-making, has made it possible for advocates for children's educational content and other safeguards, such as CDD, to encourage the commission to develop broadcasting and cable TV policies to better serve this vulnerable audience. CDD continues to rely on the independence of the FCC to serve the interests of the general public as well, especially in the digital and connected TV era.

Free Press is a non-partisan, nonprofit, nationwide media and technology advocacy organization. Since its founding in 2003, Free Press has believed that positive social change and meaningful engagement in public life require equitable access to open channels of communication and journalism that holds leaders accountable. Free Press engages in litigation, congressional advocacy, and administrative agency proceedings on these issues, like this one at the Federal Communications Commission, and is supported by over a million members who sign petitions, visit lawmakers, participate in protests, and mobilize other activists in their communities.

## SUMMARY OF ARGUMENT

Petitioner States ("States") contend that the Federal Communications Commission's ("FCC") structure violates Article II. This separation-of-powers challenge disregards nearly a century of Supreme Court precedent upholding independent commissions and posits a form of "executive power" that enables the President to disregard, rather than implement, duly-passed laws of the United States. The Constitution vests "[t]he executive Power … in a President of the United States of America" who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1; id., § 3. These laws include the establishment of independent agencies with members of fixed terms. A Constitutional theory that allows the President to ignore the law in the service of "executive power" is a contradiction in terms and a usurpation of Congressional authority, that turns the Constitution on its head: from a charter of limited government of three co-equal branches, to one that elevates the phrase "executive power" over the rule of law.

The FCC is a quintessential independent agency: a multi-member, bipartisan commission with fixed terms. Such agencies have long been held constitutionally permissible. In *Humphrey's Executor v. United States*, the Supreme Court upheld Congress's authority to create the Federal Trade Commission ("FTC")—an independent, expert commission with tenure-protected members. 295 U.S. 602 (1935). The FCC's structure closely parallels the FTC's, and is dissimilar from

1

single member bodies such as the CPFB. Moreover, the President retains significant influence over the FCC through appointments and designation of its Chair. Under established precedent—including *Humphrey's Executor*, *Morrison v. Olson*, 487 U.S. 654 (1988), *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), and *Wiener v. United States*, 357 U.S. 349 (1958)—the FCC's design does not transgress Article II. States' contrary arguments would upend settled law and should be rejected.

This long-settled constitutional understanding is reflected not only in judicial precedent but in the deliberate choices Congress made when designing the FCC. The legislative history of the Communications Act and its precursors demonstrates that Congress intended the FCC to function independently from the Executive Branch. That history begins with the Federal Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927), which established the Federal Radio Commission in response to years of dysfunction and interference in the airwaves. Early legislative proposals to place regulatory authority in the hands of a single executive official—specifically the Secretary of Commerce—were rejected, precisely because Congress feared that such concentrated power would be subject to political manipulation. As Secretary of Commerce Herbert Hoover himself testified, "unlimited authority to control the granting of radio privileges was too great a power to be placed in the hands of any

one administrative officer." H.R. Rep. No. 69-464, at 19 (1926). Congress ultimately concluded that only a fully independent commission could safeguard the public interest. As Senator Clarence Dill explained in the 1927 Senate Report, "[t]he exercise of this power is fraught with such great possibilities that it should not be entrusted to any one man nor to any administrative department of the government." S. Rep. No. 69-772, at 2 (1926).

The result was a bipartisan, expert, multi-member commission insulated from political interference and entrusted with regulating communications in the public interest. When Congress merged the responsibilities of the Federal Radio Commission and the wireline responsibilities of the Interstate Commerce Commission in 1934, it reaffirmed that the new Federal Communications Commission would likewise be independent. That structure has remained unchanged in its essentials to this day.

Thus, both judicial precedent and legislative history confirm the constitutionality and wisdom of the FCC's design. Petitioners' attempt to destabilize this structure now—after a century of settled practice and reliance—would not only contradict the Constitution's text and history, but also invite chaos across the federal government. The Constitution does not require such upheaval, and precedent forecloses it.

