# United States Court of Appeals
# for the First Circuit

_____

No. 24-8028
In re: MCP 191
*(Caption Continued on Inside Cover)*

_____

On Petitions for Review of a Final Order of the
Federal Communications Commission

_____

**JOINT APPENDIX
VOLUME III of VII (Pages JA732 – JA1054)**

_____

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison
Society*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights
and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform
Clinic*

*Additional Counsel Listed on Inside Cover*

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER SCHRECK,
 LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus Technologies, LLC*

Salvatore Taillefer, Jr.
BLOOSTON, MORDKOFSKY, DICKENS &
 PRENDERGAST, LLP
2120 L Street, NW Suite 825
Washington, DC 20037
(202) 828-5562
sta@bloostonlaw.com

*Counsel for the National Sheriffs'*
*Association*

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel Communications,*
*Inc.*

Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8900
ACollins@cahill.com

Landis C. Best
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
LBest@Cahill.com

*Counsel for Global Tel\*Link*
*Corporation d/b/a ViaPath*
*Technologies*

D. Adam Candeub
  General Counsel
Bradley Craigmyle
  Deputy General Counsel
Sarah E. Citrin
  Deputy Associate General Counsel
Matthew J. Dunne
  Counsel
FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
Communications Commission*


Tim Griffin
  Attorney General of Arkansas
OFFICE OF ATTORNEY GENERAL TIM
  GRIFFIN
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

Autumn Hamit Patterson
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General and Interim
Solicitor General

*Counsel for the State of Arkansas*


Abigail A. Slater
  Assistant Attorney General
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
  ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United
States of America*


Theodore E. Rokita
  Attorney General of Indiana
OFFICE OF THE INDIANA ATTORNEY
  GENERAL
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

Blake E. Lanning
  Assistant Chief Deputy
Joshua J. David
  Deputy Attorney General
  Legislative & Policy Division
Jade A. Poorman
Bradley S. Davis
  Deputy Attorneys General
  Litigation Division

*Counsel for the State of Indiana*

Elizabeth B. Murrill
  Attorney General of Louisiana
Kelsey L. Smith
  Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

James Uthmeier
  Attorney General of Florida
John Guard
  Chief Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

*Counsel for the State of Florida*

Christopher M. Carr
  Attorney General of Georgia
Stephen J. Petrany
  Solicitor General
OFFICE OF THE GEORGIA
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

Steve Marshall
  Attorney General of Alabama
Edmund G. Lacour Jr.
  Solicitor General
OFFICE OF THE ALABAMA ATTORNEY
  GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

*Counsel for the State of Alabama*

Raúl R. Labrador
  Attorney General of Idaho
Alan Hurst
  Solicitor General
Sean M. Corkery
  Assistant Solicitor General
OFFICE OF THE IDAHO ATTORNEY
  GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

*Counsel for the State of Idaho*

Lynn Fitch
  Attorney General of Mississippi
Justin L. Matheny
  Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
  OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


Dave Yost
  Attorney General of Ohio
T. Elliot Gaiser
  Ohio Solicitor General
Mathura J. Sridharan
  Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*


Marty J. Jackley
  Attorney General of South Dakota
Ryan Mcfall
  Assistant Attorney General
OFFICE OF ATTORNEY GENERAL
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

*Counsel for the State of South Dakota*


Brenna Bird
  Attorney General of Iowa
Eric H. Wessan
  Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*


Andrew Bailey
  Attorney General of Missouri
Joshua M. Divine, #69875MO
  Solicitor General
Dominic X. Barceleau, #76510MO
  Assistant Attorney General
815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


Alan Wilson
  Attorney General of South Carolina
Joseph D. Spate
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*

Ken Paxton
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Aaron L. Neilson
  Solicitor General
Jacob Beach
  Assistant Solicitor General
Office of the Attorney General of
Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

*Counsel for the State of Texas*


Jason Miyares
  Attorney General of Virginia
Kevin M. Gallagher
  Principal Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S
  OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of
Virginia*

Jonathan Skrmetti
  Attorney General of Tennessee
J. Matthew Rice
  Solicitor General of Tennessee
OFFICE OF TENNESSEE ATTORNEY
  GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

*Counsel for the State of Tennessee*


Derek E. Brown
  Attorney General of Utah
Stanford Purser
  Solicitor General
OFFICE OF THE UTAH ATTORNEY
  GENERAL
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

*Counsel for the State of Utah*

Craig E. Frosch
  Executive Counsel, Louisiana Sheriffs'
Association
FROSCH, RODRIGUE, ARCURI, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

Mary Erlingson
East Baton Rough Parish
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

Shannon Dirmann
LOUISIANA SHERIFF'S ASSOCIATION
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

*Counsel for Sheriff Sid Gautreaux; Sheriff
Bobby Webre; Sheriff Mark Wood; Sheriff
Kevin Cobb; and The Louisiana Sheriffs'
Association*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

Nos. 24-1860 & 24-1927

SECURUS TECHNOLOGIES, LLC,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE
REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY; OFFICE OF
COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

———————————

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

# VOLUME I

Certified List of items constituting the record of FCC proceedings in WC Docket Nos. 23-62 & 12-375 ................................................................. JA1

Comments of Center on the Administration of Criminal Law, WC Docket No. 12-375 (Mar. 25, 2013) ................................................................ JA93

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) [excerpt pages 14111, 14138-43, 14194] ................................. JA107

Comments of National Sheriffs' Association, WC Docket No. 12-375, Exh. A (Jan. 12, 2015) .................................................................................... JA116

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd. 12763 (2015) [excerpt pages 12768, 12775, 12790, 12813-18, 12838-39] ............................................................................................... JA133

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 31 FCC Rcd. 9300 (2016) [excerpt page 9311] ............................................................................ JA145

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd. 8485 (2020) [excerpt page 8514 n.209] ................................................................... JA147

Comments of Worth Rises, WT Docket No. 12-375 (Nov. 23, 2020) .............. JA149

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (May 13, 2021) .......................................................................................... JA197

Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement, WC Docket No. 12-375 (Aug. 30, 2021) ................................... JA203

Securus Technologies, LLC Pet. for Clarification, WC Docket No. 12-375 (Sept. 17, 2021) .............................................................................. JA212

Comments of Prison Policy Initiative, Inc. on Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Sept. 27, 2021) .................... JA218

i

Comments of Securus Technologies, LLC on Petition for Waiver, WC Docket No. 12-375 (Jan. 7, 2022)........................................................................ JA259

Comments of Nathan Miller, WC Docket No. 23-62 (May 4, 2023), Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay* (Nov. 4, 2022) ............................................................. JA274

Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Dec. 15, 2022) [excerpt cover and pp. 7-8, 11-13].......................................... JA300

Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Dec. 15, 2022) ................................................................................................. JA306

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Instructions*, WC Docket Nos. 23-62 & 12-375 ........................................................................................................ JA326

## VOLUME II

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Word Template*, WC Docket Nos. 23-62 & 12-375 ........................................................................................................ JA385

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Excel Template*, WC Docket Nos. 23-62 & 12-375 ........................................................................................................ JA409

Reply Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Mar. 3, 2023) [excerpt cover and pp. 6-8]................................................ JA424

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023)................................................................................. JA428

Comments of California State Senator Josh Becker, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................... JA483

Comments of Civil Rights Corps, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................................. JA485

Comments of Color of Change, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................................. JA492

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............................................ JA502

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ...................................................................... JA539

Comments of the NCIC Inmate Communications, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ..................................................................... JA558

Comments of the Pay Tel Communications, Inc. in Response to Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....... JA576

Opening Comments of Stephen A. Raher, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................................. JA604

Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................................. JA632

Opening Comments of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............ JA686

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................................................... JA711

## VOLUME III

Comments of the Wright Petitioners et al., WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................................. JA732

Coleman Bazelon & Paroma Sanyal, Brattle Report (May 8, 2023) ................ JA774

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ............................................................................... JA812

Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (June 2, 2023) .............................................................................. JA819

Securus Technologies, LLC's Initial Comments to the Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ...................................................................................................... JA827

Comments of the Electronic Privacy Information Center, WC Docket Nos. 23-62 & 12-375 (June 6, 2023) .......................................................................... JA835

Reply Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ...................................................................... JA844

Reply Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ............................................................................. JA865

Reply Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ................................................................................... JA915

Reply Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ......................................................................................................... JA957

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, 38 FCC Rcd 6625 (WCB 2023) ............. JA963

Letter from Gregory R. Capobianco, Counsel for the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 15, 2023) ..................................................................................................... JA991

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 21, 2023) ...................................................................................... JA1016

## VOLUME IV

IPCS Chicago Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Feb. 6, 2024) .................................. JA1055

IPCS Charleston Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Mar. 5, 2024).................................. JA1159

Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 & 12-375 (Apr. 29, 2024) ....................................... JA1251

Letter from Virginia Association of Regional Jails, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62 (May 29, 2024)................................ JA1256

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) ...................................................................................................... JA1266

Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (June 7, 2024) [excerpt pages 5–6] ........................................................... JA1276

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC and Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 10, 2024) ............................................. JA1280

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 14, 2024) ................................................................................. JA1300

Letter from Leadership Conference to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (filed June 17, 2024) ...................... JA1302

Joint Letter of 90+ Organizations Supporting Low Rates, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (June 17, 2024) ....................................................................................... JA1306

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 18, 2024) ................................................ JA1310

IPCS Phoenix Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed June 20, 2024) ............................... JA1326

Letter from Salvatore Taillefer, Jr., Counsel to NSA to Marlene Dortch, Secretary of the FCC, WC Dockets Nos. 23-62 & 12-375 (June 20, 2024) ... JA1390

Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 8, 2024) ........................................................................................ JA1408

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 9, 2024) .................................................. JA1409

Letter from Melonie Perez, Aliza Kaplan, Jennifer Scaife, & Leigh Owens, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) ............................................................................ JA1432

Letter from Sheriff Kieran Donahue, Canyon County, Idaho, and President of the National Sheriffs' Association to Marlene Dortch, Secretary of the FCC, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 1] .... JA1439

Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 & 12-375 (July 11, 2024).................................................................................... JA1440

Comments of the Montana Sheriffs & Peace Officer Association, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt pages 1–2] ................ JA1445

Comments of the Virginia Association of Regional Jails, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 2] .......................................... JA1447

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 12, 2024) ............................................................................ JA1449

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ........................................................................ JA1453

Comments of Virginia Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ........................................................................ JA1485

## VOLUME V

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647 (2024)..................................................................... JA1486

## VOLUME VI

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Aug. 26, 2024)................................................................... JA1950

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Second Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) ................................................................... JA1951

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 10944 (WCB 2024) ........................................................................... JA1953

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11373 (WCB 2024) ........................................................................... JA1972

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11607 (WCB 2024) ........................................................................... JA1994

Motion of Pay Tel Communications, Inc. for Stay Pending Judicial Review, *Pay Tel Communications, Inc. v. FCC*, No. 24-8028 (1st Cir. Oct. 25, 2024) ......................................................................................... JA2011

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375, DA 24-1074 (Oct. 28, 2024) .................. JA2041

Letter from Aaron M. Dawson, Executive Director of the Alabama Jail Administrators' Council, to the FCC, Re: Report and Order, Order on Reconsideration, Clarification and Waiver, and Further notice of Proposed Rulemaking (Nov. 21, 2024) ......................................................... JA2053

Letter from Geoffrey G. Why, Verrill Dana LLP, Counsel to Ameelio, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (Dec. 6, 2024) ......................................................................................... JA2055

Panka Bencsik et al., *Calls and Conduct: The Impact of Free Communication on Prison Misconduct* (Dec. 2024) (forthcoming publication) ................................................................................... JA2057

Ameelio Iowa Model Memo (Nov. 26, 2024) ................................................. JA2084

**UNDER SEAL**
**VOLUME VII**

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (rel. July 22, 2024) .......................................... JA2091

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) ...................................................... JA2582

**JENNER&BLOCK** LLP

**REDACTED – FOR PUBLIC INSPECTION**

May 8, 2023

Gregory R. Capobianco
Tel  +1 202 639 6016
GCapobianco@jenner.com

VIA ECFS

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Re:   *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62; *Rules for Interstate Inmate Calling Services*, WC Docket No. 12-375.

Dear Ms. Dortch:

The Wright Petitioners herein submit a REDACTED version of comments in response to the Commission's Notice of Proposed Rulemaking.[1]  The Wright Petitioners are also submitting a CONFIDENTIAL version of these comments pursuant to the Protective Orders adopted for the above-captioned dockets.[2]  Encrypted electronic copies of the CONFIDENTIAL filing are being sent via email to the members of the Commission staff listed below pursuant to their requests.

Please contact me if you have any questions or require any additional information.

Sincerely,
/s/ Gregory R. Capobianco
Gregory R. Capobianco
*Counsel for The Wright Petitioners*

---

[1] *In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Notice of Proposed Rulemaking and Order, WC Docket Nos. 23-62, 12-375, FCC 23-19 (rel. Mar. 17, 2023).

[2] *In re Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Protective Order, 28 FCC Rcd 16954 (WCB 2013) ("2013 Protective Order"); *see also In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Protective Order, WC Docket Nos. 23-62, 12-375, DA 23-298 (rel. Apr. 5, 2023) ("2023 Protective Order").  The 2023 Protective Order incorporates by reference into WC Docket No. 23-62 all acknowledgements filed pursuant to the 2013 Protective Order.  2023 Protective Order ¶ 6.

Marlene H. Dortch
May 8, 2023
Page 2


Enclosures

cc:    William Kehoe
        Victoria Goldberg
        David Zesiger

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |

**COMMENTS OF**

**THE WRIGHT PETITIONERS**
**BENTON INSTITUTE FOR BROADBAND & SOCIETY**
**PRISON POLICY INITIATIVE**
**PUBLIC KNOWLEDGE**

Andrew Jay Schwartzman
Senior Counselor
Benton Institute for Broadband & Society
1341 G Street, NW
Washington, DC 20005
(202) 241-2408

*Counsel for the Benton Institute for Broadband & Society*

Peter Wagner
Executive Director
Prison Policy Initiative
P.O. Box 127
Northampton, MA 01060
(413) 527-0845

Albert H. Kramer
Senior Fellow
Public Knowledge
1818 N Street, NW
Suite 410
Washington, DC 20036
(202) 861-0020

Rebekah P. Goodheart
Gregory R. Capobianco
Xinyue Lu
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

Jacqueline Kutnik-Bauder
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005

*Counsel for the Wright Petitioners*

May 8, 2023

**JA734**

**EXECUTIVE SUMMARY**

The Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWRA") amends the Communications Act of 1934 to give the Federal Communications Commission ("Commission") a clear mandate to wholistically reform the incarcerated people's communications services ("IPCS") marketplace and eliminate the excessive, unjust, and unreasonable rates and charges faced by IPCS consumers.

With the passage of the MWRA, Congress decisively responded to the D.C. Circuit's decision in *Global Tel*Link v. FCC* ("*GTL*") and made clear that the Commission has broad authority to adopt reforms to ensure that *all* rates and charges for "any audio or video communications service" are just and reasonable, including all methods used to communicate via audio or video regardless of technology used, including on-site video visitation. This authority extends to IPCS practices, classifications, and regulations, as well.

In implementing the MWRA, the Commission should find that the term "just and reasonable" in the IPCS context has the same meaning as in Section 201(b) of the Communications Act, and that Section 276's requirement to ensure fair compensation is satisfied when there are just and reasonable rates. It should also preempt any state and local intrastate rates that would permit higher rates than the Commission's reforms.

When adopting a methodology to reform IPCS, the Commission should use industry-wide average costs of all providers of telephone and advanced communications services to develop a model carrier approach. As part of its reforms, the Commission must "consider" safety and security costs but is free to exclude costs that are not necessary for the provision of IPCS. The Commission should prohibit the recovery of site commissions under the amendments from MWRA and preempt state and local governments from assessing site commissions under Section 253 of the Communications Act. The Commission should also ensure that IPCS

providers may not evade the rate caps it adopts through pilot programs offering alternative rate structures.

Finally, the Commission should advance digital equity for all, as well as its diversity, equity, and inclusion goals, by using more inclusive terminology throughout its regulations and by ultimately adopting broad reforms to its IPCS rules.

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY ................................................................................ i

I.    THE MARTHA WRIGHT-REED ACT AUTHORIZES THE COMMISSION TO
      REFORM ALL AUDIO AND VIDEO IPCS. ................................................... 2

      A.    The Martha Wright-Reed Act Gives the Commission Jurisdiction over
            Intrastate IPCS. ............................................................................. 4

      B.    The Commission's Authority Extends to Any and All Methods Used to
            Communicate via Audio or Video. ...................................................... 4

      C.    The Commission Has the Authority to Adopt IPCS Reforms "Regardless
            of Technology Used." ...................................................................... 6

      D.    The Commission's Authority Extends to On-Site Video Visitation. ........ 7

II.   THE COMMISSION MUST ENSURE THAT ALL RATES AND CHARGES
      FOR IPCS ARE JUST AND REASONABLE. ................................................. 9

      A.    "Just and Reasonable" in the IPCS Context Should Have the Same
            Meaning as in Section 201(b) of the Communications Act. ................... 9

      B.    The Commission's Obligation to Ensure Fair Compensation Is Satisfied
            Through Setting Just and Reasonable Rates That Account for Any Costs
            Unique to the Provision of IPCS ...................................................... 11

      C.    The Commission Must Preempt State and Local Intrastate Rates That Are
            Higher Than Its Rate Caps. ............................................................. 13

      D.    The Commission's Mandate to Ensure Just and Reasonable Rates and
            Charges Extends to IPCS Practices, Classifications, and Regulations. ....... 14

III.  THE COMMISSION SHOULD USE INDUSTRY-WIDE AVERAGE COSTS. ........... 16

      A.    The Commission Has the Authority to Consider the Industry-Wide Costs
            of All Providers of Telephone and Advanced Communications Services. .......... 16

      B.    The Commission Should Use Industry-Wide Average Costs to Develop a
            Model Carrier Approach to Set Rate Caps. .......................................... 19

IV.   THE COMMISSION MUST ONLY "CONSIDER" WHETHER SAFETY AND
      SECURITY COSTS ARE "NECESSARY." ..................................................... 22

V.    THE COMMISSION SHOULD PREEMPT SITE COMMISSION PAYMENTS
      AND OTHERWISE EXCLUDE SUCH COSTS FROM RATES. ................................ 24

VI.    ANY ALTERNATIVE RATE STRUCTURES IN PILOT PROGRAMS MUST
       NOT EVADE THE COMMISSION'S RULES. ............................................................ 28

VII.   THE COMMISSION SHOULD ADOPT REFORMS TO ADVANCE DIGITAL
       EQUITY FOR ALL. ...................................................................................... 30

       A.    The Commission Should Update Its Rules to Use More Inclusive
             Terminology .......................................................................................... 30

       B.    Reforming IPCS Would Advance the Commission's Diversity, Equity,
             and Inclusion Goals .............................................................................. 31

CONCLUSION .................................................................................................... 33

APPENDIX A

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |

### COMMENTS OF THE WRIGHT PETITIONERS, BENTON INSTITUTE FOR BROADBAND & SOCIETY, PRISON POLICY INITIATIVE, AND PUBLIC KNOWLEDGE

The Wright Petitioners,[1] Benton Institute For Broadband & Society, Prison Policy Initiative, and Public Knowledge (the "Public Interest Parties"), submit these comments in the above-captioned proceedings to urge the Federal Communications Commission ("Commission") to ensure that rates and charges for incarcerated people's communications services ("IPCS") are just and reasonable.

Nearly twenty years after Martha Wright filed a petition for rulemaking with the Commission to address "the exorbitant long distance telephone service rates imposed on inmates at privately administered prisons and persons receiving collect calls from such inmates,"[2] the

---

[1] The Wright Petitioners—the late Martha Wright, Ulandis Forte, Ethel Peoples, Laurie Lamancusa, Dedra Emmons, Charles Wade, Earl Peoples, Darrell Nelson, and Jackie Lucas—brought suit in the United States District Court for the District of Columbia against Corrections Corporation of America in 2000, seeking to set aside exclusive telephone contracts among the private prisons and certain telephone companies. The matter was subsequently referred to the Commission in August 2001. Since 2003, these petitioners have actively petitioned the Commission for regulation of inmate calling services through The D.C. Prisoners' Legal Services Project, Inc. at the Washington Lawyers' Committee for Civil Rights and Urban Affairs.

[2] *See* Petition for Rulemaking by Martha Wright, et al., CC Docket No. 96-128 (Oct. 31, 2003), *on referral from Wright v. Corrections Corporation of America*, CA No. 00-293 (GK) (D.D.C.), https://www.prisonlegalnews.org/media/publications/wright_petition_re_petition_for_rulemaking_by_martha_wright_et_al_2003.pdf.

Martha Wright-Reed Just and Reasonable Communications Act of 2022[3] presents the Commission with an historic opportunity to finally see that justice is served to IPCS consumers—incarcerated people, their families, and loved ones—and adopt rules ensuring that they pay just and reasonable rates when communicating. The Public Interest Parties applaud the Commission for quickly adopting a notice of proposed rulemaking that will allow it to implement the MWRA on the timeline prescribed by Congress.[4] Through the MWRA's amendments to the Communications Act of 1934,[5] the Commission now has a clear mandate from Congress to wholistically reform the IPCS marketplace and eliminate the excessive, unjust, and unreasonable rates and charges faced by IPCS consumers.

## I.    THE MARTHA WRIGHT-REED ACT AUTHORIZES THE COMMISSION TO REFORM ALL AUDIO AND VIDEO IPCS.

With the passage of the MWRA, Congress unambiguously has made clear that the Commission has broad authority to adopt reforms to ensure that *all* rates and charges for "any audio or video communications service" are just and reasonable.

The MWRA amends Section 153 of the Communication Act to define "advanced communications services" to include "*any audio or video communications service* used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used,"[6] and amends Section 276 of the Communications Act to expand the Commission's authority over "payphone service" to

---

[3] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("Martha Wright-Reed Act," "MWRA," or the "Act").

[4] *See In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket Nos. 23-62, 12-375, FCC 23-19 (rel. Mar. 17, 2023) ("*NPRM*").

[5] *See* 47 U.S.C. § 151 *et seq.* (the "Communications Act").

[6] MWRA, § 2(b); 47 U.S.C. § 153(1)(E) (emphasis added).

2

encompass advanced communications services. As described further below, Congress, in taking this action, was responding directly to the D.C. Circuit's ruling in *GTL* and granted the Commission additional powers and responsibilities precisely to resolve the concerns forming the basis for the panel's decision. Congress enacted the MWRA to protect incarcerated people's ability to maintain connections with family and loved ones.[7] The MWRA closes any perceived loopholes in the Commission's authority, and empowers the agency to address market failures that for too long have resulted in unjust and unreasonable rates and charges for all audio and video IPCS. The Commission thus has "broad, plenary authority" to regulate the rates and charges for "any audio or video communications service" used by incarcerated people to communicate.[8]

　　　The Commission seeks comment on several interpretive issues relating to this unequivocal expansion of the Commission's ratemaking authority, including (1) whether "Congress intended to grant the Commission authority over all intrastate communications services between incarcerated people and non-incarcerated people with whom they wish to communicate";[9] (2) the types of devices that the phrase "any audio or video communications service" encompasses;[10] (3) the proper scope of the "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held"

---

[7] *See* Martha Wright-Reed Act pmbl., 168 Cong. Rec. H10027 (statement of Rep. Pallone) (daily ed. Dec. 22, 2022) ("It is my hope that this bill will help reduce financial burdens that prevent people from being able to communicate with loved ones and friends.") ("*MWRA Dec. 22, 2022 Congressional Record*"); *MWRA Dec. 22, 2022 Congressional Record*, 168 Cong. Rec. H10027 (statement of Rep. Lee) ("What is the basis of the issue? It is family. It is family connectedness. We have heard over and over again how exorbitant the cost is for grandmothers, mothers and fathers, and sisters and brothers to keep connections to individuals who, yes, have committed a crime, have been convicted, and are incarcerated, but they should not have been left out of the circle of humanity and family and the ability to stay connected.").

[8] *NPRM* ¶ 11 (internal quotation marks and alteration omitted).

[9] *NPRM* ¶ 37.

[10] *NPRM* ¶ 17.

limitation as applied to the Commission's authority;[11] and (4) whether the Act extends the Commission's ratemaking authority to on-site video visitation services.[12]

### A.    The Martha Wright-Reed Act Gives the Commission Jurisdiction over Intrastate IPCS.

In enacting the MWRA, Congress added Section 276 to the list of exceptions to the general limitation on the Commission's authority over intrastate communications in Section 2(b) of the Communications Act.[13]  This clarification of the Commission's authority to adopt rules regarding intrastate IPCS was a direct response to *GTL*, in which the D.C. Circuit had found that the Commission's pre-MWRA authority was limited to only interstate and international IPCS.[14]  Congress has thus decisively mooted the concerns that the D.C. Circuit raised about the Commission's intrastate jurisdiction in *GTL*.  The Commission should broadly view the MWRA as a direct, legislative response to the *GTL* decision and rejection of the limitations that decision may have articulated on the Commission's authority, including over intrastate rates.[15]  There is no dispute that Congress intended to, and did, give the Commission authority over intrastate IPCS.

### B.    The Commission's Authority Extends to Any and All Methods Used to Communicate via Audio or Video.

The Communications Act now explicitly permits the Commission to adopt reforms for a wide array of "advanced communications services" in correctional institutions.[16]  These

---

[11] *NPRM* ¶¶ 31-33.

[12] *NPRM* ¶¶ 30, 34.

[13] Martha Wright-Reed Act § 2(c); 47 U.S.C. § 152(b).

[14] *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ("*GTL*") (amending 859 F.3d 39 (D.C. Cir. 2017)).

[15] *See NPRM* ¶ 13; *infra* Secs. I.A, III.B.

[16] 47 U.S.C. § 276(b)(1)(A), (d); *see also NPRM* ¶ 4.

"advanced communications services" include, but are not limited to, interconnected VoIP, non-interconnected VoIP, interoperable video conferencing service, and any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.[17] Congress chose to use expansive language covering "any technology used" to grant the Commission authority as broadly as possible, intending to cover any and all technologies that an incarcerated person may use to communicate today or in the future.

The Public Interest Parties thus support the Commission's proposal to interpret "any audio or video communications service" broadly to "encompass all devices that incarcerated people either use presently or may use in the future to communicate with individuals not confined within the incarcerated person's correctional institution."[18]  The Commission correctly observes that the MWRA extends the Commission's authority over communications services "to include not just incarcerated people's audio and video communications using traditional payphones, but also their communications using 'other calling device[s],'" and does not otherwise qualify what "'other calling device[s]'" may encompass.[19]  The Commission should interpret "'other calling device[s]'" broadly, as it has proposed, to cover all devices that incarcerated people may presently or in the future use to communicate with those not confined within the incarcerated people's correctional institution.[20]  Consistent with the Commission's mandate to provide Telecommunications Relay Service ("TRS") for incarcerated people with

---

[17] 47 U.S.C. §§ 276(d), 153(1); *see also NPRM* ¶ 4.

[18] *NPRM* ¶ 17.

[19] *Id.*

[20] *Id.*

disabilities,[21] this could include devices that enable text-to-speech, speech-to-text, relay services for deaf, deafblind, and individuals with speech or other disabilities, assisted video conferencing, and any extant or future technology that assists incarcerated people with disabilities to communicate with others outside of their facility—or incarcerated people to communicate with non-incarcerated people with disabilities.

### C.  The Commission Has the Authority to Adopt IPCS Reforms "Regardless of Technology Used."

The Public Interest Parties support the Commission's proposal to interpret the limiting phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held" to apply *only* to "any audio or video communications service."[22]  There is no basis for extending this limiting phrase to any of the other advanced communications services subject to the Commission's general ratemaking authority.

As a purely textual matter, this limiting phrase appears only in conjunction with the category of "any audio or video communications service" in the definition of "advanced communications services," and no language in this definitional section or elsewhere in the Communications Act or the MWRA links this limiting phrase to any of the other types of advanced communications services itemized in Section 153(1)(A)-(D).  Furthermore, the category of "any audio or video communications service" in Section 153(1)(E) already encompasses each of the other categories of "advanced communications services" listed in Section 153(1)(A)-(D), each of which comprises some form of audio or video communications

---

[21] *See In re Rates for Interstate Inmate Calling Services*, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 22-76 (rel. Sept. 30, 2022) ("*Fourth Report and Order*").

[22] *NPRM* ¶ 31.

service.[23]  As such, interpreting the limiting phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held" as applying to the other types of advanced communications services would make the category of "audio or video communications service" added under the MWRA substantially repetitive of the other existing advanced communications services subject to the Commission's ratemaking authority.  Such an interpretation would violate the well-established canon against surplusage, and there is no indication in the statute or legislative history that Congress had intended such a result.[24]

### D.        The Commission's Authority Extends to On-Site Video Visitation.

The Commission seeks comment on interpreting the limiting phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held" as applied to "any audio or video communications service" in Section 3(1)(E) of the Communications Act.[25]  In view of Congress's clear intent for the MWRA to protect incarcerated people's ability to communicate with their family and loved ones, the physical location of the called party should not be relevant.  To interpret this language as suggesting that the Commission's authority over an incarcerated person's communications with their family

---

[23] 47 U.S.C. § 153(1)(E).  The other categories of advanced communications services are "interconnected VoIP service," "non-interconnected VoIP service," "electronic messaging service," and "interoperable video conferencing service."  47 U.S.C. § 153(1)(A)-(D).

[24] *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); Anita S. Krishnakumar & Victoria F. Nourse, *The Canon Wars*, 97 Tex. L. Rev. 163, 187 (2018) ("[T]he well-established rule against superfluity dictates that statutes should be construed to avoid redundancy, so that when there are two overlapping terms, each should be construed to have an independent meaning.").

[25] *NPRM* ¶¶ 32-33.  Specifically, the Commission seeks comment on whether it should interpret "individuals outside the correctional institution where the inmate is held" to mean "people who are neither confined in nor employed by the institution, even if they are temporarily located on the premise of the institution for purposes of communicating with incarcerated individuals through some form of audio or video communications service."  *NPRM* ¶ 33.

member might cease the moment the family member steps foot on the grounds of a correctional institution would contravene the goals of the MWRA, and create an arbitrary distinction in light of the overarching purpose of the Act.

The Commission should interpret the MWRA as extending the Commission's authority over on-site video visitation services as either "any audio or video service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held" or "interoperable video conferencing services."[26]  On-site video visitation service used by an incarcerated person for the purpose of communicating with those neither confined nor employed by the correctional facility fits plainly within the statutory language in Section 3(1)(E), as the service is used by incarcerated persons to communication with "individuals outside the correctional institution where the inmate is held," *i.e.*, persons not held within the institution. Nothing in the statute requires the Commission to take a cramped reading of this definition that would exclude communications with on-site visitors; although the term "outside the correctional institution" can mean "not physically within the structure," it can equally mean "not held within the institution."  Irrespective of whether the statutory text could permit the former reading, the latter is far more consistent with the greater statutory scheme.  As the Commission notes, on-site video visitation services are often operated by IPCS providers, making them similarly vulnerable to the same type of rate abuse that Congress was concerned about.[27]

Finally, a contrary interpretation about the Commission's authority over on-site video visitation would create a perverse incentive for both facilities and IPCS providers to reduce the availability of other forms of IPCS as well as in-person visitation.  If on-site video visitation is

---

[26] *NPRM* ¶ 34.

[27] *See id.*

not subject to the Commission's oversight, IPCS providers will be able to charge unjust and unreasonable rates for the service and be motivated to shift IPCS consumers toward the more profitable service and away from those over which the Commission has authority.

## II. THE COMMISSION MUST ENSURE THAT ALL RATES AND CHARGES FOR IPCS ARE JUST AND REASONABLE.

The MWRA amends the Communications Act to require the Commission to ensure that all IPCS rates and charges are just and reasonable.[28]  The Commission seeks comment on how to implement this new statutory language.[29]  As explained below, the Commission should follow established canons of statutory interpretation and interpret "just and reasonable" as part of the broader Section 201 context.

### A.     "Just and Reasonable" in the IPCS Context Should Have the Same Meaning as in Section 201(b) of the Communications Act.

The Public Interest Parties support the Commission's proposal to interpret the term "just and reasonable" in Section 276(b)(1)(A) to have the same meaning as in Section 201(b).[30]  Tracking the Section 201(b) meaning is the most sound reading of the statute and of congressional intent.  "[I]dentical words and phrases within the same statute should normally be given the same meaning,"[31] and it is reasonable to conclude that Congress was aware of the Section 201(b) standard—and the Commission's decades of relevant precedent interpreting it— when it chose to add the identical term to Section 276.[32]  Indeed, any other approach would be

---

[28] Martha Wright-Reed Act § 2(a)(1)(B).

[29] *NPRM* ¶¶ 18-28.

[30] *NPRM* ¶ 18.

[31] *See FCC v. AT&T Inc.*, 562 U.S. 397, 408 (2011) (internal quotation marks omitted).

[32] This approach is also consistent with the presumption of consistent usage, which teaches that the Commission should interpret Congress's addition of "just and reasonable" to Section 276 as having the same meaning as when used elsewhere in the Communications Act.  *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 171-73 (2011).

inconsistent with the well-established principle of statutory construction that identical terms should be given the same meaning when they recur within different but related sections of a statute.[33]

Incorporating Section 201(b)'s just and reasonable standard into Section 276 also imports the Commission's "used and useful" framework, which excludes certain impermissible costs from any rate methodology. The Public Interest Parties ultimately urge the Commission to set rates based on broader industry costs, rather than based upon the idiosyncratic cost structure of any particular carrier.[34] The "used and useful" constraint remains an important equitable principle preventing ratepayers from being "forced to pay a return" on costs that are "primarily for the benefit of the carrier."[35] The Commission has found that "Section 201(b) of the Communications Act requires that only reasonable investments and expenses be recovered" as part of a rate paid by end users.[36] The Commission has enforced this prohibition against the recovery of unrelated costs through its "used and useful" standard, which serves as a protection against inefficiencies and abuse.[37]

The Commission has identified general principles to evaluate whether investment and expenses are "used and useful," including "whether the investment and expense benefits

---

[33] *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 536 (2013).

[34] *See infra* Sec. III.

[35] *NPRM* ¶ 21 & n.68 (internal quotation marks omitted).

[36] *In re Connect America Fund*, Report and Order, Third Order on Reconsideration, and Notice of Proposed Rulemaking, 33 FCC Rcd 2990, 3011-12 ¶ 47 (2018) (citing *In re Am. Tel. & Tel. Co.*, 64 F.C.C.2d 1, 38-39, ¶¶ 111-112 (1977) ("[C]ourts have felt that the owners of public utilities must be compensated for the use of their property in providing service to the public … [e]qually central to the used and useful concept, however, is the equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them.")).

[37] *See In re Sandwich Isles Communications, Inc.*, Order, 31 FCC Rcd 12999, 13029 ¶ 98 (2016) ("*Sandwich Isles Order*").

ratepayers and thus is necessary for the provision of interstate telecommunications services."[38]
In this context, the Commission's consideration of what is necessary is dependent on whether the
cost "benefits ratepayers."[39]  It also requires that investments be "prudent" even if otherwise
"used and useful."[40]  The Public Interest Parties look forward to a more granular discussion of
appropriate cost categories following the IPCS providers' responses to the proposed 2023
Mandatory Data Collection.[41]

> ### B. The Commission's Obligation to Ensure Fair Compensation Is Satisfied Through Setting Just and Reasonable Rates That Account for Any Costs Unique to the Provision of IPCS.

The Commission seeks comment on the relationship between the legacy requirement in
Section 276 that providers be "fairly compensated" and the new requirement that rates and
charges be "just and reasonable."[42]  The Public Interest Parties agree that Congress intended for
the "just and reasonable" standard to be the Commission's "central focus" moving forward.[43]
The basic "fairness" contemplated in Section 276 naturally flows from just and reasonable rates.

As acknowledged by the concurring opinion in *GTL*, "[t]here is no question that the
relevant statutory language, 'fairly compensated,' is ambiguous."[44]  However, in everyday
language, for a service provider to be "fairly compensated" for its services would signify that it

---

[38] *In re Connect America Fund*, 33 FCC Rcd at 3012 ¶ 49.

[39] *See infra* Sec. III.B.

[40] *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 499 (2002) (quoting *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 312 (1989)).

[41] *See Wireline Competition Bureau and Office of Economics and Analytics Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services*, Public Notice, WC Docket Nos. 23-62, 12-375, DA 23-355 (rel. Apr. 28, 2023).

[42] *NPRM* ¶ 16 ("What independent meaning does the 'fairly compensated' requirement have for communications services for incarcerated people in light of the other provisions of the Martha Wright-Reed Act, including the newly-added requirement to ensure 'just and reasonable' rates and charges?").

[43] *NPRM* ¶ 14.

[44] *GTL*, 866 F.3d at 480 (J. Silberman, concurring).

is paid an amount that reasonably reflects the value of the services that it provides. The standard focuses on the *objective* value of the services being provided, rather than on the subjective or idiosyncratic cost structure of any particular provider in provisioning them. The standard does not require every carrier to be profitable, but rather for rates to be set at a level where carriers receive compensation that would allow a well-run and prudent IPCS carrier to realize a fair rate of return.

In context, therefore, the requirement that all payphone carriers be "fairly compensated," as applied to IPCS providers, is thus sensibly understood as requiring that any "just and reasonable" rates adopted by the Commission includes a methodology that accounts for unique costs, if any, specific to the provision of IPCS. The Commission's just and reasonable rate precedent is broad enough to encompass the concept of fair compensation so long as it includes allowance for these considerations. Accordingly, as discussed in more detail in Section III.B below, the requirement that rates and charges be "just and reasonable" while providers are "fairly compensated" is consistent with using a price cap approach based on a model carrier, which models the reasonable costs and fair return for a hypothetical well-run provider in the industry.

Any argument that rates must be *higher* than they otherwise would be under a "just and reasonable" approach to achieve "fairness" to any specific IPCS providers is inconsistent with the underlying purpose driving enactment of the MWRA. It also ignores Congress's deliberate qualification of "rates and charges" with "just and reasonable," which the statute does not permit. The Commission should reject any arguments that there is independent meaning to "fairly compensated" that would lead to higher rates.

The Public Interest Parties also agree that the Commission is no longer required to ensure that the established compensation plan allows for fair compensation for each and every

completed call.[45]  Congress eliminated that term from the statute, decisively addressing the *GTL* decision's contrary interpretation.  To the extent there is any independent obligation to ensure fair compensation, it would apply generally, and not to individual calls.

### C.    The Commission Must Preempt State and Local Intrastate Rates That Are Higher Than Its Rate Caps.

The Commission should clarify that any rate methodology will act as a ceiling, not a floor and, consistent with precedent, preempt intrastate rates that are higher than a rate cap but not lower.  Section 276 empowers the Commission to preempt requirements that are inconsistent with the federal rules.[46]  And in contrast to other sections of the Communications Act that preserve some degree of state and local authority,[47] there is no such explicit or other preservation of any non-federal regulation of IPCS.  At the same time, state and local laws that require intrastate rates to be *lower* than the Commission's rate caps are not inconsistent with the Commission's regulations.[48]  That is because any intrastate rates lower than the Commission's rate cap would not violate any specific provision of the Communications Act and lower rates are consistent with the underlying purpose of the MWRA.

---

[45] *NPRM* ¶ 23.

[46] *See* 47 U.S.C. § 276(c) ("To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.").

[47] *See, e.g.*, 47 U.S.C. § 253(c) ("Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis."); 47 U.S.C. § 332(c)(7)(A) ("[N]othing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.").

[48] *See, e.g.*, *In re Connect America Fund*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 17992 ¶ 915 n.1808 (2011) ("states are free to lower intrastate access rates more quickly than specified by our reform"), *aff'd*, *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

### D.    The Commission's Mandate to Ensure Just and Reasonable Rates and Charges Extends to IPCS Practices, Classifications, and Regulations.

The Commission seeks comment on whether it has authority to ensure that the practices, classifications, and regulations for or in connection with IPCS services are just and reasonable.[49] It does.  As the Commission observes, Section 3(b) of the MWRA amends Section 276 to require that the Commission "establish a compensation plan to ensure that . . . all rates and charges are just and reasonable."  The responsibility to ensure that rates and charges are just and reasonable necessarily encompasses a corresponding responsibility to ensure that IPCS providers do not evade those caps through their other practices, classifications, and regulations.  The Commission has previously found that "the bedrock protection[] of Section[] 201" is that those subject to it "must act justly and reasonably."[50]  In applying its Section 201(b) precedent to the IPCS context,[51] the Commission therefore should ensure that providers *implement* any just and reasonable rates justly and reasonably, including with respect to any other "practice, classification, or regulation" connected to offering IPCS.

In any event, even separate and apart from the "just and reasonable" standard necessarily encompassing IPCS practices, classifications, and regulations, the Commission's ancillary jurisdiction is also broad enough to reach those matters.  The Commission may exercise its ancillary jurisdiction to regulate matters beyond its immediate statutory directives when its "general jurisdictional grant under Title I covers the regulated subject" and any adopted regulations would be "reasonably ancillary to the Commission's effective performance of its

---

[49] *NPRM* ¶¶ 27-28.

[50] *In re Technology Transitions*, Declaratory Ruling, Second Report and Order, and Order on Reconsideration, 31 FCC Rcd 8283, 8302 ¶ 59 (2016).

[51] The Supreme Court has explained that "the grant in § 201(b) means what it says: The FCC has rulemaking authority to carry out the 'provisions of this Act' . . . ." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 (1999).

statutorily mandated responsibilities."[52]  Both prongs of that test are easily met here.  First, IPCS

providers' practices, classifications, and regulations fall within the Commission's general grant

of jurisdiction under Title I of the Communications Act, which encompasses all "interstate and

foreign commerce in communication by wire or radio."[53]  Second, ensuring that those practices,

classifications, and regulations are just and reasonable is "reasonably ancillary" to the

Commission's mandate under both Sections 201(b) and 276 to ensure just and reasonable rates

and charges, since carriers could otherwise use unreasonable practices, classifications, and

regulations to circumvent or undermine the Commission's ability effectively to carry out those

responsibilities.[54]

Since the intrastate and interstate components of IPCS providers' practices,

classifications, and regulations are not readily separable, the Commission can also rely on the

impossibility exception to ensure that it may appropriately regulate them using its ancillary

authority.  Application of the impossibility exception over "jurisdictionally mixed" services—

where it is impossible or impracticable to separate out interstate and intrastate components—is

appropriate where a failure to extend regulations to the intrastate matter would frustrate

achievement of the Commission's statutory responsibilities.[55]  One key element in this analysis is

whether "regulation of the interstate aspects of the matter can[] be 'unbundled' from regulation

---

[52] *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 691-92 (D.C. Cir. 2005); *see also United States v. Sw. Cable Co.*, 392 U.S. 157, 178 (1968) ("It is enough to emphasize that the authority which we recognize today . . . is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities . . . .").

[53] 47 U.S.C. § 151.

[54] *Cf. Comcast Corp. v. FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010) ("Although policy statements may illuminate that authority, it is Title II, III, or VI to which the authority must ultimately be ancillary.").

[55] *See California v. FCC*, 905 F.2d 1217, 1242-43 (9th Cir. 1990) (recognizing the impossibility exception); *In re Vonage Holdings Corp.*, Memorandum Opinion and Order, 19 FCC Rcd 22404, 22413 ¶ 17 (2004), *aff'd sub nom. Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007).

of the intrastate aspects."[56]  Here, IPCS providers cannot practicably separate the general

practices that may apply broadly to IPCS providers, which all offer both interstate and intrastate

services, themselves into interstate and intrastate components.  The Commission has reasonably

applied the impossibility exception in the ancillary service charges context,[57] and should do so

here as well, to the extent necessary.

## III.　THE COMMISSION SHOULD USE INDUSTRY-WIDE AVERAGE COSTS.

In passing the MWRA, Congress amended the statute to authorize the Commission to set

just and reasonable rates based on industry-wide average costs.  Understood in the context of

addressing the *GTL* decision, "industry-wide" should be interpreted to mean the entire

telecommunications industry, not just the provision of IPCS.  This interpretation would

encourage IPCS that is efficient and does not include costs unrelated to the provision of IPCS.

### A.　The Commission Has the Authority to Consider the Industry-Wide Costs of All Providers of Telephone and Advanced Communications Services.

The Commission seeks comment on the meaning of the term "industry-wide" as used in

Section 3(b)(1) of the Act.[58]  That section provides that the Commission "may use industry-wide

average costs of telephone service and advanced communications services and the average costs

of service of a communications service provider" in determining just and reasonable rates.[59]  The

---

[56] *In re Rates for Interstate Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8496 ¶ 30 (2020).

[57] *Cf. In re Rates for Interstate Inmate Calling Services*, 35 FCC Rcd at 8501 ¶ 48 ("It would frustrate our efforts to ensure that charges for interstate ancillary services are just and reasonable if providers could recover, through their interstate ancillary service charges, costs that should be allocated to a parallel intrastate ancillary service, or that providers have already recovered through their intrastate ancillary service charges."); *see also* Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Mar. 20, 2020) (arguing that nearly all ancillary service fees charged to IPCS consumers are jurisdictionally mixed and subject to the impossibility exception).

[58] *NPRM* ¶ 48.

[59] Martha Wright-Reed Act § 3(b).

section does not define "industry-wide" as the costs of the *IPCS* industry.  Rather, the statute generally refers to "industry-wide average costs of telephone service and advanced communications services."[60]

Although the term "industry-wide" is arguably ambiguous, any ambiguity, however, is resolved by the context in which it was added to the statute, which demonstrates that Congress was empowering the Commission to consider cost data from the telecommunications and advanced communications services industries more generally.  It is clear that, in enacting the MWRA, Congress was responding to the D.C. Circuit's decision in *GTL* that the Commission could *not* use industry-wide data to set its rates for IPCS by giving the Commission statutory authority to do exactly that.  The *GTL* court had determined that the Commission could not use industry-wide averages because doing so would not be consistent with its statutory mandate that "each and every" call be fairly compensated.[61]  Congress clearly intended to alter this outcome of *GTL* by adding "industry-wide average costs" to Section 3(b)(1) of the Act and deleting the fair compensation requirement for "each and every call," thereby authorizing the Commission to do exactly what the *GTL* court had held it could not: consider industry-wide costs when setting just and reasonable rates.

In light of both the text of the MWRA and its underlying purpose, the Commission should interpret "industry-wide" to encompass the entire communications industry.  If Congress had intended to limit the Commission's consideration of the industry to only providers of IPCS, it easily could have done so.[62]  Moreover, the legislative history of the Act also supports a

---

[60] Martha Wright-Reed Act § 3(b).

[61] *GTL*, 866 F.3d at 414.

[62] *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Had Congress intended to restrict [the application of a certain statute], it presumably would have done so expressly.").

reading of "industry-wide average costs of telephone service and advanced communications services" as meaning "the industry for telephone and advanced services generally" as opposed to the averages for IPCS providers alone.[63]  The term "industry-wide" is thus best interpreted as referring collectively to all providers of telephone service and advanced communications service, not just the average costs of IPCS providers alone.

The Commission seeks comment on whether the statutory language allows, or even requires, the Commission "to set rates for each provider based on that provider's average costs of service."[64]  The Act clearly does not require such a result; on its face, it uses the permissive "may," giving the Commission discretion as to whether to use provider-specific costs in setting rates.  Since the Commission already had authority to consider provider-specific costs under the pre-MWRA statutory text, the phrase "may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider" is best understood as *adding* to the Commission's range of permissible options in the types of data it can consider in setting rates, rather than requiring it to use any particular methodology.

The inclusion of "industry-wide" authority, moreover, reflects Congress's clear intent to overturn the limitations of *GTL*, and to affirmatively empower the Commission to use industry-wide weighted averages to determine rate caps.[65]  Nowhere does the MWRA speak in terms of

---

[63] *Rivers v. Roadway Exp., Inc*., 511 U.S. 298, 307 n.7 (1994) (noting that Congress can, "in response to a judicial decision that construed a . . . statute narrowly, amend the legislation to broaden its scope"); *Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045, 1052 (9th Cir. 2015) ("Under the rules of statutory construction, we presume that . . . when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation." (internal quotation marks omitted)).

[64] *NPRM* ¶ 50.

[65] *GTL*, 866 F.3d at 414.

provider-specific costs in connection with setting just and reasonable rates.[66]  The goal of the Act was to remove constraints on the Commission's authority to set just and reasonable rates—not restrict the Commission's ability to consider average costs.  Furthermore, adopting a limiting approach would not be beneficial or consistent with the goals of the Act, which is to "help reduce financial burdens that prevent people from being able to communicate with loved ones and friends."[67]

### B.    The Commission Should Use Industry-Wide Average Costs to Develop a Model Carrier Approach to Set Rate Caps.

In the attached report,[68] the Brattle Group recommends using industry-wide average costs to set IPCS rates, rather than the average costs of IPCS providers.[69]  This approach would allow the Commission to construct an efficient provider, rather than propping up existing providers that may have inflated costs.  This approach encourages efficiency and is similar to the Commission's approach of assuming a forward-looking efficient carrier in the universal service cost model context.[70]

---

[66] Martha Wright-Reed Act § 3(b).  As the Commission rightly notes, taken as a whole, the Act addresses "the constraints imposed by the D.C. Circuit's interpretation on the Commission's jurisdiction in *GTL*" and expands the Commission's jurisdiction over IPCS.  *See NPRM* ¶ 11.

[67] *MWRA Dec. 22, 2022 Congressional Record*, 168 Cong. Rec. H10027 (statement of Rep. Pallone).  Moreover, setting individual provider rate caps based on that IPCS provider's average costs of service would create a perverse incentive for providers to overstate their costs even more than they already do, as the benefits of submitting inflated cost data would flow directly to the provider submitting such data.

[68] The Brattle Group report is attached hereto as Appendix A.  Coleman Bazelon & Paroma Sanyal, Comments on "FCC Seeks Comment on Its Expanded Authority to Ensure Just and Reasonable Rates and Charges for Incarcerated People's Communications Services," Notice of Proposed Rulemaking (WC Docket Nos. 23-62, 12-375) (May 8, 2023) (the "Brattle Report").

[69] Brattle Report, ¶¶ 3-11.

[70] *See, e.g.*, *In re Connect America Fund*, Report and Order, Order and Order On Reconsideration, and Further Notice of Proposed Rulemaking, 31 FCC Rcd 3087, 3090 ¶ 4 (2016) (establishing a "new forward-looking, efficient mechanism for the distribution of support in rate-of-return areas"); *In re Connect America Fund*, Report and Order, 29 FCC Rcd 3964, 3966-67 ¶¶ 3-7 (2014) (summarizing the Commission's efforts in implementing in the USF auction context a cost model to estimate "the forward-

Using industry-wide costs fully comports with the statute and will avoid frequent data collections and persistent concerns about misallocation and inflated costs as reported by IPCS providers. A model would implement the statutory directive that IPCS rates be "just and reasonable," while also ensuring that providers are "fairly compensated," by (1) identifying the reasonable and objective value of the services provided as they would be priced in a competitive market, rather than by focusing on any particular provider's idiosyncratic cost structure disconnected from the fair value of its service offerings; and (2) including consideration of additional costs, as the Commission may determine are "necessary," specific to the IPCS industry and uniquely associated with the provision of IPCS services.

The Brattle Report proposes adopting a model-carrier approach to calculate rates, which would use the industry-average costs for non-IPCS audio calls "and then potentially adjust[ing] for costs that may be particular to the provision of service in incarceration facilities."[71] From an economic modeling perspective, the core inputs could be 1) service costs benchmarked from the costs of providing similar services commercially; 2) facilities costs benchmarked from a combination of broader industry costs, especially for equipment, and IPCS provider costs; 3) safety and security costs, such as Communications Assistance for Law Enforcement Act ("CALEA") costs, but otherwise exclude safety and security costs not necessary for IPCS;[72] 4)

---

looking economic costs of an efficient wireline provider at a granular level – census block or smaller – in all areas of the country").

[71] Brattle Report, ¶ 8.

[72] *See* Reply Comments of Worth Rises at 4, WC Docket No. 12-375 (Mar. 3, 2023) ("Accordingly, we echo our previous comments that IPCS rates should include the cost of security and surveillance that conforms to the Communications Assistance for Law Enforcement Act (CALEA),which preserves the ability of law enforcement to surveil calls and is trusted to reasonably protect public safety." (footnote omitted)); *id.* at 2 ("Security and surveillance services are not necessary to the provision of IPCS and instead serve separate and distinct penal interests."); s*ee infra* Sec. IV.

overhead costs benchmarked from a mix of IPCS and general communications industry sources; and 5) allowed return informed by industry benchmarks.[73]

Using a model carrier approach to set just and reasonable rates is well within the Commission's wide discretion.[74]  An industry-wide approach also avoids concerns about the cost data submitted by the IPCS providers, which, as the Brattle Group finds, appear to be inflated.[75] In particular, the Brattle Report finds that IPCS costs and rates appear to each be uncorrelated with the standard and expected economic drivers behind costs and rates.[76]  Even when observable, differences in costs driven by facility or provider size are overwhelmed by other factors.[77]  In some cases, the reported costs in the Third Mandatory Data Collection are greater than the rates charged based on the facility-level contract, which would not be expected in an efficient market.[78]

By comparing the IPCS providers' submitted cost data to publicly available contracts, the Brattle Report found anomalies.[79]  As a result, there is "a significant variation in costs across facilities[,] . . . even when the facilities seem generally comparable, that cannot be explained by economic rationale."[80]  At bottom, "the costs reported by the IPCS industry likely include costs that either should not be included because they are not related to providing IPCS or may be

---

[73] Brattle Report, ¶ 6.

[74] *See supra* n.68.

[75] Brattle Report, ¶ 5.

[76] Brattle Report, ¶ 20.

[77] *See* Brattle Report, ¶¶ 16, 20, 29.

[78] *See* Brattle Report, ¶ 16.

[79] *See generally* Brattle Report.

[80] Brattle Report, ¶ 10.

greater than they would be if they were provided in a competitive market."[81]  Using a model cost approach avoids these concerns.  Under this approach, the Commission can specify the costs that "an IPCS carrier should have or would have if they operated under competitive pressures" based on "industry average costs, using a combination of non-IPCS telecom industry costs and IPCS provider costs to calculate those averages."[82]  The Commission can also exclude costs that are not related to providing IPCS, such as certain safety and security costs as further discussed below.

## IV.   THE COMMISSION MUST ONLY "CONSIDER" WHETHER SAFETY AND SECURITY COSTS ARE "NECESSARY."

The MWRA directs the Commission to "consider costs associated with any safety and security measures *necessary* to provide" IPCS,[83] and the Commission seeks comment on how to implement this part of the Act.[84]  As Worth Rises has explained, the Commission should recognize that correctional facilities that may use certain safety and security features are fundamentally not IPCS *providers*.[85]  Instead, these facilities contract *with* providers, which themselves then offer communications services to incarcerated people.  Correctional facilities incur various costs in their overall operation, most of which have nothing to do with the provision of communications services.  The record demonstrates that providing safety and

---

[81] *Id.*

[82] Brattle Report, ¶ 5.

[83] Martha Wright-Reed Act § 3(b)(2) (emphasis added).

[84] *NPRM* ¶ 52.

[85] *See, e.g.*, Letter from Bianca Tylek, Executive Director & Maya Ragsdale, Legal Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1-2 (Mar. 16, 2022) (arguing that the Commission should remove security and surveillance services from its IPCS cost calculation because "agencies' interest in procuring these services stems from their core responsibility to maintain security and safety in their facilities"); Comments of Worth Rises at 1-12, WC Docket No. 12-375 (Sept. 27, 2021) (demonstrating that security and surveillance services are "separate and distinct" from IPCS).

security services is a core function of operating a *facility*, but unrelated to the provision of communications services.[86]  Indeed, safety and security are for the benefit of "investigators, correctional administrators, prosecutors, and other law enforcement officers."[87]

Congress did not say that the Commission "must include" or "shall allow for the recovery of" the safety and security costs claimed by IPCS providers.  Instead, it deferred to the Commission's expertise and discretion, requiring only that it *consider* costs associated with safety and security measures when developing rate caps.[88]  While the Commission must therefore consider these costs, it is plainly not obligated to pass them through in the rate caps ultimately adopted.

The Commission seeks comment on how to interpret the word "necessary" in the MWRA, and observes the relationship between the "ordinary and fair meaning" of the term and how the D.C. Circuit has interpreted the word.[89]  With respect to its plain meaning, Black's Law Dictionary defines "necessary" to mean something "[t]hat is needed for some purpose or reason; essential," or "[t]hat must exist or happen and cannot be avoided; inevitable."[90]  The first definition is nearly circular, using "needed" to define "necessary."  The second definition clarifies that something is necessary if it *must exist* and *cannot be avoided*.

---

[86] *See* Reply Comments of Worth Rises at 5, WC Docket No. 12-375 (Dec. 17, 2021) ("Security is a core feature of operating a correctional facility and should be paid for by the agencies themselves and not IPCS users."); *see generally* Comments of Worth Rises, WC Docket No. 12-375 (Dec. 15, 2022) ("Worth Rises Sixth FNPRM Comments").

[87] *See, e.g.*, Worth Rises Sixth FNPRM Comments; *see also* Letter from Bianca Tylek, Founder and Executive Director, Worth Rises, to Marlene Dortch, Secretary, FCC, WC Docket No. 12-375 (Mar. 24, 2021).

[88] *See* Martha Wright-Reed Act § 3(b)(2).

[89] *NPRM* ¶ 53

[90] *Black's Law Dictionary* (11th ed. 2019).

Courts have likewise recognized that the Commission has considerable deference in defining "necessary," recognizing "the chameleon-like nature of the term 'necessary,' whose meaning depends on its statutory context."[91]  The Commission's prior efforts to interpret the term in other contexts do not mean that it must reach any particular conclusion here.[92]  Security and safety costs may be necessary for the operation of a correctional facility, but that does not mean the costs should be shifted to the incarcerated person.  It should also be clear that safety and security features that are not universally used across facilities suggests that they cannot be "necessary," as some providers do offer IPCS without needing to use such features.[93]

## V.    THE COMMISSION SHOULD PREEMPT SITE COMMISSION PAYMENTS AND OTHERWISE EXCLUDE SUCH COSTS FROM RATES.

The Commission seeks comment on whether to preempt state and local laws that impose site commission payments on incarcerated people's communications services providers.[94]  The treatment of site commission has been a long-standing issue in this proceeding.[95]  Following the

---

[91] *Cellco Partnership v. FCC*, 357 F.3d 88, 90 (D.C. Cir. 2004).

[92] *See, e.g.*, *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 509-10 (D.C. Cir. 2003) (discussing "necessary" in the context of the forbearance statute); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 391-94 (D.C. Cir. 2004) (discussing "necessary" in the context of media ownership).

[93] Moreover, the Commission should separately evaluate whether such costs are "necessary" pursuant to the Commission's "used and useful" standard.  *See NPRM* ¶¶ 53-54; *infra* Sec. II.A.  The Commission has recognized that whether an investment and expense is "used and useful" depends on the particular facts of the case.  *See In re Connect America Fund*, 33 FCC Rcd at 3012-13 ¶ 49 (*citing Sandwich Isles Order*, 31 FCC Rcd at 12999).  Costs unrelated to IPCS, including safety and security measures, could be excluded as not "used and useful" for the provision of IPCS.

[94] *NPRM* ¶ 23.

[95] *See, e.g.*, *In re Rates for Interstate Inmate Calling Services*, Second Report & Order and Third Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12818-31 ¶¶ 117-132 (2015), *vacated in part sub nom. GTL*, 866 F.3d 397 (D.C. Cir. 2017); *In re Rates for Interstate Inmate Calling Services*, Order on Reconsideration, 31 FCC Rcd 9300, 9319-20 ¶¶ 35-38 (2016); *In re Rates for Interstate Inmate Calling Services*, Third Report & Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9561-92 ¶¶ 100-168 (2021); *GTL*, 866 F.3d at 404-06, 412-16; Petition for Reconsideration of United Church of Christ & Public Knowledge, WC Docket No. 12-375 (corrected version filed Dec. 14, 2022); Reply Comments of the Wright Petitioners et al., WC Docket No. 12-375, at 9-10, 13-14 (Jan. 15, 2021).

enactment of the MWRA and Congress's response to *GTL*, the Commission should preempt state and local laws that require or permit site commission payments.

The Commission may preempt state and local laws where it has statutory authority to regulate,[96] which is the case here.[97] First, as noted above, the broad statutory grant to ensure just and reasonable rates for IPCS in light of the MWRA encompasses the ability to ensure that IPCS providers' practices are just and reasonable as well. That power includes the ability to declare that it is an unjust and unreasonable practice for IPCS providers to enter into exclusive arrangements with correctional facilities, or governmental units operating those facilities, requiring the payment of site commissions, the cost of which causes the services provided to incarcerated persons to become unjust and unreasonable.[98]

Second, separate and apart from the Commission's authority under Section 276 itself, Section 253(a) of the Communications Act prohibits state or local statutes or regulations from "prohibit[ing] or having the effect of prohibiting the ability of any entity to provide any interstate

---

[96] *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A] federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority.")

[97] Earlier in this proceeding, IPCS providers sought for the Commission to prohibit or limit site commissions. *See* Letter from Andrew D. Lipman, Counsel for Inmate Calling Services, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Ex. A at 3-4 (Sept. 28, 2015) (proposing a rule that "No Provider may pay a Site Commission or any other form of monetary compensation except for the Facility Administrative Support established herein. Payment of a Site Commission exceeding the Facility Administrative Support established in this part shall be an unjust and unreasonable practice."); Letter from Brian D. Oliver, Chief Executive Officer, Global Tel*Link Corporation et al., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (Oct. 15, 2015) (supporting a path "to address site commissions in the manner proposed by Andrew D. Lipman"); *see also* Letter from Andrew D. Lipman, Counsel for Inmate Calling Services, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (Apr. 8, 2015) (explaining that the Commission has legal authority to limit or prohibit site commissions).

[98] The Commission has found that if it has jurisdiction over the carrier and the contracts it can lawfully enter, it does not need to also have jurisdiction over the counterparty. *Cf. In re Improving Competitive Broadband Access to Multiple Tenant Environment*, Report and Order and Declaratory Ruling, GN Docket No. 17-142, FCC 22-12 (rel. Feb. 15, 2022) (adopting rules that prohibit providers from entering into certain types of revenue sharing agreements with third parties).

or intrastate telecommunications service."[99]  Section 253(d) gives the Commission authority to preempt the enforcement of such state law or laws "to the extent necessary to correct such violation or inconsistency."[100]

The Commission has recently affirmed that in determining whether a state or local law has the effect of prohibiting the provision of telecommunications services under Section 253, it must consider "whether the ordinance *materially inhibits* or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."[101] The Commission further explained that "a legal requirement can 'materially inhibit' the provision of services even if it is not an insurmountable barrier,"[102] and that a state or local legal requirement could inhibit service in a number of different ways, including "by restricting the entry of a new provider in providing service in a particular area [and] by materially inhibiting the introduction of new services or the improvement of existing services."[103]  With this authority, the Commission has preempted state and local fees associated with the deployment of wireless infrastructure, permitting them only "to the extent that they represent a reasonable approximation of the local government's objectively reasonable costs, and are non-discriminatory."[104]

---

[99] 47 U.S.C. § 253(a).

[100] 47 U.S.C. § 253(d).

[101] *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Declaratory Ruling and Third Report and Order, 33 FCC Rcd 9088, 9092-93 ¶ 10 (2018) ("*Small Cell Order*") (quoting *California Payphone Ass'n*, 12 FCC Rcd 14191, 14206 ¶ 31 (1997)), *rev. granted, rev'd in part sub nom. City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020).

[102] *Small Cell Order*, 33 FCC Rcd at 9102-03 ¶ 35.

[103] *Id.* at 9104-05 ¶ 37.

[104] *Id.* at 9100-01 ¶ 32.

The material inhibition that site commissions place on the provision of IPCS is undisputed.  Site commissions, which the record shows sometimes approach 100%,[105] redirect funds from the IPCS provider to the facility.  This, in turn, reduces the capacity of the provider to (1) introduce new services, (2) improve the quality of existing services, or (3) invest money elsewhere in other facilities.  Moreover, because they operate as a gating function to access the facility, the use of site commissions has a severe anti-competitive effect during the contract bidding process, often foreclosing from participation smaller providers that are unable to make such payments.[106]

In light of these negative effects on the IPCS marketplace, the Commission should find that Section 253(a)'s requirement that state and local laws cannot *materially inhibit* the provision of telecommunications applies to state and local governments that require IPCS providers to pay site commissions as a condition precedent to offering IPCS, or that authorize correctional institutions to impose such conditions.  The Commission has found that Section 253 "makes no distinction between a state or locality's regulatory and proprietary conduct" and thus applies both to contracts or other arrangements as it would to direct regulation.[107]  It should adopt the same approach here.

---

[105] *See In re Rates for Interstate Inmate Calling Services*, 30 FCC Rcd at 12820-21 ¶ 122 ("[Site commission] payments represent a significant portion of total [IPCS] revenues.  Indeed, as the Commission has noted, site commissions can amount to as much as 96 percent of gross [IPCS] revenues.").  Moreover, based on the responses to the Third Mandatory Data Collection, site commissions paid by some of the largest IPCS providers represent significant portions of their total operating expenses.

[106] *See generally* Brattle Report ¶¶ 43-47 (discussing cost distortions due to contract bidding).

[107] *Small Cell Order*, 33 FCC Rcd at 9135 ¶ 94.

In the alternative, to the extent that the Commission finds that Section 253 does not restrict states when they act in their proprietary capacity,[108] the Commission should nonetheless conclude that laws requiring mandatory site commission payments "involve states and localities fulfilling regulatory objectives,"[109] and are within the ambit of the Commission's preemption authority.  When a state or local government requires a facility to pay site commissions, it is acting in a regulatory capacity because operating correctional facilities is a characteristically governmental role.[110]  Moreover, site commission payments may be set by statutes and regulations,[111] rather than through individual contracting decisions by facilities, which further emphasizes their "regulatory" nature.  When a state or local government requires a facility to pay site commissions, or authorizes facilities to require site commissions, it acts in a regulatory capacity.

## VI.  ANY ALTERNATIVE RATE STRUCTURES IN PILOT PROGRAMS MUST NOT EVADE THE COMMISSION'S RULES.

The Commission seeks comment on whether it has the authority to allow alternative pricing structures for incarcerated people's audio or video communications, and if so, what types of pricing plans it should allow.[112]  Following the enactment of the MWRA, Congress has

---

[108] *Cf. City of Portland v. United States*, 969 F.3d 1020, 1045 (9th Cir. 2020) ("The FCC's regulations in the Small Cell Order were premised on the agency's determination that municipalities, in controlling access to rights-of-way, are not acting as owners of the property; their actions are regulatory, not propriety, and therefore subject to preemption. This is a reasonable conclusion based on the record." (citation omitted)).

[109] *Small Cell Order*, 33 FCC Rcd at 9137 ¶ 96.

[110] *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1336 (D.C. Cir. 1996); *Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1287 (D.C. Cir. 1997) ("To distinguish governmental from proprietary functions, we ask whether the activity amounts to a 'quintessential' governmental function, like law enforcement."); *Case v. Anderson*, No. 16 CIV. 983, 2017 WL 3701863, at *22 (S.D.N.Y. Aug. 25, 2017) ("Running a jail . . . is prototypically governmental in nature.").

[111] *In re Rates for Interstate Inmate Calling Services*, 36 FCC Rcd at 9562 ¶ 100 & n.304.

[112] *NPRM* ¶¶ 45-46.

entrusted to the Commission the responsibility of ensuring that IPCS rates are just and reasonable, including the authority to consider certain alternative pricing structures to the extent such structures ensure just and reasonable rates.  To that end, any pilot program must have protections to ensure they are not used to evade the Commission's rules and regulations.

As the Public Interest Parties have explained, innovative pricing holds promise to reduce rates, but also risks opening the door to abuse and higher prices.[113]  If pilot programs are permitted, the Commission should ensure that IPCS consumers are protected through the adoption of certain guardrails; for example, a rule that no IPCS consumer should pay more than they otherwise would under the Commission's adopted rate cap and related rules.[114]  The purpose of allowing alternative rate structures should be to benefit IPCS consumers, not allow IPCS providers additional ways to profit from IPCS.

In addition, IPCS consumers must be fully informed about any alternative pricing structures made available to them through a system of robust disclosures, including highlighting differences between a pilot program's terms and conditions and the existing rates and fees.  A standardized "IPCS label" could help accomplish this goal,[115] as the Commission could require IPCS providers to include on the label a comparison between alternative pricing structures and per-minute calling.  The applicable per-minute rate cap—which providers may not exceed— should be included for reference.[116]  Terms and conditions about how to participate in such plans should be written in plain language and be as concise as possible to avoid consumer confusion.

---

[113] Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Dec. 15, 2022).

[114] *Id.* at 10.

[115] *See id.* at 11; *see also id.* at 6-9.

[116] *Id.* at 11 n.30.

Finally, IPCS providers should bear the burden of demonstrating compliance with the Commission's IPCS rate caps, as they are in the best position to provide this information about usage to the Commission.

## VII. THE COMMISSION SHOULD ADOPT REFORMS TO ADVANCE DIGITAL EQUITY FOR ALL.

The Public Interest Parties applaud the Commission's efforts to advance digital equity for all, including "people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality."[117]  This proceeding offers the Commission opportunity to continue these efforts through reforms to its IPCS rules, specifically in adopting more inclusive terminology, and more broadly by promoting fairer treatment in a carceral system that disproportionately affects members of the aforementioned groups.

### A.      The Commission Should Update Its Rules to Use More Inclusive Terminology.

The Public Interest Parties support the Commission's proposal to revise its rules to refer to "incarcerated people" instead of "inmates," and to more broadly use the terms "incarcerated people's communications services" and "IPCS" instead of "inmate calling services" and "ICS."[118]  As the Commission has noted, there is ample record evidence that the term "inmate" is dehumanizing and disparaging.[119]  Commenters have used more inclusive terminology in this

---

[117] *Id.*

[118] *See NPRM* ¶¶ 11 n.37, 82.

[119] *See id.* ¶ 11 n.37 (citing to Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ, OC Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (July 19, 2020)); *see also* Reply Comments of Prison Policy Initiative, Inc. at 35 n.141, WC Docket No. 12-375 (Dec. 17, 2021) (observing that the term "inmate calling service" is outdated and the Commission's use of the term "appears to have arisen from the former 'ad hoc coalition' of ICS providers that formed to participate in the 1996 payphone proceeding, referring to themselves as the 'Inmate Calling Service Providers Coalition'").

proceeding for years.[120]  As part of its implementation of the MWRA, the Commission should

incorporate this more inclusive terminology throughout its existing and future rules.[121]

## B.     Reforming IPCS Would Advance the Commission's Diversity, Equity, and Inclusion Goals.

Reforms adopted by the Commission in this proceeding will also help advance diversity,

equity, and inclusion.  Low-income and people of color are subject to incarceration at a much

higher rate than others,[122] and incarcerated people with disabilities must overcome special

challenges to communicate with those outside of their facility's walls.  For example, unhoused

people are often imprisoned for violations related to their poverty, with a quarter of unhoused

people reporting having been arrested for activities related to homelessness.[123]  Incarceration

often follows a failure to pay child support or fines for other minor infractions, even if an

individual cannot afford to pay their fines, a practice that continues despite being ruled

unconstitutional.[124]  And of the nearly two million incarcerated people in the United States,

---

[120] *See, e.g.*, Letter from the Leadership Conference on Civil and Human Rights to Hon. Tom Wheeler, Chairman, FCC, WC Docket No. 12-375 (Oct. 15, 2015) (using "incarcerated people" instead of "inmates"); Letter from Bianca Tylek, Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (Apr. 7, 2020) (using "incarcerated people" instead of "inmates"); Letter from Jesse Hahnel, Executive Director, National Center for Youth Law, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (Apr. 21, 2021) (using "incarcerated persons calling services" and "IPCS" instead of "inmate calling services" and "ICS").

[121] *See NPRM* ¶ 82 (soliciting comments on any "equity-related considerations").

[122] Tara O'Neill Hayes & Margaret Barnhorst, *Incarceration and Poverty in the United States*, American Action Forum (June 30, 2020), https://www.americanactionforum.org/research/incarceration-and-poverty-in-the-united-states/.

[123] *Id.*  The enforcement of laws related to homelessness creates a "vicious cycle," where an unhoused individual is eleven times more likely to be incarcerated, and having been incarcerated makes a person ten times more likely to experience homelessness.  *Id.*

[124] *Id.* (citing *Bearden v. Georgia*, 461 U.S. 660 (1983)).

427,000, or 22%, have not been convicted of any crime.[125]  These people are being held in jail pre-trial, primarily because they cannot afford to pay bail.[126]

Similarly, people of color are incarcerated at disproportionate rates.  In 2020, the U.S. Census Bureau reported that 57.8% of the population identifies as White and Non-Hispanic. Hispanic and Latino Americans are the largest ethnic minority, at 18.7% of the population, while Black or African Americans make up 12.1% of the population.[127]  However, Black and Hispanic/Latino identifying men are six and two-and-a-half times more likely than White men to be incarcerated, respectively.[128]  Black Americans make up 33% of the national prison population, and 46% of the population that have already served at least ten years in prison.[129]

Finally, the Commission has already recognized the unique and onerous barriers that people with disabilities face when subjected to the carceral system.[130]  Incarcerated people with disabilities face isolation without access to their primary forms of communication.[131]  The Public Interest Parties commend the Commission for its recent actions to mandate TRS in many carceral facilities,[132] and urge the Commission to take further action here to expand accessible services to people experiencing incarceration to the greatest extent possible.

---

[125] Wendy Sawyer & Peter Wagner, *Mass Incarceration: The Whole Pie 2023*, Prison Policy Initiative (Mar. 14, 2023), https://www.prisonpolicy.org/reports/pie2023.html.

[126] Tara O'Neill Hayes & Margaret Barnhorst, *supra*, note 117.

[127] *Racial and Ethnic Diversity in the United States: 2010 Census and 2020 Census*, U.S. Census Bureau (Aug. 12, 2021), https://www.census.gov/library/visualizations/interactive/racial-and-ethnic-diversity-in-the-united-states-2010-and-2020-census.html.

[128] Ashley Nellis, *Mass Incarceration Trends*, The Sentencing Project (Jan. 25, 2023), https://www.sentencingproject.org/reports/mass-incarceration-trends/.

[129] *Id.*

[130] *See, e.g.*, Comments of HEARD et al., WC Docket No. 12-375 (Sept. 27, 2021).

[131] *See Fourth Report and Order*, ¶ 34.

[132] *See generally id.*

The carceral system, rife with inequity based on economic status, race, ethnicity, and incarcerated people's disabilities, presents an opportunity for the Commission to advance the cause of digital equity. Studies have "consistently found that prisoners who maintain close contact with their family members while incarcerated have better post-release outcomes and [a] lower recidivism rate,"[133] and a better reintegration rate after incarceration could be critical to addressing the inequities in the American justice and carceral systems. The Commission should not allow exceptions and carve-outs to its rules that leave traditionally marginalized, incarcerated people without access to lifeline communication links to their families and loved ones.

**CONCLUSION**

The Public Interest Parties urge the Commission to adopt rules consistent with these comments.

Respectfully submitted,

*/s/ Rebekah P. Goodheart*

|  |  |
|---|---|
| Andrew Jay Schwartzman | Rebekah P. Goodheart |
| Senior Counselor | Gregory R. Capobianco |
| Benton Institute for Broadband & Society | Xinyue Lu |
| 1341 G Street, NW | Jenner & Block LLP |
| Washington, DC 20005 | 1099 New York Avenue, NW |
| (202) 241-2408 | Suite 900 |
| *Counsel for the Benton Institute for Broadband & Society* | Washington, DC 20001 |
|  | (202) 639-6000 |
| Peter Wagner |  |
| Executive Director | Jacqueline Kutnik-Bauder |
| Prison Policy Initiative | Washington Lawyers' Committee for |
| P.O. Box 127 | Civil Rights and Urban Affairs |
| Northampton, MA 01060 | 700 14th Street, NW |
| (413) 527-0845 | Suite 400 |
|  | Washington, DC 20005 |
|  | *Counsel for the Wright Petitioners* |

---

[133] Alex Friedmann, *Lowering Recidivism through Family Communication*, Prison Legal News (Apr. 15, 2014), https://www.prisonlegalnews.org/news/2014/apr/15/lowering-recidivism-through-family-communication/.

Albert H. Kramer
Senior Fellow
Public Knowledge
1818 N Street, NW
Suite 410
Washington, DC 20036
(202) 861-0020

May 8, 2023

# Appendix A

"REDACTED – FOR PUBLIC INSPECTION"

# Brattle Report

## COMMENTS ON "FCC SEEKS COMMENT ON ITS EXPANDED AUTHORITY TO ENSURE JUST AND REASONABLE RATES AND CHARGES FOR INCARCERATED PEOPLE'S COMMUNICATIONS SERVICES," NOTICE OF PROPOSED RULEMAKING (DOCKET NO. 23-62, 12-375)

PREPARED BY

Coleman Bazelon

Paroma Sanyal

May 8, 2023



CONTENTS

I.  Introduction ...................................................................................................1

II.  FCC Reforms in the IPCS Industry - The FCC Should Set Rates based on Average Industry Costs ...............................................................................2

III.  Public Contracts and Data Submitted in Response to the Third MDC Show a Wide Dispersion in IPCS Voice Calling Rates........................................5

   A.  The Market Failure in the IPCS Industry has Led To Significant Variations in Rates Charged Amongst States, Providers and Facilities That Appear Unrelated to Costs ....................................5

   B.  Costs Reported in the Third MDC Show Significant Differences ......................................7

IV.  Voice Calling Rates Charged by Providers Appear to Have Little Correlation with Reported Costs ......................................................................11

   A.  Illustrative Examples from Four Largest IPCS Providers Showing the Lack of Correlation Between Reported Costs and Rates Charged ............................... 11

   B.  Reported Costs Vary Widely Amongst Comparable-Sized Facilities............................. 15

V.  Safety and Security Costs That May Not Be Necessary for IPCS And Cost Distortions Due to Contract Bidding Can Lead to High Observed Costs............21

   A.  Safety and Security Feature Additions Can Lead to High Costs..................................... 21

   B.  The Current Market Structure Lacks Incentives for Lowering Costs and Creates Incentives for Higher Rates.............................................................................. 23

VI.  Conclusion ...................................................................................26

Appendix.................................................................................................27

   A.  Illustrative Examples Showing Costs and Rates Appear to be Uncorrelated................. 27

   B.  VoIP Rates .................................................................................... 36

# I.    Introduction

1. On January 5, 2023, President Biden signed the Martha Wright-Reed Act.[1]  This act marks a watershed event in the history of incarcerated people's communication services (IPCS).  It "removes the principal statutory limitations that have prevented the Commission from setting comprehensive and effective just and reasonable rates for incarcerated people's communications services."[2]  In addition to enabling the FCC to require IPCS rates that are just and reasonable, it also "allows the Commission to 'use industry-wide average costs,' as well as the 'average costs of service of a communications service provider' in setting just and reasonable rates."[3]  In this report, we discuss the notion of an appropriate industry-wide average cost, discuss the broad principles of setting rates under this new mandate and show why using  these alternatives would avoid potential overstatement of costs as reported by the IPCS providers in the Third Mandatory Data Collection (Third MDC).[4]

2. This report comprises four sections in addition to the introduction and conclusion.  In Section II, we propose a methodology for using average costs to set IPCS rates.  In Section III, we analyze a sample of publicly available contracts and cost data from the Third MDC, and show the wide dispersion in rates and costs amongst states, providers and at the facility level.[5]  In Section IV, we examine costs reported by providers in response to the Third Mandatory Data Collection and Supplemental filings and use examples that illustrate the lack of correlation between reported costs and rates at the facility level.  In Section V, we examine some of the cost drivers that can potentially explain some of the differences observed in the rates and costs data.  Section VI concludes.

---

[1]   FCC, "In the Matter of Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act," WC Docket No, 23-62, Rates for Interstate Inmate Calling Services, WC Docket No. 12-375, Notice of Proposed Rulemaking and Order, ¶3, adopted March 16, 2023, https://docs.fcc.gov/public/attachments/FCC-23-19A1.docx, ("2023 IPCS NPRM and Order").

[2]   2023 IPCS NPRM and Order, ¶3.

[3]   2023 IPCS NPRM and Order, ¶4.

[4]   FCC, "In the Matter of Rates for Interstate Inmate Calling Services," WC Docket No. 12-375, DA 22-52, Order,  adopted January 18, 2022, https://docs.fcc.gov/public/attachments/DA-22-52A1.pdf.

[5]   These publicly available contracts are available at the Prison Policy Initiative, Correctional Contracts Library. *See,* "Correctional Contracts Library," last accessed May 5, 2022, https://www.prisonpolicy.org/contracts/documents.html?text-search-fields=facility-and-remarks&q=mississippi&q-state=&q-document-type=&q-service=&q-vendor=&sort=state#search-form.

# II.   FCC Reforms in the IPCS Industry - The FCC Should Set Rates based on Average Industry Costs

3.   In a well functioning market, competitive forces police excess profits and tend to drive prices toward costs, ensuring that rates are just and reasonable.  IPCS, however, are not provided in a well functioning market with competitive forces that would drive prices towards costs.[6]  Given this market failure, the FCC has required IPCS providers to submit costs to facilitate setting rates for IPCS.

4.   In the IPCS market, the IPCS provider typically competes for the contract to serve a facility, or a set of facilities, and is granted exclusive rights to serve the facility if it wins the contract.[7]  Once the provider is selected, providers have exclusive access to the IPCS market in a facility or set of facilities.  From the incarcerated person's perspective, there are no alternative buyers.  Furthermore, demand for calling is highly inelastic.  Therefore, IPCS providers in each facility have a monopoly over all the communication services for the length of their contract period, with incarcerated persons having only one choice if they want to call their loved ones.

5.   As a consequence of these market dynamics, the FCC needs to correct for this market failure by setting a regulated rate.  To gather information to set a rate, the FCC has required IPCS providers to submit data on their costs.[8]  While the FCC's methodology for collecting data is sound, particularly with improvements in the Third Mandatory Data Collection, IPCS providers have not reported data consistently.[9]  Comparisons to other publicly reported data, including contracts that these same

---

[6]   This is because the market forces at play between providers and institutions, leaving the consumer who pays the prices out of the competitive dynamic.

[7]   FCC, "In the Matter of Rates for Interstate Inmate Calling Services," WC Docket No. 12-375, Notice of Proposed Rulemaking, DA/FCC No. FCC 12-167, Docket/RM No. 12-375, ¶ 5, adopted December 24, 2012, https://docs.fcc.gov/public/attachments/FCC-12-167A1.pdf.

[8]   FCC, "Rates for Interstate Inmate Calling Services," WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, adopted August 9, 2013, ¶¶ 119, 124-126, https://docs.fcc.gov/public/attachments/FCC-13-113A1.pdf.

[9]   Note, submissions in response to the FCC's Third Mandatory Data Collection ("MDC") used in our analysis include confidential versions of the data filed by the following eight providers: (1) Combined Public Communications, LLC "Proceedings: WC 12-375," submitted July 8, 2022, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/1070865211653  ("Combined's Third MDC");  (2) Global Tel*Link Corporation d/b/a ViaPath Technologies, "WC 12-375," submitted July 7, 2022, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/10707134489355  ("GTL"); (3) Inmate Calling Solutions, LLC, "WC 12-375," submitted June 30, 2022, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/10630720910084 ("ICSolutions"); (4) Network Communications International Corp d/b/a NCIC Inmate Communications, "Proceedings: WC 12-375,"  submitted April 6, 2023, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/104060618508753, ("NCIC's Third MDC"); (5) Pay Tel Communications, Inc., "Proceedings: WC 12-375," submitted July 11, 2022, redacted version  available at https://www.fcc.gov/ecfs/search/search-filings/filing/107112614603733  ("Pay Tel"); (6) Prodigy Solutions, Inc., "WC 12-375," submitted June 30, 2022, redacted version available at  https://www.fcc.gov/ecfs/search/search-filings/filing/106300859414388 ("Prodigy's Third MDC"), (7) Securus Technologies, LLC, "Proceedings: WC 12-375," submitted June 30 2022, available at https://www.fcc.gov/ecfs/search/search-filings/filing/107012946100914  ("Securus");

providers have to provide IPCS, show anomalies and suggest IPCS providers may be inflating their response to the FCC's collection. With the Martha Wright Reed Act, the FCC has new authority and flexibility to look to average industry costs to set a rate methodology that takes into account information from the broader communications industry. Given the FCC's new authority, we propose using a model carrier approach to implement the average industry cost mandate. To implement this approach, the FCC can specify the costs that an IPCS carrier should have or would have if they operated under competitive pressures. This can be implemented based on industry average costs, using a combination of non-IPCS telecom industry costs and IPCS provider costs to calculate those averages. Such a model carrier's cost of providing IPCS service can take into account things such as facility size, type and location, to the extent they are found to cause meaningful differences in the cost of providing IPCS service. Below, we briefly discuss this approach.

6. This approach for calculating the rates based on average industry costs is based on building up the costs of providing IPCS using a model carrier approach. The model carrier costs would be comprised of four modules, plus an allowed return. Below, each module and the data and calculations they would contain, are outlined.

- Service Costs (Voice, Video, Texting)
  - These could be benchmarked from the costs of providing similar services commercially.
- Facility Costs (Equipment, Installation, Maintenance)
  - These likely would be benchmarked from a combination of broader industry costs, especially for equipment, and IPCS provider costs.
- Safety and Security Costs (such as CALEA)
  - If the FCC finds that safety and security costs are not necessary, these would be excluded from any model.
- Overhead Costs (Contract Administration, Marketing, General and Administrative)
  - These costs would likely come from a mix of IPCS and general communications industry sources.
- Allowed Return

---

and (8) Talton Communications, Inc., "Proceedings: WC 12-375," submitted June 30, 2022, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/1063093541534 ("Talton's Third MDC").
Note that the following providers submitted supplemental data, which we incorporate in our analysis and substitute for earlier MDC submissions: Global Tel*Link Corporation d/b/a ViaPath Technologies, "Proceedings: WC 12-375," submitted March 10, 2023, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/10311589815709 ("GTL's Third MDC"); Inmate Calling Solutions, LLC d/b/a ICSolutions, "Proceedings: WC 12-375," submitted March 30, 2023, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/10330814028729 ("ICSolutions' Third MDC"); Pay Tel Communications, Inc. "Proceedings: WC 12-375," submitted March 2, 2023, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/10303207825273 ("Pay Tel's Third MDC"); and Securus Technologies, LLC, "Proceedings: WC 12-375," submitted April 5 2023, redacted version available at https://www.fcc.gov/ecfs/search/search-filings/filing/10405170724179, ("Securus' Third MDC"). When referring to the data used in our analysis as the "Third MDC" we are collectively referring to the submissions of all providers listed above. We make specific references to contracts and facilities from the following providers' MDC submissions: Combined ("Combined's Third MDC"), GTL ("GTL's Third MDC"), ICSolutions ("ICSolutions' Third MDC"), and Securus (Securus' Third MDC").

       o   Industry benchmarks would be useful in informing an allowed return.

7. The costs that are used in the model carrier construct can vary along multiple dimensions. The degree of variation in costs will be driven by the underlying variability in the data and the FCC's policy preference. More precise cost data on IPCS is preferable, but the model carrier approach is general enough to accommodate using multiple data sources. For example, the FCC could use the average service provision costs of non-IPCS audio-calls, and then potentially adjust for costs that may be particular to the provision of service in incarceration facilities. This approach is attractive as it does not rely on the data submitted by the providers and breaks the nexus between costs and rates and the potential associated incentives to distort reported costs. In this approach, the Commission could potentially calculate the voice calling rates based on publicly available data on the cost of VoIP calls for small, medium, and large enterprises. These reported rates already build-in profit margins for the companies that provide these calls and can serve as an initial benchmark.[10] For example, we find that for an enterprise with 250 users with an assumed usage for 3,000,000 minutes – the rates are less than $0.01 per minute.[11] See the Appendix for a chart on VoIP rates.

8. IPCS provider costs can also be used when appropriate. These costs can come from two sources. First, although the Third MDC has some concerning inconsistencies in how the IPCS providers chose to report data, the data may provide benchmarks, particularly in areas where alternative data are not available. Second, provider contracts. As we describe below, there is data on the rates charged, sometimes accompanied by a detailed list of services included in the contract, and in a few cases the costs.

9. An IPCS cost-based rate setting methodology may be a fall back option if the regulator can accurately assess costs and those costs are set at the efficient level. However, the FCC may not have a good read on actual industry costs, as we observe a significant variation in costs across facilities in the data reported in the Third MDC, even when the facilities seem generally comparable, that cannot be explained by economic rationale. The large variance in costs, and that providers are observed to charge rates that are lower than their reported costs, calls into question just how much these reported costs reflect the cost of providing IPCS service. In addition, as the analysis below shows, the costs reported by the IPCS industry likely include costs that either should not be included because they are not related to providing IPCS or may be greater than they would be if they were provided in a competitive market. For example, a significant share of the reported total capital costs for some providers include amortization of goodwill and intangible assets – if goodwill is a depreciable asset as the result of an acquisition or merger, it may not be related to the cost of providing IPCS.[12] If rates

---

[10] For publicly available data, *see*, Julia Watts, "Telephone Systems Costs: The Ultimate Guide for 2023," January 10, 2023, https://www.expertmarket.com/phone-systems/telephone-system-cost ("Telephone Systems Costs"). Note that these are prices/rates and not costs. As profit-maximizing enterprises, economic logic dictates that these companies' costs are below these rates otherwise they would not be able to operate in the long-term.

[11] For a large enterprise, the monthly charges are between $30 and $140 per user. *See,* Telephone Systems Costs.

[12] *See,* Figure 6 and Figure 7. [BEGIN HIGHLY CONFIDENTIAL] ███████████████████████ █████████████████ [END HIGHLY CONFIDENTIAL]

are set based on inflated or mis-reported costs, then the rates will not be efficient – they will not reflect the cost of providing the service.

10. The FCC should carefully consider all cost elements reported by the providers under the Third MDC, analyze the outliers, and understand the drivers of the claimed costs, because as discussed below, the IPCS industry cost sources (Third MDC or publicly available contracts) contain a mix of costs that are required to provide IPCS and other costs that go beyond this requirement.  In the discussion in the sections that follow, we highlight the inconsistencies in the observed reported costs and voice rates data, to highlight the issues that the FCC will need to account for if it chooses to use some of the data reported in the Third MDC.  In all cases, the FCC should be clear about what costs are allowed (or "used and useful"[13]) and only those costs should be incorporated in the model carrier construct.

# III. Public Contracts and Data Submitted in Response to the Third MDC Show a Wide Dispersion in IPCS Voice Calling Rates

## A. The Market Failure in the IPCS Industry has Led To Significant Variations in Rates Charged Amongst States, Providers and Facilities That Appear Unrelated to Costs

11. Based on a review of available contracts collected by Prison Policy Initiative (PPI),[14] rates charged for IPCS often seem unrelated to costs as reported by providers in the Third MDC.  State-level data shows that while in-state voice calling rates have declined over the years, and the statewide average rates appear to be bounded above by $0.14 per minute in 2021, there is still a wide variation in these rates.[15]  Additionally as we will discuss later, these averages, while giving an overall state-level picture, mask the wide variation in rates at the facility level, where rates can vary between $0.01 per minute and $0.14 per minute.[16] The 2018 state-level average in-state voice rates varied between $0.01 per minute and $0.32 per minute.[17]

---

[13] For "used and useful" debate, *see*, 2023 IPCS NPRM and Order, ¶¶21-23, ¶52.

[14] "Correctional Contracts Library," Prison Policy Initiative, last accessed April 27, 2023, https://www.prisonpolicy.org/contracts/documents.html, ("PPI Contracts Library").

[15] Peter Wagnar and Wanda Bertram, "State of Phone justice 2022: The Problem, the Progress, and What's Next," Prison Policy Initiative, at Appendix Table 1. Phone rates for 15-minute increments in state prisons, 2008-2021, last accessed April 25, 2023, https://www.prisonpolicy.org/phones/appendices2022_1.html ("PPI: State of Phone Justice – state prison Appendix").

[16] *See,* Figure 1.

[17] *See,* Figure 1, PPI: State of Phone Justice – state prison Appendix.

FIGURE 1: AVERAGE PER MINUTE IN-STATE PRISON PHONE RATES IN STATE PRISONS, 2018 AND 2021



Source: "Rates for 15-minute increments in state prisons," 2008-2021, Prison Policy Institute,
https://www.prisonpolicy.org/phones/appendices2022_1.html.

12. The significant observed variation in the state-level rates raises questions about the drivers of these rates and the correlation between the rates and the costs underlying these rates. It is unlikely the variation is driven to any significant degree by underlying cost differences. That is, we are unaware of any arguments in the record, or elsewhere, as to why proving IPCS in Oklahoma is significantly more expensive than providing IPCS in neighboring states such as Texas and New Mexico. Additionally, the state average voice rates also mask the significant variation that exists within states. Thus, in this section of the report, we analyze the publicly available contract-level voice call rate data and the costs reported in the Third MDC to examine how, if at all, costs and rates charged are related. We first examine the variability in observed rates, and then examine how they are related to costs.

13. We also find that the rates charged for making voice calls can vary greatly between different facilities. This is true even after certain observable attributes such as facility size and type are held constant. Publicly available contracts show that the rates can range from very low, just a few cents per minute, to quite high, over $0.20 per minute and this observation holds true even when controlling for facility size.[18] Sometimes the variability in price exists for the same provider across different states, or for the same provider and same facility size, or across providers in the same state. For instance, we see from the contracts that in Larimer County, Colorado, GTL is charging $0.15 per minute but in Montgomery County, Tennessee, GTL is charging $0.25 per minute – while both facilities are similar in size.[19] Another example of this can be seen in two contracts located in the same state: Securus

---

[18] *See,* Table 1 where rates vary from less than a cent to $0.025 per minute, and Table 5, Table 6, Table 7, and Table 8 for examples of contracts where rates exceed or equal $0.20 per minute.

[19] *See,* Larimer County, "Colorado Professional Services Agreement", signed by Board of County Commissioners of Larimer County February, 3, 2021, at p. 29 of pdf,

charges $0.086 for a minute of voice calling in Denver County, Colorado but ICSolutions charges upwards of $0.20 in Mesa County, Colorado.[20] While there can be differences in the underlying costs due to geographic factors, we believe that the ultimate driver of these differences are not driven by the cost of provisioning IPCS but by the way the IPCS industry is structured.

## B. Costs Reported in the Third MDC Show Significant Differences

14. It is not only that rates charged seem to be driven by forces other than underlying economics, but costs as reported by Providers seem to vary, too. The FCC spent significant time revising the Third MDC to minimize the opportunities for anomalies with the prior collection and incorporated many suggestions from the Brattle Group. While the FCC's collection itself is sound, the responses show some inconsistencies that could be addressed if providers resubmit their responses. The FCC would otherwise need to consider their anomalies if these data are used to set rates.

15. In the Third MDC and the Supplemental filings providers submitted information on costs in the Facility Specific Information tab.[21] To calculate cost per minute for each facility, we aggregated the Total Capital Expenses and the Total Operating Expenses and divided by the sum of the total billed minutes for interstate communication and intrastate communication. Upon performing calculations for total cost per minute using the reported costs in the Third MDC, the resulting values appear untethered to underlying economic drivers such as facility size, type or location. As an example, we observe that for similarly sized facilities, there is a lot of variability in the cost per minute. For similarly sized facilities, barring differences in the services offered, we would expect the magnitude of these costs to be roughly comparable.

16. This is not what the data show. We do observe, however, [BEGIN HIGHLY CONFIDENTIAL] ████████ ████████████████ [END HIGHLY CONFIDENTIAL] between average daily population (ADP) and costs per minute (CPM), with [BEGIN HIGHLY CONFIDENTIAL] ████████████████

---

https://www.prisonpolicy.org/contracts/file.php?document_id=379&name=GTL-%20Larimer%20County%2C%20Colorado.pdf, ("GTL, Larimer County, Colorado Professional Services Agreement"). Note: the ADP observation is based on data reported in the Third MDC; GTL, "Master Services Agreement," signed by GTL December 12, 2017, at p.16 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=500&name=Montgomery%20County%20Sheriff%20-%20Global%20Tel%20Link%20video%20visit%20contract.pdf.

20  County of Denver, "Second Amendatory Agreement," signed November 27, 2018, p. 4 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=399&name=Denver%20City%20_%20County%20Jail%2C%20CO_16012_16011_2nd%20Amendment_Redacted.pdf; Mesa County, "Inmate Telephone Services Agreement", signed by ICSolutions March 30, 2017, p. 10 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=387&name=Mesa%20County%2C%20CO_2017%20Contract.pdf.

21  GTL, Securus, ICSolutions, and Paytel have produced supplemental data in March 2023, that updates their original Third MDC submissions. For these providers when we refer to the Third MDC data, we are referring to their Supplemental submissions.

[END HIGHLY CONFIDENTIAL],  as shown in Figure 3.  We believe that this, in large part, can be attributed to economies of scale as facilities that serve a larger population can spread their fixed costs out over a larger number of consumers.  That there are economies of scale that go beyond the facility size is evidenced by [BEGIN HIGHLY CONFIDENTIAL] ███████████████████████ [END HIGHLY CONFIDENTIAL].

17. Figure 2 includes observations where CPM is less than $10.[22]  We show facilities with CPM less than $10 to aid in visualization since there are some outliers with uncommonly high cost per minute.  From the data, we see [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████████ [END HIGHLY CONFIDENTIAL].  Thus going back to our model carrier approach, this suggests, that if the FCC were to use this data in rate setting, it would have to restrict the data to a sample of reported CPM that are deemed just and reasonable for a rate setting exercise.

18. To observe the effect of restricting the data to facilities with some lower cost per minute, we arbitrary restrict our sample to facilities with reported costs of less than $0.25 per minute. [23] Here, we observe a negative relationship between ADP and CPM.  Figure 3 shows that for the segment of facilities with CPM less than $0.25, in general, the larger facilities tend to report lower CPM.[24] The calculated CPM, based on this sample is [BEGIN HIGHLY CONFIDENTIAL] ██████ [END HIGHLY CONFIDENTIAL], as shown by the solid navy-blue line.[25]  This suggests that filtering out high-cost facilities, where the costs appear unreasonable, excluding cost elements that should not be a part of IPCS provision costs, excluding cost elements that are potentially unreasonable when compared to similar facilities, are some ways in which the FCC can arrive at a reasonable set of cost elements and cost magnitudes for the data reported in the Third MDC.  Thus, with appropriate measures to account for and filter out costs elements and facilities, the FCC would be able to use the data from the Third MDC to establish a reasonable industry wide rate.

---

[22]  When we filter down to facilities with CPM of less than $10, we exclude approximately 1.1% of the sample.

[23]  This excludes approximately 14.9% of the facilities.

[24]  This can be observed in the red smoothed trend line sloping downwards, and the relatively tight 95 percent confidence interval around it. To calculate the trend line, we estimated a variation of a GLM model which is a curve-fitting exercise to capture the trend between ADP and CPM.

[25]  Based on the sample shown in Figure 3, the calculated mean CPM was [BEGIN HIGHLY CONFIDENTIAL] ██████ [END HIGHLY CONFIDENTIAL].

REDACTED – FOR PUBLIC INSPECTION

FIGURE 2: SCATTERPLOT OF CPM VERSUS ADP BY PROVIDER (FOR FACILITIES WITH CPM LESS THAN $10)
FOR 2021
[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:
Third MDC.

**JA784**

REDACTED – FOR PUBLIC INSPECTION

**FIGURE 3: SCATTERPLOT OF CPM VERSUS ADP BY PROVIDER FOR FACILITIES WITH CPM LESS THAN $0.25**
**FOR 2021**
[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:
Third MDC.

**JA785**

# IV.  Voice Calling Rates Charged by Providers Appear to Have Little Correlation with Reported Costs

## A. Illustrative Examples from Four Largest IPCS Providers Showing the Lack of Correlation Between Reported Costs and Rates Charged

19. IPCS rates and costs appear to each be fairly uncorrelated with the usual economic drivers behind costs and rates, such as facility observable attributes like facility size. Costs and rates are also uncorrelated with each other.  Our contract analysis revealed instances where there was no direct correlation between ADP and the observed rates.  There were large facilities charging higher rates compared to smaller facilities, despite their economics of scale advantage.[26]

20. Using the contracts database from the Prison Policy Initiative (PPI) website, we began by filtering on contracts that specify voice calling as a covered service.  From the PPI data, we have 261 voice calling contracts, of which 107 mention Securus, 78 mention GTL, 29 mention ICSolutions and 10 mention Combined – [BEGIN HIGHLY CONFIDENTIAL] ██████████ [END HIGHLY CONFIDENTIAL] and sufficient contracts in the PPI database – and the remaining 37 from 23 other providers. [27]  For this analysis, we randomly selected six non-Department of Corrections (DOC) contracts for each of the four providers from the PPI contract database.[28]  We then matched the contracts to those reported in the Third MDC.  If there was no match, or the contract did not fall within the years covered in the third MDC or did not have sufficient information on rates, we randomly picked another contract.[29]  This process continued until we found six matched contracts for each of the four providers.

21. We find that in general, the costs reported by the providers in the Third MDC are [BEGIN HIGHLY CONFIDENTIAL] ██████████ [END HIGHLY CONFIDENTIAL] than the rates charged in the

---

[26] *See,* Table 5, Table 6, Table 7, and Table 8.

[27] *See,* PPI Contracts Library. For the contract review process, [BEGIN HIGHLY CONFIDENTIAL] ██████████ ██████████ [END HIGHLY CONFIDENTIAL] However, NCIC only had two contracts available in the PPI database, so we excluded NCIC from our analysis. *See,* PPI Contracts Library.

[28] We used a random number generator to pick the contracts at every stage. *See,* "Google's random number generator", last accessed April 27, 2023, https://www.google.com/search?client=firefox-b-d&q=google+random+number+generator. After copying and pasting over the entire population of PPI voice contracts into excel, contracts were numbered in alphabetical order by provider. We used this approach to generate a random sample. Given the significant time requirements for analyzing the universe of contracts, for now, using a random sample is a good approach, and in the future, we plan to do a comprehensive analysis of all the contracts. Also, DOC contracts were selected as these contracts typically had very low rates and spanned many facilities, whereas other contracts typically covered fewer facilities.

[29] The third MDC includes cost data from 2019-2021.

contracts and show that the companies are able to provide voice services at a much [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████████ [END HIGHLY CONFIDENTIAL]. We report detailed results in the Appendix.

22. We also observe a fair number of instances when reported costs are [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] than the rates charged.  This is obviously problematic as firms cannot stay in business charging less than it costs them to provide a service.  This may also point towards cross-subsidization amongst facilities and/or a mis-allocation of costs.  Below we discuss some selected contracts from Securus, GTL, and Combined where [BEGIN HIGHLY CONFIDENTIAL] ██ ██████████████████████████ [END HIGHLY CONFIDENTIAL] the rates charged based on the facility-level contract.

23. The PPI contracts offer a window into the rates providers are charging facilities.[30]  For GTL's contract with state Department of Corrections (DOCs), we were able to find public contracts containing voice calling rates California and New Hampshire and match them with the contracts reported in the Third MDC.[31]  From Table 1, we observe that these contracts span multiple facilities with different ADPs, and in both contracts, it reportedly costs [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] to provide services at these facilities than the rates incarcerated individuals and their families pay to make telephone calls.[32]

---

[30]  *See,* PPI Contracts Library.

[31]  GTL reports minutes of use and expenses at the contract level so we found the matching contracts for 2021.

[32]  "Standard Agreement: California Department of Corrections and Rehabilitation," signed by GTL December 28, 2020, at p. 124 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=317&name=CDCR_C5610009_Agreement.pdf ("California DOC and GTL Agreement"). *See,* Third MDC for the ADP data.

**TABLE 1: SAMPLE OF MATCHED CONTRACTS WHERE REPORTED COSTS ARE GREATER THAN RATES CHARGED, 2021**

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:

MDC data is reported at the facility level, whereas PPI data is reported at the contract level. For contracts with more than one facility, we sum the costs and ADP across all facilities to get total costs and ADP for a single contract. To calculate the percentage of site commissions related to IPCS, we take the average percentage across facilities in a contract.

[1]-[9]: Third MDC. Note, all costs are taken as reported in the Third MDC, this does not guarantee such costs are reported accurately by providers.

[4]: Total billed minutes is the sum of intrastate and interstate billed communications rows in the Third MDC, *see* tab "D1. Revenue and Demand Data."

[7]: [5]*[6].

[8]: [3]/[4].

[9]: ([3]+[7]) / [4].

[10]: PPI contracts.

[A][10]: "Standard Agreement: California Department of Corrections and Rehabilitation," signed by GTL December 28, 2020. *See,* p. 124 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=317&name=CDCR_C5610009_Agreement.pdf.

[B][10]: "Contract Amendment #1," signed by GTL June 3, 2021. *See,* pp. 3-4 of pdf https://www.prisonpolicy.org/contracts/file.php?document_id=377&name=GTL%20-%20Colorado%20DOC.pdf.

[C][10]: Note third MDC values are taken for 2019, as 2020 and 2021 included incomplete site commission data. "IL DOC, State of Illinois Contract: Illinois Department of Innovation and Technology Phone Services for Incarcerated Persons", signed by Securus June 29, 2019. *See,* p. 22 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=5&name=ILDOC_Securus%207-1-18%20-%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_Redacted.pdf.

[D][10]: "Inmate Telecommunications General Service Agreement," signed by the Otero County Sheriff's Office March 25, 2020. *See,* p. 5 of pdf,

**JA788**

https://www.prisonpolicy.org/contracts/file.php?document_id=371&name=Otero%20CO%20ITS%20Contract%2003262020.pdf.

24. There may be two potential explanations for this divergence between costs and rates.  First, this disparity in costs could be a result of how providers chose to allocate costs to various facilities, rather than real underlying cost differences.  Second, providers could also be including costs not directly associated with audio calls, such as non-telecom costs associated with peripheral services like video calling, tablet and kiosk services, and other safety and security expenses.  The FCC's mandate is to set a rate that recovers costs of providing IPCS, but not services that go beyond IPCS.

25. For example, in the GTL contract for California, we find evidence of [BEGIN HIGHLY CONFIDENTIAL] ████████████████████ [END HIGHLY CONFIDENTIAL].[33]  In the "Cost Workbook" section  GTL estimates the "Annual Cost" of "Telephone Call Rates and Charges" to be around $5.9 million and minutes of use to be around 237 million .[34]  In the Third MDC however, for roughly [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] billed minutes, the reported operating costs alone are nearly [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL] for the same contract. [35]   This [BEGIN HIGHLY CONFIDENTIAL] ██████████████████ [END HIGHLY CONFIDENTIAL] in costs for similar call volumes may imply mis-allocated or mis-reported costs.

26. There is also significant disparity in [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████████ ██████████████████ [END HIGHLY CONFIDENTIAL], which illustrates that the site commissions have little to do with the actual provision of telecom services.  For example, in California, for [BEGIN HIGHLY CONFIDENTIAL] █████████████████████ [END HIGHLY CONFIDENTIAL]), the site commission cost is approximately [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL].[36]  In New Hampshire however, for only [BEGIN HIGHLY CONFIDENTIAL] ████████ ██████████████████ [END HIGHLY CONFIDENTIAL]), GTL pays around [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL] in site commissions in 2021.[37]  The [BEGIN

---

[33] This inconsistency can been seen when comparing California's publicly available DOC contract (California DOC and GTL Agreement, at p.123 of pdf) with information reported by GTL in the Third MDC. In the publicly available contract, GTL includes a "Cost Workbook (p. 123), which states that the "Telephone Call Rates and Charges" are equal to an amount of $5,943,165.07.

[34] *See,* California DOC and GTL Agreement, at pp. 123-124 of pdf. GTL report's "Anticipated Annual Call Volume (minutes)" to be 237,316,204.

[35] *See,* Third MDC, GTL's reported tab "D1. Revenue and Demand Data" for the sum of interstate and intrastate communication billed calls, for facilities with contract ID "PCA01075" in 2021, and tab "D. Facility-Specific Information" for the sum of "Total Operating Expenses Excluding Termination of International Communication Expense" for facilities with contract ID "PCA01075" in 2021. In 2021, the total operating expenses for facilities covered by the California DOC-GTL contract are [BEGIN HIGHLY CONFIDENTIAL] ███████████████████████████████ ███████████████ [END HIGHLY CONFIDENTIAL]

[36] *See,* Table 1, row 7.

[37] *See,* Table 1, row 7.

HIGHLY CONFIDENTIAL] ████████████████████████████████████████
████████████████ [END HIGHLY CONFIDENTIAL].[38]

27. The above discussion on the rates and costs draw a clear picture of an industry where the reported costs appear to have little or no correlation with the rates charged for voice calling services. In the next section, we undertake some additional analysis to further illustrate this point.

## B. Reported Costs Vary Widely Amongst Comparable-Sized Facilities

28. Closer inspection of costs in the Third MDC reveals a large heterogeneity in costs amongst facilities that are of similar size. This again illustrates the lack of correlation between reported costs and observable facility attributes.

29. There are several categories of operating costs in the Third MDC that have large differences even amongst similar sized facilities. These operating expenses span security services, infrastructure related costs, and costs that are peripherally related to IPCS.[39] We have examined some randomly selected contracts at various ADP levels and have observed that [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████████████████████████████████ ████████████████ [END HIGHLY CONFIDENTIAL].[40] This correlation could be a result of how these reported costs are allocated. In our investigation we have also found an instance where billing, collection, client management and customer care costs are [BEGIN HIGHLY CONFIDENTIAL] ████████ ████████████████ [END HIGHLY CONFIDENTIAL] for high cost per minute small facilities compared to low cost per minute small facilities.[41]

30. Another example of significant costs variations can be seen when comparing two facilities of the same size with similar levels of ADP. One would expect both facilities to be approximately comparable when it comes to costs related to network operations. However, we see that amongst small sized facilities, in our sample, the network operations cost for high cost-per-minute facilities is [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████ [END HIGHLY CONFIDENTIAL] than the network operations cost for low cost-per-minute facilities.

---

[38] *See,* Table 1: Total billed minutes in GTL's New Hampshire DOC contract are [BEGIN HIGHLY CONFIDENTIAL] ████████████████ [END HIGHLY CONFIDENTIAL]

[39] *See,* Third MDC, tab "D. Facility-Specific Financial Information."

[40] For a complete list of operating cost categories, *see* Figure 4 and Figure 5.

[41] We define "small" to be facilities in the ADP range of 100-300; *See,* Third MDC, tab "D. Facility-Specific Financial Information" and "D1. Revenue and Demand Data."

31. To better understand the differences in cost reporting, we can examine the largest five operating cost categories for the three largest providers by ADP.[42]  In Figure 4, we can see the breakdown of operating expenses for Securus, GTL and ICSolutions.  Figure 5 shows the same operating expenses as a percentage of the total annual expenses for Securus, ICSolutions and GTL.  These figures exclude any reported operating costs associated with site commissions.[43]

32. The comparison between GTL and Securus is especially noteworthy.  In 2021, Securus reports a total ADP in the Third MDC of around [BEGIN HIGHLY CONFIDENTIAL] ███ [END HIGHLY CONFIDENTIAL] and GTL reports a total ADP of approximately [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL].[44]  When it comes to billed minutes GTL had around, [BEGIN HIGHLY CONFIDENTIAL] ██████ [END HIGHLY CONFIDENTIAL] and Securus had [BEGIN HIGHLY CONFIDENTIAL] ████ ████████ [END HIGHLY CONFIDENTIAL].  From Figure 4, we observe that for Securus, the reported maintenance, repair and engineering costs are [BEGIN HIGHLY CONFIDENTIAL] ██████ ████ [END HIGHLY CONFIDENTIAL]  that of GTL.  However, with comparable levels of ADP, GTL spends [BEGIN HIGHLY CONFIDENTIAL] ████████████████████ [END HIGHLY CONFIDENTIAL].

33. From Figure 4 and Figure 5, we observe the large difference across providers in the percentage of operating and total costs allocated to the "General and Administrative" category.  ICSolutions allocates [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] of its total costs to this category, while both, GTL and Securus allocate [BEGIN HIGHLY CONFIDENTIAL] ██████ ██ [END HIGHLY CONFIDENTIAL] of their total expenses to this category.  Another notable difference comes in how providers allocate costs for data center, call center, network operations, safety and security services and other overheads – all of which are [BEGIN HIGHLY CONFIDENTIAL] ██████ ███ [END HIGHLY CONFIDENTIAL] for ICSolutions and Securus.

---

[42]  Note that in the Third MDC, tab "C. Company Wide Information" lists company-wide operating and capital expenses.

[43]  The category "Termination of International Communication" is also excluded from operating expenses calculations. Note, in the tab "C. Company Wide Information", the row "Total Operating Expenses Excluding Termination of International Communication Expense [row 84 - row 70]" is composed of 16 categories, we exclude [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████████████████████████ [END HIGHLY CONFIDENTIAL] it would account for [BEGIN HIGHLY CONFIDENTIAL] ███████████████ [END HIGHLY CONFIDENTIAL] and [BEGIN HIGHLY CONFIDENTIAL] ███████████████ [END HIGHLY CONFIDENTIAL].

[44]  Note these values are for 2021. In total, [BEGIN HIGHLY CONFIDENTIAL] ██████ [END HIGHLY CONFIDENTIAL] reports operating expenses in excess of [BEGIN HIGHLY CONFIDENTIAL] █████ [END HIGHLY CONFIDENTIAL], with more than [BEGIN HIGHLY CONFIDENTIAL] █████ [END HIGHLY CONFIDENTIAL] going towards the "General and Administrative" category. In contrast, [BEGIN HIGHLY CONFIDENTIAL] █████ [END HIGHLY CONFIDENTIAL]  has total operating expenses in excess of [BEGIN HIGHLY CONFIDENTIAL] █████ [END HIGHLY CONFIDENTIAL] and [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] reports total operating expenses in excess of [BEGIN HIGHLY CONFIDENTIAL] █████████ [END HIGHLY CONFIDENTIAL], each spending more than [BEGIN HIGHLY CONFIDENTIAL] █████ [END HIGHLY CONFIDENTIAL] and [BEGIN HIGHLY CONFIDENTIAL] █████ [END HIGHLY CONFIDENTIAL] respectively on G&A costs.

REDACTED – FOR PUBLIC INSPECTION

**FIGURE 4: OPERATING EXPENSES ACROSS THE THREE LARGEST PROVIDERS (FOR 2021)**
**[BEGIN HIGHLY CONFIDENTIAL]**



[END HIGHLY CONFIDENTIAL]

Sources and Notes:

*See*, ICSolutions' Third MDC, GTL's Third MDC, and Securus' Third MDC.

Data from tab "C. Company Wide Information" from the Third MDC submission, reported in the column for 2021 "Inmate Calling Services." Note we calculate operating expenses excluding two categories: "Payment of Site Commissions" and "Termination of International Communication."

FIGURE 5 OPERATING COSTS AS A PERCENTAGE OF TOTAL COSTS ACROSS PROVIDERS (FOR 2021)
[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:
*See*, ICSolutions' Third MDC, GTL's Third MDC, and Securus' Third MDC.
Data from tab "C. Company Wide Information" from the Third MDC submission, reported in the column for 2021 "Inmate Calling Services." Note we calculate operating expenses excluding two categories: "Payment of Site Commissions" and "Termination of International Communication." When referring to "total costs" we also exclude these two categories.

34. A similar story holds true for capital expenses when compared across the largest three providers in the MDC.  Figure 6 shows the important capital expenses categories across providers excluding tax adjustments and Figure 7 shows capital expenses as a percentage of total costs as reported across providers. [45]  In Figure 6, we can see that each provider reportedly allocate capital expenses in very different manners.  For example, GTL's ADP is approximately [BEGIN HIGHLY CONFIDENTIAL] ▮ ▮ [END HIGHLY CONFIDENTIAL] than that of Securus, but its capital expenses are [BEGIN HIGHLY

CONFIDENTIAL] ▮▮▮▮▮ [END HIGHLY CONFIDENTIAL], with GTL spending [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮▮▮ [END HIGHLY CONFIDENTIAL] while Securus spends [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮▮▮▮ [END HIGHLY CONFIDENTIAL].[46]

35. If we look at the same capital expense categories as a percentage of the total cost, we can see the heterogeneity across the three providers as reported in the Third MDC.  We observe that for GTL, depreciation and amortization seem to be [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮▮▮▮ ▮▮▮ [END HIGHLY CONFIDENTIAL] compared to the other two providers.  We also observe that for Securus, [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮▮▮▮▮ [END HIGHLY CONFIDENTIAL] of their total expenses.  This is because Securus, [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ [END HIGHLY CONFIDENTIAL].

FIGURE 6: CAPITAL EXPENSES FOR THE THREE LARGEST PROVIDERS (FOR 2021)

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:
*See*, ICSolutions' Third MDC, GTL's Third MDC, and Securus' Third MDC.
Data from tab "C. Company Wide Information" from the Third MDC submission, reported in the column for 2021 "Inmate Calling Services."

---

[46] *See also*, ICSolutions' Third MDC for comparison. [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮▮▮ [END HIGHLY CONFIDENTIAL]  in capital expenses.

**FIGURE 7: CAPITAL COSTS AS A PERCENTAGE OF TOTAL COSTS ACROSS PROVIDERS**

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:

*See*, ICSolutions' Third MDC, GTL's Third MDC, and Securus' Third MDC.

Data from tab "C. Company Wide Information" from the Third MDC submission, reported in the column for 2021 "Inmate Calling Services." Note when referring to total costs we exclude two operating expense categories, "Payment of Site Commissions" and "Termination of International Communication."

36. Despite the observed inconsistencies, our proposed model carrier approach provides a potential path to using this data. The FCC can choose the lowest or the average percentage of a particular cost as a share of operating or total expenses (after controlling for facility attributes) and use that as the model carrier cost percentage, and then adjust the reported costs of facilities that are higher than this benchmark. If the FCC makes adjustments to various cost categories based on reasonable benchmarks (such as a similar sized facility, for instance), or excludes the cost category if it considers it unrelated to the provision of IPCS, then it can adjust cost components and arrive at a more appropriate CPM. Such an adjustment would limit the amount of various categories that would be allowed.  For instance, if Inmate Calling Solution's General and Administrative Costs, which is [BEGIN HIGHLY CONFIDENTIAL] ████████████████████ [END HIGHLY CONFIDENTIAL] is decreased by [BEGIN HIGHLY CONFIDENTIAL] ████████████████████ CONFIDENTIAL] ████████████ [END HIGHLY CONFIDENTIAL] then Inmate Calling Solution's average CPM will be

reduced by [BEGIN HIGHLY CONFIDENTIAL] 

[END HIGHLY CONFIDENTIAL].[47]

# V.    Safety and Security Costs That May Not Be Necessary for IPCS And Cost Distortions Due to Contract Bidding Can Lead to High Observed Costs

37. Given the significant differences in the reported rates and costs between facilities, we briefly examined some different costs, focusing on those generally unrelated to the provision of IPCS, but included as a part of it in contracts or reported in the Third MDC.  Below we focus on two issues that can lead to high observed costs of IPCS - safety and security costs and cost distortions from the contract bidding process.

## A. Safety and Security Feature Additions Can Lead to High Costs

38. To get a better sense of the costs that are associated with providing telecommunications services in correctional facilities in the US, we reviewed state level contracts that were publicly available through the Ameelio database.[48]  It is very common, in state level contracts, to have stipulations for security services.  However, it is not clear to what extent, if any, some of the safety and security costs are directly related to the provision of voice calls.  While state level contracts, for the most part, do not report specific cost estimates, there are certain categories of safety and security costs that are unlikely to be related to the provision of IPCS.[49]  For instance, the Utah contract with Century Link lists the following safety and security features:

---

[47]    *See*, ICSolutions' Third MDC, GTL's Third MDC, and Securus' Third MDC at the tab "C. Company-Wide Information." Note: Total Expenses excludes two categories: Termination of International Calling Services and Payment of Site Commissions.

[48]    *See,* Ameelio, "Technology for a more rehabilitative corrections system," last accessed May 2, 2023, available at https://www.ameelio.org/. Ameelio provides an overview of state-level contracts it has, as well as a comparison between the rates charged by Ameelio versus providers for voice calling. Note that Ameelio provides voice calling services for 15 minutes at a rate of $0.00.  *See, also,* Ameelio, "Competitor comparison," last accessed May 4, 2023, available at https://www.ameelio.org/child-products/voice-calls.

[49]    *See,* Figure 8 for a list of security costs included in the Utah-Century Link contract.

FIGURE 8: SAFETY AND SECURITY FEATURES OUTLINED IN UTAH CONTRACT WITH CENTURY LINK



Sources and Notes:
Century Link, "State of Utah 'Best Value' Cooperative Contract, Contract Number: PD2178," RFP submitted August 11, 2014, at p. 69 of pdf, https://www.prisonphonejustice.org/media/phonejustice/UT%20Contract%20with%20CenturyLink%20201 4-2019.pdf.

39. In Utah, according to the state contract, pre-paid calling rates are around $0.20 per minute for interstate and intrastate calls.[50] In addition, in Georgia, in-state calls are around $0.13 per minute and the Georgia state contract with Securus has provisions for additional technology costs such as costs for "Forensics Lab" and "Guarded Exchange Call Monitoring."[51]  Forensics lab costs include costs for data extraction from contraband cell phones/devices, MAS (Managed Access System) and computer forensics and analytics.[52]  It even includes costs for intake specialists, forensics lab technicians, intelligence analysts, MAS intelligence analysts and the intelligence operations program manager and training costs.

---

[50]  *See,* Century Link, "State of Utah "Best Value" Cooperative Contract, Contract Number: PD2178," RFP submitted August 11, 2014, at p. 17 of pdf, https://www.prisonphonejustice.org/media/phonejustice/UT%20Contract%20with%20CenturyLink%202014-2019.pdf , ("Utah-Century Link contract"). Note, "Local" calls cost $0.00 per minute. "Inmate Collect" calls cost $0.15 per minute for Intra-Lata and Intra-State calls, and $0.25 for Inter-State calls. Meanwhile, "Inmate Debit, Pre-Paid Card or Advance Pay" calls cost $0.15 for Intra-Lata and Intra-State calls, while Inter-State calls are $0.19.

[51]  Long distance out of state calls are $0.14 per minute, while local and long distance in-state calls (with a mileage of 0-16) are $0.13 per minute.  *See,* Securus, "Georgia Department of Corrections Inmate Telephone Service Provider: Securus Technologies," last updated October 26, 2021, https://gdc.ga.gov/sites/default/files/pdf/Securus.pdf.  *See also,* Securus, "Second Amendment to Inmate Telephone Services Contract," signed by Georgia Department of Corrections March 9, 2020, at pp. 4, 6, and 9, https://global-uploads.webflow.com/62b9c090d4224b1a9394c46a/631ac63e73b68d02964327ec_GA%20x%20Securus%20Contract%20A mendment%202%20-%202016_2020.pdf, ("Securus-Georgia DOC Second Amendment").  Forensics Lab cost are reported as $68,000 a month, while voice-to-text transcription is $4,000 a month, and guarded exchange call monitoring is $0.014 per minute (p. 9).

[52]  *See,* Securus-Georgia DOC Second Amendment at pp. 4-5. See also, National Institute of Justice, "Managed Access Systems Can Prevent Contraband Cellphone Use," accessed May 7, 2023, https://nij.ojp.gov/topics/articles/managed-access-systems-can-prevent-contraband-cellphone-use, for a definition of managed access systems.

**TABLE 2: TABLE INCLUDED IN SECURUS CONTRACT AMENDMENT FOR GEORGIA**

| ADDITIONAL TECHNOLOGY | ASSOCIATED COST |
|---|---|
| Guarded Exchange Call Monitoring (1% of Calls/Month) | $0.014/Minute deducted from monthly Revenue Share payments (eliminated effective with this Third Amendment) |
| Voice-to-Text Transcription (Up to 500 Calls/Month) | $4,000.00/Month for English and/or Spanish, plus $2.50 per recorded minute for all other languages; deducted from monthly Revenue Share payments<br>*Only to be applied if customer elects to utilize this service* |
| Forensics Lab | $68,000.00/Month deducted from monthly Revenue Share payments |

Sources and Notes:

Securus, "Second Amendment to Inmate Telephone Services Contract," signed by Georgia Department of Corrections March 9, 2020, at p. 9, https://global-uploads.webflow.com/62b9c090d4224b1a9394c46a/631ac63e73b68d02964327ec_GA%20x%20Securus%20Contract%20Amendment%202%20-%202016_2020.pdf.

40. In the Third MDC Collection, [BEGIN HIGHLY CONFIDENTIAL] ■ [END HIGHLY CONFIDENTIAL] acknowledges that it provides Law Enforcement Support Services.[53] This includes items such as unlimited reverse number lookup, investigative note attachment, case management, security threat group investigation, call detail reporting, and report building.[54] These are clear examples of costs unrelated to the provision of IPCS.

41. It is unclear if any safety and security measures are necessary components of providing IPCS, and, if so, the FCC should exclude such costs from the rate for the services. We believe that the only costs that should be recouped from voice calling rates are the fixed costs of setting up the infrastructure for calling, the costs of maintenance and repair, and necessary safety and security costs (if any).[55]

## B. The Current Market Structure Lacks Incentives for Lowering Costs and Creates Incentives for Higher Rates

42. Another very important factor that can lead to cost variation amongst similar types of facilities is the bidding, bid evaluation, and contract award process for incarceration facilities. More specifically,

---

[53] *See,* GTL, "APPENDIX A: Calling Services for Incarcerated People Third Mandatory Data Collection," March 10, 2023, at p. 19, ("GTL-Appendix A, March 2023").

[54] *See,* GTL-Appendix A, March 2023, at p. 19.

[55] We understand that some have advocated that only costs related to the fulfilment of CALEA requirement, no other safety and security costs should be included in IPCS rates. *See,* FCC, "Communications Assistance for Law Enforcement Act," last accessed May 3, 2023, https://www.fcc.gov/calea. *See also,* Worth Rises, "FCC – 6th NPRM Reply Comments," March 2, 2023, https://www.fcc.gov/ecfs/document/10304221918581/1.

there may be imperfections in the process of awarding telecommunication contracts, which could potentially contribute to the higher voice calling rates observed in certain states.

43. From reviewing publicly available bid evaluation forms, we find that correctional agencies use a scoring system to determine which provider gets the winning contract.[56] However, there is no universal scoring system – that is, the weighting put on each category is not consistent across facilities. In an ideal world, the highest emphasis would be put on the actual rates that end-users will have to pay for a given contract, as would happen if market forces were at work. However, from reviewing the bid evaluation forms, it is unclear whether that is the case.[57] More often than not, these bid evaluation forms include site commissions or revenue sharing percentages. If correctional agencies put a larger emphasis on revenue sharing percentages and site commissions in the scoring criteria, then they may not always pick the best possible outcome that maximizes consumer surplus.

44. Table 3 and Table 4 show graphics from bid evaluation documents from Harrison County, Mississippi and Oldham County, Kentucky. In the scoring rubric for Harrison County, we can clearly see that of the 100 total points, 25 points are attributed to "Call Rate Plan and Commission," meaning evaluation of the rates charged counts for less than one-quarter of the overall evaluation. Similarly, in the second graphic for Oldham County, we can see that one of the categories to decide the winning bidder is "Commission Offer." For Oldham County, the voice calling rates for end-users are not being taken into consideration when deciding which bidder to contract with. If the ultimate end-user rates are not given sufficient weight in the bid scoring rubric, correctional agencies can contract with providers that do not charge the lowest possible rate. Furthermore, deprioritization of the end-user rates in the contract awarding process can lead to a lack of incentives for providers to be cost efficient. We suggest that regulators establish a uniform scoring rubric that assigns appropriate weight to final rates.

45. With the current system in place, from a provider's point of view, providing lower rates for voice calling services is unfortunately not always the optimal strategy for winning the contract. If a provider places a high value on commissions, they may be able to win contracts for audio and video services even if their infrastructure is more expensive than their competitors. This is because they can offer higher site commissions to decision makers who have the power to award contracts. As a result, the decision makers may prioritize the financial benefits they will receive from a provider rather than the

---

[56]  See, e.g., "Harrison County Mississippi Selection Committee Scores Tabulation Sheet," dated July 27, 2017, last accessed April 28, 2023, https://www.prisonpolicy.org/contracts/file.php?document_id=202&name=Harrison%20County%20Mississippi%20-%20bid%20scoring.pdf, ("Harrison County, Selection Committee Scores Tabulation Sheet").

[57]  See, Harrison County, Selection Committee Scores Tabulation Sheet. For example, Harrison County Mississippi's evaluation criteria uses several categories including "call rate plan and commission" which can earn providers 25 points out of 100 available points. However, Dawson County's evaluation sheet includes categories like "Company Experience & Staff Backgrounds." In addition, their evaluation criteria, "Price Proposal" refers to commission rates and annual signing bonuses rather than telephone rates. See, Dawson County, "Inmate Telephone Systems for DCSO #249-15 RFP," April 24, 2015, last accessed April 28, 2023, https://www.prisonpolicy.org/contracts/file.php?document_id=201&name=Dawson%20County%20Georgia%20-%20RFP%20response%20presentation.pdf.

REDACTED – FOR PUBLIC INSPECTION

cost and quality of the infrastructure they offer.  This can result in the provider getting away with charging higher rates for their services, even if there are other providers who offer better infrastructure at a lower cost.

TABLE 3: SAMPLE BID SCORING RUBRIC

| Technical Specifications – Hardware, technical, and system requirements | |
|---|---|
| Section II: Inmate Telephone System. | 30 points |
| | |
| Company Background and References – History, market share, and experience of the company providing the required system and services, and experience/qualifications of employees assigned to the project | 25 points |
| Call Rate Plan and Commission | 25 points |
| Installation - Implementation plan | 10 points |
| Maintenance and Support - Availability and quality of on-going support and maintenance procedures and personnel. Training. Support plan, trouble ticket flow and escalation procedures | 10 points |

Sources and Notes:

"Harrison County Mississippi Selection Committee Scores Tabulation Sheet", dated July 27, 2017, last accessed April 28, 2023, at p. 2, https://www.prisonpolicy.org/contracts/file.php?document_id=202&name=Harrison%20County%20Mississippi%20-%20bid%20scoring.pdf.

TABLE 4: SAMPLE BID EVALUATION TABLE

| Contractor | Combined Public Communications | ICSolutions | NCIC Inmate Communications | Securus Technologies | Telmate, LLC |
|---|---|---|---|---|---|
| Ky SOS Standing | good | good | good | good | good |
| Federal Exclusion | no | no | no | no | no |
| Insurance/Workers Comp | provided | provided | provided | provided | provided |
| Proposal Received | ✓ | ✓ | ✓ | ✓ | ✓ |
| Commission Offer | 50% | up to 76% | 60% | $0.21 - $0.31 | 16% - 32% |

Source:

Oldham County Kentucky, "Bid Tabulation – Inmate Telephone System," August 15, 2017, last accessed April 28, 2023, https://www.prisonpolicy.org/contracts/file.php?document_id=206&name=Oldham%20County%20Kentucky%20-%20bid%20tabulation.pdf.

46. Once a contract is signed, correctional facilities are locked into the contract for a pre-determined number of years.  Once the terms of the contract are set in stone, the provider essentially has monopoly power since they do not have to worry about adjusting costs in order to stay competitive. This means that at any given time, the end-users are not necessarily benefiting from the lowest possible cost of the service — the suboptimal outcome.

# VI.    Conclusion

47. On January 5, 2023, President Biden signed the Martha Wright-Reed Act, and granted the FCC authority to require IPCS rates that are just and reasonable. The Act also allowed the Commission to use industry-wide average costs, as well as the average costs of service of other non-IPCS service providers in setting those just and reasonable rates.  In this report, we discuss the notion of an appropriate industry-wide average cost, discuss the broad principles of setting rates under this new mandate and show why these alternatives are preferable to using the costs as currently reported by the IPCS providers in response to the Third Mandatory Data Collection.

48. Given the FCC's new authority and flexibility to look to average industry costs to set a rate methodology that takes into account information from the broader communications industry, we propose using a model carrier approach to implement the average industry cost mandate.  To implement this approach, the FCC can specify the costs that an IPCS carrier should have or would have if they operated under competitive pressures.  This can be implemented based on industry average costs, using a combination of non-IPCS telecom industry costs and IPCS provider costs to calculate those averages.

49. We discuss the use of reported costs from the Third MDC, the inconsistencies found in data, and suggest that the FCC should carefully consider all cost elements reported by the providers, analyze the outliers, and understand the drivers of the costs, when using them to set rates.  We find that the IPCS industry reported cost sources (Third MDC or publicly available contracts) contain a mix of costs that are required to provide IPCS and other costs that go beyond this requirement.  We also find potential inconsistencies in the reported cost data, and compare the reported costs to publicly available rates charged to inmates in various facilities.  In many cases, excess costs at the provider level can be corrected in the Third MDC by scaling individual cost elements to appropriate benchmarks.  Based on our findings, we believe that the FCC should be clear about what costs are allowed (or "used and useful"), what magnitudes should be reasonable, and only those cost elements and magnitudes that are just and reasonable should be incorporated in the model carrier construct.

REDACTED – FOR PUBLIC INSPECTION

# Appendix

## A. Illustrative Examples Showing Costs and Rates Appear to be Uncorrelated

1. Using the random selection process, we selected six GTL facilities contracts that include voice rates that spanned the years covered in the data reported in the Third MDC (2019-2021). Table 5 shows six publicly available contracts GTL has with jails in five different states. The facilities covered by these contracts have names and addresses that match the data reported by GTL in the Third MDC. The facilities included in Table 5 range in size and location: there are two smaller facilities in New York (with ADP ranging from [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL] to [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]), one larger facility in Michigan (ADP of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]), one facility from Colorado that is similar in size to the Michigan facility (ADP of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]), two facilities in Tennessee (combined ADP of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]) and [BEGIN HIGHLY CONFIDENTIAL] ▎ [END HIGHLY CONFIDENTIAL] facilities in Texas with a combined ADP of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]. Unlike other providers that submitted their cost data in the Third MDC at the facility level, GTL reported their data at the contract level, with the exception of total billed minutes. Thus, several facilities are covered under a single contract ID in the data reported in the Third MDC. To arrive at the "Number of Facilities Covered" count, we uniquely identify the number of facilities GTL lists in the Third MDC that are covered by the same contract ID.

2. In Table 5, we observe that the maximum cost reported (excluding site commissions) is [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL] per minute, and the lowest is [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL] per minute. All six randomly selected contracts show that GTL's reported costs allow them to earn a profit [BEGIN HIGHLY CONFIDENTIAL] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ [END HIGHLY CONFIDENTIAL]. In Larimer County, GTL is able to make a profit of $0.01 per minute. In contrast, GTL's contract with Jefferson County Detention center in Texas charges $0.16 per minute to make voice calls (at a reported CPM of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]), while Delaware County Jail in New York charges $0.20 per minute for all calls in the United States (at a reported CPM of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY CONFIDENTIAL]). The examples from our sample show that the reported rates in publicly available contracts [BEGIN HIGHLY CONFIDENTIAL] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ [END HIGHLY CONFIDENTIAL].

3. To provide further support of this point, we can compare the cases of Delaware County Jail in New York and Genessee County Jail in Michigan. In this case, it becomes evident that there is little correlation between the costs a facility incurs and the rates they charge to incarcerated individuals and their loved ones. Delaware County Jail in New York has an ADP of [BEGIN HIGHLY CONFIDENTIAL] ▇ [END HIGHLY

CONFIDENTIAL] and Genessee County Jail in Michigan has an ADP of [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL]. Despite the [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮ [END HIGHLY CONFIDENTIAL] in ADP, Delaware County Jail in New York is able to provide voice calling services for $0.20 per minute while Genessee does so at $0.21 per minute[58]. To provide voice communication services, we calculate that Delaware costs are [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮▮ [END HIGHLY CONFIDENTIAL] while we calculate Genessee's costs to be [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL] per minute. In the case of these two contracts, it is not obvious that [BEGIN HIGHLY CONFIDENTIAL] ▮▮▮▮ [END HIGHLY CONFIDENTIAL] leads to facilities offering IPCS at lower rates, in fact, it shows that incarcerated individuals at Genessee pay $0.01 more than individuals in Delaware County Jail in New York.

**TABLE 5: GTL COSTS REPORTED IN THE THIRD MDC AND NON-DOC CONTRACT RATE COMPARISON, 2021 PROFIT**

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:

MDC data is reported at the facility level, whereas PPI data is reported at the contract level. For contracts with more than one facility, we sum the costs and ADP across all facilities to get total costs and ADP for a single contract. To calculate the percentage of site commissions related to IPCS, we take the average percentage across facilities in a contract.

[1]-[9]: Third MDC. Note, all costs are taken as reported in the Third MDC, this does not guarantee such costs are reported accurately by providers.

[4]: Total Billed minutes is reported at the facility level. Total billed minutes is the sum of intrastate and interstate billed communications rows in the Third MDC, *see* tab "D1. Revenue and Demand Data.

---

58   *See,* "Amendment to Inmate Telephone Service Agreement", signed by GTL November 18, 2020, *see* p. 8 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=61&name=Delaware_County_NY.pdf. *See also,* "Second Amendment to Master Service Agreement (dated August 17, 2018)", signed by GTL January 21, 2022, at p. 2 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=480&name=Genesee%20County%20GTL%20Amendment%20%232%20signed.pdf.

[7]: [5]*[6]

[8]: [3]/[4].

[9]: ([3]+[7]) / [4].

[E][1]-[9]: Montgomery data from Third MDC complete for 2020 and 2019, not 2021, therefore 2020 values from Third MDC were used.

[A][10]: "Amendment to Inmate Telephone Service Agreement," signed by GTL April 16, 2020.  *See,* p.8 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=61&name=Delaware_County_NY.pdf

[B][10]: "Second Amendment to Master Service Agreement (dated August 17, 2018)," signed by GTL January 21, 2022. *See,* p. 2 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=480&name=Genesee%20County%20GTL%20Amendment%20%232%20signed.pdf.

[C][10]: "Amendment #06 to Inmate Telephone Service Agreement," signed by GTL October 19, 2021. *See,* p. 1 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=13&name=Amendment%20No.%206%20-%20Global%20TelLink%20Corporation.pdf.

[D][10]: Larimer County, "Colorado Professional Services Agreement," signed by Board of County Commissioners of Larimer County February 3, 2021. *See,* p. 29 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=379&name=GTL%20-%20Larimer%20County%2C%20Colorado.pdf.

[E][10]: "Master Services Agreement," signed by GTL December 12, 2017. *See,* p. 16 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=500&name=Montgomery%20County%20Sheriff%20-%20Global%20Tel%20Link%20video%20visit%20contract.pdf.

[F][10]: "Inmate Telephone Service Agreement," signed by GTL January 31, 2020. *See,* p. 11 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=92&name=Oswego_County_NY.pdf.

4. When repeating the same process for [BEGIN HIGHLY CONFIDENTIAL] ███ [END HIGHLY CONFIDENTIAL], we observe a [BEGIN HIGHLY CONFIDENTIAL] ███████ ██████ [END HIGHLY CONFIDENTIAL].  As Table 6 shows, overwhelmingly, the costs Securus reports in the Third MDC show that the company is able to [BEGIN HIGHLY CONFIDENTIAL] ████████████ [END HIGHLY CONFIDENTIAL]. Across the six contracts, the total cost per minute ranges from [BEGIN HIGHLY CONFIDENTIAL] ███ [END HIGHLY CONFIDENTIAL] to a maximum of [BEGIN HIGHLY CONFIDENTIAL] ███ [END HIGHLY CONFIDENTIAL].  At Sanilac County Jail in Michigan, Securus reports their total expenses to be [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL]  for 2021, with total billed intra and inter-state minute calling equaling [BEGIN HIGHLY CONFIDENTIAL] ██████ [END HIGHLY CONFIDENTIAL]. This means it costs Securus [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] per minute to provide voice services, while the rate they charge to place a voice call is $0.21.[59]  Although Sanilac County provides services to [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL], and has the [BEGIN HIGHLY CONFIDENTIAL] ██████████ [END HIGHLY CONFIDENTIAL] ADP covered by a contract in our sample ([BEGIN HIGHLY CONFIDENTIAL] ███ [END

---

[59]    *See,* Sanilac County Jail and Securus, "Securus Technologies Sanilac County Master Services Agreement," signed by the Sanilac County Sheriff's Office August 21, 2018, at p. 12 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=550&name=Sanilac%20County%20Telecomms%20FOIA%20Response%20Letter%20%26%20Documents%20%28dragged%29.pdf.

HIGHLY CONFIDENTIAL] incarcerated individuals), its reported costs are [BEGIN HIGHLY CONFIDENTIAL] ███████████████████████████████████████████ [END HIGHLY CONFIDENTIAL].  For instance, Denver County Jail has a total ADP of [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] individuals across two facilities [BEGIN HIGHLY CONFIDENTIAL] ████ ██████████████████████████████ [END HIGHLY CONFIDENTIAL], [60] yet its cost per minute is a reported [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] per minute. This is roughly [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL] than what it costs to provide services at Sanilac County. Despite the [BEGIN HIGHLY CONFIDENTIAL] ████████████ [END HIGHLY CONFIDENTIAL] between Sanilac and Denver, their reported cost per minute [BEGIN HIGHLY CONFIDENTIAL] ██████ [END HIGHLY CONFIDENTIAL]. Yet, incarcerated individuals and their families will only have to pay $0.086 per minute to place a voice call at Denver County, which is less than a half of what it costs in Sanilac.

**TABLE 6: SECURUS: COST REPORTED IN THE THIRD MDC AND DOC CONTRACT RATE COMPARISON, 2021**
**[BEGIN HIGHLY CONFIDENTIAL]**



**[END HIGHLY CONFIDENTIAL]**

Sources and Notes:
MDC data is reported at the facility level, whereas PPI data is reported at the contract level. For contracts with more than one facility, we sum the costs and ADP across all facilities to get total costs and ADP for a single contract. To calculate the percentage of site commissions related to IPCS, we take the average percentage across facilities in a contract.
[1]-[9]: Third MDC. Note, all costs are taken as reported in the Third MDC, this does not guarantee such costs are reported accurately by providers.
[4]: Total billed minutes is the sum of intrastate and interstate billed communications rows in the Third MDC, see tab "D1. Revenue and Demand Data."

---

[60]  *See,* Third MDC, contract ID I-302597 for year 2021.

[7]: [5]*[6].

[8]: [3]/[4].

[9]: ([3]+[7]) / [4].

[A][10]: "Securus Technologies Berkshire County Updated Scope and Budget," Effective as of August 1, 2021. *See*, https://www.prisonpolicy.org/contracts/file.php?document_id=320&name=berkshire_amendment_14cent s_august2021.pdf.

[B][10]: "Securus Technologies Bristol County Contract (Exhibit A)," signed by the Bristol County Sheriff's Office July 28, 2020. *See*, p. 2 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=321&name=bristol_securus_contract.pdf.

[C][10]: "Second Amendatory Agreement," signed by the city and county of Denver November 27, 2018. *See*, p. 4 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=399&name=Denver%20City%20_%20Count y%20Jail%2C%20CO_16012_16011_2nd%20Amendment_Redacted.pdf.

[D][10]: "Commonwealth of Massachusetts ~ Standard Contract Form," signed by the Essex County Sheriff's Department August 2, 2019. *See*, p. 7 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=326&name=essex_contract_sep2019_to_m ar2023.pdf.

[E][10]: "County of San Diego – Department of Purchasing and Contracting – Contract No. 542145 Amendment No. 9," signed by the County of San Diego Department of Purchasing & Contracting January 29, 2018. *See*, p. 2 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=457&name=CONTRACT_542145_Amendme n_09.pdf.

[F][10]: "Securus Technologies Sanilac County Master Services Agreement," signed by the Sanilac County Sheriff's Office August 21, 2018. *See*, p. 12 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=550&name=Sanilac%20County%20Telecom ms%20FOIA%20Response%20Letter%20%26%20Documents%20%28dragged%29.pdf.

5.  Compared to the Securus contracts, the sample of ICSolutions contracts we selected shown in Table 7 include facilities [BEGIN HIGHLY CONFIDENTIAL] ██████████████ [END HIGHLY CONFIDENTIAL]. Like the Securus contracts, however, the ICSolutions contracts include [BEGIN HIGHLY CONFIDENTIAL] ██████████████ [END HIGHLY CONFIDENTIAL].  In all contracts, the cost for ICSolutions to provide voice services per ranges from [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] to [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL]. All facilities, with the exception of Tehama County Jail in California, charge greater than $0.15 per minute to place a voice call.   There is also a clear variation in rates even in facilities of [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL].  Calhoun in Texas reports an ADP of [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] and charges $0.21 per minute, while Dunn County jail in Wisconsin with a reported ADP of [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] charges $0.16 per minute for voice calling, and Ionia County jail in Michigan charges anywhere from $0.21 to as much as $0.30 to make call in the United States.[61]

---

[61]    *See,* Third MDC. *See also,* Table 7.

**TABLE 7: ICSOLUTIONS COST REPORTED IN THE THIRD MDC AND NON-DOC CONTRACT RATE
COMPARISON, 2021**

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:

MDC data is reported at the facility level, whereas PPI data is reported at the contract level. For contracts with more than one facility, we sum the costs and ADP across all facilities to get total costs and ADP for a single contract. To calculate the percentage of site commissions related to IPCS, we take the average percentage across facilities in a contract.

To calculate total reported expenses for ICSolutions, we used an allocator that was calculated using the company-wide total expenses and the inmate calling services total expenses for the year 2021 from the "C. Company-Wide Information" tab. We noticed the ICSolutions applied a 90% allocator to specific line items in operating expenses but their allocation process for capital expenses was unclear and hard to follow.

[1]-[9]: Third MDC. Note, all costs are taken as reported in the Third MDC, this does not guarantee such costs are reported accurately by providers.

[4]: Total billed minutes is the sum of intrastate and interstate billed communications rows in the Third MDC, see tab "D1. Revenue and Demand Data."

[7]: [5]*[6].

[8]: [3]/[4].

[9]: ([3]+[7]) / [4].

[A][10]: "Renewal Option for the Agreement for Inmate Telephone Services, Resident Banking Software, Commissary Services & Fiduciary Management Services," signed by ICSolutions, February 2, 2021. *See*, p. 5 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=299&name=Calhoun_ICS.pdf.

[B][10]: "Inmate Telephone Services Agreement," signed by ICSolutions, August 8, 2020. *See*, p. 12 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=264&name=Dunn%20county%20FOIA%20-2021-Jun-16.pdf.

[C][10]: "Inmate Telephone Services Agreement," signed by ICSolutions, July 19, 2017. *See*, p. 9 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=168&name=Ionia%20County.pdf.

[D][10]: "Inmate Telephone Services Agreement," signed by ICSolutions, March 30, 2017. *See*, p. 10 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=387&name=Mesa%20County%2C%20CO_2017%20Contract.pdf.

[D][1]-[9]: Mesa County data in Third MDC unavailable in 2021, values for 2020 taken.

[E][10]: "Amendment 2 To the Agreement Between The County of Tehama and ICSolutions," signed by ICSolutions, June 23, 2022. *See*. p. 1 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=475&name=IC%20Solutions%20Amendment%202%20-%20compensation%20FINAL%202022-201.pdf

[F][10]: "Inmate Telephone Services Agreement," signed by ICSolutions, August 14, 2020. *See*, p. 9 https://www.prisonpolicy.org/contracts/file.php?document_id=539&name=Montcalm%20County%2C%20MI%20-%20Contract%202020.pdf.

6. The final provider included in the contract sample is Combined (see Table 8). Of all the randomly selected contracts, Combined reports some of the [BEGIN HIGHLY CONFIDENTIAL] ███████████████ ████████████████ [END HIGHLY CONFIDENTIAL]. In four of the six facilities included in Table 8, Combined reports that it costs the company more than [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] per minute to provide services.[62] Each of these four facilities have ADP less than

---

[62]   *See,* Table 8. At Hillsdale County Jail (Michigan), reported CPM is [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL] at Logan County Detention Centre (Colorado), reported CPM is [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY CONFIDENTIAL], at Kit Carson County Jail (Colorado) CPM is [BEGIN HIGHLY CONFIDENTIAL] ████ [END HIGHLY

[BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL], and charge voice calling rates of $0.20 per minute.[63] In the remaining two facilities, CPM is [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL] and [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL] and the rate for voice calling is $0.20 per minute and $0.19 per minute. Perplexingly, the contract with the largest ADP, Saginaw County Jail in Michigan, which provides services to [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL] incarcerated individuals on average, charges the same reported rates in our sample as the smaller facilities. Phoning an individual at Saginaw County jail will cost an individual $0.19 per minute, while the reported CPM for Combined to provide this service is [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL].[64] Meanwhile, facilities with much higher reported costs and smaller ADPs are able to charge lower per minute rates. Like the Securus, GTL, and ICSolutions contracts we have examined, Combined provides no clear, observable relationship between ADP, the rates providers are charging incarcerated persons and their loved ones to make voice calls, and the CPM reported in the Third MDC.

**TABLE 8: COMBINED: COST REPORTED IN THE THIRD MDC AND NON-DOC CONTRACT RATE COMPARISON, 2021**

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

Sources and Notes:

MDC data is reported at the facility level, whereas PPI data is reported at the contract level. For contracts with more than one facility, we sum the costs and ADP across all facilities to get total costs and ADP for a single contract. To calculate the percentage of site commissions related to IPCS, we take the average. percentage across facilities in a contract.

CONFIDENTIAL], and at Otero County Jail (Colorado) CPM is [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL]

[63]  *See,* Table 8. At Newaygo County Jail (Michigan) reported CPM is [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL] and at Saginaw County Jail (Michigan) reported CPM is [BEGIN HIGHLY CONFIDENTIAL] ▮ [END HIGHLY CONFIDENTIAL].

[64]  Combined, "Inmate Telecommunications General Service Agreement," signed by the Saginaw County Sheriff's Office July 31, 2019, at p.5 of pdf, https://www.prisonpolicy.org/contracts/file.php?document_id=494&name=Saginaw%20County%20FOIA%203418.pdf.

[1]-[9]: Third MDC. Note, all costs are taken as reported in the Third MDC, this does not guarantee such costs are reported accurately by providers.

[4]: Total billed minutes is the sum of intrastate and interstate billed communications rows in the Third MDC, see tab "D1. Revenue and Demand Data."

[7]: [5]*[6]

[8]: [3]/[4]

[9]: ([3]+[7]) / [4]

[A][10]: "Inmate Telecommunications General Service Agreement," signed by the Hillsdale County Sheriff's Office, July 11, 2018. *See,* p. 5 of pdf,

https://www.prisonpolicy.org/contracts/file.php?document_id=547&name=Hillsdale%20MI%20contract%2007112018.pdf.

[B][10]: "Inmate Telecommunications General Service Agreement," signed by the Kit Carson Sheriff's Office, July 15, 2019. *See,* p. 5 of pdf,

https://www.prisonpolicy.org/contracts/file.php?document_id=369&name=Kit%20Carson%20ITS%20renewal%2007152019.pdf.

[C][10]: "Inmate Telecommunications General Service Agreement," signed by the Logan County Sheriff's Office, December 30, 2019. *See,* p. 5 of pdf,

https://www.prisonpolicy.org/contracts/file.php?document_id=370&name=Logan%20CO%20ITS%20Contract%2012302019.pdf.

[D][10]: "Inmate Telecommunications General Service Agreement," signed by the Newaygo County Sheriff's Office, July 6, 2022. *See,* p. 4 of pdf,

https://www.prisonpolicy.org/contracts/file.php?document_id=545&name=Newaygo%20FOIA%20%2322-287%20%28Inmate%20telephone%20agreement%29%20response%20%28dragged%29.pdf.

[E][10]: "Inmate Telecommunications General Service Agreement," signed by the Saginaw County Sheriff's Office, July 31, 2019. *See,* p. 5 of pdf,

https://www.prisonpolicy.org/contracts/file.php?document_id=494&name=Saginaw%20County%20FOIA%203418.pdf.

[F][10]: "Inmate Telecommunications General Service Agreement," signed by the Otero County Sheriff's Office, March 25, 2020. *See,* p. 5 of pdf,

https://www.prisonpolicy.org/contracts/file.php?document_id=371&name=Otero%20CO%20ITS%20Contract%2003262020.pdf.

[B][1]-[9]: Total expenses for Kit Carson Co. Jail increased 2571% between 2020 and 2021 while maintaining the same ADP. We believe costs may have been reported incorrectly for 2021 therefore, we use data from 2020.

In the excel sheet with company-wide costs, Combined allocates a certain percentage of total costs to inmate calling services. However, it is unclear what percentage is allocated for each line item. Hence, we backed out an allocator using the total expenses for company-wide and inmate calling services and applied it to all line items.

## B. VoIP Rates



**FIGURE 9: VOIP RATES**

Sources: "Voip Rates," last accessed May 4, 2023, https://voiprates.info/.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| ——————————————————— | ) | |

**COMMENTS OF**
**GLOBAL TEL*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES ON**
**PROPOSED 2023 MANDATORY DATA COLLECTION**

Global Tel*Link Corporation d/b/a ViaPath Technologies ("ViaPath"),[1] by its undersigned

counsel, respectfully submits these Comments in response to the *Public Notice* issued by the

Wireline Competition Bureau and the Office of Economics and Analytics (the "Bureaus") seeking

comment on the upcoming 2023 Mandatory Data Collection ("MDC") for incarcerated people's

communications services ("IPCS").[2]   In the *2023 IPCS Order*,[3] the Federal Communications

---

[1]    These comments are filed by ViaPath on behalf of itself and its wholly owned subsidiaries that also provide incarcerated people's communications services: DSI-ITI, Inc. d/b/a ViaPath Technologies, Public Communications Services, Inc. d/b/a ViaPath Technologies, Telmate, LLC d/b/a ViaPath Technologies, and Value-Added Communications, Inc. d/b/a ViaPath Technologies.

[2]    WC Docket Nos. 23-62, 12-375, *Wireline Competition Bureau and Office of Economics and Analytics Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services*, Public Notice, DA 23-355 (rel. April 28, 2023) ("*Public Notice*").  In addition to the *Public Notice*, the Bureaus also released Draft MDC Instructions and the Proposed MDC Form, which consists of a Word document and an Excel spreadsheet.

[3]    WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19 (rel. Mar. 17, 2023) ("*2023 IPCS NPRM*" and "*2023 IPCS Order*"). The *2023 IPCS NPRM* and *2023 IPCS Order* are the latest in a series of orders issued by the Commission with respect to IPCS.  *See Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) ("*2013 ICS Order*"), *pets. for stay granted in part sub nom. Securus Tech., Inc. v. FCC*, No. 13-1280, Order (D.C. Cir. Jan.13, 2014), *superseded as stated in Securus Tech., Inc. v. FCC*, No. 13-1280, Order (D.C. Cir. Dec. 21, 2017); *Rates for Interstate Inmate Calling Services*, 29 FCC Rcd 13170 (2014) ("*2014 ICS FNPRM*"); *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) ("*2015 ICS Order*"), *pets. for stay*

1
**JA812**

Commission (the "Commission") directed the Bureaus to "update and restructure" the Commission's most recent data collection "as appropriate in light of the requirements" of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWR Act").[4] ViaPath offers the following comments on the proposed MDC:

**_Timeline for Responses_**:  The Bureaus propose to require IPCS providers to file their responses to the MDC within 90 days of the approval of the MDC by the Commission, which would also include approval by the Office of Management and Budget ("OMB").[5]  ViaPath proposes the response to the MDC be due within 120 days after approval by the Commission.

The Commission estimates completion of the MDC will take approximately 230 hours.[6] ViaPath submits the Commission's hours estimate is substantially understated. Spreading the Commission's 230-hour estimate over 12 weeks (*i.e.*, 90 days), a provider would need to dedicate 20 hours a week of human resources to compile and analyze the requested data and prepare its response to the MDC. The MDC requires data to be reported both company-wide and at the individual facility level.  ViaPath serves over 1500 individual facilities across the United States. If ViaPath spent only 30 minutes per facility to collect, compile, allocate, and report in the many data categories required by the MDC (which is an unrealistically low estimate), ViaPath would

---

granted in part sub nom. *Global Tel*Link Corporation v. FCC*, No. 15-1461, Order (D.C. Cir. Mar. 7, 2016), Order (D.C. Cir. Mar. 23, 2016), *vacated in part, rev'd and remanded in part by Global Tel*Link v. FCC*, 866 F. 3d 397 (D.C. Cir. 2017); *Rates for Interstate Inmate Calling Services*, 31 FCC Rcd 9300 (2016) ("*2016 ICS Reconsideration Order*"), *pets. for stay granted in part sub nom. Securus Tech., Inc. v. FCC*, No. 16-1321, Order (D.C. Cir. Nov. 2, 2016), *vacated and remanded by Securus Tech., Inc. v. FCC*, No. 16-1321, Order (D.C. Cir. Dec. 21, 2017); *Rates for Interstate Inmate Calling Services*, 35 FCC Rcd 8485 (2020) ("*2020 ICS Order*"); *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519 (2021) ("*2021 ICS Order*"); WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, FCC 22-76 (rel. Sept. 30, 2022) ("*2022 ICS Order*").

[4]     *2023 IPCS Order* ¶ 84.

[5]     *Public Notice* at 9.

[6]     88 Fed. Reg. 27885 (May 3, 2023).

spend over 750 hours to respond to the MDC.  Providers need a reasonable amount of time to complete the report and continue to place the offering of IPCS first.  While ViaPath appreciates the Commission's need to complete implementation of the MWR Act within the timeframes established by Congress, a slight extension of the MDC filing deadline is reasonable, can be accommodated, and will benefit all stakeholders by ensuring the Commission receives the best data possible.  In light of these concerns, in no event should the MDC deadline be shorter than 90 days proposed by the Bureaus.[7]

*Separate cost data for audio IPCS and video IPCS*.  The Bureaus ask whether they should require separate cost data for audio IPCS and video IPCS.[8]  ViaPath supports providing separate cost data for audio IPCS and video IPCS as the costs and the categories of costs for each of the services differ.  As ViaPath has explained and the Commission has recognized, IPCS providers are not required to keep their books and records in a certain manner and are not subject to the accounting rules applicable to dominant carriers, such as the Uniform System of Accounts ("USOA").[9]  Accordingly, some costs related to audio IPCS and video IPCS may need to be allocated as the Bureaus appear to recognize.[10]  In allocating such costs (and any others in connection with the MDC), an IPCS provider should be permitted to use the allocation

---

[7]     *Public Notice* at 9 (asking whether the Bureaus should consider a shorter timeframe).

[8]     *Public Notice* at 4.

[9]     *See, e.g.*, WC Docket No. 12-375, Comments of Global Tel*Link Corporation (filed Nov. 4, 2021); WC Docket No. 12-375, Reply Comments of Global Tel*Link Corporation (filed Nov. 19, 2021); *see also 2021 ICS Order* at Appendix E ¶ 32 (stating the Commission "did not create a uniform system of accounts or a detailed set of cost accounting requirements for inmate calling services"); *id.* (finding the Commission did not specify any "set of rules for assigning or allocating inmate calling services costs to rate-regulated inmate calling services, nonregulated inmate calling services, and non-inmate calling services"); *id.* ¶ 53 ("The Commission, to date, has not adopted accounting rules for calling service providers."); *id.* at n.238 ("[W]e recognize that [ViaPath] has not been required to keep, or indeed kept, accounting records that would enable it to isolate the costs it incurs in providing calling services to incarcerated individuals.").

[10]     *Public Notice* at 4 (asking about allocation of audio IPCS and video IPCS costs).

methodologies that best reflect its business and the way in which it keeps its books and records as long as the provider documents and explains its methodologies in its MDC response.[11]

***Subcategories of cost for audio IPCS and video IPCS***.  The Bureaus ask whether the MDC should require IPCS providers to subdivide their audio IPCS costs and video IPCS costs into more discrete categories based on the type of audio or video service provided.[12]  In ViaPath's experience, the costs for voice do not significantly vary based on service type.  However, the cost to provide video IPCS (and especially the capital costs associated with video) do vary based on the equipment used to deliver the video service.  For example, video IPCS provided over a tablet may have different costs than video IPCS provided over a dedicated unit such as a kiosk.

***Interstate/international and intrastate costs***.  The Bureaus ask whether costs vary significantly depending on whether they are interstate, intrastate, or international, and propose that providers report their costs on a company-wide basis without separating them into interstate/international and intrastate components.[13]  ViaPath agrees there is no meaningful difference in cost to provide interstate/international versus intrastate service with the exception of international termination charges paid to underlying carriers, which are a cost only present with international IPCS.

***Granularity of reporting***.  The Bureaus propose that providers submit data at both the company-wide level and for each correctional facility, but ask how they should treat "providers that do not track costs on a facility level."[14]  ViaPath appreciates the Bureaus' acknowledgment

---

[11]     *See, e.g.*, Draft MDC Instructions at 23 (directing providers to "document, explain, and justify all cost assignments, attributions, and allocations"); *see also* Draft MDC Instructions at 4 (stating providers "must report their information according to the best information in their possession, custody, or control").

[12]     *Public Notice* at 4.

[13]     *Public Notice* at 4.

[14]     *Public Notice* at 7.

that not all IPCS providers track costs at the facility level in the normal course of business.[15]  For this reason, IPCS providers should be permitted to use the allocation methodologies that best reflect their business and the way in which they keep their books and records as long as the provider documents and explains such methodologies in its MDC response.[16]

***Safety and security costs***.  The Bureaus propose to require IPCS providers to report the costs they incur to provide safety and security measures both in the aggregate and in specific categories, and at the facility level.[17]  It may be difficult for providers to separate their safety and security costs, and then allocate and report those costs in each of the Commission-established categories.  As the Commission has recognized, "important security features, such as call recording and monitoring, that advance the safety and security of the general public, inmates, their loved ones, and correctional facility employees" are all part of IPCS.[18]  Courts likewise have found correctional facilities face "legitimate security interest[s]" when it comes to incarcerated communications.[19]  As such, separating the costs associated with safety and security measures from other IPCS costs may not be possible in all cases, especially using the specific cost categories established by the Commission.

---

[15]    *Public Notice* at 7; *see also 2021 ICS Order* ¶ 57 (finding "many providers assess their inmate calling services operations on a contract-by-contract basis").

[16]    *See, e.g.*, Draft MDC Instructions at 23 (directing providers to "document, explain, and justify all cost assignments, attributions, and allocations"); *see also* Draft MDC Instructions at 4 (stating providers "must report their information according to the best information in their possession, custody, or control").

[17]    *Public Notice* at 5.

[18]    *2013 ICS Order* ¶ 2; *see also Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 17 FCC Rcd 3248, ¶¶ 38, 72 (2002) (finding "inmate calls impose expensive security costs" and "the provision of inmate calling services implicates important security concerns and, therefore, involves costs unique to the prison environment").

[19]    *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989).

*__Demand data__*.  ViaPath reiterates its prior comments regarding certain categories in the MDC that are intended to capture the "demand" for IPCS.[20]  The number of kiosks installed at a particular correctional facility has no bearing on the demand for IPCS at that facility.[21]  Kiosks can be used to access and/or pay for a number of different services, many of which have nothing to do with IPCS.  Further, the number of phones, tablets, or other communications devices in a particular facility also will not yield accurate demand information.[22]  Incarcerated individuals are not entitled to unfettered access to communications,[23] and correctional facilities typically impose limits on access to communications.[24]  The presence of communications equipment in a facility does not equate to demand for IPCS.  In addition, information concerning the opening and closing of IPCS accounts also would not serve as accurate proxies for demand.[25]  The opening or closing of an account does not provide information on whether that account is actively being used for IPCS.  A better indicator of demand is billed and unbilled minutes and/or communications, which

---

[20]    *See, e.g.*, WC Docket No. 12-375, Comments of Global Tel*Link Corporation (filed Nov. 4, 2021); WC Docket No. 12-375, Reply Comments of Global Tel*Link Corporation (filed Nov. 19, 2021).

[21]    Draft MDC Instructions at 42-43 (asking for data on the "Number of Incarcerated People's Kiosks").

[22]    Draft MDC Instructions at 42-43 (asking for data on the "Number of Incarcerated People's phones or other communications devices" and the "Number of Incarcerated People's Tablets").

[23]    *See, e.g.*, *Gilday v. Dubois*, 124 F.3d 277, 293-294 (1st Cir. 1997); *see also Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994) (stating that "a prisoner's right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution'") (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir.1986)); *Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir.1978) (stating that the right of pretrial detainees to make telephone calls, while "not free from doubt[,]" is subject to reasonable restrictions); *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y.1988) (noting that prisoners have no right to unrestricted telephone use).

[24]    *See, e.g.*, *Robbins v. South*, 595 F. Supp. 785, 789 (D. Mont. 1984) (limiting prisoners to one outside call per week); *Pope v. Hightower*, 101 F.3d 1382, 1383-85 (11th Cir. 1996) (restricting inmate telephone access and the number of people inmates were permitted to call).

[25]    Draft MDC Instructions at 42-43 (asking for data on the "Total number of IPCS accounts opened" and the "Total number of IPCS accounts closed").

6

is included in the proposed MDC.[26]  Finally, IPCS providers do not track or have adequate information to respond to questions about "weekly turnover," "total admissions," or "total releases" at each correctional facility they serve,[27] and it is unclear how this data would correlate to IPCS demand.  Each of the above-referenced categories should therefore be removed from the MDC.

## **CONCLUSION**

ViaPath respectfully submits the Commission should modify the proposed MDC as set forth herein.

Respectfully submitted,

**GLOBAL TEL*LINK CORPORATION**
**D/B/A VIAPATH TECHNOLOGIES**

/s/ Cherie R. Kiser

Chérie R. Kiser
Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street, NW, Suite 950
Washington, DC 20006
202-862-8900
ckiser@cahill.com
acollins@cahill.com

Dated:  June 2, 2023                                  Its Attorneys

---

[26]    Draft MDC Instructions at 42-43 (asking for data on various categories of billed and unbilled minutes and communications).

[27]    Draft MDC Instructions at 42-43 (asking for data on "Weekly Turnover Rate," "Total Admissions," and "Total Releases").

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling | ) | WC Docket No. 12-375 |
| Services | ) | |

To: The Wireline Competition Bureau

## COMMENTS OF PAY TEL COMMUNICATIONS, INC.

Pay Tel Communications, Inc. ("Pay Tel") respectfully submits these comments in response to the 2023 Mandatory Data Collection Public Notice (the "Public Notice"), DA 23-355, released April 28, 2023, in these dockets.

The Public Notice seeks comments regarding the statutory revisions set forth in the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("Martha Wright-Reed Act" or the "Act") with respect to the FCC's Proposed 2023 Mandatory Data Collection ("2023 MDC").

Pay Tel supports the Commission's ongoing efforts to collect accurate information from all providers concerning costs incurred in providing IPCS and is appreciative of the incremental improvements that have been made in this initiative to date. With this overall goal in mind, Pay Tel offers the following comments in response to the Public Notice.

### (1)    Safety and Security Costs

The Martha Wright-Reed Act requires the Commission, in promulgating regulations, to "consider costs associated with any safety and security measures necessary to provide" IPCS. *See*

**JA819**

Act, at sec. 3(b)(2). The Overview to the Proposed Instructions focuses on the word "necessary" ("The Act requires the Commission to consider, as part of its implementation, the costs of 'necessary' safety and security measures . . .") and, presumably in an effort to assist in differentiation between "necessary" and "unnecessary" costs, the 2023 MDC seeks detailed total company and facility-specific information concerning safety and security costs. There are several concerns with the approach taken in the proposed MDC.

The mechanism for reporting safety and security costs in the 2023 MDC limits providers to costs which can be assigned to seven categories: (1) CALEA, (2) law enforcement support services, (3) communication security services, (4) communication recording services, (5) communication monitoring services, (6) voice biometrics services, and (7) other.

As has been carefully and comprehensively documented in the record of these proceedings (WC Docket Nos. 12-375 and 23-62),[1] safety and security are (and have been) an integral part of providing IPCS since the inception of the service. As such, providers' accounting systems are not designed to track "safety and security" costs (as opposed to specific security-related service offerings) as functional components separate from other aspects of the service. The *primary* (not incidental, collateral or ancillary) function of confinement facilities is to make the public safe, and when designing and provisioning IPCS providers must comply with the facilities' requirements consistent with this primary objective. Accordingly, providers have tracked their costs of IPCS

---

[1] *See, e.g.,* National Sheriffs' Association Comments, WC Docket Nos. 23-62, 12-375, at 9–10 (May 8, 2023); National Sheriffs' Association Comments, WC Docket No. 12-375, at 5–6 (Nov. 23, 2020); California State Sheriffs' Association Comments, WC Docket No. 12-375, at 1–2 (Nov. 21, 2020); National Sheriff's Association Comments, WC Docket No. 12-375 (Fifth FNPRM), at 6 (Sept. 27, 2021); Securus Comments, WC Docket No. 12-375 (Sixth FNPRM), at 17-8 (Dec. 15, 2022); Securus Reply Comments, WC Docket No. 12-375 (Fifth FNPRM), at 28-31 (Dec. 17, 2021); Pay Tel Comments, WC Docket No. 12-375 (Fifth FNPRM), at 9-13 (Sept. 27, 2021); Pay Tel Reply Comments, WC Docket No. 12-375 (Fifth FNPRM), at 8-10 (Dec. 17, 2021); Setting the Record Straight on Confinement Facility Costs, Pay Tel Communications, Inc., *Ex Parte Presentation,* WC Docket No. 12-375 (May 8, 2015).

consistent with the service requirements reflecting the reality that safety and security costs are embedded in the nature of the service.

The Martha Wright-Reed Act recognizes this underlying reality by making clear that the Act "shall [not] be construed to . . . prohibit the implementation of any safety and security measures related to such services at such facilities." *See* Act, at sec. 4. With this language, the Act clearly and appropriately reserves decisions concerning safety and security matters to the officials operating confinement facilities, and IPCS providers are, by definition, required to conform to the requirements imposed by these facilities in providing services. Notwithstanding the Proposed Instructions' declaration that "[t]he classification of a system, product, or service as a Safety and Security Measure does not mean that it is part of a Provider's IPCS-Related Operations," as codified by the Act, the costs associated with tailoring IPCS to meet the specified requirements of the facility are costs which are recoverable through rates charged to consumers of the service.

The 2023 MDC does not reflect, nor is it designed to capture, this nuance. In contrast to the directive in the Act, and the way in which IPCS providers operate their businesses, the proposed 2023 MDC attempts to segregate "safety and security" costs into seven arbitrarily-assigned buckets which will not provide a full or accurate picture of how safety and security costs are associated with the service offering. By way of illustration:

- Section IV.C.3.b.(1)(b) (and the succeeding provisions of IV.C.3.c and -.d) of the Proposed Instructions classifies "maintenance of data repositories for use by law enforcement personnel" as a "law enforcement support service"—implying that costs associated with this function are not directly related to the provision of IPCS. However, the appropriate classification of a "data repository" depends entirely on the nature of the data being collected and the intended purpose of its use—information which will not be collected by the form.

- Section IV.C.3.b(1)(g) (and the succeeding provisions of IV.C.3.c and -.d) of the Proposed Instructions requires reporting of "all other" Safety and Security Measures. But "Safety and Security Measures" is defined as any "system, product, or service, including any such system, product, or service that allows Incarcerated

People to communicate using IPCS as permitted by the Facility; helps the Facility ensure that Incarcerated People do not communicate with whom they are not allowed to communicate; helps monitor and record on-going communications; or inspects and analyzes recorded communications." This definition is so broad as to encompass the entirety of IPCS. As discussed above, the entirety of the service is designed and constructed to provide safe and secure communications functionality consistent with the requirements established by confinement facilities. The definition creates a feedback loop where providers are being asked to report the entirety of their service costs—not previously report in the prior six arbitrary buckets—in a "catch all" category. This undermines the efficacy of this category.

What would perhaps be a more productive reporting exercise would be to specifically seek data regarding Safety and Security Measures associated with distinct and separate "system[s], product[s], or service[s]" which are provided as ancillary components to the IPCS offering, whether or not offered for a separate fee. For example, some providers offer ancillary or supplementary services under a general "security" umbrella which are not intrinsic to the service itself—such as ankle bracelets and data analytics which are related to law enforcement activity as opposed to core IPCS functionality. However, other services such as call transcription, translation, advanced voice biometrics, and supplemental call monitoring are typically associated with core IPCS functionality and are used, for example, to detect, verify and deter illegal or improper activity using IPCS. As currently framed, the proposed data collection does not meaningfully distinguish among these costs or provide a basis upon which the Commission may draw distinctions between these functions.

As crafted, the reporting form conflates essential and non-essential costs into a single category. But the appropriateness of cost for recovery is not dependent on how a provider aligns its cost with arbitrary buckets established in a data collection form. Given that the Commission has not adopted a uniform system of accounting for IPCS providers, there will be significant differences in the way in which providers record costs and the way in which they interpret and apply the Commission's MDC instructions and requirements. The Commission's MDC efforts to

date prove this beyond any debate. Forcing providers to allocate what are, by definition, recoverable costs into arbitrary buckets of costs is a fundamentally flawed data collection methodology and, if improperly relied on in setting rates, will lead to arbitrary and capricious ratemaking.

    **(2)**    **Costs Incurred by Facilities in Making IPCS Available**

Section IV.C.3.d of the Proposed Instructions seeks information about the costs incurred by the Facilities themselves to provide Safety and Security Measures by requiring providers to report "verifiable, reliable, and accurate information in your possession about the costs incurred by the Facilities [ ] served during 2022 to provide Safety and Security Measures in connection with the provision of IPCS." Pay Tel has two primary concerns with this request.

First, providers are highly unlikely to have such information. Providers do not typically have access to facility books and records and costs incurred by facilities will either need to be reported by the facilities or estimated through best available information. To assist facilities with providing such information, the Commission may wish to develop a template data form which could be utilized by facilities for this purpose and should seek voluntary submission of this data directly from facilities.

Second, costs which should be recoverable by facilities are not limited to what the Commission proposes to label as "safety and security" costs. As regards facilities, the relevant question is what costs are incurred by facilities in making IPCS available, which includes a variety of activities which have been documented in the record in these proceedings. Pay Tel supports the Commission's efforts to document and acknowledge these costs, but the proposed data collection, as currently framed, is not likely to result in the collection of robust and reliable data.

**(3)**     **Definitions of "Provider" and "Subcontractor"**

The Martha Wright-Reed Act will potentially subject certain entities which have formally been doing business in the IPCS ecosystem on an "unregulated" basis to regulation. These entities include entities which have self-classified as "non-interconnected VoIP" providers and entities providing video visitation services. Further, as recognized in the Proposed Instructions in some instances a regulated IPCS provider may "partner" with another entity to provide a now covered service such as video visitation. Pay Tel would offer the following observations related to these issues:

First, the Commission has not yet issued rules concerning the full extent of its regulatory authority under the Martha Wright-Reed Act. As such, entities which have previously regarded themselves as outside the Commission's authority (whether accurately or not) have yet to receive clarification on these issues from the Commission. To the extent that the Commission, implements the full extent of its jurisdiction as permitted under the Act, it will be important that the Commission receive cost information from *all* entities subject to the Commission's authority. There will necessarily be a transition period as entities are educated concerning the Commission's requirements, and any regulation in this area will need to reflect the reality that the quality and completeness of the underlying data will almost certainly lag behind the assertion of regulatory authority.

Second, the Proposed Instructions' definition of "Provider" appropriately recognizes that some service offerings may be facilitated by more than one entity, each entity providing discrete components of the service. For example, Pay Tel has utilized third party vendors to facilitate the provision of video visitation services in some instances. These vendors have previously operated outside the Commission's regulatory authority, and Pay Tel lacks detailed information concerning the costs that they incur in providing their components of the service. Without data from the

"subcontractor" the Commission will not have insight into overall service costs—as has been observed previously with some IPCS vendors who have subcontracted portions of standard IPCS service. The Commission should take steps to ensure that it is apprised of situations where multiple entities are involved in providing a covered service to avoid instances of incomplete or duplicated data.

### (4)     Two-year snapshot of business operations

Section IV.A.(18) of the 2013 MDC Proposed Instructions requires IPCS providers to provide a "representative" two-year looking forward snapshot of business operations and "specific known and measurable changes to the Company's IPCS or Ancillary Services investments, expenses, revenues, and demand that are not reflected in the data collected through this data collection." Pay Tel appreciates the Commission's recognition that provider costs are variable over time and are constantly evolving through technology upgrades and rollouts—some of which are planned well in advance and some of which are not. Additionally, the industry is impacted by other extrinsic events such as experienced with the COVID pandemic. The Commission's approach to rate setting should provide cushion for providers to respond to such changing conditions—conditions which will not be fully captured in the proposed data collection.

* * *

Pay Tel requests that the Commission take into consideration the foregoing comments in connection with the 2023 MDC.

- 7 -

Dated: June 2, 2023                    Respectfully submitted,

                                       **PAY TEL COMMUNICATIONS, INC.**

                          By:          _____
                                       Marcus W. Trathen
                                       Christopher B. Dodd
                                       BROOKS, PIERCE, McLENDON,
                                        HUMPHREY & LEONARD, L.L.P.
                                       Wells Fargo Capitol Center, Suite 1700
                                       Post Office Box 1800 (zip 27602)
                                       Raleigh, N.C. 27601
                                       Telephone: (919) 839-0300
                                       Facsimile: (919) 839-0304
                                       mtrathen@brookspierce.com
                                       cdodd@brookspierce.com

4872-1373-8855.v3

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | |

**SECURUS TECHNOLOGIES, LLC'S INITIAL COMMENTS TO THE PROPOSED 2023**
**MANDATORY DATA COLLECTION**

Securus Technologies, LLC ("Securus") respectfully submits these comments to the

Federal Communications Commission's ("Commission") proposed 2023 Mandatory Data

Collection ("2023 MDC").[1]  Securus supports the overall approach of largely paralleling the

Third Mandatory Data Collection ("3rd MDC") and its detailed allocations of cost and demand

data.  As Securus has previously informed the Commission, based on the assessment of its

consultants, FTI Consulting ("FTI"), the information collected in response to the 3rd MDC is

sufficiently credible to underpin establishment of permanent rates.[2]  Although supportive of the

overall approach, Securus suggests certain refinements and adjustments to ease use of the

instructions and related templates and to minimize burden without sacrificing the requisite level

of detail.

---

[1] *Wireline Competition Bureau and Office of Economics and Analytics Seek Comment on Proposed Mandatory Data Collection for Incarcerated People's Communications Services,* Public Notice, WC Docket Nos. 23-62, 12-375, DA 23-355 (rel. April 28, 2023) (Public Notice).
[2]  Securus Technologies, LLC Comments, Sixth Further Notice of Proposed Rulemaking, WC Docket 12-375, filed Dec. 15, 2022,  at 14.

*Reporting Period.*  Securus supports the proposal to collect data on voice and video calling services for the 2022 calendar year.  The Commission should refrain from requiring providers to go back and isolate video calling data from 2020 and 2021.  The burden of this approach outweighs any material benefit.  Moreover, because intrastate and interstate costs are not materially different, and no provider had sought to isolate intrastate costs, there is little value in requiring providers to isolate those costs for prior years.

*Cost Categories Generally.*  In light of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWR Act") expansion of the Commission's authority to regulate video calling services, Securus concurs that providers should endeavor to allocate costs among traditional voice service or ICS, and video calling services.  There is no need to further segregate costs into subcategories of voice and video service.  To the extent a provider offers other unregulated services, costs should be allocated to those services in the aggregate.  As in the 3rd MDC, costs should also be allocated to ancillary services.

*Costs to Provide Services to the Disabled and Other New Obligations.*   The Commission should enable, but not require, providers to submit data on estimated costs to provide access to internet-based TRS services for incarcerated people with communication disabilities and to implement new requirements regarding the treatment of unused funds, including refund obligations.  The Fourth Report and Order implemented new disability access mandates and refund obligations without any cost estimates or provision for cost recovery.  The Commission noted "that providers may supplement their responses to the [3rd MDC] to separately document, on an annualized basis, any increased costs they will incur in implementing this Order's requirements relating to disability access."[3]  The Commission should extend the opportunity to the 2023 MDC

---

[3] *Rates for Interstate Inmate Calling Services*, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking,  WC Docket No. 12-375, FCC 22-76, at ¶ 28 (2022).

for both disability access and the implementation and deployment of new systems to effectuate the new refund obligations and provide optional worksheets for providers to document project development and compliance costs related to the Commission's disability access obligations, even where those cost are incurred in 2023. The Commission should, to the extent possible, identify the cost data it would consider most relevant to support inclusion of disability services' deployment costs in IPCS rates.

*Safety and Security Costs*. The Commission proposes to collect highly granular, disaggregated information on costs of providing safety and security features. The IPCS industry will be challenged to report this information in the manner proposed.

The Commission proposes a 4-step process to eventually allocate safety and security costs at the facility level among seven separate categories. Providers must first identify company-wide total safety and security costs. Next providers must allocate total company-wide safety and security costs, on a percentage basis, among the following seven categories: (1) expenses related to the Communications Assistance for Law Enforcement Act ("CALEA"), (2) law enforcement support services, (3) communication security services, (4) communication recording services, (5) communication monitoring services, (6) voice biometrics services, and (7) other safety and security measures.[4] Providers would then be required to attribute the percentage of costs for each of those categories to audio services, video services, ancillary services and other services. The last step would require providers to indicate whether they provide any of the seven categories at a facility, allocate a portion of the company-wide cost for that category to a particular facility, and then further allocate that cost among audio, video, ancillary services or other services at that facility.[5]

---

[4] Notice at 5.
[5] Notice at 6.

The proposed level of disaggregation is far beyond what the Commission required in the 3rd MDC. With the exception of the addition of CALEA expenses, which as noted below should be eliminated, the 2023 MDC uses the same categories that the Commission established in the 3rd MDC under the heading of "Security Services Not Classified as Site Commissions."[6] The 3rd MDC, however, only requested this break down of security costs on a company-wide basis. For facility-level data, the 3rd MDC requested only a total cost estimate for "Security Services Relating to the Company's ICS-Related Operations."[7]

The Notice provides no rationale for why the proposed further level of disaggregation is necessary to implement the MWR Act's requirement that the Commission consider the costs associated with any safety and security measures necessary to provide voice (telephone or VoIP) or video visitation services. For one, the MWR Act does not require analysis of security costs associated with ancillary services or services other than voice and video as described in the Act. As far as Securus is concerned, there are no safety and security costs associated with ancillary services of the type contemplated for communication services.

With respect to the categories, the Commission should remove the category for CALEA costs because the Commission has exempted pay telephone providers, which include inmate telephone service providers, from the CALEA requirement.[8] Nor would it make sense to have imposed CALEA obligations on IPCS providers. Those obligations require covered telecommunications carriers to ensure their equipment and services are capable of enabling electronic surveillance of calls when authorized by court order. IPCS already enables electronic

---

[6] 3rd MDC Instructions at IV.C.3.b.(1)(a)-(f).
[7] 3rd MDC Instructions at IV.D.1.b.(3)(h).
[8] *See, Communications Assistance for Law Enforcement Act*, Second Report and Order, 15 FCC Rcd 7105, 7119, para. 25 (1999) (finding that pay telephone providers are not telecommunications carriers for purposes of CALEA); 47 USC § 276(d).

surveillance as a basic component of the service as required by correctional authorities.  As CALEA is not and has never been applicable to IPCS, it is unclear what specific categories of costs are expected to be allocated to these services.  CALEA obligations are superfluous to the provision of IPCS and not applicable to an environment in which it is assumed that callers have diminished privacy rights and their communications are subject to monitoring and recording as a standard practice.

Securus continues to evaluate the proposed 2023 MDC instructions related to safety and security costs and reserves the right to provide additional comments in its reply comments.

*Definitions*.  The Commission requires providers to allocate costs between audio IPCS and video IPCS, but neither of those terms are defined.[9]  The Commission should make clear that audio IPCS refers to voice-only calling services using either circuit switched or VoIP technology.  It should also clarify that video IPCS refers to real-time remote or on-site video visitation services.  Certain definitions can also be eliminated.  The definitions contain four separate terms to reference a prison or jail (Correctional Facility, Correctional Institution, Detention Facility, and Facility).  It's not at all clear what value or distinction is derived from having these multiple terms.  The Instructions themselves repeatedly use the term Facility.  The other defined terms should be eliminated.

*Time Frame for Responding*.  The Commission proposes requiring providers to submit responses within 90 days of the order adopting instructions and approving the data collection.  Securus respectfully urges the Commission to provide more time and recommends 120 days, the same time provided in the 3rd MDC.  Securus recognizes that the Commission has a statutory deadline to complete its implementation of the MWR Act.  Nevertheless, 90 days is an insufficient period

---

[9] The Commission defines IPCS but not audio IPCS or video IPCS.

of time in light of the substantial amount of detailed and disaggregated information the Commission is requesting.  Although the 2023 MDC would cover only one year, there is a substantial increase in the types and categories of data to collect, allocate and report.

The Commission has continually underestimated the amount of time required for these data collections.  Securus' internal personnel spent about one thousand hours compiling information for the last data collection, far in excess of the 230 hours estimated.  This does not include the time and expense for FTI consultants who were instrumental in collecting and compiling the information and completing the reporting documentation.  The providers should be given sufficient time to accurately collect and report the information requested.

*Eliminate Certain Facility Demand Data*.  The Commission should eliminate the requirement to report on accounts opened and closed, admissions, and releases, as well as calculating Weekly Turnover Rate.  For the 3rd MDC, the Commission argued that turnover rates may play a significant role in cost causality at smaller facilities and that this information would supplement, and help correct potential flaws in, other population metrics.  The Commission directed providers to work with respective facilities to compile this data.[10]

It is not at all clear whether the information obtained was useful or superior to other available information.  Securus worked through its Sales and Account Management teams to query its customers for this information, and obtained responses from only a small fraction of facilities.  Securus had no way of gauging the accuracy of this data or whether the sample size was useful.  As Securus noted in its 3rd MDC Word Template submission, turnover rate is regularly compiled and reported by the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.  The Commission's effort appears largely redundant of this data set,

---

[10] FCC WCB OEA Order, Jan. 18, 2022, issuing final 3rd MDC Instructions and Templates, ¶ 5.

which is also likely to be superior to anything providers can glean in hit-or-miss efforts.

Moreover, attempting to collect this information is a distraction of resources and effort during a very difficult process of preparing the 2023 MDC submission (particularly if the Commission decides to keep the compressed 90-day timeframe for preparing submissions). The Commission can ease some of the burden by eliminating the obligation to gather this data (or at least make it optional) and it should instead rely on the information already being collected by the Department of Justice.

*Easing Use of the Instructions.* Securus suggests certain fairly simple revisions to the instructions that should make them more accessible and easy to use. The Commission should add page numbers to the instructions. Adding page numbers to the instructions will aid cross referencing. For example, the excel spreadsheet includes a crosswalk index that refers to page numbers in instructions but the instructions themselves do not include page numbers. The instructions should include tags to section heads and data requirements identifying the specific tab and row in the excel spreadsheet to which a particular instruction refers.

**CONCLUSION**

Securus supports the overall approach that the Commission proposed for the 2023 data

collection but respectfully urges the Commission to make the adjustments as described above.

Respectfully submitted,


_____/s/_____
Michael H. Pryor
Shareholder
Brownstein Hyatt Farber Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

*Counsel to Securus Technologies, LLC*

June 2, 2023



**epic.org**

**Electronic Privacy Information Center**
1519 New Hampshire Avenue NW
Washington, DC 20036, USA

📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

## COMMENTS OF THE ELECTRONIC PRIVACY INFORMATION CENTER

to the

Federal Communications Commission

on

Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services - REPLY

88 Fed. Reg. 20804, WC Docket Nos. 12-375, 23-62

June 6, 2023

---

The Electronic Privacy Information Center (EPIC) submits these comments in response to the Federal Communication Commission's (FCC or "the Commission") April 7, 2023 notice of proposed rulemaking implementing the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or "the Act").[1] The Martha Wright-Reed Act expands the FCC's jurisdiction to cover all forms of "calling device" used by incarcerated people to communicate with their families and provides new instructions to the Commission to set "just and reasonable" rates for calls. After filing initial comments in this docket on May 8, 2023,[2] EPIC now submits comments in reply.

EPIC is a public interest research center in Washington, DC seeking to protect privacy, freedom of expression, and democratic values in the information age. EPIC works to challenge and roll back unnecessary surveillance, including surveillance of incarcerated persons and their friends

---

[1] 88 Fed. Reg. 20804, https://www.federalregister.gov/documents/2023/04/07/2023-07068/incarcerated-peoples-communication-services-implementation-of-the-martha-wright-reed-act-rates-for#p-88 [hereinafter "NPRM"].
[2] EPIC Comments to FCC on Martha-Wright Reed Act Implementation, WC Docket Nos. 12-375, 23-62 (May 8, 2023), https://epic.org/documents/epic-comments-to-fcc-on-martha-wright-reed-act-implementation/.

and families. In addition to recent comments in this docket,[3] EPIC has filed amicus briefs on

attorney-client privilege and petitioned the FCC for rulemaking regarding the privacy and security of

phone subscriber data, as well as offered congressional testimony on the same issues.[4]

EPIC urges the FCC to 1) adopt a "used and useful (to ratepayers)" standard for calculating

allowable pass-through costs to ratepayers instead of a "necessary" standard, 2) recognize that so-

called "video visitation" is a telecommunications service and should not be associated with in-person

visitation, 3) adopt a broad interpretation of covered institutions including secure mental health,

immigration detention, and juvenile detention facilities 4) not to rely on precedents that are no longer

binding in light of the Martha Wright-Reed Act.

## Background

As the Commission describes it, "the Act removes the principal statutory limitations that

have prevented the Commission from setting comprehensive and effective just and reasonable rates

for incarcerated people's communications services."[5] The FCC now has explicit statutory authority to

regulate not just phone calls from prisons and jails, but also video calls and other

telecommunications regardless of the technology used to make the call.

---

[3] EPIC Comments WC Docket No. 12-375 (Dec. 15, 2022), https://www.fcc.gov/ecfs/search/search-filings/filing/121545964412

[4] *See, e.g.,* Br. of Amici Curiae Electronic Privacy Information Center (EPIC) in Support of Appellant, Anibowei v. Wolf, No. 20-10059 (June 9, 2020), https://epic.org/documents/anibowei-v-wolf/ (amicus in support of plaintiff, an attorney whose phone was searched without a warrant by border agents at Dallas airport); Report and Order and Further Notice of Proposed Rulemaking, Federal Communications Commission, Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Information, FCC 07-22 (Apr. 2, 2007), https://docs.fcc.gov/public/attachments/FCC-07-22A1.pdf (Commission Report and Order on protecting Customer Proprietary Network Information (CPNI) initiated by EPIC petition); EPIC Letter to House Energy & Commerce Committee, Accountability and Oversight of the Federal Communications Commission (May 14, 2019), https://epic.org/documents/accountability-and-oversight-of-the-federal-communications-commission/ (testimony regarding the FCC's oversight of robocalls, location tracking, and unnecessary collection and retention of subscriber call records).

[5] NPRM at 3.

The Commission is empowered to reconsider its rate caps with the touchstone of "just and reasonable" pricing instead of the "fairly compensated for each and every call" standard that existed previously. The Act was explicitly intended to aid the Commission in lowering the price of prison telecommunications services for incarcerated peoples and their loved ones.[6] It also directed the Commission to "consider" costs associated with safety and security measures for providing telecommunications services in jails and prisons.

I.      **The Commission Should Adopt A "Used and Useful" Standard Because Surveillance Tools Are Not Necessary to Connect Calls, Nor Are They Useful to Ratepayers.**

*In response to comments of the National Sheriff's Assn., NCIC*

The Commission has for decades applied a "used and useful" standard in its' general telecommunications dockets to identify which costs to service providers can fairly be passed on to consumers, and which costs are excessive or unfair to consumers.[7] EPIC urges the Commission to apply this standard in this docket to properly allocate costs between ratepayers, prison telecommunications providers, and jails and prisons themselves.

The Martha Wright-Reed Act requires that the Commission "shall consider costs associated with any safety and security measures necessary to provide a [telephone or advanced communications] service"[8]—which as one commenter has already noted would include tools that protect IPCS systems from malicious online threats, but not tools that facilitate law enforcement investigation (of any crime that might be discussed on any call).[9] Other commenters document

---

[6] 88 Fed. Reg. 20806.
[7] *See e.g.,* 47 CFR § 65.800; AT&T Application for Review; Sandwitch Isles Communications Inc. Petition for Declaratory Ruling, Memorandum Opinion and Order, 31 FCC Rcd 12977, paras 20-46 (2016).
[8] Martha Wright-Reed Act § 3(b)(2)
[9] Stephen Raher https://www.fcc.gov/ecfs/search/search-filings/filing/10509037027510 ("The Commission should narrowly define the types of security costs that are properly recoverable from IPCS ratepayers. A leading example of properly recoverable expenses is the cost of protecting networked IPCS systems from malicious online threats—such costs are necessary to the provision of IPCS because without such security,

multiple instances in which these services cannot be considered necessary by virtue of the fact that they are not utilized universally.[10] Additionally, to the extent that the Commission has historically made any determinations about what surveillance tools are necessary to the provision of these services, Congress has mandated that the Commission "consider" the issue anew, as we discuss further below in Section IV.

EPIC agrees that there is compelling evidence that these tools are not necessary for the provision of telephone (or advanced communications) service, and urges the Commission to employ its "used and useful (to ratepayers)" standard when determining what should be paid by incarcerated persons and by those who wish to remain in contact with them—this will further avoid conflating what the facility deems is necessary to its safe and secure operation with what is technologically necessary to connect a phone call or other communication safely and securely.

---

systems might fail and thus be unable to connect calls. In contrast, law enforcement surveillance systems are designed to detect and document criminal activity (both real and imagined), and calls can be completed whether or not these systems are in place. If correctional agencies believe these systems provide value, then the agencies can pay for such technology from their budgets. To fund such systems through involuntary transfers from ratepayers is neither just nor reasonable.")

[10] See, e.g., Worth Rises https://www.fcc.gov/ecfs/search/search-filings/filing/105092861411581 ("We have explained how such measures are separable from IPCS and differ from one jurisdiction to another negating their indispensability, have historically been and still are marketed independently from communication services, have a separate and distinct consumer base from IPCS ratepayers that has penal interests rather than an interest in communication, and are used to appeal to that consumer base, corrections administrators, rather than IPCS ratepayers."); id. ("Global Tel Link's own IPCS contracts outline elective, optional rates for safety and security measures, such as Voice Biometrics, Word Search (call transcription), Data IQ (data analytics), and even investigative staff, that it tells the Commission are necessary. IPCS at its core is no different from communication services outside carceral settings and does not require special safety and security for adaptation.") (internal citations omitted); id. ("Furthermore, the use of off-the-shelf advanced communication technologies that do not have the safety and security bells and whistles should cause the Commission to question traditional IPCS providers and corrections administrators and their claims about the necessity of such measures. How could these safety and security measures or any safety and security adaptation be necessary for the provision of IPCS when incarcerated people are currently using communication services that do not support these measures? They cannot be."); Wright Petitioners et al., https://www.fcc.gov/ecfs/search/search-filings/filing/1050883878528 ("It should also be clear that safety and security features that are not universally used across facilities suggests that they cannot be "necessary," as some providers do offer IPCS without needing to use such features.")

Many of these surveillance tools are actively harmful to incarcerated persons and to their loved ones and to others they communicate with. While the reality of this harm may not outright preclude a facility from deploying these tools (as the facility has other equities), such harms should preclude facilities and service providers from charging the callers and called parties themselves for the costs of these tools. The ratepayer should not be charged for functionality that is neither used nor useful by them in the course of their call or advanced communication, and functionality that is harmful to them (e.g. voiceprinting,[11] keyword alerting,[12] etc.) is presumptively neither used nor useful to the ratepayer. Multiple commenters have made similar observations.[13] Comments that focus on the Commission's lack of authority over safety and security mechanisms in facilities covered by the Martha Wright-Reed Act have conflated the Commission's clear authority over what the facility and its service providers may charge to ratepayers with the Commission's less clear

---

[11] George Joseph and Debby Nathan, Prisons Across the U.S. Are Quietly Building Databaes of Incarcerated People's Voiceprints, The Intercept (Jan. 30, 2019), https://theintercept.com/2019/01/30/prison-voice-prints-databases-securus/

[12] Akela Lacy et al., Prisons Launch "Absurd" Attempt to Detect Coronavirus in Inmate Phone Calls, The Intercept (Apr. 21, 2020), https://theintercept.com/2020/04/21/prisons-inmates-coronavirus-monitoring-surveillance-verus/

[13] See, e.g., UCC and PK https://www.fcc.gov/ecfs/search/search-filings/filing/105091636628717 ("The FCC also recognized "the equitable principle that the ratepayers may not be forced to pay a return except on investment which can be shown directly to benefit them." As the Commission has explained elsewhere, "[t]he used and useful and prudent investment standards allow into the rate base portions of plant that directly benefit the ratepayer, and exclude any imprudent, fraudulent, or extravagant outlays." Virtually all payments to carceral facilities will fall outside of that standard.") (internal citations omitted); Wright Petitioners, Benton, PPI, PK https://www.fcc.gov/ecfs/search/search-filings/filing/1050883878528 at appendix: Brattle report ("Based on our findings, we believe that the FCC should be clear about what costs are allowed (or "used and useful"), what magnitudes should be reasonable, and only those cost elements and magnitudes that are just and reasonable should be incorporated in the model carrier construct."); Stephen Raher https://www.fcc.gov/ecfs/search/search-filings/filing/10509037027510 ("Indeed, when read in conjunction with § 4 of the Wright-Reed Act (which clarifies that the law does not "prohibit the implementation of any safety and security measures related to [IPCS] at [correctional] facilities"), Congressional intent comes into focus: the Commission cannot dictate what lawful security measures correctional facilities may deploy in connection with IPCS, but it may define the type of security costs that are recouped through user-paid rates and fees"); Worth Rises https://www.fcc.gov/ecfs/search/search-filings/filing/105092861411581 ("Law enforcement support services are not useful to incarcerated people and their loved ones, but instead used and useful to law enforcement."); Wright Petitioners et al.,  https://www.fcc.gov/ecfs/search/search-filings/filing/1050883878528 ("Security and safety costs may be necessary for the operation of a correctional facility, but that does not mean the costs should be shifted to the incarcerated person.")

authority over what measures the facility and its service providers may choose to employ at their own expense.[14]

The reality that surveillance services are not necessary to ratepayers and do not benefit them underscores the importance of adopting a "used and useful" standard. While many, if not all, of these systems would fail under a strict interpretation of the "necessary" standard, the used and useful standard better accounts for the interests of ratepayers.

## II.    Video Calls Are Not Visitation

*In support of comments from Civil Rights Corps.*

Video calls—including on-site video calls—are distinct from in-person visitation; as such, the term "video visitation" should not be used. The record supports this, in comments such as those of Securus and of Civil Rights Corps.[15] Video calling services can be an important way to help incarcerated persons and their loved ones connect. When used frequently, video visitation can be an important factor in reducing recidivism and the negative impacts of incarceration on inmates' mental health.[16] The expansion of video calling services is a net good, but only if 1) calls are reasonably priced or free and 2) video calls do not displace in-person visits.

---

[14] See, e.g., Natl Sheriffs Assoc https://www.fcc.gov/ecfs/search/search-filings/filing/10508621303592 ("Section 4 of the MWRA states that the Commission cannot prohibit any security and surveillance mechanisms in connection with the provision of IPCS in jails."); Securus https://www.fcc.gov/ecfs/search/search-filings/filing/10509775016702 ("Correctional authorities, who are in a far better position than the Commission to assess the features necessary to protect incarcerated persons, correctional personnel, and the public generally, require as a condition of providing communications service that providers include safety and security features.")

[15] Civil Rights Corps https://www.fcc.gov/ecfs/search/search-filings/filing/10509288112410 at 2 ("While we acknowledge that certain advancements in technology have created valuable opportunities to expand access to communications, there is no equivalent to seeing a parent, child, or friend in person. As such, we urge the rejection of the phrase 'video visitation.' "); Securus https://www.fcc.gov/ecfs/search/search-filings/filing/10509775016702 at 7 ("On-site video visitation service should be viewed as complementary to, and not in lieu of, in person site visits.").

[16] Grant Duwe and Susan McNeely, *Just as Good as the Real Thing? The Effects of Prison Video Visitation on Recidivism*, Minnesota Dep't. of Corrections (Jun. 2020), https://mn.gov/doc/assets/Video%20Visit%20Evaluation_tcm1089-438546.pdf.

In addition to the observable deficits of on-site video visitation like reduced intimacy and lack of person contact, video calls also expose incarcerated persons and their loved ones to more surveillance than in-person visits. Video calls are recorded by default, while in-person visits may or may not be.

Onsite video visitation is a poor substitute in-person visits, with demonstrably fewer benefits and often higher costs.[17] For years, jails and prisons have slowly replaced in-person visitation with on-site video calls, a trend that accelerated dramatically during the Covid-19 pandemic.[18] While many facilities have returned to some amount of in-person visitation, the Commission should be careful not to endorse video visitation as a substitute for in-person visitation. Treating both in-person and remote video visitation as the same type of service would support this goal.

### III.    "Jail" Includes Secure Mental Health, Immigration Detention, and Juvenile Detention Facilities

*In opposition to comments from the National Sheriffs Assn.*

The Commission should standardize definitions of "jail" between dockets. EPIC supports the Commission's adoption of an amended interpretation of "jail" in 47 CFR § 64.6000(m)(3)—which took effect earlier this year—to include secure mental health facilities, immigration detention centers, and juvenile detention centers;[19] this is in opposition to the comments of the National

---

[17] *See* Bernadette Rabury and Peter Wagner, Screening Out Family Time: The for-profit video visitation industry in prisons and jails, Prison Policy Initiative (Jan. 2015), https://www.prisonpolicy.org/visitation/report.html.

[18] Timothy Lee, NOFACETIME- Jails are replacing visits with video calls—inmates and families hate it, ArsTechnica (May 14, 2018), https://arstechnica.com/tech-policy/2018/05/jails-are-replacing-in-person-visits-with-video-calling-services-theyre-awful/;

[19] https://www.federalregister.gov/d/2022-25192/p-19  (para 11); https://www.federalregister.gov/documents/2022/12/09/2022-25192/rates-for-interstate-inmate-calling-services#p-165

Sheriffs' Association,[20] but seems to align with the comments of the California Public Utilities Commission.[21] The Commission's rate-making authorities apply equally to communications made to or from these types of facilities. We urge the Commission to standardize its definitions so that this is consistent within this docket and across related dockets.  We also note that many of the same providers operate in each of these markets, and many consumers of communications services are participants in each of these markets, further counseling towards consistency in regulation.

## IV.    Congress Mandated the Commission to Perform a Re-Accounting of Necessary Costs

EPIC strongly disagrees with commenters who argue that the Martha-Wright Reed Act requires safety and security costs to be included, as the language of the statute suggests that Congress intended for the Commission to make a fresh accounting of its position.  We agree with commenters who argue that the Commission must consider safety and security but is not required to include them as recoverable costs.  Indeed, the fact that Congress is calling for a fresh accounting seems to suggest a departure from the status quo.

The Martha Wright-Reed Act reflects an unambiguous Congressional intent to reduce the costs of prison phone services by directing the FCC to implement new rulemakings accounting for "industry-wide average costs of telephone services and advanced communications services and the

---

[20] https://www.fcc.gov/ecfs/document/10508621303592/1 NSA at 11 ("As NSA has said previously, the Commission should not expand the definition of correctional facility, prison and/or jails to include these types [civil commitment facilities, residential facilities, group facilities, and nursing facilities in which people with disabilities, substance abuse problems, or other conditions are routinely detained] of facilities."); id. at 12 ("because these additional facilities are not jails or prisons or for criminal offenders, it is unlikely that calling services in these facilities have the same cost characteristics of providing calling services in jails and prisons")

[21] https://www.fcc.gov/ecfs/search/search-filings/filing/10508214070640 CPUC at 2 (" The FCC now has the authority to determine just and reasonable IPCS rates for correctional and detention facilities, which should extend to prisons, jails, and juvenile facilities of all types.") (internal citations omitted).

average costs of service of a communications service provider".[22] We urge the Commission not to rely on now non-binding precedents mandating the inclusion of security costs. This rulemaking should reflect a new vision on prison telecommunications where the Commission has the Congressional authority to reduce the price of prison communications to the greatest extent possible.

### Conclusion

EPIC applauds the Commission for reading the Martha Wright-Reed Act to confer broad authority to regulate prison telecommunications. We urge the Commission to take all possible steps to reduce the cost of calls, video calls, and messaging services while acting swiftly to protect inmates from privacy violations Please reach out with any questions to EPIC Counsel Jake Wiener at wiener@epic.org or EPIC Law Fellow Christopher Frascella at frascella@epic.org.


Respectfully Submitted,


*Jake Wiener*
Jake Wiener
EPIC  Counsel

*Chris Frascella*
Chris Frascella
EPIC Law Fellow

---

[22] Martha Wright-Reed Act § 3(b)(1); Sen. Tammy Duckworth, Duckworth-Portman's Bipartisan Martha Wright-Reed Just and Reasonable Communications Passes House and Senate, Awaiting President Biden's Signature (Dec. 22, 2022), https://www.duckworth.senate.gov/news/press-releases/01/03/2023/duckworth-portmans-bipartisan-martha-wright-reed-just-and-reasonable-communications-passes-house-and-senate-awaiting-president-bidens-signature.

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services: Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**To:  The Commission**

## <u>REPLY COMMENTS OF THE NATIONAL SHERIFFS' ASSOCIATION</u>

Salvatore Taillefer, Jr.
Mary J. Sisak

Blooston, Mordkofsky, Dickens,
Duffy, & Prendergast, LLP
2120 L Street NW, Suite 825
Washington, DC  20037
Tel:     202-659-0830
Fax:    202-828-5568

Filed: July 12, 2023

**Table of Contents**

Executive Summary ................................................................................................... iii

I.    The Commission's Ratemaking Authority Is Not Unlimited ................................. 1

    a.  The Commission Does Not Have Authority Over On-Site Communications .................... 2

    b.  The Commission Does Not Have Authority Over Practices, Classifications, and Regulations ..................................................................................... 4

II.   Necessary Safety and Security Measures Are Recoverable ................................. 6

    a.  The Commission Must Not Interfere with Safety and Security Through Rates ................. 7

    b.  Surveillance is Not a Separate and Unrecoverable Cost ................................. 7

    c.  Safety and Security Measures are Necessary for IPCS ................................. 9

    d.  The Used and Useful Framework Does Not Fit Facility-Incurred Safety and Security Costs ..................................................................................... 12

III.  The Commission Must Permit Site Commissions to the Extent They Act as a Cost Recovery Mechanism for Correctional Institutions ............................... 14

IV.  The Record Overwhelmingly Supports the Use of Size and Type Differentials in Establishing IPCS Rates ....................................................... 15

V.   Conclusion ..................................................................................... 16

**<u>Executive Summary</u>**

NSA responds to comments on the record suggesting that the Commission has authority over on-site communications, and over practices, classifications, and regulations (not just rates). NSA also responds to those comments that propose safety and security measures other than CALEA requirements, for one reason or another, should not be recoverable. Further, NSA addresses those comments proposing that site commissions should be eliminated wholesale. Finally, NSA continues to support the use of size and type of facility in establishing tiered rates for incarcerated persons communications services (IPCS), including the use of average daily population ("ADP") as a key indicator of cost.

First, the Commission does not have authority over on-site communications, such as video visitation. The plain language of the Martha Wright-Reed Act ("MWRA") limits the Commission's authority to communications between incarcerated persons and persons not physically located on the correctional institution's premises. The proposed interpretations, which suggest the MWRA instead distinguishes between those under the correctional institution's authority vs. those who are not (regardless of physical location), seek to draw a distinction without a difference and, moreover, violate the canon against surplusage. Further, the Commission does not have authority over practices, classifications, and regulations for pay-phone services under the MWRA, unlike the broader authority it has over general telecommunications under section 201(b). Where a subsequent statute is narrower, it takes precedent over the older, broader language.

Second, the Commission must allow for the recovery of safety and security measures. Commenters in the record seek to draw arbitrary and unsupportable distinctions to support assertions that this is not the case. These assertions are incorrect. There is no meaningful

distinction between "surveillance" measures and safety and security measures that prohibits the recovery of the former. Nor are safety and security measures limited to CALEA compliance obligations only, since Congress could have simply said as much if that were the case. Assertions that safety and security measures are entirely unnecessary ignore findings by courts, this Commission, and evidence on the record that this is simply not the case. Assertions that safety and security measures are not recoverable because they are not "used and useful" fail to recognize that they are costs, not plant investments, which are not appropriately analyzed under the used and useful framework.

Third, the Commission must allow for recovery of costs related to site commissions, at least to the extent they are related to IPCS. Once again, courts, the Commission, and the record all demonstrate that site commissions are not simply monopoly rents. Nor can it be said that they have no benefit to incarcerated persons, because site commissions in some instances go toward safety and security measures. Suggestions that site commissions reduce IPCS providers' ability to improve service offerings and invest in infrastructure are also incorrect, at least to the extent that site commissions compensate correctional facilities for costs incurred in allowing IPCS. It is important to note that any finding the Commission makes regarding site commissions must be limited to services over which the Commission has authority under the MWRA.

Finally, the Commission must take into account differences in size and type among facilities when setting rates. The record overwhelmingly supports the use of both size and type, and makes clear that average daily population (ADP) is a strong indicator of cost. NSA also agrees that the Commission should include an inflation factor in setting rates, as it does in setting interstate access rates, for example.

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services: Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**To:  The Commission**

## <u>REPLY COMMENTS OF THE NATIONAL SHERIFFS' ASSOCIATION</u>

The National Sheriffs' Association (NSA), by its attorneys, hereby submits these reply comments in connection with the Notice of Proposed Rulemaking (NPRM) in the above-captioned proceeding. Specifically, NSA responds to those comments suggesting that the Commission has authority over on-site communications, and over practices, classifications, and regulations (not just rates). NSA also responds to those comments that propose safety and security measures other than CALEA requirements, for one reason or another, should not be recoverable. Finally, NSA addresses those comments proposing that site commissions should be eliminated wholesale.

### I.    <u>The Commission's Ratemaking Authority Is Not Unlimited</u>

Commenters argue that the Commission's ratemaking authority under the Martha Wright-Reed Act (MWRA) is significantly more expansive than the plain language of the statute. Some argue that the Commission has authority over on-site communications, while the MWRA clearly limits its authority to those communications that take place with people who are not physically located on the facility. Others argue that the Commission has authority not only over rates and

**JA848**

charges, but also over practices, classifications, and regulations, when the MWRA expressly covers only the former. As demonstrated below, neither of these arguments is correct.

### a. The Commission Does Not Have Authority Over On-Site Communications

The commenters asserting that the MWRA gives the Commission ratemaking authority over on-site communications, including on-site video visitation, argue that the statutory phrase "individuals outside the correctional institution where the inmate is held" refers to whether the called party is under the authority of the correctional institution (i.e., as an employee or incarcerated person), and not the physical location of the called party (i.e., located on or within the premises).[1]  As NSA showed in its initial comments, this interpretation violates the plain meaning of the quoted language, which controls statutory interpretation in the first instance.[2] In addition, however, the distinction these commenters seek to draw is one without a difference, because all persons physically located on the premises are under the authority of the correctional institution. This interpretation also violates the canon of statutory construction against surplusage.

There can be no genuine question that correctional institutions have authority over those who are on its premises, including visitors. Visitors are required to comply with correction institution rules and polices while on the premises for any purpose and can be denied entry or removed if they do not. The MWRA took clear steps to preserve and defer to the correctional facility's authority and expertise over its own operation and management. Section 4 in particular requires deference to the correctional institution on whether to allow IPCS in the first instance,

---

[1] Comments of Civil Rights Corp, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 6; Comments of the Worth Rises, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 12; Comments of the Wright Petitioners, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 7-8.
[2] Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 6.

2

**JA849**

and over what safety and security measures should be implemented.[3] Attempting to draw the distinction urged by these commenters would serve only to interfere with the internal operations of correctional institutions, which is not the purpose of the MWRA.

Furthermore, the canon against surplusage, which the Wright Petitioners rely upon elsewhere in their comments, requires that a statute be construed so that no clause, sentence, or word is rendered "superfluous, void, or insignificant."[4] Incarcerated persons are not permitted to make calls to other incarcerated persons; the only persons they may contact are those who are not also incarcerated. Therefore, to interpret the phrase "individuals outside the correctional institution where the inmate is held" to merely refer to non-incarcerated individuals, regardless of physical location, renders the phrase superfluous.

Some of these commenters also suggest that interpreting this phrase to refer to physical locations cannot be correct because it creates absurd situations.[5] These suppositions ignore reality, and do not form a basis for the Commission to ignore the plain meaning of the statutory language at issue. The Wright Petitioners posit that unless their preferred interpretation is adopted, "the Commission's authority over an incarcerated person's communications with their family member might cease the moment the family member steps foot on the grounds of a correctional institution."[6] Yet, the Commission's jurisdictional history is full of such line-drawing – such as jurisdiction reserved to the states under section 152(b) of the Communications

---

[3] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("MWRA").
[4] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)); Wright Petitioners at p. 7.
[5] Comments of Civil Rights Corps at p. 6; Comments of Worth Rises at p. 12; Comments of Wright Petitioners at p. 6-7.
[6] Comments of Wright Petitioners at p. 6-7.

3

**JA850**

Act of 1934, as amended.[7] Civil Rights Corps asks, "Why … would the Commission be able to regulate a phone call made from the street next to a jail but not a video call made only a few yards away in its lobby?"[8] For the same reason the Commission can regulate a call that crosses a state line, but not one that does not cross a state line, even if the calls are made from customers in towns are right next to one another.[9]

Instead, the Commission should rely upon the plain meaning of the phrase, which limits its authority to communications made to individuals who are not on-site. This outcome is further supported by the fact that Section 4 of the MWRA makes clear that Congress did not intend for the Commission to become embroiled in the internal workings of correctional institutions.

b. **The Commission Does Not Have Authority Over Practices, Classifications, and Regulations**

The Wright Petitioners argue that the Commission's authority under the MWRA extends to practices, classifications, and regulations as well as rates.[10] The Wright Petitioners support this argument by appealing to precedent under section 201(b) of the Act, as well as the Commission's ancillary jurisdiction under Title I. As discussed following, neither is applicable.

Section 201(b) expressly states that, "[a]ll charges, practices, classifications, and regulations" for telecommunications services must be just and reasonable.[11] By comparison, the MWRA amends section 276 only to require IPCS "rates and charges" to be just and reasonable.[12]

---

[7] 47 USC 152(b).
[8] Comments of Civil Rights Corps at p. 6
[9] 47 USC 152(b).
[10] Comments of Wright Petitioners at p. 14.
[11] 47 USC 201(b).
[12] 47 USC 276.

4

**JA851**

It is impossible to read these two sections as meaning the same thing, and the Commission would violate Congress' express mandate as well as the rules of statutory construction to do so.

When "Congress includes a particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[13] In this case, Congress expressly limited the Commission's authority to include only rates and charges under the MWRA. The suggestion that Congress chose to specify rates and charges in the MWRA, on the one hand, and to include practices, classifications, and regulations by implication through 201(b), on the other hand, contradicts this rule. Another canon of statutory construction is that a specific provision – here, revised section 276, which applies specifically to pay-phone service – controls one of more general application – the general mandate for telecommunications services under Title II.[14] It is clear that Congress' choice to confer jurisdiction only upon rates and charges in section 276 was intentional and must be honored. The Commission does not have jurisdiction over practices, classifications, and regulations over IPCS in correctional institutions – just rates and charges.

The Wright Petitioners' reliance on the Commission's ancillary jurisdiction fails for the same reason. In *Verizon v. FCC,* the D.C. Circuit held, in relevant part, that in order to exercise ancillary jurisdiction, the Commission must show that its exercise not inconsistent with other principles in the Act.[15] In *Verizon,* the court treated this test as a simple application of the specific-controls-the-general rule discussed above.[16] There, the general grant of FCC authority

---

[13] *Russello v. United States*, 464 U.S. 16, 23 (1983) *citing United States v. Wooten*, 688 F.2d 941, 950 (CA4 1982).
[14] *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), *citing Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987).
[15] Wright, Christopher J., *The Scope of the FCC's Ancillary Jurisdiction After the D.C. Circuit's Net Neutrality Decisions,* Fed. Com. Law J., 19, 32 (2014-2015) *citing Verizon v. FCC,* 740 F.3d 623, 634 (D.C. Cir. 2014).
[16] *Id.* at 37.

over the Internet in section 706 could not trump the specific provision requiring that information service providers may not be treated as common carriers.[17] In the same way, the general provision giving the FCC authority over charges, classifications, practices, and regulations cannot trump the specific provision requiring pay phone rates and charges – with no mention of classifications, practices, and regulations – be just and reasonable.

## II.    <u>Necessary Safety and Security Measures Are Recoverable</u>

The MWRA requires the Commission to consider and allow for the recovery of necessary safety and security measures through IPCS rates. The record shows that these costs are a real and necessary part of allowing IPCS in correctional institutions.[18] NSA and several IPCS providers have repeatedly explained the need for safety and security measures and demonstrated that these costs are real.[19]

Some commenters urge the Commission to ignore its obligation to make these costs recoverable by various means. Therse arguments include recasting safety and security measures as unrecoverable 'surveillance' costs; limiting recoverable costs to CALEA obligations only; and suggesting security and safety measures are entirely unnecessary.[20]  Some argue they are not "used and useful" framework.[21] These points are discussed in turn.

---

[17] *Id.*
[18] *See, e.g.,* Comments of Pay Tel, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 4; Comments of NCIC, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 5.
[19] *See,* Comments of NSA at p. 9, 11.
[20] *See, e.g.,* Comments of Electronic Privacy Information Center (EPIC), WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 3; Comments of Worth Rises at p. 2-5; Comments of Wright Petitioners at p. 20-23.
[21] Comments of Worth Rises at p. 5-8.

### a. <u>The Commission Must Not Interfere with Safety and Security Through Rates</u>

Worth Rises argues that the Commission's statutory duty under the MWRA does not require it to include safety and security measures in IPCS rates.[22] According to Worth Rises, this does not violate the MWRA's mandate that the Commission may not prohibit the implementation of any safety and security measures related to IPCS because the Commission would be merely defunding such measures, not prohibiting them.[23] This semantical approach is obviously at odds with intent of the MWRA.

As GTL correctly points out, IPCS is not required by law, and is necessarily subject to rational limitations based upon the correctional institution's security requirements.[24] NSA supports GTL in asserting that the purpose of section 4 of the MWRA is to accord facilities the deference required to adopt and execute the polices that, in their judgment, are needed to preserve safety and security.[25]

The record clearly shows that facilities incur costs to allow access to IPCS.[26] Prohibiting facilities from recovering these costs has the same effect as prohibiting them outright.

### b. <u>Surveillance is Not a Separate and Unrecoverable Cost</u>

Worth Rises and Pay Tel propose that 'surveillance' is a separate and distinct function that should not be included in IPCS rates. Worth Rises appeals to the "fair meaning" of the terms safety and security, arguing that neither implies surveillance.[27] Pay Tel does not use the term

---

[22] *Id.* at p. 8.
[23] *Id.*
[24] Comments of Global Tel*Link Corporation, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 13.
[25] *Id. citing Washington v. Reno*, 35 F. 3d 1093 (6th Cir. 1994); *Gilday v. Dubois*, 124 F.3d 277 (1ˢᵗ Cir. 1997); *Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir. 1986).
[26] *See* fn 19, *infra*.
[27] Comments of Worth Rises at p 2-3.

surveillance, but argues that costs associated with safety and security features that are the outgrowth of pre-existing criminal investigation should not be recoverable.[28] NSA respectfully disagrees.

As a threshold matter, it is important to note that these are two separate arguments – first, that surveillance is separate, and second that it is not recoverable. Even if the MWRA does not obligate the Commission to consider costs associated with surveillance because they are separate from safety and security measures, as Worth Rises argues, this does not make surveillance costs unrecoverable per-se. For example, the Commission may well decide such costs are recoverable under the principle of cost causation, as outlined in NSA's initial comments.[29]

That said, NSA believes surveillance fits comfortably within the rubric of safety and security measures. The Supreme Court has found, for example, that call monitoring is directly related to institutional security.[30] The Commission has also found that "call recording and monitoring" … "advance[s] the safety and security of the general public, inmates, their loved ones, and correctional facility employees."[31] Moreover, as discussed below, surveillance is not necessarily conducted expressly or solely for safety or security purposes.

Worth Rises' suggestion that surveillance is distinct and separate from safety and security by its plain meaning is simply incorrect. The Law Dictionary – a source Worth Rises relies upon elsewhere in its comments – defines 'surveillance' as the "observation and collection of data to

---

[28] Comments of Pay Tel at p. 17.
[29] Comments of NSA at p. 7.
[30] Reply Comments of Global Tel*Link Corporation, WC Docket No. 12-375, filed January 15, 2021, at p. 15, *citing United States v. Amen*, 831 F.2d 373, 379–80 (2d Cir. 1987).
[31] *In re Rates for Interstate Inmate Calling Servs.*, 28 FCC Rcd 14107, 14109 (F.C.C. September 26, 2013)

8

**JA855**

provide evidence for a purpose."[32]  Nothing in this definition suggests that surveillance is necessarily unrelated to safety or security. And in fact, Worth Rises appears to acknowledge this fact when it asserts that CALEA requirements – which are surveillance obligations – are the only safety and security measures that are necessary under the MWRA.[33]

Pay Tel presents a more nuanced perspective. It argues that costs associated with producing evidence for past crimes should not be recoverable, but producing evidence to support steps to prevent future crimes should be recoverable.[34] In NSA's experience, however, this is not how surveillance costs are typically incurred. Instead, surveillance is conducted for safety and security purposes and may produce information that is useful to an ongoing investigation. In this more typical scenario, the cost is incurred either way, and it becomes a question of whether that information may be passed on. Given that, as discussed previously, there is a clear safety and security benefit for surveillance, there is no reason to make the separation proposed by Pay Tel.

Finally, NSA is concerned that such a proposal would interfere with jail operations and increase costs. Jail staff must remain free to run their safety and security protocols as they see fit, and in any event the Commission has no authority over jails themselves.

### c.  Safety and Security Measures are Necessary for IPCS

Worth Rises and the Wright Petitioners argue that safety and security measures are not necessary for the provision of IPCS, except for CALEA requirements.[35] To establish this point, they argue that safety and security is the obligation of the correctional institution, not the

---

[32] SURVEILLANCE Definition & Meaning - Black's Law Dictionary (thelawdictionary.org), https://thelawdictionary.org/surveillance/, last visited July 12, 2023.
[33] Worth Rises at p. 2.
[34] Pay Tel at p. 17-18.
[35] Comments of Worth Rises at p. 3-5; Comments of Wright Petitioners at 20; *see also* Comments of EPIC at p. 3.

9

**JA856**

incarcerated person, and therefore the cost cannot be passed on to the incarcerated person through IPCS rates.[36] But, if Congress intended to limit recovery to the cost of compliance with CALEA requirements, it could have easily said so specifically. The fact that Congress did not do so suggests it did not intend such a limitation. As discussed in greater detail in the next section, this argument also flatly ignores the reality of the IPCS-facility-caller relationship.[37] NSA's initial comments further demonstrated that this argument also ignores the principle of cost causation, which states that those who cause costs should pay for them.[38] Thus, at the very least, the Commission would be justified in allocating a portion of these costs, as it does in other ratemaking contexts.

Beyond reiterating its previous arguments, Worth Rises adds that the fact that some states have used "off-the-shelf" products for video calls, such as Microsoft Teams or Zoom, is evidence that safety and security measures should not be recoverable through IPCS rates.[39] Because these products do not have "safety and security bells and whistles," they argue, no safety and security measures are necessary. This argument is flawed for several reasons.

First, this argument presumes that these platforms were chosen because no safety and security measures were necessary. In reality, the use of these platforms was a temporary measure implemented during the COVID-19 pandemic, because in-person visitation was limited or prohibited. Wisconsin, for example, states as follows:

---

[36] *Id.*
[37] *See,* Section II(c), *infra.*
[38] Comments of NSA at p. 7.
[39] Comments of Worth Rises at p. 13.

[t]he Zoom option was never meant to be permanent. It was a quick solution to an urgent problem, which required borrowing needed equipment from other areas of our institutions. It also required the DOC to use its limited staffing resources to schedule and facilitate video visits.[40]

Maryland states its video visitation program was implemented, "[i]n the face of the global COVID-19 pandemic where travel restrictions and social distancing is helping keep society healthy …"[41] The same is reportedly true for California.[42]

Second, this argument presumes that because these platforms have no integrated safety and security measures, no safety and security measures exist. This is not true. In all cases cited by Worth Rises, video visitation is recorded and monitored by staff to some degree.[43] Video visitation rules, such as prohibitions on certain topics of discussion, activities, and types of dress are actively enforced and can result in immediate termination of visitation.[44] These are the exact types of safety and security measures Worth Rises refers to as "bells and whistles" – they are just being performed by staff, not software.[45]

Third, this argument presumes there have been no safety or security issues with these platforms. Worth Rises supplies no evidence that these are functional solutions, and in fact

---

[40] *Enhanced Video Visitation Service*, Wisconsin Department of Corrections, https://doc.wi.gov/Documents/OffenderInformation/AdultInstitutions/Enhanced%20Video%20Visitation%20%28ADA%20compliant%29.pdf, last visited July 12, 2023.
[41] *Inmate Visitation Services,* Maryland Department of Public Safety and Correctional Services, news.maryland.gov/dpscs/inmate-visitation/, last visited July 12, 2023.
[42] Goldstein, Phil. *California Enables Video Visitation for Inmates.* StateTech Magazine, December 15, 2020, https://statetechmagazine.com/article/2020/12/california-enables-video-visitation-inmates, last visited July 12, 2023.
[43] *Televisit Request Form.* City of New York Correction Department, https://www.nyc.gov/site/doc/inmate-info/video-visit-request-form.page, last visited July 12, 2023.
[44] *Visitor Cancellation / Limitation / Denial Grid,* City of New York Correction Department, https://www.nyc.gov/assets/doc/downloads/pdf/Visit_Restriction_Grid_4.24.20.pdf, last visited July 12, 2023.
[45] Comments of Worth Rises at p. 13.

Wisconsin is currently in the process of moving to a virtual visitation platform provided by ICSolutions.[46]

Finally, it is worth noting that just because an "off the shelf" program may be used by some facilities, it does not mean such programs are per-se appropriate for every facility. It is well established that different facilities have different security requirements, in some cases because of the type of person incarcerated (for example, violent offenders versus non-violent offenders).

Ultimately, Worth Rises and the Wright Petitioners would have the Commission believe that IPCS is no different than ordinary telecommunications services. Such a notion begs the question: what about contraband devices? According to the Commission, "Prisoners' use of contraband wireless devices to engage in criminal activity is a serious threat to the safety of prison employees, other prisoners, and the general public."[47] NSA demonstrated in its initial comments that, absent safety and security measures, incarcerated persons use IPCS to engage in criminal activity that is a serious threat to the safety of facility employees, other incarcerated persons, and the general public.[48] It simply defies logic to suggest, as these commenters do, that IPCS needs no safety and security measures.

### d.  The Used and Useful Framework Does Not Fit Facility-Incurred Safety and Security Costs

Some carriers argue that security and safety measures are not recoverable because they are not "used and useful" to incarcerated persons.[49] As an initial matter, this is not correct, as

---

[46] *Enhanced Video Visitation Service*, fn. 40 *supra*.
[47] *In re Promoting Tech. Solutions to Combat Contraband Wireless Devices*, 28 FCC Rcd 6603, 6605 (F.C.C. May 1, 2013).
[48] Comments of NSA at p. 10-11.
[49] Comments of Worth Rises at p. 3-5; Comments of Wright Petitioners at p. 10.

security and safety measures directly benefit incarcerated persons. NSA has previously demonstrated that security and safety measures protect inmates by reducing crime within the facility.[50] An article cited by Worth Rises states that natural language processing and transcription tools are anticipated to reduce suicide rates among incarcerated people.[51] More importantly, though, this argument illustrates precisely why used and useful is not an appropriate ratemaking mechanism for IPCS rates.

As Securus correctly points out, the IPCS market is not the same as the traditional telecommunications marketplace.[52] The incarcerated person may be the end-user of the service, but IPCS providers must meet the requirements of a third party other than the end-user in a way that a traditional provider does not. Securus correctly concludes that "to suggest that all [correctional institution]-mandated service features that they find used and useful must inure directly to the benefit of each caller or their friends and family is untenable."[53] The MWRA expressly states that Commission cannot ignore the safety and security requirements of correctional institutions in setting rates. Accordingly, it should not accept these commenters' invitation to use the used and useful framework to attempt an end-run around that requirement.

Although Securus' discussion of used and useful is in the context of site commission payments, it is also applicable to safety and security measures. Where a jail is required to provide its own safety and security measures (because the IPCS provider does not), such measures are essentially an operating expense of the IPCS provider that is passed on to the jail. And, as

---

[50] *See Comments of the National Sheriffs' Association,* WC Docket No. 12-375, Sixth Further Notice of Proposed Rulemaking, filed December 15, 2022, at p. 3.
[51] Sherfinsky, David. *U.S. Prisons Mull AI to Analyze Inmate Phone Calls.* Reuters, Aug. 9, 2021, https://www.reuters.com/article/us-usa-tech-prison/us-prisons-mull-ai-to-analyze-inmate-phone-callsidUSKBN2FA0OO, last visited July 12, 2023; Comments of Worth Rises at p. 7.
[52] Comments of Securus Technologies, LLC, WC Docket Nos. 23-62, 12-375, filed May 8, 2023 at p. 25-26.
[53] *Id.*

Securus demonstrates, the used and useful framework "plays no role in determining appropriate operating expenses."[54] And indeed, these costs are typically recouped by the jail in the form of site commissions. Therefore, the used and useful framework is equally inapplicable to safety and security costs, to the extent they are incurred by the facility.

### III.  The Commission Must Permit Site Commissions to the Extent They Act as a Cost Recovery Mechanism for Correctional Institutions

Several commenters argue that site commissions must not be recoverable through IPCS rates. UCC Media Justice and Public Knowledge argue they are monopoly rents that serve no purpose but to create monopolies.[55] EPIC argues they do not benefit incarcerated persons and their loved ones.[56] According to the Wright Petitioners, they reduce IPCS provider's ability to improve service offerings and invest in infrastructure, as well as exclude participation in the market by smaller providers that are unable to make such payments.

Each of these arguments ignores the record, which plainly shows that at least some portion of site commissions are directly related to the provision of IPCS. This includes findings by both the court and the Commission, as well as demonstrations by IPCS providers and NSA that site commissions compensate facilities for their costs in allowing IPCS.[57] Accordingly, it is simply incorrect to suggest they do not serve a legitimate cost-recovery purpose.

Furthermore, as Securus aptly demonstrates, site commissions are operating costs which, under the used and useful framework urged by these same commenters, do not earn a return. The

---

[54] *Id.* at p. 27.
[55] Comments of the United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62, 12-375, filed May 8, 2023, at p. 12-13.
[56] Comments of EPIC at p.4.
[57] *Global Tel*Link v. FCC*, 866 F. 3d 397, 413 (D.C. Cir. 2017); 2016 ICS Reconsideration Order, 31 FCC Rcd at 9307, para. 12.

Wright Petitioner's assertion that the elimination of site commissions would free up funding to be invested in new and improved services and infrastructure is therefore incorrect. Elimination of site commissions would most likely <u>reduce</u> the availability of IPCS because facilities that relied on site commissions to recover costs are no longer able to do so.

It is also not possible for the Commission to eliminate site commissions to the extent that they relate to services the Commission does not have authority over. This includes streaming services that enable incarcerated persons to access movies, educational content, vocational content, and other forms of streaming.[58] Any findings the commission makes related to site commissions must be limited to the services over which it has authority.

IV.   **The Record Overwhelmingly Supports the Use of Size and Type Differentials in Establishing IPCS Rates**

The record clearly demonstrates that the size and type of facility play a major role in the costs of IPCS across the country, and NSA continues to urge the Commission to take these differences into account when setting rates. In this regard, NSA supports Securus' recommendation that the Commission set different caps for prisons and jails, and that rates should further be tiered based on the size of the prison or jail.[59] Like NSA, Securus also supports the use of Average Daily Population (ADP) for the purpose of determining the different size categories. NSA further supports the comments of Pay Tel, which also demonstrate that the Commission must take into account size and type differences if it uses industry average data in

---

[58] Comments of Securus at p. 18-19.
[59] *Id.*

setting rates.[60] As Pay Tel notes, the record contains extensive documentation of the cost differences between jails and prisons, and between small, medium, and large jails.[61]

NSA also agrees with Securus' assertion that the three-year data that the Commission is using to set rates does not consider the massive inflation over the past years.[62] The costs shown in NSA's cost data from the 2015 cost survey also have likely increased substantially. To this end, NSA joins Securus in calling for the Commission to include an inflation factor in setting rates, as it does, for instance, in setting interstate access rates.[63]

## V.    Conclusion

For the forgoing reasons, the Commission should find that it does not have authority over on-site communications, or over practices, classifications, and regulations (not just rates). It should also find that safety and security measures are necessary and eligible for recovery through IPCS rates. The Commission should also retain site commissions to the extent that they provide recovery for costs incurred in making IPCS available in correctional institutions, and to the extent that they compensate for services that are outside the Commission's jurisdiction. Finally, the Commission should adopt rate tiers based on both size and type of facility to best account for the varied landscape of the IPCS marketplace.

---

[60] Comments of Pay Tel at p. 10-12.
[61] *Id.*
[62] Comments of Securus at p. 20.
[63] In the Matter of 1993 Annual Access Tariff Filings; 1994 Annual Access Tariff Filings, 20 FCC Rcd 6077, 6077, (F.C.C. March 17, 2005) ("the Price Cap Index (PCI) [is] a complex formula that is adjusted annually by a measure of inflation minus a productivity factor…").

Respectfully submitted,

**NATIONAL SHERIFFS' ASSOCIATION**


Salvatore Taillefer, Jr.
Mary J. Sisak
Blooston, Mordkofsky, Dickens
                  & Prendergast, LLP
2120 L Street, N.W., STE 825
Washington, D.C., 20037
(202) 659-0830
sta@bloostolaw.com
mjs@bloostonlaw.com
Its Attorneys

Dated: July 12, 2023

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling | ) | WC Docket No. 12-375 |
| Services | ) | |

**REPLY COMMENTS OF PAY TEL COMMUNICATIONS, INC.
IN RESPONSE TO NOTICE OF PROPOSED RULEMAKING
ON IMPLEMENTATION OF MARTHA WRIGHT-REED ACT**

Marcus W. Trathen
Christopher B. Dodd
BROOKS, PIERCE, McLENDON,
 HUMPHREY & LEONARD, L.L.P.
Wells Fargo Capitol Center, Suite 1700
Raleigh, N.C. 27601
Telephone: (919) 839-0300
Facsimile: (919) 839-0304
mtrathen@brookspierce.com
cdodd@brookspierce.com

*Counsel for Pay Tel Communications, Inc.*

July 12, 2023

# SUMMARY

Pay Tel Communications, Inc. ("Pay Tel") respectfully submits these reply comments in response to the initial comments submitted in connection with the Notice of Proposed Rulemaking on the Implementation of the Martha Wright-Reed Act (the "NPRM"), released March 17, 2023, in these dockets.

In summary, Pay Tel responds to the initial comments as follows:

- As discussed in Pay Tel's initial comments, ratemaking based on industry-wide average costs cannot be agnostic to the size and type of facility. These dockets contain extensive documentation of IPCS provider cost differences between jails and prisons, as well as between small, medium, and large jails. As such, Pay Tel supports the NSA's contention that the Commission should interpret the term 'industry-wide' to refer to subsets of IPCS providers, and agrees with GTL and NSA that the use of average daily population is the best approach for differentiating between facilities for the purposes of setting rates or rate caps. Moreover, the term "industry-wide" in the Act should be interpreted as referring to the IPCS industry, not the entire telecommunications industry writ large.

- Pay Tel disagrees with the Wright Petitioners contention that providing safety and security services is unrelated to the provision of communications services. As noted repeatedly since the inception of the industry, safety and security is integral to the provision of IPCS, and is for the protection of correctional facilities, incarcerated people, and the general public.

- Relatedly, as Pay Tel has observed in these proceedings, confinement facilities themselves incur costs in making IPCS available, which is one of the animating drivers of site commissions. Pay Tel agrees with the Wright Petitioners' Brattle Report that, unquestionably, site commissions exert upward cost pressure on IPCS costs and, therefore, rates. However, the solution to this dynamic is to create a per-minute rate additive intended to allow facilities to recover their costs of administering IPCS and making that service available. But Pay Tel agrees with Securus that so long as site commissions are permitted in their current form, they are a cost of providing IPCS service and they must be recoverable in rates. The Martha Wright-Reed Act only reinforces this.

- Pay Tel agrees with Securus that state rate caps both above or below federal rate caps should be preempted, and disagrees with the Wright Petitioners' contention that states should be free to impose rate caps which are lower than the caps established by the Commission. This position is inconsistent with the requirements of the Section 276 and would result in situations, such as presently exists in California, where providers are unable to recover their costs of providing IPCS in jails.

- Pay Tel has no objection to the Wright Petitioners' position that the Act should be interpreted as extending the Commission's authority over on-site video visitation services. Since carceral facilities typically require on-site video visitation to be provided to at no charge, and given the extension of jurisdiction over video communication services, the cost of all video visitation equipment, including that associated with on-site services, should be recoverable from regulated operations to ensure that IPCS providers are make that service available.

* * *

**TABLE OF CONTENTS**

I.    RATEMAKING ................................................................................ 3

    A.   The Use of "'Industry-Wide' Average Costs" in Ratemaking Must
         Include Consideration of the Size and Type of Facility ........................ 3

    B.   "'Industry-wide' average costs" Are the Average Costs of the IPCS
         Industry .............................................................................. 5

    C.   "Used and Useful" Principles Have Limited Applicability to IPCS
         Rate Setting ......................................................................... 6

    D.   The Commission Must Allow Recovery of Safety and Security
         Costs Associated with the Provision of IPCS ....................................... 7

    E.   Recovery of Site Commissions ....................................................... 11

II.    PREEMPTION OF INCONSISTENT STATE REQUIREMENTS ........................ 16

III.   REGULATION OF ON-SITE VIDEO VISITATION ............................................. 18

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Incarcerated People's Communications ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha ) | |
| Wright-Reed Act ) | |
| ) | |
| Rates for Interstate Inmate Calling ) | WC Docket No. 12-375 |
| Services ) | |

To: The Wireline Competition Bureau

**REPLY COMMENTS OF PAY TEL COMMUNICATIONS, INC.**

Pay Tel Communications, Inc. ("Pay Tel"), through counsel, submits these reply comments in response to the initial comments submitted in connection with the Notice of Proposed Rulemaking (the "NPRM") in the above-captioned dockets,[1] which seeks comments on the interpretation of the Martha Wright-Reed Act.[2]

In the following pages, Pay Tel discusses several specific issues addressed in the comments of various parties: (1) the rate-making implications of the Act, including that "industry-wide" average costs must be limited to the IPCS industry and not be agnostic to facility size, and the necessity for recovery of necessary safety and security costs and site commissions (as long as site commissions are permitted by the Commission); (2) the importance of preemption of state rate

---

[1] *See* Notice of Proposed Rulemaking and Order, WC Docket Nos. 23-62 and 12-375, FCC 23-19 (rel. Mar. 17, 2023) (the "MWRA NPRM").

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("Martha Wright-Reed Act," "MWR Act," or "Act").

- 1 -

**JA869**

caps above *or below* federal rate caps; and (3) potential regulation by the Commission of on-site video visitation.

In general, as stated in its opening comments, Pay Tel continues to believe that the Martha Wright-Reed Act largely represents a codification of the Commission's general approach to the regulation of IPCS—an approach which has led to steady, measurable improvements for consumers of IPCS. For example, the MWR Act mandates consideration of costs incurred by "small, medium, or large facilities" or other similar characteristics, which is already an aspect of the Commission's current regulatory approach. The MWR Act now expressly permits the "use" of industry average costs as a data point in setting rates, which the Commission has been exploring in its recent notices, including the use of a "zone of reasonableness" approach which makes various statistical adjustments to industry average costs. The MWR Act mandates that the Commission consider costs associated with safety and security measures, which the Commission presently does in its mandatory data collection. Given the alignment of the Commission's current regulatory approach with the Congressional directives, the Commission should reject the more radical interpretations proposed by some advocates, such as proposals to set IPCS rates by reference to costs of disparate industries with different cost and service profiles; proposals to rejuvenate outdated "used and useful" standards developed in rate-of-return regimes; and proposals to disallow recovery of safety and security costs. Not only are these proposals not compelled by the MWR Act, they would take the Commission's reform efforts backwards by creating a regulatory environment which will lessen service options, alternatives and availability.

As the Commission approaches the "next steps" in this proceeding, it is critical to keep in mind that the IPCS ecosystem is comprised of diverse facilities with radically different sizes and service needs; that the service is voluntarily made available by entities which are outside of the

Commission's regulatory authority (i.e., confinement facilities); and that barriers to entry are high given the sophisticated technology necessary to provide the service. Given these dynamics, the Commission's approach to incremental reform has proven the correct approach and Pay Tel would urge the Commission to continue on this path.

## I.  RATEMAKING

### A.  The Use of "'Industry-Wide' Average Costs" in Ratemaking Must Include Consideration of the Size and Type of Facility

As discussed in Pay Tel's initial comments, ratemaking based on industry-wide average costs cannot disregard differences in the size and type of facility. The Martha Wright-Reed Act provides that the Commission "may use industry-wide average costs" in ratemaking[3] but "shall consider . . . differences in the [average costs of telephone service and advanced communications services] by small, medium, or large facilities."[4]

Accordingly, Pay Tel agrees with Securus that "the Commission should ensure that providers serving low call volume carceral facilities, those with small average daily populations, should be allowed to recover their costs."[5]  To that end, Pay Tel supports the NSA's contention that the Commission should "interpret the term 'industry-wide' to refer to subsets of IPCS providers. This would . . . allow the Commission to better account for the cost differences that exist with the subsets of the IPCS industry, such as between jails and prisons."[6]

These industry-wide "subsets" should be defined by facility size and type. Pay Tel agrees with GTL and NSA that the use of average daily population ("ADP") is the "best practical

---

[3] *See* NPRM, ¶¶ 47, 49.
[4] *See id.* at ¶¶ 58, 63.
[5] Securus Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 12 (May 8, 2023).
[6] NSA Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 8 (May 8, 2023).

approach" for differentiating between facilities for the purposes of setting rates or rate caps.[7] The record in these dockets contains extensive documentation of these cost differences, and the reasons for the IPCS provider cost differences between jails and prisons, as well as between small, medium, and large jails.[8] Primary drivers of the cost differences include (1) the heavy turnover of the inmate population in jails,[9] and (2) the rural nature of many smaller facilities, which tends to increase costs due to higher telecommunications expenses and customization requirements.[10]

---

[7] *See* GTL Comments (MWRA NPRM), WC Docket Nos. 23-62, 12-375, at 9 (May 8, 2023) ("The Use of Average Daily Population Tracked by Correctional Facilities Continues To Be the Best Practical Approach for Differentiating between Facilities."); NSA Comments (MWRA NPRM), WC Docket Nos. 23-62, 12-375, at 11 (May 8, 2023) ("[T]he record demonstrates that the size of a facility, in terms of ADP, is currently the best available factor for determining costs, and should be considered when setting rates or rate caps.").

[8] *See, e.g.,* Pay Tel Comments (Sixth FNPRM), WC Docket No. 12-375, at 3-5 (Dec. 15, 2022); Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 7 (Sept. 27, 2021) (quoting Pay Tel Communications, Inc., *Ex Parte Presentation*, WC Docket No. 12-375 (July 3, 2013), citing U.S. Department of Justice Bureau of Justice Statistics - Jail Inmates at Midyear 2011 Statistical Tables, Table 4) ("Average daily jail population, admissions and turnover rate, by size of jurisdiction, week ending June 30, 2010 and 2011.").

[9] *See, e.g.,* Pay Tel Comments (MWRA NPRM), WC Docket Nos. 23-62, 12-375, at 11 (May 8, 2023) ("This turnover increases costs by creating additional work in account set-up (*i.e.*, working with inmates and staff in accessing calling services, setting up accounts, establishing blocked number lists, and other similar customizations to address the needs of a particular inmate) and increases the likelihood that portions of prepaid accounts will need to be refunded."). Yet, while the total static population of prisons greatly exceeds that of local jails, because of the transient nature of jails the total number of individuals housed in jails over the course of a year greatly exceeds that of prisons. *See* U.S. Department of Justice, Jail Inmates in 2021 - Statistical Tables, Dec. 2022, NCJ 304888 (Exhibit 2).

[10] *See* Pay Tel Comments (MWRA NPRM), WC Docket No. 12-375, at pp. 17–18 (Mar. 25, 2013) ("There is abundant record evidence demonstrating there are very real cost differences associated with providing ICS in jails and prisons—and that those differences make it significantly more costly to provide ICS in a jail than a prison. . . . these differences flow from the fundamentally different purposes served by the facilities and include matters such as: the heavy, consistent, and faster turnover of the inmate population in jails, leading to increased account set-up costs and requiring more phones per inmate in jails (and higher costs associated with the investment therein and maintenance thereof); a greater reliance on prepaid accounts and collect calling in jails, each of which is more costly to provide than debit calling; the necessity of integrating ICS systems with other services, like jail management, inmate banking and commissary systems, in order to facilitate the movement of money to pay for ICS calls—coupled with the fact that such integration is customized for each facility; the requirement that ICS providers operating in jails provide a significant amount of zero-revenue, or free, calls to inmates; and fewer overall calling minutes in jails relative to prisons over which to spread costs due to prescribed limits on the length of calls in jails and other similar reasons.").

- 4 -

**JA872**

As noted in Pay Tel's initial comments, if the Commission were to use flat industry average costs (driven by large, dominant providers of ICS such as Securus and GTL), then service will likely be curtailed in smaller facilities as providers will not be able to recover their costs of providing service. Such curtailment would be at direct odds with the goals of the Act, including to ensure the widespread availability of service to incarcerated persons.

**B.    "'Industry-wide' average costs" Are the Average Costs of the IPCS Industry**

Any reasonable ratemaking scheme must take into account the basic realities of the regulated industry. Given the cost disparities between different types and sizes of carceral facilities discussed above—let alone the cost differences between IPCS and other forms of telecommunication used by the general public—the Wright Petitioner's suggestion that "'industry-wide' should be interpreted to mean the entire telecommunications industry, not just the provision of IPCS"[11] would lead to the adoption of confiscatory rates which will undermine the intent of Congress in Section 276 to promote competition in the ICS industry.  Pay Tel agrees with NCIC[12] that an interpretation of "industry-wide" to refer to providers of services which bear little to no similarity to IPCS in cost, features, functions, and regulation makes no sense and would not result rates which would achieve the intent and purpose of Section 276.  The Wright Petitioners' suggestion that the Commission should set IPCS rates by reference to the costs of a wholly different industry is a radical, nonsensical proposal that would put the Commission's reform efforts in legal jeopardy, would lead to rates which are insufficient to recover costs, and cause disruption in service availability.

---

[11] Wright Petitioners Comments (MWRA NPRM), WC Docket Nos. 23-62, 12-375, at 16 (May 8, 2023).

[12] NCIC Comments (MWRA NPRM), at 12-13

### C.    "Used and Useful" Principles Have Limited Applicability to IPCS Rate Setting

In the MWRA NPRM, the Commission seeks comment on implementation of the "just and reasonable" standard as set out in Section 276(b)(1)(A) ("all rates and charges are just and reasonable").[13]   Pay Tel agrees with the industry representative commenting parties that urge a limited interpretation of that standard as applied here.[14]

The "used and useful" standard is a vestige of rate-of-return regulation, where it was developed to ensure that incumbent utilities were only recovering a return on assets which were "used and useful" in the provision of the service and not, for example, for the purpose of "gold plating" or spending to enhance shareholder returns.[15] As a rate-setting construct, there is little work for this regulatory application here—as there is no incentive for IPCS providers to make investments which are not accretive to the competitive service offering.  As pointed out by GTL, "[i]n the competitive IPCS market, IPCS providers are free to determine how to best manage their investments and expenses, and they are not constrained by the accounting requirements applicable to dominant carriers."[16]

Accordingly, in setting "just and reasonable" rates in the competitive IPCS market, where providers actively compete for the right to serve facilities, historic "used and useful" rate principles have little application.

---

[13] *See* MWRA NPRM, at ¶¶ 21-22.
[14] *See* GTL Comments, at 6
[15] GTL Comments (MWRA NPRM), at 6; Securus Comments, at 25-29.  Securus cites examples of property not "used and useful": overbuilt plant, discarded property, destroyed or lost property, obsolete and inadequate property, abandoned or to be abandoned property, property temporarily out of use, property once used and useful but no longer so because of a decrease in business.  *Id.,* at 29.
[16] GTL Comments (MWRA NPRM), at 6.

### D. The Commission Must Allow Recovery of Safety and Security Costs Associated with the Provision of IPCS

Pay Tel disagrees with the Wright Petitioners that "providing safety and security services is a core function of operating a facility, but unrelated to the provision of communications services."[17]

As an initial matter, safety and security is *integral* (and "necessary") to the provision of IPCS. As noted in Pay Tel's initial comments, ICS is a specialized service that is available to persons who have been incarcerated by the government. Some of the users of this service seek to engage in inappropriate, unsafe, and illegal activity using the communications functionality.[18] It is a primary obligation of confinement facilities to operate their facilities in a manner which ensures public safety. It is the obligation of service providers to conform their service to the requirements and specifications of the confinement facilities, including those requirements and specifications relating to safety and security. The relationship between security features and ICS has been the subject of extensive commentary in these dockets.[19]

The Wright Petitioners contend that "safety and security are for the benefit of 'investigators, correctional administrators, prosecutors, and other law enforcement officers.'"[20]

---

[17] *Id.* at 22-23.

[18] *See, e.g., id.* at ¶ 58 (noting that the Department of Justice has chronicled hundreds of criminal convictions involving the use of ICS and that ICS-enabled crimes "victimize vulnerable populations consisting of victims, witnesses, jurors, inmates and family members of these individuals" and help identify potential altercations; potentially suicidal persons; prevent criminal activity outside the jail, including no contact orders and witness tampering, and aid in the prosecution of criminal cases).

[19] *See, e.g.,* National Sheriffs' Association Comments, WC Docket No. 12-375, at 5–6 (Nov. 23, 2020); California State Sheriffs' Association Comments, WC Docket No. 12-375, at 1–2 (Nov. 21, 2020); National Sheriff's Association Comments, WC Docket No. 12-375 (Fifth FNPRM), at 6 (Sept. 27, 2021); Securus Comments, WC Docket No. 12-375 (Sixth FNPRM), at 17-8 (Dec. 15, 2022); Securus Reply Comments, WC Docket No. 12-375 (Fifth FNPRM), at 28-31 (Dec. 17, 2021); Pay Tel Comments, WC Docket No. 12-375 (Fifth FNPRM), at 9-13 (Sept. 27, 2021); Pay Tel Reply Comments, WC Docket No. 12-375 (Fifth FNPRM), at 8-10 (Dec. 17, 2021); Setting the Record Straight on Confinement Facility Costs, Pay Tel Communications, Inc., *Ex Parte Presentation,* WC Docket No. 12-375 (May 8, 2015).

[20] *Id.* at 23.

This is a gross mischaracterization of the record in this proceeding and the accepted understanding of the nature of the service as raising unique security concerns and challenges.[21]   Pay Tel agrees with GTL that failure to include safety and security costs in permanent rates for IPCS would violate the mandates of the MWR Act that require the Commission to consider "costs associated with any safety and security measures necessary to provide [IPCS]" and prohibit the Commission from impeding on the prerogatives of correctional authorities to implement and maintain safety and security measures related to the provision of IPCS in their facilities.[22]

The essential and integral nature of safety and security to IPCS has been acknowledged since the inception of the industry. In the formative years of the inmate telecommunications industry, the Telecommunications Fraud Prevention Committee ("TFPC") of the Alliance for Telecommunications Industry Solutions ("ATIS") convened industry experts, including Pay Tel's President, Vincent Townend, to address the need for the development of technologies and practices to address growing instances of fraud and abuse that were plaguing the incipient industry.  As an example of their work, the TFPC submitted a letter dated August 24, 2007 to the Commission in Docket No. 96-128 addressing various fraud challenges related to the Wright Alternative Petition for Rulemaking—the rulemaking from which all of the Commission's subsequent efforts to reform

---

[21] *See, e.g., Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* 17 FCC Rcd 3248, ¶¶ 38, 72 (2002) ("*2002 Remand Order")* (finding "inmate calls impose expensive security costs" and "the provision of inmate calling services implicates important security concerns and, therefore, involves costs unique to the prison environment"); *Rates for Interstate Inmate Calling Services,* 31 FCC Rcd 9300 (2016) ("*2016 ICS Reconsideration Order"), pets. for stay granted in part sub nom. Securus Tech., Inc. v. FCC,* No. 16-1321, Order (D.C. Cir. Nov. 2, 2016), *vacated and remanded by Securus Tech., Inc. v. FCC,* No. 16-1321, Order (D.C. Cir. Dec. 21, 2017), at ¶ 12 (finding "(1) at least some facilities likely incur costs that are directly and reasonably related to the provision of ICS, (2) it is reasonable for those facilities to expect providers to compensate them for those costs, (3) such costs are a legitimate cost of ICS that should be accounted for in our rate cap calculations"); *see also Global Tel\*Link v. FCC, 866 F. 3d 397, 413 (D.C. Cir. 2017)* ("*GTL")* ("Not only does the FCC's reasoning defy comprehension, the categorical exclusion of site commissions cannot be easily squared with the requirements of § 276 and § 201.").

[22] GTL Comments (MWRA NPRM), at 13.

the IPCS industry have flowed.[23]   The letter noted: "Over the past eighteen (18) years, the TFPC has actively worked eighty (80) different fraud issues impacting the telecommunications industry. Almost 20% of these issues address, to some degree, preventing fraud on the telecommunications network from the provision of inmate telephone service."[24] For example:

- **TFPC Issue #002, January 1988**: "Most correctional facilities today make telephones available to inmates during varying hours of the day. Most often these telephones are restricted to collect calling only to prevent unwanted [c]alling and/or harassment."[25] In response, AT&T and BellSouth determined that additional screening on telephone lines was the best method at curtailing network abuse by prison inmates.[26]

- **TFPC Issue #0011, July 1989**: "Business offices within the Bell Atlantic Region are being charged with hours of fraudulently placed collect calls placed by prisoners."[27] In response, in the late 1980's the industry developed automated safety and security tools.[28]

- **TFPC Issue #046, April 1995**: "A significant amount of fraud originates from prisons due to several known methods which circumvent existing fraud controls. New fraud technology has made it possible for fraudsters to avoid detection and these methods exacerbate other types of fraud on operator assisted calls."[29]

These issues—going as far back as 1988—highlight the persistent arms race between new fraud technology and new anti-fraud security measures. Although fraud resulting from non-payment of LEC billed calls (as discussed in TFPC Issues #002 and #0011) is nonexistent today due to prepaid calling options, the potential for PIN theft and other forms of fraud is a challenge that the ICPS industry continues to battle.

---

[23] *Ex Parte* Presentation of Alliance for Telecommunications Industry Solutions ("ATIS") Telecommunications Fraud Prevention Committee ("TFPC"), CC Docket No. 96-128 (Aug. 24, 2007) (the "TFPC Letter") (attached hereto as Exhibit 1).
[24] *Id.*, at 1.
[25] *Id.*, at Attachment #1.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

Given that the work of the TFPC was directed at fraud prevention, obviously the focus of this industry group was on that particular problem—which plagued the service as it developed and continues to present challenges today. As is apparent from the foregoing, from its inception the IPCS industry was challenged with customizing a calling system suitable for the unique challenges of confinement facilities—but these challenges are not limited to fraud committed on other inmates and the public, it also includes security concerns (e.g., protection of the public from harassing or illegal conduct). Compounding these issues, carceral facilities face a nationwide pervasive staffing and funding problems. This results in significant challenges in a facility's ability to monitor and evaluate IPCS calls.

The Martha Reed-Wright Act explicitly acknowledges this reality. Section 3(b) of the Act provides that in implementing the Act, the Commission "shall consider costs associated with any safety and security measures necessary to provide [ICS]." As noted in Pay Tel's initial comments, the Commission *must* consider costs associated with necessary safety and security measures in identifying just and reasonable rates, and set rates accordingly. It may not set rates without taking safety and security measures into account.

If the Commission adopts the Wright Petitioner's position and disallows recovery for *any* safety and security costs, then IPCS providers will be unable to recover their costs associated with providing safe and secure calling systems.  As discussed in previous Pay Tel advocacy:

> regulation should be exercised in such a way that ensures that facilities are afforded the ability to recover their costs in deploying ICS—or else many facilities may simply not make the service available or will otherwise constrain the service so that inmates are unable to receive the benefits of modern communications systems. This reality must be acknowledged—the goal of this proceeding is not to make the provision of ICS so difficult, onerous, and unprofitable that no one will wish to offer it and facilities will not

wish to have it; rather the goal is to ensure that consumers are
protected and that the service is widely available.[30]

For these reasons, the position of the Wright Petitioners, which would seemingly have the

Commission disregard the essential nature of the service, must be rejected.

### E.    Recovery of Site Commissions

Consistent with above discussion, confinement facilities themselves incur costs in making

IPCS available and ensuring the safety and security of that service.   These costs are not currently

reflected in mandatory data collection submissions (except indirectly through site commission

payments) and are one of the animating drivers of site commissions, as the Commission has

recognized.[31]  Pay Tel has previously sought to detail these costs in ex parte submissions to the

Commission.[32]  For example, one or more facility officers per shift must:[33]

- Be trained on operation of the IPCS system

- Answer questions from inmates and family members (how calls are billed, why
  calls are blocked, how to open an account to receive calls to CLEC and wireless
  carrier numbers)

- Maintain and administer the list of numbers to be blocked (facility numbers,
  officers' numbers, judges' numbers, witnesses' numbers, victims' numbers,
  jurors' numbers)

- Take requests from the public to have numbers blocked

---

[30] Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 10–11 (Sep. 27, 2021)

[31] *Rates for Interstate Inmate Calling Services,* 28 FCC Rcd 14107 (2013) ("*2013 ICS Order*"),
*pets. for stay granted in part sub nom. Securus Tech., Inc. v. FCC,* No. 13-1280, Order (D.C. Cir. Jan.13,
2014), *superseded as stated in Securus Tech., Inc. v. FCC,* No. 13-1280, Order (D.C. Cir. Dec. 21, 2017),
at n.203 ("we cannot foreclose the possibility that some portion of payments from ICS providers to some
correctional facilities may, in certain circumstances, reimburse correctional facilities for their costs of
providing ICS").

[32] *See, e.g.,* Pay Tel *Ex Parte* Presentation, Docket No. 12-375 (May 31, 2013) (attached hereto as
Exhibit 2).  *See also* Pay Tel *Ex Parte* Presentation, Docket No. 12-375 (May 8, 2015), at Exhibit A,
"Administration of Inmate Calling Services in Jails – Pay Tel's Experience Serving Jails" (attached hereto
as Exhibit 3).

[33] *See generally* Pay Tel *Ex Parte* Presentation, Docket No. 12-375 (May 31, 2013) (attached hereto
as Exhibit 2).

- Administer prepaid cards, if utilized

- Administer a debit system, if utilized (set up debit accounts, receive payments, refund unused funds)

- Train inmates on use of inmate phones to include use of commissary ordering via phone, facility information delivered via phone, etc.

- Administer a PIN system, if utilized

- Administer a voice biometric system, if utilized

- Maintain an approved number list, if utilized

- Contact the IPCS provider for service issues

- Accompany IPCS technicians while in the facility to service inmate phone systems

Facility officers also have responsibilities to manage call traffic, requiring one or more officers per shift to:

- Maintain negative databases of blocked numbers

- Initiate call traffic reviews

- Flag calls to specific phone numbers for review

- Flag calls from various cell blocks to same phone numbers

Facility officers also have responsibilities to record and monitor calls to protect the public from abuse and to prevent criminal activity when inmates make telephone calls. These responsibilities frequently require two or more officers per shift:[34]

- Enrollment and management of inmates into voice biometrics system

- Flag calls for system alerts for real-time call monitoring and investigations

---

[34] *See* Pay Tel Comments (MWRA NPRM), at 16-17 (distinguishing between monitoring and recording activities that are necessary to prevent ongoing criminal, fraudulent, and improper activity versus activities associated with the investigation of crimes unrelated to the use of IPCS devices).

- 12 -

- Conduct real-time monitoring of inmate conversations

- Recording playback and analysis of inmate conversations

- Burn CDs of conversations for further review

- Respond to subpoenas for call detail records and recordings

In addition, facility officers have responsibilities to manage the ICS system, including:

- Increased educational requirements for officers to learn to use the complex IPCS system

- Administration of phone use rules and restrictions

- Facility officers having full access and control of the IPCS system

- Establishing security levels and clearance codes for various officers

- Removing and implementing administrative blocks

- Administration of special numbers, for PREA, crime tip lines, attorney numbers, etc.

- Generating reports and statistical analyses

- Researching and identifying call traffic patterns

For Pay Tel, for facilities with less than 1,000 ADP these activities are performed by facility officers. Only in the largest facilities does Pay Tel provide an on-site administer who will perform these functions (other than call monitoring) during regular business hours—still leaving the duties to be performed by facilities officers for the remaining 128 hours of the week. These functions can be summarized as follows:

**Facilities with >1000 ADP**

1 Full Time (40 Hours) System Administrator Provided by ICS Provider
(Estimated 1 System Administrator per 2000 Inmates)

| Duties Performed by Pay Tel System Administrator | Duties Performed by Facility Officers |
|---|---|
| • PIN Administration<br>• Administer/Enroll Voice Biometrics<br>• Administer Debit Accounts<br>• Respond to Inmate Questions on Using ICS<br>• Respond to Family Questions on Using ICS and Account Setup<br>• Accept Public Requests for Blocking /Unblocking<br>• Administer Blocked Numbers<br>• Accompany technicians who come to the facility to repair | • Monitor Calls to ensure safety of inmates, staff and the public<br>• Perform all System Administrator Tasks for the remaining 128 hours of the week |

**Facilities with <1000 ADP**

| No Site Administrator | Duties Performed by Facility Officers |
|---|---|
| | • Monitor Calls to ensure safety of inmates, staff and the public<br>• Perform all System Administrator Tasks 24/7<br>• PIN Administration<br>• Administer/Enroll Voice Biometrics<br>• Administer Debit Accounts<br>• Respond to Inmate Questions on Using ICS<br>• Respond to Family Questions on Using ICS and Account Setup<br>• Accept Public Requests for Blocking /Unblocking<br>• Administer Blocked Numbers<br>• Accompany technicians who come to the facility to repair |

Each of these activities has an associated cost and facilities will have little incentive to allow IPCS in their facilities in the first place if they are unable to recover these costs—particularly in an environment where facilities are understaffed and budgets are under stress. *See also* Exhibits 2 and 3 hereto. Moreover, under cost causation principles applied by the Commission under Section 201, it must be underscored that the users of these services, that are within the discretion of the facility whether to permit, are the parties causing the costs to be incurred. Facilities should be compensated for the time and effort in administering safety and security programs that enable IPCS services.

- 14 -

**JA882**

Pay Tel acknowledges, as the Wright Petitioners observe in the Brattle Report submitted with their comments, that site commissions exert upward cost pressure on IPCS costs and, therefore, rates. As explained in the Brattle Report:

> With the current system in place, from a provider's point of view, providing lower rates for voice calling services is unfortunately not always the optimal strategy for winning the contract. If a provider places a high value on commissions, they may be able to win contracts for audio and video services even if their infrastructure is more expensive than their competitors. This is because they can offer higher site commissions to decision makers who have the power to award contracts.[35]

Pay Tel has seen this exact scenario play out numerous times when bidding on IPCS requests for proposal.[36]

The solution to this dynamic is to create a per-minute rate additive intended to allow facilities to recover their costs of administering IPCS and making that service available. [37] As Pay Tel has advocated, "[s]uch an approach would help to align the interests of facilities with consumers by incenting facilities to enter into contracts with lower calling rates in order to

---

[35] Wright Petitioners Comments (MWRA NPRM), WC Docket Nos. 23-62, 12-375 (May 8, 2023), Appendix A (Coleman Bazelon & Paroma Sanyal, Comments on "FCC Seeks Comment on Its Expanded Authority to Ensure Just and Reasonable Rates and Charges for Incarcerated People's Communications Services," Notice of Proposed Rulemaking (WC Docket Nos. 23-62, 12-375) (May 8, 2023) (the "Brattle Report")), ¶ 45 (emphasis added).

[36] *See* Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 12 (Sep. 27, 2021) ("By way of example, Pay Tel has submitted as Exhibit 3 several recent requests for proposals ("RFPs") in which Pay Tel competed but ultimately lost due to site commission payment amounts. In each case, Pay Tel ranked higher in every single RFP scoring category except the 'Cost/Commission' category, and yet Pay Tel still lost the contract. By contrast, the ICS provider who won the contracts did so by proposing to pay site commissions of 90% and 88.8%, respectively, with $150,000 to be paid up front each year in the case of the facility receiving 90% commission. With that much money at stake for the facilities, it is therefore little surprise that the Chief of one of the facilities noted in the RFP approval documentation that the contract award was 'primarily [a] commission based decision.'").

[37] *See, e.g.,* Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 12 (Sep. 27, 2021) ("By removing the current incentive for facilities to award contracts based primarily (or, at times, exclusively) on site commission offerings, the Commission would leave facilities with only service-based, competitive market factors to compare when awarding contracts.").

stimulate increased phone usage, thereby spurring healthy competition among providers that will benefit consumers.[38]

However, as Pay Tel and many other past commenters in this proceeding have previously explained, so long as the Commission permits site commissions, those commissions are costs ICS providers generally must incur in order to provide ICS service, and therefore must be fully considered in any proposed rate caps.[39] As the D.C. Circuit explained in *GTL v. FCC*, because ICS providers must incur site commissions costs that facilities require them to pay, those commissions are "directly related to the provision of ICS and therefore [are] legitimate" compensable costs.[40] The Martha Wright-Reed Act does not change this.

## II.    PREEMPTION OF INCONSISTENT STATE REQUIREMENTS

Pay Tel agrees with Securus that "[t]he Commission should expressly preempt state action that attempts to set lower rates or charges, including for ancillary services, than those set in the compensation plan"[41] and disagrees with the Wright Petitioners' contention that "state and local laws that require intrastate rates to be *lower* than the Commission's rate caps are not inconsistent with the Commission's regulations."[42]

---

[38] Pay Tel Communications, Inc., *Ex Parte Presentation*, WC Docket No. 12-375 (Oct. 15, 2015) ("Pay Tel has consistently advocated in this proceeding for adoption of an explicit cost recovery mechanism as an additive component of ICS rates as part of a regulatory structure that prohibits providers from paying other forms of compensation. Such an approach would help to align the interests of facilities with consumers by incenting facilities to enter into contracts with lower calling rates in order to stimulate increased phone usage, thereby spurring healthy competition among providers that will benefit consumers.").

[39] *See, e.g.*, Securus Comments (MWRA NPRM), WC Docket Nos. 23-62, 12-375, at 25 (May 8, 2023) (as long as site commission are allowed, they are a 'cost of providing service' and their categorical exclusion 'cannot be easily squared with the requirements of § 276 and § 201.'").Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 12 (Sep. 27, 2021); Pay Tel Communications, Inc., Comments, WC Docket No. 12-375, at 8–15 (Nov. 23, 2020); 47 U.S.C. § 276.

[40] *See Glob. Tel*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 413 (D.C. Cir. 2017) ("GTL").

[41] Securus Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 42 (May 8, 2023).  *See also* Comments of California Public Utilities Commission

[42] Wright Petitioners Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 13 (May 8, 2023).

No party has articulated any cognizable public policy interest that would justify permitting individual states to impose disparate regulatory schemes where the FCC has been granted plenary authority over intrastate and interstate rates, where the FCC seeks to establish unitary rates for the service, and where provider costs are reported on an unseparated basis.[43]  To the contrary, Pay Tel agrees with Securus that allowing states to deviate from the unified federal scheme will only provide disruptive to federal policy by requiring increases in federal rates to defray costs which are not being recovered at the state level and creating potential issues of cross-subsidization as been states, and creating consumer confusion.[44]

The State of California provides an example of exactly these sort of harms.   In August 2021, the California PUC issued an "interim" decision imposing a $0.07 rate cap (inclusive of a $0.05 additive to defray facility costs) on all IPCS calls in prisons and jails, irrespective of size and prohibiting all ancillary fees (except third party financial transaction fees up to $6.95).[45]  This decision was taken without any collection of data from providers of this service or any analysis of the costs to provide service; instead, the decision was based on a service contract for providing service in state prisons.

California's intemperate decision to regulate rates without an analysis of costs rendered it impossible for Pay Tel to continue providing service in that state.  As a result, Pay Tel was forced to surrender its lone contract (for a county jail with an ADP of 93) in California,[46] and Pay Tel

---

[43] Providers did not separate their interstate and intrastate voice costs in responding to the Third Mandatory Data Collection.  *See* MWRA NPRM at n. 103.
[44] *See* Securus Comments at 42-44.
[45] *Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services,* Cal. P.U.C. Dec. 21-08-037, 2021 WL 3929844 (Aug. 19, 2021), *aff'd Securus Tech., LLC v. Public Utils. Comm'n*, 88 Cal.App.5th 787, 305 Cal.Rptr.3d 153 (Feb. 1, 2023).
[46] Pay Tel was able to assign its unprofitable contract to a vendor serving a neighboring county. Ultimately, California's below-cost rate cap will result in a reduction in services to incarcerated persons, the consolidation of providers to a few large vendors, and seriously limit competition for California IPCS contracts.

will, in the future, not be in a position to bid on services in that state.   Decisions like these by other states will undoubtedly result in fewer vendors offering services—which will primarily impact small, high costs facilities and create a regulatory environment of service consolidation where only the dominant providers with state prison contracts can continue to provide service. Such a result is manifestly contrary to the intent of Congress in enacting Section 276 in the first place.

In order to prevent such harm, the Commission should exercise its authority to preempt *all* inconsistent state law—including rate caps both above and below federal rate caps.

## III.    REGULATION OF ON-SITE VIDEO VISITATION

Pay Tel does not oppose the Wright Petitioners' position that the Commission "should interpret the MWR Act as extending the Commission's authority over on-site video visitation services . . . ."[47]

In Pay Tel's experience, facilities generally require on-site video visitation to be provided to incarcerated persons for no charge.[48] However, on-site video visitation equipment and administration is not free—it must be paid for by someone. Recovery of equipment and administration costs for on-site video visitation should be enabled through fees for remote video visitation.  Providers must be permitted to recover the cost of all video visitation equipment used to facility inmate communications.

---

[47] Wright Petitioners Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 7-9 (May 8, 2023). *But see* NSA Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 6 (May 8, 2023) ("the Commission has no jurisdiction over video visitation.").

[48] *See also* Securus Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 7 (May 8, 2023) ("Securus does not charge for on-site video visitations and is not aware of other providers assessing fees for on-site visitations.").

**CONCLUSION**

The Martha Wright-Reed Act generally codifies the Commission's current approach to IPCS regulation, and expands the scope of Commission authority over interstate as well as intrastate IPCS rates, and all audio and video telecommunication providers, regardless of the technology used. This enables comprehensive, holistic ICS regulatory reform—as has long been advocated for by Pay Tel and other IPCS providers—to provide just and reasonable rates for consumers, fair compensation to providers, and cost recovery to facilities for safety and security costs. These are not inconsistent objectives; to the contrary, alignment of incentives and compensation for all stakeholders is not only possible, but essential to ensure the affordability and availability of quality IPCS to all facilities, particularly jails and other small facilities. Consistent with these goals, in lieu of traditional revenue-based commissions, the Commission should allow for recovery of facility safety and security costs through more efficient means, such as per-minute additives to rate caps. Furthermore, state law regulating IPCS rates—whether above or below FCC rate caps—must be broadly preempted. Finally, the Commission should collect further comments and cost data before exercising its regulatory authority over video visitation services.

Respectfully submitted,

Marcus W. Trathen
Christopher B. Dodd
BROOKS, PIERCE, McLENDON,
 HUMPHREY & LEONARD, L.L.P.
Wells Fargo Capitol Center, Suite 1700
Raleigh, N.C. 27601
Telephone: (919) 839-0300
Facsimile: (919) 839-0304
mtrathen@brookspierce.com
cdodd@brookspierce.com

*Counsel for Pay Tel Communications, Inc.*

July 12, 2023

**EXHIBIT 1**


***Ex Parte* Presentation of Alliance for Telecommunications Industry Solutions Telecommunications Fraud Prevention Committee, Docket No. 96-128 (Aug. 24, 2007)**



1200 G Street, NW
Suite 500
Washington, DC 20005

P: 202-628-6380
F: 202-393-5453
W: www.atis.org

Chairman
**Christopher T. Rice**
AT&T

First Vice Chairman
**Nick Adamo**
Cisco Systems

Second Vice Chairman
**Mark Wegleitner**
Verizon

Treasurer
**Harald Braun**
Siemens Networks

President & Chief
Executive Officer
**Susan M. Miller**
ATIS

Vice President of
Finance & Operations
**William J. Klein**
ATIS

August 24, 2007

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, S.W., Room TW-A 325
Washington, D.C. 20554

Re:   *Ex Parte*, CC Docket No. 96-128
        Fraud Challenges Related to the *Wright Alternative Petition*

Dear Ms. Dortch:

The Alliance for Telecommunications Industry Solutions ("ATIS")
Telecommunications Fraud Prevention Committee ("TFPC") is writing to
express its concerns regarding the potential for fraud that could result from the
implementation of the *Wright Alternative Petition.*[1]

ATIS is a technical planning and standards development organization that
develops and promotes technical and operational standards for
communications and related information technologies worldwide using a
pragmatic, flexible, and open approach.  Industry professionals representing
more than 300 companies from all segments of the communications industry
actively participate in ATIS' open industry committees, forums and
"Incubators."  The ATIS TFPC is composed of leading fraud prevention
experts from the nation's local telephone companies and interexchange
carriers who work to resolve issues involving fraud impacting the
telecommunications industry.

Over the past eighteen (18) years, the TFPC has actively worked eighty (80)
different fraud issues impacting the telecommunications industry.  Almost
20% of these issues address, to some degree, preventing fraud on the
telecommunications network from the provision of inmate telephone service.
Attached to this letter are:  (1) a list of TFPC issues that relate to the control or
prevention of inmate fraud, criminal activity and fraud on the
telecommunications network; and (2) a list of current TFPC member
companies that support recommendations to prevent fraud on the
telecommunications network resulting from inmates using the telephone.

---

[1] *Petitioners Alternative Rulemaking Proposal* ("*Wright Alternative Petition*"), filed by Martha
Wright et al., CC Docket No. 96-128 (February 28, 2007); Errata to *Wright Alternative
Proposal*, CC Docket No. 96-128 (March 1, 2007).

**JA890**

Ex Parte, CC Docket No. 96-128
August 24, 2007
Page 2 of 3

The ability to control inmate calling depends on the Inmate Telephone Service (ITS) providers'
visibility and control over call traffic. Any attempt to alter that visibility and control over call
traffic could create significant security breaches in the confinement facilities and fraud on the
telecommunications network.

The *Wright Alternative Petition* seeks to dramatically lower interstate rates. If the FCC were to
implement significant rate reductions on interstate calls only, the result would be disparate
intrastate and interstate rates. This rate differential would create a significant incentive for
arbitrage as family members of inmates obtain prepaid cellular telephones and voice over IP
(VoIP) telephones with telephone numbers associated with a state different from the one where
the family member resides. This would be rational economic behavior; however, it would have
negative consequences for safety and security in confinement facilities.

The interstate-only rate benchmarks would directly degrade the ability of confinement officers to
investigate inappropriate activity and to enforce calling restrictions. While some arbitrage is
already occurring where a limited number of out-of-state customers are getting prepaid cellular
or VoIP phones with numbers that are local to a specific confinement facility, the overwhelming
majority (80% to 90%) of calls coming from a confinement facility are being placed to intra-state
customers. If the *Wright Alternative Petition* were granted, it is likely that a significant number
of customers would obtain telephones with out-of-state numbers. Such an increase could add to
the burden on confinement officials and increase the potential risks described below.

Investigation of Inappropriate Activity. A called party's use of a telephone number that is not
associated with the geographic area in which he or she resides is a cause for concern with inmate
calling and may indicate inappropriate activity. Is the called party really a person the inmate is
authorized to call? Are the inmate and the called party attempting to evade security features and
mislead officers? Is the called party using a prepaid cellular phone to mask their identity and
their true location?

For jurisdictional reasons, interstate activity may be more difficult for local officers to
investigate than intrastate activity. For instance, to investigate potential inappropriate or illegal
activities involving an intrastate call, a confinement official can utilize established contacts with
appropriate local and state officials. To investigate an interstate call, the confinement official
may not have established contacts or protocols to investigate such activity. Additional
complexities are inherent in this type of situation. It is therefore especially problematic when the
called party obtains and uses a telephone number from a different state.

Enforcement of Calling Restrictions. These interstate rate benchmarks will lead to a reduction in
confinement officers' ability to maintain adequate controls on inmate calling. This could impact
the safety and security of the facility and the general public. The inability to identify the location
of the called party could in some cases impede the confinement officials' ability to prevent
harassing calls to victims.

Ex Parte, CC Docket No. 96-128
August 24, 2007
Page 3 of 3

By dramatically increasing the number of interstate calls and therefore the number of calls for which the location of the called party may not be known, the *Wright Alternative Petition* could also compromise the safety and security of the confinement facility by providing opportunities for inmates to obscure illegal activity (*i.e.*, smuggling of contraband).

The ATIS TFPC recommends that the FCC not adopt the proposal outlined in the *Wright Alternative Petition*. The inevitable rate arbitrage resulting from interstate-only rate benchmarks could compromise security controls at confinement facilities, and the resulting fraud on the telecommunications network would increase telecommunication company costs and negatively impact the public.

If you have any questions or would like additional information regarding this matter, please feel free to contact the undersigned.

Sincerely,

Thomas Goode
ATIS General Counsel

**JA892**

**Attachment #1 - List of TFPC Issues Focusing on Controlling Inmate Calling to Prevent Abuse of the Public, Criminal Activity and Fraud on the Telecommunications Network**

| TFPC Issue #002, Prison Fraud Control, Opened January 1988, Placed in Final Closure March 1989 | |
|---|---|
| Issue Statement: | Most correctional facilities today make telephones available to inmates during varying hours of the day.  Most often these telephones are restricted to collect calling only to prevent unwanted balling and/or harassment.<br><br>However, due to the intricacies of network architecture, inmates have been successful at reaching a subscriber's dial tone. Utilizing the touch tone pad on the prison phone, the inmates are able to place calls at the subscriber's expense. |
| Resolution Statement: | A trial co-sponsored by AT&T and BellSouth to determine the best method of curtailing network abuse by prison inmates has been completed. It was discovered that a number of vendors have devices that can provide additional screening on individual line basis.<br><br>The most positive finding is that these devices allow for only a given number of digits to be dialed, thus disallowing the input of authorization codes or use of customer dial tone.  A trial of one manufacturer's product verified its effectiveness.<br><br>There are 4 known vendors of these devices:<br>* Mitel Corporation<br>* CTI Corporation<br>* Science Dynamics<br>* Tennessee Sheet Metal<br><br>AT&T and BellSouth concur that the resolution of the issue is to attach these devices to the inmate lines.  Determination as to which unit to choose should be on an individual company basis. Both AT&T and BellSouth recommend that these devices be adopted as the industry standard for curtailing fraud of this nature by prison inmates. |
| TFPC Issue #011, Prisoners Placing Fraudulent Collect Calls to Business Offices, Opened October 1988, Placed in Final Closure July 1989 | |
| Issue Statement: | Business offices within the Bell Atlantic Region are being charged with hours of fraudulently placed collect calls placed by prisoners. |
| Action Taken by the TFPC: | In the late 1980's the industry developed automated collect calling for inmate facilities to: |

Attachment #1
Ex Parte, CC Docket No. 96-128
August 24, 2007

|  | • Prevent inmates from having access to live operators;<br>• Provide notice to the called party that the call was from a "Named" inmate in a "Named" confinement facility;<br>• Provide the called party an opportunity to accept or refuse the collect call before any charges were incurred and before the inmate was allowed to speak.<br>• Provide set time limits on all calls. |
|---|---|
| **TFPC Issue #018, Automated Collect Calls, Opened July 1990, Placed in Final Closure May 1991** | |
| Issue Statement: | New technology in private payphones allows "Automated Collect" calls to be made from a pay station to any other phone connected to the network, including any other payphone, which when answered, will cause a bill to be sent by the calling parties set, through the calling parties billing company to the set/phone that answered the originating call. This system is not known to check with any BVA in the usual manner and essentially allows calls to be completed with NO pre-validation. Fraud calls billed to the answering party can be the result. |
| Resolution Statement: | The TFPC recommends that any telecommunications service provider, opting to originate Automated Collect type calls billed to other than the original party, validate the billing number to prevent unauthorized calls from being placed as a result of such non-validation. |
| **TFPC Issue #020, Subscription Fraud, Opened October 1990, Placed in Final Closure April 1992** | |
| Issue Statement: | With growing frequency, defrauders are establishing telephone service and billing large numbers of calls to that service, with no intention of paying the bill. This is often done by providing the LEC with fraudulent information on the service application. |
| Resolution Statement: | The TFPC agreed to close the issue with the following resolution statement:<br>• Enhanced verification procedures would allow for further up-front screening for initial service therefore assisting in preventing this fraud before it occurs. Prevention should always be the first option to pursue if possible. This would require regulators to permit sufficient flexibility, when negotiating new service, to take legitimate precautions.<br>• Advance high toll notifiers as well as other indicators such as call duration and specific country codes help with early identification of this fraud.<br>• Education and incentive programs will assist in further reduction of this fraud. Programs can be geared for the |

**JA894**

Attachment #1
Ex Parte, CC Docket No. 96-128
August 24, 2007

| | |
|---|---|
| | local exchange companies, long distance companies, and the general public at large. |
| **TFPC Issue #026, Call Forwarding Fraud, Opened February 1993, Placed in Final Closure January 1995** | |
| Issue Statement: | We have become aware of many instances in which remote call forwarding has been used as a vehicle to commit toll fraud. IXCs wish to avoid completing collect and third (3rd) party billed calls when acceptance comes from other than the billed number.<br><br>A. Fraud perpetrators are activating the call forwarding feature by tampering with the junction box in the apartment basement. Residence lines are then call forwarded to a coin station where third (3rd) party billing is accepted.<br>B. Additionally, local service is being established (usually fraudulently) and the line is call forwarded to a toll-free number IXC access number which allows outbound calling. By transiting through a local number, the real ANI is masked, allowing the caller to bypass call controls in place at the originating location. |
| Resolution Statement: | Call forwarding features have been successfully exploited in a variety of ways by the fraud community to gain access to the domestic and international networks.<br><br>The Toll Fraud Prevention Committee performed an extensive evaluation of the vulnerabilities associated with call forwarding features and developed a list of potential solutions which could minimize the toll fraud implications.<br><br>The industry recommendation should not be construed as the only solution to call forwarding fraud, nor should it preclude any segment of the telecommunications industry from developing and deploying other solutions. Just as new variations of a fraud problem occur over time, innovative solutions to deal with the problems should continue to be developed and pursued.<br><br>Successful fraud control is achieved by implementing up-front toll fraud prevention measures balanced with the ability to detect abuse and the capability to impose controls or corrective measures. Following is a list of prevention and detection measures for your consideration in controlling call forwarding abuse. Some of the solutions are technologically feasible now; others require development. All service providers are also encouraged to continue efforts to educate customers regarding |

Attachment #1
Ex Parte, CC Docket No. 96-128
August 24, 2007

| | the use of social engineering in committing call forwarding fraud. |
|---|---|
| **TFPC Issue #029, Identify Potential Fraud Issues with Billed Party Preference (BPP) Opened August 1993, Withdrawn January 1997** | |
| Issue Statement: | With Billed Party Preference (BPP) being considered by the FCC the issue of the impact of BPP and any potential fraud concerns (e.g. inmate phone service) need to be identified. |
| Action Taken by the TFPC: | During the work of Issue #029, the TFPC identified numerous fraud concerns for Inmate Telephone Service ("ITS"), and threats to the telecommunications network that would result from using multiple carriers to provide ITS in a confinement facility. Following the FCC decision to withdraw consideration of BPP, TPFC Issue #029 was withdrawn. |
| **TFPC Issue #046, Prison Originated Fraud, Opened April 1995, Placed in Final Closure, July 1996** | |
| Issue Statement: | A significant amount of fraud originates from prisons due to several known methods which circumvent existing fraud controls. New fraud technology has made it possible for fraudsters to avoid detection and these methods exacerbate other types of fraud on operator assisted calls. |
| Resolution Statement: | The Toll Fraud Prevention Committee in its effort to control fraud from confinement facilities recommend that utilizing any of the possible solutions listed below would assist in minimizing this risk. Utilizing credit assessments as depicted in the TFPC White Paper on Subscription Fraud (TFPC Issue 20) could also help deter this problem.<br>• Provision an Alternate Billing Services Fraud Monitoring System<br>• Utilize LIDB<br>• Provisioning of Specific ANI II digits for Inmate Service<br>• Utilize Inmate Dialing Screening:<br>• Conference Call Detection<br>• Confinement Facility Call Branding<br>• Automated Operator Services<br>• Excessive Toll Notification<br>• Traffic Velocity Checking with Customer Provided Equipment<br>• Predetermined inmate call duration limits<br>• Establish working relationships between local and long distance service providers<br>• On-Site administration for use in fraud detection. |

Attachment #1
Ex Parte, CC Docket No. 96-128
August 24, 2007

| TFPC Issue #057, Subscription Fraud Revisited, Opened October 1997, Placed in Final Closure October 1999 | |
|---|---|
| Issue Statement: | Perpetrators of Subscription Fraud have become more sophisticated and aggressive in their efforts to assume new identities and to mask their real identities. As a result, the TFPC White Papers on Subscription Fraud may be out of date or missing pertinent information. |
| Resolution Statement: | Telecom industry service providers should continue to cooperate in their efforts to combat subscription fraud. It is also recommended that these service providers join forces to lobby for regulatory changes that will assist the industry in controlling subscription fraud. Tariff language should be enhanced to require certain pieces of identification and the right to refuse service when the information given cannot be verified or proves to be false. |
| **TFPC Issue #058, Fraud Prevention for Local Resale, Opened May 1998, Placed in Final Closure January 2003** | |
| Issue Statement: | Local resale presents significant opportunities for fraudulent activities since there is no way to identify the Billing Telephone Company at the time casually billed direct dialed (101XXXX) or alternately billed (collect, third party, or calling card) calls are placed. |
| Resolution Statement: | The TFPC agrees that the problems surrounding service provider identification create the opportunity for fraud. The TFPC encourages companies to be vigilant in checking for this type of fraud and to adopt the solutions outlined in this paper. |
| **TFPC Issue #64, Identity Theft, Opened October 2000, Placed in Final Closure, February 2003** | |
| Issue Statement: | Inconsistent industry practices regarding Identity Theft has resulted in Federal review. This could result in Federal mandated practice if the Industry does not implement best practices. |
| Resolution Statement: | The Telecommunications Fraud Prevention Committee, in its efforts to develop standards to address the various ID Theft issues, recommends that members review the above list of suggested resolutions for implementation in their companies.<br><br>The TFPC strongly recommends that member companies adopt and implement the FTC/Industry developed Standard Fraud Declaration Package. The TFPC assisted in the development of the package and endorses its use for the Telecom Industry. Use |

Attachment #1
Ex Parte, CC Docket No. 96-128
August 24, 2007

| | by all member companies ensures the effective handling of victim claims to reduce the complaints registered at the FTC.<br><br>In addition, the following closed TFPC issues should be reviewed for additional background and recommendations as appropriate:<br>• Issue # 57 – Subscription Fraud Revisited (White Paper)<br>• Issue # 44 – Coordinated Criminal Investigations<br>• Issue # 62 – Social Engineering of Telecom Personnel (White Paper)<br>• |
|---|---|
| **TFPC Issue #065, Guarding Against Fraud from Prepaid Local Service Accounts, Opened September 2000, Placed in Final Closure January 2003** | |
| Issue Statement: | There is a growing industry in the pre-paid local service market. Most often these lines are sold to customers with low or no credit and/or those who wish anonymity. A cash payment in advance is required to get dial tone and little or no credit/identify checks are done on the subscriber. In fact, it is impossible to get BNA information on the subscribers from virtually all of the pre-paid local providers. When fraudsters purchase service from these pre-paid providers abuse on other carriers is a regular occurrence. |
| Resolution Statement: | With the projected increase in Prepaid Local Service, the members of this sub-committee feel this is a critical issue, however, the solutions examined are expensive and require significant lead-time for implementation. This sub-committee recommends the following actions be considered for implementation in the near-term:<br>1. Pursue regulatory measures to force providers of prepaid local services to adhere to prepaid local resale identification and blocking standards as outlined in Section D of the white paper, "Guarding against Fraud from Pre-Paid Local Service Accounts" associated with Issue #065.<br>2. Implementation of, and full industry participation in industry line level databases<br><br>The long-term solution should place more emphasis on "the big picture," which includes implementing proposed solutions from Issue #58 – Fraud Prevention in Local Resale. |
| **TFPC Issue #066, Payment Fraud in Telecom Accounts, Opened June 2001, Placed in Final Closure January 2002** | |
| Issue Statement: | New payment options are being introduced as a form of payment that result in delay in identification of a subscription fraud account, resulting in significant final bill write-offs. |

**JA898**

Attachment #1
Ex Parte, CC Docket No. 96-128
August 24, 2007

| Resolution Statement: | The Telecommunications Fraud Prevention Committee in its efforts to control all types of fraud perpetrated against the industry hereby recommends use of the Payment Fraud White Paper dated December 11, 2001 as a reference and educational document on the subject of controlling Payment Fraud in telecom accounts. |
|---|---|
| **TFPC Issue #068, Failure to Launch or Correctly Populate LIDB Validation Queries for all ABS** | |
| Issue Statement: | LIDB (Line Information DataBase) validation queries are not performed for every alternately billed services (ABS) and information in queries is sometimes erroneous and/or incomplete, hindering the ability to monitor ABS validation attempts.  ABS includes collect, billed to third and calling card calls. |
| Resolution Statement: | Carriers are encouraged to provide accurate and complete information on originating and terminating numbers for calls when querying LIDB. With the variety of billing validation techniques utilized in the industry today, it is suggested that industry participants develop methods for sharing information as discussed in the attached 4 Step Document for Issue #068. This sharing of information would serve to enhance the data provided by LIDB. |

**Attachment #2 - List of Current TFPC Member Companies**

AT&T
Bell Canada
British Telecom
Consolidated Communications
Cox Communications
NeuStar, Inc.
Pay Tel/APCC
Qwest
Sprint Nextel
TCC Teleplex
Verizon

**EXHIBIT 2**

**Pay Tel *Ex Parte* Presentation, Docket 12-375 (May 31, 2013)**



MARCUS W. TRATHEN
1600 WELLS FARGO CAPITOL CENTER
150 FAYETTEVILLE STREET
RALEIGH, NC 27601

T 919.839.0300
F 919.839.0304
MTRATHEN@BROOKSPIERCE.COM

May 31, 2013

*By Electronic Filing*                    *Notice of Ex Parte Presentation*

Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C.  20554

> Re:    *Docket No. 12-375, Rates for Interstate Inmate Calling Services*

Dear Ms. Dortch:

On May 29, 2013, Vincent Townsend, President of Pay Tel Communications, Inc., Marcus Trathen of Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, and Jack Pringle of Ellis, Lawhorne & Sims. P.A., met with Deena Shetler, Kalpak Gude, Pamela Arluk, Randolph Clarke, Lynne Engledow, David Zesiger, Gregory Haledjian, Rhonda Lien, and Anjali Vohra of the Wireline Competition Bureau. In this meeting, Pay Tel discussed the FCC's Notice of Proposed Rulemaking (NPRM) issued December 28, 2012, in response to the Petitions of Martha Wright, et al. for rulemaking, the potential detrimental effect of the Wright Petitioners' interstate rates proposal on inmate providers primarily serving jail facilities, and other positions of record in the proceeding regarding inmate calling services.

Pay Tel presented its views that: (1) the Commission should consider appropriate reform affecting all relevant spheres of the Inmate Calling Services ("ICS") industry so that consumer welfare is maximized, jail and prison facility operators will continue to have the resources to provide adequate security for inmates, staff, and the general public, and ICS providers will be able to operate profitable businesses; (2) the ICS industry is comprised of diverse types and sizes of correctional facilities that have different cost characteristics and that, in particular, jails and prisons should be treated distinctly by the Commission with respect to any consideration of ICS costs; (3) merely addressing one or even some of the industry's myriad challenges in a piecemeal fashion will lead to ineffective results and create unintended consequences such as a potential reduction in ICS services and rate arbitrage; (4) adoption of the Wright Petitioners' latest proposal to establish a benchmark ICS rate for interstate calls at $0.07 per minute would lead to immediate "rate arbitrage" to the detriment of safety and security, would cause severe financial harm to operators such as Pay Tel that primarily provide service in jail facilities, and would result in further industry consolidation by the two dominant national companies; (5) elimination of payments to facilities could leave facility administrators without the funds to cover the legitimate costs required to operate phones in a safe and secure manner and thereby risk cessation or diminution of ICS availability; and (6) the Commission should address the growing problem of add-on fees that drive up the cost to consumers of ICS.

Pay Tel Communications Ex Parte Notice
May 31, 2013
Page 2


       Pay Tel urged that the Commission; (1) consider a tiered rate structure that distinguishes between, at a minimum, ICS in jails and prisons; (2) address the problem of escalating fees; and (3) ensure that facility providers are adequately compensated for their costs of ICS administration.   Pay Tel also stated its view that the Commission has, pursuant to Section 276 of the Communications Act, broad jurisdiction over ICS.

       Attached are copies of written materials referenced during the meeting.

       In accordance with Section 1.1206 of the Commission's rules, this letter is submitted for inclusion in the record of the above-captioned proceeding.   Please do not hesitate to contact the undersigned should any questions arise concerning this letter or the issues discussed.

                    Sincerely yours,

                    /s/ Marcus W. Trathen
                    Marcus W. Trathen

cc:    Deena Shetler (via email)
       Kalpak Gude (via email)
       Pamela Arluk (via email)
       Randolph Clarke (via email)
       Lynne Engledow (via email)
       David Zesiger (via email)
       Gregory Haledjian (via email)
       Rhonda Lien (via email)
       Anjali Vohra (via email)

### *Cost Recovery for Facility ICS Administration*

The Alternative Wright Petition, as did the ICS Order & NPRM before it, misunderstands the nature of the so-called "commissions" that ICS providers pay to confinement facilities. The term "commission," in this context, is really a misnomer. While a small portion of the amounts paid in some states or counties may be used to compensate the facility for use of the premises as in the payphone analogy relied on by the Commission in denying cost recovery for commission payments, such allocations are rare in Pay Tel's experience. Rather, the payments made to facilities are typically used to support inmate welfare programs or to recover the facility's administration costs involved in operating an ICS system for the benefit of its inmates and their families and the protection of the community. In this regard, these payments are <u>directly</u> related to the provision of the service itself and, therefore, are an allowable component of ICS cost.

Every confinement facility incurs costs related to the facility officers' time to administer the ICS system. These duties focus on protecting the public from abuse and preventing criminal activity, while allowing inmates to place calls. Today's sophisticated controls and monitoring features require significantly more officer time to administer the system.

Facility officers perform several duties with respect to the basic operation of the ICS system. Thus, one or more facility officers per shift must:

- Be trained on operation of the ICS system

- Answer questions from inmates and family members (how calls are billed, why calls are blocked, how to open an account to receive calls to CLEC and wireless carrier numbers)

- Maintain and administer the list of numbers to be blocked (facility numbers, officers' numbers, judges' numbers, witnesses' numbers, victims' numbers, jurors' numbers)

- Take requests from the public to have numbers blocked

- Administer prepaid cards, if utilized

- Administer a debit system, if utilized (set up debit accounts, receive payments, refund unused funds)

- Training inmates on use of inmate phones to include use of commissary ordering via phone, facility information delivered via phone, etc.

- Administer a PIN system, if utilized

- Administer a voice biometric system, if utilized

- Maintain an approved number list, if utilized

- Contact the ICS provider for service issues

- Accompany ICS technicians while in the facility to service inmate phone systems

Facility officers also have responsibilities to manage call traffic, requiring one or more officers per shift to:

- Maintain negative databases of blocked numbers

- Initiate call traffic reviews

- Flag calls to specific phone numbers for review

- Flag calls from various cell blocks to same phone numbers

Facility officers also have responsibilities to record and monitor calls to protect the public from abuse and to prevent criminal activity when inmates make telephone calls. These responsibilities frequently require two or more officers per shift:

- Enrollment and management of inmates into voice biometrics system

- Flag calls for system alerts for real-time call monitoring and investigations

- Conduct real-time monitoring of inmate conversations

- Recording playback and analysis of inmate conversations

- Burn CDs of conversations for further review

- Respond to subpoenas for call detail records and recordings

In addition, facility officers have responsibilities to manage the ICS system, including:

- Increased educational requirements for officers to learn to use the complex ICS system

- Administration of phone use rules and restrictions

- Facility officers having full access and control of the ICS system

- Establishing security levels and clearance codes for various officers

- Removing and implementing administrative blocks

- Administration of special numbers, for PREA, crime tip lines, attorney numbers, etc.

- Generating reports and statistical analyses

- Researching and identifying call traffic patterns

Today's sophisticated ICS equipment requires more technically proficient and experienced facility officers. Inmate phone service can only be provided when trained facility officers can daily monitor and review vast amounts of information to protect the public from abuse and prevent criminal activity.

Thus, a significant purpose of the so-called "commission" paid by ICS providers is intended to recover the costs incurred by the confinement facility to administer the ICS system. Under established cost causation principles, these are true costs that should be borne by users of the system—the inmates and the recipients of their phone calls.

The Commission is well aware of the very serious budget constraints faced by state and local inmate facilities. ICS, of course, is a discretionary service offered for the benefit of inmates and their families. The reality is that if confinement facilities are not pertmitted to recover their own ICS costs, then some administrators will simply opt to limit significantly or eliminate altogether ICS in their facilities. Such a result is certainly at odds with the goals of this proceeding but is a very real possible outcome of the path urged by the Petitioners.

In sum, if the Commission moves forward to assert jurisdiction over commission payments, the Commission should examine fully the costs of facility ICS system administration and not merely assume a "commission" is a locational rent.

# INMATE CALLING SERVICE

*The Perception...*



Inmate                     Local Exchange Company                     Called Party

# *The Reality...*



**Inmate Phone & Manual Controls** → **Centralized ICS Automated Call Platform** → **ICS System Integrations & Required Free Services** → **Facility Administration Officer Responsibilities** → **Recording & Monitoring Functions – Facility Officer Responsibilities** → **Local Exchange Company** → **Called Party** → **Technical Support Center 24/7 Client Support** → **ICS Customer Service 24/7 Support** → **ICS Customer Account Services**

---

## Inmate Phone & Manual Controls

"Dumb" phones with vandal proof equipment

- Concealed security wiring, tamper-proof mounting
- Frequent repairs of damage
- Specialized mounting, enclosures
- Repairs require officer escort of technician into secure area of facility

**INMATE VOICE PROMPTS**

- **Phone taken off hook**

*For English, press 1. For Spanish, press 2 (Spanish prompt spoken in Spanish).*

*This call will be recorded and is subject to monitoring at any time.*

*Please enter your personal ID number, followed by the # sign.*

*One moment.*

*For a collect call, press 1.*

*For a free local call, press 3.*

*To place a debit call, press 5.*

*For a calling card call, press 6.*

*To report a crime, press 7.*

*To connect to the grievance Hotline, press 8.*

*To place a commissary order, press 9.*

*Where available at facility

*Please dial 0 plus the area code and number you wish to call.*

*Please state your name clearly after the tone.*

*Your name has been recorded as (Name of Inmate).*

*Please hold while your call is being connected.*

- **Called party answers phone and accepts call**

*Call accepted. Thank you for using Pay Tel Communications.*

*This call will be recorded and is subject to monitoring at any time.*

*You may begin speaking.*

- **Near end of call**

*You have one more minute for your call.*

*You have 15 seconds left.*

- **Terminate call when allotted time expires**

**Manual Emergency Cut-Off Switches to supplement software controls**

---

## Centralized ICS Automated Call Platform

**Basic Functions**

- Automated collect, prepaid and debit call process
- Automated Operator provides voice prompts/instructions in multiple languages
  - Inmate initiates call, enters PIN, dials number
- System performs internal database screening
  - Number blocks: harassing calls, witnesses
- LIDB/BNS database validation query
- LIDB identifies unbillable calls to C-LEC and wireless numbers, billed numbers screening ("BNS") and operating company number ("OCN") of LEC
- In service date and bill name and address query
- ACP determines correct call routing to 1+ to 1+ call conversion
- Call is completed
- Call branding with name of facility and inmate's name
- Called parties with C-LEC, VoIP, and Wireless numbers are provided a "First Call Free" and then connected to a live agent to open an account to receive future calls
- Automated rate quotes
- Call time limits
- 3-way call detection
- Voice overlay/repeat branding
- Incoming calls blocked
- Fraud digit detection to prevent secondary dial tone

**Recording & Monitoring**

- Full time, full channel recording and archiving of conversations
- Real time monitoring of inmate conversations
- Flag calls for alerts to monitor conversations real time
  - Emails or cell phone calls
- Record and playback of inmate conversations
- Monitor calls by PIN, phone number or cell block
- Voice identification
- Key word search

**Administrative Access**

- Allow facility to have direct control and access to databases and information
- Administer security levels and clearance codes
- Digital and mechanical controls to turn off individual phones or cell blocks
- Provide administrative and statistical reporting
- Implement and remove administrative blocks
- Flag calls to specific called numbers
- Flag calls from various Cell Blocks to same called numbers
- Implement call alerts for real-time call monitoring and investigation
- Administer PINs to restrict access to approved numbers only

---

## ICS System Integrations & Required Free Services

**Required ICS System Integrations with:**

- Commissary/Trust Account System to allow free calls for:
  - Transfer of funds for debit calling
  - Commissary ordering via phone
  - Trust account balance inquiries
  - Automated refund of inmate funds at time of release
- Jail Management System to enable:
  - Sharing of inmate PIN data
  - PIN based debit calling for greater security
  - PIN based biometric voice verification
- Victim Notification Systems
- Existing Security Systems
- Video Visitation Systems

**Non-Revenue Generating Services Provided through the ICS**

- Free Calls in Booking
- Free Calls to Public Defenders
- Free Calls to Crime Tip Number
- Free Calls to PREA Number
- Free Calls to other Facility required numbers
- Free Calls to transfer funds from Trust Account
- Inquiries on Trust Account Balances to ICS vendor
- Reporting of Grievances to Facility
- Requests of Medical Appointments
- Reporting of Phone Service Issues to ICS vendor

---

## Facility Administration Officer Responsibilities

**Basic System Operation**

*One or more facility officers per shift*

- Trained on operation of the ICS system
- Answer questions from inmates and family members
  - How calls are billed
  - Why calls are blocked
  - How to remove calls to C-LEC, VoIP, and wireless carrier numbers
- Maintain administration list of numbers to be blocked
  - Facility numbers
  - Judges' numbers
  - Victims' numbers
  - Officers' numbers
  - Witnesses' numbers
  - Jurors' numbers
- Take requests from the public to have numbers blocked
- Administer prepaid cards if utilized
- Administer debit system if utilized
  - Set up debit accounts
  - Receive payments
  - Refund unused funds
- Administer a PIN system if utilized
  - Maintain approved number list
  - Maintain attorney list with 'do not record' setting
- Contact ICS provider for service issues
- Accompany ICS technicians while in facility to service inmate phone equipment
- Enroll newly booked inmates into the voice biometry system

**Manage Call Traffic**

*One or more facility officers per shift*

- Maintain negative databases of blocked numbers
- Initiate call traffic reviews
- Flag calls to specific phone numbers for review

**Manage System**

*One or more facility officers per shift*

- Increased educational requirements for officers to learn to use system
- Facility officers have full access and control of system
- Establish security levels and clearance codes for various officers
- Remove and implement administrative blocks
- Generate reports and statistical analysis
- Research and identify call traffic patterns

---

## Recording & Monitoring Functions – Facility Officer Responsibilities

**Record & Monitor Calls**

*Two or more facility officers per shift*

- Flag calls for system alerts for real time call monitoring and investigations
- Real time monitoring of inmate conversations
- Recording and playback of inmate conversations
- Burn CDs of conversations for further review
- Assist law enforcement detectives with ongoing investigations related to specific inmates
- Respond to subpoenas for call detail records and recordings

**Investigations**

- Initiate call traffic investigations
- Flag calls for system alerts for real time call monitoring and investigations
- Monitor inmate conversations real time
- Burn CDs of conversations for further review by investigators and use in court cases
- Analyze biometric tools to identify targeted calls for in-depth review

---

## Local Exchange Company

Inmate Calling Service Provider completes calls via leased network – calls are connected to the calling party via:

- LECs or C-LECs connect calls to called parties that use POTS service (land lines)
- Wireless carriers connect calls to called parties that use wireless phones
- VoIP providers connect calls to called parties that use VoIP service

---

## Called Party

**CALLED PARTY VOICE PROMPTS**

- **Called party answers phone**

*Hello. This is a collect call from (Name of Inmate), an inmate at the (Name of Detention Center).*

*This service is provided by Pay Tel Communications.*

*For rate information, press 1 now.*

*To accept this call, press 1 now.*

*To block all future calls, press 4 now.*

*To refuse this call, press 5 or hang up now.*

*To repeat this information, press 9 now.*

- **Called party presses 3 to accept call**

*Call accepted. Thank you for using Pay Tel Communications.*

*This call will be recorded and is subject to monitoring at any time.*

*You may begin speaking.*

- **Near end of call**

*You have one more minute for your call.*

*You have 15 seconds left.*

- **Call is terminated when allotted time expires**

---

## Technical Support Center 24/7 Client Support

**ICS Tech Support will:**

- Monitor automatic polling/blocking cycles 24/7
- Provide call detail reports on requested numbers
- Block/unblock phone number
- Change dial patterns for local/long distance calls
- Analyze line usage to maintain phone availability
- Make test calls to requested bill to numbers
- Place call alerts
- Provide frequently called number reports
- Maximize officer system expertise on administrative access functions

**ICS Service Technicians will:**

- Provide ongoing training of facility officers on ICS system function and administration as officers are reassigned
- Repair/replace handsets/ keypads/hook switches on phones in cell blocks
- Troubleshoot network connectivity issues and repair them
- Install high-speed modems and maintain functionality
- Reset/reboot automated call processors when necessary
- Upgrade functions of software and hardware when necessary
- Repair and replace defective equipment

**ICS Tech Support will assist with investigations:**

- Review recorded conversations to burn CDs of requested calls
- Respond to subpoenas for explanation of ICS system features, call detail records and call recordings

**Installation & Expansion of ICS System**

- Site surveys
- Phone recommendations based on ADP and site survey
- Established network connectivity of individual inmate phones and facility administrative access
- Order all managed telecommunications network circuits
- Install and maintain all inmate phones, wiring and administrative access at no cost to the facility
- Coordinate ICS transition to minimize loss of service
- Training of facility officers on ICS system function and administration
- Provide a detailed site survey for expansion and/or new sites
- Install wiring, phones and enclosures for expansion

---

## ICS Customer Service 24/7 Support

**Customer Service will:**

- Provide 24/7 account setup
- Offer bilingual service
- Answer calling plan inquiries
- Implement customer requested blocks
- Secure bill name and address
- Contact customers to verify billing
- Process direct bill credit applications
- Perform direct bill credit checks
- Assist with account billing and collection
- Investigate Ethical 3-Way Calls for account credits
- Respond to inmate inquiries on debit account balances
- Respond to customer inquiries on dropped calls for credits
- Respond to customer inquiries on account balances
- Respond to customer refund inquiries
- Process refund request
- Process account payments

---

## ICS Customer Account Services

**LEC Billing**

- Processing billing records to LECs
- Identify off-net and Code 50 rejects
- Maintain database for off-net and Code 50 rejects
- Live agents to assist customers with inquiries

**Direct Bill & Prepaid Accounts**

- Provide 24/7 account setup
- Website access for customers to setup and manage their account
- Automated phone account setup and account management
- Credit Verification
- Live agents to assist customers with inquiries
- Fraud Investigations
- Delinquent account collection
- Process account refunds
- Provide monthly account statements automatically delivered via website or mail, including:
  - Period beginning account balance
  - List of all calls during period, with rate
  - List of all government mandated taxes and fees
  - List of all account payments and credits
  - List venitor tariffed Bill Processing Fee
  - Period ending account balance
  - Payment options and vendor contact information

**Manage Customer Inactive Accounts**

- Comply with state specific Unclaimed Property Laws
- Maintain Account Balances
- Automatically refund balances to customers at six (6) months of inactivity
- File Annual Reports with State Escheat Tax Departments for inactive year (3-5 years)
  - Report remaining account balances along with customer name and address
  - Pay funds to appropriate state for all remaining account balances

---

**EXHIBIT 3**

**Pay Tel *Ex Parte* Presentation, Docket No. 12-375 (May 8, 2015)**



1600 WELLS FARGO CAPITOL CENTER
150 FAYETTEVILLE STREET
RALEIGH, NC 27601

T 919.839.0300
F 919.839.0304
WWW.BROOKSPIERCE.COM

May 8, 2015

*Via ECFS*                                                  *Notice of Ex Parte Presentation*

Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

      *Re:    WC Docket No. 12-375, Rates for Interstate Inmate Calling Services*

Dear Ms. Dortch:

    Attached please find the ex parte presentation submitted on behalf of Pay Tel Communications, Inc. entitled "Setting the Record Straight on Confinement Facility Costs".

    Please do not hesitate to contact me if you have any questions regarding same.

        Sincerely,

        BROOKS, PIERCE, McLENDON,
         HUMPHREY & LEONARD, L.L.P.

        Timothy G. Nelson
        Direct Dial: (919) 573-6205
        tnelson@brookspierce.com

Attachment

303340

**JA910**

Case: 24-2013    Document: 00118293595    Page: 199    Date Filed: 06/02/2025    Entry ID: 6725373

**Administration of Inmate Calling Services in Jails – Pay Tel's Experience Serving Jails**

**FACILITY ADMINISTRATIVE & SECURITY RELATED ICS TASKS**

| | TASK DESCRIPTION[#] | PAY TEL | JAIL<br>✓= Jail Personnel Only<br>✓* = Jail Personnel Assisted by System Administrator WHERE APPLICABLE |
|---|---|---|---|
| 1 | Initial and on-going training of new personnel on operation of ICS System | ✓<br>Pay Tel provides initial training and on-going support | ✓*<br>Facility handles training for new personnel throughout contract |
| 2 | Answer questions from inmates and family members (how calls are billed, why calls are blocked, how to open an account to receive calls to CLEC and wireless carrier numbers) | | ✓* |
| 3 | Maintain and administer the list of numbers to be blocked (facility numbers, officers' numbers, judges' numbers, witnesses' numbers, victims' numbers, jurors' numbers) | | ✓*<br>Facility provides initial list of numbers (officers, judges, witness, etc.) and updates the block list to reflect changes throughout the contract |
| 4 | Take requests from the public to have numbers blocked | ✓<br>Pay Tel may receive some direct requests from called parties | ✓* |
| 5 | Administer prepaid cards, if utilized | | ✓*<br>Facility personnel responsible for distributing commissary items |
| 6 | Administer a debit system, if utilized (set up debit accounts, receive payments, refund unused funds) | | ✓* |
| 7 | Train inmates on the use of ICS to include use of trust account | | ✓* |

**JA911**

# FACILITY ADMINISTRATIVE & SECURITY RELATED ICS TASKS

| | TASK DESCRIPTION# | PAY TEL | JAIL<br>✔ = Jail Personnel Only<br>✔* = Jail Personnel Assisted by System Administrator WHERE APPLICABLE |
|---|---|---|---|
| | balance inquiry, transfer of funds to debit account, placement of debit calls and ordering commissary items via phone. | | |
| 8 | Administer a PIN system, if utilized | | ✔* |
| 9 | Administer a voice biometric system, if utilized | | ✔* |
| 10 | Maintain an approved number list, if utilized | | ✔* |
| 11 | Contact the ICS provider for service issues | | ✔* |
| 12 | Accompany ICS technicians while in the facility to service inmate phone systems | | ✔* |
| 13 | Maintain negative databases of blocked numbers | | ✔* |
| 14 | Initiate call traffic reviews | | ✔ |
| 15 | Flag calls to specific phone numbers for review | | ✔ |
| 16 | Flag calls from various cell blocks to same phone numbers | | ✔ |
| 17 | Administer phone use rules and restrictions | | ✔* |
| 18 | Establish security levels and clearance codes for various officers | | ✔* |
| 19 | Authorize selected facility officers for levels of access and control | | ✔* |
| 20 | Remove and implement administrative blocks | | ✔* |
| 21 | Administer special numbers, PREA, crime tip lines, attorneys, etc. | | ✔* |
| 22 | Generate reports and statistical analyses | | ✔ |
| 23 | Research and identify call traffic patterns | | ✔ |
| 24 | Enrollment and management of inmates into voice biometrics system | | ✔ |
| 25 | Flag calls for system alerts for real-time call monitoring | | ✔ |
| 26 | Forward alerts and recorded calls to investigators | | ✔ |

**JA912**

## FACILITY ADMINISTRATIVE & SECURITY RELATED ICS TASKS

| | TASK DESCRIPTION# | PAY TEL | JAIL<br>✔= Jail Personnel Only<br>✔* = Jail Personnel Assisted by System Administrator WHERE APPLICABLE |
|---|---|---|---|
| 27 | Conduct real-time monitoring of inmate conversations | | ✔ |
| 28 | Recording playback and analysis of inmate conversations | | ✔ |
| 29 | Burn CDs of conversations for further review by investigators | | ✔* |
| 30 | Respond to subpoenas for call detail records and recordings | | ✔* |

# Tasks identified by NSA.  *See* NSA Second Further Notice Comments, at 2-3.

*Notes:*

- *Jails operate 24 hours a day, 365 days a year.  Even IF a facility is large enough for Pay Tel to provide a System Administrator on-site, this individual will only be on hand for 20-40 hours per week out of the 168 total hours per week when the facility is operational. Facility personnel will be required to perform these tasks at all other times.*

- *Pay Tel serves approximately 175 facilities; only four of which are provided with System Administrators:*
    - *3 facilities in the 350-999 ADP range are provided with a part-time System Administrators*
    - *1 facility with 1,000+ inmates is provided with a full-time System Administrator.*
    - *At these locations, the System Administrators only assist with the tasks associated with ICS. Administration during the hours they are on-site; facility personnel handle the tasks at all other times.*
    - *In no event do System Administrators participate in inmate call monitoring or recording analysis as this is reserved for officers and investigators.*

- *Important List Observations:*
    - *Pay Tel routinely assists with only two of the thirty items listed.*
    - *IF PROVIDED -- System Administrators assist with twenty of the tasks.  At all other locations, these tasks are handled only by facility personnel.*

- *Ten of the items on the list are performed only by facility personnel.*

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Incarcerated People's Communications | **)** | WC Docket No. 23-62 |
| Services; Implementation of the Martha | **)** | |
| Wright-Reed Act | **)** | |
| | **)** | WC Docket No. 12-375 |
| | **)** | |
| Rates for Interstate Inmate Calling Services | **)** | |

## REPLY COMMENTS OF SECURUS TECHNOLOGIES, LLC

Joshua P. Martin
Senior Vice President and General Counsel
Securus Technologies, LLC
4000 International Parkway
Carrollton, Texas 75007
(972) 277-0300
joshuamartin@securustechnologies.com

Michael H. Pryor
Shareholder
Brownstein Hyatt Farber Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

*Counsel to Securus Technologies, LLC*

July 12, 2023

# TABLE OF CONTENTS

**Page**

I.  The Act Doses Not Confer Authority to Regulate the "Practices" of Advanced Services ................................................................................................ 2

II.  The Act Does Not Confer Authority to Regulate Voice Mail or VideoGrams ................ 5

III.  The Appropriate Rate Making Methodology ........................................................ 6

    A.  The Public Interest Parties' Proposal to Use a Model Provider Approach Based on Costs (or Rates) of the Entire Telecommunications Industry Is Contrary to the Statutory Scheme and Wholly Unworkable ................................ 7

        1.  The Statutory Context Confirms that Industry Refers to Providers of IPCS ................................................................................................ 7

        2.  Using the Entire Telecommunications Industry Is Unworkable and Contrary to Precedent ................................................................ 8

        3.  The Commission Must Ensure that "All" Providers are Fairly Compensated ............................................................................ 11

    B.  The Model Approach is Unnecessary and Unreasonable ................................ 12

IV.  The Commission's Regulatory Authority Now Covers Previously Unregulated Entities Providing IPCS ................................................................................ 17

V.  State Preemption of Rates and Charges ............................................................ 18

VI.  IPCS Rates Must Include Safety and Security Costs ........................................ 20

    A.  Fundamental Policy Basis for Finding that Safety and Security Features Are Directly Related to IPCS – To Prevent and Detect Criminal Activity – Remains Unchanged .................................................................................. 21

    B.  Safety and Security Features Benefit the Incarcerated ................................ 24

    C.  The Commission Must Ensure Public Safety ............................................ 26

    D.  Safety and Security Developments Have Reduced Cost and Increased Availability of Communications .......................................................... 27

    E.  On This Record, the MWR Act Requires Inclusion of Safety and Security Measures in Rates ........................................................................ 28

VII.  The Commission Should Consider a Workshop to Address Disability Access Concerns .................................................................................................... 30

-1-

**JA916**

## <u>EXECUTIVE SUMMARY</u>

The initial comments in this proceeding reflect substantial agreement that the Martha Wright-Reed Act ("MWR Act" or "Act") confers upon the Federal Communications Commission ("Commission") plenary authority to regulate the rates and charges for intrastate services and video communications and was intended to reverse certain of the findings in the D.C. Circuit's *Global Tel\*Link v. FCC* decision. The record, however, also reflects significant differences in interpretation regarding the scope of the Commission's expanded authority over "advanced services" and the methodology to develop fair, just and reasonable rates.

Securus Technologies, LLC ("Securus") and other commenters agree that the MWR Act confers upon the commission the express authority to utilize the industry-wide averaging methodology it adopted in its 2021 ICS Order. The Commission should reject as unworkable, unnecessary and contrary to Commission precedent proposals to develop Incarcerated People's Communications Services ("IPCS") rates utilizing a hypothetical model provider based on average rates charged by the telecommunications industry. Claims that such an approach is necessary due to deficiencies in the Third Mandatory Data Collection ("3rd MDC") are overblown, as reflected in the attached report by FTI Consulting ("FTI"). As FTI previously concluded in its review of the 3rd MDC data, that data overall is sufficiently complete and credible to underpin the development of permanent rates. The data from the 3rd MDC will be supplemented with a further mandatory data collection.

The Commission should reject requests to regulate the practices of advanced services such as VoIP and video communications. The MWR Act confers authority to regulate charges, not practices, and neither VoIP nor video communications are telecommunications services subject to the Commission's Title II authority. Nor should the Commission regulate non-real time service such as voice mail and Videograms. These are either electronic messaging services

i

**JA917**

that the MWR Act specifically excluded from Commission regulation or constitute information services.

There is universal agreement that the MWR Act confers plenary authority on the Commission to regulate intrastate as well as interstate rates as well as substantial support for the adoption of a unitary rate. In light of the Commission's new authority, and new duty to develop a comprehensive compensation plan for interstate and intrastate IPCS, the Commission should preempt different state rates, whether higher or lower. Should the Commission allow states to set lower rate caps, the Commission should follow its precedent in the pay telephone proceeding and require states to first demonstrate to the Commission that its rates comply with the statutory standard and include a waiver option.

On the basis of this record, the MWR Act compels inclusion of safety and security measures in IPCS rates. The Commission has previously found that safety and security measures are directly related to incarcerated calling services and recoverable in rates. The record provides no reasonable grounds to reverse course. Organizations ranging from the Department of Justice to the United Nations universally recognize that security measures are a necessary component of incarcerated calling services. Such measures benefit the incarcerated, their friends and family, as well as the general public.

Securus looks forward to continuing to work with the Commission as it implements the MWR Act and strikes an appropriate balance that meets the needs of consumers, providers and correctional authorities.

ii

**JA918**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| Rates for Interstate Inmate Calling Services | ) | |

## <u>REPLY COMMENTS OF SECURUS TECHNOLOGIES, LLC</u>

Securus Technologies, LLC, ("Securus") submits these reply comments in response to the Federal Communications Commission's ("Commission") notice of proposed rulemaking in the above-captioned proceedings to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MRA Act" or "Act").[1]  The initial comments in this proceeding reflect substantial agreement that the Act confers upon the Commission plenary authority to regulate the rates and charges for intrastate services and video communications and was intended to reverse certain of the findings in the D.C. Circuit's *Global Tel*Link v. FCC* decision.  The record, however, also reflects significant differences in interpretation regarding the scope of the Commission's expanded authority over "advanced services" and the methodology to develop fair, just and reasonable rates.  Securus' reply comments address these differences.  Securus incorporates by reference its prior filings in WC Docket No. 12-375 into this docket.

---

[1] *In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act,* WC Docket Nos. 23-62, 12-375, Notice of Proposed Rulemaking and Order, FCC 23-19 (rel. March 17, 2023) ("Notice").  The Commission extended the reply comment deadline to July 12, 2023.  *In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act,* WC Docket Nos. 23-62, 12-375, Order, FCC 23-19 (rel. June 1, 2023.)

1

I.       **THE ACT DOES NOT CONFER AUTHORITY TO REGULATE THE "PRACTICES" OF ADVANCED SERVICES**

Some commenters mistakenly contend that by incorporating the MWR Act into section 276, which is contained in Title II of the Communications Act, Congress intended to confer authority to regulate not simply the "rates and charges" of advanced services but to also regulate IPCS providers' "practices" related to such services.  The argument is without merit

Commenters point to the language of section 201(b), which addresses unreasonable charges and practices.  Congress, however, did not incorporate all of section 201(b) into the MWR Act.  Instead, Congress limited the Commission's authority to regulating the "rates and charges" for specified advanced services.[2]  As amended by the Act, section 276 directs the Commission to prescribe regulations to "establish a *compensation plan* to ensure that all payphone service providers are fairly compensated, and all *rates and charges* are just and reasonable."[3]  Regulation of charges is but one aspect of Section 201(b), which requires that "charges, practices, classifications, and regulations for and in connection with" telecommunications services be "just and reasonable."[4]  Congress could have incorporated all of section 201(b) into the MWR Act amendments but it chose not to do so.  Instead, although it expanded the Commission's authority to include intrastate and advanced services, the Act specifically limited that authority to the regulation of "rates and charges."

---

[2] Act § 2(a)(2) (expanding the definition of payphone service to include advanced services defined in section 153(1) of the Communications Act).  The provisions of section 276 that extend regulation beyond compensation are highly specific.  It imposes nondiscrimination obligations, structural safeguards, and negotiation rights on Bell operating companies, *see* 276(a), 276(b)(1)(C) & (D).  Other provisions are limited to public payphones, 276(b)(2), or specified negotiations rights, 276(b)(1)(E).  Nothing in these subsections suggest that the Commission has broad authority to regulate the practices of non-Bell providers of the advanced communications services incorporated into Section 276.

[3] Section 276 as amended by section 2 of the Act (emphasis added).  Clearly, in context, a compensation plan refers to the payment of money to IPCS providers for the service rendered.

[4] 47 U.S.C. § 201(b).

Well recognized principles of statutory construction teach that the exclusion of statutory language from one provision of a statute that is included in another creates a presumption that Congress intentionally meant to exclude such language.[5] Here, it must be presumed that by expressly excluding any reference to "practices, classifications and regulations," Congress intended to preclude the Commission from exercising this regulatory authority over the advanced services added by the Act.

Nor are the advanced services that the MWR Act added to section 276 subject to general Title II regulation.[6] The Commission has not determined that VoIP or video communications are telecommunications services. Contrary to some claims, the placement of advanced services in section 276 for the specific purpose of regulating their charges when provided in carceral settings does not empower the Commission to impose on them the full weight of Title II regulation.[7] Title II is replete with specific obligations related to information services or providers of information services, yet the Commission recognizes that information services and their

---

[5] *Hamden v. Rumsfeld,* 548 U.S. 557, 578 (2006) ("[A] negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.); *Russello v. United States,* 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion' "). As noted by the Public Interest Parties, "Congress was aware of the Section 201(b) standard" but it chose to incorporate only one aspect of it to the regulation of advanced services. Public Interest Parties Comments at 9.

[6] The Raher Comments incorrectly contend that the Commission has previously classified "IPCS" as common carrier services. Raher Comments at 8 (citing 2013 ICS Order, 28 FCC Rcd at 14114, para. 13). The 2013 ICS Order reaffirmed prior holdings relating to the provision of operator-assisted calls from correctional institutions by traditional common carriers such as MCI and AT&T. *Id.* (citing *Billed Party Preference for Interlata 0+ Calls*, Second Report and Order and Order on Reconsideration, 13 FCC Rcd 6122, 6156 (1998)). IPCS, by contrast, refers to the broader range of services such as VoIP or video communications services that the Commission has never classified as common carrier services. Moreover, courts have found that a provider may be considered a common carrier with respect to its offering of telecommunications services but not with respect to its offerings of non-telecommunications services. *NARUC v. FCC,* 533 F.2d 601, 608 (D.C. Cir. 1976). It is thus not correct to claim that the Commission has classified "IPCS" as common carrier services.

[7] *See* Raher Comments at 4.

providers are not subject to its broad Title II authority.  For example, section 230 of the Communications Act imposes certain obligations on providers of "interactive computer services" yet no one claims that such providers must as a result be treated as common carriers or that interactive services are telecommunications services.[8]  Section 231 bars persons from knowingly distributing commercial information over the World Wide Web that is harmful to minors, yet persons distributing content across the internet are not deemed common carriers. Sections 273 to 274 placed certain restrictions on Bell Operating Companies from offering manufacturing, publishing or alarm monitoring services yet those services were not thereby converted into telecommunications services. The placement of highly specific regulatory obligations on non-telecommunications services within Title II is not an indication that Congress intended for the full weight of Title II regulation to fall on such services.

Should the Commission nevertheless determine it has authority to regulate practices of advanced services, the Commission's regulations will preempt state regulation of practices of these services.  Commenters, including advocacy organizations, agree that the Commission has plenary authority over intrastate services and, just as with the adoption of rates and charges, state regulation is expressly preempted.[9]  If the Commission's plenary authority to set interstate and intrastate rates implies power to adopt practices regarding the implementation of the Commission's rate requirements, then state regulation of such practices must yield.

---

[8] *See* 47 U.S.C. § 230(d) (requiring providers of interactive computer services to alert users of the availability of parental controls)
[9] *See, e.g.,* Public Interest Parties Comments at 15-16 (arguing that the impossibility doctrine requires preemption of state regulation of practices); UCC/PK Comments at 18-20 (Congress expressly preempted state and local law).

4

**JA922**

## II.    <u>THE ACT DOES NOT CONFER AUTHORITY TO REGULATE VOICE MAIL OR VIDEOGRAMS</u>

Some commenters argue that the Act confers authority for the Commission to regulate the rates for voicemail or Videograms sent to incarcerated persons by friends and family or others.[10]  They assert that these one-way, non-real-time services constitute an advanced service pursuant to the definition in section 3(1)(E) of the Act.  As set forth below, the Act does not extend to these services.

As part of its eMessaging suite of services, Securus allows friends and family to send texts as well as photos or a short, 30-second VideoGram.[11]  These services fall within the definition of electronic messaging services that the Commission appropriately recognizes are excluded from the Act's revised definition of "payphone service."[12]  As the Commission has found, electronic messaging services include texts as well as photos or videos that can be sent using wireless messaging technology.[13]  Videograms are thus a form of electronic messaging services that Congress specifically excluded from the revised definition of payphone service.  Congress having expressly excluded electronic messaging services from the scope of the Act, the Commission is without authority to rate regulate Videograms.

Securus also provides in-bound voicemail by which friends and family may leave a voice mail message for the incarcerated person.[14]  The Commission treats voicemail as an information

---

[10] See Opening Comments of Stephen Raher at 9-11; Worth Rises Comments, section V,B. (the comments are no paginated).

[11] Securus eMessaging, Securus eMessaging® - Securus Technologies (last visited July 12, 2023)

[12] Notice at para. 29.

[13] Notice at n. 83 (citing *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Services*, WT Docket No. 08-7, Declaratory Ruling, 33 FCC Rcd 12075 (2018)).

[14] Securus also used to offer outbound voice service by which an incarcerated person could leave a voice message to someone outside the facility, but it discontinued the service due to its high cost.  *See* Securus Outbound Voicemail™ - Securus Technologies ("A number of consumers expressed reservations about the Outbound Voicemail service, prompting a review of the service," Mr. Abel said. "When we found that the cost of third-party fees made it impossible to reach a price point that was accessible and affordable,

service due to its store and retrieve functionality.[15]  It is by definition then not a common carrier or telecommunications service.  Nor is one-way, inbound voicemail an audio or video communications service as defined in section 3(1)(E).  To fall within 3(1)(E), incarcerated people must use the service "for the purpose of communicating with individuals" outside of the institution.  Inbound voicemail is not and cannot be used by an incarcerated person to communicate with a remote party.  The incarcerated person may listen to the message, but he or she cannot use it to communicate with someone outside the facility.  In-bound only voicemail is thus not an audio service encompassed by section 3(1)(E).

### III.  THE APPROPRIATE RATE MAKING METHODOLOGY

In response to the D.C. Circuit's decision in *GTL v. FCC*, which held that the per call obligation in section 276 precluded industry average costing methodologies, the MWR Act expressly authorizes the Commission to use "industry-wide average costs of telephone service and advanced communications services and the average costs of a communications service provider."  A number of commenters agree with Securus' initial comments that this provision enables the Commission to utilize the methodology it adopted in the 2021 ICS Order.[16]  The Public Interest Parties, on the other hand, propose a wholly unworkable new scheme predicated on developing a cost model based on the average costs of the entire telecommunications industry.  The Commission has previously rejected the Wright Petitioners' efforts to base IPCS rates on the rates or costs of other, unrelated, segments of the industry and it should do so again.

---

we took those concerns to heart and chose to discontinue the service accordingly.") (quoting Dave Abel, Securus CEO).
[15] *See e.g., Implementation of Sections 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996; Access to Telecommunications Service, Telecommunications Equipment and Customer Premises Equipment by Persons with Disabilities*, WT Docket No. 96-198, Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd 6417, 6457, para. 97 (1999).
[16] See PayTel Comments at 3-4; Global Tel*Link Comments at 4-5; NCIC Comments at 9-10.

6

**JA924**

**A.    The Public Interest Parties' Proposal to Use a Model Provider Approach Based on Costs (or Rates) of the Entire Telecommunications Industry Is Contrary to the Statutory Scheme and Wholly Unworkable**

The Public Interest Parties claim that the term "industry" in "industry-wide average costs" should include "the entire telecommunications industry."[17]  The Public Interest Parties' interpretation is contextually inconsistent and wildly unworkable.

**1.    The Statutory Context Confirms that Industry Refers to Providers of IPCS**

The meaning of the term "industry-wide" must be defined within the statutory context in which it is used.[18]  The provision authorizing industry-wide average costs lies within a section of the Communications Act addressing the "Provision of Payphone Service" and then more particularly in context of an amendment dealing solely with provision of payphone service in carceral facilities.  At its broadest, industry could mean the payphone industry, both commercial and for the incarcerated.  The commercial payphone industry, however, is effectively non-existent and thus would provide little data for comparison purposes.  Hence, the most reasonable interpretation of "industry" in the context of the MWR Act is the group of companies that provide "telephone and advanced communications services" to correctional institutions for use by incarcerated people.

The phrase "telephone and advanced communications services" following "industry-wide" further confirms that the term "industry" means collectively the providers of IPCS.  The definition of payphone service, as amended by the Act, consists of "inmate *telephone* service" and "advanced communications services" dovetailing perfectly with the language in the industry

---

[17] Public Interest Comments at 16-19.
[18] *See Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 702 (1995) ("A word 'gathers meaning from the words around it.'")(quoting *Jarecki v. G D Searle & Co.* 367 U.S. 303, 307 (1961)).

7

averaging provision. The definition of payphone services provides further context for defining the appropriate industry whose cost may be assessed.

The Public Interest Parties nonetheless claim that the statutory context supports their interpretation that industry-wide means the entire telecommunications industry. The claim reflects a misreading of the statute and the D.C. Circuit's *GTL v. FCC* opinion. They argue that the Act is intended to overturn the D.C. Circuit's decision in *GTL v. FCC* that section 276 bars use of industry-wide averages. The court, however, did not bar use of industry-wide averages because the Commission limited it's assessment of costs to the IPCS industry. The court rejected the industry average cost approach because it violated the requirement that providers be fairly compensated for each and every call, not that the industry reviewed was limited to IPCS providers.[19] Nothing in *GTL* nor the MWR Act bars the Commission from developing rate caps based on the average costs of providers in the IPCS industry now that the each and every call requirement has been eliminated.[20]

### 2. Using the Entire Telecommunications Industry Is Unworkable and Contrary to Precedent

The Public Interest Parties proposal to utilize the average costs of the entire telecommunications industry is unworkable and has previously been rejected. In addition to being inconsistent with the statutory context, the proposal to use commercial telecommunications

---

[19] *GTL v. FCC*, 866 F.3d at 414 (using average costs "makes *calls* with above-average costs . . . unprofitable" and "does not fulfill the mandate of Section 276 that 'each and every' inter- and intrastate call be fairly compensated."). (Emphasis added*)*.

[20] The Commission also sought comment on the Act's authority to assess the average costs of service "of a communications service provider."). Notice at para. 50. As this provision is juxtaposed with the authority to use industry-wide average costs, which as explained above is most reasonably interpreted to mean the IPCS industry, the provision authorizes the Commission to review the average costs of individual IPCS providers. Hence the use of the singular "a" communications service provider. The implication of this language, coupled with the requirement that "all" IPCS providers be fairly compensated, is to enable the Commission to assess the ability of any specific IPCS provider to recover its average costs of service in light of rate caps established based on industry-wide averages.

8

services as a starting point is misplaced because the provision of communications services in correctional institutions bears little resemblance to commercially provided telecommunications and advanced services.  The Commission has long recognized this fact, particularly in light of the various security-related measures required to provide communications services in carceral settings.[21]  For this reason, the Commission previously rejected a similar approach proposed by the Wright Petitioners to develop incarcerated calling services ("ICS") rates by analyzing rates for commercial prepaid calling cards and then adding further costs necessary to provide ICS.[22]

The differences between providing IPCS and commercial services extend beyond safety and security costs.  Larger providers enjoy massive economies of scale, scope and density well beyond anything provided by IPCS providers.  Whereas IPCS providers must connect isolated facilities, the major facilities-based providers cover large contiguous areas that enable them to deploy networks efficiently.  The largest of these providers have substantial economies of scale that allows them to spread costs across millions of users.[23]  They also bundle different services over a single platform that allows them to assess minimal charges for voice services while recovering costs from the provision of data services.  At the other end of the scale, the smaller VoIP providers that serve enterprises typically do not deploy facilities, often do not lease last mile connections, do not incur the cost of installing or maintaining customer premises equipment, and are not required to operationalize discrete specific call blocking schemes.

---

[21] *See, e.g., Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-128, Order on Remand & Notice of Proposed Rulemaking, 17 FCC Rcd 3248, 3252, para. 9 (2002 ICS Order) (finding that, largely for security reasons, ICS is "quite different" from public payphone service.)

[22] 2013 ICS Order, 28 FCC Rcd at 14145, para 67 ("We do not find on the basis of this record that using commercial prepaid calling card rates is a reasonable starting point for calculating ICS calling rates given the significant differences between the two services, most notably, security requirements.").

[23] NCIC Comments at 13 (noting that Verizon, T-Mobile, and AT&T combined have more 350 million subscribers).

Apart from the dissimilarity of commercial services and IPCS, the Public Interest Parties recognize that the Commission has no information on the costs incurred by the universe of telecommunications providers, which totals in the thousands. The Public Interest Parties do not propose that the Commission require all telecommunications service providers to submit cost data. The Public Interest Parties, therefore, do not actually rely on cost information for comparison but instead turn to a small sampling of publicly available information on commercial VoIP provider *rate*s.[24] The Commission has rejected this approach as well, finding that data on commercial rates and data on ICS provider costs are not necessarily related.[25]

The Public Interest Parties propose using the end user rates of commercial providers of VoIP services purportedly charged to various size businesses as an example of services similar to IPCS which could serve as a starting point for calculating IPCS provider costs.[26] The Brattle Group report lists a number of VoIP provider rates that purport to be in the range of approximately $0.01 per minute.[27] Brattle makes no effort however to explain how this list of VoIP providers, many of which simply provide software to enable free calling, remotely compares to the provision of IPCS.[28] Even if one excludes safety and security costs, for VoIP provider end user rates to be even remotely comparable to costs of providing IPCS, the VoIP providers must: (1) incur the cost of installing inside wire and Wi-Fi within the enterprise it is

---

[24] See Brattle Report, II-4 n. 10 and Appendix B, VoIP Rates. Although recommending the Commission "could potentially calculate the [ICS] voice calling rates based on publicly available data on *cost* of VoIP calls for small, medium and large enterprises," the Brattle Report actually relies on end user prices. *Id.* at n. 10 ("Note that these are prices/rates and not costs.")

[25] 2013 ICS Order, 28 FCC Rcd at 14144-45, para. 67. ("Further, [Wright] Petitioners' proposed methodology relies on combining prepaid calling card rates with ICS providers' costs. Because the two sets of data are not necessarily related, it would be difficult for us to adopt this methodology as the basis for our rates without further explanation.")

[26] Brattle Report at II-4.

[27] Brattle Report at App. B (listing a number of VoIP providers).

[28] *See, e.g., VoIPRaider,* VoipRaider; *VoIPDiscount,* Easy option to save on your monthly calling charges right away. (voipdiscount.com).

10

**JA928**

serving (which VoIP providers almost never do); (2) incur the costs of providing, installing and maintaining customer premises equipment, which most commercial VoIP providers do not do, let alone providing the specialized, hardened devices required to provide IPCS service; (3) incur the cost of leasing last mile connections (many VoIP providers serving enterprises require the customer "bring their own broadband" by paying a broadband provider for the last mile broadband connection); (4) incur the cost of enabling a number of specific requirements, such as integrating with jail management systems, and enabling only very specific calls to preselected and preapproved numbers; (5) incur the costs of terminating international calls; (6) incur the costs of on-site maintenance personnel; (7) incur the costs of training its customers' employees; (8) incur the costs of enabling a number of different payment arrangements; and (9) incur the costs of detailed reporting. This list does not even include safety and security costs such as monitoring, recording and storage. By the time all of these costs are "added back," the Commission may as well have started with IPCS costs in the first instance.

### 3.    The Commission Must Ensure that "All" Providers are Fairly Compensated

The Public Interest Parties argue that the Commission need not concern itself with ensuring that every IPCS provider recovers its costs, including a reasonable return on investment.[29] This claim ignores the plain language of the statute. Although "fair compensation" may no longer be required for each and every call, the MWR Act does require that each IPCS provider be fairly compensated for completed communications. The Commission's compensation plan must "ensure that *all* payphone service providers are fairly compensated."[30] The statute does not say some, and it does not say "well-run and prudent"[31]

---

[29] Public Interest Parties Comments at 12.
[30] Section 276(b)(1)(A), as amended (emphasis added).
[31] Public Interest Parties Comments at 12.

11

providers, it says "all." Moreover, while the Act authorizes the use of industry-wide average costs, the Act also conjunctively authorizes the Commission to assess the "average *costs of service* of a communications service provider."[32] Utilization of the specific phrase "costs of service" indicates Congress intended to ensure that a provider be able to recover the costs it incurs in providing the service plus a reasonable rate of return. Thus the Public Interest Parties' claim that the Commission need not concern itself with ensuring that all providers are "profitable"[33] must be tempered by the requirement that the each provider receive fair compensation.

Nor would use of provider-specific average costs dictate that the Commission must develop provider-specific rate caps, the consequence suggested by the Public Interest Parties.[34] The most reasonable reading of the statutory provision authorizing use of both IPCS industry wide and IPCS company specific average costs is that the Commission should not rely on a simple mean that would result in half of the IPCS providers' average costs being unrecoverable. Instead, the language is a strong signal from Congress to employ a mechanism such as standard deviations, as the Commission has previously done, or interquartile ranges as Securus has proposed, to enable the largest number of providers to recover their average costs of service, consistent with the obligation to ensure fair compensation and just and reasonable rates.

### B.    The Model Approach is Unnecessary and Unreasonable

Rather than assessing the historical cost data the industry has spent substantial resources compiling and presenting to the Commission, the Public Interest Parties propose identifying the costs of a "model hypothetical well-run provider," whose costs would be based in large part on

---

[32] Act section 3(b)(1) (emphasis added). That section allows use of industry-wide average "and" average costs of a provider.
[33] Public Interest Parties Comments at 12.
[34] *Id.* at 18.

costs of non-IPCS telecommunications providers.[35]  The Public Interest Parties' rationale for such an approach is that the cost data submitted in response to the Third Mandatory Data collection is unreliable and likely inflated.[36]  Use of a model provider would, they argue, result in rates that reflect the "value of the services as they would be priced in a competitive market."  The Public Interest Parties, however, never explain what they mean by "value" and how "value" relates to the fundamental requirement of any rate making, which is to ensure that providers can recover their reasonable costs so as to remain viable and attract capital.

The infirmities of utilizing costs (or rates) from non-IPCS telecommunications providers as inputs for a model IPCS provider have been explained above.  Another major infirmity of the proposal relates to the proposed use of IPCS provider costs.  The Brattle Report states that the Commission "can choose the lowest or average percentage of a particular cost as a share of operating or total expenses (after controlling for facility attributes) and use that as a model carrier cost percentage."  This approach unreasonably assumes that only the provider that allocated the lowest amount of its direct and common costs to a particular cost category reflects an accurate cost allocation for the industry.  There is no reason to assume that the carrier that happens to have allocated the least to a particular cost category is an appropriate benchmark for all other providers' allocation of costs to that particular category.  Such an approach likely would result in no provider recovering its actual costs.

Apart from the infirmities of the model approach, the Public Interest Parties' claim that such an approach is justified in light of deficiencies in the reported cost data is unwarranted.  They claim that there is significant variation in costs across facilities, even when the facilities

---

[35] Public Interest Parties Comments at 12.
[36] *Id.* at 20-21.  The Commission is likely to supplement or supplant the 3rd MDC data with the data it intends to collect in its proposed 2023 mandatory data collection.

seem generally comparable in terms of size; that some contracts include end user rates that are higher than the reported costs; and that reported costs "include costs that either should not be included because they are not related to providing IPCS or may be greater than they would be if they were provided in a competitive market."[37]  They claim to observe a large variety of rates both at a state-wide average level and for individual facilities within the state.

The Brattle Report's critique does not withstand scrutiny.  As reflected in the detailed analysis submitted by Securus' consultants, FTI Consulting, Inc. ("FTI"), in 2022, the 3rd MDC cost data overall is sufficiently credible to underpin the development of rates.[38]  The Brattle Report does not address FTI's analysis.  Since that analysis, providers have submitted updated cost data in response to staff inquiries.  To the extent that there is some cost data that appears unreasonable, the solution, as reflected in the FTI analysis, is to exclude such data, not to dismiss the entire data collection as unreliable.

The Public Interest Parties and the Brattle Report contain little information on how they derive their conclusions.  They claim, for example, that reported costs submitted in the Facility Specific Information tab in the 3rd MDC "appear untethered to underlying economic drivers such as facility size, type or location."[39]  Their methodology, however, is unclear.  They state that they derive costs per minute (CPM) at the facility level by "aggregate[ing] the Total Capital Expenses and the Total Operating Expenses and divid[ing] by the sum of total billed minutes for interstate communication and intrastate communication."[40]  They then perform "calculations for total cost per minute using the reported costs in the Third MDC" resulting in the "untethered" findings.  As

---

[37] Brattle Report II-4.  The criticisms in part simply reflect the Wright Petitioners policy preference, such as excluding safety and security costs.
[38]  Comments of Securus Technologies, WC Docket No. 12-375 (filed Dec. 15, 2022) (Securus 6th FNPRM Comments) attaching the Declaration of Charlie J. Choe et al. (FTI 2022 Report).
[39] Brattle Report III-7, para. 15.
[40] *Id.*

14

**JA932**

noted in the attached report by FTI, the Brattle Report fails to explain their methodology, appears to conflate contract-level data with facility-level data, and includes data for a few providers that FTI has noted is questionable.[41]  FTI concluded that "[w]ithout any documentation of how the Brattle Group handled outliers, questionable data, and potential mismatches, it is difficult to not only replicate their results but also to trust their conclusions."[42]

It is important to note that despite their claim that costs are untethered to cost drivers, the Brattle Report repeatedly states that the data shows an inverse relationship between costs per minute and facility size, which undercuts their assertion that the cost data is untethered to cost drivers such as facility size.  In other words, large facilities show lower costs per minute; exactly what you would expect in an industry that offers some economies of scale.[43]  FTI's previous detailed analysis of the 3rd MDC cost data showed strong correlations between cost drivers such as facility type and size.[44]  In its 2022 Report, FTI's analysis found relatively large $R^2$ values between ADP, minutes, revenue and the various subcategories of operating expenditures.[45]  The FTI 2022 Report also found strong linear associations between ADP and total cost for each of the providers whose data was sufficiently complete and consistent for purposes of analysis.[46]  These strong relationships between overall costs with ADP, provider, facility size, and facility type also translate to CPM as well, with these factors being significantly predictive of CPM.[47] Based on FTI's assessment and in light of its previous findings, FTI concludes that the Brattle Report

---

[41] Attached FTI Report at 2.
[42] *Id.*.
[43] *See, e.g.,* Brattle Report at III-7, para. 16; III-8, para. 18 ("we observe a negative relationship between ADP and CPM . . . larger facilities tend to report lower CPM.").
[44] Attached FTI Report at 2.
[45] FTI 2022 Report at page 14.
[46] FTI 2022 Report page 16
[47] *See* Attached FTI Report at 2.

"appears to exaggerate the degree of variability and that once facilities are grouped based on facility type, size and associative provider, the degree of variation decreases dramatically."[48]

The Brattle Report also purports to show that costs and rates are not correlated with each other. Those claims, however, are based on select subsets of facilities. Specific variations between subsets of contracts may be due to a number of factors, such as extent of site commissions, specific requirements of the facility, and scope of services. The Brattle Report incorrectly concludes that variation must be the result of misstated or inflated costs. Moreover, these variations can be accommodated through industry-wide cost averaging, particularly when appropriately tiered.

Finally, the Brattle Report questions the veracity of cost data for contracts or facilities where ICS costs exceed ICS revenues. The Brattle Report suggests that this is evidence that costs may be inflated either by including non-ICS costs or misallocating costs. FTI notes, however, that the Brattle Report fails to consider other reasons why reported ICS costs for a particular facility may exceed reported ICS revenues.[49] For example, cost allocations tend to produce more reliable results across entire datasets than for individual facilities whose costs may reflect differing requirements set by the correctional authority. Moreover, for multi-facility contracts, providers may rely on the overall costs and revenues for all facilities regardless of the particular cost and revenue ratio at any particular facility. Another factor may be that ultra-low state rate caps are constraining ICS revenue to the point that not all ICS costs can be recovered. The issue is thus one of revenue generation, not inflating costs. This conclusion is substantiated by the figures in the attached FTI Report showing that whereas costs-per-minute are distributed

---

[48] *Id.*
[49] *Id.* at 3.

across profitable and unprofitable contracts, the latter are associated with low revenue contracts.[50]

Some variation of data is to be expected when companies are called upon to allocate costs in ways wholly unrelated to the method by which companies track their costs. As has been repeatedly noted, IPCS providers are not subject to cost accounting rules. After-the-fact allocations will lack some degree of precision, but that does not mean that the painstakingly prepared costs submissions should be ignored. Rather, the Commission can utilize standard statistical techniques, as it has done in the past, to identify and exclude outliers and utilize remaining credible data to derive cost-based rates.

### IV.   THE COMMISSION'S REGULATORY AUTHORITY NOW COVERS PREVIOUSLY UNREGULATED ENTITIES PROVIDING IPCS

Some commenters note that certain entities that have been providing unregulated services (or services they interpreted as unregulated) may now be subject to the Commission's expanded authority.[51] To the extent these providers offer advanced services in carceral settings would now be subject to the Commission's authority to regulate rates and charges, these providers should be subject to the same rates caps as traditional ICS providers and to submit cost data. This will help ensure a level competitive playing field.

One segment of the communications industry serving incarcerated individuals that may now fall within the Commission's jurisdiction to regulate rates and charges are providers of interoperable video conferencing services, one of the advanced services adopted in the CVAA and imported into the MWR Act. In its initial comments, Securus noted that the Commission

---

[50] *Id.* at 3-5.
[51] *See, e.g.,* NCIC Comments at 7 (identifying commissary providers that offer non-interconnected VoIP in-facility video visitation services); PayTel Comments at 5-6 (noting some providers have been offering "non-interconnected VoIP" services and have deemed themselves exempt from regulation).

had not defined "interoperable" making it difficult to assess the implications of importing this advanced service into the MWR Act.  The Commission, in the context of seeking to ensure that interoperable video conferencing services provided by entities such as Zoom, Microsoft Teams, and WebEx are accessible, recently adopted an order concluding that it need not separately define interoperable and that the statutory definition is sufficient.[52]  Providers that fall within the statutory definition and provide the service to carceral facilities will now be subject to the Commission's regulation and should be required to submit cost data if the service is deemed to be IPCS.

## V.    STATE PREEMPTION OF RATES AND CHARGES

Consistent with Securus' initial comments, there is broad consensus that the Commission should set the same rate caps for interstate and intrastate services.  These unitary rate caps would reflect the Commission's determination of rate levels that would be just and reasonable and fairly compensate providers.  Despite vociferously claiming that the Commission must preempt higher state rates, state commenters and advocates nevertheless claim that states should be free to set lower rate caps ostensibly because states are in a better position to know what is reasonable in their states.  The California Public Utility Commission, for example, touts its $0.07 per minute rate cap for ICS for all correctional facilities in California, from the smallest rural jail to its giant state prison system.[53]

---

[52] *Access to Video Conferencing*, CG Docket No. 23-161, Report and Order, Notice of Proposed Rulemaking, and Order, FCC 23-50 (June 12, 2023) (adopting the statutory definition of the service as "a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing.").
[53] Comments of the California Public Utilities Commission and the People of the State of California on the Federal Communications Commission Notice of Proposed Rulemaking and Order, WC Docket Nos. 23-62, 12-375 (May 8, 2023) at 5-6 (CPUC Comments).

The CPUC's determination points to the potential hazards of giving states unfettered discretion to cap state-wide rates.  The CPUC made no effort to determine the *costs* of providing service in its state, instead justifying its rate cap based on a hodge-podge of *rates* in other states, regardless of the type of facility to which those rates applied or whether site commissions were included.  The state rejected a waiver process by which providers could show that their reasonable costs exceeded the cap.[54]  The CPUC in fact engaged in a form of reverse preemption by barring IPCS providers from assessing ancillary service fees on "jurisdictionally mixed" services that by definition include interstate services.[55]  Granting states the right to set lower caps may invite further reverse preemption.  The CPUC argues that the Commission should set a unitary interstate and intrastate rate (and we agree).  If, however, the CPUC determines to set a lower cap for "intrastate service" while advocating for a unitary rate, the state presumably will apply its lower cap to both interstate and intrastate services.  The MWR Act grants plenary authority over interstate and intrastate IPCS rates to the Commission, not the states.

The cost data submitted by Securus in response to the 3rd MDC shows that, in fact, Securus' ICS costs in many of its California facilities exceed the state's rate cap.  FTI analyzed the 3rd MDC cost data submitted by Securus specifically for the facilities it serves in California and found that for each of three reported years, the vast majority of Securus' California facilities' costs exceeded the CPUC's $0.07 interim rate.  Specifically, the costs per minute at 45 out of 52

---

[54] CPUC, Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services, D 21-08-037, Aug. 21 2021 at 59  (CPUC Interim Rate Order) available at https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M401/K375/401375687.PDF  The CPUC stated that a waiver process would delay implementing interim rates and impede the delivery of immediate relief to consumers, and the CPUC would consider implementing a waiver process later in the proceeding.  *Id.* The interim rate order was issued nearly two years ago and the CPUC's proceeding to establish permanent rates is presently stalled with no further progress towards setting permanent rates or providing a waiver process.
[55] CPUC Interim Rate Order at 72.

California facilities costs exceeded the interim rate cap in 2019. The numbers are 40 out of 52 for 2020 and 38 out of 51 for 2021.[56]

Should the Commission nevertheless decide not to preempt lower state rates, it should adopt a mechanism similar that described in the First Payphone Order. There, the Commission preempted lower state coin-paid rates for commercial payphones but allowed states to make a showing to the Commission that lower rates were cost-justified.[57] The Commission similarly should preempt lower state rates unless they can make a showing to the Commission that IPCS costs in the state justify a lower rate and that the lower rate satisfies the statutory standard that providers are fairly compensated and that rates and charges are just and reasonable. To protect providers from overly aggressive state actions, the Commission should make clear that, under this process, a proposed lower state rate cap would not take effect until the Commission first finds that the state had met its burden of demonstrating that the lower rate complies with the statutory standard. Moreover, states should be required to adopt a waiver process.

## VI.    IPCS RATES MUST INCLUDE SAFETY AND SECURITY COSTS

Securus' initial comments demonstrated that the Commission has consistently found safety and security measures integral to the provision of IPCS and, accordingly, that their costs must be included in IPCS rates.[58] Having consistently found that security features are "directly related to the provision of ICS,"[59] and that they are appropriately included in rates IPCS

---

[56] Attached FTI Report at 5.

[57] *The Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Report and Order, 11 FCC Rcd 20,541, 20572 at para. 61 (1996) (creating exception to state preemption "for states that are able to *demonstrate to the Commission* that there are market failures within the state that would not allow market based rates" by for example, providing a detailed summary of a state proceeding that "examines the cost of providing payphone service" and "the reasons why the public interest is served by having the state set rates within that market.") (emphasis added).

[58] Securus Comments at 35-37. *See also* Global Tel*Link Comments at 12-13.

[59] 2013 ICS Order, 28 FCC Rcd at 14134, para. 53.

providers charge consumers,[60] the Commission must show that there are good reasons for the blatant policy reversal that removal of security costs from rates would entail.[61]  Moreover, in light of the serious reliance on this source of funding that has built up over the years of consistently finding that safety and security features are inherent in IPCS and constitute allowable costs, the Commission must provide a reasoned explanation for disregarding the facts and circumstances that underlay or were engendered by that policy.[62]

### A. Fundamental Policy Basis for Finding that Safety and Security Features Are Directly Related to IPCS – To Prevent and Detect Criminal Activity – Remains Unchanged

The policy basis for finding that safety and security features are inherent in providing communications services to the incarcerated is irrefutable evidence that ineffectively monitored communications were and are being used to commit crimes.  This fundamental fact underlays not just the Commission's long-standing policy of including the costs of safety and security features in IPCS rates, but is universally recognized by Congress, law enforcement,[63] governmental agencies as varied as the Department of Justice Office of Inspector General,[64] the National

---

[60] *Id.* at 14138, para. 58 ("we include costs associated with security features in the compensable costs recoverable in ICS rates."); 2015 ICS Order 30 FCC Rcd 12763, 12787, para. 48 ("[W]e find that the following rate caps will ensure that ICS rates are just, reasonable, and fair for inmates, their families and loved ones, as well as the ICS providers, *and will incorporate the costs associated with the necessary security protocols.*").(Emphasis added)

[61] *FCC v. Fox Television Stations, Inc.* 566 U.S. 502, 515-16 (2009).

[62] *Id.*

[63] *See,* Comments of the National Sheriffs' Association, May 8, 2023, at 10-11.

[64]  U.S. Dep't of Just., Office Of The Inspector Gen., Criminal Calls: A Review Of The Bureau Of Prisons' Management Of Inmate Telephone Privileges (1999) (Bromwich Report), available at https://oig.justice.gov/sites/default/files/legacy/special/9908/index.htm (last visited May 23, 2023). ("[I]nmate abuse of prison telephones appears to be widespread").

Institute of Justice,[65] the Bureau of Prisons,[66] and the United Nations,[67] and private non-profit

organizations.[68]

The U.S. Department of Justice Office of Inspector General ("OIG") report is particularly

instructive.  It "found that a significant number of federal inmates use prison telephones to

commit serious crimes while incarcerated – including murder, drug trafficking, and fraud."[69]  At

the time of that report, technologically advanced monitoring had not been widely deployed and

the methods then used were "virtually useless in preventing inmates from committing crimes

---

[65] At the time DOJ's OIG wrote that report in 1999, some facilities were already using more sophisticated safety and security measures that would address the issues that the report identified.  Other sources identified these efforts and noted their effectiveness.  For example, in 2003, the National Institute of Justice was "examining the use of automated telephone abuse monitoring systems with voice recognition and other checks to help prevent illegal activities through phone calls in correctional facilities." Hart, *Making Prisons Safer Through Technology*, Corrections Today, April 2003.

[66] The Bureau of Prisons (BOP) policy has also formally recognized the need for safety and security measures for IPCS.  Its binding federal regulations require that "limitations and conditions may be imposed upon an inmate's telephone privileges to ensure that these are consistent with other aspects of the Bureau's correctional management responsibilities," and that inmate telephone use is subject to those limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public. 28 C.F.R. § 540.100.  The BOPs regulations *require* that wardens "establish procedures that enable monitoring of telephone conversations on any telephone located within the institution . . . to preserve the security and orderly management of the institution and to protect the public." 28 C.F.R. § 540.102.

[67] United Nations Office on Drugs and Crime, Handbook on Dynamic Security and Prison Intelligence, at 21 (2015).  Available at  https://www.unodc.org/documents/justice-and-prison-reform/UNODC_Handbook_on_Dynamic_Security_and_Prison_Intelligence.pdf. ("The prison administration's duty to encourage communication with the outside world must be balanced against the risks that may be associated with the ability of prisoners to communicate with those outside.  Communication must be managed to prevent crime, inhibit the trafficking of unauthorized items, ensure the protection of the public from unwanted communications, and prevent escapes.")

[68]  Countering Threats to Correctional Institution Security: Identifying Innovation Needs to Address Current and Emerging Concerns, Priority Criminal Justice Needs Institute, 2019,  https://www.rand.org/pubs/research_reports/RR2933.html.  The Institute is a joint project of the RAND Corporation, the Police Executive Research Forum, RTI International, and the University of Denver. That report summarized findings from a workshop of nineteen experts involved with prison security, including representatives from several state departments of corrections, the Federal Bureau of Prisons, the U.S. Department of Homeland Security, and the FCC's Chief Engineer, Ronald Repasi.  The report catalogued first, that 80% of the participants assigned a "high rank" to the security threat posed by "unmonitored communications and unauthorized use of technology. *Id.* at 4.

[69] OIG Report, Executive Summary.

using the telephones."[70]  As a result, the OIG advised that "inmate calling must be reduced."[71]  From the perspective of the OIG, the remedy for limited security was limited prison calling – an outcome that would have reduced the many benefits that derive from communications between incarcerated persons and their families.

The Wright Petitioners, at one time, also recognized the direct relationship between enabling communications and the need to ensure safety and security.  In their initial 2003 Petition for Rulemaking, the Wright Petitioners defended their rate proposal as meeting "all legitimate security, anti-fraud and other penological goals."[72]  The safety and security features to be included in call rates as endorsed by the Wright Petitioners included number control (e.g., call blocking), personal allowed number ("PAN") lists, individual phone and phone group definitions (to allow facilities to control calling "in any manner they chose"), voice prompts, personal identification numbers ("PIN"), monitoring, recording and playback, reporting, and calling as a commodity (i.e., "rules to make calling reasonably unattractive as a commodity" so that it "is not subject to coercion or extortion among prisoners").[73]

There has been no change in the underlying concerns animating the Commission's determination that the unsecured communications foster criminal activity.  To the contrary, that the use of unmonitored communications from prisons and jails foster criminal activities lies at the heart of Congress' and the Commission's substantial efforts to prevent use of contraband cell phones.  In 2010, Congress enacted the Cell Phone Contraband Act of 2010[74] to classify wireless devices as "prohibited objects" within federal prisons.  Federal law makes the possession of cell

---

[70] *Id.*
[71] OIG Report, Chapter 7 (Analysis).
[72] Affidavit of Douglas A. Dawson, Attachment A to Martha Wright, et al., Petition for Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending Rulemaking (Oct. 31, 2003), ¶ 75.
[73] *Id.*, ¶¶19-29.
[74] Pub. L. No. 111-225, 124 Stat. 2387 (2010) (codified at 18 USC § 1791).

phones by incarcerated persons in federal institutions a crime, and providing a cell phone to an incarcerated person is a crime, as well.[75]

Consistent with Congressional findings, the Commission has found that unmonitored cell phones have been used to "order hits, run drug operations, operate phone scams, and otherwise engage in criminal activity that endangers prison employees, other inmates, and innocent members of the public."[76]  A more recent order from the Commission reiterates these concerns, explaining that incarcerated people use unmonitored cell phones "to engage in a variety of criminal activities posing serious threats to officials and incarcerated people within the facility and innocent members of the public."[77]  A recent further example was reported in the LA Times. According to the article, incarcerated members of the "Mexican Mafia" conspired over illegal cellphones to assassinate an individual held in another state correctional facility, who in fact was later killed.[78]

**B.    Safety and Security Features Benefit the Incarcerated**

The foregoing discussion of contraband cellphones highlights policy makers' concerns that unmonitored communications present a direct threat to inmates, their families, and the general public.  Policy makers preclude access to cell phones so that communications occur over monitored and recorded lines.  Nonetheless, advocates have recently pushed to exclude the costs of safety and security from IPCS rates on the specious claim that such measures are of no benefit to the incarcerated and their friends and families and only work to hinder their ability to

---

[75] 18 U.S.C. § 1791.

[76] In the Matter of Promoting Tech. Sols. to Combat Contraband Wireless Device Use in Corr. Facilities, 32 F.C.C. Rcd. 2336, ¶ 1 (2017).

[77] In the Matter of Promoting Tech. Sols. to Combat Contraband Wireless Device Use in Corr. Facilities, 36 F.C.C. Rcd. 11813, ¶ 3 (2021) ("2021 Contraband Cellphone Order").

[78] Matthew Ormseth, Contraband Cellphones, coded messages help Mexican Mafia operate in California prison, LA Times (Jan. 30, 2023), https://www.latimes.com/california/story/2023-01-30/cell-phones-prison-mexican-mafia (last visited Jul.12, 2023, 6:12 PM).

communicate freely. It appears that a major objection to surveillance of IPCS communications is that criminal activity is being detected and the perpetrators prosecuted.[79] This, of course, is the point of monitoring calls, along with ensuring compliance with correctional authorities' reasonable calling restrictions.

The advocates' ultimate argument to the Commission, however, is not that security measures cannot or should not be implemented, but that users of communications service should not have to pay for any of them because they derive no benefit from them. The argument that security features do not benefit incarcerated persons or their friends and families is readily rebutted by Commission findings that security measures help protect incarcerated persons as well as the general public. Certainly, the unfortunate incarcerated person who was the victim of the "Mexican Mafia's" contraband cell phone murder conspiracy would have found it "used and useful" for additional monitoring capabilities that might have interdicted the plot. Not only do today's sophisticated safety and security features benefit the incarcerated by protecting them from criminal schemes, these features enable substantially greater amount of calling activity than would be available without them.

---

[79] *See, e.g.,* Worth Rises Comments (unpaginated) (objecting to call recording and monitoring because they aid investigations "to the detriment of IPCS ratepayers, who may be subject to prosecution as a result of call recording and monitoring services."). *See also* Worth Rises, Reply Comment on Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Mar. 3, 2023) at 4-5 ("Each of these activities [call recording and monitoring, investigation support, enforcing agency policies] are to the detriment of IPCS ratepayers, who may be subjected to prosecution as a result of call recording and monitoring services … . In other words, call recording and monitoring services, while not denoted by IPCS providers as 'law enforcement support services,' function as exactly that – intel that is used by law enforcement to prosecute IPCS ratepayers.")

25

C.      **The Commission Must Ensure Public Safety**

Advocates also contend that the Commission need not be concerned if correctional

authorities choose not to pay for security measures or decide to reduce access to communications

services in the absence of security features.  Worth Rises states:  "These [correctional agency

safety and security requirements] are independent decisions, and any decision to reduce access to

IPCS if security and surveillance costs are excluded from IPCS rates would be just another

administrative decision, and not the fault of the Commission. … The Commission cannot be

responsible for any correctional administrator's decision to reduce access to IPCS because they

and their lawmakers are not willing to prioritize security and surveillance in their budgets."[80]

This is a remarkable assertion by an entity purporting to promote access for incarcerated people

to communications services.

The Commission, however, cannot simply wash its hands of the implications to public

safety that the lack of robust safety and security will entail.  To the contrary, one of the central

functions of the agency is to "make available, so far as possible, to all people of the United States

. . . rapid, efficient, Nation-wide . . . communication service . . . for the purpose of promoting

safety of life and property."[81]  In making communications services available to the incarcerated,

the Commission cannot ignore its mandate to also promote public safety, which is the

fundamental purpose of safety and security features.

---

[80] Worth Rises, Reply Comment on Fourth Report and Order and Sixth Further Notice of Proposed
Rulemaking, WC Docket No. 12-375 (Mar. 3, 2023), at 7
[81] 47 U.S.C. 151.

26

**JA944**

**D.    Safety and Security Developments Have Reduced Cost and Increased Availability of Communications**

Security features have been central to the growth and availability of communications services in carceral settings.  Early IPCS security was typically provided by on-site operators that would handle the approval and connection of collect calls placed by incarcerated persons.  These operators provided some limited oversight by, for example, verifying that call recipients agreed to the calls and were known to the calling party.

Security features have driven down costs and enabled the expansion of IPCS over time.  Call blocking, three-way calling detection, call recording and IVR technology, for example, provided greater security than human operators at lower cost.  As these technologies developed and improved, facilities were able to move away from dedicated operators and expensive on-site in-person monitoring to automated systems that allowed carceral facilities to provide security and supervision of calling much more economically.

This evolution has continued.  Facilities have sought centralized management of communications through sophisticated software that allows real-time oversight, more robust call recording and data management tools, more advanced security controls for access to data and systems, and secure dedicated networks.

Other advances, such as voice biometrics, significantly increase the ability to limit misuse of accounts by unauthorized persons, therefore preventing fraud against account holders and use of those accounts for illegal or other improper purposes.

Today's advanced communications present significantly more complex security challenges for carceral institutions.  Tablets, for example, come with wireless connectivity that must be carefully limited to ensure access is only provided to approved communications and materials.  Such limits require not only controlling connectivity, including by building secure,

27

**JA945**

dedicated Wi-Fi networks, but also designing and deploying devices that cannot be modified or reprogrammed. Similarly, the mobility of devices means that device and account authorizations must be carefully controlled, including through biometric tools such as voice and facial recognition, to ensure that only authorized individuals have access.

In Securus' experience, demand for security features has largely been driven by facilities, as they have defined the tools they need to provide communications while ensuring the safety of their facilities and the public. In particular, facilities often express their communications-security needs through RFPs with detailed security requirements. Bidders that do not meet security requirements risk losing contracts or being disqualified from the bidding process.

### E. On This Record, the MWR Act Requires Inclusion of Safety and Security Measures in Rates

The plain text of the MWR Act requires that safety and security costs be included in calling rates. As noted by commenters, barring cost recovery for safety and security measures from IPSC rates violates section 4 of the Act.[82] On the record in this proceeding, the Act's mandate to consider safety and security necessary to provide IPCS constitutes a directive to include such costs in IPCS rates. As discussed above, the record and Commission precedent make clear that safety and security measures are "necessary" for the provisions of IPCS. By directing that the Commission "shall" consider those necessary costs, Congress has made their inclusion in rate caps a requirement.[83]

---

[82] 136 Stat. 6157, §§ 3(b)(2), 4. *See, e.g.,* National Sheriffs' Association Comments at 10 (precluding safety and security costs from rates would effectively prohibit such measures and "interfere[] with the operation of the correction facility, which is expressly prohibited by section 4 of the MWRA."); Global Tel*Link Comments at 12 ("Failure to include safety and security costs in permanent rates for IPCS would violate the mandates of the MWR Act that prohibit the Commission from impeding on the prerogatives of correction authorities to implement and maintain safety and security measures related to the provision of IPCS in their facilities.").

[83] *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *compare* 136 Stat. 6157, § 3(b)(1)

Inclusion of the term "consider" does not give the Commission the leeway to ignore including safety and security costs as certain commenters contend. Both in light of the record and precedent, the Commission would violate the Administrative Procedures Act if it found that safety and security costs were not "necessary" for IPCS and their costs not recoverable through rates. The volume of evidence in the record to the contrary is overwhelming. Rejecting that evidence—particularly when the Commission has previously found safety and security measures directly related to IPCS and compensable in rates—would contravene its obligation to engage in reasoned decision making.[84]

Moreover, the statute does not contemplate that the Commission could identify safety and security costs, consider including those costs in calling rates, but then exclude the costs. The Martha Wright Reed Act modifies a ratemaking statute, and in the context of a ratemaking statute, "consider" cannot mean "consider but then ignore." By directing the Commission to "consider" safety and security costs, the statute gives the Commission flexibility about *how* to include those costs. But it nevertheless directs the Commission *to include* in calling rates what the Commission identifies as necessary safety and security costs. Further, there is nothing in the legislative history of the Martha Wright Reed Act indicating that Congress contemplated or intended to invite a disruption of existing safety and security measures.

Other authority likewise demands that safety and security costs be included when setting calling rate caps. The D.C. Circuit's decision in *Global Tel*Link v. FCC*, which was decided *before* Congress added the more specific language directing consideration of safety and security

---

(providing by contrast that the Commission "*may* use industry-wide average costs" in implementing the Act and defining just and reasonable rates (emphasis added)).

[84] *FCC v. Fox Television Stations, Inc.* 566 U.S. 502, 515-16 (2009); *Sec'y of Lab., Mine Safety & Health Admin. v. Westfall Aggregate & Materials, Inc*., No. 22-1088, 2023 WL 3830210, at *7 (D.C. Cir. June 6, 2023) ("there can be no reasoned decision-making when an agency relies on findings that are not supported by the record").

measures in calling rates, already required that costs "directly related" to the provision of IPCS should be included in rate caps.[85]  That decision also quoted the petitioners' assertion that the "specific security features that correctional authorities demand" affect the cost of providing service, and commented that this was "well taken and largely undisputed."[86]  Thus, even before Congress expressly identified the need for rates to account for safety and security features, the D.C. Circuit had effectively required it.

## VII.    THE COMMISSION SHOULD CONSIDER A WORKSHOP TO ADDRESS DISABILITY ACCESS CONCERNS

The Commission's 2022 ICS Order embarked on an ambitious program requiring IPCS providers to provide to TRS-eligible incarcerated people access to any relay service eligible for TRS Fund support by January 1, 2024, subject to consent by the correctional authority.[87]  Pursuant to this order, IPCS providers will be obligated to offer access to advanced, internet-based forms of TRS, including on devices such as tablets.[88]

Securus read with interest the comments submitted by HEARD from members of the disabled community regarding the difficulties and frustrations they have faced accessing various types of IPCS.  These comments raised an broad and diverse set of concerns that IPCS providers and TRS providers will be challenged to meet.  In light of these varied concerns, Securus respectfully suggest that the Commission convene a workshop of interested stakeholders to discuss how to address these concerns in a meaningful yet economically efficient manner, and identify common technical criteria specific to the IPCS industry for providing disability access services in a correctional environment.  These stakeholders could include members of the

---

[85] *Glob. Tel*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 414 (D.C. Cir. 2017).
[86] *Id.*
[87] 2022 ICS Order para. 19
[88] *Id.* at para. 26.

disabled community and/or their advocates, IPCS providers, TRS providers and correctional authorities. Much of the commentary expresses concerns about costs and the Commission should explore ways in which the TRS fund or other sources of federal funding can help defray costs so that the various forms of disability access can be made economically available.

## **CONCLUSION**

Securus looks forward to continuing to work with the Commission as it implements the

provisions of the MWR Act and develops fair, just and reasonable rates.

Respectfully submitted,

/s/                                          /s/

_____        _____

Joshua P. Martin                             Michael H. Pryor
Senior Vice President and General Counsel     Shareholder
Securus Technologies, LLC                   Brownstein Hyatt Farber Schreck, LLP
4000 International Parkway                  1155 F Street NW, Suite 1200
Carrollton, Texas 75007                    Washington, DC 20004
(972) 277-0300                            (202) 383-4706
joshuamartin@securustechnologies.com      mpryor@bhfs.com

Counsel to Securus Technologies, LLC

July 12, 2023

**ATTACHMENT**

**Before The**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

---

| | |
|---|---|
| **In the Matter of**<br>**Rates for Interstate Inmate Calling**<br>**Services** | **WC Docket Nos. 23-62, 12-375** |

---

**Report of FTI Consulting, Inc.**

**Prepared by:**
CHARLIE J. CHOE
ROBERT O. FISHER,
BRIAN F. PITKIN, and
STEVEN E. TURNER

---

**July 12, 2023**

1.      Securus Technologies, LLC ("Securus") has requested FTI Consulting, Inc. ("FTI") to analyze certain of the findings contained in the Brattle Report appended to the Comments of the Wright Petitioners, Benton Institute for Broadband & Society, Prison Policy Initiative and Public Knowledge (Public Interest Parties) filed in response to the notice of proposed rulemaking to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 issued by the Federal Communications Commission (Commission) on March 17, 2023.

2.      Additionally, Securus has asked FTI to assess the cost per minute for providing incarcerated calling services at the facilities that Securus serves in the State of California based on the facility-specific cost data submitted by Securus in response to the Third Mandatory Data Collection (3rd MDC).  FTI was intimately involved in the preparation of Securus' cost submission.

3.      FTI also submitted a declaration assessing the credibility and utility of the cost data submitted by the industry in response to the 3rd MDC that was appended to Securus' initial comments to the Sixth Further Notice of Proposed Rulemaking in WC Docket No. 12-375 filed on December 15, 2022.[89]  We will call this the FTI 2022 Report.

4.      The FTI 2022 Report addressed a series of questions posed by the Commission to help it determine whether certain submissions so substantially deviated from the Commission's instructions or were otherwise so deficient that they should be discarded in whole or in part; whether data appeared to be sufficiently accurate and reliable in reflecting actual costs of providing service; and whether data appeared atypical or implausible, for example, where costs exceeded revenues.

5.      Based on a detailed analysis of the data submitted in response to the 3rd MDC, including the information provided in the Word Template, FTI concluded that:

> "the majority of providers' responses to the Third MDC are sufficiently complete, accurate, and credible to underpin the development of rate caps.  Nevertheless, there are specific instances in which certain provider's responses are either entirely lacking or are unsuitable for further analysis, as described below. We do not believe discarding these responses undermines the utility of the provider cost data as a whole."[90]

### Review of the Brattle Report

6.      The Brattle Report claims that the responses to the 3rd MDC are so deficient that the Commission should not rely on it to develop rates for "incarcerated people's communications services" or IPCS.  Instead, the Brattle Report recommends developing a model of a hypothetically efficient IPCS provider whose costs would consist largely of average costs from non-IPCS communications providers supplemented with certain allowable costs to reflect the unique nature of services in carceral settings.  This supplemental IPCS data would, however, be

---

[89] Declaration of Charlie J. Choe, Robert O. Fisher, Brian F. Pitkin, Steven E. Turner, Dec. 15, 2022, attached to the Comments of Securus Technologies, WC Docket No. 12-375 (filed Dec. 15, 2022) (FTI 2022 Report).
[90] FTI 2022 Report at para. 12.

1

**JA952**

predicated on the lowest average cost per cost category submitted by IPCS providers in response to the Commission's data collection.

7.      Based on our review, the Brattle Report grossly exaggerates the deficiencies of the 3rd MDC cost data, particularly as contrasted with the analysis in the FTI 2022 Report, which the Brattle Report does not address. The Brattle Reports first concludes that the 3rd MDC cost data are "untethered" to cost drivers such as facility size or type.

8.      The methodology used to reach this conclusion is unclear.  The Brattle Report states that it derived costs per minute (CPM) at the facility level by "aggregate[ing] the Total Capital Expenses and the Total Operating Expenses and divid[ing] by the sum of total billed minutes for interstate communication and intrastate communication."[91]  It then performed "calculations for total cost per minute using the reported costs in the Third MDC" resulting in the "untethered" findings.

9.      The Brattle Report is also unclear on how issues with data quality were handled in their analysis. For example, certain providers did not break out their company-wide information into a per facility basis as instructed by the MDC. Rather the data was presented in the facility-level tabs on a per contract basis, which could have a material effect on the outcome of an analysis purporting to compare facility-level costs with the applicable cost driver.  The Brattle Report does not explain how it addressed that issue. Mixing in aggregated contract data points with individual facility data points would lead to inconsistent comparisons and flawed conclusions. In its FTI 2022 Report, FTI split out the contract-level data for these providers into individual facilities on an average basis to harmonize the disparate data sets. Additionally, in contrast to the FTI 2022 Report, the Brattle Report seems to have included provider information that had major data quality concerns.[92] Without any documentation of how the Brattle Group handled outliers, questionable data, and potential mismatches, it is difficult to not only replicate their results but also to trust their conclusions.

10.      The Brattle Report's conclusion that costs are untethered to cost drivers is also inconsistent the findings of FTI 2022 Report, which showed strong correlations between cost drivers such as facility type and size. The FTI 2022 Report found relatively large $R^2$ values between ADP, minutes, revenue and the various subcategories of operating expenditures.[93]  The FTI 2022 Report also found strong linear associations between ADP and total cost for each of the providers whose data was sufficiently complete and consistent for purposes of analysis.[94] These strong relationships between overall costs with ADP, provider, facility size, and facility type also translate to CPM as well, with these factors being significantly predictive of CPM.  Based on the analysis in the FTI 2022 Report, the Brattle Report appears to exaggerate the degree of variability and that once facilities are grouped based on facility type, size and associative provider, the degree of variation decreases dramatically.

---

[91] Brattle Report III-7, para 15.
[92] FTI, for example, eliminated facilities that reported 0 ADP, as well as clear outliers at both ends of the cost spectrum to work with a cleaner, more representative data set. FTI 2022 Report at 6.
[93] FTI 2022 Report at page 14.
[94] FTI 2022 Report page 16

2

11.     The Brattle Report also purports to show that costs and rates are not correlated.  The finding, however, is based on a select subset of facilities. Selecting a small subset of facilities or contracts has the potential to distort relationships present in the data. Variations among subsets of contracts may be due to a number of factors, such as extent of site commissions, specific requirements of the facility, and scope of services.  The Brattle Report does not account for such factors and incorrectly concludes that variation must be the result of misstated or inflated costs.

12.     Finally, the Brattle Report questions the veracity of cost data for contracts or facilities where ICS costs exceed ICS revenues.  The Brattle Report suggests that this is evidence that costs may be inflated either by including non-ICS costs or misallocating costs.  The Brattle Report fails to consider other reasons why reported ICS costs for a particular facility may exceed reported ICS revenues.  For example, costs allocations tend to produce more reliable results across entire datasets than for individual facilities whose costs may reflect differing requirements set by the correctional authority.  Moreover, for multi-facility contracts, providers may rely on the overall costs and revenues for all facilities regardless of the particular cost and revenue ratio at any particular facility.  Another factor may be that ultra-low state rate caps are constraining ICS revenue to the point that not all ICS costs can be recovered.  The issue is thus one of revenue generation, not inflating costs.

13,     FTI calculated and compared the cost and revenue per minute distributions among contracts that are net-profitable and contracts that are net-unprofitable, as shown below in the two figures below.  In these figures, the solid blue line refers to the average of contracts that were profitable the redline shows the average value of contracts that were unprofitable.  The figures reflect that it is the low rates being charges at facilities within contracts that are unprofitable, not increased costs.  In fact, the average cost-per-minute for unprofitable contracts is actually less than the average CPM for profitable contracts.



*Figure 1 – Distribution of Costs per Contract*

*Figure 2 – Distribution of Revenues per Contract*

4

**JA955**



**Cost Data for Securus' California Facilities**

14.      In 2021, the California Public Utilities Commission (CPUC) established an interim rate cap of $0.07 per minute for intrastate calls.  The CPUC calculated the $0.07 rate cap by doubling the contracted $0.025 per minute at the California Department of Corrections and Rehabilitation ($0.05 per minute) and then adding $0.02 per minute to account for site commission costs.  To assess the potential impact of these interim rates, we calculated the CPM for Securus' California facilities based on the facility-level cost data submitted by Securus in response to the 3rd MDC.  Securus served 52 California facilities in 2019 and 2020, and 51 facilities in 2021.  To derive a CPM for each facility, we added total operating expenses and total capital expenses and divided the sum by the total amount of billed minutes.  We did this calculation for each facility for each of the three years of data requested by the Commission – 2019-2021.

15.      Based on this calculation, we found that the CPM at 45 of the 52 facilities exceeded the $0.07 in 2019; the CPM exceeded the rate cap in 40 of 52 facilities in 2020 and at 39 of 51 facilities in 2021.



85 Delancey St., 2nd Fl.
New York, NY 10002
www.worthrises.org
🐦 📷 📘 @worthrises

July 12, 2023

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Re: WC Docket No. 23-62 and 12-375 – Reply Comment on *Notice of Proposed Rulemaking***

Dear Commissioners and Staff,

Worth Rises applauds the Federal Communication Commission ("the Commission") for exercising its authority to regulate the prison telecom industry. Worth Rises submits this reply comment in response to comments made by the National Sheriffs' Association ("NSA"), Securus Technologies ("Securus"), ViaPath Technologies ("ViaPath"), Paytel Communications ("Paytel"), and NCIC Inmate Communications ("NCIC") in response to the Commission's *Notice of Proposed Rulemaking.* Despite disagreement with the providers on various topics, we reiterate the arguments in our initial comment. We reply here only to new claims made by the providers regarding the Commission's goal in regulating IPCS, the prudent investment rule versus the used and useful standard, the role of state regulators, and expense allocation related to infrastructure investments.

I.     **The Commission's goal in regulating IPCS is to protect IPCS ratepayers from unjust and unreasonable rates not to prevent crime.**

Securus defines "necessary" in the context of ratemaking as "that which is required to achieve a desired goal," and claims that "the goal [of regulating IPCS] is to prevent communications services from being used to commit or facilitate potential crimes, fraud, or other abuses."[1] This claim is utterly unsupported and inconsistent with a basic understanding of the Commission's mandate with regard to IPCS. Securus appropriately anticipates the baselessness of its claim, and admits that the Commission may define the "desired goal [of regulating IPCS] more broadly as enabling communications services."[2] It should be without dispute that the goal of regulating IPCS is to enable communication services for IPCS ratepayers. However, this is not a "broader" goal, it is a different goal in that it does not include law enforcement.

Further, Securus manages to reach an unreasonable conclusion from even this straightforward goal that the Commission must still defer to correctional authorities "to protect incarcerated persons, correctional personnel, and the public generally."[3] In its assertion, Securus continues to focus on safety and security measures related to crime prevention and fails to establish any

---

[1]  Securus, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 37-38.
[2] *Id.*
[3] *Id*.

relationship between such measures and their necessity for the provision of IPCS. The assertion also prioritizes stakeholders that are not the ratepayers that the Commission intends to protect.

## II.     The used and useful standard is the best framework for considering safety and security expenses.

Worth Rises continues to urge the Commission to apply the used and useful standard to determine that safety and security measures are not recoverable through IPCS rates.

### A.   The used and useful standard does not lead to unreasonable outcomes.

Securus complains that "the used and useful concept potentially leads to unreasonable outcomes where the entity that sets the requirements for service, the correctional institution, is different from the 'rate payer.' As the direct customer of the service, the correctional authority prescribes the features and functions it deems necessary to provide the service in its facilities."[4] We do not contest that corrections agencies are an IPCS stakeholder and that they make demands of providers, but the exclusion of the costs of their demands from rates is not an unreasonable outcome. Any stakeholder who makes demands of a provider should pay for the services it demands, not make demands that others must pay for, especially when those others are, in fact, largely harmed by the provision of those services. The Commission's duty is to protect IPCS ratepayers and ensure reasonable compensation for providers, not to protect the interests and demands of non-ratepaying stakeholders.

As an aside, the providers' reference to correctional agencies as "customers" is misleading, at least as commonly understood. While corrections agencies do procure IPCS from providers and decide who will be awarded the contract for their facilities, they do not pay for the services they are procuring. The ratepayers are those who use the services, incarcerated people and their loved ones, who do not have any say in what provider is chosen to provide IPCS. Corrections administrators often choose a provider based on how much it is willing to pay in site commissions, or the best financial arrangement it can secure, and together the parties control access and rates, which suggests more of a profit-sharing arrangement between IPCS providers and corrections agencies than a business-customer relationship. This is further supported by the alignment in the comments from the National Sheriffs' Association and the providers, there is greater similarity between the providers and correctional agencies than between correctional agencies and IPCS ratepayers.

Securus' intentions in asking the Commission to reject the used and useful standard in this case is obvious. The provider plainly admits that "to suggest that all [correctional agency]-mandated service features that [correctional agencies] find used and useful must inure directly to the benefit of each caller or their friends and family is untenable."[5] Securus recognizes that it cannot defend the inclusion of safety and security expenses in IPCS rates by this standard, but admitting so does not justify its ask of the Commission to throw out the well-established used and useful standard with empty claims of unreasonable outcomes. It implores IPCS providers to reexamine

---

[4] Securus, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 25.
[5] *Id.*

their business model, which has been predicated on predatory practices from their start, and demand correctional agencies start paying for the services they seek.

B. **The prudent investment rule is not relevant to the consideration of safety and security expenses.**

Understanding that its safety and security expenses cannot meet the used and useful standard, Securus calls on the Commission to use the prudent investment rule to evaluate safety and security expenses as an alternative.[6]

The prudent investment rule is helpful in evaluating investments by utility providers that would be used and useful in the future but proved not because the investment was ultimately unsuccessful and never bore fruit. Consider the expenses of an energy provider when constructing a plant. If the plant is only partially constructed and then abandoned, then under the used and useful standard its expense could not be included in rates because a partially constructed plant would have no value or use to ratepayers, and therefore justify no recovery.[7] However, this outcome would be detrimental to ratepayers as it would discourage new plant investment and construction by providers. So, instead, under the prudent investment rule, regulators can determine if a provider's investment was prudent at the time it was made, and if so, allow the provider to recover the investment cost from ratepayers. This outcome serves ratepayers and providers.

However, this rule is largely unhelpful and unresponsive to the Commission's regulation of IPCS. To start, there appears to be no dispute among the commenters that providers have made large investments in safety and security measures that are not yet actively in-use, the primary applicability of the prudent investment rule. However, more importantly, the use of the prudent investment rule as an alternative to the used and useful standard is predicated on there being a benefit to the ratepayer, even eventually, which these safety and security measures fail to present. In fact, as Worth Rises has explained in past comments,[8] while the Commission has departed from the used and useful standard on rare occasions, it has always ensured that ratepayers benefitted from this departure.[9] The prudent investment rule would require the same evaluation of the benefit to the ratepayer. But, in this case, Securus is asking the Commission to depart from the used and useful standard, not to benefit ratepayers, but rather to benefit a different stakeholder that does not pay for IPCS, correctional agencies, which cannot be the basis of such a departure.

---

[6] Securus, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 27-34.

[7] Duquesne Light Co. v. Barasch, 488 U.S. 299 (1989) "to the extent that utilities' investments turn out to be bad ones (such as plants that are canceled and so never used and useful to the public), the utilities suffer because the investments have no fair value and so justify no return."

[8] Worth Rises, Reply Comment on *Fourth Report and Sixth Further Notice of Proposed Rulemaking*, WC Docket No. 12-375, p. 9.

[9] The Accounting and Ratemaking Treatment for the Allowance for Funds Used During Construction (AFUDC), Order, 10 FCC Rcd No.5, para. 13 (1995) (stating that "We believe, however, that this limited additional departure from the used and useful standard will not harm the ratepayers...The ratepayers receive the benefits of reduced rates in the initial years of implementation.").

We urge the Commission to not depart from the used and useful standard in considering the cost of safety and security measures and their inclusion in or exclusion from IPCS rates as it produces clearly reasonable outcomes. However, should the Commission consider a departure, we implore it to not relinquish its responsibility to ensure that any departure benefits IPCS ratepayers.

## III.    In its regulation, the Commission should incorporate rules that allow states to offer more protection for IPCS ratepayers.

Several providers ask the Commission to preempt state regulators and prevent state regulators from promulgating additional rules and regulations to protect IPCS ratepayers in their states. The Commission should value state regulators as partners in ensuring just and reasonable rates for IPCS consumers.

### A.    The Commission can provide room for harmony in its rules and regulation for State Public Utility Boards.

Worth Rises echoes the comments of the California Public Utilities Commission (CPUC)[10] and Stephen Raher[11] related to whether state regulators are inherently preempted by any rules and regulation promulgated by the Commission. As outlined by the CPUC and Raher, the Commission can promulgate rules and regulations that explicitly provide room for harmony with state regulators, and allow state regulators to improve upon the rules and regulations established by the Commission. The Commission has successfully created such room for harmony in the past by noting that "to the extent that state law allows or requires providers to impose rates or fees lower than those in [federal rules], that state law or requirement is specifically not preempted."[12]

### B.    State Public Utility Boards can be more responsive and informed than the Commission.

The Commission is charged with regulating IPCS for the entire nation, and in doing so, must balance notable legal and environmental differences from state to state — often making accommodations for some states that others do not need. State regulators have the advantage of being able to focus solely on their landscape to better understand the nuances of providing IPCS in their states and how they can drive better rates for their IPCS consumers.

For example, in prior comments to the Commission, the Indiana Utility Regulatory Commission has outlined its unique mandate to regulate IPCS within the state. Indiana state law only requires the Department of Administration to "consider necessary security and fraud control services"

---

[10] California Public Utilities Commission, Reply Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 2 ("If the FCC rules that its caps are a ceiling but not a floor, then any state or local rate that are lower than the FCC's rates cannot, by definition, be inconsistent with the FCC's regulations.").
[11] Stephen A. Raher, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 13 ("In its Third Report and Order, the Commission articulated a reasoned policy of cooperative federalism…The Commission should continue this policy out of comity to state lawmakers and regulators who may be able to identify ways in which IPCS can be profitably delivered in certain jurisdictions under lower price caps than those prescribed by the Commission")
[12] Third R&O Paragraph 217 36 FCC Rcd. 9617

when evaluating IPCS,[13] a narrower mandate than the Commission is charged with under the Martha Wright-Reed Act[14]. Indiana regulators have also determined that IPCS rate caps should depend on county populations, and not facility size, which the Commission uses[15] — larger counties should have more negotiating power regardless of their carceral population size.

We agree with the Commission's prior stance that "there is no presumption that state-mandated rates deny fair compensation simply because they are lower than our rate caps."[16] State legislatures and regulators should be able to determine if they want to consider a narrower set of factors, different definitions, or alternative formulas when determining IPCS rates for their residents, especially since they largely have a similar mandate to protect providers as well. The Commission should view its regulation as a minimum protection for IPCS ratepayers, particularly given that many states do not regulate IPCS, but should allow states to further protect IPCS ratepayers in their states.

## IV.    The Commission must consider expenses allocation across service offerings when including infrastructure investment in IPCS rates.

The Commission must not allow providers to recover the total expense of all IPCS providers' infrastructure investments in IPCS rates. Several providers, both in response to the current *NPRM* and the *Proposed Mandatory Data Collection*, demand greater consideration of infrastructure investment expenses related to the provision of IPCS, such as video kiosks and tablets.[17] While some of these investments in broadband and hardware is necessary for the provision of IPCS, and is used and useful to IPCS ratepayers, much, if not all, of the providers' same infrastructure investments is also used to support the sale of non-regulated services to IPCS ratepayers and correctional agencies. For example, correctional tablets, and the broadband they depend on, are not just used to make voice and video calls but also to send e-messages, listen to music, watch movies, read e-books, and play games at egregious rates.[18] As such, it would be inappropriate for the Commission to allow providers to recover the full cost of such investments through IPCS rates. The Commission must determine an appropriate way to allocate the expenses related to such infrastructure investments across all service offerings that rely on them and not just IPCS to prevent providers from artificially and unjustly raising IPCS rates and double dipping through its non-regulated services.

---

[13] Indiana Utility Regulatory Commission, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 12-375, p. 2.

[14] MarthaWright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338,136 Stat.6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 152

[15] *Id.*

[16] Second FCC Order Paragraph 211 30 FCC Rcd 12763

[17]  NCIC, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 10.; ViaPath, Comment on *Notice of Proposed Rulemaking*, WC Docket No. 23-62 and No. 12-375, p. 26.

[18] Bardelli, T., Zarook, R., McCarthy, D., Weill-Greenberg, E., Law, V., Iannelli, J., & Free, S. (2022, March 7). *How corporations turned prison tablets into a predatory scheme*. The Appeal. https://theappeal.org/prison-tablets-ipads-jpay-securus-gtl/

* * *

In summary, we reiterate our recommendations that the Commission consider safety and security measures within the framework of the used and useful standard, promulgate rules and regulations that support the further protection of IPCS ratepayers at the state level, and consider appropriate expense allocation for infrastructure investments related to IPCS. We appreciate your consideration.

Sincerely,

Bianca Tylek
Executive Director

Andrew Lama
Government Affairs Specialist

**Federal Communications Commission**                                    DA 23-638

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**ORDER**

**Adopted:  July 26, 2023**                                    **Released:  July 26, 2023**

By the Chief, Wireline Competition Bureau, and the Chief, Office of Economics and Analytics:

## I.    INTRODUCTION

1.      By this Order, the Wireline Competition Bureau (WCB) and the Office of Economics and Analytics (OEA) adopt instructions, a reporting template,[1] and a certification form to implement the 2023 Mandatory Data Collection relating to incarcerated people's communications services (IPCS).  Our actions today are taken pursuant to the authority delegated to WCB and OEA by the Commission and largely implement the proposals set forth in the *2023 IPCS Mandatory Data Collection Public Notice*,[2] with refinements and reevaluations responsive to record comments.

## II.    BACKGROUND

2.      On January 5, 2023, the President signed into law the Martha Wright-Reed Just and Reasonable Communications Act (Martha Wright-Reed Act or Act),[3] which expanded the Commission's statutory authority over communications between incarcerated people and the non-incarcerated, including "any audio or video communications service used by inmates . . . regardless of technology used."[4]  The new Act also amends section 2(b) of the Communications Act of 1934, as amended (Communications Act), to make clear that the Commission's authority extends to intrastate as well as interstate and international communications services used by incarcerated people.[5]

3.      The Martha Wright-Reed Act directs the Commission to "promulgate any regulations necessary to implement" the Act, including its mandate that the Commission establish a "compensation plan" ensuring that all rates and charges for IPCS "are just and reasonable," not earlier than 18 months

---

[1] The reporting template consists of a Word document and Excel spreadsheets.  For simplicity, we refer to these respective portions of the reporting template as the Word template and the Excel template.

[2] *WCB and OEA Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communication Services*, WC Docket Nos. 23-62, 12-375, Public Notice, DA 23-355 (WCB/OEA Apr. 28, 2023) (*2023 IPCS Mandatory Data Collection Public Notice* or *Public Notice*).

[3] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156; 47 U.S.C. §§ 152(b), 153(1)(E), 276(b)(1)(A), (d).

[4] Martha Wright-Reed Act § 2(a)(2), (b).

[5] *Id.* § 2(c).

and not later than 24 months after the Act's January 5, 2023 enactment date.[6]  The Act requires the Commission to consider, as part of its implementation, the costs of "necessary" safety and security measures, as well as "differences in costs" based on facility size or "other characteristics."[7]  It also allows the Commission to "use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider" in determining just and reasonable rates.[8]

4.      The Martha Wright-Reed Act contemplates an additional data collection by requiring or allowing the Commission to consider certain types of other costs necessary to its implementation.  Prior to the enactment of the Martha Wright-Reed Act, the Commission had sought provider data related to audio communications services provided to incarcerated persons on three occasions, as part of its ongoing efforts to establish just and reasonable rates for those services, while ensuring that providers are fairly compensated for such services.[9]  To ensure that it will have the data it needs to meet its substantive and procedural responsibilities under the Act, the Commission delegated authority to WCB and OEA to "update and restructure" its most recent data collection (the Third Mandatory Data Collection) "as appropriate in light of the requirements of the new statute."[10]  This delegation requires that we collect "data on all incarcerated people's communications services from all providers of those services now subject to" the Commission's authority, including, but not limited to, requesting "more recent data for additional years not covered by the [Third Mandatory Data Collection]."[11]

5.      In accordance with this delegation, WCB and OEA developed proposals for the 2023 Mandatory Data Collection that updated and expanded the instructions and reporting templates from the Third Mandatory Data Collection, and issued a *Public Notice* seeking comments on all aspects of the proposed revisions to the collection.[12]  Concurrently, in accordance with the Paperwork Reduction Act of 1995 (PRA), the Commission published a notice in the Federal Register seeking comment on potential burdens of the proposed reporting requirements.[13]

---

[6] *Id.* §§ 2, 3(a); 47 U.S.C. § 276(b)(1)(A).

[7] Martha Wright-Reed Act § 3(b)(2).

[8] *Id.* § 3(b)(1).

[9] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14172-73, paras. 124-26 (2013) (adopting the First Mandatory Data Collection); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12862, para. 198 (2015) (adopting the Second Mandatory Data Collection); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9619-20, para. 221 (2021) (*2021 ICS Notice* or *2021 ICS Order*) (adopting the Third Mandatory Data Collection).

[10] *Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Notice of Proposed Rulemaking and Order, FCC 23-19, at 2, 33, paras. 2, 84 (2023) (*2023 IPCS Notice* or *2023 IPCS Order*).

[11] *2023 IPCS Order* at 33-34, paras. 84-85.  The Commission directed WCB and OEA to "implement any appropriate modifications" to the Third Mandatory Data Collection, including updating the instructions and reporting template for that collection, "to the extent appropriate to timely collect . . . information to cover the additional services and providers now subject to [the Commission's] authority."  *Id.* at 33-34, para. 85.

[12] *Public Notice* at 2.

[13] Federal Communications Commission, Information Collection Being Reviewed by the Federal Communications Commission, 88 Fed. Reg. 27885 (May 3, 2023) (*60-Day PRA Notice*).

6.      We received comments from several IPCS providers, public interest advocates, and other interested parties in response to the *Public Notice*,[14] and one comment in response to the PRA notice.[15] We have thoroughly considered all of these filings in adopting the requirements for the final 2023 Mandatory Data Collection.

## III.    DISCUSSION

### A.    Implementing the 2023 Mandatory Data Collection

7.      Pursuant to our delegated authority, we adopt the 2023 Mandatory Data Collection Instructions, Word and Excel templates, and certification form as proposed in the *Public Notice*, with some exceptions discussed below.  Commenters generally support the broad contours and specific requirements of the data collection as proposed and do not challenge our proposal to retain the overall reporting structure and organization of the Third Mandatory Data Collection as the basis for this collection.[16]

8.      Commenters offer various suggestions that, in their view, would improve the proposed data collection.[17]  In light of these comments, we reevaluate some of our proposals and refine certain aspects of the instructions and templates, as set forth in greater detail below, while retaining the overall structure of the data collection as proposed.  These refinements include modifying the treatment of video IPCS and safety and security measures, clarifying the reporting of costs related to site commissions, and revising certain proposed definitions.  We conclude that the modifications we make "appropriately balance the need for 'detailed and specific instructions and templates' and the desire to avoid unduly burdening providers."[18]

9.      In finalizing the requirements for the data collection, we do not resolve issues pending in the *2023 IPCS Notice*, as some commenters propose.[19]  Doing so would exceed the authority the Commission delegated to WCB and OEA.[20]  The *Public Notice* expressly foreclosed "seek[ing] additional comment on the questions and other issues previously raised in the *2023 IPCS Notice* or in relevant prior Commission or Bureau notices,"[21] and we do not address commenters' proposals to the contrary in this

---

[14] We received comments or replies in response to the *Public Notice* from Ameelio; Global Tel*Link Corporation d/b/a ViaPath Technologies (ViaPath); Pay Tel Communications, Inc. (Pay Tel); Securus Technologies, LLC (Securus); Worth Rises; and the Wright Petitioners.

[15] ViaPath Paperwork Reduction Act Comments (filed July 3, 2023) (ViaPath PRA Comments).

[16] Pay Tel Comments at 1; Securus Comments at 1; ViaPath Comments at 3; Worth Rises Comments at 1; Wright Petitioners Comments at 2.

[17] ViaPath Comments at 4; Pay Tel Comments at 3, 4, 6-7; Securus Comments at 2, 5; Wright Petitioners Comments Appx. A, Brattle Report at 13-14, para. 28 (Brattle Report).

[18] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, 37 FCC Rcd 368, 370, para. 7. (WCB/OEA 2022) (*Third Mandatory Data Collection Order* or *Third MDC Order*).

[19] *See, e.g.*, Pay Tel Comments at 3 (seeking a determination that all safety and security measure costs are recoverable); *but see* Worth Rises Reply at 3 ("There simply is no basis for [Pay Tel's] claim that all safety and security measures are recoverable through IPCS rates.").

[20] A change in the Commission's rules requires action by the full Commission and cannot be adopted by WCB and OEA on delegated authority.  *Third MDC Order*, 37 FCC Rcd at 371, para. 8 (explaining that a data collection is "not the proper administrative vehicle to . . . change Commission rules").

[21] *Public Notice* at 2; *see also 2021 ICS Order*, 36 FCC Rcd at 9618-19, paras. 218, 221 (explaining that the purpose of a data collection is to provide the Commission with sufficient information to resolve various issues it is considering).

Federal Communications Commission                                    DA 23-638

Order.  Instead, the purpose of the data collection is to provide the Commission with an objective foundation for addressing the issues it must resolve to implement the Martha Wright-Reed Act.[22]

10.     In the sections that follow, we first address the overall scope of the data collection and then turn to proposals to revise specific instructions.

**B.     Overall Scope of the Data Collection**

**1.     Reporting Period**

11.     We limit the data collection to calendar year 2022, consistent with our proposal in the *Public Notice*.[23]  We find that the data from 2022 will provide the most pertinent and the best indicator of relevant costs.  Some commenters propose that we expand the data collection reporting period beyond just 2022.[24]  Others argue that the burden of requiring additional years of data would "outweigh[] any material benefit."[25]  We decline to expand the reporting period.  Data from 2022 represent the most recent data available, and are therefore likely to be more representative of future operations by IPCS providers than data from prior years.  To the extent that data from prior years would be useful in determining just and reasonable rates, we already have data regarding audio IPCS, including investments, expenses, revenues, demand, site commission payments, and ancillary services charges and practices, from the Third Mandatory Data Collection.  We recognize that those data are limited to audio IPCS, but find that the burdens associated with collecting video data for prior years would outweigh any potential benefit.  In particular, the pandemic had a substantial impact on providers' operations and likely accelerated the implementation of (and therefore increased the costs and revenues associated with) video IPCS as a substitute for in-person visitation, such that data from those prior years may not be representative of providers' future operations.[26]  As a result, we find that collecting data solely for 2022 will best equip us to set rate caps that reflect providers' operations going forward and avoid the burdens associated with collecting additional data that may not be representative or are already available for prior periods.[27]

---

[22] *See 2021 ICS Order*, 36 FCC Rcd at 9618-19, paras. 218, 221.

[23] *Public Notice* at 3.

[24] *See, e.g.*, Worth Rises Comments at 3 (suggesting that we expand the data collection to include "safety and security expense data" from 2020 and 2021 so as to have three years of such data to reconcile and compare); Worth Rises Reply at 5; *see also* Wright Petitioners Comments, Brattle Report at 3, para. 4 (suggesting that the Commission should expand the entire data collection to capture 2021 data as well).  *But see* ViaPath Reply at 2 ("The Bureaus should reject calls to expand the proposed MDC beyond what is 'appropriate in light of the requirements' of the MWR Act."); Securus Reply at 2-4.

[25] *See, e.g.*, Securus Comments at 2 (reasoning that "there is little value" in requiring data, specifically on intrastate costs, beyond 2022, because such costs are "not materially different" from interstate costs and have not been isolated by providers); Pay Tel Reply at 4 (agreeing with Securus that "the reporting period for voice and video calling services should be limited to the 2022 calendar year"); Securus Reply at 8.

[26] *See, e.g.*, *Third MDC Order*, 37 FCC at 381, para. 36 (finding that the record indicated that "providers [may have] incurred large one-time costs related to COVID-19," which posed the risk of "atypical, one-time expenses . . . being considered normal company costs"); Pay Tel Reply at 4 (explaining that "safety and security data for 2020 and 2021 is not reconcilable with past or present data submissions due to the paradigm-shifting effects of the COVID pandemic" to argue imposing reporting requirements for safety and security costs for those years "would impose a significant burden with little to no material benefit").

[27] In our *60-Day PRA Notice*, we estimated that it would take IPCS providers an average of 230 hours to respond to the data collection.  *60-Day PRA Notice*, 88 Fed. Reg. at 27885.  ViaPath argues that we have "grossly underestimated the amount of time it will take IPCS providers to respond to the proposed MDC."  ViaPath PRA Comments at 3.  We previously rejected ViaPath's almost identical argument regarding our burden estimate for the Third Mandatory Data Collection, explaining that ViaPath "is the largest calling services provider, 'with an estimated market share approaching 50%.'  Given that market share, we would expect that [ViaPath's] total response time would far exceed any industry average, regardless of the number of estimated hours."  *Third MDC*

(continued....)

12.    While we recognize the incremental benefits of having more comprehensive cost data, most of the categories of data that we seek in this data collection were addressed in the previous data collection, such that collecting these data from years prior to 2022 would be largely redundant. To the extent we seek new categories of data, the burden on providers to produce those data would be significant. Given the burdens already imposed by this revised data collection which are necessary to implement the new statute, as well as the comparatively shorter timeframe for submitting responses,[28] we decline to impose an additional burden by expanding the reporting period as some commenters propose.

### 2.    Cost Reporting and Cost Allocation

13.    In the *Public Notice*, we proposed to adapt the cost reporting and cost allocation methodologies specified for the Third Mandatory Data Collection for use in the 2023 Mandatory Data Collection. No commenter challenges this overall approach or suggests fundamental changes to our proposals for applying those methodologies to video IPCS. Instead, commenters suggest relatively discrete modifications to our proposed instructions for reporting company-wide cost data and for allocating reported costs among cost categories.[29] After considering these comments, we adopt the cost allocation methodology essentially as proposed, with modifications to the instructions designed to help providers understand our cost allocation methodology and to obtain further information on how providers implement it. We also modify the instructions to establish, at the facility-specific level, the same reporting structure for capital assets and expenses that is in place at the company-wide level.

14.    As a general matter, our changes to the cost reporting and cost allocation instructions reflect an understanding, from our review of the Third Mandatory Data Collection submissions, that certain providers' internal accounting and recordkeeping systems limit those providers' ability to provide highly disaggregated cost data and to finely tune their cost allocation procedures.[30] Given these limitations, our revised instructions generally require providers to describe in greater detail their implementation of our cost reporting and cost allocation instructions, rather than prescribe additional cost reporting and cost allocation requirements for which certain providers may not have the internal accounting systems needed to comply with such requests.

15.    For example, we require providers to describe the types of costs they include in various capital and operating expense categories, rather than list the types of costs that are to be included in each category, as one commenter suggests.[31] We also require providers to describe in greater detail the factors they use to allocate certain types of shared and common costs among audio IPCS, video IPCS, and

---

(Continued from previous page)
*Order*, 37 FCC Rcd at 380 n.105 (citing *2021 ICS Order*, 36 FCC Rcd at 9550, para. 74). The record in this proceeding provides no indication that ViaPath's market status has changed or that our proposed burden estimate did not reflect the industry average. Nevertheless, we will revise our average burden estimate to account for the additional effort required to comply with the changes from our proposals that we adopt in this Order. Our revised estimate, which will be included in the subsequent 30-day PRA notice related to this data collection, will reflect the likely burden of the data collection.

[28] As discussed below, responses to this data collection will be due 97 days from the date of this Order.

[29] Wright Petitioners Comments, Brattle Report at 5, 7, 8, paras. 10, 15, 17 (suggesting the Commission could improve the data collection by "providing more detailed instructions on what costs should be included in a category" and by providing examples of how providers allocate shared costs).

[30] Securus Reply at 2-3 (arguing that "[p]recision will not be improved by requiring providers to artificially allocate costs into ever more discrete buckets that in no way reflect how expenses are tracked in the normal course of business," and noting the difficulty smaller providers would encounter in trying to perform "highly granular allocations"); ViaPath Comments at 3-4.

[31] Wright Petitioners Comments, Brattle Report at 7, para. 15 (contending that we should require providers "to list out example[s] of the types of services and associated costs they are attributing to each [operating expense category]").

nonregulated services, rather than specifying factors for providers to use in performing those allocations.[32] We find that these revisions will help the Commission understand the nature of the reported costs, without imposing significant additional burdens on providers that would be unlikely to result in more useful information.[33]

16.     We reject, however, ViaPath's proposal that we permit providers to "use the allocation methodologies that best reflect [their] business and the way in which [they] keep[] [their] books and records as long as the provider[s] document[] and explain[] [such] methodologies in [their] MDC response[s]."[34]  The detailed cost allocation hierarchy set forth in the proposed instructions was carried forward from the instructions for the Third Mandatory Data Collection and, as such, reflects the Commission's directive that the Third Mandatory Data Collection collect, "to the extent possible, uniform cost . . . data from each provider.[35]  In directing that we "update and restructure" that prior data collection,[36] the Commission did not propose or suggest that we should undertake wholesale revisions to the core methodologies of the Third Mandatory Data Collection by allowing each provider to devise its own allocation methodology.  As the Wright Petitioners point out, allowing providers to devise their own cost allocation methodologies in the previous data collection led to "large discrepancies between costs allocated towards capital expenses and operating expenses,"[37] with providers assigning costs inconsistently among the categories provided and reporting nonregulated service costs as inmate calling services costs.[38]  Allowing providers to use their own allocation methodologies also would substantially increase the back-end burden on all parties that want to process and analyze the reported data, because of the extent and complexity of the adjustments that would be necessary to correct for inconsistencies among providers' responses.  The cost allocation hierarchy set forth in the instructions provides a necessary and workable framework within which to standardize and compare the data submitted, while, as we recognize above, affording providers flexibility to implement the cost allocation instructions in a manner that reflects their accounting and recordkeeping systems.

---

[32] *See id.* at 4, para. 9 (suggesting the possible use of a cost allocation factor "based on speed requirements, bandwidth consumption, or storage costs of audio versus video calls" to allocate common costs between audio and video IPCS); Securus Reply, Attach. Declaration of Charlie J. Choe, Brian F. Pitkin, and Steven E. Turner Regarding the Proposed 2023 Mandatory Data Collection (FTI Declaration) at 13-14, paras. 6-7 (discussing factors that Securus may use to allocate costs to services using tablets, noting "[t]ablets may provide access to . . . a multitude of other [nonregulated] services").

[33] Relatedly, we decline to identify and exclude specific types of costs that could be characterized as unrelated to the provision of IPCS from any particular category.  Wright Petitioners Comments, Brattle Report at 15-16, para. 33.  The *2023 IPCS Notice* invited comment on which types of costs should be reflected in IPCS rates, and we indicated that advocacy concerning issues before the Commission in the rulemaking would not be considered in this context.  *See 2023 IPCS Notice* at 21, para. 49; *Public Notice* at 2.

[34] ViaPath Comments at 3-4; ViaPath Reply at 4.  *But see* Wright Petitioners Reply at 5 n.11 ("As the Commission has previously concluded, concerns about different approaches to cost allocation are not a reason for the Commission to decline to take action." (citing the *2021 ICS Order*, 36 FCC Rcd at 9544, para. 59)).  We once again reject ViaPath's argument, previously raised in response to the Third Mandatory Data Collection, regarding the differences in book and record keeping between non-dominant and dominant carriers.  ViaPath PRA Comments at 4.  As WCB found in the *Third MDC Order*, "[w]hether providers are dominant has no bearing on the Commission's authority to mandate the manner in which ICS providers report cost data.  Our requests apply to all ICS providers."  *Third MDC Order*, 37 FCC Rcd at 381, para. 37 & n.109 (internal quotation marks and citation omitted).

[35] *2021 ICS Order*, 36 FCC Rcd at 9621, para. 225.

[36] *2023 IPCS Order* at 33, para. 84.

[37] Wright Petitioners Comments, Brattle Report at 4, para. 7.

[38] *Id*. At 6-7, para. 13.

### 3.    Overall Reporting Categories

17.    We adopt our proposal to require providers to allocate their investments and expenses among audio IPCS, video IPCS, safety and security measures, various types of ancillary services, and other services and products.[39]  We find, subject to certain refinements related to safety and security measures, that these categories are well-suited to provide the Commission with the information it needs to comply with its ratemaking responsibilities under the Communications Act and the Martha Wright-Reed Act without unduly burdening providers.

18.    We decline to require providers to subdivide their audio and video IPCS costs into more discrete categories based on the type of audio or video service being provided, as some parties suggest.[40]  While we recognize that video IPCS costs may vary based on the equipment used to provide the service,[41] we find that the best way to address this possibility is to ask providers to report the per-unit costs of the devices used for video IPCS.  This information, combined with the requirement that providers report their video IPCS costs on a facility-by-facility basis while describing the video services provided at each facility, should provide sufficient information to measure any cost differentials among different video services without imposing on providers the burden of subdividing video IPCS costs into more discrete categories.

19.    We adopt our proposal to allow, but not require, providers to subdivide their investments and expenses for audio IPCS, video IPCS, safety and security measures, and ancillary services between interstate/international and intrastate services.[42]  While we recognize that providers likely experience "no meaningful difference[s]" between the costs of providing interstate/international and intrastate IPCS (other than the costs of terminating audio communications in foreign destinations),[43] we find this option properly allows providers the flexibility to inform the Commission if they do incur different costs based on the jurisdictional nature of the services they provide.

### 4.    Safety and Security Measures

20.    We adopt our proposal to require providers to allocate the annual total expenses they incurred in providing safety and security measures among seven categories using the provider's best estimate of the percentage of those expenses attributable to each category.[44]  After considering the

---

[39] *See Public Notice* at 4; Securus Comments at 2 (agreeing that providers should endeavor to allocate their costs among traditional voice service, video calling services, ancillary services, and nonregulated services); ViaPath Comments at 3 (supporting separate cost categories for audio and video IPCS).

[40] *See Public Notice* at 4; Securus Comments at 2 (asserting that "[t]here is no need to further segregate costs into subcategories of voice and video service"); ViaPath Comments at 4.

[41] ViaPath Comments at 4 (stating that "video IPCS provided over a tablet may have different costs than video IPCS provided over a dedicated unit such as a kiosk"); Wright Petitioners Comments, Brattle Report at 16 (suggesting the providers' "overall cost structure of providing video calling services" is impacted by the cost of equipment).

[42] *See Public Notice* at 4-5.

[43] ViaPath Comments at 4.

[44] *Public Notice* at 5.  The seven categories, as set forth in the instructions adopted in this Order, are Communications Assistance for Law Enforcement Act (CALEA) compliance measures (i.e., safety and security measures that providers took to comply with CALEA); law enforcement support services; communication security services; communication recording services; call monitoring services; voice biometrics services; and other safety and security measures.  With the exception of the CALEA compliance measures category, these categories update categories used in the Third Mandatory Data Collection.  Calling Services for Incarcerated People Third Mandatory Data Collection Instructions, §§ IV.C.3.b., IV.D.2.c., http://www.fcc.gov/sites/default/files/2022_mdc_-_instructions_to_third_mandatory_data_collection_1.18.2022.docx (link provided in *Third MDC Order* at Appx. A, Third Mandatory Data Collection Instructions and Template).

comments regarding this proposed allocation process, we modify the instructions for this allocation to make them clearer and more comprehensive.

21.    Some providers take issue with our proposed seven-category framework for reporting safety and security measure costs, claiming that their internal accounting systems do not align with these categories and that providers will have difficulty allocating their costs in the manner proposed.[45]  We do not find these arguments persuasive.  As Securus concedes, the cost categories we proposed are similar to categories employed in the Third Mandatory Data Collection.[46]  Accordingly, we find, as we did with the Third Mandatory Data Collection, that the proposed categories provide a comprehensive and workable framework for dividing safety and security measure costs into reasonably homogenous groupings that "should capture all [safety and] security costs,"[47] particularly with our addition of multiple examples of costs for each category.  To the extent that providers make measures available that do not fit within the first six categories,[48] the data collection also includes a catch-all category for "Other Safety and Security Measures."[49]

22.    The Martha Wright-Reed Act requires the Commission to consider "costs associated with any safety and security measures necessary to provide" IPCS in setting IPCS rates.[50]  While the commenters present sharply divergent views as to whether providers should be allowed to recover the costs of various types of safety and security measures through their rates,[51] our purpose here is to ensure, to the extent consistent with the providers' internal accounting and recordkeeping,[52] that the data collection generates, in a timely manner, sufficient information for the Commission to implement

---

[45] ViaPath Comments at 5 (noting "it may be difficult" for providers to separate their safety and security costs and allocate those costs into the seven categories); ViaPath Reply at 5 (repeating its position that it may not be possible to separate all safety and security costs into the Commission's categories); Pay Tel Comments at 2 (arguing that providers' accounting systems are not designed to track safety and security costs separately); Pay Tel Reply at 1-2 (agreeing with Securus and ViaPath "that it will be difficult for providers to report safety and security cost information in the manner proposed by the Commission"); *compare with* Securus Reply at 8 ("[T]he 3rd MDC in fact did ask for cost data for these same categories of security services (excluding CALEA)."); Worth Rises Reply at 2, 4 (challenging certain providers' assertions that they cannot separate these costs and asserting that "[i]t is absurd to believe that the providers do not have the means to separate their safety and security costs across all IPCS categories").

[46] Securus Comments at 4 (noting that the categories are the same as those established in the Third Mandatory Data Collection "[w]ith the exception of the addition of CALEA expenses").

[47] *Third MDC Order*, 37 FCC Rcd at 374, para. 19 (establishing a category-based framework for reporting costs and additional information on security measures, and finding this approach to be comprehensive).

[48] *See* ViaPath Comments at 5; Pay Tel Comments at 4 (proposing the Commission collect data on safety and security measures that are ancillary or supplementary to IPCS).

[49] We find that imperfect alignment between our framework and providers' accounting systems fails to compel an alternative approach, especially where record proposals suggesting alternative approaches or changes are predicated on policy determinations beyond the scope of this Order.  The Commission's obligation to "consider costs associated with any safety and security measures necessary to provide" IPCS is imposed by statute, and is not contingent on the particularities of the various "way[s] in which providers record costs."  Martha Wright-Reed Act § 3(b)(2); Pay Tel Comments at 4; Wright Petitioners Reply at 5 n.11 ("As the Commission has previously concluded, concerns about different approaches to cost allocation are not a reason for the Commission to decline to take action." (citing the *2021 ICS Order*, 36 FCC Rcd at 9544, para. 59)).

[50] Martha Wright-Reed Act § 3(b)(2).

[51] Pay Tel Comments at 4-5 (arguing that safety and security costs are "by definition, recoverable costs" and suggesting that due to the lack of "a uniform system of accounting for IPCS providers," reported costs for safety and security measures will vary depending on how providers record those costs and interpret the Commission's instructions); Worth Rises Reply at 2-4; Wright Petitioners Reply at 2.

[52] Securus Reply at 2; Pay Tel Reply at 5.

"whatever decision it makes regarding the necessity of safety and security measures."[53] This necessarily requires tradeoffs between pinpointing the costs of each safety and security measure providers offer and the providers' ability to produce (and the Commission's ability to process) highly disaggregated safety and security measure cost data within the 18 to 24 month statutory timeframe.[54] We find the proposed reporting structure and associated categories, modified as described below, to be the most effective means of balancing these competing considerations.

23.    One commenter claims that the proposed categories "will not provide a full or accurate picture of how safety and security costs are associated with the service offering,"[55] while other commenters propose that we should "provid[e] examples and or definitions . . . of certain security services and costs that would fall under the seven categories," and that the required safety and security cost data should, in general, be more granular.[56] The proposed instructions already include multiple examples of safety and security measures that fall within each of the seven categories. We find that these lists, as revised in response to the comments, are sufficiently comprehensive to allow providers to sort their safety and security measures into the categories we have established. However, because some commenters may not have understood the examples we provided,[57] we have reorganized the relevant instructions to simplify them and increase their clarity. Specifically, we modify both the company-wide and the facility-by-facility instructions to first require providers to assign each of their safety and security measures to one of the seven listed categories and second to allocate their aggregate costs of providing safety and security measures among these categories.

24.    In addition, we give providers the option to supplement what we require them to submit should they determine that more specific categories are needed to reflect their operations. Specifically, when allocating these costs, providers may divide the seven listed categories into subcategories of their own choosing, and thereby report costs in a more detailed manner. We find that allowing for further subdivision will better enable providers to submit a "full [and] accurate picture" of their costs in a way that "meaningfully distinguish[es] among these costs," while also retaining the uniform reporting structure that is necessary for us to effectively compare cost data among providers.[58] We also adopt a suggestion that we instruct providers to assign any safety and security measure that does not precisely match any of our provided examples to the category that provides the best fit, and to allocate the costs of such measures accordingly.[59] Directing providers to categorize services in this manner will give them additional flexibility in applying the categories to their own internal accounting structures.[60]

---

[53] Worth Rises Reply at 2.

[54] Martha Wright-Reed Act § 2(d).

[55] Pay Tel Comments at 3; Pay Tel Reply at 2.

[56] Wright Petitioners Comments, Brattle Report at 10, para. 22. Conversely, Securus argues that the *Public Notice* "provides no rationale for why the proposed . . . level of disaggregation is necessary to implement" the requirement that we "consider the costs associated with any safety and security measures necessary to provide" IPCS. Securus Comments at 4. However, the *Public Notice* explicitly proposed that this disaggregation would "facilitate the Commission's consideration" of "costs associated with any safety and security measures necessary to provide" IPCS, as required under the Act. *Public Notice* at 5. In sum, in order to assess and distinguish between "necessary" and unnecessary costs, the Commission must obtain as comprehensive an understanding of such costs as is feasible under the circumstances.

[57] *Public Notice* at 3-4; ViaPath Comments at 5; Pay Tel Comments at 5; Securus Comments at 3-4.

[58] Pay Tel Comments at 3.

[59] Wright Petitioners Comments, Brattle Report at 10, para. 22.

[60] We decline to adopt Securus's proposal to remove the category for CALEA compliance measures. Securus Comments at 4. Questions of the applicability of CALEA to IPCS providers are not relevant to the purpose of the data collection. Wright Petitioners Reply at 5 (arguing in opposition to proposals to remove the CALEA-related cost category, "[t]he Commission need not resolve at this time whether all IPCS providers are exempt from the

(continued….)

25.        To further help providers allocate safety and security costs among the established categories, we modify the instructions to include additional guidance.  These changes address certain commenters' concerns about their ability to allocate their security costs among each category within our seven-category reporting framework without further guidance.[61]  However, given providers' concerns with their ability to implement the seven-category framework,[62] we decline to require that the expenses allocated to each of the seven categories be further allocated among the various safety and security measures within each category.[63]  Conversely, we also decline to adopt Pay Tel's proposal that we limit our collection to "data regarding Safety and Security Measures associated with distinct and separate 'system[s], product[s], or service[s]' which are provided as ancillary components to the IPCS offering."[64]  As an initial matter, those measures are effectively encompassed within our categories.  To the extent that Pay Tel is proposing that we only collect such data, that approach would require that we prejudge which safety and security measures are "necessary," which would be beyond the scope of our delegated authority.[65]

26.        We also decline to subdivide the safety and security measures reporting category into different real-time and non-real-time subcategories, as one commenter urges.[66]  We find that the granularity already included in the safety and security reporting requirements is sufficient to provide the Commission with the data it will need to set just and reasonable rates caps for IPCS.  The additional

---

(Continued from previous page) ————————————————

CALEA requirement" and find that only providers subject to CALEA compliance and with reportable costs "should allocate those costs in the appropriate category. . . .  There is no reason to eliminate the category.").  We require data on providers' costs of complying with CALEA, to the extent they are incurred, so that the Commission may decide whether to include or exclude these costs from the underlying rates.  Worth Rises Reply at 5.  If, as Securus claims, CALEA is not applicable to IPCS, then providers should have no costs to report in this category and the reporting burden (if any) will be minimal.  Securus Comments at 4-5; Wright Petitioners Reply at 2, 5.

[61] ViaPath Comments at 5 ("separating the costs associated with safety and security measures from other IPCS costs may not be possible in all cases, especially using" the seven-category framework); Pay Tel Comments at 3-4; Securus Comments 3-5; Wright Petitioners Comments, Brattle Report at 10, para. 22.

[62] Securus Comments at 4 (taking issue with the proposed structure, level of disaggregated data sought, and categories for collecting information regarding providers' safety and security measures ); Securus Reply, FTI Declaration at 14 ("A key concern is that many of the [safety and security] services do not fit neatly into the categories as outlined by the Commission."); Pay Tel Comments at 3-5 (criticizing the seven-category framework, and disputing its accuracy and usefulness); Pay Tel Reply at 3 (opposing record proposals that would require actual expense reporting of safety and security costs by arguing that "the Commission has appropriately realized" that the reporting of actual expenses may not be possible if the provider's record keeping systems do not allow for precise allocations); ViaPath Comments at 5 (noting that "it may be difficult" to perform the proposed cost allocation for safety and security measures).

[63] Worth Rises Comments at 2 (proposing that the Commission require providers to allocate expenses for each "line item" reported under each safety and security category); Pay Tel Reply at 3 (explaining that "if an [IPCS] provider's books and records do not show a precise allocation, then some estimate is required in order to categorize safety and security costs" and that "the reporting of 'actual expenses' in the manner [certain commenters] proposed simply is not possible in all cases, as the Commission has appropriately recognized"); Securus Reply at 2 ("Advocates appear to believe that the collection of ever more information subdivided into ever more discrete categories will heighten precision and diminish the ability of providers to submit inflated costs.  This belief simply does not reflect reality.").

[64] Pay Tel Comments at 4.

[65] See Third MDC Order, 37 FCC Rcd at 371, para. 8 (finding that data collections, such as this one, are "not the proper administrative vehicle" to make policy determinations).

[66] See Worth Rises Comments at 1-2 (suggesting that we should require providers to allocate their costs of providing safety and security measures among real-time audio, real-time video, non-real-time audio, and non-real-time video); Worth Rises Reply at 2.

burden more subdivision would impose on providers outweighs any potential benefit of further disaggregation.

27.　One commenter observes that "there are no safety and security costs associated with ancillary services of the type contemplated" for IPCS.[67]  We agree that this is likely the case for most providers, but those providers can simply enter "0" in the appropriate Excel template cells.  Accordingly, we will include the proposed inquiries asking providers to report any safety and security costs they incur in connection with their ancillary services.  We find that this approach will accommodate potential variation among providers' practices without burdening any provider.[68]

28.　Lastly, we supplement questions in the Word template in order to obtain additional information on providers' safety and security measures.[69]  Commenters discuss certain nuances that may apply to the implementation of safety and security measures and consequent cost allocation issues that are not fully addressed by the questions proposed (e.g., differences based on infrastructure and devices used to provide IPCS, and circumstances in which safety and security services apply to both IPCS and nonregulated services).[70]  We agree with these commenters on the need to seek additional information from providers regarding their safety and security measures and attendant practices.  Commenters also dispute the extent to which "providers' accounting systems" are—or are not—"designed to track 'safety and security' costs."[71]  Given this ambiguity as to providers' accounting practices for safety and security measures, particularly in light of providers' concerns about their ability to apply their accounting systems to the categories we proposed, we find that additional information concerning providers' accounting practices and how they allocate their internal data among  our seven categories will assist the Commission in accurately determining the costs of providers' safety and security measures and distinguishing between "essential and non-essential costs."[72]  Accordingly, we modify the instructions and Word template to obtain information on these subjects, in order to provide the Commission with a more comprehensive and accurate understanding of providers' implementation of, and accounting and recordkeeping practices regarding, safety and security measures.[73]

---

[67] Securus Comments at 4.

[68] *Id.*

[69] Worth Rises Comments at 1-2; Wright Petitioners Comments, Brattle Report at 16-18, para. 34; Wright Petitioners Reply at 3-4.

[70] Wright Petitioners Comments, Brattle Report at 9-10, paras. 20-22 (suggesting that providers' costs to provide security features may differ "depending on the video access infrastructure");Worth Rises Reply at 1-2 (advocating that the Commission not limit the definitions of audio IPCS and video IPCS based on the technologies used to deliver the services); Wright Petitioners Reply at 3-4 (evaluating some record proposals to collect more safety and security data before urging the Commission to "not collect less data than proposed").

[71] Pay Tel Comments at 2 (arguing that safety and security are "integral" to IPCS such that "providers' accounting systems are not designed to track 'safety and security' costs (as opposed to specific security-related service offerings)" as separable components of the service); Pay Tel Reply at 5 (repeating the statement); ViaPath Comments at 5 (arguing that "correctional facilities face 'legitimate security interest[s]' when it comes to" IPCS and so "separating the costs associated with safety and security measures from other IPCS costs may not be possible in all cases"); *but see* Wright Petitioners Reply at 4-5 (pointing out that "a review of publicly available contracts indicates that safety and security costs are broken out in certain contracts"); Worth Rises Reply at 4 (arguing that "providers consistently offer many of their safety and security services to corrections agencies on an optional basis with a separate price, which demonstrates an analysis of related expenses").

[72] Pay Tel Comments at 4 (arguing that "[a]s crafted, the reporting form conflates essential and non-essential costs into a single category").

[73] We decline to adopt Pay Tel's proposal to develop a separate template for facilities to submit data on their own costs of providing safety and security measures.  Pay Tel Comments at 5.  Although we acknowledge that facilities are more likely to have this information than providers, this proposal goes beyond our delegated authority.

5.        **Video IPCS**

29.        We adopt the majority of our proposals related to video IPCS, but make targeted changes to capture more complete information.[74] As the record now makes clear, the costs of providing video IPCS likely vary depending on the specific infrastructure, devices, methods, technologies, and features used to provide those services. We find that this data collection should attempt to capture those variations at a more granular level than we proposed, to the extent possible without unduly burdening providers. Informed by the record compiled in response to the *Public Notice*,[75] we agree that additional information concerning video IPCS would assist the Commission in its ratemaking efforts and therefore add general inquiries regarding the technical requirements of the providers' video IPCS offerings, the infrastructure used to provide those services, and the reasons for and costs of any data storage associated with those services, among other matters.

30.        *Service Parameters*. To help the Commission understand the providers' video IPCS offerings, we require providers to describe in detail each video service they provided during 2022.[76] Providers must also identify, among other matters, each transmission technology used to provide each type of video service they provided to incarcerated people, provide any information they have regarding service parameters and performance indicators, and describe any steps they take to monitor whether the service functions properly.[77] We also require providers to state whether they, as opposed to the correctional facilities, provide any broadband connection needed for the providers' IPCS offerings; the extent to which they use those connections to provide audio as well as video IPCS; and the extent to which facilities use those connections for their own communications.

31.        *Infrastructure*. We require providers to describe the infrastructure they used to provide video IPCS, including any infrastructure that is located within correctional facilities.[78] We find that information on the type of infrastructure facilities deployed and its technical capabilities, to the extent the providers have that information, will help the Commission evaluate providers' video IPCS offerings. Accordingly, we have added a question to the Word template that directs providers to explain whether they, as opposed to the facilities they serve, provide and maintain any infrastructure that is located within facilities. We also direct providers to submit any information they have on the nature and capabilities (e.g., speed and latency) of the video IPCS infrastructure located within the facilities they serve, including use and general capability of Wi-Fi routers, if known.

32.        *Data Storage*. We add additional inquiries to the Word template designed to capture data on the storage costs associated with video IPCS in comparison to audio IPCS, as well as other

---

[74] *See generally* Wright Petitioners Comments, Brattle Report at 16-18, para. 34 (suggesting several proposed additions to video IPCS-related data requests); *cf.* Securus Reply at 2 (challenging, generally, the relevance and appropriateness of the proposals in the Brattle Report); ViaPath Reply at 2-3 (contending that the Brattle Report's proposals exceed the mandate of the Martha Wright-Reed Act).

[75] *See generally* Wright Petitioners Comments, Brattle Report at 16-18, para. 34 (generally discussing additional inquiries for us to consider regarding video IPCS).

[76] Ameelio Reply at 3 (noting that the facility's network equipment and broadband connection has an impact on video IPCS and offering alternative methods the Commission could use to collect more complete information on video IPCS), *see also* Wright Petitioners Comments, Brattle Report at 14 (suggesting the Commission collect data on performance indicators for video IPCS).

[77] Ameelio Reply at 3 (proposing that either specifying parameters for performance indicators to be reported against or allowing providers to specify the parameters over which they provide video IPCS and the resulting performance indicators would produce "a more complete picture of IPCS performance").

[78] *See id.* (identifying the impact that a facility's network equipment has on video call quality and noting "[f]or example, if a facility has a relatively low-speed broadband connection, or a limited number of WiFi access points," a provider's video IPCS "might be limited by factors that are extrinsic to the provider's service").

information regarding data storage policies and practices.[79]  Based on information in publicly available contracts, the Wright Petitioners suggest expanding our data storage-related questions to request information on data retention policies and the data processing and analysis costs associated with video IPCS.[80]  We agree that additional questions regarding the quantity of data stored and the storage period will help the Commission understand the costs associated with video IPCS.[81]  Likewise, if, as the Wright Petitioners suggest, data storage costs vary depending on the storage method and underlying technology used,[82] information on those factors may also be useful to help the Commission discharge its ratemaking responsibilities.  We therefore include an additional narrative request asking providers to explain these matters.  We find that allowing providers to submit a narrative response to this request imposes less of a burden on providers than would a more granular approach, such as requiring providers to report this information on a facility-by-facility basis.

33.    *Other Video IPCS Information.*  We also add questions about how providers market and sell video IPCS to consumers.  These questions include inquiries regarding whether video IPCS is offered as a stand-alone service or is "bundled" with other services.  We also include questions asking whether video IPCS rates are based on minutes of use, number of communications, or data usage, and whether there are any limitations or conditions on how incarcerated people may use video IPCS.[83]  We find that these questions provide the best approach for ensuring that the data collection captures information on providers' rate structures and practices affecting video IPCS.[84]

34.    We decline to adopt one commenter's proposal that we require providers to "track and report usage data for apps that are not free to the end-user."[85]  Although such usage data might be helpful in providing context for the provision of IPCS on tablets and any associated costs, that is not the focus of this collection.  Rather, we directly address the fundamental elements of providing IPCS on tablets by requiring providers to submit data on video sessions, audio minutes, and inputs for providing audio and video IPCS (e.g., hardware, software, and network connectivity), as well as costs exclusively attributable to IPCS versus other services.  We find that these questions are sufficient to address, and more directly target, any issues that may be particular to the provision of IPCS on tablets.

**6.    Site Commissions**

35.    As a general matter, we adopt the questions concerning company-wide and facility-level site commissions proposed in the *Public Notice*, which were largely based on the Third Mandatory Data Collection, as well as the proposed updates to the related instructions and templates.[86]  Those updates

---

[79] Wright Petitioners Comments at 5 (identifying how IPCS providers store video IPCS as a type of data for the Commission to collect); *see also* Wright Petitioners Comments, Brattle Report at 19-20, paras. 35-36 (discussing data storage costs for video IPCS and offering proposals); *see also* Ameelio Reply at 2 (noting that the costs to store a video call may be as much as ten times higher than similar costs for storing voice calls).

[80] Wright Petitioners Comments, Brattle Report at 19, para. 35 (stating "[i]f data is stored for a long time, there is a need for more storage capacity"); *see also* Ameelio Reply at 2 (stating that the costs for storing video and voice calls "scales linearly with the number of months of storage required by the correctional facility").

[81] Wright Petitioners Comments, Brattle Report at 18-20, paras. 35-36 (asking that we collect data on duration of storage of video calls and the costs of storage).

[82] *Id.* at 19, para. 36 (explaining that "[r]ecent advancements in technology have made it cost effective to store large amounts of data" and that "cloud storage solutions are [now] significantly cheaper than data storage solutions that were traditionally used").

[83] *Id.* at 16-18, para. 34 (identifying these as topics to include in the data collection, among other proposals).

[84] *2023 IPCS Notice* at 19, para. 45.

[85] Ameelio Reply at 2 (citing the Wright Petitioners Comments, Brattle Report at 21 (identifying services that are potentially ancillary to video IPCS on which the Commission could collect data)).

[86] *Public Notice* at 8.

include additional questions seeking information on interstate, intrastate, and international site commissions, as well as information concerning site commissions for both audio and video services.[87]  No commenter opposed the adoption of this general framework.  The Wright Petitioners additionally propose that the instructions include a diagram or chart explaining the structure of our site commission data requests.[88]  We agree that visual aids may improve the accuracy and consistency of the data reporting by helping providers better understand how to allocate their data among the different categories of site commissions.[89]  Accordingly, we have added diagrams to the instructions.

36.    We decline, however, to adopt the related request that we add instructions requiring providers to report specific details regarding each type of site commission.[90]  The updated instructions and templates already require providers to submit this level of detail at the facility-level.[91]  For instance, with regard to what qualifies as a legally mandated site commission, the instructions require that providers include a citation to the authority requiring such payment in the attached Excel template.[92]  Moreover, for in-kind site commissions, the Word template requires providers to describe "each payment, gift, exchange of services or goods, fee, technology allowance, or product provided to the Facility that [the provider] classif[ies] as an In-Kind Site Commission payment" for both legally mandated and contractually prescribed site commissions.[93]  Thus, the instructions and templates are already designed to provide the level of transparency sought.

### C.    Specific Instructions

#### 1.    Definitions

37.    Commenters generally support or do not comment on our proposed definitions.  We therefore adopt the proposed definitions with certain modifications, as explained below.

38.    *Audio IPCS and Video IPCS.*  The proposed instructions included a definition of "IPCS," but did not separately define "Audio IPCS" or "Video IPCS."  We adopt a request that we define each of these terms because we require cost allocation "between audio IPCS and video IPCS,"[94] and defining the relevant terms will help avoid potential confusion in making this allocation.  We therefore add the following definitions to the instructions:

> Audio IPCS means, for the purpose of this data collection, all services classified as inmate calling services within the meaning of 47 CFR § 64.6000(j), including (a) Interconnected VoIP; (b) Non-interconnected VoIP; (c) all Telecommunications Relay Services (TRS), including the use of a device or transmission service to access TRS; and (d) all point-to-point video services made available to incarcerated people for

---

[87] *Id.*

[88] Wright Petitioners Comments, Brattle Report at 11, para. 23.

[89] *Id.*

[90] *Id.* at 12, para. 24.

[91] *Incarcerated People's Communications Services*, *2023 Mandatory Data Collection Instructions* at 53-59, § IV.D.2.b (*2023 MDC Instructions*) (linked to by Appx. A, *infra*).

[92] *Id.*

[93] *Incarcerated People's Communications Services*, *2023 Mandatory Data Collection Word Template* at 24-25, questions 65, 68 (linked to by the *2023 MDC Instructions* at 66, Appx. A, Mandatory Data Collection Word Template).

[94] Securus Comments at 5.

communication in American Sign Language (ASL) with other ASL users.[95]

Video IPCS means any video communications service used by incarcerated people for the purpose of communicating with individuals outside the correctional institution where the people are incarcerated, regardless of the technology used.  It typically includes an integrated audio component, and excludes all services classified as Audio IPCS, as well as Other Products and Services, such as one-way entertainment, educational, religious, vocational, and instructional programming.

39.      We decline to restrict the definitions of Audio IPCS "to voice-only calling services using either circuit switched or VoIP technology" and Video IPCS "to real-time remote or on-site video visitation services," as one commenter suggests.[96]  The Martha Wright-Reed Act unequivocally expands the definition of IPCS to include advanced communications services.[97]  Advanced communications services broadly include "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[98]  We therefore do not limit the definitions of Audio IPCS or Video IPCS to specific types of technology used to transmit the services.[99]

40.      *Safety and Security Measures.*  We proposed a broad definition of "safety and security measures," in accordance with the Martha Wright-Reed Act's directive that the Commission "shall consider," as part of its ratemaking, "costs associated with any safety and security measures necessary to provide" telephone service and advanced communications services in correctional institutions.[100]  This approach was designed to allow the Commission the broadest possible view of the costs that providers and facilities incur.  We agree, however, with Pay Tel's observation that the proposed definition is "so broad as to encompass the entirety of IPCS."[101]  To eliminate this issue, we revise the definition of "safety and security measures" to read:

> [A]ny safety or security surveillance system, product, or service, including any such system, product, or service that: helps the Facility ensure that Incarcerated People do not communicate with persons they are not allowed to communicate with; helps monitor and record on-going communications; or inspects and analyzes recorded communications. Safety and Security Measures also include other related systems, products, and services, such as a voice biometrics system, a PIN system, or a system concerning the administration of subpoenas concerning

---

[95] The services described in clauses (c) and (d) in this definition must be made available to incarcerated people with communication disabilities, to the extent required by 47 CFR § 64.6040, because they enable communication that is functionally equivalent to Audio IPCS.  *See id.* § 225(a)(3).  Therefore, they shall be treated as Audio IPCS for purposes of this data collection, notwithstanding any video component of those services.

[96] Securus Comments at 5; *see also* Securus Reply at 3-4 (maintaining that the Commission lacks authority to regulate the rates for non-real time audio and video services); *contra* Worth Rises Reply at 1 (challenging Securus's position and proposal as being based in a "desire to limit the definition of audio and video IPCS [which] is driven by an intent to exclude services from regulation that Congress made no signal it intended to exclude").

[97] Martha Wright-Reed Act § 2(a)(2); *see also* Worth Rises Reply at 1-2.

[98] 47 U.S.C. §§ 153(1)(E), 276(d); Worth Rises Reply at 1-2.

[99] Worth Rises Reply at 1-2.

[100] Martha Wright-Reed Act § 3(b)(2).

[101] Pay Tel Comments at 4 (arguing that that the proposed definition "creates a feedback loop where providers are being asked to report the entirety of their service costs . . . in a 'catch all' category").

**Federal Communications Commission**                    DA 23-638

communications.  The classification of a system, product, or service as a Safety and Security Measure does not mean that it is part of a Provider's IPCS-Related Operations.[102]

41.    *Provider, Contractor, and Subcontractor.*  In our proposed definitions, we sought to clarify the relationship between two types of IPCS providers—contractors and subcontractors—to provide notice of filing obligations to entities that may not have previously been subject to our authority.[103]  We conclude, however, that further revisions are necessary.  Pay Tel suggests that the Commission "should take steps to ensure that it is apprised of situations where multiple entities are involved in providing a covered service to avoid instances of incomplete or duplicated data."[104]  While it does not explain what the Commission should do in the event multiple entities are involved in the provision of IPCS, we agree that clarification of the definitions of "Provider" and "Subcontractor" will ensure we receive the data necessary to achieve "insight into overall service costs."[105]  We therefore amend our proposed definitions of "Provider" and "Subcontractor" to make clear that any contractor or subcontractor that is providing IPCS, regardless of whether that entity has a contract directly with the facility or with another provider, is considered to be a provider for the purposes of the data collection.

42.    *Facility.*  In the proposed instructions, we proposed including definitions for several synonyms for the term "Facility," given the apparently interchangeable use of different terms in both the Martha Wright-Reed Act and the Commission's rules.[106]  One provider suggests eliminating the four separate terms used "to reference a prison or jail," and points out that "the Instructions themselves repeatedly use the term Facility."[107]  We agree that the inclusion of these terms is redundant and could cause confusion.[108]  We therefore delete the defined terms "Correctional Facility," "Correctional Institution," and "Detention Facility" and edit the definition of "Facility" to include these terms synonymously.  We likewise make conforming edits to refer only to "Facility" throughout the final instructions, templates, and certification form.

43.    *Miscellaneous Definitional Edits.*  We have also made various administrative revisions to the definitions.  These include grammatical corrections, consistent use of terms, and other non-substantive edits.

### 2.    Facility-Specific Data

44.    We adopt, in modified form, the suggestion that we require providers to indicate via a checkbox "whether [facility-specific] data submitted is at the facility level or has been allocated from a contract, in order to ensure that contract-level data is correctly allocated to the facility level."[109]  We find

---

[102] We proposed defining "Safety and Security Measures" as "including any such system, product, or service that allows Incarcerated People to communicate using IPCS as permitted by the Facility . . . "  *Incarcerated Peoples' Communication Services*, *2023 Mandatory Data Collection*, Proposed Instructions at 12, https://docs.fcc.gov/public/attachments/DOC-393014A1.docx (last visited July 13, 2023) (*2023 MDC Proposed Instructions*) (linked to by the *Public Notice* at 12, Appx. A, Proposed Mandatory Data Collection Instructions, Templates, and Certification Form.  We now exclude this language from the definition.

[103] *2023 MDC Proposed Instructions* at 8, 12.

[104] Pay Tel Comments at 7; *see also* ViaPath Reply at 5-6 (urging us "to ensure that all entities providing IPCS respond to the MDC").

[105] Pay Tel Comments at 6-7.

[106] *2023 MDC Proposed Instructions* at 9; *see also* Martha Wright-Reed Act §§ 2(b), 3(b), 4; 47 CFR § 64.6000.

[107] Securus Comments at 5 (referencing the terms "Correctional Facility, Correctional Institution, Detention Facility, and Facility").

[108] *Id.*

[109] Wright Petitioners Comments, Brattle Report at 4, 22-23, paras. 8, 41.

Federal Communications Commission                    DA 23-638

that obtaining this information may help eliminate confusion when attempting to understand how providers arrived at the amounts reported in their cost categories.[110]  However, we determine that this area is too nuanced for a checkbox and therefore revise the Word template to direct providers to identify whether the facility-specific data they report were recorded at the company, contract, or facility level.  This requirement will clarify whether data were recorded at the facility-level or whether they have been allocated and must be justified.  Because this step would be helpful and impose only minimal burdens on reporting providers, we add this question to the Word template.

### 3.    Telecommunications Relay Services Costs

45.    We amend the Word template to allow providers the option of providing information regarding any cost increases resulting from the TRS requirements adopted in the *2022 ICS Order*.[111]  In that order, the Commission adopted several requirements to improve access to communications services for incarcerated people with communication disabilities.[112]  IPCS providers must provide incarcerated people with communications disabilities with access to all relay services eligible for TRS Fund support in any correctional facility where broadband is available and where the average daily population incarcerated in that jurisdiction totals 50 or more persons.[113]  It also required that where inmate calling service providers are required to provide access to all forms of TRS, they also must allow ASL direct, or point-to-point, video communication.[114]  The Commission clarified and expanded the scope of the restrictions on inmate calling service providers assessing charges for TRS calls, expanded the scope of the required Annual Reports to reflect the above changes, and modified TRS user registration requirements to facilitate the use of TRS by eligible incarcerated persons.[115]  Providers have had to comply with certain of these requirements (i.e., the limitations on charging) since they became effective earlier this year, while compliance with other requirements is mandated beginning January 1, 2024, or, in some cases, pending approval by the Office of Management and Budget pursuant to the Paperwork Reduction Act.[116]

46.    Because this data collection seeks data only for calendar year 2022, providers' submissions will not fully reflect any additional costs they incur in complying with the new TRS requirements.  In recognition of this fact, Securus and Pay Tel urge that providers be given the option of submitting data estimating the costs of implementing the new requirements, even if those costs were not incurred in calendar year 2022.[117]  We find this suggestion reasonable and therefore modify the Word template to allow, but not require, providers to report their estimates of their annual incremental costs of complying with the TRS requirements adopted in the *2022 ICS Order*, to the extent those costs are not

---

[110] *Id.* at 4, para. 8.

[111] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, FCC 22-76 at 8-28, paras. 19-65 (2022) (*2022 ICS Order* or *2022 ICS Notice*).

[112] *Id.*

[113] 47 CFR § 64.6040(b)(2).  TRS are "telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind or who has a speech disability to engage in communication by wire or radio . . . in a manner that is functionally equivalent to the ability of a hearing person who does not have a speech disability to communicate using voice communication services."  47 U.S.C. § 225(a)(3); 47 CFR § 64.601(a)(43).

[114] 47 CFR § 64.6040(b)(2)(ii).

[115] *Id.* §§ 64.611, 64.6040, 64.6060.

[116] *See* Federal Communications Commission, Rates for Interstate Inmate Calling Services, 87 Fed. Reg. 75514 (Dec. 9, 2022).  Amendments to 47 CFR §§ 64.611(k)(1)(iv)-(v), 64.6040(c), and 64.6060(a)(5)-(7) will not become effective until the Office of Management and Budget (OMB) completes any review required under the Paperwork Reduction Act (PRA), and the Commission establishes an effective date by subsequent Public Notice.

[117] Securus Comments at 2; Pay Tel Reply at 3-4.

reflected in their data for 2022.[118]  Annual incremental costs of TRS compliance are those the provider would not have incurred but for its compliance with these TRS requirements.  Shared and common costs will already be reflected in the data providers will be reporting for 2022 and thus should be excluded from the annual incremental costs of TRS compliance.

### 4.    Facility Costs of Providing Safety and Security Measures

47.    We adopt our proposal to require providers to report any verifiable and reliable information in their possession about the costs the facilities they serve incur to provide safety and security measures in connection with the provision of IPCS, as well as any verifiable and reliable information on other facility-incurred costs that are not directly related to safety and security.  Any such information will provide the Commission with a more comprehensive picture of the total costs of providing IPCS.  Pay Tel has encouraged us to include facilities' costs in any effort to calculate the costs of IPCS.[119]  It argues that facilities incur recoverable costs "in making IPCS available" and supports our "efforts to document and acknowledge these costs."[120]

48.    The record also suggests, however, that providers are "highly unlikely" to have such information on facilities' costs.  One commenter proposes that the Commission develop a reporting template for use by facilities and seek this information directly from facilities.[121]  Although we acknowledge that facilities may be more likely to have access to this information than providers, collecting data directly from facilities would raise a number of difficulties.  Any attempt to seek data directly from facilities would arguably exceed the authority delegated to WCB and OEA by the Commission regarding this data collection.[122]  Attempting to expand the data collection to include facilities would also pose significant practical challenges.  Doing so would greatly expand the group of entities subject to the data collection and would multiply the burdens imposed by the collection.  Furthermore, developing a template, seeking comments, and collecting responses from facilities would significantly delay the data collection and could prevent the Commission from meeting the statutory timeframe established by the Martha Wright-Reed Act.  Accordingly, we decline to adopt this proposal.  We emphasize, however, that the Commission has repeatedly encouraged correctional officials to submit data on their IPCS-related costs, including any costs they incur for safety and security measures.[123]

49.    Finally, we adopt our proposal to require providers to be able to produce, on request, documentation sufficient to explain and justify the accuracy and reliability of any data they report regarding the costs incurred by facilities.[124]  This requirement will enable the Commission to evaluate the

---

[118] Securus Comments at 2; Pay Tel Reply at 4 ("Because the Commission has adopted rules which may impose significant new costs on IPCS providers, the Commission should enable data collection on estimated costs associated with those rules.").

[119] Pay Tel Comments at 5 ("[C]osts which should be recoverable by facilities are not limited to what the Commission proposes to label as 'safety and security' costs. . . .  Pay Tel supports the Commission's efforts to document and acknowledge these costs.").

[120] *Id.* ("[C]osts which should be recoverable by facilities . . . [include] costs . . . incurred by facilities in making IPCS available.").

[121] *Id.*

[122] *2023 IPCS Order* at 33, para. 84 (directing WCB and OEA to collect data "from all providers of those services now subject to [the Commission's] expanded authority under the Martha Wright-Reed Act and the Communications Act").

[123] *2021 ICS Notice*, 36 FCC Rcd at 9666, para. 324; *2022 ICS Notice* at 44, para. 96; *2023 IPCS Notice* at 24-25, paras. 56-57.

[124] *Public Notice* at 6.  Absent a future order adjusting the retention period, providers shall retain any such documentation until any rules the Commission adopts to implement the Martha Wright-Reed Act have become effective and are no longer subject to judicial review.

reliability and accuracy of any such data. It will minimize burdens by not requiring the submission of such documentation with providers' responses but only requiring the retention and subsequent production of the relevant documents upon request—documents which providers would likely retain in the normal course of business. No commenters challenged this aspect of our proposal. We find that this requirement will help ensure that the Commission will be able to evaluate the accuracy and reliability of the data submitted while adding only a minimal additional burden on providers.

### 5.    Admissions, Releases, and Turnover Rates

50.    We modify the Excel template to make the questions regarding facility-specific total admissions, total releases, and weekly turnover rates optional. In the *Third Mandatory Data Collection Order*, WCB and OEA identified these metrics as important to helping the Commission correct for the possibility that other population metrics, such as average daily population, might not fully account for all the costs of providing audio IPCS at smaller jails.[125] We therefore required the submission of facility-specific data on admissions, releases, and weekly turnover rates as part of the Third Mandatory Data Collection and, in the *Public Notice*, proposed to incorporate that requirement into the 2023 Mandatory Data Collection.[126] However, our review of providers' responses to the Third Mandatory Data Collection,[127] as well as comments on the proposed instructions,[128] make clear that requiring these data would impose a significant burden on providers without producing meaningful results, due in large part to difficulties providers encounter in obtaining accurate data from correctional officials.[129]

51.    As one commenter explains, "IPCS providers do not track or have adequate information to respond to questions about 'weekly turnover,' 'total admissions,' or 'total releases' at each correctional facility they serve."[130] Another provider explains that it has "no way of gauging the accuracy of this data or whether the sample size was useful."[131] In attempting to balance competing considerations regarding the potential importance of these data and the relative inaccessibility, we make the reporting of this information optional. This approach will reduce the burdens on providers,[132] while still allowing them to report this information where possible.[133]

---

[125] *Third MDC Order*, 37 FCC Rcd at 372 n.37 (finding that this information well help correct issues in reported data for population metrics and citing the *2021 ICS Notice*, 36 FCC Rcd at 9662-63, para. 319, for its discussion on the impact of turnover rates between jails with ADP's below 1,000 and higher population facilities; *see also 2021 ICS Notice*, 36 FCC Rcd at 9962-63, para. 319 (establishing the points that generally jails with ADPs smaller than 1,000 face higher admissions and turnover rates than facilities with larger populations and noting one provider's estimated weekly turnover rates representing a significant disparity in this relationship between jails and prisons).

[126] *Third MDC Order*, 37 FCC Rcd at 371-72, paras. 11-12; *2023 MDC Proposed Instructions* at 44.

[127] Multiple providers indicated they did not track the data and were unable to obtain them from correctional officials.

[128] Securus Comments at 6-7 (discussing issues with reporting of facility-specific demand data including turnover data and arguing that the Department of Justice's, Office of Justice Programs, Bureau of Justice Statistics' datasets on turnover rate is "likely to be superior to anything providers can glean in hit-or-miss efforts"); ViaPath Comments at 7 (listing issues with collecting this information generally).

[129] *Id.* at 6 (explaining the efforts Securus undertook to report turnover rate and related data for the Third Mandatory Data Collection and the results of those efforts).

[130] ViaPath Comments at 7.

[131] Securus Comments at 6 (discussing its view of the data received from the "small fraction" of facilities that responded to its queries for these data).

[132] *See id.* at 7 (stating that "[t]he Commission can ease some of the burden by eliminating the obligation to gather this data (or at least make it optional)").

###### 6. Bundling

52.    We modify the Word template to obtain specific information on the extent to which providers bundle IPCS with nonregulated services and on the steps providers employ to ensure that the costs of their nonregulated services are not allocated to IPCS or associated ancillary services.[134]  Although we did not explicitly include questions about bundling in our proposals, in the *Public Notice*, we sought comment on whether there were "additional data" that providers should be required to submit in response to the Mandatory Data Collection.[135]  The Wright Petitioners explain that bundling data are needed because providers offer different services that "may or may not be bundled together when reporting the data,"[136] potentially inflating the costs reported for regulated services.

53.    We agree that data on service bundles will assist the Commission in understanding what services are provided and how they are provided, and, most importantly, in establishing just and reasonable IPCS rates.  We therefore add questions to the Word template that direct each provider to report, among other information, whether it offers regulated and nonregulated services as a bundle and, if so, to identify each of the components included in the bundle; to identify which components are regulated or nonregulated and the standalone price of each component; to state whether bundling affects the provider's overall costs and, if so, how; and to indicate whether the provider's bundling practices vary by facility or by contract.

###### 7. Financial Reports

54.    We adopt our proposal to require all providers to submit audited financial statements or reports for 2022, or, in the absence of an audited financial statement or report, similar financial documentation for 2022 to the extent produced in the ordinary course of business.[137]

#### D. Timeframe for Provider Responses to the Data Collection

55.    In the *Public Notice*, we sought comment on our proposal to require providers to file their responses to the data collection within 90 days of the release of this Order.[138]  The proposed timeframe, which admittedly is somewhat shorter than the timeframe for the previous mandatory data collection,[139] reflects the time constraints the Martha Wright-Reed Act imposes for "promulgat[ing] any regulations necessary to implement" the Act.[140]

(Continued from previous page) ─────────────
[133] Because we make this this requirement optional, we do not address Securus's suggestion that the Commission rely on potentially relevant data from the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.  *Id.* at 6-7.

[134] Wright Petitioners Comments, Brattle Report at 20, para. 37 ("When the same provider supplies a regulated and unregulated product, especially when the unregulated product is a necessary input to the regulated service, the provider can charge monopoly prices in the unregulated market.  For IPCS, if there are regulations on video calling and the calling requires the use of tablets, the providers can charge monopoly prices for the unregulated services and each supernormal profits.").

[135] *Public Notice* at 7.

[136] Wright Petitioners Comments, Brattle Report at 7 n.11 ("For example, some providers offer video calling through tablets but these tablets also offer a wide range of additional 'enhanced services', such as games, books, movies, e-messaging, and picture/video messaging.").

[137] *2023 MDC Proposed Instructions* at 4-5.  We note that this exception for the ordinary course of business is only applicable to the submission of this alternative documentation and does not extend to other requirements of the data collection, and we remind providers to follow the instructions for each section of the data collection.

[138] *Public Notice* at 9.

[139] *Third MDC Order*, 37 FCC Rcd at 385, para. 46 (requiring responses in 120 days).

[140] Martha Wright-Reed Act § 3(a).

56.    Providers instead propose requiring responses to the data collection 120 days following release of this Order.[141]  ViaPath asserts that "[p]roviders need a reasonable amount of time to complete the report"[142] and Securus comments that "90 days is an insufficient period of time" to respond to the data collection.[143]  ViaPath contends that "a slight extension of the MDC filing deadline is reasonable."[144]  We agree with ViaPath and establish October 31, 2023 as the date on which provider responses will be due, unless final PRA authority for this collection is not granted prior to then.  Given the date of release of this Order, this represents an extension of an additional week from the originally proposed 90-day deadline, which, while not as extensive as sought, will nonetheless allow providers additional time to prepare their submissions.  We find that granting this extension will still provide the Commission with sufficient time to promulgate regulations to implement the Martha Wright-Reed Act consistent with the Act's time constraints.

###    E.    Digital Equity and Inclusion

57.    As part of our continuing effort to advance digital equity for all,[145] including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, we invited comment on any equity-related considerations[146] and benefits (if any) that may be associated with the proposals and issues associated with the data collection.[147]  Specifically, we sought comment on how our proposals for that collection may promote or inhibit advances in diversity, equity, inclusion, and accessibility.

58.    We conclude that the Mandatory Data Collection adopted here will promote digital equity, particularly for incarcerated people and their families.  In recent years, the Commission has collected data from providers of calling services for incarcerated people as part of its ongoing efforts to establish just and reasonable rates for those services that reduce the inequitable financial burdens unreasonable rates impose on incarcerated people and their loved ones, while ensuring that providers are fairly compensated for their services.[148]  The information IPCS providers submit in their data collection responses will help the Commission advance these goals in accordance with the Communications Act and

---

[141] ViaPath Comments at 2; Securus Comments at 5; Pay Tel Reply at 5; ViaPath Reply at 3; Securus Reply at 9; *but see* Wright Petitioners Reply at 6 ("urg[ing] the Commission to retain the proposed 90-day requirement").

[142] ViaPath Comments at 3; *see also* Pay Tel Reply at 5 (explaining that "[a]dditional time to prepare data collection submissions would help alleviate [the data collection's burden] by facilitating staffing flexibility and allowing for deconfliction with other reporting deadlines").

[143] Securus Comments at 5-6; *see also* ViaPath Reply at 3 ("The proposed 90-day response deadline is insufficient.").

[144] ViaPath Comments at 3.

[145] Section 1 of the Communications Act provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex."  47 U.S.C. § 151.

[146] The term "equity" is used here consistent with Executive Order 13985 as "the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality."  *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[147] *Public Notice* at 9-10.

[148] *Supra* note 9.

**Federal Communications Commission**         DA 23-638

the Martha Wright-Reed Act.

## IV. PROCEDURAL MATTERS

59. *Regulatory Flexibility Act*. The Regulatory Flexibility Act of 1980, as amended (RFA),[149] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[150] Accordingly, we have prepared a Supplemental Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Order* on small entities. The Supplemental FRFA supplements the Final Regulatory Flexibility Analyses completed by the Commission in the *Rates for Interstate Inmate Calling Services* proceeding and is set forth in Appendix B.

60. *Final Paperwork Reduction Act Analysis*. The Order contains new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to OMB for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198; *see* 44 U.S.C. § 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.[151] We have assessed the effects of the data collection on small business concerns, including those having fewer than 25 employees, and find that to the extent such entities are subject to the collection, any further reduction in the burden of the collection would be inconsistent with the objectives behind the collection.

## V. ORDERING CLAUSES

61. Accordingly, IT IS ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 155(c), 201(b), 218, 220, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 155(c), 201(b), 218, 220, 255, 276, 403, and 617 and the authority delegated in sections 0.21, 0.91, 0.201(d), 0.271, and 0.291 of the Commission's rules, 47 CFR §§ 0.21, 0.91, 0.201(d), 0.271, 0.291 and paragraphs 84 and 85 of the *2023 IPCS Order*, this Order IS ADOPTED.

---

[149] 5 U.S.C. §§ 601–612. The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[150] 5 U.S.C. § 605(b).

[151] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8536-37, para. 146 (2020).

Case: 24-2013     Document: 00118293595     Page: 273     Date Filed: 06/02/2025     Entry ID: 6725373

**Federal Communications Commission**                                           **DA 23-638**

62.     IT IS FURTHER ORDERED that the Commission's Office of the Secretary, Reference Information Center, SHALL SEND a copy of this Order, including the Supplemental Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION


Trent Harkrader
Chief
Wireline Competition Bureau


Giulia McHenry
Chief
Office of Economics and Analytics

**JA985**
6647

**Federal Communications Commission**                                    **DA 23-638**

**APPENDIX A**

**2023 Mandatory Data Collection Instructions,**
**Templates, and Certification Form**

The instructions, templates, and certification form for the 2023 Mandatory Data Collection are available through this link:    https://www.fcc.gov/2023-ipcs-mandatory-data-collection.

Federal Communications Commission                    DA 23-638

APPENDIX B

**Supplemental Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] a Supplemental Initial Regulatory Flexibility Analysis (Supplemental IRFA) was incorporated in the *2023 Mandatory Data Collection Public Notice*, released in April 2023.[2]  The Wireline Competition Bureau (WCB) and the Office of Economics and Analytics (OEA) (collectively, WCB and OEA) sought written public comment on proposals in the *Public Notice*, including comment on the Supplemental IRFA.  No comments were filed addressing the Supplemental IRFA.[3]  The *Public Notice* sought comment on proposals to implement the 2023 Mandatory Data Collection in the Commission's Incarcerated People's Communications Services (IPCS) proceeding and supplements the Final Regulatory Flexibility Analyses completed by the Commission in the *Rates for Interstate Inmate Calling Services* and other Commission orders pursuant to which this data collection will be conducted.[4]  This present Supplemental FRFA conforms to the RFA.[5]

     **A.       Need for, and Objectives of, the Order**

2.        In the Order, WCB and OEA adopt policies and specific requirements to implement the forthcoming 2023 Mandatory Data Collection for IPCS.[6]  In the *2023 IPCS Order*, the Commission adopted a new data collection requirement.[7]  The Commission determined that this data collection would enable it to "meet both [its] procedural obligations (to consider certain types of data) and [its] substantive responsibilities (to set just and reasonable rates and charges)" under the Martha Wright-Reed Act and the Communications Act of 1934, as amended (the Communications Act).[8]  Likewise, it directed WCB and

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *WCB and OEA Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communication Services*, WC Docket Nos. 23-62, 12-375, Public Notice, DA 23-355, at 13, Appx. B (Supplemental Initial Regulatory Flexibility Analysis) (WCB/OEA Apr. 28, 2023) (*2023 IPCS Mandatory Data Collection Public Notice* or *Public Notice*); *Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Notice of Proposed Rulemaking and Order, FCC 23-19, at 33, paras. 84 (2023) (*2023 IPCS Notice* or *2023 IPCS Order*).

[3] *Public Notice* at 10-11.

[4] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14201, Appx. C (Final Regulatory Flexibility Analysis) (2013) (implementing the First Mandatory Data Collection); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12944, Appx. E (Final Regulatory Flexibility Analysis) (2015) (implementing the Second Mandatory Data Collection); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9668, Appx. C (Supplemental Final Regulatory Flexibility Analysis) (2021) (implementing the Third Mandatory Data Collection).

[5] *See* 5 U.S.C. § 604.

[6] In the *2023 IPCS Order*, the Commission ordered a new mandatory data collection to ensure the proper implementation of the Martha Wright-Reed Act.  *2023 IPCS Order* at 33, para. 84; Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (Martha Wright-Reed Act or the Act).  The accompanying *2023 IPCS Notice* included an Initial Regulatory Flexibility Analysis.  *2023 IPCS Notice* at 38, Appx. A (Initial Regulatory Flexibility Analysis).  The *2023 IPCS Mandatory Data Collection Public Notice* also included a Supplemental Initial Regulatory Flexibility Analysis. *2023 IPCS Mandatory Data Collection Public Notice* at 13, Appx. B (Initial Regulatory Flexibility Analysis).

[7] *2023 IPCS Order* at 33, para. 85.

[8] *2023 IPCS Order* at 33, para. 84.

OEA "to update and restructure the most recent data collection as appropriate to implement the Martha Wright-Reed Act."[9]

3.    The Order determines the overall scope of the data collection including: limiting the data collection reporting period to calendar year 2022; defining cost reporting and cost allocation methodologies; defining reporting categories; requiring providers to allocate safety and security measures among seven categories; requiring that providers submit additional information for video IPCS; and adding questions concerning company-wide and facility-level site commissions.  The Order also clarifies specific instructions for data collection to provide clarity for the providers completing the forms.  Finally, the Order establishes that providers must submit responses by October 31, 2023.  Pursuant to their delegated authority, WCB and OEA have prepared instructions, reporting templates, and a certification form for the 2023 Mandatory Data Collection[10] and are issuing this Order to adopt all aspects of these documents.

**B.    Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

4.    There were no comments filed that specifically addressed the proposed rules and policies presented in the Supplemental IRFA.

**C.    Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

5.    Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[11]  The Chief Counsel did not file any comments in response to the rules and policies proposed in the Supplemental IRFA.

**D.    Description and Estimate of the Number of Small Entities to Which the 2023 Mandatory Data Collection Will Apply**

6.    The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the 2023 Mandatory Data Collection.  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[12]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[13]  A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[14]

7.    As noted above, an IRFA was incorporated in the *2023 IPCS Notice*.[15]  In that analysis, the Commission described in detail the small entities that might be affected.  Accordingly, in this Order,

---

[9] *Id.*

[10] *See* Appx. A, *supra.*

[11] 5 U.S.C. § 604(a)(3).

[12] *See id.* § 601(6).

[13] *See id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[14] *See* 15 U.S.C. § 632.

[15] *2023 IPCS Notice* at 38, Appx. A (Initial Regulatory Flexibility Analysis); *2023 IPCS Mandatory Data Collection Public Notice* at 13, Appx. B (Initial Regulatory Flexibility Analysis).

for the Supplemental FRFA, we incorporate by reference from these previous Regulatory Flexibility Analyses the descriptions and estimates of the number of small entities that may be impacted by the *Order*.

### E.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

8.    The 2023 Mandatory Data Collection will impose new or modified reporting, recordkeeping and other compliance obligations on small entities.  The Order requires IPCS providers to submit data and other information on, among other matters, calls, demand, operations, company and contract information, information about facilities served, revenues, site commission payments, the costs of safety and security measures, video IPCS, and ancillary fees.  WCB and OEA estimate that approximately 30 IPCS providers will be subject to this one-time reporting requirement.  In the aggregate, WCB and OEA estimate that responses will take approximately 7,950  hours and cost approximately $493,224.

### F.    Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

9.    The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency that affect the impact on small entities was rejected."[16]

10.    The 2023 Mandatory Data Collection is a one-time collection and does not impose a recurring obligation on providers.  Because the Commission's *2023 IPCS Order* requires all IPCS providers to comply with the 2023 Mandatory Data Collection,[17] the collection will affect smaller as well as larger IPCS providers.  WCB and OEA have taken steps to ensure that the data collection template is competitively neutral and not unduly burdensome for any set of providers and have considered the economic impact on small entities in finalizing the instructions and the template for the 2023 Mandatory Data Collection.  For example, the 2023 Mandatory Data Collection requires the collection of data for a single calendar year instead of three calendar years, as in previous data collection.  In response to the comments, WCB and OEA have refined certain aspects of the data collection, including modifying the treatment of audio IPCS and safety and security measures, clarifying the reporting of costs related to site commissions, and revising certain proposed definitions.  WCB and OEA have also revised instructions for cost reporting and cost allocation that will help the Commission understand the nature of the reported costs, without imposing significant additional burdens on providers.  WCB and OEA reorganized instructions for our proposed seven-category framework for reporting safety and security measure costs to simply them and increase clarity.  Further, the instructions for the data collection include relevant diagrams to facilitate providers' responses and improve the accuracy and consistency of the data they report.  The instructions allow, but do not require, providers to subdivide their audio and video IPCS costs into more discrete categories based on the type of audio or video service being provided, as some parties suggest, to give providers greater flexibility in reporting these costs.

11.    WCB and OEA considered but rejected alternative proposals to allow providers to use their own allocation methodologies because of the undue burden it would have on the interested parties and the Commission to analyze and correct inconsistent responses.  The modifications adopted in the Order avoid unduly burdening small and other responding providers while ensuring that providers have sufficiently detailed and specific instructions to respond to the data collection.  The data collection also

---

[16] 5 U.S.C. § 604(a)(6).

[17] *2023 IPCS Order* at 33, para. 84.

makes certain questions optional to reduce reporting burdens, including the questions regarding correctional facility-specific total admissions, total releases, and weekly turnover rates.

### G.    Report to Congress

12.    The Commission will send a copy of the Order, including this Supplemental FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[18]  In addition, the Commission will send a copy of the Order, including this Supplemental FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the Order, and Supplemental FRFA (or summaries thereof) will also be published in the Federal Register.[19]

---

[18] 5 U.S.C. § 801(a)(1)(A).

[19] *See id.* § 604(b).

1099 NEW YORK AVENUE, NW SUITE 900 WASHINGTON, DC 20001-4412

# JENNER&BLOCK LLP

## REDACTED – FOR PUBLIC INSPECTION

December 15, 2023

Gregory R. Capobianco
Tel  +1 202 639 6016
GCapobianco@jenner.com

VIA ECFS

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62; *Rules for Interstate Inmate Calling Services*, WC Docket No. 12-375.

Dear Ms. Dortch:

The Wright Petitioners herein submit a REDACTED version of a notice of ex parte in the above-captioned proceedings.  The Wright Petitioners are also submitting a CONFIDENTIAL version of this notice of ex parte pursuant to the Protective Orders adopted in the same dockets.[1]

Please contact me if you have any questions or require any additional information.

Sincerely,
/s/ Gregory R. Capobianco
Gregory R. Capobianco
*Counsel for The Wright Petitioners*

Enclosures

---

[1] *In re Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Protective Order, 28 FCC Rcd 16954 (WCB 2013) ("2013 Protective Order"); *see also In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Protective Order, WC Docket Nos. 23-62, 12-375, DA 23-298 (rel. Apr. 5, 2023) ("2023 Protective Order").  The 2023 Protective Order incorporates by reference into WC Docket No. 23-62 all acknowledgements filed pursuant to the 2013 Protective Order.  2023 Protective Order ¶ 6.

CHICAGO  LONDON  LOS ANGELES  NEW YORK  SAN FRANCISCO  WASHINGTON, DC     WWW.JENNER.COM

1099 NEW YORK AVENUE, NW SUITE 900 WASHINGTON, DC 20001-4412

JENNER&BLOCK LLP

**REDACTED – FOR PUBLIC INSPECTION**

December 15, 2023

Gregory R. Capobianco
Tel  +1 202 639 6016
gcapobianco@jenner.com

VIA ECFS

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62; *Rules for Interstate Inmate Calling Services*, WC Docket No. 12-375

Dear Ms. Dortch:

On December 13, 2023, Rebekah P. Goodheart, Christian J. Hatten, and the undersigned of Jenner & Block LLP, on behalf of the Wright Petitioners, and Coleman Bazelon, Paroma Sanyal, L. Shea Peretz, Natalie Selfe, and Preetul Sen from The Brattle Group, met via video conference with Victoria Goldberg, William Kehoe, Stephen Meil, Terri Natoli, Erik Raven-Hansen, and Simon Solemani of the Wireline Competition Bureau ("WCB") and Amanda Betag, Eugene Kiselev, Richard Kwiatkowski, Eric Ralph, Lester Roberts, and Geoff Waldau of the Office of Economics and Analytics ("OEA") to discuss The Brattle Group's preliminary observations on the responses to the Federal Communications Commission's ("Commission") 2023 Mandatory Data Collection ("MDC"). During this meeting, we discussed the importance of the Commission receiving complete and accurate responses from providers of Incarcerated People's Communications Services ("IPCS").

While The Brattle Group continues to analyze the 2023 MDC submissions, based on the information reviewed to date, we encouraged the Commission to work with IPCS providers so that they provide more complete and uniform data submissions and clarify any applicable

Ms. Marlene H. Dortch
December 15, 2023
Page 2

subcontractor relationships.[1]  To the extent any entities fail to comply with the 2023 MDC, the Commission should evaluate corrective action, including enforcement.[2]

One area with varying compliance concerns safety and security cost data.  Some of the IPCS providers submitted responses with allocations that do not track the instructions, including the seven categories set forth by WCB and OEA.[3]  Other providers left the safety and security cost section of their submissions entirely blank.  In either case, the Commission should presume that such a submission means that an IPCS provider has no safety and security-related costs entirely or at least with respect to the identified categories.[4]

Finally, in the attached appendix, The Brattle Group also responds to comments from Pay Tel regarding the model carrier approach[5] and comments from Securus about The Brattle Group's method of cleaning and compiling data from the Third MDC to inform The Brattle Group's recommendations about how to design the 2023 MDC.[6]

Please contact the undersigned if you have any questions about this matter.

Sincerely,

/s/ Gregory R. Capobianco
Gregory R. Capobianco
*Counsel for The Wright Petitioners*

cc:     Amanda Betag
        Eric Ralph
        Erik Raven-Hansen
        Eugene Kiselev
        Geoff Waldau
        Lester Roberts
        Richard Kwiatkowski

---

[1] For example, some IPCS providers use subcontractors to provide services, particularly video services, and these subcontractors either have not submitted their responses to the 2023 MDC or have submitted data in a way that makes it difficult to connect with the contracting IPCS providers.  *See* Appendix A at 4 ("Brattle Report").

[2] 47 U.S.C. §§ 502; 503(b); 47 C.F.R. § 1.80, tbl. 1 to paragraph (B)(10) (establishing a base forfeiture for failure to file required forms or information); *see also In re Custom Teleconnect, Inc.*, Forfeiture Order, 36 FCC Rcd 16516 (2021) (assessing forfeiture for "failing to timely file an accurate Annual ICS Report and certification, in violation of the Commission's rules").

[3] *See* Brattle Report at 4-5.

[4] To complete the 2023 MDC, an authorized officer of each IPCS provider certified that "all statements and information contained" in the response were "true, accurate, and complete."  *See* Incarcerated People's Communications Services 2023 Mandatory Data Collection Certification Form (FCC Form 2303(b)).

[5] *See* Brattle Report at 5-11.

[6] *See id.* at 11-20.

Ms. Marlene H. Dortch
December 15, 2023
Page 3

Simon Solemani
Stephen Meil
Terri Natoli
Victoria Goldberg
William Kehoe

# Appendix A

# Brattle Report

**NOTICE OF EX PARTE FOR "FCC SEEKS COMMENT ON ITS EXPANDED AUTHORITY TO ENSURE JUST AND REASONABLE RATES AND CHARGES FOR INCARCERATED PEOPLE'S COMMUNICATIONS SERVICES," NOTICE OF PROPOSED RULEMAKING (DOCKET NO. 23-62, 12-375) AND "PROPOSED 2023 MANDATORY DATA COLLECTION FOR INCARCERATED PEOPLE'S COMMUNICATIONS SERVICES" (DA 23-355)**

PREPARED BY

Coleman Bazelon, Paroma Sanyal,
L. Shea Peretz, Natalie Selfe, and
Preetul Sen

December 15, 2023



REDACTED – FOR PUBLIC INSPECTION

CONTENTS

I.     Introduction .................................................................................................... 2

II.    Observations from the 2023 MDC Submissions ............................................. 3

III.   Pay Tel (Wood Report) ................................................................................... 5

    III.A.   Incentives to Minimize Costs ............................................................. 5

    III.B.   Potential "Misreporting" of Costs ...................................................... 7

    III.C.   Feasibility of the Proposed Model Carrier Approach ......................... 8

    III.D.   Choosing the Lowest Cost Category ................................................... 9

IV.   Securus (FTI) ................................................................................................ 11

    IV.A.   Overview of Brattle's Data Cleaning Process ................................. 12

        IV.A.1.   GTL ............................................................................. 14

        IV.A.2.   Securus ....................................................................... 15

        IV.A.3.   Combined .................................................................... 15

        IV.A.4.   ICSolutions ................................................................. 15

        IV.A.5.   NCIC ........................................................................... 17

        IV.A.6.   Pay Tel ........................................................................ 17

        IV.A.7.   Prodigy ........................................................................ 18

        IV.A.8.   Talton ........................................................................... 18

    IV.B.   Compilation of Provider-Specific Data ............................................ 19

REDACTED – FOR PUBLIC INSPECTION

# I.     Introduction

1.  In this report, we document our observations of the 2023 Mandatory Data Collection ("MDC") submissions from IPCS providers and we respond to submissions and questions regarding Brattle's proposed IPCS cost model.  With recent IPCS provider submissions for the 2023 MDC, we observed aspects of the data that might pose challenges for comprehensive data analysis. Some of these issues are outlined in Section II. In Section III, we address the comments raised by Don J. Wood, on behalf of Pay Tel Communications Inc. on August 21, 2023 (the "Wood Report") in response to the May 8, 2023 and July 12, 2023 Brattle Reports.[1] In Section IV, we address comments raised by FTI Consulting, Inc. on behalf of Securus Technologies, LLC on July 12, 2023 in response to the June 2, 2023 Brattle Report submitted in response to the Proposed 2023 Mandatory Data Collection.[2]  We also outline the steps we took to process the data from provider submissions for the 2022 Third MDC for use in the cost model.

---

[1]  *See*, Don J. Wood, "Report of Don J. Wood, MBA, CVA, MAFF on behalf of Pay Tel Communications, Inc.," FCC WC Docket Nos. 12-375, 23-62, August 21, 2023, https://www.fcc.gov/ecfs/document/10821038405941/2 ("Wood Report"). *See also,* Coleman Bazelon and Paroma Sanyal, "Reply Comments on the Federal Communications Commission's 'Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services' (DA 23-355)," The Brattle Group, July 12, 2023, https://www.fcc.gov/ecfs/document/10712916402481/1, ("Brattle 2023 IPCS NPRM Reply Report") *and* Coleman Bazelon and Paroma Sanyal, "Comments on 'FCC Seeks Comment on its Expanded Authority to Ensure Just and Reasonable Rates and Charges for Incarcerated People's Communications Services,' Notice of Proposed Rulemaking (Docket No. 23-62, 12-375)," The Brattle Group, May 8, 2023, https://www.fcc.gov/ecfs/document/1050883878528/1 ("Brattle 2023 IPCS NPRM Report").

[2]  Securus Technologies, LLC, "Reply Comments In the Matter of Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services," FCC WC Dockets No. 23-62, 12-375, July 12, 2023, https://www.fcc.gov/ecfs/document/1071374145896/1, *see*, Attachment, Charlie J. Choe, Robert O. Fisher, Brian F. Pitkin, and Steven E. Turner, "Report of FTI Consulting, Inc.," FTI Consulting, Inc., July, 12, 2023 ("FTI Report"). *See also,* Coleman Bazelon and Paroma Sanyal, "Comments on the Federal Communications Commission's 'Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services' DA 23-355,'" WC Docket Nos. 23-62 and 12-375, The Brattle Group, June 2, 2023, https://www.fcc.gov/ecfs/document/10602467321705/1, ("Brattle 2023 MDC Reply Report").

# II.    Observations from the 2023 MDC Submissions

2.  The FCC's request for IPCS providers' 2023 MDC submissions aims to bring greater transparency to the costs associated with offering audio and video calling services. Notably, this iteration of the data collection introduces information on video calling expenses, video calling usage, information on IPCS specific equipment and expenses related to the provision of safety and security.[3]

3.  The submitted data exhibits inconsistencies among providers. While some have reported usage metrics in the "D1. Facility Demand and Revenue" tab, some provided incomplete information in the tabs concerning expenses for audio and video calling.[4] In order to compute the cost per

---

[3]   The following IPCS providers produced data in late 2023 which records audio, video, and security costs by facility or contract level. *See,* City Tele-coin Company Inc, "Proceedings: WC 12-375", submitted November 2, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1102163807724 (City Telecoin 2023 MDC); Ameelio Inc., "Proceedings: WC 23-62, WC 12-375", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/110121191147 ("Ameelio 2023 MDC"); Securus Technologies LLC, "Proceedings: WC 23-62, WC 12-375", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/11012289827195 ("Securus 2023 MDC");  Global Tel*Link Corporation d/b/a ViaPath Technologies, "Proceedings: WC 23-62, WC 12-375", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1101210000852 ("GTL 2023 MDC"); iWebVisit.com, LLC, "Proceedings: WC 23-62, WC 12-375", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1031978728508 ("iWebVisit 2023 MDC"); Smart Communications Holding, Inc., "Proceedings: WC 23-62, WC 12-375", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1031698222228 ("Smart MDC 2023"); Paytel Communications, Inc., "Proceedings: WC 23-62, WC 12-375", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1031268493661 ("Paytel 2023 MDC"); Correct Solutions, LLC, "Proceedings: WC 23-62, WC 12-375", submitted October 30, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1030879526709 ("Correct 2023 MDC"); Talton Communications, Inc., "Proceedings: WC 23-62, WC 12-375", submitted October 30, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/103086493808 ("Talton 2023 MDC"); Crown Correctional Telephone, Inc., "Proceedings: WC 23-62, WC 12-375", submitted October 30, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/103084147224 ("Crown 2023 MDC"); Prodigy Solutions, Inc., "Proceedings: WC 23-62, WC 12-375", submitted October 30, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/103003408440 ("Prodigy 2023 MDC"); Combined Public Communications, "Proceedings: WC 23-62", submitted October 31, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/103170127855 ("Combined 2023 MDC"); Encartele, Inc., "Proceedings: WC 12-375", submitted November 8, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1108061913372 ("Encartele 2023 MDC"). While we cite the public versions of these filings, our analysis and review are based on the confidential submissions.

[4]   For instance, for [BEGIN HIGHLY CONFIDENTIAL] ████████ [END HIGHLY CONFIDENTIAL] submission, the minutes of use information in the "D1. Facility Demand and Revenue" tab was filled incorrectly but the

minute of calling, it is useful to have comprehensive data that encompasses both usage and cost information. Additionally, there are instances where the level of granularity in the data varied amongst different line items.[5]

4. Furthermore, the latest data collection on video calling reveals the use of subcontractors among some providers.[6] In order to conduct thorough data analysis, we need to reconcile the information between these subcontractors and the entities they serve. However, the reconciliation process currently lacks definitive clarity and conducting any analysis would necessitate making assumptions about the data.

5. The guidelines for data submission required providers to categorize their security expenses into seven distinct categories. These categories were comprehensive and would cover all security related expenses. However, some submissions did not adhere to this requirement. For instance, [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] reported all security costs under one single category.[7] When these expenses are not appropriately segmented, any comprehensive data analysis would require making assumptions on how to allocate across categories. One possible way of making these allocations would be to base them off of benchmarks from providers who categorized these expenses correctly.[8]

---

expenses in the tabs "D1. Facility Audio IPCS Costs" and "D1. Facility Video IPCS Costs" were left as zeroes. Computing the facility level cost per minute would require data on both usage and expenses. *See,* [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL].

[5]  *See,* [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL]. In [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] submission, while all the usage information in the tab "D1. Facility Demand and Revenue" was reported at the facility level, the average daily population was reported at the contract level.

[6]  *See* e.g. [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL], 2023 MDC. [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL], uses [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL], and [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL], as subcontractors. Comprehensive analysis for this provider would require us to not only have their data but also data from their subcontractors and a clarity on how to identify facilities that are in common across the different submissions. Specifically, *see,* [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL].

[7]  *See,* [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL]. Note that the entirety of [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] safety and security expenses is reported under "(g) Other Safety and Security Measures ($)" and the other categories have been left blank.

[8]  For instance, [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL] correctly breaks down their safety and security expenses into multiple categories. One could use their submission as a template in order to compute the fractions of total security and safety expenses that are attributable to each subcategory. *See,* [BEGIN HIGHLY CONFIDENTIAL] ███████ [END HIGHLY CONFIDENTIAL].

# III.     Pay Tel (Wood Report)

6.  Mr. Wood acknowledges that the dynamics in the IPCS market are unusual and agrees that market forces are unable to constrain IPCS rates.[9] In 2015, Mr. Wood concluded that "just and reasonable rates for end users, and fair compensation for providers, can only be achieved through additional Commission action."[10] Mr. Wood also acknowledges that the current market structure creates incentives for providers to charge higher rates since correctional agencies put more emphasis on revenue sharing percentages and site commissions at the expense of rates that are charged to end-users.[11] The Wood Report is also in agreement with past Brattle filings regarding the inconsistencies in data reporting across providers.[12] However, Mr. Wood criticizes our analysis in the Brattle 2023 IPCS NPRM Report and the Brattle 2023 IPCS NPRM Reply Report on four counts.

## III.A.     Incentives to Minimize Costs

7.  Mr. Wood argues that The Brattle Group's conclusion that "deprioritization of end-user rates in the contract awarding process can lead to a lack of incentives for providers to be cost efficient" is incorrect.[13] He argues that to maximize revenue sharing percentages and site commissions that providers offer to correctional facilities, IPCS providers need to minimize their costs – which includes both direct and indirect costs of operation.[14]

8.  While we agree that the contracting process can potentially exert downward pressure on costs. However, this is not fully reflected in IPCS prices, as Mr. Wood acknowledges.[15]  In the IPCS market, bidders are evaluated on multiple dimensions, and the price charged to incarcerated people for the services provided is only one of those dimensions.  With the incarcerated people and their families who pay for IPCS not in the 'market' for choosing IPCS providers, it is not surprising that prices are often not the primary driver of contract selection.  Although there are

---

9   *See*, Wood Report, pp. 5-7.

10   *See*, Wood Report, p. 7.

11   *See*, Wood Report, pp. 2, 6-7.

12   *See*, Wood Report, pp. 2, 9-10.

13   *See*, Wood Report, p. 8.

14   *See*, Wood Report, pp. 8-9.

15   *See*, Wood Report, p. 6.

other incentives for IPCS providers to reduce costs, those incentives are muted compared to a more traditional competitive market.

9.    When considering competition for contracts, as the Wood Report points out, site commissions may be an important factor in facility and provider decision making. Mr. Wood argues that lower costs are an incentive to provide higher site commissions, thereby increasing commissions.[16] This argument, while partially true, does not provide the full picture. First, there are things other than the ability to pay higher site commissions that will drive the cost minimization decision of firms, for instance, the uncertainty regarding future cost-based regulation. Given the complexity of the contract granting process, one cannot definitively say how efficient costs are as a result of the presence of site commissions. Second, rents being earned in this industry are often a product of site commissions. Such rents are not solely based upon offering the lowest or low costs when bidding for contracts. Site commissions are a decision related to how much of rents providers are willing to share with facilities. As a result, costs have a second order effect on site commissions. However, site commissions may not necessarily result in an incentive for providers' to reduce their costs. For these reasons, a model-carrier approach, looking at the incentives for lowering costs in the broader telecommunications industry, is valuable.

10.    The idea, as the Wood Report alludes to, that cost savings have a 100 percent pass through to higher site commissions is not necessarily true. The implication of significant rents in the industry is that cost savings have a marginal benefit (profits go up by the amount costs are reduced) but a much less inframarginal benefit (lower costs do not directly translate into more contracts).[17] If lower costs do not translate into selling more IPCS, then the incentives to lower costs are diminished and management may focus more on the full set of factors that do win contracts. Such factors can include: donations to sheriffs' campaigns (who ultimately choose the IPCS provider in certain instances), contributing to site commissions, or meeting non-IPCS related "asks" from facilities such as technology for guards (such as iPhones) or excessive security features that go beyond CALEA requirements.[18]

---

[16]  Wood Report, pp. 8-9.

[17]  *See*, Law Insider, "Inframarginal Definition," accessed September 8, 2023, https://www.lawinsider.com/dictionary/inframarginal# ("Inframarginal rents represent the difference between the market price and a market participants' marginal cost of production").

[18]  *See*, Aleks Kajstura, "Jail Phone Companies Flood Money into Sheriff Races," Prison Policy Initiative, October 12, 2017, https://www.prisonpolicy.org/blog/2017/10/12/phone-elections/; Equal Justice Initiative, "Lawsuit Alleges Florida Corrections Department Chose Perks Over Lower Phone Rates for Incarcerated People," February 11, 2019, https://eji.org/news/lawsuit-alleges-florida-corrections-department-chose-perks-over-

## III.B.    Potential "Misreporting" of Costs

11.  Mr. Wood critiques the Brattle Report's conclusion that "if rates are set based on inflated or mis-reported costs, then the rates will not be efficient – they will not reflect the cost of providing the service."[19]  He argues that the Brattle Report's analysis fails to point to evidence that may suggest that costs have been misreported in the data collection process or are likely to be inflated in the existing market conditions.[20]  He also points out that for Pay Tel, all produced cost data tie directly to audited financial statements and operating records of the company.[21]

12.  Mr. Wood's concerns are misguided.  Brattle's concern does not revolve around the authenticity of the reported costs and we have no reason to believe that the reported costs are inconsistent with audited financials of Pay Tel or any other provider.[22]  However, we are concerned about the allocation of costs to the IPCS industry.  Given that many IPCS providers span multiple lines of business and often use subcontractors, we question the accuracy and consistency of cost allocation since the data collection focused on a single line of business. Additionally, Mr. Wood alludes to the fact that for "IPCS Providers, there is not (and has not been) either a Uniform System of Accounts or a set of rules for assigning, allocating, and reporting accounting data in the way that regulated carriers were historically required to do."[23] We agree that a standard set of reporting rules would enhance clarity, leading to a more transparent allocation of costs. Given that this is not possible, a model carrier corrects for any over-reporting.

13.  An alignment between reported costs and audited financials does not address this issue.  It is possible, for instance, for a provider to mis-allocate common costs between IPCS and non-IPCS business segments, and within the IPCS segment, there can be a mis-allocation between costs that are strictly related to the provision of telecommunications service, versus those that are not. Even if costs are correctly allocated using a reasonable allocation methodology, the very fact that there are multiple ways to do an allocation and that carriers chose different and sometimes

---

lower-phone-rates/; Securus Technologies, Inc., versus. Florida Department of Corrections, "Complaint for Writ of *Quo Warranto*, Declaration of Relief, and Injunctive Relief," In The Circuit Court for Leon County, Florida, filed January 1, 2019, p. 11, ¶ 39, https://www.documentcloud.org/documents/5700428-SecurusComplaint.html.

19   *See*, Wood Report, p. 12.

20   *See*, Wood Report, pp. 12-13.

21   *See*, Wood Report, p. 12.

22   *See*, Wood Report, pp. 12-16.

23   *See*, Wood Report, p. 16.

inconsistent approaches means that data are not always comparable across carriers. Past Brattle Group reports have discussed this issue.[24] The fact that various services covered by IPCS providers are interlinked and utilize the same infrastructure, may hinder the precise allocation of the shared costs.[25] There is some uncertainty regarding the accuracy, effectiveness, and consistency of the current cost allocation practices. It is also important to recognize that not all reported costs should be recoverable.[26] For the FCC to exercise its authority on which costs are recoverable, they need accurate, consistent and, in some cases, detailed cost data.

## III.C.    Feasibility of the Proposed Model Carrier Approach

14.    Mr. Wood also states that Brattle Group's "Model Carrier Approach" has never been utilized by the Commission and represents a step away from cost-based rates.[27] He also argues that any comparison with the universal service cost model is inappropriate.[28] Mr. Wood also states, however, that "a complete list of distinctions between the cost methodology previously used by the Commission 'in the universal service model context' and the proposed Model Carrier Approach is beyond the scope of [the Wood Report]."[29]

15.    Given the new mandate given to the FCC in the IPCS context, including use of industry average costs, the Commission has discretion to use a methodology, including a cost model, to set rates.[30] Nothing compels the FCC to use costs. The IPCS service and the costs associated with it are somewhat distinct from other contexts and, given some of the challenges of previous data collections, it is appropriate for the Commission to adopt a new cost model that aligns with the particular industry. Nevertheless, the FCC has a long history of modelling costs for telecommunications services using comparables, similar to what the Brattle model proposes, in other contexts. A classic example is the 1996 TELRIC (total element long run incremental cost)

---

[24]    *See*, Brattle 2023 MDC Reply Report, ¶¶ 7-9; Brattle 2023 IPCS NPRM Reply Report, ¶ 24.

[25]    *See*, Brattle 2023 MDC Reply Report, ¶¶ 15, 17, and 38.

[26]    *See*, Brattle 2023 MDC Reply Report, ¶ 33; Brattle 2023 IPCS NPRM Reply Report, ¶ 24.

[27]    *See*, Wood Report, pp. 16-19.

[28]    *See,* Wood Report, p. 17.

[29]    *See,* Wood Report, p. 18.

[30]    FCC, "Congress Enacts Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Updated with Link to Legislation)," updated January 9, 2023, accessed December 15, 2023, https://www.fcc.gov/congress-enacts-martha-wright-reed-just-and-reasonable-communications-act-2022-updated-link.

model, where the Commission adopted "forward-looking costs rather than historical costs" as the basis for determining rates.[31] Another example is the 2010 National Broadband Plan, where one can observe the detailed cost model based on appropriate comparables, outlined by the FCC for rolling out nationwide services to America's first responders.[32]  In the USF context, for instance, in the 2015 Alternative Connect America Cost Model (A-CAM) context, the FCC conducted a detailed cost study that would be used to provide model-based support to rate-of-return carriers who chose to receive this support and the recent Enhanced ACAM does a similar estimation.[33]

## III.D.    Choosing the Lowest Cost Category

16.  Mr. Wood notes that we offered that the lowest cost observation from MDC data could be used.[34]  He argues that choosing the lowest observed cost from each cost category reported in the 2023 MDC, and then using those to construct a model carrier cost, is problematic. He notes that providers often make strategic decisions that can impact their cost structures and these decisions may result in lower costs in one category and higher costs in another.[35]

17.  This is not what the Brattle model does, and we agree with Mr. Wood that this would not be appropriate.[36]  In our current iteration of the Model Carrier Approach, we use a combination of commercial, telecoms industry cost data and 2023 MDC data on minutes of voice calling and ADP. We include costs that are not from the IPCS industry because those costs are widely trusted for

---

[31]  FCC, "In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996," CC Docket No. 96-98, ¶110, adopted August 1, 1996, https://transition.fcc.gov/Bureaus/Common_Carrier/Orders/1996/fcc96325.pdf.

[32]  FCC, "A Broadband Network Cost Model: A Basis for Public Funding Essential to Bringing Nationwide Interoperable Communications to America's First Responders," OBI Technical Paper No. 2, May 2010, https://docs.fcc.gov/public/attachments/DOC-297709A1.pdf, ("NBP Public Safety Cost Model"), pp.1-2.

[33]  FCC, "Alternative Connect America Cost Model Overview," April 2015, https://transition.fcc.gov/wcb/ACAM040115.pdf, ("2015 A-CAM Overview"), p.3. *See also*, Federal Communications Commissions, "In the Matter of Connect America Fund: A National Broadband Plan for Our Future High-Cost Universal Service Support," WC Docket No.'s 10-90, 14-58, 09-197, 16-271, RM-11868, Report and Order, Notice of Proposed Rulemaking and Notice of Inquiry, adopted July 23, 2023, p. 2, ¶ 2, https://docs.fcc.gov/public/attachments/FCC-23-60A1.pdf.

[34]  Wood Report, pp. 19-21.

[35]  Wood Report, pp. 19-21

[36]  We proposed this idea because it would represent a cost achievable when the provider demonstrates efficiency across all cost categories

evaluating efficiency within the telecom sector.  Mr. Wood points out by using industry minimums our model undercompensates providers.[37]  However, our current approach is using industry averages from the broader telecom industry, not minimums, so this criticism is invalid. Despite Mr. Wood's criticisms, the overarching point remains: when comparing costs for the exact same service between the external industry and the IPCS industry, significant disparities in cost categories point to inefficiencies and problems with resource allocation.

18. Mr. Wood also incorrectly interprets our earlier report's (dated May 8, 2023) introduction of a potential model carrier methodology with what we propose in our most recent filing (dated July 12, 2023). Wood's writes:

> *"Our proposed model carrier approach provides a potential path to using this data. The FCC can choose the lowest or the average percentage of a particular cost as a share of operating or total expenses (after controlling for facility attributes) and use that as the model carrier cost percentage, and then adjust the reported costs of facilities that are higher than this benchmark.[38]*

19. Although both our reports state there is a path forward in using the MDC data, we do not discuss taking the "lowest or the average percentage of a particular cost as a share of operating or total expenses" in our most recent report.[39]  Mr. Wood incorrectly assumes that we are using the "lowest" costs from the MDC and industry data at points in our report.  He also misunderstands what we mean by "benchmarking" and "adjust[ing] reported costs of facilities" and incorrectly assumes our approach will lead to "a series of benchmarks that do not represent a real world combination."[40]  Using commercial, telecoms' costs information provides a useful, accurate benchmark for the IPCS market. The Commission can certainly benefit from comparing IPCS costs to commercial telecoms costs, and may also revise our model as they see fit.

20. We describe the Model Carrier Approach as follows:

> *"… we propose a model carrier approach that avoids issues with industry incentives, encourages efficiency for providers, avoids allocation issues with cost*

---

[37] *See,* Wood Report, pp. 19-22. ("The proposed Model Carrier Approach is almost certain to result in less than fair compensation to IPCS Providers.")
[38] Wood Report, p. 21 describing the Brattle 2023 IPCS NPRM Report.
[39] Brattle 2023 IPCS NPRM Reply Report, ¶ 36.
[40] Wood Report, p. 21.

REDACTED – FOR PUBLIC INSPECTION

*reporting, and ensures just and reasonable rates. This approach is based on estimating rate caps that are based on industry-wide average costs from the communications industry, which the FCC is now authorized to use under the Martha Wright Reed Act as discussed earlier. Our proposed model carrier approach involves creating a hypothetical, idealized carrier or company that represents the standard for efficiency, costs, and performance within the industry. This model carrier serves as a benchmark against which the rates of actual carriers are evaluated and set."* [41]

21.   What we are suggesting is for the FCC to consider how the costs in the IPCS market compare to costs in the commercial, telecoms industry via benchmarking with our model. Of course the FCC can adapt this model as appropriate, but, as it stands, our model relies largely on industry data to make the point that some of the costs reported by providers' in the Third MDC are not strictly costs related to the provision of telecommunications service. For instance, merger and acquisition costs, litigation costs, and security costs are all legitimate costs that a provider faces. However, these costs are not necessarily required in the operations and provisions of offering incarcerated individuals and their loved ones voice and video calling.  Should the FCC deem certain costs as rightfully recoverable, our Model Carrier approach could expand the cost categories.

# IV.    Securus (FTI)

22.   In the Reply Comments submitted by Securus, FTI Consulting Inc. has provided comments on the Brattle Report that was filed in June 2023, in response to the June 2, 2023 Brattle Report submitted in response to the Proposed 2023 Mandatory Data Collection. [42] The report raises questions about how the Brattle Report handled issues of data quality, such as addressing how it handled outliers and mismatches in the data. [43] For example, the FTI report states that, [44]

> *"For example, certain providers did not break out their company-wide information into a per facility basis as instructed by the MDC. Rather the data was presented*

---

[41]   Brattle 2023 IPCS NPRM Reply Report, ¶ 34.

[42]   *See*, FTI Report. *See also*, Brattle 2023 MDC Reply Report.

[43]   *See*, FTI Report, ¶ 9.

[44]   *See,* FTI Report, ¶ 9.

> *in the facility-level tabs on a per contract basis, which could have a material effect on the outcome of an analysis purporting to compare facility-level costs with the applicable cost driver. The Brattle Report does not explain how it addressed that issue."*
>
> *. . .*
>
> *"the Brattle Report seems to have included provider information that had major data quality concerns."*

23. The FTI Report concludes that the lack of a detailed methodology documentation that explains the Brattle Group's approach to addressing outliers, questionable data, and potential mismatches, made it difficult for FTI to replicate the findings related to the Third MDC data in the Brattle Report. In Section IV.A, we present a detailed methodology that should allow any commenters to replicate the findings based on the Third MDC dataset.

## IV.A.    Overview of Brattle's Data Cleaning Process

24. To create a usable dataset, we compiled all relevant MDC submissions from providers and dropped outliers when appropriate.[45] FTI correctly notes that there are some data submissions which provide data at the contract level rather than facility level. FTI is wrong in assuming Brattle did not address this in our data cleaning and analysis.  We addressed contract level data by using appropriate allocation methodologies to translate data to the facility level. FTI also notes that it is possible Brattle did not correctly account for outliers, and, as a result, "it is difficult to not only replicate [Brattle's] results but also to trust [Brattle's] conclusions." [46] This is incorrect, as we carefully developed a methodology to identify and drop outliers as they relate to ADP, costs, and

---

[45]   As we will discuss in more detail in the next section, the data for the following providers was usable for our analysis after the data cleaning process: [BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL].

[46]   Counsel to Securus Technologies, "Before the Federal Communications Commission: In the Matter of Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services. Reply Comments of Securus Technologies, LLC," FCC, WC Docket Nos. 23-62 and 12-375, submitted July 12, 2023, p. 15, https://www.fcc.gov/ecfs/document/1071374145896/1.

reported minutes.  To address FTI's concerns, we have provided a detailed overview of our data cleaning and analysis methodology below.

25.    Nearly all the providers used different cost allocation methodologies to report their data. In addition, the quality of the data reported varies by provider. To compile all MDC data for our analysis, we first processed each providers' MDC submissions separately. Of the 14 providers who submitted data, we determined five providers' submissions were unusable: [BEGIN HIGHLY CONFIDENTIAL] ███████████████████████████████████████████████████████████████████ ███████ [END HIGHLY CONFIDENTIAL].[47] Note, in March 2023, GTL, ICSolutions, Pay Tel, and Securus resubmitted their MDC submissions.[48] We use their most recent submissions in our analyses. After we individually processed the data for each provider, we combined the data for subsequent, downstream analysis (such as our minutes and ADP calculations).[49] Below we report the data deficiencies and cleaning we had to perform with each provider's raw MDC submission.

---

[47]   Data was declared unusable if large amounts of information were missing from the "D. Facility-Specific Informatio[n]" (mainly financial info) or "D1. Revenue and Demand Data" tabs. [BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL].

[48]   GTL, Securus, ICSolutions, and Paytel have produced supplemental data in March 2023 which updates their original Third MDC submissions. For these providers when we refer to the Third MDC data, we are referring to their Supplemental submissions. the following providers submitted supplemental data, which we incorporate in our analysis and substitute for earlier MDC submissions: Global Tel*Link Corporation d/b/a ViaPath Technologies, "Proceedings: WC 12-375," submitted March 10, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1031158981570 ("GTL's Third MDC"); Inmate Calling Solutions, LLC d/b/a ICSolutions, "Proceedings: WC 12-375," submitted March 30, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10330814028729 ("ICSolutions' Third MDC"); Pay Tel Communications, Inc. "Proceedings: WC 12-375," submitted March 2, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10303207825273 ("Pay Tel's Third MDC"); and Securus Technologies, LLC, "Proceedings: WC 12-375," submitted April 5 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10405170724179, ("Securus' Third MDC").

[49]   *See*, Figure 2 and Figure 3 in Coleman Bazelon and Paroma Sanyal, "Comments on 'FCC Seeks Comment on Its Expanded Authority to Ensure Just and Reasonable Rates and Charges for Incarcerated People's Communications Services,' Notice of Proposed Rulemaking (Docket No. 23-62, 12-375)," The Brattle Group, May 8, 2023, ¶¶ 5-8, https://www.fcc.gov/ecfs/document/1050883878528/1. *See also*, Coleman Bazelon and Paroma Sanyal, "Reply Comments on the Federal Communications Commission's 'Proposed 2023 Mandatory Data Collection for Incarcerated People's Communication Services DA 23-233,'" WC Docket Nos. 23-62 and 12-

## IV.A.1.  GTL[50]

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

---

375, The Brattle Group, July 12, 2023, https://www.fcc.gov/ecfs/document/10712916402481/1, Table 1 rows [1]-[3] and Appendix A: Table 6.

[50] Global Tel*Link Corporation d/b/a ViaPath Technologies, "Proceedings: WC 12-375," submitted March 10, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10311589815709 ("GTL's Third MDC").

[51] [BEGIN HIGHLY CONFIDENTIAL]                                              [END HIGHLY CONFIDENTIAL]

[52] Note that in the Third MDC template, there was a typological error for the name of the "D. Facility-Specific Informatio" tab. For clarity, we refer to this tab as the "D. Facility-Specific Informatio[n]" tab.

### IV.A.2.  Securus[53]

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

### IV.A.3.  Combined[54]

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

### IV.A.4.  ICSolutions[55]

[BEGIN HIGHLY CONFIDENTIAL]

---

[53]  Securus Technologies, LLC, "Proceedings: WC 12-375," submitted April 5 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10405170724179, ("Securus' Third MDC").

[54]  Combined Public Communications, LLC, "Proceedings: WC 12-375," submitted July 8, 2022, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/107086521163 ("Combined's Third MDC").

[55]  Inmate Calling Solutions, LLC d/b/a ICSolutions, "Proceedings: WC 12-375," submitted March 30, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10330814028729 ("ICSolutions' Third MDC")

[56]  [BEGIN HIGHLY CONFIDENTIAL] ████████████████████ [END HIGHLY CONFIDENTIAL]

REDACTED – FOR PUBLIC INSPECTION



[END HIGHLY CONFIDENTIAL]

---

57 [BEGIN HIGHLY CONFIDENTIAL] ████████████████████████ [END HIGHLY CONFIDENTIAL]

58 [BEGIN HIGHLY CONFIDENTIAL] ██████████████████████████████ [END HIGHLY CONFIDENTIAL]

**JA1012**

REDACTED – FOR PUBLIC INSPECTION

## IV.A.5.  NCIC[59]

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

## IV.A.6.  Pay Tel[60]

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

---

[59] Network Communications International Corp d/b/a NCIC Inmate Communications, "Proceedings: WC 12-375," submitted April 6, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/104060618508753, ("NCIC's Third MDC").

[60] Pay Tel Communications, Inc. "Proceedings: WC 12-375," submitted March 2, 2023, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/10303207825273 ("Pay Tel's Third MDC").

REDACTED – FOR PUBLIC INSPECTION

## IV.A.7.  Prodigy[61]

[BEGIN HIGHLY CONFIDENTIAL]



[END HIGHLY CONFIDENTIAL]

## IV.A.8.  Talton[62]

[BEGIN HIGHLY CONFIDENTIAL]



---

[61]  Prodigy Solutions, Inc., "WC 12-375," submitted June 30, 2022, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/106300859414388 ("Prodigy's Third MDC").

[62]  Talton Communications, Inc., "Proceedings: WC 12-375," submitted June 30, 2022, redacted version: https://www.fcc.gov/ecfs/search/search-filings/filing/1063093541534 ("Talton's Third MDC").

[63]  *See*, Talton's Third MDC. [BEGIN HIGHLY CONFIDENTIAL]

[END HIGHLY CONFIDENTIAL]

REDACTED – FOR PUBLIC INSPECTION



[END HIGHLY CONFIDENTIAL]

## IV.B.    Compilation of Provider-Specific Data

39.    After reviewing and cleaning the data submitted by the providers, we combine the provider-specific data to create a unified dataset. In this dataset, we first calculate total minutes by adding up billed minutes for intrastate calls and billed minutes for interstate calls.[64] We exclude observations where total minutes, ADP, or total expenses are equal to zero as it is impossible for a facility to have these values at zero.[65] To calculate cost per minute at the facility-level, we divide total expenses by total minutes. Using our facility specific calculations for cost per minute, we generate a range of charts and summary tables in our previous filings.

---

[64]  In Third MDC submissions, this would be the sum of the fields "(i) Interstate Communication" and "(iii) Intrastate Communication" under "(f) Billed Minutes Separately."

[65]  In Third MDC submissions, "total expenses" would be the sum of "Total Operating Expenses Excluding Termination of International Communication Expense [row 57 - row 44]" and "Total Capital Expenses [row 24 + row 25 + row 27 + row 29 + row 34 + row 39]."

# Bro**/**nstein

**Brownstein Hyatt Farber Schreck, LLP**
202.296.7353 main
1155 F Street NW, Suite 1200
Washington, DC  20004

December 21, 2023

Michael H. Pryor
Attorney at Law
202.383.4706 direct
mpryor@bhfs.com

**VIA ECFS**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L St. NE
Washington, DC 20554

Re:    Notice of Ex Parte Meeting, WC Docket Nos. 23-62, 12-375

Dear Ms. Dortch:

On December 19, 2023, Jessica Lust, Senior Vice President and General Manager for Technology, Communications and Media; Michael Lozich, Associate General Counsel, Regulatory; Alan Reidmiller, Senior Manager, Product Management, Voice Communications, Communication & Technology; all with Securus Technologies, LLC ("Securus") and the undersigned met with members of the Wireline Competition Bureau and the Office of Economics and Analytics as identified on attachment A.  During the meeting Securus described how consumers sign up for and manage Securus' AdvanceConnect program and provided detailed information regarding its alternative pricing program, called the subscription program, which Securus operated in 2020 and 2021.  The points of discussion are reflected in the PowerPoint presentation attached hereto.  Please contact the undersigned if you have any questions.

Sincerely,


_____/s/_____
Michael H. Pryor


Enclosures

**www.bhfs.com**

Attachment A
FCC Attendees

Wireline Competition Bureau

Terri Natoli, Deputy Bureau Chief
Victoria Goldberg, Deputy Division Chief
Simon Solemani, Acting Legal Advisor
William Kehoe, Assistant Division Chief
Susan Bahr, Attorney-Advisor
Erik Raven-Hansen, Assistant Division Chief
Peter Bean, Pricing Policy Division
Amy Goodman, Attorney-Advisor
David Zesiger, Deputy Division Chief
Steve Meil, Attorney Advisor
Ahuva Battans, Attorney Advisor
Lynne Engledow, Deputy Division Chief

Office of Economics and Analytics

Eric Ralph, Associate Chief, Wireline
Liesl Himmelberger, Economist
Geoff Waldau, Economist,
Eugene Kiselev, Deputy Chief
Richard Kwiatkowski, Economist

# Alternative Pricing Plans

## Empowering Consumer Choice

December 19, 2023

**SECURUS**
Technologies®
*an aventiv company*

JA1018

# Contents

**01**

**AdvanceConnect Consumer Experience**

**02**

**Securus Pilot Subscription Program Overview**

**03**

**Securus Pilot Subscription Program Consumer Experience**

**04**

**Securus Pilot Subscription Program Performance**

**05**

**Recommendations**

**JA1019**

# 01. AdvanceConnect Consumer Experience



JA1020

# AdvanceConnect Account Overview

- AdvanceConnect Accounts are the primary method for F&F consumers to prepay for calling services.

- Accounts may be used across multiple facilities and allow calls to multiple numbers.

- Accounts can be set up, managed, and closed using Web or downloaded App

- Account holders informed about usage through regular monthly electronic statements.

- Refunds available upon request (unless otherwise automatically required by contract or law)

*Designed for consumer flexibility and savings.*

**JA1021**

# AdvanceConnect Consumer Rate Disclosures



# AdvanceConnect Consumer Statements

**SECURUS** Technologies ™

## Calls By Billing ID

**Account:**

**Statement Date:**     11/30/2023

**To number:**     (267)503

**Billing ID:**     Billing ID        - Billed on behalf of Securus

| From Number | Destination | Date | Time | Type | Min | Provider Rate / Min | Facility Rate / Min | Intl Term Rate / Min | Charge | Footnote |
|---|---|---|---|---|---|---|---|---|---|---|
| (570)794 | YARDLEY,PA | 10/25/2023 | 2:05:52 PM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)794 | YARDLEY,PA | 10/25/2023 | 7:28:45 AM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)794 | YARDLEY,PA | 10/26/2023 | 3:07:00 PM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)794 | YARDLEY,PA | 10/26/2023 | 7:25:56 AM | IAE | 10 | 0.039 | 0.02 | | $0.59 | 1 |
| (570)794 | YARDLEY,PA | 10/27/2023 | 1:54:03 PM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)794 | YARDLEY,PA | 10/27/2023 | 7:23:35 AM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)794 | YARDLEY,PA | 10/28/2023 | 7:25:39 AM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)79 | YARDLEY,PA | 11/15/2023 | 7:21:29 PM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)79 | YARDLEY,PA | 11/16/2023 | 6:33:08 PM | IAE | 7 | 0.039 | 0.02 | | $0.42 | 1 |
| (570)79 | YARDLEY,PA | 11/16/2023 | 7:24:14 AM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)79 | YARDLEY,PA | 11/17/2023 | 2:24:53 PM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)79 | YARDLEY,PA | 11/17/2023 | 7:06:17 PM | IAE | 5 | 0.039 | 0.02 | | $0.30 | 1 |
| (570)79 | YARDLEY,PA | 11/17/2023 | 7:23:55 AM | IAE | 11 | 0.039 | 0.02 | | $0.65 | 1 |
| (570)79 | YARDLEY,PA | 11/18/2023 | 7:22:46 AM | IAE | 15 | 0.039 | 0.02 | | $0.89 | 1 |
| (570)79 | YARDLEY,PA | 11/19/2023 | 7:31:18 AM | IAE | 13 | 0.039 | 0.02 | | $0.77 | 1 |
| (570)79 | YARDLEY,PA | 11/20/2023 | 3:20:45 PM | IAE | 5 | 0.039 | 0.02 | | $0.30 | 1 |
| (570)79 | YARDLEY,PA | 11/21/2023 | 7:30:32 AM | IAE | 11 | 0.039 | 0.02 | | $0.65 | 1 |
| (570)79 | YARDLEY,PA | 11/21/2023 | 8:06:17 PM | IAE | 13 | 0.039 | 0.02 | | $0.77 | 1 |

**Totals for-Billing ID:**        - Billed on behalf of Securus          **494**          **$29.31**

**ACCOUNT TOTAL:**          **494**          **$29.31**

# 02. Securus Pilot Subscription Program Overview



JA1024

# Securus Pilot Subscription Program - Overview

- Started in six select facilities in December 2020, ultimately in 9 agencies (8 jails and 1 DOC)

- Purely voluntary alternative to per-minute pricing

- Structured based on consumer input
  - Seeking predictable budget for communications
  - Number of calls over number of minutes

- **Pilot** program to gain insight into pricing and consumer acceptance

- Intrastate calls only because interstate calls required pricing on a per-minute basis

- Hugely popular based on testimonials from users and customers

- Program suspended at the end of 2021 in light of Commission's jurisdictional ruling and no action on Securus' Waiver Petition

  o About 1500 participants lost program benefits

*Number of calls and call duration increased; decreased cost to consumer*

JA1025

# 03. Securus Pilot Subscription Program Consumer Experience



**JA1026**

# Securus Pilot Subscription Programs – How They Worked

- Offered to friends and family the opportunity to purchase a set number of calls per month (or per week in one instance) for a set price – *E.g.*, 100 calls per month for $24.00

- Plans not made available to the incarcerated person, but to their friends and family.

- Designed to be used only to call specific numbers from a specific facility.
    - Calls to others based on per-minute call rate.
    - Multiple individuals can call out to the specified number under the same subscription.

- Price consisted of a base rate, plus site commissions (if applicable), plus $3.00 automated payment fee

- Time per call dependent on correctional authority rules, typically 15 to 30 minutes

- For calls in excess of subscription amount, rates automatically reverts to per-minute pricing.

JA1027

# Securus Pilot Subscription Program – Sign Up Process

- Register using Securus' Online or Mobile App to establish an account and select subscription option.
  - Sign up process detailed in PPI declaration from Stephen Raher who signed up for the program
  - The following slides are screen shots that a subscriber would see on Securus' website to sign up.
  - Taken from Raher declaration and thus his specific entered information is redacted

**JA1028**

# Securus Pilot Subscription Program – Sign Up Process

- On the Securus F&F-facing website (securustech.net), the consumer could find a menu of product and service offerings by selecting "Products", which displayed a link for Subscriptions.

- Selecting "Get Started Now" initiates the sign-up process.



**JA1029**

# Securus Pilot Subscription Program – Sign Up Process



*Completely optional to the consumer whether to sign up or continue with per-minute pricing*

# Securus Pilot Subscription Program − Sign Up Process



*If available, option to select among different plans to meet consumer needs.*

# Securus Pilot Subscription Program – Sign Up Process



*Consumer provided with cost breakdown and decides how renewals will be administered.*

# Securus Pilot Subscription Program – Sign Up Process



JA1033

# Securus Pilot Subscription Program – Sign Up Process



JA1034

# Securus Pilot Subscription Program – Mobile App







JA1035

# Securus Pilot Subscription Program – Mobile App






JA1036

# Securus Pilot Subscription Program – Mobile App

  

JA1037

# Securus Pilot Subscription Program – Mobile App







JA1038

# Obtain more information by hitting the "+" sign




*Consumer provided with cost breakdown and decides how renewals will be administered.*

# Mobile App Sign Up Process



## Call Subscription

✓ Success

You have successfully enrolled in a Call Subscription.

**Manage Subscriptions**



## Review Agreement

To save your credit card, you must review and agree to the following agreement(s).

Visa XXXX-1111 | Expires Mar 2026

**Call Subscription:**
Call Connect 100 - $42.75 - 100 Calls/ Month

**Add Funds to AdvanceConnect**

Cancel     View Payment Agreement

JA1040

## Review Agreement

To save your credit card, you must review and agree to the following agreement(s).

**WEBSITE & MOBILE APP AGREEMENT**

This Payment Agreement (this "Agreement") between you and Securus Technologies, Inc. (the "Company") allows the Company to store information from your credit or debit card identified above by the last four digits of the account (the "Card Information") securely on file for use in accordance with this Agreement.

**Storing Card Information**

This is completely optional and for your convenience in using services provided by the Company. By storing your payment information, you can make secure payments via our website, app, or automated system without having to re-enter the Card Information for each transaction.

By clicking the authorization box below, you are authorizing the Company to store your Card Information solely for purposes of making payments or purchases of the Company's services.

**Recurring Transactions**

I agree to the Payment Agreement, certify that this is my credit or debit card, and authorize the Company to charge my credit or debit card for the transactions described above.

Cancel     Agree

SECURUS Technologies®
an aventiv company

# Securus Pilot Subscription Program – Renewal, Cancellation and Refunds

- Automatic renewals at consumer's option
- Status updates available
  - Number of calls remaining noted at the beginning of each call
  - Status available on-line
  - Email reminder when reaching call limit
- Consumers could cancel at any time and revert to per minute pricing – hit the unsubscribe button
- No refunds for cancelling mid-month
- No refunds for unused calls unless consumer cancels within 14 days of autorenewal and no program usage.
- Refunds available for verified performance problems such as poor quality or outages caused by Securus systems.

# Securus Pilot Subscription Program – Managing Subscriptions

**SECURUS** Technologies®                    My Account    Products    Securus Alerts    SIGN OUT

CALL SUBSCRIPTIONS



## CALL SUBSCRIPTIONS                                    (+) Add Subscription

Your authorized call subscriptions are shown below. You can manage a call subscription by selecting the related action icon. You can also add a new subscription by selecting + Add Subscription.

### Active Subscriptions

| FACILITY | CALLS REMAINING | EXPIRE DATE | PHONE # | ACTION |
|----------|-----------------|-------------|---------|--------|
| Fannin County, TX | 15 | 05/09/2021 | 214-387-5514 | ⚙ |
| Fulton Co, GA | 100 | 05/11/2021 | 214-387-5514 | ⚙ |
| Broward County, FL | 25 | None | 214-387-5514 | ⚙ |
| Ector County, TX | 2 | None | 214-387-5514 | ⚙ |

JA1042

# Securus Pilot Subscription Program – Managing Subscriptions



Subscription Management "Gear" Button



JA1043

# Securus Pilot Subscription Program − Managing Subscriptions



*Easy to unsubscribe and consumers have multiple opportunities to select renewal options*

# Securus Pilot Subscription Program – Managing Subscriptions



*Online status changes after consumer cancels subscription plan and reverts to per-minute pricing.*

# 04. Securus Pilot Subscription Plan Performance



# Securus Pilot Subscription Program - Benefits

- Resulted in significant savings and increased calling time

  - Effective per minute rates well below rate caps
    - $0.02 to $0.05 at full utilization
    - $0.03 to $0.07 at 50% utilization

  - Calling times increased 58%
    - Average call duration 14.5 minutes (15-minute agency prescribed call limit at most participating facilities)

- Provided budget predictability for consumers.

- Accounted for about 43% of all call minutes utilized in facilities where available

*Costs decreased average of 61% per call and 74% on a per-minute basis*

JA1047

# Securus Pilot Subscription Programs – Key Data Points

- Aggregate utilization ranged from 70% to 82% (use of available minutes); average across 9 facilities 76%

- Average per minute cost $0.04/$0.65 for calls averaging 14.51 minutes compared to per minute costs of $0.18/$1.62 for calls averaging only 9.2 minutes

    - Average per call length increased from 9.2 minutes to 14.5 minutes

- Subscribers saved money at low levels of utilization:  15-30%.

- Subscribers are price sensitive:  Subscribership dropped by nearly half at one facility when costs increased by a significant percent due to inclusion of commissions.

*Consumers leveraged their power of choice by responding to cost increases by shifting back to per-minute pricing.*

JA1048

SECURUS Technologies®
an aventiv company

# Subscription Plans versus Traditional Per Minute Pricing Plans – Aggregate Performance

|  | Subscription Plan Calls | Traditional Per-Minute Calls |
|---|---|---|
| Number of Calls | 938,311 | 1,992,540 |
| Connected Minutes | 13,614,732 | 18,302,169 |
| Average Price / Minute | $0.04 | $0.18 |
| Average Minutes / Call | 14.51 | 9.19 |
| Average Cost / Call | $0.65 | $1.62 |

*Subscription usage constituted a significant portion of overall usage at pilot facilities reflecting significant value to consumers.*

JA1049

# Subscription Plans versus Traditional Per Minute Pricing Plans –Agency Performance

| Account Name | Start Date | Total Calls | Total Minutes | Minutes / Call | Facility Max Call Duration | Available Minutes (Max Duration) | Allowed Minutes Used (%) |
|---|---|---|---|---|---|---|---|
| Agency #1 | 12/10/2020 | 333,196 | 3,993,525 | 11.99 | 15 | 4,997,940 | 80% |
| Agency #2 | 12/15/2020 | 204,134 | 4,347,447 | 21.30 | 30 | 6,124,020 | 71% |
| Agency #3 | 12/15/2020 | 138,291 | 1,702,892 | 12.31 | 15 | 2,074,365 | 82% |
| Agency #4 | 12/15/2020 | 108,841 | 1,599,057 | 14.69 | 20 | 2,176,820 | 73% |
| Agency #5 | 12/15/2020 | 86,210 | 1,028,767 | 11.93 | 15 | 1,293,150 | 80% |
| Agency #6 | 12/15/2020 | 65,442 | 915,790 | 13.99 | 20 | 1,308,840 | 70% |
| Agency #7 | 9/20/2021 | 1,071 | 13,058 | 12.19 | 15 | 16,065 | 81% |
| Agency #8 | 8/7/2021 | 828 | 9,725 | 11.75 | 15 | 12,420 | 78% |
| Agency #9 | 8/3/2021 | 298 | 4,471 | 15.00 | 30 | 8,940 | 50% |
| **TOTAL** | | **938,311** | **13,614,732** | **14.51** | | **18,012,560** | **76%** |

SECURUS Technologies®
an aventiv company

**JA1050**

# 05. Recommendations



JA1051

# Recommendations from Lessons Learned

- Purely optional participation by consumers

- Easy to cancel – ultimate consumer protection

- Measure value based on effective cost per minute at an average level of usage.

- Cannot be used to evade rate caps: disallow if effective per minute rate at full utilization is above applicable rate cap. (The more a consumers uses the program, the lower the effective rate – cross over point will vary depending on program).

- Require baseline disclosures so consumer can make an informed choice (trust consumers to make rational choices).

- Allow flexibility to maximize consumer value and choice

- Do not require refunds for unused calls/minutes or roll overs as those effectively replicate per minute pricing and disincentivize offering "alternative" pricing

- Where agency paid models have gone into effect, correctional authorities have typically elected some form of flat-rate pricing rather than per minute rates.

# Additional Recommendations

- Avoid arbitrary sunset of pilot programs; allow programs to continue as long as provider can demonstrate consumer value

- Track plans through existing annual reporting structure.

Questions?

JA1054