# United States Court of Appeals
# for the First Circuit

---

No. 24-8028
In re: MCP 191
*(Caption Continued on Inside Cover)*

---

On Petitions for Review of a Final Order of the
Federal Communications Commission

---

**JOINT APPENDIX**
**VOLUME I of VII (Pages JA1 – JA384)**

---

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison
Society*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights
and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform
Clinic*

*Additional Counsel Listed on Inside Cover*

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER SCHRECK,
 LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus Technologies, LLC*


Salvatore Taillefer, Jr.
BLOOSTON, MORDKOFSKY, DICKENS &
 PRENDERGAST, LLP
2120 L Street, NW Suite 825
Washington, DC 20037
(202) 828-5562
sta@bloostonlaw.com

*Counsel for the National Sheriffs'
Association*

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel Communications,
Inc.*


Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8900
ACollins@cahill.com

Landis C. Best
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
LBest@Cahill.com

*Counsel for Global Tel*Link
Corporation d/b/a ViaPath
Technologies*

D. Adam Candeub
  General Counsel
Bradley Craigmyle
  Deputy General Counsel
Sarah E. Citrin
  Deputy Associate General Counsel
Matthew J. Dunne
  Counsel
FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
Communications Commission*

Tim Griffin
  Attorney General of Arkansas
OFFICE OF ATTORNEY GENERAL TIM
  GRIFFIN
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

Autumn Hamit Patterson
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General and Interim
Solicitor General

*Counsel for the State of Arkansas*

Abigail A. Slater
  Assistant Attorney General
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
  ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United
States of America*

Theodore E. Rokita
  Attorney General of Indiana
OFFICE OF THE INDIANA ATTORNEY
  GENERAL
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

Blake E. Lanning
  Assistant Chief Deputy
Joshua J. David
  Deputy Attorney General
  Legislative & Policy Division
Jade A. Poorman
Bradley S. Davis
  Deputy Attorneys General
  Litigation Division

*Counsel for the State of Indiana*

Elizabeth B. Murrill
  Attorney General of Louisiana
Kelsey L. Smith
  Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

James Uthmeier
  Attorney General of Florida
John Guard
  Chief Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

*Counsel for the State of Florida*

Christopher M. Carr
  Attorney General of Georgia
Stephen J. Petrany
  Solicitor General
OFFICE OF THE GEORGIA
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

Steve Marshall
  Attorney General of Alabama
Edmund G. Lacour Jr.
  Solicitor General
OFFICE OF THE ALABAMA ATTORNEY
  GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

*Counsel for the State of Alabama*

Raúl R. Labrador
  Attorney General of Idaho
Alan Hurst
  Solicitor General
Sean M. Corkery
  Assistant Solicitor General
OFFICE OF THE IDAHO ATTORNEY
  GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

*Counsel for the State of Idaho*

Lynn Fitch
  Attorney General of Mississippi
Justin L. Matheny
  Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
  OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


Dave Yost
  Attorney General of Ohio
T. Elliot Gaiser
  Ohio Solicitor General
Mathura J. Sridharan
  Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*


Marty J. Jackley
  Attorney General of South Dakota
Ryan Mcfall
  Assistant Attorney General
OFFICE OF ATTORNEY GENERAL
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

*Counsel for the State of South Dakota*


Brenna Bird
  Attorney General of Iowa
Eric H. Wessan
  Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*


Andrew Bailey
  Attorney General of Missouri
Joshua M. Divine, #69875MO
  Solicitor General
Dominic X. Barceleau, #76510MO
  Assistant Attorney General
815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


Alan Wilson
  Attorney General of South Carolina
Joseph D. Spate
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*

Ken Paxton
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Aaron L. Neilson
  Solicitor General
Jacob Beach
  Assistant Solicitor General
Office of the Attorney General of
Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

*Counsel for the State of Texas*


Jason Miyares
  Attorney General of Virginia
Kevin M. Gallagher
  Principal Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S
  OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of
Virginia*

Jonathan Skrmetti
  Attorney General of Tennessee
J. Matthew Rice
  Solicitor General of Tennessee
OFFICE OF TENNESSEE ATTORNEY
  GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

*Counsel for the State of Tennessee*


Derek E. Brown
  Attorney General of Utah
Stanford Purser
  Solicitor General
OFFICE OF THE UTAH ATTORNEY
  GENERAL
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

*Counsel for the State of Utah*

Craig E. Frosch
  Executive Counsel, Louisiana Sheriffs'
Association
FROSCH, RODRIGUE, ARCURI, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

Mary Erlingson
East Baton Rough Parish
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

Shannon Dirmann
LOUISIANA SHERIFF'S ASSOCIATION
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

*Counsel for Sheriff Sid Gautreaux; Sheriff
Bobby Webre; Sheriff Mark Wood; Sheriff
Kevin Cobb; and The Louisiana Sheriffs'
Association*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

———————————————

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

———————————————

Nos. 24-1860 & 24-1927

SECURUS TECHNOLOGIES, LLC,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE
REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY; OFFICE OF
COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

———————————————

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

———————————————

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

———————————————

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

———————————————

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

———————————

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON
SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF
CHRIST, INC.

Intervenors.

———————————

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

## VOLUME I

Certified List of items constituting the record of FCC proceedings in WC Docket Nos. 23-62 & 12-375 ................................................................................. JA1

Comments of Center on the Administration of Criminal Law, WC Docket No. 12-375 (Mar. 25, 2013) .............................................................. JA93

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) [excerpt pages 14111, 14138-43, 14194] ................................. JA107

Comments of National Sheriffs' Association, WC Docket No. 12-375, Exh. A (Jan. 12, 2015) ................................................................................ JA116

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd. 12763 (2015) [excerpt pages 12768, 12775, 12790, 12813-18, 12838-39] .............................................................................................. JA133

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 31 FCC Rcd. 9300 (2016) [excerpt page 9311] ....................................................................... JA145

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd. 8485 (2020) [excerpt page 8514 n.209] ............................................................. JA147

Comments of Worth Rises, WT Docket No. 12-375 (Nov. 23, 2020) .............. JA149

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (May 13, 2021) .............................................................................................. JA197

Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement, WC Docket No. 12-375 (Aug. 30, 2021) .................................. JA203

Securus Technologies, LLC Pet. for Clarification, WC Docket No. 12-375 (Sept. 17, 2021) ................................................................................. JA212

Comments of Prison Policy Initiative, Inc. on Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Sept. 27, 2021) .................... JA218

i

Comments of Securus Technologies, LLC on Petition for Waiver, WC Docket No. 12-375 (Jan. 7, 2022) ....................................................................... JA259

Comments of Nathan Miller, WC Docket No. 23-62 (May 4, 2023), Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay* (Nov. 4, 2022) ............................................................ JA274

Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Dec. 15, 2022) [excerpt cover and pp. 7-8, 11-13]........................................... JA300

Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Dec. 15, 2022) ..................................................................................................... JA306

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Instructions*, WC Docket Nos. 23-62 & 12-375 ............................................................................................................ JA326

## VOLUME II

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Word Template*, WC Docket Nos. 23-62 & 12-375 ............................................................................................................ JA385

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Excel Template*, WC Docket Nos. 23-62 & 12-375 ............................................................................................................ JA409

Reply Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Mar. 3, 2023) [excerpt cover and pp. 6-8]................................................ JA424

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023) .................................................................................. JA428

Comments of California State Senator Josh Becker, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............................................................................ JA483

Comments of Civil Rights Corps, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ..................................................................................................... JA485

Comments of Color of Change, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ..................................................................................................... JA492

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............................................ JA502

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....................................................................... JA539

Comments of the NCIC Inmate Communications, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................... JA558

Comments of the Pay Tel Communications, Inc. in Response to Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....... JA576

Opening Comments of Stephen A. Raher, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................. JA604

Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................. JA632

Opening Comments of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............ JA686

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................................. JA711

## VOLUME III

Comments of the Wright Petitioners et al., WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................. JA732

Coleman Bazelon & Paroma Sanyal, Brattle Report (May 8, 2023) ................ JA774

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ................................................................................. JA812

Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ................................................................................. JA819

Securus Technologies, LLC's Initial Comments to the Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ................................................................................................. JA827

Comments of the Electronic Privacy Information Center, WC Docket Nos. 23-62 & 12-375 (June 6, 2023) ......................................................................... JA835

Reply Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ....................................................................... JA844

Reply Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (July 12, 2023) .............................................................................. JA865

Reply Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) .................................................................................. JA915

Reply Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ....................................................................................................... JA957

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, 38 FCC Rcd 6625 (WCB 2023) ............. JA963

Letter from Gregory R. Capobianco, Counsel for the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 15, 2023) .................................................................................................... JA991

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 21, 2023) ........................................................................................ JA1016

## VOLUME IV

IPCS Chicago Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Feb. 6, 2024) ................................... JA1055

IPCS Charleston Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Mar. 5, 2024) ................................... JA1159

Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 & 12-375 (Apr. 29, 2024) ........................................ JA1251

Letter from Virginia Association of Regional Jails, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62 (May 29, 2024) ................................. JA1256

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) .................................................................................................JA1266

Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (June 7, 2024) [excerpt pages 5–6]...........................................................JA1276

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC and Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 10, 2024) ...........................................JA1280

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 14, 2024)................................................................................JA1300

Letter from Leadership Conference to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (filed June 17, 2024) .....................JA1302

Joint Letter of 90+ Organizations Supporting Low Rates, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (June 17, 2024) .................................................................................JA1306

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 18, 2024)................................................JA1310

IPCS Phoenix Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed June 20, 2024)...............................JA1326

Letter from Salvatore Taillefer, Jr., Counsel to NSA to Marlene Dortch, Secretary of the FCC, WC Dockets Nos. 23-62 & 12-375 (June 20, 2024)...JA1390

Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 8, 2024) .................................................................................JA1408

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 9, 2024) .................................................JA1409

Letter from Melonie Perez, Aliza Kaplan, Jennifer Scaife, & Leigh Owens, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) ............................................................................ JA1432

Letter from Sheriff Kieran Donahue, Canyon County, Idaho, and President of the National Sheriffs' Association to Marlene Dortch, Secretary of the FCC, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 1] .... JA1439

Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) .................................................................................................... JA1440

Comments of the Montana Sheriffs & Peace Officer Association, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt pages 1–2] ................ JA1445

Comments of the Virginia Association of Regional Jails, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 2] .......................................... JA1447

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 12, 2024) ............................................................................................ JA1449

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ........................................................................................ JA1453

Comments of Virginia Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ........................................................................................ JA1485

## VOLUME V

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647 (2024) .................................................................................... JA1486

## VOLUME VI

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Aug. 26, 2024) ............................................................................ JA1950

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Second Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) .................................................................... JA1951

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 10944 (WCB 2024) ........................................................................... JA1953

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11373 (WCB 2024) ........................................................................... JA1972

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11607 (WCB 2024) ........................................................................... JA1994

Motion of Pay Tel Communications, Inc. for Stay Pending Judicial Review, *Pay Tel Communications, Inc. v. FCC*, No. 24-8028 (1st Cir. Oct. 25, 2024) ........................................................................... JA2011

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375, DA 24-1074 (Oct. 28, 2024).................. JA2041

Letter from Aaron M. Dawson, Executive Director of the Alabama Jail Administrators' Council, to the FCC, Re: Report and Order, Order on Reconsideration, Clarification and Waiver, and Further notice of Proposed Rulemaking (Nov. 21, 2024) ........................................................ JA2053

Letter from Geoffrey G. Why, Verrill Dana LLP, Counsel to Ameelio, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (Dec. 6, 2024) ........................................................................... JA2055

Panka Bencsik et al., *Calls and Conduct: The Impact of Free Communication on Prison Misconduct* (Dec. 2024) (forthcoming publication) ...................................................................... JA2057

Ameelio Iowa Model Memo (Nov. 26, 2024) ................................. JA2084

**UNDER SEAL**
**VOLUME VII**

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (rel. July 22, 2024) ........................................... JA2091

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) ....................................................... JA2582

Nos. 24-8028(L)
24-1814, 24-1859, 24-1860, 24-1861, 24-1884, 24-1886,
24-1922, 24-1927, 24-1969, 24-2013, 24-2061

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

IN RE: MCP 191, ET AL.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

---

On Petition for Review of an Order of
the Federal Communications Commission

---

### CERTIFIED INDEX OF ITEMS IN THE RECORD

---

The Federal Communications Commission herewith files a certified list of items constituting the record of Commission proceedings in the above captioned case. The filing consists of (1) a list of items constituting the record and (2) certificate of the Commission's Secretary.

JA1

December 20, 2024                    Respectfully submitted,

                                    */s/ Sarah E. Citrin*

                                    Sarah E. Citrin
                                    *Deputy Associate General Counsel*

                                    FEDERAL COMMUNICATIONS
                                    COMMISSION
                                    Washington, D.C 20554
                                    (202) 418-1740

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/22/2024 | Federal Communications Commission | REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER, AND FURTHER NOTICE OF PROPOSED RULEMAKING |
| 7/19/2024 | Canyon County Sheriff | LETTER |
| 7/18/2024 | Office of General Counsel | LETTER |
| 7/18/2024 | Office of General Counsel | LETTER |
| 7/18/2024 | Office of General Counsel | LETTER |
| 7/18/2024 | Ulandis Forte | STATEMENT |
| 7/18/2024 | Worth Rises | ERRATA, ERRATUM OR ADDENDUM |
| 7/17/2024 | Alecia Davies | COMMENT |
| 7/17/2024 | Evangelina garcia | STATEMENT FOR THE RECORD |
| 7/17/2024 | Major County Sheriffs of America | COMMENT |
| 7/17/2024 | Stand for Children, Jonah Edelman | COMMENT |
| 7/17/2024 | Worth Rises | LETTER |
| 7/16/2024 | Securus Technologies LLC | LETTER |
| 7/15/2024 | Aventiv Technologies, LLC, Securus Technologies, LLC | NOTICE OF EXPARTE |
| 7/15/2024 | Montana Sheriffs and Peace Officers Association | COMMENT |
| 7/15/2024 | Securus Technologies, LLC | LETTER |
| 7/15/2024 | Securus Technology, LLC | NOTICE OF EXPARTE |
| 7/15/2024 | The Wright Petitioners | NOTICE OF EXPARTE |
| 7/15/2024 | Virginia Sheriffs' Association | COMMENT |
| 7/12/2024 | American Civil Liberties Union | LETTER |
| 7/12/2024 | Blyth White Consultancy | LETTER |
| 7/12/2024 | Global Tel*Link Corporation d/b/a ViaPath Technologies | NOTICE OF EXPARTE |
| 7/12/2024 | HomeWAV, LLC | NOTICE OF EXPARTE |
| 7/12/2024 | Inmate Calling Solutions, LLC d/b/a ICSolutions | NOTICE OF EXPARTE |
| 7/12/2024 | NCIC Correctional Services | NOTICE OF EXPARTE |
| 7/12/2024 | Securus Technologies, LLC | LETTER |
| 7/12/2024 | Securus Technology, LLC | NOTICE OF EXPARTE |
| 7/12/2024 | The Wright Petitioners | NOTICE OF EXPARTE |
| 7/12/2024 | United Church of Christ Media Justice Ministry | NOTICE OF EXPARTE |
| 7/11/2024 | American Civil Liberties Union | LETTER |
| 7/11/2024 | American Jail Association | LETTER |
| 7/11/2024 | Canyon County Sheriff's Office | NOTICE OF EXPARTE |
| 7/11/2024 | Florida Department of Corrections | COMMENT |
| 7/11/2024 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 7/11/2024 | NCIC Correctional Services | NOTICE OF EXPARTE |
| 7/11/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/11/2024 | Virginia Association of Regional Jails | COMMENT |

In the Matter of

Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services

WC Docket No. 23-62

WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/11/2024 | Virginia Association of Regional Jails | COMMENT |
| 7/10/2024 | Direct Action for Rights and Equality (DARE), et al. | COMMENT |
| 7/9/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/8/2024 | Georgia Justice Project | COMMENT |
| 7/3/2024 | Wireline Competition Bureau | PUBLIC NOTICE |
| 7/2/2024 | Aventiv Technologies, LLC, Securus Technologies, LLC | NOTICE OF EXPARTE |
| 7/2/2024 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 6/28/2024 | Global Caption, Inc. | NOTICE OF EXPARTE |
| 6/28/2024 | National Sheriffs' Association | OTHER |
| 6/28/2024 | Wireline Competition Bureau | NOTICE OF EXPARTE |
| 6/25/2024 | Prison Policy Initiative | LETTER |
| 6/24/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 6/21/2024 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 6/20/2024 | Wireline Competition Bureau | NOTICE OF EXPARTE |
| 6/18/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 6/17/2024 | Alabama Appleseed Center for Law & Justice, et al. | LETTER |
| 6/17/2024 | NCIC Correctional Services | NOTICE OF EXPARTE |
| 6/14/2024 | Global Tel Link Corporation d/b/a ViaPath Technologies | REPORT |
| 6/14/2024 | NCIC Correctional Services | REQUEST |
| 6/14/2024 | United Church of Christ Media Justice Ministry | NOTICE OF EXPARTE |
| 6/13/2024 | Global Tel*Link Corporation d/b/a ViaPath Technologies | NOTICE OF EXPARTE |
| 6/12/2024 | Securus Technologies LLC, Pay Tel Communications | NOTICE OF EXPARTE |
| 6/12/2024 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/11/2024 | NCIC Correctional Services | REQUEST |
| 6/10/2024 | National Sheriffs Association | REQUEST |
| 6/10/2024 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 6/10/2024 | Securus Technologies, LLC, Pay Tel Communications, | NOTICE OF EXPARTE |
| 6/10/2024 | Securus Technologies, LLC, Pay Tel Communications, | LETTER |
| 6/7/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 6/7/2024 | Pay Tel Communications, Inc. | CORRECTION |
| 6/7/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 6/5/2024 | Stephen A. Raher | NOTICE OF EXPARTE |
| 6/3/2024 | Worth Rises | COMMENT |
| 5/29/2024 | The Virginia Association of Regional Jails | NOTICE OF EXPARTE |
| 5/28/2024 | Stephen Raher | NOTICE OF EXPARTE |
| 5/24/2024 | NCIC Correctional Services | NOTICE OF EXPARTE |
| 5/24/2024 | NCIC Inmate Communications | REQUEST |
| 5/24/2024 | The Wright Petitioners | NOTICE OF EXPARTE |
| 5/23/2024 | The Wright Petitioners | NOTICE OF EXPARTE |
| 5/17/2024 | Worth Rises | NOTICE OF EXPARTE |
| 5/8/2024 | The Wright Petitioners | NOTICE OF EXPARTE |
| 5/8/2024 | The Wright Petitioners | NOTICE OF EXPARTE |

**JA4**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 5/7/2024 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 5/6/2024 | Office of Communications Business Opportunities | OTHER |
| 4/30/2024 | Securus Technologies, LLC | LETTER |
| 4/29/2024 | U.S. Department of Justice, Antitrust Division | NOTICE OF EXPARTE |
| 4/29/2024 | U.S. Department of Justice, Antitrust Division | NOTICE OF EXPARTE |
| 4/24/2024 | Allison Elder | COMMENT |
| 4/24/2024 | FCC | OTHER |
| 4/24/2024 | FCC | OTHER |
| 4/24/2024 | Marcus Stanley | COMMENT |
| 4/24/2024 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 4/24/2024 | Shirene Hansotia | COMMENT |
| 4/23/2024 | HomeWAV, LLC | AMENDMENT |
| 4/19/2024 | NCIC Correctional Services | NOTICE OF EXPARTE |
| 4/19/2024 | Securus Technologies, LLC | LETTER |
| 4/16/2024 | Wright Petitioners, et al. | NOTICE OF EXPARTE |
| 4/10/2024 | Pay Tel Communications Inc | REPORT |
| 4/8/2024 | NCIC Inmate Communications | REQUEST |
| 4/8/2024 | Network Communications International Corp d/b/a NCIC | REPORT |
| 4/8/2024 | Smart Communications Holding Inc | REPORT |
| 4/5/2024 | Talton Communications Inc | REPORT |
| 4/4/2024 | Karina Wilkinson, Coalition for Social Justice, New | COMMENT |
| 4/4/2024 | Karina Wilkinson,, Coalition for Social Justice, New | COMMENT |
| 4/4/2024 | Network Communications International Corp. | REPORT |
| 4/4/2024 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 4/4/2024 | Securus Technologies LLC | REPORT |
| 4/3/2024 | ATN, Inc. | REPORT |
| 4/3/2024 | Combined Public Communications | SUBMISSION OF REPORT |
| 4/3/2024 | Pay Tel Communications, Inc. | REPORT |
| 4/3/2024 | Prodigy Solutions, Inc. | REPORT |
| 4/3/2024 | Talton Communications, Inc. | REPORT |
| 4/2/2024 | Global Tel Link Corporation d/b/a, ViaPath Technologies | REPORT |
| 4/2/2024 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMPLIANCE FILING |
| 4/2/2024 | Pay Tel Communications, Inc. | REPORT |
| 4/1/2024 | Atn, Inc. | REPORT |
| 4/1/2024 | ATN, Inc. | REPORT |
| 4/1/2024 | ATN, Inc. | REPORT |
| 4/1/2024 | City Tele Coin | REPORT |
| 4/1/2024 | Combined Public Communications | SUBMISSION OF REPORT |
| 4/1/2024 | Crown Correctional Telephone Inc | RESPONSE |
| 4/1/2024 | Inmate Calling Sollutions LLC | REPORT |
| 4/1/2024 | Reliance Telephone of Grand Forks, Inc | REPORT |
| 4/1/2024 | Reliance Telephone of Grand Forks, Inc | REPORT |

3

**JA5**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/1/2024 | Securus Technologies, LLC | REPORT |
| 4/1/2024 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 3/29/2024 | Correct Solutions, LLC | REPORT |
| 3/29/2024 | Crown Correctional Telephone, Inc. | REPORT |
| 3/29/2024 | Securus Technologies, LLC | LETTER |
| 3/28/2024 | Inmate Calling Solutions, LLC | REPORT |
| 3/19/2024 | Consumer and Governmental Affairs Bureau | PUBLIC NOTICE |
| 3/19/2024 | Crown Correctional Telephone, Inc. | SUPPLEMENT |
| 3/18/2024 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/12/2024 | Incarcerated People's Communications Services | OTHER |
| 3/8/2024 | Incarcerated People's Communications Services | LETTER |
| 3/5/2024 | Pay Tel Communications, Inc. | SUPPLEMENT |
| 3/5/2024 | The Wireline Competition Bureau | NOTICE OF EXPARTE |
| 2/28/2024 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/27/2024 | Aventiv Technologies, LLC | NOTICE OF EXPARTE |
| 2/21/2024 | The Leadership Conference on Civil and Human Rights, | NOTICE OF EXPARTE |
| 2/15/2024 | Network Communications International Corp. | REPORT |
| 2/14/2024 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 2/12/2024 | NCIC Inmate Communications | REQUEST |
| 2/12/2024 | The Wright Petitioners | NOTICE OF EXPARTE |
| 2/9/2024 | Global Tel*Link Corporation d/b/a ViaPath Technologies | LETTER |
| 2/7/2024 | Dave Hangsleben | REPORT |
| 2/6/2024 | Correct Solutions, LLC | SUPPLEMENT |
| 2/6/2024 | The Wireline Competition Bureau | NOTICE OF EXPARTE |
| 2/5/2024 | NCIC Inmate Communications, Inc. | NOTICE OF EXPARTE |
| 2/2/2024 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 2/2/2024 | The Wright Petitioners, United Church of Christ Media | NOTICE OF EXPARTE |
| 1/30/2024 | Ameelio Inc. | REPORT |
| 1/26/2024 | City Tele-Coin Company, Inc | REPORT |
| 1/18/2024 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 1/18/2024 | Wireline Competition Bureau | PUBLIC NOTICE |
| 1/11/2024 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 1/9/2024 | Inmate Calling Solutions, LLC d/b/a ICSolutions | RESPONSE |
| 1/9/2024 | Prodigy Solutions, Inc. | AMENDMENT |
| 1/9/2024 | Prodigy Solutions, Inc. | AMENDMENT |
| 1/9/2024 | TKC Telecom LLC | COMPLIANCE FILING |
| 1/2/2024 | Inmate Calling Solutions, LLC | REPORT |
| 12/28/2023 | Prodigy Solutions, Inc. | REPORT |
| 12/22/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | SUPPLEMENT |
| 12/21/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | SUPPLEMENT |
| 12/21/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |

**JA6**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**　　　　　　　　**Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/21/2023 | Vicky Moody | REQUEST FOR SUPPLEMENTAL INFORMATION |
| 12/20/2023 | Colin K. Artinger | AMENDMENT |
| 12/20/2023 | HAMILTON RELAY, INC. | NOTICE OF EXPARTE |
| 12/20/2023 | Pay Tel Communications Inc. | OTHER |
| 12/18/2023 | NCIC Inmate Communications | LETTER |
| 12/18/2023 | Pay Tel Communications, Inc. | SUPPLEMENT |
| 12/18/2023 | Wright Petitioners | NOTICE OF EXPARTE |
| 12/15/2023 | Pay Tel Communications, Inc. | SUPPLEMENT |
| 12/15/2023 | The Wright Petitioners | NOTICE OF EXPARTE |
| 12/14/2023 | Securus Technologies, LLC | SUPPLEMENT |
| 12/13/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | NOTICE OF EXPARTE |
| 12/13/2023 | Securus Technologies, LLC | SUPPLEMENT |
| 12/12/2023 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 12/8/2023 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 12/8/2023 | Tidal Wave Telecom Incorporated | LETTER |
| 12/6/2023 | NCIC Inmate Communications | REPLY |
| 12/6/2023 | Network Communications International, Corp. | RESPONSE |
| 12/6/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 12/4/2023 | Network Communications International Corp. | REPORT |
| 12/1/2023 | ATN, Inc | SUBMISSION OF REPORT |
| 11/30/2023 | Andrew Smith | COMMENT |
| 11/30/2023 | Cristina Toste | COMMENT |
| 11/30/2023 | Esperanza Dillard | COMMENT |
| 11/30/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPLY TO COMMENTS |
| 11/29/2023 | HEARD, et al. | OPPOSITION |
| 11/29/2023 | Pay Tel Communications, Inc. | REPLY |
| 11/29/2023 | Securus Technologies, LLC | REPLY |
| 11/27/2023 | Robert J & Susan M Mather | REPLY TO COMMENTS |
| 11/22/2023 | gyybh gyhu | CORRECTION |
| 11/21/2023 | NCIC Inmate Communications | PETITION FOR WAIVER |
| 11/20/2023 | Stephen Raher, The Center for Accessible Technology, The Utility Reform Network, Public Advocates Office at Consumer and Governmental Affairs Bureau | NOTICE OF EXPARTE |
| 11/15/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | OTHER |
| 11/14/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 11/13/2023 | ClearCaptions, LLC | COMMENT |
| 11/13/2023 | National Association of the Deaf, National Association of | LETTER |
| 11/13/2023 | Pay Tel Communications, Inc. | COMMENT |
| 11/13/2023 | Tidal Wave Telecom Incorporated | OPPOSITION |
| 11/10/2023 | Securus Technologies, LLC | RESPONSE |

**JA7**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/9/2023 | National Association of the Deaf, et al. | MOTION FOR EXTENSION OF TIME |
| 11/8/2023 | Tidal Wave Telecom, Inc. | NOTICE OF EXPARTE |
| 11/6/2023 | Consolidated Telecom, Inc. | RESPONSE |
| 11/6/2023 | Encartele, Inc. | OTHER |
| 11/6/2023 | Global Tel*Link Corporation d/b/a Via Path Technologies | RESPONSE |
| 11/6/2023 | iWebVisit.com, LLC | RESPONSE |
| 11/6/2023 | Pay Tel Communications, Inc. | RESPONSE |
| 11/6/2023 | Pay Tel Communications, Inc. | RESPONSE |
| 11/3/2023 | Inmate Calling Solutions d/b/a ICSolutions | RESPONSE |
| 11/2/2023 | City Tele-Coin Company, Inc | REPORT |
| 11/2/2023 | i Web Visit.com, LLC | RESPONSE |
| 11/2/2023 | Inmate Calling Solutions, LLC | REPORT |
| 11/1/2023 | Ameelio Inc. | REPORT |
| 11/1/2023 | Correct Solutions, LLC | RESPONSE |
| 11/1/2023 | Crown Correctional Telephone, Inc. | RESPONSE |
| 11/1/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPORT |
| 11/1/2023 | Prodigy Solutions, Inc. | RESPONSE |
| 11/1/2023 | Securus Technologies, LLC | REPORT |
| 11/1/2023 | Talton Communications, Inc. | RESPONSE |
| 10/31/2023 | Combined Public Communications | COMPLIANCE FILING |
| 10/31/2023 | Consolidated Telecom, Inc. | RESPONSE |
| 10/31/2023 | iWebVisit.com, LLC | REPORT |
| 10/31/2023 | Pay Tel Communications, Inc. | REPORT |
| 10/31/2023 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 10/30/2023 | Correct Solutions, LLC | REPORT |
| 10/30/2023 | Crown Correctional Telephone, Inc. | REPORT |
| 10/30/2023 | Prodigy Solutions, Inc. | RESPONSE |
| 10/30/2023 | Prodigy Solutions, Inc. | RESPONSE |
| 10/30/2023 | Talton Communications, Inc. | REPORT |
| 10/27/2023 | Consumer and Governmental Affairs Bureau | PUBLIC NOTICE |
| 10/20/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 10/19/2023 | Securus Technologies, LLC | PETITION FOR WAIVER |
| 10/12/2023 | The Leadership Conference on Civil and Human Rights | NOTICE OF EXPARTE |
| 10/9/2023 | ClearCaptions, LLC | NOTICE OF EXPARTE |
| 10/5/2023 | Securus Technologies, LLP | NOTICE OF EXPARTE |
| 10/3/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 9/26/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPLY TO COMMENTS |
| 9/26/2023 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 9/25/2023 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 9/25/2023 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 9/18/2023 | The Wright Petitioners, The Brattle Group | NOTICE OF EXPARTE |

**JA8**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/13/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 9/11/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 9/8/2023 | Securus Technologies, Inc. | COMMENT |
| 9/1/2023 | USTelecom - The Broadband Association | NOTICE OF EXPARTE |
| 8/22/2023 | Pay Tel Telecommunications, Inc. | NOTICE OF EXPARTE |
| 8/21/2023 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 8/9/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 8/4/2023 | Global Caption, Inc. | NOTICE OF EXPARTE |
| 8/3/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 7/26/2023 | Wireline Competition Bureau | OTHER |
| 7/26/2023 | Wireline Competition Bureau | OTHER |
| 7/17/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 7/13/2023 | Colorado Public Utilities Commissions Inmate | OTHER |
| 7/13/2023 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 7/13/2023 | The Wright Petitioners | REPLY TO COMMENTS |
| 7/13/2023 | Worth Rises | REPLY TO COMMENTS |
| 7/12/2023 | Ameelio | REPLY TO COMMENTS |
| 7/12/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPLY TO COMMENTS |
| 7/12/2023 | N.S. | COMMENT |
| 7/12/2023 | National Sheriffs' Association | REPLY TO COMMENTS |
| 7/12/2023 | NCIC Inmate Communications | REPLY TO COMMENTS |
| 7/12/2023 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 7/12/2023 | Stephen A. Raher | REPLY TO COMMENTS |
| 7/12/2023 | The Leadership Conference on Civil and Human Rights, | REPLY TO COMMENTS |
| 7/12/2023 | The Wright Petitioners, et al. | REPLY TO COMMENTS |
| 7/3/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 6/29/2023 | Global Caption, Inc. | NOTICE OF EXPARTE |
| 6/28/2023 | Securus Technology, LLC | REPLY TO COMMENTS |
| 6/28/2023 | Worth Rises | REPLY TO COMMENTS |
| 6/27/2023 | Ameelio | REPLY TO COMMENTS |
| 6/27/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPLY TO COMMENTS |
| 6/27/2023 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 6/27/2023 | The Wright Petitioners | REPLY TO COMMENTS |
| 6/19/2023 | Rivka Bar-Chaim | COMMENT |
| 6/9/2023 | Ameelio | NOTICE OF EXPARTE |
| 6/9/2023 | TKC Telecom, LLC. | REPORT |
| 6/7/2023 | Electronic Privacy Information Center (EPIC) | REPLY TO COMMENTS |
| 6/6/2023 | California Public Utilities Commission | REPLY TO COMMENTS |
| 6/5/2023 | The Wright Petitioners | COMMENT |
| 6/2/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 6/2/2023 | Pay Tel Communications, Inc. | COMMENT |
| 6/2/2023 | Securus Technologies, LLC | COMMENT |

**JA9**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/2/2023 | The Wright Petitioners | COMMENT |
| 6/2/2023 | Worth Rises | COMMENT |
| 6/1/2023 | Wireline Competition Bureau | OTHER |
| 5/30/2023 | City Tele Coin Inc | REPORT |
| 5/29/2023 | latonya poledore tonya sam | COMMENT |
| 5/26/2023 | Global Caption, Inc. | NOTICE OF EXPARTE |
| 5/26/2023 | Securus  Technologies, LLC | RESPONSE |
| 5/25/2023 | The Wright Petitioners | NOTICE OF EXPARTE |
| 5/23/2023 | City Tele-Coin Company, Inc | REPORT |
| 5/23/2023 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 5/23/2023 | The Brattle Group, Inc. | OTHER |
| 5/23/2023 | The Wright Petitioners | OTHER |
| 5/23/2023 | The Wright Petitioners, et al. | MOTION FOR EXTENSION OF TIME |
| 5/17/2023 | Jamie Cabrera | COMMENT |
| 5/16/2023 | Consolidated Telecom, Inc. | REPORT |
| 5/15/2023 | Pay Tel Communications, Inc. | OTHER |
| 5/12/2023 | Consolidated Telecom, Inc. | COMPLIANCE FILING |
| 5/10/2023 | Christie Ong | COMMENT |
| 5/9/2023 | Alyssa Jennings | COMMENT |
| 5/9/2023 | Ben Lang | COMMENT |
| 5/9/2023 | California State Senator Josh Becker | COMMENT |
| 5/9/2023 | Civil Rights Corps | COMMENT |
| 5/9/2023 | COMMENT | COMMENT |
| 5/9/2023 | Electronic Privacy Information Center (EPIC) | COMMENT |
| 5/9/2023 | HEARD, Incarcerated Deaf/Disabled People | COMMENT |
| 5/9/2023 | Madalyn Wasilczuk | COMMENT |
| 5/9/2023 | Securus Technologies, LLC | COMMENT |
| 5/9/2023 | Stephen A. Raher | COMMENT |
| 5/9/2023 | The Wright Petitioners | COMMENT |
| 5/9/2023 | United Church of Christ Media Justice Ministry, Public | COMMENT |
| 5/9/2023 | Worth Rises | COMMENT |
| 5/8/2023 | Allyson McFadden | COMMENT |
| 5/8/2023 | California Public Utilities Commission | COMMENT |
| 5/8/2023 | ClearCaptions, LLC | COMMENT |
| 5/8/2023 | Color Of Change | COMMENT |
| 5/8/2023 | Esperanza Dillard | COMMENT |
| 5/8/2023 | Franly | COMMENT |
| 5/8/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 5/8/2023 | Jeanine Pollard | COMMENT |
| 5/8/2023 | Jessica | COMMENT |
| 5/8/2023 | Katie molloy | COMMENT |

**JA10**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 5/8/2023 | Krystal Starks | COMMENT |
| 5/8/2023 | maggie kopp | COMMENT |
| 5/8/2023 | Maya Branch | COMMENT |
| 5/8/2023 | National Sheriffs Association | COMMENT |
| 5/8/2023 | NCIC Inmate Communications | COMMENT |
| 5/8/2023 | New York Public Service Commission | COMMENT |
| 5/8/2023 | nicholas holton | COMMENT |
| 5/8/2023 | Patty Liang | COMMENT |
| 5/8/2023 | Pay Tel Communications, Inc. | COMMENT |
| 5/8/2023 | Rebekah Pollock | COMMENT |
| 5/8/2023 | Stephanie Wilcox | COMMENT |
| 5/8/2023 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 5/8/2023 | The Wright Petitioners, et al. | COMMENT |
| 5/8/2023 | Trinity M. | COMMENT |
| 5/8/2023 | USTelecom - The Broadband Association | COMMENT |
| 5/8/2023 | VIVIAN | COMMENT |
| 5/5/2023 | Julie Hochgesang | COMMENT |
| 5/5/2023 | Katelynn Chabot | COMMENT |
| 5/5/2023 | The Wright Petitioners | NOTICE OF EXPARTE |
| 5/5/2023 | Thelma | COMMENT |
| 5/4/2023 | Jessica Willman | COMMENT |
| 5/4/2023 | Katie Monette | COMMENT |
| 5/4/2023 | Nathan Miller | COMMENT |
| 5/4/2023 | Tamisha Williams | COMMENT |
| 5/4/2023 | Will Scharfenberger | COMMENT |
| 5/3/2023 | AB brown | COMMENT |
| 5/3/2023 | Charles A Slaughter III | REPORT |
| 5/3/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 4/28/2023 | Wireline Competition Bureau | OTHER |
| 4/28/2023 | Wireline Competition Bureau | OTHER |
| 4/28/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 4/28/2023 | Wireline Competition Bureau | OTHER |
| 4/25/2023 | Custom Teleconnect Inc | COMPLIANCE FILING |
| 4/25/2023 | Global Tel*Lind Corporation d/b/a ViaPath Technologies | REPORT |
| 4/21/2023 | Encartele, Inc. | COMPLIANCE FILING |
| 4/21/2023 | Global Tel*Link Corporation and Its Subsidiaries | REPORT |
| 4/14/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 4/12/2023 | NCIC Inmate Communications | OTHER |
| 4/10/2023 | Emma Lau | COMMENT |
| 4/10/2023 | Network Communications International Corp. d/b/a NCIC | REPORT |
| 4/10/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 4/6/2023 | Correct Solutions LLC | REPORT |

JA11

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/6/2023 | Network Communications International Corp d/b/a NCIC | REPORT |
| 4/6/2023 | Prodigy Solutions, Inc. | REPORT |
| 4/6/2023 | Securus Technologies, LLC | SUPPLEMENT |
| 4/6/2023 | Talton Communications, Inc. | REPORT |
| 4/5/2023 | Securus Technologies, LLC | SUPPLEMENT |
| 4/5/2023 | Securus Technologies, LLC | REPORT |
| 4/5/2023 | Securus Technologies, LLC | REPORT |
| 4/5/2023 | Wireline Competition Bureau | OTHER |
| 4/4/2023 | Combined Public Communications, LLC | REPORT |
| 4/4/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMPLIANCE FILING |
| 4/4/2023 | Talton Communications, Inc. | REPORT |
| 4/4/2023 | Talton Communications, Inc. | REPORT |
| 4/4/2023 | The Wright Petitioners | NOTICE OF EXPARTE |
| 4/3/2023 | Correct Solutions, LLC | REPORT |
| 4/3/2023 | Crown Correctional Telephone, Inc. | REPORT |
| 4/3/2023 | Pay Tel Communications, Inc. | REPORT |
| 4/3/2023 | Securus Technologies, LLC | REPORT |
| 4/3/2023 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 4/3/2023 | Talton Communications, Inc. | REPORT |
| 3/31/2023 | Inmate Calling Solutions, LLC | REPORT |
| 3/31/2023 | Talton Communications, Inc. | REPORT |
| 3/30/2023 | Inmate Calling Solutions, LLC d/b/a ICSolutions | REPORT |
| 3/30/2023 | Talton Communications, Inc. | REPORT |
| 3/29/2023 | ATN, INC | REPORT |
| 3/29/2023 | ATN,INC | REPORT |
| 3/29/2023 | ATN,INC | REPORT |
| 3/29/2023 | ATN,INC. | REPORT |
| 3/22/2023 | Stephen A. Raher | NOTICE OF EXPARTE |
| 3/17/2023 | Wireline Competition Bureau | OTHER |
| 3/15/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | LETTER |
| 3/13/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPORT |
| 3/13/2023 | Globe Tel*Link Corporation d/b/a ViaPath Technologies & | LETTER |
| 3/10/2023 | Ameelio | NOTICE OF EXPARTE |
| 3/10/2023 | The Wright Petitioners, et al. | NOTICE OF EXPARTE |
| 3/10/2023 | The Wright Petitioners, et al. | NOTICE OF EXPARTE |
| 3/9/2023 | NCIC Inmate Communications | COMMENT |
| 3/8/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 3/8/2023 | Securus Technologies, LLC | REPLY |
| 3/7/2023 | National Sheriffs' Association | PETITION FOR WAIVER |
| 3/7/2023 | Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI), et al. | ERRATA, ERRATUM OR ADDENDUM |
| 3/7/2023 | Telecommunications for the Deaf and Hard of Hearing, | REPLY |

**JA12**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**           **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/7/2023 | United Church of Christ Media Justice Ministry, Public | RESPONSE |
| 3/6/2023 | Black Women's Roundtable | REPLY TO COMMENTS |
| 3/6/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPLY TO COMMENTS |
| 3/6/2023 | Pay Tel Communications, Inc. | OTHER |
| 3/6/2023 | Pay Tel Communications, Inc. | OTHER |
| 3/6/2023 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 3/6/2023 | Securus Technologies, LLC | REPLY TO PETITION FOR RECONSIDERATION |
| 3/6/2023 | Worth Rises | REPLY TO COMMENTS |
| 3/3/2023 | ClearCaptions, LLC | REPLY TO COMMENTS |
| 3/3/2023 | HAMILTON RELAY, INC. | REPLY TO COMMENTS |
| 3/3/2023 | National Sheriffs' Association | REPLY |
| 3/3/2023 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 3/3/2023 | Pay Tel Communications, Inc. | AMENDMENT |
| 3/3/2023 | Stephen A. Raher | REPLY TO COMMENTS |
| 3/3/2023 | Inc. (TDI), et al. | REPLY TO COMMENTS |
| 3/3/2023 | The Leadership Conference on Civil and Human Rights, | REPLY TO COMMENTS |
| 3/3/2023 | The Wright Petitioners, et al. | REPLY TO COMMENTS |
| 3/1/2023 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/24/2023 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 2/24/2023 | Inmate Calling Solutions, LLC | RESPONSE |
| 2/23/2023 | ClearCaptions, LLC | COMMENT |
| 2/23/2023 | HAMILTON RELAY, INC. | COMMENT |
| 2/23/2023 | National Sheriffs' Association | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 2/23/2023 | Securus Technologies, LLC | REPLY TO PETITION FOR RECONSIDERATION |
| 2/23/2023 | Securus Technologies, LLC | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 2/23/2023 | Telecommunications for the Deaf and Hard of Hearing, | RESPONSE |
| 2/23/2023 | United Church of Christ Media Justice Ministry, Public | PARTIAL OPPOSITION |
| 2/17/2023 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 2/16/2023 | Inmate Calling Solutions, LLC | REPORT |
| 2/8/2023 | American Civil Liberties Union | COMMENT |
| 2/4/2023 | Globel Tel*Link Corporation d/b/a ViaPath Technologies | REPORT |
| 2/1/2023 | Talton Communications, Inc. | RESPONSE |
| 1/30/2023 | Encartele, Inc. | COMPLIANCE FILING |
| 1/30/2023 | Talton Communications, Inc. | REPORT |
| 1/27/2023 | Consumer and Governmental Affairs Bureau | PUBLIC NOTICE |
| 1/20/2023 | United Church of Christ Media Justice Ministry | LETTER |

In the Matter of

Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services

WC Docket No. 23-62

WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/9/2023 | HAMILTON RELAY, INC. | PETITION FOR RECONSIDERATION |
| 1/9/2023 | NCIC Inmate Communications | PETITION FOR RECONSIDERATION |
| 1/9/2023 | NCIC Inmate Communications | PETITION FOR RECONSIDERATION |
| 1/5/2023 | Wireline Competition Bureau | OTHER |
| 12/23/2022 | DC Mayor's Office of Deaf, DeafBlind, and Hard of | COMMENT |
| 12/20/2022 | Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI), et al. | MOTION FOR EXTENSION OF TIME |
| 12/19/2022 | kah mendoza | COMMENT |
| 12/19/2022 | Securus Technologies, LLC | RESPONSE |
| 12/16/2022 | Global Tel*Link Corporation d/b/a Viapath | COMMENT |
| 12/16/2022 | Securus Technologies, LLC | COMMENT |
| 12/15/2022 | Electronic Privacy Information Center (EPIC) | COMMENT |
| 12/15/2022 | Esperanza Dillard | COMMENT |
| 12/15/2022 | Franly Ulerio | COMMENT |
| 12/15/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 12/15/2022 | Javid Khoshnood | COMMENT |
| 12/15/2022 | Mack Thompson | COMMENT |
| 12/15/2022 | Mallory Cross | COMMENT |
| 12/15/2022 | Minnesota Department of Commerce | COMMENT |
| 12/15/2022 | National Sheriffs' Association | COMMENT |
| 12/15/2022 | NCIC Inmate Communications | COMMENT |
| 12/15/2022 | Pay Tel Communications, Inc. | COMMENT |
| 12/15/2022 | Prison Policy Initiative | COMMENT |
| 12/15/2022 | Stephen A. Raher | COMMENT |
| 12/15/2022 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 12/15/2022 | The Wright Petitioners, et al. | COMMENT |
| 12/15/2022 | United Church of Christ Media Justice Ministry, Public | COMMENT |
| 12/15/2022 | United Church of Christ, OC Inc., Public Knowledge | ERRATA, ERRATUM OR ADDENDUM |
| 12/15/2022 | Worth Rises | COMMENT |
| 12/14/2022 | Dr. Mei Kennedy | COMMENT |
| 12/14/2022 | Greg Donahoe | COMMENT |
| 12/13/2022 | ClearCaptions, LLC | COMMENT |
| 12/6/2022 | Global Caption, Inc. | NOTICE OF EXPARTE |
| 12/2/2022 | Wireline Competition Bureau | PUBLIC NOTICE |
| 11/21/2022 | Mei Bowers | COMMENT |
| 11/17/2022 | Dana M. Mims | COMMENT |
| 11/16/2022 | Marshelle A. Pharr, BSW | COMMENT |
| 11/16/2022 | Marshelle A. Pharr, BSW | COMMENT |

**JA14**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/4/2022 | Office of Managing Director | OTHER |
| 11/1/2022 | ATN | SUBMISSION OF REPORT |
| 10/26/2022 | Wireline Competition Bureau | PUBLIC NOTICE |
| 10/18/2022 | Securus Technologies, LLC | LETTER |
| 10/6/2022 | Encartele, Inc. | COMPLIANCE FILING |
| 9/30/2022 | Wireline Competition Bureau | OTHER |
| 9/29/2022 | Wireline Competition Bureau | OTHER |
| 9/27/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | LETTER |
| 9/23/2022 | The Wright Petitioners | NOTICE OF EXPARTE |
| 9/22/2022 | Benton Institute for Broadband and Society, et al. | LETTER |
| 9/22/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 9/22/2022 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 9/22/2022 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 9/21/2022 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 9/21/2022 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 9/21/2022 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 9/20/2022 | Pay Tel Communications, Inc. | LETTER |
| 9/20/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 9/20/2022 | Securus Technologies, LLC | LETTER |
| 9/16/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 9/15/2022 | Stephen Raher | OTHER |
| 9/14/2022 | Prison Policy Initiative | OTHER |
| 9/12/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 9/2/2022 | Securus Technologies LLC | SUPPLEMENT |
| 9/1/2022 | Securus Technologies, LLC | SUPPLEMENT |
| 8/31/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 8/25/2022 | Global Caption, Inc. | LETTER |
| 8/22/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 8/4/2022 | Encartele, Inc. | COMPLIANCE FILING |
| 7/20/2022 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 7/18/2022 | Custom Teleconnect Inc | COMPLIANCE FILING |
| 7/18/2022 | Custom Teleconnect Inc. | REPORT |
| 7/18/2022 | Telecommunications for the Deaf and Hard of Hearing, | REPLY TO COMMENTS |
| 7/15/2022 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 7/15/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 7/14/2022 | Pay Tel Communications, Inc. | ORDER |
| 7/13/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 7/13/2022 | The Brattle Group, Inc. | OTHER |
| 7/13/2022 | The Brattle Group, Inc. | OTHER |
| 7/12/2022 | Consolidate Telecom, Inc. | OTHER |
| 7/12/2022 | Consolidate Telecom, Inc. | OTHER |
| 7/12/2022 | Consolidate Telecom, Inc. | OTHER |

**JA15**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                              Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/12/2022 | Consolidated Telecom, Inc. | OTHER |
| 7/12/2022 | Consolidated Telecom, Inc. | OTHER |
| 7/12/2022 | Consolidated Telecom, Inc. | OTHER |
| 7/12/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | RESPONSE |
| 7/12/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | RESPONSE |
| 7/12/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | RESPONSE |
| 7/11/2022 | Consolidated Telecom, Inc. | OTHER |
| 7/11/2022 | Pay Tel Communications, Inc. | REPORT |
| 7/8/2022 | Combined Public Communications, LLC | OTHER |
| 7/8/2022 | Combined Public Communications, LLC, Vicky Moody | COMPLIANCE FILING |
| 7/8/2022 | Consolidated Telecom, Inc. | RESPONSE |
| 7/8/2022 | Consolidated Telecom, Inc. | RESPONSE |
| 7/8/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | RESPONSE |
| 7/8/2022 | Securus Technologies, LLC | RESPONSE |
| 7/8/2022 | Securus Technologies, LLC | RESPONSE |
| 7/7/2022 | Crown Correctional Telephone, Inc. | OTHER |
| 7/7/2022 | Crown Correctional Telephone, Inc. | OTHER |
| 7/7/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | SUPPLEMENT |
| 7/7/2022 | Network Communications International Corp. | OTHER |
| 7/6/2022 | ViaPath Technologies | OTHER |
| 7/5/2022 | Combined Public Communications, LLC | OTHER |
| 7/5/2022 | Correct Solutions, LLC | OTHER |
| 7/5/2022 | Crown Correctional Telephone, Inc. | OTHER |
| 7/5/2022 | Inmate Calling Solutions, LLC | OTHER |
| 7/5/2022 | Inmate Calling Solutions, LLC | OTHER |
| 7/5/2022 | Network Communications International Corp. | OTHER |
| 7/5/2022 | Prodigy Solutions, Inc. | OTHER |
| 7/5/2022 | Securus Technologies, LLC | RESPONSE |
| 7/5/2022 | Talton Communications, Inc. | OTHER |
| 7/1/2022 | Correct Solutions, LLC | OTHER |
| 7/1/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPORT |
| 7/1/2022 | Inmate Calling Solutions, LLC | OTHER |
| 7/1/2022 | Prodigy Solutions, Inc. | OTHER |
| 7/1/2022 | Securus Technologies, LLC | REPORT |
| 7/1/2022 | Talton Communications, Inc. | OTHER |
| 7/1/2022 | ViaPath Technologies | OTHER |
| 6/30/2022 | Correct Solutions, LLC | REPORT |
| 6/30/2022 | Crown Correctional Telephone, Inc. | REPORT |
| 6/30/2022 | Crown Correctional Telephone, Inc. | RESPONSE |
| 6/30/2022 | Inmate Calling Solutions, LLC | RESPONSE |
| 6/30/2022 | Network Communications International Corp | REPORT |
| 6/30/2022 | Network Communications International Corp. | REPORT |

**JA16**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/30/2022 | Prodigy Solutions, Inc. | REPORT |
| 6/30/2022 | Prodigy Solutions, Inc. | REPORT |
| 6/30/2022 | Talton Communications, Inc. | REPORT |
| 6/29/2022 | Encartele, Inc. | REQUEST FOR EXTENSION OF TIME |
| 6/29/2022 | Prodigy Solutions, Inc. | REPORT |
| 6/29/2022 | Prodigy Solutions, Inc. | REPORT |
| 6/27/2022 | Prodigy Solutions, Inc. | REPORT |
| 6/24/2022 | Wireline Competition Bureau | OTHER |
| 6/23/2022 | Prodigy Solutions Inc | REPORT |
| 6/22/2022 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 6/21/2022 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 6/17/2022 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 6/15/2022 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 6/14/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 6/13/2022 | Aventiv Technologies | NOTICE OF EXPARTE |
| 6/10/2022 | Aventiv Technologies | NOTICE OF EXPARTE |
| 6/10/2022 | Talton Communications, Inc. | REPORT |
| 6/2/2022 | Global Tel Link Corporation d/b/a ViaPath Technologies | REPORT |
| 6/2/2022 | Network Communications International Corp., d/b/a | REPORT |
| 6/2/2022 | Network Communications International Corp., d/b/a | REPORT |
| 6/1/2022 | Consolidated Telecom, Inc. | REPORT |
| 6/1/2022 | Consolidated Telecom, Inc. | REPORT |
| 5/31/2022 | Aventiv Technologies | NOTICE OF EXPARTE |
| 5/23/2022 | Aventiv Technologies | NOTICE OF EXPARTE |
| 5/20/2022 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 5/18/2022 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 5/17/2022 | Correct Solutions, LLC | COMPLIANCE FILING |
| 5/16/2022 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 5/9/2022 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 5/6/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 4/29/2022 | The Leadership Conference on Civil and Human Rights | LETTER |
| 4/28/2022 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 4/22/2022 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 4/21/2022 | CITY TELE COIN COMPANY, INC. | SUBMISSION OF REPORT |
| 4/19/2022 | Embarq Communications | REPORT |
| 4/19/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPORT |
| 4/19/2022 | Legacy Long Distant International, Inc. | REPORT |
| 4/19/2022 | Pay Tel Communications, Inc. | REPORT |
| 4/19/2022 | Securus Technologies, LLC | REPORT |
| 4/18/2022 | Consolidated Telecom, Inc. | COMPLIANCE FILING |
| 4/15/2022 | Reliance Telephone | REPORT |

**JA17**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/7/2022 | TKC TELECOM - Mack | REPORT |
| 4/6/2022 | Custom Teleconnect Inc. | COMPLIANCE FILING |
| 4/4/2022 | Global Tel Link Corporation d/b/a ViaPath Technologies | REPORT |
| 4/4/2022 | Network Communications International Corp., d/b/a | REPORT |
| 4/2/2022 | CenturyLink | COMPLIANCE FILING |
| 4/1/2022 | Crown Correctonal Telephone, Inc. | REPORT |
| 4/1/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | REPORT |
| 4/1/2022 | Legacy Long Distance Interantional Inc. | REPORT |
| 4/1/2022 | Network Communications International Corp d/b/a NCIC | REPORT |
| 4/1/2022 | Pay Tel Communications, Inc. | REPORT |
| 4/1/2022 | Prodigy Solutions, Inc. | REPORT |
| 4/1/2022 | Securus Technologies, LLC | REPORT |
| 4/1/2022 | Securus Technologies, LLC | REPORT |
| 4/1/2022 | Talton Communications, Inc. | REPORT |
| 4/1/2022 | Vicky Moody | REPORT |
| 3/31/2022 | ATN, Inc. | REPORT |
| 3/31/2022 | Crown Correctional Telephone, Inc | REPORT |
| 3/31/2022 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 3/31/2022 | Synergy Telecom Service Co Inc | REPORT |
| 3/31/2022 | Talton Communications, Inc. | REPORT |
| 3/30/2022 | ATN, Inc | REPORT |
| 3/30/2022 | ATN, Inc. | REPORT |
| 3/30/2022 | CITY TELE COIN COMPANY INC | SUBMISSION OF REPORT |
| 3/30/2022 | Inmate Calling Solutions, LLC | REPORT |
| 3/29/2022 | Correct Solutions, LLC | COMPLIANCE FILING |
| 3/29/2022 | Inmate Calling Solutions, LLC | REPORT |
| 3/28/2022 | Encartele, Inc. | COMMENT |
| 3/22/2022 | TKC TELECOM | COMMENT |
| 3/17/2022 | The Leadership Conference on Civil and Human Rights | LETTER |
| 3/17/2022 | The Leadership Conference on Civil and Human Rights | LETTER |
| 3/17/2022 | Worth Rises | COMMENT |
| 3/8/2022 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 3/2/2022 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/2/2022 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/15/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 2/14/2022 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/9/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 2/9/2022 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/4/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 2/2/2022 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 1/28/2022 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 1/27/2022 | National Association of State Utility Consumer | REPLY |

**JA18**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/27/2022 | Prison Policy Initiative | REPLY TO COMMENTS |
| 1/21/2022 | Prison Policy Initiative | REPLY TO COMMENTS |
| 1/21/2022 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 1/18/2022 | Wireline Competition Bureau | OTHER |
| 1/12/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 1/12/2022 | NCIC Inmate Communications | COMMENT |
| 1/12/2022 | Prison Policy Initiative | COMMENT |
| 1/12/2022 | Securus Technologies, LLC | COMMENT |
| 1/11/2022 | Colorado Public Utilities Commission | COMMENT |
| 1/11/2022 | Prison Policy Initiative | OTHER |
| 1/8/2022 | Electronic Privacy Information Center | COMMENT |
| 1/8/2022 | Global Tel*Link Corporation d/b/a ViaPath Technologies | COMMENT |
| 1/7/2022 | NCIC Inmate Communications | COMMENT |
| 1/7/2022 | Prison Policy Initiative | COMMENT |
| 1/7/2022 | Securus Technologies, LLC | COMMENT |
| 1/7/2022 | Worth Rises | COMMENT |
| 12/20/2021 | Securus Technologies LLC | REPLY TO COMMENTS |
| 12/18/2021 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 12/18/2021 | Worth Rises | COMMENT |
| 12/17/2021 | ClearCaptions, LLC | REPLY TO COMMENTS |
| 12/17/2021 | Katherine Clad | REPLY |
| 12/17/2021 | National Association of State Utility Consumer Advocates | REPLY TO COMMENTS |
| 12/17/2021 | National Sheriffs' Association | REPLY TO COMMENTS |
| 12/17/2021 | NCIC Inmate Communications | REPLY TO COMMENTS |
| 12/17/2021 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 12/17/2021 | Prison Policy Initiative | REPLY TO COMMENTS |
| 12/17/2021 | Prisoners' Legal Services of Massachusetts, Karina | COMMENT |
| 12/17/2021 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 12/17/2021 | Telecommunications for the Deaf and Hard of Hearing, | REPLY TO COMMENTS |
| 12/17/2021 | The Leadership Conference on Civil and Human Rights | REPLY TO COMMENTS |
| 12/17/2021 | The Wright Petitioners, et al. | REPLY TO COMMENTS |
| 12/17/2021 | ZP Better Together, LLC | REPLY TO COMMENTS |
| 12/16/2021 | Benj Azose | REPLY TO COMMENTS |
| 12/16/2021 | Talton Communications, Inc. | REPLY TO COMMENTS |
| 12/15/2021 | Wireline Competition Bureau | PUBLIC NOTICE |
| 12/6/2021 | Global Tel*Link Corporation | COMMENT |
| 12/2/2021 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 12/1/2021 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 11/19/2021 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 11/19/2021 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 11/19/2021 | Prison Policy Initiative | REPLY TO COMMENTS |
| 11/19/2021 | Securus Technologies, LLC | REPLY TO COMMENTS |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/19/2021 | The Wright Petitioners, et al. | REPLY TO COMMENTS |
| 11/19/2021 | Worth Rises | COMMENT |
| 11/18/2021 | Securus Technologies, LLC | LETTER |
| 11/12/2021 | Network Communications International Corp. | REPORT |
| 11/12/2021 | Wireline Competition Bureau | PUBLIC NOTICE |
| 11/10/2021 | Network Communications International Corp | REPORT |
| 11/5/2021 | Global Tel*Link Corporation | COMMENT |
| 11/5/2021 | Securus Technologies, LLC | LETTER |
| 11/5/2021 | Securus Technologies, LLC | COMMENT |
| 11/4/2021 | Encartele, Inc. | COMPLIANCE FILING |
| 11/4/2021 | NCIC Inmate Communications | COMMENT |
| 11/4/2021 | Prison Policy Initiative | COMMENT |
| 11/4/2021 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 11/4/2021 | The Wright Petitioners, The Benton Institute for | COMMENT |
| 11/4/2021 | Worth Rises | COMMENT |
| 11/2/2021 | Benj Azose | COMMENT |
| 10/29/2021 | ASL Services Holdings, LLC dba GlobalVRS | COMMENT |
| 10/27/2021 | Center for Advanced Communications Policy | REPLY TO COMMENTS |
| 10/27/2021 | Worth Rises | COMMENT |
| 10/26/2021 | Global Tel*Link Corporation | COMMENT |
| 10/26/2021 | Global Tel*Link Corporation | COMMENT |
| 10/25/2021 | Pay Tel Communications, Inc. | COMMENT |
| 10/20/2021 | Synergy Telecom Service Company Inc | REPORT |
| 10/18/2021 | Encartele, Inc. | COMPLIANCE FILING |
| 10/18/2021 | Office of Communications Business Opportunities | OTHER |
| 10/15/2021 | Wireline Competition Bureau | OTHER |
| 10/14/2021 | Dana Hoyle | COMPLIANCE FILING |
| 10/14/2021 | Worth Rises | COMMENT |
| 10/8/2021 | The Wright Petitioners, et al. | REPLY |
| 10/7/2021 | Global Tel*Link Corporation | MOTION FOR EXTENSION OF TIME |
| 9/28/2021 | Global Tel*Link Corporation | COMMENT |
| 9/28/2021 | Securus Technologies, LLC | COMMENT |
| 9/28/2021 | United Church of Christ, OC Inc., et al. | COMMENT |
| 9/27/2021 | Beth McConnell, William Hall, Jack Berroug | COMMENT |
| 9/27/2021 | California Public Utilities Commisison | COMMENT |
| 9/27/2021 | ClearCaptions, LLC | COMMENT |
| 9/27/2021 | Hamilton Relay, Inc. | COMMENT |
| 9/27/2021 | National Association of State Utility Consumer Advocates | COMMENT |
| 9/27/2021 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 9/27/2021 | National Sheriffs' Association | COMMENT |
| 9/27/2021 | NCIC Inmate Communications | COMMENT |

**JA20**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/27/2021 | Pay Tel Communications, Inc. | COMMENT |
| 9/27/2021 | Praeses LLC | COMMENT |
| 9/27/2021 | Prison Policy Initiative | COMMENT |
| 9/27/2021 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 9/27/2021 | Tidal Wave Telecom, Inc. | COMMENT |
| 9/27/2021 | Worth Rises | COMMENT |
| 9/27/2021 | ZP Better Together, LLC | COMMENT |
| 9/27/2021 | ZP Better Together, LLC | REQUEST |
| 9/23/2021 | Correct Solutions, LLC | COMPLIANCE FILING |
| 9/23/2021 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 9/23/2021 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 9/22/2021 | Wireline Competition Bureau | PUBLIC NOTICE |
| 9/20/2021 | Benj Azose | COMMENT |
| 9/17/2021 | Securus Technologies, LLC | PETITION |
| 9/2/2021 | The Wright Petitioners | NOTICE OF EXPARTE |
| 8/30/2021 | Custom Teleconnect Inc | COMPLIANCE FILING |
| 8/30/2021 | Securus Technologies, LLC | PETITION FOR WAIVER |
| 8/30/2021 | Securus Technologies, LLC | LETTER |
| 8/27/2021 | NCIC Inmate Communications | PETITION FOR RECONSIDERATION |
| 8/27/2021 | United Church of Christ, OC Inc., Public Knowledge | PETITION FOR RECONSIDERATION |
| 8/23/2021 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 8/18/2021 | Another tester | COMMENT |
| 8/18/2021 | Gabriel M | COMMENT |
| 8/18/2021 | Gabriel M | COMMENT |
| 8/18/2021 | Gabriel M | COMMENT |
| 8/18/2021 | J tester | COMMENT |
| 8/18/2021 | Jardel Costa | COMMENT |
| 8/18/2021 | Jardel Costa | COMMENT |
| 8/18/2021 | Jardel Costa | COMMENT |
| 8/18/2021 | Jardel test | COMMENT |
| 8/18/2021 | John Doe | COMMENT |
| 8/18/2021 | Other Tester | COMMENT |
| 8/12/2021 | Consolidated Telecom Inc. | REPORT |
| 8/10/2021 | Consolidated Telecom, Inc. | COMPLIANCE FILING |
| 8/10/2021 | Wireline Competition Bureau | OTHER |
| 8/3/2021 | Network Communications International Corp | REPORT |
| 8/2/2021 | Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI) | MOTION FOR EXTENSION OF TIME |
| 7/30/2021 | Preferred Communications of Texas, LLC | COMPLIANCE FILING |
| 7/27/2021 | Inmate Calling Solutions, LLC | REPORT |

19

**JA21**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/26/2021 | California Public Utilities Commission | COMPLIANCE FILING |
| 7/26/2021 | California Public Utilities Commission | COMPLIANCE FILING |
| 7/23/2021 | Network Communications International Corp. | REPORT |
| 7/23/2021 | Network Communications International Corp. | OTHER |
| 7/21/2021 | Network Communications International Corp | REPORT |
| 6/24/2021 | Wireline Competition Bureau | OTHER |
| 6/21/2021 | California Public Utilities Commission | COMPLIANCE FILING |
| 6/17/2021 | Wireline Competition Bureau | OTHER |
| 6/9/2021 | Correct Solutions, Inc. | COMPLIANCE FILING |
| 6/9/2021 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 6/9/2021 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/8/2021 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 5/24/2021 | Wireline Competition Bureau | REPORT AND ORDER |
| 5/20/2021 | Wireline Competition Bureau | OTHER |
| 5/19/2021 | Legacy Long Distance International, Inc. | OTHER |
| 5/18/2021 | Network Communications International Corp | REPORT |
| 5/18/2021 | Prodigy Solutions inc. | REPORT |
| 5/18/2021 | Talton Communications Inc | REPORT |
| 5/17/2021 | Global Tel Link | REPORT |
| 5/17/2021 | Legacy Long Distance International, Inc. | REPORT |
| 5/14/2021 | Combined Public Communications, LLC | SUBMISSION OF REPORT |
| 5/14/2021 | Crown Correctional Telephone | REPORT |
| 5/14/2021 | RIght On Crime | LETTER |
| 5/14/2021 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 5/14/2021 | The Wright Petitioners | NOTICE OF EXPARTE |
| 5/14/2021 | United Church of Christ, OC Inc., et al. | LETTER |
| 5/14/2021 | United Church of Christ, OC Inc., Public Knowledge | LETTER |
| 5/13/2021 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 5/13/2021 | ICSolutions | COMMENT |
| 5/13/2021 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 5/13/2021 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 5/13/2021 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 5/12/2021 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 5/12/2021 | United Church of Christ, OC Inc. | LETTER |
| 5/6/2021 | Jardel Costa | COMMENT |
| 5/6/2021 | Jardel Costa | COMMENT |
| 5/6/2021 | Jardel Costa | COMMENT |
| 4/26/2021 | United Church of Christ, OC Inc. | LETTER |
| 4/23/2021 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/23/2021 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/22/2021 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 4/21/2021 | Combined Public Communications, LLC | RESPONSE |

**JA22**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                              **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/21/2021 | Legacy Long Distance International, Inc. | REPORT |
| 4/21/2021 | National Center for Youth Law | NOTICE OF EXPARTE |
| 4/19/2021 | Legacy Long Distance International, Inc. | REPORT |
| 4/19/2021 | Smart Communications Holding, Inc. | REPORT |
| 4/16/2021 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/13/2021 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 4/5/2021 | PayTel Communications, Inc. | REPORT |
| 4/2/2021 | Michael Pryor | LETTER |
| 4/2/2021 | National Association of State Utility Consumer Advocates | LETTER |
| 4/2/2021 | Preferred Communications of Texas, LLC | REPORT |
| 4/2/2021 | Securos Technologies, LLC | REPORT |
| 4/1/2021 | ATN, Inc. | REPORT |
| 4/1/2021 | Correct Solutions, Inc. | COMPLIANCE FILING |
| 4/1/2021 | Crown Correctional Telephone Inc | REPORT |
| 4/1/2021 | Global Tel*Link Corporation and Subsidiaries | REPORT |
| 4/1/2021 | IC Solutions | REPORT |
| 4/1/2021 | Network Communications International Corp | REPORT |
| 4/1/2021 | Pay Tel Communications, Inc. | REPORT |
| 4/1/2021 | Preferred Communications of Texas, LLC | COMPLIANCE FILING |
| 4/1/2021 | Prodigy Solutions, Inc. | REPORT |
| 4/1/2021 | Securos Technologies, LLC | REPORT |
| 4/1/2021 | Securos Technologies, LLC | REPORT |
| 4/1/2021 | Securos Technologies, LLC | REPORT |
| 4/1/2021 | Securos Technologies, LLC | REPORT |
| 4/1/2021 | Securos Technologies, LLC | REPORT |
| 4/1/2021 | Smart Communications Holding, Inc. | COMPLIANCE FILING |
| 4/1/2021 | Talton Communications Inc | REPORT |
| 3/31/2021 | ATN, Inc. | REPORT |
| 3/31/2021 | Prodigy Solutions, Inc. | REPORT |
| 3/31/2021 | Public Knowledge, United Church of Christ, OC Inc. | LETTER |
| 3/30/2021 | ATN Inc | REPORT |
| 3/30/2021 | Combined PUblic Communications, LLC | SUBMISSION OF REPORT |
| 3/30/2021 | Inmate Calling Solutions, LLC | REPORT |
| 3/29/2021 | Global Tel*Link Corporation | LETTER |
| 3/29/2021 | Wright Petitioners | NOTICE OF EXPARTE |
| 3/26/2021 | The Wright Petitioners | LETTER |
| 3/24/2021 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 3/24/2021 | Worth Rises | NOTICE OF EXPARTE |
| 3/23/2021 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 3/23/2021 | Prison Policy Initiative | LETTER |
| 3/23/2021 | The Wright Petitioners | NOTICE OF EXPARTE |
| 3/20/2021 | United Church of Christ, OC Inc., et al. | NOTICE OF EXPARTE |

**JA23**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/15/2021 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 3/10/2021 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 3/3/2021 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/25/2021 | Prison Policy Initiative | LETTER |
| 2/16/2021 | The Leadership Conference on Civil and Human Rights | NOTICE OF EXPARTE |
| 2/11/2021 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 2/5/2021 | Telecommunications for the Deaf and Hard of Hearing, | NOTICE OF EXPARTE |
| 2/5/2021 | The Wright Petitioners | NOTICE OF EXPARTE |
| 2/3/2021 | Inmate Telephone Rate Control Supporters, MMTC | COMMENT |
| 1/30/2021 | Media Justice, Civil Rights, Public Interest, Labor, and | NOTICE OF EXPARTE |
| 1/22/2021 | The Leadership Conference on Civil and Human Rights | REPLY TO COMMENTS |
| 1/21/2021 | Global Tel*Link Corporation | REPLY |
| 1/21/2021 | NCIC Inmate Communications | REPLY TO PETITION FOR RECONSIDERATION |
| 1/19/2021 | Global Tel*Link Corporation | COMMENT |
| 1/19/2021 | The Wright Petitioners | REPLY TO COMMENTS |
| 1/16/2021 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 1/16/2021 | Mezmo Corporation (dba InnoCaption) | REPLY TO COMMENTS |
| 1/16/2021 | Telecommunications for the Deaf and Hard of Hearing, | REPLY TO COMMENTS |
| 1/15/2021 | Bonita Tenneriello, Esq., Karina Wilkinson | REPLY TO COMMENTS |
| 1/15/2021 | ClearCaptions, LLC | REPLY TO COMMENTS |
| 1/15/2021 | Hamilton Relay, Inc. | REPLY TO COMMENTS |
| 1/15/2021 | MMTC, Inmate Telephone Rate Control Supporters | REPLY TO COMMENTS |
| 1/15/2021 | National Sheriffs' Association | REPLY TO COMMENTS |
| 1/15/2021 | NCIC Inmate Communications | REPLY TO COMMENTS |
| 1/15/2021 | Pay Tel Communications, Inc. | COMMENT |
| 1/15/2021 | RICHARD RAY | REPLY TO COMMENTS |
| 1/15/2021 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 1/15/2021 | The Episcopal Church, United States Conference of | REPLY TO COMMENTS |
| 1/15/2021 | The Wright Petitioners, et al. | REPLY TO COMMENTS |
| 1/15/2021 | Worth Rises | COMMENT |
| 1/15/2021 | ZP Better Together, LLC | REPLY TO COMMENTS |
| 1/15/2021 | ZP Better Together, LLC | REPLY TO COMMENTS |
| 1/14/2021 | ASL Services Holdings, LLC dba GlobalVRS | REPLY TO COMMENTS |
| 1/13/2021 | The Arizona Commission for the Deaf and the Hard of | REPLY TO COMMENTS |
| 1/11/2021 | Pay Tel Communications, Inc. | COMMENT |
| 1/8/2021 | Karl Leukefeld, Disabilities Program Manager | COMMENT |
| 1/8/2021 | Karl Leukefeld, Disabilities Program Manager | COMMENT |
| 1/8/2021 | Wireline Competition Bureau | PUBLIC NOTICE |
| 12/23/2020 | Global Tel*Link Corporation | SUPPLEMENT |
| 12/21/2020 | Convo Communications, LLC | REPLY TO COMMENTS |
| 12/17/2020 | Wireline Competition Bureau | ORDER |

**JA24**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                          Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/16/2020 | not applicable | COMMENT |
| 12/15/2020 | Amy Scheller | COMMENT |
| 12/15/2020 | cindy sandberg | COMMENT |
| 12/15/2020 | Laurel Armstrong | COMMENT |
| 12/15/2020 | Tate Allen Sheppard | COMMENT |
| 12/14/2020 | Annie Enneking | COMMENT |
| 12/14/2020 | Connor Klausing | COMMENT |
| 12/14/2020 | Denise Konen | COMMENT |
| 12/14/2020 | Eliana Meyerowitz | COMMENT |
| 12/14/2020 | Janet Folina | COMMENT |
| 12/14/2020 | John Heimbuch | COMMENT |
| 12/14/2020 | John Schuerman | COMMENT |
| 12/14/2020 | Kristen Froebel | COMMENT |
| 12/14/2020 | Margaret Rittenhouse | COMMENT |
| 12/14/2020 | Margaret Rozycki | COMMENT |
| 12/14/2020 | Michelle Hensley | COMMENT |
| 12/14/2020 | Neely Heubach | COMMENT |
| 12/14/2020 | Pearce Bunting | COMMENT |
| 12/10/2020 | Secured Perimeters International | LETTER |
| 12/10/2020 | The Wright Petitioners, et al. | MOTION FOR EXTENSION OF TIME |
| 12/3/2020 | NCIC Inmate Communications | REQUEST |
| 12/3/2020 | Wireline Competition Bureau | PUBLIC NOTICE |
| 12/1/2020 | Combined Public Communications, LLC | OTHER |
| 12/1/2020 | Franly Ulerio-Nunez | COMMENT |
| 11/30/2020 | Pay Tel Communications, Inc. | LETTER |
| 11/25/2020 | Erin Jackson | COMMENT |
| 11/25/2020 | Global Tel*Link Corporation | LETTER |
| 11/24/2020 | Adaria McGill | COMMENT |
| 11/24/2020 | Angeliqua Ortiz | COMMENT |
| 11/24/2020 | Bethani Walker-Branch | COMMENT |
| 11/24/2020 | Camille Ashford | COMMENT |
| 11/24/2020 | Emilia Barnecut | COMMENT |
| 11/24/2020 | Free Press | COMMENT |
| 11/24/2020 | Helping Educate to Advance the Rights of Deaf | COMMENT |
| 11/24/2020 | Helping Educate to Advance the Rights of Deaf Communities - HEARD | ERRATA, ERRATUM OR ADDENDUM |
| 11/24/2020 | Jawan Collins | COMMENT |
| 11/24/2020 | Julie Spigner | COMMENT |
| 11/24/2020 | Marie Forrest | COMMENT |
| 11/24/2020 | Maya Branch | COMMENT |
| 11/24/2020 | Monique Newell | COMMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/24/2020 | Nia Ocansey | COMMENT |
| 11/24/2020 | Nicole Mapp | COMMENT |
| 11/24/2020 | Nicole Turner | COMMENT |
| 11/24/2020 | Roxanne Zech | COMMENT |
| 11/24/2020 | Shannon Finnegan | COMMENT |
| 11/24/2020 | Shannon Fowler | COMMENT |
| 11/24/2020 | Sierra Heinzman | COMMENT |
| 11/24/2020 | Teraca Florence | COMMENT |
| 11/24/2020 | Wright Petitioners, Prison Policy Initiative, Public | COMMENT |
| 11/23/2020 | Bonita Tenneriello, Esq., Karina Wilkinson | COMMENT |
| 11/23/2020 | California State Sheriffs' Association | COMMENT |
| 11/23/2020 | Correct Solutions, LLC | NOTICE OF EXPARTE |
| 11/23/2020 | Correct Solutions, LLC | REPORT |
| 11/23/2020 | Emily Danker-Feldman | COMMENT |
| 11/23/2020 | Emily Danker-Feldman | COMMENT |
| 11/23/2020 | Esperanza | COMMENT |
| 11/23/2020 | Global Tel Link Corporation | COMMENT |
| 11/23/2020 | Global Tel Link Corporation | COMMENT |
| 11/23/2020 | Global Tel*Link Corporation | COMMENT |
| 11/23/2020 | Global Tel*Link Corporation | PETITION FOR RECONSIDERATION |
| 11/23/2020 | HEARD, Tiffany | COMMENT |
| 11/23/2020 | Jenni Nguyen | COMMENT |
| 11/23/2020 | Julie Gross | COMMENT |
| 11/23/2020 | Mallory Sepler-King | COMMENT |
| 11/23/2020 | MediaJustice, UCC OC, Inc. | COMMENT |
| 11/23/2020 | NASUCA | COMMENT |
| 11/23/2020 | National Sheriffs' Association | COMMENT |
| 11/23/2020 | NCIC Inmate Communications | COMMENT |
| 11/23/2020 | Office of Communications Business Opportunities | OTHER |
| 11/23/2020 | Pay Tel Communications, Inc. | COMMENT |
| 11/23/2020 | San Francisco Financial Justice Project | COMMENT |
| 11/23/2020 | Sara Yurkovic | COMMENT |
| 11/23/2020 | sarah dyson, anna dyson, charley dyson, aaron dyson | COMMENT |
| 11/23/2020 | Sarah Whittington | COMMENT |
| 11/23/2020 | Securus Technologies | NOTICE OF EXPARTE |
| 11/23/2020 | Securus Technologies, LLC | COMMENT |
| 11/23/2020 | Securus Technologies, LLC | COMMENT |
| 11/23/2020 | Shannon Callahan | COMMENT |
| 11/23/2020 | Sorenson Communications, LLC, CaptionCall, LLC | COMMENT |
| 11/23/2020 | Telecommunications for the Deaf and Hard of Hearing, | COMMENT |
| 11/23/2020 | Tessa Xuan | COMMENT |

**JA26**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/23/2020 | Verizon | COMMENT |
| 11/23/2020 | Worth Rises | COMMENT |
| 11/20/2020 | Enforcement Bureau | PUBLIC NOTICE |
| 11/20/2020 | Madison Stricker | COMMENT |
| 11/20/2020 | Secured Perimeters International | LETTER |
| 11/18/2020 | Aylia | COMMENT |
| 11/18/2020 | Crystal Eusebio | COMMENT |
| 11/18/2020 | hayley stokar | COMMENT |
| 11/18/2020 | Lee O. | COMMENT |
| 11/18/2020 | National Sheriffs' Association | OTHER |
| 11/18/2020 | Tyrone Giordano | COMMENT |
| 11/17/2020 | Alfred Sonnenstrahl | COMMENT |
| 11/17/2020 | Anna Hayes | COMMENT |
| 11/17/2020 | Kaley Klecka | COMMENT |
| 11/17/2020 | Philip Kong | COMMENT |
| 11/16/2020 | Aja McMillan | COMMENT |
| 11/16/2020 | Chad Valasek | COMMENT |
| 11/16/2020 | Cory Dostie | COMMENT |
| 11/16/2020 | Kathryn Hartfield | COMMENT |
| 11/16/2020 | Ludivine Kom Liapoe | COMMENT |
| 11/16/2020 | Mallory Cross | COMMENT |
| 11/16/2020 | Susan Sunday | COMMENT |
| 11/13/2020 | Grace Karkanias | COMMENT |
| 11/13/2020 | Wireline Competition Bureau | LETTER |
| 11/10/2020 | Wireline Competititon Bureau | LETTER |
| 11/9/2020 | Wireline Competition Bureau | LETTER |
| 11/2/2020 | CoreCivic | NOTICE OF EXPARTE |
| 10/27/2020 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/23/2020 | COMBINED PUBLIC COMMUNICATIONS | COMPLIANCE FILING |
| 10/23/2020 | Global Tel*Link Corporation | REPORT |
| 10/23/2020 | Securus Technologies, LLC | REPORT |
| 10/23/2020 | Wireline Competition Bureau | PUBLIC NOTICE |
| 10/22/2020 | Inteserra Consulting Group | REPORT |
| 10/20/2020 | Network Communications International Corp | REPORT |
| 10/19/2020 | Global Tel*Link Corporation | LETTER |
| 10/8/2020 | Securus Technologies | NOTICE OF EXPARTE |
| 10/2/2020 | National Sheriffs' Association (NSA) | NOTICE OF EXPARTE |
| 10/1/2020 | Global Tel*Link Corporation | LETTER |
| 9/24/2020 | Wireline Competition Bureau | PUBLIC NOTICE |
| 9/23/2020 | Kaley Kalecka | COMMENT |
| 9/17/2020 | NCIC Inmate Communications | LETTER |
| 9/14/2020 | Global Tel Link Corporation | RESPONSE |

**JA27**

In the Matter of

Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services

WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/14/2020 | Global Tel*Link Corporation | RESPONSE |
| 9/14/2020 | Global Tel*Link Corporation | COMMENT |
| 9/11/2020 | Global Tel*Link Corporation | REQUEST |
| 9/10/2020 | Pay Tel Communications, Inc. | LETTER |
| 9/10/2020 | Securus Technologies, Inc. | LETTER |
| 9/3/2020 | Office of General Counsel | PUBLIC NOTICE |
| 9/3/2020 | The Wright Petitioners | LETTER |
| 9/1/2020 | Wireline Competition Bureau | ORDER |
| 8/26/2020 | The Wright Petitioners | LETTER |
| 8/17/2020 | Securus Technologies, LLC | OTHER |
| 8/17/2020 | Securus Technologies, LLC | OTHER |
| 8/13/2020 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 8/13/2020 | The Brattle Group, Inc. | OTHER |
| 8/13/2020 | The Brattle Group, Inc. | OTHER |
| 8/13/2020 | Wright Petitioners | LETTER |
| 8/12/2020 | Pay Tel Communications, Inc. | LETTER |
| 8/10/2020 | NCIC Inmate Communications | OTHER |
| 8/7/2020 | Wireline Competition Bureau | REPORT AND ORDER |
| 8/6/2020 | Wireline Competition Bureau | OTHER |
| 8/5/2020 | Secured Perimeters International | COMMENT |
| 7/31/2020 | Human Rights Defense Center, Paul Wright | COMMENT |
| 7/30/2020 | Global Tel*Link Corporation | LETTER |
| 7/30/2020 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/30/2020 | Securus Technologies LLC | NOTICE OF EXPARTE |
| 7/30/2020 | United Church of Christ, OC Inc. | LETTER |
| 7/30/2020 | Wright Petitioners | NOTICE OF EXPARTE |
| 7/28/2020 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 7/28/2020 | United Church of Christ, OC Inc. | LETTER |
| 7/24/2020 | NCIC Inmate Communications | NOTICE OF EXPARTE |
| 7/24/2020 | Public Knowledge | NOTICE OF EXPARTE |
| 7/15/2020 | Wireline Competition Bureau | LETTER |
| 6/12/2020 | Legacy Long Distance International, Inc | REPORT |
| 5/20/2020 | Network Communications International Corp. | SUPPLEMENT |
| 5/19/2020 | Global Tel*Link Corporation and Its Subsidiaries | REPORT |
| 5/19/2020 | Network Communications International Corp | OTHER |
| 5/13/2020 | Network Communications International Corp | REPORT |
| 5/6/2020 | Crown Correctional Telephone, Inc. | OTHER |
| 5/6/2020 | Network Communications International Corp. | OTHER |
| 5/5/2020 | Crown Correctional Telephone, Inc. | REPORT |
| 5/5/2020 | Network Communications International Corp | REPORT |
| 5/4/2020 | Correct Solutions, LLC | OTHER |
| 5/4/2020 | Securus Technologies, Inc. | SUPPLEMENT |

**JA28**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                          Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 5/4/2020 | Securus Technologies, Inc. | COMMENT |
| 5/1/2020 | Pay Tel Communications, Inc. | RESPONSE |
| 5/1/2020 | Securus Technologies, LLC | OTHER |
| 4/28/2020 | Combined Public Communications, LLC | OTHER |
| 4/28/2020 | Correct Solutions, LLC | REPORT |
| 4/28/2020 | Pay Tel Communications, Inc. | AMENDMENT |
| 4/27/2020 | Crown Correctional Telephone, Inc. | REPORT |
| 4/24/2020 | CenturyLink Public Communications, Inc. | COMPLIANCE FILING |
| 4/24/2020 | Inteserra Consulting Group | OTHER |
| 4/24/2020 | Inteserra Consulting Group | OTHER |
| 4/23/2020 | Inmate Calling Solutions, LLC | REPORT |
| 4/21/2020 | CenturyLink | SUPPLEMENT |
| 4/21/2020 | Pay Tel Communications, Inc. | COMMENT |
| 4/21/2020 | Securus Technologies, LLC | REPLY TO COMMENTS |
| 4/21/2020 | The Wright Petitioners, et al. | COMMENT |
| 4/20/2020 | CenturyLink Public Communications, Inc. | COMPLIANCE FILING |
| 4/20/2020 | Pay Tel Communications, Inc. | REPORT |
| 4/20/2020 | Talton Communications Inc | REPORT |
| 4/17/2020 | Securus Technologies, LLC | COMMENT |
| 4/16/2020 | Talton Communications, Inc. | OTHER |
| 4/16/2020 | Talton Communications, Inc. | OTHER |
| 4/15/2020 | Pay Tel Communications, Inc. | REPORT |
| 4/15/2020 | Pay Tel Communications, Inc. | REPORT |
| 4/15/2020 | Pay Tel Communications, Inc. | REPORT |
| 4/14/2020 | Talton Communications, Inc. | REPORT |
| 4/13/2020 | Pay Tel Communications, Inc. | REPORT |
| 4/10/2020 | Correct Solutions, LLC | COMPLIANCE FILING |
| 4/9/2020 | Legacy Long Distance International, Inc | REPORT |
| 4/9/2020 | Prodigy Solutions Inc | REPORT |
| 4/8/2020 | Pay Tel Communications, Inc. | OTHER |
| 4/7/2020 | MediaJustice, United Church of Christ, OC Inc. | COMMENT |
| 4/7/2020 | Securus Technologies, LLC | NOTICE OF EXPARTE |
| 4/7/2020 | Talton Communications, Inc. | REPORT |
| 4/7/2020 | Worth Rises | REQUEST |
| 4/3/2020 | Talton Communications, Inc. | REPORT |
| 4/2/2020 | ATN, Inc. | REPORT |
| 4/2/2020 | CenturyLink | OTHER |
| 4/2/2020 | CenturyLink Public Communications, Inc. | COMPLIANCE FILING |
| 4/2/2020 | Securus Technologies, LLP | REPORT |
| 4/1/2020 | ATN Inc | REPORT |
| 4/1/2020 | ATN, Inc | REPORT |
| 4/1/2020 | Global Tel*Link Corporation | REPORT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/1/2020 | LEGACY LONG DISTANCE INTERNATIONAL, INC | REPORT |
| 4/1/2020 | Prodigy Solutions Inc | REPORT |
| 4/1/2020 | Securus Technologies, LLC | REPORT |
| 4/1/2020 | Securus Technologies, LLC | REPORT |
| 3/31/2020 | Combined Public Communications, LLC | REPORT |
| 3/31/2020 | Crown Correctional Telephone, Inc. | REPORT |
| 3/31/2020 | Inmate Calling Solutions, LLC | REPORT |
| 3/31/2020 | Securus Technologies, LLC | COMMENT |
| 3/31/2020 | Securus Technologies, LLC | REPORT |
| 3/31/2020 | Wireline Competition Bureau | ORDER |
| 3/30/2020 | Correct Solutions, LLC | COMPLIANCE FILING |
| 3/25/2020 | The Wright Petitioners | MOTION FOR EXTENSION OF TIME |
| 3/20/2020 | Global Tel*Link Corporation | COMMENT |
| 3/20/2020 | Network Communications International Corporation | COMMENT |
| 3/20/2020 | Pay Tel Communications, Inc. | COMMENT |
| 3/20/2020 | Secured Perimeters International | COMMENT |
| 3/20/2020 | Securus Technologies, LLC | COMMENT |
| 3/20/2020 | The Wright Petitioners, et al. | COMMENT |
| 3/19/2020 | Inmate Calling Solutions, LLC | COMMENT |
| 3/17/2020 | Reliance Telephone of Grand Forks Inc | COMMENT |
| 3/17/2020 | Reliance Telephone of Grand Forks, Inc. | COMMENT |
| 3/9/2020 | Reliance Telephone of Grand Forks, Inc. | COMMENT |
| 2/20/2020 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/19/2020 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/18/2020 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 2/18/2020 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 2/10/2020 | Reliance Telephone of Grand Forks, Inc. | REPORT |
| 2/4/2020 | Wireline Competition Bureau | PUBLIC NOTICE |
| 11/26/2019 | Worth Rises | COMMENT |
| 11/25/2019 | Global Tel*Link Corporation | COMMENT |
| 11/4/2019 | Jail Education Solutions, Inc. ,dba Edovo | LETTER |
| 11/4/2019 | Jail Education Solutions, Inc. dba Edovo | REPORT |
| 10/31/2019 | Legacy Long Distance International, Inc. | REPORT |
| 10/31/2019 | Legacy Long Distance International, Inc. | REPORT |
| 10/24/2019 | Combined Public Communications, LLC | COMMENT |
| 9/18/2019 | Consolidated Telecom, Inc. | REPORT |
| 9/18/2019 | Prodigy Solutions, Inc. | REPORT |
| 9/17/2019 | Consolidated Telecom, Inc. | COMPLIANCE FILING |
| 9/17/2019 | Consolidated Telecom, Inc. | COMPLIANCE FILING |
| 9/17/2019 | Consolidated Telecom, Inc. | COMPLIANCE FILING |
| 9/16/2019 | Prodigy Solutions, Inc | REPORT |

**JA30**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/9/2019 | Consolidated Telecom, Inc. | OTHER |
| 9/6/2019 | Consolidated Telecom, Inc. | LETTER |
| 8/26/2019 | Talton Communications Inc | REPORT |
| 8/20/2019 | Correct Solutions, LLC | OTHER |
| 8/19/2019 | Pay Tel Comminications, Inc. | REPORT |
| 8/19/2019 | Pay Tel Communications, Inc. | AMENDMENT |
| 8/15/2019 | Pay Tel Communications, Inc. | AMENDMENT |
| 8/7/2019 | Legacy Long Distance International, Inc | REPORT |
| 7/22/2019 | Securus Technologies, Inc. | SUPPLEMENT |
| 7/22/2019 | Securus Technologies, Inc. | SUPPLEMENT |
| 7/22/2019 | Securus Technologies, Inc. | SUPPLEMENT |
| 5/30/2019 | Inmate Calling Solutions, LLC | AMENDMENT |
| 5/28/2019 | Inmate Calling Solutions, LLC | REPORT |
| 4/11/2019 | Network Communications International Corp. | REPORT |
| 4/9/2019 | Network Communications International Corp | COMMENT |
| 4/4/2019 | Talton Communications, Inc. | REPORT |
| 4/3/2019 | Crown Correctional Telephone, Inc. | REPORT |
| 4/3/2019 | Inmate Calling Solutions, LLC | REPORT |
| 4/3/2019 | Pay Tel Communications, Inc. | REPORT |
| 4/3/2019 | Pay Tel Communications, Inc. | REPORT |
| 4/2/2019 | Compliance Solutions | REPORT |
| 4/2/2019 | Crown Correctional Telephone, Inc | REPORT |
| 4/2/2019 | Custom Teleconnect, Inc. | REPORT |
| 4/2/2019 | Legacy Long Distance International, Inc. | MOTION FOR EXTENSION OF TIME |
| 4/2/2019 | Talton Communications, Inc | REPORT |
| 4/1/2019 | ATN, Inc. | REPORT |
| 4/1/2019 | CenturyLink | REPORT |
| 4/1/2019 | CenturyLink Public Communications, Inc. | REPORT |
| 4/1/2019 | Custom teleconnect Inc | REPORT |
| 4/1/2019 | Global Tel*Link Corporation | REPORT |
| 4/1/2019 | Global Tel*Link Corporation | REPORT |
| 4/1/2019 | Hawaiian Telcom, Inc. | REPORT |
| 4/1/2019 | Inmate Calling Solutions, LLC | REPORT |
| 4/1/2019 | OCA-Asian Pacific American Advocates etal | NOTICE OF EXPARTE |
| 4/1/2019 | Pay Tel Communications, Inc. | COMPLIANCE FILING |
| 4/1/2019 | Prodigy Solutions, Inc. | REPORT |
| 4/1/2019 | Securus Technologies, Inc. | REPORT |
| 4/1/2019 | Securus Technologies, Inc. | OTHER |
| 4/1/2019 | Securus Technologies, Inc. | REPORT |
| 4/1/2019 | Securus Technologies, Inc. | REPORT |
| 4/1/2019 | Securus Technologies, Inc. | REPORT |

**JA31**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/1/2019 | Securus Technologies, Inc. | REPORT |
| 3/29/2019 | ATN, Inc. | REPORT |
| 3/29/2019 | Correct Solutions, LLC | REPORT |
| 3/29/2019 | Prodigy Solutions Inc | REPORT |
| 3/28/2019 | Hawaiian Telcom, Inc. | COMMENT |
| 3/20/2019 | Combined Public Communication | COMMENT |
| 3/18/2019 | Securus Technologies, Inc. | LETTER |
| 3/12/2019 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/8/2019 | AmTel Confinement Communications | REPORT |
| 3/8/2019 | Securus Technologies, Inc. | REPORT |
| 3/5/2019 | Inmate Calling Solutions, LLC | OTHER |
| 3/5/2019 | Network Communications International Corp. | OTHER |
| 3/5/2019 | Pay Tel Communications, Inc. | OTHER |
| 3/5/2019 | Securus Technologies, Inc. | ERRATA, ERRATUM OR ADDENDUM |
| 3/4/2019 | Correct Solutions, LLC | OTHER |
| 3/4/2019 | Crown Correctional Telephone, Inc. | OTHER |
| 3/4/2019 | Network Communications International Corp | REPORT |
| 3/4/2019 | Prodigy Solutions, Inc. | OTHER |
| 3/4/2019 | Talton Communications, Inc. | OTHER |
| 3/1/2019 | ATN, Inc | REPORT |
| 3/1/2019 | CenturyLink Public Communications, Inc. | OTHER |
| 3/1/2019 | CenturyLink Public Communications, Inc. | RESPONSE |
| 3/1/2019 | Correct Solutions, LLC | REPORT |
| 3/1/2019 | Crown Correctional Telephone, Inc. | REPORT |
| 3/1/2019 | Global Tel*Link Corporation | RESPONSE |
| 3/1/2019 | Global Tel*Link Corporation and subsidiaries | REPORT |
| 3/1/2019 | Inmate Calling Solutions, LLC | REPORT |
| 3/1/2019 | Pay Tel Communications, Inc. | COMPLIANCE FILING |
| 3/1/2019 | Prodigy Solutions, Inc. | REPORT |
| 3/1/2019 | Securus Technologies, Inc | REPORT |
| 3/1/2019 | Securus Technologies, Inc. | OTHER |
| 3/1/2019 | Talton Communications, Inc. | REPORT |
| 2/28/2019 | Combined Public Communications | COMMENT |
| 2/25/2019 | Legacy Long Distance International, Inc. | MOTION FOR EXTENSION OF TIME |
| 2/23/2019 | Free Press | NOTICE OF EXPARTE |
| 2/14/2019 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/12/2019 | Public Interest Groups | NOTICE OF EXPARTE |
| 2/8/2019 | Various Civil Rights Organizations | LETTER |
| 10/15/2018 | Custom Teleconnect Inc | REPORT |
| 10/15/2018 | Custom Teleconnect Inc | REPORT |

**JA32**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                              Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 10/11/2018 | PROTOCALL, LLC | COMPLIANCE FILING |
| 10/11/2018 | PROTOCALL, LLL | COMPLIANCE FILING |
| 9/21/2018 | Crown Correctional Telephone, Inc. | REPORT |
| 9/21/2018 | Prodigy Solutions, Inc. | REPORT |
| 9/19/2018 | Prodigy Solutions Inc | REPORT |
| 9/7/2018 | Legacy Long Distance International, Inc. | REPORT |
| 7/24/2018 | Inmate Calling Solutions, LLC | REPORT |
| 7/16/2018 | Lattice Incorporated | REPORT |
| 7/12/2018 | Lattice Incorporated | REPORT |
| 7/6/2018 | Wright Petitioners | NOTICE OF WITHDRAWAL OF COUNSEL |
| 5/7/2018 | Global Tel*Link Corporation | AMENDMENT |
| 5/7/2018 | Global Tel*Link Corporation | AMENDMENT |
| 5/4/2018 | Wright Petitioners | OTHER |
| 5/3/2018 | Global Tel*Link Corporation | AMENDMENT |
| 5/3/2018 | Global Tel*Link Corporation | AMENDMENT |
| 4/26/2018 | Correct Solutuons, LLC | REPORT |
| 4/24/2018 | Correct Solutions, LLC | REPORT |
| 4/9/2018 | Prodigy Solutions, Inc. | REPORT |
| 4/5/2018 | Legacy Long Distance International, Inc. | REPORT |
| 4/4/2018 | Combined Public Communications, LLC | REPORT |
| 4/4/2018 | Infinity Networks, Inc. | REPORT |
| 4/4/2018 | Legacy Long Distance International, Inc. | REPORT |
| 4/4/2018 | Pay Tel Communications, Inc. | REPORT |
| 4/2/2018 | Infinity Networks, Inc. | REPORT |
| 4/2/2018 | Inmate Calling Solutions, LLC | REPORT |
| 4/2/2018 | Network Communications International Corp. | REPORT |
| 4/2/2018 | Pay Tel Communications, Inc. | REPORT |
| 4/2/2018 | Securus Technologies, Inc. | REPORT |
| 4/2/2018 | Securus Technologies, Inc. | REPORT |
| 4/2/2018 | Securus Technologies, Inc. | REPORT |
| 4/2/2018 | Talton Communications, Inc. | REPORT |
| 3/31/2018 | Combined Public Communications, LLC | COMMENT |
| 3/30/2018 | Global Tel*Link Corporation | REPORT |
| 3/30/2018 | Global Tel*Link Corporation | REPORT |
| 3/30/2018 | Network Communications International Corp | REPORT |
| 3/30/2018 | Prodigy Solutions, Inc. | REPORT |
| 3/30/2018 | Telmate, LLC | REPORT |
| 3/29/2018 | CenturyLink | REPORT |
| 3/29/2018 | CenturyLink Public Communications, Inc. | REPORT |
| 3/29/2018 | Inmate Calling Solutions, LLC | REPORT |

**JA33**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/29/2018 | Talton Communications, Inc. | REPORT |
| 3/28/2018 | Custom Teleconnect Inc | REPORT |
| 3/28/2018 | Synergy Telecom Service Company, Inc | REPORT |
| 3/20/2018 | Crown Correctional Telephone, Inc | REPORT |
| 3/20/2018 | Hawaiian Telecom, Inc. | REPORT |
| 3/16/2018 | Hawaiian Telcom, Inc. | REPORT |
| 3/4/2018 | Infinity Networks, Inc. | REPORT |
| 1/2/2018 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 12/22/2017 | California Public Utilities Commission | NOTICE OF EXPARTE |
| 12/14/2017 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/16/2017 | Karina Wilkinson, Bonnie Tenneriello, Esq. | COMMENT |
| 10/6/2017 | R Street Institute | NOTICE OF EXPARTE |
| 8/30/2017 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 8/28/2017 | Inmate Calling Solutions, LLC | REPORT |
| 8/24/2017 | Inmate Calling Solutions, LLC | REPORT |
| 8/23/2017 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 8/23/2017 | Securus Technologies, Inc. | OTHER |
| 8/22/2017 | Network Communications International Corp. | REPORT |
| 8/21/2017 | Pay Tel Communications, Inc. | REPORT |
| 8/17/2017 | Securus Technologies, Inc. | REPORT |
| 8/17/2017 | Securus Technologies, Inc. | REPORT |
| 8/16/2017 | Hawaiian Telcom, Inc. | OTHER |
| 8/15/2017 | Pay Tel Communications, Inc. | REPORT |
| 8/14/2017 | CenturyLink | REPORT |
| 8/14/2017 | CenturyLink | REPORT |
| 8/14/2017 | CenturyLink | SUPPLEMENT |
| 8/14/2017 | Telmate, LLC | PETITION FOR WAIVER |
| 8/10/2017 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 7/31/2017 | The Wright Petitioners | NOTICE OF EXPARTE |
| 7/24/2017 | Securus Technologies Inc. | NOTICE OF EXPARTE |
| 7/21/2017 | Correct Solutions, LLC | REPORT |
| 7/18/2017 | Global Tel*Link Corporation | COMMENT |
| 7/14/2017 | The Wright Petitioners | NOTICE OF EXPARTE |
| 7/12/2017 | The Wright Petitioners | NOTICE OF EXPARTE |
| 7/11/2017 | Combined Public Communications, LLC d/b/a Combined | REPORT |
| 7/7/2017 | Network Communications International Corp. | REPORT |
| 7/6/2017 | Infinity Networks, Inc. | REPORT |
| 7/6/2017 | Lattice Incorporated | REPORT |
| 7/6/2017 | Network Communications International Corp | REPORT |
| 7/5/2017 | Infinity Networks, Inc. | REPORT |

**JA34**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/5/2017 | Lattice Incorporated | REPORT |
| 7/5/2017 | Legacy Long Distance International, Inc. | REPORT |
| 7/5/2017 | Pay Tel Communications, Inc. | REPORT |
| 7/3/2017 | Correct Solutions, LLC | REPORT |
| 7/3/2017 | Legacy Long Distance International, Inc. | REPORT |
| 7/1/2017 | Crown Correctional Telephone, Inc. | REPORT |
| 7/1/2017 | Inmate Calling Solutions, LLC | REPORT |
| 6/30/2017 | ATN, Inc. | REPORT |
| 6/30/2017 | CenturyLink | REPORT |
| 6/30/2017 | CenturyLink  Public Communications, Inc. | REPORT |
| 6/30/2017 | Crown Correctional Telephone, Inc. | REPORT |
| 6/30/2017 | Crown Correctional Telephone, Inc. | REPORT |
| 6/30/2017 | Custom Teleconnect, Inc. | REPORT |
| 6/30/2017 | Custom Teleconnect, Inc. | REPORT |
| 6/30/2017 | Global Tel *Link Corporation | REPORT |
| 6/30/2017 | Global Tel*Link Corporation | REPORT |
| 6/30/2017 | Hawaiian Telecom, Inc. | REPORT |
| 6/30/2017 | Inmate Calling Solutions, LLC | REPORT |
| 6/30/2017 | Pay Tel Communications, Inc. | REPORT |
| 6/30/2017 | Securus Technologies, Inc. | REPORT |
| 6/29/2017 | Crown Correctional Telephone, Inc. | REPORT |
| 6/29/2017 | Custom Teleconnect | REPORT |
| 6/29/2017 | Hawaiian Telcom, Inc. | REPORT |
| 6/29/2017 | Synergy Telecom Service Company Inc. | REPORT |
| 6/29/2017 | Talton Communications, Inc. | REPORT |
| 6/28/2017 | Drew Simshaw | WITHDRAWAL OF COUNSEL |
| 6/28/2017 | Telmate, LLC | REPORT |
| 6/28/2017 | Telmate, LLC | REPORT |
| 6/1/2017 | Inmate Calling Solutions, LLC | MOTION |
| 5/25/2017 | Wireline Competition Bureau | LETTER |
| 5/24/2017 | Wireline Competition Bureau | PUBLIC NOTICE |
| 5/12/2017 | Free Press, et al. | NOTICE OF EXPARTE |
| 5/9/2017 | The Leadership Conference on Civil and Human Rights | LETTER |
| 5/8/2017 | Wireline Competition Bureau | ORDER |
| 4/4/2017 | CenturyLink | REPLY TO COMMENTS |
| 4/4/2017 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 4/4/2017 | Wright Petitioners, CURE, Prison Policy Initiative | REPLY TO COMMENTS |
| 3/28/2017 | Global Tel*Link Corporation | COMMENT |
| 3/28/2017 | Human Rights Defense Center | COMMENT |
| 3/28/2017 | Pay Tel Communications, Inc. | COMMENT |
| 3/28/2017 | Pay Tel Communications, Inc. | COMMENT |

**JA35**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/28/2017 | Wright Petitioners, CURE, Prison Policy Initiative | COMMENT |
| 3/27/2017 | Inmate Calling Solutions, LLC | COMMENT |
| 3/14/2017 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/10/2017 | Securus Technologies, Inc. | MOTION FOR EXTENSION OF TIME |
| 3/10/2017 | Securus Technologies, Inc. | MOTION FOR EXTENSION OF TIME |
| 3/9/2017 | National Consumers League | NOTICE OF EXPARTE |
| 3/7/2017 | Leadership Conference on Civil and Human Rights | COMMENT |
| 3/2/2017 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/1/2017 | Wireline Competition Bureau | OTHER |
| 2/23/2017 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 2/23/2017 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 2/21/2017 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 1/27/2017 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 1/27/2017 | The Wright Petitioners | NOTICE OF EXPARTE |
| 1/26/2017 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 1/24/2017 | Wright Petitioners, et al. | SUPPLEMENT |
| 1/23/2017 | Curtis Brown | LETTER |
| 1/13/2017 | New Jersey Advocates for Immigrant Detainees, et al. | NOTICE OF EXPARTE |
| 1/13/2017 | Wright Petitioners, et al. | NOTICE OF EXPARTE |
| 1/11/2017 | The Leadership Conference on Civil and Human Rights | COMMENT |
| 12/5/2016 | MMTC | NOTICE OF EXPARTE |
| 12/5/2016 | MMTC | NOTICE OF EXPARTE |
| 12/5/2016 | MMTC | NOTICE OF EXPARTE |
| 12/5/2016 | MMTC | NOTICE OF EXPARTE |
| 11/7/2016 | Wireline Competition Bureau | PUBLIC NOTICE |
| 10/26/2016 | Inmate Calling Solutions, LLC | COMMENT |
| 10/6/2016 | Shelby Easton | COMMENT |
| 10/6/2016 | Shelby Easton | COMMENT |
| 9/30/2016 | Wireline Competition Bureau | ORDER |
| 9/14/2016 | Network Communications International Corp. | OPPOSITION |
| 9/14/2016 | Securus Technologies, Inc. | MOTION TO STRIKE |
| 9/9/2016 | The Wright Petitioners | OPPOSITION |
| 9/8/2016 | The Wright Petitioners | OPPOSITION |
| 9/6/2016 | The Wright Petitioners | OPPOSITION |
| 9/2/2016 | The States of Oklahoma, et al. | PETITION |
| 9/1/2016 | Global Tel*Link | PETITION |
| 9/1/2016 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 9/1/2016 | Inmate Calling Solutions, LLC | OPPOSITION |

34

**JA36**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                         Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/1/2016 | The Wright Petitioners | OPPOSITION |
| 8/29/2016 | Telmate, LLC | PETITION |
| 8/29/2016 | Telmate, LLC | PETITION |
| 8/25/2016 | Securus Technologies, Inc. | PETITION |
| 8/25/2016 | Securus Technologies, Inc. | PETITION |
| 8/12/2016 | Office of General Counsel | PUBLIC NOTICE |
| 8/9/2016 | Wireline Competition Bureau | ORDER |
| 8/8/2016 | Global Tel*Link Corporation | LETTER |
| 8/5/2016 | Secured Perimeters International | COMMENT |
| 8/1/2016 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 7/29/2016 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 7/29/2016 | Telmate, LLC | NOTICE OF EXPARTE |
| 7/29/2016 | Wright Petitioners | NOTICE OF EXPARTE |
| 7/29/2016 | Wright Petitioners | NOTICE OF EXPARTE |
| 7/28/2016 | CenturyLink | NOTICE OF EXPARTE |
| 7/28/2016 | Inmate Calling Solutions, LLC | NOTICE OF EXPARTE |
| 7/28/2016 | Michael S. Hamden | NOTICE OF EXPARTE |
| 7/28/2016 | Securus Technologies, Inc., Pay Tel Communications, Inc. | LETTER |
| 7/27/2016 | CenturyLink | NOTICE OF EXPARTE |
| 7/27/2016 | CenturyLink | NOTICE OF EXPARTE |
| 7/27/2016 | Network Communications International Corp. | REPLY |
| 7/26/2016 | CenturyLink | NOTICE OF EXPARTE |
| 7/26/2016 | CenturyLink | NOTICE OF EXPARTE |
| 7/26/2016 | Wright Petitioners | OTHER |
| 7/25/2016 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/25/2016 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/22/2016 | Michael S. Hamden | NOTICE OF EXPARTE |
| 7/22/2016 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/15/2016 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 7/14/2016 | Office of Media Relations | OTHER |
| 7/13/2016 | Wireline Competition Bureau | COMMENT |
| 6/30/2016 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 6/30/2016 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 6/27/2016 | Global Tel*Link Corporation | REPLY |
| 6/27/2016 | The Wright Petitioners, et al. | REPLY |
| 6/24/2016 | Human Rights Defense Center | SUBMISSION FOR THE RECORD |
| 6/24/2016 | iWebVisit.com, LLC | NOTICE OF EXPARTE |
| 6/22/2016 | Human Rights Defense Center | COMMENT |
| 6/21/2016 | The Wright Petitioners | OTHER |

**JA37**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                         **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/17/2016 | Human Rights Defense Center | COMMENT |
| 6/17/2016 | Pay Tel Communications, Inc. | COMMENT |
| 6/17/2016 | Wright Petitioners, et al. | COMMENT |
| 6/15/2016 | Bob Shipman | COMMENT |
| 6/9/2016 | Daniel E. Haar | OTHER |
| 6/9/2016 | Robert B. Nicholson | OTHER |
| 6/7/2016 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/2/2016 | Carlos Ruiz | LETTER |
| 6/1/2016 | Global Tel*Link Corporation | PETITION FOR WAIVER |
| 5/17/2016 | Andrea Ducote Aymond | LETTER |
| 5/16/2016 | Telmate, LLC | NOTICE OF EXPARTE |
| 5/12/2016 | Telmate, LLC | NOTICE OF EXPARTE |
| 5/11/2016 | Emily Pollom | COMMENT |
| 4/27/2016 | Telmate, LLC | NOTICE OF EXPARTE |
| 4/25/2016 | Lyma adundo | COMMENT |
| 4/21/2016 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/18/2016 | David Cadran | COMMENT |
| 4/15/2016 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 4/8/2016 | Wireline Competition Bureau | ORDER |
| 4/6/2016 | Jody Miller | COMMENT |
| 4/5/2016 | Pay Tel Communications, Inc. | WITHDRAWAL |
| 4/4/2016 | Michael S. Hamden | REPLY TO OPPOSITION TO PETITION FOR RECONSIDERA |
| 3/29/2016 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/28/2016 | Niki Ruscitto | COMMENT |
| 3/23/2016 | CenturyLink | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 3/23/2016 | National Sheriffs' Association | OPPOSITION |
| 3/23/2016 | Network Communications International Corp. | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 3/23/2016 | Pay Tel Communications, Inc. | OTHER |
| 3/23/2016 | Securus Technologies, Inc. | REPLY |
| 3/23/2016 | Telmate, LLC | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 3/23/2016 | Wright Petitioners | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 3/21/2016 | Correct Solutions, LLC | OTHER |

**JA38**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/16/2016 | Wireline Competition Bureau | PUBLIC NOTICE |
| 3/16/2016 | Wright Petitioners | REPLY |
| 3/15/2016 | Pay Tel Communications, Inc. | LETTER |
| 3/15/2016 | Pay Tel Communications, Inc. | LETTER |
| 3/14/2016 | Wireline Competition Bureau | ORDER |
| 3/11/2016 | Telmate, LLC | LETTER |
| 3/11/2016 | Wright Petitioners | OPPOSITION |
| 3/10/2016 | Prison Policy Initiative | LETTER |
| 3/8/2016 | Protocall | COMMENT |
| 3/7/2016 | Vera Institute of Justice | NOTICE OF EXPARTE |
| 3/3/2016 | Wireline Competition Bureau | OTHER |
| 2/26/2016 | Inmate Calling Solutions, LLC | OPPOSITION TO PETITION FOR RECONSIDERATION |
| 2/25/2016 | Adan | COMMENT |
| 2/22/2016 | Securus Technologies, Inc. | OTHER |
| 2/19/2016 | Correct Solutions, LLC | OTHER |
| 2/18/2016 | Securus Technologies, Inc. | LETTER |
| 2/16/2016 | Praeses LLC | NOTICE OF EXPARTE |
| 2/11/2016 | Consumer and Governmental Affairs Bureau | PUBLIC NOTICE |
| 2/9/2016 | Cynthia Norman | COMMENT |
| 2/8/2016 | Human Rights Defense Center | COMMENT |
| 2/8/2016 | Larry VanSchaick | COMPLAINT |
| 2/8/2016 | Leadership Conference on Civil and Human Rights et al | REPLY TO COMMENTS |
| 2/8/2016 | MMTC | COMMENT |
| 2/8/2016 | National Sheriffs' Association | REPLY |
| 2/8/2016 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 2/8/2016 | Prison Policy Initiative | REPLY TO COMMENTS |
| 2/8/2016 | Prison Policy Initiative | REPLY TO COMMENTS |
| 2/8/2016 | Secured Perimeters International | COMMENT |
| 2/8/2016 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 2/8/2016 | Stacey Davis | COMMENT |
| 2/8/2016 | Telmate, LLC | REPLY TO COMMENTS |
| 2/8/2016 | Wright Petitioners | REPLY TO COMMENTS |
| 2/3/2016 | Wright Petitioners | OPPOSITION |
| 2/3/2016 | Wright Petitioners | NOTICE OF EXPARTE |
| 2/2/2016 | California State Sheriff's Association | COMMENT |
| 2/2/2016 | Wright Petitioners | NOTICE OF EXPARTE |
| 2/1/2016 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 2/1/2016 | iWebVisit.com, LLC | REPLY TO COMMENTS |
| 2/1/2016 | Margaret Bick | COMMENT |
| 2/1/2016 | Smart Communications Holdings, Inc. | COMMENT |

**JA39**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/29/2016 | Wireline Competition Bureau | ORDER |
| 1/28/2016 | Martha Wright, et al | COMMENT |
| 1/28/2016 | Martha Wright, et al | COMMENT |
| 1/28/2016 | Pay Tel Communications, Inc. | MOTION FOR EXTENSION OF TIME |
| 1/27/2016 | CenturyLink Public Communications, Inc. | PETITION |
| 1/27/2016 | Custom Teleconnect | NOTICE OF EXPARTE |
| 1/27/2016 | Martha Wright, Et. Al. | MOTION FOR EXTENSION OF TIME |
| 1/27/2016 | Pay Tel Communications, Inc. | PARTIAL OPPOSITION |
| 1/27/2016 | Telmate, LLC | MOTION FOR EXTENSION OF TIME |
| 1/22/2016 | CenturyLink Public Communications, Inc. | PETITION |
| 1/22/2016 | Wireline Competition Bureau | ORDER |
| 1/20/2016 | ANGELA | COMMENT |
| 1/20/2016 | Harris, Wiltshire & Grannis LLP | OTHER |
| 1/20/2016 | Joanne S. Jones | COMMENT |
| 1/20/2016 | Legal Services for Prisoners with Children | COMMENT |
| 1/20/2016 | LES PERRYMAN | COMMENT |
| 1/19/2016 | American Council of Chief Defenders | COMMENT |
| 1/19/2016 | American Council of Chief Defenders | COMMENT |
| 1/19/2016 | Barbara Forrest-Ball | COMPLAINT |
| 1/19/2016 | Barry C. Taylor | COMMENT |
| 1/19/2016 | Brian Dolinar | COMMENT |
| 1/19/2016 | California State Sheriffs' Association | COMMENT |
| 1/19/2016 | CenturyLink | COMMENT |
| 1/19/2016 | CenturyLink | COMMENT |
| 1/19/2016 | Charlotte Graham | COMMENT |
| 1/19/2016 | Correct Solutions | NOTICE OF EXPARTE |
| 1/19/2016 | Electronic Frontier Foundation | COMMENT |
| 1/19/2016 | Global Tel*Link Corporation | COMMENT |
| 1/19/2016 | Grassroots Leadership | COMMENT |
| 1/19/2016 | Helping Educate to Advance the Rights of the Deaf | COMMENT |
| 1/19/2016 | Human Rights Defense Center | COMMENT |
| 1/19/2016 | iWebVisit.com, LLC | COMMENT |
| 1/19/2016 | J. Marchak | COMMENT |
| 1/19/2016 | Jennifer Jacobs | COMMENT |
| 1/19/2016 | Joanne Jones | COMMENT |
| 1/19/2016 | john turala | COMMENT |
| 1/19/2016 | Josh Gravens | COMMENT |
| 1/19/2016 | Katia Rabacchi | COMMENT |
| 1/19/2016 | Kelsey Gleeson | COMMENT |

**JA40**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/19/2016 | LatinoJustice PRLDEF and AILA | COMMENT |
| 1/19/2016 | Laura Hernandez | COMMENT |
| 1/19/2016 | Los Angeles County Sheriff's Department | COMMENT |
| 1/19/2016 | Martha Wright, Et. Al. | COMMENT |
| 1/19/2016 | Media Alliance | COMMENT |
| 1/19/2016 | Michael S. Hamden | PETITION FOR RECONSIDERATION |
| 1/19/2016 | Misi Misi | COMMENT |
| 1/19/2016 | New Jersey Advocates for Immigrant Detainees, New | COMMENT |
| 1/19/2016 | Pay Tel Communications, Inc. | COMMENT |
| 1/19/2016 | Prison Policy Initiative | COMMENT |
| 1/19/2016 | Prison Policy Initiative | COMMENT |
| 1/19/2016 | Prison Policy Initiative | COMMENT |
| 1/19/2016 | Prison Policy Initiative | COMMENT |
| 1/19/2016 | Prison Policy Initiative | COMMENT |
| 1/19/2016 | Secured Perimeters International | COMMENT |
| 1/19/2016 | Securus Technologies, Inc. | COMMENT |
| 1/19/2016 | Shelly Hansen | COMMENT |
| 1/19/2016 | Telmate, LLC | COMMENT |
| 1/19/2016 | Verizon | COMMENT |
| 1/19/2016 | Xenia Woods | COMMENT |
| 1/19/2016 | Zoe Wilmott | COMMENT |
| 1/14/2016 | Global Tel*Link Corporation | LETTER |
| 1/14/2016 | Wireline Competition Bureau | LETTER |
| 1/13/2016 | Wireline Competition Bureau | PUBLIC NOTICE |
| 1/11/2016 | Martha Wright, et al | OPPOSITION |
| 1/8/2016 | Global Tel*Link Corporation | PETITION FOR WAIVER |
| 1/7/2016 | Securus Technologies, Inc. | REPLY |
| 1/6/2016 | Martha Wright, et al | OPPOSITION |
| 1/6/2016 | Telmate, LLC | PETITION |
| 1/5/2016 | Global Tel*Link Corporation | PETITION FOR WAIVER |
| 1/5/2016 | Securus Technologies, Inc. | MOTION |
| 1/4/2016 | Global Tel*Link | LETTER |
| 12/31/2015 | Human Rights Defense Center | COMMENT |
| 12/29/2015 | Martha Wright, et al | OPPOSITION |
| 12/23/2015 | Securus Technologies, Inc. | SUPPLEMENT |
| 12/22/2015 | Global Tel*Link | PETITION |
| 12/22/2015 | Securus Technologies, Inc. | PETITION |
| 12/22/2015 | Securus Technologies, Inc. | SUPPLEMENT |
| 12/22/2015 | Securus Technologies, Inc. | PETITION |
| 12/22/2015 | Wireline Competition Bureau | PUBLIC NOTICE |
| 12/21/2015 | Wireline Competition Bureau | ORDER |

**JA41**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/18/2015 | Diane Smith Howard | COMMENT |
| 12/18/2015 | Mark McWilliams | COMMENT |
| 12/17/2015 | vander grift | COMMENT |
| 12/16/2015 | CuWAV, LLC. | COMMENT |
| 12/7/2015 | Aaron Lamb | LETTER |
| 12/7/2015 | frank Ayala | COMMENT |
| 12/7/2015 | Protocall | NOTICE OF EXPARTE |
| 12/3/2015 | Wireline Competition Bureau | LETTER |
| 12/3/2015 | Wireline Competition Bureau | ORDER |
| 12/2/2015 | Bonita Tenneriello | REQUEST |
| 12/2/2015 | lila pniewski | COMMENT |
| 11/30/2015 | Dan Curry | COMMENT |
| 11/24/2015 | CenturyLink | REPLY |
| 11/24/2015 | Securus Technologies, Inc. | LETTER |
| 11/20/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 11/20/2015 | Office of General Counsel | PUBLIC NOTICE |
| 11/20/2015 | Securus Technologies, Inc. | LETTER |
| 11/16/2015 | Wireline Competition Bureau | CONGRESSIONAL CORRESPONDENCE |
| 11/12/2015 | Dean Knickerbocker | COMMENT |
| 11/5/2015 | Global Tel*Link Corporation | REPLY |
| 11/5/2015 | Wireline Competition Bureau | REPORT AND ORDER |
| 11/3/2015 | Securus Technologies, Inc. | REPLY |
| 11/2/2015 | Martha Wright, et al | MOTION TO STRIKE |
| 10/30/2015 | Securus Technologies, Inc. | OTHER |
| 10/27/2015 | Global Tel*Link Corporation | LETTER |
| 10/27/2015 | manbir sodhi | COMMENT |
| 10/26/2015 | Maura Healy | NOTICE OF EXPARTE |
| 10/26/2015 | Securus Technologies, Inc. | LETTER |
| 10/26/2015 | SumOfUs.org | COMMENT |
| 10/22/2015 | Beverly Knaak | COMMENT |
| 10/22/2015 | David A. Woldseth | COMMENT |
| 10/21/2015 | Attorney General Maura Healey | COMMENT |
| 10/21/2015 | Linda Kraus | COMMENT |
| 10/21/2015 | Margaret E. Robertson | COMMENT |
| 10/21/2015 | Secured Perimeters International | NOTICE OF EXPARTE |
| 10/21/2015 | Thomas M. Susman, American Bar Association | COMMENT |
| 10/21/2015 | Wireline Competition Bureau | PUBLIC NOTICE |
| 10/20/2015 | Beaver County Sheriff's Office | NOTICE OF EXPARTE |
| 10/20/2015 | California State Sheriff's Association | NOTICE OF EXPARTE |
| 10/20/2015 | Kaleena Devine | COMMENT |
| 10/20/2015 | Washington County Sheriff's Office | NOTICE OF EXPARTE |

40

**JA42**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 10/19/2015 | Coconino County Sheriff's Office | NOTICE OF EXPARTE |
| 10/19/2015 | Ellen Posel | COMMENT |
| 10/19/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/19/2015 | John and Anne Olden | COMMENT |
| 10/19/2015 | Laramie County Sheriff Office | NOTICE OF EXPARTE |
| 10/19/2015 | Michelle Dillon | COMMENT |
| 10/19/2015 | Navajo County Sheriff's Office | NOTICE OF EXPARTE |
| 10/19/2015 | Patricia McDonald | COMMENT |
| 10/16/2015 | Badger State Sheriffs' Association | NOTICE OF EXPARTE |
| 10/16/2015 | Demand Progress | COMMENT |
| 10/16/2015 | Demand Progress | COMMENT |
| 10/16/2015 | Gail Sistrunk | COMMENT |
| 10/16/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/16/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/16/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/16/2015 | Global Tel*Link Corporation | MOTION |
| 10/16/2015 | Global Tel*Link Corporation | OPPOSITION |
| 10/16/2015 | GTL, Pay Tel, Securus & Telmate | NOTICE OF EXPARTE |
| 10/16/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/16/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/16/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/16/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/16/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 10/16/2015 | MMTC | NOTICE OF EXPARTE |
| 10/16/2015 | Public Knowledge | NOTICE OF EXPARTE |
| 10/16/2015 | Vanda Jafggard | COMMENT |
| 10/15/2015 | American Jail Association | COMMENT |
| 10/15/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/15/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/15/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/15/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/15/2015 | CenturyLink | NOTICE OF EXPARTE |
| 10/15/2015 | CenturyLink | NOTICE OF EXPARTE |
| 10/15/2015 | Derrell Durrett | COMMENT |
| 10/15/2015 | Florida Sheriffs Association | SUPPLEMENT |
| 10/15/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/15/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/15/2015 | GTL, Pay Tel, Securus & Telmate | NOTICE OF EXPARTE |
| 10/15/2015 | GTL, Securus and Telmate | NOTICE OF EXPARTE |
| 10/15/2015 | ICSolutions, LLC | NOTICE OF EXPARTE |
| 10/15/2015 | ICSolutions, LLC | NOTICE OF EXPARTE |
| 10/15/2015 | ICSolutions, LLC | NOTICE OF EXPARTE |

**JA43**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                              Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 10/15/2015 | Inmate Calling Solutions, LLC | NOTICE OF EXPARTE |
| 10/15/2015 | Ken McKay | COMMENT |
| 10/15/2015 | Leadership Conference and Prison Phone Reform | NOTICE OF EXPARTE |
| 10/15/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/15/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/15/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/15/2015 | Martha Wright Petitioners | NOTICE OF EXPARTE |
| 10/15/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 10/15/2015 | Maryland Sheriffs' Association | NOTICE OF EXPARTE |
| 10/15/2015 | MMTC | LETTER |
| 10/15/2015 | National Association of Regulatory Utility Commissioners | NOTICE OF EXPARTE |
| 10/15/2015 | New Jersey Advocates for Immigrant Detainees | COMMENT |
| 10/15/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/15/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/15/2015 | Ryan Fazio | COMMENT |
| 10/15/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/15/2015 | Verizon | NOTICE OF EXPARTE |
| 10/14/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/14/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/14/2015 | Anonymous Advocate | COMMENT |
| 10/14/2015 | Anthony Young | COMMENT |
| 10/14/2015 | Avery Kolers | COMMENT |
| 10/14/2015 | Bob Smith | COMMENT |
| 10/14/2015 | Byron F. Oedekoven | NOTICE OF EXPARTE |
| 10/14/2015 | California State Sheriffs' Association | NOTICE OF EXPARTE |
| 10/14/2015 | Catherine Hunt | COMMENT |
| 10/14/2015 | Greg Sullivan | NOTICE OF EXPARTE |
| 10/14/2015 | Indiana Sheriffs' Association | NOTICE OF EXPARTE |
| 10/14/2015 | J. Terry Norris | NOTICE OF EXPARTE |
| 10/14/2015 | James D. Franklin | NOTICE OF EXPARTE |
| 10/14/2015 | John Clark et. al. | NOTICE OF EXPARTE |
| 10/14/2015 | John W. Jones | NOTICE OF EXPARTE |
| 10/14/2015 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 10/14/2015 | Network Communications International Corp | COMMENT |
| 10/14/2015 | North Dakota Correctional Center Administrators | NOTICE OF EXPARTE |
| 10/14/2015 | Robert Timmons | NOTICE OF EXPARTE |
| 10/14/2015 | Securus Technologies, Inc. | LETTER |
| 10/14/2015 | Sheriff Casey Salisbury | NOTICE OF EXPARTE |
| 10/14/2015 | Sheriff Gene Dana | NOTICE OF EXPARTE |
| 10/14/2015 | Sheriff Paul Laney | NOTICE OF EXPARTE |
| 10/14/2015 | Sybil Schlesinger | COMMENT |
| 10/14/2015 | Tara Morris | NOTICE OF EXPARTE |

**JA44**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 10/14/2015 | Theodore Marszalek | COMMENT |
| 10/13/2015 | Amy Harlib | COMMENT |
| 10/13/2015 | Andrew Lenz | COMMENT |
| 10/13/2015 | Anita Savio | COMMENT |
| 10/13/2015 | Ann Watters | COMMENT |
| 10/13/2015 | Antonia Bernard | COMMENT |
| 10/13/2015 | AUDREY S REED | COMMENT |
| 10/13/2015 | Bobby Ketcham | COMMENT |
| 10/13/2015 | Carol Rodgers | COMMENT |
| 10/13/2015 | Carolyn Villanova | COMMENT |
| 10/13/2015 | CenturyLink | NOTICE OF EXPARTE |
| 10/13/2015 | Charles burke | COMMENT |
| 10/13/2015 | Charles Sharpe | COMMENT |
| 10/13/2015 | Charles Shaw | COMMENT |
| 10/13/2015 | Christian Blanco | COMMENT |
| 10/13/2015 | Christopher MacKrell | COMMENT |
| 10/13/2015 | Cindy Noble | COMMENT |
| 10/13/2015 | DAVID LAIRD | COMMENT |
| 10/13/2015 | David Massie | COMMENT |
| 10/13/2015 | David Young | COMMENT |
| 10/13/2015 | Diane Bouska | COMMENT |
| 10/13/2015 | Diane Hendricks | COMMENT |
| 10/13/2015 | Dominick Falzone | COMMENT |
| 10/13/2015 | E. Thomas Costello | COMMENT |
| 10/13/2015 | Elsbeth Meier | COMMENT |
| 10/13/2015 | Eric Haskins | COMMENT |
| 10/13/2015 | Francis Courser | COMMENT |
| 10/13/2015 | Frederick Chadwick | COMMENT |
| 10/13/2015 | Gene Golden | COMMENT |
| 10/13/2015 | George Courser | COMMENT |
| 10/13/2015 | Gerald Nadreau | COMMENT |
| 10/13/2015 | Giny Lonser | COMMENT |
| 10/13/2015 | Gladys Tchatal | COMMENT |
| 10/13/2015 | Glenn Welsh | COMMENT |
| 10/13/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/13/2015 | Gloria Picchetti | COMMENT |
| 10/13/2015 | Gordon Gerbitz | COMMENT |
| 10/13/2015 | henry | COMMENT |
| 10/13/2015 | James Simmons | COMMENT |
| 10/13/2015 | Jan Aszman | COMMENT |
| 10/13/2015 | Jan Thomas | COMMENT |
| 10/13/2015 | Jason Crawford | COMMENT |

**JA45**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 10/13/2015 | Jeff Sears | COMMENT |
| 10/13/2015 | Jennifer Top | COMMENT |
| 10/13/2015 | Jill Tropea Galvez | COMMENT |
| 10/13/2015 | Jody Gibson | COMMENT |
| 10/13/2015 | Joe Salazar | COMMENT |
| 10/13/2015 | John Eisner | COMMENT |
| 10/13/2015 | Jonathan Boyne | COMMENT |
| 10/13/2015 | Karen Muhammad | COMMENT |
| 10/13/2015 | kath feeley | COMMENT |
| 10/13/2015 | Kathleen Bryson | COMMENT |
| 10/13/2015 | Kathy Groth | COMMENT |
| 10/13/2015 | Kevin Vaught | COMMENT |
| 10/13/2015 | La Porte County Sheriff's Office | NOTICE OF EXPARTE |
| 10/13/2015 | Lawrence Green | COMMENT |
| 10/13/2015 | louis rossman | COMMENT |
| 10/13/2015 | Louisiana Sheriff's Association | NOTICE OF EXPARTE |
| 10/13/2015 | Luis Lozano | COMMENT |
| 10/13/2015 | Martha Howell | COMMENT |
| 10/13/2015 | Matthew Tarpley | COMMENT |
| 10/13/2015 | McCoy Weible | COMMENT |
| 10/13/2015 | McNeill | COMMENT |
| 10/13/2015 | Michael F Adams Sr | COMMENT |
| 10/13/2015 | Michael Klausing | COMMENT |
| 10/13/2015 | Michael McClennen | COMMENT |
| 10/13/2015 | Michael W Evans | COMMENT |
| 10/13/2015 | Nancy Dollard | COMMENT |
| 10/13/2015 | NCIC Inmate Phone Service | NOTICE OF EXPARTE |
| 10/13/2015 | Patricia Baley | COMMENT |
| 10/13/2015 | Patricia Nadreau | COMMENT |
| 10/13/2015 | Paul J. Palla | COMMENT |
| 10/13/2015 | Philip Noel | COMMENT |
| 10/13/2015 | Praeses LLC | NOTICE OF EXPARTE |
| 10/13/2015 | Rachael Pappano | COMMENT |
| 10/13/2015 | Robert A. Long, Jr. | LETTER |
| 10/13/2015 | Robert Blumenthal | COMMENT |
| 10/13/2015 | Rosemary Graham-Gardner | COMMENT |
| 10/13/2015 | Ruth Gutman | COMMENT |
| 10/13/2015 | Sally Laporte | COMMENT |
| 10/13/2015 | Sandra Cobb | COMMENT |
| 10/13/2015 | Shabrea McNear | COMMENT |
| 10/13/2015 | Shirley Ward | COMMENT |
| 10/13/2015 | Stefan C Taylor | COMMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 10/13/2015 | Stephen Girard | COMMENT |
| 10/13/2015 | Tara Cremeans | COMMENT |
| 10/13/2015 | Tiffany Snyder | COMMENT |
| 10/13/2015 | Timothy O'Dell | COMMENT |
| 10/13/2015 | William Combs | COMMENT |
| 10/9/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/9/2015 | Network Communications International Corp | COMMENT |
| 10/9/2015 | Network Communications International Corp. | COMMENT |
| 10/9/2015 | Securus Technologies, Inc. | LETTER |
| 10/8/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/8/2015 | Media Action Grassroots Network | NOTICE OF EXPARTE |
| 10/8/2015 | Media Action Grassroots Network | NOTICE OF EXPARTE |
| 10/8/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/8/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/8/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/8/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/7/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/7/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/7/2015 | E. Marie Green | COMMENT |
| 10/7/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/7/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/7/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/7/2015 | T Stephen Jones, MD | COMMENT |
| 10/6/2015 | Alabama Public Service Commission | OTHER |
| 10/6/2015 | CenturyLink | NOTICE OF EXPARTE |
| 10/6/2015 | CenturyLink | NOTICE OF EXPARTE |
| 10/6/2015 | Edward Neal | COMMENT |
| 10/6/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 10/6/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 10/5/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 10/5/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/5/2015 | Human Rights Defense Center | COMMENT |
| 10/5/2015 | Jeffrey W MIller | COMMENT |
| 10/5/2015 | Kenneth W. Tate | LETTER |
| 10/2/2015 | Chris Thomas | COMMENT |
| 10/2/2015 | Daniel Ream | COMMENT |
| 10/1/2015 | Global Tel*Link Corporation | REPLY |
| 10/1/2015 | Kaylan Stuart | NOTICE OF EXPARTE |
| 10/1/2015 | Matt Borus | COMMENT |
| 10/1/2015 | Pay Tel Communications, Inc. | OTHER |
| 10/1/2015 | Securus Technologies, Inc. | LETTER |
| 9/30/2015 | Don J. Wood | NOTICE OF EXPARTE |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/28/2015 | Alabama Public Service Commission | OTHER |
| 9/28/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 9/28/2015 | CenturyLink | NOTICE OF EXPARTE |
| 9/28/2015 | Don J. Wood | NOTICE OF EXPARTE |
| 9/28/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 9/25/2015 | Alabama Public Service Commission | LETTER |
| 9/25/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 9/24/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 9/23/2015 | CenturyLink | NOTICE OF EXPARTE |
| 9/23/2015 | Don J. Wood | NOTICE OF EXPARTE |
| 9/23/2015 | Don J. Wood | REPORT |
| 9/23/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 9/23/2015 | John T Peterson | COMMENT |
| 9/23/2015 | Michael S. Hamden | NOTICE OF EXPARTE |
| 9/23/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 9/21/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 9/21/2015 | Securus Technologies, Inc. | LETTER |
| 9/21/2015 | Wireline Competition Bureau | ORDER |
| 9/17/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 9/16/2015 | Praeses LLC | NOTICE OF EXPARTE |
| 9/11/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 9/9/2015 | Praeses LLC | NOTICE OF EXPARTE |
| 9/8/2015 | Human Rights Defense Center | COMMENT |
| 9/8/2015 | John C. Musselman | LETTER |
| 9/2/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 9/1/2015 | Martha Wright etal | NOTICE OF EXPARTE |
| 8/28/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 8/27/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 8/24/2015 | John Clark et. al. | NOTICE OF EXPARTE |
| 8/21/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 8/21/2015 | Securus Technologies, Inc. | LETTER |
| 8/20/2015 | CenturyLink | NOTICE OF EXPARTE |
| 8/20/2015 | Dr. Brian Dolinar | COMMENT |
| 8/20/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 8/20/2015 | Stephanie A. Joyce | REQUEST |
| 8/14/2015 | CenturyLink | NOTICE OF EXPARTE |
| 8/14/2015 | CenturyLink | NOTICE OF EXPARTE |
| 8/14/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 8/13/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 8/12/2015 | Christopher Lish | COMMENT |
| 8/12/2015 | Prison Policy Initiative | NOTICE OF EXPARTE |
| 8/10/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |

In the Matter of

Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act

Rates for Interstate Inmate Calling Services

WC Docket No. 23-62

WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 8/10/2015 | Human Rights Defense Center | COMMENT |
| 8/7/2015 | Securus Technologies, Inc. | LETTER |
| 8/6/2015 | Human Rights Defense Center | ERRATA, ERRATUM OR ADDENDUM |
| 8/5/2015 | Pay Tel Communications, Inc. | OTHER |
| 8/5/2015 | Phil Sawatsky | COMMENT |
| 8/5/2015 | Virginia Association of Regional Jails | NOTICE OF EXPARTE |
| 7/31/2015 | Dr. Brian Dolinar | COMMENT |
| 7/31/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/31/2015 | Pay Tel Communications, Inc. | OTHER |
| 7/30/2015 | Human Rights Defense Center | COMMENT |
| 7/29/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 7/29/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/29/2015 | Human Rights Defense Center | COMMENT |
| 7/28/2015 | CenturyLink | NOTICE OF EXPARTE |
| 7/28/2015 | CenturyLink | NOTICE OF EXPARTE |
| 7/27/2015 | Securus Technologies, Inc. | OTHER |
| 7/23/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 7/23/2015 | HAMILTON RELAY, INC. | NOTICE OF EXPARTE |
| 7/23/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/22/2015 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/21/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 7/21/2015 | Darrell A. Baker | NOTICE OF EXPARTE |
| 7/21/2015 | Darrell A. Baker | NOTICE OF EXPARTE |
| 7/20/2015 | CenturyLink | NOTICE OF EXPARTE |
| 7/20/2015 | Lyon County Sheriff's Office | NOTICE OF EXPARTE |
| 7/17/2015 | Darrell A. Baker | LETTER |
| 7/16/2015 | Global Tel*Link Corporation | MOTION |
| 7/15/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/15/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/14/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 7/14/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/14/2015 | Human Rights Defense Center | COMMENT |
| 7/14/2015 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 7/13/2015 | Darrell A. Baker | NOTICE OF EXPARTE |
| 7/13/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/9/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/9/2015 | Michael S. Hamden | NOTICE OF EXPARTE |
| 7/8/2015 | Darrell A. Baker | NOTICE OF EXPARTE |
| 7/8/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/7/2015 | Campaign for Prison Phone Justice | COMMENT |
| 7/6/2015 | Alan Papscun | COMMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/6/2015 | Andrei Kuznetsov | COMMENT |
| 7/6/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 7/6/2015 | Bernadette Monaghan | COMMENT |
| 7/6/2015 | Christopher MacKrell | COMMENT |
| 7/6/2015 | Cynthia Marrs | COMMENT |
| 7/6/2015 | Elizabeth ODear | COMMENT |
| 7/6/2015 | Gene Frank | COMMENT |
| 7/6/2015 | James Parr | COMMENT |
| 7/6/2015 | JamesEric McGee | COMMENT |
| 7/6/2015 | Jeffrey S. Cramer | COMMENT |
| 7/6/2015 | Jessica White | COMMENT |
| 7/6/2015 | Jonathan Hooks | COMMENT |
| 7/6/2015 | Julia DuBois | COMMENT |
| 7/6/2015 | Katha Pollitt | COMMENT |
| 7/6/2015 | Kim Bliven | COMMENT |
| 7/6/2015 | Laura Pinfield | COMMENT |
| 7/6/2015 | Margie Borchers | COMMENT |
| 7/6/2015 | McNeill | COMMENT |
| 7/6/2015 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 7/6/2015 | Neale X Trangucci | COMMENT |
| 7/6/2015 | Paul Bennett | COMMENT |
| 7/6/2015 | Prison Policy Initiative | COMMENT |
| 7/6/2015 | Samuel Durkin | COMMENT |
| 7/6/2015 | Sandra Parshall | COMMENT |
| 7/6/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 7/6/2015 | Silent Sentence Coalition | COMMENT |
| 7/6/2015 | Theodore Wagner | COMMENT |
| 7/6/2015 | W. Andrew Stover | COMMENT |
| 7/2/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/2/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 7/1/2015 | Darrell A. Baker and Don Wood | NOTICE OF EXPARTE |
| 7/1/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/1/2015 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 6/30/2015 | New Jersey Advocates for Immigrant Detainees and New | LETTER |
| 6/29/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 6/29/2015 | Network Communications International Corp. | COMMENT |
| 6/25/2015 | Alex Welch | COMMENT |
| 6/25/2015 | Human Rights Defense Center | COMMENT |
| 6/25/2015 | Human Rights Defense Center | COMMENT |
| 6/24/2015 | American Correctional Association | NOTICE OF EXPARTE |
| 6/24/2015 | Madison Selby | COMMENT |
| 6/24/2015 | Michael S. Hamden | NOTICE OF EXPARTE |

**JA50**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/23/2015 | linda byrum | COMMENT |
| 6/23/2015 | The Silent Sentence Coalition | COMMENT |
| 6/22/2015 | Ann Tobin | COMMENT |
| 6/22/2015 | Dianne C. Stone | COMMENT |
| 6/19/2015 | Beth Stone | COMMENT |
| 6/19/2015 | Linda E Zobel | COMMENT |
| 6/19/2015 | Vernell Dees | COMMENT |
| 6/18/2015 | Adele Bastacky | COMMENT |
| 6/18/2015 | Bill Sorem | COMMENT |
| 6/18/2015 | Charles Krutsinger | COMMENT |
| 6/18/2015 | Daniel J. Deren | COMMENT |
| 6/18/2015 | Dennis Sherman | COMMENT |
| 6/18/2015 | elizabeth stone | COMMENT |
| 6/18/2015 | Emily Sherman | COMMENT |
| 6/18/2015 | John Hunter | COMMENT |
| 6/18/2015 | JOHN MACADAMS | COMMENT |
| 6/18/2015 | Joseph Cotton | COMMENT |
| 6/18/2015 | Lisa Ashley | COMMENT |
| 6/18/2015 | Matthew Gleason | COMMENT |
| 6/18/2015 | Paul L. Bolden | COMMENT |
| 6/18/2015 | Stephanie Spevack | COMMENT |
| 6/17/2015 | Adam Miller | COMMENT |
| 6/17/2015 | Alan Bachers, Ph.D. | COMMENT |
| 6/17/2015 | Cynthia Bryant | COMMENT |
| 6/17/2015 | David C. Berkshire | COMMENT |
| 6/17/2015 | Douglas Spurlin | COMMENT |
| 6/17/2015 | E Anna Zander | COMMENT |
| 6/17/2015 | Ed Kramer | COMMENT |
| 6/17/2015 | Emil Scheller | COMMENT |
| 6/17/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 6/17/2015 | Jack Kincaid | COMMENT |
| 6/17/2015 | Joseph Willenbrink | COMMENT |
| 6/17/2015 | Judith K. Sanders | COMMENT |
| 6/17/2015 | Laurie Bodenheimer | COMMENT |
| 6/17/2015 | Louise McClure | COMMENT |
| 6/17/2015 | Mark Ashley | COMMENT |
| 6/17/2015 | Richard Calk | COMMENT |
| 6/17/2015 | Robin B Fussell | COMMENT |
| 6/17/2015 | Securus Technologies, Inc. | LETTER |
| 6/17/2015 | Thomas Kowalski | COMMENT |
| 6/15/2015 | Joe Murley | COMMENT |
| 6/15/2015 | Joey Stevenson | COMMENT |

49

**JA51**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024          Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/15/2015 | Kathryn Prichard | COMMENT |
| 6/15/2015 | Lynn Carol Smith | COMMENT |
| 6/15/2015 | Pat Bliss | COMMENT |
| 6/15/2015 | Robert Rosko | COMMENT |
| 6/15/2015 | Shannon Pitts | COMMENT |
| 6/15/2015 | Yvonne Trotman | COMMENT |
| 6/12/2015 | Albert T. Tahhan | COMMENT |
| 6/12/2015 | Arnold Warshaw | COMMENT |
| 6/12/2015 | Audrey Reed | COMMENT |
| 6/12/2015 | Christopher MacKrell | COMMENT |
| 6/12/2015 | Deborah David | COMMENT |
| 6/12/2015 | J. F. Nemastil | COMMENT |
| 6/12/2015 | Jay Harlan | COMMENT |
| 6/12/2015 | John Trodglen | COMMENT |
| 6/12/2015 | Kathleen Bryson | COMMENT |
| 6/12/2015 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 6/12/2015 | National Sheriffs' Association | ERRATA, ERRATUM OR ADDENDUM |
| 6/12/2015 | Prison Policy Initiative | COMMENT |
| 6/12/2015 | Ruth Gutman | COMMENT |
| 6/12/2015 | Sarah Jenkins | COMMENT |
| 6/12/2015 | Susan Sabella | COMMENT |
| 6/12/2015 | Timothy A. Spong | COMMENT |
| 6/11/2015 | Anita Savio | COMMENT |
| 6/11/2015 | Anita Young | COMMENT |
| 6/11/2015 | Barbara Adkins | COMMENT |
| 6/11/2015 | Barbara Brisson | COMMENT |
| 6/11/2015 | Barbara Wine | COMMENT |
| 6/11/2015 | Brent Bobo | COMMENT |
| 6/11/2015 | c j claybaker | COMMENT |
| 6/11/2015 | Carol Martz | COMMENT |
| 6/11/2015 | Dan Danziger | COMMENT |
| 6/11/2015 | DONALD GORDON | COMMENT |
| 6/11/2015 | Dr. David Santoro | COMMENT |
| 6/11/2015 | E. Thomas Costello | COMMENT |
| 6/11/2015 | Edward Deering | COMMENT |
| 6/11/2015 | Emerelle | COMMENT |
| 6/11/2015 | Esta Lewallen | COMMENT |
| 6/11/2015 | Gene Golden | COMMENT |
| 6/11/2015 | Georgios Mihail | COMMENT |
| 6/11/2015 | Jake Maier | COMMENT |
| 6/11/2015 | James Dawson | COMMENT |

**JA52**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/11/2015 | Jan Aszman | COMMENT |
| 6/11/2015 | Jeff Brown | COMMENT |
| 6/11/2015 | Jody Gibson | COMMENT |
| 6/11/2015 | John Cipora | COMMENT |
| 6/11/2015 | Jonathan Boyne | COMMENT |
| 6/11/2015 | K Teel | COMMENT |
| 6/11/2015 | K. Gerhart | COMMENT |
| 6/11/2015 | Kris gentry | COMMENT |
| 6/11/2015 | Larry Bates | COMMENT |
| 6/11/2015 | Larry Phair | COMMENT |
| 6/11/2015 | Lawrence Green | COMMENT |
| 6/11/2015 | Louis Buchetto | COMMENT |
| 6/11/2015 | Lynne Hammer | COMMENT |
| 6/11/2015 | Margie Zalesak | COMMENT |
| 6/11/2015 | Mario Zecca | COMMENT |
| 6/11/2015 | Marisa Pisani | COMMENT |
| 6/11/2015 | Mark Marchand | COMMENT |
| 6/11/2015 | Martha Bushnell | COMMENT |
| 6/11/2015 | Martha Sammartano | COMMENT |
| 6/11/2015 | Matthew Tarpley | COMMENT |
| 6/11/2015 | McNeill | COMMENT |
| 6/11/2015 | Merrill A. Carter | COMMENT |
| 6/11/2015 | Michael Klausing | COMMENT |
| 6/11/2015 | Michelle Ognjanovic | COMMENT |
| 6/11/2015 | Nora Williquette | COMMENT |
| 6/11/2015 | Patricia Jewitt | COMMENT |
| 6/11/2015 | Philip Abromats | COMMENT |
| 6/11/2015 | Rachael Poore | COMMENT |
| 6/11/2015 | Richard  B Bazel | COMMENT |
| 6/11/2015 | RoseMarie Dorer | COMMENT |
| 6/11/2015 | Ruth Kay Souder | COMMENT |
| 6/11/2015 | Sandra Alverson | COMMENT |
| 6/11/2015 | Sandra Burson | COMMENT |
| 6/11/2015 | Securus Technologies, Inc. | LETTER |
| 6/11/2015 | Shardae Lindsey | COMMENT |
| 6/11/2015 | sophia | COMMENT |
| 6/11/2015 | sophia | COMMENT |
| 6/11/2015 | Stefan C Taylor | COMMENT |
| 6/11/2015 | Tanya Burak | COMMENT |
| 6/11/2015 | Theodore Zook | COMMENT |
| 6/11/2015 | Tim Brellow | COMMENT |
| 6/11/2015 | Vidal Salas | COMMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/11/2015 | W. Andrew Stover | COMMENT |
| 6/11/2015 | William James Diehl | COMMENT |
| 6/11/2015 | William Todd | COMMENT |
| 6/11/2015 | Zach Kaplan | COMMENT |
| 6/10/2015 | E-Complish, Inc. | LETTER |
| 6/8/2015 | Anita Brokaw | COMMENT |
| 6/8/2015 | Michael D Story | COMMENT |
| 6/1/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 5/22/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 5/22/2015 | ICSolutions, LLC | NOTICE OF EXPARTE |
| 5/22/2015 | Kaylan Stuart, et al. | NOTICE OF EXPARTE |
| 5/21/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 5/21/2015 | Human Rights Defense Center | NOTICE OF EXPARTE |
| 5/21/2015 | Major Craig Rowe, CJM | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff Bill McCarthy | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff Bradley D. Rogers | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff Danny L. Glick | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff Gregory R. Oeth | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff Jim Hammond | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff John R. Layton | NOTICE OF EXPARTE |
| 5/21/2015 | Sheriff Robert R. Snaza | NOTICE OF EXPARTE |
| 5/20/2015 | CenturyLink | NOTICE OF EXPARTE |
| 5/19/2015 | Alabama Public Service Commission | COMMENT |
| 5/19/2015 | Alabama Public Service Commission | COMMENT |
| 5/19/2015 | Alabama Public Service Commission | REPORT |
| 5/19/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 5/19/2015 | Securus Technologies, Inc. | LETTER |
| 5/18/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 5/18/2015 | Network Communications International Corp | NOTICE OF EXPARTE |
| 5/15/2015 | New Jersey Advocates for Immigrant Detainees | LETTER |
| 5/14/2015 | CenturyLink | NOTICE OF EXPARTE |
| 5/13/2015 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 5/12/2015 | Alabama Public Service Commission | LETTER |
| 5/12/2015 | Sheriff Neil Elks | NOTICE OF EXPARTE |
| 5/11/2015 | Captain Jody Hovey | NOTICE OF EXPARTE |
| 5/11/2015 | Carisa Duston | NOTICE OF EXPARTE |
| 5/11/2015 | J. Terry Norris | NOTICE OF EXPARTE |
| 5/11/2015 | James D. Franklin | NOTICE OF EXPARTE |
| 5/11/2015 | Michael B. Mattern | NOTICE OF EXPARTE |
| 5/11/2015 | Numerous | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Bill Holt | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Billy Breeding | NOTICE OF EXPARTE |

**JA54**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 5/11/2015 | Sheriff C. Aaron Rovenstine | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Dale J. Schmidt | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Donald Lauer | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Harold Eavenson | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Jerry Harbstreit | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff John F. Matz | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff John W. Ingram V | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff M. Biniecki | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Michael R. Kreinhop | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Michael T. Nielsen | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Mike Evans | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Phil R. Stammitti | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Robert B. Davis | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Scott A. Adams | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff Timothy G. Miller | NOTICE OF EXPARTE |
| 5/11/2015 | Sheriff William T. Schatzman | NOTICE OF EXPARTE |
| 5/11/2015 | Undersheriff Joseph Pascale | NOTICE OF EXPARTE |
| 5/11/2015 | Vaughn Killeen | NOTICE OF EXPARTE |
| 5/8/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 5/7/2015 | Newton County Sheriff's Office | COMMENT |
| 5/5/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 5/5/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 5/5/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 5/4/2015 | Arlington County, Virginia office of The Sheriff | NOTICE OF EXPARTE |
| 5/4/2015 | Securus Technologies, Inc. | LETTER |
| 5/1/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 5/1/2015 | Numerous | NOTICE OF EXPARTE |
| 4/30/2015 | McKinley County Adult Detention | LETTER |
| 4/30/2015 | Sheriff John Cary Bittick | NOTICE OF EXPARTE |
| 4/30/2015 | Sheriff Mike Yeager | NOTICE OF EXPARTE |
| 4/30/2015 | Sheriff St Lawrence | LETTER |
| 4/29/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/29/2015 | Sheriff Association of The Commonwealth of | NOTICE OF EXPARTE |
| 4/28/2015 | CenturyLink | NOTICE OF EXPARTE |
| 4/28/2015 | Numerous | NOTICE OF EXPARTE |
| 4/27/2015 | Columbia County Sheriff's Office | NOTICE OF EXPARTE |
| 4/27/2015 | Hamilton County(OH) Sheriff's Office | NOTICE OF EXPARTE |
| 4/27/2015 | Miami County Sheriff's Office | NOTICE OF EXPARTE |
| 4/27/2015 | Sheriff of Pulaski County | NOTICE OF EXPARTE |
| 4/24/2015 | Sheriff of Blount County | NOTICE OF EXPARTE |
| 4/24/2015 | Sheriff of Howard County | NOTICE OF EXPARTE |
| 4/24/2015 | Wilson County Office of the Sheriff | NOTICE OF EXPARTE |

**JA55**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/23/2015 | shelby County sheriff's Office | NOTICE OF EXPARTE |
| 4/23/2015 | St.Clair County's Sheriff's Office | NOTICE OF EXPARTE |
| 4/22/2015 | Lancaster County Sheriff | NOTICE OF EXPARTE |
| 4/22/2015 | Polk County Sheriff's Office | NOTICE OF EXPARTE |
| 4/22/2015 | St. Francois County Sheriff's Department | NOTICE OF EXPARTE |
| 4/21/2015 | Branch County Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | Chesterfield County Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | City of Alexandria, Virgina Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | Crisp County Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | Eaton County Office of The Sheriff | NOTICE OF EXPARTE |
| 4/21/2015 | Floyd County Sheriff's Department | NOTICE OF EXPARTE |
| 4/21/2015 | Franklin County Sheriff | NOTICE OF EXPARTE |
| 4/21/2015 | Kalamazoo county Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | Montgomery County Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | Rush County Sheriff | NOTICE OF EXPARTE |
| 4/21/2015 | Tuscola County Sheriff's Office | NOTICE OF EXPARTE |
| 4/21/2015 | Warren County Sheriff | NOTICE OF EXPARTE |
| 4/21/2015 | William T. Schatzman, Sheriff | NOTICE OF EXPARTE |
| 4/21/2015 | Wilson County Sheriff | NOTICE OF EXPARTE |
| 4/20/2015 | Cheboygan County Sheriff Department | NOTICE OF EXPARTE |
| 4/20/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 4/17/2015 | County of Manistee, Office of the Sheriff | NOTICE OF EXPARTE |
| 4/17/2015 | Crawford County Sheriff's Office | NOTICE OF EXPARTE |
| 4/17/2015 | Ingham County sheriff's Office | NOTICE OF EXPARTE |
| 4/17/2015 | Marion County Sheriff | NOTICE OF EXPARTE |
| 4/17/2015 | Passaic County Sheriff's Office | NOTICE OF EXPARTE |
| 4/17/2015 | Washington County sheriff | NOTICE OF EXPARTE |
| 4/16/2015 | Alten County Sheriff's Department | NOTICE OF EXPARTE |
| 4/16/2015 | Marengo County Sheriff's Office | NOTICE OF EXPARTE |
| 4/16/2015 | Marshall County Sheriff's Office | NOTICE OF EXPARTE |
| 4/16/2015 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 4/16/2015 | Oneida County Sheriff's Office | NOTICE OF EXPARTE |
| 4/16/2015 | Pemiscot County Sheriff's Office | NOTICE OF EXPARTE |
| 4/16/2015 | Pennington County Sheriff's Office | NOTICE OF EXPARTE |
| 4/16/2015 | Tuscaloosa County Sheriff's Office | NOTICE OF EXPARTE |
| 4/15/2015 | Bradley County Sheriff's Office | NOTICE OF EXPARTE |
| 4/15/2015 | Mackinac County Sheriff's Office | NOTICE OF EXPARTE |
| 4/15/2015 | Montgomery County Sheriff's Office | NOTICE OF EXPARTE |
| 4/15/2015 | Norfolk Sheriff's Office | NOTICE OF EXPARTE |
| 4/15/2015 | St. Croix County Sheriff Office | NOTICE OF EXPARTE |
| 4/14/2015 | Auglaize County Sheriff's Office | NOTICE OF EXPARTE |
| 4/14/2015 | Brazos County Office of The Sheriff | NOTICE OF EXPARTE |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/14/2015 | K. Matt Shults | NOTICE OF EXPARTE |
| 4/14/2015 | Office of the Clare County Sheriff | NOTICE OF EXPARTE |
| 4/14/2015 | Sequatchie County Sheriff's Office | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Brian D. Gardner | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Bryan L. Atkins | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Chad Anderson | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff D. Keith Davis | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Dale Rantala | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff David L. Wedding | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Dennis Conard | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Don Schneider | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Frank P. Denning | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff George T. Maier | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff John R. Gossage | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Lance Babcock | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Michael Anderson | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Michael Scroggins | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Randal Ward | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Randy Krukow | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Rich McNamee | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Richard C. Fuller III | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Robert P. Craft | NOTICE OF EXPARTE |
| 4/14/2015 | Sheriff Stuart D. Miller | NOTICE OF EXPARTE |
| 4/10/2015 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 4/9/2015 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 4/9/2015 | MMTC | NOTICE OF EXPARTE |
| 4/8/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 4/8/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 4/7/2015 | Steve Casey | SUPPLEMENT |
| 4/3/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/3/2015 | Pay Tel Communications | NOTICE OF EXPARTE |
| 3/27/2015 | NASUCA | COMMENT |
| 3/26/2015 | Elizabeth Matos | LETTER |
| 3/26/2015 | Elizabeth Matos | OTHER |
| 3/25/2015 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 3/23/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 3/23/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 3/20/2015 | Lancaster County Department of Corrections | LETTER |
| 3/18/2015 | Numerous | LETTER |
| 3/18/2015 | Wireline Competetion Bureau | LETTER |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/17/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 3/16/2015 | Lancaster County Department of Corrections | LETTER |
| 3/9/2015 | Representative Nugent | CONGRESSIONAL CORRESPONDENCE |
| 3/9/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 3/9/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 3/6/2015 | Martha Wright, et al | NOTICE OF EXPARTE |
| 3/6/2015 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 2/27/2015 | HAMILTON RELAY, INC. | NOTICE OF EXPARTE |
| 2/24/2015 | Iowa Cure | COMMENT |
| 2/20/2015 | Andrew D. Lipman | NOTICE OF EXPARTE |
| 2/18/2015 | Don J. Wood | NOTICE OF EXPARTE |
| 2/18/2015 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 2/18/2015 | Securus Technologies, Inc. | LETTER |
| 2/13/2015 | Jack Coots | COMMENT |
| 2/13/2015 | Rep Curbelo | CONGRESSIONAL CORRESPONDENCE |
| 2/12/2015 | Deborah S Reithmuller | COMMENT |
| 2/10/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 2/10/2015 | FCC | COMMENT |
| 2/9/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 2/9/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 2/9/2015 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 2/6/2015 | Matthew Colt | LETTER |
| 2/3/2015 | Adrian Bustamante | LETTER |
| 2/3/2015 | Martha Wright, et al | REQUEST |
| 2/2/2015 | Dwight W. Lowery | LETTER |
| 2/2/2015 | Joseph W. Atwell | LETTER |
| 1/30/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 1/30/2015 | Pay Tel Communications, Inc. | REQUEST |
| 1/30/2015 | Pay Tel Communications, Inc. | REQUEST |
| 1/29/2015 | Don J. Wood | REPORT |
| 1/29/2015 | Martha Wright et al | REPLY TO COMMENTS |
| 1/29/2015 | Securus Technologies, Inc. | REQUEST |
| 1/29/2015 | Securus Technologies, Inc. | REQUEST |
| 1/28/2015 | Global Tel*Link Corporation | LETTER |
| 1/28/2015 | Global Tel*Link Corporation | LETTER |
| 1/27/2015 | CenturyLink | REPLY TO COMMENTS |
| 1/27/2015 | Don J. Wood | REPLY TO COMMENTS |
| 1/27/2015 | Emerald Correctional Management | REPLY TO COMMENTS |
| 1/27/2015 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 1/27/2015 | Human Rights Defense Center | COMMENT |

**JA58**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**             **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/27/2015 | Jennifer Long | COMMENT |
| 1/27/2015 | Lattice Incorporated | REPLY TO COMMENTS |
| 1/27/2015 | Martha Wright, et al | REPLY |
| 1/27/2015 | National Sheriffs' Association | REPLY |
| 1/27/2015 | Network Communications International Corp. | REPLY |
| 1/27/2015 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 1/27/2015 | Pennsylvania Public Utility Commission | REPLY TO COMMENTS |
| 1/27/2015 | Prison Policy Initiative | REPLY TO COMMENTS |
| 1/27/2015 | Rochester Institute of Technology | NOTICE OF EXPARTE |
| 1/27/2015 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 1/27/2015 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 1/26/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 1/26/2015 | American Bar Association | COMMENT |
| 1/26/2015 | Andrew D. Lipman | REPLY |
| 1/26/2015 | Jail Education Solutions | COMMENT |
| 1/26/2015 | NYU Law Immigrant Rights Clinic and New Jersey | LETTER |
| 1/26/2015 | Prison Policy Initiative | ERRATA, ERRATUM OR ADDENDUM |
| 1/26/2015 | Prison Policy Initiative | COMMENT |
| 1/26/2015 | San Diego County Sheriff's Department | NOTICE OF EXPARTE |
| 1/23/2015 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 1/22/2015 | Jason Moore | LETTER |
| 1/21/2015 | A. John Pritchard | LETTER |
| 1/21/2015 | Securus Technologies, Inc. | OTHER |
| 1/21/2015 | William H Lockard | COMMENT |
| 1/20/2015 | County of Delaware, PA | COMMENT |
| 1/20/2015 | Jennifer Marson | COMMENT |
| 1/20/2015 | Santa Barbara County Sheriff | NOTICE OF EXPARTE |
| 1/20/2015 | Shasta County Sheriff | NOTICE OF EXPARTE |
| 1/16/2015 | Alabama Public Service Commission | NOTICE OF EXPARTE |
| 1/16/2015 | Alameda County Sheriff's Office | REPLY TO COMMENTS |
| 1/15/2015 | Martha Wright, et al | REQUEST |
| 1/15/2015 | Pay Tel Communications, Inc. | REQUEST |
| 1/15/2015 | Pay Tel Communications, Inc. | REQUEST |
| 1/15/2015 | Securus Technologies, Inc. | REQUEST |
| 1/14/2015 | Donald C. Jackson | LETTER |
| 1/14/2015 | Global Tel*Link Corporation | LETTER |
| 1/14/2015 | Global Tel*Link Corporation | LETTER |
| 1/14/2015 | Global Tel*Link Corporation | LETTER |
| 1/14/2015 | Global Tel*Link Corporation | LETTER |
| 1/14/2015 | Global Tel*Link Corporation | LETTER |
| 1/14/2015 | Major Mitch Stanley | COMMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**          **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/14/2015 | Pay Tel Communications, Inc. | REQUEST |
| 1/14/2015 | Securus Technologies, Inc. | REQUEST |
| 1/14/2015 | Wood & Wood | LETTER |
| 1/13/2015 | Alex Friedmann | COMMENT |
| 1/13/2015 | Alex Friedmann | ERRATA, ERRATUM OR ADDENDUM |
| 1/13/2015 | Alexander Yaskov | COMMENT |
| 1/13/2015 | Congresswoman Bonnie Watson Coleman | COMMENT |
| 1/13/2015 | Helping Educate to Advance the Rights of the Deaf | COMMENT |
| 1/13/2015 | Martha Wright et al | COMMENT |
| 1/13/2015 | Prison Policy Initiative | COMMENT |
| 1/13/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Alliance of Baptists et al. | COMMENT |
| 1/12/2015 | American Jail Association | COMMENT |
| 1/12/2015 | Andra Byous | COMMENT |
| 1/12/2015 | Andrew D. Lipman | COMMENT |
| 1/12/2015 | Annette cyr | COMMENT |
| 1/12/2015 | Arizona Corporation Commission | COMMENT |
| 1/12/2015 | California Immigrant Policy Center | COMMENT |
| 1/12/2015 | Charles Harris | LETTER |
| 1/12/2015 | Clay Jenkins | COMMENT |
| 1/12/2015 | Congressman Tom Reed | COMMENT |
| 1/12/2015 | Cook County Illinois | COMMENT |
| 1/12/2015 | Don J. Wood | COMMENT |
| 1/12/2015 | Dr. Artika R. Tyner | COMMENT |
| 1/12/2015 | Elizabeth Matos | COMMENT |
| 1/12/2015 | Georgia Department of Corrections | COMMENT |
| 1/12/2015 | Global Tel*Link Corporation | COMMENT |
| 1/12/2015 | Hampden County Sheriff | LETTER |
| 1/12/2015 | Imperial County Sheriff's Office | LETTER |
| 1/12/2015 | Inmate Calling Solutions, LLC | COMMENT |
| 1/12/2015 | Jason Moore | LETTER |
| 1/12/2015 | Kevin J. Collins | LETTER |
| 1/12/2015 | Kim Keenan | COMMENT |
| 1/12/2015 | Lattice Incorporated | COMMENT |
| 1/12/2015 | Lee Vando | LETTER |
| 1/12/2015 | Los Angeles County Sheriff's Department | LETTER |
| 1/12/2015 | Margaret Laffa | COMMENT |
| 1/12/2015 | Martha Wright, et al | COMMENT |
| 1/12/2015 | Matt Cate | COMMENT |
| 1/12/2015 | Michael S. Hamden | COMMENT |
| 1/12/2015 | National Sheriff's Association | COMMENT |

**JA60**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/12/2015 | Network Communications International Corp. | COMMENT |
| 1/12/2015 | New Jersey Advocates for Immigrant Detainees and NYU | COMMENT |
| 1/12/2015 | New Jersey Institute for Social Justice | COMMENT |
| 1/12/2015 | Ohio Department of Rehabilitation and Correction | COMMENT |
| 1/12/2015 | Paul Cain | LETTER |
| 1/12/2015 | Pay Tel Communications, Inc. | COMMENT |
| 1/12/2015 | Praeses LLC | COMMENT |
| 1/12/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Prison Policy Initiative | COMMENT |
| 1/12/2015 | Raymond C. Walen, Jr | LETTER |
| 1/12/2015 | San Patricio County | LETTER |
| 1/12/2015 | Securus Technologies, Inc. | COMMENT |
| 1/12/2015 | Securus Technologies, Inc. | COMMENT |
| 1/12/2015 | Sheriff Bill Brown | COMMENT |
| 1/12/2015 | Sophia Lewis | COMMENT |
| 1/12/2015 | State of Tennessee Department of Corrections | COMMENT |
| 1/12/2015 | Stephan Bell | COMMENT |
| 1/12/2015 | The Leadership Conference on Civil and Human Rights | COMMENT |
| 1/12/2015 | United States Conference of Catholic Bishops | COMMENT |
| 1/12/2015 | Verizon | COMMENT |
| 1/12/2015 | Waller County | LETTER |
| 1/12/2015 | Washington Lawyers Committee for Civil Rights and | COMMENT |
| 1/9/2015 | 51 Former State Attorneys General | COMMENT |
| 1/9/2015 | Community Initiatives for Visiting Immigrants in | COMMENT |
| 1/9/2015 | Danielle Chynoweth | COMMENT |
| 1/9/2015 | Florida Sheriffs Association | COMMENT |
| 1/9/2015 | Los Angeles County Sheriff's Department | LETTER |
| 1/9/2015 | National Association of Regulatory Utility Commissioners | COMMENT |
| 1/9/2015 | RIT/NTID Student Life Team | COMMENT |
| 1/8/2015 | Charles E. Riley | LETTER |
| 1/8/2015 | Donald J. Knutz. Jr | LETTER |
| 1/8/2015 | Joanne Jones | COMMENT |
| 1/8/2015 | Matthew Curtis | LETTER |
| 1/8/2015 | Oklahoma Department of Corrections | COMMENT |
| 1/7/2015 | Alberto Villescos | LETTER |
| 1/7/2015 | Daniel Rogowski | LETTER |
| 1/7/2015 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/7/2015 | Robert Jean Ingram | LETTER |

**JA61**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/7/2015 | Romell | LETTER |
| 1/7/2015 | State of Texas | LETTER |
| 1/6/2015 | American Civil Liberties Union of Idaho | COMMENT |
| 1/6/2015 | Anonymous | LETTER |
| 1/6/2015 | Daryl L. Fowler | COMMENT |
| 1/6/2015 | Jamaal Ali Bilal | LETTER |
| 1/6/2015 | Orange County Sheriff's Department | LETTER |
| 1/6/2015 | Pat Thelen | LETTER |
| 1/6/2015 | Rasool McCrimmon | LETTER |
| 1/6/2015 | Sheriff Raymond Loera | COMMENT |
| 1/6/2015 | Steven A. Taliani | LETTER |
| 1/6/2015 | Tyrone Perry | LETTER |
| 1/6/2015 | Vinnie Chu | LETTER |
| 1/6/2015 | Virginia Association of Regional Jails | COMMENT |
| 1/5/2015 | Campaign for Prison Phone Justice | COMMENT |
| 1/5/2015 | Chief Probation Officers of California | COMMENT |
| 1/5/2015 | Colorado Jail Association | COMMENT |
| 1/5/2015 | Kevin Inge | LETTER |
| 1/5/2015 | Kimberly Trujillo | COMMENT |
| 1/5/2015 | Lezak Shallat | COMMENT |
| 1/5/2015 | National Association of the Deaf | COMMENT |
| 1/5/2015 | Rev. Craig H. Scott | COMMENT |
| 1/5/2015 | Rev. Deborah Lee | COMMENT |
| 1/5/2015 | Rosen Bien Galvan & Grunfeld, LLP | COMMENT |
| 1/5/2015 | Sheriff John Bishop (Ret) | COMMENT |
| 1/5/2015 | tanisha | COMMENT |
| 1/5/2015 | TAYLOR COUNTY COMMISSIONER'S COURT | COMMENT |
| 1/2/2015 | Rev. Craig H. Scott | COMMENT |
| 1/2/2015 | Williamson County Sheriff's Office | COMMENT |
| 12/31/2014 | Arizona Department of Corrections | COMMENT |
| 12/31/2014 | Cynthia Miller | COMMENT |
| 12/31/2014 | Eric Allston | LETTER |
| 12/31/2014 | Montana Department of Corrections | COMMENT |
| 12/31/2014 | Mr. Mitchell | LETTER |
| 12/31/2014 | Sidney R. Hertz | LETTER |
| 12/30/2014 | James Cavenaugh | COMMENT |
| 12/30/2014 | Riverside County Sheriff | COMMENT |
| 12/30/2014 | Sean Lynn | LETTER |
| 12/29/2014 | A New Way of Life Reentry Project | LETTER |
| 12/29/2014 | Butler County Prison Board | LETTER |
| 12/29/2014 | Columbia Legal Services | LETTER |
| 12/29/2014 | Consolidated Telecom, Inc. | COMMENT |

60

**JA62**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/29/2014 | Darryl Willingham | LETTER |
| 12/29/2014 | Darryl Willingham | LETTER |
| 12/29/2014 | Ima Qtpie | COMMENT |
| 12/29/2014 | John Ussery | LETTER |
| 12/29/2014 | Kathie Gourlay | COMMENT |
| 12/29/2014 | Marion County Sheriff | NOTICE OF EXPARTE |
| 12/29/2014 | Marion County Sheriff | NOTICE OF EXPARTE |
| 12/29/2014 | Marion County Sheriff | NOTICE OF EXPARTE |
| 12/29/2014 | Marion County Sheriff | NOTICE OF EXPARTE |
| 12/29/2014 | Marion County Sheriff | NOTICE OF EXPARTE |
| 12/29/2014 | Norman Belcher | LETTER |
| 12/29/2014 | Sean O'Geary | LETTER |
| 12/29/2014 | Ventura County Sheriff's Office | LETTER |
| 12/24/2014 | Anthony Shepardson | LETTER |
| 12/24/2014 | James M. Cummings | COMMENT |
| 12/24/2014 | Kansas Department of Corrections | NOTICE OF EXPARTE |
| 12/24/2014 | Lt J Kemmerle | COMMENT |
| 12/23/2014 | Combined Public Communications, Inc. | COMMENT |
| 12/23/2014 | Kevin Dalcourt | LETTER |
| 12/22/2014 | B.A. Quarles | LETTER |
| 12/22/2014 | California State Sheriffs' Association | ERRATA, ERRATUM OR ADDENDUM |
| 12/22/2014 | Christopher Du Pree | LETTER |
| 12/22/2014 | Consolidated Telecom, Inc. | COMMENT |
| 12/22/2014 | King George County, Virginia | LETTER |
| 12/22/2014 | MoHave county Sheriff's Office | LETTER |
| 12/19/2014 | California State Sheriffs' Association | COMMENT |
| 12/19/2014 | Denton County Sheriff's Office | LETTER |
| 12/18/2014 | Cayuga County Sheriff's Office | LETTER |
| 12/18/2014 | Lee Norman | LETTER |
| 12/18/2014 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 12/18/2014 | William Deatsch | COMMENT |
| 12/17/2014 | Lt. Lisa Burch | COMMENT |
| 12/17/2014 | Michael Razavi | LETTER |
| 12/17/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 12/17/2014 | Wireline Competition Bureau | ORDER |
| 12/16/2014 | Jeffrey L. Starr | LETTER |
| 12/16/2014 | Samuel Braxton | LETTER |
| 12/15/2014 | Brandon L. Hawkins | LETTER |
| 12/15/2014 | Demitrius Lowe | LETTER |
| 12/15/2014 | Eric Phoenix Mason | LETTER |
| 12/15/2014 | Fred D. Douty | LETTER |

**JA63**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/15/2014 | James D. Wilson | LETTER |
| 12/15/2014 | Jeremy Sklanka | LETTER |
| 12/15/2014 | Justin M. Williams | LETTER |
| 12/15/2014 | Michael Keetley | LETTER |
| 12/15/2014 | Office of the Sheriff, City and County of San Francisco | NOTICE OF EXPARTE |
| 12/15/2014 | Pinal County Sheriff's Office | LETTER |
| 12/12/2014 | Securus Technologies, Inc. | OPPOSITION |
| 12/11/2014 | Oregon Department of Corrections | COMMENT |
| 12/10/2014 | Charlevoix County Sheriff's Office | LETTER |
| 12/10/2014 | Kelsey Kauffman | LETTER |
| 12/10/2014 | Prison Policy Initiative | MOTION FOR EXTENSION OF TIME |
| 12/9/2014 | Jerome Ceasar Alverto | LETTER |
| 12/9/2014 | John Kacy Jones | LETTER |
| 12/9/2014 | Nick Brosz | LETTER |
| 12/8/2014 | Anonymous | LETTER |
| 12/8/2014 | Greene County Sheriff's Office | LETTER |
| 12/8/2014 | Hemphill County | LETTER |
| 12/8/2014 | Hutchinson County Judge | LETTER |
| 12/8/2014 | Jack Halloran | LETTER |
| 12/8/2014 | Jason Sean Evans | LETTER |
| 12/8/2014 | John Brieden | COMMENT |
| 12/8/2014 | Joseph Schaffer | LETTER |
| 12/8/2014 | Kenneth West | LETTER |
| 12/8/2014 | Legal Services for Prisoners With Children | COMMENT |
| 12/8/2014 | Niagara County Sheriff | LETTER |
| 12/8/2014 | Open Access Connections | LETTER |
| 12/8/2014 | Panola County Judge | LETTER |
| 12/8/2014 | Raymond J. Smulsky | LETTER |
| 12/8/2014 | Robert Gralfeldo | LETTER |
| 12/8/2014 | Ron A. Ozment | LETTER |
| 12/8/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 12/8/2014 | Terry County Judge | LETTER |
| 12/8/2014 | Tuolumne County Sheriff | LETTER |
| 12/8/2014 | Uhuru Baraka Rowe | LETTER |
| 12/8/2014 | Walter Thompson | LETTER |
| 12/5/2014 | Alabama Public Service Commission | PRODUCTION OF DOCUMENTS |
| 12/5/2014 | Mary Horn | COMMENT |
| 12/4/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 12/4/2014 | Plymouth County Sheriff | LETTER |
| 12/4/2014 | The Honorable Frank Pallone | LETTER |

**JA64**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/4/2014 | Victor J. Russo | LETTER |
| 12/3/2014 | Edward Monroe | LETTER |
| 12/3/2014 | Graham County Sheriff's Office | LETTER |
| 12/3/2014 | John W. McGovern | LETTER |
| 12/3/2014 | Lisa Kavanaugh | COMMENT |
| 12/3/2014 | Margot Brinn | LETTER |
| 12/3/2014 | patricia curran | COMMENT |
| 12/3/2014 | Ronald D. Schackart | LETTER |
| 12/3/2014 | Terence Jerome Wilson | LETTER |
| 12/3/2014 | Wheeler County Sheriff's Office | LETTER |
| 12/3/2014 | Yell County Sheriff's Department | LETTER |
| 12/2/2014 | Patrick Bearup | LETTER |
| 12/2/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 12/2/2014 | Samye Johnson | COMMENT |
| 12/2/2014 | The Promise of Justice Initiative | LETTER |
| 12/1/2014 | Columbia County Sheriff's Office | NOTICE OF EXPARTE |
| 12/1/2014 | Lt. Joe Morris | COMMENT |
| 12/1/2014 | Prison Law Office | COMMENT |
| 11/26/2014 | Diana Page | COMMENT |
| 11/26/2014 | Tom | COMMENT |
| 11/25/2014 | Anita Hunter | COMMENT |
| 11/25/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 11/24/2014 | Adam M. Andrews | LETTER |
| 11/24/2014 | Edward Monroe | LETTER |
| 11/24/2014 | Michael S. Dotson | LETTER |
| 11/24/2014 | San Bernardino County Sheriff's Department | LETTER |
| 11/24/2014 | Securus Technologies, Inc. | REPLY |
| 11/24/2014 | Timothy Lawrence | LETTER |
| 11/24/2014 | Unknown | LETTER |
| 11/21/2014 | Diane Meier | COMMENT |
| 11/21/2014 | Global Tel*Link Corporation | LETTER |
| 11/21/2014 | Lisa Drapkin | COMMENT |
| 11/21/2014 | Margaret Bick | COMMENT |
| 11/21/2014 | Mitchell Zimmerman | COMMENT |
| 11/21/2014 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 11/21/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 11/20/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 11/20/2014 | Idaho Dept of Correction | COMMENT |
| 11/20/2014 | Idaho Dept of Correction | COMMENT |
| 11/20/2014 | John B. Corcoran | LETTER |
| 11/20/2014 | william quigley | COMMENT |
| 11/19/2014 | CenturyLink | OTHER |

**JA65**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/19/2014 | CenturyLink | SUPPLEMENT |
| 11/19/2014 | Charles E. Zellers | LETTER |
| 11/19/2014 | Mary Roark | LETTER |
| 11/19/2014 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 11/19/2014 | Samantha Burnett | LETTER |
| 11/19/2014 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 11/19/2014 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 11/18/2014 | Adrien J. Espinoza | LETTER |
| 11/18/2014 | Anthony M. Dodson | LETTER |
| 11/18/2014 | David Phillips | LETTER |
| 11/18/2014 | Edgar Gutierrez | LETTER |
| 11/18/2014 | Jason Maurice Powell | LETTER |
| 11/18/2014 | Timothy J. Muise | LETTER |
| 11/18/2014 | Tony Dedupone | LETTER |
| 11/17/2014 | Global Tel*Link Corporation | OPPOSITION |
| 11/14/2014 | Paytel Communications, Inc. | NOTICE OF EXPARTE |
| 11/13/2014 | Pay Tel Communications | REPLY |
| 11/13/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 11/13/2014 | Pay Tel Communications, Inc. | OPPOSITION |
| 11/12/2014 | Anthony Yreh | LETTER |
| 11/12/2014 | Encartele, Inc. | REPORT |
| 11/12/2014 | Global Tel*Link Corporation | OPPOSITION |
| 11/12/2014 | Global Tel*Link Corporation | LETTER |
| 11/12/2014 | Global Tel*Link Corporation | LETTER |
| 11/12/2014 | Kerby Keller | LETTER |
| 11/12/2014 | Pay Tel Communications | NOTICE OF EXPARTE |
| 11/12/2014 | Robert Davenberg | LETTER |
| 11/12/2014 | Timothy Mark Dodge | LETTER |
| 11/10/2014 | ATN, Inc. | COMMENT |
| 11/10/2014 | Carl Sheldon Daniels | LETTER |
| 11/10/2014 | Daniel M. White | LETTER |
| 11/10/2014 | EagleTel, Inc. | COMMENT |
| 11/10/2014 | Michael Moore | LETTER |
| 11/10/2014 | Michael Russell | LETTER |
| 11/10/2014 | Vincenzo E. Valachi | LETTER |
| 11/6/2014 | Arizona Community College Coordinating Council | COMMENT |
| 11/6/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 11/6/2014 | Pay Tel Communications | NOTICE OF EXPARTE |
| 11/6/2014 | Rodney Derrickson | LETTER |
| 11/5/2014 | Securus Technologies, Inc. | OPPOSITION |
| 11/4/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 11/3/2014 | Anibal Roman | LETTER |

**JA66**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/3/2014 | Jared Downward | LETTER |
| 11/3/2014 | John C. Musselman | LETTER |
| 11/3/2014 | Kevin Crow | LETTER |
| 11/3/2014 | Malik D. Hardin | LETTER |
| 10/31/2014 | MMTC | NOTICE OF EXPARTE |
| 10/31/2014 | Pay Tel Communications, Inc. | PETITION FOR WAIVER |
| 10/30/2014 | Global Tel*Link | LETTER |
| 10/30/2014 | MMTC | NOTICE OF EXPARTE |
| 10/30/2014 | Securus Technologies, Inc. | WITHDRAWAL |
| 10/30/2014 | Stephanie A. Joyce | APPLICATION FOR REVIEW |
| 10/29/2014 | ATN, Inc. | COMMENT |
| 10/29/2014 | Freddie Merritt | COMMENT |
| 10/29/2014 | Global Tel*Link Corporation | LETTER |
| 10/28/2014 | Global Tel*Link Corporation | OPPOSITION |
| 10/28/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/28/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 10/24/2014 | Diana Page | COMMENT |
| 10/23/2014 | Securus Technologies, Inc. | REQUEST |
| 10/21/2014 | Gary Cassis | MOTION TO ENLARGE ISSUE |
| 10/17/2014 | Wireline Competition Bureau | FURTHER NOTICE OF PROPOSED RULEMAKING |
| 10/15/2014 | Virginia Association of Regional Jails | NOTICE OF EXPARTE |
| 10/14/2014 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 10/10/2014 | Thomas M. Dethlefs | NOTICE OF EXPARTE |
| 10/8/2014 | Securus Technologies, Inc. | LETTER |
| 10/6/2014 | Global Tel*Link Corporation | OTHER |
| 10/6/2014 | Pay Tel Communications, Inc. | OTHER |
| 10/6/2014 | Praeses LLC | ERRATA, ERRATUM OR ADDENDUM |
| 10/6/2014 | Securus Technologies, Inc. | LETTER |
| 10/3/2014 | ATN, Inc. | COMMENT |
| 10/3/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/3/2014 | Praeses LLC | NOTICE OF EXPARTE |
| 10/2/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 10/2/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 10/2/2014 | Securus Technologies, Inc. | LETTER |
| 10/1/2014 | Wireline Competition Bureau | ORDER |
| 9/30/2014 | Alabama Public Service Commission | REPLY TO COMMENTS |
| 9/29/2014 | Global Tel*Link Corporation | SUPPLEMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 9/29/2014 | Global Tel*Link Corporation | LETTER |
| 9/29/2014 | Network Communications International Corp | NOTICE OF EXPARTE |
| 9/26/2014 | Securus Technologies, Inc. | LETTER |
| 9/25/2014 | Public Knowledge | NOTICE OF EXPARTE |
| 9/25/2014 | Securus Technologies, Inc. | LETTER |
| 9/24/2014 | Edyael Casaperalta | LETTER |
| 9/24/2014 | Pay Tel Communications, Inc. | OTHER |
| 9/22/2014 | Arkansas C.U.R.E. | COMMENT |
| 9/22/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 9/22/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 9/22/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 9/19/2014 | Alex Friedmann | COMMENT |
| 9/19/2014 | CenturyLink | NOTICE OF EXPARTE |
| 9/19/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 9/19/2014 | Martha Wright et al | OTHER |
| 9/18/2014 | Alex Friedmann | COMMENT |
| 9/18/2014 | Martha Wright, et al | NOTICE OF EXPARTE |
| 9/17/2014 | Martha Wright, et al | NOTICE OF EXPARTE |
| 9/17/2014 | Michelle Moore | LETTER |
| 9/16/2014 | Alex Friedmann | NOTICE OF EXPARTE |
| 9/16/2014 | CenturyLink | OTHER |
| 9/16/2014 | CenturyLink | OTHER |
| 9/15/2014 | Global Tel*Link, Securus and Telmate | LETTER |
| 9/12/2014 | Global Tel*Link Corporation | OTHER |
| 9/12/2014 | Telmate, LLC | OTHER |
| 9/3/2014 | Virginia Association of Counties | LETTER |
| 8/29/2014 | Inmate Calling Solutions, LLC | LETTER |
| 8/29/2014 | Lattice Incorporated | LETTER |
| 8/28/2014 | CenturyLink | NOTICE OF EXPARTE |
| 8/28/2014 | Inmate Calling Solutions, LLC | OTHER |
| 8/28/2014 | Lattice Incorporated | OTHER |
| 8/25/2014 | Inmate Calling Solutions, LLC | LETTER |
| 8/22/2014 | Global Tel*Link Corporation | REPORT |
| 8/22/2014 | Global Tel*Link Corporation | OTHER |
| 8/22/2014 | Inmate Calling Solutions, LLC | OTHER |
| 8/21/2014 | Combined Public Communications, Inc. | OTHER |
| 8/21/2014 | Correct Solutions, LLC | OTHER |
| 8/21/2014 | Correct Solutions, LLC | ERRATA, ERRATUM OR ADDENDUM |
| 8/20/2014 | Combined Public Communications, Inc. | OTHER |
| 8/20/2014 | Custom Teleconnect, Inc. | LETTER |
| 8/20/2014 | Lattice Incorporated | OTHER |

66

**JA68**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                              **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 8/20/2014 | Martha Wright, et al | OTHER |
| 8/20/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 8/19/2014 | Custom Teleconnect, Inc. | OTHER |
| 8/19/2014 | Inmate Calling Solutions, LLC d/b/a ICSolutions | OTHER |
| 8/19/2014 | Lattice Incorporated | OTHER |
| 8/19/2014 | Pay Tel Communications | OTHER |
| 8/19/2014 | Pay Tel Communications, Inc. | OTHER |
| 8/18/2014 | ATN INC | REPORT |
| 8/18/2014 | CenturyLink | OTHER |
| 8/18/2014 | CenturyLink | OTHER |
| 8/18/2014 | Correct Solutions, LLC | OTHER |
| 8/18/2014 | Correct Solutions, LLC | OTHER |
| 8/18/2014 | David Lindgren | COMMENT |
| 8/18/2014 | Inmate Calling Solutions, LLC | OTHER |
| 8/18/2014 | Martha Wright, et al | NOTICE OF EXPARTE |
| 8/18/2014 | Network Communications International Corp. | OTHER |
| 8/18/2014 | Pay Tel Communications, Inc. | OTHER |
| 8/18/2014 | Telmate, LLC | OTHER |
| 8/15/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 8/15/2014 | Securus Technologies, Inc. | REPLY |
| 8/14/2014 | CenturyLink | NOTICE OF EXPARTE |
| 8/14/2014 | Wireline Competition Bureau | ORDER |
| 8/12/2014 | Network Communications International Corp. | MOTION FOR EXTENSION OF TIME |
| 8/11/2014 | Cherie R. Kiser | NOTICE OF EXPARTE |
| 8/11/2014 | Cherie R. Kiser | NOTICE OF EXPARTE |
| 8/8/2014 | Global Tel*Link Corporation | MOTION FOR EXTENSION OF TIME |
| 8/8/2014 | Pay Tel Communications | REPLY |
| 8/8/2014 | Telmate, LLC | MOTION FOR EXTENSION OF TIME |
| 8/6/2014 | CenturyLink | MOTION FOR EXTENSION OF TIME |
| 8/6/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 8/6/2014 | Inmate Calling Solutions, LLC | MOTION FOR EXTENSION OF TIME |
| 8/6/2014 | Securus Technologies, Inc. | OTHER |
| 8/1/2014 | Coleman Bazelon | OTHER |
| 7/31/2014 | Pay Tel Communications, Inc. | LETTER |
| 7/31/2014 | Securus Technologies, Inc. | LETTER |
| 7/31/2014 | Wireline Competition Bureau | LETTER |
| 7/30/2014 | FCC | TRANSCRIPT |

67

**JA69**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/30/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/30/2014 | Securus Technologies, Inc. | OTHER |
| 7/30/2014 | Securus Technologies, Inc. | REPLY |
| 7/30/2014 | Securus Technologies, Inc. | LETTER |
| 7/24/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/23/2014 | Alex Friedmann | OPPOSITION |
| 7/23/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 7/21/2014 | National Association of Regulatory Utility Commissioners | NOTICE OF EXPARTE |
| 7/21/2014 | National Association of Regulatory Utility Commissioners | NOTICE OF EXPARTE |
| 7/17/2014 | Alex Friedmann | COMMENT |
| 7/17/2014 | Securus Technologies, Inc. | OTHER |
| 7/15/2014 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 7/14/2014 | Federal Communications Commission - Wireline | OTHER |
| 7/14/2014 | Federal Communications Commission - Wireline | OTHER |
| 7/14/2014 | Martha Wright, et al, Prison Policy Initiative, Human | NOTICE OF EXPARTE |
| 7/11/2014 | Wireline Competition Bureau | ORDER |
| 7/10/2014 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/10/2014 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/10/2014 | Telmate, LLC | MOTION FOR EXTENSION OF TIME |
| 7/9/2014 | Network Communications International Corp. | NOTICE OF EXPARTE |
| 7/9/2014 | United Church of Christ, OC Inc. | NOTICE OF EXPARTE |
| 7/8/2014 | Federal Communications Commission - Wireline | LETTER |
| 7/8/2014 | Prison Policy Initiative & Human Rights Defense Center | COMMENT |
| 7/8/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 7/7/2014 | Barbara Graves-Poller | COMMENT |
| 7/7/2014 | Inmate Calling Solutions, LLC | MOTION FOR EXTENSION OF TIME |
| 7/7/2014 | Mitchell R. Morrissey | STATEMENT |
| 7/7/2014 | Securus Technologies, Inc. | APPLICATION FOR REVIEW |
| 7/7/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 7/3/2014 | CenturyLink | MOTION FOR EXTENSION OF TIME |
| 7/3/2014 | Network Communications International Corp. | MOTION FOR EXTENSION OF TIME |
| 7/2/2014 | Paul Cain | LETTER |
| 7/1/2014 | Global Tel*Link Corporation | MOTION FOR EXTENSION OF TIME |
| 6/30/2014 | Alex Friedmann | COMMENT |
| 6/30/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 6/30/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**          **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 6/27/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/23/2014 | Ryan Feiock | COMMENT |
| 6/20/2014 | Prison Policy Initiative | COMMENT |
| 6/17/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/16/2014 | Wireline Competition Bureau | LETTER |
| 6/10/2014 | CenturyLink | NOTICE OF EXPARTE |
| 6/9/2014 | Katherine P Nicholson | COMMENT |
| 6/6/2014 | Wireline Competition Bureau | ORDER |
| 6/3/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 6/2/2014 | Clayton Chan | COMMENT |
| 5/30/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 5/29/2014 | Representative Higgins | CONGRESSIONAL CORRESPONDENCE |
| 5/29/2014 | Senator Stabenow | CONGRESSIONAL CORRESPONDENCE |
| 5/23/2014 | CenturyLink | NOTICE OF EXPARTE |
| 5/21/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 5/19/2014 | Pay Tel Communications, Inc. | COMMENT |
| 5/16/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 5/15/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 5/12/2014 | Wireline Competition Bureau | OTHER |
| 5/12/2014 | Wireline Competition Bureau | OTHER |
| 5/7/2014 | William Chandler | COMMENT |
| 5/6/2014 | Century | NOTICE OF EXPARTE |
| 5/2/2014 | Emily Townsend | COMMENT |
| 5/2/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 4/24/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 4/23/2014 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 4/22/2014 | Office of Communications and Business Op | OTHER |
| 4/17/2014 | Martha Wright, et al | NOTICE OF EXPARTE |
| 4/15/2014 | FCC/WCB Staff | LETTER |
| 4/15/2014 | Jeffrey C. Hunter | COMMENT |
| 4/2/2014 | CenturyLink | NOTICE OF EXPARTE |
| 3/31/2014 | Columbia County Sheriff's Office | NOTICE OF EXPARTE |
| 3/31/2014 | Jennie Pfeiffer | COMMENT |
| 3/28/2014 | Representative Griffith | CONGRESSIONAL CORRESPONDENCE |
| 3/28/2014 | Representative Hanna | CONGRESSIONAL CORRESPONDENCE |
| 3/28/2014 | Representative Hanna | CONGRESSIONAL CORRESPONDENCE |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024          Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/28/2014 | Representative Owens | CONGRESSIONAL CORRESPONDENCE |
| 3/28/2014 | Representative Visclosky | CONGRESSIONAL CORRESPONDENCE |
| 3/28/2014 | Representative Walorski | CONGRESSIONAL CORRESPONDENCE |
| 3/25/2014 | Allegany County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Caldwell County Sheriffs Office | NOTICE OF EXPARTE |
| 3/25/2014 | California State Sheriffs' Association | NOTICE OF EXPARTE |
| 3/25/2014 | Chautauqua Co. Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Clallam County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Clay County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Crawford County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Dan Watts, Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Department of Corrections Okaloosa County | NOTICE OF EXPARTE |
| 3/25/2014 | Dickson County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Essex County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Garfield County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Genesee County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Gila County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Hernando County Sheriff Office | NOTICE OF EXPARTE |
| 3/25/2014 | Illinois Sheriff's Association | NOTICE OF EXPARTE |
| 3/25/2014 | Jack Weisenburger | NOTICE OF EXPARTE |
| 3/25/2014 | Joy Guy, Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Kirk A. Wakefield | NOTICE OF EXPARTE |
| 3/25/2014 | Lake County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Las Vegas Metropolitan Police Department | NOTICE OF EXPARTE |
| 3/25/2014 | Len Hagaman, Jr., Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Lincoln County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Madison County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Martha Wright, et al. | OTHER |
| 3/25/2014 | McKean County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Minnesota Sheriffs Association | NOTICE OF EXPARTE |
| 3/25/2014 | Minnesota Sheriffs Association | NOTICE OF EXPARTE |
| 3/25/2014 | Monroe County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Monroe County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Northampton County Sheriff Office | NOTICE OF EXPARTE |
| 3/25/2014 | Office of Sheriff County of Ontario | NOTICE OF EXPARTE |
| 3/25/2014 | Oklahoma County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Otero County Sheriff, La Junta, Co | NOTICE OF EXPARTE |
| 3/25/2014 | Palm Beach County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Paulding County Sheriff's Department | NOTICE OF EXPARTE |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/25/2014 | Perry County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Salina County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Sangamon County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Gary Bettencourt | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Grady Judd | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Hendry County | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Jack Mahar | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff John M York | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Ken J. Mascara | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Kevin A. Mulverhill | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Kevin E. Walsh | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff of Douglas County Kansas | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff of Elbert County Ga, et al. | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff of Levy County | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff of Santa Rosa County | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff of Swain County, NC | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff of Wakulla County | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Paul VanBlarcum | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Rob Street | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff Ron Spike | NOTICE OF EXPARTE |
| 3/25/2014 | sheriff Tim Wilkerson | NOTICE OF EXPARTE |
| 3/25/2014 | Sheriff William E Yessman Jr. | NOTICE OF EXPARTE |
| 3/25/2014 | Steuben County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Storey County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Suwannee County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | Tallapoosa County Sheriff's Department | NOTICE OF EXPARTE |
| 3/25/2014 | Trego County Sheriff | NOTICE OF EXPARTE |
| 3/25/2014 | UnKnown | NOTICE OF EXPARTE |
| 3/25/2014 | Vigo County Sheriff's Offfice | NOTICE OF EXPARTE |
| 3/25/2014 | Washita County Sheriff's Dept | NOTICE OF EXPARTE |
| 3/25/2014 | Wayne County Sheriff's Office | NOTICE OF EXPARTE |
| 3/25/2014 | Woodard County Sheriff | NOTICE OF EXPARTE |
| 3/20/2014 | Global Tel*Link Corporation | COMMENT |
| 3/20/2014 | Securus Technologies, Inc. | COMMENT |
| 3/20/2014 | Telmate, LLC | COMMENT |
| 3/18/2014 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 3/18/2014 | Martha Wright, et al | REPLY TO COMMENTS |
| 3/18/2014 | Network Communications International Corp. | COMMENT |
| 3/18/2014 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 3/18/2014 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 3/13/2014 | Wireline Competition Bureau | LETTER |
| 3/13/2014 | Wireline Competition Bureau | LETTER |

**JA73**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/11/2014 | CenturyLink | COMMENT |
| 3/11/2014 | FCC/WCB Staff | LETTER |
| 3/11/2014 | FCC/WCB Staff | LETTER |
| 3/11/2014 | Martha Wright, et al | COMMENT |
| 3/10/2014 | Securus Technologies, Inc. | LETTER |
| 3/10/2014 | Ulster County Legislature | NOTICE OF EXPARTE |
| 3/10/2014 | Wireleine Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/10/2014 | Wireline Competition Bureau | LETTER |
| 3/7/2014 | Christopher Thomas | COMMENT |
| 3/5/2014 | Senator Burr | CONGRESSIONAL CORRESPONDENCE |
| 3/5/2014 | Senator Burr | CONGRESSIONAL CORRESPONDENCE |
| 3/4/2014 | Securus Technologies, Inc. | LETTER |
| 3/4/2014 | Wireline Competition Bureau | PUBLIC NOTICE |
| 2/28/2014 | Jennifer Lyon | COMMENT |
| 2/28/2014 | Martha Wright, et al | OPPOSITION |
| 2/27/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 2/26/2014 | Idaho Department of Correction | COMMENT |
| 2/24/2014 | Commonwealth of Massachusetts Sheriff of Hampden | OTHER |
| 2/21/2014 | John A Garner | MOTION FOR PRODUCTION OF DOCUMENTS |
| 2/21/2014 | Scott Schneider | COMMENT |
| 2/19/2014 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 2/19/2014 | Securus Technologies, Inc. | PETITION |
| 2/12/2014 | Office of the Sheriff of Dukes County | OTHER |
| 2/11/2014 | American Jail Association | NOTICE OF EXPARTE |
| 2/11/2014 | Mmoja ajabu | COMMENT |
| 2/11/2014 | Wireline Competition Bureau | ORDER |
| 2/10/2014 | Florida Sheriffs Association | NOTICE OF EXPARTE |

**JA74**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 2/10/2014 | Securus Technologies, Inc. | LETTER |
| 2/5/2014 | Betty Hicks | COMMENT |
| 2/5/2014 | Florida Sheriffs Association | LETTER |
| 2/5/2014 | Mr. Darts | COMMENT |
| 2/3/2014 | Colorado Jail Association | OTHER |
| 2/3/2014 | sunshine martinez | COMMENT |
| 1/30/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/30/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/28/2014 | CenturyLink Public Communications, Inc. | LETTER |
| 1/28/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/27/2014 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 1/27/2014 | Office of The Sheriff Ulster County | OTHER |
| 1/24/2014 | Federal Bureau of Prisons | COMMENT |
| 1/23/2014 | Delaware County District Attorney | OTHER |
| 1/23/2014 | Pay Tel Communications | NOTICE OF EXPARTE |
| 1/22/2014 | Arkansas Department of Correction | COMMENT |
| 1/22/2014 | John Hawkins | COMMENT |
| 1/22/2014 | Office of The Sheriff County of Oneida | OTHER |
| 1/22/2014 | Office of The Sheriff County of Oneida | OTHER |
| 1/22/2014 | Office of the Sheriff County of Oneida | OTHER |
| 1/22/2014 | Office of The Sheriff County of Oneida | OTHER |
| 1/22/2014 | Office of The Sheriff County of Oneida | OTHER |
| 1/22/2014 | Office of The Sheriff County of Oneida | OTHER |
| 1/22/2014 | Office of The Sheriff County of Rockland | OTHER |
| 1/22/2014 | Office of The Sheriff Steuben County | OTHER |
| 1/22/2014 | Office of The Sheriff Steuben County | OTHER |
| 1/22/2014 | Office of The Sheriff Steuben County | OTHER |
| 1/22/2014 | Office of The Sheriff Steuben County | OTHER |
| 1/22/2014 | Office of The Sheriff Steuben County | OTHER |
| 1/22/2014 | Office of The Sheriff Steuben County | OTHER |
| 1/22/2014 | Pay Tel Communications | REPLY TO COMMENTS |
| 1/22/2014 | Representative Maffei | CONGRESSIONAL CORRESPONDENCE |
| 1/22/2014 | Representative Nugent | CONGRESSIONAL CORRESPONDENCE |
| 1/22/2014 | Securus Technologies, Inc. | COMMENT |
| 1/22/2014 | Sheriff's Office Livingston County | OTHER |
| 1/17/2014 | County Sheriff of Washington County New York | OTHER |
| 1/17/2014 | Pay Tel Communications, Inc. | LETTER |
| 1/17/2014 | Pay Tel Communications, Inc. | REQUEST |
| 1/17/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/16/2014 | Martha Wright, et al | COMMENT |

**JA75**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 1/16/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/16/2014 | Pay Tel Communications, Inc. | NOTICE OF EXPARTE |
| 1/16/2014 | Securus Technologies, Inc. | COMMENT |
| 1/16/2014 | Sheriff of Wyoming County | OTHER |
| 1/15/2014 | Allegany County Sheriff | OTHER |
| 1/15/2014 | Cattaraugus County Sheriff's Office | OTHER |
| 1/15/2014 | Delaware County Sheriff's Office | OTHER |
| 1/15/2014 | Representative Nugent | CONGRESSIONAL CORRESPONDENCE |
| 1/14/2014 | Delaware County Board of Supervisors | OTHER |
| 1/14/2014 | Global Tel*Link Corporation | LETTER |
| 1/14/2014 | Office of The Sheriff County of Madison | OTHER |
| 1/14/2014 | St. Lawrence County Sheriff's Office | OTHER |
| 1/13/2014 | Alex Friedmann | COMMENT |
| 1/13/2014 | Arkansas Department of Correction | COMMENT |
| 1/13/2014 | CenturyLink | REPLY |
| 1/13/2014 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 1/13/2014 | Martha Wright, et al | REPLY |
| 1/13/2014 | National Sheriffs' Association | REPLY TO COMMENTS |
| 1/13/2014 | New York Westchester County Department of Correction | PETITION |
| 1/13/2014 | NJ Institute For Social Justice | COMMENT |
| 1/13/2014 | Office of The Sheriff Chautauque County | OTHER |
| 1/13/2014 | Pay Tel Communications, Inc. | REPLY TO COMMENTS |
| 1/13/2014 | Prison Policy Initiative | REPLY TO COMMENTS |
| 1/13/2014 | Prison Policy Initiative | REPLY TO COMMENTS |
| 1/13/2014 | Schoharie County Sheriff's Office | OTHER |
| 1/13/2014 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 1/13/2014 | Talila A. Lewis | REPLY |
| 1/13/2014 | Telmate, LLC | COMMENT |
| 1/10/2014 | AT&T Services Inc. | NOTICE OF EXPARTE |
| 1/9/2014 | Montana Public Service Commission | REPLY TO COMMENTS |
| 1/8/2014 | Pay Tel Communications | PETITION FOR WAIVER |
| 1/8/2014 | Pay Tel Communications | SUPPLEMENT |
| 1/8/2014 | Prison Policy Initiative | COMMENT |
| 1/7/2014 | Maryland Sheriffs' Association, Inc. | LETTER |
| 12/31/2013 | John E. Hatt | COMMENT |
| 12/31/2013 | Solano County Sheriff's Office | LETTER |
| 12/30/2013 | Raymond C. Walen | COMMENT |
| 12/27/2013 | Onondaga County Sheriff's Office | LETTER |
| 12/26/2013 | Annette Russ | COMMENT |
| 12/26/2013 | Gregory Thomas | LETTER |
| 12/26/2013 | James D. Hardin | LETTER |

**JA76**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                                        Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/26/2013 | Michigan Sheriffs' Association | LETTER |
| 12/24/2013 | Raymond C. Walen, Jr | COMMENT |
| 12/23/2013 | Antonio Johnson | LETTER |
| 12/23/2013 | Helping Educate to Advance the Rights of the Deaf - | LETTER |
| 12/23/2013 | New York State Senate | LETTER |
| 12/23/2013 | Talila A. Lewis | COMMENT |
| 12/23/2013 | US Conference of Catholic Bishops | COMMENT |
| 12/20/2013 | Alex Friedmann | COMMENT |
| 12/20/2013 | American Civil Liberties Union | COMMENT |
| 12/20/2013 | American Jail Association | COMMENT |
| 12/20/2013 | Campaign for Prison Phone Justice, Free Press, UCC OC | COMMENT |
| 12/20/2013 | CenturyLink | COMMENT |
| 12/20/2013 | CenturyLink | OTHER |
| 12/20/2013 | Correctional Institutions | COMMENT |
| 12/20/2013 | Global Tel*Link Corporation | COMMENT |
| 12/20/2013 | Karen Doss-Harbison | COMMENT |
| 12/20/2013 | Kimberly Boone | COMMENT |
| 12/20/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 12/20/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 12/20/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 12/20/2013 | Martha Wright, et al | COMMENT |
| 12/20/2013 | Michelle Miles | COMMENT |
| 12/20/2013 | National Association of Regulatory Utility Commissioners | COMMENT |
| 12/20/2013 | Network Communications International Corp. | COMMENT |
| 12/20/2013 | Network Communications International Corp. | EXHIBIT |
| 12/20/2013 | Ohio Department of Rehabilitation and Correction | COMMENT |
| 12/20/2013 | Pay Tel Communications | COMMENT |
| 12/20/2013 | Prince William - Manassas Regional Adult Detention | COMMENT |
| 12/20/2013 | Prison Phone Justice, Free Press, UCC OC Inc., et al. | COMMENT |
| 12/20/2013 | Prison Policy Initiative | COMMENT |
| 12/20/2013 | Securus Technologies, Inc. | COMMENT |
| 12/20/2013 | Stephen A. Raher | COMMENT |
| 12/20/2013 | Telmate, LLC | COMMENT |
| 12/20/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 12/19/2013 | Los Angeles County Sheriffs Department | OTHER |
| 12/19/2013 | Onondaga County Sheriff's Office | LETTER |
| 12/19/2013 | Onondaga County Sheriff's Office | LETTER |
| 12/19/2013 | Wireline Competition Bureau | ORDER |
| 12/18/2013 | Beth Allen | COMPLAINT |
| 12/18/2013 | Elizabeth Matos | COMMENT |
| 12/18/2013 | Houston County Sheriff's Office Detention Center | COMMENT |
| 12/18/2013 | Joanne Neale | COMMENT |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/18/2013 | Jonathan O'Hara | COMMENT |
| 12/18/2013 | JUAN VAUGHAN | COMMENT |
| 12/18/2013 | National Sheriffs' Association | COMMENT |
| 12/17/2013 | Deborah Aylor-Polisoto | COMMENT |
| 12/17/2013 | L Miller | COMMENT |
| 12/17/2013 | Marilyn McCarty | COMMENT |
| 12/17/2013 | Sharon Bourke | COMMENT |
| 12/17/2013 | Vania Gulston | COMMENT |
| 12/16/2013 | County of Roanoke, VA Office of the Sheriff | LETTER |
| 12/16/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 12/16/2013 | Mindy Stone | COMMENT |
| 12/13/2013 | Chief Deputy Max Bartlett | COMMENT |
| 12/13/2013 | John A. Garner | COMMENT |
| 12/13/2013 | LatinoJustice PRLDEF | COMMENT |
| 12/13/2013 | Michigan Sheriffs Association | COMMENT |
| 12/13/2013 | National Sheriff's Association | PETITION FOR RECONSIDERATION |
| 12/13/2013 | Network Communications International Corp. | PETITION FOR RECONSIDERATION |
| 12/13/2013 | New Jersey Advocates for Immigrant Detainees and NYU | COMMENT |
| 12/13/2013 | Prison Policy Initiative and SumOfUs | COMMENT |
| 12/13/2013 | THe GEO Group, Inc. | COMMENT |
| 12/12/2013 | DisAbility Rights Idaho | COMMENT |
| 12/12/2013 | Edward Potter | COMMENT |
| 12/12/2013 | Massachusetts Department of Telecommunications and | COMMENT |
| 12/12/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 12/12/2013 | Rebekah Cash | COMMENT |
| 12/12/2013 | Sheriff Mike Rainey | COMMENT |
| 12/12/2013 | WA State Department of Corrections | COMMENT |
| 12/12/2013 | Wireline Competition Bureau | ORDER |
| 12/11/2013 | Arizona Detention Association, Vice Chairman, | LETTER |
| 12/11/2013 | California State Sheriffs' Association | COMMENT |
| 12/11/2013 | Jay V. Yunitz | COMMENT |
| 12/11/2013 | Martha Wright, et al | STATEMENT |
| 12/11/2013 | Pamunkey Regional Jail | COMMENT |
| 12/11/2013 | Protocall | COMMENT |
| 12/11/2013 | Public Service Commission of the District of Columbia | COMMENT |
| 12/11/2013 | Randall C. Wall | COMMENT |
| 12/11/2013 | Sheriff B J Barnes | COMMENT |
| 12/9/2013 | Christopher M. Rodland | COMMENT |
| 12/9/2013 | Correctional Institutions | LETTER |
| 12/9/2013 | Global Tel*Link Corporation | LETTER |

**JA78**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 12/9/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 12/9/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 12/9/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 12/9/2013 | Sheriff William T. Schatzman | COMMENT |
| 12/6/2013 | Ohio Department of Rehabilitation & Correction | MOTION FOR EXTENSION OF TIME |
| 12/5/2013 | AT&T Services, Inc. | NOTICE OF EXPARTE |
| 12/4/2013 | Martha Wright, et al | OPPOSITION |
| 12/4/2013 | Network Communications International Corp. | COMMENT |
| 12/3/2013 | James H. H. Lampert | COMMENT |
| 12/3/2013 | Martha Wright, et al | OPPOSITION |
| 12/3/2013 | Pitt County, North Carolina Office of the Sheriff | LETTER |
| 12/2/2013 | Chad Clary | COMMENT |
| 12/2/2013 | David Honig | NOTICE OF EXPARTE |
| 12/2/2013 | David Honig | NOTICE OF EXPARTE |
| 12/2/2013 | Doug Lande | COMMENT |
| 12/2/2013 | Guy H. Short | COMMENT |
| 12/2/2013 | Idaho Department of Correction | COMMENT |
| 12/2/2013 | John T. Vance | LETTER |
| 11/27/2013 | Alexander County Detention Center | LETTER |
| 11/27/2013 | CenturyLink | PETITION |
| 11/27/2013 | Kenneth Sealey-Sheriff, George Kenworthy- Jail | COMMENT |
| 11/26/2013 | Lorenzo L. Stone | LETTER |
| 11/26/2013 | MADELINE EYSIE | COMMENT |
| 11/26/2013 | Pay Tel Communications | PETITION |
| 11/25/2013 | Global Tel*Link | NOTICE OF EXPARTE |
| 11/25/2013 | Larry Randlett | LETTER |
| 11/25/2013 | Numerous | LETTER |
| 11/25/2013 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 11/22/2013 | United Church of Christ, OC Inc. | NOTICE OF EXPARTE |
| 11/21/2013 | Gerald Niles | LETTER |
| 11/21/2013 | Wireline Competition Bureau | ORDER |
| 11/20/2013 | JEFFREY S. FEWELL | COMMENT |
| 11/20/2013 | Numerous | LETTER |
| 11/20/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 11/20/2013 | R. Allen | COMMENT |
| 11/19/2013 | Martha Wright, et al | OPPOSITION |
| 11/18/2013 | Global Tel*Link | NOTICE OF EXPARTE |
| 11/15/2013 | Andrew G. Osmun | COMMENT |
| 11/14/2013 | Global Tel*Link | NOTICE OF EXPARTE |
| 11/14/2013 | Global Tel*Link | NOTICE OF EXPARTE |
| 11/13/2013 | Robert Brassell | COMMENT |

**JA79**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 11/13/2013 | Victoria Anonymous | COMMENT |
| 11/13/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 11/12/2013 | Correctional Institutions | PETITION |
| 11/12/2013 | Numerous | LETTER |
| 11/7/2013 | Global Tel*Link | NOTICE OF EXPARTE |
| 11/6/2013 | amalia deloney | LETTER |
| 11/6/2013 | Martha Wright, et al | OPPOSITION |
| 11/6/2013 | Wireline Competition Bureau | ERRATA, ERRATUM OR ADDENDUM |
| 11/4/2013 | Aaron D. Kennard , ET AL | LETTER |
| 11/4/2013 | American Jail Association | COMMENT |
| 11/1/2013 | Charles Seelig | COMMENT |
| 10/31/2013 | National Sheriffs' Association | COMMENT |
| 10/30/2013 | Global Tel*Link | PETITION |
| 10/29/2013 | Martha Wright, et al | OPPOSITION |
| 10/29/2013 | Martha Wright, et al | OPPOSITION |
| 10/23/2013 | Jason Walach | LETTER |
| 10/23/2013 | Shawn Moss | LETTER |
| 10/22/2013 | Numerous | LETTER |
| 10/22/2013 | Securus Technologies, Inc. | PETITION |
| 10/22/2013 | Securus Technologies, Inc. | PETITION |
| 10/22/2013 | Wireline Competition Bureau | ERRATA, ERRATUM OR ADDENDUM |
| 9/30/2013 | Christopher Thomas | COMMENT |
| 9/30/2013 | Clarence A. Yates | LETTER |
| 9/30/2013 | Numerous | LETTER |
| 9/30/2013 | Ralph C. Kimpton | LETTER |
| 9/30/2013 | Tyrone Wheatley | LETTER |
| 9/30/2013 | Zachary L. Wilson | LETTER |
| 9/27/2013 | Hameen Stewart | LETTER |
| 9/17/2013 | Numerous | COMMENT |
| 9/16/2013 | Arizona Department of Corrections | COMMENT |
| 9/16/2013 | Numerous | COMMENT |
| 9/10/2013 | Larry Randlett | COMMENT |
| 9/9/2013 | Lisa Tillis | COMMENT |
| 9/9/2013 | Numerous | COMMENT |
| 9/6/2013 | Richard B. Reichart | COMMENT |
| 9/5/2013 | Cathryne | COMMENT |
| 9/5/2013 | Numerous | COMMENT |
| 9/4/2013 | Emily Sowers | COMMENT |
| 9/3/2013 | Numerous | COMMENT |
| 8/27/2013 | Numerous | COMMENT |

**JA80**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 8/27/2013 | Porter County Sheriffs Department | COMMENT |
| 8/26/2013 | Leroy Johnson | COMMENT |
| 8/26/2013 | William Johnson | COMMENT |
| 8/22/2013 | Mark Hodges | COMMENT |
| 8/21/2013 | neil williamson | COMMENT |
| 8/19/2013 | Judy Krajenka | COMMENT |
| 8/13/2013 | Los Angeles County Sheriff's Department | LETTER |
| 8/9/2013 | Wireline Competition Bureau | OTHER |
| 8/8/2013 | Diane Wilson | COMMENT |
| 8/7/2013 | Free Polazzo | COMMENT |
| 8/7/2013 | Ken Hayes | COMMENT |
| 8/7/2013 | Nils Pearson | COMMENT |
| 8/5/2013 | Consumer Advisory Committee | NOTICE OF EXPARTE |
| 8/5/2013 | Nile Elam | COMMENT |
| 8/2/2013 | amalia deloney | NOTICE OF EXPARTE |
| 8/2/2013 | CenturyLink | NOTICE OF EXPARTE |
| 8/2/2013 | Leadership Conference on Civil and Human Rights | NOTICE OF EXPARTE |
| 8/2/2013 | Martha Wright | NOTICE OF EXPARTE |
| 8/2/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 8/2/2013 | Network Communications International Corp. | COMMENT |
| 8/2/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 8/2/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 8/1/2013 | CenturyLink | NOTICE OF EXPARTE |
| 8/1/2013 | Network Communications International Corp. | REPLY TO COMMENTS |
| 8/1/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 8/1/2013 | Prison Policy Initiative | LETTER |
| 8/1/2013 | Prison Policy Initiative | COMMENT |
| 8/1/2013 | United Church of Christ, OC Inc. | LETTER |
| 7/31/2013 | JLG Technologies, LLC | NOTICE OF EXPARTE |
| 7/31/2013 | Michael S. Hamden | COMMENT |
| 7/31/2013 | Michael S. Hamden | COMMENT |
| 7/31/2013 | Michael S. Hamden | COMMENT |
| 7/31/2013 | National Sheriffs' Association | NOTICE OF EXPARTE |
| 7/31/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/30/2013 | JLG Technologies, LLC | NOTICE OF EXPARTE |
| 7/30/2013 | JLG Technologies, LLC | NOTICE OF EXPARTE |
| 7/30/2013 | JLG Technologies, LLC | NOTICE OF EXPARTE |
| 7/29/2013 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 7/26/2013 | CenturyLink | NOTICE OF EXPARTE |
| 7/26/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/26/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/26/2013 | Pay Tel Communications | NOTICE OF EXPARTE |

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                              Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/26/2013 | Telmate, LLC | NOTICE OF EXPARTE |
| 7/26/2013 | Telmate, LLC | NOTICE OF EXPARTE |
| 7/26/2013 | Telmate, LLC | NOTICE OF EXPARTE |
| 7/25/2013 | NASUCA | COMMENT |
| 7/25/2013 | Telmate, LLC | NOTICE OF EXPARTE |
| 7/24/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 7/24/2013 | Pay Tel Communications, Inc. | OTHER |
| 7/24/2013 | Pay Tel Communications, Inc. | OTHER |
| 7/24/2013 | Pay Tel Communications, Inc. | REQUEST |
| 7/24/2013 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 7/23/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 7/22/2013 | CenturyLink | NOTICE OF EXPARTE |
| 7/18/2013 | JLG Technologies | COMMENT |
| 7/18/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 7/18/2013 | NASUCA | COMMENT |
| 7/18/2013 | Network Communications International Corp. | COMMENT |
| 7/18/2013 | Securus Technologies, Inc. | OTHER |
| 7/17/2013 | Global Tel*Link Corporation | COMMENT |
| 7/17/2013 | JLG Technologies, LLC | COMMENT |
| 7/17/2013 | Marcus Spectrum Solutions LLC | COMMENT |
| 7/17/2013 | Martha Wright, et al | COMMENT |
| 7/17/2013 | Pay Tel Communications | COMMENT |
| 7/17/2013 | Prison Policy Initiative | COMMENT |
| 7/17/2013 | Prison Policy Initiative | COMMENT |
| 7/17/2013 | Prison Policy Initiative | COMMENT |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | FCC/WCB Staff | SUBMISSION FOR THE RECORD |
| 7/16/2013 | Justice Fellowship | REQUEST |

**JA82**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 7/16/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 7/16/2013 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 7/15/2013 | FCC/WCB Staff | TRANSCRIPT |
| 7/15/2013 | Herman L. Nitz, Jr. | COMMENT |
| 7/12/2013 | Jason Marks | NOTICE OF EXPARTE |
| 7/11/2013 | Deborah Munson-Cardenas | SUBMISSION FOR THE RECORD |
| 7/10/2013 | United Church of Christ, OC Inc. | TESTIMONY |
| 7/9/2013 | Securus Technologies, Inc. | LETTER |
| 7/8/2013 | Inside Connect, d/b/a Jail Calls | COMMENT |
| 7/8/2013 | Securus Technologies, Inc. | LETTER |
| 7/8/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 7/5/2013 | Jasa Gathern Wallace | COMMENT |
| 7/5/2013 | Prison Policy Initiative | COMMENT |
| 7/3/2013 | Fernando Camilo | LETTER |
| 7/3/2013 | Joseph Vitale | COMMENT |
| 7/3/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 7/1/2013 | Numerous | COMMENT |
| 6/26/2013 | Christian White | LETTER |
| 6/26/2013 | Global Tel*Link Corporation | NOTICE OF EXPARTE |
| 6/26/2013 | Numerous | LETTER |
| 6/26/2013 | Tersa Williams | COMMENT |
| 6/26/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/26/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/21/2013 | American Jail Association | COMMENT |
| 6/21/2013 | Wireline Competition Bureau | LETTER |
| 6/19/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 6/18/2013 | Nile Elam | NOTICE OF EXPARTE |
| 6/17/2013 | Byron Williams | COMMENT |
| 6/17/2013 | Ernest Viturino | COMMENT |
| 6/17/2013 | Tyrone L. Burlesan | COMMENT |
| 6/17/2013 | Yotuhel Montane | COMMENT |
| 6/13/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 6/10/2013 | Human Rights Defense Center | NOTICE OF EXPARTE |
| 6/10/2013 | Numerous | COMMENT |
| 6/6/2013 | Wireline Competition Bureau | LETTER |
| 5/31/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 5/31/2013 | Pay Tel Communications | NOTICE OF EXPARTE |
| 5/31/2013 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 5/30/2013 | CenturyLink | NOTICE OF EXPARTE |
| 5/29/2013 | Dusten Davis | LETTER |
| 5/28/2013 | Numerous | LETTER |

**JA83**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                 Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 5/23/2013 | Martimoz Brown | LETTER |
| 5/23/2013 | Michael Millspaugh | COMMENT |
| 5/20/2013 | Corey Brown | LETTER |
| 5/20/2013 | Numerous | LETTER |
| 5/16/2013 | Numerous | LETTER |
| 5/15/2013 | Free Press | NOTICE OF EXPARTE |
| 5/14/2013 | Leadership Conference on Civil and Human Rights | NOTICE OF EXPARTE |
| 5/13/2013 | Mira Rainey | COMMENT |
| 5/13/2013 | Powhatan Correctional Center | COMMENT |
| 5/13/2013 | The Leadership Conference on Civil and Human Rights | NOTICE OF EXPARTE |
| 5/9/2013 | Prison Policy Initiative | COMMENT |
| 5/6/2013 | Joseph Oye Ozuntodu | LETTER |
| 5/6/2013 | NAACP | LETTER |
| 5/3/2013 | Numerous | LETTER |
| 5/1/2013 | Numerous | LETTER |
| 4/30/2013 | David J. Hodges | LETTER |
| 4/30/2013 | Martha Wright, et al | NOTICE OF EXPARTE |
| 4/29/2013 | Frederick Trons | LETTER |
| 4/29/2013 | Mary R. Gorman | LETTER |
| 4/29/2013 | Numerous | LETTER |
| 4/29/2013 | The Leadership Conference on Civil and Human Rights | COMMENT |
| 4/23/2013 | American Civil Liberties Union of Delaware | LETTER |
| 4/23/2013 | The Congressional Black Caucus | COMMENT |
| 4/22/2013 | Alabama Sheriffs' Association | COMMENT |
| 4/22/2013 | Alex Friedmann | COMMENT |
| 4/22/2013 | Artika Tyner | REPLY TO COMMENTS |
| 4/22/2013 | Clackamas County Sheriff's Office | COMMENT |
| 4/22/2013 | Cmdr Mike Anderson | COMMENT |
| 4/22/2013 | Coconino County Sheriff's Office | COMMENT |
| 4/22/2013 | Congressional Black Caucus | COMMENT |
| 4/22/2013 | Congressional Black Caucus | COMMENT |
| 4/22/2013 | Deschutes County Sheriff's Office | COMMENT |
| 4/22/2013 | Elmore County Sheriff | COMMENT |
| 4/22/2013 | Global Tel*Link Corporation | REPLY TO COMMENTS |
| 4/22/2013 | Idaho Sheriffs' Association | COMMENT |
| 4/22/2013 | Lake County Sheriff's Office | COMMENT |
| 4/22/2013 | Marion County Detention Center | COMMENT |
| 4/22/2013 | MARTHA WRIGHT, ET AL., | REPLY TO COMMENTS |
| 4/22/2013 | Michael S. Hamden | REPLY TO COMMENTS |
| 4/22/2013 | National Association of Regulatory Utility Commissioners | COMMENT |
| 4/22/2013 | New Jersey Institute for Social Justice | REPLY TO COMMENTS |
| 4/22/2013 | Oregon State Sheriffs' Association | COMMENT |

**JA84**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 4/22/2013 | Pay Tel Communications | REPLY TO COMMENTS |
| 4/22/2013 | Public Interest Groups | COMMENT |
| 4/22/2013 | Rock County Sheriff | COMMENT |
| 4/22/2013 | Securus Technologies, Inc. | REPLY TO COMMENTS |
| 4/22/2013 | Stephen A. Raher | REPLY TO COMMENTS |
| 4/22/2013 | Telmate, LLC | COMMENT |
| 4/22/2013 | Thurston County Sheriff's Office | COMMENT |
| 4/18/2013 | NASUCA | REPLY TO COMMENTS |
| 4/18/2013 | National Consumers League | REPLY TO COMMENTS |
| 4/17/2013 | Numerous | LETTER |
| 4/17/2013 | Public Knowledge | LETTER |
| 4/15/2013 | cindy harris | COMMENT |
| 4/15/2013 | Numerous | LETTER |
| 4/9/2013 | Numerous | LETTER |
| 4/9/2013 | Numerous | LETTER |
| 4/8/2013 | Numerous | LETTER |
| 4/5/2013 | Numerous | LETTER |
| 4/2/2013 | Mary Gottschalk | COMMENT |
| 4/2/2013 | Numerous | LETTER |
| 4/2/2013 | Saoirse Folsom | COMMENT |
| 4/1/2013 | Numerous | LETTER |
| 3/29/2013 | Curtis Decker | COMMENT |
| 3/29/2013 | Numerous | LETTER |
| 3/28/2013 | Dwayne Arndt | LETTER |
| 3/28/2013 | Numerous | LETTER |
| 3/28/2013 | Verizon | NOTICE OF EXPARTE |
| 3/27/2013 | Gregory Conley | LETTER |
| 3/27/2013 | Numerous | LETTER |
| 3/27/2013 | Securus Technologies, Inc. | SUPPLEMENT |
| 3/26/2013 | Numerous | LETTER |
| 3/26/2013 | Numerous | LETTER |
| 3/26/2013 | Rev. Sandra Decker | COMMENT |
| 3/25/2013 | Adrienne Lauby | COMMENT |
| 3/25/2013 | Akio Tanaka | COMMENT |
| 3/25/2013 | Alex Friedmann | COMMENT |
| 3/25/2013 | amalia deloney | COMMENT |
| 3/25/2013 | amalia deloney | COMMENT |
| 3/25/2013 | American Immigration Lawyers Association | COMMENT |
| 3/25/2013 | Brian Carr | COMMENT |
| 3/25/2013 | California Department of Corrections and Rehabilitation | COMMENT |
| 3/25/2013 | Center on the Administration of Criminal Law | COMMENT |
| 3/25/2013 | CenturyLink | COMMENT |

**JA85**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/25/2013 | Colin G. Gallagher | COMMENT |
| 3/25/2013 | Community Initiatives for Visiting Immigrants in | COMMENT |
| 3/25/2013 | Connie J. Goodspeed | COMMENT |
| 3/25/2013 | CREDO Mobile | COMMENT |
| 3/25/2013 | David Troupe | COMMENT |
| 3/25/2013 | Debra Washington | COMMENT |
| 3/25/2013 | Derrick James | COMMENT |
| 3/25/2013 | Dr. Artika R. Tyner | COMMENT |
| 3/25/2013 | Elizabeth Kroboth | COMMENT |
| 3/25/2013 | Elizabeth Matos | COMMENT |
| 3/25/2013 | Ellen Whitt | COMMENT |
| 3/25/2013 | Global Tel*Link Corporation | COMMENT |
| 3/25/2013 | Helping Educate to Advance the Rights of the Deaf | COMMENT |
| 3/25/2013 | Indiana Utility Regulatory Commission | COMMENT |
| 3/25/2013 | Jamada Farmer | COMMENT |
| 3/25/2013 | James Mosley | COMMENT |
| 3/25/2013 | Jesselyn McCurdy | COMMENT |
| 3/25/2013 | Jordan Wells | COMMENT |
| 3/25/2013 | Joseph Newbold | LETTER |
| 3/25/2013 | Karina Wilkinson | COMMENT |
| 3/25/2013 | Kim Lehmkuhl, ColorOfChange.org | COMMENT |
| 3/25/2013 | Kim Reliford | COMMENT |
| 3/25/2013 | LeeAnn Taylor | COMMENT |
| 3/25/2013 | Levi Albert | COMMENT |
| 3/25/2013 | Louisiana Department of Corrections | COMMENT |
| 3/25/2013 | Malcolm Hammond | COMMENT |
| 3/25/2013 | Mara Rivera | COMMENT |
| 3/25/2013 | Marteze Harris | COMMENT |
| 3/25/2013 | MetroPCS Communications, Inc. | COMMENT |
| 3/25/2013 | Michael P. Kearns | COMMENT |
| 3/25/2013 | Michael Rogers | COMMENT |
| 3/25/2013 | Michael S. Hamden | COMMENT |
| 3/25/2013 | Michael Stein | COMMENT |
| 3/25/2013 | Minority Media and Telecommunications Council | COMMENT |
| 3/25/2013 | Moustafa Silly | COMMENT |
| 3/25/2013 | NASUCA | COMMENT |
| 3/25/2013 | National Association of the Deaf | COMMENT |
| 3/25/2013 | National Sheriffs' Association | COMMENT |
| 3/25/2013 | Network Communications International Corp. | COMMENT |
| 3/25/2013 | Numerious | LETTER |
| 3/25/2013 | Numerous | LETTER |
| 3/25/2013 | Pay Tel Communications | COMMENT |

**JA86**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                    Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/25/2013 | Payid Persha | COMMENT |
| 3/25/2013 | Peter Phillips Ph.D. | COMMENT |
| 3/25/2013 | Phone Justice Commenters | COMMENT |
| 3/25/2013 | Public Service Commission of the District of Columbia | COMMENT |
| 3/25/2013 | Raheem | COMMENT |
| 3/25/2013 | Rosen Bien Galvan & Grunfeld, LLP | COMMENT |
| 3/25/2013 | Securus Technologies, Inc. | COMMENT |
| 3/25/2013 | Sharif Abdullah | COMMENT |
| 3/25/2013 | Sister Kay Coll | COMMENT |
| 3/25/2013 | Stephen A. Raher | COMMENT |
| 3/25/2013 | Talila A. Lewis -- Helping Educate to Advance the Rights | COMMENT |
| 3/25/2013 | TechFreedom | COMMENT |
| 3/25/2013 | Telmate,LLC | COMMENT |
| 3/25/2013 | Texas Civil Rights Project | COMMENT |
| 3/25/2013 | The Leadership Conference on Civil and Human Rights | COMMENT |
| 3/25/2013 | The Legal Center for People with Disabilities and Older | COMMENT |
| 3/25/2013 | Thomas J. Hillgardner, Esq. | COMMENT |
| 3/25/2013 | TurnKey Corrections | COMMENT |
| 3/25/2013 | TurnKey Corrections | COMMENT |
| 3/25/2013 | Tyrone Brown | COMMENT |
| 3/25/2013 | Unique Westbrook | COMMENT |
| 3/25/2013 | Verizon and Verizon Wireless | COMMENT |
| 3/25/2013 | William D. Linley (David) | COMMENT |
| 3/22/2013 | California State Sheriffs' Association | COMMENT |
| 3/22/2013 | Chia-Chia Wang | COMMENT |
| 3/22/2013 | CREDO Mobile | COMMENT |
| 3/22/2013 | CREDO Mobile | COMMENT |
| 3/22/2013 | CREDO Mobile | COMMENT |
| 3/22/2013 | CREDO Mobile | COMMENT |
| 3/22/2013 | CREDO Mobile | COMMENT |
| 3/22/2013 | Nancy C. McCormick | COMMENT |
| 3/22/2013 | Numerous | LETTER |
| 3/22/2013 | Victoria Neilson | COMMENT |
| 3/21/2013 | Barbara Raimondo | COMMENT |
| 3/21/2013 | Danielle Arbogast | COMMENT |
| 3/21/2013 | Dennis Kaemingk, Cabinet Secretary | COMMENT |
| 3/21/2013 | Diana Claitor | COMMENT |
| 3/21/2013 | Justice Fellowship | COMMENT |
| 3/21/2013 | Numerous | LETTER |
| 3/20/2013 | Gabriel Ascher | COMMENT |
| 3/20/2013 | Idaho Department of Correction | COMMENT |
| 3/20/2013 | Numerous | LETTER |

**JA87**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/19/2013 | Kristina Green | COMMENT |
| 3/19/2013 | Marisa Diaz | COMMENT |
| 3/19/2013 | Michael McManus | COMMENT |
| 3/19/2013 | Numerous | LETTER |
| 3/19/2013 | Numerous | LETTER |
| 3/19/2013 | Wendy Salkin | COMMENT |
| 3/18/2013 | Antonia House | COMMENT |
| 3/18/2013 | Gene Schlack | COMMENT |
| 3/18/2013 | Kay K Ramirez | COMMENT |
| 3/18/2013 | Monte Frenkel | COMMENT |
| 3/18/2013 | Numerous | LETTER |
| 3/18/2013 | Paul VanDeCarr | COMMENT |
| 3/18/2013 | Sindhu Boddu | COMMENT |
| 3/15/2013 | Amanda Brouillette | COMMENT |
| 3/15/2013 | Corrine Keel | COMMENT |
| 3/15/2013 | Jessie Snyder | COMMENT |
| 3/15/2013 | Numerous | LETTER |
| 3/14/2013 | James G. Cox | COMMENT |
| 3/14/2013 | Numerous | LETTER |
| 3/13/2013 | Amelia Wilson | COMMENT |
| 3/13/2013 | Dave Whym | COMMENT |
| 3/13/2013 | Kiana | COMMENT |
| 3/13/2013 | Mary White | LETTER |
| 3/13/2013 | Matthew Brimberry | LETTER |
| 3/13/2013 | Nancy Kritz | COMMENT |
| 3/13/2013 | Numerous | LETTER |
| 3/13/2013 | Numerous | LETTER |
| 3/13/2013 | Powhatan Correctional Center | COMMENT |
| 3/13/2013 | Ruth Ellen Elinski | COMMENT |
| 3/13/2013 | Vincent Ransom | COMMENT |
| 3/12/2013 | Numerous | LETTER |
| 3/12/2013 | Numerous | LETTER |
| 3/12/2013 | Suzanne Nash | COMMENT |
| 3/11/2013 | Numerous | LETTER |
| 3/11/2013 | Numerous | LETTER |
| 3/11/2013 | Sherri Condon | COMMENT |
| 3/11/2013 | Stephen Ruszczyk | COMMENT |
| 3/8/2013 | Barbara Raimondo | COMMENT |
| 3/8/2013 | Barbara Willard | LETTER |
| 3/8/2013 | Jonathan O'Hara | COMMENT |
| 3/7/2013 | Belinda Redpath | COMMENT |
| 3/7/2013 | Betty Zhang | COMMENT |

**JA88**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                           Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 3/7/2013 | Chuck Cox | COMMENT |
| 3/7/2013 | Kathy Gladys | COMMENT |
| 3/7/2013 | kelley Schaffer | COMMENT |
| 3/7/2013 | Numerous | LETTER |
| 3/7/2013 | Numerous | LETTER |
| 3/7/2013 | Public Knowledge | NOTICE OF EXPARTE |
| 3/7/2013 | Salvador Ortiz | COMMENT |
| 3/7/2013 | Samantha Murphy | COMMENT |
| 3/7/2013 | Sandra Crnkovic | COMMENT |
| 3/7/2013 | Shelia Edwards | COMMENT |
| 3/7/2013 | Wendy Miller | COMMENT |
| 3/5/2013 | Harold C. Hagood | LETTER |
| 3/5/2013 | Harold C. Hagood | LETTER |
| 3/5/2013 | Mei Kennedy | COMMENT |
| 3/5/2013 | Mississippi Department of Corrections | COMMENT |
| 3/5/2013 | Numerous | LETTER |
| 3/5/2013 | Numerous | LETTER |
| 3/4/2013 | Numerous | LETTER |
| 3/4/2013 | Numerous | LETTER |
| 3/4/2013 | Stonney Rivers | LETTER |
| 3/1/2013 | Numerous | LETTER |
| 2/28/2013 | Anonymous | COMMENT |
| 2/28/2013 | Lawanda M. Smith | LETTER |
| 2/27/2013 | Brandon Bloss | COMMENT |
| 2/27/2013 | Numerous | LETTER |
| 2/26/2013 | Lois DeMott | COMMENT |
| 2/26/2013 | Michael E. Tory | LETTER |
| 2/26/2013 | Numerous | LETTER |
| 2/26/2013 | Numerous | LETTER |
| 2/25/2013 | Alice Squires | COMMENT |
| 2/25/2013 | Eddie Henry | LETTER |
| 2/25/2013 | Gary Rockwell | OTHER |
| 2/25/2013 | Lorenzo Arroyo | COMMENT |
| 2/25/2013 | Michael E. Stewart | COMMENT |
| 2/25/2013 | T. Rubinsky | COMMENT |
| 2/25/2013 | Zuraya Wright | NOTICE OF EXPARTE |
| 2/22/2013 | Richard Stewart | COMMENT |
| 2/21/2013 | Commonwealth of Virginia Department of Corrections | OTHER |
| 2/20/2013 | Margaret Robertson | COMMENT |
| 2/20/2013 | Paul Forster | COMMENT |
| 2/19/2013 | Bernadette McKinney | COMMENT |
| 2/19/2013 | Sarah Clawson | COMMENT |

**JA89**

In the Matter of
Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act
Rates for Interstate Inmate Calling Services
WC Docket No. 23-62
WC Docket No. 12-375

**REPORT AND ORDER, ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER
AND FURTHER NOTICE OF PROPOSED RULEMAKING**

Adopted: July 18, 2024                              Released: July 22, 2024

| Date Received | Name of Filers(s) | Type of Filing |
|---|---|---|
| 2/15/2013 | Justine Garrett | COMMENT |
| 2/14/2013 | Securus Technologies, Inc. | NOTICE OF EXPARTE |
| 2/13/2013 | Mark Rothstein | COMMENT |
| 2/13/2013 | Stephen W. Wolf | COMMENT |
| 2/12/2013 | Linda Humphrey | COMMENT |
| 2/11/2013 | Annabel Z. Dodd | COMMENT |
| 2/11/2013 | Bruce Hempel | COMMENT |
| 2/11/2013 | Courtney R. Holthus | COMMENT |
| 2/11/2013 | Jackie McComb | COMMENT |
| 2/11/2013 | Nathan Leach | COMMENT |
| 2/11/2013 | Richa | COMMENT |
| 2/8/2013 | Jonathan Fisher | COMMENT |
| 2/8/2013 | Numerous | LETTER |
| 2/8/2013 | Paul Jacob | COMMENT |
| 2/7/2013 | Numerous | LETTER |
| 2/6/2013 | Essie Grant | LETTER |
| 2/5/2013 | Missouri Public Defender System | LETTER |
| 2/4/2013 | Andrew Kay | COMMENT |
| 2/4/2013 | Michael De Neut | LETTER |
| 1/30/2013 | Michael Glaser | COMMENT |
| 1/29/2013 | Tyree Morris | LETTER |
| 1/22/2013 | Colette Croteau | COMMENT |
| 1/22/2013 | Margaret Cullum | COMMENT |
| 1/22/2013 | Wireline Competition Bureau | PUBLIC NOTICE |
| 1/17/2013 | Brad Borevitz | COMMENT |
| 1/15/2013 | Amanda Callahan | COMMENT |
| 1/14/2013 | Jennifer Martinez | COMMENT |
| 1/7/2013 | Jeremy Smart | COMMENT |
| 1/7/2013 | Martin MacKerel | COMMENT |
| 1/4/2013 | James Cannon | NOTICE OF EXPARTE |
| 12/31/2012 | Maria Lindbloom | COMMENT |
| 12/31/2012 | Mark Simons | COMPLAINT |
| 12/31/2012 | Michael G. Nicholas | COMMENT |
| 12/28/2012 | Mark Simons | COMMENT |
| 12/28/2012 | Pete Olsen | COMMENT |
| 12/24/2012 | Wireline Competition Bureau | NOTICE OF PROPOSED RULEMAKING |

**JA90**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

IN RE: MCP 191, ET AL.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

## CERTIFICATE OF MARLENE H. DORTCH, SECRETARY
## FEDERAL COMMUNICATIONS COMMISSION

I, Marlene H. Dortch, Secretary, Federal Communications

Commission, do hereby certify that the preceding list is a true and

correct list of items in the record of the proceedings before the Federal

Communications Commission pertinent to the above-captioned case.

Witness my hand and Seal of the Federal Communications

Commission this 11th day of October 2024.

FEDERAL COMMUNICATIONS COMMISSION

*Marlene H. Dortch*

Marlene H. Dortch
*Secretary*

## CERTIFICATE OF FILING AND SERVICE

I, Sarah E. Citrin, hereby certify that on December 20, 2024, I

filed the foregoing Certified Index of Items in the Record with the Clerk

of the Court for the United States Court of Appeals for the First Circuit

using the electronic CM/ECF system. Participants in the case who are

registered CM/ECF users will be served by the CM/ECF system.

*/s/ Sarah E. Citrin*

Sarah E. Citrin
*Deputy Associate General Counsel*

FEDERAL COMMUNICATIONS
COMMISSION
Washington, D.C 20554
(202) 418-1740

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

## COMMENTS OF THE CENTER ON THE ADMINISTRATION OF CRIMINAL LAW

The Center on the Administration of Criminal Law (the "Center") respectfully submits these comments urging the Commission to take action to lower the rates charged for interstate inmate calling services.[1]  The Center, based at New York University School of Law, is dedicated to defining and promoting good government practices in the criminal justice system through academic research, litigation, and participation in the formulation of public policy.  In pursuit of these goals, the Center regularly comments on issues of broad importance to the administration of the criminal justice system.[2]

The cost of interstate inmate calling services is such an issue.  Because many inmates are housed out of state and have only a limited ability to engage in meaningful written communication, phone services are often the sole means for inmates and their families to stay in touch.  Unfortunately, inmate calling service fees are so high that this option too is frequently off the table—a 15-minute call from an inmate to his or her loved ones can cost as much $17, which is nearly forty times what the same call would cost outside the incarceration setting.  That is fundamentally unfair.  Inmates often come from low-income families, and those families are

---

[1]  These comments are submitted in response to the Commission's Notice of Proposed Rulemaking, adopted December 24, 2012, FCC 12-167.

[2]  For example, the Center filed an amicus brief in the Supreme Court in *Brown v. Plata*, 131 S. Ct. 1910 (2011), on behalf of leading criminologists about whether California could release inmates without a negative effect on crime rates.  Furthermore, the Center's most recent scholar-in-residence has written extensively on the effect of prison conditions on inmates.

forced to shoulder this financial burden. It is also bad public policy. High inmate calling service rates make it more difficult for inmates to maintain family ties. Those ties, however, are critical to inmate rehabilitation and success upon release. Inmates that maintain strong family bonds are more likely to obtain gainful employment when they return to their communities and less likely to re-offend. High inmate calling service rates also make it difficult for incarcerated parents to remain involved in the lives of their children. And high inmate calling service rates encourage prisoners to break the rules and acquire cell phones, which raises security concerns and can result in increased jail time for inmates and increased costs to the state.

## I.     Exorbitant Charges For Inmate Calling Services Make It Difficult—And In Some Cases Impossible—For Inmates To Stay In Touch With Their Families.

For many families, the only way to stay in touch with an incarcerated relative is by telephone. That is due, at least in part, to the increasingly common practice of incarcerating convicted individuals outside their state of conviction. States now routinely send thousands of "prisoners of all offense categories to serve their time in out-of-state facilities."[3] California, for example, currently has 8,852 of its prisoners housed out of state.[4] As of June 2011, 2,000 Hawaii prisoners—about one-third of the State's prison population—were housed out of state.[5] And these geographically displaced inmates are frequently housed far from home. The country's

---

[3] Steven J. Jackson, *Ex-Communication: Competition and Collusion in the U.S. Prison Telephone Industry*, 22 Critical Studies in Media Communication 263, 267 (2005), http://sjackson.infosci.cornell.edu/Jackson_CompetitionandCollusioninPrisonPhoneIndustry(CSMC2005).pdf.

[4] Paige St. John, *Judge seeks California's out-of-state prison plan*, L.A. Times PolitiCal Blog (Feb. 6, 2013, 4:39 PM), http://latimesblogs.latimes.com/california-politics/2013/02/californias-out-of-state-prison-plan-ff-.html.

[5] Robert Brown, *Initiative Aims To Bring Hawaii's Prisoners Home*, Honolulu Civil Beat (June 28, 2011), http://www.civilbeat.com/articles/2011/06/28/11909-initiative-aims-to-bring-hawaiis-prisoners-home. As of 2000, about 5,000 of Wisconsin's 20,000 prisoners were housed out of state. *See* Walter J. Dickey, *Thinking Strategically About Correctional Resources*, 2000 Wis. L. Rev. 279.

leading provider of out-of-state incarceration services, which houses more than 80,000 inmates in 60 plus facilities, "maintains a geographic stronghold in Tennessee, housing inmates from as far afield as Montana, Hawaii, and Puerto Rico."[6]  It would obviously be extremely expensive for an inmate's Hawaiian or Montanan family to make the trip to Tennessee to visit their incarcerated loved one.

In a significant number of cases, written correspondence cannot close the gap that out-of-state inmate housing creates.  Inmates by and large have very limited access to e-mail.  As of 2009, only six states had systems in place allowing inmates to send or receive e-mails.[7]  None of these systems permit unfettered communication between inmates and their families.  Michigan, for example, allows inmates to receive, but not send, e-mails.[8]  And some states, like Oregon, apply word filters to inmate e-mails that, in effect, censor inmates' communications with the outside world.[9]  What is more, the ability of inmates and their families to engage in meaningful written communication (be it electronically or through conventional mail) is severely constrained by the fact that approximately 40% of the nation's prison population is functionally illiterate.[10]

---

[6]  Jackson, *supra* note 3, at 267; *see* Corrections Corp. of Am., *About CCA* (2008), www.cca.com/about/.  In 2003, nearly 1,000 Wisconsin prisoners were housed in Oklahoma. *See* John E. Dannenberg, *Nationwide PLN Survey Examines Prison Phone Contracts, Kickbacks*, 22 Prison Legal News 1, 8 (Apr. 2011).

[7]  *Computer Use For/By Inmates*, Corrections Compendium, June 22, 2009, at tbl. 2 (Indiana, Iowa, Kentucky, Louisiana, Michigan, and Oregon).

[8]  *See id.*

[9]  *See id.*  Inmates in Federal Bureau of Prisons facilities do not have Internet access.  They can, however, pay to have a service that will send and receive e-mails for them.  *See* Clarissa Ramon, *The Price of Communicating From Behind Bars*, Public Knowledge Policy Blog (Apr. 5, 2012), http://publicknowledge.org/blog/price-communicating-between-bars.  Those communications are monitored and an inmate may only communicate with individuals on a staff-approved contact list.  *See* Fed. Bureau of Prisons, TRULINCS FAQs, BOP.gov, http://www.bop.gov/ inmate_programs/trulincs_faq.jsp (last visited Mar. 3, 2013).

[10]  Ctr. on Crime, Communities & Culture, *Education as Crime Prevention: Providing Education to Prisoners*, Research Brief: Occasional Paper Series 2 (Sept. 1997); *see* American Bar Ass'n,

That often leaves families with one option: the telephone. But for many families, communicating with an incarcerated relative over the phone is prohibitively expensive. Inmate calls frequently involve a "connection charge" in excess of $3.00 per call and an additional per-minute charge of up to $.89.[11] As a result, a 15-minute call between an inmate and his or her spouse or child can cost anywhere from "$10 to $17."[12] One hour of conversation per week for a month can cost nearly $300. "This is a far cry from the much lower"—nearly forty times lower—"long distance rates paid by the non-incarcerated public."[13] The average citizen does not have to pay a per-call connection fee for long distance service and is charged a much more modest $.05 to $.10 per minute.[14]

## II.    The High Costs Of Inmate Calling Services, Which Are Paid By Inmates' Families, Are Fundamentally Unfair.

The exceedingly high costs of inmate calling services are anything but just and reasonable. The unfair price of these services places an enormous burden on the people who "regularly shoulder the high cost of prison telephone services"—inmates' families.[15] Inmates themselves usually lack the resources necessary to cover the costs of inmate calling services. "[M]ost prisoners are poor."[16] Though most inmates work while incarcerated, they often receive

---

Recommendation Adopted by the House of Delegates 2 (Aug. 2005) [hereinafter *Bar Report*] (noting the "significant percentage of the incarcerated population with limited literacy skills").

[11] Dannenberg, *supra* note 6, at 5; *see id.* at 16 (listing interstate connection fees and per-minute rates). The argument that these high rates are necessitated by the costs of providing inmate calling services is critically undermined by the fact that some inmates can make interstate calls without paying connection fees and for less than $.05 per minute. *Id.*

[12] *Id.* at 5.

[13] *Id.* at 5-6; *see* John J. Gibbons & Nicholas de B. Katzenbach, Comm'n on Safety & Abuse in America's Prisons, *Confronting Confinement*, 22 J. L. & Policy 385, 438 (2006) ("family members of prisoners pay many times more than anyone else for the opportunity to speak with a loved one").

[14] Dannenberg, *supra* note 6, at 5-6.

[15] *Bar Report*, *supra* note 10, at 4.

[16] Tara Herivel & Paul Wright, *Prison Nation: The Warehousing of America's Poor* 2 (2003).

very little compensation for their labor. The average minimum wage in state prison systems is $.93 *per day*.[17] Federal inmates can make more, but still not very much: food service, warehouse, and maintenance jobs in federal prison can pay as much as $.40 per hour.[18] In many cases, the bulk of an inmate's income is put toward paying off the inmate's financial obligations—such as court-ordered fines and victim restitution—or to cover the costs of the inmate's incarceration.[19] Moreover, the vast majority of inmates were poor before their imprisonment. "[A]bout 80 percent of people who go to prison weren't able to afford to pay an attorney."[20]

Inmates' relatives are rarely better off financially. Most "prisoners come from low-income families."[21] To make matters worse, incarceration is a financially devastating event that often leaves the family left behind to "scramble to make ends meet."[22] Incarcerated individuals were frequently their family's bread winner before conviction; "more than half of imprisoned parents (52 percent of mothers and 54 percent of fathers) were the primary earners for their" families before incarceration.[23]

---

[17] Peter Wagner, *The Prison Index: Taking the Pulse of the Crime Control Industry* § 3 (2003), *available at* http://www.prisonpolicy.org/prisonindex/prisonlabor.html.

[18] *See* Fed. Bureau of Prisons, *Workers Programs*, http://www.bop.gov/inmate_programs/ work_prgms.jsp (last visited Mar. 3, 2013). A limited number of federal inmates can obtain UNICOR employment where they can make between $.23 and $1.25 per hour. *See* Fed. Bureau of Prisons, *UNICOR Federal Prison Industries, Inc.*, http://www.bop.gov/ inmate_programs/unicor.jsp (last visited Jan. 12, 2013). UNICOR employs approximately 16% of work-eligible federal inmates. *See id.*

[19] *Cf.* U.S. Dep't of Justice, Bureau of Justice Assistance Fact Sheet, *Prison Industry Enhancement Certification Program* (Nov. 1995), https://www.ncjrs.gov/pdffiles/pie.pdf.

[20] Herivel & Wright, *supra* note 16, at 2.

[21] Dannenberg, *supra* note 6, at 14.

[22] Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility* 21 (2010), http://www.pewtrusts.org/uploadedFiles/wwwpewtrustsorg/Reports/Economic_Mobility/ Collateral%20Costs%20FINAL.pdf [hereinafter *Collateral Costs*].

[23] *Id.*

Because of the financial strain associated with incarceration and the cost of inmate telephone services, inmates' families are often presented with impossible choices. Some families have reported forgoing medical operations or required drug prescriptions to cover the costs of calls from their incarcerated family members.[24] Others reported losing their telephone service altogether because they were unable to pay prison phone bills.[25] And some families are left with no choice but to cut off contact with their incarcerated loved one because they simply cannot afford to keep in touch via the only means available.[26]

In effect, high inmate calling service rates operate as a regressive tax.[27] A substantial portion of the revenue generated by inmate calling services ends up in the states' hands. That is because the contractual agreements between state prison systems and calling service providers usually involve a significant payment to the state in exchange for the right to provide service. Indeed, a recent study concluded that nearly "42% of gross revenues from prisoners' phone calls"—over $143 million per year—went toward "lucrative kickbacks" to "state contracting agencies."[28] As a result, low-income families pay exorbitant phone rates that fund state revenues. That dynamic is clearly in contravention "of our generally progressive tax structure where tax burdens increase as income rises."[29] High inmate calling service rates also

---

[24] Jackson, *supra* note 3, at 272.

[25] *Id.*

[26] *Id.*

[27] *See* Drew Kuorowski, Prison Policy Initiative, *The Price to Call Home: State-Sanctioned Monopolization in the Prison Phone Industry* 3 (Sept. 2012).

[28] Dannenberg, *supra* note 6, at 1 (emphasis omitted). Notably, the state prison systems with the lowest interstate inmate calling service rates—New York ($.048 per minute) and Minnesota ($.15 per minute)—do not receive kickbacks from service providers. *Id.* at 16.

[29] Kuorowski, *supra* note 27, at 4.

disproportionately affect communities of color.  Approximately 38% of state and federal prison inmates are Black/African American and approximately 23% are Hispanic/Latino.[30]

### III.    Reducing The Costs Of Communication Between Inmates And Their Relatives Will Benefit Inmates, Their Families, And Society As A Whole.

While the fundamental unfairness of high inmate calling service fees alone is sufficient to justify Commission action, capping inmate calling costs is necessary for a second, independent reason.  Curbing the costs of communication between inmates and their families will result in tangible benefits for inmates, their relatives—the children of inmates in particular—and society more broadly.  It is hard to overstate the benefits of continued contact with family and friends during incarceration.  Maintaining critically important family and community ties decreases the likelihood that an inmate will engage in conduct requiring discipline while incarcerated.  Family contact is also integral to an inmate's rehabilitation and successful reintegration into society. The support that family and friends provide during incarceration can mean the difference between becoming a productive member of the community upon release and a trip back to jail.

#### A.    Familial Contact Promotes Good Inmate Behavior While Incarcerated And Is Integral To Inmate Success Upon Release From Prison.

Inmates who maintain contact with their families during incarceration typically fare better while incarcerated than those who do not.  Inmate-family interactions "can positively affect an inmate's behavior in prison."[31]  As the Department of Justice has recognized, "contacts

---

[30] E. Ann Carson & William J. Sabol, U.S. Dep't of Justice, Bureau of Justice Statistics, NCJ 239808, *Prisoners in 2011* 7 (2012).

[31] U.S. Gov't Accountability Office, Bureau of Prisons, GAO-12-743, *Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure* 21 (2012) [hereinafter *Growing Inmate Crowding*].

with family contribute to inmate morale" and "better staff-inmate interactions."[32]  Consequently, inmates that keep in touch with their loved ones are involved in fewer disciplinary incidents—prison is a safer place for both prisoners and prison employees.[33]  And, at least in some instances, the end result of frequent inmate-family contact is that an inmate secures an early release through "good behavior."

The benefits of inmate-family interaction continue after the inmate is released.  Communicating with loved ones during incarceration is "a critical component of a prisoner's successful transition to a productive, law-abiding life after leaving prison."[34]  Inmates that maintain strong family ties throughout their incarceration are more likely to find a job after release and less likely to engage in illicit activity such as drug use.[35]  The "first months after an offender returns to the community" are "crucial."[36]  Those first several weeks usually determine an inmate's path for the next several years.  Maintaining ties during incarceration ensures that the inmate will have the necessary support structure in place immediately upon release to be able to make the right choices.  Family can provide a push in the right direction when needed or intervene before a lapse in judgment becomes something worse.

Numerous states and state officials have recognized the importance of family contact—and the role that phone communication plays in fostering that contact—to a successful transition

---

[32] U.S. Dep't of Justice, Office of the Inspector Gen., *Criminal Calls: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges*, Ch. II n.6 (Aug. 1999), http://www.justice.gov/oig/special/9908/.

[33] *Bar Report*, *supra* note 10, at 2.

[34] *Id.*; *see* Rebecca L. Naser & Christy A. Visher, *Family Members' Experiences with Incarceration and Reentry*, 7 Western Criminology Review 20, 21 (2006) ("research supports a strong correlation between family ties and post-release success"); Jackson, *supra* note 3, at 267 (contact with family members is vital to an inmate's rehabilitation).

[35] Dannenberg, *supra* note 6, at 14.

[36] Pew Ctr. on the States, *State of Recidivism: The Revolving Door of America's Prisons* 29 (Apr. 2011) [hereinafter *State of Recidivism*].

after release.  Tennessee is one example.  When Tennessee state officials were considering raising inmate calling service fees in 2002, the head of the state Department of Corrections cautioned against doing so because it would make it more difficult for inmates to "maintain[] contact[s] with family and friends" that are "an important part of an inmate's rehabilitation and preparation to return to the community."[37]  The Oregon Department of Corrections has come to the same conclusion, stating that "[o]ngoing contact with supportive family and friends is an important part of inmates' success in prison and upon release."[38]  And Wisconsin law expressly states that prison officials "shall encourage communication between an inmate and an inmate's family" because such "[c]ommunication fosters reintegration into the community" after release.[39]

### B.  Maintaining Family Ties During Incarceration Reduces Recidivism Rates And The Costs Associated With Sending Former Inmates Back To Prison.

Given the positive outcomes associated with inmate-family contact during incarceration and upon release, it is unsurprising that inmates that keep in touch with their loved ones are less likely to return to prison.  By making it easier for inmates and their families to communicate, reducing the costs of inmate calling services would reduce recidivism rates and the costs recidivism entails.

Telephone access was originally granted to inmates to address "weakened family and community bonds" that increased the "likelihood of re-offense."[40]  The connection between inmate-family contact and recidivism is more than theoretical—studies time and again have

---

[37] Dannenberg, *supra* note 6, at 14.

[38] *Id.* (internal quotation marks omitted).

[39] Wis. Admin. Code DOC § 309.39(1); *see id.* (Communication with family members "helps to motivate the inmate and thus contributes to morale and to the security of the inmate and staff.").

[40] Jackson, *supra* note 3, at 267; *see* Gov't Accountability Office, Bureau of Prisons, GAO-11-893, *Improved Evaluations and Increased Coordination Could Improve Cell Phone Detection* 6 (Sept. 2011) ("BOP extends telephone privileges to inmates and asserts that telephone privileges help inmates maintain family and community ties and facilitate the reintegration of inmates into society upon release from prison.") [hereinafter *Cell Phone Detection*].

concluded that "family contact during incarceration is associated with lower recidivism rates."[41] That makes sense. A "reliable way of increasing the likelihood that prisoners will re-offend is to break all ties with the outside world and then place them back on the street years later, with little reentry support, in a community to which they have become a stranger."[42] Conversely, a reliable way of decreasing the likelihood that prisoners will re-offend is to foster the growth of a family support structure that gives inmates a stake in the community to which they return and can provide them with the tools and incentives they need to succeed upon release.

Reducing recidivism is a laudable goal in and of itself, but doing so will also create a number of secondary benefits. Recidivism is one of the most significant problems facing our criminal justice system. More "than four out of 10 adult American offenders . . . return to prison within three years of their release."[43] When released inmates return to a life of crime, "they cost society all over again" in the form of more arrests, more prosecutions, increased prison populations, and more victims.[44] To the extent that reducing inmate calling service rates reduces recidivism, lowering rates promises to reduce these costs as well. The savings may be substantial. A 10% reduction in recidivism rates would yield more than $635 million in prison

---

[41] Nancy G. La Vigne et al., *Examining the Effect of Incarceration and In-Prison Family Contact on Prisoners' Family Relationships*, 21 J. of Contemporary Criminal Justice 314, 316 (2005); *see, e.g.*, Kuorowski, *supra* note 27, at 2 ("The link between family contact during incarceration and reduced recidivism is well-documented."); *Cell Phone Detection*, *supra* note 40, at 1 ("contact with family and friends" during incarceration "reduces the likelihood of inmates' return to prison once they complete their sentences"); Naser & Visher, *supra* note 34, at 21 ("a remarkably consistent association has been found between family contact during incarceration and lower recidivism rates").

[42] Jackson, *supra* note 3, at 272.

[43] *State of Recidivism*, *supra* note 36, at 2.

[44] *Collateral Costs*, *supra* note 22, at 22.

cost savings per year.[45]  And, most importantly, reducing recidivism would decrease the number of victims of crime.

### C. Fostering Family Relations During Incarceration Yields Better Outcomes For Inmates' Children.

An oft overlooked effect of incarceration is the adverse impact it has on inmates' children.  As of 2007, 52% of inmates in state prisons and 63% of inmates in federal prisons were parents of minor children.[46]  As a result, more than 1.7 million children have an incarcerated parent.[47]  Having an incarcerated parent generally makes it more likely that a child will act out, have substance abuse problems, perform poorly in school, and engage in criminal conduct.[48]

Lowering the cost of inmate calling services will make it easier for inmates to maintain contact with their children and thus help mitigate these ill effects.  A child that stays in touch with an incarcerated mother or father is less likely to drop out of school or be suspended.[49]  Keeping in contact with an incarcerated parent can also reduce instances of child depression and feelings of alienation that can lead a child to engage in antisocial behavior.[50]  Moreover, maintaining the parent-child relationship during incarceration makes it more likely that the parent will be an active participant in his or her child's life upon release, which is more often than not to the child's benefit.[51]

---

[45] *State of Recidivism*, *supra* note 36, at 26.
[46] Kuorowski, *supra* note 27, at 4.
[47] Lauren E. Glaze & Laura M. Maruschak, U.S. Dep't of Justice, Bureau of Justice Statistics, NCJ 222984 *Parents in Prison and Their Minor Children* 1 (Aug. 2008), http://bjs.ojp.usdoj.gov/content/pub/pdf/pptmc.pdf.
[48]  Julie Poehlman et al., *Children's Contact With Their Incarcerated Parents*, 65 Am. Psychologist 575 (2010), *available at* http://psycnet.apa.org/journals/amp/65/6/575.pdf.
[49] *Id.* at 591.
[50] *Id.*
[51] LaVigne, *supra* note 41, 328.

IV. **Lowering The Cost Of Inmate Calling Services Will Reduce Incentives For Inmates To Acquire Cell Phones.**

Lowering the cost of inmate calling services is beneficial in yet another way: it will reduce incentives for inmates to illegally obtain and use cell phones. Inmate cell phone possession has exploded in the last few years. Thousands of cell phones—8,656—were confiscated in federal prisons between 2008 and 2010.[52] States collected tens of thousands more during the same period. California alone confiscated 20,400 cell phones between 2008 and 2010.[53] This marked increase in inmate cell phone possession is due, at least in part, to the high cost of inmate calling services.[54] Because of the "exorbitant rates charged by prison phone companies" inmates "use illegal—but much more affordable—cell phones to stay in touch with their families and friends."[55]

High inmate calling service rates incentivize the acquisition and use of cell phones and, by doing so, set inmates up for failure. Several states expressly prohibit cell phone use in prison. Under Maryland law, for example, a "person detained or confined in a place of confinement may not knowingly possess or receive a telecommunications device."[56] Using such a device can result in a loss of "good time" credits (meaning more time served) or a transfer to a "higher-security institution."[57] It can also result in additional jail time following a conviction for contraband possession—running afoul of Maryland's cell phone prohibition can result in up to

---

[52] *Cell Phone Detection*, *supra* note 40, at 20.

[53] *See id.* at 22.

[54] *See* Kuorowski, *supra* note 27, at 3 ("lower prison telephone rates would . . . lessen the recent problem of contraband cell phones").

[55] Dannenberg, *supra* note 6, at 14; *see Cell Phone Detection*, *supra* note 40, at 1 (discussing security risks associated with cell phones).

[56] Md. Code. Ann., Crim. Law § 9-417.

[57] *Cell Phone Detection*, *supra* note 40, at 8.

three years' imprisonment.[58]  And while not all states address inmate cell phone possession expressly, it is likely that cell phones fall within the scope of most general state contraband statutes.[59]  Reducing the costs of inmate calling services will "reduce the demand for . . . contraband cell phones," which will, in turn, reduce the likelihood that an inmate's prison term will be extended for violating prison rules.[60]

Reducing the costs of inmate calling services (and thus the incentives to acquire cell phones) will also reduce the number of cell phone related security incidents.  While inmates use cell phones to communicate with their loved ones, cell phones are used in prison for other activities as well.  Inmates have used cell phones to facilitate the commission of crimes beyond prison walls and to enable in-prison illicit activity.[61]  Cell phones also create numerous security issues that are difficult for prison officials to address.[62]  "[B]y providing less incentive for incarcerated people to acquire contraband cell phones," lowering the cost of inmate calling services will aid in addressing some the problems created by inmate cell phone possession.[63]

Respectfully submitted,

---

[58] Md. Code. Ann., Crim. Law § 9-417; *see* Ariz. Rev. Stat. §§ 13-2501, 13-2505 (expressly defining "wireless communication device" as proscribed contraband); *see also* 18 U.S.C. § 1791 (criminalizing possession of cell phones while incarcerated).

[59] *See* Ala. Code §§ 13A-10-30, 13A-10-38 (defining contraband as "[a]ny article or thing which a person confined in a detention facility is legally prohibited from obtaining or possessing by statute, rule, regulation or order").

[60] Dannenberg, *supra* note 6, at 14.

[61] *Cell Phone Detection*, *supra* note 40, at 1.

[62] *Id.*

[63] Kuorowski, *supra* note 27, at 3.

/s/ Paul D. Clement
Paul D. Clement
D. Zachary Hudson
Bancroft PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

*Attorneys for The Center on the Administration of Criminal Law*

March 25, 2013

**Federal Communications Commission**      **FCC 13-113**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: August 9, 2013**                    **Released:  September 26, 2013**

**Comment Date:  30 days after date of publication in the Federal Register**
**Reply Comment Date:  45 days after date of publication in the Federal Register**

By the Commission: Acting Chairwoman Clyburn and Commissioner Rosenworcel issuing separate statements.  Commissioner Pai dissenting and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                                                     Paragraph #

I.    INTRODUCTION ........................................................................................................... 1
II.   PROCEDURAL BACKGROUND ................................................................................. 9
III.  ENSURING THAT RATES FOR INTERSTATE INMATE CALLING SERVICES ARE
      JUST, REASONABLE, AND FAIR ............................................................................. 12
      A.  Statutory Requirements for ICS ........................................................................... 13
          1.  Statutory Standards for ICS Rates and Practices ......................................... 13
          2.  Types of Facilities ........................................................................................ 16
      B.  Need for Reform .................................................................................................. 20
          1.  Current Structures for ICS Rates and Payment Options ............................... 21
          2.  The Record on ICS Costs .............................................................................. 25
          3.  The Record on ICS Rates .............................................................................. 35
          4.  Competition in the ICS Market ..................................................................... 39
          5.  Societal Impacts of High ICS Rates ............................................................. 42
          6.  Reforms are Necessary to Ensure That Interstate ICS Rates Are Just, Reasonable, and
              Fair ............................................................................................................... 45
      C.  Framework for Just, Reasonable, and Fair ICS Rates ........................................... 47
          1.  Interstate ICS Rates and Charges Must be Cost-Based .................................. 50
          2.  Costs of Providing Interstate ICS ................................................................. 53
              a.   General Standard ................................................................................... 53
              b.   Site Commission Payments .................................................................... 54
          3.  Interim Interstate Rate Levels ...................................................................... 59
              a.   Interim Safe Harbors for Interstate ICS Rates ....................................... 60
              b.   Interim Rate Caps for Interstate ICS Rates ............................................ 73
              c.   Interim Rate Structure ........................................................................... 85
              d.   Ancillary Charges ................................................................................. 90
      D.  Inmate Calling Services for the Deaf and Hard of Hearing .................................. 94
      E.  Existing ICS Contracts ........................................................................................ 98
          1.  Background .................................................................................................. 98
          2.  Discussion .................................................................................................... 100

14107

friends and family.  There is also support in the record that ICS rate reform has not compromised the security requirements of correctional facilities.[16]  Thus, these examples disprove critics who fear that reduced rates will undermine security or cannot be implemented given provider costs.  Our actions build upon these examples by reducing rates, while balancing the unique security needs of facilities and ensuring that inmate phone providers receive fair compensation and a reasonable return on investment.

5.     While some states have taken action to reduce ICS rates, the majority have not.  We therefore take several actions to address interstate rates.  We require inmate phone providers to charge cost-based rates to inmates and their families, and establish "safe-harbor" rates at or below which rates will be treated as lawful (*i.e.*, just, reasonable, and fair) unless and until the Commission issues a finding to the contrary.[17]  Specifically, we adopt interim safe harbor rates of $0.12 per minute for debit and prepaid interstate calls and $0.14 per minute for collect interstate calls.[18]  Based on the evidence in this record, we also set an interim hard cap on ICS providers' rates of $0.21 per minute for interstate debit and prepaid calls, and $0.25 per minute for collect interstate calls.  This upper ceiling ensures that the highest rates are reduced immediately to the upper limit of what can reasonably be expected to be cost-based rates.[19]  Interstate ICS rates at or below the safe harbor are presumed just, reasonable, fair and cost-based.  Rates between the interim safe harbor and the interim rate cap will not benefit from this presumption.

6.     We base the safe harbor rate levels and rate caps on data and cost studies presented by parties and/or taken directly from ICS provider service contracts in the record.[20]  The safe harbor rate levels are derived from ICS rates in seven states that have prohibited site commission payments from ICS providers to facilities.[20]  The interim rate caps adopted are based on (1) the highest total-company costs presented in a cost study provided by Pay Tel, an ICS provider that exclusively serves jails, and (2) the highest collect calling cost data presented in the 2008 ICS Provider Data Submission, compiling data from seven different ICS providers that serve various types and sizes of correctional facilities.  We based the interim rate caps on these high levels, without attempting to exclude any unrecoverable costs or adjust any inputs, in order to ensure that the cap levels were a conservative estimate of the levels under which all ICS providers could provide service.  Even so, we provide a waiver process to account for any unique circumstances.

7.     In addition to immediate rate reform, we find that site commission payments and other provider expenditures that are not reasonably related to the provision of ICS are not recoverable through

---

[16] *See* Transcript of Reforming ICS Rates Workshop at 186-87 (Jason Marks, former Commissioner, New Mexico Public Regulation Commission, stating that "there are no security problems in New Mexico"); *see also* Letter from Anthony Annucci, Acting Commissioner, State of New York Department of Corrections and Community Supervision, to Gregory Haledjian, Attorney-Advisor, FCC, WC Docket No. 12-375 at 1 (filed July 16, 2013) (NY DOCCS July 16, 2013 *Ex Parte* Letter) (discussing the New York statute that "requires the department to . . . ensure that any inmate phone call system . . . provides reasonable security measures to preserve the safety and security of each correctional facility").

[17] *See infra* Section III.C.3.

[18] We find that the record provides ample justification for assuming a 15-minute call as the basis for our calculations.  *See infra* note 232.  Additionally, we address rates by adopting interim safe harbor rate levels and interim rate caps that work together.  We adopt interim safe harbor interstate rate levels for prepaid and debit calls and separately for collect calls, and we will presume that interstate ICS rates at or below the safe harbors are cost-based and therefore just, reasonable, and fair.

[19] We emphasize that ICS providers should not read this Order as providing a basis to increase rates up to either the interim safe harbor or interim rate caps.  The goals of the reforms adopted herein are to reduce rates and ensure that rates are cost-based.  This Order does not provide an independent basis for raising rates.  Consistent with our requirement that rates be cost-based, providers may raise rates when necessary to ensure recovery of costs directly and reasonably related to the provision of ICS on a holding-company level.

[20] *See infra* para. 62.

Although these causes may contain worthy goals, we are bound by our statutory mandate to ensure that end user rates are "just and reasonable," and "fair," taking into account end users as well as ICS providers. The Act does not provide a mechanism for funding social welfare programs or other costs unrelated to the provision of ICS, no matter how successful or worthy.

58.      We also are cognizant of the critical security needs of correctional facilities. For example, the U.S. Department of Justice has chronicled hundreds of criminal convictions involving the use of ICS as part of the criminal activity.[216] Moreover, according to one commenter, a disproportionately large percentage of ICS-enabled crimes target and victimize vulnerable populations consisting of victims, witnesses, jurors, inmates, and family members of these individuals.[217] While our actions to establish interim ICS safe harbors and rate caps prohibit the recovery of site commission payments, we include costs associated with security features in the compensable costs recoverable in ICS rates.[218] Security monitoring helps correctional facilities identify potential altercations; monitor inmates who the facility is concerned may be suicidal; prevent criminal activity outside of the jail; prevent violation of no-contact orders and witness tampering; and aid in the prosecution of criminal cases.[219] Our actions in this Order take into account security needs as part of the ICS rates as well as the statutory commitment to fair compensation. Indeed, data from facilities without site commission payments, which form the basis for our interim safe harbor rates, demonstrate the feasibility of providing ICS on an on-going basis to hundreds of thousands of inmates without compromising the levels of security required by these states' correctional facilities.[220] Our interim rate caps are based on cost studies that include the cost of advanced security features such as continuous voice biometric identification.[221]

### 3.      Interim Interstate Rate Levels

59.      In the *2012 ICS NPRM*, the Commission sought comment not only on various rate cap alternatives, but also on other possible ways of regulating ICS rates, as well as any other proposals from parties.[222] Below, we adopt interim rate caps that include interim safe harbors setting boundaries for rates

---

(Continued from previous page) ─────────────

from Michael S. Hamden to Marlene H. Dortch, Secretary, FCC, CC Docket No. 96-128, NSA Resolution, at 2 (filed Oct. 28, 2008) (NSA Resolution including language urging "the FCC to establish a firm ceiling for reasonable inmate calling rates and to enforce that ceiling").

[216] *See* Letter from Jay Gainsboro, Founder, JLG Technologies to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 Attach. at 4 (filed July 17, 2013) (JLG White Paper). According to one report, inmates have been documented using ICS to order executions, to continue running organized crime operations; to continue the direction of large drug trafficking, manufacturing and distribution activities; to order or participate in gang activities; and even to conspire to commit acts of terrorism. *Id.*; *see also* NSA 2013 Comments at 1 (explaining that individuals in local jails try to continue their criminal activities on the outside via ICS while they are incarcerated, contact witnesses with wrongful intent, call their victims, and plot and plan criminal enterprises with regularity).

[217] *See* JLG White Paper at 4; *see also* Securus 2013 Reply at 1-2.

[218] *See supra* para. 53 & n.196.

[219] *See generally* JLG White Paper; *see also* NSA March 25, 2013 *Ex Parte* Letter at 1; Coconino Cnty. Sheriff's Office 2013 Reply at 1; Deschutes Cnty. Sheriff's Office 2013 Reply at 1; Thurston Cnty. Sheriff's Office 2013 Reply at 1-2; OSSA 2013 Reply at 2.

[220] *See* Transcript of Reforming ICS Rates Workshop, at 186-87 (Jason Marks, former Commissioner, New Mexico Public Regulation Commission, stating that "There are no security problems in New Mexico."); NY DOCCS July 16, 2013 *Ex Parte* Letter at 1 (discussing the NY statute that requires the "department to . . . ensure that any inmate phone call system . . . provides reasonable security measures to preserve the safety and security of each correctional facility").

[221] *See* Pay Tel Cost Summary at 3, 8, 15.

[222] *See generally 2012 ICS NPRM*, 27 FCC Rcd at 16636-47, paras. 16-48. From the outset, Petitioners made clear that their proposed rate caps were designed to ensure that ICS rates better reflected the costs of providing ICS service. *See, e.g., Alternative Wright Petition* at 4, 16-18 (the Commission should base caps on charges for

(continued….)

**Federal Communications Commission** FCC 13-113

(Continued from previous page) ──────────────

comparable services as well as service costs, because even though it "'is not a pure cost-based methodology,'" reliance on rates for comparable services "'enables [the Commission] to bring rates closer to costs'"). The Commission sought comment on these proposed caps, and on possible variations, seeking comment throughout the *2012 ICS NPRM* on ways of regulating ICS rates based on the costs of providing ICS. *See supra* para. 48 & n.191. Moreover, the "just and reasonable" standard under section 201(b) has traditionally been construed to require rates to be cost-based, absent Commission justification for a departure from that approach. *See supra* para. 45. The Commission also historically has evaluated the issue of fair compensation under section 276 with reference to the costs of providing the relevant service, including in the context of ICS. *See supra* para. 46. In this context, no one can be surprised that the Commission is now adopting caps and taking other steps to ensure that rates reflect costs.

More specifically, the Commission sought comment on how any caps should be set and how they should operate. *See, e.g.*, *2012 ICS NPRM*, 27 FCC Rcd at 16637, para. 20 (seeking comment on the cap proposal in the Alternative Wright Petition, including whether "the proposed rate caps [are] just and reasonable consistent with sections 201 and 276 of the Act," and "[i]f not, [whether] different rate caps [would] be appropriate," as well as the "factors [] the Commission [should] consider in determining an appropriate per-minute rate cap"); *id.* at 16638, para. 22 (seeking comment on "benefits to per-minute rate caps," as well as "perceived problems or challenges associated with" such caps); *id.* at 16638, para. 23 (seeking comment on how the Commission should implement rate caps in the ICS market if it decided to do so). What we do here is establish a system that relies on rate caps as well as potential complaints that rates are not based on costs, which is the kind of variant on rate caps that was contemplated in the *NPRM*. The *2012 ICS NPRM* also specifically highlighted the relationship between possible rate caps and tailoring rates to the cost of providing service. For example, in earlier comments on these issues the GEO Group argued that there were variations among facilities in the costs of providing ICS and to reflect those in setting rate maximums the Commission would need to rely on facility-specific ICS cost evaluations. GEO Group 2007 Comments at 10-11. The *2012 ICS NPRM* sought comment on those arguments, in conjunction with asking how the Commission should implement rate caps if it decided to do so. *2012 ICS NPRM*, 27 FCC Rcd at 16638, para. 23 & n.76; *see also* Petitioners 2007 Reply at 15 (observing that "[s]ome opponents [of Petitioners' proposal] go so far as to suggest that each prison facility should have its own individualized cost-based rate") (citing GEO Group 2007 Comments at 10). The rate cap approach we adopt addresses both the concern about variability in ICS costs and the potential disconnect between a particular rate cap and the cost of providing ICS service. In particular, it sets caps at a level designed to reflect the evidence of potential variability in ICS costs, *see* Section III.C.3.b(i), while also operating in a manner that enables rates to be linked back to costs on an ongoing basis, similar to the rate benchmark advocated by NASUCA in comments in response to the *2012 ICS NPRM*, *see infra* note 224. We thus disagree with the Dissent that there was inadequate notice for the Commission to specify a cost-based rate requirement as part of a rate cap framework such as the one adopted here. *See* Dissent at 112-116. The *2012 ICS NPRM* sought comment on the relevant issues and made clear that we were contemplating such a rule; at a minimum, it plainly left open the possibility that we would implement rate caps in a manner that addressed concerns about the variability in ICS costs, such that the notice "adequately frame[d] the subjects for discussion." *Omnipoint v. FCC*, 78 F.3d 620, 631-32 (D.C. Cir. 1996) (citing precedent that "[a] final rule is not a logical outgrowth of a proposed rule 'when the changes are so major that the original notice did not adequately frame the subjects for discussion,'" and holding that the Commission's action there was a logical outgrowth of its notice where the notice had identified certain concerns about extending a rule but the record revealed ways to address those concerns, leading the Commission to modify the rule as the commenters proposed); *see also, e.g.*, *Nat'l Mining Ass'n v. Mine Safety and Health Admin.*, 512 F.3d 696, 699-700 (D.C. Cir. 2008) (rule was a logical outgrowth of a proposal where the proposal suggested a particular rule but left open certain questions about how it would be implemented). Contrary to the Dissent's claim, this conclusion is consistent with the recent *Time Warner* decision, which merely applied existing case law to find that a particular rule – the so-called "standstill" rule – was promulgated in violation of the APA. *Time Warner Cable Inc. v. FCC*, Nos. 11-4138(L), 11-5152(Con), slip op. (2d Cir. Sept. 4, 2013); *see* Dissent at 113, 115. There, the Commission had not provided notice of issues related to the standstill rule but nonetheless adopted it primarily based on the belief that it fell within the APA's exception for procedural rules, *see* slip op. at 19. The Court found that the standstill rule was substantive, not procedural, and then held that the rule – once stripped of its presumed exemption under the APA – could not be considered a logical outgrowth of issues considered in the earlier NPRM, whose solicitations were so general that not a single party commented on the merits of a possible standstill provision. *Id.* at 60-63. In contrast, the framework at issue here was never viewed as exempt from the APA's notice requirements; has evolved out of specific rate cap and cost issues teed up in the *2012 ICS NPRM*; and was the subject of extensive comments, reply comments, and ex parte submissions in the record, including the submission of cost studies intended to provide a basis for rates adopted by the Commission.

14139

that will be treated as lawful absent a Commission decision to the contrary,[223] and serve to minimize regulatory burdens on ICS providers.[224]  The interim rate cap framework we adopt enables providers to charge cost-based rates up to the interim rate caps.[225]

### a.    Interim Safe Harbors for Interstate ICS Rates

60.    We adopt interim safe harbor rates of $0.12 per minute for debit and prepaid interstate ICS calls and $0.14 per minute for collect interstate ICS calls.  Rates at or below these interim interstate safe harbor rate levels will be treated as lawful, *i.e.*, just and reasonable under section 201(b) of the Act and ensuring fair compensation under section 276(b)(1)(A) of the Act, unless and until the Commission makes a finding to the contrary.[226]  Providers will have the flexibility to take advantage of the interim safe harbor rates if they so choose.  Providers that elect to take advantage of the safe harbors will enjoy the presumption that their rates are lawful and will not be required to provide refunds in any complaint proceeding.

### (i)    Methodology for Setting Interim Safe Harbor Per-Minute Rate Levels

61.    We base our methodology for setting conservative interim interstate ICS safe harbor rate levels on our analysis of rate data in the record.  In particular, the record includes detailed data on interstate ICS rates charged by ICS providers serving various types of correctional facilities.  Specifically,

---

[223] *See infra* Section III.H.

[224] As described in greater detail below, our rate caps are similar to rate benchmarks proposed by NASUCA that would operate "without prejudice to any party's ability to argue that a higher or lower rate is in fact just and reasonable in a particular case."  NASUCA 2013 Comments at 5-6.  Because we conclude that our rate caps are set conservatively, *see infra* para. 83, we rely on a waiver process for ICS providers with costs that necessitate higher rates to justify rates above the rate caps.  *See infra* Section III.C.3.b(ii).  We also allow the Commission or others to challenge ICS providers' rates set at or below the level of the cap if not cost-based, in which case we may require lower rates, potentially including refunds.  *See infra* Section III.H.4.  However, to ease administrability, provide additional protection for ICS providers under this interim framework, and focus the Commission's resources where they are most likely to be beneficial, we insulate providers from the possibility of being subject to refunds when charging rates at or below the interim safe harbor levels.  Consistent with our discussion above, *see supra* note 222, we disagree with the Dissent that there was insufficient notice to adopt rate caps that include a safe harbor mechanism.  Dissent at 114-115.

[225] As noted above, we emphasize that ICS providers should not read this Order as providing a basis to increase rates up to either the interim safe harbor or interim rate caps, though they may raise rates to the extent necessary to recover their direct and reasonable costs on a holding-company level.  *See supra* note 19.

[226] To ensure that ICS providers are fairly compensated, we adopt a number of provisions that will ensure providers have adequate flexibility to implement the rates we establish.  We also note that the "fair" standard in section 276 considers the impact on consumers.  *See supra* para. 14.  An ICS provider will lose the benefit of the safe harbor if rates at any of the facilities it serves exceed the safe harbor rate levels.  We impose this requirement for several reasons.  First, the record makes clear that ICS providers typically serve multiple correctional facilities by providing many of the necessary functionalities out of centralized locations.  *See, e.g.*, Pay Tel 2013 Comments at 13; Securus 2013 Comments at 4.  Doing so significantly reduces the costs incurred on an individual facility basis.  Moreover, the record indicates that ICS providers often obtain exclusive contracts for several facilities in a state, rather than specific rates per facility.  *See, e.g.*, Request for Proposal for Contractual Services, Inmate Calling services RFP No. 2505Z1, *available at* http://www.prisonphonejustice.org/Prison-Phone-Kickbacks.aspx?state=Nebraska (ICS contract between Public Communications Services, Inc. and Nebraska Department of Correctional Services, dated July 8, 2008); *see also* Susskind June 6, 2013 *Ex Parte* Letter.  Second, we have adopted interim safe harbor rates at conservative levels to ensure that providers are fairly compensated across facilities with different cost levels.  In doing so, we find it would be unreasonable to allow ICS providers to be subject to the burdens of a challenge for only their higher cost facilities while, at the same time, obtaining the benefits of the safe harbor to protect rates in their lower cost facilities.  *See infra* para. 121.

HRDC filed detailed and comprehensive 2012 ICS rate data for virtually all of the state departments of corrections in the country. We conclude that these data provide a reasonable basis for establishing safe harbor rates that are intended to approximate the costs of providing interstate ICS – costs that include fair compensation (including a reasonable profit) and include full recovery for security features the correctional facilities have determined to be necessary to protect the public safety.[227] Further, these safe harbor rates are validated by other evidence in the record.

62.     The comprehensive rate data submitted by HRDC include data for seven states that have excluded site commission payments from their rates.[228] Rates in every state, including the non-commission states, were included by ICS providers in their bids for state ICS contracts, such that we can presume that they are high enough to cover the providers' costs. We find that this subset of rates, derived from states that have eliminated site commissions and maintained adequate security, is the most relevant to our approach to determining the costs that should still be recoverable through interstate ICS rates. The subset provides a reasonable basis for establishing a conservative proxy for cost-based rates.[229] We set our interim safe harbor at conservative levels to account for the fact that there may be cost variances among correctional facilities.[230]

63.     We first derive an interim safe harbor rate for interstate ICS debit and prepaid calls. We establish a single rate for both debit and prepaid calls, given the evidence that costs for both billing

---

[227] HRDC 2013 Comments, Exh. A; HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B.

[228] The state departments of correction that do not include commissions are Michigan, Missouri, Nebraska, New Mexico, New York, Rhode Island, and South Carolina. *See* HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B. Although California expressly does not include commission payments in its ICS rates, analysis of its ICS contract indicates its ICS rates recover the costs of significant in-kind contributions that, under the contract, the ICS provider is required to make, in addition to the costs of ICS. *See* Standard Agreement, *available at* http://www.prisonphonejustice.org/includes/_public/rates//California/CA_current_rates_from_2012_contract.pdf (ICS rate sheet for contract between GTL and California Technology Agency, dated May 31, 2012). Because California's ICS rates recover the costs of required in-kind contributions, we find that these rates are dissimilar to the other seven states that have prohibited site commissions and we therefore do not include California in the subset of data used to derive the interim safe harbor.

[229] Our use of these states' data does not indicate that we conclude these interstate rates are necessarily at cost. Instead, we select them because they exclude site commissions, which we find is the most important factor leading to interstate ICS rates being above cost. There may well be other factors driving these rates above what we would consider to be reasonable cost but we nevertheless include these states to make a conservative safe harbor rate level calculation.

[230] *See infra* para. 69. We note that in this Order we are not simply "calling" our measures conservative, *cf.* Dissent at 120, but rather are relying on record evidence in a conservative fashion. Indeed, as we emphasize herein, the rates we set for the safe harbor and cap reflect costs that *exceed* the cost data that any party submitted in the record.

The Dissent also faults the Order for setting a uniform rate based on average costs of serving multiple facilities, claiming that a "one-size-fits-all" approach is inherently arbitrary. Dissent at 120-123. But the Dissent itself supports a uniform rate cap of 19 cents a minute for debit calls, to apply to all prisons regardless of size. Dissent at 131. Moreover, if this argument had merit, it would mean that the Commission never could base a rate on any approach that relied on the averaging of relevant record data. If this argument were to be accepted, it would lead to absurd results, requiring the Commission to eschew any form of averaging – whether across providers, across facilities, across geographic regions, or across calls – whenever there is some degree of "variability" in the averaged data. Dissent at 120-121. In the end, it would not be possible, much less practical, to set this kind of exquisitely granular rate – unsullied by any taint of averaging notwithstanding the Dissent's arguments. Requiring such an outcome would be at odds with the Commission's long-standing practice of basing prescribed rates on some form of averaged data. *See infra* note 280.

**Federal Communications Commission**                                    **FCC 13-113**

approaches are substantially similar.[231]  We begin by calculating the average per-minute interstate ICS debit and prepaid call rates of the seven identified state departments of corrections.  We assume a call duration of 15 minutes for purposes of our calculation.[232]  We then total the charges for a 15-minute call for each state, taking into account per-minute as well as per-call charges.  We divide that total by 15 to calculate an average per-minute rate for each state.  Finally, we average those per-minute rates across the seven relevant states.  This calculation results in an average rate of $0.1186 per minute for a 15-minute debit call.[233]  We similarly calculate the same states' prepaid interstate ICS calling rates, to obtain an average prepaid rate of $0.1268 per minute.  Given the similarities of debit and prepaid charges, we group the two into a single category[234] and average those rates to obtain an overall per minute average of $0.1227, which we round to $0.12 per minute.[235]  We therefore adopt $0.12 as the safe harbor per minute

---

[231] See HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B (citing states such as Arizona, Maryland, Missouri, Nebraska, New Hampshire, South Carolina, South Dakota, and Virginia where rates for pre-paid and debit calls are the same and are both below those for collect calls).

[232] We find that the record supports an average call duration of 15 minutes.  The record contains various assertions as to the call duration that should be used for purposes of calculating ICS rates.  Petitioners use a 15-minute call duration as the basis for their proposal.  Petitioners 2013 Comments, Exh. C, Bazelon Decl. at 14.  They also state that in 2010 the average duration for interstate ICS calls in California prisons was 12.1 minutes.  *Id.*  The flat interstate ICS rates in South Carolina are based on a maximum 15-minute call length.  *See* State of South Carolina B&CB DSIT DOC Inmate Calling System Contract, *available at* http://www.prisonphonejustice.org/includes/_public/contracts//South%20Carolina/SC_contract_with_GTL_201120 16_with_RFP.pdf at 17 (ICS contract between GTL and the South Carolina DOC dated April 22, 2011).  The flat interstate ICS rates in New Mexico are based on a 20-minute maximum call length.  *See* New Mexico ICS Contract, Attach. A.  Securus states that the average duration of interstate calls across all of its facilities in 2012 was 11.63 minutes.  Securus 2013 Comments, Expert Report of Stephen E. Siwek at 8.  Given that lower rates tend to stimulate usage, it is reasonable to anticipate that call durations would tend to increase under our rates.  We therefore utilize a 15-minute call duration to convert per-call charges to per-minute charges.

[233] To derive this per minute average, we initially converted the per-call charges that some of the states include in their rates to per-minute charges using a 15-minute call duration.  For example, the ICS provider for South Carolina's state prisons charges a $0.75 per-call charge which was divided by 15 minutes to yield a per-minute charge of $0.05.  We added the resulting per minute amounts to the per-minute rates also charged by the providers for the eight states to derive a total per-minute charge for each state.  Finally, we averaged the total per-minute charges for the seven states to arrive at the average per-minute rate of $0.12.  The rate data was submitted by HRDC.  *See* HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B.

[234] *See supra* note 231.

[235] Even with such rounding, we conclude that our interim safe harbor is conservative.  Indeed, in evaluating the data from the states that have eliminated the use of commissions, we note that there are five state rates with a cluster within the $0.04 - $0.08 per minute range and two other states outside this cluster with significantly higher rates.  *Compare* HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B (per-minute rates for interstate debit calls of $0.043 for New Mexico, $0.048 for New York, $0.05 for Missouri and South Carolina, and $0.08 for Nebraska) *with id.* (per-minute rates for interstate debit calls of $0.21 for Michigan and $0.348 for Rhode Island) (assuming a 15 minute call duration to translate per-call charges into effective per-minute rates).  Given that evidence in the record does not suggest a dramatic difference in costs among states (and, indeed, such states may be served by the same ICS provider using common, centralized facilities), the states with higher rates are likely to include non-ICS costs and therefore could reasonably be excluded from the state rate data used to determine a reasonable interim safe harbor for interstate debit ICS rates.  Excluding these states would result in an average per-minute rate of $0.054, less than half the safe harbor debit rate we set above.  Although evidence in the record suggests that some of the seven states that have eliminated commissions may continue to include significant non-ICS costs in setting their rates, in the interest of being conservative in setting our interim safe harbor, we choose not to exclude these states from our calculation.

Moreover, looking at these states from a statistical perspective, the two states with higher rates, Michigan and Rhode Island, have an average debit cost of $0.279 per minute whereas the other five states have an average debit cost of $0.054 per minute, less than one-fifth of the Michigan and Rhode Island level.  An analysis of variance (ANOVA) indicates that this difference of $0.225 per minute is statistically significant ($p = 0.002$) under assumptions of

(continued....)

14142

**Federal Communications Commission**      **FCC 13-113**

rate for interstate ICS debit and prepaid calls. As described in more detail below, ICS providers have the flexibility to satisfy the safe harbor either by certifying that the per-minute rate is at or below the safe harbor or by demonstrating that their total charge for a 15-minute call is at or below the safe harbor per-minute rate times 15.[236]

64.     We derive a corresponding interim safe harbor rate level for interstate ICS collect calls by utilizing the data provided by HRDC for the interstate ICS collect calling rates for the same set of states. Employing the same methodology utilized by ICS debit and prepaid calls, we determine the average rate for a 15-minute interstate ICS collect call for these states to be $0.1411 per minute, which we round to $0.14 per minute. We therefore adopt $0.14 per minute as the safe harbor rate for interstate ICS collect calls.[237]

65.     Other data in the record further validate that the interim interstate safe harbor rates we establish here are just, reasonable, and fair. In addition to being higher than rates currently charged by several state departments of corrections without site commissions,[238] our $0.12 per minute safe harbor debit call rate is at or above the rate that would result if site commissions were deducted from the rates in ten states that allow them.[239] Similarly, there are nine states with site commission payments in their rates whose interstate ICS collect rates are at or below our $0.14 per minute safe harbor collect call rate when

---

(Continued from previous page) ───────────────

normality. That is, there is only one chance out of 500 that one would randomly draw a sample with these characteristics if all seven rates came from a normal distribution with a common mean and standard deviation. Consequently, statistical evidence indicates that Michigan and Rhode Island debit costs are drawn from a different distribution than the debit costs for the other five states.

[236] *See infra* para. 88.

[237] This interstate collect ICS rate is likewise conservative. The collect rate data of the seven states that have eliminated site commissions reflect substantially the same distribution pattern as did the debit and prepaid rates. *See supra* note 235. Five state rates are clustered in a relatively low range between $0.04 and $0.12 with the same two states' rates being significantly higher. Given the lack of record evidence suggesting a dramatic difference in costs among states, the states with higher rates likely include non-ICS costs and therefore could reasonably be excluded from the state rate data in a determination of a reasonable interim safe harbor for interstate collect ICS rates. Excluding these states would result in an average per-minute rate of $0.074, or approximately half the safe harbor rate we set above for interstate ICS calling. In the interest of being conservative in setting our interim safe harbor, however, we choose to include these states from our calculation. A statistical analysis of the state rate data would also lead to exclusion of these two states. Consistent with our view that both Michigan and Rhode Island departments of corrections debit rates likely include non-ICS costs, which we consider irrelevant to the recovery of ICS, both states stand out as unusual in the distribution of per-minute rates for a 15-minute collect call. They are the only states with collect rates that exceed $0.117 per minute. Taken together, Michigan and Rhode Island have an average collect rate of $0.3085 per minute, while the other five state have an average collect rate of $0.0742 per minute, less than one-fourth that of Michigan and Rhode Island. An analysis of variance (ANOVA) indicates that this difference of $.234 per minute is statistically significant ($p = 0.0045$) under assumptions of normality. That is, there is only one chance out of 220 that one would randomly draw a sample that looked like this if all seven rates came from a normal distribution with a common mean and standard deviation. Consequently, the evidence indicates that Michigan and Rhode Island collect rates are drawn from a different distribution than the collect rates for the other five states.

[238] *See* HRDC 2013 Comments, Exh. A; HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B (New York charges $0.048 per minute for all calls ($0.72 total for a 15-minute call), New Mexico charges a flat rate of $0.65 per call for all calls ($0.043 per minute for a 15-minute call), and South Carolina charges effective rates of $0.05 per minute for debit calls and $0.12 per minute for collect calls (based on flat fees; assuming a 15 minute call)).

[239] The states are Colorado, Connecticut, Florida, Louisiana, Massachusetts, Montana, New Hampshire, North Carolina, Oklahoma, and Vermont. *See* HRDC June 8, 2013 *Ex Parte* Letter, Rev. Exh. B. Per-call rates were translated into per-minute rates by assuming a 15 minute call duration.

### F.    Initial Regulatory Flexibility Analysis

186.    As required by the Regulatory Flexibility Act of 1980 (RFA),[561] the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) for this Notice, of the possible significant economic impact on small entities of the policies and rules addressed in this document.  The IRFA is set forth as Appendix D.  Written public comments are requested on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the Notice provided on or before the dates indicated on the first page of this Notice.  The Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, will send a copy of this Notice of Proposed Rulemaking, including the IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[562]

## VII.    ORDERING CLAUSES

187.    Accordingly, IT IS ORDERED that pursuant to sections 1, 4(i), 4(j), 201, 225, 276, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 201, 225, 276, 303(r), the Report and Order and Further Notice of Proposed Rulemaking in WC Docket No. 12-375 ARE ADOPTED, effective 90 days after publication in the Federal Register, except those rules and requirements involving Paperwork Reduction Act burdens, as discussed below.

188.    IT IS FURTHER ORDERED that Part 64 of the Commission's Rules, 47 C.F.R. Part 64, is AMENDED as set forth in Appendix A.  These rules shall become effective 90 days after publication in the Federal Register, except for § 64.6060 of the Commission's Rules and the Mandatory Data Collection requirement as discussed in Section I of the Order, which WILL BECOME EFFECTIVE immediately upon announcement in the Federal Register of OMB approval.

189.    IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Order and Further Notice of Proposed Rulemaking, including the Final Regulatory Flexibility Analysis and Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.


FEDERAL COMMUNICATIONS COMMISSION



Marlene H. Dortch
Secretary

---

[561] *See* 5 U.S.C. § 603.

[562] *See* 5 U.S.C. § 603(a).

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

In the Matter of                                  )
                                                  )          WC Docket No. 12-375
Rates for Interstate Inmate Calling Services      )


## COMMENTS OF THE NATIONAL SHERIFFS' ASSOCIATION

The National Sheriffs' Association (NSA), by its attorney, hereby submits comments on

the *Second Further Notice of Proposed Rulemaking (SFNPRM),*[1] in which the Commission seeks

comment on a number of issues in connection with the regulation of Inmate Calling Services

(ICS).  In it comments, NSA demonstrates that Sheriffs incur significant costs in allowing ICS in

jails and that Sheriffs must be allowed to recover their costs to encourage the deployment of ICS.

NSA supports a tiered rate structure for ICS rates to ensure that the rates for ICS providers that

serve jails are sufficient to allow ICS providers to recover their costs.  NSA also supports a

transition of at least two years for the implementation of the rules.

NSA represents over 3,000 Sheriffs nationwide who operate approximately 80% of the

jails in the country.  Sheriffs, typically, are the chief law enforcement official of their counties

with numerous duties in addition to the operation of county jails.  The Sheriffs in the United

States are very diverse and have different jurisdictional sizes and challenges, including budget

constraints.  Similarly, the size of the jails operated by Sheriffs and their inmate populations are

very diverse with different challenges.  Accordingly, the needs of Sheriffs with respect to ICS,

the cost to provide ICS in jails and the cost to the Sheriffs to perform ICS-related duties varies by

---

[1] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Further Notice of
Proposed Rulemaking, FCC 14-158 (rel. October 22, 2014) (*Second Further Notice of Proposed
Rulemaking or SFNPRM*).

facility. Moreover, the cost structure and needs of jails are very different from prisons.[2] Therefore, a one-size-fits-all approach for cost recovery for Sheriffs or ICS providers will not be sufficient to ensure the continued operation of ICS in jails.

**Sheriffs Incur Real and Significant Cost in Allowing ICS in Jails**

In the *SFNPRM*, the Commission seeks comment on whether correctional facilities incur costs in the provision of ICS and, if so, how facilities should recover those costs. The Commission requests data on costs "that are directly related to the provision of ICS."[3]

Every jail incurs costs for facility officers' time to maintain security and to administer the ICS system. A top priority for all Sheriffs operating jails is to maintain and ensure security in all aspects of the jail's operation, including when inmates make and receive calls. In the *SFNPRM*, the Commission focuses exclusively on benefits of ICS for inmates. However, ICS also presents significant risks. Inmates oftentimes try to continue criminal activity from jails. They communicate with other criminals outside of jails and in other jails and prisons to circumvent security. They contact witnesses, their victims, judges, attorneys and law enforcement to harass or intimidate.

In order to ensure the security of the public, facility officers and inmates, facility officers have responsibilities to record and monitor calls to protect the public from abuse and to prevent criminal activity when inmates make telephone calls. Security duties performed by facility officers may include:

- Enrollment and management of inmates into voice biometrics system

---

[2] In general, a jail is used by local jurisdictions such as counties and cities to confine people for short periods of time, including people who have been convicted to serve a short sentence, individuals awaiting trial, and people who have not yet paid bail. In contrast, prisons are operated by the state and federal government and are used to house convicted criminals for periods of much longer duration.

[3] SFNPRM at ¶28.

2

**JA117**

- Respond to ICS system alerts
- Forward alerts and recorded calls to investigators
- Conduct real-time monitoring of inmate conversations
- Analyze call recording of inmate conversations
- Burn CDs of conversations for further review by investigators
- Respond to law enforcement requests and subpoenas for call detail records and recordings

Facility officers also must perform various administrative functions when inmates have access to ICS. Facility officers may be required to perform duties such as:

- Be trained on the operation of the ICS system
- Answer questions from inmates and family members (how calls are billed, why calls are blocked, how to open an account to receive calls to CLEC and wireless carrier numbers)
- Maintain and administer the list of numbers to be blocked (facility numbers, officers' numbers, judges' numbers, witnesses' numbers, victims' numbers, jurors' numbers)
- Take requests from the public to have numbers blocked
- Administer prepaid cards and/or debit system, if utilized
- Train inmates on the use of ICS to include use of trust account balance inquiry, transfer of funds to debit account, placement of debit calls
- Administer a PIN system, if utilized
- Administer a voice biometric system, if utilized
- Maintain an approved number list, if utilized
- Contact the ICS provider for service issues
- Accompany ICS technicians while in the facility to service inmate phone systems
- Maintain negative databases of blocked numbers
- Initiate call traffic reviews
- Flag calls to specific phone numbers for review
- Flag calls from various cell blocks to the same phone numbers

In addition, facility officers have increased training requirements to learn to use the complex ICS system, including:

- Administer the facility's phone use rules and restrictions
- Establish security levels and clearance codes for various officers
- Authorize selected facility officers for levels of access and control
- Remove and implement administrative blocks
- Administer special numbers, PREA, crime tip lines, attorneys, etc.
- Generate reports and statistical analyses
- Research and identify call traffic patterns

To determine the cost of performing duties associated with ICS, NSA conducted a survey

3

of its membership. Sheriffs reported the number of hours per week for officers, supervisors and other employees spent on monitoring/security duties[4] and administrative duties[5] in connection with ICS and the annual compensation for the officers and employees engaged in these duties. Sheriffs also were asked to provide the most recent three months of data from ICS providers concerning the total minutes of use for the facility for each month. Survey results were received from Sheriffs operating jails in 23 states and the District of Columbia.

The per minute cost to perform duties in connection with ICS for each jail was calculated based on the data provided. A spreadsheet showing the data for the facilities that responded to the survey and the per minute cost calculated for each facility is attached as Exhibit A. In addition to the total cost per minute, Exhibit A also shows the per minute cost to perform monitoring/security tasks and the per minute cost to perform administrative tasks for each facility.

Based on the data provided, it is clear that ICS requires jails to incur cost for officer and supervisor time that they otherwise would not incur. As shown in Exhibit A, each individual facility has its own per minute cost because of differences in officer, supervisor and other employee hours spent on various duties, which may reflect differences in the ICS system and security needs of each facility; the compensation rates for officers, supervisors and other employees; and differences in minutes of use. Although in general, jails with a larger average daily population (ADP) of inmates have a lower per minute cost, this does not hold true for all jails. Even jails with similar ADP's have a significantly different per minute cost for

---

[4] The survey asked Sheriffs to report time spent on call monitoring, responding to ICS system alerts, responding to law enforcement requests for records/recordings, call recording analysis, enrolling inmates for voice biometrics, and other duties.

[5] The survey asked Sheriffs to report time spent on system administration, answering questions from the public, answering questions from inmates, blocking/unblocking numbers, providing escorts for phone repairs, educating inmates on the use of ICS and other duties.

4

monitoring/security and administrative duties.

### ICS Providers Should Pay Jails for the Costs Incurred to Allow ICS

The Commission asks for comment on how to enable facilities to recover the demonstrated costs related to the provision of ICS "in a manner that does not disrupt a market-based approach to lowering rates for end users of ICS."[6] As an initial matter, the Commission is incorrectly focusing only on lower rates for end users. Section 276 of the Act requires the Commission to ensure the deployment of payphone services to the benefit of the general public. Denying payments to jails or restricting such payments to levels that do not at least cover costs, will have the effect of reducing the incentive and ability to allow ICS in jails.

In this regard, the Commission has it exactly backwards when it asks if site commissions hinder the widespread deployment of payphone services. On the contrary, site commissions and/or other payments to correctional facilities have made it possible for even the smallest of jails and jails with the most limited of budgets to allow this labor intensive activity. This conclusion is supported by the numerous comments in the record in which Sheriffs and jail administrators have stated that a loss of compensation from ICS providers would force them to reexamine whether and the extent to which, ICS would be allowed in their jail.

The NSA survey clearly shows that jails incur a significant cost for duties officers must perform if inmate calling services are to be allowed. Today's sophisticated ICS system requires technically proficient and experienced facility officers. Inmate phone services can only be provided when trained officers daily monitor and review information to protect the public from abuse and prevent criminal activity. Accordingly, jails must receive cost recovery to administer the ICS system. There is no valid reason to restrict the ability of jails to recover these costs from

---

[6] *SFNPRM* at ¶28.

ICS providers or to restrict the ability of ICS providers to recover these costs from inmates and the recipients of their phone calls.

In addition, in many, if not most, cases, inmate calling is a discretionary service allowed for the benefit of inmates and their families. If jails are not permitted to recover their ICS costs, then some Sheriffs may be forced to significantly limit or eliminate altogether access to inmate phones in their jails. Accordingly, the Commission must not prohibit the recovery of these costs. Moreover, the NSA cost survey demonstrates that the cost structure in jails varies, as does call volume, and, therefore, a single compensation amount for all jails is not appropriate and would not be sufficient. Similarly, a single compensation amount for prisons and jails would not be sufficient as jails are local or county-based facilities that do not have the economies of scale or scope of larger federal and state prisons.

Thus, the Commission must balance its desire to keep ICS rates at a low level with the requirement to ensure the deployment of services. To ensure the deployment of services, the Commission must not restrict the ability of jails to recover their costs from ICS providers. Further, the ICS provider and facility should be able to structure cost recovery in any manner to which they agree, including a per minute payment, a percentage payment or a lump sum payment.

### The Data Does Not Support the Commission's Conclusions on Site Commissions

The Commission seeks comment on whether site commissions, including all payments whether in-kind payments, exchange, allowances, or other fees, should be prohibited. The Commission states that site commissions are the primary reason ICS rates are unjust and unreasonable and ICS compensation is unfair. The Commission has acknowledged, however, the possibility that some portion of payments to correctional facilities may reimburse

6

**JA121**

correctional facilities for costs, such as security costs, that the Commission would likely consider reasonably and directly related to the provision of ICS.

As shown in the data provided by NSA, at least some portion of commission payments, in fact, reimburse jails for security and administrative costs directly related to ICS. Accordingly, the Commission's proposal to eliminate all commission payments is not justified.

The Commission also states that where states have eliminated site commissions, rates have fallen dramatically. The Commission predicts that prohibiting site commissions "will enable the market to perform properly and encourage selection of ICS providers based on price, technology and services rather than on the highest site commission payment."[7] The Commission seeks comment on whether this approach will foster a competitive market that will ensure just and reasonable rates and fair compensation for ICS while minimizing regulatory burdens on ICS providers and the Commission.

It is not at all clear that site commissions must be eliminated to reduce ICS rates, especially since the Commission intends to cap all ICS rates. However, it is clear that eliminating payments to jails will reduce the ability and incentive of Sheriffs to allow ICS in jails. Accordingly, the Commission should not eliminate site commissions for jails.

**A Single Nationwide ICS Rate Will Adversely Impact the Availability of ICS in Jails**

The Commission asks whether it should establish one nationwide per minute rate for interstate and intrastate ICS or whether it should establish tiered rate caps. The record shows that the cost to provide ICS in jails, and especially smaller jails, is greater than the cost to serve prisons. Thus, as NSA has argued previously, a uniform ICS rate will not provide adequate compensation to ICS providers that primarily serve jails and smaller facilities and, as a result, a

---

[7] *SFNPRM* at ¶21.

uniform ICS rate plan will impact whether ICS providers will be willing to provide service in higher cost jails.

Accordingly, NSA supports the development of separate rates for jails operated by Sheriffs. The characteristics that cause the cost structure for jails operated by Sheriffs to be higher than other institutions include the fact that these facilities are operated on a local jurisdiction basis, such as a county, with fewer inmates and higher turnover rates. A rate structure which sets a uniform, low rate cap based on average costs that apply to all facilities means that the costs at some facilities are higher than the rate allowed. Jails operated by Sheriffs are most likely to fall into that category.

In fact, ICS providers have stated that they may stop providing ICS altogether in higher cost facilities, like jails, if rate caps are based on average costs. For example, Securus stated that it would be difficult to continue providing services to smaller institutions that are more costly to serve.[8] Pay Tel stated that "it will not be able to provide service to those facilities where it is unable to recover its costs."[9] CenturyLink stated that cross subsidized facilities will not be able to recover costs which could lead to companies terminating service[10] and that it is "unlikely to pursue contracts with certain county facilities at least until the Commission concludes its anticipated rulemakings to clarify and finalize the ICS rate structure."[11]

Against this backdrop, NSA has significant concerns with the proposal filed by Securus, GTL and Telmate urging the Commission to adopt rate caps of $0.20 per minute for debit and prepaid interstate and intrastate ICS and $0.24 per minute for all interstate and intrastate collect

---

[8] Letter from Stephanie A. Joyce, Counsel to Securus Technologies, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed Nov. 25, 2013).

[9] Petition of Pay Tel Communications, Inc. for Partial Stay of Rates for Interstate Inmate Calling Services Order, WC 12-345, at 24, (Nov. 26, 2013) (Pay Tel Stay Petition).

[10] Petition of CenturyLink for Stay Pending Judicial Review, WC 12-345, at 13 (Nov. 27, 2013).

[11] Id., Declaration of Paul Cooper at ¶18.

8

**JA123**

ICS, effective 90 days after adoption of a final order.  The proposal urges the FCC to prohibit all in-kind payments and administrative fees not directly related to the provision of ICS.  The proposal also argues that any compensation to correctional facilities must be nominal or else it will require higher ICS rates.

NSA notes that these three carriers primarily serve prisons and large jails.  Therefore, it appears that their proposed ICS rate does not reflect the cost to serve small jails.  A single rate as proposed by these carriers will not support ICS in all facilities and will decrease the deployment in jails, contrary to section 276 of the Act.  A uniform, low rate also would provide no incentive to increase the number of ICS providers willing to provide service in small jails.  On the contrary, it may encourage ICS providers to stop providing service in higher cost facilities altogether to increase their profit margins.

Similarly, the uniform, nominal compensation rate for jails proposed by these carriers does not accurately reflect the cost to Sheriffs to allow access to ICS in jails and, in particular, small jails.  Accordingly, the nominal compensation rate proposed by the carriers will not provide adequate compensation to Sheriffs, which could lead to less access to ICS in jails.

**A Transition Period of at Least Two Years Should be Adopted**

The Commission asks about the impact of the ICS requirements on existing contracts between correctional facilities and ICS providers and asks if there should be a transition period before any new rules go into effect.  The Commission asks whether 90 days after the effective date of the order is an appropriate transition period to comply with new rules and rate caps; whether a two year transition period should be allowed; or whether "one state or state subdivision budget cycle to transition away from site commission payments to allow facilities and states time to adjust" is the appropriate period.  The Commission also asks for comment on

9

Securus' proposal that site commissions should be completely eliminated by January 1, 2016 and that rate reform should be effective by that date.

NSA supports a transition period of at least two years before any new rules become effective to permit jails time to try to adjust their budgets so that ICS in jails can be continued. As stated by NSA in its Petition for Reconsideration of the interim rate caps for interstate ICS calls, a short implementation period will preclude the ability of Sheriffs operating jails to modify their budgets to account for the loss of revenues they will experience or consider other alternatives that will allow them to maintain the security and administrative functions necessary to allow ICS. A two-year transition period also may reduce the impact on existing contracts. NSA urges the Commission to reject Securus' request to implement rate reform and eliminate site commissions by January 1, 2016, as this time period is too short to allow Sheriffs to adjust their budgets.

**Conclusion**

NSA asks the Commission to adopt the recommendations contained herein. As shown, Sheriffs incur real and significant costs in connection with the security and administrative duties that are incurred when ICS is allowed in jails and, at a minimum, they must be allowed to recover these costs to ensure the continued deployment of ICS in jails. Moreover, the needs and cost structure for jails and prisons are different and, therefore, one uniform rate for ICS calls and a uniform approach for compensation for facilities is not sufficient to ensure the continuation of

10

ICS in jails.  Further, to reduce the impact of any new rules and to provide Sheriffs with the opportunity to adjust their budgets, the Commission should adopt at least a two-year transition period.

Respectfully submitted,

**NATIONAL SHERIFFS' ASSOCIATION**

By:     /s/ Mary J. Sisak

Blooston, Mordkofsky, Dickens, Duffy & Prendergast, LLP
2120 L Street, N.W., #300
Washington, D.C., 20037
(202) 659-0830
mjs@bloostonlaw.com

Its Attorney

Dated:  January 12, 2015

Exhibit A

**NSA Member Data Summary - ADP 1-99**

| | | Administrative | | | | | | | | | Monitoring/Security | | | | | | | | | Minutes of Use Data | | | Calculating Summary Analysis Fields | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Size # | ADP | Weekly Detention Officer Hours | Detention Officer Annual Wages | Detention Officer Annual Benefits | Weekly Detention Supervisor Hours | Detention Supervisor Annual Wages | Detention Supervisor Benefits | Other Hours | Other Annual Wages | Other Annual Benefits | Weekly Detention Officer Hours | Detention Officer Annual Wages | Detention Officer Benefits | Weekly Detention Supervisor Hours | Detention Supervisor Annual Wages | Detention Supervisor Benefits | Other Hours | Other Annual Wages | Other Annual Benefits | Month 1 Minutes | Month 2 Minutes | Month 3 Minutes | Calculated Monthly ADMIN Expense | Calculated Monthly SECURITY Expense | Average Monthly Call Minutes | Average Monthly Call SECURITY per Minute | Average ADMIN Cost per Minute | Average SECURITY Cost per Minute | Average TOTAL Cost per Minute |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15 | 10.5 | $31,692 | $14,230 | 1 | | | 3 | $38,615 | $16,990 | 8 | $37,892 | $34,230 | 3 | | | 11 | $38,615 | $16,990 | 7,412 | 6,948 | 10,215 | $3,294 | $2,140 | 8,192 | $0.158 | $0.261 | $0.419 |
| 2 | 18 | 5 | $42,184 | $11,100 | | | | | | | 10 | $42,184 | $11,100 | 2 | $50,000 | $16,800 | 3 | $60,000 | $16,990 | 3,259 | 3,248 | 1,494 | $555 | $1,762 | 2,700 | $0.205 | $0.653 | $0.858 |
| 3 | 20 | 9.5 | $32,562 | $9,117 | 5 | $42,486 | $11,896 | | | | 9.5 | $32,562 | $9,117 | 6.5 | $42,486 | $11,896 | 3 | | | 2,263 | 1,979 | 850 | $1,991 | $1,341 | 1,667 | $0.800 | $0.920 | $1,740 |
| 4 | 30 | 15 | $29,744 | $4,069 | 30 | $38,168 | $5,694 | | | | 2 | $29,744 | $4,069 | 18 | $38,168 | $5,694 | | | | 7,944 | 6,578 | 4,528 | $3,761 | $3,763 | 6,350 | $0.582 | $0.278 | $0.870 |
| 5 | 41 | 24 | $49,895 | $26,715 | 1 | $60,560 | $33,135 | | $67,503 | $32,830 | 2 | $49,895 | $26,715 | 2 | $60,560 | $33,135 | 8 | $67,503 | $32,830 | 8,457 | 8,010 | 11,777 | $4,009 | $2,088 | 9,415 | $0.429 | $0.222 | $0.651 |
| 6 | 44 | 28 | $29,702 | $12,808 | 22 | $37,232 | $14,086 | | | | 2 | $29,702 | $12,908 | 21 | $37,232 | $14,086 | | | | 7,256 | 8,109 | 7,714 | $4,838 | $2,423 | 7,723 | $0.636 | $0.334 | $0.940 |
| 7 | 45 | 14.5 | $45,000 | $14,000 | 4 | $60,000 | $16,000 | | | | 2.5 | $45,000 | $24,000 | 4.5 | $60,000 | $16,000 | | | | 2,723 | 2,430 | 2,604 | $2,416 | $1,880 | 2,586 | $0.534 | $0.727 | $1,601 |
| 8 | 45 | 10 | $23,789 | $9,263 | 4 | $27,359 | $10,103 | | | | 1 | $23,789 | $9,263 | 1 | $27,359 | $10,103 | | | | 7,327 | 8,565 | 7,579 | $2,001 | $147 | 6,157 | $0.163 | $0.024 | $0.186 |
| 9 | 46 | 4 | $40,302 | $30,076 | 7 | $58,968 | $30,076 | | | | 2 | | | 2 | $58,968 | $30,076 | 4 | $49,913 | $30,076 | 5,633 | 4,722 | 4,721 | $1,891 | $1,038 | 5,025 | $0.375 | $0.206 | $0.581 |
| 10 | 48 | | | | 5 | $45,000 | $5,000 | | | | | | | 1 | $45,000 | $50,000 | 5 | $35,000 | $5,000 | 2,882 | 6,519 | 8,920 | $521 | $615 | 6,374 | $0.119 | $0.141 | $0.260 |
| 11 | 57 | 7 | $39,702 | $15,086 | 7 | $61,800 | $19,651 | | | | 6 | $39,702 | $15,086 | 6 | $61,800 | $19,651 | | | | 20,462 | 21,370 | 17,620 | $1,957 | $1,703 | 19,817 | $0.100 | $0.086 | $0.186 |
| 12 | 60 | 14 | $36,451 | $24,913 | 7 | $38,022 | $23,595 | | | | 20 | $36,451 | $24,913 | 8 | $38,022 | $23,595 | | | | 9,754 | 11,061 | 12,241 | $2,662 | $3,546 | 11,032 | $0.190 | $0.253 | $0.442 |
| 13 | 65 | 3 | $42,640 | $40,000 | 3.5 | $38,168 | $55,000 | | | | 2 | $42,640 | $40,000 | 4 | $38,168 | $55,000 | | | | 3,783 | 5,199 | 8,164 | $1,270 | $1,204 | 4,049 | $0.314 | $0.298 | $0.611 |
| 14 | 69 | 11 | $40,394 | $21,932 | 12 | $43,591 | $29,937 | | | | 3 | $40,394 | $21,932 | 19 | $43,591 | $29,937 | | | | 15,850 | | | $3,267 | $2,910 | 15,850 | $0.206 | $0.184 | $0.390 |
| 15 | 70.33 | 1.5 | $44,650 | $28,532 | 4.5 | $56,150 | $34,094 | | | | | $44,650 | $28,532 | 2.2 | $56,160 | $34,094 | 0.5 | $76,296 | $40,120 | 3,513 | 7,121 | 11,269 | $1,037 | $333 | 8,134 | $0.128 | $0.066 | $0.193 |
| 16 | 78 | 6.4 | $36,400 | $21,640 | 1 | $52,000 | $31,200 | | | | 0 | $36,400 | $21,840 | 0.5 | $52,000 | $31,200 | | | | 14,576 | 12,307 | 12,673 | $950 | $587 | 13,152 | $0.063 | $0.006 | $0.069 |
| 17 | 79 | 12.5 | $50,336 | $7,550 | 10 | $69,950 | $10,493 | | | | 3 | $50,336 | $7,550 | 7 | $69,950 | $10,493 | | | | 10,009 | 12,051 | 16,567 | $2,183 | $1,535 | 12,876 | $0.247 | $0.119 | $0.366 |
| 18 | 80 | 8 | $56,160 | | 8 | $70,720 | | | | | | $56,160 | | | | | | | | 2,894 | | | $2,115 | $906 | 2,894 | $0.731 | $0.323 | $1,054 |
| 19 | 81 | 9 | $41,900 | $2,000 | 1.7 | $53,500 | $2,000 | | | | 5 | $41,900 | $2,000 | 4 | $35,500 | $2,000 | | | | 3,526 | 3,837 | 4,924 | $1,017 | $936 | 4,096 | $0.251 | $0.229 | $0.479 |
| 20 | 90 | 9 | $26,500 | | 4.5 | $29,000 | | | | | 1 | $26,500 | | 3 | $29,000 | | 10 | $35,000 | | 8,773 | 7,643 | 10,419 | $788 | $1,086 | 8,915 | $0.086 | $0.122 | $0.208 |
| 21 | 91 | 5 | $28,600 | | 2 | $40,000 | | 2 | $35,500 | | 1 | $28,600 | | 4 | $40,000 | | | | | 14,941 | 30,442 | | $613 | $393 | 22,692 | $0.027 | $0.017 | $0.044 |
| 22 | 91 | 5 | $35,000 | $10,000 | 2 | $39,000 | $12,000 | | | | 1 | $35,000 | $10,000 | 2 | $29,000 | | 2 | | $12,000 | 31,540 | 34,223 | 40,618 | $400 | $200 | 35,464 | $0.011 | $0.006 | $0.017 |

**NSA Member Data Summary - ADP 100-349**

| Site # | ADP | Weekly Detention Officer Hours | Detention Officer Annual Wages | Detention Officer Annual Benefits | Weekly Administrative Detention Supervisor Hours | Administrative Detention Supervisor Annual Wages | Administrative Detention Supervisor Annual Benefits | Weekly Other Hours | Other Annual Wages | Other Annual Benefits | Weekly Detention Officer Hours | Monitoring/Security Detention Officer Annual Wages | Detention Officer Annual Benefits | Weekly Detention Supervisor Hours | Detention Supervisor Annual Wages | Detention Supervisor Annual Benefits | Weekly Other Hours | Other Annual Wages | Other Annual Benefits | Month 1 Minutes | Month 2 Minutes | Month 3 Minutes | Calculated Monthly ADMIN Expense | Calculated Monthly SECURITY Expense | Average Monthly ADMIN Cost per Minute | Average Monthly SECURITY Cost per Minute | Average ADMIN Cost per Minute | Average TOTAL Cost per Minute |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**NSA Member Data Summary - ADP 350-999**

| Site # | ADP | Weekly Detention Hours | Detention Officer Wages | Detention Officer Annual Benefits | Weekly Detention Supervisor Hours | Administrative Detention Supervisor Annual Wages | Detention Supervisor Annual Benefits | Weekly Other Hours | Other Annual Wages | Other Annual Benefits | Weekly Detention Officer Hours | Detention Officer Annual Wages | Detention Officer Annual Benefits | Weekly Detention Supervisor Hours | Detention Supervisor Annual Wages | Detention Supervisor Annual Benefits | Weekly Other Hours | Other Annual Wages | Other Annual Benefits | Month 1 Minutes | Month 2 Minutes | Month 3 Minutes | Calculated Monthly ADMIN Expense | Calculated Monthly SECURITY Expense | Average ADMIN Minutes per Minute | Average SECURITY Minutes per Minute | Average ADMIN Cost per Minute | Average TOTAL Cost per Minute |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 83 | 360 | | | | 1.5 | $71,000 | $28,000 | | | | | | | 2 | $71,000 | $26,000 | | | | 81,046 | 112,322 | 99,370 | $300 | $404 | $0.046 | $0.004 | $0.004 | $0.007 |
| 84 | 376 | 6 | $41,185 | $22,958 | | $47,361 | $22,958 | | $41,542 | $22,958 | 3 | $41,185 | $22,958 | 2.5 | $47,361 | $22,958 | 56.5 | $48,097 | $22,958 | 141,991 | 199,633 | 197,896 | $1,124 | $9,162 | $195,507 | $0.006 | $0.047 | $0.047 |
| 85 | 379 | 46.5 | $38,000 | $16,583 | 3 | $54,000 | $20,414 | 15 | $28,000 | $18,262 | 22 | $38,000 | $16,583 | 5 | $54,000 | $20,414 | 72 | $28,000 | $18,262 | 139,242 | 126,113 | 140,836 | $7,042 | $10,603 | $185,296 | $0.051 | $0.076 | $0.141 |
| 86 | 384 | 19 | $32,611 | | 12 | $38,000 | | | $58,000 | | 6 | $38,000 | | 14 | $38,000 | | 4 | $53,300 | $21,880 | 30,037 | 18,378 | | $2,239 | $1,544 | $2,208 | $0.092 | $0.064 | $0.156 |
| 87 | 385 | 6 | $48,290 | $19,275 | 11 | $68,540 | $27,418 | 3 | $48,190 | $19,275 | 1.5 | $48,190 | $19,275 | | $68,540 | $27,418 | 44 | $53,300 | $21,880 | 191,503 | 200,966 | 198,459 | $3,484 | $8,851 | $196,943 | $0.018 | $0.045 | $0.063 |
| 88 | 385 | 3 | $64,943 | $18,184 | | $67,517 | $18,905 | 3 | $39,769 | $11,135 | 1 | $64,943 | $18,184 | | $67,517 | $18,905 | 2 | $39,769 | $11,135 | 135,508 | 139,324 | 132,278 | $481 | $545 | $28,703 | $0.004 | $0.004 | $0.008 |
| 89 | 386 | 20 | $30,493 | $299 | 10 | $41,512 | $234 | 1 | $32,031 | $82,032 | | $41,512 | $234 | 26 | $44,512 | $556 | | $32,031 | $82,032 | 102,441 | 107,730 | 86,619 | $2,348 | $2,441 | $6,317 | $0.024 | $0.025 | $0.048 |
| 90 | 386 | 7.8 | $47,422 | $39,690 | 3 | $60,053 | $51,111 | | | | 3 | $47,422 | $39,890 | 10 | $69,093 | $61,111 | | | | 25,769 | 22,731 | 28,973 | $2,316 | $2,862 | $25,824 | $0.082 | $0.111 | $0.193 |
| 91 | 389 | 0.5 | $37,796 | $12,472 | 1 | $45,448 | $54,998 | 5 | $67,122 | $22,150 | 10.5 | $40,706 | $13,433 | | | | 2.5 | $67,122 | $22,150 | 154,274 | 183,699 | 164,188 | $1,035 | $1,449 | $180,700 | $0.006 | $0.008 | $0.014 |
| 92 | 404 | | | | 7 | $53,696 | $37,763 | 2 | $25,357 | $10,935 | | | | 3.75 | $33,086 | $23,768 | | | | 4,134 | 4,134 | 4,134 | $1,232 | $401 | $4,134 | $0.298 | $0.145 | $0.453 |
| 93 | 404.5 | 57.1 | $49,420 | $46,914 | 31.6 | $67,197 | $56,759 | | | | 11 | $49,420 | $46,914 | 54 | $67,197 | $56,759 | 70 | $49,088 | $55,533 | 236,479 | 286,509 | 296,041 | $27,700 | $34,324 | $275,606 | $0.100 | $0.125 | $0.225 |
| 94 | 405 | 4.5 | $45,000 | $36,600 | 1.5 | $5,500 | $40,000 | | | | 3.5 | $45,000 | | 1.5 | $55,000 | | 8 | $76,000 | $46,760 | 130,005 | 146,685 | 147,791 | $910 | $2,312 | $141,494 | $0.006 | $0.018 | $0.024 |
| 95 | 409 | -10.5 | $52,835 | $10,000 | | $70,022 | $10,000 | | | | 6.5 | $70,022 | $10,000 | | | | 2 | | | 30,593 | 12,643 | 12,443 | $2,875 | $1,084 | $11,899 | $0.242 | $0.091 | $0.333 |
| 96 | 420 | 4.3 | $29,081 | $10,987 | | | | 17 | $54,509 | $16,368 | | $28,061 | $10,987 | | | | 2 | $54,509 | $16,368 | 136,613 | 131,961 | 115,089 | $2,795 | $785 | $24,554 | $0.022 | $0.002 | $0.024 |
| 97 | 427 | 4 | $53,221 | $22,368 | | $71,983 | $30,698 | | | | | $71,983 | $30,608 | | | | | | | 238,979 | 131,055 | 121,956 | $3,477 | $50 | $130,663 | $0.011 | $0.000 | $0.011 |
| 98 | 431 | 3.5 | $43,971 | $23,378 | 3.5 | $58,183 | $23,436 | | | | 2.5 | $58,183 | $23,436 | | | | | | | 109,832 | 121,791 | 132,539 | $1,101 | $925 | $121,347 | $0.009 | $0.008 | $0.008 |
| 99 | 447 | | $40,000 | $9,500 | 33 | $60,000 | $7,500 | | | | 96 | $60,000 | $7,500 | | | | | | | 67,112 | 63,612 | 57,449 | $6,641 | $13,500 | $63,058 | $0.074 | $0.214 | $0.288 |
| 100 | 490 | 21 | $33,200 | $11,121 | 8 | $41,600 | $14,627 | | | | 2 | $41,600 | $14,627 | | | | | | | 102,093 | 88,722 | 102,093 | $1,874 | $232 | $7,594 | $0.009 | $0.002 | $0.002 |
| 101 | 499 | 16 | $33,693 | $57,918 | 6 | $69,215 | $96,872 | | | | | $33,693 | $57,918 | 6 | $69,215 | $96,372 | | | | 85,923 | 72,897 | 77,833 | $5,068 | $1,995 | $78,885 | $0.064 | $0.025 | $0.089 |
| 102 | 480 | 9 | $54,000 | $11,600 | 5.5 | $69,000 | $25,200 | 1 | $26,000 | $9,600 | 2 | $69,000 | $21,600 | 2 | $69,000 | $35,330 | | | | 123,989 | 109,970 | 102,496 | $2,948 | $6,426 | $112,772 | $0.023 | $0.051 | $0.065 |
| 103 | 487 | 7 | $69,000 | $22,250 | 1 | $70,720 | $24,560 | 1 | $43,000 | $21,950 | 17 | $69,000 | $22,250 | 6 | $70,720 | $24,560 | | | | 144,878 | 146,929 | 164,837 | $1,707 | $4,607 | $152,073 | $0.011 | $0.030 | $0.042 |
| 104 | 495 | 25 | $26,000 | $10,000 | 18 | $35,027 | $25,000 | | | | 6 | $29,352 | $25,000 | 24 | $34,944 | $25,000 | | $48,000 | $21,000 | 221,644 | 222,697 | 220,349 | $4,126 | $3,684 | $217,230 | $0.019 | $0.017 | $0.036 |
| 105 | 503 | 9.3 | $46,944 | | 13 | $58,884 | | | $85,558 | | | $58,884 | | 1035 | $59,384 | | | | | 29,290 | 33,422 | 47,107 | $2,725 | $1,258 | $36,609 | $0.074 | $0.035 | $0.110 |
| 106 | 505 | 4.3 | $24,000 | $6,442 | 4.2 | $55,000 | $15,500 | 8 | $18,500 | | | $55,000 | $15,500 | 1.5 | $57,000 | $10,500 | 2.5 | $50,856 | $14,560 | 151,025 | 177,774 | 149,350 | $1,199 | $577 | $159,300 | $0.008 | $0.004 | $0.011 |
| 107 | 518 | 1.5 | $64,918 | $21,070 | 0.5 | $71,468 | $28,329 | 19 | | | 8 | $64,916 | $21,070 | 1 | $71,468 | $28,329 | 2 | | | 103,731 | 104,708 | 103,794 | $575 | $1,641 | $104,078 | $0.004 | $0.016 | $0.019 |
| 108 | 526 | 4 | $20,000 | $10,000 | 13 | $22,500 | $10,000 | | | | | $22,500 | $10,000 | 45 | $22,500 | $10,000 | | | | 223,039 | 222,790 | 227,292 | $1,120 | $3,047 | $224,374 | $0.006 | $0.014 | $0.019 |
| 109 | 541 | | | | 26 | $58,902 | $12,510 | | | | | $58,240 | $12,910 | 135 | $32,832 | $11,713 | | | | 125,754 | 118,531 | 127,073 | $5,341 | $16,305 | $123,766 | $0.043 | $0.131 | $0.174 |
| 110 | 547 | 9 | $71,355 | $37,414 | | | | 3 | $57,835 | $53,166 | 6 | $71,355 | $37,414 | | | | 30 | $34,098 | | 160,682 | 161,696 | 165,029 | $2,513 | $2,341 | $162,799 | $0.015 | $0.014 | $0.029 |
| 111 | 550 | 1 | $34,628 | $16,126 | | | | 4 | $56,459 | $21,467 | | | | | | | | | | 70,915 | 71,789 | 75,431 | $674 | $50 | $73,365 | $0.009 | $0.000 | $0.009 |
| 112 | 558 | 38 | $32,573 | $5,694 | | | | 38 | $31,782 | $6,159 | 15 | $32,573 | $5,694 | | | | | | | 89,086 | 98,508 | 488 | $6,083 | $1,396 | $9,191 | $0.302 | $0.020 | $0.122 |
| 113 | 564 | | | | 2 | $72,000 | | 6 | $54,000 | | | $72,000 | | 56 | $49,520 | | | | | 411,725 | | | $876 | $7,849 | 411,725 | $0.002 | $0.019 | $0.021 |
| 114 | 575 | 12 | $32,716 | $9,211 | 10 | $45,798 | $11,137 | | | | 3 | $32,716 | $9,211 | 11 | $45,798 | $11,137 | | | | 106,010 | 112,591 | 121,191 | $2,232 | $1,544 | $118,415 | $0.020 | $0.014 | $0.034 |
| 115 | 591 | 30.5 | $31,965 | $9,593 | 12 | $42,927 | $22,878 | 5 | $52,322 | $15,967 | | $42,927 | $22,878 | 7 | $52,325 | $15,967 | | | | 89,840 | 82,416 | 42,124 | $4,747 | $996 | $71,460 | $0.066 | $0.014 | $0.080 |
| 116 | 594 | 43 | $35,172 | | | | | | $43,000 | | | $43,000 | | | | | 1 | $41,000 | | 42,969 | 54,224 | 58,635 | $3,151 | $50 | $51,930 | $0.061 | $0.001 | $0.062 |
| 117 | 610 | 13 | $59,852 | $83,959 | 6 | $68,798 | $35,976 | 5 | $44,832 | $24,258 | 6 | $98,798 | $95,976 | | $44,882 | $24,258 | | | | 246,672 | 250,809 | 187,594 | $4,573 | $2,484 | $244,849 | $0.018 | $0.010 | $0.028 |
| 118 | 613 | 7.75 | $63,005 | $23,965 | 7.25 | $95,967 | $32,667 | | | | 6.5 | $63,085 | $23,965 | 7 | $95,967 | $32,667 | | | | 136,657 | 148,557 | 178,150 | $3,187 | $2,909 | $154,121 | $0.021 | $0.019 | $0.040 |
| 119 | 640 | 13 | $42,245 | | | | | | | | 30 | $42,245 | | | | | | | | 183,611 | | | $1,164 | $2,640 | 183,611 | $0.007 | $0.018 | $0.025 |
| 120 | 647 | 11 | $33,432 | $18,231 | 14 | $42,763 | $21,185 | 9 | $36,673 | $44,855 | 1 | $33,432 | $18,231 | | $62,763 | $21,155 | | | | 74,561 | 108,289 | 127,459 | $4,554 | $453 | $101,770 | $0.040 | $0.004 | $0.044 |
| 121 | 660 | 7 | $33,000 | $39,000 | 9 | $45,000 | $54,000 | 12 | $12,500 | $12,500 | | $45,000 | $54,000 | 12 | $25,000 | $25,000 | | | | 444,240 | 442,244 | 467,412 | $3,531 | $2,694 | $451,312 | $0.008 | $0.006 | $0.014 |
| 122 | 687 | 43 | $65,940 | $12,579 | 16 | $60,162 | $21,058 | 3 | $75,840 | $26,544 | 4 | $35,040 | $32,579 | 3 | $69,600 | $24,360 | 3 | $69,594 | $18,668 | 124,984 | 111,616 | 128,508 | $7,694 | $1,684 | $121,784 | $0.063 | $0.014 | $0.077 |
| 123 | 687 | 16 | $47,424 | $16,040 | 5 | $52,041 | $24,300 | 2 | $47,424 | $16,097 | 13 | $92,061 | $24,300 | 12 | $47,424 | $24,300 | | | | 199,212 | 201,663 | 200,466 | $3,592 | $9,824 | $214,787 | $0.017 | $0.046 | $0.062 |
| 124 | 703 | 96 | $37,300 | $21,200 | 89 | $48,300 | $14,300 | | | | | $48,300 | $14,300 | | | | | | | 148,886 | 149,533 | 155,481 | $21,213 | $30,778 | $151,300 | $0.140 | $0.211 | $0.351 |
| 125 | 716.13 | 3 | $48,496 | $22,864 | 3 | $60,641 | $37,513 | | | | 48 | $45,544 | $80,792 | | | | 41 | $48,408 | $35,650 | 108,048 | 114,470 | 106,365 | $4,315 | $14,956 | $109,628 | $0.040 | $0.136 | $0.176 |
| 126 | 742 | | $48,571 | $22,844 | 3 | $60,641 | $37,513 | | | | 16 | $48,571 | $22,845 | | | | | $67,673 | $24,883 | 68,431 | 60,454 | 73,017 | $758 | $2,581 | $67,168 | $0.011 | $0.035 | $0.046 |
| 127 | 750 | 2 | $27,800 | $15,809 | 3 | $52,000 | $16,559 | | | | 14 | $48,571 | $22,845 | | | | | | | 86,082 | | | $635 | $464 | 86,052 | $0.007 | $0.005 | $0.013 |
| 128 | 774 | 35 | $65,364 | $37,518 | 3.1 | $93,824 | $44,791 | 4 | $74,212 | $28,270 | 48.5 | $52,371 | $89,715 | 6.6 | $93,824 | $44,791 | 7.5 | $25,964 | | 287,300 | 268,774 | 298,191 | $13,513 | $13,687 | $278,111 | $0.048 | $0.049 | $0.098 |
| 129 | 776 | 68 | $39,523 | $12,568 | 36 | $58,770 | $18,699 | | | | 3 | $39,523 | $12,568 | 21 | $58,770 | $18,689 | | | | 111,282 | 105,911 | 116,729 | $13,189 | $5,734 | $111,307 | $0.118 | $0.051 | $0.152 |
| 130 | 808 | 16 | $28,395 | $9,214 | | | | 168 | $24,000 | | | $45,126 | $29,565 | | $45,126 | $29,565 | 89 | $45,126 | $29,565 | 199,662 | 197,523 | 208,657 | $3,492 | $54,715 | $208,697 | $0.017 | $0.271 | $0.088 |
| 131 | 817 | 8 | $45,126 | $29,565 | 3 | $57,450 | $32,845 | 12 | $45,275 | $22,301 | | $58,781 | $10,516 | 12 | $91,117 | $10,536 | | $45,126 | $29,565 | 159,662 | 197,523 | 233,157 | $3,492 | $7,475 | $206,657 | $0.027 | $0.071 | $0.087 |
| 132 | 833 | 51 | $58,781 | $10,516 | 3 | $65,475 | $10,536 | 15 | $31,117 | $10,536 | 84 | $58,781 | $10,516 | | $91,117 | $10,536 | | $91,117 | $10,536 | 228,534 | 232,099 | 233,167 | $9,223 | $13,172 | $228,007 | $0.040 | $0.059 | $0.099 |
| 133 | 900 | 2 | $42,378 | $12,802 | 16 | $44,265 | $28,904 | 90 | $50,237 | $23,966 | 46.25 | $27,371 | $12,307 | 21.25 | $50,237 | $23,966 | 121.5 | $49,134 | $28,619 | 175,500 | 180,733 | 96,671 | $687 | $621 | $59,114 | $0.020 | $0.018 | $0.039 |
| 134 | 900 | 2 | $40,938 | $13,915 | 2 | $73,164 | $24,875 | | | | | $73,164 | $24,875 | | | | | | | 175,500 | 180,733 | 96,671 | $687 | $321 | $59,114 | $0.021 | $0.010 | $0.031 |
| 135 | 943 | 5 | $48,000 | $24,283 | 8.8 | $92,000 | $39,783 | 13 | $61,200 | $15,857 | | $48,000 | $24,243 | | $63,200 | $15,857 | 1 | $63,200 | $15,857 | 491,817 | 462,101 | 455,608 | $5,278 | $10,138 | $469,842 | $0.011 | $0.022 | $0.032 |
| 136 | 967 | 47 | $51,514 | $23,082 | 3.7 | $72,824 | $28,774 | 25 | $53,740 | $23,678 | 20 | $51,514 | $23,082 | 54 | $72,824 | $28,774 | 44.5 | $53,740 | $23,878 | 356,576 | 327,399 | 379,432 | $12,120 | $10,709 | $341,134 | $0.036 | $0.031 | $0.067 |

**NSA Member Data Summary - ADP 1000+**

| Identification | | Administrative | | | | | | | | | Monitoring/Security | | | | | | | | | | | Minutes of Use Data | | | Calculating Summary Analysis Fields | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site # | ADP | Weekly Detention Officer Hours | Detention Officer Annual Wages | Detention Officer Annual Benefits | Weekly Detention Supervisor Hours | Detention Supervisor Annual Wages | Detention Supervisor Annual Benefits | Weekly Other Hours | Other Annual Wages | Other Annual Benefits | Weekly Detention Officer Hour | Detention Officer Annual Wages | Detention Officer Annual Benefits | Weekly Detention Supervisor Hours | Detention Supervisor Annual Wages | Detention Supervisor Annual Benefits | Weekly Other Hours | Other Annual Wages | Other Annual Benefits | | | Month 1 Minutes | Month 2 Minutes | Month 3 Minutes | Calculated Monthly ADMIN Expense | Calculated Monthly SECURITY Expense | Average Monthly Call Minutes | Average ADMIN Cost per Minute | Average SECURITY Cost per Minute | Average TOTAL Cost per Minute |
| Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 | Column9 | Column10 | Column11 | C Column11 | Column12 | Column13 | Column14 | Column15 | Column16 | Column17 | Column18 | Column19 | Column20 | Column21 | C Column21 | Column23 | Column24 | Column25 | Column26 | Column27 | Column28 | Column29 | Column30 | Column31 |
| 137 | 1048 | 11 | $38,200 | $17,300 | 7 | $54,500 | $21,500 | 30 | | | 5 | $38,200 | $17,300 | 1 | $54,500 | $21,500 | 20 | $38,200 | $17,300 | | 928,261 | | | $2,380 | $3,049 | 928,261 | $0.003 | $0.003 | $0.006 |
| 138 | 1053 | 81.5 | $58,321 | $17,496 | 2.5 | $81,206 | $24,362 | 26 | $38,695 | $11,608 | 40 | $58,321 | $17,496 | 2 | $81,206 | $24,362 | 1 | $38,695 | $11,608 | | 276,508 | 293,034 | 347,281 | $16,065 | $6,863 | 305,608 | $0.053 | $0.022 | $0.075 |
| 139 | 1150 | 64 | $52,104 | $18,000 | 24 | $66,477 | $20,000 | 16 | $47,278 | $16,000 | 36 | $52,104 | $18,000 | | $66,477 | $20,000 | | $47,278 | $16,000 | | 347,149 | 327,058 | 289,209 | $19,780 | $5,258 | 319,139 | $0.049 | $0.016 | $0.066 |
| 140 | 1153 | 19.8 | $41,871 | $14,568 | 10.3 | $56,995 | $15,156 | 0 | | | 0 | $41,871 | $14,568 | 2 | $56,985 | $15,156 | 30 | $62,947 | $18,226 | | 79,148 | 85,540 | 83,347 | $3,875 | $5,374 | 82,678 | $0.047 | $0.065 | $0.112 |
| 141 | 1187 | 26.5 | $39,438 | $16,243 | 1.5 | $30,929 | $12,131 | 20 | | | 12 | $39,438 | $16,243 | 8 | $50,929 | $12,131 | 0 | | | | 617,907 | 626,219 | 592,973 | $3,271 | $2,643 | 612,366 | $0.005 | $0.004 | $0.009 |
| 142 | 1233 | 20 | $81,988 | $36,911 | | | | 8 | $66,000 | $27,852 | 81 | $81,988 | $36,911 | 80 | $91,889 | $41,641 | 30 | $85,268 | $43,120 | | 803,645 | 740,712 | 859,746 | $6,518 | $30,343 | 801,368 | $0.008 | $0.038 | $0.046 |
| 343 | 1350 | 9 | $40,331 | | | | | 15 | $31,354 | | 13.4 | $40,352 | | | | | 23 | $54,080 | | | 258,683 | 229,062 | 220,476 | $1,742 | $4,222 | 236,066 | $0.007 | $0.018 | $0.025 |
| 144 | 1364 | 30 | $52,827 | $16,759 | 17 | $48,018 | $15,749 | 34 | | | 34 | $52,827 | $18,759 | 20 | $48,018 | $15,749 | 10 | | | | 916,698 | 1,019,807 | 941,128 | $6,608 | $7,586 | 959,211 | $0.007 | $0.008 | $0.015 |
| 145 | 1394 | 4.5 | $47,174 | $19,781 | 5.5 | $56,084 | $23,525 | 190 | | | 50 | $47,174 | $19,780 | 20 | $56,084 | $23,524 | 24 | | | | 711,675 | 685,131 | 636,286 | $1,539 | $10,288 | 677,681 | $0.002 | $0.015 | $0.017 |
| 146 | 1399 | 119 | $62,000 | $27,200 | 57 | $71,700 | $30,000 | 17 | $35,700 | $23,500 | 60 | $62,000 | $27,200 | 0 | $70,000 | $30,000 | 35 | $35,700 | $23,500 | | 857,670 | 345,242 | 311,804 | $36,288 | $15,467 | 338,269 | $0.107 | $0.046 | $0.153 |
| 147 | 1500 | | | | | | | 2 | $84,000 | $20,000 | | | | | | | 1 | $84,000 | $20,000 | | 173,448 | 200,476 | 217,721 | $433 | $217 | 197,215 | $0.002 | $0.001 | $0.003 |
| 148 | 1525 | 273.3 | $55,567 | $16,059 | 54 | $78,200 | $21,181 | 130 | $66,783 | $19,300 | 200 | $51,199 | $14,797 | 30 | $80,019 | $23,125 | 6.5 | $87,936 | $25,413 | | 627,061 | | | $74,724 | $35,480 | 627,061 | $0.119 | $0.057 | $0.176 |
| 149 | 1640 | 11 | $66,955 | $46,175 | | | | 3 | | | 12 | $66,955 | $46,175 | | | | | | | | 540,844 | 531,647 | 543,809 | $2,379 | $2,813 | 545,433 | $0.005 | $0.005 | $0.010 |
| 150 | 2097 | 145 | $36,441 | $16,269 | 4 | $50,419 | $21,567 | 73 | $27,726 | $12,477 | 80 | $36,441 | $16,269 | 40 | $50,419 | $21,567 | 125 | $27,726 | $12,477 | | 335,794 | 706,036 | 728,104 | $22,637 | $25,253 | 589,978 | $0.038 | $0.043 | $0.081 |
| 151 | 2147 | 6 | $40,000 | $13,200 | | | | 38 | $50,000 | $16,500 | | | | | | | 553 | $50,000 | $16,500 | | 1,023,120 | 1,052,871 | 1,088,621 | $5,653 | $76,814 | 1,048,204 | $0.005 | $0.073 | $0.078 |
| 152 | 2698 | 20 | $52,000 | $26,969 | 0.5 | $101,000 | $52,318 | | | | 14 | $52,000 | $26,969 | | | | | | | | 833,066 | 930,599 | 889,363 | $3,450 | $2,308 | 884,343 | $0.004 | $0.003 | $0.007 |

Survey Notes

1. Column B- ADP- Average Daily Population

2. Column Z- Calculated Monthly Admin. Expense

$(((C*52)/12)*((D+E)/2080))+(((F*52)/12)*((G+H)/2080))+(((I*52)/12)*((J+K)/2080))$

3. Column AA- Calculated Monthly Security Expense

$(((M*52)/12)*((N+O)/2080))+(((P*52)/12)*((Q+R)/2080))+(((S*52)/12)*((T+U)/2080))$

4. Column AB- Average Monthly Call Minutes

AVERAGE(W,X,Y)

5. Column AC- Average Admin Cost Per Minute

+Z/AB

6. Column AD- Average Security Cost Per Minute

+AA/AB

7. Column AE- Average Total Cost Per Minute

+AD+AC

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rates for Interstate Inmate Calling Services | )    WC Docket No. 12-375 |
| | ) |
| | ) |

**SECOND REPORT AND ORDER AND**
**THIRD FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: October 22, 2015**                          **Released:  November 5, 2015**

**Comment Date:  [[30]] days after date of publication in the Federal Register**
**Reply Comment Date:  [[45]] days after date of publication in the Federal Register**

By the Commission:  Chairman Wheeler and Commissioners Clyburn and Rosenworcel issuing separate
                    statements; Commissioners Pai and O'Rielly dissenting and issuing separate
                    statements.

## TABLE OF CONTENTS

Heading                                                                                    Paragraph #

I.   INTRODUCTION ................................................................................................... 1
II.  EXECUTIVE SUMMARY ..................................................................................... 9
III. BACKGROUND ...................................................................................................... 12
IV.  REPORT AND ORDER .......................................................................................... 20
     A. Rate Caps that Comply with the Statute. ........................................................... 20
        1. Tiered Structure Distinguishing Between Jails and Prisons. ........................ 24
           a.  Justification for Separate Tiers. ............................................................ 25
           b.  Determination of Facility Type and Average Daily Population. ........... 38
        2. Tiers for Jails. ............................................................................................... 44
        3. Determination of Specific Rate Caps. .......................................................... 48
           a.  Marketplace Evidence of Rates in Certain States. ............................... 49
           b.  Analysis of Data Received in Response to the Mandatory Data Collection ... 50
           c.  Evidence that the Mandatory Data Collection Likely Overstates Providers' Costs. ........ 71
           d.  Alternative Proposals in the Record. ................................................... 76
           e.  Rate Caps for Collect Calls. ................................................................ 84
           f.  Cost-Benefit Analysis. ......................................................................... 93
        4. Rejection of Certain Types of Charges. ....................................................... 98
           a.  No Per-Call or Per-Connection Charges. ............................................ 98
           b.  No Flat-Rate Calling. ........................................................................... 102
        5. Legal Authority for Intrastate and Interstate Rate Caps. ............................. 106
     B. Payments to Correctional Institutions. ............................................................... 117
        1. Background. ................................................................................................... 120
        2. Discussion. .................................................................................................... 123
           a.  Facility Costs Related to Providing ICS. ............................................. 133
           b.  Ensuring Fair Compensation. ............................................................... 141

I get to see my loved one once in every six months or so, and he doesn't get any visitors apart from me, so calling daily helps him retain his sanity. I think the connection he's given to his family is really important; there are so many times that he's called really angry at other inmates, saying that he just wanted to talk so that he can cool down and not start a fight. If calls are made more affordable, especially for indigent families, it may reduce prison violence as well as make the prisons a safer place for [corrections officers] to work in.[23]

6.    The record indicates that our interim interstate rate caps increased call volumes, without compromising correctional facility security requirements.[24] Similarly, we expect our actions in this Order to reduce rates and increase call volume, while ensuring that ICS providers receive fair compensation and a reasonable return. Some commenters have argued that lowering ICS rates will compromise security in correctional facilities and fail to cover the cost of providing calling services.[25] Some have even argued the financial strain from rate regulation could lead to correctional facilities banning inmate calls altogether.[26] However, we find these assertions unpersuasive and unsupported by the record and our experience from the 2013 reforms.

7.    While the actions taken to date have been positive in key respects (e.g., lower interstate rates and increased interstate call volume), more remains to be done. The Commission adopted interim interstate rate caps, but over 80 percent of calls to and from correctional facilities are intrastate, and were not subject to the reforms of the *2013 Order*.[27] Throughout this proceeding, the Commission has repeatedly called on states to reform inmate calling within their jurisdictions, but rates remain egregiously high in over half the states. The Commission has the legal authority to reform the rate structure for all ICS calls, and herein we determine it is appropriate and necessary to do so.[28]

8.    In addition, we commit to continue evaluating the impact of these reforms and to conduct a review in two years to evaluate the changes in the market and determine whether further refinements are appropriate.

---

[23] Media Action July 7, 2015 *Ex Parte* Letter, Attach. at 5 (testimony of Amsani Yusli).

[24] *See infra* para. 13.

[25] *See* Comments of Ohio Department of Rehabilitation and Correction, WC Docket No. 12-375, at 12 (filed Jan. 12, 2015) (ODRC Second FNPRM Comments) (stating that rate reductions would undermine the availability of security procedures needed to maintain the safety of inmate communications).

[26] *See id.* at 13 (stating "Any further reduction in ICS rates or the extension of the Commission's new rate regime to intrastate ICS rates, as suggested by the Order and FNPRM, would undercut the ODRC's ability to fund and deliver these critical and valuable programs and services to its inmate population"); Reply of CenturyLink, WC Docket No. 12-375, at 22 (filed Jan. 27, 2015) (CenturyLink Second FNPRM Reply) (stating that if a prospective interexchange carrier will not accept certain proposed terms, an ICS provider will not be able to uphold its contractual obligations to public entities).

[27] *See* Comments of Pay Tel, WC Docket No. 12-375, at 7 (filed Dec. 20, 2013) (asserting that in 2012, 84% of its calls in jail facilities were local calls); Comments of Telmate, WC Docket No. 12-375, at 3 (filed Mar. 20, 2013) (stating that "interstate traffic is a small percentage of ICS calling"); Letter from Marcus W. Trathen, Counsel to Pay Tel, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 96-128, at 6 (filed Apr. 20, 2007) (stating that in 2007, 81% of its calls in jail facilities were local calls).

[28] The record illustrates the exorbitant rates that many ICS providers charge per minute for intrastate calls. Per-minute rates vary, but commenters report paying as high as $1 per minute, and rates were exacerbated by ancillary service charges that greatly raised average per-minute cost of a call. *See* Media Action July 7, 2015 *Ex Parte* Letter, Attach. at 7 (testimony of Susanne Mason); *id.*, Attach. at 16 (testimony of Bianca Clarke).

## IV.    REPORT AND ORDER

### A.    Rate Caps that Comply with the Statute

20.    In this section we adopt tiered rate caps for intrastate and interstate ICS that will allow providers to continue to offer safe and secure ICS while complying with the requirements of the Communications Act.  These rate caps will apply to jails, prisons and immigration detention facilities, secure mental health facilities and juvenile detention facilities.

21.    A review of the record, including over 100 comments and replies, costs reported in response to the Mandatory Data Collection, and various *ex parte* filings, indicates that, notwithstanding our interim caps on interstate rates, more work still must be done to bring ICS rates in conformance with the mandates of the Communications Act.[67]  The record demonstrates that many interstate rates are not "just and reasonable rates as required by Sections 201 and 202" and that many interstate and intrastate rates result in compensation that exceeds the fair compensation permitted by section 276.[68]  The Commission's finding in the *2013 Order* that the marketplace alone has not ensured that ICS rates are just, reasonable, and fair remains true today.[69]  Nor has the risk of complaints filed under section 208, or enforcement actions pursuant to section 201(b) or section 276, been sufficient to keep ICS rates at levels that are just and reasonable and fairly compensatory.[70]  We therefore act, pursuant to our statutory authority, to ensure that ICS rates comply with the Communications Act, while balancing the unique security needs related to providing telecommunications service in correctional institutions and ensuring that ICS providers receive fair compensation and a reasonable return on investment.[71]

22.    Specifically, we adopt a rate cap of $0.22/MOU for debit and prepaid calls from jails with an ADP of 0-349; a $0.16/MOU cap for debit and prepaid calls from jails with an ADP of 350-999; and a $0.14/MOU cap for debit and prepaid calls from jails with an ADP of 1,000 or more.  Debit and prepaid calls from prisons will be capped at a rate of $0.11/MOU.  Collect calls from jail facilities will be capped at $0.49/MOU and collect calls from prison facilities will be capped at $0.14/MOU until July 1, 2017, and then transition down on an annual basis to the applicable debit/prepaid rate cap as described herein.

---

[67] Comments of HRDC, WC Docket No. 12-375, at Exh. C (filed Jan. 12, 2015) (HRDC Second FNPRM Comments) (detailing 2013-2014 intrastate rates and showing that some are above the Commission's interim interstate caps adopted in 2013); *see id.* at 9 ("After the Commission issued its Order capping interstate ICS phone rates, that should have served as a bellwether for state public utility commissions to take similar action to protect consumers from high intrastate ICS rates and fees.  With the exception of Alabama, it appears that none have chosen to do so.  This highlights the need for the Commission to take action to protect consumers nationally, as the past decades of exploitative ICS practices and profiteering indicate that absent action by the Commission, nothing will be done at the state level in the vast majority of states."); Comments of Minnesota Department of Commerce (MNDOC), WC Docket 12-375, at 5 (filed Dec. 13, 2013) (Minnesota DOC 2013 Order Comments) ("Clearly . . . with respect to rates, further intrastate reform is needed in a non-competitive market such as this, in which neither the inmates themselves nor the recipients of inmate telephone communications have an opportunity to choose their own service provider to avoid or minimize charges, even when full disclosure is provided and rates are clearly presented. . . . To the extent that states like Minnesota do not have the ability to constrain the level of intrastate ICS rates through regulation, establishment of a structure that addresses both intrastate and interstate rate levels holistically may need to be handled by the FCC.").

[68] *2013 Order*, 28 FCC Rcd at 14131, para. 45.

[69] *Id.*

[70] *See* 47 U.S.C. §§ 201(b), 208, 276.

[71] *See 2013 Order*, 28 FCC Rcd at 13179, para. 19.

12775

52.    The debit and prepaid rate caps we adopt are based on 2012 and 2013 data submitted by the 14 responding providers.  The caps rely on the 2012 and 2013 data because it represents actual, rather than projected, data, and allows averaging across the two years to account for cost variations that may occur between the years.  Costs per minute were calculated using a weighted average per minute cost (which is the same as dividing aggregate costs (i.e., the entirety of all costs reported by the providers for any category) by aggregate minutes of use in that category).[170]  This prevents small outliers from having a disproportionate impact on our analysis.

53.    Based on the record and our analysis described below, we believe the applicable rate caps will ensure just, reasonable and fair compensation for ICS.  We have relied on the cost data and allocations as submitted by ICS providers in calculating these rate caps.  We note that the providers cost data reflect their determinations about how to allocate certain common costs, such as call centers and back-office operations.  It is generally understood that an economically rational provider will serve a facility if it can recover its incremental cost of doing so, which the record and our analysis indicate will be the case.  We take the data at face value, even though the analysis shows that there is significant evidence—both from our own analysis and commenters' critiques—suggesting that the reported costs are overstated.  We also find support in the record evidence of increased demand and additional scale efficiencies, which are not included in our quantitative analysis.  Our analysis and the record evidence support our conclusion that efficient providers would be able to operate profitably under our rate caps.

54.    *Discussion and Analysis*.  Based on the record and our own analysis described below,[171] we find that our prescribed rate caps as outlined above[172] are more than sufficient to allow providers to recover efficiently-incurred ICS costs (excluding reported commissions).[173]

55.    The record supports our conclusion.  Coleman Bazelon, economics consultant for the Wright Petitioners, analyzed our rate caps and concluded that they "will largely cover the individual ICS providers' costs in providing service."[174]

---

[170] Contrary to the suggestion in one of the dissenting statements, our decision to base the rate caps on total costs divided by total minutes shows that providers, in the aggregate, will be able to set rates at levels that allow them to recover average costs at each and every tier.  *See* Dissenting Statement of Commissioner Pai at 6 (including the 2012-2013 costs of international and collect calls in its analysis but omitting the higher rate caps for collect calls in the first two years of our reform, and assuming that call volumes, including collect calls, and cost efficiencies will remain unchanged going forward from levels reported in 2012 and 2013).  Moreover, as explained below, our approach is conservative in its analysis of both costs and call volumes. *See, e.g., infra* paras. 58-70. The record evidence indicates that average reported costs are exaggerated and in any case exceed efficient costs and that costs for collect calls should decline as inmates continue to move from collect to debit and prepaid calls, while overall call volumes are anticipated to increase as a result of our rate caps, leading to increased revenue. We also expect providers to achieve increased efficiencies in their provision of ICS, further driving down costs.

[171] For the purposes of this analysis, we assumed that the reported data are accurate and require no discounting or omission.  This analysis thus likely reflects a worst-case scenario, and, as discussed below, even in the worst-case scenario, our rates are fair and reasonable.

[172] *See supra* para. 22.

[173] Efficiently-incurred costs are the lowest possible costs (sometimes called economic costs) necessary to produce a given level of output. An efficient firm, including an efficient provider, necessarily supplies output at the least cost of production.

[174] *See* Letter from Lee G. Petro, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Oct. 15, 2015) (Wright Petitioners Oct. 15, 2015 *Ex Parte* Letter) (describing Dr. Bazelon's analysis and conclusions, and further noting that "only [[BEGIN CONFIDENTIAL]] ███ [[END CONFIDENTIAL]] firms, with about [[BEGIN CONFIDENTIAL]] ███ [[END CONFIDENTIAL]] of total industry costs, would not recover their costs under the proposed rates and may require waivers"); *see also id.* at Exh. A (FCC Rate Cap Impact Summary) (analysis of FCC rate caps performed by Wright Petitioners' economic

(continued....)

have taken advantage of this language and vague guidance since release of the ICS Order and are charging end users a flat rate of $3.15 or $3.75 per call, even if the call is disconnected prior to expiration of fifteen minutes," which it asserts is "an abuse of the intent of the Commission's rules."[325]

105.    We prohibit the imposition of flat-rate calling. There is minimal record support for such charges, which penalize those who make shorter calls (the record indicates that ICS calls last typically less than 15 minutes).[326]  If an end user is charged for a 15-minute call but the duration of that call is less than 15 minutes, the price for that call is disproportionately high.[327]  We also agree with those commenters who assert that allowing providers to charge a flat rate based on a 15-minute call does not comport with our requirement to make ICS rates just, reasonable, and fair.  As such, we ban flat-rate calling rate plans.

### 5.    Legal Authority for Intrastate and Interstate Rate Caps

106.    *Background.*  In the *2013 FNPRM,* the Commission tentatively concluded that section 276 affords it broad authority to reform intrastate ICS rates and practices that deny fair compensation, as well as to preempt inconsistent state requirements.[328]  The Commission sought comment on these tentative conclusions.[329]  Multiple commenters supported the Commission's tentative conclusion that it has jurisdiction over intrastate as well as interstate ICS rates.[330]  These commenters argue that section 276 provides the Commission with clear jurisdiction, and that it must regulate intrastate rates to ensure comprehensive ICS reform.[331]  After examining the record, we affirm the tentative conclusion that intrastate ICS rates are well within the Commission's jurisdiction for the reasons described below.

107.    Our authority to ensure the reasonableness of rates and practices for interstate ICS is not in dispute.  Under section 201(b) of the Communications Act, the FCC is empowered to "prescribe such rules and regulations as may be necessary" to ensure that "[a]ll charges [and] practices . . . for and in connection with [interstate] communication service" by wire or radio are "just and reasonable."[332]  Section 276[333] directs the Commission to "establish a per call compensation plan to ensure that all

(Continued from previous page) ———————————————
2015) ("[The use of flat rates], which has become more common since the FCC capped interstate ICS rates, can result in extremely high effective rates when calls are required to be cut short by either party.").

[325] Pay Tel Second FNPRM Reply at 53-54.

[326] The Mandatory Data Collection required providers to submit call lengths.  An analysis of that data shows that the average length of reported calls was less than 13 minutes. *See Second FNPRM,* 29 FCC Rcd at 13201, para. 78. NCIC reports that in a trial of lower rates and fees it conducted in Alabama, inmates started making more calls at shorter duration. *See* NCIC Apr. 16, 2015 *Ex Parte* Letter at 10 (showing typical call duration between eight and 10 minutes).

[327] *2013 Order,* 28 FCC Rcd at 14154-55, para. 85.

[328] *See 2013 Order,* 28 FCC Rcd at 14175-76, para. 135.

[329] *See id.*

[330] Comments of Lattice Incorporated, WC Docket No. 12-375, at 4 (filed Jan. 12, 2015) (Lattice Second FNPRM Comments); Pay Tel Second FNPRM Comments at 3.

[331] Lattice Second FNPRM Comments at 4; Pay Tel Second FNPRM Comments at 3.  Commenters also claim that it is necessary for the Commission to exercise its intrastate authority, particularly because "Public Utility Commissions in many states are unable to regulate intrastate rates due to deregulation of telecom services." Comments of 51 Former State Attorneys General (NSAG), WC Docket No. 12-375, at 2 (filed Jan. 9, 2015) (NSAG Second FNPRM Comments).

[332] 47 U.S.C. § 201(b).

[333] 47 U.S.C. § 276.

payphone service providers"—which the statute defines to include providers of ICS[334]—"are fairly compensated for each and every completed intrastate and interstate call."[335]  We find that these statutory sections provide the Commission with the authority to regulate interstate ICS rates and practices, including the use of per-call or per-connection fees as well as flat-rate calling.

108.     *Legal Authority to Reform Intrastate Rates.*  The Commission's authority over intrastate telecommunications is, except as otherwise provided by Congress, generally limited by section 2(b) of the Act, which states that "nothing in this Act shall . . . give the Commission jurisdiction with respect to . . . intrastate communication service by wire or radio."[336]  As the Supreme Court has held, however, section 2(b) has no effect where the Communications Act, by its terms, unambiguously applies to intrastate services.[337]  We conclude that such is the case here.[338]

109.     Under section 276 of the Communications Act, the Commission is charged with implementing Congress's directive "that all payphone service providers [be] fairly compensated for each and every completed intrastate and interstate call."[339]  Section 276 contains several express references both to ICS and intrastate calling, making it clear that the Commission has the authority to regulate intrastate ICS calling.  For example, section 276 requires the Commission to broadly craft regulations to "promote the widespread development of payphone services for the benefit of the general public" including, notably, "the provision of *inmate telephone service in correctional institutions*, and any ancillary services."[340]  In addition to this general grant of jurisdiction, section 276 includes a mandate to "establish a per call compensation plan to ensure that *all* payphone service providers are fairly compensated for each and every completed *intrastate* and interstate call using their payphone."[341]  Section

---

[334] 47 U.S.C. § 276(d) ("As used in this section, the term 'payphone service' means the provision of public or semi-public pay telephones, the provision of inmate telephone service in correctional institutions, and any ancillary services.").

[335] 47 U.S.C. § 276(b)(1)(A).  The Commission has previously found that the term "fairly compensated" permits a range of compensation rates that could be considered fair, but that the interests of both the payphone service providers and the parties paying the compensation must be taken into account.  *See Inmate Calling Order on Remand and NPRM*, 17 FCC Rcd 3248, 3254-58, paras. 14-24 (2002) (*2002 Order*); *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Third Report and Order, and Order on Reconsideration of the Second Report and Order, 14 FCC Rcd 2545 at 2570, para. 55 (1999) (*Payphone Third Report and Order*); *see also Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Fifth Order on Reconsideration and Order on Remand, 17 FCC Rcd 21274, 21302-03, para. 82 (2002) (holding that "fair" compensation under section 276 "implies fairness to both sides").

[336] 47 U.S.C. § 152(b).

[337] *See AT&T v. Iowa Utils. Bd.*, 525 U.S. 366, 380-81 (1999) (ruling that section 2(b) does not preclude the Commission from regulating intrastate telecommunications under the provisions of section 251); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 377 (1986) (section 2(b)'s jurisdictional fence may be breached when Congress used "unambiguous or straightforward" language to give the Commission jurisdiction over intrastate communications); *see also Illinois Public Telecommunications. Ass'n v. FCC*, 117 F.3d 555, 561-62 (D.C. Cir. 1997) (*Illinois Public Telecommunications Association*) (applying "unambiguous or straightforward" standard to find that section 276 unambiguously grants the Commission authority to regulate the rates for local coin payphone calls).

[338] *See* Joint Provider Oct. 15, 2015, *Ex Parte* Letter at 3-4 ("Further, in *AT&T v. Iowa Utils. Bd.*, the Supreme Court held that the local competition provisions of the 1996 Act grant the FCC the authority to regulate intrastate matters." (citing *AT&T v. Iowa Utils. Bd.*, 525 U.S. 366, 380-81 (1999)).

[339] 47 U.S.C. § 276(b)(1)(A).

[340] 47 U.S.C. §§ 276(b)(1), (d) (emphasis added).

[341] 47 U.S.C. § 276(b)(1)(A) (emphases added).

Federal Communications Commission                    FCC 15-136

276 also expressly directs the Commission to "discontinue the *intrastate* and interstate carrier access charge payphone service elements…and all *intrastate* and interstate payphone subsidies."[342] In addition, section 276 explicitly grants the Commission authority to preempt state requirements to the extent they are inconsistent with FCC regulations.[343]

110.    Furthermore, significant judicial precedent supports the Commission's authority to regulate intrastate ICS. In *Illinois Public Telecommunications Association*, the U.S. Court of Appeals for the D.C. Circuit found that the Act's requirement that "all payphone service providers are fairly compensated" provides the FCC with "authority to set local coin call rates"—which included intrastate service rates.[344] Additionally, in *New England Public Comm'ns Council, Inc. v. FCC*, the same court found that "section 276 unambiguously and straightforwardly authorizes the Commission to regulate…intrastate payphone line rates."[345] Therefore, we conclude that both section 276 and the associated case law give the Commission the authority to regulate ICS provider compensation for intrastate calls, including the rates ICS providers charge end users, per-call or per-connection charges, and flat-rate charges.[346]

111.    We find arguments that the Commission lacks the authority to regulate intrastate ICS unpersuasive.[347] For example, we disagree with commenters who argue that section 276 is limited to prohibiting discrimination by Bell operating companies (BOCs).[348] While section 276(a) includes

---

[342] 47 U.S.C. § 276(b)(1)(B) (emphases added).

[343] 47 U.S.C. § 276(c).

[344] *Illinois Public Telecommunications Association*, 117 F.3d at 562.

[345] *New England Public Comm'ns Council, Inc. v. FCC*, 334 F.3d 69, 75 (D.C. Cir. 2003) (*New England Public Comm's Council*); *see also Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1072 (9th Cir. 2005) ("§ 276 substantially expands the Commission's jurisdiction and gives it broad authority to regulate both intrastate and interstate payphone calls.") (*citing Illinois Public Telecommunications Association*, 117 F.3d at 561-62), *aff'd sub nom. Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45 (2007).

[346] We note that this situation is analogous to the market surrounding competitive LEC terminating access charges, in which the Commission recognized that regulation was required because "the party that actually chooses the terminating access provider does not also pay the provider's access charges and therefore has no incentive to select a provider with low rates." *See Access Charge Reform*, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd 9923, 9934, para. 28 (2001) As in that circumstance, here we have a situation in which the person choosing the ICS provider, i.e. the facility, is not the person required to pay the charges and thus, has little incentive to choose the provider with the lowest rates. Accordingly, Commission regulation is necessary to ensure that rates, term and conditions comply with the statute.

[347] *See* Comments of EagleTel, Inc. WC Docket No. 12-375, at 1(filed Nov. 12, 2014) ("[T]he FCC has no jurisdictional authority to regulate in-state ITS calling."); ICSolutions Second FNPRM Comments at 4-5; Praeses Second FNPRM Comments at 6, 17-18.

[348] Comments of National Association of Regulatory Utility Commissioners, WC Docket No. 12-375, at 8 (filed Jan. 9, 2015) (NARUC Second FNPRM Comments); *see also* Letter from Phillip R. Marchesiello, Counsel to Praeses LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 3 (filed Sept. 9, 2015) (Praeses Sept. 9, 2015 *Ex Parte* Letter) ("Section 276 only can be interpreted to provide the Commission with authority to regulate ICS if a single provision, Section 276(b)(1)(A), is read out of context and in a manner that is fundamentally inconsistent with the statute's legislative history. Of course, if the statute does not provide the Commission with authority to regulate ICS, then it cannot provide the Commission with authority to regulate, much less ban, site commissions. The purpose of this statute, which is clear both on its face and in its legislative history, was to protect independent payphone service providers ("PSPs")—i.e., the owners of physical payphones—from discrimination by Bell Operating Companies ("BOC") and against revenue losses caused by the PSPs' customers' use of free dial around services. The "fair compensation" mandate in Section 276(b)(1)(A) only can be properly read in that context, and such protections are no longer applicable to Providers, which do not face BOC discrimination or a loss

(continued….)

12815

provisions specifically prohibiting discrimination by BOCs, we do not believe Congress intended for that subsection to limit the scope of the remaining provisions of section 276. For example, section 276(b)(1) expressly mandates that the Commission adopt regulations addressing five specific subjects related to payphone services; only two of those subjects—clauses (C) and (D)—relate to preventing BOC discrimination.[349]

112.    In addition, although section 276(a) refers to Bell operating companies, and applies only to the BOCs, section 276(b) refers more broadly to "payphone service providers."[350] If Congress had intended for the regulations prescribed under section 276(b) to be limited to the narrow purpose of effectuating the nondiscrimination goals set forth in section 276(a), it easily could have made that clear.[351] Instead, Congress made clear that it was conferring a broader mandate in section 276(b), stating that: "[i]n order to promote competition among payphone service providers and to promote the widespread deployment of payphone services . . . , the Commission shall take all actions necessary . . . to prescribe regulations that . . . [*inter alia*] ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone[s] . . . ."[352]

113.    We also disagree with commenters who argue that the Commission has never determined that section 276 extends to intrastate rates[353] or that section 276 applies only to "local calls made from a payphone and paid with coins."[354] Section 276 does not specify that compensation is only for calls paid by coin but rather "each and every" call.[355] Indeed, the very Commission order under review in *Illinois Public Telecommunications* held that the Commission had the authority to regulate intrastate payphone rates and preempt state regulation of intrastate rates.[356] Therefore, the Commission's position regarding its authority over intrastate rates under section 276 has remained consistent.[357]

(Continued from previous page) ——————————————
of revenue to dial around calls. The mere reference to "inmate telephone service in correctional institutions" in the definitions section of the statute does not somehow change the fundamental scope of the statute to cause Section 276(b)(1)(A) to newly provide the Commission with plenary authority over ICS".).

[349] *See* 47 U.S.C. §§ 276(b)(1)(C), (D).

[350] *Compare* 47 U.S.C. § 276(a) *with* 47 U.S.C. § 276(b); *see also* 47 U.S.C. § 276(b)(1)(A) (requiring the Commission to establish a per call compensation plan that ensures fair compensation for "all payphone service providers."). Moreover, neither section 276(c), addressing preemption, nor section 276(d), defining "payphone service," are limited to, or even refer explicitly to, Bell operating companies. *See* 47 U.S.C. §§ 276(c)-(d).

[351] Section 271, for example, is explicitly limited to regulating Bell operating companies. *See* 47 U.S.C. § 271. By contrast, section 251, like section 276, contains some provisions that apply to all carriers and some provisions that apply only to incumbent local exchange carriers. *Compare* 47 U.S.C. § 251(a) (describing duties of all telecommunications carriers) *with* 47 U.S.C. § 251(c) (describing obligations that apply only to incumbent local exchange carriers).

[352] 47 U.S.C. § 276(b)(1)(A).

[353] Comments of Arizona Corporation Commission (ACC), WC Docket No. 12-375, at 6 (filed Jan. 12, 2015) (ACC Second FNPRM Comments); Comments of CenturyLink, WC Docket No. 12-375, at 5 (filed Dec. 20, 2013) (CenturyLink 2013 Order Comments).

[354] NARUC Second FNPRM Comments at 12.

[355] *See* Reply of Andrew D. Lipman, WC Docket No. 12-275, at 3 (filed Jan. 26, 2015) (Lipman Second FNPRM Reply) ("'Each and every' means every call of every type, regardless of whether the destination is local or toll, and regardless of whether the charges are paid by coins or by credit card or in some other manner.").

[356] *Illinois Public Telecommunications Association*, 117 F.3d at 561-62.

[357] We reject claims that *Illinois Public Telecommunications Association* only applied to local calls paid for by coins, and could not be extended to intrastate toll calls because "[payphone service providers] have no right to impose long-distance rates." Comments of the National Association of Regulatory Utility Commissioners, WC

(continued....)

12816

114.    *Rate Caps are Just, Reasonable and Fair.*  As noted above, we have accepted the data submitted by providers in response to the Mandatory Data Collection as reported even though there is evidence that they are overstated.[358]  As a result, we believe our rate caps are conservative and include sufficiently generous margins to allow providers to earn a profit.  More generally, it is well-established that rates can be lawful if they fall within a zone of reasonableness, and hence a particular state's cap might be lower than our caps and still fall within that zone.[359]  The rate caps we adopt today are intended both to ensure that ICS rates are "just and reasonable" and do not take unfair advantage of inmates, their families, or providers consistent with the "fair compensation" mandate of section 276.[360]

115.    The Commission has broad discretion in establishing just and reasonable rates, as long as it articulates a rational basis for its decisions and as long as the result is not confiscatory.[361]  As the Supreme Court has explained in construing the similar "just and reasonable rates" provision of the Natural Gas Act, "the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.'"[362]  Section 276(b) charges us with ensuring that "all payphone service providers [be] fairly compensated."[363]  This provision must be read in conjunction with our obligation under section 201(b) to ensure that charges and practices be just and reasonable.[364]  Neither section 276(b) nor 201(b) require us to allow for recovery of costs that are not just, reasonable and fair.

116.    We recognize that some ICS providers may see their profits decrease because the adopted caps are below the costs they reported to us under the Mandatory Data Collection (assuming that MOU stay constant).[365]  The Commission has broad authority to set rate caps to apply to a particular service and

---

(Continued from previous page) ─────────────────────
Docket No. 12-375, at 11 (filed Dec. 20, 2013) (NARUC 2013 Order Comments); *see also* Lipman Second FNPRM Comments at 3-4 ("Payphone service providers (PSPs) can and do set rates for long-distance calls, in the form of sender-paid coin rates for such calls (whether interstate or intrastate).  Thus, there is no bright-line boundary between local rates charged by PSPs and toll rates charged by IXCs.").

[358] *See supra* Section IV.A.3.b.

[359] *See 1996 Order on Recon*, 11 FCC Rcd at 20569, para. 51.

[360] *See* 47 U.S.C. §§ 201(b); 276; *see also 2013 Order*, 28 FCC Rcd at 14115, para. 14 ("The Commission has previously found the term 'fairly compensated' permits a range of compensation rates that could be considered fair, but that the interests of both the payphone service providers and the parties paying the compensation must be taken into account."); *see also supra* note 335.

[361] *See* Letter from Andrew D. Lipman, Morgan, Lewis & Bockius, LLP, to Marlene Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed July 6, 2015) (Lipman *Ex Parte* July 6, 2015 Letter) (citing *Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968) (*Permian Basin*); *see also Verizon Communications Inc. v. FCC*, 535 US 467, 501-02 (2002) (citing *Permian Basin* as guidance for interpretation of Telecommunications Act of 1996).

[362] *See* Lipman July 6, 2015 *Ex Parte* Letter at 2 (citing *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585) ("No other rule would be consonant with the broad responsibilities given to the Commission by Congress; it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Permian Basin*, 390 U.S. at 767; *see also National Ass'n of Reg. Util. Com'rs v. FCC*, 737 F.2d 1095, 1141 (D.C. Cir. 1984) (*NARUC*) (citing *Permian Basin* in upholding Commission's adoption of $25 special access surcharge).

[363] 47 U.S.C. § 276(d).

[364] 47 U.S.C. § 201(b).

[365] *See supra* Section IV.A.3.b (some inefficient operators may operate at a loss but there is reason to doubt that providers with <u>actually</u> incur net losses); *see also supra* para. 14 (discussing increase in minutes of use after the *2013 Order*).

12817

**Federal Communications Commission**      **FCC 15-136**

does not have to set provider-specific rates that embody a rate of return for each individual provider.[366] Indeed, as at least one provider has explained in this proceeding, courts have recognized that the use of industry-wide average cost data to set rates is not arbitrary, and therefore agencies may use composite industry data or other averaging methods to set rates.[367] We therefore find that the rates we adopt today are reasonable for the reasons provided above and will allow economically efficient – possibly all – providers to recover their costs that are reasonably and directly attributable to ICS. The costs reported by the providers that are above our rate caps represent significant outliers, suggesting that their reporting methods may have varied from those of other providers or that they may be less efficient than their peers. Indeed, encouraging efficiency will lead to lower rates, which will both benefit end users as well as increase calling demand, thus furthering the dual goals of section 276 "to promote competition among payphone service providers" and encourage the "widespread deployment of payphone services to the benefit of the public."[368]

### B. Payments to Correctional Institutions

117. The record indicates[369] that, in many cases, ICS bids are predicated on the winning providers' willingness to share part of its ICS revenues with the correctional facility.[370] These payments, commonly referred to as "site commissions," may take the form of monetary payments, in-kind payments, exchanges, or allowances.[371] In this Order, we define the term "site commission" broadly, to encompass any form of monetary payment, in-kind payment requirement, gift, exchange of services or goods, fee, technology allowance, product or the like.[372]

---

[366] *See generally Policy and Rules Concerning Rates for Dominant Carriers*, CC Docket No. 87-313, Second Report and Order, 5 FCC Rcd 6786 (1990) (*Rates for Dominant Carriers*) (subsequent history omitted) (in which the Commission found that the public interest benefits of creating appropriate economic incentives for carriers to reduce their costs by becoming more efficient justified the departure from strict rate-of-return regulation).

[367] *See* GTL Sept. 2, 2015 *Ex Parte* Letter at 9 (citing, *inter alia, FPC v. Texaco Inc.,* 417 U.S. 380, 387 (1974) (noting that agency ratemaking does not "require that the cost of each company be ascertained and its rates fixed with respect to its own costs"); *Permian Basin,* 390 U.S.).

[368] 47 U.S.C. § 276(b); *see also Rates for Dominant Carriers,* 5 FCC Rcd at 6787, para. 22 ("By establishing limits on prices carriers can charge for their services, and placing downward pressure on those limits or 'caps,' we create a regulatory environment that requires carriers to become more productive."); *Telecommunications Relay Services and Speech-To-Speech Services for Individuals with Hearing and Speech Disabilities,* Report and Order, 22 FCC Rcd 20140, 20167 (2007) (*2007 TRS Order*) (adopting tiered rate caps designed to promote competition); *In the Matter of Price Cap Performance Review for Local Exch. Carriers,* 10 FCC Rcd 8961 (1995) (*1995 Price Cap Order*) (explaining that the Commission's price cap plan for local exchange carriers was "designed to mirror the efficiency incentives found in competitive markets.").

[369] *See* Petitioners *FNPRM* Comments at 16 ("it would appear that, in the context of evaluating RFP responses, the determining factor for the contracting party is not whether the ICS providers can meet the technical requirements and security measures required by the correctional institutions. Instead, the selection of the winning bidder is based on the extra 'add-ons' that an ICS provider will provide, such as free calls, pilot programs, or additional commissions paid to the correctional institution.").

[370] *See, e.g.,* Comments of Prison Policy Initiative, WC Docket No. 12-375, Attach. at 2 (filed May 9, 2013) (PPI 2012 NPRM Comments) (explaining that "in all but a few locations . . . [ICS providers] are contractually obligated to pay a large portion of the revenue collected back to the correctional facility . . .'").

[371] *2013 Order,* 28 FCC Rcd at 14135, para. 54. As the Commission has acknowledged, these payments, and the terminology used to describe them, vary from facility-to-facility. *2013 Order,* 28 FCC Rcd at 14135, para. 54, n.199; *see also, e.g.,* PPI May 9, 2013 Comments (attaching *Boston Globe* and *NYT* articles referring to "concession fees" that ICS providers pay facilities in exchange for exclusive contracts.").

[372] *See, e.g.,* Letter from Chérie R. Kiser, Counsel to GTL, to Marlene H. Dortch, Secretary, FCC at 8 (filed April 3, 2015) (GTL April 3, 2015 *Ex Parte* Letter) (emphasis added); *see also* Joint Provider Proposal at 4 (proposing that
(continued....)

12818

an effort to circumvent possible Commission regulations.[517]  We find it unlikely that our rates will result in a "taking," but the waiver process described below should offer providers an adequate avenue for relief if they find our ICS regulations unworkable.

### C.     Ancillary Service Charges and Taxes

#### 1.     Background

144.     The record contains evidence that ancillary service charges have increased since the *2013 Order*,[518] which highlights the fact that, absent reform, ICS providers have the ability and incentive to continue to increase such charges unchecked by competitive forces.  Indeed, the continuing growth in the number and dollar amount of ancillary service charges represents another example of market failure necessitating Commission action.  These charges are unchecked by market forces because inmates and their families must either incur them when making a call or forego contact with their loved ones.[519]

---

[517] *See, e.g.*, Letter from Paul Wright, Executive Director, HRDC to Tom Wheeler, Chairman, FCC, WC Docket No. 12-375, at 1, 3 (filed Aug. 8, 2015) (describing "signing bonuses in excess of $1 million plus hundreds of free computer tablets" Securus and GTL offered to "entice jails" to enter into exclusive ICS contracts as part of an effort to "work around any new regulations expected to be issued by the Commission"); Pay Tel July 8, 2015 *Ex Parte* Letter at 4-7 (describing various demands contained in RFPs that Praeses has issued to ICS providers on behalf of facilities, including "upfront payments and other 'creative' arrangements"); *see also* contract between Securus and San Bernardino County, California requiring a $4 million upfront minimum annual guarantee (MAG) payment, subsequent MAG payments equal to the greater of $3.5 million or 81 percent of "commissionable revenues," and $300 thousand per year in "technology fund" payments at 15-16 (*available at* http://cob-sire.sbcounty.gov/sirepub/agdocs.aspx?doctype=summary&itemid=239559.

[518] *See* Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene. H. Dortch, Secretary, FCC, WC Docket No. 12-375 at Attach. 2 (filed July 10, 2014) (Pay Tel July 10, 2014 *Ex Parte* Letter); *see also, e.g.*, Comments of Praeses, LLC, WC Docket No. 12-375, at 43 (Praeses Second FNPRM Reply) ("Over the last few years, ICS providers have been deriving a greater percentage of their overall ICS revenue from multiple and sometimes exorbitant ancillary fees rather than ICS rates."); *see also* Letter from Paul Wright, Executive Director, HRDC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (filed Aug. 8, 2015) (HRDC Aug. 8, 2015 *Ex Parte* Letter) ("As the Commission is aware, ancillary fees related to inmate calling services (ICS) increased after the Order implementing interstate ICS rate regulation became effective in February 2014.") (citing 2014 ICS Workshop Transcript at 169 (Lee G. Petro, Counsel to Petitioners)).  We note that, due to the partial stay, the requirement that ancillary service charges be based on costs did not go into effect and there have been no reforms to ancillary service charges and fees.  *See* 47 C.F.R. § 64.6010 (Cost-Based Rates for Inmate Calling Services).

[519] ICS providers typically assess a wide range of separate charges for services ancillary to the provision of ICS, such as fees to open, fund, maintain, close, or refund an ICS account. *See, e.g.*, *2013 Order*, 28 FCC Rcd at 14156-57, para. 90, n.335 (citing examples of charges).  Ancillary service charges reported in response to the Mandatory Data Collection included an account close-out fee, account transfer fee, automated information services, automated operator recharge fee, bill processing charge for direct billed calls, bill processing fee, bill statement fee, biometric service charge, carrier cost recovery fee, collect call bill statement fee, collect call regulatory fee, collect interstate USF cost recovery fee, continuous voice verification, credit card charge-back fee, credit card processing fee, federal regulatory recovery fee, federal USF, federal USF administration fee for LEC billed calls, federal USF administration fee for non-LEC billed calls, funding fee, funding fee from cashier's check deposit, funding fee from credit/debit cards, funding fee from money order deposit, funding fee from Western Union deposit, live operator recharge fee, live prepaid account set-up fee, load fee, location validation, minimum payment fee, monthly bill statement fee, payment fee - IVR/web, payment fee - live operator, per call administrative fee for calls from county facilities, prepaid accounts, prepaid deposit fees, processing fee, refund fee, regulatory assessment fee, sales tax, state cost recovery fee, state regulatory cost recovery fee for LEC-billed calls, state regulatory cost recovery fee for non-LEC billed calls, state USF, state USF administration fee for LEC billed calls, technology, USF administrative fee, USF federal, USF federal (LEC billed), validation recovery fee, victim information and notification everyday (VINE), voice biometrics, web interface account set-up and recharge fee, and wireless administration fee.

Ancillary service charges inflate the effective price consumers pay for ICS. According to some estimates, ancillary service charges may represent as much as 38 percent of total consumer ICS payments.[520] The sheer number of ancillary service charges, their varying nomenclature, and the variability of the amounts charged make for a confusing system.

145. The record overwhelmingly supports the need to reform ancillary service charges.[521] While we would prefer to allow the market to discipline rates, the evidence since the Commission's *2013 Order* confirms that ancillary service charges have not only increased, but new charges have appeared. We find our statutory directive requires us to adopt reforms to limit ancillary service charges. As described below, we adopt caps for certain ancillary fees, and we prohibit all other charges that are ancillary to ICS.

146. Our Mandatory Data Collection confirmed that various ICS providers charge a plethora of ancillary service charges, and that different providers may describe the same charge by different names. Commenters suggest that ancillary service charges inflate the cost of ICS to end users without justification.[522] For example, some providers charge account set-up, maintenance, closure, and refund fees.[523] Praeses contends that "[p]roviders should not be permitted to charge any ancillary fees to recover… intrinsic ICS costs, such as validation fees or fees related to Facility-required security."[524] This distinction between what is an intrinsic part of providing ICS, and what is not, has helped us to select the ancillary service charges we find appropriate and to ban all other ancillary service charges.

147. In responding to the unique challenges posed by escalating ancillary fees, this Order establishes a limited list of ancillary fees that the Commission will permit ICS providers to charge. The amount of each of these fees is capped, and ICS providers are restricted from charging any ancillary fees not specifically allowed in our Order. For fees for single-call and related services and third-party financial transaction fees, we allow providers to pass through only the charges they incur without any additional markup. We limit automated payment fees to $3.00, live agent fees to $5.95, and paper statement fees to $2.00. Apart from these specific fees, no additional ancillary service charges are allowed. Taxes are discussed separately and must be passed through with no markup. We also take

---

[520] *See* LSPC Second FNPRM Comments at 4 (citing Letter from Peter Wagner, Exec. Dir., Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, (filed May 9, 2013)); *see also* Pay Tel July 10, 2014 *Ex Parte* Letter at Attach. (explaining that "[i]f a family has budgeted $100 for calls during a month, and they make a $25 payment each week using the vendor's website," after accounting for payment processing fees, account fees, and completing one single call service call per month, the funds actually available for calls out of the $100 is only $40).

[521] *See infra* paras. 148-160.

[522] *See, e.g.*, Wright Petitioners *Second FNPRM* Reply at 12-15; Pay Tel Second FNPRM Reply at 39-41; HRDC Sept. 8, 2015 *Ex Parte* Letter at 2.

[523] *See generally* Please Deposit All of Your Money Study (suggesting that ICS providers are "Profiting on prepayment," "Profiting on calls that are never made," and "Making money on holding customer's money.").

[524] Praeses Second FNPRM Comments at 44-45 (further contending "[o]nly certain services that are offered by Providers to inmates or their friends and families as a convenience, and that therefore are not reasonably required to be incurred for an inmate to place a call should be permitted to be subject to ancillary fees, and all such ancillary fees should be required to be cost-based."); *see also* PLS Second FNPRM Comments at 9 ("Most expenses covered by fees are incident [sic] to the general costs of doing business in the ICS industry and should be included in the per-minute rates."). In addition, Praeses argues that ancillary service charges should only be allowed for "certain services that are offered by Providers to inmates or their friends and families as a convenience, and that therefore are not reasonably required to be incurred for an inmate to place a call." Praeses Second FNPRM Comments at 44-45. Further, "Praeses agrees with the Commission's proposal to prohibit ancillary fees related to 'account establishment by check or bank account debit; account maintenance; payment by case, check or money order; monthly electronic account statements; account closure; and refund of remaining balances.'" *Id.* at 45.

**Federal Communications Commission**                    **FCC 16-102**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Rates for Interstate Inmate Calling Services | **)** | WC Docket No. 12-375 |
| | **)** | |

**ORDER ON RECONSIDERATION**

**Adopted: August 4, 2016**                                    **Released: August 9, 2016**

By the Commission:  Chairman Wheeler and Commissioners Clyburn and Rosenworcel issuing separate statements; Commissioners Pai and O'Rielly dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Para.

I.   INTRODUCTION ................................................................................................................. 1
II.  BACKGROUND ................................................................................................................. 6
III. DISCUSSION ..................................................................................................................... 12
     A.  The Rate Caps Should Account for Costs Reasonably and Directly Related to the
         Provision of ICS .......................................................................................................... 14
     B.  The Hamden Petition and Underlying Record Demonstrate That the Existing Rate Caps
         May Not Adequately Account for Facility Costs.......................................................... 17
     C.  We Increase Our Rate Caps to Better Reflect Evidence in the Record ........................ 22
     D.  We Amend the Definition of "Mandatory Tax or Mandatory Fee"............................... 31
     E.  We Deny All Other Aspects of the Hamden Petition ................................................... 34
         1.  There Is No Need to Regulate Site Commissions at This Time................................ 35
         2.  There Is No Need to Further Clarify the Single-Call Rule Adopted
             in the *2015 ICS Order*....................................................................................... 39
IV.  PROCEDURAL MATTERS................................................................................................ 42
     A.  Paperwork Reduction Act ............................................................................................ 42
     B.  Congressional Review Act ........................................................................................... 43
V.   ORDERING CLAUSES...................................................................................................... 44
APPENDIX A – Final Rules
APPENDIX B – List of Commenting Parties
APPENDIX C – Final Regulatory Flexibility Act Certification

**I.    INTRODUCTION**

1.      In this Order on Reconsideration (Order), we respond to a petition filed by Michael S. Hamden,[1] and build on our reforms of inmate calling services (ICS) by amending our rate caps to better allow providers to cover costs facilities may incur that are reasonably related to the provision of ICS.  The resulting rates will better allow ICS providers to recover their costs of providing ICS even while

---

[1] Petition of Michael S. Hamden for Partial Reconsideration, WC Docket No. 12-375 (filed Jan. 19, 2016), http://apps.fcc.gov/ecfs/document/view?id=60001408060 (Hamden Petition).

**Federal Communications Commission**                    **FCC 16-102**

Telmate has argued that our 2015 rate caps are not "sufficiently generous" to cover the "costs that facilities bear in providing ICS."[80]

21.     These arguments are consistent with earlier filings claiming that facilities may incur costs related to the provision of ICS that are "non-trivial."[81]  Out of an abundance of caution, we now revise our rate caps to incorporate those costs more fully.

### C.     We Increase Our Rate Caps to Better Reflect Evidence in the Record

22.     In view of the further evidence and arguments we have received, we now reconsider our earlier rate caps insofar as they did not separately account for ICS costs that facilities may incur.[82]  Accordingly, we increase our rate caps to better reflect the costs that facilities incur that are reasonably related to the provision of ICS.  In addition, consistent with our findings in the *2015 ICS Order* and with the evidence in the record, we recognize that the per-minute costs associated with ICS are higher in smaller facilities than in larger ones.[83]  Thus, we increase our rate caps more for smaller facilities than for larger ones.[84]  Specifically, we rely on the analyses submitted by NSA and by Baker/Wood to increase our rate caps by $0.02 per minute for prisons, by $0.05 per minute for larger jails, and by $0.09 per minute for the smallest jails.[85]  In adopting these revisions to our rate caps, we once again rely on our core ratemaking authority.[86]

23.     As noted above, in the *2015 ICS Order*, we agreed with parties that argued that facilities' reasonable ICS-related costs likely amounted to no more than one or two cents per minute and did not

---

[80] Motion of Telmate, LLC for Stay Pending Judicial Review at 11-12, USCA Case #15-1461, Document #1596259 (filed Jan. 29, 2016).  As Telmate asserts, "it is the Commission's *rate caps*, not any single cost that providers face, that dictate whether providers' compensation is fair.  The *Order's* rate caps fail to permit full cost recovery."  Telmate PFR Opposition at 4.

[81] Letter from Chérie R. Kiser, Counsel to GTL, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375. Attach at 11 (filed Sept. 19, 2014) (GTL Sept. 19, 2014 *Ex Parte* Letter) (citing Economists Inc.'s conclusion that ICS costs borne by facilities are "non-trivial"); *see also, e.g.,* CenturyLink Jan. 27, 2015 Reply at 19 (explaining that "correctional facilities incur legitimate costs in making ICS available"); Georgia DOC Jan. 12, 2015 Comments at 17; GTL Sept. 19, 2014 *Ex Parte* Letter, attach 2 at 3 (discussing correctional facility's staffing costs associated with ICS) *id.,* attach at 6 (stating that [p]ublicly available documents suggest that the Texas DOC requested to increase their investigative staff by 30 FTEs as a direct result of the new ICS system").

[82] We do not, however, revisit the rate structure or overall methodology used in the *2015 ICS Order*.  Specifically, we reject Telmate's argument that our rate caps "are based on a flawed methodology, and thus cannot be saved by the proposed rate increase[s]."  Telmate *Ex Parte* Letter at 1.  This argument addresses the fundamental structure of our rate caps and methodology and goes to the heart of our *2015 ICS Order*.  As such, the argument appears to be an untimely – and improperly presented – request for reconsideration of that order.

[83] *See 2015 ICS Order*, 30 FCC Rcd at 12777, para. 28.

[84] Consistent with our conclusion in the *2015 ICS Order*, we find that providers will need more time to transition all of the country's jails to the new rate caps than to transition prisons.  *Id.*  at 12887, para. 256 (noting that there are over 2000 jails).  Accordingly, we adopt a six-month transition period for jails, in order to "give providers and jails enough time to negotiate (or renegotiate) contracts to the extent necessary to comply" with our new rules.  *Id.; see also infra* para. 45.

[85] As explained below, Baker/Wood and NSA provided the most credible data regarding facilities' costs and we find that a hybrid of those two proposals yields the most reliable basis for determining how much we must increase our rate caps to ensure that providers can compensate facilities for the costs the facilities incur that are reasonably related to the provision of ICS.  The rate increases we adopt today are also supported by the Pay Tel Proposal.  *See supra* n. 16; Pay Tel Proposal at 7.

[86] *See 2015 ICS Order*, 30 FCC Rcd at 12822, para. 124.  Accordingly, and for the reasons described below, we do not prohibit or regulate site commission payments.  *See infra* Section III.D; *see also 2015 ICS Order*, 30 FCC Rcd at 12822, para. 124.

Federal Communications Commission    **FCC 20-111**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Rates for Interstate Inmate Calling Services | **)** | WC Docket No. 12-375 |
| | **)** | |

**REPORT AND ORDER ON REMAND AND**
**FOURTH FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: August 6, 2020**                                     **Released: August 7, 2020**

**Comment Date: [[30]] days after date of publication in the Federal Register**
**Reply Comment Date: [[60]] days after date of publication in the Federal Register**

By the Commission: Chairman Pai and Commissioners Carr, Rosenworcel, and Starks issuing separate statements.

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1
II.   BACKGROUND ................................................................................................................. 5
III.  REPORT AND ORDER ON REMAND ........................................................................... 27
      A.  Ancillary Service Charges .......................................................................................... 28
          1.  The Extent of the Commission's Authority .......................................................... 29
          2.  Applying Our Authority to Particular Ancillary Services .................................... 33
          3.  Related Issues ....................................................................................................... 47
      B.  Mandatory Pass-Through Taxes and Fees ................................................................... 61
      C.  Revisions to Certain Inmate Calling Services Rules .................................................. 63
IV.   FOURTH FURTHER NOTICE OF PROPOSED RULEMAKING .................................. 66
      A.  Proposing New Interstate Rate Caps .......................................................................... 70
          1.  Methodology ......................................................................................................... 78
          2.  Necessary Adjustments to Data ............................................................................ 92
          3.  Accounting for Correctional Facilities Costs ....................................................... 99
          4.  Waiver Process for Outliers ................................................................................ 108
          5.  Consistency with Section 276 of the Act ............................................................ 112
          6.  Cost-Benefit Analysis ......................................................................................... 116
      B.  Proposing International Rate Caps ............................................................................ 122
      C.  Other Issues............................................................................................................... 131
V.    PROCEDURAL MATTERS............................................................................................ 137
VI.   ORDERING CLAUSES................................................................................................... 147
      APPENDIX A – FINAL RULES
      APPENDIX B – PROPOSED RULES
      APPENDIX C – SUPPLEMENTAL FINAL REGULATORY FLEXIBILITY ANALYSIS
      APPENDIX D – INITIAL REGULATORY FLEXIBILITY ANALYSIS
      APPENDIX E – ANALYSIS OF RESPONSES TO THE SECOND MANDATORY DATA
                   COLLECTION
      APPENDIX F – SENSITIVITY TESTING:  ADDITIONAL STATISTICAL ANALYSIS OF COST
                   DATA

facility costs.[207]  Our calculations use total industry costs, both interstate and intrastate, because the available data do not suggest that there are any differences between the costs of providing interstate and intrastate inmate calling services.  Nor do such data suggest a method for separating reported costs between the intrastate and interstate jurisdictions that might capture such differences, if any.  Finally, providers do not assert any such differences.  We seek comment on these views.

84.     Our analysis of the cost data shows greater variations from mean costs for jails than for prisons, and our proposed rate caps reflect these standard deviations.  We examined whether various characteristics, such as location or size, would reveal additional, meaningful differences in costs that would justify separate rate caps for different groups of contracts.  We found the main predictors of both costs per minute and high-cost contracts were the provider's identity and the state where the facilities subject to a particular contract are located.  We also found that facility type (whether the contracts covered prisons or jails) was a less strong predictor of costs per minute and high-cost contracts.  By contrast, other variables such as facility size (measured by average daily population) and rurality, or combinations of such variables provided negligible predictive value.[208]  We seek comment on this analysis and on whether we nevertheless should set interstate rate caps on a more granular basis.  We invite parties to suggest alternative approaches.  Any commenter proposing an alternative approach should submit an explanation of how the data support such an approach, as well as a discussion of the administrative feasibility of the proposed alternative.

85.     We believe our proposed rate caps will permit cost recovery for interstate inmate calling services and we seek comment on this view.  We specifically invite comment on whether our proposed interstate rate caps would allow providers to recover their costs of providing interstate inmate calling services, including their direct costs of providing interstate inmate calling services under each of their contracts and correctional facility costs directly related to the provision of inmate calling services, while making reasonable contributions to providers' indirect costs that are associated with inmate calling services.

86.     Our calculations show a limited number of contracts where providers' reported costs plus our allocation of overhead exceed the revenues that the proposed interstate rate caps would generate: specifically, in only two out of 131 prison contracts, and 114 out of 2,804 jail contracts.[209]  If revenues that are currently generated from certain ancillary services, such as automated payment fees and paper billing and statement fees, are included, only 42 jail contracts fail to recover costs under our allocation of overheads.  Over half of these 42 jail contracts belong to a single provider, but account for a small portion of that provider's broad contract portfolio.[210]  In addition, we do not include revenues earned from live operator fees because those data were not collected, even though the costs of live operators were collected and are included in our analysis.  We seek comment on this approach and on whether we should exclude both the costs of, and revenues from, live operator interactions from our analysis.

87.     In *GTL v. FCC*, the Court found the Commission's reliance on industry average costs unreasonable because even if any cost component of site commissions were disregarded, the proposed caps were "below average costs documented by numerous ICS providers and would deny cost recovery

---

[207] Part IV.A.3, below, explains the basis for this $0.02 allowance and how we calculated it based on the data.

[208] *See generally* Appx. F (describing the Lasso analysis).

[209] We note that the inmate calling services providers' reported costs exclude site commission payments, although they do report information on site commission payments.  The Commission has determined previously that some portion of these site commission payments do reflect legitimate costs that correctional facilities incur that are reasonably related to the provision of inmate calling services.  Based on our analysis, our proposed rate caps include a $0.02 per minute allowance for these correctional facility costs.

[210] Based on staff analysis of these 42 jail contracts, approximately  {[                                                                                                                              ]}.  Material set off by double brackets {[    ]} is confidential and is redacted from the public version of this document.



**WORTH RISES**

**Bianca Tylek**
(973) 650-4277
btylek@worthrises.org

168 Canal Street, 6th Fl
New York, NY 10013
www.worthrises.org
🐦 📷 f @worthrises

November 23, 2020

Marlene H. Dortch
Office of the Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

**Re: WC Docket No. 12-375 – Comment for Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking**

Dear Commissioners and Staff,

Worth Rises applauds the Federal Communication Commission's willingness to regulate the prison telecom industry. As the Commission is all too aware, prison telecom providers have exploited incarcerated people and their families for decades with dire consequences for our most marginalized communities—which are also disproportionately impacted by the COVID-19 pandemic. These corporations exploit the human need for connection by charging exorbitant rates and fees, separating families and harming communities. The Commission's rulemaking is an important step towards ending this exploitation.

Still, Worth Rises is concerned that the Commission's methodology for setting new interstate rate caps has flaws that are artificially inflating its proposed rate caps. To address these concerns, the Commission should limit its reliance on self-reported data from correctional telecom providers, penalize misrepresentations in self-reported data, reconcile cost of service data with actual rates in the market, exclude security and surveillance costs from costs of service for communication, and consider how marketplace innovations might impact its cost of service analysis. We also urge the Commission to complete its rulemaking process by April 30, 2021.

**A. Data Reliability**

**1. Self-reported cost of service data provided by correctional telecom providers is not reliable and should not constitute the basis of the Commission's rate cap calculations.**

Currently, the Commission relies on correctional telecom providers to self-report cost of service data, which is then used by the Commission to determine rate caps. As the Commission has recognized, this approach incentivizes the providers to artificially inflate their costs of service and wrongly influence the Commission to increase the rate caps they can charge. And,

unsurprisingly, the providers routinely report inflated costs. In fact, the Commission has acknowledged that the two largest providers in the market overstate their costs of service, forcing the Commission to not only request comment on what it should do when providers inflate their data, but also to already discount one provider's self-reported numbers by 10 percent.[1] Yet, the Commission recognizes that even this discount may not fully correct the inflated costs reported by the provider.[2]

Moreover, providers have repeatedly demonstrated their willingness to submit inaccurate information to the Commission. The prison telecom industry has a well-documented history of obstruction, obfuscation, and outright lying in front of the Commission. There are countless examples that range from Securus' 2017 submission of inaccurate and misleading information to the Commission for which it was fined $1.7 million[3] to Global Tel*Link (GTL)'s prior attempt to inflate their costs earlier this year.[4] In fact, Worth Rises has previously catalogued a litany of deliberate misrepresentations from providers in their annual reports to the Commission.[5] Outside of proceedings before the Commission, providers have been accused of devising elaborate cost-fixing schemes and paying bribes to officials.[6]

Even the best methodology will only produce outputs as reliable as its inputs. Financially self-interested parties with a history of deceitful behavior cannot be relied upon to provide the inputs on which the Commission sets rate caps fair to consumers. Considering this, the Commission should not rely on providers to self-report cost data.

2. **The Commission has the industry expertise to determine rate caps independently, or at the very least, to use raw financial data to determine costs of service.**

The Commission has the institutional expertise to determine rate caps without relying on filtered cost of service data from the providers. Despite claims by providers to the contrary, communication services in prisons and jails are not meaningfully different from communication services in any other marketplace, and history is the best indicator.

Before niche telecom providers bought out the correctional market by paying prisons and jails commissions, the same major telecom providers that serve the broader public served the

---

[1] Rates for Interstate Inmate Calling Services, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, FCC 20-111 (rel. Aug. 7, 2020) (hereinafter Fourth Further Notice), Paragraph 92-98.

[2] Fourth Further Notice, para. 94.

[3] "Securus Agrees to Pay $1.7 Million Civil Penalty." 32 FCC Rcd 9552 (11). (Oct. 30, 2017). https://www.fcc.gov/document/securus-agrees-pay-17-million-civil-penalty.

[4] "Request for Information and Documents Regarding Global Tel*Link Corporation's Inmate Calling Services Costs (WC Docket No. 12-375)." DA 20-740 (July 15, 2020).

[5] Worth Rises, Comment, Docket No. 12-375 (November 25, 2019), available at https://ecfsapi.fcc.gov/file/112642500199/Worth%20Rises%20-%20Public%20Comment%20(12-375).pdf.

[6] Washington Lawyers Committee, "Families of Prisoners Sue Nation's Largest Providers of Inmate Calling Services for Fixing and Lying about Prices." (June 29, 2020), available at https://www.washlaw.org/families-of-prisoners-sue-nations-largest-providers-of-inmate-calling-services-for-fixing-and-lying-about-prices/; "Second company settles lawsuit filed by attorney general in Epps bribery case." *Mississippi Today* (Aug. 15, 2017), available at https://mississippitoday.org/2017/08/15/second-company-settles-lawsuit-filed-by-attorney-general-in-eppsbribery-case/.

correctional market (e.g. AT&T, MCI, Verizon, etc.). These corporations provided collect call services inside prisons and jails in much the same way they did outside. Niche telecom providers took over the market by paying off cash strapped prison and jail administrators at a time when the carceral population was rapidly growing. And to cement their stake in the market, they introduced security surveillance that again previous providers had not offered.[7]

The bottom line is that the communication services have changed minimally in the past few decades, what has changed in the business model of the providers in the market and the additional services they offer their contracting customers: prisons and jails. Their decision to introduce a new business model and new services should not weigh on the Commission, which has a mandate to regulate communication services. The Commission should use its deep institutional expertise in telecom to set appropriate rate caps in the correctional landscape.

Alternatively, if the Commission determines it cannot appropriately set rate caps independent of self-reported data from the providers, it should collect and analyze detailed financial data from the providers rather than relying on the providers' cost of service figures. As the Commission recognizes, the cost of service data reported by providers is not raw data. This data has already been manipulated by the providers with their financial interests in play. The Commission should collect and analyze raw financial data from the providers and determine what their true costs of service. By collecting and analyzing the data itself, the Commission can ensure it sets fair rate caps based on accurate cost of service figures.[8]

### 3. The Commission should punitively discount the data of any provider found to be inflating its costs of service by 25% and fine the provider.

The Commission has been forced to reduce the cost of service reported by at least one provider, GTL, by 10% after it provided misleading data that was out of line with the rest of the industry.[9] The Commission acknowledges that this discount is likely insufficient to address the provider's overstatement of these costs.[10] Despite many requests for candor, the Commission further acknowledges that other major providers have also overstated their costs of service.[11] Finally, the Commission recognizes that the inflation of costs by the markets two largest players likely has an outsized impact on its analysis and the proposed rate caps.[12] Accordingly, there is a critical concern about the accuracy of self-reported data and significant interest in ensuring that providers submit accurate data.

Thus, it is not enough to simply try to correct the provider's data nor is it the responsibility of the Commission to do so. In fact, it is unlikely that the Commission could correct the data with precision and its inability to so would only hurt the consumer by artificially increasing the proposed rate caps. The only way to cure for this critical concern is for the Commission to

---

[7] Worth Rises, "Connecting Families: Compelling messaging for prison phone justice campaigns," available at https://worthrises.org/s/Worth-Rises-Connecting-Families-Mar-2020-FINAL-wbwf.pdf.
[8] Fourth Further Notice, para. 98, 133.
[9] Fourth Further Notice, para. 93.
[10] Fourth Further Notice, para. 94.
[11] Fourth Further Notice, para. 98.
[12] Fourth Further Notice, para. 97.

implement a meaningful punitive discount to cost data and assess a fine to any provider found submitting misleading or false data to discourage such behavior.

## B. Methodology

**1. The Commission should lower its proposed rate caps for both prisons and jails to no more than $0.05 per minute because existing bidding and contract trends clearly demonstrate that providers can recoup their service costs with an acceptable profit margin at this rate.**

We appreciate that the Commission took great care in developing its methodology to determine the proposed rate caps and are thankful to the Commission for seeking comment on gaps in its methodology. Unfortunately, the current proposed rate caps of $0.14 for prisons and $0.16 for jails are not supported by current practices in the field. We urge the Commission to lower its proposed rate caps across the board for all prisons and jails to the lowest possible based on market date, which would be no more than $0.05 per minute.

The Commission based its proposed rate caps on self-reported cost of service data from providers. As already discussed, this approach incentivizes providers to inflate their costs of service, but the self-reported cost of service data is not the only relevant data available to the Commission. The Commission also has access to the actual rates providers offer and charge in the marketplace. It should consider both in determining true costs of service in the market.

Providers, like all for-profit entities, are protective of their profit margins. In fact, in the case of the largest providers, the fiduciary duty of their private equity owners further ensures that they are.[13] Accordingly, the rates they offer in procurement bids and charge in awarded contracts undoubtedly include a strong profit margin, especially in states that are entirely unregulated. These rates should be considered in evaluating the accuracy of their reported costs of service and are likely a better indicator of their costs of service. Their bidding and charging practices support far lower rate than the Commission has proposed.

As of October 2020, providers serving the Federal Bureau of Prisons and 43 state prison systems are all charging less than the Commission's proposed rate cap for prisons—24, or nearly half, are charging less than half the rate cap. Their rates range from $0.009 per minute to $0.13 per minute and, in agreement with the Commission's findings, suggest no correlation with the average daily population in these systems, which ranges from roughly 1,700 to 180,000 people. These systems, which in some cases charge rates 94 percent below the proposed rate cap, hold nearly 90 percent of the entire federal and state prison population, meaning that the proposed rate cap would impact just 10 percent of the prison population if set as is.[14]

---

[13] GTL is owned by American Securities. Securus is owned by Platinum Equity. Inmate Calling Solutions is owned by H.I.G. Capital.

[14] Worth Rises pulled federal and state prison intrastate call rates from provider websites as of October 2020. Rates listed in Table 1.

*Chart 1: Average Daily Population v. Cost of 15-minute Call by Prison System*



Rates in jails vary more than they do in prisons, ranging from $0.02 to more than a dollar a minute—and hundreds of varying size and rurality charge less than the Commissions' proposed rate caps.[15] However, mere variation in rates does not imply much about the actual costs of service. There are many jail systems with remarkably similar profiles to existing prison systems, including size, geography, and security needs. Thus, it does not follow that providers should enjoy a higher rate cap merely for serving jails, instead there should be one rate cap for all correctional facilities.

The critical difference in rates charged at prisons and jails is a result of the varied negotiating interest, information, and proficiency of each agency. Jails have historically negotiated higher rates than prisons for two reasons: (1) they are often more reliant and interested in high site commissions and (2) jails receive less scrutiny from advocacy organizations due to the transient nature of the detained population and the difficulty of organizing at the local level. But cost of service is not a function of either the financial interests of jails or the lack of critical oversight.

The Commission has noted that, based on the provider's self-reported data, costs of service vary largely along just two factors: (1) provider's identity and (2) the state where a facility is located,[16] but neither should, in fact, impact the Commission's cost of service analysis.

Regarding the first factor, some providers report spending less to provide communication service than others, but the capability or willingness of providers to deliver communication service in the most cost-effective way should not negatively impact consumers. The most cost-effective delivery mechanism should be an industry standard that providers are expected meet, and thus rate caps based on it. Rate caps should not make allowances for costly delivery mechanisms. Thus, the Commission should set rate caps based on the costs of service submitted by the vast majority of providers, excluding outliers, or those providers with the highest costs.[17]

---

[15] Prison Policy Initiative, "2018 Phone Rates Survey." Available at
https://www.prisonpolicy.org/phones/appendix_table_2.html.
[16] Fourth Further Notice, para. 84.
[17] Fourth Further Notice, para. 88.

Regarding the second factor, while it might be tempting to argue that different states may have different requirements that impact cost of service, again the actual rates offered and charged do not support that argument. For example, in Kansas, per minutes rates in jails range from $0.10, well below the proposed rate cap, to $1.24 per minute.[18] There are similar variations within many states, and none are tied to facility size or rurality, as the Commission found, and we affirm.

Where there is consistency in the rates charged in a particular state, it is often because of regional monopolies and information flow between sheriffs. For example, in New York, 48 of the 55 jails outside New York City contracted with GTL,[19] the only platinum level telecom sponsor of the New York State Sheriffs' Association.[20] Of these, 92 percent had the exact same rate structure: $4.35 for the first minute and $0.40 for every additional minute, or $9.95 for a 15-minute call.[21] Meanwhile, the handful of counties that opted for a different provider have substantially different rate structures, some that charge as low as $3.15 for a 15-minute call.[22] And the state prison system charges just $0.65 for the same call.[23]

There are also about half a dozen states that have instituted their own rate caps.[24] Many of these rate caps were instituted over the last few years when litigation determined that the Commission could not regulate intrastate rates. In these states, there is some consistency in rates because providers often charge at the max rate permitted by state regulation.

The real reason for the variation in rates across the country in both prisons and jails is not due to cost of service, but rather what providers can get away with in each bid and negotiation, baking in site commissions, signing bonuses, technology grants, and more.

In setting a rate cap, we recommend the Commission evaluate the providers' self-reported costs of service against their actual rates in the field, relying on the lesser of the two since both are representations of the providers' interests. Further, given the unexcused variation of jail rates and practical similarity between prisons and jails, we recommend the Commission focus on the offered and charged rates in prisons, which undergo more scrutiny.

The mean rate charged across all federal and state prisons is $0.09 per minute and the weighted mean charged across the same facilities is $0.08 per minute (*see Table 1*). These figures are critical given that the Commission is using mean contract costs to set its rate cap, but they do not support the proposed rate caps of $0.14 per minute for prisons and $0.16 per minute for jails.

---

[18] Prison Policy Initiative, "2018 Phone Rates Survey." Available at https://www.prisonpolicy.org/phones/appendix_table_2.html.

[19] Worth Rises and Brooklyn Community Bail Fund, "Paying for Jail: How County Jails Extract Wealth from New York Communities." Available at https://worthrises.org/s/Paying-For-Jail-NY.

[20] New York Sheriff's Association, "Our Corporate Partners." Available at https://nysheriffs.org/corporate-partners/.

[21] Worth Rises and Brooklyn Community Bail Fund, "Paying for Jail: How County Jails Extract Wealth from New York Communities." Available at https://worthrises.org/s/Paying-For-Jail-NY.

[22] *Id.*

[23] Securus Technologies, as of October 2020, available at https://securustech.online/#/rate-quote.

[24] The following states currently have rate caps for intrastate calls Alabama, Illinois, Louisiana, Massachusetts, Montana, New Jersey, and Ohio. These rate caps, which range from $0.07 to $0.25 per minute for prepaid calls, were all set since 2015 and, in many cases, relied on rate caps set by the Commission.

*Table 1: Call Rates in Prison Systems*

| State | Provider | 2018 Al | First Minute (local prepa | Add'l Minute (local prepa | 15 Minute Call (local prepa |
|---|---|---|---|---|---|
| Connecticut | Securus | 13,681 | $ 0.24 | $ 0.24 | $ 3.65 |
| Indiana | GTL | 26,877 | $ 0.24 | $ 0.24 | $ 3.60 |
| Louisiana | Securus | 32,397 | $ 0.21 | $ 0.21 | $ 3.15 |
| Oklahoma | GTL | 26,943 | $ 0.20 | $ 0.20 | $ 3.00 |
| Kansas | ICSolutions/CenturyLink | 10,218 | $ 0.18 | $ 0.18 | $ 2.70 |
| Michigan | GTL | 38,761 | $ 0.16 | $ 0.16 | $ 2.40 |
| Arkansas | Securus | 17,799 | $ 0.15 | $ 0.15 | $ 2.25 |
| Georgia | Securus | 54,870 | $ 0.13 | $ 0.13 | $ 1.95 |
| Hawaii | GTL | 5,375 | $ 0.13 | $ 0.13 | $ 1.95 |
| Arizona | ICSolutions/CenturyLink | 41,937 | $ 0.12 | $ 0.12 | $ 1.80 |
| Massachusetts | Securus | 8,692 | $ 0.12 | $ 0.12 | $ 1.80 |
| Montana | ICSolutions/CenturyLink | 3,744 | $ 0.12 | $ 0.12 | $ 1.73 |
| Washington | GTL | 19,369 | $ 0.11 | $ 0.11 | $ 1.65 |
| Nevada | Securus | 13,640 | $ 0.11 | $ 0.11 | $ 1.65 |
| Iowa | ICSolutions | 9,419 | $ 0.11 | $ 0.11 | $ 1.65 |
| Wyoming | ICSolutions | 2,577 | $ 0.11 | $ 0.11 | $ 1.65 |
| Colorado | GTL | 20,200 | $ 0.11 | $ 0.11 | $ 1.61 |
| North Carolina | GTL | 34,899 | $ 0.10 | $ 0.10 | $ 1.50 |
| Kentucky | Securus | 24,136 | $ 0.10 | $ 0.10 | $ 1.50 |
| Utah | ICSolutions/CenturyLink | 6,648 | $ 0.10 | $ 0.10 | $ 1.50 |
| Oregon | Telmate | 15,433 | $ 0.09 | $ 0.09 | $ 1.35 |
| Maine | Legacy/Edovo | 2,426 | $ 0.09 | $ 0.09 | $ 1.35 |
| Idaho | ICSolutions/CenturyLink | 8,664 | $ 0.08 | $ 0.08 | $ 1.20 |
| New Mexico | Securus | 7,253 | $ 0.08 | $ 0.08 | $ 1.20 |
| South Dakota | GTL | 3,918 | $ 0.08 | $ 0.08 | $ 1.20 |
| North Dakota | Securus | 1,695 | $ 0.08 | $ 0.08 | $ 1.19 |
| California | GTL | 128,935 | $ 0.08 | $ 0.08 | $ 1.14 |
| Tennessee | GTL | 30,128 | $ 0.07 | $ 0.07 | $ 1.05 |
| Alaska | Securus | 4,380 | $ 0.07 | $ 0.07 | $ 1.05 |
| Nebraska | GTL | 5,456 | $ 0.06 | $ 0.06 | $ 0.94 |
| Federal | GTL | 179,898 | $ 0.06 | $ 0.06 | $ 0.90 |
| Texas | Securus/CenturyLink | 163,635 | $ 0.06 | $ 0.06 | $ 0.90 |
| Wisconsin | ICSolutions/CenturyLink | 24,064 | $ 0.06 | $ 0.06 | $ 0.90 |
| Pennsylvania | Securus | 47,370 | $ 0.06 | $ 0.06 | $ 0.89 |
| South Carolina | GTL | 19,033 | $ 0.06 | $ 0.06 | $ 0.83 |
| Ohio | GTL | 50,431 | $ 0.05 | $ 0.05 | $ 0.75 |
| Missouri | Securus | 30,369 | $ 0.05 | $ 0.05 | $ 0.75 |
| Alabama | Securus/CenturyLink | 26,841 | $ 0.05 | $ 0.05 | $ 0.75 |
| Minnesota | GTL | 10,101 | $ 0.05 | $ 0.05 | $ 0.75 |
| New Jersey | GTL | 19,362 | $ 0.04 | $ 0.04 | $ 0.66 |
| New York | Securus | 47,459 | $ 0.04 | $ 0.04 | $ 0.65 |
| Virginia | GTL | 37,340 | $ 0.04 | $ 0.04 | $ 0.61 |
| Florida | Securus | 97,538 | $ 0.04 | $ 0.04 | $ 0.60 |
| Mississippi | GTL | 19,614 | $ 0.04 | $ 0.04 | $ 0.60 |
| Delaware | GTL | 6,067 | $ 0.04 | $ 0.04 | $ 0.60 |
| Vermont | GTL | 1,735 | $ 0.04 | $ 0.04 | $ 0.60 |
| Maryland | GTL | 17,815 | $ 0.06 | $ 0.03 | $ 0.48 |
| West Virginia | ICSolutions/CenturyLink | 6,775 | $ 0.03 | $ 0.03 | $ 0.48 |
| Rhode Island | Securus | 2,767 | $ 0.03 | $ 0.03 | $ 0.44 |
| New Hampshire | GTL | 2,647 | $ 0.01 | $ 0.01 | $ 0.20 |
| Illinois | Securus | 39,915 | $ 0.01 | $ 0.01 | $ 0.14 |
| **Average** | | | **$ 0.09** | **$ 0.09** | **$ 1.33** |

Yet, we are not suggesting that the Commission use these means to set its rate cap for several reasons that we will continue to discuss throughout this comment, namely that the actual rates that underlie this mean include (1) unexamined profit margins, (2) site commissions for the transfer of market power which the Commission has rightfully excluded from costs of service, and (3) the cost of security and surveillance services that should not be passed on to consumers. After these matters are addressed, we estimate that the proper rate cap would be much lower and be, at most, in line with the one third of prison systems charging $0.05 per minute or less.

## 2. The Commission should perform its cost-recovery analysis at the contract level because that approach reflects how corporations and facilities negotiate rates.

Providers and correctional agencies negotiate contracts at an agency-wide level. Individual facilities are not responsible for negotiating their own rates, and rates for individual facilities do not generally vary within a larger correctional agency contract. Therefore, we agree with the Commission's proposed model for cost-recovery analysis.

## 3. The Commission should set rate caps based on the cost of providing communication service to consumers, and not the added costs of security and surveillance.

The cost of security and surveillance services is one of the two leading costs providers point to to justify their egregious call rates, the other being site commissions. In its current methodology, the Commission considers security and surveillance a cost of service for the purposes of setting its proposed rate caps.[25] We disagree with this approach, and urge the Commission to exclude the costs of security and surveillance that providers have reported and passed through to consumers because they are not directly related to communication services.

Security and surveillance costs are not related to the provision of communication service and provide no benefit to consumers, though consumers bear the burden. These security and surveillance services are not different in purpose than the barbed wire, guard dogs, and security cameras that secure correctional facilities. They are most similar to the security and surveillance conducted in correctional mailrooms, where mail set to and from incarcerated people and their families is reviewed for contraband. In recent years, some correctional agencies have even outsourced the security and surveillance of mail by requiring families send their mail to a private vendor, who then photocopies the mail and send the copies to the correctional facilities for distribution to the intended mail recipient. For instance, in 2018, the Pennsylvania Department of Corrections outsourced the security and surveillance of mail to Smart Communication for $4 million,[26] yet the cost of sending mail is still the regular price of a stamp. These, and all other security and surveillance measures, are paid for out of the core operating budgets of correctional agencies, not shifted onto incarcerated people or their support networks.

Designed to serve the interests of facilities and their administrators, these security and surveillance measure are invasive and intrusive for those subjected to them. The same is true for

---

[25] Fourth Further Notice, para. 107.
[26] Raven Rakia, "Pennsylvania prisons hired a private company to intercept and store prisoners' mail." *The Appeal* (September 24, 2018), available at https://theappeal.org/pennsylvania-prisons-hired-a-private-company-to-intercept-and-store-prisoners-mail/.

the security and surveillance services imposed on prison and jail communication. For instance, in the California prison system, where GTL is contracted to provide call services, calls are limited to 15 minutes, and three times during each call, a loud automated message interrupts the call with a reminder that the call is being monitored. These interruptions happen at inconsistent intervals and are incredibly distracting, imposing, and insensitive. In this case, not only are consumers paying for the cost of these security and surveillance services, but they are also paying for the lost time the system takes to make the automated announcement.

Worse yet, these security and surveillance services are often used against consumers—to violate their privacy and expose them to a significant risk of abuse.[27] Recordings of jail phone calls have been routinely used in the prosecution of people awaiting trial and location tracking to monitor callers on the outside.[28] In the worst cases, providers have illegally recorded privileged calls between incarcerated people and their attorneys and turned those calls over to law enforcement.[29] The technology that made this possible was funded by the consumers whose lives were destroyed by it.

Isolating the costs of these security and surveillance services would be in line with the arguments made by providers, their marketing materials, and the surveillance related payments and technology grants they make to prisons and jails.

First, when questioned about the high rates of calls, providers routinely site the cost of security and surveillance.[30] They often explain that calls in prisons and jails are not like calls elsewhere due to the security and surveillance needs of correctional agencies. But in doing so, they refuse to acknowledge that they are not addressing communication service costs at all and are instead an entirely different product and service.

Second, significant portions of provider bids are often focused on security and surveillance. While their products often come with a base level of security and surveillance, such as the recording of calls, providers often offer additional services with added per minute costs from an a la carte menu or in bundles.[31] At times, they even subcontract additional security and surveillance services to third parties and add the cost of those services onto their rates.[32]

And finally, they make payments to correctional agencies to reimburse them for costs of security and surveillance conducted by the agencies themselves. The Commission has currently made an allowance of $0.02 for these security related commissions. This allowance should be removed

---

[27] Jennifer Valentino-DeVries, "Service Meant to Monitor Inmates Could Track You, Too." *NY Times*, May 10, 2018, https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html.

[28] Jennifer Valentino-DeVries, "Service Meant to Monitor Inmates' Calls Could Track You, Too." The New York Times (May 10, 2018), available at https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html.

[29] Luke Nozicka, "Leavenworth detainees reach $1.45M settlement over recorded attorney phone calls." The Kansas City Star (August 26, 2019), available at https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html.

[30] https://www.nytimes.com/2015/03/31/us/steep-costs-of-inmate-phone-calls-are-under-scrutiny.html

[31] "GTL Shelby County contract December 2017," available at https://www.documentcloud.org/documents/5000150-GTL-Shelby-County-contract-December-2017.html#document/p27/a472471.

[32] https://abcnews.go.com/Technology/us-prisons-jails-ai-mass-monitor-millions-inmate/story?id=66370244

from the proposed rate cap as these costs simply do not constitute a cost of communication service, they are costs of security and surveillance services.

But not only are security and surveillance costs not directly related to communication service, they also fall outside the purview of the Commission for regulation. According to its original mandate, the Commission's responsibility is to ensure the availability of worldwide wire and radio communication services to all people in the U.S. The mandate was not to ensure that correctional facilities have the ability to surveil such communication, or that such communication should be used as a vehicle to shift unrelated costs of security and surveillance onto communication consumers.

In *GTL v. FCC* the Court of Appeals for the D.C. Circuit determined that consumers may be charged for costs that are "directly related" to the provision of calling services.[33] While the Court appeared to have a broad understanding of what constitute costs "directly related" to the provision of communication service based largely on what is requested by correctional agencies, the Court was clearly most disturbed by what it described as the prior Commission's "categorical exclusion of site commissions." Excluding security and surveillance costs from the Commission's cost-recovery analysis would not violate the Court's decision in *GTL v. FCC* for the following reasons: (1) the exclusion is not a prohibition on commissions, (2) any impact on commissions could not be described as a "categorical exclusion" of them, (3) many of the security and surveillance costs layered on to communication services are not requested by correctional agencies but rather offered additionally by providers, and (4) the Court's decision cannot be interpreted to mean that *anything* correctional agencies ask for would be "directly related."

The Commission should not legitimize the shifting of unrelated correctional costs onto consumers using communication services. Once these unrelated services have been excluded from the cost of service, the Commission should adjust its rate caps accordingly.

## C.  Impact of Rates

The high rates charged for prison and jail communication damage entire communities. The Commission's action to lower these rates will increase connections and carry numerous tangible and intangible benefits. The positive impact of rate reductions goes far beyond the factors listed in the Order both quantitatively and qualitatively.

At the current proposed rates, roughly 10 percent of the prison population would be impacted by the rulemaking. Assuming every prison system currently above the rate adjusted their interstate rate to the new cap, we estimate that consumers would save nearly $3 million annually and that call volume would increase by 184 million minutes annually. If the rate cap was instead set to $0.05 per minute, 35 prison systems would be impacted, and we estimate consumers would save over $45 million annually and call volume would increase by 1.5 billion minutes annually.

While jail figures are more difficult to estimate, assuming that the national jail average for interstate calls is the current rate cap of $0.21 per minute, we estimate that the proposed rates

---

[33] Fourth Further Notice, para. 102; *GTL v. FCC,* 866 F.3d at 417.

would save consumers almost $9 million annually and increase call volume by nearly 800 million minutes annually. If the rate cap was instead set to $0.05, we estimate consumers would save over $75 million annually and call volume would increase by 3.2 billion minutes annually.

## D. Marketplace Developments

The Commission's rulemaking should account for developments in the market that have allowed incarcerated people and their support networks to communicate for free or significantly less.[34] In the last three years, the prison phone justice movement has made significant strides.

In 2018, New York City passed the nation's first piece of legislation to make jail phone calls free to incarcerated people and their families. The legislation shifted the cost burden for jail calls back onto the city after more than 20 years. As a result, the city could no longer collect site commissions and renegotiated the price of its calls with Securus from $0.50 for the first minute and $0.05 for every additional minute to $0.03 per minute across the board. The legislation went into effect in May 2019, saved families nearly $10 million annually, and increased call times by almost 40% overnight.[35]

In 2019, San Francisco became the second city to make jail calls free to incarcerated people and their families.[36] Rather than negotiating its existing contract with GTL, the city decided to bring the service back to procurement. They released a groundbreaking request for proposal that prohibited providers from bidding on a per minute, which is not just an antiquated model but also creates a perverse incentive for the city to curb phone use.[37]

With this new request for proposals in San Francisco, providers could only bid according to two structures: a fixed cost for the entire contract or a per phone line lease. Four providers bid on the contract, and GTL, which bid using both structures—$39,055 monthly or $89.78 per phone line—won the contract with the lowest bid.[38] The new policy went into full effect in August of 2020 and is now saving families $1.1 million annually.[39] It also increased call volume by roughly 40% overnight.[40] We hope other will move toward this model.

There are now several states, including Connecticut, Massachusetts, and New York, considering legislation to make phone calls free across state and local facilities.[41] There are also efforts in California to introduce a meaningful rate cap.[42] Several state and local agencies have also

---

[34] Fourth Further Notice, Paragraph 134.

[35] Zero Profits site, available at https://www.zeroprofits.org/phonecalls.

[36] Carla Marinucci, "San Francisco becomes first county in the nation to offer free calls to jail inmates." Politico (August 10, 2020), available at https://www.politico.com/states/california/story/2020/08/10/san-francisco-becomes-first-county-in-the-nation-to-offer-free-calls-to-jail-inmates-1306715.

[37] *See* Appendix.

[38] *See* Appendix.

[39] Lisa Pickoff-White and Marisa Lagos, "Will San Francisco Taxpayers Have to Pay for Phone Calls From Inmates?" *KQED* (June 17, 2019), available at https://www.kqed.org/news/11754818/will-san-francisco-taxpayers-have-to-pay-for-phone-calls-from-inmates.

[40] Analysis conducted by Worth Rises for the City of San Francisco.

[41] Connect Families Now website, available at https://connectfamiliesnow.com/ourcampaigns.

[42] California Senate Bill 555, available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB555.

negotiated dramatically improved rates, namely Illinois, which negotiated the nation's cheapest contract with Securus in 2018 for $0.009 per minute for domestic calls and $0.23 per minute for international calls,[43] and Dallas, which negotiated a comparable contract with Securus for $0.0119 per minute earlier this year.[44]

In conclusion, we again applaud the Commission for pursuing a rulemaking to lower interstate rate caps, and urge the Commission to adjust the proposed rate caps according to these comments. Please do not hesitate to reach out with any questions. Thank you for your consideration.

Sincerely,

Bianca Tylek
Executive Director

---

[43] State of Illinois Contract, Illinois Department of Innovation and Technology, Phone Services for Incarcerated Persons, available at https://www.prisonphonejustice.org/media/phonejustice/Securus_7-1-18_-_6-30-2021_Redacted.pdf.

[44] Keep Families Connected Letter to Massachusetts Governor Charlie Baker (March 20, 2020), available at https://www.nclc.org/images/pdf/special_projects/covid-19/COVID-19-prison-telephone-letter.pdf.

# Appendix

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

# City and County of San Francisco

## Request for Proposals for

## Incarcerated Person Communication Services
## RFP # SHF | 2019-11/ Sourcing Event No. 0000003286



| | |
|---|---|
| Date issued: | December 20, 2019 |
| Pre-proposal conference: | 9:00 a.m., January 8, 2020 |
| Proposal due: | 2:00 p.m., February 5, 2020 |

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

Request for Proposals for Incarcerated Person Communication Services:  **RFP # SHF | 2019-11**

I.   INTRODUCTION AND SCHEDULE .................................................................... 3

II.  SCOPE OF WORK................................................................................................ 5

III. SUBMISSION REQUIREMENTS ....................................................................... 5

IV.  EVALUATION AND SELECTION CRITERIA ............................................... 16

V.   PRE-PROPOSAL CONFERENCE AND AGREEMENT AWARD ............................ 19

VI.  TERMS AND CONDITIONS FOR RECEIPT OF PROPOSALS ................................ 20

VII. CONTRACT REQUIREMENTS........................................................................ 25

VIII. PROTEST PROCEDURES............................................................................... 26

TABLE OF CONTENTS

**Appendices:**

A.   Standard Forms:  Listing and Internet addresses of Forms related to Taxpayer Identification Number and Certification, to Business Tax Declaration, and to Chapters 12B and 12C, and 14B of the S.F. Administrative Code.

B    Agreement for Professional Services (form P-600) [separate document]

C    Proposal Response Outline Example [separate document]

**Attachments:**
Attachment 1- RFP Requirements

**Request for Proposals for**
**Incarcerated Person Communications Services**

I.     **Introduction and Schedule**

    A.  **General**

        **1.**    The City and County of San Francisco ("City") with the San Francisco Sheriff's Department ("Sheriff's Department") invite responses to this Request for Proposal (RFP) from qualified, experienced Proposers who can provide a comprehensive, reliable incarcerated person communications solution including incarcerated person telephones, standard visitation services and additional technologies that meet the requirements described in this RFP. For the purposes of this RFP, City and Sheriff's Department are considered interchangeable.

        **2.**    City is seeking an experienced Proposer to provide, install and maintain various incarcerated person communication solutions inclusive of an incarcerated person, visitation and public payphone telephone system (IPTS) at the Jail Facilities. Proposer shall provide all incarcerated person communication services to the incarcerated persons in accordance with the requirements and provisions set forth in this RFP and to all of the Facilities listed in **Attachment 1, Section I (Facility Specifications)**. All calls through the IPTS, including International calls, shall be completed as free and shall not require a charge or transaction fee.

        **3.**    The Sheriff's Department may engage third party consultants both in the process of this procurement and in the management of the day-to-day operations of the selected Proposer. Currently, the Sheriff's Department works with Praeses, LLC ("Praeses) as its independent and objective compliance monitor ("Designated Agent") relative to the Sheriff's Department incarcerated person communication services environment. Proposers responding to this RFP shall accept the Sheriff's Department's direction in working with its Designated Agent.

        **4.**    The awarded Agreement shall have an original term of three years. In addition, the Sheriff's Department shall have two options to extend the term for a period of one year each, which the Sheriff's Department may exercise in its sole, absolute discretion.

### B. Schedule of Events

The anticipated schedule for selecting an incarcerated person communications Proposer is:

| Proposal Phase | Date |
|---|---|
| RFP is issued by the Sheriff's Department | 12/20/19 |
| Deadline for mandatory pre-proposal conference registration | 01/03/2020 |
| Mandatory pre-proposal conference | 9:00 a.m. (PST), 01/08/2020 |
| Deadline for submission of written questions or requests for clarification | 01/13/2020 |
| Proposals due | 2 p.m. (PST), 02/05/2020 |
| Tentative effective date of Agreement | 05/1/2020 |

### C. Contractors Unable to do Business with the City

#### 1. Generally

Contractors that do not comply with laws set forth in San Francisco's Municipal Codes may be unable to enter into an Agreement with the City. Some of the laws are included in this RFP, or in the sample terms and conditions attached as the P-600 Professional Services Agreement (4-19).

#### 2. Companies Headquartered in Certain States

The awarded Agreement is subject to the requirements of Administrative Code Chapter 12X, which prohibits the City from entering into contracts with companies headquartered in states with laws that perpetuate discrimination against LGBT populations or where any or all of the work on the contract will be performed in any of those states. Proposers are hereby advised that Proposers that have their United States headquarters in a state on the Covered State List, as that term is defined in Administrative Code Section 12X.3, or where any or all of the work on the contract will be performed in a state on the Covered State List may not enter into contracts with the City. A list of states on the Covered State List is available at the website of the City Administrator.

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

## II. Scope of Work

A. The Sheriff's Department is seeking an experienced incarcerated person communications Proposer to provide, install and maintain various incarcerated person communication solutions inclusive of an incarcerated person telephone service (IPTS), audio recording of visitation sessions, and a payphone telephone system.

1. All incarcerated person telephone calls and visitation sessions processed by and through the IPTS shall be completed as free and no fees shall be charged by Proposer to the incarcerated persons or the called parties.

2. The Sheriff's Department will pay the Proposer a fixed annual cost amount split into equal monthly payments to compensate Proposer for the IPTS services outlined in this RFP and **Attachment 1 – RFP Requirements**. Proposer may offer an alternative Price Proposal utilizing a lease per incarcerated person telephone in Option 2 of the RFP and as outlined in **Attachment 1, Section J (Rates and Fees).**

   a) The Sheriff's Department reserves the right to request an adjustment in the fixed annual cost amount in the event of a material change in the active incarcerated persons or open facilities. Material change shall be considered a fluctuation of 10% or more in the incarcerated persons population for a period of 4 (four) consecutive months.

   b) The Sheriff's Department reserves the right to modify the free call or fixed annual cost arrangement with the awarded Proposer. In such event, the Sheriff's Department and Proposer will mutually negotiate any adjustments to the Agreement and all such changes will be documented in an amendment.

   c) The Sheriff's Department reserves the right to impose a percentage cap on Proposer-proposed increases in pricing beyond the fixed annual cost amount.

B. Detailed Proposer responsibilities and specific requirements are set forth in in **Attachment 1 – RFP Requirements** and define the scope of work associated with this RFP.

## III. Submission Requirements

### A. Time and Place for Submission of Proposals

1. Proposals must be received by 2:00 p.m. (PST), on 2/05/2020. Postmarks will not be considered in judging the timeliness of submissions. Proposals may be delivered electronically via the City's PeopleSoft system at https://sfcitypartner.sfgov.org/pages/index.aspx, or mailed to:

Henry Gong
San Francisco Sheriff's Department SFSD City Hall, Room 456
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4676

2. For hardcopy deliveries, Proposers shall submit five print copies (1 original and 4 copies) of the proposal and one copy, separately bound, of the required CMD Forms in a sealed envelope clearly labeled **INCARCERATED PERSON COMMUNICATION SERVICES PROPOSAL**, and include the RFP number to the above location. Proposals that are submitted by fax or email will not be accepted. Late submissions will not be considered.

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

3. Additional requirements are found in **Attachment 1, Section B (Instructions and Format).**

B. **Format**

1. **Hardcopy**

a. Place proposals in three-ring binders for the review panel. Please use three-hole recycled paper, print double-sided to the maximum extent practical, use recycled paper that is comprised at minimum of 30% post-consumer materials, and bind the proposal with a binder clip, rubber band, or single staple, or submit it in a three-ring binder. Please do not bind your proposal with a spiral binding, glued binding, or anything similar. You may use tabs or other separators within the document.

b. For word processing documents, the Sheriff's Department prefers that text be unjustified (i.e., with a ragged-right margin) and use a serif font (e.g., Times Roman, and not Arial), and that pages have margins of at least 1" on all sides (excluding headers and footers).

c. Please include a Table of Contents.

d. Additional requirements are found in **Attachment 1, Section B (Instructions and Format).**

2. **Electronic**

a. Submit an electronic version of the proposal on a USB stick or via the City's PeopleSoft bidding system at https://sfcitypartner.sfgov.org/pages//index.aspx.

b. For word processing documents, the Sheriff's Department prefers that text be unjustified (i.e., with a ragged-right margin) and use a serif font (e.g., Times Roman, and not Arial), and that pages have margins of at least 1" on all sides (excluding headers and footers).

c. Please include a Table of Contents.

d. The electronic version shall be in a searchable format and shall follow the order specified in **Attachment 1, Section B.1 (Proposal Order).** Non-searchable documents may be considered non-compliant. Proposer is responsible for ensuring the electronic version and the chosen media are free from any viruses, malware or malicious code. Electronic versions so compromised will be considered non-compliant.

e. Additional requirements are found in **Attachment 1, Section B (Instructions and Format).**

C. **Content**

Firms interested in responding to this RFP must submit the following information, in the order specified in **Attachment 1, Section B.1 (Proposal Order).** Proposers shall adhere to page lengths specified in **Attachment 1, Section B.1 (Proposal Order).**

1. **Introduction and Executive Summary**

Submit a letter of introduction and an executive summary of the proposal. The letter must be signed by a person authorized by your firm to obligate your firm to perform the commitments contained in the proposal. Submission of the letter will constitute a

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

representation by your firm that your firm is willing and able to perform the commitments contained in the proposal.

This RFP document provides instructions for the RFP process. This RFP document also includes several sections and numbered items where Proposer must provide additional information or documentation as indicated.

a.  Proposer's proposal shall follow the order specified in **Attachment 1, Section B.1 (Proposal Order).** Proposer's proposal shall include the original RFP language where specified. The original text from each section and numbered requirement of the RFP document shall be inserted into Proposer's proposal document to be immediately followed by a complete response provided by the Proposer. Please reference Appendix C - Proposal Response Outline Example.

b.  Proposer's proposal shall include specified sections and numbered items in the RFP document that require additional explanation. Proposer shall provide specific, concise responses that fully address the question/information requested in that section. Include only those exhibits and/or images that are clearly relevant to the specific section and numbered item.

c.  If Proposer is in full compliance with the RFP section or requirement number set forth in Attachment 1, Proposer's response shall be, "Read and Agree."

d.  If Proposer's response to the requirements set forth in Attachment 1 is not "Read and Agree", the Proposer's response shall be, "Read and Do Not Agree" and shall be considered an exception ("Exception"). Exceptions to any section or numbered requirement must be listed **in Attachment 1, Section K (Exceptions to RFP).**

e.  **Attachment 1 – RFP Requirements. Attachment 1, Sections B through N** includes specifications that require Proposer Response for Proposer to be considered. Proposer shall indicate whether Proposer will comply with the requirement, as written. Proposer shall specify, "Read and Agree" or "Read and Do Not Agree" in the PROPOSER RESPONSE space. Items answered with "Read and Do Not Agree" require a statement from the Proposer in the PROPOSER COMMENT space as to why the requirement cannot be met and an explanation of how the Proposer proposes to meet City's needs without the required item. All statements where Proposer responded with "Read and Do Not Agree" must be listed in **Attachment 1, Section K (Exceptions to RFP).** Proposer comments will be evaluated in accordance with the Evaluation and Section Criteria of this RFP as well as **Attachment 1, Section C (Evaluation & Selection and Section C.1 (Evaluation Criteria).**

1)  Section A - Proposer Instructions
2)  Section B - Instructions & Format
3)  Section B.1 - Proposal Order
4)  Section C - Evaluation & Selection
5)  Section C.1 - Evaluation Criteria
6)  Section D - General Conditions
7)  Section E - User Billing & Payments
8)  Section F - Customer Service
9)  Section G - General Installation Requirements
10) Section H - IPTS Requirements
11) Section I - Facility Specifications
12) Section J - Rates and Fees
13) Section K - Exceptions to RFP

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

14) Section L - Exceptions to P-600 Professional Service Agreement (4-19)
15) Section M - Receipt of Addenda
16) Section N - Pre-Proposal Conference Registration Form

f. **Appendix B – P-600 Professional Service Agreement (4-19).** Proposer is required to review the standard agreement in its entirety and indicate any exceptions in **Attachment 1, Section L (Exceptions to P-600 Professional Service Agreement),** including an explanation of how the Proposer proposes to meet the Sheriff's Department needs without the required item.

g. The City shall propose an agreement resulting from this RFP, which shall incorporate **Attachment 1 – RFP Requirements, Appendix B – P-600 Professional Service Agreement (4-19)** and Proposer's RFP response ("Agreement"). The terms of any agreement between the selected Proposer and the Department shall be subject to further negotiation and approval before the Sheriff's Department may be legally bound thereby. If satisfactory negotiations with the selected Proposer cannot be negotiated in a reasonable time, the Sheriff's Department may begin Agreement negotiations with the next Proposer. The awarded Proposer shall not unduly delay negotiations or execution of the Agreement. Proposer is expected to respond timely to the Sheriff's Department's requests.

h. Additional format requirements are provided in **Attachment 1, Section B (RFP Instructions & Format).**

2. **Project Approach**

Describe the services and activities that your firm proposes to the City, including the following information.

a. **Equipment and Installation Requirements**

1) Specific Equipment and Installation requirements applicable to all systems are outlined in **Attachment 1, Section G (General Installation Requirements).**

2) Proposer shall submit a preliminary implementation plan, which shall include a proposed installation schedule for the Facilities for IPTS.

3) Proposer shall indicate any environmental conditions required for the proposed IPTS. Include minimum and maximum operating temperatures and humidity levels.

4) Proposer shall indicate the number of hours of back-up power that the provided UPS components supply to the IPTS.

5) Proposer shall indicate whether Proposer proposes any changes to Sheriff's Department's communications room at the Facilities.

**IPTS**

1) Specific IPTS Equipment and Installation requirements are outlined in **Attachment 1, Section H (IPTS Requirements).**

2) Proposer shall supply details of Proposer's proposed IPTS which shall include, but not be limited to: system version (if Proposer uses multiple IPTS versions and/or releases), system design (centralized vs. premise based), technical specifications, software applications, hardware architecture and networking capabilities.

3)  Proposer shall include a diagram demonstrating the proposed IPTS solution.

4)  Proposer must indicate the physical size of the IPTS equipment to be installed at the Facilities including information on height, depth, width, weight, abuse tolerances and any limitations.

5)  Proposer shall include a description, as well as images, of the incarcerated person and visitation telephone sets, TDD and/or video relay service units, and cart/portable sets proposed for installation at the Facilities.

b.  **Technology Features and User Applications**

**IPTS**

1)  IPTS and User Application Specifications are outlined in **Attachment 1, Section H (IPTS Requirements).**

2)  Proposer shall provide information on how the proposed IPTS is capable of recognizing and distinguishing standard or irregular busy signals, standard or irregular ringing signals, answering machines, digital voicemail, cellular telephones, ring-back tones, chain dialing.

3)  Proposer shall provide a script of the call acceptance information provided to the called party.

4)  Proposer shall indicate the number of times the IPTS plays the call acceptance information to the called party and whether the called party may interrupt the prompts by selecting a digit on the keypad.

5)  The IPTS shall process calls on a selective trilingual basis in English, Spanish and Cantonese. Proposer shall indicate whether the called party (in addition to the incarcerated person) will be able to select the preferred language for call prompts.

6)  For calls that are not completed, the IPTS shall play a recorded message to the incarcerated person detailing why the call was not completed. Proposer shall provide a list of the available recordings as well as a complete description of each.

7)  Proposer shall specify if the IPTS can limit free calls per incarcerated person, within a specified number of hours, daily, weekly or monthly. Proposer shall list the ways in which rules for free calls can be assigned.

8)  Proposer shall provide information on any security configurations available within the IPTS to prevent fraud relative to automated phone trees (e.g. incarcerated persons pressing digits and getting to a live operator).

9)  Proposer shall provide detailed information on the frequency Proposer performs remote diagnostics and troubleshooting processes that shall include failure reports, alarms, service history and other steps taken.

10) The IPTS shall comply with the Americans with Disabilities Act (ADA) requirements including, but not limited to, providing telephones and video relay units, which are accessible to persons in wheelchairs and providing devices, including video relay units, which are compatible with Telephone Devices for the Deaf (TDD).

   a)  Proposer must indicate how the TDDs work with the proposed IPTS.
   b)  Proposer shall provide detail on how TDD calls can be recorded and monitored via the IPTS.

    c)   Proposer shall provide detail relative to its capability to provide a Video Relay System (VRS) at no additional cost to the Sheriff's Department. Proposer shall include information on any translation options associated with the VRS.

    d)   Proposer shall provide detail on how call controls configured in the IPTS are preserved for calls placed using the VRS (e.g. branding, blocked telephone numbers).

c.   **Security Features**

1)   IPTS Security Features requirements are specified in **Attachment 1, Section G (General Installation Requirements)**.

**IPTS**

1)   Proposer shall provide a detailed explanation of the information displayed on the called party's caller ID each time a call from the Facilities is placed (e.g. unknown number, Proposer's City service number, dummy ANI).

2)   Relative to Proposer's fraud prevention feature, provide a list of the available pre-recorded announcements. Proposer shall describe its process for adjusting the duration of the call or excluding the pre-recorded announcements from the cost of a call.

3)   Specify the method used by Proposer to detect three-way calls, specifically if the called party is utilizing a cell phone to place the three-way call.

    a)   Upon detection of a three-way call, indicate whether the IPTS is capable of playing a message to the incarcerated person and/or the called party prior to terminating the call.

d.   **Monitoring, Recording and Data Requirements**

1)   Proposer shall provide detailed information on its data storage locations, data redundancy practices, and the processes used when copying and storing all data.

**IPTS**

1)   Monitoring, Recording and Data Requirements are outlined in **Attachment 1, Section H (IPTS Requirements).**

2)   Proposer shall include detailed information on the IPTS alert application. The description shall include, at a minimum, the types of alerts available (cell phone, SMS text, email) and whether a security PIN for accessing the live call/visitation session is required.

3)   Proposer shall provide a detailed description of the process for copying/exporting recordings. Include information on date/time stamps and how the IPTS prevents tampering with a recording.

4)   Proposer shall describe its capabilities to allow authorized users of the IPTS application to share call recordings (single and bulk) without copying recordings onto a CD or other storage medium.

5)   Provide a listing of all available file types for IPTS data including reports and recordings.

e.   **Additional Technology**

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

Sheriff's Department is interested in additional technology products that the Proposer can provide as part of the Proposer's proposal offering for this RFP. At its sole option, Sheriff's Department may elect to implement any proposed Additional Technologies throughout the life of the Agreement by way of Amendment. If Proposer is interested in providing information for additional technology products, it should supply information regarding each item listed below as indicated:

1) **Video Visitation System (VVS) (to be included in the fixed cost proposal):** Proposer shall describe its VVS feature, which shall provide both incarcerated persons and external users with onsite and remote video visits.

    a) Proposer shall supply details of Proposer's proposed optional VVS, which shall include, but not be limited to: hardware components, operating system, default applications, power options, proposed cabling, and bandwidth parameters.

    b) Proposer shall include a description, as well as images, of the proposed video visitation stations proposed for installation at the Facilities.

    c) Proposer shall detail any unique or distinctive features regarding the proposed VVS, including the capability for the incarcerated person to initiate video visitation sessions. If Proposer does not have the capability for the incarcerated person to initiate video visitations sessions, provide information on Proposer's research and development progress.

    d) Proposer shall list the requirements for a visitor to complete remote video visitation sessions, including but not limited to minimum bandwidth, equipment, software, browser type.

    e) Proposer shall specify its proposed process for providing information on upcoming video visits, including reports available in the VVS user application.

    f) Proposer shall provide a list of all available reports in the optional VVS user application.

    g) Proposer shall describe security features of the proposed VVS, including capabilities to capture the visitor's photo or identification automatically, verify the visitor's identity, run a warrant search on the visitor, create automated/custom restrictions.

    h) Proposer shall describe all methods for visitors to register and schedule a video visit.

    i) Proposer shall describe City's options for both manual and automatic approval of video visits.

    j) Proposer shall describe if the proposed VVS scheduling software can also accommodate standard in-person visits. If so, Proposer shall describe its visitation scheduling platform to be used by City for standard in-person visits.

    k) Proposer shall describe City's options for live VVS monitoring and playbacks of video visits.

    l) Proposer must provide 2 references of facilities where this feature has been implemented for at least 6 months.

    m) Proposer shall include its costs for VVS within the IPTS Price Proposal as described in Attachment 1 – RFP Requirements, Section J (Rates & Fees).

2) **Automated Information Technology System (AITS) (to be included in the fixed cost proposal):** Proposer shall describe its AITS feature, which shall provide both incarcerated persons and external users with information relative to the facility or to a specific incarcerated person.

      a) Proposer must provide 2 references of facilities where this feature has been implemented for at least 6 months.

3) **Cell phone detection (to be included in the fixed cost proposal)**: Proposer must provide an overview of both mobile and stationary cell phone detection technology

      a) Proposer must provide 2 references of facilities where this feature has been implemented for at least 6 months.

4) **Identity Detection Technology (Beyond Voice Biometrics and Face Recognition Technology) (to be included in the fixed cost proposal)**: Proposer must provide an overview of incarcerated person identity detection technologies available from the Proposer, beyond or superseding voice biometrics.

      a) Proposer must provide 2 references of facilities where this feature has been implemented for at least 6 months.

3. **Firm Qualifications**

Provide information on your firm's background and qualifications which address the following:

a. **Proposer Information**

1) Name, address and telephone number of a contact person for this RFP response.

2) Documentation that Proposer is registered to do business in the state of California.

3) Documentation that all necessary requirements of the Federal Communications Commission (FCC) and BSCC Title 15 (Minimum Standards for Local Detention Facilities) for the IPTS are met.

4) A copy of Proposer's telecommunications service tariff, for the IPTS, for the state of California.

5) Proposer's current annual report and its 2 most recent Dun and Bradstreet or similar reports.

6) If Proposer has operated under a different name, or affiliate, in the past 3 years, provide names, dates, addresses and state where incorporated.

7) If Proposer has participated in an acquisition or merger in the last 6 months, provide information about the acquiring company or the company to be acquired and information regarding the stage of negotiations.

8) A synopsis of any and all incarcerated person telephone RFP and/or contract related protests in within the last 3 years. Include location and outcome of the protest. A response indicating this information is confidential and/or proprietary will be considered an Exception.

9) A synopsis of any and all litigation(s) within the last 5 years where Proposer or Proposer's IPTS is a party. Include venue, style of case and status of litigation.

10) Provide information on your firm's background and qualifications which includes a brief description of your firm as well as how any joint venture or association would be structured.

b. **Disaster Recovery Plan**

1) Proposer shall detail its Disaster Recovery Plan (DRP). This plan should provide the Proposer processes, policies and procedures relating to the

recovery of services and data requirements as specified in this RFP preceding and/or following a natural or human-induced disaster.

    a) The DRP shall address the Proposer's recovery processes following a natural or human-induced disaster for these scenarios.

       i. A localized event affecting only the Proposer's facilities, infrastructure, and personnel;

      ii. A localized affecting only the Sheriff's Department's facilities, infrastructure, and personnel; and

    iii. A broad geographic event affecting both the Proposer and the Sheriff's Department.

**c.** **Customer Service**

    **1.** Provide the following information regarding Proposer's processes for handling incarcerated person/end-user service matters for the IPTS specified in this RFP.

      a) Describe procedure(s) for handling incarcerated person/end-user complaints including the contact options available for end-users to request assistance from Proposer;

      b) Indicate whether Proposer's customer service center defaults to an Interactive Voice Response (IVR) or a live customer service representative;

      c) The hours during which live customer service representatives are available to speak with end-users via telephone;

      d) Indicate the average on-hold time to reach a live representative; and

      e) Describe procedure(s) for handling incarcerated person or end-user refund requests and the timeframe for completing such requests.

**d.** **Maintenance**

    1) Proposer shall provide Sheriff's Department with the escalation procedures for handling customer support issues including, but not limited to, maintenance, outages and reporting issues for the IPTS. Procedure description shall include the contact names, contact numbers, email addresses and level of authority for the person(s) responsible for escalated issues.

    2) Proposer shall provide the on-site response time, priority levels and escalation schedule for emergency outage/service issues at and/or related to the Facilities as an exhibit to its RFP response and as outlined in **Attachment 1, Section B.1 (Proposal Order).**

    3) Proposer shall describe its detailed approach to routine and emergency maintenance as an exhibit to its RFP response and as outlined in **Attachment 1, Section B.1 (Proposal Order).**

    4) Proposer shall provide a synopsis of all IPTS outages lasting longer than 6 hours in a single day for the past 6 months. Include reason and outcome of the outage.

      a. A response indicating this information is confidential and/or proprietary will be considered an Exception.

**4.** **Team Qualifications**

a. Proposer shall provide the names of Proposer's employees, consultants, and subcontractors that will be involved in providing the requirements in this RFP and the Agreement using format of the table below. Provide a list identifying: (1) each

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

key person on the project team, (2) the project manager, (3) the role each will play in the project, Proposer may add additional rows to the table as necessary.

b.    Proposer shall include a written assurance that the key individuals listed and identified will be performing the work and will not be substituted with other personnel or reassigned to another project without the Sheriff's Department's prior approval.

c.    Proposer shall supply resumes for all employees, consultants and subcontractors that will be working under the terms of this RFP and Agreement. There is no limit on the

| Technician Name | Company | Location (Address, City, State) | Contact Phone Number | Proximity (In Miles) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

number of resumes that the Proposer may submit. Resumes shall be included in Proposer's proposal as indicated in **Attachment 1, Section B.1 (Proposal Order).**

d.    All resumes shall be no more than 2 pages and include the following information.
  1)    Each shall contain the name, position, qualifications, certifications, years of experience, and educational background information.
  2)    The amount of time that the individual will devote to work related to the requirements outlined in this RFP. Indicate clearly whether the given response is being expressed in hours per month or a percentage of time per month.
  3)    Two related, past performance references for projects of comparable size and complexity where the team member has performed duties similar to the ones outlined in this RFP.
    a)    Proposer must include a contact name, number and email address of someone who has knowledge of the team member's work for that project.
  4)    Work experience for no more than the last 10 years. List relevant current/recent work experience, employers, dates and duties in reverse chronological order.

e.    Proposer shall provide information regarding maintenance personnel for the IPTS using the format provided in the table below.
  1)    Indicate the number of technicians directly employed by Proposer as well as the number of technicians that will be subcontracted for service at the Facilities.
  2)    Indicate the names, company, primary physical work location, telephone numbers, and proximity to the Facilities for the technicians that will be maintaining, servicing and performing work under the Agreement.
  3)    Proposer shall disclose, with percentages clearly shown, the specific work tasks for the Facilities that will be subcontracted and the specific work tasks that will be performed by Proposer employees.

5.    **References**

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

Provide references for the projects that comprise your minimum qualifications. Proposer's references will be used to confirm and verify that proposer has met the minimum qualifications.

By including these references, proposers are representing that the references are familiar with proposer's work and experience, and references will be truthful in any representations.

a. Provide a list of agreements not renewed, lost or prematurely cancelled in the last 5 years.
    1) If applicable, include the reason for non-renewal and/or cancellation(s) of the agreement(s). A response indicating this information is confidential and/or proprietary will be considered an exception.

b. Provide a list of clients/agencies who have notified Proposer of unauthorized fees/charges, overbillings or revenue share owed within the last 3 years and the status of resolution of those claims.
    1) A response indicating this information is not monitored, confidential and/or proprietary will be considered an Exception.

c. Provide 3 client references for facilities where Proposer provides the equipment and services comparable to the requirements in this RFP.
    1) References provided must be currently under contract with Proposer and have been operating under that contract for at least 6 months.
    2) Proposer shall ensure updated references and accurate contact information is provided.

d. References may be contacted at any time during the RFP.

e. Using the format in the table below, provide the requested information for each reference.

| | |
|---|---|
| **City Name:** | |
| **Contact Person and Title:** | |
| **Telephone Number(s):** | |
| **Email Address:** | |
| **City, State:** | |
| **Number of Facilities:** | |
| **ADP:** | |
| **Agreement Effective Date:** | |
| **Total Number of Incarcerated Person Phones:** | |
| **Total Number Visitation Phones:** | |
| **Portion of Free Calls via IPTS:** | |

6. **Price Proposal**

The City intends to award this contract to the firm that it considers will provide the best overall program services. The City reserves the right to accept other than the lowest priced offer and to reject any proposals that are not responsive to this request.

Using **Attachment 1 – Section J (Rates and Fees)** please provide the price proposal in a separate electronic folder or sealed envelope with your proposal submission. The City will only select one Price Proposal Option to score, either a) Fixed Annual Cost or b) Lease Cost option.

a. In Option 1, Proposer shall:
    1) Propose a fixed annual cost amount that shall be payable by City in equal monthly increments covering the scope of the RFP asscoated with the IPTS.

b. In Option 2, Proposer shall:
    1) Propose a flat per-incarcerated person telephone lease fee that shall be payable by City on a per station basis covering the scope of the RFP associated with the IPTS. The per-incarcerated person telephone lease rate shall be applied to new incarcerated person telephone installations.

7. **Certification of Headquarters in Accordance with Administrative Code Chapter 12X.**

Proposals should contain the following statement:

"I certify that my company is headquartered at the following address:

_____

I will notify the San Francisco Sheriff's Department if my company's headquarters moves."

The required statement is found at the bottom of **Attachment 1 – Section J (Rates and Fees).** Proposers should enter the address of their company's headquarters and sign under the form. Failure to sign this statement may be cause for disqualification.

## IV. Evaluation and Selection Criteria

### A. Minimum Qualifications

Proposals should clearly demonstrate that the qualifications are met. Insufficient or incomplete information may result in a proposal being considered non-responsive and may not be eligible for award of the contract. If required information is complete, but City determines that the Proposer does not meet minimum qualifications, proposer may be deemed non-responsible.

1. Proposer must complete and submit **Attachment 1 – RFP Requirements (Sections A through N)** in its entirety**.** Proposers may include exceptions to the RFP Requirements per **Attachment 1 – Section K. Exceptions to the RFP.**

2. Proposer must currently manage and operate IPTS with a minimum annual incarcerated person population of 1,300 incarcerated persons or process over 900,000 IPTS minutes of use per month.

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

3.      Proposer warrants the possession of all licenses and/or permits required by the laws and regulations of the United States, the State of California and the Sheriff's Department to provide the sought services.

4.      Proposer must attend the Mandatory Pre-Proposal Conference and Facility tours.

5.      Proposer must be a City-approved vendor by the time of Agreement award.

6.      Proposer shall comply with free calls and no fees for the IPTS.

**B.  Selection Criteria**

The proposals will be evaluated by a selection committee comprised of parties with expertise incarcerated person communications services. The City intends to evaluate the proposals generally in accordance with the criteria itemized in **Attachment 1, Section C.1 (Evaluation Criteria)**. Further information on the proposal evaluation and selection process is covered in **Attachment 1, Section C (Evaluation and Selection).**

1.    **Overall Evaluation Process**

The evaluation process will consist of the phases specified below as well as in **Attachment 1, Section C.1 (Evaluation Criteria).**

| Evaluation Phase | Maximum Points |
|---|---|
| Screening of Minimum Qualifications | Pass/Fail |
| Written Proposal (Project Approach, Firm Qualifications, Team Qualifications, References) | Attachment 1 – Section C.1  - (55 points) |
| Price Proposal (Including BAFO) | Attachment 1 – Section C.1 – (40 points) |
| Oral Interview | Attachment 1 – Section C.1 – (5 Points) |
| **TOTAL** | **100 points** |

**Screening of Minimum Qualifications**

Each proposal will be reviewed for initial determinations on whether Proposer meets minimum qualifications referenced in **Section IV, Part A (Minimum Qualifications)** of this RFP. Proposals will not be scored during the screening of Minimum Qualifications. This screening is simply a pass or fail determination as to whether the proposer has met the minimum qualifications. A proposal that fails to meet the minimum qualifications will not be eligible for consideration in the evaluation process. The City reserves the right to request clarifications from proposers prior to rejecting a proposal for failure to meet the minimum qualifications. Clarifications are limited exchanges between the City and Proposer for the purpose of clarifying certain aspects of the proposal and will not provide a proposer the opportunity to revise or modify its proposals. Only proposals that meet the minimum qualifications can proceed to the next evaluation phases.

**Written Proposal Evaluation**

The proposals will be evaluated by a selection committee comprised of parties with expertise in the needed services.  The City intends to evaluate the proposals generally in accordance with the criteria itemized in **Attachment 1, Section C.1. (Evaluation Criteria).**

**Price Proposal:**

The City intends to award this contract to the firm that it considers will provide the best overall services.  The City reserves the right to accept other than the lowest priced offer and to reject any proposals that are not responsive to this request.

The Price Proposal score will be determined by the equation below and will be based on the total price proposal. The City will only select one Price Proposal Option to score, either a) Fixed Cost or b) Lease Cost option.

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

Score = (Lowest Proposed price / Proposer's price) x (max Price points possible).

**Oral Interview**

Following the evaluation of the written proposals, the 3 proposers receiving the highest scores may be invited to an oral interview. The interview will consist of a presentation of the proposed IPTS with a sample of the proposed phone equipment and standard questions asked of each of the 3 proposers.

Following the evaluation of the written proposals and price proposals, both scores will then be tabulated and proposers will be ranked starting with the proposer receiving the highest score, then continuing with the proposer receiving the second highest score, and so on. The 3 proposers receiving the highest scores will be invited to an oral interview. The City will determine the format and the scoring criteria to be used during the interview. The interview will consist of either or both standard questions asked of each of the proposers, and may include questions of clarification for specific proposals. The selection panel will evaluate each proposer based on their presentation and/or responses. After the oral interview, the City will combine all scores, rank the proposers and select the highest ranked proposer to enter into agreement with.

**V.    Pre-proposal Conference and Agreement award**

**A.        Pre-Proposal Conference**

Proposers are required to attend a mandatory pre-proposal conference on the date and time specified in **Section I, Part B (Schedule of Events), Table 1 (Anticipated Schedule)** of this RFP. The pre-proposal conference will be held at **County Jail #1 – Lobby Conference Room, 425 7th St., San Francisco, CA 94103**, followed by a tour of downtown Facilities (CJ #1, CJ #2, CJ #4) and CJ #5 in San Bruno. Proposer should plan to be involved in the pre-proposal conference for a minimum of 5 hours. All questions will be addressed at this conference and any available new information will be provided at that time. If you have further questions regarding the RFP, please contact the individual designated in **Section VI. Part B.**

To attend the pre-proposal conference, Proposer must complete and email **Attachment 1, Section N (Pre-Proposal Conference Registration Form)** to the RFP contact specified in this RFP on or before the date specified in **Section I, Part B (Schedule of Events)** of this RFP. Each Proposer will be limited to 2 representatives at the site evaluation. Proposer must confirm attendance via email to the RFP contact at least 3 days prior to the site evaluation. This will be the only time available for Proposer to visit the Facilities during the RFP process.

Oral responses to questions during the site evaluation shall be considered nonbinding on City. Proposer's questions regarding the pre-proposal conference and/or this RFP must be submitted by Proposer in writing as specified herein on or before the date specified in **Section I, Part B (Schedule of Events)** of this RFP.

**Question and Answer Period**

Proposers shall submit all questions concerning this Request for Proposal in writing by email only during the Question and Answer Period, ending on or before the date specified **in Section I, Part B (Schedule of Events)** of this RFP. Questions and Answers will be posted publically. All questions concerning the RFP or process shall be submitted no later than 72-hours prior to the proposal deadline. Questions should include the RFP section number title, subsection and page of the corresponding RFP document.

Henry Gong

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

San Francisco Sheriff's Department Finance
1 Dr. Carlton B. Goodlett Place
Room 456, City Hall
San Francisco, CA 94102
henry.gong@sfgov.org

Please reference RFP No. SHF 2019-11

The Pre-Proposal Conference will begin at the time specified, and company representatives are urged to arrive on time. Topics already covered will not be repeated for the benefit of late arrivals. Failure to attend the pre-bid conference shall not excuse the successful Proposer from any obligations of the contract. Written Bid Addendum will execute any change or addition to the requirements contained in this RFP, as a result of the Pre-Proposal Conference. It is the responsibility of the Proposer to check for any RFP Addendums, Q&A postings, and other updates which will be posted on the County/City's <u>Events and Bid</u> website:

https://sfcitypartner.sfgov.org/pages/index.aspx

### B.    Agreement Award

The Sheriff's Department will select a proposer with whom the Sheriff's Department staff or Sheriff's Department's Designated Agent shall commence Agreement negotiations. The selection of any proposal shall not imply acceptance by the Sheriff's Department of all terms of the proposal, which may be subject to further negotiations and approvals before the Sheriff's Department may be legally bound thereby. If a satisfactory Agreement cannot be negotiated in a reasonable time the Sheriff's Department in its sole discretion, may terminate negotiations with the highest ranked proposer and begin contract negotiations with the next highest ranked proposer. Additional details surrounding Agreement selection and award can be found in **Attachment 1, Section C (Evaluation and Selection).**

## VI.  Terms and Conditions for Receipt of Proposals

### A.    Errors and Omissions in RFP

Proposers are responsible for reviewing all portions of this RFP. Proposers are to promptly notify City, in writing, if the proposer discovers any ambiguity, discrepancy, omission, or other error in the RFP. Any such notification should be directed to City promptly after discovery, but in no event later than 72-hours prior to the date that proposals are due. Modifications and clarifications will be made by addenda as provided below.

### B.    Inquiries Regarding RFP

Proposers shall submit all questions concerning this RFP scope of services or requirements in writing by email only during the Question and Answer Period as specified in **Section I, Part B (Schedule of Events), Table 1 (Anticipated Schedule)** of this RFP and directed to: **henry.gong@sfgov.org.** All Proposer questions concerning the bid process shall be submitted no later than the date and time specified in the **Section I, Part B (Schedule of Events), Table 1 (Anticipated Schedule)** of this RFP**.** Proposers who fail to do so will waive all further rights to protest, based on these specifications and conditions.

### C.    Objections to RFP Terms

Should a proposer object on any ground to any provision or legal requirement set forth in this RFP, the proposer must, not less than 72-hours prior to the RFP deadline, provide written notice to City setting

forth with specificity the grounds for the objection. The failure of a proposer to object in the manner set forth in this paragraph shall constitute a complete and irrevocable waiver of any such objection. All Exceptions or Objections to the RFP must be noted in **Attachment 1, Section K (Exceptions to RFP).**

**D.    Change Notices**

The Sheriff's Department may modify the RFP, prior to the proposal due date, by issuing an Addendum to the RFP, which will be posted on the website. The proposer shall be responsible for ensuring that its proposal reflects any and all Bid Addendum(s) issued by City prior to the proposal due date regardless of when the proposal is submitted. Therefore, City recommends that the Proposer consult the website frequently, including shortly before the proposal due date, to determine if the proposer has downloaded all Bid Addendum(s).  It is the responsibility of the proposer to check for any Addendum, Questions and Answers, and updates, which will be posted on the City's Events and Bid website:

https://sfcitypartner.sfgov.org/pages/index.aspx

**E.    Term of Proposal**

Submission of a proposal signifies that the proposed services and prices are valid for 180 calendar days from the proposal due date and that the quoted prices are genuine and not the result of collusion or any other anti-competitive activity. At Proposer's election, the proposal may remain valid beyond the 180-day period in the circumstance of extended negotiations.

**F.    Revision of Proposal**

A proposer may revise a proposal on the proposer's own initiative at any time before the deadline for submission of proposals. The proposer must submit the revised proposal in the same manner as the original. A revised proposal must be received on or before, but no later than the proposal due date and time.

In no case will a statement of intent to submit a revised proposal, or commencement of a revision process, extend the proposal due date for any proposer.

At any time during the proposal evaluation process, City may require a proposer to provide oral or written clarification of its proposal. City reserves the right to make an award without further clarifications of proposals received.

**G.    Errors and Omissions in Proposal**

Failure by City to object to an error, omission, or deviation in the proposal will in no way modify the RFP or excuse the vendor from full compliance with the specifications of the RFP or any contract awarded pursuant to the RFP.

**H.    Financial Responsibility**

City accepts no financial responsibility for any costs incurred by a firm in responding to this RFP. Submissions of the RFP will become the property of the City and may be used by the City in any way deemed appropriate.

**I.    Proposer's Obligations under the Campaign Reform Ordinance**

Proposers must comply with Section 1.126 of the S.F. Campaign and Governmental Conduct Code, which states:

"No person who contracts with the City and County of San Francisco for the rendition of personal services, for the furnishing of any material, supplies or equipment to the City, or for selling any land or building to the City, whenever such transaction would require approval by a City elective officer, or the

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

board on which that City elective officer serves, shall make any contribution to such an officer, or candidates for such an office, or committee controlled by such officer or candidate at any time between commencement of negotiations and the later of either (1) the termination of negotiations for such contract, or (2) three months have elapsed from the date the contract is approved by the City elective officer or the board on which that City elective officer serves."

If a proposer is negotiating for a contract that must be approved by an elected local officer or the board on which that officer serves, during the negotiation period the proposer is prohibited from making contributions to:

- The officer's re-election campaign;
- A candidate for that officer's office; and/or
- A committee controlled by the officer or candidate.

The negotiation period begins with the first point of contact, either by telephone, in person, or in writing, when a contractor approaches any city officer or employee about a particular contract, or a city officer or employee initiates communication with a potential contractor about a contract. The negotiation period ends when a contract is awarded or not awarded to the contractor. Examples of initial contacts include: (1) a vendor contacts a city officer or employee to promote himself or herself as a candidate for a contract; and (2) city officer or employee contacts a contractor to propose that the contractor apply for a contract. Inquiries for information about a particular contract, requests for documents relating to a request for proposal, and requests to be placed on a mailing list do not constitute negotiations.

Violation of Section 1.126 may result in the following criminal, civil, or administrative penalties:

1. Criminal.  Any person who knowingly or willfully violates section 1.126 is subject to a fine of up to $5,000 and a jail term of not more than six months, or both.
2. Civil. Any person who intentionally or negligently violates section 1.126 may be held liable in a civil action brought by the civil prosecutor for an amount up to $5,000.
3. Administrative. Any person who intentionally or negligently violates section 1.126 may be held liable in an administrative proceeding before the Ethics Commission held pursuant to the Charter for an amount up to $5,000 for each violation.

For further information, proposers should contact the San Francisco Ethics Commission at (415) 581-2300.

**J.    Sunshine Ordinance**

In accordance with S.F. Administrative Code Section 67.24(e), contractors' bids, responses to RFPs and all other records of communications between the City and persons or firms seeking contracts shall be open to inspection immediately after a contract has been awarded.  Nothing in this provision requires the disclosure of a private person's or organization's net worth or other proprietary financial data submitted for qualification for a contract or other benefits until and unless that person or organization is awarded the contract or benefit.  Information provided which is covered by this paragraph will be made available to the public upon request.

**K.    Public Access to Meetings and Records**

If a proposer is a non-profit entity that receives a cumulative total per year of at least $250,000 in City funds or City-administered funds and is a non-profit organization as defined in Chapter 12L of the S.F. Administrative Code, the proposer must comply with Chapter 12L. The proposer must include in its proposal (1) a statement describing its efforts to comply with the Chapter 12L provisions regarding public access to proposer's meetings and records, and (2) a summary of all complaints concerning the proposer's compliance with Chapter 12L that were filed with the City in the last two years and deemed by the City to be substantiated.  The summary shall also describe the disposition of each complaint.  If no such complaints were filed, the proposer shall include a statement to that effect.  Failure to comply with the reporting requirements of Chapter 12L or material misrepresentation in proposer's Chapter 12L

submissions shall be grounds for rejection of the proposal and/or termination of any subsequent Agreement reached on the basis of the proposal.

**L.    Reservations of Rights by the City**

The issuance of this RFP does not constitute an agreement by the City that any contract will actually be entered into by the City. The City expressly reserves the right at any time to:

1. Waive or correct any defect or informality in any response, proposal, or proposal procedure;
2. Reject any or all proposals;
3. Reissue a Request for Proposals;
4. Prior to submission deadline for proposals, modify all or any portion of the selection procedures, including deadlines for accepting responses, the specifications or requirements for any materials, equipment or services to be provided under this RFP, or the requirements for contents or format of the proposals;
5. Procure any materials, equipment or services specified in this RFP by any other means; or
6. Determine that no project will be pursued.

**M.    No Waiver**

No waiver by the City of any provision of this RFP shall be implied from any failure by the City to recognize or take action on account of any failure by a proposer to observe any provision of this RFP.

**N.    Local Business Enterprise Goals and Outreach**

The requirements of the Local Business Enterprise and Non-Discrimination in Contracting Ordinance set forth in Chapter 14B of the San Francisco Administrative Code as it now exists or as it may be amended in the future (collectively the "LBE Ordinance") shall apply to this RFP.

Each solicitation process requires a **new submittal of CMD Attachment 3 forms** at the following link, located under the heading "Attachment 3: General Services Contracts":

http://www.sfgsa.org/index.aspx?page=6135

1) Form 2A-CMD Contract Participation Form
2) Form 2B- CMD "Good Faith Outreach" Requirements Form
3) Form 3- CMD Non-Discrimination Affidavit
4) Form 4- CMD Joint Venture Form (if applicable), and
5) Form 5- CMD Employment Form

Please submit Forms 2A, 2B, 3 and 5 (and Form 4 if Joint Venture response) with your Response Package.  The forms should be part of the "Original" of your response.  The forms should have original signatures.

If these forms are not returned with the response, the response may be determined to be non-responsive and may be rejected.

**A.    Local Business Enterprise Goals and Outreach**

The requirements of the Local Business Enterprise (LBE) and Non-Discrimination in Contracting Ordinance set forth in Chapter 14B of the S.F. Administrative Code as it now exists or as it may be amended in the future (collectively the "LBE Ordinance") shall apply to this solicitation. More information regarding these requirements can be found at:

http://www.sfgov.org/cmd

**B.    LBE Sub-consultant Participation Requirement**

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

Please refer to San Francisco Administrative Code Chapter 14B and *CMD* Attachment *2* for information concerning the City's LBE program.

The LBE sub-consulting goal % of the total value of the goods and/or services to be procured will be provided at the pre-proposal conference. Sub-consulting goals can only be met with CMD-certified Small or Micro-LBEs located in San Francisco.

### C.    Link to LBE Sub-consultant Directory

This link takes you to a directory of current Local Business Enterprises:

http://mission.sfgov.org/hrc_certification/

### D.    Good Faith Outreach to Select LBE Sub-consultants

Each firm responding to this solicitation shall demonstrate in its response that it has used good-faith outreach to select LBE sub-consultants as set forth in S.F. Administrative Code §§14B.8 and 14B.9, and shall identify the particular LBE sub-consultants solicited and selected to be used in performing the contract. For each LBE identified as a subcontractor, the response must specify the value of the participation as a percentage of the total value of the goods and/or services to be procured, the type of work to be performed, and such information as may reasonably be required to determine the responsiveness of the response. LBEs identified as sub-consultants must be certified with the Contract Monitoring Division at the time the response is due, and must have been contacted by the (prime contractor) prior to listing them as subcontractors in the response. Any response that does not meet the requirements of this paragraph will be non-responsive.

### E.    Documentation of Good Faith Outreach Efforts

In addition to demonstrating that it will achieve the level of sub-consulting participation required by the contract, a Respondent shall also undertake and document in its submittal the good faith efforts required by Chapter 14B.8(C) & (D) and CMD Attachment 2, Requirements for Architecture, Engineering and Professional Services Contracts.

Responses which fail to comply with the material requirements of S.F. Administrative Code §§14B.8 and 14B.9, CMD Attachment 2 and this solicitation will be deemed non-responsive and will be rejected. During the term of the contract, any failure to comply with the level of LBE sub-consultant participation specified in the contract shall be deemed a material breach of contract.

*Note: If Respondent meets/exceeds LBE participation by 35% (i.e. 31.05% LBE participation for this contract), Good Faith Outreach documentation is not required.*

### F.    LBE Participation and Rating Bonuses

The City strongly encourages responses from qualified LBEs. Pursuant to Chapter 14B, the following rating bonuses will be in effect for the award of this project for any Respondents who are certified as a Small or Micro-LBE, or joint ventures where the joint venture partners are in the same discipline and have the specific levels of participation as identified below. Certification applications may be obtained by calling (415) 581-2310. The rating bonus applies at each phase of the selection process. The application of the rating bonus is as follows:

a) A 10% bonus to a Small or Micro LBE—including Non-Profit; or a joint venture between or among LBEs; or

b) A 5% bonus to a joint venture with LBE participation that equals or exceeds 35%, but is under 40%;

c) A 7.5% bonus to a joint venture with LBE participation that equals or exceeds 40%;

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

Joint Venture Rating Bonus If applying for a rating bonus as a joint venture, the LBE must be an active partner in the joint venture and perform work, manage the job and take financial risks in proportion to the required level of participation stated in the response, and must be responsible for a clearly defined portion of the work to be performed and share in the ownership, control, management responsibilities, risks, and profits of the joint venture. The portion of the LBE joint venture's work shall be set forth in detail separately from the work to be performed by the non-LBE joint venture partner. The LBE joint venture's portion of the contract must be assigned a commercially useful function.

### G.    Application of the Rating bonus:

The following rating bonus/bid discount shall apply at each stage of the selection process, i.e., qualifications, proposals, and interviews:

   a)  Contracts with an Estimated Cost in Excess of $10,000 and Less Than or Equal To $400,000. A 10% rating bonus/bid discount will apply to any proposal submitted by a CMD-Certified Small or Micro-LBE. Proposals submitted by SBA-LBEs are not eligible for a rating bonus/bid discount.
   b)  Contracts with an Estimated Cost in Excess of $400,000 and Less Than or Equal To $10,000,000. A 10% rating bonus/bid discount will apply to any proposal submitted by a CMD-Certified Small or Micro-LBE. Pursuant to Section 14B.7(E), a 5% rating bonus/bid discount will be applied to any proposal from an SBA-LBE, except that the 5% rating bonus/bid discount shall not be applied at any stage if it would adversely affect a Small or Micro-LBE.
   c)  Contracts with an Estimated Cost In Excess of $10,000,000 and Less Than or Equal To $20,000,000. A 2% rating bonus/bid discount will apply to any proposal submitted by a Small LBE, Micro LBE and SBA-LBE. C.

The rating bonus/bid discount does not apply for contracts estimated by the Contract Awarding Authority to exceed $20 million.

### H.    CMD Contact

If you have any questions concerning the CMD Forms and to ensure that your response is not rejected for failing to comply with S.F. Administrative Code Chapter 14B requirements, please call the Contract Monitoring Division (CMD) at (415) 581-2310.  The forms will be reviewed prior to the evaluation process.

## VII.    Contract Requirements

### A.    Standard Contract Provisions

The successful proposer will be required to enter into a contract substantially in the form of the Agreement for Professional Services, attached hereto as Appendix B. Failure to timely execute the contract, or to furnish any and all insurance certificates and policy endorsement, surety bonds or other materials required in the contract, shall be deemed an abandonment of a contract offer. The City, in its sole discretion, may select another firm and may proceed against the original selectee for damages.

### B.    Nondiscrimination in Contracts and Benefits

The successful proposer will be required to agree to comply fully with and be bound by the provisions of Chapters 12B and 12C of the San Francisco Administrative Code. Generally, Chapter 12B prohibits the City and County of San Francisco from entering into contracts or leases with any entity that discriminates in the provision of benefits between employees with domestic partners and employees with spouses, and/or between the domestic partners and spouses of employees. The Chapter 12C requires nondiscrimination in contracts in public accommodation. Additional information on Chapters 12B and 12C is available on the CMD's website at http://sfgov.org/cmd/.

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

### C.    Minimum Compensation Ordinance (MCO)

The successful proposer will be required to agree to comply fully with and be bound by the provisions of the Minimum Compensation Ordinance (MCO), as set forth in S.F. Administrative Code Chapter 12P. Generally, this Ordinance requires contractors to provide employees covered by the Ordinance who do work funded under the contract with hourly gross compensation and paid and unpaid time off that meet certain minimum requirements. For the amount of hourly gross compensation currently required under the MCO, see www.sfgov.org/olse/mco.  Note that this hourly rate may increase on January 1 of each year and that contractors will be required to pay any such increases to covered employees during the term of the contract.

Additional information regarding the MCO is available on the web at www.sfgov.org/olse/mco.

### D.    Health Care Accountability Ordinance (HCAO)

The successful proposer will be required to agree to comply fully with and be bound by the provisions of the Health Care Accountability Ordinance (HCAO), as set forth in S.F. Administrative Code Chapter 12Q. Contractors should consult the San Francisco Administrative Code to determine their compliance obligations under this chapter.  Additional information regarding the HCAO is available on the web at www.sfgov.org/olse/hcao.

### E.    First Source Hiring Program (FSHP)

If the contract is for more than $50,000, then the First Source Hiring Program (Admin. Code Chapter 83) may apply. Generally, this ordinance requires contractors to notify the First Source Hiring Program of available entry-level jobs and provide the Workforce Development System with the first opportunity to refer qualified individuals for employment.

Contractors should consult the San Francisco Administrative Code to determine their compliance obligations under this chapter. Additional information regarding the FSHP is available on the web at http://oewd.org/first-sourceand from the First Source Hiring Administrator, (415) 701-4848.

### F.    Conflicts of Interest

The successful proposer will be required to agree to comply fully with and be bound by the applicable provisions of state and local laws related to conflicts of interest, including Section 15.103 of the City's Charter, Article III, Chapter 2 of City's Campaign and Governmental Conduct Code, and Section 87100 et seq. and Section 1090 et seq. of the Government Code of the State of California. The successful proposer will be required to acknowledge that it is familiar with these laws; certify that it does not know of any facts that constitute a violation of said provisions; and agree to immediately notify the City if it becomes aware of any such fact during the term of the Agreement.

Individuals who will perform work for the City on behalf of the successful proposer might be deemed consultants under state and local conflict of interest laws. If so, such individuals will be required to submit a Statement of Economic Interests, California Fair Political Practices Commission Form 700, to the City within ten calendar days of the City notifying the successful proposer that the City has selected the proposer.

## VIII.    Protest Procedures

### A.    Protest of Non-Responsiveness Determination

Within five working days of the City's issuance of a notice of non-responsiveness, any firm that has submitted a proposal and believes that the City has incorrectly determined that its proposal is non-responsive may submit a written notice of protest. Such notice of protest must be received by the City on or before the fifth working day following the City's issuance of the notice of non-responsiveness. The notice of protest must include a written statement specifying in detail each and every one of the grounds asserted for the protest. The protest must be signed by an individual authorized to represent the proposer, and must cite the law, rule, local ordinance,

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

procedure or RFP provision on which the protest is based. In addition, the protestor must specify facts and evidence sufficient for the City to determine the validity of the protest.

**B.      Protest of Non-Responsible Determination**

Within five working days of the City's issuance of a notice of a determination of non-responsibility, a vendor that would otherwise be the lowest responsive proposer may submit a written notice of protest.  The vendor will be notified of any evidence reflecting upon their responsibility received from others or adduced as a result of independent investigation. The Proposer will be afforded an opportunity to rebut such adverse evidence, and will be permitted to present evidence that they are qualified to perform the contract. Such notice of protest must be received by the City on or before the fifth working day following the City's issuance of the notice of non-responsibility. The notice of protest must include a written statement specifying in detail each and every one of the grounds asserted for the protest. The protest must be signed by an individual authorized to represent the proposer, and must cite the law, rule, local ordinance, procedure or RFP provision on which the protest is based. In addition, the protestor must specify facts and evidence sufficient for the City to determine the validity of the protest.

**C.      Protest of Contract Award**

Within five working days of the City's issuance of a notice of intent to award the contract, any firm that has submitted a responsive proposal and believes that the City has incorrectly selected another proposer for award may submit a written notice of protest.  Such notice of protest must be received by the City on or before the fifth working day after the City's issuance of the notice of intent to award.

The notice of protest must include a written statement specifying in detail each and every one of the grounds asserted for the protest. The protest must be signed by an individual authorized to represent the proposer, and must cite the law, rule, local ordinance, procedure or RFP provision on which the protest is based.  In addition, the protestor must specify facts and evidence sufficient for the City to determine the validity of the protest.

**D.      Delivery of Protests**

All protests must be received by the due date. If a protest is mailed, the protestor bears the risk of non-delivery within the deadlines specified herein.  Protests should be transmitted by a means that will objectively establish the date the City received the protest. Protests or notice of protests made orally (e.g., by telephone) will not be considered. Protests must be delivered to:

Henry Gong
San Francisco Sheriff's Department Finance
1 Dr. Carlton B. Goodlett Place
Room 456, City Hall
San Francisco, CA 94102
henry.gong@sfgov.org

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

## Appendix A

## Standard Forms

**i.**      **How to become Eligible to Do Business with the City:**

Before the City can award any contract to a contractor, all vendors must meet the minimum requirements described below. There may be additional requirements placed upon a vendor depending on the type of good or service to be purchased.

**ii.**      **Mandatory Forms:**

At a minimum, in order to become eligible to do business with the City, a vendor must submit the following documents to the Vendor Support Division via the City's supplier portal located at https://sfcitypartner.sfgov.org/pages/index.aspx:

1. Vendor Application Packet (includes *New Vendor Number Request Form* and *IRS Form W-9*)
2. CCSF Vendor - Business Registration (Electronic Submission - you must have a vendor number to complete)
3. CMD 12B-101 Declaration of Nondiscrimination in Contracts and Benefits

**iii.**      **Vendor Eligibility and Invoice Payment:**

Vendors must have a City-issued vendor number, have all compliance paperwork submitted and approved by the City, and have an executed contract or purchase order before payments can be made. Once a vendor number has been assigned, an email notification will be provided by the City's Vendor File Support Division. This notification will include instructions on how to sign up to receive payments through the City's supplier portal located at https://sfcitypartner.sfgov.org/ .

**iv.**      **Vendor Eligibility Forms:**

| Form | Purpose/Info | Routing |
|---|---|---|
| CCSF Vendor - Business Registration (Electronic Submission - you must have a vendor number to complete) | This declaration is required for city vendors to determine if you are required to obtain a Business Registration Certificate. | https://sfcitypartner.sfgov.org/ |
| Declaration of Nondiscrimination in Contracts and Benefits *with supporting documentation* (Form CMD-12B-101) | This Declaration is used by the City's Contract Monitoring Division to determine if a vendor offers benefits to employees. When a vendor offers benefits, it must be verified that all benefits, including insurance plans and leaves, are offered equally to employees with spouses and employees with | https://sfcitypartner.sfgov.org/ |

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

|  | domestic partners. For more information and assistance, please visit the City Administrator's **Contract Monitoring Division** Equal Benefits web page. |  |
| --- | --- | --- |
| Vendor Profile Application | Includes New Vendor Number Request Form and IRS Form W-9. | https://sfcitypartner.sfgov.org/ |

### v.    Supplemental Forms:

| Form: | Required If: |
| --- | --- |
| Minimum Compensation Ordinance (MCO) Declaration (pdf) | You have at least $25,000 ($50,000 for non-profit organizations) in cumulative annual business with a City department or departments and have more than 5 employees, including employees of any parent, subsidiaries and subcontractors. |
| Health Care Accountability Ordinance (HCAO) Declaration (pdf) | You have at least $25,000 ($50,000 for non-profit organizations) in cumulative annual business with a City department or departments and have more than 20 employees (more than 50 employees for nonprofit organizations), including employees of any parent, subsidiaries or subcontractors. |
| Insurance Requirements (pdf) | The solicitation requires the successful proposer to demonstrate proof of insurance. |
| Payment (Labor and Material) Bond (pdf) | The solicitation requires the awarded vendor to post a Payment (Labor and Material) bond. |
| Performance Bond (pdf) | The solicitation requires the awarded vendor to post a Performance bond. |
| Local Business Enterprise Program Application (Contract Monitoring Division) | You desire to participate in the City's Local Business Enterprise Program which helps certain financially disadvantaged businesses increase their ability to compete effectively for City contracts |

For further guidance, refer to the City's supplier training videos that are located online at: https://sfcitypartner.sfgov.org/ .

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

A.     **Proposer Eligibility Forms:**

| Form | Purpose/Info | Routing |
|------|-------------|---------|
| CCSF Proposer - Business Registration (Electronic Submission - you must have a vendor number to complete) | This declaration is required for city vendors to determine if you are required to obtain a Business Registration Certificate. | https://sfcitypartner.sfgov.org/ |
| Declaration of Nondiscrimination in Contracts and Benefits *with supporting documentation* (Form CMD-12B-101) | This Declaration is used by the City's Contract Monitoring Division to determine if a vendor offers benefits to employees. When a vendor offers benefits, it must be verified that all benefits, including insurance plans and leaves, are offered equally to employees with spouses and employees with domestic partners. For more information and assistance, please visit the City Administrator's **Contract Monitoring Division** Equal Benefits web page. | https://sfcitypartner.sfgov.org/ |
| Proposer Profile Application | Includes New Proposer Number Request Form and IRS Form W-9. | https://sfcitypartner.sfgov.org/ |

B.     **Supplemental Forms:**

| Form: | Required If: |
|-------|-------------|
| Minimum Compensation Ordinance (MCO) Declaration (pdf) | You have at least $25,000 ($50,000 for non-profit organizations) in cumulative annual business with a City department or departments and have more than 5 employees, including employees of any parent, subsidiaries and subcontractors. |
| Health Care Accountability Ordinance (HCAO) Declaration (pdf) | You have at least $25,000 ($50,000 for non-profit organizations) in cumulative annual business with a City department or departments and have more than 20 employees (more than 50 employees for nonprofit organizations), including employees of any parent, subsidiaries or subcontractors. |
| Insurance Requirements (pdf) | The solicitation requires the successful proposer to demonstrate proof of insurance. |
| Payment (Labor and Material) Bond (pdf) | The solicitation requires the awarded vendor to post a Payment (Labor and Material) bond. |

RFP # SHF | 2019-11/Event #0000003286 for Incarcerated Person Communication Services

| | |
|---|---|
| Performance Bond (pdf) | The solicitation requires the awarded vendor to post a Performance bond. |
| Local Business Enterprise Program Application (Contract Monitoring Division) | You desire to participate in the City's Local Business Enterprise Program which helps certain financially disadvantaged businesses increase their ability to compete effectively for City contracts |

For further guidance, refer to the City's supplier training videos that are located online at:
https://sfcitypartner.sfgov.org/ .

Case: 24-2013    Document: 00118298763    Page: 212    Date Filed: 06/11/2025    Entry ID: 6728147

| SECTION J - RATES AND FEES | | | | | |
|---|---|---|---|---|---|
| **OPTION 1**<br>**IPTS REQUIRED FREE CALLS (FIXED COST)** | | | **OPTION 2**<br>**IPTS ALTERNATIVE FREE CALLS (LEASE)** | | |
| Category | Cost Per Minute | Avg Cost/Call: 15 Minutes | Category | Cost Per Minute | Avg Cost/Call: 15 Minutes |
| Rates to Incarcerated Persons or Called Party | | | Rates to Incarcerated Persons or Called Party | | |
| All Domestic Calls | N/A | N/A | All Domestic Calls | N/A | N/A |
| International | N/A | N/A | International | N/A | N/A |

In Option 1, Proposer shall:
1) Propose a fixed annual cost amount that shall be payable by City in equal monthly increments covering the scope of the RFP associated with the IPTS & optional VVS.

All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program.

In Option 2, Proposer shall:
1) Propose a flat per-incarcerated person telephone & video station lease fee that shall be payable by City on a per station basis covering the scope of the RFP associated with the IPTS & optional VVS. The per-incarcerated person telephone & video station lease rate shall be applied to new incarcerated person telephone installations.

All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program.

| IPTS/OPTIONAL VVS RATE PROPOSAL | | | IPTS/OPTIONAL VVS LEASE PROPOSAL<br>Per Incarcerated Person Telephone & Optional Video Station | | |
|---|---|---|---|---|---|
| Category | Amount | Interval | Category | Amount | Interval |
| Fixed cost for IPTS/optional VVS: | $39,055 | Month | Lease cost for IPTS/optional VVS (Per Telephone & Video Station): | $89.78 | Month |

**FAILURE TO SIGN BELOW WILL DISQUALIFY PROPOSER'S PROPOSAL**

To the best of my knowledge and belief, the information presented in this proposal is true and complete. I further acknowledge a continuing obligation to update the proposal if material discrepancies are discovered. Failure to do so may result in this proposal being disqualified from further consideration.

Proposer Name: Global Tel*Link
Authorized Representative: Jonathan Walker
Signature: _____  Date: 1/31/2020

**CERTIFICATION OF COMPANY HEADQUARTERS ADDRESS**

" I certify that my company is headquarted at the following address: 3120 Fairview Park Drive, Suite 300
Falls Church, VA 22042-4570
(Address, City, State, and Zip)

I will notify the County and City of San Francisco and the San Francisco Customer if my company's headquarters moves"

Proposer Name: Global Tel*Link
Authorized Representative: Jonathan Walker
Signature: _____  Date: 1/31/2020

| SECTION J - RATES AND FEES | | | | | | |
|---|---|---|---|---|---|---|
| **OPTION 1**<br>IPTS REQUIRED FREE CALLS (FIXED COST) | | | **OPTION 2**<br>IPTS ALTERNATIVE FREE CALLS (LEASE) | | | |
| Category | Cost Per Minute | Avg Cost/Call:<br>15 Minutes | Category | Cost Per Minute | Avg Cost/Call:<br>15 Minutes | |
| **Rates to Incarcerated Persons or Called Party** | | | **Rates to Incarcerated Persons or Called Party** | | | |
| All Domestic Calls | N/A | N/A | All Domestic Calls | N/A | N/A | |
| International | N/A | N/A | International | N/A | N/A | |

**In Option 1, Proposer shall:**

1) Propose a fixed annual cost amount that shall be payable by City in equal monthly increments covering the scope of the RFP associated with the IPTS & optional VVS.

All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program.

**In Option 2, Proposer shall:**

1) Propose a flat per-incarcerated person telephone & video station lease fee that shall be payable by City on a per station basis covering the scope of the RFP associated with the IPTS & optional VVS. The per-incarcerated person telephone & video station lease rate shall be applied to new incarcerated person telephone installations.

All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program.

| IPTS/OPTIONAL VVS RATE PROPOSAL | | | IPTS/OPTIONAL VVS LEASE PROPOSAL<br>Per Incarcerated Person Telephone & Optional Video Station | | |
|---|---|---|---|---|---|
| Category | Amount | Interval | Category | Amount | Interval |
| Fixed cost for IPTS/optional VVS: | $52,800.00 | Month | Lease cost for IPTS/optional VVS (Per Telephone & Video Station): | $122.00 | Month |

**FAILURE TO SIGN BELOW WILL DISQUALIFY PROPOSER'S PROPOSAL**

To the best of my knowledge and belief, the information presented in this proposal is true and complete. I further acknowledge a continuing obligation to update the proposal if material discrepancies are discovered. Failure to do so may result in this proposal being disqualified from further consideration.

Proposer Name: Securus Technologies, LLC
Authorized Representative: Russell Roberts
Signature: _____                                          Date: 2/3/20

**CERTIFICATION OF COMPANY HEADQUARTERS ADDRESS**

" I certify that my company is headquartered at the following address: 4000 International Parkway, Carrollton, TX 75007

(Address, City, State, and Zip)

I will notify the County and City of San Francisco and the San Francisco Customer if my company's headquarters moves"

Proposer Name: Securus Technologies, LLC
Authorized Representative: Russell Roberts
Signature: _____                                          Date: 2/3/20

| SECTION J - RATES AND FEES | | | | | |
|---|---|---|---|---|---|
| **OPTION 1** | | | **OPTION 2** | | |
| **IPTS REQUIRED FREE CALLS (FIXED COST)** | | | **IPTS ALTERNATIVE FREE CALLS (LEASE)** | | |
| **Category** | **Cost Per Minute** | **Avg Cost/Call: 15 Minutes** | **Category** | **Cost Per Minute** | **Avg Cost/Call: 15 Minutes** |
| Rates to Incarcerated Persons or Called Party | | | Rates to Incarcerated Persons or Called Party | | |
| **All Domestic Calls** | N/A | N/A | **All Domestic Calls** | N/A | N/A |
| **International** | N/A | N/A | **International** | N/A | N/A |

| | |
|---|---|
| **In Option 1, Proposer shall:**<br>**1) Propose a fixed annual cost amount that shall be payable by City in equal monthly increments covering the scope of the RFP associated with the IPTS & optional VVS.**<br><br>**All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program.** | **In Option 2, Proposer shall:**<br>**1) Propose a flat per-incarcerated person telephone & video station lease fee that shall be payable by City on a per station basis covering the scope of the RFP associated with the IPTS & optional VVS. The per-incarcerated person telephone & video station lease rate shall be applied to new incarcerated person telephone installations.**<br><br>**All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program.** |

| IPTS/OPTIONAL VVS RATE PROPOSAL | | | IPTS/OPTIONAL VVS LEASE PROPOSAL<br>Per Incarcerated Person Telephone & Optional Video Station | | |
|---|---|---|---|---|---|
| **Category** | **Amount** | **Interval** | **Category** | **Amount** | **Interval** |
| Fixed cost for IPTS/optional VVS: | $     29,000.00 | Month | Lease cost for IPTS/optional VVS (Per Telephone & Video Station): | $     123.40 | Month |

**FAILURE TO SIGN BELOW WILL DISQUALIFY PROPOSER'S PROPOSAL**

To the best of my knowledge and belief, the information presented in this proposal is true and complete.  I further acknowledge a continuing obligation to update the proposal if material discrepancies are discovered.  Failure to do so may result in this proposal being disqualified from further consideration.

**Proposer Name:** Inmate Calling Solutions, LLC

**Authorized Representative:** Mike Kennedy, VP Sales & Marketing

**Signature:** _Michael Kennedy_     **Date:** 2/4/2020

**CERTIFICATION OF COMPANY HEADQUARTERS ADDRESS**

" I certify that my company is headquarted at the following address:     2200 Danbury St., San Antonio, TX 78217

(Address, City, State, and Zip)

I will notify the County and City of San Francisco and the San Francisco Customer if my company's headquarters moves"

**Proposer Name:** Inmate Calling Solutions, LLC

**Authorized Representative:** Mike Kennedy, VP Sales & Marketing

**Signature:** _Michael Kennedy_     **Date:** 2/4/2020

**JA195**

## SECTION J - RATES AND FEES

| OPTION 1 | | | OPTION 2 | | |
| IPTS REQUIRED FREE CALLS (FIXED COST) | | | IPTS ALTERNATIVE FREE CALLS (LEASE) | | |
| Category | Cost Per Minute | Avg Cost/Call: 15 Minutes | Category | Cost Per Minute | Avg Cost/Call: 15 Minutes |
|---|---|---|---|---|---|
| Rates to Incarcerated Persons or Called Party | | | Rates to Incarcerated Persons or Called Party | | |
| All Domestic Calls | N/A | N/A | All Domestic Calls | N/A | N/A |
| International | N/A | N/A | International | N/A | N/A |

| In Option 1, Proposer shall: <br><br>1) Propose a fixed annual cost amount that shall be payable by City in equal monthly increments covering the scope of the RFP associated with the IPTS & optional VVS. <br><br>All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program. | In Option 2, Proposer shall: <br><br>1) Propose a flat per-incarcerated person telephone & video station lease fee that shall be payable by City on a per station basis covering the scope of the RFP associated with the IPTS & optional VVS. The per-incarcerated person telephone & video station lease rate shall be applied to new incarcerated person telephone installations. <br><br>All calls and video visits, including international calls, shall be processed as free through the IPTS or VVS scheduling program. |
|---|---|

| IPTS/OPTIONAL VVS RATE PROPOSAL | | | IPTS/OPTIONAL VVS LEASE PROPOSAL <br> Per Incarcerated Person Telephone & Optional Video Station | | |
| Category | Amount | Interval | Category | Amount | Interval |
|---|---|---|---|---|---|
| Fixed cost for IPTS/optional VVS: | $40,000 / $60,000 | Month | Lease cost for IPTS/optional VVS (Per Telephone & Video Station): | n/a | Month |

### FAILURE TO SIGN BELOW WILL DISQUALIFY PROPOSER'S PROPOSAL

To the best of my knowledge and belief, the information presented in this proposal is true and complete. I further acknowledge a continuing obligation to update the proposal if material discrepancies are discovered. Failure to do so may result in this proposal being disqualified from further consideration.

Proposer Name:     Edovo
Authorized Representative:     . Brian Hill
Signature:                                  Date:     3-Feb-20

### CERTIFICATION OF COMPANY HEADQUARTERS ADDRESS

" I certify that my company is headquarted at the following address: 215 W Superior St Suite #600, Chicago, IL 60654

(Address, City, State, and Zip)

I will notify the County and City of San Francisco and the San Francisco Customer if my company's headquarters moves"

Proposer Name:     Edovo
Authorized Representative:     .Brian Hill
Signature:                                  Date:     3-Feb-20

Case: 24-2013     Document: 00118298763     Page: 215     Date Filed: 06/11/2025     Entry ID: 6728147



Michael H. Pryor
Attorney at Law
202.383.4706 tel
mpryor@bhfs.com

May 13, 2021

**VIA ECFS**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L St. NE
Washington, DC 20554

RE:    Rates for Interstate Inmate Calling Service, Draft Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, FCCCIRC23105-01,WC Docket No. 12-375 ("Draft ICS Order")

Dear Ms. Dortch:

Securus Technologies, LLC ("Securus"), by and through undersigned counsel, submits this *ex parte* letter in response to the Draft ICS Order slated for consideration at the Federal Communications Commission ("Commission") May 20, 2012 Open Meeting.

As Securus has previously relayed to the Commission, under the direction of new ownership and new leadership, Securus has launched an expansive and holistic transformation to make its products more accountable, affordable, and accessible. It is committed to working collaboratively with this Commission and other regulators to ensure that all rates for calling services are just and reasonable. As part of that effort, Securus has initiated a limited number of pilot programs to offer incarcerated persons and their families the option of using a fixed price monthly calling plan. Securus requests that the Commission include language in the Draft ICS Order encouraging the development of these programs by allowing their use for interstate calls pursuant to a waiver.

Securus additionally seeks clarification on the following points: (1) confirm that telephone numbers and other proxies continue to be available to determine jurisdiction for purposes of collecting taxes and fees; (2) clarify or confirm that the average daily population ("ADP") for jails be determined on per facility basis, and not on a per contract basis, and provide further guidance on ADP threshold determinations; (3) clarify the distinction between state laws requiring payment of fees and taxes and those addressing site commissions; and (4) clarify certain statements in the Draft ICS Order regarding the veracity of a cost study commissioned by Securus.

**Enable Alternative Rate Structures**

The Draft ICS Order defers action on alternative rate structures that can reduce costs for incarcerated persons and their loved ones and instead seeks further comment on the issue.[1] These phone plans replace per minute rates with a flat fee for a set number of calls or minutes per month and have been

---

[1] Draft ICS Order, ¶¶ 69, 306.

1155 F Street NW, Suite 1200
Washington, DC  20004
main 202.296.7353

Marlene H. Dortch
May 13, 2021
Page 2

requested by prison advocates and affected families.[2] Securus has established six pilot programs in select county jails and one state prison offering families of incarcerated persons the option of paying a flat rate for a set number of calls per month.[3] Participation is purely voluntary and incarcerated persons and their families can continue to use per minute plans. Given the Commission's rules requiring per minute charges for interstate calls, Securus offers the pilot programs only for intrastate calls. In light of the Commission's requirement that the jurisdiction of ICS calls be definitively determined by the physical end points of the call, continuation of these programs may become impossible if they cannot also include interstate calls, which would obviate the need to distinguish between the intrastate and interstate calls when offering these alternative arrangements.

Initial results from Securus's pilot programs are highly encouraging. The programs, developed as a direct result of consultations between Securus leadership and justice-involved families, have increased call length by about 27 percent and reduced per minute costs by over 50 percent. An initial program survey conducted by Securus found that 80 percent of participants said the program was important to them and 70 percent would recommend the plan to others. Securus looks forward to sharing more information about the program and its results with the Commission.

Securus is eager to provide the same opportunities for interstate calls. It requests that the Commission specifically indicate a willingness to review and approve, on an appropriate showing, waivers enabling ICS providers to establish pilot programs for interstate calls. Although the Commission is seeking comment on whether to consider alternative rate structures, Securus suggests that the Commission should move more expeditiously to enable these valuable programs through a separate waiver process. The pilot programs will also assist the Commission in assessing the merits of different types of alternative arrangements. The Commission would assess waivers using the good-cause standard under 47 C.F.R. §1.3.[4] Securus proposes the following language for inclusion at the end of paragraph 69 of the Draft ICS Order.

69. We recognize that our choice of allocator is affected, in part, by our decision to continue to require providers to charge per-minute rates for inmate calling services. But changing that rate structure would likely impose significant burdens on providers, and we find no basis for requiring such a change in connection with our adoption of new interim rate caps. We also cannot meaningfully assess, on the record before us, how different rate structures would affect incarcerated persons and their families. We therefore defer action on alternative rate structures—under which calling services consumers might be charged a predetermined monthly fee for unlimited calls, for example—pending the development of a more complete record in response to the Further Notice. Nevertheless, we recognize the benefit that alternative rate structures can provide and we welcome requests by ICS providers to waive the per minute rate requirement for interstate calls in order to establish pilot programs offering families the option of utilizing a flat rate plan instead of paying per minute rates. We would be inclined to expeditiously

---

[2]  The California Public Utility Commission recently held public hearings on its interim ICS proposals. Several members of the public commented that the regulator should enable flat-rate monthly calling plans. *See* Public Participation Hearing, Vol. 1, at pp. 18, 53, 132-133, available at
https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K604/382604073.PDF;  Public Participation Hearing, Vol. 2, at p. 233, available at https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K478/382478114.PDF.

[3]  *See* Securus Technologies' First-Of-Its-Kind Subscription Pricing Plan Reduces Call Costs By More Than 50 Percent, Aventiv Technologies Press Release, Feb. 11, 2021, available at SECURUS TECHNOLOGIES' FIRST-OF-ITS-KIND SUBSCRIPTION PRICING PLAN REDUCES CALL COSTS BY MORE THAN 50 PERCENT - Aventiv Technologies

[4]  The Commission should not use the waiver process for ICS providers seeking to exceed the rate caps due to high costs.  S*ee* Draft ICS Order at ¶¶ 171-177. That rigorous process is designed for a completely different purpose. Waivers for alternative rate structures would enable programs that offer more affordable, efficient calling plans.

Marlene H. Dortch
May 13, 2021
Page 3

grant such requests upon a showing that the pilot alternative rate plan would result in a lower effective rate than the interim provider-related per minute rate caps established in this order.

**Correcting Assertions Regarding Costs Determined by Securus's Consultant**

To assist the Commission in setting reasonable rates, Securus commissioned a comprehensive independent study of the company's costs. Securus hired FTI Consulting, Inc., a firm with substantial experience in developing and evaluating costs in the telecommunications industry. Following standard cost-causation modeling technologies, the firm conducted a highly granular analysis, applying over 90 different attribution allocators to identify Securus' direct costs of providing ICS, allocated shared and common costs, developed a return on equity input, quantified the cost of site commissions, and calculated demand for Securus' products to develop per minute ICS costs.

The Draft ICS Order "assign[s] significant weight" to the FTI cost study in setting the interim provider-related rate cap for large jails, finding that "a number of factors support its credibility and that it therefore provides valuable supporting evidence" for the new cap.[5] It describes the study as "based on highly disaggregated cost data and a relatively sophisticated set of cost allocation procedures tailored specifically to the business of providing inmate calling services and appears consistent with cost-causation principles."[6]

Despite lauding the FTI study, the Draft ICS Order makes a blanket, summary claim that its cost per minute determinations are "likely overstated."[7] In a separate part of the Draft ICS Order, the Commission objects to Securus's calculation of the return component of costs using the price paid for the company by its current owners.[8] Although Securus disagrees with the Commission's objection, if that is the basis of the Commission's conclusion that FTI's results are "likely overstated," the Commission should explicitly say so rather than potentially undermine the entire study.[9]

Securus requests that the Commission either strike the phrase "Although we find that these figures are likely overstated" from paragraph 98, or modify the statement to clarify that it is based solely on the method used by FTI to develop the rate of return component, as follows:

> 98.  The record supports these interim rate cap choices. The cost study presented by Securus's outside consultant estimates that Securus incurs maximum per minute costs of {[   ]} to serve prisons and {[   ]} to serve jails, exclusive of site commissions. ~~Although we find that these figures are likely overstated,~~ Although these figures include a rate of return based on purchase price, the study's costs estimates suggest that interim provider-related rates caps of $0.12 for prisons and $0.14 for larger jails will provide a cushion large enough for the providers at those facilities to earn at last a normal risk-adjusted rate of return on their capital investment in providing inmate calling services.

---

[5] Draft ICS Order, ¶¶ 95, 98.

[6] Draft ICS Order, ¶ 95.

[7] Draft ICS Order, ¶ 98. As support for this assertion, the Draft ICS Order cites to the analysis of data submitted in response to the Second Mandatory Data Collection contained in Appendix E, which is completely unrelated to the FTI cost study. Draft ICS Order, ¶ 98, n 284 (citing Part F of Appx. E). Appendix E analyzes data submitted in the Second Mandatory Data Collection, Appx. E, ¶ 1, and Part F analyzes revenue information from that submission.

[8] Draft ICS Order, ¶ 86.

[9] If the Commission has any other reasons for assuming that FTI's cost figures are likely overstated, it should state and justify them. For example, the FTI cost study includes Securus' site commission costs. The Draft ICS Order's statement regarding overstating costs was made solely in the context of developing the provider-related cost component, which does not involve site commission issues.

Marlene H. Dortch
May 13, 2021
Page 4

**Confirm the Scope of the End-to-End Jurisdictional Analysis**

The Draft ICS Order states that the jurisdiction of ICS calls must be definitively determined by the physical location of the endpoints of the call and not on the area code or NXX prefix.[10] Securus seeks confirmation that the end-to-end jurisdictional analysis based on the geographic endpoints of the call does not nullify the use of the phone numbers as a proxy for location where traditionally allowed for that traffic. The Commission should provide guidance on how to treat, for tax and fee purposes, a call determined to be interstate for ICS rate purposes because the ICS provider cannot definitively determine that it is intrastate. The Commission Does the Commission intend that such traffic may not be subject to state or local taxes or fees even if the state or local government uses methodologies other than physical end points in determining if revenue from a call is subject to its fees or taxes? Providers could potentially be caught between conflicting assertions of jurisdiction for tax or fee collection purposes. Similarly, does the Commission intend to require that calls deemed interstate under its jurisdictional analysis because the ICS provider cannot definitively determine it is intrastate be subject to federal USF contribution rather than a state's USF fund, which could have the effect of increasing the cost of such calls.

As the Commission has recognized, it "has allowed carriers to use proxies for determining the jurisdictional nature of calls in specific contexts, typically related to carrier-to-carrier matters or payment of fees owed."[11] In light of that finding, the Commission should confirm that state and local laws or regulations that use phone numbers or billing addresses or methodologies other than physical endpoints to determine application of their fees and taxes are not preempted by this FCC requirement applicable to determining the jurisdiction for ICS rates. Securus proposes the following highlighted language be inserted at paragraph 41 of the ICS Draft Order:

> 41. Consistent with the *2020 ICS Notice*, the new interim interstate rate cap components will apply to all calls that a provider identifies as interstate as well as to all calls that the provider cannot definitively identify as intrastate, as determined through the application of the Commission's traditional end-to-end jurisdictional analysis, which we affirm in the companion Order on Reconsideration we adopt today. Under this analysis, the jurisdictional nature of a call "depends on the physical location of the endpoints of the call and not on whether the area code or NXX prefix of the telephone number, or the billing address of the credit card associated with the account, are associated with a particular state." Thus, to the extent that a provider cannot determine that the physical endpoints of a call are within the same state, that provider must comply with our new interim interstate rate caps for that call. <span style="color:red">The use of physical endpoints for purposes of determining the appropriate rate for the call, including ancillary services, does not preclude the use of telephone number proxies where permitted by the Commission or state or local authorities in determining the appropriate taxing jurisdiction for such calls.</span>

Finally, the Commission should confirm that the use of NPA-NXX is appropriate for wireline calls.

---

[10] ICS Draft Order, at ¶ 41.
[11] *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8504, ¶ 54 (citing *See Universal Service Contribution Methodology et al.*, WC Docket No. 06-122 et al., Report and Order and Notice of Proposed Rulemaking, 21 FCC Rcd 7518, 7544-45, paras. 52-53 (2006); *see also* 2020 Telecommunications Reporting Worksheet Instructions (FCC Form 499-A), at 40-42.)

Marlene H. Dortch
May 13, 2021
Page 5

**Confirm That Average Daily Population (ADP) Applies to Individual Facilities and Provide Additional Guidance on implementation of the Threshold**

The Draft ICS Order proposes to apply different interim rate caps for large jails and small jails, using an ADP of 1,000 or more as the dividing line.[12] Securus has and continues to support adopting differing rate caps based on the size of the facility. As the Commission knows, ICS providers enter into contracts that may include a number of different sized facilities. Securus requests that the Commission confirm, as we assume is the case, that the determination of facility size by ADP applies on a per facility basis, not on a per contract basis.

The Commission should also provide additional guidance on the application of the ADP threshold. ICS providers do not independently have population counts and depend on correctional authorities for that information. The Commission could, for example, utilize the guidance provided in the 2015 Order. There, the Commission proposed to set "the initial average daily population as the sum of all inmates in a facility each day in the 12-month period prior to the effective date of Order divided by the number of days in the year." The Commission noted that "that correctional institutions often publicly report their ADP and that this publicly-reported population data should be used, where available, to determine the appropriate ADP for a facility."[13] The Commission should indicate what information an ICS provider should use if the ADP information is not publicly available.

Assuming that interim rates continue for an extended period of time, the Commission could also use the 2015 Order's process going forward. There the Commission calculated the ADP on a calendar year basis "as the sum of all inmates in a facility each day between January 1 and December 31 of the previous year, divided by the number of days in the year. The applicable ADP will then be determined as of January 31 of each year pursuant to the ADP from the previous year and will remain in effect throughout that year."[14]

**Confirm that Caps on Site Commission Cost Recovery Does Not Apply to State Taxes or Fees Imposed on ICS Providers.**

The Commission should confirm that any caps on the ability of ICS providers to recover site commission costs in per minute rates does not apply to state or local taxes or general fees, which ICS providers should continue to be permitted to pass through without markup. This request stems from the Draft ICS Order's citation to Tennessee's fee statute, Tenn. Code § 41-7-104, as an example of a legally-mandated site commission.

The Tennessee statute is a general fee provision that requires $0.10 per completed call to be collected by the ICS provider and remitted to the state treasurer and credited to the state general fund to be used exclusively for training provided by the institute for local correctional personnel within the state.[15] This fee is not contained in provider contracts or paid to any correctional agency, nor is it the subject of any negotiation. It therefore should not be considered as a site commission subject to caps on cost recovery but rather as a mandatory tax or fee that the FCC allows ICS providers to pass through without markup, at least with respect to interstate services.[16]

---

[12] Draft ICS Order at ¶ 41.
[13] 2015 Order, 30 FCC Rcd at 12784, ¶ 42.
[14] *Id.*
[15] Tenn. Code Ann. § 41-7-104.
[16] 2020 ICS Order on Remand, ¶¶ 61-62.

Marlene H. Dortch
May 13, 2021
Page 6

Conclusion

Securus appreciates the Commission's consideration of these matters. Please contact the undersigned if you have any questions.

Sincerely,

_____
/s/
Michael H. Pryor
Brownstein Hyatt Farber Schreck, LLP
1155 F Street N.W., Suite 1200
Washington, DC 20004
202.383.4706 tel

cc. (via email)
Travis Litman, Acting Chief of Staff, Acting Chairwoman Jessica Rosenworcel
Ramesh Nagarajan, Acting Wireline Legal Advisor, Acting Chairwoman Jessica Rosenworcel
Danielle Thumann, Legal Advisor, Commissioner Brendan Carr
Dr. Alisa Valentin, Special Advisor, Commissioner Geoffrey Starks
Carolyn Roddy, Chief of Staff and Wireline Legal Advisor, Commissioner Nathan Simington
Kris Monteith, Chief, Wireline Competition Bureau
William Kehoe, Senior Counsel, Wireline Competition Bureau
Gil Strobel, Chief Pricing and Policy Division, Wireline Competition Bureau

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rates for Interstate Inmate Calling Services | )     WC Docket No. 12-375 |
| | ) |

**SECURUS TECHNOLOGIES, LLC PETITION FOR WAIVER OF THE PER MINUTE RATE REQUIREMENT TO ENABLE PROVISION OF SUBSCRIPTION BASED CALLING SERVICES**

Pursuant to 47 C.F.R. § 1.3, Securus Technologies, LLC ("Securus") submits this petition to waive the requirement of Federal Communications Commission ("Commission") rules 64.6030, 64.6080, and 64.6090 that interstate incarcerated calling services ("ICS") must be charged on a per minute basis.[1] Granting this petition will enable Securus and other providers to offer alternative rate options that promote increased calling while reducing costs. As described below, there is an urgency to this request in light of the recent Commission rulings regarding the jurisdiction of calls that places Securus' existing pilot flat-rate calling packages for multiple calls in jeopardy.

**I.      Introduction**

Securus began piloting extremely popular subscription plans for intrastate calls in six select facilities in December 2020. Securus recently extended the program to two additional facilities and hopes to finalize a contract to provide the subscription calling option to another facility very soon. These programs allow incarcerated persons and their families to purchase a set

---

[1] 47 C.F.R. §§ 64.6030, 64.6080, 64.6090. *See also Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 21-60, at ¶ 305 (rel. May 24, 2021) ("Our rules preclude providers from imposing on consumers of interstate inmate calling services any charges other than per-minute usage charges."). Although § 64.6090, which bars a single fee for a single call regardless of duration, does not appear applicable to Securus' subscription plans, Securus includes it in this waiver request out of an abundance of caution.

number of calls per month much like consumers pay for commercial telephone services. To remain compliant with the Commission's per-minute rate rules for interstate calls, Securus limits participation in its subscription plans to calls to in-state numbers and has instituted the plans in states that do not mandate per-minute rates for in-state calls. Securus currently offers the plans at facilities in Texas, Utah, North Dakota, Washington, and Colorado.

The Commission's recent orders requiring providers to determine the jurisdiction of a call by its physical end points coupled with its requirement to treat indeterminate calls as interstate jeopardizes these programs.[2] In short, the problem is that, despite informing participants that the plan is limited to in-state calls and is only available for calls to in-state numbers, Securus cannot definitively determine if a call is intrastate when a subscription plan call is made. Many of the calls using the subscription service are made to wireless phones whose exact physical location is difficult to determine. Securus thus is unable to definitively confirm that a call is intrastate. Per the Commission's requirements, Securus must treat potentially in-state but indeterminate calls as interstate calls whose rates are limited to per-minute charges, jeopardizing the development and availability of flat-rate subscription plans for multiple calls. Absent this waiver, Securus will have to suspend these programs and further development of alternative payment options for ICS calling.

Apart from complications arising from the Commission's jurisdictional framework, waiving the per-minute rate rules to enable alternative rate plans furthers the public interest in providing incarcerated persons and their loved ones more affordable and accessible calling

---

[2] *Rates for Interstate Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485 (2020) ("*Remand Order*"); *Rates for Interstate Inmate Calling Services,* Third Report and Order, Order on Reconsideration, Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 21-60 (2021) ("*Reconsideration Order*").

options at a more predictable price, whether they are making intrastate, interstate, or jurisdictionally indeterminate calls. As set forth below, there is good cause to grant this petition.

**II.    Securus' Pilot Subscription Programs**

Under Securus' subscription plans, subscribers pay a flat monthly fee for up to 100 calls per month or 25 calls per week. The maximum amount of time for each call is set by the correctional institution and typically varies between 15 and 30 minutes. The subscription plans are optional, and consumers may choose to use Securus' other prepaid calling options that are based on per-minute rates for intrastate or local calls.

A fixed subscription rate allows consumers to plan and budget for calling expenses, and the calls are much less expensive than under current per-minute rates.[3] Consumers are presented with a description of the plan and costs are broken out into a base price and the separately itemized cost for site commissions (if applicable). There is also a $3.00 automated payment fee in connection with enrolling in the program. Subscribers have the option to automatically renew their participation. The pilot programs grew out of discussions Securus held with formerly incarcerated persons and their families that signified strong support for fixed rate plans.

The initial pilot subscription plans made available in December 2020 offered a single subscription option for each facility, and our goal was to gain insight on customer acceptance, as well as market viability. Securus continues to improve the call subscription functionality based on consumer responses at the six early pilot facilities. Securus is now testing multiple pricing options and packages for 100 calls per month, 60 calls per month, or 25 calls per week (although not all of these options are available at all facilities). The 25 calls per week program is targeted

---

[3] A characteristic of subscription plans such as those offered by Securus is that they allow lower but sustainable effective rates based on average call volumes compared to the current traditional per-minute, per-call rates. This is possible because the recurring predictable call volumes and revenue permit better cost management and investment decisions.

for persons incarcerated in jails for a relatively short period of time. As noted, all call subscription pricing is composed of a base rate, site commission cost, and a one-time $3.00 automated payment fee that is assessed upon enrolling in or renewing a subscription plan.

The results from the initial pilot subscription plans and subsequent modifications indicate that the per-minute effective rate (including all three cost components) is well below the Commission's new interim rates caps for intrastate ICS calls. Assuming subscribers use all available minutes under the plan, per-minute effective rates under these preliminary pricing structures (which Securus continues to adjust with more experience with the programs to ensure cost recovery) range from $0.02 to $0.05 for the 100 or 60 calls per month options and from $0.03 to $0.07 for the 25 calls per week plan. If subscribers only use half of their available minutes, the effective per-minute rates range from $0.03 to $0.10 for the monthly call options and $0.07 to $0.13 per minute for the weekly call option. With the exception of the subscription program offered at North Dakota prisons, all of these programs are offered at jails.

An analysis of the pilot subscription plans as of June 2021 conducted by Securus showed increasing participation and usage. Overall, more than 7 million minutes of calls have been made under subscription plans as of that time, with an overall average per call duration of 14.5 minutes. Many users make back-to-back calls where the facility has adopted short time limits, such as 15 minutes, for each call.

## III.    The Commission's Jurisdictional Framework Jeopardizes the Plans' Viability

In compliance with the Commission's rules requiring per-minute rates for interstate calls, Securus limits the subscription plan to intrastate and local calls. Securus informs consumers that want to participate in the program that it is only available for calls to in-state numbers. Securus selected the initial facilities to participate in the program by identifying states that do not require

per-minute charges for in-state calls and where the vast majority of calls likely would be in-state in light of the state's size and facility location. Except where the called party uses a traditional wireline phone, it is impracticable for Securus to make a call-by-call determination that the called party's phone is physically located in the state when the call is made. Many subscription plan calls are to wireless phones whose physical location is difficult, at best, to determine.[4]

The Commission's *Remand Order*, however, requires providers to determine the jurisdiction of calls based on their physical end points. The *Remand Order* further states that providers that "cannot definitively establish the jurisdiction of a call . . . may *and should* treat the call as jurisdictionally mixed and thus subject to our ancillary service rules."[5] The *Reconsideration Order* stated that this jurisdictional analysis applies to calling rates, as well as ancillary services, and that where "providers find it impossible or impracticable to determine the actual endpoints, hence the jurisdictional nature of a call, [providers] must treat the call as jurisdictionally indeterminate and must charge a rate at or below the applicable interstate cap."[6]

Under this mandate and finding it impossible or impracticable to determine the actual end points of all subscription plan calls, Securus must treat those calls as jurisdictionally indeterminate and may not charge rates in excess of interstate caps, which are based on per-minute rates. Although all of Securus' subscription plans have effective rates below the Commission's existing rate caps,[7] the prices are not based on per-minute rates as required for interstate and jurisdictionally indeterminate calls. Rather than suspending these popular programs, Securus requests that the Commission waive its per-minute rate rules for interstate

---

[4] *See Reconsideration Order* at ¶ 247 (noting the difficulty of determining the called party's location when calling a mobile or nomadic VoIP devices).
[5] *Remand Order*, 35 FCC Rcd at 8503, ¶ 53 (emphasis added).
[6] *Reconsideration Order* at ¶ 254.
[7] The Commission's newly adopted interim rate caps become effective October 26, 2021, 90 days after publication of the Third Report and Order in the Federal Register which occurred on July 28, 2021.

calls and all jurisdictionally indeterminate calls to allow it to further develop and deploy alternative rate options, such as its pilot subscription plans.

Apart from the potentially adverse effects of the Commission's jurisdictional framework on the viability of Securus' subscription plans, a waiver of the per-minute rate rules to allow for alternative payment options would benefit all providers and their end users. There is no reason why consumers making interstate calls should be precluded from using payment options such as Securus' subscription plans. Securus thus requests that the Commission waive the per-minute rule for all alternative payment options that result in effective rates, based on average usage of the plans, below the Commission's interstate rate caps.

## IV. There is Good Cause to Grant the Waiver

The general standards for granting a waiver are well known. Generally, the Commission's rules may be waived for good cause shown.[8] The Commission may exercise its discretion to waive a rule where the particular facts make strict compliance inconsistent with the public interest.[9] In addition, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.[10] Waiver of the Commission's rules is appropriate only if both (i) special circumstances warrant a deviation from the general rule, and (ii) such deviation will serve the public interest.[11]

These standards are readily met here. The overarching public interest is served where communications options for the incarcerated are made more affordable and easier to use. The Commission has repeatedly cited the benefits of reducing calling costs for individual families

---

[8] 47 C.F.R. § 1.3.
[9] *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) ("*Northeast Cellular*").
[10] *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969), *affirmed by WAIT Radio v. FCC*, 459 F.2d 1203 (D.C. Cir. 1972); *Northeast Cellular*, 897 F.2d at 1166.
[11] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 125–28 (D.C. Cir. 2008) ("*NetworkIP*"); *Northeast Cellular*, 897 F.2d at 1166.

and their surrounding communities.[12] As the Commission recently concluded, "making communications less costly and easier to use for incarcerated people promotes their ability to plan for housing, employment, and successful integration into communities once released from prison." The Commission went on to note that "[i]n financial terms, increased communication helps reduce repeated incarceration, which benefits society by saving millions of dollars in incarceration-related costs annually."[13] Barring alternative rate plans that reduce costs below per-minute capped rates simply because they do not charge by the minute is counterproductive.

Participants in Securus' subscription plans confirm that these plans produce those benefits. As noted, Securus developed the subscription plans based on lessons learned from listening sessions with formerly incarcerated persons and their loved ones. Key takeaways from those sessions included overwhelming support for subscription services with particularly strong emphasis on the benefit of having a known and expected monthly payment.

Results of the pilot programs for voice service have been very positive. The plans increased calling time while decreasing costs. An initial assessment done in February concluded that the subscription plans increased call length by approximately 27% while reducing costs by over 50%. Initial surveys of users were also positive. Some 80% found the program to be important to them, with more than half stating it was "extremely important," and 70% would recommend it to their friends or families.[14] With respect to the sign-up process, more than 80% also stated they found plan enrollment either "easy to follow" or "acceptable."

In a separate set of interviews, plan users rated the plans as a 10 (the best score) in terms of increasing the amount of time talking with their loved ones and increased peace of mind with

---

[12] *See, e.g., Reconsideration Order* at ¶¶ 34-38.
[13] *Id.* at ¶ 37.
[14] *See* https://www.aventiv.com/securus-technologies-first-of-its-kind-subscription-pricing-plan-reduces-call-costs-by-more-than-50-percent/

having a flat monthly billing option. Among the comments were "you know what you are spending," "don't have to worry about being short of cash," "way cheaper – 100 calls versus 2 to 4 calls before," and "I feel more connected." All respondents said they would recommend the plan to others, with one stating, "Yes, I have because of the unbelievable price and number of calls."

The sheriff of Fannin County, one of the participating facilities, stated that: "When Securus approached us to trial a subscription program that would make phone calls cheaper and more frequent, we jumped at the chance and it's been rewarding to see the difference it's made for our population." He went on to note that "more than 70% of our friends and family have enrolled in the subscription plan. We are proud to be one of the first facilities to take a chance and make measurable change to provide cost savings for our community while increasing connections."

Single-price rate plans enable incarcerated persons and their friends and families to utilize payment structures that commercial users have long enjoyed. Although inmate calling services differ from commercial services in many ways, there is no reason that payment for these services cannot more closely resemble commercial offerings, and incarcerated persons have strongly indicated their interest in such programs.[15]

Further, the Commission's overall policy in this docket for almost a decade has been to reduce the cost of ICS calls to the consumer. In furtherance of that objective, the Commission conducted multiple rounds of cost data collection and ratemaking, producing multiple rate cap

---

[15] The California Public Utility Commission recently held two days of public participation hearings as part of its rulemaking to set intrastate rate caps. Several persons suggested adoption of single price calling plans like those available for commercial cell phones or streaming services. *See, e.g.* Public Participation Hearing Transcript, Rulemaking 20-10-002, Vol I, April 28, 2021, at p 30 & 132-34 available at https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K604/382604073.PDF; *Id.* Vol. 2, April 29, 2021 at p. 233, available at https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K478/382478114.PDF.

structures within the framework of per-minute rates. Subscription plans for multiple calls with effective per-minute rates (based on average call volumes) allows for a more effective implementation of the Commission's policy objectives. Granting a waiver for this limited purpose will provide regulatory flexibility for ICS providers to develop these options to provide consumer value and that, in turn, can be used to inform the next stage in ICS rulemaking with practical, real-world data and examples.

## Conclusion

For the reasons set forth above, Securus respectfully requests that the Commission promptly grant the requested waiver to allow continuation of the company's pilot subscription programs that offer tremendous benefits to incarcerated persons and their friends and families.

Respectfully submitted,

_____/s/_____
Joshua P. Martin
Senior Vice President and General Counsel
Securus Technologies, LLC
4000 International Parkway
Carrollton, Texas 75007
(972) 277-0300
joshuamartin@securustechnologies.com

August 30, 2021

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rates for Interstate Inmate Calling Services | )          WC Docket No. 12-375 |
| | ) |

### PETITION FOR CLARIFICATION

Securus Technologies, LLC ("Securus") hereby requests clarification regarding the limitations on the ability of providers of incarcerated calling services ("ICS") to recover site commission costs from ICS rates as established in the Third Report and Order in the above captioned proceeding.[1] Securus files this petition to ensure uniform implementation across the industry in light of indications of potentially conflicting interpretations regarding the extent to which providers may use revenues from FCC-regulated services to pay for site commissions.

### I.     Background

In the Third Report and Order, the Federal Communications Commission ("Commission") adopted a new interim regime governing the payment of site commissions by ICS providers. For prisons and larger jails, those with an average daily population of 1000 or more, the Commission distinguished between contractually-prescribed site commissions and legally mandated site commission payments.[2] This petition addresses only contractually-prescribed site commission payments. The Third Report and Order adopted a contractually-prescribed facility rate component that "permits providers to recover no more than $0.02 per

---

[1] *Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 21-60 (rel. May 24, 2021) ("Third Report and Order").

[2] Third Report and Order ¶ 100. The Third Report and Order capped ICS rates for smaller jails at $0.21 and did not establish separate rate components for these smaller facilities. *Id.* ¶ 46.

1

minute over and above the otherwise applicable provider-related rate cap" of $0.12 for prisons and $0.14 for larger jails.[3] The $0.02 per minute contractually-prescribed facility rate component reflects the Commission's view that only facility costs reasonably related to the provision of ICS may legitimately be recovered through ICS rates and hence constitute a prudently incurred expense.[4]

## II.    Need for Clarification

Prior to the Third Report and Order, the Commission concluded that site commissions were not a compensable cost for purposes of setting of ICS rates.[5] The Third Report and Order appears to take a different approach. The Commission affirmatively regulates site commissions by establishing facility-related rate components. Securus seeks clarification whether, by adopting a contractually-prescribed rate component for site commissions, the Commission intended to preclude providers from paying site commissions from any profits that providers may retain as part of their provider-related cost component. In other words, Securus seeks clarification whether the Third Report and Order absolutely bars providers from using revenues from ICS rates to pay site commission costs above the $0.02 rate cap for contractually-prescribed site commissions.

The Third Report and Order seems clear that end users may not be charged more than $0.02 as the facility-related rate component of the overall interim rate caps. Potentially less clear is whether providers are precluded from paying site commissions in excess of $0.02 per minute from calling revenue, provided that the total charged to consumers does not exceed the applicable rate cap. The potential ambiguity arises due to the language in paragraph 168 of the Third Report and Order. In relevant part, paragraph 168 states:

---

[3] Third Report and Order ¶ 134.
[4] Third Report and Order ¶ 127.
[5] *See Rates for Interstate Inmate Calling Services,* Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14136-37 (2013) ("2013 Order").

Finally, NCIC Inmate Communications (NCIC) ask us to clarify that our $0.02 allowance 'does not prohibit the payment of additional site commissions should the inmate calling services provider and correctional facility so negotiate.' We confirm that the $0.02 figure does not prevent or prohibit the payment of additional site commission amounts to correctional facilities should the calling services provider and the facility enter into a contract resulting in the provider making per-minute payments to the facility higher than $0.02. All we do here is limit the providers' ability to recover these commissions to $0.02.[6]

This language clarifies that the Commission is not capping the amount that providers may pay correctional authorities in site commissions. It also affirms that the facility-related rate component cannot exceed $0.02 per minute. The language, however, creates ambiguity over whether providers may pay additional site commissions from end user revenues collected under the provider-related rate component of $0.14 for larger jails or $0.12 for prisons.

The ambiguity is further heightened by the context in which NCIC raised the question that the Commission addresses in paragraph 168. NCIC's comments expressed concern that a cap of $0.02 per minute on site commission payments might preclude state and local governments from recovering their full costs for making ICS available, and it would permit ICS providers "to retain revenue that was previously paid as site commissions."[7] NCIC also noted that site commissions are a common feature in the "prison payphone ecosystem" and often required for the provision of ICS services. In light of these circumstances, NCIC asked the Commission to "make clear that ICS providers will continue to be able to pay site commissions in excess of $0.02 per minute, *so long as inmates and their families are not charged more than the adopted caps on ICS rate[s] and ancillary fees.*"[8] In other words, NCIC asked the FCC to

---

[6] Third Report and Order ¶ 168 (citations omitted).
[7] NCIC Comments at 4.
[8] NCIC Comments at 5 (emphasis added).

clarify that it may use ICS revenues to pay site commissions in excess of $0.02 per minute as long as the rate remains below the applicable provider-related rate cap.[9]

### III.    Confirm Guidance Provided by FCC Staff to Ensure Uniform Implementation

Securus met with Commission staff to seek clarification on the extent to which site commission costs can be recovered through ICS rates.[10] As a result of that meeting, it is Securus' understanding that ICS providers cannot use any end user ICS revenues to pay more than $0.02 per minute for site commissions to prisons and large jails. Providers may, however, pay additional site commissions to correctional authorities from revenue sources other than FCC-regulated ICS rates.

In order to ensure uniform interpretation of the limits on site commission cost recovery from ICS rates across the industry, Securus respectfully requests that the Commission grant this petition for clarification and either confirm the interpretation stated above or provide further guidance on the extent to which ICS providers may recover site commission costs from ICS rates. Failure to clarify the limits of site commission cost recovery from ICS rates may lead to varying interpretations that could result in some providers being competitively disadvantaged in the bidding process by which ICS service providers are selected to serve carceral facilities.

Securus is aware of one provider that has already contacted correctional authorities advising them that the Third Report and Order "does not extend to interfering with your Agency's commission payments." The provider informs correctional authorities that "your

---

[9] NCIC has recently filed a petition for reconsideration asking the Commission to allow providers to recover site commissions of up to $0.08 per minute for jails with populations less than 350, $0.05 for jails between with populations between 350 to 2499, and at $0.02 for prisons and jails larger than 2500, consistent with recommendations from the National Sheriffs Association. NCIC's petition asks that providers be allowed to recover site commission costs up to these amount within the interim rate caps and not as additives. NCIC Petition for Reconsideration, WC Docket No. 12-375 at 6-7 (filed August 27, 2021). Securus takes no position on NCIC's petition in this filing.

[10] *See* Letter from Michael Pryor, Counsel for Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed August 23, 2020) ("Securus Ex Parte Notice").

Agency does not have to entertain a lower contractual commission rate based on the latest FCC rules" because the Commission's rate caps and fees "allow room for Providers to recoup their operational costs *while also returning a monthly revenue share to Agencies per their current contracts,* unless such provider was charging excess rates for local and instate calling."[11] In other words, if a current contract calls for a commission in excess of $0.02 per minute, the provider may recover that excess amount from its ICS rates as long as its operational costs are below the applicable rate cap.

The interpretation quoted above appears to conflict with the guidance provided to Securus by Commission staff that providers may charge no more than $0.02 per minute in ICS rates to pay for site commissions to prisons and large jails, even if there is additional "room" in the rates to make a higher payment. This attached note to correctional authorities highlights the need for industry-wide clarification on the extent to which providers can use revenue from ICS services to pay for site commissions.

## CONCLUSION

For the reasons stated above, Securus respectfully requests the Commission to grant this petition for clarification.

Respectfully submitted,

_____/s/_____

Joshua M. Martin
Senior Vice President and General Counsel
Securus Technologies, LLC
4000 International Parkway
Carrollton, Texas 75007
T: (972) 277-0300
E: joshuamartin@securustechnologies.com

Dated: September 17, 2021

---

[11] A full copy of the email is attached hereto.

5

**ATTACHMENT**



**Is your Inmate Telephone Provider trying to re-negotiate your Agreement?**

Dear Sheriffs and Corrections Professionals,

The current FCC Rulemaking regarding Inmate Calling Services has an implementation deadline of October 26, 2021. The Rulemaking goes a long way towards reducing some of the abuses that have plagued the Inmate Telephone Industry for years but, thankfully, **does not extend to interfering with your Agency's commission payments.**

Unfortunately, the vague wording surrounding commission payments and how providers report commission payments to the FCC has given certain Providers an opportunity to approach their Facility customers with requests to re-structure / re-negotiate their existing Inmate Communications Agreements, based on misrepresentations regarding the current FCC Rulemaking. The simple fact of the matter is that **your Agency does not have to entertain a lower contractual commission rate based on the latest FCC rules**. The current Rulemaking provides clarity regarding what are the allowed calling rates (and ancillary fees) and then goes on to say:

*"Site commission payments prescribed under negotiated contracts impose contractual obligations on the provider and, in our judgment, on the current record, reflect not only correctional officials' discretion as to whether to request site commission payments as part of requests for proposals,311 and if so in what form and amount,312 but also providers' voluntary decisions to offer payments to facilities that are mutually beneficial313 in the course of the bidding and subsequent contracting process.314 Providers may recover up to $0.02 per minute to account for these facility costs. Where a law or regulation merely allows a correctional facility to collect site commissions, requires a correctional facility to collect some amount of site commission payment but does not prescribe any specific amount, or is not subject to state administrative procedural requirements, site commissions would also fall into*

*the category of a site commission payment prescribed by contract, because the correctional facilities and providers can negotiate, in their discretion, regarding how much the providers will pay in site commissions." (Page 45, Paragraph 103 of the FCC ruling) https://ecfsapi.fcc.gov/file/0524685718516/FCC-21-60A1.pdf*

The allowed rates and fees are very reasonable and absolutely allow room for Providers to recoup their operational costs while also returning a monthly revenue-share to Agencies per their current contracts, unless such provider was charging excessive rates for local and instate calling.

The team at NCIC Inmate Communications encourages your Agency to have an open dialogue with your current Provider about this issue in the leadup to the implementation deadline. If there are any questions about the current FCC Rulemaking and the allowed rates and fees, please feel free to reach out to your local NCIC representative or respond to this email.

Sincerely,

Craig Storer
NCIC Inmate Communications
www.ncic.com
Craig.Storer@ncic.com

**NCIC Inmate Communications** |ncic.com　　 

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of:<br><br>**Rates for Interstate Inmate Calling Services** | WC Docket No. 12-375 |

**COMMENTS OF PRISON POLICY INITIATIVE, INC.**
**ON FIFTH FURTHER NOTICE OF PROPOSED RULEMAKING**

Peter Wagner, Executive Director
Stephen Raher, General Counsel
Andrea Fenster, Staff Attorney
Prison Policy Initiative, Inc.
P.O. Box 127
Northampton, MA  01060
(413) 527-0845

Dated: September 27, 2021

# TABLE OF CONTENTS

Executive Summary ........................................................................................... ii

I.   While the Commission Has Made Progress on Lowering Prison Phone Rates, Much Work Remains to be Done to Address Issues Related to Jail Calling ..................... 1

II.  The Commission Should Take Steps to Reduce Economic Burdens Created by Ancillary Service Charges ................................................................................ 6

     A.  The Commission Should Stop Unfair Practices Related to Third-Party Transaction Fees .................................................................................. 6

     B.  The Commission Should Prohibit Ancillary-Fee Double Dipping ..................... 10

     C.  Single-Call Fees Should be Subject to the Same Caps as Automated Payments and Live-Agent Transactions ........................................................ 11

III. The Commission Should Seek Legislative Authority to Exempt ICS Customers from Mandatory Contributions to the Universal Service Fund ....................... 12

IV.  Current Rules Inflate the Amount that Customers Pay in Locational Rents ................... 13

     A.  The 2015 NSA Survey is Not Adequate Evidence for Purposes of Rate Setting ............................................................................................... 13

     B.  Site Commissions Should Only be Allowed to the Extent that They Cover Facility Costs that are Reasonably and Directly Related to the Provision of Telecommunications Service ............................................................... 16

V.   Available Evidence Indicates Procurement Practices Favor the Dominant Carriers by Erecting Substantial Barriers to Entry into the ICS Market ....................... 19

     A.  Contract Durations are Long and Incumbent Carriers Frequently Evade Competitive Rebidding through Serial Contract Extensions ............................ 19

     B.  The Prevalence of Bundled Contracts is a Critical Fact that the Commission Must Address ................................................................. 20

VI.  The Commission Should Carefully Structure its Actions, Including the Upcoming Mandatory Data Collection, to Provide Information Relevant to Other Miscellaneous Issues Raised in the FNPRM ................................................... 22

     A.  A Regular, Recurring Data Collection Would be Beneficial ............................. 22

     B.  Carriers Must Provide Substantial Information before the Commission Can Even Begin to Evaluate Alternative Pricing Models ................................ 22

     C.  The Commission Should Ensure that Non-Filing Companies Are Required to Become Compliant and Participate in the Mandatory Data Collection ........... 24

     D.  Greater Access to Contract Information Can Only Help ................................. 25

VII. Conclusion ................................................................................................. 26

## EXECUTIVE SUMMARY

The genesis for this proceeding occurred nearly eighteen years ago, when the Wright Petitioners came to the Commission seeking relief from exorbitant phone rates.  In the intervening years, the Commission has confronted recalcitrant telecommunications companies, a changing technological landscape, new methods of circumventing the Commission's rules, partial vacation by the D.C. Circuit Court of Appeals, and changes in composition of the Commission.  In the face of these challenges, the commissioners and Commission staff have worked diligently to provide meaningful relief to inmate calling services ("ICS") ratepayers.

While the Commission should be proud of the progress it has made, substantial work remains, and Prison Policy Initiative welcomes a new phase of this rulemaking.  We have paid careful attention to the questions posed in the notice of rulemaking, and we aim to provide data and ideas that will help the Commission further lower rates and fees in the ICS industry.

We begin in section I by explaining why a concerted focus on the unique issues of jail ICS is necessary at this time.  We then discuss various ways to further reduce end-user costs, starting with much-needed reforms to current ancillary fee rules (section II), and then outlining a proposal for legislative relief from Universal Service Fund assessments (section III).  In section IV, we review the record concerning correctional-facility costs and make suggestions for further actions the Commission should take.  Section V responds the Commission's questions about procurement practices and competition in the ICS market.  And we conclude in section VI with various miscellaneous issues that the Commission should address in the next phases of this proceeding.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of: | WC Docket No. 12-375 |
| **Rates for Interstate Inmate Calling Services** | |

**COMMENTS OF PRISON POLICY INITIATIVE, INC.**
**ON FIFTH FUTHER NOTICE OF PROPOSED RULEMAKING**

Pursuant to the Commission's Fifth Further Notice of Proposed Rulemaking (the "Fifth FNPRM"),[1] the Prison Policy Initiative ("PPI") submits these comments regarding additional steps needed to bring fairness to the ICS market.  The stated purpose of the Fifth FNPRM is to obtain "further evidence and comments from stakeholders to consider additional reforms to inmate calling services rates, services, and practices within [the Commission's] jurisdiction."[2]  In support of this objective, PPI provides the following information, comment, and suggestions for the Commission's consideration.

**I.    While the Commission Has Made Progress on Lowering Prison Phone Rates, Much Work Remains to be Done to Address Issues Related to Jail Calling**

PPI has, both independently and in coalition with the Wright Petitioners, worked diligently to fight unfair ICS rates and practices for the past nine years.  During this time, our organization has received correspondence from incarcerated and non-incarcerated ICS users in virtually all states in the country.  These cumulative contacts reveal trends and patterns that we hope will inform the Commission's actions going forward.  In particular, we receive many complaints regarding high rates and confusing or unreasonable payment provisions in small jails.

---

[1] 86 Fed. Reg. 40416 (Jul. 28, 2021).
[2] Fifth FNPRM ¶ 262, 86 Fed. Reg. at 40420.  All citations to the Fifth FNPRM in these comments refer to the paragraph numbering contained in the Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking [hereinafter "Third R&O"], Dkt. No. 12-375 (May 24, 2021), not the version published in the Federal Register.

With the new interim rates announced in the Third Report & Order, the Commission reaffirmed its intent to allow higher rates in smaller jails because "*based on the current record*, providers appear to incur somewhat higher costs in serving jails with average daily populations ["ADP"] less than 1,000."[3] We encourage the Commission to refine its data analysis with respect to facility size, with a goal of discontinuing the use of tiered rate caps. Throughout these comments, we will discuss several inter-related components that relate to facility size, including the consumer perspective (discussed in the immediately following paragraphs), facility costs (discussed in section IV.B), and carrier costs (discussed throughout).

While we continue to advocate for permanent rate caps at significantly lower levels than the current interim caps, the new caps announced in the Third Report & Order do represent progress for many consumers, particularly those incarcerated in large jails. PPI collected ICS rate information as of June 2021 (prior to the effective date of the Third Report & Order) for 105 jurisdictions with average daily jail populations over 1,000.[4] Of these jurisdictions, 70% imposed interstate rates in excess of the newly promulgated cap of 16¢ for large jails, with average interstate rate among these facilities of 21¢ per minute. The new interim rate caps will provide financial relief for approximately 170,000 people housed in those jurisdictions (see summary in **Table 1**, on the following page, and complete data in **Appendix 1**).

\\\

\\\

\\\

---

[3] Third R&O ¶ 47 (emphasis added).

[4] We used the source data from the Bureau of Justice Statistics' *Census of Jails, 2013* (available at https://www.icpsr.umich.edu/web/NACJD/studies/36128/summary) to identify a total of 139 county jails with average daily populations over 1,000. Fifteen facilities are excluded from our analysis because we could not find rate information; we also excluded four large jails in New York City that do not charge incarcerated people for phone calls. Of the remaining 120 large jails, 25 are located in 10 counties that operate multiple large jails. Because these 25 facilities are all governed by county-level contracts with uniform rates at all facilities within the relevant county, we have consolidated the facilities and list data by county, not facility. Thus, Appendix 1 lists rates for 105 jurisdictions.

| Table 1. Summary of Large Jail Rate Survey (Jun. 2021) | | | | |
|---|---|---|---|---|
| | Jail Systems | Jail ADP | Interstate Rates | |
| | | | Average | Std. Dev. |
| Rates over 16¢ | 73 | 169,782 | 0.21 | 0.08 |
| Rates at or below 16¢ | 32 | 61,563 | 0.10 | 0.05 |

Source: Rate data comes from survey conducted by Prison Policy Initiative in June 2021. Average daily population (ADP) comes from BJS Census of Jails 2013. Complete results can be found in Appendix 1 to these comments.

In contrast, we believe that the new interim rate caps will provide more modest relief to customers in prison. We conducted a similar rate survey of the fifty state prison systems (see **Appendix 2**) and discovered an average per-minute rate of 10¢. Sixteen jurisdictions lowered the price of calling since 2018, with an average reduction of 33%. Massachusetts and Rhode Island's prison systems increased rates by 20% and 25%, respectively. Notably three state prison systems feature higher rates for intrastate calls than for interstate calling; whereas six systems feature lower interstate rates.

Of all of the people currently incarcerated in the United States, roughly one-third are in jails,[5] yet jails seem to receive far less than one-third of the attention of policymakers, including telecommunications regulators. For that reason, several of our proposals focus on reducing the economic burdens borne by ICS customers in the jail sector. When evaluating these proposals, we hope the Commission keeps three key facts in mind related to the experience of ICS customers in jails.

First: jail churn is key to understanding the profile of ICS customers. While jails only hold half as many people as state and federal prisons on a given day, jail churn is immense and many more people are impacted by jail policies. Every year, over 600,000 people enter *prison* gates, but people go to *jail* 10.6 million times each year.[6] Because people in prison are there for longer periods of time, there is more opportunity for a culture of accountability to develop in

---

[5] Wendy Sawyer & Peter Wagner, *Mass Incarceration: The Whole Pie 2020* (Mar. 24, 2020).
[6] Bureau of Justice Statistics, *Prisoners in 2017* at tbl. 7 (Apr. 2019), Bureau of Justice Statistics, *Jail Inmates in 2016*, tbl. 1 (Feb. 2018).

correctional systems, with incarcerated people and their family-support networks successfully lobbying administrators for better treatment, including in the form of reasonable phone rates. But because of the comparatively transient population, such advocacy in jails is rare, and things like the award of ICS contracts often go unchecked by public-interest advocates.

Second: Compared to people in prison, callers in jail spend less time on the phone but pay substantially more on calls. In addition to collecting comprehensive rate data, we have analyzed ICS usage data from a number of prison and jail systems (see **Table 2**). Using ICS rates from five states, and estimating usage figures based on a sample of facilities, we estimate that the average ICS caller in jail spends 16% less time on the phone in a typical month than a caller in prison, but pays twice as much for calls due to inflated jail rates.

**Table 2.  Consumer Spending on ICS in Jails vs. Prisons**

|  | Jails | | | Prisons | | | Jail excess spending per person ($/mo) | Jail excess spending as % of prison spending |
|---|---|---|---|---|---|---|---|---|
|  | Est. per capita monthly MOU | Avg. per-minute rate ($) | Avg. cost per person ($/mo) | Est. per capita monthly MOU | Per-minute rate ($) | Avg. cost per person ($/mo) | | |
| Colorado | 340 | 0.43 | 147.33 | 403 | 0.11 | 43.26 | 104.08 | 241% |
| Illinois | 340 | 0.47 | 161.16 | 403 | 0.01 | 3.76 | 157.40 | 4185% |
| Michigan | 340 | 0.80 | 272.68 | 403 | 0.16 | 64.48 | 208.20 | 323% |
| New York | 340 | 0.52 | 176.57 | 403 | 0.04 | 17.46 | 159.11 | 911% |
| Wisconsin | 340 | 0.53 | 181.11 | 403 | 0.06 | 24.18 | 156.93 | 649% |
| Averages | -- | 0.55 | 187.77 | -- | 0.08 | 153.14 | 157.14 | 103% |

Notes

1. "MOU" means minutes of use (voice calling).

2. Per capita jail MOU is estimated based on data reviewed from a sample of 72 jails in 12 states. Source documents are on file at the Prison Policy Initiative, and are available to the FCC or any party-in-interest participating in WCB Docket 12-375, upon request.

3. Average jail calling rates are from 2019, and come from data in "The Biggest priorities for prison and jail phone justice in 40 states," Table 3: https://www.prisonpolicy.org/blog/2019/09/11/worststatesphones/ (the rates published in this report reflect the cost of a 15-minute call; the per-minute rate used here is the published rate divided by 15).

4. Per capita prison MOU comes from an analysis of monthly ICS call reports from a sample of five state prison systems. Calculations and source documents are available at https://www.prisonpolicy.org/scans/phones/PrisonMOUSourceDocs.pdf

5. Prison calling rates are from 2021 and were obtained by PPI staff from corrections department and phone carrier websites.

Higher jail rates appear to be due at least in part to the nature of incentives and bargaining power related to bidding and procurement processes at local jails.[7]  Local governments are often more dependent on non-appropriated revenue, and are thus more eager to reap income from ICS site commissions.  At the same time, some carriers appear to have developed a concerted strategy of negotiating jail contracts with higher-than-average rates and lower-than-average site commissions.[8]  Due to information asymmetry, counties with under-resourced procurement staff are particularly vulnerable to agreeing to these high-rate, low-commission contracts—which serves merely to enrich ICS carriers at the expense of low-income ratepayers.

Third: People in jail are under immense pressure and are more susceptible to unfair carrier practices.  People in jail have often been forcibly removed from their homes and are facing a profoundly uncertain future.[9]  This makes jail ICS customers vulnerable not only to paying high rates, but also using financially-ineffective single-call products that incur unnecessary transactional fees on a per-call basis (as opposed to funding a prepaid account and incurring fees only when adding funds).[10]  Different areas of law have long recognized the need to guard against business practices that exploit consumers who are under stress.[11]  The Commission should crack down on such exploitation, beginning by granting the petition for reconsideration recently filed by NCIC Inmate Communications ("NCIC") (we discuss this petition in greater detail in section II.C, below).

---

[7] *See* Peter Wagner & Alexi Jones, *State of Phone Justice: Local Jails, State Prisons, and Private Providers* (Feb. 2019), at https://www.prisonpolicy.org/phones/state_of_phone_justice.html#whobenefits.

[8] *Id.*, text accompanying n.7.

[9] *See* Wendy Sawyer, "Why expensive phone calls can be life-altering for people in jail—and can derail the justice process" (Feb. 5, 2019).

[10] *See* PPI, Notice of *Ex Parte* Presentation, at 2-3 and attachment "Single Calls" (p.5) (May 13, 2021).

[11] Stephen Raher, *The Company Store and the Literally Captive Market: Consumer Law in Prisons and Jails*, 17 Hastings Race & Poverty L.J. 3, 35, n.146-148 and accompanying text (2020).

Having reviewed these three key facts related to jail ICS, we turn now to specific proposals for action.

## II.   The Commission Should Take Steps to Reduce Economic Burdens Created by Ancillary Service Charges

When the Commission first took steps to regulate ancillary service charges, it did so because the record established that ICS carriers used unreasonable, non-cost-based fees as a profit center.[12]   Although the Commission has subsequently restricted the type and amount of ancillary charges, carriers are no less motivated to exploit every available opportunity to continue deriving unreasonable profits from such fees.  The Commission asks whether current ancillary-fee rules should be modified,[13] to which PPI answers emphatically: <u>yes</u>.

In this section, we propose three actions that the Commission should take to reduce the economic damage that families incur as a result of paying inflated ancillary fees.  First, with regards to "pass-through" third-party fees allowed under 47 C.F.R. § 64.6020(b)(5), the Commission should lower the current price cap and prohibit revenue-sharing agreements. Second, the Commission should prohibit the practice of double dipping used by several ICS carriers.  Finally, the Commission should explore ways to counter the problems of single-call products, beginning by granting the currently-pending petition for reconsideration filed by NCIC.  These three steps would represent a major step forward in the decades-long fight against oppressive, non-cost-based fees.  Each proposal is discussed in more detail below.

### A.   The Commission Should Stop Unfair Practices Related to Third-Party Transaction Fees

Some of the most common and burdensome ancillary charges are so-called third-party pass-through fees.  In actuality, many interested parties confuse two distinct types of third-party pass-through fees: those related to single calls (allowed under 47 C.F.R. § 64.6020(b)(2)) and those related to financial transactions (allowed under § 64.6020(b)(5)).  Although both of these

---

[12] *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, <u>Report and Order and Further Notice of Proposed Rulemaking</u> [hereinafter "<u>First R&O</u>"] ¶¶ 90-91, 28 FCC Rcd. 14156-14158 (Sep. 26, 2013).

[13] Fifth FNPRM ¶ 326, 86 Fed. Reg. at 40432.

categories diffuse accountability by involving a non-transparent third-party entity, they are functionally and legally different. PPI addresses financial transaction pass-through fees (i.e., those for making payments and funding prepaid accounts) in this section. Single-call fees are addressed later, at page 11.

PPI has focused our recent ICS-related research on addressing third-party fees, but collecting definitive and comprehensive information is difficult. Given the level of difficulty encountered by experienced researchers, it should be obvious that consumers face even steeper challenges in understanding alternative fee structures and making informed decisions. As an example, investigating a carrier's automated payment fees can usually be done with one visit to a website, whereas determining fees charged by Western Union or MoneyGram (which are levied at physical locations and can vary even among the same money transmitter) is far more challenging.

In addition, carriers have disclosed third-party transaction fees that may be legal (at least under the rules in place prior to the Third Report & Order), but which are suspiciously high. PPI discovered that Global Tel*Link's ("GTL") 2019 annual report identifies 140 correctional facilities with fees above $6.95, which exceeds any known fee charged by a bona fide money transmitter like Western Union or MoneyGram. These fees often approach $10 per transaction, and in one case, rise to $12.95 per transaction. PPI brought this to the Commission's attention early this year,[14] but to our knowledge no action has been taken, and GTL again listed similarly high fees in their 2020 annual report.[15]

PPI suggests that the Commission take two actions to address the unreasonable financial burden created by inflated third-party transaction fees. First, we recommend temporarily capping such fees at $3 and $5.95 for automated payments and live-agent transactions,

---

[14] PPI, *Ex Parte* Submission Re: Transaction Fees Reported by GTL (Feb. 25, 2021).
[15] GTL, FCC Form 2301(a) – Inmate Calling Services Annual Report, Tab III. Ancillary Fees, Column E (filed Apr. 1, 2021).

respectively.[16]  This action should be an interim measure, with the ultimate goal of imposing even lower caps after the Commission has completed its third mandatory data collection.

The second sorely-needed action is to prohibit revenue sharing between ICS carriers and third-party money transmitters or payment processors.  As a matter of law and fact, such revenue sharing is contrary to the spirit of the Commission's existing rules, and it serves no purpose other than to extract unreasonable profits from consumers.[17]  Specifically, the Commission set ancillary-fee caps for the purpose of "allow[ing] ICS providers to recover the costs incurred for providing the ancillary service associated with the relevant fee *while ensuring just, reasonable and fair rates to end users.*"[18]  Thus, any portion of the third-party fee that is kicked back to the carrier represents an end-run around the Commission's carefully constructed rules.  Worse yet, in the case of "pass through" fees defined in 47 C.F.R. § 64.6000(a)(5), carriers are required to pass through the "exact fee[], with no markup."  This pass-through mechanism is designed to prevent ICS carriers from using these fees as a revenue source; therefore, any revenue the carrier receives with respect to such fees is functionally equivalent to a "markup" and is *per se* unreasonable.

Inmate Calling Solutions, LLC ("ICSolutions") suggests that the rules should be modified to crack down on "third party" entities that are affiliated with the carrier.[19]  While PPI supports this suggestion, it does not go far enough because carriers can still profit from fees charged by bona fide third parties if there is a contractual agreement to "share" or kick back revenue from the third-party to the carrier.  Accordingly, we advocate for a complete prohibition on carriers receiving any payments or consideration in connection with any fees that are levied under 47 C.F.R. § 64.6020(b)(5).  This solution is the simplest and most administratively efficient to

---

[16] This proposal is explained in more detail in NCIC's Petition for Reconsideration [hereinafter "NCIC Petition"], at 4-5 (Aug. 27, 2021).

[17] *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, Second Report & Order and Third Further Notice of Proposed Rulemaking [hereinafter "Second R&O"] ¶ 161, 30 FCC Rcd. 12763, 12845 (Nov. 5, 2015); *see also* Fifth FNPRM ¶ 333, 86 Fed. Reg. at 40434 ("[W]e remain concerned about the adverse effect of revenue-sharing arrangements between calling service providers and third-party financial institutions.").

[18] Second R&O ¶ 166, 30 FCC Rcd. at 12847 (emphasis added).

[19] ICSolutions, *Ex Parte* Submission [hereinafter "ICS *Ex Parte*"] at 5 (May 12, 2021).

implement, and is strongly rooted in the Commission's long-standing framework regarding third-party fees.[20]

In the Fifth FNPRM, the Commission asks for "renewed comment on how revenue sharing arrangements work in the context of ancillary service charges, including concrete evidence of these arrangements."[21]  As explained above, we believe the fairest and most efficient approach is to prohibit revenue sharing outright, in which case extensive factual investigation may not be necessary.  Nonetheless, to the extent that the Commission finds it necessary to collect additional information on this topic, we would respond by stating that our organization is unable to provide any greater detail with respect to these arrangements than we already have.[22]  ICS carriers tightly guard their contractual relationships with financial-service providers, and in the rare instance when PPI has been able to examine such contracts, it has been pursuant to a protective order that strictly prohibits our using such information in a setting such as this proceeding.

Carriers will obviously not voluntarily disclose the terms of their revenue-sharing agreements, since doing so would potentially jeopardize the regulatory loophole that currently allows for collection of unregulated kick-back revenue.  Accordingly, if the Commission does conduct further investigation of this topic, PPI proposes a two-step approach to collecting relevant evidence.  First, the forthcoming mandatory data collection should require all carriers to provide: (a) full contracts with any entity that receives or processes payments from end-users on the carrier's behalf (including payment-card processors, acquiring banks, and money

---

[20] A different approach has been adopted by the Alabama Public Service Commission, which uses an indirect prohibition (or at least constraint) on revenue sharing, based on a disclosure requirement.  *See* Alabama Pub. Serv. Comm'n, *Generic Proceeding Considering the Promulgation of Tel. Rules Governing Inmate Phone Serv.*, Dkt. 15957, Further Order Adopting Revised Inmate Phone Service Rules, appx G at 13 (Dec. 9, 2014).  This approach still allows revenue sharing (something that is never warranted, in our opinion), but at least confines it with reference to the total cost imposed on consumers.

[21] Fifth FNPRM ¶ 333, 86 Fed. Reg. at 40434.

[22] *See* Wagner & Jones, *State of Phone Justice*, *supra* n. 7, at https://www.prisonpolicy.org/phones/state_of_phone_justice.html/#moneytransfer.

transmitters); and, (b) a detailed accounting of all consideration (whether in the form of monetary payments, account credits, or other value) the carrier has received from such entities in the last three years.

The second step in any investigation of revenue sharing should be to verify the accuracy of the information produced by the carriers. To do this, the Wireline Competition Bureau should subpoena relevant contracts and accounting documents directly from the third-party entities that are known to serve ICS carriers (this would include, at a minimum, Western Union, MoneyGram, and PayNearMe, as well as any other processors disclosed during the carrier data collection). The Bureau has the power to subpoena relevant information from non-parties, and the course of this proceeding vividly illustrates the high degree to which this particular information is relevant to the Commission's ongoing attempts to address unreasonable practices related to ancillary charges.[23]

### B.    The Commission Should Prohibit Ancillary-Fee Double Dipping

PPI has previously alerted the Commission to the troublesome practice of at least five ICS carriers who charge automated payment fees while also passing through their alleged payment-card processing costs.[24] The Fifth FNPRM asks several questions about this practice and whether the Commission should act in response.[25] PPI believes that this practice of double dipping is entirely unjustified, and it constitutes the newest iteration of the rent-seeking game of "whack-a-mole" that carriers have been perpetuating for decades. The Commission should act as quickly as possible to cease this bad-faith practice.

---

[23] 47 C.F.R. § 0.291 ("The Chief of the Wireline Competition Bureau or her/his designee is authorized to issue non-hearing related subpoenas for the . . . production of books, papers, correspondence, memoranda, schedules of charges, contracts, agreements, and any other records deemed relevant to the investigation of matters within the jurisdiction of the Wireline Competition Bureau."); *Authority to Issue Subpoenas* (FCC 94-319), Order, 10 FCC Rcd. 707 (Dec. 21, 1994) ("The agency's power of subpoena is not confined to those over whom it exercises regulatory jurisdiction, but extends to private individuals and entities over whom it does not.").

[24] PPI, *Ex Parte Submission Re: Informal Complaints Regarding Improper Assessment of Ancillary Fees* (Mar. 23, 2021).

[25] Fifth FNPRM ¶¶ 327-329, 86 Fed. Reg. at 40432.

The fundamental problem of double dipping is that carriers are recouping payment-card processing costs twice over.  The Commission allowed carriers to charge automated payment fees of $3, with the express goal of allowing carriers to recoup the costs of accepting payments via credit and debit cards.[26]  When carriers impose the $3 fee allowed under 47 C.F.R. § 64.6020(b)(1) while also making customers pay the carrier's card-processing costs under § 64.6020(b)(5), this constitutes an unreasonable charge, unjust enrichment, and circumvention of the Commission's stated purpose in promulgating ICS rules.  On May 12, 2021, ICSolutions proposed a clarifying amendment that would allow carriers to charge only one type of funding fee per transaction.[27]  PPI supports this proposal, and we encourage the Commission to amend 47 C.F.R. § 64.6020 to specify that carriers may only charge one type of funding fee in relation to any single transaction.[28]

### C.    Single-Call Fees Should be Subject to the Same Caps as Automated Payments and Live-Agent Transactions

As mentioned previously, people in jail are uniquely susceptible to overpaying for calls by incurring multiple unnecessary transaction fees levied on "single call" products.[29]  NCIC has raised these concerns in its petition for reconsideration, noting two steps that the Commission should take.  First, NCIC expressly requests that the Commission reconsider its interim rules by capping single-call fees at $3 for automated transactions, and $5.95 for live-agent transactions.[30]  Second, while not explicitly requested in the petition, NCIC voices general support for a required number of free jail calls for each customer, which would allow newly incarcerated people to "connect immediately with family or friends to expedite their release, and reduce the reliance on single-call services in general."[31]  PPI agrees with NCIC that the Commission's recent decision

---

[26] Second R&O ¶ 167, 30 FCC Rcd. 12848.

[27] ICS *Ex Parte* at 3-6.

[28] We adopt ICSolutions' usage of the phrase "funding fee" to refer to the automated-payment fee, live-agent fee, and third-party financial transaction fee described in 47 C.F.R. § 64.6020(b)(1), (3), and (5), respectively.  *See* ICS *Ex Parte* at 5-6.

[29] *See supra*, at 5.

[30] NCIC Petition at 4-5.

[31] *Id.* at 4.

to cap third-party fees at $6.95 will simply encourage some carriers to steer customers toward unnecessarily expensive calling options.  We therefore support NCIC's suggestions, both in terms of "fee cap parity" and mandatory free calls.[32]

### III.    The Commission Should Seek Legislative Authority to Exempt ICS Customers from Mandatory Contributions to the Universal Service Fund

One frequent issue that ICS customers have raised with PPI is the high cumulative amounts that they pay in Universal Service Fund ("USF") assessments.  In Docket No. 19-232, the Commission denied several requests to waive USF contributions via waiver or forbearance.  As an organization that works with low-income communities on matters related to communications technology, we wholeheartedly support the policy underlying the universal service program.  But, as we noted in Docket No. 19-232, ICS ratepayers are disproportionately low-income, and the policy goals of the universal service program would be best served by not requiring ICS end-users to make contributions in connection with ICS calls.[33]  Indeed, in order to even receive calls from an incarcerated family member, a non-incarcerated ICS customer is likely paying for mobile or wireline phone service, in which case they are already paying USF assessments.  Requiring that customer to make additional USF contributions through ICS rates is inequitable.

The Commission denied previous requests for USF relief, questioning whether it had the authority to waive assessments, and finding that the statutory criteria for forbearance had not been met.[34]  PPI respects the Commission's determination regarding the scope of its authority, but we remain concerned about the financial burdens caused by USF assessments in connection

---

[32] While NCIC suggests two free calls per caller, PPI would advocate for a higher number.  A newly incarcerated person may have numerous parties to notify (domestic partners, employers, children, attorneys, landlords), and may have to call multiple persons before a call recipient actually answers.  Accordingly, four calls would be more practical, even if such calls are subject to fairly short durational limit.

[33] *Petition of NCIC for Forbearance & Securus Request for Wavier*, WC Dkt. 19-232, Comments of PPI (Aug. 30, 2019).

[34] *Petition of NCIC for Forbearance & Securus Request for Wavier*, WC Dkt. 19-232, Order, 35 FCC Rcd. 8348 (Jul. 31, 2020).

with ICS calls.  We are aware of no evidence suggesting that an exemption for ICS callers would jeopardize the fiscal health of the USF, and we believe that an exemption would provide material and much-needed relief for ICS ratepayers.  Accordingly, PPI respectfully suggests that the Commission seek a legislative amendment to 47 U.S.C. § 254(d) that would allow the Commission to exempt ICS carriers from USF contributions.  If the Commission seeks such an amendment, PPI is committed to supporting such a proposal.

## IV.    Current Rules Inflate the Amount that Customers Pay in Locational Rents

The Commission's Third Report & Order sensibly reaffirms the obvious fact ICS operates as a locational monopoly, and that site commissions have historically been used in large part to extract locational rents from ratepayers.[35]  At the same time, the Commission is tasked with implementing the ruling in *GTL v. FCC*, which "[left] it to the Commission to assess on remand which portions of site commissions might be directly related to the provision of ICS and therefore legitimate, and which are not."[36]  As part of this undertaking, the Commission asks how to distinguish between facility costs that are properly versus improperly recovered through site commissions.[37]  In response, PPI encourages the Commission to adhere to its original determination that ICS rates may only be used to recover costs that are reasonably and directly related to the provision of ICS.[38]  More specifically, the Commission should use this opportunity to correct serious problems with the evidentiary record and to formulate a detailed standard for defining legitimate facility costs.

### A.    The 2015 NSA Survey is Not Adequate Evidence for Purposes of Rate Setting

As an interim measure, the Commission has allowed prisons and large jails to recover up to 2¢ per minute from ratepayers for payment of site commissions.  No comparable cap currently applies to smaller jails.[39]  The way in which the Commission frames this issue raises the

---

[35] Third R&O ¶¶ 7, 31 at n.82, 86 at n.262, 107, 115, 147 at n.450, and 312.
[36] *Global Tel\*Link Corp. v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).
[37] Fifth FNPRM ¶ 312, 86 Fed. Reg. at 40429.
[38] First R&O ¶ 53, 28 FCC Rcd. at 14134-35.
[39] Third R&O ¶ 140.

possibility that the current rulemaking will result in tiered caps on site-commission recovery charges.  While PPI would strongly prefer the simplicity of uniform caps, we are not necessarily opposed to tiered caps if reliable evidence demonstrates that such a structure is warranted.  Yet the National Sheriffs' Association ("NSA") and others continue to point to the NSA's 2015 "survey" of jail ICS costs (the "NSA 2015 Survey")[40] as justification for allowing higher site-commission recovery (and, by extension, higher rates) in smaller jails.[41]  As the Commission itself acknowledges, the NSA 2015 Survey suffers from a plethora of problems.  It should not be used to calculate permanent rate caps.  Specifically, PPI would make three points in regards to the data contained in the 2015 Survey.

First, the NSA's filing is deficient as a matter of law because the only information in the record is scanned copy of a spreadsheet that is, in several instances, illegible due to poor graphic quality.  When a federal agency relies on data in promulgating a regulation, the agency "generally has an obligation under the [Administrative Procedure Act] to provide such data for public inspection."[42]  This requirement is designed to allow the public to test and challenge underlying data relied upon in a rulemaking.[43]  The public is denied such an opportunity here, where the record only contains a semi-illegible document not in its native file format.

Second, as discussed in the following section, the NSA's definition of ICS-related costs is overbroad.  Given these inappropriately expansive descriptions—and the fact that survey relies entirely on self-reported data from correctional facilities that often have a financial interest in boosting site-commission revenue—there is serious reason to doubt the accuracy of the staff-time figures in the survey.

---

[40] Comments of the Nat'l Sheriffs' Ass'n., exh. A (Jan. 12, 2015).
[41] Fifth FNPRM ¶ 316, n.944, 86 Fed. Reg. at 40430.
[42] *Endangered Species Comm. of the Bldg. Industry Ass'n of Southern Calif. v. Babbitt*, 852 F.Supp. 32, 36 (D.D.C. 1994).
[43] *Id.* at 36-37 (*quoting Chemical Mfrs. Ass'n v. Envt'l Protection Agency*, 870 F.2d 177, 200 (5th Cir. 1989)).

Finally, even if one could set aside the reliability problems inherent in the survey, the results, as presented, do not support a factual finding that facility costs are directly related to calling volume or inversely related to facility size.  PPI manually retyped the staff-time and minutes-of-use data from the NSA 2015 Survey, and found no correlation between facility size, staff-time allegedly spent on ICS, and ICS minutes of use.[44]  As shown in **Figure 1**, when comparing average per-capita minutes of use in a facility with total staff time allegedly spent on

**Figure 1. Comparison of reported staff time spent on ICS and average usage per person**



Using data from the NSA 2015 Survey, the vertical (*y*) axis shows the number of hours that facility staff time claim to spend on ICS-related tasks.  The horizontal (x) axis shows the average per-capita minutes of phone time at that same facility.  Facilities are grouped into four size categories, reflected by color.

---

[44] *See also* Fifth FNPRM ¶ 317, 86 Fed. Reg. at 40430 ("[T]he [NSA's] survey data for jails with fewer incarcerated people varied far too widely to comfortably estimate any values that would withstand scrutiny today).  PPI's reconstruction of the NSA 2015 Survey, along with an explanation of how we completed this project, is available at https://www.prisonpolicy.org/scans/phones/NSA-data-for-web.xlsx.

ICS-related tasks, there is no obvious overall trend, nor is there any significant trend by facility size.[45]

Because of the numerous problems inherent in the NSA 2015 Survey, the Commission should not rely on that data for purposes of estimating correctional facility costs. Moreover, because parties like the NSA bear the burden of proof when advocating for a rule,[46] the Commission should not allow any site-commission recovery in excess of the current 2¢ per minute (for facilities of any size), unless and until a representative number of facilities come forward with substantial verifiable evidence of their costs.

### B. Site Commissions Should Only be Allowed to the Extent that They Cover Facility Costs that are Reasonably and Directly Related to the Provision of Telecommunications Service

The record conclusively shows that payments to correctional facilities are a major component of ICS rates. PPI therefore supports any lawful action that the Commission can take to address exorbitant site commissions. While this could potentially include a prohibition on contractual payments,[47] such a bold move cannot realistically be implemented without substantial planning. As just one example: if the Commission prohibited contractual site commissions for interstate and international calling, one likely impact would be that site-commission agreements would simply focus on intrastate calls, thereby creating even greater incentives for regulatory arbitrage than exist currently. Dynamics like this deserve careful consideration before a categorical prohibition on contractual site commissions can be adopted.

Unless and until the Commission decides to directly prohibit or regulate contractual site commissions, it should ensure that site commission payments are not recovered from ratepayers unless such payments are used to cover costs that are legitimately related to the facility's cost of

---

[45] For facility size, we have used the same four categories that NSA used in presenting its survey. We label a facility with average daily population of 1-99 as small, 100-349 as medium, 350-999 as large, and over 1,000 as mega.

[46] 5 U.S.C. § 556(d) ("[T]he proponent of a rule or order has the burden of proof.").

[47] *See* Fifth FNPRM ¶ 314, 86 Fed. Reg. at 40430 ("[S]hould we simply consider prohibiting providers from entering into any contract requiring the payment of contractually prescribed site commissions for interstate and international calling services?").

providing telecommunications services.  PPI proposes that such a determination should be made under the following standard: expenses recovered through site commissions should only be regarded as "legitimate" ICS expenses if they are: (a) incurred by the correctional facility, (b) relate directly to the provision of telecommunication service, and (c) would not be incurred but for the facility's provision of ICS.  The contours and reasons for each of these three requirements are discussed in more detail below.

Incurred by facilities.  It is axiomatic that facilities can only recover expenses that they actually incur, but the NSA's reference to vague categories of expenses makes it necessary to clarify this elemental point.  As one example, many counties mention the cost of monitoring calls.  In the next paragraph and Table 3, we discuss whether ratepayers should pay for security services; but, even assuming for the sake of argument that such costs are properly recovered through site commission payments, many monitoring activities are not paid for by the correctional facility in the first place.  Securus Technologies' ("Securus") "guarded exchange" program provides call monitoring services in exchange for a non-commissionable fee that is "deducted from [the] call when engaged."[48]  Thus, in the facilities that use programs like this, ratepayers are already covering the cost of monitoring, and no additional recovery through site commission payments is appropriate.

Directly related to the provision of telecommunications service.  In its 2015 comments, and in more recent filings,[49] the NSA describes facility costs by rote recitation of various types of tasks that jail staff allegedly perform.  In response to the questions posed by the Commission in paragraph 312 of the Fifth FNPRM, we list the NSA's categories of tasks in **Table 3** and explain whether each category is directly related to the provision of telecommunications services.

---

[48] *See e.g.,* Contract between Securus and Plymouth County (MA) Sheriff's Dept., attch. C at 4 (Nov. 2018), available at https://www.prisonpolicy.org/scans/mass_contracts/plymouth_securus_nov_2018.pdf.
[49] Comments of the Nat'l Sheriffs' Ass'n, (Jan. 12, 2015) and Comments of the Nat'l Sheriff's Ass'n (Nov. 23, 2020).

**Table 3.  Categories of Alleged Facility ICS-Related Costs**

| Task Category | Directly Related? |
|---|---|
| Call monitoring<br>Responding to alerts<br>Call recording analysis and interacting with external investigators<br>Enrolling users in voice biometrics<br>Blocking/unblocking numbers | No.  These are all security costs that are only indirectly related to telecommunications.  Security functions are properly viewed as overhead in a correctional environment,[50]  and recovering such costs from ratepayers is inequitable and contrary to the policies set forth in 47 U.S.C. § 201(b). |
| System administration<br>Interacting with ICS company | Potentially.  The time that staff spend directly administering the ICS system and interacting with the carrier could be considered directly related.  However, carriers routinely advertise their systems by emphasizing how much staff-time is saved through technology.  Accordingly, it's unclear whether this is a significant time commitment for facilities. |
| Answering questions from end-users<br>Administering PIN system<br>Training incarcerated users on use of ICS system | No.  Issuing PINs to incarcerated customers and otherwise training them on the use of ICS systems is part of orienting new admittees to the facility—no different than assigning an inmate number or explaining the disciplinary process.[51]  This is not directly related to the provision of telecommunications.  As for inquiries from friends and family members, it is dubious that facilities provide any regular or substantial support to non-incarcerated customers, since ICS carriers advertise on the basis of taking over this function. |
| Providing escorts for phone repairs | Potentially, but it is far from clear that providing such an escort represents an actual marginal cost to the facility.  To the extent that the escort is a correctional officer who provides the escort as part of their regularly-scheduled shift, this is an expense that would be incurred even in the absence of ICS (see next section on but-for causation). |
| Administering prepaid cards or debit systems | Potentially.  Recovering billing costs is appropriate, but once again, ICS carriers (not correctional officers) handle many such billing functions.  Facility expenses related to incarcerated user accounts may be recoverable, but not to the extent the facility staff handle ICS prepaid systems as part of the normal inmate trust accounting (this would constitute general overhead that would still be incurred even in the absence of ICS). |

Not incurred but for the facility's provision of ICS.  Finally, facility costs should not be recovered via site commissions if the cost would not have been incurred but for the facility's provision of ICS.  This prong is necessary because it reinforces the need for a clear nexus between the telecommunications and the subject expense.  But it is also important to establish that this test is only one part of a larger framework.  NSA would have but-for causation as the *only* test and would apply it so indiscriminately that it would result in manifestly unfair treatment

---

[50] Comments of Worth Rises at 8-9 (Nov. 23, 2020)
[51] *See* Fifth FNPRM ¶ 319, 86 Fed. Reg. at 40431.

of ratepayers. For example, many correctional systems employ internal investigators. NSA argues that the time an investigator spends reviewing phone data should be recoverable, because he or she would not spend time on such a task but for the calls placed on the ICS system. This myopic approach ignores the reality that the investigator would be paid to investigate regardless of whether there is a phone system—just because the ICS system's monitoring feature provides additional investigative tools does not mean that family members should be forced to pay for this facility overhead.

PPI's proposal, discussed above, is flexible enough to apply to different types of data. The current record contains evidence that the Commission has used to calculate 2¢ per minute site-commission recovery.[52] By applying PPI's proposed framework, we are confident that the Commission can substantially reduce this figure below the current 2¢ level. To the extent that any parties wish to increase the allowed facility recovery from the current level, it is their burden to come forward with relevant and reliable evidence.

## V. Available Evidence Indicates Procurement Practices Favor the Dominant Carriers by Erecting Substantial Barriers to Entry into the ICS Market

The Commission poses several questions regarding ICS bidding markets and facility procurement practices.[53] To help the Commission enhance the current record, PPI has analyzed certain procurement trends based on public records. We present our findings here, along with a proposal to encourage greater competition in the ICS industry.

### A. Contract Durations are Long and Incumbent Carriers Frequently Evade Competitive Rebidding through Serial Contract Extensions

The Commission seeks information regarding lengths of ICS monopoly contracts with correctional facilities.[54] In response to this question, PPI examined 93 contract documents from counties in four states (complete details are available in **Appendix 3**). Our review reveals two important trends that indicate a lack of competition in the bidding market. First, incumbent

---

[52] *But see* Third R&O ¶ 136 ("[The Commission's] updated analysis supports a facility-related rate component of less than the $0.02 allowance we originally calculated.").
[53] Fifth FNPRM ¶¶ 350-358, 86 Fed. Reg. at 40437-38.
[54] *Id.* ¶ 353, 86 Fed. Reg. at 40437.

carriers and facilities utilize various methods to extend contracts and avoid competitive rebidding.  Appendix 3 shows 66 contracts that have been either expressly amended to extend the term (Table 1) or have been extended through option periods, automatic renewal, or informal mutual agreement of the parties (Table 2).  These contracts had an average original average term of 50 months, but through these various methods the contract terms have more than doubled, to an average of 119 months.

Second, *initial* contract terms are also growing longer.  The average initial term for the 66 extended contracts noted above (originally issued between 1999 and 2019) is 50 months.  But the contracts we reviewed that are still in their initial terms (contracts originating from 2013 through 2020) have an average term of 63 months.

These trends are not just about the avoidance of bidding competition, but they also constitute a barrier to entry into the ICS market.  Contract extensions reduce bidding opportunities, which has both direct and indirect impacts on market competition.  Directly, fewer bidding opportunities means fewer chances for competitive carriers to enter the market.  In addition, many facilities impose minimum-experience requirements when evaluating bids—thus, contract extensions constitute an indirect barrier because competitive carriers cannot gain the experience necessary to pass the screening requirements for many open bids.

### B.      The Prevalence of Bundled Contracts is a Critical Fact that the Commission Must Address

PPI previously shared the most comprehensive analysis of ICS contract bundling that we have been able to compile from public sources.[55]  We encourage the Commission to use its further mandatory data collections to collect a comprehensive picture of the prevalence of bundled contracts, and to quantify *all* revenue and expenses associated with any contract that bundles regulated and unregulated services.

---

[55] Prison Policy Initiative *Ex parte* submission re: bundled service contracts (Mar. 23, 2021).

**C.    The Commission Should Treat Securus and GTL as Dominant Carriers and Structure Permanent Rate Caps to Encourage Competition**

The Commission has noted several times that Securus and GTL collectively dominate the ICS market.[56]  We are confident that an analysis of the bidding market will deliver similar results.  The Commission asks whether it should classify Securus and GTL as dominant carriers, and if so, "what type of regulatory regime would promote regulatory certainty and permit us to ensure that inmate calling service rates and charges are just and reasonable."[57]  Separately, the Commission asks whether it should set permanent rate caps based on industry-wide average cost data or facility-level data.[58]  PPI proposes that these two issues should be decided in tandem.

We suggest that, as part of this rulemaking, the Commission formulate a definition of a dominant carrier.[59]  The Commission should then use the forthcoming mandatory data collection to examine costs on both an industry-wide and facility-level basis.  Given the dominant carriers' economies of scale and ability to cover marginal locations, they should be subject to one uniform (i.e., non-tiered) set of price caps based on industry-wide average costs.  However, if the review of facility-level expenses reveals an inverse correlation between facility size and carrier costs, then the Commission could calculate a separate (tiered) set of rate caps, based on facility-level data, and apply those caps to competitive carriers.  This second set of rate caps would promote competition and ensure that multiple carriers remain available to serve smaller (allegedly higher-cost) correctional facilities.

---

[56] *E.g.*, Second R&O ¶ 76, 30 FCC Rcd. at 12801 (Noting that GTL, Securus, and Telmate represent 85% of industry revenue in 2013.  GTL subsequently acquired Telmate (*see* Fifth FNPRM ¶ 74, n.220)).

[57] Fifth FNPRM ¶ 358, 86 Fed. Reg. at 40438.

[58] Fifth FNPRM ¶ 303, 86 Fed. Reg. at 40427.

[59] The Commission should use its economic expertise to determine the specific parameters of the definition based on market share and/or bidding market patterns, but for purposes of this discussion, we informally propose a 35% market share, measured by revenue, as a reasonable threshold for defining a dominant carrier.

**VI.    The Commission Should Carefully Structure its Actions, Including the Upcoming Mandatory Data Collection, to Provide Information Relevant to Other Miscellaneous Issues Raised in the FNPRM**

The Fifth FNPRM raises several questions that do not fit within the major themes that have dominated this proceeding in recent years.  PPI agrees that many of these miscellaneous topics are important.  We encourage the Commission to collect and disseminate as much relevant data as possible, with the goal of informing future policies.  Four specific issues are discussed below.

**A.    A Regular, Recurring Data Collection Would be Beneficial**

As illustrated by the labyrinthine path that this proceeding has taken, the ICS market is in a constant state of flux, with new technologies and business practices regularly appearing.  To be able to quickly respond to future developments, the Commission should seek to maintain an "evergreen" record through the use of regular recurring mandatory data collections.[60]  Such recurring collections could provide ongoing cost data, while being shorter and more focused than the pending Third Mandatory Data Collection (but more probing and adaptable than the annual reports currently filed by carriers).  In addition, the Commission could use such periodic collections to calculate facility-level data for the purpose of revising the competitive-carrier price caps that we propose above (see page 21).

**B.    Carriers Must Provide Substantial Information before the Commission Can Even Begin to Evaluate Alternative Pricing Models**

The Commission seeks comment regarding the potential of "alternative rate structures, such as one under which an incarcerated person would have a specified—or unlimited—number of monthly minutes for use for a predetermined monthly charge."[61]  This issue has also been raise in a petition for waiver filed by Securus.[62]  These proposed alternative structures are vastly premature as a matter of both law and fact.

---

[60] *See* Fifth FNPRM ¶ 342, 86 Fed. Reg. at 40435 (seeking comment on "conduct[ing] cost data collections on a more routine, periodic basis").
[61] Fifth FNPRM ¶ 305, 86 Fed. Reg. at 40428.
[62] Securus, Petition for Waiver of the Per Minute Rate Requirement to Enable Provision of Subscription Based Calling Services (Aug. 30, 2021).

Factually, the record contains absolutely no information about how such structures work, and how they impact the reasonableness of rates.  As a bare threshold, any carrier advocating for such a rate structure must provide detailed information about the price, information given to consumers, and the terms and conditions imposed on subscribers (details that are conspicuously absent from Securus's petition).

After having reviewed the basic terms of the carriers' proposals, the Commission must then obtain reliable evidence about the "real world" experience of consumers: how are initial disclosures conveyed to customers (especially incarcerated people who lack internet access), what monthly price *and usage* information do customers get (are they provided with adequate information to determine whether their effective per-minute rate under the subscription plan is lower than what they would pay under standard rates?), and how is a customer able to terminate their subscription (does a customer need to call?  if so, what are the hold times?  if an incarcerated customer is prohibited from using the phone due to segregation, lockdown, work assignment, or medical emergency, can they designate a family member cancel on their behalf?).

Finally, the Commission must review evidence (either projected or actual evidence from similar intrastate calling plans) about the carriers' profits from such plans.  Amorphous references to "better cost management and investment decisions"[63] are not adequate.  Do carriers advocate for these plans because of administrative simplicity, or is it simply a way to ensure a stream of revenue from a (potentially shifting, but statistically predictable) portion of customers who pay monthly subscription fees but make few or no calls in certain months because of life events?

These facts are legally relevant for two reasons.  Under 47 U.S.C. § 201(b), charges *and practices* must be just and reasonable.  If carriers use vague or misleading information to lure customers into paying effective per-minute rates under a subscription plan that are higher than (or even equal to) standard rates, then neither the rate nor the practice can be just and reasonable.

---

[63] *Id.* at 3, n.3.

Additionally, under 47 U.S.C. § 276(b)(1)(A), the Commission is responsible for ensuring that payphone service providers are "fairly compensated" for payphone calls (ICS calling is statutorily deemed to be payphone calling under § 276(d)). But consumers paying fixed fees for periods in which they do not make calls is not fair, it is excessive. As the Commission has held, "Section 276 requires us to ensure that per-call compensation is fair, which implies fairness to both sides."[64]

In sum, the Commission has spent years crafting a regulatory framework that addresses numerous problematic practices of the ICS industry. Allowing carriers to toss aside that framework based on a wink and a "trust us" would be folly. If carriers are serious about pushing a subscription-based model, they must provide detailed, accurate, and verifiable information demonstrating that such models are fair to consumers.

### C.    The Commission Should Ensure that Non-Filing Companies Are Required to Become Compliant and Participate in the Mandatory Data Collection

The success of the Commission's oversight of the ICS industry hinges to a significant degree on data collected through the annual-reporting requirement imposed under 47 C.F.R. § 64.6060. Administrative consistency demands that the annual-reporting rule be applied to all ICS carriers, even fringe competitors. Yet, PPI has identified nine carriers who have failed to consistently file annual reports during the three most recent full calendar years. These carriers are reported in **Table 4**. It is also worth noting that PPI does not claim to have comprehensive knowledge of ever ICS carrier operating in the U.S., thus there could be other non-reporting companies in addition to these.

\\\

\\\

\\\

\\\

---

[64] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Dkt. No. 96-128, Fifth Order on Reconsideration and Order on Remand ¶ 82, 17 FCC Rcd. 21274, 21302 (Oct. 23, 2002).

**Table 4. Non-Filing ICS Carriers**

| Company | Reports filed (2018-20) |
|---|---|
| ATN, Inc./Amtel | 2018 only |
| CenturyLink Public Comm'cns | 2018-19 |
| City Tele Coin Co. Inc. | none |
| Encartele, Inc. | none |
| Infinity Networks | none |
| JCW Electronics | none |
| Lattice, Inc. | none |
| Smart Communications | 2020 only |
| Turnkey Corrections (dba TKC Telecom) | none |

Note

Prison Policy Initiative staff used the FCC's ECFS system to search for each carrier's annual reports (Form 2301(a)) in 2018, 2019, and 2020. We have conducted independent research of public sources to determine that the companies listed here do provide ICS services.  We also excluded two companies (Protocall, LLC and Preferred Communications of Texas, LLC), which were both acquired by larger ICS carriers.

The Commission has previously noted that it can take action, including imposition of monetary forfeitures, against carriers that do not comply with applicable rules.[65]  Because of the paramount importance of accurate information, the Commission should follow through on its previous statements and take enforcement action against non-compliant companies.

### D. Greater Access to Contract Information Can Only Help

The Commission asks whether "requiring [ICS] contracts to be made publicly available [would] make bidding more competitive."[66]  PPI supports a public disclosure-requirement, and notes that it is not just bidders that have an interest in obtaining such information.  Public interest advocates and the ICS customers they represent have a strong need to understand the entire economic and legal structure of the ICS system writ large and its constituent contractual agreements.  PPI has done substantial research on the ICS industry, and facility contracts are a key piece of this research; yet, we incur substantial time simply requesting and obtaining these

---

[65] Enforcement Bureau Advisory, DA 20-1364, at 1, n.5, 35 FCC Rcd. (citing 47 U.S.C. § 503(b)(2) & 47 C.F.R. § 1.80(b)(2)) (Nov. 20, 2020).
[66] Fifth FNPRM ¶ 357, 86 Fed. Reg. at 40438.

public documents on a one-by-one basis.  A comprehensive system of proactive disclosure would be beneficial to consumers and competitive carriers.

## VII.    Conclusion

PPI appreciates the major strides that the Commission has taken over the years to reform the ICS industry, and we thank the Commission for conducting another rulemaking and data collection.  As explained above, PPI believes that the next phase in the fight against unfair ICS practices includes addressing particular concerns of jail customers, curtailing unfair ancillary fee practices, and reducing the economic burdens caused by site-commission payments and USF assessments.  Armed with the record that has already been compiled, plus the results of the upcoming data collection, we are confident that the Commission can address these problems and take steps to promote a competitive marketplace.  As in the past, millions of ICS users await prompt and decisive action, and PPI encourages the Commission to take every lawful action to provide economic relief to consumers.

Respectfully submitted,

PRISON POLICY INTIATIVE, INC

*/s/ Stephen Raher*
Peter Wagner, Executive Director
Stephen Raher, General Counsel
Andrea Fenster, Staff Attorney
P.O. Box 127
Northampton, MA 01060
(413) 527-0845

September 27, 2021

# APPENDIX 1

Comments of Prison Policy Initiative, Inc.
on Fifth Further Notice of Proposed Rulemaking

*Large Jail Phone Rates*

*Interstate rates at jurisdictions
with average daily jail populations over 1,000
(as of June 2021)*



# Interstate Phone Rates at Jurisdictions with Jail ADP over 1,000

| | | | | Intrastate Rate Difference? |
|---|---|---|---|---|
| **Jurisdiction/Facility** | **Avg. Daily Pop** | **Carrier** | **Interstate Rate ($/min)** | |
| Maricopa County (AZ) Jail Sys. | 8,099 | GTL | 0.20 | |
| Pima County (AZ) Adult Det. Cplx. | 2,018 | GTL | 0.20 | |
| Pinal Co. (AZ) Jail | 1,121 | Securus | 0.18 | |
| Fresno County (CA) Jail | 3,017 | GTL | 0.18 | |
| Kern County (CA) Lerdo Pre-Trial Facility | 1,209 | Securus | 0.21 | Higher (10¢) |
| Los Angeles County (CA) - multiple facilities | 17,533 | GTL | 0.21 | |
| Monterey County (CA) Jail | 1,100 | Telmate | 0.21 | |
| Orange County (CA) - multiple facilities | 4,510 | GTL | 0.21 | Higher (2¢) |
| Riverside County (CA) - multiple facilities | 2,582 | Securus | 0.20 | Lower (-6¢) |
| Sacramento County (CA) - multiple facilities | 4,132 | ICSolutions | 0.21 | |
| San Diego County (CA) Det. Fac. | 1,739 | Securus | 0.21 | Higher (12¢) |
| San Joaquin County (CA) Jail | 1,350 | Securus | 0.21 | |
| Adams County (CO) Det. Fac. | 1,046 | ICSolutions | 0.21 | |
| Arapahoe County (CO) Sheriff's Office | 1,076 | Securus | 0.21 | Higher[†] |
| El Paso County (CO) Criminal Justice Ctr | 1,485 | GTL | 0.21 | Higher (23¢) |
| Jefferson County (CO) Jail | 1,141 | Securus | 0.21 | |
| Broward County (FL) Jails | 4,610 | Securus | 0.21 | Lower (-9¢) |
| Metro West Det. Ctr. (FL) | 2,109 | GTL | 0.21 | Lower (-7¢) |
| Pre-Trial Det. Ctr. (FL) | 1,260 | GTL | 0.21 | Lower (-7¢) |
| Lee County (FL) Core Facility | 1,038 | GTL | 0.21 | Higher (1¢) |
| Marion County (FL) Jail | 1,479 | Securus | 0.21 | Higher (14¢) |
| Palm Beach County (FL) Main Det. Ctr. | 1,805 | Securus | 0.21 | Higher (6¢) |
| Pasco County (FL) Det. Fac. | 1,486 | ICSolutions | 0.21 | |
| Pinellas County (FL) Jail | 2,864 | GTL | 0.21 | Higher (3¢) |
| South County (FL) Jail | 1,634 | Securus | 0.21 | Higher (15¢) |
| St. Lucie County (FL) Main Jail | 1,213 | GTL | 0.21 | Higher (9¢) |
| Chatham County (GA) Adult Det. Ctr. | 1,524 | Paytel | 0.21 | Lower (-2¢) |
| Clayton County (GA) Jail | 1,283 | Securus | 0.21 | Lower (-3¢) |
| Dekalb County (GA) Jail | 2,380 | Securus | 0.21 | Lower (-3¢) |
| Gwinnett County (GA) Jail | 2,180 | Securus | 0.19 | Lower (-6¢) |
| Muscogee County (GA) Jail | 1,132 | CPC | 0.18 | |
| Jenkins Corr. Ctr. (GA) | 1,136 | Legacy | 0.21 | Lower (-2¢) |
| Cook County (IL) Jail | 10,565 | Legacy | 0.06 | |
| Marion County (IN) - multiple facilities | 2,041 | GTL | 0.28 | |
| Sedgwick County (KS) Jail and Work Release | 1,199 | Securus | 0.21 | Lower[†] |
| Louisville/Jefferson (KY) Jail Complex | 1,816 | Securus | 0.21 | Higher[†] |
| Ouachita Parish (LA) Corr. Ctr. | 1,050 | GTL | 0.18 | |
| East Baton Rouge Prison (LA) | 1,650 | ICSolutions | 0.21 | Lower (-6¢) |
| Orleans Parish (LA) Prison | 2,468 | Securus | 0.21 | Higher (4¢) |
| Bristol County (MA) - multiple facilities | 1,333 | Securus | 0.21 | |
| Essex County (MA) CF | 1,213 | Securus | 0.18 | |
| South Bay House of Correction (MA) | 1,140 | Securus | 0.18 | |
| Kent County (MI) C.F. & Comm. Reentry Ctr. | 1,119 | ICSolutions | 0.21 | |
| Oakland County (MI) Law Enf. Cplx | 1,177 | ICSolutions | 0.21 | |
| Andrew C. Baird Det. Fac. (MI) | 2,258 | GTL | 0.21 | Higher (41¢) |

† Indicates facility where intrastate rates include different first minute rate

Appendix A
Page 1 of 3

| | | | | |
|---|---|---|---|---|
| Douglas Dept. of Corr. (NE) | 1,203 | GTL | 0.21 | Lower (-8¢) |
| Clark County (NV) Det. Ctr. | 3,832 | Securus | 0.21 | |
| Nassau County (NY) Corr. Ctr. | 1,254 | GTL | 0.21 | Higher[†] |
| Cuyahoga County (OH) Corr. Ctr. | 1,897 | Securus | 0.21 | |
| Hamilton County (OH) Justice Ctr | 1,252 | Securus | 0.21 | |
| Berks County (PA) Prison | 1,163 | GTL | 0.21 | Lower (-7¢) |
| Dauphin County (PA) Prison | 1,226 | GTL | 0.21 | Higher (1¢) |
| Lancaster County (PA) Prison | 1,023 | Securus | 0.21 | |
| Lehigh County (PA) Prison | 1,045 | GTL | 0.21 | Higher (3¢) |
| Montgomery County (PA) C.F. | 1,940 | GTL | 0.19 | |
| Philadelphia Prison System Facilities (PA) | 8,930 | GTL | 0.17 | |
| George W. Hill C.F. (PA) | 1,986 | GTL | 0.17 | |
| Greenville County (SC) Det. Ctr. | 1,252 | Securus | 0.21 | |
| Alvin S. Glenn Det. Ctr. (SC) | 1,028 | Legacy | 0.21 | |
| Metro-Davidson County (TN) Det. Fac. | 1,131 | Securus | 0.21 | Lower (-16¢) |
| Bexar County (TX) Adult Det. Ctr. | 3,750 | ICSolutions | 0.21 | |
| Cameron County (TX) Jails | 1,373 | Securus | 0.21 | Higher (4¢) |
| El Paso County (TX) Det. Fac. - Annex | 1,395 | GTL | 0.21 | Lower (-12¢) |
| Harris County (TX) - multiple facilities | 7,961 | Securus | 0.18 | |
| Lubbock Dentention Center (TX) | 1,228 | ICSolutions | 0.21 | |
| Montgomery County (TX) Jail | 1,140 | Securus | 0.21 | Higher (32¢) |
| Tarrant County (TX) - multiple facilities | 2,755 | Securus | 0.21 | Higher[†] |
| Salt Lake County (UT) Jail | 2,036 | GTL | 0.19 | Lower (-9¢) |
| Chesapeake City Jail (VA) | 1,144 | ICSolutions | 0.21 | |
| Norfolk City Jail (VA) | 1,423 | GTL | 0.21 | |
| Richmond City Jail (VA) | 1,267 | GTL | 0.90 | Lower (-81¢) |
| Snohomish County (WA) Sheriff's Office | 1,170 | GTL | 0.20 | |
| Milwaukee House of Correction (WI) | 1,658 | ICSolutions | 0.21 | |

### Interstate Rates at or under 16¢ / min

| Jurisdiction/Facility | Avg. Daily Pop | Carrier | Interstate Rate ($/min) | Intrastate Rate Difference? |
|---|---|---|---|---|
| Jefferson County (AL) Birmingham Jail | 1,177 | Telmate | 0.14 | |
| Santa Clara County (CA) - multiple facilities | 3,963 | GTL | 0.08 | |
| Santa Barbara County (CA) Jails | 1,249 | GTL | 0.16 | |
| Denver Downtown Det. Ctr. (CO) | 1,434 | Securus | 0.09 | |
| Department of Corrections (Wash. DC) | 2,288 | GTL | 0.08 | |
| Escambia County (FL) Main Jail | 1,375 | GTL | 0.15 | |
| Hillsborough County (FL) Jail | 2,090 | GTL | 0.10 | |
| Orange County (FL) Corr. Dept. | 2,923 | GTL | 0.15 | |
| Cobb County (GA) Sheriffs Office | 1,632 | GTL | 0.12 | |
| Lexington-Fayette County (KY) Jail | 1,252 | Securus | 0.14 | |
| Baltimore County (MD) Det. Ctr. | 1,184 | ICSolutions | 0.16 | Lower (-6¢) |
| Prince Georges County (MD) Corr. Ctr. | 1,273 | GTL | 0.10 | Higher (6¢) |
| Plymouth County House of Corrections (MA) | 1,236 | Securus | 0.14 | |
| St. Louis Co. (MO) Dept. of Justice Services | 1,331 | Securus | 0.05 | |
| Washoe County (NV) Det. Ctr. | 1,080 | NCIC | 0.14 | |
| Camden County (NJ) C.F. | 1,497 | GTL | 0.05 | |
| Essex County (NJ) C.F. | 3,391 | GTL | 0.05 | |
| Hudson County (NJ) C.F. | 1,806 | GTL | 0.05 | |
| Passaic County (NJ) Jail | 1,039 | GTL | 0.05 | |

† Indicates facility where intrastate rates include different first minute rate

| | | | | |
|---|---|---|---|---|
| Monroe County (NY) Jail | 1,369 | Securus | 0.10 | |
| Westchester Dept. of Corr. (NY) | 1,332 | Securus | 0.00 | |
| Mecklenburg County (NC) Jail North | 1,909 | GTL | 0.09 | Lower (-4.47¢) |
| Franklin County (OH) Corr. Ctr. | 1,771 | GTL | 0.04 | |
| York County (PA) Prison | 2,387 | GTL | 0.16 | |
| Shelby Couty (TN) - multiple facilities | 4,684 | GTL | 0.10 | |
| Dallas County (TX) - multiple facilities | 5,700 | Securus | 0.07 | |
| Denton County (TX) Jail | 1,147 | Securus | 0.11 | |
| Hidalgo County (TX) Adult Det. Ctr. | 1,097 | Securus | 0.02 | Higher (23¢) |
| Travis County (TX) Corr. Complex | 2,345 | Securus | 0.02 | |
| Riverside Regional Jail (VA) | 1,408 | GTL | 0.11 | |
| Virginia Beach Municipal Corr. Ctr. (VA) | 1,284 | GTL | 0.11 | |
| King County (WA) C.F. | 1,910 | Securus | 0.13 | |

Methodology: Phone rates were collected by Prison Policy Initiative staff in June 2021 using service provider and jail websites.  Not included in this list are fifteen counties with large jails for which staff could not find published phone rates, as well as four large jails operated by New York City, which does no longer charge incarcerated people for phone calls.  Facilty identification and average daily population comes from the Bureau of Justice Statistics Census of Jails 2013, available at https://bjs.ojp.gov/library/publications/census-jails-population-changes-1999-2013.

† Indicates facility where intrastate rates include different first minute rate

# APPENDIX 2

Comments of Prison Policy Initiative, Inc.
on Fifth Further Notice of Proposed Rulemaking

*Prison System Phone Rates*
*as of 2021*



**PRISON**
POLICY INITIATIVE

**Cost of a calling from state prison systems**
As of June 2021

| State | Interstate Rate ($/min) | Carrier | % rate change from 2018 interstate rate | Different intrastate rate?[1] |
|---|---|---|---|---|
| Alaska | 0.21 | Securus | | |
| Alabama | 0.05 | Securus | -80.9% | |
| Arkansas | 0.21 | Securus | | Yes ($0.25) |
| Arizona | 0.10 | CenturyLink/ICSoln | -62.2% | |
| California | 0.03 | GTL | -87.9% | |
| Colorado | 0.08 | GTL | -33.3% | |
| Connecticut | 0.21 | Securus | | Yes ($0.24) |
| Delaware | 0.04 | GTL | | |
| Florida | 0.14 | GTL | -3.3% | |
| Georgia[2] | 0.21 | Securus | | Yes ($0.16) |
| Hawaii | 0.20 | GTL | | Yes ($0.13) |
| Iowa | 0.11 | Iowa DOC[3] | | |
| Idaho | 0.08 | ICSolutions | -27.3% | |
| Illinois | 0.01 | Securus | -3.6% | |
| Indiana | 0.21 | GTL | | Yes ($0.24) |
| Kansas | 0.18 | ICSolutions | | |
| Kentucky | 0.21 | Securus | | |
| Louisiana | 0.21 | Securus | | |
| Massachusetts | 0.13 | Securus | 20.4% | Yes ($0.12) |
| Maryland | 0.03 | GTL | -7.7% | |
| Maine[5] | 0.09 | Maine DOC[4] | | |
| Michigan | 0.16 | GTL | -23.8% | |
| Minnesota | 0.05 | GTL | | |
| Missouri | 0.05 | Securus | | |
| Mississippi | 0.04 | GTL | | |
| Montana | 0.10 | ICSolutions | -30.2% | |
| North Carolina | 0.10 | GTL | | |
| North Dakota | 0.08 | Securus | -0.4% | |
| Nebraska | 0.06 | GTL | | |
| New Hampshire | 0.01 | GTL | | |
| New Jersey | 0.04 | GTL | | |
| New Mexico | 0.08 | Securus | | |
| Nevada | 0.11 | Securus | | |
| New York | 0.04 | Securus | | |
| Ohio | 0.05 | GTL | | |
| Oklahoma | 0.20 | Securus | -1.0% | |
| Oregon | 0.09 | ICSolutions | -35.7% | |
| Pennsylvania | 0.06 | Securus | | |
| Rhode Island | 0.06 | Securus | 25.4% | |
| South Carolina | 0.06 | GTL | -38.5% | |
| South Dakota | 0.06 | GTL | -25.0% | |
| Tennessee[5] | 0.21 | GTL | | Yes ($0.16) |
| Texas | 0.06 | Securus | | |
| Utah | 0.19 | GTL | | Yes ($0.10) |
| Virginia | 0.04 | GTL | | |
| Vermont | 0.07 | GTL | | Yes ($0.04) |

**JA252**

| State | Interstate Rate ($/min) | Carrier | % rate change from 2018 interstate rate | Different intrastate rate?[1] |
|---|---|---|---|---|
| Washington | 0.11 | GTL | | |
| Wisconsin | 0.06 | ICSolutions | -66.7% | |
| West Virginia | 0.03 | ICSolutions | | |
| Wyoming | 0.11 | ICSolutions | | |

Notes

1. Where intrastate rates differ, the per-minute cost for an intrastate call is shown in parentheses

2. Calls can be as low as 13¢ per minute, depending on end point locations.

3. The Iowa Department of Corrections has its own system for calling. However, it buys bandwith wholesale from ICSolutions. More information can be found at https://www.prisonpolicy.org/blog/2017/08/28/merger/.

4. The Maine Department of Corrections has its own system for calling. As of August 2017, it bought bandwith wholesale from Legacy. However, the Maine DOC is now listed on GTL's website. More information can be found at https://www.prisonpolicy.org/blog/2017/08/28/merger/.

5. Calls can be as low as 7¢ per minute, depending on end point locations.


Methodology

Prison Policy Initiative staff manually looked up prepaid rates on providers' and state corrections departments' websites for both intrastate and interstate calls in June 2021. For intrastate calls, we got a rate quote for a phone call to each state's governor's office, and for out-of-state calls we used an out-of-state number.  Rates from 2018 are published as Appendix 4 to Prison Policy Initiative's State of Phone Justice report, available at https://www.prisonpolicy.org/phones/appendix_table_4.html

# APPENDIX 3

Comments of Prison Policy Initiative, Inc.
on Fifth Further Notice of Proposed Rulemaking

*Analysis of ICS Contract Durations*



Methodology

Prison Policy Initiative conducted this analysis of ICS contract terms using contract documents obtained from county jails through open records requests. Requests were sent to counties in four states (California, Massachusetts, New York, and Wisconsin). One hundred counties responded, although seven were omitted from this analysis because they did not provide complete contract documents.

Of the 93 counties included, 7 are in California, 13 are in Massachusetts, 49 are in New York, and 24 are in Wisconsin.

The results are presented in three separate tables:

Table 1 consists of contracts that have been amended to extend the original term.

Table 2 consists of contracts that have passed their original term, but the incumbent carrier is still providing service to the relevant facility.[*] In these situations, the contract has been extended either by the exercise of an option period, auto-renewal provisions, or by the parties' mutual, informal agreement to continue the contractual relationship. The nature of the renewal or extension is noted in the table.

Table 3 contains contracts for which the initial term has not yet passed.

Definitions

Except as noted otherwise, in all three tables, "contract date" is defined as the date of the last signature on the original contract, and the "length of initial contract" is based on the contract's description of its initial term.

---

[*] This analysis was conducted over several months in 2021. For a handful of contracts that expired in mid-2021, it is possible that some facilities either further extended the contract or issued a contract to a new carrier soon after we obtained and reviewed the documents.

**Table 1. Contracts extended by amendment**

| County (State) | Carrier | Contract date | Length of initial contract (months) | Length of Contract, as amended |
|---|---|---|---|---|
| Glenn (CA) | PCS/GTL | 9/30/2007 | 24 | 180 |
| Imperial (CA) | Telmate/GTL | 6/1/2015 | 35 | 71 |
| Calaveras (CA) | GTL | 12/29/2015 | 60 | 120 |
| Suffolk (MA) | Securus | 8/1/2019 | 43 | 103 |
| Tompkins (NY) | GTL | 6/15/1999 | 60 | 288 |
| Broome (NY) | GTL | 1/26/2009 | 12 | 156 |
| Steuben (NY) | GTL | 2/20/2009 | 60 | 144 |
| Tioga (NY) | GTL | 5/19/2009 | 60 | 192 |
| Clinton (NY) | GTL | 10/5/2009 | 60 | 168 |
| Washington (NY) | GTL | 4/12/2010 | Unknown[†] | 167 |
| Niagara (NY) | GTL | 4/12/2012 | 60 | 110 |
| Erie (NY) | ICSolutions | 7/2/2012 | 60 | 122 |
| Chemung (NY) | GTL | 12/9/2013 | 48 | 100 |
| Cattaraugus (NY) | GTL | 5/21/2014 | 59 | 95 |
| Seneca (NY) | GTL | 8/9/2014 | 60 | 108 |
| Fulton (NY) | GTL | 10/1/2014 | 60 | 108 |
| Oswego (NY) | GTL | 10/22/2014 | 60 | 87 |
| Madison (NY) | GTL | 11/18/2014 | 60 | 83 |
| St. Lawrence (NY) | GTL | 2/20/2015 | 60 | 108 |
| Yates (NY) | GTL | 3/16/2015 | Unknown[†] | 72 |
| Schuyler (NY) | GTL | 3/23/2015 | 60 | 119 |
| Suffolk (NY) | Securus | 5/1/2015 | 47 | 71 |
| Wyoming (NY) | GTL | 6/11/2015 | 60 | 108 |
| Delaware (NY) | GTL | 10/13/2015 | Unknown[†] | 96 |
| Lewis (NY) | GTL | Not provided | Unknown* | Unknown (most recent amendment extends term by 36 months) |
| Jefferson (WI) | Securus | 5/9/2007 | 60 | 191 |
| Polk (WI) | Securus | 12/7/2007 | 36 | 191 |
| Sheboygan (WI) | Securus | 1/11/2008 | 48 | 168 |
| Columbia (WI) | Securus | 12/14/2009 | 36 | 167 |
| Green (WI) | Securus | 12/16/2009 | 36 | 155 |
| Kenosha (WI) | GTL | 12/1/2010 | 60 | 156 |
| Price (WI) | Securus | 8/19/2011 | 60 | 131 |
| La Crosse (WI) | Securus | 12/31/2011 | 37 | 113 |
| Eau Claire (WI) | Securus | 1/3/2012 | 25 | 151 |
| Marathon (WI) | Securus | 3/25/2013 | 60 | 102 |
| Chippewa (WI) | Securus | 4/25/2013 | 50 | 98 |
| Monroe (WI) | Securus | 12/17/2015 | 36 | 97 |
| Milwaukee (WI) | CenturyLink/ICS | 1/21/2016 | 24 | 59 |
| Adams (WI) | Securus | Not provided | Unknown* | Unknown (most recent amendment extends term by 48 months + three 12-month option periods) |
| Manitowoc (WI) | Securus | Not provided | Unknown* | Unknown (most recent amendment extends term by 36 months + two 12-month option periods) |
| Waupaca (WI) | Securus | Not provided | Unknown* | Unknown (most recent amendment extends term by 60 months) |
| **Averages** | | | **49** | **129** |

Notes
* County only provided the most recent amendment; term of that amendment has not passed.
† County did not provide original contract, but the date of the original contract is referenced in the most recent amendment.

**JA256**

**Table 2.  Contracts extended through options, renewals, or mutual consent**

| County (State) | Carrier | Contract date | Length of initial contract (months) | Nature of Renewal/Extension | Length of contract, through most recent extension |
|---|---|---|---|---|---|
| Monterey (CA) | Telmate/GTL | 12/14/2016 | 35 | Renewal option (1 yr) | 59 |
| Shasta (CA) | GTL | 7/17/2018 | 36 | Automatic renewal (two 1-yr terms) | 48 |
| Dukes (MA) | Securus | 6/11/2012 | 60 | Automatic renewal (one 60-month term) | 120 |
| Wayne (NY) | GTL | 9/11/2006 | 60 | Original option terms have expired; contract appears to have been extended through mutual consent.[†] | 180 |
| Greene (NY) | GTL | 6/8/2009 | 60 | Automatic renewal (unlimited 1-year terms) | 156 |
| Oneida (NY) | GTL | 6/15/2009 | 36 | Automatic renewal (unlimited 1-year terms) | 156 |
| Nassau (NY) | GTL | 1/14/2010 | 36 | Original option terms have expired; contract appears to have been extended through mutual consent.[†] | 140 |
| Warren (NY) | GTL | 2/2/2010 | Unknown | Automatic renewal (unlimited 1-year terms) | 144 |
| Rensselaer (NY) | GTL | 3/4/2010 | 36 | Original option terms have expired; contract appears to have been extended through mutual consent.[†] | 138 |
| Orange (NY) | GTL | 2/2/2011 | 60 | Original option terms have expired; contract appears to have been extended through mutual consent.[†] | 127 |
| Sullivan (NY) | GTL | 5/27/2011 | 60 | Automatic renewal (unlimited 1-year terms) | 132 |
| Otsego (NY) | GTL | 12/20/2011 | 60 | Automatic renewal (unlimited 1-year terms) | 120 |
| Montgomery (NY) | GTL | 4/13/2012 | 60 | Automatic renewal (unlimited 1-year terms) | 120 |
| Jefferson (NY) | GTL | 10/10/2012 | 60 | Automatic renewal (unlimited 1-year terms) | 108 |
| Herkimer (NY) | GTL | 10/24/2014 | 60 | Automatic renewal (unlimited 1-year terms) | 96 |
| Schenectady (NY) | GTL | 8/14/2015 | 60 | Automatic renewal (unlimited 1-year terms) | 84 |
| Dutchess (NY) | GTL | 9/29/2015 | 60 | Automatic renewal (unlimited 1-year terms) | 60 |
| Columbia (NY) | GTL | 12/29/2017 | 36 | Automatic renewal (unlimited 1-year terms) | 48 |
| Westchester (NY) | GTL | 11/9/2018 | 32 | Renewal option (2 yr) | 56 |
| Cortland (NY) | GTL | 2/2015 | 60 | Automatic renewal (unlimited 1-year terms) | 75 |
| Allegany (NY) | GTL | 2009 | 60 | Original contract not provided, but county states that initial contract began in 2009, and was a 5-year contract that expired in 2014 and has been renewed every year. Contract length listed here is approximate | 144 |
| Juneau (WI) | Securus | 2/7/2013 | 60 | Automatic renewal (unlimited 1-year terms) | 108 |
| Vernon (WI) | Securus | 5/27/2016 | 60 | No specification of renewal terms; contract appears to have been extended through mutual consent.[†] | 63 |
| Wood (WI) | Securus | 6/6/2016 | 60 | No specification of renewal terms; contract appears to have been extended through mutual consent.[†] | 63 |
| Barron (WI) | Securus | 4/27/2018 | 36 | Automatic renewal (two 1-yr terms) | 48 |
| **Averages** | | | **52** | | **104** |

Notes
† Extended contract duration calculated as original contract date through September 2021.

**Table 3. Contracts still in intial term**

| County (State) | Carrier | Contract date | Length of initial contract (months) |
|---|---|---|---:|
| Ventura (CA) | Securus | 3/13/2018 | 60 |
| Santa Barbara (CA) | Telmate/GTL | 8/16/2018 | 36 |
| Hampden (MA) | ICSolutions | 10/1/2018 | 35 |
| Plymouth (MA) | Securus | 11/8/2018 | 60 |
| Essex (MA) | Securus | 9/2/2019 | 102 |
| Worcester (MA) | Securus | 10/2/2019 | 101 |
| Norfolk (MA) | Securus | 2/1/2020 | 37 |
| Franklin (MA) | Securus | 4/3/2020 | 94 |
| Barnstable (MA) | Securus | 5/14/2020 | 93 |
| Berkshire (MA) | Securus | 6/22/2020 | 92 |
| Middlesex (MA) | Securus | 7/21/2020 | 59 |
| Bristol (MA) | Securus | 8/6/2020 | 90 |
| Hampshire (MA) | ICSolutions | 11/13/2020 | 36 |
| Chautauqua (NY) | GTL | 5/31/2013 | 120 |
| Livingston (NY) | GTL | 10/8/2018 | 60 |
| Ontario (NY) | Securus | 10/26/2018 | 60 |
| Albany (NY) | Securus | 2/11/2019 | 36 |
| Onondaga (NY) | ICSolutions | 2/25/2019 | 34 |
| Putnam (NY) | GTL | 4/26/2019 | 60 |
| Orleans (NY) | ICSolutions | 6/1/2019 | 35 |
| Schoharie (NY) | GTL | 2/11/2020 | 60 |
| Monroe (NY) | Securus | 5/1/2020 | 59 |
| Essex (NY) | GTL | 7/1/2020 | 36 |
| Rusk (WI) | Securus | 9/12/2016 | 60 |
| Lincoln  (WI) | Securus | 3/29/2019 | 60 |
| Brown (WI) | Securus | 6/15/2020 | 60 |
| Dunn (WI) | ICSolutions | 12/8/2020 | 60 |
| **Average** | | | **63** |

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

### COMMENTS OF SECURUS TECHNOLOGIES, LLC ON PETITION FOR WAIVER OF THE INMATE CALLING SERVICES PER-MINUTE RATE REQUIREMENT

Securus Technologies, LLC ("Securus"), by and through its counsel, submits these initial comments on its petition to waive Federal Communication Commission ("Commission") rules that require charging interstate incarcerated calling services ("ICS") on a per minute basis.[1] On November 12, 2021, the Wireline Competition Bureau released a Public Notice seeking comment on the Petition and on concerns raised by a response to the Petition filed by Worth Rises on October 14, 2021.[2] Securus files these initial comments to respond to the filing by Worth Rises.

Since filing the Petition, Securus unfortunately has had to suspend the pilot subscription programs, resulting in approximately 1500 participants losing the benefits of the plans.[3] Securus' analysis shows that the plans had increased calling times by 58% while costs had decreased by 61 percent. Securus has received numerous requests to restart the program, some of which are

---

[1] Securus Technologies, LLC, Petition for Waiver of the Per Minute Rate Requirement to Enable Provision of Subscription Based Calling Services, WC Docket No. 12-375 (filed Aug. 30, 2021) ("Petition").

[2] *Wireline Competition Bureau Seeks Comment on Securus Technologies, LLC's Petition for Waiver of the Interstate Inmate Calling Services Per-Minute Rate Requirement,* WC Docket No. 12-375, DA 21-1422 (rel. Nov. 12, 2021); Worth Rises' Response to Securus Technologies, LLC Petition for Waiver of the Per-Minute Rate Requirement to Enable Provision of Subscription-Based Calling Services, WC Docket No. 12-375 (filed Oct. 14, 2021) ("Worth Rises Response"). The Worth Rises Response was technically untimely under the Commission's default pleading rules that require opposition to petitions be filed within 10 days after the original pleading is filed. 47 C.F.R. 1.45(b).

[3] As explained in the Petition, the Commission's end-to-end jurisdictional rules requiring use of the physical end points of the call, coupled with treating indeterminate calls as interstate, jeopardizes the continuing viability of the pilot programs that are limited to intrastate calls. Petition at 5.

1

quoted below. Securus looks forward to working with the Commission to demonstrate that these programs serve the public interest and to quickly resume the pro-consumer offerings.

## I.    Securus Has Provided Substantial Information Regarding the Pilot Plans

Worth Rises raises a number of questions regarding the operation of the subscription plans, many of which have already been answered in the Petition or are addressed on Securus' website.[4] At bottom, Worth Rises seeks to ensure that the subscription plans serve the public interest, that end users are not disadvantaged, and that Securus does not evade otherwise applicable regulations. This is not unreasonable and Securus welcomes Worth Rises' interest in these programs. Securus contemplates that the Commission would undertake a similar examination of the program before granting a waiver. Such an examination would readily demonstrate that the subscription plans benefit incarcerated persons and their loved ones, as feedback on the pilot programs confirm.[5] Below we provide responses to key issues raised by Worth Rises based on information provided in the Petition or in FAQs on Securus' website and supplemented by further data collected regarding the programs.

Worth Rises asserts that Securus has not disclosed the length of the calls covered by the plans or average usage. Securus does not limit the length of calls under the programs. The only per call limits are those imposed by the correctional facility that apply to all calls. Securus noted in its Petition that call duration for calls covered by the subscription plans is coextensive with the limits established by the correctional agency, which Worth Rises accurately notes is usually 15 to 30 minutes per call. The Petition also noted that the average call duration was 14.5 minutes,

---

[4] In response to similar concerns raised in response to the Commission's Fifth Further Notice of Proposed Rulemaking, Securus' Reply Comments outlined the substantial information regarding operation of the pilot programs contained in the Petition and the Securus' website. Reply Comments of Securus Technologies, LLC, WC Docket No. 12-375 at 34-35 (filed Dec. 17, 2021).

[5] Petition at 7-8 (describing program benefits, including increased calling, reduced costs, and budget predictability).

2

indicating that callers are using the maximum per call duration allowed by the facility.[6] Moreover, callers often make back-to-back calls, redialing once the correctional facility's time limit is reached.

Much of the information that Worth Rises seeks is readily available on Securus' website.[7] Worth Rises asks about unused calls, refunds, and renewals. As set forth on Securus' website, the subscription plans are purely optional and subscribers can cancel at any time, but the subscription will stay active for the remainder of the current subscription period (i.e., for the remainder of the month or week, depending on the plan). With certain exceptions, there are no refunds for cancelling in the middle of the month, for example, or for unused calls. For convenience, Securus does offer an automatic renewal option. Consumers must affirmatively opt into the auto-renewal program.

Full or partial refunds are available under certain circumstances. For example, a full refund, less the $3 transaction fee, is available if a consumer signs up by mistake and there is no usage under the program. Full refunds are also available if the consumer cancels within 14 days of an auto-renewal, and there has been no usage of the program. Partial refunds are also available when an incarcerated person is transferred to another facility, and the refund request is made within 14 days. Partial refunds are also available for verified performance issues such as poor quality or outages. Consumers will be provided an explanation if their request for a refund is denied.

Worth Rises also asks about dropped calls based on an unfounded concern that subscription plans based on the number of calls might incentivize providers to deliberately drop calls. Securus has received no complaints regarding dropped calls. Securus' internal data reflects

---

[6] Petition at 3, 4.
[7] *See https://securuscallsubscription.com/.*

3

**JA261**

that the number of calls dropped due to network performance issues within its control are a fraction of one percent (0.28% of completed calls). Securus processes dropped call claims in its subscription plans in the same manner as its standard calling services. A call may disconnect for a variety of reasons having nothing to do with problems in Securus' network. For example, a call may be disconnected if it violates the correctional facility's calling policies, such as attempting to forward the call or establishing a three-way call. Disconnections may also occur due to problems on the called party's provider's network. Persons experiencing a dropped call may file a report using a form available on Securus' website or by filing a complaint with the correctional authorities. If a call under a subscription plan was dropped due to problems on Securus' network (as opposed to a violation of calling policy or other causes outside of Securus' control), the end user will receive a refund of the prorated amount of the call's portion of the subscription plan cost (e.g., if there is a dropped call in connection with a 25-call plan, then the refund for that call would be 1/25th of the cost of that plan). As noted above, however, Securus has received no complaints or requests for refunds due to dropped calls.

Worth Rises states that subscription plans should be based on number of minutes rather than number of calls. Securus determined to use number of calls following consumers' input stating that they preferred a program using number of calls rather than one based on minutes of use. Securus had been piloting these programs offering different rates and terms in order to gain experience and data to help develop the best plans for consumers while avoiding operating at loss. A primary benefit of the subscription program is that friends and family can properly budget based on a fixed price per month. They also can better utilize the calls knowing how many calls they have available and planning specific days and times throughout the subscription period for the calls to take place. The Commission should not, at this stage, dictate the manner in

4

**JA262**

which these programs are offered but allow a market to develop for plans with appropriate

consumer protections and reflecting consumer preferences.

## II.    The Commission Should Act Quickly So that Securus Can Resume Offering the Programs

With implementation of the Commission's rules mandating that jurisdictionally

indeterminate calls be treated as interstate calls, Securus has had to suspend the pilot programs

that were designed for intrastate calls only in light of the requirement that interstate and

indeterminate ICS be charged at per-minute rates. Securus has sent suspension notices to more

than 1500 subscribers. Suspension of the programs is unfortunate in light of their substantial

benefits, not only in terms of reduced costs and increased calling times, but also in helping

families plan for and budget calling expenses.[8]

Securus has begun to hear from correctional authorities and subscribers asking that the

program be reinstated. A sample of emails that the company received is set forth below. Last

names of consumers have been redacted for privacy purposes. The emails are also attached to

this filing.

Good morning,

My name is Colby Braun, Director of Facility Operations for the North Dakota
Department of Corrections and Rehabilitation. It has come to my attention that a
decision was made to suspend subscription plans for residents of our prisons and
their families. This decision is short-si[ghted] and will disrupt family connections
across our prison system. The FCC has been an advocate to ensure residents in
our prisons and jails have affordable connections with their loved ones. This
decision is completely in the opposite direction and will be harmful. I've
personally talked with the men in our prisons and their families about this
decision. They were devastated to hear that you are taking away the most
economical option for communication with their wives and children.

ND DOCR puts a phone (tablet) in every resident's hand upon admission. We
allow residents to call their loved ones from the comforts of their own room. We
encourage and solicit families to stay connected and the calling subscription plan

---

[8] *See* Petition at 7-8.

has taken this opportunity to another level as the possibility to communicate is endless. Instead of suspending this plan, you should be encouraging expansion of this plan. The only complaint I've heard is that this is for in-state calling only. Every resident I personally spoke to asked why this can't be an option for loved ones living out of state.

I beg you to reconsider this decision. Talk to the consumer, the people you are trying to protect. The people who live in prison and their families are pleading with me to not take this away.

If you want to discuss this further, I am available anytime at the number below.

Colby Braun

Below is a transcription of a handwritten note to Mr. Braun:

I am a mentor in Restoring Promise. Last time we spoke you mentioned that Securus is no longer going to be offering the 100 calls for 25 $ starting on the month of January 2022. My wife is a single mother who makes little to NO money at all. The 100 calls for 25 $ is literally our life line. PLEASE is there anything that can be done about this. I don't ask for anything but if can help me with this. Thank you. I greatly appreciate your time.          Jeffrey B.

Below are emails received by Securus from consumers:

I'm writing to you to request that you approve either a waiver or the continuation of Call subscription plans to prisoners in Utah and throughout the United States. This subscription plan is immensely important to me and my family, as my son who is in prison has a seven-year-old daughter that he speaks to daily. This communication is so important to maintaining a relationship with her while he is absent. The cost of calls per day to her would cause a great hardship on my family if we could not use the subscription plan. Please please reinstate it. Thank thank you.          Wendy M.

My fiancé is an incarcerated individual at the Fannin County Jail in Bonham Texas. The Securus subscription program has become a lifeline for us, so that it is affordable for us to talk every day. Please bring this program back as our daily communication helps both he and I survive during this painful and difficult time apart. Covid protocol is still in place and in person visitation is limited. Please bring this subscription program back so that speaking to our loved ones isn't ridiculously expensive! Thank you so much.          Sarah S.

If our goal is to rehabilitate rather than punish; if our goal is to help rather than monetize, the telephone subscription program is one step in the right direction. The subscription program has directly helped me develop a better relationship with my incarcerated son by providing a more affordable platform for longer (albeit interrupted) conversations about meaningful topics that we haven't

6

**JA264**

managed in the past. We are finally talking about family dynamics and relationship issues and finding healing and understanding in new ways. I have his willing attention to discuss things I have always wanted to be able to teach him about how to succeed in relationships and in life. Having a loved one in jail, or being in jail, is a horrible enough experience without having to pay a lot of money to have the human connection which science has shown to be key in managing addictive behaviors. I hope it will be permitted to continue, and that other programs and policies will be developed to alleviate the cost and hardship associated with communicating with inmates.                    Colleen P.

I am very grateful for the subscription service with Securus, their customer service team is very appreciated on my end. Given the circumstance of incarceration in our family and any other families. The subscription calls helped us stay connected while our loved one serves their time. I would like to add that canceling the subscription calls would be very disappointing for those who care dearly for the inmate. This is a very difficult time for many other families involved. Hearing the inmates voice helps go through this hard time given that the incarceration could have been done to avoid such hard times. It is well known that the Pandemic has financially struggling a lot of us. The subscription helped financially as well as emotionally through this terrible time. Therefore, I would greatly appreciate it and as well as many family members would appreciate if the subscription service were to continue. Thank you for considering this.
          Consuela M.

Call subscription helps my sister speak with her 5 children and help them with their homework over the phone because she could call several times during the day. I don't know how life will be without this subscription. It has really helped our situation. Subscription is the only good that have happened since my sister was arrested. She calls me every single day that it helps all of us to stay sane.
          Glory E.

This is a way for me to contact people I love and stabilize my mental health with conversations with them. The discontinuation of this service will negatively effect my mental health as well as that of my loved one who is incarcerated. With the world experiencing COVID and the uncertainty that that entails, communication with loved ones whether they are incarcerated or not is important. Please reinstate these call subscriptions.                    Esa R.

Please let the call subscriptions continue, it's the only way i can talk to my loved ones while being on a budget. With everything else in this world that costs so much this was a nice feature that i could manage. Idk how i will be able to talk to my loved ones anymore without it.                    Veronica F.

I'm writing regarding the Securus call subscription service. The subscription service has been extremely important in communicating with loved ones who are incarcerated. The cost to communicate with individuals who are detained in a

7

**JA265**

facility is astronomical, and most Americans simply cannot afford the high price for even very limited phones calls. The subscription service has made communication significantly more cost effective, and it is vital that this service be permitted to continue. I appreciate your time in considering this matter.
   Alex R.

This plan is very important for us to be able to keep in touch with our son. All costs at the jail/prison are outrageously expensive so this has been a big help to keep the costs down and to be able to stay in contact with him. Please keep this in place or re-instate it as quickly as possible.   Rene W.

Y como le haria para adquirir un plan para comunicarme con mi ser querido.
   Abidail P.

As these messages reflect, the pilot program was helping achieve the goals of enhancing communication between the incarcerated and their loved ones.

## CONCLUSION

Securus looks forward to working with the Commission to address any concerns or questions it may have regarding the operation of the subscription plans.

      Respectfully submitted,


      _____/s/_____
      Michael H. Pryor
      Shareholder
      Brownstein Hyatt Farber Schreck, LLP
      1155 F Street NW, Suite 1200
      Washington, DC 20004
      (202) 383-4706
      mpryor@bhfs.com

      *Counsel to Securus Technologies, LLC*


January 7, 2022

# ATTACHMENT A

## Communications Regarding Subscription Program Suspension[9]

| | |
|---|---|
| **From:** | Braun, Colby J. <cobraun@nd.gov> |
| **Sent:** | Thursday, December 23, 2021 10:03 AM |
| **To:** | FCCSubscription |
| **Subject:** | Securus Subscription Program |

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning,

My name is Colby Braun, Director of Facility Operations for the North Dakota Department of Corrections and Rehabilitation. It has come to my attention that a decision was made to suspend subscription plans for residents of our prisons and their families. This decision is short-sided and will disrupt family connections across our prison system. The FCC has been an advocate to ensure residents in our prisons and jails have affordable connections with their loved ones. This decision is completely in the opposite direction and will be harmful. I've personally talked with the men in our prisons and their families about this decision. They were devastated to hear that you are taking away the most economical option for communication with their wives and children.

ND DOCR puts a phone (tablet) in every resident's hand upon admission. We allow residents to call their loved ones from the comforts of their own room. We encourage and solicit families to stay connected and the calling subscription plan has taken this opportunity to another level as the possibility to communicate is endless. Instead of suspending this plan, you should be encouraging expansion of this plan. The only complaint I've heard is that this is for in-state calling only. Every resident I personally spoke to asked why this can't be an option for loved ones living out of state.

I beg you to reconsider this decision. Talk to the consumer, the people you are trying to protect. The people who live in prison and their families are pleading with me to not take this away.

If you want to discuss this further, I am available anytime at the number below.

Colby Braun

Colby Braun
*Director of Facility Operations*

701.328.6112    •    cobraun@nd.gov    •    www.docr.nd.gov



  

Click here to report this email as spam.

---

[9] In correspondence to subscription plan participants announcing suspension of the program, Securus invited participants to express their views regarding the program that Securus would share with the Commission.

9

**RESIDENT REQUEST**
NORTH DAKOTA DEPARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF ADULT SERVICES
SFN 11245 (03-2020)



To Colby Braun                                                      Date 12/22/2021

Nature of Request (give complete details) I am a mentor in Restoring Promise. Last time we spoke you mentioned that Securus is no longer going to be offering the 100 calls for 25$ starting on the month of January 2022. My wife is a single mother who makes little to NO money at all. The 100 calls for 25$ is literally our life line. PLEASE is there anything that can be done about this. I dont ask for anything but if you can help me with this. Thank you  I greatly appreciate your time

Response

Job Assignment Restoring Promise Mentor          Living Unit East Unit - 261 - C

Name Tottry B                          Resident Number

| | |
|---|---|
| **From:** | wendy m ███████████ |
| **Sent:** | Friday, December 10, 2021 10:08 AM |
| **To:** | FCCSubscription |
| **Subject:** | FCC Subscription Inquiry |

🟥🟨 **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I'm writing to you to request that you approve either a waiver or the continuation of Call subscription plans to prisoners in Utah and throughout the United States. This subscription plan is immensely important to me and my family, as my son who is in prison has a seven-year-old daughter that he speaks to daily. This communication is so important to maintaining a relationship with her while he is absent. The cost of calls per day to her would cause a great hardship on my family if we could not use the subscription plan. Please  please reinstate it. Thank thank you. Wendy M███

Click here to report this email as spam.

| | |
|---|---|
| **From:** | Sarah S███████████ |
| **Sent:** | Friday, December 10, 2021 2:53 PM |
| **To:** | FCCSubscription |
| **Subject:** | Securus subscription Program - Bring it Back! |

🟥🟨 **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello there,

My fiancé is an incarcerated individual at the Fannin County Jail in Bonham Texas. The Securus subscription program has become a lifeline for us, so that it is affordable for us to talk every day. Please bring this program back as our daily communication helps both he and I survive during this painful and difficult time apart. Covid protocol is still in place and in person visitation is limited. Please bring this subscription program back so that speaking to our loved ones isn't ridiculously expensive! Thank you so much.

Sarah S███████

Click here to report this email as spam.

11

**JA269**

| | |
|---|---|
| **From:** | Coco P███████████████ |
| **Sent:** | Friday, December 10, 2021 1:52 PM |
| **To:** | FCCSubscription |
| **Subject:** | FCC Subscription Inquiry |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

To whom it may concern:

If our goal is to rehabilitate rather than punish; if our goal is to help rather than monetize, the telephone subscription program is one step in the right direction.

The subscription program has directly helped me develop a better relationship with my incarcerated son by providing a more affordable platform for longer (albeit interrupted) conversations about meaningful topics that we haven't managed in the past. We are finally talking about family dynamics and relationship issues and finding healing and understanding in new ways. I have his willing attention to discuss things I have always wanted to be able to teach him about how to succeed in relationships and in life.

Having a loved one in jail, or being in jail, is a horrible enough experience without having to pay a lot of money to have the human connection which science has shown to be key in managing addictive behaviors.

I hope it will be permitted to continue, and that other programs and policies will be developed to alleviate the cost and hardship associated with communicating with inmates .

Colleen P████████

Click here to report this email as spam.

| | |
|---|---|
| **From:** | Consuela M██████████████ |
| **Sent:** | Friday, December 10, 2021 10:19 AM |
| **To:** | FCCSubscription |
| **Subject:** | FCC Subscription Inquiry |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

To whom is may concern,

I am very grateful for the subscription service with Securus, their customer service team is very appreciated on my end. Given the circumstance of incarceration in our family and any other family's. The subscription calls helped us stay connected while our loved one serves their time. I would like to add that canceling the subscription calls would be very disappointing for those who care dearly for the inmate. This is a very difficult time for many other families involved. Hearing the inmates voice helps go through this hard time given that the incarceration could have been done to avoid such hard times. It is well known that the Pandemic has financially struggling a lot of us. The subscription helped financially as well as emotionally through this terrible time. Therefore I would greatly appreciate it and as well as many family members would appreciate if the subscription service were to continue. Thank you for considering this.

Sincerely Consuela M███████

12

**JA270**

| | |
|---|---|
| **From:** | Glory E ██████████████ |
| **Sent:** | Friday, December 10, 2021 9:03 PM |
| **To:** | FCCSubscription |
| **Subject:** | FCC Subscription Inquiry |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Call subscription helps my sister speak with her 5 children and help them with their homework over the phone  because she could call several times during the day. I don't know how life will be without this subscription. It has really helped our situation. Subscription is the only good that have happened since my sister was arrested. She calls me every single day that it helps all of us to stay sane.

Click here to report this email as spam.

| | |
|---|---|
| **From:** | Esa R ████████████ |
| **Sent:** | Wednesday, December 15, 2021 7:42 PM |
| **To:** | FCCSubscription |
| **Subject:** | FCC Subscription Inquiry |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This is a way for me to contact people I love and stabilize my mental health with conversations with them.

The discontinuation of this service will negatively effect my mental health as well as that of my loved one who is incarcerated.

With the world experiencing COVID and the uncertainty that that entails, communication with loved ones whether they are incarcerated or not is important.

Please reinstate these call subscriptions.

Thank you
Esa R ██████

Click here to report this email as spam.

| | |
|---|---|
| **From:** | Veronica F ██████████████ |
| **Sent:** | Wednesday, December 15, 2021 11:37 PM |
| **To:** | FCCSubscription |
| **Subject:** | FCC Subscription Inquiry |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Please let the call subscriptions continue, it's the only way i can talk to my loved ones while being on a budget. With everything else in this world that costs so much this was a nice feature that i could manage. Idk how i will be able to talk to my loved ones anymore with out it.

13

**JA271**

**From:** Alex R███████████████
**Sent:** Thursday, December 16, 2021 2:25 PM
**To:** FCCSubscription
**Subject:** FCC Subscription Inquiry

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

I'm writing regarding the Securus call subscription service. The subscription service has been extremely important in communicating with loved ones who are incarcerated. The cost to communicate with individuals who are detained in a facility is astronomical, and most Americans simply cannot afford the high price for even very limited phones calls. The subscription service has made communication significantly more cost effective, and it is vital that this service be permitted to continue.

I appreciate your time in considering this matter.

Thanks,
Alex R█████

---

**From:** Rene W███████████████
**Sent:** Thursday, December 16, 2021 6:43 PM
**To:** FCCSubscription
**Subject:** FCC Subscription Inquiry

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

This plan is very important for us to be able to keep in touch with our son. All costs at the jail/prison are outrageously expensive so this has been a big help to keep the costs down and to be able to stay in contact with him. Please keep this in place or re-instate it as quickly as possible.
Thanks,
Rene W████████████



Click here to report this email as spam.

14

**JA272**

**From:** Abidail P

**Sent:** Tuesday, December 28, 2021 2:05 PM

**To:** FCCSubscription

**Subject:** FCC Subscription Inquiry

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Y como le haria para adquirir un plan para comunicarme con mi ser querido

Click here to report this email as spam.

**JA273**



Nathan Miller
Professor of Economics
Georgetown University
Washington, D.C.  20057
nhm27@georgetown.edu

GEORGETOWN UNIVERSITY

May 4, 2023

RE: Implementation of the Martha Wright-Reed Act

To: The Federal Communications Commission

This letter summarizes my academic research on the economics of the inmate telecommunications services (ITS) industry, and specifically the working paper titled "The Price that Inmates Pay" that I have written jointly with Professors Marleen Marra (Sciences Po) and Gretchen Sileo (Georgetown and Temple Universities). The working paper is available for download from my website[1] and I have provided it with this letter for your convenience. My hope is that the economic analysis contained in the paper and summarized here helps the FCC better implement the Martha Wright-Reed Act.

In the working paper, we analyze the ITS industry based on data that we have culled from public records requests submitted to every state and the District of Columbia. The requests targeted information about states' procurement practices, the contracts with ITS suppliers, and the prices that incarcerated individuals pay for phone calls, across two decades (2000-2019). The project has been funded by the National Science Foundation (Grant SES 2117197). Our research findings include:

- In two states that have lowered the price of phone calls—New Jersey and New York—the volume of calls increased significantly. This illustrates two things. First, ITS can be provided profitably at these lower prices. Second, lower prices not only save money for incarcerated individuals and their families, they also facilitate greater social contact.

- Many states evaluate prospective ITS suppliers in part based on how much of the revenue will be paid back to the state (i.e., based on "commissions"). It is common for the selected supplier to provide commissions in excess of 50% of revenues or more.

- The ITS industry is concentrated. GTL and Securus obtain most of the state-level contracts. It is likely that these firms, and perhaps others as well, have significant market power.

- Most states compare prospective ITS suppliers based on proposed prices. Economic theory then indicates that commissions put "upward pressure" on the proposed prices. The reason is that by proposing higher prices, prospective ITS suppliers can pay more in commissions to the state, thereby increasing the probability with which they win the contract.

---

[1] www.nathanhmiller.org/research

- In the presence of commissions, increasing competition among ITS suppliers likely benefits states more than incarcerated individuals. Economic theory indicates that competition pushes prospective ITS suppliers to bid more aggressively. In states that weight commissions heavily in their evaluation of prospective suppliers, this translates into a greater incentive to extract money from incarcerated individuals and provide it to the state in the form of commissions.

- Eliminating commissions would allow prospective ITS suppliers to operate profitably at significantly lower prices. This is straight-forward given the commissions that we observe.

- Obtaining these lower prices likely requires regulation or alternative procurement practices due to the market power of ITS suppliers. The reason is that, absent more intense competitive pressures, ITS suppliers have an incentive to pocket much of what they would save from not paying a commission to the state.

In summary, there appear to be two main economic distortions that disadvantage incarcerated individuals: the commissions received by states and the market power of ITS suppliers. Both have significant implications for outcomes, including the price of phone calls. Eliminating commissions and either introducing new, meaningful competition or capping phone prices well below current levels would result in lower prices that nonetheless allow for ITS to be provided profitably.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Nathan H. Miller

# The Price That Inmates Pay[*]

Marleen Marra[†]
Sciences Po

Nathan H. Miller[‡]
Georgetown University

Gretchen Sileo[§]
Georgetown University

November 4, 2022

## Abstract

Incarcerated individuals in the United States purchase goods and services from monopoly vendors selected by their correctional authority. We study the price that inmates pay for phone calls, which the Federal Communications Commission has characterized as "exorbitant." We specify an auction model of procurement and estimate it using data from public records requests. Our results indicate that market power contributes to high prices but that more important are kickbacks (or "commissions") that providers give to the correctional authority. Regulation that substantially lowers price and eliminates commissions can more than double inmate surplus and simultaneously enable providers to recover their costs.

JEL Codes: D43, D44, H57, H71, L13, L51, L96
Keywords: telecommunications, prison systems, Department of Corrections, regulatory policy

[*]We thank Matthew Parayil and Maria Abissi for excellent research assistance. The research was funded by National Science Foundation (SES 2117197).

[†]Sciences Po, Department of Economics, Paris. Email: marleen.marra@sciencespo.fr.

[‡]Georgetown University, McDonough School of Business, 37th and O Streets NW, Washington DC 20057. Email: nathan.miller@georgetown.edu.

[§]Georgetown University, Department of Economics, 37th and O Streets NW, Washington DC 20057. Email: gs907@georgetown.edu.

# 1   Introduction

In the United States, two million people are incarcerated in prisons and jails, representing nearly one percent of the adult population.[1] These individuals use telephone calls to maintain contact with family, friends, and counsel. For this, they rely on a provider of *inmate telecommunications services* (ITS), which installs and maintains phone systems, monitors compliance with rules and regulations, and charges prisoners on a per-call and per-minute basis. An ITS provider is selected by the correctional authority of each prison system and jail, and incarcerated individuals cannot use an alternative provider. A nonprofit advocacy group estimated in 2019 that a typical 15-minute call costs about $6.00 in local jails and about $1.75 in state prisons.[2] The Federal Communications Commission (FCC) recently characterized these prices as "exorbitant" and well exceeding their understanding of providers' costs.[3]

Given these prices, the frequency and duration of calls, and the sheer number of incarcerated individuals, ITS is big business. The press has placed total revenue at more than one billion dollars annually.[4] Three providers—Securus, GTL, and IC Solutions—account for 58% of facility contracts. These contracts tend to be with the state prison systems and the larger local jails, and they cover approximately 78% of the incarcerated population. For the other side of the market, the FCC has summarized evidence and claims that the prices charged by ITS providers place unreasonable burdens on one of the more disadvantaged segments of society, leading prisoners' families to incur debt, reducing social contact between prisoners and the outside world, including their children, and ultimately making it more difficult for incarcerated individuals to reintegrate into communities once their sentence is completed.[5]

In this paper, we study the price that incarcerated people ("inmates") pay to make telephone calls. We focus specifically on the contracting process used by correctional authorities to select a provider and determine price. The broad contours of this process are understood. It starts when a correctional authority issues a request for proposals (RFPs). The responses of prospective suppliers typically are evaluated following a predetermined scoring rule. The outcome is a contract, typically with a duration of 3-5 years, that dictates financial terms. Often the selected ITS provider agrees to share some of the revenue obtained from inmates with the correctional

---

[1]Information sourced from the "Census of State and Federal Adult Correctional Facilities, 2019" and the "Census of Jails 2005-2019" reports published by the Bureau of Justice Statistics and "Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United States, States, and Puerto Rico" published by the U.S. Census Bureau.

[2]See the press release of the Prison Policy Initiative titled "State of Phone Justice: Local Jails, State Prisons, and Private Phone Providers," written by Peter Wagner and Alexi Jones, and dated February 2019.

[3]Federal Communications Commission, "Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking," released May 24, 2021.

[4]Todd Shields, "Prison Phones Prove Captive Market for Private Equity," *Bloomberg Business-Week* (October 4, 2012), available at https://www.bloomberg.com/news/articles/2012-10-04/prison-phones-prove-captive-market-for-private-equity, last accessed December 9, 2020.

[5]Federal Communications Commission, "Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking," released May 24, 2021.

authority. Such payments are reasonably characterized as kickbacks but, in industry parlance, they are known as "commissions." As a result, correctional authorities can benefit financially from the contract that they sign with their ITS provider.

To make empirical progress, we issued public records requests to all 50 states and the District of Columbia. Specifically, we requested documents pertaining to the RFPs issued over 2000-2019, the associated responses of prospective suppliers, how those responses were evaluated, and the contracts that were signed as a result. We also requested documents on call volumes and the size of inmate populations. Compliance with our public records requests was mixed. We received at least some documents from 43 states and, of these, 26 states provided a complete set of documents on at least one procurement event. Most information provided was in the form of hundreds of pages of scanned documents. We converted these into a digitized database with approximately 40 procurement events and demand information (e.g., the number and duration of calls) for 15 states. These data supplement what has been obtained previously by nonprofit advocacy groups, and constitute our first contribution.[6]

We formulate an empirical model of ITS procurement to make use of the data. In the model, the correctional authority issues an RFP that dictates how a scoring rule will be applied to evaluate the quality, commission, and prices proposed by prospective suppliers. The model accommodates that some authorities prescribe the commission or the price; that component then receives zero weight in the scoring rule. Heterogeneous ITS suppliers observe the RFP and submit bids—a combination of a commission and a price—that maximize profit, balancing for example that a higher commission increases the likelihood of being selected but reduces profit conditional on being selected. Finally, inmates observe the resulting price and determine how many calls to place. In estimation, we take the RFPs and scoring rules as given, and focus on the second and third stages of the model. Then, using counterfactual simulations, we explore how alternative scoring rules and regulatory actions affect outcomes.

For the demand-side of the model, we focus specifically on New Jersey and New York, for which we obtained call volume and inmate population data that span exogenous reductions in price imposed by the states in order to obtain more equitable outcomes for inmates. In New Jersey, we observe that the price of a 15-minute call fell from $4.95 before 2014 to around $2.00 dollars in 2014, and then again to $0.66 in 2015 and afterward. In New York, the price fell from $2.30 before 2010 to $0.72 in 2010 and afterward. The average monthly number of calls per inmate increased from eight to 26 in New Jersey and from nine to 16 in New York. Therefore, these data indicate that inmates respond to the price of calls. With these data, we estimate a linear demand function that connects the price of a call to the revenue that ITS providers (and the states, via commissions) receive from their prisoners.

For the supply-side of the model, we apply the parametric first-score auction framework dis-

---

[6]Estimates of call costs are available from the Prison Policy Initiative (PPI) and Prison Phone Justice (PPJ), and commission rates for many states are available from PPJ.

cussed in Miller (2014). We observe the state-specific scoring rules and the proposed commissions and prices of each prospective supplier in the data. We also observe how the correctional authority evaluates the quality of prospective suppliers, and we use that as our measure of quality. The structural parameters to be estimated convert the commissions, prices, and qualities into comparable units, and also scale their contributions relative to a logit error term. The logit error term incorporates an element of subjectivity, and rationalizes that we sometimes observe employees differ in their evaluations of the same bid. We estimate the structural parameters using maximum likelihood, based on a loss function that compares the probability with which a prospective supplier wins the auction to whether the same supplier is actually selected. Consistent with expectation, our results indicate that proposals with lower prices, higher commissions, and higher quality are more likely to be awarded contracts.

We impute the marginal cost of providing ITS from the providers' first-order conditions for profit maximization, following standard practice in empirical industrial organization. The results corroborate that prices are, indeed, well above providers' costs. The gap between price and cost comprises two components: an oligopolistic markup of the provider, representing its market power, and the commission that is paid to the correctional authority. Of these, the commission typically is much larger. This result flows from the raw data, as commissions often account for more than 60% of the revenue that the ITS provider obtains. Thus, looking broadly across states, we find that the practice of soliciting commissions contributes substantially more to "the price that inmates pay" than does the market power of ITS providers.

We explore counterfactual policies using a series of simulations that reveal economically interesting interplay between regulatory policy and antitrust enforcement. We focus on a procurement event in one particular state in which there were four prospective suppliers, the winning supplier provided a commission of 60%, and the state predetermined prices for a 15-minute call of $2.36 (if collect) and $1.78 (if prepaid). First, we show that adding competition in this setting benefits the state, as prospective suppliers increase their proposed commissions, but that inmates do not benefit. Second, simply eliminating commissions transfers money from the state to the ITS provider, as again inmates do not gain unless prices also fall. Third, a policy that reduces price by 50% substantially decreases state revenues, both because less revenue is obtained from inmates and because prospective providers decrease their proposed commissions. Inmates surplus, however, nearly doubles. Fourth, a policy that reduces price by 76% and eliminates commissions improves inmate surplus by 230%—and the ITS provider still obtains sufficient revenue to cover its cost. These and other results that we develop may be relevant for regulators at the FCC and policy-makers at the state and local levels.

Our results are based on a limited sample size that reflects a best effort to collect data in a predominantly confidential market. The FCC has collected a vast amount of information from correctional authorities and ITS providers over the course of a regulatory effort that has spanned parts of the three most recent administrations. These data, however, are not pub-

3

**JA279**

licly available. We observe that even summary statistics are largely redacted from published FCC materials. Our data and results have heightened value in this context. It is possible that economists at the FCC or elsewhere could confirm our results, or extend them for example by relaxing our parametric assumptions (e.g., based on Asker and Cantillon, 2008).

Our research relates to a large literature on government procurement practices. Among recent articles, Kang and Miller (2021) use a principal-agent model to investigate the implications of low levels of competition, with an application to information technology and telecommunications contracts. Takahashi (2018) and Bolotnyy and Vasserman (2021) use auction models to study government procurement by state-level Departments of Transportation. Takahaski examines the effects of uncertainty in procurement auctions, and Bolotnyy and Vasserman study scaling auctions. Slattery (2020) studies proposals submitted by local governments to companies considering where to place their headquarters. Similar to these articles, we examine an interesting and special case of procurement auctions—one in which the contracting process allows procurement entities to receive compensation from providers, with the final consumers of the product being unable to influence contract outcomes.

There is a similarly large literature on prisons and their effects on incarcerated individuals that we cannot fully describe here. Among recent contributions, Bhuller et al. (2021) and Rose and Shem-Tov (2021) determine that incarceration reduces further criminal behavior, with the first article using a random judge research design and the second exploiting discontinuities in North Carolina's sentencing thresholds. Mukherjee (2021) provides evidence that privately-owned prisons delay the release of inmates based on exogenous capacity shocks at prisons in Mississippi. Notably, at least three articles look at how the conditions *within* prisons affect outcomes. Hjalmarsson and Lindquist (2022) finds that incarceration in high-quality prisons improves health and decreases mortality, Mastrobuoni and Terlizzese (2022) finds that "open" prisons that allow for inmates greater freedom and responsibility lower recidivism, and Tobón (2022) finds that recidivism is lower for inmates assigned to newer facilities.

We organize our paper as follows. Section 2 describes the market for ITS, the data collection process, and details on the data. Section 3 presents the model, develops selected comparative statics, and discusses identification and estimation. Section 4 evaluates alternate policies that could improve outcomes for incarcerated individuals. Finally, Section 5 concludes.

## 2    Inmate Telecommunications Services

### 2.1    The Competitive Landscape

In the 1990s, at the height of competition in the market, almost 30 different ITS providers vied for prison and jail contracts. Over time, the market has experienced significant consolidation, mainly through mergers and acquisitions by the current market leaders: Global Tel*Link (GTL) and Securus. In recent merger activity, GTL acquired Telmate in 2018 and a proposed acquisi-

Table 1: ITS Providers and Estimated Market Shares

|  | GTL | Securus | CenturyLink | ICSolutions | Telmate | Paytel |
|---|---|---|---|---|---|---|
| # of Contracts | 377-586 | 635-794 | 6-20 | 129-288 | 101-157 | 151 |
| Market Share | 46.0%-52.9% | 15.0%-19.4% | 10.6%-11.5% | 3.7%-6.3% | 1.9%-3.1% | 1.3% |

Notes: Based on PPI data collected in July 2017. Ranges are shown because some providers had outdated information on their websites. Market shares are measured based on the inmate population served. Providers with a market share less than 1% include: NCIC, Legacy Inmate, Regent, AmTel, and Reliance. See the August 28, 2017 press release titled "Prison Phone Giant GTL Gets Bigger, Again," by Peter Wagner.

tion of IC Solutions by Securus in 2019 was blocked by the Department of Justice on antitrust grounds. Table 1 provides estimates of market shares published by PPI in 2017. Securus, GTL, and CenturyLink—the three largest providers—collectively account for most state-level prison contracts and many of the jail contracts. The smaller providers, including IC Solutions, tend to have jail contracts.

Outside of proposed mergers, federal regulation of the ITS industry has taken the form of Orders issued by the FCC. In response to multiple campaigns to reduce the costs to inmates and their families, the FCC in 2013 instituted rate caps and regulated the ancillary fees often associated with making phone calls from prison. At the time, the FCC set rate caps of $0.25 per minute for collect calls and $0.21 per minute for prepaid and debit calls. In 2017, the District of Columbia Court of Appeals ruled that the FCC did not have the authority to regulate rates within a state, but the across state rate caps (interstate rates) remained in place. In 2021, the FCC further reduced these rate caps to $0.12 per minute for prisons and $0.14 per minute for larger jails. However, due to the Court of Appeals ruling, intrastate rates remain at the discretion of the states.

Individual states have made progress in reducing call rates. Eleven states—New York, Rhode Island, New Jersey, Maryland, South Carolina, Ohio, Illinois, Nebraska, Colorado, New Mexico, and California—and DC have each passed laws to eliminate commissions in contracts that provide services to state facilities. Additionally, some states have placed their own caps on call rates: in 2022 Indiana capped call rates at $0.12 per minute, in 2021 California capped intrastate call rates at $0.07 per minute, and in 2020 Connecticut declared prison phone calls would be free of charge. Despite this progress, commissions remain in 39 states, and many of the aforementioned changes only apply to state prison facilities, but not county jails.

On multiple occasions ITS providers have been accused of predatory practices. In the initial 2013 investigation, the FCC found that in addition to high per minute call rates, the ancillary fees associated with making a call increased costs to inmates and their families by as much as 40 percent. Although the 2013 interstate rate caps remained in place, the FCC noted that as of 2021, 34 percent of prisoners' families are going into debt just to stay in touch. Recently, GTL settled a 2022 class action lawsuit alleging that the company had seized money from prepaid accounts following a brief period of inactivity. During the trial it was disclosed that over a

5

**JA281**

Figure 1: An Application of a Scoring Rule in Missouri

| NAME OF OFFEROR | Experience And Reliability (Max. 20 Pts.) | Proposed Method of Performance (Max. 30 Pts.) | TOTAL SUBJECTIVE POINTS (Max. 50 Pts.) | For DPMM Use Only | |
|---|---|---|---|---|---|
| | | | | COST POINTS INSERTED BY PURCHASING (Max. 50 Pts.) | TOTAL POINTS (Max. 100 Pts.) |
| 1. MCI Worldcom | 20 | 30 | = 50 | + 50 | TOTAL = 100 |
| 2. Public Communications Service | 15 | 25 | = 40 | + 47.75 | TOTAL = 87.75 |

seven-year period GTL took $121 million from these "inactive" customer accounts.

## 2.2 Procurement Process

ITS providers enable inmates to make phone calls from a prison or jail. This involves installing physical infrastructure such as phones and cable lines, as well as certain technological features that allow the facility to monitor calls in order to ensure that, for example, the correct person is being called. Most inmates reside in state prisons and county jails. Usually, the entities that procure ITS for these facilities are state-level Departments of Corrections (DOCs) and county governments, respectively.[7]

The contracting process begins when a procuring entity issues an RFP, which typically outlines a set of technical and cost requirements, and describes how proposals will be evaluated. Prospective suppliers often have the opportunity to ask clarifying questions, and participate in a joint "walk through" of the facilities. Thus, each supplier has good information about the opportunity and the identity of its competitors prior to submitting its bid. Although the evaluation of bids varies, most RFPs assign a numerical value to certain elements of the bid—often the phone rates, commission, and a measure of technical quality. Using these criteria, an evaluation committee reviews all proposals and assigns a score to each element. The bidder with the highest overall score wins the contract, which is typically 3-5 years in length and adopts the terms outlined in the RFP and the winning proposal. Figure 1 provides an example from the Missouri DOC procurement process in 2000.[8]

---

[7]The largest individual accounts, however, are the Federal Bureau of Prisons (FBP) and Immigration Customs Enforcement (ICE). We did not solicit data from either the FBP or ICE.

[8]We obtained the scoring sheet along with other documents using a FOIA request. In most cases the evaluation criteria for technical quality, proposed call rates, and commissions were clearly delineated. We do not include in our analysis the few cases where call rates and commissions were jointly considered and assigned a single score. More detail on our data collection effort is provided in Section 2.3.

## 2.3   Data Collection and Descriptive Analysis

The data we use come from public records requests that we submitted over 2020-2021 to all 50 states and Washington, DC. Thus, the data pertain to state-level prison systems. Our public record requests included six specifications:

(i) Requests for proposals (RFPs) related to ITS from 2000-2019, including the evaluation criteria for RFPs.

(ii) For each RFP issued, all of the corresponding responses received from ITS providers, including those from providers that did not win the contract.

(iii) Corresponding documents, reports, and spreadsheets that evaluate responses to the RFPs, including any scoring of the responses.

(iv) Contracts with ITS providers over 2000-2019, and any modifications to those contracts.

(v) Detailed inmate call volume information, including the number of calls and total minutes of use for Local, InterLATA, IntraLATA, and Interstate calls for each facility, for each month, over 2000-2019.

(vi) Average daily population of inmates, on a monthly basis, at each prison facility over 2000-2019.

Specifications (i)-(iii) are designed to cover the ITS procurement process from beginning to end, and specifications (iv)-(vi) are designed to help us estimate the relationship between phone usage and call prices. Together, the specifications request the information needed to estimate an auction model of procurement.

The responses that we received from the states reflect their specific compliance requirements, their willingness to engage with our request, and their document retention practices. We received at least some documents from 43 states. Of these, 26 states provided a complete set of documents on at least one procurement event (i.e., specifications (i)-(iv)). Only nine states provided information on multiple procurement events. For call volumes and inmate populations, most states provided a limited, time-bound snapshot (specifications (v)-(vi)). Few states provided a longer time-series of data. Among this smaller set, the data we obtain from New York and New Jersey span an exogenous change in price imposed by the states and so are useful in understanding how prices affect call volumes. Across all of the specifications, the documents we received were (mostly) not digitized and came in a myriad of different formats. Processing the documents and constructing a usable database was time intensive.

The data that we use to estimate the model of procurement features 137 proposals submitted in response to 35 RFPs. Thus, the average RFP generated 3.9 proposals. The years of the earliest and latest RFPs are 2000 and 2019, respectively, the year of the median RFP is 2014,

and we observe multiple RFPs in every year over 2012-2019. Securus bids in response to 28 of the RFPs and wins eight times; GTL bids in response to 28 of the RFPs and wins 11 times. The RFPs to which Securus and GTL do *not* bid tend to occur earlier in the sample, before those firms reached their current size.

We observe that 17 RFPs (49% of the sample) specify that bids will be evaluated in part based on the proposed commission. For these RFPs, the average proposed commission among all bidders is 64% of revenue, and this increases to 65% for those bidders that ultimately are selected. Another seven RFPs simply dictate a preset commission to prospective suppliers; in only 11 instances is no commission obtained.

With regard to prices, we observe that 25 RFPs (71%) specify that bids will be evaluated in part based on the prices they propose to charge inmates (with lower prices being desired). For these RFPs, the average proposed price of a 15-minute local collect call is $1.32, taking into account connection charges and per-minute charges. For the remaining RFPs, the average price of a 15-minute collect call is $1.91.

Before turning to the model, we provide some qualitative evidence regarding how prospective suppliers adjust their bids based on the terms of the RFP. Figure 3 features two panels. In the left panel, we plot the weight that the RFP places on the commission in the scoring rule (horizontal axis) against the proposed commission (vertical axis). The orange triangles show winning bids and the blue circles show other bids. A positive relationship between the weight placed on the commission and the proposed commissions is evident, and the bivariate correlation statistic is 0.73. The right panel shows the analogous relationship for prices, specifically for the price of a 15-minute local collect call. Although it is less clear visually, a negative relationship exists, and the bivariate correlation statistic is -0.18. Putting the panels together, the data are consistent with higher weights on the commission and on prices, respectively, leading prospective suppliers to submit bids with higher commissions and lower prices.

## 3    Empirical Model of Procurement

### 3.1    Overview

The model features three types of agents: Departments of Corrections (DOCs), ITS providers, and inmates. Within each state, a DOC issues a request for proposals (RFP) for ITS. The RFP specifies how providers will be evaluated, and in particular the relative weight that the DOC will place on the commission to be paid to the state, the price to be charged inmates, and the quality of the providers. The RFP may also impose the commission, the price, or both. We take the RFPs as given. Procurement then unfolds as follows:

1. Providers observe the RFP and submit proposals.

2. DOCs observe the proposals and select a provider.



Figure 2: Proposed Commissions and Prices

Notes: Each symbol represents a proposed commission (left panel) or a proposed price (right panel). The symbols are orange triangles if the proposal was selected by the DOC and blue circles otherwise. The horizontal axis is the weight that the DOC placed on the commission (left panel) or price (right panel) in the scoring rule. The data are from 137 proposals in response to 35 different RFPs.

3. Inmates observe the price and determine how many calls to place.

The second and third stages of the model are non-strategic because the decision of one DOC does not affect other DOCs and inmates are price-takers. Nonetheless, they guide the trade-offs faced by providers as they determine the commissions and prices to submit with their proposals in the first stage. We assume that the (state-specific) costs and qualities of providers are common knowledge and exogenously determined. Therefore, the solution concept that we apply for the first stage is Nash equilibrium. We now consider each stage of the model in turn, proceeding in reverse order.

## 3.2 Inmates' Demand for Calls

We specify a demand function that connects the price of a 15-minute phone call to the number of calls that inmates place. In practice, this price often incorporates an upfront connection charge and a per-minute charge, and furthermore these charges can vary based on whether the call is local, intrastate (within the state), or interstate (between states). We construct a state-specific price based on a typical call length and average across different types of calls (with weights based on the number of calls). The data indicate a strong relationship between our measure of price and the number of calls that inmates place.

Figure 3 plots price and quantity over time for New Jersey (left panels) and New York (right panels). We measure quantity using the average number of calls placed per inmate in a given month. Among the states for which we have data, New Jersey and New York are distinct because (1) a long time-series of price and quantity data are available and (2) we observe

9

**JA285**



Figure 3: Prices and Quantities in New Jersey and New York

changes in price that occur for reasons that are unrelated to any changes in inmate demand for calls. In New Jersey, the DOC stopped accepting commissions in 2014 and imposed a series of price reductions. The state then passed a law that lowered prices once again in 2015. In New York, price fell in 2010 in conjunction with a change in ITS providers from GTL to Unisys, which resulted in a price decrease.

A visual inspection confirms that these price reductions are associated with an increase in the number of calls. In New Jersey, the average number of calls per inmate-month rises from an average of 8.32 before the first price reduction to 26.46 after the last. In New York, it rises from 8.66 to 16.09. This pattern corroborates our understanding that the price of calls is an important consideration for many inmates in their phone usage.

In the model, we assume that demand is linear and of the form $q(p_i, \boldsymbol{\beta}) = \beta_0 + \beta_1 p_i$, where $i$

10

**JA286**

Table 2: Inmate Demand for Calls

|  | (i) | (ii) | (iii) | (iv) |
|---|---|---|---|---|
| Price | -2.72 | -3.51 | -3.53 | -3.39 |
|  | (0.37) | (0.31) | (0.35) | (0.49) |
| Constant | 19.54 | . | 24.11 | 16.61 |
|  | (1.22) |  | (1.34) | (1.13) |
| NJ Constant | . | 24.07 | . | . |
|  |  | (1.24) |  |  |
| NY Constant | . | 16.79 | . | . |
|  |  | (0.66) |  |  |
| Sample | NJ/NY | NJ/NY | NJ | NY |
| # Observations | 63 | 36 | 38 | 25 |

*Notes*: The dependent variable is the number of calls divided by the average daily population of inmates. Observations are at the state-month level. The sample for New Jersey runs from February 2013 to May 2015. The sample for New York runs from January 2009 to January 2011. Standard errors are adjusted to account for heteroskedasticity and reported in parentheses.

indexes the state, $q_i$ is the number of calls per inmate-month, $p_i$ is the price of a 15-minute call, and $\boldsymbol{\beta} = (\beta_0, \beta_1)$ contains the demand parameters. We assume that demand does not depend on the ITS provider for reasons other than price. This is consistent with our understanding that quality differentiation among providers relates to various types of security provisions (e.g., call monitoring) rather than latency or other issues that would have a direct effect on the experience of inmates.

To estimate the demand parameters, we specify an econometric version of the demand system that allows for changes in prices and quantities over time:

$$q_{it} = \beta_0 + \beta_1 p_{it} + v_{it} \tag{1}$$

where $v_{it}$ captures seasonal and idiosyncratic changes in call volumes. We use ordinary least squares and estimate on the monthly data from New Jersey and New York, including 24 months on either side of the price changes. The OLS coefficients are unbiased if the changes in price are orthogonal to the error term.

The results are summarized in Table 2. The baseline specification is estimated in column (i). The coefficients indicate that if the cost of a 15-minute call increases by one dollar then the average number of calls placed per inmate-month decreases by nearly three. This corresponds to a mean price elasticity of demand of -0.53 in New Jersey and -0.42 in New York. With linear demand, this elasticity of demand is larger in magnitude if price is higher, all else equal. Indeed, the mean elasticity of demand in New Jersey falls from -1.62 (before the price decreases begin) to -0.07 (once they are finished). The corresponding mean elasticities in New York are -0.72 and -0.12.

A reduction in the price of a call saves money for inmates and for their families and friends, who often bear the financial burden of calls. Increasing the number of calls that can be afforded also supports greater contact between inmates and their social networks. It is unclear to us whether these benefits can be reliably measured by integrating under the demand curve to obtain "inmate surplus." However, if we do so, we find that the price reductions observed in New Jersey increase the monthly surplus of inmates by $1.27 million and the price reductions observed in New York increase the monthly surplus of inmates by $1.37 million.

Table 2 also shows the results that we obtain using a state-specific intercept (column (ii)) and state-level subsamples (columns (iii) and (iv)). Although some differences in the calling patterns between these two states exist, they are not different enough to matter substantially for the results that follow. Henceforth, we assume that the parameters shown in column (i) characterize the demand curve that we use in the model.

### 3.3    The DOCs' Procurement of ITS

Within each state, the DOC must select an ITS provider. We assume that the DOC evaluates providers based on the commissions they would pay the state, the prices they would charge inmates, and the quality of their service. The DOC commits to a scoring rule prior to the procurement process that is used to weight each of these factors. We assume that some subjectivity exists in the scoring process, consistent with the fact that we observe variation in how the same proposal is scored by different DOC employees. The DOC selects the provider that receives the highest score.

Letting $i$ index the state and $j$ index the provider, the scoring rule takes the form:

$$score_{ij} = \alpha^p \omega_i^p p_{ij} + \alpha^k \omega_i^k \overline{k}_{ij}(p_{ij}; \boldsymbol{\beta}) + \alpha^x (1 - \omega_i^k - \omega_i^p) x_{ij} + \epsilon_{ij} \qquad (2)$$

where $p_{ij}$ is the proposed price of a 15-minute phone call, $\overline{k}_{ij}(p_{ij}; \boldsymbol{\beta})$ is the commission as a function of the price, and $x_{ij}$ is the quality of the provider. These terms are weighted by $\omega_i^k$, $\omega_i^p$, and $(1 - \omega_i^k - \omega_i^p)$, respectively, with each of the weights between zero and one. The parameters to be estimated, $\boldsymbol{\theta} = (\alpha^p, \alpha^k, \alpha^x)$, convert the elements of the scoring function into comparable units, and scale contributions relative to the subjective component of the scoring, which we incorporate through an additive shock, $\epsilon_{ij}$. As we observe that DOCs prefer lower prices, higher commissions, and higher quality, we expect: $\alpha^p < 0$, $\alpha^k > 0$, and $\alpha^x > 0$.

Our formulation of the scoring rule allows the model to accommodate the heterogeneity that we observe in the data. For instance, in some procurement settings, the DOC imposes the price *ex ante*, and evaluates providers based on their proposed commission and their quality.[9] In the model, that would imply $\omega_i^p = 0$ and $p_{ij} = \tilde{p}_i$ for some $\tilde{p}_i$ selected by the DOC. Analogously,

---

[9]An example is Georgia in 2015, which imposed a price schedule for all bidders that set the cost of a 15-minute local collect call at $1.95, and selected a provider that would pay 97% of revenues to the state as a commission.

in some other procurement settings, the DOC imposes the commission *ex ante* and evaluates providers based on their prices and qualities. Further, as the weights that the DOC applies are available in the data, these scenarios are easily accounted for in the empirical implementation.

Reflecting industry practice, we allow the commission to feature fixed payments and also to depend on prices, through the revenue that is obtained from inmates:

$$\overline{k}_{ij}(p_{ij};\boldsymbol{\beta}) = k^0_{ij} + q(p_{ij};\boldsymbol{\beta})p_{ij}k^1_{ij} \tag{3}$$

where $q(p_{ij};\boldsymbol{\beta})$ is a demand function that characterizes the number of calls an average inmate places per month (as specified in the previous section), $k^0_{ij} \geq 0$ is a fixed payment per inmate-month, and $k^1_{ij} \in [0,1]$ is the fraction of revenue that the provider proposes to pay the state.[10] Most typically, DOCs specify that commissions must be paid as a fraction of revenue (i.e., they dictate *ex ante* that $k^0_{ij} = 0$ for all $j$). However, we observe instances in which DOCs specify the opposite (i.e., $k^1_{ij} = 0$ for all $j$), or specify some nonzero level of fixed payment and allow providers to select the fraction of revenue to pay the DOC. Again, the model accommodates this heterogeneity.

Finally, we assume that $\epsilon_{ij}$ is a stochastic term with a Type I extreme value distribution. We assume that draws from this distribution are realized after providers submit proposals, but that the distribution itself is common knowledge. Therefore, letting the objective portion of the scoring rule be given by

$$\delta_{ij}(\boldsymbol{\theta},\boldsymbol{w}_{ij}) = \alpha^p \omega^p_i p_{ij} + \alpha^k \omega^k_i \left(k^0_{ij} + q(p_{ij};\boldsymbol{\beta})p_{ij}k^1_{ij}\right) + \alpha^x(1 - \omega^k_i - \omega^p_i)x_{ij} \tag{4}$$

where $\boldsymbol{w}_{ij}$ collects the data associated with provider $j$ and state $i$, the *ex ante* probability with which provider $j$ is selected in state $i$ is

$$s_{ij}(\boldsymbol{\theta},\boldsymbol{W}_i) = \frac{\exp(\delta_{ij}(\boldsymbol{\theta},\boldsymbol{w}_{ij}))}{\sum_n \exp(\delta_{in}(\boldsymbol{\theta},\boldsymbol{w}_{in}))} \tag{5}$$

The denominator sums across all prospective providers, and the matrix $\boldsymbol{W}_i$ contains all the data relevant for state $i$ (we will let $\boldsymbol{W}$ combine data across states).

We estimate the parameters of the model using maximum likelihood. In doing so, we treat the commission, prices, scoring weights, and demand-side parameters (i.e., $\boldsymbol{\beta}$) as data. We use the quality score assigned to each provider as a measure of quality, and similarly treat it as data. The log-likelihood function is given by

$$\ln L(\boldsymbol{\theta}|\boldsymbol{y},\boldsymbol{W}) = \sum_i \sum_j y_{ij} \ln(s_{ij}(\boldsymbol{\theta},\boldsymbol{W}_i)) \tag{6}$$

---

[10]With Idaho in 2014, the contract stipulates a payment of $20 per inmate per month. The fixed payments that appear in other contracts are not tied explicitly to the inmate population, and we convert using data on ADP.

13

**JA289**

Table 3: Estimation of the Scoring Rule

|  | Parameter | Point Estimate | Std. Error |
|---|---|---|---|
| Price | $\alpha^p$ | -1.90 | (1.88) |
| Commission | $\alpha^k$ | 2.17 | (1.03) |
| Quality | $\alpha^q$ | 49.11 | (13.21) |

*Notes*: The table summarizes the results of maximum likelihood estimation. The estimation sample uses data on a total of 137 proposals, submitted in response to 35 RFPs.

where $y_{ij}$ equals one if provider $j$ is selected in state $i$, and zero otherwise. Estimation is based on the sample described in Section 2.3. In total, there are 137 proposals submitted in response to 35 different RFPs.

Table 3 summarizes the results. The parameter estimates have the expected signs. The magnitudes of each parameter determine the extent to which a change in the corresponding element of the proposal affects the likelihood of being selected. Under the maintained parametric assumptions, we have

$$\frac{\partial s_{ij}}{\partial \delta_{ij}} = s_{ij}(1 - s_{ij}) \tag{7}$$

and also

$$\frac{\partial s_{ij}}{\partial k_{ij}^0} = \frac{\partial s_{ij}}{\partial \delta_{ij}} \alpha^k \omega_i^k \tag{8}$$

$$\frac{\partial s_{ij}}{\partial k_{ij}^1} = \frac{\partial s_{ij}}{\partial \delta_{ij}} \alpha^k \omega_i^k q(p_{ij}) p_{ij} \tag{9}$$

$$\frac{\partial s_{ij}}{\partial p_{ij}} = \frac{\partial s_{ij}}{\partial \delta_{ij}} \left[ \alpha^p \omega_i^p + \alpha^k \omega_i^k \frac{\partial q(p_{ij})}{\partial p_{ij}} p_{ij} k_{ij}^1 + \alpha^k \omega_i^k q(p_{ij}) k_{ij}^1 \right] \tag{10}$$

The first two expressions are positive: the score of a provider increases at least weakly with the commissions it provides. The third expression can be positive or negative. To the extent that the DOC considers price in the scoring rule, there is a direct effect through which higher prices reduce the probability that the provider is selected. This is represented by the first term inside the brackets. However, price also can have an indirect effect, through the revenue that is obtained from inmates. This is represented by the second and third terms inside the brackets. Through the indirect effect, higher prices increase the probability of being selected if prices are on the inelastic portion of the demand curve, and decrease the probability of being selected otherwise.

14

**JA290**

### 3.4   ITS Providers' Responses to RFPs

We assume that the expected profit of a prospective supplier, heading into a procurement event, is given by

$$\pi_{ij}(k_{ij}^0, k_{ij}^1, p_{ij}) \;\; = \;\; s_{ij} \underbrace{\left[ ((1 - k_{ij}^1) p_{ij} - \gamma_{ij}) q(p_{ij}) - k_{ij}^0 \right]}_{\equiv A_{ij}} \tag{11}$$

where $s_{ij}$ is the probability with which the provider is selected (as previously defined) and $A_{ij}$ is the profit per inmate-month conditional on selection. The profit function embeds that the provider obtains revenue from the price that it charges inmates, and that some of that revenue is transferred to the state in the form of a commission.

The profit function includes another term, $\gamma_{ij}$, that represents the per-call cost of service less any ancillary revenues that the provider obtains from fees.[11] Prisons with larger populations typically have multiple facilities and require more physical phone installations and have greater maintenance requirements. Inmate phone calls can also require per-call costs such as live call monitoring, continuous voice analytics, preventing three-way calling, voice-to-text, etc. Thus, it is reasonable to assume that the cost of service is proportional to the number of calls that will be placed (given price). As we maintain the same assumption for ancillary revenue, we have:

$$\text{cost}_{ij} - \text{ancillary revenue}_{ij} = \gamma_{ij} q(p_{ij}; \boldsymbol{\beta}) \tag{12}$$

where cost and ancillary revenue are per inmate-month. The value of $\gamma_{ij}$ is larger if costs are higher and if ancillary revenues are lower.

Depending on the RFP, providers may be able to select their commission, their price, or both. We assume that, in doing so, they maximize expected profit conditional on the choices of other providers. We assume the existence of a Nash equilibrium.

In choosing the commission—either the fixed payment or the fraction of revenue—each provider balances that a higher commission increases the probability of being selected by the DOC, but reduces profitability in the event that it is selected. Whether one differentiates the profit function with respect to the fixed payment ($k_{ij}^0$) or the revenue-based payment ($k_{ij}^1$), the same first order condition obtains:

$$\underbrace{(1 - k_{ij}^1) p_{ij} q(p_{ij}) - k_{ij}^0}_{\text{Retained Revenue}} \;\; = \;\; \underbrace{\gamma_{ij} q(p_{ij})}_{\text{Cost Less Ancillary Revenue}} \;\; + \underbrace{\left( \frac{1}{\alpha^k \omega_i^k} \frac{1}{(1 - s_{ij})} \right)}_{\text{Markup}} \tag{13}$$

---

[11]As we discuss in Section 2, there are variety of fees that can be imposed on inmates and their families, including charges for adding money to an account and charges for making collect calls. These fees can be difficult for the DOC to observe, and our public records requests did not provide systematic information on the fees that different providers apply.

The left hand side is the portion of revenue obtained from inmates that is retained by the provider after payments to the state have been made ("retained revenue"). The right hand side is additive in the provider's cost, the ancillary revenues it obtains, and a profit-maximizing markup term.[12]

We assume that equation (13) holds if providers can choose at least one of their commission terms. This allows us to recover each $\gamma_{ij}$, and thus the net of providers' costs and ancillary revenues, as the other terms in the equation depend on data and already-estimated parameters. We obtain a median retained revenue of $9.15, a median cost (less ancillary revenue) of $4.32, and a median markup of $3.68, each measured on a per inmate-month basis. For comparison, the median amount to be paid to the state in (proposed) commissions is $14.45 per inmate-month.

We now consider how providers determine the price to be charged to inmates. Differentiating the profit function obtains the following first order condition:

$$\frac{\partial s_{ij}}{\partial p_{ij}} A_{ij} + s_{ij} \left( (1 - k_{ij}^1)q(p_{ij}) + [(1 - k_{ij}^1)p_{ij} - \gamma_{ij}]\frac{\partial q(p_{ij})}{\partial p_{ij}} \right) = 0 \tag{14}$$

We assume that this equation holds if the DOC permits providers to choose price in their RFP responses. This provides another path to recovering the $\gamma_{ij}$ terms. However, we find that any such inferences are sensitive to the (imprecisely estimated) $\alpha^p$ parameter, and so we rely instead on equation (13).

For providers that choose price, a somewhat complicated set of trade-offs arises. To tease this out, assume for the moment that price does not affect the choice of provider (i.e, $\partial s/\partial p = 0$). In that case, the model simplifies to a standard monopoly pricing problem, albeit one in which cost (less ancillary revenue) is inflated by the commission:

$$p_{ij} = \left( \frac{1}{1 - k_{ij}^1} \right) \gamma_{ij} - \left( \frac{\partial q(p_{ij})}{\partial p_{ij}} \right)^{-1} q(p_{ij}) \tag{15}$$

The price that solves this simplified condition must fall along the elastic portion of the demand curve.[13] It exceeds the price that would maximize profit without the commission; it also exceeds the price that would maximize the revenue obtained from inmates. From this baseline, any

---

[12]Equation (13) reveals that our model of procurement is comparable to a standard, one-shot oligopoly pricing game with logit demand. The first order conditions of that game can be expressed as

$$p = mc - \frac{1}{\alpha}\frac{1}{1 - s}$$

where $p$ is the price to consumers (analogous to net revenue in our model), $mc$ is marginal cost, $\alpha < 0$ is the price parameter in the logit demand function (analogous to $\alpha^k \omega_i^k$ in our model), and $s$ is a market share (analogous to the selection probability in our model).

[13]With the linear demand curve specified in the previous section, $q(p) = \beta_0 + \beta_1 p$, the price that solves equation (15) equals $\frac{1}{2}\left( -\frac{\beta_0}{\beta_1} + \frac{\gamma_{ij}}{1 - \kappa_{ij}^1} \right)$. The revenue-maximizing price is $-\frac{1}{2}\frac{\beta_0}{\beta_1}$.

effect of price on the selection probability must exert downward pressure on price. The reason is that a lower price would directly increase the score and would obtain more revenue from inmates (to be shared with the DOC). The extent to which price falls below the baseline level depends at least on the commission, which itself may be a choice variable of the provider, and the scoring rule.

An implication of this analysis is that revenue-based commissions can induce providers to set prices higher than they otherwise would, and these prices can exceed what would maximize providers' profit and what would maximize the revenue obtained from inmates. On this point, the example of New Jersey is salient. Given our demand estimates, the price that maximizes revenue is $2.83 per 15-minute call. Yet Figure 3 shows that prices were well above that level before the New Jersey DOC changed its procurement practices in 2014. During the period of high prices, New Jersey received 41% of the revenue obtained from its provider of ITS.

## 4   Policy Evaluation

We use the procurement of ITS in one selected state to explore the economic effects of various regulatory interventions in the market.[14] The RFP describes a scoring rule in which providers would be evaluated based on their commission (with a weight of 14%) and their quality of service (with a weight of 86%). The RFP also dictates prices based on payment type. The price for all collect calls incorporates a $0.86 surcharge and a $0.10 per-minute charge, which amounts to $2.36 for a 15-minute call. The price for prepaid calls incorporates a $0.65 surcharge and a $0.075 per-minute charge, which amounts to $1.78 for a 15-minute call. These prices are the same for local, intralata, interlata, and interstate calls.

Table 4 summarizes the bids of the four providers that responded to the RFP—GTL, Securus, IC Solutions, and Telmate—and the implications for revenue and profit that are implied by the model. The DOC evaluated the quality of GTL, Securus, and ICS as being much higher than that of Telmate, and assigned the highest quality rating to GTL, at 98% of the available quality points. The four providers proposed commissions of 60%, 71%, 66%, and 66%, respectively. For GTL, which won the contract, those commissions imply a payment to the state of $18.59, a retained revenue of $12.39, and a profit of $4.99 (all per inmate-month).

Our results indicate that Securus, and to a lesser extent IC Solutions, benefit from a lower "Cost Less Ancillary Revenue" than GTL. The model infers this in order to rationalize the higher proposed commissions of Securus and IC Solutions, given the quality scores. As we have already described, a lower "Cost Less Ancillary Revenue" value can reflect lower costs or higher fees, as the two are not separately identifiable in the model. However, we are not aware that either Securus or IC Solutions has a substantial cost advantage in the market. Furthermore, in

---

[14]The results presented in this section are based on our initial modeling and should not be interpreted (yet) as reliable characterizations of any actual or counterfactual procurement event.

Table 4: Procurement in a Selected State

| Provider | Commission | Quality Score | Payment to State | Retained Revenue | Cost Less Ancillary Revenue | Profit |
|---|---|---|---|---|---|---|
| GTL | 0.60 | 0.98 | 18.59 | 12.39 | 7.41 | 4.99 |
| Securus | 0.71 | 0.96 | 22.06 | 8.92 | 2.48 | 6.44 |
| IC Solutions | 0.66 | 0.95 | 20.45 | 10.53 | 6.34 | 4.19 |
| Telmate | 0.66 | 0.48 | 20.45 | 10.53 | 7.17 | 3.37 |

*Notes*: The table summarizes the data and modeling results for the procurement of ITS in a selected state. The commission is the fraction of revenues that the provider proposed to give to the state. The commission score and the quality score show the percentage of the maximum possible points each provider was awarded. The scoring rule placed a 14% weight on commissions and an 86% weight on quality. Prices were mandated and received no weight in the scoring rule. Payment to the state, retained revenue, cost less ancillary revenue, and profit are expressed in dollars per inmate-month. We calculate payment to the state based on the data on commission and prices and the estimated demand function. Retained revenue is calculated based on prices and the estimated demand function (which obtain gross revenue) less the payment to the state. Cost less ancillary revenue is inferred from the model. Profit is calculated as the difference between retained revenue and cost less ancillary revenue.

its evaluation of the providers, the DOC explicitly mentioned that Securus' fees were notably higher than those of IC Solutions, and that GTL was not imposing any fees. Therefore, we interpret the modeling results as consistent with heterogeneity among the providers in their fee structure.[15] The value of $7.41 for GTL—which may represent the cost of service per inmate-month—corresponds to $0.025 per minute if the average inmate places twenty calls each month, each with a duration of 15 minutes.

Table 5 considers a number of counterfactual policy scenarios. For each, we obtain the expected number of calls, inmate surplus, commission, revenue from inmates, provider profit, and payment to the state. We obtain the expectations by averaging across the four providers, weighting by their choice probability. Inmate surplus is calculated by integrating under the demand curve. We report it for completeness but have reservations about whether it captures the myriad of benefits that inmates and their families and friends may gain from phone calls (see Section 3.2). The revenue obtained from inmates does not include fees, though fees are implicitly included in provider profit through "cost less ancillary revenue." Aside from the commission, all numbers are per inmate-month.

---

[15]Securus planned to impose a bill statement fee of $3.49 for collect calls, a transaction processing fee of $6.95 for prepaid collect debit on credit/debit card transactions, a return check charge fee of $20.00 for all call types, a wireless administration fee of $2.99 applicable to account with wireless numbers; and a Federal Regulatory Recovery Fee of $3.49 for Interstate calls. IC Solutions planned to impose a prepaid account funding fee of $2.00 per deposit of $50.00 or less and a FUSF recovery fee for interstate calls at a rate of 3.2% of interstate collect call charges.

Table 5: Counterfactual Policy Evaluation

| Provider | Baseline (*) | No Fees (i) | Double Competition + No Fees (ii) | No Commission + No Fees (iii) | 50% Price Reduction + No Fees (iv) | No Commission + 67% Price Reduction + No Fees (v) | No Commission + 76% Price Reduction + No Fees (vi) | Free Calls + No Fees (vii) |
|---|---|---|---|---|---|---|---|---|
| Number of Calls | 12.85 | 12.85 | 12.85 | 12.85 | 17.19 | 18.67 | 19.46 | 21.54 |
| Inmate Surplus | 22.40 | 22.40 | 22.40 | 22.40 | 40.13 | 47.32 | 51.42 | 62.98 |
| Revenue from Inmates | 30.32 | 30.32 | 30.32 | 30.32 | 20.29 | 14.54 | 10.98 | 0 |
| Commission | 0.66 | 0.59 | 0.62 | 0 | 0.26 | 0 | 0 | 0 |
| Provider Profit | 5.51 | 5.28 | 4.16 | 23.07 | 5.28 | 4.01 | 0 | -12.15 |
| Payment to State | 20.06 | 17.79 | 18.91 | 0 | 5.31 | 0 | 0 | 0 |

19

To provide a baseline, column (*) provides the statistics for the procurement event as it actually occurred.

In column (i) we consider a scenario in which the fees of Securus and IC Solutions are removed. We do so by assuming that "Cost Less Ancillary Fees" for those two providers equals that of GTL. Within the model, this change does not affect the demand for calls or the scores that are assigned to the prospective suppliers. The commission falls from 66% to 59% because Securus and IC Solutions benefit less from winning the contract. Still, profit decreases relative to baseline, from $5.51 to $5.28, due to the loss of fees. The payment to the state decreases from $20.06 to $17.79. There is a benefit to inmates but this is not captured in the model. In all of the remaining counterfactuals, we maintain the assumption that providers do not charge fees.

In column (ii) we "double" the amount of competition. We do so by cloning each of the four prospective suppliers and including the clones in the model. Thus, there are two providers with the cost and quality of GTL, for example. As prices are set by the DOC, they do not decrease with more competition. Instead, the effect of competition is to increase the proposed commissions. We compute that the (expected) commission increases to 62%. Profit decreases to $4.16 and the payment to the state increases to $18.91. The scenario highlights that, with commissions, inmates may not benefit from greater competition. As a general matter, the effect of competition within the model depends on whether the DOC allows prospective providers to compete on price and, if there is price competition, the weight that the DOC places on low prices in the scoring rule.

In column (iii) we eliminate commissions. Inmates do not benefit because we hold prices fixed at the level set by the DOC. Without commissions, profit increases to $23.07 and payments to the state no longer occur. The scenario highlights that eliminating commissions alone does benefit inmates. However, as doing so substantially increases the profitability of the provider, service could be provided profitably at much a lower price. We explore price changes next.

In column (iv) we decrease the price by 50% and recompute equilibrium. At the lower prices, the number of calls that inmates place increases from 12.85 to 17.19 and inmate surplus increases from $22.40 to $40.13. Less revenue is obtained from inmates so the providers decrease the commissions they offer; in expectation this falls to 26%. The price change leaves provider profit at exactly the same level as in column (i). Thus, we interpret it as consistent with a long run equilibrium in which providers must obtain some amount of profit to recover fixed costs outside the model. The payment to the state decreases substantially, to $5.31, which reflects lower revenue and a lower commission.

In columns (v) and (vi) we eliminate commissions and also decrease the price by 67% and 76% percent, respectively. The first change leaves provider profit slightly lower than the setting in column (ii) where providers face increased competition. The second price change eliminates profit entirely. We find that the number of calls increases to 18.67 and 19.46, respectively,

20

**JA296**

and inmate surplus increases to $47.32 and $51.42. The scenarios in (iv)-(vi) highlight how profitable service can be provided at much lower prices if commissions are eliminated.

Finally, in column (vii) we consider free calls. The number of calls increases to 21.54 and inmate surplus increases to $62.98. In this scenario, providers obtain no revenue, and thus lose money. We calculate a profit of -$12.15. Implementing this scenario likely would require reversing the flow of payments. That is, the state could pay providers to provide service, and the procurement process could balance service quality and the cost of that service.

## 5    Conclusion

In this paper we conduct an empirical examination of the inmate telecommunications services market. Correctional authorities that operate prisons and jails select a monopolist service provider based on the authorities' preferences for quality, phone rates, and the percent of revenue returned as a commission. Inmates and their families are at the mercy of the quality and prices of a provider that is determined without their input. We study this market using a dataset meticulously collected from public records requests to every state and the District of Columbia. First, we use exogenous price changes observed in two states to estimate inmate demand for calls as a function of phone call prices. Incorporating these estimates into a first-score auction model, we recover structural model parameters that enable us to impute ITS provider costs. We find that prices are substantially higher than costs, and that these elevated prices are due to RFP incentives to offer commissions as well as the limited number of ITS providers competing in the market. Lastly, we run counterfactual analyses in a specific state to demonstrate how surplus shifts to different parties under alternate regulatory environments or increased competition. We find that a procurement process in which the correctional authority sets reduced phone rates (a 76% reduction) and eliminates commission more than doubles consumer surplus and allows ITS providers to profitably provide services.

# References

ASKER, J. AND E. CANTILLON (2008): "Properties of scoring auctions," *The RAND Journal of Economics*, 39, 69–85.

BHULLER, M., G. B. DAHL, K. V. LOKEN, AND M. MOGSTAD (2021): "Incarceration, Recidivism, and Employment," *Journal of Political Economy*, 128, 1269–1324.

BOLOTNYY, V. AND S. VASSERMAN (2021): "Scaling Auctions as Insurance: A Case Study in Infrastructure Procurement," Working Paper.

HJALMARSSON, R. AND M. J. LINDQUIST (2022): "The Health Effects of Prison," *American Economic Journal: Applied Economics*, 14, 234–270.

KANG, K. AND R. A. MILLER (2021): "Winning by Default: Why is There So Little Competition in Government Procurement?" *The Review of Economic Studies*, 89, 1495–1556.

MASTROBUONI, G. AND D. TERLIZZESE (2022): "Leave the Door Open? Prison Conditions and Recidivism," *American Economic Journal: Applied Economics*, 14, 200–233.

MILLER, N. (2014): "Modeling the Effects of Mergers in Procurement," *International Journal of Industrial Organization*, 37, 201–208.

MUKHERJEE, A. (2021): "Impacts of Private Prison Contracting on Inmate Time Served and Recidivism," *American Economic Journal: Economic Policy*, 13, 408–438.

ROSE, E. K. AND Y. SHEM-TOV (2021): "How Does Incarceration Affect Reoffending? Estimating the Dose-Response Function," *Journal of Polical Economy*, 129, 3302–3356.

SLATTERY, C. (2020): "Bidding for Firms: Subsidy Competition in the U.S." Working Paper.

TAKAHASHI, H. (2018): "Strategic Design Under Uncertain Evaluations: Structural Analysis of Design-Build Auctions," *The RAND Journal of Economics*, 49, 594–618.

TOBÓN, S. (2022): "Do Better Prisons Reduce Recidivism? Evidence from a Prison Construction Program," *Review of Economics and Statistics*, forthcoming.

# Appendix

## A   Additional Figures and Tables



Figure A.1: Price Elasticity of Demand and Consumer Surplus

23

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | |
| Rates for Interstate Inmate Calling Services | WC Docket No. 12-375 |

## <u>COMMENTS OF SECURUS TECHNOLOGIES, LLC</u>

Joshua P. Martin
Senior Vice President and General Counsel
Securus Technologies, LLC
4000 International Parkway
Carrollton, Texas 75007
(972) 277-0300
joshuamartin@securustechnologies.com

Michael H. Pryor
Shareholder
Brownstein Hyatt Farber Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

*Counsel to Securus Technologies, LLC*

December 15, 2022

principles to address accessibility by persons with disabilities.  For example, Securus reviews the color pallet for readability by persons that are color blind, gives attention to spacing radius for those that may have lessened motor skills, and focuses on simplicity of design for flow and functionality so that the webpage is easy to read.  For incarcerated persons, Securus recently added the TalkBack screen reader accessibility service to its deployed tablets and added a chatbot to its website to assist users in obtaining answers to frequently asked questions ("FAQ").  Securus is continuously assessing ways to improve the functionality and accessibility of its website and other public platforms.  The Notice provides a number of examples of accessible formats and providers should have some flexibility in selecting appropriate formats in light of restrictions imposed by correctional authorities and available access technologies at the facility.

## III.    THE COMMISSION SHOULD PROMPTLY ENABLE PROVIDERS TO OFFER ALTERNATIVE PRICING STRUCTURES

### A.  Securus Strongly Supports Allowing Alternative Pricing Plans

Securus strongly urges the Commission to promptly allow providers to offer optional alternative pricing structures.  Securus was testing highly popular and beneficial alternative subscription programs for intrastate calls that were producing substantial savings to consumers.  Consumers welcomed and supported these programs that unfortunately had to be suspended due to the Commission's determination that the jurisdiction of calls must be based on their physical end points.  Given the difficulty in determining the physical end point of calls to wireless phones coupled with the Commission's ruling that indeterminate calls must be treated as interstate and thus must be priced on a per-minute basis, Securus suspended the programs and sought a waiver of the per-minute pricing requirement.[6]  The waiver has been pending for almost a year and a

---

[6] *Wireline Competition Bureau Seeks Comment On Securus Technologies, LLC's Petition For Waiver of the Inmate Calling Services Per-Minute Rate Requirement*, Public Notice, 36 FCC Rcd 15841 (2021).

half, notwithstanding pleas from consumers to restore the programs and the submission of detailed data showing substantial cost savings at even modest levels of usage.[7]  Securus submitted examples of these pleas, such as:

> Please let the call subscriptions continue, it's the only way i can talk to my loved ones while being on a budget. With everything else in this world that costs so much this was a nice feature that i could manage. Idk how i will be able to talk to my loved ones anymore without it. Veronica F.

> This plan is very important for us to be able to keep in touch with our son. All costs at the jail/prison are outrageously expensive so this has been a big help to keep the costs down and to be able to stay in contact with him. Please keep this in place or re-instate it as quickly as possible. Rene W

> Call subscription helps my sister speak with her 5 children and help them with their homework over the phone because she could call several times during the day. I don't know how life will be without this subscription. It has really helped our situation. Subscription is the only good that have happened since my sister was arrested. She calls me every single day that it helps all of us to stay sane. Glory E.[8]

## B.  Securus' Pilot Programs Provide Strong Evidence that Alternative Pricing Structures Benefit Consumers

Subscription programs provide consumers a choice between conventional per-minute calling services and an optional flat rate charge for a package of calls.  As a voluntary alternative to per-minute pricing, Securus offered subscription programs for in state calls in six different states encompassing nine sites, eight of which were county jails and one of which encompassed a state prison system.  The plans offered consumers the opportunity to purchase a set number of calls per month or week at a flat rate, which included a base rate, a $3.00 automated payment fee

---

[7] Securus Subscription Waiver Comments, WC Docket No. 12-375 at 5-8 (Jan. 7, 2022) ("Securus Subscription Waiver Comments") (submitting requests from consumers and correctional authorities to continue the subscription programs).
[8] *Id.*

allowed to continue the programs.[12]  It is truly unfortunate that the Commission's failure to act

on Securus' waiver petition has deprived consumers of cost-saving calling programs.

### C. Reasonable Conditions for Alternative Pricing Structures

Securus appreciates the Commission's concerns that alternative pricing programs should

not result in consumers paying more than they would under the Commission's rate caps or

otherwise harm consumers.  The focus of these pilot programs should be on the overall value

experienced by the average consumer.  Securus believes that consumer choice is key.  Any pilot

program should only be offered as a voluntary alternative to standard, per-minute rates and

consumers must have the ability to easily opt out of the program should they find that the

program does not create value for them.  Consumers are savvy enough to know that a flat price

subscription plan is only optimal for them if they anticipate making a large number of calls each

month.

Subscription plans must not be proffered as a mechanism to evade rate caps and the

Commission recognizes that persons who severely underutilize a flat rate plan may not enjoy

savings compared to standard per-minute rates.  This is true of commercial plans as well.  The

Commission thus asks how and whether it should ensure that the effective rate of a subscription

plan, on a per-minute basis, is less than the per-minute rate cap applicable to the facility.[13]  The

Commission suggests that one way to ensure that, overall, the plan generates savings is to take

the total price of the program and divide it by the total available minutes.[14]  Securus' view is that

no pilot program should be offered if its effective per-minute rate at full utilization is not below

the applicable per-minute rate cap.  Another approach suggested by the Commission is to take

---

[12] Securus Subscription Waiver Comments at 5-15.
[13] Notice ¶ 154.
[14] *Id.*

11

account of actual usage of plan participants. The Commission could set as a condition of a program that its effective per minute rate be below per-minute rate caps at an average level of usage. The Commission should be mindful, however, of not imposing excessive burdens on providers. The Commission's concerns may be overstated. Securus' experience with its pilot programs was that they are cost-effective for consumers at levels well below full utilization and in the range of 15% to 30% usage of available minutes, and on average, consumers utilized 76% of available minutes, resulting in substantial savings on average.

The alternative approach of ensuring that the consumer is assured that the effective rate of each minute of use is at or below the applicable rate cap regardless of their level of program utilization (whether through use of roll-over requirements, refunds or rebates for underutilized plans) is likely to result in nothing more than the repackaging of per-minute calling. As the economic risk to the ICS provider under those arrangements is identical to per-minute calling (in that the provider is only assured of the sale of the current minute of use), there is little or no incentive to price these plans at a substantial price discount that would be valuable to the consumer.

In determining the characteristics of permitted programs, the Commission should ensure that consumers have access to information for making an informed choice and that ICS providers have incentives to provide value to consumers that provide for a meaningful alternative to per-minute pricing. With a reasonably structured subscription plan, an informed consumer should be trusted to use their judgment in selecting the option that best meets their needs. Beyond the current subscription term, the consumer should have a readily accessible means to decline or cancel any renewal option. Refund options should be available, but limited to specific circumstances (e.g., where the incarcerated person has been transferred or released, where there

12

has been no use of the plan, etc.).  As long as the programs are voluntary, have adequate disclosures, and enable cancellation at any time, consumers can be expected to make rational choices for what works best for them.

The Commission should not require refunds or rebates in the case where a consumer underutilizes the program to ensure that the consumer always obtains the benefit of the applicable per-minute rate cap, because the ICS provider will need to factor that economic risk into the pricing of the plan.  The result may be nothing more than repackaged per-minute pricing of little or no value to the consumer, thus eliminating a true option for alternative pricing.  Nor should providers be required to prorate a refund for a consumer who cancels during the subscription period.  Such requirements would deprive providers of the benefit of the bargain – low rates in exchange for a predictable revenue stream.

### D.  Providers Should Be Given Flexibility to Modernize Rate Structures

Securus respectfully urges the Commission to allow providers flexibility in developing pilot programs that offer consumers the option to utilize price models more consistent with general commercial communications offerings.  As long as the basic consumer protections as outlined above are maintained, providers should be able to design programs that they believe best meets the needs of consumers and the provider.  The Commission should not, for example, require that all programs be based on minutes of use rather than number of calls.  Securus' pilot programs are based on the number of calls because consumer feedback indicated that that was preferred over a set number of minutes.  Basing a program on the number of calls also makes it easier for consumers to track their utilization.  Providers may also test programs that offer flat monthly pricing for unlimited minutes or calls.

13

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Rates for Interstate Inmate Calling Services ) | WC Docket No. 12-375 |
| ) | |
| ) | |

**COMMENTS OF**

**THE WRIGHT PETITIONERS**
**BENTON INSTITUTE FOR BROADBAND & SOCIETY**
**PRISON POLICY INITIATIVE**
**PUBLIC KNOWLEDGE**
**WORTH RISES**

Andrew Jay Schwartzman
Senior Counselor
Benton Institute for Broadband & Society
1341 G Street, NW
Washington, DC 20005
(202) 241-2408

*Counsel for the Benton Institute for
Broadband & Society*

Peter Wagner
Executive Director
Prison Policy Initiative
P.O. Box 127
Northampton, MA 01060
(413) 527-0845

Albert H. Kramer
Senior Fellow
Public Knowledge
1818 N Street, NW, Suite 410
Washington, DC 20036
(202) 861-0020

Bianca Tylek
Executive Director
Worth Rises
85 Delancey Street, 2nd Fl.
New York, NY 10002

December 15, 2022

Rebekah P. Goodheart
Gregory R. Capobianco
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

Davina S. Sashkin
Keenan P. Adamchak
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861-1759

Jacqueline Kutnik-Bauder
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005

*Counsel for the Wright Petitioners*

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY ................................................................. 1

I.    The Commission Should Adopt Refinements to the Rules for Inactive Accounts to
      Protect Consumers. ........................................................................................... 2

II.   The Commission Should Create an ICS Label, Similar to the Recently Adopted
      Broadband Label. ............................................................................................. 6

III.  If the Commission Permits ICS Providers to Offer Pilot Programs with
      Alternative Pricing Structures, It Should Adopt Conditions to Protect Incarcerated
      People. ............................................................................................................... 9

IV.   The Commission Should Require ICS Providers to Resubmit Their Responses to
      the Third Mandatory Data Collection as Necessary. ..................................... 12

CONCLUSION ......................................................................................... 13

## INTRODUCTION AND SUMMARY

The Wright Petitioners,[1] the Benton Institute for Broadband & Society, Prison Policy Initiative, Public Knowledge, and Worth Rises (collectively, the "Public Interest Parties"), applaud the Federal Communications Commission ("Commission") for its leadership in adopting reforms to prevent abusive practices and charges in the provision of inmate communication services ("ICS"). These reforms represent considerable progress, but more work needs to be done to ensure rates and practices are just and reasonable. Most recently, in the *2022 ICS Order*,[2] the Commission took long-awaited action to better ensure that incarcerated people with disabilities are able to communicate by broadly mandating access to all relay services in many facilities. In the *Sixth FNPRM*, the Commission seeks comment on additional reforms to ensure services are accessible, and practices and charges are transparent and fair.

In response, the Public Interest Parties support further efforts to ensure just and reasonable rates and urge the Commission to adopt the following reforms:

- To ensure funds are returned to consumers, adopt refinements to its rules that address balances in inactive accounts to prevent ICS providers from unjustly claiming funds that are not their own.

---

[1] The Wright Petitioners—the late Martha Wright, Ulandis Forte, Ethel Peoples, Laurie Lamancusa, Dedra Emmons, Charles Wade, Earl Peoples, Darrell Nelson, and Jackie Lucas—brought suit in the United States District Court for the District of Columbia against Corrections Corporation of America in 2000, seeking to set aside exclusive telephone contracts among the private prisons and certain telephone companies. The matter was subsequently referred to the Commission in August 2001. Since 2003, these petitioners have actively petitioned the Commission for regulation of inmate calling services through The D.C. Prisoners' Legal Services Project, Inc. at the Washington Lawyers' Committee for Civil Rights and Urban Affairs.

[2] *See In re Rates for Interstate Inmate Calling Services*, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 22-76 (rel. Sept. 30, 2022) ("*2022 ICS Order*" or "*Sixth FNPRM*").

- To promote clear and transparent information about fees and other costs, adopt an "ICS label" that builds on the transparency and clarity of the recently adopted broadband labels.[3]

- To ensure consumers are protected, require that pilot programs with alternative pricing structures do not make consumers pay more than they would otherwise under the Commission's existing rules.

- To have a full and complete record, take all steps necessary to ensure that ICS providers comply with the Third Mandatory Data Collection ("MDC").

Adopting these measures, as well as proposed reforms to improve the accessibility of ICS,[4] will continue the Commission's steadfast path to a more just and reasonable ICS market.

## I.   THE COMMISSION SHOULD ADOPT REFINEMENTS TO THE RULES FOR INACTIVE ACCOUNTS TO PROTECT CONSUMERS.

The Public Interest Parties support the Commission's actions to curb ICS providers' abusive practice of seizing and retaining unused account balances.  As the Commission observed in the *2022 ICS Order*, these practices "'deprive[] consumers of money that is rightfully theirs.'"[5]  As a result, the Commission prohibited providers from seizing or otherwise disposing

---

[3] *See In re Empowering Broadband Consumers Through Transparency*, Report and Order and Further Notice of Proposed Rulemaking, CG Docket No. 22-2, FCC 22-86 (rel. Nov. 17, 2022) ("*2022 Broadband Label Order*").

[4] The Public Interest Parties also generally support the Commission's proposals regarding disability access.  *See Sixth FNPRM* ¶¶ 93-98; *see also* Comments of HEARD, Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI) et al., WC Docket No. 12-375 (Dec. 15, 2022).

[5] *See 2022 ICS Order* ¶ 75 (quoting Reply Comments of Prison Policy Initiative at 30, WC Docket No. 12-375 (Dec. 17, 2021) ("PPI Reply")).  *See also id.* ¶ 73 & n.203 (citing 51 Former State Attorneys General Comments at 2, WC Docket No. 12-375 (Jan. 9, 2015) (noting that ICS providers "are actually taking prepaid monies from prisoner accounts if for whatever reason the account is 'inactive'" for a period of time)); *id.* ¶ 74 n.207 (citing Letter from Stephen Raher, General Counsel, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (May 6, 2022) (alleging that ICS providers "hold substantial amounts of

of unused funds in any account for ICS until the account has been inactive for at least 180 days. Even after that point, the provider first must make reasonable efforts to refund the balance to the account holder and then, only if such efforts are unsuccessful, treat any remaining funds consistent with applicable state law.

In the *Sixth FNPRM*, the Commission seeks comment on refining its rules to further protect consumers from unjust and unreasonable practices. The Public Interest Parties support refinements to ensure that ICS consumers are provided with a realistic opportunity to obtain refunds of unused funds. Accordingly, the Commission should also: (1) require ICS providers to notify consumers of the provider's policies on inactive accounts and refunds upon creating an account and annually; (2) require ICS providers to notify consumers if their accounts are at risk of being deemed inactive; (3) expand its refund requirement to require automatic refunds both (a) when incarcerated individuals are released from the contracting agency's custody, and (b) when a facility changes its ICS vendor; and (4) require ICS providers to issue refunds to account holders within seven business days of a refund request.

These rules are necessary to protect consumers. ICS providers frequently fail to inform their account holders (i) that an account has, or will become, inactive, (ii) as to the status or disposition of unused account balances, and (iii) how the consumer may seek a refund of those unused funds. Instead, account holders must actively seek out ICS account information (whether by logging in to an online system or by calling an account service operator) in order to learn whether an account has become inactive. It is our understanding that ICS consumers often only discover that their account has been deemed inactive at the moment that they are unable to

---

customer prepaid funds, which carriers are free to use as unrestricted working capital" and that "many carriers impose inactivity policies under which customer funds are forfeited to the carrier after a certain period of account inactivity")).

answer a call from an incarcerated loved one.  This is the case despite the fact that ICS providers generally require, as a matter of course in establishing accounts and accepting payments into accounts, an email address and/or cell phone number, which should make basic automatic account alerts, such as an alert about inactivity, frictionless.  Once an inactive account is discovered, however, the consumer must affirmatively request that the account be reactivated, and the funds reinstated, or must jump through hoops to secure refunds of unused balances.  As has been noted in this proceeding for years, many providers have refused to reinstate funds or provide refunds at all, or have made their policies and procedures regarding refunds difficult to find, follow, or enforce.[6]

A similar lack of fair treatment characterizes when changes to a facility's ICS provider occur.  In those circumstances, consumers may be notified just prior to the change or not at all and providers do not generally provide automatic refunds to account holders.  For example, in 2017, the New York State Department of Corrections and Community Supervision ("NYS DOCCS") switched its systemwide ICS vendor from GTL to Securus, but notice was not targeted to reach the affected ICS consumers.[7]  Attached hereto as Attachment A is a flyer

---

[6] Indeed, evidence supported in the record indicates that ICS providers only issue refunds when mandated to do so.  *See, e.g.*, Human Rights Defense Center Reply Comments at 7, WC Docket No. 12-375 (Jan. 27, 2015) ("A recent ICS contract between CenturyLink and the Idaho Department of Corrections generally prohibits refunds for unused phone time:  Unused phone time will only be refunded when an Inmate has been moved to a county jail, or an out-of-state facility or in the event the Inmate's conviction is vacated." (internal quotation marks omitted)).  *Cf. 2022 ICS Order* ¶ 74 n.207 ("ICS Solutions, Prodigy, and Securus do not issue refunds . . . ." (citing PPI Reply at Ex. 1)).

[7] It is the Public Interest Parties understanding that, in this case, notice was posted at the time within the NY DOCCS website, though it was not readily obvious unless a person was actively seeking it.  In addition, some incarcerated individuals reported to Worth Rises that they observed postings inside carceral facilities regarding the upcoming change; however, to Worth Rises' knowledge as a holder of multiple accounts itself, no notices were provided by GTL or Securus directly to ICS customers (*i.e.*, account holders/payors).

circulated by the Urban Justice Center's Corrections Accountability Project [8] to impacted ICS consumers, providing guidance on requesting refunds from GTL of their unused account balances as a result of the NYS DOCCS's change in ICS vendor.  The flyer identifies the variety of steps necessary to obtain a refund of their unused account balances from GTL.  Because many affected ICS consumers were not provided with meaningful information from either the NYS DOCCS, GTL, or Securus regarding the long-planned vendor change or rights to refunds of unused account balances, many consumers' balances are presumed to have been forfeited to GTL unless the consumer took deliberate steps to request a refund from GTL as outlined in Attachment A.

Consumers should not be at the mercy of a patchwork of obscure corrections facility notices and information from third-party advocates to obtain funds that are rightfully theirs.  The Commission should mandate that the ICS providers give ICS consumers reasonable and fulsome notice of any expected vendor change and that ICS providers automatically refund account balances upon the end of a contract.

It is no secret that ICS providers have a financial incentive to retain unused account balances and therefore to make it difficult for account holders to request refunds.[9]  For this reason, the Commission should require that ICS providers notify consumers on a monthly basis

---

[8] The Urban Justice Center was Worth Rises' fiscal sponsor at the time the attached flyer was prepared.  The flyer was prepared by Worth Rises when it was known at the time as The Corrections Accountability Project.

[9] *See 2022 ICS Order* ¶ 74 ("The record [] establishes that, collectively, the amounts [of unused funds] can represent a significant windfall to the providers, which have strong incentives to retain these funds for themselves" (citing Comments of the Prison Policy Initiative at 15-16 n.27, WC Docket No. 12-375 (Nov. 4, 2021) (noting that GTL's 2019 and Securus' 2018 balance sheets reported tens of millions of dollars in unused funds))); Letter from Stephen Raher, General Counsel, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (Aug. 31, 2022) ("For the entire period from April 2011 through August 2019, GTL's *monthly* revenue from account seizures averaged $1.2 million.").

of account balances, and provide at least two notices in advance of an account approaching deactivation. These notices must include clear recitation of the consumers' rights to their funds and spell out the process by which an account can be kept active or, alternatively, the steps an account holder must take to be issued a full refund of their unused account balances—a process that should be as streamlined and simple as possible.[10]

Finally, ICS providers should be required to issue refunds to account holders within seven business days of a request. Refunds should be issued either to the account holder's original form of payment or to a credit or debit card provided by the account holder at the time of the request. If an ICS consumer does not respond to the request, the unused funds should be automatically returned to the original form of payment on file. If the automatic return fails, the ICS provider should be required to treat remaining funds consistent with applicable state law. Adoption of these notification and refund requirements should help to protect consumers and prevent ICS providers from wrongly, and sometimes illegally, seizing and retaining unused balances.

## II.    THE COMMISSION SHOULD CREATE AN ICS LABEL, SIMILAR TO THE RECENTLY ADOPTED BROADBAND LABEL.

In the *Sixth FNPRM*, the Commission seeks comment on how to improve its consumer disclosure rules.[11] Although the Commission already requires ICS providers to "clearly,

---

[10] For example, the Commission could direct that: ICS providers deploy an easy one-click election (if the account is accessed via internet or app) or SMS text response option (for account holders/payors who are not the incarcerated party) for the ICS consumer to indicate intent to continue account activity or request a refund; the refund should apply to the credit or debit card on file unless the consumer specifically opts for a different refund method (such as check, with easy instructions for the consumer to direct this method to the person/address of their choice); and the default upon lack of response from the consumer after a minimum of two attempts should be that the ICS provider must follow the state laws regarding unclaimed funds.

[11] *See 2022 ICS Order* ¶¶ 110-124.

accurately, and conspicuously disclose" their rates and ancillary service charges to consumers,[12] there is no clear guidance on how to do so uniformly and not all ICS providers appear to comply with the rule.[13]  Transparency regarding charges and fees is critical for ensuring that ICS users understand the full range of prices and fees for these services, allowing these users to make more informed decisions when using ICS.  Because consumers should be able to understand the cost of a call before picking up the phone, the Commission should adopt a version of its consumer broadband label for ICS.[14]

In the *2022 Broadband Label Order*, the Commission required internet service providers to display, at the point of sale, labels that disclose certain information about broadband prices, introductory rates, data allowances, and broadband speeds, and to include links to information about network management practices, privacy policies, and the Commission's Affordable Connectivity Program.[15]  The broadband label was designed to resemble the well-known, simple food nutrition labels, and was developed in collaboration with the Consumer Financial Protection Bureau's expertise in consumer disclosures to efficiently provide consumers with necessary information for making informed purchasing decisions.[16]

The Commission should build upon the broadband labels—tailoring them for ICS—and require ICS providers to make information about their rates, terms, and conditions of service, including information about site commissions and international rate components, available

---

[12] 47 C.F.R. § 64.6110(a).

[13] *See* Peter Wagner & Wanda Bertram, *State of Phone Justice 2022: The Problem, the Progress & What's Next*, Prison Pol'y Initiative (2022), https://www.prisonpolicy.org/phones/state_of_phone_justice_2022.html (noting that "many companies do not publish rates on their websites").

[14] *See generally 2022 Broadband Label Order*.

[15] *Id.* ¶ 12.

[16] *Id.* ¶¶ 3-4, 64.

generally to the public in an easily accessed manner.[17]  The ICS labels should also list other pertinent information that will aid consumer decision-making, such as separate line items for any site commission fees.  This will enable consumers to make informed decisions before making a call.

The Public Interest Parties agree that service details should be made publicly available through either the provider's website or other publicly available source[18]—as is already required for rates and ancillary service charges[19]—but this alone is insufficient because incarcerated persons may not have access to online resources.[20]  Like the broadband labels, ICS labels should be displayed at the same time the product is offered for sale.  In this context, the labels should be posted prominently in each facility in the locations where incarcerated people make outgoing calls.[21]

Consistent with the broadband labels, ICS labels must be accessible to a wide range of users and circumstances, including in a format for incarcerated persons with disabilities.[22]  A standardized label format simplifies the process of generating variations addressed to specific needs and communities.  At a minimum, ICS labels should be effective in providing information about rates, charges, and fees to people who are deaf, hard of hearing, deaf-blind, have a speech

---

[17] *2022 ICS Order* ¶ 114.

[18] *Id.*

[19] 47 C.F.R. § 64.6110(a).

[20] Some information can be reasonably offloaded onto the ICS provider's website, such as some practices and privacy policies, with an appropriate link appearing on the label.  *Cf. 2022 Broadband Label Order* ¶ 56.

[21] This approach aligns with the *2022 Broadband Label Order*'s conclusion that the point of sale must include not only ISP websites, but also any other channels through which their service is sold, including ISP-owned retail locations and third-party owned retail locations.  *See 2022 Broadband Label Order* ¶ 88.

[22] *2022 ICS Order* ¶ 118.

disability, or face other challenges.[23]  And, like with broadband labels,[24] the Commission should require ICS providers to make ICS labels available in any other languages in which the provider sells or markets its services in the U.S.  To be effective, ICS labels should be tailored to reach as many communities and individuals as possible among incarcerated people and those they call.

## III.    IF THE COMMISSION PERMITS ICS PROVIDERS TO OFFER PILOT PROGRAMS WITH ALTERNATIVE PRICING STRUCTURES, IT SHOULD ADOPT CONDITIONS TO PROTECT INCARCERATED PEOPLE.

The Commission seeks comment on allowing ICS providers to offer optional pilot programs with alternative pricing structures.[25]  Innovative pricing holds promise to reduce rates, but also risks opening the door to abuse and higher prices.  If such pilot programs are permitted, the Commission should ensure that consumers are protected.[26]  Any alternative rate structures should (1) not require consumers to pay more than they otherwise would have under the Commission's rate cap and related rules; (2) make information to the consumer clear and transparent using the ICS labels discussed above to ensure that pricing information is properly disclosed; and (3) place the burden on the ICS providers to demonstrate their compliance with the Commission's rules, including its rules about balances in inactive accounts.

The days of per-minute calling and a limited bucket of minutes are largely gone, and most phone plans today offer unlimited calling.  Unlimited minutes or similar alternative

---

[23] *Id.*

[24] *2022 Broadband Label Order* ¶ 84.

[25] *Sixth FNPRM* ¶¶ 148-160.

[26] Concerns have been raised about these programs.  For example, Prison Policy Initiative noted the opaque terms of Securus's pilot program, including its "one-time" $3.00 automated payment fee, which is, in reality, charged each month, and whether cancelling a subscription ends the plan immediately or allows it to continue until the next billing cycle.  *See* Comments of Prison Policy Initiative, Inc. on Securus Technologies, LLC's Petition for Waiver at 12, 17-18, WC Docket No. 12-375 (Jan. 7, 2022).

arrangements may be beneficial to incarcerated people if structured properly.  Unfortunately, the

Public Interest Parties are concerned that alternative structures could open the door to

unreasonable and unjust rates and practices.  To provide a baseline consumer protection, ICS

providers proposing to offer alternative pricing plans should not be permitted to charge more for

their service than the current per-minute caps established under the Commission's rules.  One

way to accomplish this would be to require an ICS provider to implement a true-up procedure to

ensure that ICS users will pay, at worst, the same as they would under the current rate cap

regime.  The per-minute cost could be calculated by dividing the cost of the plan by the number

of *actual* minutes used.  If the resulting figure exceeded the rate caps, ICS providers should be

required to promptly refund any difference to the user's account.[27]

Participation in an alternative pricing plan should be voluntary, just like participation in

any ICS pilot program; consumers should be able to select between a per-minute structure that

exists today and any alternative plan, if offered.  Any alternative plan should, however, provide

unlimited minutes or be based on a set number of allotted minutes rather than a specified number

of calls.  This is important because dropped calls would otherwise deprive a consumer using a

per-call plan of a call to which they would otherwise be entitled.  Consumers should also not be

bound by any long-term commitments and should be free to switch to a per-minute structure

upon request.

The Public Interest Parties agree it is "critical that incarcerated people and their families

understand the provider's alternative pricing offerings and how they differ from per-minute

---

[27] Alternatively, unused minutes could roll-over into the next billing cycle so users may avoid
paying for services that have not been rendered.  But safeguards would need to be in place to
ensure ICS users do not indefinitely aggregate minutes in such a way that their actual usage
results in an effective per-minute rate that exceeds the Commission's caps.

usage."[28]  As described above, a standardized "ICS label" could accomplish this goal, as the Commission could require that ICS providers inform consumers how any alternative pricing options compare to per-minute calling.[29]  The existing per-minute rate cap—which providers may not exceed—should be included for reference.[30]  Terms and conditions about how to participate in such plans should be written in plain language and be as concise as possible to avoid consumer confusion.  Any differences between the pilot program's terms and conditions should be highlighted.  Providers offering a pilot program at a facility should also provide notice to all ICS users with this information.

The Commission asks about the information it should consider when evaluating the efficacy of pilot programs.[31]  When evaluating the impact of alternative rate structures, the Commission should analyze whether pilot programs have resulted in lower prices for ICS users and improved consumer experiences.  ICS providers should be required to report quantitative pricing data about the effective rates charged in the pilot programs.[32]  The Commission should also seek qualitative information from users about the clarity of information received from ICS providers, their overall satisfaction with the service, and any comments that could help improve future offerings.  If the effective price of calling is lower and the qualitative data suggests an

---

[28] *Sixth FNPRM* ¶ 156.

[29] *See supra* Section II.

[30] The Commission could also consider requiring ICS providers compare the pilot program and per-minute plans at a high, medium, and low call volumes, showing both per-minute rate and total cost, including fees.

[31] *Sixth FNPRM* ¶ 159.

[32] Specifically, the Commission should require ICS providers submit, at regular intervals during the term of the waiver period, compliance reports to the Commission with data that demonstrates that no ICS consumer participating in the pilot program is charged more than the appliable current per-minute caps.

improvement over the per-minute system, the Commission may explore extending the alternative price structure programs.[33]

Finally, ICS providers should bear the burden of demonstrating compliance with the Commission's ICS rate and ancillary service fee caps, because they are in the best position to provide this information about usage to the Commission.

## IV.    THE COMMISSION SHOULD REQUIRE ICS PROVIDERS TO RESUBMIT THEIR RESPONSES TO THE THIRD MANDATORY DATA COLLECTION AS NECESSARY.

In the *2021 ICS Order*, the Commission adopted a new data collection obligation as "an essential prerequisite to adopting permanent interstate rate caps."[34]  To ensure that this Third MDC addressed "imperfections and inconsistencies" in prior data collections, the Commission delegated to the Wireline Competition Bureau ("WCB") and Office of Economics and Analytics ("OEA") the authority to implement the collection, which was completed earlier this year.[35]

All ICS providers were required to submit responses to the Third MDC by June 30, 2022.[36]  The Wright Petitioners, with the assistance of the Brattle Group, have been reviewing

---

[33] The Commission should require ICS providers to obtain a new waiver in advance of renewing or extending any pilot program.

[34] *In re Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9618-20 ¶¶ 218, 221 (2021) ("*2021 ICS Order*").

[35] *2021 ICS Order*, 36 FCC Rcd at 9618 ¶ 218; *In re Rates for Interstate Inmate Calling Services*, Order, WC Docket No. 12-375, DA 22-52 (WCB/OEA rel. Jan. 18, 2022).

[36] *See Wireline Competition Bureau Announces The Due Date For Responses To The Commission's Inmate Calling Services Third Mandatory Data Collection*, Public Notice, WC Docket No. 12-375, DA 22-214 (WCB rel. Mar. 2, 2022).

these submissions.[37]  The Commission seeks comment as to their sufficiency and potential use to establish reasonable rates.[38]

Upon initial review, the submissions do not appear to be complete.[39]  To the extent that providers have not fully complied, WCB and OEA should aggressively pursue corrections to these responses.[40]  The Enforcement Bureau should also remind ICS providers of their responsibility to comply with the Commission's rules[41] and not hesitate to investigate continued non-compliance.[42]  The Public Interest Parties look forward to evaluating the complete responses to the Third MDC.

## CONCLUSION

The Public Interest Parties urge the Commission to adopt rules consistent with these comments.

---

[37] Only those Public Interest Parties that have signed the Commission's Protective Order in this proceeding have reviewed the confidential data filed in response to the Third MDC.  *See In re Rates for Inmate Calling Services*, Order, 28 FCC Rcd 16954 (WCB 2013).

[38] *Sixth FNPRM* ¶¶ 126-129.

[39] For example, some responses to the Third MDC do not provide sufficient data to do a facility-specific cost per-minute analysis.  Others manipulated the Commission-provided template in ways that make standardizing the information more difficult.  Site commission data was often incomplete or inconsistently broken out, making it more challenging to do any subgroup analysis.

[40] The Commission delegated authority to the WCB and OEA "to require any provider to clarify and supplement its response to [the] data collection where appropriate."  *2021 ICS Order*, 36 FCC Rcd at 9622 ¶ 227.  With prior data submissions, WCB and OEA "conducted multiple follow-up discussions with providers to supplement and clarify their responses resulting in direction to several providers to amend their submissions and respond to questions from staff."  *See id.* at 9619 ¶ 219 n.690.

[41] *See Enforcement Bureau Reminds Providers of Inmate Calling Services That They Are Responsible For Complying With The Commission's Rules Relating To Those Services*, Public Notice, 35 FCC Rcd 12999 (EB 2020).

[42] *Cf. In re Custom Teleconnect, Inc.*, Forfeiture Order, 36 FCC Rcd 16516 (EB 2021) (imposing forfeiture for failing to timely file an accurate Annual ICS Report and certification).

Respectfully submitted,

*/s/  Rebekah P. Goodheart*

Andrew Jay Schwartzman
Senior Counselor
Benton Institute for Broadband & Society
1341 G Street, NW
Washington, DC 20005
(202) 241-2408

*Counsel for the Benton Institute for Broadband & Society*

Peter Wagner
Executive Director
Prison Policy Initiative
P.O. Box 127
Northampton, MA 01060
(413) 527-0845

Albert H. Kramer
Senior Fellow
Public Knowledge
1818 N Street, NW, Suite 410
Washington, DC 20036
(202) 861-0020

Bianca Tylek
Executive Director
Worth Rises
85 Delancey Street, 2nd Fl.
New York, NY 10002


December 15, 2022

Rebekah P. Goodheart
Gregory R. Capobianco
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

Davina S. Sashkin
Keenan P. Adamchak
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861-1759

Jacqueline Kutnik-Bauder
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005

*Counsel for the Wright Petitioners*

**Attachment A**

# URBAN JUSTICE CENTER

## CORRECTIONS ACCOUNTABILITY PROJECT

March 1, 2018

**RE: Requesting a Refund on GTL/VAC AdvancePay Accounts**

In 2017, NYS DOCCS switched telecom providers, moving from GTL to Securus. Just a few weeks ago, it released the implementation schedule, detailing the date that each facility would be transitioned to the new system. This transition requires that all those communicating with people incarcerated in a New York State prison setup a new account with Securus. What happens to the money already in your GTL account? It will likely be forfeited unless you ask for a refund. Below we have outlined the process that account holders can follow to request a refund for any money left on GTL AdvancePay accounts after the transition.

**IMPORTANT:** Requesting a refund will close your GTL account immediately, so we suggest requesting a refund after the facility relevant to you officially transitions. Attached is the schedule.

**Step 1:** Call 800-777-2522
**Step 2:** Select 1 for English or 2 for Spanish
**Step 3:** Select 7 to request a refund on your AdvancePay account
**Step 4:** Select 1 to continue to a representative
**Step 5:** Work with the representative to identify your account
   o   After a brief wait, a representative should answer and will pose the following questions:

| Representative's Question | Your Answer |
|---|---|
| What's your phone number? | Provide the phone number on your account that you receive calls to |
| What's your name? | Provide and spell your first and last name |
| Are you the account holder? | "Yes" (Please make sure that you are the account holder, only account holders can request a refund) |
| What's your passcode? | • If you have previously setup a passcode, provide your passcode<br>• If you have not previously setup a passcode, answer "I don't have one" and be prepared to answer a series of security questions:<br>  ▪ What is the name of a facility you receive calls from?<br>  ▪ What is the date and amount of your last deposit?<br>  ▪ What is the last four digits of the credit card you used to make the deposit? Or how else have you deposited funds? |

**Step 6:** Once your account has been identified and you have been verified as the account holder, request a refund on your account
   o   If you deposited your funds by credit/debit card and the credit/debit card is valid for at least another 60 days, your funds should be refunded to your credit/debit card within 30 days
   o   If you deposited your funds by credit/debit card, but the credit/debit card will not be valid for another 60 days, your funds should be refunded to your new/replacement card within 30 days
   o   If you deposited your funds using any other form (e.g. check/money order), you should be issued and mailed a refund check within 30 days

URBAN JUSTICE CENTER
CORRECTIONS ACCOUNTABILITY PROJECT

**JA323**

| NYS Department of Corrections & Community Supervision<br>Inmate Phones - Securus Implementation Schedule | | |
|---|---|---|
| **Location** | **Start Date** | **End Date** |
| Adirondack Correctional Facility | 3/14/18 | 3/14/18 |
| Albion Correctional Facility | 2/27/18 | 2/27/18 |
| Altona Correctional Facility | 3/7/18 | 3/7/18 |
| Attica Correctional Facility | 3/12/18 | 3/13/18 |
| Auburn Correctional Facility | 3/5/18 | 3/6/18 |
| Bare Hill Correctional Facility | 3/12/18 | 3/13/18 |
| Bedford Hills Correctional Facility | 2/27/18 | 2/27/18 |
| Cape Vincent Correctional Facility | 3/5/18 | 3/5/18 |
| Cayuga Correctional Facility | 3/7/18 | 3/7/18 |
| Clinton Correctional Facility | 3/5/18 | 3/6/18 |
| Collins Correctional Facility | 3/6/18 | 3/6/18 |
| Coxsackie Correctional Facility | 3/9/18 | 3/9/18 |
| Downstate Correctional Facility | 3/7/18 | 3/7/18 |
| Eastern Correctional Facility | 3/8/18 | 3/9/18 |
| Edgecombe Correctional Facility | 3/8/18 | 3/8/18 |
| Elmira Correctional Facility | 3/12/18 | 3/13/18 |
| Fishkill Correctional Facility | 3/7/18 | 3/8/18 |
| Five Points Correctional Facility | 3/8/18 | 3/9/18 |
| Franklin Correctional Facility | 3/8/18 | 3/9/18 |
| Gouverneur Correctional Facility | 3/6/18 | 3/7/18 |
| Gowanda Correctional Facility | 3/7/18 | 3/8/18 |
| Great Meadow Correctional Facility | 3/12/18 | 3/13/18 |
| Green Haven Correctional Facility | 3/5/18 | 3/6/18 |
| Greene Correctional Facility | 3/12/18 | 3/13/18 |
| Groveland Correctional Facility | 3/15/18 | 3/15/18 |
| Hale Creek ASACTC | 3/14/18 | 3/14/18 |
| Hudson Correctional Facility | 2/26/18 | 2/26/18 |
| Lakeview Shock Incarceration Correctional Facility | 3/5/18 | 3/5/18 |
| Lincoln Correctional Facility | 3/12/18 | 3/12/18 |
| Livingston Correctional Facility | 3/14/18 | 3/14/18 |
| Marcy Correctional Facility | 3/7/18 | 3/8/18 |
| Mid-State Correctional Facility | 3/6/18 | 3/6/18 |
| Mohawk Correctional Facility | 3/5/18 | 3/5/18 |
| Moriah Shock Incarceration Correctional Facility | 2/27/18 | 2/27/18 |
| Ogdensburg Correctional Facility | 3/16/18 | 3/16/18 |
| Orleans Correctional Facility | 3/12/18 | 3/12/18 |
| Otisville Correctional Facility | 3/5/18 | 3/5/18 |
| Queensboro Correctional Facility | 3/6/18 | 3/6/18 |
| Riverview Correctional Facility | 3/15/18 | 3/15/18 |
| Rochester Correctional Facility | 3/13/18 | 3/13/18 |
| Shawangunk Correctional Facility | 3/14/18 | 3/14/18 |
| Sing Sing Correctional Facility | 3/5/18 | 3/6/18 |
| Southport Correctional Facility | 3/14/18 | 3/14/18 |

| NYS Department of Corrections & Community Supervision Inmate Phones - Securus Implementation Schedule | | |
|---|---|---|
| **Location** | **Start Date** | **End Date** |
| Sullivan Correctional Facility | 3/6/18 | 3/6/18 |
| Taconic Correctional Facility | 2/27/18 | 2/27/18 |
| Ulster Correctional Facility | 3/13/18 | 3/13/18 |
| Upstate Correctional Facility | 3/14/18 | 3/14/18 |
| Wallkill Correctional Facility | 3/12/18 | 3/12/18 |
| Washington Correctional Facility | 3/14/18 | 3/14/18 |
| Watertown Correctional Facility | 3/8/18 | 3/9/18 |
| Wende Correctional Facility | 3/9/18 | 3/10/18 |
| Willard Drug Treatment Center | 3/15/18 | 3/15/18 |
| Woodbourne Correctional Facility | 3/7/18 | 3/7/18 |
| Wyoming Correctional Facility | 3/14/18 | 3/14/18 |



**Incarcerated People's Communications Services**

**2023 Mandatory Data Collection**

**WC Docket Nos. 23-62, 12-375**


**Proposed Instructions**

**TABLE OF CONTENTS**

I.  DATA COLLECTION OVERVIEW .......................................................................3

II.  GENERAL INSTRUCTIONS .........................................................................4

    A.  Who Must Submit Data ....................................................................4

    B.  What Must Be Submitted ..................................................................4

    C.  Filing Deadline and Submission ..........................................................6

III.  RELEVANT DEFINITIONS .........................................................................7

IV.  REQUIRED INFORMATION .......................................................................13

    A.  General Information .......................................................................13

    B.  Overview Information ....................................................................16

    C.  Company-Wide Information ..............................................................17

        1.  Overall Financial Information .......................................................17

        2.  Service-Specific Financial Information ..............................................19

        3.  Other Company-Wide Information ..................................................27

    D.  Facility-Specific Information .............................................................39

        1.  Facility-Specific Financial Information ..............................................39

        2.  Other Facility-Specific Information .................................................45

V.  CERTIFICATION FORM .............................................................................56

APPENDIX A
APPENDIX B
APPENDIX C

**JA327**

# I. Data Collection Overview

On January 5, 2023, President Biden signed into law the Martha Wright-Reed Act, expanding the Commission's statutory authority over communications between incarcerated people and the non-incarcerated to include "any audio or video communications service used by inmates . . . regardless of technology used."[1]  The new Act also amends section 2(b) of the Communications Act, to make clear that the Commission's authority extends to intrastate as well as interstate and international communications services used by incarcerated people.[2]

The Act requires the Commission to consider, as part of its implementation, the costs of "necessary" safety and security measures, as well "differences in costs" based on facility size or "other characteristics."[3]  It also allows the Commission to "use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider" in determining just and reasonable rates for incarcerated people's communications services (IPCS).[4]

The Commission delegated authority to the Wireline Competition Bureau (WCB or Bureau) and the Office of Economics and Analytics (OEA) (collectively, WCB/OEA) to "update and restructure" the Commission's most recent data collection "as appropriate in light of the requirements of the new statute."[5]  This delegation requires that we collect "data on all incarcerated people's communications services from all providers of those services now subject to" the Commission's ratemaking authority, including, but not limited to, requesting "more recent data for additional years not covered by the [most recent Mandatory Data Collection]."[6]

These instructions and the accompanying template are designed to implement the Commission's directives.[7]

# II. General Instructions

---

[1] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156, § 2(a)(2), (b) (Martha Wright-Reed Act or the Act); *see* 47 U.S.C. §§ 152(b), 153(1)(E), 276(b)(1)(A), (d).

[2] *Id.* § 2(c).

[3] *Id.* § 3(b)(2).

[4] *Id.* § 3(b)(1).

[5] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Notice of Proposed Rulemaking and Order, FCC 23-19, at 33, para. 84 (2023) (*2023 IPCS Notice* or *2023 IPCS Order*).

[6] *Id.*; *id.* at 33-34, para. 85.  The Commission directed WCB/OEA to modify the template and instructions of the most recent data collection to the extent appropriate to timely collect such information to cover the additional services and providers now subject to the Commission's authority.  *2023 IPCS Order* at 33, para. 84.  The Commission previously sought data related to audio services provided to incarcerated people, now included in IPCS, on three occasions.  *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107 (2013); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12862, para. 198 (2015); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9619-20, para. 221 (2021).

[7] The template consists of a Word document and Excel spreadsheets.  For simplicity, we refer to these respective portions of the template as the Word template and the Excel template.

In these instructions, we first identify the entities that we require to respond to this data collection. We then review the information we require those entities to provide, and describe the procedure for submitting the requisite responses.

Throughout these instructions, the terms "you" and "your" refer to any entities directed to respond to these data requests that qualify as Providers, as we define that term below.

You may contact Commission staff at mandatorydatacollection@fcc.gov if you have questions regarding whether your Company must file a data collection response, or the requirements for such a response.

## A.  Who Must Submit Data

All Providers, as defined below, must submit complete, accurate, and truthful responses to this data collection.[8]  "Providers" includes all entities within the definition of "payphone provider" in section 276(d) of the Communications Act that provide communications between incarcerated people and the non-incarcerated[9] and their subcontractors as defined herein.  Providers that are affiliated shall respond as a single entity, regardless of the number of separately incorporated companies or other entities within that group that provide IPCS.[10]

An entity is classified as a Provider if it provides IPCS to people incarcerated in a Prison or Jail, as defined in Part III of these instructions.  In some instances, two entities work together to provide IPCS to a particular Facility.  We refer to the Provider that has the contractual or other arrangement with the Facility or other entity with contracting authority as the Contractor, and the Provider without that arrangement as the Subcontractor.  Thus, an entity is classified as a Provider if it partners with or serves a Contractor, and also, for example, completes communications for incarcerated people, bills Consumers for those communications, and retains the revenue from those communications.  Subcontractors are therefore not exempted from the definition of a Provider simply because they lack a direct contractual relationship with a correctional authority.  Where a Subcontractor completes communications but the Provider that holds the contract with correctional authority, bills Consumers for those communications, and then pays the Subcontractor, that Subcontractor may also meet the definition of an Provider.  In contrast, an entity that provides billing and collection for IPCS provided by a separate entity and remits those revenues may not, without more, meet the definition of a Provider.

Providers (including all Contractors and Subcontractors) must complete all portions of this data collection unless otherwise indicated.  Section II.C below provides instructions as to how certain data shall be reported.

## B.  What Must Be Submitted

You must fully and completely respond to each request for information in this data collection by using the specified Word and Excel templates and certification form, as approved by the Office of Management and Budget (OMB) pursuant to the Paperwork Reduction Act of 1995 (PRA), Public Law No. 104-13.[11]  After obtaining approval from OMB, WCB/OEA will issue a Public Notice providing links to the approved

---

[8] See Part III, below, for the definition of "Provider."

[9] 47 U.S.C. § 276(d); see Martha Wright-Reed Act § 2(a)(2).

[10] See Part III, below, for the definitions of "Accounting Entity" and "Affiliates," which collectively make clear which entities must file responses to this Data Collection.

[11] Pub. L. No. 104-13, 109 Stat. 163 (1995) (codified at 44 U.S.C. §§ 3501-3520); see 2023 IPCS Order at 33, para. 84 (delegating to WCB and OEA the authority to conduct the requisite Paperwork Reduction Act analysis). Providers must report their information according to the best information in their possession, custody, or control. See generally Appx. C (certification of an authorized officer stating that all statements and information are "true, accurate, and complete").

Word and Excel templates and certification form.  A reference copy of the templates and certification form is attached to these instructions.

Your full response shall consist of several parts:

(1)    A Word document (i.e., the Word template) containing responses that require a narrative explanation (see Appendix A to these instructions);
(2)    A set of Excel spreadsheets (i.e., the Excel template) containing responses that indicate specific numbers, percentages, and/or information (see Appendix B to these instructions);
(3)    An audited financial statement or report for 2022; and
(4)    A signed certification of truthfulness, accuracy, and completeness (see Appendix C to these instructions).

The Word and Excel templates and any additional spreadsheets must be submitted in machine-readable and manipulatable formats.  As indicated, you also must submit an audited financial statement or report for 2022, or similar documentation, to the extent they have been produced in the ordinary course of business.  Additionally, all responses must be accompanied by a certification by an officer of the Provider that, based on information and belief formed after reasonable inquiry, the statements and information contained in the submission are true, accurate, and complete.  You must complete the certification form provided in Appendix C before submitting your response.  Submissions made without a completed certification form will be rejected and returned for correction and resubmission.

We caution Providers to proceed in good faith and with absolute candor in responding to this data collection.[12]  Any failure to timely file an accurate, complete, and truthful response to this data collection may subject the Provider to sanctions, including, but not limited to, monetary forfeitures.[13]  Willful false statements in responses to this data collection also are punishable by fine or imprisonment under 18 U.S.C. § 1001.

As a general matter, these instructions direct you to enter your responses to requests for certain information or numbers at specific places in the Word and Excel templates.  Where these instructions require you to provide the workpapers, formulas, calculations, or data underlying your responses, report and display the required information as clearly and succinctly as possible.

Narrative responses are to be provided in the Word template (Appendix A).  Use that template to provide any additional information needed to ensure that your responses are full and complete, and to identify and explain any caveats associated with your responses.  You should also use the Word template to provide any formulas, explanations, or appropriate references for calculations, where necessary, including any explanations needed to make your entries in the Excel template transparent and understandable.

Unless otherwise stated, use the Excel template (Appendix B) to provide your responses to the inquiries that follow.  As a general matter, your entries on that template will be specific numbers or percentages (e.g., a Facility's Average Daily Population) or discrete information (e.g., a Facility's geographical coordinates).  The Excel template has formulas in certain cells that operate in accordance with these

---

[12] *See FCC Enforcement Advisory; Enforcement Bureau Reminds Providers of Inmate Calling Services that They Are Responsible for Complying with the Commission's Rules Relating to Those Services*, WC Docket No. 12-375, Public Notice, 35 FCC Rcd 12999, 13001-02 (WCB 2020) (reminding providers of the duty of absolute candor); *see generally Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8502, 8533, paras. 51, 133 (2020) (*2020 ICS Order* or *2020 ICS Notice*) (stating that the Commission "will not hesitate to take action to ensure full compliance with" its inmate calling services rules; and reminding "inmate calling services providers of their duty to provide complete and accurate information in required reports and responses").

[13] *See* 47 U.S.C. §§ 502, 503(b).

instructions and use data you enter in other cells to facilitate a complete reporting of the required data.  To be complete, your submission must include both the data that you enter in the cells and the data that are automatically generated by the Excel formulas embedded in the template.  Do not delete formulas from any cells or manually enter data or other information in cells that contain formulas.  To ensure accurate and complete reporting, allow cells that have formulas to generate the appropriate data.  The Excel template uses "N/A" to identify cells in which no data are to be reported.  Do not report data in cells populated with "N/A."  Following the same format provided in the Excel template, you should add additional rows or columns to this template as necessary to complete your responses.

This data collection seeks data for the single calendar year 2022, covering the period from January 1, 2022, through December 31, 2022.

You must submit a valid entry on the designated template in response to each request in this data collection.  If a request does not apply to your Company, enter "N/A" in the appropriate field, and use the Word template to fully explain why the request is not applicable to you.  Blank cells in the Excel spreadsheets will be understood to be zeros.  Do not hide cells or split cells.  Do not add rows above the Provider's reported data in the spreadsheets.  If a Provider wishes to state that the data in a particular spreadsheet are confidential, do so on rows below the Provider's data response.

If your responses are deemed incomplete or are not submitted in the required format, your filing may be rejected and returned to you for correction and resubmission.  An incomplete or noncompliant submission may subject you to enforcement actions, including monetary forfeitures.[14]

## C.  Filing Deadline and Submission

The Commission will submit this data collection, including all required forms, to OMB for its approval, pursuant to the Paperwork Reduction Act (PRA).  After obtaining approval from OMB, WCB/OEA will publish a notice in the Federal Register announcing OMB's approval and establishing an effective date for data collection.[15]  WCB/OEA will also issue a Public Notice announcing the deadline for submitting a complete response to this data collection.

You must submit public versions of your response by filing the completed templates and certification form electronically, using the Commission's Electronic Comment Filing System (ECFS), accessible at https://www.fcc.gov/ecfs/.

You may file any information that you believe should be afforded confidential treatment in accordance with the terms of the *Protective Order* adopted for use in these dockets and by adhering to the standard set forth in section 0.459(b) of the Commission's rules.[16]  You may access the *Protective Order* through this link: https://www.fcc.gov/document/wireline-competition-bureau-adopts-ipcs-protective-order. Confidential versions of the reports must be submitted to the Secretary's office using the original Word and Excel templates, as approved by OMB, and in a machine-readable and manipulatable format.  You

---

[14] *See* 47 U.S.C. §§ 502, 503(b).

[15] *2023 IPCS Order* at 34, para. 85 (explaining that any new or modified data collections that require OMB approval will "be effective on the date specified in a notice published in the Federal Register announcing OMB's approval").

[16] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Protective Order, DA 23-298 (WCB Apr. 5, 2023) (specifying the procedures for filing and providing access to confidential information filed in these proceedings); 47 CFR § 0.459(b); *see id.* § 0.459(c) (specifying that "[c]asual requests [for confidential treatment] (including simply attaching pages 'confidential') . . . will not be considered"); *Enforcement Bureau Reminds Public that Requests for Confidentiality Must Cover Only Material Warranting Confidential Treatment Under the Commission's Rules*, Public Notice, 35 FCC Rcd 6300 (EB 2020).

must also provide courtesy copies of the confidential filing to WCB/OEA via email at
mandatorydatacollection@fcc.gov.

For further information and any questions on completing your response, please contact Simon Solemani,
WCB, Pricing Policy Division, at 202-418-2270 or at Simon.Solemani@fcc.gov, or Richard
Kwiatkowski, OEA, Economic Analysis Division, at 202-418-1383 or at Richard.Kwiatkowski@fcc.gov.

## III.  Relevant Definitions

<u>All capitalized terms used in these instructions are defined terms with the meaning assigned to them in
this section.</u>

<u>2022</u> means calendar year 2022, the one-year period from January 1, 2022 to December 31, 2022.

<u>Accounting Entity</u> means the smallest group of separate Business Segments that collectively account for
100% of the Provider's IPCS-Related Operations and IPCS-related investments, expenses, and revenues.

<u>Admissions</u> means the number of Incarcerated People booked into and housed in a Facility by formal
legal documents and the authority of the courts or other official agency, including repeat offenders
booked on new charges as well as people sentenced to weekend programs who enter the Facility for the
first time.  It excludes Incarcerated People reentering the Facility after an escape, work release, medical
appointment, treatment facility appointment, or bail and court appearance.

<u>Affiliates</u> means any two or more companies, partnerships, or other legal entities where (a) one entity
directly or indirectly owns or controls the other or others, (b) a Third Party controls or has the power to
control both or all, (c) the entities share common ownership or have interlocking directorates, or (d) the
entities share employees, equipment, and/or facilities.  For purposes of this definition, the term "own"
means to hold or control an equity interest (or the equivalent thereof) of more than 10%.

<u>Ancillary Services Charges</u> means any fees or charges Consumers may be assessed for, or in connection
with IPCS that are not included in the per-minute charges assessed for individual audio communications
or the per-minute, per-session, or per-month charges assessed for video communications.  Ancillary
Services Charges for, or in connection with interstate and international audio IPCS are limited to those
listed in 47 CFR § 64.6000(a)(1)-(5) and consist of Automated Payment Fees, Live Agent Fees, Paper
Bill/Statement Fees, Fees for Single-Call and Related Services, and Third-Party Financial Transaction
Fees.  All other Ancillary Services Charges are prohibited in connection with interstate and international
audio IPCS.  For purposes of this definition, "interstate" includes any jurisdictionally mixed charge, as
defined in 47 CFR § 64.6000(u).

<u>Ancillary Services</u> means services provided for or in connection with audio or video IPCS.  Ancillary
Services includes both Permissible Ancillary Services and Other Ancillary Services, as defined in these
Instructions.

<u>Annual Total Expenses</u> means the sum of annual Operating Expenses and annual Capital Expenses.

<u>Automated Payment Fees</u> means credit card payment fees, debit card payment fees, and bill processing
fees, including fees for payments made by interactive voice response, through the internet, or by use of an
Incarcerated Person Kiosk.

<u>Automated Payment Service</u> means any service providing Customers of IPCS with credit card payment,
debit card payment, and bill processing services, including enabling payments by interactive voice
response, web, or Incarcerated Person Kiosk.

JA332

<u>Average Daily Population</u> or <u>ADP</u> means the sum of all Incarcerated People in a Facility for each day of a Year, divided by the number of days in the Year.

<u>Billed Communications</u> means the number of IPCS communications supplied during a Year for which payment is demanded.

<u>Billed Minutes</u> means the number of audio and/or video IPCS minutes supplied during a Year for which payment is demanded.

<u>Billed Revenues</u> means gross sales, without adjustment for uncollectable accounts or expenses related to producing these sales, derived from the number of units of a service supplied during a Year for which payment is demanded.

<u>Billed Transactions</u> means the number of discrete instances where a seller supplies Single-Call and Related Service or Third-Party Financial Transaction Service and a buyer agrees to pay a price for that service.

<u>Billed Uses</u> means the number of times Automated Payment Service, Live Agent Service, or Paper Bill/Statement Service is put into action during a Year and for which payment is demanded.

<u>Business Segment</u> means a component of a Company that generates its own revenues and creates its own products, product lines, or services and for which a financial report is routinely prepared for management, shareholder, or creditor review.

<u>C Corporation</u> means a Company that is taxed as a distinct entity under the rules of the Internal Revenue Service.

<u>Capital Expenses</u> means the sum of (a) the Return that debt, preferred stock, and equity investors require; (b) interest paid on customer prepayments or deposits; (c) depreciation expense; (d) amortization expense; and (e) federal and state income tax expense attributable to the fraction of the Return attributable to equity holders.

<u>Cash Working Capital</u> means the average investor-supplied capital a firm needs to fund its day-to-day operations.

<u>Company</u> means the Accounting Entity unless otherwise indicated.

<u>Consumer</u> means the party paying a Provider of IPCS.

<u>Contractor</u> means the Provider that has a contractual or other arrangement with the Facility or other entity with contracting authority to provide IPCS to a Facility.

<u>Contractually Prescribed Site Commission</u> means a Site Commission payment, other than a Legally Mandated Site Commission payment, required pursuant to a contract negotiated between a Facility or other entity with contracting authority for Facilities and a Provider.

<u>Correctional Facility</u> or <u>Correctional Institution</u> means a Jail or Prison.

<u>Customer</u> means the party paying a Provider of IPCS.

<u>Detention Facility</u> means a Jail or Prison.

**JA333**

<u>Extra Payments to Telecommunications Carriers or Other Entities for International Communications</u> means the incremental charges a Provider pays to complete communications solely to international destinations.

<u>Facility</u> means a Jail or Prison.

<u>Fees for Single-Call and Related Services</u> or <u>Single-Call and Related Services Fees</u> means billing arrangements whereby an Incarcerated Person's collect communications are billed through a Third Party on a per-communication basis, where the called party or Incarcerated Person does not have an account with the Provider and does not want to establish an account.

<u>Fixed Site Commission</u> means a Site Commission that is assessed or paid without regard to IPCS usage or revenues. Fixed Site Commissions include, but are not limited to, minimum annual guaranteed payments, other lump-sum payments, and payments in kind that Providers make pursuant to IPCS contracts.

<u>Gross Investment</u> means the book value of an asset prior to subtracting accumulated depreciation or amortization.

<u>Incarcerated People's Communications Services</u> or <u>IPCS</u> means the provision of telephone service; interconnected VoIP service; non-interconnected VoIP service; interoperable video conferencing service; and any other audio or video communications service used by incarcerated people for the purpose of communicating with individuals outside the correctional institution where the incarcerated person is held, regardless of the technology used.

<u>IPCS-Related Operations</u> means the actions or tasks performed by the Provider or authorized personnel to deliver IPCS and associated Ancillary Services to Incarcerated People and those they communicate with, including but not limited to billing, customer service, and other requirements as determined by contract or by law. It excludes all Site Commission payments, including In-Kind Site Commission payments.

<u>IPCS-Related Services and Products</u> means any hardware, software, applications, devices, products, or services used by a Provider or under a Provider's direction as part of its IPCS-Related Operations. IPCS-Related Services and Products also may support a Company's non-IPCS Services and Products.

<u>Incarcerated Person</u> means a person detained in a Correctional Facility, regardless of the duration of the detention. These Instructions use Incarcerated People as the plural of Incarcerated Person.

<u>Incarcerated Person Kiosk</u> means a self-service transaction machine that a Provider owns or leases and makes available to Incarcerated People at a Facility to obtain IPCS-Related Services, such as obtaining a calling card or depositing money in a prepaid account.

<u>In-Kind Site Commission</u> means a Site Commission that does not take the form of a Monetary Site Commission.

<u>Interconnected Voice over Internet Protocol</u> or <u>Interconnected VoIP</u> means a service that: (i) Enables real-time, two-way voice communications; (ii) requires a broadband connection from the user's location; (iii) requires internet protocol-compatible customer premises equipment (CPE); and (iv) permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network.

<u>International Communication</u> means a communication or transmission from any state, territory, or possession of the United States, or the District of Columbia to points outside the United States.

<u>Interstate Communication</u> means, pursuant to 47 U.S.C. § 153(28), communication or transmission (a) from any state, territory, or possession of the United States (other than the Canal Zone), or the District

of Columbia, to any other state, territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, (b) from or to the United States to or from the Canal Zone, insofar as such communication or transmission takes place within the United States, or (c) between points within the United States but through a foreign country. Interstate Communication shall not, for purposes of these instructions, include wire or radio communication between points in the same state, territory, or possession of the United States, or the District of Columbia, through any place outside thereof, if such communication is regulated by a state commission.

Interoperable Video Conferencing Service means a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing.

Intrastate Communication means any communication that originates and terminates in the same state, territory, or possession of the United States (other than the Canal Zone), or the District of Columbia.

Jail means a facility of a local, state, or federal law enforcement agency that is used primarily to hold individuals who are: (a) awaiting adjudication of criminal charges; (b) post-conviction and committed to confinement for sentences of one year or less; or (c) post-conviction and awaiting transfer to another facility. The term also includes city, county or regional facilities that have contracted with a private company to manage day-to-day operations; privately owned and operated facilities primarily engaged in housing city, county or regional Incarcerated People; facilities used to detain individuals operated directly by the Federal Bureau of Prisons or U.S. Immigration and Customs Enforcement, or pursuant to a contract with those agencies; juvenile detention centers; and secure mental health facilities.

Legally Mandated Site Commission means a Site Commission payment required by state statutes or regulations that are adopted pursuant to state administrative procedure statutes where there is notice and an opportunity for public comment, such as by a state public utility commission or similar regulatory body with jurisdiction to establish IPCS rates, terms, and conditions, and that operate independently of the contracting process between Facilities and Providers.

Live Agent Fees means fees associated with the optional use of a live operator to complete IPCS Transactions.

Live Agent Service means providing Customers of IPCS the optional use of a live operator to complete IPCS-related transactions.

Maximum Communication Duration means the maximum limit, if any, that a Provider or Facility imposes on the length of IPCS communications from a Facility.

Monetary Site Commission means a Site Commission that takes the form of a monetary payment.

Net Capital Stock means Gross Investment in assets, net of accumulated depreciation and amortization, accumulated deferred federal and state income taxes, and customer prepayments or deposits, plus an allowance for Cash Working Capital.

Net Investment means the book value of an asset after subtracting accumulated depreciation or amortization.

Non-interconnected VoIP Service means a service that enables real-time voice communications that originate from, or terminate to, the end-user's location using Internet Protocol or any successor protocol and that requires Internet protocol compatible customer premises equipment. It does not include any service that is an Interconnected VoIP service.

Operating Expenses means recurring expenses incurred to supply a service on a continuous basis, including but not limited to maintenance and repair of plant, equipment, and facilities; billing, collection,

and customer care; general and administrative expense; other overhead expense; tax expense other than income tax expense; bad debt expense; and the IPCS-specific expenses specified in this data request.

Other Ancillary Services means Ancillary Services other than Automated Payment Service, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, and Third-Party Financial Transaction Services. Other Ancillary Services can be associated with interstate, international, or intrastate, audio or video IPCS.

Other Services and Products means services and products other than audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Service, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, Third-Party Financial Transaction Services, and Other Ancillary Services.

Paper Bill/Statement Fees means fees associated with providing Customers of IPCS an optional paper billing statement.

Paper Bill/Statement Service means providing Customers of IPCS a paper billing statement.

Pass-Through Entity means a Company that passes its income through to its owners.

Permissible Ancillary Services means Automated Payment Service, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, and Third-Party Financial Transaction Services, as defined in Part 64 of the Commission's rules and these instructions.

Prison means a facility operated by a territorial, state, or federal agency that is used primarily to confine individuals convicted of felonies and sentenced to terms in excess of one year. The term also includes public and private facilities that provide outsource housing to other agencies such as the State Departments of Correction and the Federal Bureau of Prisons; and facilities that would otherwise fall under the definition of Jail but in which the majority of Incarcerated People are post-conviction or are committed to confinement for sentences of longer than one year.

Provider means any communications service provider that provides IPCS, as defined in 47 U.S.C. §§ 153, 276(d), regardless of the technology used. This definition includes all entities acting as Subcontractors as defined below, to the extent that their activities otherwise include the provision of IPCS. A Provider may be an audio IPCS Provider or video IPCS Provider, or both.

Releases means the number of Incarcerated People released after a period of confinement (e.g., sentence completion, bail or bond releases, other pretrial releases, transfers to other jurisdictions, and deaths). It includes Incarcerated People who have completed weekend programs and are leaving the Facility for the last time. It excludes temporary discharges, such as discharges for work, medical or other appointments, court appearances, furloughs, and day reporting.

Return means the product of a Company's Net Capital Stock and its Weighted Average Cost of Capital.

Revenue-Sharing Agreement means any agreement, whether express, implied, written, or oral between a Provider or any Affiliate and a Third Party, such as a financial institution, or between a Provider and any of its Affiliates that, over the course of the agreement, directly or indirectly results in the payment of all or part of the revenue received from the provision of IPCS or any Ancillary Services to the other party to the agreement.

Safety and Security Measures means any safety or security surveillance system, product, or service, including any such system, product, or service that allows Incarcerated People to communicate using IPCS as permitted by the Facility; helps the Facility ensure that Incarcerated People do not communicate with whom they are not allowed to communicate; helps monitor and record on-going communications; or

inspects and analyzes recorded communications.  Safety and Security Measures also include other related systems, products, and services, such as a voice biometrics system, a PIN system, or a system concerning the administration of subpoenas concerning communications.  The classification of a system, product, or service as a Safety and Security Measure does not mean that it is part of a Provider's IPCS-Related Operations.

Single-Call and Related Services means billing arrangements whereby an Incarcerated Person's collect communications are billed through a Third Party on a per-communication basis, where the called party does not have an account with the Provider or does not want to establish an account.

Site Commissions means any form of monetary payment, in-kind payment, gift, exchange of services or goods, fee, technology allowance, or product that a Provider or Affiliate of a Provider may pay, give, donate, or otherwise provide to an entity that operates a correctional institution, an entity with which the Provider enters into an agreement to provide IPCS, a governmental agency that oversees a Facility, the city, the county, or state where a Facility is located, or an agent of any such Facility.

Subcontractor means an entity that provides IPCS to a Facility and has a contract or other arrangement with another Provider for provision of IPCS to that Facility.  A Subcontractor need not have a contractual relationship with the Facility.

Third Party means an entity that is not a Provider, including a Subcontractor, an Affiliate of a Provider, or a Facility.

Third-Party Financial Transaction Fees means the exact fees, with no markup, that Providers are charged by Third Parties to transfer money or process financial transactions to facilitate a Customer's ability to make account payments via a Third Party.

Third-Party Financial Transaction Services means the transfer of money or the processing of financial transactions to facilitate a Customer's ability to make account payments via a Third Party.

Unbilled Communications means the number of IPCS communications supplied during a Year for which payment is not demanded.

Unbilled Minutes, Unbilled Minutes of Use, and Unbilled MOU mean the number of audio and/or video IPCS minutes supplied during a Year for which payment is not demanded.

Variable Site Commissions means Site Commissions that are assessed on a per-unit basis, such as a per-minute basis, percentage of IPCS revenue, or number of IPCS devices at a Facility.

Weekly Turnover Rate means the percentage calculated by subtracting the average number of weekly Releases during a Year from the average number of weekly Admissions during that Year and then dividing the resulting number by the Average Daily Population for that Year.

Weighted Average Cost of Capital means the sum of the cost of equity, the cost of preferred stock, and the cost of debt, each expressed as an annual percentage rate and weighted by its proportion in the capital structure.

Year means a calendar year, beginning January 1 and ending December 31 of any given year.

# IV.  Required Information

This Part sets forth the information you must provide in your response to this data collection.  In some cases, the data are to be reported on the attached Excel template, while other questions require a narrative

response on the attached Word template.  Unless otherwise indicated, all responses should be entered into the Excel template.  In general, this Part proceeds from Company-level inquiries to specific Facility-level inquiries.

This Part begins by asking you to provide general information about your Company, including information pertaining to your IPCS operations.  Next, we direct you to provide financial data and related information at the Company level.  We then direct you to disaggregate that financial information into service-specific categories and provide you detailed instructions regarding cost allocation in connection with this step.  We also instruct you how to report data where a Provider has an agreement with another entity for the provision of IPCS.  We then require you to report Company-level Ancillary Services and Site Commission data, followed by data regarding transactions with Affiliates.  Finally, following the instructions for reporting Company-level data, we direct you to report certain financial information at the Facility level.

As a reminder, this data collection seeks data for calendar year 2022.  Please provide data for your responses for 2022, the one-year reporting period from January 1, 2022, to December 31, 2022.

## A.  General Information

This section directs you to provide general information and data about your Company and its Affiliates, among other matters, in total for 2022, unless otherwise specified.

(1)    **Company Name:**  Enter the Company's name.

(2)    **Accounting Entity:**  Enter the name of each corporation, partnership, or other legal entity within the Accounting Entity.

(3)    **Contact Person:**  Enter the name, title, email address, and phone number of the person whom the Commission may contact to inquire about the Company's response to the collection.

(4)    **Holding Company Name:**  Enter the name of Company's ultimate parent, if any.

(5)    **Filing Date:**  Enter the filing date using the following format: "MM/DD/YYYY" to indicate the month, day, and year.

(6)    **Headquarters Address:**  Enter the physical address where the Company's headquarters are located.

(7)    **Publicly Listed:**  Identify whether the Company is a corporation or part of a corporation whose ownership is dispersed among the general public in many shares of stock which are traded on a stock exchange or in over-the-counter markets.

(8)    **IPCS or Ancillary Services:**  List all IPCS or Ancillary Services that the Company provided at or for Facilities, or to Incarcerated People or those they communicate with, during 2022.  List all such services even if the Company only provided them at some Facilities.  List one service per column, starting in Column B.

    (a)    In the Word template, describe in detail all audio IPCS that the Company provided at or for Facilities during 2022.  Specifically, identify the technologies used to deliver each of these services.

    (b)    In the Word template, describe in detail all video IPCS that the Company provided at or for Facilities during 2022.  Specifically, identify the technologies used to deliver each of these services.

**JA338**

(c)    In the Word template, identify and describe the shared equipment or technologies used by the Company to deliver both audio and video IPCS.

(d)    In the Word template, identify and describe any equipment or technology the Company used to provide only audio IPCS.  Also identify and describe any equipment or technology the Company used to provide only video IPCS.

(e)    In the Word template, if the Company provided any services for which it charged Automated Payment Fees during 2022, describe the function of the Automated Payment Fees and the processes used to provide Automated Payment Services.

(f)    In the Word template, if the Company provided any services for which it charged Live Agent Fees during 2022, describe the function of the Live Agent Fees and the processes used to provide Live Agent Services.

(g)    In the Word template, if the Company provided any services for which it charged Single-Call and Related Services Fees during 2022, describe the function of the Single-Call and Related Services Fees and the processes used to provide Single-Call and Related Services.

(h)    In the Word template, if the Company provided any services for which it charged Third-Party Financial Transaction Fees during 2022, describe the function of the Third-Party Financial Transaction Fees and the processes used to provide Third-Party Financial Transaction Services.

(i)    In the Word template, if the Company provided any services for which it charged Other Ancillary Services Charges during 2022, identify each Other Ancillary Services Charge, describe the purpose and function of each Other Ancillary Services Charge, and explain in detail each process used to provide each Other Ancillary Service.

(j)    In the Word template, if the Company mailed paper bills or statements for any IPCS account and charged Paper Bill/Statement Fees during 2022, describe the Company's policy for issuing and mailing such bills or statements, including any elections that must be made by the account holder or recipient of any mailed bills or statements.

(9)    **Business Segments Other than IPCS or Ancillary Services:**

(a)    List all Business Segments, other than IPCS or Ancillary Services, that the Company engaged in during 2022.  List one Business Segment per column, starting in Column B.

(b)    Provide the Billed Revenues for each listed Business Segment during 2022.  Enter Billed Revenues in the same column as the corresponding Business Segment.

(c)    List all Business Segments, other than IPCS or Ancillary Services, the Company or an Affiliate provided at or for Facilities, or to Incarcerated People or those they communicate with, during 2022.  List all such Business Segments even if the Company or Affiliate provided them only at some Facilities.  List one Business Segment per column, starting in Column B.

(d)    In the Word template, describe in detail all Business Segments, other than IPCS or Ancillary Services, the Company or an Affiliate provided at or for Facilities, or to Incarcerated People or those they communicate with, during 2022.

(e)    In the Word template, describe in detail how, if at all, the Company's IPCS or Ancillary Services interact with Business Segments other than IPCS or Ancillary Services.

(10)    **Assets:**

(a)    List each type of tangible (e.g., phones, tablets, audio communications equipment, video communications equipment, and kiosks) and intangible asset (e.g., capitalized research and development, purchased software, internally developed software, patents, trademarks, capitalized

site commissions, acquired technology rights, acquired contract rights, costs to obtain customer contracts, and capitalized Site Commissions) attributable to providing IPCS or associated Ancillary Services during 2022. Exclude any type of asset whose Net Investment is less than 5% of the Company's total Net Investment. List one asset per column, starting in Column B.

(b)     Provide the Net Investment in each listed type of asset as of December 31, 2022. Enter Net Investment in the same column as the corresponding asset.

(c)     List each audio IPCS or video IPCS or Ancillary Service, if any, that each listed type of asset supported. List each service in the same column as the corresponding asset.

(d)     List each Non-IPCS-Related Service or Product, if any, that each listed type of asset supported. List each Product or Service in the same column as the corresponding asset.

(11)    **Affiliates Other Than Affiliates that Provide IPCS or Ancillary Service:** List the names of all of the Company's Affiliates, other than Affiliates that provide IPCS or Ancillary Services, during 2022. List one Affiliate per column, starting in Column B.

(12)    **Billed Revenues of Affiliates Other Than Affiliates that Provide IPCS or Ancillary Services:** Enter total Billed Revenues for these Affiliates for 2022. Enter Billed Revenues in the same column as the corresponding Affiliate.

(13)    **Business Segments of Affiliates Other Than Affiliates that Provide IPCS or Ancillary Services:**

(a)     List all Business Segments in which Affiliates, other than Affiliates that provide IPCS or Ancillary Services, engaged during 2022. List one Business Segment per column, starting in Column B.

(b)     Identify each Affiliate, other than Affiliates that provide IPCS or Ancillary Services, that participated in the supply of each Business Segment on your list. List Affiliates in the same column as the corresponding Business Segment.

(14)    **Billed Revenues of Affiliates Other Than Affiliates that Provide IPCS or Ancillary Services by Business Segments:** Enter Billed Revenues for 2022 by each Affiliate, other than Affiliates that provide IPCS or Ancillary Services, for each Business Segment on your list. Enter Billed Revenues in the same column as the corresponding Affiliate.

(15)    **Affiliate Transactions:** List all types of assets and services that the Company obtained from an Affiliate, other than an Affiliate that provides IPCS or Ancillary Services, that were used in the provision of IPCS or Ancillary Services during 2022. List one asset or service per column, starting in Column B. List each of the below items in the same column as the corresponding asset or service for 2022:

(a)     Each Affiliate, other than an Affiliate that provides IPCS, that provided those assets or services;

(b)     The amounts the Company paid its Affiliates, other than Affiliates that provide IPCS or Ancillary Services, for those assets and services; and

(c)     The Net Investment of Affiliates, other than Affiliates that provide IPCS or Ancillary Services, in those assets as of the date of the transaction.

(d)     The Annual Total Expenses that Affiliates, other than Affiliates that provide IPCS or Ancillary Services, incurred to provide those services during the Year immediately prior to the transaction.

(16)    **Accounting and Record Keeping Systems:** In the Word template, describe in detail the Accounting Entity's accounting and record-keeping systems.

(17)  **Mandatory Data Collection Response:**  In the Word template, provide an overview of how the Company used its accounting and record-keeping system to respond to this Mandatory Data Collection.  As part of this overview, explain the process by which the Company used data from income statements, balance sheets, general ledger, subledger, journals, department, division, or other organization group accounts or subaccounts, and other records or sources of financial data to develop, compile, assign, attribute, allocate or report Company-wide, service-specific, and Facility-specific revenues, investments, and expenses, as required by this Mandatory Data Collection.  Identify the sources for all depreciation and amortization schedules or asset life projections used to determine the amount of depreciation and amortization expenses reported and how these expenses are derived using these schedules and projections or other methods in lieu of or in combination with these schedules and projections.  Explain how Company-wide, service-specific, Facility-specific, department, division, or other organization group data are used to determine how costs are incurred in order to assign, attribute, or allocate investments and expenses, as required by this Mandatory Data Collection, including, for example, data as to the number of communications or call minutes, ADP, headcounts, labor hours, or salaries; computer processing, electronic equipment or other inside or outside plant equipment, circuit, and electric power use or capacity; internal or external maintenance or computer-center help desk requests, tickets, orders or dispatch numbers; and purchase orders, transactions, or other measures of resource use and cost-causation.

(18)  **Representative Information:**  In the Word template, address in detail whether the information collected though the data collection will be representative of the Company's future provision of IPCS and associated Ancillary Services.  Identify for the two-year period from January 1, 2024, to December 31, 2025, any specific known and measurable changes to the Company's IPCS or Ancillary Services investments, expenses, revenues, and demand that are not reflected in the data collected through this data collection.

(19)  **Sources:**  In the Word template, identify the source for any data or any document included in or relied upon in your response.

## B. Overview Information

This section provides an overview of your provision of audio and video IPCS and associated Ancillary Services by incorporating information from other sections of your Excel template.  You should first enter the information required in those other sections of the Excel template.  Once you do that, the information required for this section will automatically be entered into this portion of the template.  All of the information will be at the Accounting Entity level.

(1)  **Company Name**

(2)  **Facilities**
  (a)  Number of Facilities
  (b)  Number of Prisons
  (c)  Number of Jails with ADP of 1,000 and above
  (d)  Number of Jails with ADP below 1,000
  (e)  Number of contracts
  (f)  Number of Prison contracts
  (g)  Number of Jail contracts

(3)  **Annual Total Expenses during 2022 for:**
  (a)  Audio IPCS
  (b)  Video IPCS
  (c)  Safety and Security Measures
  (d)  Automated Payment Services
  (e)  Live Agent Services

**JA341**

    (f)    Paper Bill/Statement Services
    (g)    Single-Call and Related Services
    (h)    Third-Party Financial Transactions Services

(4)    Billed Revenues during 2022 for:
    (a)    Audio IPCS
    (b)    Video IPCS
    (c)    Safety and Security Measures
    (d)    Automated Payment Services
    (e)    Live Agent Services
    (f)    Paper Bill/Statement Services
    (g)    Single-Call and Related Services
    (h)    Third-Party Financial Transactions Services

(5)    **Site Commissions paid during 2022:**
    (a)    Total Site Commissions
       (i)    Total Monetary Site Commissions
      (ii)    Total In-Kind Site Commissions

    (b)    Total Legally Mandated Site Commissions

    (c)    Total Contractually Prescribed Site Commissions

## C.  Company-Wide Information

This section seeks financial data and other information about the Company and directs you to determine the Annual Total Expenses the Company incurs to provide audio IPCS, video IPCS, Safety and Security Measures, various types of Ancillary Services, and Other Services and Products during 2022.

### 1.  Overall Financial Information

This subsection directs you to provide financial data and other information in the aggregate for the entire Company as defined above in Section III. Relevant Definitions (i.e., Accounting Entity).  All financial data must comply with generally accepted accounting principles (GAAP).[17]  The carrying value of all assets, both tangible and intangible, shall reflect the results of the most recent impairment testing, and any adjustments required to account for any impairment loss shall be separately identified.  In the Word template, explain in detail the process the Company used ensure GAAP-consistent impairment testing and provide any additional information needed to make that process fully transparent and understandable.  Alternatively, explain in detail in the Word template why an impairment test is not necessary, when impairment testing normally occurs under Company policy, and identify with specificity any accounting adjustments that were made at the time of the most recent impairment testing.

(6)    **Investment and Expense Data:**  Provide the following investment and expense data in the aggregate for the Accounting Entity for 2022.  If you have no investment or expense data to report for any of the following categories, report zero in the corresponding cell in the Excel template.

---

[17] *See generally* Financial Accounting Standards Board, *Accounting Standards Codification,* https://asc.fasb.org/ (last visited Apr. 17, 2023).  The Financial Accounting Standards Board (FASB) Accounting Standards Codification is the "source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities."  FASB Accounting Standards Codification, *About the Codification*, v. 5.11, at 4, https://asc.fasb.org/layoutComponents/getPdf?isSitesBucket=true&fileName=FASB_About_the_Codification.pdf (last visited Apr. 17, 2023).  Other sources of authoritative GAAP for Securities and Exchange Commission (SEC) registrants include rules and interpretive releases of the SEC.  *Id.* at 7 (last visited Apr. 17, 2023).

(a)　**Capital Assets:**  Report year-end amounts for 2022 for each of the items specified below.  Report amounts for items (i), (ii) or (iii), and (iv) separately for each of the following categories of assets: (aa) tangible assets; (bb) capitalized research and development; (cc) purchased software; (dd) internally developed software; (ee) trademarks; (ff) capitalized site commissions; (gg) other identifiable intangible assets; and (hh) goodwill.  Report a single amount for each of items (v), (vi), and (vii).

　(i)　　Gross Investment;
　(ii)　　Accumulated depreciation;
　(iii)　　Accumulated amortization;
　(iv)　　Net Investment;
　(v)　　Accumulated deferred federal income taxes;
　(vi)　　Accumulated deferred state income taxes; and
　(vii)　　Customer prepayments or deposits.

(b)　**Capital Expenses:**  Report the amount for 2022 for each of the items specified below.  Report amounts for items (i) and (ii) separately for each of the following categories of assets: (aa) tangible assets; (bb) capitalized research and development; (cc) purchased software; (dd) internally developed software; (ee) trademarks; (ff) capitalized site commissions; (gg) other identifiable intangible assets; and (hh) goodwill.  Report as amortization in item (ii) any amortization of capitalized site commissions that the Company's books recognized as an amortization expense or as an offset against gross revenues (e.g., as contra revenues).  Report a single amount for each of items (iii), (iv), and (v).

　(i)　　Depreciation;
　(ii)　　Amortization;
　(iii)　　Interest other than interest paid on customer prepayments or deposits;
　(iv)　　Interest paid on customer prepayments or deposits; and
　(v)　　Other income tax-related adjustments.

(c)　**Operating Expenses:**  Report the amount for 2022 for each of the items specified below.  Each expense must be reported for only one category.  For example, do not report expenses incurred for Extra Payments to Telecommunications Carriers or Other Entities for International Communications as an expense incurred for payments for Interstate, International, or Intrastate Communications; report such expenses in the designated category separately.  Exclude any charges for asset impairment loss.

　(i)　　Maintenance, repair, and engineering of site plant, equipment, and facilities;
　(ii)　　Payments to Telecommunications carriers or other entities for Interstate, International, or Intrastate Communications other than Extra Payments for International Communications;
　(iii)　　Extra Payments to Telecommunications Carriers or Other Entities for International Communications;
　(iv)　　Field services;
　(v)　　Network operations;
　(vi)　　Call centers;
　(vii)　　Data centers;
　(viii)　　Payment of Site Commissions recognized as an expense or an offset against gross revenues when paid or when the Site Commissions-related transaction occurred;
　(ix)　　Billing, collection, client management, and customer care;
　(x)　　Sales and marketing;
　(xi)　　General and administrative;
　(xii)　　Other overhead;
　(xiii)　　Taxes other than income taxes;
　(xiv)　　Transactions related to mergers and acquisitions; and
　(xv)　　Bad debt.

**JA343**

## 2.  Service-Specific Financial Information

The preceding subsection instructs you to provide financial information at the Company level.  We now require you to provide Company-wide revenue and Annual Total Expense data for 2022, separately and discretely, for audio IPCS, video IPCS, Safety and Security Measures, various types of Ancillary Services, and Other Services.

Determining the Company's Annual Total Expenses for 2022 involves several steps.  First, we instruct you to assign, attribute, or allocate the reported Company-wide investments and expenses (in total, without separation into interstate, international, and intrastate components), other than those for Site Commissions, among audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, Other Ancillary Services, and Other Services in accordance with the cost allocation instructions set forth below.

We then instruct you to calculate federal and state income taxes, Cash Working Capital, Net Capital Stock, and Return for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services.  We do not require a calculation of federal and state income taxes, Cash Working Capital, Net Capital Stock, or Return for Other Ancillary Services or Other Services.  Cells are populated with N/A in the Excel template to indicate that federal and state income taxes, Cash Working Capital, Net Capital Stock, and Return should not be reported for these services.  Cells also are populated with N/A in the Excel template to indicate that capitalized Site Commissions, amortization related to capitalized Site Commissions, and Site Commissions accounted for as an expense or offset to gross revenues should not be allocated to or reported for any service.

We next instruct you to provide the results of your cost assignments, attributions, and allocations separately and discretely (i.e., totaling, in sum, the respective amounts reported for Company-wide investments and expenses) for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, Other Ancillary Services, and Other Services, which shall include amounts for investments, Capital Expenses, and Operating Expenses.  We also instruct you to report your federal and state income tax calculations separately and discretely for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services.

We then require you to make two elections.  We first instruct you to elect whether to use the default Weighted Average Cost of Capital or an alternative Weighted Average Cost of Capital.  We then instruct you to elect whether to include an allowance for Cash Working Capital.  If you elect an alternative Weighted Average Cost of  Capital greater than 9.75% or include an allowance for Cash Working Capital, we require you to report the components of those elections.

We instruct you to provide the Company's Annual Total Expenses (in total, without separation into interstate, international, and intrastate components) of providing, separately and discretely, audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services.

We then instruct you to make three elections relating to potential adjustments to the Company's investments, expenses, Net Capital Stock, and Annual Total Expenses.  These potential adjustments would involve: (a) separating your investments, expenses, Net Capital Stock, and Annual Total Expenses for certain types of Ancillary Services into audio and video components; (b) separating the Company's

investments, expenses, Net Capital Stock, and Annual Total Expenses for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services into interstate, international, and intrastate components; and (c) adjusting those investments, expenses, Net Capital Stock, and Annual Total Expenses for any other reason. We will interpret elections to not make these adjustments as establishing that the adjustments would show no meaningful differences in investments, expenses, Net Capital Stock, and Annual Total Expenses costs.

## a. Revenue Data

Enter, for 2022, the total Billed Revenues for the Accounting Entity for each of the following categories. The revenue reported for items (a), (b), and (d) though (j) shall exclude all revenue associated with Safety and Security Measures for which there is a separate price:

(a)    Audio IPCS;
(b)    Video IPCS;
(c)    Safety and Security Measures;
(d)    Automated Payment Services;
(e)    Live Agent Services;
(f)    Paper Bill/Statement Services;
(g)    Single-Call and Related Services;
(h)    Third-Party Financial Transaction Services;
(i)    Other Ancillary Services; and
(j)    Other Services.

## b. Cost Allocation Instructions

Using the hierarchy of methods specified below, you must assign, attribute, or allocate Company-wide investments and expenses (in total, without separation into interstate, international, and intrastate components) among:

(a)    Audio IPCS;
(b)    Video IPCS;
(c)    Safety and Security Measures;
(d)    Automated Payment Services (ancillary to audio or video IPCS);
(e)    Live Agent Services (ancillary to audio or video IPCS);
(f)    Paper Bill/Statement Services (ancillary to audio or video IPCS);
(g)    Single-Call and Related Services (ancillary to audio or video IPCS);
(h)    Third-Party Financial Transaction Services (ancillary to audio or video IPCS);
(i)    Other Ancillary Services (ancillary to audio or video IPCS); and
(j)    Other Services.

For purposes of these cost allocation instructions, each of these services is treated as a separate (or particular) "service." The data for items (a), (b), and (d) though (j) shall exclude all investments and expenses associated with Safety and Security Measures. The data for items (d) through (i) should reflect all of the Company's Ancillary Services, regardless of whether they are provided in connection with audio IPCS, video IPCS, or both. Allocate any fees paid to third parties to provide Single-Call and Related Services, as well as any costs the Provider incurred to self-provide those services, to Single-Call and Related Services.

The sums of the investment and expense amounts assigned, attributed, or allocated to each particular service (excluding amounts for federal and state income taxes, Cash Working Capital, Net Capital Stock, and Return allocated to these services) shall, for each type of investment or expense, equal the total investment and expense amounts (excluding Site Commissions) respectively reported for the Company in the Excel template.

(1) First, to the extent possible, directly assign investments used exclusively to provide a particular service to that service; likewise, to the extent possible, directly assign expenses incurred exclusively to provide a particular service to that service. Calculate federal and state income taxes separately for each of audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services but not for Other Ancillary Services or Other Services, as specified in items 7 and 8 below. For any investments or expenses that are not directly assignable, turn to the next step.

(2) Second, determine which remaining investments and expenses are shared investments or expenses and which are common investments or expenses. Any investments and expenses that are not directly assignable to a specific service are either shared or common investments and expenses. Then, group shared investments and expenses into shared investment and expense categories based on business function, activity, or task. Similarly, group common investments and expenses into common investment and expense categories based on business function, activity, or task.

   (a) Shared investments are for assets used exclusively to supply a specific subset of services that are not assignable or attributable to a particular service. Shared expenses are expenses incurred solely to supply a specific subset of services that are not assignable or attributable to a specific service.

   (b) Common investments are for assets not assignable or attributable to a specific service or subset of services. Common expenses are expenses that are not assignable or attributable to a specific service or subset of services.

(3) Third, determine the subset of services for which each category of shared investments and expenses, and each category of common investments and expenses, was incurred. Then, to the extent possible, directly attribute each category of shared and common investments and expenses to their associated services based on direct analysis of factors that cause a particular business function, activity, or task, and thus investments or expenses, attributable to a particular service to increase or decrease. For any category of shared or common investments or expenses that cannot be directly attributed in this manner, turn to the next step.

(4) Fourth, for each remaining category of shared and common investments and expenses for which neither direct assignment nor direct attribution is possible, determine whether there is an indirect, cost-causative link to an investment or expense category (or group of categories) that has already been directly assigned or directly attributed. Where there is such a link, indirectly attribute each remaining category of shared and common investments and expenses to the same services, in the same proportion, to which its linked categories were directly assigned or directly attributed. For any category of shared or common investments or expenses that cannot be indirectly correlated in this manner, turn to the next step.

(5) Fifth, where none of the methods described above is possible, allocate categories of shared investments and expenses among the particular services that share those investments and expenses in proportion to each service's share of the sum of all of those investments or expenses that have already been directly assigned or attributed to these particular services. Allocate categories of common investments and expenses among the particular services in proportion to each service's share of the total of all investments or expenses already directly assigned or attributed to all services.

(6) **Federal income taxes** (calculated for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services): First, subtract reported interest expense other than interest paid on customer prepayments or deposits (and any amount reported for other income tax-related adjustments) from Return to determine the federal taxable income. Second, divide the corresponding reported federal income tax rate by 1 minus this reported federal income tax

**JA346**

rate to determine a federal income tax gross-up factor. (See the following instructions below for determining the federal income tax rate to report.) Third, multiply the federal income tax gross-up factor by federal taxable income to determine the amount of federal income tax to report.

(a) **Federal income tax rate for Accounting Entities that are C Corporations or taxed as C Corporations under the rules of the IRS.** Report the 2022 federal corporate income tax rate, 21%, if the Accounting Entity is or is part of a company that is a C corporation or taxed as a C Corporation under the rules of the IRS. Use this tax rate to calculate federal income taxes as instructed above.

(b) **Federal income tax rate for Pass-Through Entities under the rules of the IRS**. An Accounting Entity that passes income through or is part of a company that passes income through to its owners (as defined in section IV.A) for federal income tax purposes may claim an allowance for federal income taxes. If the Accounting Entity passes income through or is part of a company that passes income through to its owners and wishes to claim an allowance for federal income taxes, report a weighted average of the 2022 federal income tax rate applicable to each owner, where the weights reflect each owner's share of the 2022 total income passed through. Use this weighted average federal income tax rate to calculate federal income taxes as instructed above. Otherwise, report a federal tax rate equal to zero.

(7) **State income taxes** (calculated for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services): First, add the portion of federal income tax not deductible for state income tax purposes to federal taxable income to determine state taxable income. Second, divide the weighted average of the reported applicable individual state income tax rates by 1 minus the weighted average of the reported applicable state income tax rates to determine a state income tax gross-up factor. (See the following instructions below for calculating the weighted average of the reported applicable state income tax rates.) Third, multiply the state income tax gross-up factor by state taxable income to determine the amount of state income tax to report.

(a) **Weighted average state income tax rate:** Enter "C" in the specified cells in the Excel template if the Company is subject to the state corporate income tax rate under the rules of a given state's taxing authority. Enter "PTE" (for Pass-Through Entity) if the Company passes income through to its owners (as defined above) under the rules of a given state's taxing authority. Report separately for 2022 each state income tax rate applicable to the Company. (See the following instructions below for determining the state income tax rates to report.) Report the total of your 2022 Billed Revenues from audio IPCS, video IPCS, and Ancillary Services separately for each state. The Excel template uses these reported data to calculate an audio and video IPCS and Ancillary Services revenue-weighted average of the individual state income tax rates (i.e., the sum of the products of each state tax rate multiplied by the percentage of the Company's total of audio and video IPCS and Ancillary Services Billed Revenues derived from the supply of these services in each corresponding state). Use the weighted average state income tax rate to calculate state income taxes as instructed above.

(b) **State income tax rates for Accounting Entities that are subject to state corporate income taxes under the rules of the applicable state taxing authority.** Report the 2022 state corporate income tax rate for each state in which the Accounting Entity is subject to or is part of a company that is subject to state corporate income taxes. Use these state corporate income tax rates to calculate the revenue-weighted average of the state income tax rates as instructed above. If the Accounting Entity is subject to state corporate income taxes in some states but passes income through to its owners for state tax purposes in other states, follow the instruction below for reporting income tax rates for those other states.

(c) **State income tax rates for Accounting Entities that pass income through to their owners for state income tax purposes**.  An Accounting Entity that passes income through or is part of a company that passes income through to owners for state income tax purposes may claim an allowance for state income taxes.  If the Accounting Entity passes income through to its owners and wishes to claim an allowance for state income taxes, report, for each pass-through income state, a weighted average of the 2022 state income tax rate applicable to each owner, where the weights reflect each owner's share of the 2022 total pass through income attributable to the state.  Use each owner income-weighted state tax rate, where applicable, to calculate the revenue-weighted average of the individual state income tax rates as instructed above.  Otherwise, use a state income tax rate equal to zero for these states to calculate the revenue-weighted average of the individual state income tax rates as instructed above.

(8) Fully document, explain, and justify all cost assignments, attributions, and allocations using the Word template and submit additional workpapers developed using Excel spreadsheets.

## c. Cost Allocation Results

The preceding subsection instructs you to determine, using a hierarchy of cost allocation and other required methods, the Annual Total Expenses the Company incurred to provide certain specified services during 2022.  We now explain how you are to report the results of those determinations.

Report your attributions, and allocations separately for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, Other Ancillary Services, and Other Services in the Excel template, as specified below.  Report your federal and state income tax calculations, Cash Working Capital, Net Capital Stock, and Return separately only for audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, Other Ancillary Services, and Other Services in the Excel template, as specified below.  If you have no investment or expense data to report for any of the following categories, report zero in the corresponding cell in the Excel template.

(1) **Capital Assets:**  Report the year-end amount for 2022 for each of the items specified below.

First, report amounts for the following items separately for each of the following types of assets: (i) tangible assets; (ii) capitalized research and development; (iii) purchased software; (iv) internally developed software; (v) trademarks; (vi) other identifiable intangible assets; and (vi) goodwill:

(a) Gross Investment;
(b) Accumulated depreciation;
(c) Accumulated amortization; and
(d) Net Investment.

Next, report a single amount for each of the following items:

(e) Accumulated deferred federal income taxes;
(f) Accumulated deferred state income taxes;
(g) Customer prepayments or deposits;
(h) Cash Working Capital (see below); and
(i) Net Capital Stock.

(2) **Capital Expenses and Related Tax Information:**  Report the annual amount for 2022 for each of the items specified below.

First, report amounts for the following items separately for each of the following types of assets: (i) tangible assets; (ii) capitalized research and development; (iii) purchased software; (iv) internally developed software; (v) trademarks; (vi) other identifiable intangible assets; and (vii) goodwill:

(a)    Depreciation; and
(b)    Amortization.

Next, report a single amount or percentage, as appropriate, for each of the following items:

(c)    Weighted Average Cost of Capital (see below);
(d)    Return;
(e)    Interest other than interest paid on customer prepayments or deposits;
(f)    Interest paid on customer prepayments or deposits;
(g)    Other income tax-related adjustments;
(h)    Federal taxable income;
(i)    Federal income tax rate;
(j)    Federal income tax gross-up factor;
(k)    Federal income tax;
(l)    Federal income tax not deductible for state income tax purposes;
(m)    State taxable income;
(n)    State income tax rate;
(o)    State income tax gross-up factor; and
(p)    State income tax.

(3)    **Operating Expenses:**  Report the annual amount for 2022 for each of the items specified below. Each expense must be reported for only one category; for example, do not report expense incurred for Extra Payments to Telecommunications Carriers or Other Entities for International Communications as an expense incurred for Interstate, International, or Intrastate communications other than Extra Payments to Telecommunications Carriers or Other Entities for International Communications.  Exclude any charges for asset impairment loss.

(a)    Maintenance, repair, and engineering of site plant, equipment, and facilities;
(b)    Payments to telecommunications carriers or other entities for interstate, international, or intrastate communications other than Extra Payments to Telecommunications Carriers or Other Entities for International Communications;
(c)    Extra Payments to Telecommunications Carriers or Other Entities for International Communications;
(d)    Field services;
(e)    Network operations;
(f)    Call centers;
(g)    Data centers;
(h)    Billing, collection, client management, and customer care;
(i)    Sales and marketing;
(j)    General and administrative;
(k)    Other overhead;
(l)    Taxes other than income taxes;
(m)    Transactions related to mergers and acquisitions; and
(n)    Bad debt.

## d. Weighted Average Cost of Capital

(1)    For each of audio IPCS, video IPCS, Safety and Security Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services, elect, by checking the appropriate box in the Excel template,

whether to use the default Weighted Average Cost of Capital of 9.75% (which is the Commission's currently authorized rate of return for incumbent local exchange carriers regulated on a rate-of-return basis) for 2022, or an alternative Weighted Average Cost of Capital. This Alternative Weighted Average Cost of Capital shall reflect, and be calculated based upon, the Company's own and a demonstrably comparable group of firms': (a) financial data and economic circumstances; (b) the use of widely accepted methods to estimate current debt and equity costs and capital structure; and (c) the collective risks of providing these services.

(2)     If you elect to use an Alternative Weighted Average Cost of Capital greater than 9.75%, report in the Excel template the components of the Company's current Weighted Average Cost of Capital and the Weighted Average Cost of Capital itself, as specified below:

     (a)     Cost of debt;
     (b)     Cost of preferred stock;
     (c)     Cost of equity;
     (d)     Total debt outstanding in dollars and as a percent of total capital outstanding (the sum of debt, preferred stock, and equity outstanding);
     (e)     Total preferred stock outstanding and as a percent of total capital outstanding;
     (f)     Total equity outstanding and as a percent of total capital outstanding; and
     (g)     Weighted Average Cost of Capital.

Use this singular estimate of the Company's current Weighted Average Cost of Capital to calculate the Return for 2022. In the Word template, fully document each of these components by submitting data, formulas, cost of equity analyses (using, for example, the Discounted Cash Flow Model or Capital Asset Pricing Model), calculations, and worksheets, and explain and justify the development of each claimed component. Failure to fully document, explain, and justify each claimed component may result in the application of the default Weighted Average Cost of Capital of 9.75%.

## e. Cash Working Capital

(1)     Elect, by checking the appropriate box in the Excel template, whether to include an allowance for Cash Working Capital in the Company's Net Capital Stock.

(2)     If you elect to include an allowance for Cash Working Capital in the Company's Net Capital Stock, report the allowance claimed for 2022 in the Excel template separately for: (a) audio IPCS; (b) video IPCS; (c) Safety and Security Measures; (d) Automated Payment Services; (e) Live Agent Services; (f) Paper Bill/Statement Services; (g) Single-Call and Related Services; and (h) Third-Party Financial Transaction Services. Submit a lead-lag study or the equivalent that estimates the average number of days between the payment of expenses and the receipt of revenues, and average daily cash expenses, as support for each claimed allowance. Fully document, explain, and justify each claimed allowance in the Word template.

## f. Annual Total Expenses

(1)     Report Company-wide Annual Total Expenses separately for: (a) audio IPCS; (b) video IPCS; (c) Safety and Security Measures; (d) Automated Payment Services; (e) Live Agent Services; (f) Paper Bill/Statement Services; (g) Single-Call and Related Services; and (h) Third-Party Financial Transaction Services.

Exclude reported interest expense other than interest paid on customer prepayments or deposits from Annual Total Expenses. The allowance for interest expense other than interest paid on customer prepayments or deposits is already included in the Return component of the Annual Total Expenses calculation. However, you should include reported interest paid on customer prepayments or deposits in Annual Total Expenses. You should also exclude expense reported for Extra Payments to

Telecommunications Carriers or Other Entities for International Communications from Annual Total Expenses.

## g. Optional Allocations and Adjustments

### Audio and Video Ancillary Services

(1)   In the Word template, state whether the Company elects to further separate its investments, expenses, Net Capital Stock, and Annual Total Expenses for Ancillary Services (including each of Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, and Other Ancillary Services) between audio Ancillary Services and video Ancillary Services to reflect any measurable differences between the average costs of providing audio Ancillary Services versus video Ancillary Services.

(2)   If you make this election, you must: (a) fully document and explain this separation in the Word template; and (b) submit additional Excel spreadsheets, similar in design and level of data disaggregation to those in the Excel template, showing in detail each aspect of the Company's separations processes.  Electing this cost allocation option does not relieve the Company of its obligation to report its unseparated investments, expenses, Net Capital Stock, and Annual Total Expenses in the Excel template and in accordance with the instructions for reporting unseparated data.

### Interstate/International and Intrastate IPCS

(3)   In the Word template, state whether the Company elects to further separate its investments, expenses, Net Capital Stock, and Annual Total Expenses for audio IPCS, video IPCS, Safety and Security Measures, Ancillary Services (including each of Automated Payment Services, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, Third-Party Financial Transaction Service, and Other Ancillary Services) between interstate/international and intrastate services to reflect any measurable differences between the average costs of providing interstate/international versus intrastate services.

(4)   If you make this election, you must: (a) fully document, explain, and justify this separation in the Word template; and (b) submit additional Excel spreadsheets, similar in design and level of data disaggregation to those in the Excel template, showing in detail each aspect of the Company's separation processes.  These showings in the Word template and Excel spreadsheets must fully document and justify each aspect of the processes by which the Company-wide interstate/international or intrastate audio IPCS, video IPCS, and Safety and Security Measures investments and expenses are further assigned, attributed, or allocated to or among each of the Company's Facilities, and how the Net Capital Stock and Annual Total Expenses for each of these services are developed for each of these Facilities.  Electing this cost allocation option does not relieve the Company of its obligation to report its unseparated investments, expenses, Net Capital Stock, and Annual Total Expenses in the Excel template and in accordance with the instructions for reporting unseparated data.

### Other Optional Adjustments

(5)   In the Word template, state whether the Company elects to further adjust its investments, expenses, Net Capital Stock, and Annual Total Expenses developed in accordance with the instructions set out in this document for any other reason.  If you elect to make such an adjustment, you must: (a) fully document, explain, and justify it in the Word template; and (b) submit additional Excel spreadsheets, similar in design and level of data disaggregation to those in the Excel template, showing in detail each aspect of the Company's adjustments, including all changes to the Company's data, cost allocation procedures, and results.  If the Company also elects to further separate its investments, expenses, Net Capital Stock, and Annual Total Expenses as specified in Parts IV.C.2.g.(1) or IV.C.2.g.(3), above, you also must separately justify and document the impact of any further

**JA351**

adjustments in response to this Inquiry upon your results under Parts IV.C.2.g.(1) and IV.C.2.g.(3). Electing this additional adjustment option does not relieve the Company of its obligation to report its unseparated and unadjusted investments, expenses, Net Capital Stock, and Annual Total Expenses in the Excel template and in accordance with the instructions for reporting unseparated and unadjusted data.

## 3. Other Company-Wide Information

This subsection directs you to report, among other information, Company-wide data on Site Commissions, Safety and Security Measures, Ancillary Services, and Affiliate Transactions. It also provides instructions on reporting data and other information where a Provider subcontracts with another entity for the provision of IPCS.

### a. Site Commissions

(1)  **Total Site Commissions:** Enter the total amount of all Site Commissions paid by the Company during 2022, without regard to whether the Site Commission was Legally Mandated, Contractually Prescribed, Fixed, Variable, Monetary, or In-Kind and without regard to whether the Site Commission was paid in connection with audio IPCS, video IPCS, Safety and Security Measures, Ancillary Services, or Other Services for 2022.

    (a)  Enter the percentage of the total Site Commissions paid by the Company during 2022 that were attributable to the Company's provision of IPCS and associated Ancillary Services.

    (b)  Enter the percentage of the total Site Commissions paid by the Company during 2022 that were attributable to the Company's provision of Safety and Security Measures.

(2)  **Total Legally Mandated Site Commissions:** Enter the total amount of Legally Mandated Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services.

    (a)  **Total Monetary Site Commissions:** Enter the total amount of Legally Mandated, Monetary Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services.

        (i)  **Total Fixed Site Commissions:** Enter the total amount of all Legally Mandated Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both Monetary Site Commissions and Fixed Site Commissions.

        (aa) **Total Upfront Payments:** Enter the total amount of all Legally Mandated Site Commissions for 2022 for IPCS and associated Ancillary Services that not only were Monetary Site Commissions and Fixed Site Commissions but also were paid by the Company at the signing of a contract for IPCS or during the first year of a contract for these services.

        (ii)  **Total Variable Site Commissions:** Enter the total amount of all Legally Mandated Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both Monetary Site Commissions and Variable Site Commissions.

    (b)  **Total In-Kind Site Commissions:** Enter the total amount of Legally Mandated Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were also In-Kind Site Commissions.

        (i)  In the Word template, describe these in-kind payments in detail. Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product that you classify as an In-Kind Site Commission payment for IPCS and associated Ancillary Services.

(ii) **Total Fixed Site Commissions:** Enter the total amount of all Legally Mandated Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both In-Kind Site Commissions and Fixed Site Commissions.

(aa) **Total Upfront Payments:** Enter the total amount of all Legally Mandated Site Commissions for 2022 for IPCS and associated Ancillary Services that not only were In-Kind Site Commissions and Fixed Site Commissions but also were paid by the Company at the signing of a contract for IPCS or during the first year of a contract for these services.

(iii) **Total Variable Site Commissions:** Enter the total amount of all Legally Mandated Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both In-Kind Site Commissions and Variable Site Commissions.

(3) **Total Contractually Prescribed Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services.

(a) **Total Monetary Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were also Monetary Site Commissions.

(i) **Total Fixed Site Commissions:** Enter the total amount of all Contractually Prescribed Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both Monetary Site Commissions and Fixed Site Commissions.

(aa) **Total Upfront Payments:** Enter the total amount of all Contractually Prescribed Site Commissions for 2022 for IPCS and associated Ancillary Services that not only were Monetary Site Commissions and Fixed Site Commissions but also were paid by the Company at the signing of a contract for IPCS or during the first year of a contract for these services.

(ii) **Total Variable Site Commissions:** Enter the total amount of all Contractually Prescribed Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both Monetary Site Commissions and Variable Site Commissions.

(b) **Total In-Kind Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions that paid by the Company during 2022 for IPCS and associated Ancillary Services that were also In-Kind Site Commissions.

(i) In the Word template, describe these in-kind payments in detail. Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product that you classify as an In-Kind Site Commission payment for IPCS and associated Ancillary Services.

(ii) **Total Fixed Site Commissions:** Enter the total amount of all Contractually Prescribed Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both In-Kind Site Commissions and Fixed Site Commissions.

(aa) **Total Upfront Payments:** Enter the total amount of all Contractually Prescribed for 2022 for IPCS and associated Ancillary Services that not only were In-Kind Site Commissions and Fixed Site Commissions but also were paid by the Company at the signing of a contract for IPCS or during the first year of a contract these services.

**JA353**

(iii) **Total Variable Site Commissions:** Enter the total amount of all Contractually Prescribed Site Commissions paid by the Company during 2022 for IPCS and associated Ancillary Services that were both In-Kind Site Commissions and Variable Site Commissions.

(4) **Site Commissions Allocation Methodology:** In the Word template, fully describe, document, explain, and justify the allocation methodology you used to allocate Site Commission payments between the Company's IPCS and associated Ancillary Services and services other than IPCS and associated Ancillary Services in situations where you made Site Commission payments for both types of services.

(5) In the Word template, state whether you pay Site Commissions separately for audio IPCS and video IPCS, and explain in detail how these payments differ between the two types of communications, including whether the company offers to make separate Site Commission payments for audio and video communications and whether correctional authorities request Site Commissions separately for audio IPCS and video IPCS.

(6) In the Word template, explain whether the formula or formulas used to calculate monetary Site Commission payments differ depending on whether the communication is audio or video. For example, if a provider offers to pay or a correctional facility asks the provider to pay a flat sum as a Site Commission, how, if at all, do you determine what portions of that Site Commission are allocated to audio IPCS and video IPCS.

(7) In the Word template, state whether you pay Site Commissions separately for intrastate IPCS, interstate IPCS, and international IPCS, and explain in detail how these payments differ among jurisdictions, including whether the company offers to make separate Site Commission payments on intrastate, interstate, and international communications and whether correctional authorities request such payments.

(8) In the Word template, explain whether the formula or formulas used to calculate monetary Site Commission payments differ depending on whether the communication is intrastate, interstate, or international. For example, if a provider offers to pay or a correctional facility asks the provider to pay a flat sum as a Site Commission, how, if at all, do you determine what portions of that Site Commission are allocated to intrastate IPCS, interstate IPCS, and international IPCS.

## b. Company-Wide Costs of Provider's Safety and Security Measures

In Part IV.C.2, above, we instruct you to determine the Annual Total Expenses the Company incurred to provide Safety and Security Measures during 2022. This subsection directs you to allocate those Annual Total Expenses among certain specified categories using your best estimate of the percentage of your total Annual Total Expenses for Safety and Security Measures that are attributable to the measures within each of the seven categories below.

(1) In the Excel template, report the Company's best estimate of the percentage of the Company's Annual Total Expenses of providing Safety and Security Measures that are attributable to each of the following seven categories for 2022. The Excel template will multiply the Company's Annual Total Expenses by each reported percentage to attribute a share of these expenses to each category.

(a) Communications Assistance for Law Enforcement Act (CALEA) services, including, but not limited to the expenses incurred by the provider in complying with CALEA.

(b)     Law enforcement support services, including but not limited to the following examples of such services: the administration of subpoenas, the administration of crime tip lines, the administration of informant lines, and the maintenance of data repositories for use by law enforcement personnel.

(c)     Communication security services, including, but not limited, to the following examples of such services: setting up communication limitations such as for witnesses, judges, or other individuals, setting up permitted telephone numbers, providing personal identification numbers (PINs), implementing disclaimers to called parties regarding communication origination, implementing communication acceptance procedures, preventing three-way communications, preventing chain communications, dual-tone multifrequency detection, manual call control for the facility, tracking frequently called numbers, implementing incoming communication restrictions, and fraud management.

(d)     Communication recording services, including, but not limited to, the following examples of such services: implementation of a disclaimer regarding communication recording, recording of communications, and storage of recorded communications.

(e)     Communication monitoring services, including, but not limited to, the following examples of such services: live or real-time monitoring of communications, automatic word detection, communication transcription, analysis of recordings which may also include keyword searches, and remote capabilities.

(f)     Voice biometrics services, including, but not limited to, the following examples of such services: voice printing, voice identification, continuous voice verification, and voice databasing.

(g)     Other Safety and Security Measures, including, but not limited to, the following examples of such services: reporting obligations, acquisition of patents to support safety and security technologies, and research and development of new safety and security technologies.

(2)     In the Word template, identify by name and describe each service you classify as a law enforcement support service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(3)     In the Word template, identify by name and describe each service you classify as a communication security service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(4)     In the Word template, identify by name and describe each service you classify as a communication recording service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(5)     In the Word template, identify by name and describe each service you classify as a communication monitoring service, including a description of the specific tasks and functions covered by this service whether you routinely provide those tasks and functions in connection with IPCS.

(6)     In the Word template, identify by name and describe each service you classify as a voice biometrics service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(7)     In the Word template, identify by name and describe each service you provide as a Safety and Security Measure that is not included in one of the foregoing categories, including a description of the specific tasks and functions covered by each service and whether you routinely offer each service in connection with IPCS.

**JA355**

## c. Service-Specific Costs of Providing Safety and Security Measures

In section IV.C.3.b. above, we instruct you to report the Company's best estimate of the percentage of the Company's Annual Total Expenses of providing Safety and Security Measures that are attributable to different categories for 2022. The Excel template will multiply the Company's Annual Total Expenses of providing Safety and Security Measures by each of those reported percentages to attribute a share of these expenses to each category. Next, this section directs you to report for 2022 for each of those same Safety and Security categories the Company's best estimate of the percentage of the Safety and Security expenses that are attributable to (1) audio IPCS; (2) video IPCS; (3) Ancillary Services; and (4) Other Services and Products. The Excel template will multiply the Safety and Security expenses already attributed to each different Safety and Security category by each of these reported percentages to attribute these expenses to these four categories of services.

In the Excel template, report for 2022 for each of the categories identified below the Company's best estimate of the percentage of the Safety and Security expenses that are attributable to: (1) audio IPCS; (2) video IPCS; (3) Ancillary Services; and (4) Other Services and Products.

(a)     Communications Assistance for Law Enforcement Act (CALEA) services, including, but not limited to the expenses incurred by the provider in complying with CALEA.

(b)     Law enforcement support services, including but not limited to the examples identified for such services in section IV.C.3.b, above.

(c)     Communication security services, including, but not limited, to the examples identified for such services in section IV.C.3.b, above.

(d)     Communication recording services, including, but not limited to, the examples identified for such services in section IV.C.3.b, above.

(e)     Communication monitoring services, including, but not limited to, the examples identified for such services in section IV.C.3.b, above.

(f)     Voice biometrics services, including, but not limited to, the examples identified for such services in section IV.C.3.b, above.

(g)     Other Safety and Security Measures, including, but not limited to, the examples identified for such services in section IV.C.3.b, above.

## d.  Ancillary Services

In Part IV.C.2, above, we instruct you to determine the Annual Total Expenses the Company incurred to provide various types of Ancillary Services (i.e., Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services) during 2022. This subsection directs you to provide certain additional Company-level information on your Ancillary Services operations during 2022.

We begin with questions designed to learn generally about the Company's Ancillary Services operations during 2022. We then ask questions designed to learn information about the Company's use, if any, of Affiliates or Third Parties in its provision of Ancillary Services during that year. We then turn to questions about the Company's Ancillary Services revenues and Ancillary Services revenue-sharing agreements, if any, during 2022.

(1) **Ancillary Services:** In the Excel Template, enter "Yes" if you charged Customers Automated Payment Service Fees, Live Agent Service Fees, Paper Bill/Statement Service Fees, Fees for Single-Call and Related Services, Third-Party Financial Transaction Services Fees, or Other Ancillary Services Fees during 2022. Otherwise, enter "No."

    (a) In the Excel Template, enter "Yes" if you charged Customers more than one Permissible Ancillary Service Charge fee in connection with the same interstate, international, or mixed-jurisdictional transaction during 2022.

        (i) If you answered "Yes," describe in detail the circumstances relating to those charges in the Word template. Your description shall include, in addition to all other relevant information, a list of the specific transactions for which you charged multiple fees, the fee charged in each transaction, the functions that were covered by each fee, and the total amounts that Customers paid for each fee.

    (b) In the Word template, explain in detail any differences between your practices during 2022 regarding the assessment of Ancillary Services fees in connection with audio IPCS and your practices during 2022 regarding the assessment of Ancillary Services fees in connection with video IPCS.

    (c) In the Word template, explain in detail any differences between your practices during 2022 regarding the assessment of Ancillary Services fees in connection with interstate/international IPCS and your practices during 2022 regarding the assessment of Ancillary Services fees in connection with intrastate IPCS.

(2) **Ancillary Services Expenses:** The Excel template will enter your Annual Total Expenses incurred in providing Automated Payment Services, Paper Bill/Statement Services, Live Agent Services, Single-Call and Related Services, and Third Party Financial Transaction Services during 2022.

    (a) **Automated Payment Services:** The Excel template will enter the Annual Total Expenses the Company incurred in providing Automated Payment Service during 2022.

        (i) In the Excel template, identify each Affiliate, if any, that the Company used in providing its Automated Payment Services during 2022.

        (ii) In the Excel template, enter "Yes" if the Company used a Third Party in providing its Automated Payment Services during 2022. Otherwise Enter "No."

            (aa) If you entered "Yes," identify each such Third Party in the next cell; and

            (ab) Enter the amount the Company paid, separately and individually, to each listed Third Party for providing Automated Payment Services during 2022.

        (iii) In the Word template, please respond to the additional information requests related to payment card processing services provided in connection with your Automated Payment Service during 2022.

    (b) **Live Agent Services:** The Excel template will enter the Annual Total Expenses the Company incurred in providing Live Agent Services during 2022.

        (i) In the Excel template, identify each Affiliate, if any, that the Company used in providing its Live Agent Services during 2022.

(ii)    In the Excel template, enter "Yes" if the Company used a Third Party in providing its Live Agent Services during 2022.  Otherwise enter "No."

    (aa)If you entered "Yes," identify each such Third Party in the next cell; and

    (ab)In the Excel template, enter the amount the Company paid, separately and individually, to each listed Third Party during 2022 to provide Live Agent Services.

(iii)    In the Word template, please respond to the additional information requests related to your Live Agent Services during 2022.

(c)    **Paper Bill/Statement Services:**  The Excel template will enter the Annual Total Expenses the Company incurred in providing Paper Bill/Statement Services during 2022.

(i)    In the Excel template, identify each Affiliate that the Company used in providing its Paper Bill/Statement Services during 2022.

(ii)    In the Excel template, enter "Yes" if the Company used a Third Party in providing its Paper Bill/Statement Services during 2022.  Otherwise, enter "No."

    (aa)If you entered "Yes," identify each such Third Party in the next cell; and

    (ab)In the Excel template, enter the amount the Company paid, separately and individually, each listed Third Party during 2022 to provide Paper Bill/Statement Services.

(iii)    In the Word template, please respond to the additional information requests related to your Paper Bill/Statement Services during 2022.

(d)    **Single-Call and Related Services:** The Excel template will enter the Annual Total Expenses the Company incurred in providing Single-Call and Related Services during 2022.

(i)    List each entity that charged the Company for billing services in connection with Single-Call and Related Services during 2022.  Indicate whether each listed entity is a Third Party.

(ii)    For each such Third Party, enter the amount the Company paid that Third Party for billing services in connection with Single-Call and Related Services during 2022.

(iii)    From the amount the Company paid each Third Party for billing services in connection with Single-Call and Related Services, enter the amount that the Company passed through to Customers during 2022.

(iv)    Enter the amount the Company paid to any entity other than a Third Party for billing services in connection with Single-Call and Related Services during 2022.

(v)    From the amount the Company paid to any entity other than a Third Party for billing services in connection with Single-Call and Related Services during 2022, enter the amount that the Company passed through to Customers.

(vi)    In the Word template, please respond to the additional information requests related to payment card processing services offered in connection with your Single-Call and Related Services Fees during 2022.

(e)    **Third-Party Financial Transaction Services:**  The Excel template will enter the Annual Total Expenses the Company incurred in providing Third Party Financial Services during 2022.

   (i)    List each entity that charged the Company for providing Third-Party Financial Transaction Services during 2022 in connection with the Company's IPCS.  Indicate whether each listed entity is a Third Party.

   (ii)    For each such Third Party, enter the amount the Company paid to that Third Party for Third-Party Financial Transaction Services during 2022.

   (iii)    From the amount the Company paid to each Third Party for Third-Party Financial Transaction Services, enter the amount that the Company passed through to Customers during 2022.

   (iv)    Enter the amount the Company paid to any entity other than a Third Party for Third-Party Financial Transaction Services during 2022.

   (v)    From the amount the Company paid to any entity other than a Third Party for Third-Party Financial Transaction Services during 2022, enter the amount that the Company passed through to Customers.

   (vi)    In the Word template, state whether any entity other than the Company charged Customers for Third-Party Financial Transaction Services in connection with the Company's IPCS during 2022.  If so, list each such entity and provide the amount of such fees each listed entity charged Customers during 2022.

   (vii)    In the Word template, please respond to the additional information requests related to payment card processing services provided in connection with your Third-Party Financial Transaction Services during 2022.

(f)    **Other Ancillary Services:**

   (i)    Identify each Affiliate, if any, that the Company used in providing its Other Ancillary Services during 2022.

   (ii)    In the Excel template, enter "Yes" if the Company used a Third Party in providing its Other Ancillary Services during 2022.  Otherwise Enter "No."

      (aa) If you entered "Yes," identify each such Third Party in the next cell; and

      (ab) Enter the amount the Company paid, separately and individually, to each listed Third Party for providing Other Ancillary Services during 2022.

   (iii)    In the Word template, please respond to the additional information requests related to the Other Ancillary Services offered by your Company during 2022.

(3)    **Ancillary Services Revenues:**  Enter the total revenues you received from Customers for providing Ancillary Services during 2022.  This total shall include fees Customers paid the Company for Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, and Other Ancillary Services.

  (a)    **Automated Payment Services Revenues:**  Enter the total revenues the Company received from charging Automated Payment Fees during 2022.

    (i)    **Payment Card Processing Revenues for Automated Payment Services:** Of the amount reported for total Automated Payment Fees revenues above during 2022, enter the amount of those revenues from payment card processing.

    (ii)    **Automated Payment Services Revenue-Sharing Agreements:** If the Provider has a Revenue-Sharing Agreement with an Affiliate or Third Party in connection with Automated Payment Services, including for any payment card processing functions, enter "Yes." Otherwise, enter "No."

        (aa)If you answered "Yes," for each such Revenue-Sharing Agreement you must provide in the Word Template the information requested below under the "Ancillary Services Revenue-Sharing Agreements" heading  (at section IV.C.3.c.(4)(a)).

(b)    **Live Agent Fees Revenues:** Enter the total revenues the Company received from charging Live Agent Fees during 2022.

    (i)    In the Excel template, enter "Yes" if an Affiliate or Third Party charged Live Agent Fees during 2022.  Otherwise, enter "No."  If you entered "Yes," identify each such Affiliate or Third Party in the next cell and provide the amount charged by each respective Affiliate or Third Party next to its name.

(c)    **Paper Bill/Statement Fees Revenues:** Enter the total revenues the Company received from charging Paper Bill/Statement Fees during 2022.

(d)    **Single-Call and Related Services Revenues:** Enter the total revenue the Company received during 2022 from charging Fees for Single-Call and Related Services.

    (i)    **Single-Call and Related Services Revenue-Sharing Agreements:** If the Provider has a Revenue-Sharing Agreement with an Affiliate or a Third Party in connection with Single-Call and Related Services enter "Yes."  Otherwise, enter "No."

        (aa)If you answered "Yes," for each such Revenue-Sharing Agreement you must provide in the Word Template the information requested below under the "Ancillary Services Revenue-Sharing Agreements" heading (at section IV.C.3.c.(4)(a)).

(e)    **Third-Party Financial Transaction Fees Revenue:** Enter the total revenues the Company received from charging Third-Party Financial Transaction Fees during 2022.

    (i)    **Payment Card Processing Revenues from Third-Party Financial Transaction Services:** Of the amount reported for Total Third-Party Financial Transaction Fee Revenue above during 2022, enter the amount of that revenue applicable to payment card processing services.

        (aa)In the Word template, describe these payment card processing services, including whether they were performed by the Provider, an Affiliate, or a Third Party.  If provided by an Affiliate or a Third Party, identify each Affiliate or Third Party.

(f)    **Payment Card Processing Fees:** State whether the Company charged Customers payment card processing fees during 2022.  If so, enter the amount of such fees charged to Customers during 2022.

(g)    **Third-Party Financial Transaction Fee Revenue-Sharing Agreements:** If the Provider has a Revenue-Sharing Agreement with an Affiliate or a Third Party in connection with Third-Party Financial Transaction Fees, enter "Yes."  Otherwise, enter "No."
If you answered "Yes," for each such Revenue-Sharing Agreement you must provide in the Word

Template the information requested below under the "Ancillary Services Revenue-Sharing Agreements" heading (at section IV.C.3.C.(4)(a)).

(h) **Other Ancillary Services Revenue:** Enter the total revenues the Company received from charging Other Ancillary Services Fees during 2022.

    (i) **Payment Card Processing Revenues from Other Ancillary Services:** Of the amount reported for each of the Total Other Ancillary Services Revenue above during 2022, enter the amount of that revenue applicable to payment card processing.

        (aa) In the Word template, describe these payment card processing services, including whether they were performed by the Provider, an Affiliate, or a Third Party. If provided by an Affiliate or a Third Party, identify each Affiliate or Third Party. State whether the Company charged Customers payment card processing fees during 2022. If so, enter the amount of such fees charged to Customers during 2022.

    (ii) **Other Ancillary Services Revenue-Sharing Agreements:** If the Provider has a Revenue-Sharing Agreement with an Affiliate or a Third Party in connection with Other Ancillary Services offered, enter "Yes." Otherwise, enter "No."

    (iii) If you answered "Yes," for each such Revenue-Sharing Agreement you must provide in the Word Template the information requested below under the "Ancillary Services Revenue-Sharing Agreements" heading (at section IV.C.3.C.(4)(a)).

(4) **Ancillary Services Revenue-Sharing Agreements:** In the Word template, identify and describe any Revenue-Sharing Agreements between the Provider and any Affiliate and/or Third Party in connection with any Ancillary Service.

    (a) For each Revenue-Sharing Agreement identified, provide, at a minimum, the following information:

        (i) The parties to the agreement;
        (ii) Identify each payor and each payee under the agreement;
        (iii) Whether any party to the agreement is an Affiliate or Third Party;
        (iv) Each Ancillary Service for which revenue is required to be shared under the agreement;
        (v) The amount of revenue to be shared under the terms of the agreement for each Ancillary Service covered by the agreement and the formula used to calculate that revenue;
        (vi) The total amount of revenue shared during 2022;
        (vii) The total amount of revenue shared for each Ancillary Service; and
        (viii) The effective and termination dates of the agreement.

(5) In the Word template, identify and explain in detail all Ancillary Services Charges that the Company charged during 2022 in connection with video IPCS.

(6) In the Word template, identify and explain in detail how the Company's Ancillary Services Charges in connection with audio IPCS differed from those in connection with video IPCS.

## e. Affiliate Transactions

(1) In the Word template, describe in detail all types of transactions between the Accounting Entity and its non-Accounting Entity Affiliates.

(2) **Provider's Transactions With Non-Accounting Entity Affiliates:**

(a) **Total IPCS Revenue Passed Through to Non-Accounting Entity Affiliates:** Enter the amount of IPCS revenue passed through to any non-Accounting Entity Affiliate during 2022.

(b) **Total Automated Payment Fee Revenue Passed Through to Non-Accounting Entity Affiliates:** Enter the amount of Automated Payment Fee revenue the Provider passed through to any non-Accounting Entity Affiliate during 2022.

(c) **Total Single-Call and Related Services Revenue Passed Through to Non-Accounting Entity Affiliates:** Enter the amount of revenue from charging Fees for Single-Call and Related Services the Provider passed through to any non-Accounting Entity Affiliate during 2022.

(d) **Total Live Agent Fee Revenue Passed Through to Non-Accounting Entity Affiliates:** Enter the amount of Live Agent Fee revenue the Provider passed through to any non-Accounting Entity Affiliate during 2022.

(e) **Total Paper Bill/Statement Fee Revenue Passed Through to Non-Accounting Entity Affiliates:** Enter the amount of Paper Bill/Statement Fee revenue the Provider passed through to any non-Accounting Entity Affiliate during 2022.

(f) **Total Third-Party Financial Transaction Fee Revenue Passed Through to Non-Accounting Entity Affiliates:** Enter the amount of Third-Party Financial Transaction Fee revenue the Provider passed through to any non-Accounting Entity Affiliate during 2022.

(g) **International Termination Payments to Non-Accounting Entity Affiliates:** Enter the Company's total payments to any non-Accounting Entity Affiliate during 2022 to complete International Communications for Incarcerated People.

## f. Instructions Relating to Subcontracts to Provide Incarcerated People's Communications Services

This subsection provides instructions on reporting data and other information where a Contractor contracts with a Subcontractor for the provision of IPCS. The primary goal of this section is to account for 100 percent of the costs or revenues without double counting when two entities have a contractual or other arrangement to provide IPCS to the same Facility. We also seek to understand the nature of any such arrangements.

**Subcontractor Reporting of Cost and Revenue Data:** In reporting cost and revenue data, Subcontractors shall not treat any Billed Revenue passed on to another Provider as an expense and shall otherwise report investments, expenses, and revenues in accordance with the instructions set forth in this document.

(1) **Provider Reporting of Cost Data:** Where a Provider has or is a Subcontractor:

(a) The Provider shall directly assign, attribute, or allocate all of the investments it makes and the expenses it incurs, as a Contractor or a Subcontractor, based on the cost allocation hierarchies set forth in these instructions to or among:

(i) Audio IPCS, video IPCS, Security and Safety Measures, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, Third-Party Financial Transaction Services, Other Ancillary Services, and Other Services; and

(ii) Further directly assign, attribute, or allocate the Provider's audio IPCS and video IPCS investments and expenses to or among (i) Contractor-supplied facilities (i.e., facilities at

**JA362**

which the Provider incurs costs as a Contractor); and (ii) Subcontractor-supplied facilities (i.e., facilities at which the Provider incurs costs as a Subcontractor).

(2)  **Narrative Description of a Subcontract to Provide IPCS:**  If a Contractor contracts with a Subcontractor to provide any aspect of audio or video IPCS, the Contractor and the Subcontractor shall explain each arrangement in the Word templates of their respective responses.  At a minimum, each explanation shall include:

(a)  The name of the Provider with the contractual or other arrangement with a Facility or other entity with contracting authority for the provision of IPCS;
(b)  The services provided by the Contractor;
(c)  The name of the Subcontractor;
(d)  The services provided by the Subcontractor;
(e)  The unique identifier and address for the Facilities at which the Subcontractor provides services under the agreement;
(f)  A description of the operations of the Contractor and the Subcontractor related to providing IPCS;
(g)  The types of audio IPCS and video IPCS billed by the Contractor and the Subcontractor, respectively; and
(h)  A description of any Revenue-Sharing Agreement between the Contractor and the Subcontractor.

## D.  Facility-Specific Information

The previous section directs you to provide general financial data and other information at the Company level.  In this section, we direct you to provide financial data and other information at the Facility level.  You must submit individual data for each Facility even if that Facility is covered by the same contract as other Facilities.  Those data must be specific to the Facility in question and not simply a repeat of data reported for other Facilities covered by the same contract.

### 1.  Facility-Specific Financial Information

Part IV.C.2, above, directs you to provide Company-wide financial information.  We now direct you to provide financial information at the Facility level.  We begin by providing cost allocation instructions.  We then direct you to provide the results of the cost allocation process.  We also direct you to provide Annual Total Expenses for audio IPCS and video IPCS at each Facility in accordance with the cost allocation instructions set forth below.  We further direct you to report Facility-specific demand and revenue data for audio IPCS, video IPCS, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services as specified below.

#### a.  Cost Allocation Instructions

In Part IV.C.2, above, we direct you to allocate your Company-wide investments and expenses to audio and video IPCS, among other services, in accordance with certain instructions.  We now provide instructions on how you are to allocate the Company-wide investments and expenses already allocated to audio IPCS and video IPCS among the Facilities at which the Company provides these services to Incarcerated People.

To the extent possible, you must assign or allocate Company-wide investments and expenses for audio IPCS and video IPCS among Facilities using the hierarchy of methods specified below.

(1)  As a guiding principle, the sums of the investment and expense amounts assigned to, attributed to, or allocated among all Facilities for audio IPCS and video IPCS shall equal the total of the Company-wide investment and expense amounts, respectively, reported above for audio IPCS and video IPCS.

Similarly, the sums of the federal income taxes calculated separately for each Facility for audio IPCS and video IPCS shall equal the total of the Company-wide federal income tax amounts, respectively, reported above for audio IPCS and video IPCS. Fully document, explain, and justify all cost assignments, attributions, and allocations in the Word template.

(2)    First, to the extent possible, directly assign investments and expenses used exclusively to provide audio IPCS and video IPCS at or for a particular Facility to that Facility. Calculate federal and state income taxes relative to audio IPCS and video IPCS for a particular Facility as specified in items 7 and 8, below. For any investments or expenses that are not directly assignable to a particular Facility, proceed to the next step.

(3)    Second, determine which remaining investments and expenses are shared investments or expenses and which are common investments or expenses. Any investments and expenses that are not directly assignable to a specific Facility are shared or common investments and expenses.

    (a)    Shared investments are for assets used exclusively to provide audio IPCS and video IPCS at or for a specific subset of Facilities that are not assignable or attributable to a particular Facility. Shared expenses are expenses incurred solely7 to provide audio IPCS and video IPCS at or for a specific subset of Facilities that are not assignable or attributable to a specific Facility.

    (b)    Common investments are for assets not assignable or attributable to a specific Facility or subset of facilities. Common expenses are expenses that are not assignable or attributable to a specific Facility or subset of Facilities.

(4)    Third, to the extent possible, directly attribute a percentage of shared and common investments and expenses to their associated Facilities, with the percentage of a given investment or expense attributed to each constituent Facility based on direct analysis of factors that cause a particular business function, activity, or task—and thus investments or expenses—attributable to a particular Facility to increase or decrease. For any shared or common investments or expenses that cannot be attributed to their constituent Facilities in this fashion, turn to the next step.

(5)    Fourth, where neither direct assignment nor direct attribution to a Facility is possible, determine where shared and common investments and expenses are related to an already assigned or attributed shared or common investment or expense. Then, allocate these shared and common investments and expenses to particular Facilities in proportion to the related investment or expense that has already been assigned or attributed. For any shared or common investments or expenses that cannot be indirectly correlated in this fashion, proceed to the next step.

(6)    Fifth, where none of the methods described above is possible, allocate shared investments and expenses to the particular Facilities that share those investments and expenses in proportion to each Facility's share of the sum of all of those investments or expenses that have already been directly assigned or attributed to these particular Facilities. Allocate common investments and expenses to particular Facilities in proportion to each Facility's share of the total of all investments or expenses already directly assigned or attributed to all Facilities.

(7)    **Federal income taxes:** First, for each Facility, subtract reported interest expense other than interest paid on customer prepayments or deposits (and any amount reported for other income tax-related adjustments) from Return to determine federal taxable income. Second, divide the corresponding reported federal income tax by one minus this reported federal income tax rate to determine a federal income tax gross-up factor. (See the following instructions below for determining the federal income tax rate to report.) Third, multiply the federal income tax gross-up factor by federal taxable income to determine the amount of federal income tax to report.

    (a)    **Federal income tax rate for Accounting Entities that are C corporations or taxed as C corporations under the rules of the IRS**. Report the 2022 federal corporate income tax rate,

JA364

21%, if the Accounting Entity is or is a part of a company that is a C corporation or taxed as a C corporation under IRS rules. Use this tax rate to calculate federal income taxes as instructed above.

(b) **Federal income tax rate for Accounting Entities that pass income through to their owners under the rules of the IRS.** An Accounting Entity that passes income through or is part of a company that passes income through to owners (as defined in section IV.A) for federal income tax purposes may claim an allowance for federal income taxes. If the Accounting Entity passes income through or is part of a company that passes income through to its owners and wishes to claim an allowance for federal income taxes, report a weighted average of the 2022 federal income tax rate applicable to each owner, where the weights reflect each owner's share of the 2022 total income passed through. Use the weighted average federal income tax rate to calculate federal income taxes as instructed above. Otherwise, report a federal tax rate equal to zero.

(8) **State income taxes:** First, for each Facility, add the portion of federal income tax that is not deductible for state income tax purposes to federal taxable income to determine state taxable income. Second, divide the reported state income tax rate applicable to a particular Facility by one minus this reported state income tax rate applicable to that Facility to determine a state income tax gross-up factor. (See the following instructions below for determining the state income tax rates to report.) Third, multiply the state income tax gross-up factor by state taxable income to determine the amount of state income tax to report.

(a) **State income tax rates for Accounting Entities that are subject to state corporate income taxes under the rules of the state taxing authority**. Report the state corporate income tax rate during 2022 for each state in which the Accounting Entity provides IPCS and is subject to or is part of a company that is subject to state corporate income taxes. Use the state corporate income tax rate applicable to state taxable income derived from a particular Facility to calculate the state income tax for that Facility as instructed above. If the Accounting Entity is subject to state corporate income taxes in some states but passes income through to its owners for state tax purposes in other states, follow the instruction below for reporting income tax rates for those other states.

(b) **State income tax rates for Accounting Entities that pass income through to their owners under the rules of the state taxing authority.** An Accounting Entity that passes income through or is part of a company that passes income through to its owners for state income tax purposes may claim an allowance for state income taxes. If the Accounting Entity passes income through or is part of a company that passes income through to its owners and wishes to claim an allowance for state income taxes, report, for each pass-through income state, a weighted average of the 2022 state income tax rate applicable to each owner, where the weights reflect each owner's share of the 2022 total pass through income attributable to the state. Use the owner income-weighted state income tax rate applicable to state taxable income derived from a particular Facility to calculate the state income tax for that Facility as instructed above. Otherwise, report a state income tax rate equal to zero for that Facility.

## b. Cost Allocation Results

Report the results of your Facility-specific cost assignments, attributions, and allocations for audio IPCS and video IPCS in the Excel template, as specified below. Separate spreadsheets are provided in the Excel template for reporting these results separately for each of these services. If you have no investment or expense data to report for any of the following categories, report zero in the corresponding cell in the Excel template.

(1) **Capital Assets:** Report separate year-end amounts related to the provision of audio IPCS and video IPCS at or for each Facility for 2022 for each of the items specified below. For Cash Working Capital (item (h)), please report the average amount.

(a)  Gross Investment;
(b)  Accumulated depreciation;
(c)  Accumulated amortization;
(d)  Net Investment;
(e)  Accumulated deferred federal income taxes;
(f)  Accumulated deferred state income taxes;
(g)  Customer prepayments or deposits;
(h)  Cash Working Capital; and
(i)  Net Capital Stock.

(2)  **Capital Expenses and Related Tax Information:** Report separate annual amounts or percentages related to the provision of audio IPCS and video IPCS at or for each Facility for 2022 for each of the items specified below.

(a)  Depreciation;
(b)  Amortization;
(c)  Weighted Average Cost of Capital;
(d)  Return;
(e)  Interest other than interest paid on customer prepayments or deposits;
(f)  Interest paid on customer prepayments or deposits;
(g)  Other income tax-related adjustments;
(h)  Federal taxable income;
(i)  Federal income tax rate;
(j)  Federal income tax gross-up factor;
(k)  Federal income tax;
(l)  Federal income tax not deductible for state income tax purposes;
(m)  State taxable income;
(n)  State income tax rate;
(o)  State income tax gross-up factor; and
(p)  State income tax.

(3)  **Operating Expenses:** Report separate annual amounts related to the provision of audio IPCS and video IPCS Services at or for each Facility for 2022 for each of the items specified below. Each expense must be reported for a particular category; for example, do not report an expense incurred for Extra Payments to Telecommunications Carriers or Other Entities for International Communications as an expense incurred for Payments to telecommunications carriers or other entities for Interstate, International, or Intrastate Communications other than for International Communications. Exclude any charges for asset impairment loss.

(a)  Maintenance, repair, and engineering of site plant, equipment, and facilities;
(b)  Payments to telecommunications carriers or other entities for Interstate, International, or Intrastate Communications other than Extra Payments to Telecommunications Carriers or Other Entities for International Communications;
(c)  Extra Payments to Telecommunications Carriers or Other Entities for International Communications;
(d)  Field service;
(e)  Network operations;
(f)  Call center;
(g)  Data center;
(h)  Billing, collection, client management, and customer care;
(i)  Sales and marketing;
(j)  General and administrative;
(k)  Other overhead;
(l)  Taxes other than income taxes;
(m)  Transactions related to mergers and acquisitions; and

(n)     Bad debt.

## c.  Facility-Specific Annual Total Expenses

Report separate Facility-specific Annual Total Expenses for (a) audio IPCS; (b) video IPCS; (c) Safety and Security Measures; (d) Automated Payment Services; (e) Live Agent Service; (f) Paper Bill/Statement Service; (g) Single- Call and Related Services; and (h) Third-Party Transaction Services for each Facility at which you provided these services.

Exclude reported interest expenses other than interest paid on customer prepayments or deposits from Annual Total Expenses.  The allowance for interest expense other than interest paid on customer prepayments or deposits is included in the Return component of the Annual Total Expenses calculation. However, you should include reported interest paid on customer prepayments or deposits in Annual Total Expenses.  You also should exclude expenses reported for Extra Payments to Telecommunications Carriers or Other Entities for International Communications from Annual Total Expenses.

## d.  Facility-Specific Demand and Revenue Data

We now direct you to report Facility-specific demand and revenue data.  As indicated below, you must submit separate data for each Facility even if that Facility is covered by the same contract as other Facilities.

(1)     **Demand for IPCS:**  Report the separate Facility-specific annual demand for audio IPCS and video IPCS for 2022.  Provide separate data for each Facility at which you provided these services during 2022.  Annual demand shall be expressed in the units and for the categories specified below. Report demand expressed in terms of the number of discrete communications (e.g., calls, remote visits, or sessions) and in minutes, even if neither measure reflects the actual sales unit.  Count each call, remote visit, session, or other communication, without regard to duration, as one communication. Estimate demand expressed in communications and minutes if necessary.  In the Word template, identify any facilities for which you estimated the number of communications or minutes and explain how you developed these estimates.  Identify the unit of sale, where indicated in the Excel spreadsheet, if the actual sales unit for video IPCS is other than per communication or per minute (e.g., capacity plans such as a two gigabytes per month plan) and express demand as the number of those other units for the same categories specified for demand expressed in minutes and communications.  Add rows as necessary to the Excel spreadsheet to report demand relative to these same categories if the Company uses more than one sales unit for video IPCS that is other than per communication or per minute.

The reported demand expressed in Billed and Unbilled Minutes and Billed and Unbilled Communications shall sum to the relevant total reported for Billed and Unbilled Minutes and Billed and Unbilled Communications.  Likewise, for example, demand expressed in Billed and Unbilled two gigabyte per month plans shall sum to the relevant total reported for Billed and Unbilled two gigabyte per month plans.  You must submit separate data for each Facility even if that Facility is covered by the same contract as other Facilities.  Those data must be specific to the Facility in question and not simply a repeat of data reported for other Facilities covered by the same contract.  If you repeat or merge data across multiple Facilities covered by a single contract, explain in the Word template why you did so and how you reported the data.

If you do not know a Facility's Average Daily Population, provide your best estimate of that Average Daily Population in the Excel template.  Explain the basis for this estimate in the Word template.

(a)     Total Billed Communications for audio IPCS;

(b)     Billed Communications for audio IPCS separately for (i) Interstate Communication,
        (ii) International Communication, and (iii) Intrastate Communication;

## JA367

(c)     Total Unbilled Communications for audio IPCS;

(d)     Total Billed and Unbilled Communications for audio IPCS;

(e)     Total Billed Minutes for audio IPCS;

(f)     Billed Minutes for audio IPCS separately for (i) Interstate Communication, (ii) International Communication, and (iii) Intrastate Communication;

(g)     Total Unbilled Minutes for audio IPCS;

(h)     Total Billed and Unbilled Minutes for audio IPCS;

(i)     Total Billed Communications for video IPCS;

(j)     Billed Communications for video IPCS separately for (i) Interstate Communication, (ii) International Communication, and (iii) Intrastate Communication;

(k)     Total Unbilled Communications for video IPCS;

(l)     Total Billed and Unbilled Communications for video IPCS;

(m)     Total Billed Minutes for video IPCS;

(n)     Billed Minutes for video IPCS separately for (i) Interstate Communication, (ii) International Communication, and (iii) Intrastate Communication;

(o)     Total Unbilled Minutes for video IPCS;

(p)     Total Billed and Unbilled Minutes for video IPCS;

(q)     Total Billed video IPCS sales units other than discrete communications or minutes;

(r)     Billed video IPCS sales units other than discrete communications or minutes separately for (i) Interstate Communication, (ii) International Communication, (iii) Intrastate Communication;

(s)     Total Unbilled video IPCS sales units other than discrete communications or minutes;

(t)     Total Billed and Unbilled video IPCS sales units other than discrete communications or minutes;

(u)     Average Daily Population;

(v)     Total number of IPCS accounts opened;

(w)     Total number of IPCS accounts closed;

(x)     Total Admissions;

(y)     Total Releases;

(z)     Weekly Turnover Rate;

(aa)    Number of Incarcerated People's phones or other communications devices;

(bb)    Number of Incarcerated People's Tablets; and

(cc)    Number of Incarcerated People's Kiosks.

(2)     **Demand for Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services:** Report the annual demand for each of Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services provided in connection with IPCS during 2022. Provide separate data for each Facility at which you provided these services. Calculate the annual demand for each Facility by summing: (a) the demand experienced for each of these Ancillary Services in connection with audio IPCS at or for that Facility during 2022; plus (b) to the extent the Ancillary Service did not support both audio and video IPCS, the demand for the functional equivalent of each of these respective services provided in connection with video IPCS during 2022. Express demand for Automated Payment Services, Live Agent Services, and Paper Bill/Statement Services as the number of Billed Uses. Express demand for Single-Call and Related Services and Third-Party Financial Transaction Services as the number of Billed Transactions. Billed demand reported for each Facility shall sum to the relevant total for each service for all Facilities.

(3)     **Revenues from IPCS:** Report the annual Billed Revenues from IPCS for 2022. Provide separate data for each of the categories specified below for each Facility at which you provided these services. Billed Revenues reported for different categories shall sum to the relevant total reported for Billed Revenues.

(a)     Total Billed Revenues from audio IPCS;

(b)     Billed Revenues from audio IPCS separately for (i) Interstate Communication, (ii) International Communication, and (iii) Intrastate Communication;

(c)   Total Billed Revenues from video IPCS;

(d)   Billed Revenues from video IPCS separately for (i) Interstate Communication, (ii) International Communication, and (iii) Intrastate Communication.

(4)   **Revenues from Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services:** Report the annual Billed Revenues from each of Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services provided in connection with audio and video IPCS during 2022.  .  Provide separate data for each Facility at which you provided IPCS during 2022.  Calculate the annual revenue for each Facility by summing: (a) the revenue from each of these Ancillary Services in connection with audio IPCS at or for that Facility during 2022; plus (b) to the extent the Ancillary Service did not support both audio and video IPCS, the revenue from the functional equivalent of each of these respective services provided in connection with video IPCS during 2022.  Billed Revenues reported for each Facility shall sum to the relevant total for each service for all Facilities.

## 2.  Other Facility-Specific Information

This subsection directs you to report, among other information, Facility-Specific data on Site Commissions, Costs of Providers' Safety and Security Measures Not Classified as Site Commissions, Costs of Facilities' Safety and Security Measures, and Ancillary Services.

### a.  General Information

(1)   **Unique Identifier for Facility:**  Enter a unique identifier for each Facility at which the Company offered IPCS during 2022.

(2)   **Contractor Name:**  Enter the name of the Provider that has the contractual or other arrangement with the Facility, or other entity with contracting authority, to provide IPCS to the Facility. If you are the Contractor, enter your name.

(3)   **Subcontractor Name:**  Enter the name of the Provider that provides IPCS under a contract or other arrangement with another Provider for provision of IPCS. If you are the Subcontractor, enter your name.

(4)   **Counterparty to Contract:**  For each Facility identified above, list the name of the party or entity that entered into the contract with the Contractor.

(5)   **Unique Identifier for Contract:**  Enter a unique identifier for each Contract under which the Company provided IPCS during 2022.

(6)   **Facility Address:**  Enter on separate rows the complete address of the physical location of each Facility parsed into five separate fields: (1) street number and street name; (2) building identifier (if any); (3) city; (4) state; and (5) ZIP Code.  Do not enter PO Box addresses.

(7)   **Facility Geographic Coordinates:**  Enter the geographic coordinates of each Facility.  Use decimal degrees (DD) to express latitude and longitude geographic coordinates.  (These coordinates can be identified using a geocoding application available on the Internet.)

(8)   **Facility Type (Jail or Prison):**  Indicate whether each Facility is a Prison (P) or a Jail (J).

(9)   **Maximum Audio Communication Duration:**  Enter in minutes the Maximum Communication Duration for audio IPCS communications originating from each Facility.  If neither the Facility nor

**JA369**

the Company imposes a limit on the length of audio IPCS communications placed from the Facility, enter "N/A."

(10)   **Maximum Video Communication Duration:**  Enter in minutes the Maximum Communication Duration for video IPCS communications originating from each Facility.  If neither the Facility nor the Company imposes a limit on the length of video IPCS communications placed from the Facility, enter "N/A."

## b.  Site Commissions

This subsection directs you to report Facility-specific data on Site Commissions.  You must fully allocate all Site Commissions reported for 2022 among the Facilities associated with each Site Commission payment.

(1)   **Total Site Commissions:**  Enter the total amount of all Site Commissions paid by the Company during 2022 that was related to the Facility, without regard to whether the Site Commissions were Legally Mandated, Contractually Prescribed, Fixed, Variable, Monetary, or In-Kind and without regard to whether the Site Commission was paid in connection with audio IPCS, video IPCS, Safety and Security Measures, Ancillary Services, or Other Services for 2022.

    (a)   Enter the percentage of the total Site Commissions paid by the Company during 2022 that was related to the Facility and that was attributable to the Company's provision of IPCS and associated Ancillary Services.

    (b)   Enter the percentage of the total Site Commissions paid by the Company during 2022 that was related to the Facility and that was attributable to the Company's provision of Safety and Security Measures.

    (c)   List the Other Services and Products and associated Ancillary Services that the Company provided at the Facility during 2022.

    (d)   In the Word template, identify any Site Commissions paid by the Company during 2022 that related to any Facility and that included both a monetary payment and an in-kind payment.  Provide the name of the Facility, the entity to which you paid the Site Commissions, and the amount of the monetary payment, and describe in detail the in-kind payment, including any Safety and Security Measures.

    (e)   In the Word template, list each entity to which you paid a Site Commission during 2022.  Provide the name of each Facility for which that entity is responsible and the amount paid to that entity without regard to whether the Site Commission was Legally Mandated, Contractually Prescribed, Fixed, Variable, Monetary, or In-Kind.

(2)   **Legally Mandated Site Commissions:**  Enter the total amount of Legally Mandated Site Commissions paid in connection with IPCS and associated Ancillary Services provided at the Facility during 2022.

    (a)   **Recipient:**  Enter the name of the entity or entities to which you paid Legally Mandated Site Commissions during 2022 in connection with the Company's IPCS or associated Ancillary Services provided at the Facility.  If the Site Commissions were paid to more than one entity, allocate the payment among the relevant entities.

    (b)   **Legally Mandated Site Commission Authority:**  If you paid Legally Mandated Site Commissions in connection with IPCS or associated Ancillary Services provided at the Facility during 2022, provide a citation to the authority requiring the such payment.

(c)     **Total Monetary Site Commissions:**  Enter the total amount of Legally Mandated, Monetary Site Commissions paid during 2022 in connection with IPCS and associated Ancillary Services provided at the Facility.

(d)     **Recipient:**  Enter the name of the entity or entities to which you paid Legally Mandated, Monetary Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.  If the Site Commissions were paid to more than one entity, allocate the payment among the relevant entities.

(i)     **Fixed Site Commissions:**  Enter the total amount of Legally Mandated Site Commissions that were both Monetary Site Commissions and Fixed Site Commissions and that were paid during 2022 in connection with IPCS and associated Ancillary Services provided at the Facility.

(aa)  **Recipient:**  Enter the name of the entity or entities to which you paid Legally Mandated, Fixed, Monetary Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.  If these Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(ab) If the Legally Mandated, Fixed, Monetary Site Commission was imposed at the contract level (e.g., a minimum annual guarantee due annually under a contract covering multiple Facilities), allocate the Site Commission payments among all Facilities covered by the contract.

(ac) In the Word template, describe the methodology used to allocate the Legally Mandated, Fixed, Monetary Site Commission payments among all Facilities covered by the contract.

(ad) **Upfront Payments:**  Enter the total amount of all Legally Mandated Site Commissions for 2022 that not only were Monetary Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of IPCS and associated Ancillary Services provided at the Facility.

(aaa)     **Recipient**:  Enter the name of the entity or entities to which you made these upfront payments during 2022.  If those Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(ii)     **Variable Site Commissions:**  Enter the total amount of Legally Mandated Site Commissions that were both Monetary Site Commissions and Variable Site Commissions and that were paid during 2022 in connection with IPCS and associated Ancillary Services provided at the Facility.

(aa) **Recipient**:  Enter the name of the entity or entities to which you paid Legally Mandated, Variable, Monetary Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.  If these Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(e)     **Total In-Kind Site Commissions:**  Enter the total amount of Legally Mandated Site Commissions that were also In-Kind Site Commissions and that were paid during 2022 in connection with IPCS and associated Ancillary Services provided at the Facility.

(i)     **Recipient**:  Enter the name of the entity or entities to which you paid Legally Mandated, In-Kind Site Commissions during 2022 in connection with IPCS or associated Ancillary

Services provided at the Facility. If those Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(ii)　　In the Word template, describe these in-kind payments in detail. Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product provided the Facility that you classify as an In-Kind Site Commission payment.

(iii)　　**Fixed Site Commissions:** Enter the total amount of Legally Mandated Site Commissions that were both In-Kind Site Commissions and Fixed Site Commissions and that were paid during 2022 in connection with IPCS and associated Ancillary Services provided at the Facility.

　　(aa) **Recipient**: Enter the name of the entity or entities to which you paid Legally Mandated, Fixed, In-Kind Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

　　(ab) If the Legally Mandated, Fixed, In-Kind Site Commission was imposed at the contract level (e.g., a minimum annual guarantee due annually under a contract covering multiple Facilities), allocate the Site Commission payments among all Facilities covered by the contract.

　　(ac) In the Word template, describe the methodology used to allocate the Legally Mandated, Fixed, In-Kind Site Commission payments among all Facilities covered by the contract.

　　(ad) Upfront Payments: Enter the total amount of all Legally Mandated Site Commissions for 2022 that not only were In-Kind Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of IPCS provided at the Facility.

　　　(aaa) **Recipient**: Enter the name of the entity or entities to which you made these upfront payments. If those Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(iv)　　**Variable Site Commissions:** Enter the amount of Legally Mandated Site Commissions that were both In-Kind Site Commissions and Variable Site Commissions and that were paid during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.

　　(aa) **Recipient:** Enter the name of the entity or entities to which you paid Legally Mandated, Variable, In-Kind Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(3)　　**Contractually Prescribed Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions paid during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.

　　(a)　　**Recipient:** Enter the name of the entity or entities to which you paid Contractually Prescribed Site Commissions Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If the Site Commissions were paid to more than one entity, allocate the payment among the relevant entities.

**JA372**

(b) **Total Monetary Site Commissions:** Enter the total amount of Contractually Prescribed, Monetary Site Commissions paid by the Company during 2022 that was related to the Facility.

   (i) **Recipient:** Enter the name of the entity or entities to which you paid Contractually Prescribed, Monetary Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

   (ii) **Fixed Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions that were both Monetary Site Commissions and Fixed Site Commissions and that were paid during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.

      (aa) **Recipient:** Enter the name of the entity or entities to which you paid Contractually Prescribed, Fixed, Monetary Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If these Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

      (ab) If the Contractually Prescribed, Fixed, Monetary Site Commission was imposed at the contract level (e.g., a minimum annual guarantee due annually under a contract covering multiple Facilities), allocate the Site Commission payments among all Facilities covered by the contract.

      (ac) In the Word template, describe the methodology used to allocate the Contractually Prescribed, Fixed, Monetary Site Commission payments the among Facilities covered by the contract.

      (ad) **Upfront Payments:** Enter the total amount of all Contractually Prescribed Site Commissions for 2022 that not only were Monetary Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of IPCS provided at the Facility.

        (aaa) **Recipient:** Enter the name of the entity or entities to which made these upfront payments. If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

   (iii) **Variable Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions for 2022 that were both Monetary Site Commissions and Variable Site Commissions and that were paid in connection with IPCS or associated Ancillary Services provided at the Facility.

      (aa) **Recipient:** Enter the name of the entity or entities to which you paid Contractually Prescribed, Variable, Monetary Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(c) **Total In-Kind Site Commissions:** Enter the total amount of Contractually Prescribed Site Commissions for 2022 that were also In-Kind Site Commissions and that were paid in connection with IPCS or associated Ancillary Services provided at the Facility.

   (i) **Recipient:** Enter the name of the entity or entities to which you paid Contractually Prescribed, In-Kind Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility. If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

**JA373**

(ii)  In the Word template, describe these in-kind payments in detail.  Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product provided the Facility that you classify as an In-Kind Site Commission payment.

(iii)  **Fixed Site Commissions:**  Enter the amount of Contractually Prescribed Site Commissions for 2022 that were both In-Kind Site Commissions and Fixed Site Commissions and that were paid in connection with IPCS or associated Ancillary Services provided at the Facility.

   (aa)  **Recipient**:  Enter the name of the entity or entities to which you paid Contractually Prescribed, Fixed, In-Kind Site Commissions during 2022 in connection with in connection with IPCS or associated Ancillary Services provided at the Facility.  If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

   (ab)  If the Contractually Prescribed, Fixed, In-Kind Site Commission was imposed at the contract level (e.g., a minimum annual guarantee due annually under a contract covering multiple Facilities), allocate the Site Commission payments among all Facilities covered by the contract.

   (ac)  In the Word template, describe the methodology used to allocate the Contractually Prescribed, Fixed, In-Kind Site Commission payments among Facilities.

   (ad)  **Upfront Payments:**  Enter the amount of all Contractually Prescribed Site Commissions for 2022 that not only were In-Kind Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of IPCS provided at the Facility.

      (aaa)  **Recipient:**  Enter the name of the entity or entities to which you made these upfront payments.  If those Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(iv)  **Variable Site Commissions:**  Enter the amount of Contractually Prescribed Site Commissions for 2022 that were both In-Kind Site Commissions and Variable Site Commissions and that were paid in connection with IPCS or associated Ancillary Services provided at the Facility.

   (aa)  **Recipient:**  Enter the name of the entity or entities to which you paid Contractually Prescribed, Variable, In-Kind Site Commissions during 2022 in connection with IPCS or associated Ancillary Services provided at the Facility.  If the Site Commissions were paid to more than one entity, allocate the payments among the relevant entities.

(4)  **Site Commission Allocation Methodology:**  In the Word template, fully describe, document, explain, and justify the allocation methodology you used to allocate Site Commission payments between IPCS (and associated Ancillary Services) and Other Services at each Facility during 2022 in situations where you made Site Commission payments for both IPCS and Non-IPCS Other Services.

(5)  In the Word template, identify any Facility for which you used different formulas to calculate the Site Commissions paid during 2022 for interstate IPCS, international IPCS, or intrastate IPCS, respectively.  For each such Facility, identify separately the amount of the Site Commissions paid for interstate IPCS, international IPCS, and intrastate IPCS.

(6)    In the Word template, identify any Facility for which you used different formulas to calculate the Site Commissions paid during 2022 for audio IPCS and video IPCS, respectively.  For each such Facility, identify separately the amount of Site Commissions paid for audio IPCS and video IPCS.

## c.  Costs of Providers' Safety and Security Measures

This subsection requires you to report certain information regarding the expenses the Company incurred during 2022 providing Safety and Security Measures at each Facility it served.

(1)    In section IV.C.3.c., above, we direct you to provide percentages that the Excel template will use to allocate, separately for audio IPCS and video IPCS, the Company's Annual Total Expenses of providing Safety and Security Measures among seven categories of such measures. We now direct you to allocate those Company-wide expenses among the individual Facilities for which you provided measures within each category during 2022 using your best estimate of the percentage of the expenses attributable to each Facility.  The Excel template provides separate Facility-level worksheets on which to report Security and Safety expenses related to the provision of each category of Safety and Security Measures, separately for audio IPCS and video IPCS.  If you provided no Safety and Security Measures within any specific category during 2022 for any Facility, enter zero in the appropriate cell in the Excel template.

    (a)    Communications Assistance for Law Enforcement Act (CALEA) services, including, but not limited to the costs incurred by the provider in complying with CALEA.

    (b)    Law enforcement support services, including but not limited to the examples identified for such services in section IV.C.3.b. above.

    (c)    Communication security services, including, but not limited, to the examples identified for such services in section IV.C.3.b. above.

    (d)    Communication recording services, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

    (e)    Communication monitoring services, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

    (f)    Voice biometrics services, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

    (g)    Other services not included in one of the foregoing categories, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

(2)    In the Word template, for each Facility for 2022, identify by name and describe each service you classify as a law enforcement support service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(3)    In the Word template, for each Facility for 2022, identify by name and describe each service you classify as a communication security service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(4)    In the Word template, for each Facility for 2022, identify by name and describe each service you classify as a communication recording service, including a description of the specific tasks and

functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(5)  In the Word template, for each Facility for 2022, identify by name and describe each service you classify as a communication monitoring service, including a description of the specific tasks and functions covered by this service whether you routinely provide those tasks and functions in connection with IPCS.

(6)  In the Word template, for each Facility for 2022, identify by name and describe each service you classify as a voice biometric service, including a description of the specific tasks and functions covered by this service and whether you routinely provide those tasks and functions in connection with IPCS.

(7)  In the Word template, for each Facility for 2022, identify by name and describe each service you provide as a Safety and Security Measure that is not included in one of the foregoing categories, including a description of the specific tasks and functions covered by each service and whether you routinely offer each service in connection with IPCS.  categories, including a description of the specific tasks and functions covered by each service and whether you routinely offer each service in connection with IPCS.

## d. Safety and Security Measures Costs Incurred by Facilities; Other Costs Incurred by Facilities

This subsection directs you to report any verifiable, reliable, and accurate information in your possession about the costs incurred by the Facilities you served during 2022 to provide Safety and Security Measures in connection with the provision of IPCS.

(1)  In the Excel template, enter "Yes" if you have any verifiable, reliable, and accurate information in your possession about the costs the Facilities you serve incurred during 2022 to provide Safety and Security Measures in connection with the provision of IPCS.  Otherwise, enter "No."

(2)  In the Excel template, if you entered "Yes" in response to the question above, for each Facility for which you have such information, enter the total amount of Facility-incurred expenses associated with Safety and Security Measures incurred in connection with the provision of IPCS during 2022.

(3)  In the Excel template, for each facility, disaggregate the total amount of Facility-incurred expenses associated with Safety and Security Measures incurred in connection with the provision of IPCS among the following categories:

(a)  Communications Assistance for Law Enforcement Act (CALEA) services, including, but not limited to the costs incurred by the provider in complying with CALEA.

(b)  Law enforcement support services, including but not limited to the examples identified for such services in section IV.C.3.b. above.

(c)  Communication security services, including, but not limited, to the examples identified for such services in section IV.C.3.b. above.

(d)  Communication recording services, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

(e)  Communication monitoring services, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

(f)    Voice biometrics services, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

(g)    Other services not included in one of the foregoing categories, including, but not limited to, the examples identified for such services in section IV.C.3.b. above.

(4)    In the Word template, fully document, explain, and justify the accuracy and reliability of any data you have provided in response to questions (1), (2), and (3). The Company shall also retain any documentation supporting any data provided in connection with questions (1), (2), and (3) above.

(5)    In the Word template, state whether you have any verifiable, reliable, and accurate information regarding any expenses for IPCS and associated Ancillary Services, other than Safety and Security Measure expenses, incurred by Facilities served by the Company during 2022. If you have such information, explain in detail the source of the information, the products and services for which the expenses were incurred, including a description of the expenses and the Facility to which that information pertains. Providers must be able to reproduce, on request, documentation sufficient to fully explain and justify the accuracy and reliability of any data they report in response to this inquiry.

### e. Ancillary Services Information

(1)    **Automated Payment Fee Revenues:** Enter the amount of Automated Payment Fee revenues the Accounting Entity received from Customers for the provision of audio and video IPCS during 2022.

(2)    **Automated Payment Fees Passed Through to An Affiliate:** Enter the amount of Automated Payment Fee revenues the Accounting Entity passed through to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for the provision of audio and video IPCS during 2022.

(3)    **Affiliates Used in Providing Automated Payment Service:** List each Affiliate, if any, that the Accounting Entity used in providing its Automated Payment Service at each Facility for 2022.

(4)    **Third Parties Used in Providing Automated Payment Service:** List each Third Party, if any, that the Accounting Entity used in providing its Automated Payment Service at each Facility for 2022 and enter the amount of Automated Pay Service for which the Company was billed by each listed Third Party at each Facility for 2022.

(5)    **Automated Payment Fees and Third-Party Transaction Fees Charged in the Same Transaction:** In the Word template and for each Facility for 2022, identify any transactions for which both Automated Payment Fees and Third-Party Transaction Fees were charged, describe the services provided for the transaction, and apportion the fees charged for the services provided for each.

(6)    **Payment Card Processing Revenue for Automated Payment Fees:** Of the amount reported for Automated Payment Fee Revenue above, enter the amount of that revenue attributable to payment card processing fees charged in connection with communications at each Facility during 2022.

(a)    In the Word template, to the extent that payment card processing for a Facility or Facilities differs from the explanation provided in response to the Company-Wide Ancillary Services questions, describe how and why these payment card processing functions differ from your response to the Company-Wide request, including whether they were performed by the Provider, an Affiliate, or a Third Party. If such functions were performed by an Affiliate or Third Party, identify the Affiliate or Third Party.

(7) **Fees for Single-Call and Related Services:** Enter the amount of Fees for Single-Call and Related Services the Accounting Entity received from Customers in connection with its provision of audio and video IPCS and Ancillary Services at the Facility during 2022.

(8) **Single-Call and Related Services Revenues Passed Through to An Affiliate:** Enter the amount of revenues from Fees for Single-Call and Related Services passed through to any Affiliate for audio and video IPCS and Ancillary Services provided at the Facility during 2022.

(9) **Entities Charging the Accounting Entity for Billing Services:** List each entity that charged the Accounting Entity for billing services for Single-Call and Related services at each Facility for each year during 2022. Indicate whether each listed entity is a Third Party.

(10) **Amounts Paid to Third Parties for Billing Services:** Enter the amount the Accounting Entity paid to a Third Party for billing services in connection with Single-Call and Related Services provided at each Facility during 2022.

(11) **Single-Call and Related Services Fees Passed through to Customers:** Enter the amount the Accounting Entity paid to Third Parties for billing services in connection with Single-Call and Related Services that the Company passed through to Customers at each Facility during 2022.

(12) **Amounts Paid to Other Entities for Billing Services:** Enter the amount the Accounting Entity paid to entities other than Third Parties for billing services in connection with Single-Call and Related Services at each Facility during 2022.

(13) **Amounts Paid to Other Entities for Billing Services Passed Through to Customers:** Enter the amount the Accounting Entity paid to entities other than Third Parties for billing services in connection with Single-Call and Related Services that the Company passed through to Customers at each Facility during 2022.

(14) **Other Entities that Charged Customers for Single-Call and Related Services:** In the Word template, to the extent that an entity other than the Company charged Customers Single-Call and Related Services fees in connection with the Company's audio or video IPCS at a Facility or Facilities that is not identified in your response to the Company-wide questions, list each such entity and each Facility, indicate whether each listed entity is a Third Party, and provide the amount of such fees each listed entity charged Customers at each Facility during 2022. Additionally, explain why each different entity is used at the Facility or Facilities.

(15) **Live Agent Fees:** Enter the amount of Live Agent Fee revenue the Accounting Entity received from Customers in connection with its provision of audio and video IPCS and associated Ancillary Services at the Facility during 2022.

(16) **Affiliates Used to Provide Live Agent Service:** List each Affiliate, if any, that the Accounting Entity used in providing its Live Agent Service at each Facility during 2022.

(17) **Third Parties Used to Provide Live Agent Service:** List each Third Party, if any, that the Accounting Entity used in providing its Live Agent Service at each Facility during 2022.

(18) **Amounts Paid to Third Parties for Live Agent Service:** Enter the amount the Accounting Entity paid to each listed Third Party for Live Agent Service at each Facility during 2022.

(19) **Live Agent Fee Revenue Paid to an Affiliate:** Enter the amount of Live Agent Fee revenues the Accounting Entity paid to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for the provision of audio and video IPCS at the Facility during 2022.

(20)  **Paper Bill/Statement Fee Revenue:**  Enter the amount of Paper Bill/Statement Fee revenue generated by communications originating in the Facility during 2022.

(21)  **Affiliates Used to Provide Paper Bill/Statement Service:**  List each Affiliate, if any, that the Accounting Entity used in providing its Paper Bill/Statement Service at each Facility during 2022.

(22)  **Third Parties Used to Provide Paper Bill/Statement Service:**  List each Third Party, if any, that the Accounting Entity used in providing its Paper Bill/Statement Service at each Facility during 2022.

(23)  **Amounts Paid to Third Parties for Paper Bill/Statement Service:**  Enter the amount the Accounting Entity paid to each listed Third Party for Paper Bill/Statement Service at each Facility during 2022.

(24)  **Paper Bill/Statement Fee Revenue Passed Through to an Affiliate:**  Enter the amount of Paper Bill/Statement Fee revenue passed through by the Accounting Entity to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for the provision of audio and video IPCS and Ancillary Services during 2022.

(25)  **Third-Party Financial Transaction Fees:**  Enter the amount of revenue from Third-Party Financial Transaction Fees the Accounting Entity received from Customers in connection with its audio and video IPCS and Ancillary Services provided at the Facility during 2022.

(26)  **Per-Transaction Charges for Third-Party Transactions:**  Enter the per-transaction fee(s) charged to an end user for transferring money or processing other financial transactions to facilitate an end user's ability to make account payments via a Third Party, including a Third Party that is an Affiliate of the Provider.  For each fee, indicate whether the Third Party receiving the payment is an Affiliate or non-Affiliate.

(27)  **Payment Card Processing Revenue from Third-Party Financial Transaction Fees:**  Of the amount reported for Third-Party Financial Transaction Fees above, enter the amount of that revenue applicable to charging Customers for payment card processing for each Facility during 2022.

    (a)  In the Word template, to the extent that payment card processing services in connection with revenue reported for Third-Party Financial Transaction Fees for a Facility or Facilities differs from the explanation provided in response to the Company-Wide Ancillary Services questions, describe how these payment card processing services in connection with revenue reported for Third-Party Financial Transaction Fees differ from your response to the Company-Wide request, including whether they were performed by the Provider, an Affiliate, or a Third Party.  If such services were provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

(28)  **Entities Charging the Accounting Entity for Third-Party Financial Transaction Services:**  List each entity that charged the Accounting Entity for providing Third-Party Financial Transaction Services at each Facility for 2022.  Indicate whether each listed entity is a Third Party.

(29)  **Amounts Paid to Third Parties for Third-Party Financial Transaction Services:**  Enter the amount the Accounting Entity paid to Third Parties for Third-Party Financial Transaction Services at each Facility during 2022.

(30)  **Amounts Paid to Third Parties for Third-Party Financial Transaction Services Passed Through to Customers:**  Enter the amount the Accounting Entity paid to Third Parties for Third-Party Financial Transaction Services that the Company passed through to Customers at each Facility for 2022.

(31) **Amounts Paid to Other Entities for Third-Party Financial Transaction Services:**  Enter the amount the Accounting Entity paid to entities other than Third Parties for Third-Party Financial Transaction Services at each Facility during 2022.

(32) **Amounts Paid to Other Entities for Third-Party Financial Transaction Services Passed Through to Customers:**  Enter the amount the Accounting Entity paid to entities other than Third Parties for Third-Party Financial Transaction Services that the Company passed through to Customers at each Facility during 2022.

(33) **Other Entities that Charged Customers for Third-Party Financial Transaction Services:**  In the Word template, to the extent that an entity other than the Company charged Customers for Third-Party Financial Transaction Services in connection with the Company's provision of audio and video IPCS at a Facility or Facilities that is not identified in your response to the Company-Wide Ancillary Services questions, list each such entity and each Facility, indicate whether each listed entity is a Third Party, and provide the amount of such fees each listed entity charged Customers at each Facility during 2022.  Additionally, provide an explanation as to why each different entity is used at the Facility or Facilities.

(34) **Third-Party Financial Transaction Fees Paid to an Affiliate:**  Enter the amount of Third-Party Financial Transaction Fees paid by the Accounting Entity to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for audio and video IPCS and Ancillary Services provided at the Facility during 2022.

(35) In the Word template, identify any Facilities at which the Company assessed both Ancillary Services Charges and any other charges in connection with video services.  For each facility, list and describe each Ancillary Services Charge the Company assessed during 2022 for video services.  Separately, for each Facility, list and describe any other charges that are not Ancillary Services Charges the Company assessed for video IPCS during 2022.

# V.  Certification Form

Each Provider of audio or video IPCS must submit a signed certification form as part of its Mandatory Data Collection response.  The Chief Executive Officer (CEO), Chief Financial Officer (CFO), or other senior executive of the Provider must complete the form and certify that, based upon the executive's own reasonable inquiry, that all statements and information contained in the Provider's Mandatory Data Collection response are true, accurate, and complete.  The Certification Form is Appendix C to these instructions.

(1) **Name of Service Provider:**  Provide the name under which the Provider offers audio or video IPCS. If the Provider offers audio or video IPCS under more than one name, provide all relevant names.

(2) **Reporting Period:**  Calendar year 2022.

(3) **Officer Name, Title:**  Provide the name and title of the officer completing the certification form.  The officer must be the Chief Executive Officer (CEO), Chief Financial Officer (CFO), or other senior executive of the Provider who can attest to the truthfulness, accuracy, and completeness of the information provided.

(4) **Mailing Address of Officer:**  Provide the business mailing address of the officer identified in item  (3).

(5)  **Telephone Number:**  Provide the business telephone number, with area code, of the officer identified in item (3).

(6)  **Email Address:**  Provide the business email address of the officer identified in item (3).

(7)  **Certification:**  This section requires the person who signs the certification form on behalf of the Provider to declare, under penalty of perjury, that (1) the signatory is an officer of the above-named Provider and is authorized to submit the attached Mandatory Data Collection response on behalf of the Provider; (2) the signatory has examined the attached Mandatory Data Collection response and determined that all requested information has been provided; and (3) based on information known to the signatory, or provided to the signatory by employees responsible for the information being submitted, and on the signatory's own reasonable inquiry, all statements and information contained in the Provider's Mandatory Data Collection response are true, accurate, and complete.

(8)  **Signature of Authorized Officer:**  The signature of the officer identified in item (3) is required in this block.

(9)  **Date:**  The date the officer identified in item (3) signs the form is required in this block.

(10)  **Printed Name of Authorized Officer:**  The printed name of the officer identified in item (3) is required in this block.

**APPENDIX A**

The Proposed Word template is available at this link:  https://docs.fcc.gov/public/attachments/DOC-393009A1.docx.

**APPENDIX B**

The Proposed Excel template is available at this link:  https://docs.fcc.gov/public/attachments/DOC-392987A2.xlsx.

**APPENDIX C**

The Proposed Certification Form is available at this link:  https://docs.fcc.gov/public/attachments/DOC-392987A1.docx.