# United States Court of Appeals
# for the First Circuit

_____

No. 24-8028
In re: MCP 191
*(Caption Continued on Inside Cover)*

_____

On Petitions for Review of a Final Order of the
Federal Communications Commission

_____

**JOINT APPENDIX**
**VOLUME II of VII (Pages JA385 – JA731)**

_____

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison
Society*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights
and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform
Clinic*

*Additional Counsel Listed on Inside Cover*

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER SCHRECK,
 LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus Technologies, LLC*

Salvatore Taillefer, Jr.
BLOOSTON, MORDKOFSKY, DICKENS &
 PRENDERGAST, LLP
2120 L Street, NW Suite 825
Washington, DC 20037
(202) 828-5562
sta@bloostonlaw.com

*Counsel for the National Sheriffs'
Association*

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel Communications,
Inc.*

Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8900
ACollins@cahill.com

Landis C. Best
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
LBest@Cahill.com

*Counsel for Global Tel*Link
Corporation d/b/a ViaPath
Technologies*

D. Adam Candeub
  General Counsel
Bradley Craigmyle
  Deputy General Counsel
Sarah E. Citrin
  Deputy Associate General Counsel
Matthew J. Dunne
  Counsel
FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
Communications Commission*

Tim Griffin
  Attorney General of Arkansas
OFFICE OF ATTORNEY GENERAL TIM
  GRIFFIN
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

Autumn Hamit Patterson
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General and Interim
Solicitor General

*Counsel for the State of Arkansas*

Abigail A. Slater
  Assistant Attorney General
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
  ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United
States of America*

Theodore E. Rokita
  Attorney General of Indiana
OFFICE OF THE INDIANA ATTORNEY
  GENERAL
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

Blake E. Lanning
  Assistant Chief Deputy
Joshua J. David
  Deputy Attorney General
  Legislative & Policy Division
Jade A. Poorman
Bradley S. Davis
  Deputy Attorneys General
  Litigation Division

*Counsel for the State of Indiana*

Elizabeth B. Murrill
  Attorney General of Louisiana
Kelsey L. Smith
  Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

James Uthmeier
  Attorney General of Florida
John Guard
  Chief Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

*Counsel for the State of Florida*

Christopher M. Carr
  Attorney General of Georgia
Stephen J. Petrany
  Solicitor General
OFFICE OF THE GEORGIA
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

Steve Marshall
  Attorney General of Alabama
Edmund G. Lacour Jr.
  Solicitor General
OFFICE OF THE ALABAMA ATTORNEY
  GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

*Counsel for the State of Alabama*

Raúl R. Labrador
  Attorney General of Idaho
Alan Hurst
  Solicitor General
Sean M. Corkery
  Assistant Solicitor General
OFFICE OF THE IDAHO ATTORNEY
  GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

*Counsel for the State of Idaho*

Lynn Fitch
  Attorney General of Mississippi
Justin L. Matheny
  Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
  OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


Dave Yost
  Attorney General of Ohio
T. Elliot Gaiser
  Ohio Solicitor General
Mathura J. Sridharan
  Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*

Marty J. Jackley
  Attorney General of South Dakota
Ryan Mcfall
  Assistant Attorney General
OFFICE OF ATTORNEY GENERAL
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

*Counsel for the State of South Dakota*

Brenna Bird
  Attorney General of Iowa
Eric H. Wessan
  Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*


Andrew Bailey
  Attorney General of Missouri
Joshua M. Divine, #69875MO
  Solicitor General
Dominic X. Barceleau, #76510MO
  Assistant Attorney General
815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


Alan Wilson
  Attorney General of South Carolina
Joseph D. Spate
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*

Ken Paxton
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Aaron L. Neilson
  Solicitor General
Jacob Beach
  Assistant Solicitor General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

*Counsel for the State of Texas*


Jason Miyares
  Attorney General of Virginia
Kevin M. Gallagher
  Principal Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

Jonathan Skrmetti
  Attorney General of Tennessee
J. Matthew Rice
  Solicitor General of Tennessee
OFFICE OF TENNESSEE ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

*Counsel for the State of Tennessee*


Derek E. Brown
  Attorney General of Utah
Stanford Purser
  Solicitor General
OFFICE OF THE UTAH ATTORNEY GENERAL
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

*Counsel for the State of Utah*

Craig E. Frosch
  Executive Counsel, Louisiana Sheriffs'
Association
FROSCH, RODRIGUE, ARCURI, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

Mary Erlingson
East Baton Rough Parish
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

Shannon Dirmann
LOUISIANA SHERIFF'S ASSOCIATION
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

*Counsel for Sheriff Sid Gautreaux; Sheriff
Bobby Webre; Sheriff Mark Wood; Sheriff
Kevin Cobb; and The Louisiana Sheriffs'
Association*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

Nos. 24-1860 & 24-1927

SECURUS TECHNOLOGIES, LLC,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE
REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY; OFFICE OF
COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

# VOLUME I

Certified List of items constituting the record of FCC proceedings in WC Docket Nos. 23-62 & 12-375 ................................................................. JA1

Comments of Center on the Administration of Criminal Law, WC Docket No. 12-375 (Mar. 25, 2013) ................................................................. JA93

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) [excerpt pages 14111, 14138-43, 14194] ................................. JA107

Comments of National Sheriffs' Association, WC Docket No. 12-375, Exh. A (Jan. 12, 2015) ................................................................................ JA116

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd. 12763 (2015) [excerpt pages 12768, 12775, 12790, 12813-18, 12838-39] ........................................................................................... JA133

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 31 FCC Rcd. 9300 (2016) [excerpt page 9311] ....................................................................... JA145

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd. 8485 (2020) [excerpt page 8514 n.209] ............................................................ JA147

Comments of Worth Rises, WT Docket No. 12-375 (Nov. 23, 2020) .............. JA149

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (May 13, 2021) ...................................................................................... JA197

Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement, WC Docket No. 12-375 (Aug. 30, 2021) ................................. JA203

Securus Technologies, LLC Pet. for Clarification, WC Docket No. 12-375 (Sept. 17, 2021) ............................................................................... JA212

Comments of Prison Policy Initiative, Inc. on Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Sept. 27, 2021) .................... JA218

Comments of Securus Technologies, LLC on Petition for Waiver, WC Docket No. 12-375 (Jan. 7, 2022)..................................................................JA259

Comments of Nathan Miller, WC Docket No. 23-62 (May 4, 2023), Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay* (Nov. 4, 2022) ...........................................................JA274

Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Dec. 15, 2022) [excerpt cover and pp. 7-8, 11-13].........................................JA300

Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Dec. 15, 2022) ...........................................................................JA306

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Instructions*, WC Docket Nos. 23-62 & 12-375 ........................................................................JA326

## VOLUME II

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Word Template*, WC Docket Nos. 23-62 & 12-375 ........................................................................JA385

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Excel Template*, WC Docket Nos. 23-62 & 12-375 ........................................................................JA409

Reply Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Mar. 3, 2023) [excerpt cover and pp. 6-8].................................JA424

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023)...................................................JA428

Comments of California State Senator Josh Becker, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ...........................................................JA483

Comments of Civil Rights Corps, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ...............................................................................JA485

Comments of Color of Change, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ...............................................................................JA492

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............................................ JA502

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ...................................................................... JA539

Comments of the NCIC Inmate Communications, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................. JA558

Comments of the Pay Tel Communications, Inc. in Response to Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....... JA576

Opening Comments of Stephen A. Raher, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................ JA604

Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................ JA632

Opening Comments of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............ JA686

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................... JA711

## VOLUME III

Comments of the Wright Petitioners et al., WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................ JA732

Coleman Bazelon & Paroma Sanyal, Brattle Report (May 8, 2023) ................ JA774

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ........................................................................ JA812

Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ........................................................................ JA819

Securus Technologies, LLC's Initial Comments to the Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ........................................................................ JA827

Comments of the Electronic Privacy Information Center, WC Docket Nos. 23-62 & 12-375 (June 6, 2023) ......................................................................... JA835

Reply Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ....................................................................... JA844

Reply Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ............................................................................. JA865

Reply Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ................................................................................. JA915

Reply Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ...................................................................................................... JA957

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, 38 FCC Rcd 6625 (WCB 2023) ............. JA963

Letter from Gregory R. Capobianco, Counsel for the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 15, 2023) ....................................................................................................... JA991

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 21, 2023) ......................................................................................... JA1016

## VOLUME IV

IPCS Chicago Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Feb. 6, 2024) .................................. JA1055

IPCS Charleston Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Mar. 5, 2024).................................. JA1159

Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 & 12-375 (Apr. 29, 2024) ....................................... JA1251

Letter from Virginia Association of Regional Jails, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62 (May 29, 2024)................................. JA1256

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) ...................................................................................... JA1266

Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (June 7, 2024) [excerpt pages 5–6] ........................................................... JA1276

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC and Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 10, 2024) ............................................ JA1280

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 14, 2024) ................................................................................ JA1300

Letter from Leadership Conference to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (filed June 17, 2024) ..................... JA1302

Joint Letter of 90+ Organizations Supporting Low Rates, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (June 17, 2024) ................................................................................... JA1306

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 18, 2024) ................................................ JA1310

IPCS Phoenix Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed June 20, 2024) ............................... JA1326

Letter from Salvatore Taillefer, Jr., Counsel to NSA to Marlene Dortch, Secretary of the FCC, WC Dockets Nos. 23-62 & 12-375 (June 20, 2024)... JA1390

Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 8, 2024) ....................................................................................... JA1408

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 9, 2024) ................................................... JA1409

Letter from Melonie Perez, Aliza Kaplan, Jennifer Scaife, & Leigh Owens, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) ................................................................ JA1432

Letter from Sheriff Kieran Donahue, Canyon County, Idaho, and President of the National Sheriffs' Association to Marlene Dortch, Secretary of the FCC, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 1] .... JA1439

Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) ................................................................................ JA1440

Comments of the Montana Sheriffs & Peace Officer Association, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt pages 1–2] ................ JA1445

Comments of the Virginia Association of Regional Jails, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 2] .......................................... JA1447

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 12, 2024) ................................................................................ JA1449

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ........................................................................ JA1453

Comments of Virginia Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ............................................................................ JA1485

## VOLUME V

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647 (2024) ........................................................................ JA1486

## VOLUME VI

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Aug. 26, 2024) ................................................................ JA1950

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Second Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) ................................................................... JA1951

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 10944 (WCB 2024) ......................................................................... JA1953

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11373 (WCB 2024) ......................................................................... JA1972

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11607 (WCB 2024) ......................................................................... JA1994

Motion of Pay Tel Communications, Inc. for Stay Pending Judicial Review, *Pay Tel Communications, Inc. v. FCC*, No. 24-8028 (1st Cir. Oct. 25, 2024) ............................................................................................. JA2011

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375, DA 24-1074 (Oct. 28, 2024) ................... JA2041

Letter from Aaron M. Dawson, Executive Director of the Alabama Jail Administrators' Council, to the FCC, Re: Report and Order, Order on Reconsideration, Clarification and Waiver, and Further notice of Proposed Rulemaking (Nov. 21, 2024) ......................................................... JA2053

Letter from Geoffrey G. Why, Verrill Dana LLP, Counsel to Ameelio, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (Dec. 6, 2024) ............................................................................................. JA2055

Panka Bencsik et al., *Calls and Conduct: The Impact of Free Communication on Prison Misconduct* (Dec. 2024) (forthcoming publication) ...................................................................................... JA2057

Ameelio Iowa Model Memo (Nov. 26, 2024) ................................................. JA2084

**UNDER SEAL**
**VOLUME VII**

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (rel. July 22, 2024) ..........................................JA2091

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) ......................................................JA2582

WC Docket Nos. 23-62, 12-375
FCC Form 2303(a)
Not Approved by OMB
OMB Control No. 3060-XXXX

# APPENDIX A

# Incarcerated People's Communications Services
# 2023 Mandatory Data Collection
# Proposed Word Template

## Introduction and Instructions

As set forth in the Instructions for the 2023 Mandatory Data Collection (Instructions), a full response to the data collection includes completion of this Word template, which shall contain responses to questions identified in the Instructions as requiring a narrative explanation. This template shall also be used to provide any additional information needed to ensure that your response is full and complete and to identify and explain any caveats associated with your response. This template shall also include formulas, explanations, and appropriate references for calculations, where necessary, including any explanations needed to make your entries on the Excel template transparent and understandable.

In this template, we have consecutively numbered each of the inquiries identified in the Instructions as requiring a narrative explanation and included a cross reference to the appropriate section of the Instructions. Thus, all cross references in this template are to the Instructions. For any additional explanatory responses beyond those explicitly required by the Instructions, please number that response after the last numbered inquiry in this document and, as part of that response, clearly specify the section and question in the Instructions to which your answer corresponds.

All terms defined in the Instructions have the same meaning where they are used in this document.

## General Information (Section IV.A of the Instructions)

Section IV.A of the Instructions requires you to provide general information and data about the Company and its Affiliates, among other matters. Specifically, we require you to respond to the following inquiries here:

1. **Company Name:** As instructed in section IV.A.(1), enter the Company's name.

[[*Insert Provider Response Here*]]

2. **IPCS or Ancillary Services:**

   a. As instructed in section IV.A.(8)(a), describe in detail all audio IPCS that the Company provided at or for Facilities during 2022. Specifically, identify the technologies used to deliver each of these services.

   [[*Insert Provider Response Here*]]

   b. As instructed in section IV.A.(8)(b), describe in detail all video IPCS that the Company provided at or for Facilities during 2022. Specifically, identify the technologies used to deliver each of these services.

   [[*Insert Provider Response Here*]]

c.   As instructed in section IV.A.(8)(c), identify and describe the shared equipment or technologies used by the Company to deliver both audio and video IPCS.

[[*Insert Provider Response Here*]]

d.   As instructed in section IV.A.(8)(d), identify and describe any equipment or technology the Company used to provide only audio IPCS.  Also identify and describe any equipment or technology the Company used to provide only video IPCS.

[[*Insert Provider Response Here*]]

e.   As instructed in section IV.A.(8)(e), if the Company provided any services for which it charged Automated Payment Fees during 2022, describe the function of the Automated Payment Fees and the processes used to provide Automated Payment Services.

[[*Insert Provider Response Here*]]

f.   As instructed in section IV.A.(8)(f), if the Company provided any services for which it charged Live Agent Fees during 2022, describe the function of the Live Agent Fees and the processes used to provide Live Agent Services.

[[*Insert Provider Response Here*]]

g.   As instructed in section IV.A.(8)(g), if the Company provided any services for which it charged Single-Call and Related Services Fees during 2022, describe the function of the Single-Call and Related Services Fees and the processes used to provide Single-Call and Related Services.

[[*Insert Provider Response Here*]]

h.   As instructed in section IV.A.(8)(h), if the Company provided any services for which it charged Third-Party Financial Transaction Fees during 2022, describe the function of the Third-Party Financial Transaction Fees and the processes used to provide Third-Party Financial Transaction Services.

[[*Insert Provider Response Here*]]

i.   As instructed in section IV.A.(8)(i), if the Company provided any services for which it charged Other Ancillary Services Charges during 2022, identify each Other Ancillary Services Charge, describe the purpose and function of each Other Ancillary Services Charge, and explain in detail each process used to provide each Other Ancillary Service.

[[*Insert Provider Response Here*]]

j.   As instructed in section IV.A.(8)(j), if the Company mailed paper bills or statements for any IPCS account and charged Paper Bill/Statement Fees during 2022, describe the Company's

**JA386**

policy for issuing and mailing such bills or statements, including any elections that must be made by the account holder or recipient of any mailed bills or statements.

[[*Insert Provider Response Here*]]

3. **Business Segments Other than IPCS or Ancillary Services:**

   a. As instructed in section IV.A.(9)(d), describe in detail all Business Segments, other than IPCS or Ancillary Services, the Company or an Affiliate provided at or for Facilities, or to Incarcerated People or those they communicate with, during 2022.

   [[*Insert Provider Response Here*]]

   b. As instructed in section IV.A.(9)(e), describe in detail how, if at all, the Company's IPCS or Ancillary Services interact with Business Segments other than IPCS or Ancillary Services.

   [[*Insert Provider Response Here*]]

4. **Accounting and Record-Keeping Systems:** As instructed in section IV.A.(16), describe in detail the Accounting Entity's accounting and record-keeping systems.

   [[*Insert Provider Response Here*]]

5. **Mandatory Data Collection Response:** As instructed in section IV.A.(17), provide an overview of how the Company used its accounting and record-keeping system to respond to this Mandatory Data Collection. As part of this overview, explain the process by which the Company used data from income statements, balance sheets, general ledger, subledger, journals, department, division, or other organization group accounts or subaccounts, and other records or sources of financial data to develop, compile, assign, attribute, allocate or report Company-wide, service-specific, and Facility-specific revenues, investments, and expenses, as required by this Mandatory Data Collection. Identify the sources for all depreciation and amortization schedules or asset life projections used to determine the amount of depreciation and amortization expenses reported and how these expenses are derived using these schedules and projections or other methods in lieu of or in combination with these schedules and projections. Explain how Company-wide, service-specific, Facility-specific, department, division, or other organization group data are used to determine how costs are incurred in order to assign, attribute, or allocate investments and expenses, as required by this Mandatory Data Collection, including, for example, data as to the number of communications or call minutes, ADP, headcounts, labor hours, or salaries; computer processing, electronic equipment or other inside or outside plant equipment, circuit, and electric power use or capacity; internal or external maintenance or computer-center help desk requests, tickets, orders or dispatch numbers; and purchase orders, transactions, or other measures of resource use and cost-causation.

   [[*Insert Provider Response Here*]]

6. **Representative Information:** As instructed in section IV.A.(18), address in detail whether the information collected though the data collection will be representative of the Company's future provision of IPCS and associated Ancillary Services. Identify for the two-year period from January 1, 2024, to December 31, 2025, any specific known and measurable changes to the

Company's IPCS or Ancillary Services investments, expenses, revenues, and demand that are not reflected in the data collected through this data collection.

[[*Insert Provider Response Here*]]

7. **Sources:**  As instructed in section IV.A.(19), identify the source for any data or any document included in or relied upon in your response.

[[*Insert Provider Response Here*]]

# Company-Wide Information (Section IV.C of the Instructions)

Section IV.C of the Instructions requires you to provide general financial data and other information about the Company.  Use the section below to complete the requests for information in the Company-Wide Information section.

## Overall Financial Information (Section IV.C.1 of the Instructions)

Section IV.C.1 of the Instructions directs you to provide financial data and other information about the Company.  All financial data must comply with Generally Accepted Accounting Principles (GAAP).  The carrying value of all assets, both tangible and intangible, shall reflect the results of the most recent impairment testing, and any adjustments required to account for any impairment loss shall be separately identified.

8. As instructed in section IV.C.1, explain in detail the process the Company used to ensure GAAP-consistent impairment testing and provide any additional information needed to make that process fully transparent and understandable.  If the carrying value of all assets did not reflect the results of the most recent impairment testing and any adjustments required to account for any impairment loss separately on the Excel template, explain in detail the following:

   a. Why an impairment test is not necessary;
   b. When impairment testing normally occurs under Company policy; and
   c. Identify with specificity any accounting adjustments that were made at the time of the most recent impairment testing.

[[*Insert Provider Response Here*]]

## Cost Allocation (Section IV.C.2.b of the Instructions)

Section IV.C.2.b of the Instructions requires you to perform a cost allocation.

9. As instructed in section IV.C.2.b.(8), fully document, explain, and justify all cost assignments, attributions, and allocations in this section and submit additional workpapers developed using Excel spreadsheets.

[[*Insert Provider Response Here*]]

4

# Weighted Average Cost of Capital (Section IV.C.2.d of the Instructions)

Section IV.C.2.d of the Instructions requires you to elect to use the default Weighted Average Cost of Capital of 9.75% or an alternative Weighted Average Cost of Capital.

10. As instructed in section IV.C.2.d.(2), if you elect to use an alternative Weighted Average Cost of Capital greater than 9.75%, fully document each of the following components by submitting data, formulas, cost of equity analyses (using, for example, the Discounted Cash Flow Model or Capital Asset Pricing Model), calculations, and worksheets, and explain and justify the development of each claimed component. As noted in the Instructions, failure to fully document, explain, and justify each claimed component may result in the application of the default Weighted Average Cost of Capital of 9.75%.

   a. Cost of debt;
   b. Cost of preferred stock;
   c. Cost of equity;
   d. Total debt outstanding in dollars and as a percent of total capital outstanding (the sum of debt, preferred stock, and equity outstanding);
   e. Total preferred stock outstanding and as a percent of total capital outstanding;
   f. Total equity outstanding and as a percent of total capital outstanding; and
   g. Weighted Average Cost of Capital.

   [[*Insert Provider Response Here*]]

# Cash Working Capital (Section IV.C.2.e of the Instructions)

Section IV.C.2.e of the Instructions requires you to elect whether to include an allowance for Cash Working Capital in the Company's Net Capital Stock.

11. As instructed in section IV.C.2.e.(2), if you elect to include an allowance for Cash Working Capital in the Company's Net Capital Stock, you are required to report the allowance claimed for 2022 in the Excel template separately for: (a) audio IPCS; (b) video IPCS; (c) Safety and Security Measures; (d) Automated Payment Services; (e) Live Agent Services; (f) Paper Bill/Statement Services; (g) Single-Call and Related Services; and (h) Third-Party Financial Transaction Services. We require you to submit a lead-lag study or the equivalent that estimates the average number of days between the payment of expenses and the receipt of revenues, and average daily cash expenses, as support for each claimed allowance. Here, we require you to fully document, explain, and justify each claimed allowance.

   [[*Insert Provider Response Here*]]

# Optional Allocations and Adjustments (Section IV.C.2.g of the Instructions)

12. As instructed in section IV.C.2.g.(1), state whether the Company elects to further separate its investments, expenses, Net Capital Stock, and Annual Total Expenses for Ancillary Services (including each of Automated Payment Services, Live Agent Services, Paper Bill/Statement

5

**JA389**

Services, Single-Call and Related Services, Third-Party Financial Transaction Services, and Other Ancillary Services) between audio Ancillary Services and video Ancillary Services to reflect any measurable differences between the average costs of providing audio Ancillary Services versus video Ancillary Services.

[[*Insert Provider Response Here*]]

13. As instructed in section IV.C.2.g.(2), if you elect to perform the optional allocation identified in IV.C.2.g.(1), (a) fully document and explain this separation here; and (b) submit additional Excel spreadsheets, similar in design and level of data disaggregation to those in the Excel template, showing in detail each aspect of the Company's separations processes.  Electing this cost allocation option does not relieve the Company of its obligation to report its unseparated investments, expenses, Net Capital Stock, and Annual Total Expenses in the Excel template and in accordance with the instructions for reporting unseparated data.

[[*Insert Provider Response Here*]]

14. As instructed in section IV.C.2.g.(3), state whether the Company elects to further separate its investments, expenses, Net Capital Stock, and Annual Total Expenses for audio IPCS, video IPCS, Safety and Security Measures, Ancillary Services (including each of Automated Payment Services, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, Third-Party Financial Transaction Service, and Other Ancillary Services) between interstate/international and intrastate services to reflect any measurable differences between the average costs of providing interstate/international versus intrastate services.

[[*Insert Provider Response Here*]]

15. As instructed in section IV.C.2.g.(4), if you elect to perform the optional allocation identified in IV.C.2.g.(3), you must (a) fully document, explain, and justify this separation below; and (b) submit additional Excel spreadsheets, similar in design and level of data disaggregation to those in the Excel template, showing in detail each aspect of the Company's separation processes. These showings below and in the Excel spreadsheets must fully document and justify each aspect of the processes by which the Company-wide interstate/international or intrastate audio IPCS, video IPCS, and Safety and Security Measures investments and expenses are further assigned, attributed, or allocated to or among each of the Company's Facilities, and how the Net Capital Stock and Annual Total Expenses for each of these services are developed for each of these Facilities.  As noted in the Instructions, electing this cost allocation option does not relieve the Company of its obligation to report its unseparated investments, expenses, Net Capital Stock, and Annual Total Expenses in the Excel template and in accordance with the instructions for reporting unseparated data.

[[*Insert Provider Response Here*]]

16. As instructed in section IV.C.2.g.(5), state whether the Company elects to further adjust its investments, expenses, Net Capital Stock, and Annual Total Expenses developed in accordance with the Instructions for any other reason.  If you elect to make such an adjustment, you must: (a) fully document, explain, and justify it below; and (b) submit additional Excel spreadsheets, similar in design and level of data disaggregation to those in the Excel template, showing in detail

each aspect of the Company's adjustments, including all changes to the Company's data, cost allocation procedures, and results.  If the Company also elects to further separate its investments, expenses, Net Capital Stock, and Annual Total Expenses as specified in sections IV.C.2.g.(1) and IV.C.2.g.(3), you also must separately justify and document the impact of any further adjustments in response to this inquiry upon your results under section IV.C.2.g.(1) and IV.C.2.g.(3).  As noted in the Instructions, electing this additional adjustment option does not relieve the Company of its obligation to report its unseparated and unadjusted investments, expenses, Net Capital Stock, and Annual Total Expenses on the Excel template and in accordance with the instructions for reporting unseparated and unadjusted data.

[[*Insert Provider Response Here*]]

## Site Commissions (Section IV.C.3.a of the Instructions)

Section IV.C.3.a of the Instructions requires you to report, among other things, the total amount of In-Kind Site Commissions paid by the Company during 2022.  Here, we require you to do the following:

17. **Total In-Kind Site Commissions:**  As instructed in section IV.C.3.a.(2)(b)(i), describe your Legally Mandated, In-Kind payments in detail.  Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product that you classify as an In-Kind Site Commission payment for IPCS and associated Ancillary Services.

    [[*Insert Provider Response Here*]]

18. **Total In-Kind Site Commissions:**  As instructed in section IV.C.3.a.(3)(b)(i), describe your Contractually Prescribed, In-Kind payments in detail.  Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product that you classify as an In-Kind Site Commission payment for IPCS and associated Ancillary Services.

    [[*Insert Provider Response Here*]]

19. **Site Commissions Allocation Methodology:**  As instructed in section IV.C.3.a.(4), fully describe, document, explain, and justify the allocation methodology you used to allocate Site Commission payments between the Company's IPCS and associated Ancillary Services and services other than IPCS and associated Ancillary Services in situations where you made Site Commission payments for both types of services.

    [[*Insert Provider Response Here*]]

20. As instructed in section IV.C.3.a.(5), state whether you pay Site Commissions separately for audio IPCS and video IPCS, and explain in detail how these payments differ between the two types of communications, including whether the Company offers to make separate Site Commission payments for audio and video communications and whether correctional authorities request Site Commissions separately for audio IPCS and video IPCS.

    [[*Insert Provider Response Here*]]

21. As instructed in section IV.C.3.a.(6), explain whether the formula or formulas used to calculate Monetary Site Commission payments differ depending on whether the communication is audio or video.  For example, if a Provider offers to pay or a Correctional Facility asks the Provider to pay

7

**JA391**

a flat sum as a Site Commission, how, if at all, do you determine what portions of that Site Commission are allocated to audio IPCS and video IPCS?

[[*Insert Provider Response Here*]]

22. As instructed in section IV.C.3.a.(7), state whether you pay Site Commissions separately for intrastate IPCS, interstate IPCS, and international IPCS, and explain in detail how these payments differ among jurisdictions, including whether the Company offers to make separate Site Commission payments on intrastate, interstate, and international communications and whether correctional authorities request such payments.

[[*Insert Provider Response Here*]]

23. As instructed in section IV.C.3.a.(8), explain whether the formula or formulas used to calculate Monetary Site Commission payments differ depending on whether the communication is intrastate, interstate, or international. For example, if a Provider offers to pay or a Correctional Facility asks the Provider to pay a flat sum as a Site Commission, how, if at all, do you determine what portions of that Site Commission are allocated to intrastate IPCS, interstate IPCS, and international IPCS?

[[*Insert Provider Response Here*]]

## Company-Wide Costs of Provider's Safety and Security Measures (Section IV.C.3.b of the Instructions)

Section IV.C.3.b of the Instructions requires you to provide Company-level information on the costs of Safety and Security Measures. Use the section below to respond to the following requests for information regarding your costs of Safety and Security Measures.

24. **Law Enforcement Support Services:** As instructed in section IV.C.3.b.(2), identify by name and describe each service you classify as a law enforcement support service, including a description of the specific tasks and functions covered by this service and whether you routinely offer those tasks and functions in connection with IPCS.

[[*Insert Provider Response Here*]]

25. **Communication Security Services:** As instructed in section IV.C.3.b.(3), identify by name and describe each service you classify as a communication security service, including a description of the specific tasks and functions covered by this service and whether you routinely offer those tasks and functions in connection with IPCS.

[[*Insert Provider Response Here*]]

26. **Communication Recording Services:** As instructed in section IV.C.3.b.(4), identify by name and describe each service you classify as a communication recording service, including a description of the specific tasks and functions covered by this service and whether you routinely offer those tasks and functions in connection with IPCS.

[[*Insert Provider Response Here*]]

8

**JA392**

27. **Communication Monitoring Services:**  As instructed in section IV.C.3.b.(5), identify by name and describe each service you classify as a communication monitoring service, including a description of the specific tasks and functions covered by this service whether you routinely offer those tasks and functions in connection with IPCS.

   [[*Insert Provider Response Here*]]

28. **Voice Biometrics Services:**  As instructed in section IV.C.3.b.(6), identify by name and describe each service you classify as a voice biometric service, including a description of the specific tasks and functions covered by this service and whether you routinely offer those tasks and functions in connection with IPCS.

   [[*Insert Provider Response Here*]]

29. **Other Safety and Security Measures:**  As instructed in section IV.C.3.b.(7), identify by name and describe each service you provide as a Safety and Security Measure that is not included in one of the foregoing categories, including a description of the specific tasks and functions covered by each service and whether you routinely offer each service in connection with IPCS.

   [[*Insert Provider Response Here*]]

## Ancillary Services (Section IV.C.3.d of the Instructions)

Section IV.C.3.d of the Instructions requires you to provide Company-level information on Ancillary Services costs and revenues and Revenue-Sharing Agreements in connection with your Ancillary Services.  Use the section below to respond to the following requests for information regarding your Ancillary Services.

30. As instructed in section IV.C.3.d.(1)(a)(i), if you charged Customers more than one Permissible Ancillary Services fee in connection with the same interstate, international, or mixed-jurisdictional transaction during 2022, describe in detail the circumstances relating to those charges.  Your description shall include, in addition to all other relevant information, a list of the specific transactions for which you charged multiple fees, the fee charged in each transaction, the functions that were covered by each fee, and the total amounts that Customers paid for each fee.

   [[*Insert Provider Response Here*]]

31. As instructed in section IV.C.3.d.(1)(b), explain in detail any differences between your practices during 2022 regarding the assessment of Ancillary Services fees in connection with audio IPCS and your practices during 2022 regarding the assessment of Ancillary Services fees in connection with video IPCS.

   [[*Insert Provider Response Here*]]

32. As instructed in section IV.C.3.d.(1)(c), explain in detail any differences between your practices during 2022 regarding the assessment of Ancillary Services fees in connection with

9

**JA393**

interstate/international IPCS and your practices during 2022 regarding the assessment of Ancillary Services fees in connection with intrastate IPCS.

[[*Insert Provider Response Here*]]

33. **Payment Card Processing for Automated Payment Services:**  As instructed in section IV.C.3.d.(2)(a)(iii), provide responses to the following information requests related to your Automated Payment Services:

   a. Select the checkbox for each of the following services for which you offered payment card processing in connection with Automated Payment Services in 2022.

   ☐ audio IPCS

   ☐ video IPCS

   ☐ IPCS-Related Services

   ☐ Other Services – Regulated

   ☐ Other Services – Unregulated

   b. If you identified any service segments in the previous question with which you offered payment card processing services, describe for each service segment the payment card processes that your Company offered as a part of Automated Payment Services for 2022.  For example, if your Company offered Customers the option of adding funds to an account by using a payment card, describe the steps that must be completed to add such funds.  If you offer payment card processing services differently between service segments, describe in detail how the payment card processing service differs for each service segment.  If you did not identify any service segments with which you offered payment card processing services in the previous question or if you did not offer Automated Payment Services of any kind for 2022, please confirm your response in the space below.

   [*Insert Provider Response Here*]

   c. If you offer payment card processing services differently between audio and video IPCS, describe in detail how the payment card processing service differs for each service segment.

   [*Insert Provider Response Here*]

   d. If you indicated that you offered payment card processing services in connection with Automated Payment Services, identify whether the payment card processing was performed by the Company, an Affiliate, or a Third Party.  If provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

   [*Insert Provider Response Here*]

   e. Describe in detail how Customers are billed for each payment card processing service in connection with Automated Payment Services across the applicable service segments, including how the transaction amount is calculated and how the Company treats such payments.

10

**JA394**

[*Insert Provider Response Here*]

    f.  If you need to provide an additional explanation to any of your responses related to Automated Payment Services to ensure that your responses are full and complete, please use the space provided below:

       [*Insert Provider Response Here*]

34.  **Live Agent Services:**  As instructed in section IV.C.3.d.(2)(b)(iii), provide responses to the following information requests related to your Live Agent Services:

    a.  Select the checkbox for each of the following services for which you offered Live Agent Services in 2022.

        ☐  audio IPCS

        ☐  video IPCS

        ☐  IPCS-Related Services

        ☐  Other Services – Regulated

        ☐  Other Services – Unregulated

    b.  If you identified any service segments in the previous question with which you offered Live Agent Services, describe the functions or uses of your Live Agent Services for 2022.  For example, if your Company offered Customers the option of adding funds to an account by speaking with a Customer service representative, describe what the Customer service representative will do to complete this task.  If you did not identify any service segments with which you offered Live Agent Services in the previous question or if you did not offer Live Agent Services of any kind for 2022, please confirm your response in the space below.

       [*Insert Provider Response Here*]

    **c.**  If your Live Agent Services differ between audio and video IPCS, describe in detail how these services differ for each service segment.

       [*Insert Provider Response Here*]

    d.  If you indicated that you offered Live Agent Services in 2022, identify whether the Live Agent Service was performed by the Company, an Affiliate, or a Third Party.  If provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

       [*Insert Provider Response Here*]

    e.  Describe in detail how Customers are billed when using your Live Agent Service.

       [*Insert Provider Response Here*]

    f.  If you need to provide an additional explanation to any of your responses related to Live Agent Services to ensure that your responses are full and complete, please use the space provided below:

[*Insert Provider Response Here*]

35. **Paper Bill/Statement Services:**  As instructed in section IV.C.3.d.(2)(c)(iii), provide responses to the following information requests related to your Paper Bill/Statement Services:

    a.  Select the checkbox for each of the following services for which you offered Paper Bill/Statement Services in 2022.

       ☐  audio IPCS

       ☐  video IPCS

       ☐  IPCS-Related Services

       ☐  Other Services – Regulated

       ☐  Other Services – Unregulated

    b.  If you identified any service segments in the previous question with which you offered Paper Bill/Statement Services, describe how an Incarcerated Person, Customer, or Consumer makes the election to pay for and receive a paper bill or statement, including the typical length of time for delivery by using your Paper Bill/Statement Services.  If you did not identify any service segments with which you offered Paper Bill/Statement Services in the previous question or if you did not offer Paper Bill/Statement Services of any kind for 2022, please confirm your response in the space below.

[*Insert Provider Response Here*]

    c.  If your Paper Bill/Statement Services differ between audio and video IPCS, describe in detail how this service differs for each service segment.

[*Insert Provider Response Here*]

    d.  If you indicated that you offered Paper Bill/Statement Services in 2022, identify whether the Paper Bill/Statement Services was performed by the Company, an Affiliate, or a Third Party. If provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

[*Insert Provider Response Here*]

    e.  Describe in detail how Customers are billed when using your Paper Bill/Statement Services.

[*Insert Provider Response Here*]

    f.  If you need to provide an additional explanation to any of your responses related to Paper Bill/Statement Services to ensure that your responses are full and complete, please use the space provided below:

**JA396**

[*Insert Provider Response Here*]

36. **Single-Call and Related Services:** As instructed in section IV.C.3.d.(2)(d)(vi), provide responses to the following information requests related to your Single-Call and Related Services:

   a. Select the checkbox for each of the following services for which you offered Single-Call and Related Services in 2022.

      ☐ audio IPCS

      ☐ video IPCS

      ☐ IPCS-Related Services

      ☐ Other Services – Regulated

      ☐ Other Services – Unregulated

   b. If you identified any service segments in the previous question with which you offered Single-Call and Related Services, describe the services an Incarcerated Person, Customer, or Consumer receive when electing to use your Single-Call and Related Services. If you did not identify any service segments with which you offered Single-Call and Related Services in the previous question or if you did not offer Single-Call and Related Services of any kind for 2022, please confirm your response in the space below.

   [*Insert Provider Response Here*]

   c. If your Single-Call and Related Services differ between audio and video IPCS, describe in detail how this service differs for each service segment.

   [*Insert Provider Response Here*]

   d. If you indicated that you offered Single-Call and Related Services in 2022, identify whether the Single-Call and Related Services was performed by the Company, an Affiliate, or a Third Party and provide the amount of such fees charged to Customers during 2022. If provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

   [*Insert Provider Response Here*]

   e. Describe in detail how Customers are billed when using your Single-Call and Related Services.

   [*Insert Provider Response Here*]

   f. If you need to provide an additional explanation to any of your responses related to Single-Call and Related Services to ensure that your responses are full and complete, please use the space provided below:

   [*Insert Provider Response Here*]

13

**JA397**

37. **Third-Party Financial Transaction Services:**  As instructed in section IV.C.3.d.(2)(e)(vi), state whether any entity other than the Company charged Customers for Third-Party Financial Transaction Services in connection with the Company's IPCS during 2022.  If so, list each such entity and provide the amount of such fees each listed entity charged Customers during 2022.

[*Insert Provider Response Here*]

38. **Third-Party Financial Transaction Services:**  As instructed in section IV.C.3.d.(2)(e)(vii), provide responses to the following information requests related to your Third-Party Financial Transaction Services:

a. Select the checkbox for each of the following services for which you offered Third-Party Financial Transaction Services in 2022.

☐ audio IPCS

☐ video IPCS

☐ IPCS-Related Services

☐ Other Services – Regulated

☐ Other Services – Unregulated

b. If you identified any service segments in the previous question with which you offered Third-Party Financial Transaction Services, describe the services an Incarcerated Person, Customer, or Consumer receive when electing to use your Third-Party Financial Transaction Services. If you did not identify any service segments with which you offered Third-Party Financial Transaction Services in the previous question or if you did not offer Third-Party Financial Transaction Services of any kind for 2022, please confirm your response in the space below.

[*Insert Provider Response Here*]

c. If your Third-Party Financial Transaction Services differ between audio and video IPCS, describe in detail how these services differs for each service segment.

[*Insert Provider Response Here*]

d. If you indicated that you offered Third-Party Financial Transaction Services in 2022, for each service identify whether the Third-Party Financial Transaction Services was performed by the Company, an Affiliate, or a Third Party.  If provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

[*Insert Provider Response Here*]

e. Describe in detail how Customers are billed when using your Third-Party Financial Transaction Services.

[*Insert Provider Response Here*]

14

**JA398**

f.  If you need to provide an additional explanation to any of your responses related to Third-Party Financial Transaction Services to ensure that your responses are full and complete, please use the space provided below:

[*Insert Provider Response Here*]

39. **Other Ancillary Services:** As instructed in section IV.C.3.d.(2)(f)(iii), provide responses to the following information requests related to your Other Ancillary Services:

a.  Select the checkbox for each of the following services for which you offered Other Ancillary Services in 2022.

☐  audio IPCS

☐  video IPCS

☐  IPCS-Related Services

☐  Other Services – Regulated

☐  Other Services – Unregulated

b.  If you identified any service segments in the previous question with which you offered Other Ancillary Services, describe each Other Ancillary Service and explain the function the Other Ancillary Service performs.  If you did not identify any service segments with which you offered Other Ancillary Services in the previous question or if you did not offer Other Ancillary Services of any kind for 2022, please confirm your response in the space below.

[*Insert Provider Response Here*]

c.  If any of your Other Ancillary Services differ between audio and video IPCS, describe in detail how each Other Ancillary Service differs for each service segment.

[*Insert Provider Response Here*]

d.  If you indicated that you offered Other Ancillary Services in 2022, for each service, identify whether the Other Ancillary Service was performed by the Company, an Affiliate, or a Third Party.  If provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

[*Insert Provider Response Here*]

e.  Describe in detail how Customers are billed when using each of your Other Ancillary Services.

[*Insert Provider Response Here*]

f.  If you need to provide an additional explanation to any of your responses related to Other Ancillary Services to ensure that your responses are full and complete, please use the space provided below:

[*Insert Provider Response Here*]

15

**JA399**

g. **Payment Card Processing Revenues from Third-Party Financial Transaction Services:** As instructed in section IV.C.3.d.(3)(e)(i)(aa), describe the payment card processing services from your Third-Party Financial Transaction Services, including whether they were performed by the Provider, an Affiliate, or a Third Party. If provided by an Affiliate or a Third Party, identify each Affiliate or Third Party.

[[*Insert Provider Response Here*]]

40. **Payment Card Processing Revenues from Other Ancillary Services:** As instructed in section IV.C.3.d.(3)(h)(i)(aa), describe the payment card processing services from your Other Ancillary Services, including whether they were performed by the Provider, an Affiliate, or a Third Party. If provided by an Affiliate or a Third Party, identify each Affiliate or Third Party. State whether the Company charged Customers payment card processing fees during 2022. If so, enter the amount of such fees charged to Customers during 2022.

[[*Insert Provider Response Here*]]

41. **Automated Payment Service Revenue-Sharing Agreements:** As instructed in section IV.C.3.d.(3)(a)(ii)(aa), provide the information requested below under the Ancillary Services Revenue-Sharing Agreements question for any Revenue-Sharing Agreement with an Affiliate or a Third Party in connection with Automated Payment Service, including for any payment card processing functions.

[[*Insert Provider Response Here*]]

42. **Single-Call and Related Services Revenue-Sharing Agreements:** As instructed in section IV.C.3.d.(3)(d)(i)(aa), provide the information requested below under the Ancillary Services Revenue-Sharing Agreements question for any Revenue-Sharing Agreement with an Affiliate or a Third Party in connection with Single-Call and Related Services.

[[*Insert Provider Response Here*]]

43. **Third-Party Financial Transaction Fee Revenue-Sharing Agreements:** As instructed in section IV.C.3.d.(3)(g), provide the information requested below under the Ancillary Services Revenue-Sharing Agreements question for any Revenue-Sharing Agreement with an Affiliate or a Third Party in connection with Third-Party Financial Transaction Fees.

[[*Insert Provider Response Here*]]

44. **Ancillary Services Revenue-Sharing Agreements:** As instructed in section IV.C.3.d.(4) and other than the Revenue-Sharing Agreements identified in response to questions 41, 42, and 43, identify any other Revenue-Sharing Agreements between the Provider and any Affiliate and/or Third Party in connection with any Ancillary Services. For each Revenue-Sharing Agreement identified, provide, at a minimum, the following information:

a. The parties to the agreement;
b. Identify each payor and payee under the agreement;
c. Whether any party to the agreement is an Affiliate or a Third Party;

    d.   The Ancillary Services for which revenue is required to be shared under the agreement;

    e.   The amount of revenue to be shared under the terms of the agreement;

    f.   The total amount of revenue shared during 2022;

    g.   The total amount of revenue shared for each Ancillary Services; and

    h.   The effective and termination dates of the agreement.

[[*Insert Provider Response Here*]]

45. As instructed in section IV.C.3.d.(5), identify and explain in detail all Ancillary Services Charges that the Company charged during 2022 in connection with video IPCS.

[[*Insert Provider Response Here*]]

46. As instructed in section IV.C.3.d.(6), identify and explain in detail how the Company's Ancillary Services Charges in connection with audio IPCS differed from those in connection with video IPCS.

[[*Insert Provider Response Here*]]

## Affiliate Transactions (Section IV.C.3.e of the Instructions)

47. As instructed in section IV.C.3.e.(1), describe in detail all types of transactions between the Accounting Entity and its non-Accounting Entity Affiliates.

[[*Insert Provider Response Here*]]

## Instructions Relating to Subcontracts to Provide ICS (Section IV.C.3.f of the Instructions)

48. **Narrative Description of a Subcontract to Provide ICS:** As instructed in section IV.C.3.f.(2), if a Provider contracts with a Subcontractor to provide any aspect of audio or video IPCS, the Provider and the Subcontractor shall explain each such arrangement. At a minimum, such explanation shall include:

    a.   The name of the Provider with the contractual or other agreement with a Facility or contracting authority for the provision of IPCS;

    b.   The services provided by the Contractor;

    c.   The name of the Subcontractor;

    d.   The services provided by the Subcontractor;

    e.   The unique identifier and address for the Facility or Facilities at which the Subcontractor provides services under the agreement;

    f.   A description of the operations of the Contractor and the Subcontractor related to providing IPCS;

    g.   The types of audio IPCS and video IPCS billed by the Contractor and the Subcontractor, respectively; and
A description of any Revenue-Sharing Agreement between the Contractor and the Subcontractor.

17

**JA401**

*[[Insert Provider Response Here]]*

# Facility-Specific Information (Section IV.D of the Instructions)

Section IV.D of the Instructions requires you to provide general financial data and other information at the Facility level.

## Facility-Specific Cost Allocation Instructions (Section IV.D.1.a of the Instructions)

Section IV.D.1.a of the Instructions requires you to perform a cost allocation among the Facilities at which the Company provides calling services to incarcerated people.

49.  As instructed in section IV.D.1.a, fully document, explain, and justify all cost assignments, attributions, and allocations in your cost allocation.

   *[[Insert Provider Response Here]]*

## Facility-Specific Demand and Revenue Data (Section IV.D.1.d of the Instructions)

50. As instructed in section IV.D.1.d.(1), if you repeat or merge data across multiple facilities covered by a single contract, explain why you did so and how you reported the data.

   *[[Insert Provider Response Here]]*

51. As instructed in section IV.D.1.d.(1), identify any Facilities for which you estimated the number of communications or minutes and explain how you developed these estimates.

   *[[Insert Provider Response Here]]*

52. As instructed in section IV.D.1.d.(1), if you repeat or merge data across multiple facilities covered by a single contract, explain why you did so and how you reported the data.

   *[[Insert Provider Response Here]]*

53. As instructed in section IV.D.1.d.(1), if you do not know a Facility's Average Daily Population and have provided your best estimate of that Average Daily Population in the Excel template, explain the basis for this estimate.

   *[[Insert Provider Response Here]]*

# Facility-Specific Site Commissions (Section IV.D.2.b of the Instructions)

54. **Site Commissions:**  As instructed in section IV.D.2.b.(1)(d), identify any Site Commissions paid by the Company during 2022 that related to any Facility and that included both a monetary payment and an in-kind payment.  Provide the name of the Facility, the entity to which you paid the Site Commissions, and the amount of the monetary payment, and describe in detail the in-kind payment, including any Safety and Security Measures.

    [[*Insert Provider Response Here*]]

55. As instructed in section IV.D.2.b.(1)(e), list each entity to which you paid a Site Commission during 2022.  Provide the name of each Facility for which that entity is responsible and the amount paid to that entity without regard to whether the Site Commission was Legally Mandated, Contractually Prescribed, Fixed, Variable, Monetary, or In-Kind.

    [[*Insert Provider Response Here*]]

56. **Fixed Site Commissions:**  As instructed in section IV.D.2.b.(2)(d)(i)(ac), if the Legally Mandated, Fixed, Monetary Site Commission was imposed at the contract level (e.g., a minimum annual guarantee is due annually under a contract covering multiple Facilities), describe the methodology used to allocate the Legally Mandated, Fixed, Monetary Site Commission payments among Facilities covered by the contract.

    [[*Insert Provider Response Here*]]

57. **Legally Mandated Total In-Kind Site Commissions:**  As instructed in section IV.D.2.b.(2)(e)(ii), describe any Legally Mandated, In-Kind Site Commission payments in detail.  Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product provided the Facility that you classify as an In-Kind Site Commission payment.

    [[*Insert Provider Response Here*]]

58. **Fixed Site Commissions:**  As instructed in section IV.D.2.b.(2)(e)(iii)(ac), if the Legally Mandated, Fixed, In-Kind Site Commission was imposed at the contract level (e.g., a minimum annual guarantee is due annually under a contract covering multiple Facilities), describe the methodology used to allocate the Legally Mandated, Fixed, In-Kind Site Commission payments among Facilities covered by the contract.

    [[*Insert Provider Response Here*]]

59. **Fixed Site Commissions:**  As instructed in section IV.D.2.b.(3)(b)(ii)(ac), if the Contractually Prescribed, Fixed, Monetary Site Commission was imposed at the contract level (e.g., if a minimum guaranteed amount is due annually under a contract covering multiple Facilities), describe the methodology used to allocate the Contractually Prescribed, Fixed, Monetary Site Commission payments among Facilities covered by the contract.

19

**JA403**

[[*Insert Provider Response Here*]]

60. **Contractually Prescribed Total In-Kind Site Commissions:** As instructed in section IV.D.2.b.(3)(c)(ii), describe your Contractually Prescribed, In-Kind Site Commission payments in detail. Specifically describe each payment, gift, exchange of services or goods, fee, technology allowance, or product provided the Facility that you classify as an In-Kind Site Commission payment.

[[*Insert Provider Response Here*]]

61. **Fixed Site Commissions:** As instructed in section IV.D.2.b.(3)(c)(iii)(ac), if the Contractually Prescribed, Fixed, In-Kind Site Commission was imposed at the contract level (e.g., if a minimum guaranteed amount is due annually under a contract covering multiple Facilities), describe the methodology used to allocate the Contractually Prescribed, Fixed, In-Kind Site Commission payments among Facilities covered by the contract.

[[*Insert Provider Response Here*]]

62. **Site Commissions Allocation Methodology:** As instructed in section IV.D.2.b.(4), fully describe, document, explain, and justify the allocation methodology you used to allocate Site Commission payments between IPCS (and associated Ancillary Services) and Other Services at each Facility during 2022 in situations where you made Site Commission payments for both IPCS and Non-IPCS Other Services.

[[*Insert Provider Response Here*]]

63. As instructed in section IV.D.2.b.(5), identify any Facility for which you used different formulas to calculate the Site Commissions paid during 2022 for interstate IPCS, international IPCS, or intrastate IPCS, respectively. For each such Facility, identify separately the amount of Site Commissions paid for interstate IPCS, international IPCS, and intrastate IPCS.

[[*Insert Provider Response Here*]]

64. As instructed in section IV.D.2.b.(6), identify any Facility for which you used different formulas to calculate the Site Commissions paid during 2022 for audio IPCS and video IPCS, respectively. For each such Facility, identify separately the amount of Site Commissions paid for audio IPCS and video IPCS.

[[*Insert Provider Response Here*]]

## Costs of Providers' Safety and Security Measures (Section IV.D.2.c of the Instructions)

65. **Law Enforcement Support Services:** As instructed in section IV.D.2.c.(2), for each Facility for 2022, identify by name and describe each service you classify as a law enforcement support

service, including a description of the specific tasks and functions covered by this service and whether you routinely offer this service in connection with IPCS.

[[*Insert Provider Response Here*]]

66. **Communication Security Services:**  As instructed in section IV.D.2.c.(3), for each Facility for 2022, identify by name and describe each service you classify as a communication security service, including a description of the specific tasks and functions covered by this service and whether you routinely offer this service in connection with IPCS.

[[*Insert Provider Response Here*]]

67. **Communication Recording Services:**  As instructed in section IV.D.2.c.(4), for each Facility for 2022, identify by name and describe each service you classify as a communication recording service, including a description of the specific tasks and functions covered by this service and whether you routinely offer this service in connection with IPCS.

[[*Insert Provider Response Here*]]

68. **Communication Monitoring Services:**  As instructed in section IV.D.2.c.(5), for each Facility for 2022, identify by name and describe each service you classify as a communication monitoring service, including a description of the specific tasks and functions covered by this service and whether you routinely offer this service in connection with IPCS.

[[*Insert Provider Response Here*]]

69. **Voice Biometrics Services:**  As instructed in section IV.D.2.c.(6), for each Facility for 2022, identify by name and describe each service you classify as a voice biometric service, including a description of the specific tasks and functions covered by this service and whether you routinely offer this service in connection with IPCS.

[[*Insert Provider Response Here*]]

70. **Other Services:**  As instructed in section IV.D.2.c.(7), for each Facility for 2022, identify by name and describe each service you provide as a Safety and Security Measure that is not included in one of the foregoing categories, including a description of the specific tasks and functions covered by each service and whether you routinely offer each service in connection with IPCS.

[[*Insert Provider Response Here*]]

## Safety and Security Measures Costs Incurred by Facilities; Other Costs Incurred by Facilities (Section IV.D.2.d of the Instructions)

71. As instructed in section IV.D.2.d.(4), fully document, explain, and justify the accuracy and reliability of any data you have provided in response to questions IV.D.2.d.(1), IV.D.2.d.(2), and IV.D.2.d.(3).  The Company shall also retain any documentation supporting any data provided in connection with questions IV.D.2.d.(1), IV.D.2.d.(2), and IV.D.2.d.(3).

21

[[*Insert Provider Response Here*]]

72. As instructed in section IV.D.2.d.(5), state whether you have any verifiable, reliable, and accurate information regarding any expenses for IPCS and associated Ancillary Services, other than Safety and Security Measure expenses, incurred by Facilities served by the Company during 2022.  If you have such information, explain in detail the source of the information, the products and services for which the expenses were incurred, including a description of the expenses and the Facility to which that information pertains.  Providers must be able to reproduce, on request, documentation sufficient to fully explain and justify the accuracy and reliability of any data they report in response to this inquiry.

   [[*Insert Provider Response Here*]]

## Facility Specific Ancillary Services Information (Section IV.D.2.e of the Instructions)

73. **Automated Payment Fees and Third-Party Transaction Fees Charged in the Same Transaction:**  As instructed in section IV.D.2.e.(5) and for each Facility for 2022, identify any transactions for which both Automated Payment Fees and Third-Party Transaction Fees were charged, describe the services provided for the transaction, and apportion the fees charged for the services provided for each.

   [[*Insert Provider Response Here*]]

74. **Payment Card Processing Revenue for Automated Payment Fees:**  As instructed in section IV.D.2.e.(6)(a), to the extent that payment card processing for a Facility or Facilities differs from the explanation provided in response to the Company-Wide Ancillary Services questions, describe how and why these payment card processing functions differ from your response to the Company-Wide request, including whether they were performed by the Provider, an Affiliate, or a Third Party.  If such functions were performed by an Affiliate or Third Party, identify the Affiliate or Third Party.

   [[*Insert Provider Response Here*]]

75. **Other Entities that Charged Customers for Single-Call and Related Services**:  As instructed in section IV.D.2.e.(14), to the extent that an entity other than the Company charged Customers Single-Call and Related Services fees in connection with the Company's audio or video IPCS at a Facility or Facilities that is not identified in your response to the Company-wide questions, list each such entity and each Facility, indicate whether each listed entity is a Third Party, and provide the amount of such fees each listed entity charged Customers at each Facility during 2022.  Additionally, explain why each different entity is used at the Facility or Facilities.

   [[*Insert Provider Response Here*]]

76. **Payment Card Processing Revenue from Third-Party Financial Transaction Fees:**  As instructed in section IV.D.2.e.(27)(a), to the extent that payment card processing services in connection with revenue reported for Third-Party Financial Transaction Fees for a Facility or

22

**JA406**

Facilities differs from the explanation provided in response to the Company-Wide Ancillary Services questions, describe how these payment card processing services in connection with revenue reported for Third-Party Financial Transaction Fees differ from your response to the Company-Wide request, including whether they were performed by the Provider, an Affiliate, or a Third Party.  If such services were provided by an Affiliate or a Third Party, identify the Affiliate or Third Party.

[[*Insert Provider Response Here*]]

77. **Other Entities That Charged Customers for Third-Party Financial Transaction Services:** As instructed in section IV.D.2.e.(33), to the extent that an entity other than the Company charged Customers for Third-Party Financial Transaction Services in connection with the Company's provision of audio and video IPCS at a Facility or Facilities that is not identified in your response to the Company-Wide Ancillary Services questions, list each such entity and each Facility, indicate whether each listed entity is a Third Party, and provide the amount of such fees each listed entity charged Customers at each Facility during 2022.  Additionally, provide an explanation as to why each different entity is used at the Facility or Facilities.

[[*Insert Provider Response Here*]]

78. As instructed in section IV.D.2.e.(35), identify any Facilities at which the Company assessed both Ancillary Services Charges and any other charges in connection with video services.  For each Facility, list and describe each Ancillary Services Charge the Company assessed during 2022 for video services.  Separately, for each Facility, list and describe any other charges that are not Ancillary Services Charges the Company assessed for video IPCS during 2022.

[[*Insert Provider Response Here*]]

## Additional Provider Explanatory Responses

79. [[*Insert Additional Provider Explanatory Response Here*]]

80. [[*Insert Additional Provider Explanatory Response Here*]]

**FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT**

We have estimated that each ICS provider's response to Form 2303(a) (consisting of Word and Excel Templates) will take 230 hours on average. Our estimate includes the time to read the instructions, look through existing records, gather and maintain the required data, and complete and review the form. It also includes the time it will take each provider to: (a) submit audited financial statements or reports, or similar documentation, for 2022, to the extent they have been produced in the ordinary course of business; (b) respond to any Commission requirement that the provider clarify or supplement its response to the data collection; and (c) keep all records necessary to implement this collection and make such records available to the Commission upon request. If you have any comments on this estimate, or on how we can improve the collection and reduce the burden it causes you, please write the Federal Communications Commission, AMD-PERM, Washington, DC 20554, Paperwork Reduction Project (3060-####). We will also accept your comments via the Internet if you send them to pra@fcc.gov. Please DO NOT SEND COMPLETED APPLICATIONS TO THIS ADDRESS. Remember—you are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB Control Number of 3060-####.

**THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, P.L. 104-13, OCTOBER 1, 1995, 44 U.S.C. 3507.**

24

**JA408**

Note: This crosswalk index has One-to-One, One-to-Many, or Many-to-One relationships

| **Excel Tab** | **Section of Instructions** | **Pages** |
|---|---|---|
| A. General Information | IV. Required Information,  A General Information | 13 - 16 |
| B. Overview Information | IV. Required Information,  B Overview Information | 16 - 17 |
| | | |
| C1. Company-Wide Information | IV. Required Information,  C1 Overall Financial Information | 17 - 19 |
| | IV. Required Information,  C2 Service-Specific Financial Information | 19 - 27 |
| C2. Commissions and Revenue Sharing | IV. Required Information,  C3 Other Company-Wide Information, a. Site Commissions, d., e. | 27 - 38 |
| C3. Safety & Security Measures | IV. Required Information,  C3 Other Company-Wide Information, b., c. | 30 - 32 |
| | | |
| D1. Facility Audio IPCS Costs | IV. Required Information,  D1 Facility-Specific Financial Information, a., b., c. | 39 - 43 |
| D1. Facility Video IPCS Costs | IV. Required Information,  D1 Facility-Specific Financial Information, a., b., c. | 39 - 43 |
| D1. Facility Demand and Revenue | IV. Required Information,  D1 Facility-Specific Financial Information, d. Facility-Specific Demand and Revenue Data | 43 - 45 |
| D2.a Not used (no excel inputs required)* | | |
| D2.b Facility-Specific Site Comm | IV. Required Information,  D2 Other Facility-Specific Information, b. Site Commissions | 45 - 51 |
| D2.c. Fac-Spec S&S - Audio IPCS | IV. Required Information,  D2 Other Facility-Specific Information, c. Costs of Providers' Safety and Security Measures | 51 - 52 |
| D2.c. Fac-Spec S&S - Video | IV. Required Information,  D2 Other Facility-Specific Information, c. Costs of Providers' Safety and Security Measures | 51 - 52 |
| D2.d. Facilities' S&S Costs | IV. Required Information,  D2 Other Facility-Specific Information, d. Costs of Facilities' Safety and Security Measures | 52 - 53 |
| D2.e. Facility-Spec Ancilliary | IV. Required Information,  D2 Other Facility-Specific Information, e. Ancillary Services Information | 53 - 56 |

FCC Notice

* There is no tab D2a tab because the Word instructions
under the D2a heading relate to the general information
reported at the top of the D1. Facility Audio IPCS and D1.
Facility Video IPCS tabs.

Appendix B
Incarcerated People's Communications Services
2023 Mandatory Data Collection
Proposed Excel Template

WC Docket Nos. 23-62, 12-375
FCC Form 2303(a)
OMB Control No. 3060-XXXX / Not Approved by OMB
Estimated Time Per Response: 230 Hours

| A. General Company Information | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) Company Name | | | | | | | | | | | | | | | | | | | | | |
| (2) Accounting Entity | | | | | | | | | | | | | | | | | | | | | |
| (3) Contact Person Information | | | | | | | | | | | | | | | | | | | | | |
| Name | | | | | | | | | | | | | | | | | | | | | |
| Title | | | | | | | | | | | | | | | | | | | | | |
| Email | | | | | | | | | | | | | | | | | | | | | |
| Phone Number | | | | | | | | | | | | | | | | | | | | | |
| (4) Holding Company Name | | | | | | | | | | | | | | | | | | | | | |
| (5) Filing Date (MM/DD/YYYY) | | | | | | | | | | | | | | | | | | | | | |
| (6) Headquarters Address | | | | | | | | | | | | | | | | | | | | | |
| (7) Publicly Listed (Yes/No) | | | | | | | | | | | | | | | | | | | | | |
| **2022 General Company Information** | | | | | | | | | | | | | | | | | | | | | |
| (8) List all IPCS-Related Services or any Ancillary Services that the Company provided at or for Facilities, or to Incarcerated Persons or those they communicate with, during 2022.  List all such services even if the Company only provided them at some Facilities. | | | | | | | | | | | | | | | | | | | | | |
| (9a) List all Business Segments, other than IPCS or Ancillary Services, that the Company engaged in during 2022. | | | | | | | | | | | | | | | | | | | | | |
| (9b) 2022 Billed Revenues for each Listed Business Segment during 2022. | | | | | | | | | | | | | | | | | | | | | |
| (9c) List all Business Segments, other than IPCS or Ancillary Services, the Company or an Affiliate provided at or for Facilities, or to Incarcerated People or those they communicate with, during 2022. List all Business Segments even if the Company or Affiliate provided them only at some Facilities. | | | | | | | | | | | | | | | | | | | | | |
| (10a) List each type of tangible and intangible asset attributable to providing IPCS or Ancillary Services during Year 2022. Exclude any type of asset whose Net Investment is less than 5% of the Company's total Net Investment. | | | | | | | | | | | | | | | | | | | | | |
| (10b) Provide the Net Investment in each Listed Type of Asset as of December 31, 2022. | | | | | | | | | | | | | | | | | | | | | |
| (10c) List each audio IPCS or video IPCS or Ancillary Service, if any, that each Type of Asset Supported | | | | | | | | | | | | | | | | | | | | | |
| (10d) List each Non-IPCS-Related Product or Service, if any, that each Type of Asset Supported | | | | | | | | | | | | | | | | | | | | | |
| (11) List the Names of all of the Company's IPCS Affiliates, other than Affiliates that provide IPCS or Ancillary Services, during 2022. | | | | | | | | | | | | | | | | | | | | | |
| (12) Affiliates, other than Affiliates that provide IPCS or Ancillary Services, Billed Revenues:  Enter Billed Revenues for 2022. | | | | | | | | | | | | | | | | | | | | | |
| (13a) List all Business Segments in Which Affiliates, other than Affiliates that provide IPCS or Ancillary Services,  engaged during 2022. | | | | | | | | | | | | | | | | | | | | | |
| (13b) Identify each Affiliate, other than Affiliates that provide IPCS or Ancillary Services, that participated in the supply of each Business Segment on your list. | | | | | | | | | | | | | | | | | | | | | |
| (14) Enter Billed Revenues for 2022 by each Affiliate, other than Affiliates that provide IPCS or Ancillary Service, for each Business Segment on your list. | | | | | | | | | | | | | | | | | | | | | |
| (15) List All Types of Assets and Services that the Company Obtained from an Affiliate, other than an Affiliate that provides IPCS or Ancillary Services, that were used in the provision of IPCS or Ancillary Services during 2022. | | | | | | | | | | | | | | | | | | | | | |
| (15a) List Each Affiliate, other than an Affiliate that provides IPCS or Ancillary Services, that provided those assets or services | | | | | | | | | | | | | | | | | | | | | |
| (15b) Provide the Amounts the Company Paid its Affiliates, other than Affiliates that provide IPCS or Ancillary Services, for those assets and services | | | | | | | | | | | | | | | | | | | | | |
| (15c) Provide the Net Investment of Affiliates, other than Affiliates that provide IPCS or Ancillary Services, in those assets as of the date of the transaction. | | | | | | | | | | | | | | | | | | | | | |
| (15d) Provide the Annual Total Expenses that Affiliates, other than Affiliates that provide IPCS or Ancillary Services, incurred to provide those services during the year immediately prior to the transaction. | | | | | | | | | | | | | | | | | | | | | |

**JA410**

| B. Overview Information for 2022 | |
|---|---|
| (1) Company Name | 0 |
| (2a) Number of Facilities | |
| (2b) Number of Prisons | |
| (2c) Number of Jails with ADP of 1,000 and above | |
| (2d) Number of Jails with ADP below 1,000 | |
| (2e) Number of Contracts | |
| (2f) Number of Prison Contracts | |
| (2g) Number of Jail Contracts | |
| (3a) Annual Total Expenses for Audio IPCS | 0 |
| (3b) Annual Total Expenses for Video IPCS | 0 |
| (3c) Annual Total Expenses for Safety and Security Measures | 0 |
| (3d) Annual Total Expenses for Automated Payment Service | 0 |
| (3e) Annual Total Expenses for Live Agent Service | 0 |
| (3f) Annual Total Expenses for Paper Bill/Statement Service | 0 |
| (3g) Annual Total Expenses for Single-Call and Related Services | 0 |
| (3h) Annual Total Expenses for Third-Party Financial Transaction Services | 0 |
| (4a) Revenues from Audio IPCS | 0 |
| (4b) Revenues from Video IPCS | 0 |
| (4c) Revenues from Safety and Security Measures | 0 |
| (4d) Revenues from Automated Payment Service | 0 |
| (4e) Revenues from Live Agent Service | 0 |
| (4f) Revenues from Paper Bill/Statement Service | 0 |
| (4g) Revenues from Single-Call and Related Services | 0 |
| (4h) Revenues from Third-Party Financial Transactions Services | 0 |
| (5a) Total Site Commissions | 0 |
| (i) Total Monetary Site Commissions | 0 |
| (ii) Total In-Kind Site Commissions | 0 |
| (5b) Total Legally Mandated Site Commissions | 0 |
| (5c) Total Contractually Prescribed Site Commissions | 0 |

**Company-Wide and Service Specific Financial Information for 2022**

| Revenue, Investment, or Expense Item | Company Wide | Services | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Audio IPCS | Video IPCS | Safety and Security Measures | Automated Payment Services | Live Agent Services | Paper Bill/Statement Services | Single-Call and Related Services | Third-Party Financial Transaction | Other Ancillary Services | Other Products and Services |

*(Dense financial table — individual line items largely illegible, including sections for: Total Billed Revenues; Investments and Expenses; Capital Assets; Taxable Assets; Gross Investment; Accumulated Depreciation; Net Investment; Capitalized Research and Development; Intangible Assets; Goodwill; Operating Expenses; and related calculations. Several rows contain "N/A" entries and "0" values across the service columns.)*

**[Col] Weighted Average of the Individual State Income Tax Rates for 2022**

| State | Enter "C" if the Company is subject to the state corporate income tax rate, or "PTE" if the Company passes income through to its owners | State Income Tax Rate (%) | IPCS and Ancillary Services Billed Revenues ($) | Percent of Total IPCS and Ancillary Services Billed Revenues (%) |
|---|---|---|---|---|
| Weighted Average of the Individual State Income Tax Rates (sum of the products of column B and column D) in Total | | 0.00% | 0 | 0.00% |

**4. Weighted Average Cost of Capital for 2022**

Enter "Y" if you elect to claim a WACC other than 9.75%. If you enter "Y" and claim a WACC greater than 9.75% on row 57, report the components of the WACC and the WACC itself, as specified below.

| Type of Capital | Cost (%) | Capital Outstanding ($) | Percent of Total Capital Outstanding (%) |
|---|---|---|---|
| Debt | | | |
| Preferred Stock | | | |
| Equity | | | |
| Weighted Average Cost of Capital (sum of the products of col. B and col. D) in Total | 0.00% | 0 | 0.00% |

**4. Cash Working Capital for 2022**

Enter "Y" if you elect to claim an allowance for Cash Working Capital. If you enter "Y," report the allowances claimed for Cash Working Capital on row 65 separately for Audio IPCS, Video IPCS, Automated Payment Services, Live Agent Services, Paper Bill/Statement Services, Single-Call and Related Services, and Third-Party Financial Transaction Services.

| b. Company-Wide and c. Service-Specific Costs of Provider's Safety and Security Measures for 2022 |
|---|

| 1. Annual Total Expenses of Providing Safety and Security Measures [C1. Company-Wide Information, E90] | 0 |
|---|---|

| Safety and Security Measures Expense Category | Percentage of Annual Total Expenses of Providing Safety and Security Measures (%) | Safety and Security Measures Expenses ($) | Percentage of Safety and Security Expenses Attributable to Audio IPCS (%) | Percentage of Safety and Security Expenses Attributable to Video IPCS (%) | Percentage of Safety and Security Expenses Attributable to Ancillary Services (%) | Percentage of Safety and Security Expenses Attributable to Other Products and Services (%) | Total of the Percentages Attributed to Services (%) | Safety and Security Expenses Attributable to Audio IPCS ($) | Safety and Security Expenses Attributable to Video IPCS ($) | Safety and Security Expenses Attributable to Ancillary Services ($) | Safety and Security Expenses Attributable to Other Products and Services ($) | Total of Safety and Security Measures Expenses Attributed to Services ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Input | B*84 | Input | Input | Input | Input | D + E + F + G | C*D | C*E | C*F | C*G | I + J + K + L |
| (a) Communications Assistance for Law Enforcement Services | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| (b) Law Enforcement Support Services | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| (c) Communication Security Services | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| (d) Communication Recording Services | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| (e) Communication Monitoring Services | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| (f) Voice Biometrics Services | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| (g) Other Safety and Security Measures | | 0 | | | | | 0.00% | 0 | 0 | 0 | 0 | 0 |
| Total (8 + 9 + 10 + 11 + 12 + 13 + 14) | 0.00% | 0 | | | | | | 0 | 0 | 0 | 0 | 0 |

**JA414**

**D. Facility-Specific Audio IPCS Costs For 2022**

| a. General Information | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) |
|---|---|---|---|---|---|
| (1) Unique Facility Identifier | | | | | |
| (2) Contractor Name | | | | | |
| (3) Subcontractor Name | | | | | |
| (4) Counter-Party to Contract | | | | | |
| (5) Unique Identifier for Each Contract | | | | | |
| (6)(a) Facility Street Number and Street Name | | | | | |
| (6)(b) Facility Building Identifier (if any) | | | | | |
| (6)(c) Facility City | | | | | |
| (6)(d) Facility State | | | | | |
| (6)(e) Facility Zip Code | | | | | |
| (7) Facility Geographic Coordinates | | | | | |
| (8) Facility Type (Jail (J) or Prison (P)) | | | | | |
| (9) Maximum Audio Communication Duration | | | | | |
| **b. Cost Allocation Results** | | | | | |
| (1) Capital Assets | | | | | |
| (a) Gross Investment | | | | | |
| (b) Accumulated Depreciation | | | | | |
| (c) Accumulated Amortization | | | | | |
| (d) Net Investment [row 18 - row 19 - row 20] | 0 | 0 | 0 | 0 | 0 |
| (e) Accumulated Deferred Federal Income Taxes | | | | | |
| (f) Accumulated Deferred State Income Taxes | | | | | |
| (g) Customer Prepayments or Deposits | | | | | |
| (h) Cash Working Capital (report "0" unless you elect to claim an allowance) | | | | | |
| (i) Net Capital Stock [row 21 - row 22 - row 23 - row 24 + row 25] | 0 | 0 | 0 | 0 | 0 |
| (2) Capital Expenses and Related Tax Information | | | | | |
| (a) Depreciation | | | | | |
| (b) Amortization | | | | | |
| (c) Weighted Average Cost of Capital | | | | | |
| (d) Return [row 30 x row 26] | 0 | 0 | 0 | 0 | 0 |
| (e) Interest Other Than Interest Paid on Customer Prepayments or Deposits | | | | | |
| (f) Interest Paid on Customer Prepayments or Deposits | | | | | |
| (g) Other Income Tax-Related Adjustments | | | | | |
| (h) Federal Taxable Income [row 31 - row 32 - row 34] | 0 | 0 | 0 | 0 | 0 |
| (i) Federal Income Tax Rate | | | | | |
| (j) Federal Income Tax Gross-Up Factor [row 36/(1-row 36)] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| (k) Federal Income Tax [row 37 x row 35] | 0 | 0 | 0 | 0 | 0 |
| (l) Federal Income Tax Not Deductible for State Income Tax Purposes | | | | | |
| (m) State Taxable Income [row 35 + row 39] | 0 | 0 | 0 | 0 | 0 |
| (n) State Income Tax Rate | | | | | |
| (o) State Income Tax Gross-Up Factor [row 41/(1-row 41)] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| (p) State Income Tax [row 42 x row 40] | 0 | 0 | 0 | 0 | 0 |
| Total Capital Expenses [row 28 + row 29 + row 31 + row 33 + row 38 + row 43] | 0 | 0 | 0 | 0 | 0 |
| (3) Operating Expenses | | | | | |
| (a) Maintenance, Repair, and Engineering of Site Plant, Equipment, and Facilities | | | | | |
| (b) Payments to Telecommunications Carriers or Other Entities for Interstate, International, or Intrastate Communications other than Extra Payments for International Communications | | | | | |
| (c) Extra Payments to Telecommunications Carriers or Other Entities for International Communications | | | | | |
| (d) Field Service | | | | | |
| (e) Network Operations | | | | | |
| (f) Call Center | | | | | |
| (g) Data Center | | | | | |
| (h) Billing, Collection, Client Management, and Customer Care | | | | | |
| (i) Sales and Marketing | | | | | |
| (j) General and Administrative | | | | | |
| (k) Other Overhead | | | | | |
| (l) Taxes Other than Income Taxes | | | | | |
| (m) Transactions Related to Mergers and Acquisitions | | | | | |
| (n) Bad Debt | | | | | |
| Total Operating Expenses [sum of rows 46-59] | 0 | 0 | 0 | 0 | 0 |
| Total Operating Expenses Excluding Extra Payments to Telecommunications Carriers or Other Entities for International Communications [row 60 - row 48] | 0 | 0 | 0 | 0 | 0 |
| c. Annual Total Expenses for Audio IPCS Excluding Extra Payments to Telecommunications Carriers or Other Entities for International Communications [row 44 + row 61] | 0 | 0 | 0 | 0 | 0 |

**JA415**

**D. Facility-Specific Video IPCS Costs For 2022**

| a. General Information | | | | | |
|---|---|---|---|---|---|
| | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) |
| (1) Unique Facility Identifier | | | | | |
| (2) Contractor Name | | | | | |
| (3) Subcontractor Name | | | | | |
| (4) Counter-Party to Contract | | | | | |
| (5) Unique Identifier for Each Contract | | | | | |
| (6)(a) Facility Street Number and Street Name | | | | | |
| (6)(b) Facility Building Identifier (if any) | | | | | |
| (6)(c) Facility City | | | | | |
| (6)(d) Facility State | | | | | |
| (6)(e) Facility Zip Code | | | | | |
| (7) Facility Geographic Coordinates | | | | | |
| (8) Facility Type (Jail (J) or Prison (P)) | | | | | |
| (10) Maximum Video Communication Duration | | | | | |
| b. Cost Allocation Results | | | | | |
| (1) Capital Assets | | | | | |
| (a) Gross Investment | | | | | |
| (b) Accumulated Depreciation | | | | | |
| (c) Accumulated Amortization | | | | | |
| (d) Net Investment [row 18 - row 19 - row 20] | 0 | 0 | 0 | 0 | 0 |
| (e) Accumulated Deferred Federal Income Taxes | | | | | |
| (f) Accumulated Deferred State Income Taxes | | | | | |
| (g) Customer Prepayments or Deposits | | | | | |
| (h) Cash Working Capital (report "0" unless you elect to claim an allowance) | | | | | |
| (i) Net Capital Stock [row 21 - row 22 - row 23 - row 24 + row 25] | 0 | 0 | 0 | 0 | 0 |
| (2) Capital Expenses and Related Tax Information | | | | | |
| (a) Depreciation | | | | | |
| (b) Amortization | | | | | |
| (c) Weighted Average Cost of Capital | | | | | |
| (d) Return [row 30 x row 26] | 0 | 0 | 0 | 0 | 0 |
| (e) Interest Other Than Interest Paid on Customer Prepayments or Deposits | | | | | |
| (f) Interest Paid on Customer Prepayments or Deposits | | | | | |
| (g) Other Income Tax-Related Adjustments | | | | | |
| (h) Federal Taxable Income [row 31 - row 32 - row 34] | 0 | 0 | 0 | 0 | 0 |
| (i) Federal Income Tax Rate | | | | | |
| (j) Federal Income Tax Gross-Up Factor [row 36/(1-row 36)] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| (k) Federal Income Tax [row 37 x row 35] | 0 | 0 | 0 | 0 | 0 |
| (l) Federal Income Tax Not Deductible for State Income Tax Purposes | | | | | |
| (m) State Taxable Income [row 35 + row 39] | 0 | 0 | 0 | 0 | 0 |
| (n) State Income Tax Rate | | | | | |
| (o) State Income Tax Gross-Up Factor [row 41/(1-row 41)] | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| (p) State Income Tax [row 42 x row 40] | 0 | 0 | 0 | 0 | 0 |
| Total Capital Expenses [row 28 + row 29 + row 31 + row 33 + row 38 + row 43] | 0 | 0 | 0 | 0 | 0 |
| (3) Operating Expenses | | | | | |
| (a) Maintenance, Repair, and Engineering of Site Plant, Equipment, and Facilities | | | | | |
| (b) Payments to Telecommunications Carriers or Other Entities for Interstate, International, or Intrastate Communications other than Extra Payments for International Communications | | | | | |
| (c) Extra Payments to Telecommunications Carriers or Other Entities for International Communications | | | | | |
| (d) Field Service | | | | | |
| (e) Network Operations | | | | | |
| (f) Call Center | | | | | |
| (g) Data Center | | | | | |
| (h) Billing, Collection, Client Management, and Customer Care | | | | | |
| (i) Sales and Marketing | | | | | |
| (j) General and Administrative | | | | | |
| (k) Other Overhead | | | | | |
| (l) Taxes Other than Income Taxes | | | | | |
| (m) Transactions Related to Mergers and Acquisitions | | | | | |
| (n) Bad Debt | | | | | |
| Total Operating Expenses [sum of rows 46-59] | 0 | 0 | 0 | 0 | 0 |
| Total Operating Expenses Excluding Extra Payments to Telecommunications Carriers or Other Entities for International Communications [row 60 - row 48] | 0 | 0 | 0 | 0 | 0 |
| c. Annual Total Expenses for Video IPCS Excluding Extra Payments to Telecommunications Carriers or Other Entities for International Communications [row 44 + row 61] | 0 | 0 | 0 | 0 | 0 |

**JA416**

**D. Facility-Specific Revenue and Demand Data for 2022**

| d. Facility Specific Revenue and Demand Data | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Total 2022 |
|---|---|---|---|---|---|---|
| **(1) Annual Demand for IPCS** | | | | | | |
| (a) Total Billed Communications for Audio IPCS | | | | | | |
| (b) Billed Communications for Audio IPCS Separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| (c) Total Unbilled Communications for Audio IPCS | | | | | | |
| (d) Total Billed and Unbilled Communications for Audio IPCS | | | | | | |
| (e) Total Billed Minutes for Audio IPCS | | | | | | |
| (f) Billed Minutes for Audio IPCS Separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| (g) Total Unbilled Minutes for Audio IPCS | | | | | | |
| (h) Total Billed and Unbilled Minutes for Audio IPCS | | | | | | |
| (i) Total Billed Communications for Video IPCS | | | | | | |
| (j) Billed Communications for Video IPCS Separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| (k) Total Unbilled Communications for Video IPCS | | | | | | |
| (l) Total Billed and Unbilled Communications for Video IPCS | | | | | | |
| (m) Total Billed Minutes for Video IPCS | | | | | | |
| (n) Billed Minutes for Video IPCS Separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| (o) Total Unbilled Minutes for Video IPCS | | | | | | |
| (p) Total Billed and Unbilled Minutes for Video IPCS | | | | | | |
| (q) Total Billed Video IPCS Sales Units Other than Discrete Communications or Minutes - **(identify other units here)** | | | | | | |
| (r) Billed Video IPCS Sales Units Other than Discrete Communications or Minutes - **(identify other units here)** - separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| (s) Total Unbilled Video IPCS Sales Units Other than Discrete Communications or Minutes - **(identify other units here)** | | | | | | |
| (t) Total Billed and Unbilled Video IPCS Sales Units Other than Discrete Communications or Minutes - **(identify other units here)** | | | | | | |
| (u) Average Daily Population | | | | | | |
| (v) Total Number of IPCS Accounts Opened | | | | | | |
| (w) Total Number of IPCS Accounts Closed | | | | | | |
| (x) Total Admissions | | | | | | |
| (y) Total Releases | | | | | | |
| (z) Weekly Turnover Rate | | | | | | |
| (aa) Number of Incarcerated People's Phones or Communication Devices | | | | | | |
| (bb) Number of Incarcerated People's Tablets | | | | | | |
| (cc) Number of Incarcerated People's Kiosks | | | | | | |
| **(2) Annual  Demand for Automated Payment Service, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, and Third-Party Financial Transaction Service** | | | | | | |
| Billed Uses of Automated Payment Service | | | | | | |
| Billed Uses of Live Agent Service | | | | | | |
| Billed Uses of Paper Bill/Statement Service | | | | | | |
| Billed Transactions for Single-Call and Related Services | | | | | | |
| Billed Transactions for Third-Party Financial Transaction Service | | | | | | |
| **(3) Annual Revenues from IPCS** | | | | | | |
| (a) Total Billed Revenues from Audio IPCS | | | | | | |
| (b) Billed Revenues from Audio IPCS Separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| (c) Total Billed Revenues from Video IPCS | | | | | | |
| (d) Billed Revenues from Video IPCS Separately for: | | | | | | |
| (i) Interstate Communication | | | | | | |
| (ii) International Communication | | | | | | |
| (iii) Intrastate Communication | | | | | | |
| **(4) Annual Revenues from Automated Payment Service, Live Agent Service, Paper Bill/Statement Service, Single-Call and Related Services, and Third-Party Financial Transaction Service** | | | | | | |
| Revenues from Automated Payment Service | | | | | | |
| Revenues from Live Agent Service | | | | | | |
| Revenues from Paper Bill/Statement Service | | | | | | |
| Revenues from Single-Call and Related Services | | | | | | |
| Revenues from Third-Party Financial Transaction Service | | | | | | |
| Total Revenues from Ancillary Services (sum of rows 66 through 70) | 0 | 0 | 0 | 0 | 0 | 0 |

| Facility-Specific Site Commissions for 2022 | Unique Facility Identifier (FSI-1 here) | Unique Facility Identifier (FSI-2 here) | Unique Facility Identifier (FSI-3 here) | Unique Facility Identifier (FSI-3B re) | Unique Facility Identifier (FSI-4 here) |
|---|---|---|---|---|---|
| **A. Site Commissions** | | | | | |
| (1) Total Site Commissions | | | | | |
| (a) **Percentage** of Total Site Commissions paid by the Company during 2022 that was related to the facility and that was attributable to the Company's provision of MCS and associated Ancillary Services. | | | | | |
| (b) **Percentage** of Total Site Commissions paid by the Company during 2022 that was related to the facility and that was attributable to the Company's provision of Safety and Security Measures. | | | | | |
| (c) List the **Other Products and Services** and associated Ancillary Services that the Company provided at the facility during 2022. | | | | | |
| (d) – (k) [Incomplete entry] | | | | | |
| (2) **Legally Mandated Site Commissions** | | | | | |
| (a) **Recipient:** Name of the entity or entities to which you paid Legally Mandated Site Commissions during 2022 in connection with the Company's MCS (or associated Ancillary Services provided at the facility. | | | | | |
| (b) **Legally Mandated Site Commission Authority:** If you paid Legally Mandated Site Commissions in connection with MCS or associated Ancillary Services provided at the facility, provide a citation to the authority requiring the such payment. | | | | | |
| (c) **Total Monetary Site Commissions:** Total amount of Legally Mandated, Monetary Site Commissions paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (d) **Recipient:** Name of the entity or entities to which you paid Legally Mandated, Monetary Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payment amounts the relevant entities. | | | | | |
| (i) **Fixed Site Commissions:** Total amount of Legally Mandated, Fixed Site Commissions and that were paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity or entities to which you paid Legally Mandated, Fixed, Monetary Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payment amounts among the relevant entities. | | | | | |
| (bb) **Allocation:** If the Legally Mandated, Fixed, Monetary Site Commission was imposed at the contract level (e.g. a minimum annual guarantee that accrues under a contract covering multiple facilities), allocate the Site Commission payments among all facilities covered by the contract. | | | | | |
| (cc) Word template entry | | | | | |
| (cc) **Upfront Payments:** Total amount of all Legally Mandated Site Commissions for 2022 that are only worth in that Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aaa) **Recipient:** Name of the entity or entities to which you made these upfront payments during 2022. Allocate the payments among the relevant entities. | | | | | |
| (ii) **Variable Site Commissions:** Amount of Legally Mandated Site Commissions that were both Monetary Site Commissions and variable Site Commissions and that were paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity or entities to which you paid Legally Mandated, Variable, Monetary Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (e) In-Kind Site Commissions: Amount of Legally Mandated Site Commissions that were in-Kind Site Commissions and that were paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (i) **Recipient:** Name of the entity or entities to which you paid Legally Mandated, In-Kind Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (ii) Word template entry | | | | | |
| (3) **Fixed Site Commissions:** Amount of Legally Mandated Site Commissions that were both In-Kind Site Commissions and Fixed Site Commissions and that were paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity or entities to which you paid Legally Mandated, Fixed, In-Kind Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (bb) **Allocation:** If the Legally Mandated, Fixed, In-Kind Site Commission was imposed at the contract level (e.g. a minimum annual guarantee that accrues under a contract covering multiple facilities), allocate the Site Commission payments among all facilities covered by the contract. | | | | | |
| (cc) Word template entry | | | | | |
| (cc) **Upfront Payments:** Amount of all Legally Mandated Site Commissions for 2022 that not only were in-kind Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aaa) **Recipient:** Name of the entity or entities to which you made these upfront payments. Allocate the payments among the relevant entities. | | | | | |
| (ii) **Variable Site Commissions:** Amount of Legally Mandated Site Commissions that were both in-Kind Site Commissions and Variable Site Commissions and that were paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity or entities to which you paid Legally Mandated, Variable, In-Kind Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (3) **Total Contractually Prescribed Site Commissions** | | | | | |
| (a) **Recipient:** Name of the entity or entities to which you paid Contractually Prescribed Site Commissions Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payment amount the relevant entities. | | | | | |
| (b) **Total Monetary Site Commissions:** Total amount of Contractually Prescribed, Monetary Site Commissions paid by the Company during 2022 that was related to the facility. | | | | | |
| (c) **Recipient:** Name of the entity or entities to which you paid Contractually Prescribed, Monetary Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (i) **Fixed Site Commissions:** Amount of Contractually Prescribed Site Commissions that were both Monetary Site Commissions and Fixed Site Commissions and that were paid during 2022 in connection with MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity to which you paid Contractually Prescribed, Fixed, Monetary Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (bb) **Allocation:** If the Contractually Prescribed, Fixed, Monetary Site Commission was imposed at the contract level (e.g. a minimum annual guarantee that accrues under a contract covering multiple facilities), allocate the Site Commission payments among all facilities covered by the contract. | | | | | |
| (cc) Word template entry | | | | | |
| (cc) **Upfront Payments:** Amount of all Contractually Prescribed Site Commissions for 2022 that not only were Monetary Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of MCS and associated Ancillary Services provided at the facility. | | | | | |
| (aaa) **Recipient:** Name of the entity to which made these upfront payments. Allocate the payments among the relevant entities. | | | | | |
| (ii) **Variable Site Commissions:** Amount of Contractually Prescribed Site Commissions that were both Monetary Site Commissions and variable Site Commissions and that were paid during 2022 in connection with MCS or associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity or entities to which you paid Contractually Prescribed, Variable, Monetary Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (e) In-Kind Site Commissions: Amount of Contractually Prescribed Site Commissions for 2022 that were also In-Kind Site Commissions and that were paid in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (i) **Recipient:** Name of the entity or entities to which you paid Contractually Prescribed, In-Kind Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (ii) Word template entry | | | | | |
| (3) **Fixed Site Commissions:** Amount of Contractually Prescribed Site Commissions for 2022 that were both In-Kind Site Commissions and Fixed Site Commissions and that were paid in connection with MCS or associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** name of the entity to which you paid Contractually Prescribed, Fixed, In-Kind Site Commissions during 2022 in connection with MCS or associated Ancillary Services provided at the facility. Allocate the payments among the relevant entities. | | | | | |
| (bb) **Allocation:** If the Contractually Prescribed, Fixed, In-Kind Site Commission was imposed at the contract level (e.g. a minimum annual guarantee that accrues under a contract covering multiple facilities), allocate the Site Commission payments among all facilities covered by the contract. | | | | | |
| (cc) Word template entry | | | | | |
| (cc) **Upfront Payments:** Amount of all Contractually Prescribed Site Commissions for 2022 that not only were In-Kind Site Commissions and Fixed Site Commissions but also were paid, at the signing of a contract or during the first year of the contract, in connection with the provision of MCS provided at the facility. | | | | | |
| (aaa) **Recipient:** Name of the entity to which you made these upfront payments. Allocate the payments among the relevant entities. | | | | | |
| (ii) **Variable Site Commissions:** Amount of Contractually Prescribed Site Commissions for 2022 that were both In-Kind Site Commissions and Variable Site Commissions and that were paid in connection with MCS or associated Ancillary Services provided at the facility. | | | | | |
| (aa) **Recipient:** Name of the entity or entities to which you made these upfront payments. Allocate the payments among the relevant entities. | | | | | |
| (ii) – (iii) Word template entry | | | | | |

**D.2.c. Facility-Specific Costs of Provider's Safety and Security Measures Attributable to Audio IPCS During 2022**

| Safety and Security Measures Expense Category | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Total 2022 |
|---|---|---|---|---|---|---|
| (1)(a) Communications Assistance for Law Enforcement Services | | | | | | |
| (1)(b) Law Enforcement Support Services | | | | | | |
| (1)(c) Communication Security Services | | | | | | |
| (1)(d) Communication Recording Services | | | | | | |
| (1)(e) Communication Monitoring Services | | | | | | |
| 1(f) Voice Biometrics Services | | | | | | |
| (1)(g) Other Safety and Security Measures | | | | | | |
| Total (sum of rows 3 through 9) | 0 | 0 | 0 | 0 | 0 | 0 |

**D.2.c. Facility-Specific Costs of Provider's Safety and Security Measures Attributable to Video IPCS During 2022**

| Safety and Security Measures Expense Category | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Total 2022 |
|---|---|---|---|---|---|---|
| (1)(a) Communications Assistance for Law Enforcement Services | | | | | | |
| (1)(b) Law Enforcement Support Services | | | | | | |
| (1)(c) Communication Security Services | | | | | | |
| (1)(d) Communication Recording Services | | | | | | |
| (1)(e) Communication Monitoring Services | | | | | | |
| 1(f) Voice Biometrics Services | | | | | | |
| (1)(g) Other Safety and Security Measures | | | | | | |
| Total (sum of rows 3 through 9) | 0 | 0 | 0 | 0 | 0 | 0 |

**JA420**

**D.2.d. Facilities' Costs of Providing Safety and Security Measures Attributable to IPCS During 2022**

(1) Enter "Yes" if you have any verifiable, reliable, and accurate information in your possession about the costs the Facilities you serve incurred during 2022 to provide Safety and Security Measures in connection with the provision of IPCS. Otherwise, enter "No."

| Safety and Security Measures Expense Category | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Total 2022 |
|---|---|---|---|---|---|---|
| (2) Total IPCS-Related Safety and Security Measures Expenses | | | | | | |
| (3) IPCS Safety and Security Measures Expenses Attributable to: | | | | | | |
| (a) Communications Assistance for Law Enforcement Services | | | | | | |
| (b) Law Enforcement Support Services | | | | | | |
| (c) Communication Security Services | | | | | | |
| (d) Communication Recording Services | | | | | | |
| (e) Communication Monitoring Services | | | | | | |
| (g) Voice Biometrics Services | | | | | | |
| (g) Other Safety and Security Measures | | | | | | |

**JA421**

| Ancillary Services Information for 2022 | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Unique Facility Identifier (fill in here) | Notes |
|---|---|---|---|---|---|---|
| **Automated Payment Service** | | | | | | |
| (1) **Automated Payment Fee Revenues:** Enter the amount of Automated Payment Fee Revenues the Accounting Entity received from Customers for the provision of audio and video IPCS during 2022. | | | | | | |
| (2) **Automated Payment Fees Passed Through to An Affiliate:** Enter the amount of Automated Payment Fee revenues the Accounting Entity passed through to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for the provision of audio and video IPCS during 2022. | | | | | | The same question is asked in connection with Single-Call and Related Services (A16), Live Agent Service (A21), Paper Bill/Statement Service (A27), and Third-Party Financial Transaction Service (A37). |
| (3) **Affiliates Used in Providing Automated Payment Service:** List each Affiliate, if any, that the Accounting Entity used in providing its Automated Payment Service at each Facility during 2022. | | | | | | The same question is asked in connection with Live Agent Service (A18) and Paper Bill/Statement Service (A24). |
| (4) **Third Parties Used in Providing Automated Payment Service:** List each Third Party, if any, that the Accounting Entity used in providing its Automated Payment Service at each Facility for 2022 and enter the amount of Automated Pay Service for which the Company was billed by each listed Third Party at each Facility for 2022. | | | | | | |
| (5) **Payment Card Processing Revenue for Automated Payment Fees:** Of the amount reported for Automated Payment Fee Revenue above, enter the amount of that revenue attributable to Payment card processing fees charged in connection with communications at each Facility during 2022. | | | | | | The same question is asked in connection with Third-Party Financial Transaction Service (A31). |
| **Single-Call and Related Services** | | | | | | |
| (7) **Fees for Single-Call and Related Services:** Enter the amount of Fees for Single-Call and Related Services the Accounting Entity received from Customers in connection with its provision of audio and video IPCS and Ancillary Services at the Facility during 2022. | | | | | | |
| (8) **Single-Call and Related Services Revenues Paid to an Affiliate:** Enter the amount of revenues from Fees for Single-Call and Related Services passed through to any Affiliate for audio or video IPCS and Ancillary Services provided at the Facility during 2022. | | | | | | |
| (9) **Entities Charging the Accounting Entity for Billing Services:** List each entity that charged the Accounting Entity for billing services for Single-Call and Related services at each Facility for 2022. Indicate whether each listed entity is a Third Party. | | | | | | The same question is asked in connection with Third-Party Financial Transaction Service (A33). |
| (10)A **Amounts Paid to Third Parties for Billing Services:** Enter the amount the Accounting Entity paid to a Third Party for billing services in connection with Single-Call and Related Services at each Facility during 2022. | | | | | | The same question is asked in connection with Live Agent Service (A20), Paper Bill/Statement Service (A26), and Third-Party Financial Transaction Service (A33). |
| (11) **Single-Call and Related Services Fees Passed through to Customers:** Enter the amount the Accounting Entity paid to Third Parties for billing services in connection with Single-Call and Related Services that the Company passed through to Customers at each Facility during 2022. | | | | | | |
| (12) **Amounts Paid to Other Entities for Billing Services:** Enter the amount the Accounting Entity paid to entities other than Third Parties for billing services in connection with Single-Call and Related Services at each Facility during 2022. | | | | | | The same question is asked in connection with Third-Party Financial Transaction Service (A35). |
| (13) **Amounts Paid to Other Entities for Billing Services Passed Through to Customers:** Enter the amount the Accounting Entity paid to entities other than Third Parties for billing services in connection with Single-Call and Related Services that the Company passed through to Customers at each Facility during 2022. | | | | | | The same question is asked in connection with Third-Party Financial Transaction Service (A36). |
| **Live Agent Service** | | | | | | |
| (15) **Live Agent Fees:** Enter the amount of Live Agent Fee revenue the Accounting Entity received from Customers in connection with its provision of audio and video IPCS and associated Ancillary Services at the Facility during 2022. | | | | | | |
| (16) **Affiliates Used to Provide Live Agent Service:** List each Affiliate, if any, that the Accounting Entity used in providing its Live Agent Service at each Facility during 2022. | | | | | | |
| (17) **Third Parties Used to Provide Live Agent Service:** List each Third Party, if any, that the Accounting Entity used in providing its Live Agent Service at each Facility during 2022. | | | | | | |
| (18) **Amounts Paid to Third Parties for Live Agent Service:** Enter the amount the Accounting Entity paid to each listed Third Party for Live Agent Service at each Facility during each 2022. | | | | | | |
| (19) **Live Agent Fee Revenue Paid to an Affiliate:** Enter the amount of Live Agent Fee revenues the Accounting Entity paid to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for the provision of audio and video IPCS at the Facility during 2022. | | | | | | |
| **Paper Bill/Statement Service** | | | | | | |
| (20) **Paper Bill/Statement Fee Revenue:** Enter the amount of Paper Bill/Statement Fee revenue generated by communications originating in the Facility during 2022. | | | | | | |
| (21) **Affiliates Used to Provide Paper Bill/Statement Service:** List each Affiliate, if any, that the Accounting Entity used in providing its Paper Bill/Statement Fee Service at each Facility during 2022. | | | | | | |
| (22) **Third Parties Used to Provide Paper Bill/Statement Service:** List each Third Party, if any, that the Accounting Entity used in providing its Paper Bill/Statement Service at each Facility during 2022. | | | | | | |
| (23) **Amounts Paid to Third Parties for Paper Bill/Statement Service:** Enter the amount the Accounting Entity paid to each listed Third Party for Paper Bill/Statement Service at each Facility during 2022. | | | | | | |
| (24) **Paper Bill/Statement Fee Revenue Passed Through to an Affiliate:** Enter the amount of Paper Bill/Statement Fee revenue paid by the Accounting Entity to any Affiliate, other than an Affiliate that provides audio or video IPCS and Ancillary Services, for the provision of audio and video IPCS and Ancillary Services at the Facility during 2022. | | | | | | |
| **Third-Party Financial Transaction Services** | | | | | | |
| (25) **Third-Party Financial Transaction Fees:** Enter the amount of revenue from Third-Party Financial Transaction Fees the Accounting Entity received from Customers in connection with its audio and video IPCS and Ancillary Services provided at the Facility during 2022. | | | | | | |
| (26) **Other Transaction Charges for Third-Party Transactions:** Enter the per transaction fee(s) charged to an end user for transferring money or processing other financial transactions to facilitate an end user's ability to make account payments via a Third Party, including a Third Party that is an Affiliate of the Provider. For each fee, indicate whether the Third Party receiving the payment is an Affiliate or non-Affiliate. | | | | | | |
| (27) **Payment Card Processing Revenue from Third-Party Financial Transaction Fees:** Of the amount reported for Third-Party Financial Transaction Fees above, enter the amount of that revenue applicable to charging Customers for payment card processing for each Facility during 2022. | | | | | | |
| (28) **Entities Charging the Accounting Entity for Third-Party Financial Transaction Services:** List each entity that charged the Accounting Entity for providing Third-Party Financial Transaction Services at each Facility for 2022. Indicate whether each listed entity is a Third Party. | | | | | | |
| (29) **Amounts Paid to Third Parties for Third-Party Financial Transaction Services:** Enter the amount the Accounting Entity paid to Third Parties for Third-Party Financial Transaction Services at each Facility during 2022. | | | | | | |
| (30) **Amounts Paid to Third Parties for Third-Party Financial Transaction Services Passed Through to Customers:** Enter the amount the Accounting Entity paid to Third Parties for Third-Party Financial Transaction Services that the Company passed through to Customers at each Facility for 2022. | | | | | | |
| (31) **Amounts Paid to Other Entities for Third-Party Financial Transaction Services:** Enter the amount the Accounting Entity paid to entities other than Third Parties for Third-Party Financial Transaction Services at each Facility during 2022. | | | | | | |
| (32) **Amounts Paid to Other Entities for Third-Party Financial Transaction Services Passed Through to Customers:** Enter the amount the Accounting Entity paid to entities other than Third Parties for Third-Party Financial Transaction Services that the Company passed through to Customers at each Facility during 2022. | | | | | | |
| (33) **Third-Party Financial Transaction Fees Paid to an Affiliate:** Enter the amount of Third-Party Financial Transaction Fees paid by the Accounting Entity to any Affiliate, other than an Affiliate that provides audio and video IPCS and Ancillary Services, for audio and video IPCS and Ancillary Services provided at the Facility during 2022. | | | | | | |

**JA422**

**FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT**

We have estimated that each ICS provider's response to Form 2303(a) (consisting of Word and Excel Templates) will take 230 hours on average.  Our estimate includes the time to read the instructions, look through existing records, gather and maintain the required data, and complete and review the form.  It also includes the time it will take each provider to: (a) submit audited financial statements or reports, or similar documentation, for 2022, to the extent they have been produced in the ordinary course of business; (b) respond to any Commission requirement that the provider clarify or supplement its response to the data collection; and (c) keep all records necessary to implement this collection and make such records available to the Commission upon request.  If you have any comments on this estimate, or on how we can improve the collection and reduce the burden it causes you, please write the Federal Communications Commission, AMD-PERM, Washington, DC 20554, Paperwork Reduction Project (3060-####).  We will also accept your comments via the Internet if you send them to pra@fcc.gov.  Please DO NOT SEND COMPLETED APPLICATIONS TO THIS ADDRESS.  Remember—you are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice.  This collection has been assigned an OMB Control Number of 3060-####.

**THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, P.L. 104-13, OCTOBER 1, 1995, 44 U.S.C. 3507.**

**REDACTED – FOR PUBLIC INSPECTION**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | |
| Rates for Interstate Inmate Calling Services | WC Docket No. 12-375 |

**REPLY COMMENTS OF SECURUS TECHNOLOGIES, LLC**

Joshua P. Martin
Senior Vice President and General Counsel
Securus Technologies, LLC
4000 International Parkway
Carrollton, Texas 75007
(972) 277-0300
joshuamartin@securustechnologies.com

Michael H. Pryor
Shareholder
Brownstein Hyatt Farber Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

*Counsel to Securus Technologies, LLC*

March 3, 2023

### III. THE RECORD SUPPORTS ESTABLISHMENT OF ALTERNATIVE PRICING STRUCTURES WITH REASONABLE CONDITIONS

#### A. The Commission Should Take Immediate Action Allowing Alternative Pricing Plans

Securus reiterates its strong support for promptly allowing ICS providers to offer voluntary, alternative pricing plans.[16] Securus is eager to resume its pilot programs and thus respectfully urges the Commission to consider carving out this issue and taking affirmative action in advance of a comprehensive order addressing all of the issues raised in the Fifth Further Notice and Sixth Further Notice. Carving out issues, just as the Commission did in the *2022 ICS Order*, would be particularly appropriate if it appears a comprehensive order is not forthcoming in near future. One approach to taking immediate action is to grant Securus' waiver petition, subject to reasonable conditions if the Commission believes they are necessary.[17] In addition to restoring substantial benefits to consumers, allowing Securus to resume its pilot programs for both intrastate and interstate calls will provide valuable data that can inform the Commission's continuing consideration of this issue.

#### B. Alternative Rate Programs Should Empower Consumer Choice

The record supports the establishment of voluntary, alternative rate plans that provide consumers with attractive alternatives to traditional, per-minute pricing.[18] The only real issue relates to the nature of conditions that the Commission may deem necessary to ensure that the

---

[16] Securus Comments at 7.

[17] Securus Technologies, LLC Petition for Waiver Reply Comments, WC Docket No. 12-375, (rec. Jan. 21, 2022) (Securus Waiver Petition).

[18] ViaPath Comments at 21-22; Wright Petitioners et al. Comments, WC Docket No. 12-375, at 9-10 (rec. Dec. 15, 2022) (Wright Petitioners et al. Comments) ("Unlimited minutes or similar alternative arrangements may be beneficial to incarcerated people if structured properly."). *See also* Pay Tel Comments at 13. Alternative rate plans and subscription programs have also garnered support from Congress. In his floor statement supporting the recently enacted Martha Wright-Reed Just and Reasonable Communications Act of 2022, Congressman Latta expressed support for alternative rate programs and urged the Commission to "evaluate the results of these efforts to lower costs and facilitate competition." 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022).

plans provide value to consumers and do not constitute an end run of its rate caps. Proposals to require informed consent, easy opt-out processes, and adequate disclosures are reasonable and are consistent with the programs that Securus had been offering.[19] Securus agrees that programs, like those it offered, should be voluntary, that participants should be able to opt-out easily and return to per-minute pricing, and that consumers should have sufficient information to make an informed choice of whether to utilize a program. Securus' subscription programs are centered on empowering consumers.

As Securus previously explained, its pilot programs resulted in cost savings from per-minute rates at relatively low levels of usage, in the range of 15% to 30% of available minutes.[20] Consumers had little difficulty recognizing when it made economic sense to use the subscription program rather than per-minute pricing. Securus generally concurs with the Wright Petitioners et al. Comments that disclosures should provide sufficient information to enable consumers to assess the value to them of the alternative rate plan versus using standard per-minute rate plans.[21] For example, the materials describing the alternative rate program should indicate the offered terms, (e.g., X number of calls per month for $X) and state the prevailing per-minute rate at the facility. Consumers can readily make determinations based on this information.

Moreover, Securus agrees that information regarding the availability to friends and family of alternative pricing plans should be widely distributed, including at facilities in which the programs are available, subject to constraints that may be imposed by correctional authorities. Anticipating that the Commission will allow alternative rate plans subject to

---

[19] *See* Wright Petitioners et al. Comments at 10-11. Securus agrees with the Wright Petitioners et al., that consumers should not be required to sign up for long term commitments. Consumers should have the right to opt out and return to per-minute rates on a monthly or weekly basis, depending on the structure of the program.
[20] Securus Comments at 12.
[21] Wright Petitioners et al. Comments at 11 (suggesting that the Commission require providers to inform consumers how any alternative pricing options compare to per minute calling.).

reasonable conditions, Securus is reviewing its processes and disclosures to identify areas where its disclosures may be improved.

The Commission should avoid, however, dictating the exact form that alternative pilot programs must take. Requiring that plans be based on minutes rather than calls or other potential options would undermine a key goal of enabling pilot programs – to gather information on program effectiveness and benefits by allowing a degree of experimentation. As Securus previously informed the Commission, its pilot programs offered a set number of calls at a flat rate because focus groups indicated that consumers preferred this option over buckets of minutes.[22] This type of fixed-rate pricing helps consumers budget for calls. For this same reason, correctional authorities that have moved to an agency paid model, where calls are free to the consumer, have also favored fixed-price plans. For example, the Connecticut Department of Corrections, which now pays for calls, requested that Securus charge the agency for ICS based on a set dollar amount per incarcerated person in order to better budget for these services. Consumers should also have flat pricing options to assist in their budgeting when they pay for calls. Securus also concurs with ViaPath that providers should be able to explore alternative rate plans that bundle various services, just as regular consumers have options to purchase bundle services such as voice, video, and internet access under a single price.[23]

### C. Alternative Rate Programs Should Enable Cost Savings

In addition to avoiding the prescription of specific forms that alternative programs must take, the Commission should also refrain from adopting conditions that negate the value to consumers of alternative rate plans. For example, proposals that would require that every minute under a plan not exceed the rate cap by requiring true ups, refunds or rollover of minutes, would

---

[22] Securus Comments at 13.
[23] ViaPath Comments at 21.

**Federal Communications Commission**                    **FCC 23-19**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**NOTICE OF PROPOSED RULEMAKING AND ORDER**

**Adopted: March 16, 2023**                    **Released: March 17, 2023**

**Comment Date: 30 days after publication in the Federal Register**
**Reply Comment Date: 60 days after publication in the Federal Register**

By the Commission: Chairwoman Rosenworcel and Commissioners Carr and Starks issuing separate statements.

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................................................1
II.  BACKGROUND ...................................................................................................................................3
     A.  The Martha Wright-Reed Just and Reasonable Communications Act of 2022 ...............................3
     B.  History of Proceeding to Date.........................................................................................................5
III. NOTICE OF PROPOSED RULEMAKING .........................................................................................10
     A.  The Martha Wright-Reed Act: Technical Amendments ...............................................................13
         1.  Section 2(a)—Amendments to Section 276(b)(1)(A) of the Communications Act...............13
         2.  Section 2(b)—Amendments to Section 3(1) of the Communications Act.............................29
         3.  Section 2(c)—Amendment to Section 2(b) of the Communications Act...............................37
     B.  Implementation of the Martha Wright-Reed Act .........................................................................39
         1.  Approach to Ratemaking...................................................................................................39
         2.  Use of Data in Ratemaking...............................................................................................47
         3.  Necessary Safety and Security Costs ................................................................................52
         4.  Size and Type of Correctional Institution .........................................................................58
     C.  Effect on Other Laws ...................................................................................................................66
     D.  Necessary Rule Changes...............................................................................................................73
     E.  Other Reforms Related to Incarcerated People's Communications Services ...............................80
     F.  Digital Equity and Inclusion ........................................................................................................82
IV.  ORDER................................................................................................................................................83
V.   PROCEDURAL MATTERS.................................................................................................................89
VI.  ORDERING CLAUSES.......................................................................................................................95
APPENDIX A – INITIAL REGULATORY FLEXIBILITY ANALYSIS

**I.    INTRODUCTION**

       1.      Nearly twenty years have passed since Martha Wright-Reed and her fellow petitioners first sought Commission relief from the exorbitant telephone rates they had to pay to talk to their incarcerated family members.  More than a decade has passed since the Commission began to respond to

those petitioners' request and embarked on a process to pursue just and reasonable rates for telephone calls between incarcerated people and their loved ones.[1]  The Commission's ability to achieve that objective, however, was limited by statutory provisions,[2] as explained by the United States Court of Appeals for the District of Columbia Circuit in *GTL v. FCC*.[3]  Recently, Congress, through the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act), addressed these limitations and significantly expanded the Commission's jurisdiction over incarcerated people's communications services.[4]  In response to the D.C. Circuit's decision, and recognizing the increasing role of advanced communications, including video, in connecting incarcerated people with their families and friends, Congress now expressly directs that the Commission "ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities."[5]

    2.    In this item, we build on the Commission's efforts to date, bolstered by the new tools Congress has bestowed, and begin the process of implementing the Martha Wright-Reed Act to adopt just and reasonable rates and charges for incarcerated people's audio and video communications services.[6]  We seek comment on how we should interpret the Act's language to ensure that we implement the statute in a manner that fulfills Congress's intent.  We also seek comment on how the Act affects our ability to ensure that such services and associated equipment are accessible to and usable by incarcerated people with disabilities.  Relatedly, we reaffirm the Commission's prior delegation of data collection authority to the Wireline Competition Bureau and the Office of Economics and Analytics and direct them to update and restructure their most recent data collection as appropriate in light of the requirements of the new statute, so that we may meet our statutory obligation to ensure that the rates and charges for communications services between incarcerated people and their friends and families are just and reasonable.

## II.    BACKGROUND

### A.    The Martha Wright-Reed Just and Reasonable Communications Act of 2022

    3.    On January 5, 2023, President Biden signed into law the Martha Wright-Reed Act.[7]  The Act was the product of efforts by multiple individuals and committed stakeholders over a number of years to comprehensively address the persistent problem of unreasonably high rates and charges incarcerated people and their families pay for communications services.  At its core, the Act removes the principal

---

[1] *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9523-25, 9527-30, paras. 12-15, 22-25, 28 (2021) (*2021 ICS Order* or *2021 ICS Notice*).

[2] 47 U.S.C. §§ 152(b), 201(b), 276(b)(1)(A) (1996).

[3] *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) (*GTL v. FCC*) (amending 859 F.3d 39 (D.C. Cir. 2017)); *see 2021 ICS Order*, 36 FCC Rcd at 9525-27, paras. 16-21.

[4] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 152(b), 153(1)(E), 276(b)(1)(A), (d).

[5] Martha Wright-Reed Act pmbl.; 168 Cong. Rec. H10027-28 (daily ed. Dec. 22, 2022) (statements of Reps. Pallone and Rush) (referencing the *GTL v. FCC* decision that the Commission lacked authority over intrastate rates).

[6] This item continues ongoing efforts to reform providers' rates, charges, and practices in connection with interstate and international inmate calling services.  *See, e.g., 2021 ICS Order*, 36 FCC Rcd 9519; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, FCC 22-76 (Sept. 30, 2022) (*2022 ICS Order* or *2022 ICS Notice*).  At the same time, this item initiates a new docket, WC Docket No. 23-62, to specifically address implementation of, and changes required by, the provisions of the Martha Wright-Reed Act.

[7] Martha Wright-Reed Act.

statutory limitations that have prevented the Commission from setting comprehensive and effective just and reasonable rates for incarcerated people's communications services.

4.    Specifically, the Martha Wright-Reed Act modifies section 276 of the Communications Act of 1934 (Communications Act)[8] to explicitly enable the Commission to require that rates for incarcerated people's communications services be just and reasonable, irrespective of the "calling device" used.[9]  It also expands the definition of payphone service in correctional institutions to encompass all advanced communications services (other than electronic messaging), including "any audio or video communications service used by inmates . . . regardless of technology used."[10]  In addition, the new statute amends section 2(b) of the Communications Act to make clear that the Commission's jurisdiction extends to intrastate as well as interstate and international communications services used by incarcerated people.[11]  And, in direct response to the *GTL v. FCC* decision, the Act expressly allows the Commission to "use industry-wide average costs," as well as the "average costs of service of a communications service provider" in setting just and reasonable rates.[12]  The Martha Wright-Reed Act also requires that the Commission "shall consider," as part of its ratemaking, "costs associated with any safety and security measures necessary to provide" telephone service and advanced communications services.[13]  Finally, the statute directs the Commission to promulgate regulations necessary to implement the statutory provisions not earlier than 18 months and not later than 24 months after the date of its enactment.[14]

## B.    History of Proceeding to Date

5.    In 2003, Martha Wright and her fellow petitioners, then-current and former incarcerated people and their relatives and legal counsel (collectively, the Wright Petitioners) filed petitions seeking a rulemaking to address "excessive" rates for incarcerated people's telephone services.[15]  The Wright Petitioners filed an alternative petition in 2007, in which they emphasized the urgent need for the Commission to act on "exorbitant" rates for calling services for incarcerated people.[16]  In 2012, the Commission commenced a rulemaking proceeding, releasing the *2012 ICS Notice* seeking comment on the Wright Petitioners' petitions and on establishing rate caps for interstate calling services for incarcerated people.[17]  In the *2013 ICS Order* that followed, the Commission adopted interim interstate rate caps and adopted the Commission's first mandatory data collection regarding inmate calling services

---

[8] 47 U.S.C. § 151 *et seq.*

[9] Martha Wright-Reed Act § 2(a).

[10] *Id.* § 2(a)(2), (b).

[11] *Id.* § 2(c).

[12] *Id.* § 3(b); *see also GTL v. FCC*, 866 F.3d at 414-15.

[13] Martha Wright-Reed Act § 3(b)(2).

[14] *Id.* § 3(a).

[15] Petition for Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending Rulemaking by Martha Wright et al., CC Docket No. 96-128, at 1 (filed Nov. 3, 2003).  The petition sought to prohibit "exclusive inmate calling service agreements contracts and collect call-only restrictions" in correctional facilities.  *Id.* at 3.  Ms. Wright-Reed went on to lead a campaign for just communications for incarcerated people for over a decade.  She passed away in 2015, before fully realizing her dream.

[16] Petitioners' Alternative Rulemaking Proposal by Martha Wright et al., CC Docket No. 96-128, at 2 (filed Feb. 28, 2007).  In the alternative petition for rulemaking, the Wright Petitioners proposed benchmark rates for interstate long distance inmate calling services calls and reiterated their request that providers offer debit calling as an alternative option to collect calling.  *Id.* at 5, 10.

[17] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 16629, 16629-30, 16636, paras. 1, 17 (2012) (*2012 ICS Notice*).  Unless specifically noted, references herein to "interstate" include both interstate and international communications services.

(ICS), requiring all providers of those services to submit data on their underlying costs of service.[18]  It also adopted an annual reporting obligation requiring providers to provide specific information on their operations, including their rates and ancillary service charges.[19]  In 2015, in light of record evidence of continued "egregiously high" rates, the Commission adopted a comprehensive framework for regulating rates and charges for both interstate and intrastate calling services for incarcerated people, re-adopting the interim interstate rate caps, and extending them to intrastate calls.[20]  As part of that framework, the Commission concluded that site commissions—payments made by inmate calling providers to correctional facilities or state authorities—were not costs reasonably related to the provision of inmate calling services and thus excluded those payments from the cost data used to set the rate caps.[21]

    6.    Several parties appealed the Commission's *2015 ICS Order*, as well as a subsequent Commission Order on Reconsideration.  The D.C. Circuit addressed the appeal of the *2015 ICS Order* in its 2017 decision in *GTL v. FCC*, holding that the Commission lacked statutory authority to regulate intrastate rates and vacating the intrastate rate caps adopted in the *2015 ICS Order*.[22]  The Court also ruled that the Commission's use of industry-wide average costs to set its interstate rate caps "lack[ed] justification in the record and [was] not supported by reasoned decisionmaking" in the *Order*,[23] and it vacated a reporting requirement related to video visitation services, finding the requirement was "too attenuated to the Commission's statutory authority."[24]  Finally, the Court concluded that the "Commission's categorical exclusion of site commissions from the calculus used to set [inmate calling services] rate caps defie[d] reasoned decision making because site commissions obviously are costs of

---

[18] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107 (2013) (*2013 ICS Order*).  Prior to the effective date of the *2013 ICS Order*, the D.C. Circuit stayed some of the rules adopted but allowed other aspects of the decision to take effect, including the interim interstate rate caps and Mandatory Data Collection.  *See Securus Techs v. FCC*, No. 13-1280, 2014 U.S. App. LEXIS 13669, at *3 (D.C. Cir. Jan. 13, 2014).

[19] *2013 ICS Order*, 28 FCC Rcd at 14169, para. 116; *see also Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12891-92, paras. 266-67 (2015) (*2015 ICS Order*); 47 CFR § 64.6060.

[20] *2015 ICS Order*, 30 FCC Rcd at 12769-70, para. 9.  .  The Commission used industry-wide average costs based on data from the First Mandatory Data Collection, explaining that this approach would allow providers to "recover average costs at each and every tier."  *Id*. at 12790, para. 52 & n.170.  The Commission readopted the interim interstate rate caps it had adopted in 2013 and extended them to intrastate calls, pending the effectiveness of the new rate caps.  *Id*. at 12769, para. 9.  The Commission also adopted a Second Mandatory Data Collection to enable it to identify trends in the market and adopt further reforms.  *Id*. at 12862, para. 198.  In 2016, the Commission continued its reform of the inmate calling services marketplace by, among other things, amending its rate caps to better allow inmate calling service providers to recover costs incurred as a result of providing such services, including certain correctional facility costs that the Commission found, based on the record then before it, were reasonably and directly related to the provision of inmate calling services.  *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order on Reconsideration, 31 FCC Rcd 9300, 9307-08, paras. 12, 15 (2016) (*2016 Order on Reconsideration*).

[21] *2015 ICS Order*, 30 FCC Rcd at 12819, para. 118.  The Commission's rules define "Site Commissions" to mean "any form of monetary payment, in-kind payment, gift, exchange of services or goods, fee, technology allowance, or product that a Provider of Inmate Calling Services or affiliate of a Provider of Inmate Calling Services may pay, give, donate, or otherwise provide to an entity that operates a correctional institution, an entity with which the Provider of Inmate Calling Services enters into an agreement to provide Inmate Calling Services, a governmental agency that oversees a correctional facility, the city, county, or state where a facility is located, or an agent of any such facility."  47 CFR § 64.6000(t).

[22] *GTL v. FCC*, 866 F.3d at 402, 412.

[23] *Id*. at 402.

[24] *Id*. at 414-15.

doing business incurred by [inmate calling services] providers."[25]  The Court directed the Commission to "assess on remand which portions of site commissions might be directly related to the provision of [inmate calling services] and therefore legitimate, and which are not."[26]

7.      Subsequently, the Commission sought comment on additional steps to address unreasonable rates in the *2020 ICS Notice*,[27] and released the comprehensive *2021 ICS Order*,[28] in which, among other actions, it reformed the treatment of site commissions, set new interim interstate rate caps for prisons and jails with average daily populations of 1,000 or more incarcerated people, and capped international calling rates for the first time.[29]

8.      In the *2021 ICS Order*, the Commission also sought to improve the data it collected on calling services for incarcerated people as part of its efforts to set reasonable permanent rate caps.  It delegated authority to the Wireline Competition Bureau (WCB) and the Office of Economics and Analytics (OEA) to establish a Third Mandatory Data Collection to collect uniform cost data to use in setting rate caps that more closely reflect inmate service providers' costs of providing service at correctional facilities.[30]  After seeking public comment,[31] in January 2022, WCB and OEA released an Order adopting the data collection.[32]  Parties' responses to the Third Mandatory Data Collection were due June 30, 2022, and we affirmatively incorporate those responses into the record in this proceeding.

9.      Finally, in September 2022, while analyzing the data from the Third Mandatory Data Collection, the Commission issued the *2022 ICS Order*, which adopted requirements to improve access to communications services for incarcerated people with communication disabilities and targeted reforms to lessen the financial burden on incarcerated people and their loved ones when using calling services.[33]  We also issued the *2022 ICS Notice* seeking additional stakeholder input and evidence relating to additional reforms concerning incarcerated people with communication disabilities and providers' rates, charges, and practices in connection with interstate and international calling services.

---

[25] *Id.* at 413.

[26] *Id.* at 414.  In view of the its decision in *GTL*, the D.C. Circuit separately dismissed the separate appeal of the Commission's *2016 Order on Reconsideration* and vacated the Order on Reconsideration, "insofar as it purport[ed] to set rate caps on inmate calling service," with the consent of all parties to that appeal.  *Securus Techs., Inc. v. FCC*, No. 16-1321, 2017 U.S. App. LEXIS 26360, at *4-5 (D.C. Cir. Dec. 21, 2017) (per curiam).

[27] *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485 (2020) (*2020 ICS Order* or *2020 ICS Notice*).  The Commission proposed to lower the interstate rate caps on an interim basis, and to cap international rates.  *Id.* at 8509, paras. 67-68.

[28] *2021 ICS Order*, 36 FCC Rcd 9519.  In the *2021 ICS Notice*, the Commission sought comment on, among other matters, the methodology to be employed in setting permanent interstate and international rate caps.  *Id.* at 9521, para. 5.

[29] *Id.* at 9530, para. 28.

[30] *Id.* at 9619-20, para. 221.  As indicated above, the Commission conducted two prior mandatory data collections seeking this type of uniform cost data.  *Supra* note 20.

[31] *WCB and OEA Seek Comment on Upcoming Third Mandatory Data Collection for Inmate Calling Services*, WC Docket No. 12-375, Public Notice, 36 FCC Rcd 13859 (WCB/OEA 2021).

[32] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, DA 22-52 (WCB/OEA Jan. 18, 2022).  In September 2022, the Commission sought comment on how to use inmate calling services providers' responses to establish "reasonable, permanent caps on rates and ancillary service charges for interstate and international calling services for incarcerated people."  *2022 ICS Notice* at 52, para. 125.

[33] *2022 ICS Order* at 3, paras. 3-4 (discussing adopted reforms).

## III.    NOTICE OF PROPOSED RULEMAKING

10.    The ability to communicate through affordable audio and video communications is essential to allowing incarcerated people to stay connected to their family and loved ones, clergy, counsel, and other critical support systems. Studies consistently show that incarcerated people who have regular contact with family members are more likely to succeed after release and have lower recidivism rates.[34] We interpret the Martha Wright-Reed Act as providing us with the authority we need to ensure that the charges associated with communications services for incarcerated people are just and reasonable and do not create an unnecessary deterrent to their ability to stay connected with the world outside their correctional facilities. We invite comment on this interpretation.

11.    As a threshold matter, we interpret the Martha Wright-Reed Act, taken as a whole, as enhancing and supplementing the Commission's existing jurisdiction, and effectively addressing the constraints imposed by the D.C. Circuit's interpretation of the Commission's jurisdiction in *GTL v. FCC*, and seek comment on this interpretation. Specifically, we interpret the statute as expanding our existing jurisdiction over communications services for incarcerated people as specified in the implementation and implementation sections of the law.[35] In our view, through this Act, Congress effectively granted the Commission broad, plenary authority over the rates and charges for "any [inmate] audio or video communications service."[36] We propose to read the Act, in the context of the *GTL* decision and its aftermath, as removing any limitations on the Commission's authority over incarcerated people's audio and video communications services and empowering us to prohibit unreasonably high rates and charges for, and in connection with, all such services, including intrastate services.[37] We seek comment on this interpretation. To the extent that parties have a more limited view of our authority or suggest that we must make additional jurisdictional findings, we ask that they describe in detail those limits and additional findings. We further seek comment on the ultimate goal of Congress in passing the Martha Wright-Reed Act, described in the legislative history as legislation that "will help reduce financial burdens that prevent [incarcerated] people from being able to communicate with loved ones and friends."[38]

12.    We encourage all parties to comment on the issues raised in this Notice, and specifically invite previous participants in this proceeding to update their prior submissions to reflect changed circumstances stemming from the passage of the Martha Wright-Reed Act. We thus seek renewed comment on all the issues raised in our prior Notices in light of the statutory amendments contained in the

[34] *See, e.g., 2021 ICS Order*, 36 FCC Rcd at 9534-35, paras. 34-37 (discussing the impact of high calling rates on consumers and society).

[35] The Martha Wright-Reed Act does not contain language limiting our pre-existing authority over international services. As a result, our authority over international services remains intact and will now include all incarcerated people's international communications services covered by the statute.

[36] Martha Wright-Reed Act § 2(b)(3).

[37] The Commission has historically used the term "inmate calling services" or "ICS" when referencing payphone service in the incarceration context. We will now use the term "incarcerated people's communications services" or "IPCS" instead of "inmate calling services" or "ICS" to refer to the broader range of communications services subject to the Commission's jurisdiction as a result of the Act. In connection with this change in terminology, we are also changing references to "inmates" to "incarcerated people" at the request of public interest advocates. *See* Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ, Office of Communication Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (filed July 29, 2020) (United Church of Christ July 29, 2020 *Ex Parte* Letter) (urging the Commission to "eliminate the term 'inmate,'" explaining that "[m]any incarcerated people and advocates view the term 'inmate' as dehumanizing and disparaging"). We seek comment on codifying this updated terminology in the Notice below. *See infra* Section III.F. To avoid confusion, however, when discussing the Commission's prior actions or current rules in this item, we may continue to use the terms "inmate calling services" or "ICS."

[38] 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone).

Martha Wright-Reed Act.[39]  We emphasize that unresolved issues previously raised in WC Docket No. 12-375 remain pending and are now incorporated in this dual-captioned proceeding to be addressed in forthcoming Commission orders considering the record developed in response to this Notice to the extent applicable.[40]  As part of their responses, parties are welcome to update filings previously submitted regarding these pending matters in light of the enactment of the Martha Wright-Reed Act.

### A.     The Martha Wright-Reed Act: Technical Amendments

#### 1.     Section 2(a)—Amendments to Section 276(b)(1)(A) of the Communications Act

##### a.     Purpose and Scope of Amendments Taken as a Whole

13.     As part of our effort to fulfill Congress's directives in the Martha Wright-Reed Act, we seek comment on the effect of the amendments Congress made to the authority granted to the Commission in section 276(b)(1)(A) of the Communications Act.[41]  Do commenters agree that, taken as a whole, these amendments fundamentally expand the scope of our authority pursuant to sections 2(b) and 276 and effectively moot the concerns the D.C. Circuit raised about the Commission's jurisdiction in *GTL v. FCC*?[42]

14.     Prior to the enactment of the Martha Wright-Reed Act, section 276(b)(1)(A) focused on requiring that service providers be "fairly compensated" for "each and every" completed call.[43]  Congress has now eliminated the "each and every" call language and added a new dimension to section 276 of the Communications Act by requiring the Commission to "establish a compensation plan to ensure that . . . all rates and charges" for incarcerated people's communications services "are just and reasonable."[44]  We seek comment on whether the amendments to section 276(b)(1)(A) change the central focus of the section from ensuring that payphone service providers are "fairly compensated" for voice calls with little, if any, "considerations of fairness to the consumer,"[45] to a more balanced approach emphasizing consumers' (particularly incarcerated people's) and providers' right to just and reasonable rates and charges for each audio and video communications service now encompassed within the statutory definition of "payphone service."[46]  How should we balance these interests going forward?  Does the addition of "just and

---

[39] *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd 9519; *2022 ICS Notice*.

[40] *See* Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 12-375 & 23-62, at 5 (Securus Mar. 8, 2021 *Ex Parte* Letter).

[41] 47 U.S.C. § 276(b)(1)(A); Martha Wright-Reed Act § 2(a)(1).

[42] *GTL v. FCC*, 866 F.3d at 402 (holding that the Commission's proposed rate caps on intrastate rates exceeded its authority).

[43] 47 U.S.C. § 276(b)(1)(A) (2021); *see, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9600, para. 185 (discussing the requirements of section 276(b)(1)(A)); *see also GTL v. FCC*, 866 F.3d at 409 (finding "unfounded" the Commission's assertion that "'the interests of both the payphone service providers and the parties paying the compensation must be taken into account'" in determining whether payphone providers are fairly compensated) (quoting *2015 ICS Order*, 30 FCC Rcd at 12814, n.335).

[44] 47 U.S.C. § 276(b)(1)(A).

[45] *GTL v. FCC*, 866 F.3d at 409.

[46] *See* 47 U.S.C. § 153(1) (defining "advanced communications services"); *id.* § 276(d) (defining "payphone service" to include "the provision of inmate telephone service and advanced communications services described in sub-paragraphs (A), (B), (D), and (E) of section 3(1) in correctional institutions, and any ancillary services"); *see also id.* § 153(25), (27), (36) (respectively defining "interconnected VoIP service," "interoperable video conferencing service," and "non-interconnected VoIP service").

reasonable" inform the meaning of "fair compensation?"[47]  If not, what are we to make of Congress' apparent emphasis on affordability for consumers?[48]  Conversely, does the requirement that providers be "fairly compensated" for completed calls inform the meaning of "just and reasonable?"  In this regard, we seek comment, generally, on the relationship between the requirement that providers be "fairly compensated" and the requirement that their rates and charges be "just and reasonable."[49]

15.     Relatedly, we seek comment on Congress's intent in striking the "per call" and "each and every [call]" language from section 276(b)(1)(A), particularly the effect of these changes to the "fairly compensated" requirement in the context of communications services for incarcerated people under this new Act.  As originally conceived, the "fairly compensated" requirement of section 276(b)(1)(A) was designed to fix the specific problem of uncompensated payphone calls at that time.[50]  But the situation is quite different in the context of communications services for incarcerated people.  Providers generally receive compensation for the calls they carry through the per-minute rates charged to consumers of calling services for incarcerated people.[51]  No other entity receives compensation for calls other than through a contractual arrangement with the provider.[52]  It is therefore difficult to discern what the "fairly compensated" requirement adds to the "just and reasonable" requirement in the context of

---

[47] *See, e.g., Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984) (pointing out that historically, rates had been seen as just and reasonable when they fell "within a 'zone of reasonableness,' where rates are neither 'less than compensatory' [for providers] nor 'excessive' [for consumers]") (quoting Supreme Court decisions) (internal citations omitted).

[48] *See, e.g.,* Martha Wright-Reed Act pmbl. (characterizing the legislation as requiring the Commission to "ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities"); 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Latta) (explaining that the bill "would require the Federal Communications Commission to ensure that charges for payphone services, including advanced communications services in correctional institutions, are just and reasonable"); *id.* H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Jackson Lee) ("We have heard over and over again how exorbitant the cost is for grandmothers, mothers and fathers, and sisters and brothers to keep connections to individuals"); *id.* H10028 (daily ed. Dec. 22, 2022) (statement of Rep. Rush) ("The bill ends the practice of phone companies charging families astronomically high rates to call incarcerated loved ones in prison.  These rates are unjust and unreasonable, and I am elated that this bill will finally put an end to them.").

[49] *See* 47 U.S.C. § 276(b)(1)(A).

[50] When originally enacted, the "fairly compensated" requirement was premised, at least in part, on the fact that payphone providers were "largely uncompensated" for certain types of calls, including "dial-around" calls in which a caller "makes a long distance call using a long distance carrier other than the payphone's presubscribed long distance carrier."  *See Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Third Report and Order, and Order on Reconsideration of the Second Report and Order, 14 FCC Rcd 2545, 2548, paras. 3-4 (1999); *see also Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Notice of Proposed Rulemaking, 11 FCC Rcd 6716, 6721, 6725, paras. 8, 15-16 (1996) (*1996 Pay Telephone Notice*) (explaining that some payphone providers "do not receive any revenue directly from [interLATA operator-service] calls," and proposing to use the "fairly compensated" mandate to "prescribe compensation only when payphone providers are not already 'fairly compensated'").  Against this backdrop and considering the prior requirement of section 276(b)(1)(A) to ensure fair compensation for "each and every" completed call, the Commission concluded in 1996 that it should ensure that "all calls are fairly compensated, including those for which the [payphone service provider] currently receives no revenue."  *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996 et al.*, CC Docket Nos. 96-128 and 91-35, Report and Order, 11 FCC Rcd 20541, 20566, para. 48 (1996).

[51] *See, e.g.,* 47 CFR § 64.6030 (specifying interim rate caps for calling services for incarcerated people).

[52] *See, e.g., 1996 Pay Telephone Notice*, 11 FCC Rcd at 6721, paras. 7-8 (discussing payphone provider compensation arrangements).

communications services for incarcerated people, especially given the historical backdrop underlying this provision.[53]

16.     We interpret the elimination of the "per call" and "each and every [call]" language from section 276 as a signal of Congress's intent to restrict the application of the "fairly compensated" requirement with respect to communications services for incarcerated people by no longer requiring the Commission to ensure that its compensation plan allows for "fair" compensation for "each and every" completed call.  We seek comment on this interpretation.  This interpretation appears to be consistent with Congress's decision to allow the Commission to set rates based on average costs.[54]  Do commenters agree that the Commission is no longer required to ensure that providers are "fairly compensated" for *every* call they carry or facilitate?  Does elimination of the "per call" language give the Commission additional flexibility to consider rates or rate caps that apply to units others than minutes?  What independent meaning does the "fairly compensated" requirement have for communications services for incarcerated people in light of the other provisions of the Martha Wright-Reed Act, including the newly-added requirement to ensure "just and reasonable" rates and charges?  For example, does the "fairly compensated" requirement circumscribe the Commission's analysis of "just and reasonable" rates?[55]  Does it require the Commission to ensure that providers are able to recover their costs of providing incarcerated people's communications services, at least on average, even if not on a per-call basis?  Does the fair compensation requirement affect the Commission's analysis of other issues related to incarcerated people's communications services, such as the payment of site commissions or the imposition of ancillary service charges?  We seek comment on these questions.

**b.     Addition of "Other Calling Devices"**

17.     The Martha Wright-Reed Act extends our authority over communications services to include not just incarcerated people's audio and video communications using traditional payphones, but also their communications using "other calling device[s]."[56]  Given the absence of additional qualifying language in the new statute, we propose to interpret "other calling device[s]" broadly to encompass all devices that incarcerated people either use presently or may use in the future to communicate with individuals not confined within the incarcerated person's correctional institution.  Under this proposed

---

[53] Prior to the enactment of the Martha Wright-Reed Act, the Commission treated the requirement that providers be "fairly compensated for each and every completed . . . call" in section 276(b)(1)(A) as supplementing the "just and reasonable" standard in section 201(b) in the context of audio calling services for incarcerated people, even though section 276(b)(1)(A) was designed to solve a problem affecting the payphone market that no longer applied to the market for communications services for incarcerated people.  *See, e.g., 2021 ICS Order*, 36 FCC Rcd at 9530, para. 28 (framing calling services reforms as balancing the need to ensure that incarcerated people and their families "obtain essential communications capability at just and reasonable rates" and "remain[ing] faithful to [the Commission's] obligations under section 276 of the Act").  Thus, the Commission reasoned that "fair compensation" in the context of audio calling services for incarcerated people "does not mean that each and every completed call must make the same contribution to a provider's indirect costs.  Nor does it mean a provider is entitled to recover the total 'cost' it claims it incurs in connection with each and every separate inmate calling services call."  *Id.*, 36 FCC Rcd at 9602, para. 189.  Instead, the Commission found compensation to be fair "if the price for each service or group of services 'recovers at least its incremental costs, and no one service . . . recovers more than its stand-alone cost.'"  *Id.* at 9602, para. 189 (quoting *Implementation of Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Order on Remand and Notice of Proposed Rulemaking, 17 FCC Rcd 3248, 3255-56, para. 18 (2002)).

[54] Martha Wright-Reed Act § 3(b)(1).

[55] As the Supreme Court has held, "[r]ates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called 'fair value' rate base." *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 605 (1944) (*Hope Natural Gas*).

[56] Martha Wright-Reed Act § 2(a)(1); 47 U.S.C. § 276(b)(1)(A).

interpretation, "other calling device[s]" would encompass all wireline and wireless phones, computers, tablets, and other communications equipment capable of sending or receiving the audio or video communications described in section 276(d), regardless of transmission format.  That interpretation also would encompass all wireline and wireless equipment, whether audio, video, or both, that incarcerated people with disabilities presently use to communicate, through any payphone service, with the non-incarcerated, including but not limited to videophones, captioned telephones, and peripheral devices for accessibility, such as braille display readers, screen readers, and TTYs.[57]  Our interpretation would also encompass other potential devices, not yet in use, to the extent incarcerated people use them in the future to communicate with people not confined within the incarcerated person's correctional institution.  We seek comment on this proposal.  Are there any additional devices that should be included within "other calling device[s]"?  Conversely, are there any devices that are excluded from our jurisdiction?  If so, what is the statutory basis for concluding that Congress intended to exclude audio or video communications using those devices from our jurisdiction?

### c.    Addition of "Just and Reasonable" Language

18.    We next seek comment on the Martha Wright-Reed Act's addition to section 276(b)(1)(A) requiring that the Commission "establish a compensation plan to ensure that . . . all rates and charges" for incarcerated people's communications services be "just and reasonable."[58]  This language mirrors the "just and reasonable" language in section 201(b) of the Communications Act and other federal statutes, which has a long interpretive history.[59]

19.    *Just and Reasonable.*  The "traditional regulatory notion of the 'just and reasonable' rate was aimed at navigating the straits between gouging utility customers and confiscating utility property."[60]  Setting "just and reasonable" rates therefore "involves a balancing of the investor and the consumer interests."[61]  Given the parallel between the "just and reasonable" language in section 276(b)(1)(A) and the same language in section 201(b) and other federal statutes, we propose to interpret "just and reasonable" in section 276(b)(1)(A) to have the same meaning given to that term in section 201(b) and relevant precedent interpreting that standard in the ratemaking context.[62]  We seek comment on this proposal.  To the extent commenters disagree, how should we understand the "just and reasonable" requirement in section 276(b)(1)(A) and how would we distinguish between the "just and reasonable" requirement in section 276(b)(1)(A) and the "just and reasonable" requirement in section 201(b) if they are not the same?

---

[57] Where a person with a disability must use a peripheral device to access an advanced communications service or device, that service or device is required to be compatible with such peripheral devices, unless that is not achievable.  47 U.S.C. § 617(c); 47 CFR § 14.20(a)(3).

[58] *See* Martha Wright-Reed Act § 2(a)(1)(B); 47 U.S.C. § 276(b)(1)(A).

[59] Section 201(b) of the Communications Act requires that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate or foreign communication by wire or radio] shall be just and reasonable."  47 U.S.C. § 201(b).

[60] *Verizon Commc'ns., Inc. v. FCC*, 535 U.S. 467, 481 (2002).

[61] *Hope Natural Gas*, 320 U.S. at 603; *see also NAACP v. FPC*, 425 U.S. 662, 666-69 (1976) (holding that the Federal Power Commission's statutory authority to "establish 'just and reasonable' rates" gave the agency "ample authority" to prevent a regulatee from charging consumers for "unnecessary or illegitimate costs" that the regulatee might incur through "racially discriminatory employment practices").

[62] *See, e.g., 2021 ICS Order*, 36 FCC Rcd at 9575-76, 9587, paras. 126, 128-29, 153 (citing and discussing precedent supporting the Commission's implementation, in the context of audio calling services for incarcerated people, of the "just and reasonable" standard in section 201(b)).

20.    We also seek comment on how the "just and reasonable" standard in section 276(b)(1)(A) relates to the issue of site commission payments.[63]  How should section 276(b)(1)(A)'s requirement that rates for communications services for incarcerated people be "just and reasonable" affect our treatment of site commission payments?  In implementing the "just and reasonable" requirement in section 201(b), the Commission traditionally relies on the "used and useful" framework to separate costs and expenses that may be recovered through rates from those that may not.[64]

21.    Under the "used and useful" framework, the determination of "just and reasonable" rates focuses on affording the regulated entity an opportunity to "recover[] prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service for which rates are being set."[65]  That framework, which "is rooted in American legal theory and particularly in the constitutional limitations on the taking of private property for public use,"[66] balances the "equitable principle that public utilities must be compensated for the use of their property in providing service to the public" with the "[e]qually central . . . equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them."[67]  In applying these principles, "the Commission considers whether the investment or expense 'promotes customer benefits, or is primarily for the benefit of the carrier.'"[68]  Should we apply the "used and useful" ratemaking concept as a limiting factor in considering the costs and expenses allowable in the rates for communications services for incarcerated people?  Why or why not?  If not, what principle or framework should we use in evaluating "just and reasonable" rates and charges under section 276(b)(1)(A) and why would any such principle or framework be preferable to the well-established framework the Commission routinely uses when implementing identical language in section 201(b)?

---

[63] *See* 47 CFR § 64.6000(t) (defining "Site Commission").

[64] *See, e.g.*, *Sandwich Isles Communications, Inc.*, WC Docket No. 10-90, Order on Reconsideration, 34 FCC Rcd 577, 580, para. 7 (2019) (*Sandwich Isles Reconsideration Order*) (explaining that the 'used and useful' standard "provides the foundation for Commission decisions evaluating whether particular investments and expenses are reasonable" under section 201(b)).

[65] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126 (citing Commission precedent).

[66] *American Tel. and Tel. Co.*, Docket No. 19129, Phase II Final Decision and Order, 64 F.C.C.2d 1, 38, para. 111 (1977) (*AT&T Phase II Order*).

[67] *Id.* at 38, paras. 111-12.

[68] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126 (quoting *Establishing Just and Reasonable Rates for Local Exchange Carriers*, WC Docket No. 07-135, Notice of Proposed Rulemaking, 22 FCC Rcd 17889, 17997, para. 19 n.47 (2007)).  There are several elements of the Commission's used and useful analysis.  First, the Commission considers the need to compensate providers "for the use of their property and expenses incurred in providing the regulated service."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 111).  Second, the Commission looks to the "equitable principle that ratepayers should not be forced to pay a return except on investments that can be shown to benefit them."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing AT&T Phase II Order, 64 F.C.C.2d at 38, para. 112).  In this regard, the Commission considers "whether the expense was necessary to the provision of interstate telecommunications services."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7.  And third, the Commission considers "whether a carrier's investments and expenses were prudent (rather than excessive)."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Communications Revisions to Tariff F.C.C. Nos. 1, 2, 11, 13, and 14 Applications for Review*, CC Docket No. 87-611, Memorandum Opinion and Order, 5 FCC Rcd 5693, 5695, para. 17 (1990)).  Though the Commission has identified these "general principles regarding what constitutes 'used and useful,'" it "has recognized 'that these guidelines are general and subject to modification, addition, or deletion.  The particular facts of each case must be ascertained in order to determine what part of a utility's investment is used and useful.'"  *Sandwich Isles Communications, Inc.*, WC Docket No. 09-133, Declaratory Ruling, 25 FCC Rcd 13647, 13652, para. 12 (WCB 2010) (quoting *AT&T Phase II Order*, 64 F.C.C.2d at 39, para. 114).

22.     We invite comment on how we should apply the "used and useful" concept, or any alternative principle or framework commenters suggest, to providers' site commission payments. The Commission has previously sought broad comment on the ratemaking treatment of those payments, including on whether it is appropriate to permit providers to recover any portion of their site commission payments from end users through calling services rates[69] and on whether it "should preempt state and local laws that impose these payments on interstate and international" inmate calling services.[70] We incorporate our prior questions on site commissions into this Notice,[71] and request that commenters address each of them in relation to each incarcerated people's communications service now subject to our ratemaking authority. Should our ratemaking calculations include providers' site commission payments only to the extent, if any, that they compensate facilities for used and useful costs that the facilities themselves incur? Why or why not? And if we take that approach, how should we determine the facilities' used and useful costs? Should we make generalized findings as to what used and useful costs facilities typically incur and allow each facility to show through the waiver process that its costs exceed the typical amount? Or should we instead allow those costs only to the extent an individual facility establishes the extent to which it incurs used and useful costs?

23.     *Fairly Compensated.* We also invite comment on how the requirement that providers be "fairly compensated . . . for completed intrastate and interstate communications" should affect our ratemaking decisions, including our treatment of site commissions. What factors should we consider in determining whether a provider is fairly compensated for completed communications? Does the "fairly compensated" requirement mean that we must include all or part of providers' site commission payments in our ratemaking calculus irrespective of their utility in the completion of incarcerated people's communications?[72] Why or why not? How should our answers to these questions affect our policies regarding site commissions and, in particular, our decision on whether we should preempt state and local laws that impose site commission payments on incarcerated people's communications services providers?

24.     *Rates and Charges.* We next seek comment on what constitutes the "rates and charges" mentioned in the amendments to section 276(b)(1)(A). We propose to interpret "rates" to refer to the amounts paid by consumers of incarcerated people's communications services for calls or other audio or video communications covered by the statute or our rules.[73] And we propose to interpret "charges" to refer to all other amounts assessed on consumers of incarcerated people's communications services in connection with those services. These would include ancillary service charges, authorized fees, mandatory taxes and fees, and any other charges a provider may seek to impose on consumers of communications services for incarcerated people. These interpretations are consistent with the Commission's rules, which currently carve out ancillary service charges, authorized fees, and mandatory taxes and fees as separate from our rate caps.[74] Do commenters agree with our proposed interpretations of these terms? If not, what alternative interpretations do commenters propose and what is the justification for these alternative interpretations?

---

[69] *2021 ICS Notice*, 36 FCC Rcd at 9660-61, paras. 313-14.

[70] *Id.* at 9661, para. 315.

[71] *Id.* at 9659-66, paras. 311-24.

[72] *See* Securus Mar. 8, 2021 *Ex Parte* Letter at 5 (suggesting that the "requirement that providers be 'fairly compensated'" may "counterbalance the use of 'used and useful' as a potential limiting factor"); *id.* (asking whether the D.C. Circuit's holding that "site commissions 'obviously are costs of doing business incurred by [inmate calling services] providers,'" *GTL v. FCC*, 866 F.3d at 413, suggests that a "failure to include any site commission cost recovery in rates [may] preclude providers from being fairly compensated").

[73] 47 CFR § 64.6030 (setting forth interim rate caps for communications services for incarcerated people). Under the Commission's rules the term "Consumer" means "the party paying a Provider of Inmate Calling Services." *Id.* § 64.6000(e).

[74] *See* 47 CFR §§ 64.6000(a)-(b), (n), 64.6020, 64.6070.

**Federal Communications Commission** **FCC 23-19**

25.      *Compensation Plan.*  We also propose finding that setting industry-wide rate caps or rate caps applying to groups of providers, as opposed to separate rates for individual providers, would be sufficient to "establish a compensation plan," as required by the Act.[75]  We note that setting industry-wide rate caps for incarcerated people's communications services would be consistent with the Commission's previous rate regimes regulating rates for these services.[76]  Do commenters agree that mandatory rate caps would constitute a "compensation plan" within the meaning of section 276(b)(1)(A)?  Are there other rate regimes that the Commission should consider that are consistent with—or required by—section 276(b)(1)(A)?  If so, what are they and how do they square with the statutory language and Congress's intent?

26.      Our current rate caps for inmate calling services limit the amount providers may charge any individual consumer for any particular call.  Other forms of rate cap regulation allow providers to charge different amounts for particular services as long as the total charges (weighted by demand) for all services do not exceed an overall cap,[77] or specify that the providers' total revenues must not exceed a specified revenue cap.  We seek comment on whether a regime that constrains rates and ancillary service charges collectively across all service categories (e.g., audio communications services and video communications services) and allows providers to set different rates and charges for the various different services (e.g., lower rates and charges for audio communications services and higher rates and charges for video communications services or vice versa) would constitute a "compensation plan" sufficient to ensure just and reasonable rates and that providers are fairly compensated for completed communications, as required by the Act.  Commenters should address how such a regime would protect individual consumers against unreasonably high rates.  Would sub-caps on rates and charges for different services within each service category be needed and, if so, how should they be structured?

27.      We seek comment on whether section 276(b)(1)(A)'s mandate that we "establish a compensation plan to ensure that . . . all rates and charges" for incarcerated people's communications services be "just and reasonable" extends to ensuring that the providers' practices, classifications, and regulations for or in connection with those services are just and reasonable.  Specifically, does Congress's reference to a "compensation plan" in section 276(b)(1)(A) allow—or require—that we go beyond simply "determining just and reasonable rates," as set forth in section 3(b) of the Martha Wright-Reed Act, and ensure that providers implement those rates justly and reasonably?  We ask for detailed comment on this area, including on the extent of our section 276(b)(1)(A) authority, if any, to address providers' practices, classifications, and regulations, as well as any limitations on that authority.  What other authority, if any, do we have to address the practices, classifications, and regulations for or in connection incarcerated people's communications services?

28.      We also ask how our authority to address unjust and unreasonable "practices, classifications, and regulations" under section 201(b) of the Communications Act should affect our treatment of practices, classifications, and regulations for or in connection with incarcerated people's communications services.  The Commission has previously recognized that where it "has jurisdiction under section 201(b) . . . to regulate rates, charges, and practices of interstate communications services, the impossibility exception extends that authority to the intrastate portion of jurisdictionally mixed services 'where it is impossible or impractical to separate the service's intrastate from interstate components' and state regulation of the intrastate component would interfere with valid federal rules

---

[75] 47 U.S.C. § 276(b)(1)(A).  These rate caps could potentially vary based on facility size "or other characteristics." *See infra* Section III.B.4 (discussing section 3(b)(2) of the Martha Wright-Reed Act).

[76] *See, e.g.*, *2013 ICS Order*, 28 FCC Rcd at 14111, para. 5 (setting interim rate caps); *2015 ICS Order*, 30 FCC Rcd at 12769, para. 9 (adopting tiered rate caps); *2021 ICS Order*, 36 FCC Rcd at 9520-21, para. 2 (adopting interim rate caps for prisons and jails with 1,000 or more incarcerated people).

[77] Our price cap rules for rate of return local exchange carriers establish this type of rate cap regime.  *See* 47 CFR pt. 69.

applicable to the interstate component."[78]  Given the provisions of the Martha Wright-Reed Act granting us authority over intrastate communications services and advanced communications services generally in the incarceration context,[79] we ask whether we may similarly extend our section 201(b) authority to regulate practices, classifications, and regulations for or in connection with incarcerated people's intrastate communications services that were previously subject to state regulation and video services that were unregulated prior to the enactment of the Act.  Can providers practicably separate incarcerated people's communications services into interstate and intrastate, or regulated and nonregulated, components?

## 2.    Section 2(b)—Amendments to Section 3(1) of the Communications Act

29.    Prior to the enactment of the Martha Wright-Reed Act, our authority under section 276 was limited to "payphone service," a term then defined as "the provision of public or semi-public pay telephones, the provision of inmate telephone service in correctional institutions, and any ancillary services."[80]  The new Act expands our authority over services in correctional institutions under section 276 to include "advanced communications services," as defined in sections 3(1)(A), (B), (D), and new (E) of the Communications Act.[81]  Those provisions of section 3(1), in turn, define "advanced communications services" as including (1) "interconnected VoIP service," (2) "non-interconnected VoIP service," (3) "interoperable video conferencing service," and (4) "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[82]  Apart from the restriction to communications with individuals "outside the correctional institution" in section 3(1)(E), and the exclusion of "electronic messaging service" from the revised definition of "payphone service,"[83] the language in the new statute appears to confer on the Commission broad jurisdiction to develop a compensation plan for the categories of audio and video communications now included in the definition of "payphone services" and includes no other limitation except for a limitation to communications "by wire and radio" arising from sections 1 and 2(a) of the Communications Act.[84]  We seek comment on this

---

[78] *2020 ICS Order*, 35 FCC Rcd at 8496, para. 31 (*citing Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, Memorandum Opinion and Order, 19 FCC Rcd 22404, 22413, para. 17 (2004)); *see also Pub. Serv. Comm'n of Md. v. FCC*, 909 F.2d 1510, 1515 (D.C. Cir. 1990); *Illinois Bell Tel. Co. v. FCC*, 883 F.2d 104, 113 (D.C. Cir. 1989).

[79] Martha Wright-Reed Act §§ 2(a)-(c) (amending 47 U.S.C. §§ 153(1), 152(b), 276(b)(1)(A), (d)).

[80] 47 U.S.C. § 276(d) (1996).

[81] Martha Wright-Reed Act § 2(a)(2); 47 U.S.C. § 153(1)(A)-(B), (D)-(E).

[82] 47 U.S.C. §§ 153(1)(A)-(B), (D)-(E), 276(d).  The Communications Act's definitions of "interconnected VoIP service," "interoperable video conferencing service," and "non-interconnected VoIP service" are set forth in 47 U.S.C. §§ 153(25), (27), and (36), respectively.

[83] The Communications Act defines "electronic messaging service" as "a service that provides real-time or near real-time non-voice messages in text form between individuals over communications networks."  47 U.S.C. § 153(19).  "Electronic messaging services" include "services such as e-mail, short message service (SMS) text messaging, and instant messaging.  *See, e.g., Consumer and Governmental Affairs Bureau Seeks Comment on Tentative Findings for the 2022 Twenty-First Century Communications and Video Accessibility Act Biennial Report*, CG Docket No. 10-213, Public Notice, DA 22-661, at 2, para. 7 (CGB June 22, 2022).  In connection with text messaging, the Commission has recognized that "the content that can be sent by wireless messaging is not limited to mere text.  In particular, [multimedia messaging service] is an extension of the SMS protocol and can deliver a variety of media, and enables users to send pictures, videos, and attachments over wireless messaging channels."  *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, WT Docket No. 08-7, Declaratory Ruling, 33 FCC Rcd 12075, 12078, para. 8 (2018).  "Electronic messaging service" is nonetheless included in the definition of "advanced communications services," and is required to be accessible to and usable by people with disabilities, including in carceral facilities, under section 716 of the Communications Act.  *See, e.g.*, 47 U.S.C §§ 610, 617.

[84] 47 U.S.C. §§ 151, 152(a).

unequivocal expansion of our statutory authority under section 276, including how each of the first three types of "advanced communications services" provides additional statutory authority under section 276 beyond what is added by new subsection 3(1)(E) and how each type applies to communications services for incarcerated people.

30.    The Martha Wright-Reed Act extends our ratemaking authority to "interoperable video conferencing service" by including sub-paragraph 3(1)(D) of the Communications Act in the definition of "payphone service" in section 276(d) of that Act.[85]  The Communications Act defines "interoperable video conferencing service" as "a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing."[86]  We seek comment on which video services used, or potentially used, by incarcerated people are included within this definition and whether any are excluded.  Are video visitation services used by incarcerated people "interoperable video conferencing service[s]" under this statutory definition?  How should we interpret the phrases "real-time video communications" and "enable users to share information of the user's choosing" in the context of incarcerated people's communications services?  Are there types of video communications services for incarcerated people that are not real-time?  If so, what are they?  Would it include real-time video that is based in applications or other technologies?  Additionally, given the statutory phrase "any audio or video communications . . . regardless of technology used" in new section 3(1)(E), we seek comment on how to address non-traditional audio and video communications technologies or applications that could effectively enable providers of communications services to incarcerated people to circumvent our rate-making authority.  Consistent with Congressional intent, we will be vigilant in overseeing the provision of all forms of audio and video communications, and invite comment on the steps we should take to ensure that our rules adequately address all forms of audio and video communications subject to our authority.

31.    We seek comment on the proper scope of the limiting phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held" as used in new section 3(1)(E) of the Communications Act.  We note that phrase appears only in section 3(1)(E) and there is no language within section 3(1)(E), or elsewhere in the Communications Act or the Martha Wright-Reed Act, extending this limitation to the other categories of advanced communications services identified in section 2(a)(2) of the Martha Wright-Reed Act.  More specifically, we interpret the use of the limiting phrase of new subsection 3(1)(E) as not applying to the other subsections of section 3(1) that are now referenced in section 276(d).  In addition, this limiting phrase has no application to any other aspect of section (3)(1) outside the context of section 276.  We invite comment on the proper scope of the limitation included in section 3(1)(E).

32.    We propose to interpret the phrase "any audio or video communications service" in subsection 3(1)(E) as encompassing every method that incarcerated people may presently, or in the future, use to communicate, by wire or radio, by voice, sign language, or other audio or visual media.  We seek comment on this proposal.  We also seek comment on how to interpret the phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."  Does this phrase include all types of audio or video communications services—regardless of whether the communication is interstate, intrastate, or international—that an incarcerated person uses to communicate with a person not confined within the incarcerated person's correctional institution, regardless of that person's physical location at the time of the communication?  In other words, if a calling service is typically used for communicating with family, friends, or loved ones, is that person's physical location at the time of the call determinative, so that, for

---

[85] Martha Wright-Reed Act § 2(a)(2).

[86] 47 U.S.C. § 153(27).  We note that the Commission has a pending proceeding seeking further comment on the kinds of services encompassed by the term "interoperable video conferencing services."  *Consumer and Governmental Affairs Bureau Seeks to Refresh the Record on Interoperable Video Conferencing Services*, CG Docket No. 10-213, Public Notice, DA 22-463, at 1 (Apr. 27, 2022) (refreshing the record on the meaning of the term "interoperable" in the context of video conferencing services and equipment).

example, our authority over an incarcerated person's calls to family members' cell phones might cease when the family members enter the incarcerated person's correctional institution as opposed to when they are at their homes?

33.     We seek comment on the meaning of the phrase "outside the correctional institution where the inmate is held" with reference to the audio and video communications services covered by section 2(b)(3) of the Martha Wright-Reed Act.  Does it refer to any physical location not subject to involuntary confinement restrictions?  As we discuss below, a chief defining characteristic of correctional institutions is that they are places where people are involuntarily confined.[87]  Could physical locations "outside" the correctional institution include any location not used for confinement purposes, including rooms designated for communicating with, or visitation by, persons not subject to confinement, including family, friends, and members of the general public not subject to confinement?  Similarly, could "individuals outside the correctional institution" refer to people who are neither confined in nor employed by the institution, even if they are temporarily located on the premises of the institution for purposes of communicating with incarcerated individuals through some form of audio or video communications service?  We invite comment on these potential interpretations.  Are there additional types of communications encompassed within these statutory phrases?  Conversely, are there other types of communications that fall outside those phrases?  For example, should we interpret the statutory language as excluding all audio and video communications between employees of the correctional institution and incarcerated people from the definition of "payphone service" as revised by the Act?

34.     Under certain of the interpretations suggested above, our newly expanded authority under section 276(b)(1)(A) could extend to onsite video visitation services (i.e., services in which video communication between persons located within the same building or site substitute for traditional in-person visitation), either because: (1) they are interoperable video conferencing services within the meaning of section 3(1)(D) or because (2) they are video services within the meaning of section 3(1)(E).  In the latter case, incarcerated people would use onsite video visitation services to communicate with persons not confined in or employed by a correctional institution—and with whom the incarcerated person is only allowed to communicate via an audio or video communications service and only when they are at a location where the incarcerated person is unable to be.  We seek comment on whether these interpretations of the Martha Wright-Reed Act are consistent with the language of the statute and would further the purposes of the Act.  We note that on-site video visitation services are typically operated by providers of inmate calling services as currently defined in our rules, and the same services and equipment may be used by an incarcerated person regardless of whether the "visitor" is on-site, at home, or at another remote location.[88]

35.     We also seek comment on whether the phrase "regardless of technology used" in section 3(1)(E) of the Communications Act encompasses the technology used for video visitation, now and in the future.  The record shows that some institutions are restricting or prohibiting in-person visits in favor of video visitation and a visitor may lack sufficient broadband service or equipment to enable video visitation from their home or elsewhere.[89]  To the extent a service provider charges for video visitation at the facility, should those charges be subject to our ratemaking authority?

---

[87] *See infra* Section III.B.4 (Size and Type of Correctional Institution).

[88] *See 2021 ICS Notice*, 36 FCC Rcd at 9648-49, para. 281 ("[T]he record indicates that remote video visitation, where available, is often provided by an inmate calling service provider.").

[89] *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Further Notice of Proposed Rulemaking, 29 FCC Rcd 13170, 13229, para. 151 (2014) ("[T]he record shows that some correctional institutions have eliminated all in-person visitation and replaced it with video visitation."); *see also 2022 ICS Order* at 12, para. 24 (discussing the exponential demand for video visitation services since the onset of the COVID-19 pandemic); *Petition of Network Communications International Corporation for Forbearance pursuant to 47 U.S.C. § 160(c) from Application of Contribution Obligations on Inmate Calling Services*; *Securus Technologies, LLC, Request for Waiver of Section 54.706 of the Commission's Rules*, WC Docket No. 19-232, Order, 35 FCC Rcd 8348, 8353, para. (continued….)

36.    In light of these concerns, we seek comment on interpreting the Act broadly to achieve its stated goal of ensuring "just and reasonable charges for telephone and advanced communications services in correctional and detention facilities."[90]  Further, we seek comment on whether a broad interpretation will advance the goal of section 716 of the Communications Act to ensure that services and equipment used for advanced communications services are accessible to and usable by people with disabilities.[91]  We invite comment on whether a broad interpretation would be a correct reading of section 2(b)(3) of the Martha Wright-Reed Act.  Are there other onsite audio and video services that we should consider within our authority under this interpretation of the statutory language?  Finally, if we interpret video communications services as including onsite video visitation, we seek comment on how the Commission can ensure that all forms of onsite video visitation services within the scope of our authority that are used to communicate with non-incarcerated people are subject to the rules we adopt to implement the Act.  Are there instances where correctional institutions impose charges on video visitation or predicate its use on charges for other related or unrelated services?

### 3.    Section 2(c)—Amendment to Section 2(b) of the Communications Act

37.    The Martha Wright-Reed Act amends section 2(b) of the Communications Act, which generally acts as a limitation on the Commission's jurisdiction over intrastate communications, as well as a rule for interpreting other provisions of the Communications Act.[92]  Section 2(b) enumerates certain statutory provisions that are not subject to the generally applicable limitation on the Commission's jurisdiction.[93]  When Congress enacted the Martha Wright-Reed Act, it added section 276 of the Communications Act to section 2(b)'s list of exceptions to the general limitation on the Commission's authority over intrastate communications.[94]  This change, when coupled with the broad language in the amended section 276, suggests that Congress intended to grant the Commission authority over all intrastate communications services between incarcerated people and non-incarcerated people with whom they wish to communicate.[95]  Do commenters agree?

38.    We propose finding that, in combination, the amendments to section 276 and the addition of section 276 to the exceptions contained in section 2(b) of the Communications Act grant the Commission plenary authority over intrastate communications services provided to incarcerated people.[96]

(Continued from previous page)  ―――――――――――
16 (2020) (finding that pre-pandemic many incarcerated persons were not permitted in-person visits and already were limited to video visitations).

[90] Martha Wright-Reed Act pmbl.

[91] 47 U.S.C. § 617.

[92] Martha Wright-Reed Act § 2(c); 47 U.S.C. § 152(b)(1); *see La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 373 (1986) (holding that section 2(b)(1) of the Communications Act provides "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction" in interpreting the Act's provisions).

[93] 47 U.S.C. § 152(b)(1) ("Except as provided in [certain enumerated sections of the Act] . . . nothing in this Act shall be construed to apply or give the Commission jurisdiction" over intrastate communications services.).

[94] Martha Wright-Reed Act § 2(c); 47 U.S.C. § 152(b)(1).

[95] *See, e.g.*, 168 Cong. Rec. at H10028 (daily ed. Dec. 22, 2022) (statement of Rep. Rush) (explaining that the "legislation would confirm the FCC's regulatory power to protect all prison and jail phone calls, not just those that cross state lines"); *id.* H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) (stating that the bill would give the FCC authority to regulate "the rates charged for calls made between confinement facilities and people within the same State").

[96] 47 U.S.C. §§ 152(a)-(b), 276.  The Commission's authority to adopt rules for intrastate incarcerated people's communications service is further supported by section 276(b)(1)'s directive that the Commission adopt regulations to implement, among other things, section 276(b)(1)(A), along with the broad authority in provisions such as section 201(b) of the Communications Act, which authorizes the Commission to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act."  *Id.* § 201(b).

In addition, we propose finding that our expanded jurisdiction over intrastate communications extends to any communications service now covered by section 276, including the "advanced communications services" added to the definition of "payphone service."[97]  We seek comment on these proposed findings and on whether the inclusion of section 276 in the section 2(b) exemption list now provides the Commission with definitive authority to regulate all audio and video communications services covered by section 276.

## B.    Implementation of the Martha Wright-Reed Act

### 1.    Approach to Ratemaking

39.    Section 3(a) of the Martha Wright-Reed Act directs the Commission to "promulgate any regulations necessary to implement" that Act,[98] including its mandate that "all rates and charges" for completed payphone communications be "just and reasonable."[99]  Below, we seek comment on how we can best discharge this statutory mandate.

40.    The Commission's prior efforts to ensure just and reasonable rates for inmate calling services focused on capping, on an industry-wide basis, the rates and ancillary services charges providers could assess for, or in connection with, voice calls, based on providers' costs.[100]  We seek comment on whether we should follow this approach with regard to all communications services provided to incarcerated people.  Should we instead set separate caps on rates and charges for different types of providers or, alternatively, for each individual provider?  We ask that commenters address the relative benefits and burdens of each approach, including the potential impact on consumers, providers, and Commission resources.

41.    We also seek comment on whether we should set separate rate and ancillary services rate caps for audio and video services.  Do the costs of providing audio and video services vary significantly? Do the costs of ancillary services depend on whether these services are ancillary to audio or video services?  Would separate caps for different services benefit incarcerated people and their families, and other consumers?  Would providers incur additional costs if separate rate caps were implemented, and if so, how would these costs compare to any benefits consumers might receive from separate caps?  Is there a risk that separate caps for different services could be exploited in a way that would harm consumers? What burdens, if any, would separate rates and charges impose on providers?  Would it be difficult for providers to separate their costs in a meaningful way for different services for purposes of submitting the data the Commission would need to set separate rate caps?  Are there any voice and video services that are, or could be, combined such that it would be burdensome to assess separate rates and charges for them?  If so, what are they?  Should we allow voice and video services to be offered as bundles?  If so, should we require that all rates, charges, and terms and conditions of service be included in the same contract, and the rates and charges for each type of service and bundle be separately listed so as to be easily identifiable?

42.    In the event we decide to set separate caps for audio and video services, should we subdivide either category into different types of services for ratemaking purposes?  If so, what should those subcategories be?  What types of audio and video services do providers offer?  Do providers offer different audio and video services as part of a package?  Do different types of audio and video services make different demands on provider resources and, if so, how should we reflect those differences in our

---

[97] The revised definition of advanced communications services includes "any audio or video communications service used by inmates . . . regardless of technology used," which was added to the definition of "payphone service" for purposes of section 276 of the Communications Act.  Martha Wright-Reed Act §§ 2(a)(2), 2(b)(3).

[98] Martha Wright-Reed Act § (3)(a).

[99] *Id.* pmbl., § 2(a)(1)(B).

[100] *See, e.g., 2021 ICS Order,* 36 FCC Rcd at 9536-9604, paras. 39-193.

ratemaking?  If we were to set separate caps for different services, how would we decide what caps to apply to any new covered services providers may introduce in the future?

43.     Assuming that the Martha Wright-Reed Act expands the Commission's existing jurisdiction over ratemaking to include all communications services for incarcerated people, including intrastate services, the Commission must ensure that intrastate rates are also just and reasonable.  In the past, the Commission did not distinguish between costs for interstate and intrastate voice services in setting rate caps for interstate inmate calling services.  Rather it adopted a total industry cost approach, explaining that:

> Our calculations use total industry costs, both interstate and intrastate, because the available data do not suggest that there are any differences between the costs of providing interstate and intrastate inmate calling services.  Nor do such data suggest a method for separating reported costs between the intrastate and interstate jurisdictions that might capture such differences, if any.  Finally, providers do not assert any such differences.[101]

The Commission followed this total cost approach in the *2021 ICS Order*, as detailed in the Appendices to that *Order*.[102]  We propose to take a similar approach in implementing the Martha Wright-Reed Act and to continue to treat costs for interstate voice services and intrastate voice services as having identical per-unit costs.  Do commenters agree with this approach?  If not, they should address in detail how costs differ between interstate and intrastate voice services and how to measure these differences.  Commenters should also address whether such differences are substantial enough to warrant different rate caps based on the jurisdiction of a voice call, taking into account the burden associated with such a separation.  In the time since the *2020 ICS Notice*, have providers developed ways to separate intrastate voice costs from interstate voice costs?[103]  What burdens would be associated with such a separation process?

44.     We also seek comment on whether we should take a total cost approach to video services and assume that the average costs for intrastate video communications services are identical to the average costs for interstate video communications.  If parties disagree with that assumption, they should explain how costs differ based on the jurisdictional nature of video communications.  Can the jurisdictional nature of video communications services even be determined or are such services inherently interstate?  Parties should also address whether such differences are substantial enough to warrant different rate caps for interstate and intrastate video communications services.  Is there a way for providers to separate the costs associated with interstate video services in a meaningful way from the costs associated with intrastate video services?  What burdens would be associated with such a separation?

45.     We invite comment on the types of pricing plans we should allow for the audio and video communications services subject to our section 276 ratemaking authority.  Our rules currently prohibit providers from charging incarcerated people or their loved ones for calls on a per-call or per-connection basis and require providers to price their interstate, international, and jurisdictionally indeterminate calling services at or below specific per-minute rate caps.[104]  This structure results in incarcerated persons

---

[101] *2020 ICS Notice*, 35 FCC Rcd at 8513-14, para. 83.

[102] *2021 ICS Order*, 36 FCC Rcd at 9542, 9544-46, paras. 54, 60-65; *see also id.* Appx. E, paras. 9, 17, 34, 36 (referencing total costs).

[103] We note that no provider submitting data in response to the Third Mandatory Data Collection attempted to separate its interstate and intrastate costs.

[104] 47 CFR § 64.6030 (setting forth the Commission's interstate and international interim rate caps); *id.* § 64.6080 (prohibiting per-call or per-connection charges); *id.* § 64.6090 (prohibiting flat-rate calling); *see also id.* § 64.6070 (limiting the taxes and governmental fees that providers may pass through to consumers).  For convenience, we refer to 47 CFR §§ 64.6030, 64.6080, 64.6090 as the "pricing structure rules."  Separately, our rules allow incarcerated people's communications services providers to charge consumers for any of five specified types of ancillary services charges, each subject to their own respective caps.  *Id.* § 64.6020.

and their families paying for their interstate and international phone calls on a per-minute basis.[105]  In the *2022 ICS Notice*, we sought comment on whether we should authorize pilot programs under which providers of incarcerated people's calling services could offer alternative pricing structures for voice calls, including structures under which an incarcerated person would receive a specified—or unlimited— number of monthly minutes of use for a predetermined monthly charge.[106]  Do commenters agree that nothing in the Act precludes us from adopting alternative pricing structures for audio or video communications?

46.    We seek comment on whether we should require a specific pricing structure for incarcerated people's video communications services.  If so, what should that structure be?  Should we require that providers offer such video communications services at per-minute rates?  If not, what alternative structure do commenters support, and what would be the benefits and burdens of any alternative structure?  How can we best ensure that the rates for video communications services are just and reasonable?  We seek broad comment on the pricing structures under which providers presently offer video services to incarcerated people and whether those structures can harm consumers or lead to unreasonably high rates.  What would be the benefits or burdens of allowing providers to continue to use their current pricing structures for video communications services, either under pilot programs or on a permanent basis?  Should we allow providers to use these alternative structures for audio services?  If so, what conditions should we impose on providers to ensure just and reasonable rates for both incarcerated people's audio and video communications services?

## 2.    Use of Data in Ratemaking

47.    Section 3(b)(1) of the Martha Wright-Reed Act specifies that the Commission "may use industry-wide average costs of telephone service and advanced communications services" in promulgating implementing regulations and determining just and reasonable rates.[107]  That section also specifies that the Commission may use "the average costs of service of a communications service provider" for such purposes.[108]  In our view, these authorizations, when read in conjunction with the elimination of the requirement that providers be "fairly compensated for each and every" completed call,[109] respond directly to the D.C. Circuit's holding that, in the *2015 ICS Order*, the Commission had improperly used industry-wide average costs in setting interstate rate caps.[110]  We invite comment on our view that the language of the new statutory provisions allows, but does not require, the Commission to rely on average costs—either on an industry-wide, or provider-specific basis—to set rate caps for all forms of incarcerated people's communications services.

48.    We also seek comment on the meaning of "industry-wide," as used in section 3(b)(1) of the Act.  Should we interpret "industry-wide" as referring exclusively to entities that provide "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used"?[111]  Or should we read "industry-wide" as referring collectively to all providers of "telephone service and advanced communications services?"  Alternatively, should we interpret "industry-wide" to refer only to some subset of providers of incarcerated people's communications services?  Similarly, does the phrase

---

[105] *See generally 2021 ICS Order*, 36 FCC Rcd at 9547, para. 68 (determining that per-minute rates are preferable to per-call rates).

[106] *2022 ICS Notice* at 60-65, paras. 148-60.

[107] Martha Wright-Reed Act § 3(b)(1).

[108] *Id.*

[109] 47 U.S.C. § 276 (1996).

[110] *GTL v. FCC*, 866 F.3d at 414-15.

[111] Martha Wright-Reed Act § 2(b)(3).

"average costs of service of a communications service provider" refer to all communications service providers? Or only to providers of incarcerated people's communications service or even an individual provider of communications services for incarcerated people? We ask that parties explain the basis for their preferred interpretation of these statutory phrases.

49.    We seek comment on the best approach to using industry-wide average costs to determine just and reasonable rates for both traditional telephone service and advanced communications services provided to incarcerated people. Are there any circumstances under which setting rates based on industry-wide average costs would result in unreasonably high or unreasonably low rates for any particular group of providers or consumers? If so, does the statutory language permit us to divide the relevant industry into groups based on their average costs per unit of service or specific cost-related characteristics, such as whether the provider serves facilities primarily located in rural or urban areas; and, if so, which specific cost-related characteristics should we consider? If we take that step, what additional steps should we take to discharge our obligation, under section 3(b)(2) of the Martha Wright-Reed Act, to "consider . . . differences in the [average costs of telephone service and advanced communications services] by small, medium, or large facilities."[112]

50.    We also seek comment on how we might use "the average costs of service of a communications service provider" to set just and reasonable rates.[113] Would this statutory language allow us to use the average costs of an efficient (i.e., least cost) provider holding quality and provided services constant, or a group of efficient providers, to set industry-wide rates or to set rates for a subset of the industry?[114] Does any commenter view the statutory language as allowing—or even requiring—us to set rates for each provider based on that provider's average costs of service? Assuming we have the flexibility to adopt rate caps on an industry-wide or individual-provider basis, which approach would best allow us to ensure that rates and charges are just and reasonable? Additionally, we seek comment on whether using average costs of service to set rates for smaller subsets of the industry would raise any confidentiality concerns and whether those concerns might be outweighed by the public interest benefits of using average costs.

51.    In the accompanying Order, we conclude that it is necessary to update and restructure the most recent data collection to ensure that rates and charges for all incarcerated people's communications services are "just and reasonable," and we delegate authority to WCB and OEA to implement such a data collection.[115] We ask for detailed comment on how should we proceed if a particular provider or a group of providers do not provide reliable and accurate information in response to the forthcoming data collection. We also ask how we should proceed if the submitted information does not allow us to determine with precision the costs attributable to any particular service or function or groups of services or functions for which WCB and OEA request data.

### 3.    Necessary Safety and Security Costs

52.    We seek comment on the directive in section 3(b)(2) of the Martha Wright-Reed Act that the Commission "shall consider costs associated with any safety and security measures necessary to provide" telephone service and advanced communications services to incarcerated people.[116] As an initial matter, we seek comment on what "shall consider" means. How much discretion, if any, does that phrase give the Commission in evaluating safety and security costs? Is the Commission required to treat all

---

[112] *Id.* § 3(b)(2).

[113] *Id.* § 3(b)(1).

[114] *Cf. GTL v. FCC*, 866 F.3d at 414-15 (taking issue with the Commission's efficient providers approach because the sampled providers represented less than one percent of the market).

[115] *See infra* Section IV.

[116] Martha Wright-Reed Act § 3(b)(2).

safety and security costs identified by providers or facilities as costs recoverable through rates for communications services for incarcerated people?  Could the Commission "consider" such costs, but ultimately decide to exclude all of them from its rate calculations as unnecessary?  Is there a middle ground whereby the Commission could consider safety and security costs and decide to include some of those costs, but exclude others, from its rate calculations?  To what extent does the Commission's duty to consider "costs" depend on the strength or credibility of the record documenting such costs?

53.    We seek comment on several aspects of the phrase "necessary safety and security measures."[117]  How are we to understand the word "necessary" here?  How does a standard of "necessary" compare to the "used and useful" standard the Commission traditionally uses in analyzing whether rates are just and reasonable rates under section 201(b)?  The Commission has, in the past, interpreted "necessary" as having essentially the same meaning as "used and useful."[118]  But the D.C. Circuit has previously found that interpretation overly broad, explaining that "necessary" "must be construed in a fashion that is consistent with the ordinary and fair meaning of the word, *i.e.,* so as to limit 'necessary' to that which is required to achieve a desired goal."[119]  The D.C. Circuit also observed that "courts have frequently interpreted the word 'necessary' to mean less than absolutely essential, and have explicitly found that a measure may be 'necessary' even though acceptable alternatives have not been exhausted."[120]  How should we implement the D.C. Circuit's guidance in this context?  What is the "ordinary and fair meaning" of the word "necessary" as used in section 3(b)(2) of the Martha Wright-Reed Act?"  Should we interpret "necessary" in that section to mean something less than absolutely essential or indispensable?  Is it something more than "used and useful"?  What interpretation do commenters suggest, and why?

54.    We seek detailed, specific comment on which safety and security measures are "necessary" to the provision of telephone and advanced communications services for incarcerated people and why those measures are "necessary."[121]  Are any safety and security measures "necessary" to the provision of those services?[122]  Or are such measures core features of the correctional environment, rather than features needed to adapt communications services to that environment?[123]

---

[117] *Id.*

[118] *See, e.g.*, *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, First Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 4761, 4776-77, para. 28 (1999) (interpreting "necessary" in section 251(c)(6) of the Communications Act as requiring incumbent local exchange carriers to allow "collocation of any equipment that is 'used or useful' for either interconnection or access to unbundled network elements, regardless of other functionalities inherent in such equipment").

[119] *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000) (*GTE*) (italics in original).  The Commission later revised its interpretation of "necessary" in line with *GTE*.  The Commission concluded that equipment is "necessary" for purposes of interconnection or access to unbundled network elements under section 251(c)(6) if "an inability to deploy equipment would, as a practical, economic, or operational matter, preclude the requesting carrier from obtaining interconnection or access to unbundled network elements."  *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, Fourth Report and Order, 16 FCC Rcd 15435, 15441, para. 12 (2001), *aff'd sub nom. Verizon Tel. Cos. v. FCC*, 292 F.3d 903 (D.C. Cir. 2002).

[120] *Natural Resources Defense Council, Inc. v. Thomas*, 838 F.2d 1224, 1236 (D.C. Cir. 1988) (citations omitted); *see also FTC v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979) ("Obviously however, the word 'necessary' is not always used in its most rigid sense.").

[121] The Commission has previously sought comment on similar issues regarding telephone service for incarcerated people.  *See 2021 ICS Notice*, 36 FCC Rcd at 9664-65, para. 323; *2022 ICS Notice* at 53, para. 131.

[122] *See, e.g.*, National Sheriffs' Association Comments, WC Docket No. 12-375, at 4 (filed Sept. 27, 2021) (characterizing security and administrative duties as "necessary" for communication services for incarcerated people); Pay Tel Communications, Inc., Reply, WC Docket No. 12-375, at 9-10 (filed Dec. 17, 2021) (arguing that certain security functions may be required for the provision of communications services for incarcerated people in certain contexts); Global Tel*Link Corporation Reply, WC Docket No. 12-375, at 8-9 (filed Dec. 17, 2021)

(continued….)

55.      Some commenters assert that safety and security measures can cover a wide range of tasks, including, but not limited to, enrolling incarcerated people into voice biometrics systems, call monitoring, responding to alerts, blocking and unblocking numbers, and analyzing call recordings.[124]  We seek comment not only on what constitute safety and security measures, but also which of those measures, if any, are "necessary" within the meaning of the statutory language.[125]  Commenters should identify and describe any safety and security measures they consider "necessary" to the provision of any form of communications services for incarcerated people and to explain in detail why they deem each identified service to be "necessary."  Conversely, we invite comment on why specific safety and security measures, or even broad categories of such measures, are not "necessary" to the provision of communications services for incarcerated people.  We also seek comment on whether we should interpret the Martha Wright-Reed Act's use of the term "safety and security" as having the same or different meaning as the term "security and surveillance" previously used in this proceeding.[126]

(Continued from previous page) ———————————————
(explaining that "security and surveillance are a core function of [inmate calling services]" and that such costs are "inextricably intertwined with the provision of" those services).

[123] *See, e.g.*, Worth Rises Comments, WC Docket No. 12-375, at 1-4 (filed Sept. 27, 2021) (arguing that security is a "core function of correctional agencies and is related to the standard operation of correctional facilities" and that "[i]n all cases, except when layered onto communication services, these security and surveillance products and services are paid for out of agencies' operating budget[s]"); United Church of Christ et al. Comments, WC Docket No. 12-375, at 12 (filed Sept. 27, 2021) (UCC OC, Inc., Comments) (explaining that "security and surveillance are procured in the interest of correctional facilities"); National Sheriffs' Association Reply, WC Docket No. 12-375, at 7 (filed Dec. 21, 2021) (acknowledging that the "primary duty of Sheriffs and jails is to ensure security in the facility and in the community and access to [incarcerated people's communications services] cannot override this").  Worth Rises traces the development of safety and security services in this context, explaining that such services were historically sold to correctional facilities by "standalone security firms" separate from communications services.  Worth Rises Comments at 2.  Worth Rises asserts that as new providers entered the market for telecommunications services following the breakup of AT&T, these security firms "quickly began providing communications services to their correctional customers" and "layered their security and surveillance services on top of their new communications services and shifted their cost onto [calling services] consumers."  Worth Rises Comments at 3.  Since that time, "providers have continued to expand their suite of security and surveillance services through R&D and the acquisition of other security firms, technologies, and patents."  Worth Rises Comments at 3.

[124] *See, e.g.*, National Sheriffs' Association Comments at 3; Prison Policy Initiative Comments, WC Docket No. 12-375, at 18 (filed Sept. 27, 2021); Pay Tel Communications, Inc., Comments, WC Docket No. 12-375, Exh. 2 (filed Sept. 27, 2021) (Pay Tel Comments).

[125] *Compare* Inmate Calling Solutions, LLC, Comments, WC Docket No. 12-375, at 15 (filed Jan. 12, 2015) (suggesting that a "basic" telephone system only requires security for "allowing calls with simple call control: (a) identifying the inmate calling; (b) restricting who the inmate can and cannot call; (c) providing the called party with the ability to accept, reject, or block the caller; and (d) providing the facility with the ability to monitor and record the calls"), Worth Rises Comments at 12 (contending that the only relevant security services are "those required on all communications by the Communications Assistance for Law Enforcement Act")*, and* UCC OC, Inc., Comments at 12 (arguing that there is "no reason that the staff time of a correctional officer should be reflected in rates for phone service, and security and surveillance should not be a profit center for incarcerating institutions"), *with* Praeses LLC Comments, WC Docket No. 12-375, at 13 (filed Sept. 27, 2021) (arguing, broadly, that the Commission "should defer to Facilities on issues regarding the welfare and security of inmates") *and* National Sheriffs' Association Comments at 3 (explaining that "security duties include: enrollment and management of inmates into voice biometrics system; responding to [inmate calling services] system alerts; forwarding alerts and recorded calls to investigators; conducting real-time monitoring of inmate conversations; analyzing call recording of inmate conversations; burning CDs of conversations for further review by investigators; and responding to law enforcement requests and subpoenas for call detail records and recordings").

[126] Letter from Gregory R. Capobianco, counsel to Telecommunications for the Deaf and Hard of Hearing, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375, at 2 (filed Mar. 10, 2023).

56.    In addition, we invite comment on the extent to which resources (e.g., labor, tangible and intangible assets, and materials) of the provider—as opposed to the resources of carceral facilities or authorities—are used to provide any "necessary" safety and security measures.  To the extent more data are required from providers regarding safety and security measures, WCB and OEA should seek to obtain those data in the forthcoming supplemental data collection.[127]  We also invite comment on how we can determine the "costs associated with" any necessary safety and security measures to the extent resources of the facilities are used to provide these measures.[128]  We ask for detailed comment on what steps, if any, we should take to determine those costs and on how we should proceed if we are unable to determine those costs.  We also seek comment on how we should address any information we have regarding those costs in setting just and reasonable rates for communications services for incarcerated people.  For example, if we determine that a particular safety or security measure is necessary to provide a covered service, would it be appropriate to include the underlying costs in rates and let the provider and facility determine how to appropriately share those costs?

57.    Finally, we invite detailed comment on the relationship, if any, between safety and security measures and site commission payments.  For example, to what extent do monetary site commission payments compensate correctional institutions for costs they bear in connection with "necessary" safety and security services they incur, if any, using their own resources?  Do providers offer safety and security products and services at discounted rates or at no cost to correctional institutions?[129]  If so, what are these products and services?  Do correctional facilities instruct providers to furnish safety and security products and services on their behalf?  If so, what products and services do correctional facilities typically ask providers to furnish?  Do providers introduce new security and surveillance services during the contract negotiation process or at some point during the duration of a contract?[130]  If so, why do they do so and what effect do such services have on end-user rates?[131]  To the extent commenters argue that safety and security measures are embedded in site commission payments, to what extent, if any, do these payments serve to reimburse correctional facilities for costs they incur to ensure that the provision of communications services for incarcerated people does not pose any associated safety or security risk?[132]  If so, what information do correctional facilities have documenting those costs?  Do correctional facilities ever provide data regarding their safety and security costs during the contract negotiation process?  We invite comment on these and any other matters that would assist the

---

[127] Our action today includes an Order delegating authority to the Wireline Competition Bureau and the Office of Economics and Analytics to update and restructure the existing data collection.  *See infra* Section IV.

[128] *See, e.g.*, National Sheriffs' Association Comments 4 (suggesting that the correctional officials perform certain security and administrative tasks "in many" facilities instead of the calling services provider); Pay Tel Comments, Exh. 2 (providing a chart listing various security and administrative tasks and whether the calling services provider or the facility performs them).

[129] Letter from Bianca Tylek, Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed Mar. 24, 2021) (Worth Rises Mar. 24, 2021 *Ex Parte*) (explaining that providers have offered "to provide security and surveillance products and services that were not requested to sweeten a bid and distract from the stated purpose of the procurement process").

[130] *Id.* (arguing that providers have "routinely introduced new security and surveillance services," sometimes mid-contract, and that these new services are "not associated with any increase in rates").

[131] *Id.* (contending that new security and surveillance services become "normalized" such that "[s]ubsequent procurement processes then require or prefer these new technologies" effectively allowing providers to "perpetually introduce new security and surveillance services that they sell to correctional facilities but force incarcerated people and their families to pay for or use to justify high calling rates").

[132] *See, e.g., id.* at 3 (suggesting that correctional officials "have claimed that the commissions they are paid are for security and surveillance costs borne by their facilities" but that this is really "meant to justify longstanding commission payments").

Commission in understanding the relationship between safety and security measures and site commission payments.

### 4.    Size and Type of Correctional Institution

58.    The Martha Wright-Reed Act directs that the Commission "shall consider . . . differences in the [average costs of telephone service and advanced communications services] by small, medium, or large facilities."[133]  We seek comment on certain questions raised by this language.

59.    We first seek comment on the Martha Wright-Reed Act's use of differing terms to refer to incarceration facilities, apparently interchangeably, including "correctional institutions," "correctional facilities," "detention facilities," and "facilities."[134]  We propose to interpret each of these statutory terms as generically and interchangeably referencing places where people are involuntarily confined.  We seek comment on this proposal.  We also seek comment on the meaning of the terms "detention facility" and "detention facilities," as used in the Martha Wright-Reed Act.[135]  The statute neither defines these terms nor provides direction on how the Commission should interpret them.  Neither do the Commission's rules.  Should we interpret the term "detention facilities" as having the same meaning as the Commission's existing definition of "correctional institution" or "correctional facility?"[136]  Does "detention facility" have a meaning different from jails and prisons?  Are there compelling reasons to make any definitional distinctions between correctional institutions and detention facilities?

60.    We also seek comment on whether the terms currently defined in our rules— "correctional facility or correctional institution"—could be used as generic terms to encompass the different terms used in the Martha Wright-Reed Act.  We propose to continue to interpret these terms as applying to all portions of a correctional institution, collectively, to avoid the risk of any particular institution being divided into multiple entities of differing sizes in an effort to take advantage of whatever size-based rate tiers we may adopt as part of our rate structure for incarcerated people's communications services.[137]  We invite comment on this proposal.

61.    Our current rules define "Correctional Facility or Correctional Institution" as "a jail or a prison" and then separately define "Jail" and "Prison."[138]  We propose to continue to interpret the term "Correctional Institution" to include all the facilities encompassed within the current definitions of "Prison" and "Jail."[139]  We seek comment on this proposal, as well as on whether we should expand those definitions to include other types of facilities.[140]  By way of example, the Commission has previously sought comment on including "civil commitment facilities, residential facilities, group facilities, and nursing facilities in which people with disabilities, substance abuse problems, or other conditions are routinely detained" as part of the definition of "Correctional Facility."[141]  Should we include those, or any other additional facilities, in our definitions of "Jail," "Prison," or "Correctional Facility"?

62.    The Martha Wright-Reed Act states that the Commission "shall consider . . . differences

---

[133] Martha Wright-Reed Act § 3(b)(2).

[134] *Id.* pmbl., §§ 2(b)(3), 3(b)(2), 4.  Similarly, the Commission's rules use "Correctional Facility" and "Correctional Institution" interchangeably.  47 CFR § 64.6000(f) (definition of Correctional Facility or Correctional Institution).

[135] *Id.* § 4.  We note that both uses of these terms occur outside the operative portions of the statute and therefore provide guidance on the intent of Congress or context for limiting the statute's effect on other laws.

[136] *See* 47 CFR § 64.6000(f).

[137] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12783-84, paras. 40-41.

[138] 47 CFR § 64.6000(f).

[139] *Id.* § 64.6000(m), (r).

[140] *2022 ICS Notice* at 65, para. 161.

[141] *Id.*

in the costs . . . by small, medium or large facilities or other characteristics," as part of its rate-setting process.[142] We seek comment on how to interpret "small, medium, or large facilities." What size categories should the Commission adopt to implement this language? What size thresholds should apply to each category? What metrics should we use to define size categories, and what data should we consider in setting size thresholds? We also seek comment on whether the directive to consider size differences is only relevant if the Commission uses cost-averaging in setting rates for incarcerated people's communications services, as addressed in section 3(b)(1) of the Act. In other words, if the Commission were to base its rates on something other than industry-wide average costs, would it still be obligated to consider potential cost differences associated with serving different-sized facilities?

63.    Our current rate structure distinguishes among different types and sizes of correctional institutions, establishing separate rate caps for prisons and jails, as well as separate rate tiers for different-sized jails. This seems consistent with the Martha Wright-Reed Act's reference to "small, medium, or large facilities," but we seek comment on whether the Act allows or requires any change in the Commission's current approach to analyzing providers' costs based on the type and size of correctional institution being served. Does the Martha Wright-Reed Act require us to implement more or fewer rate tiers based on type or size? We invite parties to provide information in support of any claims they may make in regard to the differences or similarities in the costs associated with serving different types or sizes of facilities. Could the Commission set the same rates for small, medium, and large facilities after considering cost differences, if any?

64.    To the extent we continue to use multiple rate tiers for different-sized correctional institutions, we seek comment on our continued use of average daily population as the primary metric for measuring the size of correctional institutions. We incorporate and renew prior calls for comments on how average daily population should factor into our rate caps, if at all.[143] Should we adjust our current distinction between jails with average daily populations below 1,000, and jails with average daily populations at or above 1,000 based on the Act's use of the terms "small, medium, or large"? Should the Commission adopt other size thresholds to account for differing cost characteristics of different-sized correctional institutions? Are there compelling reasons to adopt a different metric for determining size other than average daily population?

65.    The Martha Wright-Reed Act also directs the Commission to consider "other characteristics" besides size-based distinctions in setting rates for incarcerated people's communications services.[144] We seek comment on what other characteristics we should consider in setting rates, including correctional institution type (whether it is a prison, jail, or other kind of institution), geographic location (whether it is in an urban, as opposed to a rural, area), and the technology used (whether it is wireline as opposed to wireless, internet protocol-based as opposed to circuit-switched, or is connected to the public switched telephone network (PSTN) as opposed to transmitted only via the Internet). How do these characteristics affect costs? Should the Commission use "other characteristics" in tandem with the size of a facility when setting new rate caps? If so, how do these characteristics impact costs? How much weight should be given to the impact of other characteristics on the underlying costs? Is the primary driver of costs for some types of calls the number of calls, minutes, bits, phones, tablets, incarcerated people, network capacity, some combination of these, or something else? How does this vary with the nature of the call, for example, whether it is connected to the PSTN or is an app-to-app call, or whether it is a video or audio call regardless of the mode of transmission? Can the Commission disregard the size of the facility if some "other characteristic" provides more compelling cost-related differences?

---

[142] Martha Wright-Reed Act § 3(b)(2).

[143] *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9658-59, paras. 306-10.

[144] Martha Wright-Reed Act § 3(b)(2).

### C.      Effect on Other Laws

66.      Section 4 of the Martha Wright-Reed Act states that: "[n]othing in this Act shall be construed to modify or affect any Federal, State or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities."[145]  Below, we seek comment on the meaning and purpose of this provision.  As an initial matter, we propose finding that the phrase "this Act," as used in section 4, refers specifically to the Martha Wright-Reed Act, as opposed to the Communications Act.  This seems to be the most logical reading of that reference, and we seek comment on this proposed finding.

67.      We next invite comment on the meaning of the language in the first clause of section 4 of the new Act providing that "[n]othing in this Act shall be construed to modify or affect any Federal, State or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility."[146]  We seek comment on how we should interpret this language as a general matter.  Does the language of this clause simply mean that the Martha Wright-Reed Act does not create any new obligation for state or local facilities to provide any form of incarcerated people's calling services?[147]  Does the language carry any different or additional meanings?  Should we interpret "to require" in this context as referring to all Federal, State, and local laws that affirmatively mandate the provision of telephone service or advanced communications services?  Are there other possible meanings of the phrase in this provision?  We observe that the statute uses the phrase "to require," as opposed to "to provide," or "to offer."  What is the significance of the choice of the word "require" in section 4?  We invite comment about any of the other language in this clause and about the interplay between this language and any of the proposals contained in this Notice.

68.      We also seek comment on how we should interpret the second clause of section 4, which specifies that nothing in the Act shall "prohibit the implementation of any safety and security measures related to such services at such facilities."[148]  Does the language of this clause simply mean that the just and reasonable ratemaking focus of the Martha Wright-Reed Act is not intended to interfere with any correctional official's decision on whether to implement any type of safety or security measure that the official desires in conjunction with audio or video communications services?  Why or why not?  How broadly should the Commission interpret the phrase "safety and security measures" in this section?  Should the Commission rely on prior definitions of safety and security measures in these types of facilities?  We also seek comment on how we should construe the word "related."  What does it mean when safety and security measures are "related" to telephone service or advanced communications services?

69.      We note that the Martha Wright-Reed Act also references "safety and security measures" in section 3(b)(2), which requires the Commission to consider the costs associated with "necessary" safety and security measures in determining just and reasonable rates.[149]  How do commenters propose that the Commission reconcile the language of this clause with the Commission's duty under the Act to ensure that rates are "just and reasonable"?  The provision in section 3(b)(2) requires that the Commission consider certain costs when determining just and reasonable rates, whereas the reference in section 4 ensures that correctional officials retain the ability to implement "related" safety and security measures.  Thus, under section 4, correctional officials remain free to implement any safety and security measures

---

[145] *Id*. § 4.

[146] *Id*.

[147] For example, if a federal law requires provision of a particular form of disability access in prisons, jails, or detention facilities, this clause would not modify or affect that federal law.

[148] Martha Wright-Reed Act § 4.

[149] *Id*. § 3(b)(2).

related to inmate telephone service or advanced communications services.  We seek comment on this analysis.

70.     Consistent with the above analysis, we seek comment on what relationship, if any, section 4 may have with the Commission's consideration of "necessary" safety and security costs in its ratemaking calculus under section 3.  We have recognized that, in some circumstances, correctional officials may have used monetary site commission payments to implement safety and security measures that, for ratemaking purposes, are not necessary for the provision of incarcerated people's communications services.[150]  Contracts between correctional officials and incarcerated people's communications services providers also may require, as in-kind site commission payments, that the providers implement safety and security measures unrelated to the provision of communications services. Do commenters agree that our decision to exclude the costs of such "unnecessary" measures from our ratemaking calculus will not proscribe correctional facilities' prerogatives to implement them as contemplated by section 4?  If not, why not?  Are there other considerations we should take into account with respect to the "safety and security measures" clause in section 4?

71.     Finally, we seek comment on the relationship of section 4 to section 276(c) of the Communications Act, as amended,[151] which remains unchanged by the Martha Wright-Reed Act.  Section 276(c) provides that, "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements."[152]  In practice, the Commission has relied on the "impossibility exception" to preempt intrastate rates and charges where it is impossible or impracticable to separate the intrastate components of a service from interstate components regulated by the Commission's rules.[153]  The impossibility exception applied to such "jurisdictionally mixed" rates and charges when the Commission adopted rate caps pursuant to its authority under section 201(b) of the Act.[154]  Since we propose to interpret the Martha Wright-Reed Act to provide the Commission clear authority to establish a compensation plan ensuring "just and reasonable" rates and charges and fair compensation for providers for both interstate and intrastate services under section 276 of the Communications Act,[155] we propose to find that state regulations that exceed the rates or rate caps we adopt pursuant to the Martha Wright-Reed Act shall be preempted under section 276(c).[156]

---

[150] *Cf. 2021 ICS Order*, 36 FCC Rcd at 9585, para. 148 (explaining that the Commission has been unable to determine "whether security and surveillance costs that correctional facilities claim to incur in providing inmate calling services are 'legitimate' inmate calling services costs that should be recoverable through interstate and international calling rates"); *2021 ICS Notice*, 36 FCC Rcd at 9665, para. 323 (suggesting that site commission payments may cover "security-related costs . . . that should more appropriately be deemed to be general security services that are added on to inmate calling services but not actually necessary to the provision of the calling service itself"); *see also* Worth Rises Mar. 24, 2021 *Ex Parte* at 3 (arguing that correctional officials justify site commission payments by claiming that such payments compensate them for security and surveillance costs they bear).

[151] 47 U.S.C. § 276(c).

[152] *Id.*

[153] *See, e.g.*, *Qwest Corp. v Minnesota Pub. Utils. Comm'n*, 380 F.3d 367, 372 (8th Cir. 2004) (explaining that "[t]he FCC has authority to preempt state regulation of telecommunications where it is not possible to separate the interstate and intrastate aspects of a communications service, and where the Commission concludes that federal regulation is necessary to further a valid federal regulatory objective").

[154] *See, e.g.*, *2020 ICS Order*, 35 FCC Rcd at 8495-8500, paras. 29-46 (discussing and applying the impossibility exception to determine whether intrastate and jurisdictionally mixed ancillary service charges are subject to the Commission's ancillary service charge caps); *2021 ICS Order*, 36 FCC Rcd at 9617, para. 217 (justifying the preemption of state regulation of jurisdictionally mixed services under the impossibility exception).

[155] *Supra* Section II.A.1.c.

[156] 47 U.S.C. § 276(c).

72.      We also seek comment on the proper exercise of our preemption authority as it relates to state laws that mandate lower rates and charges for incarcerated people's communications services or that mandate that such services be offered free to consumers.[157]  In light of our proposal to find that we have plenary authority over intrastate communications services provided to incarcerated people, we invite comment on what steps, if any, the Commission should consider following a state mandate where a provider is able to claim, and clearly substantiate its claim, that an unreasonably low rate leads to unfair compensation to providers.[158]  Additionally, we seek to be clear, we propose to find that section 4 is no bar to the Commission's preemption authority with respect to establishing the rates and charges for audio and video communications in correctional facilities and prohibiting state or local requirements that would require higher rates or charges.  We seek comment on these proposed findings.  Further, we propose to find that nothing in section 4 affects the Commission's prior preemption policies under the impossibility exception, and we seek comment on this proposed finding.  To the extent a party contends there is such an effect, we ask for detailed comment on how we should take that effect into account in our regulation of incarcerated people's communication services.  Finally, we seek comment broadly on the scope of the Commission's preemption authority in light of the Martha Wright-Reed Act, including in particular, our authority over site commissions.[159]

### D.    Necessary Rule Changes

73.      *Changes to Part 64, Subpart FF.*  The Martha Wright-Reed Act specifies that the Commission "shall promulgate any regulations necessary to implement this Act and the amendments made by this Act" not earlier than 18 months and not later than 24 months after the date of enactment.[160]  As discussed above, we interpret the statutory amendments to sections 2, 3, and 276 of the Communications Act as providing the Commission plenary authority over all audio or video communications services (other than electronic messaging), by wire or radio, between incarcerated people and individuals not subject to involuntary confinement.  As part of the Act, the Commission must ensure that all payphone providers are fairly compensated and that all rates and charges are just and reasonable.[161]  In addition, some entities that are not subject to our current inmate calling services rules are now "payphone service providers" within the meaning of section 276(b)(1) of the Communications Act and thus will be subject to our new rules implementing these statutory mandates.[162]  We seek

---

[157] Cal. Penal Code § 2084.5 (West 2023) (providing that state prison or youth residential placement or detention centers operated by the Department of Corrections and Rehabilitation "shall provide persons in their custody and confined in a correctional or detention facility with accessible, functional voice communication services free of charge to the person initiating and the person receiving the communication"); Cal. Welf. & Inst. Code § 208.1 (West 2023) (requiring county or city youth residential placement or detention centers to provide "persons in their custody with accessible, functional voice communication services free of charge to the person initiating and the person receiving the communication"); 2021 Conn. Legis. Serv. P.A. No. 21-54 (S.B. 972), § 1(b) (West) (requiring the Commissioner of Correction to "provide voice communication service to persons who are in the custody of the commissioner and confined in a correctional facility . . . free of charge to such persons and any communication, whether initiated or received through any such service, shall be free of charge to the person initiating or receiving the communication").

[158] *See* Securus March 8, 2023 *Ex Parte* (suggesting that we consider "establish[ing] unitary [intra]state and interstate rate caps and prevent any variation by the states).

[159] *See* Corrected Petition for Reconsideration of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket No. 12-375 (filed Dec. 15, 2022).

[160] Martha Wright-Reed Act §§ 2-3.

[161] *Id.* § 2.

[162] *See* Letter from Nick Galvin, Public Policy & Advocacy Manager, Ameelio, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 12-375 & 23-62 (Ameelio Mar. 10, 2023 *Ex Parte* Letter) (asking how the Commission's inmate calling services accessibility rules should be applied to entities that qualify as incarcerated people's communications service providers).

comment on what specific rule changes or new rules are necessary to effectuate the Martha Wright-Reed Act.  Any comments proposing new or amended rules should include, as part of the commenter's submission, a draft rule or markup of an existing rule to be incorporated into Subpart FF of Part 64 of the Commission's rules.[163]  We note that while the Act precludes our implementing rules from becoming effective earlier than July 2024, the statutory amendments became effective upon enactment and are effective today.[164]  Pending the effective date of any new rules we adopt, any entity that is an inmate calling services provider within the meaning of our existing rules must comply fully with those rules.[165]

74.    The Act allows or requires that we make certain types of data analyses in promulgating implementing regulations.[166]  We propose to interpret the Act as allowing us to perform any and all acts and issue any orders, including orders requiring the submission of data and other information from audio and video communications service providers now covered by the Act, conducive to the discharge of these and our other implementation responsibilities under the Martha Wright-Reed Act.[167]  We invite comment on this proposal.

75.    *Accessibility Rule Changes Necessitated by the Expanded Definition of Advanced Communications Services.*  We also seek comment on the extent to which the Martha Wright-Reed Act expands our ability to ensure that any audio and video communications services used by incarcerated people are accessible to and usable by people with disabilities.  With the addition of this new category of services to the definition of "advanced communications services," some of these services, as well as some equipment used for such services, regardless of technology used, may be newly subject to accessibility requirements under section 716 of the Communications Act.[168]  Section 716, added to the Communications Act by the Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA),[169] requires providers of advanced communications services and manufacturers of equipment used with such services to ensure that such services and equipment are accessible to and usable by people with disabilities, unless doing so is not achievable.[170]  If accessibility is not achievable either by building it into the service or equipment or by using third party accessibility solutions, then a manufacturer or service provider must ensure that its equipment or service is compatible with existing peripheral devices or specialized customer premises equipment, unless not achievable.[171]  Each provider of advanced communications services has a duty not to install network features, functions, or capabilities that impede accessibility or usability.[172]  In 2011, the Commission adopted Part 14 of its rules, which implements these statutory provisions, requiring service providers and equipment manufacturers of all types of

---

[163] 47 CFR §§ 64.6000-64.6130.

[164] Martha Wright-Reed Act § 3(a).  The Act became effective upon its being signed into law on January 5, 2023.

[165] *See* 47 CFR § 64.6000(j), (s).

[166] Martha Wright-Reed Act § 3(b).

[167] *Cf.* 47 U.S.C. § 154(i).

[168] 47 U.S.C. § 617.

[169] Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751 (2010) (as codified in various sections of U.S.C. tit. 47) (CVAA).  The law was enacted on October 8, 2010.  *See also* Amendment of Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-265, 124 Stat. 2795 (2010) (also enacted on October 8, 2010; making technical corrections).

[170] 47 U.S.C. § 617(a)(1), (b)(1), (e).

[171] *Id.* § 617(c).

[172] *Id.* § 617(d).

advanced communications services and equipment to meet specific obligations, performance objectives, recordkeeping, and reporting requirements.[173]

76.     We seek comment generally on what changes to Part 14 of our rules are needed to implement the amended definition of "advanced communications services." We specifically propose to amend the Part 14 definition of "advanced communications services" to incorporate the amended statutory definition, and seek comment on this proposal. Is there any reason we should not adopt the statutory definition verbatim? Are there specific terms in the new category of advanced communications services, apart from those raised above,[174] that we should separately define in section 14.10 of our rules, and if so, how should they be defined?

77.     We also seek comment on whether any changes are needed to other provisions of Part 14 to reflect the inclusion of these services and equipment. For example, are there specific performance objectives or recordkeeping requirements that should be added or modified to ensure that providers of covered communications services and manufacturers of associated equipment used by incarcerated people are in full compliance with their accessibility obligations?

78.     *Payphones Other Than in the Incarceration Context.* Although the Martha Wright-Reed Act specifically addresses payphones in the incarceration context, certain amendments to section 276 of the Communications Act apply to payphones more generally, including both those used by incarcerated people and those used by the public, in the case of more traditional payphones. For payphone service outside of the incarceration context, we propose to find that no new regulations are "necessary" to implement the Martha Wright-Reed Act and its amendments to the Communications Act pursuant to section 3(a) of the Act. Accordingly, we propose relying on our existing rules governing traditional payphone service to ensure that all payphone providers outside of the incarceration context are fairly compensated and that their rates and charges are just and reasonable, consistent with section 276(b)(1)(a), as amended.[175] We seek comment on the proposal to find new payphone service rules unnecessary and to continue relying on our existing rules to satisfy any of the new statutory requirements that apply outside the incarceration context.

---

[173] *Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010*; *Accessible Mobile Phone Options for People who are Blind, Deaf-Blind, or Have Low Vision*; *Amendments to the Commission's Rules Implementing Sections 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996*, CG Docket Nos. 10-213 and 10-145, WT Docket No. 96-198, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 14557 (2011); *see also* 47 CFR §§ 14.20, 14.21, 14.31.

[174] *See supra* Section III.A.2.

[175] Martha Wright-Reed Act § 2(a)(1)(B); 47 U.S.C. § 276(b)(1)(a). In 1999, the Commission determined that traditional (i.e., non-inmate calling services) payphones do not require pricing regulation because that portion of the payphone market was sufficiently competitive. *Implementation of the Pay Telephone Reclassification and Compensation Provision of the Telecommunications Act of 1996*, CC Docket No. 96-128, Third Report and Order and Order on Reconsideration of the Second Report and Order, 14 FCC Rcd 2545, 2548, para. 2 (1999) (*1999 Traditional Payphone Order*) ("The Commission also deregulated the local coin rate for payphone calls to allow the competitive market place to set fair compensation for such calls."). In addition, advancements in mobile and wireless technology have made traditional payphones virtually obsolete. *See, e.g.*, *1999 Traditional Payphone Order*, 14 FCC Rcd at 2550, para. 9 (asserting that the rapid growth of cellphone technology provides an alternative to traditional payphones, leading to "a reduction in the deployment of payphones in some areas"); *Modernization of Payphone Compensation Rules*; *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*; *2016 Biennial Review of Telecommunications Regulations*, WC Docket Nos. 17-141 and 16-123, CC Docket No. 96-128, Report and Order, 33 FCC Rcd 2589, 2589-90, 2591, paras. 1, 4-6 (2018) ("eliminat[ing] rules that are no longer needed to ensure that payphone service providers (PSPs) receive the compensation to which they are entitled" and finding that "the steady and steep decline over more than a decade of the number of payphones in service demonstrates that they no longer play as critical a role in society's communications as they once did, as would-be users rely instead on mobile subscriptions").

79.    *Effect on Small Entities.*  We recognize that our actions in this proceeding may affect several groups of small entities.  For example, payphone service providers that provide only limited communications services to incarcerated people, or that provide communications services to incarcerated people via technologies not previously covered by section 276, will be subject to new regulatory requirements.  In addition, our implementation of the Martha Wright-Reed Act may subject entities currently subject to our inmate calling services rules to new regulatory obligations.  We therefore seek comment on how we should take into account the impact on small businesses and, in particular, any disproportionate impact or unique burdens that small businesses may face, in effectuating the mandates set forth in the Martha Wright-Reed Act and the Communications Act.  Parties should also address any alternative proposals that would minimize the burdens on small businesses.

### E.    Other Reforms Related to Incarcerated People's Communications Services

80.    In addition to seeking comment on actions the Commission should take to implement the Martha Wright-Reed Act, we propose revisions to our rules to reflect updated language used to refer to calls made by incarcerated people.  Our rules currently use "inmate calling services" or "ICS" to refer to "a service that allows Inmates to make calls to individuals outside the Correctional Facility where the Inmate is being held, regardless of the technology used to deliver the service."[176]  With the Martha Wright-Reed Act's expansion of the Commission's authority beyond calling services to include all audio and video communications services used by incarcerated people, the Commission uses today and will use going forward the term "incarcerated people's communications services" or "IPCS" to refer to these broader service offerings.[177]  In connection with this change in terminology, we have also changed references to "inmates" to "incarcerated people" at the request of public interest advocates.[178]  To reflect this evolution in terminology, we propose codifying these changes in our existing rules and in any new rules we adopt pursuant to this proceeding.[179]  We seek comment on this proposal.

81.    Finally, we invite parties to comment on any other matters that may be relevant to our implementation of the Martha Wright-Reed Act to adopt just and reasonable rates and charges for incarcerated people's audio and video communications services.

### F.    Digital Equity and Inclusion

82.    The Commission, as part of its continuing effort to advance digital equity for all,[180] including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, invites comment on any equity-related considerations[181] and benefits (if any) that may be

---

[176] 47 CFR § 64.6000(j).

[177] *See supra* note 37.

[178] *See* United Church of Christ July 29, 2020 *Ex Parte* Letter at 1-2 (urging the Commission to "revise the title of this docket and eliminate the term 'inmate,'" explaining that "[m]any incarcerated people and advocates view the term 'inmate' as dehumanizing and disparaging").

[179] *See* 47 CFR §§ 64.1200(a)(9)(ii), 64.6000-64.6120.

[180] Section 1 of the Communications Act provides that the Commission "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex."  47 U.S.C. § 151.

[181] The term "equity" is used here consistent with Executive Order 13985, to mean "as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality."  *See* Exec. Order No. 13985, 86 Fed. Reg. 7009,

(continued….)

associated with the proposals and issues discussed herein.  Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well the scope of the Commission's relevant legal authority.

## IV.    ORDER

83.     The Martha Wright-Reed Act directs the Commission to promulgate regulations necessary to implement its provisions not earlier than 18 months and not later than 24 months after the date of its enactment, and includes specific language addressing the use of data in promulgating implementing regulations.[182]  The statutory language provides both guidance and directives regarding data, including allowing the Commission to "use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider" in determining just and reasonable rates.[183]  It further states that the Commission "shall consider costs associated with safety and security measures necessary to provide a service" and "differences in costs" by "small, medium and large facilities or other characteristics."[184]  These provisions contemplate and require the collection and analysis of advanced communications services' costs and related data, especially for video communications, among other data that, prior to the Act, the Commission either had no jurisdiction to collect or reason for doing so.[185]  The data analysis to implement the statute's mandate that rates and charges be "just and reasonable" must be completed within the required 18 to 24 month timeframe.

84.     To ensure that we have the data we need, in the timeframe to meet this statutory mandate, and given the procedurally complex and time-consuming process for data collections such as these, we reaffirm the Commission's prior delegation of authority to WCB and OEA and direct them to update the prior data collection to encompass, and collect, data on all incarcerated people's communications services from all providers of those services now subject to our expanded authority under the Martha Wright-Reed Act and the Communications Act.[186]  Specifically, we delegate authority to WCB and OEA to update and restructure the most recent data collection as appropriate to implement the Martha Wright-Reed Act.[187]  The Commission has collected three data collections related to incarcerated people's calling services in the past ten years.  To allow for consistent data reporting, the Commission directed the Commission staff to develop a template for providers to use when submitting their data and to furnish providers with

---

(Continued from previous page)
Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[182] Martha Wright-Reed Act § 3(a)-(b).

[183] *Id*. § 3(b)(1).

[184] *Id*. § 3(b)(2).

[185] *See GTL v. FCC*, 866 F.3d at 413 (vacating a Commission reporting requirement related to video visitation services, as "too attenuated to the Commission's statutory authority").

[186] For example the most recent data collection, limited only to inmate telephone services data, took nearly 14 months from the date the Commission delegated authority to WCB and OEA to conduct the data collection on May 24, 2021, to obtaining OMB approval of the data collection instructions and templates, issuing the order directing providers to file their responses and waiting for the data responses to be filed on June 30, 2022 (a total 402 days for Commission staff to receive responses from the date of delegation of authority).  *See 2021 ICS Order*, 36 FCC Rcd at 9618, para. 218; *see also Wireline Competition Bureau Announces the Due Date for Responses to the Commission's Inmate Calling Services Third Mandatory Data Collection*, WC Docket No. 12-375, Public Notice, DA 22-214 (WCB Mar. 2, 2022) (establishing the response due date of June 30, 2022).  In addition to these steps, WCB and OEA will need time to compile the data into a consistent and meaningful format, analyze the data, and make recommendations for Commission consideration to result in the Act's implementing rules.

[187] Martha Wright-Reed Act §§ 2-3.

instructions to implement the collection.[188]  The Commission also directed staff to review the providers' submissions and delegated to the staff the authority to require providers to submit additional data as necessary to perform its review.[189]

85.    We conclude that we must immediately begin the process of updating and restructuring the most recent data collection if we are to meet both our procedural obligations (to consider certain types of data) and our substantive responsibilities (to set just and reasonable rates and charges) under the Martha Wright-Reed Act and the Communications Act.[190]  We therefore delegate to WCB and OEA authority to implement any appropriate modifications to this data collection, including with respect to information concerning "any audio or video communications service used by inmates for the purpose of communicating with individuals outside of the correctional institution where the inmate is held, regardless of technology used."[191]  We direct WCB and OEA to modify the template and instructions for the collection[192] to the extent appropriate to timely collect such information to cover the additional services and providers now subject to our authority.[193]  We also delegate to WCB and OEA the authority to require providers not covered by section 276 of the Communications Act to submit any additional information that they find will assist the Commission in implementing the Martha Wright-Reed Act, including, but not limited to, the authority to request more recent data for additional years not covered by the most recent data collection.  Finally, we delegate to WCB and OEA the authority to conduct the requisite Paperwork Reduction Act analysis for any new or modified data collection(s) that they implement pursuant to this Order.  Any new or modified requirements that require approval from the Office of Management and Budget (OMB) under the Paperwork Reduction Act shall be effective on the date specified in a notice published in the Federal Register announcing OMB's approval.

86.    *Annual Reports.*  We also reaffirm and update the Commission's prior delegation of authority to WCB and the Consumer and Governmental Affairs Bureau (CGB) to revise the instructions and reporting template for the Annual Reports that all service providers are required to file each year.[194]  Specifically, we delegate authority to WCB and CGB to modify, supplement, and update those instructions and that template as appropriate to supplement the information we will be receiving in response to the Mandatory Data Collection described above.  We find that this additional information is needed to enable us to understand the rates and ancillary service fees incarcerated people's communications services providers charge for or in connection with all the audio and video services now subject to our authority.[195]  Finally, we delegate to WCB and CGB the authority to conduct the requisite Paperwork Reduction Act analysis for any changes to the Annual Report requirements that are implemented pursuant to this Order.

87.    *Effective Date of Delegations of Authority.*  Our delegations of authority to WCB, OEA, and CGB will take effect immediately upon publication of this Order in the Federal Register.  Making the

[188] *2021 ICS Order*, 36 FCC Rcd at 9620, para. 221; *2015 ICS Order*, 30 FCC Rcd at 12863, para. 201; *2013 ICS Order*, 28 FCC Rcd at 14173, para. 126.

[189] *2021 ICS Order*, 36 FCC Rcd at 9622, para. 227; *2015 ICS Order*, 30 FCC Rcd at 12863, para. 201; *2013 ICS Order*, 28 FCC Rcd at 14173, para. 126.

[190] *See* Martha Wright-Reed Act § 3.

[191] *Id.* § 2.

[192] *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, DA 22-52 (WCB/OEA Jan. 18, 2022).

[193] *See 2021 ICS Order*, 36 FCC Rcd at 9620, para. 221.

[194] *See 2022 ICS Order* at 25, para. 52.

[195] We note that incarcerated people's communications services providers that do not provide any services classified as inmate calling services under our current rules will not be subject to this reporting requirement.  *See* 47 CFR §§ 64.6000(j), (s), 64.6060.

delegations effective at that time will enable WCB, OEA, and CGB to move as expeditiously as practicable toward modifying, supplementing, and updating the Third Mandatory Data Collection to include additional information to facilitate our ability to fully implement the Martha Wright-Reed Act. Indeed, the Martha Wright-Reed Act directs the Commission to "promulgate any regulations necessary" to establish just and reasonable rates "not later than 24 months" after enactment.[196]  Any unnecessary delay in our efforts to collect appropriate information would be inconsistent with, and undermine the Commission's ability to meet the deadlines contained in, the Act.  Furthermore, given the importance of these areas to incarcerated people, including those with communication disabilities, any unnecessary delay in these initiatives would be inconsistent with the public interest.

88.    For purposes of administrative efficiency and to further assist the Commission in its efforts to implement the Martha Wright-Reed Act, we intend to consider the extensive record developed in WC Docket No. 12-375, Rates for Interstate Inmate Calling Services, and hereby incorporate the record of that proceeding into WC Docket No. 23-62.

## V.    PROCEDURAL MATTERS

89.    *Filing of Comments and Replies.*  Pursuant to sections 1.415 and 1.419 of the Commission's rules, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.[197]  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).[198]

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS: https://www.fcc.gov/ecfs/filings.

- Paper Filers:

    o  Parties who choose to file by paper must file an original and one copy of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

    o  Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

    o  Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

    o  U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street, NE, Washington, DC 20554.

    o  Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings.  This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.[199]

---

[196] Martha Wright-Reed Act § 3.

[197] 47 CFR §§ 1.415, 1.419.

[198] *See* FCC, Electronic Filing of Documents in Rulemaking Proceedings, 63 Fed. Reg. 24121 (May 1, 1998).

[199] *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice*, 35 FCC Rcd 2788 (OMD 2020), https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy.

- Comments and reply comments must include a short and concise summary of the substantive arguments raised in the pleading. Comments and reply comments must also comply with section 1.49 and all other applicable sections of the Commission's rules. We direct all interested parties to include the name of the filing party and the date of the filing on each page of their comments and reply comments. All parties are encouraged to use a table of contents, regardless of the length of their submission. We also strongly encourage parties to track the organization set forth in the Notice of Proposed Rulemaking in order to facilitate our internal review process.

90.    *People with Disabilities.*  To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530.

91.    *Ex Parte Rules.*  The proceeding that the Notice of Proposed Rulemaking initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[200] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in the prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b).[201]  In proceedings governed by section 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

92.    *Regulatory Flexibility Act.*  The Regulatory Flexibility Act of 1980, as amended (RFA),[202] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[203]  Accordingly, the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the possible impact of the rule and policy changes contained in this *Notice of Proposed Rulemaking*. The IRFA is set forth in Appendix A.

93.    *Paperwork Reduction Act.*  This Order does not contain information collection(s) subject to the Paperwork Reduction Act of 1995 (PRA).[204]  In addition, therefore, it does not contain any new or

---

[200] 47 CFR § 1.1200 *et seq.*

[201] *Id.* § 1.1206(b).

[202] *See* 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601–612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[203] *Id.*

[204] Pub. L. No. 104-13, 109 Stat. 163 (1995) (codified at 44 U.S.C. §§ 3501-3520).

modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002.[205]

94.    *Initial Paperwork Reduction Act of 1995 Analysis*.  The Notice of Proposed Rulemaking may contain new or modified information collection(s) subject to the PRA.[206]  If the Commission adopts any new or modified information collection requirements, they will be submitted to the OMB for review under section 3507(d) of the PRA.  OMB, the general public, and other federal agencies are invited to comment on the new or modified information collection requirements contained in these proceedings.  In addition, pursuant to the Small Business Paperwork Relief Act of 2002,[207] we seek specific comment on how we might "further reduce the information collection burden for small business concerns with fewer than 25 employees."[208]

## VI.    ORDERING CLAUSES

95.    Accordingly, IT IS ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 5(c), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 155(c), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), this Notice of Proposed Rulemaking and Order ARE ADOPTED.

96.    IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 5(c), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 155(c), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), and sections 0.201 and 1.103(a) of the Commission's rules, 47 CFR §§ 0.201, 1.103(a), this Order delegating authority to the Wireline Competition Bureau, the Office of Economics and Analytics, and the Consumer and Governmental Affairs Bureau SHALL BE EFFECTIVE upon publication in the Federal Register.

97.    IT IS FURTHER ORDERED that, pursuant to applicable procedures set forth in sections 1.415 and 1.419 of the Commission's Rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on this Notice of Proposed Rulemaking on or before 30 days after publication of a summary of this Notice of Proposed Rulemaking in the Federal Register and reply comments on or before 60 days after publication of a summary of this Notice of Proposed Rulemaking in the Federal Register.

98.    IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Notice of Proposed Rulemaking and Order to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[205] 44 U.S.C. § 3506(c)(4).

[206] Pub. L. No. 104-13.

[207] Pub. L. No. 107-198.

[208] 44 U.S.C. § 3506(c)(4).

## APPENDIX A

### INITIAL REGULATORY FLEXIBILITY ANALYSIS

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies and rules proposed in the Notice of Proposed Rule Making.[2]  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments in the Notice of Proposed Rulemaking.  The Commission will send a copy of the Notice, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[3]  In addition, the Notice and IRFA (or summaries thereof) will be published in the *Federal Register*.[4]

### A.        Need for, and Objectives of, the Proposed Rules

2.        In the Notice, the Commission seeks comment on implementing the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act), enacted by Congress to ensure just and reasonable rates for telephone and advanced communications services in correctional and detention facilities.  The Act was passed in an effort to remedy decades of exorbitant rates for telecommunications services paid by family members, clergy, counsel, and other critical support systems.

3.        The Commission seeks comment on the purpose and scope of the amendments made to the Commission's authority and how the Act expands its authority over incarcerated people's communications services, including over advanced communications services, intrastate services, and "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[5]  The Commission also seeks comment on the Act's directions regarding how it should consider implementing the Act, including when the Commission is to adopt rules, the use of data to set just and reasonable rates, the costs of facility safety and security measures, and the size of correctional facilities.  Lastly, the Commission also seeks comment on how the Act affects its ability to ensure that incarcerated people's communications services and associated equipment promote digital equity and are accessible to and usable by incarcerated people with disabilities.

### B.        Legal Basis

4.        The proposed action is authorized pursuant to Sections 1, 2, 4(i)-(j), 5(c), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 155(c), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022).

---

[1] *See* 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] This item continues ongoing efforts to reform providers' rates, charges, and practices in connection with interstate and international inmate calling services.  *See, e.g.*, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519 (2021); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, FCC 22-76 (Sept. 30, 2022).

[3] *See* 5 U.S.C. § 603(a).

[4] *Id.*

[5] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (Martha Wright-Reed Act or the Act).

### C.    Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

5.        The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rule revisions, if adopted.[6]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[7]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[8]  A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[9]

6.        *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe here, at the outset, three broad groups of small entities that could be directly affected herein.[10]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[11]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[12]

7.        Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[13]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[14]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[15]

---

[6] 5 U.S.C. § 603(b)(3).

[7] *See* 5 U.S.C. § 601(6).

[8] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[9] *See* 15 U.S.C. § 632.

[10] *See* 5 U.S.C. § 601(3)-(6).

[11] *See* SBA, Office of Advocacy, Frequently Asked Questions, "What is a small business?," https://cdn.advocacy.sba.gov/wp-content/uploads/2021/12/06095731/Small-Business-FAQ-Revised-December-2021.pdf (Dec. 2021).

[12] *Id.*

[13] *See* 5 U.S.C. § 601(4).

[14] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations — Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data do not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[15] *See* Exempt Organizations Business Master File Extract (EO BMF), CSV Files by Region, https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.

(continued….)

**Federal Communications Commission**  FCC 23-19

8.       Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[16]  U.S. Census Bureau data from the 2017 Census of Governments[17] indicate that there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[18]  Of this number there were 36,931 general purpose governments (county[19] or municipal and town or township[20]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[21] with enrollment populations of less than 50,000.[22]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[23]

9.       *Wired Telecommunications Carriers.*  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[24]  Transmission facilities may be based on a single technology or a

---

(Continued from previous page)

The data utilized for purposes of this description were extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000, for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) which includes the continental U.S., Alaska, and Hawaii.  These data do not include information for Puerto Rico.

[16] *See* 5 U.S.C. § 601(5).

[17] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7."  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[18] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2. Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, or municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes_Local Governments by Type and State_2017.

[19] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[20] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[21] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

[22] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data do not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts are included in the special purpose governments category.

[23] This total is derived from the sum of the number of general purpose governments (county, or municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[24] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

combination of technologies.  Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including Voice over Internet Protocol (VoIP) services, wired (cable) audio and video programming distribution, and wired broadband internet services.[25]  By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[26]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[27]

10.    The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[28]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[29]  Of this number, 2,964 firms operated with fewer than 250 employees.[30]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 5,183 providers that reported they were engaged in the provision of fixed local services.[31]  Of these providers, the Commission estimates that 4,737 providers have 1,500 or fewer employees.[32]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

11.    *Local Exchange Carriers (LECs)*.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services.  Providers of these services include both incumbent and competitive local exchange service providers.  Wired Telecommunications Carriers[33] is the closest industry with a SBA small business size standard.[34]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[35]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[36]  U.S. Census Bureau data for 2017 show that there were 3,054 firms

---

[25] *Id.*

[26] *Id.*

[27] Fixed Local Service Providers include the following types of providers: incumbent LECs, Competitive Access Providers (CAPs) and competitive LECs, Cable/Coax competitive LECs, Interconnected VoIP Providers, Non-Interconnected VoIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers are not included in this industry.

[28] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[29] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[30] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[31] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[32] *Id.*

[33] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[34] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[35] Fixed Local Exchange Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VoIP Providers, Non-Interconnected VoIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[36] *Id.*

that operated in this industry for the entire year.[37]  Of this number, 2,964 firms operated with fewer than 250 employees.[38]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 5,183 providers that reported they were fixed local exchange service providers.[39]  Of these providers, the Commission estimates that 4,737 providers have 1,500 or fewer employees.[40]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

   12. *Incumbent Local Exchange Carriers (Incumbent LECs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers[41] is the closest industry with a SBA small business size standard.[42] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[43]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[44]  Of this number, 2,964 firms operated with fewer than 250 employees.[45]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 1,227 providers that reported they were incumbent local exchange service providers.[46]  Of these providers, the Commission estimates that 929 providers have 1,500 or fewer employees.[47]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

   13. *Competitive Local Exchange Carriers (LECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers.[48]

---

[37] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[38] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[39] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[40] *Id.*

[41] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[42] *See* 13 CFR § 121.201, NAICS Code 517311.

[43] *Id.*

[44] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[45] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[46] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[47] *Id.*

[48] Competitive Local Exchange Service Providers include the following types of providers: Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (competitive LECs, Cable/Coax competitive LECs, Interconnected VoIP Providers, Non-Interconnected VoIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

Wired Telecommunications Carriers[49] is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[50]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[51]  Of this number, 2,964 firms operated with fewer than 250 employees.[52]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 3,956 providers that reported they were competitive local exchange service providers.[53]  Of these providers, the Commission estimates that 3,808 providers have 1,500 or fewer employees.[54]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

14.    *Interexchange Carriers (IXCs)*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers.  Wired Telecommunications Carriers[55] is the closest industry with a SBA small business size standard.[56]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[57]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[58]  Of this number, 2,964 firms operated with fewer than 250 employees.[59]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 151 providers that reported they were engaged in the provision of interexchange services.  Of these providers, the Commission estimates that 131 providers have 1,500 or fewer employees.[60]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

15.    *Local Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers.  Telecommunications Resellers is the closest industry with

---

[49] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[50] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[51] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[52] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[53] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[54] *Id.*

[55] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[56] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[57] *Id.*

[58] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[59] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[60] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

a SBA small business size standard.[61] The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[62] Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[63] Mobile virtual network operators (MVNOs) are included in this industry.[64] The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[65] U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[66] Of that number, 1,375 firms operated with fewer than 250 employees.[67] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 293 providers that reported they were engaged in the provision of local resale services.[68] Of these providers, the Commission estimates that 289 providers have 1,500 or fewer employees.[69] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

16.    *Toll Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers.  Telecommunications Resellers[70] is the closest industry with a SBA small business size standard.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[71]  MVNOs are included in this industry.[72]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[73]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[74]  Of that number, 1,375 firms operated with fewer than 250

---

[61] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[62] *Id.*

[63] *Id*.

[64] *Id*.

[65] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[66] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[67] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[68] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[69] *Id.*

[70] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers*," https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[71] *Id.*

[72] *Id*.

[73] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[74] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

employees.[75]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 518 providers that reported they were engaged in the provision of toll services.[76]  Of these providers, the Commission estimates that 495 providers have 1,500 or fewer employees.[77]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

17.    *Other Toll Carriers*.  Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers.  This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers.  Wired Telecommunications Carriers[78] is the closest industry with a SBA small business size standard.[79]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[80]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[81]  Of this number, 2,964 firms operated with fewer than 250 employees.[82]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 115 providers that reported they were engaged in the provision of other toll services.[83]  Of these providers, the Commission estimates that 113 providers have 1,500 or fewer employees.[84]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

18.    *Payphone Service Providers (PSPs)*.  Neither the Commission nor the SBA have developed a small business size standard specifically for payphone service providers, a group that includes incarcerated people's communications services providers.  Telecommunications Resellers[85] is the closest industry with a SBA small business size standard.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[86]  Mobile virtual network operators (MVNOs) are

---

[75] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[76] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[77] *Id.*

[78] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[79] *See* 13 CFR § 121.201, NAICS Code 517311.

[80] *Id.*

[81] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[82] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[83] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[84] *Id.*

[85] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers*," https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[86] *Id.*

included in this industry.[87]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[88]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[89]  Of that number, 1,375 firms operated with fewer than 250 employees.[90]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 58 providers that reported they were engaged in the provision of payphone services.[91]  Of these providers, the Commission estimates that 57 providers have 1,500 or fewer employees.[92]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

19.    *Telecommunications Relay Service (TRS) Providers.* Telecommunications relay services enable individuals who are deaf, hard of hearing, deaf-blind, or who have a speech disability to communicate by telephone in a manner that is functionally equivalent to using voice communication services.[93]  Internet-based TRS (*iTRS*) connects an individual with a hearing or a speech disability to a TRS communications assistant using an Internet Protocol-enabled device via the Internet, rather than the public switched telephone network.[94]  Video Relay Service (VRS) one form of *iTRS*, enables people with hearing or speech disabilities who use sign language to communicate with voice telephone users over a broadband connection using a video communication device.[95]  Internet Protocol Captioned Telephone Service (IP CTS) another form of *iTRS*, permits a person with hearing loss to have a telephone conversation while reading captions of what the other party is saying on an Internet-connected device.[96]  Providers must be certified by the Commission to provide VRS and IP CTS[97] and to receive compensation from the TRS Fund for TRS provided in accordance with applicable rules.[98]

20.    Neither the Commission nor the SBA have developed a small business size standard specifically for TRS Providers.  All Other Telecommunications is the closest industry with a SBA small business size standard.[99]  Internet Service Providers (ISPs) and Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are included in this industry.[100]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as

---

[87] *Id.*

[88] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[89] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[90] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[91] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[92] *Id.*

[93] 47 U.S.C. § 225(a)(3).

[94] 47 CFR § 64.601(a)(22).  Except as authorized or required by the Commission, Internet-based TRS does not include the use of a text telephone (TTY) or RTT over an interconnected Voice over Internet Protocol service.

[95] *Id.* § 64.601(a)(51).

[96] *Id.* § 64.601(a)(23).

[97] *Id.* § 64.606(a)(2).

[98] *Id.* § 64.604(c)(5)(iii)(F).

[99] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[100] *Id.*

small.[101]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[102]  Of those firms, 1,039 had revenue of less than $25 million.[103]  Based on Commission data there are ten certified *iTRS* providers.[104]  The Commission however does not compile financial information for these providers.  Nevertheless, based on available information, the Commission estimates that most providers in this industry are small entities.

21.    *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[105]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[106]  Providers of Internet services (e.g. dial-up ISPs) or VoIP services, via client-supplied telecommunications connections are also included in this industry.[107]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[108]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[109]  Of those firms, 1,039 had revenue of less than $25 million.[110]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

**D.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

22.    In the Notice, the Commission seeks comment on further reforms to the regulations governing incarcerated people's communications services, which could potentially affect potential reporting and compliance requirements for small entities and for providers of incarcerated people's communications services of all sizes.  For example, the Notice seeks comment on whether to continue

---

[101] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[102] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[103] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[104] *See* Internet-Based TRS Providers | Federal Communications Commission (fcc.gov), https://www.fcc.gov/general/internet-based-trs-providers (last visited February 15, 2023).

[105] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[106] *Id.*

[107] *Id.*

[108] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[109] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[110] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

using a "total industry cost" approach in setting rate caps, which would result in the same per-unit rate caps for interstate and intrastate voice services. Were the Commission to follow this approach in implementing the Act's "just and reasonable rates" requirement—resulting in a unitary rate cap for any providers of incarcerated people's interstate and intrastate communications services—it would potentially reduce the compliance burden on smaller providers.

23.     The Commission's implementation of the Martha Wright-Reed Act may require entities, including small entities and incarcerated people's communications services providers of all sizes, currently subject to our inmate calling services rules to be subject to modified or new reporting or other compliance obligations. This may also be the case for providers newly subject to the Commission's expanded regulatory authority, such as providers offering only intrastate or certain advanced communications. In addition, we recognize that our actions in this proceeding may affect the reporting, recordkeeping, and other compliance requirements for several groups of small entities. In assessing the cost of compliance for small entities and for providers of incarcerated people's communications services of all sizes, at this time the Commission is not in a position to determine whether the proposed rules in the Notice will impose any significant costs for compliance in general, or whether it will require small entities to hire attorneys, engineers, consultants, or other professionals to comply. It is also undetermined at this time if any new software, or modifications to existing software, will be necessary for small entities and for providers of incarcerated people's communications services of all sizes to effectively comply with the proposed rules.

24.     Within 18-24 months following enactment, the Commission is required by the Martha Wright-Reed Act to adopt rules to ensure that the rates and fees for incarcerated people's communications services are just and reasonable. This may include new ratemaking methodologies, such as the use of industry-wide average costs of telephonic service and advanced communications data; new services, such as any audio or video communications service used to communicate with persons outside of the facility, regardless of technology used; and new entities, such as providers that are newly subject to our authority. In the Notice, the Commission seeks comment on the collection and use of existing and additional data in determining just and reasonable rates and charges for incarcerated people's communications services, as well as on the implementation of its newly expanded jurisdictional authority. If rules are adopted pursuant to these proposals, they would apply to incarcerated people's communications services providers of all sizes, including small providers.

25.     The Commission seeks comment on updating and restructuring its current (third) mandatory data collection. First, to the extent that the Commission updates and restructures its most recent data collection, providers of incarcerated people's communications services of all sizes, including small providers, would need to maintain and report their cost data in accordance with the Commission's rules. Similarly, if the Commission imposes data collection requirements, or other new rules specific to implementation of the Martha Wright-Reed Act, the data collection requirements and other rules will be applicable to incarcerated people's communications services providers of all sizes. The Commission also seeks comment on how it should proceed if a particular provider or providers do not provide reliable and accurate information in response to the updated data collection. Any procedures it may adopt would impact reporting requirements for all relevant entities, including small entities. Additionally, the Commission seeks comment on how to proceed if information submitted by providers does not allow it to determine with precision the costs attributable to any particular service or function, or groups of services or functions. Any steps the Commission would take to ensure the accuracy or precision of providers' data submissions could also potentially affect reporting requirements for all relevant entities, including small entities and providers of incarcerated people's communications services of all sizes.

E.     **Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered**

26.     The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements

or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rules for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities.[111]

27.    In the Notice, the Commission seeks to fulfill Congress's intent via the implementation of the Martha Wright-Reed Act, including its directive that the Commission ensure just and reasonable rates and charges for incarcerated people's audio and video communications services.  While doing so, the Commission is mindful of the potential impact on small businesses and, in particular, any disproportionate impact or unique burdens that small businesses may face in complying with any rules the Commission may adopt.  Below we discuss several steps the Commission has taken that could reduce the economic impact for small entities.

28.    Allowing additional time for small and medium-sized businesses to comply with the proposed rules, including the timeframe for compliance, could reduce the economic impact for small entities.  We considered and seek comment on whether such an approach would serve the public interest.  In doing so, we have provided small entities the opportunity to offer alternatives not already considered, giving small entities ample time to minimize whatever potential burdens they may face.

29.    The Commission also seeks comment on the Martha Wright-Reed Act's directive to consider the size of incarceration facilities in setting just and reasonable rates and charges for services.[112]  The Commission seeks comment on whether the "industry-wide" average cost language in the Martha Wright-Reed Act refers only to some subset of providers of incarcerated people's communications services or all such providers.[113]  In doing so, the Commission seeks information that will help to determine the appropriate approach to ensuring just and reasonable rates as required by the Act.  The Commission would also benefit by using the information obtained from comments to inform its evaluation of its regulatory options, including those that may potentially be less burdensome for smaller providers.

30.    The Martha Wright-Reed Act states that the Commission "shall consider . . . differences in the costs . . . by small, medium or large facilities or other characteristics," as part of its rate-setting process.[114]  The Commission seeks comment on how to interpret "small, medium, or large facilities."[115]  We considered and seek comment on whether the Commission is obligated to consider potential cost differences associated with serving different-sized facilities if it sets rates based on something other than industry-wide average costs.  This information will assist the Commission in considering alternatives such as whether it should implement more or fewer rate tiers based on the type or size of facility, and whether the Commission should set the same rates for small, medium, and large facilities after considering cost differences, if any.

31.    Considering the economic impact on small entities through comments filed in response to the Notice and this IRFA, as part of its efforts to implement the Martha Wright-Reed Act and promulgate rules in these proceedings, could allow the Commission to potentially obtain cost-benefit analyses and other input that would enable it to identify reasonable alternatives that may not be readily apparent, and offer alternatives not already considered that could minimize the economic impact on small entities.

---

[111] 5 U.S.C. § 603(c)(1)-(4).

[112] Martha Wright-Reed Act § 3(b).

[113] *Id.* § 3(b)(1).

[114] *Id.* § 3(b)(2).

[115] *Id.*

**F.    Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

32.    None.

**STATEMENT OF**
**CHAIRWOMAN JESSICA ROSENWORCEL**

Re:    *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking and Order (March 16, 2023).

It was twenty years ago a grandmother named Martha filed a petition calling on the Federal Communications Commission to do something about the unconscionably high phone rates charged to incarcerated people and their loved ones. You see, she just wanted to stay in touch with her grandson, who was in prison. She wanted to make sure he heard what was happening at home and in her church and that he kept in contact with his young nephews.

Justice delayed can be justice denied. And it took this agency far too long to pick up that petition. It took us longer still to act on it and try to address the outrageous charges families of the incarcerated pay for phone service. When we did, we made headway. We cut rates for calls. We limited ancillary service fees. We put restrictions on site commissions. But our work was not always embraced by the courts. We were told—over and over again—that we did not have the authority to address every aspect of these rates, because while interstate calls fell within our jurisdiction, intrastate calls did not. This limited our ability to provide families relief and meaningfully address that petition filed so long ago.

No more. At the start of this year, President Biden signed into law the Martha Wright-Reed Just and Reasonable Communications Act. It is a piece of legislation that honors the trailblazing work of a grandmother who knew something was wrong and set out to make it right.

In the United States we are home to the largest incarcerated population in the world. No other country comes close. We spend so much to keep our criminal justice system in place. But that understates the real cost—swelling despair, destroyed potential, and diminished possibilities for rehabilitation. And phone calls, simple as they are, are important. Because those in prison are often separated from their families by hundreds of miles and families may lack the time and means to make regular visits. Phone calls are the only way to stay connected. But when the price of a single phone call can be as much as most of us spend for unlimited monthly plans, it can be hard to stay in touch. This is not just a strain on the household budget. It harms all of us because regular contact with kin can reduce recidivism.

We are now due for some speed. We are going to use this new law and the expanded authority it provides to ensure the rates for prison phone calls—both interstate and intrastate—are just and reasonable. We are going to use it to address advanced communications services like video. And we are going to use it to ensure access to these communications by those with disabilities. Along the way, we will work to integrate these new efforts with what we have done before, so that across the board these policies are fair and sustainable.

Like I said, we are going to move fast. Because the Martha Wright-Reed Just and Reasonable Communications Act demands we produce results between 18 and 24 months after enactment and too many have waited too long for us to address these usurious rates.

Martha Wright-Reed passed away eight years ago. But we would not be here today without her. We also would not be here without the work of my friend and former colleague Mignon Clyburn who was the one to tell this agency to pick up that petition. Her conscience informs this proceeding and everything in this new law.

Thank you also to the Congressional leaders who worked for years on this new law, putting a more just system within reach, including Senator Tammy Duckworth and former Congressman Bobby Rush, as well as the many co-sponsors of this legislation. Thank you also to the advocates who supported this effort and the work of this agency. We would not be here without you.

In addition to these leaders, I want to thank the Commission staff for their continued efforts to

this work, including Susan Bahr, Ahuva Battams, Peter Bean, Callie Coker, Victoria Goldberg, Amy Goodman, Trent Harkrader, William Kehoe, Lee McFarland, Stephen Meil, Terri Natoli, Simon Solemani, Hayley Steffen, Gil Strobel, Jennifer Best Vickers, and David Zesiger from the Wireline Competition Bureau; Robert Aldrich, Diane Burstein, Darryl Cooper, Aaron Garza, Eliot Greenwald, Alejandro Roark, and Michael Scott from the Consumer and Governmental Affairs Bureau; Connor Altman, Amanda Betag, Paula Cech, Zaira Gonzalez, Eugene Kiselev, Richard Kwiatkowski, Giulia McHenry, Eric Ralph, Michelle Schaefer, and Geoff Waldau from the Office of Economics and Analytics; Sarah Citrin, Michele Ellison, Valerie Hill, Marcus Maher, Richard Mallen, Joel Rabinovitz, William Richardson, and Chin Yoo from the Office of General Counsel; Jim Balaguer and Brian Moulton from the Office of Legislative Affairs; Anne Veigle and Will Wiquist from the Office of Media Relations; and Cara Grayer, Michael Gussow, and Joy Ragsdale from the Office of Communications Business Opportunities.

Federal Communications Commission                                    FCC 23-19

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:      *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking and Order (March 16, 2023).

Over the last few years, I've had the chance to hear directly from families who have experienced firsthand the difficulties of maintaining contact with their incarcerated loved ones. I've also listened to formerly incarcerated individuals who underscored the decline in mental and emotional health that can result from a lack of external communications.

Indeed, studies have repeatedly shown just how vital increased communication between incarcerated people and their families, friends, and other outside resources is and that these types of connections also help reduce recidivism rates. This is no coincidence. Successful reintroduction to society largely turns on having a meaningful support network, including access to job and housing resources.

A big part of enabling this increased communication is ensuring that providers are limited to charging just and reasonable rates for inmate calling services. But the marketplace for these services has long been broken—providers face no competition and market forces do not operate to constrain the charges they pass along to consumers.

The FCC has had a critical role to play in regulating certain aspects of this marketplace, and it has taken actions to address providers' abusive practices. But courts have turned aside several FCC actions that they deemed in excess of agency authority. With that string of D.C. Circuit decisions, the FCC has been unable to alter the status quo, despite broad consensus on the types of reforms that are necessary.

For this reason, I welcomed Congress' passage of the Martha Wright-Reed Act, which provides the FCC with the authority to establish rules for intrastate and international prison calls, as well as for a broader range of advanced communications services.

This will be increasingly important as more incarcerated individuals rely on video communications to stay in touch with their family, friends, and other important resources, such as attorneys and medical professionals.

As we move to implement the Martha Wright-Reed Act, I am hopeful that we will do a top-to-bottom review of the costs borne today by the families of incarcerated individuals. This proceeding presents a unique opportunity to think outside of the box and explore new ways of ensuring that the rates charged are just and reasonable. This includes exploring the role that site commissions play in the rates charged and whether the Commission can and should do more to address those charges, which can add to the cost of providing services inside correctional facilities.

The Martha Wright-Reed Act also requires the Commission to ensure that these advanced communications services are accessible to incarcerated individuals with disabilities, including those with hearing or speech loss. This remains an important issue for the FCC and I hope we move expeditiously to ensure that all incarcerated individuals have equal and affordable access to equivalent communications services in prisons and jails.

This item will have a meaningful impact on incarcerated individuals and their families and friends, so I want to thank the Wireline Competition Bureau for their work on this item. And I want to thank the Wright Petitioners for their diligent work to bring these issues to light and for their efforts over this now two decade long fight.

The item has my support.

## STATEMENT OF
## COMMISSIONER GEOFFREY STARKS

Re:    *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking and Order (March 16, 2023).

"The arc of the moral universe is long, but it bends towards justice." Famous words from Dr. Martin Luther King, Jr.

More than 20 years ago, Mrs. Martha Wright-Reed began her fight for affordable and fair rates for communications services for incarcerated individuals and their families. Many of you know her story, but it is worthwhile to revisit it briefly. As a blind, elderly woman, her options to stay in touch with her grandson were limited when he was moved to a correctional facility in Arizona, some 2000 miles from her home in Washington, DC. Without the ability to communicate via letters or in-person, her only option to stay in contact was via a weekly phone call on Sunday after church. Calling her grandson a few times a month turned out to be a struggle—the per-minute rates were very expensive on top of various fees that added up to hundreds of dollars a month. She was forced to decide between staying in touch with her grandson, providing him a connection to the outside world, and paying for her other expenses like medication and groceries. Sometimes something had to give. It was never her connection with her grandson.

But here's what she realized—if she was struggling to afford paying for these calls, surely other families were as well. Over the next 23 years, what started with her personal phone bill turned into a nationwide movement dedicated to lowering the communication rates in incarceration facilities. When Wright-Reed started her efforts, a call from Washington to an incarceration facility in California used to cost as much as $17 for 15 minutes. That same call can now be as low as $3-4 dollars.

The Commission has worked, going back to then Commissioner Mignon Clyburn's leadership nearly 10 years ago, to stop exorbitant charges. However, the Commission was at the time limited in what it could do with regard to the rates for intrastate calls, which represent over 80% of total calls from incarceration facilities.[324] Following Wright-Reed's passing in 2015, others picked up her mantle, including Senator Duckworth alongside her co-sponsors, Senators Blumenthal, Booker, Casey, Coons, Gillibrand, King, Klobuchar, Lujan, Markey, Portman, Schatz, Warren, and Wyden, and Congressman Rush. And last year, Congress passed the Martha Wright-Reed Act which, for the first time, gives the FCC authority to regulate intrastate rates at incarceration facilities.

By clearly extending the Commission's authority over intrastate communications services, we can now work towards ensuring that rates charged are just and reasonable, consistent with the Commission's standard in Section 202. This is a huge step.

Equally important, the Martha Wright-Reed Act expands our authority to ensure that rates are just and reasonable for advanced communications systems—such as video visitation services—that many incarcerated persons and correctional facilities use to stay connected while also protecting security.

Ensuring that rates for advanced communications services offered to incarcerated individuals are just is also long overdue to support incarcerated populations that are deaf and hard of hearing or face other communications disabilities. Last September, we adopted a *Report and Order and Notice of Proposed Rulemaking*[325] focused specifically on ensuring that incarcerated people with communications disabilities have functionally equivalent services as those without disabilities. The Martha Wright-Reed

---

[324] Shira Hoffer, *Mother or Money? The Exorbitant Cost of Phone Calls from Jail*, HARVARD POLITICAL REVIEW (Jan. 15, 2022), https://harvardpolitics.com/jail-phone-calls.

[325] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, FCC 22-76 (2022).

**Federal Communications Commission**                                   **FCC 23-19**

Act will help ensure the advanced communications services, such as IP CTS, will be charged at a just and reasonable rate, and help support that proceeding as well.

Martha Wright-Reed's call to action moved our world. Millions of incarcerated individuals, their families, and our society are all beneficiaries of her powerful work. What a legacy.

I look forward to seeing the record develop from the Notice as we work to implement the Act. I applaud the Commission's fantastic staff for their dedicated work on this issue, as well as Commissioner Clyburn and Chairwoman Rosenworcel's continued leadership. I strongly approve.



# California State Senate

## SENATOR
## JOSH BECKER
### THIRTEENTH SENATE DISTRICT

CAPITOL OFFICE
1021 O STREET
SUITE 7250
SACRAMENTO, CA 95814
(916) 651-4013

DISTRICT OFFICE
1528 S. EL CAMINO REAL
SUITE 303
SAN MATEO, CA 94402
(650) 212-3313

SENATOR.BECKER@SENATE.CA.GOV
WWW.SENATE.CA.GOV/BECKER

STANDING COMMITTEES
BUDGET & FISCAL REVIEW
BUSINESS, PROFESSIONS &
ECONOMIC DEVELOPMENT
ENERGY, UTILITIES & COMMUNICATIONS
TRANSPORTATION

SUBCOMMITTEE
BUDGET & FISCAL REVIEW
SUBCOMMITTEE #2 ON
RESOURCES, ENVIRONMENTAL
PROTECTION, AND ENERGY
CHAIR

SELECT COMMITTEES
NON-PROFIT SECTOR

JOINT COMMITTEE
LEGISLATIVE BUDGET

Chairwoman Jessica Rosenworcel
Federal Communications Commission
45 L Street NE
Washington, DC 20554

May 8, 2023

**RE: Comment on Proposed Rulemaking and Order in the Matter of Incarcerated People's Communication Services; Implementation of the Marth Wright-Reed Act; and Rates for Interstate Inmate Calling Services**

Dear Chairwoman Rosenworcel,

I submit this comment in response to the Federal Communications Commission's (FCC) request for comment on the Proposed Rulemaking in WC Dockets Nos. 23-62 and 12-375 adopted on March 16, 2023.

I agree with the FCC's interpretation of the Martha-Wright Reed Act, specifically as it relates to Congress's intent to remove the FCC's limitations on regulating audio and video communications, such that it reduces the financial burdens placed on those incarcerated and the families who support them and helps families stay connected.[1]

The prison telecommunications industry is a predatory institution that profits off of our country's most vulnerable populations – incarcerated people and their loved ones. Studies show that disconnection from family and personal support systems creates mental health problems for the currently incarcerated and their families.[2] Research also shows that incarcerated people who are able to keep in frequent contact with their loved ones are more successful re-entering society than those who have limited or no contact.[3]

The high costs of keeping in contact drive more than 1 in 3 families, who are already financially burdened, into debt for phone calls and visits with their loved ones.[4] According to a study conducted by the Ella Baker Center for Human Rights, the costs of staying connected were

---

[1] Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services, WC Docket Nos. 23-62, 12-375, Notice of Proposed Rulemaking and Order, FCC 23-19 (rel. Mar. 17, 2023) (Notice), paras 10-11.
[2] Quandt, Katie Rose, and Alexi Jones. "Research Roundup: Incarceration can cause lasting damage to mental health." *Prison Policy Initiative*, 13 May 2021.
[3] Shanahan, Ryan, and Sandra Villalobos Agudelo. "The family and recidivism." *American Jails* 26.4 (2012): 17-24.
[4] Hoffer, Shira. "Mother or Money? The Exorbitant Cost of Phone Calls from Jail." *Harvard Political Review*, 15 January 2022.

shouldered by families, and 87% of the family members bearing the financial responsibility were women.[5]

This predatory phenomenon is what led me to introduce legislation in California making phone calls free in our state prisons. In partnership with eight sponsor organizations, including Worth Rises, The Ella Baker Center, and the San Francisco Financial Justice Project, the California Legislature passed SB 1008, The Keep Families Connected Act, which went into effect on January 1, 2023. In doing so, California established that phone calls should not inflict any financial burden on incarcerated people or their families.

The Keep Families Connected Act establishes free phone calls for all incarcerated people in the California State prisons for intrastate, interstate, and international voice calls from any California Department of Corrections and Rehabilitation (CDCR) approved device. Under this bill, California interprets "just and reasonable" to mean free. Further, I have and continue to encourage the CDCR to eliminate the outdated per-minute pay model for phone calls, and instead opt for a flat rate model that is standard for most consumer telephone contracts. Not only would this payment model bring contracts into the modern age, it is also the most fiscally responsible measure that the state can take, as proven in San Francisco.[6]

While we have yet to see the long term impacts of this policy, in the months since Governor Newsom signed the bill, calls increased by 85.2% in the first three months. My office has received overwhelmingly positive outreach from people impacted by incarceration, including incarcerated people who are able to call our office directly for the first time.

The Martha Wright-Reed Act is a monumental achievement that extends opportunities afforded under my bill even further. By granting the FCC an opportunity to expand its authority to regulate interstate and intrastate prison telecommunications, the Martha Wright-Reed Act will extend financial stability to millions of Americans impacted by incarceration.

I respectfully express my support for the FCC's proposed rulemaking to implement the Martha Wright-Reed Act. Should you have any questions, please contact my Legislative Aide, Samantha James, at Samantha.James@sen.ca.gov or (916) 651-4242.

Sincerely,

Josh Becker
California State Senator
District 13

---

[5] deVuono-Powell, Saneta, et al. "Who pays? The true cost of incarceration on families." *Oakland, Calif.: Ella Baker Center, Forward Together, Research Action Design. Accessed July* 23.2021 (2015): 221-43.
[6] Agreement between the City and County of San Francisco and Global Tel*Link: Contract ID 1000017882, 2019.



May 8, 2023

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Re: WC Docket No. 23-62 and 12-375 — Comment on *Notice of Proposed Rulemaking***

Dear Commissioners and Staff,

Civil Rights Corps appreciates the Federal Communications Commission's ("the Commission")
continued work to protect incarcerated people and their loved ones by regulating the
telecommunications industry. The Commission's *Notice of Proposed Rulemaking* is an initial
step key to achieving the bipartisan vision of the Martha Wright-Reed Just and Reasonable
Communications Act. As a result of the expansion of its statutory authority, the Commission now
has the opportunity to honor Martha Wright-Reed, a courageous advocate for families separated
by the exploitative practices of IPCS providers.[1]

We submit this comment in response to Section 2(b)—Amendments to Section 3(1) of the
Communications Act, which poses questions relating to the expanded authority of the
Commission. As we will explain in more detail, the Act should be interpreted to extend to every
audio or visual method that incarcerated people currently use or may use in the future to
communicate, regardless of the physical location of the person with whom they are
communicating. It is imperative to close all current and potential loopholes to prevent IPCS
providers from engaging in their longstanding tactic of responding to government intervention by
shifting their exploitative practices to spaces left unregulated.

We also urge the Commission to adopt different language in its writing on communications
between incarcerated people and their loved ones. In addition to using "IPCS" ("Incarcerated
People's Communications Services") and other person-centric terminology, we use "video call"
in place of "video visitation." Around the country, IPCS providers are separating families by

---

[1] Along with other advocates, Civil Rights Corps uses "Incarcerated People's Communications Services"
or "IPCS" to refer to telecommunications services provided in carceral settings like jails and prisons. This
person-centric terminology centers incarcerated people and their loved ones, consumers who must be
protected from an exploitative industry.



replacing in-person visits with video calls.[2] While we acknowledge that certain advancements in technology have created valuable opportunities to expand access to communications, there is no equivalent to seeing a parent, child, or friend in person. As such, we urge the rejection of the phrase "video visitation."

**About Civil Rights Corps and Our Clients**

Civil Rights Corps is a non-profit organization dedicated to challenging systemic injustice in the American legal system. We have worked with currently and formerly incarcerated people around the country to successfully challenge systems that financially exploit and disproportionately harm low-income people of color, such as cash bail and pretrial detention, debt-based driving restrictions, and for-profit private probation and pretrial diversion. In addition to bringing innovative legal challenges, we have worked with jurisdictions nationwide, as well as the federal government, on proposed rules and legislation to limit these abuses. Our work centers the principle that no individual should be denied their rights solely due to their poverty.

Throughout our work, our clients and partners consistently describe the costs associated with communicating from behind bars as crippling. For people who struggle to afford basic necessities, the charges and fees of phone and video calls are prohibitive, resulting in the routine and complete separation of families. In a class action lawsuit challenging a private probation system in Tennessee, we represented a mother with disabilities who had no bank account, no real property or assets, and who frequently struggled to maintain active utilities in her home. She was so destitute—with any limited means going to extortionate probation fees—that she could not afford to fix her broken tooth. She also lost her car after being unable to pay her loans, causing her to pass out in public multiple times from the exhaustion of long commutes by foot.[3] In another class action challenging the unconstitutional cash bail system in a North Carolina county, we represent a mother who struggled to pay for bills and necessities for herself and her 6-year-old daughter. Prior to being jailed, which she would have avoided had she been able to afford a $3,500 cash bail, she couldn't pay her cell phone bill and was soon to lose her car insurance.[4] At Civil Rights Corps, we have seen too many people become enmeshed in extractive schemes or thrown in jail because of their poverty—then, desperate to communicate with their children and other loved ones, they are further extorted by IPCS providers.

---

[2] *See Notice of Proposed Rulemaking and Order,* WC Docket No. 23-62 and 12-375, FCC 23-19, p. 16, para. 35 (2023) ("The record shows that some institutions are restricting or prohibiting in-person visits in favor of video visitation").

[3] Complaint at 24-31, Rodriguez v. Providence Cmty. Corr., Inc., 191 F. Supp. 3d 758, (M.D. Tenn. 2016).

[4] Complaint at 8, Allison, et al. v. Allen, et al., 1:19-cv-01126, (M.D.N.C. 2019).

People like our clients and their children, parents, partners, and friends are the consumers whom IPCS providers exploit. Family members are often driven into debt in order to communicate with their loved ones. These high costs, along with the increasing replacement of in-person visits with video calls, are separating families. Disproportionately bearing this financial and emotional burden are millions of poor women and children of color.[5] This family separation also inflicts broader societal harms, as family contact is linked to reducing recidivism, improving health, and strengthening parent-child relationships.[6] Swift regulatory action is needed, and the Commission's implementation of the Martha Wright-Reed Act is a critical step toward combating the rampant exploitation that is keeping families apart.

### 1. The Commission's Authority is Expansive, Inclusive of On-Premises Video Calls, and Not Limited by a Person's Physical Location

Subsection 3(1)(E) of the Martha Wright-Reed Just and Reasonable Communications Act expands the Commission's authority such that it can regulate "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[7] This expansion of authority raises questions about the scope of the Commission's jurisdiction. We comment on some of these questions below, urging robust protection of incarcerated people and their loved ones in order to keep families together and prevent exploitation of those who are most vulnerable.

### a. The Commission Has Expansive Authority Over Audio and Visual Communications

The Commission should interpret "any audio or video communications service" to encompass every audio or visual method that incarcerated individuals use or will use to communicate with

---

[5] *See* Saneta deVuono-powell et al., *Who Pays? The True Cost of Incarceration on Families*, Ella Baker Center, Forward Together, Research Action Design (Sept. 2015), www.whopaysreport.org (discussing the costs of incarceration for women, low-income families, and communities of color); *See also* Annie E. Casey Foundation, A Shared Sentence: The Devastating Toll of Parental Incarceration on Kids, Families and Communities (2016), https://assets.aecf.org/m/resourcedoc/aecf-asharedsentenc e-2016.pdf (discussing the more than 5 million children who have had a parent incarcerated at some point in their lives).

[6] Leah Wang, *Research Roundup: The Positive Impacts of Family Contact for Incarcerated People and Their Families*, Prison Policy Initiative (Dec. 21, 2021), https://www.prisonpolicy.org/blog/2021/12/ 21/family_contact/.

[7] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338,136 Stat.6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 153(1).



individuals who are not incarcerated within the same facility. The language of the statute clearly indicates the Commission has authority to regulate a broad and inclusive range of communications services and does not limit what technology qualifies as an "audio or video communications service." As such, all existing or future audio or visual methods of communication used by incarcerated individuals to communicate with those not incarcerated or employed at the same facility fall under the definition of the phrase as it is used in the statute, whether the individuals being contacted are intrastate, interstate, or international and whether or not the communication is in real time.

This expanded regulatory authority is imperative as IPCS providers routinely move their businesses to unregulated spaces, profiteering wherever they can. Civil Rights Corps has seen this broader practice in our litigation and policy work challenging private probation, debtors' prisons, fines and fees, and other spheres in which entities adjust their business models in order to continue exploiting incarcerated people and their loved ones. In the carceral telecommunications context, providers have often responded to increased government intervention by seeking profits in spaces left unregulated.

In recent years, as phone calls have increasingly been subject to regulation, and in some places made free,[8] IPCS providers have responded by expanding their exploitative practices through other services, including video calls, electronic messaging, money transfers, tablets, and tablet-based purchases like games and movies. In 2015, after increased regulation of phone calls, Securus acquired a competitor, JPay—a move that its then-CEO declared "thrusts Securus into the fastest growing segments in corrections; payments, email and most recently, inmate tablets."[9] Each one of these "segments" has provided enormous profits for IPCS providers like Securus as well as for sheriff's departments and correctional facilities in the form of lucrative kickbacks.[10] IPCS providers also use these new, unregulated sources of revenue, which they bundle into existing contracts, to prevent facilities from ever changing vendors.[11] Given these practices, it is

---

[8] *See* Worth Rises, *Our Campaigns*, https://worthrises.org/ourcampaigns (last visited May 2, 2023) (listing some of the cities and states that have successfully made prison and jail phone calls free).

[9] Securus Technologies, Inc., *Securus Technologies, Inc. Completes Transaction to Acquire JPay Inc.*, PR Newswire (July 31, 2015), https://www.prnewswire.com/news-releases/securus-technologies-inc-completEs-transaction-to-acquire-jpay-inc-300122095.html.

[10] Peter Wagner and Alison Walsh Bertram, *State of Phone Justice 2022: The Problem, the Progress, and What's Next*, Prison Policy Initiative (Dec. 2022), https://www.prisonpolicy.org/phones/state_of_phone_justice_2022.html.

[11] *Id.* (IPCS providers bundle new, profitable services into existing phone contracts. In addition to serving as a way to evade regulation and pursue new sources of revenue, this "bundling" practice effectively prevents facilities from changing vendors. "In a normal contract, when a facility is unhappy with a vendor it can theoretically pressure the vendor to improve, cancel the contract, or wait the contract out and replace the vendor with someone else. But in a contract where multiple services are bundled together, a

imperative to heed the Martha Wright-Reed Act's call to expand the Commission's authority to "any audio or video communications service." Leaving open any loopholes, in the form of on-premises video calls or the physical location of the person being contacted, would undermine the intended goal of the Act, enabling further exploitation of a literally captive market.

### b.  The Commission Has Authority Over On-Premises Video Calls

The Commission's authority over "any audio or video communications service" clearly includes on-premises video calls. Both remote and on-premises video calls are typically operated by the same IPCS providers, involve the same technological systems, and have the same functions and equipment for the incarcerated user, regardless of the location of the person with whom they are communicating. GTL/ViaPath and Securus/Aventiv–the two largest IPCS providers–each use a singular system to schedule and manage on-site and remote calls. GTL describes its "VisitMe" system for remote and on-site video calls as one "highly scalable solution."[12] Similarly, Securus' "Securus Video Connect" system encompasses both remote and on-site video calls and allows non-incarcerated persons to use one phone application to schedule both types of video calls.[13] There is no reasonable justification to interpret the Act to allow the Commission to regulate one but not the other.

The Commission's authority over on-premises video calls is key to preventing further harm to incarcerated people and their loved ones. As articulated by the Commission, "institutions are restricting or prohibiting in-person visits in favor of video visitation and a visitor may lack sufficient broadband service or equipment to enable video visitation from their home or elsewhere."[14] We recognize the benefits of certain technological advancements in communications for incarcerated people, but we see no form of virtual communication (audio, visual, or otherwise) as an adequate replacement for in-person visits, which we believe should remain in all facilities at no cost and in humane settings that offer opportunities for dignified, high-quality interactions, along with free options for virtual communication like video calls. The increasing replacement of free in-person visits with video calls is separating families and causing inordinate harm to people with loved ones behind bars, especially poor women and children of

---

vendor can do a bad job on one service, raise its prices on a second, and insist on adding a third service the facility doesn't want, all because it would be too hard for a facility to replace all of the services at the same time.").

[12] GTL, *Video Visitation*, https://www.gtl.net/correctional-facility-services/communication-solutions/video-visitation/ (last visited May 2, 2023).

[13] Securus Technologies, *Video Products*, https://securustech.net/video-products/index.html (last visited May 2, 2023).

[14] *See Notice of Proposed Rulemaking and Order,* WC Docket No. 23-62 and 12-375, FCC 23-19, p. 16, para. 35 (2023).

color.[15] On-premises video is often the last remaining lifeline for people hoping to connect with incarcerated loved ones, especially for those who lack the means, physical space, internet, or technology necessary to engage in remote audio or video calls. These on-premises video calls come with the costs associated with transport to and from the facility (parking, gas, public transportation etc.), and we believe they should otherwise be free. Nonetheless, to the extent an IPCS provider exploits families by charging for these on-premises calls now or in the future, the video calls would certainly be subject to the ratemaking authority of the Commission.

### c. The Commission's Authority is Not Limited by a Person's Physical Location

The Commission should interpret the phrase "individuals outside the correctional institution where the inmate is held" to refer to all individuals who are not actively incarcerated or working in the correctional institution at the time of the communication. As stated above, the Commission's authority to regulate the rates of video calls, regardless of technology used, is clearly inclusive of on-premises video calls. The language of the Act does not provide any indication that Congress intended for an enormous regulatory loophole that would prevent the Commission from protecting IPCS consumers depending on where they are physically located at the time of communication. The Commission's authority extends regardless of physical location, whether a person is calling from a mobile device by the entrance of the jail or prison, sending a videogram from the parking lot, or making a video call from an on-premises or satellite location. Why, for example, would the Commission be able to regulate a phone call made from the street next to a jail but not a video call made only a few yards away in the jail's lobby? If an IPCS consumer is experiencing charges to communicate, then they are protected by the Commission's ratemaking authority, no matter where they are located at the time of the communication.

### 2. The Commission Should Adopt Humanizing and Accurate Language

### a. The Commission Should Adopt IPCS and Person-Centric Terminology

---

[15] *See* Peter Wagner & Bernadette Rabuy, *Screening Out Family Time: The For-Profit Video Visitation Industry in Prisons and Jails,* Prison Policy Initiative (2015), https://www.prisonpolicy.org/visitation/report.html (discussing limitations of video calls (which consistently freeze, lag, and become pixelated) and their capacity to induce "traumatic reactions" in children); *See also* Emily Widra, Prison Policy Initiative, *The Campaign for Face-to-Face Family Visits* (April 11, 2016), https://www.prisonpolicy.org/blog/2016/04/11/eye-contact/ (discussing how video communication is less personal, less fluid, and less conducive to building trust); *See also* Face to Face Knox, *To What End: Assessing the Impact of the Knox County Jail's Ban on In-Person Visits* 4-5 (2018) (discussing how replacing in-person visits with video calls is detrimental to life inside jails and prisons and has even been linked with a dramatic increase in assaults).



The Commission should adopt and codify person-centric terminology when referring to people who are incarcerated. Civil Rights Corps appreciates the Commission's proposed use of the term "IPCS" (Incarcerated People's Communications Services) and, alongside other advocates, believes this should be the official terminology for describing the consumers and providers involved in this industry. Embracing person-centric language is critical to humanizing incarcerated people and their loved ones and centering their experiences as consumers exploited by the communications industry.

### b. The Commission Should Adopt "Video Call" in Place of "Video Visit"

The Commission should adopt and codify the language of "video call" and "video calling" in place of "video visit" and "video visitation." IPCS providers use "video visitation" to suggest that video communication services are equivalent to in-person visits. Pushing back against this linguistic sleight of hand is imperative as these providers are continuing to work with carceral facilities to replace free in-person visits with exploitative video calls—an extractive practice that allows them to share profits while causing incarcerated people and their loved ones suffer. As glitchy, impersonal video calls are far from equivalent to in-person visits, separate children from their parents, and impose disproportionate financial harms on poor women of color, they must not be described in ways that suggest they can be used as a replacement.

***

Civil Rights Corps urges the Commission to fulfill the vision of the Martha Wright-Reed Just and Reasonable Communications Act. The Commission must embrace its expanded authority under this legislation for the purpose of preventing rampant exploitation. In closing current and anticipated loopholes and acknowledging its broad jurisdiction, the Commission will be protecting incarcerated people and their loved ones, enabling more fair and dignified communication.

Sincerely,

Thea Sebastian
Director of Policy
Civil Rights Corps

Julia Udell
Litigation Support Fellow
Civil Rights Corps

Elizabeth Rossi
Director of Strategic Initiatives
Civil Rights Corps

Ben Perelmuter
Investigative Fellow
Civil Rights Corps



*Before the*

*Federal Communications Commission*

*Washington, D.C. 20554*

| | |
|---|---|
| In the Matter of | WC Docket No. 23-62 |
| Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act | WC Docket No. 12-375 |
| Rates for Interstate Inmate Calling Services | |

**OPENING COMMENTS**

**Color Of Change**

Brandon Tucker

Senior Director of Policy & Government Affairs

Color Of Change

Oakland, California

brandon.tucker@colorofchange.org

Filed May 8, 2023

**JA492**



Color Of Change submits these comments in response to the Federal Communications Commission's (FCC) proposed rule to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022.[1] COC urges the FCC to develop strong regulations that protect incarcerated individuals and their families from the predatory telecommunications companies that stand in the way of connection between families and support networks.

Color Of Change, the nation's largest online racial justice organization, has a singular mission: Create a more human, less hostile world for Black people in America. Since 2005, our organization - powered by millions of members - has held corporate and government leaders accountable for systemic injustices and enacted real solutions that promote racial justice and move our country forward.

Further, maintaining communication with loved ones during incarceration has measurable positive impacts on public safety and benefits the families of those incarcerated.[2] Research has shown that more consistent and frequent phone calls are linked to the lowest odds of recidivism.[3] Further, a 2020 study found that children who communicated weekly with their incarcerated parent reported

---

[1] Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services, Notice of Proposed Rulemaking, Docket Nos. 23-62 and 12-375 (March 17, 2023), 88 FR 20804 (April 7, 2023) ("Notice").
[2] Wang, L. (2021, December 21). *Research roundup: The positive impacts of family contact for incarcerated people and their families*. Prison Policy Initiative. Retrieved February 14, 2023, from https://www.prisonpolicy.org/blog/2021/12/21/family_contact/
[3] *Id*.

1



having better relationships with that parent as compared to less frequent communication[4].

And Black families are disproportionately harmed by corporations' efforts to exploit incarcerated individuals and their loved ones. Racial bias permeates every aspect of the criminal legal system, from the over policing of Black neighborhoods to prosecutorial decisions, pretrial release options, conviction and sentencing, incarceration, release, and beyond.[5] Despite only accounting for 13% of the U.S. population, Black people make up 38% of those incarcerated in the nation's prisons and jails.[6] Further, within prisons incarcerated individuals and their support networks on the outside are drained of resources by a vast and predatory network of public-private partnerships that charge for services ranging from soap and toilet paper to food and phone calls to debit and checking account fees. Each year, private corporations generate $80 billion in revenue by leveraging their lack of competition and exploiting incarcerated people and their support networks.[7]

---

[4] Haverkate, D., & Wright, K. (n.d.). *The differential effects of prison contact on parent–child relationship quality and child behavioral changes*. Retrieved February 9, 2023, from https://static.prisonpolicy.org/scans/PRIMER_electronic_version.pdf
[5] National Academies of Sciences, Engineering, and Medicine. (2022). (publication). Reducing Racial Inequalities in the Criminal Justice System. Retrieved from https://www.nationalacademies.org/our-work/reducing-racial-inequalities-in-the-criminal-justice-system.
[6] Enns, P. K., Yi, Y., Comfort, M., Goldman, A. W., Lee, H., Muller, C., Wakefield, S., Wang, E. A., & Wildeman, C. (2019). What Percentage of Americans Have Ever Had a Family Member Incarcerated?: Evidence from the Family History of Incarceration Survey (FamHIS). Socius, 5. https://doi.org/10.1177/2378023119829332
[7] Worth Rises. (n.d.). *The Prison Industry Corporate Database*. Worth Rises Database. Retrieved February 9, 2023, from https://data.worthrises.org/

**JA494**



The $1.4 billion dollar prison telecommunications industry is dominated by two private equity-owned corporations, Securus and ViaPath, which control 79% of the market.[8] These companies charge egregiously high fees, like $11.25 for a 15-minute phone call, to pad their bottom lines.[9] Incarcerated individuals and their families are left to bear the financial burden. Such was the case of Maria Marshall, who, after spending $120 in just two weeks to maintain contact with both her teenage son and her ex-husband behind bars, was forced to make the difficult choice between the two, as she struggled to pay exorbitant phone rates and could only afford one of their accounts.[10] Maria Marshall's experience is not singular and is the direct result of systemic exploitation.

To combat the unreasonable rates charged to incarcerated people, the FCC must address the discrepancies between the carceral telecommunications industry and the telecommunications industry accessed outside of the carceral system. In addition to unreasonable rates, the carceral telecommunications sector is plagued by a lack of competition, kickbacks and commissions to facilities, predatory fees and coercive practices; all inflating the true cost of business for telecommunications providers and consumers. **Any additional costs for**

---

[8] Bertram, W., & Wagner, P. (2022, December). State of Phone Justice 2022: The problem, the progress, and what's next. Retrieved April 13, 2023, from https://www.prisonpolicy.org/phones/state_of_phone_justice_2022.html
[9] *Ending carceral profiteering*. Color Of Change. (2023, February 11). Retrieved February 13, 2023, from https://colorofchange.org/bearingthecost/
[10] Pipia, L. (2019, December 31). *Many families struggle to pay for phone calls of loved ones in U.S. prisons*. NBCNews.com. Retrieved February 9, 2023, from https://www.nbcnews.com/news/us-news/many-families-struggle-pay-phone-calls-loved-ones-u-s-n1107531



**telecommunications providers doing business within carceral systems should not be the responsibility of incarcerated people or their support networks.**

Telecommunications services like phone calls are widely accessible to the general public with monthly unlimited call plans often comparable to the rates charged for a single call for incarcerated individuals. The FCC's efforts to regulate the rates that incarcerated individuals are charged should be informed by rates charged to those outside of the carceral system. Further, companies must be penalized for failing to properly disclose their rates on websites or obfuscate the traditional presentation of rates per minute to rates based on volume of data. **The FCC must use its authority under 47 C.F.R. S 64.6110 to crackdown on companies that seek to exploit incarcerated people through these deceptive practices.**

As we have already seen in recent years, capping the rates paid for telecommunications services will only shift companies markups to commissions, fees and new technologies that have yet to be regulated. Private telecommunications corporations, like ViaPath, typically offer carceral facilities a portion of the revenue generated from phone calls, or kickbacks, in exchange for monopoly control over a facility's communication services. An estimated 85% of state carceral systems collect kickbacks on prison phone calls—as high as 90% of

4

**JA496**

all rates.[11] These anticompetitive practices lead to high call rates for incarcerated people.

Federal, state, and local governments have opened the door to these predatory practices in exchange for corporate kickbacks. Together, they fought to expand incarceration into a carceral crisis and collected the windfalls. **It is crucial that the FCC prohibit kickbacks and payments in all forms from being included in customer rates and fees charged by carceral communications vendors. Instead of relying on kickbacks and commissions, the Bureau of Prisons (BOP) should request the funding needed to ensure safe and humane facilities.** Thus, the "just and reasonable" rates charged to consumers will not take into account any commissions or kickbacks.

Moreover, corporations add additional fees to further pad their profit margins. There are a number of examples of these damaging practices, including:

- **Pre-paid account caps:** Corporations require incarcerated people and their loved ones to maintain prepaid accounts to pay for calls and charge flat fees to deposit funds. Deposits are also often capped, forcing more transactions, thus more fees.

---

[11] Worth Rises. (2022). The Prison Industry: How It Started, How It Works, How It Harms. Retrieved April 13, 2023, from https://static1.squarespace.com/static/58e127cb1b10e31ed45b20f4/t/621682209bb0457a2d6d5cfa/1645642294912/The+Prison+Industry+How+It+Started+How+It+Works+and+How+It+Harms+December+2020.pdf

5

- **Ancillary fees:** Ancillary fees, the fees required to maintain prepaid phone accounts, can increase the cost of staying in touch with loved ones by 40%.[12] Paragraph 217 of the FCC's 2021 order allows states to set caps on ancillary fees lower than that set by the FCC. California is the only state to lower ancillary fees below those set by the FCC.[13]

- **Single-call fees:** The FCC's 2015 ancillary fee reform allows for companies to direct individuals to "single calls."[14] Companies like Securus make it hard to add money to deposit accounts, and they steer incarcerated individuals and their loved ones to pay for each call individually.[15] Single calls often carry a "one-time transaction" fee, which funnels additional money to corporations and away from families.

- **Double dipping:** A number of providers charge both an automated payment fee and a fee for the card processor costs for the same transactions. This results in charging incarcerated individuals or their loved ones 21% more on average than the intended $3 cap.[16]

---

[12] Jones, A., & Wagner, P. (2019, February). State of Phone Justice: Local jails, state prisons and private phone providers. Retrieved April 13, 2023, from https://www.prisonpolicy.org/phones/state_of_phone_justice.html

[13] Wagner, P., &; Bertram, W. (2022, December). State of Phone Justice 2022: The problem, the progress, and what's next. The problem, the progress, and what's next. Prison Policy Initiative. Retrieved April 19, 2023, from https://www.prisonpolicy.org/phones/state_of_phone_justice_2022.html

[14] *Id.*

[15] Jones, A., & Wagner, P. (2019, February). State of Phone Justice: Local jails, state prisons and private phone providers. Retrieved April 13, 2023, from https://www.prisonpolicy.org/phones/state_of_phone_justice.html

[16] Wagner, P., &; Bertram, W. (2022, December). State of Phone Justice 2022: The problem, the progress, and what's next. The problem, the progress, and what's next | Prison Policy Initiative. Retrieved April 19, 2023, from https://www.prisonpolicy.org/phones/state_of_phone_justice_2022.html

6



**The FCC should address these harmful practices. To correct abuses on the federal level, we recommend the FCC work with the BOP to conduct and publish a comprehensive review of telecommunications services for which incarcerated people or their families are charged,** including the fees and who collects revenue, and adopt rules to ensure rates are just and reasonable.

The rise of other communication methods in the telecommunications industry, such as video calling, electronic messaging, and the scanning of mail—which are typically subject to no regulation at all—has expanded the opportunities through which corporations can profit off of communication from incarcerated people and their loved ones. Carceral telecommunications corporations have required, incentivized, or lobbied carceral administrators to limit in-person visits to drive the use of their products and services, specifically more expensive services like video calling.

**In order to sustainably impact the longstanding exploitation in prison telecommunications, the FCC's regulations should encompass current and future communications services.** Without extensive regulation across the sector, the protections put in place by the FCC will only last until the next service is developed. For example, many states are moving away from allowing physical mail to incarcerated individuals. What was once a simple and inexpensive way for incarcerated people to stay in touch with their support networks is now being banned in order for telecommunications companies to receive profits from emails.

7



While the Martha Wright Reed Act does not give the FCC authority to regulate paper mail, the **FCC can provide the technical support and guidance needed for other agencies, such as the BOP, to prohibit physical mail from being replaced by scans or copies and end other practices of moving incarcerated individuals to more expensive and less-regulated services.** As much as possible, the BOP should issue model policy guidance that help to extend protections beyond federal prisons.

**Conclusion**

The prison telecommunications sector is but one example of the vast profiteering in the carceral system that steals resources from some of the poorest individuals in the country. With the authority affirmed in the Martha Wright-Reed Just and Reasonable Communications Act of 2022, the FCC has the opportunity to decrease the extensive exploitation of incarcerated individuals and their support networks.

Given the positive benefits to public safety and the Administration's multiple executive orders on advancing racial equity,[17] COC urges the FCC to issue regulations that increase incarcerated individuals' ability to connect with their loved ones. Further, the FCC should contribute the technical advice and guidance necessary for the BOP to provide federal prison phone calls, video calls, and

---

[17] Exec. Order No. 14091, Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government. 88 FR 10825 (February, 16, 2023). Exec. Order No. 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 86 FR 7009 (January 20, 2021).

**JA500**



emails free for incarcerated people and their support networks with an increased

minimum allowance of 120 minutes per person per day.

Respectfully submitted,

/s/ Brandon Tucker

Brandon Tucker
Color Of Change
Oakland, California
brandon.tucker@colorofchange.org

May 8, 2023

9

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| _____ | ) | |

**COMMENTS OF**
**GLOBAL TEL*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES**

Chérie R. Kiser
Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street, NW, Suite 950
Washington, DC 20006
202-862-8900
ckiser@cahill.com
acollins@cahill.com

Dated:  May 8, 2023                                   Its Attorneys

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*May 8, 2023*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 2

COMMENTS ....................................................................................................... 4

I.      THE COMMISSION'S EXISTING RATE CAP APPROACH SATISFIES THE MWR ACT AND WILL ENSURE THE FLEXIBILITY NEEDED FOR A VARIETY OF IPCS PROVIDERS AND THE COMPETITIVE BIDDING ENVIRONMENT IN WHICH THEY MUST OPERATE ................................................................... 4

      A.     The Commission Should Continue to Use Backstop Rate Caps to Establish Just and Reasonable Rates for the Services Subject to the MWR Act .................................. 4

      B.     Alternative Pricing Structures Should Be Permitted as an Alternative to Per-Minute Pricing ................................................................................. 7

II.     THE COMMISSION SHOULD ADOPT ITS EXISTING RATE CAPS AS PERMANENT RATE CAPS FOR VOICE IPCS WHEN ADJUSTED FOR MARKET CHANGES ................................................................................. 8

      A.     The Existing Rate Caps Are Just and Reasonable for Voice IPCS and Provide Fair Compensation to Providers as Required under the MWR Act When Adjusted for Market Changes ............................................................ 8

      B.     The Use of Average Daily Population Tracked by Correctional Facilities Continues To Be the Best Practical Approach for Differentiating between Facilities ............ 9

      C.     The Data Supports Continuation of the Existing Rate Caps as Backstop Rates for Voice IPCS ................................................................................ 10

      D.     The Existing Rate Caps for IPCS Appropriately Take into Account the Costs of Safety and Security Measures .......................................................... 12

      E.     The Commission Does Not Need to Take Additional Steps to Address Interstate Versus Intrastate Costs ................................................................... 14

CONCLUSION .................................................................................................. 16

Attachment:   Secretariat Economists, Report in Support of Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies Regarding the FCC's *Notice of Proposed Rulemaking and Order* to Implement the Martha Wright-Reed Act

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| _____ | ) | |

**COMMENTS OF**
**GLOBAL TEL\*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES**

Global Tel\*Link Corporation d/b/a ViaPath Technologies ("ViaPath"),[1] by its undersigned counsel, respectfully submits these Comments in response to the Notice of Proposed Rulemaking issued by the Federal Communications Commission ("FCC" or "Commission") in the above-referenced dockets regarding incarcerated people's calling services ("IPCS" or "ICS")[2] and the implementation of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWR Act" or "Act").[3] ViaPath hereby incorporates by reference its prior filings in WC Docket No. 12-375 into this docket pursuant to the Commission's directive.[4]

---

[1]    These comments are filed by ViaPath on behalf of itself and its wholly owned subsidiaries that also provide incarcerated people's calling services:   DSI-ITI, Inc. d/b/a ViaPath Technologies, Public Communications Services, Inc. d/b/a ViaPath Technologies, Telmate, LLC d/b/a ViaPath Technologies, and Value-Added Communications, Inc. d/b/a ViaPath Technologies.

[2]    Consistent with the Commission's approach, ViaPath uses IPCS herein, but continues to use the term inmate calling service or "ICS" when referring to historic Commission actions or current Commission rules.

[3]    S. 1541 (2022), https://www.congress.gov/bill/117th-congress/senate-bill/1541/text.

[4]    WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19 (rel. Mar. 17, 2023) ("*MWR NPRM*").  The *MWR NPRM* is the latest in a series of orders issued by the Commission with respect to IPCS.  *See Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) ("*2013 ICS Order*"), *pets. for stay granted in part sub nom. Securus Tech., Inc. v. FCC*, No. 13-1280, Order (D.C. Cir. Jan.13, 2014), *superseded as stated in Securus Tech., Inc. v. FCC*, No. 13-1280, Order (D.C. Cir. Dec. 21, 2017); *Rates for Interstate Inmate Calling Services*,

1
**JA504**

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*May 8, 2023*

## INTRODUCTION

The MWR Act permits the FCC, for the first time, to assert jurisdiction over all interstate and intrastate IPCS covered by Section 276 of the federal Communications Act, of 1934, as amended (the "Communications Act"), which should bring greater uniformity and regulatory certainty to the IPCS market throughout the country. ViaPath strongly supports the Act's goals of ensuring just and reasonable rates for consumers and fair compensation for IPCS providers. As a leading provider of IPCS, ViaPath is committed to working with the Commission to establish permanent rates consistent with the MWR Act.

The Commission already has completed much of the work needed to implement the MWR Act. The Commission's existing rate caps for voice IPCS are consistent with the mandates of the Act. The Commission's existing rate caps: (1) are just and reasonable for consumers; (2) provide fair compensation for the varied group of IPCS providers based on the data already collected;[5] (3) are based on industry-wide costs; (4) take into account safety and security costs; and (5) take into consideration differences in cost based on the size and type of correctional facilities.

---

29 FCC Rcd 13170 (2014) ("*2014 ICS FNPRM*"); *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) ("*2015 ICS Order*"), *pets. for stay granted in part sub nom. Global Tel\*Link Corporation v. FCC*, No. 15-1461, Order (D.C. Cir. Mar. 7, 2016), Order (D.C. Cir. Mar. 23, 2016), *vacated in part, rev'd and remanded in part by Global Tel\*Link v. FCC*, 866 F. 3d 397 (D.C. Cir. 2017) ("*GTL*"); *Rates for Interstate Inmate Calling Services*, 31 FCC Rcd 9300 (2016) ("*2016 ICS Reconsideration Order*"), *pets. for stay granted in part sub nom. Securus Tech., Inc. v. FCC*, No. 16-1321, Order (D.C. Cir. Nov. 2, 2016), *vacated and remanded by Securus Tech., Inc. v. FCC*, No. 16-1321, Order (D.C. Cir. Dec. 21, 2017); *Rates for Interstate Inmate Calling Services*, 35 FCC Rcd 8485 (2020) ("*2020 ICS Order*"); *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519 (2021) ("*2021 ICS Order*"); WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, FCC 22-76 (rel. Sept. 30, 2022) ("*2022 ICS Order*").

5    When those rate caps are adjusted for inflation as explained in the attached Secretariat Economists, Report in Support of Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies Regarding the FCC's *Notice of Proposed Rulemaking and Order* to Implement the Martha Wright-Reed Act (May 8, 2023) ("Secretariat Economists May 2023 Report").

The significant actions taken by the Commission have been successful in promoting lower interstate (and in some instances even intrastate[6]) IPCS rates and already advance the goals of the MWR Act.  As the record reflects, many IPCS contracts contain rates lower than the existing FCC rate caps.[7]  The marketplace response is confirmation that the FCC's IPCS regulatory framework is working.  The extension of the FCC's existing IPCS rate caps to all interstate and intrastate voice (or audio) IPCS as permanent rate caps would be consistent with the mandates of the MWR Act.  Based on the record to date, those rate caps will satisfy the Act's mandates to ensure just and reasonable rates, fair compensation to all IPCS providers, and ensure correctional facility safety and security requirements can be met.[8]

---

[6]    *See, e.g.*, Colorado H.B. 21-1201 (signed July 6, 2021); Indiana H.B. 1181 (effective July 1, 2022); Maine H.P. 853 (effective October 1, 2022); Nevada S.B. 387 (effective June 2, 2021); Ohio Admin. Code § 4901:1-6-22 (effective May 24, 2018).

[7]    *See, e.g.*, WC Docket No. 12-375, Global Tel\*Link Corporation Annual Reporting Form and Certification (filed April 3, 2023); WC Docket No. 12-375, Comments of Global Tel\*Link Corporation (dated Nov. 23, 2020) (explaining that a significant percentage of ViaPath's interstate IPCS rates were below the Commission's interim interstate rate caps in effect at the time); *see also Ohio Department of Rehabilitation and Correction (ODRC) Announces 60% Reduction in Call Rates as Part of Extended Agreement with GTL*, Press Release (June 30, 2021), https://www.gtl.net/about-us/press-and-news/odrc_gtl_new_contract_reduces_call_rates/; *California Prisoners to Get Reduced Phone, Communication Rates this Month*, California Globe (Mar. 2, 2021), https://californiaglobe.com/articles/california-prisoners-to-get-reduced-phone-communication-rates-this-month/; *York County Prison May Reduce Inmates' Phone Call Costs*, York Dispatch (Jan. 14, 2021), https://www.yorkdispatch.com/story/news/2021/01/14/york-county-prison-reduce-inmates-phone-call-costs/4145174001/; *San Francisco Announces All Phone Calls from County Jails Are Now Free*, Patch.com (Aug. 11, 2020), https://patch.com/california/san-francisco/san-francisco-announces-all-phone-calls-county-jails-are-now-free.

[8]    *See generally* Secretariat Economists, Report in Support of Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies Regarding the FCC's *Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking* (Dec. 15, 2022) ("Secretariat Economists December 2022 Report"); *see also* Secretariat Economists May 2023 Report.

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*May 8, 2023*

## COMMENTS

I.  **THE COMMISSION'S EXISTING RATE CAP APPROACH SATISFIES THE MWR ACT AND WILL ENSURE THE FLEXIBILITY NEEDED FOR A VARIETY OF IPCS PROVIDERS AND THE COMPETITIVE BIDDING ENVIRONMENT IN WHICH THEY MUST OPERATE**

A.  **The Commission Should Continue to Use Backstop Rate Caps to Establish Just and Reasonable Rates for the Services Subject to the MWR Act**

As the Commission notes, its existing rate regime for voice IPCS focuses on industry-wide rate caps.[9]  The Commission determined rate caps would "allow providers to continue to offer safe and secure ICS while complying with the requirements of the Communications Act."[10]  The Commission elected the use of rate caps "to ensure that ICS rates comply with the Communications Act, while balancing the unique security needs related to providing telecommunications service in correctional institutions and ensuring that ICS providers receive fair compensation and a reasonable return on investment."[11]

ViaPath supports the continued use of industry-wide rate caps for all communications services under the purview of the MWR Act.[12]  The Commission has long-recognized the "difficulties in designing a single regulatory structure to apply to multiple companies."[13]  This difficulty is even more pronounced in the IPCS market in which contracts are awarded in response to Requests for Proposals ("RFPs") and developed through the competitive bidding process.  Rate caps are based on cost data,[14] but provide the rate flexibility needed in the IPCS market.  Use of a

---

[9]      *MWR NPRM* ¶ 40.

[10]     *2015 ICS Order* ¶ 20.

[11]     *2015 ICS Order* ¶ 21.

[12]     *MWR NPRM* ¶ 40.

[13]     *Policy and Rules Concerning Rates for Dominant Carriers*, 5 FCC Rcd 6786, ¶ 4 (1990) ("*1990 Order*").

[14]     *National Rural Telecom Ass'n v. FCC*, 988 F.2d 174, 178 (D.C. Cir. 1993).

reasonable backstop rate cap will continue to protect consumers and provide the IPCS market the flexibility necessary to respond to the differing security and communication service needs of each correctional facility.[15]

Rate caps also eliminate the "danger that [carriers] would charge unreasonably high prices" while providing carriers "with the pricing flexibility that would encourage innovation."[16] The "primary objective" of a rate cap regime is "protecting ratepayers against unreasonable charges for services" and "giving carriers both the flexibility to introduce new, innovative services quickly and to provide the most efficient mix of services their networks permit and the incentive to do so."[17] "[P]ermitting flexibility in price-setting generates economic efficiencies that benefit ratepayers through lower rates."[18] A fluid rate cap regime provides "flexibility in light of existing market conditions, while protecting against anti-competitive, unreasonably discriminatory or other negative consequences."[19] Without such flexibility, IPCS providers would be limited in their "ability to respond in a timely manner to their customers' demands for innovative service arrangements tailored to each customer's individualized needs . . . . The better policy for consumers is to allow [carriers] to respond to technological and market developments."[20]

---

[15]    *2014 ICS FNPRM* ¶ 48 (noting the Commission's goal of "allow[ing] market forces to ensure that rates are just and reasonable"); *2013 ICS Order* at n.416 (noting the Commission's goal of ensuring IPCS providers have "flexibility in how they offer ICS").

[16]    *Amendment of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Sub-Elements for Open Network Architecture Policy and Rules Concerning Rates for Dominant Carriers*, 7 FCC Rcd 5235, ¶ 17 (1992).

[17]    *Policy and Rules Concerning Rates for Dominant Carriers*, 2 FCC Rcd 5208, ¶ 47 (1987).

[18]    *1990 Order* ¶ 35.

[19]    *Price Cap Performance Review for Local Exchange Carriers*, 11 FCC Rcd 858, ¶ 61 (1995).

[20]    *Petition of the Embarq Local Operating Companies for Forbearance under 47 U.S.C. § 160(c) from Application of Computer Inquiry and Certain Title II Common Carriage Requirements*, 22 FCC Rcd 19478, ¶ 32 (2007) (discussing the disadvantages of dominant carrier regulation of rates).

By contrast, the IPCS market would not benefit from establishing rates "for each individual provider."[21]  This is the hallmark of rate-of-return regulation,[22] and is not appropriate for the IPCS market.  Under rate-of-return regulation, "a carrier's rates are set at levels to give the carrier an opportunity to recover its operating costs plus an authorized rate of return on the regulated rate base (plant in service minus accumulated depreciation)."[23]  In light of the competitive bidding that occurs in the IPCS market, establishing rates for each individual provider "could be interpreted as the Commission picking winners and losers . . . instead of the marketplace determining winners."[24]

Nor should the establishment of IPCS rates rely on the Commission's historical "used and useful" standard.[25]  That standard is a vestige of rate-of-return regulation, and focuses "on recovering prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service for which rates are being set."[26]  In the competitive IPCS market, IPCS providers are free to determine how to best manage their investments and expenses, and they are not constrained by the accounting requirements applicable to dominant carriers.[27]

---

[21]    *MWR NPRM* ¶ 40.

[22]    *2021 ICS Order* ¶ 52 (noting the Commission's traditional exercise of rate regulation was "through company-specific cost-of-service studies that measure the regulated firms' total cost of providing the regulated service using the firm's accounting data").

[23]    *Connect America Fund, et al.*, 31 FCC Rcd 3087, ¶ 229 (2016).

[24]    *See, e.g.*, *Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses*, 12 FCC Rcd 16436, ¶ 19 (1997).

[25]    *MWR NPRM* ¶¶ 21-22.

[26]    *2021 ICS Order* ¶ 126.  Although the Commission claims it has applied the "used and useful" standard to price cap rates – *see id.* – such rates were for dominant carriers moving from rate-of-return regulation to price cap regulation in the first instance, not carriers operating in a competitive market.  *See generally Policy and Rules Concerning Rates for Dominant Carriers*, 5 FCC Rcd 6786 (1990).

[27]    *See, e.g.*, *2021 ICS Order* at Appendix E ¶ 32 (stating the Commission "did not create a uniform system of accounts or a detailed set of cost accounting requirements for inmate calling services"); *id.* ¶ 53 ("The Commission, to date, has not adopted accounting rules for calling service providers."); *id.* at n.238 ("[W]e recognize that [ViaPath] has not been required to keep, or indeed kept, accounting records that would enable it to isolate the costs it incurs in providing calling services to incarcerated individuals.").

**B.      Alternative Pricing Structures Should Be Permitted as an Alternative to Per-Minute Pricing**

The Commission should allow IPCS providers to implement alternative pricing plans as a supplement (not a replacement) to per-minute backstop rate caps.[28]   The record demonstrates alternative pricing arrangements provide consumers significant benefits, and that such arrangements can be structured to ensure rates continue to be just and reasonable.[29]   Consumers are in the best position to determine whether alternative pricing arrangements meet their needs, and per-minute pricing should remain available for consumers who prefer that option.   There is nothing in the MWR Act that would prevent the Commission from adopting alternative pricing structures[30] such as the "unit" pricing currently in use by some IPCS providers today.[31]

---

[28]      *MWR NPRM* ¶ 45; *see also* Robert Latta (OH), *Congressional Record* 168 (2022), p. 10027 ("Given the unique market they serve, providers of inmate calling services are also identifying ways to lower costs, such as through offering a subscription model. In some States, a pilot program to offer a flat rate for unlimited time on the phone has resulted in inmates calling family more often at a lower cost than on a per-minute basis.   I urge the FCC to evaluate the results of these efforts to lower costs and facilitate competition in the inmate calling marketplace before imposing heavy-handed regulations.").

[29]      *See generally* WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Comments of Securus Technologies, LLC, at 7-12 (dated Dec. 15, 2022).

[30]      *MWR NPRM* ¶ 16.

[31]      *See, e.g.*, WC Docket No. 12-375, Encartele, Inc. Annual Report (filed April 20, 2023) (stating Encartele has ceased operations as a provider of "inmate calling services" and is now an "internet applications provider"); *see also* Encartele, Inc. correspondence to Colorado Public Utilities Commission (dated May 6, 2022) (stating Encartele "does not track traditional call volumes or the number of minutes for which telephone calls are made" and instead "tracks data events and bandwidth utilization"), https://drive.google.com/drive/folders/1rXGHurARZcserR2GjrK91ZUHqrzIMbpQ.

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*May 8, 2023*

## II. THE COMMISSION SHOULD ADOPT ITS EXISTING RATE CAPS AS PERMANENT RATE CAPS FOR VOICE IPCS WHEN ADJUSTED FOR MARKET CHANGES

### A. The Existing Rate Caps Are Just and Reasonable for Voice IPCS and Provide Fair Compensation to Providers as Required under the MWR Act When Adjusted for Market Changes

In 2021, the Commission set voice IPCS rate caps based on the reported costs of IPCS providers.[32] The Commission's analysis began "by looking at industry-wide average costs" and it adjusted those costs as necessary.[33] The MWR Act embraces the use of industry-wide average costs to set rate caps for IPCS and those advanced communications services subject to the law.[34] The current record supports the adoption of the Commission's existing rate caps as permanent rate caps for voice IPCS with necessary adjustments for market changes.[35] The existing rate caps account for the variant cost structures of IPCS competitors and the different size and types of facilities they serve.[36] The MWR Act also supports, at a minimum, continuation of the current site commission allowances and rules regarding the pass-through of legally mandated site

---

[32] *2021 ICS Order* ¶ 56.

[33] *2021 ICS Order* ¶ 188.

[34] MWR Act § 3(b)(1).

[35] WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Securus Technologies, LLC Ex Parte Notification (dated Feb. 17, 2023) (". . . the MWR Act enables the Commission to continue on the same road it began on with the *2021 ICS Order* by using industry averages and mechanisms . . . that ensure the vast majority of a provider's contract and facility costs can be recovered."); *see also* WC Docket No. 12-375, Comments of NCIC Inmate Communications, at 7 (dated Dec. 15, 2022) (stating the Commission has already capped IPCS rates at appropriate, fair, and reasonable levels).

[36] *MWR NPRM* ¶ 63.

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*May 8, 2023*

commissions.[37]  The D.C. Circuit has determined that site commissions are a cost to be considered in determining IPCS rate caps,[38] and the MWR Act does not disturb that finding.

**B.      The Use of Average Daily Population Tracked by Correctional Facilities Continues To Be the Best Practical Approach for Differentiating between Facilities**

The Commission adopted IPCS rate caps based on the average daily population ("ADP") of a particular correctional facility.[39]  The MWR Act allows the Commission to continue on the same regulatory path taken in 2021.[40]  If the record continues to support that costs vary based on size of the facility, ADP tracked by correctional authorities is a practical approach for differentiating between facilities.[41]  Although ADP may fluctuate and/or correctional authorities

---

[37]      Secretariat Economists December 2022 Report at 4-5.

[38]      *GTL*, 866 F. 3d at 413 (finding the "categorical exclusion of site commissions from the calculus used to set ICS rate caps defies reasoned decisionmaking because site commissions obviously are costs of doing business incurred by ICS providers").

[39]      *2021 ICS Order* ¶ 46.

[40]      The Commission asks how it should interpret "rates and charges" as used in the MWR Act.  *See MWR NPRM* ¶ 24.  ViaPath disagrees with the Commission's proposed interpretation of what constitutes "rates and charges."  The Commission's proposed interpretation is inconsistent with precedent and the distinction between telecommunications services or services ancillary to the telecommunications service and "other" charges permitted or required under law.  "Other" charges do not include ancillary service charges.  *See id.*  As the Commission's current IPCS rules acknowledge, authorized fees and mandatory taxes and fees are separate and apart from ancillary service charges.  *See* 47 C.F.R. § 64.6000 *et seq.*  This approach also is consistent with Commission precedent.  *See, e.g.*, *Procedures for Filing Informational Tariffs by Operator Services Providers*, 7 FCC Rcd 3335 (1992) (requiring "rates and charges" to be separately stated from "commissions, surcharges, and fees"); *see also* 47 C.F.R. § 64.710(a) (requiring inmate operator service providers to give consumers the option to hear the "total cost of the call," which is "exclusive of taxes").  Authorized fees or mandatory taxes and fees should not be considered when determining whether rates and charges are just and reasonable and whether providers are fairly compensated.

[41]      *MWR NPRM* ¶ 63.  A reasonable backstop rate cap, however, could eliminate the need to adopt different rate tiers for jails of different sizes.  A simpler approach may be two rate caps – one for prisons and one for jails - which would eliminate the need for the Commission to rely on ADP to establish rate caps.  *See, e.g.*, Secretariat Economists December 2022 Report at 7-8.  A simplified rate structure also could make IPCS charges more transparent for the incarcerated and their friends and family, as well as more straightforward for IPCS providers and correctional facilities to administer.

may track ADP differently,[42] ADP remains the best way to distinguish between "small, medium, or large" facilities.[43]  However, correctional facilities generally require IPCS contracts to be for a term of years.  Consequently, ViaPath suggests the Commission modify Rule 64.6000(c)[44] defining "ADP" to permit ADP to be calculated as "the sum of all Incarcerated People in a facility for each day of the preceding calendar year, divided by the number of days in the year as calculated and applied for the initial term of an IPCS contract, and thereafter recalculated and applied for each renewal term of such contract."

Requiring ADP to be calculated yearly could require negotiated per-minute IPCS rates to increase or decrease each year due to changes in facility population year-to-year.  The proposed modification to the ADP definition will address concerns about consistency and variations in populations from year-to-year and align calculation of the population with the terms of each contract.  It is in the public interest to have a reasonable degree of consistency in the rates for per-minute services for consumers and for correctional facilities when those rates are established based on the ADP of the facility.

### C.    The Data Supports Continuation of the Existing Rate Caps as Backstop Rates for Voice IPCS

The Third Mandatory Data Collection submissions support adoption of the Commission's existing IPCS rate caps as permanent backstop rates for voice IPCS when adjusted for inflation and other market changes.[45]  The data shows the existing rate caps allow a variety of competitors

---

[42]    *2021 ICS Order* ¶ 310.

[43]    MWR Act § 3(b)(2).

[44]    47 C.F.R. § 64.6000(c).

[45]    Secretariat Economists December 2022 Report at 4; *see also* Secretariat Economists May 2023 Report.  Decreases in call volume, minutes of use, or units also could have an effect on the recovery of costs.  The minutes of use reported in response to the Third Mandatory Data Collection reflect increased calling due to limitations on in-person visitation during COVID, additional available funds due to stimulus payments, and the introduction of new calling methods.  Data from 2022 and beyond may reflect a decrease

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*May 8, 2023*

to operate in the IPCS market despite their different cost structures and the provision of service to different types and sizes of facilities.[46]  This is precisely the reasoning behind the use of backstop rates.[47]  The Commission already has established "a sensible way to identify a range of rates that would be just and reasonable to investors and ratepayers,"[48] and that existing range of rates is supported by the Third Mandatory Data Collection submissions.[49]

The data to be submitted in response to the Fourth Mandatory Data Collection[50] likely will also support the continuation of the existing rate caps for voice IPCS when adjusted for inflation. The record demonstrates that IPCS costs are rising.[51]  Inflation has increased substantially since the adoption of the existing rate caps as explained in the attached report.[52]  Other experts also have

---

in minutes, especially due to reductions in the prison population.  *See, e.g.*, WC Docket No. 12-375, Global Tel\*Link Corporation d/b/a ViaPath Technologies Amended and Restated Response to Third Mandatory Data Collection, at 9-10 (filed Mar. 10, 2023).

[46]      Secretariat Economists December 2022 Report at 9-10.

[47]      *See, e.g.*, *Price Cap Performance Review for Local Exchange Carriers*, 10 FCC Rcd 8961, ¶ 166 (1995) (using a backstop mechanism when a rate formula "might not prove to be perfectly accurate either for the [carrier] industry or for individual [carriers] or market conditions"); *see also 1992 Annual Access Tariff Filings*, 7 FCC Rcd 4731, ¶ 4 (1992) (implementing backstop measures to ensure the "formula produces a result fair to both ratepayers and carriers" finding backstop rates create "incentives and constraints similar to those in competitive marketplaces" and "provides an additional safeguard against rates that are unreasonably high or low").

[48]      *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 487-88 (2002).

[49]      *GTL*, 866 F.3d at 414-15 (finding the FCC must account for "cost discrepancies among providers").

[50]      *MWR NPRM* ¶ 84; *see also* WC Docket Nos. 23-62, 12-375, *Wireline Competition Bureau and Office of Economics and Analytics Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services*, Public Notice, DA 23-355 (rel. April 28, 2023).

[51]      *See, e.g.*, WC Docket Nos. 23-62, 12-375, Securus Technologies, LLC Notice of *Ex Parte* Meetings (April 14, 2023) (stressing "the importance of a data-driven approach to rate setting, while noting the need to address the impact of inflation and the changing economic environment on the delivery of services"); WC Docket No. 12-375, Comments of NCIC Inmate Communications, at 7 (dated Dec. 15, 2022) (discussing the effect of inflation and increased labor, shipping, transportation, and equipment costs).

[52]      *See generally* Secretariat Economists May 2023 Report.

reported that the prices for key inputs to IPCS have increased since the collection of 2021 data.[53]

Although the Fourth Mandatory Data Collection is expected to show the magnitude of these price

changes for each provider, the record already reflects that the costs incurred to provide IPCS today

are much greater than those incurred by IPCS providers to provide the same services in 2021.

### D.    The Existing Rate Caps for IPCS Appropriately Take into Account the Costs of Safety and Security Measures

The MWR Act requires the Commission to consider costs associated with any safety and

security measures necessary to provide the required IPCS and advanced communications.[54]  The

existing voice IPCS rate caps appropriately include the safety and security costs incurred to permit

the provision of voice IPCS[55] consistent with the mandates of the MWR Act.  The Act moots any

further arguments about whether safety and security costs should be considered when setting voice

IPCS rate caps.

There is no question that safety and security measures are "necessary" to the provision of

IPCS in correctional facilities.[56]  The "ordinary and fair meaning" of the term "necessary" is that

which is required to achieve a desired goal, and a measure may be "necessary" even though

acceptable alternatives have not been exhausted.[57]  The Commission long has recognized that

---

[53]    WC Docket No. 12-375, Report of Don J. Wood on behalf of Pay Tel Communications, Inc., at 17 (filed March 3, 2023).

[54]    MWR Act § 3(b)(2); *MWR NPRM* ¶¶ 52-57.  The Commission should not interpret "safety and security" to mean something different than the term "security and surveillance" previously used in the Commission's IPCS proceedings.  *See MWR NPRM* ¶ 55.

[55]    *2021 ICS Order* ¶ 150; *see also* WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Comments of the National Sheriffs' Association, at 1 (Dec. 15, 2022) (explaining how security and surveillance costs are appropriately included in IPCS rates); WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Comments of Securus Technologies, LLC, at 17-18 (dated Dec. 15, 2022) (stating security measures have always been integral to IPCS and it defies logic to argue that security is not directly related to the provision of IPCS).

[56]    *MWR NPRM* ¶ 54.

[57]    *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000); *Natural Resources Defense Council, Inc. v. Thomas*, 838 F.2d 1224, 1236 (D.C. Cir. 1988).

correctional facilities incur security costs to provide incarcerated individuals with access to IPCS.[58]

Courts likewise have found correctional facilities face "legitimate security interest[s]" when it

comes to incarcerated communications.[59]   Correctional facilities would not otherwise incur such

safety and security costs if they did not provide incarcerated people access to communications

services.[60]   Such costs must be taken into consideration by the Commission when setting

permanent rate caps pursuant to the MWR Act.[61]

Failure to include safety and security costs in permanent rates for IPCS would violate the

mandates of the MWR Act that prohibit the Commission from impeding on the prerogatives of

correctional authorities to implement and maintain safety and security measures related to the

provision of IPCS in their facilities.[62]   Federal law recognizes an incarcerated person's right to

communications access is subject to rational limitations in the face of the penal institution's

legitimate security interests.[63]   Correctional authorities must be "accorded wide-ranging deference

---

[58]    *2013 ICS Order* at n.203 ("we cannot foreclose the possibility that some portion of payments from ICS providers to some correctional facilities may, in certain circumstances, reimburse correctional facilities for their costs of providing ICS"); *see also Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 17 FCC Rcd 3248, ¶¶ 38, 72 (2002) ("*2002 Remand Order*") (finding "inmate calls impose expensive security costs" and "the provision of inmate calling services implicates important security concerns and, therefore, involves costs unique to the prison environment").

[59]    *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989).

[60]    *See generally* WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Comments of the National Sheriffs' Association (dated Dec. 15, 2022); WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Reply Comments of the National Sheriffs' Association (dated March 3, 2023).

[61]    *2016 ICS Reconsideration Order* ¶ 12 (finding "(1) at least some facilities likely incur costs that are directly and reasonably related to the provision of ICS, (2) it is reasonable for those facilities to expect providers to compensate them for those costs, (3) such costs are a legitimate cost of ICS that should be accounted for in our rate cap calculations"); *see also GTL*, 866 F.3d at 413 ("Not only does the FCC's reasoning defy comprehension, the categorical exclusion of site commissions cannot be easily squared with the requirements of § 276 and § 201.").

[62]    MWR Act § 4.

[63]    *Washington v. Reno*, 35 F. 3d 1093 (6th Cir. 1994); *see also Gilday v. Dubois*, 124 F.3d 277 (1st Cir. 1997); *Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir. 1986).

in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[64]  The Commission therefore cannot take any action that would hamper the ability of correctional authorities to maintain safety and security generally, or specifically as to the provision of IPCS, within their facilities.

### E.    The Commission Does Not Need to Take Additional Steps to Address Interstate Versus Intrastate Costs

The Commission asks whether it needs to differentiate between "interstate" costs and "intrastate" costs when setting rates for voice IPCS.[65]  Such a differentiation is not necessary.  As the Commission notes, it used a "total cost approach" for setting its current rate caps for IPCS voice and did not distinguish between costs for interstate and intrastate voice services.[66]  Nor did providers separate their interstate and intrastate voice costs in responding to the Third Mandatory Data Collection.[67]  The Commission's existing rate caps for IPCS already take into consideration interstate and intrastate costs.[68]

The Commission also asks whether it should take the same "total cost approach" with respect to the costs for so-called "intrastate" video communications and "interstate" video

---

[64]    *Bell v. Wolfish*, 441 U.S. 520 (1979).

[65]    *MWR NPRM* ¶ 43.  The Commission already has addressed the jurisdictional issues related to ancillary service charges finding that all such charges, with the exception of charges for single-call and related services, cannot be segregated into interstate and intrastate components.  *See 2020 ICS Order* ¶ 28. As a result, the Commission concluded "providers are generally prohibited from imposing any ancillary service charges other than those permitted by the Commission's rules, and providers are generally prohibited from imposing charges in excess of [its] applicable ancillary service fee caps."  *See 2021 ICS Order* ¶ 23.

[66]    *MWR NPRM* ¶ 43.

[67]    *MWR NPRM* at n.103.

[68]    However, it will be important for the Commission to address what effect the exercise of jurisdiction over all IPCS calls and associated rates will have on state and federal universal service fund and state tax obligations.  *See, e.g.*, *2021 ICS Order* ¶ 256 ("We do not disturb state and local laws or regulations that use NPA-NXX or other proxies to determine, for example, the application of state fees and taxes.").

communications.[69]  This analysis is both unnecessary and contrary to the law governing video services.  It is unlikely providers will be able to readily separate their video communications costs into "intrastate" and "interstate" components because video-based services generally are not segregated or priced based on the interstate/intrastate dichotomy.  Video services have been treated under the law as inherently interstate services.[70]

---

[69]     *MWR NPRM* ¶ 44.

[70]     47 U.S.C. § 153(27); 47 C.F.R. § 14.10(m); *see also Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010, et al.*, 26 FCC Rcd 14557, ¶¶ 49-50 (2011); *see also Framework for Broadband Internet Service*, 25 FCC Rcd 7866, ¶ 107 (2010) ("we do not intend to address in this proceeding the classification of information services such as e-mail hosting, web-based content and applications, voicemail, interactive menu services, video conferencing, cloud computing").

## **CONCLUSION**

Accordingly, consistent with the foregoing comments and those set forth in ViaPath's prior submissions, ViaPath urges the Commission to bring greater uniformity and regulatory certainty to the IPCS marketplace by finding the existing rate caps are consistent with the mandates of the MWR Act and adopting those rate caps as suggested herein as permanent rate caps for all voice IPCS.

Respectfully submitted,

**GLOBAL TEL\*LINK CORPORATION
D/B/A VIAPATH TECHNOLOGIES**

*/s/ Chérie R. Kiser*
Chérie R. Kiser
Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street, NW, Suite 950
Washington, DC 20006
202-862-8900
ckiser@cahill.com
acollins@cahill.com

Dated:  May 8, 2023                              Its Attorneys

**Before the**
**Federal Communications Commission**
**Washington, D.C.**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| ———————————————————— | ) | |

**Supplemental Report in Support of Comments of Global Tel\*Link**

**Corporation d/b/a ViaPath Technologies Regarding the FCC's Notice of**

**Proposed Rulemaking and Order to Implement the Martha Wright-Reed Act**

**Paul E. Godek, Ph.D.**

**Secretariat Economists**

**May 8, 2023**

**Table of Contents**

I.      **Qualifications and Assignment** ........................................................ 1

II.     **Overview** ........................................................................................ 1

III.    **Inflation** ......................................................................................... 2

IV.   **The Need for Indexing** .................................................................. 4

**Attachment: CV of Paul Godek**

## I.    Qualifications and Assignment

1.     I am a Managing Director at Secretariat Economists, an economic consulting firm. On December 15, 2022, I submitted a "Report in Support of Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies Regarding the FCC's Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking." My qualifications are described therein and my curriculum vitae is attached to this Supplemental Report.[1]

2.     As noted in my prior reports, I have been retained by counsel for Global Tel*Link Corporation d/b/a ViaPath Technologies ("GTL / ViaPath"), a provider of incarcerated people's communications services ("IPCS"), to analyze certain issues related to the FCC's regulation of IPCS and implementation of the Martha Wright-Reed Just and Reasonable Communications Act of 2022.

3.     For my time spent on this matter, Secretariat Economists is compensated at the rate of $825 per hour. My compensation is not contingent upon the analyses and conclusions presented in this Supplemental Report or upon the outcome of the FCC's regulatory initiatives related to incarcerated people's communications services. This Report presents the results of my research and analysis to date. As additional information becomes available it is my intention to review that material and, if appropriate, to amend or supplement this Report.

## II.    Overview

4.     In 2021, the FCC adopted interim rate caps for the provision of voice IPCS, to be applied on a per-minute-of-use ("MOU") basis, according to the type and the size of the facility, based

---

[1]     Secretariat Economists (f/k/a Economists Incorporated) also submitted three reports in support of GTL/ViaPath comments in prior phases of this proceeding. See WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Economists Incorporated Report in Support of Comments of Global Tel*Link Corporation Regarding the FCC's *Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking* (filed November 23, 2020); Economists Incorporated Supplemental Report in Support of Comments of Global Tel*Link Corporation Regarding the FCC's *Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking* (filed January 15, 2021); Economists Incorporated Second Supplemental Report in Support of Comments of Global Tel*Link Corporation Regarding the FCC's *Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking* (filed April 23, 2021).

on the average daily population ("ADP") of incarcerated people in a facility. The interim rate caps are as follows:[2]

— for prisons: 12 cents per MOU, plus 2 cents per MOU for site commissions;

— for jails with 1,000 ADP or greater: 14 cents per MOU, plus 2 cents per MOU for site commissions;

— for smaller jails: 21 cents per MOU, with no additional allowance for site commissions.

These specific rate caps were adopted by the FCC in May 2021 and went into effect in October 2021.[3] The FCC adopted these interim rate caps based primarily on IPCS providers' cost information from 2018, as reflected in the responses to the Second Mandatory Data Collection and information from providers' annual reports for the years 2019 and 2020.[4]

5.     Over the last few years, inflation in the United States has increased substantially. Because of inflation, the rate caps, regardless of their basis when first adopted, will over time be rendered inconsistent with the provision of the services at issue. Indeed, since the promulgation of the rate caps, inflation has already eroded their foundation. It is essential, therefore, that the FCC "index" the rate caps to account for the effects of inflation.

### III.     Inflation

6.     Recent history has reminded us about the importance of accounting for inflation. The U.S. economy is experiencing rates of inflation higher than at any point in the last 40 years. The following chart indicates annual inflation rates starting in 2018. Inflation is measured as the annual percentage change over the year ending in the quarter indicated, for two indices: the Gross Domestic Product ("GDP") Deflator, and the Producer Price Index ("PPI") for the

---

[2]     See WC Docket No. 12-375, *Rates for Interstate Inmate Calling Service*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, at Section III.C. (released May 24, 2021) ("Third Report")

[3]     See the FCC's Third Report at Section II and Section III.

[4]     See the FCC's Third Report at Section II and WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, FTI Consulting, Inc. Declaration of Charlie J. Choe, Robert O. Fisher, Brian F. Pitkin, and Steven E. Turner attached to the Comments of Securus Technologies, LLC, at Section V.C. (filed December 15, 2022) ("FTI Report").

telecommunications industry.[5] The GDP Deflator measures the changes in prices for all the goods and services produced in the United States. Producer price indices measure the changes in prices received by domestic producers in a particular industry.

7.      Inflation as measured by the GDP Deflator began to accelerate in 2021. Inflation as measured by the telecom PPI lagged behind overall inflation by about one year, but has since accelerated. The telecom PPI has continued to increase even though the overall inflation rate has started to decline in recent quarters. Over the year ending in the most recent quarter, both indices increased at an annual rate of about 5 percent.



5      The telecommunications PPI, or telecom PPI, is from the Bureau of Labor Statistics (series identifier PCU517517) and the GDP deflator is from the Federal Reserve Bank of St. Louis (series identifier GDPDEF).

3

Other reports submitted in this matter have pointed out these basic facts and have discussed the relevance of inflation to the imposition of rate caps.[6]

### IV.    The Need for Indexing

8.    Consider a rate cap that allows an industry to earn what is considered, at the time the rate cap is established, an adequate rate of return on its invested capital. During an inflationary period, with rate caps unadjusted for inflation, the return on invested capital will diminish over time. Under those conditions, the incentive for incremental investment will also decline. Indeed, once inflation negates the recovery of variable costs, the service at issue will cease to be provided.

9.    The cumulative rate of inflation in the telecom PPI (the increase in the telecom PPI index) between the first quarter of 2021 and the first quarter of 2023 was 6.5 percent. A rate cap considered adequate in 2021 is already 6.5 percent too low. It follows that the FCC should have indexed its proposed and now-adopted rate caps from the time those rate caps were first proposed. Just a few short years ago, inflation may have been low enough to be considered negligible. That is no longer the case. Even moderate levels of inflation will, over time, undermine the plausibility of a fixed set of rate caps.

10.    There are various methods that the FCC could use to index the IPCS rate caps. It could, for example, use either of the two indices considered here: the telecom PPI or the GDP Deflator. Alternatively, it could use cost information submitted to the FCC by the IPCS providers. Regardless of the method chosen, the FCC should, as a matter of basic economics, index the rate caps applied to IPCS providers.

11.    The effects of inflation on the incentives for investment in regulated industries has long been understood.[7] Finally, I note that the FCC is aware of the need for indexing in regulated environments and the various methods for doing so. See, for examples, the FCC's discussions of

---

[6]    See FTI Report at Section V.C; WC Docket No. 12-375, *Rates for Interstate Inmate Calling Services*, Report of Don J. Wood, MBA, CVA, MAFF, on behalf of Pay Tel Communications, Inc. (filed March 3, 2023), at pages 17-18.

[7]    See Wallace N. Davidson and John L. Glascock, "Rate-of-Return Attrition and Inflation-Induced Penalties in Public Utility Common Stocks," *The Energy Journal*, October 1984.

inflation adjustment for the cable industry,[8] for calculating civil penalties,[9] and for funding policy initiatives.[10]

---

[8]    https://www.fcc.gov/document/first-quarter-cable-inflation-adjustment-0.

[9]    https://docs.fcc.gov/public/attachments/DA-22-1356A1.pdf.

[10]    https://www.fcc.gov/ecfs/document/05310169808865/2.

5

**JA526**

**Attachment: CV of Paul Godek**



**Paul E. Godek, Ph.D.**
**Managing Director**

2121 K Street, NW | Suite 1100
Washington, D.C. 20037

office phone: 202-833-5225
cell phone: 703-593-4186
e-mail: pgodek@secretariat-intl.com

---

**CURRICULUM VITAE**

**Education**

    Ph.D.,  University of Chicago: Economics, 1983.
           Primary Fields:
                Industrial Organization,
                Economic Development.
           Dissertation: "Aspects of the Positive Theory of Trade Restrictions."
           Dissertation Committee:
                Prof. Sam Peltzman,
                Prof. Dennis Carlton,
                Prof. Larry Sjaastad.

    M.A.,   University of Chicago: Economics, 1980.

    B.A.,   University of Michigan: With High Distinction, 1978.
           Double Major:
                Economics,
                Political Science.

---

**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**



**Personal Information**

Citizenship: United States of America.

Born: May 30, 1956; Detroit, Michigan.

Home Address:
9070 Tower House Place
Alexandria, Virginia 22308

**Professional Experience**

Economists Incorporated:
Senior Vice President, 2018-2021.
(Economists Incorporated was integrated into Secretariat
International and renamed as Secretariat Economists in 2021.)

Navigant Economics:
Director, 2015-2018.
(Navigant Economics was integrated into Ankura Consulting Group in
2018.)

MiCRA – Microeconomic Consulting and Research Associates:
Principal, 2012-2015.
(MiCRA was integrated into Navigant Economics in 2015.)

SLCG – Securities Litigation & Consulting Group:
Principal, 2011-2012.

Compass Lexecon:
Senior Vice President, 2006-2011.

Economists Incorporated, 1988-2006:
Senior Vice President, 2004-2006,
Vice President, 1996-2003,
Senior Economist, 1988-1995,
Pension Fund Trustee, 1998-2006.

U.S. Federal Trade Commission, Bureau of Competition:
Economic Advisor to the Director, 1986-1988.

_____
**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 2**



U.S. Department of Justice, Antitrust Division, Economic Analysis Group:
     Staff Economist, 1983-1986.

University of Chicago, Center for the Study of the Economy and the State
     (now the George J. Stigler Center for the Study of the Economy and the
     State): Research Assistant, 1981-1982.

University of Chicago, Department of Economics:
     Teaching Assistant, 1981.

Chicago Board of Trade, Economic Policy Office:
     Research Assistant, 1980.


**Scholarships, Awards, and Presentations**

*Who's Who Legal, Consulting Experts — 2016, 2017, 2019 – 2022*: Listed
     among "World's Leading Practitioners" in the category of Competition
     Economists.

Shadow Securities and Exchange Commission Conference on Nasdaq's
     Trading Structure: Invited Speaker, November 1995.

World Bank Conference on Competition Policy for Developing Countries:
     Invited Speaker, April 1993.

U.S. Department of Justice:
     Special Achievement Award, 1986,
     Outstanding Performance Rating, 1986.

University of Chicago Scholarship Awards:
     Economics Department Scholarship,
     Friedman Fund Scholarship,
     Ingersoll Fund Scholarship.

University of Michigan Scholarship Awards:
     State of Michigan Scholarship,
     University of Michigan Scholarship.

⚛ **Secretariat**
Economists

**Journal Referee**

> *American Economic Review,*
> *Antitrust Law Journal,*
> *Economic Inquiry,*
> *Finance Research Letters,*
> *Journal of Law & Economics,*
> *Journal of Political Economy,*
> *Public Choice,*
> *Research in Law & Economics,*
> *Review of International Economics.*

**Published Papers**

> "Determining States' *A Priori* Preferences for the Electoral College: 1788-2016," *Cato Journal*, Fall 2018.

> "Distinct Eras in the History of U.S. Debt Monetization," *Journal of Economics and Public Finance*, 2017.

> "*Ex Ante* vs. *Ex Post*: Janis Joplin's Yearbook Revisited," *Law 360*, July 2015.

> "A Simple Model of Market Valuation and Trend Reversion for U.S. Equities: 100 Years of Bubbles, Non-Bubbles, and Inverse-Bubbles," *Finance Research Letters*, May 2015.

> "Time-Series Models for Estimating Economic Damages in Antitrust (and Other) Litigation: The Relative Merits of Predictive versus Dummy-Variable Approaches," *CPI Antitrust Chronicle*, December 2011.

> "Margin of Error: The Flawed Paradigm in the New Merger Guidelines," *CPI Antitrust Chronicle*, March 2011, (with M. Baumann).

> "Does the Tail Wag the Dog? Sixty Years of Government and Private Antitrust in the Federal Courts," *Antitrust Source*, December 2009.

> "Economic Analysis in Antitrust Class Certification: The Hydrogen Peroxide Decision," *Antitrust*, Fall 2009, (with J. Ordover).

---

**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 4**

❄ Secretariat
Economists

"Reconciling the Opposing Views of Critical Elasticity," *CPI Antitrust Chronicle*, September 2009, (with M. Baumann).

"A New Look at Critical Elasticity," *Antitrust Bulletin*, Summer 2006, (with M. Baumann).

"Another Look at *Alcoa*: Raising-Rivals'-Costs Does Not Improve the View," Chapter 11 in *Famous Fables of Economics: Myths of Market Failure*, edited by Daniel F. Spulber, Blackwell Publishers, 2001; originally published in *Journal of Law & Economics*, October 1992, (with J. Lopatka).

"A Chicago-School Approach to Antitrust for Developing Economies," *Antitrust Bulletin*, Spring 1998.

"The Regulation of Fuel Economy and the Demand for 'Light Trucks'," *Journal of Law & Economics*, October 1997.

"Why Nasdaq Market Makers Avoid Odd-Eighth Quotes," *Journal of Financial Economics*, July 1996.

"Could and Would Understood: Critical Elasticities and the Merger Guidelines," *Antitrust Bulletin*, Winter 1995, (with M. Baumann).

"Bad Policy, Bad Law, and the Constitution: A Stiglerian View," *Cato Journal*, Spring/Summer 1993.

"Foreign Profits and the Political Economy of Quotas," *Cato Journal*, Spring/Summer 1991.

"The Politically Optimal Tariff: Levels of Trade Restrictions Across Developed Countries," *Economic Inquiry*, October 1986.

"Industry Structure and Redistribution Through Trade Restrictions," *Journal of Law & Economics*, October 1985.

---

❈ Secretariat
Economists

**Other Papers and Publications**

"Is It Finally Time for Narrow Banking?" *Regulation*, forthcoming Summer 2023.

"From St. Petersburg to Monte Carlo: A Resolution Rediscovered and Affirmed," *Social Science Research Network*, revised March 2021, available at: https://ssrn.com/abstract=3062683, (with T. Dulaney).

"The Ever-Popular Electoral College," *Regulation*, Summer 2019.

"*Ex Ante* vs. *Ex Post*: Janis Joplin's Yearbook Revisited," *Economists Ink,* Winter 2019.

*Market Power Handbook: Competition Law and Economic Foundations*, Second Edition, ABA Section of Antitrust Law, 2012, contributing author.

"Jobless Numbers Are Worse Than You Think," *The Wall Street Journal*, July 23, 2010.

Comment submitted to the U.S. Federal Trade Commission, "Horizontal Merger Guidelines Revision Project B Comment," May 2010, (with M. Baumann).

"Stale CAFE," *Regulation*, Summer 2006.

"CAFE's Recipe for Light Trucks," *Regulation*, Fall 1997.

"One U.S. Export Eastern Europe Does Not Need," *International Merger Law,* September 1991, reprinted in *Regulation*, Winter 1992.

"Antitrust Will Stifle, Not Spur Eastern Growth," *The Wall Street Journal Europe*, July 26, 1991.

———————————————
**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 6**



**Expert Testimony and Reports**

Report submitted to the U.S. Federal Communications Commission, in the matter of *Rates for Interstate Inmate Calling Services: The Federal Communication Commission's Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking*, released September 30, 2022. Report filed: December 2022. Client: Global Tel*Link Corporation.

Reports submitted to the U.S. Federal Communications Commission, in the matter of *Rates for Interstate Inmate Calling Services: The Federal Communication Commission's Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking*, released August 7, 2020. Reports filed: November 2020, January 2021, April 2021. Client: Global Tel*Link Corporation.

Deposition testimony, reports, and declaration submitted in United States District Court for the Northern District of California, San Francisco Division, in the matter of *Cave Consulting Group, Inc.* v. *OptumInsight, Inc.*, Deposition: June 2018. Client: OptumInsight, Inc.

Report submitted in United States District Court for the Southern District of West Virginia, in the matter of *West Virginia — American Water Company* v. *Starr Indemnity and Liability Company*, August 2017. Client: West Virginia — American Water Company.

Report submitted to the Turkish Competition Authority, "Economic Issues in Tuborg's Contract with Ecocaps," January 2016, (with coauthor). Client: Türk Tuborg.

Report submitted to the European Commission, "Issues in the Determination of the Value of Sales – Ocean Shipments by Vehicle Carriers to, from, and within the European Union," February 2014, (with coauthor). Client: NYK Group.

Testimony and reports submitted in Administrative Law Proceeding, U.S. Department of Agriculture, in the matter of *Petition by Burnette Foods, Inc. Challenging the Application of Federal Marketing Order 930 to Burnette Foods, Inc.*, Testimony: May 2012. Client: Burnette Foods, Inc.

---

**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 7**



Report submitted to the U.S. Federal Trade Commission, in the matter of *Prohibitions on Market Manipulation and False Information in Subtitle B of the Energy Independence and Security Act of 2007*, June 2008, (with coauthor). Client: Flint Hills Resources.

Deposition testimony and report submitted in United States District Court for the District of Connecticut, in the matter of *Schick Manufacturing, Inc. et al.* v. *The Gillette Company*, Deposition: August 2005. Client: The Gillette Company.

Deposition testimony and report submitted in United States District Court for the Central District of California, Western Division, in the matter of *Hanson Aggregates West, Inc.* v. *American Mechanical Dredge, Inc.* and *Damen Shipyards Group*, Deposition: December 2004. Clients: American Mechanical Dredge, Inc. and Damen Shipyards Group.

Report submitted in United States District Court for the District of Massachusetts, in the matter of *In re Relafen Antitrust Litigation*, October 2003. Client: SmithKline Beecham Corp.

Report commissioned by the American Hospital Association, "Economic Analysis of Healthcare Cost Studies Commissioned by Blue Cross Blue Shield Association," February 2003, (with coauthors). Client: American Hospital Association.

Reports submitted to the U.S. Internal Revenue Service, "Analysis of Effective Ownership of Certain Euro Disney Theme Park Assets: Reply to the Shapiro Report," January 2003, (with coauthors); "Analysis of Effective Ownership of Certain Euro Disney Theme Park Assets: Response to the IRS Reply," October 2003 (with coauthors). Client: The Walt Disney Corporation.

Deposition testimony in Texas District Court of Tarrant County, Texas in the matter of *Carroll Brown et al.* v. *Warner-Lambert Company et al.*, Deposition: November 2002. Client: Warner-Lambert Company.

Report submitted in United States District Court for the Southern District of New York, in the matter of *In re Vitamin Antitrust Litigation*, April 2002. Client: UCB Inc.

---

**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 8**



Deposition testimony and reports submitted in United States District Court for the Northeastern District of North Dakota, in the matter of *Trade 'N' Post, LLC* v. *World Duty Free Americas, Inc.* and *Ammex Tax & Duty Free Shops West, Inc.*, Deposition: May 2001. Clients: World Duty Free Americas, Inc. and Ammex Tax & Duty Free Shops West, Inc.

Deposition testimony and reports submitted in United States District Court for the Western District of Virginia, in the matter of *Virginia Vermiculite, Ltd.* v. *W.R. Grace & Co.* and *The Historic Green Springs, Inc.*, Deposition: November 1999. Client: W.R. Grace & Co.

Report submitted to the U.S. Federal Communications Commission, "Further Cost of Capital Considerations Relating to Cable Cost of Service Regulation," in the matter of *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* May 1996, (with coauthor). Client: National Cable Television Association.

Report submitted to the U.S. Federal Communications Commission, "The Cost of Capital for The Oncor Group," in the matter of *Operator Communications, Inc. – Investigation of Rates and Charges for Interstate Operator Services,* August 1995. Client: The Oncor Group.

Report submitted to the U.S. Securities and Exchange Commission and the U.S. Department of Justice, "Nasdaq's Market Structure," June 1995, (with coauthors). Client: Nasdaq Stock Market, Inc.

Deposition testimony and report submitted in United States District Court for the Middle District of Pennsylvania, in the matter of *Petruzzi's IGA Supermarkets, Inc.* v. *Darling-Delaware Co., Inc. et al.*, Deposition: August 1994. Client: Darling-Delaware Co., Inc.

Report submitted to the U.S. Federal Communications Commission, "Revisiting the Issues of Rate Base and Rate of Return in Cable Regulation," in the matter of *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* June 1994, (with coauthor). Client: National Cable Television Association.



Reports submitted to the U.S. Federal Communications Commission, "An Event Study of AT&T's Attempted Acquisition of NCR," February 1991, (with coauthor); "Reply to AT&T's Letter to the Federal Communications Commission," February 1991, (with coauthor); in the matter of *AT&T, Petition for Emergency Investigation and Special Relief*. Client: NCR Corporation.

Report submitted to the U.S. Department of Commerce, "Economic Analysis of Brach's Application for Foreign-Trade-Zone Status," in the matter of *Foreign-Trade Zone 22; Chicago, Illinois; Application for Subzone; E.J. Brach Candy Plant*, February 1990, (with coauthors). Client: E.J. Brach and Sons, Inc.

Testimony at the U.S. International Trade Commission, Preliminary Hearing, in the matter of *Sweaters of Man-Made Fibers from Hong Kong, the Republic of Korea, and Taiwan*, Testimony: October 1989. Clients: Hong Kong, the Republic of Korea, and Taiwan.

Testimony in United States District Court for the Northern District of Florida, in the matter of *United States* v. *Trawick*, Testimony: January 1986.

Report submitted in United States District Court for the District of Columbia, in the matter of *United States* v. *The LTV Corporation et al.*, June 1984.

**Other Retentions**

Retained as a consulting expert by Norfolk Southern Railway Company in the matter *CSX Transportation, Inc. et al.* v. *Norfolk Southern Railway Company et al.*, United States District Court for the Eastern District of Virginia, 2019-2023.

Retained as a consulting expert by Sonoco Products Company regarding the acquisition of Corenso Holding America, Inc.; Antitrust Division merger review, 2019.

Retained as a consulting expert by NYK Group in its dealings with various private sector and government claimants, related to alleged price fixing in the provision of ocean transportation of vehicles, 2018-2023.

_____

**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 10**



Retained as a consulting expert and potential testifying expert by West Virginia / American Water Company in the arbitration between *West Virginia / American Water Company et al.* and *XL Insurance Company SE*, 2018.

Retained as a consulting expert and potential testifying expert by the U.S. Federal Trade Commission in the matter of *Federal Trade Commission* v. *Superior Plus Corporation* and *Canexus Corporation*, United States District Court for the District of Columbia, 2016.

Retained as a consulting expert by Crowley Maritime Corporation in the matter of *In Re: Puerto Rican Cabotage Antitrust Litigation*, United States District Court for the District of Puerto Rico, 2009-2012.

Retained as a consulting expert by PNC Bank in the matter of *Adelphia Recovery Trust* v. *Bank of America et al.*, United States District Court for the Southern District of New York, 2008-2009.

Retained as a consultant by DaimlerChrysler AG regarding econometric analysis and forecasting of US passenger vehicle sales, 1999-2003.

Retained as a consulting expert by KKR & Co. in the matter of *In Re: Cendant Corporation Securities Litigation*, United States District Court for the District of New Jersey, 1998.

Retained as a consulting expert and potential testifying expert by Duncan Industries in the matter of *P.O.M. Inc.* v. *Duncan Industries Parking Control Systems Corp.*, United States District Court for the Eastern District of Arkansas, 1993.

**Software Proficiency**

SAS: Statistical Analysis System.

Microsoft Office: MS Word, MS Excel, MS PowerPoint.

Portable document format editors:
Adobe Acrobat, Foxit Phantom PDF, ABBYY FineReader.

———————————————

**Curriculum Vitæ**
**Paul E. Godek**
**May 2023**
**Page 11**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services: Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**To:  The Commission**

## COMMENTS OF THE NATIONAL SHERIFFS' ASSOCIATION

Salvatore Taillefer, Jr.
Mary J. Sisak

Blooston, Mordkofsky, Dickens,
Duffy, & Prendergast, LLP
2120 L Street NW, Suite 825
Washington, DC  20037
Tel:    202-659-0830
Fax:    202-828-5568

Filed: May 8, 2023

**Table of Contents**

Executive Summary ................................................................................................ iii

I.      Introduction ................................................................................................. 2

II.     Interpreting Amended Section 276(b)(1)(A) ............................................. 3

III.    Interpreting Amended Section 3(1) ........................................................... 5

IV.     The Commission's Approach to Ratemaking ............................................. 7

V.      The Commission's Use of Data .................................................................. 8

VI.     Necessary Security and Safety Measures ................................................... 9

VII.    Size and Type of Correctional Institution ............................................... 11

VIII.   Interpretation of Section 4 of the MWRA ............................................... 13

IX.     Conclusion ................................................................................................ 15

**Executive Summary**

In the NPRM, the Commission seeks comment on several aspects on how to interpret the Martha Wright-Reed Act (MWRA), which amends the Communications Act of 1934, as amended, to provide for just and reasonable rates and charges for incarcerated people's communications services (IPCS). NSA's overall concerns with IPCS in jails have remained the same over the years. For jails to permit access to IPCS, proper safety and security measures need to be in place. Since jails are usually the ones required to provide those safety and security measures, any rates or rate caps adopted by the Commission must allow jails to recover the costs associated with providing those measures. Because the Commission is charged by section 276 with promoting the widespread deployment of IPCS in correctional facilities, it must take care to set rates or rate caps in such a way that does not chill the availability of IPCS.

To this end, NSA provides its comments on several of the specific questions set forth in the NPRM. Regarding the amendments to section 276, NSA has concerns about the applicability of the "used and useful" standard to security and safety measures but asserts that its cost study would provide a reasonable basis to make generalized findings about those costs. However, the Commission cannot require individual facilities to establish the extent to which their costs are used and useful, because it does not have jurisdiction over facilities. Regarding the amendments to section 3(1), NSA demonstrates that the limiting phrase in section 3(1)(E) does apply to the services set forth in sections 3(1)(A), (B), and (D). NSA also demonstrates that the Commission's jurisdiction does not include any communications that take place on or in correctional institutions.

Regarding ratemaking, NSA supports as granular and detailed an approach to setting rates or rate caps as possible. The record clearly demonstrates that costs vary depending on a

number of variables, most importantly type of facility (prison vs. jail) and size of facility (by average daily population (ADP)).

Regarding necessary security and safety measures, the MWRA plainly requires the Commission to ensure these costs are recoverable, and that Sheriffs are free to make decisions about which measures are or are not necessary. In the past, NSA has provided detailed information on the safety and security measures that are necessary in jails today but urges the Commission to adopt a more future-oriented approach. When it comes to jails, Sheriffs are experts on the safe and secure operation of the facilities and should be the ultimate arbiters of what is necessary when it comes to safety and security.

Regarding the impact of the type and size of the facility on rates or rate caps, NSA demonstrates that the definition of "correctional institution," "prison," and/or "jail" should not be expanded, and that, as stated previously, ADP is currently the most useful factor in assessing cost. NSA also continues to support three tiers of jails based on ADP: 1-349 ADP, 350-2,499 ADP, and $\geq 2,500$ ADP.

Finally, NSA believes the Commission should take a plain language approach to the interpretation of section 4 of the MWRA. Specifically, NSA supports the Commission's broad interpretation regarding the first phrase in section 4, pertaining to requiring IPCS: … "the Martha Wright-Reed Act does not create any new obligation for state or local facilities to provide any form of incarcerated people's calling services[.]" NSA also supports the interpretation of the second phrase in Section 4, regarding safety and security measures, that "the just and reasonable ratemaking focus of the Martha Wright-Reed Act is not intended to interfere with any correctional official's decision on whether to implement any type of safety or security measure that the official desires in conjunction with audio or video communications services."

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services: Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |

**To: The Commission**

## COMMENTS OF THE NATIONAL SHERIFFS' ASSOCIATION

The National Sheriffs' Association (NSA), by its attorneys, hereby submits comments in response to the Notice of Proposed Rulemaking (NPRM) in the above-captioned proceeding,[1] in which the Commission seeks comment on the implementation of the Martha Wright-Reed Act (MWRA)[2] and incarcerated people's communications services (IPCS).[3] Specifically, NSA urges the Commission to interpret and implement the MWRA in a way that allows Sheriffs to recover the costs they incur when IPCS is available in their jails, without interfering with their operation of said jails. Following, NSA addresses questions on interpreting the MWRA's amendments to section 276 and section 3 of the Communications Act of 1934, as amended; the Commission's proposed approach to ratemaking; the Commission's use of industry data in setting rates; the inclusion of necessary security and safety measures in rates; adjustments for size and type of correctional institutions; and interpreting section 4 of the MWRA.

---

[1] *In re: Implementation of the Martha Wright-Reed Act,* Order and Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375, FCC 23-19, released March 17, 2023 (NPRM).

[2] The Martha Wright-Reed Just and Reasonable Communications Act of 2022, P.L. No. 117-338, enacted January 5, 2023.

[3] NSA hereby incorporates by reference its data survey and previous comments, reply comments, and ex parte filings in Docket 12-375.

## I.    Introduction

NSA represents over 3,000 Sheriffs nationwide who operate approximately 80% of the jails in the country. In general, a jail is used by local jurisdictions such as counties and cities to confine people for short periods of time, including people who have been convicted to serve a short sentence, individuals awaiting trial, and people who have not yet paid bail. The Sheriffs are a diverse group, with different jurisdictional sizes and challenges, including budget constraints. The size of the jails themselves and their populations vary as well.

A top priority for all Sheriffs operating jails is to maintain and ensure security in all aspects of the jail's operation, including when incarcerated people communicate with individuals outside the correctional facility. Thus, important security components are required for IPCS systems, which in some cases the facility itself provides. These security components come at a cost to the facility.

The Commission has an affirmative obligation under section 276 to promote the widespread deployment of IPCS. However, it does not have authority over the operation of jails, including the security measures implemented in connection with IPCS. The MWRA makes this clear. Further, the MWRA does not require IPCS in correctional facilities. The Commission must consider these parameters on its jurisdiction when interpreting the MWRA.  Accordingly, the Commission must ensure that costs incurred to make IPCS available, including safety and security costs, are recoverable, and that Sheriffs are not hindered in their operation of jails as they deem appropriate.

## II.    Interpreting Amended Section 276(b)(1)(A)

In the NPRM, the Commission seeks comment on how to interpret the addition of language requiring the establishment of a compensation plan that ensures "all rates and charges" for IPCS are "just and reasonable," and the removal of language requiring "each and every" call to be compensated. NSA urges the Commission to interpret these revisions in such a way that maximizes recovery of costs for IPCS in jails and does not interfere with the operation of jails.

The Commission asks whether the "just and reasonable" language added to section 276(b)(1)(A) should be given the same meaning as in section 201(b), and in particular how this relates to the issue of site commissions.[4] Under a "just and reasonable" standard, the Commission notes that it has typically relied upon the "used and useful" standard to determine just and reasonable rates, and proposes to do so here. NSA has concerns about applying a "used and useful" framework to the costs and expenses allowable in the rates for IPCS, particularly in the context of site commission payments and safety and security measures.[5] Section 4 of the MWRA states that the Commission cannot prohibit any security and surveillance mechanisms in connection with the provision of IPCS in jails. The Commission must therefore take care to ensure that it does not interfere with the operation of jails by eliminating their ability to recover these types of costs through a "used and useful" analysis. Although not a prohibition per-se, disallowing a cost associated with a security or safety mechanism produces the same effect. Sheriffs, not the Commission, have expertise in determining which safety and security measures are necessary in connection with IPCS, and the MWRA clearly seeks to defer to that expertise in

---

[4] NPRM at ¶19.
[5] *See Comments of the National Sheriffs' Association,* WC Docket No. 12-375, Sixth Further Notice of Proposed Rulemaking, filed December 15, 2022, at p. 4. (NSA Sixth Comments).

3

**JA545**

section 4. The fact that a security or safety measure is implemented in connection with IPCS service makes it a recoverable cost.

The Commission also asks whether it should make generalized findings as to what used and useful costs facilities typically incur and allow each facility to show through the waiver process that its costs exceed the typical amount.[6] In the alternative, the Commission proposes to only allow those costs to the extent an individual facility establishes the extent to which it incurs used and useful costs.[7] NSA's cost survey shows the security and associated administrative costs jails typically incur based on average daily population (ADP),[8] and could be the basis for a generalized finding. However, the proposal to require individual facilities to demonstrate the extent to which a particular facility incurs such costs should not be adopted. The Commission does not have jurisdiction over correctional facilities, and it cannot seek to require them to submit to its jurisdiction. Further, facilities are not regulated carriers and do not keep books of account like a regulated carrier. This proposal would severely interfere with the operation of correctional facilities and impose tremendous costs on correctional facilities.

Finally, NSA notes that the Commission's proposal seems to conflict with its "nationwide average cost" approach to ratemaking for IPCS rates, discussed in greater detail below, as it appears no other expense is limited to rate recovery only in facilities where a particular expense is incurred. It also appears that the Commission seeks to assert jurisdiction over no other entity associated with an expense incurred by an IPCS provider. There is no basis to treat correctional facilities or security costs included in commission payments differently.

---

[6] NPRM at ¶22.
[7] *Id.*
[8] *See Comments of the National Sheriffs' Association,* WC Docket No. 12-375, Second Further Notice of Proposed Rulemaking, filed January 12, 2015, at Exhibit A. (NSA Second Comments).

### III.     Interpreting Amended Section 3(1)

In the NPRM, the Commission seeks comment on how to interpret the phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used" in new section 3(1)(E) of the Communications Act. The plain meaning of this language limits the Commission's authority over IPCS to cover only those communications that take place from within a correctional institution to a location outside the correctional institution.

First, the Commission asks whether the limiting phrase of new subsection 3(1)(E) also applies to the services listed in the other subsections of section 3(1) that are now referenced in section 276(d).[9] NSA respectfully submits that, in the context of IPCS, it does. This conclusion is evident from the fact that each of these other services – interconnected VoIP, non-interconnected VoIP, and interoperable video conferencing service – plainly fit within the scope of section 3(1)(E). This is especially so if the Commission interprets the phrase "any audio or video communications service" as it proposes, encompassing "every method that incarcerated people may presently, or in the future, use to communicate, by wire or radio, by voice, sign language, or other audio or visual media."[10] The inclusion of subsections (A), (B), and (D) in section 276(d), and the exclusion of (C), inform the scope of 3(1)(E). As such, the Commission must be cautious when using the term "visual media," as it proposes, so as not to include electronic messaging and similar services. Congress expressly excluded these types of advanced communications from the ambit of section 276 and would not have intended to recapture them in under 3(1)(E). NSA agrees, however, that Congress did not intend for the limitation in 3(1)(E) to apply outside the

---

[9] NPRM at ¶31.
[10] *Id.* at ¶32.

5

context of section 276. This is why the language was not added to 3(1)(A), (B), or (D).[11]  It also is clear that "video media" cannot be interpreted to include video entertainment and/or instructional programming.

Second, the Commission seeks comment on how to interpret the phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[12] The plain meaning of this phrase is that the Commission's jurisdiction does not include communications made on facility grounds. Where the plain meaning of a statute's language is apparent, there is no reason to seek another interpretation.[13] As such, the MWRA does not refer to "any physical location not subject to involuntary confinement restrictions" or "any location not used for confinement purposes, including rooms designated for communicating with, or visitation by, persons not subject to confinement."[14] If Congress had meant to base the Commission's authority on whether a person is incarcerated or not, it could have easily done so. For the same reason, "individuals outside the correctional institution" does not refer to people who are neither confined in nor employed by the institution, even if they are temporarily located on the premises of the institution for purposes of communicating with incarcerated individuals through some form of audio or video communications service.[15] Instead, the Commission should give these phrases their plain meaning, as is required by the basic rules of statutory construction.   Accordingly, the Commission has no jurisdiction over video visitation.

---

[11] *Id.*

[12] *Id.* at ¶33-34.

[13] *See, e.g., Lynch v. Alworth-Stephens Co.,* 267 U. S. 364, 370 (1925) ("[T]he plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense …"  (internal quotation marks omitted).

[14] NPRM at ¶33.

[15] *Id.*

## IV.    The Commission's Approach to Ratemaking

The Commission seeks comment on a variety of approaches to ratemaking for IPCS. As in the past, NSA encourages the Commission to take as granular an approach as possible when setting rates, to ensure that jails and IPCS providers can recover the cost of supporting IPCS in jails, including smaller jails. Regardless of exactly how the Commission chooses to set rates, principles of ratemaking require the allowance of legitimate costs in rates.[16] Facility compensation through rates also is consistent with the Commission's precedent that costs should be recovered from the cost causer.[17] The Commission has found that the calling and called party are the cost causer and the beneficiary of calls.[18]

In particular, NSA supports the Commission's proposal to set separate caps on rates and charges for different types of IPCS providers or, alternatively, for each individual provider.[19] The record clearly demonstrates it is more costly to serve jails.[20]  And, as NSA's cost survey demonstrates, even among jails costs vary significantly once a jail has an average daily population (ADP) of 1000 or more, or with an ADP of less than 350.[21] The Commission should address these differences by creating separate caps or rates for jails to ensure the continued availability and possible expansion of IPCS in jails.

---

[16] *See Comments of the National Sheriffs' Association,* WC Docket No. 12-375, Fourth Further Notice of Proposed Rulemaking, filed November 23, 2020, at p. 6. (NSA Fourth Comments); *Comments of the National Sheriffs' Association,* WC Docket No. 12-375, Fifth Further Notice of Proposed Rulemaking, filed September 7, 2021, at p. 7. (NSA Fifth Comments); NSA Sixth Comments at p. 4.
[17] NSA Fifth Comments at p. 6.
[18] *Id.*
[19] NPRM at ¶40.
[20] *See,* NSA Second Comments, Ex Parte Letter from Mary J. Sisak, Counsel to NSA, to Marlene H. Dortch, Secretary, dated June 12, 2015. *See also, Comments of Praesus*, WC Docket No. 12-375, filed September 27, 2021, at 14; Comments of NCIC Inmate Communications, WC Docket No. 12-375, filed September 27, 2021 at 5-6.
[21] NSA Fifth Comments at pp. 8-9.

## V.     The Commission's Use of Data

In this section, NSA responds to the Commission's questions about the language in the MWRA that provides the Commission "may use industry-wide average costs" to set rates.[22] Specifically, NSA encourages the Commission to interpret the term "industry-wide" to refer to subsets of IPCS providers. This would be the most useful dataset the Commission could use, as it would allow the Commission to better account for the cost differences that exist with the subsets of the IPCS industry, such as between jails and prisons. The fact that the Commission "may," and not "must," use industry-wide average costs provides the necessary flexibility to consider specific portions of the IPCS industry.

Since the beginning of these proceedings, NSA has supported the development of separate rates for jails, due to the unique cost structure for such facilities.[23]  A rate structure which sets a low rate cap based on average costs that apply to all facilities means that the costs at some facilities are higher than the cap – and that jails operated by Sheriffs are most likely to be impacted by this type of rate structure.[24] The Commission can and should address this issue by setting higher rates for jails based on ADP.  To the extent other variables further increase cost for certain jails, the Commission should consider that, as well.

The Commission should not interpret the term "industry-wide" as referring collectively to all providers of telephone and advanced communications services. If the record in the instant proceeding has demonstrated anything, it is that IPCS has a significant cost difference as compared to services provided to non-incarcerated people. Using industry data from standard public services would eliminate entirely the recovery of the unique costs associated with IPCS.

---

[22] NPRM at ¶47.
[23] *See Comments of the National Sheriffs' Association,* Notice of Proposed Rulemaking, filed December 18, 2013, at pp. 3-4. (NSA First Comments).
[24] *Id.*

## VI.     Necessary Security and Safety Measures

In the NPRM, the Commission seeks comment on the MWRA's directive to "consider costs associated with any safety and security measures necessary to provide" telephone service and advanced communications services to incarcerated people.[25] NSA agrees with the Commission's interpretation that it is "required to treat all safety and security costs identified by providers … as costs recoverable through rates for communications services for incarcerated people."[26]  This includes safety and security measures performed by the facility provider and paid for by the ICPS provider through the payment of commissions. As NSA has indicated previously, if jails are not permitted to recover their IPCS costs, then some Sheriffs may be forced to significantly limit or eliminate access to IPCS in their jails.[27]

As stated previously, Sheriffs are the experts on what safety and security measures are necessary in connection with IPCS. If a safety or security measure is implemented in connection with IPCS in any correctional facility, the cost should be recoverable. It is the duty and the right of the correctional facility to determine what safety and security measures are necessary for its facility and the Commission has no authority to second-guess this. Furthermore, the Commission has no authority over correctional facilities and the MWRA explicitly provides that "… [n]othing in this Act shall be construed to prohibit the implementation of any safety and security measures related to [telephone service or advanced communications] services at [State or local prison, jail, or detention] facilities."[28]

---

[25] NPRM at ¶52-57.
[26] NPRM at ¶52.
[27] *See, e.g.,* NSA Second Comments at p. 7.
[28] The Martha Wright-Reed Just and Reasonable Communications Act of 2022, P.L. No. 117-338, enacted January 5, 2023, at Section 4.

To interpret the MWRA in a way that permits the Commission to exclude safety and security measures from its compensation plan – even selectively, as a "middle ground"[29] – would have the effect of prohibiting them and interfering with the operation of the correctional facility, which is expressly prohibited by section 4 of the MWRA. Nothing in the MWRA gives the Commission the authority to make determinations about what safety and security measures are or are not appropriate, and the Commission should not circumvent this restriction by making costs for safety and security measures or certain such measures unrecoverable.

The Commission also seeks "detailed, specific comment on which safety and security measures are "necessary" to the provision of telephone and advanced communications services for incarcerated people and why those measures are "necessary.""[30] As discussed previously, the MWRA does not give the Commission authority to decide what is and is not an appropriate safety and security measure.  Nor is a pre-approved list of security measures appropriate in today's ever-evolving technological landscape. Indeed, the Commission clearly recognizes this limitation because it proposes to interpret the term "other calling devices" to include all devices that incarcerated people may use in the future.[31] These decisions should be left up to the individual facilities themselves.

Nevertheless, as the Commission notes in the NPRM, NSA is already on record having listed a number of safety and security measures necessary for the provision of IPCS in jails.[32] NSA has also already explained in multiple filings why such measures are necessary. This includes, among other things, that inmates oftentimes try to continue criminal activity from

---

[29] NPRM at ¶52.
[30] Id. at ¶53.
[31] Id. at ¶17.
[32] NPRM at ¶54, citing NSA Fifth Comments.

jails.[33] They communicate with other criminals outside of jails and in other jails and prisons to circumvent security.[34] They contact witnesses, their victims, judges, attorneys, and law enforcement to harass or intimidate.[35]

### VII.    Size and Type of Correctional Institution

In this section, NSA discusses the MWRA's directive for the Commission to consider the size and type of correctional institutions in setting rates. First, the Commission should not expand the definition of "correctional institution," "prison," and/or "jail." Second, the record demonstrates that the size of a facility, in terms of ADP, is currently the best available factor for determining costs, and should be considered when setting rates or rate caps. NSA's cost study provides specific information on costs based on ADP for jails around the country.

The Commission seeks comment on whether it should expand the definitions of "correctional institution," "prison," and/or "jail" to include other types of facilities such as civil commitment facilities, residential facilities, group facilities, and nursing facilities in which people with disabilities, substance abuse problems, or other conditions are routinely detained.[36] As NSA has said previously, the Commission should not expand the definition of correctional facility, prison and/or jails to include these types of facilities.

The Commission's authority under Section 276 of the Act applies to "… the provision of inmate telephone service and advanced communications … in correctional institutions..."[37] Although the Communications Act does not define "correctional institution," the U.S.

---

[33] NSA Fourth Comments at p. 3-4.
[34] *Id.*
[35] *Id.*
[36] NPRM at ¶61.
[37] 47 U.S.C. § 276(b)(1).

Department of Justice (DOJ) does. Specifically, it defines the term "institutional corrections facilities" to include "prisons and jails," and the facilities listed by the Commission do not meet either definition.[38] Further, federal law has defined "inmate" as a person incarcerated or detained in a facility for violations of criminal law.[39] The facilities listed by the Commission are in some cases not confinement facilities at all or are civil confinement facilities. Accordingly, the listed facilities are not included in the Commission's jurisdiction under Section 276. Moreover, because these additional facilities are not jails or prisons or for criminal offenders, it is unlikely that calling services in these facilities have the same cost characteristics of providing calling services in jails and prisons. Among other things, the facilities identified do not require the same security measures required in jails and prisons. In addition, there is no evidence that these facilities use the same type of secure, corrections-type systems provided by IPCS providers. Accordingly, any rate developed for facilities such as these would necessarily be developed separately from IPCS rates.

The Commission also asks how to interpret "small, medium, or large facilities," what metrics it should use to define size categories, and what data should be considered in setting size thresholds.[40] In particular, the Commission asks whether average daily population should remain the primary metric for measuring the size of correctional institutions, and whether it should adjust its current distinction between jails with average daily populations below 1,000, and jails with average daily populations at or above 1,000 based on the Act's use of the terms "small, medium, or large."[41]

---

[38] *See,* https://nij.ojp.gov/topics/corrections/correctional-facilities, last visited May 8, 2023.
[39] 34 U.S.C. § 30309.
[40] NPRM at ¶62.
[41] *Id.* at ¶64.

As recently stated in its comments on the Sixth Further Notice of Proposed Rulemaking, at this time, ADP is the best variable known to NSA for use to divide jails into cost and rate tiers.[42] Accordingly, NSA supports the use of this metric to define the size categories required by the MWRA. NSA also agrees that the Commission should further distinguish among the size of jails. NSA has previously supported three tiers of jails: 1-349 ADP, 350-2,499 ADP, and ≥ 2,500 ADP.[43]

The Commission also seeks comment on what other characteristics should be considered in setting rates.[44] NSA has previously identified a number of other factors that affect cost, including the fact that IPCS providers rely on Sheriffs and jails to provide more functions in some cases that in others and that the hourly wage and benefits of jail employees varies by state and locality; different facilities employ different IPCS systems, which may have different costs and require different administrative duties; facilities require different security measures and jails in rural areas are more costly to serve.[45] Further, jails allow different amounts of inmate calling, which also impacts cost.[46]

## VIII.   Interpretation of Section 4 of the MWRA

As a threshold matter, the MWRA does not give the Commission authority over the operation and management of jails in any way. Section 4 of the MWRA provides that "[n]othing in this Act shall be construed to modify or affect any Federal, State or local law to require telephone service or advanced communications services at a State or local prison, jail, or

---

[42] NSA Sixth Comments at p. 5.
[43] Ex Parte Letter from Mary J. Sisak, Counsel to NSA, to Marlene H. Dortch, Secretary, dated June 12, 2015.
[44] NPRM at ¶65.
[45] NSA Sixth Comments at pp. 5-6.
[46] *Id.*

detention facility." It also provides that "[n]othing in this Act shall be construed to prohibit the implementation of any safety and security measures related to such services at such facilities." Taken together, these provisions create a boundary that impacts many of the proposals contained in the NRPM.

NSA supports the Commission's broad interpretation regarding the first phrase in section 4, pertaining to requiring IPCS: … "the Martha Wright-Reed Act does not create any new obligation for state or local facilities to provide any form of incarcerated people's calling services[.]"[47] Nothing in the language of the MWRA supports an interpretation that would allow any new requirement to make IPCS available.

Similarly, NSA supports the interpretation of the second phrase in Section 4, regarding safety and security measures, that "the just and reasonable ratemaking focus of the Martha Wright-Reed Act is not intended to interfere with any correctional official's decision on whether to implement any type of safety or security measure that the official desires in conjunction with audio or video communications services."[48] In the past, NSA has expressed concern that the Commission may dictate or restrict the security and surveillance mechanisms available in connection with the provision of IPCS in jails and, as a result, interfere with the operation of jails, through the application of a "used and useful" analysis.[49] This language clearly supports NSA's position that the Commission should not do so.

---

[47] P.L. No. 117-338, enacted January 5, 2023, at Section 4.
[48] NPRM at ¶68.
[49] NSA Sixth Comments at p. 4.

## IX.    Conclusion

For the forgoing reasons, NSA urges the Commission to interpret and implement the MWRA in a way that allows Sheriffs to recover the costs they incur when IPCS is available in their jails, without interfering with their operation of said jails. The purpose of the MWRA is to ensure the just and reasonable charges for telephone and advanced communications services for incarcerated people. The availability of IPCS depends in large part on the ability of facilities to recover costs associated with allowing IPCS in jails. Accordingly, the Commission must set rates and rate caps with this reality in mind.

Respectfully submitted,

**NATIONAL SHERIFFS' ASSOCIATION**

Salvatore Taillefer, Jr.
Mary J. Sisak
Blooston, Mordkofsky, Dickens
      & Prendergast, LLP
2120 L Street, N.W., STE 825
Washington, D.C., 20037
(202) 659-0830
sta@bloostolaw.com
mjs@bloostonlaw.com
Its Attorneys

Dated: May 8, 2023

15

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling | ) | WC Docket No. 12-375 |
| Services | ) | |

## <u>COMMENTS OF NCIC INMATE COMMUNICATIONS</u>

Lee G. Petro
Adam J. Sandler
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1200 Seventeenth Street, N.W.
Washington, DC 20036-3006
(202) 663-8000

*Its Counsel*

May 8, 2023

## Table of Contents

Executive Summary.................................................................................i

I.  Background and Introduction ................................................. 2

II. Purpose and Scope of Martha Wright-Reed Act Amendments ................... 4

III. Amendments to the Communications Act................................. 8

IV.Ratemaking and Costs ........................................................ 9

V.  Conclusion .................................................................... 16

**<u>Executive Summary</u>**

In these comments, NCIC agrees that the Act expands the Commission's authority over ICS rates and charges, reminds the Commission that there are costs to provide communications services to incarcerated populations that are borne by correctional facilities, suggests creative methods for lowering rates by identifying fee abuse, while also streamlining ICS operations, suggests that the Commission explore rate sub-caps for each service, raises a gap in the Commission's ability to regulate non-interconnected VoIP providers serving incarcerated persons, explains a potential discrepancy in the Commission's authority to regulate video messaging and audio chatting, and addresses issues related to rates, fees, and costs, among other things.

i

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling | ) | WC Docket No. 12-375 |
| Services | ) | |

**COMMENTS OF NCIC INMATE COMMUNICATIONS**

## I.    Background and Introduction

NCIC Inmate Communications (NCIC), by and through its counsel,

respectfully submits these comments in response to the Notice of Proposed

Rulemaking and Order (Notice), released by the Federal Communications

Commission (FCC or Commission) on March 17, 2023, in the above-referenced

proceedings.[1]  NCIC has provided secure telecommunications services to jails and

prisons since 1995, making it the longest-serving large ICS provider in the nation.[2]

---

[1]    *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19, WC Dkts. 23-62, 12-375 (Mar. 17, 2023); *see also* 88 Fed. Reg. 20804 (April 7, 2023), establishing a comment deadline of May 8, 2023.

[2]    *About Us*, NCIC Inmate Communications, https://www.ncic.com/about-us-ncic (last visited April 26, 2023).

Its comments reflect its decades of experience serving carceral and telco settings in 56 countries, including the United States.[3]

The Notice reflects years of work by the Commission, Congress and interested parties and, in many ways, makes meaningful progress toward the goal of just and reasonable inmate calling services (ICS) rates and charges for all. NCIC looks forward to working constructively with the Commission as it crafts final rules to implement the Martha Wright-Reed Act (Act).

At the outset, NCIC encourages the Commission to expand its authority (or, if necessary, seek authority) to regulate electronic messaging in carceral settings. While the Act carved out electronic messaging service when granting authority to the Commission over "advanced communications services,"[4] this exclusion creates the potential for rate abuse for a growing method of carceral communications. Currently, NCIC's messaging revenue is 300% higher than its remote video visitation revenue generated on the same devices (tablets and video kiosks). To truly ensure that incarcerated people can communicate with their family and loved ones–no matter the medium used—the Commission must regulate rates, charges and the management of accounts applicable to electronic messaging. Without proper regulation and oversight of electronic messaging, ICS providers are likely to recoup losses associated with regulated audio and video calling rates by charging

---

[3]     *Id.*

[4]     *See* Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156; Martha Wright-Reed Act § 2(a)(2), (b); 47 U.S.C. § 276(d); 47 U.S.C. §§ 153(1)(A)-(B), (D)-(E).

higher-than-reasonable rates for electronic messaging or even by making electronic messaging the easiest form of communications to access from all devices in a facility. Further muddying the ICS regulatory landscape and causing confusion for the user is that electronic messaging is often accessed on the same communications device (*i.e.*, tablet) that is used for audio and video calling. NCIC welcomes the opportunity to work with the Commission to develop common-sense rules for regulating electronic messaging in carceral settings.[5]

## II.     Purpose and Scope of Martha Wright-Reed Act Amendments

NCIC agrees with the Commission that the Martha Wright-Reed Act expands the Commission's authority under Section 276 of the Communications Act and moots any jurisdictional concerns raised in *GTL v. FCC*.[6] When exercising this authority, however, the Commission must ensure that ICS providers and correctional agencies are "fairly compensated" for their costs, while establishing reasonable rates and fees. Fee abuse is still too common across the ICS industry and should be aggressively addressed by the FCC.[7] As it relates to reasonable rates

---

[5]     Among such rules could be a cap on the amount providers can charge for each electronic message. For its part, NCIC charges a maximum of $.25 per electronic message and messaging is funded from the single communications account. Absent a rule, the FCC could encourage providers to sell messages in bulk and to use a single "communications account" under which all communications (voice calls, video calls, video visits, and electronic messaging) would be billed.

[6]     *See Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).

[7]     NCIC has for years raised the issue of ICS industry fee abuse. *See generally* Comments of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (Nov. 23, 2020); Ex Parte Notice of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (May 12, 2021); Supplemental Comments of NCIC Inmate Communications,

and fees, the Commission should acknowledge that correctional facilities incur costs when offering communications to their populations and that reasonable rate and fee structures enable efficient ICS providers to share a reasonable portion of those revenues with facilities to cover those facilities' costs without the ICS provider reaping additional profits.

Similar to its treatment of payphones,[8] the FCC must determine how facilities can best offset the costs of offering and managing incarcerated communications services. One method would be to use revenues collected to support the federal Universal Service Fund (USF), similar to how USF is used to fund internet and phone service in rural, underserved areas, schools and libraries.[9] Two important goals of the USF are 1) to provide support to qualifying telephone companies that serve high cost areas, making phone service affordable for the

---

*Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (May 13, 2021); Comments of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (Sept. 27, 2021); Reply Comments of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (Dec. 17, 2021); Comments of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (Dec. 15, 2022).

[8] "In regulating payphones and "to advance competition and ensure widespread deployment of payphones, Congress directed the Commission to 'take all actions necessary (including any reconsideration) to prescribe regulations that—establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every call . . . discontinue all intrastate and interstate payphone subsidies . . . .'" *See 47 U.S.C. § 276(b)(1); See also Dissenting Statement of Commissioner Mignon L. Clyburn*, Declaratory Ruling and Order, Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, FCC 13-24 (Feb. 27, 2013).

[9] *See* Comments of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services; Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket Nos. 12-375, 23-62 (Mar. 9, 2023).

residents of these regions, and 2) to assist low-income customers by subsidizing both initial connection and monthly recurring charges for wireline or wireless telephone service.[10]  Both of these goals are applicable to the carceral community: Jails and prisons are high cost areas whose residents would benefit from USF support to offset the costs of providing communications services, and most incarcerated people (or their loved ones) are low-income customers who need help paying for communications charges beyond Lifeline subsidies.  By tapping into the USF, the Commission could subsidize jails and prisons at a rate of $.05 per minute for voice and video calls to cover the facilities' costs of offering and managing the services. The Commission could then lower by $.05 the existing ICS rates from their current caps, resulting in substantial savings for incarcerated people and their loved ones.

NCIC agrees with the Commission's proposed interpretation of "rates" as the amounts paid by consumers of incarcerated people's communications services for calls or other audio or video communications covered by the Act or FCC rules and its proposed interpretation of "charges" as all other amounts assessed on consumers of incarcerated people's communications services in connection with those services, including ancillary service charges, authorized fees, mandatory taxes and fees, and any other charges an ICS provider may seek to impose.[11]

---

[10]    *See Universal Service Fund*, Federal Communications Commission, https://www.fcc.gov/general/universal-service-fund (last visited Mar. 27, 2023).

[11]    *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19, WC Dkts. 23-62, 12-375 at ¶ 11 (Mar. 17, 2023).

NCIC believes that sub-caps for each service type are necessary. Without sub-caps, ICS providers will have too much leeway to shift fees between different service types to reach their desired profit level. The FCC should use its current "just and reasonable" voice calling rate caps[12] as a benchmark and then require certain consumer-friendly practices, including per-minute billing and a prohibition on charging the consumer for incomplete video visits, as some providers charge for a scheduled visit whether it was used or not. As part of its review of rates and charges, the FCC should consider correctional facilities' use of services provided by non-interconnected voice over internet protocol (VoIP) providers which may provide in-facility video visitation services. These providers are often commissary companies that offer video visitation without registering with the Commission or applicable state regulatory agencies, and do not comply with regulatory and tax obligations. If the Commission's goal is to ensure that incarcerated people are paying just and reasonable rates for calls and messages, then requiring non-interconnected VoIP providers serving inmate populations to comply with the Commission's ICS regulatory obligations should be a priority.[13] Otherwise, these

---

[12]    NCIC maintains that the FCC should prohibit transaction fees on single calls. *See Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519 (May 24, 2021).

[13]    NCIC notes that non-interconnected VoIP providers have been required to participate in the Telecommunications Relay Services Fund since 2011. *See Contributions to the Telecommunications Relay Services Fund*, Order, FCC 11-150 (Oct. 7, 2011).

providers will charge whatever they want to charge, to the detriment of incarcerated people and their loved ones.

Video visitation continues to be a difficult area to regulate, because it is impossible to determine jurisdiction. In practice, a video visitation account could be established using a mobile phone number as the account identifier with no way to determine if the visitation is originating locally, from another state, or even from another country. To solve for this, all video visitation services should be considered to be interstate and all rates and charges should follow what is allowable for interstate video visits.[14]

## III.  Amendments to the Communications Act

Under the Communications Act, the FCC appears to have authority over video visitation services.[15] However, video messaging, essentially a short, pre-recorded video message, which is typically a component of the messaging system and the video visitation platform, may fall into a gray area of the Commission's authority as it is both a video product and a messaging product. NCIC believes that the inclusion of audio chat through a comprehensive communications application could be the hook the Commission needs to address non-interconnected VoIP providers providing services to incarcerated persons that have largely escaped federal and state regulatory compliance. Even though on-site video visitation is

---

[14]     To NCIC's knowledge, California is the only jurisdiction that is considering regulating video visitation services. *See Order Instituting Rulemaking to Consider Regulating Telecommunications Services Used by Incarcerated People*, Rulemaking 20-10-002 (filed Oct. 6, 2020).

[15]     47 U.S.C. § 276(b)(1)(A).

8

**JA567**

generally provided for free, correctional facilities that charge for such services should not be permitted to charge in excess of what they charge for off-site video visitation. Correctional facilities sometimes discourage face-to-face visitation to limit facility staff comingling with the public to prevent exposure to COVID and other sicknesses, to eliminate passing of contraband from the public to the staff and incarcerated people, and to minimize the need to escort potentially violent incarcerated persons to a visiting area.

In some cases, correctional agencies may not be aware that their ICS provider is charging a flat fee for remote video visits, the result of which is that loved ones are traveling to the carceral facilities to use free on-site visitation more often, as the travel and parking costs are often less than paying for remote video visitation. This frustrates the facilities' ability to limit public-staff interaction and places a heavier administrative burden on correctional staff. If the FCC eliminated per session flat fee billing, which could run as high as $10 for 20 minutes, and mandated that the industry bill on a per-minute basis at $.35 per minute or less, then more visitors are likely to choose remote video visitation and realize savings.

## IV.    Ratemaking and Costs

Setting industry-wide rate caps is the fairest and most efficient way to regulate ICS, as incarcerated people may be transferred to several different facilities during their incarceration and different rates would be confusing for the consumers and their loved ones. NCIC acknowledges that there may be some necessary exceptions for smaller, rural facilities (including those with populations of 50 or fewer). Currently, NCIC offers its remote video visitation product at $.20 to

9

$.35 per minute, generally charging the higher rate at rural facilities with smaller populations where the costs of delivering services are higher.

Separate rate caps for audio and video services are necessary and each should be dictated by the resources required to provide the service. For example, the costs of providing remote video visitation are at least 300% higher than the costs to provide traditional voice calling. The bandwidth used to make a traditional phone call is approximately 64 kilobytes per side if using SIP (VoIP) protocol g.711, which provides the best voice quality. Some providers use SIP protocol g.729 which compresses the call down to as little as 32 kilobytes per side and results in degraded voice quality. For video, the standard bandwidth is up to 1 megabyte per side, which is approximately 15 times more than a phone call. The costs of storing video recordings hew closely to the amount of bandwidth used and can cost 15 times more than the costs to store voice calls. There are also wildly disparate costs for the hardware necessary to offer voice calls and video calls. The average cost of a new secure, corrections-grade telephone is about $165; a communal corrections-grade video kiosk can cost as much as $2,000 per kiosk and its screen and internal electronics are much more expensive to maintain. Many facilities are transitioning to rugged, handheld tablets, which can cost up to $350 per device and are often issued to an individual incarcerated person, to prevent disputes over tablet use. These tablets are supported by a $3,000 charging cart that can charge up to 40 devices at a time. The breakage rate on handheld tablets is as high as 100% per year, as the devices are dropped on cement floors, thrown against walls, thrown into

10

**JA569**

toilets, and damaged when being cleaned with corrosive cleaners. One benefit to providers of deploying tablets is that they can be shipped back to the provider for repair or replacement which eliminates the need for a technician to visit the facility. The facilities also incur additional costs when deploying individual tablets, because they either need to add additional staff to administer and manage the devices or require the provider to staff an on-site technician to do so.

The Commission should retain the current rate caps for voice calling, which have taken more than a decade to arrive at,[16] and focus its efforts on video visitation services rates and transaction fee abuse. Further, there is no practical difference between terminating an interstate voice call and an intrastate voice call. NCIC agrees with the Commission that the same rates and charges should apply to voice calls irrespective of the jurisdiction of the call.[17] Relatedly, the Commission should follow the same ratemaking approach for video calls. There is no jurisdictional cost difference for video services, as all providers use exclusive IP termination for connection of these services. All remote video sessions terminate to either a browser or an app, so there is no practical difference between a local remote video visit and an internationally terminated remote video visit.

---

[16]     *See Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519 (May 24, 2021).

[17]     *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19, WC Dkts. 23-62, 12-375 at ¶ 28 (Mar. 17, 2023).

11

With respect to pricing plans and provider billing practices, the Commission should require the same billing practices for remote video visitation as it does for voice calls. If providers sell packages of minutes at a discounted rate, they should also allow users to place a single remote video call. Forcing users to buy minutes in bulk disadvantages consumers who are incarcerated overnight or for short terms. ICS providers have taken advantage of the lack of regulation of video visitation and engaged in serious abuses.[18] NCIC believes that per-minute billing would be the most cost-effective solution for short-term and county jails that may house incarcerated persons for an evening or weekend. A bulk package option could be offered for longer-term facilities, with an option to pay for just single video sessions without separate, single-video fees.

NCIC urges the Commission to interpret the term "industry-wide" narrowly.[19] The term, as it relates to the Act and ratemaking, should include only

---

[18]     Among the video visitation billing abuses NCIC has observed across the industry are: (1) Billing per session where family members or incarcerated persons prepay for a time block and pay for the whole block even if they only speak for one minute; (2) billing for a reserved time slot and not refunding money if the visitation is missed or occurs late; (3) not refunding for visitation sessions that were disconnected; (4) not refunding for cancelled visitation slots; (5) separating phone, video visitation, and messaging accounts thereby allowing providers to charge additional deposits and fees to use the video visitation and messaging systems. (One commissary provider currently charges an $8.95 deposit fee for its video visitation product.); and (6) charging credit card processing fees above the traditional transaction fees of $3.00 for automated funding and $5.95 for live agent funding, as some providers still do on phone accounts.

[19]     *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19, WC Dkts. 23-62, 12-375 at ¶ 48 (Mar. 17, 2023).

inmate calling services providers. Even a cursory glance at the provision of voice and data services by providers like Verizon, T-Mobile, and AT&T (with a combined 350+ million mobile subscribers as of 2021)[20] to the non-incarcerated population lays bare vast differences in how ICS providers must deliver services to incarcerated people. Federal, state, and local authorities and correctional agencies require call recording, call transcription, keyword alerting, voice printing, facial detection to detect nudity or illegal activities in the background of video calls, and other stringent security measures. These measures are expensive to design, implement, and administer and are continuously evolving to meet security needs. Regular consumer telecommunications providers do not provide similar suites of services.[21] Moreover, the incarcerated population in the United States is steadily declining, according to a national organization that seeks to end mass incarceration, reaching its peak in 2008 and down to approximately 1.8 million incarcerated people in 2020.[22] A reduction in the incarcerated population is undoubtedly a benefit to the public and owing to judicial reform, alternative sentencing, bail reform, improvements in GPS tracking, and increases in mental health and reentry

---

[20]    *See Mobile Cellular Subscriptions – United States*, The World Bank, https://data.worldbank.org/indicator/IT.CEL.SETS?locations=US (citing to International Telecommunication Union Indicators Database) (last visited Apr. 6, 2023).

[21]    Certain wiretapping and other surveillance tools may be available to the government with a valid court order.

[22]    *See Incarceration Statistics: Get the Data*, Vera, https://www.vera.org/ending-mass-incarceration/causes-of-mass-incarceration/incarceration-statistics (last visited Mar. 31, 2023).

programs.  This trend, however, means that the ICS industry's consumer base is likely to continue to decline, with no corresponding reduction in the cost to deliver those critical services.

In fact, delivering services to fewer consumers increases the cost, as economies of scale shrink, and fixed costs are distributed across fewer users. Consumer telecommunications providers face none of these challenges and have instead seen their subscriber bases increase exponentially.[23]  Including consumer telecommunications providers' average costs in the calculation to determine how the Commission should set ICS rates will give the Commission an inaccurate picture of what should be considered "just and reasonable" rates for delivering ICS communications.  And any average cost for delivering ICS calling that includes consumer telecommunications providers' average costs will necessarily be lower than is appropriate.  The Commission should also consider the impact on the price of goods and services from high inflation rates that have risen steeply since 2021, with no signs of significantly decreasing.[24]  A potential solution to this problem – already familiar to the Commission – would be to establish the current rates and ancillary fees as a floor and adjust them upward according to increases in the Consumer Price Index.[25]

---

[23]     *See supra* note 21 (showing an increase of more than 250 million mobile subscribers from 2000 to 2021).

[24]     *See United States Inflation Rates*, Trading Economics, https://tradingeconomics.com/united-states/inflation-cpi (last visited Mar. 31, 2023).

[25]     For example, the Commission by statute is required to adjust application fees in even-numbered years according to changes in the Consumer Price Index.  *See*

The Commission should fully understand and appreciate the "costs associated with any safety and security measures necessary to provide telephone service and advanced communications services to incarcerated people."[26]  ICS providers operate in unique environments that require specialized and expensive solutions.  The security technology built into the infrastructure and devices used for ICS communications is necessary for the safety of incarcerated people, victims, witnesses, judges, lawyers, facility staff and others.  The security features also allow unsupervised use of phones and video devices, which promotes more contact between incarcerated people and their loved ones and frees facility staff to undertake other duties.  To be sure, safety features like call and video recording and storage, voice biometrics that ensure the correct user is calling from the correct account, call transcription with keyword flagging, correctional-grade phones and video kiosks, hardened tablets, call blocking, call limitations, and time-of-day scheduling are just some of the features that illustrate why serving the communications needs of incarcerated people is vastly more expensive than placing a call from a payphone.

---

*Amendment of the Schedule of Application Fees Set Forth in Sections 1.1102 through 1.1109 of the Commission's Rules*, Order, FCC 22-94 (Dec. 16, 2022).

[26]    *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking and Order, FCC 23-19, WC Dkts. 23-62, 12-375 at ¶ 52 (Mar. 17, 2023).

15

**JA574**

Though it has been about eight years since the National Sheriffs' Association did a survey[27] of the costs for offering and administering communications services in their facilities, NCIC's experience makes clear that those costs have increased. Since the pandemic, nearly every jail and prison has introduced video visitation and, similar to what the general public has experienced, goods have been subject to price increases due to supply chain issues and unavailability.

## V.    Conclusion

The Notice represents the next step in delivering just and reasonable ICS rates for incarcerated people and NCIC looks forward to working closely with the Commission to ensure that rules implemented as a result of the Martha Wright-Reed Act treat all parties fairly.

Respectfully submitted,

**NCIC INMATE COMMUNICATIONS**

By: _____

Lee G. Petro
Adam J. Sandler
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
1200 Seventeenth Street, N.W.
Washington, DC 20036-3006
(202) 663-8000

*Its Counsel*

May 8, 2023

---

[27]    *See* Ex Parte Notice of National Sheriffs' Association, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 (Feb. 18, 2023).

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling | ) | WC Docket No. 12-375 |
| Services | ) | |

**COMMENTS OF PAY TEL COMMUNICATIONS, INC.**
**IN RESPONSE TO NOTICE OF PROPOSED RULEMAKING**

Marcus W. Trathen
Christopher B. Dodd
BROOKS, PIERCE, McLENDON,
 HUMPHREY & LEONARD, L.L.P.
Wells Fargo Capitol Center, Suite 1700
Raleigh, N.C. 27601
Telephone: (919) 839-0300
Facsimile: (919) 839-0304
mtrathen@brookspierce.com
cdodd@brookspierce.com

*Counsel for Pay Tel Communications, Inc.*

May 8, 2023

## SUMMARY

Pay Tel Communications, Inc. ("Pay Tel") respectfully submits these comments in response to the Notice of Proposed Rulemaking (the "NPRM"), released March 17, 2023, in these dockets.

The NPRM seeks comments regarding the statutory revisions set forth in the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("Martha Wright-Reed Act" or the "Act"). The Act modifies 47 U.S.C. §§ 276, 152(b), and 153(1) by, *inter alia*, requiring that charges for inmate calling services are "just and reasonable" and expanding the scope of inmate calling services ("ICS") regulations to include (1) "any audio or video communications service . . . regardless of technology used," and (2) intrastate as well as interstate ICS. In uncodified provisions, the Act (1) authorizes the Commission to "use industry-wide average costs," as well as the "average costs of service of a communications service provider" in setting just and reasonable rates, (2) mandates that the Commission consider safety and security costs as well as differences in costs depending on the type and size of facility, and (3) clarifies that the Act does not modify any Federal, State, or local law to require the provision of ICS services nor prohibit the implementation of "any safety and security measures" related to ICS services.

In summary, Pay Tel responds to the NPRM as follows:

- The Martha Wright-Reed Act generally codifies the Commission's current approach to ICS regulation, and expands the scope of Commission authority. In many ways, the Act simply confirms the Commission's current regulatory approach, for example, by endorsing the use of an average industry approach to rate setting disaggregated by facility type and size and by mandating FCC consideration of necessary safety and security costs, both of which the Commission is already doing. Additionally, the Act fills the jurisdiction gap identified by the D.C. Circuit's decision in *Global Tel*Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017), by expressly granting the Commission authority over (1) intrastate ICS and (2) audio and video ICS regardless of the technology used, enabling the Commission to implement comprehensive reform aimed at regulating the entire ICS market, rather

than a limited subset of ICS providers. Pay Tel has long advocated for such comprehensive whole-market regulation.

- The Act imposes a three-pronged approach to rate making: (1) just and reasonable rates for consumers, (2) fair compensation to providers, and (3) cost recovery to facilities for safety and security costs. Consistent with Pay Tel advocacy for over a decade (as far back as the Commission's First Notice of Proposed Rulemaking on Martha Wright's petition to the Commission seeking reform of ICS in 2013), Pay Tel remains steadfast in its belief that only by balancing the interests of each of these stakeholders can lasting reform be achieved. The Martha Wright-Reed Act provides the Commission the tools it needs to achieve holistic reform by recognizing the consumer interest ("just and reasonable rates"), the provider interest ("fair compensation"), and the facility interest ("safety and security" costs). Specifically, under the Act, fair compensation to ICS providers is still required.

- The Commission should preempt inconsistent state requirements. In short, the Martha Wright-Reed Act grants the Commission plenary authority over intrastate and interstate rates. The Commission should exercise its powers to regulate all aspects of interstate and intrastate ICS—which necessarily entails that inconsistent state regulations are preempted. A state-imposed intrastate rate cap that is either *below or above* an intrastate cap established by the Commission is, by definition, "inconsistent" therewith—and Section 276(c) requires preemption of same.

- Lastly, the Act's new regulation of video visitation services will expand the scope of regulation to providers who, previously, have not been subject to the Commission's regulations and will require the submission of cost data specific to these services. In light of the unique aspects of this service, the Commission should collect comments on and data concerning video visitation prior to the adoption of regulations.

* * *

- ii -

## TABLE OF CONTENTS

SUMMARY ....................................................................................................... i

I.　　The Martha Wright-Reed Act Generally Codifies the Commission's
Current Approach to ICS Regulation and Addresses the Jurisdictional
"Gap" Identified in *GTL v. FCC* ...........................................................2

II.　　The Act Imposes a Three-Pronged Approach to Rate Making: Just and
Reasonable Rates for Consumers; Fair Compensation to Providers; and
Cost Recovery to Facilities for Safety and Security Costs................................6

　　A.　Fair Compensation is Still Required ........................................................8

　　B.　Use of Industry-Wide Average Costs Cannot Be Agnostic to the
Size and Type of Facility .....................................................................10

　　C.　Recovery of Necessary Safety and Security Costs and Site Commissions ..........13

III.　The Commission Should Preempt Inconsistent State Requirements .............................18

IV.　Regulation of Video Visitation .....................................................................22

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling | ) | WC Docket No. 12-375 |
| Services | ) | |

To: The Wireline Competition Bureau

### COMMENTS OF PAY TEL COMMUNICATIONS, INC.

Pay Tel Communications, Inc. ("Pay Tel"),[1] through counsel, submits these comments in response to the Notice of Proposed Rulemaking (the "NPRM") in the above-captioned dockets.[2]

In the following pages, Pay Tel: (1) summarizes the statutory revisions set forth in the Martha Wright-Reed Act and their impact on existing Commission regulation of ICS; (2) discusses the Act's statutory support for comprehensive, holistic Commission regulation of just and reasonable rates for consumers, fair compensation to providers, and cost recovery to facilities for safety and security costs—as has been long advocated by Pay Tel, and (3) the need for Commission

---

[1] Since 1989, Pay Tel has provided high-quality ICS with a strong emphasis on ethical treatment of inmates and their loved ones. Consistent with this emphasis, Pay Tel has actively participated in these dockets and has persistently advocated for reforms beneficial to consumers of its services. Through effective and innovative growth across that same time period, Pay Tel has sought to expand its ICS offerings nationwide in facilities that complement its business plan and has become a market-leading provider to confinement facilities in the Southeast. For more information, please see generally *About Pay Tel* (last visited Apr. 25, 2023), https://www.paytel.com/about-paytel/.

[2] *See Notice of Proposed Rulemaking and Order*, WC Docket Nos. 23-62 and 12-375, FCC23-19 (rel. Mar. 17, 2023) (the "NPRM").

preemption of inconsistent state requirements under the Act's broad plenary grant of Commission authority to regulate interstate and intrastate ICS rates.

## I.  The Martha Wright-Reed Act Generally Codifies the Commission's Current Approach to ICS Regulation and Addresses the Jurisdictional "Gap" Identified in *GTL v. FCC*.

In its Notice of Proposed Rulemaking,[3] the Commission seeks comment on the proper interpretation of the Martha Wright-Reed Act.[4] The Act, signed into law on January 5, 2023, makes various revisions to Sections 276, 2(b), and 3(1) of the Communications Act of 1934 (the "Communications Act") and directs the Commission to engage in rulemaking necessary to implement that Act subject to specified guardrails.

Specifically, the Act modifies Section 276 by:

- Deleting the former requirement that the Commission establish a "per call" compensation plan to ensure that all ICS providers are fairly compensated for "each and every" completed call.

- Explicitly enabling the Commission to require that rates and charges for inmate calling services be "just and reasonable".

- Expanding the scope of the regulations to include "any audio or video communications service used by inmates . . . regardless of technology used."[5]

Relatedly, the Act amends Section 2(b) of the Communications Act, 47 U.S.C. § 152(b), to make clear that the Commission's jurisdiction under Section 276 extends to intrastate as well as

---

[3] *Id.*

[4] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("Martha Wright-Reed Act" or the "Act").

[5] Subparagraphs (A), (B), (D), and (E) of Section 3(1) of the Communications Act (47 U.S.C. § 153(1)) apply, respectively, to (A) interconnected VoIP service, (B) non-interconnected VoIP service, (D) interoperable video conference service, and (E) "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used." Subparagraph (E) is newly codified by the Act.

interstate ICS, responding to the determination of the D.C. Circuit in *GTL v. FCC* that Section 276 did not grant the Commission authority over intrastate ICS rates.[6]

Further, Section 3 of the Act provides specific direction to the Commission as regards the implementation of Section 276, as amended. Specifically, it:

- Directs the Commission to promulgate implementing regulations not earlier than 18 months and not later than 24 months after the date of its enactment.

- Authorizes the Commission to "use industry-wide average costs," as well as the "average costs of service of a communications service provider" in setting just and reasonable rates.

- Mandates that the Commission consider "costs associated with any safety and security measures necessary to provide" ICS in setting just and reasonable rates.

- Mandates that the Commission consider "differences in [ICS costs] by small, medium, or large facilities or other characteristics".

Finally, Section 4 of the Act clarifies that it shall not "be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation off any safety and security measures related to such services at such facilities."

Pay Tel would offer the following preliminary observations flowing from these statutory revisions.

<u>First</u>, the Martha Wright-Reed Act is not a significant departure from the approach that the Commission has been taking with respect to ICS regulation and reform. In many ways, the Act simply confirms the Commission's current regulatory approach. For example, the Commission currently regulates ICS rates disaggregated by facility type and size and the Act confirms this approach by mandating consideration of differences in costs incurred by "small, medium, or large

---

[6] *Global Tel*Link v. FCC*, 866 F.3d 397, 409 (D.C. Cir. 2017).

facilities" or other similar characteristics.[7] Additionally, the Act now expressly permits the "use" of industry average costs as a data point in setting rates.[8] Again, the Commission has been exploring various methodologies for analyzing the cost data it has collected, including the use of a "zone of reasonableness" approach which makes various statistical adjustments to industry average costs.[9] Further, the Commission has recognized that providers and facilities incur costs associated with ensuring that ICS can be offered in a safe and secure fashion and that these costs should be recoverable through rates.[10] Again, the Martha Wright-Reed Act endorses this approach by mandating that the Commission consider costs associated with safety and security measures.[11] Directionally these new Congressional directives seem aligned with the Commission's current regulatory analysis.

---

[7] *See* 47 C.F.R. § 64.6030; Second Report and Order and Third Further Notice of Proposed Rulemaking, WC Docket No. 12-375, ¶¶ 45, 48 (rel. Nov. 5, 2015) (the "*2015 ICS Order*") (adopting 1,000 ADP threshold to differentiate larger jails from smaller jails) ("we are convinced that providers' costs of serving larger jails are likely below the industry average for all jails"). *See* Martha Wright-Reed Act § 3(b) (in "determining just and reasonable rates, the Federal Communications Commission . . . (2) shall consider . . . differences in the costs described in paragraph (1) by small, medium, or large facilities or other characteristics.").

[8] To be clear, as discussed *infra*, the Act does not authorize the adoption of rates which are equal to average costs.

[9] *See 2015 ICS Order*, at ¶ 81 (adopting "zone of reasonableness approach"—mean contract costs per paid minute plus one standard deviation).

[10] *See, e.g.,* Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 12-375, at ¶ 63 (rel. Sept. 26, 2013) (the "*2013 ICS Order*") (implementing "safe harbor rates that are intended to approximate the costs of providing interstate ICS—costs that include fair compensation (including a reasonable profit) and include full recovery for security features the correctional facilities have determined to be necessary to protect the public safety."); Order on Reconsideration, WC Docket No. 12-375, 31 FCC Rcd 9300 (rel. August 9, 2016) ("*2016 Reconsideration Order*") (reconsidering decision to entirely exclude site commission payments from 2015 permanent rate caps); Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, at p. 30, n. 209 (rel. Aug. 7, 2020) (the "*2020 ICS Order*") ("The Commission has determined previously that some portion of these site commission payments do reflect legitimate costs that correctional facilities incur that are reasonably related to the provision of inmate calling services.").

[11] *See* Martha Wright-Reed Act § 3(b)(2).

<u>Second</u>, one area that deviates from the Commission's current approach is with respect to intrastate ICS rates. The Act fills the jurisdictional gap identified by the D.C. Circuit's decision in *GTL v. FCC*[12] and provides the Commission with express authority over intrastate ICS—something Pay Tel has long supported.[13] Providers have not endeavored to separate costs as between intrastate and interstate jurisdictions in their prior mandatory data collection cost filings, so any rate caps set on the basis of unseparated costs assume that providers will be able to recover costs through both intrastate and interstate rates. Adopting a unified approach to ratemaking will ensure a consistent regulatory approach to cost recovery based on the most accurate cost information and benefit ratepayers by simplifying and unifying rate structures in a manner more consistent with today's consumer expectations and experiences with other telecommunications services.

<u>Third</u>, the Act gives the Commission authority over video services and calls via other technology, such as tablets. As far back as the *2015 ICS Order*, the Commission has made clear that Section 276 is "technology neutral" and that the Commission's rules would apply "regardless of the technology used to deliver the services."[14] Notwithstanding this clear, common-sense directive, various providers have sought to evade Commission regulation by characterizing their service offering as "non-interconnected VoIP" or other similar "exempt" status.[15] The Martha

---

[12] *See Global Tel*Link v. FCC*, 866 F.3d 397, 409 (D.C. Cir. 2017) (holding that 47 U.S.C. "§ 276 did not authorize the Commission to impose intrastate rate caps . . . .").

[13] *See, e.g.,* Pay Tel Comments (FNPRM), WC Docket No. 12-375, at pp. 2–3 (Dec. 20, 2013) ("As part of its consistent advocacy for reform of the ICS industry, Pay Tel has previously explained that, at least for jails, any action to regulate interstate rates impacts a provider's overall profitability due to rigid state rate constraints. In this regard, meaningful reform can only occur through coordinated Commission action with respect to both interstate and intrastate ICS rates.").

[14] *See 2015 ICS Order* at ¶ 250.

[15] *See, e.g.,* Inmate Calling Solutions, LLC Comments on FCCCIRC2105-01, WC Docket No. 12-375 (May 12, 2021), at 8 and Attachment B (Vendors imposing charges and calculating site commissions based on megabytes used and/or asserting non-interconnected VoIP status).

Wright-Reed Act helps close any such loopholes by making clear that the Commission has jurisdiction over "*any audio or video communications service* used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, *regardless of the technology used*."[16] The new law will help to eliminate competitive inequities and ensure that the benefits of regulation are realized by all consumers of ICS.

Together these changes expand the scope of Commission authority over ICS providers, enabling the Commission to implement comprehensive reform aimed at regulating the entire ICS market, rather than a limited subset of ICS providers.

## II.    The Act Imposes a Three-Pronged Approach to Rate Making: Just and Reasonable Rates for Consumers; Fair Compensation to Providers; and Cost Recovery to Facilities for Safety and Security Costs.

Pay Tel has consistently advocated in this proceeding for a solution that addresses the "three legs of the stool"—inmates/families, facilities, providers. As far back as the Commission's First Notice of Proposed Rulemaking on Martha Wright's petition to the Commission seeking reform of ICS, Pay Tel counseled the Commission to undertake holistic, comprehensive reform of the ICS that addressed all components of the ecosystem.[17] Pay Tel cautioned that "[t]he best way to avoid . . . constant revision is for the Commission to settle on reforms that are comprehensive and holistic and affect *all* relevant spheres of the ICS industry, rather than addressing one, or even several, at a time.[18] Yet, this ambition for comprehensive reform has proven elusive, with the

---

[16] *See* Martha Wright-Reed Act § 2(b)(3) (emphasis added).

[17] *See, e.g.,* Pay Tel Reply Comments (NPRM), WC Docket No. 12-375, at 2 (April 22, 2013) ("applying a fix to only one or even several spheres of the ICS industry is a flawed strategy").

[18] *Id.* at 3.  *See also* Pay Tel Comments (NPRM), WC Docket No. 12-375, at 3 (Mar. 25, 2013) ("[A]ny reform of ICS requires a holistic approach that analyzes the impacts on the overall ICS industry, rather than a piecemeal strategy . . . that looks at one, insular aspect and tackles it in isolation."); Pay Tel Comments (Second FNPRM), WC Docket No. 12-375, at 1 (Jan. 12, 2015) ("Pay Tel agrees with Commissioner Clyburn: the time is long overdue for true, comprehensive, fair reform of the inmate calling

result, as Pay Tel feared back in 2013, that this proceeding has devolved into a perpetual cycle of filing upon filing while the underlying dynamics which have perpetuated the need for regulation in the first place have never been fully addressed.

Based on its thirty-four years of experience in the industry and  its over ten years of participation in the Commission's ongoing regulatory reform efforts, Pay Tel is steadfast in its belief that only by balancing the interests of each of these stakeholders can lasting reform be achieved. If only consumer interests are considered, providers will not be able to recover their costs and make service available. If only provider and facility interests are considered, consumers will be harmed. If facility costs are ignored, the facilities will not permit the service to be offered. ICS is a unique, specialized service; historical solutions that may work in a standard two-party transaction will not work here where there are at least three parties (consumer, provider, and facility) with interests to be managed and protected.

With the Martha Wright-Reed Act, the Commission should have the tools it needs to achieve holistic reform by recognizing the consumer interest ("just and reasonable rates"), the provider interest ("fair compensation"), and the facility interest ("safety and security" costs). By recognizing this dynamic and imposing a three-pronged approach to the Commission's regulations, the Martha Wright-Reed Act recognizes that a balanced regulatory approach

---

services ('ICS') industry."); Pay Tel Reply Comments (Second FNPRM), WC Docket No. 12-375, at 18 (Jan. 27, 2015) (noting Pay Tel's "longstanding participation in proceedings at the state and federal level aimed at reforming ICS and [Pay Tel's] good faith efforts to be part of a comprehensive solution that is fair to inmates and their families, facilities and ICS providers."); Pay Tel Comments (Third FNPRM), WC Docket No. 12-375, at 1 (Jan. 19, 2016) (noting that "there remains work to be done to achieve meaningful, lasting, comprehensive reform of ICS."); Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 3 (Sep. 27, 2021) (footnotes omitted) ("Fundamentally, due to the inherent structure of the ICS marketplace, ICS providers' rational economic incentive is to entice confinement facilities to award the provider a service contract at the facility, and confinement facilities' rational economic incentive is to award contracts to ICS providers who provide the greatest payments (monetary or otherwise) to the facility. Notably absent from the foregoing calculus are the inmate/ICS consumers themselves, despite the fact that they are the ones who ultimately pay for ICS service.").

addressing all elements of the service will bring meaningful consumer benefits for this important service while also helping to facilitate the widespread availability of ICS, even in facilities where costs are higher and the opportunities for recovering those costs are fewer.

As the Commission exercises this authority, Pay Tel would emphasize the following components of its ratemaking authority as amended by the Martha Wright-Reed Act.

### A.    Fair compensation is still required

The Martha Wright-Reed Act leaves in place Section 276(b)(1)(A)'s requirement that all ICS providers must be "fairly compensated" and further mandates that "all rates and charges [be] just and reasonable."  Additionally, the Act extends the fair compensation requirement to ICS providers using "other calling device[s]" as well as "advanced communications services."[19] Accordingly, the Commission must balance Section 276's long-standing fair compensation requirement with the Act's mandate of "just and reasonable" rates and charges.

The NPRM asks for comments on the appropriate interpretation of "fair compensation," particularly in light of the Act's elimination of the references to "per call" and "each and every [call]" language from Section 276(b)(1)(A) and new reference to "just and reasonable".  The NPRM states that it is "difficult to discern" what "fair compensation" adds to "just and reasonable," especially considering legislative history suggesting that the principal concern of the language was to address the specific problem of uncompensated payphone calls at that time.[20]  The NPRM further proposes to interpret the amendments as an "intent to restrict the application of 'fair

---

[19] *See* Martha Wright-Reed Act § 2(a)(1)

[20] NPRM, at ¶ 15.

compensation'" given the Act's authorization that the Commission "may use industry-wide average costs" in determining just and reasonable rates.[21]

Pay Tel does not disagree that the "just and reasonable" standard includes considerations of fairness to the service provider but does not agree that the Commission may disregard the "fair compensation" requirement in determining just and reasonable rates. Whatever its history, the "fair compensation" requirement has been applied in the ICS context since its enactment and was left as an independent requirement by the Martha Wright-Reed Act, reflecting a purposeful decision by Congress to retain the requirement as an essential component of ICS reform. The plain language of the text makes clear that "fair compensation" stands on equal footing in Section 276(b)(1)(A) with "just and reasonable." Pay Tel disagrees with any interpretation which would effectively read the requirement out of the statute or diminish its importance.

Further, as regards the interplay between "fair compensation" and the potential use of "industry-wide average costs," Pay Tel disagrees with the assertion that permissive "use" of average costs by the Commission in any way diminishes the validity of the fair compensation requirement. "Fair compensation" is codified in Section 276(b)(1)(a) as an independent statutory requirement, while Section 3 of the Act simply makes clear that the Commission may use average costs in setting just and reasonable rates. This does not imply that industry average rates would satisfy the "fair compensation" standard (or, alternatively, the "just and reasonable" standard), but rather it makes clear that the Commission may utilize average costs (subject to the constraints discussed below) as one of the tools to establish rates which are just and reasonable and which ensure fair compensation to the provider.

---

[21] NPRM, at ¶ 16.

**B.    Use of industry-wide average costs cannot be agnostic to the size and type of facility**

The Martha Wright-Reed Act provides that the Commission "may use industry-wide average costs" in ratemaking[22] but "shall consider . . . differences in the [average costs of telephone service and advanced communications services] by small, medium, or large facilities."[23]  Together, these provisions drive home that average costs, by themselves, cannot be used to determine just and reasonable rates; rather average costs are merely one data point that "may" be considered so long as consideration is given to cost differentials between facility type and size.[24]

This is consistent with current Commission practice. For example, 47 C.F.R. § 64.6030 provides for interim rate caps disaggregated by jails with ADP of less than 1,000, jails with ADP of 1,000 or greater, and prisons.  It is also consistent with Pay Tel's advocacy for over a decade:

> Another aspect critical to taking a holistic view of ICS comes in recognizing that not all correctional facilities are created equal. Nor are all ICS providers. It is improper to paint either (all facilities or all providers) with one broad brush. . . . These differences are driven by inherent and fundamental differences between prison and jail calling.[25]

The record in the ICS reform proceeding contains extensive documentation of these cost differences, and the reasons for those differences, between jails and prisons and between small,

---

[22] *See* NPRM, ¶¶ 47, 49.

[23] *See id.* at ¶¶ 58, 63.

[24] The clarification that the Commission is permitted to consider average costs in adopting just and reasonable rates is responsive to the concerns of the D.C. Circuit in *GTL v. FCC.* There the Court held that Commission rate caps below average costs documented by ICS providers were "patently unreasonable," particularly since the Commission calculated the rate caps based on a weighted average per minute in each tier, which made calls with above-average costs in each tier unprofitable.  *GTL v. FCC*, 866 F.3d at 414. The Acts's permissive use of average costs does not, however, alter the basic concern of the Court in *GTL*— that fair compensation demands more than simply averaging costs.

[25] Pay Tel Comments (NPRM), WC Docket No. 12-375, at p. 10 (Mar. 25, 2013).

medium, and large jails.[26]

As previously explained, a primary driver of the differences between jails and prisons is the heavy turnover of the inmate population in jails. This turnover increases costs by creating additional work in account set-up (*i.e.*, working with inmates and staff in accessing calling services, setting up accounts, establishing blocked number lists, and other similar customizations to address the needs of a particular inmate) and increases the likelihood that portions of prepaid accounts will need to be refunded. Additionally, the rural nature of many smaller facilities tends to increase costs due to higher telecommunications expenses and customization requirements. As explained by Pay Tel in 2013:

> There is abundant record evidence demonstrating there are very real cost differences associated with providing ICS in jails and prisons— and that those differences make it significantly more costly to provide ICS in a jail than a prison. . . . these differences flow from the fundamentally different purposes served by the facilities and include matters such as: the heavy, consistent, and faster turnover of the inmate population in jails, leading to increased account set-up costs and requiring more phones per inmate in jails (and higher costs associated with the investment therein and maintenance thereof); a greater reliance on prepaid accounts and collect calling in jails, each of which is more costly to provide than debit calling; the necessity of integrating ICS systems with other services, like jail management, inmate banking and commissary systems, in order to facilitate the movement of money to pay for ICS calls—coupled with the fact that such integration is customized for each facility; the requirement that ICS providers operating in jails provide a significant amount of zero-revenue, or free, calls to inmates; and fewer overall calling minutes in jails relative to prisons over which to spread costs due to prescribed limits on the length of calls in jails and other similar reasons.[27]

---

[26] *See, e.g.,* Pay Tel Comments (Sixth FNPRM), WC Docket No. 12-375, at 3-5 (Dec. 15, 2022); Pay Tel Comments (Fifth FNPRM), WC Docket No. 12-375, at 7 (Sept. 27, 2021) (quoting Pay Tel Communications, Inc., *Ex Parte Presentation*, WC Docket No. 12-375 (July 3, 2013), citing U.S. Department of Justice Bureau of Justice Statistics - Jail Inmates at Midyear 2011 Statistical Tables, Table 4) ("Average daily jail population, admissions and turnover rate, by size of jurisdiction, week ending June 30, 2010 and 2011.").

[27] Pay Tel Comments (NPRM), WC Docket No. 12-375, at pp. 17–18 (Mar. 25, 2013).

The most recent U.S. Bureau of Justice Statistics published in February 2023[28] show the following breakdown of inmate population as of December 31, 2021:

| | |
|---|---|
| Prisons: | 1,204,300 |
| Local Jails: | 636,300 |

However, while the total static population of prisons greatly exceeds that of local jails, because of the transient nature of jails the total number of individuals housed in jails over the course of a year greatly exceeds that of prisons.  For example:[29]

- From July 1, 2020 to June 30, 2021, local jails admitted 6.9 million persons, compared to 8.7 million the year before and 10.3 million 2 years before.  (Table 12).

- The weekly inmate turnover rate in jails nationwide was 42% from July 1, 2020 to June 30, 2021, down from 61% 10 years before. (Table 12).

- In 2021, jail jurisdictions with an ADP of fewer than 50 inmates experienced the highest weekly inmate turnover rate (99%), more than three times the rate for jail jurisdictions holding 2,500 or more inmates (31%).  (Table 13).

If the Commission were to use flat industry average costs (driven by large, dominant providers of ICS such as Securus and GTL), then service will likely be curtailed in smaller facilities as providers will not be able to recover their costs of providing service. Certainly, a goal of Section 276, and the ICS reform proceeding, has been to ensure the widespread availability of the service, and painting all facilities will too broad a brush will run counter to these goals, as recognized by Congress in the Martha Wright-Reed Act. Accordingly,  to ensure access in smaller facilities, smaller facilities must be treated differently from larger facilities.

---

[28] U.S. Department of Justice, Correctional Populations in the United States, 2021 – Statistical Tables, Feb. 2023, NCJ 305542 (Exhibit 1).

[29] U.S. Department of Justice, Jail Inmates in 2021 - Statistical Tables, Dec. 2022, NCJ 304888 (Exhibit 2).

The Commission, too, has acknowledged both this consistent advocacy and the potential for cost disparities based on facility size. For example, in the *2013 ICS Order*, the Commission characterized smaller facilities as "potentially higher-cost" relative to larger facilities,[30] and acknowledged that groups have argued since at least 2007 that "there were variations among facilities in the costs of providing ICS and [that the Commission should] reflect those in setting rate maximums . . . ."[31] And in the Commission's *2021 ICS Order*,[32] the Commission found that "[a]lthough the record indicates that some jails bear the characteristics we otherwise associate with prisons, on this record we are not persuaded that these situations are the norm, and we find that, overall, the evidence suggests higher provider costs at jails than prisons. . . . We therefore find it appropriate to set different interstate provider-related rate caps for prisons than for jails on an interim basis.").

The mandated consideration of these cost differentials set forth in the Martha Wright-Reed Act is supported by the record evidence produced in Docket No. 12-375 to date and is consistent with the Commission's approach to rate-setting to date.

## C.     Recovery of Necessary Safety and Security Costs

ICS is a specialized service that is available to persons who have been incarcerated by the government.  Some of the users of this service seek to engage in inappropriate, unsafe, and illegal activity using the communications functionality.[33]  It is a primary obligation of confinement

---

[30] *2013 ICS Order* at ¶ 80.

[31] *Id.* at ¶ 59 n. 222.

[32] Third Report and Order, WC Docket No. 12-375, at ¶ 51 (rel. May 24, 2021) (the "*2021 ICS Order*")

[33] *See, e.g., id.* at ¶ 58 (noting that the Department of Justice has chronicled hundreds of criminal convictions involving the use of ICS and that ICS-enabled crimes "victimize vulnerable populations consisting of victims, witnesses, jurors, inmates and family members of these individuals" and help identify

facilities to operate their facilities in a manner which ensures public safety. It is the obligation of service providers to conform their service to the requirements and specifications of the confinement facilities, including those requirements and specifications relating to safety and security.  The relationship between security features and ICS has been the subject of extensive commentary in the ICS reform proceeding.[34]

The Commission has explicitly recognized the relationship between security and ICS, including the need to support cost recovery for ensuring the security of the service. In its *2016 ICS Reconsideration Order*, the Commission amended rate caps to better allow ICS providers to cover costs facilities may incur that are reasonably related to the provision of ICS.[35] The Commission noted that: (1) at least some facilities likely incur costs that are directly and reasonably related to the provision of ICS, (2) it is reasonable for those facilities to expect providers to compensate them for those costs, (3) such costs are a legitimate cost of ICS that should be accounted for in our rate cap calculations, and (4) our existing rate caps do not separately account for such costs.[36]

Similarly, in the *2021 ICS Order*, the Commission "recognize[d] that contractually prescribed site commission payments that simply compensate a correctional institution for the costs (if any) an institution incurs to enable interstate and international inmate calling services to

---

[34] *See, e.g.,* National Sheriffs' Association Comments, WC Docket No. 12-375, at 5–6 (Nov. 23, 2020); California State Sheriffs' Association Comments, WC Docket No. 12-375, at 1–2 (Nov. 21, 2020); National Sheriff's Association Comments, WC Docket No. 12-375 (Fifth FNPRM), at 6 (Sept. 27, 2021); Securus Comments, WC Docket No. 12-375 (Sixth FNPRM), at 17-8 (Dec. 15, 2022); Securus Reply Comments, WC Docket No. 12-375 (Fifth FNPRM), at 28-31 (Dec. 17, 2021); Pay Tel Comments, WC Docket No. 12-375 (Fifth FNPRM), at 9-13 (Sept. 27, 2021); Pay Tel Reply Comments, WC Docket No. 12-375 (Fifth FNPRM), at 8-10 (Dec. 17, 2021); Setting the Record Straight on Confinement Facility Costs, Pay Tel Communications, Inc., *Ex Parte Presentation,* WC Docket No. 12-375 (May 8, 2015).

[35] *2016 ICS Reconsideration Order*, at ¶¶ 1, 12.

[36] *Id.* at ¶ 12.

be made available to its incarcerated people, can, on an interim basis and in light of the current regulatory backdrop, be considered a prudent expense the provider incurs . . . ."[37]

The Martha Reed-Wright Act acknowledges the linkage between security and ICS by mandating that the Commission "shall consider costs associated with any safety and security measures" in establishing ICS rates.[38] Specifically, section 3(b) of the Act provides that in implementing the Act, the Commission "shall consider costs associated with any safety and security measures necessary to provide [ICS]." The NPRM asks for comment on the appropriate interpretation of this requirement and, in particular, how much discretion, if any, the Commission has in implementing this directive.[39]

The statutory requirement that the Commission "*shall* consider costs associated with [necessary] safety and security measures" is mandatory—not permissive—and provides no discretion to the FCC. The United States Supreme Court has held that "the mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."[40] While in some limited contexts "shall" can be interpreted as "may," the use of both "shall" and "may" in the same statutory

---

[37] *2021 ICS Order*, ¶ 127 (footnotes omitted). *See also* Order on Remand and Notice of Proposed Rulemaking, *CG Docket No. 96-128, 17 FCC Rcd 3248, 3252, ¶* 9 (2002) (identifying various security requirements for ICS including call screening, calling restrictions, monitoring for signs of "possible criminal activity or a scheme to evade calling restrictions," and listening and recording capabilities); *2021 ICS Order*, at ¶ 53 and n.196 (2013) (including various security features related to ICS as compensable costs, including costs of recording and screening calls, storage and more "sophisticated" measures such as biometrics and tracking tools for law enforcement).

[38] Martha Wright-Reed Act, at sec. 3(b).

[39] NPRM, ¶ 52.

[40] *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). *See also Jennings v. Rodriguez*, 200 L. Ed. 2d 122, 138 S. Ct. 830, 844 (2018) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72, 136 S. Ct. 1969, 1977, 195 L. Ed. 2d 334 (2016)) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Ass'n of Civilian Technicians, Montana Air Chapter No. 29 v. Fed. Lab. Rels. Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive."); *Shall*, Black's Law Dictionary 1375 (6th ed. 1990) ("As used in statutes . . . this word is generally imperative or mandatory").

provision underscores their different meaning.[41] Here, the use of "shall" as regards safety and security costs juxtaposed with the use of "may" as regards average costs confirms that the Commission *must* consider costs associated with necessary safety and security measures in setting just and reasonable rates, and set rates accordingly. It may not set rates without taking safety and security measures into account.

These safety and security measures, however, include both costs incurred by ICS providers and facilities. There are multiple tasks and functions that are required to make ICS available safely and securely, some of these functions are performed by providers, some by facilities, and at times both the ICS Provider and the facility will perform various component pieces of the "same" task.[42] For example, when inmate security concerns prompt a facility investigation, facility personnel will often perform various investigatory tasks while at the same time requesting Pay Tel to provide call data and to investigate aspects of those data.

As Pay Tel has previously explained, a complicating factor in determining when a cost is a "necessary safety and security cost" is that many tasks performed by facilities are performed at distinct times and for distinct reasons such that simple classification of tasks—standing alone—is insufficient. By way of illustration, security functions such as "call monitoring" and "blocking/unblocking numbers" may all be performed by facility personnel at different times and for different reasons. To use "call recording analysis" as an example, such a security function may need to be performed to ensure the safety of the public from an inmate using ICS service to threaten

---

[41] *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section. . . . Congress used 'shall' to impose discretionless obligations . . . ."); *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359-60 (1895) ("In the law to be construed here it is evident that the word 'may' is used in special contradistinction to the word 'shall.'").

[42] *See* Pay Tel Comments (5th FNPRM), WC Docket No. 12-375, at Exhibit 2 (table illustrating ICS administrative and security tasks) (Sept. 27, 2021).

or intimidate a called individual, such as a judge or a witness in his or her case. In such an instance, the facility would not incur the cost but for the provision of the ICS service—if inmates were cut off from telephone service, there would be no risk of threats or other security concerns stemming from telephone calls. And that core security function is needed in that instance to ensure the safety of the public when ICS is deployed.

However, such a "call recording analysis" security function may <u>also</u> be performed in the investigation of prior crimes after the fact. In such instances, the facility would incur that cost as a result of its desire to investigate prior crimes and the fact that it identified a particular call as likely to yield evidence of criminal activity <u>prior to the inmate's incarceration</u>. This latter use of the "call recording analysis" security function should not be considered a legitimate cost of ICS since it is an outgrowth of a pre-existing criminal investigation, whereas the former, forward-looking protection use <u>should</u> be considered a legitimate cost of ICS.[43] Pay Tel has previously noted similar distinctions in its analysis of NSA's cost submission.[44] And Pay Tel respectfully urges the Commission to carefully examine the unique circumstances in which each cost may be incurred.

As a component of comprehensive ICS reform, facility cost recovery should be a permissible component of ICS rates, a principle that is at least implicitly acknowledged by the Act's directive to consider "safety and security costs". By permitting express recovery for the costs of ensuring the safety and security of ICS, the Commission provides facilities with service-based, competitive market factors to compare when awarding contracts. This, in turn, would create

---

[43] By way of further example, "answering questions from end-users," "administering PIN system," and "training incarcerated users on use of ICS system" are all expenses that are necessarily incurred <u>only</u> as a result of a facility offering ICS and therefore must be recovered by facilities.

[44] *See* Setting the Record Straight on Confinement Facility Costs, Pay Tel Communications, Inc., *Ex Parte Presentation*, WC Docket No. 12-375, at 6 (May 8, 2015).

downward pressure on ICS rates, as providers compete to provide the best service for the lowest consumer cost as the only way to distinguish themselves and win bids. Such an approach would help to align the interests of facilities with consumers by incenting facilities to enter into contracts with lower calling rates in order to stimulate increased phone usage, thereby spurring healthy competition among providers that will benefit consumers."[45]  This sort of approach, permitting an explicit, per-minute cost recovery fee as an additive to the rate caps, has been supported by multiple stakeholders in these proceedings.[46]

## III.    The Commission Should Preempt Inconsistent State Requirements

The Martha Wright-Reed Act establishes, effectively, a three-pronged test for ratemaking: that rates be both just and reasonable for consumers; that they ensure fair compensation for providers; and that the costs of ensuring safety and security are recovered.

As the Commission has noted previously, adopting a rate that applies equally to intrastate and interstate services should be quite straightforward as providers have historically reported costs

---

[45] *E.g.,* Pay Tel Communications, Inc., *Ex Parte Presentation,* WC Docket No. 12-375 (Oct. 15, 2015).

[46] *See, e.g.,* Pay Tel Comment to Third Further Notice of Proposed Rulemaking, WC Docket No. 12-375, p. 2 (Jan. 16, 2019); Letter from Brian D. Oliver, CEO, GTL; Richard A. Smith, CEO, Securus; Curt Clifton, Vice President of Government Affairs and Strategic Planning, Telmate; and Vincent Townsend, President, Pay Tel, to Marlene H. Dortch, Secretary, FCC, at 1-2, WC Docket No. 12-375 (Oct. 15, 2015) ("Joint Proposal Letter").

on an unseparated basis.[47] Pay Tel has long advocated for regulation of both intrastate and interstate rates as part of comprehensive, holistic reform of the ICS industry.[48]

Assuming that the Commission continues to regulate through rate caps, it is not sufficient for the Commission to only preempt state rate caps that are in excess of the FCC's prescribed rate caps while implicitly inviting states to adopt rate caps for intrastate services that are below the FCC-mandated caps. Such a bifurcated system is unworkable, conceptually flawed, and inconsistent with the regulatory regime established by Congress.

Pay Tel has previously explained the impact of below-cost rate caps imposed by state public service commissions, and that addressing only interstate without preempting below-cost intrastate rates would rob providers of ICS in jails of their ability to recover costs on a holding company level.[49] The Wireline Competition Bureau, in granting Pay Tel a temporary waiver from

---

[47] *See, e.g.,* NPRM, ¶ 43 (quoting Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd at 8513-14, para. 83 (2020) (the "*2020 ICS Notice*")) ("Our calculations use total industry costs, both interstate and intrastate, because the available data do not suggest that there are any differences between the costs of providing interstate and intrastate inmate calling services. Nor do such data suggest a method for separating reported costs between the intrastate and interstate jurisdictions that might capture such differences, if any.").

[48] *See, e.g.,* Pay Tel Comments (FNPRM), WC Docket No. 12-375, at pp. 2–3 (Dec. 20, 2013) ("As part of its consistent advocacy for reform of the ICS industry, Pay Tel has previously explained that, at least for jails, any action to regulate interstate rates impacts a provider's overall profitability due to rigid state rate constraints. In this regard, meaningful reform can only occur through coordinated Commission action with respect to both interstate and intrastate ICS rates.").

[49] *See, e.g.,* Pay Tel 2007 Comments at 7, CC Docket No. 96-128 (May 2, 2007); Pay Tel June 2008 Ex Parte Presentation, at 2, 8 n.20 (arguing for preemption of below cost intrastate rates); Pay Tel, Ex Parte Presentation, CC Docket No. 96-128 (Sept. 9, 2008) (attaching 50-state rate analysis; pointing out the necessity of preempting below cost intrastate rates and identifying below-cost rate caps in Tennessee, North Carolina, Florida, South Carolina and Georgia based on the Wood Study demonstrating of ICS costs); Pay Tel, Comments, at 7, CC Docket No. 96-128 (May 2, 2009) ("Because most states impose price caps on a local call and because many of those capped rates are below the costs incurred to handle the call, ICS providers lose money in many states on every local call."); *id.* at n. 40 ("average rate charged by Pay Tel for all local collect calls (81.2% of total calls) . . . is 33% below the rate proposed by [Petitioners]."); Pay Tel Ex Parte at 2, CC Docket No. 96-128 (July 15, 2009) (referring to 50-state rate chart submitted with Sept. 9, 2008 ex parte demonstrating that Petitioners' rate proposal would result in long distance rates that would be lower than the then-current collect call rate in 32 states; attaching updated 50-state rate chart showing proposed rates would result in interstate rates lower than local rates in 30 states).

the *ICS Order's* interim interstate rate caps in February 2014, clearly understood and appreciated the impact that below cost intrastate rate caps and restrictions, when working in tandem with the *ICS Order's* interim interstate rate restrictions, could have on a provider's ability to recovery its total costs.[50]

Section 276(c) requires that "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters *shall preempt* such State requirements."[51]

Pay Tel assumes for the sake of this discussion (and because Section 276—as amended by the Martha Wright-Reed Act—requires it) that ICS providers will be able to recover their costs and receive fair compensation pursuant to whatever interstate and intrastate rate regime the Commission ultimately adopts. Once that framework is in place, should any state's rate caps or other ICS reforms (either then-current or adopted in the future) undercut the Commission's rules, the plain language and clear intent of Section 276 requires that the Commission preempt same. A state-imposed intrastate rate cap that is either *below or above* an intrastate cap established by the Commission is, by definition, "inconsistent" therewith—and Section 276(c) requires preemption.

The Commission previously has noted that "some states have adopted laws that effectively require intrastate ICS rates to be provided at below-cost rates, with the difference presumably to be recouped by charging interstate rates that are set significantly above costs."[52] Such state laws

---

[50] *See Pay Tel Communications, Inc.'s Petition for Waiver of Interim Interstate ICS Rates,* Order, WC Docket No. 12-375, 29 FCC Rcd 1302, at ¶¶ 11-18, 20 (2014) ("Pay Tel Waiver Order") ("[W]e conclude that Pay Tel has shown that the combination of its existing below-average-cost state ICS rates and the Commission's interim rate caps, which accurately reflect its average total company costs constitute "extraordinary circumstances" that justify temporary waiver of the Commission's rate caps, and that the waiver will be in the public interest.").

[51] 47 U.S.C. § 276(c) (emphasis added).

[52] Second Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 14-158, at ¶ 121 (rel. Oct. 22, 2014) (the "*2014 ICS Order*").

that "require below-cost intrastate ICS rates" would indeed be inconsistent "with a Commission cap on intrastate ICS rates" where the state was "more 'aggressive' than the Commission cap."[53] If they are not the same, they are different. If they are different, they are inconsistent.

The regulatory scrutiny employed by the states on this issue differs widely. For example, California, has asserted that it has the authority to completely eliminate jurisdictionally mixed ancillary service fees.[54] This sort of approach is particularly problematic, given the Commission's mandate to ensure all ICS providers are "fairly compensated". In order to meet its obligations under the Act, the Commission must broadly preempt inconsistent state rates.

If the Commission does permit states to impose lower intrastate rate caps, then providers must be afforded the opportunity to revise their mandatory data collection cost filings to reflect the costs which are not being recovered at the state level. This will result, of course in higher interstate rates, and will, as practical matter, invite states to "game" their ratemaking so as to shift costs from the state to the federal jurisdiction.

The preferable outcome—for consumers and providers—is to have uniform rate regulation applicable to the service nationwide. The Commission has been granted plenary authority over ICS by Congress in the Martha Wright-Reed Act and has been directed to preempt inconsistent state regulations. The Commission must exercise this authority.

---

[53] *Id.*

[54] *Order Instituting Rulemaking to Consider Regulating Telecommunications Services Used by Incarcerated People,* Rulemaking 20-10-002, D. 21-08-037 at 76 (Cal. P.U.C. 2021) (barring imposition of automated payment fees, paper bill/statement fees, live agent fees and single call fees "in association with intrastate and jurisdictionally mixed calls" and concluding the California commission "is not preempted from imposing lower rates or fees . . . including with regard to calls with interstate and intrastate components, where federal requirements operate as ceilings.")

IV.     **Regulation of Video Visitation**

The Martha Wright-Reed Act grants the Commission authority over video visitation services, as least as regards off-site services.  Increasingly, video services are substitutable for traditional voice calls and, for this reason, Pay Tel supports the regulation of video calling services.

There are several aspects of this authority that are worthy of comment.

First, the assertion of regulatory authority over video visitation services will impose regulatory authority over several entities that are currently providing services on an unregulated basis.  In other words, there are several providers of this service who are not traditional ICS providers, so the application of new rules to this class of specialized providers may create uncertainties or compliance issues that are not presently foreseen.  Nonetheless, Pay Tel supports the equal application of regulation to all providers of the service, regardless of the technology used, as authorized in the Act.

Second, the costs associated with video visitation are not identical to those associated with voice ICS.  For example, the cost of video storage is typically higher than that of call data storage given the substantially greater sizes of video files.  Additionally, the cost of video equipment is greater than the cost of traditional phone equipment and, in some cases, duplicative video facilities may be required by the facility.  Further, some facilities may require certain video calls to be offered for free (e.g., on-site video calls and/or visits with public defenders), in which case the unrecovered costs associated with free calls still must be recovered from users of the ICS system generally.

In light of the unique factors associated with this service, the Commission should collect comments and cost data concerning this service from current participants as well as video visitation

providers that have not previously been regulated prior to adopting regulations applicable to video visitation.

## CONCLUSION

The Martha Wright-Reed Act generally codifies the Commission's current approach to ICS regulation, and expands the scope of Commission authority over interstate as well as intrastate ICS rates, and all audio and video telecommunication providers, regardless of the technology used. This enables comprehensive, holistic ICS regulatory reform—as has long been advocated for by Pay Tel and other ICS providers—to provide just and reasonable rates for consumers, fair compensation to providers, and cost recovery to facilities for safety and security costs. These are not inconsistent objectives; to the contrary, alignment of incentives and compensation for all stakeholders is not only possible, but essential to ensure the affordability and availability of quality ICS to all facilities, particularly jails and other small facilities. Consistent with these goals, in lieu of traditional revenue-based commissions, the Commission should allow for recovery of facility safety and security costs through more efficient means, such as per-minute additives to rate caps. Furthermore, state law regulating ICS rates—whether above or below FCC rate caps—must be broadly preempted. Finally, the Commission should collect further comments and cost data before exercising its regulatory authority over video visitation services.

Respectfully submitted,

Marcus W. Trathen
Christopher B. Dodd
BROOKS, PIERCE, McLENDON,
 HUMPHREY & LEONARD, L.L.P.
Wells Fargo Capitol Center, Suite 1700
Raleigh, N.C. 27601
Telephone: (919) 839-0300
Facsimile: (919) 839-0304
mtrathen@brookspierce.com
cdodd@brookspierce.com

*Counsel for Pay Tel Communications, Inc.*

May 8, 2023

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matters of: | WC Docket No. 23-62 |
| **Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act** | |
| **Rates for Interstate Inmate Calling Services** | WC Docket No. 12-375 |

**OPENING COMMENTS OF STEPHEN A. RAHER**
**ON NOTICE OF PROPOSED RULEMAKING**

Stephen A. Raher
P.O. Box 15189
Portland, OR  97293
stephen@amalgamatedpolicy.com
(971) 867-2440

Dated: May 8, 2023

# TABLE OF CONTENTS

Executive Summary ...................................................................................................... ii

I.  The Wright-Reed Act is an Important Tool that Allows the Commission to
Continue the Work it Began When it Granted the Wright Petitions in 2012 ...................... 1

    A.  Congress's Primary Intent in Passing the Wright-Reed Act is Best
Understood as a Legislative Reversal of the D.C. Circuit's *GTL* Ruling .............. 2

    B.  Congress's Decision to Keep IPCS Regulation Under § 276 of the
Communications Act Demonstrates an Intent to Reaffirm IPCS Providers'
Status as Common Carriers ........................................................................................ 4

    C.  Because IPCS Providers are Common Carriers, the Commission Must
Ensure Fairness in Both Rates *and* Practices ........................................................ 7

II.  The Commission's Ratemaking Activities Should Focus on Setting Just and
Reasonable Rates Throughout the Multifaceted IPCS Ecosystem ...................................... 9

    A.  Define Covered Services Broadly ............................................................................ 9

    B.  Construct a Compensation Plan That Focuses on Cost-Based Rates with
Reasonable Allocations of Shared Costs ................................................................ 11

        1.  Cap Intrastate IPCS Rates at the Same Level as Interstate Services ....... 12

        2.  Consider the Use of Sub-caps Based on Economically Similar
Classes of IPCS ............................................................................................. 13

        3.  Collect Comprehensive Carrier Cost Data and Ensure Reasonable
Allocations for Shared Features .................................................................. 13

        4.  The Commission Should Define Recoverable Safety and Security
Costs with a Focus on What Costs are Strictly "Necessary" to the
Provision of Communications Services ...................................................... 14

    C.  Address Specific Known Problems in the IPCS Industry ................................... 17

        1.  Failure to Publish Rates ............................................................................... 17

        2.  Per-Session Billing for Video Calling ........................................................ 19

        3.  Non-Compliant Carriers............................................................................... 20

        4.  Charging Consumers to Listen to FM Radio ............................................. 21

III.  The Commission Should Address Data Privacy in the IPCS Setting ................................. 22

IV.  Conclusion ......................................................................................................................... 23

## EXECUTIVE SUMMARY

In 2012, the Commission accepted the challenge posed by activist Martha Wright-Reed (then known as Martha Wright) by granting her petitions for rulemaking and beginning the long process of identifying and prohibiting some of the most economically exploitative rates and practices in the telecommunications industry. After a decade of progress, Congress has also taken up the mantle by passing the Martha Wright-Reed Just and Reasonable Communications Act (the "Wright-Reed Act").

As required by the terms of the Wright-Reed Act, the Commission has commenced a new rulemaking to ensure consumer protection in the incarcerated people's communications services ("IPCS") market. These comments seek to aid the Commission in effectively implementing the new statute by responding to questions posed in the Commission's Notice of Proposed Rulemaking and proposing a framework for achieving just and reasonable IPCS rates and practices.

Based on the Wright-Reed Act's affirmation of IPCS as a type of common carriage, the Commission should use traditional notions of rate regulation, service on demand, non-discrimination, and pricing transparency to inform its oversight of the industry. As part of this work, the Commission must address not just rates and charges, but also carrier practices including price disclosures and billing structures.

With respect to rate regulation, the Commission should broadly define covered IPCS services consistent with the language of 47 U.S.C. § 276(d) (as amended by the Wright-Reed Act) and craft a "compensation plan" (as required by § 276(b)(1)(A)) that sets cost-based rates for different classes of IPCS regardless of intra- and interstate classification. These comments also explain that when "considering" security costs (as required by § 3(b)(2) of the Wright-Reed Act), the Commission should focus on defining the small number of costs are strictly necessary to the provision of IPCS. Surveillance and security features that are not necessary for providing telecommunications service should not be recovered from ratepayers.

Commenter also urges the Commission to address known problems including some carriers' failures to publish rate information, per-session billing structures for video calling, certain carriers' refusal to comply with IPCS regulations, and charging incarcerated people to listen to FM radio.

These comments conclude with a call for the Commission to address important issues of data privacy in the IPCS market.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matters of: | |
| **Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act** | WC Docket No. 23-62 |
| **Rates for Interstate Inmate Calling Services** | WC Docket No. 12-375 |

**OPENING COMMENTS OF STEPHEN A. RAHER**
**ON NOTICE OF PROPOSED RULEMAKING**

Pursuant to the Commission's Notice of Proposed Rulemaking and Order (the "NRPM"),[1] the undersigned, Stephen A. Raher ("Commenter"),[2] submits these opening comments regarding the Commission's implementation of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (the "Wright-Reed Act"[3]).

**I.     The Wright-Reed Act is an Important Tool that Allows the Commission to Continue the Work it Began When it Granted the Wright Petitions in 2012**

The Commission is correct to note that the Wright-Reed Act removes statutory provisions that have been used in the past to "prevent[] the Commission from setting comprehensive and effective just and reasonable rates for incarcerated peoples' communications services."[4]  As explained below, the text and legislative history of the Wright-Reed Act indicate Congressional intent to effectuate broad regulation of rates and practices in the incarcerated people's communications services ("IPCS") market, regardless of technological distinctions.  The NPRM takes many tentative positions that are entirely consistent with Congressional intent, and which the Commission should formally adopt in an expeditious fashion.  As a general matter, the Commission should keep two overarching principles in mind when implementing the Wright-

---

[1] FCC 23-19 (released Mar. 17, 2023), 88 Fed. Reg. 20804 (Apr. 7, 2023).

[2] These comments are submitted solely in the commenter's individual capacity, and do not reflect the views of any current or former employers or clients.

[3] Pub. L. 117-338, 136 Stat. 6156 (Jan. 5, 2023).

[4] NRPM ¶ 3.

Reed Act.  First, Congress's primary (but not exclusive) intent in enacting the statute is to legislatively overrule of the Court of Appeals' decision in *Global Tel\*Link v. FCC* ("<u>*GTL*</u>").[5] Second, the most notable way in which the Wright-Reed Act goes beyond merely reversing the *GTL* ruling is by expanding the scope of IPCS offerings subject to the Commission's jurisdiction—accordingly, the Commission must revise its rules to the extent necessary to bring fair rates and practices to all regulated categories of IPCS.

### A.   Congress's Primary Intent in Passing the Wright-Reed Act is Best Understood as a Legislative Reversal of the D.C. Circuit's *GTL* Ruling

Since the Commission granted the First Wright Petition and the Alternative Wright Petition in December 2012,[6] it has gradually succeeded in cracking down on some of the worst abuses in the IPCS industry through a system of rate and fee caps, data collection, and other consumer-protection measures.  The most significant setback in the decade-plus history of this proceeding occurred when the Commission failed to defend its Second Report and Order before the D.C. Circuit, leading to the *GTL* ruling that—among other things—substantially curtailed the Commission's ability to regulate intrastate rates and created unnecessary confusion regarding the proper procedure for calculating IPCS rate caps.

When Congress amends a statute, the new law "should be interpreted in light of the court decisions that may have prompted the amendment."[7]  The Wright-Reed Act is best understood as Congressional abrogation of many parts of the *GTL* ruling.[8]  This conclusion is supported both by the text of the bill itself and by relevant legislative history.  As shown below in **Table 1**, the enacted bill consistently and methodically reverses several substantive portions of the *GTL* holding, instead adopting the reasoning of Judge Pillard's dissent.

---

[5] 866 F.3d 397 (D.C. Cir. 2017).

[6] *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, <u>Notice of Proposed Rulemaking</u>, 27 FCC Rcd. 16629 (rel. Dec. 28, 2012).

[7] *Lummi Tribe of the Lummi Reservation v. U.S.*, 112 Fed. Cl. 353, 366 (2013) (*quoting* 1A Norman J. Singer, *Sutherland Statutory Construction* § 22:29 (5th ed. 1993)).

[8] *See U.S. Wrestling Federation v. Wrestling Div. of the AAU, Inc.*, 545 F.Supp. 1053 (N.D. Ohio 1982) ("That Congress may amend a statute when it disagrees with a judicial interpretation thereof, and that such amendment must be given effect, is beyond cavil.").

**Table 1. Comparison of *GTL* and Wright-Reed Act**

| Issue | *GTL v. FCC* (citations to 866 F.3d) | | Wright-Reed Act (citations to sections of PL 117-338) |
|---|---|---|---|
| | Holding of the court | Dissent | |
| Intrastate rate caps | § 152(b) prevents FCC from regulating intrastate rates; § 276 does not provide mechanism for preemption (pp. 408-412). | The plain text of § 276 allows the FCC to regulate intrastate rates and preempt contrary state law (pp. 422-423). | FCC jurisdiction over intrastate IPCS affirmed (§ 2(c)). |
| Site commissions | FCC cannot "categorically exclude" site-commission payments from IPCS carriers' costs when calculating rate caps (pp. 412-414). | FCC validly concluded that site commissions are a division of monopoly rents that should not be counted as carrier costs (pp. 423-425). | FCC has broad discretion in setting rates, provided it "considers" necessary security costs and facility size (§ 3(b)(2)). |
| Rate-setting data | FCC's use of "industry-wide averages" for setting rate caps contravenes § 276(b)(1)(A)'s requirement of fair compensation "for each and every completed call" (pp. 414-415). | § 276's "fair compensation" requirement is a two-way standard that requires fairness for both the carrier and the consumer (pp. 419-420). | Fair compensation to carriers must be balanced against consumers' right to just & reasonable rates, and fair compensation no longer applies on a per-call basis (§ 2(a)). The FCC is expressly authorized to use industry-wide average costs (§ 3(b)(1)). |
| Ancillary fee caps | FCC may regulate ancillary fees for interstate—but not intrastate—IPCS calling (p. 415). | FCC can regulate intrastate fees for the same reason it can regulate intrastate rates (p. 419). | FCC jurisdiction over intrastate IPCS affirmed (§ 2(c)). |
| Services subject to FCC oversight | Although *GTL* did not directly address the FCC's ability to regulate services other than voice-calling, the court's holding regarding collection of video-calling cost data signaled a conservative judicial interpretation of the FCC's jurisdiction. | | Regulated service includes "any audio or video communications service" used by incarcerated people (§ 2(b)). |

In addition, Congress's titling of section 2 of the bill as "Technical Amendments" is probative, since it suggests that the changes made by this section would not have been strictly necessary were it not for the D.C. Circuit's interpretation of prior law.[9]

Legislative history also suggests a deliberate Congressional intent to overrule *GTL*. As general matter, when Congress legislates, it is presumed to know about relevant judicial

---

[9] *See Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998) (title of a statute is an interpretive aid when divining legislative intent); *Arthurs v. U.S. Immigration & Naturalization Serv.*, 959 F.2d 142, 143 (9th Cir. 1992) (recognizing the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 as Congress effectively overruling the Ninth Circuit's decision in *Ayala-Chavez v. I.N.S.*, 945 F.3d 288 (9th Cir. 1991)).

decisions.[10]  This presumption becomes a conclusive statement of legislative intent when a particular judicial ruling is explicitly referenced as a leading reason for enacting a bill that substantively undoes the impact of such a ruling.  In the case of the Wright-Reed Act, the Senate sponsor specifically cited the D.C. Circuit's *GTL* decision when explaining that the legislation "is precisely targeted at clarifying *existing* law in light of the U.S. Court of Appeals decision and to permit the FCC to use traditional procedures and authority to address unjust and unreasonable rates."[11]  Of the four Representatives who gave floor statements in favor of the Wright-Reed Act, two referenced the need to overrule the *GTL* holding as a rationale for the bill, and no member spoke in defense of *GTL*'s reasoning.[12]

### B. Congress's Decision to Keep IPCS Regulation Under § 276 of the Communications Act Demonstrates an Intent to Reaffirm IPCS Providers' Status as Common Carriers

The specific way in which Congress chooses to amend a statute can provide evidence of legislative intent.[13]  This is true in the case of the Wright-Reed Act, where Congress chose to keep IPCS within the realm of 47 U.S.C. § 276, a payphone statute that was originally enacted as part of the Telecommunications Act of 1996 (the "1996 Act"), and which defined all "provision of inmate telephone service" as *per se* "payphone service."[14]  As the Supreme Court has noted, the 1996 Act is significant in that it "was adopted, not as a freestanding enactment, but as an amendment to, and hence part of" the Communications Act of 1934 (the "Communications

---

[10] 2A Norman & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 45:12, n.25 (7th ed. rev. 2022).

[11] Office of Sen. Tammy Duckworth, "The Martha Wright-Reed Just and Reasonable Communications Act," (n.d.), available at https://perma.cc/Q8AC-27V8 (emphasis in original).

[12] *See* 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) (referencing *GTL* and stating "This bill would give the FCC this authority [over intrastate calling] and also clarify its authority over video communications") and H10028 (statement of Rep. Rush) ("[D]ue to a 2017 Federal court decision, [the FCC's] authority has been restricted to only regulating calls that cross state lines.  That decision made a mockery of families, creating a perverse world in which families that are just a few miles away from their incarcerated loved ones can be charged inhumane costs for a simple phone call.").

[13] *See e.g.*, *Psychotherapy & Counseling Ctr v. Shalala (In re Psychotherapy & Counseling Ctr)*, 195 B.R. 536, 541 (Bankr. D.C. 1996) ("By amending the statute here the way it did, Congress plainly recognized the old statute compelled a different result").

[14] Telecommunications Act of 1996, Pub. L. No., 104-104, § 276(d), 110 Stat. 56, 107 (1996) (prior to 2023 amendment).

Act").[15]  This is relevant here because, while twenty-first century telecommunications policy has generally preferred competition over regulation, the historical regulatory framework of the Communications Act is still highly relevant to IPCS, where monopoly contracts prevent any semblance of market competition.[16]

Section 276 is situated within title II of the Communications Act, which covers common carriers.  While the public, coin-operated phones that existed in 1996 have become increasingly rare, Congress nonetheless decided to use § 276 as the vehicle for modernizing IPCS, both keeping the statutory classification of service within correctional institutions as "payphone service," while also expanding the definition to cover several types of advanced communications services.  This framing strongly indicates an intent to retain and reaffirm IPCS providers' status as common carriers notwithstanding the specific type of technology used.  While contemporary U.S. telecommunications policy has largely favored competition over common-carrier regulation,[17] Congress's choice to adhere to a traditional common-carrier framework with respect to IPCS is entirely understandable, given the complete lack of competition within the IPCS market.[18]  While IPCS providers have spent years arguing that contract bidding is an

---

[15] *AT&T Corp. v. Iowa Utils. Board*, 525 U.S. 366, 378, n.5 (1999) (emphasis omitted).

[16] *See e.g.*, *Rates for Interstate Inmate Calling Services*, WC Dkt. No. 12-375, Report & Order and Further Notice of Proposed Rulemaking [hereinafter "First R&O"] at 111, 28 FCC Rcd. 14107, 14217 (rel. Sep. 26, 2013) (Pai, Comm'r, dissenting) ("I believe that the government should usually stay its hand in economic matters and allow the price of goods and services to respond to consumer choice and competition.  But sometimes the market fails.  And when it does, government intervention carefully tailored to address that market failure is appropriate.  The provision of inmate calling services (ICS) is one such market.").

[17] *See* Dean Burch, *Common Carrier Communications by Wire and Radio: A Retrospective*, 37 Fed. Comm. L.J. 85, 101-102 (1985) (arguing that, following the divestiture of AT&T, "Title II [of the Communications Act] retains little vitality except as an alternative to regulation by competition, applicable only to carriers that develop or retain market power through an overwhelming presence *or through continued control of essential facilities.*" (emphasis added)).

[18] *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, Third Report & Order, Order on Reconsideration and Fifth Further Notice of Proposed Rulemaking [hereinafter "Third R&O"] ¶ 31, 36 FCC Rcd. 9519, 9531-9532 (rel. May 24, 2021) ("The Commission has previously determined that providers of telephone services to incarcerated people have monopoly power in the facilities they serve. We reaffirm this long-established finding."); *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, Report & Order on Remand and Fourth Further Notice of Proposed Rulemaking ¶ 100, 35 FCC Rcd. 8485, 8520-8521 (rel. Aug. 7, 2020) (Correctional facilities possess "market power…created by incarcerated people's inability to choose an inmate calling services provider other than the provider the

adequate competitive substitute for consumer choice, the Commission has repeatedly rejected this unpersuasive argument.[19]  Now Congress has sided with the Commission by reaffirming IPCS providers' status as common carriers despite the otherwise prevailing policy of market competition over traditional rate regulation.

In light of Congress's decision to revise and modernize § 276 as applied to IPCS, the Commission should craft future regulations that are informed by, and consistent with, historical principles covering common carriers—principles including just and reasonable rates, service on demand, non-discrimination, and publication of rate schedules.  While the Commission has latitude to craft rules that reflect the technological and operational issues unique to IPCS,[20] the foundational tenets of common-carrier regulation should remain as a focal point, given that IPCS providers offer services "affected with a public interest" under monopolistic concessions granted by government agencies.[21]

---

correctional facility selects, effectively creating a monopoly for inmate calling services within a prison or jail."); *Rates for Interstate Inmate Calling Services*, WC Dkt. No. 12-375, Second Report & Order and Third Further Notice of Proposed Rulemaking [hereinafter "Second R&O"] ¶ 2, 30 FCC Rcd. 12763, 12765 (rel. Nov. 5, 2015) ("While the Commission prefers to rely on competition and market forces to discipline prices, there is little dispute that the ICS market is a prime example of market failure.  Market forces often lead to more competition, lower prices, and better services.  Unfortunately, the ICS market, by contrast, is characterized by increasing rates, with no competitive pressures to reduce rates.").

[19] Third R&O ¶ 33, 36 FCC Rcd. at 9533 (specifically rejecting the theory that "the market for inmate calling services is competitive because providers of those services bid against each other to win contracts with correctional facilities"); Second R&O ¶ 62, 30 FCC Rcd. at 12794 (evidence of lack of competition in procurement); First R&O ¶ 176, 28 FCC Rcd. at 14190 ("While the Commission found that there is competition among ICS providers to provide service to correctional facilities, it concluded that there is not sufficient competition within facilities to ensure that rates are just and reasonable to end users because of exclusive contract arrangements.").

[20] One example of how the Commission might depart from traditional common-carrier frameworks in regulating IPCS carriers is in the case of published rates.  Historically, common carriers have been subject to strict tariffing regimes.  Consistent with the Commission's general policy of detariffing, IPCS carriers are not subject to tariff-filing requirements, but the Commission does require companies to clearly, accurately, and conspicuously disclose their rates online.  47 C.F.R. § 64.6110.  As discussed below, in section III.C.1, not all IPCS carriers publish their video-calling rates.  Thus, as part of implementing the Wright-Reed Act, the Commission should update and enhance its rate-publication rule, while stopping short of a traditional tariffing regime.

[21] *See e.g.*, *FRC v. Nelson Bros.*, 289 U.S. 266 (1933) (public-interest mandate of the Commission's predecessor agency "is to be interpreted by its context . . . [and] by the scope, character and quality of services"); *Munn v. Illinois*, 94 U.S. 113, 130-132 (1876) (adopting English common law of common carriage).

**C.    Because IPCS Providers are Common Carriers, the Commission Must Ensure Fairness in Both Rates *and* Practices**

The NPRM establishes several tentative positions that are thoroughly justified by the record, and which promise to bring much-needed relief to IPCS ratepayers.  For example, the NPRM concludes that the Wright-Reed Act authorizes the Commission to ensure just and reasonable IPCS charges that "do not create an unnecessary deterrent to [incarcerated peoples'] ability to stay connected with the world outside their correctional facilities."[22]  This statement concisely and accurately encapsulates the purpose underlying the Wright-Reed Act.

With respect to rate regulation, The NPRM tentatively concludes that "Congress effectively granted the Commission broad, plenary authority over the rates and charges for any [inmate] audio or video communications service."[23]  This too is a necessary and correct interpretation of legislative intent.  The NPRM also proposes interpreting "just and reasonable" in § 276(b)(1)(A) as having "the same meaning given to that term in section 201(b) and relevant precedent interpreting that standard in the ratemaking context."[24]  This proposed interpretation is consistent with standard canons of statutory construction and is a sound exercise in policymaking.[25]

But rates and charges are not the only problems confronting IPCS consumers.  In a similar vein, the NRPM asks whether the Commission can continue regulating IPCS providers' "practices, classifications, and regulations."[26]  Not only *can* the Commission continue regulating such areas, it *must* do so if IPCS consumers are to enjoy meaningful relief.  As noted previously, Congress's choice to place new IPCS provisions in title II of the Communications Act is significant evidence of intent to continue classifying IPCS providers as common carriers.  Even

---

[22] NPRM ¶ 10.

[23] *Id.* ¶ 11 (alteration in original).

[24] *Id.* ¶ 19.

[25] *See e.g.*, Singer, *supra* note 10 at § 51:2 ("Unless context indicates otherwise, courts construe words or phrases from a prior act on the same subject in the same sense." (citations omitted)); *Sea-Land Serv. v. Fed. Maritime Comm'n*, 404 F.2d 824, 828 (D.C. Cir. 1968) (when interpreting amendment to common-carriage provisions of the Interstate Commerce Act, the court "must assume that Congress intended to use [certain maritime terms of art] as they have historically been understood for the past half century.").

[26] NPRM ¶ 27.

prior to the Commission's 2012 IPCS rulemaking, the Commission had classified IPCS as a common carrier service—a decision that the Commission affirmed in its 2013 IPCS report and order, and which has never been subject to serious dispute.[27]

In light of the Commission's long-standing classification of IPCS providers as common carriers, Congress is presumed to have known of such precedent and relied on it when using title II as the vehicle for new IPCS rules.[28]  Specifically, the Commission has utilized its broad powers under § 201(b) to address and counteract IPCS carriers' exploitation of loopholes to extract unearned revenue in the face of rate caps.[29]  Moreover, the Commission's "plenary authority" to regulate "practices . . . for and in connection" with IPCS was affirmed by the D.C. Circuit in the *GTL* case,[30] in one of the isolated parts of the court's holding that is *not* modified by the Wright-Reed Act.  The Commission is currently considering several important IPCS consumer-protection issues that extend beyond matters of rate regulation.[31]  The Commission should continue this work while also identifying additional unfair and unjust practices that can be targeted under the Commission's refined jurisdiction as set forth in the Wright-Reed Act.

[27] First R&O ¶ 13, 28 FCC Rcd. at 14114 ("The Commission has previously found that interstate ICS, typically a common carrier service, falls within the mandates of section 201.").

[28] *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165 (D.C. Cir. 2015) ("Where Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." (citation and internal quotation marks omitted)); *Kansas City v. Fed. Pac. Electric Co.*, 310 F.2d 271, 275 (8th Cir. 1962) ("[I]t is to be assumed that Congress was aware of established rules of law applicable to the subject matter of the statute and thus, upon enactment, the statute is to be read in conjunction with the entire existing body of law.").

[29] *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, Fourth Report & Order and Sixth Further Notice of Proposed Rulemaking [hereinafter "Fourth R&O"] ¶ 71 (carrier seizure of consumer prepaid funds "constitutes an unjust and unreasonable practice within the meaning of section 201(b) of the Act") (rel. Sep. 30, 2022); Third R&O ¶ 31, 36 FCC Rcd. at 9531-9532 (IPCS carriers' monopoly power "applies equally not only to the rates and charges for calling services provided to incarcerated people, including ancillary services, but also to providers' practices associated with their provision of calling services"); Second R&O ¶¶ 144, 30 FCC Rcd. at 12838 ("[A]bsent reform, ICS providers have the ability and incentive to continue to increase [ancillary] charges unchecked by competitive forces.  Indeed, the continuing growth in the number and dollar amount of ancillary service charges represents another example of market failure necessitating Commission action") and 193, n.690, 30 FCC Rcd. at 12859 (citing § 201(b) as statutory authority).

[30] *GTL*, 866 F.3d at 415 (omission by court).

[31] *See infra*, note 57.

## II.    The Commission's Ratemaking Activities Should Focus on Setting Just and Reasonable Rates Throughout the Multifaceted IPCS Ecosystem

As evidenced in its title, the Wright-Reed Act is expressly framed with the intent of ensuring just and reasonable rates for IPCS consumers.  The Commission should achieve this goal through a combination of regulatory definitions, data-informed rate regulation, and overarching consumer protections that address known problems in the IPCS industry.

### A.    Define Covered Services Broadly

In the NPRM, the Commission correctly notes that the Wright-Reed Act "appears to confer on the Commission broad jurisdiction to develop a compensation plan for the categories of audio and video communications now included in the definition of 'payphone services' and includes no other limitation except for a limitation to communications 'by wire or radio' arising from sections 1 and 2(a) of the Communications Act."[32]  This interpretation is correct, and the Commission should deploy this statutory authority to define regulated IPCS as broadly as possible.

Importantly, the Wright-Reed Act's statutory definition of IPCS contains no requirement that the communications in question be real-time or bi-directional.  The concept of "communication" includes both the transmission *and* receipt of information, whether such process is one-way (as with a mailed letter) or two-way (as in the case of a telephone call).  In one of modern telecommunications' foundational texts, Claude Shannon describes a "communication system" as being comprised of five parts:

**Figure 1. Schematic diagram of a general communication system**



Source: Shannon, *infra* note 33, at 34.

---

[32] NRPM ¶ 29.

(1) an information source, (2) a transmitter, (3) a channel, (4) a receiver, and (5) a destination.[33] Communications systems are further described as either "discrete" (where message and signal are "a sequence of discrete signals," as in a telegraph), "continuous" (where message and signal are a continuous function, as in radio or television broadcasting), or "mixed" (a combination of both).[34]  As relevant here, communications systems can be one-directional (as with Shannon's examples), or they can be bi-directional, as with voice telephony or video conferencing.  A schematic diagram of Shannon's communications-system framework appears as **Figure 1**, above.

Returning to the context of IPCS, the theoretical framework described by Shannon demonstrates that while almost all two-way communications via radio or wire are covered by the Wright-Reed Act's definition of IPCS, so too are one-way communications such as voicemail and recorded video messages.  Voicemail is offered by many IPCS carriers, with typical charges ranging from $1 to $3 for a brief recorded voice message.[35]  There is no evidence suggesting that these prices are even remotely cost-based—to the contrary, contracts suggest that user fees for voicemail are simply a method of directing locational rents to correctional facilities via site-commission payments.  Current contracts indicate that site commission rates of 50% to 82.5% on voicemail are common.[36]

---

[33] Claude E. Shannon, *The Mathematical Theory of Communication* 33-34 (1963 reprint, U. of Ill. P.).

[34] *Id.* at 34-35.

[35] *See e.g.*, GTL's "Inmate Voicemail" webpage, *available at* https://web.connectnetwork.com/communications/inmate-voicemail/ (archived May 6, 2023 at https://perma.cc/PMC3-ZEPR) ("Voicemail lengths (1-minute, 2-minute, or 3-minute) and prices (ranging from $1.00-$3.00) vary by facility. You will be notified of options and costs when you access the Inmate Voicemail system."); Contract between Inmate Calling Solutions, LLC and Garfield County, Colo., Exh. C (May 2021) ($1.99 per voicemail message); Contract #CIT9331500 between Securus and State of Illinois, Exh. A at 36 (Jun. 2018) ($1.99 per 45-second voicemail message).

[36] *See* Contract #MA-060-21011490 between GTL and Orange County, Calif., Attch. C (May 2021) (50% commission on voicemail revenue); Contract between Securus and Kings County, Calif., § 5.1 (May 2021) (50% commission on gross voicemail revenue); Contract between Inmate Calling Solutions, LLC and Scott County, Minn., § 4(a)(2) (Jan. 2021) (82.5% commission on gross voicemail revenue).

Another type of non-real-time communication service consists of pre-recorded video messages that an IPCS customer records and sends for viewing by the recipient at a later time. This clearly qualifies as a "video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held,"[37] and should thus be regulated by the Commission. Securus, for example, offers such recorded video messages (branded as "VideoGrams"), through its mobile app (see **Figure 2**).

**Figure 2. App screenshot of Securus's "VideoGram" service**



Because correctional facilities exert nearly absolute control over the lives of incarcerated people, incarcerated IPCS customers cannot always control their schedules to be available when a non-incarcerated friend or relative wishes to communicate. Accordingly, non-real time services like voicemail and video messages assume particular importance in the IPCS market. To ensure just and reasonable rates regardless of technology, the Commission should craft a regulatory definition of IPCS that includes both real-time services (like voice- and video-calling) and recorded audio or video transmissions such as voicemail and video messages.

### B. Construct a Compensation Plan That Focuses on Cost-Based Rates with Reasonable Allocations of Shared Costs

The Wright-Reed Act retains § 276's requirement that the Commission "establish a compensation plan to ensure that all payphone service providers are fairly compensated."[38] However, unlike the version of § 276 enacted as part of the 1996 Act, the amended statute: (1) no longer requires the compensation plan to be measured on a "per call" basis, (2) requires that

---

[37] 47 U.S.C. § 153(1)(E).

[38] 47 U.S.C. § 276(b)(1)(A) (as amended by the Wright-Reed Act).

carriers' "fair compensation" be balanced with "just and reasonable" rates charged to consumers, and (3) applies to all covered communications services, not just voice calling from payphones. As acknowledged in the NPRM, one of the major issues facing the Commission today is the design of a new compensation plan that comports with the requirements of the Wright-Reed Act. Commenter encourages the Commission to frame a compensation plan that makes use of four specific features: regulation of intrastate services, sub-caps for different types of IPCS, comprehensive data collection, and a prohibition on recovery of security and surveillance costs from ratepayers unless such costs are strictly necessary to the provision of IPCS. Each of these features is discussed in turn.

### 1. Cap Intrastate IPCS Rates at the Same Level as Interstate Services

The NPRM asks whether the Wright-Reed Act now grants the Commission "plenary authority over intrastate communications services provided to incarcerated people."[39] The text and legislative history of the statute demand that this question be answered in the affirmative. Section 2(c) of the Wright-Reed Act clearly gives the Commission preemptory power with respect to intrastate rates and practices, and the Commission is correct in its tentative conclusion that this jurisdictional grant "extends to any communications service now covered by section 276, including the 'advanced communications services' added to the definition of 'payphone service.'"[40] The record contains absolutely no evidence suggesting that operational costs differ between inter- and intrastate IPCS, and therefore the Commission should impose uniform rate caps on services regardless of their jurisdictional nature (to the extent that such jurisdictional classification is even possible).[41]

---

[39] NPRM ¶ 38.

[40] *Id.*

[41] The one potential cost difference between inter- and intrastate IPCS is that some states may impose certain taxes in intrastate communications; however, this scenario is already anticipated by the Commission's tax rules (47 C.F.R. §§ 64.6000(n) (definition) and 64.6070 (substantive rule)), which allow carriers to pass through mandatory state and local taxes. While no modifications to the tax rules are necessary now, the Commission should monitor this issue to ensure that states and localities do not use sham taxes to evade federal protections for IPCS ratepayers.

Even though the Wright-Reed Act clarifies and enhances the Commission's powers of preemption, the Commission should continue its existing practice of allowing states to act as partners in protecting consumers from unjust IPCS rates and practices. In its Third Report and Order, the Commission articulated a reasoned policy of cooperative federalism where, "to the extent that state law allows or requires providers to impose rates or fees lower than those in [federal rules], that state law or requirement is specifically not preempted."[42] The Commission should continue this policy out of comity to state lawmakers and regulators who may be able to identify ways in which IPCS can be profitably delivered in certain jurisdictions under lower price caps than those prescribed by the Commission.

### 2. Consider the Use of Sub-caps Based on Economically Similar Classes of IPCS

Because audio and video communications require different hardware and data bandwidth, the Commission should use its data collection activities to determine if separate sub-caps for different types of IPCS would provide the greatest relief for consumers.

The NRPM asks whether the Commission should set separate ancillary services fee caps for audio and video services, specifically inquiring if "the costs of ancillary services depend on whether these services are ancillary to audio or video services."[43] Currently, all ancillary fees authorized under the Commission's rules relate to payment and billing,[44] and therefore there is no need for separate fee caps based on the technology of the underlying service.

### 3. Collect Comprehensive Carrier Cost Data and Ensure Reasonable Allocations for Shared Features

Certain IPCS offerings, particularly those delivered by tablets or other handheld devices, involve shared costs that may relate to both regulated and non-regulated services. To ensure just and reasonable rate caps, the Commission must collect complete and accurate cost data for *all*

---

[42] Third R&O ¶ 217, 36 FCC Rcd. at 9617.
[43] NPRM ¶ 41.
[44] 47 C.F.R. § 64.6020.

such shared expenses, and ensure that rate caps are formulated using a reasonable allocation methodology.

As for the meaning of "industry-wide data," the Commission should consider data from the general (i.e., non-IPCS-specific) telephone and advanced communications services industry.[45]  Procedurally, this should entail collection of cost data from IPCS carriers (via a mandatory data collection), followed by a comparative analysis (utilizing general industry data) to identify unique ways in which IPCS carriers "raise prices, pad costs, and cross-subsidize."[46]  The Commission can then use general industry data to calculate rate caps that incentivize IPCS carriers to adopt efficiencies found in the broader telecom industry.

The NPRM also asks for input on how the Commission should "proceed if a particular provider or a group of providers do not provide reliable and accurate information in response to the forthcoming data collection."[47]  In such a scenario, the Commission can, as appropriate, make necessary adjustments to reported data (as it has in the past)[48] or exclude patently inaccurate or unreliable data.[49]

### 4. The Commission Should Define Recoverable Safety and Security Costs with a Focus on What Costs are Strictly "Necessary" to the Provision of Communications Services

Section 3(b)(2) of the Wright-Reed Act states that when determining just and reasonable rates, the Commission "shall consider costs associated with any safety and security measures necessary to provide a [covered IPCS service]."  As discussed below, this provision is best read as giving the Commission wide latitude to consider security costs as one of many factors, and to

---

[45] *See* NPRM ¶ 48.

[46] *See* Tracy Palmer, *Rate-of-Return versus Price Caps: The Long Distance Regulation Battle*, 14 Colum.-VLA J.L. & Arts 571, 577 (1990) (anti-competitive practices that can be ameliorated via price caps).

[47] NPRM ¶ 51.

[48] *See* Third R&O, appx G ¶¶ 11-28, 36 FCC Rcd. at 9746-9754 (adjusting GTL's reported information from Second Mandatory Data Collection).

[49] *See Securus Tech. v. Pub. Utils. Comm'n*, No. B320207, slip op. at 19-21, ___ Cal. App. 4th ___ (Feb. 1, 2023, cert. for publication Feb. 27, 2023) (IPCS carrier's failure to submit accurate data to inform ratemaking proceedings does not prevent regulator from imposing price caps based on best available evidence).

define which safety and security measures are *actually necessary* to the provision of communications services.

To begin, § 3(b)(2) does not require that carriers recover any particular type of cost. Instead, the language in question empowers the Commission to fill in gaps left under the broad standard of "just and reasonable" rates.[50]  Indeed, if Congress requires an agency to issue regulations "on the basis of a factor that on its face does not include cost," then courts will normally read the statute as *prohibiting* the agency from considering cost.[51]  Thus, the "consideration" language in the Wright-Reed Act is properly understood as providing the Commission with the flexibility to consider necessary security costs, without mandating any particular outcome.

The Wright-Reed Act's "consideration" requirement can be compared to a statutory command that an agency promulgate regulations "based on" particular data.[52]  As the Court of Appeals has concluded with respect to such statutory language, "the words 'based on' are unquestionably ambiguous: they neither compel the agency to rest its decisions 'solely on' the specified factor nor indicate the extent to which the agency may rely on additional factors. Instead, they simply constrain the agency from 'abandon[ing]' or 'supplant[ing]' the specified factor altogether."[53]  Here, the Wright-Reed Act does not even go so far as to require rates "based on" security costs; rather, the law merely requires that the Commission "consider" security costs, while simultaneously giving the agency great discretion in balancing such costs with the statutory mandate of just and reasonable rates.

---

[50] *See Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843-844 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."); *see also. Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) (ratemaking agency charged with ensuring "just and reasonable" rates is "not bound to the use of any single formula or combination of formulae in determining rates.").

[51] *Utility Solid Waste Activities Group v. EPA*, 901 F.3d 414, 448 (D.C. Cir. 2018).

[52] *See e.g.*, 42 U.S.C. § 7407(d)(6) (requiring the EPA Administrator to promulgate regional ambient air quality standards "based on air quality monitoring data collected in accordance with any applicable Federal reference methods.").

[53] *Catawba County v. EPA*, 571 F.3d 20, 37 (D.C. Cir. 2009).

- 15 -

Perhaps the most notable aspect of the relevant statutory language is the reference to safety and security measures that are "necessary to provide a [communications] service."[54]  This is even more restrictive than the concepts of "used and useful," or "directly related to the provision of telecommunications service."  Indeed, when read in conjunction with § 4 of the Wright-Reed Act (which clarifies that the law does not "prohibit the implementation of any safety and security measures related to [IPCS] at [correctional] facilities"), Congressional intent comes into focus: the Commission cannot dictate what lawful security measures correctional facilities may deploy in connection with IPCS, but it *may* define the type of security costs that are recouped through user-paid rates and fees.

IPCS carriers advertise their surveillance add-ons as "investigative" tools "designed to identify potential criminal activity."[55]  That these tools may *utilize* data generated by communications service does not make the technology *necessary to the provision* of the communications service.  The Commission should narrowly define the types of security costs that are properly recoverable from IPCS ratepayers.  A leading example of properly recoverable expenses is the cost of protecting networked IPCS systems from malicious online threats—such costs are necessary to the provision of IPCS because without such security, systems might fail and thus be unable to connect calls.  In contrast, law enforcement surveillance systems are designed to detect and document criminal activity (both real and imagined), and calls can be completed whether or not these systems are in place.  If correctional agencies believe these systems provide value, then the agencies can pay for such technology from their budgets.  To fund such systems through involuntary transfers from ratepayers is neither just nor reasonable.

As for recovery of alleged security costs through site commissions, the Commission should directly regulate the amount of site-commission payments that can be charged to ratepayers.  The 1996 Act significantly bolstered the Commission's powers of preemption in

---

[54] Wright-Reed Act § 3(b)(2).
[55] *See* Securus Proposal for Inmate Phone/Visitation System (Oakland County, Mich. RFP #0052118) at 114 (Jun. 7, 2021).

numerous areas,[56] and § 2(c) of the Wright-Reed Act expressly extends this power to IPCS regulation.  The Commission should invoke its powers to the extent necessary to override local law that seeks to recover extraneous non-communications costs through a system of site-commission payments.

### C.    Address Specific Known Problems in the IPCS Industry

Despite the progress the Commission has made in lowering IPCS voice-calling rates, there are still numerous documented problems that require regulatory intervention.  Some of these problem are already pending Commission action, including carrier seizure of "inactive" customer funds, unreasonable layering of duplicative ancillary fees, and inadequate billing statements and consumer disclosures.[57]  Several public-interest commenters have already provided meritorious proposals for addressing these unfair practices, and the Commission should address these matters as part of the current Wright-Reed Act rulemaking.  In addition to acting on these previously-identified issues, the Commission should also confront—and curtail—other specific known problems, including the four practices described below.

### 1.    Failure to Publish Rates

Commission rules currently require IPCS carriers to publish their rates for voice calling.[58]  The Commission should extend this requirement to other IPCS technologies (consistent with the scope of 47 U.S.C. §§ 153(1) and 276(d), as amended by the Wright-Reed Act), and should revise the publishing requirement to standardize the format of such rate information.

---

[56] *See e.g.*, *T-Mobile S. LLC v. City of Roswell*, 574 U.S. 293, 310 (2015) (Roberts, CJ, dissenting) (the 1996 Act "places several limits on local governments' authority to regulate the siting of cell towers and other telecommunications facilities"); *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 405 ("the 1996 Act marked a significant change in federal telecommunications policy[, by ending] States' longstanding practice of granting and maintaining local exchange monopolies.").

[57] Fourth R&O ¶¶ 71-80 (customer prepaid funds), 141-142 (duplicative ancillary fees), and 110-124 (billing and consumer disclosures).

[58] 47 C.F.R. § 64.6110.

The problem of unpublished rates is most prominent in the context of video-calling. While some IPCS carriers post video-calling rates on publicly-accessible webpages, others make it unreasonably difficult for interested parties to view rates, thus preventing consumers and other

**Figure 3. GTL's webpage for its video-calling service does not provide actual prices, but instead informs visitors "you will see the cost associated with your visit at the time of scheduling"**



## How It Works

1. Check to see if your inmate's **facility** offers video visitation.

2. If video visitation is offered at the facility, go to **www.gtlvisitme.com**. Register yourself and all visitors participating in the visitations.

3. Select the facility where your loved one is located.

4. Search for your inmate, and add them.

5. Click "Schedule" to begin the scheduling process.

6. You will see the cost associated with your visit at the time of scheduling. Enter your credit card or debit card information to complete the scheduling process. You will receive a confirmation email and receipt for your visit.

7. **For at-home video visits**: sign in to the visitation scheduling site 15 minutes prior to your scheduled visit. Test your connection, and follow the steps to start your visit.

8. **For on-site video visits:** arrive at the facility at least 15 minutes prior to check-in. A valid photo ID is required. Each facility has its own rules for on-site visits. Please review rules prior to arrival.

For additional helpful information and a list of useful questions about visitation, scheduling, and facility policies, view our **visitation FAQs**.

## What It Costs

Visitation costs vary by correctional facility and visitation duration.

Different types of visits may have different costs or no cost at all.

All costs associated with visits are clearly displayed at the time of scheduling. Visitors are aware of all the options and can choose based on their visitation preferences.

Source: GTL's "Video Visitation" webpage, https://web.connectnetwork.com/communications/video-visitation/ (archived May 1, 2023, at https://perma.cc/2BYK-84RA)).

interested parties from verifying billing accuracy or gathering rate information to inform the policy process. Most notably, Global Tel*Link ("GTL") does not provide video-calling rate

information until a consumer initiates the call-scheduling process with respect to a specific incarcerated call recipient, as shown in **Figure 3**, above.

GTL's practice needlessly prevents interested parties from compiling comprehensive and accurate video-calling rate information and is flatly contrary to the principle of rate transparency that applies to common carriers.

### 2.    Per-Session Billing for Video Calling

In 2014, IPCS carrier Securus Technologies ("Securus") asked the Commission whether it could charge a flat rate of $3.75 for a voice call of any duration up to fifteen minutes.[59]  In response, the Commission correctly concluded that such billing methods are not just, reasonable, or fair because "[i]f an end user is charged for a 15-minute call but the duration of that call is less than 15 minutes, the price for that call is disproportionately high."[60]  Based on this conclusion, the Commission prohibited such flat-rate calling charges.[61]

Unfortunately, flat-rate charges are common in connection with IPCS video calling. While some IPCS carriers charge simple per-minute rates based on the actual length of a video call, others bill on a "per-session" basis, wherein carriers will only sell video-calling time in blocks of time (typically 20 minutes or more), and consumers are charged for the full block of time regardless of the actual length of the session.  Commenter's review of IPCS contracts in California indicates that the two largest IPCS providers, Securus and GTL use per-session billing in at least some of their California facilities.[62]

The use of per-session billing for video calling presents the exact same problems that the Commission identified when it prohibited flat-rate calling for voice telephony.  No carrier has come forward with a reasonable or compelling justification for this practice and the Commission

---

[59] Second R&O ¶ 103, 30 FCC Rcd. at 12812.

[60] *Id.* ¶ 105, 30 FCC Rcd. at 12813.

[61] 47 C.F.R. § 64.6090.

[62] *Order Instituting Rulemaking to Consider Regulating Telecomm'ns Servs. Used by Incarcerated People*, Calif. PUC Rulemaking 20-10-002, Intervenor Testimony of Stephen Raher at 15:19 – 16:11 (Sep. 19, 2022).

should extend the provisions of 47 C.F.R. § 64.6090 to cover IPCS video calling.

### 3. Non-Compliant Carriers

As other parties have previously noted, certain IPCS carriers have track records of refusing to comply with applicable rules.[63]  The Commission should use its expansive powers under the Wright-Reed Act to craft new rules that allow for decisive enforcement action against such companies.

Of particular note, Encartele, Inc. has a pattern of non-compliance consisting of inaccurate reporting[64] and denominating calling rates by megabytes of data, instead of on a per-minute basis as required by 47 C.F.R. § 64.6110.[65]  Recently, Encartele has ratcheted up its defiance by filing a 2022 annual report unilaterally declaring itself to be beyond the Commission's regulatory jurisdiction because it claims to be "an internet application provider."[66]  Yet Encartele, operating under the consumer-facing brand "Cidnet,"[67] continues to advertise app-based voice- and video-calling, with the same

**Figure 4. Encartele's consumer-facing webpage shows that the company provides audio and video communications for incarcerated people to communicate with people outside of correctional institutions**



Source: https://cidnet.net

---

[63] *See* Prison Policy Initiative, *Ex Parte* Filing re: Ancillary Fee Reform at 5-6 (Jul. 15, 2022) (describing non-compliance by Encartele, TKC Telecom, and Reliance Telephone of Grand Forks).

[64] *Id.* (describing Encartele's inaccurate statements on its 2021 Annual Report (FCC Form 2301(a)) regarding ancillary fees).

[65] *See* NCIC Inmate Comm'cns, Notice of *Ex Parte* Presentation at 5 (Jul. 15, 2022) and Prison Policy Initiative, *Ex Parte* Filing re: Informal Complaints Regarding Improper Assessment of Ancillary Fees, attch. 3 at 3 (Mar. 23, 2021) (both describing Encartele's pricing structure).

[66] Encartele, Inc., 2022 Annual Report (FCC Form 2301), appx. A (Apr. 20, 2023).

[67] *See* Encartele webpage: "About Encartele," https://www.encartele.net/ (archived May 3, 2023 at https://perma.cc/APJ6-Y34X) ("Encartele's proprietary system and software, Cidnet, was developed as a solution to previously manual systems and processes that created inefficiencies in jail operations.")

opaque pricing structure that parties have previously brought to the Commission's attention (see **Figure 4**).

Thus, Based on Encartele's own marketing material, the company is not only continuing to use confusing pricing, but it is also defying the Commission's regulatory jurisdiction in the face of the Wright-Reed Act's broad coverage of voice and video calling "regardless of technology used."[68]  The Commission should proactive address non-compliance by Encartele and others.

### 4. Charging Consumers to Listen to FM Radio

At least one IPCS carrier (GTL) has a practice of charging users for listening to FM radio broadcasts via carrier-issued equipment.[69]  This feature appears to operate via an FM chip that is standard equipment in modern mobile devices.[70]  While there may not be any other example of a company with the temerity to charge consumers to listen to FM broadcasts, the novelty of GTL's extortionate behavior should not distract from the profound legal problems attendant to such a practice.

To begin, once a consumer has access to a device that can receive FM broadcasts, the concept of *charging* such consumer for actual reception of broadcasts over the public airwaves is antithetical to the public-interest principles upon which federal broadcasting law is premised.[71]  GTL's practice also presents antitrust concerns, since the company is using its control over an

---

[68] Wright-Reed Act § 2(b)(3).

[69] *See, e.g.*, Professional Services Contract between GTL and Indiana Dept. of Corr., EDS #D12-19-17055, exh. A, § 7 (Jul. 24, 2018) (listing FM radio as an "enhanced service" available only with a paid subscription).

[70] *See* GTL Inspire 2.0 tablet specifications sheet, available at http://www.gtl.net/wp-content/uploads/2017/11/Inspire2-Datasheet.pdf (archived May 4, 2023 at https://perma.cc/NM8U-JH76); FCC Press Release, "Chairman Pai urges Apple to activate FM chips to promote public safety" (Sep. 28, 2017) (describing "FM chips that are already installed in almost all smartphones sold in the United States.").

[71] *See e.g.*, L. Andrew Tollin & Robert G. Kirk, *The Comparative Renewal Process: A New Approach Based on Old Law*, 1 CommLaw Conspectus 15, 17 (1993) ("The language of the Communications Act imposes few specific requirements on the FCC and grants the Commission broad powers to define the public interest by rule.").

essential facility (i.e., multi-function tablets that increasingly mediate all contact with the outside world) to induce consumers into "tying" arrangements.[72]

When granting the Commission regulatory jurisdiction over the FM spectrum, Congress "did not frustrate the purposes for which the Communications Act of 1934 was brought into being by attempting an itemized catalogue of the specific manifestations of the general problems for the solution of which it was establishing a regulatory agency," but instead "define[d] broad areas for regulation and . . . establish[ed] standards for judgment adequately related in their application to the problems to be solved."[73]  While the Commission's authority over radio *broadcasters* is found in title III of the Communications Act, title II (which includes authority over IPCS carriers) also covers "communication by . . . radio."[74]  To further remove any ambiguity, the Wright-Reed Act directs the Commission to regulate audio communications used by incarcerated people "regardless of technology used."[75]  Because charging for reception of public broadcasts is neither just nor reasonable, the Commission should promulgate rules prohibiting IPCS carriers from imposing such charges.

## III.    The Commission Should Address Data Privacy in the IPCS Setting

IPCS carriers—particularly the two dominant carriers, GTL and Securus—frequently market themselves to correctional facilities based on sweeping data collection, analysis, and surveillance services that collect and use data from both incarcerated and non-incarcerated IPCS users for ill-defined purposes with little, if any, consumer disclosure.  Given that IPCS carriers operate in the correctional field, some security is to be expected; however, the broad and unchecked control that carriers have over nearly all communications requires some level of

---

[72] *Eastman Kodak Co. v. Image Tech. Servs*, 504 U.S. 451, 461-462 (1992) ("A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. . . .  Such an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." (citations and internal quotation marks omitted)).

[73] *Nat'l Broadcasting Co. v. U.S.*, 319 U.S. 190, 215 (1943).

[74] 47 U.S.C. § 201(a).

[75] Wright-Reed Act § 2(b)(3) (codified as 47 U.S.C. § 153(1)(E)).

oversight to guard against unfair, deceptive, or abusive practices.  In addition, IPCS carriers do not merely provide security services directly to the contracting agency, but increasingly market their services based on an ability to share data across jurisdictional boundaries (see **Figure 5**). This is a uniquely interstate problem deserving of the Commission's attention.  Just as the Commission has recently taken steps to address issues of data security and privacy in the setting of wireless carriers,[76] so too are IPCS consumers deserving of data privacy and enforcement of their rights under existing law.  When implementing the Wright-Reed Act, the Commission should examine IPC carriers' data-management practices and issue rules protecting consumers' data privacy and requiring compliance with applicable law including 47 U.S.C. § 222.



**Figure 5. Securus promises cross-jurisdiction data sharing as part of its THREADS product**

Source: Securus Proposal to Dallas County Texas (2019), available at https://www.prisonpolicy.org/contracts/file.php?document_id=315&name=Securus_RFP%20No.%202019-064-6828_Dallas%20County.pdf.

## IV.    Conclusion

Passage of the Wright-Reed Act provides an important opportunity for the Commission to enhance and refocus its work addressing problems in the IPCS industry.  By using traditional concepts of common-carrier regulation—tailored, as necessary, to address known issues in the IPCS sector—the Commission can provide important relief to IPCS consumers.  Commenter encourages the Commission to incorporate the proposals set forth above in this phase of its IPCS rulemaking.

---

[76] *Data Breach Reporting Requirements*, WC Dkt. No. 22-21, Notice of Proposed Rulemaking (rel. Jan. 6, 2023).

Respectfully submitted,

*/s/ Stephen A. Raher*
Stephen A. Raher
P.O. Box 15189
Portland, OR  97293
stephen@amalgamatedpolicy.com
(971) 867-2440

May 8, 2023

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| Rates for Interstate Inmate Calling Services | ) | |

**COMMENTS OF SECURUS TECHNOLOGIES, LLC**

Joshua P. Martin
Senior Vice President and General Counsel
Securus Technologies, LLC
4000 International Parkway
Carrollton, Texas 75007
(972) 277-0300
joshuamartin@securustechnologies.com

Michael H. Pryor
Shareholder
Brownstein Hyatt Farber Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com

*Counsel to Securus Technologies, LLC*

May 8, 2023

**JA632**

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................. i

I.    Introduction ............................................................................................ 1

    A.    The Structure of the Market Is Changing ..................................... 2

    B.    The Industry Has Reduced Prices But Faces Inflationary Pressures ......................... 3

II.   The MWR Act Extends the Commission's Jurisdiction to VoIP and Video Visitation Services ...................................................................................... 4

    A.    The Act's Revised Definition of Payphone Service ..................... 4

    B.    New Subsection 3(1)(E) Provides Authority over Remote Video Visitation Services ........................................................................ 7

    C.    The Commission Must First Define "Interoperable" In Order to Determine the Scope of Interoperable Video Conferencing Services ........................ 8

    D.    The Act Does Not Confer Authority to Regulate Streaming Services ...................... 9

III.  Standard for Ratemaking ...................................................................... 10

    A.    The Commission Must Ensure That the Rates It Sets Fairly Compensate Providers and Are Just and Reasonable for Consumers ................................... 10

        1.    The Definition and Application of the Fairly Compensated Standard in the Context of Commercial Payphone Service .................... 10

        2.    The Commission's Previous Assessments of The Meaning of Fairly Compensated in the Context of Payphone Service to Incarcerated Persons .................... 13

        3.    The Fair, Just and Reasonable Standard .................... 14

    B.    General Standard for Just and Reasonable Ratemaking .................... 16

    C.    The MWR Act Expressly Authorizes the Commission to Utilize the Industry-Average Cost Methodology Adopted in the *2021 ICS Order* .................... 18

IV.   The Commission Should Set Different Rates for Audio and Video Communications ...... 20

    A.    Securus' Video Visitation Service – Securus Video Connect .................... 21

    B.    Video Visitation Service Costs Are Substantially Different Than Voice-Only Services. .................... 23

    C.    The Commission Should Provide Flexibility to Use Different Pricing Plans for Video Communications, Including Bundling of Services .................... 23

V.    The Treatment of Site Commission Payments .................... 24

    A.    Securus' Position on Site Commissions .................... 24

    B.    The Used and Useful Framework is Not an Appropriate Basis to Restrict or Eliminate Site Commissions .................... 25

1. History and Application of the Used and Useful Framework **..................................... 27**

2. Regulators Are Not Required to Apply the Used and Useful Standard **.................... 30**

3. The Commission's Application of Used and Useful in the 2021 ICS Order **............. 31**

4. The Preferable Approach to Site Commissions That is Consistent With *GTL* **.......... 33**

VI. Providers Should Be Able to Recover Safety and Security Costs in Rates ...................... 34

A. The Commission Has Consistently Found that Safety and Security Costs Are Inherent in Incarcerated People's Calling Services ............................................................ 35

B. Safety and Security Costs Are "Necessary" ............................................................ 37

VII. The Commission's Compensation Plan Must Ensure That Any Rates Set by State Commissions Comply with the Statutory Standard ........................................................ 41

A. The Commission Has a Statutory Responsibility to Ensure Compliant State Rates 41

B. The Commission Should Preempt State Regulation of Rates and Charges .............. 42

VIII. The Commission Should Act Promptly to Authorize Alternative Pricing Plans .......... 44

IX. IP CTS Enterprise Registration ........................................................................... 46

CONCLUSION ........................................................................................................ 47

# EXECUTIVE SUMMARY

The Martha Wright-Reed Just and Reasonable Communications Act of 2022 (the MWR Act or Act) provides an opportunity for the Federal Communications Commission (Commission) to promulgate a cohesive, uniform regulatory framework governing interstate and intrastate voice and video services for the incarcerated. Securus looks forward to working with the Commission in its implementation of the Act and the development of rates and charges that are both fairly compensatory and just and reasonable.

Securus concurs with the Commission's assessment that the Act fundamentally expands its authority and reverses several key findings from the D.C. Circuit's decision in *GTL v. FCC*. Specifically, Securus agrees that the Act confers on the Commission plenary authority over the rates and charges for intrastate services, extends the Commission's authority to include rate regulation of video visitation services, expressly authorizes the Commission to ensure rates are just and reasonable, removes the impediment to utilizing industry-wide cost averages while directing consideration of security costs, facility size and weighing company-specific average costs. The Commission has already taken the first step in the process by issuing draft instructions for a new mandatory data collection.

The Act expands the definition of payphone service to include, in addition to "inmate telephone service," four "advanced services." The practical effect of this expansion is to confirm authority to regulate rates for telephone service that uses VoIP technology, which the Commission has already asserted, and to regulate the intrastate and interstate rates and charges for remote video visitation services pursuant to new Section 3(1)(E). The Act may also enable regulation of on-site video visitation service if deemed to be an interoperable video conferencing

service.  The Act does not, however, confer authority to regulate streaming content such as educational, vocational or entertainment programming streamed to tablets.

The Act tasks the Commission with developing a compensation plan for intrastate and interstate voice and video communications services that ensures providers are fairly compensated and rates and charges are just and reasonable.  These terms are not coterminous and seek to achieve different goals.  The Commission must balance the two in a way that promotes competition and deployment of payphone services to the incarcerated as newly defined.

A reasonable outcome is for the Commission to utilize the same general methodology it applied in the *2021 ICS Order*, which entails determining industry-wide average costs, and then applying a mechanism, such as one or more standard deviations or an interquartile range, to ensure that the vast majority of providers can recover their reasonable average costs.  The development of permanent rates and charges should account for the effects of inflation and continue to provide a waiver or other process by which providers can recover higher, but reasonable costs.

The Commission will once again have an opportunity to revisit site commission costs.  Securus reiterates its position that the Commission work with stakeholders to phase out site commissions in an orderly transition process that preserves the ability to offer beneficial programs for the incarcerated.  As long as site commissions are allowed, however, *GTL v. FCC* requires their recovery as a cost of doing business.  The Commission's reliance on the "used and useful" framework to limit or even eliminate site commissions is misguided.  The used and useful framework is utilized in rate of return regulation to determine which investments in plant and equipment to include in the "rate base."  The Commission here is not engaged in rate of return regulation and site commission costs are not plant and equipment for which providers seek

a return.  The framework is also unsuited in the unique context of incarcerated services where the customer that specifies the services and features required to provide communications services in its facilities is most often not the ratepayer.  Determining whether customer-required services and features are used and useful to the consumer ratepayer may lead to illogical results.

In setting rates, the Act requires the Commission to consider costs associated with safety and security measures necessary to provide a regulated communications service.  Commission precedent is crystal clear that the costs of safety and security measures such as recording, monitoring, biometrics and related services are inherent in the provision of communications services to the incarcerated.  Nothing has changed to overturn this precedent.  To the contrary, correctional authorities continue to require a suite of safety and security measures as an integral component of incarcerated calling services, as readily evidenced by their requests for proposals.  Failure to offer the requisite safety and security measures disqualifies a provider from serving that facility.  Moreover, these safety and security features inure to the benefit of ratepaying consumers because they help prevent fraudulent use of accounts and identify and deter potential criminal actions often targeted to other incarcerated persons or their loved ones.  These costs should continue to be recoverable from rates.

The Commission should preempt states from imposing different rate caps or charges than those adopted by the Commission.  The Commission has plenary authority over intrastate rates and must promulgate a compensation plan setting unitary intrastate and interstate fair, just and reasonable rates.  These rates will be based on detailed cost data that does not materially differ between intrastate and interstate services.  State rates inconsistent with those developed by the Commission are preempted by Section 276(c).  Lower state rates in particular may result in consumers in states conforming with federal rates subsidizing consumers in states with lower

rate caps.  Moreover, rate caps lower than those that the Commission has found to enable reasonable cost recovery undermine the primary policy goal of Section 276 to promote competition and widespread deployment of communications services to the incarcerated.  Rates below the levels that the Commission finds to be fair, just and reasonable may also be confiscatory, particularly if below a zone of reasonableness identified by the Commission.

Finally, although the Act confers new authority and obligations on the Commission, a number of existing issues are ready for decision and the Commission should move quickly.  One issue involves the ability to provide alternative rate structures.  The Commission has an ample record on this issue.  The Commission also has a sufficient record, which demonstrates strong support, for allowing enterprise registration for IP captioning services.  Promptly deciding that question will help providers properly allocate resources to implement the Commission's new disability requirements.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | |

## COMMENTS OF SECURUS TECHNOLOGIES, LLC

Securus Technologies, LLC (Securus) submits these initial comments in response to the Federal Communications Commission's (Commission) Notice of Proposed Rulemaking[1] to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (MWR Act or Act).[2]  Securus looks forward to working with the Commission as it implements the Act, which affords an opportunity to establish a more cohesive and universal framework governing the provision of regulated communications service to the incarcerated.

## I.      INTRODUCTION

Securus agrees with the Commission's assessment that the Act "fundamentally expands" the Commission's authority by reversing certain of the findings of the D.C. Circuit in *GTL v. FCC*.[3] Specifically, the Act provides authority to set rates for intrastate services and for video communications services, to employ both the fair compensation standard from section 276 and the just and reasonable standard under section 210(b) when setting rates, and to utilize industry

---

[1] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking and Order, FCC 23-19 (rel. March 17, 2023) (Notice).

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156.

[3] Notice at para. 13 (citing *Global Tel*Link v. FCC,* 866 F.2d 397, 404 (D.C. Cir. 2017) (*GTL v. FCC*).

1
**JA639**

cost averages. The Act reflects a compromise among a "diverse group" of organizations, including civil rights groups and the National Sheriffs Association.[4] Securus' comments are intended to reflect the nature of this compromise by recommending steps that will ensure that providers will continue to be able to make investments in next-generation communications infrastructure while also ensuring that consumer rates are just and reasonable.

### A.    The Structure of the Market Is Changing

The structure of the market for providing communications services to incarcerated persons has changed and continues to change. The change is in part due to regulation and fundamental revisions of policy at all levels of government, but also to innovation and the deployment of new technologies and avenues of communication. The days in which communication services consisted simply of a payphone attached to a wall are long gone in many facilities. Today, multifunctional devices, including new types of terminals and tablets that can or do enable voice calling, video calling and access to curated content, are proliferating. Providing these services over a single platform by a single provider fosters efficiencies and cost savings, as well as the opportunity in the future to further reduce costs by offering bundled discounts, much as commercial providers bundle voice, video and internet access at a discounted price. Providing services over a single platform reduces infrastructure costs by avoiding multiple providers each deploying potentially duplicative network facilities.

Securus has invested more than $140 million in each of the past four years in new infrastructure and equipment that enable the deployment of digital services such as streaming curated educational, vocational and entertainment content to Securus-provided tablets. The

---

[4] *See* 168 Cong. Rec. H10027 (statement of Rep. Pallone) (noting support from a "diverse group of organizations, including the Leadership Conference on Civil and Human Rights, the Color of Change, and the National Sheriffs' Association").

availability of digital services is helping incarcerated people bridge the digital divide that has long made correctional institutions among the most arid of digital deserts.

More state and local governments are eliminating site commissions, which have been a major driver of consumer costs. Even where site commissions remain, the Commission's restrictions on use of telephone service revenues to fund site commissions have curbed their adverse effects on the prices consumers pay. Securus has encouraged the Commission to take an even more aggressive stand and, working with all stakeholders, phase out site commissions in a way that does not unduly disrupt the welfare-enhancing programs site commission revenues often fund.

The elimination and restriction of site commissions removes or substantially lessens their distorting effect on the competitive bidding process. The Commission has long acknowledged that providers compete in a structured bidding process for the opportunity to provide service in facilities. The Commission has discounted this competition due to the presence of site commissions, which the Commission contends results in bidding up consumer prices so as to offer higher site commissions. The elimination or restriction on site commissions removes this impediment and the bidding process can be presumed to discipline prices as providers compete fiercely to win contracts.

**B.    The Industry Has Reduced Prices But Faces Inflationary Pressures**

Securus has moved aggressively to reduce prices consumers pay for services. Securus has lowered all of its intrastate rates to levels at or below the Commission's interim interstate rate caps. Today's inflationary environment is nevertheless having an impact on calling volumes. Rising costs for consumers means that some have had to cut back on the number of calls, even as rates have come down. This unfortunate circumstance reduces provider revenues at the same time that providers' capital and operating costs are increasing due to the same

inflationary pressures.  Securus has experienced double digit increases in the costs of inputs since 2021.  The Commission should take the effects of inflation into account as a factor in the methodology of developing permanent rates.

## II.      THE MWR ACT EXTENDS THE COMMISSION'S JURISDICTION TO VOIP AND VIDEO VISITATION SERVICES

Securus agrees with the Commission that the Act fundamentally expands its authority to regulate certain communications services.  This section of Securus' comments addresses the Act's extension of authority to regulate specified advanced services identified in the Act, namely VoIP and video  services.  Video services are fundamentally different than the traditional voice-only payphone services historically provided in carceral settings.  Securus looks forward to collaborating with the Commission as the Commission collects information regarding the nature of these services, how they are provided and priced, and developing an understanding of the costs of providing video services.

At the same time, the Act's expansion of authority is limited to the specific advanced services identified in the statute.  The Act does not extend the Commission's jurisdiction "over ratemaking to include all communications services for incarcerated people."[5]

### A.      The Act's Revised Definition of Payphone Service

The Notice appropriately seeks comment on the scope of the MWR Act amendments to Section 276, including the revised definition of payphone service, and proposes that the Commission broadly interpret the new definition.[6]  The Act expands the definition of payphone service to include, in addition to "inmate telephone service," four specific "advanced

---

[5] Notice at para. 43.
[6] *Id.* at paras. 29-36.  The Commission replaces "inmate calling services" or ICS, the term used for voice-only calling services, with a new term "incarcerated people's communications services" or IPCS to "refer to the broader range of communications services subject to the Commission's jurisdiction as a result of the [MWR] Act."  *Id.* at n. 37.

4

communications services" found at sections 3(1)(A), (B), (D) and (E) of the Communications Act:  (1) interconnected VoIP; (2) non-interconnected VoIP; (3) interoperable video conferencing service; and (4) any audio or video communications service used by incarcerated people to communicate with persons outside of the facility.[7]  The first three of these advanced services were added to the Communications Act by the Twenty-First Century Communications and Video Accessibility Act ("CVAA") and are incorporated by the Act into section 276 by reference. The last is added by the Act.[8]  As the Commission notes, the Act expressly excludes e-messaging services from the revised definition of payphone service.  Those services thus are not subject to rate regulation.[9]

The Commission refers to the range of services over which it has been given authority by the MWR Act as "incarcerated people's communications service" or IPCS.[10]  Securus appreciates the rationale behind the change in terminology from "inmate" to "incarcerated people."  Potentially more problematic is the replacement of "calling services" with the broader, and somewhat ambiguous term "communications services," which may engender confusion going forward.  At bottom, the Act confers regulatory authority over two categories of service.  One remains telephone services, clarified now to expressly include use of VoIP technology.  To maintain current usage while avoiding stigmatizing language, the Commission might consider calling these services "incarcerated calling services," which allows continued use of the ICS abbreviation.[11]  The Commission should also clarify that "audio" communications service refers

---

[7] 47 U.S.C. 153(1)).
[8] Act at 2(b).
[9] Notice at para. 29, n. 83.
[10] *Id* at  n. 37.
[11] There is no compelling reason to describe these services in relation to a specific set of consumers, particularly when the consumers of the service include non-incarcerated loved ones as well as other stakeholders such as correctional agencies.

to ICS whether based on traditional circuit-based technology or VoIP, or IP-enabled. The second class of services are, as described below, what the Commission has previously called video visitation services. The Commission could label these services as "incarcerated video services" or IVS. The reason for retaining the distinction between the two is to avoid any suggestion that they may be subject to the same regulatory framework when in fact they are quite different services.

The primary practical significance of the revised payphone service definition is to confer authority upon the Commission to regulate the rates and charges for what it has previously labeled "video calling, including video visitation" services, at least some of which the Commission had determined may qualify as ICS.[12] These services enable an incarcerated person to communicate using video technology with friends, family or loved ones either remotely or at the correctional institution. The *2015 ICS Order* required providers to include information regarding "video visitation services, either as a form of ICS or not," in their annual reports.[13]

The D.C. Circuit vacated the requirement to report on video visitation services because the Commission had not explained "how its statutory authority extends to video visitation services as a 'communication by wire or radio' under §201(b) for interstate calls or as an 'inmate telephone service' under §276(d) for interstate and intrastate calls."[14] As part of the MWR Act's reversal of *GTL's* preclusion of Commission authority, the Act overturned this particular finding and expressly confers jurisdiction on the Commission to regulate video calling, including video

---

[12] *Rates for Interstate Inmate Calling Service,* WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12902, para. 296 (2015) (*2015 ICS Order or 2015 ICS Notice*). The Commission described "video calling" as "another way for inmates to make contact with the outside world in addition to in person visits and ICS telephones hanging on the wall." *Id.* at 12903, para. 298. "Video visitation" also refers to using video technology at the facility to visit with the incarcerated person. *Id.* at 12904, para. 298.
[13] *2015 ICS Order,* 30 FCC Rcd at 12891-92, para. 267.
[14] *GTL v. FCC,* 866 F.2d at 415.

visitation services.  It is reasonable to interpret "video communications" as meaning video calling and video visitation services and these comments use those terms interchangeably with "video communications" unless specifically noted.

### B.     New Subsection 3(1)(E) Provides Authority over Remote Video Visitation Services

New subsection 3(1)(E) adds to the definition of advanced communications services "any audio or video communications service used by inmates for the *purpose of communicating with individuals* outside the correctional institution where the inmate is held, regardless of technology used."  The plain statutory language limits this provision to voice-only calling or remote video calling.  The audio or video communications service must be used to communicate remotely with an incarcerated person's friends, family or loved ones, attorney or another authorized person.  Section 3(1)(E) serves the purpose of authorizing the Commission to regulate the rates for remote video calls so as to ensure that they are fairly compensatory and just and reasonable.[15]

The Commission's primary interpretive focus with respect to section 3(1)(E) is whether it extends to video visitations at the facility.  On-site video visitation service should be viewed as complementary to, and not in lieu of, in person site visits.  Securus does not charge for on-site video visitations and is not aware of other providers assessing fees for on-site visitations.  The Commission seeks comment on whether section 3(1)(E) could include on-site visitations if the visitor is in a section of the facility not used for confinement purposes.[16]  Such an interpretation would appear inconsistent with the intent of section 3(1)(E) to regulate as necessary the rates for *remote* video calling (*i.e.,* a communication with someone that is outside of the correctional

---

[15] *See* 168 Cong. Rec. H.10027 ("Whether a simple phone call or video chat, staying in touch with a friend or loved one down the street or across the country is incredibly meaningful")(Comments of Rep. Pallone); *id.* at H10027 (comments of Rep. Jackson emphasizing importance of "family connectedness").
[16] Notice at paras. 33-34.

institution.)  This approach may also be impractical to implement given different facility designs and designated areas where incarcerated persons or visitors are allowed.  Nor is it clear that on-site video visitation services require Commission oversight as the industry has no history of charging for such services.   Should the Commission determine that rate regulation for on-site video visitation is necessary, authority may be conferred by subsection 3(1)(D) if on-site visitation constitutes an interoperable video conferencing service, which is discussed below.

### C.    The Commission Must First Define "Interoperable" In Order to Determine the Scope of Interoperable Video Conferencing Services

The Notice seeks comment on the scope of video services that may be included within interoperable video conferencing services or IVCS, which is one of the advanced communications services added to the Communications Act by the CVAA and incorporated by reference in the MWR Act.  Specifically, the Notice seeks comment on which video services may fall within the statutory definition of IVCS as "a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing."[17] In the context of implementing the CVAA, from which this definition derives, the Commission has made clear that the term "interoperable" must be independently defined in order to identify the types of services that qualify as an interoperable video conferencing service.  As it previously recognized, failing to define "interoperable" impermissibly reads the term out of the statute. [18] In the absence of a Commission adopted definition of "interoperable," it is difficult to identify which video services made available to incarcerated persons qualify for potential rate regulation.

---

[17] *Id,* at para. 30 (quoting 47 C.F.R. § 153(27)).
[18] *Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010*, 26 FCC Rcd 14557, 14577,, para. 47 (2011). (*CVAA Order*).

Apart from the question of what constitutes an interoperable video conferencing service, Securus concurs with the Commission's proposal that the limiting phrase "used by inmates for the purpose of communicating with individuals outside the correctional institution," does not apply to interoperable video conferencing services in section 3(1)(D). To the extent they are interoperable, on-site visitation services may qualify as video conferencing services because on-site video visitation services enable real-time communication of information of the user's choosing.

### D. The Act Does Not Confer Authority to Regulate Streaming Services

Although the Act expands authority to regulate the rates and charges for video services as described above, it cannot be read to confer broader authority over every kind of service provided to incarcerated persons that may include an audio or video component.[19] For example, the Act does not confer authority for the Commission to regulate the rates and charges for streaming curated educational, vocational, religious or entertainment content to incarcerated persons over closed systems.[20] The Commission has never asserted authority to regulate internet content and the MWR Act does not confer such authority in relation to IPCS. Services that enable incarcerated persons to access movies, educational content, vocational content or other forms of streaming content fall outside the definition of the advanced services added to section 276, including interoperable video conferencing services.

---

[19] The MWR Act includes within the definition of payphone services telephone calls using VoIP technology. The Commission, however, has never distinguished its rate regulation over voice telephony for incarcerated persons based on the use of traditional circuit switched or VoIP technology. *See 2015 ICS Order*, 30 FCC Rcd at 12885, para. 250, n. 878 (finding that the use of VoIP does not affect the Commission's authority under section 276).

[20] To the best of Securus' knowledge, no IPCS provider enables unfettered access to the internet.

III.    **STANDARD FOR RATEMAKING**

Section 276 states an overarching goal of promoting competition among payphone providers and the widespread deployment of payphone services. To achieve these goals in the context of communications services to incarcerated people, the Act directs the Commission to develop rates and charges that ensure payphone service providers are fairly compensated and that rates are just and reasonable for consumers.

A.    **The Commission Must Ensure That the Rates It Sets Fairly Compensate Providers and Are Just and Reasonable for Consumers.**

Although the Act eliminated the per call requirement, it expressly retained the requirement that providers be fairly compensated for "completed intrastate and interstate communications." The Commission cannot read this requirement out of the statute and must give it effect. Although the Commission finds it "difficult to discern what the 'fairly compensated' requirement adds to the 'just and reasonable' requirement" in the context of services for incarcerated people, the standards are not conterminous and serve fundamentally different purposes.[21] The Commission must thus strive to accommodate and reconcile both standards.

1.    **The Definition and Application of the Fairly Compensated Standard in the Context of Commercial Payphone Service**

As the Commission has recognized, neither section 276 nor its legislative history makes clear what Congress meant by the phrase "fairly compensated" except that it must be determined in a way that promotes competition among payphone providers (or in this case among providers of communications service to incarcerated persons) and that promotes the widespread deployment of payphone services (again, in this case, the widespread deployment of

---

[21] *GTL v. FCC*, 866 F.3d at 409.

communications services to incarcerated people).[22]  The Commission has held, and the courts agree, that a provider is fairly compensated when it is able to negotiate a rate.  At that point, the Commission's work is done.[23]

There are several other pertinent findings from the Commission's previous application of the fair compensation standard.  One is in the area of state preemption.  In its First Payphone Order, the Commission interpreted the fair compensation standard as authorizing it to preempt state regulation of local coin calls (where a customer inserts coins into the payphone to make a local call) that the Commission was concerned would be set too low by the state.[24]  The Commission found the market for local payphone coin calls to be sufficiently competitive to deregulate prices that historically were set by the states.  Due to the historical structure of the market, some states had set local coin rates very low.  To ensure its deregulatory policy would ensure fair compensation, the Commission barred states from setting rates.  The Commission's preemption of state regulation over local coin rates was sustained by the D.C. Circuit in *Illinois Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555 (DC Cir. 1997), which also found that deregulation was an acceptable compensation plan.[25]  In sum, one teaching from the commercial payphone

---

[22] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Third Report and Order, Order on Reconsideration of the Second Report and Order, 14 FCC Rcd 2545, 2569, para. 54 (1999) (*Third Payphone Order*).

[23] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Report and Order, 11 FCC Rcd 20541, 20568, para. 52 (1996) (*First Payphone Order*) (fair compensation is "where there is a willing seller and a willing buyer at a price agreeable to both.")  *GTL v. FCC,* 866 F.3d at 410 ("whenever a [payphone provider] is able to negotiate for itself the terms of compensation for the calls its payphones originate, then [the Commission's] statutory obligation to provide fair compensation is satisfied)(quoting *First Payphone Order*, 11 FCC Rcd at 21269).

[24] *First Payphone Order*, 11 FCC Rcd at 20571, para. 58 (noting that states typically regulate local coin rates and may set rates too low because they may have been subsidized by other local exchange carrier services).

[25] 117 F.3d at 563 ("A market-based approach is as much a compensation scheme as a rate-setting approach.").

cases is that the Commission may preempt states from setting rates that would not result in fair compensation as set forth in its compensation plan.

Another potentially relevant set of findings stem from the Commission's development of a payphone rate where the market could not be counted on to provide fair compensation through negotiation. This was the rate for so-called dial around long distance calls. The Commission established a rate that would ensure cost recovery for payphones in low call volume locations.[26] The Commission recognized that setting a rate to ensure cost recovery for low call volume locations would result in above-cost recovery at high volume locations, a result due to high fixed costs and the requirement to ensure recovery for each and every call. The solution to this problem was not to lower rates to the point that low volume locations could not recover their costs (which would undermine the goal of payphone service deployment) but, if necessary, to use a competitive bidding process to select the payphone provider or otherwise encourage competition.[27] By analogy, the Commission should ensure that providers serving low call volume carceral facilities, those with small average daily populations, should be allowed to recover their costs. To avoid the possibility that high volume carceral settings might be overcompensated, notwithstanding the existence of a competitive bidding process, the Commission should adopt a tiering mechanism as it has in previous orders.

Another fundamental tenant of the Commission's application of the fairly compensated standard was that the cost of one service should not be cross subsidized by another. [28] This

---

[26] *Third Payphone Order*, 14 FCC Rcd at 2551-52, paras. 13-15. This conclusion was upheld by the courts. *American Public Communications Council v. FCC*, 215 F.3d 51 (D.C. Cir. 2000).

[27] *Illinois Public Telecomm. Ass'n v. FCC*, 117 F.3d 555, 562 (D.C. Cir. 1997) (citing *First Payphone Order*, 11 FCC Rcd at 20573, para. 61.),

[28] *Third Payphone Order*, 14 FCC Rcd at 2566, para. 45 (stating the general rule that regulated service should not cross subsidize each other); *Id.* at 2570, para. 56 ("consumers making one type of call, such as a local coin call, should not pay a higher amount to subsidize consumers that make other types of calls, such as dial-around or toll-free calls").

concept, which is also fundamental to rate regulation generally, should inform the Commission's IPCS rate determinations.  Rate caps for voice only services and for video communications should be set a level where each is able to recover its costs and contribute a proportionate share to common costs.  Voice services should not be required to subsidize video calling and vice versa.

2. **The Commission's Previous Assessments of The Meaning of Fairly Compensated in the Context of Payphone Service to Incarcerated Persons**

In a 2002 order, the Commission grappled with the meaning of fairly compensated in the context of "inmate telephone service" and a request by certain providers that the Commission either preempt state rate caps on operator services that were preventing them from recovering "the high costs of inmate calling services" or, alternatively, provide an additional compensation amount on top of the state's rate caps.[29]  The Commission there interpreted "fairly compensated" to require that "costs must ultimately be recovered" but would not mandate a particular method of cost recovery.[30]  Instead, it articulated a standard in the negative:  "Unless an ICS provider can show that (i) revenue from its interstate or intrastate calls fail to recover, for *each* of these services, both its direct costs and some[31] contribution to common costs, or (ii) the *overall* profitability of its payphone operations is deficient because the provider fails to recover its total

---

[29] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Order on Remand and Notice of Proposed Rulemaking, 17 FCC Rcd 3248, 3254 (2002) (*2002 ICS Order*).  At the time, virtually all calls from prison payphones were collect calls using live operators and hence subject to state rate caps on operator services.  *See id.* 17 FCC Rcd at 3261, para. 31 (pursuant to state authority to regulate intrastate operator (OS) services, "states place caps on local collect calling  -- collect calls cannot be made without OS; therefore, the power to regulate OS is the power to regulate collect calls.").

[30] *2002 ICS Order*, 17 FCC Rcd at 3258, para. 23.

[31] The Commission did not prescribe how much the revenue of a service must contribute to common costs, other than concluding each service need not make the same contribution to common costs.

costs from its aggregate revenues (including both revenues from interstate and intrastate calls), then we would see no reason to conclude that the provider has not been fairly compensated."[32]

The Commission also effectively disclaimed the requirement that providers be fairly compensated for each and every call.[33] The Commission grounded this interpretation in the Communications Act's policy goal of creating a "pro-competitive, de-regulatory national policy framework." In reality, the Commission was clearly animated by a view that *all* prison payphone operations must be profitable because they all pay site commissions, which the Commission at that time decided were profits, not costs.[34]

### 3.     The Fair, Just and Reasonable Standard

Beginning in 2012, the Commission revisited incarcerated people's calling services rates and articulated a fair, just and reasonable standard combining the fair compensation directive of section 276 with the just and reasonable standard in section 201(b).[35] In the *2013 ICS Order*, the Commission stated that the fair compensation requirement permits a wide range of compensation rates, that the interests of both consumers and providers should be taken into account, and that rates should be cost based. The Commission reaffirmed the fair, just and reasonable standard in the *2015 ICS Order*. The D.C. Circuit, however, overturned this standard finding that it

---

[32] 17 FCC Rcd at 3258, para. 23. (emphasis in original).

[33] *Id.* at 3257 at para 23. (concluding that section 276 "does not require *every* call to make an identical contribution to shared and common cost.") (emphasis in original). The Commission has not actually sought to ensure that providers are compensated for each and every call, recognizing that requirement is impracticable. Instead, it has sought to identify costs at the contract or facility level. Thus, the MWR Act's elimination of the per call requirement has little practical significance. *See* Notice at paras. 15-16.

[34] *2002 ICS Order,* 17 FCC Rcd at 3526, para. 19 ("[C]onsidering that ICS providers offer commissions, prison payphones are already profitable" and "[a]ny increase in inmate calling services' revenue to permit a larger contribution to common costs will not encourage it to provide more payphones but will only encourage higher location commissions."); *id.* at para. 27 (because providers must offer site commissions to win a contract, the relief sought would not increase the providers' revenues because any revenue would likely be passed on to the correctional authorities through higher site commissions.)

[35] *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107, 14114, at para 13 (2013) ("The Communications Act requires ICS rates, charges, and practices to be just, reasonable and fair.") (*2013 ICS Order*).

"ignore[ed] that terms of § 276" and impermissibly "conflates two distinct statutory grants of authority into a synthetic 'just, reasonable and fair' standard."[36] The Court also held that the Commission's finding that it must take consumer interests into account when implementing section 276 was "unfounded."[37]

The *2021 ICS Order* once again relied on a combination of the fair compensation standard and the just and reasonable standard to set interim rate caps. Whether the Commission's approach would have been upheld if challenged is now academic because the MWR Act expressly authorizes the Commission to ensure that rates are both just and reasonable and fairly compensate providers for completed communications. One interpretation of the MWR Act is that the Commission is now authorized to apply a methodology that balances the interests of both providers and consumers. In doing so, however, the Commission must give effect to both the fair compensation prong and the just and reasonable prong and not simply assume that the requirement of "fair compensation" adds nothing to the just and reasonable standard.[38] For one, the fair compensation standard does not necessarily incorporate concepts sometimes associated with a just and reasonable standard such as determining whether utilities are allowed to obtain a return on investments only if found to be "used and useful." The primary function of the fair compensation standard is to ensure that providers recover the costs they incur, including of course the costs to deploy infrastructure, as well as site commissions payments that correctional authorities require as a condition of providing service.[39]

---

[36] *GTL v, FCC*, 866 F.3d at 409.
[37] *Id.*
[38] Notice at para. 15.
[39] *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 16629, 16632, para. 5 (2012 (*2012 ICS Notice).* ("To have a realistic chance of winning a contract, the bidder must include an amount to cover commissions paid to the inmate facility.")(quoting *2002 ICS Order,* 17 FCC Rcd at 3252, para. 10.) *See GTL*, 866 F.3d at ("site commissions are obviously costs of doing business incurred by ICS providers.").

### B.     General Standard for Just and Reasonable Ratemaking

In *Fed. Power Commission v. Hope Nat. Gas Co*, the Supreme Court articulated a general standard for rate making when implementing a just and reasonable framework.  The *Hope* standard assesses the end result of the process rather than necessarily reviewing each step of the methodology employed.[40]  Under *Hope* the end result is constitutionally acceptable if the rate is just and reasonable, which involves a balancing of investor and consumer interests.[41]  With respect to the investor interest, *Hope* held that the investor "has a legitimate concern with the financial integrity of the company whose rates are being regulated."  The rates adopted must ensure "that there be enough revenue not only for operating expenses but also for the capital costs of the business," which includes "service on the debt and dividends of stock."  The allowed return to the investor "should be commensurate with returns on investment in other enterprises having corresponding risks" and "be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital."[42]

*Hope's* articulation of the investor interest echoed the Supreme Court's earlier decision in *Bluefield Waterworks Co. v. Public Service Comm'n of West Virginia*, which held that the return allowed to the regulated utility "should be reasonably sufficient to assure confidence in the financial soundness of the utility" and be adequate to "maintain and support its credit and enable it to raise money necessary for the proper discharge of its public duties."[43]

---

[40] 320 U.S. 591, 601 (1944) ("Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling.")  As stated in *Jersey Central III*, however, the court "must assure itself *both* that 'each of the order's essential elements is supported by substantial evidence' *and* that 'the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177 (D.C. Cir. 1987) (*Jersey Central III*) (emphasis in original) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968)).
[41] *Id*. at 603
[42] *Id*.
[43] 262 U.S. 679, 692-93 (1923).

The courts have generally upheld a rate as just and reasonable if it falls within a zone of reasonableness, the lower bound of which identifies the rate necessary to avoid confiscation and the upper bound identifies the point at which rates become excessive.[44]  This traditional articulation of the zone of reasonableness appears different from that used in the *2021 ICS Order*.  There, the Commission identified a zone of reasonableness bounded at the upper end by industry average costs as reflected in collected data without adjustment and the lower end reflected costs after various adjustments to cost data the Commission deemed untrustworthy.  If, however, the Commission intended its zone of reasonableness to coincide with the traditional articulation of the concept, rates below the lower bound set in the *2021 ICS Order* should be considered confiscatory.

Coinciding with these general tenants of just and reasonable ratemaking is the specific statutory standard that providers be fairly compensated, which should provide additional assurance that regulated rates enable sufficient revenue generation from the regulated service to ensure that each service recovers its own costs plus contributes a proportionate share to joint and common costs on a fully distributed basis.

In terms of actual implementation, Securus interprets the MWR Act as giving the Commission authority to utilize the same *general* methodology it applied in the *2021 ICS Order*, subject to the MWR Act's specific instructions to consider the costs of safety and security measures, cost differences based on facility size, and the average costs of individual providers as well as industry average costs.

---

[44] *Jersey Cent. III,* 810 F.2d  at 1177 (D.C. Cir. 1987) ("[T]here is a zone of reasonableness within which rates may properly fall.  It is bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates.")(quoting *Washington Gas Light Co. v. Baker*, 188 F.2d 11, 18 (D.C. Cir. 1951) (J. Bazelon).)

### C.  The MWR Act Expressly Authorizes the Commission to Utilize the Industry-Average Cost Methodology Adopted in the *2021 ICS Order*

The MWR Act expressly enables the Commission to continue the general approach it took in setting interim rate caps for voice services, which involves capping per minute rates based on industry average historical cost data and applying a mechanism, such as applying one standard deviation, to enable most providers to recover costs.  The Commission should continue with this general approach, including adopting a process such as adding one or more standard deviations from the mean (or using an interquartile range) to set rates at a level where providers can recover their average costs and continue investing in new technology.  This is compelled both by the requirement that providers be fairly compensated and that the Commission is authorized to assess both industry average costs and individual company average costs.

In applying the existing methodology, the Commission should adhere to several basic principles consistent with certain of its previous findings:

*Interstate and Intrastate Costs Do Not Vary*: As suggested in the Notice, the Commission should continue to apply a total cost approach that includes both interstate and intrastate costs because there are no material differences in providing interstate and intrastate voice-only services.[45] Similarly, the costs of providing video communications services does not vary between interstate and intrastate services to a degree that warrants setting different intrastate and interstate video communications rate caps.  Any rate caps the Commission adopts should apply equally to interstate and intrastate services thus creating a unitary rate.

*Avoid Provider-by-Provider Rates and Adopt Appropriate Tiering*.  The Commission has to date never sought to set any payphone service rates on a provider specific basis and there is no

---

[45] Notice at paras. 43-44.

reason to do so now.[46]  Setting different rate caps for different providers in a bidding market would lead to competitive distortions.  To the extent costs differ among efficient providers, it is likely due to the type of facilities they serve.  A provider that exclusively or primarily serves smaller jails particularly in more rural areas is likely to have higher average per unit costs than a provider that serves a diverse array of facilities.  These cost differences, however, are best addressed through appropriate tiering of rates to reflect differences in average costs of providing services to different types or sizes of facilities.  Securus continues to believe it is appropriate to set different caps for prisons and jails and that Average Daily Population at the facility level is a useful proxy for differentiating among jails.  Tiering based on size is fully consistent with the MWR Act, which directs the Commission to consider differences in costs "by small, medium or large facilities or other characteristics."[47]  To the extent cost data reflects differing per unit costs at different types or sizes of facilities, faithful adherence to the MWR Act requires adoption of rate tiers.

    *Rates Should Enable Regulated Service Cost Recovery Without Subsidization from Other Services.*  As reflected in the Notice, when evaluating the effect of regulated rates on the regulated company, "courts do not consider the profitability of a company's nonregulated lines of business."[48]  It would thus be unlawful for the Commission to set a rate for voice or video communications that did not permit each to recover their costs on the assumption that a company's profits from unregulated services, such as e-messaging or streaming content, would make up a shortfall.  In a similar vein, the result of the rate making process should not permit ultra-low rates in one state that may need to be subsidized by the ratepayers of another state.

---

[46] *Id.* at para. 40 (seeking comment of whether to set separate caps for different types of providers or for individual providers).
[47] Act at 3(b)(2).
[48] *2021 ICS Order*, 36 FCC Rcd at 9587, para. 153.

*Above Average Cost Providers Must Have an Opportunity to Seek Relief.* The Commission has consistently included in its rate decisions a mechanism, such as a waiver, for providers with demonstrably higher than average costs to avoid an applicable price cap. Securus recommends continuation of a reasonable waiver process that affords a provider a timely relief if it can demonstrate that its reasonable costs either on a company-wide basis or contract basis exceed Commission rate caps.

*Rate Caps Must Accommodate Inflation.* Setting permanent price caps in an inflationary environment is not sustainable. The Commission recognized this fact when developing its price cap regime for other carriers. The price caps included adjustments for inflation and exogenous costs along with offsets for productivity increases. The Commission need not completely mimic its other price cap regimes but it should avoid adopt some mechanism to adjust for increasing costs due to inflation. Moreover, the Commission should take into account the effect of inflation when basing rates on historical costs. For example, the three-year period of 2019-2021 covered by the Third Mandatory Data Collection was primarily a time of low inflation, which began to sharply accelerate toward the end of that period. Historical cost data should be adjusted to reflect high inflation that has occurred since the data collection period.

## IV. THE COMMISSION SHOULD SET DIFFERENT RATES FOR AUDIO AND VIDEO COMMUNICATIONS.

Traditional "inmate telephone service" and video visitation service are substantially different. They have different cost structures, use different technologies, and are offered, at least by Securus, in a different manner than traditional voice-only calls.[49] As a result, Securus urges the Commission to adopt separate rate caps for each service should it determine that rate

---

[49] Notice at para. 41 (seeking comment on whether "the costs of providing audio and video services vary significantly" and whether the costs of ancillary services vary when used with audio or video services.)

regulation of video communications is necessary.  The Commission should also delineate the circumstances under which rates for one type of service apply versus the other.  For example, a provider should not initiate a communication as a video call and then convert it to a voice-only call yet continue to charge video calling rates.  To prevent gaming, the Commission should specify when rates apply to different services as definitively as possible.

There is no need to set different ancillary service rate caps for voice and video communications.  Ancillary service fees are largely designed to recover the costs involved in funding accounts, which are the same for voice-only and video communications services.

## A.     Securus' Video Visitation Service – Securus Video Connect

Securus' web-based video service, called Securus Video Connect or SVC, is far different than its standard voice-only service.  SVC enables incarcerated people to have a video session with a loved one virtually anywhere in which the remote party has a Wi-Fi or cellular data connection.  Securus currently provides SVC at more than 650 facilities.

Where available, incarcerated persons access SVC through enhanced wall-mounted terminals or by using tablets.  The friends and family that wish to engage in video communications must first install free software provided by Securus on their device: a computer, laptop, tablet or smartphone. This software creates an application, just like FaceTime or Google Duo, which enables the establishment of the video and audio streamed connection.  Unlike voice-only calls that can be made anytime by an incarcerated person subject to calling time restrictions imposed by the facility, a Securus video session must be scheduled in advance due to the limited number of video-enabled kiosks deployed at many of the facilities.

The camera and functions native to the remote party's device must be synchronized with the equipment and software at the facility.  To initiate the video session, the remote party must send an IP address to Securus in order to enable the connection.   To provide the service, Securus

has also invested in equipment and software at the facility to compress and encrypt the video and audio signals.  Securus' service must then un-compress and decrypt the video and audio packets to enable viewing and listening on the remote party's device.  Moreover, if the remote party's device utilizes different codecs native to the operating system running their device, Securus must convert the video signal from one codec to another.

SVC service also bundles a number of related features. Securus' SVC application includes the ability: (1) of loved ones to view a schedule of upcoming video sessions; (2) to synchronize the details of an upcoming video session with the remote party's online calendar, such as Outlook; (3) to receive notifications regarding upcoming video sessions; and (4) to run tests of their Wi-Fi or cellular data connections to assess video quality.[50]

Securus' video service must also be capable of providing many of the same security functionalities required with voice-only services, such as monitoring and recording sessions. Unlike voice-only services, where Securus has enabled automatic transcription of a call preventing the need to listen to a call or a recording of the call, video calls currently require monitoring of the session.  The specific nature of the service and related security functions are often described in the RFPs issued by correctional authorities.

Securus also prices SVC differently than its voice-only product which, consistent with Commission rules, is priced on a per-minute basis.  SVC is priced on a flat rate per session basis subject to time limitations set by the correctional authorities.  It has been Securus' experience that SVC sessions almost always take the full amount of time allocated.  Securus also provides on-site visitation services at a number of facilities.  Securus does not charge for on-site visitation services.

---

[50] *See* Securus App, https://securustech.net/mobile/index.html (last visited Jan. 27, 2022)

**B.    Video Visitation Service Costs Are Substantially Different Than Voice-Only Services.**

As may be inferred from the preceding discussion, the capital and operational costs of providing SVC are substantially different than for stand-alone voice services.  A number of additional costs are incurred, including the development costs of the application software downloaded on loved ones' devices, different or more costly software to enable recording and monitoring, increased equipment costs for providing terminals or other devices capable of providing SVC, costs to deploy WiFi in the facility, and increased transport and storage costs as video communications take more bandwidth than voice-only communications.  Unlike voice service, which is a mature technology, video services are still relatively new and evolving.  Securus has and continues to improve the quality and functionality of its video services and is exploring additional features.

Consumers are able to fund accounts to prepay for SVC just as they can for voice-only services.  Consumers are assessed the same ancillary service charges that apply when funding an account for voice-only services.  There is thus no reason to set different rate caps for ancillary services used in relation to video communications.

**C.    The Commission Should Provide Flexibility to Use Different Pricing Plans for Video Communications, Including Bundling of Services**

The Commission should allow consumers to benefit from different pricing options that maximize the opportunity for them to stay connected using video technology.  To accomplish this, providers need flexibility in the way video communications are priced.  Securus concurs with the Commission's conclusion that nothing in the MWR Act bars use of different pricing structures.  As noted above, Securus prices its SVC on a per-session basis and it has received no complaints regarding this pricing format.  Other providers utilize per-minute pricing for their video communications services.  The Commission should permit flexibility in pricing models.

## V.     THE TREATMENT OF SITE COMMISSION PAYMENTS

### A.     Securus' Position on Site Commissions

Securus' comments in response to the Fifth Further Notice, which are incorporated by reference, articulated the company's position on site commissions.  Securus shares the view of many of the advocacy groups that "the use of site commissions is inimical to the shared goals of all stakeholders of improving access to, and affordability of, communications services for incarcerated persons and their families."[51]  Securus has thus publicly called for the elimination of site commissions, noting their impact on consumer costs.  Securus offers commission-free options in response to RFPs and is working with corrections agencies to remove site commissions and has pledged to pass savings from the elimination of site commissions through to consumers.

Neither unilateral action by Securus nor any other individual provider can solve the distortions caused by site commissions.  It requires coordinated action by all stakeholders to ensure that the elimination of site commissions is accomplished in a way that protects welfare-enhancing programs funded by commission revenues.  Securus has urged the Commission to take the lead and tackle the issue head on through preemption of site commissions rather than indirectly through caps on revenues from regulated services that be used to fund them.  The Commission's rate cap approach results in potentially inconsistent interpretations of its rules resulting in an unlevel playing field.[52]  The reality is that many local governments continue to

---

[51] Securus Fifth Further Notice Comments at 13 (filed Sept. 27, 2021).

[52] Securus petitioned the Commission to issue a clarification of its facility-related rate component requirements to ensure consistent interpretation and application.  Securus Technologies, LLC, Petition for Clarification, WC Docket No. 12-375 (filed Sept. 17, 2021).  The Commission, however, has not sought comment on Securus' petition.

rely on site commission revenues and providers that refuse to offer them will lose business and it imperils the availability and affordability of services to incarcerated individuals.

Securus reiterates its recommendation for the Commission to either uniformly bar providers from entering into contracts requiring site commissions or to preempt site commissions provided that the Commission include a transition period that provides state and local governments time to identify alternative funding sources.[53]  As long as site commissions are allowed and correctional authorities demand them in their RFPs, however, site commissions are a "cost of providing service" and their categorical exclusion "cannot be easily squared with the requirements of § 276 and § 201."[54]  The Commission's reliance on the "used and useful" framework for limiting or eliminating site commission payments from regulated rates defies the D.C. Circuit's opinion and misapplies the "used and useful" standard.

### B.    The Used and Useful Framework is Not an Appropriate Basis to Restrict or Eliminate Site Commissions

The *2021 ICS Order* applied the used and useful framework to determine whether providers should be allowed to recover site commission costs from regulated services.  The framework, however, is wholly unsuited for this purpose and the Commission's effort to shoehorn it into its determination of appropriate site commission recovery leads to illogical results.  For one, the used and useful concept potentially leads to unreasonable outcomes where the entity that sets the requirements for service, the correctional institution, is different from the "rate payer."  As the direct customer of the service, the correctional authority prescribes the features and functions it deems necessary to provide the service in its facilities.  The utility, in this case the IPCS provider, is not making unilateral determinations regarding the investments in

---

[53] Securus Fifth Further Notice Comments at 16-17.
[54] *GTL v. FCC*, 866 F.3d at 397.

plant and equipment needed to provide service.  It is responding to the requirements of its customer in terms of equipment, network facilities, operations and services as stated in requests for proposals.  To be sure, providers invest in new technologies and services as necessary to meet customer demands, and, like any provider of services, they may invest in new technologies or features designed to improve the customer's ability to carry out its duties.  Many of the customer-mandated requirements inure to the direct benefit of the "rate payer," such as educational programs financed by site commissions or anti-fraud measures designed to prevent unauthorized use of a debt or prepaid account.  But to suggest that all customer-mandated service features that they find used and useful must inure directly to the benefit of each caller or their friends and family is untenable.

The used and useful standard is inapplicable for the further reason that it is a feature of rate of return regulation used to identify investment in plant and equipment for which the regulated utility may receive a return.  The Commission has disclaimed use of rate of return regulation to set incarcerated communications services rate caps and it is not applying the used and useful framework to preclude a return on plant and equipment.

Rate of return regulation is relatively formulaic.  Its goal is to determine a utility's revenue requirement, which, when divided by units of service, results in a rate.  The revenue requirement is the sum of operating expenses plus the rate base multiplied by the rate of return on equity allowed by the regulator.[55]  The role of the used and useful framework is to determine the rate base, defined as net investment in plant and equipment.[56]  The used and useful

---

[55] *American Tel. and Tel. Co.,* Phase II Final Decision and Order, 64 FCC 2d 1, at para. 108 (1977) (*AT&T Phase II Order*)

[56] The Commission has defined the rate base as

. . . the net (or depreciated) valuation of the public utility's tangible property comprising the plant and equipment used and useful in serving the public. . . . In addition, the rate base includes an allowance for working capital, and, depending on the circumstances may also include amounts for the overhead costs of

framework plays no role in determining appropriate operating expenses, such as site commissions. Providers are allowed to recover operating expenses, unless totally unrelated to the provision of service or excessive, but no return is attached to them under rate of return regulation.[57] Operating expenses are not part of the rate base.

The Commission has never sought to determine the rate base of ICS providers and it does not propose to do so now.[58] In fact, it has steadfastly claimed it is not engaging in rate of return regulation at all when setting the rates caps for incarcerated people's communications services.[59] Instead, the Commission has opted to utilize a form of price caps, a rate methodology found superior in many ways to rate of return regulation with its built-in incentives for "gold platting" while discouraging productivity enhancing investments.[60] A review of the historical development and application of the use and useful framework illustrates its inapplicability to issue of site commission cost recovery.

1.    **History and Application of the Used and Useful Framework**

The used and useful framework has its origins in the "fair value" cases that followed the Supreme Court's decision in *Smyth v. Ames*, which for first time sought to develop a cohesive

---

organizing the business, intangibles and going concern value." *AT&T Phase II Order*, 64 FCC 2d at 38, para. 111.

[57] *See, e.g. AT&T Communications Revisions to Tariff F.C.C. Nos. 1, 2, 11, 13, and 14*, Memorandum Opinion and Order, 5 FCC 5693 (1990) (excluding billing expenses found to be unnecessary, excessive, inefficient and improvident, and hence not of benefit to the ratepayer.)

[58] This is not to say the Commission has not sought to determine the costs the providers incur in deploying infrastructure. It has not sought to value a rate base using a used and useful framework.

[59] *See, e.g., 2013 ICS Order*, 28 FCC Rcd at 14134, n. 195 ('we are not imposing rate-of-return regulation on ICS providers.").

[60] *See Policy and Rules Concerning Rates for Dominant Carriers*, Second Report and Order, 5 FCC Rcd 6786, 6789-91 (1990) (describing advantages of price cap regulation over rate of return regulation). Rate of return regulation encourages over investment because it guarantees a return on the investment at least to the extent used and useful. By simply setting a price, on the other hand, price cap regulation encourages innovation and productivity enhancements because the utility may retain as profits any reduction of costs.

theory to protect companies from public expropriation of their property through rate regulation.[61]

Under this line of cases, regulators valued the rate base on its current value, not the property's

actual cost to investors, and in that context used and useful has been described as an "inventory

of currently operative items of physical plant" devoted to public use.[62]  The complexity of

attempting to determine the current value of plant comprising the rate base – and the circularity

of a valuation methodology that depended on the result of the ratemaking process (the property is

more valuable if the utility is afforded a higher return) – led to the demise of the fair value

methodology at least in some settings.[63]

　　　　Disgruntlement with fair value rate making led to the evolution of another method to

determine the rate base, the prudent investment rule, which was perhaps best articulated by

Justice Brandeis in his dissenting opinion in *Southwestern Bell Telephone v. Public Service

Comm'n*.[64]  The prudent investment rule, which the D.C. Circuit has described as "far more

sensible" than the used and useful framework, is designed to protect the capital supplied by

investors, not the utility's property as currently valued.  As stated by the D.C. Circuit, "with the

demise of "fair value," "used and useful" ceased to have any constitutional significance . . . . [i]t

is now simply one of several permissible tools of ratemaking, one that need not be, and is not,

employed in every instance."[65]

　　　　Consistent with this history, the Commission has applied the used and useful framework

in the context of rate of return regulation to determine whether investments in plant should be

---

[61] 169 U.S. 466 (1898).  *See* James J. Hoecker *Used and Useful: Autopsy of a Rate Making Policy,* 8 Energy L.J. 303, 305 (1987) (*Autopsy*).
[62] *Autopsy*, 8 Energy L. J. at 306.
[63] *Jersey Central III*, 810 F.2d at 1175.  *See Generally Autopsy*, 8 Energy L.J. at 307.
[64] *Southwestern Bell Tel. v. Pub. Serv. Comm'n of Missouri,* 262 U.S. 276,  289-312 (1926) (J. Brandeis dissenting).
[65] *Jersey Central III,* 810 F.2d at 1175.

included in the rate base.[66]  The Commission's 1977 decision establishing rates for AT&T,

which is cited in the Notice, is a prime example.[67]  To determine AT&T's rate base, the

Commission utilized the fair value methodology adopted in *Smythe* to determine the "net

investment in *plant and property* used and useful" in the provision of interstate telephone

service."[68]  The Commission further noted that "the concept 'used and useful' denotes *property*

necessary to the efficient conduct of a utility's business, presently or within a reasonable future

period."  The concept has a temporal component that seeks to determine if the investment results

in equipment that can be used to serve current ratepayers or future ratepayers in near term.

The used and useful framework thus seeks to ensure that investment in plant benefits the

public asked to pay for it through the utility's rates.[69]  The AT&T decision provided an example

of the types of investment in property that fails the used and useful test: overbuilt plant,

discarded property, destroyed or lost property, obsolete and inadequate property, abandoned or to

be abandoned property, property temporarily out of use, property once used and useful but no

longer so because of a decrease in business.[70]

The Notice also cites *Sandwich Isles* for the proposition that the Commission

"traditionally relies on the 'used and useful' framework to separate costs and expenses that may

be recovered through rates and those that may not."[71]  That case was simply another application

---

[66] *Sandwich Isles Comm. Inv.*, Order on Reconsideration, WC Docket No 10-90, 34 FCC Rcd 577, 580, para 7 ("The Commission for decades has applied the "used and useful" standard in determining the appropriate investments and expenses to be included in a *rate of return* carrier's interstate *rate base*.") (emphasis added) (*Sandwich Isles*).
[67] Notice at para. 21, no. 66 (citing *American Tel. and Tel. Co.*, Docket No. 19129, Phase II Final Decision and Order, 64 F.C.C. 2d 1, 38 para. 111 (1977) (*AT&T Phase II Order*).
[68] AT&T Phase II Order at para. 110 (emphasis added).
[69] AT&T Phase II Order at para. 113 ("The phrase 'presently or within a reasonable future period' in the denotation of 'used and useful' is included to protect ratepayers from being forced to pay a return on investment which may not be used for a considerable length of time or is not needed to serve as a reserve for currently used investment.")
[70] AT&T Phase II Order at para.114.
[71] Notice at para. 21 (citing *Sandwich Isles*).

of the framework in rate of return regulation to identify whether investment in property, in that case a lease in undersea cable capacity, should have be included in the base.[72]

### 2. Regulators Are Not Required to Apply the Used and Useful Standard

Even in the context of rate of return regulation, there is no compulsion that the Commission apply the used and useful framework and, while permissible in its appropriate context, it has been found to be less sensible than an alternative method to value the rate base, called the prudent investment rule. As stated by the D.C. Circuit in *Jersey Central II:*

> [W]e have long held that [regulators are] free to use various methods of computing a rate base so long as the end result of the rate order falls within the zone of reasonableness. Thus, we have previously upheld use of both the so-called "used and useful" method, first set out in *Smyth v. Ames,* 169 U.S. 466, 546, 18 S.Ct. 418, 42 L.Ed. 819 (1898), and the far more sensible "prudent investment" method, developed by Justice Brandeis in *Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 289, 43 S.Ct. 544, 547, 67 L.Ed. 981 (1923) (Brandeis, J., dissenting), and approved by this court in *Washington Gas Light Co. v. Baker,* 188 F.2d 11. The "prudent investment" method has some advantages over the "used and useful" method because it treats utilities more like other businesses by allowing them to start recovering future development costs as they are incurred. Nonetheless, use of either method is certainly permissible so long as a reasonable balancing of consumer and investor interests is achieved as the end result.[73]

As the above quote states, the D.C. Circuit views the prudent investment method as "far more sensible" than the used and useful method of valuation:

---

[72] *Sandwich Isles,* 34 FCC Rcd at 579, para. 6 (When carrying out the directive of section 201(b) to ensure just and reasonable rates "in the context of rate of return regulation" the Commission seeks to ensure rate of return regulated carriers obtain sufficient revenue to recover costs and receive a return on investment.)

[73] *Jersey Central Power and Light v. FERC,* 768 F.2d 1500 (D.C. Cir. 1985) (*Jersey Central II*); vacated on other grounds, *Jersey Central Power and Light v. FERC,* 810 F.2d 1168 (D.C. Cir. 1987) (*en banc*) (*Jersey Central III*). These cases, like many others, addressed the difficult question of whether investment in new power plants that were prudent when made should nevertheless be excluded from the rate base because the plant was ultimately cancelled. It is worth noting that the issue was not whether the utility could recover its $397 million investment in a now defunct nuclear plant, which the regulator allowed the company to amortize over a 15-year period. Instead, the issue was whether the company could apply the unamortized amount in the rate base with a return sufficient to cover the carrying cost of debt. *Jersey Central III,* 810 F.3d at 1171. Even when an investment is deemed not used and useful, the company may recover its out-of-pocket expenses but not earn a return. In other words, the utility may obtain a return *of* its investment but not a return *on* its investment if found not used and useful.

Indeed, when the regulated company is permitted to earn a return not on the market value of the property used by the public, *see Smyth v. Ames,* but rather on the original cost of the investment, placing prudent investments in the rate base would seem a more sensible policy than a strict application of "used and useful," for under this approach it is the investment, and not the property used, which is viewed as having been taken by the public. The investor interest described in [*FPC v. Hope,*] after all, is an interest in return on *investment.*[74]

3.     **The Commission's Application of Used and Useful in the 2021 ICS Order**

The *2021 ICS Order*, the Commission disallowed contractually prescribed site commission cost recovery for payments to correctional authorities in excess of amounts used to defray their costs in making calling services available. The Commission disallowed these costs on two independent grounds.  It found them to be excessive, and hence imprudent, because correctional authorities were unlikely to stop providing access to calling services if they did not receive these payments.[75]  As an "independent and alternative basis," the Commission found these payments were "not used and useful in the provision" of service.[76]

The Commission's efforts to shoehorn the used and useful framework into its rate determinations for site commissions is convoluted at best.  It recognizes that used and useful is used to determine whether regulated entities can be compensated for the use of their property, but then acknowledges that site commission do not involve the use provider property.[77]  They are operating expenses.  The Commission then goes to some lengths to foreclose providers from receiving a return (*i.e.,* receiving a profit) on the payment of site commissions.[78]  This is nonsensical.  For one, because site commissions are not investment in property, but rather

---

[74] *Jersey Central III,* 810 F.3d at 1181 (emphasis in original).
[75] *2021 ICS Order*, 36 FCC Rcd at 9576, para. 128.
[76] *Id*. para. 129.
[77] *Id*., n. 395 ("We do not view site commission payments … as involving the use of provider property and investment in a manner analogous to the circumstances addressed in our provider-based rate caps.")
[78] *Id.* at 9567-77, n. 395.

operating expenses, there is no expectancy of a return on site commission payments as there is with investment in property that goes into the rate base.  Secondly, even when an investment does not meet the used and useful test and thus the utility may not reap a return, the actual cost incurred is recoverable, at least if prudent when made.

The Commission nevertheless finds dispositive the feature of "used and useful" that ratepayers "may not fairly be forced to pay a return except on investment which can be shown directly to benefit them."[79]  This again is illogical.  The Commission had already decided that ratepayers will not be required to "pay a return" on site commission costs because site commissions are not an investment in property upon which a return can be expected.  The Commission wants to reach the issue of whether incarcerated people and their loved ones receive a direct benefit from the payment of site commission.  The Commission, however, cannot extract one discrete aspect of the use and useful framework while ignoring the context in which used and useful is applied.  As noted in the preceding paragraph, asking whether a provider can receive a return on operating expenses is a nonsensical question at least in the realm of rate of return regulation where used and useful is applied.

Securus critiques the Commission's application of used and useful in the *2021 ICS Order*, not to reconsider that Order (that time has passed), but because the Notice seeks comment on whether the Commission should again rely on that framework to determine whether any site commission payment should be recoverable.[80] As the discussion above illustrates, the framework is unsuited for the purpose of determining cost recovery for site commission payments.

---

[79] Notice at 9577, para. 129 (quoting *AT&T Phase II Order*, 64 FCC 2d at 38, para. 113).

[80] *Id.* at paras. 20-21.  Moreover, the Commission recently sought comment on pending petitions to reconsider the *2021 ICS Order*, including by Public Knowledge and the United Church of Christ claiming the Commission did not sufficiently explain why any site commission payment satisfied the used and useful test.

4.  **The Preferable Approach to Site Commissions That is Consistent With *GTL***

As noted in the beginning of this section, Securus has urged the Commission to take a more direct approach to site commissions and move to preempt them in a carefully constructed manner that provides state and local governments time to transition to alternative funding sources.  This approach is preferable to the Commission's efforts to regulate local governments' use of site commissions through regulation of provider rates and misapplying concepts such as the used and useful framework.

Directly addressing site commissions through preemption is also consistent with *GTL*.  Nothing in *GTL* bars preemption of site commissions.  As long as local governments are allowed to require site commissions as a condition of providing service, however, *GTL* teaches that section 276 and section 201 require that they be recoverable.[81]  The Commission's effort to limit site commission cost recovery based on the purpose to which the correction authority puts those revenues to use violates *GTL*, which held "it does not matter that states may use the commissions for purposes unrelated to the activities of the correctional facilities . . . ICS providers who are required to pay site commissions as a condition of doing business have no control over the funds once they are paid."[82]

For purposes of setting rates for providers, the Commission's focus on the correctional authorities' use of site commission revenue asks the wrong question.  Rather, the question is whether a provider is able to offer IPCS without paying a site commission when that is a required condition of offering service in a correctional facility.  If a provider cannot offer service without paying a demanded site commission then a site commission is "related to the provision

---

[81] *GTL v. FCC,* 866 F.3d at 397 ("categorical exclusion of site commissions cannot be easily squared with the requirements of § 276 and § 201.")

[82] *Id.* at 413.

of ICS."[83]  That is the holding of *GTL*.  It is hard to fathom how a cost required to be incurred to provide service can be considered improvident or why it might not be used and useful to ratepayers if, absent incurring the cost, the ratepayer would receive no service at all.[84]  Thus even if the used and useful framework could be applied to site commissions, the test would be met.

## VI.   PROVIDERS SHOULD BE ABLE TO RECOVER SAFETY AND SECURITY COSTS IN RATES

The Notice seeks comment on the requirement in the MWR Act that the Commission "shall consider costs associated with any safety and security measures necessary to provide" telephone or video communications services to incarcerated persons when setting rates.[85] Additionally, Congress specified that the Act shall not be construed to "prohibit the implementation of *any* safety and security measures related" to "telephone service or advanced communications services" at a "State or local prison, jail, or detention facility."[86]  Congress has thus sent a strong signal to the Commission that it include safety and security costs in IPCS rates absent a finding that those costs bear no relation to the provision of telephone or video services. Such a finding would be inconsistent with a long line of Commission precedent that security costs are an "inherent" aspect of telephone services to the incarcerated and that their costs are recoverable in the rates charged to consumers.[87]  Nothing in the record developed since these

---

[83] *Id*.
[84] The Commission presumes that if all providers refuse to pay site commissions, or site commissions above a certain level, correctional authorities will have no choice but to accept the situation rather than refuse to provide any service at all.  In reality, however, unless site commissions are banned outright, providers will be required to fund site commissions one way or the other if they wish to provide service at certain facilities.  Precluding the use of regulated services to pay for site commissions puts pricing pressure on nonregulated services and could result in small providers unable or provide multiple services leaving the market.  This is not only bad for competition, but it also thoroughly undermines the goals of section 276 to promote deployment of payphone service, as now newly defined.
[85] Notice at para. 52, (quoting section 3(b)(2) of the MWR Act).
[86] Act at Section 4 (emphasis added).
[87] *2013 ICS Order*, 28 FCC Rcd 14107, 14134, para. 53, n. 196 (describing security features "inherent in the ICS providers' network); *2012 ICS Notice*, 27 FCC Rcd 16629, 16633, para. 7 (2012).

findings compel a different conclusion.  In making any determination as to what costs are "necessary" to ensure the safety and security of incarcerated persons, those working in carceral settings, and the general public, the Commission should give substantial deference to correctional authorities that have expertise in this area.

### A.     The Commission Has Consistently Found that Safety and Security Costs Are Inherent in Incarcerated People's Calling Services

The Commission has consistently found that safety and security costs are an inherent part of providing communications service to the incarcerated.  As early as its *2002 ICS Order*, the Commission noted that "largely for security reasons" payphones for incarcerated calling are "quite different from the public payphone services that non-incarcerated individuals use."[88]  The Commission identified a number of security processes required by correctional authorities when making calls from carceral facilities:

> "[P]rison security rules typically require [] a special automated voice-processing system . . . in order to provide prison authorities with the ability to screen calls . . . . [I]nmate calling services employ numerous blocking mechanisms to prevent inmates from making direct-dialed calls, access code calls, 800/900 calls, and calls to certain individuals like judges or witnesses … [C]onfinement facilities also require that phones be monitored for frequent calls to the same number, a sign of possible criminal activity or a scheme to evade calling restrictions via call forwarding or three-way calling … and require periodic voice-overlays that identify a call as being placed from a confinement facility, as well as listening and recording capabilities for all calls.  Finally, inmate calling systems generally must provide detailed, customized reports for confinement facility officials."[89]

To further emphasize the point that safety and security measures are inherent in the provision of incarcerated people's calling services, the Commission stated in the *2002 ICS Order* that "the provision of inmate calling services *implicate* important security concerns" and the 3payphone provider "typically is contractually obligated to monitor and control inmate calling to

---

[88] 17 FCC Rcd at 3252, para. 9.
[89] *Id.* at 3252, para. 9.

prevent abuse and ongoing criminal activity and to assist in criminal investigations."[90]  This is still very much the case.

The Commission's *2013 ICS Order* specifically identified "[s]ecurity features *inherent* in the ICS providers' network [that] would also likely constitute recoverable costs" because they are "reasonably and directly related to the provision of ICS."[91]  The Commission there identified various security features "that are closely related to the provision of interstate ICS," and are thus recoverable in rates.  These included "the costs of recording and screening calls, as well as the blocking mechanisms the ICS provider *must employ* to ensure that inmates cannot call prohibited parties" as well as "biometric caller verification based on voice analysis, and sophisticated tracking tools for law enforcement," and "the costs of the storage of inmate call recordings, which are necessary for court proceedings, and any reports that the ICS provider must provide to the confinement facility."[92]  Voice biometrics can also be used to ensure that that appropriate incarcerated person is using the tablet assigned to him or her.

The *2013 ICS Order* recognized that the security features were necessary to prevent use of ICS for criminal purposes, noting for example that incarcerated persons have been "documented using ICS to order executions, to continue running organized crime operations; to continue the direction of large drug trafficking, manufacturing and distribution activities; to order or participate in gang activities; and even to conspire to commit acts of terrorism."[93]  The Commission noted as well that "a disproportionately large percentage of ICS-enabled crimes target and victimize vulnerable populations consisting of victims, witnesses, jurors, *inmates, and*

---

[90] *Id.* at 3276, para. 72 (emphasis added).
[91] 2013 ICS Order, 28 FCC Rcd at 13134, para. 53 (emphasis added).
[92] *Id.* at 14134, n. 196 (emphasis added).
[93] *Id.* at 14138, para. 58, n. 216.

*family members of these individuals.*"[94]  Security features thus directly benefit ratepayers.  The Commission held that including security features as compensable costs met the dual standards of fair compensation in section 276 and the just and reasonable standard under section 201(b).[95]

By the time of the *2015 ICS Order*, ensuring recovery of the costs of security features were integral to ensuring fair, just and reasonable rates:  "We therefore act, pursuant to our statutory authority, to ensure ICS rates comply with the Communications Act, while balancing the unique security needs related to providing telecommunications service in correctional institutions and ensuring that ICS providers receive fair compensation and a reasonable return on investment."[96]  That safety and security measures involved costs reasonably and directly related to the provision of ICS had become a cornerstone of the Commission's rate determination.

### B.    Safety and Security Costs Are "Necessary"

The same types of safety and security costs that the Commission previously found to be "inherent" in the provision of calling services also satisfy the MWR Act's statutory provision that costs are "necessary" to provide IPCS.  Citing a D.C. Circuit decision interpreting "necessary "in another part of the 1996 Communications Act, the Notice proffers a definition of "necessary" as "that which is required to achieve a desired goal."[97] Application of this definition requires identification of a desired goal.  Commission precedent here too points the way.  The goal is to prevent communications services from being used to commit or facilitate potential

---

[94] *Id.* at 14138, para. 58.(emphasis added).

[95] *Id.* ("Our action in this Order take into account security needs as part of the ICS rates as well as the statutory commitment to fair compensation."). The Commission included "the cost of advanced security features such as continuous voice biometric identification." *Id.*

[96] 2015 ICS Order, 30 FCC Rcd at 12775, para. 21.  *See also id.* at 12787, para. 48 ("Specifically, we find that the following rate caps will ensure that ICS rates are just, reasonable, and fair for inmates, their families and loved ones, as well as the ICS providers, and will incorporate the costs associated with the necessary security protocols.")

[97] Notice at para. 53 (quoting *GTE Serv. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000)).

crimes, fraud, or other abuses. Safety and security features such as monitoring, restricting numbers that can be called, preventing call forwarding or three-way conversations, biometrics, recording and storage features all are necessary to achieve the goal of the safe use of communications services in carceral settings.

Even if one identifies the desired goal more broadly as enabling communications services or, as stated in section 276, promoting competition and the deployment of more payphone services, safety and security features meet the test. Correctional authorities, who are in a far better position than the Commission to assess the features necessary to protect incarcerated persons, correctional personnel, and the public generally, require as a condition of providing communications service that providers include safety and security features. As noted above, the Commission recognized as far back as 2002 that correctional authorities demand that providers include security features as part of their service capabilities.

To avoid the obvious conclusion that correctional authorities demand security features, one commenter submitted comments arguing that safety and security features were not initially an aspect of incarcerated people's calling services.[98] Securus rebutted this narrative and provided the historical context for the development of safety and security features, which Securus incorporates here by reference.[99] Securus cited a comprehensive 1997 historical study of the issue that concluded "an inmate telephone system would not exist if it did not possess these security features."[100]

Safety and security features are necessary in another sense. The RFPs issued by correctional authorities typically include a detailed list of safety and security features that

---

[98] Worth Rises Fifth Further Notice Comments at 2-3.
[99] Securus Fifth Further Notice Reply Comments at 28-31.
[100] *Id.* at 30.

providers must be able to offer in order to successfully bid on the contract. The scope of these requirements provides the Commission with insight into the safety and security measures "necessary for the provision of telephone and advanced communications services."[101] Following is a representative sample of some of the types of safety and security measures that correctional authorities expect providers to include in their offerings::

- Flag, archive, and generate alert reports for unauthorized call attempts, including attempts to call restricted numbers.
- Provide the ability for authorized personnel to selectively monitor call activity in real time and to immediately terminate any call.
- Prevent attempts to initiate 3-way calls, call forwarding, and calls to non-billable numbers.
- Record the content of all telephone connections; store recordings for at least 2 years; transfer the recorded calls to removable media for archiving or review; enable search and access for designated contractors; deliver records upon agency or court request.
- Automated turn on and shut off of telephones at times designated by the agency and for immediate manual system shut off.
- Enable multiple approved personnel and designees to simultaneously access the system without compromising security or prevention of unauthorized use and access.
- Enable searches, at minimum, using the following criteria: incarcerated person's PIN; date and time; telephones individually or by groups; call type; facility locations (housing units, library, booking area, visiting); called number; and by call status including complete and incomplete calls.
- Voice biometrics to prevent unauthorized use and the ability to search for key words or phrases in audio recordings.
- Provide software or other capabilities to continue to search and access recordings after the termination of the contract.
- Features to trace calls, detail call history, allow for call monitoring without detection while recording and include other call detail capabilities that can be used to aid investigations related to the detention facilities.
- Analytical and query features for linkages, relationships, associations, and mapping of data points, data mining, data analytics, data visualization, and predictive modeling.

In addition to these safety and security functions, RFPs require anti-fraud measures, including:

- Preventing chain dialing and secondary tones, hook switch dialing and other fraudulent activities and require incarcerated person to hang up before dialing a new number.
- Disabling the key pad during a call.
- Blocking all three-way, conference calling and call forwarding.
- Permitting a called party to block all future calls.

---

[101] Notice at 54.

- Blocking calls to restricted numbers on a system-wide basis or a case-by-case basis.

Finally, the Notice seeks comment on how a standard of "necessary" compares with the "used and useful" standard.  As was explained above the "used and useful standard" has no application to the Commission's determination of rate caps in the context of IPCS.  Even if the Commission were to apply it here, safety and security costs that the Commission repeatedly found are directly related to the provision of ICS readily meet the test.  Used and useful seeks to ensure that the costs that are being incurred in the provision of the service are for features being used by consumers.  It is important to note that the Commission had no hesitation finding that safety and security costs are compensable when it was applying a standard that included both fair compensation and the just and reasonableness under section 201(b).

Certain advocates will no doubt claim that security features do not directly benefit the consumers that pay for IPCS.  The Commission, however, has recognized that security features protect incarcerated persons, their friends and family, the correctional institution, and the general public.  Safety and security features that prevent fraud, such as a person seeking to use another person's calling account, directly benefit incarcerated persons or their loved ones that are funding the account.  Deterring plans to injure another incarcerated person or their loved ones directly benefits rate payers.  To the extent the used and useful standard requires a finding of direct benefit to the ratepayer, safety and security measures readily pass the test.

Further, if the used and useful standard is to be applied to the question of recovering the costs of safety and security features, then the subject of who benefits from these services should be considered broadly given the unique context of IPCS.  The Commission has noted that "used and useful" is a flexible framework subject to "modification, addition or deletion."[102]  In that

---

[102] Notice at n. 68.

regard, the Commission should also assess the utility of safety and security measures from the viewpoint of the carceral institution, its general responsibility to protect public safety, its substantial interest in deterring potential violations of its calling rules, and the agency's responsibility to ensure a safe environment. The correctional agency is a necessary party to the provision of IPCS; the agency does not merely contract for the availability of communications for incarcerated people (in the way a hotel may provide telephone access for the use of its guests), but defines the circumstances and under what conditions the services are provided. An analysis of whether safety and security measures are "used and useful" should necessarily include the benefit provided to correctional agency, as well as the consumer.

## VII.    THE COMMISSION'S COMPENSATION PLAN MUST ENSURE THAT ANY RATES SET BY STATE COMMISSIONS COMPLY WITH THE STATUTORY STANDARD

### A.    The Commission Has a Statutory Responsibility to Ensure Compliant State Rates

The MWR Act confers on the Commission plenary authority over intrastate IPCS rates and charges, including ancillary service charges.[103] The Act obligates the Commission to ensure that intrastate rates satisfy the statutory standard that rates fairly compensate providers for completed communications and are just and reasonable to consumers. The Commission intends to satisfy this obligation by prescribing a compensation plan setting unitary rate caps for intrastate and interstate services predicated on detailed cost information that does not vary between intrastate and interstate services.[104] Securus in fact has already adopted unitary rate caps. It has set its rates for intrastate services, including charges for ancillary services, at or below the Commission's interim interstate rate caps. The end result of the Commission's

---

[103] *Id.* at para. 38.
[104] *Id.* at paras. 25, 26.

process will be a set of cost-based rate caps that the Commission will have found to be fair, just and reasonable for intrastate and interstate voice only and video visitation services.  As set forth below, the Commission should preempt states from imposing different rates.

### B.    The Commission Should Preempt State Regulation of Rates and Charges

The Commission has released proposed instructions and templates for a new mandatory data collection to collect cost and other information necessary to fulfill its obligations under the Act.[105]  This data will underpin the Commission's process culminating in a compensation plan establishing unitary rate structures that the Commission will, by definition, have found to have satisfied the statutory standard of fair compensation and that are just and reasonable.  Given those findings, states should be precluded from imposing regulated rates that vary from these caps in either direction.

Section 276(c), which is undisturbed by the MWR Act, compels preemption of state-imposed rates that would be inconsistent with Commission's compensation plan.  It provides that "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters *shall* preempt such State requirements."[106]  State imposed rates that differ from what the Commission has determined to be fair, just and reasonable will necessarily impinge on the effective implementation of the Commission's compensation plan and run afoul of Section 276(c).

The Commission should expressly preempt state action that attempts to set lower rates or charges, including for ancillary services, than those set in the compensation plan.  Lower state rates pose several problems.  First, state rate caps below the Commission's levels creates an

---

[105] Wireline Competition Bureau and Office of Economics and Analytics Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services, Docket Nos. 23-62, 12-375, Public Notice, DA 23-355 (rel. April 28, 2023).
[106] 47 U.S.C. § 276(c)(emphasis added).

impermissible cross subsidy from states where only the Commission's cap applies.[107]  If consumers in one state pay less than the rate the Commission has determined is necessary to fairly compensate providers for the reasonable costs they incur, consumers in other states may end up making a larger contribution to the company's costs.

Second, states that set rates below the Commission's levels will hamper achievement of the overarching goals of promoting competition and the widespread deployment of payphone services.  Rate caps below what the Commission has found to be fair, just and reasonable may lessen the willingness of providers to bid for facilities, depress market participation (particularly by smaller, regional providers), and reduce investment in new technologies.  Overall deployment of payphone services in carceral settings will be depressed, in contravention to the objectives of section 276.

Third, states that adopt industry-wide rate caps for intrastate services, including ancillary service charges, below the level established by the Commission raise the very real possibility of confiscatory rates.  This is particularly true if the Commission utilizes a zone of reasonableness. As noted above, rates below the lower bound of a zone of reasonableness are confiscatory.

These concerns relate to ancillary services as well.  Costs related to ancillary services do not vary by state, and a unity cap on these charges will be based on aggregate nation-wide data. Any decision by a state to arbitrarily reduce the rate caps or eliminate charges entirely will result in consumers of other states bearing a greater portion of these costs while the IPCS is undercompensated for its costs.

---

[107] *See, e.g., In the Matter of Policy & Rules Concerning Rates for Dominant Carriers*, 4 F.C.C. Rcd. 2873, 3056 (1989) (limiting AT&T's ability to lower certain rates and thereby cause other payors to subsidize the less expensive service).

The case of preemption is particularly strong for video communications. Unlike calling service rates, states have no history or experience regulating video communications rates. The Commission will collect data on the cost of providing video communications services and will thus be in the best position to adopt rates that ensure reasonable cost recovery for intrastate and interstate video communications.

Based on the discussion above the Commission should expressly preempt state regulation. Preemption of state rate should not rely on the impossibility doctrine. Preemption here would be based on express authority conferred by the combination of the MWR Act's directive to establish a compensation plan for intrastate communications services, the exemption of section 276 from section 2(b) of the Communications Act, and the requirements of section 276(c). The jurisdictional analysis adopted by the Commission to invoke the impossibility exception and regulate rates for jurisdictionally indeterminate services is no longer needed in light of the MWR Act's express grant of authority over intrastate rates and charges and should be jettisoned. To be clear, Securus is not suggesting that states or local governments may not negotiate lower rates in contracts. The fair compensation requirement is met where the provider can negotiate rates for itself. Preemption here addresses state efforts to set industry-wide rate caps below or above the Commission's caps.

## VIII.  THE COMMISSION SHOULD ACT PROMPTLY TO AUTHORIZE ALTERNATIVE PRICING PLANS

Securus agrees that nothing the MWR Act precludes alternative pricing structures for audio and video communications.[108] The legislative history of the Act lends support to alternative pricing structures. During consideration of the Act in the House of Representatives, Congressman Latta noted that providers are "identifying ways to lower costs, such as through

---

[108] Notice at para 45.

offering subscription models" and specifically referenced the pilot programs that Securus had been offering.[109]  The Commission need not wait until it implements the MWR Act before authorizing alternative rate structures. There is complete record developed both in response to Securus' waiver petition and the Commission's prior requests for comment on the issue.  The issue is ripe for decision.

Securus has amply described and substantiated benefits of its now-suspended pilot program including lowering costs by 61 percent on average while increasing calling times by 58 percent.[110]  Prompt action allowing pilot programs would not only provide substantial benefits to the incarcerated and their loved ones, but would also provide a source of data that could inform the Commission's further deliberations on the issue in the context of the MWR Act.

The Commission should also make clear that alternative rate plans may bundle voice, video and other services just as providers of commercial services routinely bundle services at discounted prices. The Commission would have ample opportunity to exercise oversight of bundled offerings through reporting requirements that is has suggested be adopted as part of any policy to enable alternative pricing plans.

---

[109] 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (remarks of Rep. Latta)

[110] *See*, e.g., Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement to Enable Provision of Subscription Based Calling Services, WC Docket No. 12-375 (filed Aug. 30, 2021); Comments of Securus Technologies, LLC on Petition for Waiver of The Inmate Calling Services Per-Minute Rate Requirement, WC Docket 12-375, at 1 (filed Jan. 7, 2022) (noting that Securus' subscription plans has increased calling times by 58% while reducing consumer costs by 61%); Reply Comments of Securus Technologies, LLC on Petition for Waiver of the Inmate Calling Services Per-Minute Rate Requirement, WD Docket No. 12-375 (filed Jan. 21, 2022); Letter from Joanna Acocella, Aventiv Technologies to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (June 10, 2022)..

## IX.     **IP CTS ENTERPRISE REGISTRATION**

While issues involving the scheduled deployment of TRS at correctional agencies with ADP of 50 or more are not part of the Notice, there is a matter that requires the Commission's attention sooner rather than later.

The Commission's rules currently required ICS providers to coordinate with correctional agencies to collect and provide to IP CTS TRS providers the information necessary for the individual registration of persons with disabilities who require these services.[111]  Such arrangements must be developed, coordinated with correctional agencies, and implemented by the January 1, 2024, deadline.  This undertaking will require significant time, energy, and resources to implement.[112]

At the same time, every party commenting on this subject has recommended the Commission adopt an enterprise registration requirement in place of individual registration.  The Commission should do so no later than this summer in order to allow IPCS providers to develop their implementation plans in an efficient and effective manner.  If the Commission is already anticipating allowing enterprise registration of IP CTS, delaying this decision to later in 2023 or after the implementation date will result in wasted time, energy, and resources.  Securus respectfully requests the Commission give this matter prompt attention and quickly issue an order (even with interim requirements) allowing enterprise registration of IP CTS for correctional facilities.

---

[111] 47 CFR § 64.6040(c)(3)-(4).
[112] Securus has over 1,400 facilities at which to coordinate and tailor (as needed) these information collection requirements.

## **CONCLUSION**

As stated in the Introduction, the Act affords the Commission the opportunity to develop a cohesive, unified regulatory framework to ensure that rates and charges for interstate and intrastate voice and video communications service are fair, just and reasonable.  Securus respectfully urges the Commission to consider the recommendations described above and looks forward to continuing dialogue with the Commission.

Respectfully submitted,

_____/s/_____                              _____/s/_____

Joshua P. Martin                                   Michael H. Pryor
Senior Vice President and General Counsel          Shareholder
Securus Technologies, LLC                          Brownstein Hyatt Farber Schreck, LLP
4000 International Parkway                          1155 F Street NW, Suite 1200
Carrollton, Texas 75007                            Washington, DC 20004
(972) 277-0300                                     (202) 383-4706
joshuamartin@securustechnologies.com               mpryor@bhfs.com

*Counsel to Securus Technologies, LLC*

May 8, 2023

*Before the*
*Federal Communications Commission*
*Washington, D.C. 20554*

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications | ) | WC Docket No. 23-62 |
| Services; Implementation of the Martha | ) | |
| Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| Rates for Interstate Inmate Calling | ) | |
| Services | ) | |

## OPENING COMMENTS

## United Church of Christ Media Justice Ministry and Public Knowledge

Cheryl A. Leanza
Policy Advisor
United Church of Christ, OC Inc.
100 Maryland Ave., NE
Suite 330
Washington, DC 20002
202-904-2168
cleanza@alhmail.com

Al Kramer
Senior Policy Adviser
Public Knowledge
1818 N Street, NW
Suite 410
Washington, DC 20036

May 8, 2023

Table of Contents

I.   Strong Regulation is needed to address a monopolistic, non-competitive marketplace. ................................................................................ 1

   A.   The carceral communications market offers no choices to consumers footing the bills. ........................................................................................ 1

   B.   Communications reform implicates other human rights. .................... 5

II.  Technical Corrections to Section 276 of the Act ........................................ 6

   A.   Martha Wright Act and *GTL* ................................................................. 7

   B.   Just and reasonable rates. ..................................................................... 8

      *1.   Site commissions do not belong in just and reasonable rates.* ........................... 8

      *2.   Facilities that house communications provided by payphones or carceral communications providers are not communications providers themselves; security is a separate service.* ................................................................. 11

      *3.   Any data included in the rate must be produced pursuant to a Commission data collection and must be auditable.* ...................................................... 13

   C.   Fairly compensated ............................................................................. 13

III. Preemption ................................................................................................. 16

   A.   Congress did not preserve any state or local authority to force unjust and unreasonable rates on consumers. ........................................................17

   B.   Action by the FCC to set just and reasonable rates inherently preempts state site commissions. ............................................................................................20

## Summary

United Church of Christ Media Justice Ministry and Public Knowledge proudly submit these comments in response to the Commission's Notice of Proposed Rulemaking.

The Martha Wright Act establishes Commission authority over all rates for incarcerated people for all audio and video communication and restores the Commission's authority to establish rates using time-tested and long-standing techniques and ensures the Commission can establish backstop rate caps for both intrastate and interstate calls.

UCC Media Justice and Public Knowledge urge the Commission to recognize the dysfunctional and consolidated market for carceral communications, interpret the new "just and reasonable" standard to exclude site commissions, and to reject calls that "fairly compensated" requires an increase in rates.

As part of its effort to adopt just and reasonable rate caps for this sector, the Commission must take clear, direct and complete action to remove any question that "site commissions" –no matter by what name they may be called and no matter by what artifice they may be assessed— are barred and  may not be included in a rate for any reason.  Concomitantly, the Commission  must clearly and definitively preempt any state or local entity that attempts to include in communications rates unregulated and/or undocumented fees given to any carceral institution.

## COMMENTS

United Church of Christ Media Justice Ministry and Public Knowledge proudly submit these comments in response to the Commission's Notice of Proposed Rulemaking.[1] UCC Media Justice is proud of its decades of effort and UCC members to push for just and reasonable rate regulation for incarcerated people and their families.[2]

## I.    Strong Regulation is needed to address a monopolistic, non-competitive marketplace.

### A.    The carceral communications market offers no choices to consumers footing the bills.

Unlike any other consumer for whom the Commission acts today, people who communicate to and from carceral institutions have **no choices** in the companies they use to communicate: **no choices at all**. The Commission in years past often confronted markets where consumers could use only a regulated wired telephone to communicate with each other. This began to change in the 1970s.[3]  In the 1980s the Justice Department broke up AT&T. In 1996, Congress put forward legislation intending to create more local wired telephone competition. During that time period, the Commission and Congress developed policies they hoped would, and intended to, permit wireless services, cable television infrastructure and broadband infrastructure to provide more and more choices to consumers. Even with all this competition the FCC

---

[1] Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act and Rates for Interstate Inmate Calling Services, Notice of Proposed Rulemaking, Docket Nos. 23-62 and 12-375 (rel. March 17, 2023) ("*Notice*").
[2] Sara Fitzgerald, "UCC celebrates law limiting prison phone rates," UCC News (Jan. 13, 2023), https://www.ucc.org/ucc-celebrates-law-limiting-prison-phone-rates/.
[3] *See, e.g., MCI Telecommunications Corp v. FCC*, 580 F.2d 590 (D.C. Cir. 1978); *MCI Telecommunications Corp v. FCC*, 561 F.2d 365 (D.C. Cir. 1977), *cert. denied* 434 U.S.1040 (1978).

has still often found some existing markets to be less than competitive. For example, the FCC found the wireless 5G market "has been reshaped in recent years by multibillion-dollar horizontal and vertical acquisitions."[4] "[M]illions of Americans lack access to high-speed broadband or can only access high-speed broadband through a single provider."[5] The Commission views access to multiple providers as a key aspect of competition analysis and details its conclusions with respect to access to multiple broadband providers. The Competition Report found that, in 2021, 8.5% of U.S. households had only 1 choice of a provider offering 25/3 Mbps and 30.5% had only one provider for 100/20 Mbps.[6]

Even in these cases, after decades of FCC decisions, Congressional action, business investment, and other efforts, we often see analyses demonstrating that lower income people receive poorer service for more money.[7] We see wireless and broadband marketplaces that do not produce the lowest prices or the best service.[8] Residents in U.S. cities pay more for broadband than other cities worldwide; the average U.S. consumer broadband bill increased 19 percent from 2017 through 2019; a 2019 Consumer Reports study found that fees imposed by cable and broadband providers can increase monthly bills by as much as 24 percent.[9]

---

[4] Communications Marketplace Report, GN Docket 22-23, at ¶ 5 (rel. Dec. 30, 2022).
[5] Id. at ¶ 4.
[6] Id. at ¶ 57, Fig. II.A.28.
[7] Leon Yin and Aaron Sankin, "Dollars to Megabits, You May Be Paying 400 Times As Much As Your Neighbor for Internet Service," The Markup (Oct. 19, 2022), https://themarkup.org/still-loading/2022/10/19/dollars-to-megabits-you-may-be-paying-400-times-as-much-as-your-neighbor-for-internet-service.
[8] James K. Willcox, *Best and Worst Home Internet Providers of 2023*, Consumer Reports (Jan. 1, 2023), https://www.consumerreports.org/electronics-computers/telecom-services/best-and-worst-home-internet-providers-a2853390170/.
[9] Kevin Taglang, Benton Foundation, *Broadband Prices are Soaring. Competition is the Answer* (2021), https://www.benton.org/blog/broadband-prices-are-soaring-competition-answer.

And yet none of these markets bears even the slightest resemblance to the marketplace faced by a grandmother whose beloved grandchild can only be reached at the other end of a line, and at costs completely controlled by the state and other interested  parties and/or institutions –some of whom often don't  have the best interests of that person at heart yet can choose to permit that person to use communications devices—or not; to receive medical care—or not; to obtain fair legal representation—or not. No marketplace the Commission has regulated at any time since perhaps the 1970s can come close to the ICSP marketplace the Commission is faced with in 2023.

While competition is non-existent for a consumer trying to call their incarcerated loved one, the companies that provide communications services are making extreme profits. For example, Worth Rises found that, in 2020:

> Securus' revenues grew 10 percent, or $69.5 million, to $767.5 million, compared to just 2 percent in 2019. During the pandemic, every business line – phone calls, video calls, tablets, payment services, and electronic monitoring – experienced growth. …. Even more incredibly, Securus' operating income more than doubled to $80.3 million, EBITDA (a key financial metric) grew 41 percent to $209.2 million, and net cash flow from operating activities grew nearly five-fold to $133.5 million between 2019 to 2020.[10]

Similarly, a financial analyst projection based on a potential merger by GTL, concluded that the prison phone firm could be valued "at more than USD 1.5 billion."[11] The market is extremely consolidated, when Securus attempted to acquire ICSolutions in 2018,

---

[10] Worth Rises, *Financials Reveal Securus Cashed in on the Pandemic to Revive Struggling Business* (July 15, 2021), https://worthrises.org/blogpost/2021/7/15/financials-reveal-securus-cashed-in-on-the-pandemic-to-revive-struggling-business.
[11] Market Screener, *Viapath Technologies Is Discussing A Merger with Tristar Acquisition I* (Feb. 23, 2023), https://www.marketscreener.com/quote/stock/TRISTAR-ACQUISITION-I-COR-130287805/news/Viapath-Technologies-Is-Discussing-A-Merger-with-Tristar-Acquisition-I-43107737/.

estimates concluded that GTL and Securus controlled approximately 70 percent of the market.[12] Today, that estimate is up to 79 percent.[13]

     Every element of the Commission's analysis must be premised on this knowledge of this market place. The companies and carceral institutions have no incentive to bring down prices or improve service—in fact they have the opposite incentive. The only pressure to improve the circumstances for the people subject to the whims and exploitation of the entities in such a market are FCC rules (and sometimes state or local regulation) and public outrage.

     Therefore, we strongly urge the Commission to conduct and solicit anti-trust and marketplace analysis to undergird its findings. The FCC should include an analysis of the market serving incarcerated people in its biennial Communications Marketplace report. The market for the services under consideration in this proceeding face virtually no market pressure—only regulatory and public pressure. Even when various carceral facilities solicit RFPs, when site commissions are part of the equation—no matter how they enter the equation—the system grants no power to the people who are incarcerated or the people who are trying to support them via communication.

     As so often has been said in the FCC's carceral communications dockets, the market is completely dysfunctional, not only for family members and incarcerated people who have no choices of the companies they use, but also for the entities that contract for services.[14] The carceral communications industry is characterized by the

---

[12] Michael Sainato, "'They're profiting off pain': the push to rein in the $1.2bn prison phone industry," The Guardian (Nov. 26, 2019), https://www.theguardian.com/us-news/2019/nov/26/theyre-profiting-off-pain-the-push-to-rein-in-the-12bn-prison-phone-industry.

[13] Peter Wagner and Wanda Bertram, *State of Phone Justice 2022,* Prison Policy Initiative (December 2022), https://www.prisonpolicy.org/phones/state_of_phone_justice_2022.html/.

[14] *E.g.*, Rates for Interstate Inmate Calling Services, Report and Order on Remand, WC Docket No. 12-375 at ¶5 (2020) ("Unlike virtually every other American, however, incarcerated people and the

economic term, a "moral hazard." A moral hazard occurs when a person "use[s] more resources than he otherwise would have used, because he knows, or believes he knows, that someone else ... will provide some or all of these resources." [15] A moral-hazard problem appears if person A is able to use person B's resources against B's will and if he knows this:

> Laymen would call A's incentives a "temptation to steal" or a "temptation to act irresponsibly."…. [T]he essential feature of moral hazard is that it incites some people to expropriate other people…. Many economists have therefore concluded that moral hazard entails market failures; it brings about a different allocation of resources than the one that would exist in the absence of moral hazard.[16]

In the marketplace under consideration in this docket, decision-makers rarely spend their own money, and the consumers spending their own money have no choices available to them.

## B.     Communications reform implicates other human rights.

Not just marketplace analysis, but protection of constitutional rights and promotion of public safety will result from clear, accurate, and just FCC regulation. The Commission correctly concludes that regulation of rates is important for, and promotes, public safety. Studies consistently show that incarcerated people who have regular contact with family members are more likely to succeed after release and have lower

---

individuals they call have no choice in their telephone service provider. Instead, their only option is typically an inmate calling services provider chosen by the correctional facility that, once chosen, operates as a monopolist."); Rates for Interstate Inmate Calling Services, Report and Order, WC Docket No. 12-375 at ¶ 3 (2013) ([T]his market, as currently structured, is failing to protect the inmates and families who pay these charges. Evidence in our record demonstrates that inmate phone rates today vary widely, and in far too many cases greatly exceed the reasonable costs of providing the service.")

[15] Jörg Guido Hülsmann , "The Political Economy of Moral Hazard," (April 2008), available at https://mises.org/library/political-economy-moral-hazard (originally published as "The Political Economy of Moral Hazard" in the Czech journal Politická ekonomie at 35-47 (February 2006)).

[16] *Id.*

recidivism rates.[17] Formerly incarcerated people with support networks and can more successful rejoin their communities upon release. For example, "A 2014 study of incarcerated women found that those who had any phone contact with a family member were less likely to be reincarcerated within the five years after their release. In fact, phone contact had a stronger effect on recidivism compared to visitation, which the study also examined."[18]

Communication is essential to protect other human rights.[19] As one scholarly piece explains, applying traditional regulatory consumer protections has the potential to address issues that, all too often, escape when constitutional suits are brought.[20] An incarcerated person who is not receiving medical care or proper legal representation, or is suffering other kinds of abuse often cannot get help without communication outside the facility. Where many efforts at reform brought relying upon constitutional protections, ordinary regulatory protection may be more relief.

## II.     Technical Corrections to Section 276 of the Act

The Commission seeks comment on the changes in Section 276, including: 1) impact of the Act as a whole; 2) the addition of "just and reasonable," and the proper

---

[17] *Notice* at ¶10. Leah Wang, "Research roundup: The positive impacts of family contact for incarcerated people and their families," Prison Policy Initiative (December 21, 2021), https://www.prisonpolicy.org/blog/2021/12/21/family_contact/.
[18] *Id.*, citing Kelle Barrick et al., Reentering Women: The Impact of Social Ties on Long-Term Recidivism, The Prison Journal (2014).
[19] ACLU, Free Speech in Prison, What's at Stake, https://www.aclu.org/issues/prisoners-rights/civil-liberties-prison/free-speech-prison.
[20] Aaron Litman, *Free-World Law Behind Bars,* 131 Yale Law Journal 1385 (2022), https://www.yalelawjournal.org/article/free-world-law-behind-bars.

interpretation of the "used and useful" standard; and 3) the meaning of the term "fairly compensated."[21]

## A.    Martha Wright Act and *GTL*

The Commission correctly concludes in its Notice that the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("Martha Wright Act" or "Act") was a Congressional response, and rebuke, of the poorly reasoned and outlier decision rendered by the D.C. Circuit in *Global Tel*Link v. FCC*.[22]  The legislation directly responds to several elements of the decision and corrects the incorrect interpretation of the court. The timing of the legislation's introduction and the bill's original findings, as introduced, made clear it responded to *GTL*.[23]

The Commission is correct that Congress, in passing the Martha Wright Act, focused on bringing the protections of the Communications Act to all consumers, including those consumers who are incarcerated and the people who communicate with them. Notice ¶14-15. When she introduced the bill, Senator Duckworth described it as intended to address the court decision which deprived the FCC of authority to take action. She discussed the bill during confirmation hearings with the then-FCC Chair and with Commissioner nominees and the materials describing the bill's introduction make the connection between *GTL* and the proposed bi-partisan solution.[24]

---

[21] *Notice* at ¶¶ 13-38.

[22] *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) (*GTL v. FCC*) (amending 859 F.3d 39 (D.C. Cir. 2017)) ("*GTL*"); Notice at ¶11.

[23] S. 1541 (as introduced), https://www.congress.gov/bill/117th-congress/senate-bill/1541/text/is

[24]  Nominations to the Federal Communications Commission, Hearing, Senate Committee on Commerce, Science and Transportation, S. Hrg. 114-478 at 82-83 (Jul. 19, 2017) (colloquy between Sen. Duckworth and FCC Chairman Ajit Pai); see also Sen. Tammy Duckworth, Press Release, The Inmate Calling Technical Corrections Act, https://www.duckworth.senate.gov/imo/media/doc/18.03.09%20-%20Press%20Release%201-pager.pdf (noting that a U.S. Court of Appeals limited the application of the

**B.      Just and reasonable rates.**

As the Commission explained, just and reasonable rates under Section 201 of the Communications Act are "focused on recovering prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service for which rates are being set. In applying this framework, the Commission considers whether the investment or expense 'promotes customer benefits, or is primarily for the benefit of the carrier.'"[25] The Commission recognized that the "used and useful concept is designed, in part, based on the principle that regulated entities 'must be compensated for the use of their property in providing service to the public.'"[26] The FCC also recognized "the equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them."  As the Commission has explained elsewhere, "[t]he used and useful and prudent investment standards allow into the rate base portions of plant that directly benefit the ratepayer, and exclude any imprudent, fraudulent, or extravagant outlays."[27] Virtually all payments to carceral facilities will fall outside of that standard.[28]

*1.      Site commissions do not belong in just and reasonable rates.*

---

word 'fair' and that the legislation is "precisely targeted at clarifying existing law in light of the U.S. Court of Appeals decision and to permit the FCC to use its traditional procedures and authority to address unjust and unreasonable rates."); S. 2520, The Inmate Calling Technical Corrections Act was introduced on March 8, 2018 and the amended GTL decision was released approximately six months before on August 4, 2017.

[25] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order at ¶126 (Sept. 30,2022).

[26] Id., ¶129.

[27] *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992*, 9 FCC Rcd 4527, ¶39 (1994).

[28] In a few instances, it is possible that, in an arm's length transaction a provider could contract with a facility for a market-rate service, such as leasing a portion of a communications network. Such situations are rare and must be tested to avoid 'sweetheart deals.'

As UCC Media Justice and Public Knowledge have explained in prior dockets, existing FCC precedent does not permit the Commission to include site commissions in just and reasonable rates. Existing Commission precedent treats payments between payphone or communications service providers and locations as monopoly rents. As the FCC explained in the *Fourth Notice*, "Allowing inmate calling services providers to treat all their site commission payments as 'costs' would almost inevitably result in unjust and unreasonably high rates for incarcerated individuals and their loved ones to stay connected."[29] This is true.

The FCC correctly and thoroughly considered the impact of competition and the relationship between locations of payphones and payphone providers when it considered Section 276 as applied to traditional payphones in its *Fourth Notice*.[30] In particular, the FCC found that in a competitive payphone market where additional payphones would be added until the demand and supply of payphones were in equilibrium.[31] But this outcome was not expected because locational monopolies limit where payphones could be placed. As the FCC explained in its *Third Payphone Order*:

> [An] important characteristic of the payphone market is that many of the payphone locations are controlled by owners that can limit the entry of competing payphones. …. [W]e would expect the location owner to attempt to limit entry to increase the profitability of payphones and then demand at least a share of the profits in the form of a location rent. This phenomenon is frequently described as a "locational monopoly" that generates location rents. Where demand is higher than average, and the premises owner can limit entry, it is possible that some payphones would generate a higher-than-average number of calls, and thus positive profits. …. This profit would be split between the owner of the locational monopoly and the payphone provider.[32]

---

[29] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Further Notice of Proposed Rulemaking at ¶101 (2020) ("*Fourth Further Notice*").
[30] *Id.*
[31] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 14 FCC Rcd. 2545 (1999) (*Third Payphone Order*).
[32] *Third Payphone Order*, 14 FCC Rcd. at 2562, ¶37. *See also id.* at 2561-63, ¶¶36-39, 2615-16 ¶154.

The phenomenon is exactly what occurs in carceral facilities. The carceral facility permits no competition whatsoever in service provision. The customer is literally captive and that permits the location provider to request the high location rents from the service provider.

The FCC rejected the argument that these locational payments could be treated as costs. The FCC explained payments are not costs because the ability to charge purely anti-competitive location payment occurs "only when a particular payphone location generates a number of calls that exceeds the break-even number of calls, given the prices of various types of payphone calls."[33] In other words, if the provider possesses additional inefficient profit from which to pay location payments, it has covered its costs and is now paying those location payments out of non-competitive rates.

Thus, the FCC thoroughly considered the situation in which anti-competitive practices prevented competition in location-based communications services and found that payments between a communications provider and a locational monopoly should not be included in the rate. It would be arbitrary and capricious under the Administrative Procedure Act to treat the costs of communications providers for incarcerated people differently from the costs of communications providers via payphones when the economic incentives and factual circumstances are nearly identical, and both are governed by the same statute.

Not only was the commission's economic analysis correct, but the incentives set up by a contrary determination are also present in the case of carceral communications and are highly relevant. Specifically, if payments are permitted, the locational

---

[33] *Id.*, n.72.

monopolist has the ability and incentive to demand increased payments and the resulting higher prices to end users. Creating such a structure requires more close regulation and monitoring by the FCC because the structure sets up the economic incentives to impose unjustified costs on consumers.

> 2. *Facilities that house communications provided by payphones or carceral communications providers are not communications providers themselves; security is a separate service.*

The FCC must reject its incorrect and isolated conclusion in 2016 that carceral facilities "likely incur costs that are directly related to the provision of ICS."[34] The costs cited by the FCC in the 2016 Reconsideration Order are not costs related to the provision of communications services that can be distinguished from the costs rejected by the FCC in the Payphone Orders. Specifically, the premises that housed payphones faced costs related to those premises and the functions performed on those premises and those costs were never considered part of offering a service. For example, a hotel or a bus station would pay janitors and security staff to maintain their lobbies, including the areas where payphones are located, but that does not transform a bus station into a communications provider just because it maintains the facility designed for another purpose and also houses the payphone. The service a customer of a payphone receives is communication between themselves and the called party. The payphone customer, by virtue of using a payphone in a bus station, does not become a bus patron. A bus depot, by virtue of housing a payphone, does not become a communications provider even if the bus depot incurs costs that would not occur except for the existence of the payphone.

---

[34] *Fourth Further Notice* at ¶101.

Similarly, as explained by Worth Rises, the function of a carceral facility is to provide security and safety for incarcerated persons.[35] The need for surveillance, correctional officers, janitorial staff and other services do not transform a carceral facility into a communications service provider. Just because a carceral facility contracts for security and monitoring services with the same provider that it chooses for the provision of the underlying communications service in order to perform its function as a carceral facility, does not mean that it has become a communications provider entitled to pass on those costs to telephone customers.

The very services considered in the 2016 Reconsideration Order—monitoring costs, blocking and unblocking numbers and enrolling inmates in voice biometrics service—are security costs that are part of carceral functions, not communications functions. The customer of carceral functions is the carceral institution. The customers of the communication are the two people using a service to communicate with each other.

Not only are the costs not communications costs, but even if they were communications costs, by permitting these costs to be included in the rate the FCC creates a complex situation in which common costs between the facility and the provider not only increase but require allocation. Sound regulatory policy should steer away from rules that inevitably increase costs and require complex and difficult division of common costs. This creates regulatory burdens on the providers and the facilities, which must account for a precise amount of a common cost that might be used in the provision of service, and which reduces the reliance on incentives and structures an increased

---

[35] Worth Rises *ex parte* at 2, WC Docket No. 12-375 (filed March 24, 2021).

reliance on careful auditing of cost allocations in its place. No party in this proceeding prefers additional detailed cost submissions and allocations. The Commission's proposal to estimate this cost at 2 cents per minute has already been questioned in this record. But a proper cost analysis would be highly burdensome.

3.    *Any data included in the rate must be produced pursuant to a Commission data collection and must be auditable.*

If the Commission were to erroneously permit companies to include commission paid to jails and prisons, the Commission is obligated to treat this cost data with the same care and detailed analysis as the cost data covering provider costs. Carceral facilities seeking to include their costs in the rate should comply with the same cost data as providers and, if necessary, whatever cost data is necessary to support the allocations as a proportion of the total costs. If the FCC believes it cannot require submission of such data, this is a good indicator that the services provided and the entities providing them are not communications providers regulated by the FCC. Indeed, the Commission's inability to require complete supporting and confirming data would put the Commission in the awkward and potentially illegal position of having to justify compensation to ICS providers and rates to incarcerated persons without full access to the underlying data. Accordingly, the Commission cannot impose these costs on ratepayers or include them as part of the compensation for providing services under Section 276.

## C.    **Fairly compensated**

The *GTL* decision contained many flaws, not least of which was the court's consideration of the Commission's previous interpretations of "fairly compensated." The court used the Commission's failure to serve people without protection for decades as an

excuse to prevent the Commission from taking action. Specifically, although consumers negatively impacted by the dysfunctional prison phone market sought the Commission's help as early as 2001, the Commission refused to even begin a proceeding until 2012. And yet the D.C. Circuit found the Commission's failure to act offered an excuse for continuing with an unjust interpretation of the Communications Act.[36]

Section 276, even before it was amended, did not require "fair" compensation for each and every call, as UCC Media Justice and Public Knowledge explained in the prior docket.[37] "In using 'each and every call,' the intent of the statute was to be inclusive of all *categories* of calls made using the facilities and service for which the payphone provider *would otherwise go uncompensated*. There was no expression of any intent to ensure that any single call taken on its own was fully compensatory."[38]

Section 276, as the Commission correctly explained in its *Notice*, was intended to address the situation, in the past, where payphone providers were receiving no compensation because of the rise of dial-around services, which mean that customers could uses a physical payphone but never insert coins in the phone.[39] Therefore, Congress provided for the FCC to create a plan to compensate payphone providers. This problem and solution have no bearing whatsoever on the current providers of

---

[36] *GTL*, 866 F.3d at 401.

[37] As noted by the Commission, the original Section 276 was designed to "ensure that payphone providers were compensated for all calls (except for two categories specifically mentioned in the statute). Among the calls were so-called "dial around calls," where the caller at a payphone dialed a toll free call to reach the caller's long distance company rather than using the long distance carrier chosen by the payphone provider, or the caller dialed a toll free number for which no coin deposits were permitted. In either event, the payphone provider was left uncompensated for the use of the payphone. There were also other calls the payphones were required to allow but for which they were uncompensated. Congress wanted to address this issue by requiring some form of compensation." This also was clear from the law that preceded Section 276. Ex Parte Letter from Albert Kramer and Cheryl A. Leanza to Marlene Dortch, Docket No. 12-375 at 6-7 (filed March 28, 2021).

[38] *Id.*

[39] *Notice* at ¶15, n.50.

communications services for incarcerated people. Therefore, the Commission is fully capable of making a factual finding that existing providers are not in the same financial position as payphone providers at the time this statute was originally adopted and implemented. For the Commission to use the "fairly compensated" wording to apply to the current marketplace for carceral communications would be a fundamentally arbitrary and capricious decision.  In Section 276, Congress clearly aimed to "promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public." 47 U.S.C. § 276(b)(1).

It is overwhelmingly clear that Congress adopted the MWA to bring rates down. On the floor of the House when the Martha Wright Act was adopted, Rep. Pallone explained, "due to a broken system, it can sometimes cost as much as $1 a minute to make a call to or from a prison, jail, or other confinement facility."[40] Mr. Pallone continued, "[i]t is no coincidence that incarcerated persons are subjected to these exorbitant rates. In most if not all cases, one company has a monopoly in the facilities it serves. Unfortunately, kickbacks, not competition, are often the deciding factor in which company is selected."[41] He emphasized, "It is my hope that this bill will help reduce financial burdens that prevent people from being able to communicate with loved ones and friends."[42] Rep. Jackson Lee explained on the floor, "We have heard over and over again how exorbitant the cost is for grandmothers, mothers and fathers, and sisters and brothers to keep connections" with incarcerated individuals.[43] She described Martha

---

[40] 168 Cong. Rec. H10027 (Dec. 22, 2022).
[41] Id.
[42] Id.
[43] Id.

Wright-Reed's plight as someone who "who wanted to be involved with her grandson and wound up spending thousands of dollars to be able to communicate...."[44] Rep. Jackson Lee stated explained Ms. Wright-Reed's situation is "the plight of many of my constituents and those around the Nation who have loved ones incarcerated, who are blocked because of the exorbitant cost that really takes their mortgage or their ability to buy food because the cost is so high."[45] She endorsed S. 1541, saying "it will be fair to those families who cannot afford to spend this amount of money just to communicate with their loved ones."[46] Similarly, Rep. Rush, who led a decades-long campaign to lower the rates paid by incarcerated people and their families decried multiple times in his remarks the problems with high rates.  He described "astronomically high rates," "prohibitively expensive fees," "the extreme costs of making a phone call—as much as $25 for a 15–minute call," he praised the 2017 FCC effort to "lower costs." Almost every element of every aspect of the public debate regarding this issue points to costs that are too high. It is impossible that Congress intended the Martha Wright Act to increase rates for consumers.

## III.   Preemption

The Commission seeks comment on how it should address preemption of state and local rules.[47]  In this docket, the issue of preemption is essential, and thus far the FCC failed acknowledge that its decisions preempt state and local carceral facilities' actions when they contravene the Commission's decisions. As explained here, this failure to acknowledge basic conflict preemption has led to unnecessary losses in court

---

[44] Id.
[45] Id.
[46] Id. at H10028.
[47] Notice at ¶¶ 22-23, 71-72.

and confusion around the country. Providers have argued that they are required to pay site commissions even when the Commission excludes those payments from authorized rates. But this is not the case. FCC decisions preempt conflicting state and local decisions, regardless of whether the Commission makes an express finding. State and local governments cannot pass laws or adopt policies that mandate some consumers suffer unjust and unreasonable rates based on who they are calling. The Commission should make that express finding to make sure that no consumer fails to receive the protection of the Communications Act.

### A.  Congress did not preserve any state or local authority to force unjust and unreasonable rates on consumers.

To summarize, federal preemption can be express or implied. Congress can expressly provide for preemption of state or local law. In addition, federal law impliedly preempts state or local law even without express preemption language in two cases: 1) when federal law preempts the field or 2) when there is a conflict—a conflict occurs when it is impossible to comply with both federal and state or local law, or, when state or local law poses an "obstacle" to Congress' objectives.[48]

In this case, Congress expressly provided for preemption of state and local law extremely clearly. Section 276(c) states: "To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements."[49] Further, Congress directly amended Section 152, which otherwise preserves State authority over intrastate rates.[50] And finally, the Martha Wright Act provides that the Act shall not be construed to "require

---

[48] *Gade v. Nat'l Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 98 (1992).
[49] 47 U.S.C. § 276(c).
[50] *La. Pub. Serv. Comm'n*, 476 U.S. 355, 373 (1986).

telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities."[51] While this provision demonstrates that the Act does not affirmatively require any additional service offering or prohibit safety and security measures, it also makes clear that no additional local or state authority is preserved.

If the Commission compares this language with other language where Congress addresses state and local authority in the Communications Act, it becomes evident that Congress directed the Commission to act and directed it to preempt state and local law in order to achieve just and reasonable rates.

For example, in the Cable Act, Congress intended to preserve local authority because of the longstanding federal-local partnership in regulation of cable service. Section 556 is titled "Coordination of Federal, State, and local authority," and it explicitly recognizes the preservation of local authority. For example, it states, "Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter."[52] It clarifies "Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services consistent with this subchapter."[53] And it further preempts only the state and local rules which are

---

[51] 136 STAT. 6157, Section 4.
[52] 47 U.S.C. § 556(a).
[53] 47 U.S.C. § 556(b).

"inconsistent with this chapter,"[54] recognizing the very limited, precise and delicate intrusions on local authority.

In location regulation of wireless facilities, Congress preserves local power, stating "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."[55] In Section 332, Congress lays out particular procedures and requirements for wireless facility placement but it does not grant the same kind of plenary authority granted in Section 276.[56] Similarly in Section 253, Congress clearly preserved significant local authority at the same time as it barred state or local prohibitions of telecommunications services.[57] In the case of Section 253, Congress protected "the ability of a State to impose, on a competitively neutral basis … requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers"[58] and state and local authority to "manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way …."[59]

Nothing comparable is present in the provisions addressing communications services for incarcerated people. The Commission retains its full "express and expansive authority to regulate" under Section 276.[60]  Except for Section 4 of the Martha Wright

---

[54] 47 U.S.C. § 556(c).
[55] 47 U.S.C. § 332(c)(7).
[56] See 47 U.S.C. § 332((c)(7)(B).
[57] 47 U.S.C. § 253(a)-(d).
[58] 47 U.S.C. § 253(b).
[59] 47 U.S.C. § 253(c)
[60] See *Comcast Corp. v. Federal Communications Commission*, 600 F.3d 642, 645 (D.C. Cir. 2010).

Act, which merely indicates no additional obligations on the part of state and local authorities to provide communications service, a close analysis of the statute's text demonstrates that the FCC's action must preempt contrary state and local authority.

### B. Action by the FCC to set just and reasonable rates inherently preempts state site commissions.

Even if the Communications Act and the Martha Wright Act did not expressly preempt state and local authority, FCC action to adopt just and reasonable rates would impliedly preempt state and local authority. [61] Where a federal scheme is incompatible with the local scheme, the local scheme is preempted. Such preemption would be a defense in court if a company were directed by a state or locality to pay a site commission that is properly excluded from the rate by the FCC. Thus, even if Congress had not adopted the Martha Wright Act, the *GTL* decision was incorrect that carriers would be required to pay fees that superseded just and reasonable rates set by the Commission. [62] A Commission decision to exclude site commissions would be a defense by a carrier against a state or locality demanding payment that conflicts with a federal regulatory scheme.

Preemption of state and local authority is inherent in regulating rates for incarcerated people, as state and local entities run carceral facilities. Given the structure of the industry, where the carceral facility selects a provider of its choosing for use by

---

[61] *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64-65 (2002); Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 869 (2000).
[62] GTL, 866 F.3d at 413 (finding ICS providers must pay site commissions).

incarcerated people and their loved ones, it is impossible to regulate communications rates without implicating the federal/state/local legal relationship.[63]

The FCC cannot let the legal status of a local government prevent regulation when the local or state government is acting as a marketplace participant in procuring communications services. For example, if a local government owned a port or airport, and contracted with a traditional payphone provider to charge $5 per call and used the supra-competitive funds to defray the cost of building or operating the facility, the FCC would have no doubt that the local government was violating the Communications Act's just and reasonable rates mandate.

The Commission must change course and explicitly preempt any and all site commissions inconsistent with its decisions on permissible rates.

## CONCLUSION

UCC Media Justice and Public Knowledge urge the Commission to recognize the dysfunctional and consolidated market for carceral communications, interpret the new "just and reasonable" standard to exclude site commissions, and to reject calls that "fairly compensated" requires an increase in rates. The commission must further explicitly and clearly preempt states and localities given the clear statutory language and Congressional intent and the problems caused if the FCC does not preempt inconsistent state and local rules.

---

[63] Gregory Day, *Antitrust Federalism and the Prison-Industrial Complex,* Minnesota Law Review (forthcoming) draft available at SSRN: https://ssrn.com/abstract=4287622 (explaining how state actors create artificial scarcity as monopolists via marketplace activity).

Respectfully submitted,


Cheryl A. Leanza
Policy Advisor
United Church of Christ, OC Inc.
100 Maryland Ave., NE
Suite 330
Washington, DC 20002
202-904-2168
cleanza@alhmail.com

Al Kramer
Senior Policy Adviser
Public Knowledge
1818 N Street, NW
Suite 410
Washington, DC 20036


May 8, 2023



85 Delancey St., 2nd Fl.
New York, NY 10002
www.worthrises.org
@worthrises

May 8, 2023

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Re: WC Docket No. 23-62 and 12-375 – Comment on *Notice of Proposed Rulemaking***

Dear Commissioners and Staff,

Worth Rises applauds the Federal Communications Commission's ("the Commission") continued efforts to regulate the prison telecom industry and protect incarcerated people and their families from predatory IPCS rates.

Worth Rises also recognizes the significance of the newly opened docket regarding the implementation of the Martha Wright-Reed Just and Reasonable Communications Act, a generational effort to bring regulatory and legislative attention to the exploitation of incarcerated people and their loved ones by IPCS providers. Martha Wright-Reed was a loving grandmother and tireless advocate. She spent almost two decades making regular calls to her incarcerated grandson, often spending more than $1 per minute on phone calls,[1] and advocating for others suffering similarly. We are grateful that Congress has finally recognized the legacy of Martha Wright-Reed and passed the Act, calling the Commission to action.

The Commission's new *Notice of Proposed Rulemaking and Order* continues the Commission's laudable trajectory, and is a constructive first step toward fulfilling Martha Wright-Reed's vision to secure justice for incarcerated people and their loved ones who are exploited by IPCS providers. We submit this comment in response to various questions posed by the Commission, related to the safety and security measures the Commission must consider in ratemaking, how the Commission should evaluate if a rate is just and reasonable, ratemaking price structures, the extent of the Commission's jurisdictional scope, and other reforms that should be adopted by the Commission.

---

[1] Norwood, C. (2023, January 31). *A woman's calls sustained her incarcerated grandson. Now a law in her name will lower prison phone rates.* The 19th. Retrieved from https://19thnews.org/2023/01/prison-phone-call-costs-biden-martha-wright-reed/

I.   **The Commission must only consider necessary safety and security measures, and only safety and security measures required for compliance with CALEA are *necessary* for the provision of IPCS.**

A.   **'Shall consider' means study and examine and does not require inclusion.**

Section 3(b)(2) of the Martha Wright-Reed Act states that the Commission "shall consider costs associated with any safety and security measures necessary to provide [telephone service and advanced communications services to incarcerated people]."[2] The Act does not require the Commission to *include* the cost of necessary safety and security measures within rates. Rather, the Act requires the Commission instead to *consider*, or study and examine,[3] whether there are safety and security measures necessary to provide communication services, and their related costs, when promulgating regulations and determining just and reasonable rates.

In this *NPRM*, the Commission asks commenters about necessary safety and security measures and the appropriateness of the inclusion of their costs in IPCS rates using several standards. Upon review of the responsive comments, the Commission will expectedly consider first, which measures are necessary for the provision of IPCS and, second, whether the costs of those measures should be included in rates. In asking these thoughtful questions and reflecting on commenters' responses, the Commission is fulfilling its mandate to consider costs associated with necessary safety and security measures. The Act does not require the Commission to include the cost of any, even necessary, safety or security measures within rates, just to consider them.

B.   **'Safety and security measures' does not include surveillance.**

While the Martha Wright-Reed Act requires the Commission to consider costs associated with any safety and security measures necessary to provide IPCS, the scope of these services is more limited than those that the Commission has considered in the past. In the *Sixth NPRM* of docket WC 12-375, the Commission asked which "types of expenditures, such as those for providers' security and surveillance services, should be excluded from providers' costs."[4] As evident here, the Commission has struggled with how to deal with security and surveillance costs, asking commenters across multiple NPRMs how to decide. The Act clarifies this, at least in part, by specifying "necessary safety and security measures." This language includes two limiting factors: (1) narrowing security and surveillance services to safety and security measures, which we discuss here and (2) narrowing the services of consideration to only those that are "necessary," which we discuss in the next section.

The language of the Act limits what the Commission must consider as it relates to security and surveillance costs and compares to what the Commission previously considered — it relieves the Commission of considering surveillance measures at all. The ordinary and fair meaning of neither safety nor security includes or implies surveillance. Specifically, as it relates to audio and video

---

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338,136 Stat.6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 152

[3] *Consider Definition & Meaning*. The Law Dictionary. (2013, March 28). Retrieved from https://thelawdictionary.org/

[4] *Fourth Report and Order and Sixth Notice of Proposed Rulemaking*, WC 12-375. Paragraph 131

communications, wire and electronic surveillance both require warrants outside of the correctional environment, to secure U.S. residents against unreasonable searches and seizures.[5] And that is because once someone is being surveilled there is often already a presumption of wrongdoing—after all, a warrant requires probable cause. While the privacy rights of incarcerated people are not afforded the same protection, surveillance still raises the same assumption of wrongdoing and encourages investigation, raising intentions, considerations, and questions that safety and security measures do not.

Not only is the Commission not required to consider surveillance measures in its rulemaking, but it also should not. As we discuss in later sections, surveillance measures are not necessary for the provision of IPCS and are harmful to IPCS consumers, the surveilled parties. The Commission should determine that surveillance measures are separable from the provision of safety and security, outside of what it must consider in ratemaking, and not consider surveillance in this rulemaking.

> **C. 'Necessary' is more limited than 'used and useful' and is limited to that which is required or indispensable for a desired goal.**

Despite the Commission's past use of "necessary" as essentially synonymous with "used and useful," "necessary" is more limited. According to the D.C. Circuit in *GTE Serv. Corp. v. FCC,* which the Commission took responsive action to comply with, "necessary" must be interpreted according to its ordinary and fair meaning, which is limited to that which is "required [or indispensable] to achieve a desired goal."[6] In its decision, the Court explicitly denounced the FCC's use of the "used and useful" standard, deciding that it is overly broad.

In the current case, the desired goal, as prescribed by Section 3(b)(2) of the Martha Wright-Reed Act, is "to provide [telephone service and advanced communications services to incarcerated people]."[7] Accordingly, for a security and surveillance measure to be necessary it must be required or indispensable for the provision of telephone service and advanced communications services to incarcerated people. In other words, without the safety or security measure the provision of such services would be hindered. Importantly, this interpretation of necessary centers largely on technology and not on policies that may interfere with the provision of such services. For example, simply because a sheriff claims they will not provide telephone service in their jail if certain security measures are not funded by IPCS rates does not make those measures necessary. Safety and security measures can only be determined to be necessary if they are required or indispensable to the provision of telephone services and advanced communications services.

Importantly, however, this interpretation of "necessary" does not negate the importance of the Commission's "used and useful" standard, which should still be applied after finding that something is necessary to determine whether the inclusion of its costs is just and reasonable.

---

[5] Legal Information Institute. (2022, November). *Electronic Surveillance*. Legal Information Institute. Retrieved from https://www.law.cornell.edu/wex/electronic_surveillance

[6] *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422-423 (D.C. Cir. 2000).

[7] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338,136 Stat.6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 152

**D.  The only safety and security measures necessary for the provision of IPCS are the safety and security measures necessary for compliance with CALEA.**

The Commission must determine what safety and security measures are necessary to the provision of IPCS, and thus that their costs may be included in IPCS rates, by determining what measures are required or indispensable to the provision of IPCS services. At a bare minimum, if a measure is required or indispensable, it must be at least directly related to the service, the line drawn by the Court in *GTL v. FCC*.[8] We have argued at length in our initial and reply comments to the *Fifth NPRM* and *Sixth NPRM* in the WC 12-375 docket that most safety and security measures are not directly related to the provision of IPCS.[9] We have explained how such measures are separable from IPCS and differ from one jurisdiction to another negating their indispensability, have historically been and still are marketed independently from communication services, have a separate and distinct consumer base from IPCS ratepayers that has penal interests rather than an interest in communication, and are used to appeal to that consumer base, corrections administrators, rather than IPCS ratepayers. We reiterate those arguments, while also asserting our position that the *GTE Serv. Corp. v. FCC* definition of necessary is even more limiting than simply directly related to. We ask the Commission to revisit our comments, and the facts in them, with this narrower definition of necessary.

Still, we also reiterate our point from previous comments that the only safety and security measures necessary to the provision of IPCS are those that maintain its compliance with the Communications Assistance for Law Enforcement Act (CALEA).[10] CALEA compliance is required of all telecommunications carriers and providers of interconnected voice over internet protocol services, not just providers of IPCS. Mandated by Congress, it appropriately balances important interests in public safety and individual privacy, ensuring law enforcement can ensure the public's safety and security without unreasonably infringing on the privacy rights of U.S. residents. The broad spectrum of elective safety and security measures that IPCS providers offer goes far beyond that with no demonstrated, or at times even articulated, public benefit. These other elective measures are nice-to-haves for corrections agencies, law enforcement, and prosecutors and vary from agency to agency, making them by definition not necessary to the provision of IPCS.

Finally, importantly, there are no safety and security measures needed to adapt communication services to the corrections environment — admittedly there are likely necessary infrastructure adaptations, but not safety and security adaptations. Safety and security measures placed on IPCS are not necessary for the provision of IPCS, but instead elective features sought after by corrections administrators, law enforcement, and prosecutors with no basis. Again, as we have explained in previous comments, there is a long history of IPCS provision without robust safety and security measures and of the market for elective safety and security measures growing and evolving apart from IPCS,[11] though providers would like to claim otherwise. For example, despite Global Tel Link's past assertions that "security and surveillance are a core function of [IPCS]" and that such costs are "inextricably intertwined with the provision of" those

---

[8] Global Tel*Link v. FCC, Justia US Law (United States Court of Appeals District of Columbia Circuit June 13, 2017 AD). Retrieved from https://law.justia.com/cases/federal/appellate-courts/cadc/15-1461/15-1461-2017-06-13.html.
[9] Worth Rises, Comment on the *Fifth Notice of Proposed Rulemaking*, WC Docket No. 12-375 p. 1-12.;  Worth Rises, Reply Comment on the *Sixth Notice of Proposed Rulemaking*, WC Docket No. 12-375 p. 1-10.
[10] Worth Rises, Comment on the *Fifth Notice of Proposed Rulemaking*, WC Docket No. 12-375, p. 12.
[11]  Worth Rises, Comment on the *Fifth Notice of Proposed Rulemaking*, WC Docket No. 12-375, p. 2-3.

services,[12] Global Tel Link's own IPCS contracts outline elective, optional rates for safety and security measures, such as Voice Biometrics, Word Search (call transcription), Data IQ (data analytics), and even investigative staff, that it tells the Commission are necessary.[13] IPCS at its core is no different from communication services outside carceral settings and does not require special safety and security for adaptation.

In summary, the Act requires the Commision to consider, not include, the costs of necessary safety and security measures. Through this *NPRM* and the questions it poses, the Commission is clearly considering which security and safety measures are necessary and considering the inclusion of their costs in IPCS rates. The Commission should interpret "necessary" to mean required or indispensable to the provision IPCS — a high bar — and conclude, in light of the separability of security and safety measures from the provision of IPCS, that the only measures that are necessary, and may be included in rates, are those related to CALEA compliance, and no others.

## II.    'Used and useful' is the best standard to evaluate just and reasonable rates.

The Commission should apply the used and useful standard as a limiting factor when considering the costs allowable in just and reasonable rates. The Commission has applied the used and useful standard for decades when considering whether a provider can recover costs for an asset or service, or in this case, necessary safety and security measures.[14]

Applying the used and useful concept as a limiting factor when considering which costs to include in rates requires the Commission to ensure that a cost is both used and useful to the ratepayer, here, incarcerated people and their loved ones. As mentioned in past comment, while the Commission has departed from the used and useful standard on rare occasions, it has always ensured that ratepayers benefitted from this departure.[15] Generally, the Commission has only departed from the used and useful standard in instances when ratepayers pay for capital costs that will produce utility for them in the future. For example, if a provider incurred major construction costs that would eventually reap benefits for the ratepayer, then it may be acceptable to include these capital costs in rates. However, there is no reason for the Commission to depart from the "used and useful" standard in this case, and if it was to do so, the decision would have to benefit IPCS ratepayers, which departing would not do.

In response to IPCS providers' arguments for the inclusion of security and surveillance services in IPCS rates, we have continued to demonstrate that these services are not used and useful to IPCS ratepayers.[16] In previous comments, we have analyzed five categories of security and surveillance measures, including

---

[12] GTL Reply Comment to *Third MDC*, p. 7.

[13] *See* Appendix A, Price List for Master Blanket Purchase Order 88935-T1934, Inmate/Resident Telephone Control Service; *See* Appendix B, Exhibit 6P - Pricing for Optional Service Contract #071B1300208.

[14] *Sandwich Isles Communications, Inc.*, *Order on Reconsideration,* 34 FCC Rcd 623-24, para. 125 (2019)("SIC Reconsideration Order") (citing *Connect America Fund et al.*, Report and Order, Third Order on Reconsideration, and Notice of Proposed Rulemaking, 33 FCC Rcd 3012-13, para. 49 (March 2018 CAF Order)

[15] The Accounting and Ratemaking Treatment for the Allowance for Funds Used During Construction (AFUDC), Order, 10 FCC Rcd No.5, para. 13 (1995) (stating that "We believe, however, that this limited additional departure from the used and useful standard will not harm the ratepayers...The ratepayers receive the benefits of reduced rates in the initial years of implementation.").

[16] Worth Rises, Comment on the *Sixth Notice of Proposed Rulemaking*, WC Docket No. 12-375, at 2.

law enforcement support services, call security services, call recording and monitoring services, voice biometrics, and other similar services, and concluded that none meets the used and useful standard. We summarize those arguments here, but encourage the Commission to revisit our prior comments.

- **Law Enforcement Support Services** – Law enforcement support services are not useful to incarcerated people and their loved ones, but instead used and useful to law enforcement. Securus' own submissions in response to the Commission's *Third MDCO* underscores this point as it notes that its subpoena and warrant support services allow agencies to respond to requests by "prosecutors, investigators, DAs, police, [and] detectives."[17] While law enforcement support services are explicitly used and useful to law enforcement, it is also important to note that they are outright harmful to ratepayer interests. Law enforcement support services assist law enforcement officers in investigations that are intended to, ultimately, punish the incarcerated person or the person they are calling. Often, that punishment is the denial of what is of utmost value to them – their freedom.

- **Call Security Services** – Call security services "limit the number and length of calls" incarcerated people can make,[18] "control" who they can call often by allowing calls only to a list of people "authorized" by correctional agencies,[19] add call recipients to watch lists,[20] and more. Call security services cannot be considered used and useful to IPCS consumers as they are designed and intended to restrict the access that incarcerated people and their loved ones have to communications. For example, in many states, these features limit allowable numbers to just 10 per person, limit calls to as little as 15 minutes, interrupt calls with automated messages that further detract from call time, and more.[21] None of this is useful to the IPCS ratepayers, in many cases, it is just offensive.

- **Call Recording and Monitoring Services** – Call recording and monitoring services aid corrections agencies and law enforcement in "investigation and litigation activities,"[22] enforcing "agency policy,"[23] covertly forwarding live calls to officers without the knowledge of the incarcerated person or their loved ones,[24] and terminating calls without the consent of the called or calling party.[25] Each of these activities is to the detriment of IPCS ratepayers, who may be subjected to prosecution as a result of call recording and monitoring services, experience an intrusion of their privacy, or have their call time prematurely cut off. At this point, we further assert that call recording and monitoring services are a surveillance measure that does not fall under safety and security, and thus is excluded from required consideration under the Marth Wright-Reed Act.

---

[17] Securus Response to *Third MDCO*, p. 23-24
[18] *Id*., p. 24.
[19] *Id*.
[20] *Id*.; ICS response to Third MDCO, p. 7
[21] Worth Rises Sep. 27, 2021 Comments, p. 9.
[22] Securus Response to Third MDCO, p. 24-25
[23] *Id*. p. 25.
[24] *Id*.
[25] NCIC Response to Third MDCO, p. 7

- **Voice Biometrics** – Voice biometric services purport to identify speakers in real time to ensure that incarcerated people do not circumvent calling restrictions. Securus, NCIC, and ICS describe their voice biometric services in their public responses to the Commission's *Third MDCO*, reporting that they are used to "generate targeted investigative leads,"[26] "help investigators find correlations among calls,"[27] and for "investigative reporting."[28] These services are not consensual as incarcerated people who refuse to enroll in voice recognition, as many would like to do, are often prohibited from accessing IPCS.[29] Services that IPCS ratepayers are coerced to use and put them at future risk of surveillance are not to their benefit.

- **Other Services** – The final category of services that IPCS providers claim are related to IPCS, are included in the catch-all "other services" category, which includes various technologies that provide "expanded security and analysis for facility personnel,"[30] technology that helps correctional agencies generate targeted investigative leads,[31] and a number of speech-to-text tools that include transcription and keyword searches and reports.[32] Consider speech-to-text technology, for example, which is intended to create "actionable intelligence" for federal law enforcement.[33] Correctional agencies have used speech-to-text services to prevent incarcerated people from speaking out against abuse — one agency used the technology to flag calls in which incarcerated people discussed contacting media about cover-ups of COVID-19 outbreaks by facility administration.[34] And in an email pitch to sell the technology, an executive explained that another sheriff "believes (the calls) will help him fend off pending liability via civil action from inmates [sic] and activists."[35] Services which assist in the prosecution of IPCS consumers, stifle their ability to speak to the press, and worsen their ability to litigate against correctional agencies are not used and useful to IPCS ratepayers.

The Commission must apply healthy skepticism when IPCS providers claim that a safety or security measure is used and useful to IPCS ratepayers. IPCS ratepayers are incarcerated people and their loved ones, not correctional or law enforcement authorities. The Commission must only consider the position and perspective of IPCS ratepayers when determining whether a measure is used and useful and can be included in rates.

---

[26] Securus MDCO Response, p. 25.
[27] *Id.*
[28] NCIC MDCO Response, p. 7.
[29] George Joseph and Debbie Nathan, "Prisons Across The U.S. Are Quietly Building Databases Of Incarcerated People's Voice Prints," The Intercept (Jan. 30, 2019), https://theintercept.com/2019/01/30/prison-voice-printsdatabases-securus/.
[30] Paytel MDCO Response, p. 9.
[31] Securus MDCO Response, p. 26.
[32] NCIC MDCO Response, p. 7; Securus MDCO Response, p. 26.
[33] David Sherfinksi, "U.S. Prisons Mull AI to Analyze Inmate Phone Calls", Reuters (Aug. 9, 2021) https://www.reuters.com/article/us-usa-tech-prison/us-prisons-mull-ai-to-analyze-inmate-phone-callsidUSKBN2FA0OO.
[34] *Id.*
[35] Asher-Schapiro, A., & Sherfinski, D. (2021, November 16). *AI surveillance takes U.S. prisons by Storm*. Context. https://www.context.news/surveillance/ai-surveillance-takes-us-prisons-by-storm?utm_source=news-trust&utm_medium=redirect&utm_campaign=context&utm_content=article

Finally, we note that facilities may incur used and useful costs on behalf of IPCS ratepayers, but generally do not. IPCS rates may include all costs directly related to the provision of IPCS that are also used and useful to IPCS consumers. While exceedingly rare in the provision of IPCS, correctional facilities may incur used and useful costs which the Commission could include within rates. As a general principle, corrections facilities should only be able to recover capital investments which IPCS providers could themselves recover. An example of this would be if an IPCS provider of video calling software were to provide communication services via infrastructure paid for by the correctional facility. If a correctional facility were to pay for internet installation and maintenance to enable the provision of IPCS, the inclusion of such facility costs would both be necessary for the provision of IPCS and used and useful to IPCS consumers. The preceding example is an extreme rarity in the IPCS industry, as very few facilities invest capital to directly provide IPCS. It would be most effective for the Commission to take a generalized approach and determine that correctional facilities do not generally incur any cost directly related to the provision of IPCS that are also used and useful to IPCS consumers. Facilities which do incur costs related to the provision of IPCS may demonstrate their costs through a waiver process.

In summary, the Commission should continue to use the used and useful standard to determine which costs can be included in IPCS rates and ensure that they are just and reasonable. None of the broad based categories of safety and security measures included in the *Third MDCO* meet the used and useful standard. Accordingly, the Commission should only allow the inclusion of costs for safety and security measures necessary for compliance with CALEA, as previously discussed, which are necessary and meet the used and useful standard in protecting public safety while minding individual privacy rights.

### III. The exclusion of safety and security costs from IPCS rates would not prohibit the implementation of any safety and security measures.

We support the Commission's assertion that the exclusion of the cost of necessary or simply related safety and security measures from IPCS rates does not prevent corrections officials from implementing any such measures, as the Martha Wright-Reed Act prohibits.[36] It simply prevents IPCS providers and corrections administrators from charging IPCS ratepayers for them. As mentioned in previous comments, the Commission does not have, nor should it seek, the authority to prescribe or even evaluate the safety and security measures implemented by corrections agencies.[37] However, it also does not have the mandate, or authority, to fund every safety and security measure corrections agencies seek. By excluding the cost of safety or security measures that are not necessary and/or used and useful to IPCS ratepayers from IPCS rates, the Commission is only determining that IPCS ratepayers cannot be forced to pay for such measures.

The exclusion of security and surveillance costs from IPCS rates does not preclude an agency from procuring and directly funding such services. Corrections agencies can still procure the services they want, in the same manner they procure barbed wire, closed-circuit television, and mail elimination

---

[36] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338,136 Stat.6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 152, stating "[n]othing in this Act shall be construed to … prohibit the implementation of any safety and security measures related to such services at such facilities."

[37] Worth Rises, Reply Comment on the *Sixth Notice of Proposed Rulemaking*, WC Docket No. 12-375

services, just not on the backs of IPCS ratepayers.[38] Notably, since Connecticut and California began providing free IPCS to their custodial populations, there has been no change to the safety and security measures used by the corrections agencies.[39] By excluding safety or security costs from rates, the Commission is not prohibiting the implementation of any safety or security measures, but protecting IPCS ratepayers from paying for measures that are not necessary or used and useful to them.

IV.   **The Commission should require IPCS providers to always offer per minute rates, and implement heightened oversight of alternative rate structures.**

The Commission should require IPCS providers to always offer a per minute pricing structure for all communication services, including video communications, and not allow IPCS providers to only offer subscription pricing structures to IPCS ratepayers. Per minute pricing structures, while less than ideal in 2023 when toll rates are largely extinct outside the correctional setting, protect ratepayers who may only make a few calls and do not want to be locked into paying for extended time periods.

The Commission should also implement heighted oversight of these subscription pricing structures to ensure that actual paid rates are in line with the Commission's per minute rate caps. IPCS providers have a record of exploiting incarcerated people and their loved ones, and should not be trusted to institute new pricing structures without proof that they are in fact equally beneficial, if not more beneficial, than the existing pricing structures required by the Commission.

Importantly, the Commission should never allow for per call pricing structures in either phone calls or video communications. There is a documented history in the WC 12-375 docket of IPCS providers using per call fees to exploit incarcerated people and their loved ones. Shotty service with dropped calls works to the advantage of IPCS providers in such models. While per call fees have been largely eliminated for phone calls, they are still prevalent for video calls and should be similarly eliminated.

A.   **The Commission should not allow pilots of subscription pricing structures unless petitioners produce data that demonstrates IPCS ratepayer benefit.**

We continue to voice our concerns regarding subscription pilots as outlined in our response to Securus' waiver petition[40] and the reinforcing public interest coalition letter,[41] both urging the Commission to request and carefully review more information about proposed subscription pilots before granting waivers. IPCS providers have not provided sufficient data for the Commission to determine the true per minute rate range offered through subscription packages and whether subscriptions generally conform to the Commission's rate caps or are beneficial to IPCS ratepayers.

---

[38] Worth Rises, Reply Comment to *Fourth Report and Order and Sixth Notice of Proposed Rulemaking,* WC Docket No. 12-375 at 8
[39] See Appendix C, Amendment 5 of the DAS Inmate Telephone Service Contract #12PSX009MA, July 1, 2022.
[40] Worth Rises, Comment on the *Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement to Enable Provision of Subscription Based Calling Service* , WC Docket No. 12-375.
[41] Comment on the *Securus Technologies, LLC Petition for Waiver of the Incarcerated Person Calling Services Per Minute Rate Requirement*, WC Docket No. 12-375.

The Commission should request more data from IPCS providers regarding their current subscription package pilots in order to verify provider claims, understand the impact of subscriptions on consumers, and determine whether waivers are in the interest of ICS ratepayers. At a minimum, we recommend that the Commission require providers to provide the following data regarding proposed pilot programs:

- Share all policies related to the pilot subscription programs provided to either agency customers and/or consumers, and specifically answer the following:
    - In piloting facilities, do consumers still have the option to pay per minute?
    - Does the subscription period start at the moment of purchase? If not, when does it start and is the package prorated? Is the period start date communicated to the consumer? If so, how?
    - What policies govern dropped calls? Are consumers refunded for dropped calls? If so, how do consumers request a refund? How is the refund policy communicated to consumers?
    - What happens if a consumer does not use all of their calls in a period? Are consumers able to rollover unused calls into subsequent periods?
    - Are subscriptions automatically renewed? If so, how can a consumer terminate their subscription? How are the renewal and termination policies communicated to consumers?
- Data regarding cost basis of the pilot subscription packages by pilot location:
    - Breakdown of subscription packages
        - Calls allotted per period
        - Max minutes allowed per call
        - Length of subscription period
        - Cost of subscription
    - Adoption
        - Average daily population
        - Monthly average active consumers
        - Total subscribers
        - Total subscription terminations
        - Trailing 3-month retention rate (and change over time)
    - Disaggregated call level data
        - Call length
        - Call type (e.g., interstate, instate, etc.)
    - Errors
        - Calls placed
        - Calls connected
        - Calls dropped
            - National call drop rate
        - Refund requests (number and value)
        - Refunds granted (number and value)

We understand that the current pilots are only possible on intrastate calls because of the Commissions limited authority to regulate intrastate calls, and that going forward, such pilots will not be possible given

the Commission's new regulatory authority over all interstate and intrastate calls. Accordingly, in the future, we recommend that any provider seeking to pilot a new pricing structure be required to request a temporary waiver from the Commission per minute rate caps with ample information about the pilot. The Commission can allow for a short waiver, no longer than 3 months, and should then immediately collect data to ensure compliance with the Commission's per minute rate caps before allowing the pilot or its outgrowth to continue.

### B.  The Commission should not allow a per call pricing structure.

Similar to what it did around phone calls, the Commission should prohibit per call pricing structures on video calls. Currently, many IPCS providers charge per call rather than per minute for video calls. For example, in Michigan prisons, all video calls are billed per 20-minute call and must be paid for in advance.[42] If a caller ends the call early or the call is dropped because of bad service or an officer cuts off the call, the IPCS ratepayer must still pay for the full 20-minute call, or a service they have not used. Given the cost of safety and security measures, such as storage for call recordings, this pricing structure may even incentivize IPCS providers to artificially cause calls to drop, which allows them to collect the full cost of a video call and save on the storage that full video call recording would cost them. And since IPCS providers have locational monopolies over the facilities they contract with, IPCS ratepayers have no choice but to continue using their services, no matter how awful or manipulated. The Commission already prevents IPCS providers from charging per call for phone calls, and should treat video communications no differently.[43]

The Commission should continue ratemaking by instituting per minute rate caps and evaluate all other proposed pricing structures against those rate caps, including subscriptions. The Commission should also prohibit pre call pricing structures for video calls, similar to what it has done with phone calls.

### V.     The Commission has the authority to promulgate rules related to on-premises video calls and non-live video and audio advanced communications.

The Martha Wright-Reed Act expands the Commission's authority to promulgate rules related to "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[44] This expansion of authority introduces broad jurisdictional questions for the Commission to consider. We comment on two jurisdictional questions below.

---

[42] Department of Corrections. (n.d.). *Video Visitation*. SOM - State of Michigan. Retrieved from https://www.michigan.gov/corrections/services/family-information/video-visitation
[43] 47 C.F.R. § 64.6080.
[44] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338,136 Stat.6156 (Martha Wright-Reed Act or the Act); 47 U.S.C. §§ 153(1)

### A.  The Commission has authority over on-premises video calls.

Under the intent and language of the Martha Wright-Reed Act, the Commission has the authority to regulate on-premise video calls. According to the Act, the Commission has authority over communication services used to communicate with people "outside the correctional institution." The Commission should interpret this to mean all individuals who are not actively working or incarcerated within the correctional institution at the time of the communication. There is no evidence that Congress intended for a miniscule regulatory cut-out that leaves IPCS ratepayers unprotected from rate regulation when they are physically located within a building that is property of the correctional authority. Whether the outside called party is on their mobile phone in the lobby of a correctional facility or sitting at a video kiosk booth in the on-site video calling room, they should be protected by the Commission's ratemaking authority.

Further, not regulating these on-premise video calls may create a similar anomaly to the one created between essentially long distance and local calls by the decision in *GTL v. FCC*, which negated the Commission's regulatory authority over intrastate calls. As a result, soon after, long distance calls, historically considered more expensive, became cheaper than local calls, historically considered less expensive, thanks to the Commission's regulation. In the current case, regulating off-premise video calls could strangely make them cheaper than on-premise calls that are, in nearly all cases, free now as they simply pass through internal information technology infrastructure. Again, there is no way that Congress intended to create such a minor carve out.

### B.  The Commission has authority over non-real time video and audio communications.

The Commission has authority over non-real time video and audio communications, commonly referred to as videograms or voicemails, as they constitute a type of "audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held," explicitly covered by the Martha Wright-Reed Act. Videograms and voicemails may be watched and listened to asynchronously by IPCS ratepayers. Global Tel Link, charges $1 per minute for every voicemail.[45] JPay, an Aventiv company, charges one 'stamp' or as much as $0.47 per 'outbound videogram' and three stamps or $1.41 per inbound videogram.[46] These are egregious rates that are hard to imagine could ever exist outside of the carceral setting. These non-real time communications services are audio and video communications services and deserve the Commission's ratemaking attention.

### VI.  The use of off-the-shelf advanced communication services provides another source of rate data and negates claims about necessary safety and security measures.

The provision of advanced communications to IPCS ratepayers has grown rapidly in recent years, particularly during the COVID-19 pandemic, which prevented incarcerated people from receiving visits in many jurisdictions for more than a year. In response, to minimize costs, corrections administrators began implementing off-the-shelf advanced communication technologies that are available outside the

---

[45] Global Tel Link. (2021, April 16). *Inmate Voicemail*. ConnectNetwork. Retrieved from https://web.connectnetwork.com/communications/inmate-voicemail/.
[46] Wessler, M. (2023, March). *SMH: The rapid and unregulated growth of e-messaging in prisons*. SMH: The rapid and unregulated growth of e-messaging in prisons | Prison Policy Initiative. Retrieved from https://www.prisonpolicy.org/reports/emessaging.html

carceral setting. The Commission should consider the adoption of these technologies when determining industry-wide average costs and determining whether a safety or security measure is necessary for the provision of IPCS.

Many states and local jurisdictions have turned to off-the-shelf advanced communication providers for the provision of IPCS, specifically video calls. For example, in Maryland, incarcerated people use Microsoft Teams to make video calls.[47] In Wisconsin and Pennsylvania, incarcerated people use Zoom.[48] In California and New York City, incarcerated people use Cisco Webex.[49] In Iowa, incarcerated people used Google Meets before the agency transitioned to Ameelio.[50] The above-mentioned providers should be considered part of the industry-wide definition of IPCS providers considered by the Commission, and the cost of their services should be considered in the Commission's ratemaking.

Furthermore, the use of off-the-shelf advanced communication technologies that do not have the safety and security bells and whistles should cause the Commission to question traditional IPCS providers and corrections administrators and their claims about the necessity of such measures. How could these safety and security measures or any safety and security adaptation be necessary for the provision of IPCS when incarcerated people are currently using communication services that do not support these measures? They cannot be.

The Commission should consider these off-the-shelf services and products in collecting cost data and making industry determinations about necessary safety and security measures. Much can be gleaned from their use in carceral settings.

## VII.    The Commission should codify person-centric language.

The Commission should codify the adoption of IPCS and person-centric terminology in reference to incarcerated people. Worth Rises, alongside the public interest community, applauds and praises the Commission for its proposed change in terminology. Codifying person-centric language is critical to recognizing incarcerated people and their loved ones as ratepayers who must be protected from an exploitative correctional communications industry.

* * *

---

[47] *Virtual visitation with Microsoft teams*. DPSCS. (n.d.). Retrieved from https://dpscs.maryland.gov/publicinfo/virtual_visitation.shtml
[48] DOC. (2022, September 12). *Video Visits at PDCI*. DOC. Retrieved from https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/ResumingInPersonVisitation.aspx ; *PA DOC Inmate Visitation*. Department of Corrections. (2022, April 12). Retrieved from https://www.cor.pa.gov/family-and-friends/Pages/Inmate-Visitation.aspx
[49] California Department of Corrections and Rehabilitation. (2022, February 28). *How to use Webex to join a video visit*. California Department of Corrections and Rehabilitation. Retrieved from https://www.cdcr.ca.gov/visitors/prepare-to-visit/how-to-use-webex-to-join-a-video-visit/ ; Department of Correction of the City of New York. (n.d.). *How to Schedule a Televisit*. NYC.gov. https://www.nyc.gov/assets/doc/downloads/pdf/scheduled_Televisit_4-7-20.pdf
[50] Iowa Department of Corrections. (2021, November 11). *For families during covid19*. Iowa Department of Corrections. Retrieved from https://doc.iowa.gov/families-during-covid19

Worth Rises urges the Commission to meet the moment presented by the enactment of the Martha Wright-Reed Just and Reasonable Communications Act. Passed by Congress in response to runaway consumer exploitation and the need to statutorily expand the Commission's authority in the aftermath of *GTL v. FCC*, the Commission must interpret its expanded authority as a mandate to scrutinize and regulate the rates burdening our nation's most disenfranchised and economically disadvantaged consumers. The Commission must assert its broad jurisdictional reach across all audio and video communications and ensure that pricing structures represent just and reasonable rates.

Sincerely,

Bianca Tylek
Executive Director

Andrew Lama
Government Affairs Specialist

Appendix A

**T-1934**
**Contract A88935**

**Inmate/Resident Call Rate: All Inclusive - All Domestic Call Types**

**Basic Call Rate = $ 0.03584/Minute**

**Optional Security Features:**

- **Option 1 - Data IQ**
- **Option 2 - Voice Biometrics**
- **Option 3 - Word Search**

**Pricing below to be added to Basic Call Rate if selected.**

|                    | Option 1 Rate  | Option 2 Rate  | Option 3 Rate  |
|--------------------|----------------|----------------|----------------|
| **Option #1**      | $0.01000/Min   |                |                |
| **Option #1 and #2** | $0.00700/Min | $0.00400/Min   |                |
| **Option #1 and #3** | $0.00700/Min |                | $0.00400/Min   |
| **Option #2**      |                | $0.00448/Min   |                |
| **Option #2 and #3** |              | $0.00448/Min   | $0.00448/Min   |
| **Option #3**      |                |                | $0.00448/Min   |
| **All 3 Options**  | $0.00700/Min   | $0.00400/Min   | $0.00400/Min   |

**Note:  State & Federal Taxes and Fees do not apply to this contract.  All calls billed in 15 second increments except for the initial minute.**

Appendix B

**CONTRACT #071B1300208**

## Exhibit 6P – Pricing for Optional Services

Exhibit 6P includes pricing for the optional services described in Exhibit 4. The State may select to procure these optional services at any time during the contract period.

The following rate adjustments are provided for each of the Optional Services listed below:

| Optional Service | Addition to the Per-Minute Rate for Each Call Type |
|---|---|
| 1 - Special Equipment Fund (1) | See Special Equipment Fund Table for pricing |
| 2 - RESERVED | |
| 3 - Nexidia Key Word Search | $0.0075 |
| 4 - InTime Labor Management | $0.0050 |
| 5 - Cell Phone Detection/Control | To be determined based on the product, scope, and features selected by the State |
| 6 - iPhones (2) | To be determined based on quantity |
| 7 - Additional Investigative Site Administrators (3) | $0.0035 |
| 8 - Voice Verification/Biometrics | $0.0450 |

(1) See Special Equipment Fund Table for pricing.

(2) The PCS Team would work with the MDOC to determine the number of phones and service desired and would then negotiate whether any additional per-minute price is required to meet those needs.

(3) This includes 3 or more site administrators in addition to the 5 that are already included as part of the standard service offering.

Appendix C

**CONTRACT AMENDMENT 5**

**Effective July 1, 2022**

BACKGROUND:

Pursuant to Connecticut General Statutes, Sec. 18-81oo*, this CTsource Amendment is being issued to allow voice communications (telephone) services to be provided free of charge to persons who are housed within a Connecticut correctional facility.  Such communication services for inmates shall be provided free of charge to such persons and any such communications, whether initiated or received, shall be made free of charge effective July 1, 2022 to the person initiating or receiving the communication.

This Amendment has been issued for the voice (telephone) communication services under DAS Contract #12PSX0098MA will be billable to DOC at the bundle fee of $30.00/month per inmate.  Annually, beginning on July 1st, the Contractor may request a price adjustment if the inmate population over the previous twelve (12) months has increased or decreased by 10% or more.   If the inmate population hasn't increased or decreased by 10% or more, then the bundle pricing rate will remain unchanged.  If the inmate population has increased or decreased by 10% or more, then DAS and the Contractor reserve the right to negotiate a new bundle rate based on the then current July 1st population.

Pursuant to C.G.S. Sec. 18-81oo, Exhibit 4 Product & Price Schedule of DAS Contract 12PSX0098MA has been updated to include price adjustments effective July 1, 2022.

All terms and conditions of Contract #12PSX0098MA not otherwise affected by this Amendment remain unchanged and in full force and effect.

*C.G.S. Section 18-81oo codifies P.A. 21-54, as amended by P.A. 21-2.

**EXHIBIT 4, RFP-16**  
**PRODUCT & PRICING SCHEDULE**

**CONTRACT NO: 12PSX0098MA**  
<mark>**Revised 4/29/2022**</mark>  
<mark>**Effective 7/1/2022**</mark>

| CONTRACTOR NAME: | Securus Technology, Inc. | |
|---|---|---|
| DELIVERY: | As Required by Connecticut DOC | PROMPT PAYMENT TERMS: NET 45 DAYS |

| ITEM # | DESCRIPTION OF COMMODITY AND / OR SERVICES | UNIT OF MEASURE | PER UNIT COST | Commission Rate % removed effective 7/1/2022 through Contract Expiration Date |
|---|---|---|---|---|
| 1.) | Voice (telephone) communications fee for inmates effective July 1, 2022. | All | <u>$0.00</u> | <u>Commission Rate % removed on 7/1/2022</u> |
| 2) | Voice (telephone) communications fee per inmate **payable by DOC** effective July 1, 2022, there will be no charge to inmates for telephone communications services per C.G.S. Section 18-81oo codifies P.A. 21-54, as amended by P.A. 21-2. | Monthly bundle fee per inmate | <u>$30.00</u> | <u>Commission Rate % removed on 7/1/2022</u> |

Page **1** of **1**

**JA731**