# United States Court of Appeals for the First Circuit

_____

No. 24-8028
In re: MCP 191
*(Caption Continued on Inside Cover)*

_____

On Petitions for Review of a Final Order of the
Federal Communications Commission

_____

## JOINT APPENDIX
## VOLUME IV of VII (Pages JA1055 – JA1485)

_____

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform Clinic*

*Additional Counsel Listed on Inside Cover*

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER SCHRECK,
 LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus Technologies, LLC*

Salvatore Taillefer, Jr.
BLOOSTON, MORDKOFSKY, DICKENS &
 PRENDERGAST, LLP
2120 L Street, NW Suite 825
Washington, DC 20037
(202) 828-5562
sta@bloostonlaw.com

*Counsel for the National Sheriffs'
Association*

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel Communications,
Inc.*

Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8900
ACollins@cahill.com

Landis C. Best
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
LBest@Cahill.com

*Counsel for Global Tel\*Link
Corporation d/b/a ViaPath
Technologies*

D. Adam Candeub
  General Counsel
Bradley Craigmyle
  Deputy General Counsel
Sarah E. Citrin
  Deputy Associate General Counsel
Matthew J. Dunne
  Counsel
FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
Communications Commission*

Tim Griffin
  Attorney General of Arkansas
OFFICE OF ATTORNEY GENERAL TIM
  GRIFFIN
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

Autumn Hamit Patterson
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General and Interim
Solicitor General

*Counsel for the State of Arkansas*

Abigail A. Slater
  Assistant Attorney General
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
  ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United
States of America*

Theodore E. Rokita
  Attorney General of Indiana
OFFICE OF THE INDIANA ATTORNEY
  GENERAL
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

Blake E. Lanning
  Assistant Chief Deputy
Joshua J. David
  Deputy Attorney General
  Legislative & Policy Division
Jade A. Poorman
Bradley S. Davis
  Deputy Attorneys General
  Litigation Division

*Counsel for the State of Indiana*

Elizabeth B. Murrill
  Attorney General of Louisiana
Kelsey L. Smith
  Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*


James Uthmeier
  Attorney General of Florida
John Guard
  Chief Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

*Counsel for the State of Florida*


Christopher M. Carr
  Attorney General of Georgia
Stephen J. Petrany
  Solicitor General
OFFICE OF THE GEORGIA
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*


Steve Marshall
  Attorney General of Alabama
Edmund G. Lacour Jr.
  Solicitor General
OFFICE OF THE ALABAMA ATTORNEY
  GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

*Counsel for the State of Alabama*


Raúl R. Labrador
  Attorney General of Idaho
Alan Hurst
  Solicitor General
Sean M. Corkery
  Assistant Solicitor General
OFFICE OF THE IDAHO ATTORNEY
  GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

*Counsel for the State of Idaho*

Lynn Fitch
  Attorney General of Mississippi
Justin L. Matheny
  Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
  OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


Dave Yost
  Attorney General of Ohio
T. Elliot Gaiser
  Ohio Solicitor General
Mathura J. Sridharan
  Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*


Marty J. Jackley
  Attorney General of South Dakota
Ryan Mcfall
  Assistant Attorney General
OFFICE OF ATTORNEY GENERAL
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

*Counsel for the State of South Dakota*


Brenna Bird
  Attorney General of Iowa
Eric H. Wessan
  Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*


Andrew Bailey
  Attorney General of Missouri
Joshua M. Divine, #69875MO
  Solicitor General
Dominic X. Barceleau, #76510MO
  Assistant Attorney General
815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


Alan Wilson
  Attorney General of South Carolina
Joseph D. Spate
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*

Ken Paxton
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Aaron L. Neilson
  Solicitor General
Jacob Beach
  Assistant Solicitor General
Office of the Attorney General of
Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

*Counsel for the State of Texas*


Jason Miyares
  Attorney General of Virginia
Kevin M. Gallagher
  Principal Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S
  OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of
Virginia*

Jonathan Skrmetti
  Attorney General of Tennessee
J. Matthew Rice
  Solicitor General of Tennessee
OFFICE OF TENNESSEE ATTORNEY
  GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

*Counsel for the State of Tennessee*


Derek E. Brown
  Attorney General of Utah
Stanford Purser
  Solicitor General
OFFICE OF THE UTAH ATTORNEY
  GENERAL
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

*Counsel for the State of Utah*

Craig E. Frosch
  Executive Counsel, Louisiana Sheriffs'
Association
FROSCH, RODRIGUE, ARCURI, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

Mary Erlingson
East Baton Rough Parish
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

Shannon Dirmann
LOUISIANA SHERIFF'S ASSOCIATION
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

*Counsel for Sheriff Sid Gautreaux; Sheriff
Bobby Webre; Sheriff Mark Wood; Sheriff
Kevin Cobb; and The Louisiana Sheriffs'
Association*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

———————————————

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

———————————————

Nos. 24-1860 & 24-1927

SECURUS TECHNOLOGIES, LLC,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE
REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY; OFFICE OF
COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

———————————————

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON
SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF
CHRIST, INC.

Intervenors.

_____

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

———————————————

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

# VOLUME I

Certified List of items constituting the record of FCC proceedings in WC Docket Nos. 23-62 & 12-375 .................................................................................. JA1

Comments of Center on the Administration of Criminal Law, WC Docket No. 12-375 (Mar. 25, 2013) ............................................................................ JA93

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) [excerpt pages 14111, 14138-43, 14194] ................................. JA107

Comments of National Sheriffs' Association, WC Docket No. 12-375, Exh. A (Jan. 12, 2015) ............................................................................................ JA116

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd. 12763 (2015) [excerpt pages 12768, 12775, 12790, 12813-18, 12838-39] .......................................................................................................... JA133

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 31 FCC Rcd. 9300 (2016) [excerpt page 9311] .................................................................................... JA145

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd. 8485 (2020) [excerpt page 8514 n.209] .................................................................................. JA147

Comments of Worth Rises, WT Docket No. 12-375 (Nov. 23, 2020) ............. JA149

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (May 13, 2021) .......................................................................................................... JA197

Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement, WC Docket No. 12-375 (Aug. 30, 2021) ................................... JA203

Securus Technologies, LLC Pet. for Clarification, WC Docket No. 12-375 (Sept. 17, 2021) ............................................................................................... JA212

Comments of Prison Policy Initiative, Inc. on Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Sept. 27, 2021) .................... JA218

Comments of Securus Technologies, LLC on Petition for Waiver, WC Docket No. 12-375 (Jan. 7, 2022)........................................................................ JA259

Comments of Nathan Miller, WC Docket No. 23-62 (May 4, 2023), Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay* (Nov. 4, 2022) ............................................................ JA274

Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Dec. 15, 2022) [excerpt cover and pp. 7-8, 11-13]........................................ JA300

Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Dec. 15, 2022) ............................................................................................... JA306

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Instructions*, WC Docket Nos. 23-62 & 12-375 ....................................................................................................... JA326

**VOLUME II**

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Word Template*, WC Docket Nos. 23-62 & 12-375 ....................................................................................................... JA385

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Excel Template*, WC Docket Nos. 23-62 & 12-375 ....................................................................................................... JA409

Reply Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Mar. 3, 2023) [excerpt cover and pp. 6-8]............................................. JA424

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023).................................................................... JA428

Comments of California State Senator Josh Becker, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .............................................................. JA483

Comments of Civil Rights Corps, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ......................................................................................... JA485

Comments of Color of Change, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ......................................................................................................... JA492

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............................................ JA502

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....................................................................... JA539

Comments of the NCIC Inmate Communications, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................... JA558

Comments of the Pay Tel Communications, Inc. in Response to Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (May 8, 2023)....... JA576

Opening Comments of Stephen A. Raher, WC Docket Nos. 23-62 & 12-375 (May 8, 2023)........................................................................... JA604

Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (May 8, 2023)........................................................................... JA632

Opening Comments of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............ JA686

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) .................................................................................................. JA711

## VOLUME III

Comments of the Wright Petitioners et al., WC Docket Nos. 23-62 & 12-375 (May 8, 2023)........................................................................... JA732

Coleman Bazelon & Paroma Sanyal, Brattle Report (May 8, 2023)................ JA774

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023)............................................................................ JA812

Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (June 2, 2023).......................................................................... JA819

Securus Technologies, LLC's Initial Comments to the Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) ................................................................................................. JA827

Comments of the Electronic Privacy Information Center, WC Docket Nos. 23-62 & 12-375 (June 6, 2023) ......................................................................... JA835

Reply Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ....................................................................... JA844

Reply Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ............................................................................ JA865

Reply Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) .................................................................................. JA915

Reply Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ........................................................................................................... JA957

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, 38 FCC Rcd 6625 (WCB 2023) ............. JA963

Letter from Gregory R. Capobianco, Counsel for the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 15, 2023) ........................................................................................................ JA991

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 21, 2023) .......................................................................................... JA1016

**VOLUME IV**

IPCS Chicago Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Feb. 6, 2024) .................................. JA1055

IPCS Charleston Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Mar. 5, 2024).................................. JA1159

Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 & 12-375 (Apr. 29, 2024) ........................................ JA1251

Letter from Virginia Association of Regional Jails, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62 (May 29, 2024)................................ JA1256

iv

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) ................................................................................................ JA1266

Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (June 7, 2024) [excerpt pages 5–6] .......................................................... JA1276

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC and Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 10, 2024) ............................................ JA1280

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 14, 2024) ................................................................................ JA1300

Letter from Leadership Conference to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (filed June 17, 2024) ..................... JA1302

Joint Letter of 90+ Organizations Supporting Low Rates, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (June 17, 2024) ............................................................................................ JA1306

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 18, 2024) ............................................... JA1310

IPCS Phoenix Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed June 20, 2024) ............................... JA1326

Letter from Salvatore Taillefer, Jr., Counsel to NSA to Marlene Dortch, Secretary of the FCC, WC Dockets Nos. 23-62 & 12-375 (June 20, 2024) ... JA1390

Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 8, 2024) ............................................................................................ JA1408

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 9, 2024) ................................................. JA1409

Letter from Melonie Perez, Aliza Kaplan, Jennifer Scaife, & Leigh Owens, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) ............................................................ JA1432

Letter from Sheriff Kieran Donahue, Canyon County, Idaho, and President of the National Sheriffs' Association to Marlene Dortch, Secretary of the FCC, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 1] .... JA1439

Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) ................................................................................ JA1440

Comments of the Montana Sheriffs & Peace Officer Association, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt pages 1–2] ............... JA1445

Comments of the Virginia Association of Regional Jails, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 2] ......................................... JA1447

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 12, 2024) ............................................................................... JA1449

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ..................................................................... JA1453

Comments of Virginia Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ......................................................................... JA1485

## VOLUME V

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647 (2024) ................................................................. JA1486

## VOLUME VI

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Aug. 26, 2024) .................................................................. JA1950

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Second Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) .................................................................. JA1951

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 10944 (WCB 2024)......................................................................... JA1953

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11373 (WCB 2024)......................................................................... JA1972

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11607 (WCB 2024)......................................................................... JA1994

Motion of Pay Tel Communications, Inc. for Stay Pending Judicial Review, *Pay Tel Communications, Inc. v. FCC*, No. 24-8028 (1st Cir. Oct. 25, 2024) ........................................................................................... JA2011

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375, DA 24-1074 (Oct. 28, 2024).................. JA2041

Letter from Aaron M. Dawson, Executive Director of the Alabama Jail Administrators' Council, to the FCC, Re: Report and Order, Order on Reconsideration, Clarification and Waiver, and Further notice of Proposed Rulemaking (Nov. 21, 2024)......................................................... JA2053

Letter from Geoffrey G. Why, Verrill Dana LLP, Counsel to Ameelio, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (Dec. 6, 2024) ........................................................................................... JA2055

Panka Bencsik et al., *Calls and Conduct: The Impact of Free Communication on Prison Misconduct* (Dec. 2024) (forthcoming publication) ................................................................................... JA2057

Ameelio Iowa Model Memo (Nov. 26, 2024) ............................... JA2084

**UNDER SEAL**
**VOLUME VII**

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (rel. July 22, 2024) ..........................................JA2091

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024).......................................................JA2582

**Federal Communications Commission**

February 6, 2024

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re: Notice of *Ex Parte* Communication, WC Docket Nos. 23-62 and 12-375

Dear Ms. Dortch,

On October 27, 2023, the Federal Communications Commission (Commission) hosted a listening session in Chicago, Illinois to obtain additional comment for the record in the above-referenced proceedings as part of its ongoing work to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Act). The listening session included Commission representatives, federal and state elected officials, representatives from non-governmental organizations, and members of the public, as listed below. Participants at the listening session provided additional public comment regarding the purpose of the Act and the impact of unreasonable rates on incarcerated people and their families, including first-hand accounts of those impacts. The listening session was part of the Commission's broader efforts to engage a broad segment of the public in its continuing efforts to implement the Act.

**Public Listening Session**: October 27, 2023, 2:30pm-4:00pm CST at The Women's Justice Institute in Chicago, Illinois.

The following individuals participated in the listening session:

- The Honorable Jessica Rosenworcel, FCC Chairwoman
- The Honorable Senator Tammy Duckworth, U.S. Senator from Illinois
- The Honorable Juliana Stratton, Lieutenant Governor of Illinois
- Colette Payne, Director, Women's Justice Institute Reclamation Project
- Ana Navarro, current Incarcerated People's Communications Services consumer
- Desiree Lumpkin, current Incarcerated People's Communications Services consumer
- Monserat (Monse) Arreola, former Incarcerated People's Communications Services consumer
- Sandra Brown, current Incarcerated People's Communications Services consumer
- Paloma Perez, FCC Press Secretary

A description, schedule, and recording of the public listening session can be found here: https://www.youtube.com/watch?v=Ou2_k5-SKcE.

Additional information about the Commission's efforts in connection with IPCS can be found at: https://www.fcc.gov/general/ics-data-collections. For questions concerning this filing, please contact Ahuva Battams at ahuva.battams@fcc.gov or at (202) 418-1565.

**JA1055**

**Federal Communications Commission**

Respectfully submitted,

/s/ Ahuva Battams
Ahuva Battams
Attorney Advisor
Pricing Policy Division
Wireline Competition Bureau
Federal Communications Commission

**JA1056**

**IPCS October 27, 2023 Chicago Listening Session**

**WC Docket Nos. 23-62 and 12-375**

**Video Subtitles**

1
00:00:00,000 --> 00:00:03,920
And thank you for joining today's Listening
Session on the Federal Communications Commissions.

2
00:00:03,920 --> 00:00:07,841
Ongoing work to ensure a just and reasonable rates
for communication services

3
00:00:07,841 --> 00:00:10,176
provided to incarcerated people
and their families.

4
00:00:10,176 --> 00:00:11,261
My name is Paloma Perez.

5
00:00:11,261 --> 00:00:15,432
I'm the communications director
for the FCC and the moderator of today's events.

6
00:00:15,515 --> 00:00:16,599
Before we get started,

7
00:00:16,599 --> 00:00:21,146
I like to invite Colette Payne for a
welcome to the Women's Justice Institute's Reclamation Center.

8
00:00:21,187 --> 00:00:24,691
For those who don't know Colette, Colette
was appointed to serve as the first director

9
00:00:24,691 --> 00:00:29,195
of the Women's Justice Institute Reclamation
Project in 2020, the first initiative of its kind

10
00:00:29,195 --> 00:00:33,658
in Illinois to be led to be led by
and for system impacted women.

11
00:00:33,742 --> 00:00:37,454

**JA1058**

In her role, Colette engages women
directly impacted by the criminal legal system

12
00:00:37,537 --> 00:00:42,167
to become agents of change and to create solutions
to end the incarceration of women and girls.

13
00:00:42,250 --> 00:00:45,795
And with that, I'll welcome Colette to the podium.

14
00:00:45,879 --> 00:00:51,468
Thanks, of course.

15
00:00:51,551 --> 00:00:54,471
Good afternoon, everyone.

16
00:00:54,471 --> 00:00:58,349
Hey. For those of you that don't know me, I'm Colette Payne

17
00:00:58,433 --> 00:01:00,518
the director of the Reclamation Center

18
00:01:00,518 --> 00:01:03,521
here with the Women's Justice Institute.

19
00:01:03,646 --> 00:01:06,066
The Women's Justice Institute is a dynamic

20
00:01:06,066 --> 00:01:11,321
think and do tank that collaborates and consults
with a wide range of stakeholders

21
00:01:11,488 --> 00:01:15,950
to end women's
mass incarceration, reduce harm to impacted women,

22
00:01:16,159 --> 00:01:22,123
their children and families, improve health,
well-being and outcomes among them.

```
23
00:01:22,207 --> 00:01:24,417
I am so glad we are having this

24
00:01:24,417 --> 00:01:27,420
communication justice conversation.

25
00:01:27,629 --> 00:01:31,883
I served my first prison sentence
at the age of 14.

26
00:01:31,966 --> 00:01:34,928
My mom and dad didn't have much raising
six children,

27
00:01:35,136 --> 00:01:39,099
sending us to Catholic school,
feeding us, housing, and clothing us.

28
00:01:39,140 --> 00:01:44,354
It wasn't enough money to carve out
for phone calls so that I could call home.

29
00:01:44,437 --> 00:01:49,818
I cycled in and out of jails and prisons for years

30
00:01:49,901 --> 00:01:51,361
and I wasn't always able to

31
00:01:51,361 --> 00:01:55,073
speak with my own children
during my incarceration.

32
00:01:55,156 --> 00:01:58,034
No mother wants to see their children
incarcerated.

33
00:01:58,034 --> 00:02:03,289
And I found myself in that same place
```

that my mother was in. And

34
00:02:03,373 --> 00:02:06,918
my youngest wasn't concentrated in Iowa
at Polk County Jail.

35
00:02:07,001 --> 00:02:10,004
And the phone calls was ridiculous.

36
00:02:10,004 --> 00:02:14,342
Between making sure he had commissary video
visits and phone calls.

37
00:02:14,551 --> 00:02:19,389
I had to sacrifice
and make a way for him to stay connected.

38
00:02:19,472 --> 00:02:24,352
He got his time, went to federal prison
where the phone calls were free.

39
00:02:24,435 --> 00:02:27,063
They gave everyone there 1000 minutes

40
00:02:27,063 --> 00:02:30,191
each month, which is the right thing to do.

41
00:02:30,441 --> 00:02:33,444
Keep families connected.

42
00:02:33,486 --> 00:02:34,988
Oh, and I'm having a hot flash.

43
00:02:34,988 --> 00:02:36,447
My God. Jesus, excuse the swearing.

44
00:02:36,447 --> 00:02:39,784
It just happened

```
45
00:02:39,868 --> 00:02:44,122
Oh, God. I'm sorry.

46
00:02:44,205 --> 00:02:47,000
My experience,

47
00:02:47,000 --> 00:02:48,877
Someone get me a tissue.

48
00:02:48,877 --> 00:02:53,214
my experience is why I do this work.

49
00:02:53,256 --> 00:02:55,425
And I work with an amazing team

50
00:02:55,425 --> 00:02:58,970
of experts, former incarcerated women
we work across.

51
00:02:58,970 --> 00:03:00,346
Thank you so much.

52
00:03:00,346 --> 00:03:03,933
We work across sectors
to build transformative solutions

53
00:03:04,017 --> 00:03:06,936
that include innovative, data driven systems,

54
00:03:06,936 --> 00:03:10,773
assessment tools,
and the development of programs and policies

55
00:03:10,773 --> 00:03:15,111
rooted in the research of women's
unique justice pathways.

56
00:03:15,111 --> 00:03:18,531
```

before, during and after incarceration.

57
00:03:18,615 --> 00:03:20,742
Can my team please stand up?

58
00:03:20,742 --> 00:03:23,745
I just want you all to meet the amazing team: Alexis,

59
00:03:23,953 --> 00:03:26,956
Sandra, Keesha.

60
00:03:27,040 --> 00:03:31,044
Diana is somewhere greeting people.

61
00:03:31,085 --> 00:03:36,299
Diana,
I mean, Diane, our co-founder, she believes in us.

62
00:03:36,382 --> 00:03:41,846
She entrusted us with this work
because we're experts in this field.

63
00:03:41,930 --> 00:03:47,018
In 2021, we launch our groundbreaking
report titled Redefine

64
00:03:47,018 --> 00:03:51,147
the Narrative, centering the voices of women
with lived experience,

65
00:03:51,231 --> 00:03:55,276
making available a blueprint
as to how we can work together

66
00:03:55,485 --> 00:03:58,488
and providing pathways to justice by exploring

67
00:03:58,655 --> 00:04:02,784
five rights and needs which every woman deserves.

68
00:04:02,825 --> 00:04:05,828
Relationships, safety, health and well-being.

69
00:04:05,954 --> 00:04:07,455
safe and stable housing,

70
00:04:07,455 --> 00:04:12,168
economic security and empowerment.

71
00:04:12,252 --> 00:04:14,170
supporting families

72
00:04:14,170 --> 00:04:18,383
and supportive families.

73
00:04:18,466 --> 00:04:22,762
In the Economic Security and Empowerment Chapter

74
00:04:22,845 --> 00:04:26,391
we have top ten recommendations in all chapters,

75
00:04:26,391 --> 00:04:29,394
but in that chapter number eight,

76
00:04:29,435 --> 00:04:32,355
eliminate exploitive prison survivor costs

77
00:04:32,355 --> 00:04:36,567
by ensuring more equitable prison commissary,

78
00:04:36,651 --> 00:04:41,656
communications, justice
and dignified access to basic needs.

79
00:04:41,739 --> 00:04:47,078
We are grateful to elevate
WJI's communication platform

80
00:04:47,287 --> 00:04:51,582
by exploring what we coined PSCs,

81
00:04:51,791 --> 00:04:55,336
prison survival costs, that will ensure

82
00:04:55,336 --> 00:05:00,800
more equitable access to communications justice
for all that are warehoused

83
00:05:00,883 --> 00:05:04,387
in a correctional facility.

84
00:05:04,470 --> 00:05:06,306
We are glad to have

85
00:05:06,306 --> 00:05:09,309
Lieutenant Governor Juliana Stratton here.

86
00:05:09,392 --> 00:05:13,313
Elgie Stratton has been a long
standing partner of our work.

87
00:05:13,396 --> 00:05:17,650
We we are excited for this continued partnership.

88
00:05:17,734 --> 00:05:20,111
We are grateful

89
00:05:20,111 --> 00:05:21,946
to Illinois Senator Tammy

90
00:05:21,946 --> 00:05:25,366
Duckworth and her team for hosting this community

91
00:05:25,450 --> 00:05:30,079
Justice conversation

here at the Reclamation Center

92
00:05:30,163 --> 00:05:33,166
to envision opportunities that reduce harm

93
00:05:33,166 --> 00:05:36,210
caused by exploitive practices that harm

94
00:05:36,210 --> 00:05:39,213
families impacted by incarceration.

95
00:05:39,255 --> 00:05:47,638
Thank you.

96
00:05:47,722 --> 00:05:50,350
Thank you so much, Colette.

97
00:05:50,350 --> 00:05:53,519
And thank you honestly for hosting us
and welcoming us into this space.

98
00:05:53,603 --> 00:05:56,230
Today's Listening
session will obtain additional public comment

99
00:05:56,230 --> 00:06:00,318
in support of the Commission's ongoing efforts
to ensure a just and reasonable rates and charges

100
00:06:00,318 --> 00:06:04,989
for incarcerated people's communication services
and engage the public in their continued efforts.

101
00:06:05,156 --> 00:06:09,619
bolstered by the Martha Wright-Reed Just
and Reasonable Communications Act of 2022.

102
00:06:09,702 --> 00:06:12,622
For those who aren't keeping track at home,

the FCC is moving quickly

103
00:06:12,622 --> 00:06:16,459
to implement the Martha Wright-Reed Just
and Reasonable Communications Act of 2022

104
00:06:16,667 --> 00:06:20,171
and initiated
a rulemaking proceeding in March of 2023.

105
00:06:20,254 --> 00:06:23,466
This listening session will complement
and supplement the extensive record developed

106
00:06:23,466 --> 00:06:26,469
so far in response to the Commission's
notice of proposed rulemaking.

107
00:06:26,594 --> 00:06:29,555
Specifically, we will hear from formerly
incarcerated people and their loved ones

108
00:06:29,555 --> 00:06:33,351
about their experiences using incarcerated
people's communications services.

109
00:06:33,434 --> 00:06:36,396
This listening session
will become part of the public record

110
00:06:36,437 --> 00:06:38,981
for this proceeding,
which the Commission will rely on

111
00:06:38,981 --> 00:06:42,235
to adopt the just and reasonable rates
required under the law.

112
00:06:42,318 --> 00:06:45,029
Please note that given our limited time today,

113
00:06:45,029 --> 00:06:48,157
we couldn't accommodate dedicated time
for questions or comments from the audience.

114
00:06:48,157 --> 00:06:51,160
However, we highly encourage you
to share your thoughts and comments

115
00:06:51,202 --> 00:06:52,912
and there are multiple ways you can do so.

116
00:06:52,912 --> 00:06:57,625
Specifically, three, and I'll share those now, first,
you can submit formal comments into the record.

117
00:06:57,667 --> 00:07:00,044
We have copies of a guide detailing this process,

118
00:07:00,044 --> 00:07:02,296
which you can find on the table
where you signed in.

119
00:07:02,296 --> 00:07:05,091
Second,
you can also, submit express comments by visiting

120
00:07:05,091 --> 00:07:09,137
FCC.gov/ecfs/filings/expresss .

121
00:07:09,345 --> 00:07:13,391
And once again, you can find that hyperlink
in the guide at the signing table as well.

122
00:07:13,474 --> 00:07:15,977
And then lastly, you can also write your thoughts
and comments today

123
00:07:15,977 --> 00:07:17,895

and give them to us at the end of the session.

124
00:07:17,895 --> 00:07:19,272
We have copies of a brief form

125
00:07:19,272 --> 00:07:23,276
for you to use for this purpose and again,
they're all available at the signing table.

126
00:07:23,317 --> 00:07:27,071
The FCC greatly values public participation
in the rulemaking process, and your comments

127
00:07:27,071 --> 00:07:31,075
play a crucial role in shaping these regulations.
To ensure your voice is heard

128
00:07:31,117 --> 00:07:33,911
we kindly request you submit your comments
through the provided channels.

129
00:07:33,911 --> 00:07:36,998
And to kick off this important discussion
we are privileged to have with us

130
00:07:36,998 --> 00:07:40,209
the Chairwoman of the Federal Communications
Commission, Jessica Rosenworcel.

131
00:07:40,460 --> 00:07:42,920
She is the first woman to ever permanently lead
the Commission in

132
00:07:42,920 --> 00:07:46,716
its more than 100 year history,
and she has been an advocate

133
00:07:46,716 --> 00:07:50,052
for overlooked and underserved communities
for her time in public service.

134
00:07:50,303 --> 00:08:03,733
Please welcome Jessica Rosenworcel.

135
00:08:03,816 --> 00:08:06,819
Yeah, yeah, yeah,

136
00:08:06,819 --> 00:08:07,987
yeah.

137
00:08:07,987 --> 00:08:17,955
Yeah.

138
00:08:18,039 --> 00:08:18,915
All right.

139
00:08:18,915 --> 00:08:20,082
Does this work?

140
00:08:20,082 --> 00:08:22,543
All right.

141
00:08:22,543 --> 00:08:27,423
It is an honor to be here in Illinois,

142
00:08:27,507 --> 00:08:33,179
and I am so grateful to Senator Duckworth,

143
00:08:33,262 --> 00:08:36,557
Lieutenant Governor of Illinois, for being here.

144
00:08:36,641 --> 00:08:41,062
And I'm really grateful to the Women's
Justice Institute

145
00:08:41,145 --> 00:08:44,899
for having us here today,
but more importantly for what you do.

146
00:08:44,982 --> 00:08:48,027
And I also got to be honest with you,
I'm never in a room with this many women.

147
00:08:48,027 --> 00:08:51,948
It's really neat.

148
00:08:52,031 --> 00:08:52,573
I mean that

149
00:08:52,573 --> 00:08:55,868
sincerely, because I work in technology policy.

150
00:08:55,952 --> 00:08:59,497
In the tables I sit out there not that diverse,

151
00:08:59,580 --> 00:09:02,625
but here I also want to tell you a little bit
about what

152
00:09:02,625 --> 00:09:06,754
we're talking about today,
which is about the high cost

153
00:09:06,837 --> 00:09:10,299
of prison phone services and how difficult it is

154
00:09:10,299 --> 00:09:15,263
for families to stay in touch,
because it is also a story about women.

155
00:09:15,346 --> 00:09:16,514
It was 20 years

156
00:09:16,514 --> 00:09:20,476
ago that a grandmother named Martha Wright

157

```
00:09:20,560 --> 00:09:25,565
filed a document with the agency
I oversee, the Federal Communications Commission,

158
00:09:25,648 --> 00:09:28,359
to tell us she was having difficulty

159
00:09:28,359 --> 00:09:31,946
paying to keep in touch with her grandson,

160
00:09:31,988 --> 00:09:33,698
who was in prison.

161
00:09:33,698 --> 00:09:37,034
She wanted to tell him about her nephews,
what was going on with her nephew.

162
00:09:37,034 --> 00:09:39,954
She wanted to make sure he knew
what was happening in her church.

163
00:09:39,954 --> 00:09:43,207
She wanted to make sure he had a lifeline
to a future

164
00:09:43,207 --> 00:09:46,210
when he got out of serving time.

165
00:09:46,294 --> 00:09:49,213
And she asked the Federal Communications
Commission

166
00:09:49,213 --> 00:09:52,216
to do something about it.

167
00:09:52,258 --> 00:09:52,842
And you know what?

168
00:09:52,842 --> 00:09:56,846
```

That petition, it sat on the shelf for many years.

169
00:09:56,846 --> 00:10:00,391
It gathered dust. It was in file cabinets.

170
00:10:00,474 --> 00:10:03,436
And then it took another woman,
one of my predecessors,

171
00:10:03,436 --> 00:10:08,232
I worked with a commissioner named Mignon Clyburn,
who said we should do something about this.

172
00:10:08,316 --> 00:10:12,862
Nobody's paying attention,
but what's happening isn't right.

173
00:10:12,945 --> 00:10:15,823
And so she got the Federal Communications
Commission to start

174
00:10:15,823 --> 00:10:18,826
looking at rates for phone calls.

175
00:10:19,035 --> 00:10:21,412
And what we found was crushing.

176
00:10:21,495 --> 00:10:22,038
So many

177
00:10:22,038 --> 00:10:25,833
families were paying as much for a single phone
call as most of us here

178
00:10:25,875 --> 00:10:30,796
pay for an unlimited monthly plan.

179
00:10:30,880 --> 00:10:34,258
And she convinced the Federal Communications

Commission to do something about it.

180
00:10:34,258 --> 00:10:34,842
And we did.

181
00:10:34,842 --> 00:10:39,430
We lowered rates
and we changed policies for junk fees

182
00:10:39,430 --> 00:10:41,766
they add to those bills.

183
00:10:41,766 --> 00:10:44,226
And then the courts told us,

184
00:10:44,226 --> 00:10:48,105
you don't actually have all the authority
you think you do to do these things.

185
00:10:48,189 --> 00:10:51,067
And they sent some of our decisions back.

186
00:10:51,067 --> 00:10:54,070
So we had to go to Congress and say,
we need more authority.

187
00:10:54,153 --> 00:10:56,739
We want to fix this. We're not done yet.

188
00:10:56,739 --> 00:11:00,618
These things that these women started,
we're going to keep on working on them.

189
00:11:00,701 --> 00:11:04,372
And so we needed a champion in Congress.

190
00:11:04,455 --> 00:11:09,335
And Senator Duckworth is sitting here who helped

```
191
00:11:09,418 --> 00:11:09,960
develop a

192
00:11:09,960 --> 00:11:13,005
law named for that grandmother, the
Martha Wright-Reed

193
00:11:13,005 --> 00:11:18,052
Just and Communications,
Just and Reasonable Communications Act,

194
00:11:18,135 --> 00:11:22,348
which passed into law late last year
and was signed by the president this year.

195
00:11:22,348 --> 00:11:27,436
And it gives the Federal Communications
Commission power to fix more phone rates.

196
00:11:27,603 --> 00:11:30,606
Instead of just fixing rates
that are across state lines,

197
00:11:30,731 --> 00:11:32,942
we can now fix rates within state lines.

198
00:11:32,942 --> 00:11:36,070
80% of the calls that are made to

199
00:11:36,070 --> 00:11:40,199
and from incarcerated
people happen within a state.

200
00:11:40,199 --> 00:11:41,951
So we got a lot of work to do.

201
00:11:41,951 --> 00:11:43,994
And she also did something that's important.
```

202
00:11:43,994 --> 00:11:48,124
She had an eye towards the future,
which was making sure

203
00:11:48,207 --> 00:11:51,210
that we don't just think about voice calls,

204
00:11:51,335 --> 00:11:53,170
the future is about video calls.

205
00:11:53,170 --> 00:11:55,464
So she gave us that authority to.

206
00:11:55,464 --> 00:11:59,009
The bottom line is that we have got to right
this wrong.

207
00:11:59,051 --> 00:12:01,178
It's taken too long.

208
00:12:01,178 --> 00:12:05,516
But I want everyone to know
a whole bunch of women are making it happen.

209
00:12:05,558 --> 00:12:08,936
And we're going to need the help of people
in this audience to continue to make sure we right

210
00:12:08,936 --> 00:12:09,520
these wrongs.

211
00:12:09,520 --> 00:12:10,938
But we're committed to it.

212
00:12:10,938 --> 00:12:12,940
So that's all I wanted to say to you today.

213
00:12:12,940 --> 00:12:15,067

I'm so glad to be able to be here with you.

214
00:12:15,067 --> 00:12:18,362
Thank you for taking some time out of your day.

215
00:12:18,446 --> 00:12:21,449
And thank you

216
00:12:21,490 --> 00:12:23,284
for working.

217
00:12:23,284 --> 00:12:26,454
Thank you, Chairwoman Rosenworcel,
for sharing the FCC's ongoing efforts

218
00:12:26,454 --> 00:12:27,997
and your commitment around this work.

219
00:12:27,997 --> 00:12:29,081
We're honored to have U.S.

220
00:12:29,081 --> 00:12:32,460
Senator Tammy Duck, Tammy Duckworth with us today.

221
00:12:32,543 --> 00:12:35,963
Chairwoman already gave an introduction,
but I will add on a little bit more.

222
00:12:36,046 --> 00:12:39,467
As the Chairwoman mentioned, Senator Duckworth
introduced the Martha Wright-Reid

223
00:12:39,467 --> 00:12:43,471
Just and Reasonable Communications
Act on May 10, 2021.

224
00:12:43,471 --> 00:12:45,848
And after much hard work and collaboration,

225
00:12:45,848 --> 00:12:50,478
Congress passed this bill and President
signed it into law on January 5th, 2023.

226
00:12:50,561 --> 00:12:53,564
This legislation, as a result
of the dedication of the late Martha Wright,

227
00:12:53,564 --> 00:12:58,486
a grandmother who led the charge in 2003
to ensure families with incarcerated individuals

228
00:12:58,486 --> 00:13:01,989
have the ability to stay in contact
with their loved ones by eliminating the burden

229
00:13:02,072 --> 00:13:04,575
of exorbitant calling rates.

230
00:13:04,575 --> 00:13:07,912
With the continued leadership of Senator
Tammy Duckworth, the Martha Wright Reid,

231
00:13:07,995 --> 00:13:10,998
Martha Wright's initial efforts
led to the passage of this law.

232
00:13:11,248 --> 00:13:14,168
And with that, please
welcome U.S. Senator Tammy Duckworth.

233
00:13:14,168 --> 00:13:16,837
Thank you.

234
00:13:16,921 --> 00:13:18,464
Thank you.

235
00:13:18,464 --> 00:13:24,136
And thank you, Chairman Rosenworcel, for

being a champion of telecommunications justice.

236
00:13:24,220 --> 00:13:26,680
We're here today to discuss this huge step

237
00:13:26,680 --> 00:13:30,518
forward in phone justice
and to hear some stories firsthand

238
00:13:30,518 --> 00:13:33,979
from Illinoisans who have been impacted
by the criminal justice system.

239
00:13:34,063 --> 00:13:39,693
Picking up a phone call to call a loved one
may sound simple, but its power is immeasurable,

240
00:13:39,693 --> 00:13:44,865
especially for the more than 2 million people
who are incarcerated in this in this nation.

241
00:13:44,949 --> 00:13:48,536
Yet for far too many years,
families were forced to spend outrageous sums

242
00:13:48,536 --> 00:13:53,123
to speak by phone with a loved one
living miles away in a correctional facility.

243
00:13:53,165 --> 00:13:54,500
There were charges,

244
00:13:54,500 --> 00:13:59,505
not only was it a per minute charge, but
it was a connection charge and people were calling

245
00:13:59,505 --> 00:14:04,760
from who were incarcerated would have their call
dropped three, four, five, six, ten times.

246
00:14:04,760 --> 00:14:08,389
And each time that would drop another $2 charge,
another $3 charge.

247
00:14:08,389 --> 00:14:13,811
And at the end of the day,
a single phone call could cost 50, 60, $70.

248
00:14:13,978 --> 00:14:16,856
That is absolutely unacceptable.

249
00:14:16,856 --> 00:14:20,276
It prevented children
from being able to hear their parents voices.

250
00:14:20,276 --> 00:14:24,905
It kept spouses from being able to say
the simple I'm here for you to their partners.

251
00:14:24,989 --> 00:14:28,868
And we must be clear what unjust and unreasonable
communication rates

252
00:14:28,868 --> 00:14:31,871
cut off an incarcerated person
from vital connections,

253
00:14:32,079 --> 00:14:35,332
the harm extends beyond that family.

254
00:14:35,332 --> 00:14:37,793
It breaks times into our community.

255
00:14:37,793 --> 00:14:42,506
After all, the vast majority of incarcerated
persons will eventually be released.

256
00:14:42,590 --> 00:14:47,553
And we all have a stake in making

sure that our nation prepares our fellow Americans

257
00:14:47,761 --> 00:14:51,765
to navigate the daunting challenge of reentry
into our communities.

258
00:14:51,849 --> 00:14:56,270
Ending a predatory status quo
that enabled prison telecom providers to gouge

259
00:14:56,270 --> 00:15:00,608
the families of incarcerated
people was a moral imperative, particularly

260
00:15:00,608 --> 00:15:05,571
for the more than 2 million children
who have at least one parent who was incarcerated.

261
00:15:05,654 --> 00:15:09,199
And the evidence tells us that preserving
connections helps

262
00:15:09,283 --> 00:15:13,829
to reduce recidivism
and it prevents repeat offenses.

263
00:15:13,913 --> 00:15:17,750
Preventing repeated offenses helps all of us.

264
00:15:17,833 --> 00:15:20,586
That's
why it was so important to enshrine in federal law

265
00:15:20,586 --> 00:15:24,632
a clear and enforceable requirement
that all prison communication rates,

266
00:15:24,632 --> 00:15:29,178
whether it is interstate or intrastate,
must be just and reasonable.

267
00:15:29,261 --> 00:15:34,391
Fortunately, President Biden acted swiftly
to sign my bipartisan Martha Wright-Reed

268
00:15:34,391 --> 00:15:38,562
Just and Reasonable Communications
Act into law at the beginning of this year.

269
00:15:38,646 --> 00:15:41,982
The law's title appropriately honors the late
Martha Wright-Reed,

270
00:15:42,149 --> 00:15:45,027
an incredible woman
who established an incredible legacy

271
00:15:45,027 --> 00:15:49,490
that will live on in every preserved connection
across our great nation.

272
00:15:49,573 --> 00:15:53,118
Her example is so powerful
because it represents America at its best.

273
00:15:53,369 --> 00:15:57,581
A regular citizen
refusing to remain silent in the face of injustice

274
00:15:57,665 --> 00:16:00,668
and ultimately a regular citizen, using her voice

275
00:16:00,668 --> 00:16:05,547
to galvanize the forces of change to
right a longstanding wrong.

276
00:16:05,631 --> 00:16:08,759
Of course, restoring the FCC authority
to ensure prison

277
00:16:08,759 --> 00:16:11,929
communication rates are just
and reasonable was only the first step.

278
00:16:12,012 --> 00:16:15,015
And I'm grateful
that because of Chair Rosenworcel leadership,

279
00:16:15,015 --> 00:16:19,895
the FCC is working around the clock
to effectively, to effectively implement this law.

280
00:16:19,979 --> 00:16:22,982
And today
represents a critical part of this process.

281
00:16:23,148 --> 00:16:26,819
I'm a big believer in the principle
that the best public policy results

282
00:16:26,819 --> 00:16:29,863
from listening to the public one seeks to serve.

283
00:16:29,863 --> 00:16:31,573
And that is why we're here today.

284
00:16:31,573 --> 00:16:34,785
And now I'm going to turn this over
to our wonderful Lieutenant Governor

285
00:16:34,785 --> 00:16:37,955
Stratton, for the work
that she's doing at the state.

286
00:16:38,038 --> 00:16:41,625
This is a whole partnership between federal
and state, as well as the Commission,

287
00:16:41,625 --> 00:16:45,379

because this could not take effect
without all of us working together at all levels.

288
00:16:45,504 --> 00:16:49,508
Lieutenant Governor. Thank you so much.

289
00:16:49,591 --> 00:16:51,260
Good afternoon, everyone.

290
00:16:51,260 --> 00:16:53,429
I am Lieutenant Governor Juliana Stratton.

291
00:16:53,429 --> 00:16:57,474
She/her pronouns and it's such an honor
to share space with each of you

292
00:16:57,516 --> 00:17:01,854
to our wonderful Senator, Tammy Duckworth.

293
00:17:02,062 --> 00:17:06,608
Thank you for your leadership on this issue,
but also for being such a fighter

294
00:17:06,608 --> 00:17:11,238
for Illinois
every single day as you work in Washington, D.C.

295
00:17:11,321 --> 00:17:15,242
And of course, to FCC Chairwoman
Jessica Rosenworcel.

296
00:17:15,325 --> 00:17:20,414
Thank you so much for your advocacy
and making sure that we could get to this point.

297
00:17:20,497 --> 00:17:23,500
We are here today to listen as this

298
00:17:23,709 --> 00:17:26,462

Act now gets implemented.

299
00:17:26,462 --> 00:17:28,464
And I just want to again acknowledge

300
00:17:28,464 --> 00:17:33,469
Senator Duckworth's incredible leadership
in passing and getting the Martha Wright-Reed

301
00:17:33,552 --> 00:17:37,222
Just and Reasonable
Communications Act signed into law.

302
00:17:37,306 --> 00:17:39,975
And I thank you both for honoring her

303
00:17:39,975 --> 00:17:44,188
and speaking her name
and just recognizing that it is

304
00:17:44,271 --> 00:17:44,688
everyday

305
00:17:44,688 --> 00:17:47,649
Americans who decides something is not right,

306
00:17:47,649 --> 00:17:51,445
and I want to see something different
to really make a difference in this world.

307
00:17:51,528 --> 00:17:56,158
I want to thank the Reclamation Center
and WJI for hosting us today.

308
00:17:56,241 --> 00:17:59,536
As a state representative,
I worked with many of you to pass the Women's

309
00:17:59,536 --> 00:18:04,041

Correctional Services Act,
and I've always appreciated your leadership

310
00:18:04,124 --> 00:18:07,628
and as a restorative justice
practitioner, it's always important to me

311
00:18:07,628 --> 00:18:11,090
to recognize that the wisdom is in the room.

312
00:18:11,173 --> 00:18:14,176
The wisdom is found right here in this room
as we think about

313
00:18:14,176 --> 00:18:17,930
how to build a justice system
that better reflects our values,

314
00:18:17,930 --> 00:18:22,935
not one that is punitive,
but one that is restorative and equitable

315
00:18:23,018 --> 00:18:27,606
and really meets the needs of the people
who are just as impacted.

316
00:18:27,689 --> 00:18:32,111
Today's conversation is so important
because it's imperative that we keep in mind

317
00:18:32,319 --> 00:18:38,450
how families and whole communities
have been disrupted by our criminal legal system,

318
00:18:38,534 --> 00:18:41,954
because it's never just the person
that's in custody who is impacted.

319
00:18:42,162 --> 00:18:45,457
Family members and loved ones are also impacted.

320
00:18:45,457 --> 00:18:47,835
And I know many of you are here today.

321
00:18:47,835 --> 00:18:51,380
We know it's important for, not just important,
but essential

322
00:18:51,380 --> 00:18:54,591
for people in custody
to hear the voices of their children,

323
00:18:54,675 --> 00:19:00,055
to hear the comforting words of a parent,
to get the supportive advice of their partners,

324
00:19:00,222 --> 00:19:03,767
and to have access to consult
with their legal counsel.

325
00:19:03,851 --> 00:19:06,728
This is about centering humanity

326
00:19:06,728 --> 00:19:10,315
in this work
because we are all communal people, right?

327
00:19:10,357 --> 00:19:13,277
We need to be able to connect with one another.

328
00:19:13,277 --> 00:19:18,365
And any time there's a barrier to
those connections, there is a level of injustice.

329
00:19:18,448 --> 00:19:21,743
I just want to say, by the way,
and we'll talk about this more around

330
00:19:21,743 --> 00:19:24,872

what those fees really look like,
but I just want to say that

331
00:19:24,872 --> 00:19:28,417
for black and brown communities,
which are disproportionately impacted

332
00:19:28,417 --> 00:19:33,380
by the criminal justice system,
this is not just a matter of economic justice.

333
00:19:33,380 --> 00:19:36,091
This is also an issue of racial justice.

334
00:19:36,091 --> 00:19:41,513
So the fact that you are all here today to
participate in this conversation is so important.

335
00:19:41,597 --> 00:19:46,393
I lead something called the Justice Equity and
Opportunity Initiative for the State of Illinois.

336
00:19:46,602 --> 00:19:50,355
Governor Pritzker
established that by executive order.

337
00:19:50,522 --> 00:19:54,151
And so this conversation, I'm here to listen
and learn from all of you,

338
00:19:54,276 --> 00:19:58,197
but also to work with these incredible,
credible leaders, as well as all of you

339
00:19:58,197 --> 00:20:02,451
in this room
to make sure that we pursue true justice for all.

340
00:20:02,618 --> 00:20:08,207
Thank you.

341
00:20:08,290 --> 00:20:10,083
Thank you so much, Governor Stratton.

342
00:20:10,083 --> 00:20:13,462
Now it's time to hear from those
who have direct experience with voice and video,

343
00:20:13,462 --> 00:20:16,840
communication services and detention incarceration
facilities.

344
00:20:16,924 --> 00:20:19,551
Chairwoman Rosenworcel,
Senator Duckworth and Lieutenant Governor

345
00:20:19,551 --> 00:20:23,347
Stratton will have the opportunity
to introduce each speaker and ask questions

346
00:20:23,347 --> 00:20:27,142
to learn about their personal experiences
and engage in a meaningful dialog.

347
00:20:27,226 --> 00:20:30,270
I now invite current and former
consumers of incarcerated

348
00:20:30,270 --> 00:20:33,273
people's communication services
to join us on stage.

349
00:20:33,315 --> 00:20:35,067
Welcome with me. Welcome to the stage.

350
00:20:35,067 --> 00:20:39,613
Please welcome Monse Arreola,
Sandra Brown, Desiree Lumpkin,

351

00:20:39,821 --> 00:21:16,483
Marlene Delgado and Ana Navarro.

352
00:21:22,364 --> 00:21:22,948

353
00:21:22,948 --> 00:21:23,532
We're settled in, All right.

354
00:21:23,532 --> 00:21:26,326
We will now have Chairwoman Rosenworcel to introduce
the first participant

355
00:21:26,326 --> 00:21:30,831
to share their experiences.

356
00:21:30,914 --> 00:21:33,583
Thank you all for being here today,

357
00:21:33,583 --> 00:21:37,671
for choosing to use your voice
so that other people can use theirs.

358
00:21:37,754 --> 00:21:39,464
I appreciate it.

359
00:21:39,548 --> 00:21:40,966
I'm going to start with Monse

360
00:21:40,966 --> 00:21:43,927
and I want to say welcome.

361
00:21:44,094 --> 00:21:45,721
And as you probably know,

362
00:21:45,721 --> 00:21:49,599
for people
who are experiencing incarceration, and

363
00:21:49,683 --> 00:21:53,562
they've got to spend time away from their family
and friends and the community

364
00:21:53,562 --> 00:21:57,357
they know best, and that's difficult.

365
00:21:57,441 --> 00:22:01,320
So at the same time, we recognize

366
00:22:01,403 --> 00:22:04,031
that maintaining connections
to those family, friends

367
00:22:04,031 --> 00:22:07,034
and community is so important,

368
00:22:07,034 --> 00:22:10,412
their viability
when they move on with their lives.

369
00:22:10,495 --> 00:22:13,957
So I just want you to set the stage by describing

370
00:22:13,957 --> 00:22:17,711
how you experienced this firsthand,

371
00:22:17,794 --> 00:22:19,379
what it means to you,

372
00:22:19,379 --> 00:22:22,591
and any personal experiences
you had with communications.

373
00:22:22,591 --> 00:22:24,217
So tell us your story.

374
00:22:24,217 --> 00:22:26,136

First and foremost, I would like to say thank you.

375
00:22:26,136 --> 00:22:29,723
And it's an honor to be here
today, to be a part of this moment.

376
00:22:29,723 --> 00:22:33,101
I feel so inspired

377
00:22:33,185 --> 00:22:35,312
and just grateful.

378
00:22:35,312 --> 00:22:38,648
I never in a million years
would have imagined sitting next

379
00:22:38,648 --> 00:22:43,320
to such such powerful and motivating

380
00:22:43,403 --> 00:22:43,904
forces.

381
00:22:43,904 --> 00:22:47,657
So thank you for for taking this serious
because, yes, it's a

382
00:22:47,741 --> 00:22:50,619
it's a very impactful situation.

383
00:22:50,619 --> 00:22:53,080
I was brought here when I was two years old.

384
00:22:53,080 --> 00:22:58,251
I'm a little bit about me
and I grew up here like any normal American would.

385
00:22:58,335 --> 00:23:03,507
And so along with all the my time growing up,
I experienced a lot.

386
00:23:03,507 --> 00:23:08,887
And and unfortunately,
I got into a very abusive relationship.

387
00:23:08,970 --> 00:23:14,476
And I very quickly
I was criminalized and I, I went through a lot.

388
00:23:14,476 --> 00:23:17,020
So being incarcerated

389
00:23:17,020 --> 00:23:19,606
in the phone and in the visit, it was

390
00:23:19,606 --> 00:23:24,611
it was a lot to take in at first,
you know, especially once I was released,

391
00:23:24,611 --> 00:23:28,115
because I did ten years in state prison for for,

392
00:23:28,198 --> 00:23:31,576
you know, being in a situation with my abuser.

393
00:23:31,660 --> 00:23:34,955
And by the grace of God, I took I took the time to

394
00:23:34,955 --> 00:23:37,958
to make the most of my my, my time there.

395
00:23:38,083 --> 00:23:41,378
And when I was released, I made myself a promise

396
00:23:41,378 --> 00:23:45,173
that I was going to be able
to make my dreams a reality.

397

00:23:45,173 --> 00:23:48,260
And be able to set the tone
for other family members

398
00:23:48,260 --> 00:23:51,346
that have been through the same thing
that I've been through and educate the youth

399
00:23:51,346 --> 00:23:55,725
and be able to let them know like, Hey,
this is not where you want to go.

400
00:23:55,809 --> 00:24:01,690
And being in contact with family members
while you're incarcerated is very, very hard.

401
00:24:01,690 --> 00:24:05,569
And it's very limited
due to the policies that we have,

402
00:24:05,652 --> 00:24:08,780
you know, in that type of environment
with the lockdowns

403
00:24:08,780 --> 00:24:13,160
and the restrictions,
especially when COVID came around.

404
00:24:13,243 --> 00:24:15,162
So eventually I was released

405
00:24:15,162 --> 00:24:19,040
and I was able to do a lot of good,
positive things.

406
00:24:19,040 --> 00:24:22,085
And before you knew it,
as I was starting to blossom

407
00:24:22,085 --> 00:24:26,089

and turn my life around and do everything
that I said that I was going to do.

408
00:24:26,173 --> 00:24:28,508
ICE came in, apprehended me,

409
00:24:28,508 --> 00:24:32,888
and I was thrown into a detention center
for a year and five and a half months.

410
00:24:32,888 --> 00:24:38,435
And my experience there was
I don't even have the words to describe.

411
00:24:38,518 --> 00:24:41,396
I had no access to any mental health.

412
00:24:41,396 --> 00:24:45,233
And my the distance was terrible
because I was out of state, because,

413
00:24:45,233 --> 00:24:49,488
as you all know, if you don't know,
we don't have detention centers here in Illinois.

414
00:24:49,571 --> 00:24:54,201
So I was transferred to Wisconsin,
and so I was making out of state phone calls,

415
00:24:54,284 --> 00:24:59,623
which were very, very hard to make
because a 20 minute phone call

416
00:24:59,706 --> 00:25:02,000
and I was in a removal administration proceeding,

417
00:25:02,000 --> 00:25:05,629
so I didn't even have the chance
at the time to see a judge or anything.

418
00:25:05,712 --> 00:25:09,174
So getting all this information to my family

419
00:25:09,174 --> 00:25:14,054
at the time was very hard
because there was just so much.

420
00:25:14,054 --> 00:25:18,517
And then in in in
may I say in respect to my family,

421
00:25:18,600 --> 00:25:21,269
there's a lot of cultural things
that I grew up with.

422
00:25:21,269 --> 00:25:23,104
And you just start
you just don't talk about anything.

423
00:25:23,104 --> 00:25:27,192
So when legally I had to be brave and voice

424
00:25:27,192 --> 00:25:31,238
what I actually went through
and what I what I was experiencing,

425
00:25:31,321 --> 00:25:36,493
it was very hard to get that out in a
in a window period of 20 minutes or 7.

426
00:25:36,576 --> 00:25:40,455
Was it $7.50, I think for a video call, $3.50

427
00:25:40,539 --> 00:25:43,542
for a 15 minute call video.

428
00:25:43,750 --> 00:25:50,173
And then for the telephone,
it was about $8 for 20 minutes. And

429
00:25:50,257 --> 00:25:51,967
I just I just kept calling.

430
00:25:51,967 --> 00:25:55,220
And before you knew it, I was

431
00:25:55,303 --> 00:25:58,974
I was experiencing making choices by

432
00:25:59,015 --> 00:26:04,020
having to choose good, nutritious food
or call my family.

433
00:26:04,104 --> 00:26:07,065
And it put me in a situation where I was
first of all,

434
00:26:07,065 --> 00:26:10,151
I was allergic to soy, so I had to consume the soy
that they were giving me.

435
00:26:10,151 --> 00:26:14,281
And you know, it was just very, very like not

436
00:26:14,281 --> 00:26:18,034
fair decisions
that I had to make because of the budget, too.

437
00:26:18,034 --> 00:26:22,497
Like, obviously when you're incarcerated, you
can't you can't work, you can't have a good job.

438
00:26:22,497 --> 00:26:26,293
So you depend on your family members
and your friends and your support to help

439
00:26:26,293 --> 00:26:31,131
you get through communicating

and staying in touch with humanity.

440
00:26:31,214 --> 00:26:36,970
And when I was in there, unfortunately, you know,
I spent a lot of a lot of money

441
00:26:36,970 --> 00:26:41,182
that could have went towards my education,
could have went towards coming back home.

442
00:26:41,266 --> 00:26:47,105
By the grace of God, I was given a federal pardon
and my waiver was granted.

443
00:26:47,105 --> 00:26:50,900
And I get emotional thinking about that
because I was given the opportunity

444
00:26:50,900 --> 00:26:55,905
to be here today to finally be heard
because my voice has been shun for so long.

445
00:26:55,905 --> 00:26:59,784
I felt like ever since I was three
and now being able to sit here

446
00:26:59,784 --> 00:27:03,705
and be a part of this, this is very serious stuff.

447
00:27:03,788 --> 00:27:06,791
My partner of 12 years,
I was with her for a long time.

448
00:27:06,791 --> 00:27:10,545
She was desperate measures to be able
to take care of me financially in there.

449
00:27:10,629 --> 00:27:13,798
And it was really hard because

450
00:27:13,882 --> 00:27:16,259
you think about. It.

451
00:27:16,259 --> 00:27:19,554
Being like exiled from a lot of people in their

452
00:27:19,638 --> 00:27:23,475
and you feel like you're not part of something.

453
00:27:23,558 --> 00:27:27,562
Today I can
I say this all by humbling, humble with my heart.

454
00:27:27,562 --> 00:27:33,818
I feel honored to be here today because
communication with your family is very vital.

455
00:27:33,818 --> 00:27:36,571
And there are so many times
where I contemplate suicide.

456
00:27:36,571 --> 00:27:40,533
There were so many times
where mental health was not given to me.

457
00:27:40,533 --> 00:27:44,412
So my mental health was my support system at home,
my lawyers,

458
00:27:44,496 --> 00:27:48,208
you know, my community with OCAD
and with Ana Navarro,

459
00:27:48,208 --> 00:27:51,252
with, you know, those were the little things
that I didn't have to hold on to.

460
00:27:51,252 --> 00:27:55,131
And, you know, it was just unfair

461
00:27:55,173 --> 00:28:00,345
to not be able to sit in a in an area
where I can actually have

462
00:28:00,345 --> 00:28:05,892
a decent conversation with my family in regards
to what I was really going through.

463
00:28:05,975 --> 00:28:10,897
I had the opportunity to have an amazing team
through NIJC, and SCAD

464
00:28:10,897 --> 00:28:15,652
and in my lawyers, my, my team of lawyers
and representatives were just so

465
00:28:15,735 --> 00:28:17,529
they did, they went above and beyond.

466
00:28:17,529 --> 00:28:22,909
And I feel like because of them, I'm,
you know, I'm motivated to to sit here today

467
00:28:22,909 --> 00:28:26,871
and have the courage to
to share these experiences with you

468
00:28:26,955 --> 00:28:32,001
and I just want to just once again
say it is very important

469
00:28:32,085 --> 00:28:33,878
that we stay connected with our families.

470
00:28:33,878 --> 00:28:38,508
And my mom had to, you know, borrow money

471
00:28:38,591 --> 00:28:42,053

from family members because it's it's

472
00:28:42,137 --> 00:28:46,975
just not affordable and it's not feasible
and it's not fair, especially when

473
00:28:47,058 --> 00:28:52,605
we don't educate one another
on the potential criminalization

474
00:28:52,689 --> 00:28:55,150
that, you know, domestic violence survivors
go through.

475
00:28:55,150 --> 00:28:57,819
And also human trafficking survivors go through.

476
00:28:57,819 --> 00:29:01,531
And because you're so scared and you know,
you're intimidated, I mean, at least for me.

477
00:29:01,614 --> 00:29:05,827
And so being here
today, I just I just want to say that um

478
00:29:05,910 --> 00:29:06,786
that it was very hard.

479
00:29:06,786 --> 00:29:10,665
And right now,
I think that I could have I'm I'm almost done

480
00:29:10,665 --> 00:29:14,753
with my associate's degree that could have went
towards paying my associate's degree

481
00:29:14,836 --> 00:29:20,300
and unfortunately, right now, you know, I'm
I'm waiting for my visas to come through and I'm

482
00:29:20,300 --> 00:29:24,012
trying to get involved as many community efforts
as I can

483
00:29:24,095 --> 00:29:27,724
to try to, you know, do something

484
00:29:27,807 --> 00:29:30,643
because it's important that, you know, we we

485
00:29:30,643 --> 00:29:36,232
we just have that communication
and that have that bond with one another

486
00:29:36,316 --> 00:29:38,610
to support each other like you all receive.

487
00:29:38,610 --> 00:29:40,153
It is very important.

488
00:29:40,153 --> 00:29:44,491
And I just I wish that it would have been
more affordable for me that way.

489
00:29:44,699 --> 00:29:48,411
I wouldn't
have had to make those unfair decisions.

490
00:29:48,495 --> 00:29:52,874
And I'm just grateful that I was heard today.

491
00:29:52,874 --> 00:30:02,675
Thank you so much.

492
00:30:02,759 --> 00:30:05,762
Can I just ask one follow up question?

493
00:30:05,887 --> 00:30:12,143

First, I'll start with
I know why the tissues are on the table now.

494
00:30:12,185 --> 00:30:14,395
In addition to changing rates,

495
00:30:14,395 --> 00:30:18,399
which we all want to do, because you shouldn't
have to make those hard choices.

496
00:30:18,483 --> 00:30:22,695
Is there anything else about communications

497
00:30:22,779 --> 00:30:26,324
that you would change based on your experience?

498
00:30:26,407 --> 00:30:26,783
Sure.

499
00:30:26,783 --> 00:30:30,537
So the only we were only allowed like

500
00:30:30,620 --> 00:30:34,666
a certain amount of tablets for the virtual visit.

501
00:30:34,749 --> 00:30:37,335
And you can only imagine

502
00:30:37,335 --> 00:30:41,965
the under the stress
that certain women are in in that environment.

503
00:30:42,006 --> 00:30:44,384
And it got really nasty sometimes.

504
00:30:44,384 --> 00:30:50,515
A lot of the times I'm not going to lie
and I would say provide more electronic

505
00:30:50,557 --> 00:30:54,185
devices so that it can be more accommodating

506
00:30:54,185 --> 00:30:57,438
for everyone to be able to have that opportunity.

507
00:30:57,522 --> 00:31:02,235
Minus the the fact that,
like we were always on lockdown or just

508
00:31:02,277 --> 00:31:07,866
there was a lot of obstacles
that prevented us all getting a fair time

509
00:31:07,949 --> 00:31:09,200
video, visiting our families,

510
00:31:09,200 --> 00:31:12,203
because sometimes we couldn't even have them
physically come to the institution.

511
00:31:12,328 --> 00:31:16,374
So I would say more electronic devices

512
00:31:16,416 --> 00:31:19,419
that are equally distributed

513
00:31:19,419 --> 00:31:22,714
into the units where they're housing these people.

514
00:31:22,797 --> 00:31:26,926
And as far as the phone rates go,

515
00:31:27,010 --> 00:31:29,512
yeah, they're very expensive,
especially out of state.

516
00:31:29,512 --> 00:31:33,224

And so maybe there could be a way where

517
00:31:33,308 --> 00:31:35,560
instead of 20 minutes, maybe get a little bit

518
00:31:35,560 --> 00:31:38,813
more for the for the amount that we're paying.

519
00:31:38,855 --> 00:31:41,608
I mean, I know that life is not there.

520
00:31:41,608 --> 00:31:44,027
However, it breaks families apart.

521
00:31:44,027 --> 00:31:46,446
It really does. Like,
my family was fighting a lot.

522
00:31:46,446 --> 00:31:48,823
You know, a lot of people
went to a lot of desperate measures.

523
00:31:48,823 --> 00:31:52,201
And I just want to say
that maybe implementing a new way of

524
00:31:52,285 --> 00:31:54,787
maybe having more time for the amount of money

525
00:31:54,787 --> 00:31:58,041
that you're being charged and distributing, again,

526
00:31:58,124 --> 00:32:01,794
electronic devices in the in the environment.

527
00:32:01,836 --> 00:32:03,046
Thank you so much.

528

00:32:03,046 --> 00:32:05,840
I'm going to pass it
on to the Lieutenant Governor.

529
00:32:05,924 --> 00:32:06,549
Thank you.

530
00:32:06,549 --> 00:32:09,344
And thank you for your words.

531
00:32:09,344 --> 00:32:11,346
That was so powerful.

532
00:32:11,346 --> 00:32:16,351
I am going to turn it over to Sandra Brown.

533
00:32:16,434 --> 00:32:19,854
Can we give it up for Sandra?

534
00:32:19,938 --> 00:32:21,397
Sandra

535
00:32:21,397 --> 00:32:23,650
and I did not meet today.

536
00:32:23,650 --> 00:32:28,321
I came to an event here
probably last holiday season.

537
00:32:28,321 --> 00:32:29,405
It was an arts event.

538
00:32:29,405 --> 00:32:34,535
And I walked by a table where
someone was selling a book and it was Sandra.

539
00:32:34,535 --> 00:32:37,956
The book is called Odyssey in Progress,

540
00:32:38,039 --> 00:32:40,917
and she had sold out
the book, let's just say that.

541
00:32:40,917 --> 00:32:43,002
So really proud of that.

542
00:32:43,002 --> 00:32:46,047
But also, I want to tell you that Sandra

543
00:32:46,047 --> 00:32:49,676
is the first incarcerated woman in Illinois

544
00:32:49,717 --> 00:32:53,471
to earn an academic Master's degree

545
00:32:53,554 --> 00:32:59,310
and the first to be accepted
into an academic Doctoral program.

546
00:32:59,394 --> 00:33:03,272
Congratulations Sandra. Thank you.

547
00:33:03,356 --> 00:33:07,026
So um Sandra,

548
00:33:07,026 --> 00:33:11,114
I know that when we think about and we just heard
a little bit about the challenges

549
00:33:11,114 --> 00:33:14,575
and the impact it can have to not having access

550
00:33:14,617 --> 00:33:18,079
to basic communication with others.

551
00:33:18,329 --> 00:33:21,249
I want to talk about that

in the context of your efforts

552
00:33:21,249 --> 00:33:24,252
to pursue higher education

553
00:33:24,252 --> 00:33:27,255
and the impact of barriers to either

554
00:33:27,255 --> 00:33:31,009
voice or video
communication might have had on that.

555
00:33:31,092 --> 00:33:36,389
I know that the challenges to higher
education is really what has driven you

556
00:33:36,472 --> 00:33:39,892
to continue your work
as a student, as an educator, as a researcher,

557
00:33:39,892 --> 00:33:43,813
as an advocate, as an activist,
and as a creative writer.

558
00:33:43,896 --> 00:33:46,774
So how did not having real access

559
00:33:46,774 --> 00:33:51,612
and I think all of us know
that education inside our corrections

560
00:33:51,612 --> 00:33:55,450
facilities, there's not enough opportunities
for a higher education.

561
00:33:55,450 --> 00:33:57,660
We have to do more.

562
00:33:57,744 --> 00:33:59,495

How is that even further,

563
00:33:59,495 --> 00:34:04,375
you know, what other additional burdens
or barriers existed

564
00:34:04,417 --> 00:34:07,837
with as you were trying to pursue those dreams?

565
00:34:07,920 --> 00:34:10,256
Thank you, Lieutenant Governor,

566
00:34:10,256 --> 00:34:13,259
and thank you for sharing part of that.

567
00:34:13,426 --> 00:34:17,889
A lot of the challenges
with respect to education inside,

568
00:34:17,972 --> 00:34:22,435
that's a huge thing
that I want to lift up in this space today.

569
00:34:22,477 --> 00:34:25,354
I'll just go all the way back to when I began

570
00:34:25,354 --> 00:34:31,486
serving my 22 year sentence
as an incarcerated survivor. um.

571
00:34:31,569 --> 00:34:34,864
I came into a system where collect phone calls

572
00:34:34,947 --> 00:34:38,409
where at the very least $30 a piece.

573
00:34:38,493 --> 00:34:43,664
And that was the only way to communicate
with anyone in real time in the free community.

574
00:34:43,748 --> 00:34:49,545
I started my time in January of 2000,
so video visits did not exist.

575
00:34:49,629 --> 00:34:52,632
Video communication that was

576
00:34:52,673 --> 00:34:56,552
like we saw that on cartoons
like The Jetsons or something like that.

577
00:34:56,552 --> 00:35:00,723
So that was unheard of.

578
00:35:00,807 --> 00:35:02,100
During my time inside

579
00:35:02,100 --> 00:35:08,523
I earned a pittance of $30 a month as a teaching
assistant for almost 14 of those years.

580
00:35:08,606 --> 00:35:12,735
And with my mother working part-
time for the Chicago Public Schools, earning only

581
00:35:12,735 --> 00:35:15,822
$10 an hour, she helped where she could

582
00:35:15,822 --> 00:35:19,158
with like hygiene items and underclothes

583
00:35:19,242 --> 00:35:23,204
and charges for those 30 minute allotments
they applied.

584
00:35:23,204 --> 00:35:29,210
Whether I use the full 28 minutes, whether I was
disconnected or whether calls were interrupted.

585
00:35:29,293 --> 00:35:33,631
And I say 28 minutes,
because those charges included moments

586
00:35:33,798 --> 00:35:38,553
where throughout the calls we were interrupted
by these automated voice messages, um

587
00:35:38,636 --> 00:35:43,683
even right down to the beginning, where it says,
be aware, any calls are monitored and recorded.

588
00:35:43,891 --> 00:35:47,311
We're paying for that call
the moment it's connected.

589
00:35:47,395 --> 00:35:49,730
So there are times during that call
we don't even get to talk

590
00:35:49,730 --> 00:35:54,527
and our families were being charged for it.

591
00:35:54,610 --> 00:35:57,613
But after about three years into my incarceration,

592
00:35:57,697 --> 00:36:01,367
my family just couldn't afford to pay
for those calls anymore.

593
00:36:01,450 --> 00:36:03,911
And so I would write home

594
00:36:03,911 --> 00:36:07,290
whenever I could save to buy a stamped envelope.

595
00:36:07,373 --> 00:36:12,253
But the cost of voice of video

communication made staying connected to my son

596
00:36:12,336 --> 00:36:16,424
or other family members
or any source of support for that matter,

597
00:36:16,507 --> 00:36:20,636
just impossible. um.

598
00:36:20,720 --> 00:36:22,180
I was

599
00:36:22,180 --> 00:36:26,225
I had to navigate challenges
with getting access to education

600
00:36:26,225 --> 00:36:29,353
because of my sentence. Criteria meant

601
00:36:29,353 --> 00:36:33,232
that those were shortest or closest to going home

602
00:36:33,316 --> 00:36:35,526
got access to those programs.

603
00:36:35,526 --> 00:36:41,282
And that's where I began turning
to correspondence programs for my education.

604
00:36:41,365 --> 00:36:47,079
But preparing for a real chance at a successful
reentry was incomprehensibly difficult.

605
00:36:47,079 --> 00:36:50,875
I can't begin to tell you what that's like
when you're trying to do it from

606
00:36:50,958 --> 00:36:54,712
behind barbed wires and bricks.

607
00:36:54,795 --> 00:36:56,255
Many attempts, for example,

608
00:36:56,255 --> 00:37:00,676
to communicate like by snail
mail, were lost or discarded.

609
00:37:00,760 --> 00:37:05,514
Sometimes I received like delayed responses
to my my communication.

610
00:37:05,598 --> 00:37:08,601
And because of the way
that things were set up at that time,

611
00:37:08,768 --> 00:37:13,898
I oftentimes missed application deadlines.
As an undergrad and grad student,

612
00:37:14,148 --> 00:37:18,486
I couldn't make phone calls to college faculty
or staff, you know, primarily

613
00:37:18,486 --> 00:37:24,825
because my state issued pittance just didn't
allow to pay for those kinds of calls, but also

614
00:37:24,825 --> 00:37:27,995
because policy nor practice did not allow

615
00:37:27,995 --> 00:37:32,208
educational institutions to accept collect calls.

616
00:37:32,291 --> 00:37:35,294
So consequently, I couldn't contact professors

617
00:37:35,503 --> 00:37:39,382
with time sensitive questions

about assignments or exams.

618
00:37:39,465 --> 00:37:42,260
I couldn't communicate with peers who were taking

619
00:37:42,260 --> 00:37:45,888
the same courses with me in the free community.

620
00:37:45,972 --> 00:37:49,558
um. And I was
I was just without the benefit of contacting,

621
00:37:49,558 --> 00:37:53,896
like the financial aid departments
for private scholarships. um.

622
00:37:53,980 --> 00:37:57,316
I tried I navigated the education arena

623
00:37:57,566 --> 00:38:02,571
at a time where people who were incarcerated
didn't qualify for state or federal financial aid.

624
00:38:02,655 --> 00:38:06,575
So I relied heavily on private scholarships
where I could get them.

625
00:38:06,659 --> 00:38:09,996
And so not having video or voice access

626
00:38:10,079 --> 00:38:14,959
to the very people who could help me
with that part resulted in one year

627
00:38:15,042 --> 00:38:20,214
just to tell it just to just to personify
the gravity of how hard it can be.

628
00:38:20,298 --> 00:38:22,633

**JA1114**

I wound up asking for a whole year.

629
00:38:22,633 --> 00:38:27,930
I would ask housing unit officers
if I could clean showers after the women were done

630
00:38:28,014 --> 00:38:30,558
so that I could

631
00:38:30,641 --> 00:38:33,311
so that I could collect the soap chips

632
00:38:33,311 --> 00:38:35,980
and I would use the soap chips to wash my body

633
00:38:35,980 --> 00:38:40,067
and use that money that I would use to buy soap

634
00:38:40,151 --> 00:38:44,655
to pay for school.

635
00:38:44,739 --> 00:38:47,450
Yea I did that for a whole year.

636
00:38:47,450 --> 00:38:49,327
A whole year.

637
00:38:49,327 --> 00:38:53,205
And so, you know, it.

638
00:38:53,289 --> 00:38:54,832
I can't begin to tell you

639
00:38:54,832 --> 00:38:58,961
the impact that that has not only on us
but on our children.

640
00:38:58,961 --> 00:39:01,964

I had a son that I was trying to encourage
to stay in school.

641
00:39:01,964 --> 00:39:04,717
We had lost his mom at eight.

642
00:39:04,717 --> 00:39:07,636
And so what was the point in continuing?

643
00:39:07,636 --> 00:39:11,015
And so I'm trying to encourage him,
but at the same time, I'm having to choose

644
00:39:11,015 --> 00:39:15,728
between talking to him and saving for school.

645
00:39:15,811 --> 00:39:17,480
Occasionally, though,

646
00:39:17,480 --> 00:39:20,232
staff could reach out on my behalf

647
00:39:20,232 --> 00:39:22,902
to communicate with colleges about work.

648
00:39:22,902 --> 00:39:27,114
But that always depended on whether or not
that communication was approved,

649
00:39:27,156 --> 00:39:30,409
working within the parameters
of what was convenient for staff.

650
00:39:30,493 --> 00:39:36,165
And as as my peer here mentioned during lockdowns,

651
00:39:36,248 --> 00:39:39,251
those communications just did not happen.

652
00:39:39,502 --> 00:39:41,545
And so to say that access

653
00:39:41,545 --> 00:39:46,759
to voice or video communication would have made
an impact in my educational journey,

654
00:39:46,842 --> 00:39:50,721
I mean, that's a huge understatement,
to say the least.

655
00:39:50,805 --> 00:39:52,640
Now, remember, I shared with you that I,

656
00:39:52,640 --> 00:39:56,268
I entered the system at a time
when there were no video visits.

657
00:39:56,352 --> 00:39:59,730
So the advent of these video visits

658
00:39:59,730 --> 00:40:02,817
and tablets and mp3 players magnified

659
00:40:02,817 --> 00:40:06,237
for me like the impact of the digital divide

660
00:40:06,320 --> 00:40:10,116
that it had on people who are incarcerated.

661
00:40:10,199 --> 00:40:13,452
These video communications also came with a cost

662
00:40:13,452 --> 00:40:18,040
that was too expensive
for many of us in our families to pay for.

663
00:40:18,124 --> 00:40:21,377

Again, for me, I reiterate regarding my story

664
00:40:21,460 --> 00:40:25,214
that practice nor policy
didn't allow for educational facilities

665
00:40:25,214 --> 00:40:30,594
to just set up a video call for me one on one
so that I could talk to professors about questions

666
00:40:30,636 --> 00:40:33,848
I couldn't hop online with, with my peers

667
00:40:33,848 --> 00:40:36,851
who were taking classes online in the community.

668
00:40:37,017 --> 00:40:38,811
I couldn't engage in chats.

669
00:40:38,811 --> 00:40:43,149
I couldn't submit the assignments electronically
because I didn't have access

670
00:40:43,315 --> 00:40:47,445
to those forms of communication.

671
00:40:47,528 --> 00:40:50,531
After I graduated with my master's degree,

672
00:40:50,531 --> 00:40:55,619
I spent two years looking for a doctoral program
while inside

673
00:40:55,703 --> 00:41:01,667
and I could not get accepted into a program,
not because I wasn't a suitable candidate,

674
00:41:01,750 --> 00:41:05,421
not because there were any questions

about whether or not I could complete the work

675
00:41:05,504 --> 00:41:11,343
or whether I could compete on the same level
as a student in the free community.

676
00:41:11,427 --> 00:41:15,347
The only reason I kept getting rejected
during those two years is because I lacked

677
00:41:15,556 --> 00:41:17,266
digital access.

678
00:41:17,266 --> 00:41:21,228
That was the only reason.

679
00:41:21,312 --> 00:41:23,647
Again, I couldn't speak with instructors.

680
00:41:23,647 --> 00:41:26,317
I couldn't submit assignments.

681
00:41:26,317 --> 00:41:29,737
I remember sharing with someone here today

682
00:41:29,820 --> 00:41:33,407
that during my master's program,
when I was finishing up,

683
00:41:33,491 --> 00:41:38,537
I had to rewrite an entire master's
thesis all over again.

684
00:41:38,621 --> 00:41:41,081
Not because there was anything wrong with rubric.

685
00:41:41,081 --> 00:41:43,626
Anything wrong with my argument.

686
00:41:43,626 --> 00:41:49,256
But because my margin was a half
inch off on the left side.

687
00:41:49,340 --> 00:41:53,886
And so I spent four days retyping an assignment

688
00:41:53,969 --> 00:41:56,514
that could have taken maybe 4 seconds

689
00:41:56,514 --> 00:42:00,476
had I had digital access.

690
00:42:00,559 --> 00:42:03,187
And so I say all of this to say that

691
00:42:03,187 --> 00:42:06,440
even when voice and video communication seem to be

692
00:42:06,440 --> 00:42:09,443
operative in carceral settings

693
00:42:09,485 --> 00:42:13,697
for people who are desperate to enter
the community,

694
00:42:13,781 --> 00:42:16,325
able to be restored to useful citizenship.

695
00:42:16,325 --> 00:42:21,956
Because, I mean, we hear that that's supposed
to be the whole objective of corrections.

696
00:42:21,997 --> 00:42:24,917
Many of us still lacked what we needed

697
00:42:24,917 --> 00:42:31,757
most in order to come back successful

698
00:42:31,840 --> 00:42:35,719
Oh, like that.

699
00:42:35,803 --> 00:42:39,515
Yes. Your words are so powerful
and one of the things that.

700
00:42:39,557 --> 00:42:41,016
I think.

701
00:42:41,016 --> 00:42:45,854
You said so much
that I know touched many in this room.

702
00:42:45,938 --> 00:42:50,776
One was talking about the digital divide,
which typically when we hear that phrase

703
00:42:50,776 --> 00:42:54,613
and those of us in policymaking
hear the word or phrase digital divide,

704
00:42:54,780 --> 00:42:58,200
or we often think about it in terms of, you know,

705
00:42:58,409 --> 00:43:02,079
rural communities
or other certain urban communities.

706
00:43:02,079 --> 00:43:07,501
And I don't think that we often use that term
to relate to the carceral system

707
00:43:07,501 --> 00:43:13,090
and so the idea of you helping us to reframe
that in this conversation is really important,

708
00:43:13,173 --> 00:43:16,176

but also that you talked about those 2 minutes

709
00:43:16,302 --> 00:43:20,222
and that really stuck with me as well,

710
00:43:20,306 --> 00:43:21,348
the fact that 2

711
00:43:21,348 --> 00:43:25,311
minutes of not communicating with someone,

712
00:43:25,394 --> 00:43:29,565
whether it's a family member, a child,
someone that you needed to talk

713
00:43:29,565 --> 00:43:32,318
as you pursued your education.

714
00:43:32,318 --> 00:43:36,864
That 2 minutes is a long time when you get to talk
to people like you just hear 2 minutes

715
00:43:36,864 --> 00:43:41,827
somebody might think, well, that's 120 seconds.
When you haven't talked to someone.

716
00:43:41,910 --> 00:43:43,912
and all you have is those 30 minutes,

717
00:43:43,912 --> 00:43:46,498
those 2 minutes are everything.

718
00:43:46,498 --> 00:43:47,666
So that was powerful.

719
00:43:47,666 --> 00:43:52,087
And then, of course, to just hear what you
how you persevered in your brilliance,

720
00:43:52,338 --> 00:43:55,341
to do what you did on the inside,

721
00:43:55,341 --> 00:43:58,135
to not just get your master's,

722
00:43:58,135 --> 00:44:01,096
but also get into a doctoral program.

723
00:44:01,096 --> 00:44:02,556
It's remarkable.

724
00:44:02,556 --> 00:44:03,849
It's remarkable.

725
00:44:03,849 --> 00:44:07,728
So my question to you, Sandra, is, is there
what one or two things

726
00:44:07,728 --> 00:44:11,774
in Monse, am I saying your name right,
is it, Monse, excuse me.

727
00:44:11,774 --> 00:44:16,362
Monse Monse talked about more digital devices.

728
00:44:16,445 --> 00:44:21,659
What one or two things do you think in addition
to what's happening with making calls

729
00:44:21,659 --> 00:44:28,374
more accessible, what are one or two more things
that you would recommend and to really

730
00:44:28,415 --> 00:44:29,792
change the communication

731
00:44:29,792 --> 00:44:34,797

services that are available in within corrections
facilities?

732
00:44:34,880 --> 00:44:37,091
Well, I think some of those changes

733
00:44:37,091 --> 00:44:40,094
we're starting to see in other places

734
00:44:40,177 --> 00:44:43,055
in California, the calls are free.

735
00:44:43,055 --> 00:44:47,476
You know, people who are incarcerated
can reach out to their families

736
00:44:47,476 --> 00:44:51,522
and friends and loved ones and not have to worry
about whether or not they have to choose

737
00:44:51,730 --> 00:44:55,401
between buying soap for their body
or talking to their children.

738
00:44:55,484 --> 00:44:59,405
So um my my colleague Collette said

739
00:44:59,405 --> 00:45:04,201
federal calls free
the first thousand minutes a month free.

740
00:45:04,284 --> 00:45:08,747
So I'm thinking that it's definitely doable
and I would love to see that happen

741
00:45:08,831 --> 00:45:13,836
for our brothers and sisters
who are behind the walls here in Illinois.

742

00:45:13,919 --> 00:45:16,922
But I also saw something happen during COVID

743
00:45:17,089 --> 00:45:21,176
and often during lockdowns that

744
00:45:21,260 --> 00:45:24,596
inspires the recommendation that was lifted here.

745
00:45:24,680 --> 00:45:27,474
The tablets that that we were allowed access

746
00:45:27,474 --> 00:45:30,477
to, they gave us digital entertainment,

747
00:45:30,644 --> 00:45:34,690
but not any real connection
to family, friends or resources.

748
00:45:34,773 --> 00:45:38,902
I think those tablets should also be used
to be able

749
00:45:38,902 --> 00:45:44,658
to communicate with family, friends and loved ones
and that communication should be free.

750
00:45:44,742 --> 00:45:48,996
I can't begin to imagine in a day room
full of people who are fighting for time on

751
00:45:48,996 --> 00:45:50,664
the phone.  What

752
00:45:50,664 --> 00:45:54,668
what would happen if we didn't have to fight
for that time on the phone

753
00:45:54,877 --> 00:46:01,008

because everyone had access to these devices
and were able to talk to their people

754
00:46:01,091 --> 00:46:02,468
minus that competition.

755
00:46:02,468 --> 00:46:06,764
So those are
those are the two things I'd like to see happen.

756
00:46:06,847 --> 00:46:11,894
Thank you, Sandra, for sharing those thoughts
and ideas and of course, sharing your story.

757
00:46:12,019 --> 00:46:13,520
Very powerful.

758
00:46:13,520 --> 00:46:18,233
I'm going to turn it back over
to Chairwoman Rosenworcel.

759
00:46:18,317 --> 00:46:19,568
Thank you.

760
00:46:19,568 --> 00:46:23,989
We've just heroically heard
about how you're using your voice

761
00:46:24,072 --> 00:46:27,493
to talk about your experiences

762
00:46:27,576 --> 00:46:29,077
and how to improve communications.

763
00:46:29,077 --> 00:46:32,331
But I want to talk about
a different kind of heroism right now.

764
00:46:32,414 --> 00:46:36,960

So I want to talk to Desiree Lumpkin.

765
00:46:37,044 --> 00:46:40,380
So you're currently the caretaker

766
00:46:40,464 --> 00:46:43,467
of four grandchildren

767
00:46:43,550 --> 00:46:45,177
while

768
00:46:45,177 --> 00:46:46,804
um your daughter is incarcerated.

769
00:46:46,804 --> 00:46:50,516
And I just want to acknowledge
that's a different kind of heroism.

770
00:46:50,599 --> 00:46:53,894
And I feel like

771
00:46:53,977 --> 00:46:58,315
you too have stories to tell about what it's like

772
00:46:58,398 --> 00:47:01,151
to stay in touch with your daughter

773
00:47:01,151 --> 00:47:04,863
and ensure that those children maintain
a relationship with her

774
00:47:04,947 --> 00:47:10,327
because we all know maintaining
those ties is good for everyone involved,

775
00:47:10,410 --> 00:47:13,997
but also good for all of us
because it reduces recidivism.

776
00:47:14,081 --> 00:47:20,546
So I want you to talk about what this looks like
from your perspective and tell us your story. You.

777
00:47:20,587 --> 00:47:22,005
Good afternoon, everyone.

778
00:47:22,005 --> 00:47:24,967
Good afternoon, everyone on the panel.

779
00:47:25,008 --> 00:47:30,639
Thank you all for the opportunity to speak
and share my story,

780
00:47:30,722 --> 00:47:33,225
what I'm experiencing right now.

781
00:47:33,225 --> 00:47:36,645
So I am the mother.

782
00:47:36,728 --> 00:47:38,230
My daughter is incarcerated.

783
00:47:38,230 --> 00:47:41,942
She has four children

784
00:47:42,025 --> 00:47:49,867
ranging from the ages of 17 months to 12 year old.

785
00:47:49,950 --> 00:47:53,370
Did I expect

786
00:47:53,453 --> 00:47:54,705
things that I will have to

787
00:47:54,705 --> 00:47:58,041
raise my four grandchildren

788
00:47:58,125 --> 00:48:02,921
into supporting my daughter? No.

789
00:48:03,005 --> 00:48:04,423
But I am very happy

790
00:48:04,423 --> 00:48:08,176
that they're with me because they are safe.

791
00:48:08,260 --> 00:48:11,054
We are raising them as though I was raising.

792
00:48:11,054 --> 00:48:13,599
I have four children,
so I'm raising them, as I have

793
00:48:13,599 --> 00:48:16,602
four children.

794
00:48:16,602 --> 00:48:18,854
But it's difficult

795
00:48:18,854 --> 00:48:21,732
with the communication

796
00:48:21,732 --> 00:48:25,777
as far as them being able to speak with
mom is difficult.

797
00:48:25,819 --> 00:48:31,033
So they may speak to her maybe

798
00:48:31,116 --> 00:48:35,579
a week and a half and two weeks if that.

799
00:48:35,662 --> 00:48:38,916
If it had not been for WJI,

800
00:48:38,916 --> 00:48:43,712
with the reunification bus ride

801
00:48:43,795 --> 00:48:46,340
we wouldn't have a

802
00:48:46,340 --> 00:48:49,343
in-person visit

803
00:48:49,426 --> 00:48:52,012
that visit has been helping

804
00:48:52,012 --> 00:48:54,431
but the children still

805
00:48:54,431 --> 00:48:55,599
ask about their mother.

806
00:48:55,599 --> 00:48:59,895
When we see our mom, we can we talk to mom

807
00:48:59,978 --> 00:49:02,606
and I do my best to explain to them,

808
00:49:02,606 --> 00:49:07,778
She will be calling soon.  We going to see her soon.
Things Like that.

809
00:49:07,778 --> 00:49:11,073
It kind of settled down,
but then it comes right back up.

810
00:49:11,156 --> 00:49:12,574
You know, I miss my mommy.

811
00:49:12,574 --> 00:49:15,202
I love my mom. Things like that.

812
00:49:15,202 --> 00:49:18,705
The baby

813
00:49:18,789 --> 00:49:21,541
doesn't remember my daughter,

814
00:49:21,541 --> 00:49:25,629
so it's even more

815
00:49:25,712 --> 00:49:28,090
hurtful.

816
00:49:28,090 --> 00:49:32,511
that when we do go and see her, he doesn't go too.

817
00:49:32,594 --> 00:49:34,471
He cries

818
00:49:34,471 --> 00:49:35,597
for about half of the time that we're there
and then he kind of comes around

819
00:49:35,597 --> 00:49:39,142
about that hour before

820
00:49:39,226 --> 00:49:41,728
it's time to leave.

821
00:49:41,728 --> 00:49:46,441
he may give her a little smile,
one that will pick him up.

822
00:49:46,525 --> 00:49:50,529
I feel um that video visits,

823
00:49:50,570 --> 00:49:54,408
I was denied from video visits, I

824
00:49:54,491 --> 00:49:56,076
signed up.

825
00:49:56,076 --> 00:49:58,245
I would be mad and I'm right now

826
00:49:58,245 --> 00:50:02,207
in the process
trying to get reinstated to, not reinstated,

827
00:50:02,207 --> 00:50:09,214
I'm sorry, just trying to get access
to the video visits because those would help

828
00:50:09,297 --> 00:50:12,300
when we are unable to go physically to see their mom.

829
00:50:12,551 --> 00:50:17,806
The video at least them seeing her and
that I really feel for the baby

830
00:50:17,806 --> 00:50:19,891
If he sees her face more often

831
00:50:19,891 --> 00:50:24,688
he would feel comfortable
and kind of put it together like, Oh,

832
00:50:24,771 --> 00:50:27,774
this is mom, my daughter and I look, almost,

833
00:50:27,858 --> 00:50:30,444
we almost look like twins. So.

834
00:50:30,444 --> 00:50:35,449
So he sees me and then we see her it's almost like okay,

835
00:50:35,532 --> 00:50:40,954

but I'm he's with me all the time, you know
so it's difficult.

836
00:50:41,038 --> 00:50:46,334
But as I stated, I love my grandchildren
wouldn't trade them for the world

837
00:50:46,418 --> 00:50:47,502
not only that I'm standing

838
00:50:47,502 --> 00:50:51,339
here speaking on behalf of my daughter
and for her support.

839
00:50:51,423 --> 00:50:57,012
I speak for all the mothers
that are in the facility,

840
00:50:57,095 --> 00:51:01,433
their families who are going through, I speak
for all of them,

841
00:51:01,516 --> 00:51:07,314
because collectively
we need to all stick together,

842
00:51:07,397 --> 00:51:12,402
rally together, support one another.

843
00:51:12,486 --> 00:51:14,071
And I think what you all are doing with

844
00:51:14,071 --> 00:51:17,240
this platform definitely

845
00:51:17,324 --> 00:51:19,576
will help that and help push this new law

846
00:51:19,576 --> 00:51:24,289

to get, it's already passed,
but to get things more in effect

847
00:51:24,372 --> 00:51:29,878
quickly.

848
00:51:29,961 --> 00:51:32,547
I'm getting kind of caught up

849
00:51:32,547 --> 00:51:37,803
because I get emotional

850
00:51:37,886 --> 00:51:43,850
when it comes to as you say paying
for the calls on the financial side

851
00:51:45,352 --> 00:51:48,688
I don't get, I get a little finance for the children.

852
00:51:48,688 --> 00:51:54,903
But in the system we asked for the kids
to be, to stay together

853
00:51:54,903 --> 00:51:57,239
what the system says they want

854
00:51:57,239 --> 00:51:59,157
those kids to stay together,

855
00:52:00,283 --> 00:52:02,369
they are they are together,

856
00:52:02,369 --> 00:52:06,248
But I feel like I'm
not receiving the support from the system.

857
00:52:06,248 --> 00:52:08,708
as I should

858
00:52:08,708 --> 00:52:10,544
with taking them

859
00:52:10,544 --> 00:52:13,130
there might be a separate conversation

860
00:52:13,130 --> 00:52:16,925
like later or maybe afterwards

861
00:52:17,008 --> 00:52:21,346
but again, financing support

862
00:52:21,429 --> 00:52:21,638
would,

863
00:52:21,638 --> 00:52:26,643
definitely or should definitely be looked
at much more further.

864
00:52:26,726 --> 00:52:29,354
Very much so much more further.

865
00:52:29,354 --> 00:52:32,315
And I don't know if that took up too much that.

866
00:52:32,524 --> 00:52:33,066
But thank you.

867
00:52:33,066 --> 00:52:36,653
Thank you all for listening.
Can I ask a follow up?

868
00:52:36,695 --> 00:52:41,658
We so important to think about calls
now is not just voice calls,

869
00:52:41,741 --> 00:52:44,327
but where technology is going

870
00:52:44,327 --> 00:52:46,037
and we all know that's video calls.

871
00:52:46,037 --> 00:52:47,706
But you said you were denied.

872
00:52:47,706 --> 00:52:52,460
And I'm curious if you could describe
just what that was all about.

873
00:52:52,544 --> 00:52:57,924
So with the video calling you have to sign up for it.

874
00:52:57,966 --> 00:53:03,597
And so I did the process with the application everything online.

875
00:53:03,680 --> 00:53:07,058
It had been sometime went past

876
00:53:07,142 --> 00:53:12,147
as I was thinking like okay I should have recieved
some type of response back or something,

877
00:53:12,230 --> 00:53:12,981
well I did.

878
00:53:12,981 --> 00:53:18,653
I recieved an email stating that my request was denied.

879
00:53:18,737 --> 00:53:22,157
No real explanation just that it was denied

880
00:53:22,240 --> 00:53:27,996
Also, and then also trying to
and reach out to that department,

881
00:53:28,079 --> 00:53:32,125

you're on the phone,
you're not going to answer.

882
00:53:32,167 --> 00:53:36,338
The communication with the system
on that level is very bad.

883
00:53:36,421 --> 00:53:38,173
Also,

884
00:53:38,173 --> 00:53:41,009
I think the Lieutenant Governor is listening.

885
00:53:41,009 --> 00:53:43,595
Yes, right here.

886
00:53:43,595 --> 00:53:44,304
We will.

887
00:53:44,304 --> 00:53:46,806
Help. We'll talk. Okay? Yeah.

888
00:53:46,806 --> 00:53:48,141
Okay.

889
00:53:48,141 --> 00:53:51,144
Michelle, what the reason was I can't say what,

890
00:53:51,186 --> 00:53:56,149
but in terms of messaging, getting a
and you said, yeah, okay, thank you so much.

891
00:53:56,316 --> 00:54:02,155
So we're going to turn it over to Senator Duckworth.

892
00:54:02,239 --> 00:54:03,657
So I'm going to turn,

893

00:54:03,657 --> 00:54:08,828
I know Ana and her cousin Marlene were here,
but Marlene is taking care of her nephew.

894
00:54:08,828 --> 00:54:13,792
So I'm gonna ask Ana,
and thank you for being here today.

895
00:54:13,875 --> 00:54:17,212
I know a Cook County judge
just vacated Ana's conviction

896
00:54:17,212 --> 00:54:21,091
this week and dismissed all charges
against her so congratulations on your release.

897
00:54:21,341 --> 00:54:24,302
Thank you.

898
00:54:24,386 --> 00:54:26,471
She's had about 4 hours of sleep

899
00:54:26,471 --> 00:54:30,976
in over 24 hours to get here
because she was just released from detention.

900
00:54:30,976 --> 00:54:34,896
And I know you were only 19
when you were incarcerated.

901
00:54:34,980 --> 00:54:39,317
Can you please share your personal experience
relying on the communication services

902
00:54:39,401 --> 00:54:42,320
that were available during your time? Yes.
Thank you.

903
00:54:42,320 --> 00:54:45,824
So I got locked up in 2010.

904
00:54:45,907 --> 00:54:48,076
And the phone calls when I got locked up

905
00:54:48,076 --> 00:54:50,370
in County jail was $7.

906
00:54:50,370 --> 00:54:52,539
It was like 3
something for something for a collect call

907
00:54:52,539 --> 00:54:56,251
for it to connect. Yes.

908
00:54:56,334 --> 00:55:00,380
A few girls had it dropped constantly lost

909
00:55:00,463 --> 00:55:03,091
communication
and in that time is like I'm locked up.

910
00:55:03,091 --> 00:55:05,844
I don't know what I'm doing. I'm trying
to figure out what's going on with my life.

911
00:55:05,844 --> 00:55:07,512
I'm trying to let my family know what's going on.

912
00:55:07,512 --> 00:55:09,889
And I'm in a place that I don't.

913
00:55:09,889 --> 00:55:12,434
I'm not I'm not used to it obviously,

914
00:55:12,434 --> 00:55:16,604
and it's a whole different world.

915
00:55:16,688 --> 00:55:20,191

It's easy, but it's hard to describe just being

916
00:55:20,191 --> 00:55:22,152
there and away from your family.

917
00:55:22,152 --> 00:55:24,821
Not seeing the people
that you used to talking to everyday.

918
00:55:24,821 --> 00:55:29,701
And when you're going through things
emotionally, like my cousin me and her are raised like sisters,

919
00:55:29,784 --> 00:55:32,203
during those times,
I wanted to call her like just cry

920
00:55:32,203 --> 00:55:33,079
everytime I couldn't

921
00:55:33,079 --> 00:55:35,915
because I was limited in that time,

922
00:55:35,915 --> 00:55:37,125
Who I can call and

923
00:55:37,125 --> 00:55:40,086
how many times I could call.

924
00:55:40,086 --> 00:55:40,879
And then during the frustration

925
00:55:40,879 --> 00:55:43,298
when I'm going

926
00:55:43,298 --> 00:55:44,966
and even them driving to see me

927

00:55:44,966 --> 00:55:48,803
was expensive, it was 3 hours drive
4 hour drive to see me

928
00:55:48,845 --> 00:55:51,222
and doing this type of video phone calls in 2020

929
00:55:51,222 --> 00:55:54,225
the video visit.

930
00:55:54,309 --> 00:55:57,437
I had my first visit with my aunt in 2020
after my grandma had passed away

931
00:55:57,437 --> 00:56:04,069
and I hadn't seen my aunt in over seven years
and the painful things were.

932
00:56:04,152 --> 00:56:05,862
She couldn't see me, but obviously

933
00:56:05,862 --> 00:56:09,949
she got stuck seeing a picture of an officer.

934
00:56:10,033 --> 00:56:10,992
Not me.

935
00:56:10,992 --> 00:56:12,035
And that's my first visit.

936
00:56:12,035 --> 00:56:14,162
And then it dropped and they never refunded

937
00:56:14,162 --> 00:56:15,288
her back either and

938
00:56:15,288 --> 00:56:17,457
never let her reschedule the visit.

939
00:56:17,457 --> 00:56:18,875
And with those visits still going

940
00:56:18,875 --> 00:56:20,960
and from a correctional.

941
00:56:20,960 --> 00:56:23,296
Like, say, for instance,
my nephew has autism if I was still

942
00:56:23,296 --> 00:56:24,923
locked up in Logan Correctional.

943
00:56:24,923 --> 00:56:27,133
I couldn't have a video visit with him because there

944
00:56:27,133 --> 00:56:28,635
families cannot move around.

945
00:56:28,635 --> 00:56:32,222
If your family is having a birthday party,
there's nobody there that can have any movement

946
00:56:32,305 --> 00:56:33,098
or else will shut down your visit.

947
00:56:33,098 --> 00:56:35,850
And a kid runs in the background
of a cat runs in the background

948
00:56:35,850 --> 00:56:38,436
they shut down your video visit and can even deny

949
00:56:38,436 --> 00:56:41,398
and block your family for video visit anymore.

950
00:56:41,398 --> 00:56:43,900
And where I was at right now, the immigration

951
00:56:43,900 --> 00:56:48,988
detention facility, I know for a fact that there

952
00:56:49,072 --> 00:56:49,948
the, for eight months,

953
00:56:49,948 --> 00:56:53,576
between my family and friends and loved ones
paying for the video visits, phone calls

954
00:56:53,618 --> 00:56:56,121
it was like a lot of thousand some dollars.

955
00:56:56,121 --> 00:56:59,040
I spent in eight months
in trying to communicate with my family.

956
00:56:59,040 --> 00:57:03,169
And like all of us,
she has said it was a choice

957
00:57:03,253 --> 00:57:08,466
do I get to buy some basic ramen
to survive through the month

958
00:57:08,466 --> 00:57:09,759
or do I call my family?

959
00:57:09,759 --> 00:57:14,973
do I buy this bar of soap
or do I use the state stuff that irritates, like me?

960
00:57:14,973 --> 00:57:18,393
I have psoriasis, it irritates my psoriasis,
but I rather call my family

961
00:57:18,435 --> 00:57:23,106
talk to them, especially when going to courts

and fight for my freedom in my life.

962
00:57:23,106 --> 00:57:29,571
Like I chose to call my family and to take care of
the basic needs that I needed.

963
00:57:29,654 --> 00:57:32,740
It's one thing I do like of
where I was at is that

964
00:57:32,740 --> 00:57:36,244
we had the option to get a call to our family
when we can, they called

965
00:57:36,244 --> 00:57:36,578
it wasn't

966
00:57:36,578 --> 00:57:37,620


967
00:57:37,620 --> 00:57:41,541
scheduled it's scheduled too,
it is the nice thing to call

968
00:57:41,583 --> 00:57:48,381
regular call when we had a chance
but the phone just dropped to the connect dropped.

969
00:57:48,465 --> 00:57:50,925
The text messages would sometimes freeze

970
00:57:50,925 --> 00:57:53,553
and they won't go through until the next day or two.

971
00:57:53,553 --> 00:57:55,054
Or at all.

972
00:57:55,054 --> 00:57:57,599
They will charge us for those text messages.

973
00:57:57,599 --> 00:58:00,685
Still, it never refunded us can you imagine that

974
00:58:00,727 --> 00:58:05,148
and I had to choose and it ruined a lot of some

975
00:58:05,315 --> 00:58:08,151
a relationship with one
like that of being able to call.

976
00:58:08,151 --> 00:58:08,902
in ruined my

977
00:58:08,902 --> 00:58:12,614
relationship that I had with somebody,
and it put a strain on my relationship

978
00:58:12,614 --> 00:58:14,741
with my family.

979
00:58:14,741 --> 00:58:16,576
because it

980
00:58:16,576 --> 00:58:18,870
just wasn't the same as I was

981
00:58:18,870 --> 00:58:19,245
because I was

982
00:58:19,245 --> 00:58:23,666
blessed to be home for three
only three months before ICE picked me up.

983
00:58:23,708 --> 00:58:25,210
And yes, it's just three but it was short

984
00:58:25,210 --> 00:58:29,506

but I built connections with my family,
it was hard like my niece constantly cried

985
00:58:29,506 --> 00:58:32,383
because I didn't call them a lot and

986
00:58:32,383 --> 00:58:35,970
it was very hurtful that being able to talk to them

987
00:58:36,054 --> 00:58:39,182
and they were like why aren't you calling,
why can't we see you, why can't you do this?

988
00:58:39,182 --> 00:58:42,227
I'm like, I, I can't. It's very expensive.

989
00:58:42,227 --> 00:58:43,978
And where was that?

990
00:58:43,978 --> 00:58:45,522
Dodge is one of the

991
00:58:45,522 --> 00:58:49,108
few detentions for immigration and federal.

992
00:58:49,192 --> 00:58:51,945
that do not get the free ten

993
00:58:52,028 --> 00:58:54,405
national and ten international phone calls
they're supposed to

994
00:58:54,405 --> 00:58:55,907
get a week.

995
00:58:55,907 --> 00:59:00,078
That is one of the only ones
that did not get those phone calls.

996
00:59:00,161 --> 00:59:02,038
That will impact a lot, like

997
00:59:02,038 --> 00:59:05,625
I'm blessed that where I was
that was a reentry house,

998
00:59:05,708 --> 00:59:10,129
firehouse when ICE picked me up and they had emergency,
like the girls did,

999
00:59:10,171 --> 00:59:15,051
they had emergency contacts for each other and
to get a hold of my family to call my lawyer

1000
00:59:15,051 --> 00:59:17,470
so they could let my lawyer know that I had got picked up.

1001
00:59:17,470 --> 00:59:20,765
If I wouldn't have had that, I don't know how I would

1002
00:59:20,765 --> 00:59:24,602
I would have probably been deported by then.
Because they were not,

1003
00:59:24,602 --> 00:59:26,563
they don't help anyone connect with your family.

1004
00:59:26,563 --> 00:59:29,857
There's no way of communicating, like my sister,

1005
00:59:29,857 --> 00:59:34,904
when I first got there, they tried to put money on the phone,
they put $5 in a phone they charge $8

1006
00:59:34,904 --> 00:59:38,283
tax to put $5 on the phone.

1007

00:59:38,283 --> 00:59:42,453
on her side, my cousin, put like 20, 20, 20,

1008
00:59:42,537 --> 00:59:45,373
she had to pay 100 and some dollars to put $20

1009
00:59:45,373 --> 00:59:47,542
on three phones.

1010
00:59:47,542 --> 00:59:51,296
And they are like like they can't do it anymore.

1011
00:59:51,379 --> 00:59:52,213
It was hard.

1012
00:59:52,213 --> 00:59:57,468
But people have bills. They have life.

1013
00:59:57,552 --> 00:59:59,262
And it's

1014
00:59:59,262 --> 01:00:02,849
you have to choose, can we communicate
with this person that's inside or do we pay rent?

1015
01:00:03,057 --> 01:00:04,475
Do we buy food?

1016
01:00:04,475 --> 01:00:06,352
Do we get the kids

1017
01:00:06,352 --> 01:00:09,230
school supplies that they need?

1018
01:00:09,230 --> 01:00:11,774
It's hard.

1019
01:00:11,774 --> 01:00:12,525

Well.

1020
01:00:12,525 --> 01:00:14,235
Thank you for sharing your story.

1021
01:00:14,235 --> 01:00:17,739
Just so you know, ICE
came and found her at Harden House,

1022
01:00:17,739 --> 01:00:20,825
which is a home for women
who were recently released from prison.

1023
01:00:20,825 --> 01:00:22,535
So she's been released on good behavior.

1024
01:00:22,535 --> 01:00:25,580
And ICE came and found her at a place
where she was trying

1025
01:00:25,580 --> 01:00:29,334
to reintegrate back into society

1026
01:00:29,375 --> 01:00:31,753
and then,

1027
01:00:31,753 --> 01:00:37,550
in fact, her conviction has been dismissed,

1028
01:00:37,634 --> 01:00:39,969
was vacated, and all charges dismissed

1029
01:00:39,969 --> 01:00:43,097
against you
and thanks in part to the work of your attorneys.

1030
01:00:43,139 --> 01:00:49,854
Can you talk a little bit about the importance of

1031
01:00:49,937 --> 01:00:51,606
and your experience with

1032
01:00:51,606 --> 01:00:54,776
how you communicated with your attorney
and other resources during ICE

1033
01:00:54,776 --> 01:01:01,783
detention?

1034
01:01:01,866 --> 01:01:04,035
Yes. So during my time

1035
01:01:04,035 --> 01:01:08,122
there, I was limited to her, my lawyers
scheduling.  The

1036
01:01:08,164 --> 01:01:11,250
phone calls
whenever they had one open and talking to

1037
01:01:11,250 --> 01:01:12,794
her between. Sometimes that's only an

1038
01:01:12,794 --> 01:01:17,048
hour phone call scheduled
and they're like, no, we only have half an hour

1039
01:01:17,048 --> 01:01:19,717
we have somebody else coming in.

1040
01:01:19,717 --> 01:01:21,594
Because for instance.

1041
01:01:21,594 --> 01:01:23,054
Where I was at

1042
01:01:23,054 --> 01:01:25,807

I couldn't call her directly because our phone.

1043
01:01:25,807 --> 01:01:28,434
call number would show up as spam.

1044
01:01:28,434 --> 01:01:30,770
So if you have a spam blocker

1045
01:01:30,770 --> 01:01:33,106
we can't call you,

1046
01:01:33,106 --> 01:01:35,066
it's going to get blocked.

1047
01:01:35,066 --> 01:01:38,903
Same thing with when we were sending like emails

1048
01:01:38,903 --> 01:01:42,949
Sometimes that email,  GTL stuff, it would
go directly to the spam folder

1049
01:01:43,199 --> 01:01:48,955
and I found that whenever there is an application I
was trying to add them as a contact to the video text

1050
01:01:49,038 --> 01:01:49,997
So it's very

1051
01:01:49,997 --> 01:01:53,960
limited on the phone calls with them
and sometimes officers try and get you off

1052
01:01:54,001 --> 01:01:57,046
because they don't want to deal with other people,
they want to put them in that room and stuff

1053
01:01:57,046 --> 01:02:09,267
and they will interrupt
your legal phone calls with your lawyer.

**JA1151**

1054
01:02:09,350 --> 01:02:10,393
Thank you.

1055
01:02:10,393 --> 01:02:15,440
It sounds like we need to work on
some of the refunds and we need to talk about this

1056
01:02:15,523 --> 01:02:19,610
being marked as spam
and the text messages as well.

1057
01:02:19,694 --> 01:02:24,866
I think we have some homework to do which. This

1058
01:02:24,866 --> 01:02:26,743
Before I closes out.

1059
01:02:26,743 --> 01:02:30,705
Chairwoman do you want to offer any closing remarks.

1060
01:02:30,788 --> 01:02:32,582
Can we just have a round of applause

1061
01:02:32,582 --> 01:02:45,970
for these people who had their amazing stories?

1062
01:02:46,053 --> 01:02:47,847
You know, they see justice delayed

1063
01:02:47,847 --> 01:02:51,058
is justice denied.

1064
01:02:51,142 --> 01:02:53,394
And we've been waiting a really long time

1065
01:02:53,394 --> 01:02:57,857
to fix prison phone services

1066
01:02:57,940 --> 01:03:00,943
way too long.

1067
01:03:00,943 --> 01:03:05,114
And we've been working on it way too slowly.

1068
01:03:05,198 --> 01:03:06,199
But despite all that,

1069
01:03:06,199 --> 01:03:10,119
I actually feel really optimistic right now

1070
01:03:10,203 --> 01:03:11,621
because for the first time ever,

1071
01:03:11,621 --> 01:03:15,082
we passed a law that the president signed

1072
01:03:15,166 --> 01:03:18,044
that gives us authority to fix this,

1073
01:03:18,044 --> 01:03:20,922
because the first time ever we're seeing states

1074
01:03:20,922 --> 01:03:26,344
and cities around the country
addressing this with free and, low cost calling.

1075
01:03:26,427 --> 01:03:28,262
And also I feel optimistic as people

1076
01:03:28,262 --> 01:03:32,266
like you have decided to dedicate your voices

1077
01:03:32,350 --> 01:03:36,270
and let people know what this sounds like,
what it feels like, what it means

1078
01:03:36,270 --> 01:03:41,859
for your families, and how that burden
that you bear is something we should all share.

1079
01:03:41,943 --> 01:03:44,695
Because everyone in this country deserves

1080
01:03:44,695 --> 01:03:47,698
access to communications

1081
01:03:47,865 --> 01:03:49,283
and that

1082
01:03:49,283 --> 01:03:52,578
is whether you're incarcerated or not,
it is all of us.

1083
01:03:52,578 --> 01:03:55,456
When we say everyone, we've got to remember that.

1084
01:03:55,456 --> 01:03:58,084
So we are on our way to writing this wrong,

1085
01:03:58,084 --> 01:04:00,336
and I'm grateful for all of you.
I'm really grateful

1086
01:04:00,336 --> 01:04:02,463
for the senator for championing this bill.

1087
01:04:02,463 --> 01:04:10,763
Thank you all for being here.

1088
01:04:10,847 --> 01:04:12,765
All right.

1089
01:04:12,765 --> 01:04:15,059

I don't know how to follow that up.

1090
01:04:15,059 --> 01:04:17,812
Yeah, the tissues are really necessary,

1091
01:04:17,812 --> 01:04:21,232
but just thank you to all our distinguished guests
and participants for joining us today.

1092
01:04:21,274 --> 01:04:25,319
We heard some incredibly compelling stories
that emphasized the importance of fair

1093
01:04:25,319 --> 01:04:26,487
and accessible communications

1094
01:04:26,487 --> 01:04:30,366
services at just and reasonable rates
of detention incarceration facilities.

1095
01:04:30,449 --> 01:04:32,785
As your moderator,

1096
01:04:32,785 --> 01:04:37,456
I think often when you work
in policymaking spaces, it can be

1097
01:04:37,540 --> 01:04:39,458
it is, as hard as it is to hear,

1098
01:04:39,458 --> 01:04:44,255
it is incredibly reinvigorating
on our end to know that we have real,

1099
01:04:44,338 --> 01:04:46,966
real folks who are doing this work
here on the ground and we're here in DC

1100
01:04:46,966 --> 01:04:50,928

trying to support and make sure
that your lives are better and this means a lot.

1101
01:04:50,928 --> 01:04:53,180
So thank you guys. For doing, being
vulnerable with us.

1102
01:04:53,180 --> 01:04:55,641
It's not easy. It's not easy at all.

1103
01:04:55,725 --> 01:04:56,017
And with

1104
01:04:56,017 --> 01:04:59,020
that, I just want to let folks know,
as I mentioned before,

1105
01:04:59,186 --> 01:05:02,273
that there are ways to make sure your voice is
heard also in this rulemaking process.

1106
01:05:02,273 --> 01:05:04,400
It's really, really important.

1107
01:05:04,400 --> 01:05:08,070
There are guides at the sign in table
how to submit public comments into this rulemaking

1108
01:05:08,070 --> 01:05:12,742
proceeding and that really and please,
those don't go ignored at the commission.

1109
01:05:12,742 --> 01:05:14,535
We read those, we analyze those.

1110
01:05:14,535 --> 01:05:17,496
Those are ways that when folks are asking
about what

1111

```
01:05:17,622 --> 01:05:21,834
whose voice and whose are you hearing about
for this rule, I want to make sure
```

```
1112
01:05:21,834 --> 01:05:25,880
that everyone in this room has direct experience,
that your voice is in the record, too.
```

```
1113
01:05:25,963 --> 01:05:28,591
So please, please pick up one of those guides
before we leave.
```

```
1114
01:05:28,591 --> 01:05:30,760
And that concludes our listening session
on Just and
```

```
1115
01:05:30,760 --> 01:05:34,430
Reasonable Rates and Charges
for Incarcerated Peoples Communication Services.
```

```
1116
01:05:34,513 --> 01:05:38,351
Let us continue our efforts to ensure
that everyone has the opportunity to connect
```

```
1117
01:05:38,351 --> 01:05:39,101
and communicate.
```

```
1118
01:05:39,101 --> 01:05:41,687
Thank you all for being a part
of this important discussion.
```

```
1119
01:05:41,687 --> 01:05:42,980
Have a wonderful rest of your day.
```

```
1120
01:05:42,980 --> 01:05:45,066
And for those who arrived for the press
conference, please
```

```
1121
01:05:45,066 --> 01:05:47,401
know we'll get started shortly in a few minutes
```

1122
01:05:47,401 --> 01:05:49,070
and the press conference
will take place in this room.

1123
01:05:49,070 --> 01:05:50,363
Thanks to everyone for being here.

**Federal Communications Commission**

March 5, 2024

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

      Re:  Notice of *Ex Parte* Communication, WC Docket Nos. 23-62 and 12-375

Dear Ms. Dortch,

On February 1, 2024, the Federal Communications Commission (Commission) hosted a listening session in Charleston, South Carolina to obtain additional comment for the record in the above-referenced proceedings as part of its ongoing work to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Act).  The listening session included Commission Chairwoman Jessica Rosenworcel, former Chair and Commissioner Mignon Clyburn, FCC staff, and members of the public, as listed below.  Participants at the listening session provided additional public comment regarding the purpose of the Act and the impact of unreasonable rates on incarcerated people and their families, including first-hand accounts of those impacts.  The listening session was part of the Commission's broader efforts to engage a broad segment of the public in its continuing efforts to implement the Act.

**Public Listening Session**:  February 1, 2024, 2:30pm-4:00pm EDT at the City of North Charleston Cultural Arts Department, Park Circle Community Building, 4800 Park Circle, North Charleston, South Carolina 29405.

The following individuals participated in the listening session:

- The Honorable Jessica Rosenworcel, FCC Chairwoman
- The Honorable former Chair and Commissioner Mignon Clyburn
- Ahuva Battams, FCC attorney advisor and moderator
- Eric Mitchell, former incarcerated people's communications services consumer
- Brian Howard, former incarcerated people's communications services consumer
- Deon Nowell, former incarcerated people's communications services consumer
- Jada Cochran, former incarcerated people's communications services consumer

Additional information about the Commission's efforts in connection with Incarcerated People's Communications Services can be found at:  https://www.fcc.gov/general/ics-data-collections.  For questions concerning this filing, please contact Ahuva Battams at ahuva.battams@fcc.gov or at (202) 418-1565.

Respectfully submitted,

/s/ Ahuva Battams
Ahuva Battams
Attorney Advisor
Pricing Policy Division
Wireline Competition Bureau
Federal Communications Commission

**JA1159**

1    UNITED STATES FEDERAL COMMUNICATIONS COMMISSION

2

3

4    INCARCERATED PEOPLE'S COMMUNICATIONS SERVICES

5                  LISTENING SESSION

6

7

8    _____

9

10   DATE:        FEBRUARY 1, 2024

11   TIME:        2:30 P.M.

12

13   LOCATION:    PARK CIRCLE COMMUNITY BUILDING
                  NORTH CHARLESTON, SC

14   BEFORE:      THE HONORABLE JESSICA ROSENWORCEL,
                  CHAIRWOMAN OF THE FCC

15

16                THE HONORABLE MIGNON CLYBURN,
                  FORMER ACTING CHAIR AND
17                COMMISSIONER OF THE FCC

18                AHUVA BATTAMS,
                  FCC ATTORNEY ADVISOR, MODERATOR

19   SPEAKERS:    ERIC MITCHELL
                  BRIAN HOWARD
20                DEON NOWELL
                  JADA COCHRAN

21

22   REPORTED BY: RUTH MOTT, RPR, CRR
                  CLARK BOLEN
23                P.O. BOX 12189
                  CHARLESTON, SC 29422
24                843-762-6294
                  WWW.CLARKBOLEN.COM

25

```
 1              P R O C E E D I N G S
 2              MS. BATTAMS:  Hello, and thank you
 3   for coming today to today's listening session.
 4   My name is Ahuva Battams, and I am an attorney
 5   advisor with the Federal Communications
 6   Commission's Wireline Competition Bureau's
 7   Pricing Policy Division, and that's a mouthful,
 8   and I am today's moderator.
 9              The purpose of today's listening session
10   is to engage with the public about the
11   commission's ongoing work to secure just and
12   reasonable rates for communication services
13   provided to incarcerated people and their
14   families, particularly in response to the Martha
15   Wright-Reed Just and Reasonable Communications
16   Act of 2022.  The Martha Wright-Reed Act requires
17   that the commission adopt just and reasonable
18   rates no earlier than 18 months, which is July of
19   this year, and no later than 24 months, December,
20   after the law's January 5th, 2023 enactment.
21              The commission is moving quickly to
22   implement this new act and initiated a rulemaking
23   proceeding in March of 2023.  This listening
24   session will supplement the extensive record
25   developed so far for -- excuse me, in response to
```

1  that notice of proposed rulemaking and will

2  become part of the public record that the

3  commission will rely on to adopt the just and

4  reasonable rates required by the Martha

5  Wright-Reed Act.

6           This afternoon we will hear from

7  formerly incarcerated people about their

8  experiences using Incarcerated People's

9  Communications Services.  Please note that during

10 the event there will be no dedicated time for

11 questions or comments from the audience given

12 tower limited time; however, as you saw out on

13 the table, we encourage you to share your

14 thoughts and comments.  There are three ways you

15 can submit comments to the FCC.  You can submit

16 formal comments.  There's a guide outside that

17 explains how you submit them onto the FCC's

18 electronic filing system; it's called ECFS.  It's

19 relatively easy to use and we've got those

20 instructions.

21          You can also write your comments and

22 thoughts with us on forms we have outside that we

23 will then enter into the record for you.  And

24 either of these are available for any member of

25 the public that would like to have their thoughts

1   and comments get into the record for us to rely

2   on.

3          The FCC greatly values public

4   participation in the rulemaking process and your

5   comments will play a crucial role in shaping

6   these regulations.  To ensure your voice is heard

7   we request that you submit your comments through

8   these two different channels.

9          To kick off this important discussion we

10  are very privileged today to have with us the

11  chairwoman of the FCC, Jessica Rosen Rosenworcel,

12  and Former Acting Chair and Commissioner Mignon

13  Clyburn.

14         Chairwoman Rosenworcel, I turn it over

15  to you.

16         CHAIRWOMAN ROSENWORCEL:  Oh, thank

17  you so much.  Thank you to our speakers for being

18  here today, my friend Mignon.  We are on her home

19  turf in South Carolina.  And that's really

20  important because we wanted to talk about this

21  issue in places other than just Washington, D.C.

22         Now, the Federal Communications

23  Commission is headquartered in Washington, D.C.,

24  and we oversee a really big part of the economy.

25  Communications, it's dynamic, it's evolving, but

1    we also have a really big duty when it comes to

2    communications, and that's making sure that it is

3    available in just and reasonable terms and rates

4    for all.

5         Let me emphasize for all. Doesn't

6    matter who you are, where you live in this

7    country, you deserve access to just and

8    reasonable rates for communications. Now, that's

9    a really big and lofty principle, and when we

10   sometimes get down to the details, we can -- we

11   can miss the realities of what people are

12   experiencing on the ground.

13        And it was back two decades ago when

14   Martha Wright, a grandmother, filed a petition

15   with us that asked the agency to take a look at

16   what people were being charged when they tried to

17   communicate with their families when they were

18   incarcerated. She wanted to talk to her

19   grandson. That was filed with us two decades

20   ago. Now, that petition sat at my agency like

21   too many of them do, didn't get attention. From

22   time to time someone would pick it up and say,

23   maybe we should look into this, but oh, who's

24   going to have sympathy for the incarcerated?

25   Should we really work on this issue? Don't we

1    have more important things to do?

2            And it was almost a decade later when

3    then Commissioner Clyburn pulled that petition

4    and a subsequent one out of the file and said,

5    this is not right.  It's not right what people

6    who are incarcerated are being charged, it's not

7    right for the burden it places on their families,

8    and it's not right that this agency that is

9    entrusted with making sure we have just and

10   reasonable communications for all hasn't done

11   anything.  And so we started down a road under --

12   with your pressure and leadership, we first put

13   caps on rates.  We put restrictions on ancillary

14   fees that are all these other fees that they add

15   to the bill to make it hard for you to pay for

16   the service.  And we sought to try to address

17   site commissions, which can lead to other fees on

18   the bill that make it unaffordable.

19           Now, I'd love to tell you it was easy

20   and it was all over, but we wouldn't be here

21   today.  Because what happened is the agency did

22   work on it, the courts handed our work back to

23   us, we tried again.  We were persistent.  We

24   learned from her, keep on at it.  And over time

25   we recognized that we were going to need new

1  authority from Congress.  And I just want to say

2  that Senator Duckworth and Senator Portman came

3  through, and they passed a bill last year, the

4  Martha Wright-Reed Just and Reasonable

5  Communications Act.  They named it for that

6  grandmother that filed the petition with us that

7  my colleague and friend Mignon picked up.

8       And they gave us the authority to fix

9  these rates for once and for all, both instate

10  and across state lines.  And they gave us

11  authority to not just think about voice calls but

12  think about the future of communications in

13  video.  And that is very exciting, and it's also

14  a really big task.  And our goal is to get it

15  right this time.  And to get it right, we

16  concluded that we're not, again, just going to be

17  talking to people in Washington, but we're going

18  to go around the country and try to build a

19  record where we converse with people that have

20  real world experience.

21       And with that I want to hand it off to

22  the woman who really got this started, and I'm

23  grateful for her being here today.  I'm also just

24  grateful for the moral clarity that led you to

25  pick that petition up and say we should work on

1    it in Washington.

2              COMMISSIONER CLYBURN:  Thank you,

3    chairwoman.  It's a pleasure to be here.  Thanks

4    for not forgetting about me.

5              CHAIRWOMAN ROSENWORCEL:  Never.

6              COMMISSIONER CLYBURN:  I really --

7    really appreciate you coming just a few miles

8    from where I was born at McClennan Banks Hospital

9    and a few blocks from where my cousin lived, you

10   know some Joys, if you know this area, if you

11   know Liberty Hill, you know some Joys.

12             I would like to start with a story.  It

13   wouldn't be right if a daughter of a librarian

14   and a history teacher didn't start out with a

15   little bit of context.  So I had the opportunity,

16   the incredible privilege to meet Mrs. Martha

17   Wright-Reed and her grandson Ulandis.  This was

18   during a screening of the award-winning film

19   Middle of Nowhere by, everybody knows her name,

20   Ava Duvernay.

21             Someone had a great idea at the FCC to

22   host this film right at the agency on 12th Street

23   in Southwest.  This beautifully produced film

24   highlighted several levels of pain that families

25   go through, that friends go through when someone

1    is incarcerated.  Now, that was the summer or

2    early fall of 2012, because my memory's a little

3    shaky whether it was summer or fall.  I know I

4    wasn't wearing a coat.

5        And the face of the movement for just

6    and reasonable telephone rates entered the room

7    with the aid of her grandson.  She was confined

8    to a wheelchair, and the presence of her dark

9    glasses should have told us, but it was

10   confirmed, that her eyesight was failing due to

11   medical complications, accelerated I think,

12   brought quicker to light by her rationing

13   medicine due to her struggle to pay for those

14   sky-high monthly costs of keeping in touch with

15   her grandson, maintaining that connection,

16   traveling several miles away, several hundred

17   miles away when they closed the Lorton facility

18   where Ulandis was housed.  And, of course, you

19   know with aging, we're more likely to have

20   underlying conditions.

21       So I met this person with some physical

22   challenges, but what wasn't a challenge was her

23   spirit and her resolve when it came to speaking

24   up and speaking out about an issue so important

25   to her.  What we would hear that day from her and

1    during subsequent encounters with her was this

2    powerful story of this giant who personified the

3    struggle of millions of families, your families,

4    and while economic relief never came for her, she

5    made it clear to us that her support would never

6    waiver.  She would be with us.

7         Now the economic and physical and other

8    tolls brought us to 2015 when we lost her, but

9    she never let us forget that as policy makers, as

10   government officials, people who care, that we

11   had a job to do.  And while it was decades even

12   after that when we met her that the first

13   legitimate, real, official complaint came through

14   our doors.  We weren't done.  The market would

15   not cure itself.  It was very clear that the

16   industry was not going to fix itself, that it was

17   going to take government intervention, and I say

18   that very proudly, for this to be fixed.

19        And since that day when I met them in

20   2012, I've heard from those families and formerly

21   incarcerated about the trade-offs I talked about.

22   They were already financially strapped.  There

23   was always a problem with legal services being

24   able to keep in touch, but now you're going to

25   compound this with these rates.  And it was just

1   a burden too heavy for many to stand.

2        I mentioned a rationing of meds.  The

3   foregoing of essential needs.  I met a young lady

4   who could not -- her grandparents could not

5   afford a computer because they made the trade-off

6   to keep in touch with her father.  I could not

7   stand by.  You sent me from Charleston to not

8   stand by and be satisfied with the situation that

9   I had an opportunity to make a difference about

10  and sit by on the eighth floor, which was really

11  not the eighth floor, but that's another story

12  for another time, while the majority of those 2

13  million children who have at least one parent

14  incarcerated could not afford to keep in touch.

15  We had no choice but to act.

16       So I've got three or four more pages

17  that I won't read, but I want to affirm to you

18  that our job is not done and these dedicated

19  people, present and past, will not let you down.

20  We cannot promise you the exact day or the exact

21  hour, but we will promise you that we will not

22  stop.  As a regulatory family, inside of the

23  agency and out, we will not stop, until you hear

24  us be able to loudly proclaim that we have just

25  and reasonable rates for everyone, no matter

1    where you live temporarily, no matter where your

2    families live permanently, that we will not give

3    up until the job is done.  Thank you, Madam

4    Chair.

5              MS. BATTAMS:  Thank you so much

6    Former Acting Chair and Commissioner Clyburn for

7    your leadership on this very important

8    proceeding.  Without you we wouldn't be here now.

9              Now it's time to hear from those with

10   direct experience with the communications

11   available to the incarcerated.  We want to hear

12   your voice.  Chairwoman Rosenworcel and Former

13   Acting Chair and Commissioner Clyburn will have

14   the opportunity to introduce each speaker and ask

15   questions about their personal experiences and

16   have a meaningful dialogue about what you

17   experienced.

18             I now invite current and former

19   consumers of incarcerated peoples communications

20   services to join us on stage.  They're already

21   here because of our setup, so I shouldn't have

22   just followed that script.  Welcome Brian Howard,

23   Deon Nowell, Eric Mitchell, and joining us

24   virtually, Jada Cochran.

25             We will now have Chairwoman Rosenworcel

1  introduce the first participant to share his

2  experience.

3            CHAIRWOMAN ROSENWORCEL:  All right.

4  Thank you so much.  Thank you also for being here

5  today because the two was could stand on a soap

6  box and do this forever, but it's much more

7  important to hear from people with real world

8  experience.

9            MR. MITCHELL:  Thank you for that.

10           CHAIRWOMAN ROSENWORCEL:  So I'm

11 going to start with Eric Mitchell, and I just

12 want to thank you for joining us today.

13           MR. MITCHELL:  Thank you for having

14 me.

15           CHAIRWOMAN ROSENWORCEL:  And I

16 think it's always good to put these issues in

17 context and what it -- so I'd like you to talk a

18 little bit about your background, what led you to

19 have experience like this, and what it was like

20 trying to stay in touch with family and friends,

21 because I think we need to hear stories to make

22 change.  So why don't you start with your story.

23           MR. MITCHELL:  Okay.  First of all,

24 my name is Eric Mitchell.  I just want to say

25 thank you all for having me here.  I correspond

with federal inmates as well as state inmates
just about every other week.  And one of the
things that they always talk about, that we
always talk about that the pricing of the phone
calls are just too high.  Some people have to
choose between, you know, commissary, food on the
table at the house, or, you know, having money on
the phone.  So if you have kids at the house to
feed, the smartest thing would be just to scratch
the phone and just, you know, communicate via pen
and paper.

        But I'm 34 years old.  I'm from
Charleston, South Carolina.  I grew up in a nice
household.  I also grew up in Stone Mountain,
Georgia for close to ten years.  My parents were
married.  Upon coming back to Charleston, South
Carolina, they got divorced, and it's like after
that divorce is when a lot of my run-ins with the
law started to come.  I was first arrested at the
age of 15.  Right now today I'm 34 years old.  I
have been arrested a total of 11 times in my
life.  I've been to state prison twice, and I
have just finished a ten-year prison in
federal -- a ten-year sentence in federal prison.
        I'm a full-time college student now.

1   I'm a sergeant at arms at my Toastmaster club
2   called The Choice.  I have a full-time job.  But
3   just a little bit about my experience with
4   telecommunications.  You know, you have the
5   institution.  They have their policies.  They
6   have their rules.  And then you have different
7   prison organizations that are inside these
8   institutions.  They have their policies and they
9   have their rules too.
10          So the depending on which organizations
11  you are associated with or affiliated with you
12  may not be able to use the phone.  It's just that
13  simple.  You can't touch that phone, don't let us
14  catch you by that phone, so, you know, that puts
15  a burden on guys.  Guys are afraid to use the
16  phone.  You see what I'm saying?  Then you have
17  guys that might have infractions for whatever
18  reason that may not allow you to use the phone,
19  but when you can't use the phone, you can't keep
20  in contact with your loved ones, with your kids.
21          You have guys that have appeals in the
22  courtroom.  You can't contact your lawyer.  You
23  can't use the phone, so it's -- it's -- it's
24  really just -- it's very stressful.  You know,
25  most people just give up.  You know what I'm

1   saying?  People just give up and, you know, I

2   mean, people just -- you know, once you give up,

3   it's pretty much a dead end from there.  But yes,

4   my experience, this has been talked about for a

5   long, long, long time, and I'm just glad that

6   you-all are really trying to do something about

7   this.  And I'm just -- I'm very, very glad to be

8   a part of this and to speak my personal

9   experience in helping make this come to light.

10               CHAIRWOMAN ROSENWORCEL:  Thank you.

11  I can see that Toastmaster streak in you.

12               We held another one of these sessions a

13  little while ago in Chicago, and one of the

14  things that kept on coming up in addition to the

15  rates was a lot of stories about calls being

16  dropped and not working.

17               MR. MITCHELL:  That's right.

18               CHAIRWOMAN ROSENWORCEL:  As if the

19  system was designed to only work occasionally and

20  that you would wind up paying for contact that

21  never connected.

22               MR. MITCHELL:  Exactly.

23               CHAIRWOMAN ROSENWORCEL:  And I

24  wonder if you could -- you're nodding your head,

25  so I assume that you've got some stories to tell

1  about it, but I'm curious what you can tell about

2  it.

3          MR. MITCHELL:  I have years and

4  years of stories about this.  That is true.

5  There have been times with me personally I have

6  been on the phone and in the middle of call it

7  hangs up.  Say you pay $4 for the call.  You

8  might have been on 45 seconds to a minute, and it

9  automatically hangs up.  You don't get a refund

10  nor if you have money to call back, you don't get

11  the continuation of that call.  So that's another

12  $4 you would have to charge again.  But yes,

13  those are -- that happens daily.  I mean, it

14  happens daily, yes.  It happens all the time.

15          And sometimes you might not be able to

16  call back.  There have been times when the phones

17  were down.  I mean, the phones might not be on

18  until after 6:00 or they might go off at 6:00.

19  They might not be on until the following day.

20  But just these things do happen with our

21  telecommunications.  And it's just -- it's -- the

22  phone is a serious thing, and -- for those who

23  are incarcerated.  You know, a lot of bad things

24  happen because of the phone.  You know what I'm

25  saying?  And man, I have seen some good and I

1    have seen some bad.

2            And it's just -- I would like for

3    something to be done about this because it's

4    just -- everybody deserves, you know what I'm

5    saying, to be able to communicate with your

6    lawyer, your loved ones, family, however people

7    want to keep in touch, you want to be in the

8    know.  And you care about your loved ones out

9    there.  But yes, those calls do drop, don't get

10   refunds, you don't get continuations, and then if

11   you don't have any money to call back, then

12   it's -- it's just that.

13            CHAIRWOMAN ROSENWORCEL:  Do you

14   have any questions for Eric?

15            COMMISSIONER CLYBURN:  You know,

16   I'm hearing you and you're saying it, so I

17   answer -- I'll ask it more boldly.  If you had

18   three wishes right now, given all of your, you

19   know, experiences and all of the things that you

20   shared, what would be the three things that you

21   would change about this regime?  What would be

22   the three things you would change right now?

23            MR. MITCHELL:  Right now, the three

24   things -- the first would be lowering the prices

25   for calls.  If not, I just -- I'd give them for

1  free.  That mean -- you know what I'm saying?

2  But lowering the prices.  And adding more phones,

3  you know, you might have -- you might have five

4  to six phones in a unit when you've got over 100,

5  200 guys, so it's pretty much -- like I'm saying,

6  you know, things happen, bad things happen when

7  you've got six phones, and you've got all these

8  different groups of people who are here for years

9  and years and years and years nowhere to go,

10 bunch of frustration and anger.

11        So more telephones, lowering the prices,

12 and I'm just -- number three would be I guess

13 coming up with other ways of communications.  You

14 know, I notice that they have started doing like

15 virtuals for some situations, so I guess coming

16 up with other ways of communication because the

17 phones are limited and the prices are just sky

18 high.  Those would be the three things.

19        COMMISSIONER CLYBURN:  So you're

20 saying like video calls or the internet had

21 seen --

22        MR. MITCHELL:  Yes, ma'am.  Yes,

23 ma'am.  Yes, ma'am, I agree.

24        CHAIRWOMAN ROSENWORCEL:  So what's

25 exciting is that this new legislation gives us

1  power to look into that, because we all know

2  that's where communications is going.  And again,

3  we need to make sure everyone gets that.

4                    MR. MITCHELL:  Yes, ma'am.

5                    CHAIRWOMAN ROSENWORCEL:  Anyway, I

6  would like to ask Mignon if you would like to

7  move on and just start the conversation.

8                    COMMISSIONER CLYBURN:  Since I'm a

9  little older, I'll take over and move over to

10 someone like --

11                    CHAIRWOMAN ROSENWORCEL:  Because

12 you're local.

13                    COMMISSIONER CLYBURN:  I know.  Be

14 A little older.  So I wanted to say hello to

15 Brian, and thank you for the work that you're

16 doing here in Charleston.  You have been

17 mentoring other men and youth for My Community's

18 Keeper.  Tell us a little bit about your journey

19 and what -- what gets you excited, you know, when

20 you walk out of the door every day.

21                    MR. HOWARD:  I'd like to thank

22 you-all for choosing me and giving me this

23 opportunity to sit here, because you'll hear my

24 story -- snapshot of my story that I'm really not

25 supposed to be sitting here.  Right?

And so, you know, with that, I come from
a two parent home.  I was actually born in
Atlantic City, New Jersey, about three, four
years old, transplanted down here to Ladson,
South Carolina.  My father's from Summerville,
and so reason why he went up there because he
went to Denmark Tech in the '60s, became a
welder.  And during the '60s, black men couldn't
get welding jobs here in Charleston.  So he had
an older brother in New Jersey, and he went to
New Jersey.  And that's when he met Mom, and the
best thing happened in the family, just had to
put that out there.

COMMISSIONER CLYBURN:  I'll arm
wrestle you on that, but go right ahead.
Continue.  This is your story, not mine.

MR. HOWARD:  And so coming down
here to Ladson, growing up, I just been a
rebellious kid, everything came so easy to me,
school just came so easy, became bored.  And then
at about 10, 11 years old my mother and father
separated.  I came home one day, the house was
empty.  I thought we was burglarized, so
something that crushed me right there.  I started
a spiral spin down, in and out of DJJ, Department

1   of Juvenile Justice.  By the time I was 17, took

2   the life of another young black male, end up

3   getting a life sentence, went to jail, spent 28

4   years and five months between Department of

5   Juvenile Justice and South Carolina Department of

6   Corrections.

7         And now I'm proud to say that I'm a

8   grateful father, a grateful husband, grandfather,

9   son, uncle, and a youth development coordinator.

10  You said what get my wheels burning?

11         COMMISSIONER CLYBURN:  Yes.

12         MR. HOWARD:  Things like this.  To

13  be able to speak my truth for those who can't

14  speak for themselves.  Right?  And so I mentioned

15  I'd been incarcerated 28 years and five months.

16  That's a long stretch.  I've seen where coming

17  into South Carolina Department of Corrections

18  local phone calls were a dime and you could talk

19  as long as you wanted.  Phones were abundance.

20  Out on the yard, it was phones.  In the dormitory

21  there was phones, able to communicate.

22         And what I learned later, communication

23  is key, vital, to our rehabilitation because it

24  extends our family support, friend support, and

25  having that support when you come home.  During

1   those years the rates started going -- you

2   mentioned two decades ago, and I remember where

3   the rates kind of flat-lined.  But here's what

4   happened, less phones but there was more people

5   in prison.

6          And so Eric talked about how hard it is

7   to get to use one of those phones, and especially

8   if you don't belong to one of those organizations

9   that kind of hold things down in prison, you may

10  not be able to get to the phone.  And then the

11  burden on your family, you become a bill.  And so

12  now you have a choice, you either make phone

13  calls to talk to your family or have your family

14  send you money so you can buy things at the

15  commissary or canteen during your incarceration.

16  It's not easy.

17         And so as the years progressed, myself

18  as well as others have lost communication.  Our

19  families got older.  They become retired.  They

20  go on Social Security.  They have a fixed income,

21  and some of our families, we don't fit in that

22  budget, so that opened the door to illegal cell

23  phones.

24         During my time, I have used illegal cell

25  phones to be able to communicate to my family.

1    When I came incarcerated at 17, I had an 11-month

2    baby girl.  Right?  And through having an illegal

3    cell phone I was able to communicate with her by

4    the time she had turned 15.  I couldn't do that

5    how they had the phone system set up.  And part

6    of that setup is you have to fill out a form

7    that's -- and get approved.  People have to be

8    approved to be on your approved call list.  If

9    they don't approve, you can't call.  And so that

10   makes it extremely difficult.

11          And talk about the prices.  I can

12   remember, I want to say in the '90s, that phone

13   calls was as much as $15 as a local phone call

14   for 15 minutes.  And then I can remember when

15   they fixed it when cell phones started coming

16   out, and then we was allowed to use those phones

17   to call cell phones, and depending on the area

18   where your people may be, the phone calls dropped

19   and you don't get that money back because it's a

20   set rate for a set time.

21          And then you try to call again, but it

22   might be four other people waiting behind you to

23   get on that same phone to where two -- and

24   some -- at that time in some prisons in

25   South Carolina, there was only two phones on each

1   wing that house 120 residents.  And so going

2   back, communication is key for rehabilitation.

3                COMMISSIONER CLYBURN:  Let me ask

4   you a follow-up on that, because I've met with

5   the director of corrections and he has been

6   frustrated about what is commonly known as

7   contraband cell phones.  I'm wondering if you

8   would say on the record, so to speak, whether or

9   not -- if you think if we had the number of

10  phones of yesteryear that you mentioned, if we

11  had that number, if you think there would be a

12  direct relation with the number of contraband

13  cell phones?  Would that go down if there were,

14  you know, a multiple?

15               MR. HOWARD:  I would say this --

16               COMMISSIONER CLYBURN:  If you're

17  comfortable in answering.

18               MR. HOWARD:  I will say this, if it

19  was affordable and easy for a resident to be able

20  to call his family --

21               COMMISSIONER CLYBURN:  Yes.

22               MR. HOWARD:  -- more than half that

23  population that may be using illegal cell phones

24  wouldn't have the need to do that.

25               COMMISSIONER CLYBURN:  Okay.  Okay.

1                     MR. HOWARD:  Including myself, vast

2     majority of guys might use it, get on it, to call

3     their family --

4                     COMMISSIONER CLYBURN:  Okay.

5                     MR. HOWARD:  -- and talk to their

6     sons, daughters, nieces, nephews, grandsons,

7     granddaughters, birthdays, Christmas,

8     Thanksgiving, to be able to talk to everybody in

9     the household because you can't be there, and by

10    our choice.  And so somebody might ask the

11    question, well, why should we make phone calls

12    affordable for somebody who committed a crime?

13    Well, one thing that we have learned, though we

14    have committed a crime and became incarcerated,

15    we incarcerated our family as well.  And so they

16    should not have to bear the burden of the costs

17    for our bad choices.  That's our responsibility.

18    We need to pay for those.  Right?  But when we

19    become incarcerated, we affect our family, our

20    community, our state.

21                     And so now May will be eight years that

22    I've been home.  I have two full-time jobs, and

23    so I'm a tax-paying citizen, right, so I'm very,

24    very deeply concerned about when a guy is or a

25    woman is released from the Department of

1  Corrections that they come back home better than

2  they was when they left.

3          CHAIRWOMAN ROSENWORCEL:  Can I ask

4  a follow-up on that?  Because you touched on

5  recidivism and one of the points we try to make

6  when we talk about this is that the usurious

7  costs of these calls doesn't just affect those

8  who are incarcerated and their families, it

9  affects the community, it affects all of us

10  because regular contact with family and friends

11  reduces recidivism.  And in your job now as a

12  youth coordinator, with your experience, I just

13  would like it if you talked about a little bit

14  more about that, because I think if that's true,

15  and I believe it is, it's just another more

16  compelling reason to try to address this even for

17  people who might be disinterested in the subject.

18          MR. HOWARD:  So I'm a youth

19  development coordinator for My Community's

20  Keeper, mental group here in North Charleston.

21  And our kids primarily come from DJJ.  We get

22  referrals from DJJ.

23          CHAIRWOMAN ROSENWORCEL:  What's

24  that, Department of Juvenile Justice?

25          MR. HOWARD:  Department of Juvenile

1    Justice.  And so currently we have over 100 boys

2    and 30 or so girls.  Right.  Sadly to say that

3    within Department of Juvenile Justice, their

4    lines of communication are even stricter than in

5    the adult system.  Right.

6             And so we have a deeply relationship

7    with the family court here in North Charleston to

8    where as an alternative they refer them to our

9    program instead of incarcerating them to the

10   Department of Juvenile Justice.  And these are

11   some of the brightest young boys and girls I've

12   met, you know, just given a chance, to need -- to

13   be heard and out of certain environments and be

14   able to drive and tap into their purpose.  You

15   know, they are -- they are amazing people.  You

16   know, they could become the chairwoman, I mean,

17   or the chairman of --

18             COMMISSIONER CLYBURN:  Yes, you

19   said it right the first time.

20             MR. HOWARD:  -- of the FCC.  You

21   know, just sitting there, you know, and that's

22   what gets my wheels turning, to be able to help

23   those, you know, to pay it forward because

24   somebody helped me.  And so I ask the question --

25   it could be a rhetorical question; you don't have

1   to answer it now.  But every one of us who have

2   some level of success, right, if you think about

3   it, you didn't become successful solely because

4   you're educated.  You had a mentor in your life

5   somewhere that mentored you into where you're at

6   today, and so mentoring is key for development.

7           CHAIRWOMAN ROSENWORCEL:  Thank you.

8   All right.  We're going to move on to you, Deon

9   Nowell.  And first of all, you're representing

10  really well for Turn90 today.  So I know you're a

11  graduate of Turn90, but that you also work with

12  them now.

13          MR. NOWELL:  Yes.

14          CHAIRWOMAN ROSENWORCEL:  I'd love

15  if you could talk about that and your experience

16  with South Carolina Statewide Reentry Coalition

17  because those kind of initiatives are really

18  important, so I want to make sure we understand

19  them here.  But also we can relate your

20  experiences back to communications and the cost

21  of staying in touch.

22          MR. NOWELL:  Definitely.

23          CHAIRWOMAN ROSENWORCEL:  Because I

24  think all of this contributes to rehabilitation

25  when you leave.  I'd love if you could tell us

1   some more about those things.

2            MR. NOWELL:  Okay.  Thank you all.

3   Definitely, we -- we all appreciate it and I

4   speak as someone coming from being incarcerated,

5   given, like Brian said, the voice of those who

6   couldn't come here today.  My story is one of I

7   say pain, I always say pain, because I was born

8   with sickle cell disease.  At eight months I was

9   diagnosed with sickle cell.  My parents were

10  divorced when I was two, and I grew up in and out

11  of hospitals, right.  But I have a loving family

12  who always came and supported and visited me.

13           And as I started getting older and

14  wanting to explore life, get jobs or whatnot, I

15  would get a job.  First job, McDonald's, never

16  forget it.  I got sick and had to be in the

17  hospital for two weeks, got out the hospital

18  looking to go back to job -- to my work as

19  normal, but being someone who's a risk of being

20  sick at any given moment, they would put me on

21  the schedule for one day, two days.  I wouldn't

22  get the schedule I would get when I first

23  started.

24           So I realized some of my family members

25  were in the drug game, and it was easier to be in

1    the streets because I didn't have to worry about

2    clocking in for a 9-to-5, reporting.  I could

3    even sell drugs from a hospital room, which I've

4    done in the past.  So selling drugs became easier

5    than working a 9-to-5 because of my illness.

6    Which led me to being incarcerated.

7              I've done time in the county jail, and

8    when I first -- my first sentence was a federal

9    sentence.  At 22 I caught a 25-year sentence, and

10   for me at that young age, like -- like Brian

11   said, I had a lot of people wanting to mentor me,

12   talk to me, and give me help to deal with a

13   25-year sentence at the age of 22.  Like, how do

14   you tell someone at 22 that they have 25 years to

15   do and they don't even know what that number

16   really looks like.

17             So going into the federal system I

18   realized that calls were expensive, super

19   expensive.  And it's hard to gauge that on your

20   own if you don't have the support, if you don't

21   have communication to even call to say, hey, I

22   need money to make phone calls.  And if you work

23   a job in the prison, they don't pay you anything.

24   It's pennies on the dollar.  So now you're --

25   like they said, you're debating whether you're

1   going to buy soap to wash with, shoes to have on

2   your feet, a soup to eat.  You have just so many

3   different choices over communication.

4          And at one point when I was in the

5   system, my mom called the prison to say, hey, is

6   my son okay.  Why?  Because I couldn't afford to

7   call her and tell her I'm okay.  Again, she has a

8   son who's in prison for 25 years.  But not only

9   am I in prison for 25 years, but I also have

10  sickle cell, so her concern for me was even

11  greater.

12         I did a year and eight months at Estill

13  in South Carolina, and I got sick.  And their way

14  of helping me in a sense, because they didn't

15  have any narcotics on the compound, was to put me

16  in the SHU, which made me only be able to use the

17  phone once a week while I'm going through a

18  sickle cell crisis.  And I called my mom that one

19  time and she panicked and she started calling and

20  calling, but I couldn't call her back.

21         So I didn't know what was going on in

22  the background, but she had called the prison and

23  made them basically take me to a hospital.  So

24  they took me to Orangeburg Hospital, and when I

25  got to the hospital, I was able to use a phone

1    like a normal person.  So I could assure her of

2    my safety.

3         And then when I got back to Estill they

4    transferred me to Buckner medical prison in North

5    Carolina.  So now her son is not only in prison

6    with sickle cell, but now I'm in a whole other

7    state.  And the communication part of that whole

8    process is that if we don't have that support and

9    if we can't call and get that support, it's a

10   burden on us, it's a burden on our families.  My

11   mother got married when I was incarcerated.  It

12   became a burden on her husband.  It becomes a

13   burden on the community.

14        And if we don't really realize the cost

15   of not lowering the rates, it's going to really,

16   really have a major impact on us as a society

17   with men coming home from prison.  Men are making

18   choices behind the wall so they can communicate.

19   I didn't have a child then.  I now have a

20   four-month-old daughter, and the love I have for

21   my daughter, it made me realize why a lot of men

22   behind the wall would do illegal things, right,

23   commit crimes while incarcerated to feed their

24   family, to make sure their families have food on

25   the table, have illegal cell phones.

1    And the thing is you probably got a lot

2    of pictures of kids in those illegal cell phones,

3    so when we -- when we burden the men behind

4    prison, it does cause an effect on us.  It caused

5    an effect on me.  And I was blessed -- when I say

6    blessed, I mean blessed -- because it was another

7    initiative that brought me home.  Just like

8    someone saw that the phones, the way they're

9    charging is wrong, Obama saw that the crime of

10   cocaine and crack disparity was wrong.  I came

11   home because of that.

12       I am in -- working at Turn90 helping men

13   come home -- who come home from prison.  I've

14   worked with Just Leadership, the South Carolina

15   initiative.  I've worked with a few other

16   mentoring programs in South Carolina, Charleston.

17   I've been in Columbia working with men, always

18   because of an initiative.  And so what this --

19   what this will do, I believe it will lessen the

20   burden on men, help men to keep the communication

21   between them, possibly someone who could put a

22   helpful quote, a helpful saying, something to

23   help them get through the day, because sometimes

24   in prison, like, we're surrounded by thousands of

25   people, but yet we're lonely because we don't

1    actually know any of them.

2         So for us to be able to communicate with

3    the outside gives us that much less stress that

4    we don't take out on each other.  It will

5    probably be less -- I mean, honestly it will

6    probably be less stabbings, less cell phones.  If

7    we could lower the rates, if we could make an

8    impact from the inside out, the men would have

9    the help they would need, calling their lawyers,

10   right, calling their parents, calling their

11   children.

12        I mean, you look at some of the jobs out

13   here, they give stipends for childcare.  They

14   give away money to help -- someone who's actually

15   working for their company to better their

16   company, they give them money so they can make

17   sure that they can take care of their children.

18   Why couldn't we give inmates help if they have

19   kids, in communication, right?

20        I remember we had to fill out the bubble

21   form -- like, this is my daughter and if I

22   couldn't -- if I didn't have that on my list, I

23   couldn't call that number.  Think about how many

24   times we have gathering for the holidays and it's

25   not at mom's house, so you're saying I can't talk

1    to my mom, my grandmother, my aunties all in one

2    place because it's over here at Aunty Jan's house

3    who's not on my list.  That is unfair and another

4    burden that the men have to deal with while

5    inside, which creates anger, it creates

6    frustration.  And it's the littlest thing that

7    will tick them off and make them fight somebody,

8    stab somebody, curse a guard or put a guard in

9    danger for a phone call.

10          So why can't we just make it affordable

11   and make it a better place for a man to

12   communicate, because at the end of the day, we're

13   human.  Yes, like you said, we -- they're

14   incarcerated, they've committed crimes, but it's

15   not just them who is being punished when they

16   don't have access to communication.  They punish

17   their families.  They punish the officers who are

18   paid to secure them, which now we struggle to

19   even get them -- get jobs in places because of

20   the violence and all of the other things that's

21   going on.

22          So in all, like, I come from pain, I

23   feel like I know pain, and without communication

24   it's very painful.  And I feel like what you-all

25   are doing is something better than what the

1    doctor prescribed.

2              CHAIRWOMAN ROSENWORCEL:  Thank you

3    for all that.  You touched on something that

4    really strikes me about the sacrifices that are

5    made to have communications, the sacrifices

6    families make who may not be able to afford

7    staying in touch with their loved ones.  I think

8    Eric mentioned, you know, are you going to pay

9    for food for your kids or are you going to pay

10   for a phone call?  Those are the choices people

11   are making.

12             When I spoke to someone else who had

13   been incarcerated for many years at this event we

14   had in Chicago -- I can't stop thinking about her

15   story -- she always wanted the jobs in the prison

16   that were in the showers.  And she said nobody

17   else wanted those jobs.  None of this paid well,

18   but she figured out there were enough little

19   small soap bits that she could push together and

20   make a sufficient bar of soap so that she

21   wouldn't have to spend money at the commissary.

22   And these were the things that would go through

23   her mind and the creativity it took just to stay

24   in touch with her children.

25             Anyway.  I don't know if you have any

1   more thoughts on that issue, but I think those

2   sacrifices that are made in some cases by someone

3   who's incarcerated but also by their families,

4   I'd just love if you'd talk a little more about

5   that.

6          MR. NOWELL:  I mean, so I wasn't a

7   saint when I first went in.  It took -- which

8   was -- that was super hard.  It took my

9   grandfather dying for me to actually want to

10  change.  My granddad is old school.  He -- when I

11  was in the county jail, he came and he says, I

12  don't do prisons, I don't do prisons.  And so,

13  like, I made a lot of bonehead mistakes just so I

14  could call.  I made wine.  I did poker tables,

15  sold tobacco, whatever I could do to keep money

16  on my books, because my mom could only send so

17  much.

18          I believe it was like $70 a month and in

19  the federal system it was a 300-minute thing, so

20  once you got to 300 minutes, that was it.  And

21  then you would have to find somebody who doesn't

22  use their 300 minutes and purchase it some way

23  from them so you can add the numbers to their

24  phone and finish making phone calls so you could

25  talk to your family members.

1    But my grandfather, had I had better

2    communication, had I had a tablet where I could

3    see his face, that would have been wonderful for

4    me to talk to him by internet.  And you said

5    that's a possibility.  Like, I didn't get that

6    opportunity.  I got pictures every so often, and

7    I could see him dying in the pictures.  I could

8    see his health deteriorate, but it was like

9    the -- it's -- it's just, like, painful for

10   someone.

11   So I was willing to take risks.  You

12   have some people who aren't willing to take risks

13   because they don't want anything to hold them

14   back from being released.  So you see a lot of

15   people going around and begging for food, and

16   then people will laugh at them, well, he on the

17   phone.  Why he can't buy his soap?  That's why he

18   can't buy his soap.  You'll see people picking up

19   the soaps and pushing them together.

20   You'll see people going to commissary

21   and even -- I mean, not commissary, main line and

22   waiting to the end to see if they can walk back

23   and get some more food.  You'll see people

24   strapping food on them, putting food in their

25   pants so they can eat later in the day to save a

 1    buck.

 2         So it's not -- a lot people -- like you

 3    said, people become creative to save that dollar,

 4    that $4, that $70 a month that they really can't

 5    afford because they actually want to talk to

 6    their kids, but they want to do it in a way

 7    that's not going to cost them --

 8              CHAIRWOMAN ROSENWORCEL:  Burden

 9    them.

10              MR. NOWELL:  -- more time, losing

11    good time.  It's a lot of penalties in prison.

12    And I'm not going to say that that's wrong,

13    right, because Amy Barch, the founder of Turn90,

14    she taught me something, and I love this lesson:

15    The more rules you don't follow, the more rules

16    you're going to have.  And that's true.

17         So when we break the rules of society, I

18    understand that there are rules that we have to

19    be governed by now, but also let's not force us

20    to have our backs against the wall to where we

21    have to make these -- we already made a bad

22    decision.  Help us to make the right decision.

23    That's why it's called rehabilitation.  Help us

24    to make the right decision, especially when it

25    deals with the costs of communication.

1          CHAIRWOMAN ROSENWORCEL:  So your

2     point is that this structure incentivizes bad

3     decisions because otherwise --

4          MR. NOWELL:  Not all the time.

5          CHAIRWOMAN ROSENWORCEL:  But it

6     can.

7          MR. NOWELL:  It's depends on the

8     decision.  If I -- if I feel like my back is

9     totally against the wall and I'm not going to be

10    the person who puts soap together so I can wash,

11    then I'm going to do something else so I can make

12    my phone calls and wash.

13          CHAIRWOMAN ROSENWORCEL:  Brian, I

14    felt like you were trying to add something.

15          MR. HOWARD:  Yes.  So I want --

16    because people leave this part of it out, right,

17    when we talk about rehabilitation and trying to

18    make some sense of our judicial system in a

19    humane way, right, but we have a prerequisite

20    within the 13th Amendment, right?  It goes to say

21    that neither slavery nor involuntary servitude,

22    except for as a punishment of a crime, right?  So

23    until -- until -- what I advocate, until we can

24    get this 13th Amendment ratified to say

25    rehabilitation instead of punishment, any laws,

1  policies that is geared towards the criminal

2  justice system or corrections systems or just a

3  buffer because nothing we can -- we can't go

4  against our Constitution.  We can't make laws

5  that contradict our Constitution, so if our

6  Constitution is saying that slavery will be

7  implemented by a punishment of a crime, the

8  thought about rehabilitating somebody who has

9  committed a crime is out the window.

10         And so that's why we have high prices of

11  phone calls, that's why we have high prices of

12  goods that come in, because we're not looking at

13  people who are incarcerated as human but they in

14  there for being punished because of what we have

15  done to our society instead of, okay, hold us

16  accountable.  Nobody's saying that we shouldn't

17  be convicted or getting sentences.  You know,

18  hold us accountable.  That's what accountability

19  is for.  But out of that accountability you

20  should be able to be free people who come out and

21  contribute to our community.

22         CHAIRWOMAN ROSENWORCEL:  Mignon, do

23  you have follow-up on that?

24         COMMISSIONER CLYBURN:  It is very

25  difficult for me to cabin my emotions right now.

1  I'm going to be honest with you.  And I

2  appreciate you challenging me there.  I'm going

3  to ask a question, but I'm going to not show you

4  how emotional I can get because whatever little

5  makeup, it's going to be gone in a second.  I'm

6  going to tell you the truth.

7       But each of you mentioned the list of

8  persons you are able to call.  How frequently can

9  you update that list?  Is there a lead time or

10 something that would help with that part of it?

11 Because I wanted to ask you what are the three

12 things, and you named a number of things, Deon

13 about, you know, what would you improve with your

14 commentary.  But I'm wondering with the three

15 with you, how difficult is that list to update or

16 edit?

17       MR. NOWELL:  Prior to my release,

18 it wasn't that difficult.  I know that if you

19 doesn't have someone on your phone list, they're

20 not allowed to come and visit you.

21       COMMISSIONER CLYBURN:  So the phone

22 list and the visitation list are the same.

23       MR. MITCHELL:  Depending on various

24 institutions --

25       COMMISSIONER CLYBURN:  Okay.

1           MR. NOWELL:  -- you know, you have

2    stricter institutions for higher levels and then

3    you have, like, lower levels, so it would also

4    vary on your institution, how strict they are.

5    You know what I'm saying?  That's -- some I can

6    change it every month or every week or however,

7    but I guess it depends on the institution of

8    where you're housed.

9           COMMISSIONER CLYBURN:  Where --

10   what about where you were, was it that you could

11   change it that frequently or how?

12          MR. HOWARD:  Yes, it was every 30

13   days and the number of people was like 15, I

14   think.

15          COMMISSIONER CLYBURN:  So it caps

16   at 15?

17          MR. HOWARD:  Yes.  I know in

18   South Carolina.  It might be different in the

19   federal, but South Carolina was 15.

20          COMMISSIONER CLYBURN:  Okay.  15

21   and you can change it -- you can modify it every

22   30 days.

23          MR. HOWARD:  Right.  And then as

24   well if it's not -- you don't have -- so when you

25   come -- when you first come in, you come through

1   a reception evaluation --

2                COMMISSIONER CLYBURN:  Okay.

3                MR. HOWARD:  -- right, a receiving

4   place where they do all the check -- the

5   checklists on you.  Right.  And at that time

6   you're supposed to list all your family members

7   who will be in communication, right, but I was --

8   I was 17 when I committed my crime.  I was 18

9   when I went to Department of Corrections, given a

10  life sentence predicated doing it for 20 years.

11  I had to -- at 18 years old, 20 years, that's

12  seems -- that's a lifetime to an 18-year-old.

13  I'm distraught.  Right?  Only family I'm thinking

14  about is momma and daddy, right?  And so it would

15  take a whole lot to go back and modify that list

16  in order to, you know, create that.

17                MS. BATTAMS:  We have Jada.  One

18  more participant, formerly incarcerated woman,

19  who's going to be joining us.  And she will be

20  joining us virtually.  We'll all see her on the

21  screen.  And Bridgette's going to set it up.

22                And while Bridgette's doing this, I just

23  want to thank you gentlemen again.  Your stories

24  are so powerful and so important for us to hear

25  and for others.  Just having the strength to

1  speak out is going to help so many other people,

2  those voices that aren't here, and so we are very

3  grateful to have had this time with you.

4              MR. HOWARD:  Just for the record,

5  we're grateful too and we won't mind coming to

6  Washington the next time.

7              CHAIRWOMAN ROSENWORCEL:  It's

8  colder.

9              COMMISSIONER CLYBURN:  Yes, I would

10  wait until, like, July.  No, no, it's too hot.

11  Late May.

12              MS. COCHRAN:  Hello.

13              COMMISSIONER CLYBURN:  Hi, Jada.

14  Thanks for being patient, you know, with us and

15  being willing to join us today.  What we're doing

16  is sharing stories.  And what we'd like for you

17  to do is, you know, talk about if you're

18  comfortable, you know, your experiences.  You

19  know, I understand that at the time when you went

20  in you had four young children.

21              MS. COCHRAN:  Yes, ma'am, that's

22  correct.

23              COMMISSIONER CLYBURN:  And you were

24  faced with some physical challenges.  That is

25  something that we really haven't talked about,

1   you know, that type of -- you know, of challenge

2   that you would have.

3          Tell us a bit about yourself and how the

4   system viewed you and treated you and whatever

5   else you want to share about your experiences,

6   particularly as it relates to communication.  So

7   I want to thank you.  And I'm sorry you couldn't

8   join us over here in Park Circle.  It's a

9   beautiful day.  But I appreciate you letting us

10  know and sharing your stories with us this

11  afternoon.

12          MS. COCHRAN:  Well, thank you so

13  much, Mignon.  And I want to say I'm very honored

14  to be here, and I really appreciate you allowing

15  me to appear virtually because it was virtually

16  impossible for me to get there in person.

17          COMMISSIONER CLYBURN:  I see what

18  you did there, Jada.

19          MS. COCHRAN:  So I use a

20  wheelchair.  I was on supplemental oxygen, but

21  thank the Lord I've got off of that recently.  So

22  I am making improvements, but -- and I'm sorry

23  everybody, my name's Jada Cochran.  And I was

24  released 11 months ago today after serving 25

25  years and 8 months in the Department of

1    Corrections.

2          To tell my story I have to go back to

3    the beginning.  I was born in 1968.  My father

4    was actually incarcerated at the time.  He was on

5    what we used to call a chain gang.  I don't know

6    if anybody's old enough to --

7               COMMISSIONER CLYBURN:  I am.  I am.

8               MS. COCHRAN:  Well, we're telling

9    our age.  But I remember being a very inquisitive

10   child and asking my momma, well, momma, if daddy

11   was in prison when I was born, how did I get

12   here.  And she said, well, your daddy used to be

13   on work release.  He could come home on the

14   weekends on the truck, which was true.

15         And so he was released in 1970, and I

16   have to tell his story a little bit first because

17   that explains mine.  My father was horribly

18   abused as a child by his mother.  This is a

19   multigenerational thing, and I pray that it stops

20   with me.  But my father was addicted to drugs.

21   He went to reform school back -- which -- back in

22   the '50s, which was really, really a very harsh

23   environment.  And it taught him all kinds of

24   things that no young fellow needs to know.  And

25   so he learned how to play pool; he got very, very

1    good at it.  He even used to be competitive at

2    one point.  But he learned -- he learned how to

3    hustle, okay, plain and simple.

4            And so when he -- when I came along, you

5    know, my dad -- this was his second time in

6    prison at that point.  And so he opened up a bar

7    and tried to, you know, go legit.  Well, a lot

8    of -- as much of you may know, in bars most times

9    drugs are available.  So he made a lot of

10   connections in Atlantic City.  You know, he used

11   to bet on the football games and all that out in

12   Las Vegas, you know.  I mean, I remember as a

13   child hearing what's the line, you know, every

14   time he'd call his bookie.  And I was just, you

15   know, the only thing on TV was football or

16   basketball, any kind of sporting event that he

17   was betting on.

18           So he ran the bar, and my brother and I

19   grew up on a bar stool.  And I remember when I

20   was 13 years old, my brother was five years older

21   than I was, so he was 18 at this point, my daddy

22   came in the kitchen with a big ole black hefty

23   trash bag full of marijuana and threw it on the

24   kitchen table and told us to start rolling.  And

25   that was the first time I ever rolled a joint, a

1   marijuana cigarette for anybody that don't know

2   what that means.

3            COMMISSIONER CLYBURN:  We're old in

4   here, Jada, so we got you.

5            MS. COCHRAN:  Well, you know there

6   may be some people that don't smoke.

7            COMMISSIONER CLYBURN:  Well, that's

8   true.  I hope not.

9            MS. COCHRAN:  I hope they aren't

10  because I received an education that I really

11  wished I had not, you know, but that was my

12  lifestyle and I didn't know that it was

13  dysfunctional because that's all I ever knew.

14  And so that began my really lifelong struggle

15  with addiction because I started smoking

16  marijuana with my brother and we just thought we

17  was having the best time in the world.  We was

18  watching Cheech and Chong movies and rolling big

19  ole Cheech and Chong joints and just going to

20  town.  You know, daddy was a big ole --

21  high-level drug dealer.

22            And so when I was 16, I was driving my

23  daddy's car.  He had a souped up '78 Thunderbird.

24  And I was driving it.  I had dropped him and my

25  momma off at a bar for a New Year's Eve

1    celebration.  And I left and I was -- had a

2    couple of my friends with me, thought I was big

3    time honey driving my daddy's car, smoking pot,

4    you know, drinking, wasn't but 16 now.

5         So I had a wreck and my right leg was

6    crushed from the knee to the ankle.  I -- the

7    steering wheel hit me in the chest and collapsed

8    one of my lungs.  I was in real bad shape, and I

9    stayed in the hospital for a long time, and I had

10   to learn how to walk again.  But during my

11   hospital stay, they were giving me morphine, and

12   so then they sent me home with narcotics, opioid

13   painkillers.  And so I got addicted to them, and

14   so like I say, everything -- you know, I just --

15   I guess I just have an addictive personality

16   because everything I do, I do to excess.  When I

17   eat, I eat too much.  I guess you can tell

18   because I'm fat as a Butterball.

19         COMMISSIONER CLYBURN:  I'm not

20   touching that Jada.

21         MS. COCHRAN:  But, I mean, really,

22   though.  Everything that I do, I do to excess.

23   You know, I don't have an off switch, you know,

24   in my brain, and so I've had to learn how to

25   control that.

1       But back to the story.  So I grew up in
2  that environment.  I got married when I was 19.
3  I was so happy.  And my husband and I had my
4  first son approximately -- well, I wasn't doing
5  anything.  You know, when I found out I was
6  pregnant, I didn't do anything.  I didn't smoke
7  marijuana or anything.  And so I had my first
8  son, and we were so happy.  And then ironically
9  enough, my husband started using drugs and I left
10 him because he was using drugs.

11      And so we got divorced and six years --
12 well, five years later, I met a -- another man
13 and we didn't get married, but we were shagging
14 up as we call it.  And so we had my second son.
15 Well, everything's good at this point, but
16 sometime after that, I got introduced to crack
17 cocaine.  And everything that I had had a problem
18 with before, marijuana, alcohol, pills, you name
19 it, I could quit it.  But boy, that crack, it
20 turned on a switch in my brain that I could not
21 shut off.  And it made me go cray-cray.  And so I
22 continued to use that.

23      I had ready babysitters, my momma, two
24 great aunts, my grandmother, you know.  They were
25 always pushing me away; here, leave the baby with

1    me.  You know, you can go.  Leave the kids with

2    me.  You can go.  You know, go have fun, go have

3    a good time.  In retrospect, they were enabling

4    me but they meant well, you know.

5            So anyway.  Wound up -- when I got

6    arrested, I left my poor old momma with an

7    eight-year-old, a two-year-old, a one-year-old,

8    and a newborn infant.  I didn't even know I was

9    pregnant.  You know, I had my baby while I was in

10   prison.  You know, I was so depressed.  I must

11   have had postpartum depression, too, and I was

12   just -- I felt like scum of the earth, like I --

13   you know, I just -- like I didn't deserve to

14   live.  I didn't want to live when I realized what

15   I had done, you know.

16           And if you-all want to know what I did,

17   I can tell you, but, you know, I don't know if

18   it -- if it matters here.  But, you know, I

19   committed some robberies and -- for crack money

20   and -- because that's what it makes you do.  It

21   makes you -- just you don't think of nothing but

22   that.  Once you hit it, you're on a mission to

23   get more, you know, and it's just -- it's like

24   you are -- it's like you're in an surreal world,

25   you know.  It really does do something to your

1   brain chemistry.  I don't know the specifics of
2   it, you know, but it really does alter it, you
3   know, the chemical composition in there.  And
4   mine was altered to the point to where I crossed
5   the line between insanity and insanity and
6   reality and a psychotic episode, because, you
7   know, I'm appalled when I think about what I did.
8   You know, but that wasn't me, you know.  That
9   wasn't the real Jada, you know.  That was the
10  impaired Jada.

11          And so anyway.  Getting around to our
12  topic today, so I entered the Department of
13  Corrections and -- I was arrested in 1997 and I
14  stayed at the county jail for nine months.  And I
15  was booked into the -- in receiving, like the --
16  my formerly incarcerated brothers talked about,
17  the reception and evaluation unit, commonly known
18  as receiving.  I was booked into there in 1998.

19          And at that time we still had pay phones
20  on the yard where you could pay a dime, like the
21  gentleman said.  And there were pay phones, you
22  know, inside the dormitories also.  And there was
23  never really a problem with phones at that point,
24  but as time went on and they took out -- you
25  know, you couldn't pay for it, you know,

1   yourself, your family -- you had to make the

2   list, you know, of your approved call -- you

3   know, people that you could call.  And your

4   family had to pay for it because when they took

5   those -- you know, stopped you being able to pay

6   for the pay phones, all you could do was call

7   your family collect.

8        And my poor old momma, she had to go on

9   welfare for the first time in her life.  She had

10  them four little children, and she couldn't

11  afford very many phone calls, so my -- and my

12  phone calls were my lifeline to my family, to my

13  children, you know.  I mean, every milestone I

14  learned about over the telephone, you know,

15  because my children were so young.  And, you

16  know, I would go sometimes months not being able

17  to have a phone call.  And so I really cherished

18  those, you know.  And I would write letters but,

19  you know, they wouldn't ever write back, so the

20  only communication I had from them in my entire

21  25-year, 8-month sentence was over the telephone,

22  you know, so -- but -- I'm trying to decide where

23  to go from here.  But -- so --

24             COMMISSIONER CLYBURN:  Well, let me

25  help you.  Let me -- let me help guide you with

1    that.  When you talk about that you could not

2    speak with your family frequently -- and, again,

3    you talked about because it was the high price,

4    you know, that you paid in addition of course to,

5    you know, paying for, you know, the everyday

6    needs, can you tell us about that experience with

7    the provider at the facility once those phones

8    got taken out of the yard and weren't as

9    plentiful?  Can you tell us about what that meant

10   for you for using a phone every day and the

11   economic consequence of that?

12              MS. COCHRAN:  Well, as the

13   gentlemen said, you know, there's only three

14   phones for 75 women, so, you know, there's long

15   lines, hot tempers, you know.  Of course, females

16   are a lot tamer than the men, that's true, but

17   they get riled up sometimes, especially when it

18   means -- it's something to do with their kids.

19              COMMISSIONER CLYBURN:  Yes, ma'am.

20              MS. COCHRAN:  And so, you know,

21   that -- it was really hard.  My mother struggled

22   and she would allow me to call as often as she

23   could afford it, but, you know, it just wasn't

24   that often.  But, you know, I really -- I really

25   did appreciate those calls.

1          But the way it changed in recent years

2    was they got tablets into the Department of

3    Corrections.  Now, that -- that was in 2020.

4          COMMISSIONER CLYBURN:  2020, okay.

5          MS. COCHRAN:  And -- but now -- but

6    now those tablets don't have internet

7    connections, and they've -- they've advertised

8    that we could have, you know, FaceTime or virtual

9    visits on there, but it still hasn't materialized

10   to this day.  I'm in contact with a lot of

11   ladies, you know, because I put minutes on my

12   phone so they can call me because I know -- I

13   know what it's like.  And see, I spent so much

14   time with those ladies that they're just as much

15   my family as my family is, you know, because I

16   spent half my life in there.

17         COMMISSIONER CLYBURN:  Right.

18         MS. COCHRAN:  And they -- they had

19   to help me a lot because I was disabled.

20         COMMISSIONER CLYBURN:  Yes, ma'am.

21         MS. COCHRAN:  You know, I remember

22   one time I had collapsed on the floor, and the

23   guard called medical and said, you know, we've

24   got Jada Cochran down here on the floor.  She

25   can't get up.  And they said, well, she'll be all

1  right.  And I was having chest pains, and I laid

2  on that concrete floor for eight hours.  And if

3  it hadn't have been for my fellow inmates, I

4  would have wet on myself, but what they did was

5  they got an adult diaper and put it on me and let

6  me go.

7               COMMISSIONER CLYBURN:  Right.

8               MS. COCHRAN:  I'm sorry.  I'm

9  sorry.

10              COMMISSIONER CLYBURN:  No, Jada.

11  No.  Thank you.  I know how hard it is.

12              MS. COCHRAN:  But I can't forget

13  about those people.  That's why I want to do

14  this.  I want to help them because they're

15  struggling, they're suffering, and, you know,

16  they're not getting the medical care that they

17  need.  That's the reason I'm in the shape I'm in,

18  is because you don't get adequate medical care in

19  there, I mean, far from it, but -- I'm sorry

20  about that, you-all.

21              COMMISSIONER CLYBURN:  No, no.

22              MS. COCHRAN:  I get really

23  emotional but it's just -- I think the

24  gentleman -- and when he brought up that 13th

25  Amendment, that just blew my mind --

1    COMMISSIONER CLYBURN:  Yes.

2    MS. COCHRAN:  -- because that's

3   what needs to happen, a focus on rehabilitation.

4   And if you don't have contact with the outside

5   world, I read a statistic somewhere that 90

6   percent of incarcerated individuals will

7   eventually be released.  So if that's true, do

8   you want somebody that's been rehabilitated to

9   come back out into society or somebody that's a

10  hardened criminal that's bitter, resentful, full

11  of hate because they haven't had, you know, that

12  softness that you get from your children, you

13  know, that, I love you mommy, you know, I love

14  you too, baby, you know?  And they don't get

15  that, you know, all they have is that hard life

16  in there.

17    And, you know, being in contact with

18  your family is, like, the most important thing I

19  think for incarcerated people because if you lose

20  that connection, you don't -- you really don't

21  care about anything else, you know.  And so the

22  rest of my story was that I made it out, but it

23  was really hard and I just...

24    COMMISSIONER CLYBURN:  We

25  appreciate it.

1          MS. COCHRAN:  Well, I'm suffering,

2    you know, the consequences.  I had to pay the

3    consequences with 25 years and 8 months of my

4    life, but now I'm suffering the consequences of

5    25 years and 8 months of not being taken care of

6    medically, you know.  And they will tell you that

7    they're taking you to an outside medical

8    appointment, and they discriminate against me a

9    lot because I was wheelchair bound.

10          See, Camille Griffin Graham doesn't have

11   a wheelchair van, and so they would have to

12   borrow one from a men's institution.  And so they

13   canceled my appointments on a routine basis

14   saying that they didn't have a wheelchair van to

15   transport me in.  This was to go to, like, the

16   cardiologist, the pulmonologist, the

17   rheumatologist.  I have to go right now to every

18   kind of ologist there is just about, and that --

19   and I'm only 55 years old.

20          COMMISSIONER CLYBURN:  Yes, ma'am.

21          MS. COCHRAN:  True, I did have

22   preexisting conditions, but if they had been

23   taken care of properly, they probably -- they may

24   not have progressed to the point that they have

25   today.

1          COMMISSIONER CLYBURN:  Yes.

2          MS. COCHRAN:  But I wanted to say,

3   you had asked about how many numbers you're

4   allowed and how often you're allowed to change

5   that.

6          COMMISSIONER CLYBURN:  Mm-hmm.

7          MS. COCHRAN:  Right now in the

8   female institutions, they can have 20 numbers and

9   they can change them once a year.

10         COMMISSIONER CLYBURN:  Once a year.

11         MS. COCHRAN:  Once a year, yup.

12         CHAIRWOMAN ROSENWORCEL:  Can I --

13  can I ask another communications question?  I'd

14  asked Eric about this earlier with dropped calls

15  because it's something we've heard a lot about.

16         MS. COCHRAN:  Oh, yes.

17         CHAIRWOMAN ROSENWORCEL:  But I want

18  to ask another problem we hear a lot about, which

19  is you set up an account to make calls and there

20  are times where the companies that you set those

21  accounts up with still hold on to the money that

22  you put in and refuse to return it.  Do you have

23  any of those problems with inactive accounts or

24  that kind of issue during your experience with

25  this, because it's something that we've heard a

 1   lot about and we're trying to get a handle on so
 2   we understand its full scope?
 3                   MS. COCHRAN:  Oh, yes, ma'am.  I
 4   had a cousin, she put $25 on a phone account for
 5   me to call her, and we had one phone call and she
 6   passed away.  Well, her family never -- was never
 7   able to get the money back.  My daughter put
 8   money on the phone, and then she got a new phone,
 9   and they never have refunded her her money.  So
10   they do that on a routine basis.  They also drop
11   calls.  There's poor sound quality.  The service
12   goes out frequently, as the gentleman said.
13   It's -- GTL is probably bottom of the barrel.
14   And it's a big money racket, because they -- on
15   those tablets, they charge $25 a month for the
16   bundle and that's as much as you pay for a phone
17   account out here.
18                   CHAIRWOMAN ROSENWORCEL:  Yes.
19                   MS. COCHRAN:  And the bundle just
20   means you can watch old movies, play certain
21   games, and listen to some music.  That's all that
22   means.  That don't -- that don't even pay for
23   your phone.  You have to pay for the phone extra.
24                   CHAIRWOMAN ROSENWORCEL:  But it's
25   really hard to get a refund if someone changes

1    their number --

2              MS. COCHRAN:  Yes, ma'am.

3              CHAIRWOMAN ROSENWORCEL:  -- is no

4    longer in contact with you, because to me that's

5    part of what it means to talk about just and

6    reasonable rates.  You get what you pay for.

7              MS. COCHRAN:  Yes, ma'am.  Well,

8    that's been plenty of times, like the gentleman

9    said, that I called and the call dropped right

10   then and you had to pay the full price.  And then

11   if you got to call back, you were charged another

12   $4 or whatever it is, you know.  And that's

13   happened -- I remember one time that happened to

14   me three times back to back.

15             COMMISSIONER CLYBURN:  Wow.  Well,

16   Jada, is there anything else?  I asked a couple

17   of questions, and you can, you know, feel free to

18   pick.  If there were up to three things that you

19   could change right now of -- for -- given your

20   experiences and the experiences that, you know,

21   your friends are still, you know, going through,

22   when it comes to communications, because the rest

23   of it we have to follow up with you when I'm

24   wearing another hat, but on the communications

25   side, what would they be?  What would be the

1   three things, if you could snap your fingers

2   right now and change today, what would they be?

3           MS. COCHRAN:  Well, first of all,

4   the prices; that's -- that's the first thing.

5   And the quality of the calls and the refunds.

6           COMMISSIONER CLYBURN:  I appreciate

7   that.

8           CHAIRWOMAN ROSENWORCEL:  Thank you.

9           MS. BATTAMS:  I just want to thank

10  everyone again.  Jada, thank you so much for your

11  very powerful story.  And Deon, Brian, Eric,

12  thank you so much.  We have heard your compelling

13  stories that emphasize the importance of

14  accessibility and affordable communication

15  service at just and reasonable rates in

16  correctional facilities.  Your experiences shed

17  light on the challenges faced by the incarcerated

18  individuals, on their families, and they will

19  become a part of the public record in this

20  proceeding.

21          The FCC greatly values public

22  participation in the rulemaking process, and we

23  encourage anyone to share your thoughts and

24  comments.  We have the forms outside.  We have

25  the instructions on how to file something, you

1  know, by the internet into our record.  We would

2  love to hear from you.

3       Gathering and analyzing these comments

4  is such an important part of the FCC's rulemaking

5  process, and it helps you the public, you the

6  formerly incarcerated, and your families

7  participate in developing these rules and

8  regulations that affect communications, that

9  affect these issues, and will have a direct

10  impact on the incarcerated and their families.

11       This concludes our listening session on

12  just and reasonable rates and charges for

13  incarcerated peoples communications services.

14  Let us continue our efforts to ensure that

15  everyone has an opportunity to connect and

16  communicate.  Thank you all so much for being

17  part of this important conversation and have a

18  wonderful rest of your day.

19            (Applause.)

20            COMMISSIONER CLYBURN:  I appreciate

21  you, Jada.

22            CHAIRWOMAN ROSENWORCEL:  Yeah, I

23  just want to say, someone once told me that it's

24  really great to have facts, but narratives are

25  how you make change.  And in Washington we have a

1   lot of facts about the injustices when it comes

2   to communications for people who are incarcerated

3   and their families, but it's really powerful that

4   you're sharing your stories.  You have paid your

5   debts.  Nobody requires you to talk about these

6   things.  But your willingness to do so is really,

7   really powerful.  Those are the narratives we

8   need.

9         I think I said at the start that my

10  friend here Mignon picked up that petition years

11  ago.  It's just so long ago now.  I mean, justice

12  has been delayed, but I just want you to know

13  we're using the tools we have to make sure it's

14  not denied.  But it's your stories that are going

15  to really power us to do that.  So thank you,

16  Deon, Brian, Eric, and Jada.  We're really

17  grateful that you were willing to share your

18  experience and tell your stories.

19              (Hearing concluded at 4:00 p.m.)

20                      – – –

21

22

23

24

25

1                  CERTIFICATE OF REPORTER

2

3                  I, Ruth Mott, Registered
   Professional Reporter, Certified Realtime
   Reporter, and Notary Public for the State of
4  South Carolina, do hereby certify that the
   witnesses in the foregoing hearing were duly
5  sworn to testify to the truth, the whole truth
   and nothing but the truth in the within-entitled
6  cause; that said matter was taken at the time and
   location therein stated; that the testimony of
7  the witnesses and all objections made at the time
   of the hearing were recorded stenographically by
8  me and were thereafter transcribed by
   computer-aided transcription, and that the
9  foregoing is a full, complete and true record of
   the testimony of the witnesses and of all
10 objections made at the time of the hearing.
                   I further certify that I am neither
11 related to nor counsel for any party to the cause
   pending or interested in the events thereof.
12                 Witness my hand, I have hereunto
   affixed my official seal on February 14, 2024 at
13 Moncks Corner, Berkeley County, South Carolina.

14

15

16                 Ruth Mott,
                   Registered Professional Reporter
                   Certified Realtime Reporter
17                 My Commission expires
                   February 23, 2025
18

19

20

21

22

23

24

25

## WORD INDEX

**< $ >**
**$15**  24:*13*
**$25**  62:*4, 15*
**$4**  17:*7, 12*  40:*4*
*63:12*
**$70**  38:*18*  40:*4*

**< 1 >**
**1**  1:*5*
**10**  21:*21*
**100**  19:*4*  28:*1*
**11**  14:*21*  21:*21*
*47:24*
**11-month**  24:*1*
**120**  25:*1*
**12189**  1:*23*
**12th**  8:*22*
**13**  49:*20*
**13th**  41:*20, 24*
*58:24*
**14**  67:*12*
**15**  14:*20*  24:*4, 14*
*44:13, 16, 19, 20*
**16**  50:*22*  51:*4*
**17**  22:*1*  24:*1*  45:*8*
**18**  2:*18*  45:*8, 11*
*49:21*
**18-year-old**  45:*12*
**19**  52:*2*
**1968**  48:*3*
**1970**  48:*15*
**1997**  54:*13*
**1998**  54:*18*

**< 2 >**
**2**  11:*12*
**2:30**  1:*11*
**20**  45:*10, 11*  61:*8*
**200**  19:*5*
**2012**  9:*2*  10:*20*
**2015**  10:*8*
**2020**  57:*3, 4*
**2022**  2:*16*
**2023**  2:*20, 23*
**2024**  1:*5*  67:*12*
**2025**  67:*17*
**22**  31:*9, 13, 14*

**23**  67:*17*
**24**  2:*19*
**25**  31:*14*  32:*8, 9*
*47:24*  60:*3, 5*
**25-year**  31:*9, 13*
*55:21*
**28**  22:*3, 15*
**29422**  1:*23*

**< 3 >**
**30**  28:*2*  44:*12, 22*
**300**  38:*20, 22*
**300-minute**  38:*19*
**34**  14:*12, 20*

**< 4 >**
**4:00**  66:*19*
**45**  17:*8*

**< 5 >**
**50s**  48:*22*
**55**  60:*19*
**5th**  2:*20*

**< 6 >**
**6:00**  17:*18*
**60s**  21:*7, 8*

**< 7 >**
**75**  56:*14*
**78**  50:*23*

**< 8 >**
**8**  47:*25*  60:*3, 5*
**843-762-6294**  1:*24*
**8-month**  55:*21*

**< 9 >**
**90**  59:*5*
**90s**  24:*12*
**9-to-5**  31:*2, 5*

**< A >**
**able**  10:*24*  11:*24*
*15:12*  17:*15*  18:*5*
*22:13, 21*  23:*10, 25*
*24:3*  25:*19*  26:*8*
*28:14, 22*  32:*16, 25*
*35:2*  37:*6*  42:*20*

*43:8*  55:*5, 16*  62:*7*
**abundance**  22:*19*
**abused**  48:*18*
**accelerated**  9:*11*
**access**  5:*7*  36:*16*
**accessibility**  64:*14*
**account**  61:*19*  62:*4,
17*
**accountability**
*42:18, 19*
**accountable**  42:*16,
18*
**accounts**  61:*21, 23*
**Act**  2:*16, 22*  3:*5*
*7:5*  11:*15*
**ACTING**  1:*16*  4:*12*
*12:6, 13*
**add**  6:*14*  38:*23*
*41:14*
**addicted**  48:*20*
*51:13*
**addiction**  50:*15*
**addictive**  51:*15*
**adding**  19:*2*
**addition**  16:*14*  56:*4*
**address**  6:*16*  27:*16*
**adequate**  58:*18*
**adopt**  2:*17*  3:*3*
**adult**  28:*5*  58:*5*
**advertised**  57:*7*
**ADVISOR**  1:*18*  2:*5*
**advocate**  41:*23*
**affect**  26:*19*  27:*7*
*65:8, 9*
**affiliated**  15:*11*
**affirm**  11:*17*
**affixed**  67:*12*
**afford**  11:*5, 14*
*32:6*  37:*6*  40:*5*
*55:11*  56:*23*
**affordable**  25:*19*
*26:12*  36:*10*  64:*14*
**afraid**  15:*15*
**afternoon**  3:*6*  47:*11*
**age**  14:*20*  31:*10, 13*
*48:9*
**agency**  5:*15, 20*  6:*8,
21*  8:*22*  11:*23*
**aging**  9:*19*

**ago**  5:*13, 20*  16:*13*
*23:2*  47:*24*  66:*11*
**agree**  19:*23*
**ahead**  21:*15*
**AHUVA**  1:*16*  2:*4*
**aid**  9:*7*
**alcohol**  52:*18*
**allow**  15:*18*  56:*22*
**allowed**  24:*16*
*43:20*  61:*4*
**allowing**  47:*14*
**alter**  54:*2*
**altered**  54:*4*
**alternative**  28:*8*
**amazing**  28:*15*
**Amendment**  41:*20,
24*  58:*25*
**Amy**  40:*13*
**analyzing**  65:*3*
**ancillary**  6:*13*
**anger**  19:*10*  36:*5*
**ankle**  51:*6*
**answer**  18:*17*  29:*1*
**answering**  25:*17*
**anybody**  50:*1*
**anybody's**  48:*6*
**Anyway**  20:*5*  37:*25*
*53:5*  54:*11*
**appalled**  54:*7*
**appeals**  15:*21*
**appear**  47:*15*
**Applause**  65:*19*
**appointment**  60:*8*
**appointments**  60:*13*
**appreciate**  8:*7*  30:*3*
*43:2*  47:*9, 14*
*56:25*  59:*25*  64:*6*
*65:20*
**approve**  24:*9*
**approved**  24:*7, 8*
*55:2*
**approximately**  52:*4*
**area**  8:*10*  24:*17*
**arm**  21:*14*
**arms**  15:*1*
**arrested**  14:*19, 21*
*53:6*  54:*13*
**asked**  5:*15*  61:*3, 14*
*63:16*

**asking** 48:*10*
**associated** 15:*11*
**assume** 16:*25*
**assure** 33:*1*
**Atlantic** 21:*3* 49:*10*
**attention** 5:*21*
**ATTORNEY** 1:*18*
2:*4*
**audience** 3:*11*
**aunties** 36:*1*
**aunts** 52:*24*
**Aunty** 36:*2*
**authority** 7:*1, 8, 11*
**automatically** 17:*9*
**Ava** 8:*20*
**available** 3:*24* 5:*3*
12:*11* 49:*9*
**award-winning** 8:*18*

**< B >**
**baby** 24:2 52:*25*
53:*9* 59:*14*
**babysitters** 52:*23*
**back** 5:*13* 6:*22*
14:*16* 17:*10, 16*
18:*11* 24:*19* 25:2
27:*1* 29:*20* 30:*18*
32:*20* 33:*3* 39:*14,
22* 41:*8* 45:*15*
48:2, *21* 52:*1*
55:*19* 59:*9* 62:7
63:*11, 14*
**background** 13:*18*
32:*22*
**backs** 40:*20*
**bad** 17:*23* 18:*1*
19:6 26:*17* 40:*21*
41:2 51:*8*
**bag** 49:*23*
**Banks** 8:8
**bar** 37:*20* 49:6, *18,
19* 50:*25*
**Barch** 40:*13*
**barrel** 62:*13*
**bars** 49:*8*
**basically** 32:*23*
**basis** 60:*13* 62:*10*
**basketball** 49:*16*

**BATTAMS** 1:*16*
2:2, *4* 12:5 45:*17*
64:*9*
**bear** 26:*16*
**beautiful** 47:*9*
**beautifully** 8:*23*
**began** 50:*14*
**begging** 39:*15*
**beginning** 48:*3*
**believe** 27:*15* 34:*19*
38:*18*
**belong** 23:*8*
**Berkeley** 67:*13*
**best** 21:*12* 50:*17*
**bet** 49:*11*
**better** 27:*1* 35:*15*
36:*11, 25* 39:*1*
**betting** 49:*17*
**big** 4:*24* 5:*1, 9*
7:*14* 49:*22* 50:*18,
20* 51:2 62:*14*
**bill** 6:*15, 18* 7:*3*
23:*11*
**birthdays** 26:7
**bit** 8:*15* 13:*18*
15:*3* 20:*18* 27:*13*
47:*3* 48:*16*
**bits** 37:*19*
**bitter** 59:*10*
**black** 21:*8* 22:2
49:*22*
**blessed** 34:*5, 6*
**blew** 58:*25*
**blocks** 8:*9*
**boldly** 18:*17*
**BOLEN** 1:*22*
**bonehead** 38:*13*
**booked** 54:*15, 18*
**bookie** 49:*14*
**books** 38:*16*
**bored** 21:*20*
**born** 8:8 21:2
30:7 48:*3, 11*
**borrow** 60:*12*
**bottom** 62:*13*
**bound** 60:*9*
**BOX** 1:*23* 13:6
**boy** 52:*19*
**boys** 28:*1, 11*

**brain** 51:*24* 52:*20*
54:*1*
**break** 40:*17*
**BRIAN** 1:*19* 12:22
20:*15* 30:5 31:*10*
41:*13* 64:*11* 66:*16*
**Bridgette's** 45:*21, 22*
**brightest** 28:*11*
**brother** 21:*10*
49:*18, 20* 50:*16*
**brothers** 54:*16*
**brought** 9:*12* 10:8
34:7 58:*24*
**bubble** 35:*20*
**buck** 40:*1*
**Buckner** 33:*4*
**budget** 23:22
**buffer** 42:*3*
**build** 7:*18*
**BUILDING** 1:*11*
**bunch** 19:*10*
**bundle** 62:*16, 19*
**burden** 6:7 11:*1*
15:*15* 23:*11* 26:*16*
33:*10, 12, 13* 34:*3,
20* 36:*4* 40:8
**Bureau's** 2:6
**burglarized** 21:*23*
**burning** 22:*10*
**Butterball** 51:*18*
**buy** 23:*14* 32:*1*
39:*17, 18*

**< C >**
**cabin** 42:*25*
**call** 17:6, *7, 10, 11,
16* 18:*11* 24:8, *9, 13,
17, 21* 25:*20* 26:2
31:*21* 32:7, *20*
33:9 35:*23* 36:9
37:*10* 38:*14* 43:8
48:*5* 49:*14* 52:*14*
55:2, *3, 6, 17* 56:22
57:*12* 62:5 63:9, *11*
**called** 3:*18* 15:2
32:*5, 18, 22* 40:*23*
57:*23* 63:9
**calling** 32:*19, 20*
35:9, *10*

**calls** 7:*11* 14:*5*
16:*15* 18:*9, 25*
19:*20* 22:*18* 23:*13*
24:*13, 18* 26:*11*
27:7 31:*18, 22*
38:*24* 41:*12* 42:*11*
55:*11, 12* 56:*25*
61:*14, 19* 62:*11*
64:*5*
**Camille** 60:*10*
**canceled** 60:*13*
**canteen** 23:*15*
**caps** 6:*13* 44:*15*
**car** 50:*23* 51:*3*
**cardiologist** 60:*16*
**care** 10:*10* 18:8
35:*17* 58:*16, 18*
59:*21* 60:5, *23*
**Carolina** 4:*19*
14:*13, 17* 21:*5*
22:5, *17* 24:*25*
29:*16* 32:*13* 33:5
34:*14, 16* 44:*18, 19*
67:4, *13*
**cases** 38:2
**catch** 15:*14*
**caught** 31:9
**cause** 34:4 67:6, *11*
**caused** 34:*4*
**celebration** 51:*1*
**cell** 23:22, *24* 24:*3,
15, 17* 25:7, *13, 23*
30:8, *9* 32:*10, 18*
33:6, *25* 34:2 35:6
**certain** 28:*13* 62:*20*
**CERTIFICATE**
67:*1*
**Certified** 67:*3, 16*
**certify** 67:4, *10*
**chain** 48:*5*
**CHAIR** 1:*16* 4:*12*
12:4, *6, 13*
**chairman** 28:*17*
**CHAIRWOMAN**
1:*14* 4:*11, 14, 16*
8:*3, 5* 12:*12, 25*
13:*3, 10, 15* 16:*10,
18, 23* 18:*13* 19:24
20:*5, 11* 27:*3, 23*
28:*16* 29:*7, 14, 23*

37:2 40:8 41:1, 5, 13 42:22 46:7 61:12, 17 62:18, 24 63:3 64:8 65:22

**challenge** 9:22 47:1

**challenges** 9:22 46:24 64:17

**challenging** 43:2

**chance** 28:12

**change** 13:22 18:21, 22 38:10 44:6, 11, 21 61:4, 9 63:19 64:2 65:25

**changed** 57:1

**changes** 62:25

**channels** 4:8

**charge** 17:12 62:15

**charged** 5:16 6:6 63:11

**charges** 65:12

**charging** 34:9

**CHARLESTON** 1:13, 23 11:7 14:13, 16 20:16 21:9 27:20 28:7 34:16

**check** 45:4

**checklists** 45:5

**Cheech** 50:18, 19

**chemical** 54:3

**chemistry** 54:1

**cherished** 55:17

**chest** 51:7 58:1

**Chicago** 16:13 37:14

**child** 33:19 48:10, 18 49:13

**childcare** 35:13

**children** 11:13 35:11, 17 37:24 46:20 55:10, 13, 15 59:12

**choice** 11:15 15:2 23:12 26:10

**choices** 26:17 32:3 33:18 37:10

**Chong** 50:18, 19

**choose** 14:6

**choosing** 20:22

**Christmas** 26:7

**cigarette** 50:1

**CIRCLE** 1:11 47:8

**citizen** 26:23

**City** 21:3 49:10

**clarity** 7:24

**CLARK** 1:22

**clear** 10:5, 15

**clocking** 31:2

**close** 14:15

**closed** 9:17

**club** 15:1

**CLYBURN** 1:14 4:13 6:3 8:2, 6 12:6, 13 18:15 19:19 20:8, 13 21:14 22:11 25:3, 16, 21, 25 26:4 28:18 42:24 43:21, 25 44:9, 15, 20 45:2 46:9, 13, 23 47:17 48:7 50:3, 7 51:19 55:24 56:19 57:4, 17, 20 58:7, 10, 21 59:1, 24 60:20 61:1, 6, 10 63:15 64:6 65:20

**Coalition** 29:16

**coat** 9:4

**cocaine** 34:10 52:17

**COCHRAN** 1:20 12:24 46:12, 21 47:12, 19, 23 48:8 50:5, 9 51:21 56:12, 20 57:5, 18, 21, 24 58:8, 12, 22 59:2 60:1, 21 61:2, 7, 11, 16 62:3, 19 63:2, 7 64:3

**colder** 46:8

**collapsed** 51:7 57:22

**colleague** 7:7

**collect** 55:7

**college** 14:25

**Columbia** 34:17

**come** 14:19 16:9 21:1 22:25 27:1, 21 30:6 34:13 36:22 42:12, 20

43:20 44:25 48:13 59:9

**comes** 5:1 63:22 66:1

**comfortable** 25:17 46:18

**coming** 2:3 8:7 14:16 16:14 19:13, 15 21:17 22:16 24:15 30:4 33:17 46:5

**commentary** 43:14

**comments** 3:11, 14, 15, 16, 21 4:1, 5, 7 64:24 65:3

**commissary** 14:6 23:15 37:21 39:20, 21

**COMMISSION** 1:1 2:17, 21 3:3 4:23 67:17

**COMMISSIONER** 1:16 4:12 6:3 8:2, 6 12:6, 13 18:15 19:19 20:8, 13 21:14 22:11 25:3, 16, 21, 25 26:4 28:18 42:24 43:21, 25 44:9, 15, 20 45:2 46:9, 13, 23 47:17 48:7 50:3, 7 51:19 55:24 56:19 57:4, 17, 20 58:7, 10, 21 59:1, 24 60:20 61:1, 6, 10 63:15 64:6 65:20

**commissions** 6:17

**Commission's** 2:6, 11

**commit** 33:23

**committed** 26:12, 14 36:14 42:9 45:8 53:19

**commonly** 25:6 54:17

**communicate** 5:17 14:10 18:5 22:21 23:25 24:3 33:18 35:2 36:12 65:16

**communication** 2:12 19:16 22:22 23:18 25:2 28:4 31:21 32:3 33:7 34:20 35:19 36:16, 23 39:2 40:25 45:7 47:6 55:20 64:14

**COMMUNICATION S** 1:1, 4 2:5, 15 3:9 4:22, 25 5:2, 8 6:10 7:5, 12 12:10, 19 19:13 20:2 29:20 37:5 61:13 63:22, 24 65:8, 13 66:2

**COMMUNITY** 1:11 26:20 27:9 33:13 42:21

**Community's** 20:17 27:19

**companies** 61:20

**company** 35:15, 16

**compelling** 27:16 64:12

**Competition** 2:6

**competitive** 49:1

**complaint** 10:13

**complete** 67:9

**complications** 9:11

**composition** 54:3

**compound** 10:25 32:15

**computer** 11:5

**computer-aided** 67:8

**concern** 32:10

**concerned** 26:24

**concluded** 7:16 66:19

**concludes** 65:11

**concrete** 58:2

**conditions** 9:20 60:22

**confined** 9:7

**confirmed** 9:10

**Congress** 7:1

**connect** 65:15

**connected** 16:21

**connection** 9:15 59:20

connections 49:*10*
57:7
consequence 56:*11*
consequences 60:2,
*3, 4*
Constitution 42:*4, 5,*
*6*
consumers 12:*19*
contact 15:*20, 22*
16:*20* 27:*10* 57:*10*
59:*4, 17* 63:*4*
context 8:*15* 13:*17*
continuation 17:*11*
continuations 18:*10*
Continue 21:*16*
65:*14*
continued 52:*22*
contraband 25:*7, 12*
contradict 42:*5*
contribute 42:*21*
contributes 29:*24*
control 51:*25*
conversation 20:*7*
65:*17*
converse 7:*19*
convicted 42:*17*
coordinator 22:*9*
27:*12, 19*
Corner 67:*13*
correct 46:*22*
correctional 64:*16*
Corrections 22:*6,*
*17* 25:*5* 27:*1* 42:*2*
*45:9* 48:*1* 54:*13*
57:*3*
correspond 13:*25*
cost 29:*20* 33:*14*
40:*7*
costs 9:*14* 26:*16*
27:*7* 40:*25*
counsel 67:*11*
country 5:*7* 7:*18*
county 31:*7* 38:*11*
54:*14* 67:*13*
couple 51:2 63:*16*
course 9:*18* 56:*4,*
*15*
court 28:*7*
courtroom 15:*22*

courts 6:*22*
cousin 8:9 62:*4*
crack 34:*10* 52:*16,*
*19* 53:*19*
cray-cray 52:*21*
create 45:*16*
creates 36:*5*
creative 40:*3*
creativity 37:*23*
crime 26:*12, 14*
34:*9* 41:*22* 42:*7, 9*
45:*8*
crimes 33:*23* 36:*14*
criminal 42:*1* 59:*10*
crisis 32:*18*
crossed 54:*4*
CRR 1:*22*
crucial 4:*5*
crushed 21:*24* 51:*6*
cure 10:*15*
curious 17:*1*
current 12:*18*
currently 28:*1*
curse 36:*8*

< D >
D.C 4:*21, 23*
dad 49:*5*
daddy 45:*14* 48:*10,*
*12* 49:*21* 50:*20*
daddy's 50:*23* 51:*3*
daily 17:*13, 14*
danger 36:*9*
dark 9:*8*
DATE 1:*5*
daughter 8:*13*
33:*20, 21* 35:*21*
62:*7*
daughters 26:*6*
day 9:*25* 10:*19*
11:*20* 17:*19* 20:*20*
21:*22* 30:*21* 34:*23*
36:*12* 39:*25* 47:*9*
56:*10* 57:*10* 65:*18*
days 30:*21* 44:*13,*
*22*
dead 16:*3*
deal 31:*12* 36:*4*
dealer 50:*21*

deals 40:*25*
debating 31:*25*
debts 66:*5*
decade 6:*2*
decades 5:*13, 19*
10:*11* 23:*2*
December 2:*19*
decide 55:*22*
decision 40:*22, 24*
41:*8*
decisions 41:*3*
dedicated 3:*10*
11:*18*
deeply 26:*24* 28:*6*
Definitely 29:*22*
30:*3*
delayed 66:*12*
denied 66:*14*
Denmark 21:*7*
DEON 1:*20* 12:*23*
29:*8* 43:*12* 64:*11*
66:*16*
Department 21:*25*
22:*4, 5, 17* 26:*25*
27:*24, 25* 28:*3, 10*
45:*9* 47:*25* 54:*12*
57:*2*
depending 15:*10*
24:*17* 43:*23*
depends 41:7 44:*7*
depressed 53:*10*
depression 53:*11*
deserve 5:7 53:*13*
deserves 18:*4*
designed 16:*19*
details 5:*10*
deteriorate 39:*8*
developed 2:*25*
developing 65:*7*
development 22:*9*
27:*19* 29:*6*
diagnosed 30:*9*
dialogue 12:*16*
diaper 58:*5*
difference 11:*9*
different 4:*8* 15:*6*
19:*8* 32:*3* 44:*18*
difficult 24:*10*
42:*25* 43:*15, 18*
dime 22:*18* 54:*20*

direct 12:*10* 25:*12*
65:*9*
director 25:*5*
disabled 57:*19*
discriminate 60:*8*
discussion 4:*9*
disease 30:*8*
disinterested 27:*17*
disparity 34:*10*
distraught 45:*13*
Division 2:*7*
divorce 14:*18*
divorced 14:*17*
30:*10* 52:*11*
DJJ 21:*25* 27:*21, 22*
doctor 37:*1*
doing 19:*14* 20:*16*
36:*25* 45:*10, 22*
46:*15* 52:*4*
dollar 31:*24* 40:*3*
door 20:*20* 23:*22*
doors 10:*14*
dormitories 54:*22*
dormitory 22:*20*
drinking 51:*4*
drive 28:*14*
driving 50:*22, 24*
51:*3*
drop 18:9 62:*10*
dropped 16:*16*
24:*18* 50:*24* 61:*14*
63:*9*
drug 30:*25* 50:*21*
drugs 31:*3, 4* 48:*20*
49:*9* 52:*9, 10*
Duckworth 7:*2*
due 9:*10, 13*
duly 67:*4*
duty 5:*1*
Duvernay 8:*20*
dying 38:*9* 39:*7*
dynamic 4:*25*
dysfunctional 50:*13*

< E >
earlier 2:*18* 61:*14*
early 9:*2*
earth 53:*12*
easier 30:*25* 31:*4*

**easy** 3:*19* 6:*19* 21:*19, 20* 23:*16* 25:*19*

**eat** 32:2 39:*25* 51:*17*

**ECFS** 3:*18*

**economic** 10:*4, 7* 56:*11*

**economy** 4:*24*

**edit** 43:*16*

**educated** 29:*4*

**education** 50:*10*

**effect** 34:*4, 5*

**efforts** 65:*14*

**eight** 26:*21* 30:8 32:*12* 58:2

**eighth** 11:*10, 11*

**eight-year-old** 53:*7*

**either** 3:*24* 23:*12*

**electronic** 3:*18*

**emotional** 43:*4* 58:*23*

**emotions** 42:*25*

**emphasize** 5:*5* 64:*13*

**empty** 21:*23*

**enabling** 53:*3*

**enactment** 2:*20*

**encounters** 10:*1*

**encourage** 3:*13* 64:*23*

**engage** 2:*10*

**ensure** 4:*6* 65:*14*

**enter** 3:*23*

**entered** 9:*6* 54:*12*

**entire** 55:*20*

**entrusted** 6:*9*

**environment** 48:*23* 52:2

**environments** 28:*13*

**episode** 54:*6*

**ERIC** 1:*19* 12:*23* 13:*11, 24* 18:*14* 23:6 37:8 61:*14* 64:*11* 66:*16*

**especially** 23:*7* 40:*24* 56:*17*

**essential** 11:*3*

**Estill** 32:*12* 33:*3*

**evaluation** 45:*1* 54:*17*

**Eve** 50:*25*

**event** 3:*10* 37:*13* 49:*16*

**events** 67:*11*

**eventually** 59:*7*

**everybody** 8:*19* 18:*4* 26:8 47:*23*

**everyday** 56:*5*

**everything's** 52:*15*

**evolving** 4:*25*

**exact** 11:*20*

**Exactly** 16:*22*

**excess** 51:*16, 22*

**excited** 20:*19*

**exciting** 7:*13* 19:*25*

**excuse** 2:*25*

**expensive** 31:*18, 19*

**experience** 7:*20* 12:*10* 13:2, 8, *19* 15:*3* 16:*4, 9* 27:*12* 29:*15* 56:6 61:*24* 66:*18*

**experienced** 12:*17*

**experiences** 3:8 12:*15* 18:*19* 29:*20* 46:*18* 47:*5* 63:*20* 64:*16*

**experiencing** 5:*12*

**expires** 67:*17*

**explains** 3:*17* 48:*17*

**explore** 30:*14*

**extends** 22:*24*

**extensive** 2:*24*

**extra** 62:*23*

**extremely** 24:*10*

**eyesight** 9:*10*

**< F >**

**face** 9:*5* 39:*3*

**faced** 46:*24* 64:*17*

**FaceTime** 57:*8*

**facilities** 64:*16*

**facility** 9:*17* 56:7

**facts** 65:*24* 66:*1*

**failing** 9:*10*

**fall** 9:2, 3

**families** 2:*14* 5:*17* 6:7 8:*24* 10:*3, 20*

**12:2** 23:*19, 21* 27:8 33:*10, 24* 36:*17* 37:6 38:*3* 64:*18* 65:6, *10* 66:*3*

**family** 11:*22* 13:*20* 18:6 21:*12* 22:*24* 23:*11, 13, 25* 25:*20* 26:*3, 15, 19* 27:*10* 28:7 30:*11, 24* 33:*24* 38:*25* 45:6, *13* 55:*1, 4, 7, 12* 56:2 57:*15* 59:*18* 62:6

**far** 2:*25* 58:*19*

**fat** 51:*18*

**father** 11:6 21:*21* 22:8 48:*3, 17, 20*

**father's** 21:*5*

**FCC** 1:*14, 16, 18* 3:*15* 4:*3, 11* 8:*21* 28:*20* 64:*21*

**FCC's** 3:*17* 65:*4*

**FEBRUARY** 1:*5* 67:*12, 17*

**FEDERAL** 1:*1* 2:*5* 4:*22* 14:*1, 24* 31:8, *17* 38:*19* 44:*19*

**feed** 14:9 33:*23*

**feel** 36:*23, 24* 41:8 63:*17*

**fees** 6:*14, 17*

**feet** 32:2

**fellow** 48:*24* 58:*3*

**felt** 41:*14* 53:*12*

**female** 61:8

**females** 56:*15*

**fight** 36:7

**figured** 37:*18*

**file** 6:*4* 64:*25*

**filed** 5:*14, 19* 7:6

**filing** 3:*18*

**fill** 24:6 35:*20*

**film** 8:*18, 22, 23*

**financially** 10:*22*

**find** 38:*21*

**fingers** 64:*1*

**finish** 38:*24*

**finished** 14:*23*

**first** 6:*12* 10:*12* 13:*1, 23* 14:*19*

**18:***24* 28:*19* 29:*9* 30:*15, 22* 31:8 38:*7* 44:*25* 48:*16* 49:*25* 52:*4, 7* 55:*9* 64:*3, 4*

**fit** 23:*21*

**five** 19:*3* 22:*4, 15* 49:*20* 52:*12*

**fix** 7:8 10:*16*

**fixed** 10:*18* 23:*20* 24:*15*

**flat-lined** 23:*3*

**floor** 11:*10, 11* 57:*22, 24* 58:2

**focus** 59:*3*

**follow** 40:*15* 63:*23*

**followed** 12:*22*

**following** 17:*19*

**follow-up** 25:*4* 27:4 42:*23*

**food** 14:6 33:*24* 37:9 39:*15, 23, 24*

**football** 49:*11, 15*

**force** 40:*19*

**foregoing** 11:*3* 67:*4, 9*

**forever** 13:6

**forget** 10:9 30:*16* 58:*12*

**forgetting** 8:*4*

**form** 24:6 35:*21*

**formal** 3:*16*

**FORMER** 1:*16* 4:*12* 12:6, *12, 18*

**formerly** 3:*7* 10:*20* 45:*18* 54:*16* 65:6

**forms** 3:*22* 64:*24*

**forward** 28:*23*

**found** 52:*5*

**founder** 40:*13*

**four** 11:*16* 21:*3* 24:*22* 46:*20* 55:*10*

**four-month-old** 33:*20*

**free** 19:*1* 42:*20* 63:*17*

**frequently** 43:8 44:*11* 56:2 62:*12*

**friend** 4:*18* 7:7 22:*24* 66:*10*

friends 8:25 13:20 27:10 51:2 63:21
frustrated 25:6
frustration 19:10 36:6
full 49:23 59:10 62:2 63:10 67:9
full-time 14:25 15:2 26:22
fun 53:2
further 67:10
future 7:12

< G >
game 30:25
games 49:11 62:21
gang 48:5
gathering 35:24 65:3
gauge 31:19
geared 42:1
gentleman 54:21 58:24 62:12 63:8
gentlemen 45:23 56:13
Georgia 14:15
getting 22:3 30:13 42:17 54:11 58:16
giant 10:2
girl 24:2
girls 28:2, 11
give 12:2 15:25 16:1, 2 18:25 31:12 35:13, 14, 16, 18
given 3:11 18:18 28:12 30:5, 20 45:9 63:19
gives 19:25 35:3
giving 20:22 51:11
glad 16:5, 7
glasses 9:9
go 7:18 8:25 17:18 19:9 21:15 23:20 25:13 30:18 37:22 42:3 45:15 48:2 49:7 52:21 53:1, 2 55:8, 16, 23 58:6 60:15, 17

goal 7:14
goes 41:20 62:12
going 5:24 6:25 7:16, 17 10:16, 17, 24 13:11 20:2 23:1 25:1 29:8 31:17 32:1, 17, 21 33:15 36:21 37:8, 9 39:15, 20 40:7, 12, 16 41:9, 11 43:1, 2, 3, 5, 6 45:19, 21 46:1 50:19 63:21 66:14
good 13:16 17:25 40:11 49:1 52:15 53:3
goods 42:12
governed 40:19
government 10:10, 17
graduate 29:11
Graham 60:10
granddad 38:10
granddaughters 26:7
grandfather 22:8 38:9 39:1
grandmother 5:14 7:6 36:1 52:24
grandparents 11:4
grandson 5:19 8:17 9:7, 15
grandsons 26:6
grateful 7:23, 24 22:8 46:3, 5 66:17
great 8:21 52:24 65:24
greater 32:11
greatly 4:3 64:21
grew 14:13, 14 30:10 49:19 52:1
Griffin 60:10
ground 5:12
group 27:20
groups 19:8
growing 21:18
GTL 62:13
guard 36:8 57:23
guess 19:12, 15

44:7 51:15, 17
guide 3:16 55:25
guy 26:24
guys 15:15, 17, 21 19:5 26:2

< H >
half 25:22 57:16
hand 7:21 67:12
handed 6:22
handle 62:1
hangs 17:7, 9
happen 17:20, 24 19:6 59:3
happened 6:21 21:12 23:4 63:13
happens 17:13, 14
happy 52:3, 8
hard 6:15 23:6 31:19 38:8 56:21 58:11 59:15, 23 62:25
hardened 59:10
harsh 48:22
hat 63:24
hate 59:11
head 16:24
headquartered 4:23
health 39:8
hear 3:6 9:25 11:23 12:9, 11 13:7, 21 20:23 45:24 61:18 65:2
heard 4:6 10:20 28:13 61:15, 25 64:12
hearing 18:16 49:13 66:19 67:4, 7, 10
heavy 11:1
he'd 49:14
hefty 49:22
held 16:12
Hello 2:2 20:14 46:12
help 28:22 31:12 34:20, 23 35:9, 14, 18 40:22, 23 43:10 46:1 55:25 57:19

58:14
helped 28:24
helpful 34:22
helping 16:9 32:14 34:12
helps 65:5
hereunto 67:12
hey 31:21 32:5
Hi 46:13
high 14:5 19:18 42:10, 11 56:3
higher 44:2
high-level 50:21
highlighted 8:24
Hill 8:11
history 8:14
hit 51:7 53:22
hold 23:9 39:13 42:15, 18 61:21
holidays 35:24
home 4:18 21:2, 22 22:25 26:22 27:1 33:17 34:7, 11, 13 48:13 51:12
honest 43:1
honestly 35:5
honey 51:3
HONORABLE 1:14
honored 47:13
hope 50:8, 9
horribly 48:17
Hospital 8:8 30:17 31:3 32:23, 24, 25 51:9, 11
hospitals 30:11
host 8:22
hot 46:10 56:15
hour 11:21
hours 58:2
house 14:7, 8 21:22 25:1 35:25 36:2
housed 9:18 44:8
household 14:14 26:9
HOWARD 1:19 12:22 20:21 21:17 22:12 25:15, 18, 22 26:1, 5 27:18, 25 28:20 41:15 44:12,

17, 23  45:3  46:4
**human**  36:13  42:13
**humane**  41:19
**hundred**  9:16
**husband**  22:8
33:12  52:3, 9
**hustle**  49:3

**< I >**
**idea**  8:21
**illegal**  23:22, 24
24:2  25:23  33:22,
25  34:2
**illness**  31:5
**impact**  33:16  35:8
65:10
**impaired**  54:10
**implement**  2:22
**implemented**  42:7
**importance**  64:13
**important**  4:9, 20
6:1  9:24  12:7
13:7  29:18  45:24
59:18  65:4, 17
**impossible**  47:16
**improve**  43:13
**improvements**  47:22
**inactive**  61:23
**INCARCERATED**
1:4  2:13  3:7, 8
5:18, 24  6:6  9:1
10:21  11:14  12:11,
19  17:23  22:15
24:1  26:14, 15, 19
27:8  30:4  31:6
33:11, 23  36:14
37:13  38:3  42:13
45:18  48:4  54:16
59:6, 19  64:17
65:6, 10, 13  66:2
**incarcerating**  28:9
**incarceration**  23:15
**incentivizes**  41:2
**Including**  26:1
**income**  23:20
**incredible**  8:16
**individuals**  59:6
64:18
**industry**  10:16

**infant**  53:8
**infractions**  15:17
**initiated**  2:22
**initiative**  34:7, 15, 18
**initiatives**  29:17
**injustices**  66:1
**inmates**  14:1  35:18
58:3
**inquisitive**  48:9
**insanity**  54:5
**inside**  11:22  15:7
35:8  36:5  54:22
**instate**  7:9
**institution**  15:5
44:4, 7  60:12
**institutions**  15:8
43:24  44:2  61:8
**instructions**  3:20
64:25
**interested**  67:11
**internet**  19:20  39:4
57:6  65:1
**intervention**  10:17
**introduce**  12:14
13:1
**introduced**  52:16
**invite**  12:18
**involuntary**  41:21
**ironically**  52:8
**issue**  4:21  5:25
9:24  38:1  61:24
**issues**  13:16  65:9
**its**  62:2

**< J >**
**JADA**  1:20  12:24
45:17  46:13  47:18,
23  50:4  51:20
54:9, 10  57:24
58:10  63:16  64:10
65:21  66:16
**jail**  22:3  31:7
38:11  54:14
**Jan's**  36:2
**January**  2:20
**Jersey**  21:3, 10, 11
**JESSICA**  1:14  4:11
**job**  10:11  11:18
12:3  15:2  27:11
30:15, 18  31:23

**jobs**  21:9  26:22
30:14  35:12  36:19
37:15, 17
**join**  12:20  46:15
47:8
**joining**  12:23  13:12
45:19, 20
**joint**  49:25
**joints**  50:19
**journey**  20:18
**Joys**  8:10, 11
**judicial**  41:18
**July**  2:18  46:10
**Justice**  22:1, 5
27:24  28:1, 3, 10
42:2  66:11
**Juvenile**  22:1, 5
27:24, 25  28:3, 10

**< K >**
**keep**  6:24  10:24
11:6, 14  15:19
18:7  34:20  38:15
**Keeper**  20:18  27:20
**keeping**  9:14
**kept**  16:14
**key**  22:23  25:2
29:6
**kick**  4:9
**kid**  21:19
**kids**  14:8  15:20
27:21  34:2  35:19
37:9  40:6  53:1
56:18
**kind**  23:3, 9  29:17
49:16  60:18  61:24
**kinds**  48:23
**kitchen**  49:22, 24
**knee**  51:6
**knew**  50:13
**know**  8:10, 11  9:3,
19  14:6, 7, 10  15:4,
14, 24, 25  16:1, 2
17:23, 24  18:4, 8, 15,
19  19:1, 3, 6, 14
20:1, 13, 19  21:1
25:14  28:12, 15, 16,
21, 23  29:10  31:15
32:21  35:1  36:23
37:8, 25  42:17

43:13, 18  44:1, 5, 17
45:16  46:14, 17, 18,
19  47:1, 10  48:5, 24
49:5, 7, 8, 10, 12, 13,
15  50:1, 5, 11, 12, 20
51:4, 14, 23  52:5, 24
53:1, 2, 4, 8, 9, 10, 13,
15, 16, 17, 18, 23, 25
54:1, 2, 3, 7, 8, 9, 22,
25  55:2, 3, 5, 13, 14,
16, 18, 19, 22  56:4, 5,
13, 14, 15, 20, 23, 24
57:8, 11, 12, 13, 15,
21, 23  58:11, 15
59:11, 13, 14, 15, 17,
21  60:2, 6  63:12, 17,
20, 21  65:1  66:12
**known**  25:6  54:17
**knows**  8:19

**< L >**
**ladies**  57:11, 14
**Ladson**  21:4, 18
**lady**  11:3
**laid**  58:1
**Las**  49:12
**Late**  46:11
**laugh**  39:16
**law**  14:19
**laws**  41:25  42:4
**law's**  2:20
**lawyer**  15:22  18:6
**lawyers**  35:9
**lead**  6:17  43:9
**leadership**  6:12
12:7  34:14
**learn**  51:10, 24
**learned**  6:24  22:22
26:13  48:25  49:2
55:14
**leave**  29:25  41:16
52:25  53:1
**led**  7:24  13:18
31:6
**left**  27:2  51:1  52:9
53:6
**leg**  51:5
**legal**  10:23
**legislation**  19:25

**legit** 49:7
**legitimate** 10:13
**lessen** 34:19
**lesson** 40:14
**letters** 55:18
**letting** 47:9
**level** 29:2
**levels** 8:24 44:2, 3
**Liberty** 8:11
**librarian** 8:13
**life** 14:22 22:2, 3
29:4 30:14 45:10
55:9 57:16 59:15
60:4
**lifeline** 55:12
**lifelong** 50:14
**lifestyle** 50:12
**lifetime** 45:12
**light** 9:12 16:9
64:17
**limited** 3:12 19:17
**line** 39:21 49:13
54:5
**lines** 7:10 28:4
56:15
**list** 24:8 35:22
36:3 43:7, 9, 15, 19,
22 45:6, 15 55:2
**listen** 62:21
**LISTENING** 1:5
2:3, 9, 23 65:11
**little** 8:15 9:2
13:18 15:3 16:13
20:9, 14, 18 27:13
37:18 38:4 43:4
48:16 55:10
**littlest** 36:6
**live** 5:6 12:1, 2
53:14
**lived** 8:9
**local** 20:12 22:18
24:13
**LOCATION** 1:11
67:6
**lofty** 5:9
**lonely** 34:25
**long** 16:5 22:16, 19
51:9 56:14 66:11
**longer** 63:4

**look** 5:15, 23 20:1
35:12
**looking** 30:18 42:12
**looks** 31:16
**Lord** 47:21
**Lorton** 9:17
**lose** 59:19
**losing** 40:10
**lost** 10:8 23:18
**lot** 14:18 16:15
17:23 31:11 33:21
34:1 38:13 39:14
40:2, 11 45:15
49:7, 9 56:16
57:10, 19 60:9
61:15, 18 62:1 66:1
**loudly** 11:24
**love** 6:19 29:14, 25
33:20 38:4 40:14
59:13 65:2
**loved** 15:20 18:6, 8
37:7
**loving** 30:11
**lower** 35:7 44:3
**lowering** 18:24
19:2, 11 33:15
**lungs** 51:8

**< M >**
**ma'am** 19:22, 23
20:4 46:21 56:19
57:20 60:20 62:3
63:2, 7
**Madam** 12:3
**main** 39:21
**maintaining** 9:15
**major** 33:16
**majority** 11:12 26:2
**makers** 10:9
**makeup** 43:5
**making** 5:2 6:9
33:17 37:11 38:24
47:22
**male** 22:2
**man** 17:25 36:11
52:12
**March** 2:23
**marijuana** 49:23
50:1, 16 52:7, 18
**market** 10:14

**married** 14:16
33:11 52:2, 13
**Martha** 2:14, 16
3:4 5:14 7:4 8:16
**materialized** 57:9
**matter** 5:6 11:25
12:1 67:6
**matters** 53:18
**McClennan** 8:8
**McDonald's** 30:15
**mean** 16:2 17:13,
17 19:1 28:16
34:6 35:5, 12 38:6
39:21 49:12 51:21
55:13 58:19 66:11
**meaningful** 12:16
**means** 50:2 56:18
62:20, 22 63:5
**meant** 53:4 56:9
**medical** 9:11 33:4
57:23 58:16, 18
60:7
**medically** 60:6
**medicine** 9:13
**meds** 11:2
**meet** 8:16
**member** 3:24
**members** 30:24
38:25 45:6
**memory's** 9:2
**men** 20:17 21:8
33:17, 21 34:3, 12,
17, 20 35:8 36:4
56:16
**men's** 60:12
**mental** 27:20
**mentioned** 11:2
22:14 23:2 25:10
37:8 43:7
**mentor** 29:4 31:11
**mentored** 29:5
**mentoring** 20:17
29:6 34:16
**met** 9:21 10:12, 19
11:3 21:11 25:4
28:12 52:12
**Middle** 8:19 17:6
**MIGNON** 1:14
4:12, 18 7:7 20:6

42:22 47:13 66:10
**miles** 8:7 9:16, 17
**milestone** 55:13
**million** 11:13
**millions** 10:3
**mind** 37:23 46:5
58:25
**mine** 21:16 48:17
54:4
**minute** 17:8
**minutes** 24:14
38:20, 22 57:11
**mission** 53:22
**mistakes** 38:13
**MITCHELL** 1:19
12:23 13:9, 11, 13,
23, 24 16:17, 22
17:3 18:23 19:22
20:4 43:23
**Mm-hmm** 61:6
**MODERATOR**
1:18 2:8
**modify** 44:21 45:15
**Mom** 21:11 32:5,
18 36:1 38:16
**moment** 30:20
**momma** 45:14
48:10 50:25 52:23
53:6 55:8
**mommy** 59:13
**mom's** 35:25
**Moncks** 67:13
**money** 14:7 17:10
18:11 23:14 24:19
31:22 35:14, 16
37:21 38:15 53:19
61:21 62:7, 8, 9, 14
**month** 38:18 40:4
44:6 62:15
**monthly** 9:14
**months** 2:18, 19
22:4, 15 30:8
32:12 47:24, 25
54:14 55:16 60:3, 5
**moral** 7:24
**morphine** 51:11
**mother** 21:21
33:11 48:18 56:21
**MOTT** 1:22 67:1,

*13*
**Mountain** 14:*14*
**mouthful** 2:*7*
**move** 20:*7, 9* 29:*8*
**movement** 9:*5*
**movies** 50:*18* 62:*20*
**moving** 2:*21*
**multigenerational** 48:*19*
**multiple** 25:*14*
**music** 62:*21*

**< N >**
**name** 2:*4* 8:*19* 13:*24* 52:*18*
**named** 7:*5* 43:*12*
**name's** 47:*23*
**narcotics** 32:*15* 51:*12*
**narratives** 65:*24* 66:*7*
**need** 6:*25* 13:*21* 20:*3* 25:*24* 26:*18* 28:*12* 31:*22* 35:*9* 58:*17* 66:*8*
**needs** 11:*3* 48:*24* 56:*6* 59:*3*
**neither** 41:*21* 67:*10*
**nephews** 26:*6*
**Never** 8:*5* 10:*4, 5, 9* 16:*21* 30:*15* 54:*23* 62:*6, 9*
**new** 2:*22* 6:*25* 19:*25* 21:*3, 10, 11* 50:*25* 62:*8*
**newborn** 53:*8*
**nice** 14:*13*
**nieces** 26:*6*
**nine** 54:*14*
**Nobody's** 42:*16*
**nodding** 16:*24*
**normal** 30:*19* 33:*1*
**NORTH** 1:*13* 27:*20* 28:*7* 33:*4*
**Notary** 67:*3*
**note** 3:*9*
**notice** 3:*1* 19:*14*
**NOWELL** 1:*20* 12:*23* 29:*9, 13, 22*

30:*2* 38:*6* 40:*10* 41:*4, 7* 43:*17* 44:*1*
**number** 19:*12* 25:*9, 11, 12* 31:*15* 35:*23* 43:*12* 44:*13* 63:*1*
**numbers** 38:*23* 61:*3, 8*

**< O >**
**Obama** 34:*9*
**objections** 67:*7, 10*
**occasionally** 16:*19*
**officers** 36:*17*
**official** 10:*13* 67:*12*
**officials** 10:*10*
**Oh** 4:*16* 5:*23* 61:*16* 62:*3*
**Okay** 13:*23* 25:*25* 26:*4* 30:*2* 32:*6, 7* 42:*15* 43:*25* 44:*20* 45:*2* 49:*3* 57:*4*
**old** 14:*12, 20* 21:*4, 21* 38:*10* 45:*11* 48:*6* 49:*20* 50:*3* 53:*6* 55:*8* 60:*19* 62:*20*
**older** 20:*9, 14* 21:*10* 23:*19* 30:*13* 49:*20*
**ole** 49:*22* 50:*19, 20*
**ologist** 60:*18*
**once** 7:*9* 16:*2* 32:*17* 38:*20* 53:*22* 56:*7* 61:*9, 10, 11* 65:*23*
**ones** 15:*20* 18:*6, 8* 37:*7*
**one-year-old** 53:*7*
**ongoing** 2:*11*
**opened** 23:*22* 49:*6*
**opioid** 51:*12*
**opportunity** 8:*15* 11:*9* 12:*14* 20:*23* 39:*6* 65:*15*
**Orangeburg** 32:*24*
**order** 45:*16*
**organizations** 15:*7, 10* 23:*8*

**outside** 3:*16, 22* 35:*3* 59:*4* 60:*7* 64:*24*
**oversee** 4:*24*
**oxygen** 47:*20*

**< P >**
**P.M** 1:*11* 66:*19*
**P.O** 1:*23*
**pages** 11:*16*
**paid** 36:*18* 37:*17* 56:*4* 66:*4*
**pain** 8:*24* 30:*7* 36:*22, 23*
**painful** 36:*24* 39:*9*
**painkillers** 51:*13*
**pains** 58:*1*
**panicked** 32:*19*
**pants** 39:*25*
**paper** 14:*11*
**parent** 11:*13* 21:*2*
**parents** 14:*15* 30:*9* 35:*10*
**PARK** 1:*11* 47:*8*
**part** 3:*2* 4:*24* 16:*8* 24:*5* 33:*7* 41:*16* 43:*10* 63:*5* 64:*19* 65:*4, 17*
**participant** 13:*1* 45:*18*
**participate** 65:*7*
**participation** 4:*4* 64:*22*
**particularly** 2:*14* 47:*6*
**party** 67:*11*
**passed** 7:*3* 62:*6*
**patient** 46:*14*
**pay** 6:*15* 9:*13* 17:*7* 26:*18* 28:*23* 31:*23* 37:*8, 9* 54:*19, 20, 21, 25* 55:*4, 5, 6* 60:*2* 62:*16, 22, 23* 63:*6, 10*
**paying** 16:*20* 56:*5*
**pen** 14:*10*
**penalties** 40:*11*
**pending** 67:*11*
**pennies** 31:*24*

**people** 2:*13* 3:*7* 5:*11, 16* 6:*5* 7:*17, 19* 10:*10* 11:*19* 13:*7* 14:*5* 15:*25* 16:*1, 2* 18:*6* 19:*8* 23:*4* 24:*7, 18, 22* 27:*17* 28:*15* 31:*11* 34:*25* 37:*10* 39:*12, 15, 16, 18, 20, 23* 40:*2, 3* 41:*16* 42:*13, 20* 44:*13* 46:*1* 50:*6* 55:*3* 58:*13* 59:*19* 66:*2*
**peoples** 12:*19* 65:*13*
**PEOPLE'S** 1:*4* 3:*8*
**percent** 59:*6*
**permanently** 12:*2*
**persistent** 6:*23*
**person** 9:*21* 33:*1* 41:*10* 47:*16*
**personal** 12:*15* 16:*8*
**personality** 51:*15*
**personally** 17:*5*
**personified** 10:*2*
**persons** 43:*8*
**petition** 5:*14, 20* 6:*3* 7:*6, 25* 66:*10*
**phone** 14:*4, 8, 10* 15:*12, 13, 14, 16, 18, 19, 23* 17:*6, 22, 24* 22:*18* 23:*10, 12* 24:*3, 5, 12, 13, 18, 23* 26:*11* 31:*22* 32:*17, 25* 36:*9* 37:*10* 38:*24* 39:*17* 41:*12* 42:*11* 43:*19, 21* 55:*11, 12, 17* 56:*10* 57:*12* 62:*4, 5, 8, 16, 23*
**phones** 17:*16, 17* 19:*2, 4, 7, 17* 22:*19, 20, 21* 23:*4, 7, 23, 25* 24:*15, 16, 17, 25* 25:*7, 10, 13, 23* 33:*15* 34:*2, 8* 35:*6* 54:*19, 21, 23* 55:*6* 56:*7, 14*
**physical** 9:*21* 10:*7* 46:*24*

pick 5:22 7:25
63:18
picked 7:7 66:10
picking 39:18
pictures 34:2 39:6,
7
pills 52:18
place 36:2, 11 45:4
places 4:21 6:7
36:19
plain 49:3
play 4:5 48:25
62:20
Please 3:9
pleasure 8:3
plentiful 56:9
plenty 63:8
point 32:4 41:2
49:2, 6, 21 52:15
54:4, 23 60:24
points 27:5
poker 38:14
policies 15:5, 8 42:1
Policy 2:7 10:9
pool 48:25
poor 53:6 55:8
62:11
population 25:23
Portman 7:2
possibility 39:5
possibly 34:21
postpartum 53:11
pot 51:3
power 20:1 66:15
powerful 10:2
45:24 64:11 66:3, 7
pray 48:19
predicated 45:10
preexisting 60:22
pregnant 52:6 53:9
prerequisite 41:19
prescribed 37:1
presence 9:8
present 11:19
pressure 6:12
pretty 16:3 19:5
price 56:3 63:10
prices 18:24 19:2,
11, 17 24:11 42:10,

11 64:4
Pricing 2:7 14:4
primarily 27:21
principle 5:9
Prior 43:17
prison 14:22, 23, 24
15:7 23:5, 9 31:23
32:5, 8, 9, 22 33:4, 5,
17 34:4, 13, 24
37:15 40:11 48:11
49:6 53:10
prisons 24:24 38:12
privilege 8:16
privileged 4:10
probably 34:1 35:5,
6 60:23 62:13
problem 10:23
52:17 54:23 61:18
problems 61:23
proceeding 2:23
12:8 64:20
process 4:4 33:8
64:22 65:5
proclaim 11:24
produced 8:23
Professional 67:3, 16
program 28:9
programs 34:16
progressed 23:17
60:24
promise 11:20, 21
properly 60:23
proposed 3:1
proud 22:7
proudly 10:18
provided 2:13
provider 56:7
psychotic 54:6
public 2:10 3:2, 25
4:3 64:19, 21 65:5
67:3
pulled 6:3
pulmonologist 60:16
punish 36:16, 17
punished 36:15
42:14
punishment 41:22,
25 42:7
purchase 38:22

purpose 2:9 28:14
push 37:19
pushing 39:19
52:25
put 6:12, 13 13:16
21:13 30:20 32:15
34:21 36:8 57:11
58:5 61:22 62:4, 7
puts 15:14 41:10
putting 39:24

< Q >
quality 62:11 64:5
question 26:11
28:24, 25 43:3
61:13
questions 3:11
12:15 18:14 63:17
quicker 9:12
quickly 2:21
quit 52:19
quote 34:22

< R >
racket 62:14
ran 49:18
rate 24:20
rates 2:12, 18 3:4
5:3, 8 6:13 7:9
9:6 10:25 11:25
16:15 23:1, 3
33:15 35:7 63:6
64:15 65:12
ratified 41:24
rationing 9:12 11:2
read 11:17 59:5
ready 52:23
real 7:20 10:13
13:7 51:8 54:9
realities 5:11
reality 54:6
realize 33:14, 21
realized 30:24
31:18 53:14
really 4:19, 24 5:1,
9, 25 7:14, 22 8:6, 7
11:10 15:24 16:6
20:24 29:10, 17
31:16 33:14, 15, 16
37:4 40:4 46:25

47:14 48:22 50:10,
14 51:21 53:25
54:2, 23 55:17
56:21, 24 58:22
59:20, 23 62:25
65:24 66:3, 6, 7, 15,
16
Realtime 67:3, 16
reason 15:18 21:6
27:16 58:17
reasonable 2:12, 15,
17 3:4 5:3, 8 6:10
7:4 9:6 11:25
63:6 64:15 65:12
rebellious 21:19
received 50:10
receiving 45:3
54:15, 18
reception 45:1
54:17
recidivism 27:5, 11
recognized 6:25
record 2:24 3:2, 23
4:1 7:19 25:8
46:4 64:19 65:1
67:9
recorded 67:7
reduces 27:11
Reentry 29:16
refer 28:8
referrals 27:22
reform 48:21
refund 17:9 62:25
refunded 62:9
refunds 18:10 64:5
refuse 61:22
regime 18:21
Registered 67:1, 16
regular 27:10
regulations 4:6
65:8
regulatory 11:22
rehabilitated 59:8
rehabilitating 42:8
rehabilitation 22:23
25:2 29:24 40:23
41:17, 25 59:3
relate 29:19
related 67:11

relates 47:6
relation 25:12
relationship 28:6
relatively 3:19
release 43:17 48:13
released 26:25
   39:14 47:24 48:15
   59:7
relief 10:4
rely 3:3 4:1
remember 23:2
   24:12, 14 35:20
   48:9 49:12, 19
   57:21 63:13
REPORTED 1:22
REPORTER 67:1,
3, 16
reporting 31:2
representing 29:9
request 4:7
required 3:4
requires 2:16 66:5
resentful 59:10
resident 25:19
residents 25:1
resolve 9:23
response 2:14, 25
responsibility 26:17
rest 59:22 63:22
   65:18
restrictions 6:13
retired 23:19
retrospect 53:3
return 61:22
rhetorical 28:25
rheumatologist
   60:17
right 6:5, 7, 8 7:15
   8:13, 22 13:3
   14:20 16:17 18:18,
   22, 23 20:25 21:15,
   24 22:14 24:2
   26:18, 23 28:2, 5, 19
   29:2, 8 30:11
   33:22 35:10, 19
   40:13, 22, 24 41:16,
   19, 20, 22 42:25
   44:23 45:3, 5, 7, 13,
   14 51:5 57:17

58:1, 7 60:17 61:7
   63:9, 19 64:2
riled 56:17
risk 30:19
risks 39:11, 12
road 6:11
robberies 53:19
role 4:5
rolled 49:25
rolling 49:24 50:18
room 9:6 31:3
Rosen 4:11
ROSENWORCEL
   1:14 4:11, 14, 16
   8:5 12:12, 25 13:3,
   10, 15 16:10, 18, 23
   18:13 19:24 20:5,
   11 27:3, 23 29:7, 14,
   23 37:2 40:8 41:1,
   5, 13 42:22 46:7
   61:12, 17 62:18, 24
   63:3 64:8 65:22
routine 60:13 62:10
RPR 1:22
rulemaking 2:22
   3:1 4:4 64:22 65:4
rules 15:6, 9 40:15,
   17, 18 65:7
run-ins 14:18
RUTH 1:22 67:1,
13

< S >
sacrifices 37:4, 5
   38:2
Sadly 28:2
safety 33:2
saint 38:7
sat 5:20
satisfied 11:8
save 39:25 40:3
saw 3:12 34:8, 9
saying 15:16 16:1
   17:25 18:5, 16
   19:1, 5, 20 34:22
   35:25 42:6, 16
   44:5 60:14
says 38:11
SC 1:13, 23
schedule 30:21, 22

school 21:20 38:10
   48:21
scope 62:2
scratch 14:9
screen 45:21
screening 8:18
script 12:22
scum 53:12
seal 67:12
second 43:5 49:5
   52:14
seconds 17:8
secure 2:11 36:18
Security 23:20
see 15:16 16:11
   39:3, 7, 8, 14, 18, 20,
   22, 23 45:20 47:17
   57:13 60:10
seen 17:25 18:1
   19:21 22:16
sell 31:3
selling 31:4
Senator 7:2
send 23:14 38:16
sense 32:14 41:18
sent 11:7 51:12
sentence 14:24
   22:3 31:8, 9, 13
   45:10 55:21
sentences 42:17
separated 21:22
sergeant 15:1
serious 17:22
service 6:16 62:11
   64:15
SERVICES 1:4
   2:12 3:9 10:23
   12:20 65:13
serving 47:24
servitude 41:21
SESSION 1:5 2:3,
9, 24 65:11
sessions 16:12
set 24:5, 20 45:21
   61:19, 20
setup 12:21 24:6
shagging 52:13
shaky 9:3
shape 51:8 58:17
shaping 4:5

share 3:13 13:1
   47:5 64:23 66:17
shared 18:20
sharing 46:16
   47:10 66:4
shed 64:16
she'll 57:25
shoes 32:1
show 43:3
showers 37:16
SHU 32:16
shut 52:21
sick 30:16, 20 32:13
sickle 30:8, 9 32:10,
   18 33:6
side 63:25
simple 15:13 49:3
sit 11:10 20:23
site 6:17
sitting 20:25 28:21
situation 11:8
situations 19:15
six 19:4, 7 52:11
sky 19:17
sky-high 9:14
slavery 41:21 42:6
small 37:19
smartest 14:9
smoke 50:6 52:6
smoking 50:15 51:3
snap 64:1
snapshot 20:24
soap 13:5 32:1
   37:19, 20 39:17, 18
   41:10
soaps 39:19
Social 23:20
society 33:16 40:17
   42:15 59:9
softness 59:12
sold 38:15
solely 29:3
somebody 26:10, 12
   28:24 36:7, 8
   38:21 42:8 59:8, 9
son 22:9 32:6, 8
   33:5 52:4, 8, 14
sons 26:6
sorry 47:7, 22 58:8,

*9*, *19*
**sought**  6:*16*
**sound**  62:*11*
**soup**  32:2
**souped**  50:*23*
**South**  4:*19*  14:*13*, *16*  21:5  22:5, *17*  24:25  29:16  32:*13*  34:*14*, *16*  44:*18*, *19*  67:*4*, *13*
**Southwest**  8:*23*
**speak**  16:*8*  22:*13*, *14*  25:8  30:*4*  46:*1*  56:2
**speaker**  12:*14*
**SPEAKERS**  1:*19*  4:*17*
**speaking**  9:*23*, 24
**specifics**  54:*1*
**spend**  37:*21*
**spent**  22:*3*  57:*13*, *16*
**spin**  21:*25*
**spiral**  21:*25*
**spirit**  9:*23*
**spoke**  37:*12*
**sporting**  49:*16*
**stab**  36:*8*
**stabbings**  35:6
**stage**  12:*20*
**stand**  11:*1*, *7*, 8  13:5
**start**  8:*12*, *14*  13:*11*, 22  20:7  49:*24*  66:9
**started**  6:*11*  7:22  14:*19*  19:*14*  21:24  23:*1*  24:15  30:*13*, 23  32:19  50:15  52:9
**state**  7:*10*  14:*1*, *22*  26:*20*  33:7  67:*3*
**stated**  67:6
**STATES**  1:*1*
**Statewide**  29:*16*
**statistic**  59:5
**stay**  13:*20*  37:*23*  51:*11*
**stayed**  51:9  54:*14*
**staying**  29:*21*  37:7
**steering**  51:7

**stenographically**  67:7
**stipends**  35:*13*
**Stone**  14:*14*
**stool**  49:*19*
**stop**  11:22, *23*  37:*14*
**stopped**  55:5
**stops**  48:*19*
**stories**  13:*21*  16:*15*, 25  17:*4*  45:*23*  46:*16*  47:*10*  64:*13*  66:*4*, *14*, *18*
**story**  8:*12*  10:2  11:*11*  13:22  20:*24*  21:*16*  30:6  37:*15*  48:2, *16*  52:*1*  59:22  64:*11*
**strapped**  10:22
**strapping**  39:*24*
**streak**  16:*11*
**Street**  8:22
**streets**  31:*1*
**strength**  45:*25*
**stress**  35:*3*
**stressful**  15:*24*
**stretch**  22:*16*
**strict**  44:*4*
**stricter**  28:*4*  44:2
**strikes**  37:*4*
**structure**  41:2
**struggle**  9:*13*  10:*3*  36:*18*  50:*14*
**struggled**  56:*21*
**struggling**  58:*15*
**student**  14:*25*
**subject**  27:*17*
**submit**  3:*15*, *17*  4:7
**subsequent**  6:*4*  10:*1*
**success**  29:2
**successful**  29:*3*
**suffering**  58:*15*  60:*1*, *4*
**sufficient**  37:*20*
**summer**  9:*1*, *3*
**Summerville**  21:5
**super**  31:*18*  38:*8*
**supplement**  2:*24*
**supplemental**  47:*20*

**support**  10:5  22:*24*, 25  31:*20*  33:*8*, *9*
**supported**  30:*12*
**supposed**  20:25  45:6
**sure**  5:2  6:9  20:*3*  29:*18*  33:24  35:*17*  66:*13*
**surreal**  53:*24*
**surrounded**  34:24
**switch**  51:*23*  52:*20*
**sworn**  67:5
**sympathy**  5:*24*
**system**  3:*18*  16:*19*  24:5  28:5  31:*17*  32:5  38:*19*  41:*18*  42:2  47:*4*
**systems**  42:2

**< T >**
**table**  3:*13*  14:7  33:*25*  49:*24*
**tables**  38:*14*
**tablet**  39:2
**tablets**  57:2, *6*  62:*15*
**take**  5:*15*  10:*17*  20:*9*  32:*23*  35:*4*, *17*  39:*11*, *12*  45:*15*
**taken**  56:*8*  60:5, *23*  67:6
**talk**  4:*20*  5:*18*  13:*17*  14:*3*, *4*  22:*18*  23:*13*  24:*11*  26:5, *8*  27:6  29:*15*  31:*12*  35:25  38:*4*, 25  39:*4*  40:5  41:*17*  46:*17*  56:*1*  63:5  66:5
**talked**  10:*21*  16:*4*  23:6  27:*13*  46:*25*  54:*16*  56:*3*
**talking**  7:*17*
**tamer**  56:*16*
**tap**  28:*14*
**task**  7:*14*
**taught**  40:*14*  48:*23*
**tax-paying**  26:*23*
**teacher**  8:*14*
**Tech**  21:7

**telecommunications**  15:*4*  17:*21*
**telephone**  9:6  55:*14*, *21*
**telephones**  19:*11*
**tell**  6:*19*  16:*25*  17:*1*  20:*18*  29:*25*  31:*14*  32:7  43:6  47:*3*  48:2, *16*  51:*17*  53:*17*  56:6, *9*  60:6  66:*18*
**telling**  48:*8*
**tempers**  56:*15*
**temporarily**  12:*1*
**ten**  14:*15*
**ten-year**  14:*23*, 24
**terms**  5:*3*
**testify**  67:5
**testimony**  67:6, *9*
**thank**  2:2  4:*16*, *17*  8:2  12:*3*, 5  13:*4*, *9*, *12*, *13*, 25  16:*10*  20:*15*, 21  29:7  30:2  37:2  45:*23*  47:*7*, *12*, *21*  58:*11*  64:8, *9*, *10*, *12*  65:*16*  66:*15*
**Thanks**  8:*3*  46:*14*
**Thanksgiving**  26:8
**thereof**  67:*11*
**thing**  14:9  17:22  21:*12*  26:*13*  34:*1*  36:6  38:*19*  48:*19*  49:*15*  59:*18*  64:*4*
**things**  6:*1*  14:*3*  16:*14*  17:20, *23*  18:*19*, 20, 22, 24  19:6, *18*  22:12  23:*9*, *14*  30:*1*  33:22  36:20  37:22  43:*12*  48:24  63:*18*  64:*1*  66:6
**think**  7:*11*, *12*  9:*11*  13:*16*, 21  25:9, *11*  27:14  29:2, 24  35:23  37:7  38:*1*  44:*14*  53:21  54:7  58:23  59:*19*  66:9
**thinking**  37:*14*  45:*13*

**thought** 21:*23* 42:*8*
*50:16* 51:*2*
**thoughts** 3:*14, 22,*
*25* 38:*1* 64:*23*
**thousands** 34:*24*
**three** 3:*14* 11:*16*
18:*18, 20, 22, 23*
19:*12, 18* 21:*3*
43:*11, 14* 56:*13*
63:*14, 18* 64:*1*
**threw** 49:*23*
**Thunderbird** 50:*23*
**tick** 36:*7*
**TIME** 1:*11* 3:*10,*
*12* 5:*22* 6:*24* 7:*15*
11:*12* 12:*9* 16:*5*
17:*14* 22:*1* 23:*24*
24:*4, 20, 24* 28:*19*
31:*7* 32:*19* 40:*10,*
*11* 41:*4* 43:*9* 45:*5*
46:*3, 6, 19* 48:*4*
49:*5, 14, 25* 50:*17*
51:*3, 9* 53:*3* 54:*19,*
*24* 55:*9* 57:*14, 22*
63:*13* 67:*6, 7, 10*
**times** 14:*21* 17:*5,*
*16* 35:*24* 49:*8*
61:*20* 63:*8, 14*
**Toastmaster** 15:*1*
16:*11*
**tobacco** 38:*15*
**today** 2:*3* 4:*10, 18*
6:*21* 7:*23* 13:*5, 12*
14:*20* 29:*6, 10*
30:*6* 46:*15* 47:*24*
54:*12* 60:*25* 64:*2*
**today's** 2:*3, 8, 9*
**told** 9:*9* 49:*24*
65:*23*
**tolls** 10:*8*
**tools** 66:*13*
**topic** 54:*12*
**total** 14:*21*
**totally** 41:*9*
**touch** 9:*14* 10:*24*
11:*6, 14* 13:*20*
15:*13* 18:*7* 29:*21*
37:*7, 24*
**touched** 27:*4* 37:*3*

**touching** 51:*20*
**tower** 3:*12*
**town** 50:*20*
**trade-off** 11:*5*
**trade-offs** 10:*21*
**transcribed** 67:*8*
**transcription** 67:*8*
**transferred** 33:*4*
**transplanted** 21:*4*
**transport** 60:*15*
**trash** 49:*23*
**traveling** 9:*16*
**treated** 47:*4*
**tried** 5:*16* 6:*23*
49:*7*
**truck** 48:*14*
**true** 17:*4* 27:*14*
40:*16* 48:*14* 50:*8*
56:*16* 59:*7* 60:*21*
67:*9*
**truth** 22:*13* 43:*6*
67:*5*
**try** 6:*16* 7:*18*
24:*21* 27:*5, 16*
**trying** 13:*20* 16:*6*
41:*14, 17* 55:*22*
62:*1*
**turf** 4:*19*
**turn** 4:*14*
**Turn90** 29:*10, 11*
34:*12* 40:*13*
**turned** 24:*4* 52:*20*
**turning** 28:*22*
**TV** 49:*15*
**twice** 14:*22*
**two** 4:*8* 5:*13, 19*
13:*5* 21:*2* 23:*2*
24:*23, 25* 26:*22*
30:*10, 17, 21* 52:*23*
**two-year-old** 53:*7*
**type** 47:*1*

**< U >**
**Ulandis** 8:*17* 9:*18*
**unaffordable** 6:*18*
**uncle** 22:*9*
**underlying** 9:*20*
**understand** 29:*18*
40:*18* 46:*19* 62:*2*

**unfair** 36:*3*
**unit** 19:*4* 54:*17*
**UNITED** 1:*1*
**update** 43:*9, 15*
**use** 3:*19* 15:*12, 15,*
*18, 19, 23* 23:*7*
24:*16* 26:*2* 32:*16,*
*25* 38:*22* 47:*19*
52:*22*
**usurious** 27:*6*

**< V >**
**values** 4:*3* 64:*21*
**van** 60:*11, 14*
**various** 43:*23*
**vary** 44:*4*
**vast** 26:*1*
**Vegas** 49:*12*
**video** 7:*13* 19:*20*
**viewed** 47:*4*
**violence** 36:*20*
**virtual** 57:*8*
**virtually** 12:*24*
45:*20* 47:*15*
**virtuals** 19:*15*
**visit** 43:*20*
**visitation** 43:*22*
**visited** 30:*12*
**visits** 57:*9*
**vital** 22:*23*
**voice** 4:*6* 7:*11*
12:*12* 30:*5*
**voices** 46:*2*

**< W >**
**wait** 46:*10*
**waiting** 24:*22* 39:*22*
**waiver** 10:*6*
**walk** 20:*20* 39:*22*
51:*10*
**wall** 33:*18, 22*
40:*20* 41:*9*
**want** 7:*1, 21* 11:*17*
12:*11* 13:*12, 24*
18:*7* 24:*12* 29:*18*
38:*9* 39:*13* 40:*5, 6*
41:*15* 45:*23* 47:*5,*
*7, 13* 53:*14, 16*
58:*13, 14* 59:*8*

61:*17* 64:*9* 65:*23*
66:*12*
**wanted** 4:*20* 5:*18*
20:*14* 22:*19* 37:*15,*
*17* 43:*11* 61:*2*
**wanting** 30:*14*
31:*11*
**wash** 32:*1* 41:*10, 12*
**Washington** 4:*21,*
*23* 7:*17* 8:*1* 46:*6*
65:*25*
**watch** 62:*20*
**watching** 50:*18*
**way** 32:*13* 34:*8*
38:*22* 40:*6* 41:*19*
57:*1*
**ways** 3:*14* 19:*13, 16*
**wearing** 9:*4* 63:*24*
**week** 14:*2* 32:*17*
44:*6*
**weekends** 48:*14*
**weeks** 30:*17*
**Welcome** 12:*22*
**welder** 21:*8*
**welding** 21:*9*
**welfare** 55:*9*
**well** 14:*1* 23:*18*
26:*11, 13, 15* 29:*10*
37:*17* 39:*16* 44:*24*
47:*12* 48:*8, 10, 12*
49:*7* 50:*5, 7* 52:*4,*
*12, 15* 53:*4* 55:*24*
56:*12* 57:*25* 60:*1*
62:*6* 63:*7, 15* 64:*3*
**went** 21:*6, 7, 10*
22:*3* 38:*7* 45:*9*
46:*19* 48:*21* 54:*24*
**we're** 7:*16, 17* 9:*19*
29:*8* 34:*24, 25*
36:*12* 42:*12* 46:*5,*
*15* 48:*8* 50:*3* 62:*1*
66:*13, 16*
**wet** 58:*4*
**we've** 3:*19* 57:*23*
61:*15, 25*
**whatnot** 30:*14*
**wheel** 51:*7*
**wheelchair** 9:*8*
47:*20* 60:*9, 11, 14*
**wheels** 22:*10* 28:*22*

willing  39:*11*, *12*
*46:15*  66:*17*
willingness  66:*6*
wind  16:*20*
window  42:*9*
wine  38:*14*
wing  25:*1*
Wireline  2:*6*
wished  50:*11*
wishes  18:*18*
within-entitled  67:*5*
Witness  67:*12*
witnesses  67:*4*, *7, 9*
woman  7:*22*  26:*25*
*45:18*
women  56:*14*
wonder  16:*24*
wonderful  39:*3*
*65:18*
wondering  25:*7*
*43:14*
work  2:*11*  5:*25*
*6:22*  7:*25*  16:*19*
*20:15*  29:*11*  30:*18*
*31:22*  48:*13*
worked  34:*14*, *15*
working  16:*16*
*31:5*  34:*12*, *17*
*35:15*
world  7:*20*  13:*7*
*50:17*  53:*24*  59:*5*
worry  31:*1*
Wound  53:*5*
Wow  63:*15*
wreck  51:*5*
wrestle  21:*15*
Wright  5:*14*
Wright-Reed  2:*15*,
*16*  3:*5*  7:*4*  8:*17*
write  3:*21*  55:*18*, *19*
wrong  34:*9*, *10*
*40:12*
WWW.CLARKBOL
EN.COM  1:*24*

< Y >
yard  22:*20*  54:*20*
*56:8*
Yeah  65:*22*

year  2:*19*  7:*3*
*32:12*  61:*9*, *10*, *11*
years  14:*12*, *15*, *20*
*17:3*, *4*  19:*8*, *9*
*21:4*, *21*  22:*4*, *15*
*23:1*, *17*  26:*21*
*31:14*  32:*8*, *9*
*37:13*  45:*10*, *11*
*47:25*  49:*20*  52:*11*,
*12*  57:*1*  60:*3*, *5*, *19*
*66:10*
Year's  50:*25*
yesteryear  25:*10*
you-all  16:*6*  20:*22*
*36:24*  53:*16*  58:*20*
young  11:*3*  22:*2*
*28:11*  31:*10*  46:*20*
*48:24*  55:*15*
youth  20:*17*  22:*9*
*27:12*, *18*
yup  61:*11*

**WORD LIST**

**< $ >**
**$15** *(1)*
**$25** *(2)*
**$4** *(4)*
**$70** *(2)*

**< 1 >**
**1** *(1)*
**10** *(1)*
**100** *(2)*
**11** *(3)*
**11-month** *(1)*
**120** *(1)*
**12189** *(1)*
**12th** *(1)*
**13** *(1)*
**13th** *(3)*
**14** *(1)*
**15** *(7)*
**16** *(2)*
**17** *(3)*
**18** *(4)*
**18-year-old** *(1)*
**19** *(1)*
**1968** *(1)*
**1970** *(1)*
**1997** *(1)*
**1998** *(1)*

**< 2 >**
**2** *(1)*
**2:30** *(1)*
**20** *(3)*
**200** *(1)*
**2012** *(2)*
**2015** *(1)*
**2020** *(2)*
**2022** *(1)*
**2023** *(2)*
**2024** *(2)*
**2025** *(1)*
**22** *(3)*
**23** *(1)*
**24** *(1)*
**25** *(6)*
**25-year** *(3)*
**28** *(2)*

**29422** *(1)*

**< 3 >**
**30** *(3)*
**300** *(2)*
**300-minute** *(1)*
**34** *(2)*

**< 4 >**
**4:00** *(1)*
**45** *(1)*

**< 5 >**
**50s** *(1)*
**55** *(1)*
**5th** *(1)*

**< 6 >**
**6:00** *(2)*
**60s** *(2)*

**< 7 >**
**75** *(1)*
**78** *(1)*

**< 8 >**
**8** *(3)*
**843-762-6294** *(1)*
**8-month** *(1)*

**< 9 >**
**90** *(1)*
**90s** *(1)*
**9-to-5** *(2)*

**< A >**
**able** *(23)*
**abundance** *(1)*
**abused** *(1)*
**accelerated** *(1)*
**access** *(2)*
**accessibility** *(1)*
**account** *(3)*
**accountability** *(2)*
**accountable** *(2)*
**accounts** *(2)*
**Act** *(6)*
**ACTING** *(4)*
**add** *(3)*

**addicted** *(2)*
**addiction** *(1)*
**addictive** *(1)*
**adding** *(1)*
**addition** *(2)*
**address** *(2)*
**adequate** *(1)*
**adopt** *(2)*
**adult** *(2)*
**advertised** *(1)*
**ADVISOR** *(2)*
**advocate** *(1)*
**affect** *(4)*
**affiliated** *(1)*
**affirm** *(1)*
**affixed** *(1)*
**afford** *(7)*
**affordable** *(4)*
**afraid** *(1)*
**afternoon** *(2)*
**age** *(4)*
**agency** *(6)*
**aging** *(1)*
**ago** *(7)*
**agree** *(1)*
**ahead** *(1)*
**AHUVA** *(2)*
**aid** *(1)*
**alcohol** *(1)*
**allow** *(2)*
**allowed** *(4)*
**allowing** *(1)*
**alter** *(1)*
**altered** *(1)*
**alternative** *(1)*
**amazing** *(1)*
**Amendment** *(3)*
**Amy** *(1)*
**analyzing** *(1)*
**ancillary** *(1)*
**anger** *(2)*
**ankle** *(1)*
**answer** *(2)*
**answering** *(1)*
**anybody** *(1)*
**anybody's** *(1)*
**Anyway** *(4)*
**appalled** *(1)*
**appeals** *(1)*

**appear** *(1)*
**Applause** *(1)*
**appointment** *(1)*
**appointments** *(1)*
**appreciate** *(9)*
**approve** *(1)*
**approved** *(4)*
**approximately** *(1)*
**area** *(2)*
**arm** *(1)*
**arms** *(1)*
**arrested** *(4)*
**asked** *(4)*
**asking** *(1)*
**associated** *(1)*
**assume** *(1)*
**assure** *(1)*
**Atlantic** *(2)*
**attention** *(1)*
**ATTORNEY** *(2)*
**audience** *(1)*
**aunties** *(1)*
**aunts** *(1)*
**Aunty** *(1)*
**authority** *(3)*
**automatically** *(1)*
**Ava** *(1)*
**available** *(4)*
**award-winning** *(1)*

**< B >**
**baby** *(4)*
**babysitters** *(1)*
**back** *(27)*
**background** *(2)*
**backs** *(1)*
**bad** *(7)*
**bag** *(1)*
**Banks** *(1)*
**bar** *(5)*
**Barch** *(1)*
**barrel** *(1)*
**bars** *(1)*
**basically** *(1)*
**basis** *(2)*
**basketball** *(1)*
**BATTAMS** *(6)*
**bear** *(1)*
**beautiful** *(1)*

beautifully *(1)*
began *(1)*
begging *(1)*
beginning *(1)*
believe *(3)*
belong *(1)*
Berkeley *(1)*
best *(2)*
bet *(1)*
better *(5)*
betting *(1)*
big *(9)*
bill *(4)*
birthdays *(1)*
bit *(7)*
bits *(1)*
bitter *(1)*
black *(3)*
blessed *(3)*
blew *(1)*
blocks *(1)*
boldly *(1)*
BOLEN *(1)*
bonehead *(1)*
booked *(2)*
bookie *(1)*
books *(1)*
bored *(1)*
born *(5)*
borrow *(1)*
bottom *(1)*
bound *(1)*
BOX *(2)*
boy *(1)*
boys *(2)*
brain *(3)*
break *(1)*
BRIAN *(8)*
Bridgette's *(2)*
brightest *(1)*
brother *(4)*
brothers *(1)*
brought *(4)*
bubble *(1)*
buck *(1)*
Buckner *(1)*
budget *(1)*
buffer *(1)*
build *(1)*

BUILDING *(1)*
bunch *(1)*
bundle *(2)*
burden *(13)*
Bureau's *(1)*
burglarized *(1)*
burning *(1)*
Butterball *(1)*
buy *(4)*

< C >
cabin *(1)*
call *(35)*
called *(8)*
calling *(5)*
calls *(24)*
Camille *(1)*
canceled *(1)*
canteen *(1)*
caps *(2)*
car *(2)*
cardiologist *(1)*
care *(8)*
Carolina *(16)*
cases *(1)*
catch *(1)*
caught *(1)*
cause *(3)*
caused *(1)*
celebration *(1)*
cell *(16)*
certain *(2)*
CERTIFICATE *(1)*
Certified *(2)*
certify *(2)*
chain *(1)*
CHAIR *(5)*
chairman *(1)*
CHAIRWOMAN
*(38)*
challenge *(2)*
challenges *(3)*
challenging *(1)*
chance *(1)*
change *(12)*
changed *(1)*
changes *(1)*
channels *(1)*
charge *(2)*

charged *(3)*
charges *(1)*
charging *(1)*
CHARLESTON
*(10)*
check *(1)*
checklists *(1)*
Cheech *(2)*
chemical *(1)*
chemistry *(1)*
cherished *(1)*
chest *(2)*
Chicago *(2)*
child *(4)*
childcare *(1)*
children *(9)*
choice *(4)*
choices *(4)*
Chong *(2)*
choose *(1)*
choosing *(1)*
Christmas *(1)*
cigarette *(1)*
CIRCLE *(2)*
citizen *(1)*
City *(2)*
clarity *(1)*
CLARK *(1)*
clear *(2)*
clocking *(1)*
close *(1)*
closed *(1)*
club *(1)*
CLYBURN *(51)*
Coalition *(1)*
coat *(1)*
cocaine *(2)*
COCHRAN *(32)*
colder *(1)*
collapsed *(2)*
colleague *(1)*
collect *(1)*
college *(1)*
Columbia *(1)*
come *(18)*
comes *(3)*
comfortable *(2)*
coming *(12)*
commentary *(1)*

comments *(10)*
commissary *(5)*
COMMISSION *(6)*
COMMISSIONER
*(51)*
commissions *(1)*
Commission's *(2)*
commit *(1)*
committed *(6)*
commonly *(2)*
communicate *(10)*
communication *(19)*
COMMUNICATION
S *(24)*
COMMUNITY *(5)*
Community's *(2)*
companies *(1)*
company *(2)*
compelling *(2)*
Competition *(1)*
competitive *(1)*
complaint *(1)*
complete *(1)*
complications *(1)*
composition *(1)*
compound *(2)*
computer *(1)*
computer-aided *(1)*
concern *(1)*
concerned *(1)*
concluded *(2)*
concludes *(1)*
concrete *(1)*
conditions *(2)*
confined *(1)*
confirmed *(1)*
Congress *(1)*
connect *(1)*
connected *(1)*
connection *(2)*
connections *(2)*
consequence *(1)*
consequences *(3)*
Constitution *(3)*
consumers *(1)*
contact *(8)*
context *(2)*
continuation *(1)*
continuations *(1)*

Continue  (2)
continued  (1)
contraband  (2)
contradict  (1)
contribute  (1)
contributes  (1)
control  (1)
conversation  (2)
converse  (1)
convicted  (1)
coordinator  (3)
Corner  (1)
correct  (1)
correctional  (1)
Corrections  (9)
correspond  (1)
cost  (3)
costs  (4)
counsel  (1)
country  (2)
county  (4)
couple  (2)
course  (3)
court  (1)
courtroom  (1)
courts  (1)
cousin  (2)
crack  (4)
cray-cray  (1)
create  (1)
creates  (2)
creative  (1)
creativity  (1)
crime  (7)
crimes  (2)
criminal  (2)
crisis  (1)
crossed  (1)
CRR  (1)
crucial  (1)
crushed  (2)
cure  (1)
curious  (1)
current  (1)
currently  (1)
curse  (1)

< D >
D.C  (2)

dad  (1)
daddy  (5)
daddy's  (2)
daily  (2)
danger  (1)
dark  (1)
DATE  (1)
daughter  (5)
daughters  (1)
day  (14)
days  (3)
dead  (1)
deal  (2)
dealer  (1)
deals  (1)
debating  (1)
debts  (1)
decade  (1)
decades  (4)
December  (1)
decide  (1)
decision  (4)
decisions  (1)
dedicated  (2)
deeply  (2)
Definitely  (2)
delayed  (1)
denied  (1)
Denmark  (1)
DEON  (6)
Department  (13)
depending  (3)
depends  (2)
depressed  (1)
depression  (1)
deserve  (2)
deserves  (1)
designed  (1)
details  (1)
deteriorate  (1)
developed  (1)
developing  (1)
development  (3)
diagnosed  (1)
dialogue  (1)
diaper  (1)
difference  (1)
different  (5)
difficult  (4)

dime  (2)
direct  (3)
director  (1)
disabled  (1)
discriminate  (1)
discussion  (1)
disease  (1)
disinterested  (1)
disparity  (1)
distraught  (1)
Division  (1)
divorce  (1)
divorced  (3)
DJJ  (3)
doctor  (1)
doing  (7)
dollar  (2)
door  (1)
doors  (1)
dormitories  (1)
dormitory  (1)
drinking  (1)
drive  (1)
driving  (3)
drop  (2)
dropped  (5)
drug  (2)
drugs  (6)
Duckworth  (1)
due  (2)
duly  (1)
duty  (2)
Duvernay  (1)
dying  (2)
dynamic  (1)
dysfunctional  (1)

< E >
earlier  (2)
early  (1)
earth  (1)
easier  (2)
easy  (6)
eat  (4)
ECFS  (1)
economic  (3)
economy  (1)
edit  (1)
educated  (1)

education  (1)
effect  (2)
efforts  (1)
eight  (4)
eighth  (2)
eight-year-old  (1)
either  (2)
electronic  (1)
emotional  (2)
emotions  (1)
emphasize  (2)
empty  (1)
enabling  (1)
enactment  (1)
encounters  (1)
encourage  (2)
engage  (1)
ensure  (2)
enter  (1)
entered  (2)
entire  (1)
entrusted  (1)
environment  (2)
environments  (1)
episode  (1)
ERIC  (10)
especially  (3)
essential  (1)
Estill  (2)
evaluation  (2)
Eve  (1)
event  (3)
events  (1)
eventually  (1)
everybody  (4)
everyday  (1)
everything's  (1)
evolving  (1)
exact  (2)
Exactly  (1)
excess  (2)
excited  (1)
exciting  (2)
excuse  (1)
expensive  (2)
experience  (13)
experienced  (1)
experiences  (9)
experiencing  (1)

expires *(1)*
explains *(2)*
explore *(1)*
extends *(1)*
extensive *(1)*
extra *(1)*
extremely *(1)*
eyesight *(1)*

< F >
face *(2)*
faced *(2)*
FaceTime *(1)*
facilities *(1)*
facility *(2)*
facts *(2)*
failing *(1)*
fall *(2)*
families *(20)*
family *(30)*
far *(2)*
fat *(1)*
father *(6)*
father's *(1)*
FCC *(9)*
FCC's *(2)*
FEBRUARY *(3)*
FEDERAL *(10)*
feed *(2)*
feel *(4)*
fees *(3)*
feet *(1)*
fellow *(2)*
felt *(2)*
female *(1)*
females *(1)*
fight *(1)*
figured *(1)*
file *(2)*
filed *(3)*
filing *(1)*
fill *(2)*
film *(3)*
financially *(1)*
find *(1)*
fingers *(1)*
finish *(1)*
finished *(1)*
first *(21)*

fit *(1)*
five *(5)*
fix *(2)*
fixed *(3)*
flat-lined *(1)*
floor *(5)*
focus *(1)*
follow *(2)*
followed *(1)*
following *(1)*
follow-up *(3)*
food *(7)*
football *(2)*
force *(1)*
foregoing *(3)*
forever *(1)*
forget *(3)*
forgetting *(1)*
form *(2)*
formal *(1)*
FORMER *(5)*
formerly *(5)*
forms *(2)*
forward *(1)*
found *(1)*
founder *(1)*
four *(5)*
four-month-old *(1)*
free *(3)*
frequently *(4)*
friend *(4)*
friends *(5)*
frustrated *(1)*
frustration *(2)*
full *(5)*
full-time *(3)*
fun *(1)*
further *(1)*
future *(1)*

< G >
game *(1)*
games *(2)*
gang *(1)*
gathering *(2)*
gauge *(1)*
geared *(1)*
gentleman *(4)*
gentlemen *(2)*

Georgia *(1)*
getting *(5)*
giant *(1)*
girl *(1)*
girls *(2)*
give *(10)*
given *(7)*
gives *(2)*
giving *(2)*
glad *(2)*
glasses *(1)*
go *(25)*
goal *(1)*
goes *(2)*
going *(38)*
good *(6)*
goods *(1)*
governed *(1)*
government *(2)*
graduate *(1)*
Graham *(1)*
granddad *(1)*
granddaughters *(1)*
grandfather *(3)*
grandmother *(4)*
grandparents *(1)*
grandson *(4)*
grandsons *(1)*
grateful *(7)*
great *(3)*
greater *(1)*
greatly *(2)*
grew *(5)*
Griffin *(1)*
ground *(1)*
group *(1)*
groups *(1)*
growing *(1)*
GTL *(1)*
guard *(3)*
guess *(5)*
guide *(2)*
guy *(1)*
guys *(6)*

< H >
half *(2)*
hand *(2)*
handed *(1)*

handle *(1)*
hangs *(2)*
happen *(5)*
happened *(5)*
happens *(3)*
happy *(2)*
hard *(9)*
hardened *(1)*
harsh *(1)*
hat *(1)*
hate *(1)*
head *(1)*
headquartered *(1)*
health *(1)*
hear *(11)*
heard *(6)*
hearing *(6)*
heavy *(1)*
he'd *(1)*
hefty *(1)*
held *(1)*
Hello *(3)*
help *(15)*
helped *(1)*
helpful *(2)*
helping *(3)*
helps *(1)*
hereunto *(1)*
hey *(2)*
Hi *(1)*
high *(5)*
higher *(1)*
high-level *(1)*
highlighted *(1)*
Hill *(1)*
history *(1)*
hit *(2)*
hold *(5)*
holidays *(1)*
home *(13)*
honest *(1)*
honestly *(1)*
honey *(1)*
HONORABLE *(2)*
honored *(1)*
hope *(2)*
horribly *(1)*
Hospital *(9)*
hospitals *(1)*

host  (1)
hot  (2)
hour  (1)
hours  (1)
house  (6)
housed  (2)
household  (2)
HOWARD  (19)
human  (2)
humane  (1)
hundred  (1)
husband  (4)
hustle  (1)

< I >
idea  (1)
illegal  (7)
illness  (1)
impact  (3)
impaired  (1)
implement  (1)
implemented  (1)
importance  (1)
important  (11)
impossible  (1)
improve  (1)
improvements  (1)
inactive  (1)
INCARCERATED
  (37)
incarcerating  (1)
incarceration  (1)
incentivizes  (1)
Including  (1)
income  (1)
incredible  (1)
individuals  (2)
industry  (1)
infant  (1)
infractions  (1)
initiated  (1)
initiative  (3)
initiatives  (1)
injustices  (1)
inmates  (4)
inquisitive  (1)
insanity  (2)
inside  (5)
instate  (1)

institution  (4)
institutions  (4)
instructions  (2)
interested  (1)
internet  (4)
intervention  (1)
introduce  (2)
introduced  (1)
invite  (1)
involuntary  (1)
ironically  (1)
issue  (5)
issues  (2)
its  (1)

< J >
JADA  (16)
jail  (4)
Jan's  (1)
January  (1)
Jersey  (3)
JESSICA  (2)
job  (9)
jobs  (7)
join  (3)
joining  (4)
joint  (1)
joints  (1)
journey  (1)
Joys  (2)
judicial  (1)
July  (2)
Justice  (8)
Juvenile  (6)

< K >
keep  (8)
Keeper  (2)
keeping  (1)
kept  (1)
key  (3)
kick  (1)
kid  (1)
kids  (9)
kind  (6)
kinds  (1)
kitchen  (2)
knee  (1)
knew  (1)

know  (143)
known  (2)
knows  (1)

< L >
ladies  (2)
Ladson  (2)
lady  (1)
laid  (1)
Las  (1)
Late  (1)
laugh  (1)
law  (1)
laws  (2)
law's  (1)
lawyer  (2)
lawyers  (1)
lead  (2)
leadership  (3)
learn  (2)
learned  (7)
leave  (4)
led  (3)
left  (4)
leg  (1)
legal  (1)
legislation  (1)
legit  (1)
legitimate  (1)
lessen  (1)
lesson  (1)
letters  (1)
letting  (1)
level  (1)
levels  (3)
Liberty  (1)
librarian  (1)
life  (10)
lifeline  (1)
lifelong  (1)
lifestyle  (1)
lifetime  (1)
light  (3)
limited  (2)
line  (3)
lines  (3)
list  (12)
listen  (1)
LISTENING  (5)

little  (14)
littlest  (1)
live  (5)
lived  (1)
local  (3)
LOCATION  (2)
lofty  (1)
lonely  (1)
long  (8)
longer  (1)
look  (4)
looking  (2)
looks  (1)
Lord  (1)
Lorton  (1)
lose  (1)
losing  (1)
lost  (2)
lot  (21)
loudly  (1)
love  (9)
loved  (4)
loving  (1)
lower  (2)
lowering  (4)
lungs  (1)

< M >
ma'am  (11)
Madam  (1)
main  (2)
maintaining  (1)
major  (1)
majority  (2)
makers  (1)
makeup  (1)
making  (6)
male  (1)
man  (3)
March  (1)
marijuana  (5)
market  (1)
married  (4)
Martha  (6)
materialized  (1)
matter  (4)
matters  (1)
McClennan  (1)
McDonald's  (1)

mean  (15)
meaningful  (1)
means  (5)
meant  (2)
medical  (6)
medically  (1)
medicine  (1)
meds  (1)
meet  (1)
member  (1)
members  (3)
memory's  (1)
men  (13)
men's  (1)
mental  (1)
mentioned  (6)
mentor  (2)
mentored  (1)
mentoring  (3)
met  (8)
Middle  (2)
MIGNON  (8)
miles  (3)
milestone  (1)
million  (1)
millions  (1)
mind  (3)
mine  (3)
minute  (1)
minutes  (4)
mission  (1)
mistakes  (1)
MITCHELL  (14)
Mm-hmm  (1)
MODERATOR  (2)
modify  (2)
Mom  (5)
moment  (1)
momma  (7)
mommy  (1)
mom's  (1)
Moncks  (1)
money  (16)
month  (4)
monthly  (1)
months  (12)
moral  (1)
morphine  (1)
mother  (4)

MOTT  (3)
Mountain  (1)
mouthful  (1)
move  (3)
movement  (1)
movies  (2)
moving  (1)
multigenerational
 (1)
multiple  (1)
music  (1)

< N >
name  (4)
named  (2)
name's  (1)
narcotics  (2)
narratives  (2)
need  (10)
needs  (4)
neither  (2)
nephews  (1)
Never  (10)
new  (8)
newborn  (1)
nice  (1)
nieces  (1)
nine  (1)
Nobody's  (1)
nodding  (1)
normal  (2)
NORTH  (4)
Notary  (1)
note  (1)
notice  (2)
NOWELL  (12)
number  (9)
numbers  (3)

< O >
Obama  (1)
objections  (2)
occasionally  (1)
officers  (1)
official  (2)
officials  (1)
Oh  (4)
Okay  (13)
old  (13)

older  (6)
ole  (3)
ologist  (1)
once  (10)
ones  (4)
one-year-old  (1)
ongoing  (1)
opened  (2)
opioid  (1)
opportunity  (6)
Orangeburg  (1)
order  (1)
organizations  (3)
outside  (6)
oversee  (1)
oxygen  (1)

< P >
P.M  (2)
P.O  (1)
pages  (1)
paid  (4)
pain  (5)
painful  (2)
painkillers  (1)
pains  (1)
panicked  (1)
pants  (1)
paper  (1)
parent  (2)
parents  (3)
PARK  (2)
part  (11)
participant  (2)
participate  (1)
participation  (2)
particularly  (2)
party  (1)
passed  (2)
patient  (1)
pay  (21)
paying  (2)
pen  (1)
penalties  (1)
pending  (1)
pennies  (1)
people  (43)
peoples  (2)
PEOPLE'S  (2)

percent  (1)
permanently  (1)
persistent  (1)
person  (4)
personal  (2)
personality  (1)
personally  (1)
personified  (1)
persons  (1)
petition  (6)
phone  (47)
phones  (31)
physical  (3)
pick  (3)
picked  (2)
picking  (1)
pictures  (3)
pills  (1)
place  (3)
places  (3)
plain  (1)
play  (3)
Please  (1)
pleasure  (1)
plentiful  (1)
plenty  (1)
point  (9)
points  (1)
poker  (1)
policies  (3)
Policy  (2)
pool  (1)
poor  (3)
population  (1)
Portman  (1)
possibility  (1)
possibly  (1)
postpartum  (1)
pot  (1)
power  (2)
powerful  (5)
pray  (1)
predicated  (1)
preexisting  (1)
pregnant  (2)
prerequisite  (1)
prescribed  (1)
presence  (1)
present  (1)

pressure *(1)*
pretty *(2)*
price *(2)*
prices *(8)*
Pricing *(2)*
primarily *(1)*
principle *(1)*
Prior *(1)*
prison *(22)*
prisons *(3)*
privilege *(1)*
privileged *(1)*
probably *(5)*
problem *(4)*
problems *(1)*
proceeding *(3)*
process *(4)*
proclaim *(1)*
produced *(1)*
Professional *(2)*
program *(1)*
programs *(1)*
progressed *(2)*
promise *(2)*
properly *(1)*
proposed *(1)*
proud *(1)*
proudly *(1)*
provided *(1)*
provider *(1)*
psychotic *(1)*
public *(8)*
pulled *(1)*
pulmonologist *(1)*
punish *(2)*
punished *(2)*
punishment *(3)*
purchase *(1)*
purpose *(2)*
push *(1)*
pushing *(2)*
put *(13)*
puts *(2)*
putting *(1)*

**< Q >**
quality *(2)*
question *(5)*
questions *(4)*

quicker *(1)*
quickly *(1)*
quit *(1)*
quote *(1)*

**< R >**
racket *(1)*
ran *(1)*
rate *(1)*
rates *(18)*
ratified *(1)*
rationing *(2)*
read *(2)*
ready *(1)*
real *(5)*
realities *(1)*
reality *(1)*
realize *(2)*
realized *(3)*
really *(45)*
Realtime *(2)*
reason *(4)*
reasonable *(13)*
rebellious *(1)*
received *(1)*
receiving *(3)*
reception *(2)*
recidivism *(2)*
recognized *(1)*
record *(10)*
recorded *(1)*
reduces *(1)*
Reentry *(1)*
refer *(1)*
referrals *(1)*
reform *(1)*
refund *(2)*
refunded *(1)*
refunds *(2)*
refuse *(1)*
regime *(1)*
Registered *(2)*
regular *(1)*
regulations *(2)*
regulatory *(1)*
rehabilitated *(1)*
rehabilitating *(1)*
rehabilitation *(7)*
relate *(1)*

related *(1)*
relates *(1)*
relation *(1)*
relationship *(1)*
relatively *(1)*
release *(2)*
released *(5)*
relief *(1)*
rely *(2)*
remember *(9)*
REPORTED *(1)*
REPORTER *(5)*
reporting *(1)*
representing *(1)*
request *(1)*
required *(1)*
requires *(2)*
resentful *(1)*
resident *(1)*
residents *(1)*
resolve *(1)*
response *(2)*
responsibility *(1)*
rest *(3)*
restrictions *(1)*
retired *(1)*
retrospect *(1)*
return *(1)*
rhetorical *(1)*
rheumatologist *(1)*
right *(53)*
riled *(1)*
risk *(1)*
risks *(2)*
road *(1)*
robberies *(1)*
role *(1)*
rolled *(1)*
rolling *(2)*
room *(2)*
Rosen *(1)*
ROSENWORCEL *(36)*
routine *(2)*
RPR *(1)*
rulemaking *(5)*
rules *(7)*
run-ins *(1)*
RUTH *(3)*

**< S >**
sacrifices *(3)*
Sadly *(1)*
safety *(1)*
saint *(1)*
sat *(1)*
satisfied *(1)*
save *(2)*
saw *(3)*
saying *(14)*
says *(1)*
SC *(2)*
schedule *(2)*
school *(3)*
scope *(1)*
scratch *(1)*
screen *(1)*
screening *(1)*
script *(1)*
scum *(1)*
seal *(1)*
second *(3)*
seconds *(1)*
secure *(2)*
Security *(1)*
see *(14)*
seen *(4)*
sell *(1)*
selling *(1)*
Senator *(2)*
send *(1)*
sense *(2)*
sent *(2)*
sentence *(8)*
sentences *(1)*
separated *(1)*
sergeant *(1)*
serious *(1)*
service *(3)*
SERVICES *(6)*
serving *(1)*
servitude *(1)*
SESSION *(5)*
sessions *(1)*
set *(6)*
setup *(2)*
shagging *(1)*
shaky *(1)*

shape  (2)
shaping  (1)
share  (5)
shared  (1)
sharing  (3)
shed  (1)
she'll  (1)
shoes  (1)
show  (1)
showers  (1)
SHU  (1)
shut  (1)
sick  (3)
sickle  (5)
side  (1)
simple  (2)
sit  (2)
site  (1)
sitting  (2)
situation  (1)
situations  (1)
six  (3)
sky  (1)
sky-high  (1)
slavery  (2)
small  (1)
smartest  (1)
smoke  (2)
smoking  (2)
snap  (1)
snapshot  (1)
soap  (7)
soaps  (1)
Social  (1)
society  (4)
softness  (1)
sold  (1)
solely  (1)
somebody  (9)
son  (7)
sons  (1)
sorry  (5)
sought  (1)
sound  (1)
soup  (1)
souped  (1)
South  (15)
Southwest  (1)
speak  (7)

speaker  (1)
SPEAKERS  (2)
speaking  (2)
specifics  (1)
spend  (1)
spent  (3)
spin  (1)
spiral  (1)
spirit  (1)
spoke  (1)
sporting  (1)
stab  (1)
stabbings  (1)
stage  (1)
stand  (4)
start  (7)
started  (12)
state  (6)
stated  (1)
STATES  (1)
Statewide  (1)
statistic  (1)
stay  (3)
stayed  (2)
staying  (2)
steering  (1)
stenographically  (1)
stipends  (1)
Stone  (1)
stool  (1)
stop  (3)
stopped  (1)
stops  (1)
stories  (11)
story  (14)
strapped  (1)
strapping  (1)
streak  (1)
Street  (1)
streets  (1)
strength  (1)
stress  (1)
stressful  (1)
stretch  (1)
strict  (1)
stricter  (2)
strikes  (1)
structure  (1)
struggle  (4)

struggled  (1)
struggling  (1)
student  (1)
subject  (1)
submit  (4)
subsequent  (2)
success  (1)
successful  (1)
suffering  (3)
sufficient  (1)
summer  (2)
Summerville  (1)
super  (2)
supplement  (1)
supplemental  (1)
support  (7)
supported  (1)
supposed  (2)
sure  (7)
surreal  (1)
surrounded  (1)
switch  (2)
sworn  (1)
sympathy  (1)
system  (10)
systems  (1)

< T >
table  (4)
tables  (1)
tablet  (1)
tablets  (3)
take  (9)
taken  (4)
talk  (23)
talked  (7)
talking  (1)
tamer  (1)
tap  (1)
task  (1)
taught  (2)
tax-paying  (1)
teacher  (1)
Tech  (1)
telecommunications  (2)
telephone  (3)
telephones  (1)
tell  (17)

telling  (1)
tempers  (1)
temporarily  (1)
ten  (1)
ten-year  (2)
terms  (1)
testify  (1)
testimony  (2)
thank  (29)
Thanks  (2)
Thanksgiving  (1)
thereof  (1)
thing  (11)
things  (25)
think  (19)
thinking  (2)
thought  (4)
thoughts  (5)
thousands  (1)
three  (15)
threw  (1)
Thunderbird  (1)
tick  (1)
TIME  (44)
times  (8)
Toastmaster  (2)
tobacco  (1)
today  (16)
today's  (3)
told  (3)
tolls  (1)
tools  (1)
topic  (1)
total  (1)
totally  (1)
touch  (10)
touched  (2)
touching  (1)
tower  (1)
town  (1)
trade-off  (1)
trade-offs  (1)
transcribed  (1)
transcription  (1)
transferred  (1)
transplanted  (1)
transport  (1)
trash  (1)
traveling  (1)

treated *(1)*
tried *(3)*
truck *(1)*
true *(9)*
truth *(5)*
try *(5)*
trying *(6)*
turf *(1)*
turn *(1)*
Turn90 *(4)*
turned *(2)*
turning *(1)*
TV *(1)*
twice *(1)*
two *(13)*
two-year-old *(1)*
type *(1)*

**< U >**
Ulandis *(2)*
unaffordable *(1)*
uncle *(1)*
underlying *(1)*
understand *(4)*
unfair *(1)*
unit *(2)*
UNITED *(1)*
update *(2)*
use *(14)*
usurious *(1)*

**< V >**
values *(2)*
van *(2)*
various *(1)*
vary *(1)*
vast *(1)*
Vegas *(1)*
video *(2)*
viewed *(1)*
violence *(1)*
virtual *(1)*
virtually *(4)*
virtuals *(1)*
visit *(1)*
visitation *(1)*
visited *(1)*
visits *(1)*
vital *(1)*

voice *(4)*
voices *(1)*

**< W >**
wait *(1)*
waiting *(2)*
waiver *(1)*
walk *(3)*
wall *(4)*
want *(28)*
wanted *(8)*
wanting *(2)*
wash *(3)*
Washington *(6)*
watch *(1)*
watching *(1)*
way *(6)*
ways *(3)*
wearing *(2)*
week *(3)*
weekends *(1)*
weeks *(1)*
Welcome *(1)*
welder *(1)*
welding *(1)*
welfare *(1)*
well *(28)*
went *(9)*
we're *(15)*
wet *(1)*
we've *(4)*
whatnot *(1)*
wheel *(1)*
wheelchair *(5)*
wheels *(2)*
willing *(4)*
willingness *(1)*
wind *(1)*
window *(1)*
wine *(1)*
wing *(1)*
Wireline *(1)*
wished *(1)*
wishes *(1)*
within-entitled *(1)*
Witness *(1)*
witnesses *(3)*
woman *(3)*
women *(1)*

wonder *(1)*
wonderful *(2)*
wondering *(2)*
work *(11)*
worked *(2)*
working *(5)*
world *(5)*
worry *(1)*
Wound *(1)*
Wow *(1)*
wreck *(1)*
wrestle *(1)*
Wright *(1)*
Wright-Reed *(5)*
write *(3)*
wrong *(3)*
WWW.CLARKBOL
EN.COM *(1)*

**< Y >**
yard *(3)*
Yeah *(1)*
year *(6)*
years *(33)*
Year's *(1)*
yesteryear *(1)*
you-all *(5)*
young *(7)*
youth *(4)*
yup *(1)*

Job No.: 61750   Job Date: 2/1/2024

Witness: FCC Hearing

Errata February 1, 2024 Charleston South Carolina Listening Session transcript:

Page 3, line 12: Strike "tower" and replace with "our"

Page 4, line 11: strike "Rosen"

Page 7, line 9: Strike "instate" and replace with "in-state"

Page 8, lines 10-11: lowercase "joys"

Page 13, line 5: Strike "was" an replace with "of us"

Page 17, line 10: Strike "nor" and replace with "and"

Page 28, line 6: Strike "deeply" and replace with "deep"

Page 39, lines 17 & 18: Strike 'soap' and replace with "soup"

Page 52, line 13: Strike "shagging" and replace with "shacking"

Page 65, line 13: Strike "peoples" and replace with "people's

# UNITED STATES
# FEDERAL COMMUNICATIONS COMMISSION

———

| | |
|---|---|
| Incarcerated People's Communications Services, Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services | WC Docket No. 23-62; WC Docket No. 12-375 |

*EX PARTE* SUBMISSION OF
THE U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION

Jonathan Kanter
Assistant Attorney General

Doha Mekki
Principal Deputy Assistant Attorney General

Margaret Goodlander
Deputy Assistant Attorney General

David Lawrence
Policy Director

Susan Athey
Chief Economist

Karina Lubell, Chief
Campbell Haynes, Attorney-Advisor
Competition Policy and Advocacy Section


Yvette Tarlov, Chief
Jared Hughes, Assistant Chief
Media, Entertainment, and
Communications Section


U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

1

Pursuant to § 1.206(b)(1) of the Commission's rules of practice and procedure, the U.S. Department of Justice submits the following *ex parte* filing as part of the above-captioned proceeding.[1]

## I.    INTRODUCTION AND DIVISION'S INTEREST

The Antitrust Division of the U.S. Department of Justice ("the Division"), which is responsible for enforcing the federal antitrust laws and other competition statutes, writes to provide its views on the Federal Communication Commission's ("the FCC" or "Commission") rulemaking entitled "Incarcerated People's Communications Services, Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services."[2] The Division applauds the Commission's efforts to build on its work over the past decade to ensure that rates and charges for communications services between incarcerated people and their loved ones are fair, just, and reasonable. The Division writes to provide its views on competition for the provision of incarcerated people's communications services ("IPCS").[3]

The federal antitrust laws represent the legal embodiment of our nation's commitment to competition and the competitive process. For more than 100 years, the Supreme Court has reaffirmed that competition is a core organizing principle of the U.S. economy.[4] This is for good reason. Vigorous competition yields myriad benefits across the U.S. economy, including lower prices, higher quality goods and services, increased access to goods and services, and greater innovation.[5] The Division has a strong interest in promoting and protecting competition across the economy, including in the IPCS market. Additionally, the Division and the Commission have a long-standing policy of cooperation in reviewing communications matters, including merger review.

The Division recognizes that communications services for incarcerated people provide an important lifeline between incarcerated people and their loved ones,[6] the

---

[1] 47 CFR § 1.206(b)(1) (*amended* Jan. 17, 2024).

[2] 88 Fed. Reg. 20,804 (Apr. 7, 2023) (to be codified at 47 C.F.R. § 64).

[3] The Division would like to acknowledge the contributions of longtime staff attorney Deborah Roy, who was instrumental in developing the Division's views on competition in this industry.

[4] *See, e.g., N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015) (referencing "the Nation's commitment to a policy of robust competition"); *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951) ("The heart of our national economic policy long has been faith in the value of competition.").

[5] *See, e.g., Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (noting that the antitrust laws reflect "a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. . . The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers.").

[6] Approximately 1.7 million adults are in the custody of state and federal prisons and local jails. *See* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Correctional Populations in

2

benefits of which serve other important non-economic values. Nonetheless, this comment is focused on the benefits of improving competition, the policy area where the Division has unique expertise.

## II.    COMPETITION IN THE IPCS MARKET

IPCS markets across the country suffer from a lack of competition, which harms both incarcerated people and those who purchase communications services to communicate with them. In most cases, correctional facilities select a sole-source communications provider with which the facility negotiates rates and charges for communications services. The scope and terms for these services are memorialized in long-term contracts between the facilities and the communication services provider. These contracts provide all incarcerated people in a correctional facility and those wishing to communicate with them a sole source of communication services. And although correctional facilities *negotiate* rates and charges for communication services, incarcerated people and their families *pay* the negotiated rates and charges for the services they use. Therefore, incarcerated people and their loved ones face an effective monopoly after the correctional facility selects a provider for its communications services.[7] This process imposes long-term, structural barriers to competition and deprives consumers the benefits of a robust, competitive IPCS market.

In the Division's experience, the markets to provide IPCS services to facilities are highly concentrated.[8] Two providers, Securus and Global Tel*Link Corporation d/b/a Viapath Technologies ("GTL") have controlled well over half of the overall market for more than a decade. Other market participants have not been able to win significant market share from Securus and GTL or discipline their prices. Additionally, there are significant barriers to entry and expansion in this market. For example, a new entrant must first gain access to capital for upfront costs such as installing infrastructure. Companies that do not have a strong track record of serving other correctional facilities face a chicken-and-egg problem of not being able to win business because they lack significant experience. In addition, the terms of IPCS contracts are generally several

---

the United States, 2021-Statistical Tables at 14 (Feb. 2023). A critical mode of communication between incarcerated parents and their children is phone calls, which can be prohibitively expensive making it difficult for parents to regularly speak with their children. U.S. Department of Justice, National Institute of Corrections, Model Practices for Parents in Prisons and Jails: Reducing Barriers to Family Connections at 59 (July 2019).

[7] The Commission has recognized that providers of telephone services to incarcerated people have monopoly power in the facilities they serve. *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, ¶ 31 (May 20, 2021).

[8] The Division last investigated the IPCS industry in 2019, when Securus Technologies Inc. attempted to acquire Inmate Calling Solutions LLC. Securus abandoned the transaction after the Division expressed concern that the merger would eliminate important competition in IPCS. *See* Press Release, U.S. Dep't of Justice, Securus Technologies Abandons Proposed Acquisition of Inmate Calling Solutions After Justice Department and the Federal Communications Commission Informed Parties of Concerns (Apr. 3, 2019).

3

years in length and renew automatically, thereby limiting the opportunity for competitors to challenge the established incumbents.[9]

Incarcerated people and their families have benefited from FCC regulatory initiatives that have brought reforms to this market. As the FCC recognizes, however, there is more work to be done. ICPS markets are characterized by unreasonably high rates, ancillary service fees, and abusive provider practices such as the seizure of unused funds in incarcerated people's accounts without notice or refund.[10] The lack of robust competition in IPCS markets disincentivizes product improvements, service, and innovation.

### III.    The Division's Recommendations

Many vulnerable consumers depend on this important market that has an oligopolistic structure. It is important that the FCC's forthcoming rules better align incentives between correctional facilities and the incarcerated people and their families who pay for IPCS. To that end, the Division encourages the FCC to consider whether site commissions ought to be included as costs of providing service when determining just and reasonable rates. Because commissions operate as a transfer of funds from the IPCS vendors to the correctional facilities, the inclusion of site commissions in bids for IPCS contracts may inhibit the competitive process from directing contracts to the lowest-priced bidders (from the point of view of the ultimate consumers of the services) by giving correctional facilities mixed incentives in choosing a vendor. Some correctional facilities may prefer vendors who pay higher site commissions, but when site commissions serve to increase the rates that incarcerated people and their families pay, they work directly against the FCC's mandate to ensure that such rates be just and reasonable.

Finally, the FCC should ensure that providers do not evade rate regulation by steering customers from regulated to unregulated communications services such as electronic messaging, which would cause competitive harm and dilute the intended benefits of the Martha Wright-Reed Act.[11] IPCS providers offer a bundle of services including phone communications that are rate-regulated, as well as electronic messaging

---

[9] Comments of Prison Policy Initiative, Inc., *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 at 19-20 (September 27, 2021) (observing that contract durations are long and incumbent carriers frequently evade competitive rebidding through serial contract extensions).

[10] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Notice of Proposed Rulemaking, ¶¶ 71-75 (Sept. 30, 2022).

[11] The FCC found that the Martha-Wright-Reed Act does not give it jurisdiction over e-messaging. *Incarcerated People's Communications Services, Implementation of the Martha Wright-Reed Act*, WC Docket No. 23-62, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, ¶ 29.

4

applications that are not regulated.[12] As documented by the Prison Policy Initiative, the rates that incarcerated people pay for e-messaging are unreasonably higher than the rates paid by people who reside outside of correctional facilities.[13]

## IV.    CONCLUSION

The Division applauds the Commission for its diligent efforts to reform the provision of communications services to enhance competition in communications markets for incarcerated people. As always, the Division looks forward to continuing to work with the Commission in protecting and promoting competition and achieving affordable communications services for incarcerated people and their families. The Division will continue to review the provision of services to incarcerated people and further competition through merger enforcement and prosecution of anticompetitive behavior.

Respectfully Submitted,

/s/ Jonathan Kanter

_____

Jonathan Kanter
Assistant Attorney General
Antitrust Division

Dated: April 29, 2024

---

[12] *See, e.g.,* Comments of NCIC Inmate Communications, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375 at 15 (Sept. 27, 2021) (noting that almost all bids include proposals for remote video visitation, messaging and premium tablet content (movies, games, music, books).

[13] Prison Policy Initiative, *SMH: The rapid & unregulated growth of e-messaging in prisons* (March 2023) (the cost for an incarcerated person to send one e-message ranges from being free in Connecticut to a high of 50 cents in Alaska and Arkansas, with prices most often between 27 cents to 30 cents).

5



5/29/2024

Marlene H. Dortch, Esquire
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Virginia Association
of Regional Jails**

P.O. Box 2080
Winchester, VA 22604

804.486.7272

admin@varj.org

**Derek Almarode**
PRESIDENT

**Eric Young**
VICE PRESIDENT

**Brandon Monk**
EXECUTIVE DIRECTOR

**Beth Healy**
TREASURER

**Ashley Knox**
SECRETARY

**RE: Ex-parte Presentation related to Proceeding 23-62**

Dear Ms. Dortch,

In compliance with federal procedures to submit the summary of an oral and/or written presentation, the Virginia Association of Regional Jails (VARJ) respectfully reports that on 5/28/2024, representatives from VARJ to include VARJ President, Superintendent Derek Almarode, VARJ Vice President and Legislative Committee Chairman, Superintendent Eric Young, VARJ Legislative Committee Member, Superintendent W. Chris Smith, and VARJ Legislative Committee Member, Superintendent Michelle Lewis met by videoconference with Ms. Terri Natoli with the Wireline Competition Bureau, Ms. Victoria Goldberg with the Pricing Policy Division, Mr. David Zesiger with the Pricing Policy Division, Mr. Erik Raven-Hansen with the Pricing Policy Division, and Ms. Lynne Engledow with the Pricing Policy Division to discuss matters related to the above referenced Proceeding.

In this meeting, a VARJ representative asked what could be expected related to the upcoming final ruling. Responder confirmed that while comment on current decisions is not appropriate, work is actively being done and the group is expected to announce the ruling on the early end of the allotted time period of between July 5, 2024 and January 5, 2025. Responder explained that three weeks prior to the public commission meeting, they will release a draft decision of what is proposed and there will be a time to provide additional feedback. A VARJ representative asked if the FCC representatives could share any feedback the other states have provided and the responder indicated that there was feedback provided under the previous proceeding and that it was being considered with this order. When asked what would contribute to a cap proposal that was different than the interim, the responder indicated that there has been a collection of detailed cost data for provisions from providers that has been reviewed and that there is a longstanding process for what is useful. When comment was requested related to the inclusion of security costs in the rate calculation, the respondent noted that there is a statute directive to consider those costs and so the rate determination will include a provision related to those costs and an evaluation is or has been done related to net cost for security measures. A VARJ representative asked if there was more that could be said about what data has contributed to the determination of a cap amount and the respondent referred to the notice they

**JA1256**

released in March 2023 in which the proposed approach was presented and comments regarding adoption of the approach were sought. An additional referral to the National Sheriff Association's comments was made by a respondent. A VARJ representative asked if there were particular studies that were used in the development of bases for the 5 goals outlined in the Martha Wright-Reed Act. The respondent referenced data collection that has been made pubic, including detailed narratives and cost data.

VARJ representatives, then satisfied with the information and references provided by the respondents, initiated a discussion to include topics such as the importance of the balance of the four basic priorities of corrections (retribution, deterrence, incapacitation, and rehabilitation) and the unique funding struggles for localities related to the costs of jail operations, particularly in Virginia due to its structure as a Commonwealth. A VARJ representative shared that the regional jails in Virginia are in compliance with and support the interim rates, noting that jail operations are feasible and objectives met without additional burden to local tax payers. A VARJ representative noted that much work has been done legislatively this year in Richmond to impact the concerns of advocate groups and practitioners alike, and that shared revenue is now a defined use line item on our budgets, specifically that commissions must be used to fund educational, recreational, and rehabilitative (to include medical costs) efforts for the direct benefit of the incarcerated population. A VARJ representative emphasized that the provision of communication/telephone use must include security measures that protect victims and families. A concern related to tax payer-supported communication provision is that essentially victims of crime are paying for this non-constitutionally protected service for the incarcerated person. A VARJ representative proposed that cost reduction would result in a reduction of services and programs that directly benefit the incarcerated population. An FCC representative asked if differences between regional jails and sheriff jails could be discussed. A VARJ representative discussed the significance of being a political subdivision, in that regional jails report to either an Authority or a Board and that they can enter into/incur debt, establish budgets, appropriate spending, and manage funding of operations.

A written, detailed presentation of relevant, and in some cases new, information as well as a copy of this letter was emailed to Deputy Chief David Zesiger via email.

Respectfully submitted,

Michelle Lewis
Michelle Lewis
Superintendent
Northern Neck Regional Jail

Marlene H. Dortch, Secretary
Federal Communications Commission
Washington, D.C. 20554


**Re:     FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services**

Dear Ms. Dortch:

The Virginia Association of Regional Jails hereby respectfully submits comments on various aspects on and of the matter of incarcerated people's communication services.  The basis of this document is one submitted in 2014 authored by then-Superintendent Ted Hull but has been updated with more current information and rationale.

The 21 jails that comprise the Virginia Association of Regional Jails service over half the jurisdictions of Virginia and house an equal percentage of the Commonwealth's pre-trial, presentence and locally responsible inmates presently incarcerated. Since 1997, the Association has been extremely successful in seeking to promote progressive and responsible penological policies that make Virginia an example in safe, secure and humane correctional management.

While the Association seeks to be a constructive partner in addressing the concerns of all interested stakeholders and shares the Commission's commitment to "fair and equitable rates", there are several factors the Association believes deserve further discussion and consideration.

 Foundationally, for the Jails of Virginia and indeed all jails, there are four fundamental principles that are the "*raison d' etre*" of every correctional agency and institution: Retribution, Deterrence, Incapacitation and Rehabilitation. Structurally, all four of these priorities have to managed and maintained for the jail system to be effective in the fulfillment of these objectives. A correctional agency cannot be successful in one facet without attempting to address them all. As such, it is within these parameters that the Association has concerns about the implementation of rates significantly different from the interim caps.

While the complexity of the dynamics associated with this market are considerable, the Association understands that as causes for action the Commission has highlighted five primary factors that compel the Commission, in their judgment,  to take action: 1.) The effect of a reduction in inmate call rates/commission payments on recidivism; 2.)the fairness of existing inmate phone contracts; 3.) the failure of the "free market" to effectively operate and regulate;

Virginia Association of Regional Jails                                                                    May 2024

4.) the negative implications of facility commissions; 5.) the provision of fair and equitable rate and fee structures.

**General Comment #1 –** *The effect of inmate call rates on recidivism*

While many if not most Commenters consistently assert a causal relationship between reduced call rates and a reduction in recidivism, it is the Association's position that none exist. The Association is not aware of a single scientific study that substantiate a relationship between rates and recidivism. A general review of those assertions that maintain that connection reflect strictly anecdotal observations and are subject to interpretation.

The difficulties in assessing the "causes" of recidivism are structural and profound.  In most circumstances, states do not consistently define recidivism in any cogent manner. [1] As is true in any circumstance, to ascertain the reasons that someone didn't do something is extremely difficult.

As described by a study performed by the PEW Center on the States on recidivism in America, "Readers are advised to use caution when comparing recidivism rates across states. A state's recidivism rate is the product of numerous variables, and valid interstate assessments are possible only with careful study and analysis of the wide range of unique conditions affecting correctional agencies in each state". [2] Obviously, this would infer that any attribution to a reduction in recidivism is extremely subjective and should be asserted with caution.

As a point of contrast, the study also concludes that any material reduction in recidivism comes from structural considerations associated with how an inmate's incarceration is organized and defined. Factors associated with considerations like call rates reduction have been shown to not be material. Case studies performed in Oregon, Michigan and Missouri all reflect these factors of success and are hard to dismiss. [3]

An updated article from PEW entitled "The Changing State of Recidivism:  Fewer People Going Back to Prison" dated August 1, 2018, indicates that the data show the number returning 3 years later – the most common measure of recidivism -  dropped nearly a quarter over the

---

[1] The PEW Center on the States, State of Recidivism, The Revolving Door of America's Prisons, April 2011, Appendix: Methodology
[2] The PEW Center on the States, State of Recidivism, The Revolving Door of America's Prisons, April 2011, Page 12
[3] The PEW Center on the States, State of Recidivism, The Revolving Door of America's Prisons, April 2011, Pages 2023
[4] The PEW Center, The Changing State of Recividism:  Fewer People Going Back to Prison Article, August 2018

FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

then-recent 7 year period.[4]  In addition, longer-term recidivism also fell.  Prisoners released in 2010 were 13% less likely than the 2005 cohort to return to prison at lease once by the end of the fifth year after release.  The article sites decrease in recidivism occurred alongside long-term reductions in crime, which dropped 26% from 2005 to 2015.  What is shown, according to the PEW Center, to improve outcomes for people released from prison?  Access to additional phone calls with family and friends or even maintenance or increased strength of family ties?  No…..Evidence-based re-entry policies and programs.

Additionally, the US Department of Justice archives contains an extensive work related to the sweeping reform work done to impact recidivism rates.  In 2016, the Bureau retained an independent social science research organization to evaluate BOP's existing criminogenic assessment tools and to propose improvements.  The conclusions don't include cost of contacting family members as central components of reducing recidivism.  Instead, while it concedes that "critical family ties could be better supported," the top 3 areas that impacted recidivism were employment, education, and addressing substance use.  In fact, the work resulted in confidence in stating a "significant volume of research exists" that cognitive/behavioral, occupational training and education programs have a "high impact" on recidivism.[3]  These programs are expensive and offered absolutely free to the incarcerated population.

<u>To the Association's knowledge, to date, there has not been any evidence based or longitudinal study of a prison system or individual jail that has reduced inmate call rates and has seen a subsequent reduction in recidivism.</u>

It is the Association's position that any assertion of a causal relationship between call rate reduction and a reduction in recidivism lacks the necessary evidence based data to support consideration.

**General Comment #2 – *Fairness* of *inmate call rates/commission rates***

The Proposed Rule Making and the many advocates who have contributed to this discussion have made many assertions as to the fundamental "fairness" of the current call rates. The Association understands those concerns but as with most things a more "in depth" assessment of that paradigm might be useful.

In many jurisdictions, with the exception of public education, local correctional expenditures account for more than any other local government operational line item. Virginia

FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

cities and counties provide approximately 623.8 million dollars to support the regional jails of the Commonwealth.[4]

From these expenditures, in whole or in part, Virginia's regional jails provide free health care, free education, free legal assistance and free vocational, recreational, rehabilitative programs to inmates.

Historically, Virginia's facilities have used inmate call revenue to offset the costs associated with the provision of these services but has sought to balance those needs with the needs of the inmates and their families. On average, prior to FCC interim action, Virginia's regional jails charged only $3.22 for a local inmate initiated debit 15 minute call and $3.38 for a local inmate initiated collect 15 minute call.[7] Rates of which exceed FCC interim rates by only $.014 and $.025 per minute respectively.

Inmate calling is a base economic transaction comparable to the inmate purchase of a bag of potato chips. Significantly, this fact illustrates that in most instances the cost of an inmate calling his friends and family has the equivalent economic impact and associated opportunity costs of 2 candy bars. The significance of which does not objectively rise to the level of "unfair" or overly burdensome.

If the Proposed rule is enacted and citizens are required to subsidize call volume, the citizens of the cities and counties of the Commonwealth that comprise and fund jails would have to incur an additional $20,246,000 in local tax burden to maintain status quo.[5]

**Restrictions on Payments to Correctional Facilities**

Contrary to assertions of the Commission, the Association does not consider the payment of site commissions or the consideration of revenue in contract award as contributing to "the primary reason ICS rates are unjust and unreasonable".[6]

Quite the contrary, the Association regards the payment of site commissions and or the consideration of the same to be legitimate public policy discussion and by extension the basis for decision.

Inmate use of a telephone is not constitutionally guaranteed and that principle has been thoroughly tested in many federal districts across the country.

---

[3] justice.gov/dag/page/file/914031/dl?inline, slide 5 and 34, 2016
[4] Virginia Compensation Board, 2022 Jail Cost Audit Report, aggregate survey.
[5] Virginia Compensation Board, 2022 Jail Cost Audit Report
[6] FCC Second Notice of Proposed Rulemaking, WC Docket No. 12-375, Paragraph 21

FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

One case that illustrates this point involves a claim where Inmate W. Holloway, an inmate in the Arkansas Department of Corrections, contended that high phone charges violated his First Amendment rights because they prevented him from making as many calls as he would have liked. "A ten-minute interstate call costs $10.43, plus taxes and any other governmental charges," said Steve Shults, one of Holloway's attorneys.

After a federal district court granted summary judgment to the prison system, Holloway appealed to the 8th U.S. Circuit Court of Appeals.

On Feb. 2, 2012 a three-judge panel of the 8th Circuit affirmed the lower court ruling against the inmate in *Holloway v. Magness.* The panel noted that the prisons had no obligation under the First Amendment to provide phone service at all. And, said the panel, "[j]ust as [Arkansas Department of Corrections] had no First Amendment obligation to provide any telephone service, it had no obligation to provide that service at a particular cost to users."[7]

Consistent with the previously referenced four guiding principles of corrections (incapacitation, deterrence, retribution and rehabilitation) a correctional facility has the moral and ethical responsibility to consider all factors that promote or advance all of these principles. It is important to recognize that one priority <u>does not</u> take precedence over the remaining three and that decisions of management have to be made within the totality of all four.

Within that context, there are many factors that may be indicative of a legitimate penological interest and may pre-empt the facility from considering inmate rates as the primary criteria in their deliberations. [12] These factors could include crime interdiction, deterrence, inmate management and yes, revenue generation.

As there is no right to a phone nor is there constitutional protection for costs an inmate or his family may incur, the inmate's use of the phone and the costs associated therein have been and should be within purview of local public policy debate and should reflect the public policy priorities of the localities or states.

Limiting ICS commissions would infringe on the authority of localities/states to make legitimate public policy decisions about how best to fund their state and local correctional systems, promote effective deterrence, manage inmate populations, the development and provision of inmate rehabilitative programs. The proposed rulemaking would override legitimate

---

[7] First Amendment Center, Vanderbilt University, David L. Hudson, First Amendment Scholar, February 12, 2012. [12] Penological Interests – "interests that relate to the treatment (including punishment, deterrence, rehabilitation or incapacitation) of persons convicted of crimes.", *Bull v City and County of San Francisco, 2010 U.S. App. LEXIS 2684 (9th Circuit Cal. Feb. 9, 2010)*

FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

constitutionally provided decisions of state and local elected officials about that funding and fulfilling policy mandates. The authority to make those decisions should remain with the states and localities, in the absence of any significant burden on interstate commerce or other compelling interest that justifies Federal preemption.

It is the position of the Virginia Association of Regional Jails that the abolition of site commissions or revenue share would be counterproductive to the provision of criminal justice, detrimental to inmate management and inappropriately interfere with the establishment of public policy.

**Eliminating the Competition-distorting role of site Commissions.**

The Commission has asserted that site commissions have undue influence on market distortions within price based markets. The assertion presupposes that the primary purpose of Agency procured ICS systems is to provide inexpensive inmate calling to the exclusion of all other considerations. A presupposition not based in application or supported by fact.

It is the position of the Association that site commissions do not distort market place competition as that individual unit costs are not the competitive decision point. The competition point that the marketplace effectively and appropriately delivers is one of aggregate value and utility. Though unit price is of intrinsic importance, it is but one factor of consideration in determining value and utility and should not supersede other considerations. Price considerations notwithstanding; ethics, public safety and fiduciary responsibilities require local facilities to evaluate the entire *value proposition.*[8] In execution of this requirement the agency insures that all of its public service requirements are met.  Additionally, many correctional facilities offer tablets and/or kiosks capable of many valuable services such as programs for job searches, free libraries of tens of thousands of books, free on-demand law library, access to games, music and TV/movies, video visits.  These services are bundled with the phone/communication services provided by vendors.

It is the position of the Association that there is no distortion of competition; the market is effectively providing a competitive price point on value and utility; to a significant degree reflects exactly what is valued in the market; and cannot be evaluated outside the policy priorities of the community.

---

[8] Financial Times, http://lexicon.ft.com/Term?term=value-proposition, 2014

   *"Customers face a choice when browsing a set of products and/ or services at various prices. The value proposition is the additional benefits the customer receives from a product/ service not offered by other competitors. The value proposition is a combination of the product and/or service and the price charged."*

FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

Virginia Association of Regional Jails                                                    May 2024

**Costs Incurred by Correctional Facilities**

It is the position of the Association that there are significant incurred costs associated with the provision of inmate calling services and due diligence in the interest of public safety. These costs are both direct and indirect and some are not easily quantifiable.

The costs associated with service management, managing inmate IDs and accounts, responding to request for service, managing maintenance and repair could be considerable and directly impacts the facility's budget. Costs associated with the supervision required by officers to insure equitable use, though not easily accounted for is none the less considerable.

A primary cost associated with inmate phone services is all the costs necessary to insure public safety. This would include all efforts needed to interdict continuing criminal enterprise, prosecute criminal acts and maintain the safety, security and good order of the institution through phone call monitoring, recording, pattern analysis and provision to law enforcement and the courts.

A potential major increase in incurred costs that would be hard to project would be the unintended consequence of <u>an increase in crime, criminal or disruptive activity that may result from the imposition of the proposed rule and its effect on call volume</u>. While it is difficult to ascertain the impact of increase call volume on recidivism, its impact on continuing criminal enterprise would be easily quantifiable and should be anticipated.

Additionally, it is the Association's position that incurred cost calculations are dynamic and defy fixed assessment as budgetary and financial conditions change.


We appreciate being part of the process and the opportunity to make comment on this important and vital issue.



Respectfully submitted,


Michelle Lewis
Northern Neck Regional Jail
VARJ Legislative Committee Member


FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

Virginia Association of Regional Jails                                                                May 2024

*Virginia Association of Regional Jails*

FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services

JA1265



85 Delancey St., 2nd Fl.
New York, NY 10002
www.worthrises.org
@worthrises

June 3, 2024

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Re: WC Docket No. 23-62 and 12-375 –** *Comment on Sixth Notice of Proposed Rulemaking*

Dear Commissioners and Staff:

Worth Rises applauds the Federal Communications Commission's (the "Commission") continued efforts to regulate the prison telecom industry and protect incarcerated people and their families from predatory Incarcerated People's Communications Services (IPCS) rates.

As the Commission nears the statutory window provided by the Martha Wright-Reed Just and Reasonable Communications Act (the "Act") to promulgate new rules and rates to protect IPCS consumers, it is important to remember the legacy of the law's namesake. Martha Wright-Reed was a loving grandmother and tireless advocate. She spent almost two decades making regular calls to her incarcerated grandson, often spending more than $1 per minute on phone calls and advocating for others suffering similarly. We are grateful for the Commission's efforts in pursuit of the dream of Martha Wright-Reed.

We submit this comment to supplement the record with new research, inclusive of new contracting practices by IPCS providers. This comment supplements the record with responses to various questions posed by the Commission related to safety and security measures, the used and useful standard, commissions, and the implementation timeline for future rates.

**I. Most safety and security services are demonstrably not necessary for the provision of IPCS**.

The Commission may include safety and security measures in IPCS rates only if those measures are "necessary" for the provision of IPCS.[1] To determine whether such measures are necessary for the provision of IPCS, the Commission must determine whether they are required or indispensable to the provision of IPCS services. *GTL Serv. Corp. v. FCC*, 205 F.3d 416, 422-24 (D.C. Cir. 2000). For a measure to be required or indispensable, it must be at least directly

---

[1] Martha Wright-Reed Act § 3(b)(2).

related to the service. *Id.* We have previously explained that the overwhelming majority of safety and security measures are neither required for nor indispensable to the provision of IPCS—and are thus not necessary—for several reasons. Such measures are separable from IPCS and differ from one jurisdiction to another, negating their indispensability. Additionally, they have been and still are marketed independently from communication services, have a separate and distinct consumer base from IPCS ratepayers with interests at loggerheads with the interests of ratepayers, and are used to appeal to that consumer base—corrections administrators—rather than ratepayers.

### A. Safety and security services are historically separable from IPCS.

Historically, providers marketed and sold safety and security services to correctional administrators separately from communication services. The IPCS providers that dominate the correctional telecommunications market today, in most cases, got their start selling safety and security services directly to correctional agencies. At the time, in the early 1980s, there was no question that safety and security services were separate and distinct from communications services. For many years, AT&T provided communication services in prisons and jails across the country with pricing practices that mirrored those in the broader telecommunications market. Safety and security services were sold separately, directly to correctional agencies, by standalone security firms, including T-Netix, EverCom, and Global Telcoin, the predecessors to Securus and Global Tel*Link (GTL), respectively.[2] However, these security firms struggled to get correctional facilities to purchase and adopt their services.[3]

For instance, in the 1980s and 1990s, the New York City Department of Correction (NYC DOC), then the nation's largest jailer, did not conduct universal call monitoring.[4] Call monitoring was not a priority for the NYC DOC as it focused on managing its exploding population, which peaked at roughly 21,000 in 1991.[5] The NYC DOC's lack of appetite for safety and security services was mirrored by agencies throughout the country, and the security firms providing these services struggled to grow their businesses.

Things changed in 1984 when the Commission forced the breakup of the AT&T monopoly, allowing new providers to enter the telecommunications market.[6] The struggling security firms

---

[2] Steven Jackson, *Ex-Communication: Competition and Collusion in the U.S. Prison Telephone Industry*, Critical Studies in Media Communication 268–279 (2005), https://sjackson.infosci.cornell.edu/Jackson_CompetitionandCollusioninPrisonPhoneIndustry(CSMC2005).pdf.

[3] Steven Jackson, *Mapping the Prison Telephone Industry*, Prison Profiteers: Who Makes Money from Mass Incarceration 236–238 (2008) https://ecfsapi.fcc.gov/file/6519871941.pdf.

[4] Elizabeth Vasquez, *Dismantle NYC's Mass Surveillance Project: Start With Jail Recordings*, TruthOut (Jun. 1, 2021), https://truthout.org/articles/dismantle-nycs-mass-surveillance-project-start-with-jail-recordings/.

[5] Tracy L. Snell, *Correctional Populations in the United States, 1991*, Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice (1993), https://www.ojp.gov/pdffiles1/bjs/142729.pdf.

[6] *See supra* note 2.

quickly began providing communications services to their correctional customers and used their safety and security services to carve out this niche micro-market for themselves. They layered their safety and security services on top of their new communications services and shifted the cost of these services onto IPCS consumers. Moreover, they offered to share the revenue with the agencies through site commissions. Cash-strapped correctional agencies welcomed the "free" safety and security services and the new revenue source. Soon after, the corrections landscape saw the widespread adoption of an increasing array of safety and security services, with IPCS consumers bearing the costs.

### B. Safety and security services are optional for the provision of IPCS.

While the history of the industry demonstrates that the provision of safety and security services are separable, an examination of current industry contracting practices shows that safety and security services are optional and by definition not necessary for the provision of IPCS. In our initial comment, we provided two price lists, one from a GTL contract with New Jersey[7] and another from a GTL (d/b/a Public Communication Services) contract with Michigan.[8] Both price lists highlighted "optional services" or "optional security features" such as DataIQ,[9] Voice Biometrics, Word Search, InTimeLabor Management, and funding for additional investigators. We argued that these services are neither directly related to, nor necessary for the provision of, IPCS and should therefore be excluded from rates.

We provide below a limited survey of Securus contracts, with a focus on three contracts executed with local governments since 2023 and one contract executed with a local government in 2014.[10] We note that among the four contracts outlined below, New York City,[11] Bristol County, Massachusetts, and Worcester County, Massachusetts have all adopted agency-paid models where the correctional agency pays for the cost of communications. Under the Commission's rules, the term "consumer" refers to the party paying for IPCS, and thus when agencies are IPCS ratepayers they must be treated as consumers. Further, this does not change the analysis as the cost-basis for a service does not change based on who the consumer is that pays for the services.

These contracts demonstrate how providers manipulate IPCS rates by including optional services in the basic IPCS rates of some contracts, while offering them as optional add-ons in other

---

[7] Appendix A.

[8] Appendix B.

[9] Mitch Volkart, *GTL Data IQ: A Unique Security Aid*, GTL (Feb/ 15, 2018), https://www.gtl.net/gtl-dataiq-a-unique-security-aid/ ("Data IQ can ingest any data source…and present the information in either a table or link diagram view that is easily customized by investigators.")

[10] Appendix C.

[11] Appendix D.

contracts. For example, the New York City,[12] Bristol County,[13] and Worcester County[14] bundle THREADS, whereas Jefferson County includes a separate rate for this service. Furthermore, some contracts bundle services within IPCS rates and other contracts do not offer those same services at all. For example, the Digital Mail Center—which is bundled within IPCS rates in the New York City contract—is not offered in the other three exemplar contracts. Finally, some services are charged per minute in some contracts and not in other contracts. For example, the GEX Offender Communications Monitoring service is paid for through an additional $0.02 increase to the phone rate in Bristol County and Worcester County but the NYC DOC pays Securus an hourly rate for the same service.

**Survey of Securus Contracting Practices**

|  | **New York City, NY (2023)** | **Bristol County, MA (2024)** | **Worcester County, MA (2023)** | **Jefferson County, MO (2014)** |
|---|---|---|---|---|
| THREADS | Bundled | Bundled | Bundled | $0.25/call |
| Digital Mail Center | Bundled | N/A | N/A | N/A |
| Word Alert Service | $0.005/min | Bundled | Bundled | N/A |
| GEX Offender Communications Monitoring | Securus sells the service at an hourly rate | $0.02/min | $0.02/min | N/A |
| ICER | N/A | Bundled | Bundled | N/A |
| Investigator Pro (IPRO)/Continuous Voice Verification (CVV) | N/A | Bundled | Bundled | $0.02/min |

***C. Pending litigation challenging—and impending legislation restricting—correctional communication surveillance is calling the "necessity" of surveillance measures further into question.***

Surveillance is not a safety and security measure that is required or indispensable to the provision of IPCS—and is therefore not "necessary"—for two primary reasons. First, surveillance is not a "safety and security" measure. As we previously stated, the plain meaning

---

[12] Appendix D.
[13] Appendix E.
[14] Appendix F.

of neither "safety" nor "security" includes surveillance.[15] Second, surveillance does not center on enhancing safety or improving security in the custodial setting. Jail and prison officials use surveillance primarily to aid law enforcement and prosecutors and harm incarcerated people and their loved ones.

A recently filed class action complaint illustrates this phenomenon. On April 15, 2024, a group of New York City public defense organizations, alongside Cleary Gottlieb Steen & Hamilton, filed a state court class action complaint challenging and seeking to enjoin NYC DOC's massive surveillance operation in the New York City jails.[16] In their petition, Plaintiffs refute NYC DOC's representations that its surveillance operations "enable jail and prison officials to identify potential sources of contraband and safety risks within the jails."[17] In reality, the New York City jail system has leveraged generalized fears of contraband to "replace simple phone service with a mass community surveillance system . . . [that] extends beyond call-related data collection to also collect additional personal data from community members who are connected to people in custody, including information like financial details and home addresses."[18] This surveillance system has been utilized "almost exclusively by prosecutors to prosecute the criminal cases for which people are held in pre-trial detention, rather than by DOC to promote safety in the jails."[19] NYC DOC's surveillance system is so wide in scope that it "cannot be called a jail safety tool."[20] In response to an open records request, "DOC was unable to provide any data or records about instances in which listening to the calls of people in custody led to the interception of contraband, the disruption of smuggling networks, or the prevention of threatened violence within DOC facilities."[21] And despite NYC DOC's widespread jail surveillance dragnet, the New York City jail system is more violent and deadly than ever.[22]

These facts underscore that even if surveillance constituted a "safety and security" measure, it is obviously not "necessary" for the provision of IPCS services. Again, in this context, "necessary"

---

[15] Comments on Notice of Proposed Rulemaking of Worth Rises, WC Docket Nos. 23-62 and 12-375 at § 1(B) (May 8, 2023).

[16] Appendix G, Verified Petition, *Matter of Marcus Reid v. New York City Department of Correction*, No. 806245/2024E (Sup. Ct., Bronx Cnty. 2024) (hereinafter "Reid Petition").

[17] *Id.* at ¶ 161.

[18] *Id.* at ¶ 162.

[19] *Id.* at ¶ 165.

[20] *Id.* at ¶ 163.

[21] *Id.* at ¶ 169.

[22] *See* Status Report by the Nunez Independent Monitor, *Nunez v. City of New York*, No. 11-CV-5845-LTS (S.D.N.Y. Apr. 18, 2024) at 1 ("The jails remain dangerous and unsafe, characterized by a pervasive, imminent risk of harm to both people in custody and staff. This risk of harm is caused by pervasive dysfunction in the jails' management resulting from polycentric and interdependent issues including, but not limited to, a broad failure to utilize sound correctional security practices for even the most basic tasks, limited staff supervision and poor-quality guidance, and a persistent failure to identify misconduct and to apply appropriate accountability. These failures perpetuate a toxic culture and a system in which none of the component parts work well or together. As a result, violence and a persistent pattern and practice of the use of unnecessary and excessive force remain evident in the system.").

means required or indispensable to the provision of IPCS. As illustrated in the *Reid* complaint, surveillance operations functionally undermine the provision of IPCS by dissuading incarcerated people and their loved ones from utilizing communications services. Loved ones and family members of incarcerated people are chilled by the City's dragnet and often avoid substantive communication with incarcerated people due to fear of being surveilled.[23] Attorneys have decided not to speak freely with their clients over the telephone due to concerns that NYC DOC and Securus will monitor their calls.[24] Incarcerated people have likewise avoided calling their lawyers for similar reasons.[25] These fears are not unfounded. While it is illegal to record attorney-client calls and the NYC DOC has represented that it does not surveil such communications, it has regularly done so through its surveillance apparatus.[26] Oversight agencies have audited and confirmed it, and NYC DOC has steadfastly failed to correct such practices.[27] This dynamic undermines the Commission's stated goal of ensuring that IPCS ratepayers have as much access as possible to communications services.[28] The inclusion of surveillance in IPCS discourages the use of IPCS and the inclusion of their costs in rates make IPCS cost-prohibitive. Surveillance is therefore far from "necessary" for the provision of IPCS—it is anathema to it.

The New York City Council has recognized that surveillance is anathema to the provision of IPCS services. On the heels of the *Reid* filing, the Council is set to consider sweeping legislation that would prohibit the universal call surveillance of jail communication services and require the same privacy protections on communications afforded all City residents. This pending legislation is a powerful rebuke of Securus' surveillance practices in both New York City and other jurisdictions, and of similar practices by other providers. Impending legislative change is yet a further indication that the Commission must not determine surveillance to be a "necessary" component of IPCS services and must not include the cost of surveillance in IPCS rates.

## II. Pending litigation and legislation shows that surveillance features are not "used and useful" to consumers.

Traditionally, the Commission has interpreted "necessary" as essentially synonymous with "used and useful."[29] We have contested this reading, insisting that the definition of "necessary" is narrower than the definition of "used and useful."[30] We have advocated that the Commission apply the used and useful standard to safety and security measures only after it determines that such measures are necessary. Even if the Commission rejects this interpretation and instead

---

[23] Reid Petition at ¶¶ 150-58.
[24] *Id.* at ¶ 136-37.
[25] *Id.* at ¶¶ 138, 144-45.
[26] *Id.* at ¶ 67-92.
[27] *Id.* at ¶¶ 95-114
[28] *Rates for Interstate Inmate Calling Services, Order on Reconsideration*, WC Docket No. 12-375. 31 FCC Rcd 9300 (2016), at ¶ 10.
[29] *See supra* note 17 at § I(C).
[30] *Id.*

interprets these terms conterminously, however, surveillance measures are not "used and useful" to IPCS ratepayers.

The *Reid* complaint illustrates this point that surveillance measures are neither used by, nor useful to, the ratepayer—here, incarcerated people and their loved ones. The *Reid* petitioners explain that NYC DOC and Securus use surveillance to "target[] communities far outside the walls of its jails," rather than protect and advance the interests of incarcerated people and their loved ones.[31] NYC DOC leverages two of Securus' most advanced system features—voiceprint and THREADS—to accomplish this goal, amassing data on incarcerated people, their networks, and their support systems.[32] We have previously specified why these features—and similar features—do not meet the used and useful standard.[33] The *Reid* complaint takes this analysis a step further, exemplifying how these surveillance measures expose the private lives of incarcerated people and their loved ones. Because they are neither necessary for the provision of IPCS nor used and useful to incarcerated people and their loved ones, the Commission must not consider the cost of surveillance measures when promulgating just and reasonable rates under section 201(b).

### III. Non-investigative safety and security measures that are directly related to the provision of IPCS may warrant inclusion in rates though not necessary or used and useful.

In prior comments, we have argued that the only safety and security measures directly related to the provision of IPCS—and thus the only safety and security features the Commission should include in rates—are those required for compliance with the Communications Assistance for Law Enforcement Act (CALEA).[34] Because IPCS providers must implement those measures to comply with federal law, they are by extension "necessary."[35]

One other very limited category of safety and security measures that is directly related to the provision of IPCS may be fairly included in rates even though it is not strictly necessary for the provision of IPCS or used and useful to ratepayers: *non-investigative* safety and security features. Unlike investigative surveillance measures, which are primarily designed to aid in law enforcement and prosecution, invasive to consumer privacy, and rarely prevent unlawful behavior, non-investigative safety and security measures are designed to *prevent* prohibited behavior *directly related* to the *instantaneous* use of IPCS.

The clearest example of such features is call blocking, which can prevent unwanted contact from a person who is incarcerated. A feature like this is activated at the moment of the call, prevents a

---

[31] Reid Petition at ¶ 21.
[32] *Id.* at ¶¶ 38-46.
[33] *See supra* note 2 at § II.
[34] *See supra* note 17 at § 1(D).
[35] *Id.*

contemporaneous specific instance of unwanted behavior, does not invade the consumer's privacy, and does not collect their data or spur future punitive action against them. While not necessary to the provision of IPCS, or used and useful to consumers per se, the impact of their inclusion in IPCS rates is unlikely to trigger the major concerns we have raised around other safety and security or surveillance measures. While we continue to recommend their exclusion from IPCS rates, we make a distinction around this category of measures in the event the Commission is inclined to include an expanded number of safety and security measures.

## IV. Value-add or optional services are a form of in-kind commission when bundled with IPCS rates.

The Commission has rightly expressed skepticism regarding commissions and questioned whether the compensation provided to correctional facilities is directly related to the provision of IPCS. The Commission should be similarly skeptical of value-add or optional services serving as a work-around of rules which may limit commissions. While oftentimes these value-add or optional services are safety and security or surveillance services, they can also be human resource management systems, like InTimeLabor Management, or even iPhones provided directly to the agency in exchange for increased IPCS rates. It is critically important that the Commission recognize that value-add services as commissions, similar to the cash payments they can replace, that provide in-kind compensation to correctional facilities.

## V. The Commission should prohibit the bundling of video calling and e-messaging rates with voice calling rates.

Securus often bundles the cost of video calling and e-messaging with voice calling. In December 2023, Massachusetts enacted a law requiring correctional facilities to provide fully free communication services to incarcerated people and their loved ones. Since then, Securus has amended its contracts with correctional facilities in the state to bundle video calling and e-messaging rates with voice calling rates. Functionally, this means that when incarcerated people use video calling and e-message services, the correctional facility does not pay for each video call or e-message, but rather the voice calling rate is increased in order to compensate Securus for these additional communication services. This pricing structure has gone into effect in Bristol, Worcester, Barnstable,[36] and Franklin[37] counties in Massachusetts. This practice artificially increases the perceived cost of voice calling services and can skew data, and has been implemented in other jurisdictions that do not have agency-paid models. The Commission should prohibit this pricing scheme.

---

[36] Comments on Notice of Proposed Rulemaking of Karina Wilkinson, Coalition for Social Justice Action, New Bedford Chapter, and Prisoners' Legal Services of Massachusetts, WC Docket Nos. 23-62 and 12-375 at 2 (Apr. 4, 2024), https://www.fcc.gov/ecfs/search/search-filings/filing/104040723430657.

[37] Appendix G.

**VI. The Commission should adopt a 30-day transition period to implement new rates.**

In the 2021 IPCS Order, the Commission adopted a 90-day transition period.[38] Since that time, there is evidence that providers can amend their contracts very quickly, or even immediately, following a new statute or regulation.[39] There are several examples of states and counties enacting statutes that require changes to IPCS rates and commissions within 30 days. A recent state law in Massachusetts which banned site commissions and also made all communications free in all state prisons and county jails went into effect in two weeks after it was signed into law,[40] demonstrating that fundamental changes to contracts can be implemented within a short period of time. When Los Angeles made phone calls free in its jails in December 2023, it enacted its policy within 10 days.[41] Finally, in 2016, when New Jersey adopted a law enacting rate caps for state prisons and county jails and banning commissions on calls, the policy went into effect immediately.[42] There is no reason to delay relief for IPCS consumers with a prolonged transition period.

***

Again, we applaud the Commission for its continued work and attention to these issues.

Sincerely,

/s/ Stefen R. Short

Stefen R. Short
Chief Counsel

---

[38] *In re Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9623 ¶ 230 (2021).

[39] *See, e.g.*, S.1880, 217th Leg. (N.J. 2016), https://pub.njleg.gov/bills/2016/S2000/1880_I1.HTM (adopting new IPCS rates and requiring that such rates take effect immediately); *see also* Public Utilities Commission of the State of California, *Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services,* Decision 21-08-037, 60 (Aug. 23, 2021) (requiring implementation of the new IPCS rate cap within 45 days)..

[40] *See* 2023 Session Laws, H.4052, Ch. 64 (Mass. 2023), https://malegislature.gov/Laws/SessionLaws/Acts/2023/Chapter64 (providing that site commissions could no longer go to correctional facilities but must instead revert to MA's "General Fund"; signed into law by the Governor on November 15, 2023 and took effect just two weeks later, on December 1, 2023).

[41] Frank Stoltze, Board of Supervisors Approves Plan That Allows Incarcerated People in LA Jails to Make Free Phone Calls at County Expense, LAist (Nov. 21, 2023, 2:31 PM), https://laist.com/news/politics/la-jails-free-phone-calls.

[42] *See supra* note 42.

/s/ Andrew Lama

Andrew Lama
Government Affairs Specialist



MARCUS W. TRATHEN
1600 WELLS FARGO CAPITOL CENTER
150 FAYETTEVILLE STREET
RALEIGH, NC 27601

T 919.839.0300
F 919.839.0304
MTRATHEN@BROOKSPIERCE.COM

June 7, 2024

VIA ELECTRONIC FILING

Ms. Marlene H. Dortch                                   **Notice of Ex Parte Presentation**
Federal Communications Commission
Office of the Secretary
45 L Street NE
Washington, DC 20554

> Re:   *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services, WC Docket Nos. 23-62, 12-375*

Dear Ms. Dortch:

On behalf of Pay Tel Communications, Inc. ("Pay Tel"), I am enclosing an *ex parte* presentation titled "Report of Don J. Wood, MBA, CVA, MAFF, on behalf of Pay Tel Communications, Inc." This report describes and provides expert analysis of a recent data collection effort undertaken by Pay Tel to provide an estimate of the Safety and Security costs incurred by confinement facilities that are specifically caused by making IPCS available at that facility. Specifically, Mr. Wood demonstrates that it is possible to collect meaningful data on costs incurred by facilities and concludes that these data support the establishment of an explicit rate additive, separate from and above costs demonstrated by IPCS providers.

Should any questions arise in connection with this filing, please do not hesitate to contact this office.

Respectfully submitted,

Marcus W. Trathen
Counsel to Pay Tel Communications, Inc.

JA1276

*Ex Parte* Presentation

\* \* \*

## Report of Don J. Wood, MBA, CVA, MAFF

## on behalf of Pay Tel Communications, Inc.

**WC Docket No. 12-375**
**WC Docket No. 23-62**

**June 7, 2024**

Purpose..................................................................................................................2

Objectives .............................................................................................................3

Methodology.........................................................................................................4

Data Collected......................................................................................................5

Conclusions..........................................................................................................6

**Data Collected**

In this limited study,[6] Pay Tel was successful in gathering data from 30 facilities. This sample includes a geographically diverse set of jails located in eleven states (Alabama, Florida, Georgia, Maryland, North Carolina, Ohio, Pennsylvania, South Carolina, Utah, Virginia, and Washington). The facilities represent a wide range of sizes; the smallest jail reports an ADP of 25 while the largest reports an ADP of 738 (with an average of 215). The sample includes small county jails and large regional facilities.

The survey template specifically sought weekly time spent on Routine Preventative Call Monitoring, Responding to ICS System Alerts, Call Recording Review, Investigate Potential PIN Theft, Enrolling Inmates for Voice Biometrics, and Blocking and Unblocking of Numbers. The template also includes options for facilities to enter time for other categories of cost specifically related to making IPCS available.[7] Other categories reported include Assisting Inmates with Login ID and PIN, Assisting Inmates/Family with account issues, adding/deleting users, inspecting phones, and researching [fraud] victim information.

Total Weekly hours devoted to the collection of tasks described above ranged from a low of .09 hours/ADP to a high of .76 hours/ADP, with an average of .22 hours/ADP. In other words,

---

[6] Pay Tel's effort was inherently limited in scope, because it has direct relationships only with the confinement facilities that it currently serves, and, like any IPCS Provider, only has the usage data necessary to express costs on a per-MOU basis for this subset of facilities. An effort by the Commission to engage in a similar data collection effort would not be subject to these constraints.

[7] Note that the template and accompanying instructions are clear regarding the limit of these additional categories. The collection form states, in red italics, "Important: Do not include time spent by investigators researching and building a case for prior criminal activity." The instructions explicitly state that "Security hours should only include the proactive work routine monitoring and review of recordings for the purpose of maintaining facility security and preventing criminal activity. Do not include time spent by investigators researching and building a case for prior criminal activity."

5



Wood Report
*Ex Parte Presentation*
June 7, 2024
WC Docket Nos. 12-375 and 23-62

facilities reported spending an average of approximately 13 minutes per week to perform this complete collection of activities for each incarcerated person. Each facility also reported an average loaded labor rate (inclusive of benefits). The reported labor rate averaged $34.70, with rural facilities generally reporting lower rates than facilities located in metropolitan areas. Pay Tel's Third MDC reporting was used as the source of Minutes of Use for this analysis.

Based on this limited information, the average reported cost for these 30 facilities is $0.08 per MOU. The contribution of each of the sub-categories of safety and security to this total is as follows:

| | |
|---|---|
| Routine Preventative Call Monitoring | 38% |
| Responding to IPCS System Alerts | 5% |
| Call Recording Review | 28% |
| Investigate Potential PIN Theft | 8% |
| Enrolling Inmates for Voice Biometrics | 8% |
| Blocking and Unblocking of Numbers | 8% |
| Other (assistance with log-ins/PINs, assistance with account issues, researching fraud impacts on victims) | 4% |

It is likely that a more robust data set would yield data providing greater insight into costs incurred by facilities with differing characteristics.

**Conclusions**

This effort demonstrates that confinement facilities do incur actual and quantifiable costs related to safety and security costs in order to make IPCS available, and that it is possible to collect this data and to do so at a sufficient level of detail to permit evaluation of different categories of

6



JA1279

June 10, 2024

**VIA ECFS**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L St. NE
Washington, DC 20554

RE:    Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket No. 23-62; Rates for Interstate Inmate Calling Services, WC Docket No. 12-375

Dear Ms. Dortch:

Securus Technologies, LLC ("Securus") and Pay Tel Communications, Inc. ("Pay Tel") file this ex parte letter to address continuing efforts to disallow safety and security costs from IPCS rates. As set forth below, the Federal Communications Commission ("Commission") has consistently found that safety and security measures are necessary to provision incarcerated people's calling services ("IPCS") in order to detect and prevent use of calling services to commit crimes or otherwise abuse calling privileges. Appropriately, the costs for these measures have thus been included in rates. Nothing has changed since these determinations were made – safety and security measures are necessary to ensure the safe use of communications services and they act to protect users of those services, as well as the public.

*The Commission Has Repeatedly Found that Safety and Security Measures Are Necessary to the Provision of IPCS, and Nothing Has Changed to Reverse That Determination*

Although the advocates raise a number of discrete arguments to support removal of safety and security features, they fail to meaningfully address the Commission's own key finding that safety and security costs are necessary for the provision of IPCS in order to curb abuse and unlawful use of communications services. That finding is most fully articulated in the Commission's initial order setting IPCS rate caps in 2013:

> "We also are cognizant of the critical security needs of correctional facilities. For example, the U.S. Department of Justice has chronicled hundreds of criminal convictions involving the use of ICS as part of the criminal activity. Moreover, according to one commenter, a disproportionately large percentage of ICS-enabled crimes target and victimize vulnerable populations consisting of victims, witnesses, jurors, inmates, and family members of these individuals. While our actions to establish interim ICS safe harbors and rate caps prohibit the recovery of site

commission payments, we include costs associated with security features in the compensable costs recoverable in ICS rates. Security monitoring helps correctional facilities identify potential altercations; monitor inmates who the facility is concerned may be suicidal; prevent criminal activity outside of the jail; prevent violation of no-contact orders and witness tampering; and aid in the prosecution of criminal cases. Our actions in this Order take into account security needs as part of the ICS rates as well as the statutory commitment to fair compensation. Indeed, data from facilities without site commission payments, which form the basis for our interim safe harbor rates, demonstrate the feasibility of providing ICS on an on-going basis to hundreds of thousands of inmates without compromising the levels of security required by these states' correctional facilities. Our interim rate caps are based on cost studies that include the cost of advanced security features such as continuous voice biometric identification."[1]

To be clear, the Commission made express findings that safety and security costs are "reasonably and *directly related* to the provision of ICS" and are an "inherent" aspect of the service.[2] It is significant that the Commission used the term "directly related" as it echoes the holding in *GTL v. FCC* that costs "directly related to the provision of ICS" are legitimate and cannot be excluded from rates.[3] The Commission's finding that safety and security costs are necessary for the provision of IPCS was carried forward to its 2015 Order: "Specifically, we find that the following rate caps will ensure that ICS rates are just, reasonable, and fair for inmates, their families and loved ones, as well as the ICS providers, and **will incorporate the costs associated with the necessary security protocols**."[4]

---

[1] *Rates for Interstate Inmate Calling Services*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14138, ¶ 58 (2013) ("*2013 ICS Order*") (citations omitted). The Commission has consistently made similar findings. *See e.g., Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Order on Remand & Notice of Proposed Rulemaking, 17 FCC Rcd 3248, 3252, ¶ 9 *(2002)*:

> "[P]rison security rules typically require [] a special automated voice-processing system . . . in order to provide prison authorities with the ability to screen calls . . . . [I]nmate calling services employ numerous blocking mechanisms to prevent inmates from making direct-dialed calls, access code calls, 800/900 calls, and calls to certain individuals like judges or witnesses … [C]onfinement facilities also require that phones be monitored for frequent calls to the same number, a sign of possible criminal activity or a scheme to evade calling restrictions via call forwarding or three-way calling … and require periodic voice-overlays that identify a call as being placed from a confinement facility, as well as listening and recording capabilities for all calls. Finally, inmate calling systems generally must provide detailed, customized reports for confinement facility officials."

[2] *2013 ICS Order*, ¶ 53 (emphasis added). *See also id.* at n. 196 ("Security features *inherent* in the ICS providers' network would also likely constitute recoverable costs," for example, "recording and screening calls;" "blocking mechanisms" to prevent calls to prohibited parties; "biometric caller verification;" "sophisticated tracking tools for law enforcement;" and storage of recordings.) (emphasis added); *id.* at n. 255 ("For example, prepaid calling cards do not include additional security features typically *needed* for ICS.") (emphasis added).

[3] *Global Tel*Link v. FCC,* 866 F.3d 397, 414 (D.C. Cir. 2017) ("*GTL v. FCC*").

[4] *Rates for Interstate Inmate Calling Services*, Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763 (2015), ¶ 48 ("*2015 ICS Order*") (emphasis added). *See also id.* ¶ 21 ("We therefore act, pursuant to our statutory authority, to ensure that ICS rates comply with the

The record contains not a shred of evidence that the Commission's underlying factual determinations regarding the necessity of safety and security measures for the provision of IPCS have changed. Securus has placed in the record the findings of a number of different entities that confirm the harms that unmonitored communications from carceral setting entail.[5] Pay Tel has placed into the record documentation of how incarcerated people's calling services evolved, with guidance from industry experts, to respond to growing instances of fraud and abuse that were plaguing the industry.[6] Law enforcement authorities have confirmed, and continue to confirm, that some incarcerated people use communications services to commit crimes or to abuse communications services.[7] These concerns in fact animate the efforts by Congress and the Commission to preclude access to contraband cell phones.[8] As stated by the Commission: "For decades, wireless devices, including cell phones, have been smuggled into correctional facilities nationwide. In some cases, incarcerated people use these devices to engage in a variety of criminal activities posing serious threats to officials, incarcerated people within the facility, and innocent members of the public."[9] Just recently, Georgia's attorney general wrote to Chairwoman Rosenworcel regarding the continued use of contraband cell phones "to plan and orchestrate violent attacks and other criminal activity," citing examples including a gang leader in North Carolina that was able to order a kidnapping of a prosecutor's father via a cell phone in prison and an incarcerated person using a contraband cell phone to "order a hit which resulted in

---

Communications Act, while balancing the *unique security needs related to providing telecommunications service* in correctional institutions and ensuring that ICS providers receive fair compensation and a reasonable return on investment.") (emphasis added).

[5] *See* Reply Comments of Securus Technologies at 21-22, (July 12, 2023).

[6] *See* Reply Comments of Pay Tel Communications, Inc. at 6-10 (July 12, 2023) (discussion of work of the Telecommunications Fraud Prevention Committee and Alliance for Telecommunications Industry Solutions).

[7] *See, e.g.,* Reply Comments of the National Sheriffs' Association (NSA) at 12, (July 12, 2023) ("NSA demonstrated in its initial comments that, absent safety and security measures, incarcerated persons use IPCS to engage in criminal activity that is a serious threat to the safety of facility employees, other incarcerated persons, and the general public."); Letter from Michele Lewis, Legislative Committee Member, Virginia Association of Regional Jails to Marlene H. Dortch, Secretary of the FCC, WC Docket No. 23-62 (May 29, 2024) ("primary cost associated with inmate phone services is all the costs necessary to insure public safety. This would include all efforts needed to interdict continuing criminal enterprise, prosecute criminal acts and maintain the safety, security and good order of the institution through phone call monitoring, recording, pattern analysis and provision to law enforcement and the courts.")

[8] *See Promoting Technological Solutions to Combat Contraband Wireless Device Use in Correctional Facilities*, Second Report and Order and Second Further Notice of Proposed Rulemaking, GN Docket No. 13-111, FCC 21-82, para. 3 (2021) (stating that contraband cell phones can be used to "engage in a variety of criminal activities posing serious threats to officials and incarcerated people within the facility and innocent members of the public.") *See also* Matthew Ormseth, *Contraband cellphones, coded messages help Mexican Mafia operate in California prisons,* Los Angeles Times (Jan. 30, 2023) (describing how four members of the "Mexican Mafia" held in prisons throughout the state joined a cell phone conversation to plot the murder of another inmate). Security measures used for ICS calls carefully monitor and seek to prevent conversations between or among incarcerated persons held in different facilities precisely to avoid this type of communication.

[9] *See* FCC: Contraband Wireless Devices https://www.fcc.gov/wireless/bureau-divisions/mobility-division/contraband-wireless-devices.

3

**JA1282**

the death of an 88-year-old Georgia veteran."[10]  To understand what the world of unmonitored and unfettered access to communications would look like, one need look no further than the use of contraband cell phones.

Real world examples of the necessity of safety and security features in making communications services available to incarcerated individuals are replete:

**Herald, Georgia**:[11] "While all suspects in the Pilot truck stop homicide are now in custody, that hasn't stopped some of them from potentially harming those on the outside, investigators said. . . . Earlier in February, investigators monitoring jail phone calls discovered several suspects involved in the murder case were attempting to harm a potential witness for the District Attorney's office. . . . Investigators were able to contact the witness and inform them of the potential plot and advised them to be vigilant about going to work.  They also advised the witness to stay with a friend, if possible."

**Suffolk County, New York**:[12] "The inmate threatened to kill the judge and prosecutor in his case after his release from prison.  'If I got to stay longer than November … I'm killing them all when I get out … and I mean it!' the inmate said on the call, according to a partial transcript provided to ABC News by LEO Technologies officials."

**Jefferson County, Alabama**:[13]  "[A]uthorities discovered that an inmate was running a prostitution ring from prison after he complained on a phone call that a sex trafficking victim was too far away to control.  Police went to the Alabama hotel where the victim was being sent and arrested her handler."

**St. Paul, Minnesota**: [14]  "A suspect who was arrested for allegedly hitting and slapping his girlfriend instructs her from jail, 'Call up that prosecutor and tell him I ain't f------ do s---, man.  Tell them we weren't even with each other or something.  You were just mad because you thought I was with some other girl or something.'  On the phone, his girlfriend says she's already talked to the prosecutor.  Her boyfriend continues, "I know you told them you don't want to press charges, but the state will so tell them I wasn't doing nothing.  You got to call and tell him that,

---

[10] Letter from Christopher M. Carr, Attorney General, Georgia, to Chairwoman Jessica Rosenworcel, June 4, 2024, available at Carr Calls for Federal Action to Combat Contraband Cell Phones in Prisons and Jails | Office of the Attorney General (georgia.gov).

[11] The Newnan Times-Herald, Suspected 'hit job' intercepted in Pilot murder investigation (Updated Mar. 13, 2023), https://www.times-herald.com/news/local/suspected-hit-job-intercepted-in-pilot-murder-investigation/article_2ea6f89a-1fc6-5720-b910-8a3f859331ca.html.

[12] Debra Cassens Weiss, Prisons use artificial intelligence to monitor inmate phone calls, ABA Journal (Oct. 25, 2019), https://www.abajournal.com/news/article/prisons-and-jails-use-artificial-intelligence-to-monitor-inmate-phone-calls.

[13] *Id.*

[14] Sasha Aslanian, Calls from jail shed light on intimate crime, MPRnews (Mar. 2, 2011), https://www.mprnews.org/story/2011/03/02/domestic-violence-jail-phone-calls.

baby!' 'Tell them that I just made everything up?' asks his girlfriend. 'Yes!' the suspect responds. 'You gotta look stupid, otherwise, I'm going to go to jail for a year!' . . . [T]he phone call itself is a crime. It violated a no-contact order between the suspect and the victim, which can be charged separately, and it provided evidence for the ongoing case."

**Moniteau County, Missouri**:[15] "[A]n example of a crime that was prevented in its tracks. . . . [Police were] tipped off by a call from a Missouri DOC investigator saying that Securus had been monitoring calls about a drug drop at Tipton Correctional Center. [Securus's] 'Guarded Exchange had latched on to a series of calls from Bull that she was going to attempt to deliver on February 15, 2019 . . . .' Thanks to the tip, DOC investigators were waiting for the suspect's arrival on that date, inside the facility. . . 'This case would've never been caught before our use of Securus' Guarded Exchange . . . .'"

The Commission's findings that safety and security are necessary and examples such as those described above informs the directive of the Martha Wright-Reed Act ("MWR Act") that the Commission "shall consider costs associated with any safety and security measures necessary to provide" telephone and advanced communications services when developing rates.[16] Congress is presumed to know that the Commission has already determined that a long, defined list of safety and security measures are necessary to the provision of ICS.[17] The MWR Act's directive that the Commission "shall consider" such costs when developing rates is not an open ended invitation to consider and reject its previous findings. Rather, in historical context, the MWR Act is best interpreted as mandating continued incorporation in rates of the safety and security measures the Commission has repeatedly found necessary for the provision of IPCS.

Even if the MWR Act did provide the Commission the discretion to reverse its previous findings regarding the necessity of safety and security measures, the Commission faces an uphill battle. Although an agency need not *always* demonstrate that the reasons for a changed policy are better than the reasons for the original policy, "[s]ometimes it must – when, for example, its new policy rests upon factual findings that contradict those which underly its previous policy; or when its prior policy has engendered serious reliance interests that must be taken into account."[18]

As noted above, the factual predicate for the Commission's finding that safety and security measures must be incorporated into rates is that they "help[] correctional facilities identify potential altercations; monitor inmates who the facility is concerned may be suicidal;

---

[15] Securus Technologies, Case Study (last accessed May 22, 2024), https://securustechnologies.tech/guarded-exchange-prevented-a-crime-in-its-tracks/.
[16] MWR Act § 3(b)(2). Worth Rises argues that the phrase "shall consider" provides the Commission with leeway to exclude from rates even those safety and security costs it finds necessary to the provision of IPCS. *See* Comments of Worth Rises, at 2 (May 8, 2023). The argument is without merit. A Commission finding that a cost was necessary in the provision of a service but nevertheless is not recoverable in rates would be arbitrary and capricious. *See GTL v. FCC,* 866 F.3d at 414 (costs "directly related to the provision" of ICS are recoverable).
[17] *See Cannon v. University of Chicago*, 441 U.S. 677, 697-98 (1979).
[18] *FCC v. Fox Television Stations, Inc*, 556 U.S. 502, 515 (2009).

5

**JA1284**

prevent criminal activity outside of the jail; prevent violation of no-contact orders and witness tampering; and aid in the prosecution of criminal cases." The Commission will be hard pressed to identify anything in the record to justify a reversal of these previously found facts. Moreover, the inclusion of safety and security costs has engendered "serious reliance interests" not just by IPCS providers but by correctional authorities that have come to rely on IPCS providers to provide the safety and security functionalities required to safely offer communications services in carceral settings.

Both IPCS providers and their government customers have entered into contracts setting rates upon the expectation that those rates will cover the costs of necessary safety and security measures. By specifying the delivery of communications service that can safely be deployed in carceral settings on agreed-upon terms and conditions, the IPCS industry has, with considerable expenditure of effort and resources, developed systems to respond to these articulated needs and specifications. Attached as Exhibit A is an illustrative summary of various requirements of facility RFPs setting expectations for the provision of calling services. Because it is a primary obligation of confinement facilities to operate their facilities in a manner which ensures public safety, facilities typically specify detailed requirements and specifications relating to safety and security when seeking to implement IPCS. These include features that are not required for residential or other commercial communications services.

The entire IPCS industry evolved based on this essential predicate which heretofore has gone unchallenged: that IPCS is a specialized service provided in a highly-individualized marketplace requiring custom solutions. The corollary to this understanding, of course, has been an expectation that providers would be permitted to recover their costs of developing solutions for this specialized service. *Fox Television* thus requires that the Commission proffer a "more detailed justification" for reversing its previous finding that safety and security measures are necessary to provision IPCS.[19]

Advocates nowhere dispute that IPCS can be and sometimes is used to further criminal activity. Nor do they dispute that, in the absence of the safety and security controls developed by the IPCS industry, IPCS would be used for a variety of harmful, illicit, and criminal activities inflicted upon other incarcerated persons and the public: the record in these proceedings is littered with examples of this sort of activity, attested to by persons with first-hand knowledge of these risks, including law enforcement officials and providers. They claim instead that this is not the Commission's concern, despite the furtherance of public safety being central to the Commission's duties.[20] The Commission's protection of rate payers does not only entail price regulation, the Commission also has an obligation to protect the safety of ratepayers, which is exactly what safety and security measures accomplish. Indeed, the Commission emphasized the need to protect public safety as a key rationale for classifying broadband service as a Title II service.[21]

---

[19] *Id.*

[20] *See* 47 U.S.C. § 151.

[21] *In re Matter of Safeguarding and Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket Nos. 23-320 & 17-108, FCC 24-52 at ¶¶ 51-52 (released May 7, 2024).

Some commenters argue that the Commission's previous findings were inadequately supported or analyzed.[22]  This assertion is grossly inaccurate and disregards the extensive commentary developed in these proceedings by the parties over decades of regulatory oversight and it minimizes the Commission's consistent determinations that calling services from carceral settings are different than standard commercial offerings due to security needs.  The determinations were grounded in the record developed in the Commission's long-running IPCS proceedings based on comments from a range of law enforcement officials with specific expertise in maintaining the safety and security of correctional facilities, the incarcerated population, their friends and families, and the public at large.  The Commission's finding regarding the necessity of safety and security measures has been amply supported.

Ignoring the use of communications services to further criminal activity, commenters urging removal of safety and security costs offer unconvincing theories, *not facts*, to justify a reversal of Commission policy.  Their arguments are readily rebuttable, as discussed below.

*Commenters Propose an Unreasonably Narrow Definition of Necessary*

Advocates proffer an unreasonably restrictive definition and application of the term "necessary."[23]  Citing *GTE Service Corp. v. FCC*, commenters argue that the term "necessary" is limited to that which is "required [or indispensable] to achieve a desired goal."[24]  In *Cellular Telecommunications & Internet Ass'n v. FCC*, the D.C. Circuit subsequently found that this narrow interpretation of "necessary" does not apply in all statutory contexts and that a measure may be "required to achieve a desired" goal but not be indispensable in the sense that other alternatives could also achieve the desired result.[25]  The Court found reasonable the Commission's interpretation of "necessary" as "referring to the existence of a strong connection between what the agency has done by way of regulation and what the agency permissibly sought to achieve with the disputed regulation."[26]

---

[22] *See* Ex Parte Letter from Gregory Capobianco, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, at 5 (April 15, 2024).

[23] *See e.g.,* Comments of Wright Petitioners et al at 23-24 (May 8, 2023); Opening Comments of Stephen Raher at 15-16 (May 8, 2023); Comments of Electronic Privacy Information Center (EPIC) at 3 (May 8, 2023); Comments of the Leadership Conference at 3 (July 12, 2023).

[24] *See* Comments of Worth Rises at 3 (May 8, 2023), quoting *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422-423 (D.C. Cir. 2000).  Worth Rises goes so far as to argue that even costs found necessary to provision IPCS need not be included if found to be not used and useful to ratepayers.  Worth Rises also argues that there is a meaningful distinction between the terms "security and surveillance," which the Commission has sometimes used, and "safety and security," and that the surveillance costs should be excluded as beyond the scope of the MWR Act. *See id.* at 2-3.  The distinction Worth Rises seeks to draw does not exist.  The Commission has identified as necessary "security" measures functions such as monitoring calls that falls within the rubric of "surveillance."  Moreover, as pointed out by NSA, Worth Rises inconsistently argues that surveillance is not a safety and security measure while simultaneously claiming that CALEA, a surveillance tool, is a necessary safety and security measure. *See* Reply Comments of NSA at 7-9 (July 12, 2023).

[25] *Cellular Telecommunications & Internet Ass'n v. FCC*, 330 F.3d 502, 510-512 ("Context is relevant to the interpretation of the term 'necessary.'") (*CTIA v. FCC*).

[26] 330 F.3d at 512 (upholding the Commission's determination that number portability was "necessary," but not indispensable, to protecting consumers.)

7

**JA1286**

The broader construction under *CTIA v. FCC* is reasonable in the context of the MWR Act. First, there is no legislative history suggesting that Congress intended section 3(b)(2) as a limitation on the Commission's ratemaking authority. Rather, the context of the MWR Act would suggest the opposite: that Congress intended to *ensure* that the Commission appropriately considered safety and security costs and needs in the context of ratemaking, not that it intended to enunciate a rate setting limitation. Second, just as the court in *CTIA v. FCC* found it impossible to conclude that any particular regulation is indispensable in protecting consumers, no particular security measure may be deemed indispensable to prevent fraud or abuse because another measure may also suffice.[27] Such measures may nevertheless be necessary and the development of the IPCS industry displays exactly this sort of iterative technology development—a "persistent arms race between new fraud technology and new anti-fraud security measures."[28].

We do not disagree that the term "necessary" must be defined in the context of achieving a desired goal but we do disagree with commenters who claim that the goal is limited to the technology needed to complete a call. Instead, in the context of determining necessary safety and security measures, the goal is to ensure that IPCS services are not being used to commit crimes or otherwise abuse available communications services and any consideration of "necessary" has to be viewed in that context.

Worth Rises grossly mischaracterizes Securus' position on this issue. It claims, wrongly, that Securus states that the goal of regulating IPCS is to prevent crime. Worth Rises inserts its own bracketed language into a Securus statement in a way that is entirely misleading. Worth Rises states: "Securus defines 'necessary' in the context of ratemaking as 'that which is required to achieve a desired goal,' and claims that "the goal [of regulating IPCS] is to prevent communications services from being used to commit or facilitate potential crimes, fraud, or other abuses."[29] Worth Rises bracketed insertion completely changes Securus' actual statement. Securus did not say the goal of regulating IPCS is to prevent fraud and crime. It said that the goal of *safety and security measures* "is to prevent communications services from being used to commit or facilitate potential crimes, fraud, or other abuses." The prevention of those abuses renders safety and security measures necessary to the provision of IPCS.

---

[27] 330 F.3d at 510 (providing the example that different solutions may be used to address water problems undermining a foundation, each can be considered necessary but none indispensable.) Similarly, different solutions may be deployed to monitor calls for unlawful activity, for example electronic monitoring or stationing a guard nearby to listen in. Neither may be indispensable since either could suffice, but both should be considered necessary to achieve of goal of preventing unlawful activity during phone calls.

[28] Reply Comments of Pay Tel Communications, Inc. at 9 (July 12, 2023).

[29] *See* Reply Comments of Worth Rises at 1 (July 12, 2023).

8

*Claims That Safety and Security Are Not Necessary Are Without Merit*

Commenters make several unavailing arguments that purport to show that safety and security measures are not necessary, as they define the term.  First, Worth Rises argues that safety and security measures historically were not used or wanted by correctional authorities.[30]  Securus thoroughly refuted Worth Rises' inaccurate historical narrative.  It cited a comprehensive 1997 report by the Joint Legislative Audit and Review Commission of the Virginia Legislature (JLARC) which canvassed a number of state correctional agencies to assess the state of security measures associated with "inmate telephone service" or ITS.[31]  The report noted that because early carceral telephone systems, from the 1970s, "contained no security features, the direct access of inmates to phones opened new avenues for inmates to call and harass individuals" including judges, witnesses and victims, as well as committing fraud.[32]  Advances in monitoring technologies – the very technology that some commenters decry – enabled more frequent calling, reduced correctional staff resource, all while reducing the incidence of unlawful activity.  That the earliest systems did not have automated security features does not mean they are not necessary – they simply did not exist.  Once they became available, correctional authorities adopted them.  The JLARC report noted that the Virginia DOC required the phone system to contain security features to counter illegal use and noted that "that an inmate telephone system would not exist if it did not possess these security features."[33]

Commenters also claim that not all safety and security features are adopted universally and some measures are provided as separate options with separate charges, indicating that they are not necessary for the provision of IPCS.  Differences in the suite of safety and security measures facilities use do not render them unnecessary.[34]  As demonstrated extensively through this record, there are many factors that can lead to discrepancies in safety costs depending on the type of facility serviced.  For example, a maximum security prison may have different safety and security requirements than a juvenile detention facility.[35]  That safety and security requirements

---

[30] Comments of Worth Rising at 2-3 (Sept. 27, 2021) (the New York City Department of Corrections' "lack of appetite for security and surveillance services was mirrored by agencies throughout the country" in the 1980s and 1990s.).

[31] Reply Comments of Securus at 36 (December 17, 2021) The JLARC report is available here: https://jlarc.virginia.gov/pdfs/reports/Rpt199.pdf

[32] JLARC at 3. The report noted that because the telephone systems "lacked automatic security devices and automated operators, inmates had increased opportunities to commit illegal activities." *Id.* at 4.  At the time of the report, all calling was collect and used live operators.

[33] JLARC at 6.  The report identified the following features: ability to block calls to certain numbers; digital recording and monitoring; PINs to identify each call; reporting capabilities on all calls; restrictions on all international calls; and announcements to the called party of the name of the institution from which the call originates.

[34] *See* NSA Reply Comments at 12 (July 12, 2023).

[35] *See* NSA Reply Comments at 12 ("It is well established that different facilities have different security requirements, in some cases because of the type of person incarcerated (for example, violent offenders versus non-violent offenders").  As several commenters point out, the record contains extensive documentation showing factors driving cost differences between types of correctional facilities. *See e.g.,* Opening Comments of Pay Tel at 22; Opening Comments of Securus at 23; Opening Comments of NCIC at 10; Opening Comments of Raher at 13. *See also*, Comments of Pay Tel at 3-5 (Dec. 15, 2022) (explaining that a primary driver of the differences between jails and prisons is the heavy turnover of the

9

may vary from one facility to another does not negate their necessity. The variation of safety and security features instead indicates that different agencies' risk assessments identified different security needs and different determinations of the features they deemed necessary in order for them to safely provide IPCS.

*The Used and Useful Framework Does Not Preclude Cost Recovery of Safety and Security Measures from Consumers*

A central argument by advocates is that consumers should not have to pay for safety and security measures because they do not benefit from them and hence such measures are not used and useful to ratepayers. According to their comments, only correctional authorities and law enforcement benefit from these measures and thus they, not incarcerated persons or their friends and family, should bear the costs. Even assuming the used and useful standard were applicable,[36] incarcerated people and their friends and family clearly benefit from safety and security measures, as the Commission has previously confirmed. The Commission identifies incarcerated people and their families as among those protected by safety and security measures.[37] PIN numbers and voice biometrics, for example, protect against fraudulent access to prepaid accounts. Surely ratepayers would view this as a benefiting them. Monitoring and recording can identify threats to other incarcerated persons or their families and friends. Such features may also be used help authorities monitor incarcerated persons that may be suicidal.[38] As noted, safety and security features assist with preventing crimes of other incarcerated persons, a clear demonstration of the direct benefit of these features to incarcerated people.

Some also claim that safety and security measures associated with communications services should be paid for by correctional authorities, just like other measures such as barbed wire, metal detectors, or mail monitoring. The fallacy of this argument is that the safety and security measures at issue are only used in connection with incarcerated people making calls. They are thus directly related to the use of communication services. In the parlance of rate making, the callers are the cost causer and thus it is appropriate that they should pay for safety and security measures necessary to prevent abuse or criminal activity using the communications services.

---

inmate population); Comments of Pay Tel at 7, (Sept. 27, 2021) (quoting Pay Tel Communications, Inc., Ex Parte Presentation, WC Docket No. 12-375 (July 3, 2013), citing U.S. Department of Justice Bureau of Justice Statistics - Jail Inmates at Midyear 2011 Statistical Tables, Table 4, "Average daily jail population, admissions and turnover rate, by size of jurisdiction, week ending June 30, 2010 and 2011.")

[36] Securus previously explained that the used and useful framework applies to determinations regarding the inclusion of plant and equipment in the rate base and is thus inapplicable to operating expenses, which make up a considerable portion of safety and security costs. Moreover, there is no requirement that the Commission use this framework. Securus Opening Comments at 26-30. *See also* NSA Reply Comments at 12-14 (explaining that the used and useful framework is not applicable to safety and security costs assessments). Thus, our response to specific arguments regarding the used and useful framework should not be viewed as agreement that the framework is applicable.

[37] *2013 ICS Order* para. 58.

[38] *See also* NSA Reply Comments at 12-13 (July 12, 2023) (noting that "security and safety measures directly benefit incarcerated persons . . . by reducing crime within the facility" and helping identify suicidal incarcerated persons).

*The Commission Could Not Remove Safety and Security Costs Without Violating the MWR Act Mandate to Ensure Just, Reasonable and Compensable Rates*

The exclusion of all safety and security costs would have a substantial impact on rates, and would have numerous likely unintended and harmful consequences. The Brattle Group's May 3, 2024 report provides a sense of the magnitude of the costs at issue. Assuming for these purposes that its numbers are correct and that its cost per minute numbers would translate into price caps, the Brattle Group's analysis shows that the exclusion of safety and security costs would lead to a reduction in provider rates of approximately 67% for facilities with ADPs between 1000 and 5000; 60% for facilities between 500 and 1000 ADP; and about 38% for facilities up to 500 ADP.[39]

Rate cuts of this magnitude would lead to confiscatory rates and violate Congress' mandate to "establish a compensation plan to ensure all payphone providers are fairly compensated, and all rates are just and reasonable, for completed intrastate and interstate communications."[40] The overarching purpose of this mandate is to ensure that the regulation of payphone service "promote[s] competition among payphone service providers and promotes the widespread deployment of payphone services."[41] It is within the context of these provisions that Congress directed the Commission to "consider costs associated with any safety and security costs measures necessary to provision" payphone service in carceral settings.

Contrary to the goal of promoting widespread deployment of IPCS, the removal of safety and security costs would, at a minimum, result in a reduction in the availability of calling services, by reverting to more manual oversight of calling or other similar measures that would result in more limited access to IPCS. The notion that correctional authorities across the nation have an untapped pool of money in reserve to pay for these additional costs is fanciful and unsupported by any evidence in this proceeding. And if IPCS providers are unable to recover the costs associated with their investment in the service, they would stop providing such services, leading to a sharp reduction in the number of industry participants. It should be recognized that, at the same time that revenues would be sharply reduced, the overall economy is still suffering inflationary impacts. Moreover, the Commission has imposed costly new mandates such as offering all forms of Telecommunications Relay Services. Rate cuts of this magnitude would fall particularly hard on smaller providers and smaller facilities, diminishing rather than promoting, the goal of competition and widespread access to IPCS.

As Securus detailed in previous comments, rate making requires the regulator to take into account investors' legitimate concern with the financial integrity of the company.[42] Slashing

---

[39] Letter from Gregory Capobianco, to Marlene H. Dortch, WC Docket Nos. 23-62, 12-375, May 7, 2024 (attaching May 3, 2024 Brattle Group Report at Slide 11, All Provider Audio CPM Comparison Between Model Carrier and 2023 MDC) (confidential version).

[40] 47 U.S.C. § 276(b)(1)(A).

[41] 47 U.S.C. § 276 (b)(1). Note that "payphone service" is defined to include the provision of "inmate telephone service". *See id.*, § 276(d).

[42] Comments of Securus at 16 (May 8, 2023) (discussing standard developed in *Hope*); *id.* at 25-32 (discussing use of used and useful standard in assessing site commissions and providing history of "used and useful" and the "more sensible" prudent investment rule).

11

rates precluding companies from recover costs legitimately incurred would fail this fundamental premise of rate making. In commenting on rate making standards, Worth Rises reviews Securus' comments and wrongly states that Securus advocates for the use of the prudent investment standard when evaluating safety and security costs. Securus said no such thing, although it did contrast the prudent investment rule with the used and useful framework as may be applied in determining inclusion of site commission costs and noted that the D.C. Circuit found the prudent investment standard "far more sensible."[43] In this discussion, Worth Rises also wrongly asserts that "there appears to be no dispute among the commenters that providers have made large investments in safety and security measures that are not yet actively in-use, the primary applicability of the prudent investment rule."[44] This statement has no support in the record and Securus in unaware of any comments regarding large investments in unused safety and security services. Perhaps Worth Rises is suggesting that some safety and security measures are not used by some facilities. That does not render the investment imprudent by any understanding of the concept. Securus, like other providers, makes investments to serve the industry at large, not for any particular facility. At any rate, Worth Rises bottom line is that safety and security measures do not benefit ratepayers, a point refuted above.

For the foregoing reasons, any contention that "safety and security costs should not be included in the Commission's rate methodology"[45] or that safety and security measures are not "necessary" for the provision of IPCS[46] is without merit.

Respectfully submitted,

_____/s/_____
Michael H. Pryor
Brownstein Hyatt Farber Schreck, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 383-4706
mpryor@bhfs.com
*Counsel to Securus Technologies, LLC*

_____/s/_____
Marcus W. Trathen
Christopher B. Dodd
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
Wells Fargo Capitol Center, Suite 1700
Raleigh, N.C. 27601
Telephone: (919) 839-0300
mtrathen@brookspierce.com
cdodd@brookspierce.com
*Counsel to Pay Tel Communications, Inc.*

---

[43] Securus Opening Comments at 30.
[44] Comments of Worth Rises at 3 (July 12, 2023).
[45] *See* Wright Petitioners Ex Parte at 5.
[46] *See* Worth Rises Ex Parte at 3.

12

**JA1291**

EXHIBIT A

A recent Clay County, Florida Sheriff's Office Request for Proposal ("RFP") is attached as **Exhibit A-1**.[47]

The Clay County RFP requires physical security features including:
- "A steel, tamper proof, housing that protects the electronic components of the unit";
- "An armored handset cord that is resistant to stretching and breaking"; and
- "Installation reinforced by security studs to prevent easy removal of unit."[48]

Additionally, the Clay County RFP specifies twenty-five "**Monitoring and Recording Requirements**," including but not limited to:
- "ITS shall offer unlimited, secure, remote access from any PC or laptop with high speed internet connectivity. This connection shall enable authorized users, with the use of a single sign in, to view, monitor and record all calls and video visitations from any telephone, kiosk, or tablet within the ITS and other select telephones outside the Facility as authorized by the Sheriff. Remote access activity shall not impair Services functionality or performance in any way."
- "The ITS must have the ability to exclude conversations with attorney client privilege or other sessions as directed by the Clay County Sheriff's Office."
- "ITS should, upon request by a qualified entity, provide specific information for tracking inmate activities and patterns by individual telephone numbers; and for billing purposes."
- "ITS must have the capability of automatically calling and alerting CCSO personnel when a specific number or numbers are dialed."
- "ITS shall allow for authorized personnel or staff to interrupt the call or visit and communicate directly with the inmate or visitor. The audio shall be heard by both the inmate and visitor and shall be included in the recording of the session."
- "ITS shall provide for simultaneous playback and recording of conversations. It is mandatory that the playback of any selected channel must be accomplished while continuing to record all input channels."
- "ITS shall allow authorized users the view and analyze call data to establish links between multiple inmates and called numbers. Service should also allow for graphical representation of such links."
- "At a minimum, playback of recordings must be able to be done from the CCSO Investigator's Office."
- "ITS must maintain phone recordings for a minimum of one hundred eighty (180) days."

---

[47] Clay County Sheriff's Office Request for Proposal, Inmate Communications Services RFP # 23-0002 (Issued January 4, 2024) (the "Clay County RFP").
[48] *Id.* § 2.5.8.

13

**JA1292**

- "Services should allow for remote conferencing sessions that are under surveillance by the CCSO investigative unit. This feature will allow authorized personnel to monitor a call or visitation from any remote location. The session will be automatically conferenced to a predetermined investigators telephone number in listen mode only once the call has been accepted and is in progress and the entry of a unique PIN by investigator."[49]

A recent Lexington County, South Carolina Sheriff's Department RFP is attached hereto as **Exhibit A-2**.[50] The Lexington County RFP seeks numerous safety and security features, including, but not limited to:

- "7. The Vendor must propose an ITS solution that allows the Lexington County Detention Center to completely restrict inmate access to outside network services/housing units/facilities. The Vendor must describe, in its response, how this restriction is accomplished with the proposed ITS."
- "10. The ITS must block all calls made to any of the following services whether the system is used in prepaid, debit or collect call mode. The Vendor shall be responsible for ensuring that the system is programmed for such blocking:
    - 900, 972, 976, 550, telephone numbers incurring excess charges;
    - Long distance carrier access codes (e.g., 101-XXXX);
    - Local toll free numbers (e.g., 950-XXXX);
    - Directory assistance numbers (e.g., 411, 555-1212, etc.); and
    - Toll free numbers (e.g., 800, 888, 877, 866, 855, etc.) unless authorized by Lexington County Detention Center."
- "11. The proposed ITS must not provide a second opportunity to dial a number without the inmate hanging up the telephone receiver after the first call is completed."
- "14. The proposed ITS shall not allow the inmate to speak to the called party until the call has been positively accepted. This requirement must be implemented for all calling methods."
- "15. The proposed ITS must not allow the inmate to hear the called party prior to the actual positive acceptance (via touch-tone entry) of the call."
- "16. The proposed ITS must allow for the Lexington County Detention Center to program times when the system will be available or unavailable to inmate calling."
- "17. The proposed ITS must allow Lexington County Detention Center personnel to temporarily restrict service to an individual inmate, inmate telephone, group of phones or entire facility."
- "18. The proposed ITS must provide technology that deters an inmate's attempt to initiate a 3-Way or Conference Call with a Third Party and provide the ability to immediately terminate the call. The Vendor must describe, in its response, how this technology operates with regard to the proposed ITS and the options available to the Lexington County Detention Center."

---

[49] *Id.* § 2.8.

[50] County of Lexington, South Carolina Request for Proposals No. 2024-RFP-11, Inmate Phone System and Video Visitation, Lexington County Sheriff's Department (Jan. 8, 2024) (the "Lexington County RFP").

14

- "20. As one of the major problems associated with inmate calling, the use of call forwarding at the destination telephone number is a constant issue with the Lexington County Detention Center. The proposed ITS must provide technology that detects real time use of call forwarding by the called party and provide the ability to immediately restrict the call from processing. The Vendor must describe, in its response, how this technology operates with regard to the proposed ITS and the options available to the Lexington County Detention Center."
- "22. The proposed ITS must provide a Call Alert feature. This feature will provide real time live monitoring for Lexington County Detention Center personnel that a designated inmate is simply placing a call or is placing a telephone call to a specific number that has been assigned alert status. E-mail notification is also required as part of this call alert feature."
- "40. Monitoring of inmate calls must be provided in 'real time'. Lexington County Detention Center personnel must be capable of monitoring an inmate's call while the call is in progress with the ability to disconnect the call at any time. The media player provided by the Vendor must have digital interactive capabilities allowing Lexington County Detention Center personnel to pause, repeat and resume the listening of a call in progress. The Vendor must describe, in its response, how this will be accomplished with the proposed system."

pThe Lexington County RFP also includes nine (9) features regarding "**Restrictions, Fraud Control Options and System Security**," including:

- "1. In order to limit possible telephone fraud, it is mandatory that a fraud prevention feature be available which will be able to randomly interject pre-recorded announcements throughout the duration of the conversation to the called party indicating the source of the call. The Vendor must describe in its proposal in detail how this is accomplished."
- "4. The Vendor must propose an ITS that is capable of detecting extra dialed digits from the inmate's telephone."
- "5. The proposed ITS must allow the Lexington County Detention Center to immediately and remotely turn telephones on and off. This shall be capable of being accomplished by individual telephones, groups of telephones, or an entire Lexington County Detention Center facility by Lexington County Detention Center personnel with the appropriate authorization level."
- "7. The proposed ITS must provide technology that deters an inmate's attempt to initiate a 3-Way or Conference Call with a Third Party and provide the ability to immediately terminate the call. The Vendor must describe, in its response, how this technology operates with regard to the proposed ITS and the options available to the Lexington County Detention Center."
- "8. The proposed ITS must provide technology that detects real time the use of call forwarding by the called party and provide the ability to immediately restrict the call from processing. The Vendor must describe, in its response, how this technology operates with regard to the proposed ITS and the options available to the Lexington County Detention Center."

15

**JA1294**

- "9. County desires a provider that offers a video visitation solution that uses facial recognition, in addition to audio to verify inmate using session matches assigned PIN."[51]

Additionally, the Lexington County RFP also includes fourteen (14) "**System Call Recording and Live Monitoring**" features, and eight (8) further "**Live Monitoring**" features.[52]

A recent Shawnee County, Kansas RFP is attached hereto as **Exhibit A-3**.[53]  Among other features, the Shawnee County RFP requires:

- "11.9 Vendor must provide telephone and wireless (e.g., tablet) equipment that is sturdy, vandal resistant, and armored with durable tamper-proof construction appropriate for a correctional environment. Provide a picture and brief description of the instruments proposed."
- "11.24 System must enable Owner or its agent to establish allowed or blocked numbers, either globally or by inmate for telephone calls:
  o Globally blocked numbers, e.g. corrections officials
  o Globally allowed numbers, e.g. public defenders (privileged)
  o Personal allowed numbers by inmate (recorded calls)
  o Designated/allowed attorney numbers by inmate (privileged)
  o Designated blocked numbers by inmate (e.g., victims)"
- "11.25 System must deny access to 800, 888, 877, 411, 555-1212, 900, 911, 950+1, 976 or 10-10xxx numbers, and allow the blocking of specific telephone number such as victims, witnesses, judges, and Owner staff."
- "11.27 System must control call and video visit duration on the basis of time limits and time of day restrictions, as defined by Owner."
- "11.28 System must be capable of setting time limits as well as calling and video visit hours by housing unit or destination number, as defined by Owner."
- "11.29 System must offer the option of voice biometric technology. This feature must be an integrated part of the call processing system and must offer related analysis tools and capabilities. Products which continue to analyze the voice throughout the length of the call are preferred."
- "11.29.1 The Owner will not be a "beta site" for unproven technology. If offering this feature, provide references where the feature is installed today - if offering continuous voice verification, your references must include a site where continuous voice verification has been in service for at least 6 months."
- "11.30 System shall provide an integrated capability to monitor, record, store and retrieve inmate phone and video visit conversations on a real time basis and retrieve conversations. Recordings of phone calls must be stored for the entire contract term with the option to archive as needed. Recordings of video visits must be stored for a minimum of sixty (60) days, with the option to archive as needed."

---

[51] Lexington County RFP, §§ 3.5.
[52] *See* Lexington County RFP, §§ 3.7, and 3.8, respectively.
[53] Shawnee County, Request for Proposal 005-24 (Issued Feb. 16, 2024) (the "Shawnee County RFP").

- "11.32 System must be capable of importing and presenting relevant inmate information as determined by Owner (e.g., whether inmate is still housed in facility, gang affiliation or victim information). Describe how Vendor's System meets this requirement."
- "11.33 System must provide verified BNA for all collect and prepaid collect numbers for phone calls."
- "11.33.1 Initial prepaid collect account setup for called parties must occur by internet or live agent, and include collection of BNA information that is verified against secondary data such as credit card information or photo identification. Detail how BNA information is verified."
- "11.33.2 Under no circumstances may such calls be completed without first obtaining verified BNA."
- "11.33.3 BNA for an individual number shall be available by simply dragging over or clicking on the number displayed in the ICS GUI."
- "11.34 System must track IP addresses or other relevant identifiers for accounts funded online for use by investigative staff. Describe in detail what is tracked and how this information is made available to investigators."
- "11.34.1 This tracking process must include the billing account of the individual putting funds onto the inmate's account (without the requirement of a subpoena)."
- "11.35 System must provide the ability to place alerts on a specific inmate PIN or destination number as determined by investigators. The alert function shall:
- "11.35.1 Automatically call designated number(s) or otherwise alert investigators, according to preference, when a call by a watched inmate or to a watched number takes place"
- "11.35.2 Offer live monitoring of alerted calls or video visits in progress"
- "11.35.3 Include a 'find and follow' feature such that if the first designated investigation phone number is not answered, the ICS will contact successive investigator numbers"
- "11.36 System must provide the ability to have an individual Personal Allowed Number (PAN) list associated with each inmate."
- "11.40 The System shall offer unlimited secure, remote access capability from any PC or laptop with high speed internet connectivity. This remote access shall (at a minimum) enable authorized users to view call records, generate reports, monitor live conversations, and search/retrieve/play recorded calls. Remote access activity shall not impair system functionality or performance in any way."
- "11.41 Vendor must provide tiered access levels to the ICS GUI that is customizable to personnel by function and security level, as required by Owner."
- "11.42 In order to reduce PIN fraud, ICS must be able to restrict calling by PIN by housing unit, and must automatically deactivate PIN for inmates no longer in custody. Describe how your system meets this requirement."
- "11.44 System shall have the ability to be shut down quickly and selectively using cut-off switches or remote software accessible to authorized personnel."
- "11.45 System shall have the ability to detect three-way call attempts (call forwarding or conferencing after a call is accepted and established). Upon detection these calls shall be marked within the Call Detail Record and the ICS shall have the ability to terminate the call immediately. If a call is terminated the ICS" will play a message, with content determined by Owner, prior to doing so."

17

- "11.46 System shall have the ability to detect attempts to forward a call remotely (call forwarding prior to a call being accepted and established). Upon detection these calls shall be marked within the associated CDR, and the ICS must have the ability to terminate the call immediately. If a call is terminated the ICS will play a message, with content determined by Owner, prior to doing so."
- "11.47 Call Detail Records (CDRs) must be established any time an inmate telephone goes off-hook, and must be stored and made available online for the duration of the Contract. CDR data must include at a minimum:
  - Off hook time
  - Inmate ID/PIN
  - End type (e.g. pre-answer hang-up, called party hang-up, max time elapsed)
  - Phone number attempted
  - Station name
  - Billing start time
  - Duration of call (in seconds)
  - Billed time
  - Call type (e.g. collect, debit)
  - Jurisdiction type (e.g. local, interstate)
  - Termination reason"
- "11.48 Call Recordings must be established and maintained any time an inmate telephone goes off-hook, and must be stored and made available online for the duration of the Contract. The recording must begin at the moment the inmate telephone goes off-hook and end upon termination of the call."
- "11.49 Recorded conversations must provide security measures to ensure they have not been tampered with. This security must extend to recordings transferred to external mediums such as external drives, USB drives, or email. Vendor must also provide expert testimony regarding security of records if required."
- "11.50 Assign and use "PIN" management with the ICS, and require entry of a valid PIN prior to attempting a call. Integration with, or file sharing from, Owner's Offender Management System (OMS) is required to automate the PIN assignment process. Owner currently utilizes the New World Systems OMS."
- "11.51 Restrict calling by PIN"
- "11.51.1 Suspension of a specific PIN"
- "11.51.2 Restriction to certain telephones, by facility or sub-location, at Owner's option"
- "11.51.4 Time of day calls may occur"
- "11.51.5 Specific numbers the PIN may NOT call, e.g. victim numbers."
- "11.51.6 Allow only certain privileged numbers a PIN may call (e.g. juvenile approved contacts)."
- "11.51.7 Allowed only certain non-privileged numbers the PIN may call (PANs)."

A recent Weld County, Colorado RFP is attached hereto as **Exhibit A-4**.[54]  The Weld County RFP specifies as "the minimum requirements of the desired inmate telephone system", *inter alia*:

---

[54] Request for Proposals, Weld County, Colorado, Bid Number B2300133, Inmate Communication Services (July 7, 2023) (the "Weld County RFP").

18

- "a. 'State of the Art' technology and web-based equipment with offsite host/central processor and multilevel password security access. The successful vendor shall provide at no cost to the County, increases to rates and/or surcharges all new company releases in technology and/or features. The architecture shall be expandable to allow future growth."
- "b. All phones shall limit one (1) call per connection."
- "c. No incoming calls shall be permitted."
- "d. No three-way calling shall be permitted."
- "e. The system proposed shall permit cellular connectivity."
- "f. All inmate calls shall be processed by an automated operator and shall not allow access to a live operator at any time."
- "g. After the dialing sequence, the inmate shall be put **"ON HOLD".** The inmate shall **NOT** be permitted to monitor call progress and shall **NOT** be allowed to communicate with the called party, until the call is positively accepted."
- "h. The system shall be capable of informing the called party the amount that will be billed for the call prior to acceptance of the call."
- "i. The system shall brand all inmate calls with a pre-recorded message announcing the collect call, name of the facility, name of the inmate initiating the call and that calls **ALL CALLS ARE RECORDED.** The system shall have, at a minimum, multi-lingual capabilities for **English and Spanish.** Please identify other language capabilities available with your system."
- "j. The system shall provide as a minimum the following security and control features:

    1) Deny access to 800, 811, 866, 888, 877, 411, 211, 555-1212, 900, 911, 950+1, 976 or 10-10xxx numbers.

    2) Allow the blocking of specific telephone numbers such as victims, witnesses, judges, county staff and others as requested by the County.

    3) The system shall be capable of allowing free local calls (determined by the **County)** to certain numbers such as Attorneys, Public Defenders, Crime Stoppers, etc.

    4) The ability to set time limits and calling hours

    5) Provide the capability to assign and use "PIN" management with the inmate telephone system. Inmate PIN verification must be provided in the form of Voice Print technology.

    6) The system shall provide an integrated capability to monitor, record, store and retrieve inmate phone conversations on a real-time basis and retrieve conversations. All call recordings must be stored on-line for a minimum of the previous thirty-six (36) months. Recordings shall be in a standard file format with playback on a non-proprietary player. At conclusion of the contract, the successful vendor shall archive for County access, the previous thirty-six (36) months of recordings.

    7) Provide correct and accurate call details and management reports for all calls placed from the inmate phones. Reports shall include at a minimum, origination number, destination number, type of call (local, intrastate, or interstate), number of minutes of call, reason for disconnecting and total call charges. Report must be available on-site.

19

**JA1298**

8) Call detail Records ~ call records and recordings shall be stored on-line at a minimum of the previous thirty-six (36) months. Alternate proposals of archive storage are not acceptable.

9) The system shall be capable of allowing secure inter-agency access to recordings with the ability for the County to limit and track agency access."

- "Once a contract is awarded as part of the RFP, the successful vendor must agree to provide and maintain a Biometric Voice Identification and Investigation System. The system shall include at a minimum the following features and functionalities:

  a. The investigation software must be completely integrated with the calling platform and not require the export and import of inmate call records, inmate account information, or called party billing name and address information related to the County.

  b. Voice identification technology to enroll, validate, monitor, and continuously identify all inmates speaking on the phone. Ability to conduct voice searches on all called parties throughout the entire platform.

  c. Provide continuous, real-time identification of inmates speaking on a call, and continuous voice analysis for the entire duration of the call.

  d. The investigation software must be able to import data from cell phones.

  e. The investigation software must be able to notify investigators when information is found related to any report or analysis previously configured.

  f. The investigation software must be able to allow investigators to flag certain words or phrases in conversations and be notified when the system recognizes them.

  g. The investigation software must provide investigators with the ability to share information with other investigators from outside agencies.

  h. The investigation software must be able to allow investigators to schedule reports and analysis.

  i. Function covertly with no audible sounds or interruptions of the phone call for the purpose identifying the inmate speaking on the phone.

  j. Capable of detecting PIN sharing or stealing amongst inmates and identify the inmates who are fraudulently using another inmate's PIN number. Provide alerts when inmates other than the PIN owner appear on a call.

  k. Capable of recognizing a single voice by incorporating multiple voice factors such as spoken words or phrases, accents, inflections, and pronunciations to identify a specific individual.

  l. Utilize biometrics analysis to detect, track, and alert when 3-way calls are attempted, and flag the call.

  m. Must be able to flag and track information on high interest group such as security threat group members, high profile inmates, institution drug dealers, escape risks, mail monitored inmates, etc. The system needs to be able to allow the County to customize the groups as desired.

  n. Must have a comprehensive management and reporting system that can be customized to the needs of the County."

20

**JA1299**



June 14, 2024

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

Re:    Incarcerated People's Communications Services; Implementation of the Martha
       Wright-Reed Act, WC Docket No. 23-62; Rules for Interstate Inmate Calling
       Services, WC Docket No. 12-375, notice of *ex parte* communication pursuant to
       47 CFR § 1.1206(b)

Dear Ms. Dortch:

Today I held a telephone meeting with Ramesh Nagarajan, Office of Chair Rosenworcel,
with respect to the above-captioned dockets. I emphasized the importance of keeping
rates in the Commission's forthcoming decision as low as possible and referenced UCC
Media Justice's prior pleadings with respect to excluding safety, security and
surveillance from the rate paid by incarcerated people and their loved ones. Facilities
may purchase whatever services they find useful to perform their functions, but those
functions are not the appropriate financial burden of incarcerated people and their
families. It is critical that the Commission distinguish between what is necessary and
thus the appropriate burden of the caller as compared with what is the appropriate
burden of the facility. As UCC Media Justice explained in its comments, neither a bus
depot nor a jail, by virtue of housing a payphone, becomes a communications provider even
if they incur costs that would not occur except for the existence of the payphone.[1]

Further, I highlighted that the Commission should address several outstanding items
with respect to people with disabilities when it implements the Martha Wright-Reed
Act. The prior FCC decision in this docket addressing disabilities now means that people
with disabilities must pay fees that previously were covered by the TRS fund. As
outlined by disability advocates themselves, the Commission should:

- adopt enterprise registration requirements for Internet Protocol Captioned
  Telephone Service (IP CTS);
- remove the 50-person average daily population (ADP) threshold for TRS-related
  and point-to-point video obligations;
- expand the definition of "jail" and "prison" to include facilities not currently
  covered where people are detained such as residential, drug rehabilitation,
  nursing, civil commitment and group facilities; and

---

[1] UCC Media Justice and Public Knowledge Comments, WC Docket No. 23-62 at 11 (filed
May 8, 2023).

- strengthen billing disclosure requirements to ensure incarcerated people with disabilities receive information about payment and billing practices in accessible formats.[2]

Specifically, no party opposes enterprise registration for people with disabilities. They often are often moved from facility to facility and require access right away, enterprise registration would help.

Further, anecdotally I and disability advocates remain concerned that many carceral facilities are not availing themselves of the new services that companies must offer to meet the needs of people with disabilities. People who are incarcerated with disabilities are often fearful of seeking the services they need for fear of retribution, therefore gathering data can be difficult. Moreover, data on disability in carceral facilities nationwide is poor. For this reason, it would be very useful for the Commission to monitor the implementation of its own rules which went into effect at the beginning of this year. In particular, the Commission should collect data from companies with respect to how many minutes, or other relevant metric, that are being used for each of the various services that meet the needs of people with disabilities. Such data should be broken out by type of facility, state, and size of facility. This would assist the Commission in evaluating whether the new rules are effective and would enable the Commission to target education and outreach efforts to facilities that may be withholding permission for companies that are trying to comply with the Commission's rules.

Moreover, the Commission promised accessible educational material for people with disabilities and those have still not been issued, more than 18 months after the Commission voted for the new, important and very welcome ruling clarifying that people with disabilities have rights under the law to receive communications that serve their needs. This must be addressed promptly to ensure compliance with the law and the well-being of individuals with disabilities.

Sincerely,

Cheryl A. Leanza
Policy Advisor

---

[2] Reply Comments of Accessibility Advocacy and Research Organizations, WC Docket No. 12-375 (filed March 6, 2023), https://www.fcc.gov/ecfs/search/search-filings/filing/10307274230953.

June 17, 2024

Jessica Rosenworcel
Chairwoman
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

    Re:    WC Docket No. 23-62 and WC Docket No. 12-375

Dear Chairwoman Rosenworcel:

We join members of The Leadership Conference, a coalition of 200 civil rights organizations, in asking the Federal Communications Commission (FCC) to adopt new, lower rate caps for incarcerated communications services that are just and reasonable. We strongly support the prompt and vigorous action of the Commission to follow Congress' mandate in the Martha Wright Reed Just and Reasonable Communications Act. We further urge the Commission to adopt meaningful consumer protection and billing transparency policies and finish the reforms needed to fully protect incarcerated people with disabilities.

For decades, telecom profiteers have exploited incarcerated people and their families, forcing them to pay extreme costs to maintain connections with their loved ones. The right to communicate throughout incarceration is not only humane, it is essential for improving people's ability to successfully re-enter their communities – supporting family stability, facilitating access to community support and job opportunities, in addition to other meaningful resources. Exorbitant costs and fees heighten depression, isolation, and loneliness among incarcerated individuals – actively harming them instead of providing any discernible benefit.

We urge the Commission to adopt the lowest possible rates for voice and video communications. In fact, evidence in the record demonstrates that rates could be as low as pennies per minute. This data, as compiled by the economists working with the Wright Petitioners, demonstrate the Commission can adopt truly just and reasonable rates in this docket.

Incarcerated people and their loved ones should not be forced to subsidize services they do not want, or that are the responsibility of the incarcerating institution. Incarcerating institutions should bear the cost of security and surveillance. These services, such as call recording and monitoring services, and voice biometrics are not for the benefit of incarcerated people. They do not belong in the rate.

The Commission should adopt consumer protection measures. It should improve billing transparency. A consumer disclosure label that builds on the recently adopted broadband consumer labels, or dynamic consumer disclosures that are sent regularly and are easily saved and retrieved, would provide consumers with the information they need to monitor their own costs and ensure they are not paying illegally high costs--

particularly for the new international rates and new limits on ancillary fees. Additionally, the Commission should make sure consumers are able to recover unused funds in their accounts and funds in inactive accounts. Protections should apply to all consumer accounts, including debit accounts

In addition, alternative pricing structures must be approved if and only if those structures save money for consumers. Although it is possible that a subscription service could save consumers money, the negative track record of companies offering service to and from carceral facilities means that the FCC has every reason to proceed cautiously before approving new business models.

Incarcerated people with disabilities must not be denied equitable access to communications. Specifically, we agree that all providers must provide access to all relay services eligible for Telecommunications Relay Services (TRS) fund support, plus American Sign Language direct, or point-to-point video communications without charge. In addition, the FCC should reverse its decision to deprive incarcerated people with disabilities of point-to-point video in jails with an average daily population of less than 50 percent in facilities if those jails have broadband service.

We, the undersigned organizations, look forward to supporting the Commission's action to protect incarcerated people with and without disabilities from unjust and unreasonable communications rates. We look forward to working with you on this issue and others of importance to our country.

Sincerely,

Alabama Appleseed Center for Law & Justice
Alpha Emergence Behavioral Health
American Civil Liberties Union
American Friends Service Committee Prison Watch
American Humanist Association
Asbury United Methodist Church - DC
Atlanta Community Support Project
Benton Institute for Broadband & Society
Black & Pink National
Black Lives Matter Rhode Island PAC
Boston Immigration Justice Accompaniment Network
CDCR Family Support Group
Center for Art and Advocacy
Children's Defense Fund
Citizens for Prison Reform
Civil Rights Corps
Coalition on Human Needs
Colorado Criminal Justice Reform Coalition
Color Of Change
Community Alliance on Prisons
Cooperative Baptist Fellowship

COYOTE RI
Cunningham Township
DARE Direct Action for Rights and Equality
Detroit Justice Center
Drop LWOP New England
Electronic Frontier Foundation
Electronic Privacy Information Center (EPIC)
Elephant Circle
Empowering Women Impacted by Incarceration
The Episcopal Church
EXPO of Wisconsin
The Festival Center
Fight for the Future
Fines and Fees Justice Center
FREE! Families Rally for Emancipation and Empowerment
Free Press
Greater Boston Legal Services
Grove Park Foundation
Hawai'i Friends of Restorative Justice
High Desert State Prison Inmate Family Council
Interfaith Action for Human Rights
Jesse's Place Organization
Justice 4 Housing
Just Future Project
JustUS Coordinating Council
Latino Action Network
Latino Action Network Foundation
Legal Rights Center
Let's Get Free: The Women & Trans Prisoner Defense Committee
Louisville Family Justice Advocates
Luvly Doula LLC
Media Alliance
Michigan Liberation
Minnesota Incarcerated Workers Organizing Committee
Minnesota Office of the Ombuds for Corrections
Mission 29:11 Reentry
Multicultural Media Telecom and Internet Coalition
Mystic Valley Action for Reproductive Justice
National Consumer Law Center (on behalf of its low-income clients)
National Center for Law and Economic Justice
Near Futures Projects
NETWORK Lobby for Catholic Social Justice
New York Initiative for Children of Incarcerated Parents
Operation Restoration
Out for Justice, Inc.
Partnership for Safety and Justice
The Pennsylvania Prison Society

Public Citizen
Public Justice Center
Prison From The Inside Out, Inc.
Prison Policy Initiative
The Promise of Justice Initiative
Rasmussen Family
The Real Cost of Prisons Project
Restoring Hope California
Root & Rebound
Safe and Just Michigan
Salinas Valley State Prison (SVSP)
San Francisco Financial Justice Project
Secure Justice
Stand for Children, Inc.
Together Colorado
Underground Ministries
United Church of Christ
Unitarian Universalist Massachusetts Action
Washington Defender Association
We Resolve
Women & Incarceration Project, Center for Women's Health & Human Rights, Suffolk
University
Worth Rises

June 17, 2024

Jessica Rosenworcel
Chairwoman
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Re:    WC Docket No. 23-62 and WC Docket No. 12-375

Dear Chairwoman Rosenworcel:

We join members of The Leadership Conference, a coalition of 200 civil rights organizations, in asking the Federal Communications Commission (FCC) to adopt new, lower rate caps for incarcerated communications services that are just and reasonable. We strongly support the prompt and vigorous action of the Commission to follow Congress' mandate in the Martha Wright Reed Just and Reasonable Communications Act. We further urge the Commission to adopt meaningful consumer protection and billing transparency policies and finish the reforms needed to fully protect incarcerated people with disabilities.

For decades, telecom profiteers have exploited incarcerated people and their families, forcing them to pay extreme costs to maintain connections with their loved ones. The right to communicate throughout incarceration is not only humane, it is essential for improving people's ability to successfully re-enter their communities – supporting family stability, facilitating access to community support and job opportunities, in addition to other meaningful resources. Exorbitant costs and fees heighten depression, isolation, and loneliness among incarcerated individuals – actively harming them instead of providing any discernible benefit.

We urge the Commission to adopt the lowest possible rates for voice and video communications. In fact, evidence in the record demonstrates that rates could be as low as pennies per minute. This data, as compiled by the economists working with the Wright Petitioners, demonstrate the Commission can adopt truly just and reasonable rates in this docket.

Incarcerated people and their loved ones should not be forced to subsidize services they do not want, or that are the responsibility of the incarcerating institution. Incarcerating institutions should bear the cost of security and surveillance. These services, such as call recording and monitoring services, and voice biometrics are not for the benefit of incarcerated people. They do not belong in the rate.

The Commission should adopt consumer protection measures. It should improve billing transparency. A consumer disclosure label that builds on the recently adopted broadband consumer labels, or dynamic consumer disclosures that are sent regularly and are easily saved and retrieved, would provide consumers with the information they need to monitor their own costs and ensure they are not paying illegally high costs--

particularly for the new international rates and new limits on ancillary fees. Additionally, the Commission should make sure consumers are able to recover unused funds in their accounts and funds in inactive accounts. Protections should apply to all consumer accounts, including debit accounts

In addition, alternative pricing structures must be approved if and only if those structures save money for consumers. Although it is possible that a subscription service could save consumers money, the negative track record of companies offering service to and from carceral facilities means that the FCC has every reason to proceed cautiously before approving new business models.

Incarcerated people with disabilities must not be denied equitable access to communications. Specifically, we agree that all providers must provide access to all relay services eligible for Telecommunications Relay Services (TRS) fund support, plus American Sign Language direct, or point-to-point video communications without charge. In addition, the FCC should reverse its decision to deprive incarcerated people with disabilities of point-to-point video in jails with an average daily population of less than 50 percent in facilities if those jails have broadband service.

We, the undersigned organizations, look forward to supporting the Commission's action to protect incarcerated people with and without disabilities from unjust and unreasonable communications rates. We look forward to working with you on this issue and others of importance to our country.

Sincerely,

Alabama Appleseed Center for Law & Justice
Alpha Emergence Behavioral Health
American Civil Liberties Union
American Friends Service Committee Prison Watch
American Humanist Association
Asbury United Methodist Church - DC
Atlanta Community Support Project
Benton Institute for Broadband & Society
Black & Pink National
Black Lives Matter Rhode Island PAC
Boston Immigration Justice Accompaniment Network
CDCR Family Support Group
Center for Art and Advocacy
Children's Defense Fund
Citizens for Prison Reform
Civil Rights Corps
Coalition on Human Needs
Colorado Criminal Justice Reform Coalition
Color Of Change
Community Alliance on Prisons
Cooperative Baptist Fellowship

COYOTE RI
Cunningham Township
DARE Direct Action for Rights and Equality
Detroit Justice Center
Drop LWOP New England
Electronic Frontier Foundation
Electronic Privacy Information Center (EPIC)
Elephant Circle
Empowering Women Impacted by Incarceration
The Episcopal Church
EXPO of Wisconsin
The Festival Center
Fight for the Future
Fines and Fees Justice Center
FREE! Families Rally for Emancipation and Empowerment
Free Press
Greater Boston Legal Services
Grove Park Foundation
Hawai'i Friends of Restorative Justice
High Desert State Prison Inmate Family Council
Interfaith Action for Human Rights
Jesse's Place Organization
Justice 4 Housing
Just Future Project
JustUS Coordinating Council
Latino Action Network
Latino Action Network Foundation
Legal Rights Center
Let's Get Free: The Women & Trans Prisoner Defense Committee
Louisville Family Justice Advocates
Luvly Doula LLC
Media Alliance
Michigan Liberation
Minnesota Incarcerated Workers Organizing Committee
Minnesota Office of the Ombuds for Corrections
Mission 29:11 Reentry
Multicultural Media Telecom and Internet Coalition
Mystic Valley Action for Reproductive Justice
National Consumer Law Center (on behalf of its low-income clients)
National Center for Law and Economic Justice
Near Futures Projects
NETWORK Lobby for Catholic Social Justice
New York Initiative for Children of Incarcerated Parents
Operation Restoration
Out for Justice, Inc.
Partnership for Safety and Justice
The Pennsylvania Prison Society

Public Citizen
Public Justice Center
Prison From The Inside Out, Inc.
Prison Policy Initiative
The Promise of Justice Initiative
Rasmussen Family
The Real Cost of Prisons Project
Restoring Hope California
Root & Rebound
Safe and Just Michigan
Salinas Valley State Prison (SVSP)
San Francisco Financial Justice Project
Secure Justice
Stand for Children, Inc.
Together Colorado
Underground Ministries
United Church of Christ
Unitarian Universalist Massachusetts Action
Washington Defender Association
We Resolve
Women & Incarceration Project, Center for Women's Health & Human Rights, Suffolk
University
Worth Rises



MARCUS W. TRATHEN
1600 WELLS FARGO CAPITOL CENTER
150 FAYETTEVILLE STREET
RALEIGH, NC 27601

T 919.839.0300
F 919.839.0304
MTRATHEN@BROOKSPIERCE.COM

June 18, 2024

VIA ELECTRONIC FILING

Ms. Marlene H. Dortch                    **Ex Parte Comments**
Federal Communications Commission
45 L Street NE
Washington, DC 20554

> Re:    *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket No. 23-62; Rates for Interstate Inmate Calling Services, WC Docket No. 12-375*

Dear Ms. Dortch:

In accordance with Section 1.1206 of the Commission's rules, this letter and the attachments thereto are submitted on behalf of Pay Tel Communications, Inc. ("Pay Tel") for inclusion in the record of the above-captioned proceedings.

Attached as Exhibit 1 is a Declaration of Vincent Townend. Mr. Townsend's Declaration responds to arguments that IPCS safety and security measures are not "necessary" to the provision of ICPS.[1] Specifically, Mr. Townsend discusses, based on his thirty-five years of experience in the industry, the origins of incarcerated people's communication services ("IPCS")[2] and how safety and security technology measures have been integrated into calling system functionality, at the request of facility administrators, in response to instances of abuse of calling service privileges. This abuse ranges from annoyance and harassment (e.g., unwanted calls to friends, family[3] and

---

[1] *See, e.g.,* Worth Rises Ex Parte, WC Docket Nos. 23-62, 12-375 at 3 (May 17, 2024) (the "Worth Rises May Ex Parte").

[2] The term "incarcerated people's communications service" is used interchangeably in Mr. Townsend's Declaration with the Commission's prior characterization of the service as "inmate communications service" or "ICS".

[3] *See, e.g.*, Craig S. Semon, Worcester County sheriff urges lawmakers to pull plug on inmates' free phone calls, Worcester Telegram & Gazette (June 7, 20240, https://www.telegram.com/story/news/2024/06/07/worcester-county-sheriff-urges-stop-to-inmates-free-phone-calls/73959704007/ ("We hear from the families (of inmates) who say, 'We can't tolerate this many calls.' It's becoming a nuisance. It's impeding their abilities to live their lives . . . .").

Letter to Ms. Marlene H. Dortch
June 18, 2024
Page 2

acquaintances[4]); to threats (e.g., intimidating witnesses and judges[5]); to theft (e.g., stealing and using other inmates' PINs to make calls[6]); to fraud (e.g., use of phones to make purchases using stolen credit card numbers[7]); and to outright criminal conduct (e.g., operating prostitution rings[8]). Mr. Townsend further describes how safety and service functionality is not optional, but a core component of IPCS that continually evolves as technology matures, facility needs change, and incarcerated people find ways to circumvent existing safety and security measures.

Illustrating the harm to the public that occurs in the absence of safety and security measures, attached as Exhibit 2 is a recent letter to the Commission from Christopher M. Carr, Attorney General of Georgia. This letter urges the Commission to lift its ban on cell phone jamming devices within prisons and jails due to the myriad of harms that occur from the use of contraband cellphones. Specifically, contraband cellphones—which lack IPCS safety and security features—pose "a real and substantial safety risk to correctional officers, visitors, inmates, and the public at large" because they "continue to be used to plan and orchestrate violent attacks and other criminal activity."[9] For example, Attorney General Carr noted that:

- "[A]n incarcerated leader of the infamous street gang, 'Yves Saint Laurent Squad,' used a contraband cell phone to order a hit which resulted in the death of an 88-

---

[4] *See, e.g.*, Sasha Aslanian, Calls from jail shed light on intimate crime, MPR News (March 2, 2011) ("A suspect who was arrested for allegedly hitting and slapping his girlfriend instructs her from jail, 'Call up that prosecutor and tell him I ain't f------ do s---, man. Tell them we weren't even with each other or something. You were just mad because you thought I was with some other girl or something.' . . . [T]he phone call itself [was] a crime. It violated a no-contact order between the suspect and the victim . . . .").

[5] *See, e.g.*, Debra Cassens Weiss, Prisons and jails use artificial intelligence to monitor inmate phone calls, ABA Journal (Oct. 25, 2019), https://www.abajournal.com/news/article/prisons-and-jails-use-artificial-intelligence-to-monitor-inmate-phone-calls ("In one case, the technology identified a problematic call earlier this month in Suffolk County, New York. The inmate threatened to kill the judge and prosecutor in his case after his release from prison. 'If I got to stay longer than November … I'm killing them all when I get out … and I mean it!' the inmate said on the call, according to a partial transcript provided to ABC News by LEO Technologies officials.").

[6] *See, e.g.*, Mark Wilson, Oregon Prisoner's Use of Another Prisoner's Phone PIN Constitutes Identity Theft, Prison Legal News (Nov. 5, 2019), https://www.prisonlegalnews.org/news/2019/nov/5/oregon-prisoners-use-another-prisoners-phone-pin-constitutes-identity-theft/ ("Michael Steven Connolly was confined at the Multnomah County Detention Center (MCDC) in Portland, Oregon after violating a pretrial release agreement in a domestic violence case. The trial court prohibited him from contacting the alleged victim, identified only as K. Nevertheless, while in jail, Connolly used the PINs of two other prisoners who were housed in his unit to call K five times. He used one prisoner's PIN to make four calls and another PIN for one call. All of the calls were recorded.").

[7] *See, e.g.*, 60 Minutes, 1-800-Con-Man: Running a National Scam out of Prison (1991), https://www.youtube.com/watch?v=vmh3_nSR1jU.

[8] *See, e.g.*, Michael Gordon, Jail phone catches plan by NC inmate to have wife, mom pimp girls for his bail, Charlotte Observer (Nov. 14, 2019), https://www.charlotteobserver.com/news/local/crime/article237296699.html.

[9] Exh. 2, at 1.

---

Letter to Ms. Marlene H. Dortch
June 18, 2024
Page 3

year-old Georgia veteran."[10]

- "A gang leader in North Carolina was able to order a kidnapping of a prosecutor's father via a cell phone in prison."[11]

- "In California, prison gangs used contraband cell phones to order murders within the prison system and traffic drugs."[12]

Contraband cell phones, of course, do not have IPCS safety and security features—which is why they are desired by inmates seeking to engage in illicit conduct. Contraband cell phones do not have call blocking; they do not have call recording; they do not have blocked numbers; they do not require PINs; they do not have alerts; they are not subject to reporting; they do not have voice biometrics; and the do not have a suspicious call list. *In the absence of safety and security measures in IPCS systems, the harms detailed above would just as easily be accomplished through unsecured IPCS platforms, posing a "real and substantial safety risk to correctional officers, visitors, inmates, and the public at large."* There is no reason to believe that facilities, legislators, or the general public would tolerate unsecured IPCS platforms in prisons in jails any more than they do contraband cell phones. IPCS providers today must continue to create safety and security features for facility officers to work with every day to identify and stop ongoing criminal activity that endangers fellow incarcerated persons, officers and members for the public. Accordingly, such safety and security measures are not only directly related to the provision of IPCS, but necessary for its function.

For the foregoing reasons, arguments that safety and security measures are not "necessary" for the provision of IPCS[13] are without merit.

Respectfully submitted,

Marcus W. Trathen
Christopher Dodd
*Counsel to Pay Tel Communications, Inc.*

---

[10] Exh. 2, at 1 (internal footnotes omitted).
[11] *Id.*
[12] *Id.*
[13] *See* Worth Rises Ex Parte at 4.

**EXHIBIT 1**

**DECLARATION OF VINCENT TOWNSEND**

## DECLARATION OF VINCENT TOWNSEND

I, Vincent Townsend, declare and state as follows:

1.      I am the founder and President of Pay Tel Communications, Inc. based in Greensboro, North Carolina.  I am over the age of 21.   I am competent to make this declaration and, unless otherwise indicated, all the facts set forth in this declaration are based on my personal knowledge.

### Pay Tel Communications

2.      Pay Tel employs approximately 100 persons and serves some 151 jails in 17 states.

3.      Pay Tel has a 35-year history of serving the corrections industry's communications needs based on a foundation of faith-based values and commitment to integrity and respect for the needs of those it serves.  Today Pay Tel is an employee-owned company whose stated mission is to care for the needs of those impacted by incarceration, our clients, our employees, and the community in a way that honors God.

4.      The purpose of this Declaration is to provide perspective on the origins of the IPCS industry. In particular, the Declaration responds to and rebuts, based on my 35 years' experience in the industry, the assertion of some advocates that safety and security measures are not "necessary," "indispensable," or otherwise "directly related" to the provision of IPCS.

### Transition from Payphones to Inmate Phone Service

5.      Pay Tel began in 1986 as a payphone provider, and between 1986 and 1989, the company grew to be the largest independent payphone provider in the Carolinas.

6.      In the 1988-1989 timeframe, Intellicall, the vendor that we used for our payphones, invented a product called intelliSTAR which provided an automated collect call option. While the product was initially designed to provide operator assisted and collect calls on payphones, the application also offered tremendous benefits for use in jails.  The value of that application in the jail setting became apparent very quickly.

7.      Prior to 1984, AT&T was the monopoly provider of telecommunications services.  After the breakup of AT&T, the regional Bell operating companies were the predominant providers of communications services in prisons—not jails.

8.      At that time, using the collect only option on a prison payphone (provided by AT&T or a local Bell company), the incarcerated person could make a collect call and get to the network and then social-engineer the live operator because the operator could not tell the call was from a prison.  Line Information Database (LIDB) and Bill Number Address (BNA) information was not yet widely available to alert the operator the call was

1

**JA1314**

originating from a prison. Nor was the call branded in any way and the operator could identify the call as coming from a confinement facility. Given this, there was a significant amount of fraud and other illicit activity on the public network originating from inmate calling activity. *For these reasons many prisons and most jails were very reluctant to install the collect-only Bell phones.*

9.      To the best of my knowledge, the only security feature that was available at that time was Dictaphone equipment purchased by some of the carriers to provide call recording capability. I am not personally aware of any competitor that was selling any security features directly to prisons—the technology was simply not available. There were no competitors at the time other than the regional Bell companies and they were relying on collect-only phones to control phone calls from prisons.

10.      Historically, inmate phone service in jails prior to the advent of automated collect technology was very limited. Usually at jails incarcerated persons were moved out of the cell block to a payphone in the booking area where they could place an officer-supervised collect call—a methodology which is both burdensome to the jail administrators and inconvenient to inmates wishing to make phone calls.

11.      With the arrival of automated collect technology in 1989, the ability to provide inmate phone service to jails entered the beginning stage of IPCS as we know it today. A vendor could install the automated collect technology using customer premise equipment (CPE) in the jail, which meant you could now have call controls in the specific facility. With this technology, when the call came out of the jail, the call was branded as coming from a jail and was announced to the called party as a call from an incarcerated person in a jail facility. That was the first level of safety and security protection that was afforded by automated collect calling technology.

<u>Technological Developments to Improve Safety and Security</u>

12.      In 1991, Pay Tel moved to a different calling platform using technology from Omni Phone. This product could block calls and it had the capacity to provide 10,000 Personal Identification Numbers (PINs), which assisted in controlling access. It also had a much better quality of call branding to help properly identify the call as originating from a confinement facility.

13.      As the service evolved, Pay Tel's local jail clients made more demands for features that would help them better protect the public and secure their facilities. Jails wanted to enable communications, but needed to have controls and security to prevent incarcerated users from taking advantage of the public.

14.      In the time span between 1989 and 1994, Pay Tel installed its calling platform in over 50 jails. Prior to our arrival, incarcerated persons were allowed to place calls once, twice, maybe three times a week. An officer would pull an individual out of the

2

**JA1315**

jail cell and escort them to either an administrative desk phone in booking or to a pay phone somewhere in a secure location and the inmate would make their phone call while an officer stood by to watch them dial the number and monitor the call. The only way the incarcerated population was allowed to make those calls was to have a direct supervision by an officer. This awkward process was cumbersome and resource intensive for the facility and disliked by the inmate placing the call and the called party given the lack of privacy. When Pay Tel came along with automated collect call technology installed in the secure cell block, it was very well received by both facility administrators and inmates, and we deployed more and more facilities.

15.    Over the next two years more security challenges surfaced. In the 1993 time-frame Pay Tel moved to its third technology solution, TelEQUIP Labs ACP 4000. The TelEQUIP had the capacity to record selected phone calls, giving the facility the ability to monitor conversations for security purposes. But, even that technology was limited because it could only record a limited number of communication channels at any given time. Facilities quickly realized they needed to monitor all the channels to properly supervise inmate calling and deter and prevent illicit conduct and abuse of the public using the service. Responding to the needs of confinement facilities, the IPCS industry developed new technology capable of recording all channels.

16.    To illustrate the pervasive and well-documented problems that facilities were encountering at that time, in 1991, *60 Minutes*—then the top-rated show on television—aired a full-length story titled "1-800Con Man" about an inmate that had engaged in extensive fraud using unsecure calling services from his cell in Dade County Jail.[1] Using inmate calling services, and stolen credit cards provided by outside accomplices, the inmate was able to buy and sell products, using the stolen credit cards, over a period of years. At one point, after the facility had confiscated the stolen card numbers, the inmate ran an ad in USA TODAY (using a card number that he had secreted away) for cosmetics and, in short order, he was back in "business" with a fresh batch of stolen credit card numbers. (One of his fraudulent purchases that I remember was a $5,000 necklace from a jeweler in Greensboro.) This was long-running and extensive fraud operation was made possible because the jail in question was using BellSouth collect-only phones with no safety and security controls and because, as illustrated in the *60 Minutes* story, the jail personnel felt like they could not cut off access to calling services. The reality is, that without safety and security controls, there will always be a certain percentage of inmates inside the facilities—like the inmate featured in the *60 Minutes* story—that are constantly focused on how they could continue doing whatever they were doing before they got in there or they will embark on new criminal endeavors. As this story illustrates, technological measures intended to deter and prevent this behavior is the only practical means of protecting abuse of the service.

---

[1] This episode is available on Youtube at: https://www.youtube.com/watch?v=vmh3_nSR1jU.

3

**JA1316**

17.     In 1997, Pay Tel upgraded its safety and security capability by moving from the Telequip 4000 to the Telequip ACP 9000 with full channel recording and a significant number of reporting capabilities.  The challenge for law enforcement now became with 1,000 of hours of recordings how do they identify the suspicious calls because there simply are not enough officers and hours in the day to listen to all the calls.   We began to focus on safety and security features we could build into our product to identify and track suspicious call activity to assist law enforcement in doing their jobs to protect fellow officers, incarcerated persons and the public from people determined to continue their criminal behavior using IPCS.

18.     Progressing from 1997 to 2000, Pay Tel moved to a technology platform licensed by Radical Systems due to the need to incorporate technology to detect three-way calling.  This security need became critical because accomplices on the outside used the latest three-way call features on phones to connect incarcerated callers directly to the phone numbers of people whose number was blocked in the inmate calling system.  For example, inmates were using three-way calling to speak directly with witnesses or even judges when their number had been blocked in the IPCS system.  Given this loop-hole exploited by inmates, jail administrators demanded that IPCS providers provide a technology "fix" to prevent this from happening.  This is good example of how IPCS safety and security is an ongoing iterative process:  providers put in place a feature (e.g., called number blocking) and inmates find a way to circumvent the protection (e.g., three-way calling), which necessitates an additional technological solution (e.g., three-way call detection).

19.     As we gained experience with IPCS, the need for additional safety and security features became apparent as facility administrators did not have sufficient resources to property identify and react to suspicious call activity.  For example, one need was for software programs that would look for frequently called numbers that were suspect so they could be flagged for review.   The Radical Systems technology had those features.  One incident comes to mind that showed the importance of this technology involved a Pay Tel served facility is where a law enforcement officer had arrested an individual, I believe, on a drug charge. The inmate was booked in jail in the afternoon.   By that same evening, using the supplied inmate telephone, the inmate had contacted two individuals: first, a person to raise the money and the second, a person to put together a "hit team" to go to the officer's home and kill the officer and his family two nights later.   Because Pay Tel's security features alerted jail personnel of suspicious activity (*i.e.,* frequent, repeated calling to specific numbers), the system alerted jail personnel who were able to listen to the phone calls in question and prevent the murder of the officer and his family.  Here, the technology protected that officer and his family because the jail personnel were able to identify criminal activity that was being orchestrated using the telephone and prevent those plans from being carried-out.

20.     Around this same time, technology was created to give the incarcerated person the ability to set up accounts to fund phone calls with their trust fund accounts. Debit calling required the vendor to create integrations between the phone system and

4

**JA1317**

dozens of incarcerated person banking systems or commissary programs to also the incarcerated person to access their trust account to move funds to their phone debit account. All of these integrations were created to help facilitate more communication between the incarcerated person and their friends and family. Unfortunately, with each new advancement in allowing incarcerated persons more options for communication, there were a certain segment of the incarcerated population who would attempt to take advantage of their fellow incarcerated persons or the families. In this case, some inmates became very adept at stealing fellow inmates' PINs to access their accounts to steal their money. In the absence of safety and security measures, an incarcerated person without access to funds would have the opportunity to use the funds of other inmates, whether by theft, coercion, or other illicit means.

21.    With the roll-out of each new feature to benefit the incarcerated person or facility we always had to think ahead to how the benefit could be compromised. The goal was to try and stay one step ahead of the incarcerated persons to stop criminal activity and prevent abuse. To protect the incarcerated person's debit funds, the first level of protections was PINs. Next level of defense was to give the incarcerated person the ability to change their PIN if they suspected someone was accessing their funds. The next level of protection was to utilize voice biometrics to verify the identity of the caller each time the PIN is used, and deter PIN theft.

22.    The first industry response was to create a "gatekeeper" function where the incarcerated person is enrolled in the voice biometric system with his/her voice matched with their PIN at booking. With this technology we were able to tie the identity of the incarcerated person to their PIN with their voice print. When an incarcerated person would try to access another incarcerated person's account they would be blocked if the voice print did not match. In a jail this technology requires officer time to enroll incarcerated persons in the program around the clock seven days a week and in many cases reenroll an incarcerated person if the original enrollment was done while intoxicated. This system feature is critical to preserving the security of the incarcerated persons funds and their ability to place phone calls using their own funds.

23.    Voice biometric technology also proved very helpful in preventing incarcerated persons from getting around calling blocked numbers. Officers are regularly updating blocked number lists as witnesses, officers and judges are identified that are receiving threatening phone calls. If an incarcerated person is identified as placing harassing phone calls officers will block those phone numbers from access using the incarcerated person's PIN. However incarcerated persons very quickly figured out they could coerce a fellow incarcerated person into placing the call. Once the call was accepted the incarcerated person would take the phone and attempt to harass the witness or judge. The "gatekeeper" function was used initially to block these harassing calls.

24.    Subsequently, it became clear that facilities needed an expanded capability of voice biometrics that would provide "continuous" monitoring of the calls to identify any

new incarcerated person that may join the call. This technology has proven to be particularly helpful in identifying incarcerated persons who are attempting to continue some type of criminal behavior by having another incarcerated person call a gang member or accomplice and then take over the call. Those conversations are not blocked but are flagged for an officer to monitor and learn what the incarcerated person wanted to communicate without using his/her own PIN.

25. At every step of the way we were constantly looking for ways to improve the technology to enhance the safety and security measures to help officers do their work faster and more efficiently. And in our case, Pay Tel made a decision in 2000 to design and build our own calling system to have better control over the development process which was requiring more and more specialization based on specific facility needs. Prior to that time, we had used outside vendors. We designed our own CPE and created a platform that could be modified to include continuous improvements in safety and security features. We were constantly looking for ways to analyze thousands of calls quickly so officers could be alerted to potential criminal activity, abuse, or threat to facility or public safety.

26. Our focus in our first 20 years was designing and building tools to make facilities safer for the incarcerated person and officers and to stop abuse of the public and help prevent criminal activity through phone calls. In 2010, we moved to a centralized call platform and we took all the intelligence and the controls that were imbedded in the on-premise computers and moved it to a centralized platform. This step enabled us to build out a more robust product and have all the features and technology the same for all clients. The first phase of our centralized platform, Orion, was deployed from 2010 until 2015 when we moved to our next major technology upgrade with our CenturionITS. Over the life of our products that we design and build ourselves, we were constantly looking for ways to tighten up safety security by putting in place features to prevent the incarcerated persons from creating workarounds. And all of those features were designed and built into the product.

27. Over our 35-year history, we have made nine complete system changes of our technology. We started in 1989 and made our first change in 1991, and again in 1993, and again in 1997, and again in 2000, and 2002, along with building our own CPE in 2002, followed by deploying our first centralized platform in 2010 and our current Centurion platform in 2015. Between the Orion release in 2010 and Centurion in 2015 we deployed 15 unique safety and security features. Between 2015 and 2020 we released 8 more safety and security features along with 20 new service offerings integrated with the Centurion platform. With each complete system upgrade we spent hundreds of thousands of dollars to provide our clients with the most advanced safety and security features. When you are in business for yourself one of your goals must be to make a profit or you will not be in business long. When a business owner makes a capital investment your goal is to try to get a reasonable return by making the investment last as long as you can. The reality of the IPCS industry was technology demands were constant so we could stay ahead of ever-changing attempts to circumvent the safety and security controls. We had to make those

6

**JA1319**

changes because we could not keep up with the demand to have better safety and security tools.

Industry Efforts to Address Fraud and Abuse

28.     During this same time period between 1990 and 2010, I was fortunate to be asked to be a member of the Telecommunications Fraud Prevention Committee (TFPC), which was a subcommittee of ATIS, the Alliance for Telecommunications Industry Solutions.  ATIS was created by the regional Bell companies and AT&T.  These companies were all facing similar challenges, whether it was in the network, switching, customer service and fraud control.  ATIS set up groups that were tasked with working together to solve industry wide problems. The TFPC met quarterly and included various sub-committee work between meetings.  During that 20-year period, we worked on 87 separate issues that were creating fraud on the public network. And when I say "worked," we worked. We would meet in person for two-three days every quarter and then we would create task forces out of the regular meetings.  Of the 87 cases we worked over 20% of them were directly related to IPCS and the havoc that inmate calling was causing to the network, resulting in millions of dollars of losses to member companies. One of the first issues the TFPC addressed was "Prison Fraud Control" and over the next twenty years the issues covered a broad range of topics:  Automated Collect Calls, Subscription Fraud, Call Forwarding, Fraud with Billed Party Preference, Local Resale, Identity Theft, Prepaid Local Service, Failure to Launch LIDB Validation, Ported Numbers, ANI Masking, and Caller ID Spoofing, with several issues having to be worked multiple times.

29.     Because very smart incarcerated users were figuring out workarounds for the safety and security features we deployed our committee often had to revisit several of these fraud issues. We had the top fraud prevention experts from AT&T, the Bell companies, MCI, Sprint, Verizon, Bell Canada and British Telecom on our committee, and we still had difficulty staying ahead of the fraud and abuse created by the incarcerated people making phone calls. Today we face the same challenge: when we create a new safety and security feature to stop abuse, the inmate figures a work around and we are right back creating a new feature to stop the abuse.

30.     All of these challenges were causing significant costs to the IPCS industry and to the public network providers. On multiple occasions Pay Tel had a significant problem with Subscription Fraud[2] that almost forced us into bankruptcy and caused millions of losses to the Bell companies.    All of these challenges had one thing in

---

[2] "Subscription Fraud" refers to a fraud scheme involving the establishment of multiple accounts with the serving local exchange company.  Originally, inmate communications services were billed through the LECs (where a billing relationship could be established). Inmates and called parties would take advantage of the lack of safety and security measures in place in the network to establish multiple billing accounts with the LECs and then using remote call forwarding to cell phones for the purpose of receiving collect calls with no intent to pay the bills for those calls.  Pay Tel lost $750,000 in one facility alone due to this method of fraud.

7

**JA1320**

common—100% of the challenges resulted from incarcerated people placing phone calls. Clearly the incarcerated persons using the phone system were creating a costly burden on the IPCS industry and the public network. The cost burden fell on the IPCS industry and the rate payers and consumers using other services provided by the carriers.

Safety and Security Is Integral to IPCS

31.    As demonstrated by my summary above, the assertion by some advocates in this proceeding that "safety and security services are historically separate from IPCS" is not true.  I have lived in this industry for 35 years and watched it grow and change firsthand.  My company has suffered financial losses because of our inability to create the controls fast enough to stop incarcerated persons from abusing the public.  Over the past thirty years the IPCS industry has worked constantly to improve the safety and security features to stay ahead of the incarcerated population's attempts to defeat the controls.

32.    Similarly, the assertion that safety and security services are "optional" to the provision IPCS is not grounded in reality.  For Pay Tel, safety and security is an inherent feature of the service, not something that the facility "selects".  The stakes are high.  If you take away safety and security from the service, people will lose their lives and fraud and other abusive conduct will occur.  We do everything we can to help ensure that our calling system can be safely deployed in our client facilities, but this is an ongoing struggle as certain elements of the inmate community are adept at finding ways around the protections we employ.

33.    Pay Tel does its best to provide IPCS at a reasonable price. The goal is to provide this service at a fair rate that enables incarcerated people to stay in contact with their friends and family.  We want to keep communication open to loved ones so they can reenter society successfully.  We want to help them do that at a low rate and a low payment fee. For Pay Tel this is not just talk.  We are proud of our record at the FCC advocating for reasonable rates and low fees.  We take pride in how we have approached operating in the IPCS industry.  But to continue making our service available we must be permitted to recover our costs of providing IPCS, including safety and security costs.

*  *  *

**JA1321**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information and materials are true and correct to the best of my knowledge, information, and belief.

Dated: June *18*, 2024

Vincent Townsend

9

# EXHIBIT 2

# LETTER FROM CHRISTOPHER M. CARR, ATTORNEY GENERAL OF GEORGIA



# Office of the Attorney General

40 Capitol Square SW
Atlanta, Georgia 30334-1300

**CHRISTOPHER M. CARR**
ATTORNEY GENERAL

www.law.ga.gov
(404) 458-3600

June 4, 2024

Chairwoman Jessica Rosenworcel
Federal Communications Commission
45 L Street NE
Washington, DC 20554

RE: FCC's Position on Cell Phone Jamming in State Prisons

Dear Chairwoman Rosenworcel:

I am writing to express my concern and objection to the Federal Communications Commission's policy prohibiting state and local governments from using cell phone jamming devices within prisons and jails. Because contraband cell phones continue to be used to plan and orchestrate violent attacks and other criminal activity, I strongly urge you to reconsider the FCC's prohibition on the use of cell phone jamming devices in state and local jails and prisons.

The prevalence and use of contraband cell phones in prison poses a real and substantial safety risk to correctional officers, visitors, inmates, and the public at large. In addition to being legally inconsistent with the statute, the FCC's prohibition limits legitimate law enforcement tools, presents dangerous conditions for correctional officers, and leads to the escalation of criminal enterprises within the prison system.

In Georgia alone, 8,074 contraband cell phones were confiscated in 2023, with 5,482 confiscated to date in 2024. Recently, an incarcerated leader of the infamous street gang, "Yves Saint Laurent Squad," used a contraband cell phone to order a hit which resulted in the death of an 88-year-old Georgia veteran.[1] A gang leader in North Carolina was able to order a kidnapping of a prosecutor's father via a cell phone in prison.[2] In California, prison gangs used contraband cell phones to order murders within the prison system and traffic drugs.[3]

---

[1] https://www.wsbradio.com/news/local/ga-prison-gang-tried-have-guard-killed-sent-hitman-wrong-house-gbi-says/NEUHLUJ23VFQTA57MT7JKVKVHU/.

[2] https://www.wral.com/story/jurors-hear-accused-kidnapping-mastermind-using-cellphone-in-prison/15776355/.

[3] https://www.latimes.com/california/story/2023-01-30/cell-phones-prison-mexican-mafia; see also https://www.cbsnews.com/sacramento/news/2-aryan-brotherhood-prison-gang-members-plead-guilty-to-murders-at-california-prisons/.

June 4, 2024
Page **2** of **2**

Unfortunately, on multiple occasions, the FCC has reiterated its position that the use of cell phone "jammers" is prohibited, and that the prohibition extends to state and local governments. *See* FCC Enforcement Advisory Nos. 2014-05, 2012-02, and 2011-03. That prohibition, however, goes far beyond any reasonable interpretation of the relevant statutes, and amounts to an unlawful administrative takeover of legislative authority. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (an agency's action taken beyond its jurisdiction is ultra vires). The purported statutory basis for the FCC's prohibition on jammers comes from 47 U.S.C. §§ 301, 302a(b), and 333, but those statutory provisions do not address the use of cell phone technology by states.

Most notably, under 47 U.S.C. § 333, "[n]o *person* shall willfully or maliciously interfere with or cause interference to any radio communications of any station licensed or authorized by or under this Act…" (emphasis added). As an initial matter, the applicable definition of "person" under 47 U.S.C. § 153(39) does not expressly apply to government agencies, departments, or instrumentalities, so any rule or interpretation applying to the State of Georgia or its agencies is beyond the FCC's delegated statutory authority. *See Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 595 U.S. 109 (2022) (administrative agencies are creatures of statute and possess only the authority that Congress has provided). The provisions of 47 U.S.C. §§ 301 and 302a(b) are similarly inapplicable to state governments for the same reason, i.e., the respective prohibitions are limited to "persons," which does not include state or local governments.

Furthermore, your enforcement policy prohibiting jamming devices no longer serves the public interest. The most recently enacted statute that the FCC's position relies upon, 47 U.S.C. § 333, was enacted in the early 1990s, years before prison inmates began using contraband cell phones to plan and engage in unlawful and dangerous behavior. Nothing in the language of 47 U.S.C. § 333 prohibits the FCC from revising its position to allow state agencies to use cell phone jamming devices in prisons. In fact, the United States Bureau of Prisons has recognized the potential value of cell phone jammers already and is permitted to use jamming devices at several penitentiaries, including at least one in Georgia.[4]

I ask that the FCC consider the recognized danger that a ban on the use of cell phone jamming devices in state prisons poses. I ask that you and the Commission take immediate action to allow for the use of these jamming devices in state prison systems. Updated guidance consistent with the language of the Communications Act would help to further our efforts to keep people safe. The Georgia Constitution declares that it is the paramount duty of government to protect persons and property. Ga. Const. Art. I, § I, Para. II. The easiest way to protect persons from the harms caused by contraband cell phones is to allow prison officials to use existing cell phone jamming technology.

Sincerely,

Christopher M. Carr
Georgia Attorney General

---

[4] https://www.bop.gov/resources/news/pdfs/dir_carvajal_written_statment_20220726_hearing.pdf.

**Federal Communications Commission**

June 20, 2024

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re: Notice of *Ex Parte* Communication, WC Docket Nos. 23-62 and 12-375

Dear Ms. Dortch,

On June 18, 2024, the Federal Communications Commission (Commission) hosted a listening session in Phoenix, Arizona to obtain additional comment for the record in the above-referenced proceedings as part of its ongoing work to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Act). The listening session included Commissioner Anna M. Gomez, FCC staff, and members of the public, as listed below. Participants at the listening session provided additional public comment regarding the purpose of the Act and the impact of unreasonable rates on incarcerated people and their families, including first-hand accounts of those impacts. The listening session was part of the Commission's broader efforts to engage a broad segment of the public in its continuing efforts to implement the Act.

**Public Listening Session**: June 18, 2024, 10:30pm-12:00pm MST at the Arizona State University Sandra Day O'Connor College of Law, 111 E Taylor St., Phoenix, Arizona 85004.

The following individuals participated in the listening session:

- The Honorable Anna M. Gomez, FCC Commissioner
- Ahuva Battams, FCC attorney advisor and moderator
- Rosalind Akins, incarcerated people's communications services consumer
- Dominque Jones-Johnson, incarcerated people's communications services consumer
- Brione Smith, daughter of incarcerated people's communications services consumer
- Kim Thomas, former incarcerated people's communications services consumer
- Omar Thomas, former incarcerated people's communications services consumer

Additional information about the Commission's efforts in connection with Incarcerated People's Communications Services can be found at: https://www.fcc.gov/general/ics-data-collections. For questions concerning this filing, please contact Ahuva Battams at ahuva.battams@fcc.gov or at (202) 418-1565.

Respectfully submitted,

/s/ Ahuva Battams
Ahuva Battams
Attorney Advisor
Pricing Policy Division
Wireline Competition Bureau
Federal Communications Commission

Federal Communications commission


Incarcerated People's Communications Services

Listening Session


June 18, 2024

Phoenix, Arizona


Prepared By:
**Kimberly Portik, RMR, CRR**
Certified Reporter
Certificate No. 50149
**CANYON STATE REPORTING**
RRF Number R1031
2415 East Camelback Road
Suite 700
Phoenix, Arizona  85016

```
 1            MS. BATTAMS:  Before we begin, I just want
 2   to remind everybody if you haven't signed the sign-in
 3   sheet, please do so before you leave.
 4            Good morning and thank you for joining
 5   today's listening session.  My name is Ahuva Battams.  I
 6   am an attorney advisor with the Federal Energy -- well,
 7   Federal -- sorry, I used to work for the Federal Energy
 8   Regulatory Commission -- the Federal Communications
 9   Commission's Wireline Competition Bureau's Pricing Policy
10   Division.  And I am today's moderator, and I will be
11   assisting Commissioner Gomez.
12            The purpose of today's listening session is
13   to engage with the public about the Commission's ongoing
14   work to secure just and reasonable rates for communication
15   services provided to incarcerated people and their
16   families, particularly in response to the Martha
17   Wright-Reed Just and Reasonable Communications Act of
18   2022.
19            The Martha Wright-Reed Act requires that the
20   Commission adopt just and reasonable rates no earlier than
21   18 months and no later than 24 months after the law's
22   January 5th, 2023 enactment.  The Commission is moving
23   quickly to implement this new Act, and it initiated a
24   rulemaking proceeding in March 2023.
25            This listening session will supplement the
```

 1  extensive record developed so far in response to that

 2  notice of proposed rulemaking.  This listening session

 3  will become part of the public record that the Commission

 4  will rely on to adopt just and reasonable rates required

 5  by the Martha Wright-Reed Act.

 6           This morning we will hear from formerly

 7  incarcerated people and their families about their

 8  experiences using incarcerated people's communications

 9  services.  Please note that during the event we don't have

10  dedicated time for questions or comments from the audience

11  because of our limited time today.  However, we highly

12  encourage you to share your thoughts and comments.

13           There are three ways you can submit comments

14  to the FCC.  You can file formal comments or express

15  comments into the record.  We have instructions on how to

16  do that at the front table.  You can also fill out a form

17  that we have at the front table to share your thoughts

18  today and we will get them into the record for you.

19           The FCC greatly values public participation

20  in the rulemaking process.  Your comments play a crucial

21  role in shaping these regulations.  To ensure your voice

22  is heard, we kindly request that you submit your comments

23  through these provided channels.

24           To kick off this important discussion, we

25  are privileged to have with us one of the Commission's

```
 1  commissioners, Commissioner Anna Gomez.

 2              COMMISSIONER GOMEZ:  Thank you.  It's great

 3  to be here in Arizona, and it's an honor to be here.

 4              Special thanks to Kim Thomas, Omar Thomas,

 5  Ms. Rosalind, Dominique Jones-Johnson, and Brione.  You

 6  are the stars of the show today.  This is, after all, a

 7  listening session as part of an official government

 8  proceeding, and my colleagues and I have come here from

 9  Washington to hear your stories.  Thank you for sharing

10  them.

11              As Ahuva said, my name is Anna Marie Gomez,

12  and I am the FCC's newest commissioner.  As FCC

13  Commissioner, my top priority is empowering consumers in

14  understanding how FCC decisions will impact them, but

15  particularly how they will impact these communities that

16  have not always been part of the conversation.  I want to

17  ensure that we are taking everyone with us, especially

18  those who have historically been left behind.  That is why

19  I am grateful to be here today to talk with you.  Because

20  for far too long, high prison phone rates have created an

21  insurmountable barrier between incarcerated persons and

22  their families.  No family should have to make the tough

23  choice between paying their bills and staying in touch

24  with an incarcerated loved one.

25              Before we get started, I want to take a step
```

```
 1  back and reflect, because although I've been at the FCC
 2  for nine months, the fight for fair and reasonable prison
 3  phone rates has been ongoing for years.  In fact, it was
 4  21 years ago that a grandmother named Martha Wright-Reed
 5  filed a document where the agency -- with the agency where
 6  I serve as commissioner, you know, the FCC, the Federal
 7  Communications Commission, to tell us she was having
 8  difficulty paying to keep in touch with her grandson who
 9  was in prison.  You may know the story, but I'd like to
10  revisit it briefly.
11            As a blind elderly woman living in
12  Washington, D.C., Ms. Wright-Reed's options for staying in
13  touch with her grandson were limited when he was moved to
14  a correctional facility here in Arizona, 2,000 miles away
15  from her home in Washington, D.C.  She wanted to tell him
16  about her nephews, what was going on at church.  And
17  without the ability to visit her grandson in person or to
18  write him letters, Ms. Wright-Reed's weekly phone calls
19  with her grandson were the only way to keep in touch.
20            Calling her grandson a few times a month
21  became a financial struggle.  A 15-minute call could cost
22  $17, which added up to hundreds of dollars a month.
23  Ms. Wright-Reed had to decide between staying in touch
24  with her grandson, providing him a connection with the
25  outside world, and paying for groceries and her other
```

1    bills.

2              So she wrote to the FCC to do something

3    about it.  And you know what?  That petition sat on the

4    shelf for many years.  It was not until one of my

5    predecessors, a commissioner named Mignon Clyburn, said we

6    should do something about this.  Nobody's paying

7    attention, but what's happening isn't right.

8              So Commissioner Clyburn got the FCC to start

9    looking at rates for phone calls, and what we found was

10   crushing.  So many families were paying as much for a

11   single phone call as most of us here pay for an unlimited

12   monthly plan.  And she convinced the FCC to do something

13   about it, and we did.  We lowered rates and we changed

14   policies to -- for junk fees that they add to these bills.

15   But as many fights for justice go, after the FCC acted

16   there were some setbacks.  The courts told us, the FCC,

17   you actually don't have all the authority you think you

18   have to do something about this.  So they sent some of our

19   decisions back.

20             Fortunately, Congress stepped in to fix the

21   problem.  Led by Senator Tammy Duckworth of Illinois,

22   Congress granted the FCC the expanded authority over

23   intrastate rates.  That means we could finally ensure that

24   the rates for local calls, those within-state calls that

25   the court said we could not oversee, are just and

 1   reasonable.  Congress also expanded the authority -- our

 2   authority to set the rate not only for phone calls across

 3   states, but also for video calls, which has become an

 4   integral part of communication in our society.  Nothing

 5   compares to the power of seeing your loved one on the

 6   screen.

 7              Thanks to Chairwoman Rosenworcel's

 8   leadership at the FCC, the FCC is quickly working to

 9   implement this law.  This new law also has an eye on the

10   future and recognizes that video visitation is going to be

11   an increasing form of contact, so it made sure that the

12   FCC also has authority over that.  And we are going to use

13   this new authority to ensure access to these

14   communications by those with disabilities.  Along the way,

15   we will work to integrate these new efforts with what we

16   have done before so that across the board the policies are

17   fair and sustainable.

18              So this listening session is part of that --

19   of the process of making things happen and putting new

20   rules on the books.  We've come a long way since

21   Ms. Wright-Reed started this fight to connect with her

22   grandson here in Arizona.  Ms. Wright-Reed passed away

23   eight years ago, but her legacy lives through this work to

24   ensure prison phone rates are just and reasonable.

25              With your stories today, we not only build a

1  public record to show the need for reform, but your

2  insight can also help us to fine-tune the details of what

3  those reforms will look like.

4           So, again, thank you all for coming and

5  being a part of this process.

6           MS. BATTAMS:  Thank you, Commissioner Gomez,

7  for sharing the FCC's ongoing efforts and your commitment

8  to this work.

9           Now it's time to hear from those who have

10  direct experience with incarcerated people's

11  communications services.  Commissioner Gomez and I will

12  have the opportunity to introduce each of our speakers and

13  ask questions to learn about their personal experiences

14  and engage in such an important dialogue.

15           Welcome, Kim Thomas, Omar Thomas, Rosalind

16  Akins, Dominique Jones-Johnson, and Brione Smith to help

17  us understand this crucial issue.

18           We will now have Commissioner Gomez

19  introduce our first participant to share their

20  experiences.

21           COMMISSIONER GOMEZ:  Thank you again.

22           So I would introduce Kim Thomas.  Welcome,

23  Kim.

24           MS. THOMAS:  Thank you.

25           COMMISSIONER GOMEZ:  First, thank you for

```
 1  joining us today.  Your experiences today will help the
 2  FCC as we aim to make changes to ensure a better
 3  experience for others currently incarcerated.  I
 4  understand you have a lot of experience using
 5  communication services and can speak to the challenges
 6  that people may experience inside and outside of prison,
 7  relying on these communication services.
 8              I know you carry many stories as a teacher
 9  and a trainer inside and outside of prison, as the
10  C.A.S.E. senior manager with Arouet, serving as a bridge
11  between individuals currently and formerly incarcerated
12  and the resources they need to integrate into society
13  successfully.  You also carry personal experiences using
14  communication services as you served 30 years incarcerated
15  here in the Arizona state prison, Perryville.  Your
16  commitment and dedication to personal growth and the
17  betterment of your fellow inmates by developing an
18  in-depth 200-hour self-improvement curriculum, the
19  first-ever peer-led program at Perryville, is truly
20  commendable.
21              Now, Kim tirelessly taught this program to
22  over a thousand women in the span of 15 years.  She earned
23  two associate degrees while in prison and successfully
24  completed her bachelor's degree --
25              (Applause.)
```

```
 1              COMMISSIONER GOMEZ:  -- in May 2022.  So two

 2   and a half years, you told me.

 3              MS. THOMAS:  Yes.

 4              COMMISSIONER GOMEZ:  Now, these are not easy

 5   to accomplish, period, especially while incarcerated.

 6              So, Kim, please share with us your

 7   experience using communication services.

 8              MS. THOMAS:  Thank you for that.  Thank you

 9   all for being here today.

10              It's a privilege and an honor to be able to

11   speak with you all.  As the Commissioner said, I did serve

12   three decades inside of Perryville prison, from 1991 until

13   November of '21.  I have seen a lot of changes throughout

14   the communication process.

15              In the beginning of my incarceration, it was

16   pretty open.  We were allowed to call anybody we wanted.

17   We did not have to have a list of people approved or

18   anything like that.  But it was very expensive, and the

19   process of that became very burdensome.  If you called in

20   your ZIP code of where the facility was located, which is

21   Goodyear, Arizona, it was one price.  If you literally

22   called Mesa, it was another price.  If you called another

23   county, it was an entire pricing.  If you had to call your

24   family out of state, it was exponentially higher than

25   that.
```

1          After the FCC did get involved the rates did

2   come down exponentially for us and for our families, which

3   I was very grateful for because then I could call my

4   elderly aunt and be able to communicate with her and walk

5   her through some of the challenges she was going through

6   as well.  And it made it -- it made it possible to stay

7   connected to something that was outside of incarceration.

8          One of the hardest things I think being

9   incarcerated and having to use communication systems that

10  you are not in control of is the disparity and

11  understanding of what income is to an incarcerated person

12  versus the price of things that they have to afford.  The

13  average person that I experienced personally was about

14  15 cents an hour is what they make.  And they can make

15  30 hours a week.  So if you calculate that out, it's not

16  very much money, and you choose to make a phone call or

17  buy soap.  That happens.  I'm not saying that it is

18  exorbitant; I'm not saying that it is all of those things.

19  I'm saying it is not proportionate to pay.  And that is

20  not anyone particular's responsibility.  But you do have

21  to make choices, and the choices do become difficult at

22  times.

23          If you only make $15 a month and you want to

24  buy a stamp, which is 25 cents, to write to your loved one

25  or your loved one wants to send you a picture of your

```
 1  family, it becomes cumbersome.  It becomes something that
 2  is not -- I think the proportionate amount of it could be
 3  dealt with, especially as someone who does it inside and
 4  out now.
 5          Now I send probably 50 to a hundred messages
 6  into Perryville because I teach there now.  And with
 7  Arouet, we serve 300 women a year while they're still
 8  incarcerated and all the way out.  So we are constantly
 9  weekly touching base with these people, and what we've
10  been able to do is provide them a return reply.  We're at
11  an advantage to be able to do that.
12          COMMISSIONER GOMEZ:  And how do you do that?
13          MS. THOMAS:  So there's a button on your
14  tablet when you send a message in that says do you want to
15  send a stamp for them to reply to you.  Currently in
16  Arizona on Wednesdays you can click that button and it
17  doesn't cost you anything.  That happened -- that started
18  during COVID and it has continued.  They didn't stop it.
19  So if you send a message -- if your family sends a message
20  on Wednesday, they can do it for 25 cents and send you a
21  stamp instead of 50.  On the other six days of the week,
22  it's 50.  So the -- that did help quite a bit.
23          During COVID, they did make -- the
24  organizations did make -- the department and the vendors
25  did make the combinations during COVID.  Not quite sure
```

```
 1  who made the rule or who it was authorized by, but we did
 2  receive free phone calls and we did receive free emails
 3  during COVID because we were on lockdown status.  So it
 4  made it -- it helped.
 5              Now that they are moving towards expanded
 6  phones, being able to do it on the tablets, I think my
 7  concern would be in order to do that you'd have to
 8  purchase accessories to do that.  I don't know if they're
 9  being provided.  They might be.  The policy isn't quite
10  clear.
11              I think the education of people who are
12  incarcerated needs to be increased because they don't know
13  the policy.  When you initially get your tablet or you
14  initially are brought into an incarceral situation, you
15  are not always given all the rules.  You are not always
16  given all the parameters.  You are not always given -- you
17  are rarely given where the information is located for you
18  to be able to find that.  And it's an education situation.
19  And I'm probably speaking that way because I am an
20  educator, and so my goal is to make sure everybody has the
21  information.
22              If I don't know that that call is going to
23  cost $2, I might make it not having it.  If I don't know
24  that my video visit will cost my family this much -- I
25  might say no more often if I know it's going to put them
```

1  in a hardship.  If I know that if I use trigger words my

2  messages are going to go out and never reach their

3  destination, then I might not send that.  But the

4  information is not readily available.

5              I think I'm more on the aspect of let's

6  educate everybody so that they know what they're dealing

7  with.  I think it is a habit for the incarceral population

8  to be a little left in the dark about some of that, and I

9  think that's the biggest opportunity for our growth, for

10 our change, and for there to be equity, is let us know

11 what we're accepting, let us know what we're agreeing to

12 prior to us blindly clicking the accept button,

13 considering a very large portion of the incarceral

14 population do not have an eighth grade literacy.  So if

15 it's written in college speak, they're going to accept it

16 and not know that they just accepted something.  So not

17 saying dumb it down.  I'm not saying they're stupid.  I'm

18 saying that you have to meet people where they are.  And

19 if their average education level is eighth grade, we need

20 to meet them there until we can educate them higher.

21             COMMISSIONER GOMEZ:  Reminds me of the

22 privacy disclosures.

23             MS. THOMAS:  Yes, ma'am.  They are pages

24 long.

25             COMMISSIONER GOMEZ:  Who really reads them?

```
 1                   MS. THOMAS:  And the tablets are this big,
 2      and you can't move forward until you do all the accepting
 3      so you're --
 4                   COMMISSIONER GOMEZ:  Right.
 5                   MS. THOMAS:  They're just accepting.
 6                   I didn't, but that's me.  I sat for -- I
 7      went line by line, but I'm also that kind of person.  But
 8      I'm sure I'm not the only one who did that.  But probably
 9      pretty -- but not a lot of people did it.
10                   You'd see people.  I was the tablet clerk.
11      I would hand someone the tablet and they would be like,
12      yeah, yeah, yeah, yeah, yeah, I want to get to the stuff,
13      and they would just process through it.  So they aren't
14      reading it.  And it's not provided in any other venue for
15      them to sit back and go, oh, yeah, I agreed to that.  So I
16      think the education part, the communication part.
17                   If we have vendors coming in who are
18      communication specialists, let's communicate.  Let's do
19      that.  Let's communicate and educate so people can make
20      informed decisions.  And I think that's where the lack is
21      the most, it was in my experience, of the understanding of
22      what you were signing up for.  Because you can choose and
23      you can be accountable, but you have to have all the
24      information.  And I don't think that's provided.
25                   COMMISSIONER GOMEZ:  So when did you get the
```

```
 1   tablets?
 2               MS. THOMAS:  We got the tablets in March of
 3   2020.
 4               COMMISSIONER GOMEZ:  So did you have access
 5   to video?
 6               MS. THOMAS:  Not initially.  The kiosk at
 7   Perryville -- I'm only speaking about San Carlos unit at
 8   Perryville.  I want to be very specific.  I'm not speaking
 9   in generalities.  I was at the San Carlos unit at
10   Perryville prison.
11               We had kiosks present, but they were not up
12   and running yet.  During COVID for the first I believe it
13   was three months, two months, two or three months, we had
14   no visitation, no video, no nothing.  It was not allowed.
15   It did come in later.  The department did provide tablets
16   in our visitation area to have free visits.
17               Now we have kiosks in our visitation room
18   that do work and people can make visits through there.
19               COMMISSIONER GOMEZ:  And is there a cost
20   difference between the video calls and the --
21               MS. THOMAS:  Regular calls?  I believe right
22   now it's double to have a video call in the state of
23   Arizona.  Yeah.  That's my understanding.
24               COMMISSIONER GOMEZ:  Thank you.
25               MS. THOMAS:  You're welcome.
```

```
 1                COMMISSIONER GOMEZ:  Thanks for sharing that
 2   with us.
 3                MS. BATTAMS:  I just have a couple follow-up
 4   questions.  Thank you so much for sharing that information
 5   with us.
 6                If you could change one or two things about
 7   communications for incarcerated people and their families,
 8   what would be those two things?
 9                MS. THOMAS:  The first thing I would change
10   is that it's proportionate to pay.  To the average pay,
11   not the people working at the good jobs that make all the
12   money.  Not the 1 percent, but the average pay of the
13   inmate, the person incarcerated, that it's commiserate,
14   it's fair, it's equitable.
15                I think if people are listed on an indigent
16   list, which is what the state of Arizona calls it, if you
17   make less than $15 an hour they'll give you, not great
18   mind you, but some free hygiene, three free envelopes.  At
19   that point maybe they could provide a free video visit a
20   month for those people listed as indigent so that just
21   because you do not have funds does not mean you don't get
22   to see your kids, just so -- just because you're
23   disadvantaged -- in a disadvantaged group, you're even in
24   the shallow end of this pool, you still have access.
25                I have known women who gave birth while
```

```
 1   incarcerated and did not get to see their child for

 2   18 months, physically or in any other way.  And they're

 3   nonverbal at that point.  So you're not even getting to

 4   look them in their eyes, and that's not okay.

 5             If we can provide them -- if the free -- if

 6   a free phone call was made every week, if when you

 7   purchased -- because we can purchase inside.  We can

 8   purchase our phone time.  If that was actually -- the

 9   process was actually smoother and consistent and it did

10   occur when they said it would and it wasn't, oh, sorry,

11   must have been a clerical -- how often -- well, if you

12   know it's a clerical error, can we fix that?  Can we fix

13   that process?  So that if you think it's coming on

14   Wednesday because that's your kid's first day of school

15   and you want to call them because you're excited to talk

16   to them and you stand in line for an hour and then your

17   money is not there and you can't make that phone call and

18   you already have to rebuild trust with your child and you

19   didn't call when you said you would, that's a problem.

20   That's a problem of trust, that's a problem of family

21   reunification, and it goes bigger than what the FCC is or

22   any vendor is.

23             This is the ripple effect of lives, and we

24   have got to take that into account.  It's not just the

25   person who's incarcerated that gets affected by this.  It
```

```
 1   is the entire family, which is the community, which makes
 2   it harder to reintegrate, which makes it harder to have a
 3   positive outlook.  If you are constantly struggling in
 4   there, you stay in survival mode, you have no chance to
 5   thrive.  None.  So when you walk out -- I can tell all of
 6   you here in this room today it took me two years to
 7   thrive.  For my first two years, released in freedom, I
 8   was still in survival mode because that's how long it
 9   lasts.
10            And if we can just -- we can get away with
11   equitable for everybody to be able to call their --
12   somebody, call a friend, maybe they'll thrive a little
13   sooner.
14            MS. BATTAMS:  Thank you.
15            I'd now like to introduce another one of our
16   participants, Omar Thomas.  Thank you for joining us
17   today.
18            For people that are experiencing
19   incarceration, the time away from family and community is
20   difficult.  We understand the importance of maintaining
21   the close connection to family and the support system.
22   It's integral for so many reasons.
23            I understand that you're a native of
24   California?
25            MR. THOMAS:  I am.
```

```
 1              MS. BATTAMS:  You were incarcerated at the
 2   age of 18 and spent over three decades in prison.
 3              As someone who experienced this firsthand,
 4   please share with us a bit about yourself, your personal
 5   experiences relying on these communication services, and
 6   the impact that staying connected had on you.
 7              MR. THOMAS:  First of all, thank you for
 8   putting together this panel.  Thank you, Commissioner.
 9   Appreciate it.
10              First off I would like to correct I am not a
11   star; I'm a servant.  The stars are those that are still
12   in there, striving and persevering, and I'm a
13   representation of them.  And I think that needs to be
14   noted.  Because they're already undervalued, and I
15   think...
16              Second of all, my name is Omar Thomas.  I
17   was incarcerated in Phoenix, Arizona, at the age of 18 for
18   aggravated assault.  I touched no one.  I hurt no one.  I
19   damaged no one.  I was sentenced to life for it.  I was
20   sentenced to life for it.  And I had no communication, my
21   personal experience, because going into the penal system
22   with a life sentence you go into lockdown.  Going into the
23   penal system with a life sentence, you are not amongst
24   your equals.  You are in a classification on your own and
25   you're locked down, and the telecommunication system is
```

1  pretty much nil.

2              I believe the biggest impact that I have

3  experienced due to the lack of communication and the

4  flawed communication and the manipulated communication —

5  because that happens too to our loved ones and to us

6  through all forms of communication, mail, the telephones,

7  emails, video messages, photos, all forms of communication

8  are affected — I think the biggest impact is mental

9  health.

10             I would wager 65 percent of the population

11 in the prison system turn to drugs secondary to not being

12 able to communicate because the penal system is designed

13 so that you don't communicate.  I can't express my

14 emotions because I'll be labeled all the derogatory terms

15 such as punks and sissies.  So I cannot cry with dignity.

16 I cannot say I hurt with dignity.  I cannot be upset and

17 express that because I'll be placed on report and locked

18 in the hole.  And so communication is already diminished.

19             And then when you do have opportunity to get

20 on a telephone to call your loved one -- we have

21 recreation periods that last probably three hours.  I've

22 never been on a minimum yard.  So when you have three

23 hours to recreate and make your phone calls and you have a

24 population of 300 people and your phone call is 15 minutes

25 long, how many people make a phone call?  You have lines

1 that are very long, you have fights that are very hard,

2 and you have people who die.  That happens on a regular

3 basis.  I'm desensitized to it; it happens that often.

4          People who have mental health issues,

5 commencement thereof is usually over communication.  If

6 the phone drops, I don't know if you hung up on me because

7 you didn't like what I was sharing with you, you didn't

8 like how I was doing, you seen on the computer that I got

9 a write-up and I haven't had opportunity to explain the

10 calls.  I don't know.  I just know the phone hung up.  So

11 now my mind is going like this, and in the environment

12 where I need to be focused on this, and you just can't

13 walk two streets that way.

14          I do not know what could be done to improve

15 it.  What I have experienced since my manumission from

16 prison is Obama phones, for lack of better terminology,

17 are given for free with a thousand minutes for free to

18 people out here who have nothing.  But people in prison

19 who have less than nothing have to pay for a minute on the

20 phone.  I cannot rationalize that.  I cannot -- I can't

21 bridge that gap.  It makes absolutely no sense to me.

22 They are wards of the state.  Why?  Why are we paying for

23 it?  Where do they do that at?  I have never seen it

24 before except for this system.  I've never been in any

25 other system before.  It is addressed on a regular basis

```
 1   inside.
 2              But the FCC cannot control it.  It's an
 3   admirable, an honorable effort; however, there has to be a
 4   village, for lack of better terminology, to fix this
 5   issue.  Because FCC can do everything right, perfect even;
 6   the system is still flawed because the phones are dropped.
 7   It's not because of what you are doing or not doing.  It's
 8   because of the system.  Or the 15 minutes that you're
 9   allotted, you only talk for 11 and it hung up, but your
10   loved one is paying for that 15 minutes.
11              I think the communication on tablets, the
12   fact that it's the penal system mandates that has to be
13   observed, and so we don't get it when you send it.  You
14   can send me a communique today.  I probably won't get it
15   until the day after tomorrow, after the event is over.  So
16   if you are going through a crisis, if you are going
17   through a pregnancy, if you are going through -- whatever
18   you're going through and you express that, I won't hear
19   about it until after the fact.  It's kinda like the sun.
20   We get the rays from the sun and we think the sun is
21   shining.  Those rays have been traveling for a long time,
22   and it's not that anymore.  That's the communication.  And
23   so for me to respond, and you have to respond to
24   communicate, it takes two, the issue is no longer an issue
25   anymore.  People miss opportunities that way.
```

```
 1              I know my words matter, I know my prayers

 2    matter, and I would like the opportunity to pray with my

 3    loved ones whenever they're in the interim of their

 4    crisis, not the after effect.  I mean, I don't think

 5    anybody pay a bill after the bill is paid.  I think it's

 6    the small things of that nature that should be addressed.

 7    They say the devil is in the details.  And I think it can

 8    be addressed.

 9              I don't think it's a big issue.  I don't

10    know how it is in Perryville.  I've corresponded with many

11    people there.

12              Congratulations for surviving that.  It

13    deserves to be applauded.

14              But in the males prison, I don't really

15    think anything can be done by the FCC without ADC being

16    present.  Because as I said, if you do everything right on

17    your end, the flaw is still there.  You still have short

18    staff.  If you have short staff, you aren't going to use

19    the phone.  Doesn't matter if it's brand new and you have

20    a thousand minutes on it for free; you're not going to use

21    it.  So the problem is not monolithic.  There are a

22    plethora of things that can be implemented.  I don't know

23    what type of jurisdiction the FCC has, but I spoke with

24    you and you explained that there were -- there were room

25    for improvement.
```

```
 1              And I think from a standpoint of somebody
 2    that's been inside and outside and having to rely on that
 3    form of communication, the very best thing that could be
 4    done is make sure whatever the price of the call is it's
 5    proportionate to what you get paid.  I think that fits
 6    inside and outside.  I mean, prices are going up in the
 7    stores but you're not getting a pay increase, and
 8    everybody recognizes that dichotomy and speak on that at
 9    the ballots.  It's the same thing is going on inside the
10    prison system.  The prison system is nothing more than a
11    microcosm of the society out here.  So the issues that
12    permeate out here, those issues permeate inside, but it's
13    concentrated because the population is smaller.  The area
14    is smaller.  And when that happens, it's a cesspool of
15    drama, BS, and a lot of high temperatures.
16              And so I think if anything should or could
17    be done, it would be expanding access of
18    telecommunications and diminishing the cost so that it's
19    proportionate to the pay.
20              In the prison system, in the male system, we
21    have phases.  It was implemented by some lady out of
22    California back in the day of 2005.  But the phases
23    include phase 1, phase 2, phase 3.  Phase 1 gets one phone
24    call.  If you are at rec, standing in line in summertime
25    for two and a half hours, waiting to get on the phone
```

1   because you only get one phone call, and you don't make

2   it, somebody's gonna get hurt that night.  It happens.  Or

3   that person is gonna hurt themselves.  That's the only

4   options.  It's the only options.  And it's real and it's

5   happened.  The system does not work that way.

6            And so I would propose find out who the

7   constituents are, who it is that you are representing

8   personally.  Because you may have phase 3s who can make

9   unlimited phone calls, but a phase 2 can only make two

10  phone calls, phase 1 can only make one phone call.  So

11  whatever type of limit is going to be applied has to be

12  applied where everybody reap the benefit.  Otherwise, it's

13  a lack of equity.

14           MS. BATTAMS:  Thank you so much.  I know how

15  impactful what you just said is and how important.  I want

16  to thank you again for sharing that experience, especially

17  as you said for the people that aren't here that you're

18  speaking for today.

19           I wanted to follow up on something that you

20  had said about the calls being disconnected and your

21  family paying for 15 minutes.

22           What can you tell us about the ability to

23  get refunds in those situations?  Is it easy to get one?

24  Do they exist?  If you have a call dropped or a video call

25  dropped, what are your options for, you know, either

1  getting your money back?  Or say the call gets

2  disconnected and you have to connect it again.  Are you

3  charged all over again?  How does that -- how does that

4  work?

5          MR. THOMAS:  That's exactly how it works.

6  We're charged all over again.  I don't think there is a

7  procedure in place to reap benefits such as refunds.  I've

8  never heard of it.  Out of my 35 years, 7 months, and

9  2 days, I've never heard of it.  I was emancipated in

10  2022, August 29th.  I never did a video call in prison.

11  I've seen the kiosks.  They were cute.  Never used one.

12  It never worked.  It was just a cage.  The kiosk at

13  visitation works, but usually the video is upside-down.

14  So you look at your people like this, and that's

15  problematic, especially when you have children that you

16  are trying to see.  But these are small things, these

17  small things that can be fixed.

18          As far as the refund, I've never known my

19  family members to reap a refund.  And I'm pretty fluent in

20  most of the policies in DOC.  Policies are the policies in

21  DOC.  I've never read a policy about a refund ever.

22          As a matter of fact, I have read that there

23  are no refunds.  We put money on our phones when we fill

24  out our commissary list.  On the commissary list, it says

25  there are no refunds.  So you buy a $20 amount of phone

```
 1  time or you can buy a dollar amount of phone time or
 2  anything in between.  But what's bought is bought.  They
 3  make mistakes.  When you put 20, they'll give you 200.
 4  You can't get that refund.  That happens all the time.  Or
 5  you may put $1 and they charge you 10 or 15.  You can't
 6  get that back.  There is no process for refund unless it
 7  happened post 2022.
 8              Usually when calls fail, we have to argue
 9  with the powers that be as to whether the call really
10  failed.  And that's really an exercise in futility because
11  it's just not worth what you're gonna feel at the end of
12  that dialogue and not have any type of reprieve.  Most
13  people just leave it alone.  But it affects everybody in
14  some way, fashion, or form.
15              MS. BATTAMS:  Thank you.
16              Commissioner Gomez.
17              COMMISSIONER GOMEZ:  Similarly, do your
18  family members get itemized invoices for the calls?
19              MR. THOMAS:  I do not know.  I experienced
20  it twice and opted to not call my family anymore.  But my
21  circumstances are different.  I was sentenced to life, and
22  so the processes I had to go through was detachment.
23  Communication was not that important to me with people
24  outside of the prison as opposed to people inside of the
25  prison.  But my circumstances are different.
```

```
 1              But most people who I've met, I've never
 2   known anybody's family to get a refund or I've never even
 3   heard anybody mention it.  So I don't know what the
 4   processes are for that or if there's processes that exist.
 5              COMMISSIONER GOMEZ:  Well, thank you so much
 6   for being here and telling us your story.
 7              MR. THOMAS:  Absolutely.
 8              COMMISSIONER GOMEZ:  So I'd like to present
 9   the next speaker, Ms. Rosalind.  Thank you for joining us
10   today.
11              I know your grandson is currently
12   incarcerated, which I still can't believe you're a
13   grandmother.  And you know the reason we are here today is
14   because of a grandmother, Martha Wright-Reed, who I
15   mentioned before, from Washington, D.C., leading the
16   campaign for just calling rates for incarcerated people
17   for over a decade.  Now, she became involved when as a
18   grandmother she was forced to choose between purchasing
19   her medication or communicating with her incarcerated
20   grandson.
21              So it's quite powerful to have you joining
22   us here today and to provide your history here, here in
23   Arizona, where her grandson was transferred when the
24   Lorton correctional facility in Virginia was closed in
25   2000 -- I forget actually exactly when it was closed.  It
```

```
 1    was in the '90s.  So as a blind elderly woman who could

 2    neither write letters nor travel such long distances for

 3    in-person visits, the phone call was her only option to

 4    stay in touch with her grandson.

 5              So please share a bit about yourself and

 6    specifically about what it means for you to be able to

 7    remain in touch with your grandson during this time away

 8    from each other and what it has meant for your grandson to

 9    be able to communicate with you.

10              MS. AKINS:  I too would like to initially

11    thank you for having me in this space.  This is totally

12    not a moment; it's a real movement that I'm excited about

13    being a part of.

14              And I am a grandmother.  My grandson was

15    24 years old when he was -- became incarcerated.  And it

16    was totally turbulent and devastating for our family as a

17    whole.  And one of the things with somebody being so

18    young, it was something I purposed that I would always

19    have money on the books.  I would always have money on the

20    phone that Dominique would have accessibility to me.

21              Interesting enough, I didn't know initially

22    how do you start this process.  And, you know, I put money

23    on I believe GTL, I put money on IC somebody, and I put

24    money -- but all of these different things I'm thinking

25    because it says prison it just didn't matter what service
```

 1 | I used; my grandson could still access it.  And that
 2 | wasn't so.  So I've had money placed on some of these
 3 | other entities that were not accessible to Dominique's
 4 | usage.  And so hence that money is lost and wherever it
 5 | is, I don't know.  But I didn't know.
 6 |             And now you get a message saying if you want
 7 | a text 30 days before your money has ran out, you have to
 8 | pay for this text reminder, which is asinine.  But what I
 9 | do know is that it's important enough to me -- you know,
10 | air and water has been commodified, and that really ticks
11 | me off because it's just a human right to access.  We have
12 | to breathe, we have to drink water.  Likewise, we have to
13 | communicate.  I wouldn't be having this moment with you if
14 | we could not communicate.  We need to talk about some
15 | things.  And so we're doing this freely, autonomously.
16 | And I think talking freely is a human right.
17 |             And as Omar alluded to, he can't wrap his
18 | mind around -- I hadn't even thought about that, but he
19 | cannot wrap his mind around a thousand free minutes to
20 | someone in the free world and no minutes to someone
21 | incarcerated.  And it's just such a yuck process.
22 |             But one thing I do know is as young as
23 | Dominique was, at some point during COVID, the way they
24 | were being housed and no movement, when I spoke with my
25 | grandson — and I get pretty emotional even in this

```
 1  moment — he says, "Granny, I think I'm hearing voices and
 2  I'm really afraid right now."  And for me, that meant I
 3  needed to never not have money on the books.  And that
 4  type of restriction and abuse is vital.  That type of
 5  thing is a human right, to be able to express and to know,
 6  psychologically know, I can call my grandmother, not
 7  wonder if I can or when I do there's no money on the
 8  books.  And so I made it -- it was like a thing.
 9            Because I could not keep up with the cost,
10  so I made it a consistent thing to almost dial myself so
11  that I can know how much money is on those books so that
12  Dominique could call me as many times as often.  And
13  sometimes my grandson literally had nothing to say, and I
14  would be like, "Dominique, you called me twice already
15  today.  What is it?"  But then I began to understand that
16  he just needed to feel close.  He just needed to feel
17  human and that someone familiar and someone that loved him
18  was close, accessible, familiar, and cared.
19            So when we start being so negligent and so
20  authoritative about -- it's rape literally.  Like that's
21  the crime.  You are raping a population of bodies a human
22  right to be able to express themselves.  They can talk to
23  their celly, as they call it, they can talk to a lot of
24  people, but that's just talking.  But we're talking about
25  intimate expression and meeting their need, is to talk to
```

```
 1   someone familiar.  And that is -- you can't even put a
 2   cost on the value of that, the therapy of that, the safety
 3   of that.  I could go on and on and on.  You cannot put a
 4   dollar amount on that human need.
 5              So for anyone to ever be denied a human
 6   expression -- babies were born saying gaga goo goo or
 7   whatever they say.  And they're so innocent.  What if we
 8   took that from a baby?  How they would be underdeveloped.
 9   And that's what happens behind the wall.  People become
10   induced mentally ill because they can't communicate.  They
11   also become underdeveloped because they become
12   desensitized and lose their trust and ability to talk to
13   what's familiar to them.  A lot happens around these
14   calls.
15              So it's not just a phone call.  It's not
16   that.  It is a lifeline.  It is life support.  And I know
17   it.  Because my grandson was released, and you know what?
18   My grandson didn't ask for a pair of Nikes.  My grandson
19   didn't ask to be laid.  You know what my grandson's first
20   thing was when he got out?  Mental help.  Granny, I --
21              Dominique, picked him up -- you know,
22   someone was sitting in the parking lot when Dominique was
23   being released.  They recorded it, and somehow it just so
24   happened to pop up on my Instagram.  I was shocked to see
25   it.  And in that moment is when I'm celebrating my
```

```
 1   grandson and saying, "Hey, where do you want to go eat?"
 2   He said, "I don't.  I got to get to some mental health."
 3   Out the gate he's asking this.  And that's someone who
 4   could call.  That's someone who didn't have enough of
 5   calling because of the restriction being so great.
 6              And I can't tell you as a grandmother how
 7   many times my grandson called me and wanted to cry and
 8   couldn't and would tell me, "Granny, in this moment I want
 9   to cry."  And also I can't tell you how many families --
10   off of that one 15-minute phone call how many families I
11   called because Granny -- Dominique would say, Granny, will
12   you call so-and-so's such-and-such and let them know
13   they're okay because they can't afford it.  Oh, and it
14   also forces the inmate to...
15              Ah, that's a big one.  Also, it forces
16   inmates to break rules because they will say will you
17   three-way me to someone else.  You're putting them in some
18   precarious positions because families cannot afford.  So
19   many things I learned about this communication piece
20   because it was personal to me through my grandson.
21              And I also want to say that Omar and I, we
22   go way back.  I was working --
23              MR. THOMAS:  Thirty-two years.
24              MS. AKINS:  Yeah, thirty-two years.
25              I was working public health, and I was in
```

```
 1   part of their suicide portion.  And Omar was incarcerated.
 2   I did not know him.  And Omar came in to Maricopa County
 3   Hospital when it was that.  It's Vitalyst now, I think.
 4   But whatever it is, he came in, attempted suicide because
 5   he didn't have the supports around him, he didn't have
 6   that communication, and that's why he's telling you he
 7   learned to disconnect.  And that began this long
 8   friendship of supporting this guy.  He's amazing now, but
 9   then he was fragile and broken, and I'm telling you it is
10   from that experience that when it came to my house I then
11   knew that I would be everything I could be for my
12   grandson, through the experience with Omar.
13            And you know what?  They gave me the
14   privilege -- because of the position I was in, they
15   allowed him to stay on the phone hours with me.  Hours
16   with me.  And it was that communication -- it is that
17   communication that I had the privilege of sitting next to
18   him today and calling him friend, because otherwise he
19   would've been gone.  But it is moments like these that
20   remind me it's not just a phone call.  It is human to
21   care, that humans can have human connections.
22            Omar is amazing, but that's who he is today.
23   That's not who he was yesterday.  And if I wasn't in
24   place, in his space, and not have the communication to
25   restore and to hold on and to encourage him, that life had
```

```
 1   value -- that took communication.  And there are thousands
 2   of Omars that we must -- like this can't be.  This isn't
 3   really a decision.  This really is not even an option.
 4   This is a must.  This is a human right.  This is a human
 5   need that someone has leveraged authority to make a
 6   decision about.
 7             And think of the families if you can even go
 8   there, families who landed where they are because they had
 9   breached and broken relationships.  And then they go into
10   a place like this and then another something is taken from
11   them.  We cannot be comfortable as a community, as the
12   FCC, whoever it is, because I now know my grandson needs
13   mental help and I know Omar needed it.
14             COMMISSIONER GOMEZ:  Wow.  That was
15   extraordinarily powerful.  I really, really am very
16   grateful for your coming here and sharing this with us
17   today.
18             Do you have any questions?
19             MS. BATTAMS:  It's hard to follow something
20   so moving.
21             The only thing I would like to hear a little
22   bit more about, I know you were, you know, very regularly
23   talking with your grandson.  How would you know how much
24   money was left on his calling account?  Did you ever
25   receive a statement or, you know, a monthly breakdown that
```

```
 1   said, you know, you have $5 left or -- you know, when did
 2   you -- how would you find out what your balance was and
 3   when you needed to add money?
 4              MS. AKINS:  You know, I'm so full in this
 5   moment, but what I will tell you is when you pay the
 6   money, which is interesting -- when you pay the money, you
 7   get an email saying we just have $50 of your money.  But
 8   it's very interesting that you can gobble that money up
 9   and in the moment of crisis and need, my grandson's
10   calling me and it's saying you have one cent left, not
11   enough for the call.  So they never told you when there
12   was enough money.  And I always felt guilty if I hadn't
13   made the regular call to check to see how much money is on
14   that phone.
15              And it's just -- it's so structurally
16   instituted, it's so -- it's so structured to destroy.
17   Like not to support.  I am paying you to induce pain.
18   Because first of all that 15-minute call is not enough to
19   say anything.  It's $3 a call for the jail now and $1.76 I
20   think for the prison now.  So if you get 15 minutes and
21   they are -- what is the purpose of interrupting my call
22   saying this is a call from Maricopa County jail, this is a
23   call from Buckeye -- why?  You're eating up my time.  I'm
24   paying for you to remind me of where my loved one is.  I
25   don't need to remember because I am paying to live this
```

```
 1  experience.  So what is that about?  I don't know.  That
 2  needs to go away.
 3              You don't have to do that if you're trying
 4  to stop them from three-waying.  Because I tell you what,
 5  the smartest people are behind the walls.  They are
 6  brilliant, and they will figure it out.  So that isn't
 7  working for anything other than to create anxiety because
 8  now you know I only have this few minutes left and you're
 9  racing.  And it's just all bizarre.  All of it induces so
10  much angst, so much pain.
11              That in answer to your question, no, you
12  don't get a receipt or anything letting you know.  But
13  that recording will let you know you have a minute left.
14  And you don't have a minute left because they have taken
15  part of that minute to make that message and then they
16  just cut you off.  So nothing is integral about that
17  process at all but my integral dollars being invested.
18              MS. BATTAMS:  How much would you estimate
19  that you spent on communications while your grandson was
20  in prison?
21              MS. AKINS:  I bet you I could have a new
22  car.  My grandson 8 years and Omar 32 years, I bet you I
23  could have some things with the dollars that I've
24  invested.  And I have standing dollars for other inmates
25  to call.  So, yeah, I could have some mortgage payments
```

```
 1  going on and own some things.
 2              MS. BATTAMS:  Thank you.
 3              MS. AKINS:  Yeah.
 4              MS. BATTAMS:  Thank you for sharing with us.
 5              MR. THOMAS:  May I make a relevant
 6  interjection, please.  I think what needs to be understood
 7  in regards to communication is that prison is a sensory
 8  deprivation tank.  We only have five senses to learn
 9  anything.  You got -- you see it, you smell it, you taste
10  it, you touch it, or you hear it.
11              In prison you don't see anything new.
12  Everybody wear orange.
13              MS. AKINS:  And brown in the cage.
14              MR. THOMAS:  And that and this.
15              You don't smell anything new.  You don't
16  hear anything new.  You don't taste anything new.  And
17  touching is prohibited.
18              And so when you have an individual, when all
19  of their external stimuli is cut off, what happens to the
20  mind?  It has to go within.  That's why you have geniuses
21  come out of prison, and that's why you have people come
22  out of prison mentally disturbed.  All of that's
23  communication.
24              And so the phone call is the stimuli.  I
25  mean, if you have a child and you could feed that child,
```

```
 1   burp it, bathe it, but if you don't -- if you don't put
 2   different colors around the room for stimuli and you don't
 3   whisper to it and stroke it, the child is gonna die.
 4   Period.  The child is gonna die.  And that's what you are
 5   dealing with in prison, a lot of individuals that are
 6   emotionally dead because there is no stimuli and they try
 7   to get it from that phone call.
 8             I mean, I can't tell you how much I've
 9   gotten out of a 15-minute phone call, but I've got more
10   than 15 minutes out of a 15-minute phone call.  Because
11   it's not 15 minutes for me.  It's life.  You see what I'm
12   saying?  And you really can't convey that in words, but
13   it's the actual fact.
14             MS. BATTAMS:  Thank you.
15             MR. THOMAS:  Yes, ma'am.
16             MS. BATTAMS:  Thank you.
17             MS. AKINS:  One other thing I want to say
18   before I can say nothing else, Omar was in solitary
19   confinement his first few years.  There was nothing but a
20   dictionary in the room that he was in.  And he was -- he
21   had no communication.  But Omar, when he talks about
22   geniuses, that's who he is.  He taught himself five
23   languages in there.  He knows every single word in the
24   dictionary and its etymology.  Let me tell you this guy
25   knows all the history.  Like he is a walking phenomenon.
```

```
 1   He is just like -- I challenge him on some things, and
 2   it's like a joke.  But he did something with that time.
 3   But the thing he understood is trying to keep himself
 4   stimulated.  That's why the phone call was a lifeline when
 5   he did get it.  I just thought that was important to
 6   share.
 7                    MS. BATTAMS:  No.  Thank you.  And --
 8                    MR. THOMAS:  That's also why I got an iPhone
 9   in prison too.  That's what she meant when she said it
10   forces the person to break the rules.  I found out that my
11   parents were ill, and I wasn't gonna wait on the letter to
12   find out that they died.  I needed to be in touch.  And so
13   I did what I had to do, circumvent everything in the
14   prison system to get an iPhone.  And I only used it to
15   communicate with my family.  And I left prison with it.
16                    MS. BATTAMS:  Thank you for sharing.
17                    I'd like to introduce our next speaker,
18   Dominique Jones-Johnson.  Ms. Jones-Johnson has flown in
19   from Louisiana to speak with us today.
20                    As a child with an incarcerated parent,
21   Dominique, you have dedicated your life to uplifting black
22   girls with parents who are in prison and developing them
23   into advocates, policymakers, and grassroots activists to
24   forever change lives, systems, and communities.
25                    In May of 2018, Dominique, along with her
```

```
 1  currently incarcerated father, Charles Brown, Jr., created
 2  Daughters Beyond Incarceration, a nonprofit committed to
 3  dismantling the stigma against black girls with parents in
 4  prison and to support all children in Louisiana impacted
 5  by parental incarceration.
 6              (Applause.)
 7              MS. BATTAMS:  This group has provided
 8  services to over 150 girls in the city of New Orleans
 9  alone.
10              Dominique, thank you for being with us
11  today.  And please share with us your experiences using
12  communication services.
13              MS. JONES-JOHNSON:  I don't know if I'm
14  supposed to talk about my own personal experience or the
15  people that I support.
16              COMMISSIONER GOMEZ:  Whatever comes to mind.
17              MS. JONES-JOHNSON:  I'll be 42 in November.
18  My dad has been incarcerated for 42 years.  He didn't kill
19  anybody.  He was addicted to drugs and so he robbed
20  people.  But he has been incarcerated my entire life and
21  (inaudible).
22              So my grandfather and my grandmother, my
23  paternal grandparents, they took care of me when my
24  grandmother -- when my mother decided that she could no
25  longer take me to visit my dad.  So they implemented
```

1  visits twice a month.  And even still to this day I can

2  still smell the bus.  I can remember what the smell is

3  like.

4          My dad is incarcerated at Angola, which is

5  one of the roughest penitentiaries in St. Francisville,

6  Louisiana.  I remember when the street to get to Angola

7  was a dirt road.  And now they've remodeled it several

8  times.  So I grew up in prison.  When I go, I see all of

9  my prison uncles, and they tell me I remember when you had

10  a Jheri curl.  I've had 42 birthdays in Angola prison.  I

11  remember the chef would bake the strawberry cake that I

12  liked.

13          So I don't know if I'm supposed to talk to

14  you about myself or the people that I serve.  Because I

15  have four children, and I can afford to pay for phone

16  calls.  Yes, it is taxing on my household financially, but

17  we've already included it in our budget.  So my husband

18  and I know what to pay and what's at stake.

19          Now, Bridgette, you asked Kim what could she

20  change.  So here's one thing that I think that you guys

21  should consider.  I have four children, which are my dad's

22  grandchildren.  Each child deserves two free phone calls.

23  Because what Omar said, it's true.  When a dad tells you

24  I'm gonna call you in the morning and that call doesn't

25  happen, oh, my daddy lied to me.  So I go to school and I

```
 1   become belligerent because I don't know why he didn't
 2   call.  I'm just a kid.
 3              And so I sat and I realized that I'm taking
 4   my children through the same thing that I went through,
 5   and that's unfair because they don't deserve that.  But
 6   they do deserve to have a relationship with their
 7   grandfather.  So how do we do that?
 8              So my husband and I, we allocate $300 a
 9   month for phone calls.  And there is no such thing as a
10   video visitation.  So I think you need to change that
11   because it's not what you would call a visit.  When you go
12   to visit your loved one, you can hug them.  You can touch
13   them.  You can smell them.
14              I have four-year-old twins.  There's no one
15   without the other.  So I can't schedule a visit for my
16   daddy with Justice without Jamar jumping in because
17   they're twins.
18              Each child deserves their own visit.  A
19   parent -- parenting from prison is extremely challenging
20   with -- when there are limitations on communications.  And
21   there are categories for your communication.  So when I
22   was growing up, I needed to talk to my daddy every
23   morning.  Because most girls -- and I'm gonna say this in
24   Louisiana.  So the girls that I serve, their nurturer is
25   their daddy.  Even though moms are there to nurture, the
```

```
 1   dads in Louisiana -- the majority of the girls we know are
 2   daddy's girls.  And so my daddy controlled my emotions.
 3   So when I went to school after a visit, and you have to
 4   leave somebody that you love, going to school the next
 5   day, oh, I wanted to fight.  I wanted to fight the
 6   principal, the teacher.  Because you don't know what I
 7   just went through and you don't care to ask.  So I needed
 8   to talk to my daddy every morning to center my emotions
 9   and to tell me he loved me, to have a good day.
10           But then I needed to talk to him at night
11   because whatever I experienced during the day.  And in New
12   Orleans, things are normalized that should not be
13   normalized.  I grew up in the St. Claude projects in New
14   Orleans, which is one of the roughest projects in the
15   city.  To get to my house, I have to step over urine and
16   feces, maybe dodge a few bullets and even some drug
17   exchanges.  And I needed to talk to my daddy about that.
18   Because the next day you go to school and that is ignored
19   and it's okay.  So like Omar said, you become desensitized
20   to it.
21           And so now one of the things that Brione and
22   the girls that we have in our program did, we passed a
23   bill that allowed incarcerated parents to parent from
24   prison, which means that you can attend your child's
25   graduations, report card conference, parent-teacher
```

```
 1   conferences, awards; you can do that virtually.
 2                   (Telephonic interruption.)
 3                   MS. JONES-JOHNSON:  Oh, and we have a call
 4   from my daddy.
 5                   COMMISSIONER GOMEZ:  Is that your dad?
 6                   MS. JONES-JOHNSON:  Can we do this?  Because
 7   this is how in sync we are.
 8                   Hey, daddy.  How are you?
 9                   (Indiscernible conversation.)
10                   MS. JONES-JOHNSON:  The prison is about to
11   go on lockdown.
12                   I am sitting on a panel right now, Daddy,
13   with Federal Communications Commission, and everyone is
14   listening to you.  Are you going to be able to call if the
15   prison is going on lockdown?
16                   (Indiscernible conversation.)
17                   COMMISSIONER GOMEZ:  Wow.
18                   MS. JONES-JOHNSON:  And so that -- that has
19   happened because we've been through a lot.
20                   So let me give you some back story.  I'm an
21   only child with my dad.  There are no other children; it's
22   just me.  The closest thing that connected me to my dad --
23   his father died when I was 16.  And so when a person is
24   incarcerated and they lose an immediate member of their
25   family, they sometimes can go home to travel to their
```

```
 1  funerals.  But because people forget that when a parent is
 2  incarcerated so is the child, they don't ask the child
 3  about that.  They don't ask the child are you okay with
 4  this.  And I need you to really see that you are about to
 5  see your incarcerated loved one outside of prison bars for
 6  the first time.  They don't tell you that the person that
 7  you love is going to be shackled and chained like a caged
 8  animal and escorted by two corrections officers.  They
 9  don't tell you that.  Oh, and you have to get up and go to
10  school the next day.
11           So I sat next to my grandmother, and I could
12  remember the smell of her White Diamonds perfume and her
13  Avon lipstick.  I remember she parted her hair to the
14  side.  And the black dress I wore I immediately burned
15  when I got home.  And told my aunty -- she comes to my
16  grandmother, she said your son is outside.  And so I say,
17  oh, she must just be talking about my uncle because -- and
18  so then the door opens and then this light shines, and
19  everybody just starts swarming to the door.  And
20  16-year-old me, I'm like what are they doing?  And when I
21  tell you I can remember exactly what the guards looked
22  like, I can remember the amount of holes that were linked
23  between each chain because that's what trauma does to you.
24  And, you know, nobody asked me was I okay about my daddy.
25           So he sat down next to me and my
```

```
 1   grandmother.  And because the guard was somebody who had
 2   known me since a child, the guard whispered in my ear,
 3   "I'm not supposed to let you touch him, but you can touch
 4   him."
 5              So I kissed my dad on the cheek.  I laid my
 6   hand on his shoulder, and I said, "No.  Why are you here?"
 7   And my grandmother didn't know that that was going to hurt
 8   me.  My mother didn't know that that was going to hurt me.
 9   I mean, they were doing what they thought was best.
10              And so I went to school that Monday and I
11   fought.  I had a fight in the principal's office, like on
12   the principal's desk.  But the principal knew.  So when my
13   dad called after track practice, I told him what happened.
14   And all he did was say I'm sorry.  He said I knew it would
15   hurt you.  And so because communication was so hard back
16   then — and this was the early '90s — we wrote a lot.
17              And so my dad and I went through for years
18   the question, "When are you coming home?"  "Soon."  I
19   wrote it in a letter.  We talked about it on the phone.
20   And what I didn't realize because of lack of communication
21   was that it is extremely hard for a child to understand
22   the mind of an incarcerated person if you don't have an
23   open conversation.  Because while I thought I -- he was
24   lying, on his end he's maintaining hope.  But I don't know
25   that.  I'm 16, Dad.  Like you spent your entire life
```

```
 1  telling me I'm coming home soon.
 2            And so then I'd say, well -- at 16, well
 3  maybe he'll come home when I graduate high school.  High
 4  school graduation comes, there was no daddy.  So then I
 5  stand at the starting line at one of the most important
 6  dates of my life, my senior state track meet.  The gun
 7  goes off -- and in my head, at every track meet -- and I
 8  started running track when I was eight years old.  My dad
 9  has always been in the stands cheering me on for every
10  track meet.  And so this one particular track meet, I
11  actually saw him.  I don't know what was going on in my
12  head.  Because when I crossed the finish line, I was in
13  the stands looking for him.
14            And so as I became the fastest person in the
15  state, there was no way for me to celebrate that with my
16  father.  So when we do talk, it is, "All right, Daddy.  I
17  graduated.  I just won state.  When you coming home?"  He
18  said, "I'm coming home soon."  "If you can't tell me when
19  you coming home, Daddy, I don't want to talk to you no
20  more."  And so what my incarcerated dad forgot or failed
21  to realize was that his daughter was becoming a young
22  woman and needed to understand why he was incarcerated.
23  And so most incarcerated parents miss that pivotal moment.
24  And so we didn't talk for the next four years.  Because in
25  my head, he was lying to me.
```

 1            And so the next time we have a conversation,

 2  it's after Hurricane Katrina, a few years after

 3  Hurricane Katrina, and I say, "Daddy, you have a grandson.

 4  His name is Kingston."  And so that moment changed the

 5  trajectory of our relationship.  Because what I didn't

 6  realize was during that time my dad graduated.  He earned

 7  a degree like Kim.  He took a parenting class in prison.

 8  It was called Malachi Dads, and it helped him understand

 9  the mind of children on the outside, the free world is

10  what they call it.  And that program was everything.

11  Because even though I did communicate, his mental

12  awareness about being a parent increased.  And so it made

13  incars- -- it made communicating better for us because we

14  became in sync.

15            And that's how Daughters Beyond

16  Incarceration was born, because we needed a way to bridge

17  that gap between incarcerated parents and their children.

18  And now our biggest battle is not only communication but

19  it's visitation.  So you have the Keep Families Connected

20  campaign that's supposed to keep incarcerated parents

21  closer, within two hours from their children, but that

22  doesn't work.

23            In 2019, we filed a bill in Louisiana to

24  reduce rates of any fees associated with prison phone

25  calls.  We had a campaign that was so powerful other

1    organizations took over the bill and refiled it without

2    us.  But then next thing I knew, Securus gives us a few

3    free phone calls during COVID, and we still have those

4    free phone calls today.  So I can say Securus is

5    affordable for me, but that's because my situation.

6            Omar and Ms. Rosalind talked about equitable

7    engagement, which means making sure that the people that

8    you are supporting have what they need to thrive.  And so

9    we make sure that people like Brione and the girls in our

10   program, who haven't seen their -- I have one woman in my

11   program who hasn't seen her father in five years.  He's at

12   David Wade.  She doesn't have a car.  So we make sure that

13   we can support her to pay for her incarcerated parent

14   communication.

15           What I think is so pivotal is that

16   incarcerated parents, their role in their child's life

17   should not be replaced.  And the way we limit or

18   categorize communication, that's what it does.

19           COMMISSIONER GOMEZ:  I wanted to ask you,

20   you mentioned categorizing communications.  What do you

21   mean by that?

22           MS. JONES-JOHNSON:  So you have a video

23   visit; that's a category.  You have phone calls; that's a

24   category.  You have letter writing; that's a category.  Or

25   you have emails; that's a category.  Commissioner Gomez,

```
 1  you can't charge us to communicate in these different
 2  categories.  Because in a child's mind -- and so let me
 3  tell you how this curse happened.
 4          My father is incarcerated.  My daughter's
 5  dad is formerly incarcerated.  His dad is formerly
 6  incarcerated.  So you make people think that you pay to
 7  communicate.  And so the child's mind doesn't understand
 8  that.  I'm ten.  I don't -- there's no pay for me to
 9  communicate with you.  So if they incarcerate my parent,
10  why do I have to pay to incarcerate my parent?  And these
11  are questions that the ten-year-old girls in my program
12  ask me.  So I have girls who have parents that are
13  incarcerated at Oakdale, which is a federal prison.  They
14  sent a picture.  And I'm not sure if you're familiar with
15  Mardi Gras, but the girls dance in Mardi Gras.  They march
16  in Mardi Gras parades, and the parades are dancers
17  uniform.  So when they send those pictures, they send them
18  back.  Imagine what that does to a child.
19          So you can't put limitations on the
20  different categories on how we communicate and how we
21  parent.  One of the things that we are working to combat
22  is if you choose to incarcerate my parent, I'm gonna make
23  sure it is -- everything in my power is done that you feel
24  how hard it is.  And I'm going to pass every bill that I
25  need to make.  One bill that we passed, it failed for the
```

```
 1  senate, which was changing the way visitation looks in the
 2  visitation rooms.  Because there are no -- there's no
 3  thrills.  There's no way for an incarcerated parent who
 4  has a trans child to communicate with that parent.  If I
 5  go to see my parent and I have -- and I'm on my cycle,
 6  they tell me I can bring two pads.  How can you control my
 7  flow?  The twins, my twins are semi potty trained.  So
 8  every time I go, I always bring two Pampers.  So you have
 9  four Pampers.  You can't bring all of those.  So what you
10  want me to do with my child using the restroom?  Like how
11  can you --
12            And then, Commissioner Gomez, my twin boy is
13  autistic.  The guards aren't educated on emotional toys.
14  Like Omar said, prison is a sensory --
15            MR. THOMAS:  Dead space.
16            MS. JONES-JOHNSON:  -- dead space.  And
17  they're not even working to educate their staff about
18  that.
19            MS. AKINS:  Absolutely not.
20            MS. JONES-JOHNSON:  So my son, his emotional
21  support toy is a plastic shark or a dinosaur.  And at
22  school he can't have it, but it's always in his personal,
23  which means his book bag or his cubby.  So when his
24  teacher feels like he is about to have a tantrum, she
25  gives him his moment to self-regulate with his toy.
```

```
 1               And so when we get to Angola and -- autism
 2    is so amazing, is that there's no -- there's a sniff dog
 3    when you go in, but you can't see the dog.  And so my son
 4    says, "Mommy, where's the doggy?"  How do you know that
 5    there's a -- and so the guard tells him you can't go in
 6    with that toy.  Do you know what my autistic son did?  He
 7    had a fit.  He had a fit.  We had to bring the toy back to
 8    the car.  Because I don't know what you could do with a
 9    plastic shark.
10               But my goal is to change that.  It's the
11    fact that the Louisiana Department of Corrections, they
12    would never put together something like this.  If they
13    did, the room would be filled with old black men and
14    women.  And I'm saying old like 80s, 70s.  And please
15    forgive my language.  I'm so sorry.  But they're not in
16    touch with the people that are actually connected with it.
17    They don't include children and youth and young women in
18    the discussion and decisions that affect their lives.  So
19    they don't know.
20               And so the people that I serve, it is -- it
21    is wild how when -- I have two girls in my program, Paris
22    and China.  Their mom is incarcerated.  Their grandmother
23    takes care of them.  I think they are two of six.  She's
24    on a fixed income.  She's on Section 8, which is an
25    affordable housing program.  She spends $150 a month.  How
```

```
 1    can she afford that?  But, again, as Paris and China write
 2    to their mom, we have to screen their pictures.  Because
 3    even if they have on a uniform skirt and the skirt may be
 4    too high for them, it's gonna get sent back.
 5                COMMISSIONER GOMEZ:  Well, I hate to do
 6    this, but we are running a little short on time, and I
 7    want to give Brione a moment, the opportunity to speak
 8    with us.
 9                Thank you so much for joining us.  And thank
10    you for that extremely powerful intervention.
11                So, Brione, thank you for joining us.  I
12    know you're a junior in high school, and I hear you're
13    doing quite well as an athlete and a scholar.  I
14    understand you have a very close relationship with your
15    father, who is currently incarcerated in Louisiana as
16    well.
17                So can you please share with us your
18    experience relying on communication services to -- and
19    specifically what it means for you to be able to remain in
20    touch with your father during your time away from each
21    other.
22                MS. SMITH:  Yeah.  Me and my dad are really
23    close, have been since I was, like, really little.  My dad
24    have been in jail, in and out of jail my whole life.
25                When I think about the phone calls, the
```

1  thing that immediately comes to mind is -- I'm about to

2  cry.  Last year, my best friend passed away from gun

3  violence.  And the day my dad called me — he called me the

4  day after that — I was by the (indiscernible) and the call

5  dropped.  And then the jail went on lockdown so I couldn't

6  call for like a week.  And then a few weeks after that my

7  grandfather passed away, but my dad was in the hole.  Like

8  it's always something.  I feel like it's always something.

9  Like when it's important, you can never get in touch with

10  him.  And it's not like I could call him or I could text

11  him.  Because even with the text, you have to be a certain

12  age to send a text.

13            COMMISSIONER GOMEZ:  How old do you have to

14  be?

15            MS. SMITH:  Eighteen.

16            MS. JONES-JOHNSON:  So her mom sends the

17  text messages for her.  It's all on her mom's phone.

18            MS. SMITH:  So it's like when it's something

19  important, it's hard to get in touch.

20            But me and my dad talk every day when we

21  can.  And I'm aware that if he don't call me it's not,

22  like, because he just didn't want to call me.  I'm aware

23  that it's because of what's going on inside the jail.

24            I'm my dad's oldest child.  My dad have

25  three other children.  My sister and my brother mom is not

1  nowhere near as fortunate as my mom, as me and my mom are.

2  She can't pay for them, for the phone bills.  For a long

3  time my mama did it for them.  But as of lately, my sister

4  don't even want to talk to my dad, and I believe she

5  thinks, like, it's his fault, like, when he doesn't call.

6  But I know that it's not and he just can't do it at the

7  time.

8              My youngest sister, she's like three now.

9  When she went to jail -- when my daddy went to jail, she

10 was a couple of months old.  I don't even think she know

11 what my dad looks like.  Like it's just a big gap.  And

12 I'm old enough to realize it.  And I've watched it my

13 whole life because he's been in jail, like in and out of

14 jail my whole life.  He went back when I was 13.  I'm

15 about to turn 17 in July.

16             I started playing volleyball my freshman

17 year of high school.  My dad's never seen me play.  And

18 that's all he talk about, like after the first week he

19 will call me and be like I can't wait to see you play.

20 And in my head I know that he probably won't see me play.

21 But like I'll never say it because I feel like it gives

22 him hope.

23             And I could graduate next year if I wanted

24 to -- well, this year as a junior.  But, like, I pushed it

25 back because they say he's supposed to get out in 2025.

```
 1   So I decided to graduate with my class in 2026 so he could

 2   see me graduate.

 3              And me and my dad do talk a lot, but, like,

 4   I don't want to -- I feel like I don't want to burden him

 5   with, like, bad stuff because he's already in a bad place

 6   and I feel like that will just make him, like, more

 7   anxious.  And, like, I don't want to do that to my dad.

 8   Because I know it's dangerous for him not to be aware of

 9   what's going on around him because of what I tell him.  So

10   I try not to tell my dad the bad things and only the good

11   stuff, like practice was good today and I had a good game.

12   I don't tell him nothing negative because I feel like

13   that's just a burden that he don't need in that type of

14   place.

15              COMMISSIONER GOMEZ:  If there was anything

16   you could change about the communications that you're able

17   to have, what would that be?

18              MS. SMITH:  With the video calls?

19              COMMISSIONER GOMEZ:  Yeah.

20              MS. SMITH:  He would be able to see me play

21   through a video call.  But if there's too many people on

22   the screen they cut.  So he's not able to see me play.

23   And you know volleyball you play in shorts.  So it's like

24   the call will cut 'cause you can see skin.  Even if I'm

25   not playing, like even if it's just me -- like if I'm in
```

```
 1  the house and I have on, like, a tank top and you can see
 2  my shoulders, the call will cut.  And even with the
 3  FaceTime calls, either you can't see him or you can barely
 4  hear nothing he's saying so you got to repeat it four,
 5  five, six times for him to even understand you.  So in a
 6  15-minute FaceTime call, you say three sentences because
 7  you can't hear or see and then they cut out.  It's another
 8  15 minutes.
 9              COMMISSIONER GOMEZ:  Is he using a kiosk, or
10  is he using --
11              MS. SMITH:  I have no idea.
12              MS. JONES-JOHNSON:  I think when she's
13  saying FaceTime calls that's a kiosk.  When you try to do
14  a video visit through the kiosk, it comes like a FaceTime,
15  like, on her phone.  You know, the video visits, you have
16  to set them up, like you have to schedule them.
17              MS. AKINS:  Appointment.  Yes.
18              COMMISSIONER GOMEZ:  So it's not a tablet
19  that you can just --
20              MS. JONES-JOHNSON:  Well, so no.  Because
21  her dad is kind of in -- he's in a place, DeQuincy, which
22  is like a work release program.  So I don't want to say
23  it's different leniency, but it kind of is.  So the tablet
24  that my dad has, there's no WiFi in Camp D.  So even
25  though I paid for the upgraded tablet, he has not been
```

```
 1   able to use it.  And so when we do the visits -- when we
 2   schedule the visits there, it comes --
 3                   (Interruption in the proceedings.)
 4                   MS. BATTAMS:  Just ignore it.
 5                   MS. JONES-JOHNSON:  It comes -- it comes
 6   across like a FaceTime visit.
 7                   (Interruption in the proceedings.)
 8                   COMMISSIONER GOMEZ:  Somebody needs to be
 9   muted.
10                   MS. BATTAMS:  It's a technical issue.  Even
11   though we work for the FCC, it's not always seamless.
12                   MS. JONES-JOHNSON:  I thought she was
13   screaming at me.
14                   And so Brione's dad, I think the kiosk works
15   in DeQuincy as opposed to Angola where it doesn't work.
16                   COMMISSIONER GOMEZ:  I understand now.
17   Thank you.  I appreciate that.
18                   So, okay.  So is there anything else that
19   you would want to improve communications with?
20                   MS. SMITH:  I really don't know, like, as --
21   for the phones, like for him to just call me and my mom, I
22   know my mom pay like $200 every month.  But, like, as far
23   as the FaceTime calls and everything go, I don't know too
24   much about the prices because my mom takes care of all
25   that.  It's not like I pay for anything out of my pocket.
```

1    But I know it is expensive.  So, like, I don't know.  Just

2    making it more affordable for people who can't afford it.

3              COMMISSIONER GOMEZ:  Well, thank you so much

4    for coming.  I know this was not the easiest thing for you

5    to listen to and probably brought up a lot of your lived

6    experience.  But we're really grateful that you're here.

7              Oh, did you have any questions?  I'm sorry.

8              MS. BATTAMS:  No.  I just wanted to say

9    thank you so much.  Thank you to all of our speakers

10   today.  We've heard so many compelling stories that

11   emphasize the importance of affordable communication

12   services at just and reasonable rates to keep families

13   connected.  I want to thank you all so much for sharing

14   these powerful stories.  Your experiences really have shed

15   light on the challenges faced by people who are

16   incarcerated, their families.  And this is going to become

17   part of the public record for our proceeding.

18             The FCC greatly values public participation

19   in our rulemaking process.  We encourage everyone to share

20   thoughts and comments with us.  And I just want to remind

21   everybody that we have forms at the sign-in table.  You

22   can write on them and give us your thoughts today, or

23   there are instructions on how to submit comments into the

24   record electronically.

25             And, really, just thank you all so much.

```
 1              Commissioner Gomez, do you have final
 2    remarks?
 3              COMMISSIONER GOMEZ:  Just again I just want
 4    to echo the thanks to all of you.  It's been really
 5    impactful listening to all of your stories and all you've
 6    done to persevere.  And hopefully the Commission can do a
 7    little bit to make lives better as we continue to
 8    implement these rules and regulations and the law.  So
 9    thank you.
10              MS. JONES-JOHNSON:  Are you guys going to do
11    these in other states as well?
12              MS. BATTAMS:  So we have done a couple
13    already.  We were in Chicago, Illinois, and we did one in
14    Charleston, South Carolina, earlier this year, and of
15    course today's session.  And it's -- the reason these have
16    been scheduled is so that we can hear from real people who
17    have experienced these challenges so that -- we know it's
18    personal.  We know that we need to hear from this
19    community.  And so that's why we've done these in-person
20    sessions.  And, you know, we have -- like I said, we have
21    this opportunity to hear from everyone through the written
22    comments as well, and it's just really important to the
23    chairwoman, to all of our commissioners, and to us that
24    are staff, you know, to have this participation.
25              MS. JONES-JOHNSON:  What is your next step?
```

```
 1              MS. BATTAMS:  I don't know.  I am the lowly
 2   staff, and so I learn about it and am just very honored to
 3   be able to take part.
 4              And this concludes our listening session
 5   today.  We will be continuing to work on this proceeding,
 6   and really we want to continue our efforts to ensure that
 7   everyone has the opportunity to connect, stay in
 8   connection with their family and their loved ones, and to
 9   communicate.
10              Thank you all for being part of this
11   conversation.  And, really, have a wonderful rest of your
12   day.  Thank you to all our participants.
13                      * * * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

LAW OFFICES
**BLOOSTON, MORDKOFSKY, DICKENS & PRENDERGAST, LLP**
2120 L STREET, NW, SUITE 825
WASHINGTON, DC 20037

BENJAMIN H. DICKENS, JR.*
JOHN A. PRENDERGAST
RICHARD D. RUBINO
D. CARY MITCHELL
SALVATORE TAILLEFER, JR.*

ARTHUR BLOOSTON
1914 – 1999
*ALSO ADMITTED IN FLORIDA

(202) 659-0830
FACSIMILE: (202) 828-5568

AFFILIATED SOUTH AMERICAN OFFICES

ESTUDIO JAUREGUI & ASSOCIATES
BUENOS AIRES, ARGENTINA

HAROLD MORDKOFSKY
RETIRED

MARY J. SISAK
OF COUNSEL

EUGENE MALISZEWSKYJ
ENGINEERING CONSULTANT
PRIVATE RADIO

June 20, 2024

WRITER'S CONTACT INFORMATION
(202) 828-5562
sta@bloostonlaw.com

*VIA ECFS*
Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re:    Incarcerated People's Communications Services: Implementation of the Martha Wright-
       Reed Act, WC Docket No. 23-62
       Rules for Interstate Inmate Calling Services, WC Docket Now. 12-375

Dear Ms. Dortch:

On June 17, Jonathan Thompson, executive director of the National Sheriffs' Association ("NSA") and the undersigned, as counsel, met with Elizabeth Cuttner of Chairwoman Rosenworcel's office to discuss the above-referenced matter. On June 18, Mr. Thompson and the undersigned met separately with: (i) Adam Cassady and Sarah Rahmjoo of Commissioner Simington's office; (ii) Justin Faulb, Milla Anderson, and Kaily Lauter of Commissioner Starks' office; (iii) Greg Watson of Commissioner Carr's office; and (iv) Terri Natoli, Victoria Goldberg, Peter Bean, William Kehoe, Isabelle Kristick, Shannon McCracken, Steve Meil, Christopher Niccolini, and Simon Solemani of the Wireline Competition Bureau and Eric Ralph of the Office of Economics and Analytics. At each of these meetings, NSA discussed the role of necessary safety and security measures, facility size, and the use of industry-wide data in incarcerated persons' calling services ("IPCS") under the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (the "MWRA").

First, NSA discussed the attached case study, which provides insight into how one particular safety and security measure – call transcription and review – provides indispensable benefits to incarcerated persons, the facility itself, and to the general public.[1] Examples covered by the Case Study include detecting mental health issues, preventing criminal enterprises from within the facility using IPCS, reacting to facility safety issues, and furthering public safety and

---

[1] *Case Study of Safety and Security Matters Recovered from Authorized Incarcerated Persons' Communications,* attached hereto ("Case Study").

**JA1390**

justice.

Second, NSA addressed arguments in the record that safety and security measures are not necessary[2] or recoverable through IPCS rates.[3] Specifically, NSA explained that jails are subject to a broad array of requirements that necessitate safety and security measures. These requirements include affirmative obligations to maintain the safety and security of incarcerated persons, carceral facilities, and the surrounding community.[4] They also include reporting requirements, such as the Death in Custody Reporting Act, which requires jails to report on the circumstances surrounding the death of an incarcerated person (such as whether the cause of death was mental health related).[5] Safety and security measures are also necessary because IPCS can expose jails to liability for failing to fulfill their obligations to the incarcerated.[6] In this way, safety and security measures become a condition precedent to allowing IPCS in jails.

Some parties in the record argue that these issues are the jail's responsibility, and their costs should not be passed on to incarcerated persons and their families.[7] But, as NSA has previously demonstrated, the well-established principle of cost causation permits recovery for these costs through rates to the extent they are caused by incarcerated persons' access to IPCS.[8] Using an example from the Case Study, an incarcerated person using IPCS to conduct a human trafficking operation directly causes the cost of safety and security measures designed to prevent the use of IPCS to commit crimes, which would not be incurred in the first place if IPCS were not available.

NSA also discussed arguments in the record that safety and security measures are not "used and useful," and therefore not recoverable. As a threshold matter, NSA demonstrated through the Case Study that many applications of safety and security measures directly benefit incarcerated persons, particularly with regard to mental health and well-being.[9] Equally as important, however, NSA explained that 'used and useful' is not the appropriate ratemaking

---

[2] *See, e.g.,* Letter from Andrew Lama, Worth Rises, to Marlene H. Dortch, Secretary, WC Dockets No. 23-62, 12-375, dated June 3, 2024.

[3] *See, e.g.,* Letter from Gregory Capobianco, the Public Interest Parties, to Marlene H. Dortch, Secretary, WC Dockets No. 23-62, 12-375, dated April 14, 2024.

[4] *See, e.g., Framer v. Brennan,* 511 US 825, 833 (1994) (holding the Eighth Amendment imposes a duty on prison officials to "protect prisoners from violence at the hands of other prisoners."); c*f,* Case Study at p 7, in which IPCS safety and security measures detect evidence of possession of a weapon by an incarcerated person.

[5] P.L. 113-242. *cf* Case Study at p 2 (providing an example of a suicide attempt that was reported by a safety and security measure on an IPCS).

[6] For example, jails are frequently sued for failing to prevent suicide. *See, e.g.,* Swanson, Sady. *Lawsuit claims negligence led to inmate suicide at Larimer County Jail*, Fort Collins Coloradoan, June 14, 2024, https://www.msn.com/en-us/news/crime/lawsuit-claims-negligence-led-to-inmate-suicide-at-larimer-county-jail/ar-BB1ofstU (last visited June 20, 2024). Where evidence of mental health issues might be accessible through IPCS monitoring, failure to monitor could cause a jail to face liability.

[7] Letter from Gregory Capobianco, the Public Interest Parties, to Marlene H. Dortch, Secretary, WC Dockets No. 23-62, 12-375, dated April 14, 2024 at p. 5.

[8] Comments of the National Sheriffs' Association, WC Docket No. 23-62, 12-375, filed May 8, 2023, at p 7.("NSA Comments").

[9] Cost Study at p.2.

principle to apply to safety and security measures. That principle is properly applied to physical plant, to determine whether a utility is entitled to include its investment in its rate in order to earn a return.[10] Safety and security measures, on the other hand, are costs, and the appropriate principle to determine whether a cost should be included in a rate is whether that cost was prudently incurred. And indeed, the Commission has acknowledged that "rates are not just and reasonable if a carrier cannot recover legitimate and prudent expenses incurred in operating the business for the benefit of ratepayers."[11]

Safety and security measures are prudently incurred expenses because, as indicated previously, they are a condition precedent for jails to responsibly permit access to IPCS.[12] It is important to recognize that the Commission does not have authority over jails, and the MWRA specifically states that it cannot be construed to require IPCS in jails or prohibit any safety and security measures related to IPCS in jails.[13] The Commission must therefore take care not to interfere with the operation of jails as it develops an IPCS compensation plan. Without cost recovery through rates, NSA expects a significant number of jails will reduce access to IPCS, which fundamentally undermines the Commission's Congressional mandate to expand access to telecommunications for the public benefit, including incarcerated persons.[14]

Opponents of recovery for safety and security measures argue that such costs should not be recoverable because they inure to the benefit of facilities, not incarcerated persons.[15] This is incorrect because as just demonstrated, safety and security measures do benefit incarcerated persons and are necessary to allow the provision of IPCS in jails in the first place. What is more, however, benefit to the ratepayer is not the only relevant metric. Section 276 of the Communications Act of 1934, as amended, (the "Act") specifically charges the Commission with promoting "the widespread deployment of payphone services to the benefit of the general public…"[16] Accordingly, the fact that safety and security measures provide benefits to entities beyond incarcerated persons is expressly contemplated in the Act and may not be discarded. Furthermore, section 151 of the Act requires the Commission to promote the safety of life and property through the use of wire and radio communications.[17]

NSA also notes that safety and security measures are generally purpose-agnostic. Call transcription and search functionality, for example, produces a variety of data, as shown in the Case Study. As is plainly evident in the contract examples provided by Worth Rises, the costs for

---

[10] *In re: American Telephone and Telegraph Company and Associated Bell System Companies Charges for Interstate Telephone Service,* 64 F.C.C.2d 1, 47, (F.C.C. March 1, 1977).

[11] *In re: Accounting for Judgments and Other Costs Associated with Litigation*, 12 FCC Rcd 5112, 5131 (F.C.C. March 13, 1997).

[12] NSA notes that in some instances, jails provide these safety and security measures themselves because IPCS providers do not offer them. In these instances, because it is effectively a cost of the IPCS provider that is being passed on to the jail, the Commission should permit like recovery. *See,* Reply Comments of the National Sheriffs' Association, WC Docket No. 23-62, 12-375, filed July 23, 2023, at p 12-14.

[13] MWRA Section 4.

[14] 47 USC 276(b)(1).

[15] *See, e.g.,* Letter from Gregory Capobianco, the Public Interest Parties, to Marlene H. Dortch, Secretary, WC Dockets No. 23-62, 12-375, dated April 14, 2024, at p 5.

[16] 47 USC 276(b)(1). Emphasis supplied.

[17] 47 USC 151.

3

**JA1392**

call monitoring functionality are not in any way tied to what kind of data is obtained.[18] It is also impossible to know for what purpose data will be useful until after it is obtained, making arguments that certain uses of call monitoring are unrecoverable a distinction without a difference.

This was all accounted for by Congress when it specified that the Commission **shall** consider the cost of necessary safety and security measures in setting IPCS rates.[19] If Congress had intended cost recovery for safety and security measures to be optional in any way, it would have used the same permissive language as in the paragraph immediately preceding this mandate, which states the Commission **may** use industry-wide average costs in setting rates.[20] Congress' use of "shall consider" is meant to provide the Commission with flexibility in addressing the requirements of each facility. It is not an opportunity for the Commission to decline to integrate such factors into rates, which Congress recognized is necessary.

Finally, NSA also discussed the use of industry-wide average costs in setting rates. As just noted, the Commission may consider industry-wide averages under the MWRA. However, as NSA has previously demonstrated, industry-wide averages do not tell the whole story.[21] The data relied upon to establish a rate must be reflective of the conditions during the period the rate is in effect.[22] Congress recognized this fact when it required that the Commission shall consider "differences in the costs … by small, medium, or large facilities or other characteristics."[23] Such other characteristics, NSA argued, include ADP, location, state requirements, varying safety and security requirements, and many others.[24] Perhaps most importantly, small facility cost is not adequately captured in industry-wide averages.

The Commission should therefore disregard proposals to use industry-wide average costs based on the general telecommunications industry. Nationwide telecommunications carriers' rates have been largely deregulated, due to repeated findings by the Commission that that market is competitive.[25] Given that this proceeding is based upon a perceived failure of the competitive marketplace,[26] any comparison between nationwide telecommunications carriers' average costs would be apples-to-oranges.  In a recent ex parte, Pay Tel, Inc. ("Pay Tel") provided a well-reasoned analysis of the Brattle Group's Model Carrier Approach which highlighted many of the reasons industry averages from the broader telecom industry are not representative of IPCS costs. The most telling observation is as follows:

---

[18] See Letter from Andrew Lama and Bianca Tylek, Worth Rises to Marlene H. Dortch, Secretary, WC Docket Nos. 23-62 and 12-375, Appendices A and B (May 8, 2023).

[19] MWRA at § 3(b)(2). Emphasis supplied.

[20] *Id.* at § 3(b)(1). Emphasis supplied.

[21] NSA Comments at p 8.

[22] *See, e.g.,* Costello, Ken. *Future Test Years: Challenges Posed for State Utility Commissions,* Briefing Paper No. 13-08 (July 2013) (discussing the value of future test years and the need for rates to conditions during effective periods).

[23] MWRA at § 3(b)(1).

[24] NSA Comments at p. 8.

[25] Indeed, it is unclear whether such costs are even available to be averaged in the first place. And, in the case of regulated rates such as interstate access charges, many are based on the individual carrier's costs.

[26] *See, e.g.,* Statement of Rep. Pallone, Congressional Record, Vol 168, No. 200 – H10027.

4

**JA1393**

Legacy providers in the "broader telecom industry," including AT&T, BellSouth, BellAtlantic, GTE, Sprint, and CenturyLink, all entered the IPCS market at its inception and later exited *en mass* when the impact of bad debt, technology demands and low margins made providing IPCS undesirable. No major telecom provider has reentered the IPCS market.[27]

The fact of the matter is, as Pay Tel put it, "IPCS … is a specialized service whose costs are the direct function of the characteristics of the locations at which it is provided and the customers being served."[28] For this reason, NSA does not believe industry average costs from the broader telecom marketplace are useful in setting rates for IPCS.

Even industry-wide averages based on the IPCS industry, however, run the risk of failing to capture the costs of small facilities. NSA continues to advocate for the development of separate rates for jails, due to the unique cost structure of such facilities, with higher rates for jails based on ADP.[29] NSA has previously identified a number of other factors that affect cost, including the fact that IPCS providers rely on Sheriffs and jails to provide more functions in some cases than in others and that the hourly wage and benefits of jail employees varies by state and locality; different facilities employ different IPCS systems, which may have different costs and require different administrative duties; facilities require different security measures; and jails in rural areas are more costly to serve.[30] All of these factors, which should be considered, are likely to be glossed over using industry averages.

In sum, the use of average data is simply not granular enough to produce just and reasonable rates, as required by the MWRA. Congress recognized the complexity of the IPCS marketplace when it put explicit requirements on the Commission to take into account at least two specific industry features: safety and security measures, and the size of the facility in which IPCS is being offered. Any use of industry-wide data must give way to these considerations. NSA continues to urge the Commission to use as granular an approach to setting IPCS rates as possible when it comes to jails, as the factors that affect cost vary widely in this subsector of the IPCS market. NSA is on the record supporting the use of ADP-based rate tiers of 1-349; 350-2,499; and ≥ 2,500 ADP.

NSA also notes that, should the Commission implement a rate cap for IPCS without preempting state rate caps, the Commission's cap should not include data from states that have their own rate caps. Otherwise, the rate cap would be based on data that does not reflect the conditions of service.

If you have any questions, please do not hesitate to contact the undersigned.

---

[27] Report of Don J. Wood on Behalf of Pay Tel Communications, Inc., WC Docket No. 12-375, 23-62, filed April 24, 2024, at p. 8.
[28] *Id.* at p. 7.
[29] NSA Comments at p. iii-iv, 7.
[30] *Id.* at p 13.

5

**JA1394**

Sincerely,

Salvatore Taillefer, Jr.
Mary J. Sisak

Counsel to the National Sheriffs'
Association

CC:    Elizabeth Cuttner
       Adam Cassady
       Sarah Rahmjoo
       Justin Faulb
       Milla Anderson
       Kaily Lauter
       Greg Watson
       Terri Natoli
       Victoria Goldberg
       Peter Bean
       William Kehoe
       Isabelle Kristick
       Shannon McCracken
       Steve Meil
       Christopher Niccolini
       Simon Solemani
       Eric Ralph

6

**JA1395**



# Prepared for FCC

Case Study of Safety and Security Matters
Recovered from Authorized Incarcerated
Persons' Communications



Respectfully submitted on behalf of the National Sheriffs' Association
Executive Director Jonathan Thompson



**Introduction**                                                                                                1

**I. Detecting Mental Health Needs, Preventing Self Harm, and Suicide Prevention**    2
    Figure 1: Top 5 Mental Health Search Terms                                               2

**II. Preventing Participation in Criminal Activity from Within the Facility**        3
  a. Human and Sex Trafficking                                                                        3
    Figure 2: Human Trafficking Reporting                                                    3
    Figure 3: Verus Hits on Human Trafficking Ring                                           4
  b. New York: Fighting back against MS-13                                                            4
  c. Contraband Phones                                                                                5

**III. Ensuring the Safety and Security of the Incarcerated, Facility Personnel, and the Facility Itself**    6
  a. Riots                                                                                            6
  b. Staff and Resident Safety                                                                        7

**IV. Public Safety Outside the Facility and Justice for Families**                   8

**V. Conclusion**                                                                     9

June 17, 2024

Chairwoman Jessica Rosenworcel
Commissioner Brendan Carr
Commissioner Geoffrey Starks
Commissioner Nathan Simington
Commissioner Anna M. Gomez
Federal Communications Commission
445 12th Street, SW Washington, DC 20554

Support Innovative Public Safety Strategies and Improved Correctional Facility Security

## Introduction

The National Sheriffs' Association (NSA) represents over 3,000 sheriffs, many of whom are leading the way in working with private companies and innovative technology providers to introduce and expand the benefits of telephone service and advanced communications services to incarcerated persons in a safe and secure manner. This includes providing secure communications options, reentry assistance, and making it all as easy as possible while maintaining a secure environment for the incarcerated to contact their loved ones.

In recent years, correctional facilities have implemented new options to provide incarcerated persons with more opportunities to stay connected with their family and friends. However, these solutions not only come at a cost but also create opportunities to undermine the safety and security of facilities, surrounding communities, and the incarcerated themselves. Accordingly, the availability of incarcerated persons communications systems (IPCS) creates the need for proactive supervision by confinement facility personnel to ensure that incarcerated persons, victims, and the community at large are protected from further criminal activity.

The FCC has done admirable work leading the charge to ensure a 21st-century accessible network for all Americans, including the incarcerated. Nationwide, sheriffs are looking for ways to improve facilities, as the highest portion of people needing government services are in correctional institutions. As the FCC is poised to establish new regulations governing IPCS rates, it is also critical to ensure that the rates established allow for reasonable compensation to facilities in which IPCS is made available, including safety and security costs occasioned by the presence of IPCS in facilities. Section 151 of the Communications Act of 1934 specifically charges the FCC with regulating communications for, among other things, promoting the safety of life and property. The MWRA specifically charges the FCC to consider necessary safety and security costs when setting IPCS rates.

NSA respectfully submits that these examples and their benefit s - to incarcerated persons, the facility itself, and the public – can leave no doubt that they are necessary and must be recoverable through IPCS rates. The following examples are from an IPCS safety and security platform called Verus, which among other things, enables highly accurate transcription and search functionality for authorized incarcerated persons' communications.

**JA1398**

## I. Detecting Mental Health Needs, Preventing Self Harm, and Suicide Prevention

Jails have a constitutional obligation to care for the incarcerated population. Monitoring activities such as those aided by Verus are necessary to ensure the safety and security of incarcerated people and the facility itself.

**Flagging keywords to reduce self-harm:**

In addition to providing information that helps identify and stop criminal activities, call analysis with Verus can mitigate the suicide risk for incarcerated persons by targeting specific mental health keywords and phrases. With automated Continuous Monitoring, Verus flags calls in near real-time for evaluation to determine if an incarcerated person is in a mental health crisis and needs proactive intervention.

### Top 5 Mental Health Search Terms

Since 2017, Verus has produced **1,772** mental health reports from analysis of **291.7** million calls, giving stakeholders early notice and the time they need to prevent in-custody suicides.



"hurt myself"
**27**

"I'm gonna kill myself"
**129**

"hang myself"
**139**

"suicide"
**150**

"kill myself"
**839**



*"This technology has detected and prevented inmate suicides, uncovered human trafficking, and prevented and solved violent crimes ... it saves lives."*

– Kevin Catalina, Deputy Police Commissioner, Suffolk County Police Department, New York

**New York Department of Correction – Rikers Island resident heard on a phone call to be in mental distress**

The Verus system discovers a call that lasts for a duration of 01:29 minutes. The incarcerated person told the female call receiver, "Happy Anniversary," and then said he's going to kill himself. The incarcerated person added that he wants her to stay on the phone and listen.

In the call, the incarcerated person appears to be choking and gagging while on the phone. This continues for about a minute and a half, and then something drops to the floor. It sounds like a tablet device. There is silence for about one minute, and then coughing and gagging start again. The incarcerated person says a name and then says, "I love you." The female call receiver says the inmate's name. The incarcerated person replies, but the words are muffled, and not understandable.



Thanks to Verus, the facility was able to conduct a wellfare check on the incarcerated person, who was safe and making calls the next day.

## II. Preventing Participation in Criminal Activity from Within the Facility

Jails also have a duty to prevent incarcerated persons from continuing to commit crimes. Without active monitoring and other necessary safety and security measures, the presence of IPCS in the facility can actually facilitate crime. This means that the costs of safety and security measures are incurred directly because of the presence of IPCS in the facility.



Results Reported By Operation United Front:

**102** ARRESTS    **47** RESCUES

### a. Human and Sex Trafficking

Human trafficking, commonly known as "Modern-Day Slavery," is very lucrative for criminal organizations; unlike drugs or weapons, victims can be caught in a never-ending cycle of being sold for profit. Public safety collaboration is the key to creating a successful response and efficiently using data to improve policies and laws. It is possible to track trends and use statistical data to understand the scope of human trafficking better. According to the U.S. State Department, there are two forms of human trafficking: forced labor and sex trafficking.



**Human Trafficking Reporting**
Sub Activity (28 February - 13 March 2024)

Human Smuggling 13% - 82
Child Pornography 14% - 91
Sexual Abuse of a Minor 14% - 91
Sex Trafficking 26% - 163
Human Trafficking 31% - 198
Prostitution 13% - 83

**Total Report 635**

Conducting human trafficking investigations can be challenging because **many victims do not report their circumstances** to Public Safety. Verus bridges the gap by evaluating incarcerated persons' communications and **identifying illegal criminal activity** associated with human trafficking. The chart below shows the level of granular detail available for analysis that can help break up human trafficking rings.



In this example, **Verus identified more than 400** calls associated with the sex trafficking ring.

## b. New York: Fighting back against MS-13

One Long Island county is making real progress in the fight against MS-13. The Suffolk County Sheriff's Office recently leveraged shared intelligence and technology to arrest suspect Leniz Escobar. Escobar allegedly lured four teenagers to their deaths at the hands of MS-13 members.

"One of the ways this case was broken was the monitoring of Escobar's phone calls with her boyfriend, who was on the inside," Sheriff Errol Toulon Jr. said in an interview with *The New York Post.*



## c. Contraband Phones

It is imperative to note that mobile phones are strictly forbidden in jails due to the severe security risks they pose and are frequently smuggled in. Technology may mitigate the widespread use and smuggling of the devices, thereby curtailing the probability of continued criminal activity with their use.

### Example 1

In this call, the incarcerated person spoke with a female call receiver. The incarcerated person explains that he has just obtained a SIM card and is waiting for his cousin to activate it. The incarcerated person stated that he planned to "sell time" to six to eight incarcerated persons at the rate of one hour a day for **one hundred dollars a week**. The incarcerated person also admitted to possessing contraband by stating that once this began, he would no longer have to sell cigarettes.



### Example 2

While listening to authorized incarcerated persons' communications on a Department of Corrections account, a Continuous Monitor alerted to the keywords "SIM card" and "activate" regarding illicit communication devices. The incarcerated caller provided the call receiver with two IMEI numbers that needed activation. The incarcerated person then instructed the call receiver to get device data plans.



*"Well, I finally got the little thing. I've got to get fifty more dollars so I can activate it, then I can start selling time."* - incarcerated person possessing contraband Wi-Fi hotspot

### Example 3

From a large correctional facility, a call based on a keyword search of "officer" regarding an anonymous tip led to the discovery of a large cache of contraband hidden in the ceiling above the incarcerated persons' housing unit.

*"… see, up there in the ceiling, everybody like to hide a lot of the major stuff ... That boy almost just put out a million-dollar operation, and how these folks get their stuff in here, where they hide their stuff at, he put everything at risk."* - incarcerated caller



## III. Ensuring the Safety and Security of the Incarcerated, Facility Personnel, and the Facility Itself

Jail security is critical for safety in correctional facilities. It includes managing incarcerated persons in restrictive housing, classification and assessment, special population, and security audits. Technology helps bridge the gap in monitoring blind spots. Authorized communication data also presents the opportunity to identify and thwart escape plans before they can be executed. Using technology to stay one step ahead will preserve facility and community safety.

## a. Riots

**Authorized incarcerated persons' communications data finds insightful information to help with disturbance investigation**

**"WHAT'S HAPPENING"**

Incarcerated Caller - "Yeah, alright we gotta make this quick, alright. So, they cut the phones off because somebody was getting beat up in the yard. And then something happened, something happened with the inmates and some cops. So, they gonna end up locking us down. You know what I'm saying?"



Call Receiver - "Oh no, wonderful."

Incarcerated Caller - "Yeah, they just hopped on these cops."

**"WHAT HAPPENED," "07644"**

Incarcerated Caller - "N****s just knocked the f**king cops out."

Call Receiver - "What happened?"

Incarcerated Caller - "N****s just beat the cops up. Just knocked some n***a out."

Call Receiver - "Where, where did you go to?"

## b. Staff and Incarcerated Person Safety

**Authorized incarcerated person communications data finds call information that leads to staff facility security risk**

| | |
|---|---|
| Incarcerated Caller - "The doors do not lock. When I tell you, Mama, this jail is wide open. It's literally a door cut in half; these n****** I made a knife out the door." |  |

Call Receiver - "And why is that dorm still open?"

Incarcerated Caller - "I don't even know."

 Call Receiver - "See, [redacted] at fault for even let [redacted] Street be open; it's not operational at all. You have a jail that don't lock. But I think [redacted] County finally starting to get their s**t together with them nice and s**t. The folks was busting out the, um, breaking the lock. So now they replaced them with some type of unbreakable."

Incarcerated Caller - "I made a knife."

## IV. Public Safety Outside the Facility and Justice For Families

Safety and security measures for IPCS can also produce a wide array of other public safety benefits outside the facility. A tool like Verus provides transcription, searchability, and analysis for all communications indiscriminately without generating additional costs based on the information discovered. Accordingly, the monitoring of IPCS can provide information relating to crimes that occur outside the jail and can help make communities safer and bring criminals at large to justice. These benefits would be lost if jails could not recover the safety and security costs associated with IPCS through IPCS rates.

### Texas: Houston Bayou homicide

On August 22, 2020, an Amber Alert was issued for the 2-year-old, Maliyah Bass. Relatives told police they left the little girl at a playground outside their southwest Houston apartment while they were inside cooking breakfast. They claimed that when they returned, Maliyah was gone. A day later, Maliyah's body was spotted in Brays Bayou by a jogger.

Using the Verus system, a phone call was located from the Harris County jail, where actionable information was discovered from an authorized incarcerated person's communication talking about the incident.







Call Receiver - "Ain't nobody kidnapped that baby, son; them people killed that girl."

Incarcerated Caller - "So, you think the Momma and the Daddy killed that baby?"

Call Receiver - "I ain't gotta think, little brother, my people stay next door, you hear me…they reported the baby missing on what, Saturday, the baby was f**kin'…man, they killed that baby like on Thursday, son!"

Call Receiver - "Wednesday night, the dude had beat the Mom or some s**t; you hear me? He beat the little girl till she died."

### Alabama: Critical evidence in high-profile kidnapping and murder cases

Verus played an instrumental part in two tragic, high-profile kidnapping and murder cases: missing Auburn University student Aniah Blanchard and three-year-old Kamille "Cupcake" McKinney. Critical witness information gained through Verus helped bring suspects to trial in both cases.



**JA1405**

### California: Finding escapees

The Verus system was requested for an exigent deployment to assist with a noteworthy investigation of two Sureño gang members in custody for a gang murder. These incarcerated persons had escaped from the Monterey County Sheriff's Office jail.




### Texas: Finding a missing teen

Verus played a pivotal role in identifying and charging suspects in a missing person's case in Seguin, Texas. Benjamin "Tank" Loera, 16, disappeared from his hometown of Vanderbilt on October 26, 2021. **Following two months of searching, his body was found near the Guadalupe River on December 20, 2021.**

Before finding his body, authorities were able to identify the suspects involved in his disappearance and determined that this was a planned action against the victim. They arrested two individuals and detained a third. All three suspects pleaded guilty to Murder and Aggravated Kidnapping with a Deadly Weapon for their roles in the October 2021 kidnapping and murder of 16-year-old Benjamin "Tank" Loera.



Missing Texas Teen Who Helped Care for Sisters with Autism Is Found Dead, 3 Suspects in Custody

Benjamin "Tank" Loera's body was found near the Guadalupe River

By Greg Hanlon | December 24, 2021 · 12:33 PM



## V. Conclusion

Safety and security measures like the active monitoring service provided by Verus are extremely beneficial to incarcerated persons, the correctional facility, and the general public. Importantly, they allow for the safe use of IPCS within correctional facilities in the first place, and without them it is likely that jails would curtail the use of IPCS. The Communications Act requires the FCC to promote safety of life and property through communication by wire and radio, and to promote the widespread development of payphone services, including IPCS. Accordingly, it is no surprise that the Martha Wright-Reed Act mandates that the FCC considers necessary safety and security measures when setting rates for IPCS. Because IPCS is subject to abuse by incarcerated persons and because its presence in a facility without proper safety and security measures necessarily compromises the safety and security of that facility, safety and security measures must be permitted to be recovered from IPCS rates.



GEORGIA
JUSTICE
PROJECT

July 8, 2024

**Re: Public Comment for WC Docket No. 23-62 and WC Docket No. 12-375**

To whom it may concern,

Georgia Justice Project writes in support of FCC's proposed regulations that will adopt more just and reasonable cap rates for incarcerated communications services.

GJP has served low-income Georgians for more than 35 years. GJP provides holistic criminal defense, social support, reentry services, and criminal record clearance to thousands of individuals. We have seen again and again that ongoing communication with loved ones and maintaining social ties is critical to successful reentry after any time incarcerated. We often hear from partners and those directly impacted by the criminal legal system about how high communication services rates not only compromises these connections, but also extracts wealth from individuals and communities already suffering from significant financial hardship.

GJP supports FCC's proposed regulations as a significant step to making such communications services more accessible and fair. We further support the adoption of the lowest possible rates for voice and video communications and consumer protection measures, such as billing transparency and guaranteed access regardless of disability status.

Sincerely,

Wade Askew
Policy Director, Georgia Justice Project
Wade@GJP.org; 404-827-0027 ext. 214



MARCUS W. TRATHEN
1600 WELLS FARGO CAPITOL CENTER
150 FAYETTEVILLE STREET
RALEIGH, NC 27601

T 919.839.0300
F 919.839.0304
MTRATHEN@BROOKSPIERCE.COM

July 9, 2024

VIA ELECTRONIC FILING

Ms. Marlene H. Dortch                          **Ex Parte Comments**
Federal Communications Commission
45 L Street NE
Washington, DC 20554

> *Re:     Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket No. 23-62; Rates for Interstate Inmate Calling Services, WC Docket No. 12-375*

Dear Ms. Dortch:

In accordance with Section 1.1206 of the Commission's rules, this letter is submitted on behalf of Pay Tel Communications, Inc. ("Pay Tel") for inclusion in the record of the above-captioned proceedings. Specifically, Pay Tel responds to the *Draft* Report and Order, Order on Reconsideration, Clarification and Waiver, and Notice of Proposed Rulemaking (rel. June 27, 2024, updated July 3, 2024) (the "Draft Order").[1]

The Draft Order is the latest step in the Commission's effort to implement regulatory reform of the specialized communications service providing service to incarcerated persons and their families in jails and prisons—now referred to as Incarcerated People's Communications Services ("IPCS").[2] The Draft Order, among other things, seeks to implement the Martha Wright-Reed Act[3] signed into law on January 5, 2023, which made various modifications to the compensation and jurisdiction provisions of Section 276 of the Communications Act of 1934 and related provisions of federal law.

This presentation explains Pay Tel's primary concerns with the Draft Order which, if not addressed, will threaten to derail the Commission's efforts to achieve lasting regulatory reform in the IPCS industry.[4]

---

[1] *Draft* Report and Order, Order on Reconsideration, Clarification and Waiver, and Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375 (Rel. June 27, 2024, updated July 3, 2024).

[2] The terms "incarcerated people's communications service" and "IPCS" are used interchangeably with the Commission's prior characterization of the service as "inmate communications service" or "ICS".

[3] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("Martha Wright-Reed Act" or "MWRA").

[4] For clarity, this submission does not catalogue all of Pay Tel's concerns with the Draft Order nor does it purport to identify all of the ways in which it may conflict with applicable law. Pay Tel's silence herein as to any particular aspect of the Draft Order should not be taken as agreement with that provision or waiver of any objection thereto.

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

## Overview of Draft Order

The Draft Order[5] proposes to dramatically reduce IPCS audio rate caps:

- from 14 cents per minute[6] to 6 cents per minute for prisons (a 57% reduction),

- from 16 cents per minute[7] to 6 cents per minute for large jails with 1,000 or more incarcerated persons (a 63% reduction),

- from 21 cents per minute to 7 cents per minute for medium jails with between 350–999 incarcerated persons (a 67% reduction),

- from 21 cents per minute to 9 cents per minute for small jails with between 100–349 incarcerated persons (a 57% reduction), and

- from 21 cents per minute to 12 cents per minute for very small jails with between 0–99 incarcerated persons (a 43% reduction).

By the Draft Order's own calculations, of the twelve IPCS providers selected by staff for analysis, four (i.e., 33%) will be driven out of business by the proposed rates.[8] These four providers collectively serve approximately 700 facilities (all jails), and 93% of these facilities are characterized as very small or small jails (i.e., less than 350 ADP). *In other words, instead of promoting a healthy and competitive IPCS market, the Draft Order actively shrinks the IPCS market by pricing out one-third of the providers— providers who are predominantly serving the smallest, most difficult-to-serve facilities—* inexplicably finding solace in the fact that the providers who will remain viable include very large providers that serve outsized portions of the IPCS market but focus service on the lager facilities.[9]

And how does the Draft Order justify slashing rates from the rates that just three years earlier it found were "just and reasonable" based on reported provider cost? By arbitrarily excluding costs associated with five out of seven categories of IPCS safety and security measures regularly demanded by our nation's sheriffs and wardens.[10]    The Draft Order attempts to rationalize this extreme step by declaring that

---

[5] *Draft* Report and Order, Order on Reconsideration, Clarification and Waiver, and Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375 (rel. June 27, 2024, updated July 3, 2024).

[6] This includes a $0.02 additive for prisons and large jails (ADP over 1,000) for which providers are obligated to pay site commissions. *See* Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, at ¶ 100 (rel. May 24, 2021) (the "*2021 ICS Order*"). The Draft Order removes this additive.

[7] *Id.*

[8] *See* Draft Order ¶ 216. The Draft Order dismisses this existential IPCS market result by—without any evidentiary basis—"anticipate[ing] that, over time, revenues for additional providers will exceed their total actual costs" and suggesting that providers can attempt to seek rate cap waivers in order to remain in business. *See id.* at ¶ 217; *id.* at 117 n. 758.

[9] *See id.* at ¶ 216 (noting that the eight IPCS providers that remain viable under proposed rates "represent over 90 percent of revenue, 96 percent of ADP, and 96 percent of billed and unbilled minutes in the dataset").

[10] *See* Draft Order ¶ 386.

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

protecting the public is not a permissible safety and security function[11] and deeming "advanced" safety and security features as "redundant" and excessive" over the protest of correctional facility operators.[12]

　　　<u>This Draft Order, if adopted, will create a serious problem for our nation's jails and the incarcerated persons therein.</u>  By adopting a heavy-handed regulatory approach based on the exclusion of IPCS providers' demonstrated costs, the Draft Order introduces the very real possibility of leaving over 2,000 very small jails—and the incarcerated persons residing therein—without any IPCS service.  Local carceral institution budgets are strained, to say the least.  Many facilities face ongoing acute personnel shortages.  If faced with offering a discretionary service, that does not include technology to protect the public from users of the service, and that requires additional commitment of personnel and monetary resources—many facilities will make the obvious choice to curtail access to those services.  They have told the Commission that in no uncertain terms, and no rationale has been put forward for disregarding these repeated admonitions.

　　　<u>It also creates a serious problem for the general public.</u>  The Draft Order, if adopted, effectively prohibits five out of seven categories of safety and security measures demanded by sheriffs and wardens, including "advanced" safety and security features that the Draft Order deems "redundant" and "excessive." This will make jails less safe and secure, leading to abuse of the other incarcerated persons, families, friends, and the public by some users of the calling systems—abuse which would be prevented using the technologies effectively prohibited by the Draft Order.

　　　The Draft Order's improper exclusion of safety and security costs from rates is inexplicable, not legally defensible, and contrary to the public interest in deterring crime, theft, and abuse.

## Impact on Pay Tel

　　　Pay Tel provides service exclusively in jails, many of them small and mid-sized facilities, and has long-supported reform of the ICS industry.[13]  To this end, in 2013 Pay Tel was the lone ICS provider that voluntarily provided a full cost study to the Commission in response to its early regulatory efforts.[14] Pay Tel never engaged in the practice of charging excessive, duplicative or otherwise  "bogus" fees for ICS services

---

[11] *Compare* Draft Order ¶ 374 (finding certain safety and security measures not "used and useful" even though "law enforcement, correctional facilities, and the public at large may benefit from these measures"); *id.* at ¶ 380 (rejecting Securus' suggestion "that the Commission has a 'general responsibility' to protect the general public and 'ensure a safe environment' for accessing communications services.");

　　　*with* 47 U.S.C. § 151 ("For the purpose of regulating interstate and foreign commerce in communication by wire and radio . . . [and] ***for the purpose of promoting safety of life and property through the use of wire and radio communications***, . . . there is created a commission to be known as the "Federal Communications Commission" . . . ." (emphasis added)).

[12] *See* Draft Order ¶ 397.

[13] Pay Tel is headquartered in Greensboro, North Carolina, employs approximately 100 persons and serves some 151 jails in 17 states. Pay Tel has a 35-year history of serving the corrections industry's communications needs based on a foundation of faith-based values and commitment to integrity and respect for the needs of those it serves. Pay Tel has not received a single formal regulatory complaint or litigation over rates or fees. Today Pay Tel is an employee-owned company whose stated mission is to care for the needs of those impacted by incarceration, our clients, our employees, and the community in a way that honors God.  *See generally* https://www.paytel.com/about-paytel/.

[14] *See In the matter of Rates for Interstate Inmate Calling Services,* Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 13-113, at ¶ 27 (rel. Sept. 26, 2013). This study, as true for subsequent cost presentations, ties to Pay Tel's audited financial statements, which have also been provided to the Commission.

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

that formerly plagued the industry.[15]  Pay Tel implemented systems to refund unused consumer deposits while competitors were absorbing those funds.

Most recently, while other competitors are seeking to drive inmate use of "pay-to-play" entertainment services on their tablets, Pay Tel has re-invested for the benefit of its users by developing and implementing educational, vocational training, and self-help resources which are available for use by incarcerated people in facilities that Pay Tel services, free of charge, on its tablets.[16] This content includes a tailored selection of information and courses that blends basic education and practical skills with self-help programs intended to facilitate behavioral changes, all with the goal of reducing recidivism. The content also includes faith-based resources as well as community reentry resources which are available to incarcerated persons following release.

As illustrated by the following quotes from tablet users, as well as the linked video with testimonials from users, these resources have been lauded by incarcerated persons for providing needed hope and opportunity.[17]



"Using the Pay Tel tablet in jail has helped me to better myself in a spiritual as well as mental and physical way and helped greatly reform my thinking back closer to normal and drug free. Basically, the tablet has been a major part in facilitating my progress to a better me. Thank you all very much for the opportunity, privilege, and blessing."
Dustin, Pay Tel Pathway to Achieve™ Learner - Davidson County Jail

"I feel like I don't [know] how we ever did jail/prison time before without this and was expected to achieve anything other than resentment and bitterness mainly at ourselves, no victim stance taken, but self-sabotage is sabotage, nonetheless."
Matthew, Pay Tel Pathway to Achieve™ Learner - Buncombe County Detention Center

"[I will] absolutely [make better choices]!!!!! This program has opened my eyes. It has shown me that I was in denial and needed to get my act and faith right. NOT JUST FOR MYSELF BUT FOR MY KIDS, MY GIRL, AND MY FAMILY BECAUSE THEY DESERVE THE BEST VERSION OF ME."
Walter, Pay Tel Pathway to Achieve™ Learner - Catawba County Jail

Pay Tel's goal is to create a positive impact on persons' lives with these products, and the 90%+ engagement rate with these services shows that positive results are being achieved.

Stated more directly, Pay Tel is the sort of company a regulatory agency should want to succeed. It has a history of cooperation with the efforts of the regulatory agency and advancing best practices within the industry for the benefit of consumers.  Much to its surprise, the Draft Order—without challenging the

---

[15] *See, e.g.*, Further Comments of Pay Tel Communications, Inc., WC Docket No. 12-375, at 2–3 (July 17, 2013) (Contrasting Pay Tel's recovery of administrative costs through a single monthly "Bill Processing Fee" of $2.45 with a list of twenty fees commonly found in other IPCS vendor tariffs and advocating for reform, because "Pay Tel agrees that these fees can significantly increase consumer cost and must be addressed in order to provide meaningful regulation of the true cost of inmate phone calls."  *See generally* Prison Policy Initiative, "Please Deposit All of Your Money: Kickbacks, Rates, and Hidden Fees in the Jail Phone Industry, May 8, 2013 (available at https://www.prisonpolicy.org/phones/pleasedeposit.html#_ftnref77). Pay Tel's fee structure was used as the basis for the Commission's initial regulation of ancillary fees.

[16] Pay Tel further incents use of these materials by inmates by allowing them to earn "credits" for successful course completion, which credits can be used to access entertainment services.

[17] *See* Pay Tel Notice of Ex Parte Meeting, WC Docket Nos. 23-62, 12-375 (June 24, 2024);  Pay Tel Pathway to Achieve Learners video (https://vimeo.com/user175402048/review/956161788/f4591aa423#).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

company's cost submission—seeks to set rate caps <u>below</u> Pay Tel's demonstrated costs for every service tier, and calculates that Pay Tel would only be able to recover its costs at about one-third of the facilities it currently serves.[18] This casts serious doubt on the ability of Pay Tel and other similarly-situated providers seeking to serve jails—particularly smaller facilities—to continue to serve this market.

While Pay Tel understands that the Commission is not intending to pick "winners" and "losers," the challenge is to implement reform in this highly specialized industry while leaving space for providers like Pay Tel that serve a niche that may not be served adequately otherwise. In its otherwise well-intentioned effort to impose "industry average" rate regulation, the Commission risks creating a regulatory environment in which it is too difficult and burdensome for smaller market participants to survive. This is of particular concern here, given the market dislocations and challenges already extant[19] in an industry dominated by two providers. If the Commission forces Pay Tel and other smaller providers out of the market, who will pick up the facilities they currently serve? What if the larger players do not wish to serve smaller, more-difficult-and-costly-to-serve jails? The Commission cannot compel service at a location, since providers are not required to meet all reasonable requests for service as they would if a common carrier.

By adopting a heavy-handed regulatory approach based on exclusion of demonstrated costs of the dominant providers, the draft introduces the very real possibility of leaving over 2,000 smaller jails, and the incarcerated persons residing therein, without service.

## Summary of Principal Concerns with Draft Order

There are positive aspects to the Draft Order—namely, the establishment of rate caps based on an ADP-based tiered structure, continuation of the distinction between rate caps for prisons and jails, rate cap differentiation between audio and video services, and the reliance on improved data collection.

However, the Draft Order suffers from fatal flaws which will undermine the otherwise positive efforts made to regulate IPCS services and threaten to derail the momentum towards achieving comprehensive and lasting reform.

First, the draft cites no evidence that providers are overearning,[20] yet it lowers existing rate caps by an average of 57% across all rate tiers—a result which, by any measure, is shocking. The draft purports to justify this extraordinary "reverse rate shock" by declaring that five of the seven categories of "safety and security" costs, which represent a significant portion of total industry costs, should be excluded from rates.

---

[18] *See* Draft Order, Appx. D, at Table 6, Appx. F, at Table 6, and Appx. J. at Table 44.

[19] *See* note 21 below.

[20] To the contrary, the order acknowledges evidence that the dominant providers are presently in deep financial distress, potentially on the edge of bankruptcy. *See* Draft Order, Appx. D, at n. 20 ("recent press reports suggest Securus may be considering filing for bankruptcy"). And recent public reports state that Viapath's efforts to refinance its substantial debt obligations maturing in 2025 and 2026 have been placed on hold due to the issuance of the Draft Order. *See* Bloomberg News, "Viapath Reportedly Places Refinancing Deal on Hold Following FCC Proposal," Mergers & Acquisitions, July 1, 2024 (available at https://www.themiddlemarket.com/news-analysis/viapath-reportedly-places-refinancing-deal-on-hold-following-fcc-proposal). *See also* "Prison telecom ViaPath, seeking refinancing, faces risk from new FCC rules," Private Equity Shareholder Project, July 2, 2024 (available at https://pestakeholder.org/news/prison-telecom-viapath-seeking-refinancing-faces-risk-from-new-fcc-rules/). Consistent therewith, as noted in the Draft Order, the 2023 data collection shows that "reported losses are so large that they result in an industry loss of about $219 million, more than 16 percent of industry revenue." *See* Draft Order, ¶ 209 & Appx. F, at ¶ 18.

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

This decision, if adopted by the Commission, effectively intrudes upon service design by arbitrarily designating certain safety and security features required by facilities—features which represent 84% of the overall reduction in audio costs[21]—as non-recoverable. This contradicts the mandate of the Martha Wright-Reed Act to "consider costs associated with any safety and security measures necessary to provide [IPCS]" as well as intent of Congress specified in the Act to not "prohibit the implementation of any safety and security measures related to [IPCS]."[22] The draft, if adopted, will make jails less safe and secure, leading to abuse of the other incarcerated persons, families, friends, and the public by some users of the calling systems—abuse which would be prevented using the technologies effectively prohibited by the Draft Order. The draft's improper exclusion of safety and security costs from rates is inexplicable, not legally defensible, and contrary to the public interest in deterring crime, theft, and abuse.

Second, the Draft Order is flawed in failing to allow for facility cost recovery. The Martha Wright-Reed Act endorses a three-pronged approach to rate making: (1) just and reasonable rates for consumers, (2) fair compensation to providers, and (3) cost recovery to facilities for safety and security costs. These "prongs" recognize that lasting reform can only be achieved if the interests of all the stakeholders (users, facilities, providers) are protected. The Commission has the opportunity to provide a regulatory framework that is supported by a respected advocate[23] and vendor (Pay Tel), with the added value of achieving the alignment recommended by the DOJ.[24] A specific fixed additive to the rate for Cost Recovery is key to that solution. The Martha Wright-Reed Act provides the Commission the tools it needs to achieve holistic reform by recognizing the consumer interest ("just and reasonable rates"), the provider interest ("fair compensation"), and the facility interest ("safety and security" costs). The draft fails to achieve the directive of the MWRA by failing to include an express recovery for the costs incurred by facilities in making IPCS available.

Additionally, contrary to the methodology used in every order to date, the Draft Order inexplicably calculates service costs by dividing permitted costs (i.e., after adjustment) by the total of billed and unbilled minutes of use—as opposed to just billed minutes of use.[25] As has been stated in the record, IPCS providers—particularly those serving jails—are required to provide certain calls (e.g., calls for booking and calls to public defenders) free of charge.[26] During COVID, the number and extent of this free calls escalated significantly. By calculating average costs by reference to both billed and unbilled minutes, the draft inappropriately deflates costs by matching costs against minutes for which the provider is not receiving revenue.

In sum, if adopted, the Draft Order will make IPCS less available, not more, particularly in smaller, more difficult to serve facilities. By setting rate caps below demonstrated costs, the order will cause further

---

[21] Draft Order ¶ 209.

[22] Martha Wright-Reed Act, § 3(b)(2).

[23] Prison Policy Initiative ex parte letter, WC Docket Nos. 23-62 and 12-375, at 1 and 7 (June 25, 2024) ("Pay Tel's letter is right on the principle that the FCC's rules must incentivize facilities to ensure fair phone rates in the short and long term") (proposing that the maximum facility cost recovery fee be set at $0.02 rather than Pay Tel's recommend $0.08, subject to revision through subsequent data collection efforts).

[24] Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 and 12-375, at 4 (Apr. 29, 2024) (noting the importance of "align[ing] incentives between correctional facilities and the incarcerated people and their families who pay for IPCS.").

[25] *See* Draft Order, Appx. E, ¶ 1 ("We determine our lower and upper bounds described in this Order by dividing allowable amounts of the reported expenses for various IPCS components by billed and unbilled minutes separately for prisons and different jail sizes.").

[26] *See, e.g.*, Comments of Pay Tel Communications, Inc., WC Docket No. 12-375, at 10 (March 25, 2013).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

disruption in an already unstable industry and will jeopardize the ability of smaller providers, like Pay Tel, to compete.

## I.    Improper Omission of Safety and Security Costs

The Draft Order imposes an average 57% reduction in rate caps across all service tiers primarily through the artifice of disregarding five of the seven categories of "safety and security" costs created in the 2023 mandatory data collection.[27]  It seeks to justify this negation of demonstrated IPCS costs by applying a novel construction of the "used and useful" standard under Section 201 of the Act.  The draft notes that prior decisions of the Commission applying the used and useful standard have considered "whether a cost 'promotes customer benefits, or is primarily for the benefit of the carrier,' as well as whether that cost was prudently incurred"[28] but then concludes that certain costs which are necessary to make the calling system safe and secure are nonetheless not recoverable in rates because the **users** of the service (i.e., incarcerated persons or their family and friends paying for IPCS calls) do not benefit directly from those features.[29] This application of the "used and useful" standard is wrong conceptually, factually, and legally.  It displays lack of understanding of the technology, its purpose, and its use.[30]

<u>First,</u> the draft's rejection of protection of the public as a permissible safety and security function[31] is nonsensical.  IPCS is a specialized communications service, which is specifically designed to meet the

---

[27] *See* Draft Order ¶ 209 (84% of the overall reduction in the audio rate caps are due to the elimination of safety and security costs).

[28] Draft Order ¶ 370 (citing *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126 (*quoting* Establishing Just and Reasonable Rates for Local Exchange Carriers, 22 FCC Rcd 17989, 17997, para. 19 n.47); *Implementation of Sections of The Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation and Adoption of a Uniform Accounting System For Provision of Regulated Cable Service*, MM Docket No. 93-215 and CS Docket No. 94–289, Report and Order and Further Notice of Proposed Rulemaking, 9 FCC Rcd 4527, 4546-67, para. 39 (1994)).

[29] Draft Order ¶ 380.

[30] It is worth noting that at least one advocacy group has taken the extreme and unsupported position that "only safety and security measures required for compliance with CALEA are *necessary* for the provision of IPCS (Worth Rises Ex Parte Presentation, WC Docket No. 23-62 and 12-375, at 2 (May 8, 2023)) and that "[m]ost safety and security services are demonstrably not necessary for the provision of IPCS."  Worth Rises Ex Parte Presentation, WC Docket Nos. 23-62 and 12-375, at 1 (June 3, 2024). This group publicly states that its "Mission" is "to dismantle the prison industry" and that, "Through our work, we strive to pave a road toward a safe and just world free of police and prisons." *See* https://worthrises.org/aboutus (last visited July 7, 2024). The comments of this extreme advocacy group appear to form the blueprint for the draft's treatment of safety and security costs, as the Draft Order cites comments of this organization more than 130 times, many of them with approval.  Given this overt mission to dismantle jails, prisons and the penal system—and its lack of any technical or operational experience in providing IPCS—it is not surprising that Worth Rises shows little interest in fair compensation to facilities or providers, let alone survival of vendors in this industry.  The FCC's charge is clearly different, and following the language of MWRA it must eschew that extreme position in favor of balanced regulation, and the draft's apparent over-reliance on the comments of an advocacy organization on issues of a technical nature is puzzling.

[31] *See* Draft Order ¶ 374 (finding certain safety and security measures not "used and useful" even though "law enforcement, correctional facilities, and the public at large may benefit from these measures"); *id.* at ¶ 380 (rejecting Securus' suggestion "that the Commission has a 'general responsibility' to protect the general public and 'ensure a safe environment' for accessing communications services."); *but see* 47 U.S.C. § 151 ("For the purpose of regulating interstate and foreign commerce in communication by wire and radio . . . [and] *for the purpose of promoting safety of life and property through the use of wire and radio communications*, . . . there is created a commission to be known as the "Federal Communications Commission" . . . ." (emphasis added)).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

safety and security needs of confinement facilities.[32] The record contains extensive evidence of the harms to the public which can be caused by unsecured access to communications services by certain incarcerated persons.[33] The draft's conclusion that costs which are incurred to satisfy the most basic pre-requisite to, and defining characteristic of, the service itself is illogical and facially arbitrary and capricious. In this regard, the draft appears to reflect a public policy preference of the drafters and certain commenting parties that the costs associated with IPCS be socialized across all taxpayers rather than being borne by the users of the system (literally, the ones causing the costs). But such a policy preference goes well beyond the Commission's permissible statutory role in implementing Section 276.

Second, the draft applies its newly-minted "user benefit" standard in an inconsistent and incoherent fashion. For example:

- The Draft Order correctly acknowledges that "prevent[ion] of witness tampering and violations of no-contact orders" are appropriate safety and security measures which should be recoverable in IPCS rates.[34] Yet, under the Commission's construction of "benefit," incarcerated persons placing calls do not "benefit" from not being permitted to tamper with witnesses or harass judges (or engage in other prohibited and/or illegal conduct). If the draft's purported test were consistently applied, those costs would be rejected—an outcome which illustrates the absurdity of the test being employed.

- The Draft Order includes "CALEA Compliance Measures" as recoverable safety and security costs[35] despite acknowledging that the measure does not pass the "user benefit" test.[36] The draft seeks to justify permitting these costs, not because ratepayers "benefit," but because of another previously unexpressed savings rationale: that providers are required to comply with CALEA as a precondition to offering services.[37] Yet providers are also required by the facilities which they seek to serve to employ a range of safety and security measures[38] which the Draft Order seeks to exclude from cost recovery, a fact which the draft ignores.

---

[32] Draft Order ¶ 380 ("Historically, the Commission has recognized that communications services for incarcerated people are different than communications services offered to the general public due, in part, to certain safety and security measures needed to adapt communications services to the carceral context.").

[33] See, e.g., Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, at ¶ 58 (rel. Sept. 26, 2013) (the "2013 ICS Order") ("We also are cognizant of the critical security needs of correctional facilities. For example, the U.S. Department of Justice has chronicled hundreds of criminal convictions involving the use of ICS as part of the criminal activity. Moreover, according to one commenter, a disproportionately large percentage of ICS-enabled crimes target and victimize vulnerable populations consisting of victims, witnesses, jurors, inmates, and family members of these individuals."); see also generally Pay Tel Communications, Inc., Ex Parte Comments, WC Docket Nos. 23-62, 12-375 (June 18, 2024) (noting that "safety and security technology measures have been integrated into calling system functionality, at the request of facility administrators, in response to instances of abuse of calling service privileges. This abuse ranges from annoyance and harassment (e.g., unwanted calls to friends, family and acquaintances); to threats (e.g., intimidating witnesses and judges); to theft (e.g., stealing and using other inmates' PINs to make calls); to fraud (e.g., use of phones to make purchases using stolen credit card numbers); and to outright criminal conduct (e.g., operating prostitution rings) (internal citations omitted)).

[34] Draft Order at p 205 n.1398.

[35] Draft Order ¶ 388.

[36] Draft Order ¶ 388 (questioning whether "the functionalities associated with CALEA compliance generally would directly benefit IPCS users").

[37] Draft Order ¶ 390.

[38] See Joint Ex Parte Presentation of Securus Technologies and Pay Tel (June 10, 2024), at 6 and Exh. A (detailing facility requirements as stated in example RFPs).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

- The Draft Order classifies as "recoverable" monitoring and recording costs associated with CALEA, yet excludes other monitoring and recording costs.[39]  Again, the draft fails to articulate a rationale for allowing recovery of some monitoring and recording costs but not others.

- The Draft Order entirely excludes costs associated with "Law Enforcement Support Services"[40] even though the draft recognizes that "some functions within this category may provide a benefit to incarcerated people, such as the administration of tiplines to anonymously report crimes and connect incarcerated people with Prison Rape Elimination Act (PREA) report centers."[41]  Under the draft's own findings, various features under the "Law Enforcement Support Services" data collection category provide direct benefit to the very users of the service, yet the Draft Order would exclude all such costs.

The Draft Order's inability to articulate and apply a consistent limiting approach to safety and security costs is compelling evidence of a "standard" which is "standard-less" and which constitutes arbitrary and capricious decision making.

Third, the Draft Order disregards the record in this proceeding which establishes that the safety and security features that the draft nullifies do, in fact, benefit incarcerated persons and ratepayers.

As stated, the Draft Order acknowledges that "prevent[ion] of witness tampering and violations of no-contact orders, and protect[ion of] consumer accounts from being used unlawfully" are appropriate safety and security measures which should be recoverable in IPCS rates.[42]  But the Draft Order ignores that various costs which are denied recovery, such as voice biometrics, monitoring, and recording of calls, are tools to prevent exactly the conduct which the draft says should be recoverable.[43]  In this vein, the draft acknowledges the necessity (and recoverability) of costs associated with the end result but rejects the costs for the very features that make it possible to curtail such activity. As explained by Pay Tel in considerable detail, the establishment of initial "gatekeeping" safety and security measures proved inadequate to protect the public as "incarcerated persons very quickly figured out they could coerce a fellow incarcerated person into placing the call. Once the call was accepted the incarcerated person would take the phone and attempt to harass the witness or judge."[44]  The measures which are found to be non-compensable under the Draft Order are, in fact, second or third generation implementations of the same measures which the draft regards as compensable.[45]  To illustrate this point, a chart describing "necessary" Category 3 safety and security features, the methods developed by some incarcerated persons to defeat each measure, and the "advanced"

---

[39] See Draft Order ¶ 388 (finding that CALEA costs include "surveillance capabilities to comply with legal request for information . . . includ[ing] *the ability to enable the government to monitor and record communications*." (emphasis added)).

[40] Draft Order ¶ 391.

[41] Draft Order ¶ 391.

[42] Draft Order at p. 205 n.1398.

[43]  See Pay Tel Communications, Inc., Ex Parte Comments, WC Docket Nos. 23-672, 12-375 at Exhibit 1 (Declaration of Vincent Townsend) (June 18, 2024) (explaining how advanced safety and security functions have evolved to respond to inmate efforts to circumvent exiting protection measures).

[44] *Id.*, at ¶ 23.

[45] *See, e.g.,* Pay Tel Communications, Inc., Ex Parte Comments, WC Docket Nos. 23-672, 12-375 at Exhibit 1 (Declaration of Vincent Townsend) (June 18, 2024).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

Category 2, 4, 5, 6, or 7 feature that was developed to restore safety and security to the system (which the Commission deems "redundant" and therefore "excessive") is attached as Exhibit 1.

Further, the draft excludes the entirety of "Communications Recording Services" as "generally . . . not used and useful in the provision of IPCS."[46] This category includes services such as recording and storing communications, transcribing recordings, and converting recordings into digital formats.[47] The draft acknowledges that communications recording services are used by providers to verify that the incarcerated person participating in a communication was the person whose PIN was used to originate the communication and to resolve complaints regarding the charges for specific communications.[48] The Draft Order further acknowledges that "such uses of communication recording services may be generally beneficial"[49] and clearly preventing PIN fraud and resolving billing complaints benefits the incarcerated ratepayer. However, the draft dismisses such benefits as "redundant" to the blocking and PIN number administration functions that it does recognize as recoverable and deems them "excessive as far as IPCS is concerned"[50]. This finding is directly contradicted by the record in this proceeding[51] and is patently erroneous.

Additionally, in its prior orders, the Commission has identified incarcerated people and their families as among those protected by safety and security measures.[52] PIN numbers and voice biometrics, for example, protect against fraudulent access to prepaid accounts. Surely incarcerated ratepayers and their families would view this as benefiting them. Monitoring and recording can identify threats to other incarcerated persons or their families and friends. Such features may also be used to help authorities monitor incarcerated persons that may be suicidal or suffering from some other crisis.[53] As noted, safety and security features assist with preventing incarcerated persons from becoming the victims of crimes committed by other incarcerated persons, a clear demonstration of the direct benefit of these features to incarcerated people.[54]

---

[46] Draft Order ¶ 395.

[47] *See id.*

[48] Draft Order ¶ 397.

[49] Draft Order ¶ 397. *See also 2013 ICS Order*, at n. 196 ("Security features inherent in the ICS providers' network would also likely constitute recoverable costs," for example, "recording and screening calls;" "blocking mechanisms" to prevent calls to prohibited parties; "biometric caller verification;" "sophisticated tracking tools for law enforcement;" and storage of recordings.).

[50] Draft Order ¶ 397.

[51] *See* Pay Tel Communications, Inc., Ex Parte Comments, WC Docket Nos. 23-672, 12-375 at Exhibit 1 (Declaration of Vincent Townsend) (June 18, 2024) ("For example, inmates were using three-way calling to speak directly with witnesses or even judges when their number had been blocked in the IPCS system. Given this loop-hole exploited by inmates, jail administrators demanded that IPCS providers provide a technology "fix" to prevent this from happening. This is good example of how IPCS safety and security is an ongoing iterative process: providers put in place a feature (e.g., called number blocking) and inmates find a way to circumvent the protection (e.g., three-way calling), which necessitates an additional technological solution (e.g., three-way call detection).").

[52] *2013 ICS Order* ¶ 58.

[53] *See also* NSA Reply Comments at 12-13 (July 12, 2023) (noting that "security and safety measures directly benefit incarcerated persons . . . by reducing crime within the facility" and helping identify suicidal incarcerated persons).

[54] *See generally* Joint Ex Parte Presentation of Securus Technologies and Pay Tel, WC Docket Nos. 23-62, 12-375, at 10 (June 10, 2024).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

The Draft Order pays lip service to facility "expertise on safety and security"[55] but ultimately second guesses that expertise using a data set that it acknowledges is "far from perfect."[56] The Commission created this issue in its administration of a results-drive data collection—by seeking the reporting of data that no provider maintained, based on confusing and contradictory instructions that mixed up the collection of data regarding safety and security *services* (i.e., stand-alone and optional service options) and safety and security *functions* (which include nearly every component of IPCS). Effectively the data collection mixed apples and oranges and then compounded the problem by attempting to exclude doughnuts: a results-driven exercise that was always intended to find costs to exclude and not to understand the nature of the costs in issue.[57]

The record contains ample evidence that the features sought to be excluded by the Draft Order do in fact provide meaningful and direct benefits to consumers of IPCS and members of the public. The Draft Order errs by concluding otherwise.

<u>Finally</u>, the draft's novel application of the used and useful framework cannot withstand scrutiny and constitutes legal error.

"Used and useful" is nowhere specified in the Martha Wright-Reed Act or in Section 276. To the extent that "used and useful" is a component of the "just and reasonable" standard which was added by the Martha Wright-Reed Act and which is also used in Section 201, that standard cannot be read in isolation from the other provisions of Section 276, including the independent requirement that providers be afforded "fair compensation"—an element which is lacking under Section 201. The draft's reliance on "used and useful" (a principle as to which Section 276 is silent), to the exclusion of "fair compensation" (an express requirement of Section 276) cannot be sustained.

In any event, the "used and useful" standard has little application here, even if "just and reasonable" is read as used in Section 201. As detailed in the record, the used and useful framework applies to determinations regarding the inclusion of utility plant and equipment in rate base and is thus inapplicable to operating expenses, which amount to a considerable portion of safety and security costs.[58] And the determinative principle applied by the Draft Order—whether the costs in issue "benefit the carrier" rather than the customer—was misapplied. The Draft Order cites no Commission order applying the principle advanced in the Draft Order.[59] To the contrary, it is clear from the Commission's well-settled application

---

[55] *See* Draft Order ¶ 362.

[56] *See* Draft Order ¶¶ 370–372. *See also* Draft Order ¶ 385 (acknowledging that the arbitrarily defined seven categories of Safety and Security costs in the 2023 Mandatory Data Collection are "imprecise.").

[57] Pay Tel and other providers warned the Bureau of the futility of this exercise in comments concerning the proposed data collection. *See, e.g.,* Comments of Pay Tel on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 12-375 and 23-62 at 1-5 (June 2, 2023); Securus Technologies' Initial Comments to the Proposed 2023 Mandatory Data Collection, at 2-5 (June 2, 2023); Comments of GTL on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 12-375 and 23-62, at 5 (June 2, 2023).

[58] *See, e.g.,* Comments of Securus Technologies, LLC, WC Docket Nos. 23-62, 12-375, at 26-30 (May 8, 2023); Reply Comments of the National Sheriffs' Association, WC Docket Nos. 23-62, 12-375, at 12-14 (July 12, 2023) (explaining that the used and useful framework is not applicable to safety and security costs assessments); Joint Ex Parte Presentation of Securus Technologies and Pay Tel, WC Docket Nos. 23-62, 12-375, at n. 36 (June 10, 2024).

[59] The Draft Order cites *Sandwich Isles Communications, Inc.*, WC Docket No. 10-90, Order on Reconsideration, 34 FCC Rcd 577, 580, para. 7 (2019) (*Sandwich Isles Reconsideration Order*), concerning the propriety of certain federal universal service fund ("USF") disbursements pursuant to high-cost support programs. Nowhere in the *Sandwich Isles Reconsideration Order* is there any mention or discussion of whether costs "benefit the carrier" as opposed to the customer. While the decision briefly cited general "used and useful" principles, it ultimately evaluated whether USF funds were distributed for "proper purposes" pursuant to the USF statutory regime,

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

of the "used and useful" framework is to protect consumers from paying for items which are not necessary (i.e., "gold plating"), not useful, or otherwise imprudent.  For example, in the *AT&T Phase II* order cited in the Draft Order, the Commission set out a "compilation" of plant and property that would not be considered used and useful, comprised of (1) overbuilt plant, (2) discarded property, (3) destroyed or lost property, (4) obsolete and inadequate property, (5) abandoned or to be abandoned property, (6) property temporarily out of use, and (7) property once used and useful but no longer so because of a decrease in business.[60]  The Draft Order makes no such findings with regards to any of the costs excluded.  In the utility context, it would be a violation of the constitutional standards established by the U.S. Supreme Court in *Federal Power Comm'n v. Hope Nat. Gas,* 320 U.S. 591 (1944) to, as the Draft Order purports to do, arbitrarily deny recovery of costs which are integral to the delivery of the service in issue, required as a condition to the provision of service, and actually used in connection with the provision of service.[61]  There is simply no order by any regulatory agency cited by the advocates or in the Draft Order which would countenance such a crabbed application of the used and useful standard.

Moreover, the dichotomy advanced in the Draft Order between costs that benefit the user and those that benefit the provider is inapt as applied here.  First if the Safety and Security features are doing their job, then they are never going to be seen as a benefit by an incarcerated person attempting to use the phone to continue criminal activity.  Second, there is no evidence in the record suggesting that providers are "benefitting" from the safety and security measures which the Draft Order excludes.  To the contrary, the evidence shows that providers have incurred substantial costs to provide features and functions which are required as a condition to the provision of service by the facilities themselves  The people benefiting from the safety and security measures are incarcerated persons, facility officers and members of the public.

Finally, there is no question but that, under cost causation principles which are well established in the Commission's jurisprudence, the users of IPCS are the "causers" of the costs in question.[62]  The reason that safety and security measures are necessary is because some users of the system have and continue to abuse their access to the service by engaging in illicit, abusive, and inappropriate conduct.  The record demonstrates how it is necessary to continually upgrade and enhance safety and security measures as some incarcerated persons find ways to "get around" the existing measures, whether for the purpose of harassing

---

wherein "carriers receiving high-cost universal service support must use it 'only for the provision, maintenance, and upgrading of facilities and services for which the support is intended.'"

[60] *American Tel. and Tele. Co.*, Docket No. 19129 (Phase II), 64 FCC2d 1, at ¶ 114 (1977).

[61] *See Federal Power Comm'n v. Hope Nat. Gas*, 320 U.S. 591 (1944) ("Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid . . . ."); *see also Bluefield Waterworks & Imp. Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692–93, 43 S. Ct. 675, 679, 67 L. Ed. 1176 (1923) ("A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding, risks and uncertainties . . . . The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.").

[62] *See, e.g., Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support; Developing a Unified Intercarrier Compensation Regime; Federal-State Joint Board on Universal Service; Lifeline and Link-Up*; WC Docket Nos. 10-90, 07-135, 05-337, 03-109, CC Docket Nos. 01-92, 96-45, GN Docket No. 09-51, Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554, at 4716 ¶ 525 (2011) (noting that "[u]nderlying historical pricing policies for termination of traffic was the assumption that the calling party was the sole beneficiary and sole cost-causer of a call. More recent analyses, however, have recognized that both parties generally benefit from participating in a call" (emphasis added).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

judges and witnesses or conducting criminal activity. In this light, it is entirely appropriate that providers undertake compensable research, development, deployment, and maintenance costs associated with "advanced" forms of safety and security—and that IPCS rate caps account for such costs.

## II.    Failure to Provide for Facility Cost Recovery

The Draft Order errs in failing to allow for a mechanism by which facilities may recover their costs associated with making IPCS available.

The Commission has repeatedly acknowledged that facilities incur legitimate costs in providing IPCS.[63] For example, in the *2016 ICS Reconsideration Order,* the Commission recognized that:

> (1) at least some facilities likely incur costs that are directly and reasonably related to the provision of ICS, (2) it is reasonable for those facilities to expect providers to compensate them for those costs, (3) such costs are a legitimate cost of ICS that should be accounted for in our rate cap calculations . . . .[64]

In the *2021 ICS Order*, the Commission adopted a $0.02 per-minute "facility rate component" which functioned as an additive to the IPCS rate cap, following the *2020 ICS Notice*'s analysis "of the costs correctional facilities incur that are directly related to providing inmate calling services."[65] If the FCC is going to prohibit the payment of commissions, it therefore must replace them with a reasonable cost recovery mechanism to compensate facilities for their cost of administering phone service and ensuring safety and security. If properly designed, the structure of this compensation will incentivize facilities to allow ample phone access, and more generally demand lower rates to stimulate calling activity

Many of the IPCS-related tasks performed by confinement facilities are directly related to IPCS safety and security functions, which have been the subject of extensive comment and documentation in these dockets. For example, as discussed in Pay Tel's *ex parte* presentation entitled "Setting the Record Straight on Confinement Facility Costs," even at larger facilities where Pay Tel provides an on-site System Administrator, many safety and security related tasks are performed *exclusively* by facility personnel, including IPCS call monitoring and recording analysis and enrolling and managing voice biometrics systems.[66] Further, System Administrators are only on site for 20 to 40 hours per week out of a total of 168 hours.[67] Thus, facility personnel must perform all on-site safety and security functions the majority of the

---

[63] *See, e.g.,* Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, at ¶ 63 (rel. Sept. 26, 2013) ("2013 ICS Order") (implementing "safe harbor rates that are intended to approximate the costs of providing interstate ICS—costs that include fair compensation (including a reasonable profit) and include full recovery for security features the correctional facilities have determined to be necessary to protect the public safety."); Order on Reconsideration, 31 FCC Rcd 9300 (rel. August 9, 2016) ("2016 Reconsideration Order*)* (reconsidering decision to entirely exclude site commission payments from 2015 permanent rate caps); Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, at p. 30, n. 209 (rel. Aug. 7, 2020) ("2020 ICS Order*")* ("The Commission has determined previously that some portion of these site commission payments do reflect legitimate costs that correctional facilities incur that are reasonably related to the provision of inmate calling services.").

[64] 2016 Reconsideration Order at ¶ 12.

[65] *See 2021 ICS Order* at ¶¶ 109, 134.

[66] *See* Setting the Record Straight on Confinement Facility Costs, Pay Tel Communications, Inc., Ex Parte Presentation, WC Docket No. 12-375 (May 8, 2015) at Exh. A (Administration of Inmate Calling Services in Jails – Pay Tel's Experience Serving Jails).

[67] *Id.*

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

time the facility is operational.[68] At the vast majority of jails, the vendor does not provide any site administration personnel, leaving all of this work as the exclusive responsibility of facility personnel.

Notwithstanding the repeated prior findings by the Commission, the Draft Order purposely omits the recovery of facility costs in setting its lower bound under its "zone of reasonableness" methodology because "our data set provides no evidence that site commissions lower providers' expenses."[69] This finding reflects a misunderstanding of the evidence in the record and in no way justifies withholding cost recovery from facilities. While the evidence in the record indicates that there are some tasks which are performed either by the provider or by the facility—depending on the facility—there is no evidence that the reduction in site commission payments will lead to more of these tasks being performed by the provider in a given facility. To the contrary, this concept is not feasible or practical for small facilities—especially at below cost rates.

Instead, the substantial, unrebutted evidence in the record shows that facilities incur costs associated with making IPCS available[70] The Commission has accepted this evidence previously, expressly acknowledging that there are "legitimate costs that correctional facilities incur that are reasonably related to the provision of inmate calling services"[71] and allowing a $0.02 recovery mechanism.[72] Previously, the Commission accepted similar evidence, expressly increasing rate caps to "to better reflect the costs that facilities incur that are reasonably related to the provision of ICS."[73]

The Draft Order does not dispute this evidence, yet it summarily reverses its prior determinations and, citing "the state of the record", finds that "no allowance for correctional facility costs is warranted in our lower bounds."[74] This cursory reversal of the Commission's findings constitutes arbitrary and capricious decision making, particularly in light of the Martha Reed-Wright Act's explicit acknowledgement of the linkage between security and IPCS, mandating that the Commission "shall

---

[68] *Id.*

[69] *See* Draft Order, Appx. H, at ¶ 116.

[70] *See, e.g.,* Pay Tel Second FNPRM Comments at 60 (January 12, 2015) ("There can be no dispute at this time that sheriffs and jail administrators do incur real costs for the provision of ICS."); Letter from Ted Hull, Chairman, Legislative Committee, Virginia Ass'n of Reg'l Jails, to Marlene H. Dortch, Secretary, FCC, at 8, WC Docket No. 12-375 (Jan. 6, 2015) ("[T]here are significant incurred costs associated with the provision of inmate calling services and due diligence in the interest of public safety."); Letter from James R. Wilson, Sheriff, Williamson County (TX), to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (Dec. 22, 2014) ("[L]ike all programs and services, there is a cost to providing inmate phone services."); Letter from Will Travis, Sheriff, Denton County (TX), to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (Dec. 8, 2014) (listing 18 different costs incurred by facility in offering inmate phone services to inmates); Letter from David S. Gould, Sheriff, Cayuga County (NY), to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (Dec. 3, 2014) ((listing 25 different costs incurred by facility in offering inmate phone services to inmates; GTL Ex Parte Letter, Attach. 2 at 3 (September 19, 2014) ("Correctional facility-level staffing costs associated with ICS are … generally non-trivial."); Letter from Mary J. Sisak, Counsel to National Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (filed Feb. 18, 2015) (discussing the "costs incurred by Sheriffs to allow inmate calling services"); *see also* Pay Tel First FNPRM Reply Comments, at 25 n.69 (January 13, 2014) (chronicling record evidence from sheriffs, jail administrators and others reporting facility-incurred costs related to provision of ICS).

[71] *See 2020 ICS Order* at p. 30, n. 209.

[72] *See 2021 ICS Order* at ¶¶ 109, 134.

[73] *See* Order on Reconsideration, WC Docket No. 12-375, FCC 16-102, at ¶ 22 (Rel. August 9, 2016).

[74] *Compare* Draft Order ¶ 138 ("Previously, the Commission found that correctional facilities incur certain costs that are 'reasonably and directly related' to the provision of IPCS") *with* ¶ 166 ("Given the state of the record, it is reasonable for us to conclude that no allowance for correctional facility costs is warranted in our lower bounds.").

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

consider costs associated with any safety and security measures" in establishing IPCS rates.[75] Moreover, as established by the D.C. Circuit in the *GTL* appeal, "[i]gnoring costs that the Commission acknowledges to be legitimate is implausible."[76]

This error is exacerbated by the Draft Order's "permit[ting] IPCS providers to reimburse correctional facilities for the used and useful costs they [correctional facilities] may incur."[77] In other words, the Draft Order does not allow IPCS providers to recover facility costs in the prescribed rate caps, but inexplicably does allow IPCS providers to reimburse facilities for those costs—notwithstanding the Draft Order's prohibition of the payment of site commissions. This defies all logic. To be clear—Pay Tel has always—and continues to—support full facility cost recovery. But reimbursement should be enabled by authorizing facility cost recovery as an express additive to IPCS rate caps. Anything less will fail to compensate providers <u>and</u> facilities for their costs associated with making IPCS available.

Failure to permit facility cost recovery—coupled with non-compensatory IPCS rates—will lead to the reduction of service to incarcerated persons—which contradicts a fundamental goal of Section 276 to "promote the widespread deployment of payphone services to the benefit of the general public."[78] The record supporting this concern has been well-established, as observed by then-Commissioner (later Chairman) Ajit Pai in dissenting from the Commission's Second Report and Order in 2015:[79]

> Compounding the problem is that the Order fails to include sufficient head room in its chosen rate caps so that providers can compensate facilities for the cost of administering inmate calling services. From enrolling inmates into a biometric voice system to real-time call monitoring, the record makes clear that facilities incur actual costs that are directly and incrementally attributable to increased access to inmate calling services. The only dispute is the amount of those costs: whether it's 1.6 cents a minute (as one of the two largest providers suggests), 5.28 cents (as one mid-sized provider explains), or 5.9 cents for large and very large jails and 9.4 cents for small and medium jails (as a mid-sized provider explains). . . .

---

[75] Martha Wright-Reed Act, § 3(b).

[76] *See Glob. Tel\*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 413 (D.C. Cir. 2017).

[77] *See* Draft Order ¶ 163.

[78] Section 276(b)(1) (47 U.S.C. § 276(b)(1)).

[79] *Rates for Interstate Inmate Calling Services,* Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, FCC 15-136 (rel. Nov. 5, 2015) (footnotes omitted), *rev'd by Global Tel\*Link v. FCC,* 866 F.3d 397, 414 (D.C. Cir. 2017) ("*GTL v. FCC*").

This statement relies on the following record evidence directly from local sheriffs or their representatives: Letter from Danny Glick, Sheriff of Laramie, Wyoming, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (Oct. 8, 2015); Letter from Jon Stivers, Sheriff of Washington County, Colorado, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (Oct. 7, 2015); Letter from Craig E. Frosch, Counsel for Louisiana Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 3 (Oct. 9, 2015); Letter from Karen J. Kruger, Executive Director and General Counsel, Maryland Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (Oct. 7, 2015) ("[R]estricting . . . payments to levels that do not at least cover costs will have the effect of reducing the ability to continue to allow ICS in this manner."); Letter from Casey Salisbury, President of Washington Association of Sheriffs and Police Chiefs and Sheriff of Mason County, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 14, 2015); Letter from Stephen P. Luce, Executive Director of the Indiana Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (Oct. 12, 2015); Letter from K.C. Clark, Sheriff of Navajo County, Arizona, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at (Oct. 7, 2015); Letter from Ezell Brown, Sheriff of Newton County, Georgia, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (May 7, 2015).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

The record makes clear the consequences: Less access to inmate calling services in jails around the country. Sheriff Danny [G]lick of Laramie, Wyoming and Sheriff Jon Stivers of Washington County, Colorado explain that they currently let inmates make calls twelve or even sixteen hours a day. But if they can't recover their costs, they'll have to cut back inmate access. The sheriffs of Louisiana and Maryland agree, noting that "discretionary access to phones by inmates and detainees may be significantly limited or eliminated altogether" absent cost recovery. The sheriffs of Washington State worry that the "rate structure, if implemented, would jeopardize the viability of the ICS market and leave many jails without the ability to provide calling services to their inmates." Indiana has already heard from many sheriffs in the state that "they may be forced to discontinue or significantly limit discretionary inmate calling services if they cannot recover their costs." Sheriff K.C. Clark of Navajo County, Arizona, points out that "[i]f the cost of allowing ICS must compete with all other budget heeds, it may not be funded." Or Sheriff Ezell Brown of Newton County, Georgia put it: We "will not be ripping the phones off the walls" but instead "forced to significantly limit access to inmate phones."

These concerns remain equally true today. Local carceral institution budgets are strained, to say the least. Many facilities face ongoing acute personnel shortages. If faced with offering a discretionary service, that does not include technology to protect the public from users of the service, and that requires additional commitment of personnel and monetary resources—many facilities will make the obvious choice to curtail access to those services. They have told the Commission that in no uncertain terms, and no rationale has been put forward for disregarding these repeated admonitions. Moreover, the Commission entirely fails to account for the downstream effects of the Draft Order—i.e., when facilities inevitably curtail access to services, IPCS call volumes will decrease. In addition to harming incarcerated persons and their loved ones through decreased communications, lower call volumes will result in IPCS providers not being able to recover their fixed costs through per-minute billings.

## III.    Inappropriate Treatment of Unbilled Minutes of Use and Unexplained Deviation from Prior Methodology

Contrary to the methodology used in every order to date, the Draft Order inexplicably calculates service costs by dividing permitted costs (i.e., after adjustment) by the total of billed and unbilled minutes of use—as opposed to just billed minutes of use.[80] As has been stated in the record, IPCS providers are required to provide certain calls (e.g., calls for booking, [81] calls to public defenders,[82] calls using Telecommunication Relay Services,[83] and, generally, on-site video visitation[84]) free of charge. During COVID, the number and extent of these free calls escalated significantly.[85] By calculating average costs

---

[80] *See* Draft Order, Appx. E, ¶ 1 ("We determine our lower and upper bounds described in this Order by dividing allowable amounts of the reported expenses for various IPCS components by billed and unbilled minutes separately for prisons and different jail sizes.").

[81] Comments of Pay Tel Communications, Inc., WC Docket No. 12-375, at 10 (March 25, 2013).

[82] *Id.*

[83] *See* Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 22-76, at ¶¶ 39–44 (Rel. September 30, 2022).

[84] *See, e.g.,* NCIC Correctional Services, Notice of Ex Parte Presentation, WC Docket Nos. 23-62, 12-375, at 2 (May 24, 2024); Securus Comments (NPRM), WC Docket Nos. 23-62, 12-375, at 7 (May 8, 2023) ("Securus does not charge for on-site video visitations and is not aware of other providers assessing fees for on-site visitations.").

[85] *See, e.g.*, Draft Order, Appx. F, n. 3 ("2022 was unusual due to the ongoing impacts of COVID, which led correctional facilities to request changes in contract terms, for example, so as to provide more free calling.").

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

by reference to both billed and unbilled minutes, the draft inappropriately deflates costs by matching costs against minutes for which the provider is not receiving revenue.

In prior ratemaking calculations in these proceedings, the FCC has used billed (i.e., paid) call minutes in the denominator to determine provider costs per minute of use. For example, in its *2020 ICS Order*, the Commission established proposed rate caps based on its "calculated mean contract costs ***per paid minute*** to provide inmate calling services as reported by providers plus one standard deviation."[86]

The *2021 ICS Order* relied on the same principal methodology: "Consistent with the approach proposed in the *2020 ICS Notice*, our rate cap methodology relies on providers' collective mean contract costs ***per paid minute of use***, plus one standard deviation."[87] Specifically, the *2021 ICS Order* analyzed seven potential cost allocators and "conclude[d] that a call-minute cost allocator remains the most reasonable choice for setting per-minute inmate calling services rate caps."[88] The *2021 ICS Order* explained that in allocating direct and indirect costs per minute of use:

> We calculate a per-minute cost of a contract for each possible allocator by allocating reported overheads among each provider's contracts in proportion to the contracts' shares of the provider's total minutes, calls, average daily population, etc., and then ***divide the total cost of each contract by its quantity of <u>paid minutes</u>***. ***Paid minutes are used as the divisor because those are the minutes that providers rely on to recover their costs***. We use total minutes to allocate reported overhead costs rather than paid minutes, because costs are incurred to build sufficient capacity to provide all minutes, regardless of whether the minutes generate revenue.[89]

In contrast, the Draft Order—without explanation—dramatically departs from earlier orders by calculating lower and upper rate bounds by "dividing allowable amounts of the reported expenses for various IPCS components by ***billed and unbilled minutes***."[90]

$$\text{Calculated "per minute cost"} = \frac{reported\ allowable\ costs}{paid\ minutes\ +\ unpaid\ minutes}$$

This is logically flawed. By using total minutes, rather than billed minutes to calculate per-minute cost, the rate caps proposed in the Draft Order are artificially lowered from prior orders and are not based

---

[86] Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, FCC 20-11, WC Docket No. 12-375, at ¶ 71 (rel. August 7, 2020) ("*2020 ICS Order*") (emphasis added); *see also id.* at n. 188 ("'Contract costs per paid minute' refers to the sum of a contract's direct costs and allocated overheads divided by the number of paid minutes of use reported for that contract. We calculate the mean of this value across all contracts for each facility type and use those averages in determining our proposed rate caps.").

[87] *See* Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375, at ¶ 65 (Rel. May 24, 2021) (the "*2021 ICS Order*") (emphasis added).

[88] *Id.* at Appx. F, ¶ 51.

[89] *Id.* at Appx. F, ¶ 38 (emphasis added).

[90] Draft Order, Appx. E, ¶ 1; *see also, e.g., id.* Appx. H, n. 4 ("Audio IPCS and video IPCS expenses per minute, respectively, are calculated by taking the sum of, respectively, the reported audio IPCS and video IPCS expenses and audio IPCS and video IPCS billed and unbilled minutes across all providers, and dividing the expenses by the minutes.").

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

on "the minutes that providers rely on to recover their costs." Even if each provider were allowed to recover 100% of its calculated "per-minute cost," no provider would actually recover 100% of its costs.

$$\frac{reported\ allowable\ costs}{paid\ minutes\ +\ unpaid\ minutes} * paid\ minutes < reported\ allowable\ costs$$

This reversal of prior policy is arbitrary and capricious. In promulgating regulations, the FCC "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[91] "An agency acts arbitrarily or capriciously if it has . . . offered an explanation either contrary to the evidence before the agency or so implausible as not to reflect either a difference in view or agency expertise."[92]

Here, the Draft Order rejects the rate cap methodology used in the *2020 ICS Order* and *2021 ICS Order* and replaces it with one that defies logic, as detailed above, without any explanation whatsoever. Particularly in light of the detailed analysis performed in the *2021 ICS Order*—which explicitly noted that "***Paid minutes are used as the divisor because those are the minutes that providers rely on to recover their costs***"—the Draft Order's use of total minutes rather than paid minutes in calculating upper and lower rate cap bounds is arbitrary and capricious.

* * *

As written, the Draft Order may achieve the Commission's short-term goal of reducing costs to the consumer, but it jeopardizes the ultimate goal of increasing communications between incarcerated persons and their friends and family and it threatens massive disruption in an already unstable industry which could lead to hard-to-serve smaller facilities losing service.

Further, the Draft Order accomplishes the goal of rate reduction at any cost by using a novel theory to exclude safety and security costs which is not applied in any other setting; it is inconsistent with the intent of the MWA; it is inconsistently applied in this proceeding; it disregards the clear evidence in the records showing that the friends, family, incarcerated persons and members of the public benefit from features the Commission excludes; and the FCC concedes its proposed regulatory regime will drive IPCS providers out of business.

However, with adjustments to address the specific concerns herein, a viable solution is achievable, and offers the best hope for a sustainable Order that can deliver the necessary reform. Authorizing full recovery of vendor safety and security costs will ensure that public safety is not compromised and will further ensure the viability of service to smaller, difficult-to-serve facilities. Authorizing full recovery of facility IPCS safety and security costs through a separate and explicit *additive* to IPCS rate caps would align the interests of all three legs of the IPCS "stool"—creating downward pressure on ICS rates for incarcerated persons by incentivizing facilities to compare service-based, competitive market factors when awarding contracts as providers compete to provide the best service for the lowest consumer cost as the

---

[91] *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866, 77 L. Ed. 2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962)) (Under the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"); *see also* 5 U.S.C. § 706(2) (Orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be set aside by the judiciary).

[92] *Glob. Tel*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 413 (D.C. Cir. 2017) (quoting *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016)).

Ms. Marlene H. Dortch
WC Docket Nos. 23-62 and 12-375
July 9, 2024

only way to distinguish themselves. Such an approach would bring competitive benefit to the people paying for the service which is what DOJ recommended.[93] The aligning of the interests of all three parties is supported by long standing advocate for incarcerated persons—PPI.[94]

Respectfully submitted,

Marcus W. Trathen
Christopher Dodd
Counsel to Pay Tel Communications, Inc.


cc:    Ramesh Nagarajan, Chief Legal Advisor, Office of Chairwoman Rosenworcel
       Elizabeth Cuttner, Legal Advisor, Office of Chairwoman Rosenworcel
       Lauren Garry, Legal Advisor, Office of Commissioner Carr
       Justin Faulb, Chief of Staff and Legal Advisor, Office of Commissioner Starks
       Adam Cassady, Legal Advisor, Office of Commissioner Simington
       Hayley Steffen, Legal Advisor, Office of Commissioner Gomez
       Terri Natoli, Deputy Bureau Chief, WCB
       Victoria Goldberg, Division Chief, Pricing Policy Division, WCB
       Lynne Engledow, Deputy Division Chief, Pricing Policy Division, WCB
       David Zesiger, Deputy Division Chief, Pricing Policy Division, WCB
       William Kehoe, Senior Counsel, Pricing Policy Division, WCB
       Erik Raven-Hansen, Assistant Division Chief, Pricing Policy Division, WCB
       Susan Bahr, Pricing Policy Division, WCB
       Ahuva Battams, Pricing Policy Division, WCB
       Peter Bean, Pricing Policy Division, WCB
       Amy Goodman, Pricing Policy Division, WCB
       Simon Solemani, Pricing Policy Division, WCB
       Stephen Meil, Pricing Policy Division, WCB
       Eric Ralph, Associate Chief, Wireline, OEA
       Eugene Kiselev, Deputy Chief, Economic Analysis Division, OEA
       Amanda Betag, OEA
       Liesl Himmelberger, OEA
       Richard Kwiatkowski, OEA
       Lester Roberts, OEA
       Geoff Waldau, OEA

---

[93] *See* Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 and 12-375, at 4 (Apr. 29, 2024) (noting the importance of "align[ing] incentives between correctional facilities and the incarcerated people and their families who pay for IPCS.").

[94] *See* Prison Policy Initiative ex parte letter, WC Docket Nos. 23-62 and 12-375, at 1 and 7 (June 25, 2024) (agreeing with the "principle that the FCC's rules must incentivize facilities to ensure fair phone rates in the short and long term" and proposing that the facility cost recovery fee be set at no more than $0.02, subject to revision through subsequent data collection efforts).

# EXHIBIT A

**PREVENTIVE SAFETY AND SECURITY FEATURES (CATEGORY 3)***

*"They also benefit consumers of IPCS by ensuring that communication services can be safely and securely offered in an incarcerated setting." Draft Order ¶ 392

("Category" refers to the "safety and security" categories established in the 2023 Mandatory Data Collection)

| CATEGORY 3 - Preventive Safety and Security Features | Objective | Work Around to Defeat Preventive Safety and Security Features | Preventive Safety and Security Feature Used To Meet FCC Approved Objective |
|---|---|---|---|
| **Personal Identification Numbers (PINs)** | Identify the caller to called party, prevent theft of incarcerated person's funds and identify caller attempting to perpetrate crime on public. | Incarcerated person –<br>a) steals PIN or<br>b) has fellow incarcerated person/accomplice in facility call number to shield identity<br>c) calls accomplice outside facility to place 3-way call to shield identity | **CATEGORY 6** –<br>Voice Biometric:<br>a) gate keeper identifies caller/blocks access or flags call for review<br>b) continuous voice identifies second incarcerated person when caller/accomplice passes phone to restricted person |
| **Allowed Call List** | Limit caller to approved contacts | Same as above | Same as above |
| **Call Blocking** | Prevent calls to victims, witnesses, judges, law enforcement, known accomplices, gang members, etc. | Same as above | Same as above plus…<br>a) **CATEGORY 3** - Alert placed on blocked number for real time call monitoring.<br>b) **CATEGORY 5** - Call monitored to ID perpetrator(s)<br>c) **CATEGORY 4** - Call recorded so facility can confirm identity of caller after harassing call is reported.<br>d) **CATEGORY 2** -- Transcription of calls to allow key word search to identify potential new criminal activity - suicide risk, witness intimidation, drug smuggling, gang contact, etc.<br>e) **CATEGORY 4** - Call recordings – short term storage for 30 days |
| **3-way Call Detection** | Prevent Calls to blocked numbers and attempts to hide identity while harassing someone or perpetrating a crime on fellow incarcerated person or the public | Incarcerated person calls accomplice outside facility to call blocked number with 3-way call after voice prompts so called party does not know call is from a confinement facility and an incarcerated person. | a) **CATEGORY 6** –<br>Continuous Voice Biometric – identifies second incarcerated person when caller-accomplice passes phone to restricted person<br>b) **CATEGORY 3** -Alert placed on identified potential 3-way calls for real time call monitoring<br>c) **CATEGORY 5** – Real time call monitoring when potential 3-way call is identified. |

|  |  |  | d) **CATEGORY 4** - Call recorded so facility can confirm identity of caller on 3-way call and preserve recording.<br>e) **CATEGORY 2** -- Transcription of 3-way calls to allow key word search to identify potential violation of blocked number prohibitions or new criminal activity—witness intimidation, drug smuggling, gang contact, etc.<br>f) **CATEGORY 4** - Call recordings – short term storage for 30 days |
|---|---|---|---|
| **Call Alerts – selected numbers** | To alert officers to calls to selected numbers | Incarcerated person –<br>a) steals PIN, or<br>b) fellow incarcerated person/accomplice in facility calls number to shield identity | **Alerts on Selected Numbers**<br>a) **CATEGORY 5** - Call monitored to ID perpetrator(s)<br>b) **CATEGORY 4** - Call recorded so facility can confirm identity of caller after harassing call is reported.<br>c) **CATEGORY 2** -- Transcription of calls to allow key word search to identify potential new criminal activity—suicide risk, witness intimidation, drug smuggling, gang contact, etc.<br><br>**CATEGORY 4** - Call recordings –short term storage for 30 days |
| **Call Alerts – Suspected 3-Way Calls** | To alert officers to suspected 3-Way Calls | Incarcerated person calls accomplice outside facility to call blocked number with 3-way call after voice prompts so called party does not know call is from a confinement facility and an incarcerated person. | **Alerts on 3-Way Calls**<br>a) **CATEGORY 6** –<br>Continuous Voice Biometric – identifies second incarcerated person when caller-accomplice passes phone to restricted person<br>b) **CATEGORY 5** – Real time call monitoring when potential 3-way call is identified.<br>c) **CATEGORY 4** - Call recorded so facility can confirm identity of caller on 3-way call and preserve recording.<br>d) **CATEGORY 2** -- Transcription of 3-way calls to allow key word search to identify potential new criminal activity—witness intimidation, drug smuggling, gang contact, etc. |

| | | | **CATEGORY 4** - Call recordings –short term storage for 30 days |
|---|---|---|---|

**Pay Tel Safety and Security Feature/Function Legend**

1 – Standard System

2 - Ongoing System integrations with   third party vendors at each facility served

3 – Ongoing System integrations with other vendor IPCS products—Video Visitation, Messaging, etc.

4 – Ongoing development improvements to accommodate evolving technology and methods to bypass system controls

**Estimated Facility Officer Time Legend**

🕐 Automated

🕐🕐 Daily – Full-time equivalent

🕐🕐🕐 Daily – Multiple full-time equivalent

🕐🕐🕐🕐 – Dedicated Officers

July 10, 2024

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

**Re: WC Docket No. 23-62 and 12-375 –** *Draft Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking*

Dear Commissioners and Staff:

We the undersigned organizations applaud the Federal Communications Commission's (the "Commission") Draft Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking in the above-referenced docket. The Commission's proposed rules will go far to regulate the prison telecom industry and protect incarcerated people and their families from predatory Incarcerated People's Communications Services (IPCS) rates. Through these proposed rules, the Commission vindicates Martha Wright-Reed and the framers of the Martha Wright-Reed Just and Reasonable Communications Act and acknowledges the vital role of IPCS as a lifeline for incarcerated people and their families.

We submit this comment to respectfully suggest that the Commission take further steps to lower its proposed rate caps, adopt consumer protection measures, protect the rights of incarcerated people with disabilities, and bar the recovery of additional safety and security measures through regulated rates. We also provide an overview of each of our organizations and our interest in these issues. Again, we are heartened by the Commission's proposed rules and believe they represent a major step forward for the people and communities we support. That said, we encourage the Commission to take advantage of this opportunity to go further.

I.      **The Commission Should Go Further to Propose Lower Rate Caps, Adopt Consumer Protection Measures, and Protect the Rights of Incarcerated People with Disabilities.**

Although the proposed rate caps would spare incarcerated people and their loved ones from unnecessary expenses, they remain far from "just and reasonable" for indigent individuals and communities. We encourage the Commission to propose even lower caps—the lowest possible caps for voice and video communications.

For decades, telecom profiteers have exploited incarcerated people and their families, forcing them to pay extreme costs to maintain connections with their loved ones. The right to communicate throughout incarceration is essential for improving people's ability to successfully

re-enter their communities, supporting family stability, and facilitating access to community support. Exorbitant costs and fees heighten depression, isolation, and loneliness among incarcerated individuals, actively harming them instead of providing any discernible benefit.

The Commission should also go further to adopt consumer protection measures, including by improving billing and transparency. A consumer disclosure label that builds on the recently adopted broadband consumer labels, or dynamic consumer disclosures that are sent regularly and are easily saved and retrieved, would provide consumers with the information they need to monitor their own costs and ensure they are not paying illegally high costs. Additionally, the Commission should take additional steps to ensure consumers are able to recover unused funds in their accounts and funds in inactive accounts.

The Commission should take additional steps to ensure alternative pricing structures are approved only if those structures save money for consumers. Although it is possible that a subscription service could save consumers money, the negative track record of companies offering service to and from carceral facilities means that the Commission has every reason to proceed cautiously before approving new business models.

Finally, we applaud the Commission's work to ensure incarcerated people with disabilities are not denied equitable access to communications. Specifically, the Commission should do all it can to require all providers to provide access to all relay services for Telecommunications Relay Services (TRS) fund support, plus American Sign Language direct, or point-to-point video communications without charge.

## II.     The Commission Should Bar the Recovery Through Regulated Rates of Costs for "Communications Security Services."

Incarcerated people and their loved ones should not be forced to subsidize services they do not want, or that are the responsibility of the incarcerating institution. Incarcerating institutions should bear the cost of all safety and security measures. These services are not for the benefit of incarcerated people and do not belong in the rate.

We strongly support the Commission's recognition that five of the seven enumerated safety and security categories are not "used and useful" for the provision of IPCS and thus must be excluded from recovery through IPCS rates.[1] We agree with commenters that the measures within the five excluded categories are "separable from IPCS and differ from one jurisdiction to another, negating their indispensability.[2] We also agree that these measures "have a separate and

---

[1] Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice on Proposed Rulemaking, WC Docket Nos. 23-62, 12-375 (hereinafter "Proposed Order") at ¶ 339 (June 27, 2024).
[2] Worth Rises Comment on Notice of Proposed Rulemaking, (hereinafter "Worth Rises Comment") WC Docket Nos. 23-62 and 12-375 at 2 (June 3, 2024).

distinct consumer base from IPCS ratepayers with interests at loggerheads with the interests of ratepayers, and are used to appeal to that consumer base—corrections administrators—rather than ratepayers."[3]

We note, however, that one category of safety and security measures that the Commission did deem recoverable through rates—communications security services—is also not used and useful in the provision of IPCS.[4] Thus, the cost of those services should not be recoverable through regulated rates. The proposed order defines these services broadly, permitting the recovery of costs related to, for example, "fraud management."[5] Here, the Commission describes a set of communication security services that are not defined with sufficient care. The Commission concludes that this broad set of services "ensur[es] that communications services can be safely and securely offered in an incarceration setting" without offering meaningful support for this conclusion.[6] Furthermore, the Commission fails to analyze the real-world impact of these measures. We have received reports that incarcerated people often have their access to communications impeded by faulty investigations and overdiscipline for alleged misuse of IPCS.[7]

These stories underscore that the primary function of communication security services is to restrict the access that incarcerated people and their loved ones have to communications. Measures that narrow access to IPCS cannot be used and useful to the provision of IPCS. The Commission concludes—without meaningful analysis—that these features "ensure the safety and security of IPCS."[8] Such analysis could only turn on an exaggeration of the misuse of IPCS by incarcerated people. The vast majority of incarcerated people use IPCS in good faith. The Commission's proposal to permit the recovery of communications support services through regulated rates relies on stereotypes about the misuse if IPCS to keep rates unnecessarily high. Furthermore, free-world consumers are the primary rate payers for IPCS. By permitting recovery of communication support services through rates, the Commission subjects these consumers to the pretense of criminality. The fact of incarceration should not be used to justify the inclusion of services in rates which are often paid for by a non-incarcerated called party.

Although we encourage the Commission to revisit this specific area, we also encourage the Commission to take all additional steps to arrive at lower proposed rate caps. We remain concerned that although the proposed rate caps are a vast improvement over the status quo, they

---

[3] *Id.*
[4] Proposed Order at ¶ 392.
[5] *Id.*
[6] Proposed Order at ¶ 394.
[7] *See generally, e.g.*, New Jersey Office of the Corrections Ombudsperson, Special Report, Visits and Phone Calls, April 2024, https://www.documentcloud.org/documents/24539968-special-report-on-visits-and-phone-calls_corrections-ombudsperson (last visited July 8, 2024).
[8] Proposed Order at ¶ 394.

would still impede access to communications for incarcerated people—a disproportionately indigent group.

### III.    Our Organizational Interests

As explained below, the Commission's decision not to propose lower rate caps would harm our organizations. Rates that are unnecessarily cost our organizations precious monetary resources, undermine our ability to remain connected to our constituents and clients, and compromise our mission.

#### A.  <u>Direct Action for Rights and Equality (DARE)</u>

DARE is a 501(c)(3) organization based in Rhode Island.[9] DARE's core mission is to organize low-income families living in communities of color for social, economic, and political justice.[10] DARE is a membership-based organization and its Board of Directors consists predominantly of formerly incarcerated individuals and individuals who were impacted by incarceration.[11] DARE's board of directors is active in the community and understands the wants and needs of the people DARE serves.

For over ten years, DARE's Behind the Walls Committee has focused on improving the lives of incarcerated and formerly incarcerated people.[12] The Committee conducts policy and reform campaigns spearheaded by people who have been impacted by incarceration, and focuses on several substantive issues, including securing voting rights for formerly incarcerated people, increasing access to public housing for people with criminal legal involvement, and making it illegal for employers to require applicants to disclose their criminal legal histories.[13] It also cares for and supports incarcerated and formerly incarcerated people by celebrating personal milestones and connecting people to employment, housing, and mentorship opportunities.[14]

Incarcerated people are directly involved in DARE's Behind the Walls Committee. By necessity, DARE speaks with incarcerated people to involve them in the committee's campaigns and ensure their interests are centered in its work. It has pursued this strategy for many years and thus has participated in scores of telephone calls with incarcerated people. Incarcerated people continue to regularly call DARE for work related to the Behind the Walls Campaign. DARE recently opened and currently maintain a Securus account through which it pays for our phone calls with incarcerated people.

---

[9] Direct Action for Rights and Equality, https://daretowin.org (last visited July 8, 2024).
[10] Our Mission, DARE, https://daretowin.org/mission/ (last visited July 8, 2024).
[11] Board of Directors, DARE, https://daretowin.org/who-we-are/ (last visited July 8, 2024).
[12] Behind the Walls, DARE, https://daretowin.org/behind-the-walls/ (last visited July 8, 2024).
[13] *Id.*
[14] *Id.*

B.  The Criminal Justice Reform Clinic at the Lewis & Clark Law School

Lewis & Clark Law School is an accredited law school in Portland, Oregon that is affiliated with Lewis & Clark College.[15] Lewis & Clark Law School affords its students the opportunity to participate in clinics, which train students to apply their legal knowledge to help individuals and organizations, under the guidance of law school faculty.[16] Among the eight clinics at Lewis & Clark Law School is the Criminal Justice Reform Clinic (CJRC or "Clinic"), which is dedicated to helping students receive hands-on legal experience while critically examining and participating in important issues in Oregon's criminal legal system.[17] Clinic students regularly represent adults in custody in Oregon's 12 prisons which are located throughout the state. They also prepare amicus briefs, work on academic studies and reports, and draft policies concerning the back end of the criminal legal system. Clinic students speak with incarcerated clients and other adults in custody on their post-conviction relief cases, clemency and parole matters, and issues involving court access and legislative projects.[18] The CJRC relies on the Department of Corrections' communication services daily to serve its clients in pursuit of these goals.

In addition to its clients, the CJRC also regularly communicates with incarcerated inquirers and their family members. The Clinic provides legal information and navigation to hundreds of adults in custody, many of whom are incarcerated over 200 miles away from the Clinic and do not have viable legal alternatives. Furthermore, the prohibitive cost barrier for incarcerated family communications causes the CJRC to take on a role as an intermediary between incarcerated individuals and their loved ones. This additional burden strains the Clinic's already limited time and resources and hinders its ability to provide services to its clients and the incarcerated community at large. Beyond providing legal guidance, the Clinic also helps adults in custody navigate the complex world of the legal system, along with providing emotional, educational, and reentry support often acting as their only resource for this assistance due to the prohibitive costs of communication services. Given the rural location of many of Oregon's most populated prisons, and the dispersed locations of clients' families, barriers to communication services only serve to limit the quality and frequency of guidance and support that adults in custody receive.

C.  The Correctional Association of New York

The Correctional Association of New York is a 501(c)(3) nonprofit organization that is empowered by New York State Correction Law to provide independent monitoring and oversight of New York's prisons.[19]

---

[15] Lewis & Clark Law School https://law.lclark.edu (last visited July 9, 2024).
[16] Clinics at Lewis & Clark Law, Lewis & Clark Law School https://law.lclark.edu/clinics/ (last visited July 9, 2024).
[17] Criminal Justice Reform Clinic, Lewis & Clark Law School, https://law.lclark.edu/clinics/criminal_justice_reform/ (last visited July 9, 2024).
[18] *Id.*
[19] Our Mission, Correctional Association of New York, https://www.correctionalassociation.org/our-mission (last visited July 8, 2024).

CANY corresponds with scores of the approximately 32,000 people incarcerated in New York State each month, many of them via telephone. Incarcerated people share with CANY reports about poor conditions and concerns of treatment in New York's prisons. These reports cover a wide range of subjects, including brutality, inadequate medical and mental health care, solitary confinement, living conditions, and access to programs and services. Without reliable and inexpensive access to IPCS, CANY is limited in its ability to effectively carry out its mission. CANY is based in New York City, and as New York's prisons are geographically dispersed, far from the City and New York's other population centers, such as Gouverneur Correctional Facility, which necessitates about 350 miles of travel from New York City. Although CANY does conduct extensive in-person monitoring, IPCS helps bridge the communication gap between CANY and incarcerated individuals under the custody of the State, providing a crucial outlet for incarcerated people to report the issues that they face and valuable resources for CANY to understand and report on what is happening in New York's state prisons to policymakers and the public, as mandated by state law. A limitation of access to IPCS would also affect CANY's ability to refer emergent concerns and incidences that are reported to the organization by phone to the relevant investigatory agencies including departmental leadership, the State Inspector General, and Justice Center for the Protection of People with Special Needs. In this sense, CANY's access to IPCS also provides a crucial service to New Yorkers. If CANY's monitoring activities were impeded, New Yorkers would lose a critical watchdog, and conditions in New York's prisons would likely dramatically worsen.

D. <u>Pennsylvania Prison Society</u>

The Pennsylvania Prison Society was founded in 1787 by this country's founding fathers out of the notion that even though a person is incarcerated they still deserve the same dignity and respect that every person deserves. The Society enjoys constitutional and statutory access to correctional facilities across the commonwealth where it is able to monitor prison conditions, interview residents about conditions and work to keep families together during incarceration. In addition, the Society focuses on legislative measures related to these conditions and works with key stakeholders on strategies to address them.

The Society maintains a helpline through which people incarcerated in Pennsylvania can report issues. The vast majority of calls to the Society's helpline, as well as from resident interviews, implicate serious conditions, including poor or substandard health care and failures to provide assistive devices and aids. The Society resolves many of these reports administratively by working directly with jail and prison officials. The Society also utilizes these reports in its broader work to improve conditions in facilities wholesale. Legislators, advocates, and other interested parties work directly with the Society on these broader reform efforts. For these

reasons, it is imperative that incarcerated people and their loved ones have low-cost and unimpeded access to the Society's helpline.

Unfortunately, phone call rates have historically impeded this access. Sometimes, incarcerated people cannot afford to call the Society's helpline and must instead resort to mail or other, slower forms of communication. Similarly, family members and friends often cannot afford to speak with their incarcerated loved ones frequently enough to gather and relay information to the Society through its helpline. The lower the rates, the easier it is for the Society to fulfill its crucial mission.

Sincerely,

/s/ Melonie Perez

Melonie Perez
Staff Organizer
Behind the Walls Committee
Direct Action for Rights and Equality

/s/ Aliza Kaplan

Aliza Kaplan
Professor of Law
Lewis & Clark Law School

/s/ Jennifer Scaife

Jennifer Scaife
Executive Director
Correctional Association of New York

/s/ Leigh Owens

Leigh Owens
Education and Advocacy Director
Pennsylvania Prison Society





**Sheriff Kieran Donahue**
*President – National Sheriffs' Association*

**Douglas S. Hart**
*Chief Deputy*

July 11, 2024

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re: Incarcerated People's Communications Services: Implementation of the Martha Wright Reed Act, WC Docket No. 23-62
Rules for Interstate Inmate Calling Services, WC Docket Now. 12-375

Dear Madam Secretary,

I am writing to express my strong opposition to the Federal Communications Commission's latest order concerning Incarcerated Persons' Calling Services (IPCS). As the Sheriff of Canyon County Idaho, and President of the National Sheriffs' Association, I am deeply concerned about the potential implications this order may have on the safety and security measures crucial to our incarcerated population, jail staff, facilities and communities.

The FCC's proposal, particularly its stance on cost recovery for IPCS, disregards fundamental aspects of safety and security that are indispensable in our jails. Call monitoring, transcription, and review are not merely operational conveniences but essential tools for detecting mental health needs, preventing self-harm and suicide, and curbing criminal activities within our facilities. These measures are critical to ensuring the safety of incarcerated individuals, facility personnel, and the integrity of the facility itself. Moreover, they play a vital role in enhancing public safety outside the facility and contribute significantly to delivering justice for victims and their families.

Jails are legally obligated to implement rigorous safety and security measures to safeguard inmates and prevent crime both within and beyond their premises. The presence of IPCS necessitates these measures, as failure to monitor calls could result in significant legal liabilities, such as lawsuits for inadequate suicide prevention efforts. Despite this, the FCC's proposed policies on cost recovery fail to acknowledge the necessity of these safety and security expenses and the regulatory constraints faced by jails. Disallowing cost recovery will only impede access to IPCS, not enhance it.

Furthermore, IPCS carrier data fail to accurately reflect the diverse needs and costs associated with IPCS in small jails. Therefore, the FCC's rates must consider the unique circumstances of each jail to ensure fair and effective regulation.



**FLORIDA DEPARTMENT OF CORRECTIONS**

GOVERNOR
**RON DESANTIS**

SECRETARY
**RICKY DIXON**

July 11, 2024

**Before the
Federal Communications Commission
Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services: | ) | W.C. Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | W.C. Docket No. 12-375 |
| | ) | |

**To: The Commission**

<u>**COMMENTS OF THE FLORIDA DEPARTMENT OF CORRECTIONS**</u>

On April 7, 2023, the Commission published a notice of proposed rulemaking ("NPRM") regarding implementation of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWRA"). The MRWA expands the Commission's jurisdiction under the Communications Act of 1934, as amended, and directs the Commission ensure "just and reasonable charges for telephone and advanced communications services in correctional and detention facilities." In its NPRM, the Commission seeks comment on a number of issues related to its interpretation and implementation of the MWRA. The following comments from FDC address the Commission's interpretation and implementation the MWRA as it relates to the recovery of safety and security costs associated with providing telephone and advanced communication services in correctional institutions and facilities. FDC urges the Commission to interpret the MWRA in a way that properly defers to the authority and expertise of prison administrators and ensures FDC can recover costs associated

with any safety and security measure it implements related to these services. As a practical matter, failing to do so would likely result in evisceration of the very purpose of the MWRA. Whereas the MWRA is intended to make telephone and advanced communications more accessible in carceral settings, a failure to allow recovery of safety and security costs would have the opposite effect; to wit, if FDC is unable to ensure the safety and security of the institution or the public in administering these privileges, the distinct possibility exists that it would have to remove them altogether and exclusively rely upon other, safer forms of communication.

Section 3(b)(2) of the MWRA provides that, in determining just and reasonable rates, the Commission "shall consider costs associated with any safety and security measures necessary to provide a [telephone and advanced communication service] … ." The Commission asks whether the phrase "shall consider" requires it to treat all safety and security costs related to communication services for incarcerated people ("IPCS") as recoverable or, alternatively, whether and to what extent it can evaluate the necessity of such measures and exclude those it deems unnecessary.[1] FDC asserts that the Commission does not have the authority to determine the necessity of institutional safety and security measures implemented by FDC as it does not have jurisdiction over FDC's institutions and facilities. Instead, the Commission must defer to the expertise of prison administrators on matters of institutional security.[2] Further, the Commission should not interpret the MWRA in a way that inhibits or prevents the recovery of safety and security costs incurred by correctional institutions and facilities in relation to IPCS as doing so may affect the availability of those services.

FDC recognizes the rehabilitative value of providing telephone and advanced communication services to incarcerated people. Telephone and advanced communication services give incarcerated people an additional way to stay in touch with family and maintain positive connections to the outside

---

[1] NPRM at ¶¶ 52 –66.
[2] *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979)*; see also Pell v. Procunier*, 417 U.S. 817, 826 (1974).

community.[3]    However, the use of telephone and other advanced communication services by incarcerated people also provides an opportunity for the perpetuation of criminal activity and thus presents safety and security risks.  FDC must balance the rehabilitative value of these services against its duty to ensure the safe operation and security of its institutions and facilities.[4]  Implementing safety and security measures in conjunction telephone and advanced communication services is necessary to ensure the safety of inmates, department staff, and the public and to provide an environment in which rehabilitation is possible.

FDC, not the Commission, possesses the requisite knowledge and expertise to determine what safety and security measures are necessary in providing telephone and advanced communication services in its institutions and facilities. The Supreme Court has recognized that, due to the complexities involved in running a correctional facility, prison administrators should be afforded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979)*; see also Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 (1977); *Pell v. Procunier*, 417 U.S. 817, 826 (1974).  Additionally, the Florida legislature has granted FDC jurisdiction over all matters related to its institutions and facilities.[5]

Nothing in the MWRA or the Communications Act empowers the Commission to override FDC's judgment or evaluate the credibility of its decisions regarding the safety and security of its institutions and facilities.  Rather, Section 4 of the MWRA indicates that Congress intended to defer to the expertise of prison administrators regarding matters of institutional safety and security by providing that no part of the MWRA "shall be construed … to prohibit the implementation of any

---

[3] In addition to inmate mail, email, and visitation.  *See Fla. Admin. Code Rules* 33-210.101–103, 33-601.713–736, and 33-602.900.

[4] § 944.151, Fla. Stat. ("It is the intent of the Legislature that the Department of Corrections shall be responsible for the safe operation and security of the correctional institutions and facilities.")

[5] § 945.025, Fla. Stat.

safety and security measures related [telephone services and advanced communication services] at a [State or local prison, jail, or detention facility]."  While not expressly prohibiting the implementation of safety and security measures, establishing rates that do not allow for the recovery of costs associated with those measures would have the effect of hindering or preventing their implementation and potentially limiting the availability of telephone and advanced communication services in correctional institutions and facilities.

The Commission seeks specific examples of safety and security measures necessary to the provision of IPCS and explanations of why those measures are necessary.[6]  As previously discussed, the Commission lacks authority to evaluate the necessity of safety and security measures implemented by FDC in relation to IPCS (or, indeed, in relation to any other institutional matter).  However, in response to the suggestion that some or all of these measures may be inherent features of correctional environment rather than necessary in the provision of IPCS, FDC notes that the security measures it has implemented in relation to inmate telephone services include call monitoring, call recording, three-way call detection and termination, voicemail recording and storage, and call blocking.[7]  FDC has also implemented security measures related to inmate use of electronic communication via tablet and kiosk services.  These security measures include screening, recording, monitoring and storing data related to electronic communications; locking tablets that are not regularly connected to an authorized kiosk; and disabling wireless networks when necessary to ensure the security and safe operation of the institution.[8] These measures are clearly not "core features of the correctional environment"[9] and exist only because FDC provides telephone and eCommunication services to its incarcerated population.  Further, these measures are necessary because the use of telephone and electronic communications by incarcerated people  provides an opportunity for continued criminal behavior or other behavior

---

[6] NPRM at ¶ 54.
[7] *See Fla. Admin. Code R.* 33-602.205.
[8] *See Id.* at R. 33-602.900.
[9] NPRM at ¶ 54.

that jeopardizes the safety and security of the institution, its incarcerated population, FDC staff, and the public at large.[10]  Monitoring telephone and other advanced communications deters improper use, allows FDC to detect when improper use occurs, and enables FDC to prevent further misuse.

In establishing just and reasonable rates for IPCS, the Commission must defer to the expertise and authority of prison administrators and treat all related safety and security measures as necessary. The Commission should be mindful of the costs of implementing these safety and security measures and set rates that allow correctional institutions and facilities to recover such costs.  Interpreting and implementing the MWRA in a way that allows correctional institutions and facilities to recover the safety and security costs associated with providing IPCS is necessary to ensure the continued availability of those services.

Sincerely,

Daniel A. Johnson
General Counsel

---

[10] *See, e.g.*, *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 957-58 (11th Cir. 2018) ("The Florida Department of Corrections has rules aimed at preventing fraud schemes and other criminal activity originating from behind bars, but inmates continually attempt to circumvent measures in place to enforce those rules" and "Inmates have the time, talent, and tendency to use their phone, pen pal, and correspondence privileges to conduct criminal activity, thwarting efforts to protect inmates and the public. The record is heavy with evidence of that unfortunate reality.").



*Montana Sheriffs & Peace Officers Association*
PO Box 794 • Helena, MT 59624 • (406) 443-5669 • www.mspoa.org

July 12, 2024

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554
**Via ECFS**

RE:     Public comment on the Implementation of the Martha Wright-Reed Act; Report and Order,
        Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed
        Rulemaking in Rulemaking in WC Docket Nos. 23-62 and 12-375

Dear Secretary Dortch:

Thank you for the opportunity to comment on the proposed FCC action to implement the Martha
Wright-Reed Act.  The Sheriffs and Jail Captains/Commanders of Montana are committed to
providing a safe environment for inmates and recognize the vital importance of keeping inmates
connected to family members, friends and outside support systems.  Jail telecommunications are
necessary to accomplish all of these goals.

There are 38 local detention facilities in our state and unfortunately the vast majority do not have
adequate funding to provide all of the expected services.  Facilities aim to meet all statutory
requirements, as well as the voluntary jail standards in the state and unmandated but expected
services, amenities, and programming in order to comply with their duty to provide for the
custody, welfare, and safety of every inmate.

Montana Sheriffs ensure availability of telephone services for both pretrial and post-sentence
inmates because they know regular communication with family members and outside support
systems is integral to helping inmates maintain strong, positive connections during their term of
incarceration and a critical component to maintaining morale in the facility.

Telephones and telecommunication devices in secure facilities require specialized equipment and
software essential for maintaining inmate well-being and secure facility safety.  Sheriffs rely on
outside vendors to install both hardware and software and maintain the equipment within the
facility and the data outside of the facility.  A secure phone system must ensure the hardware
cannot be used to physically harm an inmate and that through the software and phone
recordings, facilities are able to identify threats, coercion, and extortion of victims, family

1

**JA1445**

members and the community.  Sheriffs rely on telecommunications companies for the specialized equipment and proprietary software to provide the necessary security measures, which simultaneously allow inmates the opportunity to stay connected to family and friends outside the facility while maintaining security inside the facility.  Unfortunately, there are inmates who use the jail phones to plan the smuggling of contraband into the facility, conspire to escape from the secure facility, attempt to continue their criminal enterprise from inside, intimidate witnesses, and attempt to violate restraining orders and further traumatize their victims.  Security software is an essential safety measure for confinement facilities.  In addition, it is important to recognize that the software the facilities use is critical to providing a level of privacy for the inmates, specifically in attorney/client communication.

The equipment and software are not inexpensive and as previously stated, most facilities in our state struggle to adequately fund the all of the mandated services as well as the expected services.  Sheriffs in Montana are required by law to operate detention facilities within their means and take consideration to not further burden local tax payers.  To that end, the majority of telecommunications contracts in secure facilities include the hardware equipment and installation at no charge to the local facility.  As a mechanism to recoup some of the equipment and installation expenses, companies charge fees.  Additionally, there are other costs borne by the companies such as calling services for hearing impaired inmates and data storage for recorded calls.

If individual Sheriffs' Offices attempted to provide the telecommunications hardware, software, and data storage without the assistance of an outside telecommunications provider, the price tag would be enormous and likely cost prohibitive for most agencies.  Sheriffs would be left with few options, all of which would likely result in weakened facility security measures and diminished inmate communication with family, friends and support outside the facility.  If jail telecommunications rates are severely restricted, local detention facilities will have no choice but to return to pay phones with the option to make a collect call.  This would ultimately be more costly to inmates and would lack the necessary security measures to keep the inmates, detention officers, and the public safe.

In 2023 the Montana State Legislature passed legislation to regulate the fees for inmate telecommunication services.  The rates set in Montana are just and reasonable while still allowing telecommunication providers to operate in our state and in our local detention facilities.  The current rate cap, restriction on first minute fees, prohibition on ancillary fees, and the availability of one free phone call per week are all reasonable and just measures to ensure pre-trial detention facilities meet the needs of the inmates and maintain the safety and security of the facility.

2



**VIRGINIA ASSOCIATION OF REGIONAL JAILS**

P.O. BOX 1421
WINCHESTER, VA 22604

804.486.7272

ADMIN@VARJ.ORG

DEREK ALMARODE
PRESIDENT

ERIC YOUNG
VICE PRESIDENT

BRANDON MONK
DIRECTOR

BETH HEALY
TREASURER

ASHLEY KNOX
SECRETARY

July 11, 2024

*VIA ECFS*

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re:   Public comments on the Implementation of the Martha Wright-Reed Act ("Act"); Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking in WC Docket Nos. 23-62 and 12-375

Dear Ms. Dortch:

The Virginia Association of Regional Jails ("VARJ") respectfully submits these comments to the Commission's June 27, 2024, proposed rules related to rates and charges for incarcerated persons communications services ("ICPS"). VARJ is a professional association comprised of the superintendents of Virginia's 21 regional jails.

**Transition period unreasonable**

The proposed rule would have a negative fiscal impact on jails and localities in Virginia in the middle of the current budget year. Virginia regional jails and the localities that comprise them operate on an annual, July 1 – June 30, fiscal year budget cycle. Since Virginia law does not legally mandate site commissions, regional jails in Virginia - large, medium, and small, will suffer direct and immediate impacts to their current budgets with the elimination of site commissions. Additionally, many jails have entered into multi-year contracts with service providers that extend beyond the end of fiscal year 2025. Upfront capital investments in communications system upgrades that directly benefit inmates are often recovered, in part, over the length of contract terms, which in turn reduces pressure on rates. Given that the proposed rule impacts Virginia's regional jails the same as it impacts facilities in states with legally mandated commissions, the

proposed rule seems arbitrary. If the Commission recognizes and accommodates a legal mandate for one year, why would it choose to disregard and override legal contract provisions that comply with current law and have the exact same effect as legally mandated commissions? Most regional jails in Virginia are comprised of small, rural localities, with limited financial resources to absorb significant mid-year impacts to their budget. The proposed order should be amended to delay the implementation of the new rule until current contracts have expired, but in no event sooner than July 1, 2025, for all correctional facilities.

### The Commission did not appropriately consider costs associated security and safety

The Act states that in determining just and reasonable rates, the Commission "shall consider the costs associated with any safety and security measures necessary to provide" … telephone and advanced communications services. The Commission erred in its application of what it deems to be "used and useful" as it relates to its mandate to factor safety and security measures into the proposed rate structure. To determine that services such as call recording, transcription, real time monitoring, voice identification, record retention, etc. are not "used" or "useful" does not reflect the reality of how these services are used in a modern correctional setting. Excluding the services from allowable cost recovery ignores the importance of these services and technologies in improving the safety of these facilities, including the safety of incarcerated individuals. VARJ is happy to provide examples of how these services are both used, and useful and directly benefit inmates. Assuming inmate demand to utilize communication services increases as a result of the proposed lower rates, the need for safety and security measures will also increase dramatically. The Commission should amend the proposed rule by allowing for increased safety and security measure recovery in the rate structure to reflect the reality and importance of services that are routinely used, useful and beneficial to the safety of the public and inmates.

### Prohibiting on-site commissions is beyond the scope of the Commission's Authority

Congress directed the Commission to adopt a rule for "just and reasonable" rates. The Act makes no mention of privately contracted or legally mandated on-site commissions that may be associated with the provision of these services. Prohibition of commissions is outside the scope of the Act and beyond the Commission's inherent authority as a regulator of communication provider rates, and as long as commissions do not effectively increase rates above those set by the Commission, the rule should not implicate them. VARJ urges the Commission to amend the proposed rule and remove all regulation of site commissions from the proposed rule as long as appropriate rate limits are observed.

### Proposed rule undermines recent Virginia efforts to directly benefit inmates

During the 2024 Virginia General Assembly Session, the legislature passed by an overwhelming bipartisan 136-3 vote, a bill to require all "profits" derived from inmate phone services to be spent directly on educational, recreational, or medical purposes for the benefit of the inmates to include behavioral health, substance abuse, reentry, and rehabilitative services.[1] By preempting this new state law, the Commission

---

[1] **HB 903 Correctional facilities, local; stores and telephone systems, fees,** amended 53.1-127.2 of the Code of Virginia, to require Each sheriff or jail superintendent who operates a *local* correctional facility that utilizes *a telephonic communication system,* an electronic visitation system, or electronic messaging system, including Voice-over-Internet Protocol technology and web-based communication systems, for communication between prisoners



July 12, 2024

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

Re:    Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket No. 23-62; Rules for Interstate Inmate Calling Services, WC Docket No. 12-375, notice of *ex parte* communication pursuant to 47 C.F.R. § 1.1206(b)(2)(iv).

Dear Ms. Dortch:

This *ex parte* letter is to document the following meetings discussing the draft report and order in this docket,[1] in accordance with the Commission's rules: on July 10 with Arpan Sura, Office of Commissioner Carr, on July 11 separately with Hayley Steffen, Office of Commissioner Gomez; Justin Falb and Milla Anderson, Office of Commissioner Starks; Adam Cassady, Office of Commissioner Simington; Ramesh Nagarajan and Elizabeth Cuttner, Office of Chairwoman Rosenworcel.  Joining me in those meetings were Andrew Lama and Stefen Short, Worth Rises (all meetings); Roxanne Zech, HEARD (Commissioners Carr and Gomez); Ariel Nelson, National Consumer Law Center (Chairwoman Rosenworcel, Commissioners Gomez and Starks).

*The draft order represents high-water mark in agency decision-making.*  Advocates strongly praised the draft order overall. With one fell swoop, the Commission removes two longstanding and pernicious areas of abuse: fees and commissions. At the same time, the FCC permits local law enforcement to recoup costs if they are legitimately linked to the provision of service, and permits certain, specific, non-optional, safety and security measures, but does not permit carceral phone companies or correctional institutions to foist the costs of incarceration on to the cost of communication paid for by the loved ones of incarcerated people.[2] Further advocates, including Ms. Zech, strongly praised the draft order for adopting enterprise registration for IP captioned telephone services, requiring accessible billing for people with disabilities, and clarifying and strengthening the interoperable video conferencing requirements, including applying the CVAA to calling devices, which should assist people who use hearing aids and braille readers.

As UCC Media Justice has explained in the record, this decision is consistent with the overall policies and previous decisions of the FCC.[3] Mr. Short explained that the Commission does not

---

[1] Draft Report and Order, Order on Reconsideration, Clarification and Waiver and Further Notice of Proposed Rulemaking, WC Docket Nos. 12-375, 23-62, FCC-CIRC2407-01 (rel. June 27, 2024) (*Draft Order*).

[2] While advocates believe it would have been more favorable to prohibit the inclusion of all safety and security costs in the rate, as those costs are rightfully the burden of the facility, the overall impact of the FCC's decision is a resoundingly positive one.

[3] For example, if another private or public entity ran a bus depot or airport where consumers were forced to use public payphones, and the entity used those funds to pay to pick up garbage or feed homeless people, the Commission would not permit charging inflated costs in a

have jurisdiction or authority to permit charges based on their social good. The legal and policy justifications in this docket are even greater than in previous decisions: the Commission should unanimously approve the order.

*Clarity in permitted carceral facility-provided used and useful inputs would avoid confusion and ensure compliance with the Commission's rules.* As we strongly endorsed the order, we also urged the Commission to make several improvements to the draft. Regarding site commissions, we applauded the Commission for concluding in its Draft Order that "payments from IPCS providers to correctional facilities that are not used and useful in the provision of IPCS—are fundamentally incompatible with our mandate under section 276(b)(1)(A), as amended, to ensure both just and reasonable IPCS rates and charges for IPCS consumers and providers as well as fair compensation for IPCS providers."[4] As mentioned in Worth Rises' Initial Comment, "correctional facilities do not generally incur any cost directly related to the provision of IPCS."[5] The Commission should make that clear, and also provide a more defined, but not fully inclusive, sense of prohibited site commissions which would not be classified as used and useful. Like the Commission, we fear that IPCS providers will continue to attempt to offer kickbacks and encourage "an endless game of 'whack-a-mole'" as they try to develop kickback schemes to entice contracts from correctional agencies.[6] The Commission's draft helpfully explains that broadband infrastructure used to provide communications covered by the Martha Wright Act do qualify. We urged the Commission to clarify that some kinds of services do not qualify, such as moving incarcerated people to locations within a facility where communications devices are located.

*All rates deserve a commitment to on-going evaluation at regular intervals.* To the degree that there are any concerns in the record with respect to pricing for very small jails or jails in rural areas (which advocates do not share), we explained that the waiver process is always available for any provider that can demonstrate its costs are higher than the caps because of legitimate costs not covered by, for example, current subsidies available to providers serving rural areas. Advocates support regular re-evaluations of all rates, including very small or rural jails, but also focused on rates that should be declining because of increased efficiencies and cheaper modern technologies.

*The Commission should not defer needed and obvious technical changes to the jail definition.* The Commission should adopt the changes advocated by the ACLU by amending the definition of jail to be accurate and consistent with the Commission's prior statements that the rules should apply to immigrant detention.[7] The proposed change is ministerial and accurately implements the Commission's previously adopted policy. Without the proposed change, the Commission's rules would, for example, inadvertently exclude detention by U.S. Customs and

---

monopoly environment, no matter the importance of the public purpose of the funds. Similarly, in a much more significant expansion of authority with questionable authorization, the Commission has capped the rates local governments may charge for hosting 5G infrastructure on public property. UCC Media Justice and Public Knowledge Comments, WC Docket No. 23-62 at 11, 21-23 (filed May 8, 2023).

[4] *Draft Order*, ¶ 244. The Commission's decision on safety and security is consistent with its conclusion that it would include only the services that are not optional as offered by today's providers.

[5] Comments of Worth Rises, Docket No. 23-62 (filed May 9, 2023).

[6] *Draft Order*, ¶ 315.

[7] Letter from Eunice Cho to Chairwoman Jessica Rosenworcel, WC Dockets 12-375 and 23-62 (filed July 11, 2024).

Border Protection, a clear error. It would also exclude detention by private facilities contracted by CBP and ICE to run immigrant detention facilities, another clear error. The Commission previously adopted technical changes to its definitions to align it with previously adopted policy and should do so again here. The Commission should not conflate opposition and questions regarding secure mental health facilities with immigrant detention by subjecting this purely technical amendment to further delay via an unnecessary and duplicative comment cycle.[8]

*The Commission must make sure that AI technologies and other technologies deployed in automatic speech recognition do not discriminate against people who speak dialects, have accented speech or speech impediments.* The Commission requires providers to make at least one of each type of accessible technology available, including captioned phone service, which provides a hard-of-hearing person captions as well as an audio connection to assist in their communication. The Commission also permits the use of automated speech recognition for such captioned calls. However, people who are not incarcerated may choose a provider that offers a live communications assistant to provide captions. If an incarcerated person is forced to use a provider that does not offer a human captioner, they or the other caller could be deprived of communication if their speech is not accurately captioned by automated technology. The Commission should require that captioned technologies for incarcerated people include an opportunity to use a human communications assistant.

*The Commission should protect incarcerated people with disabilities from increased costs they shouldn't have to pay in the first place.* Ms. Zech and I expressed two concerns with the Commission's treatment of point-to-point calls. In prior orders, as we have previously contested, the Commission permitted charges for captioned telephone services and point-to-point video service. The Commission should reverse this decision and grant the outstanding Petition for Reconsideration on this point.[9] Regardless, the Commission previously stated that point-to-point video service could be charged no more than hearing callers can be charged for a voice call.[10] The current draft now adopts rate caps for video communication for non-disabled people for the first time. *The Commission should not increase the rate cap for ASL point-to-point calls over the audio rate cap originally adopted, even in alternative pricing plans.*[11] The draft

---

[8] We note while the record contained some opposition to expanding the rules to secure mental health facilities, the opposition is unfounded, raised by parties with no expertise in the matter and is directly contrary to the advocacy of people with disabilities who did directly ask for that change. *Draft Order*, ¶¶ 609-10. While the immigration detention decision is purely ministerial, the FCC should not continually defer substantive actions impacting people with disabilities either. The Commission has sought comment on mental health facilities repeatedly and its lack of action is disappointing.

[9] Response to Petitions for Reconsideration by Accessibility Advocacy and Research Organizations, WC Docket No 12-375 at 6 (filed Feb. 23, 2022), https://www.fcc.gov/ecfs/search/search-filings/filing/10223743714008; *see also* Reply Comments of Accessibility Advocacy and Research Organizations, WC Docket No. 12-375 at n.1 (filed March 6, 2023), https://www.fcc.gov/ecfs/search/search-filings/filing/10307274230953. The discriminatory effect of the Commission's decision to exclude point-to-point video from the prohibition on charges pursuant to 47 C.F.R. § 64.6040(d)(1), means that a call between a hearing caller using an interpreter and a deaf person using ASL receives a call without charges, but a similar call between two deaf people using ASL with each other directly using point-to-point video is subject to charges. This plainly discriminates against deaf people.

[10] 47 C.F.R. § 64.6040(d)(3).

[11] *Draft Order*, ¶ 465.

proposed rule 47 C.F.R. § 64.6040(e)(4) permits use of the new video rates in certain alternate pricing schemes which conflicts with the cap codified at 47 C.F.R. § 64.6040(d)(3).[12] As a matter of non-discriminatory treatment under the law and a matter of justice, video point-to-point calls are the same as audio calls for hearing people. They shouldn't be charged at all, but they certainly should not be penalized because the Martha Wright Act authorizes caps on video calls for the first time or because providers seek alternate pricing plans that may not serve the needs of consumers.

In closing, I reiterate UCC Media Justice's interest in the Commission affirmatively monitoring the ability of people with disabilities to submit complaints and receive redress when they are not able to obtain access to communications consistent with the law.[13] We also hope to see the Commission's accessible consumer information for its disability rules very soon.

The Commission's decision is a strong one that will benefit millions of consumers nationwide and advance the cause of justice for all. Advocates strongly recommend a unanimous vote in support and the modest but critical changes described above.

Sincerely,

Cheryl A. Leanza
Policy Advisor

---

[12] *Draft Order*, Appendix A.

[13] As UCC Media Justice requested last month, the Commission should commit to collecting data from companies with respect to how many minutes, or other relevant metric, are being used for each of the various services that meet the needs of people with disabilities. Such data should be broken out by type of facility, state, and size of facility. This would assist the Commission in evaluating whether the new rules are effective and would enable the Commission to target education and outreach efforts to facilities that may be withholding permission for companies that are trying to comply with the Commission's rules.

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

# Bro**///**nstein

July 15, 2024

Michael H. Pryor
Attorney at Law
202.383.4706 direct
mpryor@bhfs.com

Marlene H. Dortch
Office of the Secretary
Federal Communications Commission
9050 Junction Drive
Annapolis Junction, MD 20701

RE:    In the Matter of Incarcerated People's Communications Services WC Docket No. 23-62;
       Implementation of the Martha Wright-Reed Act Rates for Interstate Inmate Calling
       Services WC Docket No. 12-375

Dear Ms. Dortch,

In accordance with Section 1.1206 of the Commission's rules, this letter is submitted on behalf of Securus for inclusion in the record of the above captioned proceedings.  This version corrects and supersedes Securus' ex parte letter filed earlier on July 11, 2024.

Securus Technologies, LLC ("Securus") submits this ex parte letter to highlight the significant legal, practical, and public policy infirmities in the draft order to implement the Martha Wright-Reed Act ("MWR Act") and the potential unintended consequences that follow from those infirmities.[1]  Relying on an impermissible statutory interpretation, the draft order excludes from recoverable provider costs the great majority of necessary safety and security costs that the Commission has historically allowed.  It follows this by improperly excluding from consideration critical cost data over concerns about its reliability, which concerns were never raised by the Commission with Securus during the mandatory data collection process, despite engaging with Securus on other questions regarding its cost data.  Having done so, the draft order proceeds to set audio and video rate caps that are below provider cost.

These confiscatory rates may drive smaller providers out of the market, thus reducing overall competition.  The same confiscatory rates will also reduce the resources available to remaining providers, thus constraining their ability to continue closing the digital divide for incarcerated consumers through new technologies and services for incarcerated consumers.  The draft order also requires that correctional agencies find funding to cover necessary safety and security costs on an impractical timeline.  If they cannot, it is reasonable to anticipate that some agencies will reduce communication opportunities for incarcerated consumers, for the simple reason that they lack the ability to properly monitor the use of communications tools to protect incarcerated consumers and their loved ones by preventing  fraud and misuse.  While the draft

---

[1] *Incarcerated People's Communications Services: Implementation of the Martha Wright-Reed Act*; WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, Draft, FCC-CIRC2407-01 ("Draft Order" or "Draft").

1

Corrected Version

order contains pro-consumer initiatives, such as adoption of alternative pricing plans, these initiatives cannot and will not mitigate the harm caused to consumers and competition caused by the balance of the draft order. As a result, the draft order does not further the objectives of the MWR Act but instead materially frustrates them.

For all of these reasons, the Commission should reject this draft and return to the drawing board, resolve any concerns it has about the validity and completeness of provider cost data, and address the issue of rate caps and safety and security costs via a sound and defensible interpretive and methodological approach that results in a draft order that materially advances the objectives of the MWR Act. To the extent the Commission moves forward with the draft, Securus does recommend discrete revisions to the draft to provide sufficient time for providers to implement the significant changes to internal systems, operations, and product design that the proposed new rules will require and for governments to identify alternative sources of funding considering the draft order's significant disruption of existing funding mechanisms in this industry.

I.       Introduction and Summary

Securus has repeatedly stated its strong support for the MWR Act given its promise to promote a fair and equitable framework for providing incarcerated people's communications services or IPCS, and increase the affordability and accessibility of IPCS for incarcerated consumers.[2] Assuming an appropriate, reasonable, and data-driven rulemaking process, the implementation of the MWR Act should lead the Commission to only one outcome: the adoption of audio and video rate caps that are more affordable for consumers and that enable IPCS providers to recover their reasonably incurred costs for each line of regulated services, including for those safety and security costs that are necessary to the provision of IPCS.

Unfortunately, the draft order fails this test for at least the following reasons:

First, the draft order fails to meet the statutory requirement that all providers be fairly compensated for completed calls. Rather than ensuring that *all* providers are fairly compensated for completed audio calls and for completed video calls, the draft order collapses the "fairly compensated" standard into the "just and reasonable" standard, resulting in the erroneous conclusion that all providers are "fairly compensated" even though more than half will be unable to recover their costs.

Second, the MWR Act requires the Commission "to consider" those safety and security measures that are "necessary" for the provision of IPSC in a carceral setting. Rather than meaningfully addressing this pivotal statutory requirement, the draft order concludes that "necessary" means "used and useful" and only "used and useful." On the basis of that interpretation, the draft order concludes that the majority of safety and security costs necessary for the provision of IPCS in a carceral setting are unrecoverable from consumers because they are not, per the draft order, "used and useful" in the provision of IPCS. As a result, the draft order impermissibly reads "necessary" out of the MWR Act and, having done so, arrives at an outcome contrary to the statute's requirements and objectives.

---

[2] IPCS consists of voice calling services and real time video, such as video calling.

2

Third, the Commission has previously found that a variety of safety and security costs incurred by IPCS providers and agency customers are necessary for the provision of IPCS. The draft order reverses these prior findings without explanation and, in doing so, finds the majority of previously recoverable safety and security costs are no longer recoverable from consumers. Even if such excluded safety and security costs were truly not "used and useful" – and they are, in fact, "used and useful" – they are absolutely "necessary" to the provision of IPCS. By failing to consider these costs, the draft order arrives at impermissibly low rate caps that will preclude a substantial segment of the industry from recovering their costs. In legal terms, the rate caps are confiscatory.

Fourth, the draft order rejects Securus' cost-of-capital calculations that the Commission has previously accepted, and replaces it with a lower and inapplicable rate of return developed years ago for small rural telephone companies  The result of depriving Securus of a reasonable return on investment is to further reduce rate caps for the entire industry.

Fifth, the draft order refuses to account for the effects of inflation on provider costs, a decision that ignores economic reality and contributes to rates below provider cost – a problem that will be exacerbated over time as inflationary-driven cost increases diminish the ability of static rates to generate sufficient revenue to those increasing costs.

Sixth, IPCS providers often provide consumers with free or unbilled calls in order to assure communication to more incarcerated individuals. As these calls generate no revenue, they cannot result in the recovery of any provider costs. The draft order relies on unbilled minutes in its calculation of the per-minute rates needed to recover costs. The Commission has never done this before and  this change has the unreasonable outcome of assuming that provider costs can be recovered from calls that generate no revenue. This too contributes to rates below provider costs.

Seventh, Securus provided the Commission with substantial amounts of cost data related to its video service, which data shows that Securus' costs for video are greater than industry averages. Despite acknowledging the present nascent state of the video market (elements of which directly contribute to Securus' video cost structure), the draft order simply rejects this cost data as unreliable. These data are in fact reliable, and the draft order's refusal to consider them also results in rates below provider cost.

Eighth, the draft order imposes significant and new operational obligations and changes on all providers. However, it fails to account for the costs of these new obligations, which costs are not captured in the cost data, and fails to provide a mechanism by which providers can recover their costs associated with these new obligations.

Ninth and finally, the draft order contains a variety of operational uncertainties for which the Commission should seek further comment from stakeholders to better understand their implications. The requirement to designate a third person to receive refunds is a prime example of a seemingly minor change that in fact will require substantial effort and cost to operationalize.

3

**JA1455**

REDACTED – FOR PUBLIC INSPECTION                              Corrected Version

The Commission never provided industry an opportunity to comment on this revision in order to assess its costs versus benefits.

As a result of the above, the draft order does not advance, but instead materially frustrates, the objectives of the MWR Act.  While the draft order does provide consumers with substantially lower rates than presently authorized, it does so via improper interpretative and methodological decisions that ultimately result in confiscatory rates that preclude providers from recovering their costs.  It is not enough that the Commission lower rates for consumers; it must do so in an appropriate and lawful manner.  This the draft order does not do.

II.     The rate caps will prevent providers from recovering their costs, thus violating the key statutory requirement of fair compensation for all providers.

As a threshold matter, the MWR Act requires the Commission to develop a "compensation plan" to ensure that "all" providers are fairly compensated:  "In order to promote competition among payphone providers and promote the widespread deployment of payphone service . . . the Commission shall . . . establish a compensation plan to ensure that **all** payphone service providers are fairly compensated, and all rates are just and reasonable, for completed intrastate and interstate communications."[3]

To ensure fair compensation, the Commission must set rates at a level that allows providers to recover their reasonably incurred costs.  This the draft order does not do.  Instead, the draft order ignores individual company average costs and sets rates based solely on industry average costs.  This alone results in the imposition of rate caps that prevent cost recovery for a significant number of providers, as provider cost structures can and do vary widely for legitimate and understandable reasons.

This is not simply a provider problem; it is a *competition* problem. If the draft order sets rates below provider costs – and it does – then some providers may be forced out of business entirely.  Providers that remain in the industry may be forced to significantly curtail spending on the development and deployment of new consumer friendly technology, including tablets, the deployment of which has been shown to significantly increase calling volumes.  The same remaining providers might see a degradation in service quality as they attempt to allocate extremely scarce resources.  The end result will be both a lessening of competition as providers exit the market and a reduction in the technology and services available to America's incarcerated population and their loved ones.  This is not the outcome Congress intended.

A.     The draft inappropriately collapses the fairly compensated standard into the just and reasonable standard.

There are two standards at issue when it comes to Commission rate setting for this industry.  First, the fair compensation standard, which requires that each provider be able to recover its costs from the revenue generated at the regulated rate.[4]  Second, the just and

---

[3] 47 U.S.C. § 276(b)(1)(A) (as amended by the MWR Act) (emphasis added).
[4] *See Draft Order* at 33, para. 63 n.211

4

**JA1456**

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

reasonable standard, which requires a balancing of interests ensuring reasonable rates for consumers and an adequate return for service providers.  As these descriptions suggest, these are separate and independent standards, which the draft order acknowledges.[5]  However, the draft order and its underlying methodology fail to address the fair compensation standard.  Instead, the draft simply collapses the fair compensation standard into the just and reasonable standard and sets rates based solely on industry-wide average costs:  "We consequently interpret Congress' permission to use industry-wide costs to mean that the rate caps based on costs evaluated on an aggregate basis generally will satisfy the requirement that all payphone service providers be fairly compensated."[6]

Industry average costs, the draft notes, necessarily precludes any "provider-by-provider" assessment.[7]  Fair compensation, however, requires *exactly that kind of provider-by-provider assessment*, which is why Congress gave the Commission permission not just to use industry wide costs, but also permission to assess company specific average costs: The Commission "may use industry-wide average costs of [IPCS] *and* the average costs of service of a [IPCS] provider."[8]  The draft solely utilizes the former while ignoring the latter, which results in an unfortunate outcome: the setting of rate caps at such a level that a significant number of providers cannot recover their costs.[9]  This outcome is also entirely avoidable, as the Commission knows what fair compensation means in the context of payphone service, having previously concluded that if "the provider fails to recover its total costs from its aggregate revenues" at the regulated rate, the provider is not fairly compensated.[10]

---

[5] *Draft Order* at 35, para. 67.

[6] *Draft Order* at 36, para. 68.

[7] *Draft Order* at 36, para. 68 ("Use of industry-wide average costs, of necessity, evaluates provider compensation on a more aggregated – rather than provider-by-provider – basis.")

[8] Martha Wright-Reed Act § (3)(b)(1) (emphasis added).

[9] In setting interim rate caps in its 2021 order, the Commission used industry-wide average costs as a first approximation for just, reasonable and fair rates.  But it didn't stop there.  To ensure that the vast majority of providers could recover their costs under the rate caps, the Commission added a standard deviation to the average (or mean) costs. In that way, the adopted rates would cover the costs that providers incurred at most facilities and help ensure fair compensation.  Here, by contrast, the draft order simply uses averages without any extension through standard deviations or other means.  The result is that the proposed caps leave roughly half of providers unable to recover costs.

[10] *Implementation of Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Order on Remand and Notice of Proposed Rulemaking, 17 FCC Rcd 3248, 3257-58, para. 7 (2002) (*2002 Payphone Order)*. The Commission there stated the test in the negative, "Unless an ICS provider can show that . . . the *overall* profitability of its payphone operations is deficient because the provider fails to recover its total costs from its aggregate revenues (including revenues from interstate and intrastate calls), then we would see no reason to conclude that the provider has not been 'fairly compensated.'" The draft order rejects use of its previous fair compensation determinations because fair compensation was then required for each and every call whereas now fair compensation is required for completed communications.  But the quoted standard referred to "overall" profitability, not profitability on a call-by-call basis.  The Commission's previous definition of fair compensation is thus fully applicable and the draft fails to articulate a reasonably basis for departing from it.

5

**JA1457**

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

Here, as elsewhere, the draft order fails the requisite test.  By the draft's own admission, fully one-third of the 12 providers analyzed will be unable to recover their audio and video costs *even at the lowest level of costs set by the draft* (*i.e.,* after their costs are adjusted to remove a substantial portion of expenses actually incurred in the provision of IPCS).[11]  As explained further, this is a conservative estimate as it is developed using unbilled minutes.  Focusing just on audio services, *more than half* of IPCS providers will not be able to cover audio costs from audio revenue.[12]  This is particularly important as audio services account for roughly 80 percent to 90 percent of IPCS costs and expenses.  That is not an arcane or esoteric result; it is instead the unavoidable outcome of simple arithmetic when using straight averages to set rates.  Moreover, this outcome is contrary to the Congressional instruction contained in the MWR Act, which directed the Commission to ensure that each provider is fairly compensated and authorized use of individual company average costs to ensure that result.

B.      The cost data demonstrate many providers will be unable to recover their costs at the proposed rate caps, precluding fair compensation.

Attached to the text of the draft order are pages and pages of detailed explanations of the draft's rate setting methodology and dozens of charts and tables.  None of them, however, provide a ready comparison of the effects of the rate caps on provider expenses. The data exits, however, to provide an answer.

To set the stage, a quick recap of the draft order's methodology is appropriate.  Recall first that the Commission directed IPCS providers to submit highly detailed information on their 2022 costs under the 2023 Mandatory Data Collection.  The draft order finds that 12 IPCS providers submitted cost information sufficiently reliable to use in setting permanent audio rate caps and interim video rate caps.[13]  Reference to the number of providers indicated throughout this letter refers to this universe of 12 providers.

Using the cost information submitted by these 12 providers, the draft derives rate caps by establishing a "zone of reasonableness."  This is an accepted theoretical ratemaking framework that seeks to determine a range of permissible regulated rates.[14]  Assuming the underlying interpretative and methodological conclusions are sound, and here they are not, any rate within this zone should be reasonable.  The upper end of this zone, the upper bound, is the point at which any higher rate would lead to excessive profits.  The lower end or lower bound is the point where any lower rates would be unlawfully confiscatory because companies could not recover their costs.

---

[11] *Draft Order*, App. J. Table 44; Draft Order para. 216.

[12] *Draft Order*, Appx. H at 398, para. 10. Table 23 (confidential).  Table 23 shows the total reported costs incurred in providing audio services for each of the 12 providers whose cost data was considered sufficiently reliable to use in setting rate caps.  The total expenses are used to establish the upper bound of the zone of reasonableness.  Total expenses are further disaggregated by prisons and jails using the five rate tiers used in the draft.  A number of providers are also unable to recover their video costs. *Draft Order*, Appx. H at para.10, Table 24 (confidential version).

[13] *Draft Order* at 74, para. 183.

[14] *Draft Order* at 102, para. 186 n. 666.  `

6

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

The draft sets the upper bound based on the companies' total costs of providing service as reported in the 2023 Mandatory Data Collection without any adjustments or exclusions.[15]  The draft then excludes or adjusts these some of those costs, primarily by excluding many necessary safety and security measures, to derive the lower bound of the zone of reasonableness.  As a final step, the draft selects the actual rate caps for each tier at marginally above the lower bound.  It sets separate rate caps for audio and video services and separately for five types of facilities – so effectively there are 10 different rate caps.[16]

Since any rate above the lower bound is presumptively reasonable under general rate making principles, it is critical that the lower bound be reasonably derived. If the lower bound is set unreasonably low, as is the case here, then rate caps above the lower bound will still be confiscatory.  The zone of reasonableness must, as implied by its name, be reasonable.  For reasons discussed throughout this letter, the draft does not set a reasonable lower bound and the resulting rate caps set just a hair above the lower bounds are also unreasonable.

The draft proffers a number of assertions to justify setting the rate caps just above the lower bound, as opposed to a mid-point or near the upper bound.  These assertions, which are addressed below, include that providers must have inflated their reported costs because those costs in many instances exceed revenues.  It further justifies the resulting rate caps by noting that they result in *only* one-third of the industry (4 out of 12 providers) being unable to recover their costs at the lower bound.[17]  It is remarkable to justify the results of a ratemaking process by proclaiming that it will only drive a third of industry out of business. But even that admission is conservative.  It is actually worse.  To provide a more fulsome and accurate picture, we provide additional data points below based on the same data used by the draft order.

    1.       On an industry-wide basis, the industry cannot come close to recovering its reported total audio costs at the proposed rate cap levels.

Table 23 in appendix H shows that the reported industry average per minute total costs in each of the five rate cap tiers *exceed the proposed rate caps for each tier by substantial amounts.*[18]  The table below compares total industry average expenses for each tier with the draft's reported rates caps.  It is important to note that in deriving these total per minute costs, the draft inappropriately divided total reported expenses by both billed and unbilled minutes, effectively reducing reported costs.  It is not appropriate to use unbilled minutes because they generate no revenue to offset costs.  Dividing expenses just by billed minutes would result in higher, but properly calculated total costs on a per minute basis.  In short, the draft does not set the upper bound appropriately.

---

[15] The 12 IPCS providers reported total expenses for providing audio and video services, including safety and security, site commissions, and ancillary services of slightly more than $1.55 billion. *Draft Order*, App. F, Table 5.
[16] *Draft Order* para. 207.
[17] *Draft Order* at para 16; App. J at Table 44 (confidential version).
[18] Total costs are the reported company costs used the set the upper bound before any adjustments and exclusions. *See Draft Order* at para. 207; App. H. Table 22.  Total costs include IPCS expenses per minute plus all safety and security costs on a per minute basis.

REDACTED – FOR PUBLIC INSPECTION                           Corrected Version

Total audio per minute costs versus rate caps

|                       | Total costs | Rate Cap |
|-----------------------|-------------|----------|
| Prisons               | $0.107      | $0.06    |
| Large Jails 1000+     | $0.098      | $0.06    |
| Medium Jails 350-999  | $0.110      | $0.07    |
| Small Jails 100-349   | $0.121      | $0.09    |
| Very Small Jails      | $0.151      | $0.12    |

As this table makes clear, on an industry average basis, the rate caps do not come close to enabling cost recovery even at artificially deflated costs (by using billed and unbilled minutes) resulting in many providers who will be unable to recover their costs under the draft order's proposed caps.  This outcome follows naturally from, among other decisions, the draft order's failure to give effect to the fair compensation requirement.

        2.       Many IPCS providers would be deeply in the red and thus not fairly compensated.

The average costs shown in the preceding table are industry-wide costs..  But many providers actually have higher company average costs, as shown at  Table 23 (confidential version).  That table shows that a significant number of the individual providers' expenses exceed industry-wide average total upper bound costs by more than {{███████████████}}  For example, for small jails, {{███}} of the twelve providers' total per minute expenses exceed the industry average of $0.121 and {{███}} of the {{███}} providers serving large jails have expenses above the industry average of $0.098.  In other words, even if the rate caps were set at the upper bound, nearly half of the providers cannot recover their total expenses.  Of course, the rate caps are set far below the upper bound, leaving many providers even further in the hole, as demonstrated below.

Table 44 at Appendix J compares provider audio and video revenue at the rate cap levels with the lower bound costs.  It shows that four of the twelve providers cannot earn sufficient revenue from these services at the rate caps to recover lower bound costs.  By definition, the rates with respect to these four providers are confiscatory and certainly do not result in fair compensation.

**JA1460**

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

Table 44 is actually conservative in terms of effect. Securus tasked FTI consulting to assess the percentage of facilities that would be underwater at the lower bound cost level given the proposed rate caps. The table below shows the results. On an industry-wide basis, excluding {{███████████}} the remaining providers will not be able to recover even lower bound costs for *two-thirds* of the facilities they serve. On an individual provider basis, the table shows that {{██████}} providers' lower bound per minute costs exceed the rate cap by more than {{██ ███████}} and that {{████}} providers' lower bound costs exceed rate caps by {{██████████}} or more. These levels paint a far more accurate picture of the draft's devastating impact.

{{Begin confidential information}}



{{End confidential information}}

In short, the draft order's failure to consider the "fair compensation" standard alongside the "just and reasonable" standard results in the imposition of rate caps far below provider costs on both an industry and individual basis. While the failure to consider "fair compensation" is a necessary condition for this outcome, it is not a sufficient condition. Put differently, the draft order's disregard of "fair compensation" only matters when – as here – the Commission failed to properly consider provider costs when setting the lower bound of permissible rates. That failure is addressed next. Before moving forward, Securus must reiterate that the net impact of the draft order's confiscatory rate caps will be the reduction of competition and innovation in the IPCS marketplace, as smaller providers exit the marketplace and the remaining providers struggle with materially reduced resources. It is axiomatic that one cannot increase competition by driving competitors out of the marketplace.

9

**JA1461**

REDACTED – FOR PUBLIC INSPECTION                                  Corrected Version

III.     The  draft order unreasonably excludes safety and security costs.

     A.     The draft misinterprets the statutory obligation to consider necessary safety and security measures.

As set out above, the draft order's proposed rate caps fail to ensure that providers are fairly compensated, either individually or on average, because the proposed rates are below provider cost.  But that does not answer the question of how the draft order set these caps. Answering that question reveals additional failures in the draft order.

As a critical first step, the draft order's proposed rate caps result from the  failure to give effect to the provisions of the MWR Act, which the draft order asserts allows the Commission to reject previously allowed safety and security costs. Section 3(b)(2) of the MWR Act directs the Commission, when coming up with rates, to "consider costs associated with any safety and security measures necessary to provide [IPCS]."  This directive requires the Commission to interpret two key terms: "to consider" and "necessary."  These terms <u>must</u> be interpreted in the full context of the statute and with due regard to prior Commission precedent of which Congress is presumed to be aware.[19]

This the draft order does not do.  Instead, the Commission engages in a two-step process to arrive at an impermissibly low lower bound of purportedly reasonable rates.  First, the draft order equates the MWR Act's concept of "necessary" safety and security costs with the existing (and distinct) concept of "used and useful" safety and security costs.  In doing so, the draft order ignores the D.C. Circuit's previous ruling that the Commission cannot equate the two[20] and reads Section 3(b)(2) out of the statute as if it does not exist.  Second, and having done so, the draft order excludes from its rate calculation the same safety and security measures that the Commission has historically found to be both necessary and inherent in the provision of IPCS.

These conceptual problems are exacerbated by reality.  The vast majority of safety and security cost data was submitted by Securus and ViaPath.  Given that these are the two largest providers, rejecting most of their reported safety and security costs to create the lower bound results in impermissibly lower rate caps for the entire industry for the simple reason that, by rejecting Securus and ViaPath's cost data, the Commission rejected cost data covering the majority of the industry.  It is not possible to arrive at a reasonable, cost-based rates if the cost data for the majority of the industry are not considered

---

[19] *See Cannon v. University of Chicago*, 441 U.S. 677, 697-98 (1979).
[20] *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422 (D.C. Cir. 2000) (by applying the "used and useful" framework the Commission "appears to ignore the statutory reference to 'necessary.'")

10

**JA1462**

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

      1.  The draft's unreasonable interpretation of "necessary."

      The draft order's methodological failure in addressing safety and security costs begins with an act of impermissible statutory interpretation, which renders the entire "necessary" provision found at section 3(b)(2) of the MWR Act superfluous.[21]  Rather than giving effect to the plain-language of the pivotal provision, the draft order concludes that the statute's emphasis on "necessary" safety and security costs adds nothing to the Commission's obligation to derive just and reasonable rates.[22]  This interpretation impermissibly reads section 3(b)(2) out of the statue.

      Consistent with its determination that the directive to consider necessary safety and security costs is simply a reiteration of the requirement to come up with just and reasonable rates, the draft order interprets "necessary" to mean "used and useful."  *These two terms are not synonymous,* and the draft order's interpretation here effectively rewrites the statute to direct the Commission to "consider costs associated with any safety and security measures [used and useful] to provide" IPCS.[23]  As mentioned above, the D.C. Circuit previously rejected the Commission's determination that necessary means used and useful,[24] which renders this interpretation invalid from the outset. E ven in the absence of a prior decision from the D.C. Circuit on this point, the draft order's interpretation here is invalid, as the interpretation fails to give effect to Congress's direction that the Commission consider "necessary" safety and security costs.

      The draft order's additional interpretations of "necessary" are equally impermissible. Relying on the same D.C. Circuit case that rejected the Commission's previous conflation of "used and useful" with "necessary," the draft states that measures are "necessary" only if "required to achieve a desired goal."[25]  This raises an obvious question: What goals are safety and security measures required to achieve?  Securus argued that the goal of safety and security measures is to detect and deter criminal behavior and other misuse of communications to protect incarcerated persons, their loves ones and the public at large.  Tellingly, the draft order does not disagree with this articulation; it simply does not address it.[26]

---

[21] *See Duncan v. Walker*, 533, US 167, 174 (2001) (courts are particularly reluctant to render statutory terms as surplusage when they occupy a pivotal place in the statutory scheme.)

[22] *Draft Order* at 183, para. 358 (the requirement to consider necessary costs "is best understood as *merely* requiring the Commission to evaluate [safety and security] costs as part of its just and reasonable analysis")(emphasis added).

[23] *Draft Order* at 56, para. 369 (the Commission will determine what measures are necessary "under the used and useful framework we employ to determine just and reasonable IPCS rates.")

[24] *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422 (D.C. Cir. 2000) (by applying the "used and useful" framework the Commission "appears to ignore the statutory reference to 'necessary'").  Recognizing this problem, the draft order tries to reconcile that case by arguing that the Commission was using "used and useful" there differently than it is using "used and useful" here.  *Draft Order* at 189, para. 369 n. 1302. This just highlights the arbitrariness of the decision-making process.

[25] *Draft Order* at 186, para. 365.

[26] *Draft Order* at 187, para. 367. The draft order attributes to Securus a claim that it never made. Namely, that <u>all</u> safety and security measures are necessary. *Id.* That misstates Securus' argument. Securus does

11

In its place, the draft order's determination of the goal to be achieved is unreasonably circular:  In determining which measures are necessary to provision IPCS, the draft concludes that the goal should be to determine which measures are necessary to provision IPCS.[27]  This circulatory leads the draft order to concluded that "the cost of any safety and security measure that even arguably could be viewed as necessary to the provision of IPCS – under any understating of necessary – is a cost that we evaluate, and reach a reasoned decision about, under the used and useful framework that we employ to determine just and reasonable IPCS rates in this Report and Order."[28]  The end result here is that the draft order fails to address in any meaningful way the question of what are the "necessary" safety and security costs.  The draft avoids addressing whether a measure is "required" to prevent criminal activity and instead determines who is benefitted by such measures.  The former addresses what is "necessary," that latter not at all.

The draft order's failures here have very significant practical effect.  After equating "necessary" safety and security costs with "used and useful" safety and security costs, the draft order proceeds to reject the majority of safety and security costs on the grounds that they are not used and useful to the consumer of IPCS.  As a result, the draft order concludes that such non-"used and useful" security costs can be removed from providers' cost basis for the purpose of settling the lower bound of reasonable rates.[29]  The result here, as elsewhere, is the imposition of rate caps that fail to account for actual provider costs, such that providers cannot be fairly compensated in the induvial or on average.  For the reasons articulated above, these confiscatory rate caps will harm not just providers, but consumers and competition alike.

> 2.    The draft misinterprets the Commission's obligation "to consider" necessary costs.

The draft order's impermissible statutory interpretations continue with its failure to give meaningful effect to the term "consider."  The term "consider" in the context used here does not give the Commission unfettered discretion to reject necessary costs.  Another section of the MWR Act, section 4, states that the Commission may not take actions that "prohibit the implementation of any safety and security measures related to [IPCS]."[30]  This provision was

---

[27] *Draft Order* at 187, para. 366 ("for a safety and security measure to be necessary [to provision IPCS], it must be required "for the provision of [IPCS]."

[28] *Draft Order* at 56, para. 369. A measure may be "required" to achieve the goal of preventing crime if it is indispensable to crime deterrence or the measure is one of a number of equally effective measures. Those are the two definitions of "necessary."  *Compare GTE Serv. Corp v. FCC*, 416, 422-23 (D.C. Cir. 2000) (assessing if action is indispensable) *with Cellular Telecommunications & Internet Ass'n v. FCC*, 330 F.3d 502, 510-12 (D.C. Cir. 2003) (definition of necessary depends on statutory context and may include equally availing options to achieve the desired goal).

[29] As discussed below, the used and useful framework is inapt when applied to the unique attributes of the IPCS market.

[30] Martha Wright Reed Act § 4.

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

specifically added by the MWR Act and must be interpreted in light of the obligation to "consider" costs associated with any safety and security measure necessary to provision of IPCS.

The draft order interprets section 4 as merely providing that the Commission cannot bar state and local governments from adopting a safety and security measure.[31]  According to the draft, section 4 says nothing about eliminating the funding for such measures.  That interpretation is contrary to the plain language of section 4.  Section 4 does not say the Commission cannot bar correctional authorities from *adopting* safety and security measures.  It states the Commission may not bar the "*implementation*" of such measures.  Nothing is more critical to the implementation of a program than its funding.  Read in conjunction with section 4, the term "consider" means that the Commission must include safety and security costs that it finds necessary, using a reasoned interpretation of that term.

Finally, the draft repeatedly address an argument that providers, including Securus, never made.  Namely, that the Commission must accept every safety and security measure that correctional authorities want.  This is neither the point nor a provider argument. What providers have argued is straightforward: in determining which safety and security measures are necessary in the context of correctional institutions, an issue outside the expertise of the Commission, the Commission must give weight to the entities most qualified to make that assessment, the correctional authorities themselves.  This the draft order fails to do.

These failures exacerbate the unintended consequences of the draft order on the availability of IPCS for all consumers.  The draft order appears to assume that it can deprive agencies of the resources used to fund necessary safety and security measures without harming the availability of IPCS.  This is an unwarranted and pollyannish assumption.  If the draft order goes into effect without substantive changes, certain correctional agencies will be unable to secure funding for necessary safety and security measures by the implementation deadline.  Will that agency continue to allow the same type and amount of IPCS in the absence of those necessary safety and security measures, or will it curtail availability to match the limits of its now-materially-reduced safety and security capabilities?  To ask the question is to answer it: at least some facilities will curtail communications services because they no longer believe that they can do so safely in the absence of necessary safety and security measures.  Again, the draft order simply assumes that this will not happen, but the Commission will not suffer if this assumption proves incorrect.  Instead, incarcerated consumers and their loved ones will suffer via reduced communications services, an outcome entirely inconsistent with the MWR Act's central objective of increasing communications for incarcerated consumers and their loved ones.

---

[31] *Draft Order* at 30, para. 51. (In section 4, Congress did not intend to prohibit correctional institutions from "adopting policies").  Here, the draft order equates adoption with implementation, and rejects an argument that no provider has actually made: that nothing in the MWR Act requires it to include in rates any safety and security measure a correctional authority might want.  *Id.* at paras. 54-55.  This is not the point.  The point is that the Commission should allow recovery of "necessary" safety and security costs.  In making that determination, the Commission certainly should give considerable weight to correctional agency's findings regarding what is necessary.  But Securus does not suggest that the Commission give preclusive weight to such findings.  So there is no claim that anything correctional authorities wish to procure automatically qualify as "necessary" under the statute.

13

**JA1465**

Corrected Version

3.    The draft's exclusion of certain security measures reverses Commission precedent without adequate explanation.

The above interpretative and methodological failures are exacerbated not just by reality, but by the fact that the Commission is not writing on a clean slate here.  The Commission has already identified specific safety and security measures that it found "necessary" to provide communications services in carceral settings.  These include call monitoring, call recording and voice biometrics.[32]  Given this precedent, it is reasonable to assume Congress intended that the Commission *at a minimum* include in the rates the costs of measures it has previously found necessary.  The Commission found these measures inherent in the provision of calling services and necessary because they deter crimes targeted at vulnerable populations, including incarcerated people, their friends and families, and the general public.

Not surprisingly, the costs for these measures have been included in all prior rate caps.  The draft does not dispute anywhere its previous finding that such measures are necessary because they deter use of communications to commit crimes or bypass facility-based calling rules that provide protections for IPCS consumers, among others.  Rather than confront this issue directly, the draft order relies on its impermissible equation of "necessary" with "used and useful" to, in effect, move the goalposts.  Rather than determine whether a measure is necessary, the draft determines who is benefitted.

This reversal of prior Commission precedent is both contrary to the plain language of the MWR Act and prior D.C. Circuit rejection of equating "necessary" with "used and useful."  Further, the reversal is without any reasoned justification.  This too is impermissible, as an agency must explain why it reaches a different outcome from a previous finding and it needs to come up with a better reason when the reversal involves the same facts underlying its previous determination and the reversal impairs reliance interests.[33]  Both are implicated here.  The facts underlying the Commission's inclusion of safety and security costs in IPCS rates center on the need to deter criminal activity and misuse of the services in order to protect IPCS consumers and public at large.  The draft does not claim that these facts no longer exist, yet it now excludes those same measures from rates.

The draft implicates the second part of the test announced in *Fox* – reliance.  The Commission's consistent inclusion of safety and security measures in rates over decades has engendered substantial reliance interests regarding both the necessity of such measures and the manner in which they are funded.  Moreover, if correctional agencies decide not to pay for safety and security due to budget constraints (and instead curtail services), providers that have made substantial capital investments to deploy safety and security functionality based on long-running Commission precedent will be unable to recoup costs to the extent not already recovered.

---

[32] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14134, paras. 53, 58, n. 196 (2013) (*2013 ICS Order*);
[33] FCC v. Fox Television Stations, Inc, 556 U.S. 502, 515 (2009).

REDACTED – FOR PUBLIC INSPECTION                                   Corrected Version

B.      The draft order relies on the Commission's imprecise safety and security categories to drive unreasonably low rate caps.


To address the MWR Act's requirement to consider necessary safety and security costs, the Commission required IPCS providers to allocate costs among seven admittedly "imprecise"[34] categories, including a catch-all "other" category.[35]  It turns out that the necessarily "inexact"[36] allocations providers made among the categories have become hugely consequential.  This is because the draft order first defines what "necessary" safety and security costs may be paid for by consumers by reference to these seven categories, of which five are not recoverable.  It then sets rates based on the cost data contained in the two remaining categories.  If a provider failed to allocate certain safety and security costs within the Commission's own "inexact" allocation structure, those costs are not included in the draft order's rate caps, despite the fact that such costs meet the draft order's definition of used and useful.  This is not a latent or concealed problem with the Commission's approach here, as some providers found the categories so unworkable they did not allocate any costs, declaring that safety and security costs are too intertwined with the service platforms to cull out.

One of the two categories deemed to contain used and useful measures is Compliance with CALEA.  The draft order's approach here is deficient.  As a threshold matter, no provider allowed costs to CALEA, as CALEA is a statute that requires telecommunications companies to ensure that their network equipment can monitor and record calls if a subpoena is issued.  Providers allocated no costs into this category.[37]  This is for an obvious reason: the Commission's rules exclude payphone providers like IPCS providers from CALEA compliance, as Securus has pointed out.[38]  The draft order reverses this precedent without giving proper notice of the Commission's intent to do so.[39]  Reversing precedent without having provided an opportunity for notice and comment is a violation of the Administrative Procedure Act.  Because this reversal of Commission precedent is done in a wholly cursory fashion, the draft provides no analysis of whether the industry's existing ability to monitor and record calls satisfies CALEA requirements and if so, why those existing capabilities are excluded from cost recovery.  Finding CALEA expenses used and useful adds nothing to the rate caps, making the draft order's selection of this category of recoverable safety and security costs both arbitrary and meaningless.

Further, the Commission's requirement that providers allocate cost among seven "indistinct" categories has real and negative consequences.  Take the following example: the

---

[34] *Draft Order* at 199, para. 385.
[35] *Draft Order* at 180, para. 348. The seven categories are: CALEA compliance; Law enforcement; Communications Security; Communications Recording; Communications Monitoring; Voice Biometrics; and Other Safety and Security Measures.
[36] *Draft Order* at 199, para. 385.
[37] Of the nearly $570 million the industry allocated to safety and security measures, the industry allocated about $5,400 to CALEA compliance. *Draft Order* Appx. I at 414, Table 30.
[38] *Communications Assistance for Law Enforcement Act,* CC Docket No. 97-213, Second Report and Order, 15 FCC Rcd 7105, 7119, para. 25 (1999) (payphone providers are not telecommunications service providers for CALEA purposes).
[39] *Draft Order* at 201, para. 388 n. 1379.

15

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

Communications Security Service (CSS) category, which the draft finds recoverable, includes PINs that incarcerated people use to access prepaid accounts available to them and funded by friends and family for the purposes of making calls. As long as providers allocated PIN costs into the CSS category, PIN costs are allowed to be recovered in rates. But some providers may have allocated PIN costs into one of the disallowed categories such as "monitoring" or "other," in which case PIN costs are longer deemed used and useful and can no longer be recovered in rates.[40] In other words, safety and security measures are deemed used and useful not because of their functions, but into which of the Commission-derived "imprecise" and "inexact" categories the function was placed. On these nebulous grounds, the draft excludes from recovery nearly a third of the industry's reported costs.

Here, as elsewhere, the Commission could have engaged with providers to further understand their cost allocations, such that the end result is a draft order that addresses the admittedly "imprecise" nature of the cost allocation required by the Commission.

IV.    The Draft Misuses the "Used and Useful" Framework

The application of the "used and useful" framework drives virtually every rate-related decision in the draft. The draft order relies on it in order to preclude costs it decides do not benefit IPCS consumers. As applied to safety and security costs, the adoption of the used and useful framework as a substitute for "necessary" enables the exclusion of such costs the draft order concludes are of no benefit to the ratepayer.

The framework, however, is ill suited to the structure of IPCS industry where the direct customer of the provider, the correctional authorities, determine what is required to provide IPCS in their facilities, and the rate payers are the incarcerated individuals and their friends and family that pay for the costs of the service. The draft's sole reliance on and application of the used and useful framework ignores the requirements of the customer in deciding what features and functions are used and useful and hence recoverable in rates. To the contrary, a finding that a feature or function (primarily safety and security measures) is used and useful to the customer removes that feature or function from the rate. For the reasons set forth above, this is impermissible.

The draft misapplies the used and useful framework in another fundamental way. Under the framework as applied by the draft, every key decision boils down to one question: does this expense benefit IPCS consumers in the provision of IPCS? If the answer is "yes," the costs are used and useful and therefore recoverable under the draft order's framework. If the answer is "no," the costs are not recoverable.

---

[40] The draft notes that if a measure otherwise deemed "used and useful" was placed in a category deemed not used and useful, the costs are removed for purposes of calculating the lower rate. *Draft Order* at 199, para. 385 (to account for the imprecision in the categories and that providers allocations are inexact among the categories, "if the predominant use of [safety and security] tasks and functions within a category are not used and useful, the entire category will be treated as not used and useful and excluded from the lower bound our zone of reasonableness.")

This singular focus on "used and useful directly to the consumer when placing a call" framework is impermissible. This is the type of question utility regulators ask when applying the used and useful standard, but they do not ask it with respect to every kind of expense, which the draft order does. Traditionally, utility regulators ask this question when deciding what expenses go into the "rate base" for which companies may receive a return on investment. The rate base is net investment in *plant and equipment.*[41] Developing the rate base is the center piece of rate of return regulation.

The Commission has long emphasized, however, that it is not engaged in rate of return regulation of the IPCS industry.[42] And it most assuredly is not using the used and useful analysis in its intended manner, to derive the "rate base." Instead, the draft inappropriately applies the used and useful framework to *all* expenses, including operating expenses. In the ratemaking context, the Commission has consistently applied the used and useful framework to determinate which plant and equipment costs should be included in consumer rates, which Securus has previously explained to the Commission.[43]

As such, the draft order uses the used and useful framework not in compliance with ordinary ratemaking principles, but as a mechanism to remove costs it finds do not benefit ratepayers, using a highly cramped interpretation of benefit that excludes measures to protect their wellbeing. Unfortunately, the draft order never explains why safety and security measures that protect incarcerated people and their friends and family from harm do not benefit them. Instead, the draft concludes that only those safety and security measures that enable the call to be made and correctly routed are of benefit to IPCS consumers. Examples here include the establishment of PIN numbers, limiting calls to certain preapproved numbers, and preventing call forwarding or three-way calling. But the draft does not explain why those measures are used and useful but measures to ensure compliance with those measures somehow fail the test.

This limited inquiry results in nonsensical conclusions. For example, an incarcerated person who lacks funds to place a call or otherwise wishes to avoid correctional agency scrutiny might use force or the threat of force to obtain another person's PIN. Measures like voice biometrics help detect and prevent use of a stolen PIN to access the victim's account. Here, the draft order finds that costs associated with PINs are used and useful to the consumer, but not the very measures that are designed to detect, prevent, and punish PIN theft.

This is akin to arguing that criminal laws are "used and useful" to the average citizen such that the legislative bodies who pass such laws can be funded by tax revenue, but not the law enforcement and judicial personnel who actually respond to, investigate, and punish crimes. Or, in a more direct comparison, this is akin to arguing that, in the credit card context, the costs

---

[41] The Commission has defined the rate base as . . . the net (or depreciated) valuation of the public utility's tangible property comprising the plant and equipment used and useful in serving the public. . . . In addition, the rate base includes an allowance for working capital, and, depending on the circumstances may also include amounts for the overhead costs of organizing the business, intangibles and going concern value." AT&T Phase II Order, 64 FCC 2d at 38, para. 111.

[42] See, e.g., *2013 ICS Order*, 28 FCC Rcd at 14134, n. 195 ('we are not imposing rate-of-return regulation on ICS providers.").

[43] Securus May 8 2023 Comments at ii.

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

associated with identity verification are "used and useful" to the cardholder because they help prevent fraudulent transactions, but not *any other security measure* designed to deter and detect fraudulent transactions, such as back-end transaction monitoring for unusual spending patterns.

V.    The draft makes an number of other unreasonable assumptions and adjustments.

The exclusion of safety and security costs is the major contributor to the impermissibly low rate caps, but it is not the only one. As discussed below, the draft order adopts and relies on questionable assumptions and adjustments when determining the lower bound of permissible rates and setting rates just above that lower bound.

1.    The draft unreasonably assumes that where costs exceed revenues, the providers must be inflating their costs.

The draft order makes much of the fact that, even under current rates, a significant number of providers earn insufficient revenues to cover their reported cost.[44] This alone should have at least prompted the Commission to step back and ask whether the existing rate caps were impermissibly low. Failing that, the Commission could and should have made inquiries to providers during the data-collection process regarding these "questionable" cost data. Unfortunately, the Commission did neither. Instead, the draft order simply assumes that where costs exceed revenues, providers must be artificially inflating their costs otherwise providers would be out of business. Further, the assumption that costs must be inflated is contrary to the draft's conclusion that the cost information is reliable.[45]

There are two more plausible explanations for why the costs of a regulated line of business may exceed the revenues from that business line. First is that current rate caps (including caps imposed by states) coupled with inflation and other regulatory obligations are not allowing providers to recover their costs for providing regulated services. For example, more than two years ago, California "temporarily" capped all provider related audio rates at 5 cents per minute and prevented any recovery for most ancillary services.[46] Securus documented in its comments that about three-quarters of its California facilities are operating at below cost, whereas Pay Tel noted how it was compelled to transfer its only contract before leaving the California market.[47] California even applied this cap to interstate calls in a form or reverse preemption.[48]

---

[44] *See, e.g.,* Draft Order para. 199. (noting providers total reported costs across the industry exceeded total reported revenues by $219 million).

[45] *See, e.g.,* Draft Order paras. 122 and 183.

[46] California PUC Decision 21-08-037, Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services, Aug. 23, 2021 at 53 (CPUC Order). The CPUC also added two cents to fund state authorized site commissions. The rate cap was set by reference to the contracted rate at the California Department of Corrections and Rehabilitation and doubling it. No cost data was collected or analyzed in the setting of this rate cap.

[47] Securus July 12, 2023 Reply Comments at 19-20 (noting that 45 of 52 facilities had costs exceeding rate caps in 2019, 40 out of 52 for 2020, and 38 out of 51 for 2021); Pay Tel July 12, 2023 Reply Comments at 17-18 (noting Pay Tel had left the California market).

[48] CPUC Order at 72.

18

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

A second equally plausible alternative explanation is that providers receive revenue from a variety of services pursuant to a contract which may render the contract overall, or a series of contracts, profitable.  That is, a provider might accept a loss on a regulated line of business if the loss can be offset by gains on the sale of non-regulated services.  However, this possibility does not mean that the Commission can rely on provider revenue from unregulated services as a basis for capping rates for a regulated service where the regulated rates do not allow a provider to recover its costs.  This is because regulated rates must enable companies to earn a positive return specifically *from the service being regulated*.[49]  In other words, the rate cap for audio must allow sufficient audio cost recovery, and the rate cap for video must allow video cost recovery.  Here, the draft order sets audio and video rate caps that are below provider costs, both individually and on average, for a majority of providers, thus failing to meet this critical requirement.

Regardless of the explanation, and leaving aside the draft order's erroneous assumption that providers knowingly or otherwise submitted inflated cost information, the data plainly show that providers are underwater given the Commission's current rate caps.  Sharply lowering caps from existing levels, while also requiring that those new caps generate sufficient revenue to cover costs currently recoverable through separate charges, like ancillary service costs and reimbursements, will drive many providers further into the red if not out of the business altogether.  Again, this is both a provider problem and a competition problem.  If the draft order's impermissibly low rate caps drive smaller players out of the industry, competition will suffer. Similarly, providers who remain financially viable despite the caps may be required to divert resources, including financial resources, away from developing additional services and technology that benefit incarcerated consumers.

2.     The draft wrongly rejects Securus' reported video expenses.

The draft recognizes that the deployment of video services by IPCS provider is just beginning.  In its words, the market is nascent, immature and unstable.[50]  Providers are making large up-front investments in this technology including through the deployment of tablets to each incarcerated person that are replacing centrally located kiosks and phones with screens.  Securus is leading the charge, with Securus' costs representing {{ ██████ }} of the total industry video IPCS costs but only about {{ ███ }} percent of total industry revenue.  It has deployed video technology to more facilities, by far, than any other provider.  The deployment of equipment that can be used for video calling represents a large portion of the $600 million that Securus has invested over the past few years.

As a result of the nascent state of the video service market – which the draft order acknowledges – and Securus's significant capital investment – which the draft does not dispute – Securus's data show the highest cost per minute of any video service provider.  That does not

---

[49] *See* Securus May 8, 2023 Comments at 19 (regulator may not consider profits earned from non-regulated businesses) (citing *2021 ICS Order*, 36 FCC Rcd at 9587, para. 153.)

[50] *See, e.g. Draft Order* para. 122 (noting video involves relatively new services in emerging markets); *id.* at para. 211.

REDACTED – FOR PUBLIC INSPECTION                                      Corrected Version

mean the costs are wrong or inflated, or that Securus is operating inefficiently. It just reflects the acknowledged nascent state of the market.

Despite this entirely reasonable explanation of Securus's video cost data, the draft order simply excludes it as not reflecting the likely long-term ability of Securus to recover its costs. Having done so, the draft order cuts Securus's reported video expenses by nearly 80 percent.[51] There is a straightforward problem here: the draft is setting interim video rates purportedly based on current cost levels to be adjusted as the industry matures. The appropriate interim rates should reflect *current* costs, not the Commission's expectations regarding costs at some future time. As per minute costs decline in the future, as the draft predicts, it can use future costs to set permanent rates. The draft in fact contemplates future video cost data collections. The draft errs, however, in rejecting Securus' actual costs of providing video service.

> 3.    The draft wrongly rejects Securus' reported cost of capital thereby lowering allowable expenses for the entire industry due to industry-wide averaging.

One of the major components of rate regulation is determining an authorized rate of return that "debt, preferred stock, and equity investors require to provide a company with the capital it uses to finance its assets and operations."[52] Ensuring investors earn a reasonable return on investment is central to maintaining the ability of the company to serve its customers.[53] The Commission utilizes a weighted average cost of capital or WACC in developing a rate of return.[54] The 2023 mandatory data collection directed providers to estimate their WACC and the Commission allowed a default rate of 9.75 percent if companies chose not to calculate their company-specific WACC. The Commission adopted that 9.75 percent rate of return in 2016 based on the cost of capital of a mix of the largest incumbent telephone companies and smaller, rural incumbent carriers. It is used today primarily for hundreds of smaller rural incumbent telephone companies.[55] The required return of investment for those companies bears no resemblance to rate of return for companies like Securus that are primarily technology and IT service providers. Moreover, the draft provides no evidence that the investment climate in 2016 bears any resemblance to today's environment.

Only Securus and ViaPath reported WACCs and their analysis resulted in WACCs above the default 9.75 percent rate. The draft concludes, however, that ViaPath's and Securus' estimated rates of return were insufficiently justified and replaced them with the default 9.75

---

[51] Draft Order, App. I at para. 56.

[52] *Draft Order* Appx. I at 425, para. 83, See also *Connect America Fund et al.*, WC Docket Nos. 10-90; 14-58; CC Docket No. 01-92, Report and Order, Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 31 FCC Rcd 3087, 3210, para. 322 (2016) (*2016 Connect America Fund Order*) ("We note that the WACC is supposed to compensate equity holders and debtholders who provide the funds used to finance the firm's assets.")

[53] *See In re Permian Basin Rate Cases,* 390 U.S. 747, 790-91 (return on investment must be "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.") (quoting *Federal Power Commission v. Hope Natural Gas Co.* 320 U.S. 591, 603 (1944)).

[54] *2016 Connect America Fund Order*, 31 FCC Rcd 3087 at 3208, para. 319.

[55] *2016 Connect America Fund Order,* 31 FCC Rcd 3087 at 3210 para. 325. The 9.75% rate of return replaced the 11.25% rate of return the Commission had used for the preceding 25 years. *Id.*

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

percent rate.  Having rejected the only provider data submitted on WACC, the Commission then arbitrarily selected the default rate.  Not surprisingly, Securus disagrees with that conclusion.

Rejecting the WACC's of the two largest providers has implications for the entire industry.  The draft order's decision to disregard their WACC cost data has an outsized, and improper, effect on the rates applicable to everyone else.  By replacing Securus' and GTL's WACC with the lower 9.75 percent authorized rate of return, all expenses for all companies are effectively adjusted downward, resulting in a lower rate for all companies.  For example, just as a result of rejecting their costs of capital, the draft cuts $46 million for the industries' total safety and security expenses.[56]

Here, as elsewhere, the Commission took exception to Securus and ViaPath's WACC cost data.  Here, as elsewhere, the Commission could have taken any number of actions to engage with Securus and/or ViaPath on the validity of this cost data.  Here, as elsewhere, the Commission did not, instead choosing to simply exclude each providers' WACC submission.  This outcome is particularly troubling given that, after staff's review of Securus' initial 2023 mandatory date collection response, staff raised no issue regarding the WACC calculation.  In fact, Securus' WACC analysis here is essentially the same as it has used in all previous rate determinations and has never been questioned before.

4.    The draft inappropriately calculates the rate cap using unbilled minutes.

The basic formula for per minute rate caps divides expenses by minutes.  But which minutes to use?  Under standard rate making principles, only billed or paid minutes should be used to calculate costs per minute.  This is for obvious reasons; unbilled minutes provide no revenue from which to recover expense.

Here, the draft, calculates cost per minute (and hence rate caps) using both billed and unbilled minutes:  cost per minute = expenses/billed + unbilled minutes.  Use of unbilled minutes inappropriately increases the denominator, resulting in lower expense to be recovered through rates.  (100/1000 = $0.10 per minute;  100/1500 = $0.06 per minute.).

The draft's approach is both wrong and unprecedented.  It its previous orders setting IPCS rates, the commission appropriately divided costs only by billed or paid minutes.[57]  The end result of this flawed approach is as previously described: the draft order assumes that providers can recover costs via calls that do not generate revenue, thus further (and impermissibly) reducing the ability of providers to recover their costs.

---

[56] *Compare Draft Order* Appx. F, Table 5 (showing total safety and security expenses of $570 million) *with* App. I, Table 30 (after adjusting for WACC and certain tax issues, total safety and security expenses are $524 million,  ($476 million for audio plus$48 million for video related safety and security).  Only after this adjustment does the draft exclude the five categories of safety and security measures resulting in a reduction of such costs by approximately $390 million).

[57] Pay Tel Communications, July 9, 2024 ex parte letter at 16-18.

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

5.    The draft inappropriately assumes facilities incur no communications related costs when setting the lower boundary.

Due to the alleged failure of sufficient data, the draft assumes correctional authorities incur no costs in setting the lower bound.  It is simply unreasonable to assume that a facility incurs no costs in making communications services available when they plainly do.  The conservative assumption here would be to assume the same level of facility costs for the upper and lower bounds.

6.    The lower bound is not reasonably validated

The draft order identifies several mechanisms that it claims validate its lower bound as reasonable.  First, it claims that the Brattle Group model, which gathered a variety of commercial industry prices to approximate IPCS costs, confirms the lower bound is not too low.[58]  The model, however, is fatally flawed.  As Securus demonstrated, and the draft fails to address, the key component of the model relies on retail prices charged by 42 commercial voice over internet protocol (VoIP) companies that are nothing like IPCS providers.  The providers selected for the model: (1) are not interconnected VoIP providers, as are IPCS providers; (2) provide extremely limited services; and (3) incur no equipment costs.  Further, these 42 VoIP providers actually are all resellers *of a single European company*, that offers software that consumers download on their existing devices in order to make calls over the public internet to other consumers that have downloaded the same software.[59]  The draft nowhere explains how those providers are even remotely comparable to IPCS providers.  Securus also demonstrated significant analytical and methodological errors that makes the model useless to either set rates or to function as a benchmark.  The draft order nowhere explains how these "providers" (really a single provider whose services were resold by others) are comparable to IPCS providers.  They are not, and the Brattle Group's model is so flawed that it not even used as a reference.

Second, the draft order suggests that its lower bounds are validated because "nearly two thirds [of prisons] and nearly one half of [large jail] facilities, respectively, have per-minute audio revenues net of site commissions that lie below their respective lower bounds.  For medium, small and very small jails this share is between more than a fifth and more than a third of facilities."[60]  The draft order concludes such "facilities are *prima facie* profitable at prices that approximate their per-minute audio revenue rates, otherwise providers would be seeking to exit these contracts, thus showing their per-minute audio costs, net of site commissions, to be below our lower bounds."[61]  This conclusion is fatally flawed, as it simply ignores the fact that providers generate revenues from various service under a contract that combined render the contract profitable overall even though audio revenue may be insufficient to recover audio costs.

---

[58] *Draft Order,* Appx. I at 421, para. 68 (revised public version).
[59] Securus April 30, 2024 ex parte at 8.
[60] *Draft Order,* Appx. I at 425 para. 79, Table 38.
[61] *Id.*

**JA1474**

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

The third purported validation relied on a series of contracts in and around Dallas Texas some of which have audio revenues per minute below the lower bounds. This analysis suffers from the same flaw noted above in that it fails to account for total contract revenues.

In short, none of the three purported validation mechanisms justify setting the lower bound at levels that would leave a substantial portion of in the industry unable to recover its costs.

VI.    The Draft Fails to Assess the Market Effects of Eliminating Site Commissions

The draft order suffers from an additional conceptual flaw of significant importance. IPCS are among the few communications services subject to comprehensive prescriptive rate regulation, which the Commission has consistently justified due to the market distorting effects of site commissions.[62] In other words, the Commission has pointed to the existence of site commissions and their alleged impact on the IPCS market as creating the conditions that require additional regulation. Here, the draft order eliminates commissions, expands upon existing regulatory obligations, and imposes new regulatory obligations. The logical flaw here is apparent: the draft order removes the condition purportedly justifying regulation over the IPCS market and then proceeds to continue and expand upon the regulation that is allegedly justified by the existence of site commissions that are now removed. The draft order does this despite claiming that the removal of site commissions will enable the development of a properly functioning marketplace.[63] This is arbitrary and nonsensical. The Commission cannot on the one hand point to site commissions as warranting regulation and on other continue such regulation even while eliminating site commissions. The Commission should at least proffer some justification why permanent, highly prescriptive rate regulation must continue even though it believes it has created the conditions for a properly functioning, competitive marketplace.

VI.    The draft order will hurt consumers while facilitating criminal activity that may prey on incarcerated persons and their loved ones.

A.    The draft order shifts significant new budgetary obligations on state and local governments that may well reduce or eliminate services to the incarcerated.

As explained above, the draft order's rate caps are likely to result in both anti-competitive and anti-consumer outcomes as smaller providers exit the market and remaining providers respond to rates below their costs by cutting "extraneous" spending such research and development into new technologies and services for the incarcerated and their loved ones.

This is not the only unintended outcome of the draft order. It also shifts hundreds of millions of dollars of safety and security costs to state and local governments as well as reducing

---

[62] *Draft Order* at 154, para. 296 (site commissions "interfere" with the ability to implement just and reasonable rates and fair compensation); *id.* at 154, at para. 297 (site commissions historically "have been the major driver of excessive IPCS rates"); *id.* at 154, at para. 298 (site commissions historically have "distorted the IPCS marketplace" and prevent "a properly function marketplace.")

[63] *Draft Order* at 154 para. 300 (the solution to the distorting effects of site commissions is to "remove the incentive to award contracts based in whole or in part on site commissions.").

23

**JA1475**

or eliminating funding from site commissions. This will inevitably reduce the availability of calling and other services, directly undermining the goals of the MWR Act. This is because providers have invested in systems to ensure the safe use of communications service that do not require the use of substantial correctional agency resources. Before these systems, correctional staff accompanied incarcerated people to the phone and listened to conversations to prevent or deter illegal activities.[64] As one can imagine, having to escort callers to phones and monitor activities dramatically cuts down on the number of calls that can be made. New monitoring technologies relieved prison and jail staff of these duties and enabled vastly more calling.[65] The continued availability of those technologies is now in doubt and the result is likely to be fewer opportunities to make calls.

It is not just trips to wall mounted payphones that will be reduced. Providers have been deploying new technologies and services to incarcerated consumers. But these new technologies and services require some ability to ensure safe use before they will be adopted by correctional agencies. By excluding all but the most primitive safety and security costs from the rate caps, the draft order will require the remaining safety and security costs to be borne by the agency in question. This may result in agencies eliminating existing communications services that cannot be provided in the absence of necessary safety and security measures or electing not to deploy such new technologies and services if they lack the ability to ensure safe use.

The draft order hurts incarcerated people and their families in another way. The safety and security measures now excluded from cost recovery help prevent theft of incarcerated people's and their friends and family's money used for communications. It is an unfortunate fact of life that in carceral settings that some will seek extort or steal use of another person's PIN to make calls – the cost of which comes out of the victim's account. Proactive measures such as monitoring, recording and voice biometrics can stop this behavior, but these functions will no longer be financially supported. Again, this outcome ignores the practical realities of IPCS and the role necessary safety and security measures play in protecting incarcerated consumers.

B.    The draft will facilitate criminal activity using IPCS

The Commission has repeatedly recognized that the unfettered and unmonitored use communications services in jails and prisons can facilitate illegal conduct.[66] That is why the

---

[64] Letter from Marcus W. Trathen, Counsel to Pay Tel, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed June 18, 2024) Attach., Declaration of Vincent Townsend at 2 para. 10 (describing historical practice that "[u]sually at jails incarcerated persons were moved out of the cell block to a payphone in the booking area where they could place an officer supervised collect call—a methodology which is both burdensome to the jail administrators and inconvenient to inmates wishing to make phone calls.") (Pay Tel June 18, 2024 Ex Parte); Joint Legislative Audit and Review Commission of the Virginia General Assembly, Review of Department of Corrections Inmate Telephone System at 3-4 (1997) (describing how various automated safety and security measures increased calling opportunities), available at https://jlarc.virginia.gov/pdfs/reports/Rpt199.pdf

[65] *Id.*

[66] *See e.g. Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12787, para. 48 (2015) *(2015 ICS*

---

24

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

Commission and law enforcement agencies work so diligently to stop the unmonitored and unsupervised use of contraband cell phones given their use in committing crimes.[67]  The same rationale underpins the monitoring of IPCS.  And the record is replete with example after example of illegal use of IPCS that has been detected, stopped and prosecuted because of safety and security measures.[68]  Here, as elsewhere, the Commission is taking a very significant chance by removing the costs of these measures from IPCS rates and hoping they will not result in more harmful activities.[69]  Here, as elsewhere, the Commission is gambling that the draft order will not result in negative outcomes for incarcerated consumers and their loved ones, *but the only persons who will suffer if that bet does not pay off are the consumers the Commission is trying to protect*. This is why law enforcement agencies have been so vocal in asking the Commission not to take the steps that are now contained in the draft order.

It is no answer to assert that the draft simply shifts the costs of "unnecessary" safety and security measures from those using the communications services to the general taxpayer.  Cash-strapped local agencies may simply not be able to afford these measures.[70]  General taxpayers do not defray the costs commercial telecommunications companies incur to ensure their services are used safely.  Those costs are recovered through the prices we pay to our telephone providers. It is not clear why consumers of IPCS should not similarly defray the costs of ensuring IPCS is used safely, particularly when they benefit from necessary safety and security measures that the draft order precludes

The illegal use of communications services of course also creates harm to the public generally.  The prevention of such harms is a central mission of this agency, whose statutory

---

*Order); Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14134, paras. 53, 58, n. 196 (2013) *(2013 ICS Order); 2002 Payphone Order*, 17 FCC Rcd 3248, 3252, para. 9.

[67] *See Promoting Technological Solutions to Combat Contraband Wireless Device Use in Correctional Facilities*, Second Report and Order and Second Further Notice of Proposed Rulemaking, GN Docket No. 13-111, FCC 21-82, para. 3 (2021) (stating that contraband cell phones can be used to "engage in a variety of criminal activities posing serious threats to officials and incarcerated people within the facility and innocent members of the public.")  Security measures used for IPCS calls carefully monitor and seek to prevent conversations between or among incarcerated persons held in different facilities precisely to avoid these types of communications.  The draft suggests that concerns over criminal use of contraband cell phones are not relevant because those issues are being addressed in a separate docket. Draft Order n. 1300.  That is not a germane distinction. The Commission clearly recognizes the dangers of unfettered and unmonitored use of communications devices in carceral settings.

[68] *See, e.g.,* Letter from Salvatore Taillefer, Jr., counsel for National Sheriffs' Association, to Marlene Dortch, FCC, WC Docket Nos. 23-62 & 12-375 (June 20, 2024).

[69] *See* Letter from Michelle Lewis, Northern Neck Regional Jail, Virginia Association of Reginal Jails,  to Marlene Dortch, FCC, WC Docket No. 23-62, May, 29, 2024 at 7 (VARL May ex parte) ("A potential major increase in incurred costs that would be hard to project would be the unintended consequence of *an increase in crime, criminal or disruptive activity that may result from the imposition of the proposed rule and its effect on call volume*.") (emphasis added).

[70] *See* VARL May ex parte at 3 (noting that apart from education, expenses for correctional systems is the second highest operation line item for local governments.)

25

**JA1477**

REDACTED – FOR PUBLIC INSPECTION                                   Corrected Version

mandate includes ensuring "safety of life and property through the use of wire and radio communications."[71] If it adopts this draft, the Commission will fail one of its central mandates.

VII.    The draft includes unrealistic deadlines.

The draft proposes unrealistically short deadlines to implement the contemplated substantial restructuring of the IPCS industry. The draft proposes staggered deadlines for eliminating site commissions and the new rates, with the earliest deadline just months away, on January 1, 2025, for prisons and large jails. Many deadlines for implementing new reporting disclosure obligations are pegged to OMB approval. Overall the effective date of the order is 60 days after Federal Register publication.

A.    State and Local Governments Will Struggle to Meet Commission-Imposed Deadlines to Revise Local Budgets.

Between now and the January 1, 2025 deadline for prisons and large jails, state and local government will have to find new sources of income for lost site commission revenue and to fund the many necessary safety and security costs shifted to them by the draft order. It is unlikely that correctional authority budgets have sufficient headroom to accommodate these new costs. Thus, local budgets will need to be tapped, which likely will necessitate legislative and executive actions, all of which must occur within 5 months for a significant number of facilities. The deadline makes no accommodation for legislative schedules or the practical realities of finding funds to increase local budgets. State and local governments will have to try to bend to Commission-dictated deadlines or critical services for incarcerated will stop or be significantly curtailed. Further , the ability to renegotiate correctional authority contracts likely cannot even begin before state and local governments sort out these budget issues. The Commission should at least seek input from these key stakeholders before dictating their legislative and administrative time lines. In the absence of informed assessment of required time frames the Commission should provide at least a year before implementing new rates that shift costs to local and state governments.

B.    The draft ignores the substantial operational work and time required to implement the host of new obligations.

Providers too will need substantially more time to revise their internal systems to accommodate the slew of new reporting, disclosure and related regulatory obligations. Most of these requirements must be implemented within 60 days or upon OMB approval. The draft claims that its deadlines provide sufficient time to renegotiate contracts. But contract renegotiation is only one of the hurdles that needs to be overcome to implement the various new regulatory obligations. The bigger challenge is operationalizing all of these new requirements into the providers' systems. Even seemingly minor changes such as the requirement that providers give account holders the opportunity to designate an additional person eligible to receive a refund for debit or prepaid accounts will require significant time and resources to implement.

---

[71] 47 U.S.C. § 151.

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

Following are examples of work streams to implement three of the draft's requirements.

*Changing to Per Minute Video Billing*

Securus currently charges video calls on flat-rate per session basis and sessions must be scheduled in advance.  It will need to completely overall its video billing system to shift to per minute billing as required by the draft.  This revisions will touch a number of functions:

- New rating and billing capability
- New pricing management for rate setup
- Platform changes for rate disclosures
- Billing changes to support post-call billing activity and charging accounts in real-time
- Changes to communication endpoint devices and protocols for on-demand calling
- Changes to reporting and dashboards for all stakeholders (for users, officers, customer support, etc.)
- Changes to the web portal and mobile applications to accommodate new rate disclosures and other required functionality (FAQs, HOW-Tos, registration processes, etc.)
- Set up functionality to create/manage/close respective user accounts and develop a dedicated fund flow for video calls

The changes outlined above will need to be incorporated into three different systems: Securus video systems; its NextGen platform, its legacy platform and the video platform used  by is affiliate JPay.  Alternatively, Securus may need to migrate all solutions to the NextGen platform, which would require equipment replacement, data and recording migration, software customizations, and new development.

Secures estimates that it will need 1-3 months to identify resources and begin ramping up and 9 to 12 months for full development to meet the per minute billing for video requirement.

*Refunds of Unused Balances*

Securus has already implemented the requirements set forth in the Commission's interim order regarding refunds of unused balance.  The draft, however expands those requirements substantially, including requiring refunds of debit accounts controlled by correctional agencies and funded by incarcerated persons and allowing account holders to designate someone to receive the refund.  The operational changes needed for these obligations include:

REDACTED – FOR PUBLIC INSPECTION                                   Corrected Version

- Adjust and customize existing auto-refund functionality for all accounts to roll out the solution
- Changes to the web portal and mobile applications to accommodate new refund disclosures and other required functionality (FAQs, HOW-Tos, terms & conditions, claiming processes, etc.)
- Developing an option to designate a refund recipient will require:
  - Development/changes of required processes on the customer (agency) side
  - Creating/modifying increased tracking of fund flows
  - Establishing designee verification mechanisms

Securus estimates that accomplishing these tasks will take 1-2 months to scale existing procedures, 3-4 months for all new disclosure requirements, and 9-12 months for fund refund designee functionality and alignment with correctional authority processes.

*New Accessibility Requirements*

The draft concludes that onsite video visitation is an interoperable video conferencing service, as are real time remote educational or vocational services, which must be compliant with the Twenty-First Century Communications and Video Accessibility Act (CVAA).[72] The draft also establishes accessible billing requirements.[73] Compliance with these requirements will include the following:

---

[72] *Draft Order* paras. 95, 97, 111 (imposing CVAA requirements to onsite video visitation services).
[73] *Draft Order* para. 491.

REDACTED – FOR PUBLIC INSPECTION                                    Corrected Version

- Development of facility and user registration processes and functionality for facilities to capture and report on incarcerated persons with accessibility needs
- Integrated closed caption technology suitable for carceral environments, which remains under development
- Accessible billing format
  - for friends and family, Securus must integrate a 3rd party solution to be used on the web
  - for incarcerated persons, Securus will need to undertake internal development of various channels/options: paper, digital, IVR, or text-to-speech for terms and conditions, disclosure etc.

Securus estimates that it will take 6-9 months to operationalize billing accessibility requirements and 4-6 months to develop facility and user registration mechanisms.

As the preceding demonstrates, 12 months is the minimum, a reasonable implementation timetable for state and local governments and providers to implement the various legal, contractual and operational requirements contained in the draft.

VIII.   The Commission should seek comment on establishing a third-party designee.

The draft requires providers to allow account holders to designate another person to receive refunds. This seemingly innocuous provision will in fact require substantial time, commitment and resources. The Commission should seek comment from the industry and other stakeholders before announcing such a new obligation. Securus requests that the Commission move this issue into the further notice section of the draft.

Additional recommended revisions to the proposed draft order and accompanying proposed codified regulations are attached as Attachment A.

Sincerely,

_____/s/_____
Michael H. Pryor
Shareholder
Brownstein Hyatt Farber Schreck, LLP
1155 F Street, NW
Suite 1200
Washington, DC
mpryor@bhfs.com
*Counsel for Securus Technologies, LLC*

29

**JA1481**

REDACTED – FOR PUBLIC INSPECTION

Corrected Version

## ATTACHMENT A

Technical Comments and Recommendations

• 47 CFR § 64.611 (Internet-based TRS registration: The scope of 47 CFR § 64.611(k) and (l) should also include IP Relay, as well as IP CTS. While much of the focus of the comments on this subject have focused on IP CTS, Securus has also noted the importance of extending enterprise registration to IP Relay services, as the same logistical issues at the correction facility for individual registration of IP CTS extends to IP Relay services.

• 47 CFR § 64.6000 – Definition of Average Daily Population or ADP: The Order retains the current requirement that IPCS providers calculate ADP each year as of January 31. As it has repeatedly noted, Securus is not able to independently calculate the ADP for any of its customers' facilities. Securus does not have or maintain official rosters of what individuals are incarcerated at which facilities. This is likely true for other IPCS providers. The appropriate party to determine ADP for a facility is the applicable correctional agency. Compiling this information annually from correctional agencies and making necessary adjustments within the first month of the calendar year is unrealistic when needing to query several hundred facilities. If ADP must be revised each year, Securus recommends the date be set at April 30. This will permit a more realistic timeframe for the collection and compiling of the data, allow some separation in time with the annual reporting requirement due April 1, and still permit annual review and updates to rate caps.

• 47 CFR § 64.6000 – Definition of Site Commission: The Order retains the current definition of a site commission, modified to update the terminology to IPCS. Any payment by an IPCS provider to a correctional agency or related governmental entity in connection with an IPCS agreement is a site commission, and prohibited under 47 CFR § 64.6015. This would necessarily include any reimbursement payment permitted to be paid to facilities for used and useful safety and security measures. At a minimum, the definition of site commission should be modified to exclude permitted reimbursement payments.

• 47 CFR § 64.6010(d) – Incarcerated People's Communications Services rate caps (Rates for International Audio IPCS): Securus recommends the Commission allow an international safe harbor rate of an average of a provider's international termination charges, recalculated annually, as described in Securus' December 15, 2022, Comments to the Sixth Further Notice of Proposed Rulemaking, at 21-22. The summary of recommendations in ¶ 470 does not reflect Securus' comments on this issue. Securus continues to recommend providing a more stable and predictable international rate for the benefit of consumers and agencies, who have responded with confusion over the structure and quarterly fluctuations.

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

- 47 CFR § 64.6015 – Prohibition against Site Commissions:  The draft order allows providers to reimburse a facility for safety and security costs that the draft considers used and useful. However, the draft order provides no guidance to providers as to what efforts, if any, they must undertake to validate or otherwise justify such a reimbursement. Similarly, the draft order provides no guidance as to how such payments should be structured so as to avoid unjustified claims that allowable reimbursement payments are in fact prohibited commission payments. As such, providers who attempt to comply with these requirements of the draft order may inadvertently violate them. Securus requests the Commission provide guidance on how reimbursements should be structured so as to avoid unjustified claims that reimbursements are site commission payments.

- 47 CFR § 64.6040(d) – Communications access for Incarcerated People with disabilities: The Order does not revise any of the requirements of 47 CFR § 64.6040(d) to reflect changes in regulated rates.  In particular, 47 CFR § 64.6040(d)(3) requires that the charges or fees for point-to-point video service "not exceed the charge levied or collected by the Provider for a voice telephone call of the same duration, distance, jurisdiction, and time-of-day placed to or from an individual incarcerated at the same correctional facility." Now that the Commission has set rate caps for video IPCS, Securus recommends the Commission modify 47 CFR § 64.6040(d)(3) to benchmark the permitted compensation for a point-to-point video to applicable video IPCS rates charged at that correctional facility.

- 47 CFR § 64.6110 – Minimum and maximum prepaid calling account balances:  Securus recommends the Commission allow IPCS providers to set minimum funding amounts to allow them to better manage costs.  With the current regime of significantly lowered rate caps and no ancillary service charges, there will be an incentive for consumers to engage in a higher number of small funding events, each of which will generate payment processing costs for providers. The draft order's proposed lower rate caps are already below provider cost. As such, providers cannot recover the costs associated with payment transactions, much less recover the increase costs associated with a large volume of smaller payment card transactions.  The Commission should permit a provider to require a modest $15-$20 minimum funding amount.  As the consumer incurs no charges to make the deposit or to seek a refund, this requirement would have no financial impact on the consumer.  It would minimize the number of payment card transactions permitting greater efficiency and better cost management.  This change would not require modification to the text of the rule, but a clarification of the decision to eliminate minimum deposit requirements in the Order of March 14, 2016.

**JA1483**

REDACTED – FOR PUBLIC INSPECTION                    Corrected Version

- 47 CFR § 64.6120 – Waiver process:  In the discussion regarding states to set lower rate caps without regard to cost data, the Order states in ¶ 239 that a "provider may seek appropriate relief … from the Commission by submitting a specific preemption petition." Securus recommends modifying 47 CFR § 64.6120 to include criteria necessary for a preemption petition.

- 47 CFR § 64.6130(f) and (j) – Protection of consumer funds in inactive accounts:  In the discussion regarding the disposition of unclaimed account balances, the Order states that it will not adopt specific unclaimed property requirements to be applied at the state level, and that compliance with state law to be presumptively reasonable.  However, the text of the rule provides that if the state law concerning unclaimed funds or the disposition of accounts is "unclear", then the Commission will require application of the Uniform Unclaimed Property Act (even if the state may have not adopted it or adopted it with modifications).  The text of the rule is inconsistent with the Commission's stated position in the Order.  Further, who and under what circumstances will a state's unclaimed property laws be determined to be "unclear"?  If a state law excludes a category of accounts from reportable unclaimed property, is the law deemed to be "unclear" on the issue?  Securus recommends striking ", or if the state law is unclear, the Uniform Unclaimed Property Act" from both sections.

- 47 CFR § 64.140(b)(2) – Alternative Pricing Plans:  The rules regarding alternative pricing plan rates provide that a Consumer believing that an alternative pricing plan exceeding applicable per-minute rates must demonstrate "that their usage meets or exceeds the Breakeven Point for the Alternative Pricing Plan."  As a minimum, if a Consumer obtains the equal value from a subscription plan that they would from the applicable per-minute rate, then the Consumer has suffered no harm.  Further, the relevant benchmark is not whether the Consumer's *usage* exceeds the Breakeven Point but rather that the Consumer's *effective rate* exceeds the facility's per-minute rate at the Breakeven Point.  This is also inconsistent with the definition of Breakeven Point.  Securus recommends replacing "the Consumer must show that their usage meets or exceeds the Breakeven Point for the Alternative Pricing Plan" with "the Consumer must show that their usage was below the Breakeven point for Alternative Pricing Plan."



# VIRGINIA SHERIFFS' ASSOCIATION

**PHONE** (804) 225-7152 | **FAX** (804) 225-7162 | **WEB** www.vasheriff.org
901 East Byrd Street, Suite 1301, Richmond, VA 23219

*Via ECFS*
Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Re:    Incarcerated People's Communications Services: Implementation of the Martha Wright-
        Reed Act, WC Docket No. 23-62
        Rules for Interstate Inmate Calling Services, WC Docket Now. 12-375

Dear Ms. Dortch

The Virginia Sheriffs' Association has grave concerns regarding the recent Federal Communications Commission's proposed *Report and Order* implementing major regulation changes that impact the communications of incarcerated individuals in local jails. The draft *Report and Order* does not seem to consider the realities of communications in the inmate population or the legal requirements in Virginia that all net revenue of such communications service be used for the direct benefit of the inmate.  We believe the FCC's pending action may significantly reduce services to the inmates housed in our jails.

The draft *Report and Order* of June 27, 2024 and updated July 3, reduces rate caps on inmate voice and video communications among other changes impacting jail communications systems. While benefiting the individual inmate by lowering the upfront communications costs, the new caps and regulations will greatly negatively impact the services the inmates receive. In addition to programs for education, substance use disorders, life skills, and other rehabilitative services, revenue received from voice and video communications by incarcerated individuals is used by sheriffs to pay for inmate benefits such as the cable bill for inmate housing units, law library services, newspaper subscriptions, and books, as well as items such as clothing for inmates released during inclement weather who may not be prepared with adequate clothing.

The Virginia General Assembly addressed this issue during the 2024 session and passed legislation, signed into law, to ensure that all net proceeds from communications services go to the direct benefit of the incarcerated population.

Finally, the new regulatory scheme in the draft *Report and Order* ignores the limitations of government budget cycles. Requiring changes be implemented within the current and next fiscal year, when budgets are set and inflexible all but ensures a reduction or even elimination of important services and programs for inmates.  A substantial delay in the implementation timeline would allow sheriffs and state and local governments to explore alternative funding options for these important benefits to the incarcerated population.

Sincerely,

*John W. Jones*

John W. Jones
Executive Director

**President** L. W. "Lenny" Millholland ▪ **1st Vice President** Brad W. Nunnally ▪ **2nd Vice President** Antionette V. Irving ▪ **Secretary** B. C. "Chip" Shuler
**Treasurer** Steven N. Creasey ▪ **Legislative Committee Chairman** Arthur Townsend, Jr. ▪ **Region I** Kevin A. Kemp ▪ **Region II** Daniel M. Smith
**Region III** G. Steve Funkhouser ▪ **Region IV** James E. Brown, III ▪ **Region V** David P. Decatur, Jr. ▪ **Region VI** Michael L. Chapman
**Region VII** John A. Beauchamp ▪ **Region VIII** Karl S. Leonard ▪ **Region IX** Carlos Turner ▪ **Region X** Karen E. Bowden ▪ **Immediate Past President** Fred S. Clark
**Past President** Darrell W. Warren, Jr. ▪ **Past President** Steve Draper ▪ **Past President** Vanessa R. Crawford ▪ **Executive Director** John W. Jones

JAT485