# United States Court of Appeals for the First Circuit

_____

No. 24-8028
In re: MCP 191
*(Caption Continued on Inside Cover)*

_____

On Petitions for Review of a Final Order of the
Federal Communications Commission

_____

**JOINT APPENDIX**
**VOLUME VI of VII (Pages JA1950 – JA2090)**

_____

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform Clinic*

*Additional Counsel Listed on Inside Cover*

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER SCHRECK,
 LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus Technologies, LLC*

Salvatore Taillefer, Jr.
BLOOSTON, MORDKOFSKY, DICKENS &
 PRENDERGAST, LLP
2120 L Street, NW Suite 825
Washington, DC 20037
(202) 828-5562
sta@bloostonlaw.com

*Counsel for the National Sheriffs'
Association*

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel Communications,
Inc.*

Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8900
ACollins@cahill.com

Landis C. Best
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
LBest@Cahill.com

*Counsel for Global Tel\*Link
Corporation d/b/a ViaPath
Technologies*

D. Adam Candeub
  General Counsel
Bradley Craigmyle
  Deputy General Counsel
Sarah E. Citrin
  Deputy Associate General Counsel
Matthew J. Dunne
  Counsel
FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
Communications Commission*

Tim Griffin
  Attorney General of Arkansas
OFFICE OF ATTORNEY GENERAL TIM
  GRIFFIN
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

Autumn Hamit Patterson
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General and Interim
Solicitor General

*Counsel for the State of Arkansas*

Abigail A. Slater
  Assistant Attorney General
Robert B. Nicholson
Robert J. Wiggers
U.S. DEPARTMENT OF JUSTICE
  ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United
States of America*

Theodore E. Rokita
  Attorney General of Indiana
OFFICE OF THE INDIANA ATTORNEY
  GENERAL
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

Blake E. Lanning
  Assistant Chief Deputy
Joshua J. David
  Deputy Attorney General
  Legislative & Policy Division
Jade A. Poorman
Bradley S. Davis
  Deputy Attorneys General
  Litigation Division

*Counsel for the State of Indiana*

Elizabeth B. Murrill
  Attorney General of Louisiana
Kelsey L. Smith
  Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

James Uthmeier
  Attorney General of Florida
John Guard
  Chief Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

*Counsel for the State of Florida*

Christopher M. Carr
  Attorney General of Georgia
Stephen J. Petrany
  Solicitor General
OFFICE OF THE GEORGIA
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*

Steve Marshall
  Attorney General of Alabama
Edmund G. Lacour Jr.
  Solicitor General
OFFICE OF THE ALABAMA ATTORNEY
  GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

*Counsel for the State of Alabama*

Raúl R. Labrador
  Attorney General of Idaho
Alan Hurst
  Solicitor General
Sean M. Corkery
  Assistant Solicitor General
OFFICE OF THE IDAHO ATTORNEY
  GENERAL
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

*Counsel for the State of Idaho*

Lynn Fitch
  Attorney General of Mississippi
Justin L. Matheny
  Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
  OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


Dave Yost
  Attorney General of Ohio
T. Elliot Gaiser
  Ohio Solicitor General
Mathura J. Sridharan
  Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*


Marty J. Jackley
  Attorney General of South Dakota
Ryan Mcfall
  Assistant Attorney General
OFFICE OF ATTORNEY GENERAL
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

*Counsel for the State of South Dakota*


Brenna Bird
  Attorney General of Iowa
Eric H. Wessan
  Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*


Andrew Bailey
  Attorney General of Missouri
Joshua M. Divine, #69875MO
  Solicitor General
Dominic X. Barceleau, #76510MO
  Assistant Attorney General
815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


Alan Wilson
  Attorney General of South Carolina
Joseph D. Spate
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for the State of South Carolina*

Ken Paxton
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Aaron L. Neilson
  Solicitor General
Jacob Beach
  Assistant Solicitor General
Office of the Attorney General of
Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

*Counsel for the State of Texas*


Jason Miyares
  Attorney General of Virginia
Kevin M. Gallagher
  Principal Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S
  OFFICE
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of
Virginia*

Jonathan Skrmetti
  Attorney General of Tennessee
J. Matthew Rice
  Solicitor General of Tennessee
OFFICE OF TENNESSEE ATTORNEY
  GENERAL
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

*Counsel for the State of Tennessee*


Derek E. Brown
  Attorney General of Utah
Stanford Purser
  Solicitor General
OFFICE OF THE UTAH ATTORNEY
  GENERAL
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

*Counsel for the State of Utah*

Craig E. Frosch
  Executive Counsel, Louisiana Sheriffs'
Association
FROSCH, RODRIGUE, ARCURI, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

Mary Erlingson
East Baton Rough Parish
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

Shannon Dirmann
LOUISIANA SHERIFF'S ASSOCIATION
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

*Counsel for Sheriff Sid Gautreaux; Sheriff Bobby Webre; Sheriff Mark Wood; Sheriff Kevin Cobb; and The Louisiana Sheriffs' Association*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

Nos. 24-1860 & 24-1927

SECURUS TECHNOLOGIES, LLC,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE
REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY; OFFICE OF
COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

Petitioner,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

_____

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK d/b/a VIAPATH TECHNOLOGIES,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

————————————————

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK, d/b/a VIAPATH TECHNOLOGIES; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF UNITED CHURCH OF CHRIST, INC.

Intervenors.

## VOLUME I

Certified List of items constituting the record of FCC proceedings in WC Docket Nos. 23-62 & 12-375 ................................................................................ JA1

Comments of Center on the Administration of Criminal Law, WC Docket No. 12-375 (Mar. 25, 2013) ......................................................................... JA93

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) [excerpt pages 14111, 14138-43, 14194] ................................. JA107

Comments of National Sheriffs' Association, WC Docket No. 12-375, Exh. A (Jan. 12, 2015) ............................................................................................ JA116

*In re Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd. 12763 (2015) [excerpt pages 12768, 12775, 12790, 12813-18, 12838-39] ............................................................................................................ JA133

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 31 FCC Rcd. 9300 (2016) [excerpt page 9311] ...................................................................................... JA145

*In re Rates for Inmate Calling Services*, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd. 8485 (2020) [excerpt page 8514 n.209] ............................................................................. JA147

Comments of Worth Rises, WT Docket No. 12-375 (Nov. 23, 2020) .............. JA149

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (May 13, 2021) ................................................................................................... JA197

Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement, WC Docket No. 12-375 (Aug. 30, 2021) ................................. JA203

Securus Technologies, LLC Pet. for Clarification, WC Docket No. 12-375 (Sept. 17, 2021) ........................................................................................... JA212

Comments of Prison Policy Initiative, Inc. on Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Sept. 27, 2021) .................... JA218

Comments of Securus Technologies, LLC on Petition for Waiver, WC Docket No. 12-375 (Jan. 7, 2022).....................................................................JA259

Comments of Nathan Miller, WC Docket No. 23-62 (May 4, 2023), Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay* (Nov. 4, 2022) ............................................................JA274

Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Dec. 15, 2022) [excerpt cover and pp. 7-8, 11-13]..........................................JA300

Comments of the Wright Petitioners et al., WC Docket No. 12-375 (Dec. 15, 2022) ........................................................................................JA306

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Instructions*, WC Docket Nos. 23-62 & 12-375 .........................................................................................JA326

## VOLUME II

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Word Template*, WC Docket Nos. 23-62 & 12-375 .........................................................................................JA385

FCC, Incarcerated People's Communications Services, *2023 Mandatory Data Collection: Proposed Excel Template*, WC Docket Nos. 23-62 & 12-375 .........................................................................................JA409

Reply Comments of the Securus Technologies, LLC, WC Docket No. 12-375 (Mar. 3, 2023) [excerpt cover and pp. 6-8]................................................JA424

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023)..................................................................JA428

Comments of California State Senator Josh Becker, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................JA483

Comments of Civil Rights Corps, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................................JA485

Comments of Color of Change, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ........................................................................................JA492

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............................................ JA502

Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....................................................... JA539

Comments of the NCIC Inmate Communications, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................... JA558

Comments of the Pay Tel Communications, Inc. in Response to Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ....... JA576

Opening Comments of Stephen A. Raher, WC Docket Nos. 23-62 & 12-375 (May 8, 2023).................................................................. JA604

Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (May 8, 2023).................................................................. JA632

Opening Comments of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ............ JA686

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ................................................................................. JA711

## VOLUME III

Comments of the Wright Petitioners et al., WC Docket Nos. 23-62 & 12-375 (May 8, 2023)............................................................... JA732

Coleman Bazelon & Paroma Sanyal, Brattle Report (May 8, 2023)................ JA774

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies on Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023)............................................................. JA812

Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (June 2, 2023)............................................................. JA819

Securus Technologies, LLC's Initial Comments to the Proposed 2023 Mandatory Data Collection, WC Docket Nos. 23-62 & 12-375 (June 2, 2023) .............................................................. JA827

Comments of the Electronic Privacy Information Center, WC Docket Nos. 23-62 & 12-375 (June 6, 2023) ......................................................................... JA835

Reply Comments of the National Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ...................................................................... JA844

Reply Comments of Pay Tel Communications, Inc., WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ............................................................................. JA865

Reply Comments of Securus Technologies, LLC, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ................................................................................. JA915

Reply Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (July 12, 2023) ......................................................................................................... JA957

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order, 38 FCC Rcd 6625 (WCB 2023) ............. JA963

Letter from Gregory R. Capobianco, Counsel for the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 15, 2023) ............................................................................................................ JA991

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (Dec. 21, 2023) ......................................................................................... JA1016

## VOLUME IV

IPCS Chicago Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Feb. 6, 2024) .................................. JA1055

IPCS Charleston Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed Mar. 5, 2024) .................................. JA1159

Ex Parte Submission of the U.S. Department of Justice, Antitrust Division, WC Docket Nos. 23-62 & 12-375 (Apr. 29, 2024) ........................................ JA1251

Letter from Virginia Association of Regional Jails, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62 (May 29, 2024) ................................. JA1256

Comments of Worth Rises, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) ................................................................................................ JA1266

Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. (June 7, 2024) [excerpt pages 5–6] ......................................................... JA1276

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC and Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 10, 2024) ............................................ JA1280

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 14, 2024) ................................................................................ JA1300

Letter from Leadership Conference to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (filed June 17, 2024) ...................... JA1302

Joint Letter of 90+ Organizations Supporting Low Rates, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (June 17, 2024) ................................................................................ JA1306

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 18, 2024) ................................................ JA1310

IPCS Phoenix Listening Session Ex Parte, Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, WC Docket Nos. 23-62 & 12-375 (filed June 20, 2024) ............................... JA1326

Letter from Salvatore Taillefer, Jr., Counsel to NSA to Marlene Dortch, Secretary of the FCC, WC Dockets Nos. 23-62 & 12-375 (June 20, 2024) ... JA1390

Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 8, 2024) .................................................................................. JA1408

Ex Parte Letter from Marcus W. Trathen and Christopher Dodd, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 9, 2024) .................................................. JA1409

Letter from Melonie Perez, Aliza Kaplan, Jennifer Scaife, & Leigh Owens, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) ............................................................................... JA1432

Letter from Sheriff Kieran Donahue, Canyon County, Idaho, and President of the National Sheriffs' Association to Marlene Dortch, Secretary of the FCC, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 1] .... JA1439

Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) ............................................................................................. JA1440

Comments of the Montana Sheriffs & Peace Officer Association, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt pages 1–2] ................ JA1445

Comments of the Virginia Association of Regional Jails, WC Docket Nos. 23-62 & 12-375 (July 11, 2024) [excerpt page 2] .......................................... JA1447

Ex Parte Letter Cheryl Leanza, Policy Advisor, UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 12, 2024) ............................................................................................. JA1449

Ex Parte Letter from Michael H. Pryor, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ...................................................................................... JA1453

Comments of Virginia Sheriffs' Association, WC Docket Nos. 23-62 & 12-375 (July 15, 2024) ...................................................................................... JA1485

## VOLUME V

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, 39 FCC Rcd 7647 (2024) .................................................................................... JA1486

## VOLUME VI

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Aug. 26, 2024) ................................................................................. JA1950

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Second Erratum, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) ................................................................. JA1951

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 10944 (WCB 2024) .......................................................................... JA1953

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11373 (WCB 2024) .......................................................................... JA1972

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, 39 FCC Rcd 11607 (WCB 2024) .......................................................................... JA1994

Motion of Pay Tel Communications, Inc. for Stay Pending Judicial Review, *Pay Tel Communications, Inc. v. FCC*, No. 24-8028 (1st Cir. Oct. 25, 2024) .......................................................................................... JA2011

Comments of Global Tel*Link Corporation d/b/a ViaPath Technologies, WC Docket Nos. 23-62 & 12-375, DA 24-1074 (Oct. 28, 2024).................. JA2041

Letter from Aaron M. Dawson, Executive Director of the Alabama Jail Administrators' Council, to the FCC, Re: Report and Order, Order on Reconsideration, Clarification and Waiver, and Further notice of Proposed Rulemaking (Nov. 21, 2024) ......................................................... JA2053

Letter from Geoffrey G. Why, Verrill Dana LLP, Counsel to Ameelio, to Marlene H. Dortch, Secretary, FCC, Docket Nos. 23-62 & 12-375 (Dec. 6, 2024) .......................................................................................... JA2055

Panka Bencsik et al., *Calls and Conduct: The Impact of Free Communication on Prison Misconduct* (Dec. 2024) (forthcoming publication) ................................................................................ JA2057

Ameelio Iowa Model Memo (Nov. 26, 2024) ................................ JA2084

**UNDER SEAL**
**VOLUME VII**

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62 & 12-375 (rel. July 22, 2024) ..........................................JA2091

*In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, Order Denying Stay Petition, WC Docket Nos. 23-62 & 12-375 (WCB rel. Oct. 2, 2024) .......................................................JA2582

Federal Communications Commission

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | **)** |
| | **)** |
| Incarcerated People's Communications Services; | **)** WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | **)** |
| | **)** |
| Rates for Interstate Inmate Calling Services | **)** WC Docket No. 12-375 |

**ERRATUM**

**Released:  August 26, 2024**

By the Chief, Wireline Competition Bureau:

On July 22, 2024, the Commission released a Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (*Report and Order*), FCC 24-75, in the above-captioned proceedings.  This Erratum amends the *Report and Order* as indicated below:

1.    In paragraph 626, in the first sentence, replace "this Report and Order" with "this Report and Order and this Order on Reconsideration, Clarification and Waiver" .

2.    In paragraph 641, in the second sentence, replace "64.6130(b), (e), (f), (g), (i)-(l)" with "64.6130(d), (e), (f), (h)-(k)."

This Erratum also amends Appendices A and B as indicated below:

3.    In Appendix A, the corrections are as follows:

 a.    In Section 64.6010(d), in the first paragraph, replace "must charge" with "must not charge a per-minute rate in excess of"; and

 b.    In Section 64.6110(c), in the first sentence, replace "64.6010(d)" with "64.6010(e)".

4.    In Appendix B, in paragraph 1, the last sentence is corrected to read as: "This present Final Regulatory Flexibility Analysis (FRFA) relating to the Report and Order and the Order on Reconsideration, Clarification and Waiver (collectively, Report and Order) conforms to the RFA".

FEDERAL COMMUNICATIONS COMMISSION

Trent B. Harkrader
Chief
Wireline Competition Bureau

**Federal Communications Commission**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Incarcerated People's Communications Services; | **)** | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | **)** | |
| | **)** | |
| Rates for Interstate Inmate Calling Services | **)** | WC Docket No. 12-375 |

**SECOND ERRATUM**

**Released:  October 2, 2024**

By the Chief, Wireline Competition Bureau, and the Managing Director:

On July 22, 2024, the Commission released a Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (*Report and Order*), FCC 24-75, in the above-captioned proceedings.[1]  On August 26, 2024, the Wireline Competition Bureau released an Erratum amending the *Report and Order*.[2]

To conform to the publishing conventions of the National Archives and Records Administration's Office of the Federal Register, this Second Erratum further amends Appendix A of the *Report and Order* as indicated below:

1. Section 14.10 is corrected as follows:

    a. In paragraph (c), replace "shall mean" with "means".

    b. In paragraph (c)(1), replace "in this section" with "in paragraph (l) of this section".

    c. In paragraph (c)(2), replace "in this section" with "in paragraph (q) of this section".

    d. In paragraph (c)(3), replace "in this section" with "in paragraph (i) of this section".

    e. In paragraph (c)(4), replace "in this section" with "in paragraph (m) of this section".

2. In Section 64.601, paragraphs (a)(21) and (a)(22), delete "of this chapter, as such section may be amended from time to time".

3. Section 64.611 is corrected as follows:

    a. In paragraph (l)(2), replace the period following "Signed certification" with a dash.

    b. In paragraph (l)(2)(i), remove the extra space before "the TRS provider shall".

4. Section 64.6000 is corrected as follows:

    a. In paragraphs (1) and (2) of the definition of "*Ancillary Service Charge*", delete "of this chapter".

    b. In paragraph (4) of the definition of "*Controlling Judicial or Administrative Mandate*", delete "of

---

[1] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75 (2024).

[2] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Erratum (WCB Sept. 5, 2024).

**JA1951**

**Federal Communications Commission**

this chapter".

c. In the definition of "*Facility-Related Rate Component*", delete "of this chapter".

d. In the definition of "*Interconnected Voice over Internet Protocol* or *Interconnected VoIP*", capitalize the first letter in paragraphs (i), (ii), and (iii); replace "(i)", "(ii)", "(iii)", and "(iv)" with "(1)", "(2)", "(3)", and "(4)", respectively; and insert hard returns after "a service that:", "communications"; "location;" and "equipment; and".

e. In the definition of "*Provider-Related Rate Component*", delete "of this chapter".

5. In section 64.6010, paragraph (a), delete "of this chapter".

6. Section 64.6015 is corrected as follows:

a. In paragraph (a), delete "(a)".

b. In paragraph (1), replace "subparagraphs" with "paragraphs", and replace "(2) and (3)" with "(b) and (c)".

c. In paragraphs (1), (2), and (3), replace "(1)", "(2)", and "(3)" with "(a)", "(b)", and "(c)", respectively.

7. In section 64.6020, paragraph (a), delete "(a)".

8. In section 64.6030, paragraph (f), delete both instances of "of this chapter".

9. Section 64.6040 is corrected as follows:

a. In paragraph (e), delete "*Alternate Pricing Plans*".

b. In paragraphs (e)(1) and (e)(4), delete "of this chapter".

c. In paragraph (f), delete "*Accessible formats*".

10. Section 64.6110 is corrected as follows:

a. Replace "* * * * *" with the current text of section 64.6110(b).

b. In paragraphs (f) and (g), delete each instance of "of this chapter".

11. In section 64.6120, paragraph (a), delete "of this chapter".

12. Section 64.6140 is corrected as follows:

a. In paragraph (a)(1), replace "of this chapter and this subpart" with "and this subpart FF".

b. In paragraphs (a)(4)(i)-(iii), capitalize the first letter of each paragraph.

c. In paragraphs (c)(1) and (c)(3), delete "of this chapter".

FEDERAL COMMUNICATIONS COMMISSION


Trent Harkrader
Chief
Wireline Competition Bureau


Mark Stephens
Managing Director

**JA1952**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| Rates for Interstate Inmate Calling Services | ) | |

**ORDER DENYING STAY PETITION**

**Adopted:  October 2, 2024**                                        **Released:  October 2, 2024**

By the Chief, Wireline Competition Bureau:

## I.    INTRODUCTION

1.      On September 26, 2024, Securus Technologies, LLC (Securus) filed a petition requesting that the Commission stay its Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking in the captioned proceedings pending judicial review.[1]  For the reasons discussed below, we deny Securus's stay request.

## II.    BACKGROUND

2.      The *2024 IPCS Order* implemented the expanded authority granted to the Commission by the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act),[2] adopting comprehensive reforms that will significantly reduce the financial burdens incarcerated people face to communicate with their loved ones.  The Act amended the Communications Act of 1934, as amended, (Communications Act) to require that the Commission "establish a compensation plan to ensure that all [Incarcerated People's Communications Services (IPCS)] providers are fairly compensated and all rates and charges are just and reasonable for completed" IPCS communications.[3]  Consistent with this Congressional mandate, in the *2024 IPCS Order*, the Commission reduced existing per-minute rate caps for all incarcerated people's audio communication services, and established, for the first time,

---

[1] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75 (rel. July 22, 2024) (*2024 IPCS Order* or *Order*, *2024 IPCS Reconsideration Order*, or *2024 IPCS Notice*); *see* Securus Technologies, LLC, Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375 (filed Sept. 26, 2024) (Securus Stay Petition); Declaration of Alex Dougherty In Support of Securus Technologies, LLC's Motion for Stay Pending Appeal, WC Docket Nos. 23-62, 12-375 (filed Sept. 26, 2024) (Dougherty Declaration).  The Wright Petitioners, United Church of Christ Media Justice Ministry, Worth Rises, Pennsylvania Prison Society, and the Brattle Group (collectively, the Public Interest Parties) filed an opposition to the Securus Stay Petition as did Stephen A. Raher.  *See* Opposition to Securus Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375 (filed Oct. 1, 2024) (Public Interest Parties Opposition); Opposition of Stephen A. Raher to Securus Technologies' Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375 (filed Oct. 1, 2024) (Stephen Raher Opposition).

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2022).

[3] 47 U.S.C. § 276(b)(1)(A).

interim per-minute rate caps for incarcerated people's video communications services.[4]  In establishing these rate caps, the Commission employed the used and useful framework it has used for decades in determining just and reasonable rates, a zone of reasonableness methodology that it had previously used to set rate caps for audio IPCS, and an industry-average cost methodology specifically permitted in the Martha Wright-Reed Act.[5]  In setting the new rate caps, the Commission relied on cost and other data submitted by IPCS providers, including Securus.[6]

3.      In the *2024 IPCS Order*, the Commission also ended IPCS providers' long-standing practice of paying site commission to carceral facilities, the costs of which were passed through to consumers via higher IPCS rates.[7]  The *Order* strengthened the Commission's requirements for access to IPCS by incarcerated people with disabilities; adopted stronger consumer protection rules, including permanent rules addressing providers' treatment of unused funds in inactive IPCS accounts; and permitted providers, for the first time, to offer optional alternate pricing plans, subject to conditions to protect and benefit IPCS consumers.[8]  Although many of the new requirements are effective 60 days after publication in the Federal Register, the Commission established staggered compliance deadlines for the new rate caps and the elimination of site commissions.[9]

4.      On September 26, 2024, Securus filed a petition requesting that the Commission stay the effectiveness of the *2024 IPCS Order* pending judicial review.  Securus contends that it is likely to prevail on the merits, alleging that the Commission committed errors in its statutory interpretations and ratemaking resulting in rate caps that fail to comply with the Martha Wright-Reed Act's dual requirements that the Commission's compensation plan ensure both that all IPCS providers are fairly compensated and that all rates and charges are just and reasonable, and because the Commission set a compliance timeline that is impossible for IPCS providers to meet.[10]  Securus also claims that allowing the *2024 IPCS Order* to "go[] into effect as planned" will subject Securus to irreparable harm in lost revenue and compliance costs and that the balance of harms to other interested parties and the public interest support a stay.[11]

### III.    DISCUSSION

5.      To qualify for the extraordinary remedy of a stay, a petitioner must show that (1) it is likely to prevail on the merits; (2) it will suffer irreparable harm absent the grant of preliminary relief; (3) other interested parties will not be harmed if the stay is granted; and (4) the public interest would

---

[4] *See, e.g.*, *2024 IPCS Order* at 60, para. 119.

[5] *See, e.g.*, *id.* at 65-66, para. 127 (discussing the adoption of rate caps derived from industry average costs); *id.* at 89-90, paras. 159-60 (discussing the used and useful framework and the zone of reasonableness approach).

[6] See *id.* at 102-04, paras. 184-85.

[7] *See, e.g.*, *id.* at 132, para. 245 (prohibiting IPCS providers from paying site commissions of any kind and preempting all state and local laws and regulations requiring or allowing IPCS providers to pay site commissions associated with IPCS).

[8] *See, e.g.*, *id.* at 229-49, 253-61, 261-91, paras. 427-471 (discussing alternate pricing plans), 482-98 (amending the Commission's rules to improve communications for incarcerated people with disabilities), 499-556 (discussing reforms to the Commission's consumer protection rules).

[9] *Id.* at 304-08, paras. 587-94.  The Commission also issued the *2024 IPCS Reconsideration Order*, which resolved various petitions seeking reconsideration of, clarification of, or waivers from prior Commission orders.  *See 2024 IPCS Reconsideration Order* at 309-12, paras. 599-607.  Additionally, the Commission issued the *2024 IPCS Notice* to obtain additional public comment on IPCS-related issues that it could not resolve on the record then before it.  *See 2024 IPCS Notice* at 312-319, paras. 608-24.

[10] Securus Stay Petition at 2, 4-16.

[11] *Id.* at 2-3, 13-17.

favor grant of the stay.[12]  A stay is an "'intrusion into the ordinary processes of administration and judicial review,' . . . and accordingly 'is not a matter of right, even if irreparable injury might otherwise result'" to the movant.[13]  The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.[14]  Securus has failed to meet that burden.[15]

**A.      Securus Has Not Shown It Is Likely to Prevail on the Merits**

6.      To show likelihood of success on the merits, a petitioner must make a "strong showing" that they are likely to succeed;[16] a "mere possibility of relief" is insufficient.[17]  As the D.C. Circuit has recognized, "[w]ithout such a substantial indication of probable success, there would be no justification for . . . intrusion into the ordinary processes of administration and judicial review."[18]  Securus principally asserts that the *2024 IPCS Order* fails to ensure that all IPCS providers are fairly compensated pursuant to section 276(b)(1)(A) of the Communications Act and that the Commission erred in several respects in

---

[12] *See LightSquared Technical Working Group Report*, Order Denying Motion for Stay, IB Docket No. 11-109, 36 FCC Rcd 1262, 1266, para. 8 (2021) (*Ligado Stay Denial Order*) (citing *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)).

[13] *Nken*, 556 U.S. at 427 (internal citations omitted).

[14] *Ligado Stay Denial Order*, 36 FCC Rcd at 1266, para. 8 (citing *Nken*, 556 U.S. at 433-34).

[15] Securus requests that we stay the *2024 IPCS Order on Reconsideration* and the *2024 IPCS Notice*, but makes no claims regarding the former, and no attempt regarding the latter to show that the extraordinary remedy of preventing the Commission from further developing the record meets the stay criteria.  The *2024 IPCS Order on Reconsideration* dismissed as moot Securus's Petition for Clarification and Petition for Waiver because the *Order* effectively provided Securus the clarification and waiver it had requested.  *See 2024 IPCS Reconsideration Order* at 311-12, paras. 604-606.  There is no reason to suppose Securus suffered any cognizable harm from the Commission's dismissal of its Petition for Clarification as moot.  *See 2024 IPCS Reconsideration Order* at 312, para. 604.  Securus requested clarification of whether, under the existing rules, "providers [could] pay additional site commissions from end user revenues," over and above the $0.02 per-minute allowance for contractually prescribed site commissions under those rules.  *See id.* (quoting Securus Petition for Clarification at 3).  Clarification on this point was necessary, Securus argued, because without it "some providers [could be] competitively disadvantaged in the bidding process" for new IPCS contracts.  *Id.* (quoting Securus Petition for Clarification at 4).  The *2024 IPCS Order* eliminates any such risk by clarifying that, once the new rules take effect, IPCS providers will no longer be able to bid for new contracts under the terms of the old rules, even though the Commission has allowed staggered periods of time to bring "contract[s] existing as of June 27, 2024," into compliance with the new rules.  *2024 IPCS Order* at 305-06, para. 587.  Likewise, it is unclear what harm Securus could plausibly claim from the dismissal as moot of its request for waiver of sections 64.6030 and 64.6090 of the Commission's existing rules, the first of which prescribes that IPCS providers adhere to per-minute rate caps for interstate and international calls and the second of which prohibits providers from offering flat-rate calling for such calls.  *See* 47 C.F.R. §§ 64.6030, 64.6090.  Securus sought a waiver of those rules so that it could offer subscription calling plans as an alternative to assessing only per-minute rates for interstate calls.  *See 2024 IPCS Order* at 232, para. 430.  In the *2024 IPCS Order*, the Commission expressly acknowledged the benefits of Securus's alternative pricing plans and, *id.* at 234, para. 432, and decided to permit such plans under the new rules, *see id.* at 235, para. 435; *see also id.* at 236-50, paras. 437-471.  Thus, the Commission correctly recognized that Securus's waiver request was moot under the new rules.  *See 2024 IPCS Reconsideration Order* at 313, para. 606.  Securus's waiver request was also moot with regard to the application of the existing rules, given Securus's representation to the Commission, in March 2022, that it had suspended its alternative pricing plans in 2021, *see 2024 IPCS Order* at 232-33, para. 430 & n.1552.

[16] *Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[17] *Nken*, 556 U.S. at 434 (internal quotation marks omitted).

[18] *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

setting IPCS rate caps.[19]  Securus also argues that the Commission erred in not deferring compliance with certain rules adopted in the *2024 IPCS Order*.[20]

7.        *Fair Compensation for IPCS Providers*.  As the Commission concluded in the *2024 IPCS Order*, the IPCS compensation plan the Commission adopted is fully consistent with the requirement that "all payphone service providers are fairly compensated" as required by section 276(b)(1)(A).[21]  Securus, however, asserts it is not.[22]  Securus argues that "Congress's use of 'all'— rather than qualifying or limiting the class of providers that the Commission must ensure are fairly compensated—makes clear that the Commission's compensation plan must assure that *every* IPCS provider is made whole."[23]  Securus previously raised this argument in the rulemaking and the *2024 IPCS Order* squarely addressed it.[24]  As the Commission explained, the statutory mandate of fair compensation "need not be evaluated on a provider-by-provider basis."[25]  The Martha Wright-Reed Act is clear that the Commission may use "industry-wide average costs" in setting just and reasonable rates under section 276(b)(1)(A).[26]  Indeed, this language was added to the text of the Martha Wright-Reed Act in response to *GTL v. FCC*, where the court found that Commission's use of "industry-wide averages in setting the rate caps" in the *2015 ICS Order* was incompatible with section 276 as then written.[27]  Thus, Congress envisioned just and reasonable rate regulations being set on an industry-wide, rather than provider-by-provider, basis. Consistent with that harmonized understanding of the statutory mandates, the Commission concluded that "a provider will be fairly compensated if the rates and fees it is permitted to charge will afford it an opportunity to recover industry-average costs associated with prudent investments used and useful in providing IPCS and associated ancillary services at the facilities the provider serves."[28]

8.        Considering the statutory framework as a whole, along with the record before it, the Commission concluded in the *2024 IPCS Order* that rate caps "based on costs evaluated on an aggregated basis generally will satisfy the requirement that all payphone service providers be fairly compensated."[29] And "[a]cross the industry, the[] rate caps will allow providers to generate sufficient revenue from the audio and video communications they provide (1) to recover the actual, direct costs of each communication, and (2) to make a reasonable contribution to their indirect costs related to IPCS."[30]  The Commission sensibly "decline[d] to set rate caps that ensure cost recovery for providers with unusually

---

[19] Securus Stay Petition at 4-11.

[20] *Id.* at 11-13.

[21] *See, e.g.*, *2024 IPCS Order* at 122, para. 219 (finding that "a provider will be fairly compensated if it is afforded an opportunity to recover the industry average of [the prudently incurred investments and expenses that are used and useful in the provision of IPCS] on a company-wide basis"); 47 U.S.C. § 276(b)(1)(A).

[22] Securus Stay Petition at 4.

[23] *Id.* at 5 (emphasis in original).

[24] *2024 IPCS Order* at 122, para. 219 n.777 (noting that "Securus argues that the Martha Wright-Reed Act requires that *each provider* be able to recover its average costs") (emphasis in original); Public Interest Parties Opposition at 3 (noting that "Securus spends much of its discussion of its likelihood of success on the merits simply rehashing an argument that the Commission has already rejected: that Section 276(b)(1)(A) . . . requires that the new rate caps account for costs on a provider-by-provider basis, rather than using an industry average").

[25] *2024 IPCS Order* at 37, para. 69; Public Interest Parties Opposition at 3.

[26] *2024 IPCS Order* at 65-66, para. 127 (citing, among other things, Martha Wright-Reed Act § 3(b)(1)).

[27] *Global Tel* Link v. FCC*, 866 F.3d 397, 414 (D.C. Cir. 2017) (*GTL* or *GTL v. FCC*); *see 2024 IPCS Order* at 37, para 69.

[28] *2024 IPCS Order* at 38, para. 71.

[29] *Id.* at 122, para. 219 n.777.

[30] *Id.* at 122, para. 220.

high costs because to let unusual cases determine rates generally would result in unjust and unreasonable rates," contrary to the independent mandate of section 276(b)(1)(A).[31]  Instead the Commission made clear that "if such providers exist, they can seek a waiver."[32]

9.       Securus also asserts that the Commission's rate caps are "below cost for one-third of IPCS providers" and that when costs are "appropriately accounted for—including necessary safety costs the Commission excludes from its lower bound and the massive compliance costs that the Commission ignores—*more than half* of all industry providers will be unable to recover costs for audio services they provide under the new rate caps."[33]  Securus's argument is premised in part on the notion that the Commission has not "appropriately accounted" for provider costs because it has excluded certain costs. But excluding certain costs is precisely the task that Congress required the Commission to perform to ensure, consistent with the Martha Wright-Reed Act, that all "payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications."[34]  As explained in the *2024 IPCS Order*, the Commission relied on the used and useful framework and its associated prudent expenditure standard "to assess the costs that should either be included or excluded from [the Commission's] rate cap calculations to ensure just and reasonable rates and charges for IPCS."[35]  This is "a familiar task of the sort the Commission has long undertaken when seeking to ensure just and reasonable rates and charges, where it has evaluated costs and expenses of various kinds of which providers sought recovery through regulated rates."[36]  In deriving its rate caps in this way, the Commission afforded "providers an opportunity to recover the used and useful costs incurred to provide IPCS" and also ensured that IPCS rates are "affordable for incarcerated people and their loved ones."[37]  The extent to which certain costs and expenses were not included in the Commission's rate cap calculations is the result of the Commission's application of the longstanding used and useful framework to determine whether such costs and expenses are not used and useful in the provision of IPCS and therefore not recoverable through IPCS rates.

10.      We also reject Securus's argument about inadequate cost recovery insofar as it selectively relies on certain statements in the *2024 IPCS Order*.[38]  Securus claims that the Commission acknowledged that costs incurred by four of the IPCS providers exceed revenues when the Commission revealed that "[p]otential revenues for eight out of 12 IPCS providers exceed their total reported costs when excluding site commissions and safety and security categories that generally are not used and useful in the provision of IPCS."[39]  But Securus neglects the fact that those eight firms who will have adequate cost recovery under the Commission's Martha Wright-Reed Act paradigm "represent over 90 percent of revenue, 96 percent of [average daily population], and 96 percent of billed and unbilled minutes in the dataset."[40]  Securus also fails to account for the Commission's conclusion that its estimates of providers'

---

[31] *2024 IPCS Order* at 38, para. 71 n.234; *see also* Public Interest Parties Opposition at 3.

[32] *Id.* at 38, para. 71 n.234.

[33] Securus Stay Petition at 6 (emphasis in original).

[34] 47 U.S.C. § 276(b)(1)(A).

[35] *2024 IPCS Order* at 25, para. 42.

[36] *Id.* at 186, para. 355.

[37] *Id.* at 60, para. 119.

[38] Securus Stay Petition at 6.

[39] *2024 IPCS Order* at 120, para. 216.

[40] *Id.*

average costs were "likely overstated," which made it "unlikely that any provider w[ould] be unable to recover its individual average costs of providing audio and video IPCS."[41]

11.    *Treatment of Safety and Security Costs*.  Securus argues that the Commission erred in its evaluation and treatment of safety and security costs in several respects.  First, Securus asserts that the "Commission violated the 'fairly compensated' requirement by adopting a 'used and useful' approach that led it to ignore prerequisite safety and security costs."[42]  Securus argues that "[m]easures that 'are required by state correctional institutions as a condition of doing business' are 'condition[s] precedent' to IPCS providers' services, and thus must be part of the calculus in determining 'fair compensation.'"[43]  We disagree.

12.    In the *2024 IPCS Order*, the Commission observed that IPCS providers may be required to make site commission payments to correctional institutions that fund various safety and security measures.[44]  To the extent that IPCS providers were required to pay site commissions, "the D.C. Circuit's decision in *GTL v. FCC* suggests that the fair compensation requirement in section 276(b)(1)(A) requires that IPCS providers be able to recover those payments through IPCS rates and charges."[45]  The Commission in the *2024 IPCS Order* recognized that site commissions interfere with its ability to implement the dual statutory requirements of determining just and reasonable rates and charges and fair compensation for IPCS providers.[46]  To remedy this problem, the Commission precluded providers from paying site commissions altogether, thereby eliminating "the factual predicate—the payment of site commissions as a condition precedent to providing IPCS—which led the court in *GTL* to hold that site commissions could not be wholly excluded from the Commission's ratemaking calculus."[47]  The Commission also prohibited IPCS providers from "enter[ing] into a contract with a correctional facility for the provision of IPCS where, as a condition precedent to providing IPCS, the provider must agree to pay a site commission of any kind."[48]  In eliminating site commission payments, including those that may fund various safety and security measures, the Commission "best ensure[d] fair compensation and just and reasonable rates and charges for IPCS."[49]

13.    Second, Securus argues that the Commission "misapplies" the used and useful standard, which Securus argues "was created for rate-of-return regulation for services sold to end-user customers and cannot be applied to IPCS."[50]  Securus also asserts that the Commission's application of the used and useful framework "ignores Congress's requirement that the Commission consider necessary safety and

---

[41] *Id.* at 120, para. 216 n.765; *see also 2024 IPCS Order* at 111, para. 199 ("Most critically, providers' total reported costs across the industry for 2022 exceed their total reported revenues by approximately $219 million.  The existence of such a disparity, let alone its magnitude, strongly suggests that reported costs are inflated, given that rational firms are profit seeking.").  And in the event providers are unable to recover their used and useful IPCS costs, the Commission reminded providers that they would be free to seek a waiver of the Commission's rules.  *See, e.g.*, *2024 IPCS Order* at 120 n.765; *see also 2024 IPCS Order* at 250-53, paras. 475-81 (describing the waiver process).

[42] Securus Stay Petition at 7.

[43] *Id.* (quoting *GTL v. FCC*, 866 F.3d at 413).

[44] *2024 IPCS Order* at 137, para. 251 & n.873; *id.* at 204, para. 382.

[45] *Id.* at 158, para. 296.

[46] *Id.*

[47] *Id.* at 165, para. 307.

[48] *Id.* at 175, para. 331.

[49] *2024 IPCS Order* at 175, para. 332.

[50] Securus Stay Petition at 8.

security costs *on top of* the Commission's pre-existing obligation to ensure just and reasonable rates."[51] The Commission considered and rejected these same arguments in the *2024 IPCS Order*. Addressing such assertions in the *2024 IPCS Order*, the Commission observed that the used and useful framework "remains the most practical and effective method for determining the costs providers and facilities reasonably incur in providing IPCS."[52]

14.    We also disagree with Securus that the Commission ignored the Martha Wright-Reed Act's directive to consider necessary safety and security measures in determining just and reasonable rates and charges for IPCS.[53]  As the Commission explained, "[w]hile section 3(b)(2) of the Martha Wright-Reed Act requires [the Commission] to 'consider' certain safety and security costs when determining just and reasonable rates . . . [the Commission] employ[s] the 'used and useful' framework to determine what costs and expenses can be recovered through just and reasonable IPCS rates."[54]  Thus, the Commission's "consideration of safety and security costs as required by section 3(b)(2)—and with respect to other safety and security costs raised in the record—occurs within the context of that 'used and useful' analysis."[55]  And that is precisely what the Commission did in the *2024 IPCS Order* in considering and evaluating "all of the arguably recoverable costs in the record, including costs associated with safety and security measures, to distinguish those costs that should be included in [the Commission's] ratemaking calculus from those that should not."[56]  In doing so, the Commission arrived at a "middle ground that properly balances 'the equitable principle that public utilities must be compensated for the use of their property in providing service to the public' with the '[e]qually central . . . equitable principle that ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them.'"[57]

15.    Third, Securus contends that "the Commission applied the used and useful standard arbitrarily and capriciously" by, for example, excluding recovery for safety and security measures that benefit consumers and allowing recovery for measures that do not benefit consumers.[58]  This argument ignores the context in which the Commission's evaluation of safety and security measures took place. The Commission acknowledged that the categories of safety and security costs reported in the 2023 Mandatory Data Collection were "imprecise."[59]  It also acknowledged that "providers' allocations of their safety and security costs are at times inexact among these categories."[60]  To account for the imperfect nature of the data, the Commission evaluated the categories of safety and security measures "based on the nature of the preponderance of tasks or functions within each category.  If the predominant use of tasks and functions within a category [were] not used and useful, the entire category [was] treated as not used and useful."[61]  The Commission also adjusted its rate setting within the zones of reasonableness "to

---

[51] *Id.* (emphasis in original).

[52] *2024 IPCS Order* at 27, para. 44; Public Interest Parties Opposition at 4; *see also, e.g.*, *2024 IPCS Order* at 186-204, paras. 355-82 (discussing the relevant statutory considerations in the specific context of reported safety and security costs).

[53] Martha Wright-Reed Act § 3(b)(2).

[54] *2024 IPCS Order* at 195, para. 370.

[55] *Id.*

[56] *Id.* at 208, para. 389.

[57] *Id.* at 208, para. 389 (quoting *American Telephone and Telegraph Company The Associated Bell System Companies*, Docket No. 19129, Phase II Final Decision and Order, 64 F.C.C.2d 1, 38, para. 111 (1977).

[58] Securus Stay Petition at 8.

[59] *2024 IPCS Order* at 205-06, para. 385.

[60] *Id.*

[61] *Id.*

develop overall rate caps that recognize the imprecision of both the seven defined safety and security categories in the 2023 Mandatory Data Collection, and the inconsistencies in the narrative descriptions and varied allocations made in provider responses."[62]  These adjustments provided the Commission with a workable methodology to conduct a thorough and orderly review of the safety and security cost data in the record under the used and useful standard.

16.    Because the Commission evaluated the safety and security cost data based on the preponderance of tasks within each category, it is not surprising that, in some cases, such as for law enforcement support services, some functions within a given category might benefit consumers.[63]  But that does not mean they are necessarily recoverable under the used and useful standard when evaluated as a whole.  Indeed, in the case of law enforcement support services, the Commission noted that certain tasks, while potentially beneficial, "do not facilitate the provision of IPCS and are therefore not used and useful in the provision of IPCS."[64]  Conversely, in other circumstances there may be categories that have no direct benefit to the consumer but that the Commission concluded were used and useful and therefore recoverable.[65]  Should a given provider be able to demonstrate in a given instance that a particular safety and security cost not generally included in the rate caps is, in fact, used and useful, it is free to seek a waiver dealing with its special circumstances.[66]

17.    Finally, Securus argues that "the Order's finding that IPCS providers must comply with CALEA and its determination of which safety and security measures are necessary reversed decades of contrary practice with no reasoned explanation."[67]  Securus is mistaken.  Regarding CALEA, the Commission concluded in the *2024 IPCS Order* that "[c]ontrary to Securus's claim that [the Commission has] departed from Commission precedent without proper notice, [the Commission is] not modifying such precedent."[68]  IPCS providers that offer both payphone services and audio communications services, including telecommunications services and VoIP, have been and will remain subject to CALEA requirements.[69]

18.    The Commission also has not reversed practice or precedent without explanation in connection with its determination of which safety and security measures are necessary for IPCS.  In the *2024 IPCS Order*, the Commission determined that while it has "historically recognized that safety and security measures were, at least in some sense, inherent in providing communications services for incarcerated people, it has been clear from the outset that only certain safety and security costs should be recovered through regulated rates."[70]  Until the *2024 IPCS Order*, however, the Commission had not

---

[62] *Id.* at 206, para. 387.

[63] *See id.* at 212, para. 394 (recognizing that "some functions in this category may provide a benefit to incarcerated people").

[64] *Id.* at 213, para. 394.

[65] In the case of CALEA compliance measures, the Commission was "not persuaded that the functionalities associated with CALEA compliance generally would directly benefit IPCS users" but concluded that they are used and useful in the provision of IPCS primarily because "without CALEA compliance, IPCS providers could not offer their audio and certain advanced communications services."  *Id.* at 209, para. 391.

[66] *Id.* at 205-06, para. 385 n.1384; *see also id.* at 124, para. 222 n.787 (explaining how the Commission has relied on similar approaches to identifying recoverable costs in other contexts in the past).

[67] Securus Stay Petition at 9.

[68] *2024 IPCS Order* at 210, para. 391 n.1402.

[69] *See id.*

[70] *Id.* at 198, para. 375.

**Federal Communications Commission**    **DA 24-1031**

decided which safety and security measure costs should be recoverable in IPCS rates.[71] The Commission therefore rejected Securus's "suggestion that 'Commission precedent is crystal clear that the costs of safety and security measures such as recording, monitoring, biometrics, and related services are inherent in the provision of communications services to the incarcerated.'"[72] And, as the Commission noted, "[t]he mandate in section 276(b)(1)(A) that [the Commission] ensure just and reasonable rates for consumers, in conjunction with the Martha Wright-Reed Act's requirements that [the Commission] consider safety and security costs 'necessary' to the provision of IPCS, requires that [the Commission] reevaluate this precedent at any rate."[73]

19.    *Reliance on Total Costs.* In determining the upper and lower bounds of its zones of reasonableness, the Commission calculated industry average costs per minute by dividing total costs (the sum of the costs of both billed and unbilled minutes) by total minutes, based on its finding that this approach more accurately reflected providers' average costs per minute than an approach that used billed minutes as the denominator.[74] Securus maintains that in so doing, the Commission departed from its prior practice without sufficient explanation.[75] Securus argues that the Commission's reliance on total minutes "violates the fairly compensated requirement," and guaranteed that IPCS providers would be unable to fully recover their costs of providing IPCS.[76]

20.    The Commission explained in the *2024 IPCS Order* that "[t]he use of both billed and unbilled minutes is an improvement from the *2021 ICS Order*, which divided expenses by paid minutes, and better reflects the cost of actual minutes."[77] Securus's arguments ignore the adverse effects rate caps based on only billed minutes would have on IPCS consumers, as well as the variability of unbilled minutes practices now and in the future.[78] As an initial matter, the industry-wide average cost per minute of providing IPCS equals total costs divided by total minutes, a mathematical fact that Securus does not appear to dispute. Instead, Securus contends, in effect, that the Commission should have inflated that average in recognition of the possibility that, once the rate caps are implemented, IPCS providers may continue to provide incarcerated people with "free" minutes, either in response to correctional institution requirements or at their volition. But, as the Commission explained, "the ratio of billed minutes to unbilled minutes varies across facilities, and rate caps based on the average cost of a billed minute would allow over recovery of costs, and therefore unreasonably high rates, in facilities" with relatively high ratios, "while allowing under-recovery in other facilities."[79] Given this, the Commission correctly concluded that Securus's approach would result in the Commission "effectively requiring incarcerated people who receive relatively few free minutes to subsidize other users.[80] Further, as the Commission recognized, "the relative proportions of billed to unbilled minutes [might] shift" once the rate caps are

---

[71] *Id.* Additionally, the "relevant statutory language did not dictate the inclusion of any particular safety and security costs." Stephen Raher Opposition at 3.

[72] *2024 IPCS Order* at 198-99, para. 375 (quoting Securus Technologies, LLC Comments, WC Docket Nos. 23-62 and 12-375, at iii (filed May 8, 2023)).

[73] *2024 IPCS Order* at 199, para. 375.

[74] *Id.* at 107, para. 190.

[75] Securus Stay Petition at 10.

[76] *Id.* at 9-10.

[77] *2024 IPCS Order* Appx. E at 378, para. 4.

[78] *2024 IPCS Order* Appx. E at 378, para. 4 n.8.

[79] *Id.*

[80] *Id.*

implemented.[81]  If that were to happen, rate caps calculated by dividing total costs by billed minutes "would become outdated."[82]

21.     Correctional institutions currently require many IPCS providers to provide certain types of communications (e.g., calls to public defenders) that, from the incarcerated person's perspective, are "free."[83]  Securus argues that the Commission's failure to set rate caps at levels that provide for the recovery of the costs of these communications violates the fairly compensated requirement.[84]  But under the rules adopted in the *2024 IPCS Order*, nothing requires IPCS providers to bear the costs of such calls themselves at the behest of correctional institutions.[85]  Indeed, providers may enter into contractual arrangements under which a correctional authority pays a provider for such calls.[86]  And, if providers choose to allow incarcerated people to make additional communications without charging them or those they communicate with, that approach is fully consistent with the Commission's compensation plan for IPCS, which sets rate caps rather than prescribing rates that providers must charge and thus allows providers to charge rates at or below the caps.[87]  Rate caps set in anticipation of such voluntary action by providers would be unreasonably high.

22.     *Other Methodology Issues*.  Securus claims "the Commission made several additional methodological errors in setting its zone of reasonableness."[88]  It concludes that "[e]ach of these errors (and others) further drove down the boundaries of the zone of reasonableness caps to confiscatory levels and further demonstrates that the Commission's Order is both arbitrary and capricious and contrary to law."[89]  As an initial matter, setting the upper and lower bounds of the zones of reasonableness for IPCS rate caps, while part of the rate setting process, does not set rates and therefore cannot be considered, by itself, to be confiscatory.  These bounds and the zones they prescribe are intermediary steps in the rate cap setting process and function as only several of the many parameters the Commission used to make its final determinations of IPCS rate caps.

---

[81] *Id.*

[82] *Id.*; Public Interest Parties Opposition at 5.  Given these considerations, the Commission correctly departed from the approach it have followed in the *2021 ICS Order*.  Additionally, as the Public Interest Parties argue, "the number of unbilled minutes is {[            ]}, and would have at most only *de minimis* impact on Securus and other providers."  *Id.*  For example, based on the Brattle Group's analysis, the total reported unbilled audio minutes as a percentage of total audio minutes is approximately {[     ]} for Securus and approximately {[     ]} for all providers.  *Id.*  Thus, "excluding unbilled minutes in the calculation of the rates is unlikely to materially impact the actual rate caps."  *Id.*  Material set off by double brackets {[     ]} is confidential and is redacted from the public version of this document.

[83] *2024 IPCS Order* Appx. E at 378-79, para. 4 nn.8-9.

[84] Securus Stay Petition at 10.

[85] *See* 47 CFR § 64.6015 (prohibiting site commissions); *id*. § 64.6000 (site commission "means any form of monetary payment, in-kind payment, gift, exchange of services or goods, fee, technology allowance, or product that a Provider of Incarcerated People's Communications Services or affiliate of a Provider of Incarcerated People's Communications Services may pay, give, donate, or otherwise provide to an entity that operates a Correctional Institution, an entity with which the Provider of Incarcerated People's Communications Services enter into an agreement to provide Incarcerated People's Communications Services, a governmental agency that oversees a Correctional Facility, the city, county, or state where a Facility is located, or an agent of any such Facility").

[86] *2024 IPCS Order* Appx. E at 379, para. 4 n.9.

[87] *Id.* at 130, para. 237 (declining to preempt state or local laws and regulations requiring rates lower than the caps the Commission adopted in the *2024 IPCS Order*).

[88] Securus Stay Petition at 10.

[89] *Id.* at 11.

23.    *Inflation*.  Securus mistakenly claims that the Commission "refused to account for the impact of inflation when setting its rate caps."[90]  The Commission expressly acknowledged accounting for inflation as one of a number of factors used in setting its rate caps.  It stated that "[s]etting rate caps above the lower bounds will help to account for . . . any inflation not offset by productivity growth."[91]  In addition, the Commission acknowledged advocacy in the record in favor of incorporating an inflation factor in its rate caps but found that an inflation factor was not appropriate.[92]  It noted that commenters favoring the use of an inflation factor "generally fail to acknowledge the role that productivity increases play in offsetting inflation."[93]  As a point of comparison, the Commission acknowledged its findings in a separate proceeding for price cap carriers that inflation and productivity gains generally tended to offset each other.[94]  Finally, the Commission noted that inflation in the telecommunications industry was generally lower than in the economy as a whole.[95]

24.    *Compliance Costs*.  Securus asserts that the Commission "excluded the costs of complying with its new rules from its rate cap calculations."[96]  While the Commission stated that it generally excluded one-time implementation costs as being inappropriate for inclusion in permanent rate caps,[97] it nonetheless included compliance costs as a factor in its rate setting, contrary to Securus' argument.  Specifically, in deciding to set rate caps above the lower bounds of the zones of reasonableness, it factored into its calculations the possibility that providers' costs of implementing the Commission's actions "may, on balance, exceed their ongoing savings from" implementing Commission rules that lower their costs.[98]  The Commission took "the conservative approach of setting [its] rates somewhat above the lower bounds to account for" these and other costs providers may incur.[99]

25.    *Omitting Facility Costs From Lower Bounds*.  Securus claims that the Commission erred in "omitt[ing] all facility costs from the lower bound," which it claims contributed to driving down the

---

[90] *Id.*

[91] *2024 IPCS Order* at 118-19, para. 213 ("Setting rate caps above the lower bounds will help to account for the possibility that the adjustments we applied to providers' reported costs to obtain the lower bound estimates were too aggressive, to account for the possibility that aspects of our evaluation of used and useful costs to provide IPCS may be inaccurate to some degree, to account for any inflation not offset by productivity growth, and to ensure that providers will be better able to recover their costs of providing TRS.").

[92] *Id.* at 67-68, para. 129.

[93] *Id.* at 68, para. 129.

[94] *Id.* at 68, para. 129 n.433.  *See Business Data Services in an Internet Protocol Environment, et al*., WC Docket No. 16-143 et al., Report and Order, 32 FCC Rcd 3459, 3559, para. 244 (2017), remanded in part sub nom., *Citizens Telecomms. Co. of Minn, LLC v. FCC*, 901 F.3d 991 (2018) (finding, in a price cap setting, that productivity gains over a period of 12 years "were almost exactly offset by inflation").

[95] *See 2024 IPCS Order* at 68, para. 129 n.431 ("Over the last decade, the average annual change of the Telecommunications PPI was 0.7%, as compared to the average annual change of the broader GDP Deflator over the same time period of 2.6%."); *see also* Letter from Chérie R. Kiser, Cahill Gordon & Reindel LLP, Counsel to Global Tel*Link Corporation d/b/a ViaPath Technologies, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-61 and 12-375, Attach., Report in Support of *Ex Parte* Presentation of Global Tel*Link Corp., at 26-28 (filed June 13, 2024) (showing that, historically, growth in the Telecommunications PPI has been lower, on average, than general measures of inflation); Public Interest Parties Opposition at 6 (noting that "[p]ermitted costs in the telecommunications industry have either declined or been stable for a significant period, suggesting it is not clear whether an adjustment for inflation would increase or decrease rates").

[96] Securus Stay Petition at 11.

[97] *2024 IPCS Order* at 119, para. 214.

[98] *Id.*

[99] *Id.*

zones of reasonableness "to confiscatory levels."[100]  Here again, Securus focuses only on an intermediary step in the Commission's rate setting process—the lower bounds.  While the Commission appropriately excluded any estimate of facility costs from the lower bound of the zone of reasonableness given the absence of reliable facility cost data,[101] Securus fails to acknowledge that the Commission included a generous estimate of facility costs in the upper bound.[102]  The Commission observed that "[t]his balancing reflects our recognition, on the one hand, that correctional facilities may well incur used and useful costs in allowing access to IPCS, with the absence of any basis in the record that would enable us to estimate those costs with any degree of precision."[103]  The Commission concluded that "[g]iven the likelihood that the estimate we accepted for the upper bounds is overstated, we find that using a lower estimate of these costs at the lower bounds minimizes reliance on flawed data while we still provide for the opportunity to recover costs for providing IPCS through our process for determining rate caps."[104]  Ultimately, contrary to Securus's assertions, the Commission incorporated facility costs into its final rate caps by utilizing facility costs as one of several factors in driving its final rate caps above the lower bounds.[105]

26.    *Cost of Capital*.  Securus contends that the Commission "adopted too low a cost of capital for its lower bound that ignored record evidence of the actual costs of capital," which it claims contributed to driving down the lower bounds of the zones of reasonableness to "confiscatory levels."[106]  Securus was one of two IPCS providers that sought to demonstrate a higher cost of capital than the default cost of capital most IPCS providers used in their data submissions.[107]  The Commission conducted a detailed analysis of Securus's claims for its cost of capital and found that certain aspects of its cost of capital analysis were flawed.[108]  It found that "Securus relies on a number of aggressive and insufficiently justified assumptions to develop its [cost of capital] estimate."[109]  The Commission concluded that Securus "failed to meet [its] burden of justifying the alternative [cost of capital]" it proposed and therefore determined that "the most reasonable approach for factoring the [cost of capital] into our lower bounds is to apply the default [cost of capital] figure."[110]  While Securus claims that the cost of capital

---

[100] Securus Stay Petition at 11.

[101] *2024 IPCS Order* at 92, para. 166 ("Despite these numerous and repeated public attempts to obtain relevant data, commenters have neither provided updated facility cost data nor proposed a methodology that would allow the Commission to accurately estimate used and useful correctional facility costs.").

[102] *Id.* at 93, para. 168 (conceding that "even the 2021 data analysis suggested that the $0.02 per minute interim allowance might have been too high").  *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9579-80, 9755-56, paras. 135-36 & Appx. H (2021) (*2021 ICS Order*).

[103] *2024 IPCS Order* at 93, para. 168.

[104] *Id.* at 111, para. 201; *see also, e.g.*, *id.* at 121, para. 218 (discussing the Commission's conclusion "that our rate caps do not threaten providers' financial integrity such that they could be considered confiscatory").

[105] *Id.* at 118-19, para. 214 (recognizing "several specific factors that guide us to select rate caps above our lower bounds" including that "facilities may incur certain costs that are used and useful in the provision of IPCS").  And in the unlikely event that a given provider can demonstrate that the adopted rate caps would result in confiscatory rates under its specific circumstance, it can seek a waiver.

[106] Securus Stay Petition at 11.

[107] *See, e.g.*, *2024 IPCS Order* Appx. I at 410-14, paras. 3-37.

[108] *Id.*

[109] *Id.* at 426, para. 37.

[110] *2024 IPCS Order* at 112-13, para. 203; Public Interest Parties Opposition at 6 (arguing that "Securus has not provided any evidence that the riskiness of IPCS is greater than that of the telecommunications sector in general to justify using a cost of capital value that is higher than the standard" cost of capital).

adopted by the Commission was too low, it fails to explain why Commission's decision was not reasonable or provide any additional information or analysis that would rebut the Commission's findings.

27.    *Use of Brattle Group Model as a Validator.*  Securus also claims that the Commission's limited use of the results of the Brattle Group Model represented a methodological error in setting its IPCS rate caps.[111]  The Brattle Group developed and introduced in the record a model estimating the costs of providing IPCS.[112]  The "model carrier approach . . . set rates by reference to general telecommunications industry-average costs for non-IPCS calls" and "adjust[ed] for costs that may be particular to the provision of service in incarceration facilities."[113]  The Commission considered the model but "decline[d] to adopt a model carrier approach to establish the rates for either audio or video IPCS."[114]  Instead, the Commission analyzed the model as one of three different sources to validate its lower bounds.[115]  The limited reliance the Commission placed on the model as one of several sources to validate its lower bounds does not rise to the level of a methodological flaw that would justify a stay.[116]  This is particularly true given the Commission's assessment that the validation provided by the Brattle Group model was treated as merely supportive—rather than dispositive—to the Commission's lower bound determination, which was itself a step removed from the actual establishment of rate caps above that lower bound.

28.    *Compliance Date for Ancillary Service Charges.*  Securus argues that the *2024 IPCS Order* "is ambiguous about when its prohibition of separate fees for ancillary services takes effect."[117]  It asks "the Commission [to] clarify . . . the compliance deadline for the elimination of ancillary service charges.[118]  On the contrary, the Commission in the *2024 IPCS Order* makes clear that the prohibition on separate fees for ancillary services takes effect 60 days after notice in the Federal Register.  Securus even appears to concede this lack of ambiguity when it correctly resolves its own uncertainty, stating elsewhere in its Petition that "the Order unambiguously provides an extended compliance date only for its new rate caps and its elimination of site commissions" and further states that "the Order is clear that other changes – except those subject to OMB review under the Paperwork Reduction Act – go into effect on

---

[111] Securus Stay Petition at 11.

[112] The initial model was filed on July 12, 2023 and a revised model was filed on February 11, 2024.  *See* Wright Petitioners et al. Reply, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Report (filed July 12, 2023); Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Report (filed Feb. 11, 2024).

[113] *2024 IPCS Order* at 65, para. 126.  Securus also claims that the "Brattle Group Model [] purported to derive an 'industry' model relying heavily on retail rates of resellers of *a single European company*."  Securus Stay Petition at 11 (emphasis in original).  Securus, however, does not claim that the wide range of rates the Brattle Group used to estimate VoIP costs are not representative of per minute costs generally in the VoIP industry.  *See* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Group, Response to the FCC's Implementation of the Martha Wright-Reed Act, at III-7, fig. 1 (filed July 12, 2024) (Brattle July 12, 2024 Report) (showing a range of cost per minute of 64 VoIP providers between $0.000 and $0.024).  Even at the high end of that range, the Brattle Group Model would generate cost estimates that would validate the Commission's audio IPCS rate caps.

[114] *2024 IPCS Order* at 65, para. 126.

[115] *Id.* Appx. I at 425-28, paras. 69-79.

[116] *Id.* at 428, para. 79 ("Staff acknowledge that the model carrier is not a substitute for a fully distributed cost analysis of provider investments and expenses." . . . However, staff are encouraged that the benchmark audio IPCS rates estimated by the revised model align closely with the lower bounds we have established, which helps to validate both our lower bound estimates and the rate caps that we ultimately adopt.").

[117] Securus Stay Petition at 11.

[118] *Id.* at 12.

November 19, 2024."[119]  The *2024 IPCS Order* is clear:  the "reforms eliminating site commission and [the] new permanent audio and interim video rate caps will take effect 60 days after notice of them is published in the Federal Register, but compliance with those reforms will be required on a staggered basis."[120]  It further provides that "all other rules and requirements adopted in this Order also will take effect 60 days after notice is published in the Federal Register."[121]  The rules adopted by the Commission in the Order are equally clear regarding the applicability of compliance deadlines.  The rules addressing rate caps and site commissions include provisions imposing different compliance deadlines depending on the status of the contract, the size of facility, and whether site commissions are legally mandated[122]  The rule prohibiting ancillary service charges does not.[123]

29.    Securus asserts that "the Order fails to explain why this one aspect of its rate structure reform should take effect earlier than the rest of it."[124]  Securus is incorrect.  As the Commission explained in the *2024 IPCS Order*, the compliance dates for the rate caps and the site commission prohibition as opposed to other reforms were deferred because "[t]hese timeframes recognize that, as a general matter, IPCS providers, governmental officials, and correctional officials may need additional time . . . to renegotiate contracts" and, in the case of legally mandated site commissions, "more time may be needed to accommodate the legislative process to amend state or local laws and regulations that currently require site commission payments."[125]  Securus claims that it "detailed the difficulties in complying with the many operational changes that the Order imposes on IPCS" but fails to cite any source detailing its alleged challenges in implementing the changes to the ancillary service rules.[126]  Apart from citing revenues it will forego, Securus makes no claim that it would experience any specific operational difficulties eliminating ancillary service charges.  It also does not claim that any State or local law mandates ancillary service charges.  In short, the rationales for extending the compliance dates for rate caps and the site commission prohibition generally do not apply to eliminating ancillary service charges.[127]  Securus provides no rational basis to upend the Commission's previous conclusion that it does "not view these other reforms as involving similar complexities such that a longer effective date period is necessary."[128]

30.    Securus thus has failed to establish that its challenges to the Commission's actions are likely to succeed on the merits.

---

[119] *Id.* at 11; *see also* Stephen Raher Opposition at 3 (noting that the effective date of the Commission's prohibition of separate ancillary service charges is "not ambiguous").

[120] *2024 IPCS Order* at 304, para. 587.

[121] *Id.* at 308, para. 595.

[122] 47 CFR §§ 64.6010(d), 6015(a)(2), (3).

[123] 47 CFR § 64.6020.

[124] Securus Stay Petition at 12.

[125] *2024 IPCS Order* at 305, para. 588.

[126] Securus Stay Petition at 12.

[127] Securus claims that it  {["

."]}  *Id.* at 14.  The Commission determined that "the compliance dates we adopt for our new audio and video rate caps and site commission reforms "'strike[] a reasonable balance between []' . . . the need for expedited reform contemplated by the Martha Wright-Reed Act with the need to allow IPCS providers and correctional facilities sufficient time to adapt to our rules."  *2024 IPCS Order* at 305, para. 589.  Extending compliance dates for implementing the Commission's ancillary service charge reforms did not represent the same balance of interests.  The Commission did not consider ceasing to assess ancillary service charges on consumers to fall outside of the normal scope of a change of law provision.

[128] *2024 IPCS Order* at 308, para. 595.

### B.    Securus Fails to Show It Will Suffer Irreparable Harm

31.    Securus likewise fails to demonstrate that it would suffer imminent and irreparable harm without a stay. To establish irreparable harm, a petitioner must show that it will suffer injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"[129] In doing so, the petitioner must present actual evidence to "substantiate [its] claim" of injury.[130] "'Bare allegations of what is likely to occur are of no value' under this factor, because we 'must decide whether the harm will *in fact* occur.'"[131] Securus has not met its burden to make and substantiate these showings.[132]

32.    Securus alleges it will "suffer {[                                                   ]}" if the *2024 IPCS Order* is not stayed, and that the prohibition on ancillary service charges will amount to a loss of "{[
                                              ]}"[133] Securus also asserts that even if the prohibition on ancillary service charges were to take effect beginning January 2025, it would nonetheless {[                                                                                                ]}[134] We find Securus has not substantiated these contentions. To the contrary, as described in the *2024 IPCS Order*, the new rate caps include recovery of all costs of providing ancillary services.[135] Claims of lost revenue are therefore misleading; in the long term, the Commission's IPCS rate caps allow providers to recover all ancillary service charge costs as part of their per-minute charges.[136] Further, to the extent that Securus will not have fully instituted the new rate caps, they will continue to charge above-cost rates in the interim.[137] We therefore find claims of such ongoing losses meritless, and find no irreparable harm stemming from Securus's purported lost revenues.

33.    In addition, Securus speculates that it "{[
    ]}" to account for the prohibition of ancillary service charges.[138] Again, Securus provides no support for this assertion, demonstrating neither the necessity of renegotiation nor the scope of affected contracts. As the Commission observed in the *2024 IPCS Order*, the record suggests that "providers can

---

[129] *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see Ligado Stay Denial Order*, 36 FCC Rcd at 1267, para. 10.

[130] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

[131] *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Order, CC Docket No. 96-98, 11 FCC Rcd 11754, 11757, para. 8 (1996) (quoting *Wis. Gas*, 758 F.2d at 674).

[132] We note that in alleging irreparable harm, Securus does not claim harm specifically resulting from the *2024 IPCS Order on Reconsideration* nor the *2024 IPCS Notice* . *See generally* Securus Stay Petition at 13-17.

[133] Securus Stay Petition at 2, 14.

[134] *See id.* at 14; *see also* Dougherty Declaration at 3, para. 10. Securus offers little to no concrete evidence to support the increasing scale of losses which it claims, and it ignores relief from the associated costs. *See* Public Interest Parties Opposition at 7 ("[E]conomic loss ordinarily 'does not, in and of itself, constitute irreparable harm.' . . . Securus has failed to provide any evidence that the various types of revenue loss it claims it would suffer could not be recovered through subsequent legal action." (quoting *In re NTE Conn., LLC*, 26 F.4th 990, 990–91 (D.C. Cir. 2022)).

[135] *See 2024 IPCS Order*, at 68-75, paras. 130-37 (describing ancillary services costs as folded into the rate cap calculation).

[136] *See 2024 IPCS Order*, at 220-29, paras. 408-26.

[137] And insofar as the prohibition on separate charges for ancillary services takes effect before the new rate caps, the new rate caps are in all cases *lower* than the existing rate caps. *See id.* at 3-4, para. 3. Thus, there likewise could be no financial harm while the existing rate caps remain in place.

[138] Securus Stay Petition at 14.

amend their contracts very quick[l]y, or even immediately, following a new statute or regulation," undercutting the purported harm.[139]  Securus then stacks speculation upon speculation, asserting that its "{[                                        ]}" and would be provided "{[
    ]}"[140]  Again, nothing in the record suggests the same and we reject such assertions as speculative and conclusory.

34.    Securus similarly alleges that it will "suffer additional losses when the rate caps begin to apply," up to {[                                        ]}.  However, lower rates are inherently part of rate regulation and entirely consistent with the intent of the Martha Wright-Reed Act to make IPCS more affordable for incarcerated persons and their loved ones.[141]  Furthermore, Securus fails to take into account the likelihood that demand for IPCS will increase as a result of the newly adopted rate caps and consequently reduce the average per-minute costs it observes.[142]

35.    Securus also claims that it will face "sizeable compliance costs" as a consequence of the reforms adopted in the *2024 IPCS Order* and that the Commission "does not account for" these costs.[143]  Securus fails to acknowledge the Commission's consideration of such costs when establishing its rate caps.  In the *2024 IPCS Order*, the Commission "exclude[d] one-time implementation costs" when calculating the lower bounds for its rate caps, explaining that one-time costs "are inappropriate for inclusion in permanent rate caps."[144]  The Commission nonetheless recognized that "providers' ongoing costs of implementing this Report and Order may, on balance, exceed their ongoing savings" under the new rules ("from, for example, not having to process site commission payments").[145]  The Commission accordingly took "the conservative approach of setting [the] rate[] caps somewhat above the lower bounds."[146]  Securus has not shown that it cannot recover its asserted compliance costs within the cushion allowed in the Commission's rate caps.  Thus, Securus fails to demonstrate that that these costs are "beyond remediation."

36.    Securus further alleges that {

                                                                        ]}[147]  We find

---

[139] In fact, record evidence instead suggests that renegotiation may be significantly less burdensome.  *See 2024 IPCS Order* at 74, para. 137 n.466 (suggesting that contact renegotiation can be completed in a 30-day transition period, and finding arguments of "thousands of hours" of renegotiation unpersuasive (internal citation and quotation omitted)).

[140] Securus Stay Petition at 14.

[141] *See, e.g.*, *2024 IPCS Order* at 16, para. 26 n.96; *id.* at 20-21, para. 31 & n.123.

[142] *See, e.g.*, *id.* at 120-21, 301, paras. 217, 581.  The *2024 IPCS Order* cited the Commission's previous estimate of demand elasticity for audio calling services from the *2021 ICS Order* and stated that it "continue[s] to rely on this demand elasticity estimate."  *Id.* at 301, para. 581.  In 2021, the Commission relied in part on estimates submitted by Securus and its consultant, FTI Consulting, Inc.  *See 2021 ICS Order*, 36 FCC Rcd at 9608, para. 200 & n.610.

[143] Securus Stay Petition at 15 (addressing costs related to {

                        ]}).  *But see* Public Interest Parties Opposition at 7 (arguing that "Securus fails to provide any evidence to support the compliance costs its describes").

[144] *2024 IPCS Order* at 119, para. 214.

[145] *See id.*; *see also id.* at 108-09, 118-19, paras. 193, 213.

[146] *Id.* at 119, para. 214.

[147] Securus Stay Petition at 16; *see also* Dougherty Declaration at 5-6, paras. 18-22 (claiming that Securus {[

                                        ]}).
                                                            (continued….)

Securus has not substantiated this allegation. The *2023 IPCS Notice* specifically proposed both of the reforms in question thereby putting Securus on notice that such reforms were under consideration.[148] In particular, Securus should have prepared for the possibility of a per-minute video rate structure, especially given the Commission's historical prohibition on any pricing structure other than per-minute rates.[149] In sum, Securus has been on notice since March 2023, if not earlier, that these reforms might be adopted.[150] Securus also fails to acknowledge the availability of the waiver process, which seems particularly applicable to these concerns, given the variability in the relevance of the reforms in question to the practices of the industry as a whole.[151]

37. Based on the foregoing, we therefore conclude that Securus has failed to demonstrate any imminent, actual irreparable harm resulting from the *Order*.[152]

---

(Continued from previous page) ────────────
Securus further alleges that, in light of this compliance challenge, they will {[

.]}  Securus Stay Petition at 15.

[148] *See 2023 IPCS Notice*, 38 FCC Rcd at 2688, para. 46 (proposing that providers be required to offer video communications services at per-minute rates), 2698-99, paras. 75-76 (observing that "[w]ith the addition of this new category of services to the definition of 'advanced communications services,' some of these services, as well as some equipment used for such services, regardless of technology used, may be newly subject to accessibility requirements under section 716 of the Communications Act," and proposing to amend the Part 14 definition to conform with the statutory definition).

[149] The disability access requirements identified by Securus are primarily concerned with codifying the expanded definition of "advanced communications services" established by the Martha Wright-Reed Act into the Commission's Part 14 rules. *See 2024 IPCS Order* at 253-55, paras. 483-85. Indeed, as the Commission observed, "[t]he record does not indicate to what extent, if at all, there are other audio and video communication services offered by IPCS providers that were not previously included in the definitions of 'telecommunications service' or 'advanced communications services,' and that, accordingly, are newly subject to accessibility requirements under section 716 of the Communications Act and Part 14 of our rules." *Id.* at 255, para. 485. Securus fails to explicate whether, let alone the extent to which, their services and equipment are newly subject to these accessibility requirements.

[150] Securus previously suggested that the reforms in question would require 12 months to implement. *See* Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 27-29 (filed July 11, 2024). By November 19, 2024, over 19 months will have elapsed since the publication of the *2023 IPCS Notice*, allowing Securus ample time to begin preparing for the contemplated reforms. Indeed, Securus seems to have actively contemplated the adoption of per-minute rates for video communications in its own comments in this proceeding. *See, e.g.*, Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, and Marcus W. Trathen and Christopher B. Dodd, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. B, Joint Report by FTI Consultants and Wood and Wood, at 29-30, paras. 56-57 (filed June 10, 2024) (addressing the interquartile range (IQR) methodology applied by Securus's consultant – the approach recommended by Securus for determining rate caps – which derived per-minute video calling rates from providers' cost data).

[151] *See, e.g.*, *2024 IPCS Order* at 102, para. 183 n.653 (observing that Securus "does not quantify or otherwise substantiate" its claim that the new rules impose significant and new operational obligations, "nor does it demonstrate that the waiver process would be inadequate to address any unusual implementation costs that theoretically might arise for a given provider"); *id.* at 237-38, para. 443 (recognizing that "some providers have priced video services at flat rates, and others have priced video services by the minute").

[152] Securus argues that without a stay, it will "lose its ability to challenge the Order's 60-day compliance date." Securus Stay Petition at 16. Securus does not explain how legal challenge will be impossible, and we decline to entertain such unsupported claims.

**Federal Communications Commission**                    DA 24-1031

**C.    Securus Has Not Shown that a Stay Is In the Public Interest and Would Not Harm Other Parties**

38.    Staying the *2024 IPCS Order* is not in the public interest, as a stay would inhibit or delay the Commission's ability to fulfill statutory obligations and policy objectives mandated by the Martha Wright-Reed Act and necessary to protect consumers.

39.    Securus's primary argument that granting a stay would benefit the public interest is that, by "'undermining the investment-backed expectations of correctional facilities for their safety and security costs,' the Order 'could ultimately lead to a reduction in IPCS access or the loss of essential law-enforcement tools,'" with consequent "increases in crime, fraud, or violence for both incarcerated people and their friends and family."[153]  The Commission found similar concerns raised in the record to be generally unsupported,[154] and Securus offers no further substantiation for such claims.  Nevertheless, the Order explicitly accounts for these theorized harms by "extend[ing] the transition deadlines" for the new rate cap and site commission rules,[155] which Securus fails to acknowledge.[156]

40.    Securus further argues that {[

]} as a purported consequence of the losses it may face, offering this both as an irreparable harm as well as a result inimical to the public interest.[157]  We are unconvinced by such speculation.  The Commission is tasked with establishing a compensation plan that results in both just and reasonable rates for IPCS and fair compensation for IPCS providers.  Contrary to Securus' claims, the rate setting methodology used by the Commission in the *2024 IPCS Order* accounted for the costs of research and development.[158]  Securus also fails to recognize the varied benefits of lower prices and other reforms adopted in the *2024 IPCS Order*, such as increased demand for IPCS.[159]

41.    By contrast, granting a stay would be contrary to the public interest because it would delay the benefits of comprehensive reform and otherwise inhibit the Commission's ability to protect consumers.  A stay would effectively force consumers to pay prices above the just and reasonable rates determined in the *2024 IPCS Order* over a prolonged period, while also delaying the associated reforms

---

[153] *Id.* at 17 (quoting *2024 IPCS Order* at 465 (Statement of Commissioner Carr)).

[154] *See 2024 IPCS Order* at 166-67, 209, 307-08, paras. 311-12, 390 n.1399, 594; *id.*, Appx. J at 455-56, para. 7.

[155] *Id.* at 465 (Statement of Commissioner Carr); *see also id.* at 304-08, paras. 587-94 (discussing the extended timeframes for implementing the new rate cap and site commission rules).

[156] Securus also bemoans the fact that "many [incarcerated people] will not see the benefits from the rate caps until 2026," and at the same time complains that those people "will lose out on the updated communications platforms and offerings" that Securus is allegedly stymied from offering due to requirements that apply before 2026.  Securus Stay Petition at 17.  The reforms adopted in the *2024 IPCS* Order necessarily entail a mix of costs and benefits to all parties with an interest in these proceedings.  A stay would only further delay the benefits to incarcerated people from these reforms, a consequence Securus appears to concede is against the public interest.

[157] Securus Stay Petition at 16 (citing "{[                                           ]}"); Dougherty Declaration at para. 24.

[158] *See 2024 IPCS Order* at 38, para. 71 (finding that "a provider will be fairly compensated if the rates and fees it is permitted to charge will afford it an opportunity to recover industry-average costs associated with prudent investments used and useful in providing IPCS and associated ancillary services at the facilities the provider serves"); *id.* at 90, para. 159 ("Under the used and useful framework the Commission . . . looks to the 'equitable principle that ratepayers should not be forced to pay a return except on investments that can be shown to benefit them'."); *cf. id.* at 121, para. 217 (observing that "providers' continuing expansion of an investment into their video IPCS services" will likely result in decreasing providers' average costs per minute); *id.* at 154-55, para. 287 (addressing the use of site commissions to fund social welfare programs "or other costs unrelated to the provision" of IPCS); *see also 2024 IPCS Order* at 62, para. 121, n.398; *id.*, Appx. D at 370, nn.5-6.

[159] *See id.* at 16-18, para. 27.

that also inure to the public's benefit.[160]  For example, and as the Commission observed in the Order, consumers stand to gain from the elimination of ancillary service charges, which are a source of consumer confusion and detrimental provider practices.[161]  The public interest in seeing the Commission's reforms take effect on the schedule prescribed in the *2024 IPCS Order* is especially pronounced given the length of time that incarcerated persons and their friends and family have already shouldered undue financial burdens to keep in touch, particularly when Congress expressly directed the Commission to enact regulations to implement the Martha Wright-Reed Act within 24 months from the statute's enactment.[162]

42.    For all these reasons, we find that Securus has not shown that a stay is in the public interest and would not harm other parties.

## IV.    ORDERING CLAUSES

43.    Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), and the authority delegated pursuant to sections 0.91 and 0.291 of the Commission's rules, 47 CFR §§ 0.91, 0.291, this Order Denying Stay Petition in WC Docket Nos. 23-62 and 12-375 IS ADOPTED.

44.    IT IS FURTHER ORDERED, that the Petition of Securus Technologies, LLC for Stay Pending Judicial Review of the Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (FCC 24-75) is DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Trent B. Harkrader
Chief
Wireline Competition Bureau

---

[160] *See, e.g.*, *id.* at 308, para. 594 ("Any further delays in requiring compliance with our rate cap and site commission reforms risks perpetuating unjust and unreasonable rates and charges for IPCS consumers or yielding unfair compensation for IPCS providers, contrary to the directives of the Martha Wright-Reed Act."); *id.* at 3-4, 229-30, 261-63, 277-78, 301-04, paras. 3, 427-28, 499-501, 530-31, 579-86 (discussing the compelling public interests served by the Order's reforms); Public Interest Parties Opposition at 8 (explaining that "[d]elayed implementation of the new rates would add many millions of dollars of financial burden for incarcerated people and their families each year").

[161] *See 2024 IPCS Order*, at 224-26, 227-29, paras. 418-19, 421-26.

[162] *See id.* at 6-12, paras. 9-20 (recounting over a decade of reform efforts); Martha Wright-Reed Act § 3(a). Additionally, as the Public Interest Parties argue, "[a] stay will cause tremendous harm by depriving consumers of the lower rates, and increased family connection, that Congress sought to achieve through the [Martha Wright-Reed Act]."  Public Interest Parties Opposition at 9.  "Such delay would prevent many incarcerated people from the health, safety, and wellbeing benefits that reliable communications with their loved ones could bring."  *Id.* at 9-10; *see also* Stephen Raher Opposition at 5 (noting that the "public would be harmed by granting the Petition because a stay would extend the long history of unreasonable IPCS rates, even though lowering these rates was the primary motivation behind the enactment of the [Martha] Wright-Reed Act").

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | WC Docket No. 12-375 |
| Rates for Interstate Inmate Calling Services | ) | |

**ORDER DENYING STAY PETITION**

**Adopted:  October 15, 2024**                    **Released:  October 15, 2024**

By the Chief, Wireline Competition Bureau:

## I.    INTRODUCTION

        1.        On October 7, 2024, Pay Tel Communications, Inc. (Pay Tel) filed a petition requesting that the Commission stay its Report and Order in the captioned proceedings pending judicial review.[1]  For the reasons discussed below, we deny Pay Tel's stay request.

## II.    BACKGROUND

        2.        The *2024 IPCS Order* implemented the expanded authority granted to the Commission by the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act),[2] adopting comprehensive reforms that will significantly reduce the financial burdens incarcerated people face to communicate with their loved ones.  The Act amended the Communications Act of 1934, as amended, (Communications Act) to require that the Commission "establish a compensation plan to ensure that all [Incarcerated People's Communications Services (IPCS)] providers are fairly compensated and all rates and charges are just and reasonable for completed" IPCS communications.[3]  Consistent with this Congressional mandate, in the *2024 IPCS Order*, the Commission reduced existing per-minute rate caps for all incarcerated people's audio communication services, and established, for the first time, interim per-minute rate caps for incarcerated people's video communications services.[4]  In establishing these rate caps, the Commission employed the used and useful framework it has used for decades in determining just and reasonable rates, a zone of reasonableness methodology that it had previously used to set rate caps for audio IPCS, and an industry-average cost methodology specifically permitted in the

---

[1] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75 (rel. July 22, 2024) (*2024 IPCS Order* or *Order*, *2024 IPCS Reconsideration Order*, or *2024 IPCS Notice*); *see* Pay Tel Communications, Inc.'s Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375 (filed Oct. 7, 2024) (Pay Tel Stay Petition); Declaration of Don. J. Wood, WC Docket Nos. 23-62, 12-375 (filed Oct. 7, 2024) (Wood Declaration). The Wright Petitioners, United Church of Christ Media Justice Ministry, and Pennsylvania Prison Society (collectively, the Public Interest Parties), filed an opposition to the Pay Tel Stay Petition.  *See* Opposition to Pay Tel Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375 (filed Oct. 14, 2024) (Public Interest Parties Opposition).

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2022).

[3] 47 U.S.C. § 276(b)(1)(A).

[4] *See, e.g.*, *2024 IPCS Order* at 60, para. 119.

**JA1972**
11373

Martha Wright-Reed Act.[5]  In setting the new rate caps, the Commission relied on cost and other data submitted by IPCS providers, including Pay Tel.[6]

3.        In the *2024 IPCS Order*, the Commission also ended IPCS providers' long-standing practice of paying site commission to carceral facilities, the costs of which were passed through to consumers via higher IPCS rates.[7]  The *Order* strengthened the Commission's requirements for access to IPCS by incarcerated people with disabilities; adopted stronger consumer protection rules, including permanent rules addressing providers' treatment of unused funds in inactive IPCS accounts; and permitted providers, for the first time, to offer optional alternate pricing plans, subject to conditions to protect and benefit IPCS consumers.[8]  Although many of the new requirements are effective 60 days after publication in the Federal Register, the Commission established staggered compliance deadlines for the new rate caps and the elimination of site commissions.[9]

4.        On October 2, 2024, the Wireline Competition Bureau (WCB or the Bureau) issued the *Securus Stay Denial Order*, which denied Securus Technologies, LLC's (Securus's) petition for an administrative stay of the *2024 IPCS Order*.[10]  In its October 7, 2024, petition, Pay Tel acknowledges that its legal arguments overlap, to a certain extent, with the legal arguments that we rejected in the *Securus Stay Denial Order*.[11]  Pay Tel contends, however, that a stay pending judicial review is warranted because the *2024 IPCS Order* "is founded on several instances of clear error which create a likelihood of reversal on appeal," because "Pay Tel and other similarly situated [IPCS] providers" will be irreparably harmed if that *Order* is implemented, because a stay "would not injure third parties," and because "the balance of equities favors" such a stay.[12]

**III.    DISCUSSION**

5.        To qualify for the extraordinary remedy of a stay, a petitioner must show that (1) it is likely to prevail on the merits; (2) it will suffer irreparable harm absent the grant of preliminary relief; (3) other interested parties will not be harmed if the stay is granted; and (4) the public interest would favor grant of the stay.[13]  A stay is an "'intrusion into the ordinary processes of administration and judicial

---

[5] *See, e.g.*, *id.* at 65-66, para. 127 (discussing the adoption of rate caps derived from industry average costs); *id.* at 89-90, paras. 159-60 (discussing the used and useful framework and the zone of reasonableness approach).

[6] *See id.* at 102-04, paras. 184-85.

[7] *See, e.g.*, *id.* at 132, para. 245 (prohibiting IPCS providers from paying site commissions of any kind and preempting all state and local laws and regulations requiring or allowing IPCS providers to pay site commissions associated with IPCS).

[8] *See, e.g.*, *id.* at 229-49, 253-61, 261-91, paras. 427-71 (discussing alternate pricing plans), 482-98 (amending the Commission's rules to improve communications for incarcerated people with disabilities), 499-556 (discussing reforms to the Commission's consumer protection rules).

[9] *Id.* at 304-08, paras. 587-94.  The Commission also issued the *2024 IPCS Reconsideration Order*, which resolved various petitions seeking reconsideration of, clarification of, or waivers from prior Commission orders.  *See 2024 IPCS Reconsideration Order* at 309-12, paras. 599-607.  Additionally, the Commission issued the *2024 IPCS Notice* to obtain additional public comment on IPCS-related issues that it could not resolve on the record then before it.  *See 2024 IPCS Notice* at 312-319, paras. 608-24.

[10] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, Order Denying Stay Petition, DA 24-1035 (WCB rel. October 2, 2024) (*Securus Stay Denial Order*).

[11] Pay Tel Stay Petition at 1.

[12] *Id.* at i-ii.

[13] *Securus Stay Denial Order* at para. 6; *see LightSquared Technical Working Group Report*, Order Denying Motion for Stay, IB Docket No. 11-109, 36 FCC Rcd 1262, 1266, para. 8 (2021) (*Ligado Stay Denial Order*) (citing *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)).

review,' . . . and accordingly 'is not a matter of right, even if irreparable injury might otherwise result'" to the movant.[14]  The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.[15]  Pay Tel has failed to meet that burden.[16]

**A.      Pay Tel Has Not Shown It Is Likely to Prevail on the Merits**

6.      To show likelihood of success on the merits, a petitioner must make a "strong showing" that it is likely to succeed;[17] a "mere possibility of relief" is insufficient.[18]  As the D.C. Circuit has recognized, "[w]ithout such a substantial indication of probable success, there would be no justification for . . . intrusion into the ordinary processes of administration and judicial review."[19]  Pay Tel principally argues that the *2024 IPCS Order* is inconsistent with the requirements of the Martha Wright-Reed Act and section 276(b)(1)(A) of the Communications Act because it set rate caps that fail to ensure that all IPCS providers are fairly compensated; excluded most categories of IPCS safety and security measure costs from its ratemaking calculus; failed to allow correctional facilities "to recover their demonstrated costs associated with providing IPCS"; and committed "other methodological errors exacerbating the harm to providers."[20]

7.      *Fair Compensation for IPCS Providers*.  Pay Tel argues that the Commission set rate caps that "fail to ensure that 'all' IPCS providers are 'fairly compensated'" and critiques the Commission's application of the fair compensation standard in section 276(b)(1)(A) in several respects.[21]  We find none of Pay Tel's arguments persuasive.  Pay Tel first asserts that the Martha Wright-Reed Act allows the Commission to use industry-wide average costs in setting rate caps, it also may use individual provider costs in setting rates and "must allow *all* IPCS providers to recover their prudently-incurred costs."[22]  This argument was raised in the rulemaking and, as we stated in denying Securus's request for a stay, "the *2024 IPCS Order* squarely addressed it."[23]  As the Commission explained, the

---

[14] *Nken*, 556 U.S. at 427 (internal citations omitted); *Securus Stay Denial Order* at para. 6.

[15] *Securus Stay Denial Order* at para. 6; *Ligado Stay Denial Order*, 36 FCC Rcd at 1266, para. 8 (citing *Nken*, 556 U.S. at 433-34).

[16] Although Pay Tel challenges only certain aspects of the *2024 IPCS Order*, it requests that we stay that *Order*, including the rules it adopts, in its entirety.  Pay Tel Stay Petition at 1 n.1.  Pay Tel's support for this request consists of statements that the *2024 IPCS Order* and accompanying rules were "adopted as part of a comprehensive plan of regulation which should be considered together as such" and "the segregation of individual components of the plan can lead to anomalous results."  Pay Tel Stay Petition at 1 n.1.  Those statements fall far short of meeting the stay criteria and, in any event, are inconsistent with the Commission's determinations, in the *2024 IPCS Order*, that "each of the rules and policies adopted" in that *Order* "shall be severable" from each other and that if any of those "rules or policies is declared invalid or unenforceable for any reason, the unaffected rules shall remain in full force and effect."  *2024 IPCS Order*, at 309, para. 598.  *See also* Public Interest Parties Opposition at 3 ("Pay Tel seeks an overbroad stay of the entire [Martha Wright-Reed Act] Order while only addressing one aspect of the reforms adopted under the Order.").

[17] *Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[18] *Id.* at 434 (internal quotation marks omitted).

[19] *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

[20] Pay Tel Stay Petition at 7.

[21] *Id.* at 7-11.

[22] *Id.* at 7 (emphasis in original); *see also* Martha Wright-Reed Act § 3(b)(1) (explaining that the Commission "may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider" in "determining just and reasonable rates").

[23] *Securus Stay Denial Order* at 4, para. 7; Public Interest Parties Opposition at 3 (arguing that "Pay Tel simply rehashes an argument that the Commission . . . has already rejected").

statutory mandate of fair compensation "need not be evaluated on a provider-by-provider basis."[24]  The Martha Wright-Reed Act "is clear that the Commission may use 'industry-wide average costs' in setting just and reasonable rates under section 276(b)(1)(A)."[25]  The Commission thus concluded that "a provider will be fairly compensated if the rates and fees it is permitted to charge will afford it an opportunity to recover industry-average costs associated with prudent investments used and useful in providing IPCS and associated ancillary services at the facilities the provider serves."[26]

8.      In a similar vein, Pay Tel also argues that the Commission "effectively reads the 'fair compensation' requirement out of [s]ection 276 by collapsing it with, and giving primacy to, the new language added in the [Martha Wright-Reed Act] that the Commission ensure that 'all rates and charges are just and reasonable.'"[27]  This argument was also raised in the rulemaking and squarely addressed in the *2024 IPCS Order*.[28]  There, the Commission explained that "giving effect to both standards requires a balanced approach that 'emphas[izes] consumers' (particularly incarcerated people's) and provider's right to just and reasonable rates and charges for each audio and video communications service now encompassed within the statutory definition of 'payphone service,' as well as ensuing that such rates ensure that 'all payphone providers are fairly compensated.'"[29]  Contrary to Pay Tel's assertion, the Commission's "rate-making methodology and the statutory interpretation of the Martha Wright-Reed Act ensure that both standards are given full effect."[30]

9.      Pay Tel also selectively relies on certain statements in the *2024 IPCS Order* that it contends demonstrate infirmities with the Commission's application of the fair compensation mandate.[31]  Pay Tel asserts that "of the twelve IPCS providers selected by staff for analysis, four of the twelve (i.e., 33%) will not be able to recover their demonstrated costs under the Order's rate caps."[32]  Pay Tel argues that "dismissal of one-third of the control group conflicts with the clear policy of [s]ection 276 to 'promote competition' among providers" and that "implicit in the Order's reasoning is the flawed assumption that the domination of the industry by one or two providers is a desirable outcome intended by the [Martha Wright-Reed Act]."[33]  We disagree.  In the *2024 IPCS Order*, the Commission properly

---

[24] *2024 IPCS Order* at 37, para. 69; Public Interest Parties Opposition at 3 (asserting that Pay Tel's "attack on Congress's decision to permit setting just and reasonable rates on an industry-wide, rather than provider-by-provider, basis 'ignores the fact that fair compensation does not require the Commission to adopt rate caps which allow for the recovery of inefficiently incurred costs.'" (citing *2024 IPCS Order* at 122, para. 219 n.778)).

[25] *Securus Stay Denial Order* at 4, para. 7.

[26] *2024 IPCS Order* at 38, para. 71; *2024 IPCS Order* at 66, para. 127 (explaining that "using industry average costs to set rates will best ensure rates that are just and reasonable for consumers and providers and provide fair compensation for providers"); Public Interest Parties Opposition at 4 ("Adopting rate caps based on average costs naturally means that some IPCS providers' reported costs will be below their revenue at the rate caps. This is an outcome that Congress has deemed acceptable when it empowered the Commission to use industry-average costs to set 'just and reasonable' rates.").

[27] Pay Tel Stay Petition at 7-8 (quoting 47 U.S.C. § 276(b)(1)(A)).

[28] *2024 IPCS Order* at 33, para. 60 n.207 (rejecting a claim that the *Order* collapses the fair compensation standard into the just and reasonable standard).

[29] *Id.* at 33, para. 60 (quoting *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669, 2675-76, 2697-98, paras. 14, 73 (2023)).

[30] *2024 IPCS Order* at 33, para. 60 n.207.

[31] *Cf. Securus Stay Denial Order* at 5, para. 10 (rejecting a similar argument from Securus "insofar as it selectively relies on certain statements in the *2024 IPCS Order*").

[32] Pay Tel Stay Petition at 8 (footnote omitted).

[33] *Id.* at 8-9.

"reject[ed] claims that [its] actions could harm competition."[34]  The Commission explained that "[c]ompetition should not be mistaken for the number of competitors" and that competition "delivers lower prices, adjusted for quality, and . . . may sometimes drive out inefficient competitors."[35]  Pay Tel also fails to account for the fact that the Commission's estimate of IPCS providers that it projected would have potential revenues exceeding reported costs was "conservative" and that the Commission "likely underestimate[d] the extent to which providers w[ould] be able to recover their costs under [the Commission's] rate caps."[36]

10.    Pay Tel then claims that "the Order's mathematical computation of market share fails to grapple with the substance of the problem created at the facility level."[37]  It argues that "[e]ven for the eight providers whose *total* revenue . . . is projected to exceed *total* reported expenses" that will not be true for each facility those providers serve, thus denying cost recovery "at almost 30% of the facilities serviced by the eight providers who are expected to recover their overall costs at a company level."[38]  According to Pay Tel, when "[c]ombined with the facilities put at risk for the four providers not recovering their costs, some {[     ]} facilities are at risk under the Commission's new regulatory approach—representing 31% of all jails and prisons studied by the Commission in setting rate caps."[39]  Pay Tel assumes that "most, if not all, of the facilities at risk are jails" and concludes that "approximately one-half of all jails currently receiving IPCS are at risk of losing service."[40]

11.    As to Pay Tel's initial argument that the Commission "must allow *all* IPCS providers to recover their prudently-incurred costs,"[41] in the *2024 IPCS Order*, the Commission concluded that "a provider will be fairly compensated if it is afforded an opportunity to recover the industry average of [the prudently incurred investments and expenses that are used and useful in the provision of IPCS] on a company-wide basis" rather than on a facility-by-facility basis.[42]  This conclusion is anchored in the Martha Wright-Reed Act's grant of "explicit authority" to use industry-wide average costs in setting IPCS rates.[43]  As the Commission observed, "[u]se of industry-wide average costs, of necessity, evaluates provider compensation on a more aggregated—rather than provider-by-provider—basis."[44]

12.    Furthermore, Pay Tel ignores the fact that the Commission's rate cap structure was designed to capture the differences in costs across facilities of all types and sizes, to the extent the data permitted.  Thus, in setting IPCS rate caps, the Commission adopted "a rate cap structure that first

---

[34] *2024 IPCS Order*, Appx. J at 455, para. 7.

[35] *Id.*

[36] *Id.* at 121, para. 217.

[37] Pay Tel Stay Petition at 9.

[38] *Id*. at 9 (emphasis in original); Wood Declaration at para. 21.

[39] *Id*. at 10; Wood Declaration at para. 22.  Material set off by double brackets {[ ]} is confidential and is redacted from the public version of this document.

[40] Pay Tel Stay Petition at 10.

[41] *Id*. at 7 (emphasis in original).

[42] *2024 IPCS Order* at 122, para. 219.

[43] *Id*. at 36, para. 68; Martha Wright-Reed Act § 3(b)(1).  *See also* Public Interest Parties Opposition at 5 ("At bottom, Pay Tel essentially ignores Congress's decision to shift away from a per-call compensation scheme under the [Martha Wright-Reed Act].  Specifically, in the [Martha Wright-Reed Act], Congress amended the section 276 'fair compensation' requirement to no longer ask that the Commission evaluate payphone rates on a per-call basis or ensure that providers were fairly compensated for 'each and every' completed call. . . .  Pay Tel's argument seeks to undo this shift.").

[44] *2024 IPCS Order* at 36-37, para. 68.

distinguishes between two types of facilities (jails and prisons) and then four tiers of jails based on size."[45] The Commission did so as part of its implementation of the directive in the Martha Wright-Reed Act to "consider . . . differences in the costs" incurred to provide IPCS "by small, medium, or large facilities."[46] Because record data did "in fact, indicate significant variations in costs due to facility size" the Commission decided to adopt a "more granular tiering structure" to better capture cost differences between facilities of different sizes.[47]

13.    We also find unpersuasive Pay Tel's assertion that one half of all jail facilities risk losing service under the Commission's rate caps. Pay Tel has not substantiated this assertion and otherwise ignores the Commission's analysis of the effect of its IPCS rate caps on small jails in the *2024 IPCS Order*. As the Commission explained, "[c]ontrary to some claims, which argue that [the Commission's] rate caps impact smaller providers and thus smaller facilities, provider size is no predictor of the choice to serve very small jails."[48] In fact, "{[

]}"[49] Thus, "it is implausible that [the Commission's] caps will prevent supply in small jails."[50] Pay Tel asserts that its claim regarding a potential for loss of service "relies specifically on the Commission's analysis as reflected in the order" but adds nothing more than speculation on this point.[51] We are thus unconvinced by Pay Tel's arguments.

14.    Finally, Pay Tel takes issue with the fact that the *2024 IPCS Order* references "efficient" and "inefficient" providers in connection with its discussion of cost recovery.[52] Specifically, Pay Tel alleges that the *2024 IPCS Order* "applies a circular definition of 'efficiency' in which the 'inefficient' providers are deemed as such only because their average costs exceed the average cost of the dominant providers after erroneously and arbitrarily rejecting the majority the safety and security costs reported by those companies."[53] To the extent safety and security costs are included, Pay Tel states that its reported costs "are consistent with industry average costs and consistent with the operation of an efficient provider."[54] Pay Tel's argument thus relies primarily on the notion that the Commission improperly excluded certain safety and security costs, and we therefore take it up with its other arguments about

---

[45] *Id.* at 79, para. 146.

[46] Martha Wright-Reed Act § 3(b)(2). As the Public Interest Parties highlight, "the Commission . . . found that 72% of all reported facilities would have capped revenues in excess of costs" (citing *2024 IPCS Order*, Appx. J at 454-55, para. 6)).

[47] *2024 IPCS Order* at 81-82, paras. 148, 150. "The Commission sensibly 'decline[d] to set rate caps that ensure cost recovery for providers with unusually high costs because to let unusual cases determine rates generally would result in unjust and unreasonable rates,' contrary to the independent mandate of section 276(b)(1)(A). Instead the Commission made clear that 'if such providers exist, they can seek a waiver.'" *Securus Stay Denial Order* at 4-5, para. 8 (footnote omitted).

[48] *2024 IPCS Order*, Appx. J at 454, para. 6.

[49] *Id.*, Appx. J at 454-55, para. 6; *see also id.*, Appx. J at 454, para. 6 n.14 (noting that "the eight providers which already have revenues less site commissions beneath [the Commission's] caps serve an overwhelming number of small and very small facilities, as well as medium and large facilities").

[50] *Id.*, Appx. J at 455, para. 6.

[51] Pay Tel Stay Petition at 10 (alleging that the *2024 IPCS Order* "possibly" puts at risk service in one half of all jails).

[52] *Id.* at 10; Wood Declaration at para. 23.

[53] Pay Tel Stay Petition at 10-11 (emphasis omitted).

[54] *Id.* at 11. *See also* Public Interest Parties Opposition at 5 ("Pay Tel attempts to blame any potential inefficiencies on the Commission's decision to prohibit the recovery of certain safety and security costs under the new rates. However, 'excluding certain costs is precisely the task that Congress required the Commission to perform' under the [Martha Wright-Reed Act]." (quoting *Securus Stay Denial Order* at 5, para. 9)).

safety and security costs below.

15.    *Treatment of Safety and Security Costs.*  Pay Tel contends that the Commission's handling of providers' varying safety and security costs made Pay Tel appear to be an inefficient provider.  But Pay Tel unwittingly supplies the response to its own critique in observing that "[t]he percentage of total service costs reported as falling into one of the seven Safety & Security categories varied significantly by Provider."[55]  Indeed, the Commission acknowledged that the categories of safety and security costs reported in the 2023 Mandatory Data Collection were "imprecise."[56]  It also acknowledged that "providers' allocations of their safety and security costs are at times inexact among these categories."[57]  To account for the imperfect nature of the data, the Commission evaluated the categories of safety and security measures "based on the nature of the preponderance of tasks or functions within each category.  If the predominant uses of tasks and functions within a category [were] not used and useful, the entire category [was] treated as not used and useful" in establishing the lower bounds of the Commission's zones of reasonableness.[58]  The Commission also adjusted its rate setting within those zones "to develop overall rate caps that recognize the imprecision of both the seven defined safety and security categories in the 2023 Mandatory Data Collection, and the inconsistencies in the narrative descriptions and varied allocations made in provider responses."[59]  These adjustments provided the Commission with a workable methodology to conduct a thorough and orderly review of the safety and security cost data in the record under the used and useful framework.

16.    Thus, in constructing the lower bounds of the zones of reasonableness, the Commission appropriately removed "costs of those categories of safety and security measures that [the Commission found] generally . . . not used and useful in the provision of IPCS."[60]  In doing so, it actually "retain[ed] a significant portion of providers' reported safety and security costs, i.e., $180 million."[61]  But the Commission concluded that incorporating into its lower bounds those safety and security costs that it found not to be used and useful "would run counter to the purposes and language of the Martha Wright-Reed Act and would fail to yield just and reasonable rates."[62]  Thus, contrary to Pay Tel's assertions, the Commission's treatment of certain safety and security costs was informed by the limitations of the data before the Commission and the dual requirements of the Martha Wright-Reed Act to ensure just and reasonable rates and charges for IPCS consumers and fair compensation for IPCS providers.

17.    Pay Tel argues that the Commission erred in its evaluation and treatment of safety and security costs in several respects, none of which we find persuasive.[63]  First, Pay Tel suggests that the Commission "explicitly rejects the notion that the IPCS [sic] has any responsibility to 'protect the general public' and 'ensure'" that IPCS are used safely.[64]  Here again the Commission spoke clearly in the *2024*

---

[55] Wood Declaration at para. 24; *see also id.* at para. 23 (noting that "the cost distinctions observed between Providers for both audio and video IPCS are largely an artifact of how each Provider reported costs associated with Safety & Security").

[56] *2024 IPCS Order* at 205, para. 385.

[57] *Id.*.

[58] *Id.*

[59] *Id.* at 206, para. 387.

[60] *Id.* at 111, para. 200.

[61] *Id.*

[62] *Id.* at 111-12, para. 200.

[63] *See generally* Pay Tel Stay Petition at 11-15.

[64] *Id.* at 12 (quoting *2024 IPCS Order* at 202, para. 380).

*IPCS Order* when it rejected the same argument from Pay Tel.[65]  The Commission "do[es] not dispute, and indeed the Commission has long recognized, that communications services for incarcerated people occur in a unique context" and, as a result, "the Commission has recognized that there are certain features that ensure these communications services are available to incarcerated people and can be used safely."[66]  But the Commission noted that the need to ensure the safe use of IPCS "do[es] not overcome [the Commission's] responsibility here where incarcerated people or their loved ones are the ones paying for and using IPCS subject to Commission-specified rate regulations."[67]  Nothing has changed since the Commission made these statements.

18.    Pay Tel also argues that the Commission adopted a "newly-minted user benefit standard" in its application of the used and useful framework, which "improperly fails to give weight to the technology and service configuration determinations of the local governmental entities tasked with operating confinement facilities and providers who are experts on their systems and the technology needed to keep IPCS safe and secure" and ignores that "IPCS users are the 'causers' of the safety and security costs in question."[68]  We disagree.

19.    The Commission did not adopt a new "user benefit" standard in its evaluation of safety and security measures.  Pay Tel raised this argument in the rulemaking and the Commission responded to it, noting that "the used and useful framework, as applied for decades by the Commission in its familiar ratemaking functions, is an equitable principle that prevents ratepayers from having to pay for costs that are primarily incurred for the benefit of the provider, while allowing regulated entities to be compensated for providing service."[69]  Contrary to Pay Tel's claims, it is this well-established framework that the Commission applied in evaluating "all of the arguably recoverable costs in the record, including costs associated with safety and security measures, to distinguish those costs that should be included in [the Commission's] ratemaking calculus from those that should not."[70]

20.    The Commission also did not discount, second guess, or otherwise intrude upon the discretion of correctional officials and IPCS providers in its evaluation of the costs associated with safety and security measures that should be included in the Commission's ratemaking calculus and those that should not.  The Commission's actions in the *2024 IPCS Order*, and in particular its actions regarding safety and security measures "[were] about fulfilling [the Commission's] obligation under the Martha Wright-Reed Act to adopt a compensation plan that ensures just and reasonable rates and charges for IPCS consumers and providers and fair compensation for IPCS providers."[71]  None of the Commission's actions "prohibit any correctional institution from implementing any safety and security measure that it deems appropriate or desirable.[72]  The Commission's actions do, however, "ensure that IPCS consumers do not bear the costs of those safety and security measures that are not used and useful or necessary to

---

[65] *2024 IPCS Order* at 202, para. 380 n.1362 ("Pay Tel mischaracterizes our rejection of Securus's overbroad interpretation of 'customer' as a more general rejection of the need to provide appropriate safety and security measures as part of the provision of IPCS.").

[66] *Id.* at 192-93, para. 367.

[67] *Id.* at 202, para. 380.

[68] Pay Tel Stay Petition at 13-14.

[69] *2024 IPCS Order* at 205, para. 384 n.1382; Public Interest Parties Opposition at 6 (noting that "[u]nder Commission precedents, the 'used and useful' standard calls for an evaluation of whether a cost 'promotes customer benefits, or is primarily for the benefit of the carrier'" (quoting *2024 IPCS Order* at 195, para. 370)).

[70] *Id.* at 208, para. 389.

[71] *Id.* at 208-09, para. 390.

[72] *Id.* at 32, para. 57.  *See also* Public Interest Parties Opposition at 6 (explaining that the exclusion of certain safety and security costs "by no means prohibits what safety and security measures facilities may employ, like Pay Tel erroneously suggests").

provide IPCS regardless of how desirable these measures may be to correctional institutions."[73]  And the Commission did so "in applying bedrock ratemaking precedent to evaluate all of the claimed IPCS costs and expenses in the record before [the Commission] to determine the extent to which consumers should bear those costs."[74]  Pay Tel does not attempt to address the Commission's extensive evaluation of safety and security costs in the *2024 IPCS Order* or provide any information or data to substantiate its claim that the Commission's ratemaking exercise intruded upon the discretion of correctional official and IPCS providers in connection with safety and security measures.

21.     Instead of applying the used and useful framework to safety and security costs as the Commission did, Pay Tel suggests that the proper focus of the inquiry is on IPCS consumers who "are the 'causers' of the safety and security costs in question and should therefore bear such costs under well-established [cost-causation] principles endorsed by the Commission."[75]  This same suggestion was considered and rejected by the Commission in the *2024 IPCS Order*.[76]  The Commission explained that the cost-causation analysis applicable in intercarrier compensation reform was not directly comparable to the fundamentally different context of IPCS.[77]  As the *2024 IPCS Order* further explains, "costs that are not used and useful in the provision of IPCS are not caused by IPCS communications, and thus neither party to such communications reasonably can be seen as causing those costs through the use of IPCS."[78]

22.     Finally, Pay Tel criticizes the Commission's application of the used and useful standard, arguing that it applied the standard "in an arbitrary and incoherent manner."[79]  This is because, in Pay Tel's view, the Commission "prohibits recovery for safety and security measures it concedes benefit users while allowing recovery for measures it says do not benefit users."[80]  We disagree with this characterization.  Because the Commission evaluated the safety and security cost data based on the preponderance of tasks within each category, it is not surprising that, in some cases, such as for law enforcement support services, some functions within a given category might benefit consumers.[81]  But that does not mean the costs of those functions, much less all the costs within that category, should be recoverable under the used and useful standard.  Indeed, in the case of law enforcement support services, the Commission noted that certain tasks, while potentially beneficial, "do not facilitate the provision of IPCS and are therefore not used and useful in the provision of IPCS."[82]  Conversely, in other circumstances there may be categories that have no direct benefit to the consumer but that the

---

[73] *Id.* at 32-33, para. 57.  *See also* Public Interest Parties Opposition at 6 ("Excluding safety and security costs that are not used and useful to the IPCS ratepayer from the new rate caps is merely a regulation of what facilities and service providers may charge rate payers for these measures.")

[74] *Id.* at 209, para. 390.

[75] Pay Tel Stay Petition at 13.

[76] *2024 IPCS Order* at 133, para. 246 n.846.

[77] *Id.*

[78] *Id.*

[79] Pay Tel Stay Petition at 14.

[80] *Id*.

[81] *2024 IPCS Order* at 212, para. 394 (recognizing that "some functions in this category [law enforcement support services] may provide a benefit to incarcerated people").  The zone of reasonableness approach the Commission used in developing its overall rate caps helped to account for these outcomes and the Commission acknowledged that in the *2024 IPCS Order*.  *See id.* at 196, 206-08, paras. 372, 387-88.  *See also* Public Interest Parties Opposition at 7 (noting that "tasks that benefit IPCS users do not always also facilitate the provision of IPCS").

[82] *Id.* at 213, para. 394.

Commission concluded were used and useful and therefore recoverable.[83] Should a given provider be able to demonstrate in a given instance that a particular safety and security cost not generally included in the rate caps is, in fact, used and useful, it is free to seek a waiver dealing with its special circumstances.[84]

23.     *Facility Costs*.  In the *2024 IPCS Order*, the Commission permitted "IPCS providers to reimburse correctional facilities for the used and useful costs the facilities incur to enable the provision of IPCS" to incarcerated people.[85]  Pay Tel claims that the Commission acted arbitrarily in permitting this reimbursement "despite failing to allow providers to first recover" those costs either through the rate caps or rate cap additives.[86]  This argument ignores the Commission's decision to incorporate facility costs into its final rate caps by utilizing facility costs as one of several factors in establishing its final rate caps above the lower bounds.[87]  While Pay Tel questions the Commission decision not to include a rate additive of $0.02 per minute to its rate caps to account for used and useful correctional facility costs,[88] the Commission appropriately concluded that the data before it did not enable it "to quantify such costs with anything near the level of specificity that would be required to adopt a specific "just and reasonable' additive reflecting used and useful correctional facility costs."[89]

24.     Pay Tel contends that the Commission's decision to permit IPCS providers to reimburse correctional facilities for the used and useful costs that the facilities incur to enable the provision of IPCS is both inconsistent with the Commission's prohibition against the payment of site commissions associated with IPCS and "ineffectual."[90]  The Commission, however, "decouple[d]" the "reimbursement of correctional facilities for costs used and useful in providing IPCS" from "other IPCS provider payments to correctional facilities" and excluded such reimbursement to facilities from its prohibition against site commissions.[91]  As indicated above, the Commission's ratemaking calculus specifically recognized that facilities incur used and useful IPCS costs.  The procedure the Commission chose to enable facilities to recover those costs—negotiations between IPCS providers and correctional officials—

---

[83] For example, in the case of CALEA compliance measures, the Commission was "not persuaded that the functionalities associated with CALEA compliance generally would directly benefit IPCS users" but concluded that they are used and useful in the provision of IPCS primarily because "without CALEA compliance, IPCS providers could not offer their audio and certain advanced communications services." *Id.* at 209, para. 391.

[84] *Id.* at 205-06, para. 385 n.1384; *see also id*. at 124, para. 222 n.787 (explaining how the Commission has relied on similar approaches to identifying recoverable costs in other contexts in the past); Public Interest Parties Opposition at 7 (noting that "Pay Tel has notably failed to provide any examples of a particular safety and security cost not generally included in the rate caps that is, in fact, used and useful").

[85] *2024 IPCS Order* at 132, para. 246.

[86] Pay Tel Stay Petition at 15.  Pay Tel's acknowledgement that the *2024 IPCS Order* permits IPCS providers to reimburse facilities for the costs they incur in making IPCS available to incarcerated people, Pay Tel Stay Petition at 15, contradicts its contention that the Commission erred "by failing to allow facilities to recover" those costs.  *Id.*

[87] *Securus Stay Denial Order* at 11-12, para. 25 (citing *2024 IPCS Order* at 118-19, para. 214 (recognizing "several specific factors that guide us to select rate caps above our lower bounds" including that "facilities may incur certain costs that are used and useful in the provision of IPCS").

[88] Pay Tel Stay Petition at 16.

[89] *2024 IPCS Order*, at 94, para. 169; *see id.* (recognizing that, given the state of the record, the Commission could not accept at face value a $0.02 per minute additive, or any alternative additive, and simultaneously ensure that its rate caps would be just and reasonable and fairly compensatory).  Contrary to Pay Tel's argument, Pay Tel Stay Petition at 15, the Commission appropriately excluded any estimate of facility costs from the lower bounds of the zones of reasonableness given the absence of reliable facility cost data.  *Securus Stay Denial Order* at 11-12, para. 25 (quoting *2024 IPCS Order* at 92, para. 166 ("Despite these numerous and repeated public attempts to obtain relevant data, commenters have neither provided updated facility cost data nor proposed a methodology that would allow the Commission to accurately estimate used and useful correctional facility costs.")).

[90] Pay Tel Stay Petition at 17.

[91] *2024 IPCS Order* at 143-44, para. 242.

is a reasonable one, given the sparse data on facility costs in the rulemaking record. While IPCS providers and correctional officials may encounter difficulties in determining the amounts of reimbursement providers may pay facilities, the staggered dates for complying with the prohibition against site commissions explicitly recognize those difficulties.[92] Pay Tel makes no claim that it and the facilities it serves will be unable to determine those amounts within the specified time frames.

25.      *Other Methodological Issues.* Pay Tel claims that the "Order commits a number of methodological and similar errors that materially and adversely impact providers."[93] While Pay Tel does not substantiate these claims and provides no support for its assertions, it nonetheless contends that each of the alleged errors "improperly served to understate actual IPCS costs to the harm of providers."[94] Pay Tel's alleged methodological issues are addressed below.

26.      *Reliance on Total Costs.* Pay Tel claims the Commission erred in using "unbilled minutes . . . to calculate rate caps."[95] In the *Securus Stay Denial Order*, we rejected a similar allegation made by Securus,[96] stating that, "[i]n determining the upper and lower bounds of its zones of reasonableness, the Commission calculated industry average costs per minute by dividing total costs (the sum of the costs of both billed and unbilled minutes) by total minutes, based on its finding that this approach more accurately reflected providers' average costs per minute than an approach that used billed minutes as the denominator."[97] As the Commission determined in the *2024 IPCS Order*, "[t]he use of both billed and unbilled minutes is an improvement from the *2021 ICS Order*, which divided expenses by paid minutes, and better reflects the cost of actual minutes."[98] Consistent with our prior finding with regard to Securus, we find here that Pay Tel's "arguments ignore the adverse effects rate caps based on only billed minutes would have on IPCS consumers, as well as the variability of unbilled minutes practices now and in the future."[99] "[T]he ratio of billed minutes to unbilled minutes varies across facilities, and rate caps based on the average cost of a billed minute would allow over recovery of costs, and therefore unreasonably high rates, in facilities" with relatively high ratios, "while allowing under-recovery in other facilities."[100] The *Securus Stay Denial Order* also recognized the variability of facilities' mandates to IPCS providers to offer "free" calls and hence the inherent unreliability of relying on billed minutes alone, stating that "under the rules adopted in the *2024 IPCS Order*, nothing requires IPCS providers to bear the costs of such calls themselves at the behest of correctional institutions."[101]

---

[92] *Id.* at 302, para. 588.

[93] Pay Tel Stay Petition at 17. *See also* Public Interest Parties Opposition at 8 (explaining that Pay Tel "rehashes several claims from Securus's petition for stay regarding . . . certain 'methodological errors'" and that the "Bureau has comprehensively explained why these claims lack merit in its order denying Securus's request").

[94] Pay Tel Stay Petition at 17.

[95] *Id.*

[96] *Securus Stay Denial Order* at 9-10, paras. 19-21.

[97] *Id.* at 9, para. 19 (citing *2024 IPCS Order* at 107, para. 190).

[98] *2024 IPCS Order*, Appx. E at 378, para. 4.

[99] *Securus Stay Denial Order* at 9, para. 20 (citing *2024 IPCS Order*, Appx. E at 378, para. 4 n.8).

[100] *2024 IPCS Order*, Appx. E at 378, para. 4 n.8; *see Securus Stay Denial Order*, at para. 20 (recognizing that rate caps based on the average costs of billed minutes would result in incarcerated people who receive relatively few free minutes to subsidize other IPCS users).

[101] *Securus Stay Denial Order* at 10, para. 21. Furthermore, as we observed in regard to Securus's stay petition, "the number of unbilled minutes is {[                    ]}, and would have at most only *de minimis* impact on [Pay Tel] and other providers. For example, based on the Brattle Group's analysis, the total reported unbilled audio minutes as a percentage of total audio minutes is . . . approximately {[      ]} for all providers. Thus, excluding unbilled minutes in the calculation of the rates is unlikely to materially impact the actual rate caps." *Id.* at 10, para.

(continued….)

27.     *Inflation*.  Pay Tel claims that the Commission "refus[ed] to account for inflation when setting rate caps."[102]  We addressed and rejected a similar claim made by Securus in the *Securus Stay Denial Order*.[103]  As noted there, "the Commission expressly acknowledged accounting for inflation as one of a number of factors used in setting its rate caps.[104]  We added that "[s]etting rate caps above the lower bounds will help to account for . . . any inflation not offset by productivity growth."[105]  Pay Tel makes no attempt to address or quantify the role productivity increases play in offsetting inflation.  It also does not acknowledge that inflation in the telecommunications industry has been lower than in the economy generally.[106]

28.     *Compliance Costs*.  Pay Tel claims that the Commission "exclud[ed] the costs of complying with its new rules from its rate cap calculations."[107]  Pay Tel is mistaken.  As we recognized in the *Securus Stay Denial Order*, "[w]hile the Commission stated that it generally excluded one-time implementation costs as being inappropriate for inclusion in permanent rate caps, it nonetheless included compliance costs as a factor in its rate setting."[108]  The Commission "factored into its calculations the possibility that providers' costs of implementing the Commission's actions "may, on balance, exceed their ongoing savings from" implementing Commission rules that lower their costs.[109]  The *2024 IPCS Order* took "the conservative approach of setting [its] rates somewhat above the lower bounds to account for" these and other costs providers may incur.[110]

29.     *Compliance Dates for Ancillary Service Charges*.  Pay Tel claims that the *2024 IPCS Order* does not contain a "clear and direct statement" on "when the prohibition on ancillary [service] charges takes effect" and argues in favor of delaying the compliance dates for the prohibition as the Commission did for its rate cap and site commission reforms.[111]  Pay Tel further claims that the *Securus Stay Denial Order* "fails to consider or explain why the ancillary service prohibition should be treated

---

20 n.82 (quoting Opposition to Securus Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375, at 5 (filed Oct. 1, 2024) (Public Interest Parties Opposition to Securus Stay Petition)) (quotation marks omitted).

[102] Pay Tel Stay Petition at 17.

[103] *Securus Stay Denial Order* at 11, para. 23.

[104] *Id.*

[105] *Id.* (citing *2024 IPCS Order* at 118-19, para. 213 ("Setting rate caps above the lower bounds will help to account for the possibility that the adjustments [the Commission] applied to providers' reported costs to obtain the lower bound estimates were too aggressive, to account for the possibility that aspects of our evaluation of used and useful costs to provide IPCS may be inaccurate to some degree, to account for any inflation not offset by productivity growth, and to ensure that providers will be better able to recover their costs of providing TRS.")).

[106] *2024 IPCS Order* at 68, n.431 ("[H]istorically, growth in the Telecommunications [producer price index (PPI)] has been lower, on average, than general measures of inflation.  Over the last decade, the average annual change of the Telecommunications PPI was 0.7%, as compared to the average annual change of the broader [gross domestic product] Deflator over the same period of 2.6%.").

[107] Pay Tel Stay Petition at 17.  A similar allegation by Securus was addressed and dismissed in the *Securus Stay Denial Order*.  *See Securus Stay Denial Order* at 11, para. 24.

[108] *Securus Stay Denial Order* at 11, para. 24 (citing *2024 IPCS Order* at 119, para. 214).

[109] *Id.*

[110] *2024 IPCS Order* at 119, para. 214.

[111] Pay Tel Stay Petition at 19.  *See generally id.* at 19-21.  Pay Tel references "the Bureau's new interpretation" of the Commission's prohibition on ancillary fees.  *Id.* at 20.  To clarify, the *Securus Stay Denial Order* restated the relevant provisions of the *2024 IPCS Order* related to the timing of that provision.  Further, Pay Tel's request would more naturally be the subject of a petition for clarification as opposed to a stay petition, the granting of which would not provide the clarification Pay Tel seeks but would rather stay the entirety of the Order, precluding a resolution of the issue and frustrating the goals of IPCS reform and the Commission's implementation of the Martha Wright-Reed Act generally.

differently and independently from the other components of its 'comprehensive' rate reforms."[112] Pay Tel misses the *2024 IPCS Order's* clear direction.

30.    As previously indicated in the *Securus Stay Denial Order*,[113] the *2024 IPCS Order* delays compliance with its rate cap and site commission reforms, recognizing that "IPCS providers, governmental officials, and correctional officials may need additional time . . . to renegotiate contracts in response to our actions today."[114]  The Commission explained that the staggered compliance dates it adopted for the rate caps and site commission reforms "strike[] a reasonable balance between" the need to "alleviate the burden of unreasonably high . . . rates" and the fact that IPCS providers and correctional officials "will need more than 30 days to execute any contractual amendments necessary to implement the new" rate cap and site commission reforms.[115]  The *2024 IPCS Order* further clarified that "all other rules and requirements adopted in this Order also will take effect 60 days after notice is published in the Federal Register."[116]  It found that this effective date "best balances the need to bring these important, pro-consumer rules into effect expeditiously while affording IPCS providers sufficient time to implement any changes necessary to comply with [the Commission's] rules.[117]  The staggered compliance dates for rate caps and site commission reform are therefore properly understood as exceptions to the general compliance requirements applicable to other provisions of the *2024 IPCS Order*.  The *2024 IPCS Order* noted that the Commission "do[es] not view [its] other reforms as involving similar complexities such that a longer effective date period is necessary."[118]

31.    Pay Tel nonetheless argues that "the prohibition of ancillary fees is part and parcel of a comprehensive approach to rate setting" and that ending ancillary service charges "is one component of 'comprehensive' rate reform."[119]  While it is true that the Commission's reforms are designed to work in concert, that fact alone is insufficient to justify extending compliance dates for the ancillary service charge prohibition.  The elimination of separate ancillary service charges was based on "four independently sufficient findings," which generally were independent from the specific IPCS rate caps established in the *2024 IPCS Order*.[120]  For example, the conclusions that eliminating separate ancillary services charges: (1) better reflected the nature of IPCS offerings;[121] (2) would eliminate incentives for marketplace abuses designed to inflate ancillary service fee revenue;[122] (3) accounted for the lack of data sufficient to set separate just and reasonable charges for individual ancillary services;[123] and (4) would yield other benefits such as operational efficiencies and reduced barriers to communications,[124] are entirely distinct from the details of the prospective IPCS rate caps.  Pay Tel also argues that "ancillary payments cannot be eliminated until site commission payments are eliminated—and site commission

---

[112] *Id.* at 21.

[113] *See generally Securus Stay Denial Order* at 13-14, paras 28-29.

[114] *2024 IPCS Order* at 305, para. 588; *see also Securus Stay Denial Order* at 14, para. 29.

[115] *2024 IPCS Order* at 305, para. 589 (internal quotations omitted).

[116] *Id.* at 308, para. 595.

[117] *Id.*

[118] *Id.*

[119] Pay Tel Stay Petition at 20.

[120] *2024 IPCS Order* at 223-24, para. 415.

[121] *Id.* at 223-24, paras. 415-17.

[122] *Id.* at 224-26, paras. 418-19.

[123] *Id.* at 226-27, para. 420.

[124] *Id.* at 227-28, paras. 421-24.

payments cannot be eliminated until contracts are revised."[125]  Apart from the revenue reduction that Pay Tel asserts is involved, Pay Tel does not make clear why eliminating site commissions should be a necessary predicate for eliminating ancillary service charges.  And Pay Tel also does not address the fact that it will continue to benefit from the higher prior rate caps as it manages its transition to the new rate caps and implements the Commission's site commission reforms.  Thus, there also is no practical necessity that the new IPCS rate caps be in place before the prohibition on separate ancillary service charges workably could take effect.

32.     Pay Tel claims that the *2024 IPCS Order*'s inclusion of "passthrough charges" as one type of term or condition that could require material alteration of contracts "could reasonably be understood to include ancillary fees."[126]  But the adoption of staggered compliance dates for rate caps and site commission reforms was premised on the fact that these were "terms and conditions that would require material alteration through [contract] renegotiation."[127]  Apart from its claims regarding the financial impact of prohibiting ancillary service charges, Pay Tel stops short of contending that ending ancillary service charges would require material alteration of its IPCS contracts, nor does it provide any support that its IPCS contracts have, in fact, been or are being renegotiated to comply with the prohibition on ancillary service charges.  It also claims that "the existing recovery of ancillary charges as a separate revenue source is part of the overall pool of revenue from which negotiations over facility contracts have taken place."[128]  But, again, this assertion, while unsurprising, falls short of claiming and substantiating a claim that these changes have required or will require material alterations to their IPCS contracts.

33.     Pay Tel thus has failed to establish that its challenges to the Commission's actions are likely to succeed on the merits.

**B.      Pay Tel Has Failed to Show It Will Suffer Irreparable Harm**

34.     Pay Tel likewise fails to demonstrate that it would suffer imminent and irreparable harm without a stay.  To establish irreparable harm, a petitioner must show that it will suffer injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"[129]  In doing so, the petitioner must present actual evidence to "substantiate [its] claim" of injury.[130]  "'Bare allegations of what is likely to occur are of no value' under this factor, because we 'must decide whether the harm will *in fact* occur.'"[131]  Pay Tel has not met its burden to make and substantiate these showings.

35.     The crux of Pay Tel's argument is that it "will suffer direct and unrecoverable economic losses" and "significant" compliance costs without a stay.[132]  Specifically, Pay Tel alleges that the reduced

---

[125] Pay Tel Stay Petition at 20.

[126] *Id.* at 20.

[127] *2024 IPCS Order* at 304, para. 587.

[128] Pay Tel Stay Petition at 21.

[129] *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *Securus Stay Denial Order* at 15, para. 31; *see Ligado Stay Denial Order*, 36 FCC Rcd at 1267, para. 10.

[130] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

[131] *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Order, CC Docket No. 96-98, 11 FCC Rcd 11754, 11757, para. 8 (1996) (quoting *Wis. Gas*, 758 F.2d at 674).

[132] Pay Tel Stay Petition at 18.  Although Pay Tel also claims it will suffer "stranded costs relating to prior investment," Pay Tel neither identifies which investments may be stranded, nor quantifies the costs allegedly involved.  *See id.*; *see also* Wood Declaration at para. 14 (alleging, without detail, that Pay Tel has {[
                                                                    ]}); Pay Tel Stay Petition at 2 ("Pay Tel has re-invested . . . by developing and implementing educational, vocational training, and self-help resources.").  We
(continued....)

**Federal Communications Commission**    **DA 24-1074**

rates imposed under the Commission's rate caps will result in a {[           ]}.[133] Rather than challenge the *2024 IPCS Order's* estimates or challenge the methodology that led to them, Pay Tel offers its own unsubstantiated figures, which we decline to adopt on the record before us.[134] Notably, Pay Tel's claimed future losses grossly exceed those calculated in the *2024 IPCS Order* even when using costs the Commission found likely to be overstated, which estimated a smaller {[       ]}, in combined audio and video communications revenues assuming no increase in demand.[135] This shortfall is further winnowed after accounting for the effects of audio demand elasticity, which suggests audio communications minutes will increase as the price per minute falls, largely offsetting this shortfall.[136] We estimate this increase in audio revenue to total roughly {[       ]}.[137] Given the Commission's lower interim video IPCS rate caps, video demand elasticity, which we expect to perform similarly, will

---

find Pay Tel's claims of stranded investment to be both speculative and unsupported. And, as we explained in response to Securus, we are unconvinced by claims that {[              ]} will ebb as a result of the *2024 IPCS Order. See Securus Stay Denial Order* at {[

      ]} To the extent Pay Tel asserts a claim for "significant compliance costs" as well, we find it has neither substantiated that claim nor provided evidence of such costs, and deny such claims along similar grounds, consistent with the *Securus Stay Denial Order. See* Pay Tel Stay Petition at 18; *Securus Stay Denial Order* at 16, para. 35 (refuting claims of harm based on compliance costs).

[133] Pay Tel Stay Petition at 21 (claiming {[                 ]}). We note that, inconsistent with its claim of earning a {[           ]} Pay Tel's 2022 data show that its {[            ]}. *Compare* Pay Tel Stay Petition at 4 *with 2024 IPCS Order,* Appx. F at 394, Tbl. 9. This amounts to a difference of nearly {[       ]} which we cannot explain on the data before us, leaving us wary of accepting the proffered figures, as discussed further below.

[134] Pay Tel states that their estimated {[      ]} were reached by estimating revenues at the new rate caps and adjusting "[a]ll Ancillary Service Charges" and "[a]ll costs associated with the payment of site commissions" to zero. *See* Wood Decl. at paras. 4-5. We find these numbers unsubstantiated and difficult to verify. For example, while Dr. Wood appears to have included site commissions in his estimated reduction of revenues, the lack of detail leaves it impossible to understand whether his treatment of site commissions is appropriately reflected elsewhere, such as in his calculation of "EBITDA" and "EBT." *See, e.g., id.* at para. 9.

Additionally, we note that the 2022 revenue and site commission data Pay Tel cites in its petition differ from those the Commission derived from Pay Tel's submitted data and relied upon in the *2024 IPCS Order* by a cumulative difference of nearly $1 million. *Compare* Wood Decl. at para. 5 (stating 2022 audio service revenue of {[       ]} *with 2024 IPCS Order,* Appx. F at 392, Tbl. 7 ({[      ]}); Wood Decl. at para. 6 (stating 2022 video service revenue of {[       ]} *with 2024 IPCS Order,* Appx. F at 392, Tbl. 7 ({[    ]})]}; Wood Decl. at para. 7 (stating 2022 Ancillary Service revenue of {[      ]} *with 2024 IPCS Order,* Appx. F at 392, Tbl. 7 ({[     ]})); Wood Decl. at para. 8 (stating 2022 site commissions of {[       ]} *with 2024 IPCS Order,* Appx. F at 386, Tbl. 3 ({[      ]}). Dr. Wood obtained access to the confidential version of the *2024 IPCS Order* under the relevant Protective Orders in this proceeding and presumably had an opportunity to compare those submitted data with the data included in his declaration but does not articulate a reason for such differences; nor does he provide the calculations underlying his data that might enable us to reconcile these differences.

[135] The Commission estimated Pay Tel's total IPCS potential revenue at the new rate caps to be {[             ]}), while using costs the Commission found likely to be overstated, and while assuming no increase in demand at the lower rates. *See 2024 IPCS Order* at 453-54, Appx. J, para. 4 n.6 & Tbl. 3. In subsequent *ex parte* filings, Pay Tel neither disputed nor refuted these estimates. *See generally* Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Dockets 23-62, 12-375 (filed July 9, 2024) (Pay Tel July 9, 2024 *Ex Parte*); Letter from Marcus W. Trathen, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62, 12-375 (filed July 11, 2024).

[136] *2024 IPCS Order* at 301, para. 581.

[137] A description of the staff calculations resulting in this estimate is set forth in Appendix A.

also generate additional revenue.  Therefore, other things remaining constant, we would expect to see a similar increase in video communications minutes which would further offset this shortfall.  In sum, we find Pay Tel's claims insufficient to demonstrate irreparable harm, particularly because the new rate caps will leave Pay Tel in a roughly similar position to that which Pay Tel {[

]}, when its reported IPCS expenses including site commissions {[

]}.[138]

36.　　　Tied to this claim, Pay Tel also alleges that, for the period beginning November 19, 2024, Pay Tel will suffer lost ancillary service charge revenue of {[　　　　　　]} annually from the prohibition of such charges, and alleges additional annual payments of {[　　　　　　]} in ongoing site commission payments it will remain obligated to make.[139]  We find Pay Tel has not substantiated these contentions.  As we stated in the *Securus Stay Denial Order*, the new rate caps include recovery of all costs of providing ancillary services.[140]  Claims of lost ancillary services revenue are therefore misleading; in the long term, the Commission's IPCS rate caps will allow providers to recover all ancillary service costs as part of their per-minute charges.[141]  And in the short term, before Pay Tel has fully instituted the new rate caps, it will continue to charge above-cost rates.  Therefore, because the costs of ancillary services are subsumed within the new lower rate caps, the rates that Pay Tel is currently charging will allow it to recover its costs of providing both IPCS and ancillary services, plus an additional margin of profit to the extent that their current rates lie above the new rate caps.[142]  Although full compliance with the prohibition on the payment of site commissions will not take place immediately, that same interim margin Pay Tel and other providers will collect from charging above-cost rates will more than account for their site commissions costs over the same period.[143]  We therefore find claims of significant losses from the prohibition on ancillary service charges meritless, and find no irreparable harm stemming from Pay Tel's purported lost revenues.

37.　　　Pay Tel doubles down on its arguments, asserting {["

---

[138] As the Commission noted in the *2024 IPCS Order*, we find this result much more likely to reflect accounting practices {[　　　　　　　　　　　　　　　　　]}.  *See 2024 IPCS Order* at 111, para. 199; *id.*, Appx. F at 394-95, paras. 20-21. {[　　　　　　　　　　　]} *See id.*, Appx. F at 394, Tbl. 9.

[139] Wood Decl. paras. 7-8; *see also* Pay Tel Stay Petition at 22.  *But see 2024 IPCS Order* Appx. F at 392, Tbl. 7 (citing Pay Tel's IPCS Ancillary Revenue as {[　　　　]}).

[140] *Securus Stay Denial Order* at para. 32 (citing *2024 IPCS Order* at 68-75, paras. 130-37 (describing providers' ancillary services costs as being included in the rate cap calculations)).

[141] *See 2024 IPCS Order* at 220-29, paras. 408-26; *Securus Stay Denial Order* at 15, para. 32; *see also* Public Interest Parties Opposition at 9 ("[A]s the Bureau observed in the context of Securus's petition, alleged losses in connection with the prohibition on separate ancillary fees [are] misleading because 'in the long term, the Commission's IPCS rate caps allow providers to recover all ancillary service charges costs as part of their per-minute charges'" (quoting *Securus Stay Denial Order* at 15, para. 32)).  For reference, Pay Tel's average ancillary expenses per audio minute are {[　　　　　　　　　]}.  *See 2024 IPCS Order*, Appx. F at 398, Tbl. 11.

[142] All of Pay Tel's existing rates lie well-above the new rate caps, affording them significant margin to offset these purported losses.  Specifically, Pay Tel charges audio IPCS rates that are, on average, above the respective rate cap by {[

]} *Compare 2024 IPCS Order*, Appx. F at 393, Tbl. 8 *with id.* at 115, para. 207.

[143] Our review of Pay Tel's data shows that Pay Tel's average site commissions per audio and video minute is {[　　　]}, ranging between {[

]}, i.e., amounts generally equivalent to, or substantially less than, the corresponding margin between Pay Tel's current rates and the new rate caps.  *2024 IPCS Order*, Appx. F at 401, Tbl. 14); *supra* note 142.

]}[144]  We are unpersuaded.  Pay Tel's own data show {[

]} IPCS {[                        ]}.[145]  Further, as explained in the *2024 IPCS Order*, other providers reported substantially lower per minute costs, including like-sized providers serving smaller facilities; this in turn suggests that Pay Tel may well be able to match the efficiency of its rivals.[146]  Pay Tel previously raised such claims;[147] the Commission rejected those claims in the *2024 IPCS Order*, and we do so again now.[148]

38.    In short, Pay Tel fails to account for the offsetting revenue that we expect lower rates will produce, ignores the windfalls it may reap by charging above-cost rates in the period before it must comply with the new rate caps, and claims commercial viability concerns which fall flat compared to similarly-situated providers, and alongside the IPCS {[

]}.  Based on the foregoing, we therefore conclude that Pay Tel has failed to demonstrate any imminent, actual irreparable harm resulting from the *Order*.[149]

**C.    Pay Tel Has Not Shown That a Stay Is in the Public Interest and Would Not Harm Other Parties**

39.    We next conclude that staying the *2024 IPCS Order* is not in the public interest, as a stay would inhibit or delay the Commission's ability to fulfill statutory obligations and objectives mandated by the Martha Wright-Reed Act and necessary to protect consumers.

40.    Pay Tel's primary argument that granting a stay would benefit the public interest is that the reforms adopted in the *2024 IPCS Order* will "pric[e] out IPCS providers, particularly in jails," leading to IPCS services becoming unavailable or less available in certain facilities.[150]  As discussed

---

[144] Pay Tel Stay Petition at 22.  Pay Tel argues further that the {[

]} *Id.* at 22 (citing *2024 IPCS Order* at 120-21, para. 217); *see also id.* at 8-9, n.34 (arguing that "any assumptions about call stimulation resulting from lower rates are not appropriate").  Pay Tel bases this argument on speculation that facilities will restrict access to IPCS in light of the reforms adopted in the Order, which we find unpersuasive.  *See infra* para. 41 & n.155.  Because Pay Tel offers no further rationale for why the Commission's estimates of future demand are inappropriate within the broader analysis of providers' future net losses (or gains) under the rate caps, we find such arguments meritless.  Indeed, in its *ex parte* filings, Pay Tel neither disputed nor refuted these estimates.  *See generally* Pay Tel July 9, 2024 *Ex Parte*; *see also 2024 IPCS Order* at 301, para. 581 (adopting the same demand elasticity figure as that adopted in the *2021 ICS Order*, and observing that "[n]o commenter disputed our elasticity estimate or the methodology underlying it").

[145] *See 2024 IPCS Order*, Appx. F at 394, Tbl. 9 (reflecting a {[                                    ]}).  *But see supra* n.138.  Our estimate of Pay Tel's net returns for IPCS under the new rate caps is derived from the same data, and thus relies on the same underlying accounting practices, which Pay Tel reported {[

]}, *see supra* para. 35 & n.138).  We therefore think it remains likely, for the same reasons, that Pay Tel would {[                                    ]}.

[146] *See 2024 IPCS Order*, Appx. J at 453-44, para. 5.

[147] *See, e.g.*, Pay Tel July 9, 2024 *Ex Parte* at 2 (arguing service at high cost facilities will be chilled).

[148] *2024 IPCS Order* Appx. J at 453-56, paras. 6-7 & nn.7, 14 (concluding that "it is implausible that our rate caps will prevent supply in small jails").

[149] *See* Public Interest Parties Opposition at 9 ("It is blackletter law that economic loss ordinarily 'does not, in and of itself, constitute irreparable harm.' . . . Here, Pay Tel does not demonstrate that the various types of financial losses it claims it would suffer under the MWRA Order is unrecoverable." (quoting *In re NTE Conn., LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022))).

[150] Pay Tel Stay Petition at 23-24; *see* Wood Decl. at paras. 20-22.  The *2024 IPCS Order* addressed and rejected similar claims.  *See 2024 IPCS Order*, Appx. J at 454-55, para. 6 ("Contrary to some claims, which argue that our rate caps impact smaller providers and thus smaller facilities, provider size is no predictor of the choice to serve very

(continued….)

above, however, Pay Tel ignores the Commission's conclusion that its estimates of providers' average costs were "likely overstated," making it "unlikely that any provider will be unable to recover its individual average costs."[151]  Pay Tel similarly fails to account for the Commission's conclusion that, even when applying these overstated estimates, the rate cap structure adopted in the *2024 IPCS Order* will allow adequate cost recovery for providers representing "96 percent of [average daily population], and 96 percent of billed and unbilled minutes in the dataset."[152]  Consequently, Pay Tel falls far short of establishing that, let alone the extent to which, IPCS services may become unavailable in certain facilities.[153]

41.    Pay Tel further argues that because the Commission excluded the costs of certain safety and security measures from its rate cap calculations, these measures may be curtailed or eliminated, thereby harming incarcerated people, their families, and the general public due to the potential for increased crime and fraud.[154]  Pay Tel also claims that the *2024 IPCS Order* may drive facilities to restrict access to IPCS.[155]  As we observed in the *Securus Stay Denial Order*, the Commission "found similar concerns raised in the record to be generally unsupported"; and like Securus, Pay Tel "offers no further

_____

small jails.  As illustrated in Table 4, all eight of the providers discussed above serve very small jails.  {[

]}  Thus, it is implausible that our caps will prevent supply in small jails.").

[151] *2024 IPCS Order* at 120, para. 216 n.765; *see also id.* at 120-21, para. 217 (noting that providers' average per-minute costs are likely to diminish due to, e.g., increased communications volumes and investment into video IPCS services).  We separately reject Pay Tel's arguments regarding the Commission's analysis of projected revenues under the rate caps.  *See* Appx. A; *supra* note 144.

[152] *2024 IPCS Order* at 120, para. 216.  Pay Tel observes that these providers reported per-minute costs above the rate caps for some of the facilities they serve.  *See* Pay Tel Stay Petition at 9; Wood Decl. at para. 21.  However, Pay Tel fails to acknowledge, for example, that many of these individual facilities may be grouped into contracts with other facilities in a manner that should, in the aggregate, allow for the providers to recover the total costs under each contract; or that the total costs attributed to any particular facility may be an artifact of the cost allocation process, rather than a precise estimate of the costs of serving that facility.  *See, e.g.*, ViaPath Comments, WC Docket Nos. 23-62 and 12-375, at 5 (filed June 2, 2023) ("[N]ot all IPCS providers track costs at the facility level in the normal course of business."); Securus Reply, WC Docket Nos. 23-62 and 12-375, at 16 (filed July 12, 2023) ("[C]ost allocations tend to produce more reliable results across entire datasets than for individual facilities whose costs may reflect differing requirements set by the correctional authority.  Moreover, for multi-facility contracts, providers may rely on the overall costs and revenues for all facilities regardless of the particular cost and revenue ratio at any particular facility."); *2024 IPCS Order*, Appx. E at 379-80, paras. 5-6; *id.*, Appx. G at 408, para. 6 ("[T]he [least absolute shrinkage and selection operator (Lasso)] results confirm that there are certain data deficiencies at the facility-level, likely due to differences in cost allocation approaches across providers as well as instances of cost misallocation," which "create outlier facility cost observations.").  Similarly, Pay Tel inflates its estimate of facilities where IPCS will become unavailable by assuming, in circumstances where a given provider might stop serving certain facilities or even exit the market outright, that other providers (who may operate more efficiently, i.e., at lower average costs) will not take over service at the facilities served by that provider.  *See* Pay Tel Stay Petition at 8; Wood Decl. at para. 20; *see also 2024 IPCS Order*, Appx. J at 453-56, paras. 5-7.

[153] For similar reasons, we are unpersuaded by Pay Tel's argument that "[p]ricing out IPCS providers will also harm incarcerated persons and their families through further constriction of the IPCS market."  Pay Tel Stay Petition at 24.  Additionally, the Commission considered, and rejected, such arguments in the *2024 IPCS Order*.  *See 2024 IPCS Order*, Appx. J at 455, para. 7 ("Competition should not be mistaken for the number of competitors."); *see also* Public Interest Parties Opposition at 10-11 ("Pay Tel provides no evidence that these outcomes are likely.  To the contrary . . . the Commission has comprehensively demonstrated that the new rate caps would ensure fair compensation of providers. . . .  To the extent that not being able to charge exploitative rates would cause a provider to exit the market and let a more efficient provider enter, that is an outcome consistent with Congress's intent under the [Martha Wright-Reed] Act.").

[154] *See* Pay Tel Stay Petition at 24-25.

[155] *See id.* at 25.

substantiation for such claims."[156]  Nevertheless, the *2024 IPCS Order* explicitly accounts for these theorized harms by extending the transition deadlines for the new rate cap and site commission rules, which Pay Tel fails to acknowledge.[157]

42.     By contrast, granting a stay would be contrary to the public interest because it would delay the benefits of comprehensive reform and otherwise inhibit the Commission's ability to protect consumers.[158]  A stay would effectively force consumers to pay prices above the just and reasonable rates determined in the *2024 IPCS Order* over a prolonged period, while also delaying the associated reforms that also inure to the public's benefit.[159]  For example, and as the Commission observed in the *2024 IPCS Order*, consumers stand to gain from the elimination of ancillary service charges, which are a source of consumer confusion and detrimental provider practices.[160]  The public interest in seeing the Commission's reforms take effect on the schedule prescribed in the *2024 IPCS Order* is especially pronounced given the length of time that incarcerated persons and their friends and family have already shouldered undue financial burdens to keep in touch,[161] particularly when Congress expressly directed the Commission to

---

[156] *See Securus Stay Denial Order* at 18, para. 39; *2024 IPCS Order* at 166-67, 209, 307-08, paras. 311-12, 390 n.1399, 594; *id.*, Appx. J at 455-56, para. 7; *see also* Public Interest Parties Opposition at 11-12 ("Pay Tel provides no evidence that these outcomes are likely. . . .  [N]othing in the [*2024 IPCS Order*] prevents facilities from offering the safety and security features they see fit.").

[157] *See Securus Stay Denial Order* at 18; *2024 IPCS Order* at 304-08, paras. 587-94.  Pay Tel raises a further concern identical to one raised by Securus, regarding the fact that "many [incarcerated people] will not see the benefits from the rate caps until 2026," while at the same time those people "will lose out on the updated communications platforms and offerings" that Pay Tel is allegedly stymied from offering due to requirements that apply before 2026.  Pay Tel Stay Petition at 25.  We are similarly unpersuaded by this argument.  *See Securus Stay Denial Order* at 18, paras. 39-40 & n.156.

[158] Pay Tel contends that "the public does not have a legally cognizable interest in the [*2024 IPCS Order*] taking effect before a court determines whether the Commission exceeded its legal authority."  Pay Tel Stay Petition at 23 (citing *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022), for the proposition that the "public's true interest lies in the correct application of the law").  This argument misconstrues and misapplies the relevant discussion in *Biden*, which itself addressed several elements suggesting that the government's action in question was in the public interest.  *Biden*, 23 F.4th at 612.  In any case, the cited principle from *Biden* turns the focus to the likelihood of success on the merits, which as addressed above, Pay Tel has failed to establish.  *See, e.g., Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006); *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991).

[159] *See, e.g.*, *2024 IPCS Order* at 308, para. 594 ("Any further delays in requiring compliance with our rate cap and site commission reforms risks perpetuating unjust and unreasonable rates and charges for IPCS consumers or yielding unfair compensation for IPCS providers, contrary to the directives of the Martha Wright-Reed Act."); *id.* at 3-4, 229-30, 261-63, 277-78, 301-04, paras. 3, 427-28, 499-501, 530-31, 579-86 (discussing the compelling public interests served by the Commission's IPCS reforms); Public Interest Parties Opposition at 8 (arguing that Pay Tel's stay request is overbroad, as the *2024 IPCS Order* "adopts reforms on a number of other important issues, which Pay Tel's Stay Request does not address"); *id.* at 10 ("[D]elaying the implementation of the [*2024 IPCS Order*] would cause significant financial and other harms to incarcerated people and their families that have been subject to unreasonable and predatory prices for too long" and "would add millions of dollars of financial burden for these communities each year).

[160] *See 2024 IPCS Order*, at 224-26, 227-29, paras. 418-19, 421-26.

[161] *See id.* at 6-12, paras. 9-20 (recounting over a decade of reform efforts); Martha Wright-Reed Act § 3(a).  Additionally, as the Public Interest Parties argue, a stay will "deprive many incarcerated people of the regular contact with their families and communities that is essential to their health and wellbeing, as well as their access to legal representation."  Public Interest Parties Opposition at 10-11; *see also* Public Interest Parties Opposition to Securus Stay Petition at 9-10 ("A stay will cause tremendous harm by depriving consumers of the lower rates, and increased family connection, that Congress sought to achieve through the [Martha Wright-Reed Act].  Such delay would prevent many incarcerated people from the health, safety, and wellbeing benefits that reliable communications with their loved ones could bring."); Opposition of Stephen A. Raher to Securus Technologies'

(continued….)

Federal Communications Commission                                    DA 24-1074

enact regulations to implement the Martha Wright-Reed Act within 24 months from the statute's enactment.[162]

43.     For all these reasons, we find that Pay Tel has not shown that a stay is in the public interest and would not harm other parties.

## IV.     ORDERING CLAUSES

44.     Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), and the authority delegated pursuant to sections 0.91 and 0.291 of the Commission's rules, 47 CFR §§ 0.91, 0.291, this Order Denying Stay Petition in WC Docket Nos. 23-62 and 12-375 IS ADOPTED.

45.     IT IS FURTHER ORDERED, that Pay Tel Communications Inc.'s Petition for Stay Pending Judicial Review of the Report and Order, filed October 7, 2024, in WC Docket Nos. 23-62 and 12-375, IS DENIED.

FEDERAL COMMUNICATIONS COMMISSION


Trent B. Harkrader
Chief
Wireline Competition Bureau

---

Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375, at 5 (filed Oct. 1, 2024) (noting that the "public would be harmed by granting the Petition because a stay would extend the long history of unreasonable IPCS rates, even though lowering these rates was the primary motivation behind the enactment of the [Martha Wright-Reed Act]").

[162] *See* Public Interest Parties Opposition at 11 ("Staying the [*2024 IPCS Order*] would also frustrate Congress's express directive that regulations implementing the [Martha Wright-Reed] Act be timely promulgated and effectuated to afford incarcerated people and their families much-needed relief.").

Federal Communications Commission                                    DA 24-1074

## APPENDIX A

### Estimate of the Impact of Demand Elasticity on Pay Tel's Audio IPCS Revenues Under the Commission's New Rate Caps

1.      In the *2021 ICS Order*, the Commission concluded based on evidence in the record that inmate calling services were subject to demand elasticity—i.e., that decreases in prices for inmate calling services would lead to increased demand for those services.[1]  The Commission continued to rely on its prior conclusion that incarcerated people's communications services were subject to demand elasticity in the *2024 IPCS Order*.[2]  Utilizing this conclusion in our analysis of the claims of harm Pay Tel makes in its petition for stay, we anticipate that the reduction in per-minute rates across rate cap tiers for Pay Tel's facilities will lead to increased minutes of use for audio communications and consequently increased audio IPCS revenues, which will largely offset reductions in audio IPCS revenues arising from the Commission's lower rates.

2.      To assess the stimulative effects of the Commission's rate caps on Pay Tel's audio IPCS revenues, we compare Pay Tel's 2022 audio revenues net of site commissions to the lower revenues we would expect Pay Tel to collect under the new rate cap regime, which likely will be largely offset by an increase in demand induced by lower prices.  This offsetting occurs for two reasons: the bulk of the price declines under the *2024 IPCS Order* come from the elimination of site commissions, which lowers prices without impacting providers' revenues; and this large drop in prices generates a large increase in demand.

3.      *Pay Tel's 2022 Audio IPCS Revenues*.  We first calculate Pay Tel's 2022 audio IPCS revenues.  In 2022, Pay Tel's audio IPCS revenues, inclusive of site commissions, were approximately {[          ]}.[3]  To determine Pay Tel's audio IPCS revenues net of site commission payments, we calculate and then deduct the amount of audio IPCS revenues related to site commission payments.  Pay Tel paid a total of approximately {[          ]} in IPCS site commissions to correctional facilities in 2022.[4]  We allocate approximately {[                    ]} in site commission revenues to Pay Tel audio IPCS, given that audio IPCS revenues account for about {[     ]} of Pay Tel's total audio and video IPCS revenue.[5]  Thus, we estimate that Pay Tel retained audio revenues of approximately {[                    ]} in 2022.

4.      *Pay Tel's Estimated Audio IPCS Revenues Under the New Rate Caps*.  Next, we calculate Pay Tel's audio IPCS revenues under the new rate caps, by reducing Pay Tel per-minute audio rates to the audio rate caps for each rate cap tier, multiplying those rates by total Pay Tel audio minutes in each tier, and summing across tiers.  This results in total Pay Tel audio IPCS revenues under the new caps of approximately {[                    ]}, which represents a roughly {[                    ]} in audio revenues exclusive of site commissions at 2022 demand levels.

5.      *Impact of Demand Elasticity on Pay Tel's Audio IPCS Revenues*.  As the Commission concluded in the *2024 IPCS Order*, lower IPCS rates will predictably stimulate demand.  To estimate the amount of that increase, we use an elasticity of demand for audio IPCS of 0.3 determined by the Commission and apply it to the percent decrease of Pay Tel's rates under the new rate caps.[6]  We calculate an average percentage {[

---

[1] *2024 IPCS Order* at 301, para. 581.

[2] *Id.*

[3] *Id.*, Appx. F at 392, Tbl. 7.

[4] *Id.*, Appx. F at 386, Tbl. 3.

[5] *See id.*

[6] *Id.* at 301, para. 581.

]}, which is due in large part to the elimination of site commission payments.  Using an elasticity of demand of 0.3, we estimate that this reduction in rates leads to about a {[                                    ]} increase in minutes of use and a concurrent increase in audio revenues of about {[

]}.  This expansion of expected revenues from increased demand for audio IPCS communications largely offsets the reduction in Pay Tel's audio revenues net of site commissions {[

]}.

6.        *Video IPCS Revenues.*  While we are unable to perform a similar calculation for estimating the increased revenues Pay Tel would obtain given the increase in demand for video IPCS that will result from the new lower video IPCS rate caps, Pay Tel would undoubtedly benefit from additional revenues that would further offset the reductions in revenue it claims it would experience under the new rate caps.

**Federal Communications Commission**                                    **DA 24-1098**

Before the
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Incarcerated People's Communications Services; | **)** | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | **)** | |
| | **)** | |
| Rates for Interstate Inmate Calling Services | **)** | WC Docket No. 12-375 |

**ORDER DENYING STAY PETITION**

**Adopted:  October 23, 2024**                                    **Released:  October 23, 2024**

By the Chief, Wireline Competition Bureau:

## I.    INTRODUCTION

1.      On October 16, 2024, the National Sheriffs' Association filed a petition requesting that the Commission stay its Report and Order in the above-captioned proceedings pending judicial review.[1] For the reasons discussed below, we deny the National Sheriffs' Association's stay request.

## II.    BACKGROUND

2.      The *2024 IPCS Order* implemented the expanded authority granted to the Commission by the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act),[2] adopting comprehensive reforms that will significantly reduce the financial burdens incarcerated people face to communicate with their loved ones.  The Act amended the Communications Act of 1934, as amended (Communications Act) to require that the Commission "establish a compensation plan to ensure that all [incarcerated people's communications services (IPCS)] providers are fairly compensated and all rates and charges are just and reasonable for completed" IPCS communications.[3]  Consistent with this Congressional mandate, in the *2024 IPCS Order*, the Commission adopted permanent per-minute rate caps for all incarcerated people's audio communications services, and established, for the first time, interim per-minute rate caps for incarcerated people's video communications services.[4]  In establishing these rate caps, the Commission employed the used and useful framework it has used for decades in

---

[1] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75 (rel. July 22, 2024) (*2024 IPCS Order* or *Order*, *2024 IPCS Reconsideration Order*, or *2024 IPCS Notice*); *see* National Sheriffs' Association, Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62 and 12-375 (filed Oct. 16, 2024) (National Sheriffs' Association Stay Petition).  The Wright Petitioners, United Church of Christ Media Justice Ministry, Pennsylvania Prison Society, and Stephen A. Raher (collectively, the Public Interest Parties) filed an opposition to the National Sheriffs' Association Stay Petition.  *See* Opposition to the National Sheriffs' Association's Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375 (filed Oct. 22, 2024) (Public Interest Parties Opposition).

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2022) (Martha Wright-Reed Act or Act).

[3] 47 U.S.C. § 276(b)(1)(A).

[4] *See, e.g.*, *2024 IPCS Order* at 60, para. 119.

determining just and reasonable rates, a zone of reasonableness methodology that it had previously used to set rate caps for audio IPCS, and an industry-average cost methodology expressly permitted in the Martha Wright-Reed Act.[5]  In setting the new rate caps, the Commission considered cost and other data submitted by IPCS providers and the National Sheriffs' Association.[6]

3.      In the *2024 IPCS Order*, the Commission also ended IPCS providers' long-standing practice of paying site commissions to carceral facilities, the costs of which were passed through to consumers via higher IPCS rates.[7]  The *Order* strengthened the Commission's requirements for access to IPCS by incarcerated people with disabilities; adopted stronger consumer protection rules, including permanent rules addressing providers' treatment of unused funds in inactive IPCS accounts; and permitted providers, for the first time, to offer optional alternate pricing plans, subject to conditions to protect and benefit IPCS consumers.[8]  Although many of the new requirements are effective 60 days after publication in the Federal Register, the Commission established staggered compliance deadlines for the new rate caps and the elimination of site commissions.[9]

4.      On October 2, 2024, and October 15, 2024, respectively, the Wireline Competition Bureau (WCB or the Bureau) issued orders denying Securus Technologies, LLC's (Securus's) and Pay Tel Communications, Inc.'s (Pay Tel's) petitions for administrative stays of the *2024 IPCS Order*.[10]  In its October 16, 2024, petition, the National Sheriffs' Association acknowledges that its petition overlaps, to a certain extent, with Securus's and Pay Tel's petitions.[11]  The National Sheriffs' Association asserts, however, that as an association "represent[ing] over 6,000 Sheriffs nationwide,"[12] its position differs materially from those of Securus and Pay Tel, which are IPCS providers.[13]  The National Sheriffs' Association contends that a stay pending judicial review is warranted because alleged legal and factual errors in the *2024 IPCS Order* make it likely that the National Sheriffs' Association will prevail on the

---

[5] Martha Wright-Reed Act § 3(b)(b)(1); *see also, e.g.*, *2024 IPCS Order* at 65-66, para. 127 (discussing the adoption of rate caps derived from industry average costs); *id.* at 89-90, paras. 159-60 (discussing the used and useful framework and the zone of reasonableness approach).

[6] *See 2024 IPCS Order* at 102-04, paras. 184-85. *See also id.* at 94-100, paras. 170-79.

[7] *See, e.g.*, *id.* at 132, para. 245 (prohibiting IPCS providers from paying site commissions of any kind and preempting all state and local laws and regulations requiring or allowing IPCS providers to pay site commissions associated with IPCS).

[8] *See, e.g.*, *id.* at 229-49, 253-61, 261-91, paras. 427-71 (discussing alternate pricing plans), 482-98 (amending the Commission's rules to improve communications for incarcerated people with disabilities), 499-556 (discussing reforms to the Commission's consumer protection rules).

[9] *Id.* at 304-08, paras. 587-94.  The Commission also issued the *2024 IPCS Reconsideration Order*, which resolved various petitions seeking reconsideration of, clarification of, or waivers from prior Commission orders.  *See 2024 IPCS Reconsideration Order* at 309-12, paras. 599-607.  Additionally, the Commission issued the *2024 IPCS Notice* to obtain additional public comment on IPCS-related issues that it could not resolve on the record then before it.  *See 2024 IPCS Notice* at 312-319, paras. 608-24.  The National Sheriffs' Association Petition seeks a stay only of the *2024 IPCS Order*.  National Sheriffs' Association Stay Petition at iii.

[10] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order Denying Stay Petition, DA 24-1074 (WCB rel. October 15, 2024) (*Pay Tel Stay Denial Order*); *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order Denying Stay Petition, DA 24-1035 (WCB rel. October 2, 2024) (*Securus Stay Denial Order*).

[11] National Sheriffs' Association Stay Petition at 3.

[12] *Id.* at 2.

[13] *Id.* at 3.

merits of any appeal, because the National Sheriffs' Association will suffer irreparable harm absent a stay, and because "the balance of harms and the public interest support a stay."[14]

## III.     DISCUSSION

5.      To qualify for the extraordinary remedy of a stay, a petitioner must show that (1) it is likely to prevail on the merits; (2) it will suffer irreparable harm absent the grant of preliminary relief; (3) other interested parties will not be harmed if the stay is granted; and (4) the public interest would favor grant of the stay.[15]  A stay is an "'intrusion into the ordinary processes of administration and judicial review,' . . . and accordingly 'is not a matter of right, even if irreparable injury might otherwise result'" to the movant.[16]  The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.[17]  The National Sheriffs' Association has failed to meet that burden.[18]

### A.     The National Sheriffs' Association Has Not Shown It Is Likely to Prevail on the Merits

6.      To show likelihood of success on the merits, a petitioner must make a "strong showing" that it is likely to succeed;[19] a "mere possibility of relief" is insufficient.[20]  As the D.C. Circuit has recognized, "[w]ithout such a substantial indication of probable success, there would be no justification for . . . intrusion into the ordinary processes of administration and judicial review."[21]  The National Sheriffs' Association principally argues that, in the *2024 IPCS Order*, the Commission "made several critical legal errors in interpreting key provisions" of the Martha Wright-Reed Act; "failed to adequately consider the cost[s] of safety and security measures – both independently and in the context of the size of facilities – in setting" rate caps; and "failed to follow the [Martha Wright-Reed Act's] explicit command not to construe the legislation to prohibit safety and security measures related to IPCS."[22]

7.      In making these and the other arguments regarding its probability of success on the merits, the National Sheriffs' Association ignores or mischaracterizes key aspects of the comprehensive compensation plan for IPCS that the Commission adopted in the *2024 IPCS Order*.[23]  Indeed, the National Sheriffs' Association's arguments on the merits of that *Order* are largely grounded in erroneous assertions that the Commission failed to consider the costs of certain safety and security measures in setting IPCS rate caps and deemed those costs "unrecoverable" to the extent they are incurred by correctional

---

[14] *Id*. at iii-iv.

[15] *See LightSquared Technical Working Group Report*, Order Denying Motion for Stay, IB Docket No. 11-109, 36 FCC Rcd 1262, 1266, para. 8 (2021) (*Ligado Stay Denial Order*) (citing *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)).

[16] *Nken*, 556 U.S. at 427 (internal citations omitted); *Securus Stay Denial Order* at para. 6.

[17] *Pay Tel Stay Denial Order* at para. 6; *Securus Stay Denial Order* at para. 6; *Ligado Stay Denial Order*, 36 FCC Rcd at 1266, para. 8 (citing *Nken*, 556 U.S. at 433-34).

[18] Although the National Sheriffs' Association challenges only the portions of the *2024 IPCS Order* that, in its words, prohibit "cost recovery for safety and security measures associated with" IPCS, it requests that we stay that *Order* in its entirety.  National Sheriffs' Association Stay Petition at iii, 1.  The National Sheriffs' Association, however, makes no attempt to show how its limited challenge to the *Order* requires a stay of the *Order* as a whole.  Its petition therefore falls far short of meeting the stay criteria.  *See Pay Tel Stay Denial Order*, at 3 n.16.

[19] *Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[20] *Id*. at 434 (internal quotation marks omitted).

[21] *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

[22] National Sheriffs' Association Stay Petition at iii.

[23] *Id*. at 4-7.

institutions.[24]  However, as discussed in more detail below, the Commission fully considered "all the arguably recoverable costs in the record, including costs associated with safety and security measures" in setting rate caps.[25]  And "[t]o facilitate recovery of any used and useful costs" that correctional facilities may incur in the provision of IPCS, the Commission "permit[ted] IPCS providers to reimburse correctional facilities for the used and useful costs they may incur" in the provision of IPCS.[26]

8.      *Treatment of Safety and Security Costs.*  Section 3(b)(2) of the Martha Wright-Reed Act directs that, in "determining just and reasonable rates," the Commission "shall consider costs associated with any safety and security measures necessary to provide" IPCS.[27]  The National Sheriffs' Association argues that "the Commission failed to properly implement" this statutory provision in several respects,[28] each of which the *2024 IPCS Order* addressed.  First, the National Sheriffs' Association argues that the Commission did not "adequately consider" the costs of safety and security measures "independently."[29] The National Sheriffs' Association's argument in this regard is predicated on a disagreement with the Commission's interpretation of the Martha Wright-Reed Act's directive that the Commission "shall consider" safety and security measure costs in its IPCS ratemaking.[30]  According to the National Sheriffs' Association, "[b]y deeming all but three ministerial safety and security measures – call blocking, three-way call prevention, and approved-call lists – unrecoverable, the Commission removed from consideration the costs of all other safety and security measures from its rates."[31]

9.      The National Sheriffs' Association misconstrues the Commission's evaluation of safety and security costs in the *2024 IPCS Order*, which "flows from the statutory text and context, and represents a continuation of the ratemaking role the Commission long has played in this context (and others)."[32]  Regarding the statutory text, the Commission "conclude[d] that the requirement that [the Commission] 'consider' the costs of safety and security measures means that [the Commission] must 'reach . . . express and reasoned conclusion[s]' regarding such costs—as relevant here, as part of the process of determining just and reasonable rates for IPCS."[33]  The Commission also explained that "[c]onsistent with prior interpretations of similar statutory language" the Commission "do[es] not read section 3(b)(2) [of the Martha Reed-Wright Act] . . . as a directive mandating the recovery of the costs of all safety and security measures identified by providers or facilities; or as inherently requiring the Commission 'to give any specific weight' to such costs as a statutory matter."[34]  Instead, "the text of that provision merely requires [the Commission] to examine available evidence regarding 'costs associated with any safety and security measures necessary to provide' IPCS along with the various other cost claims [the Commission] review[s] as part of [its] overall approach to ensuring just and reasonable rates and

---

[24] *Id*. at 5.

[25] *2024 IPCS Order* at 208, para. 389.

[26] *Id*. at 90-91, para. 163.

[27] Martha Wright-Reed Act § 3(b)(2).

[28] National Sheriffs' Association Stay Petition at 4.

[29] *Id*. at 4.

[30] Martha Wright-Reed Act § 3(b)(2).

[31] National Sheriffs' Association Stay Petition at 5.

[32] *2024 IPCS Order* at 189, para. 361.

[33] *Id*. at 186-87, para. 356 (quoting *Time Warner Ent. Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995)).  *See also* Public Interest Parties Opposition at 4.

[34] *Id*. at 187, para. 356 (quoting *Time Warner Ent. Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995)).  *See also* Public Interest Parties Opposition at 3 (noting that "Congress deferred to the Commission's expertise and discretion, and plainly did not obligate the Commission to pass on any such costs it shall consider through the rate caps").

charges for IPCS that also yield fair compensation for providers."[35]  To do so, "[the Commission] employ[s] the 'used and useful' framework to determine what costs and expenses can be recovered through just and reasonable IPCS rates."[36]  Thus, the Commission's "consideration of safety and security costs as required by section 3(b)(2)—and with respect to other safety and security costs raised in the record—occurs within the context of that 'used and useful' analysis."[37]

10.     The Commission thus applied the used and useful framework in considering and evaluating "all of the arguably recoverable costs in the record, including costs associated with safety and security measures, to distinguish those costs that should be included in [the Commission's] ratemaking calculus from those that should not."[38]  In doing so, the Commission arrived at a "middle ground that properly balances 'the equitable principle that public utilities must be compensated for the use of their property in providing service to the public' with the '[e]qually central . . . equitable principle that ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them.'"[39]  Thus, it is simply inaccurate to say that the Commission "removed from consideration" certain safety and security measures.[40]  As the *2024 IPCS Order* makes clear, the Commission evaluated all of the cost data before it using "bedrock ratemaking precedent."[41]

11.     Second, the National Sheriffs' Association argues that the Commission's interpretation of the requirement in section 3(b)(2) of the Martha Wright-Reed Act that the Commission "shall consider" safety and security costs necessary to provide IPCS "ignores the regulatory history of the matter here."[42]  Quite the opposite.  In the *2024 IPCS Order*, the Commission found that its "understanding of section

---

[35] *Id.*

[36] *Id.* at 195, para. 370.  In several places in its petition, the National Sheriffs' Association asserts that certain safety and security costs are "unrecoverable" or that the Commission "prohibits cost recovery for most safety and security measures."  *See, e.g.*, National Sheriffs' Association Stay Petition at 5-6.  Such characterizations are inaccurate insofar as they suggest that there is no possibility of recovery for certain costs.  The Commission made no such determinations.  Rather, it had to determine, through thorough application of "the Commission's traditional ratemaking standard, the used and useful standard . . . whether any costs of safety and security measures are properly recoverable through regulated rates."  *2024 IPCS Order* at 180, para. 339.  And, "[t]o facilitate recovery of any used and useful costs . . . that correctional facilities incur" the Commission "permit[ted] IPCS providers to reimburse correctional facilities for the used and useful costs they may incur."  *Id.* at 90-91, para. 163.

[37] *2024 IPCS Order* at 195, para. 370.

[38] *Id.* at 208, para. 389; *Securus Stay Denial Order* at 7, para. 14.  *See also* Public Interest Parties Opposition at 3 (noting that the Commission followed the "statutory directive" of the Martha Wright-Reed Act "by evaluating the evidence before it regarding" safety and security costs "and making a reasoned judgment about the extent to which such costs should be included in the rates").

[39] *2024 IPCS Order* at 208, para. 389 (quoting *American Telephone and Telegraph Company The Associated Bell System Companies*, Docket No. 19129, Phase II Final Decision and Order, 64 F.C.C.2d 1, 38, para. 111 (1977)).

[40] In fact, the *2024 IPCS Order* includes separate sections evaluating each of the seven categories of safety and security measures.  *See 2024 IPCS Order* at 205-20, paras. 388-407.

[41] *Id.* at 209, para. 390.  We note that the National Sheriffs' Association claims that the Commission denied recovery for "all but three" safety and security measures but leaves out the fact that the Commission permitted recovery for costs associated with CALEA compliance.  National Sheriffs' Association Stay Petition at 5; *see 2024 IPCS Order* at 209-11, paras. 391-93.  Additionally, while the National Sheriffs' Association characterizes those safety and security services the Commission concluded were used and useful as "ministerial," the Commission recognized that "[b]y incorporating the costs reported for these service categories into [the] lower bounds" of its zones of reasonableness, it "retain[ed] a significant portion of providers' reported safety and security costs, i.e., $180 million."  National Sheriffs' Association Stay Petition at 5; *2024 IPCS Order* at 111, para. 200; *Pay Tel Stay Denial Order* at 7, para. 16.

[42] National Sheriffs' Association Stay Petition at 5.

3(b)(2) harmonizes it with the broader regulatory history."[43]  In particular, the Commission explained that "[c]onsidering costs associated with any safety and security measures necessary to provide IPCS as part of [the Commission's] longstanding used and useful analysis reflects a continuation of the sort of analyses the Commission has long undertaken in the IPCS context," including in the *2013 ICS Order* and the *2021 ICS Order*.[44]  The Commission recognized that previously its "inquiry ha[d] been to identify costs associated with safety and security measures that have a sufficient nexus to IPCS to justify recovery of the relevant costs or expenses through IPCS rates."[45]  Insofar as the Commission did not previously, before the *2024 IPCS Order*, determine that specified services designated as "security related" were not used and useful to the provision of IPCS, that is only because the "record then before it made" definitive analysis on that point "impossible."[46]  The National Sheriffs' Association ignores these portions of the *2024 IPCS Order* in asserting that the Commission's treatment of safety and security measures somehow "ignore[s]" the regulatory history.[47]

12.    In any event, the National Sheriffs' Association's invocation of legislative history appears to be meant to support its argument that "the most reasonable interpretation of Congress' intent is that the Commission should ensure cost recovery for safety and security measures associated with IPCS."[48]  Rather than grappling with the language of the Martha Reed-Wright Act or the Commission's

---

[43] *2024 IPCS Order* at 188, para. 359.

[44] *Id.*

[45] *Id.* at 188, para. 360.  *See also id.* (noting that "[t]he Commission's evaluation of the nexus between safety and security measures and the provision of IPCS evolved over time as the industry's use of such measures has increased").

[46] *Id.*

[47] Relying on the D.C. Circuit's opinion in *Global Tel\* Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017) (*GTL* or *GTL v. FCC*), the National Sheriffs' Association also suggests that "[t]he IPCS market and the courts have historically treated safety and security measures as a cost of doing business with corrections facilities" and that "[t]he Commission has previously attempted to eliminate cost recovery for particular safety and security measures, among other costs related to the provision of IPCS, and that effort was rejected."  National Sheriffs' Association Stay Petition at 5.  This misconstrues the Commission's prior actions and the *GTL* case.  In the order under review in the *GTL* case, the Commission had excluded costs associated with site commission payments from its ratemaking calculus.  *See GTL v. FCC* , 866 F.3d at 413.  The D.C. Circuit found this exclusion to be "implausible" based on its understanding at that time that "site commissions obviously are costs of doing business incurred by ICS providers." *Id.*  To the extent the National Sheriffs' Association means to suggest that site commissions may have, at one time, funded various safety and security measures, the Commission acknowledged that linkage in the *2024 IPCS Order*. *See 2024 IPCS Order* at 137, para. 251.  But it is inaccurate to say that the Commission had previously attempted to eliminate cost recovery for certain safety and security measures.  And, in any event, in the *2024 IPCS Order*, the Commission decoupled site commission payments (which the Commission prohibited), from IPCS provider reimbursement of correctional facility costs, including safety and security costs, that are used and useful in the provision of IPCS (which the Commission permitted). *See id.* at 131, para. 242.  "By precluding providers from paying site commissions altogether," the Commission "eliminate[d] the factual predicate—the payment of site commissions as a condition precedent to providing IPCS—which led the court in *GTL* to hold that site commissions could not be wholly excluded from the Commission's ratemaking calculus." *Id.* at 165, para. 307.

[48] National Sheriffs' Association Petition at 5-6.  The National Sheriffs' Association selectively relies on "a statement on a previous version" of the Martha Wright-Reed Act that it claims demonstrates Congress' intent. National Sheriffs' Association Stay Petition at 6 and Attach. A.  Putting aside the fact this legislative statement addresses, as the National Sheriffs' Association concedes, a version of the Martha Wright-Reed Act that was never enacted, the statement's language does not help the National Sheriffs' Association.  In particular, the statement explains that "[n]othing in the bill undermines law enforcements' [sic] ability to recoup safety and security costs.  In fact, applying the just and reasonable standard *preserves* sheriffs' ability to recoup those costs."  National Sheriffs' Association Stay Petition Attach. A (emphasis in original).  In the *2024 IPCS Order*, the Commission determined that because Congress had "imported section 201(b)'s 'just and reasonable' standard into section 276(b)(1)(A) . . . the standard the Commission has used to determine just and reasonable rates under section 201(b) should also apply

(continued….)

interpretation of it in the *2024 IPCS Order*, the National Sheriffs' Association simply asserts that the Commission "substituted its own judgment as to the necessity and 'used-and-usefulness' of safety and security measures," the result of which, it claims, is that "the costs of most safety and security measures are not accounted for and effectively prohibited" in violation of section 4 of the Martha Wright-Reed Act.[49] We disagree.

13.      As an initial matter, the Commission found that the National Sheriffs' Association's preferred reading of section 3(b)(2) of the Martha Wright-Reed Act was at odds with the "best reading of" that provision.[50] The Commission explained that "[s]ome commenters misunderstand section 3(b)(2) and argue that all safety and security measures a facility identifies are automatically necessary and recoverable through regulated rates."[51] "Although section 3(b)(2) requires the Commission to 'consider' costs associated with safety and security measures necessary in providing IPCS when determining just and reasonable rates" the Commission concluded that "commenters d[id] not persuasively demonstrate that, as a textual matter, this requires more than evaluating the available information in the record and reaching a reasoned decision."[52] As the Commission explained: "[c]ontrary arguments would require [the Commission] to interpret section 3(b)(2) as establishing an anomalous approach to ratemaking under the Communications Act that would, at least with respect to the costs of safety and security measures, effectively eliminate the role Congress intended the Commission to play in determining just and reasonable rates and, instead, place that role in the hand of the providers and facilities."[53]

14.      To the extent that the National Sheriffs' Association, by its reference to "used-and-usefulness," complains that the Commission's application of the used and useful framework to the costs of safety and security measures resulted in certain costs that "are not accounted for," this argument does not undermine the Commission's reading of the statute. "[E]xcluding certain costs is precisely the task that Congress required the Commission to perform to ensure, consistent with the Martha Wright-Reed Act, that all 'payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications.'"[54] As explained in the *2024 IPCS Order*, the Commission relied on the used and useful framework and its associated prudent expenditure standard "to assess the costs that should either be included or excluded from [the Commission's] rate cap

_____

(Continued from previous page)

to [the Commission's] ratemaking under section 276(b)(1)(A)." *2024 IPCS Order* at 25, para. 41. That standard— the used and useful standard—is used by the Commission to assess "the costs that should either be included or excluded from [its] rate cap calculations to ensure just and reasonable rates and charges for IPCS." *Id.* at 25, para. 42. Thus, the application of the just and reasonable standard means that some costs will naturally be excluded from the Commission's ratemaking calculus to the extent they are not used and useful. Accordingly, the legislative statement upon which the National Sheriffs' Association relies does not advance its argument because the statement is accurate: the application of the just and reasonable standard will afford sheriffs the opportunity to recover safety and security costs to the extent they are used and useful. Nowhere does it suggest that costs associated with *any* safety and security measure a facility decides it wants are recoverable through IPCS rates.

[49] National Sheriffs' Association Stay Petition at 6; Martha Wright-Reed Act § 4 (stating, in relevant part, that "[n]othing in this Act shall be construed . . . to prohibit the implementation of any safety and security measures related to" IPCS).

[50] *2024 IPCS Order* at 189, para. 362. *See also* Public Interest Parties Opposition at 4 (noting the "complete lack of textual support" for the National Sherriffs' Association's interpretation).

[51] *Id.* (noting that the National Sheriffs' Association made such an argument).

[52] *Id. See also* Public Interest Parties Opposition at 4 (explaining that "Congress could have directed the Commission to 'include' or 'permit the recovery of' certain safety and security costs had it intended the Commission to do so" but "[i]t did not").

[53] *Id.* at 190, para. 362.

[54] *Securus Stay Denial Order* at para. 9 (quoting 47 U.S.C. § 276(b)(1)(A)).

calculations to ensure just and reasonable rates and charges for IPCS."[55]  This is "a familiar task of the sort the Commission has long undertaken when seeking to ensure just and reasonable rates and charges, where it has evaluated costs and expenses of various kinds of which providers sought recovery through regulated rates."[56]  The extent to which certain safety and security costs and expenses were excluded from the Commission's rate cap calculations reflects the Commission's application of the longstanding used and useful framework to determine which costs should not be recoverable through IPCS rates.

15.     We also disagree that the Commission's evaluation and treatment of safety and security costs in the *2024 IPCS Order* conflicts with section 4 of the Martha Wright-Reed Act.  In the *2024 IPCS Order*, the Commission explained that section 4 "makes clear that, in directing the Commission to develop a compensation plan to ensure just and reasonable IPCS rates and charges, Congress did not intend to prohibit correctional institutions from implementing policies that, in their judgment, are needed to preserve safety and security."[57]  Consistent with that interpretation, the Commission read the relevant language in section 4 as "precluding [the Commission] from construing any provision of that Act as making such a prohibition regarding the implementation of any safety and security measures at any federal, state, or local correctional institution."[58]  The Commission explained that such an interpretation was "the best interpretation of the Martha Wright-Reed Act" and would "ensure a meaningful role for both section 3(b)(2) and section 4" of that Act.[59]

16.     The Commission then rejected the argument advanced by the National Sheriffs' Association that the disallowance of costs for certain safety and security measures "effectively prohibits" the measures from being implemented.  The Commission explained that "as a statutory matter . . . in other contexts where Congress wanted to prevent not only the prohibition of certain conduct, but even things that effectively prohibit certain conduct, it has done so explicitly."[60]  The Commission was thus not "persuaded to infer a *de facto* prohibition—a prohibition in fact—from the language of section 4 as the National Sheriffs' Association [had] suggest[ed]."[61]  The National Sheriffs' Association now offers little more than bare assertions that the Commission's actions in connection with safety and security measures conflict with section 4.  Those assertions do not in any way undermine the Commission's extensive analysis in the *2024 IPCS Order* to the contrary.

17.     Third, the National Sheriffs' Association argues that the Commission's treatment of correctional facility costs in the upper bounds of its zones of reasonableness shows that the Commission "effectively failed to consider the differences in costs by small and medium facilities, as required by [s]ection 3(b)(2) of the" Martha Wright-Reed Act.[62]  We again disagree.  To begin with, the National Sheriffs' Association ignores the fact that the Commission's rate cap structure was designed to capture the differences in costs across facilities of all types and sizes, to the extent the data permitted.  Thus, in setting IPCS rate caps, the Commission adopted "a rate cap structure that first distinguishes between two

---

[55] *2024 IPCS Order* at 25, para. 42.

[56] *Id*. at 186, para. 355.

[57] *Id*. at 30, para. 51.

[58] *Id*. at 30-31, para. 51.

[59] *Id*. at 31, para. 53.

[60] *Id*. at 33, para. 58 and n.201 (providing examples).

[61] *Id*. at 33, para. 58.  *See also* Public Interest Parties Opposition at 5 (explaining that the National Sheriffs' Association's argument "conflates the Commission's authority over what service providers may charge ratepayers with the facilities' authority over what safety and security measures the facility and its service providers may choose to employ at their own expense").

[62] National Sheriffs' Association Stay Petition at 7; Martha Wright-Reed Act § 3(b)(2).

types of facilities (jails and prisons) and then four tiers of jails based on size."[63] Because record data did "in fact, indicate significant variations in costs due to facility size" the Commission decided to adopt this "granular tiering structure" to better capture cost differences between facilities of different sizes.[64] Thus, the National Sheriffs' Association is incorrect in asserting that the Commission did not consider cost differences based on facility size and other characteristics as required by the Martha Wright-Reed Act.

18.    In establishing the upper bounds of its zones of reasonableness for each rate cap tier, the Commission "account[ed] for the possibility that some correctional facilities may incur . . . used and useful costs in allowing access to IPCS" using the best data available to it.[65] Because the Commission had "no reliable reported correctional facility cost data" from IPCS providers, the Commission chose to rely on the National Sheriffs' Association's 2015 cost survey, which "[was] the only available correctional facility cost data reported by correctional facility representatives in the record."[66] The Commission relied on those data in incorporating $0.02 into the upper bounds of the Commission's zones of reasonableness for all tiers of facilities.[67] The $0.02 figure was derived from the Commission's analysis in 2021 of the amount of used and useful correctional facility costs" supported by the cost survey for prisons and jails with average daily populations of 1,000 or more.[68] Because "the record ha[d] not developed in any meaningful way since" 2021, the Commission saw "no principled or reasonable basis on which to depart from that determination" for prisons or jails with average daily populations of 1,000 or more.[69] The Commission also included a $0.02 allowance for facility costs in the upper bounds of the zones of reasonableness for jails with lower average daily populations (i.e., small jails and very small jails) because despite "numerous and repeated public attempts to obtain relevant data" commenters "[had] not substantiated their claims that correctional facility costs are higher in smaller facilities."[70] In sum, the Commission concluded that "the record [did] not support the inclusion of an amount greater than $0.02 into the upper bounds of the zones of reasonableness" for any facility tier.[71] Contrary to the National

---

[63] *2024 IPCS Order* at 79, para. 146.

[64] *Id*. at 81-82, paras. 148, 150.

[65] *Id*. at 90, para. 163.

[66] *Id*. at 94, para. 170.

[67] *Id*.

[68] *Id*.

[69] *Id*. at 95, para. 171.

[70] *Id*. at 92, 98, paras. 166, 177. *See also id.* at 92, para. 166 ("In particular, the failure of providers and facilities—which would have the relevant data—to provide such data to the Commission despite repeated calls for them to do so warrants an adverse inference that actual information would not support the case for recovery."). The National Sheriffs' Association also conveniently ignores the fact that the Commission sought comment in the *2024 IPCS Notice* regarding further disaggregation of the very small jail tier representing "those jails with average daily population of less than 100." *Id.* at 314, para. 612. The Commission recognized that "there may be additional distinctions within this tier that are not effectively captured by the available data." *Id.* As a result, the Commission sought comment on "the types of cost or other data that would be most helpful for the Commission to collect from providers serving this tier of facilities to ascertain whether, and if so how, to further disaggregate this tier to capture any variability that may exist within segments of this tier." *Id.* The Commission also sought comment on the use of a uniform additive to account for correctional facility costs. *Id.* at 317, para. 621. Thus, cost issues pertaining to small and very small jails, including facility costs for those jails, are still active issues under consideration in this proceeding. However, the Commission could not wait for additional data on these issues given the requirements of the Martha Wright-Reed Act. *See Martha Wright-Reed Act* § 3(a) (requiring the Commission to promulgate regulations necessary to implement the Act not earlier than 18 months and not later than 24 months after the date of enactment).

[71] *2024 IPCS Order* at 98, para. 177.

Sheriffs' Association's position, this ratemaking treatment is fully consistent with section 3(b)(2) of the Martha Wright-Reed Act.

19.    The National Sheriffs' Association also ignores that the Commission set its rate caps *above* the lower bounds of its zones of reasonableness for each tier.  The Commission "found it appropriate to set rates somewhat above the lower bounds to minimize reliance on the imperfect data on which [the Commission based its] rate caps."[72]  As relevant here, the Commission "recognize[d] that facilities may incur certain costs that are used and useful in the provision of IPCS but the lack of reliable data in the record makes it impossible to quantify those costs with any degree of precision."[73]  The Commission thus took "the conservative approach" of setting rate caps "somewhat above the lower bounds to account for facilities' used and useful costs."[74]  The National Sheriffs' Association fails to contend with the Commission's actions in this regard and otherwise provides no further evidence that the Commission somehow failed to consider cost differences among correctional facilities of different sizes.

20.    *Other Issues*.  The National Sheriffs' Association takes issue with several aspects of the *2024 IPCS Order* that it argues "are likely to be found arbitrary and capricious."[75]  First, the National Sheriffs' Association complains that "the Commission criticize[d] the [National Sheriffs' Association's] cost survey as outdated and likely overstated," adding that no party submitted contradictory cost data.[76]  It further argues that "Pay Tel submitted very recent data that corroborated" the National Sheriffs' Association's cost survey.[77]  But the National Sheriffs' Association fails to recognize that the Commission did, in fact, rely on its data in adding $0.02 for facility costs to the upper bounds of its zones of reasonableness.[78]  The Commission acknowledged that the "$0.02 estimate continues to reflect the best data available concerning facility costs despite outstanding questions."[79]  "[A]s the Commission has explained, 'an agency may reasonably rely on the best data available where perfect information is unavailable.'"[80]  As to the National Sheriffs' Association's assertion about data provided by Pay Tel, the Commission "decline[d] to give any weight to the survey" because it was "unrepresentative" and did "not attempt to account for the nuances of how safety and security measures are administered."[81]  The National Sheriffs' Association fails to acknowledge the Commission's treatment of Pay Tel's data and fails in any way to support its claim that those data "corroborated" the National Sheriffs' Association 2015 cost survey.

21.    The National Sheriffs' Association then argues that the Commission applied the used and useful framework inconsistently to safety and security costs.[82]  We addressed this argument fully in the

---

[72] *Id*. at 118, para. 213.

[73] *Id*. at 119, para. 214.

[74] *Id*. at 119, para. 214.

[75] National Sheriffs' Association Stay Petition at 7.

[76] *Id*. at 7-8.

[77] *Id*. at 8.

[78] *See, e.g.*, *2024 IPCS Order* at 94, para. 170.

[79] *Id*. at 108, para. 192.

[80] *Id*. at 93, para. 167 (citing *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9544, para. 62 (2021) (*2021 ICS Order*)).

[81] *2024 IPCS Order* at 97, para. 175.

[82] National Sheriffs' Association Stay Petition at 8.

*Securus* and *Pay Tel Stay Denial Orders*.[83]  Because the Commission evaluated the safety and security cost data based on the preponderance of tasks within each of seven categories, it is not surprising that, in some cases, such as for law enforcement support services, some functions within a given category might benefit consumers.[84]  But that does not mean the costs of those functions, much less all the costs within that category, should be recoverable under the used and useful standard.  Indeed, in the case of law enforcement support services, the Commission found that certain tasks, while potentially beneficial, "do not facilitate the provision of IPCS and are therefore not used and useful in the provision of IPCS."[85]  Conversely, the Commission concluded that there may be other categories of safety and security measures that provide no direct benefit to the consumer, but were used and useful and therefore recoverable through IPCS rates.[86]  Should a given provider be able to demonstrate that it provides used and useful safety and security measures whose costs are not generally recoverable under the rate caps, it is free to seek a waiver addressing its special circumstances.[87]

22.    Finally, the National Sheriffs' Association argues that the Commission failed to consider the policy effects of its actions in the *2024 IPCS Order* insofar as "a failure to properly account for safety and security measures would lead to a reduction in access to IPCS."[88]  It argues that the Commission's actions in connection with safety and security measures "impact[] the operation and budget of every jail in the country that depends on IPCS rates for recovery of safety and security measures related to IPCS," "impinge[] directly upon sheriffs' ability to determine which safety and security measures are necessary to permit IPCS and interfere[] with individual state and local governments' ability to determine budgets."[89]  We disagree.

23.    The Commission fully recognized the potential budgetary impacts of its actions and therefore adopted staggered compliance dates for its reforms eliminating site commissions and its new audio and video IPCS rates caps.  These time frames recognize that "as a general matter, IPCS providers, governmental officials, and correctional officials may need additional time . . . to renegotiate contracts" and to "accommodate states' and localities' legislative and budgetary processes."[90]  The National Sheriffs' Association ignores these parts of the Commission's compliance plan and fails to explain why the specified timeframes will be inadequate.[91]

---

[83] *Securus Stay Denial Order* at 8, para. 16; *Pay Tel Stay Denial Order* at 9-10, para. 22.  *See also* Public Interest Parties Opposition at 6 (noting the National Sheriffs' Association's repetition of arguments previously dealt with by the Bureau).

[84] *2024 IPCS Order* at 212, para. 394 (recognizing that "some functions in this category [law enforcement support services] may provide a benefit to incarcerated people").  The zone of reasonableness approach the Commission used in developing its overall rate caps helped to account for these outcomes.  *See id.* at 196, 206-08, paras. 372, 387-88.  *See also* Opposition to Pay Tel Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62 and 12-375, at 7 (filed Oct. 14, 2024) (Public Interest Parties Oct. 14, 2024 Opposition).

[85] *2024 IPCS Order* at 213, para. 394.

[86] For example, in the case of CALEA compliance measures, the Commission was "not persuaded that the functionalities associated with CALEA compliance generally would directly benefit IPCS users" but concluded that they are used and useful in the provision of IPCS primarily because "without CALEA compliance, IPCS providers could not offer their audio and certain advanced communications services."  *2024 IPCS Order* at 209, para. 391.

[87] *Id.* at 205-06, para. 385 n.1384; *see also id.* at 124, para. 222 n.787 (explaining how the Commission has relied on similar approaches to identifying recoverable costs in other contexts in the past).

[88] National Sheriffs' Association Stay Petition at 8.

[89] *Id.* at 9.

[90] *2024 IPCS Order* at 305, 307, paras. 588, 593.

[91] *See also infra* Section B.

24.     The National Sheriffs' Association's claims that the Commission's actions will lead to a reduction in access to IPCS are similarly speculative and overstated at best.[92]  The National Sheriffs' Association has not provided any concrete evidence that the Commission's actions have or will lead to such a reduction.  Instead, the National Sheriffs' Association relies entirely on a series of hypothetical statements that "the situation will be forced in many cases" or that the Commission's treatment of safety and security "will in most instances force Sheriffs to decide between access to IPCS for incarcerated people and other resources dedicated to the Sheriff's duty to protect."[93]  The National Sheriffs' Association has not met its burden to substantiate its claims.  As the Commission explained, "[g]iven the availability of reimbursement from IPCS providers for costs that are used and useful in the provision of IPCS, consistent with [the Commission's] statutory duties," there is "no reason to believe that correctional institutions will decrease or limit access to IPCS."[94]

25.     With regard to the argument that the Commission's actions in connection with safety and security measures somehow interfere with the discretion of correctional officials, we reiterate what we said in the *Pay Tel Stay Order*:  "The Commission . . . does not discount, second guess, or otherwise intrude upon the discretion of correctional officials and IPCS providers in its evaluation of the costs associated with safety and security measures that should be included in the Commission's ratemaking calculus and those that should not."[95]  And as the Commission explained in the *2024 IPCS Order*, "[w]hile correctional authorities certainly have expertise on safety and security as a general matter, Congress has not vested the authority in them to decide which safety and security costs should be recoverable in IPCS rates."[96]

26.     At bottom, the National Sheriffs' Association fundamentally misunderstands the Commission's treatment of safety and security measure costs in the *2024 IPCS Order*.  Indeed, "[c]ontrary to the characterizations of some commenters, [the Commission's] actions . . . [were] about fulfilling [the Commission's] obligation under the Martha Wright-Reed Act to adopt a compensation plan for IPCS that ensures just and reasonable rates and charges for IPCS consumers and providers and fair compensation for IPCS providers."[97]  The Commission's actions were "not about questioning or overriding the judgment of correctional officials" or "bar[ring] correctional authorities from implementing any safety and security measures they deem necessary."[98]  The Commission's task was "a narrow one:  to determine the extent to which claimed IPCS costs can be recovered through regulated rates charged to consumers."[99]  The National Sheriffs' Association falls far short of showing that the Commission made any legal or factual error in completing that task.

27.     The National Sheriffs' Association thus has failed to establish that its challenges to the Commission's actions are likely to succeed on the merits.

**B.     The National Sheriffs' Association Has Failed to Show It Will Suffer Irreparable Harm**

28.     The National Sheriffs' Association likewise fails to demonstrate that it will suffer imminent and irreparable harm without a stay.  To establish irreparable harm, a petitioner must show that

---

[92] *Infra* Section B (discussing alleged harms).

[93] National Sheriffs' Association Stay Petition at 9, Attach. B, Declaration of Sheriff Kieran Donahue at para. 5.

[94] *2024 IPCS Order* at 166, para. 311.

[95] *Pay Tel Stay Denial Order* at 8, para. 20.

[96] *2024 IPCS Order* at 190, para. 362.

[97] *Id.* at 208-09, para. 390.

[98] *Id.* at 209, para. 390.

[99] *Id.*

it will suffer injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"[100]  In doing so, the petitioner must present actual evidence to "substantiate [its] claim" of injury.[101]  "'Bare allegations of what is likely to occur are of no value' under this factor, because we 'must decide whether the harm will *in fact* occur.'"[102]  The National Sheriffs' Association has not met its burden to make and substantiate these showings.

29.    The National Sheriffs' Association's attempt to establish irreparable harm relies primarily on how, in its view, correctional officials will respond to the *2024 IPCS Order*.  The National Sheriffs' Association asserts that "the immediate first step for many Sheriffs" in response to that *Order* "will be to reduce – or in extreme cases, eliminate – [IPCS] service."[103]  This reduction will occur, according to the National Sheriffs' Association, because the correctional officials will have to "secure alternative financing" for safety and security measures that have previously been paid for through IPCS rates.[104]  The National Sheriffs' Association argues, in effect, that if alternative financing is not forthcoming, correctional officials will have to "rethink the economics of IPCS" in their facilities and "almost certain[ly]" reduce or eliminate the provision of IPCS in most jails.[105]

30.    In making this argument, the National Sheriffs' Association ignores key aspects of the Commission's compensation plan for IPCS.  As an initial matter, the National Sheriffs' Association ignores the compliance dates that the Commission established for its rate cap and site commission reforms.[106]  Because those compliance dates will give correctional facilities ample time to "secure alternative financing," the National Sheriffs' Association has failed to establish that the Commission's reforms will irreparably harm correctional facilities, much less substantiate that any such harm will be imminent.

31.    In developing its compensation plan for IPCS, the Commission was well aware that site commissions had historically been used to defray the costs of "safety, security, surveillance, and administrative tasks" that are not used and useful in the provision of IPCS.[107]  The Commission recognized that its site commission reforms may require state and local budgetary processes to account

---

[100] *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (*Mexichem v. EPA*); *Securus Stay Denial Order* at 15, para. 31; *see Ligado Stay Denial Order*, 36 FCC Rcd at 1267, para. 10.

[101] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

[102] *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Order, CC Docket No. 96-98, 11 FCC Rcd 11754, 11757, para. 8 (1996) (quoting *Wis. Gas*, 758 F.2d at 674).

[103] National Sheriffs' Association Stay Petition at 10.  The National Sheriffs' Association also suggests that IPCS "driv[es] the [safety and security] costs that are no longer recoverable" in IPCS rates.  National Sheriffs' Association Stay Petition at 10.  The Commission considered this issue in the *2024 IPCS Order*, but found such safety and security costs "are not caused by IPCS communications, and thus neither party to such communications reasonably can be seen as causing those costs through the use of IPCS."  *See 2024 IPCS Order* at 133, para. 246 n.846; *see also id.* at 202, para. 379 n.1359; *Pay Tel Stay Denial Order* at 9, para. 21.  The National Sheriffs' Association fails to contest this conclusion.

[104] National Sheriffs' Association Stay Petition, Attach. B, Declaration of Sheriff Kieran Donahue at para. 8.

[105] National Sheriffs' Association Stay Petition at iii & Attach. B, Declaration of Sheriff Kieran Donahue at para. 8;*see id.*, Attach. B, Declaration of Sheriff Kieran Donahue at para. 5 (arguing that the *2024 IPCS Order* "will in most instances force Sheriffs to decide between access to IPCS for incarcerated people and other resources dedicated to the Sheriff's duty to protect").

[106] *2024 IPCS Order* at 304-05, para. 587.

[107] *Id*. at 137, para. 251.

for lost site commission revenues.[108]  To accommodate those processes "to the extent possible" given the "directives of the Martha Wright-Reed Act,[109] the Commission deferred the compliance dates for its rate cap and site commission reforms for many IPCS contracts until January 1, 2026, and for the medium and smaller jails the National Sheriffs' Association's members typically operate, until April 1, 2026—more than 20 months from the release of the *2024 IPCS Order* and more than 17 months from now.[110]

32.    Given these staggered compliance dates, most correctional facilities, and particularly most medium and smaller facilities managed by the National Sheriffs' Association members, will face no immediate pressure to make up any shortfall for the costs of safety and security measures that have previously been paid for through IPCS rates.  Facilities managed by those sheriffs will continue to benefit from site commissions that defray, among other costs, the costs of any safety and security measures for an extended period of time.  To be sure, the Commission's rate cap and site commission reforms will require that National Sheriffs' Association's members obtain alternative financing for those safety and security measures that are not used and useful for IPCS to the extent that they elect to continue employing them. But the National Sheriffs' Association fails to substantiate that its members will be unable to do so within the compliance timeframes set by the Commission.  Indeed, the National Sheriffs' Association asserts only that it is "by no means guaranteed" that its members will receive alternative financing for safety and security measures that have previously been paid for through IPCS rates,[111] an assertion that falls far short of establishing that irreparable harm is "certain," "not theoretical," and "imminent."[112]

33.    The National Sheriffs' Association also fails to acknowledge that the rate caps adopted in the *2024 IPCS Order* "reflect, based on the record before [the Commission], all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities,"[113] and that the Commission's compensation plan for IPCS "permit[s] IPCS providers to reimburse correctional facilities for "the used and useful costs they may incur" in the provision of IPCS.[114]  To the extent facilities incur such used and useful costs, the compliance timeframes set by the Commission should allow them ample time to negotiate with providers to obtain reimbursement.[115]

34.    The National Sheriffs' Association suggests, in addition, that its member Sheriffs will be irreparably harmed because the *2024 IPCS Order* will require them to reevaluate their operations.[116] These reevaluations will include, according to the National Sheriffs' Association, a "complete reassessment of the level of IPCS the correctional facility can afford," as well as "a reassessment of each incarcerated person's risk profile."[117]  And if the facilities are unable to secure alternative financing, the reassessments may require "a redistribution of facility resources, such as staffing, scheduling, programming, and training" and may ultimately "force Sheriffs to decide between access to IPCS for

---

[108] *Id.* at 307-08, para. 594.

[109] *Id.*

[110] *Id.* at 304-05, 307-08, paras. 587, 594.

[111] National Sheriffs' Association Stay Petition, Attach. B, Declaration of Sheriff Kieran Donahue at para. 8.

[112] *See, e.g.*, *Mexichem v. EPA*, 787 F.3d at 555 (internal quotation marks omitted).

[113] *2024 IPCS Order* at 132, para. 246.

[114] *Id.* at 90-91, para. 163; Public Interest Parties Opposition at 7 (highlighting the reimbursement mechanism and noting that "the lower rates may also lead to an increased usage of IPCS").

[115] *Id.* at 305-08, paras. 588-94.

[116] National Sheriffs' Association Stay Petition at iii, 10-11; *see id.*, Attach B at paras. 5-11.

[117] National Sheriffs' Association Stay Petition at 10-11.

incarcerated people and other resources dedicated to the Sheriff's duty to protect."[118]  We fail to see how having to reevaluate their operations harms correctional facilities, much less rises to the level of an injury that is "both certain and great."[119]

35.    In short, the National Sheriffs' Association's claims of irreparable harm are vague and attenuated, and ignore the compliance timeframes the Commission established for its rate cap and site commission reforms as well as the opportunity for correctional facilities to be reimbursed for any used and useful costs they incur in the provision of IPCS.  Those claims implicitly assume, without acknowledging the relevant part of the Commission's compensation plan for IPCS, that correctional facilities will be unable to obtain reimbursement for those used and useful costs.  Those claims also assume, without identifying even an approximate scope or scale of the amounts involved, that correctional facilities will be unable to secure alternative funding for the costs of other safety and security measures that have been, and—until the compliance dates set by the Commission—may continue to be, financed through site commissions and providers' higher rate caps.[120]  We therefore conclude that the National Sheriffs' Association has failed to demonstrate any imminent, actual, irreparable harm resulting from the *Order*.

### C.    The National Sheriffs' Association Has Not Shown That a Stay Is in the Public Interest and Would Not Harm Other Parties

36.    We next conclude that staying the *2024 IPCS Order* is not in the public interest, as a stay would inhibit or delay the Commission's ability to fulfill statutory obligations and objectives mandated by the Martha Wright-Reed Act and necessary to protect consumers.

37.    The National Sheriffs' Association contends that a stay would benefit the public interest because implementation of the *2024 IPCS Order* will result in many sheriffs "reduc[ing] – or in extreme cases, eliminat[ing]" IPCS at their facilities.[121]  As we observed in the *Securus* and *Pay Tel Stay Denial Orders*, the Commission "found similar concerns raised in the record to be generally unsupported"; and like Securus and Pay Tel, the National Sheriffs' Association "offers no further substantiation for such claims."[122]  Nevertheless, the *2024 IPCS Order* explicitly accounts for these theorized harms by

---

[118] *Id*. at iii; *id*., Attach. B, Declaration of Sheriff Kieran Donahue at para. 5; *see id*., Attach. B, Declaration of Sheriff Kieran Donahue at para. 11 (asserting that Sheriffs may be forced to reduce or eliminate "discretionary programs or functions"; defer "spending on maintenance, purchases, or building improvements," "filling vacancies of nonessential personnel," hiring staff for newly authorized positions"; and reduce "discretionary travel").  *Cf. 2024 IPCS Order* at 166, para. 310 ("To the extent commenters' arguments against the elimination of site commissions are premised on the loss or depletion of state programs currently funded by site commission payments, the 'just and reasonable' standard of the Communications Act does not contemplate funding such programs that are unrelated to the provision of IPCS through regulated rates, regardless of how worthy those programs may be.").

[119] *See, e.g.*, *Mexichem v. EPA*, 787 F.3d at 555 (internal quotation marks omitted).

[120] *Cf. 2024 IPCS Order*, at 92, 98, paras. 166, 177 (recognizing the National Sheriffs' Association failure to provide reliable data on correctional facility costs despite repeated Commission requests for such data).

[121] National Sheriffs' Association Stay Petition at 10-12.  Specifically, the National Sheriffs' Association claims that, as a consequence of the reforms adopted in the *2024 IPCS Order*, jails will incur "lost money, time, and effort to comply," and thus, for example, will only be able to staff "two hours of call monitoring a per day [sic]."  *Id.* at 11.

[122] *Securus Stay Denial Order* at 18, para. 39; *Pay Tel Stay Denial Order* at 19, para. 41; *see 2024 IPCS Order* at 166-67, 209, 307-08, paras. 311-12, 390 n.1399, 594; *id.*, Appx. J at 455-56, para. 7; *see also* Public Interest Parties Oct. 14, 2024 Opposition at 11-12 ("Pay Tel provides no evidence that these outcomes are likely. . . . [N]othing in the [*2024 IPCS Order*] prevents facilities from offering the safety and security features they see fit."); Public Interest Parties Opposition at 8 (noting that the National Sheriffs' Association has "not provided sufficient evidence substantiating its claim that reduced IPCS access would be likely").  Indeed, the National Sheriffs' Association acknowledges that "inmate communications with family and friends is a significant contributor to the adherence to rules and procedures during incarceration," and that reduction in IPCS may compromise "incarcerated peoples' [sic] mental health and well-being," which risks "rais[ing] the level of harm to the incarcerated person him or herself,                          (continued….)

extending the transition deadlines for the new rate cap and site commission rules, which the National Sheriffs' Association fails to acknowledge.[123] As discussed above, those deadlines should provide correctional facilities ample time to secure alternative funding for programs and functions that are now funded through site commissions or higher IPCS rates that will be charged until the compliance deadline.

    38.    By contrast, granting a stay would be contrary to the public interest because it would delay the benefits of comprehensive reform and otherwise inhibit the Commission's ability to protect consumers. A stay would effectively force consumers to pay prices above the just and reasonable rates determined in the *2024 IPCS Order* over a prolonged period, while also delaying the associated reforms that also inure to the public's benefit.[124] For example, and as the Commission observed in the *2024 IPCS Order*, consumers stand to gain from the elimination of ancillary service charges, which are a source of consumer confusion and detrimental provider practices.[125] The public interest in seeing the Commission's reforms take effect on the schedule prescribed in the *2024 IPCS Order* is especially pronounced given the length of time that incarcerated persons and their friends and family have already shouldered undue financial burdens to keep in touch,[126] particularly when Congress expressly directed the Commission to

(Continued from previous page) ————————————————

other incarcerated people, and the jail staff." National Sheriffs' Association Stay Petition at 12. These ramifications indicate that ensuring the continued provision of IPCS is in carceral facilities' own interest, financial and otherwise. *See 2024 IPCS Order* at 20, para. 29 & n.120 (observing that formerly incarcerated persons "suggest[ed] that unlawful activities within correctional facilities would likely decrease if communications services were affordable and accessible").

[123] *See Securus Stay Denial Order* at 18, para. 39; *Pay Tel Stay Denial Order* at 19, para. 41; *2024 IPCS Order* at 304-08, paras. 587-94.

[124] *See, e.g.*, *2024 IPCS Order* at 308, para. 594 ("Any further delays in requiring compliance with our rate cap and site commission reforms risks perpetuating unjust and unreasonable rates and charges for IPCS consumers or yielding unfair compensation for IPCS providers, contrary to the directives of the Martha Wright-Reed Act."); *id.* at 3-4, 229-30, 261-63, 277-78, 301-04, paras. 3, 427-28, 499-501, 530-31, 579-86 (discussing the compelling public interests served by the Commission's IPCS reforms); Public Interest Parties Oct. 14, 2024 Opposition at 8 (arguing that Pay Tel's similar stay request was overbroad, as the *2024 IPCS Order* "adopts reforms on a number of other important issues, which Pay Tel's Stay Request does not address"); *id.* at 10 (arguing that "delaying the implementation of the [*2024 IPCS Order*] would cause significant financial and other harms to incarcerated people and their families that have been subject to unreasonable and predatory prices for too long" and "would add millions of dollars of financial burden for these communities each year"). The National Sheriffs' Association seeks to distinguish its petition from that filed by Securus by claiming that it "seeks only to temporarily preserve the status quo while the courts consider the pending requests for review." National Sheriffs' Association Stay Petition at 12-13. The National Sheriffs' Association fails to explain how this distinguishes the relief it seeks from that sought by Securus, much less how a stay would not harm incarcerated people and their families.

[125] *See 2024 IPCS Order*, at 224-26, 227-29, paras. 418-19, 421-26.

[126] *See id.* at 6-12, paras. 9-20 (recounting over a decade of reform efforts); Martha Wright-Reed Act § 3(a). Additionally, as the Public Interest Parties argued in response to Pay Tel's stay petition, a stay will "deprive many incarcerated people of the regular contact with their families and communities that is essential to their health and wellbeing, as well as their access to legal representation." Public Interest Parties Oct. 14, 2024 Opposition at 10-11; *see also* Public Interest Parties Opposition at 8; Opposition to Securus Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62 and 12-375, at 9-10 (filed Oct. 1, 2024) ("A stay will cause tremendous harm by depriving consumers of the lower rates, and increased family connection, that Congress sought to achieve through the [Martha Wright-Reed Act]. Such delay would prevent many incarcerated people from the health, safety, and wellbeing benefits that reliable communications with their loved ones could bring."); Opposition of Stephen A. Raher to Securus Technologies' Petition for Stay Pending Judicial Review, WC Docket Nos. 23-62, 12-375, at 5 (filed Oct. 1, 2024) (noting that the "public would be harmed by granting the Petition because a stay would extend the long history of unreasonable IPCS rates, even though lowering these rates was the primary motivation behind the enactment of the [Martha] Wright-Reed Act").

enact regulations to implement the Martha Wright-Reed Act within 24 months from the statute's enactment.[127]

39.    For all these reasons, we find that the National Sheriffs' Association has not shown that a stay is in the public interest and would not harm other parties.

## IV.    ORDERING CLAUSES

40.    Accordingly, IT IS ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), and the authority delegated pursuant to sections 0.91 and 0.291 of the Commission's rules, 47 CFR §§ 0.91, 0.291, this Order Denying Stay Petition in WC Docket Nos. 23-62 and 12-375 IS ADOPTED.

41.    IT IS FURTHER ORDERED, that the National Sheriffs' Association Petition for Stay Pending Judicial Review of the Report and Order, filed October 16, 2024, in WC Docket Nos. 23-62 and 12-375, IS DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Trent B. Harkrader
Chief
Wireline Competition Bureau

---

[127] *See* Public Interest Parties Oct. 14, 2024 Opposition at 11 ("Staying the [*2024 IPCS Order*] would also frustrate Congress's express directive that regulations implementing the [Martha Wright-Reed] Act be timely promulgated and effectuated to afford incarcerated people and their families much-needed relief."); Public Interest Parties Opposition at 8 (same).

REDACTED FOR PUBLIC FILING

No. 24-8028, No. 24-1969

_____

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

PAY TEL COMMUNICATIONS, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

_____

On Petition for Review of an Order of the Federal Communications Commission
in WC Docket Nos. 23-62 and 12-375

_____

## MOTION OF PAY TEL COMMUNICATIONS, INC. FOR STAY PENDING JUDICIAL REVIEW

_____

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON,
  HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC  27602
Telephone: (919) 839-0300

*Counsel for Petitioner*

October 25, 2024

**REDACTED FOR PUBLIC FILING**

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................... iii

TABLE OF CONTENTS .................................................. i

INTRODUCTION ........................................................ 1

BACKGROUND ......................................................... 4

    A.    The IPCS Industry ............................................ 4

    B.    Section 276 and Prior Industry Regulation ..................... 5

    C.    The MWRA .................................................... 6

    D.    The Order ................................................... 7

ARGUMENT ........................................................... 8

I.    PAY TEL IS LIKELY TO SUCCEED ON THE MERITS ....... 9

    A.    The Order Does Not Ensure Fair Compensation for All IPCS Providers ........................................... 9

    B.    The Order Unlawfully Excludes Safety and Security Features ................................................... 12

        1.    The FCC's "used and useful" approach is not applicable in the context of IPCS regulation ....... 12

        2.    The FCC applied its "user benefit" standard arbitrarily ............................................ 14

    C.    Treatment of Ancillary Fees ......................... 15

II.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT A STAY ........................................... 16

    A.    Pay Tel Will Suffer Irreparable Harm Without a Stay .. 16

    B.    The Remaining Factors Support a Stay ...................... 20

CONCLUSION ......................................................... 23

**REDACTED FOR PUBLIC FILING**

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

EXHIBIT A          Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375, FCC 24-75 (rel. July 22, 2024; am. Aug. 26, 2024), *Confidential Version*

EXHIBIT B-1        Declaration of Don J. Wood (Oct. 25, 2024), *Public Version*

EXHIBIT B-2        Declaration of Don J. Wood (Oct. 25, 2024), *Confidential Version*

EXHIBIT C          Ex Parte Comments of Pay Tel Communications Inc. with attached Declaration of Vincent Townsend, WC Docket Nos. 23-62, 12-375 (June 18, 2024)

EXHIBIT D-1        Order Denying Stay Petition, WC Docket Nos. 23-62, 12-375, DA 24-1074 (rel. Oct. 15, 2024), *Public Version*

EXHIBIT D-2        Order Denying Stay Petition, WC Docket Nos. 23-62, 12-375, DA 24-1074 (rel. Oct. 15, 2024), *Confidential Version*

EXHIBIT E          Declaration of Sheriff Terry S. Johnson (Oct. 24, 2024)

REDACTED FOR PUBLIC FILING

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner Pay Tel Communications, Inc. ("Pay Tel") submits the following corporate disclosure statement:

Pay Tel does not have any parent corporations. Pay Tel does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of Pay Tel's stock.

**REDACTED FOR PUBLIC FILING**

Pay Tel Communications, Inc. ("Pay Tel"), pursuant to Federal Rules of Appellate Procedure 18 and 27, and First Circuit Local Rule 27, requests a stay, pending judicial review, of the Final Rules promulgated by the Federal Communications Commission ("FCC" or "Commission") in the Report and Order released on July 22, 2024 in the Incarcerated People's Communications Services ("IPCS") dockets ("Order").[1]

## INTRODUCTION

Pay Tel is an IPCS provider. IPCS are audio and video communications services to inmates in confinement facilities, provided under contracts issued by the operators of these facilities, typically state or local governments. Pay Tel is a family-owned company transitioning to ownership by its approximately 100 employees. It has been in business for 35 years and currently serves 151 jails in 17 states. Although the IPCS industry is dominated by two large, national competitors, Pay Tel is an example of several smaller companies that seek to offer niche services—particularly to smaller facilities such as rural jails.

Pay Tel has always sought to treat users of its service with dignity and respect and has long supported reform of the IPCS industry. Pay Tel has actively participated in all phases of FCC administrative proceedings since the initial Notice of Proposed

---

[1] Ex. A. The Final Rules were published in the Federal Register at 89 Fed. Reg. 77,244 on Sept. 20, 2024.

**REDACTED FOR PUBLIC FILING**

Rulemaking in 2012. Pay Tel offers incarcerated people free self-help resources and faith-based programs,[2] and has never engaged in the practice of charging excessive or unnecessary fees and charges that formerly plagued the industry.

Regrettably, the Order's dramatic departure from decades of cautious incremental reform is exceedingly harmful. It unlawfully imposes new rules that, however well-intentioned, will catastrophically impact Pay Tel and other similarly-situated providers, endanger the public, and threaten communications availability to incarcerated people and their families. To wit:

- Under the Commission's own analysis, the Order sets rates below cost for 33% of the providers whose costs formed the basis of the decision.

- On an individual-facility basis, the Order's rate caps and elimination of ancillary fees put incarcerated people in 31% of all facilities—and up to 50% of the nation's jail facilities—at risk of losing service.

- Notwithstanding the clear instruction from Congress to consider safety and security costs in setting IPCS rates, the Order arbitrarily declares that the vast majority of safety and security costs (and their associated features and functions) are not "used and useful" in providing IPCS and not recoverable in rates—nullifying correctional officials' decisions on how to keep their facilities safe and secure, and imperiling public safety.

---

[2] *See* Pay Tel Notice of Ex Parte Meeting, WC Docket Nos. 23-62, 12-375 (June 24, 2024); Pay Tel Pathway to Achieve Learners, https://vimeo.com/user175402048/review/956161788/f4591aa423#.

**REDACTED FOR PUBLIC FILING**

A stay of the Order is justified by the applicable legal standard.

**1.**     Pay Tel is likely to succeed on the merits. The Order violates 47 U.S.C. § 276(b)(1)(A)'s requirement to ensure "all" IPCS providers are "fairly compensated" by setting rate caps below cost for *one-third* of IPCS providers whose costs formed the basis of the decision. *See* Order, App'x J ¶ 5. And, despite MWRA[3] § 3(b)(2)'s mandate to consider costs associated with necessary safety and security measures, the Order arbitrarily and capriciously rejected cost recovery for five of the seven categories of safety and security features delineated by the Commission. Order ¶ 339. Additionally, the Order's elimination of ancillary fees inappropriately shifts costs to non-cost-causers which, along with other methodological errors, will result in the under-recovery of actual costs.

**2.**     Pay Tel will suffer irreparable harm absent a stay. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[3] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("MWRA").

██████████████████████████████████████

██████████████████████████████████████

**3.** The equities favor a stay as the Order will harm the intended beneficiaries. Most significantly, the Order will reduce access to features and functions that protect the public from abuse and it risks. It will also materially inhibit competition in the marketplace, which in turn risks reduced communication access for the people the lowered rates are intended to benefit.

The Court should stay the Order's Final Rules before their November 19, 2024 effective date.

## BACKGROUND

### A.    The IPCS Industry

The IPCS industry provides communications services to inmates and their friends and family seeking to stay connected while the inmate is incarcerated.

Unfortunately, without appropriate safety and security measures, some inmates will use IPCS to engage in illicit activities. *See* Order ¶¶ 1, 367. Accordingly, IPCS providers have developed calling platforms that integrate safety and security features required by correctional facility administrators. *See generally* Ex. C, Townsend Decl.; Ex. E, Johnson Decl. ¶ 3, 8. Contrary to the Order's assumption, development of safety and security features is an iterative and ongoing

**REDACTED FOR PUBLIC FILING**

process—i.e., providers put in place a feature, inmates find a way to circumvent it, and providers implement a more advanced solution. *Id.*

IPCS does not occur in a typical bilateral market where service is dictated by market forces. *See* Order ¶ 23. Instead, facility operators select the provider through competitive bidding processes, dictate the conditions of service, and control access to calling privileges. For example, facilities may, and do, limit access to certain types of calling devices, require specified calls to be provided free-of-charge, and limit the number of calls that may be made (e.g., restricting calls to certain period of the day or certain days of the week). Traditionally, facilities have received compensation from providers through commissions on IPCS revenues—"site commissions"—which have been prohibited by the Order.

## B.     Section 276 and Prior Industry Regulation

In the Telecommunications Act of 1996[4] Congress directed the FCC "to ensure that all payphone service providers"—which includes IPCS providers—"are fairly compensated for each and every" completed call. 47 U.S.C. § 276(b)(1)(A), (d) (1996).

In 2013, the FCC first attempted to implement rate caps and require cost-based calling rates and ancillary charges. *See* Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (rel. Sep. 26, 2013) ¶¶ 12, 48. The

---

[4] Pub. L. No. 104-104, 110 Stat. 56.

D.C. Circuit stayed portions of that order requiring cost-based rates. The FCC implemented revised rate caps in the Second Report and Order and Third Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Rel. Nov. 5, 2015) (the "2015 IPCS Order").

In *Glob. Tel\*Link v. FCC* ("*GTL*"), 866 F.3d 397, 402 (D.C. Cir. 2017), the D.C. Circuit vacated the 2015 IPCS Order's rate caps and remanded for further proceedings, holding that the FCC (1) lacked statutory authority to regulate intrastate rates, *id.* at 412; (2) arbitrarily and capriciously relied on industry-wide averages costs so "all" IPCS providers were not "fairly compensated" for "each and every" call, *id.* at 414-15; and (3) unlawfully prohibited IPCS providers from recovering site commission through rates, because "[i]gnoring costs that the Commission acknowledges to be legitimate is implausible." *Id.* at 413.

## C. The MWRA

In early 2023, the MWRA was signed into law. The MWRA eliminated Section 276's requirement that payphone service providers be fairly compensated for "each and every" call, added a requirement that all rates and charges be "just and reasonable," and permitted, but did not require, the FCC to "use" both "industry-wide average costs . . . and the average costs of service of a communications provider." MWRA §§ 2(a), 3(b).

REDACTED FOR PUBLIC FILING

Critically, Congress retained the requirement that the FCC ensure "all" IPCS providers are "fairly compensated." *See id.* § 2(a); 47 U.S.C. § 276(b)(1)(A). Congress also required the FCC to "consider costs associated with any safety and security measures necessary to provide" IPCS in determining just and reasonable rates. MWRA, § 3(b).

### D.    The Order

In 2023, the FCC issued a notice of proposed rulemaking[5] for the MWRA and a mandatory data collection order.[6] As it had for the past decade in response to similar data collection orders, Pay Tel submitted extensive cost and other data related to its provision of IPCS.

Relevant here, the Order made the following decisions:

1.    The FCC set rate caps that—by the FCC's own estimation—are below cost for *one-third* of IPCS providers, including Pay Tel. *See* Order ¶ 216; *id.* App'x J, ¶ 5 & Table 3. The FCC justified these cuts, in large part, by arbitrarily excluding from cost-recovery five of the seven categories of safety and security features the FCC delineated in its prior data collection efforts. *See* Order ¶ 339. Those caps will

---

[5] *See* Notice of Proposed Rulemaking and Order, *Incarcerated People's Communications Services*, 38 FCC Rcd 2669 (2023).

[6] *See* Order, *Incarcerated People's Communications Services*, 38 FCC Rcd 6625 (2023).

begin to take effect on January 1, 2025, although in many prisons and jails they will not take effect until April 2025 or later. *See id.* ¶ 587.

2.      The FCC required IPCS providers to recover all costs through per-minute rates, eliminating separate ancillary service charges, such as for credit card processing or other transaction costs IPCS providers incur. 47 C.F.R. § 64.6020. Although the FCC delayed implementation of its rate caps, its prohibition on ancillary service charges will take effect on November 19, 2024.

3.      The FCC prohibited IPCS providers from paying direct or in-kind site commissions to facilities. This prohibition—coupled with the FCC's determination that five of seven categories of safety and security costs are not "used and useful" to IPCS—restricts the safety and security services which can be provided to facilities.

On October 7, 2024, Pay Tel petitioned the FCC to stay its Order pending judicial review, which the FCC denied on October 15, 2024.[7]

## ARGUMENT

A stay of agency action is appropriate where a petitioner demonstrates that (1) it will suffer irreparable harm in the absence of a stay; (2) it is likely to succeed on the merits of its petition for review; (3) a stay will not "substantially harm" other

---

[7] Exs. C-1 and C-2, Order Denying Stay Petition, WC Docket Nos. 23-62 & 12-375 (rel. Oct. 15, 2024, am. Oct. 23, 2024).  At Pay Tel's request, the order was re-released on October 23, 2024, with the issuance of an Erratum, due to the improper disclosure of Pay Tel's confidential information.

interested parties; and (4) a stay is in the public interest. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 42 (1st Cir. 2021).  The first two factors—likelihood of success on the merits and irreparable harm—"are the most critical." *Id.*

## I.      PAY TEL IS LIKELY TO SUCCEED ON THE MERITS

The Order is the Commission's first attempt to interpret and implement the MWRA. As such, the agency's interpretation of the MWRA is not entitled to deference. *See Loper Bright Enters., Inc. v. Raimondo*, 144 S. Ct. 2244 (2024). Regardless, the agency's interpretation is plainly inconsistent with the requirements of 47 U.S.C. § 276, the MWRA, or both, and is reflective of arbitrary and capricious decision-making.

### A.      The Order Does Not Ensure Fair Compensation for All IPCS Providers

The MWRA enacted targeted revisions to the Commission's regulatory authority over IPCS, addressing the lack of authority over intrastate rates and repealing the requirement for fair compensation for "each and every" completed call, replacing it with a requirement that all rates and charges be "just and reasonable."

Importantly, Congress did not repeal or amend the Section 276(b)(1)(A) requirement that "all" providers be "fairly compensated." Thus, consistent with the Commission's and *GTL*'s long-standing interpretation, it remains the law that the FCC must adopt a compensation plan that ensures that each provider is able to

recover its total costs from its aggregate revenues. *See GTL*, 866 F.3d at 413; Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking ¶ 112, *Rates for Interstate Inmate Calling Services*, FCC 20-111 (rel. August 7, 2020). The Order's interpretation errs by failing to give effect to this provision.

Under the Commission's own analysis, the new rates are below cost for *one-third* of the providers it studied. *See* Order ¶¶ 65, 216. The FCC trivializes this fact by stating that these providers, who presumably will go out of business, "only account for 4 percent of IPCS minutes." Order ¶ 216. The actual effect is much more significant.

Even for the "profitable" providers whose *total* revenue is projected to exceed *total* reported expenses, the Order would deny cost recovery at almost 30% of the facilities they serve. Order App'x J, Table 3; Ex. B, Wood Decl. ¶ 15. For-profit providers would be highly unlikely to continue to serve below-cost facilities. Accordingly, the Order's observation that "a large fraction of facilities of all types demonstrate profitability at rates consistent with our rate caps" (Order, App'x J, ¶ 3) obfuscates the reality that *the Order places 31% of all prisons and jails at risk of losing IPCS*. Ex. B, Wood Decl. ¶ 16. On the reasonable assumption that the majority of these below-cost facilities are jails, the Order places nearly 50% of the nation's 3,000 jails in jeopardy of losing service.

**REDACTED FOR PUBLIC FILING**

It bears emphasis that the above analysis is based on the FCC's own data,[8] which—as discussed below—improperly excludes the vast majority of safety and security costs. If those costs were properly considered, more than 50% of all providers will be unable to recover their costs under the new rate caps. *See* Ex. C, Securus Ex Parte Letter at 6 & n.12, WC Docket Nos. 23-62, 12-375 (July 15, 2024).

Smaller providers like Pay Tel who focus on service in jails and are less likely to be able to blunt the financial losses with revenues from other lines of business, will feel these effects hardest.

The Order's suggestion that the new rules will weed out "inefficient" providers is not supported by any actual evidence. *See* Order, App'x J, ¶ 6 and n.7. "Inefficient" providers are deemed as such only because their average costs exceed the average cost of the dominant providers after arbitrarily and erroneously (*see infra*) rejecting most of those companies' safety and security costs. *See* Ex. B, Wood Decl. ¶¶ 17-26. When those costs are properly considered, the record demonstrates the opposite—for Pay Tel, its reported costs are consistent with industry average costs and those deemed "efficient." *Id.* ¶ 26.

---

[8] This data incorporates various errors which understate actual IPCS costs and exemplify arbitrary and capricious decision-making: (1) improperly using unbilled minutes (*e.g.*, calls that providers are required to make available for free) to calculate rate caps, mathematically guaranteeing that providers cannot recover their costs of providing IPCS (*see id.* App'x E ¶¶ 1, 4); (2) refusing to account for inflation (*id.* App'x J ¶ 8); and (3) refusing to account for regulatory compliance costs. *Id.* ¶ 585.

## B.    The Order Unlawfully Excludes Safety and Security Features

The core purpose of IPCS—when, otherwise, "Plain Old Telephone Service" would suffice—is to keep the public safe from bad things that otherwise would happen.[9] Yet the Order effectively concludes that these "bad things" are somehow irrelevant to IPCS and that the costs associated with keeping them from happening are not recoverable because they are not "used and useful" under 47 U.S.C. § 201—a statute nowhere referenced in 47 U.S.C. § 276. This single logic-defying decision accounts for 84% of the overall reduction in IPCS audio rate caps. *See* Order ¶ 209.

### 1.    The FCC's "used and useful" approach is not applicable in the context of IPCS regulation

In implementing the MWRA, Congress decreed that: "Nothing in this Act shall be construed to . . . prohibit the implementation of any safety and security measures" related to IPCS "at a State or local prison, jail, or detention facility." MWRA § 4. Thus, in calculating "just and reasonable rates" which "fairly compensate" IPCS providers, "the Commission is required to consider the 'costs associated with any safety and security measures necessary to provide'" IPCS. Order ¶ 8 (quoting MWRA § 3(b)(2)).

The mandate to "consider" safety and security costs was not an invitation for the Commission to reject these costs wholesale—yet it did. To achieve this result,

---

[9] *See, e.g.*, Ex. C, Townsend Decl. ¶¶ 5-11; Order ¶¶ 1, 376.

**REDACTED FOR PUBLIC FILING**

the Order improperly imported Section 201's "used and useful" standard for rate-of-return carriers. *See* Order ¶¶ 42-43. Under that standard, the FCC "considers whether the investment or expense 'promotes customer benefits, or is primarily for the benefit of the carrier.'" *Id.* ¶ 43.

Application of Section 201's standard here is erroneous. <u>First</u>, neither "used and useful" nor Section 201 are referenced in the MWRA or Section 276. Here, just as in *GTL*, "the Order conflates two distinct statutory grants of authority [Section 201 and 276] . . . . This is impermissible." 866 F.3d at 412.

<u>Second</u>, even if "just and reasonable," as used in the MWRA, is read as "used and useful" is used in Section 201, the Commission's application here was in error. The Section 201 application of the "used and useful" framework is aimed at protecting consumers from paying for items that are unnecessary (*i.e.*, "gold plating"), not useful, or otherwise imprudent. *See Am. Tel. & Tele. Co.*, Docket No. 19129, Phase II Final Decision and Order, 64 F.C.C.2d 1, 8, ¶ 112 (1977) (plant and property not considered "used and useful" when overbuilt, inadequate, or no longer used due to decrease in business). The Order makes no such findings with regards to any of the safety and security costs it excludes; to the contrary, the record demonstrates that these features are essential to protection of the public.

<u>Third</u>, the dichotomy advanced in the Order between costs that benefit the user and those that benefit the provider is inapt in the unique IPCS context, where

REDACTED FOR PUBLIC FILING

the facility operator dictates the terms under which ICPS is made available. If safety

and security features are functioning properly, they will never be seen as a benefit

by an incarcerated person attempting to use the phone for criminal activity.  Thus,

the Order's focus on whether the incarcerated person "benefits" from the feature in

issue is "too cute by half," *see U.S. v. Ven-Fuel, Inc.*, 758 F.2d 741, 763 (1st Cir.

1985), and is transparently intended to achieve a specific end—the exclusion of

costs.

### 2.    The FCC applied its "user benefit" standard arbitrarily

The Order exacerbates its error by applying the "user benefit" standard

arbitrarily and incoherently.

For example, the Order disallows some features that are simply second- or

third-generation versions of features that the Order deems to be recoverable in rates.

*Id.* ¶ 385 n.1384.

Additionally, the Order prohibits recovery for safety and security measures it

concedes benefit users (¶ 394), while allowing recovery for measures it says do not

benefit users (¶ 391); excludes some features because it is possible to make calls

without them (¶ 394), while allowing recovery for others (like "fraud management")

that are unnecessary to make calls (¶ 395); and bars recovery for "call monitoring"

and "call recording" while permitting recovery for compliance with CALEA—a law

requiring call monitoring and recording capabilities. *See id.* ¶ 391.

**REDACTED FOR PUBLIC FILING**

The Order seeks to elide these inconsistencies by claiming that exclusion of costs was based on the "preponderance" or "primacy" of tasks within each category. *See id.* ¶ 385. But the evidentiary record before the Commission was woefully inadequate to make any such determination and the agency's post hoc effort to articulate a refinement to its "user benefit" test further illustrates the arbitrary nature of its decision making.

### C.    Treatment of Ancillary Fees

The Order prohibits the assessment of ancillary fees, including fees intended to recover the costs associated with establishing customer payment accounts such as third-party and live agent payment processing fees.  Order ¶ 408.

The Order's elimination of these fees shifts costs associated with these ancillary activities to general service rates, and those who do not cause the costs to be incurred will be unfairly held responsible for paying those costs.

Additionally, because IPCS providers are prohibited from imposing minimum-deposit amounts, the inability to pass through payment services costs will encourage user behavior that increases those costs—and under the new rate structure, these costs will not be recoverable. For example, end users will make decisions that marginally increase their convenience but drastically increase costs for providers—such as high volumes of small deposits and multiple refund requests for the same account. This will undermine the basis for the Commission's cost

**REDACTED FOR PUBLIC FILING**

recovery assumptions in the Order. The Order's failure to account for these additional costs is arbitrary and capricious and will result in the under-recovery of actual costs.

## II. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT A STAY

The balance of equities also strongly favors a stay of the Order. While Pay Tel will ██████████████████████████████████████████████ ██████████████████████████, a stay will not injure third parties, and will benefit the general public.

### A. Pay Tel Will Suffer Irreparable Harm Without a Stay

Absent a stay, Pay Tel will suffer irreparable harm in the form of direct and unrecoverable economic losses which ████████████████████████████ ██████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████

██████████████████████ "the irreparable harm requirement may be met upon a showing that 'absent [preliminary relief], [a party] would lose incalculable revenues and sustain harm to its goodwill.'" *Vaqueria Tres Monjitas,* ,

16

**REDACTED FOR PUBLIC FILING**

587 F.3d at 485 (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996)).

Here, none of Pay Tel's economic losses can be remedied by compensatory awards—and are therefore irreparable. And neither the Order's arbitrary 60-day compliance deadline nor its phase-in compliance deadlines for facilities with existing contracts provide cure or relief.

Beginning November 19, 2024, Pay Tel will suffer irreparable harm when the Order's ancillary service prohibition takes effect in all jails. *See* Order ¶ 587. Pay Tel's ancillary fees were established pursuant to the FCC's existing regulatory scheme, which permitted site commissions and allowed charges for certain ancillary services, subject to a cap. *See* Order ¶ 129. Absent a stay, ███████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████ At the same time, Pay Tel will incur significant regulatory compliance costs,[10] incur both stranded costs of investment for nascent safety and security features and significant

---

[10] As one example, Pay Tel will be required to renegotiate all of its existing facility contracts—an enormous undertaking which will consume extensive personnel resources.

development cost to de-integrate existing safety and security features that the Order deems not "used and useful."

On January 1, 2025, Pay Tel's losses will accelerate as the Order's rate caps begin phasing in, which, as discussed *supra*, are lower than the rates Pay Tel currently bills for the vast majority of facilities. *See* Order ¶ 216; *id.* App'x J, ¶ 5 and Table 3. Once the rate caps are fully in effect, ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████████████

**REDACTED FOR PUBLIC FILING**

█████████████████████████████ which are material to Pay Tel and

cannot be recovered or redressed if the Order is later reversed.

The FCC—attempting to downplay the irreparable financial harm and
existential threat posed by the Order—"anticipate[s] that, over time, revenues for
additional providers will exceed their total actual costs." Order ¶ 217. ████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

The Commission's characterizations of Pay Tel's cost data is equally
unavailing. *Compare* Order App'x J ¶ 10 n.27 ("Pay Tel's argument that one third
of its facilities will be loss-making under our rate caps requires belief that its cost
allocations accurately reflect underlying costs.") *with id.*, App'x D, ¶ 9 ("The IPCS
database provides a helpful depiction of the IPCS industry. The database's twelve
providers [including Pay Tel] represent the vast majority of the IPCS industry, and
their worksheets, though not audited, are broadly consistent with their submitted
financial accounts.").

In sum, absent a stay of the Order, Pay Tel will suffer irreparable harm in the
form of unrecoverable financial damage beginning November 19, 2024. This harm

will accelerate throughout 2024, culminating in ████████████████████

████████████████

### B.    The Remaining Factors Support a Stay

While Pay Tel will suffer irreparable harm absent a stay of the Order, other interested parties will not suffer cognizable harm if a stay is granted.

As an initial matter, the remaining stay factors (assessing any harm to the opposing party and weighing the public interest) "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435-36 (2009). And the "public's true interest lies in the correct application of the law." *See Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). The public's lack of a legally cognizable interest in the Order taking effect before a court determines whether the FCC exceeded its legal authority counsels in favor of a stay.

Moreover, the Order will impose significant negative unintended consequences for public safety, competition in the market, and IPCS access more broadly. First, prisoners and their families will be directly harmed if IPCS services become unavailable or less available due to the Order pricing out IPCS providers, particularly in jails—resulting in precisely the harms that the Order purports to be addressing. *See, e.g.*, Order ¶ 367 n.1308; *id.*, Statement of Comm'r Carr (approving in part and concurring in part) ("It is in nobody's interest for these providers to exit the market, or for smaller facilities to go unserved because the economics no longer

make sense."). Yet, under the Order, according to its own analysis, service will be put at risk in up to nearly fifty percent of the nation's jails. Ex. B, Wood Decl. ¶ 16.

Second, pricing out IPCS providers will also harm incarcerated persons and their families through further constriction of the IPCS market. As the United States Department of Justice explained in these proceedings:[11] "Vigorous competition yields myriad benefits across the U.S. economy, including lower prices, higher quality goods and services, increased access to goods and services and greater innovation." *Id.* at 2. Yet the IPCS market—which, prior to the Order was already "highly concentrated" and has "significant barriers to entry and expansion"[12]—will likely only become more concentrated as IPCS providers that are no longer able to recover their costs exit the industry.

Third, incarcerated persons, their families, and the general public will be harmed if safety and security features are curtailed or eliminated due to the Order deeming such services unrecoverable. These dockets are replete with evidence that safety and security technology measures have been integrated into calling system functionality at the request of facility administrators, in response to instances of abuse of calling service privileges. *See, e.g.*, Ex. C, Townsend Decl. The Order's

---

[11] Dep't of Justice Ex Parte, WC Docket Nos. 23-62, 12-375 (Apr. 29, 2024) (the "DOJ Ex Parte").

[12] *Id.* at 3.

disallowance of the majority of the existing safety and security features will mean that abuse that might have been deterred or prevented will go unchecked.

Fourth, incarcerated persons and their families will also be harmed if facilities restrict access to IPCS due to reduced safety and security features and/or inability to fund IPCS functions performed by facilities. Facility operators "cannot and will not allow the public to be exposed to ongoing criminal conduct by inmates using communications devices supplied for use in our facilities." Ex. E, Johnson Decl. ¶ 3, 8. Local carceral institution budgets and staffing are strained. If faced with offering a discretionary service that requires additional commitment of personnel and monetary resources—many facilities will "have no choice" but to curtail access to those services. *See id.*

The Order points to benefits that incarcerated persons and their families will receive from the new rates and rules. *See* Order ¶¶ 1-2. But even without a stay, incarcerated persons in many Pay Tel facilities will not see financial benefits from the rate caps until sometime in 2026, by which time service may already be curtailed to a significant number of facilities.

Given that Pay Tel is likely to succeed on the merits of the case, and considering that Pay Tel will suffer irreparable harm absent a stay, third parties will not be harmed by a stay, and the public will benefit from such stay, Pay Tel's petition should be granted.

**REDACTED FOR PUBLIC FILING**

## CONCLUSION

Pay Tel Communications, Inc. respectfully requests that the Court stay the
Final Rules promulgated in the FCC's Report and Order released on July 22, 2024
in the IPCS Dockets (WC Docket Nos. 23-62 and 12-375), pending judicial review.

**REDACTED FOR PUBLIC FILING**

Dated:  October 25, 2024

Respectfully submitted,

*/s/ Marcus W. Trathen*
Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC  27602
Telephone:  (919) 839-0300
mtrathen@brookspierce.com
ahawkins@brookspierce.com
cdodd@brookspierce.com

*Counsel for Petitioner*
 *Pay Tel Communications, Inc.*

**REDACTED FOR PUBLIC FILING**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d) and 32(g), the undersigned hereby certifies that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1.   Exclusive of the accompanying documents as authorized by Fed. R. App. P. 27(a)(2)(B) and the exempted portions of the motion as provided by Fed. R. App. P. 27(d)(2) and 32(f), the motion contains 5,174 words.

2.   The motion has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font as provided by Fed. R. App. P. 32(a)(5)-(6). As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ *Amanda S. Hawkins*
Amanda S. Hawkins

October 25, 2024

**REDACTED FOR PUBLIC FILING**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 25, 2024, I caused a redacted copy of this Motion to be filed electronically through the Court's CM/ECF system.

I further certify that on October 25, 2025, I caused a physical copy of the Motion (under seal and unredacted) to be delivered via U.S. Mail to the Clerk's Office Clerk's Office for the United States Court of Appeals for the First Circuit, John Joseph Moakley U.S. Courthouse, 1 Courthouse Way, Suite 2500, Boston, MA 02210.

I further certified that on October 25, 2024 I caused physical copies of both the redacted Motion and unredacted, under seal Motion to be served on the following parties or their counsel of record by U.S. mail:

P. Michele Ellison
General Counsel
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554
fcclitigation@fcc.gov

Merrick Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

/s/ *Amanda S. Hawkins*
Amanda S. Hawkins

October 25, 2024

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| _____ | ) | |

**COMMENTS OF**
**GLOBAL TEL\*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES**

Global Tel\*Link Corporation d/b/a ViaPath Technologies ("ViaPath"),[1] by its undersigned counsel, respectfully submits these comments regarding the effective date for implementation of the prohibition on incarcerated people's communications service ("IPCS") ancillary service charges adopted by the Federal Communications Commission ("Commission") in the *2024 IPCS Order*[2] as discussed in the Petition for Partial Stay and Petition for Reconsideration and/or Clarification filed in the above-referenced dockets.[3]

---

[1] These comments are filed by ViaPath on behalf of itself and its wholly owned subsidiaries that also provide incarcerated people's communications services: DSI-ITI, Inc. d/b/a ViaPath Technologies, Public Communications Services, Inc. d/b/a ViaPath Technologies, Telmate, LLC d/b/a ViaPath Technologies, and Value-Added Communications, Inc. d/b/a ViaPath Technologies.

[2] WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75 (rel. July 22, 2024) ("*2024 IPCS Order*") (subsequent history omitted).

[3] WC Docket Nos. 23-62, 12-375, Petition for Partial Stay (dated Oct. 21, 2024); WC Docket Nos. 23-62, 12-375, Petition for Reconsideration and/or Clarification (dated Oct 21, 2024). Pursuant to Rule 1.45(d), responses to a request for stay shall be filed within 7 days after the request is filed, or by October 28, 2024. *See* 47 C.F.R. § 1.45(d).

In the *2024 IPCS Order*, the Commission adopted "comprehensive reforms"[4] to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWR Act"),[5] which the Commission concluded represented an "effort to comprehensively address unreasonably high rates and charges that incarcerated people and their families pay for communications services."[6] There are three main components of the Commission's "comprehensive plan"[7] to ensure just and reasonable rates: (1) "Lower existing per-minute rate caps for audio IPCS and establish initial interim per-minute rates for video IPCS;" (2) "Lower the overall prices consumers pay for IPCS and simplify the pricing structure by incorporating the costs of ancillary services in the rate caps and prohibiting providers from imposing any separate ancillary service charges on IPCS consumers;" and (3) "Prohibit IPCS providers from making site commission payments for IPCS and preempt state and local laws and regulations requiring such commissions."[8]

While other rule changes are scheduled to take effect 60 days after Federal Register publication, the Commission unequivocally determined that implementation of its new comprehensive compensation plan would require additional time.[9] The Commission understood and explained that IPCS providers and their correctional facility customers would require "additional time . . . to renegotiate contracts in response to [the Commission's] actions" and to "accommodate the legislative process to amend state or local laws and regulations" that conflicted with the FCC's new compensation plan.[10] Accordingly, the Commission adopted a "staggered"

---

[4]     *2024 IPCS Order* ¶¶ 2, 3, 242, 590.

[5]     S. 1541 (2022), https://www.congress.gov/bill/117th-congress/senate-bill/1541/text.

[6]     *2024 IPCS Order* ¶ 5.

[7]     *2024 IPCS Order* ¶ 82.

[8]     *2024 IPCS Order* ¶ 3.

[9]     *2024 IPCS Order* ¶ 588

[10]     *2024 IPCS Order* ¶ 588.

implementation process for those contracts that "would require material alteration through renegotiation due to a conflict with [the Commission's] new rules involving rates, contractually prescribed site commissions, or passthrough charges included in the rates."[11]  The Commission determined such additional time was necessary "given the comprehensive nature of the reforms" adopted in the *2024 IPCS Order*.[12]

There is no question the *2024 IPCS Order* intended for all of the Commission's rate reforms – the prohibition on separate ancillary service charges, the new rate caps now incorporating the costs of ancillary service charges, and the prohibition on site commissions contained in contracts or state laws – to be subject to the staggered implementation process designed by the Commission.[13]  Any other interpretation[14] conflicts with the Commission's treatment of ancillary service charges as "rates," the Commission's rationale for adopting a staggered transition for contract amendments and state law changes, and the operational difficulties associated with changing one of the comprehensive reform measures on a different schedule than the others,[15] as supported by the attached Declaration.[16]

---

[11]    *2024 IPCS Order* ¶ 587.

[12]    *2024 IPCS Order* ¶ 590.

[13]    *2024 IPCS Order* ¶ 587.

[14]    *See, e.g.*, WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Order Denying Stay Petition, DA 24-1031, ¶¶ 28-29 (rel. Oct. 2, 2024) ("*Securus Stay Order*"); WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Order Denying Stay Petition, DA 24-1074, ¶¶ 29-32 (rel. Oct. 15, 2024) ("*Pay Tel Stay Order*").

[15]    47 C.F.R. § 0.5(c) (delegating authority to staff "to act on matters which are minor or routine or settled in nature"); 47 C.F.R. § 0.291 ("The Chief, Wireline Competition Bureau shall not have authority to act on any applications or requests which present novel questions of fact, law or policy which cannot be resolved under outstanding precedents and guidelines.").

[16]    Declaration of John C. Pitsenberger on behalf of Global Tel\*Link Corporation d/b/a ViaPath Technologies ("Declaration").

Ancillary service charges are "rates." The *2024 IPCS Order* is clear that the "new rules involving rates" are to be implemented using the staggered timeline established by the Commission.[17] The Commission has determined that ancillary service charges "are inherent in the provision of IPCS."[18] The FCC's authority to regulate ancillary service charges stems from its authority to regulate "rates" under Section 201(b) and Section 276(b).[19]

Considering ancillary service charges outside of "rates" also is inconsistent with the Commission's "total cost" approach to IPCS rates.[20] Under that approach, the Commission incorporated the costs associated with ancillary service charges into its new rate caps, and eliminated the pass-through of separate ancillary service charges by IPCS providers.[21] Ancillary service charges have been and continue to be intertwined and interdependent with IPCS rate caps.[22]

---

[17]    *2024 IPCS Order* ¶ 587.

[18]    *2024 IPCS Order* ¶ 415; *see also Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763, ¶ 146 (2015) ("*2015 ICS Order*") (subsequent history omitted).

[19]    47 U.S.C. §§ 201(b), 276(b)(1)(A); *see also Global Tel*Link v. FCC*, 866 F.3d 397, 415 (D.C. Cir. 2017) (finding the FCC has authority to regulate ancillary service charges based on its authority to regulate rates under Section 201(b), which includes practices for and in connection with calls) ("*GTL*").

[20]    *2024 IPCS Order* ¶ 129.

[21]    *2024 IPCS Order* ¶ 130.

[22]    *2024 IPCS Order* ¶ 131 ("As the record shows, all of these fees 'relate to payment and billing,' and other than the paper bill fee, all of these fees address consumers' means of paying for the service they rely upon. . . . While alternative methods of funding an account remain available (e.g., by check or money order), we find that automated payment or money transmitter services are 'an intrinsic part' of accessing the service, like most other services in the 21st-century economy."). The Commission's conclusions are consistent with the legal framework that permits it to extend its Section 201(b) jurisdiction to these ancillary service charges. *See GTL*, 866 F.3d at 415 ("The Commission has plenary authority to regulate interstate rates under § 201(b), including 'practices . . . for and in connection with' interstate calls. . . . Furthermore, ancillary fees for *interstate* [and now intrastate IPCS per the MWR Act] calls satisfy the test of the Commission's authority under § 201(b) as they are 'in connection with' interstate calls."); *2015 ICS Order* ¶ 194 ("billing and collection services provided by a common carrier for its own customers are subject to section 201, and are therefore, subject to Commission regulation . . . . because such billing is an integral part of that carrier's communication service"); *see also* FCC-FTC Consumer Protection Memorandum of Understanding (2015) (noting "FCC authority over activities engaged in by common carriers and by non-common carriers for and in connection with common carrier activities"); *Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming")*, 27 FCC Rcd 4436, ¶ 120 (2012) ("Our jurisdiction extends to carrier practices 'for and in connection' with telecommunications services,

The Wireline Competition Bureau also confirmed the "reforms are designed to work in concert."[23] The Commission's comprehensive compensation plan, including the prohibition on ancillary service charges, cannot "function sensibly" and fairly without all components of the plan taking effect at the same time.[24]

    <u>Ancillary service charges are set forth in contracts or in state laws</u>.  The Commission recognized that certain of its reforms "may take longer to implement due to the need for contractual amendments"[25] or "to accommodate the legislative process to amend state or local laws and regulations."[26]  Based on that recognition, the Commission established a staggered implementation process to "execute any contractual amendments necessary" or otherwise "come into compliance with [the Commission's] reforms."[27]

    The majority of ViaPath's correctional facility contracts contain provisions setting forth ancillary service charges to be assessed to complete IPCS calls, the per-minute rates for those calls,

---

not just to carrier practices "for" telecommunications services.").  Ancillary service charges cannot be disassociated from the telecommunications service rates or the contracts under which IPCS rates and ancillary services charges are defined and applied for implementation purposes.  It is unworkable and inappropriate.

[23]    *Pay Tel Stay Order* ¶ 31.

[24]    *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) ("Whether the offending portion of a regulation is severable depends on the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision.") (emphasis in original); *see also Board of County Commissioners of Weld County, Colorado v. Environmental Protection Agency*, 72 F.4th 284 (D.C. Cir. 2023) ("If parts of a regulation are invalid and other parts are not, we set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together."); *Nasdaq Stock Market LLC v. Securities and Exchange Commission*, 38 F.4th 1126 (D.C. Cir. 2022) ("Severability turns on agency intent, meaning that where there is substantial doubt the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper.").

[25]    *2024 IPCS Order* ¶ 595.

[26]    *2024 IPCS Order* ¶ 588.

[27]    *2024 IPCS Order* ¶ 589.

and the site commissions to be paid to the correctional facility.[28]  The ancillary service charges to be assessed for communications originating from a correctional facility are part and parcel of the competitive bidding and Request for Proposal ("RFP") process.[29]  Ancillary service charges cannot be divorced from the context of the contract as a whole.[30]  As the FCC has observed, the competitive bidding process for IPCS is "focused on contracts as a whole and not elements of the contracts."[31]  Requiring changes to ancillary service charges to be implemented separate and apart from the other necessary contractual changes is inconsistent with the intent of the staggered implementation process adopted in the *2024 IPCS Order* to allow more time for contractual renegotiations and amendments.[32]

The Commission also recognized that additional implementation time was necessary to "accommodate the legislative process" needed to change state laws that conflict with the *2024 IPCS Order*.[33]  Numerous states have adopted legislation and/or rules governing ancillary service charges for IPCS.[34]  Requiring a different implementation process for ancillary service charges

---

[28]    Declaration ¶ 4.  In most cases, the ancillary service charges to be assessed by ViaPath are included in ViaPath's best-and-final-offer made during the competitive bidding process.  *See* Declaration ¶ 4.

[29]    Declaration ¶¶ 3-4.

[30]    *See, e.g.*, *Express Scripts, Inc., Complainant v. AT&T Corp., Defendant*, 33 FCC Rcd 930, ¶ 13 (2018) ("selective citation of the Agreement's terms is unpersuasive because it ignores the principle that a contract must be read as a whole"); *BellSouth Telecommunications, LLC d/b/a AT&T Florida, Complainant v. Florida Power & Light Company, Defendant*, 36 FCC Rcd 12602, ¶ 31(2021) ("construction of the Abandonment Clause is incorrect because it reads the clause in isolation"); *see also KiSKA Construction Corp. v. Washington Metropolitan Area Transit Authority*, 321 F.3d 1151, 1163 (D.C. Cir. 2003) ("The law requires contracts to be read as a whole, with meaning given to every provision contained therein.").

[31]    *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, Appendix E ¶ 18 (2021) ("*2021 ICS Order*").

[32]    *2024 IPCS Order* ¶ 588.

[33]    *2024 IPCS Order* ¶ 588; *see also Securus Stay Order* ¶ 29 (discussing whether any state or local law mandates ancillary service charges).

[34]    *See, e.g.*, Oregon Senate Bill 498 (2019); New Mexico Public Regulation Commission, 17.11.28 NMAC, Inmate Calling Service Providers Rule (last amended Nov. 7, 2023); Louisiana Public Service

ignores the Commission's clear understanding that additional time is needed to amend contracts and state laws to reflect the Commission's reforms.

<u>Operational complexities exist</u>.    ViaPath has begun the process to renegotiate its correctional facility contracts as necessary to comply with the new rate cap, ancillary service charge, and site commission rules pursuant to the staggered schedule adopted in the *2024 IPCS Order*.[35]  Implementing contract changes to ancillary service charges separately from the other necessary contractual changes imposes significant "operational difficulties" for ViaPath.[36]

Ancillary service charges are contained in contracts (or in state laws), and cannot be unilaterally changed by ViaPath.[37]   ViaPath must engage in active renegotiations with the counterparties to such agreements, and any agreement reached pursuant to such discussions must then be approved by the governmental body overseeing the correctional facility.[38] This is precisely the reason the Commission adopted the staggered implementation process – "to renegotiate contracts in response to [the] actions today."[39]  Taking action to "end[] ancillary service charges would require material alteration of IPCS contracts,"[40] and introduces the same "complexities" as implementation of the new rate caps and site commission changes.[41]

---

Commission Docket No. R-32777, *Rulemaking to Establish Rules and Regulations Specific to the Regulation of Prison Telephone Communication Systems* (April 20, 2016).

[35]     Declaration ¶ 5.

[36]     Declaration ¶ 5; *see also Securus Stay Order* ¶ 29 (inquiring about whether Securus "would experience any specific operational difficulties eliminating ancillary service charges").

[37]     Declaration ¶ 6.

[38]     Declaration ¶ 6.  This process can take many months, especially if the governmental body only meets on a monthly basis.  *See* Declaration ¶ 7.

[39]     *2024 IPCS Order* ¶ 588.

[40]     *Cf. Pay Tel Stay Order* ¶ 32; *see also 2024 IPCS Order* ¶ 587 (allowing for a staggered implementation process when contracts require "material alteration" due to rule changes).

[41]     *2024 IPCS Order* ¶ 595.

There is a "practical necessity"[42] to have a uniform implementation process for all of the changes required to IPCS contracts due to the rate reforms adopted in the *2024 IPCS Order*. ViaPath cannot simply flip a switch and turn off all ancillary service charges at all of its correctional facility customers with contracts that permit such charges across the nation.[43]  Rates and charges are programmed into ViaPath's billing, accounting, and operational systems by contract, and ViaPath updates those records when contract amendments are executed and approved by correctional authorities.[44]  As such, each rate and charge in ViaPath's systems corresponds to the terms of the applicable contract.[45]  Implementing changes to ancillary service charges outside of the staggered implementation process would require ViaPath to renegotiate and make these system changes twice for each of its correctional facility customers with ancillary service charges in place – first by November 19th and then pursuant to the staggered implementation deadlines.[46]

Further, ViaPath cannot renegotiate all applicable contracts to eliminate ancillary service charges alone or in concert with other rule changes to rates and site commissions prior to November 19th.[47]  If ViaPath attempts to comply with the ancillary service charge rule by November 19th without a corresponding contract amendment, it will be in violation of its correctional facility contracts.[48]  Legal and "technology and operational limitations"[49] further

---

[42]     *Cf. Pay Tel Stay Order* ¶ 31.

[43]     Declaration ¶ 8.

[44]     Declaration ¶ 8.

[45]     Declaration ¶ 8.

[46]     Declaration ¶ 9.

[47]     Declaration ¶ 10.

[48]     Declaration ¶ 10.

[49]     *See, e.g.*, *Telephone Number Portability*, 19 FCC Rcd 875, ¶ 8 (2004) (finding special circumstances exist because of "technology and operational limitations" requiring the acquisition of hardware and software, network upgrades, and reliability and accuracy testing to meet Commission number portability requirements); *see also Rules and Policies Regarding Calling Number Identification Service*, 11

support uniform implementation of all of the Commission's interrelated and interdependent rate reforms to be subject to the staggered timeline for contracts adopted by the Commission.

### **CONCLUSION**

For the foregoing reasons, ViaPath submits the *2024 IPCS Order* provides for the uniform implementation of the Commission's comprehensive rate reforms, which include ancillary service charge changes, pursuant to the staggered schedule adopted by the Commission to accommodate necessary contract amendments and changes to state law.

Respectfully submitted,

**GLOBAL TEL\*LINK CORPORATION
D/B/A VIAPATH TECHNOLOGIES**

*/s/ Chérie R. Kiser*

Chérie R. Kiser
Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street, NW, Suite 950
Washington, DC 20006
202-862-8900
ckiser@cahill.com
acollins@cahill.com

Dated: October 28, 2024                    Its Attorneys

---

FCC Rcd 11437, ¶ 7 (1996) (recognizing "that unique technical problems constitute a special circumstance").

**DECLARATION ON BEHALF OF**
**GLOBAL TEL\*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES**

I, John C. Pitsenberger, state as follows on behalf of Global Tel\*Link Corporation d/b/a ViaPath Technologies ("ViaPath"):

1.    I am the Chief Financial Officer for ViaPath.  I am responsible for overseeing all financial activities of the company, including accounting, financial reporting, planning and analysis, pricing, treasury, and tax as well as the contract and procurement functions.

2.    I am making this Declaration in support of ViaPath's Comments relating to the effective date for implementation of the prohibition on incarcerated people's communications service ("IPCS") ancillary service charges adopted by the Federal Communications Commission ("Commission") in the *2024 IPCS Order*.

3.    ViaPath provides IPCS to nearly 2,000 correctional facilities across the United States pursuant to contracts entered into via competitive bidding and the Request for Proposal ("RFP") process.

4.    The majority of ViaPath's correctional facility contracts contain provisions setting forth the ancillary service charges to be assessed to complete IPCS calls, the per-minute rates for those calls, and the site commissions to be paid to the correctional facility.  The determination of which ancillary service charges will be assessed for communications originating from the facility are part and parcel of the competitive bidding and RFP process.  In most cases, the ancillary service charges to be assessed by ViaPath are included in ViaPath's best-and-final-offer made during the competitive bidding process.

5.    ViaPath has begun the process to renegotiate its correctional facility contracts as necessary to comply with the new rate cap, ancillary service charge, and site commission rules pursuant to the staggered schedule adopted in the *2024 IPCS Order*.  Implementing contract

1

changes to ancillary service charges separately from the other necessary contractual changes raises significant operational difficulties for ViaPath.

6.      Most of ViaPath's correctional facility contracts prevent it from unilaterally changing the terms of the contract without renegotiation of or amendment to the contract. Eliminating ancillary service charges from a contract would be a material alteration of the contract triggering renegotiation and requiring a contract amendment.

7.      Once a contract amendment (or new contract) is reached, the contract must be approved by the governmental body overseeing the correctional facility. This process can take many months, especially if the governmental body only meets on a monthly basis.

8.      ViaPath cannot flip a switch and turn off all ancillary service charges for all of its correctional facility customers with contracts that permit such charges across the nation. Rates and charges are programmed into ViaPath's billing, accounting, and operational systems by contract, and ViaPath updates those records when contract amendments are executed and approved by the relevant governmental body. Each rate and charge in ViaPath's systems corresponds to the terms of the applicable contract or contract amendment.

9.      Implementing changes to ancillary service charges outside of the staggered implementation process would require ViaPath to renegotiate and make system changes twice for each of its correctional facility customers with ancillary service charges in place – first by November 19th and then pursuant to the staggered implementation deadlines.

10.     ViaPath also could not renegotiate contracts to eliminate ancillary service charges alone or in concert with changes to rates and site commissions prior to November 19th. If ViaPath attempts to comply with the ancillary service charge rule by November 19th without a corresponding contract amendment, it will be in violation of its correctional facility contracts.

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

Executed on October 28, 2024

/s/ John C. Pitsenberger

John C. Pitsenberger
Chief Financial Officer
Global Tel\*Link Corporation d/b/a ViaPath
   Technologies

November 21, 2024

Federal Communications Commission

445 12th Street SW

Washington, DC 20554

**Re: REPORT AND ORDER, ORDER ON RECONSIDERATION,  CLARIFICATION AND WAIVER, AND FURTHER  NOTICE OF PROPOSED RULEMAKING**

Dear Federal Communications Commission:

On behalf of the Alabama Jail Administrators' Council, I would like to express our opposition and concerns regarding the REPORT AND ORDER, ORDER ON RECONSIDERATION,  CLARIFICATION AND WAIVER, AND FURTHER  NOTICE OF PROPOSED RULEMAKING. Regulation of inmate telephone service systems by the Federal Communications Commission (FCC) would seriously hamper the ability of Alabama Jail Administrators to effectively secure and manage their jails, as well as severely limit resources available to inmates and jail staff alike.

In Alabama, the law governing many counties requires any revenue received from inmate telephone contracts to be deposited in a Law Enforcement Fund, which in turn, funds programs and services that directly benefit the inmates. Law Enforcement Funds pay for training, equipment, and technological improvements in security mechanisms. What we do with the Law Enforcement funds provides necessary tools for jail staff to provide comprehensive and constitutional care of inmate populations.  Additionally, if these funds diminish, the burden to provide the same level of comprehensive care would be placed on the back of the taxpayers and general fund. Regulation would compromise the funding for these important resources.

We are neither unmindful of, nor unsympathetic to, the financial strains that Inmate Calling Services (ICS) rates can place on the families and friends of inmates. The challenge for Sheriffs is to balance these legitimate needs of inmates, their families, and friends, with the overriding need to ensure effective security within jails and public safety in the community.

There are very real costs associated with the administration of ICS systems, including: monitoring phone calls, analyzing recordings, investigative platforms, providing escorts for phone repair technicians, answering questions about the system from inmates and their families, etc. the commissions that jails receive help to offset these costs. Accordingly, if the FCC were to impose new regulations that prohibited the payment of commissions to jails, Sheriffs would be forced to reduce costs associated with ICS in some other manner, most likely by reducing access to inmate phones. In short, we cannot afford to jeopardize facility security and public safety—and passing ICS administration costs along to taxpayers, at a time when county budgets are already strained, is unlikely. Thus, neither inmates, their families, nor other members of the community would be served by such new FCC regulations.

Thank you for your attention to our concerns.

Sincerely,

Aaron M. Dawson, Ph.D.

Executive Director – Alabama Jail Administrators' Council

shadowridgecct@gmail.com



ME | MA | RI | CT | NY | DC | **verrill-law.com**

**GEOFFREY G. WHY**
PARTNER
gwhy@verrill-law.com
Direct: 617-274-2854

One Federal Street
Boston, MA 02110
617-309-2600
www.verrill-law.com

December 6, 2024

**VIA ELECTRONIC FILING**

Ms. Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street, SW
Washington, DC 20554

Re:    **Notice of *Ex Parte* Meeting, WC Docket Nos. 23-62 and 12-375**

Dear Ms. Dortch:

Ameelio submits this ex parte notice pursuant to 47 C.F.R. 1.1206, summarizing its Wednesday, December 4, 2024, meeting with Sanford Williams and Elizabeth Cuttner of Chairwoman Rosenworcel's office. Staff met with April Feng, Chief Executive Officer, Devyn Greenberg, Chief Operations Officer, and Sonja English, Chief of Staff, of Ameelio along with Geoffrey G. Why and Julia Watson Bartlett, outside counsel on behalf of Ameelio. During the meeting, Ameelio explained its business model for Incarcerated Persons Communications Services ("IPCS") and presented key data supporting its model.

Ameelio explained that it is a non-profit that provides video and voice IPCS to incarcerated persons and their families. Ameelio explained to Staff that it provides safe, secure video and voice IPCS services by using its unique calling platform and hardware-neutral software. In addition to providing secure software, Ameelio often provides end-user devices, such as corrections-grade tablets, to institutions that do not already have devices. If necessary, facilities purchase devices from Ameelio rather than pay leasing fees for proprietary devices from Ameelio's competitors.

Ameelio discussed its successes in Iowa's Department of Corrections ("DOC"), where Ameelio provides video IPCS services to all Iowa DOC institutions. Initial results from an Iowa DOC study conducted by the University of Chicago, Vanderbilt University, and the University of California, Berkeley show a substantial decrease in prison misconduct overall, and a more significant decrease in violent prison misconduct as a direct result of Ameelio's services. Ameelio shared the study and other supporting documents which are attached to this ex parte.

**JA2055**

December 6, 2024
Page 2

      Ameelio is grateful for the FCC's consideration of this ex parte. Pursuant to 47 C.F.R. 1.1206, this letter is being filed electronically and emailed to all meeting participants.


            Sincerely,



            _____
            Geoffrey G. Why



Attachments:
- Ameelio Iowa Memo Executive Summary
- Ameelio Iowa Memo
- Ameelio Informational One-Pager
- Calls and Conduct: The Impact of Free Communication on Prison Misconduct

CC (via email):
Elizabeth Cuttner, Legal Advisor, Wireline & Enforcement
Sanford Williams, Special Advisor to the Chairwoman, Deputy Managing Director

# Calls and Conduct:

# The Impact of Free Communication on Prison Misconduct[*]

Nour Abdul-Razzak          Ashna Arora          Panka Bencsik[†]

University of Chicago      Arnold Ventures      Vanderbilt University

Omair Gill

University of California, Berkeley

December 2024

## Abstract

45% of Americans have an immediate family member who has been jailed or incarcerated, and over $80 billion is spent each year on the public corrections system. Yet, the United States might be missing a large opportunity to intervene with individuals during incarceration as most rehabilitative programs are focused around the time of release. In this paper, we study an in-prison intervention targeting a costly aspect of life for incarcerated individuals—audio and video calls. We evaluate the impact of free video calls and eased in-person visits utilizing the staggered roll out of this technology across Iowa's nine state prisons between 2021 and 2022. We find evidence of a 27% reduction in in-prison misconduct, including a 32% decline in violent incidents. Our results indicate potentially large returns to prison communication policy reforms that are currently underway across the U.S.

Keywords: prison, technological change, criminal justice, violence

JEL classifications: K32, K42, I18, I38, O14

[*]We thank Ameelio and the Iowa Department of Corrections for sharing their data. We thank seminar participants at the University of Chicago, Tulane University, the Federal Reserve Bank of Chicago, the Virtual Crime Economics (ViCE) seminar series, the California Policy Lab at UC Berkeley, and at Vanderbilt University, and conference participants at the American Society of Health Economists (ASHEcon) conference for their invaluable feedback. We thank Brandon Domash and Joyce Yun for excellent research assistance. This study was awarded the 2024 Program Chair Award in the research area of Crime and Health by the American Society of Health Economists (ASHEcon). We thank the Upjohn Institute for Employment Research and the Vanderbilt Center for Research on Inequality and Health for their grant support of this project.

[†]Corresponding author: Bencsik: 2201 West End Ave, Nashville, TN 37235 United States (email: panka.bencsik@vanderbilt.edu). Abdul-Razzak: University of Chicago, Urban Labs, 33 N LaSalle Street, Suite 1600, Chicago, IL 60602 United States (email: abdulrazzak@uchicago.edu). Arora: Arnold Ventures (email: aarora@arnoldventures.org). Gill: 2521 Channing Way Berkeley, CA 94720 United States (email: ogill@berkeley.edu).

Approximately 45% of Americans have had a close family member spend at least one night in jail or prison and 1 in 7 have had a close family member spend at least a year in jail or prison (Elderbroom *et al.*, 2018). While existing research has extensively documented the costs of incarceration, less is known about the effectiveness of policies or interventions that improve conditions for individuals while they are incarcerated. U.S. prison conditions are largely a product of punishment—and incapacitation—focused policy. In recent years, however, there has been increasing interest in reforms within the U.S. criminal justice system, including implementing rehabilitative and harm-reducing approaches to incarceration (Batistich *et al.*, 2024; Alsan *et al.*, 2024; Clark-Moorman, 2024).

Given the widespread experience among Americans with a loved one incarcerated, focusing on in-prison conditions and circumstances related to maintaining community ties might be particularly valuable. The existing prison communication system in the U.S. is costly for families and incarcerated individuals, with the Federal Communications Commission describing prison call costs as "exorbitant" (Federal Communications Commission, 2024). In 2019, the average 15-minute phone call cost $1.91 nationwide, equivalent to over 5 hours of in-prison wages (American Civil Liberties Union, 2022; Prison Phone Justice, n.d.). Video calls, where available, are even more expensive, costing anywhere from $0.33 to $1 per minute (Rabuy & Wagner, 2015). 34% of families report going into debt just to visit or talk with family members who are incarcerated (Who Pays Report, 2015). Meanwhile, violence and incidents of misconduct are more frequent in prisons than in the community, and widespread among prisoners—with half of prisoners committing a misconduct during their incarceration and 15% committing an assault. Lastly, misconduct often leads to loss of "earned time," leading to individuals staying incarcerated longer. Infractions and violence within prison are costly to both staff and prisoners, and their determinants are not well understood.

Can easing communication improve outcomes for incarcerated individuals while in prison? This is a highly policy-relevant question as the the Federal Communications Commission (FCC) set new price caps for phone and video call services in 2024 that prisons, jails, and

2

their telecommunication providers must abide by. We are not aware of any current research documenting the causal impacts of policy shifts in communication costs. The causal research that does exist focuses on the impact of in-person visits, and finds mixed results (Lee, 2019; Cochran *et al.*, 2020; Weber, 2020; Otsu, 2023). As a result, the impact of eased communication on incarcerated individuals remains an important but unanswered empirical question.

In this study, we estimate the causal effect of free and eased communications offered by Ameelio, the largest prison communications technology non-profit in the United States. Ameelio entered the previously oligopolistic private prison communication industry in 2020, and introduced its technology in two states by 2023. The Ameelio technology studied in this context focuses on their provision of free video calls and a predictable, pre-scheduled in-person visit system. Our empirical strategy exploits the staggered rollout of Ameelio's services across all state prison facilities in Iowa using a difference-in-differences framework. We find that easing communication with Ameelio in Iowa's prisons leads to a 27-34% reduction in overall misconduct. Notably, misconducts related to violence and threats of violence drop by 55-62%, and violent misconduct specifically by 32-34%. We also observe that while modes of communication expanded in the prison, we find suggestive evidence that misconduct related to the misuse of communications declines.

Our study makes a number of contributions. First, we provide causal evidence on reducing the costs associated with communications for incarcerated individuals. Given the growth of policy reforms in this area, it becomes crucial to understand how these policies may impact prison conditions and behavior. Once incarcerated, keeping in touch with loved ones and friends may help individuals maintain well-being and improve behavior while in prison. On the other hand, one might also hypothesize that easing communication among incarcerated individuals may make it harder for individuals to cut ties with individuals in their previous networks that remain connected to criminal behavior (Weber, 2020). Our findings suggest the promise of more accessible prison communications in improving behavior for incarcerated individuals.

3

**JA2059**

Second, we expand the literature on the potential upside of making the criminal justice system less punitive and more focused on rehabilitation (Arora & Bencsik, 2021; Mueller-Smith & Schnepel, 2021; Agan *et al.*, 2023; Alsan *et al.*, 2024).[1] While the topic of rehabilitation during incarceration is still a nascent area within the broader literature of rehabilitative efforts in the criminal justice system, two contemporaneously developed working papers, both examining a jail setting, find promising results that providing educational or cognitive behavioral therapy programs to individuals detained in jail can reduce misconduct (and recidivism) (Alsan *et al.*, 2024; Batistich *et al.*, 2024). Our paper contributes to a limited but growing area of research that tries to understand the determinants of violence in prison and suggests improving communication conditions in prisons could prove beneficial for individuals' behavior.

The remainder of this paper is structured as followed. Section 1 provides a context on prison communications in our setting, Section 2 discusses the data, Section 3 discusses our empirical strategy, Section 4 contains the results, and lastly Section 5 concludes.

# 1 Institutional Context

## 1.1 Prison Communications

During the 2000s and 2010s, the U.S. prison communications industry became increasingly oligopolistic, with a few private companies partnering with all 50 Departments of Corrections (DOCs) (Wagner & Jones, 2019b).[2] This lack of competition led to incarcerated individuals facing much higher telecommunications costs than the average American. In addition, in many states, a percentage of the revenue generated is passed on to the DOC through commission payments, becoming a core part of DOC and telecommunication service contracts (Marra

---

[1]While millions of dollars are spent in the U.S. for re-entry programs, relatively little investment is done in improving the conditions of prisons in the U.S. This could be a missed opportunity, as approaching prisons from a rehabilitation perspective have been shown to reduce recidivism in contexts as distinct as Canada, Colombia, Italy, and Norway (Arbour *et al.*, 2024; Tobón, 2022; Mastrobuoni & Terlizzese, 2022; Bhuller *et al.*, 2020).

[2]In 2018, the two largest private phone companies occupied 83% of the prison communications technology market across the country (National Association of Criminal Defense Lawyers, 2020).

*et al.*, 2024; Wagner & Jones, 2019a). The average commission payments amount to $11.34 per inmate per month (Marra *et al.*, 2024). These commissions are often integrated into correctional budgets and used to fund various programs and functions within prisons.

Starting in 2021, the prison communications landscape began to change rapidly, through non-profit, state-level, and ultimately, federal efforts. First, Ameelio, the country's first (and currently largest) non-profit supplying hardware and software in support of free communication services to incarcerated individuals started offering its services in the first prison facility in Iowa in June 2021.[3] State-level reforms started to proliferate then as well, with legislative developments in five states across the country, as of the end of 2023, making or planning to make phone calls for incarcerated individuals free (Connecticut and Massachusetts on the East Coast, California on the West Coast, and Minnesota and Colorado in the Midwest). This fast-moving public policy area has resulted in 4 states starting to offer free calls with a 14-month window of each other in late 2022 to 2023.[4]

Meanwhile, federal legislative action has also moved forward. Due to the way the Communications Act of 1934 was written, no federal agency had the right to regulate intra-state and video call costs until recently. However, with a federal bill signed into law in 2023, the FCC became able to set regulation, and in July 2024, announced price caps for prison communications for the first time after nearly a hundred years. While DOCs continue to not be legally required to provide any free communication services to incarcerated people, new regulations will significantly reduce the rates by capping audio calls at $0.06 per minute, and for the first time, the FCC has set a rate cap of $0.16 per minute for video calls. These new rate caps will be implemented once current DOC-telecommunication contracts expire, generally in 2025 or 2026. As a matter of reference, compared to prison wages, this new cap will mean that on average, one hour of non-industry prison work (where most incarcerated individuals work)

---

[3]More information about Ameelio can be found at https://www.ameelio.org/.

[4]Connecticut made calls free starting October 2022 (Johnson, 2021), California starting January 2023 (California Department of Corrections and Rehabilitation, n.d.), Minnesota starting July 2023 (Minnesota Department of Corrections, n.d.), Massachusetts starting December 2023 (Massachusetts Department of Correction, 2023), and Colorado starting July 2025 (with partial cost reductions in the meantime) (Rodriguez *et al.*, 2023).

will buy the incarcerated individual approximately 5 minutes of phone time or 2 minutes of video time (American Civil Liberties Union, 2022).[5]

## 1.2    Implementation of Ameelio in Iowa

Prior to implementation of Ameelio, the cost of a 15 minute in-state call from an Iowa prison in 2019 was $1.65.[6] In person visits were free but were handled on a first-come, first-served basis. This meant that people who traveled long distances might not be able to see their loved ones if the prison reached its maximum visitor capacity for the day. With nearly two thirds of Americans incarcerated in state prisons over 100 miles away from their home (Rabuy & Kopf, 2015), this unpredictability could cause a meaningful impediment to visitations. If the loved one was granted entry, they could stay until visitation closing time, with no time limit.

The Iowa DOC partnered with Ameelio in the spring of 2021. As shown in Figure 1, Iowa transitioned to the use of Ameelio gradually, implementing it at one or two facilities at a time over the course of one year. Ameelio's services reshaped telecommunications in Iowa prisons in two key ways. First, Ameelio introduced *free* video calls on a large scale. Prior to Ameelio, video calls were largely nonexistent during the study period, outside of the COVID-19 pandemic, when Iowa introduced limited video calls because in-person visitations were restricted. However, pandemic era video calls were complicated to schedule due to them being manually set up. Instead, with Ameelio's rollout, free video calls could be scheduled through their online platform in an easy and predictable fashion. Second, Ameelio took over the management of in-person visits, replacing the old first-come, first-served system with a reservation-based approach, and integrated this process with their technology. This new system allowed both video calls and in-person visits to be scheduled predictably and in advance. In-person visits were now set to last 1 to 2 hours on average. The remaining methods of communication, paid

---

[5]Jails, generally managed by smaller jurisdictions than DOCs, such as by counties, have started to move slightly ahead of prisons in making calls free, with New York City starting this approach is 2018.

[6]In Iowa specifically, the hourly incarcerated pay scale reported in 2022 ranges from $0.28 to $0.71 for non-industry jobs, and from $0.70 to $0.95 for jobs in state-owned correctional industries. Therefore it could require anywhere from 2 to 6 hours of paid work to be able to afford a 15-minute phone call.



**Figure 1.** The Rollout of Free Communications in the Iowa Departments of Corrections

landline calls, email, and physical mail, remained unchanged throughout the study period and unaffected by Ameelio's direct services. The key features of the communications landscape in Iowa are visualized in Figure 2.

Importantly, the research team had extensive conversations separately with both the Iowa DOC and with Ameelio, and both entities reported that the facility-specific rollout of the free and eased communication was not coupled with any other facility-specific upgrades or changes. For example, the implementation of Ameelio in a given facility was not part of a larger technology or electric upgrade, instead, the policy change only constituted the commencement of Ameelio-run visitations.

## 1.3  Behavioral Misconduct in Prisons

Incidents of misconduct (also known as infractions or rule violation reports, depending on state terminology) refer to any documented violations of prison rules, including incidents like assaults or possession of dangerous contraband. Misconduct incidents are common in prison, with roughly 50% of incarcerated individuals involved in at least one infraction while serving their sentence. Violent victimization is also meaningfully higher inside prisons than outside of prison (Steiner & Cain, 2016). Additionally, the impact of infractions reaches beyond the victim—witnessing victimization and perceiving the prison as a threatening environment are both associated with post-release re-arrest and other negative outcomes (Listwan *et al.*, 2012).

**Figure 2.** Forms of Communication in the Iowa Department of Corrections



Note: In study years prior to the COVID-19 pandemic, video calls did not exist, and the universe of options for synchronous communication were landline calls or in-person visits. During the pandemic, video calls were introduced across all facilities while in-person visits were paused on the same date statewide. However, these pandemic-era video calls were scheduled and managed manually, which required extensive effort from the Department of Corrections and thus limited the video calls' availability.

8

## 2   Data

This study uses administrative data from January 2015 to October 2022 from the Iowa Department of Corrections and Ameelio. All data is at the individual level. We observe 31,761 unique offenders between 2015-2022, with Iowa housing approximately 9,000 individuals at any given time. In addition, IDOC employs over 3,500 corrections officers, as well as other staff (Raemisch, 2017). Over the treatment period, 11,580 individuals are exposed to treatment (in a facility with free communications once free communications become available) for part or all of their sentence.

During the study period, 66.4% of the sample appears in prison for one period/prison spell, while 33.6% of the sample has multiple prison spells (i.e., a person who is in prison, gets released, and then becomes incarcerated again would have 2 spells). On average, one instance of incarceration lasts 603 days in our sample, or 517 days if only including those released by the end of the data period. During one period of incarceration, a person on average moves facilities 1.6 times and stay in a total of 2.6 facilities on average (these need not be unique facilities, a person can be transferred away and then return back to their original facility as part of facility moves).

From the Iowa DOC, we received details on all prison entries and exits during our study period, including demographic data regarding race, sex, age, veteran status, and educational attainment at the time of entry (summarized in Table 1). The majority of the study sample identify as white (67%), are male (86.5%), and have finished high school (67%). Roughly 40% are incarcerated for a violent offense.

We also received information on landline phone calls (both completed and attempted), including the date, length of call, and cost incurred to the incarcerated individual. We also observe misconduct incidents with the specific rule violated, date of violation, and specific charge (e.g., battery, drug possession, disobeying order, etc.). Administrative data obtained from Ameelio includes information on in-person visits and video calls *after* Ameelio's services were available at each facility.

**Table 1. Study Sample**

|                                    | N     | %     |
| ---------------------------------- | ----- | ----- |
| **Total sample**                   |       |       |
| N Offenders                        | 31761 |       |
| N Ever Treated                     | 11580 |       |
| **Age**                            |       |       |
| <30                                | 5922  | 18.6% |
| 30-39                              | 11205 | 35.3% |
| 40-49                              | 7770  | 24.5% |
| 50-59                              | 4436  | 14.0% |
| 60-69                              | 1922  | 6.1%  |
| >60                                | 490   | 1.5%  |
| Missing                            | 16    | 0.1%  |
| **Race/ethnicity**                 |       |       |
| White                              | 21276 | 67.0% |
| Black                              | 7409  | 23.3% |
| Hispanic White                     | 2022  | 6.4%  |
| American Indian or Alaska Native   | 713   | 2.2%  |
| Asian or Pacific Islander          | 312   | 1.0%  |
| Missing                            | 29    | 0.1%  |
| **Sex**                            |       |       |
| Male                               | 27486 | 86.5% |
| Female                             | 4255  | 13.4% |
| Unknown                            | 20    | 0.1%  |
| **Highest education level**        |       |       |
| Finished High School               | 21233 | 66.9% |
| Some High School                   | 6690  | 21.1% |
| Unknown                            | 1617  | 5.1%  |
| Any Higher Ed                      | 1248  | 3.9%  |
| No High School                     | 973   | 3.1%  |
| **Current offense type**           |       |       |
| Violent                            | 18716 | 39.9% |
| Property                           | 13954 | 29.7% |
| Drug                               | 9310  | 19.8% |
| Public Order                       | 4163  | 8.9%  |
| Other                              | 818   | 1.7%  |

Notes: All variables reflect information captured at the time of prison entry. The average individual has 1.77 distinct prison spells during our sample period. If a person exits and then reenters prison (i.e., they have multiple prison spells) they are counted multiple times. Data Source: Iowa Department of Corrections.

## 2.1    Incidents of misconduct

Table 2 displays the number of incidents of misconduct that occurred in the IDOC during 2015-2022. We identify the activities constituting a given misconduct using State of Iowa Department of Corrections (2021), which defines the Rules and Discipline section of the Institutional Operations. An incident of misconduct can have multiple charges associated with it, for example if a prisoner committed an assault, and drugs were found on them during the altercation, they would have one misconduct with two charges associated with it.[7] We identify the top charge for each misconduct by ranking charges following as closely as possible the FBI Uniform Crime Reporting (UCR) Program's Hierarchy Rules (U.S. Department of Justice, 2019).[8] Throughout the paper, we consider each incident of misconduct based on the most severe charge associated with it.

In Table 2, we observe that there were a total of 261,328 incidents of misconduct, which translates to approximately 8 incidents per person during their complete incarceration period for a given conviction. There were a total of 41,460 incidents of violence, threats, and intimidation, making up 16% of all misconduct and equating to 1.3 such incidents per person during their complete incarceration for a given conviction. Contraband made up an 28% of misconduct, with drugs constituting over 1 in 10 contraband offenses. Misuse of communications is an offense type involving the use of "coded messages or symbols" or the use of another prisoner's phone account, among others. This misconduct category, of particular relevance in this study setting due to the expansion of modes and ease of communication, occurs over 7,000 times, making up 3% of misconduct. Finally, disorderly conduct (disruption to operations, failure to report to place of duty, and failure to obey a rule, among others) makes up 35% of incidents and other offenses (including unsanitary or untidy living quarters, and storing,

---

[7]This is equivalent to how arrests by police can have multiple charges associated with one arrest.

[8]The universe of UCR charges for crimes are not identical to the universe of misconduct charges the Iowa DOC issues, but given they large overlap, at least in terms of major types, allows us to follow the Hierarchy Rules closely. Specifically, if at least one charge for a misconduct is violence or sexual violence, we consider that a violent misconduct. Subsequently, we define the top charge based on the following order: threats of violence, sexual misconduct, drug, non-drug contraband, property crime, and so on.

11

giving, or receiving any medication, among others) make up 18% of misconduct incidents.

**Table 2. Incidents of misconduct (2015-2022)**

| Misconduct Category | N | % |
|---|---|---|
| Violent (inclusive) | 41,460 | 16% |
| Violence | 24,624 | |
| Threats of violence | 16,836 | |
| Contraband | 74,264 | 28% |
| Drug | 8,706 | |
| Non-drug | 65,558 | |
| Misuse of communications | 7,078 | 3% |
| Disorderly conduct | 92,549 | 35% |
| Other | 45,977 | 18% |
| Total | 261,328 | |

Notes: The specific violations constituting a misconduct charge are identified based on State of Iowa Department of Corrections (2021). Subsequently, the authors classify each misconduct into the above categories. Data Source: Iowa Department of Corrections.

Lastly, we observe the hearing outcomes for the misconduct charges in Table 3. When an incarcerated individual violates a prison rules and is charged with a misconduct, a prison disciplinary hearing is held to determine guilt. In total, there were 261,454 hearing outcomes, of which 126 resulted in a dismissal (these dismissed charges are excluded from our analysis). For non-dismissed misconduct charges, we observe that over 99.9% of incidents resulted in a guilty or reduced verdict, with 9 out of 10 hearings resulting in a guilty verdict.

12

**JA2068**

**Table 3. Misconduct Hearing Outcomes**

| Hearing Outcome | N | % |
|---|---|---|
| Guilty | 234,587 | 89.7% |
| Reduced | 26,692 | 10.2% |
| Pending | 1 | 0% |
| No outcome | 48 | 0% |
| Total | 261,328 | |
| | | |
| Dismissed | 126 | 0% |
| Total | 261,454 | |

Notes: The hearing outcome is for the most severe charge for the misconduct incident. If there are multiple most severe charges, such as two different violent charges, and the person is found guilty for one charge but not the other, we consider the more severe hearing outcome. Data Source: Iowa Department of Corrections.

## 3 Empirical Strategy

To estimate the causal impact of free communication on individual- and facility-level outcomes, we exploit the staggered rollout of Ameelio's services across Iowa facilities in a difference-in-differences framework. Specifically, we estimate the following equation:

$$Y_{i,f,t} = \beta_0 + \beta_1 Ameelio_{f,t} + \gamma_f + \alpha_t + \varepsilon_{i,f,t} \tag{1}$$

$Y_{i,f,t}$ is an outcome for individual $i$ who was in facility $f$ in week $t$, $Ameelio_{f,t} = 1$ if Ameelio's services are available in facility $f$ in week $t$, facility fixed effects $\gamma_f$ control flexibly for permanent differences across facilities, and week fixed effects $\alpha_t$ control for temporal shocks that affect Iowa's prison population as a whole.[9] Standard errors $\varepsilon_{i,f,t}$ are two-way clustered at the person and facility level.

Our research design compares how outcomes change over time in facilities with Ameelio

---

[9]We code our week-year variable as unique for each week-year in our sample, i.e., it is marked as 1 for the first week of 2015, 53 for the first week of 2016, etc.

(treatment facilities) with facilities that have not yet rolled out Ameelio's services (comparison facilities). In order to correct for biases inherent in standard two-way fixed effects models with staggered treatment dates and potentially heterogeneous treatment effects, we use the estimation method developed by Borusyak *et al.* (2024). The identifying assumption is that in the absence of Ameelio's services, outcomes would have evolved similarly across prison facilities in each state. We test this assumption by looking for similar trends in the outcomes of interest across treatment and comparison facilities prior to the introduction of Ameelio's services.

## 4    Results

### 4.1    Direct impact

Before presenting our causal effects, we present descriptive evidence for how incarcerated individuals in the IDOC are active users of various methods of communication with their loved ones. Pre-implementation of Ameelio we observe 80,000 landline call conversations per week across the state, or approximately 9 calls per person weekly (see Figure 3). On average, calls last 10 to 11 minutes, resulting in approximately 1.5 hours of conversations per person per week.

As observed in Figure 4, once Ameelio arrives to a facility, after a few weeks of ramping up, video calls settle at around 1,200-1,400 per week, and in-person visits at around 600 per week across the state, or 0.14 video calls and 0.07 in-person visits per person per week. With the average video call being scheduled to last 40 minutes, and the average in-person visit being scheduled to last 106 minutes, this translates to 13 minutes of scheduled contact through these free or eased modes of communication per person per week.[10] Each facility in IDOC did have

---

[10]For in-person visits, we only have information on how long they were scheduled for, not how long they lasted in practice. For video calls, we only have scheduled length until the end of January 2022—at which point half of facilities have rolled out Ameelio, and start to have information on the minutes the video call actually lasted from February 2022. When comparing post-February 2022 video actual visit length where that information is non-missing with the scheduled length, on average the scheduled length is 33% longer than the actual—though this average is a combination of video calls that lasted exactly as long as scheduled, and video

**Figure 3.** Trends in Landline Calls Pre- and Post-Ameelio Rollout

**(a)** Panel A: Call duration

**(b)** Panel B: Number of calls



Note: Panel A illustrates the number of minutes per call, while Panel B illustrates the number of attempted (but not completed, i.e., lasting zero minutes, for example due to the other person not picking up) landline calls and completed (lasting over 0 seconds) landline calls. The figure is normalized so that the value of 0 corresponds to the start of the facility-specific treatment. Each time period corresponds to one week, hence, each integer on the x-axis represents the number of weeks since or before the Ameelio roll-out began.

15

**JA2071**

video and in person caps placed for each prisoner, ranging from 1 to 3 calls/visits each per week depending on the security level of each prisoner and each facility.

**Figure 4.** Trends in Video Calls and In-Person Visits Post-Ameelio Rollout



Note: The figure is normalized so that the value of 0 corresponds to the start of the facility-specific treatment. Each time period corresponds to one week, hence, each integer on the x-axis represents the number of weeks since or before the Ameelio roll-out began. The graph illustrates the number of in-person visits and video calls, reflecting the growth of Ameelio services over time. The area shaded with gray captures the 11-week period for which we have landline call data.

As noted previously, we have detailed post-implementation data on the universe of synchronous communication types: landline calls, video calls, and in-person visits. Pre-implementation, we have detailed landline call data, while video calls largely didn't exist (outside of the pandemic period). However, we do not have pre-implementation in-person visit data, as visits were first come first serve, rather than pre-scheduled. Therefore, in our first-stage regression we can estimate whether the introduction of free video calls and eased scheduling for in-person visits resulted in a substitution away from landline use.

_____

calls that were brief but were scheduled for a longer time.

16

Focusing on the 5-month period around the facility-specific implementation (9 weeks pre-implementation and 11-weeks post-implementation), in Table 4 we observe that there was no substitution away from landline calls, the number of minutes spent on landline calls remains the same during the window around the implementation. (See Figure 3 Panel A for a visual representation of the minutes over time. Meanwhile, see Panel B for the count of calls over time, which also remain statistically indifferent between pre- and post-implementation.) Because the Borusyak *et al.* (2024) estimator does not allow for bootstrapped standard errors and we only have 9 prison facilities (i.e., clusters) in our current sample, we reproduce the result with the bootstrapped conventional DID estimator, and continue to conclude that during the first 2.5 months of implementation there was no substitution away from landline phone use.

An important caveat for this first-stage result is that we observe landline call data for the first 2.5 months post-implementation, but not beyond. This period, at least in part, overlaps with Ameelio's implementation on-ramp period (see Figure 4 for how this period fits with usage counts over time), meaning that it might have been too early at this point for prisoners to switch away from landline calling.

**Table 4.** Impact of Eased Communication on Minutes of Communication

| Outcome | Pre-treat mean | Borusyak estimator | | Bootstrap DID | |
|---|---|---|---|---|---|
| | | Estimate | Estimate % | Estimate | Estimate % |
| Successful landline calls (minutes) | 92.807 | 5.003 | 5.4% | -0.757 | -0.8% |
| | | (8.505) | | (1.979) | |
| | | [0.556] | | [0.738] | |

**Notes:** Column 1 uses the DiD imputation method of Borusyak *et al.* (2024). The dependent variable is weekly minutes of communication for people incarcerated between 1/1/2015 and 10/23/2022. We control for prison facility, week (e.g., week 1 in 2021), individual and demographic characteristics (race/ethnicity, veteran status, sex, current education level, and age), and current and prior convicted offenses. Standard errors (displayed in round brackets) are clustered at the person and facility level. P-values are displayed in square brackets. Column 2 displays standard errors produced via the wild cluster bootstrap.

## 4.2   Violent and non-violent misconduct in prisons

Next, we examine the impact of Ameelio on our primary outcome, prison misconduct by incarcerated individuals. As summarized in Figure 5, the availability of Ameelio's services significantly reduced the number of misconduct incidents within prisons. Pre-implementation, we see each event study period to be insignificantly different from zero, while during a year of post-implementation, we observe a clear decline, and all periods exhibit significantly lower misconduct incident counts.[11]

We examine this pattern in a table format in Table 5 and find that easing communication reduced overall in-prison misconduct by approximately 27-34% relative to the pre-treatment mean. Table 5 shows the overall impacts on misconduct in Iowa across six models. Model (1) estimates effects without controls, model (2) includes current convicting offense-related controls, model (3) adds past offense-related controls, while model (4) adds demographic controls. The sign and magnitude of the effect sizes across all four models are highly consistent, with model (4), our preferred Borusyak *et al.* (2024) specification, showing a significant (at the 1% level) decrease in misconduct by 34%. Because the Borusyak *et al.* (2024) estimator does not allow for bootstrapped standard errors and we only have 9 prison facilities (i.e., clusters) in our current sample, we reproduce the results with the bootstrapped conventional DID estimator in models (5) and (6). Model (5) uses the same controls as in model (4) with a conventional DID, while model (6) introduces bootstrapped standard errors. We find that in model (6), our results remain economically meaningful—a 27% decrease in overall misconduct—and statistically significant at the 10% level.

Next, we disaggregate misconduct into various offense categories to examine which specific types were affected. We present Model (4) and Model (6) from Table 5—which use the Borusyak estimator and DID with bootstrapped standard errors – as our preferred specifications for each outcome. With violence being a large concern in prisons, we first examine this

---

[11]We note that the event study in Figure 5 is based on the Borusyak *et al.* (2024) estimator, which does not allow bootstrapping, so the standard errors do not account for the small number of clusters (n = 9).

**Figure 5.** Eased Communication Reduces In-Prison Misconduct



Note: The figure is normalized so that the value of 0 corresponds to the start of the facility-specific treatment. Facility-specific start date is set as the date of the first call. Each time period corresponds to two months. If a person moves from a facility that has been treated to one that has not yet been treated, an infrequent occurance in our data, we continue to classify the person as being in the treated group. This approach ensures that we can analyze the pre-treatment period without any contamination and provides a more conservative treatment effect. The Borusyak estimator compares post-period outcomes relative to the average of the pre-treatment periods, setting the first period (not pictured) as zero (Roth *et al.*, 2023).

19

**JA2075**

**Table 5.** Impact of Eased Communication on Total Misconduct

|  | Borusyak estimator | | | | Conventional DID | |
|---|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) | (6) |
| Estimate | -0.0059*** | -0.0060*** | -0.0060*** | -0.0059*** | -0.0048** | -0.0048* |
| Standard Error | (0.0018) | (0.0018) | (0.0018) | (0.0017) | (0.0020) | (0.0024) |
| P-value | 0.001 | 0.001 | 0.001 | 0.000 | 0.045 | 0.098 |
| Pre-treatmean Mean | 0.018 | 0.018 | 0.018 | 0.018 | 0.018 | 0.018 |
| Percent Change | -33.47% | -34.36% | -34.54% | -33.96% | -27.44% | -27.44% |
| Week-year and facility FE | Y | Y | Y | Y | Y | Y |
| Current offense controls |  | Y | Y | Y | Y | Y |
| Past offense controls |  |  | Y | Y | Y | Y |
| Demographic controls |  |  |  | Y | Y | Y |
| Bootstrapped SE |  |  |  |  |  | Y |

**Notes:** Model 1 uses the DiD imputation method of Borusyak *et al.* (2024). The dependent variable is weekly infractions (removing dismissed infractions, infractions pending an outcome, or infractions without any outcome) for people incarcerated between 1/1/2015 and 10/23/2022. We control for prison facility, week (e.g., week 1 in 2021), individual and demographic characteristics (race/ethnicity, veteran status, sex, current education level, and age), and current and prior convicted offenses. Standard errors (displayed in round brackets) are clustered at the person and facility level. Model 6 displays standard errors produced via the wild cluster bootstrap.

outcome.[12] In Table 6, we find that violent misconduct decreases in Iowa after the introduction of eased communication. This reduction is substantial, with a decline of 32-34% relative to the pre-treatment mean. Meanwhile, our more inclusive measure of violence, which also includes threats and intimidation, as well as acts of violence, exhibits a significant decline of 55-62%. These results suggest that offering free communications results in safer prisons by reducing violent behavior and intimidation among inmates.

Despite the addition of an accessible communication option with Ameelio, we find no observed rise in the misuse of communications, such as failing to follow regulations when using mail or phone, or sending coded messages. In fact, we find large, negative point estimates although results are insignificant once we bootstrap our standard errors with the conventional DiD estimates. Meanwhile, we also observe no change in drug offenses, suggesting that the ease

---

[12]We defined violent offenses as fighting, assault, sexual misconduct and sexual violence, inappropriate sexual conduct and sexual violence, inappropriate sexual harassment and sexual abuse, sexual violence, and killing.

**Table 6.** Impact of Eased Communication by Infraction Type

| Misconduct category | Pre-treat mean | Borusyak estimator | | Bootstrap DID | |
|---|---|---|---|---|---|
| | | Estimate | Estimate % | Estimate | Estimate % |
| Violent | 0.00294 | -0.00099*** | -33.5% | -0.00094*** | -32.1% |
| | | (0.00012) | | (0.00035) | |
| | | 0.000 | | 0.000 | |
| Violent (inclusive) | 0.00458 | -0.00285*** | -62.1% | -0.00253*** | -55.2% |
| | | (0.00057) | | (0.00089) | |
| | | 0.000 | | 0.004 | |
| Misuse of communications | 0.00083 | -0.00043** | -52.0% | -0.00035 | -42.6% |
| | | (0.00020) | | (0.00031) | |
| | | 0.032 | | 0.340 | |
| Drug | 0.00115 | -0.00034 | -30.0% | -0.00030 | -25.8% |
| | | (0.00034) | | (0.00052) | |
| | | 0.310 | | 0.582 | |
| Other | 0.01100 | -0.00260* | -23.6% | -0.00178 | -16.2% |
| | | (0.00150) | | (0.00168) | |
| | | 0.083 | | 0.289 | |

**Notes:** The misconduct categories are mutually exclusive using the violent (inclusive) definition. Borusyak estimate, standard error, and p-value uses method of Borusyak *et al.* (2024). The dependent variable is weekly infractions (removing dismissed infractions, infractions pending an outcome, or infractions without any outcome) for people incarcerated between 1/1/2015 and 10/23/2022. We control for prison facility, week - year, individual and demographic characteristics (race/ethnicity, veteran status, sex, current education level, and age), and current and prior convicted offenses. Standard errors (displayed in round brackets) are clustered at person and facility level. DiD estimate, standard error, and p-value use the wild cluster bootstrapping method for OLS, with the same set of controls and clustering.

of communication predominantly impacted interpersonal conflict, rather than non-violent behaviors. Lastly, there is a marginally significant decline in other types of misconduct, however, the marginal significance does not persist once bootstrapping the standard errors. Overall, we find that it is violence that decreased as a result of free and eased communication, though it is worth to note that point estimates on all outcomes are negatively signed.

# 5   Conclusion

We find that easing communication for incarcerated individuals, through the implementation of Ameelio, significantly reduced in-prison misconduct in Iowa. An alternative way to see this

impact, displayed in Figure A1, visualizes the reduction in the counts of misconduct on a weekly basis across all misconduct, violent, and violent-inclusive categories. Prior to Ameelio's rollout, facilities in Iowa experienced about 139 misconducts per week. Post-Ameelio, we see this reduced to about 90-100 misconducts per week. This suggests a promising strategy for creating safer prisons and supporting state rehabilitation efforts. The observed decrease in overall misconduct, particularly in violent and intimidating behavior, underscores the importance of accessible communication in promoting safer and more humane prison environments. Our findings may also suggest that video connection could be particularly beneficial for individuals and allows people to keep stronger connections than just audio alone, which has been evidenced before in non-prison contexts (Sherman *et al.*, 2013). Future research will explore whether these benefits extend to reducing recidivism rates and promoting successful re-entry into society.

Our analysis, supported by anecdotal evidence from Ameelio and Iowa staff, also suggests that Ameelio might have contributed to a cultural shift within the prisons. Corrections workers face significantly higher levels of workplace violence than any other occupation, with a rate of 149 violent crimes per 1,000 workers – 18 times the national average of 8 per 1,000 workers (U.S. Department of Justice, 2022; Hughes & Vixama, 2023). This environment contributes to high turnover rates and significant stress for staff. With the introduction of Ameelio's technology, violence decreases in prisons and these changes have the potential to promote a more rehabilitative atmosphere, fostering more cooperation. Future work will share more details about the experience of using Ameelio from surveys.

Overall, our evidence to date suggests that easing communication among prisoners and their loved ones can be a promising strategy to increase safety in prisons.

# References

AGAN, AMANDA, DOLEAC, JENNIFER L., & HARVEY, ANNA. 2023. Misdemeanor prosecution. *The Quarterly Journal of Economics*, **138**(3), 1453–1505. Publisher: Oxford University Press.

ALSAN, MARCELLA, BARNETT, ARKEY, HULL, PETER, & YANG, CRYSTAL. 2024 (Mar.). *"Something Works" in U.S. Jails: Misconduct and Recidivism Effects of the IGNITE Program*. Tech. rept. w32282. National Bureau of Economic Research, Cambridge, MA.

AMERICAN CIVIL LIBERTIES UNION. 2022 (June). *Captive Labor: Exploitation of Incarcerated Workers*. Tech. rept.

ARBOUR, WILLIAM, LACROIX, GUY, & MARCHAND, STEEVE. 2024. Prison Rehabilitation Programs and Recidivism: Evidence from Variations in Availability. *Journal of Human Resources*, Feb., 1021–11933R2.

ARORA, ASHNA, & BENCSIK, PANKA. 2021. Policing substance use: Chicago's treatment program for narcotics arrests. *Working paper*.

BATISTICH, MARY KATE, EVANS, WILLIAM, GILES, TYLER, & MARGOLIT-CHAN, REBECCA. 2024 (Nov.). *Therapy to Reduce Violence and Improve Institutional Safety During Incarceration*. Tech. rept. w33147. National Bureau of Economic Research, Cambridge, MA.

BHULLER, MANUDEEP, DAHL, GORDON B., LØKEN, KATRINE V., & MOGSTAD, MAGNE. 2020. Incarceration, recidivism, and employment. *Journal of Political Economy*, **128**(4), 1269–1324.

BORUSYAK, KIRILL, JARAVEL, XAVIER, & SPIESS, JANN. 2024. Revisiting Event-Study Designs: Robust and Efficient Estimation. *The Review of Economic Studies*, Feb., rdae007.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION. *Tablets and Telephone Calls*. Tech. rept.

CLARK-MOORMAN, KYLEIGH. 2024. Restoring Promise. *Corrections Today*.

COCHRAN, JOSHUA C., BARNES, J. C., MEARS, DANIEL P., & BALES, WILLIAM D. 2020. Revisiting the Effect of Visitation on Recidivism. *Justice Quarterly*, **37**(2), 304–331. Publisher: Routledge _eprint: https://doi.org/10.1080/07418825.2018.1508606.

ELDERBROOM, BRIAN, BENNETT, LAURA, GONG, SHANNA, ROSE, FELICITY, & TOWNS, ZOË. 2018. Every Second. The Impact of the Incarceration Crisis on America's Families. *FWD.us*, Dec.

FEDERAL COMMUNICATIONS COMMISSION. 2024 (July). *FCC caps exorbitant phone \& video call rates for incarcerated persons \& their families.* Tech. rept. Federal Communications Commission.

HUGHES, SARAH, & VIXAMA, GRACE. 2023 (May). *National Correctional Workers Appreciation Week 2023.*

JOHNSON, LAUREN M. 2021. *Connecticut become first state to make calls free for inmates and their families.*

LEE, LOGAN M. 2019. Far from Home and All Alone: The Impact of Prison Visitation on Recidivism. *American Law and Economics Review*, **21**(2), 431–481.

LISTWAN, SHELLEY JOHNSON, HANLEY, DENA, & COLVIN, MARK. 2012. The Prison Experience and Reentry: Examining the Impact of Victimization on Coming Home. *Final Report. US Department of Justice: National Institute of Justice.*

MARRA, MARLEEN, MILLER, NATHAN, & SILEO, GRETCHEN. 2024. Phoning Home: The Procurement of Telecommunications for Incarcerated Individuals in the United States. *Working Paper*, Nov.

MASSACHUSETTS DEPARTMENT OF CORRECTION. 2023 (Dec.). *Massachusetts Department of Correction Implements No Cost Calls.* Tech. rept.

MASTROBUONI, GIOVANNI, & TERLIZZESE, DANIELE. 2022. Leave the door open? Prison conditions and recidivism. *American Economic Journal: Applied Economics*, **14**(4), 200–233.

MINNESOTA DEPARTMENT OF CORRECTIONS. *Phone Calls.* Tech. rept.

MUELLER-SMITH, MICHAEL, & SCHNEPEL, KEVIN T. 2021. Diversion in the criminal justice system. *The Review of Economic Studies*, **88**(2), 883–936. Publisher: Oxford University Press.

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS. 2020 (Dec.). *Detention Facilities Communication Companies.*

**JA2080**

OTSU, YUKI. 2023. Does visitation in prison reduce recidivism? *Journal of Policy Analysis and Management*, **43**(1), 126–156.

PRISON PHONE JUSTICE. *Rates and Kickbacks*. Tech. rept.

RABUY, BERNADETTE, & KOPF, DANIEL. 2015 (Oct.). *Separation by Bars and Miles: Visitation in state prisons*. Tech. rept. Prison Policy Initiative.

RABUY, BERNADETTE, & WAGNER, PETER. 2015 (Jan.). *Screening Out Family Time:*. Tech. rept. Prison Policy Initiative.

RAEMISCH, RICK. 2017. Annual Report: Corrections Officer Staffing Levels. *Colorado Department of Corrections*, Nov.

RODRIGUEZ, ROBERT, GONZALES, JULIE, AMABILE, JUDY, & LINDSAY, MANDY. 2023. *Cost Of Phone Calls For Persons In Custody*.

ROTH, JONATHAN, SANT'ANNA, PEDRO H. C., BILINSKI, ALYSSA, & POE, JOHN. 2023. What's trending in difference-in-differences? A synthesis of the recent econometrics literature. *Journal of Econometrics*, **235**(2), 2218–2244.

SHERMAN, LAUREN E, MICHIKYAN, MINAS, & GREENFIELD, PATRICIA M. 2013. The effects of text, audio, video, and in-person communication on bonding between friends. *Cyberpsychology: Journal of psychosocial research on cyberspace*, **7**(2).

STATE OF IOWA DEPARTMENT OF CORRECTIONS. 2021 (May). *Policy and Procedures*. Tech. rept. IO-RD-03.

STEINER, BENJAMIN, & CAIN, CALLI M. 2016. The Relationship between Inmate Misconduct, Institutional Violence, and Administrative Segregation: A Systematic Review of the Evidence. *Restrictive housing in the US: Issues, challenges, and future directions*, 165–197.

TOBÓN, SANTIAGO. 2022. Do Better Prisons Reduce Recidivism? Evidence from a Prison Construction Program. *Review of Economics and Statistics*, **104**(6), 1256–1272.

U.S. DEPARTMENT OF JUSTICE. 2019. *Violent Crime*. Tech. rept. Federal Bureau of Investigation.

25

**JA2081**

U.S. DEPARTMENT OF JUSTICE. 2022. Indicators of Workplace Violence, 2019. *Office of Justice Programs*, July.

WAGNER, PETER, & JONES, ALEXI. 2019a. *On kickbacks and commissions in the prison and jail phone market.* Tech. rept. Prison Policy Initiative.

WAGNER, PETER, & JONES, ALEXI. 2019b (Feb.). *State of Phone Justice.* Tech. rept. Prison Policy Initiative.

WEBER, ANNA. 2020. The Big House Far from Home: Spatial Distance and Criminal Recidivism. *Working Paper.*

WHO PAYS REPORT. 2015. *Who Pays? The True Cost of Incarceration on Families.*

# Appendix

**Figure A1.** Weekly Misconduct Averages across All Iowa Facilities, by Misconduct Category



Note: Blue bars display the pre-Ameelio weekly averages. Green bars displays the effects of Ameelio using weekly misconduct counts and our different estimators (Borusyak vs Convention DiD with bootstrapped standard errors) by the type of infraction.

27

Ameelio Iowa Model Memo                                        November 26, 2024

**Introduction:**

In a world where relationships are tested by incarceration and distance, Cindy and her wife Lisa have defied the odds. Married for thirteen years, their bond has remained strong despite Lisa's incarceration in Iowa. Cindy attributes the strength of their marriage to constant communication. Yet, it was the introduction of Ameelio's free video visits that transformed their relationship, allowing them to share moments that many take for granted—like showing off their 12-year-old dog or simply showing the warmth of their home to Lisa from miles away. For Cindy and Lisa, Ameelio is more than just a tool - it's the lifeline that keeps their marriage strong and their hearts happy.

**The Problem: Unreliable and High-Cost Voice and Video Calls for Inmates**

For decades, the prison telecommunications industry has been broken. Two companies, Securus and ViaPath, have functioned as a duopoly, charging high fees for voice and video calls for incarcerated individuals. In 2021, incarcerated persons paid, on average, $3 for a 15-minute phone call compared to just cents paid by those who are not incarcerated.[1] Many incarcerated individuals and their friends and family report paying between $50 and $100 per month for calls.[2] With two-thirds of incarcerated individuals reporting an annual income of less than $12,000 pre-arrest, the high cost of calls is not feasible.[3] This privatized duopoly is a $1.4 billion industry.[4]

In exchange for securing exclusive contracts, telecommunications companies started offering correctional facilities a percentage of their revenue, resulting in higher and higher commissions.[5] As a result, Securus and ViaPath needed other ways to profit. In response, Securus and ViaPath engaged in a number of tactics to increase revenue, including imposing consumer fees, bundling phone contracts with contracts related to money transfers and commissary sales and offering "premium services," such as the use of tablets, video calling, and access to email.[6]

---

[1] Peter Wagner & Wanda Bertram, *State of Phone Justice 2022*, PRISON POL'Y INITIATIVE (Updated July 18, 2004), State of Phone Justice 2022: The problem, the progress, and what's next | Prison Policy Initiative.

[2] Nicole Loonstyn & Alice Galley, *Low-Cost Phone Calls Benefit Incarcerated People, Their Families, and Criminal Legal Institutions*, URB. INST. (Aug. 30, 2023), Low-Cost Phone Calls Benefit Incarcerated People, Their Families, and Criminal Legal Institutions | Urban Institute.

[3] *Id.*

[4] Jennifer Zabasajja, *Can a Nonprofit Disrupt the Pricey Prison Phone Industry?*, BLOOMBERG (Sept. 8, 2011), Nonprofit Aims to Disrupt Pricey Prison Telecom Industry - Bloomberg.

[5] Peter Wagner & Alexi Jones, *On Kickbacks and Commission in the Prison and Jail Phone Market*, PRISON POL'Y INITIATIVE (Feb. 11, 2019), On kickbacks and commissions in the prison and jail phone market | Prison Policy Initiative; Juliana Kim, *Biden Signs a Bill to Fight Expensive Prison Phone Call Costs*, NPR (Jan. 6, 2023).

[6] Wagner & Jones, *supra* note 4.

1

Additionally, Securus and ViaPath have imposed administrative and rental fees on vendor equipment.[7] All of these costs are then passed on to incarcerated persons and their friends and family, significantly inflating communications costs. Consequently, friends and family are forced to choose between paying high communications fees and cutting off contact with loved ones. Those who cannot afford these high fees lose contact with their incarcerated friends and family members.

## Calling and Recidivism

External social support is key to an incarcerated person's success upon release. Research suggests that if an individual can maintain their family bonds and social supports while incarcerated, they will be less likely to reoffend.[8] A 2006 study showed that, within the first five years of release, incarcerated individuals with strong family connections are 25% less likely to re-engage in criminal activity.[9] Family and friends are essential to helping recently released individuals overcome re-entry obstacles, including debt, homelessness, and unemployment.[10] Consistent and frequent voice and video calls have been linked to the lowest odds of recidivism.[11]

An incarcerated person's ability to contact their family and friends is equally important for those outside of incarceration facilities. Severing familial bonds between parents and children hurts both parties. Children of incarcerated individuals "are more likely to suffer from behavioral issues, poor school performance, and are at a heightened risk for becoming engaged in crime and delinquency."[12] A 2020 survey of incarcerated parents showed that the parent-child relationship improved when they had weekly phone calls.[13]

---

[7] *Id.*

[8] Robert Agnew, *Foundation for a General Strain Theory of Crime and Delinquency*, 30 CRIMINOLOGY 47-88 (1992).

[9] Loonstyn & Galley, *supra* note 2 (citing Christy Visher, *Family Members' Experiences with Incarceration and Reentry*, 7 W. CRIMINOLOGY REV. 18 (2006).

[10] MINN. DEP'T OF CORR., THE EFFECTS OF PRISON VISITATION ON OFFENDER RECIDIVISM 6, REMOVING A NAIL FROM THE BOOT CAMP COFFIN: AN OUTCOME EVALUATION OF MINNESOTA'S CHALLENGE INCARCERATION PROGRAM (mn.gov).

[11] Leah Wang, *Research Roundup: The Positive Impacts of Family Contact for Incarcerated People and their Families*, PRISON POL'Y INITIATIVE (Dec. 21, 2021), Research roundup: The positive impacts of family contact for incarcerated people and their families | Prison Policy Initiative.

[12] Danielle Haverkate & Kevin Write, *The Differential Effects of Prison Contact on Parent-Child Relationship Quality and Child Behavioral Changes*, 5 CORRECTS: POL'Y, PRAC. & RESEARCH 222 (2020).

[13] *Id.*

**The Iowa Model**

Before Ameelio

In 2019, the cost of a 15-minute in-state call from an Iowa prison was $1.65 – equivalent to two to six hours of paid work.[14] Prior to 2021, the Iowa Department of Corrections ("DOC") used traditional telephony systems for voice calls between incarcerated individuals and friends and family. This technology was unsustainable due to high maintenance costs, limited scalability, security concerns, and a lack of integration with other modern communication platforms. In response to the COVID-19 pandemic, the DOC implemented Google Meet for all video communications between incarcerated individuals and friends and family. DOC staff struggled to maintain secure communications using Google Meet and had to update software each time Google released new features. Many of Google's updates did not comply with the DOC's security needs and placed an unnecessary burden on correctional staff to update Google's platform. In addition, DOC received consistent negative feedback about the prison traditional telephony communications system. Namely, incarcerated individuals and their friends and family complained of high prices and poor connectivity/service quality. The DOC knew that it needed a lower-cost system that aligned with its security needs while providing more reliable communication.

Ameelio's Pilot:

In 2021, Ameelio worked collaboratively with the DOC to initiate a pilot video calling program by replacing Google Meets with Ameelio's video platform. The Pilot lasted for several months. The DOC chose Ameelio for three reasons: (1) security, (2) cost, and (3) short launch time.

First, Ameelio's video platform, unlike many other video platforms, is specifically designed for correctional facilities. Ameelio's security functions allow correctional staff to monitor calls, issue warnings to parties during a call, and terminate calls when necessary. When Ameelio updates its platform, it does so with corrections-grade security in mind. The DOC chose Ameelio because it felt that Ameelio's platform provided more security features than any other platform at the best price.

---

[14] Bencsik, Panka et al., *Call and Conduct: The Impact of Free Communication of Prison Misconduct*, Dec. 2024 (forthcoming publication).

Second, Ameelio's platform costs less than $0.01 per minute, compared to other providers who charged approximately $0.15 per minute.[15] Lowering calling costs significantly reduced the financial burdens that incarcerated individuals, and their friends and family, faced to communicate.

Finally, Iowa's network was well-suited to implement Ameelio's communications services. The Iowa Communication Network ("ICN") owns and operates a state-wide fiber network that extends to Iowa correctional facilities.[16] ICN's network enables DOC facilities to provide incarcerated individuals with video calling and other services that require data.[17] DOC utilized ICN's network to provide video calls, ensuring security and reliability.

The Process:

*Prior to Deploying Ameelio to All Facilities:*

Prior to launching the Pilot, the DOC conducted a comprehensive network assessment. This assessment included speed and capacity tests, a security risk analysis, and an evaluation of existing infrastructure. The results highlighted the need for a robust, secure, and scalable solution that could be integrated seamlessly with the DOC's network. After conducting the network assessment, Iowa determined that its network had the capacity to accommodate Ameelio's video platform.

Upon completing the network evaluation, but prior to deploying Ameelio, the DOC, with Ameelio's assistance:

1. Determined its infrastructure and hardware used to deploy point-to-point VPNs could be used by Ameelio to ensure secure communication;

2. Provided correctional staff with comprehensive training covering Ameelio's functionality and benefits;

---

[15] In states with no cost calling laws, incarcerated individuals and their friends and family are not charged for voice and video calls. Otherwise, Ameelio offers corrections departments a low-cost option for voice and video calls.

[16] The ICN is an independent state agency that administers Iowa's statewide fiber optic telecommunications network. This network is used by schools, hospitals, clinics, libraries, state and federal government offices, and national guard armories for telecommunications services, such as high-speed broadband Internet, data, and voice calling. *Iowa Communications Network: About*, Iowa Commc'n Network, About | Iowa Communications Network (last visited Sept. 13, 2024). This network is separate from the broader administrative and incumbent networks utilized by other Iowa state government actors.

[17] Because Iowa owns its own network, the DOC was able to easily request data increases to accommodate for increased usage of video calls during the COVID-19 pandemic.

3. Established a support system, including training guides, video tutorials, and listening sessions, for correctional staff, and incarcerated individuals, and external users to address issues or concerns; and

4. Created a system for providing and receiving feedback to ensure staff knew of system issues and could resolve them quickly.

This preparatory work and collaboration enabled the DOC to more easily transition all video calling to Ameelio. The DOC did not have to make any significant physical changes, such as rewiring, to the network.

*Ameelio Launch*

The DOC implemented Ameelio's communication system in a phased approach, starting with a Pilot program in select facilities, such as the Iowa Correctional Institution for Women ("ICIW"). The DOC chose the ICIW because: (1) it had multiple security levels, allowing the DOC to test Ameelio's platform at different security levels in one facility; and (2) the ICIW is in a relatively new building, making it easier to update the network as needed. The phased approach allowed for a controlled and manageable implementation process. Throughout this Pilot period, Iowa only had to pay for data storage.[18]  Storage costs are dependent on the individual facility's needs.

During implementation, Ameelio offered DOC staff comprehensive training and additional support, such as guides and video tutorials, on how to use the platform. Ameelio and the DOC worked together to provide friends and family with step-by-step instructions on how to use Ameelio, available on the Iowa DOC's website. Stakeholders were well-prepared for the Ameelio transition because Ameelio ensured that there was effective communication and training. Due to rigorous monitoring, the DOC has easily and quickly implemented additional security measures when necessary.

Since launching the platform, Ameelio has continued to offer the DOC support. Further, the DOC continues to provide staff with ongoing support and access to resources and training. The DOC also offers support to incarcerated individuals through dedicated staff able to assist with technical issues or questions.

---

[18] Data storage costs are dependent on how long a facility keeps the recordings. On average, Iowa paid $14,500 annually for storage.

Ameelio Iowa Model Memo                                              November 26, 2024

**Outcomes**

Since implementation, Ameelio has seen a significant increase in video call volume in DOC facilities.[19] Ameelio and the DOC have documented an improvement in communication between incarcerated individuals and friends and family accompanied by enhanced security measures. The DOC reported reduced administrative costs attributed to reduced personnel needed to securely run the video calling platform and process payments for video calls.[20]

Evidence shows that Ameelio's Iowa communication platform is directly linked to a 27-34% reduction in overall in-prison misconduct.[21]  Violent misconduct, exclusive of intimidation and threats, in particular, declined by 32-34%;[22]  and violent misconduct, inclusive of intimidation and threats, declined by 55-62%.[23] These results suggest that affordable and accessible communication can result in safer incarceration facilities for both incarcerated individuals and correctional workers.

In addition to reduced violence, researchers observed no increase in the misuse of communications, despite increased access to technology.[24] This includes no observable change in drug offenses, suggesting that increased access to technology does not, on its own, increase the prevalence of drug offenses.

The DOC and Ameelio work collaboratively to respond to implementation challenges through Ameelio's customer support and regular updates to the platform. Feedback from users has driven improvements in the system, resulting in increased adoption across DOC facilities. Improvements include making Ameelio's platform more user-friendly to friends and family as well as corrections officers monitoring calls. The DOC reports an overall increase in user satisfaction and engagement, contributing to a more positive environment within facilities.

---

[19] The DOC has not reported a decrease in voice calls over regular phone lines. Rather, the overall communication between incarcerated individuals and friends and family has increased since Ameelio's introduction.
[20] Prior to using Ameelio, the DOC spent a large amount of money each year on accounting and processing bills related to calls made by incarcerated individuals. Since launching Ameelio's system across facilities, the DOC has reduced costs related to issuing and processing bills and payments for calling.
[21] Bencsik, *supra* note 14, at 18.
[22] *Id*. at 20.
[23] *Id*.
[24] *Id*.

In addition to adopting Ameelio's communication platform, the DOC adopted Ameelio's tool for scheduling calls. Now, the DOC uses Ameelio's scheduling tool to schedule all video calls as well as in-person visits, eliminating the paper scheduling method. Now, the DOC is better able to track visits to incarcerated individuals, thereby increasing security and reducing administrative costs.

## Conclusion

For a long time, the prison telecommunications system has been broken. Incarcerated individuals and their friends and family have paid high prices to communicate over unreliable platforms. As a result, many incarcerated individuals forego communicating with their support networks while incarcerated. Consistent communication with friends and family is a key component to reducing recidivism. Ameelio's Iowa Model offers prisons and jails an opportunity to provide incarcerated individuals with high-quality, low-cost video and voice communication on a platform designed to meet a correctional facility's security needs. Ameelio's model has shown that when incarcerated individuals are able to regularly communicate with friends and family, they are happier, less likely to engage in disciplinary infractions within the facility, and more likely to succeed upon release.

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2025, I caused the foregoing Joint Appendix to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by sending it via electronic mail to case manager Antonio Lopez-Blanco at Antonio_lopez-blanco@ca1.uscourts.gov, and this sealed document has been made available by email to those subject to the Commission's protective order.

I hereby certify that on June 2, 2025, I caused a redacted version of the foregoing Joint Appendix to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system and that service will be accomplished by the CM/ECF system.

*/s/ Jessica Ring Amunson*
Jessica Ring Amunson