CASE NOS. 24-8028, 24-2013, 24-2061

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

No. 24-8028

IN RE: MCP 191

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

Petitioners,

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,

Intervenor,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

OFFICE OF COMMUNCAITON OF THE UNITED CHURCH OF CHRIST, INC.; DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA PRISON SOCIETY,

Intervenors.

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS;
SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK
WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

Petitioners,

GLOBAL TEL*LINK; NATIONAL SHERIFFS' ASSOCIATION,

Intervenors,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; OFFICE OF
COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.;
PENNSYLVANIA PRISON SOCIETY,

Intervenors.

---

On Petitions for Review of a Final Order of the
Federal Communications Commission

---

**REPLY BRIEF FOR PETITIONER STATES OF INDIANA, ARKANSAS,
LOUISIANA, ALABAMA, FLORIDA, GEORGIA, IDAHO, IOWA,
MISSISSIPPI, MISSOURI, OHIO, SOUTH CAROLINA, SOUTH DAKOTA,
TENNESSEE, TEXAS, UTAH, AND VIRGINIA; LOUISIANA SHERIFFS
SID GAUTREAUX, BOBBY WEBRE, MARK WOOD, AND KEVIN COBB;
AND THE LOUISIANA SHERIFFS' ASSOCIATION**

---

THEODORE E. ROKITA
*Attorney General of Indiana*

Office of the Indiana Attorney
General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
Blake.Lanning@atg.in.gov

TIM GRIFFIN
*Attorney General of Arkansas*

Office of Attorney General Tim
Griffin
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
autumn.patterson@arkansasag.gov

ELIZABETH B. MURRILL
*Attorney General of Louisiana*

Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

BLAKE E. LANNING
  Assistant Chief Deputy
JOSHUA J. DAVID
JADE A. POORMAN
BRADLEY S. DAVIS
  Deputy Attorneys General

*Counsel for the State of Indiana*

AUTUMN HAMIT PATTERSON
  Solicitor General

*Counsel for the State of Arkansas*

KELSEY L. SMITH
  Deputy Solicitor General

*Counsel for the State of Louisiana*

*(Additional counsel listed on signature block*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .........................................................................v

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

I.    THE FCC LACKS THE STATUTORY AUTHORITY TO PROHIBIT SITE
      COMMISSION PAYMENTS .......................................................................2

      A.    Section 276 does not grant the FCC authority to regulate IPCS
            providers' "practices" like site commission payments .........................2

      B.    Section 201 does not authorize the FCC to prohibit site
            commissions .............................................................................6

      C.    The MWRA does not authorize the preemption of state and local laws
            that require site commission payments ..................................................7

II.   THE FCC EXCEEDED ITS STATUTORY DIRECTIVE BY FAILING TO
      "CONSIDER" THE COSTS OF NECESSARY SAFETY AND SECURITY
      MEASURES. ..................................................................................9

III.  THE FCC DID NOT ENGAGE IN REASONED DECISION-MAKING...11

IV.   THE STRUCTURE OF THE FCC IS UNCONSTITUTIONAL. ................17

V.    VENUE IS IMPROPER IN THIS COURT. .................................................27

CONCLUSION .................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Atieh v. Riordan*,
    797 F.3d 135 (1st Cir. 2015) .................................................................13

*Bhatti v. FHFA*,
    97 F.4th 556 (8th Cir. 2024) .................................................................27

*Bowsher v. Synar*,
    478 U.S. 714 (1986).............................................................................22

*California v. FCC*,
    905 F.2d 1217 (9th Cir. 1990) ...........................................................6, 7

*CFPB v. CashCall, Inc.*,
    35 F.4th 734 (9th Cir. 2022) .................................................................27

*CFPB v. Law Offs. of Crystal Moroney, P.C.*,
    63 F.4th 174 (2d Cir. 2023) ..................................................................27

*CFPB v. Nat'l Collegiate Master Student Loan Tr.*,
    96 F.4th 599 (3d Cir. 2024) ..................................................................27

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020)....................................................................8

*Collins v. Yellen*,
    594 U.S. 220 (2021)......................................................................22, 26

*Consumer Elecs. Ass'n v. FCC*,
    347 F.3d 291 (D.C. Cir. 2003)..............................................................29

*Consumers' Rsch. v. FCC*,
    109 F.4th 743 (5th Cir. 2024) ...............................................................21

*Council Tree Commc'ns, Inc. v. FCC*,
    503 F.3d 284 (3d Cir. 2007) ..................................................................29

*Delaware Riverkeeper Network v. FERC*,
    45 F.4th 104 (D.C. Cir. 2022)...............................................................20

CASES [CONT'D]

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ................................................................... 11

*Edd Potter Coal Co., Inc. v. Dir. Off. Workers' Comp. Progs.*,
  39 F.4th 202 (4th Cir. 2022) .................................................... 20

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................... 21

*Fleming v. USDA*,
  987 F.3d 1093 (D.C. Cir. 2021) ............................................... 20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................ 20, 21, 22

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986) ............................................... 10

*Global Tel*Link v. FCC*,
  866 F.3d 397 (D.C. Cir. 2017) ............................................ 3, 4, 5

*Integrity Adv., LLC v. CFPB*,
  48 F.4th 1161 (10th Cir. 2022) ................................................ 27

*Johnson v. Robison*,
  415 U.S. 361 (1974) ................................................................... 19

*K& R Contractors, LLC v. Keene*,
  86 F.4th 135 (4th Cir. 2023) .................................................... 27

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) .............................................................. 7, 8, 9

*Maher v. Mass. Gen. Hosp. Long Term Disability Plan*,
  665 F.3d 289 (1st Cir. 2011) .................................................... 14

*Meredith Corp. v. FCC*,
  809 F.2d 863 (D.C. Cir. 1987) ................................................. 19

CASES [CONT'D]

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*
   *Co.*,
   463 U.S. 29 (1983)............................................................*passim*

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019)....................................................7

*Myers v. United States*,
   272 U.S. 52 (1926).............................................................22

*Nat'l Parks Conservation Ass'n v. EPA*,
   788 F.3d 1134 (9th Cir. 2015) ...............................................16

*New York v. FERC*,
   535 U.S. 1 (2002)...............................................................8

*NLRB v. Starbucks Corp.*,
   125 F.4th 78 (3d Cir. 2024) ..............................................20, 27

*N.Y. State Broadcasters Ass'n v. United States*,
   414 F.2d 990 (2d Cir. 1969) .................................................19

*Pub. Citizen v. FMCSA*,
   374 F.3d 1209 (D.C. Cir. 2004)..............................................11

*Ross v. Blake*,
   578 U.S. 632 (2016)............................................................18

*Russello v. United States*,
   464 U.S. 16 (1983)..............................................................2