3

I.    **Multi-Member Bipartisan Commissions Have Long Been Constitutionally Permissible**

For nearly ninety years, the Supreme Court has recognized Congress's authority to establish independent regulatory commissions with for-cause removal protections. In *Humphrey's Executor*, 295 U.S. 602 (1935), the Court unanimously invalidated President Roosevelt's attempt to remove an FTC commissioner solely based on policy disagreements. [2] The FTC's enabling statute explicitly limited removal of commissioners to instances of "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 619–20. The Court interpreted this language as a restriction against at-will presidential removal. The Court found that the FTC was "non-partisan," required to "act with entire impartiality," and carried out duties "neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id.* at 624. Because the FTC performed legislative and adjudicatory functions, it was "not … an arm or eye of the executive." *Id.* at 628. To ensure the

---

[2] The *en banc* DC Circuit recently vacated a panel decision that attempted distinguish *Humphrey's Executor* but, in realty, merely declined to follow it. Harris v. Bessent, **Error! Main Document Only.**2025 U.S. App. LEXIS 8151, Nos. 25-5037, 25-5055, 25-5057, slip op. (D.C. Cir. Apr. 7, 2025) (en banc). And this Court is no doubt aware that the Trump *Administration's Department of Justice* has taken the position that *Humphrey's Executor* is not good law and that it will decline to defend statutory term protections for independent Commissioners. See, Letter from Sarah M. Harris, Acting Solicitor General, to Mike Johnson, Speaker, U.S. House of Representatives (Feb. 25, 2025). But as this brief argues, in each removal case that has come before it, the Court has chosen to leave *Humphrey's Executor* in place.

agency's independence of the executive, commissioners had to be protected from arbitrary dismissals, because "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Id* at 628. The Court thus confirmed that Article II's vesting of executive power does not preclude Congress from establishing tenure-protected, multi-member commissions tasked with quasi-legislative and quasi-judicial responsibilities. When Congress creates such an independent agency, the President lacks an "illimitable power of removal" of its commissioners. *Id.* at 629; *see Wiener v. United States*, 357 U.S. 349 (1958) (unanimously reaffirming removal restrictions for multimember adjudicatory boards with commissioners that serve fixed terms).

While removal restrictions for single heads of agencies exercising substantial executive powers have been found unconstitutional, *see Seila Law*, 591 U.S. 197 (2020); *Collins v. Yellen*, 594 U.S. 220 (2021), the Supreme Court explicitly stated it was not overturning the precedent established in *Humphrey's Executor* and *Wiener* regarding multimember bodies. *Seila Law*, 591 U.S. at 228 ("we do not revisit *Humphrey's Executor* or any other precedent today"); *Collins*, 594 U.S. at 250–51 (recognizing *Seila Law* did not overrule prior decisions); *see also Morrison v. Olson*, 487 U.S. 654, 687 (1988). Additionally, in *Free Enterprise Fund*, the Court expressly declined to reexamine *Humphrey's Executor* and did not "take issue with

for-cause limitations in general." 561 U.S. at 501.

The FCC falls squarely within the *Humphrey's Executor* framework. Like the FTC, the FCC comprises multiple commissioners serving staggered five-year terms, with limitations on how many commissioners may be members of the same political party. See 47 U.S.C. § 154. Although the Communications Act does not expressly enumerate "for cause" removal protections, consistent judicial and executive interpretations affirm such protections exist for agencies structured similarly to the FTC and SEC, where commissioners serve fixed terms. Free Enterprise Fund, 561 U.S. at 487; Wiener, 357 U.S. at 356.

Petitioners attempt to circumvent Humphrey's Executor by asserting that the FCC exercises substantial executive power, thus removing it from the quasi-legislative/quasi-judicial framework. Pet'rs' Br. at 45 (Corrected Opening Brief, filed Feb. 20, 2025). This argument misunderstands precedent and the nature of the FCC's functions. Like the FTC, the FCC enforces regulations and imposes penalties—functions also performed by other constitutionally accepted independent commissions, and which are ultimately subject to review by Article III courts. *Humphrey's Executor* specifically acknowledged that any such executive-like activities—notably, "as distinguished from executive power in the constitutional sense"—conducted "in the discharge and effectuation of … quasi-legislative or quasi-judicial powers" do not undermine an agency's independent character. 295

6

U.S. at 628. The FCC's civil enforcement powers are similarly ancillary to its primarily legislative and adjudicatory duties.