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)........................................................22, 24

*Serv. Emps. Int'l Union, AFL-CIO v. Gen. Servs. Admin.*,
   830 F. Supp. 5 (D.D.C. 1993).................................................16

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
   699 F.3d 1 (1st Cir. 2012)....................................................19

CASES [CONT'D]

*Sousa v. INS*,
226 F.3d 28 (1st Cir. 2000)..................................................................19, 20

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).................................................................................3

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
636 F.3d 650 (D.C. Cir. 2011).....................................................12, 13, 17

*Washington Ass'n for Television & Child. v. FCC*,
712 F.2d 677 (D.C. Cir. 1983)................................................................18

STATUTES

5 U.S.C. § 804(2) ....................................................................................25

7 U.S.C. § 6912 .......................................................................................20

15 U.S.C. § 717r.......................................................................................20

28 U.S.C. § 2112 ..........................................................................27, 28, 29

29 U.S.C. § 160 .......................................................................................20

30 U.S.C. § 932 .......................................................................................20

44 U.S.C. § 3502 .....................................................................................21

47 U.S.C. § 154 .......................................................................................21

47 U.S.C. § 201 ......................................................................................2, 4

47 U.S.C. § 276 ...............................................................................*passim*

47 U.S.C. § 405 .................................................................................18, 20

Martha Wright-Reed Just and Reasonable Communications Act of
2022, Pub. L. No. 117-338, § 3(b)(2), 136 Stat. 6156 (2023) ........................9, 10

OTHER AUTHORITIES

9/4/2024 Pet. For Review of the Pennsylvania Prison Society (Entry
ID 6670740)...........................................................................................29

9/5/2024 Pet. For Review of the Criminal Justice Reform Clinic at 2 (Entry ID 6670733).............................................................................29

9/5/2024 Pet. For Review of DARE at 1-2 (Entry ID 6665820)............................29

Department of Justice, Office of Legal Counsel, Memorandum for the Files, Re: OMB Review of Regulations of the Social Security Administration at 5 (Aug. 7, 1995)................................................................25, 26

Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025)..........................22, 23

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2309 (2001)...........................................................................................26

*Letter to Senator Richard J. Durbin*, *Restrictions on the Removal of Certain Principal Officers of the United States*, https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxboava/20 25.02.12-OUT-Durbin-530D.pdf (Feb. 12, 2025)..............................................26

Richard H. Pildes & Cass R. Sunstein, *Reinventing the Regulatory State*, 62 U. Chi. L. Rev. 1, 16 (1995)..........................................................23, 25

*Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993) ...............................................................................22, 23, 24, 25

Cass R. Sunstein, *The Office of Information and Regulatory Affairs: Myths and Realities*, 126 Harv. L. Rev. 1838, 1842 (2013)..............................23

U.S. Department of Justice, Office of Legal Counsel, Extending Regulatory Review Under Executive Order 12866 to Independent Regulatory Agencies (Oct. 18, 2019) ................................................................23

Christopher Witteman, *Net Neutrality from the Ground Up*, 55 Loy. L.A. L. Rev. 65, 105 (2022)...................................................................6

# INTRODUCTION

There are at least three independent reasons why the Rule concerning Incarcerated People's Communications Services ("IPCS") promulgated by the Federal Communications Commission ("FCC") is invalid. The FCC far exceeded its statutory authority in issuing the Rule, including by attempting to ban site commission payments and failing to consider security costs adequately when these are significant costs that state and local incarceration facilities incur to provide call services. Separately, the Rule is invalid because it is based on unreasoned decision-making and a flawed assessment of costs and benefits. And more fundamentally, the FCC's structure, which shields the agency from direct presidential oversight and control, is unconstitutional, and that constitutional defect directly harmed Petitioners in this rulemaking.

None of the FCC's attempts to rebut these points hit the mark. The FCC's arguments rest on strained interpretations of the statute authorizing the Rule, procedural technicalities that do not apply here, and circular reasoning. The Court should reject the FCC's attempt to justify a rule that has no lawful basis and that, if it remains in operation, will severely affect the safety and operations of state and local incarceration facilities.

# ARGUMENT

## I. THE FCC LACKS THE STATUTORY AUTHORITY TO PROHIBIT SITE COMMISSION PAYMENTS

### A. Section 276 does not grant the FCC authority to regulate IPCS providers' "practices" like site commission payments

As the States explained, Congress gave the FCC only limited authority to regulate IPCS. *See* States Br. 9–14. In 47 U.S.C. § 201(b), Congress authorized the FCC to regulate common carriers' "charges" and "practices" to make them "just and reasonable;" however, in 47 U.S.C. § 276(b)(1)(A), Congress authorized the FCC to regulate only the "rates and charges" IPCS providers were imposing—not the authority to regulate practices. This textual difference was "intentional[] and purpose[ful]." States Br. 13 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). It demonstrates that FCC's authority in § 276 to ensure that IPCS providers' "rates and charges" are "just and reasonable" does not include the authority to regulate all IPCS's practices, including site commission payments. The FCC offers little in response.

The FCC does not dispute that site commission payments are a "practice" or that § 276 does not expressly give it authority to regulate IPCS providers' "practices" (unlike § 201's authorization to regulate common carriers' practices). Instead, it insists that none of that matters. The FCC argues that it can still regulate all provider practices that may incidentally impact rates because § 276 tasks it with "establishing

2

a 'compensation plan to ensure' just and reasonable rates and charges."  FCC Br. 68

(quoting 47 U.S.C. § 276(b)(1)(A)).   And it contends that interpreting

"compensation plan" expansively to include providers' payment of site commissions

is consistent with the historical regulatory context.  *See* FCC Br. 69–71.  It is wrong

on both the plain-text and regulatory-history front.

> *First*, FCC's expansive interpretation of "compensation plan" is not consistent

with the plain text because it ignores the surrounding text and statutory framework.

Courts do not read statutory phrases "in isolation," but rather consider the "specific

context" and "the broader context of the statute as a whole."  *Util. Air Regul. Grp. v.*

*EPA*, 573 U.S. 302, 321 (2014) (quotation omitted).  When read in context, it is clear

that "compensation plan" refers only to a plan for payments *to* providers, not

payments *from* providers to facilities (like site commissions).  After all, § 276

provides:

> [T]he Commission shall . . . prescribe regulations that . . . establish a
> compensation plan to ensure *that all payphone service providers* are
> fairly compensated, and all rates and charges are just and reasonable,
> for completed intrastate and interstate communications using *their*
> payphone or calling device . . . .