Indeed, the FCC's enforcement authority is narrower than what was upheld in *Humphrey's Executor*: The FTC prosecutes violations of antitrust and competition laws that apply to every sector of the economy, partly sharing jurisdiction with the Department of Justice and the states (as well as private litigants). By contrast, the FCC's general subject matter jurisdiction is limited to "communication by wire or radio," 47 U.S.C. § 151, much of its activity is closer to technical standards-setting and administration than to "executive" authority, and is in most cases the sole body with either the authority or the expertise to ensure the smooth functioning of the nation's communications infrastructure. For example, although the FCC may assess a forfeiture for violation of various statutory provisions, or for failing to comply with any Commission rule or license condition, see 47 U.S.C. § 504(b)(1), the Commission may not enforce such forfeitures fine on its own. Rather, once the forfeiture order becomes final, if a party fails to pay, the Commission must "refer the matter to the Attorney General of the United States, who shall recover the amount assessed" in district court. 47 U.S.C. § 504(b)(3)(B). While the FCC may investigate and assess—quasi-judicial functions—actual enforcement is not merely "ancillary" to the quasi-judicial function, but remains completely within the hands of the Executive.

Petitioners' Article II challenge to the FCC is not only foreclosed by precedent, but also by the consistent practice since the New Deal. For decades, Congress, successive Presidencies, and courts at every level and of every political makeup have not seen the constitutional defect that States now discover. No President has ever asserted authority to dismiss an FCC Commissioner based solely on policy disagreement or party affiliation. This established understanding aligns with judicial precedent and longstanding governmental practice, reinforcing the constitutionality of the FCC's removal protections. It is also why Congress created numerous other federal agencies that share the FCC's structural characteristics, including the Federal Trade Commission, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Federal Deposit Insurance Corporation, the Federal Reserve Board, the National Labor Relations Board, and the Nuclear Regulatory Commission,[3] all operating with bipartisan, staggered-term commissions shielded by for-cause removal protections. No court has declared these agencies unconstitutional. Any decision invalidating the FCC's structure would thus necessarily extend to these agencies. To put it bluntly, a decision by this Court that the FCC's structure is unconstitutional would apply with equal force to agencies

---

[3] FTC: 15 U.S.C. §§ 46, 45, 57. SEC: 15 U.S.C. §§ 77s(a), 78w(a), 78u, 78u–2, 78u–3. CFTC: 7 U.S.C. §§ 12a(5), 13a–1, 13b. FDIC: 12 U.S.C. §§ 1819(a), 1818(a), (b), (e), (i). Federal Reserve Board: 12 U.S.C. §§ 248(p), 1844(b), 1818(b). NLRB: 29 U.S.C. §§ 156, 160. NRC: 42 U.S.C. §§ 2201(p), 2239(a), 2282.

such as the Federal Reserve and the Nuclear Regulatory Commission, destabilizing and threatening, among other things, the U.S. dollar, and the regulatory framework that ensures nuclear safety.

In sum, the FCC's structure adheres to established constitutional principles articulated and reaffirmed by the Supreme Court from *Humphrey's Executor* to *Seila Law*, and this Court may not depart from them. States' reliance on a lone Fifth Circuit judge's concurrence questioning independent agencies, Pet'r's Br. 45 n.2, does not change the controlling law. When a precedent of the Supreme Court "has direct application in a case," lower courts "'should follow the case which directly controls,'" because only the Supreme Court has "'the prerogative of overruling its own decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). Petitioners' challenge would disregard settled Supreme Court precedent, historical practice, and bipartisan consensus, disrupting agencies that touch every corner of the economy and American life. Such a radical departure from established law and governance structures is both unwarranted and constitutionally unjustified.