47 U.S.C. § 276(b)(1)(A) (emphases added).  The FCC can thus regulate plans

compensating IPCS providers, including the "rates and charges" that IPCS providers

impose for communications using their devices.  *Id.*; *see Global Tel\*Link v. FCC*,

866 F.3d 397, 409 (D.C. Cir. 2017) (describing § 276 as "direct[ing] the Commission

to 'ensure that all [IPCS] providers are fairly compensated' for their inter- and intrastate calls") (quoting 47 U.S.C. § 276(b)(1)(A))).  But there is nothing in this provision that authorizes the FCC to regulate compensation plans governing payment to other entities that are not communication providers.[1]  And the broader statutory context—including Congress's decision to not authorize the FCC to regulate IPCS providers' "*practices* . . . for and in connection with . . . communication service[s]," States Br. 12 (quoting 47 U.S.C. § 201(b) (emphasis added))—supports this interpretation.  There is no textual basis to construe the FCC's authority to regulate compensation *to* IPCS providers, including their charges and rates, as somehow giving it authority to regulate all IPCS-provider practices, including site commission payments made *by* IPCS providers.

*Second*, the regulatory history undermines the FCC's reading of § 276.  Despite the FCC's reliance on *Global Tel\*Link* as evidence that its § 276 authority has been historically understood as allowing it to regulate compensation *from* providers, FCC Br. 69, the opposite is true.  The court in *Global Tel\*Link* explained that § 276 was only concerned about fair compensation *to* providers.  *See* 866 F.3d

---

[1]     Moreover, contrary to the FCC's insinuation (at 68 n.13), this interpretation does not render the term, "plan," surplusage or construe "compensation" to mean only payment of a rate.  The compensation plan can include details, including potentially timing of payment or interest fees, about the payment of rates and charges.

4

at 409 (emphasizing that "§ 276 merely directs" that "all [IPCS] providers are fairly compensated"). It further explained the same was true of "prior orders" implementing § 276; they were concerned with "whether the providers were fairly compensated." *Id.* at 410. *Global Tel\*Link* provides no support for the FCC's argument that § 276 was historically understood as allowing the FCC to regulate payments from providers to non-provider entities, such as penological facilities.

The FCC's reference to its own description of prior FCC-imposed requirements also fails to show that § 276 allows it to regulate compensation *from* providers. *See* FCC Br. 69–70. Even assuming regulatory history can trump the plain text, all the referenced requirements relate to compensation *to* providers. So, like the plain text, the regulatory background supports the States' interpretation of § 276. When MWRA amended § 276 to authorize regulations so "rates and charges are just and reasonable," it empowered the FCC to consider whether a providers' rates and charges are "just and reasonable" from the user's perspective. 47 U.S.C. § 276(b)(1)(A). But Congress did nothing to alter the statutory language that limits the compensation plans subject to FCC regulation; § 276 still just covers compensation *to* providers. Section 276 therefore does not give the FCC the authority to prohibit site commissions: payments to penological facilities *from* providers.

**B. Section 201 does not authorize the FCC to prohibit site commissions**

The FCC's attempt to find statutory authority for its site-commission prohibition in § 201 likewise fails. That is because, as the States explained, § 201 authorizes only regulation of "interstate or foreign communications," while the prohibition on site commissions regulates aspects of intrastate communications. States Br. 16–18. Citing the doctrine of "the 'impossibility' exception" rather than § 201's text, the FCC argues that § 201 gives it the authority to "regulate the practices associated with intrastate IPCS to the extent they cannot practicably be separated from practices applicable to interstate IPCS." FCC Br. 72. The FCC also suggests that the States lack evidence to prove separability. *Id.* These arguments fail.

The FCC "bears the burden" to show that the "limited" impossibility exception applies, *California v. FCC*, 905 F.2d 1217, 1243 (9th Cir. 1990), and it is has failed to carry its burden here. After all, "separating interstate from intrastate traffic is not something new; it has been done since before the inception of the Communications Act." Christopher Witteman, *Net Neutrality from the Ground Up*, 55 Loy. L.A. L. Rev. 65, 105 (2022). And there is no reason why most communications cannot be separated here when calls may only be made to recipients on a verified list and communications are tracked and monitored. *See* Order ¶¶ 81, 340–43 (JA Vol. 5, 1528-29; 1665-67). That, in turn, would allow site commission

payments to be separated "between interstate and intrastate service" just like other operating expenses. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 375–76 (1986).

Nor is gesturing at possible "marketplace distortions," FCC Br. 72, sufficient to show that state-required site commissions "would *negate* valid FCC regulatory goals" to trigger the impossibility exception. *See California*, 905 F.2d at 1243 (emphasis added). Site commissions do not negate the FCC's goal to reduce the costs of IPCS because the FCC can still set caps on rates and charges that IPCS providers can impose. And even assuming site commission payments "frustrate" the FCC's regulatory goals, that is not enough to satisfy the impossibility exception. *Id.* Accordingly, the "judicial gloss" of the impossibility exception does not allow the FCC to stretch its authority to regulate interstate communications under § 201(b) to reach site commissions related to intrastate communications. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 77 (D.C. Cir. 2019).

### C. The MWRA does not authorize the preemption of state and local laws that require site commission payments

The FCC also cannot stretch § 276's preemption clause as authorizing it to preempt state and local laws that require site commissions. *See* States' Br. 18–20; *La. Pub. Serv. Comm'n*, 476 U.S. at 374. Because the site-commission prohibition is outside of FCC's authority, it lacks the authority to preempt state and local laws.

7

The FCC responds that it was acting pursuant to its § 276 authority so that provision's preemption clause gives it "explicit preemptive authority." FCC Br. 74–78. It then falls back on its § 201(b) "duty to ensure just and reasonable rates for interstate and international communications" as providing "a separate source of preemption authority" based on "conflict preemption." FCC Br. 76. Both arguments fail.

First, § 276's preemption clause applies *only* if the regulation was validly issued under that provision. That is because the FCC "literally has no power to act, let alone preempt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 357. The site-commission prohibition was not a valid exercise of power under § 276, *see supra* at 2–5, which means § 276(c) does not give the FCC license to run roughshod over state laws. The FCC seeks to ignore *Louisiana Public Service Commission* because it was examining a different statutory provision of the Communications Act. *See* FCC Br. 78. The Supreme Court, however, was "defining the scope of the federal power," *New York v. FERC*, 535 U.S. 1, 18 (2002)—a principle that applies across statutory schemes, *see, e.g.*, *id.*; *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Subsection (c) is not a separate, independent source of authority to issue regulations that are not authorized in subsection (b).

8

Second, the FCC lacks authority to prohibit site commissions under § 201(b), *see supra* at 5–7, so that provision likewise fails to provide a basis for the FCC to preempt state laws requiring site commissions, *see La. Pub. Serv. Comm'n v. FCC*, 476 U.S. at 357.  That conclusion is underscored by § 152(b)'s anti-preemption rule and the statutory scheme as a whole, which demonstrates congressional intent to "establish[ ] dual state and federal regulation of telephone service." *Id.* at 358.