## II.    The Legislative History Affirms the Importance of FCC Independence.

In *Wiener*, a unanimous court instructed that *Humphrey's Executor* "narrowly confined the scope of the *Myers* decision [holding that the President can remove certain officials at will] to include only 'all purely executive officers.'" 357 U.S. at

352. *See Myers v. United States*, 272 U.S. 52 (1926). Rather than looking to what power the agency exercises, a reviewing court should consider whether Congress expressly intended the agency to act without undue political interference. "This sharp differentiation derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference." *Wiener*, 357 U.S. at 353. Where Congress determined that functions of the agency demand independence from the Executive, then Congress acts constitutionally when it prevents "the Damocles's sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing." *Id.* at 356. An examination of the legislative history of the FCC confirms that Congress fully intended to make the Commission independent of Executive influence, and that it acted properly in doing so. The Commission began life as the Federal Radio Commission created by the Federal Radio Act of 1927. Pub. L. 69-632. As the legislative history demonstrates, Congress fully recognized the need for an independent agency consistent with the principles of *Humphrey's Executor* and *Weiner*.

Beginning in 1912, the use of radio frequencies was regulated by the Secretary of Commerce. That function, however, was regarded as purely ministerial, granting the Secretary no power to withhold a license or regulate its use. Powers of Secretary of Commerce to Regulate Radio Communication, 34 Op. Att'y Gen. 320 (1926). But

over only the following 10 years, the radio industry had both expanded enormously and changed dramatically—moving from a tool of communications between ships at sea and amateur radio operators to a multi-million dollar industry that was having an increasingly powerful effect on all aspects of American culture.[4] At the same time, Congress determined that the growing demand for radio frequencies and the lack of regulation threatened to make radio broadcasting essentially impossible as a result of interference between stations. 69 Cong. Rec. 5479 (Mar. 12, 1926) (statement of Rep. White).

As a result, beginning in 1923, the House of Representatives attempted to pass a major restructuring of the regulation of radio. 67 Cong. Rec. 2328 (Jan. 24, 1923) (readout of H.R. 13773). The first version of the law would have simply expanded the authority of the Secretary of Commerce. But this proposal faced considerable resistance "because it gave too great and too much unrestrained power to one man, the Secretary of Commerce." 69 Cong. Rec. 5481 (Mar. 12, 1926) (readout of report on H.R. 13773) As then Secretary of Commerce Herbert Hoover himself testified that "I have always taken the position that unlimited authority to control the granting of radio privileges was too great a power to be placed in the hands of any one

---

[4] As a consequence, the jurisdictional committee for the bill was the Committee on the Merchant Marine and Fisheries. *See* H.R. Rep. No. 69-404, Report of Committee of Merchant Marine and Fisheries to Accompany Bill H.R. 9108, February 27, 1926.

administrative officer." Testimony of Secretary Herbert Hoover, Hearings on H.R. 7357 before the House Committee on the Merchant Marine and Fisheries, 68th Cong., 1st Sess., 8 (1924); quoted in H.R. Rep. No. 69-464, at 19 (1926). He further remarked that "We cannot allow any single person or group to place themselves in a position where they can censor the material which shall be broadcast to the public." Testimony of Secretary Herbert Hoover, quoted in 69 Cong. Rec. 5484 (Mar. 12, 1926).

In 1926, the House again took up a bill to regulate radio. To address the concerns about concentrating power in the hands of a single administrative official, the 1926 bill would have created an independent Commission to which aggrieved parties could appeal decisions of the Secretary. This, too, was met with numerous objections that this still concentrated too much power in the hands of a single individual subject to political influence. This concern emanated from the recognition of the power of radio to shape public opinion and therefore a need to prevent both "Government censorship" and "private censorship." 69 Cong. Rec. 5484 (Mar. 12, 1926). As Rep. Johnson of Texas stated:

> There is no agency so fraught with possibilities for service of good or evil to the American people as the radio. As a means of entertainment, education, information and communication it has limitless possibilities. The power of the press will not be comparable to that of broadcasting stations when the industry is fully developed. If the development continues in the future as in the past, it will only be a few years before these broadcasting stations, if

12

> operated by chain stations, will reach an audience of over half of our entire citizenship, and bring messages to the fireside of nearly every American home. They can mold and crystalize sentiment as no agency in the past has been able to do.