## II.    The FCC Exceeded its Statutory Directive by Failing to "Consider" the Costs of Necessary Safety and Security Measures.

The FCC further exceeded its statutory authority by refusing to identify, much less adequately consider, all safety and security costs that are necessary to provide IPCS.  The FCC thus flouted its statutory mandate to "'consider costs associated with any safety and security measures necessary to provide' IPCS."  States Br. 8, 38 (quoting Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, § 3(b)(2), 136 Stat. 6156 (2023) ("MWRA")).  Because the FCC cannot dispute the existence of the "mandatory" statutory directive, *see* Order ¶ 356 (JA Vol. 5, 1671-72), it insists that it complied with the directive and "fully considered the costs 'necessary'" by using "the used-and-useful framework," FCC Br. 40–41.  But this argument shows that the FCC misunderstands its statutory duty—not that it complied with its duty.

Contrary to FCC's claims, FCC Br. 40–41, employing the used-and-useful framework to purportedly "weed out costs not necessary to the provision" of IPCS

based on whether the safety and security measures have utility for inmates (as opposed to utility to facilities or law enforcement) does not satisfy the statutory directive. Nor does its rejection of allegedly "elective" safety and security measures, FCC Br. 56, that are not "universally or nearly universally employed by IPCS providers," Order ¶ 381 (JA Vol. 5, 1688-89).

The statutory mandate is more extensive than the narrow inquiry the FCC conducted. Congress mandated that the FCC consider not only "safety and security measures necessary to provide" IPCS, but all costs even "*associated* with any safety and security measures necessary to provide a[n] [IPCS] service" and "differences in costs" between facilities with different characteristics. MWRA § 3(b)(2) (emphasis added). The FCC accordingly had to identify all safety and security measures and assess whether they are necessary to provide IPCS services in facilities based on their unique characteristics. The FCC did not do so. It expressly declined to even "reach[] a determination on which safety and security costs are 'necessary' to the provision of IPCS." Order ¶ 369 (JA Vol. 5, 1679-80); *see id.* ("[W]e do not opine on the necessity of safety and security measures that correctional facilities may implement."). And repeatedly stating that it has "consider[ed] *all* safety and security costs" does not make it so, Order ¶ 369 (JA Vol. 5, 1679-80), because "[s]tating that a factor was considered . . . is not a substitute for considering it," *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

10

The FCC's application of the used-and-useful framework to consider only measures that promote utility to inmates (ignoring the reality that facilities may stop paying for IPCS if it cannot be compensated for safety and security measures) underscores its failure to consider *all* costs *associated* with necessary safety and security measures.  *See* States Br. 21–23.  It is a narrower (albeit related) inquiry that "does not relieve the agency of the duty of compliance with the congressional instruction."  *See Pub. Citizen v. FMCSA*, 374 F.3d 1209, 1217 (D.C. Cir. 2004).  In short, the FCC's consideration of a related concept is not a legally adequate alternative to considering what was mandated by Congress in § 3(b)(2).

## III.    THE FCC DID NOT ENGAGE IN REASONED DECISION-MAKING

As the States explained, the FCC failed to engage in reasoned decision-making in promulgating the Order.  *See* States Br. 25–43.  The FCC was required to "articulate a satisfactory explanation" for the Order by showing it "examined the relevant data" and demonstrating a "rational connection between the facts found and the choice made."  *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  It failed at every step.

That is primarily because the FCC arbitrarily excluded necessary—and very real—security and facility costs from the new rates, all in favor of lower costs for inmates and their families.  Under the guise of the "used-and-useful" framework, the

11

FCC continues to ignore the ample record evidence about these necessary costs. *See* States Br. 26–30 (summarizing record evidence of the necessary safety and security measures (and their costs) for allowing IPCS in correctional institutions). In doing so, the FCC flouts the very purpose of IPCS and the MWRA's requirements. These fundamental defects are hallmark indicators of arbitrary-and-capricious reasoning. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency action is unreasonable when it "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency"); *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (analyzing whether agency action is "'rationally related to the goals of' the statute").

Both the used-and-useful framework itself and the resulting exclusion of safety and security measures the FCC deems "unnecessary" are arbitrary and capricious. First, the used-and-useful framework goes against the very purpose of providing IPCS, which is meant to accommodate the safety and security needs of facilities. *See* Order ¶ 339 (JA Vol. 5, 1664-65) (acknowledging IPCS services "are different" than normal communication services because of the "safety and security measures needed to adapt communications services to the carceral context"). Moreover, as explained previously, the FCC exceeded its statutory authority by failing to consider the costs of necessary safety and security measures. *See supra* at

9–10. Employing a framework that flouts both the goals and express language of a statute cannot possibly be reasonable. *See Vill. of Barrington*, 636 F.3d at 660.

Second, the FCC's exclusive focus on the user-inmate in the used-and-useful framework is irrational and inconsistently applied. By focusing solely on whether the user-inmate is benefitted by a safety or security measure, the FCC summarily excluded any safety measure that is necessary but predominately benefits other inmates, facility staff, or the public. Yet the record is replete with examples of security measures that are (a) necessary but (b) predominately benefit someone *other* than the user-inmate. *See, e.g.*, States' Br. 29 & n.1 (quoting Sheriff Donahue Letter) (JA Vol. 4, 1439) ("These measures are critical to ensuring the safety of incarcerated individuals, facility personnel, and the integrity of the facility itself."); Comments of the Florida Department of Corrections (JA Vol. 4, 1442) ("Implementing safety and security measures ... is necessary to ensure the safety of inmates, department staff, and the public."). The FCC insists it "fully considered and explained its approach to safety and security costs." FCC Br. 52–55. But the decision to exclude necessary safety and security measures simply "isn't supported by any rational view of the record." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (quotation omitted); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The FCC's remaining attempts to justify the exclusion of necessary safety and security measures via its focus on the user-inmate likewise fail. The FCC cannot

point to statutory language to support its laser-focus on the user-inmate, as that is not what the statute mandates. Instead, the FCC justifies its framework and exclusions by doubling down on the problem.