69 Cong. Rec. 5558 (Mar. 13, 1926). Members raised numerous objections that the bill both conferred too much power on the Secretary of Commerce, and required greater technical expertise than was possible for a single federal officer appointed by the President could reasonably acquire. 69 Cong. Rec. 5499 (Mar. 12, 1926); 69 Cong. Rec. 5578 (Mar. 13, 1926) (statement of Rep. Davis). Other members expressed concern that radio operators could easily influence the outcome of elections by discriminating with regard to access or rates charged for access. 69 Cong. Rec. 5561 (Mar. 13, 1926) (statement of Rep. Johnson). In the words of Representative Blanton:

> The night before election in any district in the United States serious damage could be done to any candidate for Congress. That alone should appeal to you. Damage may be done to any citizen. Serious damage could be done to any candidate for President of the United States or to the governor of any state just before election.

69 Cong. Rec. 5500 (Mar. 12, 1926). Other members objected to placing power in the hands of a political appointee for fear that incumbent politicians could exercise undue influence over radio operators who might fear retaliation. In one colloquy, two members established that a member had initially been asked to pay $10 a minute for airtime, but had refused and —according to another member—threatened action

13

in a letter. Subsequently, the member was allowed to request free airtime and was once invited by the radio station to speak for free. "I had no knowledge that any one of the opposing party was asked to pay what I was asked to pay." The colloquy concluded: "The right to charge is unquestioned. The possibility of that right being abused is inherently dangerous." 69 Cong. Rec. 5555 (Mar. 13, 1926) (statement of Rep. Celler).

Nevertheless, the House passed a version of the bill vesting initial power in the Secretary, subject to the oversight of an independent Commission. Supporters argued that this oversight would both check the power of the Secretary and would acquire sufficient expertise. Supporters of the bill also objected to proliferation of independent Commissions. 69 Cong. Rec. 5562-63 (Mar. 13, 1926). Others viewed this as merely a temporary expedient in light of the "urgent need" for radio legislation. "I was making the observation," said one supporter, "that I think it will be a wise thing ultimately to do, if we can not do it at the present time, to put all electric communication, either by wire or wireless, under the jurisdiction of one commission[.]" 69 Cong. Rec. 5498 (Mar. 12, 1926) (statement of Rep. Black).

The Senate rejected this approach and demanded a fully independent Commission. Senator Clarence Dill, Chairman of the Senate Commerce Committee, stated the reason for this change unequivocally in the Committee Report:

> After the consideration of the facts given your committee
> at the hearings the committee decided that the importance

14

of radio and particularly the probable influence it will develop to be in the social, political and economic life of the American people, and the many new and complex problems its administration presents, demand that Congress establish an entirely independent body to take charge of the regulation of radio communications in all its forms.

The exercise of this power is fraught with such great possibilities that **it should not be entrusted to any one man nor to any administrative department of the Government.** This regulatory power should be as free from political influence or arbitrary control as possible. A commission which would meet only occasionally would gain only a cursory and incomplete knowledge of radio problems…Your committee recognizes there are many important objections to the establishment of additional commissions under the Federal Government, but the relation of radio communication to the Government makes it ***absolutely necessary*** that some bureau, board or commission under the Government shall administer the law regarding radio.

S. Rep. No. 69-772, at 2 (1926) (emphases added). Despite resistance from the House when the differing versions of the bill went to conference, 69 Cong. Rec. 4109 (Feb. 18, 1927), the Senate version ultimately prevailed. The final version of the Federal Radio Act of 1927 removed authority from the Secretary of Commerce and created an independent Commission "to regulate all forms of interstate and foreign radio communications and transmissions with the United States." Pub L. 69-632. In 1934, Congress passed the Communications Act, which incorporated key provisions of the Radio Act of 1927. This legislation transferred jurisdiction over wire communications from the independent Interstate Commerce Commission

and wireless authority from the independent Federal Radio Commission, establishing the independent Federal Communications Commission.

Both of the important factors in determining both the Congressional intent under *Weiner* and the constitutionality under *Humphrey's Executor* and *Morrison* are answered in the affirmative. Congress determined that control over the means of mass communications was simply too subject to abuse—and too technically complicated—to leave in the hands of a single person, serving at the pleasure of the President. This is no less true today than it was 100 years ago. The power of electronic mass communications—whether in the form of traditional radio and television to the content on the internet—is still able to "mold and crystalize sentiment as no agency in the past has been able to do." 69 Cong. Rec. 5558 (Mar. 13, 1926). The continually growing complexity of communications networks requires an expert agency with accumulated experience consistent with a set tenure. This is impossible to achieve if "the Damocles's sword of removal by the President" hangs over the heads of every Commissioner.