According to the FCC, many safety and security measures were reasonably excluded from costs because they "primarily serve 'law enforcement' purposes unrelated to the provision of communication services." FCC Br. 54. The FCC admits, however, that—under the used-and-useful framework—the only measures that *are related* to the provision of communication services are those that enable a *user-inmate to make a call*. FCC Br. 54–55 (explaining the FCC "excluded the costs" of certain measures because, "[i]f such measures were unavailable, '*incarcerated people would still be able to place telephone calls* or use advanced communications'" (quoting Order ¶ 378 (JA Vol. 5, 1685-86) (emphasis added)). The FCC's attempted rationale to support the exclusions of necessary safety and security measures does nothing more than use the underlying problem to justify the arbitrary outcome. That's not an adequate explanation, let alone a satisfactory one. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 301 n.13 (1st Cir. 2011) (Lipez, J., dissenting) ("[C]ircular reasoning is both illogical and unpersuasive.").

Likewise, the FCC failed to explain adequately its arbitrary application of the used-and-useful framework via the preponderance standard. *See* States' Br. 35–36.

The States explained the inconsistent application of the framework (like how it excludes some measures that are unnecessary for making calls but includes others) and the inadequacies of the FCC's response (there is an inadequate record to support the FCC's sweeping categorizations under the preponderance standard). Instead of addressing the substance of these problems, the FCC latches onto the scope of the record. *See* FCC Br. 60–61 (suggesting the FCC rushed because it was "required to issue new rules by a certain date"). But the record's scope and a deadline does not alleviate the FCC of its burden to examine the data, consider the problem, and rationally explain its decision. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

As to site commission payments, the FCC does not dispute that facilities incur costs that directly result from making IPCS available. *See* Order ¶ 138 (JA Vol. 5, 1560) (recognizing the FCC has acknowledged "that correctional facilities incur certain costs that are 'reasonably and directly related' to the provision of IPCS"); States Br. 26–30 (summarizing evidence). Yet the Order unreasonably bans the recovery of these costs by prohibiting site commission payments. *See* State Br. 37–42. The FCC's response to the inadequacies alleged by the States (i.e., that excluding site commission payment is contrary to record evidence, a cursory reversal of historical policy, and internally inconsistent) are mostly regurgitations of the Order's conclusions. FCC Br. 81–85. One merits a response.

The FCC continues to assert that its approach to security and facility costs, including site commission payments, is not unreasonable because it will "not result in decreased access to IPCS services." FCC Br. 84. Its main explanation is simple: The FCC does not actually believe facilities would "make good on their implicit threats to curtail access." FCC Br. 84.

The FCC provides no evidence to support this assertion. The assertion therefore cannot be reasonable, as "unexplained assertions ... unsupported by any explained reasoning" are "arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015); *see Serv. Emps. Int'l Union, AFL-CIO v. Gen. Servs. Admin.*, 830 F. Supp. 5, 10 (D.D.C. 1993) ("[U]nsubstantiated assumptions are insufficient justification and rational to support . . . promulgation of this regulation.").

Nor does the FCC engage with the record evidence that contradicts this assertion. *See, e.g.*, Florida Comments at 4 (JA Vol. 4, 1443) ("[E]stablishing rates that do not allow for the recovery of costs associated with those measures would have the effect of hindering or preventing their implementation and potentially limiting the availability of telephone and advanced communication services in correctional institutions and facilities."); States Br. 39–40 (collecting comments). That's a textbook example of arbitrary-and-capricious reasoning. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency decision-making is arbitrary and capricious

when it "entirely fail[s] to consider an important aspect of the problem," or "offer[s] an explanation for its decision that runs counter to the evidence before the agency").

Worse still, the FCC does not care if restrictions or eliminations of IPCS come to fruition, as it has an easy out. "[I]f access to IPCS services turns out differently than the Commission expects, the agency will of course be free to revisit the rate caps if it concludes it is necessary to do so." FCC Br. 84 n.19. Suggesting it will change the course in the future is not an adequate response, especially considering any reduction of services would contradict the fundamental goal of § 276—to "promote the widespread deployment of payphone services to the benefit of the general public." 47 U.S.C. § 276(b)(l). That, too, is arbitrary and capricious. *See Vill. of Barrington*, 636 F.3d at 660.[2]

## IV.    THE STRUCTURE OF THE FCC IS UNCONSTITUTIONAL.

The FCC does not even attempt to argue that the protection from at-will removal by the President, which the FCC has long been understood to enjoy, is unconstitutional. For good reasons: the FCC's removal protections are clearly not lawful, *see* States Br. 43–46, and the agency's independence, and the manner in which that independence influenced this rulemaking process that produced the IPCS Rule, caused direct harm to the States. The FCC's attempts to erect procedural

---

[2] The FCC did not respond to the States' argument that the Order is additionally arbitrary and capricious because it failed to provide for fair compensation. States' Br. 41–42.

barriers to the States' constitutional arguments are unavailing and do not prevent the Court from vacating the Rule on constitutional grounds.

To begin, the FCC is incorrect that 47 U.S.C. § 405 requires in all cases—no exceptions—that parties challenging FCC actions exhaust all arguments in administrative proceedings before the agency, regardless of whether doing so would be futile. By conflating the different exhaustion requirements of different statutes with those of § 405 and relying on inapposite precedents, the FCC seeks to impose an inflexible exhaustion requirement where none exists. The Court can and should consider the States' constitutional argument even though it was not made in the underlying agency proceeding.

Whether a statute contains an exhaustion requirement and, if so, what kind is a question "of statutory construction," which varies by statute. *Ross v. Blake*, 578 U.S. 632, 642 (2016). Some statutes "might be best read to give judges the leeway to create exceptions or to [themselves] incorporate standard administrative-law exceptions." *Id*. That is true of § 405, which incorporates a variety of exceptions to its exhaustion requirement, including for claims that an agency acted in excess of its authority or where bringing the claim before the agency would have been futile. *See Washington Ass'n for Television & Child. v. FCC*, 712 F.2d 677, 681–82 (D.C. Cir. 1983).

The futility exception applies here and allows the Court to consider the constitutional claim. Respondent cannot possibly "suggest that it would have made any difference at all in the [actions] of the Commission had the constitutional arguments been pressed" during the rulemaking proceeding. *N.Y. State Broadcasters Ass'n v. United States*, 414 F.2d 990, 994 (2d Cir. 1969). That is because, generally, "regulatory agencies are not free to declare an act of Congress unconstitutional." *Meredith Corp. v. FCC*, 809 F.2d 863, 872 (D.C. Cir. 1987); *see Johnson v. Robison*, 415 U.S. 361, 368 (1974) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies."). Urging the FCC to determine the constitutionality of its own structure would have been, at best, an academic exercise that would have wasted the States', the agency's, and other parties' time and resources.

Thus, "a resort to the agency" on the question of whether the FCC is unconstitutionally structured "would [have] be[en] futile because the challenge is one that the agency has no power to resolve in the applicant's favor." *Sousa v. INS*, 226 F.3d 28, 32 (1st Cir. 2000). The States "were therefore under no obligation to exhaust [their] remedies" before the agency on this issue. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 n.6 (1st Cir. 2012). This is one of the

"best founded" exceptions to statutory exhaustion requirements, including the one contained in § 405. *Sousa*, 226 F.3d at 32.