## III.    The President, Congress, and the Courts Retain Ample Oversight of the FCC.

An independent agency is not an unaccountable one. As this case demonstrates, courts ensure the FCC operates within the bounds of its statutory authority, and that it follows the Administrative Procedure Act. Congress exerts significant control as well: Commissioners must be confirmed by the Senate, and

Congress holds frequent hearings that subject FCC Commissioners to thorough questioning—in addition to setting the agency's budget, granting or curtailing its authority by statute, and even overriding specific FCC actions though the Congressional Review Act.

Further, even with tenure-protected commissioners, the President exerts significant influence over the FCC's direction. First, the President appoints all five commissioners, with the advice and consent of the Senate. See 47 U.S.C. § 154(a). Each President thus shapes the Commission's composition over time. Indeed, due to staggered terms, every President will appoint (or reappoint) a majority of the FCC's members during a four-year term. Second, the President designates which commissioner will serve as Chair of the FCC. Even in the absence of a vacancy, when a new administration begins, the President can choose a new Chair from among the sitting commissioners. The Chair is the "chief executive officer" of the Commission by law, who sets the agency's agenda, oversees staff, and directs day-to-day operations. This gives the President a direct hand in selecting the FCC's leader and policymaker-in-chief. A Chair aligned with the President's priorities can ensure the agency's "faithful execution" of law in line with the Administration's goals. Third, while commissioners technically serve fixed terms, it is an established convention that FCC Chairs resign upon a change in administration. This practice allows an incoming President nominate new commissioners, giving nearly

17

immediate control of the agency to the President and the President's political party. Fourth, the President retains the power to remove commissioners for cause if necessary. "Cause" is a sufficiently broad standard to encompass serious misconduct, incapacity, or dereliction of duty. In Morrison v. Olson, the Court noted that a good-cause removal provision does not "unduly trammel[] on executive authority" or "impermissibly burden[] the President's power to control or supervise the independent counsel." 487 U.S. 654, 691–92 (1988). The Court found that even with removal protections in place, the President "retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act." Id. at 692. The President's oversight is also exercised via budget proposals, policy statements, and coordination with the Executive Branch (for example, the FCC often works with the Executive on spectrum policy and national security telecommunications issues).

In sum, the President is far from powerless over the FCC, and restrictions on the arbitrary removal of commissioners are not "of such a nature that they impede the President's ability to perform his constitutional duty." *Id.* at 691. The agency's independent structure simply means the President cannot fire commissioners on a whim or for policy or political disagreements. As the Supreme Court recognized, so long as the President has "ample authority to assure that the [officer] is competently performing" and is not totally stripped of removal power, a removal restriction does

not violate Article II. *Id.* at 692–93. This applies all the more to the FCC, where the President has significantly more ability to control policy than the President had over the U.S. Office of Independent Counsel—an officer the President did not even appoint—upheld in *Morrison*.

## CONCLUSION

Because the Constitutional validity of independent commissions has been repeatedly affirmed by the Supreme Court, because the independence of the nation's communication regulator was recognized as a priority by the legislators who first created the Federal Radio Commission (the FCC's predecessor), and because the realities of the FCC's operation and structure undercut claims that it is "unaccountable," this Court should reject States' argument that its structure is unconstitutional.

Respectfully submitted,

/s/ John Bergmayer
*Legal Director*
Public Knowledge

*Counsel for Amici Curiae*

April 21, 2025

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits set forth in Rule 29(a)(5) of the Federal Rules of Appellate Procedure because it contains 4,804 words, excluding the items that may be exempted under Fed. R. App. P. 32(f), and that it complies with the requirements of Rules 32(a)(5) and 32(a)(6) because it uses a 14-point Times New Roman font.

Respectfully submitted,

/s/ John Bergmayer

*Legal Director*
PUBLIC KNOWLEDGE

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on April 21, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

/s/ John Bergmayer

*Legal Director*
PUBLIC KNOWLEDGE

*Counsel for Amici Curiae*