The FCC's arguments otherwise hold little weight. Every single case on which the FCC relies to assert that even constitutional claims must be raised before an agency to be preserved for judicial review concern statutes other than § 405. *See* FCC Br. 101–02; *Fleming v. USDA*, 987 F.3d 1093 (D.C. Cir. 2021) (interpreting 7 U.S.C. § 6912); *Edd Potter Coal Co., Inc. v. Dir. Off. Workers' Comp. Progs.*, 39 F.4th 202 (4th Cir. 2022) (interpreting 30 U.S.C. § 932); *NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024) (interpreting 29 U.S.C. § 160); *Delaware Riverkeeper Network v. FERC*, 45 F.4th 104 (D.C. Cir. 2022) (interpreting 15 U.S.C. § 717r). As noted, what exceptions exist to a statute's exhaustion requirements turns on the specific terms of the statute at issue and how it has been interpreted. Section 405 has been interpreted to include a futility exception, even if other statutes have not, and that exception applies here.

The FCC is equally wrong that, when the Commission promulgated the Rule, the Commission's members were not shielded from at-will removal by the President. A statute need not contain an express restriction on the President's removal power for it to purport to insulate an agency's head from presidential removal. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) (treating Securities and Exchange Commission commissioners as being insulated from presidential

removal despite statute not containing any removal restrictions).  Courts have long

understood 47 U.S.C. § 154(c)'s creation of fixed terms for FCC commissioners to

protect the commissioners from at-will removal by the President.  *See e.g.*, *FCC v.

Fox Television Stations, Inc.*, 556 U.S. 502, 523 (2009) (explaining that the "FCC's

status as an 'independent' agency" means it is "sheltered . . . from the President" and

"free[] from Presidential oversight"); *Consumers' Rsch. v. FCC*, 109 F.4th 743, 762–

63 (5th Cir. 2024) ("FCC commissioners are removable by the President only for-

cause.").  Likewise, Congress by statute has designated the FCC an "independent

agency" alongside various other agencies that Congress has sought to insulate from

presidential oversight.  *See* 44 U.S.C. § 3502(5).

The FCC's independence matters and directly harmed the States in the

rulemaking process that produced the IPCS Rule.  In the context of a major

rulemaking like the IPCS rulemaking, an agency's independence from the direct

presidential oversight and control that would otherwise flow from the President's

ability to remove the agency's head at will undoubtedly inflicts meaningful harm on

parties, like the State Petitioners, that are subject to the agency's rule.  Among other

things, the FCC's independence means that, in promulgating the Order, it was not

subject to the regulatory review process by which presidents ensure that an agency

properly weighs costs and benefits, pursues sound policy, and is cognizant of state

and local interests when issuing a rule.  That undoubtedly affected the contents of

the Rule, and likely did so to the States' detriment.  In consequence, the States fully

satisfy the requirements set by *Collins v. Yellen*, 594 U.S. 220 (2021), for relief to

be granted in a case challenging an agency's structure.

Just as the President's "selection of administrative officers is essential to the

execution of the laws by him, so must be his power of removing those for whom he

cannot continue to be responsible." *Myers v. United States*, 272 U.S. 52, 117 (1926).

The power of removal is thus the ultimate source of the President's authority to

oversee and direct executive branch officers.  *See Free Enterprise*, 561 U.S. at 492

("[T]he executive power include[s] a power to oversee executive officers through

removal."); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213–14 (2020) ("[I]t is 'only the

authority that can remove] [executive] officials that they 'must fear and, in the

performance of [their] functions, obey.'" (quoting *Bowsher v. Synar*, 478 U.S. 714,

726 (1986))).

In the context of rulemaking, one of the most significant tools the President

employs to oversee and direct executive agencies is the regulatory review process

established by Executive Order 12866.  Under that order, all "significant regulatory

actions" taken by executive agencies must be submitted to the Office of Information

and Regulatory Affairs ("OIRA") for review before they are finalized.  *See*

*Regulatory Planning and Review*, 58 Fed. Reg.  51735 (Sept. 30, 1993).  Until

January 23, 2025, however, independent agencies, like the FCC, were not required

22

to submit their rules for OIRA review. *See* Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025).

OIRA plays a critically important role in federal rulemakings subject to its review. Generally speaking, "OIRA is a repository of valuable rulemaking expertise." U.S. Department of Justice, Office of Legal Counsel, Extending Regulatory Review Under Executive Order 12866 to Independent Regulatory Agencies (Oct. 18, 2019). OIRA acts as "a centralizing and rationalizing body" on which presidents rely to ensure that "an unwieldy federal bureaucracy conforms its actions to [the President's] basic principles;" to guard against "excessive public and private costs;" and to "coordinate agency activity so as to ensure consistency and coherence" across the executive branch. Richard H. Pildes & Cass R. Sunstein, *Reinventing the Regulatory State*, 62 U. Chi. L. Rev. 1, 16 (1995); *see Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993) ("The Administrator of OIRA shall provide meaningful guidance and oversight so that each agency's regulatory actions are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order and do not conflict with the policies or actions of another agency."). "[F]or economically significant rules, the analysis of costs and benefits receives careful attention" from OIRA. Cass R. Sunstein, *The Office of Information and Regulatory Affairs: Myths and Realities*, 126 Harv. L. Rev. 1838, 1842 (2013). Parties, such as the State Petitioners, interested in or affected by

23

rulemaking may also contact OIRA and offer their views in connection with OIRA's review. *See Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993).

The IPCS Rule did not go through OIRA review. When the Rule was promulgated, the FCC was not subject to the OIRA review process because the FCC was regarded as an "independent regulatory agency." The fact that the Rule was not reviewed by OIRA—and thereby evaded direct presidential oversight—undoubtedly affected the quality and substance of the Rule, to the States' detriment. It also denied the States the opportunity to engage with OIRA about their concerns with the Rule.

OIRA review "casts a long shadow over rulemaking in the Executive Branch." *Seila Law*, 591 U.S. at 293 n.13 (2020) (Kagan, J., concurring in part and dissenting in part). If the IPCS Rule had been subject to OIRA review, it is likely the Rule would have been refined to better address the concerns raised by commenters that are now the subject of Petitioners' challenge. For example, as part of the regulatory review process, an agency must provide an assessment to OIRA of how a draft rule "avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions." *Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993). With respect to the IPCS Rule, which has direct and substantial consequences for state and local prisons and jails, such an assessment very likely would have ensured the FCC gave greater consideration to how the Rule

disrupts state and local government operations, such as the security-related issues that the States argue the FCC failed to consider properly in its Order.

Likewise, for rules that "have an annual effect on the economy of $100 million or more," agencies subject to OIRA review must prepare detailed cost-benefit analyses. *Id*. Empirical data suggests that such analyses, when prepared under the guidance and supervision of OIRA, are more accurate than the analyses of costs and benefits independent agencies may prepare on their own. *See* Richard H. Pildes & Cass R. Sunstein, *Reinventing the Regulatory State*, 62 U. Chi. L. Rev. 1, 16 (1995). Here, too, there is direct connection between OIRA review that the Rule did not undergo and Petitioners' APA arguments about why the Rule is flawed, some of which focus on the FCC's failure to properly weigh costs and benefits.

Moreover, if the FCC were not insulated from presidential removal when the Rule was promulgated and treated as an independent agency, it is likely, if not certain, that the Rule would have undergone OIRA review.[3]  As the Office of Legal Counsel has acknowledged, agency independence through removal protections has limited presidents' ability to shape the substance of an agency's rule. *See* Department of Justice, OLC, Memorandum for the Files, Re: OMB Review of

---

[3] Both the FCC and the Administrator of OIRA determined that the Final Rule is "major" under the Congressional Review Act, 5 U.S.C. § 804(2), which almost certainly means it would qualify as a "significant regulatory action." *See* Order ¶ 628 (JA Vol. 5, 1804).

Regulations of the Social Security Administration at 5 (Aug. 7, 1995). And as a practical matter, presidents likely have not subjected independent agencies to OIRA review because they know any attempt to shape those agencies' rulemaking processes would be "futile" given the removal protections. Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2309 (2001). Indeed, it is likely no coincidence that the first Administration to impose OIRA review on independent agencies is also the first Administration to argue that *Humphrey's Executor* should be overturned. *See Letter to Senator Richard J. Durbin*, *Restrictions on the Removal of Certain Principal Officers of the United States*, https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxboava/2025.02.12-OUT-Durbin-530D.pdf (Feb. 12, 2025).

If the Rule had undergone OIRA review, it is likely that the FCC would have better taken into account state and local interests and more accurately weighed costs and benefits. The States would also have been afforded another procedural step in the rulemaking process at which to express their views in connection with OIRA's review. Because the Rule did not undergo OIRA review, and because the FCC's statutory independence is the primary reason why it did not undergo such review, the FCC's unconstitutional structure directly harmed Petitioners. That is more than enough to show that the FCC's independence very likely "altered" the contents of the Rule in a way that harmed the States. *Collins v. Yellen*, 594 U.S. at 259.

None of the cases Respondent cites alter that conclusion because none
concerned a challenge to a rule that was the product of a significant regulatory action,
as the present case does. Rather, all of Respondent's cases involved agency action
that, regardless of presidential control and oversight over the agencies involved,
would not have been subject to OIRA review. *See* FCC Br. 104; *Starbucks*, 125
F.4th at 84–86 (following a complaint of unfair labor practices); *Bhatti v. FHFA*, 97
F.4th 556 (8th Cir. 2024) (challenging an amendment to a conservator agreement);
*CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 96 F.4th 599 (3d Cir. 2024)
(following a petition to enforce a civil investigative demand); *K& R Contractors,
LLC v. Keene*, 86 F.4th 135 (4th Cir. 2023) (reviewing an administrative law judge
decision); *CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174 (2d Cir. 2023)
(following a petition to enforce a civil investigative demand); *Integrity Adv., LLC v.
CFPB*, 48 F.4th 1161 (10th Cir. 2022) (following a CFPB enforcement action);
*CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022) (following a CFPB
enforcement action).

## V.    VENUE IS IMPROPER IN THIS COURT.

Federal law is clear that when an agency "receives two or more petitions for
review" "within ten days after the issuance of [an] order" in two courts of appeals,
the agency "shall . . . notify the judicial panel on multidistrict litigation." 28 U.S.C.
§ 2112(a)(1) & (3). The panel shall then randomly select one court of appeals where

the record is to be "consolidated." 28 U.S.C. § 2112(a)(1), (3).  But the record demonstrates, and the FCC's response confirms, that the initial petitions filed in this Court by the Pennsylvania Prison Society, DARE, and the Criminal Justice Reform Clinic (collectively, the Public Interest Petitioners) were incurably premature.  Thus, the lottery that purported to place jurisdiction in this Court was improper.  The appropriate course is to transfer this proceeding to the Fifth Circuit Court of Appeals, where it should be heard under 28 U.S.C. § 2112.

In their Response brief, the FCC acknowledged that the agency released the *Order* on its website on July 22, 2024, that notice of the paragraphs addressing Securus's petition for clarification and waiver were published in the Federal Register on August 26, 2024; and that "by happenstance" the remainder of the *Order* was not published in the Federal Register until September 20, 2024.  *See* FCC Br. 27.  Because the FCC released parts of the Order in the Federal Register on August 26, 2024, the ten-day filing window provided by 28 U.S.C. § 2112(a) began on that day.  Securus was the first to file a petition for review in the Fifth Circuit on August 30, 2024—within the ten-day window.  *See* 8/30/2024 Pet. For Review of Securus at 2 (Entry ID 6670737).  The Public Interest Petitioners then filed their petitions on September 4 and 5, 2025, in the First, Third, and Ninth Circuits, respectively.  *See* JPML Notice (Entry ID 6670727) (schedule).

28

The Public Interest Petitioners sought to challenge the "key substantive provisions" of the FCC's Order which had not yet been published in the Federal Register, and would not be published until September 20, 2024. *See* 9/5/2024 Pet. For Review of DARE at 1-2 (Entry ID 6665820); *see* 9/5/2024 Pet. For Review of the Criminal Justice Reform Clinic at 2 (Entry ID 6670733); 9/4/2024 Pet. For Review of the Pennsylvania Prison Society (Entry ID 6670740). While the petitions were filed within the ten-day window initiated by the publication of the order addressing Securus's petition to initiate a lottery under 28 U.S.C. § 2112, Public Interest Petitioner's petitions were nonetheless filed before the complete Order—the agency actions that the State Petitioners were actually challenging—was published in the Federal Register. This Court acknowledged the premature petitions on October 3, 2024, when it ordered Public Interest Petitioners to show cause why their petitions should not be dismissed for lack of jurisdiction. October 4 Order to Show Cause (Entry ID 6672177). Nonetheless, a judicial lottery was conducted on September 18, 2024, as though the petitions had been properly filed.

When a party challenges an order under the Hobbs Act *before* it is published in the Federal Register, the court of appeals lacks jurisdiction over it. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 296-97 (D.C. Cir. 2003); *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 287 (3d Cir. 2007) ("We have no jurisdiction to consider an incurably premature petition for review."). Therefore, all three Public

Interest Petitioners' petitions were incurably premature and a judicial lottery should not have been conducted. Ultimately, because Securus's petition for review was timely filed in the Fifth Circuit, that court is the proper venue for this challenge.

## CONCLUSION

For the foregoing reasons, the Court should hold the Final Rule unlawful and set aside the FCC's Order. In the alternative, the Court should transfer this case to the United States Court of Appeals for the Fifth Circuit.

May 12, 2025

Respectfully submitted,

THEODORE E. ROKITA
  *Attorney General of Indiana*

Office of the Indiana Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
blake.lanning@atg.in.gov

/s/ Blake E. Lanning
BLAKE E. LANNING
  *Assistant Chief Deputy*
JOSHUA J. DAVID
JADE A. POORMAN
BRADLEY S. DAVIS
  *Deputy Attorneys General*

*Counsel for the State of Indiana*

TIM GRIFFIN
  *Attorney General of Arkansas*

Office of Attorney General Tim Griffin
323 Center Suite, Suite 200
Little Rock, Arkansas, 72201
(501) 682-2007
Autumn.patterson@arkansasag.gov

/s/ Autumn Hamit Patterson
AUTUMN HAMIT PATTERSON
*Solicitor General*

*Counsel for the State of Arkansas*

ELIZABETH B. MURRILL
  *Attorney General of Louisiana*

Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
smithkel@ag.louisiana.gov

/s/ Kelsey L. Smith
KELSEY L. SMITH
  *Deputy Solicitor General*

*Counsel for the State of Louisiana*

STEVE MARSHALL
   *Attorney General of Alabama*

Office of the Alabama
Attorney General
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
edmund.lacour@AlabamaAG.gov

/s/ Edmund G. LaCour Jr.
EDMUND G. LACOUR JR.
   *Solicitor General*

*Counsel for the State of Alabama*

JAMES UTHMEIER
   *Attorney General of Florida*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida, 32399-1050
(850) 414-3300
john.guard@myfloridalegal.com

/s/ John Guard
JOHN GUARD
   *Chief Deputy Attorney General*

*Counsel for the State of Florida*

CHRISTOPHER M. CARR
   *Attorney General of Georgia*

Office of the Georgia
Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

/s/ Stephen J. Petrany
STEPHEN J. PETRANY
   *Solicitor General*

*Counsel for the State of Georgia*

RAÚL R. LABRADOR
   *Attorney General of Idaho*

Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
jack.corkery@ag.idaho.gov

/s/ Alan Hurst
ALAN HURST
   *Solicitor General*
SEAN M. CORKERY
   Assistant Solicitor General

*Counsel for the State of Idaho*

BRENNA BIRD
   *Attorney General of Iowa*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

/s/ Eric H. Wessan
ERIC H. WESSAN
   *Solicitor General*

*Counsel for the State of Iowa*

LYNN FITCH
   *Attorney General of Mississippi*

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

/s/ Justin L. Matheny
JUSTIN L. MATHENY
   *Deputy Solicitor General*

*Counsel for State of Mississippi*

ANDREW BAILEY
   *Attorney General of Missouri*

815 Olive St, Suite 200
St. Louis, MO 63101
(314) 340-7366
dominic.barceleau@ago.mo.gov

/s/ Dominic X. Barceleau
JOSHUA M. DIVINE, #69875MO
   *Solicitor General*
DOMINIC X. BARCELEAU,
#76510MO
   *Assistant Attorney General*

*Counsel for State of Missouri*

DAVE YOST
   *Attorney General of Ohio*

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

/s/ T. Elliot Gaiser
T. ELLIOT GAISER
   *Ohio Solicitor General*
MATHURA J. SRIDHARAN
   *Deputy Solicitor General*

*Counsel for the State of Ohio*

ALAN WILSON
   *Attorney General of South Carolina*

1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

/s/ Joseph D. Spate
JOSEPH D. SPATE
   *Assistant Deputy Solicitor General*

*Counsel for the State of South Carolina*

MARTY J. JACKLEY
   *Attorney General of South Dakota*

Office of Attorney General
2000 E. 52nd St. N.
Sioux Falls, S.D. 57104
(605) 367-5880
ryan.mcfall@state.sd.us

/s/ Ryan McFall
RYAN MCFALL
   *Assistant Attorney General*

*Counsel for the State of South Dakota*

JONATHAN SKRMETTI
   *Attorney General of Tennessee*

Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

/s/ J. Matthew Rice
J. MATTHEW RICE
   *Solicitor General of Tennessee*

*Counsel for the State of Tennessee*

KEN PAXTON
   *Attorney General of Texas*

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2127
jacob.beach@oag.texas.gov

/s/ Jacob Beach
BRENT WEBSTER
   *First Assistant Attorney General*
AARON L. NEILSON
   *Solicitor General*
JACOB BEACH*
   *Assistant Solicitor General*

*Counsel for the State of Texas*

*admission pending

34

DEREK E. BROWN
   *Attorney General of Utah*

Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(801) 366-0260
spurser@agutah.gov

JASON MIYARES
   Attorney General of Virginia

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

/s/ Stanford Purser
STANFORD PURSER
   *Solicitor General*

*Counsel for the State of Utah*

/s/ Kevin M. Gallagher
KEVIN M. GALLAGHER
   *Principal Deputy Solicitor General*

*Counsel for the Commonwealth of Virginia*

SHERIFF SID GAUTREAUX; SHERIFF
BOBBY WEBRE; SHERIFF MARK WOOD;
SHERIFF KEVIN COBB; AND THE
LOUISIANA SHERIFFS' ASSOCIATION

/s/ Craig E. Frosch
CRAIG E. FROSCH
  Executive Counsel,
  Louisiana Sheriffs' Association
Frosch, Rodrigue, Arcuri, LLC
1615 Poydras Street – Suite 1250
New Orleans, LA 70112
(504) 592-4600
cfrosch@fralawfirm.com

SHANNON DIRMANN
  Louisiana Sheriff's Association
1175 Nicholson Drive
Baton Rouge, Louisiana 70802
(225) 343- 8402
shannon@lsa.org

MARY ERLINGSON
  EAST BATON ROUGH PARISH
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
(225) 218-4446
merlingson@erlingsonbanks.com

*Counsel for Sheriff Sid Gautreaux;
Sheriff Bobby Webre; Sheriff Mark
Wood; Sheriff Kevin Cobb; and The
Louisiana Sheriffs' Association*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this document contains 6,995 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)-(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

May 12, 2025                                      */s/ Blake E. Lanning*
                                                 Blake Lanning

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

June 16, 2025                                        /s/ *Blake E. Lanning*
                                                     Blake E. Lanning